**Exhibit A**
**Proposed Letter Rogatory**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors.[1] | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | |
| Plaintiff, | |
| v. | Adv. Proc. No. 20-1054 |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

## [PROPOSED] REQUEST FOR JUDICIAL ASSISTANCE IN SERVICE OF PROCESS (LETTER ROGATORY)

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Firestar Diamond, Inc. (2729), Fantasy, Inc. (1673), and Old AJ, Inc. f/k/a A. Jaffe, Inc. (4756).

Presenting his compliments to the appropriate judicial authority of the United Arab Emirates, this Letter Rogatory is made by the Honorable Sean H. Lane, of the United States Bankruptcy Court for the Southern District of New York, which is located at One Bowling Green, New York, New York, 10004-1408, United States of America, and requests international judicial assistance to effect service of process in the above-captioned civil proceeding.

## Background

On February 26, 2018, Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. (then known as A. Jaffe, Inc.) (the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code. On June 14, 2018, this court entered an order approving the appointment of Richard Levin as the chapter 11 trustee (the "**Trustee**") overseeing the Debtors' bankruptcy cases.

The Trustee is represented in these cases by Jenner & Block LLP, 919 Third Avenue, New York, New York 10022, United States of America, and may be contacted through his attorneys: Angela Allen, aallen@jenner.com, +1 (312) 222-9350, and Carl Wedoff, cwedoff@jenner.com, +1 (212) 891-1600.

Before filing for chapter 11 bankruptcy, each of the Debtors conducted business as wholesalers of fine jewelry. The Trustee is now managing the Debtors' estates to maximize recoveries for the Debtors' creditors.

On February 25, 2020, the Trustee commenced the above-captioned civil action, which seeks to: (i) avoid and recover actual fraudulent transfers made to or for the benefit of the Defendants; and (ii) recover from the Defendants the damages suffered as a result of Nirav Modi's, the Defendants', and their other co-conspirators' nearly decade-long criminal conduct. The conspiracy resulted in the diversion of hundreds of millions of dollars of assets for the benefit of the Modi family members and other conspirators, the collapse of the Debtors and their U.S.

affiliates, and the resulting loss of the value of the Debtors' businesses. Each of the Defendants joined and supported the Modi family's racketeering conspiracy as it morphed from bank fraud and money laundering to obstruction of justice and looting.

The Trustee has effected or is in the process of effecting service of the Judicial Documents on defendants other than the UAE Defendants.

<div align="center">

**Request for Assistance in Service of Process**

</div>

Attached to this Letter Rogatory are fourteen copies of each of the following documents filed in the above-captioned adversary proceeding: *Complaint to Avoid and Recover Actual Fraudulent Transfers and for Damages For Conspiracy To Violate The Racketeering Influenced Corrupt Organizations Act* [Exhibit 1] ("**Complaint**"), *Second Summons and Notice of Pretrial Conference in an Adversary Proceeding* [Exhibit 2] ("**Summons**"), and *Order (I) Directing Issuance of an Additional Summons; (II) Setting Foreign Defendants' Time To Respond To The Complaint; (III) Adjourning The Pretrial Conference; and (IV) Granting Related Relief* [Exhibit 3] (the "**Service Order**," and together with the Amended Complaint and Summons, the "**Judicial Documents**"). The Judicial Documents have been translated into Arabic.

In the interests of justice, this court requests that the appropriate judicial authority of the United Arab Emirates effect service of the Judicial Documents on the below-named entities at the following addresses:

- **Hamilton Precious Traders Ltd.,** Office #111, Bldg # 6WA, Dubai Airport Free Zone, Dubai, 371708 UAE

- **Unique Diamond and Jewellery FZC**, Suite 98, 4th Floor, Zone IV, New Gold Centre, PO Box 34735, Dubai

- **World Diamond Distribution FZE**, Office, D-3, Phase-II, Box, 50 Fujairah Free Zone, Fujairah, United Arab Emirates

- **Vista Jewelry FZE**, PO Box 5232, Fujairah, UAE 971 55 5834284

- **Empire Gems FZE**, Empir Gemssuit, Q1-05-010/B, P.O. B, Sharjah Airport Int'l Free Zone, Sharjah, United Arab Emirates

- **Universal Fine Jewelry FZE**, Suite Q1-05-068/A, P.O. Box 9032, International Free Zone, Sharjah Airport, United Arab Emirates

- **Diagems FZC**, Office E-499-26 Hamriyah Free Zone, PO Box 49920, Sharjah, United Arab Emirates

- **Tri Color Gems FZE**, Office E-86G-32, Hamriyah Free Zone, PO Box 51425, Sharjah, United Arab Emirates

- **Pacific Diamonds FZE**, Building B1, Office 608A, P.O. Box 40359, Ajman Free Zone, Ajman, Dubai, United Arab Emirates

- **Himalayan Traders FZE**, Bldg B1, 4th Floor, Office 471, PO Box 54285, Ajman Free Zone, Ajman, United Arab Emirates

- **Unity Trading FZE**, G15-6WA, PO Box 371741, Dubai Airport Free Zone, Dubai, United Arab Emirates

- **Fine Classic FZE**, Office M-10, Bldg 2W, PO Box 371809, Dubai Airport Free Zone, Dubai, United Arab Emirates

- **DG Brothers FZE**, P.O. Box 40310 Ajman Free Zone, Ajman, United Arab Emirates

The undersigned respectfully requests the appropriate judicial authority return or have returned (i) a certificate stating when and how the Judicial Documents were served or the reason why they have not been served, and (ii) one copy of each of the Judicial Documents to the Trustee at the below address:

> **Richard Levin**
> **Jenner & Block LLP**
> **919 Third Avenue**
> **New York, New York 10022**
> **United States of America**

### Costs

All fees and costs incurred in the execution of this Letter Rogatory shall be borne by the Trustee.

**Conclusion**

This Court expresses its appreciation for this assistance and states that the courts of the United States are authorized by statute, section 1696 of Title 28 of the United States Code, to extend similar assistance to the tribunals of the United Arab Emirates and shall be ready and willing to provide reciprocal assistance in a similar case when required.

The Court extends to the judicial authorities of the United Arab Emirates the assurances of the highest consideration.


Dated: June __, 2020
    New York, New York

_____
THE HONORABLE SEAN H. LANE
United States Bankruptcy Judge

United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004
United States of America

**<u>Letter Rogatory - Exhibit 1</u>**
**Complaint**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. _____ |
| Plaintiff, | |
| v. | |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

**COMPLAINT TO AVOID AND RECOVER ACTUAL FRAUDULENT TRANSFERS AND FOR DAMAGES FOR CONSPIRACY TO VIOLATE THE RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT**

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................................ 1

JURISDICTION AND VENUE ................................................................................................... 3

THE PARTIES & OTHER RELEVANT ENTITIES .................................................................. 4

    I.   The Debtors and Trustee ............................................................................................... 4

    II.  The U.S. Affiliates ......................................................................................................... 4

    III. The Defendants .............................................................................................................. 5

BACKGROUND .......................................................................................................................... 7

    I.   The Bank Fraud. ........................................................................................................... 10

        A.   Mechanics of the Bank Fraud ............................................................................... 10

        B.   The Debtors' and U.S. Affiliates' Role in the Bank Fraud .................................... 16

        C.   Involvement of U.S. Entities' Directors and Officers in the Bank Fraud ............. 17

        D.   Involvement of Mehul Choksi, Nehal Modi, Neena Sheth, Deepak Sheth, and
            Abhay Javeri, and the Sheth Entities and SDC Entities in the Bank Fraud. ........ 27

        E.   Laundering of Funds Through Twin Fields and Bailey Banks & Biddle ............... 30

        F.   Detection and Exposure of the Bank Fraud .......................................................... 33

    II.  Criminal Efforts Shortly Before and Following Exposure of the Bank Fraud ............. 36

        A.   Looting of the Debtors, U.S. Affiliates, and Other Firestar Entities .................... 36

        B.   Fraudulent Omissions, Misstatements, and Misrepresentations Made in
            Connection With The Debtors' Chapter 11 Cases ................................................. 46

        C.   Other Efforts to Cover Up and Frustrate Investigation of the Bank Fraud ........... 50

        D.   Money Laundering to Modi Family Members Prior to Exposure of the Bank Fraud .. 54

CLAIMS FOR RELIEF ............................................................................................................. 70

COUNTS .................................................................................................................................... 70

PRAYER FOR RELIEF ........................................................................................................... 139

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or "**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc. (collectively, the "**Debtors**") and as holder of a judgment jointly and severally against, and as assignee of all claims of, Synergies Corporation ("**Synergies**"), Firestar Group, Inc. ("**FGI**"), Firestar Diamond International, Inc. ("**FDII**"), Nirav Modi, Inc. ("**NMI**"), and AVD Trading, Inc. ("**AVD**") (collectively, the "**U.S. Affiliates**," together with the Debtors, the "**U.S. Entities**") for his Complaint alleges as follows:

## NATURE OF THE ACTION

1.      The Trustee brings this action, consisting of both estate claims and claims assigned to the Trustee by U.S. affiliates, to recover damages suffered as a result of the Modi family's nearly decade-long racketeering conspiracy lasting from at least 2010 to mid-2018 (the "**Relevant Period**"). The conspiracy resulted in the diversion of hundreds of millions of dollars of assets for the benefit of the Modi family members and other conspirators, the collapse of the U.S. Entities, and the resulting loss of the value of the U.S. Entities' businesses. Each of the Defendants joined and supported the Modi family's racketeering conspiracy as it morphed from bank fraud and money laundering to obstruction of justice and looting.

2.      Nirav Modi's sister, Purvi Mehta, agreed to act as the beneficial owner of numerous shell companies Nirav Modi used to commit the largest bank fraud in Indian history. Mehta then personally laundered over $100 million of the ill-gotten proceeds through the Modi family's web of shell companies, family trusts, family members, and otherwise-legitimate businesses—destroying those businesses in the process.

3.      Nirav Modi's wife, Ami Javeri, agreed to serve as a partner of the three India-based the companies in whose name Nirav Modi obtained nearly $3.5 billion in fraudulent loans (defined below as the LOU Entities). Javeri then managed and facilitated the Modi family's

systematic efforts to launder and shield from creditors the proceeds of the fraud, including over $30 million in real estate.

4.       Nirav Modi's brother, Nehal Modi, traveled around the world after exposure of the fraud destroying evidence, tampering with witnesses, and securing assets from seizure by government authorities and creditors. Early in these chapter 11 cases before the Trustee's appointment, Nehal Modi also enlisted several of his personal friends to loot the U.S. Affiliates' more than $40 million in inventory and cash so that those funds could not be used to pay the U.S. Affiliates' substantial debts to the Debtors.

5.       Nirav Modi's other brother, Neeshal Modi, also served as a partner of the three LOU Entities, as beneficial owner of numerous Shadow Entities and other shell companies, and as one of the key day-to-day managers of the fraudulent import and export transactions supporting the bank fraud. Neeshal Modi also personally selected and hired various "dummy" directors, officers, and other personnel for the web of companies secretly owned by his family. He also played his part in the family money laundering operation, including by holding a power of attorney for his sister Purvi Mehta, in whose name the ill-gotten proceeds were held in bank accounts across the globe.

6.       The Ithaca Trust, Central Park South 50 Properties, LLC, and Central Park Real Estate LLC, which together hold the Modi family's two Manhattan apartments, are nothing more than contrivances used by the Modi family to shield more than $30 million of their ill-gotten wealth from creditors.

7.       Twin Fields Investments Ltd. is the Delaware shell company through which the Modi family secretly owned and operated *Bailey Banks & Biddle* retail stores as another front for its money laundering operations. The Modi family laundered over $80 million through Twin Fields during the Relevant Period.

2

8.      The remaining Defendants, defined below as Shadow Entities, comprise the numerous Hong Kong and Dubai-based companies the Modi family secretly owned, yet represented as independent vendors and customers to banks, auditors, and even this Court.

9.      The Trustee also seeks to avoid numerous fraudulent transfers of the Debtors' assets made to the Defendants, and in his capacity as judgment creditor of the U.S. Affiliates, seeks to avoid fraudulent transfers of the U.S. Affiliates' assets made to the Defendants.

## JURISDICTION AND VENUE

10.     The United States District Court for this district (the "**District Court**") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under title 11 of the United States Code and arises in and is related to these chapter 11 cases and under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because this adversary proceeding arises under the laws of the United States, including 18 U.S.C. § 1962, and seeks recovery for injuries by reason of a violation of 18 U.S.C. § 1962. This Court has authority to hear this adversary proceeding by reason of the District Court's referral under 28 U.S.C. § 157(a) and under General Order M-431 (Amended Standing Order of Reference).

11.     This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(H) and (O) with respect to Counts 7 to 54, which this Court has authority to hear and determine, and is not a core proceeding with respect to Counts 1 to 6.

12.     To the extent that this Court does not have authority to determine the claims asserted in this adversary proceeding and to enter final judgment thereon, the Trustee consents to the issuance and entry of a final judgment or order by this Court.

13.     Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

3

## THE PARTIES & OTHER RELEVANT ENTITIES

### I.     The Debtors and Trustee

14.     Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) ("**FDI**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, FDI principally operated a wholesale jewelry business.

15.     Debtor Fantasy, Inc. ("**Fantasy**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy was principally a wholesale jewelry business. At all relevant times, FDI owned 100% of the equity interests in Fantasy.

16.     Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) ("**Jaffe**") is a privately-held New York corporation, with its principal place of business in New York. While in operation, Jaffe was principally a wholesale bridal jewelry business.

17.     Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered that same day. The Trustee brings this action, not individually, but solely in his capacity as Trustee.

### II.     The U.S. Affiliates

18.     FGI, a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in FDI. Samuel Sandberg owns the remaining approximately 5% of FDI.

19.     Synergies, a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in Jaffe and 100% of the equity interests in FGI. Samuel Sandberg owns the remaining approximately 5% of Jaffe.

20.     FDII, a Delaware corporation, operated primarily as a loose diamond trading business.

4

21. NMI, a Delaware corporation, operated *Nirav Modi*-branded retail boutiques in New York, Los Angeles, Las Vegas, and Honolulu.

22. On January 15, 2020, the Trustee and the U.S. Affiliates entered into a settlement agreement under which the U.S. Affiliates assigned to the Trustee any and all claims or causes of action then-owned or subsequently acquired by the U.S. Affiliates and consented to entry of a judgment jointly and severally against the U.S. Affiliates in the amount of $23,116,505.44. (*See* Dkt. 1366.)

23. Judgment in that amount was entered on February 18, 2020. (Adv. No. 20-01014; Dkt. 3.)

## III. The Defendants

24. Defendant Ami Javeri (a/k/a Ami Modi) is a New York resident and is Nirav Modi's wife.

25. Defendant Purvi Mehta (a/k/a Purvi Modi) is a Hong Kong resident and is Nirav Modi's sister.

26. Defendant Nehal Modi is a Texas resident and is Nirav Modi's second-youngest brother.

27. Defendant Neeshal Modi is a Belgium resident and is Nirav Modi's youngest brother.

28. Defendant Trident Trust Company (South Dakota) Inc., solely as trustee of the Ithaca Trust ("**Trident**"), is a South Dakota corporation and is the Trustee of The Ithaca Trust. The Ithaca Trust is an irrevocable trust governed by South Dakota law.

29. Defendant Central Park Real Estate LLC ("**CPRE**") is a Delaware limited liability company.

30.     Defendant Central Park South 50 Properties LLC ("**CPS50**") is a New York limited liability company.

31.     Defendant Twin Fields Investments Ltd. ("**Twin Fields**") is a Delaware corporation.

32.     Defendant Auragem Company Ltd. ("**Auragem**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

33.     Defendant Brilliant Diamonds Ltd. ("**Brilliant**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

34.     Defendant Eternal Diamonds Corporation Ltd. ("**Eternal**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

35.     Defendant Fancy Creations Company Ltd. ("**Fancy Creations**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

36.     Defendant Hamilton Precious Traders Ltd. ("**Hamilton**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

37.     Defendant Sino Traders Ltd. ("**Sino**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

38.     Defendant Sunshine Gems Ltd. ("**Sunshine**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

39.     Defendant Unique Diamond and Jewellery FZC ("**Unique**") is a UAE company and is alleged herein to be a Shadow Entity.

40.     Defendant World Diamond Distribution FZE ("**World Diamond**") is a UAE company and is alleged herein to be a Shadow Entity.

41.     Defendant Vista Jewelry FZE ("**Vista**") is a UAE company and is alleged herein to be a Shadow Entity.

6

42. Defendant Empire Gems FZE ("**Empire**") is a UAE company and is alleged herein to be a Shadow Entity.

43. Defendant Universal Fine Jewelry FZE ("**Universal**") is a UAE company and is alleged herein to be a Shadow Entity.

44. Defendant Diagems FZE ("**Diagems**") is a UAE company and is alleged herein to be a Shadow Entity.

45. Defendant Tri Color Gems FZE ("**Tri Color**") is a UAE company and is alleged herein to be a Shadow Entity.

46. Defendant Pacific Diamonds FZE ("**Pacific**") is a UAE company and is alleged herein to be a Shadow Entity.

47. Defendant Himalayan Traders FZE ("**Himalayan**") is a UAE company and is alleged herein to be a Shadow Entity.

48. Defendant Unity Trading FZE ("**Unity**") is a UAE company and is alleged herein to be a Shadow Entity.

49. Defendant Fine Classic FZE ("**Fine Classic**") is a UAE company and is alleged herein to be a Shadow Entity.

50. Defendant DG Brothers FZE ("**DG Brothers**") is a UAE company and is alleged herein to be a Shadow Entity.

## BACKGROUND

51. Nirav Modi entered the diamond business around 2000 under the name Diamonds 'R' Us, an India partnership formed by Modi, Modi's uncle Mehul Choksi, and Modi's business partner Hemant Bhatt.

52. In 2004, Nirav Modi founded Firestone International Private Ltd. ("**FIL**" or "**FIPL**," together with all of its direct and indirect subsidiaries, the "**Firestar Entities**"), later known as

7

Firestar International Private Ltd., and now known as Firestar International Ltd. FIPL operated as a diamond trading business in India and the parent of the global Firestar corporate umbrella. Nirav Modi has at all relevant times been the owner of substantially all of the equity interests in FIPL.

53.     In 2006, Nirav Modi formed India-based Firestar Diamond International Pvt. Ltd. ("**FDIPL**") as a wholly owned subsidiary of FIPL. FDIPL operated diamond and jewelry manufacturing operations from factories in India. FDIPL manufactured a substantial portion of the inventory sold by other Firestar Entities.

54.     Over time, Nirav Modi expanded the Firestar Entities' operations to the U.S., Hong Kong, Dubai, and Europe. Nirav Modi, acting through FIL and its subsidiaries, acquired the company that became FDI (then known as Firestone, Inc.) in 2005, acquired a 95% interest in Jaffe (then known as Sandberg & Sikorski Corp.) from Samuel Sandberg and Stanley Sikorski in 2007, and incorporated Fantasy in 2012. In connection with Nirav Modi's indirect acquisition of Jaffe, Samuel Sandberg received an equity interest in FDI.

55.     The U.S. Entities' operations were managed and controlled by Nirav Modi's cousin, Mihir Bhansali. At all relevant times, Mihir Bhansali served as the sole director and Chief Executive Officer of FDI and Fantasy, and as the sole director and President of Jaffe. Bhansali also served as the sole director of each U.S. Affiliate, as well as the Chief Executive Officer of Synergies, FGI, and NMI. Bhansali also served as a director of FIPL. In the context of both the Firestar Entities' legitimate operations and the fraudulent schemes described below, Mihir Bhansali served as Nirav Modi's second-in-command.

56.     Mihir Bhansali's own top lieutenant, Ajay Gandhi, served as the Chief Financial Officer of each of the Debtors and U.S. Affiliates for the entirety of the Relevant Period with the

8

exception of a brief 3-month departure in 2013. As alleged below, Mihir Bhansali and Ajay Gandhi managed the fraudulent aspects of Nirav Modi's U.S. operations.

57.     The Hong Kong-based Firestar Entities included Firestar Holdings Ltd. ("**FHL"),** Firestar Diamond Ltd. ("**FDL**"), Firestar Jewelry Ltd. ("**FJL**") and Nirav Modi Ltd. ("**NML**"). FHL, a wholly owned subsidiary of FIPL, had no operations of its own and instead acted as the primary holding company for the Hong Kong, Dubai, Europe, and eventually U.S.-based Firestar Entities.

58.     FDL and FJL, both wholly owned subsidiaries of FHL, each operated as a polished diamond trading business analogous to FDII in New York. FDL and FJL were managed by Aditya Nanavati, the Head of Asia-Pacific in the global Firestar umbrella. Shyam Wadhwa, FIPL's vice president of finance, served as the de facto chief financial officer of the Hong Kong-based Firestar Entities. Nanavati exercised general oversight over the Hong Kong-based Shadow Entities and Wadhwa managed their bank accounts and finances.

59.     NML, a wholly owned subsidiary of FHL, is the principal holding company for subsidiaries operating *Nirav Modi*-branded boutiques around the globe, including New York-based NMI (which operated the U.S. boutiques) and UK-based Nirav Modi Ltd. ("**NMLUK**") (which operated the London boutique). Angelina Ypma (a/k/a Angelina Nguyen) served as global president of the *Nirav Modi* brand and as a director of NML and FIPL. Purvi Mehta was also involved in the operations of NML and its subsidiaries as creative director of the *Nirav Modi* brand.

60.     The Dubai-based Firestar Entities included Firestar Diamond FZE ("**FDFZE**"), which operated as a polished diamond trading business, and Firestar Diamond FZCO ("**FDFZCO**"), which manufactured jewelry. FHL is the 100% owner of both FDFZE and FDFZCO. Satyendra Shukla, the Head of Middle East within the global Firestar umbrella, managed FDFZCO.  Kurian Mathews ran FDFZE's operations as general manager. Saju Poulose managed

9

the Dubai-based Firestar Entities' finances, books and records, and bank accounts as the de facto chief financial officer. Shukla, Mathews, and Poulose also exercised broad oversight over the Dubai-based Shadow Entities' operations and finances.

61.     Firestar Diamond BVBA ("**FDBVBA**"), a Belgium company, operated as a rough diamond trading and manufacturing business. FDBVBA was managed by Nirav Modi's youngest brother, Neeshal Modi, in Antwerp, Belgium. Neeshal Modi was also involved with the Dubai Firestar Entities. Throughout the Relevant Period, FDBVBA traded extensively with Shadow Entities in Hong Kong and Dubai in furtherance of the fraudulent scheme alleged below.

I.      **The Bank Fraud.**

        A.     *Mechanics of the Bank Fraud*

62.     From no later than 2010 to early 2018, Nirav Modi orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from numerous banks, including Punjab National Bank ("**PNB**"), a publicly-owned Indian bank majority owned by the central government of India (as set forth in more detail below, the "**Bank Fraud**").

63.     The Bank Fraud involved the fraudulent procurement of buyer's credit issued under letters of undertaking ("**LOU**s"), a financial instrument unique to India designed to facilitate efficient import transactions.

64.     When used legitimately, LOUs allow an importer to forego the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank in India, secured by invoices for the to-be imported goods. The issuing bank, in turn, enters into the foreign currency transaction: it requests a foreign branch of another Indian bank to transmit funds into the issuing bank's own account (referred to as its nostro—"our"—account) at the

10

foreign branch of a third bank to pay the exporter in its local currency. The issuing bank then repays the intermediary bank and recoups the loan from the importer (or the imported goods serving as its collateral).

65.     Since each LOU requires an import transaction, an importer's LOU borrowing capacity is tied directly to its import volume—the more imports, the more LOU funding available.

66.     Nirav Modi and his co-conspirators conspired to take advantage of this feature by artificially inflating the import volume of Nirav Modi's India-based companies—most notably Diamonds 'R' Us ("**DRUS**"), Solar Export ("**Solar**"), and Stellar Diamond ("**Stellar**") (collectively, the "**LOU Entities**")—with sham transactions so as to obtain more and more LOU funding.

67.     Nirav Modi, Ami Modi, Neeshal Modi, and Mehul Choksi, among others, each served as partner of each LOU Entity during the Relevant Period.

68.     In 2016, Neeshal Modi selected and appointed additional "dummy" partners for the LOU Entities. Neeshal Modi, together with Mihir Bhansali, also selected and hired various Shadow Entity personnel during the Relevant Period.

69.     Ami Modi served as a partner of Solar and Stellar and, in 2010, opened bank accounts Solar and Stellar used to defraud PNB.

70.     PNB and other banks advanced amounts equal to over $1 billion under LOUs for the benefit of entities under Modi's control in connection with imports to India without the ordinarily-required collateral.

71.     To carry out this scheme, Nirav Modi and his co-conspirators utilized a web of shadow entities to engage in fraudulent and fictitious import transactions, including Defendants Auragem, Brilliant, Eternal, Fancy Creations, Sino, Sunshine, Unique, World Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, Unity, and Fine Classic (collectively,

11

the "**Shadow Entities**," together with the Firestar Entities, LOU Entities, and all other entities controlled by Nirav Modi and his family members, the "**Modi-Controlled Entities**").

72.     Though designed to look like legitimate independent businesses, the Shadow Entities were no more than shell companies controlled by Modi and his co-conspirators. They conducted virtually no legitimate business, but instead existed only to further the Bank Fraud by conducting bogus transactions with the LOU Entities, Firestar Entities, and other Modi-Controlled Entities and laundering the ill-gotten proceeds.

73.     The two primary clusters of Shadow Entities operated from Hong Kong and Dubai. The Hong Kong-based Shadow Entities included Auragem, Brilliant, Eternal, Fancy Creations, Sino, and Sunshine. The Dubai-based Shadow Entities included Unique, World Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, and Unity.

74.     The Shadow Entities were mostly registered at either small, unoccupied offices or at single, leased desks within shared offices. They had almost identical websites with similar backgrounds, fonts, contact pages, and language.

75.     An Indian consultant told Indian authorities that around 2010, Mihir Bhansali sought assistance setting up two layers of British Virgin Island ("**BVI**") holding companies for the Dubai-based Shadow Entities that would be owned by Purvi Modi and Neeshal Modi.

76.     The top layer consisted of Madison Capital Private Limited ("**Madison**") and Moore Private Investments Ltd. ("**Moore**"). Mihir Bhansali completed all of the paperwork relating to the formation of these two entities. Purvi Mehta and Neeshal Modi were declared the ultimate beneficial owners of these companies to the BVI authorities.

77.     Madison and Moore each held 50% of the shares of each of ten second-layer BVI entities: Global Investing Group Ltd., Xclusive Consultants Ltd., Ashmoore Developments Ltd., Beacon Horizon Investments Ltd., Century Group Global Investments Ltd., Pushpin Trading

Ltd., Royce Group Private Ltd., Integrated Investing Ltd., Panera Assets Inc., and Ideal Star Consultants Ltd. Mihir Bhansali chose all of these entities' names. Moore served as the director of each of these entities. Purvi Mehta and Neeshal Modi were also declared the ultimate beneficial owners of these companies to the BVI authorities.

78.     These second-layer BVI entities then served as holding companies for Dubai-based Shadow Entities Tri Color, Diagems, Empire, Unique, World Diamond, Pacific, Universal; and Vista.

79.     Mihir Bhansali maintained a spreadsheet tracking the operational status of the Dubai-based Shadow Entities.

80.     The LOU Entities and Shadow Entities traded exclusively or nearly exclusively with other Modi-Controlled Entities. The following table reflects the extent to which the LOU Entities traded exclusively with Shadow Entities and Firestar Entities:

| | Fiscal Year 2012 - 2017 | | | | | |
| LOU Entity | Sales to Listed Modi-Controlled Entities as % of Gross Sales | | | Purchases from Listed Modi-Controlled Entities as % of Total Costs of Goods Sold | | |
| | Shadow Entities | Firestar Entities | Total | Shadow Entities | Firestar Entities | Total |
|---|---|---|---|---|---|---|
| DRUS | 88.4% | 7.5% | 95.9% | 99.7% | 0.4% | 100.1% |
| Stellar | 98.7% | 0.5% | 99.2% | 100.1% | 0.3% | 100.3% |
| Solar | 98.9% | 0.7% | 99.6% | 99.9% | 0.1% | 100.0% |

81.     From around 2013 onward, Nirav Modi and his co-conspirators used the Shadow Entities as an intermediary between the LOU Entities and Firestar Entities. PNB and other banks were aware of Nirav Modi's affiliation with the LOU Entities and the Firestar Entities, but his affiliation with the Shadow Entities was hidden from the banks.

82.     The Shadow Entity import and export transactions purported to involve arm's-length sales of highly valuable loose diamonds, pearls, gold, silver, and other jewelry. In truth, these transactions had no legitimate economic purpose and routinely involved goods that (i) did

13

not exist, (ii) were never transferred, (iii) were transferred at prices having nothing to do with market value, but instead based on whatever amounts were necessary to reconcile the Shadow Entities' and Firestar Entities' books and records so as to conceal other transfers made for illegitimate purposes, or (iv) were transferred in "circular transactions," in which the same goods were exported from and re-imported among Modi-Controlled Entities multiple times at varying and often inflated prices to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

83.     According to statements made by various Firestar Entity and Shadow Entity employees to Indian authorities:

(i)     FIL, FDIPL, and other India-based Firestar Entities would export jewelry to Shadow Entities in Dubai and Hong Kong, where, at least in some instances, the diamonds would be removed and then subsequently re-exported for further import and the precious metals melted.

(ii)    None of jewelry exported from India to the Shadow Entities was ever returned as defective, substandard, or otherwise noncompliant, as would be expected in the course of an arm's length vendor-customer relationship.

(iii)   Orders placed by Shadow Entities frequently lacked the formality, exactness, and diligence that ordinarily would be expected of transactions with a bona fide third party. For example, V. Suresh Ramnath Naidu, a director of Diagems, told Indian authorities that he signed blank invoices, but never actually saw any of the diamonds or jewelry.

84.     Modi-Controlled Entities also obtained additional funding through packing credit loans, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods. In the context of the Bank Fraud, the India-based Modi-Controlled Entities would obtain packing credit loans on the basis of purported orders from other Modi-Controlled Entities overseas. However, packing credit loan proceeds were frequently diverted for other purposes, including the repayment of outstanding LOUs.

14

85. Many of the Shadow Entities' directors were current or former employees of Firestar Entities. In addition, many Shadow Entity employees were current or former employees of Firestar Entities.

86. The transactions between and among Firestar Entities, LOU Entities, and Shadow Entities furthered the Bank Fraud by: (1) inflating the Indian entities' LOU borrowing capacity by artificially inflating their import volumes for LOUs and export volume for packing credit loans; (2) facilitating the repayment of some but not all outstanding LOUs and packing credit loans; (3) laundering the fraudulent proceeds by making them difficult to trace and siphoning them to Modi and his co-conspirators; and (4) making it difficult for auditors, lenders, and regulatory bodies to detect the Bank Fraud.

87. Transfers for these purposes were concealed in various ways, including: (a) round trip transactions of gems, jewelry, or funds in which Modi-Controlled Entities transferred assets amongst themselves without any legitimate economic purpose; (b) buying and selling gems at inflated or deflated prices; (c) characterizing transfers as loans or loan repayments or advances against future purchases or returns of such advances; and (d) in some instances, fraudulently doctoring books and records outright.

88. To facilitate the continuing flow of LOUs and to prevent detection, Modi and others at his direction, including Manish Bosamiya, Subhash Parab, and Miten Pandya, worked with certain PNB employees, including Gokulnath Shetty, who authorized LOUs without securing collateral and without properly recording the LOUs in PNB's records.

89. According to a forensic report issued by BDO in December 2019, PNB issued over 1,500 fraudulent LOUs to Modi-Controlled Entities during the Relevant Period involving approximately $3.5 billion.

15

**B. The Debtors' and U.S. Affiliates' Role in the Bank Fraud**

90.     Nirav Modi, Mihir Bhansali, Ajay Gandhi, and other co-conspirators funneled millions of dollars in funds, precious gems, and jewelry through the U.S. Entities and their offices in furtherance of the Bank Fraud.

91.     In the early stages of the Bank Fraud scheme, from around 2010 to 2012 when the LOU Entities were still trading directly with Firestar Entities, the U.S. Entities were directly involved in import and export transactions underlying fraudulently procured LOUs. For example, in 2011, FDI and Jaffe were the exporters under and direct beneficiaries of five LOUs and one LOU, respectively, totaling $10,192,303.

92.     As an example of the Debtors' involvement in circular transactions, from August 8, 2011 to September 13, 2011, a period of five weeks, the Debtors exported the same 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once to and from various LOU Entities and Shadow Entities at widely divergent prices.

93.     Later in 2011, the Debtors engaged in another circular trading of a diamond that was recorded as a 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond. The diamond appeared in the Debtors' records in three transactions within six weeks of each other and was valued at a different price each time.

94.     From around 2013 onward, the Shadow Entities were used as intermediaries between the Firestar Entities and LOU Entities. PNB and other banks were aware of Nirav Modi's affiliation with the Firestar Entities and LOU Entities, but his affiliation with the Shadow Entities was hidden from them.

95.     During this period, the Debtors made numerous transfers to Shadow Entities linked to the repayment of outstanding LOUs so that the Bank Fraud could continue undisturbed.

16

96.     For example, on September 24, 2015, FDI transferred $1,840,969 to Auragem and $1,400,000 to Fancy Creations. A portion of these funds were used to repay an LOU issued to DRUS that became due on September 30, 2015.

97.     As another example, on February 26, 2016, FDI transferred $1,192,106 to Tri Color. On March 9, 2016, Tri Color transferred $1,647,000 to Solar. That same day, Solar transferred $2,087,000 to repay an LOU that became due on March 11, 2016.

98.     Consistent with these examples and others alleged herein, the Debtors' and U.S. Affiliates' Shadow Entity-linked transactions from 2013 onwards were effectuated for purposes related the Bank Fraud including to: (a) facilitate repayment of LOUs and packing credit loans so that the Bank Fraud could continue undisturbed; (b) provide Shadow Entities with the goods and funds the Shadow Entities needed to transact with the LOU Entities; (c) clear the Shadow Entities', Firestar Entities', and LOU Entities' accounts receivable and accounts payable so as to avert questions from auditors, lenders, and other third parties; and (d) divert the proceeds of the Bank Fraud for the benefit of Nirav Modi, Mihir Bhansali, their families and other co-conspirators.

99.     The U.S. Entities' records reflect hundreds of millions of dollars in cash transfers and inventory shipments among the U.S. Entities and Shadow Entities during the Relevant Period.

### C. Involvement of U.S. Entities' Directors and Officers in the Bank Fraud

100.    Certain of U.S. Entities' directors and officers, including Mihir Bhansali and Ajay Gandhi, participated in and advanced the Bank Fraud. As described below, Bhansali and Gandhi, in coordination with Nirav Modi, controlled all aspects of the Debtors' internal and external operations and affairs at all relevant times.

101.    As the ultimate controlling shareholder of all of the Firestar Entities, Nirav Modi, in coordination with Bhansali and Gandhi, orchestrated and oversaw fraudulent transactions

17

among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

102.     As the sole director of each of the U.S. Entities, and as CEO of FDI, Fantasy, Synergies, FGI, and NMI, Mihir Bhansali coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

103.     As CFO of each of the U.S. Entities, and in coordination with Nirav Modi and Mihir Bhansali, Ajay Gandhi coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

104.     At all relevant times, Ajay Gandhi and Mihir Bhansali controlled the finances of the Debtors. Each had authority to approve loose diamond transactions among the U.S. Entities and the Shadow Entities totaling hundreds of millions of dollars. Gandhi and Bhansali were also each a signatory on each of the U.S. Entities' bank accounts, and their authorization was required to effectuate transfers from the U.S. Entities' accounts.

   *i.*  *Oversight and Control of Shadow Entities and LOU Entities*

105.     Nirav Modi and Mihir Bhansali, with the assistance of other co-conspirators coordinated and directed the operations of the Shadow Entities and LOU Entities to further the Bank Fraud. The following are some examples of that activity.

106.     Mihir Bhansali's prominent role in orchestrating the Bank Fraud is illustrated by several spreadsheets recovered from his work computer. Each of these spreadsheets was saved by Microsoft Excel's "AutoRecover" feature. Bhansali's computer did not contain any other versions of these spreadsheets, suggesting that he deleted them at some point. These spreadsheets are summarized as follows:

18

(i) One spreadsheet, last modified on February 16, 2018, tracked millions of dollars in payables and receivables as between each of the LOU Entities, Firestar Entities, and Shadow Entities.

(ii) Another spreadsheet, last modified on February 18, 2018, appears to be a step-by-step guide to the mechanics and economics of circular transactions between Firstar Entities and Shadow Entities. Another auto-saved version of this spreadsheet, saved eleven minutes earlier, contains only a portion of the guide, demonstrating that Bhansali himself created the spreadsheet.

(iii) Another spreadsheet, created on February 12, 2018 and last modified on February 13, 2018, appears to be a "to do" list for various co-conspirators after the exposure of the Bank Fraud. The tasks included researching their potential criminal liability, "cleaning up" outstanding A/R and A/P balances among Firestar Entities and Shadow Entities, and sending the Dubai-based Shadow Entities' computers to Hong Kong.

(iv) Another spreadsheet, last modified on January 8, 2018, shows, for the fiscal years 2012 through 2017, each LOU Entity's (a) profits & losses, (b) outstanding bank loans, (c) cash flow to trusts benefitting Nirav Modi's family, and (d) volume of transactions with various Shadow Entities and Firestar Entities.

107. Bhansali personally oversaw the creation of the Shadow Entities and LOU Entities and the selection of their principals, directors, officers, and employees.

108. Bhansali also personally completed employee performance appraisals for individuals involved in the operations of Shadow Entities and LOU Entities.

109. Bhansali's electronic calendar contained several entries, which, upon information and belief, refer to his discussions in the course of managing the operations of the LOU Entities (i.e. **S**olar, **S**tellar, and **D**iamonds R Us), including: (a) a meeting scheduled for April 4, 2016 with the subject "SSD conversation;" and (b) a meeting scheduled for April 6, 2016 with the subject "SSD infrastructure," with an invite to Saju Paulose.

110. On January 19, 2010, Ajay Gandhi directed Bhavesh Patel to prepare an aging report for accounts receivables owed to FDI excluding "affiliates such as . . . Unique", demonstrating that Gandhi knew Unique was a related party.

19

111. On May 27, 2010, Mihir Bhansali directed Aditya Nanivati to make Bhansali, Nanivati, Purvi Mehta, and Neeshal Modi authorized users of FDL's Standard Chartered Bank account. With respect to the physical devises necessary to approve transfers, he instructed Nanivati to send Purvi Mehta's device to Hemant Bhatt and Neeshal Modi's device to Ajay Gandhi. These devices enabled Bhatt and Gandhi to transfer funds out of FDL's bank account even though neither had any role at FDL or any of the other Hong Kong Firestar Entities.

112. On September 7, 2011, Kurian Mathews asked for Mihir Bhansali's approval of fee quotes from accountants for proposed audits of Auragem and Fancy Creations.

113. Mihir Bhansali required at least two of Kurian Mathews, Satyendra Shukla, and Saju Poulose to be present in Dubai at all times to monitor Shadow Entity operations. On April 27, 2013, Kurian Mathews asked Mihir Bhansali for permission to break this rule so that he could arrive in Hong Kong early to prepare for an audit of the Hong Kong Shadow Entities. Mathews explained, "We have to arrange all documents of 4 entities as Fancy's office which is very far from the offices of Brilliant and Eternal. After the same we have to check all of the purchases and sales documents with the book entries to see that correct documents are in place before the commencement of the audit." Bhansali replied, "Fine. Go ahead this time."

114. On June 10, 2013, to hide their involvement in the Bank Fraud, Modi's personal assistant instructed Gandhi, from her personal email address to Gandhi's personal email address, to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Firestar Entities' regular email system.

115. On August 6, 2013, Gandhi sent an email to a back-office employee containing purchase and sales ledgers of four Shadow Entities—Fancy Creations, Brilliant, Eternal, and Unique—showing these entities' accounting for transactions with FDI.

116.     On April 3, 2017, an India-based consultant emailed Mihir Bhansali a spreadsheet summarizing sales from various foreign Firestar Entities, including FIPL and FDIPL, to Dubai-based Shadow Entities, including World Diamond, Universal, Empire, Vista, Unique, and Diagems. The spreadsheet reflected a total of $770,730,000 in sales of rough stones, polished stones, and jewelry by various foreign Firestar Entities to these six Shadow Entities during fiscal year 2015 to 2016, and a total of $454,910,000 in such sales from April 2016 to February 2017.

117.     On May 5, 2017, Gandhi sent a list of Shadow Entities, and contact information for each, to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)."

118.     On July 1, 2017, FIPL CFO Ravi Gupta emailed Nirav Modi a spreadsheet containing fictitious biographical profiles for Brilliant, Eternal, Fancy Creations, Empire, Unique, Universal, Vista, and World Diamond and asked, "Last year someone had created the enclosed file for top 8 customers[.] Can u let me know who had helped in creation of this? We would like to do for few more customers like Augragen [sic], Eurostar, Diagem, Saumil, and Pannadium." Modi forwarded the email to Mihir Bhansali, who then directed Shyam Wadhwa, Aditya Nanivati, and Neeshal Modi to create additional fictitious profiles for Shadow Entities in their respective regions.

119.     On July 8, 2017, Satyendra Shukla asked for Mihir Bhansali's input on a proposed itinerary for FIPL CFO Ravi Gupta's and FIPL Independent Director Suresh Senapaty's upcoming visit to Dubai. The itinerary included multiple meetings with purported "owners" of Shadow Entities.

120.     Between July 31, 2017 and August 7, 2017, Satyendra Shukla and Kurian Mathews, copied Mihir Bhansali on numerous emails concerning the collection of know-your-customer and know-your-supplier documentation for Shadow Entities Unique, World Diamond, Unity,

Himalayan, DG Brothers, and Hamilton. Bhansali advised, "Gentlemen – please avoid copying me on transactional emails. Thank you."

121.     On August 19, 2017, a manager of Universal emailed Bhansali enclosing a profile of three Shadow Entities—Universal, Empire, and Diagems—and asking Bhansali to "review and advice [sic]." The manager's email signature stated he was also the General Manager of a Firestar Entity in Dubai.

122.     On October 24, 2017, Saju Poulose advised Mihir Bhansali that an independent director of FIPL had asked about the variance in profit margins between the Firestar Entities' transactions with Shadow Entity as opposed to other customers. Bhansali instructed Poulose to warn Aditya Nanivati and Satyendra Shukla so that they could prepare an explanation. Nanavati then asked Bhansali, "How are we answering this? For me it is simple, some are higher volume wholesale clients and some are smaller clients/shops. Not sure if that's the right approach."

123.     On April 23, 2018, Ajay Gandhi asked a back-office employee to send him the open accounts receivable and accounts payable between Jaffe and Empire, Vista, Eternal, Tri Color, and Universal as of April 22, 2018. Gandhi referred to these parties as "overseas non-affiliates."

124.     During the Relevant Period, Nirav Modi, Mihir Bhansali, and Ajay Gandhi exercised direct oversight and control over numerous transactions between the U.S. Entities and Shadow Entities, as illustrated by the specific examples described in Appendix A-124.

125.     Ajay Gandhi regularly advised Nirav Modi, Miten Pandya, Manish Bosamiya, Amit Magia, and Shyam Wadhwa, concerning wires of funds from the U.S. Entities to India in furtherance of the Bank Fraud, as illustrated by the specific examples described in Appendix A-125.

iii.    *Suspicious Accounting, Finance, and Inventory Management Practices*

126.    Gandhi and Bhansali engaged in and oversaw suspicious accounting, corporate finance, and inventory management practices for the purpose of furthering and concealing the Bank Fraud.

127.    Gandhi and Bhansali maintained two sets of books and records for the U.S. Entities: "core" financials, which did not include loose diamond and other high-value transactions outside the normal course of the U.S. Entities' business, and "regular" financials, which reflected transactions with Shadow Entities and other Firestar Entities to further the Bank Fraud.

128.    Jaffe's federal tax return for the fiscal year ending March 31, 2012 listed sales of $9,090,661. However, Jaffe's sales journal, as well as the Jaffe financial statements originally provided by Ajay Gandhi to the Examiner, indicates that, during that same time period, Jaffe's sales totaled $49,628,873.

129.    After Gandhi was questioned by the Examiner about the significant difference between the tax return sales of around $9 million and the "original" financial statements and sales journal which both reflected $49 million of sales, Gandhi produced a second set of financial statements, which he called the "core" set. This "core" set reflected sales at $10 million. Gandhi did not provide any real explanation as to why he maintained two sets of financial statements. The difference between these financials was primarily loose diamond sales between Jaffe and various Shadow Entities.

130.    Bhansali managed the Debtors' "house accounts," the accounts in which proceeds of loose diamond sales were segregated from regular sales accounts for purposes of computing commissions. Upon information and belief, the difference between the amounts reported in the

Jaffe's tax returns versus the amounts reflected in its sales journals primarily relates to such transactions.

131.   The secretive nature of the "regular" financials is further demonstrated by the communications between Nirav Modi, Ajay Gandhi, Mihir Bhansali, and other co-conspirators described in Appendix A-131.

132.   Mihir Bhansali and Ajay Gandhi also oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers.

133.   For example, each diamond or gem received by the Debtors for use in an ordinary retail transaction would be unpacked, compared to its packing slip, scanned for quality control, and logged as "ready to ship."

134.   These practices were not employed with respect to Shadow Entity-related transactions. For those transactions, a Shadow Entity or foreign Firestar Entity would often send bulk shipments of loose diamonds accompanied by email instructions to export them immediately upon receipt to either another Firestar Entity or a Shadow Entity at specified prices and quantities. Packing slips and invoices for the subsequent exports often accompanied these email instructions. Consistent with instructions from overseas Modi-Controlled Entities, these goods were either immediately re-shipped without being opened or, if they were opened, they were inventoried in bulk, not individually.

   iv.      *Efforts to Manipulate or Deceive Auditors and Lenders*

135.   On numerous occasions, Bhansali and Gandhi sidestepped auditors' inquiries concerning the U.S. Entities' dealings with Shadow Entities by offering farfetched explanations, feigning ignorance, or, in some cases, ignoring the questions altogether.

24

136.     For example, on July 2, 2010, a banker asked Ajay Gandhi whether FDI and Eternal were related. Ajay Gandhi forwarded the email to Mihir Bhansali and stated, "I am ignoring that question but I may not be able to avoid the same." Bhansali replied, "Speak to Nirav when he is in NY next week." The next day, Gandhi told the banker that Nirav Modi's father, Deepak Modi, owned Eternal.

137.     As another example, on June 16, 2011, an HSBC Bank representative asked Ajay Gandhi why Synergies would be wiring funds to Unique. Gandhi explained that Unique had loaned funds to Synergies, which loaned the same funds to Twin Fields, and that both loans were subsequently repaid. The representative then asked, "Unique is affiliated correct? Does Nirav own it? Is this why there are loans back and forth?" Gandhi replied, "Unique is not an affiliated company but Nirav has a very good relationship with them." The representative then asked, "Why is each company lending to the other?" Gandhi replied, "I am sure there were business reasons. What is the concern for the bank?"

138.     As another example, on September 7, 2011, a banker at Standard Chartered Bank asked Ajay Gandhi, "We understand that Firestar in NY sales [sic] mostly to big retailers in the US but the recent A/R outstanding shows more concentration on companies such as Unique Diamond, Empire Gem and SDC Designs. Can we get YTD sales data of 2010 and 2011 of the top 10 accounts for each year on year comparison?" She further stated, "Also, in the AR ageing it shows Firstar has given Steller [sic] diamonds and Unique diamonds $11m limits each—and Brilliant, Fancy creations $2m each. We understand that these foreign bills we are not discounting them, but we'd like to get more background info on these accounts given the size of exposures."

139.     On September 12, 2011, Gandhi replied, "Various overseas companies that you have mentioned are not our customers. We buy unique large diamonds/jewelry pieces from various vendors in India and sometimes these goods need to be returned, but due to the terms of

the original sale, the vendors instruct us to ship these goods to another companies [sic], that they

select, who are not located in India. We record these transfers as a reduction to purchases and an

increase to accounts receivable at the original purchase cost of the diamonds/ jewelry."

140.    Mihir Bhansali, who was included on the email from Gandhi, forwarded this

response to Modi, stating "Nirav, Please read this email below from SCB last week, and Ajay's

reply. Just an FYI." Modi then forwarded the email to the former deputy managing director of

Axis Bank's corporate banking division, and stated, "As SC is a common bank in India, Antwerp

and NY. It might be a good idea that Ajay and you discuss all responses."

141.    As another example, on April 22, 2017, an auditor asked Ajay Gandhi why FDI

had recorded a payable for an invoice issued by Fancy Creations to NMI. Gandhi replied,

"Vendor error." A few minutes later, apparently deciding that excuse was not sufficient, he

equivocated, "Also to save freight, they ship together as one invoice. Difficult to fight with them."

142.    And as yet another example, on April 26, 2017, Ajay Gandhi asked Mihir Bhansali

how he should respond to an auditor's inquiries into the U.S. Entities' multi-million-dollar A/R

and A/P balances with Shadow Entities Auragem and Fancy Creations. Bhansali directed Gandhi

to discuss the issue with Shyam Wadhwa and asked when the Shadow Entity balances could be

cleared.

143.    At least some of the coordination of the various Shadow Entities' involvement in

manipulating audits, and the Bank Fraud more generally, was conducted through an

operation1@firestardiamond.com ("**Operation 1**") email address. The Operation 1 account was

used by Sandeep Mistry and possibly others.

144.    As part of the audit process, auditors would email parties listed on the audited

company's accounts receivable and accounts payable records to request written confirmation of

the amounts reflected in the audited company's books and records. For audits of the U.S. entities,

26

which were conducted together, Ajay Gandhi would be copied on the auditor's emails to Shadow

Entities, which Gandhi would often forward to Operation 1 to ask that Operation 1 cause the

Shadow Entity to provide confirmation the auditors. Specific examples of such emails are

described in Appendix A-144

144. The Operation 1 account was also used to orchestrate transfers of funds and jewels

among Firestar Entities and Shadow Entities, as demonstrated by the specific examples described

in Appendix A-145.

> **D.** **Involvement of Mehul Choksi, Nehal Modi, Neena Sheth, Deepak Sheth, and Abhay Javeri, and the Sheth Entities and SDC Entities in the Bank Fraud.**

146. Mehul Choksi is Nirav Modi's uncle. Choksi is accused of orchestrating his own

bank fraud scheme through his India-based company Gitanjali Gems Ltd., its U.S.-based

subsidiaries including Gitanjali USA, Samuels Jewelers, Inc. ("**Samuels**"), Aston Luxury Group

(NY), Diamlink, Inc., Diamlink Jewelry, Inc., Jewelry Marketing Company, Tristar Worldwide

LLC, and Phantom Luxury Group, along with a web of fictitious vendors and customers

analogous to the Shadow Entities.

147. Although Nirav Modi's and Mehul Choksi's fraud schemes primarily operated in

parallel from a corporate standpoint, members of their family participated on both sides. For

example, Nehal Modi, Nirav Modi's brother, was in charge of Gitanjali USA, Samuels, and

Diamlink on the Choksi-side and BBB Group on the Modi side. Similarly, Mehul Choksi's sister

and Nirav Modi's aunt, Neena Sheth, served as a director of Diamlink.

148. Neena Sheth's husband, Deepak Sheth, (i.e. Nirav Modi's uncle and Mehul

Choksi's brother-in-law), owns New York-based Excellent Facets, Inc. and Amadena Investments

Inc. (collectively, the "**Sheth Entities**"). As alleged below, Deepak Sheth also served as the initial

Protector and Investment Advisor of the Ithaca Trust and as Manager of CPS50 in connection

with

149.    Also involved was Ami Modi's brother and Nirav Modi's brother-in-law, Abhay

Javeri. Javeri owns SDC Designs, Inc., SDC Designs LLC, Sangam Diamonds Corporation, and

Sangam Diamonds LLC (collectively, the "**SDC Entities**"). Abhay Javeri also served as Protector

and Investment Advisor of the Ithaca Trust and as Manager of CPS50.

150.    Deepak Sheth, Neena Sheth, Nehal Modi, Abjay Javeri, and their respective

companies participated in the Bank Fraud throughout the Relevant Period.

151.    Deepak Sheth and the Sheth Entities participated in direct transactions with

Shadow Entities totaling over $19 million during the Relevant Period.

152.    For example, in March 2016, Deepak Sheth instructed Mihir Bhansali and Ajay

Gandhi to have NMI bill Excellent Facets $965,000 for a 15.21-carat diamond necklace and a 10.71-

carat diamond ring, but to ship the pieces to Shadow Entity Sunshine in Hong Kong. Sheth

referred to Sunshine as "his customer."

153.    Abhay Javeri and the SDC Entities participated in direct transactions with Shadow

Entities involving millions of dollars during the Relevant Period.

154.    For example, on December 4, 2012, the SDC Entities' CFO Sridhar Krishnan

advised Ajay Gandhi that Shadow Entity Empire would be wiring $2.7 million to FDII as partial

payment against a July 2012 invoice and instructed Gandhi to use the funds to pay SDC Designs

LLC against another July 2012 invoice. Gandhi forwarded the email to Hemant Bhatt and asked,

"Is this OK once funds are received?" Bhatt replied, "Do not send email. Please call me to confirm

in the morning."

155.    As another example, on February 4, 2013, Sridhar Krishnan advised Mihir Bhansali

and Hemant Bhatt over personal email that he had wired $1.4 million from an SDC Entity to

Shadow Entity Universal and asked Bhatt to wire those funds to Jaffe. On February 6, 2013, Bhatt confirmed that Universal had received the funds and that Empire had paid US $1,391,570 to Jaffe. That same day, Jaffe wired $1,391,997 to SDC.

156.     As another example, on February 11, 2013, Sridhar Krishnan advised Mihir Bhansali and Hemant Bhatt over personal email that he had wired $1.2 million from SDC Designs LLC to Shadow Entity Empire and instructed Bhatt to wire those funds to Jaffe and FDI. Jaffe and FDI then wired the funds to SDC Designs LLC.

157.     As yet another example, on December 31, 2013, Mihir Bhansali directed Ajay Gandhi to wire $1.2 million from FDI to Sangam Diamonds Corp. to pay off an invoice issued to Shadow Entity Fancy Creations. On January 8, 2014, Gandhi forwarded Bhansali's December 31, 2013 email to Hemant Bhatt, stating "I paid $1.24m on 12/31/13 to Fancy per attached. This funds never came back hence I will pay $575k today. Please call me if needed."

158.     On May 25, 2018, an accountant at Marks Paneth emailed Sridhar Krishnan a request for information relating to SDC Entities' customers with outstanding A/R balances more than 90 days old, including Empire, a Shadow Entity, and Diamlink, a Mehul Choksi-owned company managed by Neena Sheth and Nehal Modi.

159.     Sridhar Krishnan could not transfer funds from the SDC Entities' bank accounts without Abhay Javeri's personal authorization. For example, on March 10, 2015, Ajay Gandhi asked Sridhar Krishnan to provide wire details for potential payments to SDC Designs Inc. and SDC Designs LLC. Krishnan replied with the bank account information but stated, "Please do not wire anything this week. **Abhay is in Mumbai and no one can approve wires**."

160.     Moreover, on many occasions, Mihir Bhansali and Ajay Gandhi would immediately transfer funds received by the U.S. Entities from the Sheth Entities and SDC Entities to Shadow Entities and Foreign Firestar Entities (including to pay off letters of credit issued to

Foreign Firestar Entities through HSBC's L/C Collections service), as they commonly did with funds received from Shadow Entities and Firestar Entities, but not from *bona fide* customers. Specific examples of such transactions are described in Appendix A-153.

161.    Ajay Gandhi, Saju Poulose, Shyam Wadhwa, and other co-conspirators treated transactions with the Sheth Entities and SDC Entities as "non-core" as they did with the Shadow Entity transactions and other transactions linked to the Bank Fraud.

162.    For example, Ajay Gandhi and Shyam Wadhwa maintained a spreadsheet summarizing the gross margin for "various divisions" for the 2012 – 2013 fiscal year. The spreadsheet contained separate columns for "core business" and "large pieces." The spreadsheet listed gross sales of $35,035,180 at a 12.03% gross margin for the "core business" column and gross sales of $17,711,569 at a 5.51% gross margin for the "large pieces" column. The spreadsheet also contained an itemized list of transactions comprising the $17,711,569 in "larger pieces" sales, including a total of $7,758,454 in sales to SDC entities, $1,253,254 to Excellent Facets, $1,912,840 to Pacific, and $3,019,406 to Empire.

163.    Additional examples illustrating the suspicious accounting practices for transactions involving SDC Entities and Sheth Entities are described in Appendix A-163.

164.    Additional suspicious transactions and communications involving the Deepak Sheth, Neena Sheth, and the Sheth Entities are described in Appendix A-164.

165.    Additional suspicious transactions and communications involving Abhay Javeri and the SDC Entities are described in Appendix A-165.

### E.    Laundering of Funds Through Twin Fields and Bailey Banks & Biddle

166.    Throughout the Relevant Period, tens of millions of dollars in proceeds of the Bank Fraud were funneled to or through Twin Fields and BBB Group, Inc. ("**BBB Group**").

167. On November 4, 2009, Ajay Gandhi, acting on behalf of Synergies, successfully bid on the intellectual property rights of Bailey Banks & Biddle, an established U.S. jewelry retailer, at a bankruptcy auction.

168. Nirav Modi formed Switzerland-based Diamonds Holdings SA to serve as Synergies' nominee to purchase the *Bailey Banks & Biddle* intellectual property.

169. On March 16, 2010, Twin Fields Investments Ltd. ("**Twin Fields**") was incorporated in Delaware. At all relevant times, Purvi Mehta and Deepak Modi indirectly owned 100% of the equity in Twin Fields through two layers of BVI shell companies, including Link High International ("**Link High**").

170. On May 13, 2010, BBB Group, Inc., d/b/a as Bailey Banks & Biddle, was incorporated in Delaware. Twin Fields owned 100% of the equity of BBB Group.

171. Diamonds Holdings SA licensed the *Bailey Banks & Biddle* intellectual property to Twin Fields, which in turn sublicensed it to BBB Group.

172. Mihir Bhansali and Nehal Modi managed and controlled Twin Fields and BBB Group throughout the Relevant Period as the *de jure* or *de facto* directors of Twin Fields and BBB Group, respectively.

173. The law firm that managed registrations for the *Bailey Banks & Biddle* intellectual property directed communications to Mihir Bhansali, sent their invoices to Bhansali, and otherwise treated Bhansali as the representative of Diamond Holdings, Twin Fields, and BBB Group.

174. In 2010, BBB Group opened several retail locations under the Bailey Banks & Biddle name, which it continued to operate throughout the Relevant Period.

175. Between November 2010 and March 2018, approximately $80 million flowed through Twin Fields. From 2010 to early 2013, Link High was the primary source of funds for the

31

Twin Fields' account, transferring $23,602,660.00. According to Indian authorities, Link High received millions of dollars of in fraudulent LOU proceeds.

176.    Between February 2013 and May 2017, Jaffe transferred at least $21,330,000.00 to Twin Fields. Jaffe maintained relatively small balances in its operating account and did not have sufficient capital to make large loan payments to Twin Fields. Most of the disbursements from A. Jaffe to Twin Fields were funded on or around the day of the payments from other sources, including FDI and known Shadow Entities Pacific Diamonds and Universal Fine Jewelry.

177.    On or about June 22, 2015, FDI transferred an additional $31,542.28 to Twin Fields.

178.    Between 2016 and 2017, Shadow Entity Fine Classic, of which Purvi Mehta was the 100% owner, transferred at least $26,864,056.00 to Twin Fields. In an email chain dated January 11, 2017, Mihir Bhansali told Marks Paneth, Twin Fields's accountant, that Fine Classic was an overseas company that lent money to Twin Fields to fund BBB Group.

179.    Between 2011 and 2017, Twin Fields transferred at least $42,748,000 to BBB Group. BBB Group made no repayments or other transfers to Twin Fields during the Relevant Period.

180.    The Twin Fields account was closed on February 21, 2018 with a balance of $13,281.

181.    Mills Menser, the manager of the *Bailey Banks & Biddle* store in Austin from July 2017 until March 2018, sent Nehal Modi and Mihir Bhansali weekly updates on the businesses' operations and performance. Bhansali would then pass these updates along to Nirav Modi.

182.    On May 1, 2018, Mills Menser proposed several options for winding down the business for Nehal Modi and Mihir Bhansali's consideration. He concluded by stating he would "support any decision ownership feels is the best fit for them."

183.    Based on, among other things, Purvi Mehta and Deepak Modi's undisclosed ownership of Twin Fields through BVI shell companies, the more than $60 million laundered through Twin Fields from Fine Classic, Link High, and Jaffe, and Mihir Bhansali and Nehal

32

Modi's involvement in its management and operations, it appears that Twin Fields and BBB Group constituted another front for Nirav Modi and his family's massive money laundering efforts.

### F. Detection and Exposure of the Bank Fraud

184.     In late May 2017, Golkunath Shetty, the PNB employee who approved fraudulent LOUs for the benefit of Nirav Modi's companies, retired. In the months leading up to his retirement, between February and May 2017, Shetty approved nearly 150 new LOUs totaling over $1 billion to the LOU Entities. These LOUs became due on or around January 25, 2018.

185.     According to Indian authorities, Nirav Modi and his brother Neeshal Modi fled India on January 1, 2018, and Ami Modi and Mehul Choksi did so on January 6, 2018 and January 4, 2018, respectively.

186.     On January 5, 2018, Nirav Modi purchased a London apartment for £7,950,000 in cash under the name "Richard Beattie" which appears to be an alias or surrogate of Nirav Modi. Modi was living in this apartment when he was arrested in March 2019. It is was also the registered office of Diamond Holdings Ltd., a UK company Nirav Modi formed in May 2018.

187.     On or around January 20, 2018, a representative of one of the LOU Entities asked PNB to roll-over the 2017 LOU balances into new LOUs. On January 22, 2018, PNB refused to issue new LOUs without a 100% cash margin deposit, among other requirements. The Modi representative refused to furnish any margin on the grounds that PNB had never before required a margin to issue an LOU. PNB immediately began investigating the borrowing practices of the Modi-Controlled Entities.

188.     The Bank Fraud has resulted in several investigations and criminal enforcement actions against Nirav Modi, Mihir Bhansali, and Defendants Ami Modi, Purvi Mehta, Mayank Mehta, Nehal Modi, Neeshal Modi, and others by Indian governmental authorities, including the

Central Bureau of Investigation ("**CBI**"); the Directorate of Enforcement ("**ED**"); the Income Tax Department; and the Serious Fraud Investigation Office.

189.     On January 29, 2018, PNB lodged a criminal complaint against Nirav Modi with India's CBI. On February 13, 2018, PNB lodged a complaint against Nirav Modi with India's ED, which subsequently attached various movable and immovable properties belonging to Nirav Modi and various Modi-Controlled Entities.

190.     On July 3, 2018, PNB filed Application No. 119/2018 in the Debts Recovery Tribunal No. I at Mumbai (the "**Indian Debt Tribunal**") against, *inter alia*, Nirav Modi and certain of his family members, each LOU Entity, FIL, and FDIPL.

191.     In early 2019, Nirav Modi was found living in London under the alias "Edmond Dantes."

192.     On or about March 12, 2019, the Indian government issued an extradition request to the government of the United Kingdom on the basis of an arrest warrant issued against Nirav Modi by an Indian court. Modi was arrested in London on or about March 20, 2019 and is currently incarcerated in London.

193.     On July 6, 2019, the presiding officer of the Indian Debt Tribunal issued a judgment against Nirav Modi, Ami Modi, Nehal Modi, Neeshal Modi, Purvi Mehta, the LOU Entities, FIL, and others based on the following factual findings, among others (capitalized terms in original):

(i)     Nirav Modi has floated Overseas Companies in Hong Kong and U.A.E. which are dummy/shell Companies. The Directors and share-holders of these Companies are either ex-employees or employees acting under instructions of Nirav Modi.

(ii)     The Overseas Companies and Hong Kong and Dubai deals with the Firestar Group directly or indirectly owned by Nirav Modi who has full control over these Companies through the dummy Directors. The Enforcement Directorate in its Complaint has recorded that the list of top 8 borrowers and top 8 suppliers are none else but the ex-employees of Firestar Group and acting and implementing the instructions given by Nirav Modi and Mihir Bhansali.

(iii)     The fraud has been perpetrated by Nirav Modi in collusion, connivance and with the aid and assistance of the group companies i.e. Firestar International Limited and Firestar Diamond International Pvt. Ltd. along with their affiliates, subsidiaries, Nirav Family Trust, Nirav Modi Family Trust, directors and key managerial personnel.

(iv)     The investigation conducted by the Enforcement Directorate further reveals that the dummy Companies were set up in Hong Kong and Dubai along with the regular Firestar Group Companies [and] acted as nodes for circular transactions to layer and launder money generated by the fraudulent LOUs.

(v)      [Nirav Modi and his family members] are the mastermind[s] behind the perpetration of the fraud. Defendants have laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purposes of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs.

(vi)     All of the aforesaid dates and events reveal the systematic fraud was perpetrated by Nirav Modi and moving the US Court for insolvency to avoid the liability. Nirav Modi and his accomplishes [sic] have taken prompt steps before the US Court to avoid the seizer [sic] and attachment of the properties purchased and acquired by Nirav Modi from the proceeds of the fraudulent debt.

The Bank Fraud resulted in a total loss to PNB and other banks in excess of $1 billion. As a result of the Bank Fraud, PNB has asserted claims against each of the Debtors in excess of $1 billion on the grounds, among others, that a substantial portion of the proceeds of the Bank Fraud were transferred to or through the Debtors. In addition, the Bank Fraud and its exposure and the seizure by Indian authorities of Modi-Controlled Entities in India resulted in the collapse of the Debtors' businesses and the filing of these chapter 11 cases.

## II.  Criminal Efforts Shortly Before and Following Exposure of the Bank Fraud

194.    In the weeks leading up to and following exposure of the Bank Fraud in January 2018 when the last LOUs Golkunath Shetty authorized before retiring became due, Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators shifted their focus to shielding assets from creditors.

### A.  Looting of the Debtors, U.S. Affiliates, and Other Firestar Entities

195.    Nirav Modi, Mihir Bhansali, Ajay Gandhi, and other co-conspirators diverted substantial amounts of the Debtors' cash and inventory to overseas Modi-Controlled Entities in the weeks leading up to the Debtors' bankruptcy filing. For example:

(i)     On or around December 5, 2017, FDI shipped inventory with a declared value of $1,632,500.53 to World Diamond.

(ii)    On January 3, 2018, FDI wired $2,672,389.48 to Pacific. That same day, Jaffe wired $530,000 to Pacific. Ajay Gandhi was directly involved in these transfers.

(iii)   On or around January 23, 2018, FDI shipped 2,319.64 carats of loose diamonds with a declared value of $426,320.97 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi and Mihir Bhansali were directly involved in this shipment.

(iv)    On January 25, 2018, FDI wired $910,278.70 to Dubai-based Firestar Diamond FZE, which was managed by co-conspirators Kurian Mathews and Satyendra Shukla. Ajay Gandhi was again directly involved in this transfer.

(v)     On January 26, 2018, FDI shipped inventory having a declared value of $85,150 to Nirav Modi Ltd. in Hong Kong.

(vi)    On February 6, 2018, FDI wired $1,002,836.77 to FIPL, Jaffe wired $505,610.51 to FIPL and Fantasy wired $401,471.08 to FIPL. That same day, Subhash Parab emailed Ajay Gandhi, copying Shyam Wadhwa, "Please pay following bills to FIPL . . . We have some urgent re-payment from IDBI bank for that [sic] we require below bills in IDBI bank[.]"

(vii)   On or around February 6, 2018, FDI shipped 4,474.15 carats of loose diamonds with a declared value of $789,140.42 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi was directly involved in this shipment.

196.     Additionally, in the weeks leading up to and following the Petition Date, Nirav
Modi, Mihir Bhansali, and Ajay Gandhi caused NMI and FDII to move significant amounts of
cash and inventory overseas where their creditors, including the Debtors, could not reach them.
For example:

(i)     On December 22, 2017, FDII shipped inventory with a declared value of
$1,418,549 through Malca Amit to Fancy Creations in Hong Kong.

(ii)    On January 4, 2018, NMI shipped two packages of inventory, with declared
values of $585,000 and $65,000, respectively, through Malca Amit to Nirav
Modi Ltd. in Hong Kong.

(iii)   On January 5, 2018, FDII shipped inventory with a declared value of
$167,810.65 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(iv)    On January 10, 2018, NMI shipped inventory with declared value of $108,550,
through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(v)     On January 10, 2018, FDII shipped inventory with a declared value of
$239,871.29 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(vi)    On January 11, 2018, NMI shipped inventory with declared value of $32,370,
through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(vii)   On January 15, 2018, FDII shipped inventory with a declared value of
$781,882.38 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(viii)  On January 16, 2018, NMI shipped inventory with declared value of $943,800,
through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(ix)    On January 19, 2018, NMI shipped three packages of inventory, with declared
values of $273,000, $409,500, and $771,680, respectively, through Malca Amit
to Nirav Modi Ltd. in Hong Kong.

(x)     On January 24, 2018, NMI shipped inventory with a declared value of
$1,075,200 through Malca Amit to FDIPL in India.

(xi)    On January 25, 2018, FDII shipped inventory with a declared value of
$1,886,922.67 through Malca Amit to Fancy Creations in Hong Kong.

(xii)   On January 26, 2018, NMI shipped inventory with a declared value of $198,750
through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xiii)   On January 29, 2018, NMI shipped inventory with a declared value of $75,050 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xiv)   On January 30, 2018, FDII shipped inventory with a declared value of $570,104.37 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(xv)   On January 31, 2018, NMI shipped inventory with a declared value of $660,500 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xvi)   On January 31, 2018, FDII wired $2,466,015 and $525,000 to Fancy Creations. That same day, Ajay Gandhi forwarded the wire confirmations to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

(xvii)   On February 2, 2018, FDII wired $400,000 to Fancy Creations. That same day, Ajay Gandhi emailed Avinash Oza and Kunal Patel, copying Shyam Wadhwa, "Please wire $400,000 to Fancy from Capital One – Advance Refund." Oza replied with the wire confirmation.

(xviii)   On February 13, 2018, NMI shipped inventory with a declared value of $154,440 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xix)   On March 6, 2018, FDII shipped inventory with a declared value of $4,325,472.34 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

197.   Around this time, Mihir Bhansali promised to use the NMI inventory to repay FDI's secured creditors, including Israel Discount Bank of New York ("**IDB**"), after transferring it to the Debtors to offset NMI's debts to FDI and Jaffe. IDB's counsel attempted to enforce this promise during negotiations regarding the Debtors' use of cash collateral by seeking to require the Debtors to collect the amounts owed to them by NMI. As alleged below, however, this never occurred, and instead, Mihir Bhansali was involved in diverting those assets to Hong Kong, beyond the Debtors' reach.

198.   Between late February and early March 2018, the NMI boutiques in Las Vegas, Honolulu, Los Angeles, and New York shipped substantially all of their inventory to New York. The inventory, which had a total value of approximately $40 million, was held in storage by Malca

Amit because its value exceeded the amount of available insurance coverage on items stored in the Debtors' vault.

199.    Around this time, Mihir Bhansali, Ajay Gandhi, and Angelina Ypma, in their capacity as directors and officers of Nirav Modi Ltd. ("**NMLUK**"), the UK-based subsidiary of NML that operated the London *Nirav Modi* boutique, were also working together to shut down the London store and divert its assets to Hong Kong.

200.    Nitin Dattani of Dattani Chartered Accounts, the London based accounting firm that had been advising NMLUK since 2016, was also heavily involved in shuttering the London boutique. Dattani assisted Nirav Modi in forming Diamonds Holdings Ltd., the company Nirav Modi established while he was hiding out in London. Additionally, as alleged below, in May 2018, Abhay Javeri appointed Nitin Dattani to replace Nehal Modi as manager of Central Park South 50 Properties LLC, which owned Nirav Modi and Ami Modi's New York Ritz Carlton apartment.

201.    On March 2, 2018, Francois-Xavier Derricks, the manager of the London boutique sent a letter to Mihir Bhansali and Angelina Ypma in their capacity as directors of NML UK. In the letter, Derricks acknowledged that Bhansali and Ypma had previously instructed him to communicate by WhatsApp and private email, but stated that he was "concerned by the recent lack of information and guidance in relation to the management of the London boutique's affairs."

202.    On March 4, 2018, Ajay Gandhi instructed Derricks to ship substantially all of the London boutique's inventory, a total of 404 pieces of jewelry, having a total value of $5,974,614, to FDL in Hong Kong. This shipment occurred shortly thereafter.

203.    On March 11, 2018, Angelina Ypma instructed Ajay Gandhi to ship a fancy pink diamond ring from NMI to the "H[ong] K[ong] office." She told Gandhi she had sent him a

picture of the ring over WhatsApp. Nirav Modi confirmed his approval from his personal email account, which Ypma copied on her email to Gandhi.

204.     Around this time, Nehal Modi and Mihir Bhansali brought in Anthony Allicock, Nehal Modi's personal friend and former colleague at Diamlink, to "manage the wind down" of the Hong Kong Firestar Entities. Allicock, a New York retail store manager, had no prior insolvency or finance experience.

205.     On March 19, 2018, Anthony Allicock was appointed the sole director of FHL, NML, and FDL.

206.     On March 22, 2018, Mihir Bhansali executed corporate resolutions on behalf of each of the U.S. Affiliates authorizing the U.S. Affiliates to indemnify Mihir Bhansali and advance his legal costs.

207.     On March 23, 2018, Mihir Bhansali, as sole director of each U.S. Affiliate, appointed Jacen Dinoff and Michael Goldman of KCP Advisory Group as directors and President and Chief Financial Officer, respectively, of each of the U.S. Affiliates.

208.     On March 26, 2018, Mihir Bhansali and Ajay Gandhi resigned from their positions with the U.S. Affiliates.

209.     On April 5, 2018, Angelina Ypma, the global president of the *Nirav Modi* brand and a director of FIL, emailed Ajay Gandhi, copying Mihir Bhansali, "Nirav has instructed me to work with you to move all of NM US inventory (HJ and core back to HK ASAP.) HK will pay Malca in advance to move the jewels." In response, Gandhi, copying Jacen Dinoff, Michael Goldman, and shipping manager Shaneeza Singh, stated that he and Bhansali had resigned from NMI "due to conflict of interest" and that she should work with Dinoff, Goldman, and Singh to coordinate the shipments. Gandhi further noted that he and Bhansali were "happy to assist as needed should [Ypma] hit any bottleneck."

210.    Ypma then instructed Dinoff and Goldman to send her a detailed inventory of NMI inventory in New York and stated, "We need to ship all products to HK." Goldman replied to Singh, "we are NOT shipping anything right now. I will let you know when it is okay to do this."

211.    That same day, Anthony Allicock emailed Goldman and Dinoff, "In my capacity as Director of Firestar Holdings Limited, I am relieving you of your duties and directorship of the New York subsidiaries effective immediately. Please confirm in writing your acceptance of the same." When interviewed by the Trustee, Allicock indicated that Mihir Bhansali or Nehal Modi directed him to terminate Goldman and Dinoff, but that he could not recall the details.

212.    Goldman forwarded the email to Mihir Bhansali and Ajay Gandhi and stated, "[W]e were attempting to verify with outside parties the position and authority of Anthony Allicock before sending him almost $7 million of diamonds. We did not move quickly enough for him and he sent us the email below. Is it your understanding that he has the authority to do this, and that his declaration is enough to make it official? Upon review of Anthony's email, do you also consider our positions and responsibilities to be terminated?" Bhansali replied, "Neither Ajay nor I will be able to comment on the below."

213.    That same day, Anthony Allicock appointed himself sole director and president of each of the U.S. Affiliates.

214.    On April 6, 2018, FDII inventory having a total declared value of $6,804,210.49 was shipped through Malca Amit to Firestar Diamond Ltd. in Hong Kong. This shipment appears to involve the "almost $7 million" in diamonds Dinoff and Goldstein refused to ship.

215.    Nehal Modi then approached Mark Motes and Eddy Friedfeld as potential replacements for Dinoff and Goldman. Mark Motes, the former chief operating officer of Maryland-based Smyth Jewelers, was a diamond industry veteran. Eddy Friedfeld was a

41

turnaround consultant who had managed Diamlink's out-of-court restructuring in 2015 and 2016. Nehal Modi had previously worked with both Motes and Friedfeld.

216.     Mihir Bhansali then interviewed Motes and Friedfeld. He told them he was looking for two industry professionals he could trust.

217.     On April 13, 2018, Anthony Allicock, at Mihir Bhansali's and Nehal Modi's direction, appointed Mark Motes the sole director and president, and Eddy Friedfeld the chief liquidation officer, of each U.S. Affiliate.

218.     On April 25, 2018, 45 pieces of NMI inventory, with a total declared value of $6,315,615, were shipped via Malca Amit to NML in Hong Kong.  Ajay Gandhi signed the packing lists included in the shipping instructions.

219.     On April 30, 2018, 93 pieces of NMI inventory, with a total declared value of $13,108,072, were shipped via Malca Amit to NML in Hong Kong. Ajay Gandhi signed the packing list included in the shipping instructions.

220.     On or around May 3, 2018, FDII inventory with a declared value of $3,200,000 was moved to Malca Amit to be held in storage.

221.     Around the same time, Anthony Allicock, Mihir Bhansali, Ajay Gandhi, Angelina Ypma, and Nitin Dattani were trying to divert NMLUK's remaining cash to Hong Kong. Gandhi, Bhansali, and Ypma officially resigned their NMLUK positions on March 12, 2018, but as with the U.S. Affiliates, their resignations were on paper only and they remained in control of NMUK and its assets.

222.     On April 9, 2018, Angelina Ypma instructed Ajay Gandhi and Mihir Bhansali to "transfer the funds available in Nirav Modi Ltd. in London to Nirav Modi Ltd. in Macau." On April 29, 2018, Anthony Allicock asked Ajay Gandhi whether the more than £ 1,000,000 in NMLUK's Barclays account had been transferred to Hong King. Gandhi replied that a portion of

42

the funds had been wired, but that the account had been blocked. Allicock, Gandhi, Bhansali, Ypma, and Dattani worked together over the next few weeks to unblock the account so they could move the remaining funds to Hong Kong.

223.    On May 4, 2018, Ypma emailed Gandhi and Bhansali, "I shall be coming to NY from Monday 7 till Thursday 10 May to review the NM inventory. Nirav told me that I can work with [FDI employee Shanna Singh] to count the inventory . . . Thank you to give me the support." Gandhi reiterated that he and Bhansali had resigned from NMI and directed Ypma to work with NMI's new management "on the logistics."

224.    During Angelina Ypma's visit to New York in May 2018, Ajay Gandhi and Mihir Bhansali gave her permission to remove several million dollars' worth of the inventory in storage at Malca Amit. According an employee who accompanied Ypma to Malca Amit, Ypma selected approximately $5 million from various parcels. The pieces Ypma selected were then shipped to Hong Kong in two shipments.

225.    First, on May 9, 2018, inventory with a declared value of $2,700,000 was shipped through Malca Amit to Fancy Creations in Hong Kong. (The Malca Amit documentation listed FDII as the shipper, but this shipment might have involved NMI inventory as well.)

226.    Then, on May 15, 2018, 122 pieces of NMI inventory with a declared value of $2,516,470.79 were shipped to NML in Hong Kong through Malca Amit. Ajay Gandhi signed the packing list included in the shipping instructions.

227.    On May 23, 2018, NML "sold" the 122 pieces of NMI inventory to FDL. That same day, FDL "sold" the same pieces to Shadow Entity Sino Traders. Anthony Allicock signed the invoices for both of these purported sales. Yet, on June 19, 2018, Allicock told attorneys for the Hong Kong Firestar Entities that the May 15 shipment was sent from New York without Allicock's authorization and asked them to attempt to locate the shipment.

228. Throughout May 2018, Anthony Allicock pressured Eddy Friedfeld and Mark Motes to ship the remaining NMI and FDII inventory to Hong Kong. They refused to do so until all of the U.S. Affiliates' creditors were paid. When Friedfeld and Motes discovered the May 15, 2018 shipment, they demanded that Allicock arrange for the return of the shipment. Allicock refused.

229. On June 1, 2018, at Nehal Modi's direction, Anthony Allicock terminated Friedfeld and Motes and appointed Rochelle Miller, another personal friend of Nehal Modi, as CEO and sole director of each U.S. Affiliate. Prior to her appointment, Rochelle Miller worked as an event planner and had no jewelry industry, insolvency, management, or financial experience.

230. That same day, Anthony Allicock introduced Rochelle Miller to Angelina Ypma. Allicock and Ypma instructed Miller to retrieve the NMI and FDII inventory from Malca Amit and ship it to Hong Kong.

231. At the time of Rochelle Miller's appointment, the U.S. Affiliates' bank accounts held a total of $1,283,454.05.

232. On June 2, 2018, Rochelle Miller, acting in her capacity as director/CEO of NMI, contacted Malca-Amit to request shipment to Hong Kong of two sets of NMI inventory: 1) 208 pieces at a declared value of $5,063,914.01; and (2) 53 pieces at a declared value of $2,846,545. Malca Amit refused to do so until it could verify Miller's authority.

233. On September 5 and 7, 2018, after confirming Rochelle Miller's appointment as director and CEO of NMI and FDII, Malca Amit released nine parcels containing the remaining NMI and FDII inventory to the custody of Rochelle Miller.

234. Rochelle Miller, on information and belief, at the direction of Nehal Modi, shipped all of the NMI and FDII inventory to be appraised by Independent Gemological Laboratories ("**IGL**"), a purportedly independent diamond grading laboratory. However, according to the

44

Samuels examiner's report, IGL is secretly owned by Mehul Choksi through a BVI shell company. The Samuels examiner found that Choksi's secret ownership of IGL permitted Samuels to conceal from consumers the fact that its jewelry products were not independently evaluated. IGL's offices were directly next to Diamlink's offices.

235. On October 2, 2018, IGL's president Curtis Lowrey advised Rochelle Miller that IGL had completed its inspection and appraisal of the NMI and FDII inventory, which Lowrey described as "17 bags and trunks of merchandise." IGL appraised the NMI and FDII inventory at a "scrap value" of approximately $1.5 million. Lowrey further noted that, "as this is a 'fire sale' . . . I made deeper discounts than would normally be customary in pricing a closeout inventory." Rochelle Miller paid IGL a total of $81,943 from June 2018 to June 2019 from FDII's and Synergies' bank accounts.

236. Rochelle Miller then purported to sell the NMI and FDII inventory to the "highest bidders" for a total purchase price of $1,593,550. It appears that most, and possibly all, of the purportedly arms-length purchasers were surrogates of Nirav Modi and his family.

237. For example, under an invoice October 4, 2018, Rochelle Miller sold an unspecified quantity of "mixed jewelry" to Hong Kong-based Alchemist Global Trading & Consulting Ltd. ("**Alchemist**") for a total price of $420,300. Alchemist was formed on May 16, 2018 and is owned by Tamer Abou El Ata, who on information and belief, is a personal friend of Nehal Modi.

238. Under an invoice dated October 8, 2018, Rochelle Miller sold 296.56 carats of "loose diamonds" for $605,000 to Diamonds Village USA Corp., the California-based subsidiary of Dubai-based Diamonds Village DMCC. In July 2018, the owner of Diamonds Village, Naresh Mehta, was accused of running his own import-export scam using a *modus operandi* similar to Nirav Modi. The Firestar Entities' books and records reflect numerous transactions with Diamonds Village over the years.

239.     On October 9, 2018, Rochelle Miller paid herself a "one-time bonus" of $50,000 from FDII's bank account. On October 17, 2018, Rochelle Miller wired $75,000 to Anthony Allicock from Synergies' bank account. These payments appear to be incentive compensation tied to Miller's sale of the FDII and NMI inventory.

240.     Between June 2018 and June 2019, Rochelle Miller received a total of $807,203 in compensation, bonuses, and expense reimbursements from the U.S. Affiliates. Miller also paid an additional $535,763 to Mint Holdings, LLC, a Miami-based "luxury concierge service" company with ties to the Modi family, for "expense reimbursements" for which she received the benefit. Miller also paid a company owned by her husband, North Star Land Services, a total of $49,060 for unknown "sales."

241.     Rochelle Miller spent the remainder of the U.S. Affiliates' funds on legal and financial advisors, taxes, office space leases, director & officer insurance premiums, and other miscellaneous expenses.

242.     The systematic diversion of the U.S. Entities' assets to overseas Modi-Controlled Entities described in the foregoing paragraphs, in combination with the fraudulent omissions and misrepresentations Ajay Gandhi and Mihir Bhansali made in the context of these chapter 11 cases, constituted millions of dollars in actual fraudulent transfers and impaired recovery of loan receivables of the Debtors and the U.S. Affiliates.

**B.      Fraudulent Omissions, Misstatements, and Misrepresentations Made in Connection With The Debtors' Chapter 11 Cases**

243.     On February 26, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. During the early weeks of the chapter 11 cases, Bhansali and Gandhi, as the Debtors' CEO and CFO, respectively, made fraudulent omissions, misstatements, and misrepresentations, formally and informally, explicitly and implicitly, to this Court, to the United

States Trustee, and to creditors, regarding the Debtors' involvement in the Bank Fraud and their relationship to various Shadow Entities.

244.    In his Declaration filed with this Court on February 28, 2018, Bhansali stated under penalty of perjury, "A list setting forth the twenty (20) largest unsecured creditors, of each of FDI, [Fantasy] and [Jaffe], excluding those persons who constitute 'insiders' under Bankruptcy Code section 101(31), is attached hereto as Exhibit B."

245.    Exhibit B to Bhansali's declaration, which purported to list the top 20 unsecured non-affiliated creditors of each Debtor, included: World Diamond as a creditor of FDI in the amount of $79,918.70; Fancy Creations as a creditor of FDI in the amount of $19,617.50; Tri Color as a creditor of Jaffe in the amount of $3,356,165.99; Pacific as a creditor of Jaffe in the amount of $2,922,239.31; Universal as a creditor of Jaffe in the amount of $42,905.00; and Eternal as a creditor of Jaffe in the amount of $31,645.39. Each of these entities was in fact an insider.

246.    Moreover, Bhansali led the bankruptcy court and other parties to believe that the Debtors were not involved in the Bank Fraud and that they were innocently caught up in an overseas matter. In a declaration filed shortly after the petition date, Bhansali declared under penalty of perjury: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to: (i) procure alternate sources of supply, (ii) establish alternate back office and support service functions; (iii) reassure their vendors and customers that they had no involvement in the alleged wrongful conduct; and (iv) reassure their customers that they were committed to carrying on their business and that swift action was being taken to mitigate the damage caused by the actions in India."

247.    On March 27, 2018, the Debtors filed their bankruptcy schedules and statements of financial affairs ("**SOFA**"), all of which Ajay Gandhi signed under penalty of perjury. The

Debtors' statements of financial affairs contained numerous misstatements, misrepresentations, and omissions.

248. FDI's SOFA did not list any transfers to Shadow Entities in response to Question No. 3, which asks for payments made to creditors within 90 days prior to the petition date, Question No. 4, which asks for transfers of property to insiders of the debtor within 1 year prior to the petition date, or Question No. 13, which asks for any other transfers made outside the ordinary course of business within 2 years prior to the petition date.

249. In truth, there were substantial transfers by FDI to Shadow Entities that Gandhi personally directed or otherwise participated in during the relevant periods. For example, Gandhi did not disclose FDI's transfers of $483,620.05 and $2,188,769.43 and Jaffe's transfer of $530,000 to Pacific on January 3, 2018—only a few weeks prior to the Petition Date. Nor did Gandhi disclose FDI's payment of $300,000 to Unique on March 22, 2017, less than a year prior to the Petition Date.

250. Additionally, neither Jaffe's bankruptcy schedules nor SOFA disclosed any amounts owed by NMI to Jaffe.

251. However, Jaffe's and NMI's books and records each reflected an $11,216,467 loan balance owed by NMI to Jaffe as of the Petition Date, which have not been repaid.

252. On March 23, 2018, the Debtors moved for approval of bidding and sale procedures for the sale of substantially all of their assets under section 363 of the Bankruptcy Code. On March 29, 2018, the Court approved the Debtors' bidding and sale procedures.

253. On April 20, 2018, the Court appointed John J. Carney as examiner (the "**Examiner**") to investigate the nature and extent of the Debtors' involvement in the Bank Fraud.

254. Shortly after the Examiner's appointment, the Examiner attempted to interview Bhansali. Bhansali flatly refused to cooperate. When pressed by the Examiner's counsel,

48

Bhansali's counsel acknowledged that Bhansali was in communication with Modi as late as March 15, 2018, and that he and Modi discussed the Debtors' sale and bankruptcy process. As alleged above, Ajay Gandhi and Angelina Ypma also communicated with Nirav Modi in March 2018.

255.     On May 1, 2018, the Debtors adjourned the auction for FDI and Fantasy's assets indefinitely. On May 3, 2018, Parag Diamonds, Inc. was the successful bidder for Jaffe's assets.

256.     On May 15, 2018, at a hearing to approve the Jaffe sale, the Debtors' chief restructuring officer Mark Samson testified that Mihir Bhansali had been in communication with Nirav Modi between the commencement of the Debtors' chapter 11 cases and March 15, 2018, and that Bhansali continued to be involved "on a daily basis" as "a key employee" in the sale process after that date.

257.     Following this revelation, the Court asked for the record to be supplemented with additional detail concerning the nature and extent of Bhansali's post-petition communications with Modi, and adjourned the sale hearing to May 23, 2018. On May 19, 2018, the Debtors withdrew the sale motion without prejudice. (Dkt. 177.) At a hastily-arranged Chambers conference on May 18, 2018, Bhansali's counsel advised the Court that Bhansali resigned as director and officer of the Debtors that same day and that Bhansali refused to submit a declaration and appear for cross-examination concerning his post-petition communications with Modi.

258.     On May 17, 2018, Ajay Gandhi sat for an interview with the Examiner's team. In that interview, Gandhi stated that the only thing he knew about the Shadow Entities was that they were Bhansali's customers. In subsequent interviews, Gandhi continued to insist he was not aware that any Shadow Entity was owned or controlled by Nirav Modi. When confronted by the Examiner's team with emails indicating that Gandhi was aware that numerous Shadow Entities

were related parties, Gandhi repeatedly maintained he did not remember these emails, nor that the Shadow Entities were in any way controlled by Modi.

259.    Additionally, in response to the Examiner's questions regarding Gandhi's involvement in hundreds of millions of dollars in loose diamond transactions, Gandhi told the Examiner that he merely signed packing slips with no verification of the contents of the shipment, its valuation, the profitability, or propriety of such transaction.

260.    Additionally, when the Examiner asked Gandhi whether he ever used his personal email accounts for Firestar business, Gandhi stated that he did not. In fact, during the Relevant Period, Gandhi sent numerous emails pertaining to the Debtors and other Modi-Controlled Entities to and from several personal email accounts.

261.    On June 14, 2018, the Court approved the Trustee's appointment, at which time the Trustee assumed control of the Debtors' estates and operations.

262.    On August 7, 2018, the Examiner conducted a deposition of Mihir Bhansali. Bhansali's knowledge, intent, and culpability with respect to the Bank Fraud and other misdeeds alleged in this Complaint can be inferred from the fact that Bhansali invoked his Fifth Amendment right against self-incrimination in response to every question except his name.

**C.    *Other Efforts to Cover Up and Frustrate Investigation of the Bank Fraud***

263.    Nirav Modi, Bhansali, and Gandhi, and their co-conspirators researched and implemented various tactics to conceal and destroy evidence of their involvement in the Bank Fraud both prior to and after the Bank Fraud's exposure.

264.    Pradeep Mhatre, a member of FIPL's information technology department, told Indian authorities that in 2010 or 2011, Mihir Bhansali instructed him to set up a secret closed email server in the Dubai office using the domain "panemail.com." The Panemail server restricted emails from being sent to or received from outside email servers, nor was it possible to download

emails and attachments from the server. The server was limited to 25 – 30 users, including Nirav Modi, Mihir Bhansali, Ajay Gandhi, Neehsal Modi, Hemant Bhatt, Aditya Nanavati, Shyam Wadhwa, Satyendra Shukla, Kurian Mathews, and Sridnar Krishnan. Mihir Bhansali instructed and approved adding users to the server.

265.     Mhatre further told Indian authorities that, in 2017, Bhansali instructed him to create a new secret server on the domain "cricketnow.live" with restrictions similar to the Panemail server. This server automatically deleted emails after one week. In this server, users were assigned generic IDs such as "user1, DOE1, DOE2, DXB1, HK1, etc." to enhance secrecy.

266.     On February 13, 2018, an attorney at Day Pitney LLP emailed Ajay Gandhi to suggest that bank statements for CPS50, which owned the 50 Central Park South property, be sent directly to Abhay Javeri as manager of CPS Properties LLC. Gandhi forwarded the email to "ajaycpa@yahoo.com", which upon information and belief is Gandhi's personal email address, and stated, "Niravbhai, OK to have CPS 50 Properties LLC bank statement from Citibank sent to Abhay Javeri to his email address or Abby's mailing address?" The fact that Gandhi addressed this email to "Niravbhai" shows that Nirav Modi and Ajay Gandhi were using Gandhi's personal email account to communicate in the weeks following the exposure of the Bank Fraud.

267.     Similarly, on March 13, 2018, Ajay Gandhi sent his own Yahoo email account an email addressed to "Niravbhai" summarizing transactions in and out of NMLUK's Barclays Bank account for Modi's review, including a £2,000,000 deposit from Nirav Modi personally on January 29, 2018. As alleged below, only a few weeks earlier, Nirav Modi purchased a £7,950,000 London apartment after fleeing India.

268.     Ajay Gandhi also coordinated with Purvi Mehta during this time. On February 16, 2018, Purvi Mehta emailed Ajay Gandhi, "Where can I reach u on WhatsApp?" Gandhi replied with his personal phone number.

51

269.     On March 11, 2018, Ajay Gandhi ran internet searches on the *Adelphia Communications* fraud case and related bankruptcy. These searches included: "how did adelphia get caught"; "how rigas family were caught in the fraud of adelphia"; and "how adelphia fraud was discovered?"

270.     On March 9, 2018, Bhansali visited an internet article entitled "14 Signal App Tips for Secure Chats," which described tips for sending and erasing secure communications through Signal, an end-to-end encryption application.

271.     On March 12, 2018, Mihir Bhansali visited an internet article entitled "How to Clear Your Cache on Any Browser." The article described methods of deleting internet browsing history on various web browsers. That same day, Bhansali visited an internet article entitled "How to Hack Wi-Fi Passwords." This article described methods of obtaining access to wireless networks without the required password.

272.     Mihir Bhansali's laptop contained a software program called "Hide My Ass! Pro VPN." Upon information and belief, the purpose of this program is to facilitate anonymous internet usage through virtual private network technology. The software's logs indicate that the program was used as recently as February 11, 2018.

273.     Bhansali's laptop also contained a program called SecurStar DriveCrypt. Upon information and belief, the purpose of this program is to encrypt data on computers.

274.     As alleged above, Bhansali created what appears to be a "to-do" list for the various co-conspirators following exposure of the Bank Fraud. The list included instructions to "Send all non-Firestar Dubai comps to HK." Upon information and belief, "comps" refers to "computers."

275.     According to statements made by various Firestar Entity and Shadow Entity directors and employees to Indian authorities, around February or March 2018:

(i) Nehal Modi and Mihir Bhansali removed approximately 50 kilograms of gold and 2.5 Lac Dirhams (worth approximately $68,000) from a Dubai-based Firestar Entity;

(ii) Neeshal Modi diverted diamonds from Dubai-based Modi-Controlled Entities to Hong Kong.

(iii) Nehal Modi removed over $6 million in diamonds and 150 boxes of pearls from one of the Hong Kong-based Modi-Controlled Entities. In the "to do" list spreadsheet recovered from Mihir Bhansali's computer, the tasks listed under "MB" included "Pearls – where to keep the inventory?" and "Pearls – original purchase entries."

(iv) Mihir Bhansali, Nehal Modi, and Nirav Modi intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities. For example, Ashish Lad, a director of Shadow Entity Unity, told Indian authorities that Nirav Modi threatened to kill or falsely implicate Lad if he revealed anything to the investigative authorities.

(v) Nehal Modi destroyed cell phones of Shadow Entity directors. He told the directors that their "mobile phones are easy to track and they are evidence." Modi also oversaw the destruction of accounts, records, and servers of various Modi-Controlled Entities.

(vi) Nehal Modi bribed Ashish Lad with INR 2,000,000 (approximately $28,000) to give false testimony to judicial authorities in Europe.

(vii) Nirav Modi told Shadow Entity personnel that "it was not safe for [them] in Dubai and [they] must shift to Cairo[, Egypt.]" Once in Cairo, Modi, or others operating at his behest, confiscated the Shadow Entity personnel's passports "on the pretext of some residency permission."

(viii) Nirav Modi, or others operating at his behest, instructed Shadow Entity personnel to sign affidavits before they left Cairo stating that the Shadow Entities were owned by the directors and were in no way related to Nirav Modi.

**D.** *Money Laundering to Modi Family Members Prior to Exposure of the Bank Fraud*

276.    As early as 2014, Nirav Modi and his co-conspirators began developing plans to "restructure" the Firestar Entities' global corporate structure in contemplation of an eventual initial public offering. The initial public offering appeared to be their exit strategy from the fraud scheme.

277.    The planned restructuring served the dual purpose of (a) sanitizing any trace of the Modi family's self-dealing during the Relevant Period from the Firestar Entities' books and records and ownership structure, and (b) providing a pretext for funneling assets to Ami Modi and Purvi Mehta.

278.    For example, one issue the planned restructuring aimed to resolve was the dubious record of Synergies' capitalization and ownership.

279.    Synergies was originally formed in April 2007 to serve as the purchaser entity in connection with the acquisition of Jaffe later that year.

280.    On October 11, 2007, Mihir Bhansali and Ajay Gandhi executed a stock certificate reflecting FIPL as the holder of 10,000 shares in Synergies.

281.    Between October 20, 2010 and March 11, 2011, Nirav Modi personally transferred a total of $14,575,000 to Synergies, which Synergies used to pay off purported loans from FIPL. The "loans" from FIPL consisted of earlier circular transactions in which FIPL wired funds to Synergies and Synergies immediately wired the funds back to FIPL, or in on other instances, to FDIPL, Brilliant, Eternal, or other Modi-Controlled Entities.

282.    On October 1, 2016, even though FIPL remained the sole owner of Synergies, Nirav Modi and FHL entered into an Agreement for Purchase of Shares in Synergies Corporation under which Nirav Modi, in his personal capacity, purported to sell 100% of the outstanding shares of

54

Synergies to FHL in exchange for a price of $100. The agreement was signed by Mihir Bhansali and Ajay Gandhi on behalf of Synergies, by Nirav Modi on his own behalf and by FHL's then-director Himanshu Trivedi. That same day, Mihir Bhansali and Ajay Gandhi executed a stock certificate reflecting FHL as the holder of 10,000 shares in Synergies.

283. In December 2016, Nirav Modi assigned to Purvi Mehta his interest in the $14,575,000 Synergies "loan" under an assignment agreement retroactively dated as of April 1, 2012. This assignment was described as a gift in numerous emails. As alleged below, in July 2017, Synergies ultimately used a purported capital infusion from FHL to pay off the loan to Purvi Mehta as part of a broader diversion of funds to Mehta under the guise of the broader restructuring.

284. Another aspect of the restructuring was developing a means to divest CPRE, which was the record owner of Nirav Modi and Ami Modi's personal residence in New York, so that those properties could not be reached by creditors.

285. CPRE was formed under Delaware law on February 15, 2007. On March 26, 2007, CPRE purchased an apartment at the Essex House, 160 Central Park South in New York City (the "**Essex House Apartment**") for $4.995 million, of which FDII paid $2 million. The balance was funded by HSBC, which was granted a mortgage on the Essex House Apartment. Bhansali signed the deed on behalf of CPRE. CPRE was owned by FDI until approximately the end of 2009, when FDI transferred it to FGI. The Essex House Apartment was used by Nirav Modi and Ami Modi as a personal residence.

286. At all relevant times, Mihir Bhansali and Ajay Gandhi served as the manager and treasurer, respectively of CPRE.

287. On December 5, 2014, Ajay Gandhi emailed Howard Hoff of Marks Paneth, asking for input on "[1] Potential Sale or Gift of Central Park LLC to Ami Modi (Nirav's wife) who is a

US Citizen [and 2] Moving Firestar Diamond, Inc. / Fantasy, Inc. from Firestar Group's umbrella to an overseas Firestar entity . . ."

288.     On February 22, 2015, Ajay Gandhi emailed Howard Hoff, copying Mihir Bhansali, a spreadsheet analyzing various scenarios for selling FDI and CPRE. The spreadsheet included as questions: "Trust set-up by Purvi Modi –HK Resident[.] HK Trust funds Nirav Modi via Gift or Loan[.]" Hoff replied, "Please be more specific on the trusts [sic] involvement in the transaction. Is it just going to loan the money or is it going to have ownership prior to an eventual transfer. What type of trust is it, who are the beneficiaries? Is it Purvi's trust or is Purvi the executor, what country is Purvi a resident and a citizen of?" Gandhi replied, "Purvi is a HK resident and she will be owner of the trust unless you have a better thought or ideas to have Ami fund the purchase."

289.     On March 4, 2015, Ajay Gandhi outlined the steps for moving CPRE beyond the reach of creditors in an email to Raghu Iyer, "1. Move $1.8m and $3m of other liabilities from CP[RE] to Firestar Group, Inc. thru J[ournal]E[ntrie]s . . . Only HSBCs $3m liability will be left. . . . Ami needs to wire $1.935m at the closing to buy CP[RE]. . . . Ami will get Gift in USA from Purvi . . . $1.935m will now be used to pay off FGI debts (Firestar Diamond, Inc.) . . . Need clarity from Howard if how much funds should come from Firestar Holdings Ltd HK to buyout Firestar Diamond/Fantasy, Inc. and how to move funds back to HK or somewhere."

290.     On March 31, 2015, Raghu Iyer asked Ajay Gandhi for a status update on the restructuring. Gandhi replied, "Not sure if you spoke to Shyam Wadhwa as he does not want to speed-up change of ownership as he has issues of how to create capital in FS, HK and issues with bank covenants in HK hence he suggest to do as late as possible in 2015-16." Raghu replied, copying Mihir Bhansali, "Mihir[,] I was not aware of these issues[.] Can you take it up with NDM?" Bhansali replied, copying Wadhwa, "Mr. Wadhwa has already spoken to Nirav."

291.     Thus, the restructuring plans were put on hold until sufficient funds were available to effectuate all of the necessary transactions.

292.     The restructuring planning ramped up in late 2016, likely prompted by the looming retirement of Gokulnath Shetty, the PNB employee who approved the fraudulent LOUs to Nirav Modi's and Mehul Choksi's entities, which occurred in May 2017.

293.     On November 3, 2016, Manish Modi emailed Ajay Gandhi a request for a status update and asked "[F]or CPRE, does Nirav Bhai have to pay money to CPRE (via Ami Modi)[?] That cash flow has to be planned." Gandhi replied, "Spoke to Howard. If Ami Modi buys CPRE and assumes $3m of HSBC loan then she needs to pay $2m for CPRE assuming valuation of $5m."

294.     On November 14, 2016, Gandhi emailed HSBC, "We are planning change of ownership of Central Park Real Estate, LLC, which [is] currently owned by Firestar Group, Inc., to Ami Modi (She is US Citizen and wife of Nirav Modi). No other changes to existing agreement. Anything to be done?"

295.     For the next several months, HSBC repeatedly requested additional information relating to the ownership structure of CPRE and other Firestar Entities and the source of Purvi Mehta's wealth.

296.     When Gandhi told Nirav Modi about HSBC's requests, Gandhi said he "avoided giving these [sic] information and told them that we may do restructuring of Central Park and may change ownership etc." but that the "only way we can avoid is only if we pay-off the $ 3 m mortgage in next few months." Modi responded, "There will be a change in ownership in May end so better to explain that."

297.     The laundering of funds through the Firestar Entities' corporate restructuring involved several steps. First, various British Virgin Island, Cayman Island, and Mauritius shell

57

companies secretly owned by the Modi family would invest up to $75 million in FIPL. FIPL would then make a $115 million capital contribution to FHL.

298.     Of this $115 million, FHL would use $65 million to redeem non-voting FHL shares owned by Purvi Mehta (both personally and through Fine Classic), $23 million to repay various loans from Purvi Mehta and Fine Classic, and $20 million to infuse capital in Synergies.

299.     Synergies would then use $14,575,000 of the new capital to "repay" Purvi Mehta for the "loans" Nirav Modi originally made to Synergies in 2010 and 2011 and subsequently assigned to Purvi Mehta in 2016.

300.     To secure the additional funding needed for these transactions, Nirav Modi and his co-conspirators obtained 150 LOUs totaling over $1 billion between February and May 2017.

301.     The "investment" in FIPL also used funds siphoned from Shadow Entities in earlier years.

302.     For example, in November 2013, Shadow Entity had Pacific transferred $30,000,000 to Mayank Mehta, Purvi Mehta's husband. These Shadow Entity payments to Mayank Mehta were characterized as "payouts" or "shareholder dividends."

303.     Mayank Mehta transferred the $30 million received from Pacific in November 2013 to Purvi Mehta as a gift. Purvi Mehta then used these funds as collateral for loans to Radashir, a Modi-Controlled Entity in India that also participated in the Bank Fraud, until 2016 when the funds were returned to Purvi Mehta. Purvi Mehta then moved $23 million to her account in Mauritius.

304.     Between December 14, 2016 and January 12, 2017, Fine Classic transferred a total of $25,700,500 to Purvi Mehta's Mauritius account. According to Kurian Mathews, Shyam Wadhwa, and Nilesh Mistry, who oversaw Fine Classic's day-to-day finances and operations, the circular import and export transactions between Fine Classic and other Shadow Entities were

structured so as to generate deliberately high profit margins for Fine Classic, with corresponding

losses in other Shadow Entities. According to the India ED, Fine Classic received approximately

$89 million from other Shadow Entities from 2011 to 2017.

305. Purvi Mehta then transferred $40 million from her Mauritius bank account to

Novelar International Holdings Ltd. ("**Novelar**"), a BVI entity of which she is the ultimate

beneficial owner.

306. Novelar owns Islington International Holdings Pvt. Ltd., a Singapore-based entity.

In January or February 2017, Novelar transferred $40 million to Islington. Around this time, Purvi

Mehta also transferred $425,000 directly into Islington. In February 2017, Islington invested $45

million, including the funds received from Novelar and Purvi Mehta, in FIPL.

307. Thus, by February 2017, $45 million in purported new investments had been

indirectly made by Purvi Mehta in FIPL using the proceeds of the Bank Fraud.

308. On March 22, 2017, Bhansali and his wife purchased apartment 24A at 50 Riverside

Boulevard in New York City for approximately $7.1 million, of which approximately $5.3 million

was paid in cash. Just weeks earlier, Mihir Bhansali had received a $1.5 million wire into his

personal HSBC checking account from Purvi Mehta on February 24, 2017. Bhansali's annual

salary from the Debtors was approximately $154,000. On June 29, 2017, Purvi Mehta wired

another $750,000 to Mihir Bhansali's personal checking account at HSBC.

309. Only two days after the Debtors filed for bankruptcy, Bhansali transferred his

interests in the apartment to his wife, Rakhi Bhansali for nominal consideration.

310. Based on, among other things, the timing of these transactions and Purvi Mehta's

role as a primary conduit for proceeds of the Bank Fraud, it appears this apartment was

purchased using proceeds of the Bank Fraud.

311.    According to Indian authorities, Purvi Mehta also purchased a new Hong Kong apartment for herself in April 2017 for 19.5 crore INR (approximately $2.7 million). Neeshal Modi signed the agreement on Purvi Mehta's behalf under a power of attorney certified by the Indian consulate of Hong Kong.

312.    In March 2017, Nirav Modi and Ami Modi also were looking to purchase another New York residence for $25–$30 million. They initially planned to purchase a unit at the River House, a cooperative apartment building located at 435 E. 52nd Street in Manhattan.

313.    In May and June 2017, Purvi Mehta, "loaned" Ami Modi a total of approximately $34 million to fund the River House purchase.

314.    According to the India ED, at least $18 million of the funds Purvi Mehta loaned to Ami Modi in May 2017 were sourced from transfers to Purvi Mehta by Fine Classic, the Shadow Entity Purvi Mehta directly owned and controlled, between March 7, 2017 and April 27, 2017. Between July 9, 2017 and October 4, 2017, Fine Classic wired an additional $16,300,000 to Purvi Mehta from various accounts.

315.    When the River House sale fell through in mid-June 2017, Nirav Modi and Ami Modi turned their attention to an apartment at the Ritz Carlton located at 50 Central Park South in Manhattan (the "**Ritz Carlton Apartment**").

316.    On July 7, 2017, Purvi Mehta entered into a contract to purchase the Ritz Carlton Apartment for $25 million. That same day, Ami Modi wired, as a down payment, $2.5 million of the funds Purvi Mehta had transferred to her in May and June 2017 to a Katz & Matz LLP escrow account. Ami Modi and Purvi Mehta accounted for this transfer as a "partial repayment" of the loan from Purvi Mehta.

60

317.    That same day, accountant Howard Hoff at Marks Paneth LLP summarized the planned transaction in an email to Nirav Modi and the Modi family's trust & estate counsel at Day Pitney LLP and their real estate counsel Katz & Matz LLP as follows:

> Entity Establishment:
> 1) Create a NY LLC owned by Purvi. This will be the purchaser of the condo. Timing is a few to days to open.
> 2) Once the trust is established, Purvi will transfer/assign ownership of the LLC to the trust (Timing is a few weeks since the trust agreements are almost complete)
>
> Flow of Funds:
> 1) Purvi will instruct Ami to partially repay the loan she made to her directly to Steven [Matz]'s escrow account on behalf of the LLC. (This will happen tomorrow)
> 2) Ami will then repay the remainder of the loan to Purvi overseas.
> 3) Purvi will have to wire directly to Steven's escrow account the balance due on the condo in order to close.

318.    On July 11, 2017, Defendant CPS50 was formed and, on August 2, 2017, its operating agreement was executed with Purvi Mehta as sole member and Nirav Modi's uncle Deepak Sheth as its manager.

319.    On July 10, 2017, Synergies and FIPL entered into a Stock Purchase Agreement under which Synergies purchased 100% of the outstanding common stock of FGI for a price of $3,694,000. Ajay Gandhi signed the agreement on behalf of Synergies.

320.    On July 13, 2017, FHL wired a $20,000,000 "capital infusion" to Synergies. The same day, Synergies wired $650,000 to Jaffe (which Jaffe used to pay off invoices from FIPL), $1,047,000 to Brilliant (as repayment of a purported loan), $3,694,000 to FIPL (as the purchase price for FGI, which Synergies acquired as part of the 2017 "restructuring"), and $14,575,000 to Purvi Mehta. The $14,575,000 payment to Purvi Mehta (the "**Synergies-Mehta Transfer**") was made under the pretext of paying off the loan Modi had assigned to Mehta.

321. On July 14, 2017, FHL wired another $20 million to Purvi Mehta for redemption of her non-voting preference shares in FHL. Thus, over a two-day period, more than $34 million in proceeds of the Bank Fraud were wired to Purvi Mehta.

322. On or around August 23, 2017, Purvi Mehta, as settlor, executed an instrument (the "**Ithaca Trust Agreement**") creating the Ithaca Trust as an irrevocable trust under Delaware law.

323. The Ithaca Trust Agreement named Commonwealth Trust Company ("**Commonwealth**") as the trustee (the "**Ithaca Trustee**"), Ami Modi and her children as the beneficiaries, and Deepak Sheth as the initial protector (the "**Ithaca Protector**" or "**Protector**") of the Ithaca Trust. It also named Purvi Mehta and Nirav Modi's parents, Deepak Modi and Pragnya Modi, and cousin, Mihir Bhansali, as residual beneficiaries for any "property not otherwise distributed."

324. Under the terms of the Ithaca Trust Agreement, the Ithaca Trustee cannot invest or manage any of the Ithaca Trust's assets without the express written direction of the investment advisor of the Ithaca Trust (the "**Ithaca Investment Advisor**" or "**Investment Advisor**")

325. Under the terms of the Ithaca Trust Agreement, the Protector has the power to, among other things: (a) remove and appoint the Ithaca Trustee; (b) remove and appoint the Investment Advisor; (c) terminate the Ithaca Trust; (d) change the situs of the Ithaca Trust; (e) amend administrative provisions of the Ithaca Trust Agreement; (f) add or exclude beneficiaries; and (g) designate a successor to replace the Protector in the event the Protector resigns or is removed.

326. Under the terms of the Ithaca Trust Agreement, if at any time there is no Protector serving and no successor named who accepts appointment within 30 days of the occurrence of the vacancy, Abhay Javeri shall be the Protector. If Abhay Javeri is unable or unwilling to serve

as Protector, a Protector may be appointed by Purvi Mehta or, if Purvi Mehta is not available or is deceased, by Ami Modi.

327.     Under the terms of the Ithaca Trust Agreement, an appointment of a Protector may impose qualifications or requirements or specify terms and conditions to be fulfilled prior to such appointment taking effect.

328.     Under the terms of the Ithaca Trust Agreement, Nirav Modi has the power to unilaterally remove the Protector. If Nirav Modi "is not available or is deceased," Purvi Mehta inherits this power. If Purvi Mehta "is not available or is deceased," Ami Modi inherits this power.

329.     Since Nirav Modi has the power to remove the Ithaca Protector, which in turn has virtually complete control over the Ithaca Trustee, the Ithaca Investment Advisor, the Ithaca Trust Agreement, and the Ithaca Trust's assets, Nirav Modi enjoys *de facto* total control over the Ithaca Trust and its assets.

330.     On or around August 23, 2017, Deepak Sheth signed and delivered to the Ithaca Trustee separate letters: (a) accepting his appointment as the Ithaca Protector; (b) appointing himself as the Ithaca Investment Advisor; and (c) accepting his appointment as the Ithaca Investment Advisor.

331.     On August 24, 2017, Nirav Modi advised Day Pitney that "the funds are in place with Purvi" and asked for wire instructions for Commonwealth's fiduciary account for the Ithaca Trust.

332.     On August 25, 2017, Purvi Mehta, on her own behalf, and Deepak Sheth, as manager of CPS50P LLC, executed an agreement under which Mehta assigned her interest in the Ritz Carlton sale contract to CPS50P LLC.

63

333.     On August 28, 2017, Deepak Sheth, in his capacity as Investment Advisor of the Ithaca Trust, signed and delivered a letter directing Commonwealth as Ithaca Trustee to: (a) accept an assignment from Purvi Mehta of the 100% membership interest in the CPS50; (b) execute an Amended and Restated Operating Agreement for CPS50; and (c) make an initial capital contribution in the amount of $23,000,000 to CPS50 by wiring that amount to the Katz & Matz LLP escrow account to fund the purchase of the Ritz Carlton Apartment.

334.     That same day, Deepak Sheth, in his capacity as manager of CPS50, executed CPS50's amended and restated operating agreement.

335.     On August 29, 2017, Purvi Mehta assigned the membership interest in CPS50 to the Ithaca Trust.

336.     On August 30, 2017, Modi emailed Day Pitney attorneys and other professionals informing them that $23 million had been wired from Mehta to Commonwealth and directing Commonwealth to further wire the funds to attorneys at Katz & Matz to execute the purchase of the Ritz Carlton Apartment.  Mehta was not on the email thread.

337.     Also on August 30, 2017, Katz & Matz attorney Steven Matz emailed Nirav Modi and others with instructions for the September 7, 2017 closing of the Ithaca Trust's purchase of the Ritz Carlton Apartment. Once again, Mehta was not on the email thread.

338.     On August 31, 2017, Mehta transferred $23 million to Commonwealth, as trustee of The Ithaca Trust. Commonwealth then transferred those funds to the Katz & Matz escrow account, where they were subsequently used to buy the Ritz Carlton Apartment.

339.     On September 1, 2017, Ami Modi returned $25 million of the funds Purvi Mehta had "loaned" to her in May 2017 (which had been sitting in Ami Modi's HSBC bank account) to Purvi Mehta.

64

340. On September 6, 2017, Katz & Matz issued a $22,567,465.92 check to the sellers of the Ritz Carlton Apartment in connection with the closing of the sale.

341. On September 25, 2017, Ami Modi wired another $6,500,000 to Purvi Mehta as a purported loan repayment.

342. On September 29, 2017 FHL wired $8,860,000 to Purvi Mehta as a "loan repayment."

343. On October 5, 2017, Ami Modi received $70,000 from Mihir Bhansali and wired another $406,188 to Purvi Mehta as a purported loan repayment.

344. On October 18, 2017, FHL wired $30,000,000 to Purvi Mehta to redeem non-voting preference shares.

345. On November 10, 2017, FHL wired $15,000,000 to Purvi Mehta to redeem non-voting preference shares. Thus, from September through November 2017, approximately $85,000,000 in proceeds of the Bank Fraud were transferred to Purvi Mehta.

346. In December 2017, Ajay Gandhi opened a CitiBank account for CPS50. Gandhi listed himself as "president" of CPS50 in the application materials. Ajay Gandhi and Abhay Javeri served as the authorized signors on the account.

347. On November 8, 2017, Deepak Sheth, as Ithaca Investment Advisor, directed Commonwealth, as Ithaca Trustee, to remove Deepak Sheth as manager, president, and chief executive officer of CPS50 and appoint Abhay Javeri as his replacement in those positions. That same day, Deepak Sheth also resigned as investment advisor (but not protector) of the Ithaca Trust and appointed Abhay Javeri as his replacement.

348. With the Ritz Carlton Apartment transaction complete, Nirav Modi and his co-conspirators returned their attention to divesting FGI's ownership of CPRE and the Essex House Apartment.

65

349. On December 4, 2017, by email, Nirav Modi told Ajay Gandhi to pay off the HSBC mortgage on the Essex House Apartment in full.

350. Gandhi contacted HSBC indicating that there was an urgent need to for the Ithaca Trust to assume the mortgage on the Essex House and transfer the liability from FGI to the Ithaca Trust. Gandhi soon determined the mortgage could not be transferred quickly enough and decided instead to arrange to have the mortgage paid off completely.

351. On December 5, 2017, Gandhi wired $3 million from FDI to HSBC in satisfaction of HSBC's mortgage on the Essex House using funds originally from Jaffe and Fantasy as well as from FDI's own account and from an HSBC line of credit.

352. In addition to the mortgage payoff, FDI had made at least $856,335 of the monthly payments on the Essex House Apartment mortgage between 2011 and 2018, and also paid JW Marriott Essex House NY $15,828.35 in January 2018, after CPRE was transferred from FGI to the Ithaca Trust.

353. With the mortgage retired, Nirav Modi asked Marks Paneth and Day Pitney to devise a strategy to transfer the unencumbered property (worth approximately $6 million) to the Ithaca Trust.

354. On December 15, 2017, one of Modi's accountants emailed Modi with three potential options for minimizing transfer taxes on "the movement of CPRE." The first option was for Nirav Modi to purchase CPRE directly from FGI, the second for Ami Modi to purchase CPRE directly, and the third was using the Ithaca Trust to make the purchase after Purvi Mehta contributed more cash to the trust. The accountant explained that, "since [Modi] prefer[red] to fast track the transaction," the existing trust could be used and then the trustee could "move the LLC to another trust in due time." The trust would use the funds from Purvi Mehta to purchase

66

CPRE from FGI, thus becoming the indirect owner of the Essex House Apartment. Modi chose the third option.

355. On December 27, 2017, Abhay Javeri, as Ithaca Investment Advisor, signed and delivered to Commonwealth as Ithaca Trustee a letter of direction instructing Commonwealth to "become the sole member of [CPRE] by purchasing a 100% membership interest in [CPRE] for $6,000,000."

356. On December 28, 2017, Ajay Gandhi, on behalf of FGI, as treasurer, and on behalf of CPRE, as chief financial officer, and Commonwealth, as Ithaca Trustee, executed the agreement for the sale of CPRE to the Ithaca Trust.

357. On December 29, 2017, Nirav Modi emailed professionals from Day Pitney and Marks Paneth and others to announce that "[t]he funds have been wired value today."

358. The funds did not clear Purvi Mehta's Singapore bank account until January 1, 2018. The Ithaca Trust then wired $6 million to FGI's HSBC account for the purchase of CPRE. FGI then transferred the equity interests in CPRE to the Ithaca Trust (the "**CPRE Equity Transfer**").

359. On January 17, 2018, after the Ithaca Trust purchased CPRE LLC, Ajay Gandhi consulted Day Pitney about transferring additional funds to the Ithaca Trust for use in connection with the Essex House Apartment and Ritz Carlton Apartment.

360. Day Pitney lawyers told Ajay Gandhi, Nirav Modi, and Purvi Mehta that "to fund either of the LLC accounts, the funds will first have to be transferred to the Ithaca Trust account, and Abhay Javeri, as Investment Advisor of the Ithaca Trust, will have to direct the trustee accordingly." Immeke Schmidt of Day Pitney followed up, "Purvi, as settlor of the trust, would fund the trust with her own assets from a non-US account in her name." Nirav responded, asking

for the instructions to wire funds to the Ithaca Trust, which a Day Pitney attorney provided in response.

361.    On January 17, 2018, Ajay Gandhi, on behalf of CPS50, executed an agreement with Izeu, a French interior design firm, under which Izeu provided interior design services for the Ritz Carlton Apartment.

362.    On January 18, 2018, $1 million was wired from Purvi' Mehta's Singapore bank account to Commonwealth. That same day, Abhay Javeri, as investment advisor of the Ithaca Trust, sent Commonwealth a letter instructing Commonwealth to make a $1 million capital contribution to CPS50. The next day, Commonwealth wired $1 million to CPS50's Citibank account. That same day, an international wire in the amount of $84,665.25 was made from CPS50's Citibank account to Izeu. On February 13, 2018, an additional $237,176.75 was wired internationally to Izeu.

363.    By March 2018, Commonwealth had flagged the Ithaca Trust as a "high risk trust" and internally expressed concern about serving as Ithaca Trustee. On March 13, 2018, Commonwealth sent notices to Deepak Sheth, as Protector of the Ithaca Trust, and Purvi Mehta, as settlor of the Ithaca Trust, informing them that Commonwealth was resigning as Ithaca Trustee effective as of April 13, 2018.

364.    At some point between March 13, 2018 and May 25, 2018, Deepak Sheth resigned or was removed as Ithaca Protector.

365.    On May 25, 2018, Ami Modi executed a deed appointing Nehal Modi as Ithaca Protector. The deed contained recital indicating that: (a) Abhay Javeri had renounced his appointment as successor Protector of the Ithaca Trust; and (b) Purvi Mehta "released the power to appoint a Protector on August 23, 2017."

68

366.     That same day, Nehal Modi signed and delivered his acceptance of his appointment as Ithaca Protector; executed a deed removing Abhay Javeri as Ithacha Investment Advisor and appointing himself as the replacement; executed a deed appointing Trident as Ithaca Trustee.; and executed a deed amending the Ithaca Trust Agreement to change the governing law from Delaware law to South Dakota law.

367.     That same day, Abhay Javeri, as Ithaca Investment Advisor, signed and delivered a letter of direction instructing Trident, as Ithaca Trustee, to remove Abhay Javeri as manager of CPS50 and appoint Nitin Dattani as his replacement.

368.     As alleged above, around this same time, Nitin Dattani was working with Angelina Ypma, Mihir Bhansali, Ajay Gandhi, and Anthony Allicock to divert NMLUK's assets to Hong Kong and was also helping Nirav Modi establish Diamonds Holdings Ltd. while Nirav Modi was in hiding in London.

369.     On information and belief, Trident remains Ithaca Trustee, Nehal Modi remains Ithaca Protector, Abhay Javeri remains Ithaca Investment Advisor, and Nitin Dattani remains manager of CPS50. On information and belief, Mihir Bhansali and Ajay Gandhi remain manager and treasurer, respectively, of CPRE.

370.     In sum, numerous members of Nirav Modi's and Ami Modi's family, including Purvi Mehta, Mihir Bhansali, Deepak Sheth, and Abhay Javeri worked together and with Ajay Gandhi and other co-conspirators to effectuate the foregoing transactions concerning Nirav Modi's and Ami Modi's personal real estate holdings as part of an effort to insulate millions of dollars in ill-gotten assets from creditors.

## CLAIMS FOR RELIEF

## COUNT 1

### Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act ("RICO")
### 18 U.S.C. § 1962(d)
### (Debtors' Claim Against All Defendants)

371.     Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

372.     Nirav Modi, Mihir Bhansali, Ajay Gandhi, and each Defendant are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

373.     As alleged below, each Defendant violated 18 U.S.C. § 1962(d) by agreeing to join, participate in, or support a conspiracy under which one or more persons, including Nirav Modi, Mihir Bhansali, and Ajay Gandhi, would conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

#### Nirav Modi, Mihir Bhansali, and Ajay Gandhi's Substantive RICO Violation

374.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi each violated 18 U.S.C. § 1962(c) by their respective acts, described in the prior paragraphs and as further described below.

375.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged below.

376.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi each committed at least two predicate acts of racketeering, as more specifically alleged below. The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participants, victims, or method of commission. Further, the acts of racketeering were continuous, spanning the period from at least 2010 to mid-2018.

70

## The RICO Enterprise

377.     Each of the U.S. Entities is a corporation. Each of the U.S. Entities is therefore an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

378.     Alternatively, the Firestar Entities, collectively, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of designing, manufacturing, and selling diamonds and jewelry.

379.     Alternatively, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, together with their known and unknown co-conspirators, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of formulating and implementing a common scheme to defraud PNB for their personal enrichment through a pattern of fraud, lies, deceit, and corruption. Such common purpose came into existence no later than 2010, when Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators implemented a scheme to defraud PNB by fraudulently obtaining LOUs by exploiting the web of Shadow Entities, LOU Entities, and other Modi-Controlled Entities.

380.     Whether conceptualized in the manner described in paragraph 377, paragraph 378, or paragraph 379, there existed during and after the Relevant Period one or more enterprises within the meaning of 18 U.S.C. § 1964(4) (the "**RICO Enterprise**").

381.     At all relevant times, Nirav Modi, Mihir Bhansali, and Ajay Gandhi each were employed by or associated with the RICO Enterprise, and each conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity.

382.     The RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

71

383. The RICO Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and its activities affected, interstate and foreign commerce.

384. The repeated and continuous violations of federal criminal law alleged in this Complaint constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq*.

385. Nirav Modi, Mihir Bhansali, and Ajay Gandhi are central and controlling figures in the RICO Enterprise, and have directed others to take actions necessary to accomplish the overall aims of the RICO Enterprise.

### The Pattern of Racketeering Activity

386. Nirav Modi, Mihir Bhansali, and Ajay Gandhi conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons (the "**RICO Pattern**").

### Predicate Acts: Mail and Wire Fraud, Violations of 18 U.S.C. § 1341, 1343

387. The RICO Pattern included numerous acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

388. Nirav Modi, Mihir Bhansali, and Ajay Gandhi voluntarily and intentionally devised and participated in one or more criminal schemes to perpetrate actual fraudulent transfers of the Debtors' and U.S. Affiliates' assets during and after the Relevant Period, including without limitation, the transfers described above, in Appendix A, and in Schedules A through L.

389. In furtherance of such scheme or schemes, Nirav Modi, Mihir Bhansali, and Ajay Gandhi willfully and knowingly transmitted, or caused to be transmitted, by means of (1) causing matters and things to be placed in any post office or authorized depository, or deposited or

caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds.

390.     The wires and mailings supporting such scheme or schemes to defraud included monetary wire transfers, shipments of inventory, telephone and electronic communications, and physical mailings of letters and other documents and communications.

391.     The use of interstate and international mail and wires to perpetrate these actual fraudulent transfers and to connect this international racketeering conspiracy was foreseeable.

392.     Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi committed numerous violations of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

393.     Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 1341 and 1343 directly and proximately caused injury to each U.S. Entity's business and property by unjustifiably and irrevocably depleting their assets in the amount of such transfers.

**Predicate Acts: National Stolen Property Act, Violations of 18 U.S.C. §§ 2314, 2315**

394.     The RICO Pattern included numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

395.     In many cases, Nirav Modi, Ajay Gandhi, and Mihir Bhansali caused the U.S. Affiliates, upon receiving actual fraudulent transfers from the Debtors, to subsequently transfer the proceeds of such actual fraudulent transfers to Shadow Entities or other Modi-Controlled Entities. Specific examples of such transactions are described in Appendix A-395 hereto.

396.     Based on the transfers by U.S. Affiliates of funds fraudulently received from the Debtors to foreign Modi-Controlled Entities alleged in paragraph 395 of this Complaint (the "**Subsequent Transfers**"), Nirav Modi, Mihir Bhansali, and Ajay Gandhi willfully and knowingly transported, transmitted, or transferred in interstate or foreign commerce—or received,

73

possessed, concealed, stored, bartered, sold, disposed of, or pledged as security for a loan—goods, wares, merchandise, securities, or money that crossed an interstate or international boundary after being stolen, converted, or taken by fraud.

397.    For each Subsequent Transfer, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, knew that the funds involved had been fraudulently transferred from the applicable Debtor to the applicable U.S. Affiliate or had otherwise been stolen, converted, or taken by fraud.

398.    Each Subsequent Transfer involved money or property having a value of $5,000 or more.

399.    Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, committed numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

400.    Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 2314 and 2315 directly and proximately caused injury to each Debtor's business and property by impairing the Debtors' ability to recover the value of the Subsequent Transfers.

**Predicate Acts: Money Laundering, Violations of 18 U.S.C. §§ 1956, 1957.**

401.    The RICO Pattern included numerous acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957.

402.    Each actual fraudulent transfer and each Subsequent Transfer supported and furthered the Bank Fraud by, at a minimum: (a) facilitating the reduction of outstanding payables and receivables among Modi-Controlled Entities so as to avert detection of the Bank Fraud; (b) layering the movement of funds so as to make them difficult to trace.

403.    Each actual fraudulent transfer and each Subsequent Transfer occurred, in whole or in part, in the United States.

404.    Each actual fraudulent transfer and each Subsequent Transfer involved or resulted from one or more acts of wire fraud.

74

405. Accordingly, each actual fraudulent transfer and each Subsequent Transfer constituted, involved, or resulted from an offense against India, a foreign nation, involving fraud, or a scheme or attempt to defraud, against PNB, a foreign bank.

406. Additionally, each actual fraudulent transfer was designed to deplete the applicable Debtor's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such Debtor's creditors.

407. Additionally, each Subsequent Transfer was designed to deplete the applicable U.S. Affiliate's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such U.S. Affiliate's creditors, including the applicable Debtor or Debtors.

408. Accordingly, each actual fraudulent transfer and each Subsequent Transfer constituted, involved, or was the result of specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7).

409. Each Subsequent Transfer affected interstate or foreign commerce and involved the movement of funds by wire or other means from a place in the United States to or through a place outside of the United States.

410. Each Subsequent Transfer involved funds that were derived from or obtained or retained, directly or indirectly, from an actual fraudulent transfer and unlawful activity related to such actual fraudulent transfer.

411. Nirav Modi, Mihir Bhansali, and Ajay Gandhi orchestrated or conducted each Subsequent Transfer with the intent to promote the carrying on of specified unlawful activity, including in relation to: (a) fraudulently depleting the applicable Debtor's and U.S. Affiliate's assets; and (b) the Bank Fraud more generally.

412. Nirav Modi, Mihir Bhansali, and Ajay Gandhi knew that each Subsequent Transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the

75

ownership, or the control of the funds derived from the actual fraudulent transfer preceding such Subsequent Transfer.

413.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi knew that the property involved in each Subsequent Transfer represented the proceeds of some form of unlawful activity.

414.    Each Subsequent Transfer involved a monetary transaction in criminally derived property of a value of greater than $10,000 and derived from specified unlawful activity.

415.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi agreed, expressly or implicitly, to: (a) effectuate each actual fraudulent transfer and each Subsequent Transfer; (b) fraudulently deplete the Debtors' and U.S. Affiliates' assets; and (c) perpetrate the Bank Fraud.

416.    Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi committed, and conspired to commit, numerous acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

417.    Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 1956 and 1957 directly and proximately caused injury to each Debtor's business and property by impairing the Debtors' ability to recover the value of the Subsequent Transfers.

### Predicate Acts: Obstruction of Justice, Violations of 18 U.S.C. §§ 1503, 1512

418.    The RICO Pattern included more than one act of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

419.    Based on the allegations set forth in paragraph 275 of this Complaint concerning the Dubai-based Shadow Entity personnel, upon information and belief, Nirav Modi and Bhansali, or others operating at their direction, knowingly intimidated, threatened, or corruptly persuaded such Shadow Entity personnel, or engaged in misleading conduct toward such Shadow Entity personnel, with the intent to influence, delay, or prevent the testimony of such Shadow Entity personnel in an official proceeding, including these chapter 11 cases, and to cause

or induce such Shadow Entity personnel to withhold testimony, or withhold a record, document or other object, from an official proceeding, including these chapter 11 cases.

420.  Additionally, Mihir Bhansali corruptly altered, destroyed, mutilated, or concealed records, documents or other objects, or attempted to do so, as demonstrated by the following actions, alleged in more detail above, which Mihir Bhansali, or others operating at his or Nirav Modi's direction, took in the weeks prior to and following the Petition Date:

(i)  Mihir Bhansali researched methods for deleting internet history, browsing the internet anonymously, communicating through encrypted and self-deleting messages, and encrypting computer data;

(ii)  Mihir Bhansali downloaded, installed, and, upon information and belief, used software designed for such purposes;

(iii)  Upon information and belief, Mihir Bhansali deleted or attempted to delete all copies of the spreadsheets described in paragraph 106 of this Complaint.

(iv)  Mihir Bhansali directed Saju Poulose to "send all non-Firestar comp[uter]s to HK[.]"

(v)  Nehal Modi, operating at the direction of or in coordination with Nirav Modi and Mihir Bhansali, destroyed mobile phones of various Shadow Entity personnel and other servers, documents, and records.

421.  Moreover, Mihir Bhansali corruptly obstructed, influenced, or impeded an official proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above, knowingly and intentionally making material misstatements, misrepresentations, and omissions under penalty of perjury in connection with the Debtors' chapter 11 cases concerning the Debtors' relationship with Shadow Entities and the Debtors' involvement in the Bank Fraud.

422.  Moreover, based on the same allegations, Mihir Bhansali corruptly endeavored to influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the discharge of his duty.

423. Moreover, based on the same allegations, Mihir Bhansali corruptly endeavored to influence, obstruct, or impede the due administration of justice.

424. Similarly, Ajay Gandhi corruptly obstructed, influenced, or impeded an official proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above, (a) knowingly and intentionally signing the Debtors' respective SOFAs under penalty of perjury without disclosing the Debtors' involvement in the Bank Fraud, their relationship with various Shadow Entities, and the substantial loan balances owed by NMI to Jaffe, or the significant transfers of the Debtors' assets to Shadow Entities and other Modi-Controlled Entities that were required to be disclosed in the SOFAs; and (b) feigning ignorance and outright lying to the Examiner concerning the Debtors' and his personal involvement in the transactions supporting the Bank Fraud.

425. Moreover, based on the same allegations, Ajay Gandhi corruptly endeavored to influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the discharge of his duty.

426. Moreover, based on the same allegations, Ajay Gandhi corruptly endeavored to influence, obstruct, or impede the due administration of justice.

427. In taking such actions, Mihir Bhansali's and Ajay Gandhi's purpose was to impair the integrity or availability of evidence for use in an official proceeding, including these chapter 11 cases, or to otherwise obstruct, influence, or impede an official proceeding, including these chapter 11 cases.

428. Nirav Modi, Mihir Bhansali, and Ajay Gandhi agreed, expressly or implicitly, with each other and others, including Nehal Modi, to commit each of the obstruction of justice offenses alleged in this Complaint.

78

429. Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, and other co-conspirators, including Nehal Modi, committed, and conspired to commit, numerous acts of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

430. Nirav Modi, Mihir Bhansali, and Ajay Gandhi's violations of 18 U.S.C. §§ 1503 and 1512 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Mihir Bhansali and Ajay Gandhi failed to disclose and, upon information and belief, actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

**Predicate Acts: Bankruptcy Fraud, Violations of 18 U.S.C. § 152**

431. The RICO Pattern included more than one act of bankruptcy fraud in violation of 18 U.S.C. § 152.

432. Based on the allegations set forth in, *inter alia*, paragraphs 421 and 424 of this Complaint, Mihir Bhansali and Ajay Gandhi each knowingly and fraudulently made one or more false oaths or accounts in or relation to these chapter 11 cases.

433. Based on those same allegations, Mihir Bhansali and Ajay Gandhi each knowingly and fraudulently made one or more false declarations, certificates, verifications, or statements under penalty of perjury in or in relation to these chapter 11 cases.

434. Based on those same allegations, Mihir Bhansali and Ajay Gandhi, after the filing of these chapter 11 cases, knowingly and fraudulently withheld from a custodian, trustee, marshal, or other officer of this Court, including the Examiner, recorded information relating to the property or financial affairs of the Debtors.

79

435. Based on those same allegations, Mihir Bhansali and Ajay Gandhi knowingly and fraudulently concealed from creditors, the United States Trustee, the Trustee, and this Court property belonging to the Debtors' estates, including the substantial loan receivable owed by NMI to Jaffe.

436. Accordingly, Mihir Bhansali and Ajay Gandhi committed acts of bankruptcy fraud in violation of 18 U.S.C. § 152.

437. Mihir Bhansali's and Ajay Gandhi's violations of 18 U.S.C. § 152 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Bhansali and Gandhi failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

**Continuity of Conduct**

438. Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of law as set forth herein, each of which directly and proximately injured the Debtors and U.S. Affiliates, constituted a continuous course of conduct in the United States beginning no later than 2010 and continuing at least through October 2018, which was intended to obtain economic gain through false representations, fraud, deceit, and other improper and unlawful means. Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

**The RICO Pattern Caused Injury to the Debtors and U.S. Affiliates**

439. Each Debtor has been injured in its business or property as a direct result and proximate result of Modi, Bhansali, and Gandhi's violations, described above, of 18 U.S.C. § 1962(c), including any injury by reason of the predicate acts constituting the RICO Pattern.

80

440.     Prior to Defendants' racketeering activities, each of the Debtors operated as a legitimate business built on fruitful relationships with reputable customers.

441.     Firestar was incorporated in 2004 for the purposes of acquiring Frederick Goldman, Inc., which was one of FIL's U.S. customers. Firestar historically operated as a distributor and wholesaler of finished gold and diamond jewelry. Its customer base consisted of legitimate jewelry retailers such as Zales, JCPenney, and Macy's.

442.     Fantasy was incorporated in 2012 for the purpose of holding the exclusive license from Chicago-based Fantasy Diamond Corp. to supply the Endless Diamond Brand to U.S. retailers. Fantasy was created primarily to conduct business with Costco Wholesale Corporation based on sales attributable to the Endless Diamond Brand. Fantasy's other customers include Zales, Sam's Club, and Walmart. Fantasy sold finished jewelry, generally at a higher price point than Firestar.

443.     Jaffe is the successor to New York-based Sandberg & Sikorksi Corporation, whose predecessors date back to 1892. Sandberg & Sikorski historically consisted of two divisions, one that sold to major U.S. retailers and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers. In 2007, FIL purchased a 95% stake in Sandberg & Sikorski. Sandberg & Sikorski was renamed A. Jaffe, Inc. in 2011. It did not become fully integrated within the operations of the other Firestar Entities until 2016.

444.     Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of federal law in furtherance of their scheme or schemes to loot the Debtors' and U.S. Affiliates' assets through a series of actual fraudulent transfers and to conceal the nature of such transfers by corruptly impeding, influencing, or obstructing these chapter 11 cases resulted in: (a) each Debtor's and each U.S. Affiliate's assets being unjustifiably and irrevocably depleted in the amount of the applicable actual fraudulent transfers, (b) each Debtor's chapter 11 estate incurring substantial

administrative expenses stemming from Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's obstruction of the Examiner's and Trustee's investigations that would not otherwise have been incurred, (c) the impairment of each Debtor's ability to sell their assets at going-concern value, and (d) the frustration of the Debtors' and U.S. Affiliates' ability to collect substantial debts owed to them by Shadow Entities and overseas Firestar Entities.

**Defendants' Agreement to Violate RICO**

445. At all relevant times, each Defendant, together with each other and with Nirav Modi, Mihir Bhansali, and Ajay Gandhi, and others known and unknown, being persons employed by or associated with the RICO Enterprise, have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) (the "**RICO Conspiracy**").

446. Defendant Purvi Mehta's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Mehta was the beneficial owner of numerous Shadow Entities, Twin Fields, and numerous other offshore shell companies used to further the Bank Fraud and launder its proceeds.

b. Mehta, through Islington, invested $45 million in proceeds of the Bank Fraud in FIPL to fund the 2017 "restructuring" of the Firestar Entities in connection with which Mehta subsequently received over $85 million in proceeds of the Bank Fraud.

c. Mehta settled and funded the Ithaca Trust to launder proceeds of the Bank Fraud for the benefit of Nirav Modi and Ami Modi and to shield ill-gotten assets from creditors.

d. Mehta wired Mihir Bhansali $1.5 million as a purported loan just weeks before Bhansali purchased a $7.1 million apartment.

82

447. Defendant Ami Javeri's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Javeri served as a partner of all three LOU entities and, in 2010, opened bank accounts for Solar and Stellar used to defraud PNB.

b. Javeri is the primary beneficiary of the Ithaca Trust and the beneficial owner of the Ritz Carlton Apartment and the Essex House Apartment.

c. Javeri received more than $30 million in proceeds of the Bank Fraud from Purvi Mehta in May and June 2017.

d. Javeri wired more than $30 million in proceeds of the Bank Fraud to Purvi Mehta between September and November 2017.

e. Javeri fled India just weeks before the fraudulent LOUs issued in 2017 became due and the Bank Fraud was exposed.

f. Javeri appointed Nehal Modi as Ithaca Trust Protector in May 2017.

448. Defendant Nehal Modi's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Nehal Modi traveled overseas with Mihir Bhansali after exposure of the Bank Fraud to threaten and bribe witnesses, destroy evidence, and remove assets.

b. Nehal Modi enlisted his personal friends, including Anthony Allicock, Rochelle Miller, and Tamer Abou El Ata, to divert the U.S. Affiliates' assets to Hong Kong following exposure of the Bank Fraud.

c. Nehal Modi became Ithaca Trust Protector following exposure of the Bank Fraud.

d. Nehal Modi, along with Mihir Bhansali, managed BBB Group as a front for the Modi family's money laundering efforts.

e. Nehal Modi managed Gitanjali USA, Samuels, Diamlink, and other Choksi-controlled entities used to defraud PNB.

449. Defendant Neeshal Modi's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Neeshal Modi served as a partner of all three LOU Entities and, in 2016, selected and appointed additional "dummy" partners for the LOU Entities.

b. Neeshal Modi was the beneficial owner of numerous Shadow Entities, other offshore shell companies used to further the Bank Fraud and launder its proceeds.

c. Neeshal Modi, along with Mihir Bhansali, selected and hired various Shadow Entity personnel throughout the Relevant Period.

d. Neeshal Modi orchestrated numerous fraudulent transactions among FD BVBA and Shadow Entities to further the Bank Fraud throughout the Relevant Period.

e. Neeshal Modi had a power of attorney for Purvi Mehta and signed agreements on her behalf, including for Purvi Mehta's purchase of a Hong Kong apartment in April 2017 for approximately $2.7 million.

450. The Ithaca Trust's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Nirav Modi enjoys complete control over the Ithaca Trust, the Ithaca Trustee, the Ithaca Protector, the Ithaca Investment Advisor, the Ithaca Trust Agreement, and all of the assets in the Ithaca Trust.

b. The Ithaca Trust was settled by Purvi Mehta, one of the Modi family's primary money laundering conduits.

c. The Ithaca Trust purchased the Ritz Carlton Apartment using the proceeds of the Bank Fraud received from Purvi Mehta.

d. The Ithaca Trust purchased the membership interests on CPRE, which owns the Essex House Apartment, using proceeds of the Bank Fraud received from Purvi Mehta.

e. Deepak Sheth, the original Ithaca Protector and Ithaca Investment Advisor, participated in the Bank Fraud through the Sheth Entities throughout the Relevant Period.

f. Abhay Javeri, who succeeded Deepak Sheth as Ithaca Investment Advisor and served as the default Ithaca Protector, participated in the Bank Fraud through the SDC Entities throughout the Relevant Period.

g. Nehal Modi, who Ami Modi appointed Ithaca Protector in May 2018, orchestrated the Modi family's efforts to destroy evidence, tamper with witnesses, and divert assets from the reach of creditors following exposure of the Bank Fraud.

451.  Defendant CPS50's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.  Nirav Modi enjoys complete control over CPS50 through his complete control over the Ithaca Trust.

b.  Deepak Sheth, the CPS50's original manager, participated in the Bank Fraud through the Sheth Entities throughout the Relevant Period.

c.  Abhay Javeri, who succeeded Deepak Sheth as CPS50's manager, participated in the Bank Fraud through the SDC Entities throughout the Relevant Period.

d.  Nitin Dattani, who succeeded Abhay Javeri as CPS50's manager in May 2018, worked with Ajay Gandhi, Angelina Ypma, and Mihir Bhansali to divert NMLUK's cash and inventory to Hong Kong following exposure of the Bank Fraud. Dattani also helped Nirav Modi set up a new company while Modi was hiding in London.

e.  Ajay Gandhi, who served as president of CPS50 and as a signatory on its bank account, participated extensively in the Bank Fraud and in the fraudulent efforts following its exposure, as alleged above.

f.  CPS50 purchased the Ritz Carlton Apartment using proceeds of the Bank Fraud.

g.  CPS50 was formed for the purpose of laundering proceeds of the Bank Fraud to and for the benefit of Nirav Modi and Ami Modi.

452.  Defendant CPRE's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.  Nirav Modi enjoys complete control over CPRE through his complete control over the Ithaca Trust.

b.  Mihir Bhansali, who served as sole director and CEO of CPRE, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

c.  Ajay Gandhi, who served as chief financial officer of CPRE, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

85

453.    Defendant Twin Fields' agreement to join and support the RICO Conspiracy is

demonstrated by or can be inferred from, among other things, the following:

a.  Purvi Mehta, who indirectly owns Twin Fields through BVI shell companies, participated extensively in the Bank Fraud and in fraudulent efforts to launder its proceeds beyond the reach of creditors.

b.  Mihir Bhansali, who acted as the de jure or de facto director of Twin Fields, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

c.  Nirav Modi enjoys complete control over Twin Fields through his dominance and control over Purvi Mehta, Mihir Bhansali, and Nehal Modi.

d.  Twin Fields served as a conduit for laundering proceeds of the Bank Fraud, including more than $25 million from Fine Classic, the Shadow Entity directly owned and controlled by Purvi Mehta.

454.    Each Shadow Entity Defendant's agreement to join and support the RICO

Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.  Nirav Modi enjoys complete control over each Shadow Entity Defendant through his dominance and control over Purvi Mehta, Neeshal Modi, and other nominal owners, directors, and officers.

b.  Each Shadow Entity Defendant engaged in millions of dollars in fraudulent import and export transactions with LOU Entities, Firestar Entities, and other Shadow Entities during the Relevant Period to further the Bank Fraud and to launder its proceeds.

c.  Each Shadow Entity Defendant was established and operated for the sole purpose of furthering the Bank Fraud and laundering its proceeds.

455.    Each Defendant knew that they were engaged in a conspiracy to commit the

predicate acts and knew that the predicate acts were part of such racketeering activity, and the

participation and agreement of each of them was necessary to allow the commission of this

pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C.

§ 1962(c), in violation of 18 U.S.C. § 1962(d).

456. Each Defendant agreed to conduct or participate in, directly or indirectly, the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above.

457. As part of the conspiracy, each Defendant, at times acting through certain of their agents, and representatives, or co-conspirators, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

458. As a direct and proximate result of the Defendants' RICO Conspiracy, the pattern of racketeering activity through which they agreed the affairs of the RICO Enterprise would be conducted, the predicate acts and other overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), each of the Debtors has been injured in its business and property.

459. Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the general and special compensatory damages suffered by each Debtor, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

## COUNT 2

### Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(d) (U.S. Affiliates' Claim Against All Defendants)

460. Plaintiff restates and re-alleges paragraphs 1 through 459 of this Complaint as though fully set forth herein.

461. Plaintiff, as assignee of the U.S. Affiliates, has standing to bring any and all claims or causes of action of the U.S. Affiliates.

462. As a direct and proximate result of the Defendants' RICO Conspiracy, the pattern of racketeering activity through which they agreed the affairs of the RICO Enterprise would be conducted, the predicate acts and other overt acts taken in furtherance of that conspiracy, and

violations of 18 U.S.C. § 1962(d), each of the U.S. Affiliates has been injured in its business and property.

463. Each mailing or shipment of the U.S. Affiliates' inventory or other assets in furtherance of the RICO Conspiracy constituted a violation of 18 U.S.C. § 1341.

464. Each wire or other electronic transfer of the U.S. Affiliates' funds in furtherance of the RICO Conspiracy constituted a violation of 18 U.S.C. § 1343.

465. Each violation of 18 U.S.C. § 1341 or 1343 involving transfers of a U.S. Affiliate's assets directly and proximately injured such U.S. Affiliate by depleting its assets.

466. Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the general and special compensatory damages suffered by each U.S. Affiliate, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

## COUNT 3

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279
### (Synergies-Mehta Transfer)

467. Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

468. As alleged and defined above as the Synergies-Mehta Transfer, on July 13, 2017, Synergies wired $14,575,000 to Purvi Mehta as part of the fraudulent laundering of funds through the Firestar Entities to Mehta in 2017.

469. The Synergies-Mehta Transfer constituted a transfer of an interest in Synergies' property.

470. The Synergies-Mehta Transfer was made, mediately or immediately, by Synergies to Purvi Mehta.

471. Plaintiff holds a judgment against Synergies.

88

472.     The Synergies-Mehta Transfer was made with the actual intent to hinder or delay or defraud creditors, including the Trustee, within the meaning of section 276 of the New York Debtor & Creditor Law ("**N.Y. DCL**"). Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Synergies-Mehta Transfer in order to launder and siphon illicit proceeds of the Bank Fraud and other valuable assets for the benefit of Purvi Mehta, Ami Modi, Nirav Modi, and others.

473.     Plaintiff, as a creditor of Synergies, may set aside the Synergies-Mehta Transfer, disregard the Synergies-Mehta Transfer, and attach or levy execution upon the property conveyed under sections 278 and 279 of the New York Debtor & Creditor Law.

474.     Alternatively, Plaintiff is entitled to a monetary damages in the amount of the Synergies-Mehta Transfer.

475.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under N.Y. DCL section 276-a, and as otherwise permitted by law.

## COUNT 4

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279
(Synergies-Mehta Transfer)**

476.     Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

477.     The Synergies-Mehta Transfer constituted a transfer of an interest in Synergies' property.

478.     The Synergies-Mehta Transfer was made, mediately or immediately, by Synergies to Purvi Mehta.

479.     Plaintiff holds a judgment against Synergies.

480.     The Synergies-Mehta Transfer was made without fair consideration.

89

481. On the date the Synergies-Mehta Transfer was made, Synergies was insolvent or was rendered insolvent as a result of such transfer.

482. Plaintiff, as a creditor of Synergies, may set aside the Synergies-Mehta Transfer, disregard the Synergies-Mehta Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

483. Alternatively, Plaintiff is entitled to a monetary damages in the amount of the Synergies-Mehta Transfer.

## COUNT 5

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279
### (CPRE Equity Transfer)

484. Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

485. As alleged and defined above as the CPRE Equity Transfer, on or around January 1, 2018, FGI transferred a 100% equity interest in CPRE to the Ithaca Trust as part of broader efforts to launder the proceeds of the Bank Fraud and shield assets from creditors.

486. The CPRE Equity Transfer constituted a transfer of an interest in FGI's property.

487. The CPRE Equity Transfer was made by FGI to the Ithaca Trust for the ultimate benefit of Ami Modi.

488. Plaintiff holds a judgment against FGI.

489. The CPRE Equity Transfer was made with the actual intent to hinder or delay or defraud creditors within the meaning of DCL section 276. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Equity Transfer to launder and siphon illicit proceeds of the Bank Fraud and other valuable assets for the benefit of Ami Modi, Nirav Modi, and others.

490.     Plaintiff, as a judgment creditor of FGI, may set aside the CPRE Equity Transfer, disregard the CPRE Equity Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

491.     Alternatively, Plaintiff is entitled to monetary damages in the amount of the CPRE Equity Transfer.

492.     Plaintiff is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 6

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279
(CPRE Equity Transfer)**

493.     Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

494.     The CPRE Equity Transfer constituted a transfer of an interest in FGI's property.

495.     The CPRE Equity Transfer was made by FGI to the Ithaca Trust for the ultimate benefit of Ami Modi.

496.     Plaintiff holds a judgment against FGI.

497.     The CPRE Equity Transfer was made without fair consideration.

498.     On the date the CPRE Equity Transfer was made, FGI was insolvent or was rendered insolvent as a result of such transfer.

499.     Plaintiff, as creditor of FGI, may set aside the CPRE Equity Transfer, disregard the CPRE Equity Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

500.     Alternatively, Plaintiff is entitled to monetary damages equal to the value of the CPRE Equity Transfer.

91

## COUNT 7

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)**
**(CPRE)**

501.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

502.     FDI made numerous cash transfers for the benefit of CPRE within two years of the commencement of FDI's chapter 11 case, as identified on <u>Schedule A</u>, attached hereto (collectively, the "**CPRE Two-Year Transfers**").

503.     The CPRE Two-Year Transfers constituted transfers of interests of FDI in property.

504.     The CPRE Two-Year Transfers were made for the benefit of CPRE.

505.     The CPRE Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the CPRE Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

506.     The Trustee may avoid the CPRE Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

507.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Two-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Two-Year Transfers were made, and from any subsequent transferees.

508.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

92

## COUNT 8

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (CPRE)

509.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

510.     FDI made numerous cash transfers for the benefit of CPRE within six years of the commencement of FDI's chapter 11 case, as identified on Schedule A, attached hereto (collectively, the "**CPRE Six-Year Transfers**").

511.     The CPRE Six-Year Transfers were made for the benefit of CPRE.

512.     The CPRE Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the CPRE Six-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

513.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the CPRE Six-Year Transfers set aside, or who could disregard the CPRE Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

514.     The Trustee may avoid the CPRE Six-Year Transfers under Bankruptcy Code section 544(b)(1).

515.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Six-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Six-Year Transfers were made, and from any subsequent transferees.

516.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 9

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(CPRE)**

517.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

518.     The CPRE Two-Year Transfers constituted transfers of interests of FDI in property.

519.     The CPRE Two-Year Transfers were made for the benefit of CPRE.

520.     FDI received less than reasonably equivalent value in exchange for the CPRE Two-Year Transfers.

521.     FDI was insolvent on the date each CPRE Two-Year Transfer was made, or became insolvent as a result of such transfer.

522.     The Trustee may avoid the CPRE Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

523.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Two-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 10

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(CPRE)**

524.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

525.     The CPRE Six-Year Transfers constituted transfers of interests of FDI in property.

94

526. The CPRE Six-Year Transfers were made for the benefit of CPRE.

527. The CPRE Six-Year Transfers were made by FDI without fair consideration.

528. On the date of each CPRE Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

529. Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the CPRE Six-Year Transfers set aside, or who could disregard the CPRE Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

530. The Trustee may avoid the CPRE Six-Year Transfers under Bankruptcy Code section 544(b)(1).

531. Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Six-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 11

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Auragem)**

532. The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

533. FDI made cash transfers to Auragem within six years of the commencement of FDI's chapter 11 case, as identified on Schedule B, attached hereto (collectively, the "**Auragem Transfers**").

534. The Auragem Transfers were made to or for the benefit of Auragem.

535. The Auragem Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi,

Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Auragem Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Auragem Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

536.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Auragem Transfers set aside, or who could disregard the Auragem Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

537.    The Trustee may avoid the Auragem Transfers under Bankruptcy Code section 544(b)(1).

538.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Auragem Transfers for the benefit of FDI's estate from Auragem, the entity to or for whose benefit the Auragem Transfers were made, and from any subsequent transferees.

539.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 12

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Auragem)

540.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

541.    The Auragem Transfers constituted transfers of interests of FDI in property.

542.    The Auragem Transfers were made to or for the benefit of Auragem.

543.    The Auragem Transfers were made by FDI without fair consideration.

544.     On the date of each Auragem Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

545.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Auragem Transfers set aside, or who could disregard the Auragem Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

546.     The Trustee may avoid the Auragem Transfers under Bankruptcy Code section 544(b)(1).

547.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Auragem Transfers for the benefit of FDI's estate from Auragem, the entity to or for whose benefit the Auragem Transfers were made, and from any subsequent transferees.

## COUNT 13

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Brilliant)

548.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

549.     FDI made numerous cash transfers to Brilliant within two years of the commencement of FDI's chapter 11 case, as identified on Schedule C, attached hereto (collectively, the "**Brilliant Two-Year Transfers**").

550.     The Brilliant Two-Year Transfers constituted transfers of interests of FDI in property.

551.     The Brilliant Two-Year Transfers were made to or for the benefit of Brilliant.

552.     The Brilliant Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-

97

conspirators approved the Brilliant Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Brilliant Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

553.     The Trustee may avoid the Brilliant Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

554.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Two-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Two-Year Transfers were made, and from any subsequent transferees.

555.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 14

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Brilliant)

556.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

557.     FDI made numerous transfers of cash and inventory to Brilliant within six years of the commencement of FDI's chapter 11 case, as identified on Schedule C, attached hereto (collectively, the "**Brilliant Six-Year Transfers**").

558.     The Brilliant Six-Year Transfers were made to or for the benefit of Brilliant.

559.     The Brilliant Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Brilliant Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for

the benefit of Modi, his family, and others. The natural consequence of the Brilliant Six-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

560.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Brilliant Six-Year Transfers set aside, or who could disregard the Brilliant Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

561.    The Trustee may avoid the Brilliant Six-Year Transfers under Bankruptcy Code section 544(b)(1).

562.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Six-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Six-Year Transfers were made, and from any subsequent transferees.

563.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 15

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Brilliant)

564.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

565.    The Brilliant Two-Year Transfers constituted transfers of interests of FDI in property.

566.    The Brilliant Two-Year Transfers were made to or for the benefit of Brilliant.

567.    FDI received less than reasonably equivalent value in exchange for the Brilliant Two-Year Transfers.

568.     FDI was insolvent on the date each Brilliant Two-Year Transfer was made, or became insolvent as a result of such transfer.

569.     The Trustee may avoid the Brilliant Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

570.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Two-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 16

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Brilliant)

571.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

572.     The Brilliant Six-Year Transfers constituted transfers of interests of FDI in property.

573.     The Brilliant Six-Year Transfers were made to or for the benefit of Brilliant.

574.     The Brilliant Six-Year Transfers were made by FDI without fair consideration.

575.     On the date of each Brilliant Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

576.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Brilliant Six-Year Transfers set aside, or who could disregard the Brilliant Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

577.     The Trustee may avoid the Brilliant Six-Year Transfers under Bankruptcy Code section 544(b)(1).

100

578.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Six-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 17

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Diagems)

579.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

580.     FDI made numerous cash transfers to Diagems within six years of the commencement of FDI's chapter 11 case, as identified on Schedule D, attached hereto (collectively, the "**Diagems Transfers**").

581.     The Diagems Transfers were made to or for the benefit of Diagems.

582.     The Diagems Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Diagems Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Diagems Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

583.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Diagems Transfers set aside, or who could disregard the Diagems Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

584.     The Trustee may avoid the Diagems Transfers under Bankruptcy Code section 544(b)(1).

585.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Diagems Transfers for the benefit of FDI's estate from Diagems, the entity to or for whose benefit the Diagems Transfers were made, and from any subsequent transferees.

586.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 18

**Avoidance and Recovery of Constructive Fraudulent Transfers**
**Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(Diagems)**

587.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

588.    The Diagems Transfers constituted transfers of interests of FDI in property.

589.    The Diagems Transfers were made to or for the benefit of Diagems.

590.    The Diagems Transfers were made by FDI without fair consideration.

591.    On the date of each Diagems Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

592.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Diagems Transfers set aside, or who could disregard the Diagems Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

593.    The Trustee may avoid the Diagems Transfers under Bankruptcy Code section 544(b)(1).

594.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Diagems Transfers for the benefit of FDI's estate from Diagems, the entity to or for whose benefit the Diagems Transfers were made, and from any subsequent transferees.

## COUNT 19

**Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(Empire)**

595.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

596.    The Debtors made transfers of inventory to Empire within two years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule E</u>, attached hereto (collectively, the "**Empire Two-Year Transfers**").

597.    The Empire Two-Year Transfers constituted transfers of interests of the Debtors in property.

598.    The Empire Two-Year Transfers were made to or for the benefit of Empire.

599.    The Empire Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Empire Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Empire Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

600.    The Trustee may avoid the Empire Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

601.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Two-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 20

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(Empire)**

602.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

603.    The Debtors made numerous transfers of cash and inventory to Empire within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule E, attached hereto (collectively, the "**Empire Six-Year Transfers**").

604.    The Empire Six-Year Transfers were made to or for the benefit of Empire.

605.    The Empire Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Empire Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Empire Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

606.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Empire Six-Year Transfers set aside, or who could disregard the Empire Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

607.    The Trustee may avoid the Empire Six-Year Transfers under Bankruptcy Code section 544(b)(1).

608.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Six-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Six-Year Transfers were made, and from any subsequent transferees.

609.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 21

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(Empire)**

610.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

611.     The Empire Two-Year Transfers constituted transfers of interests of the Debtors in property.

612.     The Empire Two-Year Transfers were made to or for the benefit of Empire.

613.     The Debtors received less than reasonably equivalent value in exchange for the Empire Two-Year Transfers.

614.     The Debtors were insolvent on the date each Empire Two-Year Transfer was made, or became insolvent as a result of such transfer.

615.     The Trustee may avoid the Empire Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

616.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Two-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Two-Year Transfers were made, and from any subsequent transferees.

105

## COUNT 22

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Empire)

617.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

618.     The Empire Six-Year Transfers constituted transfers of interests of the Debtors in property.

619.     The Empire Six-Year Transfers were made to or for the benefit of Empire.

620.     The Empire Six-Year Transfers were made by the Debtors without fair consideration.

621.     On the date of each Empire Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

622.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Empire Six-Year Transfers set aside, or who could disregard the Empire Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

623.     The Trustee may avoid the Empire Six-Year Transfers under Bankruptcy Code section 544(b)(1).

624.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Six-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Six-Year Transfers were made, and from any subsequent transferees.

106

## COUNT 23

**Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(Eternal)**

625.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

626.     The Debtors made transfers of inventory to Eternal within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule F, attached hereto (collectively, the "**Eternal Two-Year Transfers**").

627.     The Eternal Two-Year Transfers constituted transfers of interests of the Debtors in property.

628.     The Eternal Two-Year Transfers were made to or for the benefit of Eternal.

629.     The Eternal Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Eternal Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Eternal Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

630.     The Trustee may avoid the Eternal Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

631.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Two-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 24

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Eternal)**

632.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

633.     The Debtors made transfers of cash and inventory to Eternal within six years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule F</u>, attached hereto (collectively, the "**Eternal Six-Year Transfers**").

634.     The Eternal Six-Year Transfers were made to or for the benefit of Eternal.

635.     The Eternal Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Eternal Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Eternal Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

636.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Eternal Six-Year Transfers set aside, or who could disregard the Eternal Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

637.     The Trustee may avoid the Eternal Six-Year Transfers under Bankruptcy Code section 544(b)(1).

638. Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Six-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Six-Year Transfers were made, and from any subsequent transferees.

639. The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

**COUNT 25**

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(Eternal)**

640. The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

641. The Eternal Two-Year Transfers constituted transfers of interests of the Debtors in property.

642. The Eternal Two-Year Transfers were made to or for the benefit of Eternal.

643. The Debtors received less than reasonably equivalent value in exchange for the Eternal Two-Year Transfers.

644. The Debtors were insolvent on the date each Eternal Two-Year Transfer was made, or became insolvent as a result of such transfer.

645. The Trustee may avoid the Eternal Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

646. Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Two-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Two-Year Transfers were made, and from any subsequent transferees.

109

## COUNT 26

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Eternal)

647.　The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

648.　The Eternal Six-Year Transfers constituted transfers of interests of the Debtors in property.

649.　The Eternal Six-Year Transfers were made to or for the benefit of Eternal.

650.　The Eternal Six-Year Transfers were made by the Debtors without fair consideration.

651.　On the date of each Eternal Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

652.　Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Eternal Six-Year Transfers set aside, or who could disregard the Eternal Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

653.　The Trustee may avoid the Eternal Six-Year Transfers under Bankruptcy Code section 544(b)(1).

654.　Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Six-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 27

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)**
**(Fancy Creations)**

655.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

656.     The Debtors made numerous transfers of cash and inventory to Fancy Creations within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule G, attached hereto (collectively, the "**Fancy Creations Two-Year Transfers**").

657.     The Fancy Creations Two-Year Transfers constituted transfers of interests of the Debtors in property.

658.     The Fancy Creations Two-Year Transfers were made to or for the benefit of Fancy Creations.

659.     The Fancy Creations Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Fancy Creations Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Fancy Creations Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

660.     The Trustee may avoid the Fancy Creations Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

661.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Two-Year Transfers for the benefit of the Debtors' estates from Fancy Creations, the entity to or for whose benefit the Fancy Creations Two-Year Transfers were made, and from any subsequent transferees.

111

## COUNT 28

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Fancy Creations)**

662.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

663.     The Debtors made numerous transfers of cash and inventory to Fancy Creations within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule G, attached hereto (collectively, the "**Fancy Creations Six-Year Transfers**").

664.     The Fancy Creations Six-Year Transfers were made to or for the benefit of Fancy Creations.

665.     The Fancy Creations Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Fancy Creations Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Fancy Creations Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

666.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Fancy Creations Six-Year Transfers set aside, or who could disregard the Fancy Creations Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

667.     The Trustee may avoid the Fancy Creations Six-Year Transfers under Bankruptcy Code section 544(b)(1).

668.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Six-Year Transfers for the benefit of the Debtors' estates from Fancy Creations, the entity to or for whose benefit the Fancy Creations Six-Year Transfers were made, and from any subsequent transferees.

669.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 29

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(Fancy Creations)**

670.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

671.     The Fancy Creations Two-Year Transfers constituted transfers of interests of the Debtors in property.

672.     The Fancy Creations Two-Year Transfers were made to or for the benefit of Fancy Creations.

673.     The Debtors received less than reasonably equivalent value in exchange for the Fancy Creations Two-Year Transfers.

674.     The Debtors were insolvent on the date each Fancy Creations Two-Year Transfer was made, or became insolvent as a result of such transfer.

675.     The Trustee may avoid the Fancy Creations Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

676.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Two-Year Transfers for the benefit of the Debtors' estates from Fancy Creations,

the entity to or for whose benefit the Fancy Creations Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 30

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Fancy Creations)

677.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

678.    The Fancy Creations Six-Year Transfers constituted transfers of interests of the Debtors in property.

679.    The Fancy Creations Six-Year Transfers were made to or for the benefit of Fancy Creations.

680.    The Fancy Creations Six-Year Transfers were made by the Debtors without fair consideration.

681.    On the date of each Fancy Creations Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

682.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Fancy Creations Six-Year Transfers set aside, or who could disregard the Fancy Creations Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

683.    The Trustee may avoid the Fancy Creations Six-Year Transfers under Bankruptcy Code section 544(b)(1).

684.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Six-Year Transfers for the benefit of the Debtors' estates from Fancy Creations,

114

the entity to or for whose benefit the Fancy Creations Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 31

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Pacific)

685.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

686.    The Debtors made numerous transfers of cash and inventory to Pacific within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule H, attached hereto (collectively, the "**Pacific Two-Year Transfers**").

687.    The Pacific Two-Year Transfers constituted transfers of interests of the Debtors in property.

688.    The Pacific Two-Year Transfers were made to or for the benefit of Pacific.

689.    The Pacific Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Pacific Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Pacific Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

690.    The Trustee may avoid the Pacific Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

691.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Two-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 32

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(Pacific)**

692.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

693.     The Debtors made numerous transfers of cash and inventory to Pacific within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule H, attached hereto (collectively, the "**Pacific Six-Year Transfers**").

694.     The Pacific Six-Year Transfers were made to or for the benefit of Pacific.

695.     The Pacific Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Pacific Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Pacific Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

696.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Pacific Six-Year Transfers set aside, or who could disregard the Pacific Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

697.     The Trustee may avoid the Pacific Six-Year Transfers under Bankruptcy Code section 544(b)(1).

698.  Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Six-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Six-Year Transfers were made, and from any subsequent transferees.

699.  The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 33

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Pacific)

700.  The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

701.  The Pacific Two-Year Transfers constituted transfers of interests of the Debtors in property.

702.  The Pacific Two-Year Transfers were made to or for the benefit of Pacific.

703.  The Debtors received less than reasonably equivalent value in exchange for the Pacific Two-Year Transfers.

704.  The Debtors were insolvent on the date each Pacific Two-Year Transfer was made, or became insolvent as a result of such transfer.

705.  The Trustee may avoid the Pacific Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

706.  Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Two-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 34

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Pacific)

707.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

708.     The Pacific Six-Year Transfers constituted transfers of interests of the Debtors in property.

709.     The Pacific Six-Year Transfers were made to or for the benefit of Pacific.

710.     The Pacific Six-Year Transfers were made by the Debtors without fair consideration.

711.     On the date of each Pacific Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

712.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Pacific Six-Year Transfers set aside, or who could disregard the Pacific Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

713.     The Trustee may avoid the Pacific Six-Year Transfers under Bankruptcy Code section 544(b)(1).

714.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Six-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 35

**Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(Sunshine)**

715.      The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

716.      FDI transferred $965,000.00 in inventory to Sunshine on March 17, 2016 (the "**Sunshine Transfer**").

717.      The Sunshine Transfer was made within two years of the commencement of FDI's chapter 11 case.

718.      The Sunshine Transfer constituted a transfer of interest of FDI in property.

719.      The Sunshine Transfer was made to or for the benefit of Sunshine.

720.      The Sunshine Transfer was made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Sunshine Transfer in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Sunshine Transfer was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

721.      The Trustee may avoid the Sunshine Transfer under section 548(a)(1)(A) of the Bankruptcy Code.

722.      Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

## COUNT 36

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(Sunshine)**

723.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

724.    The Sunshine Transfer was made within six years of the commencement of FDI's chapter 11 case.

725.    The Sunshine Transfer constituted a transfer of an interest of FDI in property.

726.    The Sunshine Transfer was made to or for the benefit of Sunshine.

727.    The Sunshine Transfer was made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Sunshine Transfer in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Sunshine Transfer was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

728.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Sunshine Transfer set aside, or who could disregard the Sunshine Transfer and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

729.    The Trustee may avoid the Sunshine Transfer under Bankruptcy Code section 544(b)(1).

730.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

731.   The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 37

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Sunshine)

732.   The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

733.   The Sunshine Transfer constituted a transfer of an interest of FDI in property.

734.   The Sunshine Transfer was made to or for the benefit of Sunshine.

735.   FDI received less than reasonably equivalent value in exchange for the Sunshine Transfer.

736.   FDI was insolvent on the date the Sunshine Transfer was made, or became insolvent as a result of such transfer.

737.   The Trustee may avoid the Sunshine Transfer under section 548(a)(1)(B) of the Bankruptcy Code.

738.   Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

121

## COUNT 38

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Sunshine)

739.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

740.    The Sunshine Transfer constituted a transfer of an interest of FDI in property.

741.    The Sunshine Transfer was made to or for the benefit of Sunshine.

742.    The Sunshine Transfer was made by FDI without fair consideration.

743.    On the date the Sunshine Transfer was made, FDI was insolvent or was rendered insolvent as a result of such transfer.

744.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Sunshine Transfer set aside, or who could disregard the Sunshine Transfer and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

745.    The Trustee may avoid the Sunshine Transfer under Bankruptcy Code section 544(b)(1).

746.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

## COUNT 39

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Tri Color)

747.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

122

748.     The Debtors made cash transfers to Tri Color within two years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule I</u>, attached hereto (collectively, the "**Tri Color Two-Year Transfers**").

749.     The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors in property.

750.     The Tri Color Two-Year Transfers were made to or for the benefit of Tri Color.

751.     The Tri Color Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Tri Color Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Tri Color Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

752.     The Trustee may avoid the Tri Color Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

753.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Two-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 40

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Tri Color)**

754.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

755.     The Debtors made numerous transfers of cash and inventory to Tri Color within six years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule I</u>, attached hereto (collectively, the "**Tri Color Six-Year Transfers**").

756.     The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors in property.

757.     The Tri Color Six-Year Transfers were made to or for the benefit of Tri Color.

758.     The Tri Color Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Tri Color Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Tri Color Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

759.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Tri Color Six-Year Transfers set aside, or who could disregard the Tri Color Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

760.     The Trustee may avoid the Tri Color Six-Year Transfers under Bankruptcy Code section 544(b)(1).

761.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Six-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Six-Year Transfers were made, and from any subsequent transferees.

124

762. The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 41

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Tri Color)

763. The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

764. The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors in property.

765. The Tri Color Two-Year Transfers were made to or for the benefit of Tri Color.

766. The Debtors received less than reasonably equivalent value in exchange for the Tri Color Two-Year Transfers.

767. The Debtors were insolvent on the date each Tri Color Two-Year Transfer was made, or became insolvent as a result of such transfer.

768. The Trustee may avoid the Tri Color Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

769. Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Two-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Two-Year Transfers were made, and from any subsequent transferees.

125

## COUNT 42

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Tri Color)

770.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

771.     The Tri Color Six-Year Transfers constituted transfers of interests of the Debtors in property.

772.     The Tri Color Six-Year Transfers were made to or for the benefit of Tri Color.

773.     The Tri Color Six-Year Transfers were made by the Debtors without fair consideration.

774.     On the date of each Tri Color Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

775.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Tri Color Six-Year Transfers set aside, or who could disregard the Tri Color Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

776.     The Trustee may avoid the Tri Color Six-Year Transfers under Bankruptcy Code section 544(b)(1).

777.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Six-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Six-Year Transfers were made, and from any subsequent transferees.

126

## COUNT 43

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Unique)

778.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

779.    FDI made numerous transfers of cash and inventory to Unique within two years of the commencement of FDI's chapter 11 case, as identified on Schedule J, attached hereto (collectively, the "**Unique Two-Year Transfers**").

780.    The Unique Two-Year Transfers constituted transfers of interests of FDI in property.

781.    The Unique Two-Year Transfers were made to or for the benefit of Unique.

782.    The Unique Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Unique Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Unique Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

783.    The Trustee may avoid the Unique Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

784.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Two-Year Transfers for the benefit of FDI's from Unique, the entity to or for whose benefit the Unique Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 44

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Unique)

785.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

786.     The Debtors made numerous transfers of cash and inventory to Unique within six years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule J</u>, attached hereto (collectively, the "**Unique Six-Year Transfers**").

787.     The Unique Six-Year Transfers were made to or for the benefit of Unique.

788.     The Unique Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Unique Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Unique Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

789.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Unique Six-Year Transfers set aside, or who could disregard the Unique Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

790.     The Trustee may avoid the Unique Six-Year Transfers under Bankruptcy Code section 544(b)(1).

791.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Six-Year Transfers for the benefit of the Debtors' estates from Unique, the entity to or for whose benefit the Unique Six-Year Transfers were made, and from any subsequent transferees.

792.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 45

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Unique)

793.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

794.     The Unique Two-Year Transfers constituted transfers of interests of FDI in property.

795.     The Unique Two-Year Transfers were made to or for the benefit of Unique.

796.     FDI received less than reasonably equivalent value in exchange for the Unique Two-Year Transfers.

797.     FDI was insolvent on the date each Unique Two-Year Transfer was made, or became insolvent as a result of such transfer.

798.     The Trustee may avoid the Unique Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

799.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Two-Year Transfers for the benefit of FDI's estate from Unique, the entity to or for whose benefit the Unique Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 46

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Unique)

800.     The Trustee restates and re-alleges paragraphs 1 through 382 of this Complaint as though fully set forth herein.

801.     The Unique Six-Year Transfers constituted transfers of interests of the Debtors in property.

802.     The Unique Six-Year Transfers were made to or for the benefit of Unique.

803.     The Unique Six-Year Transfers were made by the Debtors without fair consideration.

804.     On the date of each Unique Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

805.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Unique Six-Year Transfers set aside, or who could disregard the Unique Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

806.     The Trustee may avoid the Unique Six-Year Transfers under Bankruptcy Code section 544(b)(1).

807.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Six-Year Transfers for the benefit of the Debtors' estates from Unique, the entity to or for whose benefit the Unique Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 47

**Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(World Diamond)**

808.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

809.     FDI made numerous transfers of inventory to World Diamond within two years of the commencement of FDI's chapter 11 case, as identified on Schedule K, attached hereto (collectively, the "**World Diamond Two-Year Transfers**").

810.     The World Diamond Two-Year Transfers constituted transfers of interests of FDI in property.

811.     The World Diamond Two-Year Transfers were made to or for the benefit of World Diamond.

812.     The World Diamond Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the World Diamond Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the World Diamond Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

813.     The Trustee may avoid the World Diamond Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

814.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the World Diamond Two-Year Transfers for the benefit of FDI's from World Diamond, the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 48

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (World Diamond)

815.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

816.     The Debtors made numerous transfers of inventory to World Diamond within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule K, attached hereto (collectively, the "**World Diamond Six-Year Transfers**").

817.     The World Diamond Six-Year Transfers were made to or for the benefit of World Diamond.

818.     The World Diamond Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the World Diamond Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the World Diamond Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

819.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the World Diamond Six-Year Transfers set aside, or who could disregard the World Diamond Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

820.     The Trustee may avoid the World Diamond Six-Year Transfers under Bankruptcy Code section 544(b)(1).

821.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

World Diamond Six-Year Transfers for the benefit of the Debtors' estates from World Diamond,

the entity to or for whose benefit the World Diamond Six-Year Transfers were made, and from

any subsequent transferees.

822.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this

claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 49

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(World Diamond)**

823.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as

though fully set forth herein.

824.     The World Diamond Two-Year Transfers constituted transfers of interests of the

Debtors in property.

825.     The World Diamond Two-Year Transfers were made to or for the benefit of World

Diamond.

826.     The Debtors received less than reasonably equivalent value in exchange for the

World Diamond Two-Year Transfers.

827.     The Debtors were insolvent on the date each World Diamond Two-Year Transfer

was made, or became insolvent as a result of such transfer.

828.     The Trustee may avoid the World Diamond Two-Year Transfers under section

548(a)(1)(B) of the Bankruptcy Code.

829.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

World Diamond Two-Year Transfers for the benefit of the Debtors' estates from World Diamond,

the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 50

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (World Diamond)

830.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

831.     The World Diamond Two-Year Transfers constituted transfers of interests of FDI in property.

832.     The World Diamond Two-Year Transfers were made to or for the benefit of World Diamond.

833.     FDI received less than reasonably equivalent value in exchange for the World Diamond Two-Year Transfers.

834.     FDI was insolvent on the date each World Diamond Two-Year Transfer was made, or became insolvent as a result of such transfer.

835.     The Trustee may avoid the World Diamond Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

836.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the World Diamond Two-Year Transfers for the benefit of FDI's estate from World Diamond, the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 51

**Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(Twin Fields)**

837. The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

838. Jaffe made numerous cash transfers to Twin Fields within two years of the commencement of Jaffe's chapter 11 case, as identified on <u>Schedule L</u>, attached hereto (collectively, the "**Twin Fields Two-Year Transfers**").

839. The Twin Fields Two-Year Transfers constituted transfers of interests of Jaffe in property.

840. The Twin Fields Two-Year Transfers were made to or for the benefit of Twin Fields.

841. The Twin Fields Two-Year Transfers were made with the actual intent to hinder, delay, or defraud Jaffe's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Twin Fields Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Twin Fields Two-Year Transfers was to deplete Jaffe's property and frustrate satisfaction of Jaffe's legitimate obligations.

842. The Trustee may avoid the Twin Fields Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

843. Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Two-Year Transfers for the benefit of Jaffe's estate from Twin Fields, the entity to or for whose benefit the Twin Fields Two-Year Transfers were made, and from any subsequent transferees.

135

## COUNT 52

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(Twin Fields)**

844. The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

845. The Debtors made numerous cash transfers to Twin Fields within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule L, attached hereto (collectively, the "**Twin Fields Six-Year Transfers**").

846. The Twin Fields Six-Year Transfers were made to or for the benefit of Twin Fields.

847. The Twin Fields Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Twin Fields Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Twin Fields Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

848. Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Twin Fields Six-Year Transfers set aside, or who could disregard the Twin Fields Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

849. The Trustee may avoid the Twin Fields Six-Year Transfers under Bankruptcy Code section 544(b)(1).

850. Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Six-Year Transfers for the benefit of the Debtors' from Twin Fields, the entity to or

for whose benefit the Twin Fields Six-Year Transfers were made, and from any subsequent transferees.

851.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 53

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Twin Fields)

852.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

853.    The Twin Fields Two-Year Transfers constituted transfers of interests of Jaffe in property.

854.    The Twin Fields Two-Year Transfers were made to or for the benefit of Twin Fields.

855.    Jaffe received less than reasonably equivalent value in exchange for the Twin Fields Two-Year Transfers.

856.    Jaffe was insolvent on the date each Twin Fields Two-Year Transfer was made, or became insolvent as a result of such transfer.

857.    The Trustee may avoid the Twin Fields Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

858.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Two-Year Transfers for the benefit of Jaffe's estate from Twin Fields, the entity to or for whose benefit the Twin Fields Two-Year Transfers were made, and from any subsequent transferees.

137

## COUNT 54

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Twin Fields)

859.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

860.     The Twin Fields Six-Year Transfers constituted transfers of interests of the Debtors in property.

861.     The Twin Fields Six-Year Transfers were made to or for the benefit of Twin Fields.

862.     The Twin Fields Six-Year Transfers were made by the Debtors without fair consideration.

863.     On the date of each Twin Fields Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

864.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Twin Fields Six-Year Transfers set aside, or who could disregard the Twin Fields Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

865.     The Trustee may avoid the Twin Fields Six-Year Transfers under Bankruptcy Code section 544(b)(1)

866.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Six-Year Transfers for the benefit of the Debtors' estates from Twin Fields, the entity to or for whose benefit the Twin Fields Six-Year Transfers were made, and from any subsequent transferees.

138

**PRAYER FOR RELIEF**

WHEREFORE, the Trustee, as chapter 11 trustee of the Debtors and as assignee and judgment creditor of the U.S. Affiliates, respectfully requests that the Court:

a.  On Count 1, enter judgment in favor of the Trustee and against all Defendants, jointly and severally, in treble the amount of damages to be proven at trial, but no less than $175,000,000 that were suffered by the Debtors and their estates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

b.  On Count 2, enter judgment in favor of the Trustee, as assignee of the U.S. Affiliates, and against all Defendants, jointly and severally, in treble the amount of damages to be proven at trial, but no less than $50,000,000, that were suffered by the U.S. Affiliates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

c.  On Count 3, avoid the Synergies-Mehta Transfer and enter judgment in favor of the Trustee and against Defendant Purvi Mehta in the amount of $14,575,000.

d.  On Count 4, avoid the Synergies-Mehta Transfer and enter judgment in favor of the Trustee and against Defendant Purvi Mehta in the amount of $14,575,000.

e.  On Count 5, avoid the CPRE Equity Transfer and enter judgment in favor of the Trustee and against the Ithaca Trust and Ami Modi, jointly and severally, in the amount of $6,000,000.

f.  On Count 6, avoid the CPRE Equity Transfer and enter judgment in favor of the Trustee and against the Ithaca Trust and Ami Modi, jointly and severally, in the

139

amount of $6,000,000.

g. On Count 7, avoid each of the CPRE Two-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $3,603,683.69.

h. On Count 8, avoid each of the CPRE Six-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $4,594,559.78.

i. On Count 9, avoid each of the CPRE Two-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $3,603,683.69.

j. On Count 10, avoid each of the CPRE Six-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $4,594,559.78.

k. On Count 11, avoid each of the Auragem Transfers and enter judgment in favor of the Trustee and against Auragem in the amount of $2,340,968.94.

l. On Count 12, avoid each of the Auragem Transfers and enter judgment in favor of the Trustee and against Auragem in the amount of $2,340,968.94.

m. On Count 13, avoid each of the Brilliant Two-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $5,264,397.13.

n. On Count 14, avoid each of the Brilliant Six-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $10,491,287.11.

o. On Count 15, avoid each of the Brilliant Two-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $5,264,397.13.

p. On Count 16, avoid each of the Brilliant Six-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $10,491,287.11.

q. On Count 17, avoid each of the Diagems Transfers and enter judgment in favor of the Trustee and against Diagems in the amount of $2,966,406.15.

r. On Count 18, avoid each of the Diagems Transfers and enter judgment in favor of

140

the Trustee and against Diagems in the amount of $2,966,406.15.

s. On Count 19, avoid each of the Empire Two-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $1,069,006.07.

t. On Count 20, avoid each of the Empire Six-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $12,113,126.57.

u. On Count 21, avoid each of the Empire Two-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $1,069,006.07.

v. On Count 22, avoid each of the Empire Six-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $12,113,126.57.

w. On Count 23, avoid each of the Eternal Two-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,433,815.61.

x. On Count 24, avoid each of the Eternal Six-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,733,815.61.

y. On Count 25, avoid each of the Eternal Two-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,433,815.61.

z. On Count 26, avoid each of the Eternal Six-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,733,815.61.

aa. On Count 27, avoid each of the Fancy Creations Two-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $3,900,916.93.

bb. On Count 28, avoid each of the Fancy Creations Six-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $10,827,802.57.

cc. On Count 29, avoid each of the Fancy Creations Two-Year Transfers and enter

141

judgment in favor of the Trustee and against Fancy Creations in the amount of $3,900,916.93.

dd. On Count 30, avoid each of the Fancy Creations Six-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $10,827,802.57.

ee. On Count 31, avoid each of the Pacific Two-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $12,494,765.63.

ff. On Count 32, avoid each of the Pacific Six-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $41,771,415.37.

gg. On Count 33, avoid each of the Pacific Two-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $12,494,765.63.

hh. On Count 34, avoid each of the Pacific Six-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $41,771,415.37.

ii. On Count 35, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

jj. On Count 36, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

kk. On Count 37, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

ll. On Count 38, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

mm. On Count 39, avoid each of the Tri Color Two-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $1,493,645.55.

nn. On Count 40, avoid each of the Tri Color Six-Year Transfers and enter judgment

in favor of the Trustee and against Tri Color in the amount of $12,395,082.86.

oo. On Count 41, avoid each of the Tri Color Two-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $1,493,645.55.

pp. On Count 42, avoid each of the Tri Color Six-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $12,395,082.86.

qq. On Count 43, avoid each of the Unique Two-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $3,475,031.42.

rr. On Count 44, avoid each of the Unique Six-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $11,494,395.02.

ss. On Count 45, avoid each of the Unique Two-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $3,475,031.42.

tt. On Count 46, avoid each of the Unique Six-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $11,494,395.02.

uu. On Count 47, avoid each of the World Diamond Two-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $10,607,792.98.

vv. On Count 48, avoid each of the World Diamond Six-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $21,175,805.74.

ww. On Count 49, avoid each of the World Diamond Two-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $10,607,792.98.

xx. On Count 50, avoid each of the World Diamond Six-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of

143

$21,175,805.74.

yy. On Count 51, avoid each of the Twin Fields Two-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $3,265,000.00.

zz. On Count 52, avoid each of the Twin Fields Six-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $21,361,542.28.

aaa. On Count 53, avoid each of the Twin Fields Two-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $3,265,000.00.

bbb. On Count 54, avoid each of the Twin Fields Six-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $21,361,542.28.

ccc. Award the Trustee his reasonable costs and expenses incurred in this action, including counsel fees under New York Debtor & Creditor Law section 276-a and as otherwise permitted by law.

Dated: February 25, 2020
    New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By: /s/ Vincent E. Lazar
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
aallen@jenner.com

Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600
cwedoff@jenner.com

*Counsel for the Chapter 11 Trustee*

# APPENDIX A

## Appendix A-124

During the Relevant Period, Nirav Modi, Bhansali, and Gandhi exercised direct oversight and control over transactions between the U.S. Entities and Shadow Entities. For example:

(i)  On June 8, 2012, Gandhi emailed Bhavesh Patel and Shyam Wadhwa, "Please email payables to HK and Dubai – all the companies. Firestar, Firestar Diamond Int'l and Jaffe. Need to pay $1m to HK or Dubai hence need name and amounts only." Bhavesh replied, "There is nothing open in Dubai however HK open payables attached herewith for your review." Gandhi replied, "It could be Pacific, World Diamond, etc too." That same day, FDI transferred $1,000,000 to Fancy Creations. This transaction is described as an "advance" in FDI's bank statement.

(ii)  On July 23, 2012, Ajay Gandhi sent a message to Nirav Modi through Panemail, which is a web-based email service that automatically deletes messages, "Niravbhai, please see attached payment plan in 5 parts to clean-up AR and AP of [FDII] for HK, Dubai, Belgium and NY. Funds should come from respective companies. 1. $452k. 2. $1.129m. 3. $1.5m. 4. $828k. 5. $1.05m. If implemented, the attached AR and AP of $4.3 million can be cleaned up. Please let me know if you have different thought." On August 3, 2012, Gandhi forwarded the email to Hemant Bhatt, copying Bhansali, and stated, "I will call you Monday to discuss. We need to move funds in Firestar Diamond International, Inc. per attached. NM/MB is fine so long as money flows from SDC/Tristar and Diamlink to any of HK or Dubai entities." On August 14, 2012, Gandhi followed up, "Hemant, When can I expect payments for the below cycle that we spoke about?" On August 27, 2012, Bhatt replied to Gandhi, copying Bhansali, "Pacific and Unique paid as above. Please pay accordingly."

The message contained a list reflecting that Pacific and Unique owed FDII $779,579 and $418,498, respectively, in accounts receivable, and that FDII owed Fancy Creations, FDL, and Diagems $1,063,369, $121,129, and $14,033, respectively, in accounts payable. On August 28, 2012, Hemant Bhatt messaged Ajay Gandhi on Panemail, "Auragem paid $200,000.00 and Brilliant paid $231,175.03. Pleease [sic] confirm receipt and pay to Fancy." FDII's bank statements reflect: (a) incoming wires of $779,544.11 and $418,463.00 on August 27, 2012 from Pacific and Unique, respectively; (b) incoming wires of $231,150.03 from Brilliant and $199,975.00 from Auragem on August 28, 2012; and (c) outgoing wires of $1,063,369, $121,129.21, and $14,032.80 on August 28, 2012 to Fancy Creations, FDL, and Diagems, respectively.

(iii)   On August 28, 2012, Gandhi emailed Bhavesh Patel, "Tomorrow, please wire $431,175 to Fancy Creations from [FDII's] Capital Old Account." FDII's bank statement reflects an outgoing wire in the amount of $431,175 to Fancy Creations on August 29, 2012.

(iv)   On September 12, 2012, Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, "Please wire $150,000 to Unique Diamond for back office expenses from January 2012 thru June 2012 – invoice #'s UD-FI-004 & UD-FI-001." That same day, Patel emailed Gandhi and Bhatt, "Please find attached wire from FSI to Unique as per new bank details for $150k." Gandhi replied solely to Patel, "Spoke to HB for return of funds?" Patel replied, "I called him today morning. He confirmed and told that, he will require invoice details if any / from which location amount will remit etc[.] so that he will arrange as per your requirement in NY." Gandhi replied, "Ask him from where he can remit and give him details. It could be in FS or Intl."

(v)   On December 4, 2012, Sridhar Krishnan of SDC Designs emailed Gandhi, "You shall receive payment of $1,737,155 . . . from Empire Gems FZE in Firestar Diamond International, part payment against your invoice # 73112 dt 7/31/12[.] Please make payment to SDC Designs LLC against their invoice # 629966 dt 7/30/12." Gandhi replied, "When?" Krishnan replied, "I am wiring today to Universal FZE, so I guess you would get it from Empire gems tomorrow." Gandhi then forwarded the email chain to Mihir Bhansali and asked, "Ok to proceed per below once funds are received?" That same day, Gandhi separately forwarded Krishnan's email to Hemant Bhatt and asked, "Is this OK once funds are received?" Gandhi followed up with Bhatt several hours later, "Do not send email. Please call me to confirm in the morning."

(vi)   On December 10, 2012, Gandhi emailed Bhavesh Patel, "Pay $1m against above invoice to Empire Gems tomorrow from HSBC per attached wire instruction. Also let HB know that $733k is already paid against this invoice. Upon information and belief, "HB" refers to Hemant Bhatt. On December 11, 2012, FDI wired $1,185,025.05 to Empire.

(vii)   On December 13, 2012, Gandhi instructed Bhavesh Patel to "prepare the following wires today: 1. Pay $231,000 to Unique for Back Office expenses from Firestar Diamond Inc. 2. Pay $391,611 to Synergies Corp from Firestar Diamond, Inc. for Interest. 3. Pay $300,000 to Unique from Synergies Corp. for Loan Repayment. 4. Pay $91,000 to Brilliant from Synergies Corp for Loan Repayment. 5. Balance amount tomorrow to Diagem once funds are here in Firestar Diamond, Inc." Later that day, Gandhi followed up, "Money is coming any minute hence wire $552,133.10 to Diagem from Firestar Diamond, Inc. (against open invoice) . . ." The next day, Patel replied, "Based o[n] HB's details, please find wire from FSI to Diagems for $552,133.10. Gandhi replied, "Please tell HB about wires from yesterday

and ask if he receives it. Upon information and belief, "HB" refers to Hemant Bhatt.

(viii)    On December 20, 2012, Bhavesh Patel emailed Ajay Gandhi, "Please find attached wire [from FDI] to Diagems ($119k) and Pacific ($652k) as per instructions." Gandhi replied, "Change Empire amount as discussed."

(ix)    In a 2012 email, Kurian Matthews relayed a conversation he had with Bhansali in which they set up a circular transaction starting at Fantasy, going through Radashir Jewelry Co. Pvt. Ltd. (a Modi-Controlled Entity that has been implicated in the Bank Fraud), FIL, and Firestar and ending back at Fantasy. The purpose was to "clear the old invoices of Radashir on FDC" because a bank was inquiring about the old invoices. Similarly, in December 2012, Bhansali and Kurian Mathews discussed wiring money to Radashir and back to the Debtors against Radashir's accounts payables to "use [the money] for NM [Modi]."

(x)    On February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, LLC wrote to Bhansali and Modi partner Hemant Bhatt using personal email addresses. Krishman told Bhatt and Bhansali, "You should expect 1.4 million in Universal fze today. Please wire the same to A Jaffe." Two days later, Bhatt confirmed that Universal Fine Jewelry FZE had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."

(xi)    On February 6, 2013, Ajay Gandhi emailed Nirav Modi, copying Mihir Bhansali, "Niravbhai, After keeping $3 million buffer, I can pay $1 million to India in February 2013. Please let me know if I should ask Manish/Amit for listing to pay." Modi replied, "Yes pls." One day earlier, Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "We can pay $1.0 million to India in the month of February 2013. Please email me a list to pay." As alleged above, Manish Bosamiya and Miten Pandya were among the individuals directly involved in obtaining LOU funding from PNB. Thus, upon information and belief, the purpose of Gandhi's emails was to inform Modi, Bosamiya, and Pandya the amount Gandhi would be able to send to facilitate repayment of LOUs.

(xii)    On February 19, 2013, Shyam Wadhwa emailed Ajay Gandhi, "Kindly clarify details of open vendor bills against which inward wire receipt of $2[,]006,987.25 on 29th May '12 has been applied. Gandhi replied, "$2m was received & wired back to FIPL and Radashir." His email included a table reflecting that, on May 19, 2012, $2,006,949.25 received from Pacific was sent to FIPL ($1,953,990) and Radashir ($126,010).

(xiii)    On February 22, 2013, Bhavesh Patel emailed Ajay Gandhi a wire confirmation reflecting a $503,501.41 transfer from FDI to Pacific.

(xiv)    On October 23, 2013, Ajay Gandhi emailed Bhavesh Patel, "Pay $150,000 to Pacific Diamonds per the attached from Firestar Diamond, Inc. – HSBC." Patel replied with the wire confirmation and stated, "Please find attached wire from FSI to Pacific as Professional Fees."

(xv)    On October 30, 2013, Bhavesh Patel emailed Ajay Gandhi, copying Altamash Ansari and Shyam Wadhwa, "Please find attached internal transfer as well as wire document for your reference. 1. FSI to Jaffe, Amount $1,768,385.00 (Internal) 2. Jaffe to Pacific, Amount $2,455,036.00 (Abu Dhabi Bank). A few hours later, Patel followed up to ask Gandhi to "please approve attached wires as discussed."

(xvi)    On December 31, 2013, Mihir Bhansali emailed Ajay Gandhi, "As discussed, FSI will pay to Sangam Diamonds Corp. on behalf of Fancy Creation Company Limited (HK) (Invoice # 100773 Dt. 19.12.2013). Attached are Invoice of Sangam Diamonds Corp Sale to Fancy and Sangam's bank info. Please make wire today." Gandhi replied, copying Bhavesh Patel, "Bhavesh, please set-up wire from Firestar to Sangam Diamond – NY." Patel then replied with the wire confirmation reflecting a $1,247,746 payment to Sangam Diamonds Corp. On January 8, 2014, Gandhi forwarded Bhansali's December 31, 2013 email to Hemant Bhatt, stating "I paid $1.24m on 12/31/13 to Fancy per attached. This funds never came back hence I will pay $575k today. Please call me if needed."

(xvii)    On February 5, 2014, Altamash Ansari emailed Ajay Gandhi, with a copy to Shyam Wadhwa and Bhavesh Patel, a table of "Receipts & Payments for the month in which [Jaffe] received money from Pacific." The table listed amounts Jaffe received from and paid to Pacific, Empire, Twin Fields, and various Firestar Entities. Replying solely to Shyam Wadhwa, Gandhi stated, "Pacific got paid more than they send funds !!!!!" Wadhwa replied, "Please ignore below email. To answer your question, A. Jaffe had received Funds through Pacific which were lying as ADVANCE in books. Post shipment of diamonds, advance has got adjusted." On February 12, 2014, Gandhi replied, "Anything I need to do?" Wadhwa replied, "Manish Bosamiya would be requiring $ 4M funds against India billing on A. Jaffe." As noted above, upon information and belief, Manish Bosamiya was one of the individuals directly involved in obtaining LOU funding from PNB, which suggests that the $4 million Wadhwa requested from Jaffe was directly related to repaying an LOU. Gandhi replied, "Spoke to MB [upon information and belief, Mihir Bhansali]. Let's talk tomorrow or Friday. He prefers outgoing shipment from Jaffe to Firestar BVBA as oppose to anywhere."

(xviii)    On March 18, 2014, Ajay Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, instructions to wire $150,000 from FDI to Unique for "back office expenses," $123, 097 from FDI to Synergies for "Interest," and $123,000 from Synergies to Brilliant for "Loan repayment." Patel replied with the wire confirmations.

(xix)    On March 25, 2014, Shyam Wadhwa emailed Ajay Gandhi, copying Bhavesh Patel, "FHL has remitted sub-debt funds [of] USD [$]4,058,500 to Firestar Diamond Inc and USD [$]1,800,000 to Firestar Group Inc. Please remit funds to Brilliant from both companies and confirm." Patel then sent Gandhi wire confirmations reflecting a transfer of $4,058,500 from FDI to Brilliant and a transfer of $1,800,000 from FGI to Brilliant.

(xx)    On August 4, 2014, Sridhar Krishnan of SDC Designs emailed Ajay Gandhi, "Did you wire to Empire. Please advise." Gandhi replied, "I need to pay overseas. I have asked for a listing to pay. I will let you know once it is wired." Krishnan replied, "I need the funds by tomorrow. Please expedite."

(xxi)    On September 18, 2014, Manish Bosamiya emailed Ajay Gandhi, copying Bhavesh Patel, "Firestar Diamond Intl Inc will receive US $550,000.00 from Firestar Diamond Ltd (HK) in Capital One Bank." Patel then emailed Gandhi, "Please approve below wire from Capital Old [one of FDII's Capital One bank accounts] to Pacific for $550,000.00 as POA."

(xxii)    On December 16, 2014, Gandhi emailed Avinash Oza and Altamash Ansari, "Please pay $1,240,273.54 to Auragem, HK tomorrow for their invoice #2580001314 from Firestar Diamond, Inc. (Part payment)." Oza replied with the wire confirmation. Gandhi replied, "Bank information confirmed with Sandeep?" Upon information and belief, Gandhi was referring to Sandeep Mistry, one of the key co-conspirators in the Bank Fraud.

(xxiii)    On February 19, 2015, Ajay Gandhi emailed Hemant Bhatt, "I would like to pay $300k for back-office expenses. Pay to Unique? Please email me wire information. Also, I would like to pay $180k from Synergies to Brilliant. Please email me wire confirmation." On February 20, 2015, Ajay Gandhi emailed Arpan Doshi and Avinash Oza instructions to wire $186,871 from FDI to Synergies as "Interest", $300,000 from FDI to Eternal as "Back Office Expense," and $180,000 from Synergies to Brilliant as "Loan Repayment." Doshi replied with the wire confirmations.

(xxiv)    On March 2, 2015, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $300,000 from FDI to Unique and $180,000 from Synergies to Brilliant. Doshi replied with the wire confirmations.

(xxv)      On June 26, 2015 Ajay Gandhi emailed Arpan Doshi and Avinash Oza
instructions to wire $300,000 from FDI to Pacific. FDI's bank statement
reflects a transfer from FDI to Pacific of $1,438,270.60 on that day.

(xxvi)     On September 28, 2015, Ajay Gandhi emailed Avinash Oza, "Please wire
$1,017,000 from Firestar Diamond, Inc to Pacific Diamond – on account."
Oza replied with the wire confirmation. Gandhi replied, please wire
$54,000 to Pacific D from Firestar Diamond, Inc." Gandhi then emailed
Operation 1, in reply to an email earlier that day in which Operation 1 sent
Gandhi Pacific's bank details, "$1.017m wired. I thought it was $1.017m
but I received $1.071m. Will wire balance tomorrow - $54k." FDI's bank
statements reflect these transfers.

(xxvii)    On February 26, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi
instructions to wire $1,192,105.55 from FDI to Tri Color. Doshi replied with
the wire confirmation.

(xxviii)   In March 2016, Evelyn Kosiec, the Jaffe operations manager, asked Bhansali
where to re-export loose diamonds, and an hour later she emailed Gandhi,
"Mihir informed to ship this to Eternal diamonds in Hong Kong, the same
price, rounded to the nearest 5 120 day terms."

(xxix)     On March 4, 2016, Gandhi emailed Avinash Oza and Arpan Doshi
instructions to wire $300,000 from FDI to Unique. Oza replied with the wire
confirmation.

(xxx)      On March 9, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi
instructions to wire $247,551 from FDI to Synergies and $250,000 from
Synergies to Brilliant. Doshi replied with the wire confirmations.

(xxxi)     On March 15, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi
instructions to wire $700,000 from Jaffe to Pacific. Oza replied with the wire
confirmation.

(xxxii)    On March 21, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi
instructions to wire $1 million from Jaffe to Pacific. Doshi replied with the
wire confirmation.

(xxxiii)   On March 24, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi
instructions to wire $1 million from Jaffe to Pacific. Oza replied with the
wire confirmation.

(xxxiv)    On March 25, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi
instructions to wire $1.4 million from Jaffe to NMI, and then $613,069 from
NMI to Auragem and $787,000 from NMI to Nirav Modi Ltd. Doshi replied
with the wire confirmations.

(xxxv)     On March 31, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $301,540 from Fantasy to Tri Color Gems. Oza replied with the wire confirmation.

(xxxvi)    On April 5, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $500,000 from Jaffe to Pacific. Doshi replied with the wire confirmation.

(xxxvii)   On May 6, 2016, Gandhi emailed Avinash Oza, Arpan Doshi, and Altamash Ansari instructions to wire $2 million from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxviii)  On June 1, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $815,000 from Jaffe to Pacific. Doshi replied with the wire confirmation. Jaffe's bank statements reflect this wire transfer.

(xxxix)    On June 29, 2016, Ajay Gandhi emailed Altamash Ansari and Vishal Popat a bank statement reflecting a $599,972 wire transfer from Pacific to Jaffe on June 29, 2016. Gandhi instructed them to "show as advance if no open AR from Pacific."

(xl)       On July 18, 2016, Ajay Gandhi emailed Avinash Oza instructions to wire $200,000 from FDI to Jaffe, $200,000 from Jaffe to Fancy Creations, $150,000 from FDI to FDII, and $150,000 from FDII to Fancy Creations. Oza replied with the wire confirmations.

(xli)      On July 19, 2016, Ajay Gandhi Emailed Avinash Oza instructions to wire $1,809,528 from FDI to Fancy Creations. Oza replied with the wire confirmation.

(xlii)     On July 22, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire "$715k from Firestar to Fancy – Purchases[;] $200k from Firestar to Jaffe[;] $200k from Jaffe to Fancy – Purchases[.]" Oza replied with the wire confirmations.

(xliii)    On March 22, 2017, Ajay Gandhi emailed Avinash Oza and Kunal Patel instructions to wire $300,000 from FDI to Unique for "Back-Office expenses" and $240,000 from Synergies to Brilliant for "Repayment of Loan." Oza replied with the wire confirmations.

(xliv)    On January 3, 2018, Gandhi emailed Avinash Oza instructions to wire
         $483,620.05 from FDI to Pacific, $2,188,769.43 from FDII to Pacific, and
         $530,000 from Jaffe to Pacific. Oza replied with the wire confirmations.
         Gandhi then forwarded this email to Subhash Parab and Shyam Wadhwa
         stating, with respect to the $2,188,769.43 transfer to Pacific, "We have wired
         these funds from FSI but please apply this amount to FSII (Pacific) due to
         bank error in Capital One." Consistent with Gandhi's email, FDI's bank
         statements confirm that FDI wired both $483,620.05 and $2,188,769.43 to
         Pacific on January 3, 2018.

(xlv)    On January 31, 2018, Avinash Oza emailed Ajay Gandhi wire
         confirmations reflecting transfers of $2,466,015 and $525,000 from FDII to
         Fancy Creations. Gandhi forwarded the wire confirmations to Shyam
         Wadhwa and stated, "Please let your vendor know of this payment and
         clear any AR from HK."

### Appendix A-125

Ajay Gandhi regularly advised Nirav Modi, Miten Pandya, Manish Bosamiya, Amit Magia, and Shyam Wadhwa, of his ability to wire funds from the U.S. Entities to India in furtherance of the Bank Fraud throughout the Relevant Period. For example:

(i) On August 14, 2009, Nirav Modi directed Gandhi to make payments totaling $2,293,326 to Brilliant and Diagem. On June 16, 2010, Nirav Modi instructed Gandhi, "Unique has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants."

(ii) On August 26, 2010, Nirav Modi emailed Ajay Gandhi to ask, "What will be the week-by-week payment plan for September to India?" On August 27, 2010, Gandhi replied, attaching two spreadsheets containing two possible scenarios, and noting "to cover August borrowing base – I have asked India to remit $1 m for one day & I will remit back on September 1. Substantial amount of inventory was shipped to India & HK hence inventory & AR became ineligible." On August 29, 2010, Gandhi forwarded this email chain to Mihir Bhansali.

(iii) On October 21, 2010, in furtherance of a circular trade, Nirav Modi and Gandhi communicated by email about the shipment of a diamond to a Shadow Entity. Modi stated, "Send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK." Gandhi responded, "Firestone, Dubai confirmed (Not Unique)[,]" to which Modi clarified, "Sorry Unique[,]" in reference to the Shadow Entity. Gandhi responded with "Glad I asked!!!"

(iv) On December 20, 2013, Ajay Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "I can pay $600k from Capital One – Diamond Division or A. Jaffe – HSBC." On December 23, 2013, Bosamiya replied, "Please find attached open invoice of $602,761.39 from FSI." Patel replied to Gandhi, "They don't have anything most recent open from Jaffe or diamond division so they gave listing from FSI for $603k. Please let me know if we can pay from FSI so that I will prepare wires as per that." Gandhi replied, "Transfer to H[s]bc but do not pay from this list but pay other list [o]f Manish around $1.8m."

(v) On January 9, 2014, Ajay Gandhi emailed Miten Pandya, Manish Bosamiya, and Amit Magia, "I can pay $5 million in January 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with the allocation of the $5 million among various Firestar Entities. On January 13, 2014, Gandhi replied, "$5m wired per below. Please acknowledge receipt of these wires." On January 21, 2014, Bosamiya replied, copying Bhavesh Patel, "Boi – London [upon

information and belief, "Boi" refers to "Bank of India] informed yesterday that they have not received $2,157,359.90 as the concern [sic] person was on leave last week and they have only received the message that funds are coming but Nostro is not credited. Please provide the swift message." Later that day, Patel replied to Gandhi, "Manishbhai called me and they received fund." Gandhi then replied to Bosamiya, "Bhavesh emailed me that funds were received. Please let me know otherwise."

(vi)     On April 1, 2014, Gandhi emailed Manish Bosamiya, "I can pay $4 million in April 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with instructions to wire $1,763,644.60 from FDI to FIL and $2,250,858.36 from FDI to FDIPL. On April 2, 2014, Gandhi replied, "1.76m wired today." On April 14, 2014, Gandhi followed up, "$240k and $341k wired today."

(vii)    On April 6, 2016, Shyam Wadhwa emailed Ajay Gandhi and Mihir Bhansali asking them to send $2.7 million from Jaffe to FIL to clear outstanding accounts receivable and stating "our fund position is tight in India, else would have wired funds to you against our payables of about USD 1M from FDIPL for clearing AR/AP between India and NY." Gandhi replied, copying Bhansali, "We have Overseas AR of around $8.5m in Firestar Diamond, Inc. – If I get funds in FD, Inc then we can wire funds to India this month." The next day, Gandhi followed up, "I can wire $1m this month from Jaffe thru FS. Can it come back to FS?

<u>Appendix A-131</u>

The secretive nature of the "regular" financials is demonstrated by the communications between Nirav Modi, Ajay Gandhi, Mihir Bhansali, and other co-conspirators.  For example:

(i) On September 24, 2009, Ajay Gandhi emailed Raghu Iyer, "I looked at cash flow totals and there are major differences in the total cash flow summary versus details by month. The main reason is that I am accounting for non-core cash receipts and non-core payments thru cash flow without increasing the corresponding sales & purchases (Loose diamonds)." Iyer replied, "Can u make this match pls[.] So we will get the annual cash flow properly[.]"

(ii) On March 8, 2010, Deepak Gupta emailed Ajay Gandhi and Mihir Bhansali asking for Jaffe and FDI's financial statements. Gandhi forwarded the email to Bhansali and asked, "Who is Deepak Gupta and OK to send FS to him?" Bhansali replied, "Yes, ok to send to him. Will explain when we talk." Gandhi replied, "Should I send him both core and non-core?" Bhansali replied, "Yes, send him both, so that they correspond with the audited numbers. Speak to him on the phone and explain to him the difference."

(iii) On October 17, 2012, Ajay Gandhi emailed Nirav Modi, Mihir Bhansali, Raghu Iyer, and Saju Poulose the "Core Business and Regular Financial Statements as of September 30, 2012 for your review." On October 25, 2012, Saju Poulose emailed Ajay Gandhi, "Need your help to understand 'third' version 'sales' number of [FDII] as on Sep 2012 . . . 1. Josh Division Sales $4,898,257 - This is only Josh diamond sales from the financials[?] 2. September Financials $8,333,842 -This is including Josh + NDM larger/corporate sales[?] 3. September Financials Josh Division for Consolidation $9,599,627 = what are [sic] this numbers include?" Gandhi replied, "1. September Josh's division of HK will include sales made to inter-company such as Firestar Diamond, Inc., A. Jaffe, Firestar HK, Firestar Dubai and other affiliated companies in HK and Dubai ($9.55 million). 2. Josh's financial - $4.89 million will include any of the affiliated sales that he may be earning margins. All Pink sales and affiliated sales without margin are not included. 3. Corporate Sales - $8.33 million will not include AN[Y] affiliated sales but only sales to outside customers including Pink diamond sales."

(iv) On September 16, 2013, Ajay Gandhi emailed Samir Shah and Rebecca Chow with the subject "Loose Diamond Sales", "$196k loss for the attached sales of August 2013. Please confirm ASAP." Shah replied, "The goods came in at the wrong prices from Sandeep. This is the reason it is showing as a loss." Gandhi forwarded the email to Mihir Bhansali and stated, "We need to stop this. I am losing control on the Core Financials. Whre do I

show such loss for August now – Core or Non-Core? Can we reverse in September 2013 please as it is affecting banks for 6 month financials…" Gandhi followed up, "$196k loss was excluded from Core Financials of August 2013 but it is part of Regular Financials." Bhansali replied, copying Saju Poulose, "Ok. Saju – pls speak to me."

(v)     On October 15, 2013, Ajay Gandhi emailed Saju Poulose, copying Kuntal Desai, "Core-Non-Core – Thru September 2013 – How much am I moving? $167k or $177k that we discussed last week?" Poulose replied, "Hi Ajaybhai, Have discussed with Kuntal and gone thru his working file in detail. He will sent [sic] you the detailed mail." Gandhi replied, "How much was the amount and Kuntal – did you sent [sic] it?" Desai replied, "Yes. Please check other mail."

## Appendix A-144

As part of the audit process, the auditors would email parties listed on the audited company's accounts receivable and accounts payable records to request written confirmation of the amounts reflected in the audited company's books and records. For audits of the U.S. entities, which upon information and belief were conducted together, Ajay Gandhi would be copied on the auditor's emails to Shadow Entities, which Gandhi would often forward to Operation 1 to ask that Operation 1 cause the Shadow Entity to provide confirmation the auditors. For example:

(i)    On June 7, 2017, Ajay Gandhi forwarded to Operation 1 an auditor's request to Fancy Creations. Operation 1 replied, "Today or tomorrow customer will confirm as discussed." Gandhi replied, "There were several emails…" Gandhi was referencing the auditor's requests to several other Shadow Entities, which Gandhi had also forwarded to Operation 1.

(ii)    On July 11, 2017, Gandhi sent an email to Operation 1 asking "Can you please have your customer [Brilliant] sign the attached confirmation for Synergies Corp?"  The attachment was not the typical auditor's confirmation request sheet; instead, it was a term sheet for an unsecured loan from Brilliant to Synergies in the amount of $1,287,000. The term sheet indicated that the loan would be interest free, repayable on demand, dated as of September 30, 2016—nearly one year earlier—and was to be used "for the business purpose of the Company." On July 19, 2017, Gandhi sent an email directly to "accounts@brilliantdiamonds.hk", copying Operation 1, stating, "Please see attached Synergies Confirmation and sign and email to me ASAP. You are holding up my audit. This is balance confirmation as of 9/30/16."  Approximately an hour later, Gandhi forwarded the email to Kurian Matthews asking, "Kurian – can you please have your customer take care of it ASAP per below email?" On July 23, 2017, an employee of Brilliant replied to Gandhi's email, copying Operation 1, attaching the signed loan term sheet.

(iii)    On November 10, 2017, Gandhi forwarded to Operation 1 an auditor's request to Eternal and asked Operation 1 to "Please chase your vendor to confirmed [sic] it. Audit is on hold."  That same day, Gandhi sent substantively identical emails to Operation 1 forwarding auditor requests to Fancy Creations and Sino Traders.

<u>Appendix A-145</u>

The Operation 1 account was also used to orchestrate transfers of funds and jewels among

Firestar Entities and Shadow Entities. For example:

(i)     On March 6, 2015, Rebecca Chow emailed Sandeep Mistry, copying Samir Shah and Paresh Mehta, "Please be informed that 1.68.52cts of 1/2ct VS loose diamond that's ready to be shipped. Please provide shipping address so we can process." Later that day, Chow forwarded the email to Operation 1 and stated, "Hi Sandeep, Hope this email reach [sic] you! Please advise below and thanks."

(ii)    On September 28, 2015, Ajay Gandhi sent Operation 1 remittance instructions for Jaffe's HSBC bank account ending 2460. The next day, Operation 1 replied, "Universal made payment of 1.4 m Advance Against Invoice[.]" A few hours later, Gandhi replied, "Received and wired to SDC." Jaffe's bank statements reflect that, on September 29, 2015, Jaffe received $1,399,962 from Universal Fine Jewelry FZE. That same day, Jaffe transferred $464,050 to SDC Designs LLC and $950,000 to FDII. FDII's bank statements reflect that, on September 29, 2015, FDII transferred $943,827.50 to SDC Designs LLC. Thus, consistent with the email exchange between Ajay Gandhi and Operation 1, the entire approximately $1.4 million Jaffe received from Universal was ultimately paid to SDC Designs, LLC.

(iii)   On January 29, 2016, Dhinakaran Pillai, a finance manager at Firestar International Pvt. Ltd., emailed Ajay Gandhi, "We have remitted today US $405,180.83 in FSI from FIPL invoice details as listed below . . . Once the payment as has been realized in your account, kindly remit the overdue outstanding of US $650,880.00 against our invoices, details as attached for your reference." The email referenced two invoices from FIPL to FDI dated October 22, 2015 and October 23, 2015, respectively. On February 3, 2016, Subhash Parab, who was copied on Pillai's email to Gandhi, forwarded the email to Operation 1 with the note "FYI". Operation 1 then emailed Gandhi, "Ajaybhai, India Team conformed [sic] that $650k is against his plan $405k, so that Please send to Firestar Dubai $650k, which we yesterday talk [sic]. Regards, Sandeep[.]" Gandhi replied, copying Subhash Parab, "I will pay $425k. Please let me know where or what company."

(iv)    On February 1, 2016, Operation 1 emailed Rebecca Chow and Samir Shah, "You will be received [sic] the goods from Tricolor[.] Please coordinate with Samir Bhai in details[.]" The email included a table listing a total of 379.02 carats of mixed diamonds of varying specifications. FDI's purchase ledger reflects a February 22, 2016 purchase of 379.02 carats of loose diamonds from Tri Color Gems for a total price of $400,131.

(v)     On February 9, 2016, Rebecca Chow emailed Operation 1, copying Ajay Gandhi, "Hi Sandeep, as per our phone conversation, please be informed that package of RE-117 & RE-119 both has [sic] been received in NY. Additionally, there is one shipment received that has no paper work at all."

(vi)    On March 3, 2016, Subhash Parab emailed Ajay Gandhi, copying Operation 1 and Shyam Wadhwa, "Dear Ajaybhai, Kindly wire USD2.00 Mio [sic] payment from A. Jaffe to FIPL as per attached listing." The attachment was a spreadsheet listing several dozen invoices issued by FIPL to Jaffe between March 20, 2015 and September 9, 2015 totaling $2,004,879.70. Gandhi replied, "Just realized cannot pay to Jaffe (Part of $3 m) unless funds are coming in from overseas."

(vii)   On March 29, 2017, Operation 1 emailed Ajay Gandhi, "Ajaybhai, We sold goods to Pacific Diamond FZE, and party will wire advice $1.9m[.] Please send to them Proforma Invoice as below details . . . Regards[,] Sales". Gandhi replied with invoice no. 032017, dated March 20, 2017, reflecting a sale by Jaffe to Pacific of 1,691.25 carats of "Mix Diamonds" at a total price of $2,114,062.50. On April 3, 2017, Jaffe received a $1,499,972 transfer from Pacific with a wire reference of "ADVANCE AGAINST PROFORMA INV N032017." That same day, Jaffe transferred $1,510,267.77 to Firestar International Pvt. Ltd.

(viii)  On September 22, 2017, Gandhi sent an email to Operation 1 attaching a report reflecting accounts receivable owed by Brilliant, Unique, and World Diamond to FDI and asking Operation 1 to "Please have your customer clear these AR - $5.5m on or before September 30, 2017."

## Appendix A-153

On many occasions, Mihir Bhansali and Ajay Gandhi would immediately transfer funds received by the U.S. Entities from the Sheth Entities to Shadow Entities and Foreign Firestar Entities (including through the L/C Collections service), as they commonly did with funds received from Shadow Entities and Firestar Entities, but not from *bona fide* customers. For example:

(i) On April 29, 2011, Excellent Facets wired $769,480 to FDI. On May 2, 2011, FDI paid $749,026.75 through the L/C Collections service.

(ii) On September 7, 2012, Excellent Facets wired $594,013.85 to FDI. The same day, FDI paid $381,290.70 through L/C Collections and paid $272,071.59 to the PNB account of FIPL. These subsequent transfers totaled $653,362.29.

(iii) On July 18, 2013, Excellent Facets received at least $751,895 from Fancy Creations. On the same day, Excellent Facets wired $949,980 to FDI. FDI then paid $489,943.35 through L/C Collections and wired $628,444.79 to FIPL.

(iv) On July 24, 2013, Excellent Facets wired $613,637.68 to FDI. The same day, FDI paid $700,000 to one of its lenders, HSBC Bank.

(v) On November 10, 2014, Excellent Facets wired $1,112,060.50 to Fantasy, after which Fantasy wired $1,100,000 to FDI, FDI transferred $1,100,000 to Jaffe, and Jaffe wired $1,117,113.16 to FIPL.

(vi) On November 19, 2015, Excellent Facets wired $976,864.85 to FDI. The next day, FDI also received $1,500,000 from Fantasy. FDI then transferred $2,100,000 to its Israel Discount Bank of New York account and paid "Trade Services"—a service similar to "L/C Collections" and through which other Firestar Entities were the ultimate beneficiaries of the transfers.

(vii) On December 23, 2015, Excellent Facets wired $969,980 to FDI. On December 28, 2015, FDI made a principal payment of $900,000 to HSBC Bank.

(viii) On April 21, 2015, Mihir Bhansali emailed Ajay Gandhi, "Please wire $250k to E[xcellent]F[acets]I[nc.] from Jaffe, as an advance." Gandhi forwarded the email to Avinash Oza and Arpan Doshi and instructed, "$200,000 from Firestar Diamond Inc. to A. Jaffe. $250,000 from A. Jaffe to Excellent Facet per attached." Oza replied with the wire confirmations. That same day,

Gandhi emailed Shyam Wadhwa with the subject "Jaffe/Twin Field/ Excellent Fac[e]t" and attaching $250,000 check from Jaffe to FDI, a $250,000 check from Twin Fields to Jaffe, confirmation of a $250,000 wire from Jaffe to Twin Fields, and confirmation of the $250,000 wire from Jaffe to Excellent Facets. Gandhi stated, "Please call me tomorrow and I will explain. We wired to Twin Field in error and Twin Field gave money back. We finally wired to Excellent Facet as Loan. Firestar Diamond, Inc. funded the transaction." On June 21, 2016, Jasmine Pradhan of Excellent Facets emailed Ajay Gandhi, "We received loan advance on 4/21/2015 from A. Jaffe Inc[.] [T]oday we are planning to return that amount. I was wondering if you could send me the bank details with wire payment instructions." Several hours later, after the wire was complete, Gandhi forwarded the email chain to Mihir Bhansali and stated, "$250k received. Paying $1.250m to India today. ($250k plus $1m based on shipment for the month)."

(ix)    On December 13, 2012, an HSBC customer service representative emailed Ajay Gandhi, "I have just been notified that there is a wire being sent from [Synergies'] account xxxxx369 in the amount of $90,970.00. There are currently not enough funds available in this account to send out this wire. Also, there are 2 wires being sent from [FDI's] account xxxxx004 totaling $622,591.00. There are currently not enough funds available in this account to send out this wire. Please advise." Gandhi replied, "I am expecting $1.175 million in Firestar Diamond and once it hits then all the wires should be fine. It should have come by now…" Gandhi attached a CitiBank wire confirmation printout showing a $1,175,213.45 wire from SDC LLC's CitiBank checking account to FDI "against invoice 15206996." The printout indicated that the wire was set up by Sridhar Krishnan and approved by Abhay Javeri. FDI's bank statements reflect an inward wire of $1,175,213.45 wire from SDC on December 13, 2012 and outward wires on that day of $391,611 to Synergies and $231,000 to Unique. Synergies' bank statements show that Synergies immediately used the funds received from FDI to wire $91,000 to Brilliant and $300,000 to Unique.

(x)    On December 26, 2013, FDI received wires from SDC Designs Inc. and SDC Designs LLC of $250,000 and $323,745, respectively. On December 30, 2013, Ajay Gandhi emailed Manish Bosamiya and Miten Pandya, "I can pay $1.6m from Firestar before December 31. Please email me a list." Gandhi then forwarded the email to Hemant Bhatt and stated, "FYI. Received some funds from SDC. Bhavesh has details." Bosamiya replied with a spreadsheet listing two invoices issued by FDIPL to FDI totaling $1,547,900.81 and seven invoices issued by FIPL to Tinex H.K. Ltd., Elegant Collection, and D. Navinchandra Jewels for which FDI was listed as the notification party totaling $50,961.26. The spreadsheet also included columns specifying for each invoice the relevant "Bank," "Bank Ref[erence No.], and "Bank Due Date." Gandhi forwarded the spreadsheet to Bhavesh Patel, copying Mihir Bhansali, and stated, "Please setup these wires." Patel then asked for and obtained Gandhi's approval to wire $1 million from

2

Jaffe to FDI to fund the other wires. Later that day, Gandhi replied to Bosamiya and Pandya, "Funds wired. Please acknowledge receipt." Bosamiya replied, "Funds received." FDI's bank statements reflect two outgoing wires to "L/C Collections" on behalf of FDIPL totaling $1,547,900.81 and another $50,961.26 wire to FIPL on December 30, 2013.

(xi)     On July 19, 2014, Manish Bosamiya emailed Hemant Bhatt and Miten Pandya a list of invoices under which FDI owed $660,197.12 to FIPL, FDI owed $731,979.58 to FDIPL, and Fantasy owed $610,268.88 to FIPL. Bhatt forwarded the email to Ajay Gandhi and stated "Please pay as per attachment." Gandhi then forwarded the email to Bhavesh Patel and instructed, "Keep it ready. Funds coming from SDC." FDI's and Fantasy's bank statements reflect that, on July 21, 2014, SDC Designs LLC wired $1,775,989.50 to FDI and that FDI and Fantasy wired a total of $1,119,301.49 to pay down letters of credit issued to FDPL and FDIPL.

(xii)    On February 26, 2014, Ajay Gandhi emailed Sridhar Krishnan, copying Shyam Wadhwa, "Sridhar: After today's payment from Jaffe to you, can you please wire $70,063 to Jaffe from SDC Design Inc. and I will wire back $69,640 to SDC Design LLC so that our AR/AP with Jaffe gets cleaned up?" On April 24, 2014, Ajay Gandhi emailed Shyam Wadhwa, "I need to wire some funds to SDC. What is our payables to them in A. Jaffe?" Wadhwa replied that Jaffe needed to receive $70,063 from SDC Designs, Inc. and to pay SDC Designs LLC $69,640. He stated "These are old balances which have been discussed with you earlier also for clearing our books." Gandhi then forwarded Wadhwa's email to Mihir Bhansali and stated "We do not have any payables to SDC in Jaffe." On June 17, 2014, Wadhwa replied, "This requirement is still open between A. Jaffe and SDC. Please have it closed." Gandhi replied, "Please email Sridhar and copy me." On June 23, 2014, Wadhwa replied, "Pl[ease] have open item wrt SDC in A. Jaffe books cleared from AR and A[P]. FYI – Sridhar has ignored your Feb '14 mail as well as my recent reminder mail." Gandhi forwarded the email chain to Krishnan and asked, "can we clean up?" Krishnan replied, "Hi Ajay[,] Is Mihir in town?"

Appendix A-163

Additional examples of documents and communications illustrating suspicious accounting practices for transactions involving SDC Entities and Sheth Entities include:

(i)    On April 3, 2012, Saju Poulose emailed Ajay Gandhi, copying Raghu Iyer's personal email address, "Need your help to understand the bifurcation of customer wise sales in totality as on Jan 2012 . . . First file is the customer wise report which we consider for consolidation. In order to knockoff the inter sales we take sales in totality. After knock off balance we consider as external sales. . . . From the sales report, (without customer of SDC and Tri star—these are included in your gross working) the total number comes to $49m. That means FS Inc. sale should be $36m instead of $33m?" Gandhi replied, "Please used the attached file for Core Business and other breakdown." He attached a report listing FDI's total sales by customer from April 2011 to January 2012. Customers such as Sams Club, Zales, Macy's, and the U.S. Army and U.S. Navy were listed as "core." Customers such as SDC, Excellent Facets, Tri-Star, and Diagem Inc. were listed as "non-core."

(ii)   On June 13, 2013, Ajay Gandhi emailed Mihir Bhansali an estimated borrowing base for FDI as of May 31, 2013. Gandhi explained that the $3.8 million in ineligible AR consisted of "SDC Designs LLC - $1,395,667, World Diamond - $1,507,816 and the rest are inter-company." Later that day, Gandhi emailed Bhansali an estimated borrowing base as of June 20, 2013. He explained that the $5.26 million in ineligible AR consisted of "SDC Designs LLC - $1,395,667, World Diamond - $1,507,816, RN Enterprise - $509,415, SDC Designs Inc. - $215,243, and the rest are inter-company."

(iii)  On July 10, 2013, Ajay Gandhi emailed Mihir Bhansali, "The following AR will fall-off over 120 days and these AR will severely affect the borrowing base. 1. Diamlink - $1,077,571[;] 2. Excellent Facet - $1,563,678[;] 3. R.N. Enterprise - $509,146[;] 4. SDC Designs, Inc. - $223,670[;] 5. SDC Designs LLC - $195,667[;] 6. SDC Designs, LLC - $195,667[;] 7. Sangam Diamonds, Inc. - $509,528."

(iv)   On July 19, 2013, Ajay Gandhi emailed Shyam Wahdwha, "Please email information on SDC AR and AP and I will contact them to get it cleared." On July 24, 2013, Ajay Gandhi emailed Shyam Wadhwa, Bhavesh Patel, and Alatamsh Ansari, "Need Jaffe AR and AP for *our parties* ASAP" (emphasis added). Ansari replied with a spreadsheet listing the accounts receivable and accounts payable balances for SDC Designs, Inc., Empire, Fancy Creations, and several Firestar Entities. For the eight parties listed, the total receivable balance was $1,878,830 and the total payable balance was $7,328,421. Gandhi replied, "Wadhwa: $5m gap? Where is the

balance AR? Are we missing any names or amounts?" Gandhi then asked for the "full listing" and Ansari replied with a spreadsheet listing both intercompany and third-party receivables and payables. Gandhi replied, "Twin Field A[R]? Where is it?" Ansari replied, "$1.5m lying in Loans receivable." Gandhi then asked for and received confirmation that no other accounts receivable were booked as loans receivable.

(v)  On August 13, 2016, Sagar Thakkar emailed Ajay Gandhi a report of Jaffe's sales and AR as of August 12, 2016, copying Mihir Bhansali, Avinash Oza, and Samuel Sandberg. Bhansali replied, copying Gandhi and Oza but leaving out Sandberg, "Please take out Pacific and Sangam Diamonds, as they are loose sales and not jewelry sales. Going forward, please be mindful of the product type before you send the MIS."

(vi)  On August 18, 2016, Ajay Gandhi emailed Dipika Devrukhkar, Avinash Oza, and Arpan Dosi a request for FDI and NMI's AR and AP as of July 31, 2016 in "Saju['s] format." Devrukhkar replied with the reports. Gandhi replied solely to Oza and instructed, "Please split between Core and Non-Core. **Non-Core are all overseas non-Firestar companies + SDC**. Rest are all core." The "overseas non-Firestar companies" in the list included Brilliant, Empire, Fancy Creations, Pacific, Tri Color, Vista, Unique, and World Diamond Distribution.

(vii)  On April 17, 2017, Kunal Patel forwarded an auditor's request for copies of invoices and other documentation relating to certain sales by NMI in the 2016-2017 fiscal year to Isaac Sandberg, copying Ajay Gandhi. Gandhi replied, "Leave out large amounts for me." The largest transactions listed were: a $2,350,000 sale to Global Diamonds Group on June 30, 2016, a $1,400,000 sale to SDC Designs Inc. on February 24, 2017, a $1,000,000 sale to SDC Designs Inc. on March 1, 2017, an $850,000 sale to Amadena Investments LLC on March 31, 2017, and an $800,000 sale to Excellent Facets Inc. on December 23, 2016.

<u>Appendix A-164</u>

Additional suspicious transactions and communications involving the Deepak Sheth, Neena Sheth, and the Sheth Entities include:

(i)     On September 13, 2010, Prakash Rao of Diamlink emailed Ajay Gandhi, copying Neena Sheth, "Today we remitted $25k to HSBC account, for your information attached swift copy."

(ii)    On August 20, 2012, Shyam Wadhwa emailed Ajay Gandhi FDL's July 2012 financials and noted, "In terms of margins, Core Polish Trading is in sync with the business model, margin of other businesses including wholesale are dependent on billing rates. Exceptional area is recognition of $141k of income received from Excellent Facet per communication from NDM." Gandhi replied, "AR of $73.8m seems too high . . . AP of $40m seems too high too . . . Are we doing anything to clean-up AR / AP? Is inter-company AR and AP matching with other books?"

(iii)   On December 20, 2013, Ajay Gandhi emailed Nirav Modi, "Niravbhai: Josh's Diamond division – yesterday we received $1.6m due to couple sales that he closed. ($1m deposit for $3.1m sales and $600k for other sale). I can ask Manish/Amit for a list to pay India. Please let me know." Nirav Modi replied, copying Mihir Bhansali, "The [$]3.1m sale proceeds will go to Excellent Facet (ask Josh when). Balance, ask Manish." That same day, Josh Weinman emailed Deepak Sheth, "Would you like me to send 1m as advance? Please send wire instructions." Sheth replied, "It can wait till first week of January." Weinman then forwarded Sheth's email to Gandhi and noted, "FYI."

(iv)    On January 2, 2014, Shyam Wadhwa emailed Josh Weinman, copying Ajay Gandhi and Bhavesh Patel, "NY has purchased 70.19 cts EM cut stone from Excellent Facets for $3.10m and sold to Shifman Inc. for $3.10m. No gross margin is reflected in this transaction. Kindly confirm commission if any to be accrued in NY books for this stone." Weinman replied, "1% on sale amount as per Nirav." Wadhwa forwarded Weinman's email to Avinash Oza, copying Ajay Gandhi, and noted, "1. FYI and incorporation in Josh's MIS. 2. Please also replace last receipt purchase cost from HK with actual purchase cost of pink stones based on actual bill of Argyle in the Commission working sheet." On January 14, 2014, Saju Poulose emailed Ajay Gandhi, "Sales to Shifman Inc. for $3.1 million shows cost of sale value purchase from Excellent Facet. Is this transactions for NDM? Have not made profit? Can you please explain if you aware the details[?]" Gandhi replied, "That is correct. It is somebody's goods that we sold." Poulose replied, "That means this is simple an entry? No profit and loss. I should not take this in consolidation?" Gandhi replied, "It is still a sale and inventory and AR

1

are affected. I think it belongs to Excellent Facet – related to NM that I know off [sic]…"

(v) On January 6, 2014, Deepak Sheth emailed Josh Weinman, "At your convenience you can send wire for $750,000 towards advance as per attached details." Weinman forwarded the wire instructions to Ajay Gandhi, who then instructed Bhavesh Patel to arrange the transfer.

(vi) On November 4, 2014, Ajay Gandhi emailed Bhavesh Patel and Avinash Oza, "Please do not include Excellent Fac[e]t sale of 11/4/14 in Fantasy, Inc. and Daily Sales and AR Reports that you email to everyone." On November 10, 2014, Ajay Gandhi emailed Deepak Sheth, "Attached please find wire instruction of Fantasy, Inc. so that you can wire recent sale of $1.112m." Sheth replied, "We will wire transfer for this purchase today and email you wire transfer copy."

(vii) On April 15, 2015, Mihir Bhansali emailed Neena Sheth and Nehal Modi, "Need all account info, and an invoice please, before we can make a wire." Jon Mitchell replied with a $30,000 invoice issued by Phantom Luxury Group to Jaffe for "sales consulting fees." Bhansali forwarded the invoice to Ajay Gandhi and instructed, "Please have this wired, from JAFFE." Gandhi then forwarded the invoice to Avinash Oza and Arpan Doshi, copying Shyam Wadhwa, and instructed, "Please wire $30,000 per below and attached from Jaffe tomorrow." Wadhwa replied, "Is this payment to be booked as Returnable Advance/Advance against services?" Gandhi replied, "$30k to be written-off over 6 months?"

(viii) On March 28, 2017, Mihir Bhansali emailed Ajay Gandhi instructions to "Please bill the following from [NMI]. Bhansali then listed three ring settings sold to SDC Designs Inc. for a total of $2,300,000 and another ring setting sold to Amadena for $850,000. The next day, Bhansali instructed Gandhi to "ADD 1 more style [a $350,000 ring setting], to Excellent Facets[.] Please send both pieces to Deepak masa on MEMO (not billing) no later than tomorrow." Gandhi replied, "Any commission on this? Send this piece on memo to Excellent / Deepak Sheth." Bhansali replied, "Both Amadena and Excellent Facets to be at 10% commission. SDC Designs to be at 3% (as below)." Gandhi replied with the invoices and commission credit memoranda.

(ix) On July 11, 2017, Ajay Gandhi emailed Shyam Wadhwa, "Funds for Wynn and Hawaii? When can I expect? There is urgency to pay this week of around $500k." Wadhwa replied, "Let [sic] speak today. I had arranged $1m through goods shipped from FDL-HK which have been sold by FJ Inc. Please confirm receipt of high jewels sales proceeds of US 1 Mio in FJ Inc." Wadhwa followed up, "US $575k expected from Excellent Facets either Thursday or latest by Friday in Firestar Jewelry, Inc." Gandhi replied, "Need $200k for ASAP."

(x)    On August 4, 2017, an employee sent Gandhi a list of NMI's sales for July 2017. The list included three items: an earring sold to an individual for $6,000, a pendant sold to another individual for $6,500, and a ring sold to Amadena for $575,000 (*i.e.*, the Amadena sale was worth 98% of the combined total of the three sales). Gandhi revised the document to reflect a larger "commission" to Amadena. The NMI employee then asked if Gandhi would send the list to Mihir Bhansali. Gandhi responded that the list was "only for me and it does not go anywhere."

(xi)    On January 22, 2018, Deepak Sheth, on behalf of Excellent Facets, and Mihir Bhansali, on behalf of himself, executed a promissory note under which Excellent Facets agreed to repay on one day's notice a purported $100,000 loan from Bhansali at a 12% annual interest rate. That same day, Deepak Sheth, on behalf of Amadena Investments LLC, and Neena Sheth, on behalf of herself, executed a promissory note under which Amadena Investments agreed to repay on one day's notice a purported $615,000 loan from Neena Sheth at a 1.97% annual interest rate.

Appendix A-165

Additional suspicious transactions and communications involving Abhay Javeri and the

SDC Entities include:

(i)     On April 10, 2012, Rushabh Jethwa emailed Ajay Gandhi, copying Kurian Mathews, asking Gandhi to confirm AR and AP balances between FDFZE and each of Jaffe, FDI, SDC, and JMC. Gandhi replied, "I am not responsible for JMC. I will send you others today." Gandhi then followed up, "for JMC please email Prakash Rao . . . for SDC email Sridhar [Krishnan" and provided Rao's and Krishnan's email addresses. Several hours later, Gandhi replied with FDI and Jaffe balance confirmations bearing his signature.

(ii)     On April 23, 2012, an accountant at Marks Paneth asked Gandhi for contact information for certain counterparties selected for AR confirmation. On April 30, 2012, Gandhi replied with Sridhar Krishnan's email address for SDC Designs LLC and Sangam Diamond, Inc. He followed up, "Tri-Star, Nipur BVBA and A. Jaffe, Inc. were paid in full. We can give you subsequent receipts for these customers. Please do not bother sending emails or mail to them. They may not response [sic]." On May 1, 2012, Gandhi followed up with email addresses for Empire (Rushabh Jethwa's), Unique, Pacific, and Radashir (Kurian Mathews').

(iii)     On August 1, 2012, Ajay Gandhi emailed Rebecca Chow, "Please create a Sales Order for [SDC Designs LLC] from Firestar Diamond Inc. ASAP – Hand Delivery." Gandhi then listed specific quantities and prices of varying grades of mixed diamonds totaling 4,102.37 carats and $2,500,213.45.

(iv)     On September 10, 2012, Shyam Wadhwa emailed Ajay Gandhi, "Kindly advice [sic] right person to be contacted for Diamond Invoices relating to Trading in A. Jaffe. Since these invoices are of high value, delay in receipt of vendor invoices results in bloating of GR/IR figure. Please arrange to mail scanned copy of SDC Invoice $2,680,997 of diamond purchased in July '12." Gandhi replied, attaching the invoice, "Usually Rebecca but I have this invoice." Gandhi then replied, "Please email, PDF invoice copies of SDC of AR and AP for possible off-set." Ansari replied with: (i) a $2,680,996.50 invoice from SDC to Jaffe dated July 25, 2012 for 2,749.74 carats of "Mix Lot" loose diamonds of "Assorted Shapes & Sizes" with a due date of November 22, 2012; and (ii) a $70,062.50 invoice from Jaffe to SDC dated July 25, 2012 for 112.1 carats of mixed diamonds with a due date of August 24, 2012.

(v)     On August 29, 2012, Ajay Gandhi emailed wire instructions for FDII to
        Sridhar Krishan at SDC. Krishnan replied, "Sorry Ajay, I shall be paying
        to Firestar Diamond Inc. from Sangam Diamonds Corp., You need to give
        me a check for $1,500,395 favoring SDC Designs LLC from Firestar
        Diamond International Inc. Pls do not wire, I shall send my messenger
        today afternoon to pickup the check." Several hours later, Gandhi
        replied, "funds never received." The next day, Krishnan replied, "You
        should have got it today. Abhay approved it late in afternoon." Gandhi
        replied, "Received. I will call you or email you once check is ready."

(vi)    On July 31, 2014, Shyam Wadhwa emailed Rebecca Chow instructions to
        send Altamash Ansari a $664,032.29 invoice issued by SDC Designs LLC
        to Jaffe so that Ansari could record the purchase in Jaffe's books. On
        August 4, 2014, Ansari forwarded the email to Gandhi, copying
        Wadhwa, and stated, "Rebecca is not responding on below mail, require
        SDC invoice to record purchase in Jaffe." Gandhi then emailed Sridhar
        Krishnan, "Can you please scan me your invoice to A.Jaffe of $664k?
        After receiving the invoice from Krishnan, Gandhi sent it to Ansari and
        Wadhwa. The invoice reflected a sale of 512.02 carats of loose diamonds
        to Jaffe for $664,030 on July 21, 2014. Several hours later, Krishnan asked
        Gandhi, "Can you please send your statements as of June 30, 2014 for
        SDC Designs LLC, SDC Designs Inc. and Sangam Diamonds Corp.[?]"
        Gandhi replied with a report showing that SDC Designs Inc. and SDC
        Designs LLC owed Jaffe a total of $2,403,062.55, of which $627,073.50 was
        overdue.

(vii)   On March 10, 2015, Ajay Gandhi emailed Sridhar Krishnan, "Please email
        us wire details for potential payments to SDC Designs Inc and LLC."
        Kirshnan replied with the bank account information, but stated, "Please
        do not wire anything this week. Abhay is in Mumbai and no one can
        approve wires."

(viii)  On March 19, 2015, Sridhar Krishnan emailed Ajay Gandhi, "Please wire
        funds of $200k to SDC Designs LLC[.]" Gandhi forwarded the email to
        Arpan Doshi and Avinash Oza, copying Shyam Wadhwa, and
        instructed, "Please wire $200,000 on account from Jaffe to SDC Designs
        LLC against accounts payable of $664k." Doshi replied with the wire
        confirmation.

(ix)    On June 9, 2015, Ajay Gandhi emailed Abhay Javeri instructions to wire
        $10,000 to Ami Modi's personal HSBC checking account. The next day,
        Gandhi followed up, "Hi Abhay: Wire done?" On June 12, 2015, Javeri
        replied, "Hi Ajay, Can you confirm receipt?" On February 7, 2017, Ajay
        Gandhi forwarded the email chain to Nirav Modi's personal assistant
        Navita Mankikar and stated, "Kavita: This is what I found in my email
        and not sure if it is relevant to your phone call from yesterday." Mankikar
        replied, copying Mihir Bhansali, "Can you find out if this account is in

Ami's name and help us get the wire details of the same?" Bhansali replied, "Below account is closed. Please ask Ami directly for info, bankers will not give us. She can call her relationship manager."

(x)     On March 28, 2017, Samir Shah emailed Rebecca Chow, copying Mihir Bhansali and Ajay Gandhi, "Attached are the lot wise details of the goods that I shipped on Friday. I have mentioned as to what goods to keep in NY and what goods to ship to other vendors. The terms for other vendors are[:] Sangam Diamonds LLC – C.O.D.[;] Pacific Diamonds – 120 days." The attached spreadsheet contained rows listing 205 diamonds weighing a total of 1,965.87 carats and having a total value of $1,472,988.04. It also contained a column indicating whether each diamond was shipped to Sangam Diamonds LLC, shipped to Pacific, or kept in New York. Gandhi asked whether the indicated values reflected the sale price or the cost price. Chow replied, "Understood these goods are at sell price. Samir, please provide invoice at cost (no document inside box)[.] [W]e need to book it in before any transaction." Chow then emailed FDI's sourcing department, copying Shah and Gandhi, instructions to create a sales order and invoice to Sangam Diamonds for 1,470.72 carats of loose diamonds for a total price of $942,878.59.

(xi)    On April 6, 2017, Rebecca Chow sent an email to Ajay Gandhi with the subject "Margin – Sales in March" stating: "FYI. Sangam – 56%[;] SDC – 18%[;] Pacific – 16%[;] World – 0[%.]"

(xii)   On August 9, 2017, Nikhil Bhatia emailed Kunal Patel, copying Ajay Gandhi and Shreeram Phanse, "I received the June 30th AR files from Reena. Could you help me in understanding the negative balances in the AR files? Eg in [NMI], there are a couple of clients (. . . SDC Designs) that have credit balance in receivables. Similarly in FSII, Fancy Creations, Auragem & Empire Gems have huge credit balances." Patel replied, "These are advances from customers, that's why it shows with negative balance. It would be settled against their future transactions."

Appendix A-395

In many cases, Nirav Modi, Ajay Gandhi, and Mihir Bhansali caused the U.S. Affiliates, upon receiving actual fraudulent transfers from the Debtors, to subsequently transfer the proceeds of such actual fraudulent transfers to Shadow Entities or other Modi-Controlled Entities. For example:

(i) On August 30, 2012, FDI wired $1,501,000 to FDII. That same day, Gandhi emailed Bhavesh Patel, "Transfer $1,501,000 from [FDI to FDII]. Pay $21,774 from [FDII] to Fancy Creation." That same day, Gandhi emailed Sridhar Krishnan of SDC Designs to let him know that FDII would issue a check in the amount of $1,500,395 to SDC Designs. On August 31, 2012, FDII issued a check in the amount of $1,500,395 to SDC Designs.

(ii) On December 11, 2012, Gandhi emailed Bhavesh Patel, "Please keep wire ready for $602,862 to SDC Designs LLC from [FDII's] Capital Old account for invoice 63966." On December 12, 2012, Gandhi emailed a banker at IDB a request for a $500,000 loan, with respect to which FDI was the obligor and FDII the beneficiary. That same day, the $500,000 loan proceeds were disbursed to FDII's Capital One Bank account. That same day, FDII wired $602,862 to SDC Designs.

(iii) On December 13, 2012, Firestar wired $391,611 to Synergies. That same day, Synergies wired $91,000 to Brilliant. On December 14, 2012, Synergies wired $300,000 to Unique. On December 13, 2012, Ajay Gandhi emailed Bhavesh Patel instructions to make these wires.

(iv) On February 19, 2013, FDI wired $627,000 to FDII. Bhavesh Patel emailed a wire confirmation for this transfer to Ajay Gandhi. That same day, FDII wired $1,266,430 to Fancy Creations and $332,300 to Diagems. That same day, Shyam Wadhwa emailed Bhavesh Patel instructions to make these two wires and stating, "Since Ajaybhai would be traveling tonight . . . please take Ajaybhai signature on wire transfer doc and send it to Mihirbhai for his signature." That same day, Bhavesh Patel emailed Gandhi the wire documents for these transfers. Gandhi forwarded them to Bhansali, stating, "Please print, sign and scan back to me." Bhansali replied, "Done and sent."

(v) On April 25, 2013, FDI wired $350,000 to FDII. That same day, Jaffe wired $480,000 to FDII. That same day, FDII wired $812,030 to Diagems.

(vi) On May 6, 2013, FDI wired $652,239 to FDII. That same day, FDII wired $463,389 to Tri Color. The next day, FDII wired $280,005 to Empire.

(vii)   On June 18, 2013, FDI wired $1,525,000 to FDII. That same day, Bhavesh Patel emailed Gandhi the confirmation for this wire, stating "Please find attached wires as per instructions." That same day, FDII wired $1,615,463.93 to Fancy Creations. On June 17, 2018, Bhavesh Patel emailed Gandhi wire documents for this transfer. Gandhi forwarded them to Mihir Bhansali to sign and return.

(viii)  On July 9, 2013, FDI wired $600,000 to FDII. That same day, FDII wired $600,024 to Fancy Creations. That same day, Bhavesh Patel emailed the wire confirmation for this transfer to Gandhi.

(ix)    On October 23, 2013, Firestar transferred $123,744 to Synergies. On October 24, 2013, Synergies transferred $125,000 to Brilliant. On October 23, 2013, Gandhi emailed Bhavesh Patel instructions to make these transfers.

(x)     On March 18, 2014, Firestar transferred $123,097 to Synergies. That same day, Synergies transferred $123,000 to Brilliant. That same day, Gandhi emailed Bhavesh Patel instructions to make these wires.

(xi)    On February 20, 2015, Firestar transferred $186,871 to Synergies. That same day, Synergies transferred $180,000 to Brilliant. That same day, Gandhi emailed instructions to Arpan Doshi and Avinash Oza to make these wires.

(xii)   On September 29, 2015, Jaffe wired $950,000 to FDII. That same day, FDII wired $943,827 to SDC Designs. That same day, Gandhi emailed Avinash Oza and Arpan Doshi instructions to make these transfers.

(xiii)  On March 9, 2016, FDI transferred $247,551 to Synergies. That same day, Synergies transferred $250,000 to Brilliant. That same day, Gandhi emailed Avinash Oza and Arpan Doshi instructions to make these wires.

(xiv)   On March 25, 2016, Jaffe transferred $1,400,000 to NMI. That same day, NMI transferred $613,069 to Auragem and $787,000 to Nirav Modi Ltd. That same day, Gandhi sent an email to Avinash Oza and Arpan Doshi instructing them to make these wires.

(xv)    On March 20, 2017, Firestar transferred $246,871 to Synergies. That same day, Gandhi emailed Avinash Oza instructions to make this wire. On March 22, 2017, Synergies transferred $240,000 to Brilliant. That same day, Gandhi emailed Avinash Oza and Kunal Patel instructions to make this wire.

| | | | | Schedule A - Transfers from Debtors for the Benefit of CPRE | | |
|---|---|---|---|---|---|---|
| **Date** | **Transferor** | **Property Transferred** | **Value** | **Transferee** | **Beneficiary** | **Description** |
| 3/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/8/2012 | Firestar Diamond, Inc. | Cash | $ 6,598.62 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/2/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/6/2012 | Firestar Diamond, Inc. | Cash | $ 6,598.62 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/10/2012 | Firestar Diamond, Inc. | Cash | $ 6,644.99 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/14/2012 | Firestar Diamond, Inc. | Cash | $ 8,046.57 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/22/2012 | Firestar Diamond, Inc. | Cash | $ 13,314.91 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/2/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/10/2012 | Firestar Diamond, Inc. | Cash | $ 11,701.80 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/16/2012 | Firestar Diamond, Inc. | Cash | $ 65.32 | TOW STUDIOS ARCHITECT PLLC | CPRE | Expense Recorded to FGI/CP |
| 9/4/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/19/2012 | Firestar Diamond, Inc. | Cash | $ 7,301.48 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/26/2012 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/16/2012 | Firestar Diamond, Inc. | Cash | $ 27,000.00 | VICHIHEL RESTORATION INC. | CPRE | Expense Recorded to FGI/CP |
| 11/16/2012 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/3/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/21/2012 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 1/2/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/24/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/21/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/11/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/3/2013 | Firestar Diamond, Inc. | Cash | $ 9,145.50 | VICHIHEL RESTORATION INC | CPRE | Expense Recorded to FGI/CP |
| 5/8/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/20/2013 | Firestar Diamond, Inc. | Cash | $ 6,749.40 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/3/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/4/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/19/2013 | Firestar Diamond, Inc. | Cash | $ 5,593.04 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 6/19/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 7/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/19/2013 | Firestar Diamond, Inc. | Cash | $ 6,675.17 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/14/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 9/3/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/5/2013 | Firestar Diamond, Inc. | Cash | $ 13,455.36 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/20/2013 | Firestar Diamond, Inc. | Cash | $ 12,698.87 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/17/2013 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/14/2013 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/2/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/12/2013 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 1/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/21/2014 | Firestar Diamond, Inc. | Cash | $ 6,996.72 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/3/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/13/2014 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 3/4/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/1/2014 | Firestar Diamond, Inc. | Cash | $ 250.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 4/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/20/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/26/2014 | Firestar Diamond, Inc. | Cash | $ 9,593.02 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/27/2014 | Firestar Diamond, Inc. | Cash | $ 4,585.52 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/28/2014 | Firestar Diamond, Inc. | Cash | $ 13,799.77 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/21/2014 | Firestar Diamond, Inc. | Cash | $ 15,244.16 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/3/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/19/2014 | Firestar Diamond, Inc. | Cash | $ 15,244.16 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/19/2014 | Firestar Diamond, Inc. | Cash | $ 2,500.00 | TOW STUDIOS ARCHITECT PLLC | CPRE | Expense Recorded to FGI/CP |
| 1/2/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/12/2015 | Firestar Diamond, Inc. | Cash | $ 7,626.66 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/2/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/9/2015 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 3/2/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/2/2015 | Firestar Diamond, Inc. | Cash | $ 300.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 4/14/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/22/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/12/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/2/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/12/2015 | Firestar Diamond, Inc. | Cash | $ 18,495.62 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/9/2015 | Firestar Diamond, Inc. | Cash | $ 18,730.79 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 7/10/2015 | Firestar Diamond, Inc. | Cash | $ 109.00 | KLIESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |

| Date | Transferor | Property Transferred | Value | Transferee | Beneficiary | Description |
|---|---|---|---|---|---|---|
| 8/1/2015 | Firestar Diamond, Inc. | Cash | $ 163.00 | KLESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |
| 8/3/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/15/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/5/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/13/2015 | Firestar Diamond, Inc. | Cash | $ 2,555.11 | TOW STUDIOS ARCHITECT PLLC | CPRE | Expense Recorded to FGI/CP |
| 10/20/2015 | Firestar Diamond, Inc. | Cash | $ 15,281.76 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/3/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/24/2015 | Firestar Diamond, Inc. | Cash | $ 7,736.69 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/3/2015 | Firestar Diamond, Inc. | Cash | $ 22,646.00 | VICHIHEL RESTORATION INC. | CPRE | Expense Recorded to FGI/CP |
| 12/4/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/15/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/22/2015 | Firestar Diamond, Inc. | Cash | $ 40.41 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 1/4/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/15/2016 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/17/2016 | Firestar Diamond, Inc. | Cash | $ 13,727.04 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/4/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/21/2016 | Firestar Diamond, Inc. | Cash | $ 300.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 5/3/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/11/2016 | Firestar Diamond, Inc. | Cash | $ 13,745.75 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/8/2016 | Firestar Diamond, Inc. | Cash | $ 1,482.51 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/13/2016 | Firestar Diamond, Inc. | Cash | $ 5,217.13 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/5/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/28/2016 | Firestar Diamond, Inc. | Cash | $ 6,930.46 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/10/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 9/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/8/2016 | Firestar Diamond, Inc. | Cash | $ 5,217.13 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/19/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/4/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/6/2016 | Firestar Diamond, Inc. | Cash | $ 4,463.88 | VICHIHEL RESTORATION INC. | CPRE | Expense Recorded to FGI/CP |
| 10/14/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/9/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/1/2016 | Firestar Diamond, Inc. | Cash | $ 5,224.41 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 12/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/14/2016 | Firestar Diamond, Inc. | Cash | $ 30,000.00 | Firestar Group Inc. | CPRE | Expense Recorded to FGI/CP |
| 12/19/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/19/2016 | Firestar Diamond, Inc. | Cash | $ 7,362.50 | KLESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |
| 1/4/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/8/2017 | Firestar Diamond, Inc. | Cash | $ 6,854.56 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/16/2017 | Firestar Diamond, Inc. | Cash | $ 4,078.21 | KLESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |
| 3/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/9/2017 | Firestar Diamond, Inc. | Cash | $ 7,000.82 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 3/24/2017 | Firestar Diamond, Inc. | Cash | $ 5,224.41 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 3/24/2017 | Firestar Diamond, Inc. | Cash | $ 2,064.00 | ROBINSON & COLE LLP | CPRE | Expense Recorded to FGI/CP |
| 4/4/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/3/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/12/2017 | Firestar Diamond, Inc. | Cash | $ 300.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 5/26/2017 | Firestar Diamond, Inc. | Cash | $ 75,000.00 | Firestar Group Inc. | CPRE | Transfer to FGI for Payment to Marks Paneth |
| 6/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/8/2017 | Firestar Diamond, Inc. | Cash | $ 11,627.60 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/12/2017 | Firestar Diamond, Inc. | Cash | $ 8,000.00 | Firestar Group Inc. | CPRE | Transfer to FGI for Payment for MR Valuation Consulting |
| 6/20/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/26/2017 | Firestar Diamond, Inc. | Cash | $ 5,948.14 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/5/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/1/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/18/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 9/5/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/20/2017 | Firestar Diamond, Inc. | Cash | $ 5,948.14 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/26/2017 | Firestar Diamond, Inc. | Cash | $ 32,592.00 | UNITED STATES TREASURY | CPRE | Expense Recorded to FGI/CP |
| 10/5/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/5/2017 | Firestar Diamond, Inc. | Cash | $ 15,723.06 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/19/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/9/2017 | Firestar Diamond, Inc. | Cash | $ 8,054.55 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/4/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/5/2017 | Firestar Diamond, Inc. | Cash | $ 3,000,642.00 | HSBC MORTGAGE CORPORATION (USA | CPRE | Pay-off of Essex House Apartment Mortgage |
| 12/5/2017 | Firestar Diamond, Inc. | Cash | $ 5,788.51 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 1/24/2018 | Firestar Diamond, Inc. | Cash | $ 15,828.35 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Unknown JW Marriott Essex House Payment |

| | | |
|---|---|---|
| Total Two-Year CPRE Transfers | $ | 3,603,683.69 |
| Total Six-Year CPRE Transfers | $ | 4,594,559.78 |

## Schedule B - Transfers from Debtors to Auragem

| Date | Transferor | Property Transferred | Value | Transferee |
|------|-----------|---------------------|-------|-----------|
| 10/11/2012 | Firestar Diamond, Inc. | Cash | $ 500,000.00 | Auragem Company Limited |
| 9/24/2015 | Firestar Diamond, Inc. | Cash | $ 1,840,968.94 | Auragem Company Limited |

| Total Auragem Transfers | $ 2,340,968.94 |
|------|------|

**Schedule C - Transfers from Debtors to Brilliant**

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 3/25/2014 | Firestar Diamond, Inc. | Cash | $ 4,058,500.00 | Brilliant Diamonds Limited |
| 6/23/2015 | Firestar Diamond, Inc. | Inventory | $ 1,168,389.98 | Brilliant Diamonds Ltd. |
| 6/27/2016 | Firestar Diamond, Inc. | Inventory | $ 840,533.18 | Brilliant Diamonds Ltd. |
| 7/15/2016 | Firestar Diamond, Inc. | Inventory | $ 1,001,354.75 | Brilliant Diamonds Ltd. |
| 7/27/2016 | Firestar Diamond, Inc. | Inventory | $ 762,432.12 | Brilliant Diamonds Ltd. |
| 9/12/2017 | Firestar Diamond, Inc. | Inventory | $ 534,095.01 | Brilliant Diamonds Ltd. |
| 10/11/2017 | Firestar Diamond, Inc. | Inventory | $ 864,587.57 | Brilliant Diamonds Ltd. |
| 11/15/2017 | Firestar Diamond, Inc. | Inventory | $ 574,980.95 | Brilliant Diamonds Ltd. |
| 11/20/2017 | Firestar Diamond, Inc. | Inventory | $ 686,413.55 | Brilliant Diamonds Ltd. |

| | |
|---|---|
| **Total Two-Year Brilliant Transfers** | **$ 5,264,397.13** |
| **Total Six-Year Brilliant Transfers** | **$ 10,491,287.11** |

### Schedule D -  Transfers from Debtors to Diagems

| Date | Transferor | Property Transferred | | Value | Transferee |
|---|---|---|---|---|---|
| 12/14/2012 | Firestar Diamond, Inc. | Cash | $ | 552,133.10 | Diagems FZC |
| 12/18/2012 | Firestar Diamond, Inc. | Cash | $ | 1,325,000.00 | Diagems FZC |
| 12/21/2012 | Firestar Diamond, Inc. | Cash | $ | 119,000.00 | Diagems FZC |
| 3/15/2013 | Firestar Diamond, Inc. | Cash | $ | 322,841.00 | Diagems FZC |
| 3/20/2013 | Firestar Diamond, Inc. | Cash | $ | 647,432.05 | Diagems FZC |

| Total Diagems Transfers | $ | 2,966,406.15 |
|---|---|---|

| | Schedule E – Transfers from Debtors to Empire | | | | |
|---|---|---|---|---|---|

| Date | Transferor | Property Transferred | Value | | Transferee |
|---|---|---|---|---|---|
| 3/14/2012 | Firestar Diamond, Inc. | Cash | $ | 733,000.00 | Empire Gems FZE |
| 7/26/2012 | A. Jaffe, Inc. | Inventory | $ | 2,611,263.60 | Empire Gems FZE |
| 8/3/2012 | A. Jaffe, Inc. | Inventory | $ | 1,819,967.35 | Empire Gems FZE |
| 11/6/2012 | Firestar Diamond, Inc. | Inventory | $ | 1,086,315.83 | Empire Gems FZE |
| 11/30/2012 | Firestar Diamond, Inc. | Inventory | $ | 1,933,090.60 | Empire Gems FZE |
| 12/11/2012 | Firestar Diamond, Inc. | Cash | $ | 1,185,025.05 | Empire Gems FZE |
| 6/20/2013 | A. Jaffe, Inc. | Inventory | $ | 673,432.57 | Empire Gems FZE |
| 1/30/2015 | Fantasy, Inc. | Inventory | $ | 1,002,025.50 | Empire Gems FZE |
| 3/31/2016 | Firestar Diamond, Inc. | Inventory | $ | 1,014,951.07 | Empire Gems FZE |
| 8/12/2016 | A. Jaffe, Inc. | Inventory | $ | 11,150.00 | Empire Gems FZE |
| 9/2/2016 | A. Jaffe, Inc. | Inventory | $ | 42,905.00 | Empire Gems FZE |

| Total Two-Year Empire Transfers | $ 1,069,006.07 |
|---|---|
| Total Six-Year Empire Transfers | $ 12,113,126.57 |

## Schedule F - Transfers from Debtors to Eternal

| Date | Transferor | Property Transferred | Value | Transferee |
|------|-----------|----------------------|-------|-----------|
| 2/20/2015 | Firestar Diamond, Inc. | Cash | $ 300,000.00 | Eternal Diamond Corporation Ltd. |
| 3/16/2016 | A. Jaffe, Inc. | Inventory | $ 218,354.22 | Eternal Diamonds Corporation Ltd. |
| 1/23/2018 | Firestar Diamond, Inc. | Inventory | $ 426,320.97 | Eternal Diamonds Corporation Ltd. |
| 2/6/2018 | Firestar Diamond, Inc. | Inventory | $ 789,140.42 | Eternal Diamonds Corporation Ltd. |

| | |
|---|---|
| Total Two-Year Eternal Transfers | $ 1,433,815.61 |
| Total Six-Year Eternal Transfers | $ 1,733,815.61 |

| Schedule G - Transfers from Debtors to Fancy Creations |
|---|

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 6/8/2012 | Firestar Diamond, Inc. | Cash | $    1,000,000.00 | Fancy Creations Company Limited |
| 12/13/2013 | Firestar Diamond, Inc. | Inventory | $    1,545,774.87 | Fancy Creations Company Limited |
| 7/23/2014 | Firestar Diamond, Inc. | Inventory | $    1,800,879.99 | Fancy Creations Company Limited |
| 9/1/2015 | Firestar Diamond, Inc. | Inventory | $    1,180,230.78 | Fancy Creations Company Limited |
| 9/24/2015 | Firestar Diamond, Inc. | Cash | $    1,400,000.00 | Fancy Creations Company Limited |
| 5/18/2016 | Firestar Diamond, Inc. | Inventory | $    1,031,353.43 | Fancy Creations Company Limited |
| 5/20/2016 | Firestar Diamond, Inc. | Inventory | $      81,455.50 | Fancy Creations Company Limited |
| 7/18/2016 | Firestar Diamond, Inc. | Cash | $    1,809,528.00 | Fancy Creations Company Limited |
| 7/21/2016 | A. Jaffe, Inc. | Cash | $      200,000.00 | Fancy Creations Company Limited |
| 7/21/2016 | Firestar Diamond, Inc. | Cash | $      715,000.00 | Fancy Creations Company Limited |
| 6/27/2017 | Firestar Diamond, Inc. | Inventory | $      63,580.00 | Fancy Creations Company Limited |

| | | |
|---|---|---|
| Total Two-Year Fancy Creations Transfers | $ | 3,900,916.93 |
| Total Six-Year Fancy Creations Transfers | $ | 10,827,802.57 |

### Schedule H - Transfers from Debtors to Pacific

| Date | Transferor | Property Transferred | Value | | Transferee |
|---|---|---|---|---|---|
| 2/28/2012 | Firestar Diamond, Inc. | Inventory | $ | 251,379.68 | Pacific Diamonds FZE |
| 3/1/2012 | Firestar Diamond, Inc. | Inventory | $ | 1,628,433.50 | Pacific Diamonds FZE |
| 3/2/2012 | Firestar Diamond, Inc. | Inventory | $ | 177,350.07 | Pacific Diamonds FZE |
| 3/5/2012 | A. Jaffe, Inc. | Inventory | $ | 280,334.62 | Pacific Diamonds FZE |
| 3/15/2012 | A. Jaffe, Inc. | Inventory | $ | 69,981.60 | Pacific Diamonds FZE |
| 5/2/2012 | Firestar Diamond, Inc. | Inventory | $ | 762,528.95 | Pacific Diamonds FZE |
| 5/31/2012 | Firestar Diamond, Inc. | Inventory | $ | 256,657.25 | Pacific Diamonds FZE |
| 6/7/2012 | Firestar Diamond, Inc. | Inventory | $ | 1,977,768.60 | Pacific Diamonds FZE |
| 9/28/2012 | Firestar Diamond, Inc. | Inventory | $ | 1,912,840.00 | Pacific Diamonds FZE |
| 12/21/2012 | Firestar Diamond, Inc. | Cash | $ | 560,000.00 | Pacific Diamonds FZE |
| 2/22/2013 | Firestar Diamond, Inc. | Cash | $ | 503,501.41 | Pacific Diamonds FZE |
| 3/15/2013 | Firestar Diamond, Inc. | Cash | $ | 670,000.00 | Pacific Diamonds FZE |
| 3/26/2013 | Firestar Diamond, Inc. | Cash | $ | 407,120.00 | Pacific Diamonds FZE |
| 3/26/2013 | Firestar Diamond, Inc. | Cash | $ | 407,120.00 | Pacific Diamonds FZE |
| 8/30/2013 | Firestar Diamond, Inc. | Inventory | $ | 1,768,423.08 | Pacific Diamonds FZE |
| 9/30/2013 | A. Jaffe, Inc. | Inventory | $ | 985,843.04 | Pacific Diamonds FZE |
| 10/10/2013 | A. Jaffe, Inc. | Inventory | $ | 1,047,311.70 | Pacific Diamonds FZE |
| 10/10/2013 | A. Jaffe, Inc. | Inventory | $ | 1,374,201.60 | Pacific Diamonds FZE |
| 10/23/2013 | Firestar Diamond, Inc. | Cash | $ | 150,000.00 | Pacific Diamonds FZE |
| 10/25/2013 | A. Jaffe, Inc. | Inventory | $ | 731,846.66 | Pacific Diamonds FZE |
| 10/30/2013 | A. Jaffe, Inc. | Cash | $ | 2,455,036.00 | Pacific Diamonds FZE |
| 4/11/2014 | Firestar Diamond, Inc. | Inventory | $ | 1,301,133.90 | Pacific Diamonds FZE |
| 1/23/2015 | Fantasy, Inc. | Inventory | $ | 1,552,482.90 | Pacific Diamonds FZE |
| 3/20/2015 | Firestar Diamond, Inc. | Inventory | $ | 1,666,072.46 | Pacific Diamonds FZE |
| 6/23/2015 | Firestar Diamond, Inc. | Cash | $ | 1,138,270.60 | Pacific Diamonds FZE |
| 6/26/2015 | Firestar Diamond, Inc. | Cash | $ | 1,438,270.60 | Pacific Diamonds FZE |
| 9/25/2015 | Firestar Diamond, Inc. | Cash | $ | 54,000.00 | Pacific Diamonds FZE |
| 9/28/2015 | Firestar Diamond, Inc. | Cash | $ | 1,017,000.00 | Pacific Diamonds FZE |
| 10/7/2015 | Firestar Diamond, Inc. | Cash | $ | 1,071,000.00 | Pacific Diamonds FZE |
| 11/13/2015 | Firestar Diamond, Inc. | Cash | $ | 560,741.52 | Pacific Diamonds FZE |
| 2/23/2016 | A. Jaffe, Inc. | Cash | $ | 1,100,000.00 | Pacific Diamonds FZE |
| 2/26/2016 | Firestar Diamond, Inc. | Inventory | $ | 296,659.46 | Pacific Diamonds FZE |
| 3/3/2016 | Firestar Diamond, Inc. | Cash | $ | 873,996.50 | Pacific Diamonds FZE |
| 3/3/2016 | Firestar Diamond, Inc. | Cash | $ | 53,863.40 | Pacific Diamonds FZE |
| 3/15/2016 | A. Jaffe, Inc. | Cash | $ | 700,000.00 | Pacific Diamonds FZE |
| 3/21/2016 | A. Jaffe, Inc. | Cash | $ | 1,000,000.00 | Pacific Diamonds FZE |
| 3/23/2016 | A. Jaffe, Inc. | Cash | $ | 900,000.00 | Pacific Diamonds FZE |
| 3/24/2016 | A. Jaffe, Inc. | Cash | $ | 1,000,000.00 | Pacific Diamonds FZE |
| 4/5/2016 | A. Jaffe, Inc. | Cash | $ | 500,000.00 | Pacific Diamonds FZE |
| 5/6/2016 | A. Jaffe, Inc. | Cash | $ | 2,000,000.00 | Pacific Diamonds FZE |
| 6/1/2016 | A. Jaffe, Inc. | Cash | $ | 815,000.00 | Pacific Diamonds FZE |

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 6/17/2016 | Firestar Diamond, Inc. | Inventory | $ 693,348.24 | Pacific Diamonds FZE |
| 3/28/2017 | Firestar Diamond, Inc. | Inventory | $ 459,508.55 | Pacific Diamonds FZE |
| 1/3/2018 | A. Jaffe, Inc. | Cash | $ 530,000.00 | Pacific Diamonds FZE |
| 1/3/2018 | Firestar Diamond, Inc. | Cash | $ 483,620.05 | Pacific Diamonds FZE |
| 1/3/2018 | Firestar Diamond, Inc. | Cash | $ 2,188,769.43 | Pacific Diamonds FZE |

| | |
|---|---|
| **Total Two-Year Pacific Transfers** | **$ 12,494,765.63** |
| **Total Six-Year Pacific Transfers** | **$ 41,771,415.37** |

**Schedule I - Transfers from Debtors to Tri Color**

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 3/1/2012 | Firestar Diamond, Inc. | Inventory | $ 1,805,720.16 | Tri Color Gems FZE |
| 3/18/2013 | Firestar Diamond, Inc. | Cash | $ 1,000,000.00 | Tri Color Gems FZE |
| 3/19/2013 | Firestar Diamond, Inc. | Cash | $ 200,024.90 | Tri Color Gems FZE |
| 3/21/2013 | Firestar Diamond, Inc. | Cash | $ 1,013,165.00 | Tri Color Gems FZE |
| 5/1/2013 | Firestar Diamond, Inc. | Cash | $ 600,000.00 | Tri Color Gems FZE |
| 5/6/2013 | Firestar Diamond, Inc. | Cash | $ 1,600,000.00 | Tri Color Gems FZE |
| 10/10/2013 | A. Jaffe, Inc. | Inventory | $ 1,914,721.20 | Tri Color Gems FZE |
| 7/11/2014 | Firestar Diamond, Inc. | Cash | $ 414,405.20 | Tri Color Gems FZE |
| 9/29/2015 | Firestar Diamond, Inc. | Inventory | $ 1,610,088.00 | Tri Color Gems FZE |
| 2/24/2016 | Firestar Diamond, Inc. | Inventory | $ 743,312.85 | Tri Color Gems FZE |
| 2/26/2016 | Firestar Diamond, Inc. | Cash | $ 1,192,105.55 | Tri Color Gems FZE |
| 3/30/2016 | Fantasy, Inc. | Cash | $ 301,540.00 | Tri Color Gems FZE |

| | |
|---|---|
| **Total Two-Year Tri Color Transfers** | **$ 1,493,645.55** |
| **Total Six-Year Tri Color Transfers** | **$ 12,395,082.86** |

**Schedule J - Transfers from Debtors to Unique**

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 3/29/2012 | Firestar Diamond, Inc. | Inventory | $ 3,144,477.38 | Unique Diamond & Jewellery FZC |
| 7/13/2012 | A. Jaffe, Inc. | Inventory | $ 874,867.52 | Unique Diamond & Jewellery FZC |
| 9/12/2012 | Firestar Diamond, Inc. | Cash | $ 150,000.00 | Unique Diamond & Jewellery FZC |
| 12/13/2012 | Firestar Diamond, Inc. | Cash | $ 231,000.00 | Unique Diamond & Jewellery FZC |
| 9/24/2013 | Firestar Diamond, Inc. | Inventory | $ 921,027.10 | Unique Diamond & Jewellery FZC |
| 3/18/2014 | Firestar Diamond, Inc. | Cash | $ 150,000.00 | Unique Diamond & Jewellery FZC |
| 1/19/2015 | Firestar Diamond, Inc. | Inventory | $ 125,590.00 | Unique Diamond & Jewellery FZC |
| 3/2/2015 | Firestar Diamond, Inc. | Cash | $ 300,000.00 | Unique Diamond & Jewellery FZC |
| 9/30/2015 | Firestar Diamond, Inc. | Inventory | $ 2,122,401.60 | Unique Diamond & Jewellery FZC |
| 3/4/2016 | Firestar Diamond, Inc. | Cash | $ 300,000.00 | Unique Diamond & Jewellery FZC |
| 6/17/2016 | Firestar Diamond, Inc. | Inventory | $ 331,028.54 | Unique Diamond & Jewellery FZC |
| 3/22/2017 | Firestar Diamond, Inc. | Cash | $ 300,000.00 | Unique Diamond & Jewellery FZC |
| 5/23/2017 | Firestar Diamond, Inc. | Inventory | $ 638,934.23 | Unique Diamond & Jewellery FZC |
| 7/17/2017 | Firestar Diamond, Inc. | Inventory | $ 1,905,068.65 | Unique Diamond & Jewellery FZC |

| | |
|---|---|
| **Total Two-Year Unique Transfers** | **$ 3,475,031.42** |
| **Total Six-Year Unique Transfers** | **$ 11,494,395.02** |

| Schedule K - Transfers from Debtors to World Diamond |
|---|

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 5/2/2012 | A. Jaffe, Inc. | Inventory | $ 1,454,821.45 | World Diamond Distribution FZE |
| 3/28/2013 | Firestar Diamond, Inc. | Inventory | $ 959,097.55 | World Diamond Distribution FZE |
| 5/2/2013 | Firestar Diamond, Inc. | Inventory | $ 548,718.30 | World Diamond Distribution FZE |
| 6/21/2013 | Firestar Diamond, Inc. | Inventory | $ 1,479,565.30 | World Diamond Distribution FZE |
| 7/26/2013 | Firestar Diamond, Inc. | Inventory | $ 480,487.13 | World Diamond Distribution FZE |
| 9/24/2013 | Firestar Diamond, Inc. | Inventory | $ 522,483.15 | World Diamond Distribution FZE |
| 10/25/2013 | Firestar Diamond, Inc. | Inventory | $ 911,408.98 | World Diamond Distribution FZE |
| 2/21/2014 | Firestar Diamond, Inc. | Inventory | $ 1,968,839.60 | World Diamond Distribution FZE |
| 10/6/2015 | Firestar Diamond, Inc. | Inventory | $ 682,219.05 | World Diamond Distribution FZE |
| 10/7/2015 | Firestar Diamond, Inc. | Inventory | $ 285,071.95 | World Diamond Distribution FZE |
| 12/10/2015 | Firestar Diamond, Inc. | Inventory | $ 1,275,300.30 | World Diamond Distribution FZE |
| 9/7/2016 | Firestar Diamond, Inc. | Inventory | $ 647,031.88 | World Diamond Distribution FZE |
| 10/18/2016 | Firestar Diamond, Inc. | Inventory | $ 946,397.24 | World Diamond Distribution FZE |
| 1/20/2017 | Firestar Diamond, Inc. | Inventory | $ 984,058.12 | World Diamond Distribution FZE |
| 2/15/2017 | Firestar Diamond, Inc. | Inventory | $ 633,111.89 | World Diamond Distribution FZE |
| 3/3/2017 | Firestar Diamond, Inc. | Inventory | $ 687,520.22 | World Diamond Distribution FZE |
| 4/27/2017 | Firestar Diamond, Inc. | Inventory | $ 821,671.50 | World Diamond Distribution FZE |
| 5/12/2017 | Firestar Diamond, Inc. | Inventory | $ 1,122,083.08 | World Diamond Distribution FZE |
| 5/31/2017 | Firestar Diamond, Inc. | Inventory | $ 790,999.16 | World Diamond Distribution FZE |
| 6/1/2017 | Firestar Diamond, Inc. | Inventory | $ 945,911.45 | World Diamond Distribution FZE |
| 7/11/2017 | Firestar Diamond, Inc. | Inventory | $ 819,420.00 | World Diamond Distribution FZE |
| 7/28/2017 | Firestar Diamond, Inc. | Inventory | $ 577,087.91 | World Diamond Distribution FZE |
| 12/5/2017 | Firestar Diamond, Inc. | Inventory | $ 1,632,500.53 | World Diamond Distribution FZE |

| Total Two-Year World Diamond Transfers | $ 10,607,792.98 |
|---|---|
| Total Six-Year World Diamond Transfers | $ 21,175,805.74 |

Sch. L

## Schedule L -  Transfers from Debtors to Twin Fields

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 2/1/2013 | A. Jaffe, Inc. | Cash | $ 400,000.00 | Twin Fields Investment |
| 3/14/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/10/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 5/17/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 5/28/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 5/29/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 7/26/2013 | A. Jaffe, Inc. | Cash | 100,000.00 | Twin Fields Investment |
| 8/5/2013 | A. Jaffe, Inc. | Cash | 300,000.00 | Twin Fields Investment |
| 9/4/2013 | A. Jaffe, Inc. | Cash | 450,000.00 | Twin Fields Investment |
| 9/12/2013 | A. Jaffe, Inc. | Cash | 750,000.00 | Twin Fields Investment |
| 9/25/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 10/1/2013 | A. Jaffe, Inc. | Cash | 300,000.00 | Twin Fields Investment |
| 10/17/2013 | A. Jaffe, Inc. | Cash | 50,000.00 | Twin Fields Investment |
| 10/30/2013 | A. Jaffe, Inc. | Cash | 100,000.00 | Twin Fields Investment |
| 11/12/2013 | A. Jaffe, Inc. | Cash | 610,000.00 | Twin Fields Investment |
| 12/3/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 3/3/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/21/2014 | A. Jaffe, Inc. | Cash | 400,000.00 | Twin Fields Investment |
| 5/22/2014 | A. Jaffe, Inc. | Cash | 200,000.00 | Twin Fields Investment |
| 6/9/2014 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 6/12/2014 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 7/25/2014 | A. Jaffe, Inc. | Cash | 600,000.00 | Twin Fields Investment |
| 8/4/2014 | A. Jaffe, Inc. | Cash | 255,000.00 | Twin Fields Investment |
| 8/20/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 9/26/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 11/19/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 2/10/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/7/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/21/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 5/22/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 6/3/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 6/22/2015 | Firestar Diamond, Inc. | Cash | 31,542.28 | Twin Fields Investment |
| 6/22/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 7/1/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 7/15/2015 | A. Jaffe, Inc. | Cash | 1,000,000.00 | Twin Fields Investment |
| 7/29/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 8/26/2015 | A. Jaffe, Inc. | Cash | 350,000.00 | Twin Fields Investment |
| 9/16/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 9/29/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 10/26/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 11/6/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 12/3/2015 | A. Jaffe, Inc. | Cash | 200,000.00 | Twin Fields Investment |
| 2/2/2016 | A. Jaffe, Inc. | Cash | 1,000,000.00 | Twin Fields Investment |
| 4/14/2016 | A. Jaffe, Inc. | Cash | 150,000.00 | Twin Fields Investment |
| 6/8/2016 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 6/14/2016 | A. Jaffe, Inc. | Cash | 150,000.00 | Twin Fields Investment |

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 7/14/2016 | A. Jaffe, Inc. | Cash | 140,000.00 | Twin Fields Investment |
| 10/11/2016 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 1/18/2017 | A. Jaffe, Inc. | Cash | 300,000.00 | Twin Fields Investment |
| 2/1/2017 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 2/10/2017 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 3/1/2017 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 3/10/2017 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 3/16/2017 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 3/30/2017 | A. Jaffe, Inc. | Cash | 150,000.00 | Twin Fields Investment |
| 5/4/2017 | A. Jaffe, Inc. | Cash | 125,000.00 | Twin Fields Investment |

| | |
|---|---|
| Total Two-Year Twin Fields Transfers | $ 3,265,000.00 |
| Total Six-Year Twin Fields Transfers | $ 21,361,542.28 |

محكمة الإفلاس في الولايات المتحدة

المنطقة الجنوبية من نيويورك

| | | |
|---|---|---|
| الفصل ١١ | | فيما يتعلق: |
| رقم: ١٨ – ١٠٨٠٩ (SHL) | | بشركة فايرستار دايموند، انك، وآخرون |
| (إدارة مشتركة) | | المدينون |
| | | ريتشارد ليفين وصي الفصل ١١ عن شركة فايرستار دايموند، انك، فنتازي، انك، وأولد أيه جيه، انك، المعروفة مسبقاً بـ أيه. جافي، إنك. |
| رقم إجراءات الخصم: | | المدعي |
| | | ضد |
| | | آمـي جـافيري (المعروفة مسبقاً آمـي مـودي)، بـورفي، ميهتـا (المعروفة مسبقاً بورفي مودي)، نهال مودي، نيشال مودي، سـنترال بـارك ريـل اسـتيت ذ.م.م، سـنترال بـارك سـاوث ٥٠ بروبرتيـز، ذ.م.م، ترايدنت تراسـت (سـاوث داكوتـا) انـك، فقـط بصفة الوصي عن شركة إيثاكا ترست، توين فيلدز انفستمنتس ليمتد، أوراجيم كومباني ليمتد، بريليانت دايموندز ليمتد، اتيرنال دايمونـدز كوربوريشـن ليمتد، فانسـي كريشـنز كومبـاني ليمتد، هاميلتون بريشوس تريـدرز ليمتـد، سينو تريـدرز ليمتـد، صن شاين جيمس ليمتد، يونيك دايموند أند جولري م.م.ح، وورلد دايموند ديستريبيوشن م.م.ح، فيستا جولري م.م.ح، امباير جيرم م.م.ح، يونيفرسال فاين جولري م.م.ح، دياجيمز م.م.ح، تراي كلر جيمز م.م.ح، باسفيك دايموندز م.م.ح، هيمالايان تريدرز |

| | م.م.ح، يونيتي تريدينجز م.م.ح، فاين كلاسيك م.م.ح، دي جي |
| | برذرز م.م.ح |
| | |
| | **المدعى عليه** |
| شكوى لتلافي واسترداد عمليات النقل الاحتيالية الفعلية، وعن أضرار التآمر بما يخالف أحكام قانون المؤسسات الفاسدة المتأثرة بالابتزاز. | |

**جدول المحتويات**

| | | |
|---|---|---|
| **طبيعة الدعوى** | | ١ |
| **الاختصاص القضائي والمكان** | | ٣ |
| **الأطراف والكيانات الأخرى ذات الصلة.** | | ٤ |
| | **أولاً:** المدينون والوصي | ٤ |
| | **ثانياً:** الشركات التابعة الأمريكية | ٤ |
| | **ثالثاً:** المدعى عليهم | ٥ |
| **الخلفية** | | ٧ |
| | **أولاً:** الاحتيال المصرفي | ١٠ |
| | أ. آلية الاحتيال المصرفي | ١٠ |
| | ب. دور المدينين والكيانات التابعة الأمريكية في الاحتيال المصرفي. | ١٦ |
| | ج. تورط مديري ومسؤولين الكيانات الأمريكية في الاحتيال المصرفي. | ١٧ |
| | د. تورط ميول تشوكسي، ونهال مودي، ونينا شيث، وديباك شيث، وأبهاي جافيري، وكيانات شيث، وكيانات إس. دي. سي في الاحتيال المصرفي. | ٢٧ |
| | هـ. غسل الأموال من خلال توين فيلدز وبايلي بنكس آند بيدل | ٣٠ |
| | و الكشف عن والتعرض للاحتيال المصرفي | ٣٣ |
| | **ثانياً: الجهود الإجرامية قبل فترة وجيزة من وبعد التعرض للاحتيال المصرفي.** | ٣٦ |
| | أ. نهب المدينين، والكيانات التابعة الأمريكية وغيرها من كيانات فايرستار | ٣٦ |
| | ب. حالات التقصير الاحتيالية، والتحريف والتضليل. التي تمت فيما يتعلق بقضايا المدينين في الفصل ١١ | ٤٦ |

| | | |
|---|---|---|
| ٥٠ | ج. جهود أخرى للتستر وإحباط التحقيقات في الاحتيال المصرفي. | |
| ٥٤ | د. غسيل الأموال إلى أفراد عائلة مودي قبل التعرض للاحتيال المصرفي | |
| ٧٠ | مطالبات الانتصاف | |
| ٧٠ | التهم | |
| ١٣٩ | استرحام الانتصاف | |

المدعي ريتشارد ليفين، ليس بصفته الشخصية، بل فقط بوصفه وصي بموجب الفصل ١١ ("الوصي" أو "المدعي") عن المدينين فايرستار دايموند، انك، فنتازي، انك، وأولد أيه جيه، انك، المعروف سابقاً أيه. جافي، أنك. (معاً "المدينين") وكصاحب حكم بالتضامن والتكافل ضد، وبصفته المحال إليه كافة المطالبات الخاصة بشركة سينيرجيز كوربوريشن ("سينيرجيز")، فايرستار جروب، انك (فايرستار)، فايرستار دايموند انترناشيونال ("فايرستار انترناشيونال")، نيراف مودي، انك (نيراف)، وأيه في دي تريدينج، انك (**أيه.في.دي**) (معاً، الكيانات التابعة الأمريكية، وتشكل معاً مع المدينين، الكيانات الأمريكية)، بخصوص الشكوى التي تزعم ما يلي:

## طبيعة الدعوى

١. يرفع الوصي هذه الدعوى، التي تشكل كلاً من مطالبات التركة والمطالبات المسندة إلى الوصي بواسطة الكيانات التابعة الأمريكية، لاسترداد الأضرار التي تمت معاناتها نتيجة لمؤامرة استغلال عائلة مودي لما يقرب فترة العقد والتي استمرت على الأقل منذ عام ٢٠١٠ إلى منتصف عام ٢٠١٨ ("الفترة المعنية"). لقد أدت المؤامرة إلى تحويل مئات ملايين الدولارات من الأصول لمصلحة أفراد عائلة مودي وغيرهم من المتآمرين، وانهيار الكيانات الأمريكية، ما أدى إلى خسارة قيمة أعمال الكيانات الأمريكية. انضم كل من المدعى عليهم ودعموا مؤامرة الاستغلال، كما تحولت من الاحتيال المصرفي وغسل الأموال إلى عرقلة العدالة والنهب.

٢. وافقت شقيقة نيراف مودي، بورفي ميهتا، على أن تكون المالك المستفيد لعدد من الشركات الوهمية التي استخدمها نيراف مودي لارتكاب أكبر عملية احتيال مصرفي في التاريخ الهندي. ثم قامت ميهتا شخصيا بغسل أكثر من ١٠٠ مليون دولار من العائدات

غير المشروعة من خلال شبكة الشركات الوهمية التي تعود لعائلة مودي، وودائع العائلة، وأفراد العائلة، والشركات الشرعية الأخرى – مما أدى إلى تدمير تلك الأعمال في هذه العملية.

٣. وافقت زوجة نيراف مودي، آمي جافيري، على العمل كشريك في ثلاث شركات مقرها في الهند، وحصلت نيراف مودي باسمها على قروض احتيالية بقيمة ٣.٥ مليار دولار تقريباً (المعرفة أدناه باسم (كيانات خطابات التعهد). عندها تولت جافيري بعد ذلك إدارة وتسهيل جهود عائلة مودي المنهجية لغسل وحماية عائدات الاحتيال من الدائنين، لما يزيد عن ٣٠ مليون دولار في العقارات.

٤. سافر شقيق نيراف مودي، نهال مودي، حول العالم بعد الكشف عن أدلة الاحتيال المدمرة، والتلاعب بالشهود، وتأمين الأصول من الحجر عليها بواسطة السلطات الحكومية والدائنين. في وقت مبكر من قضايا الفصل ١١ قبل تعيين الوصي، قام نهال مودي أيضاً باستخدام العديد من أصدقائه الشخصيين لنهب مخزون وأموال أكثر من ٤٠ مليون دولار للشركات التابعة الأمريكية، بحيث لا يمكن استخدام هذه الأموال لدفع ديون الشركات التابعة الأمريكية الكبيرة إلى المدينين.

٥. عمل أيضاً شقيق مودي الآخر، نيشال مودي، كشريك في ثلاث كيانات خطاب التعهد، بصفته المالك المستفيد من العديد من كيانات الظل وغيرها من الشركات الوهمية، وكواحد من المديرين الرئيسيين لإدارة الأعمال اليومية لمعاملات الاستيراد والتصدير الاحتيالية التي تدعم الاحتيال المصرفي. كما تم اختار نيشال مودي شخصياً واستأجر العديد من المديرين والمسؤولين وغيرهم من الموظفين "الوهميين" للعمل في شبكة الشركات التي تعود ملكيتها لعائلته سراً. كما لعب دوره في عملية غسل أموال العائلة، بما في ذلك من

خــلال الحصــول علــى توكيــل لأختــه بــورفي ميهتــا، التــي حفظت باسمها العائــدات غير المشروعة في حسابات مصرفية في جميع أنحاء العالم.

٦. إن إيثاكا ترست وسنترال بارك ساوث ٥٠ بروبرتيز، ذ.م.م، وسنترال بارك ريل استيت ذ.م.م، اللتان تمتلكان معاً شقتين لعائلة مودي في مانهاتن، لم تكن من حيل تستخدمها عائلة مودي لحماية أكثر من ٣٠ مليون دولار من ثروتهم غير المشروعة من الدائنين.

٧. شركة توين فيلدز انفستمنتس ليمتد، عبارة عن شركة وهمية في ديلاوير تمتلك عائلة مودي من خلالها وتدير سراً متاجر البيع بالتجزئة بايلي بنكس آند بيدل كواجهة أخرى لعمليات غسيل الأموال. قامت عائلة مودي بغسل أكثر من ٨٠ مليون دولار من خلال توين فيلدز خلال الفترة المعنية.

٨. يتشكل المدعى عليهم الباقون، الذي يرد تحديدهم أدناه على أنهم كيانات الظل، من العديد من الشركات التي يقع مقرها في هونج كونج ودبي، والتي تمتلكها عائلة مودي سراً، ومــع ذلك يتم تمثيلهم كبــائعين وعمــلاء للمصــارف ومــدققي حسابات مستقلين وحتى هــذه المحكمة.

٩. يسعى الوصي أيضاً إلى تجنب العديد من عمليات النقل الاحتيالية لأصول المدينين التي تم إجراؤها إلى المدعى عليهم، وبصفته دائناً للحكم في الشركات التابعة للولايات المتحدة، يسعى إلى تجنب عمليات النقل الاحتيالية لأصول الشركات التابعة الأمريكية إلى المدعى عليهم.

**الاختصاص القضائي والمكان**

١٠. لدى محكمة الولايات المتحدة الجزئية في هذه المقاطعة ("محكمة المقاطعة") اختصاص للنظر في إجراءات الخصم الماثلة بموجب قانون الولايات المتحدة الفقرة (٢٨) ١٣٣٤ (ب)، لأن إجراءات الخصم هذه تنشأ بموجب البند ١١ من قانون الولايات المتحدة وتتعلق بهذه القضايا من الفصل ١١، وبموجب قانون الولايات المتحدة الفقرة (٢٨) ١٣٣١ و ١٨ من قانون الولايات المتحدة الفقرة ١٩٦٤(ج)، لأن إجراءات الخصم الناشئة بموجب قوانين الولايات المتحدة، بما في ذلك البند ١٨ من قانون الولايات المتحدة والبند ١٩٦٢، وتطلب استرداد الخسائر بسبب مخالفة البند ١٨ من قانون الولايات المتحدة والبند ١٩٦٢. تتمتع هذه المحكمة بسلطة الاستماع إلى إجراءات الخصم هذا بسبب إحالة محكمة المقاطعة بموجب القانون ٢٨ من قانون الولايات المتحدة البند ١٥٧ (أ) وبموجب الأمر العام إم‑ ٤٣١ (الأمر المرجعي القائم المعدل).

١١. هذه إجراءات الخصم، إجراءات أساسية بموجب قانون الولايات المتحدة رقم ٢٨ البند ١٥٧ (ب) (٢) (ح) و (س) فيما يتعلق بالتهم من ٧ إلى ٥٤، وتتمتع هذه المحكمة بسلطة الاستماع إليها والبت فيها، وهي ليست إجراء أساسي فيما يتعلق بالتهم من ١ إلى ٦.

١٢. إلى الحد الذي لا تتمتع فيه هذه المحكمة بسلطة البت في المطالبات التي تم تأكيدها في إجراءات الخصم الماثلة، وإصدار حكم نهائي بشأنها، يوافق القيم على إعلان وإصدار حكم أو أمر نهائي بواسطة هذه المحكمة.

١٣. مكان إجراءات الخصم الماثلة مناسب في هذه المنطقة بموجب البند ٢٨ من قانون الولايات المتحدة، الفقرة ١٤٠٩.

**الأطراف والكيانات الأخرى ذات الصلة**

**أولاً: المدينون والوصي**

١٤. المدين شركة فايرستار دايموند، (المعروفة سابقاً فايرستون، انك)، (فايرستار) وهي شركة خاصة في ديلاوير، ويقع مقر عملها الرئيسي في نيويورك. أثناء عملها، كانت فايرستار تعمل بشكل رئيسي في تجارة المجوهرات بالجملة.

١٥. المدين فنتازي، أنك (فنتازي)، وهي شركة خاصة في ديلاوير الخاص، ويقع مقر عملها الرئيسي في نيويورك. أثناء عملها، كانت فنتازي تعمل بشكل رئيسي في تجارة المجوهرات بالجملة. وطيلة الفترة المعنية، كانت فايرستار تمتلك ١٠٠٪ من حقوق الملكية في شركة فنتازي.

١٦. المدين أولد إيه. جي، أنك (المعروفة سابقاً، جافي أنك، المعروفة سابقاً، ساندبيرج أند سيكورسكي كورب) (جافي)، وهي شركة خاصة في نيويورك، ويقع مقر أعمالها الرئيسي في نيويورك. أثناء عملها، عملت جافي بشكل أساسي في تجارة بالجملة لمجوهرات العروس.

١٧. تم تعيين المدعي ريتشارد ليفين هو الوصي بموجب الفصل ١١ للمدينين، على النحو الواجب بموجب المادة ١١٠٤ (أ) من قانون الإفلاس من قبل وصي الولايات المتحدة للمنطقة ٢ في ١٤ يونيو ٢٠١٨، وقد وافقت المحكمة على تعيينه بأمر نفذ في نفس اليوم. يرفع الوصي هذه الدعوى، ليس بصفته الشخصية، بل بصفته الوصي فقط.

**ثانياً: الشركات التابعة الأمريكية**

١٨. فايرستار جروب، شركة تأسست في ولاية ديلاوير، هي شركة قابضة تمتلك حوالي ٩٥ في المائة من حقوق الملكية في فايرستار. يمتلك صموئيل ساندبرج ما يقرب من نسبة ٥٪ المتبقية من فايرستار.

١٩. شركة سينيرجيز، شركة تأسست في ولاية ديلاوير، وهي شركة قابضة تمتلك حوالي ٩٥٪ من حقوق الملكية في شركة جافي و ١٠٠٪ من حقوق الملكية في شركة فايرستار جروب. يمتلك صموئيل ساندبرج ما يقرب من ٥٪ من جافي.

٢٠. تعمل شركة فايرستار انترناشيونال، شركة تأسست في ولاية ديلاوير، في المقام الأول كشركة تجارية تعمل في تجارة الألماس السائب.

٢١. قامت شركة نيراف مودي، وهي شركة تأسست في ولاية ديلاوير، وتعمل على إدارة متاجر التجزئة التي تحمل علامة نيراف مودي في نيويورك ولوس أنجلوس ولاس فيغاس وهونولولو.

٢٢. في ١٥ يناير ٢٠٢٠، أبرم الوصي والشركات التابعة الأمريكية اتفاقية تسوية قامت بموجبها الشركات التابعة للولايات المتحدة بتعيين الوصي لأي وجميع المطالبات أو أسباب الدعوى التي كانت لديهم أو تم الحصول عليها لاحقاً من قبل الشركات التابعة الأمريكية ووافقت على إصدار حكم بالتضامن والتكافل ضد الشركات التابعة الأمريكية بمبلغ ٢٣.١١٦.٥٠٥.٤٤ دولار أمريكي (انظر دي كيه تي ١٣٦٦).

٢٣. قد صدر الحكم بهذا المبلغ في ١٨ فبراير ٢٠٢٠. (الإعلان رقم ٢٠-٠١٠١٤، دي كيه تي ٣).

ثالثاً. المدعى عليهم

٢٤. المدعى عليها آمي جافيري (المعروفة سابقاً آمي مودي) مقيمة في نيويورك، وهي زوجة نيراف مودي.

٢٥. المدعى عليها بورفي ميهتا (المعروفة سابقاً بورفي مودي) وهي مقيمة في هونج كونج، وأخت نيراف مودي.

٢٦. المدعى عليه نهال مودي، وهو مقيم في تكساس، وهو الأخ الأصغر لنيراف مودي.

٢٧. المدعى عليه نيشال مودي، وهو مقيم في بلجيكا، وهو الأخ الأصغر لنيراف مودي.

٢٨. المدعى عليه ترايدنت ترست كومباني (داكوتا الجنوبية) انك، بصفته الوصي فقط على إيثاكا ترست ("ترايدنت")، وهي شركة في تأسست في داكوتا الجنوبية، وهي الوصي عن شركة إيثاكا ترست. إيثاكا ترست، عبارة عن صندوق تأمين لا رجعة فيه يحكم بموجب قانون داكوتا الجنوبية.

٢٩. المدعى عليه سنترال بارك للعقارات ذ م م ("**سنترال بارك**") هي شركة محدودة المسؤولية تأسست في ولاية ديلاوير.

٣٠. المدعى عليه سنترال بارك ساوث ٥٠ بروبرتيز، ذ.م.م ("**سنترال بارك ٥٠**") هي شركة ذات مسؤولية محدودة تأسست في نيويورك.

٣١. المدعى عليه توين فيلدز إنفستمنتس ليمتد ("**توين فيلدز**") هي شركة تأسست في ولاية ديلاوير.

٣٢. المدعى عليه أوراجيم كومباني ليمتد ("**أوراجيم**") شركة تأسست في هونج كونج، ويزعم بأنها كيان ظل.

٣٣. المدعى عليه بريليانت دايموند ليمتد ("**بريليانت**") شركة تأسست في هونج كونج، ويزعم بأنها كيان ظل.

٣٤. المدعى عليه اتيرنال دايموند كوربوريشن ليمتد ("**اتيرنـال**")، وهي شركة تأسست في هونج كونج، ويزعم هنا بأنها كيان ظل.

٣٥. المدعى عليه فانسي كرييشنز كومباني ("**فانسـي كرييشـنز**") هي شركة تأسست في هونج كونج ويزعم بأنها كيان ظل.

٣٦. المدعى عليه هاميلتون بريشوس تريدرز ليمتد ("**هاميلتون**") شركة هونج كونج ويُدعى أنها كيان ظل.

٣٧. المدعى عليه سينو تريدرز ليمتد ("**سينو**")، شركة هونج كونج ويُدعى أنها كيان ظل.

٣٨. المدعى عليه صن شاين جيمز ليمتد ("**صن شـاين**")، وهي شركة تأسست في هونج كونج، ويزعم بأنها كيان ظل.

٣٩. المدعى عليه شركة يونيك دايموند أند جولري ش.م.ح ("**يونيك**")، هي شركة تأسست في الإمارات العربية المتحدة، ويزعم أنها كيان ظل.

٤٠. المدعى عليـه وورلـد دايموند ديستريبيوشـن ش.م.ح ("**وورلـد دايمونـد**")، هـي شـركة تأسست في الإمارات العربية المتحدة، ويزعم أنها كيان ظل.

٤١. المدعى عليه فيستا جولري ("فيستا")، وهي شركة إماراتية تأسست في الإمارات، ويزعم بموجب هذه الوثيقة أنه كيان ظل.

٤٢. المدعى عليه إمباير جيمز م.م.ح (**"أمباير"**) هي شركة إماراتية ويزعم أنها كيان ظل

٤٣. المدعى عليه شركة يونيفرسال فاين جولري م.م.ح (**"يونيفرسال"**) هي شركة إماراتية، ويزعم بأنها كيان ظل.

٤٤. المدعى عليه دياجيمز م.م.ح (**"دياجيمز"**)، وهي شركة إماراتية يزعم بموجب هذه الوثيقة بأنها كيان ظل.

٤٥. المدعى عليه تراي كلر جيمز م.م.ح (**"تراي كلر"**) شركة إماراتية، ويزعم أنها كيان ظل

٤٦. المدعى عليه باسفيك دايموندز م.م.ح (**"باسفيك"**) وهي شركة إماراتية ويزعم أنها كيان ظل

٤٧. المدعى عليه هيمالايان تريدرز م.م.ح (**"هيمالايان"**)، وهي شركة إماراتية ويزعم أنها كيان ظل

٤٨. المدعى عليه يونيتي تريدينجز م.م.ح (**"يونيتي"**)، وهي شركة إماراتية، يزعم بأنها كيان ظل.

٤٩. المدعى عليه فاين كلاسيك م.م.ح (**"فاين كلاسيك"**) هي شركة إماراتية ويزعم أنها كيان ظل

٥٠. المدعى عليه (دي جي برذرز م.م.ح (**"دي جي برذرز"**) وهي شركة إماراتية ويزعم بأنها كيان ظل.

**الخلفية**

٥١. دخل نيراف مودي في أعمال الألماس في حوالي عام ٢٠٠٠ تحت اسم دايموندز "آر" آص، وهي عبارة عن شراكة هندية شكلها مودي، وعم مودي ميول شوكسي، وشريك مودي التجاري هيمانت بات.

٥٢. في عام ٢٠٠٤، أسس نيراف مودي شركة فايرستون انترناشيونال برايفت ليمتد مع جميع الشركات التابعة لها بشكل مباشر أو غير مباشر، "كيانات فايرستار")، المعروفة لاحقاً باسم فايرستار انترناشيونال برايفيت ليمتد، والمعروفة حالياً باسم فايرستار انترناشيونال ليمتد. فاير ستار انترناشيونال. وتعمل كشركة لتجارة الألماس في الهند، وهي الشركة الأم لمظلة شركة فايرستار العالمية. كان نيراف مودي طيلة الوقت المعني مالكاً لجميع حقوق الملكية في فايرستار انترناشيونال.

٥٣. في عام ٢٠٠٦، شكل نيراف مودي شركة فايرستار دايموند انترناشونال برايفيت ومقرها الهند (فايرستار دايموند انترناشونال برايفيت") كشركة تابعة مملوكة بالكامل من قبل فايرستون انترناشيونال برايفت ليمتد. قامت فايرستار دايموند انترناشونال برايفيت بممارسة عمليات تصنيع الألماس والمجوهرات من مصانعها في الهند. قامت فايرستار دايموند انترناشونال برايفيت بتصنيع جزء كبير من المخزون الذي تم بيعه بواسطة كيانات فايرستار أخرى.

٥٤. ومع مرور الوقت، وسع نيراف مودي عمليات كيانات فايرستار لتصل إلى الولايات المتحدة وهونج كونج ودبي وأوروبا. استحوذ نيراف مودي، الذي يعمل من خلال فايرستون انترناشيونال برايفت ليمتد والشركات التابعة لها، على الشركة التي أصبحت (فايرستار) التي كانت تُعرف آنذاك باسم فايرستون إنك، في عام ٢٠٠٥، استحوذت على نسبة ٩٥٪ في جافي (التي كانت المعروفة آنذاك باسم ("ساندبيرج آند سيكورسكي كورب)، من صاموئيل

ساندبيرج، وستانلي سيكورسكي فـي عـام ٢٠٠٧، وفـي عـام ٢٠١٢ تـم إدراج فنتازي فيمـا يتعلق بالاستحواذ غير المباشر لنيراف مودي على جافي، حصل صـاموئيل سـاندبيرج على حصة في فايرستار.

٥٥ . تمت إدارة عمليـات الكيانـات الأمريكيـة والـتحكم فيهـا بواسطة ابن عم نيراف مـودي، ميهير بهنسالي. في جميع الأوقات ذات الصلة، عمل ميهير بهنسالي كمدير وحيد ورئيس تنفيذي لفايرستار وفنتازي، والمدير الوحيد ورئيس جافي. عمل بهنسالي أيضاً كمدير وحيد لكل شركة تابعة أمريكية، وكذلك الرئيس التنفيذي لشركة سينيرجيز، وفايرستار جروب، ونيراف مودي. كما عمل بهنسالي كمدير فايرستون انترناشيونال برايفيت ليمتد في سياق كل من العمليات المشروعة لكيانات فايرستار والمخططات الاحتيالية المبينة أدناه، عمل ميهير بهنسالي كالشخص الثاني في القيادية لنيراف مودي.

٥٦. وعمل كبير مسـاعدي ميهير بهنسالي، آجـاي غانـدي، كمدير مـالي لكل من المدينين والشركات التابعة الأمريكية طيلة الفترة المعنية، باستثناء فترة مغادرته في عام ٢٠١٣. كما هو مذكور أدناه، ميهير بهنسالي وآجاي غاندي، أدارا الجوانب الاحتياليـة لعمليات نيراف مودي الأمريكية.

٥٧. وشملت كيانـات فايرستار التي يوجد مقرها في هونج كونج شركة فايرستار هولـدنجز ليمتد (فايرستار هولدنجز) وفايرستار دايموند ليمتد ("فايرستار دايموند ليمتد")، وفايرستار جولري ليمتد (فايرستار جولري ليمتد)، ونيراف مودي ليمتد (نيراف مودي ليمتد)، فاير ستار هولدنجز ليمتد، وهي شركة فرعية مملوكة بالكامل لفايرستون انترناشيونال برايفيت ليمتد، لم تكن لديها عمليات خاصة بها وبدلاً من ذلك عملت كشركة قابضة رئيسية في هونج كونج ودبي وأوروبا، وفي النهاية شركات فايرستار التي يقع مقرها في الولايات المتحدة.

٥٨ . كل من الشركتين فايرستار دايموند ليمتد، فايرستار جولري، عبارة عن فرعين تعود ملكيتهما الكاملة بالكامل لشركة فايرستار هولدنجز، وتمارس كل منهما أعمالها في تجارة الألماس المصقول، المشابهة لشركة فايرستار انترناشيونال، في نيويورك. تتم إدارة فايرستار دايموند ليمتد، وفايرستار جولري ليمتد بواسطة من قبل أديتيا نانافاتي، رئيس آسيا والمحيط الهادئ في مظلة فايرستار العالمية. ويشغل شيام وادوا منصب نائب رئيس الشؤون المالية في شركة فايرستون، وعمل في منصب المدير المالي الفعلي لكيانات فايرستار التي تتخذ من هونج كونج مقراً لها. مارس نانافاتي أعمال الإشراف العام على كيانات الظل ومقرها هونج كونج، وأدار واداوا حساباتها المصرفية والمالية

٥٩. نيراف مودي وهي شركة فرعية مملوكة بالكامل لشركة فايرستار هولدنجز، هي الشركة القابضة الرئيسية للشركات التابعة التي تدير محلات نيراف مودي في جميع أنحاء العالم، بما في ذلك نيراف مودي التي مقرها في نيويورك (التي تدير المحلات الأمريكية) وشركة نيراف مودي ليمتد ومقرها المملكة المتحدة (نيراف مودي المملكة المتحدة) التي كانت تدير محل لندن). أنجلينا يبما (المعروفة سابقاً أنجلينا نجوين)، وقد عملت كرئيسة عالمية لعلامة نيراف مودي التجارية، ومديرة نيراف مودي ليمتد وفايرستون انترناشيونال برايفيت ليمتد. شاركت بورفي ميهتا في عمليات نيراف مودي ليمتد وفروعها كمدير تطوير لعلامة نيراف مودي التجارية.

٦٠. وشملت كيانات فايرستار التي تتخذ من دبي مقرا لها، فايرستار دايموند م.م.ح (فايرستار دايموند م.م.ح)، التي كانت تعمل في تجارة الألماس المصقول، وشركة فايرستار دايموند ش.م.ح (فايرستار دايموند ش. م. ح) التي تصنع المجوهرات. وتعتبر شركة فايرستار هولدنجز ليمتد، المالك لكامل (٪١٠٠) حصة كل من فايرستار دايموند م.م.ح،

وفايرستار دايموند م.م.ح، ويدير ساتيندرا شوكلا، رئيس منطقة الشرق الأوسط ضمن مظلة فايرستار العالميـة، شـركة فايرستار دايمونـد ش. م. ح، ويتـولى كوريـان مـاثيوز عمليـات فايرستار دايموند م.م.ح بصفته مدير عام. ويتولى ساجو بولوز إدارة الشؤون المالية والقيود والسـجلات الماليـة والحسـابات المصـرفية لكيانـات فايرستار التـي تتخـذ مـن دبي مقراً لهـا، بصفته المسؤول المالي بحكم الواقـع. مارس شوكلا وماثيوز وبولوز أيضاً رقابة واسعة على عمليات ومالية كيانات الظل التي مقرها في دبي.

٦١. وتعمل الشركة البلجيكية، فايرستار دايموند بي في أيه، في تجارة الألماس الخام وتصنيعه. وتتم إدارة شركة فايرستار دايموند بي في أيه من قبل الأخ الأصـغر لنيراف مودي، نيشال مودي، في أنتويرب، بلجيكا. كمـا أن نيشال مودي يشـارك في كيانات دبي فايرستار. طوال الفترة المعنية، تداولت فايرستار دايموند بي في أيه على نطاق واسع مع كيانات الظل في هونج كونج ودبي تعزيزاً للمخطط الاحتيالي المزعوم أدناه.

**أولاً الاحتيال المصرفي.**

**أ. آليات الاحتيال المصرفي**

٦٢. في وقت لا يتجاوز عام ٢٠١٠ إلى أوائل عام ٢٠١٨، نسق نيراف مودي وأدار خطة للحصول على قروض أو ائتمانات أو أموال أخرى تحت ذرائع كاذبة وبدون ضمانات من العديد من المصارف، بما في ذلك مصرف بنجاب الوطني، وتعود ملكية غالبية المصارف الهندية للحكومة المركزية في الهند (كما هو موضح بمزيد من التفاصيل أدناه، "مصرف الاحتيال"

٦٣. تضمنت عملية الاحتيال التي قام بها مصرف الاحتيال عمليات الحصول على ائتمان المشتري الصادرة بموجب خطابات تعهد (**خطابات التعهد**)، وهي أداة مالية فريدة للهند مصممة لتسهيل معاملات الاستيراد بكفاءة.

٦٤. عند الاستخدام غير المشروع خطابات التعهد، فإنها تسمح للمستورد بالتخلي عن النفقات التي يتحملها المستورد بطريقة أخرى، عن طريق اقتراض عملة هندية ثم تحويلها إلى عملة أجنبية لدفع الموردين الأجانب. بدلاً من ذلك، يحصل المستورد على ائتمان قصير الأجل من مصرفه في الهند، مضموناً بفواتير السلع التي سيتم استيرادها. يدخل المصرف المُصدِر بدوره في معاملة بالعملة الأجنبية: يطلب من فرع أجنبي لمصرف هندي آخر تحويل الأموال إلى حساب المصرف المُصدِر (يُشار إليه بـ حسابنا لديكم مقوم بعملتكم) لدى فرع أجنبي لمصرف ثالث يدفع للمصدر بعملته المحلية. ثم يقوم المصرف المصدر بالسداد للمصرف الوسيط واسترداد القرض من المستورد (أو البضائع المستوردة ستكون بمثابة ضماناته).

٦٥. بما أن كل خطاب ضمان يتطلب طلب معاملة استيراد، فإن قدرة اقتراض خطاب التعهد المحلية الخاصة بالاقتراض ترتبط مباشرة بحجم الواردات – فكلما زادت الواردات، زاد تمويل خطاب التعهد المتاح.

٦٦. تآمر نيراف مودي والمتآمرون معه لاستغلال من هذه الميزة عبر تضخيم حجم استيراد شركات نيراف مودي التي تتخذ من الهند مقراً لها – وأبرزها شركة دايموندز آر أص وسولار أكسبورت (سولار) و ستيلار دايموند (ستيلار) (معاً: كيانات خطابات التعهد) بالمعاملات المزيفة للحصول على المزيد والمزيد من تمويل خطابات التعهد.

٦٧. كان كل من نيراف مودي وآمي مودي ونيشال مودي وميهول شوكسي، من بين آخرين، شريك لكل كيان خطاب تعهد خلال الفترة المعنية.

٦٨. في عام ٢٠١٦، قام نيشال مودي باختيار وتعيين شركاء "وهميين" إضافيين لكيانات خطابات التعهد. كما قام نيشال مودي، مع ميهير بهنسالي، باختيار واستئجار العديد من موظفي كيان الظل خلال الفترة المعنية.

٦٩. وكانت آمي مودي كشريك لـ سولار وستيلار، وفي عام ٢٠١٠، فتحت حسابات مصرفية استخدمت فيها سولار وستيلار للاحتيال على مصرف بنجاب الوطني.

٧٠. قدم مصرف بنجاب الوطني والمصارف الأخرى مبالغ متقدمة تساوي أكثر من مليار دولار بموجب خطابات التفاهم لمصلحة الكيانات الخاضعة لسيطرة مودي فيما يتعلق بالواردات إلى الهند دون الضمانات المطلوبة عادة.

٧١. لتنفيذ هذا المخطط، استخدم نيراف مودي والمتآمرين معه شبكة من كيانات الظل للانخراط في معاملات استيراد احتيالية وزائفة، تشمل المدعى عليهم أوراجيم، وبريليانت وايترنال، فانسي كرييشنز، وسينو، وصن شاين، ويونيك، وورلد دايموندز، وفيستا وإمباير ويونيفرسال ودياجيمز وتراي كلر، وباسفيكو هيمالايان، ويونيتي وفاين كلاسيك (معاً "كيانات الظل"، جنباً إلى جنب مع كيانات فايرستار وكيانات خطابات التعهد وجميع الكيانات الأخرى التي يتحكم بها نيراف مودي وأفراد أسرته، "الكيانات التي يتحكم بها مودي").

٧٢. على الرغم من تصميم كيانات الظل لتبدو وكأنها شركات مستقلة مشروعة، إلا أنها لم تكن أكثر من شركات وهمية يتم التحكم بها بواسطة مودي والمتآمرون معه. لم تجري

الشركات عملياً أي أعمال مشروعة، لكنهم بدلا من ذلك كانوا موجودين فقط لتعزيز الاحتيال المصرفي من خلال إجراء معاملات زائفة مع كيانات خطابات التعهد، وكيانات فايرستار، وغيرها من الكيانات التي يتم التحكم بها بواسطة مودي، وغسل العائدات غير المشروعة.

٧٣ تعمل المجموعتان الرئيسيتان لكيانات الظل من هونج كونج ودبي، تضم كيانات الظل التي تتخذ من هونج كونج مقراً لها، شركات أوراجيم وبريليانت وايتزنال وفانسي كريشنز وسينو وصن شاين. تضمنت كيانات الظل التي تتخذ من دبي مقرها شركات يونيك، وورلد دايموند، وفيستا، وإمباير، ويونيفرسال، دياجيمز، وتراي كلر، باسفيك، وهيمالايان، ويونيتي.

٧٤. وكانت كيانات الظل مسجَّلة في الغالب إما في مكاتب صغيرة غير مشغولة أو في مكاتب فردية مستأجرة داخل مكاتب مشتركة. كان لديهم مواقع ويب متطابقة تقريباً مع خلفيات وشعارات وصفحات الاتصال ولغة متشابهة.

٧٥. وأبلغ مستشار هندي السلطات الهندية أنه في حوالي عام ٢٠١٠، سعى ميهير بهنسالي للحصول على المساعدة في إنشاء طبقتين من شركات جزر فيرجن البريطانية القابضة لشركات كيانات الظل التي تتخذ من دبي مقراً لها والتي ستكون مملوكة لشركة بورفي مودي ونيشال مودي.

٧٦. وتتألف الطبقة العليا من شركة ماديسون كابيتال برايفت ليمتد ("ماديسون")، ومور برايفت إنفستمنتس ليمتد ("مور"). أكمل ميهير بهنسالي جميع المعاملات الورقية المتعلقة بتشكيل هذين الكيانين. تم إعلان بورفي ميهتا ونيشال مودي بأنهم المالكين المستفيدين النهائيين لهذه الشركات لسلطات جزر فيرجن البريطانية.

٧٧. يمتلك كل من ماديسون ومور ٥٠٪ من الأسهم كل منها عشر كيانات جزر فيرجن البريطانية من الطبقة الثانية: جلوبال انفستنج جروب ليمتد، واكزكلوسيف كونسالتانتس ليمد، وأشمور ديفلوبمنتس ليمتد، وبيكن هورايزون انفستمنتس ليمتد، وسنشري جروب جلوبال انفستمنتس، بوشبين تريدينج ليمتد، رويس جروب برايفت ليمتد، انتيجريتيد إنفستنج ليمتد، بانيرا أسيتس إنك، وإيديل ستار كونسالتانتس ليمتد، اختار ميهير بهنسالي جميع أسماء هذه الكيانات. فقد عملت مور كمدير لجميع من هذه الكيانات. وتم الإعلان عن أن بورفي ميهتا ونيشال مودي هم المالكين المستفيدين النهائيين لهذه الكيانات إلى سلطات جزر فيرجن البريطانية.

٧٨. عندها عملت كيانات جزر فيرجن البريطانية من الطبقة الثانية كشركات قابضة لكيانات الظل التي تتخذ من دبي مقراً لها، أي تراي كلر، دياجيمز، إمباير، ويونيك، وورلد دايموند، وباسفيك، ويونيفرسال وفيستا.

٧٩. استمر ميهير بهنسالي بتتبع جدول بيانات الحالة التشغيلية لكيانات الظل التي تتخذ من دبي مقراً لها.

٨٠. تداولت كيانات خطابات التعهد وكيانات الظل أعمالها بشكل حصري أو شبه حصري مع الكيانات الأخرى الخاضعة لتحكم مودي. يعكس الجدول التالي مدى تداول كيانات خطابات التعهد بشكل حصري مع كيانات الظل وكيانات فايرستار:

| كيان خطاب التعهد | المبيعات من الكيانات المدرجة المتحكم بها بواسطة مودي كنسبة مئوية من المبيعات الإجمالية | المشتريات من الكيانات المدرجة المتحكم بها بواسطة مودي كنسبة مئوية للتكاليف الإجمالية للبضائع المباعة | السنة المالية ٢٠١٢-٢٠١٧ |
|---|---|---|---|

| | كيانات الظل | كيانـــــات فايرستار | الإجمالي | كيانات الظل | كيانـــــات فايرستار | الإجمالي |
|---|---|---|---|---|---|---|
| دايموند آر أص | ٨٨.٤ % | ٪٧.٥ | ٪٩٥.٩ | ٪٩٩.٧ | ٪٠٠.٤ | ٪١٠٠.١ |
| ستيلار | ٪٩٨.٧ | ٪٠.٥ | ٪٩٩.٢ | ٪١٠٠.١ | ٪٠.٣ | ٪١٠٠.٣ |
| سولار | ٪٩٨.٩ | ٪٠.٧ | ٪٩٩.٦ | ٪٩٩.٩ | ٪٠.١ | ٪١٠٠.٠ |

٨١. اعتباراً من عام ٢٠١٣ فصاعداً، استخدم نيراف مودي والمتآمرين معه كيانات الظل كوسيط بـين كيانـات خطـاب التعهد وكيانـات وفايرسـتار. وكـان مصرف بنجـاب الـوطني والمصـارف الأخرى على علم بارتبـاط نيراف مودي مـع كيانات خطابـات التعهد، وكيانـات فايرستار، ولكن تم إخفاء ارتباطه بكيانات الظل عن البنوك.

٨٢. يزعم بأن معاملات الاستيراد والتصدير في كيان الظل تنطوي على مبيعات على أساس تجاري بحت للألمـاس السـائب عـالي القيمـة واللؤلـؤ والـذهب والفضـة والمجوهرات الأخرى. في الحقيقة، لم تنطوِ هذه المعاملات على أي غرض اقتصادي مشروع وكانت تنطوي بشكل روتيني على البضائع التي (١) غير الموجودة، (٢) لم يتم نقلها على الإطلاق، (٣) تم نقلها بأسعار لا علاقة لها بالقيمة السوقية، ولكن بدلاً من ذلك بناءً على أي مبالغ لازمـة لتوفيق قيود وسـجلات كيانـات الظل وكيانـات فايرسـتار مـن أجل إخفـاء التحويلات الأخرى التي تم إجراؤها لأغراض غير مشروعة، أو (٤) تم تحويلها في "معاملات دائرية" يتم فيها تصدير نفس البضائع وإعادة استيرادها بين الكيانات التي يتم التحكم بها بواسطة مودي عدة مرات بأسعار متفاوتة ومضخمة في كثير من الأحيان لإضفاء مظهر متعدد لمعاملات متميزة لغرض وحيد هو زيادة حجم واردات الكيانات المصطنعة.

٨٣. وفقاً للبيانات التي أدلى بها مختلف موظفي كيان فايرستار وكيان الظل إلى السلطات الهندية:

(١) ستقوم فايرستون، وفايرستار دايموند انترناشونال برايفيت وغيرها من كيانات فايرستار التي تتخذ من الهند مقراً لها بتصدير المجوهرات إلى كيانات الظل في دبي وهونج كونج، حيث يتم، في بعض الحالات على الأقل، إزالة الألماس ثم إعادة تصديره لاحقاً لزيادة الاستيراد، وصهر المعادن الثمينة.

(٢) لم يتم إرجاع أي مجوهرات تم تصديرها من الهند إلى كيانات الظل على أنها معيبة أو دون المستوى المطلوب أو غير متوافقة بشكل آخر، كما هو متوقع في سياق العلاقة بين البائع والعميل القائمة على أساس تجاري بحت.

(٣) غالباً ما تفتقر الطلبات التي تقدمها كيانات الظل إلى الشكلية والدقة والاجتهاد المتوقع عادةً من المعاملات مع طرف ثالث بحسن النية. على سبيل المثال، أبلغ في. سوريش رامناث نايدو، مدير دياجيمز، السلطات الهندية أنه وقع على فواتير فارغة، لكنه لم ير أياً من الألماس أو المجوهرات.

٨٤. حصلت الكيانات الخاضعة لتحكم مودي أيضاً على تمويل إضافي من خلال تعبئة قروض ائتمانية، وهي قروض لرأس المال العامل قصيرة الأجل حصل عليها البائعون لتلبية الطلبات القادمة من السلع. في سياق الاحتيال المصرفي، تحصل الكيانات التي يتحكم بها مودي ومقرها الهند على قروض ائتمانية للتعبئة على أساس أوامر مزعومة من كيانات أخرى يتحكم بها مودي في الخارج. ومع ذلك، غالباً ما يتم تحويل عائدات قرض ائتمان التعبئة لأغراض أخرى، بما في ذلك سداد خطابات التعهد المعلقة.

٨٥. كان العديد من مديري كيانات الظل موظفين حاليين أو سابقين في شركات فايرستار.
بالإضافة إلى ذلك، كان العديد من موظفي كيان الظل موظفين حاليين أو سابقين في كيان
فايرستار.

٨٦. عززت المعاملات بين كيانات فايرستار وكيانات خطابات التعهد وكيانات الظل عملية
الاحتيال المصرفي التي قام بها من خلال: (١) تضخيم قدرة اقتراض خطابات التعهد
للكيانات الهندية عن طريق التضخيم الاصطناعي لأحجام وارداتها وحجم الصادرات من
خطابات التعهد قروض الائتمان التعبئة، (٢) تسهيل سداد بعض خطابات التفويض
المستحقة وليس كلها وقروض ائتمان التعبئة، (٣) غسل العائدات الاحتيالية بجعل من
الصعب تتبعها وسحبها إلى مودي والمتآمرين معه، و (٤) جعل من الصعب على المدققين
والمقرضين والهيئات التنظيمية الكشف عن الاحتيال المصرفي.

٨٧. تم إخفاء التحويلات لهذه الأغراض بطرق مختلفة، تشمل: (أ) معاملات الذهاب
والإياب المتعلقة بالأحجار الكريمة أو المجوهرات أو الأموال التي قامت الكيانات الخاضعة
لتحكم مودي بتحويل الأصول فيما بينها دون أي غرض اقتصادي مشروع، (ب) بيع وشراء
الأحجار الكريمة بأسعار مضخمة أو منخفضة، (ج) وصف التحويلات بأنها قروض أو
سداد قروض أو دفعات مقدمة مقابل مشتريات أو عوائد مستقبلية لهذه الدفعات المقدمة، (د)
في بعض الحالات، تزوير القيود والسجلات صراحة بطريقة احتيالية.

٨٨. تسهيل التدفق المستمر لخطابات التعهد ومنع الكشف عنها، عمل مودي وآخرون بناءً
على توجيهات منه، بما في ذلك مانيش بوسامية، وسوبهاش باراب، وميتين بانديا، مع بعض
موظفي مصرف بنجاب الوطني، بمن فيهم جوكولناث شيتي، الذين صرحوا بالحصول على

خطاب التعهد دون تأمين ضمانات وبدون تسجيل خطابات التعهد في سجلات مصرف بنجاب الوطني بشكل صحيح.

٨٩. وفقاً لتقرير التحليل الجنائي الصادر عن بي دي أو في ديسمبر ٢٠١٩، أصدر مصرف بنجاب الوطني أكثر من ١٥٠٠ خطاب تعهد مزور للكيانات التي يتحكم بها مودي خلال الفترة المعنية وكانت تتضمن ما يقرب من ٣.٥ مليار دولار.

**ب. دور المدينين والكيانات التابعة الأمريكية في عمليات الاحتيال المصرفي**

٩٠. قام نيراف مودي، وميهير بهنسالي، وآجاي غاندي، والمتآمرون الآخرون، بتحويل ملايين الدولارات من الأموال والأحجار الكريمة والمجوهرات من خلال الكيانات الأمريكية ومكاتبها تعزيزاً للاحتيال المصرفي.

٩١. في المراحل الأولى من مخطط الاحتيال المصرفي، في الفترة من حوالي ٢٠١٠ إلى ٢٠١٢ عندما كانت كيانات خطابات التعهد مازالت تتداول مباشرة مع شركات فايرستار، كانت الكيانات الأمريكية منخرطة بشكل مباشر في معاملات الاستيراد والتصدير التي تقوم على خطابات التعهد التي تم الحصول عليها عن طريق الاحتيال. على سبيل المثال، في عام ٢٠١١، كانت فايرستار دايموند وجافي المصدرين ضمن المستفيدين المباشرين وخمسة خطابات تعهد، وخطاب تعهد واحد على التوالي، بإجمالي يبلغ ١٠.١٩٢.٣٠٣ دولار أمريكي.

٩٢. كمثال على مشاركة المدينين في المعاملات الدائرية، من ٨ أغسطس ٢٠١١ إلى ١٣ سبتمبر ٢٠١١، فترة خمسة أسابيع، قام المدينون بتصدير نفس الألماس ٣.٢٧ قيراط، قطع

سادة من الألماس الفاخر بلون أصفر برتقالي زاهي إس آي ١، ثلاث مرات واستوردوها مرة واحدة من وإلى كيانات خطابات التعهد المختلفة وكيانات الظل بأسعار متباينة تبايناً كبيراً.

٩٣ - وفي وقت لاحق من عام ٢٠١١، انخرط المدينون في تداول دائري آخر للألماس الذي تم تسجيله على أنه ماسة ١.٠٤ قيراط من قطع الألماس الفاخر بلون زهري زمردي قوي، إس آي ٢. ظهر الألماس في سجلات المدينين في ثلاث معاملات خلال ستة أسابيع لكل منها، وتم تقييمها بسعر مختلف في كل مرة.

٩٤. اعتباراً من عام ٢٠١٣ فصاعداً، تم استخدام كيانات الظل كوسيط بين كيانات فايرستار وكيانات خطاب التعهد. كان مصرف بنجاب الوطني والمصارف الأخرى على علم بانتماء نيراف مودي لشركات فايرستار وكيانات خطابات التعهد، ولكن تم إخفاء انتمائه إلى كيانات الظل عنهم.

٩٥. خلال هذه الفترة، قام المدينون بتحويلات عديدة إلى كيانات الظل المرتبطة بسداد خطابات الاعتماد المستحقة حتى يكون بالإمكان الاستمرار بعملية الاحتيال المصرفي دون عائق.

٩٦. على سبيل المثال، في ٢٤ سبتمبر ٢٠١٥، قام فايرستار بتحويل ١.٨٤٠.٩٦٩دولار إلى أوراجيم و ١.٤٠٠.٠٠٠ دولار إلى فانسي كريبشنز. تم استخدام جزء من هذه الأموال لسداد خطاب التعهد الصادر إلى دايموند آر أص التي صدرت وأصبحت مستحقة في ٣٠ سبتمبر ٢٠١٥.

٩٧. وفي مثال آخر، في ٢٦ فبراير ٢٠١٦، حول فايرستار ١.١٩٢.١٠٦ دولار إلى تراي كلر. في ٩ مارس ٢٠١٦، حولت تراي كلر ١.٦٤٧.٠٠٠دولار إلى سولار. وفي نفس

اليوم، نقلت سولار ٢.٠٨٧.٠٠٠ دولار لسداد خطاب تعهد أصبح مستحقاً في ١١ مارس ٢٠١٦.

٩٨. تمشياً مع هذه الأمثلة وغيرها من الأمثلة المزعومة في هذه الوثيقة، تم تنفيذ المعاملات المرتبطة بكيانات الظل التابعة للمدينين والشركات التابعة الأمريكية اعتباراً من عام ٢٠١٣ فصاعداً لأغراض تتعلق بالاحتيال المصرفي تشمل (أ) تسهيل سداد خطابات التعهد والقروض الائتمانية للتعبئة بحيث يكون بالإمكان الاستمرار في الاحتيال المصرفي دون عائق، (ب) تزويد كيانات الظل بالسلع والأموال التي تحتاجها كيانات الظل للتعامل معها. (ج) تسديد حسابات الذمم المدينة والحسابات واجبة الدفع الخاصة بكيانات الظل وكيانات فايرستار، وكيانات خطاب التعهد، وذلك لتجنب أسئلة المراجعين والمقرضين والأطراف الأخرى، (د) تحويل عائدات "الاحتيال المصرفي لصالح نيراف مودي وميهير بهنسالي وأسرهم والمتآمرين الآخرين.

٩٩. تعكس سجلات الكيانات الأمريكية مئات الملايين من الدولارات في التحويلات النقدية وشحنات المخزون بين الكيانات الأمريكية وكيانات الظل خلال الفترة المعنية.

**ج. تورط مديري ومسؤولي الكيانات الأمريكية في عمليات الاحتيال المصرفي**

١٠٠. وشارك بعض مديري ومسؤولي الكيانات الأمريكية، بما في ذلك ميهير بهنسالي وآجاي غاندي، الذين ساهموا في وطوروا عملية الاحتيال المصرفي. كما هو موضح أدناه، قام بهانسالي وغاندي، بالتنسيق مع نيراف مودي، بالتحكم من جميع الجوانب بالعمليات والشؤون الداخلية والخارجية للمدينين في جميع الأوقات ذات الصلة.

١٠١. بصفته المساهم المتحكم المطلق بجميع كيانات فايرستار، قام نيراف مودي بالتعاون مع بهنسالي وغاندي بالتنسيق والإشراف على المعاملات الاحتيالية بين الكيانات الأمريكية وكيانات الظل، وغيرها من الكيانات التي يتحكم بها مودي والتي تنطوي على مئات الملايين من الدولارات من الأموال والألماس. كانت هذه المعاملات جزءاً لا يتجزأ من عملية الاحتيال المصرفي.

١٠٢. بصفته المدير الوحيد لكل من الكيانات الأمريكية، وكمدير تنفيذي لشركة فايرستار، وفنتازي، سينيرجيز، وفايرستار جروب، ونيراف مودي، قام ميهير بهنسالي بتنسيق وتوجيه المعاملات الاحتيالية بين الكيانات الأمريكية، وكيانات الظل، وغيرها من الكيانات التي تتحكم بها مودي بما ينطوي على مئات الملايين من الدولارات من الأموال والألماس. وتشكل هذه المعاملات جزءاً لا يتجزأ من عملية الاحتيال المصرفي.

١٠٣. بصفته المدير المالي لكل من الكيانات الأمريكية، وبالتنسيق مع نيراف مودي وميهير بهنسالي، قام آجاي غاندي بتنسيق وتوجيه المعاملات الاحتيالية بين الكيانات الأمريكية وكيانات الظل وغيرها من الكيانات التي يتحكم بها مودي والتي تشمل مئات الملايين من الدولارات من الأموال والألماس. تشكل هذه المعاملات جزءاً لا يتجزأ من عملية الاحتيال المصرفي

١٠٤. وفي جميع الأوقات ذات الصلة، تحكم آجاي غاندي وميهير بهنسالي بتمويل المدينين. كان لكل منها سلطة الموافقة على معاملات الألماس السائب بين الكيانات الأمريكية وكيانات الظل التي يبلغ مجموعها مئات ملايين الدولارات. كان كل من غاندي وبهنسالي أيضاً موقعين على كل من الحسابات المصرفية للكيانات الأمريكية، وكان تفويضهم مطلوباً لإجراء التحويلات من حسابات الكيانات الأمريكية.

*(١). الإشراف والرقابة على كيانات الظل وكيانات خطابات التعهد*

١٠٥. قام نيراف مودي وميهر بهنسالي، بمساعدة متآمرين آخرين، بتنسيق وتوجيه عمليات كيانات الظل وكيانات خطابات التعهد لتعزيز عمليات الاحتيال المصرفي. ونورد وفيما يلي بعض الأمثلة على هذا النشاط.

١٠٦. يتضح الدور البارز الذي قام به ميهر بهنسالي في تنظيم عملية الاحتيال المصرفي من خلال عدة جداول بيانات تم استردادها من كمبيوتر عمله. تم حفظ كل من جداول البيانات هذه بواسطة ميزة "الاسترداد التلقائي" في مايكروسوفت اكسل. لا يحتوي كمبيوتر بهنسالي على أي إصدارات أخرى من جداول البيانات هذه، مما يشير إلى أنه حذفها في وقت ما. يتم تلخيص جداول البيانات هذه على النحو التالي:

١) جدول بيانات واحد، تم تعديله آخر مرة في ١٦ فبراير ٢٠١٨، تعقب ملايين الدولارات في حسابات المستحقات والذمم المدينة بين كل من كيانات خطاب التعهد وكيانات فايرستار وكيانات الظل.

٢) جدول بيانات آخر، تم تعديله آخر مرة في ١٨ فبراير ٢٠١٨، يبدو أنه دليل خطوة بخطوة لآليات واقتصاديات المعاملات الدائرية بين كيانات فايرستار، كيانات الظل. يحتوي إصدار آخر لجدول البيانات المحفوظ تلقائياً، تم حفظه قبل أحد عشر دقيقة، على جزء فقط من الدليل، مما يوضح أن بهنسالي نفسه أنشأ جدول البيانات.

٣) جدول بيانات آخر، تم إنشاؤه في ١٢ فبراير ٢٠١٨ وتم تعديله آخر مرة في ١٣ فبراير ٢٠١٨، يبدو أنه قائمة "للتنفيذ" لمختلف المتآمرين المشتركين بعد التعرض للاحتيال المصرفي. تضمنت المهام البحث في مسؤوليتها الجنائية المحتملة، "تنظيف" أرصدة

حسابات الدفع والقبض المستحقة بين كيانات فايرستار وكيانات الظل، وإرسال أجهزة كمبيوتر كيانات الظل في دبي إلى هونج كونج.

(٤) جدول بيانات آخر، تم تعديله آخر مرة في ٨ يناير ٢٠١٨، يظهر، أن لجميع كيانات خطاب التعهد للسنوات المالية ٢٠١٢ حتى ٢٠١٧ (أ) الأرباح والخسائر، (ب) القروض المصرفية المستحقة، (ج) التدفق النقدي إلى الإيداعات التي يستفيد منها أفراد عائلة نيراف مودي، و (د) حجم المعاملات مع مختلف كيانات الظل.

١.٧. أشرف بهنسالي شخصياً على إنشاء كيانات الظل وكيانات خطابات التعهد واختيار الإداريين والمدراء والمسؤولين والموظفين فيها.

١٠٨. أكمل بهنسالي شخصياً تقييمات أداء الموظفين للأفراد المشاركين في عمليات كيانات الظل وكيانات خطابات التعهد.

١٠٩. تضمن التقويم الإلكتروني لبهنسالي عدة مداخل، تشير، بناء على المعلومات والاعتقاد، إلى مناقشاته في سياق إدارة عمليات كيانات خطاب التعهد المحلية (أي سولار، ستيلار، ودايموندز آر أص)، بما في ذلك: (أ) اجتماع من المقرر في ٤ أبريل ٢٠١٦، مع موضوع "محادثة إس إس دي" و(ب) اجتماع مقرر عقده في ٦ أبريل ٢٠١٦ بموضوع "البنية التحتية إس إس دي" بدعوة إلى ساجو باولوس.

١١٠. في ١٩ يناير ٢٠١٠، وجّه آجاي غاندي بهافيش باتل لإعداد تقرير تقادم لحسابات القبض المستحقة لشركة فايرستار باستثناء "الشركات التابعة مثل... يونيك"، مما يدل على أن غاندي كان يعرف أن يونيك كان طرفاً ذا صلة .

١١١. في ٢٧ مايو ٢٠١٠، وجه ميهير بهنسالي أديتا نانيفاتي لجعل بهانسالي، نانيفاتي، بورفي ميهتا، ونيشال مودي مخولاً المستخدمين لحساب فايرستار دايموند ليمتد في ستاندرد تشاترد بنك. فيما يتعلق بالأجهزة المادية اللازمة للموافقة على النقل، وقدم تعليمات إلى نافنيفاتي لإرسال إشعار بورفي ميهتا إلى هيمانت بات وإشعار نيشال مودي إلى آجاي غاندي. وتمكن هذه الإشعارات باتي وغاندي لنقل الأموال من حساب مصرف فايرستار دايموند ليمتد حتى أنه لم يكن لأي منهما دور في شركة فايرستار دايموند ليمتد أو أي من كيانات فايرستار هونج كونج الأخرى.

١١٢. في ٧ سبتمبر ٢٠١١، طلب كوريان ماثيوز موافقة ميهير بهنسالي لعرض الأجور من المحاسبين من أجل تدقيق الحسابات المقترح لشركة أوراجيم وفانسي كريشنز .

١١٣. طلب ميهير بهنسالي على الأقل اثنين من كوريان ماثيوز وستيندرا شوكلا، وساجو بولوس، الحضور إلى دبي في جميع الأوقات لمراقبة عمليات كيان الظل. وفي ٢٧ أبريل ٢٠١٣، طلب كوريان ماثيو من ميهير بهنسالي الأذن لتجاوز هذه القاعدة بحيث يكون بإمكانه الوصول إلى هونج كونج مبكراً لإعداد تدقيق حسابات كيانات الظل في هونج كونج. ووضح ماثيو "يتعين علينا ترتيب كافة المستندات الخاصة بأربعة كيانات كمكتب فانسي، بعيد عن مكاتب بريليانت و إيترنال. وبعد ذلك قمنا بالتحقق من كافة مستندات الشراء والبيع مع مداخل السجل للاطلاع على المستندات الصحيحة المنفذة قبل الشروع في التدقيق "رد بهنسالي، "حسناً. امضي في هذه المرة."

١١٤. في ١٠ يونيو ٢٠١٣، لإخفاء تورطهم في الاحتيال المصرفي، أوعز المساعد الشخصي لمودي غاندي، من خلال البريد الإلكتروني الموجه إلى عنوان البريد الإلكتروني الشخصي لغاندي، للاتصال فيما يتعلق بكيانات الظل فقط على جيميل وبانميل، برنامج

يعمل تلقائياً على حـذف الرسـائل، بـدلاً مـن النظـام العـادي للبريـد الإلكترونـي فـي كيانـات فايرستار.

١١٥. في ٦ أغسطس ٢٠١٣، أرسل غاندي بريد إلكترونـي إلـى موظـف المكتـب الخلفـي الـذي يتضـمن سجلات البيع والشراء لأربعـة مـن كيانـات الظـل– فانسـي كريبشـن، بريليانـت، أيترنال، ويونيك، ليبين حسابات معاملات هذه الكيانات مع فايرستار دايموند انك.

١١٦. في ٣ أبريل ٢٠١٧، أرسل الاستشاري المقيم فـي الهنـد بريـد إلكترونـي إلـى ميهيـر بهنسالي ورقة جدول بيانات يلخص المبيعات مـن مختلـف كيانـات فايرسـتار الأجنبيـة، وبمـا فـي ذلـك فايرسـتون انترناشيونال دايمونـد ليمتـد، فايرسـتار انترناشيونال برايفيـت ليمتـد، إلـى كيانات الظل التي مقرها في دبي، بما في ذلك وورلـد دايمونـد، يونيفرسـال، امبايـر، وفيسـتا، ويونيـك وديـاجيمز. يعكـس جـدول البيانـات إجمـالي ٧٧٠.٧٣٠.٠٠٠ دولار أمريكـي فـي مبيعات الأحجار الخام، والأحجار المصقولة، والمجوهرات بواسطة مختلـف كيانـات فايرسـتار الأجنبية إلى كيانات الظل الستة المذكورة خلال السنة المالية ٢٠١٥ إلى ٢٠١٦ وإجمالـي ٤٥٤.٩١٠.٠٠٠ دولار أمريكي في هذه المبيعات من أبريل ٢٠١٦ إلى فبراير ٢٠١٧.

١١٧. في ٥ مايو ٢٠١٧، أرسل غاندي قائمة من كيانـات الظـل، ومعلومـات اتصـال لكـل منهم، إلى ألتاماش أنصاري، موظف المكتب الخلفي في الهند، وقال لـه "اسـتخدم الأسـماء مـن المرفق من أجل إيترنال وباسفيك وتراي كلر (لا تشـارك هـذه الملـف الـ بي دي إف مـع أي شخص)."

١١٨. في ١ يوليو ٢٠١٧، أرسل المدير المالي لشركة فايرستون أنترناشيونال برايفيت ليمتد، رافي جوبتا بريد إلكتروني إلى نيراف مودي جدول بيانات يتضمن ملفات سير ذاتية وهمية

للشركات بريليانت، أيترنال، فانسي كريبيشنز، أمباير، يونيك، ويونيفرسال، وفيستا، وورلد دايموند وطلب منه "في العام الماضي أنشا شخص الملف المرفق من أجل أكبر ٨ عملاء [.]، هل يمكنك أن تخبرني من ساعد على إنشاء هذا؟ نود القيام بذلك لعدد قليل من العملاء مثل أوجراجين. [كما ورد)، يوروستار، دياجيم، ساومي، وباناديوم" أعاد مودي توجيه رسالة البريد الإلكتروني إلى ميهير بهنسالي، الذي قام عندها بالإيعاز إلى شيام واداوا، أديتيا نانيفاتي، ونيشال مودي لإنشاء ملفات زائفة إضافية من أجل كيانات الظل في منطقتهم.

١١٩. في ٨ يوليو ٢٠١٧، طلب ساتيندرا شوكلا إدخال ميهير بهنسالي حول السير المقترح للمدير المالي لفايرستون انترناشيونال برايفيت ليمتد رافي جوتبا، والمدير المستقل لفايرستون انترناشيونال برايفيت ليمتد سوريش سيناباتي في زيارته المقبلة إلى دبي. يتضمن خط السير عدة اجتماعات مع المالكين "المزعومين" لكيانات الظل.

١٢٠. بين ٣١ يوليو ٢٠١٧، و ٧ أغسطس ٢٠١٧، أرسل كل من ساتيندرا شوكلا وكوريان ماثيوز، ميهير بهنسالي نسخة من مراسلاتهم حول رسائل البريد الإلكتروني المتعددة فيما يتعلق بجمع وثائق اعرف عميلك واعرف موردك من أجل كيانات الظل، يونيك وورلد دايموند، ويونيتي، وهيمالايان، ودي جي برذرز، وهاملتون. وقال بهنسالي "أيها السادة، الرجاء تفادي إرسالكم لي نسخ من مراسلاتكم الإلكترونية للمعاملات."

١٢١ في ١٩ أغسطس ٢٠١٧، أرسل مدير يونيفرسال رسالة إلكترونية مرفق طيها ملف لثلاثة كيانات ظل– يونيفرسال، إمباير، ودياجيمز – وطلب من بهنسالي أن يقوم "بالاطلاع وتقديم النصائح [وهكذا]." يبين توقيع رسالة البريد الإلكتروني للمدير أنه كان أيضاً المدير العام لكيان فايرستار في دبي.

١٢٢. في ٢٤ أكتوبر، أبلغ ساجو بولوس ميهير بهنسالي بأن مدير مستقل لشركة فايرستار انترناشيونال برايفيت ليمتد سأل عن التباين في هوامش الربح بين معاملات كيانات فايرستار مع كيان الظل على عكس العملاء الآخرين. أوعز بهنسالي بولوس تحذير أديتيا نانافاتي وساتيندرا شوكلا، حتى يتمكنوا من إعداد التفسير. ثم سأل نانافاتي بهنسالي. "كيف نرد على هذا؟ بالنسبة لي، هذا أمر بسيط، بعض العملاء عملاء جملة بمقدار كبير، والبعض الآخر هم عملاء صغار/ متاجر. ولست متأكداً إن كانت هذه مقاربة صحيحة."

١٢٣. في ٢٣ أبريل ٢٠١٨، طلب آجاي غاندي من موظف المكتب الخلفي الإرسال له حسابات المستحقات وحسابات الذمم المدينة المفتوحة بين جافي وإمباير وفيستا وايترنال وتراي كلر، ويونيفرسال كما في ٢٢ أبريل ٢٠١٨. أشار إلى هذه الأطراف كـ "الشركات غير التابعة الخارجية."

١٢٤. خلال الفترة المعنية، مارس نيراف مودي، ميهير بهنسالي، وآجاي غاندي إشراف مباشر وسيطرة على العديد من المعاملات بين كيانات الولايات المتحدة الأمريكية وكيانات الظل، كما هو موضح بأمثلة محددة موضحة في الملحق أ–١٢٤.

١٢٥. أبلغ آجاي غاندي دورياً نيراف مودي وميتين باندريا، ومانيش بوساميا، وأميت ماجيا، وشيام واداوا، ما يتعلق بتحويلات الأموال من الكيانات الأمريكية إلى الهند تعزيزاً للاحتيال المصرفي، وكما هو موضح بالأمثلة المحددة في الملحق أ. ١٢٥

*(٣) ممارسة إدارة الحسابات المشبوهة والمالية والمخزون.*

١٢٦ انخرط غاندي وبهنسالي في ممارسة والإشراف على الحسابات المشبوهة ومالية الشركة والمخزون، بغرض تعزيز وإخفاء الاحتيال المصرفي.

١٢٧. احتفظ غاندي وبهنسالي بمجموعتين من السجلات والقيود للكيانات الأمريكية البيانات المالية "الأساسية"، والتي لا تتضمن على الألماس السائب وغيرها من المعاملات عالية القيمة خارج السياق العادي للكيانات الأمريكية، والبيانات المالية "العادية" التي تعكس المعاملات مع كيانات الظل وغيرها من كيانات فايرستار لتعزيز الاحتيال المصرفي.

١٢٨. سجل الإقرار الضريبي الفيدرالي لشركة جافي عن السنة المالية المنتهية بتاريخ ٣١ مارس ٢٠١٢ مبيعات قدرها ٩.٠٩٠.٦٦١ دولار أمريكي. ومع ذلك، تشير المبيعات اليومية، فضلاً عن البيانات المالية لشركة جافي المقدمة أصلاً والمعتمدة من قبل آجاي غاندي إلى المفتش، تشير إلى أنه خلال نفس الفترة، كان إجمالي مبيعات جافي ٤٩.٦٢٨.٨٧٣ دولار أمريكي.

١٢٩. بعد أن تم استجواب غاندي من قبل المفتش حول الاختلافات الكبيرة بين مبيعات الإقرارات الضريبية التي تبلغ حوالي ٩ مليون دولار أمريكي والبيانات المالية "الأصلية" ودفتر يومية المبيعات التي تعكس ٤٩ مليون من المبيعات، قدم غاندي، مجموعة ثانية من البيانات المالية، والتي سماها المجموعة "الأساسية". وهذه المجموعة "الأساسية" تعكس مبيعات ١٠ مليون دولار. ولم يقدم غاندي أي توضيح حقيقي لاحتفاظه بمجموعتين من البيانات المالية. وكان الفرق بين هذه البيانات المالية بالمقام الأول من مبيعات الألماس السائب بين جافي ومختلف كيانات الظل.

١٣٠. أدار بهنسالي "الحسابات الداخلية" للمدينين، الحسابات التي تم فيها فصل عائدات مبيعات الألماس السائب من حسابات المبيعات العادية لأغراض حساب العمولات. وبناء على المعلومات والمعتقدات، الفرق بين المبالغ المذكورة في الإقرارات الضريبية لشركة جافي مقابل المبالغ المبينة في دفتر يومية المبيعات يتعلق بالمقام الأول بهذه المعاملات.

١٣١. وتتجلى الطبيعة السرية للبيانات المالية "العادية" في الاتصالات بين نيراف مودي، وآجاي غاندي، ميهير بهنسالي، وغيرهم من المتآمرين الآخرين المبينين في الملحق أ–١٣١.

١٣٢. أشرف كل من ميهير بهنسالي وآجاي غاندي ووجهوا استخدام مختلف المبيعات وممارسات المخزون للمدينين بخصوص معاملات المدينين مع كيانات الظل مقارنة من تلك المستخدمة مع عملاء التجزئة.

١٣٣. على سبيل المثال، كل ألماسة أو جوهرة يستلمها المدينون للاستخدام في معاملة بيع تجزئة عادية، سوف يتم تفريغها مقارنة مع وصل التعبئة الممسوح ضوئياً لمراقبة الجودة، والمسجلة على أنها "جاهز للشحن."

١٣٤. لم يتم استخدام هذه الممارسات فيما يتعلق بالمعاملات المتعلقة بكيان الظل. بالنسبة لتلك المعاملات، أو كيان الظل أو كيان فايرستار الأجنبي، غالباً ما ترسل شحنات كبيرة من الألماس السائب مصحوبة بتعليمات البريد الإلكتروني لتصديرها فور استلامها إما إلى كيان فايرستار أو كيان الظل بأسعار وكميات محددة. غالباً ما تصحب تعليمات التعبئة وفواتير الصادرات اللاحقة بهذه التعليمات في البريد الإلكتروني. تمشياً مع التعليمات من الكيانات الخارجية التي يتحكم بها مودي، هذه البضائع إما يتم إعادة شحنها على الفور دون فتحها، أو إن كانت مفتوحة، يتم تخزينها بكميات كبيرة، وليس بشكل فردي.

*(٤) جهود التلاعب أو خداع مدقق الحسابات والمقرضين.*

١٣٥. في عدة مناسبات، تجنب بهنسالي وغاندي استفسارات مدقق الحسابات فيما يتعلق بالكيانات الأمريكية بتعاملات الكيانات الأمريكية مع كيانات الظل من خلال تقديم تفسيرات بعيدة المنال، يتظاهر بالجهل، أو في بعض الحالات، تجاهل الأسئلة معاً.

١٣٦. على سبيل المثال، في ٢ يوليو ٢٠١٠، سأل مصرفي آجاي غاندي ما إذا كانت شركة فايرستار دايموندز انترناشيونال وايترنال شركات مطلوبة. أعاد توجيه رسالة بريد إلكتروني إلى ميهير بهنسالي وذكر "أنا أتجاهل هذا السؤال لكن قد لا أتمكن من تجنب الشيء نفسه." رد بهنسالي، "تحدث إلى نيراف وعندما يكون في نيويورك الأسبوع المقبل." في اليوم التالي، أخبر غاندي المصرفي بأن والد نيراف مودي، ديباك مودي، يمتلك شركة اتيرنال.

١٣٧. كمثال آخر، في ١٦ يونيو ٢٠١١، سأل ممثل مصرف إتش إس بي سي آجاي غاندي عن سبب تحويل سينيرجيز الأموال إلى يونيك. وضح غاندي بأن شركة يونيك أقرضت أموالاً إلى شركة سينيرجيز، اقراض نفس الأموال إلى توين فيلدز، وتم سداد كلا القرضين. ثم سأل الممثل "هل شركة يونيك شركة تابعة؟ وهل يملكها نيراف؟ هل هذا سبب وجود قروض ذهاباً وإياباً؟ أجاب غاندي، "يونيك ليست شركة تابعة، لكن لدى نيراف علاقة جيدة معهم." عندها سأل الممثل، "لماذا تقرض كل شركة الأخرى؟" أجاب غاندي. "أنا متأكد من وجود أسباب تجارية. ما الذي يشغل المصرف؟"

١٣٨. كمثال آخر، في ٧ سبتمبر ٢٠١١، سأل المصرفي من ستاندرد تشارترد آجاي غاندي، " نحن نفهم بأن مبيعات فايرستار في نيويورك [كما وردت] غالباً إلى كبار تجار التجزئة في أمريكا، لكن تبين حسابات الذمم المدينة المستحقة تركيزاً أكثر على الشركات مثل يونيك دايموندز وإمباير جيم، وإس دي سي ديزاينز . هل يمكننا الحصول على بيانات

البيع للسنة حتى تاريخه لعام ٢٠١٠ و ٢٠١١ لأعلى ١٠ حسابات لكل عام مع مقارنة السنة. وصرحت أيضاً، "أيضاً، في حساب الذمم المدينة المتقادم، تبين أن فايرستار قدمت إلى ستيلر [كما وردت] الألماس، ويونيك دايموند بحدود ١١ مليون دولار أمريكي لكل منها– وبريليانت، وفانسي كريشنز ٢ مليون دولار لكل منها. نفهم بأن هذه الفواتير الأجنبية لا نقوم باستبعادها، لكن نود الحصول على المزيد من المعلومات الأساسية عن هذه الحسابات نظراً لحجم التعرض."

١٣٩. في ١٢ سبتمبر ٢٠١١، أجاب غاندي، "مختلف الشركات الأجنبية التي أشرتم إليها ليست عملاء. نحن نشتري قطع ألماس/ مجوهرات كبرة وفريدة من بائعين مختلفين في الهند، وفي بعض الأوقات تستلزم هذه البضائع إرجاعها، لكن نظراً لشروط البيع الأصلي، يرشدنا البائعون المختلفون لشحن هذه البضائع إلى شركات أخرى [كما ورد]، هم يختارونها، ولا تقع في الهند. ونعمل على تسجيل هذه ونعمل على تسجيل هذه التحويلات على أنها تخفيض للمشتريات وزيادة في الحسابات المستحقة بتكلفة الشراء الأصلية للألماس/ المجوهرات.

١٤٠. ميهير بهنسالي، الذي تم إدراجه في رسالة البريد الإلكتروني من غاندي، أعاد توجيه هذا الرد إلى مودي، وذكر " نيراف، الرجاء قراءة هذه البريد الإلكتروني أدناه من ستاندرد تشارترد بنك الأسبوع الماضي، ورد آجاي. فقط لمعلوماتك." عندها أعاد مودي توجيه رسائل البريد الإلكتروني إلى نائب المدير الإداري السابق لقسم الخدمات المصرفية للشركات في مصرف أكسيز، وذكر "باعتبار أن بنك ستاندرد تشارترد بنك عام في الهند، أنتويرب ونيويورك. قد تكون فكرة جيدة أنت تناقش أنت وآجاي جميع الردود."

١٤١. وكمثال آخر، في ٢٢ أبريل ٢٠١٧، سأل مدقق حسابات آجاي غاندي عن سبب وجود تسجيل فايرستار دايموند انك مستحقات واجبة الدفع لفاتورة صدرت من قبل فانسي

كريبشنز إلى نيراف مودي انك، أجاب غاندي "خطأ البائع." وبعد بضع دقائق، رأى أنه ما
يبدوا بأن المبرر لم يكن كافياً، أصبح ملتبساً "أيضاً لتوفير الشحن، يتم شحنها معاً في فاتورة
واحدة، من الصعب التشاجر معهم.

١٤٢. وفي مثال آخر، في ٢٦ أبريل ٢٠١٧، سأل آجاي غاندي ميهير بهنسالي كيف عليه
الرد على استفسارات مدققي الحسابات في الكيانات الأمريكية بخصوص أرصدة حسابات
الذمم المدينة والمستحقات بملايين الدولارات مع كيانات الظل، أوراجيم وفانسي كريبشنز.
أوعز بهنسالي غاندي لمناقشة المسألة مع شيام واداوا وسأله متى سيتم تسوية أرصدة كيان
الظل.

١٤٣. تم إجراء بعض التنسيق على الأقل لتدخل كيانات الظل في التلاعب في عمليات
التدقيق، الاحتيال المصرفي أكثر بشكل عام، تم إجراؤه من خلال عنوان البريد الإلكتروني:
operation1@firestardiamond.com ("العملية١") تم استخدام العملية ١ بواسطة
سانديب ميستري وربما آخرين.

١٤٤. وكجزء من عملية التدقيق، سوف يرسل مدققي الحسابات رسالة بريد إلكتروني إلى
الأطراف المدرجة في حسابات الشركة المستحقة والحسابات المدينة لطلب معلومات خطية
عن المبالغ الواردة في سجلات وقيود الشركة المدققة. وبالنسبة لتدقيق الكيانات الأمريكية،
والتي تم إجراءها معاً، سوف يرسل آجاي غاندي نسخة من رسائل البريد الإلكتروني
للمدققين إلى كيانات الظل، والتي غالباً ما يحيلها غاندي إلى العمليات ١ للطلب منهم أن
تقوم كيانات الظل تقديم تأكيد للمدققين. ويرد مثال محدد لرسائل البريد الإلكتروني في
الملحق أ- ١٤٤.

١٤٥. يستخدم حساب العملية ١ أيضاً لتنسيق عمليات تحويل الأموال والمجوهرات بين كيانات فايرستار وكيانات الظل كما هو موضح في الأمثلة المحددة الموضحة في الملحق أ-١٤٥.

**د. تورط ميول شوكسي ونهال مودي ونينا شيث، وديباك شيث، وأبهاي جافيري، وكيانات شيث وكيانات إس دي سي في الاحتيال المصرفي.**

١٤٦. ميول شوكسي هو عم نيراف مودي. وتم اتهام شوكسي بالتدبير لخطة الاحتيال المصرفي الخاصة به من خلال شركته التي تتخذ من الهند مقراً لها، جيتانجالي جيمز ليمتد، الشركات التابعة لها ومقرها الولايات المتحدة تشمل جيتانجالي يو إس إيه، وصموئيلز جولرز انك (صموئيلز)، أستون لاكشري جروب (نيويورك) دياملينك أنك، دياملينك جولري انك، جولري ماركتنج كومباني، ترايستار وورلدوايد ذ.م.م، وفانتوم لاكشري جروب، جنباً إلى جنب مع شبكه البائعين والعملاء الوهميين لكيانات الظل.

١٤٧. على الرغم من خطة احتيال نيراف مودي وميول شوكسي التي كانت تنفذ بالتوازي مع وجهة نظر الشركة، شارك أفراد من أسرهم من كلا الجانبين. على سبيل المثال، كان نهال مودي شقيق نيراف مودي، المسؤول عن جيتانجالي يو إس أيه، صموئيلز، ودياملينك من جانب شوكسي، وبي بي بي جروب من جانب نيراف مودي. وبالمثل، عملت شقيقة ميول شوكسي وعمة نيراف مودي، نينا شيث، كمدير لشركة دياملينك.

١٤٨. يتملك زوج نينا شيث، ديباك شيث (أي، عم نيراف مودي وصهر ميول شوكسي)، شركة اكسلنت فاسلنت انك مقرها في نيويورك، وأمادينا انفستمنتس انك (معاً، كيانات

شيث"). كما هو مزعوم أدناه، عمل ديباك شيث كحامي أولي استشاري استثمار لإيثاكا ترست ومدير سنترال بارك ساوث ٥٠، فيما يتعلق بذلك.

١٤٩. أيضاً كان من بين المتورطين شقيق آمي مودي وصهر نيراف مودي ابهاي جافيري. يمتلك جافير إس دي سي ديزاينز انك، وإس دي سي ديزين ذ.م.م، سانجام دايمونـدز كوربوريشن، وسـانجام دايموندز ذ.م.م (معاً، كيانات إس دي سي")، عمل أبهاي جافيري كحامي واستشاري استثمار في إيثاكا ترست، ومدير سنترال بارك ساوث ٥٠.

١٥٠. شارك ديباك شيث، نينا شيث، نهال مودي، وأبجاي جافيري، وشركاتهم المعنية، في الاحتيال المصرفي خلال الفترة المعنية.

١٥١. شـارك ديبـاك شيث وكيانـات شيث في المعاملات المباشرة مـع كيانات الظل بقيمـة إجمالية قدرها أكثر من ١٩ مليون دولار خلال الفترة المعنية.

١٥٢. على سبيل المثال، في مارس ٢٠١٦، أوعز ديبـاك شيث ميهير بهنسالي وآجاي غاندي الحصول على فاتورة نيراف مودي اكسلانت فاستس ٩٦٥.٠٠٠ دولار لقاء ١٥.٢١ قيراط قلادة ألماس، و ١٠.٧١ قيراط لخاتم ألماس، لكن لشحن القطع إلى كيان الظل صن شاين في هونج كونج. أشار شيث إلى صن شاين بأنه "عميله".

١٥٣. شارك أبهاي جافيري وكيانات إس دي سي في المعاملات المباشرة مـع كيانات الظل التي تضمن ملايين الدولارات خلال الفترة المعنية.

١٥٤. على سبيل المثال، في ٤ ديسمبر ٢٠١٢، أبلغ المدير المالي لكيانات إس دي سي سيردار كريشنان آجاي غاندي بأن كيان الظل أمباير سوف يقوم بتحويل ٢.٧ مليون دولار

إلى فايرستار دايموند انترناشيونال كدفعة جزئية مقابل فاتورة يوليو ٢٠١٢، وأوعز إلى غاندي استخدام الأموال في الدفع إلى إس دي سي ديزاينز ذ.م.م، مقابل فاتورة أخرى بتاريخ يوليو ٢٠١٢. أعاد غاندي توجيه رسائل البريد الإلكتروني إلى هيمانت بات، وسأله، "هل هذا جيد بمجرد استلام الأموال؟" أجاب بات "لا ترسل رسالة بريد إلكتروني. أرجو الاتصال بي في الصباح."

١٥٥. وكمثال آخر، في ٤ فبراير ٢٠١٣، أبلغ سيردار كريشنان ميهير بهنسالي وهيمانت بات في البريد الإلكتروني الشخصي أنه قام بتحويل ١.٤ مليون دولار من كيان إس دي سي إلى كيان الظل يونيفرسال، وطلب من بات تحويل هذه الأموال إلى جافي. وفي ٦ فبراير ٢٠١٣، أكد بات بأن يونيفرسال استلمت الأموال، وأن أمباير دفعت ١.٣٩١.٥٧٠ دولار أمريكي إلى جافي. وفي نفس اليوم، أرسلت جافي مبلغ قدره ١.٣٩١.٩٩٧ دولار أمريكي إلى إس دي سي.

١٥٦. في مثال آخر، في ١١ فبراير ٢٠١٣، أبلغ سيردار كريشنان ميهير بهنسالي وهيمانت بات عبر البريد الإلكتروني الخاص أنه قام بتحويل ١.٢ مليون من إس دي سي ديزاينز ذ.م.م، إلى كيان الظل إمباير، وأوعز إلى بات تجويل هذه الأموال إلى جافي وفايرستار دايموند انك. وثم قامت جافي وفايرستار دايموند انك الأموال إلى إس دي سي ديزاينز ذ.م.م.

١٥٧. وفي مثال آخر، في ٣١ ديسمبر ٢٠١٣، أوعز ميهير بهنسالي إلى آجاي غاندي لتحويل مبلغ قدره ١.٢ مليون دولار من فايرستار دايموند انك، إلى سانجام دايموندز كورب. لتسديد فاتورة صدرت إلى كيان الظل فانسي كرييشنز. وفي ٨ يناير ٢٠١٤، أعاد غاندي توجيه رسالة بريد إلكتروني لبهنسالي بتاريخ ٣١ ديسمبر ٢٠١٣ إلى هيمانت بات، وتقول "

لقد دفعت ١.٢٤ مليون دولار في ١٣/٣١/١٢ إلى فانسي وفقاً للمرفق. ولم ترجع هذه الأموال أبداً، وبالتالي، سوف أدفع ٥٧٥ ألف دولار اليوم. أرجو الاتصال بي إن لزم الأمر "

١٥٨. في ٢٥ مايو ٢٠١٨، أرسل أحد المحاسبين لماركس بانيث عبر البريد الإلكتروني إلى سريدار كريشنان طلب للحصول على معلومات تتعلق بالعملاء كيانات إس دي سي، مـع أرصدة الذمم المدينة المسحقة لأكثر من ٩٠ يوم، بما في ذلك، كيان الظل أمباير، وديامـلاينك، الشركة التي يملكها ميول والتي تدار بواسطة نينا شيت، ونهال مودي.

١٥٩. لم يتمكن سريدار كريشنان من تحويل الأموال من الحسابات المصرفية لكيان إس دي سي دون تفويض شخصي من أبهاي جافيري، على سبيل المثال، في ١٠ مارس ٢٠١٥، طلب آجاي غاندي من سريدار كريشنان تقديم تفاصيل التحويل من أجل الدفعة المحتملة إلى إس دي سي ديزاين انك، وإس دي سي ديزاين ذ.م.م، رد كريشنان بمعلومات الحساب المصرفي لكنه قال، "الرجاء عدم تحويل أي شيء هذا الأسبوع. **أبهاي فـي مومبـاي ولا يمكن لأي شخص الموافقة على التحويلات.**"

١٦٠. إضافة إلى ذلك، في عدة مناسبات، سوف يعمل ميهير بهنسالي وآجاي غاندي، على تحويل الأموال المستلمة بواسطة الكيانات الأمريكية من كيانات سيث وكيانات إس دي سي إلى كيانات الظل. وكيانات فايرستار الأجنبية (بما في ذلك دفع خطابات الاعتماد الصادرة إلى كيانات فايرستار الأجنبية من خلال خدمة تحصيل خطابات الاعتماد من بنك إتش إس بي سي)، كما يفعلون عادة بالأموال المستلمة من كيانات الظل وكيانات فايرستار، لكن ليس من العملاء الحقيقيين. ويذكر مثال محدد عن هذه المعاملات في الملحق أ–١٥٣.

١٦١. تعامل كل من آجاي غاندي وساجو بولوس، وشيام واداوا، وغيرهم من المتآمرين الآخرين مع كيانات شيث وكيانات إس سي على أنهم "غير رئيسين" كما يفعلون مع معاملات الكيان والمعاملات الأخرى المرتبطة بالاحتيال المصرفي.

١٦٢. على سبيل المثال، احتفظ آجاي غاندي وشيام واداوا بجدول بيانات يلخص الهامش الإجمالي "لمختلف الأقسام" عن العام المالي ٢٠١٢–٢٠١٣. ويتضمن جدول البيانات أعمدة منفصلة لـ "الأعمال الرئيسية" و"القطع الكبيرة" وأدرج جدول البيانات إجمالي المبيعات البالغة ٣٥.٠٣٥.١٨٠ دولار أمريكي، وبهامش إجمالي قدره ١٢.٠٣٪ لعمود "الأعمال الأساسية"، وإجمالي المبيعات ١٧.٧١١.٥٦٩ دولار أمريكي بهامش إجمالي ٥.٥١٪ لعمود "القطع الكبيرة". يتضمن جدول البيانات أيضاً قائمة تفصيلية بالمعاملات التي تضم ١٧.٧١١.٥٦٩ في مبيعات "القطع الكبيرة"، بما في ذلك ما مجموعه ٧.٧٥٨.٤٥٤ في المبيعات إلى كيانات إس دي سي، ١.٢٥٣.٢٥٤ دولار أمريكي إلى اكسلانت فاستس، ١.٩١٢.٨٤٠ دولار أمريكي إلى باسفيك، و٣.٠١٩.٤٠٦ إلى امباير.

١٦٣ في أمثلة إضافية توضح الممارسات المحاسبية المشبوهة المتعلقة بالمعاملات التي تشمل كيانات أس دي سي وكيانات شيث المبينة في الملحق أ–١٦٣.

١٦٤. معاملات ومراسلات مشبوهة إضافية تشمل ديباك شيث، ونينا شيث، وكيانات شيث مبينة في الملحق أ–١٦٤.

١٦٥. معاملات ومراسلات مشبوهة إضافية تشمل أبهاي جافيري وكيانات إس دي سي مبينة في الملحق أ–١٦٥.

*هـ. غسل الأموال من خلال توين فيلدز ويايلي بنكس أند بيلد*

١٦٦. طوال الفترة المعنية، تم تحويل عشرات الملايين من الدولارات من عائدات الاحتيال المصرفي إلى أو من خلال توين فيلدز وبي بي بي جروب، أنك (بي بي بي جروب).

١٦٧. في ٤ نوفمبر ٢٠٠٩، نجح آجاي غاندي الذي يعمل بالنيابة عن سينيرجيز، في تقديم عرض على حقوق الملكية الفكرية لبايلي بنكس أند بيدل، بائع مجوهرات تجزئة في الولايات المتحدة الأمريكية، في مزاد الإفلاس.

١٦٨. أسس نيراف مودي شركة مقرها سويسرا دايموندز هولدنجز إس إيه، لتكون كمرشح لسينيرجيز لشراء الملكية الفكرية لبايلي بنكسأند بيدل

١٦٩ في ١٦ مارس ٢٠١٠، تم تأسيسي توين فيلدز انفستمنتس ليمتد (توين فيلدز) في ديلاوير. وفي جميع الأوقات ذات الصلة، امتلك بورفي ميهتا وديباك مودي بشكل غير مباش ١٠٠٪ من حقوق الملكية في توين فيلدز من خلال طبقتين من الشركات الوهمية في جزر بريطانيا العذراء، بما في ذلك لينك هاي انترناشيونال (لينك هاي).

١٧٠. في ١٣ مايو ٢٠١٠، تأسست في ديلاوير بي بي جروب انك، تمارس أعمالها التجارية بصفة بايلي بنكس أند بيدل. وتمتلك توين فيلدز ١٠٠٪ من حقوق الملكية في بي بي بي جروب.

١٧١. قامت شركة دايموند هولدنجز إس إيه بالترخيص لحقوق ملكية بايلي بنكسأند بيدل إلى توين فيلدز، والتي قامت بدورها بالترخيص من الباطن لمجموعة بي بي.

١٧٢. عمل ميهير بهنسالي ونهال مودي على إدارة والتحكم بتوين فيلدز وبي بي بي جروب، طيلة الفترة المعنية، كمدير قانوني أو فعلي لتوين فيلدز و بي بي بي جروب، على التوالي.

١٧٣. وجه مكتب المحاماة الذي تولى تسجيل حقوق ملكية بايلي بنكس آند بيدل، مراسلاته إلى ميهير بهنسالي، أرسل فواتيره إلى بهنسالي، وبشكل آخر عامل بهنسالي كممثل دايموندز هولدنجز، توين فيلدز، وبي بي بي جروب.

١٧٤. في عام ٢٠١٠، فتحت بي بي بي جروب عدة متاجر بيع تجزئة تحت اسم بايلي بنكسآند بيدل، واستمرت في العمل طوال الفترة المعنية.

١٧٥. بين نوفمبر ٢٠١٠ ومارس ٢٠١٨، تدفق ما يقرب ٨٠ مليون دولار أمريكي من خلال توين فيلدز. من ٢٠١٠ حتى مطلع عام ٢٠١٣. وكانت لينك هاي مبدئياً مصدر أموال حساب توين فيلدز، مع تحويل ٢٣.٦٠٢.٦٦٠.٠٠ دولار أمريكي. وفقاً للسلطات الهندية، استلمت لينك هاي ملايين الدولارات من عائدات خطاب التعهد الاحتيالي.

١٧٦. بين فبراير ٢٠١٣ ومايو ٢٠١٧، نقل جافي على الأقل ١.٣٣٠.٠٠٠.٠٠ دولار أمريكي إلى توين فيلدز. واحتفظ جافي بأرصدة صغيرة نسباً في حساب عملياته، ولم يكن لديه رأسمال كافي لسداد مدفوعات القروض الكبيرة إلى توين فيلدز. تم تجويل أيه جافي إلى توين فيلدز في يوم أو حول يوم المدفوعات من مصادر أخرى، بما في ذلك فايرستار دايموندز وكيانات الظل المعروفة باسفينك دايموند ويونيفيرسال فاين جولري.

١٧٧. في ٢٢ يونيو أو حوله، حولت فايرستار دايموند مبلغاً إضافياً قدره ٣١.٥٤٢.٢٨ إلى توين فيلدز.

١٧٨. بين ٢٠١٦ و ٢٠١٧، قام كيان الظل فاين كلاسيك، التي كان بورفي ميهتا مالكها المطلق ١٠٠٪، بتحويل ما لا يقل عن ٢٦.٨٦٤.٠٥٦.٠٠ دولار أمريكي إلى توين فيلدز. في سلسلة رسائل البريد الإلكتروني، بتاريخ ١١ يناير ٢٠١٧، أخبر ميهير بهنسالي مارك بانيث، محاسب توين فيلدز، أن فاين كلاسيك كانت شركة أجنبية أقرضت المال إلى توين فيلدز لتمويل بي بي جروب.

١٧٩. بين ٢٠١١ و٢٠١٧ نقلت توين فيلدز ما لا يقل عن ٤٢.٧٤٨.٠٠٠ دولار أمريكي إلى بي بي جروب. ولم تقم بي بي جروب بالتسديد أو بشكل أخر تجري التحويل خلال الفترة ذات الصلة.

١٨٠. تم إغلاق حساب توين فيلدز في ٢١ فبراير ٢٠١٨، برصيد قدره ١٣.٢٨١ دولار أمريكي.

١٨١. أرسل ميلز مينسر، مدير متجر بايلي بنكس أند بيدي في أوستن، من يوليو ٢٠١٧، لغاية مارس ٢٠١٨، إلى نهال مودي وميهير بهنسالي تحديثات أسبوعية عن العمليات التجارية والأداء. وعندها يرسل بهنسالي هذه التحديثات فوراً إلى نيراف مودي.

١٨٢. في ١ مايو ٢٠١٨، اقترح مايلز مينسر عدة خيارات لتصفية الأعمال لنهال مودي وأموال ميهير بهنسالي. وختم بالقول إنه سوف "يدعم أي قرار ملكية يشعر بأنه الأفضل لهم."

١٨٣. واستناداً إلى أمور من بينها، ملكية بورفي ميهتا ودييباك مودي التي لم يتم الكشف عنها لتوين فيلدز من خلال الشركات الوهمية لجزر بريطانيا العذراء، عملية غسل أكثر من ٦٠ مليون، من خلال توين فيلدز من فاين كلاسيك، لينك هاي، وجافي، ومشاركة وميهير

بهنسالي ونهال مودي في إدارتها وعملياتها، ويبدو بأن توين فيلدز وبي بي جروب تشكل واجهة أخرى لنيراف مودي، وجهود عائلته الضخمة في غسيل الأموال.

*و. الكشف عن والتعرض للاحتيال المصرفي*

١٨٤. في أواخر مايو ٢٠١٧، تقاعد جولكوناث شيتي، الموظف لدى مصرف بنجاب والذي وافق على خطابات التعهد الاحتيالية لصالح شركات نيراف مودي. وفي الأشهر التي سبقت تقاعده، بين فبراير ومايو ٢٠١٧، وافق شيتي تقريباً على ١٥٠ خطاب تعهد جديد يبلغ إجماليها أكثر من ١ مليار دولار إلى كيان خطاب التعهد. وأصبحت خطابات التعهد هذه مستحقة في أو حوالي ٢٥ يناير ٢٠١٨.

١٨٥. وفقاً للسلطات الهنديـة، هرب نيراف مـودي وشقيقه نيشـان مـن الهنـد فـي ١ ينـاير ٢٠١٨، وكذلك آمي مودي وميول شوكسي في ٦ يناير ٢٠١٨، وفي ٤ يناير ٢٠١٨ على التوالي.

١٨٦. في ٥ يناير ٢٠١٨، اشترى نيراف مودي شقة في لندن لقاء ٧.٩٥٠.٠٠٠ يورو نقداً، وباسم "ريتشـارد بيتي" ويبدو بأنـه اسم مستعار، أو بديل لنيراف مودي. كان مودي يعيش فـي شـقة عندما تم اعتقالـه فـي مـارس ٢٠١٩. كمـا كـان المكتـب المسـجل لشـركة دايموندز هولدنجز ليمتد، شركة المملكة المتحدة ليراف مودي التي شكلت في مايو ٢٠١٨.

١٨٧. في أو حوالي ٢٠ يناير ٢٠١٨، طلب أحد ممثلي كيانات خطاب التعهد من مصرف بنجاب الوطني تجديد أصدار خطابات الائتمان إلى خطابات ائتمان جديدة. وفي ٢٢ يناير ٢٠١٨، رفض مصرف بنجاب الـوطني إصـدار خطابـات تعهـد جديـدة دون وديعـة هامش نقدي بنسبة ١٠٠٪، من بين متطلبات أخرى. رفض ممثل مودي تقديم أي هامش لأسباب

أن مصرف بنجاب الوطني لم يطلب مسبقاً أي هامش لإصدار خطاب التعهد. وعلى الفور بدأ مصرف بنجاب الوطني التحقيق في ممارسات الاقتراض المتعلقة بالكيانات التي يتحكم بها مودي.

١٨٨. لقد أسفر الاحتيال المصرفي عن عدة تحقيقات وتطبيق الإجراءات الجنائية ضد نيراف مودي وميهير بهنسالي، والمدعى عليهم آمي مودي وبورفي ميهتا، ومايانك ميهتا، ونهال مودي ونيشال مودي، وآخرين من قبل السلطات الحكومية الهندية، بما في ذلك مكتب التحقيقات المركزي، ومديرية الإنفاذ، ودائرة ضريبة الدخل، ومكتب التحقيق في الاحتيال الخطير.

١٨٩. في ٢٩ يناير ٢٠١٨، قدم بنك بنجاب شكوى جنائية ضد نيراف مودي لدى مكتب التحقيقات المركزي. وفي ١٣ فبراير ٢٠١٨، قدم مصرف بنجاب الوطني شكوى ضد نيراف مودي لدى مديرية الإنفاذ الهندي، والتي عملت على حجز عدة ممتلكات منقولة وغير منقولة تعود إلى نيراف مودي والعديد من الكيانات التي يتحكم بها مودي.

١٩٠ في ٣ يوليو ٢٠١٨، قدم مصرف بنجاب الوطني طلب رقم ٢٠١٨/١١٩ في محكمة استرداد الديون رقم ١ في مومباي ("محكمة الديون الهندية")، ضد من بين أمور أخرى، نيراف مودي، وبعض أفراد عائلته، كل كيان خطاب تعهد، فايرستون، وفاير ستار دياموند انترناشيونال برايفيت ليمتد.

١٩١. في مطلع ٢٠١٩، وجد نيراف مودي يعيش في لندن الاسم المستعار "إدموند دانتس".

١٩٢. في أو حوالي ١٢ مارس ٢٠١٩، أصدرت الحكومة الأمريكية طلب تسليم إلى المملكة المتحدة على أساس أمر اعتقال صادر عن محكمة هندية ضد نيراف مودي بواسطة

المحكمة الهندية. تم اعتقال مودي في لندن في ٢٠ مارس ٢٠١٩، وهو حالياً مسجون في لندن.

١٩٣. في ٦ يوليو ٢٠١٩، أصدر رئيس محكمة الديون الهندية حكماً ضد نيراف مودي، وآمي مودي ونهال مودي ونيشال مودي، وبورفي ميهتا، وكيانات خطابات التعهد فايرستون انترناشـيونال ليمتـد، وغيرهـا بنـاءً علـى النتـائج الواقعيـة التاليـة، مـن بـين أمـور أخـرى (المصطلحات بالأحرف الكبيرة في الأصل):

(١) قام نيراف مودي بتعويم الشركات الخارجية في هونج كونج والإمارات العربية المتحدة، والتي كانت شركات زائفة/ وهمية. أعضاء مجلس الإدارة والمساهمون في هذه الشركات هم أيضاً موظفون سابقون أو يعملون بموجب تعليمات نيراف مودي.

(٢) تتعامل الشركات الخارجية وهونج كونج ودبي مـع مجموعة فايرستار أو بشكل غير مباشر تكون مملوكة بواسطة نيراف مودي الذي لديه التحكم الكامل على هذه الشركات من خلال هؤلاء المدراء الوهميين. سجلت مديرة الإنفاذ في الشكوى بأن قائمة بأكبر ٨ مقرضين و ٨ مـوردين لـم يكونـوا سـوى مـوظفين سـابقين فـي مجموعـة فايرسـتار، والتصـرف وتنفيـذ التعليمات المقدمة بواسطة نيراف مودي وميهير بهنسالي.

(٣) تـم تنفيـذ عمليـة الاحتيـال بواسطة نيراف مودي بـالتواطؤ والتسـتر، وبمعونـة ومسـاعدة شركات المجموعة، أي فايرستار انترناشيونال ليمتد وفايرستار دايموند انترناشيونال برايفيت ليمتد. جنباً إلى جنب مـع شركاتها التابعـة، والفرعيـة، نيراف فـاملي ترست، ونيراف مودي فاملي ترست، المديرين والموظفين الإداريين الرئيسيين.

(٤) وكشفت التحقيقات التي أجرتها مديرية الإنفاذ أيضاً على أن الشركات الوهمية تم تأسيسها في هونغ كونغ ودبي جنباً إلى جنب مع شركات مجموعة فايرستار العادية [و] كانت بمثابة نقطة وصل للمعاملات الدائرية، للطبقة وغسل الأموال الناتجة بواسطة خطابات التعهد الاحتيالية.

(٥) [نيراف مودي وأفراد عائلته] هم العقل [العقول] المدبر وراء ارتكاب الاحتيال. وضع المدعى عليهم هيكل معقد أو واجهة تنطوي على عدة طبقات من مكاتب أو شركات وصناديق الشراكات لأغراض ارتكاب الاحتيال وعزل أنفسهم من المسؤولية التي نشأت من خطابات التعهد المصرح بها.

(٦) تكشف جميع التواريخ والأحداث المذكورة أعلاه عن الاحتيال المنهجي الذي قام به نيراف مودي، وتحريك محكمة الولايات المتحدة الأمريكية للإعسار لتلافي المسؤولية. اتخذ نيراف مودي وإنجازه [كما ورد] خطوات فورية أمام محكمة الولايات المتحدة لتجنب الحجز [كما ورد] وحجز الممتلكات التي اشتراها نيراف مودي واكتسبها من عائدات الديون الاحتيالية.

ألحق الاحتيال المصرفي خسارة إجمالية لمصرف بنجاب الوطني أكثر من ١ مليار دولار أمريكي. نتيجة الاحتيال المصرفي، أكد مصرف بنجاب الوطني المطالبات ضد كل من المدينين أكثر من ١ مليار دولار لأسباب، من بين أمور أخرى، أنه تم تحويل جزء كبير من عائدات الاحتيال المصرفي كان يتم نقلها إلى أو من خلال المدينين. إضافة إلى، الاحتيال المصرفي، وتعرضه والمصادرة بواسطة السلطات الهندية للكيانات التي يتحكم بها مودي في الهند، أدى إلى انهيار أعمال المدينين وتقديم هذه القضية من الفصل ١١.

**ثانياً: الجهود الإجرامية قبل فترة وجيزة من وبعد التعرض للاحتيال المصرفي**

١٩٤. في الأسابيع التي سبقت وتلت كشف الاحتيال المصرفي في يناير ٢٠١٨ عندما فوض الموظف آخر خطابات تعهد جولكوناث شيتي قبل أن أصبح تعاقده مستحقاً، نقل نيراف مودي وميهير بهنسالي وآجاي غاندي والمتآمرين معه تركيزهم إلى حماية الأصول من الدائنين.

*أ. نهب المدينين، والكيانات التابعة الأمريكية وغيرها من كيانات فايرستار.*

١٩٥. حول نيراف مودي وميهير بهنسالي وآجاي غاندي وغيرهم من المتآمرين مبالغ كبيرة من النقد والمخزون الخاص بالمدينين إلى الكيانات الخارجية التي تحت تحكم مودي في الأسابيع التي سبقت إفلاس المدينين. فمثلاً:

(١) في أو حوالي ٥ ديسمبر ٢٠١٧، شحنت فايرستار دايموند الموجودات بقيمة معلنة قدرها ١.٦٣٢.٥٠٠.٥٣ دولار أمريكي إلى وورلد دايموند.

(٢) في ٣ يناير ٢٠١٨، حول فايرستار دايموند ٢.٦٧٢.٣٨٩.٤٨ دولار أمريكي إلى باسفيك. في نفس اليوم، حول جافي مبلغ قدره ٥٣٠.٠٠٠ دولار أمريكي إلى باسفيك. كان آجاي غاندي مشتركاً بشكل مباشر في هذه التحويلات.

(٣) في أو حوالي ٢٣ يناير ٢٠١٨، شحنت شركة فايرستار دايموند ٢.٣١٩.٦٤ قيراط من الألماس السائب بقيمة معلنة قدرها ٤٢٦.٣٢٠.٩٧ من خلال مالكا أميت إيترنال في هونج كونج. كان آجاي غاندي وميهير بهنسالي متورطين بشكل مباشر في هذه الشحنة.

(٤) في ٢٥ يناير ٢٠١٨، حولت فايرستار دايموند مبلغ قدره ٩١٠.٢٧٨.٧٠ دولار أمريكي إلى شركة فايرستار دايموند م.م.م التي مقرها في دبي، والتي كانت تدار بواسطة المتآمرين كوريان ماثيوز وسانتيندرا شوكلا. آجاي غاندي كان مرة أخرى متورط في هذه النقل بشكل مباشر.

(٥) في ٢٦ يناير ٢٠١٨، شحنت شركة فايرستار دايموند مخزون بقيمة معلنة قدرها ٨٥.١٥٠ دولار أمريكي إلى نيراف مودي ليمتد، في هونج كونج.

(٦) فـي ٦ فبرايـر ٢٠١٨، حولـت فايرسـتون انترناشـيونال بتحويـل مبلـغ قـدره ١.٠٠٢.٨٣٦.٧٧ دولار أمريكـي إلـى فايرسـتون انترناشـيونال، حـول جـافي مبلـغ قـدره ٥٠٥.٦١٠.٥١ دولار أمريكي إلى فايرستون، وحولت فنتازي مبلـغ قـدره ٤٠١.٤٧١.٠٨ دولار أمريكي إلى فايرستون. في نفس اليوم، أرسل سوبهاش باراب رسالة بريد إلكتروني إلى آجاي غاندي، مع إرسال نسخة إلى شيام واداوا "الرجاء دفع الفواتر التالية إلى فايرستون... لدينا بعض عمليات التسديد العاجلة من مصرف آي دي بي آي لذلك [كما ورد] نطلب أدناه الفواتير في بنك في مصرف آي دي بي آي [.]"

(٧) فـي أو حـوالي ٦ فبرايـر ٢٠١٨، شـحنت فايرسـتار دايمونـد ٤.٤٧٤.١٥ قيـراط مـن الألمـاس السـائب بقيمـة معلنـة ٧٨٩.١٤٠.٤٢ دولار أمريكـي مـن خـلال مالكـا أميـت إلـى ايترنال في هونج كونج. كانت آجاي غاندي مشترك بشكل مباشر في هذه الشحنة.

١٩٥. إضافة إلى ذلك، في الأسابيع التي سبقت تاريخ الالتماس، جعل نيراف مودي وميهير بهنسالي وآجاي غاندي نيراف مودي انك وفايرستار انترناشيونال نقل مبالغ كبيرة من النقد

والمخزون لخارج البلاد حيث لا يتمكن الدائنون، بمن فيه الدائنون، الوصول إليها. على سبيل المثال:

(١)   في ٢٢ ديسمبر ٢٠١٧، شحنت فايرستار انترناشيونال مخزون بقيمة معلنة قدرها ١.٤١٨.٥٤٩ دولار أمريكي من خلال مالكا أميت إلى فانسي كريبيشنز في هونج كونج.

(٢)   في ٤ يناير ٢٠١٨، شحن نيراف مودي انك حزمتين من المخزون، بقيمة معلنة قدرها ٥٨٥.٠٠٠ دولار أمريكي و ٦٥.٠٠٠ دولار أمريكي، على التوالي، من خلال مالكا أميت إلى نيراف مودي ليمتد. في هونج كونج.

(٣)   في ٥ يناير ٢٠١٨، شحنت فايرستار انترناشيونال موجودات بقيمة معلنة قدرها ١٦٧.٨١٠.٦٥ دولار أمريكي من خلال مالكا أميت إلى فايرستار دايموند ليمتد. في هونج كونج.

(٤)   في ١٠ يناير ٢٠١٨، شحن نيراف مودي موجودات انك بقيمة معلنة قدرها ١٠٨.٥٥٠ دولار أمريكي، من خلال مالكا أميت إلى نيراف مودي ليمتد. في هونج كونج.

(٥)   في ١٠ يناير ٢٠١٨، شحنت فايرستار انترناشيونال مخزون بقيمة معلنة قدرها ٢٣٩.٨٧١.٢٩ دولار أمريكي، من خلال مالكا أميت إلى فايرستار دايموند ليمتد. في هونج كونج.

(٦)    في ١١ يناير ٢٠١٨، شـحنت نيـراف مـودي إنـك موجـودات بقيمـة معلنـة قـدرها
٣٢.٣٧٠ دولار أمريكي من خـلال مالكا أميت إلى نيراف مودي ليمتد، في هونج
كونج.

(٧)    في ١٥ يناير ٢٠١٨، شـحنت فايرستار انترناشيونال موجودات بقيمة معلنة قدرها
٧٨١.٨٨٢.٣٨ من خلال مالكا أميت إلى فايرستار دايموند ليمتد في هونج كونج

(٨)    في ١٦ ينـاير ٢٠١٨، شـحن نيـراف مـودي انـك موجـودات بقيمـة معلنـة قـدرها
٩٤٣.٨٠٠ من خلال مالكا أميت إلى نيراف مودي ليمتد. في هونج كونج.

(٩)    في ١٩ يناير ٢٠١٨، شحنت نيراف مودي انك ثلاث حزم من الموجودات، بقيم
معلنة قدرها ٢٧٣.٠٠٠ و ٤٠٩.٥٠٠ و ٧٧١.٦٨٠ دولار أمريكي على التوالي.
من خلال مالكا أميت إلى نيراف مودي ليمتد في هونج كونج.

(١٠)    في ٢٤ ينـاير ٢٠١٨، شـحنت نيـراف مـودي انـك، موجـودات بقيمـة معلنـة قـدرها
١.٠٧٥.٢٠٠ دولار أمريكـي مـن خـلال مالكـا أميـت إلـى فايرسـتار دايمونـد
انترناشيونال برايفيت ليمتد.

(١١)    في ٢٥ يناير ٢٠١٨، شحنت فايرستار انترناشيونال موجودات بقيمة معلنة قدرها
١.٨٨٦.٩٢٢.٦٧ دولار أمريكي من خـلال مالكا أميت إلـى فانسي كرييشنز في
هونج كونج.

(١٢) في ٢٦ يناير ٢٠١٨، شحنت نيراف مودي موجودات انك موجودات بقيمة معلنة قدرها ١٩٨.٧٥٠ دولار أمريكي من خلال مالكا أميت إلى نيراف مودي ليمتد في هونج كونج.

(١٣) في ٢٩ يناير ٢٠١٨، شحنت نيراف مودي موجودات انك موجودات بقيمة معلنة قدرها ٧٥.٠٥٠ دولار أمريكي من خلال مالكا أميت إلى نيراف مودي ليمتد في هونج كونج.

(١٤) في ٣٠ يناير ٢٠١٨، شحنت فايرستار انترناشيونال موجودات بقيمة معلنة قدرها ٥٧٠.١٠٤.٣٧ دولار أمريكي من خلال مالكا أميت إلى فايرستار دايموند ليمتد في هونج كونج.

(١٥) في ٣١ يناير ٢٠١٨، شحنت نيراف مودي موجودات انك موجودات بقيمة معلنة قدرها ٦٦٠.٥٠٠ دولار أمريكي من خلال مالكا أميت إلى نيراف مودي ليمتد في هونج كونج.

(١٦) في ٣١ يناير ٢٠١٨، حولت فايرستار انترناشيونال مبلغ قدره ٢.٤٦٦.٠١٥ و ٥٢٥.٠٠٠ دولار أمريكي إلى فانسي كرييشنز. وفي نفس اليوم، وجه آجاي غاندي تأكيد الحوالة إلى شيام واداوا وذكر "الرجاء إبلاغ بائعك عن هذه الدفعة وتوضيح أي ذمم مدينة من هونج كونج."

(١٧) في ٢ فبراير ٢٠١٨، حولت فايرستار انترناشيونال مبلغ قدره ٤٠٠.٠٠٠ دولار إلى فانسي كرييشنز. وفي نفس اليوم، وجه آجاي غاندي رسالة بريد إلكتروني أفانيش

أوزا وكونال باتل، مع نسخة إلى شيام واداوا. "الرجاء تحويل مبلغ ٤٠٠.٠٠٠ دولار أمريكي إلى فانسي من كابيتال ون– إعادة الأموال مقدماً." رد أوزا بتأكيد الحوالة.

(١٨)  في ١٣ فبراير ٢٠١٨، شـحنت نيـراف مـودي أنـك مخـزون بقيمـة معلنـة قـدرها ١٥٤.٤٤٠ دولار أمريكي من خلال مالكا أميت إلى نيراف مودي ليمتد، في هونج كونج.

(١٩)  في ٦ مـارس ٢٠١٨، شـحنت فايرسـتار انترناشـيونال موجـودات بقيمـة معلنـة تبلـغ ٤.٣٢٥.٤٧٢.٣٤ من خـلال مالكـا أميت إلى فايرسـتار دايموند ليمتد في هـونج كونج.

١٩٧. في هذا الوقت تقريباً، وعد ميهير بهنسالي باستخدام موجودات نيراف مـودي انك لسداد الدائنين المؤمنين لشركة فايرستار دايموند انك، بما في ذلك، بنك ديسكونت إسرائيل في نيويورك، وبعد نقله إلى المدينين لمقاصة ديون نيراف مودي انك، إلى فايرستار دايموند انك وجافي. حاول استشاري بنك ديسكونت إسرائيل تطبيق هذا الوعد خلال المفاوضات فيما يتعلق باستخدام المدينين للضمانات النقدية من خلال السعي إلى مطالبة المدينين لتحصيل المبالغ المستحقة لهم بواسطة نيراف مودي انك. وكما هو مذكور أدناه، ومع ذلك، هذا لم يحصل بداً، وبدلاً من ذلك، كان ميهير بهنسالي متورطاً في تحويل هذه الأصول إلى هونج كونج، لتكون خارج متناول المدينين.

١٩٨. بين أواخر فبراير ومطلع مارس ٢٠١٨، شحنت محلات نيراف مودي أنك في لاس فيجاس وهونولولو ولوس أنجلوس، ونيويورك مقدار جوهري من كامل مخزونها إلى نيويورك. المخزون الذي بلغت قيمته الإجمالية حوالي ٤٠ مليون دولار أمريكي، تم تخزينه بواسطة

مالكا أميت، لأن قيمته تتجاوز مبلغ التغطية التأمينية المتاحة على القطع المخزنة بقيمة المدينين.

١٩٩. وفي هذا الوقت تقريباً، كان ميهير بهنسالي وآجاي غاندي وأنجلينا يبما، بصفتهم مديرين ومسؤولين لنيراف مودي ليمتد، (نيراف مودي المملكة المتحدة)، شركة نيراف مودي ليمتد التي مقرها في المملكة المتحدة، والتي تعمل في لندن، متجر نيراف مودي، يعملون معاً لإغلاق متجر لندن وتحويل أصوله إلى هونج كونج.

٢٠٠. نيتين داتاني، من مكتب المحاسبين القانونين داتاني، الذي يقع مقره في لندن، أبلغ نيراف مودي ليمتد المملكة المتحدة منذ ٢٠١٦، كان أيضاً مشاركاً بقدر كبير في إغلاق متجر لندن، ساعد داتاني نيراف مودي في تشكيل شركة دايموندز هولدنجز ليمتد، الشركة التي أسسها نيراف مودي أثناء فترة اختبائه في لندن. إضافة إلى ذلك، على النحو المزعوم أدناه، في مايو ٢٠١٨، عين أبهاي جافيري نيتين داتاني ليحل محل نهال مودي كمدير لسنترال بارك ساوث ٥٠ بروبرتيز ذ.م.م، والتي تعود ملكيتها إلى نيراف مودي وآمي مودي نيويورك، شقة ريتز كارلتون.

٢٠١. في ٢ مارس ٢٠١٨، أرسل فرانسوا زافيير ديريكس، مدير في متجر لندن خطاب إلى ميهير بهنسالي وانجلينا يبما بصفتهم مدراء في نيراف مودي ليمتد المملكة المتحدة. وفي الخطاب، أقر ديريكز بأن بهنسالي ويبما أصدرا سابقاً تعليمات له للتواصل عبر الواتساب والبريد الإلكتروني الخاص، لكنه ذكر أنه "كان قلقاً إزاء النقص الأخير في المعلومات والتوجيه فيما يتعلق بإدارة شؤون متاجر لندن."

٢٠٢. في ٤ مارس ٢٠١٨، أصدر آجاي غاندي تعليمات إلى ديريكس، لشحن للقسم الجوهري من كامل مخزون متجر لندن، بإجمالي ٤٠٤ قطعة مجوهرات، وبقيمة يبلغ إجماليها ٥.٩٧٤.٦١٤ دولار أمريكي إلى فايرستار دايموند ليمتد في هونج كونج. وتمت هذه الشحنة بعد فترة قصيرة بعد ذلك.

٢٠٣. في ١١ مارس ٢٠١٨، أوعزت أنجلينا بيما إلى آجاي غاندي شحن خاتم ألماسي وردي اللون فاخر من نيراف مودي غنك إلى مكتب هونج كونج "لقد أبلغت غاندي أنها أرسلت له صورة عن الخاتم عبر الواتساب. وأكد نيراف مودي موافقته عبر حسابه الخاص في البريد الإلكتروني، والذي قامت بيما بإرسال نسخة منه عبر بريدها الإلكتروني إلى غاندي.

٢٠٤. في حوالي ذلك الوقت، أحضر نهال مودي وميهير بهنسالي، أنتوني أليكوك، الصديق الشخصي والزميل السابق في داملينك في لـ "إدارة إنهاء كيانات فايرستار هونج كونج. أليكوك، مدير محل تجزئة في نيويورك، ليس لديه أي خبرة سابقة في تولي أمور الإعسار أو المالية.

٢٠٥. في ١٩ مارس ٢٠١٨، تم تعيين أنطوني أليكوك كمدير وحيد لشركات فايرستار هولدنج ليمتد ونيرافي مودي ليمتد وفايرستار دايموند ليمتد.

٢٠٦. في ٢٢ مارس ٢٠١٨، نفذ ميهير بهنسالي قرارات الشركة نيابة عن كل من الشركات التابعة في الولايات المتحدة الأمريكية، مفوضاً الشركات التابعة في الولايات المتحدة الأمريكية تعويض ميهير بهنسالي بتعويض ميهير بهنسالي ودفع تكاليفه القانونية.

٢٠٧. في ٢٣ مـارس ٢٠١٨، ميهير بهنسالي، بصـفته المدير الوحيد لكـل مـن الشركات التابعة الأمريكية، عين جيس دينوف ومايكل جولدمان من كيه سي بيه أدفايزوري جروب، بصفه مديرين ورؤساء ومدراء مالية على التوالي لكل من الشركات التابعة الأمريكية.

٢٠٨ في ٢٦ مارس ٢٠١٨، قدم ميهير بهنسالي وآجاي غاندي استقالتهما من منصبيهما لدى الشركات التابعة الأمريكية.

٢٠٩ في ٥ أبريل ٢٠١٨، أرسلت أنجلينا يبما، الرئيس العالمي للعلامة التجاريـة نيراف مودي، والمدير لشركة فايرستون انترناشيونال ليمتد، رسالة إلكترونية إلى آجاي غاندي، مع نسخة إلى ميهير بهنسالي، "أوعز نيرام بتعليماته إلي للعمل معك لنقل كافة موجودات نيراف مودي في أمريكا (HJ، إرجاع الأساسي إلى هونج كونج في أسرع وقت ممكن.). سوف تدفع هونج كونج إلى مالكا مقدماً لنقل المجوهرات." وفي الرد، غاندي مـع نسخة إلى مايكل جولدمان، ومدير الشحن، شانيزا سينج، ذكر أنه هو وبهنسالي قدما استقالتهما من نيراف مودي انك "بسبب تضـارب المصـالح" وأنـه عليهـا العمـل مـع دينـوف، وجولدمان، وسينج لتنسيق الشحنات. ذكر غاندي أيضاً بأنه وبهنسالي كانا مسرورين بما أن المساعدة ينبغي أن تضرب أي عقبات.

٢١٠. ثم أوعزت يبما دينوف وجولدمان الإرسال لها الموجودات المفصلة لموجودات نيراف مودي انك في نيويورك وذكرت، "نحن بحاجة إلى شحن كافة المنتجات إلى هونج كونج." ورد جولدمان على سينج، "نحن لا نشـحن أي شـيء الآن. سوف أعلمك عندما يكون من المقبول القيام بذلك."

٢١١. في نفس اليوم، أرسل أنطوني أليكوك بريد إلكتروني إلى جولدمان ودينوف قائلاً، "بصفتي مدير فايرستار هولدنجز ليمتد، أعفيك من واجباتك وإدارتك للشركات الفرعية في نيويورك بأثر فوري. الرجاء التأكيد خطياً على قبولكم ذلك." وعندما قابلت الوصي، أشار أليكوك إلى أن ميهير بهنسالي أو نهال مودي أوعز له إنهاء عمل جولدمان ودينوف، لكنه لا يستطيع تذكر التفاصيل.

٢١٢. أعاد جولد مان توجيه البريد الإلكتروني إلى ميهير بهنسالي وآجاي وذكر، لقد كنا نحاول التحقق مع أطراف خارجية من موقف وسلطة أنطوني أليكوك قبل إرساله ما يقرب ٧ ملايين دولار أمريكي من الألماس. نحن لم نتحرك بسرعة كافية بالنسبة له وقد أرسل لنا رسالة البريد الإلكتروني أدناه. أتفهمون أن لديه السلطة للقيام بذلك، وأن تصريحه يكفي لأن يجعله رسمياً؟ وبعد مراجعة رسالة أنطوني الإلكترونية، هل تفكر أيضاً بإنهاء مناصبنا ومسؤوليتنا؟" أجاب بهنسالي، "لن أكون أنا أو آجاي قادرين على التعليق على ما يلي"

٢١٣. في نفس اليوم، عين أنطوني أليكوك نفسه ليكون المدير الوحيد ورئيس كل من الشركات التابعة الأمريكية.

٢١٤. في ٦ أبريل ٢٠١٨، تم شحن مخزون فايرستار انترناشيونال بقيمة معلنة إجمالية تبلغ ٦.٨٠٤.٢١٠.٤٩ دولار أمريكي، تم شحنها من خلال مالكا أميت إلى فايرستار دايموند ليمتد. في هونج كونج. يبدو أن هذه الشحنة تنطوي على ما يقرب ٧ ملايين دولار من الألماس، رفض دينوف وجولدستين شحنها.

٢١٥. عندها اقترب نهال مودي من مارك موتيس وإيدي فريدفيلد كبديلين محتملين عن دينوف وجولدمان. مارك موتيس، الرئيس التنفيذي السابق لسميث جولرز التي مقرها في

ماريلاند كانت مخضرمة في قطاع الألماس، وكان إيدي فريدفيلد مستشار التحول الذي أدار إعادة الهيكلة لدياملينك خارج المحكمة في عام ٢٠١٥ و٢٠١٦. لقد عملت نهال مودي سابقاً مع كلاً من موتس وفريدفيلد.

٢١٦. عندها أجرى ميهير بهنسالي مقابلة مع موتيس وفريدفيلد أخبرهم أنه يبحث عن اثنين من المتخصصين في الصناعة ويمكن أن يثق بهما.

٢١٧. في ١٣ أبريل ٢٠١٨، أنطوني أليكوك، بناءً على تعليمات ميهير بهنسالي ونهال مودي، عين مارك موتس المدير الوحيد ورئيساً، وعين إيدي فريدفيلد ليكون مسؤول التصفية، لكل شركة أمريكية تابعة.

٢١٨. في ٢٥ أبريل ٢٠١٨، تم شحن ٤٥ قطعة من موجودات نيراف مودي انك، بقيمة معلنة إجمالية تبلغ ٦.٣١٥.٦١٥ دولار أمريكي عبر مالكا أميت إلى نيراف مودي ليمتد في هونج كونج. وقع آجاي غاندي على قائمة الشحن المدرجة في تعليمات الشحن.

٢١٩. في ٣٠ أبريل ٢٠١٨، تم شحن ٩٣ قطعة من موجودات نيراف مودي انك، بقيمة معلنة إجمالية تبلغ ١٣.١٠٨.٠٧٢ دولار أمريكي عبر مالكا أميت إلى نيراف مودي ليمتد في هونج كونج. وقع آجاي غاندي على قائمة الشحن المدرجة في تعليمات الشحن.

٢٢٠. في أو حوالي ٣ مايو ٢٠١٨، تم نقل موجودات فايرستار انترناشيونال بقيمة معلنة قدرها ٣.٢٠٠.٠٠٠ دولار أمريكي إلى مالكا أميت ليعمل على تخزينها.

٢٢١. وفي نفس الوقت تقريباً، كان أنطوني اليكوك وميهير بهنسالي وآجاي غاندي، وانجلينا يبما ونيتين داتاني يحاولون تحويل الأموال المتبقية لنيراف مودي المملكة المتحدة إلى هونج

كونج. قدم غاندي بهنسالي وبيما استقالتهما رسمياً من منصبهما في ٢١ مارس ٢٠١٨، لكن كما هو حال الشركات التابعة الأمريكية، كانت استقالاتهما على الورق فقط، وظلوا المتحكمين على نيراف مودي المملكة المتحدة وأصولها.

٢٢٢. في ٩ أبريل ٢٠١٨، أوعزت أنجلينا يبما آجاي غاندي وميهير بهنسالي "لنقل الأموال المتاحة في نيراف مودي ليمتد. في لندن إلى نيراف مودي ليمتد. في ماكاو." في ٢٩ أبريل ٢٠١٨، سأل أنطوني أليكوك آجاي غاندي ما إذا كان أكثر من ١٠.٠٠٠.٠٠٠ يورو في حساب نيراف مودي المملكة المتحدة لدى باركليز تم نقلها إلى هونج كونج. أجاب غاندي بأن جزء من الأموال تم تحويله، إلا أن الحساب تم تجميده. وعمل أليكوك وغاندي وبهنسالي وبيما وداتاني معاً على مدار الأسابيع القليلة الماضية لإلغاء تجميد الحساب، حتى يتمكنوا من نقل الأموال المتبقية إلى هونج كونج

٢٢٣. في ٤ مايو ٢٠١٨، أرسل يبما بريد إلكتروني إلى بهنسالي، "سأحضر إلى نيويورك من يوم الاثنين ٧ مايو لغاية الخميس ١٠ مايو لمراجعة موجودات نيراف مودي. لقد أبلغني نيراف بأنه يمكنني العمل مع موظف فايرستار دايموند انك شانا سينج لحساب الموجودات... شكراً لكم على تقديم الدعم لي." لقد قدم غاني استقالته، فقد قدم هو وبهنسالي استقالتهما من نيراف مودي انك، وأوعزا إلى يبما العمل مع الإدارة الجديدة نيراف مودي انك "على الخدمات اللوجستية."

٢٢٤. خلال زيارة انجلينا يبما نيويورك في مايو ٢٠١٨، أعطى آجاي غاندي وميهير بهنسالي الإذن لإزالة ثروة تبلغ ملايين الدولارات من المخزون في مخازن في مالكا أميت. وفقاً لذلك، الموظف الذي كانت برفقة يبما إلى مالكا أميت. اختارت يبما تقريباً ٥ مليون

دولار تقريباً من الطرود المختلفة. القطع التي اختارتها يبما تم شحنها بعد ذلك إلى هونج كونج في شحنتين.

٢٢٥. أولاً، في ٩ مايو ٢٠١٨، المخزون بقيمة معلنة قدرها ٢.٧٠٠.٠٠٠ دولار أمريكي تم شحنها من خلال مالكا أميت إلى فانسي كريبشنز في هونج كونج (مستندات مالكا أميت تدرج فايرستار انترناشيونال بصفة الشاحن، ولكن هذه الشحنة تضمنت مخزون نيراف مودي انك أيضاً.).

٢٢٦. بعد ذلك، في ١٥ مايو ٢٠١٨، تم شحن ١٢٢ قطعة من موجودات نيراف مودي انك بقيمة معلنة قدرها ٢.٥١٦.٤٧٠.٧٩ دولار أمريكي إلى نيراف مودي ليمتد في هونج كونج من خلال مالكا أميت. وقع آجاي غاندي على قائمة الشحن المدرجة في تعليمات الشحن.

٢٢٧. في ٢٣ مايو ٢٠١٨، نيراف مودي ليمتد "باعت" ١٢٢ قطعة من موجودات نيراف مودي ليمتد إلى فايرستار دايموند ليمتد. في نفس اليوم، باعت "فايرستار دايموند ليمتد نفس القطع إلى كيان الظل سينو تريدز. وقع أنطوني أليكوك على الفواتير لكلاً من هذه المبيعات المزعومة، ومع ذلك، في ١٩ يونيو ٢٠١٨، أبلغ أليكوك المحامين بخصوص كيانات فايرستار التي مقرها في هونج كونج بأن شحنة ١٥ مايو تم إرساله من نيويورك دون إذن أليكوك وطلب منهم محاولة تحديد مكان الشحنة.

٢٢٨. طوال شهر مايو ٢٠١٨، ضغط أنطوني أليكوك على إيدي فريد وكارك موتوس لشحن بقية موجودات نيراف مودي وفاير ستار انترناشيونال إلى هونج كونج. فقد رفضوا القيام بذلك إلى أن تم الدفع إلى جميع الدائنين للشركات الأمريكية التابعة. وعندما اكتشف

فريدفيلد وموتوس شحنة ١٥ مايو ٢٠١٨، طالبا أليكوك الترتيب لإرجاع الشحنة، ورفض أليكوك.

٢٢٩. في ١ يونيو ٢٠١٨، وبناءً على تعليمات نهال مودي، أنهى أنطوني أليكوك عمل فريدفيلد وموتوس وعين روشيل ميلر، صديق شخصي آخر لنهال مودي، كرئيس تنفيذي ومدير وحيد لكل شركة تابعة أمريكية. وقبل تعيينها، عملت روشيل ميلر كمخططة للمناسبات وليس لديها أي خبرة في قطاع المجوهرات أو إدارة الإفلاس أو المالية.

٢٣٠. في نفس اليوم، قدم انطوني أليكوك روشيل ميلر إلى انجلينا يبما. وأوعز أليكوك ويبما إلى ميلر لاسترداد مخزون نيراف مودي أنك وفايرستار انترناشيونال من مالكا اميت وشحنه إلى هونج كونج

٢٣١. في وقت تعيين روشيل ميلر، كان الحساب المصرفي للشركات الأمريكية التابعة فيه ١.٢٨٣.٤٥٤.٠٥ دولار أمريكي.

٢٣٢. في ٢ يونيو ٢٠١٨، تصرفت روشيل ميلر بصفتها مدير/ رئيس تنفيذي لنيراف مودي انك، اتصلت بمالكا أميت لطلب الشحنة إلى هونج كونج في مجموعتين من الموجودات. ١) ٢٠٨ قطعة من بقيمة معلنة قدرها ٥.٠٦٣.٩١٤.٠١ دولار أمريكي، و (٢) ٥٣ قطعة بقيمة معلنة قدرها ٢.٨٤٦.٥٤٥ دولار أمريكي. رفض مالكا أميت القيام بذلك إلى أن يتحقق من صلاحية ميلر.

٢٣٣. في ٥ و ٧ سبتمبر، بعد تأكيد روشيل ميلر تعيينها كمدير ورئيسي تنفيذي لنيراف مودي انك وفايرستار انترناشيونال، عمل مالكا أميت على تحرير تسعة طرود تتضمن باقي موجودات نيراف مودي انك وفايرستارز انترناشيونال إلى وصاية روشيل ميلر.

٢٣٤. روشيل ميللر، بناءً على المعلومـات والمعتقدات، بتوجيه من نهال مـودي، شـحنت جميع مخزونـات نيراف مـودي انك وفايرسـتار انترناشـيونال ليتم تقييمهـا بواسطة مختبرات أحجار كريمـة مسـتقلة، ومختبر مزعوم لتنصـيف الألمـاس. ومـع ذلك، وفقاً لتقرير فحص صموئيلز، كانت مختبرات تقييم الأحجار الكريمة المستقلة مملوكة من قبل ميول شوكسي من خلال شركة وهيمة في جزر بريطانيا العذراء. ووجد محقق صموئيلز بأن ملكية شوكسي السرية لمختبرات الأحجار لكريمة المستقل تسمح لصموئيلز بالإخفاء عن المستهلكين حقيقة أن منتجات المجوهرات لـم يتم تقييمهـا بشكل مسـتقل، وكانت مكاتب مختبـرات الأحجار الكريمة المستقل موجودة بجانب مكاتب دياملينك مباشرة.

٢٣٥. في ٢ أكتوبر ٢٠١٨، أبلغ رئيس مختبرات الأحجار الكريمـة المستقل كيرتس لوري وروشيل ميللر بأن مختبرات الأحجار الكريمة المستقل أكمل فحصـه وتقييمه لمخزون نيراف مـودي انـك، وفايرسـتار انترناشـيونال، حيـث وصـفه لـوري بـ " ١٧ كـيس وصـندوق مـن البضـائع." قيمت مختبرات الأحجار الكريمة المستقلة مخزون نيراف مودي انك، فايرستار انترناشيونال بـ" بقيمة الخردة" بحوالي ١.٥ مليون دولار. وأشار لوري كذلك، "باعتبار أن هذه تخفيضـات ناريـة". لقد أجريت خصـومات أعمـق مـن المعروف عـادة فـي تسـعير مخزون الإغـلاق." دفعت روشـيل ميللر مختبـرات الأحجار الكريمـة المستقلة مبلـغ إجمـالي قـدره ٨١.٩٤٣ مليون دولار أمريكي من يونيو ٢٠١٨ إلى يونيو ٢٠١٩ من الحسابات المصرفية لفايرستار انترناشيونال وسينيرجيز.

٢٣٦. عندها زعمت روشيل ميللر بيع موجودات نيراف مودي انك وفايرستار انترناشيونال إلى "أعلى المزايدين" لقاء سعر شراء يبلغ إجماليه ١.٥٩٣.٥٥٠ دولار أمريكي. يبدو أن

معظم، وربمـا جميـع، عمليـات الشـراء القائمـة على أسـاس تجـاري بحـت المزعومـة كانـت لمشترين بدلاء لنيراف مودي وعائلته.

٢٣٧. على سبيل المثال، بموجب الفاتورة بتاريخ ٤ أكتوبر ٢٠١٨، باعت روشيل كميات غير محددة من "المجوهرات المختلطة" إلى شركة الكيميست جلوبال تريدينج أند كونسالتينج ليمتد. ("الكيميست") لقاء سعر إجمـالي قـدره ٤٢٠.٣٠٠ دولار أمريكـي. لقد تـم تشـكيل الكيميست في ١٦ مايو ٢٠١٨، وكـان مملوكـاً من قبل تـامر أبو العطـا، عن المعلومـات والمعتقد هو صديق شخصي لنهال مودي.

٢٣٨. بموجب الفـاتورة بتـاريخ ٨ أكتـوبر ٢٠١٨، باعـت روشـيل ٢٩٦.٥٦ قيـراط مـن "الألمـاس السـائب" لقاء ٦٠٥.٠٠٠ دولار أمريكـي إلى دايموندز فيليج يو إس أيـه كـورب، شركة مقرها في كاليفورنيا، تابعة لشركة دايموندز فيليج م.د.م.س التي مقرها في دبي وفي يوليو ٢٠١٨، تم اتهام مالك دايموندز فيليج، انـاريش ميهتـا، بـإجراء عملية احتيال على عمليات الاستيراد والتصدير الخاصـة بـه باستخدام طرق عمل مماثلـة لنيراف مودي. تبين قيود وسجلات كيانات فايرستار عدة معاملات مع دايموندز فيليج على طول السنين.

٢٣٩. في ٩ أكتوبر ٢٠١٨، دفعت روشيل ميللر لنفسها مرة واحدة مكافأة بقيمـة ٥٠.٠٠٠ دولار أمريكي من الحساب المصرفي لشركة فايرستار انترناشيونال. وفي ١٧ أكتوبر ٢٠١٨، حولـت روشـيل ميلـر مبلـغ ٧٥.٠٠٠ دولار أمريكـي إلى أنطـوني أليكـوك مـن الحسـاب المصرفي لشركة سينيرجيز. ويبدوا بأن هاتين الدفعتين تعويض تحفيزي مرتبط ببيع ميلر موجودات فايرستار انترناشيونال ونيراف مودي انك.

٢٤٠. بين يونيو ٢٠١٨ ويونيو ٢٠١٩، تلقت روشيل ميلر ما مجموعه ٨٠٧.٢٠٣ دولار أمريكي كتعويضات ومكافآت واسترداد نفقات، من الشركات الأمريكية التابعة. ودفعت ميلر أيضاً مبلغ قدره ٥٣٥.٧٦٣ دولار أمريكي إلى مينت هولدنجز ذ.م.م، الشركة التي يقع مقرها في ميامي "خدمة استقبال وإرشاد فاخرة" شركة لها علاقة مع عائلة مودي، مقابل "تسديد النفقات" ولقاء ذلك حصلت على المنفعة. دفع مولر أيضاً لشركة يملكها زوجها، نورث ستار لاند سيرفيسيز، مبلغ إجماليه ٤٩.٠٦٠ لقاء "مبيعات غير معروفة"

٢٤١. أنفقت روشيل ميلر ما تبقى من أموال الشركات التابعة الأمريكية على الاستشاريين والقانونيين والماليين. والضرائب والمساحات المكتبية المستأجرة، وأقساط تأمين المديرين والمسؤولين، ونفقات متنوعة أخرى.

٢٤٢ التحويل المنظم لأصول الكيانات الأمريكية إلى الكيانات التي يتحكم بها مودي في الخارج مبينة في الفقرات السابقة، بالتزامن مع التقصير الاحتيالي، وتحريفات آجاي غاندي وميهير بهنسالي التي جرت في سياق قضايا الفصل ١١، شكلت ملايين الدولارات في عمليات التحويلات الاحتيالية الفعلية واسترداد قيمة القروض المستحقة للديون والشركات التابعة الأمريكية.

**ب. حالات التقصير الاحتيالية، والتحريف والتضليل. التي تمت فيما يتعلق بقضايا المدينين في الفصل ١١**

٢٤٣. في ٢٦ فبراير ٢٠١٨، قدم المدينون التماسات طوعية للحصول على الإعانة بموجب الفصل ١١ من قانون الإفلاس. وفي الأسابيع الأولى من قضايا الفصل ١١، قام بهنسالي وغاندي، بصفتهم الرئيس التنفيذي والمدير المالي على التوالي للمدينين، قاموا بالسهو

الاحتيالي، تقديم البيانات الخاطئة وتحريفات، بشكل رسمي وغير رسمي إلى المحكمة، إلى وصي الولايات المتحدة الأمريكية، وإلى المدينين فيما يتعلق بمشاركة المدينين في الاحتيال المصرفي وعلاقتهم بمختلف كيانات الظل.

٢٤٤. في بيانه المقدم لدى هذه المحكمة في ٢٨ فبراير ٢٠١٨، أفاد بهنسالي تحت عقوبة الحنث باليمين، "مرفق طيه في الملحق ب قائمة تحدد أكبر عشرين (٢٠) دائنين غير مضمونين، لكل من شركة فايرستار و [فنتازي] و [جافي]، باستثناء الأشخاص الذين يشكلون "المطلعين" بموجب القسم ١٠١(٣١) من قانون الإفلاس".

٢٤٥. الملحق ب من بيان بهنسالي، الذي يزعم أنه يحتوي على أكبر ٢٠ دائن غير مضمون من غير الشركات التابعة لكل مدين، اشتمل على: وورلد ديموند بصفة دائن لـ شركة فايرستار بمبلغ وقدره ٧٩.٩١٨.٧٠ دولار أمريكي، وفانسي كريشنز بصفة دائن لـ شركة فايرستار بمبلغ وقدره ١٩.٦١٧.٥٠ دولار أمريكي وتري كلر بصفة دائن لـ جافي بمبلغ وقدره ٣.٣٥٦.١٦٥.٩٩ دولار أمريكي، وباسفيك بصفة دائن لـ جافي بمبلغ وقدره ٢.٩٢٢.٢٣٩.٣١ دولار أمريكي ويونيفيرسال بصفة دائن لـ جافي بمبلغ وقدره ٤٢.٩٠٥.٠٠ دولار أمريكي وإتيرنال بصفة دائن لـ جافي بمبلغ وقدره ٣١.٦٤٥.٣٩ دولار أمريكي. في الواقع فإن كل من هذه الكيانات كانت مطّلعة.

٢٤٦. وعلاوة على ذلك، فإن بهنسالي جعل محكمة الإفلاس وأطراف أخرى تعتقد أن المدينين كانوا منخرطين في الاحتيال المصرفي وأنه تم الإمساك بهم بصورة بريئة في إحدى المسائل في الخارج. في بيان قدّم بعد وقت قصير من تاريخ الالتماس، أعلن بهنسالي تحت عقوبة الحنث باليمين: "لقد عمل المدينون وموظفوهم المتخصصون بلا كلل خلال الأسبوع الماضي أو نحو ذلك من أجل: (١) الحصول على مصادر بديلة للتوريد، و(٢) إنشاء

مكتب خلفي بديل ووظائف خدمة الدعم، و(٣) طمأنة مورديهم وعملائهم بعدم تورطهم في السلوك غير المشروع المزعوم، و(٤) طمأنة عملائهم أنهم ملتزمون بمزاولة أعمالهم وأنه يتم اتخاذ إجراءات سريعة للتخفيف من الأضرار الناتجة عن الإجراءات في الهند."

٢٤٧. في تاريخ ٢٧ مارس ٢٠١٨، قدّم المدينون جداول إفلاسهم وبيانات الشؤون المالية الخاصة بهم ("SOFA")، الموقعة جميعها من قبل أجاي غاندي تحت عقوبة الحنث باليمين. احتوت بيانات الشؤون المالية للمدينين على العديد من البيانات الخاطئة والتحريفات والسهو.

٢٤٨. لم تورد بيانات الشؤون المالية لـ شركة فايرستار أي تحويلات إلى كيانات الظل بالرد على السؤال رقم ٣، الذي يسأل عن الدفعات المسددة للدائنين في غضون ٩٠ يوم قبل تاريخ الالتماس، أو السؤال رقم ٤، الذي يسأل عن نقل الممتلكات إلى المطلعين على المدين في غضون سنة واحدة قبل تاريخ الالتماس، أو السؤال رقم ١٣، الذي يسأل عن أي تحويلات أخرى تمت خارج سياق العمل العادي في غضون سنتين قبل تاريخ الالتماس.

٢٤٩. في الحقيقة، كانت هناك تحويلات كبيرة من شركة فايرستار إلى كيانات الظل التي وجهها غاندي شخصياً أو شارك فيها بطريقة أخرى خلال الفترات ذات الصلة. على سبيل المثال، لم يكشف غاندي عن تحويلات شركة فايرستار بقيمة ٤٨٣.٦٢٠.٠٥ دولار أمريكي و ٢.١٨٨.٧٦٩.٤٣ دولار أمريكي وتحويل جافي بقيمة ٥٣٠.٠٠٠ دولار أمريكي إلى باسفيك في ٣ يناير ٢٠١٨ – قبل أسابيع قليلة من تاريخ الالتماس. كما لم يكشف غاندي عن قيام شركة فايرستار بدفع مبلغ وقدره ٣٠٠.٠٠٠ دولار أمريكي لشركة يونيك في ٢٢ مارس ٢٠١٧، قبل أقل من عام من تاريخ الالتماس.

٢٥٠. بالإضافة إلى ذلك، لم تكشف أي جداول إفلاس لـ جافي أو بيانات شؤونه المالية عن أي مبالغ مستحقة من قبل إن إم آي إلى جافي.

٢٥١. مع ذلك فإن دفاتر وسجلات جافي وإن إم آي بينت وجود رصيد قرض بمبلغ وقدره ١١.٢١٦.٤٦٧ دولار أمريكي مستحق من قبل إن إم سي إلى جافي كما في تاريخ الالتماس، ولم يتم تسديده.

٢٥٢. في تاريخ ٢٣ مارس ٢٠١٨، انتقل المدينون للموافقة على إجراءات المزايدة والبيع من أجل بيع جميع أصولهم بشكل أساسي بموجب القسم ٣٦٣ من قانون الإفلاس. في تاريخ ٢٩ مارس ٢٠١٨، وافقت المحكمة على إجراءات المزايدة والبيع للمدينين.

٢٥٣. في تاريخ ٢٠ أبريل ٢٠١٨، عينت المحكمة السيد جون جيه. كارني بصفة محقق (**"المحقق"**) للتحقيق بطبيعة ومدى مشاركة المدينين في الاحتيال المصرفي.

٢٥٤. وفي وقت قريب بعد تعيين المحقق، حاول المحقق إجراء مقابلة مع بهنسالي. إلا أن بهنسالي رفض التعاون رفضاً قاطعاً. وعند الضغط عليه من قبل مستشار المحقق، أقر مستشار بهنسالي أن بهنسالي كان على اتصال مع مودي في وقت متأخر من ١٥ مارس ٢٠١٨، وأنه ناقش مع مودي عملية بيع المدينين وإفلاسهم. كما هو مزعوم أعلاه، فقد تواصل أجاي غاندي وأنجلينا يبما أيضاً مع نيراف مودي في مارس ٢٠١٨.

٢٥٥. في تاريخ ٠١ مايو ٢٠١٨، قام المدينون بتأجيل المزاد لأصول شركة فايرستار وفنتازي إلى أجل غير مسمى. وفي تاريخ ٠٣ مايو ٢٠١٨، كانت باراج ديموندس إنك مقدمة العطاء الناجحة لأصول جافي.

٢٥٦. في تاريخ ١٥ مايو ٢٠١٨، في جلسة استماع للموافقة على بيع جافي، شهد رئيس إعادة هيكلة المدينين مارك سامسون أن ميهير بهنسالي كان على اتصال مع نيراف مودي في الفترة ما بين بدء قضايا الفصل ١١ للمدينين و ١٥ مارس، ٢٠١٨، وأن بهنسالي استمر في المشاركة "على أساس يومي" بصفته "موظفاً رئيسياً" في عملية البيع بعد ذلك التاريخ.

٢٥٧. وعقب هذا الكشف، طلبت المحكمة استكمال المحضر بتفاصيل إضافية تتعلق بطبيعة ومدى اتصالات بهنسالي بعد الالتماس مع مودي، وأجلت جلسة استماع البيع إلى ٢٣ مايو ٢٠١٨. وفي تاريخ ١٩ مايو ٢٠١٨، سحب المدينون حركة البيع مع عدم الإخلال. (الحافظة ١٧٧.) في مؤتمر تشامبرز الذي تم ترتيبه على عجل في ١٨ مايو ٢٠١٨، قام مستشار بهنسالي بإبلاغ المحكمة أن بهنسالي قد استقال من منصب المدير والمسؤول للمدينين في نفس اليوم وأن بهنسالي رفض تقديم إعلان والمثول للاستجواب بخصوص اتصالاته بعد الالتماس مع مودي.

٢٥٨. في تاريخ ١٧ مايو ٢٠١٨، جلس أجاي غاندي في مقابلة مع فريق المحقق. وفي تلك المقابلة، أفاد غاندي أن الشيء الوحيد الذي يعرفه عن كيانات الظل هو أنهم كانوا من عملاء بهنسالي. في المقابلات اللاحقة، استمر غاندي في الإصرار على أنه لم يكن على علم بأن نيراف مودي كان يملك أو يتحكم بأي كيان من كيانات الظل. عندما قام فريق المحقق بمواجهته برسائل البريد الإلكتروني التي تشير إلى أن غاندي كان يدرك أن العديد من كيانات الظل كانت أطرافاً معنية، أكد غاندي مراراً وتكراراً أنه لم يتذكر رسائل البريد الإلكتروني هذه، وأن مودي لم يكن بأي حال من الأحوال يتحكم بكيانات الظل.

٢٥٩. بالإضافة إلى ذلك، ورداً على أسئلة المحقق فيما يتعلق بتورط غاندي في مئات الملايين من الدولار أمريكيات في معاملات الألماس السائب، فإن غاندي أخبر المحقق أنه

قام فقط بالتوقيع على إيصالات التعبئة دون التحقق من محتويات الشحنة، وتقييمها، والربحية، أو ملاءمة هذه المعاملة.

٢٦٠. بالإضافة إلى ذلك، عندما قام المحقق بسؤال غاندي عما إذا كان قد استخدم حسابات البريد الإلكتروني الشخصية الخاصة به لأعمال فايرستار، أفاد غاندي أنه لم يفعل ذلك. في الواقع، خلال تلك الفترة، أرسل غاندي العديد من رسائل البريد الإلكتروني المتعلقة بالمدينين والكيانات الأخرى التي يتحكم بها مودي من وإلى العديد من حسابات البريد الإلكتروني الشخصية.

٢٦١. في تاريخ ١٤ يونيو ٢٠١٨، وافقت المحكمة على تعيين القيم، وفي ذلك الوقت تولى القيم السيطرة على ممتلكات المدينين وعملياتهم.

٢٦٢. في ٠٧ أغسطس ٢٠١٨، أجرى المحقق استجواباً لميهير بهنسالي. يمكن الاستدلال على معرفة بهانسالي وقصده وإدانته فيما يتعلق بالاحتيال المصرفي وغير ذلك من المخالفات المزعومة في هذه الشكوى من حقيقة أن بهنسالي احتج بتعديله الخامس ضد التجريم الذاتي بالرد على كل سؤال باستثناء اسمه.

### ج. الجهود الأخرى لحجب الحقائق عن التحقيق في الاحتيال المصرفي وتعطيله

٢٦٣. بحث نيراف مودي وبهانسالي وغاندي والمتآمرون معهم، في أساليب مختلفة وقاموا بتنفيذها لإخفاء وإتلاف أدلة تورطهم في الاحتيال المصرفي قبل وبعد الكشف عن الاحتيال المصرفي على حد سواء.

٢٦٤. قام براديب ماتري، عضو قسم تكنولوجيا المعلومات لدى في إف آي بيه إل، بإخبار السلطات الهندية أنه في عام ٢٠١٠ أو ٢٠١١، تلقى تعليمات من ميهير بهنسالي بإعداد

خادم بريد إلكتروني سري مغلق في مكتب دبي باستخدام النطاق "panemail.com". قام خادم Panemail بتقييد رسائل البريد الإلكتروني المرسلة أو المستلمة من خوادم البريد الإلكتروني الخارجية، ولم يكن من الممكن تنزيل رسائل البريد الإلكتروني والمرفقات من الخادم. كان الخادم يقتصر على ٢٥ إلى ٣٠ مستخدم، بما في ذلك نيراف مودي، ميهير بهانسالي، أجاي غاندي، نيهسال مودي، هيمنت بهات، أديتيا نانافاتي، شيام وادهوا، ساتيندرا شوكلا، كوريان ماثيوز، وسرينار كريشنان. أعطى ميهير بهنسالي التعليمات ووافق على إضافة مستخدمين للخادم.

٢٦٥. كما أن ماتري أخبر السلطات الهندية أنه في عام ٢٠١٧، تلقى أوامر من بهنسالي بإنشاء خادم سري جديد على النطاق "cricketnow.live" مع قيود مماثلة لخادم Panemail. حذف هذا الخادم رسائل البريد الإلكتروني تلقائياً بعد أسبوع واحد. في هذا الخادم، تم تعيين هويات تعريف عامة للمستخدمين مثل "user1" و DOE1 و DOE2 و DXB1 و HK1، إلخ." لتعزيز السرية.

٢٦٦. في تاريخ ١٣ فبراير ٢٠١٨، أرسل محامي في داي بيتي إل إل بيه عبر البريد الإلكتروني إلى أجاي غاندي لاقتراح إرسال كشوف الحسابات المصرفية لـ بيه إس،٥٠، التي تمتلك سنترال بارك ساوث ٥٠، مباشرة إلى أبهاي جافيري كمدير لشركة سي بيه إس بروبرتيز ذ.م.م. قام غاندي بإعادة توجيه الرسالة الإلكترونية إلى "ajaycpa@yahoo.com"، والذي بناءً على المعلومات والاعتقاد هو عنوان البريد الإلكتروني الشخصي لغاندي، وذكر، "نيراف بهاي، حسناً، لا بأس في إرسال بيانات حساب سي بيه إس بروبرتيز ذ.م.م المصرفي من سيتي بنك إلى أبهاي جافيري إلى عنوان بريده الإلكتروني أو عنوان بريد آبي؟" إن حقيقة توجيه غاندي لهذه الرسالة الإلكترونية إلى "نيراف

بهاي" تظهر أن نيراف مودي و آجاي غاندي كانا يستخدمان حساب البريد الإلكتروني الشخصي لغاندي للتواصل في الأسابيع التي تلت الكشف عن الاحتيال المصرفي.

٢٦٧. وبالمثل، في تاريخ ١٣ مارس ٢٠١٨، أرسل أجاي غاندي من حساب بريده الإلكتروني على الياهو رسالة إلكترونية موجهة إلى "نيراف بهاي" تلخص المعاملات الواردة والصادرة لحساب إن إم إل يو كيه في بنك باركليز لمراجعة مودي، بما في ذلك إيداع ٢٠٠٠٠٠٠ جنيه استرليني من نيراف مودي شخصياً في ٢٩ يناير ٢٠١٨. كما هو مزعوم أدناه، قبل أسابيع قليلة فقط، اشترى نيراف مودي شقة في لندن بقيمة ٧٠٩٥٠٠٠٠ جنيه إسترليني بعد فراره من الهند.

٢٦٨. قام أجاي غاندي أيضاً بالتنسيق مع بورفي ميهتا خلال هذه الفترة. في تاريخ ١٦ فبراير ٢٠١٨، أرسلت بورفي ميهتا رسالة إلكترونية إلى أجاي غاندي، "كيف يمكنني الوصول إليك عبر واتساب؟" رد غاندي برقم هاتفه الشخصي.

٢٦٩. في تاريخ ١١ مارس ٢٠١٨، أجرى أجاي غاندي عمليات بحث عبر الإنترنت حول قضية احتيال أدلفيا كوميونيكيشن والإفلاس المرتبط بها. تضمنت عمليات البحث هذه: "كيف تم القبض على أدلفيا؟" و "كيف تم القبض على عائلة ريغاس في احتيال أدلفيا" و "كيف تم اكتشاف احتيال أدلفيا؟"

٢٧٠. في تاريخ ٩ مارس ٢٠١٨، زار بهنسالي مقالة على الإنترنت بعنوان "١٤ نصيحة بخصوص تطبيق سيغنال للدردشة الآمنة"، والتي قدمت نصائح لإرسال ومسح الاتصالات الآمنة من خلال سيغنال، وهو تطبيق تشفير شامل.

٢٧١. في تاريخ ١٢ مارس ٢٠١٨، زار ميهير بهنسالي مقالة على الإنترنت بعنوان "كيفية مسح ذاكرة التخزين المؤقت على أي متصفح". وصفت المقالة طرق حذف محفوظات تصفح الإنترنت من متصفحات الويب المختلفة. في نفس اليوم، زار بهنسالي مقالة على الإنترنت بعنوان "كيفية اختراق كلمات مرور الواي فاي". تصف هذه المقالة طرق الوصول إلى الشبكات اللاسلكية بدون كلمة المرور المطلوبة.

٢٧٢. احتوى الحاسوب المحمول لـ ميهير بهنسالي على برنامج اسمه " !Hide My Ass Pro VPN". بناءً على المعلومات والمعتقدات، فإن الغرض من هذا البرنامج هو تسهيل استخدام الإنترنت المجهول من خلال تقنية الشبكة الخاصة الافتراضية. تشير سجلات البرنامج إلى أنه تم استخدام البرنامج مؤخراً حتى ١١ فبراير ٢٠١٨.

٢٧٣. وتضمن حاسوب بهنسالي المحمول أيضاً برنامجاً اسمه    SecurStar DriveCrypt. بناءً على المعلومات والمعتقدات، فإن الغرض من هذا البرنامج هو تشفير البيانات على أجهزة الكمبيوتر.

٢٧٤. كما زُعم أعلاه، أنشأ بهنسالي ما يبدو أنه قائمة "المهام" لمختلف المتآمرين المتعاونين بعد الكشف عن الاحتيال المصرفي. تضمنت القائمة تعليمات حول "الإرسال إلى كافة كومبس من غير فايرستار دبي إلى هونج كونج". بناء على المعلومات والمعتقدات، تشير كلمة "كومبس" إلى "أجهزة الحاسوب (الكمبيوتر)".

٢٧٥. وفقاً للإفادات التي أدلى بها مختلف مديري وموظفي كيان فايرستار وكيان الظل إلى السلطات الهندية، في حوالي فبراير أو مارس ٢٠١٨:

(١) قام كل من نهال مودي ومهير بهنسالي بإزالة ما يقرب من ٥٠ كيلوغراماً من الذهب و ٢٥٠ ألف درهم إماراتي (ما يعادل ٦٨ ألف دولار أمريكي تقريباً) من كيان فيريستار الكائن في دبي،

(٢) قام نيشال مودي بتحويل الألماس من الكيانات التي يسيطر عليها مودي في دبي إلى هونغ كونغ.

(٣) قام نهال مودي بإزالة ما يزيد على ٦ ملايين دولار أمريكي من الألماس و ١٥٠ صندوقاً من اللؤلؤ من إحدى الكيانات التي يسيطر عليها مودي ومقرها هونغ كونغ. في قائمة جدول "المهام" التي تم استردادها من كمبيوتر ميهير بهنسالي، تضمنت المهام المدرجة تحت "إم بي" "أين يجب الاحتفاظ بالمخزون؟" و "اللؤلؤ – إدخالات الشراء الأصلية".

(٤) قام ميهير بهنسالي ونيهال مودي ونيراف مودي بتخويف وإجبار المديرين والموظفين في كيانات الظل على عدم التعاون مع سلطات التحقيق. على سبيل المثال، فإن آشيش لاد، أحد مدراء وحدة كيان الظل، أخبر السلطات الهندية أن نيراف مودي هدد بقتل أو توريط لاد كذباً إذا قام بالكشف عن أي شيء إلى سلطات التحقيق.

(٥) أتلف نهال مودي الهواتف المحمولة لمديري كيان الظل. وأخبر المديرين أن "هواتفهم المحمولة سهلة التتبع وهي دليل". أشرف مودي أيضاً على إتلاف الحسابات والسجلات والخوادم لمختلف الكيانات التي يسيطر عليها مودي.

(٦) قام نهال مودي برشوة آشيش لاد بمبلغ ٢,٠٠٠,٠٠٠ روبية هندية (حوالي ٢٨,٠٠٠ دولار أمريكي) للإدلاء بشهادة كاذبة إلى السلطات القضائية في أوروبا.

(٧) أخبر نيراف مودي موظفي كيان الظل أن "الوضع غير آمن لهم [في دبي] و [عليهم] أن ينتقلوا إلى القاهرة [، مصر.]". وبمجرد أن أصبحوا في القاهرة، قام مودي، أو آخرين يعملون تحت إمرته، بمصادرة جوازات سفر موظفي كيان الظل "بذريعة تصريح إقامة".

(٨) أمر نيراف مودي، أو غيره من العاملين تحت إمرته، أفراد كيان الظل بتوقيع إقرارات قبل مغادرتهم القاهرة تفيد بأن كيانات الظل كانت مملوكة للمديرين ولم تكن مرتبطة بأي حال بنيراف مودي.

*د- غَسل الأموال لأفراد أسرة مودي قبل الكشف عن الاحتيال المصرفي*

٢٧٦. في أوائل عام ٢٠١٤، بدأ نيراف مودي وشركاؤه المتعاونون في وضع خطط "لإعادة هيكلة" الهيكل المؤسسي العالمي "لكيانات فايرستار" وذلك سعياً مهم لإجراء طرح عام أولي في نهاية المطاف. بدا أن الاكتتاب العام الأولى هو استراتيجية خروجهم من مخطط الاحتيال.

٢٧٧. وكان الغرض من إعادة الهيكلة المخطط لها يتمثل في أمرين (أ) تطهير أي أثر للمعاملة الذاتية لعائلة مودي خلال الفترة ذات الصلة من دفاتر وسجلات كيانات فايرستار وهيكل الملكية، و (ب) توفير ذريعة لتوجيه الأصول إلى آمي مودي وبورفي ميهتا.

٢٧٨. على سبيل المثال، كانت إحدى القضايا التي تهدف إعادة الهيكلة المخطط لها إلى حلها هي السجل المريب لرسملة وملكية شركة سينيرجيز.

٢٧٩ – تم إنشاء شركة سينيرجيز في الأصل في أبريل ٢٠٠٧ لتكون بمثابة الكيان المشتري فيما يتعلق بالاستحواذ على شركة جافي في وقت لاحق من ذلك العام.

٢٨٠. في تاريخ ١١ أكتوبر ٢٠٠٧، قام ميهير بهنسالي وأجاي غاندي بتنفيذ شهادة أسهم تعكس إف آي بيه إل كحامل لـ ١٠٠٠٠٠ سهم في شركة سينيرجيز.

٢٨١. في الفترة ما بين ٢٠ أكتوبر ٢٠١٠ و ١١ مارس ٢٠١١، نقل نيراف مودي شخصياً إجمالي مبلغ وقدره ١٤٥٧٥٠٠٠ دولار أمريكي إلى شركة سينيرجيز، الذي استخدمته شركة سينيرجيز لسداد القروض المزعومة من إف آي بيه إل. تألفت "القروض" من إف آي

بيه إل من معاملات دورية سابقة قامت من خلالها إف آي بيه إل بتحويل الأموال إلى شركة سينيرجيز وبدورها قامت شركة سينيرجيز على الفور بإعادة الأموال إلى إف آي بيه إل، أو في حالات أخرى، إلى شركة فايرستار بيه إل أو بريليانت أو اتيرنال أو غيرها من الكيانات التي يسيطر عليها مودي.

٢٨٢. في تاريخ ١ أكتوبر ٢٠١٦، على الرغم من أن إف آي بيه إل ظلت المالك الوحيد لـ شركة سينيرجيز، أبرم نيراف مودي و إف إتش إل اتفاقية لشراء الأسهم في شركة سينيرجيز كوربوريشن، وبموجبها، كان نيراف مودي، بصفته الشخصية، يزعم أنه يبيع ١٠٠٪ من الأسهم القائمة في شركة سينيرجيز إلى إف إتش إل مقابل سعر ١٠٠ دولار أمريكي. وقع الاتفاقية كل من ميهير بهنسالي وأجاي غاندي نيابة عن شركة سينيرجيز، ونيراف مودي نيابة عنه، ومن مدير إف إتش إل آنذاك هيمانشو تريفيدي. وفي نفس اليوم، أجرى ميهير بهنسالي و أجاي غاندي شهادة أسهم تعكس إف إتش إل كصاحب ١٠.٠٠٠ سهم في شركة سينيرجيز.

٢٨٣. في ديسمبر ٢٠١٦، تنازل نيراف مودي إلى بورفي ميهتا عن مصلحته في "قرض" شركة سينيرجيز بمبلغ وقدره ١٤.٥٧٥.٠٠٠ دولار أمريكي بموجب اتفاقية تنازل بأثر رجعي اعتباراً من ١ أبريل ٢٠١٢. تم وصف هذا التنازل كهدية "منحة" في العديد من رسائل البريد الإلكتروني. كما هو مذكور أدناه، في يوليو ٢٠١٧، استخدمت شركة سينيرجيز في نهاية المطاف ضخ رأس المال المزعوم من إف إتش إل لتسديد القرض إلى بورفي ميهتا كجزء من تحويل أوسع للأموال إلى ميهتا تحت غطاء إعادة الهيكلة الأوسع.

٢٨٤. ومن الجوانب الأخرى لعملية إعادة الهيكلة تطوير وسيلة لتجريد شركة سنترال بارك، وهي المالكة حسب السجلات لمكان الإقامة الشخصية لنيراف مودي وآمي مودي في نيويورك، بحيث لا يمكن للدائنين الوصول إلى هذه الممتلكات.

٢٨٥. تأسست شركة سنترال بارك بموجب قانون ديلاوير في ١٥ فبراير ٢٠٠٧. وفي ٢٦ مارس ٢٠٠٧، اشترت شركة سنترال بارك شقة في إسكس هاوس، ١٦٠ سنترال بارك ساوث في مدينة نيويورك (**شقة إسكس هاوس**) مقابل ٤.٩٩٥ مليون دولار أمريكي، دفعت منها شركة فايرستار آي ما قيمته ٢ مليون دولار أمريكي. تم تمويل الرصيد من قبل إتش إس بي سي، الذي حصل على رهن عقاري على شقة اسكس هاوس. وقّع بهنسالي العقد نيابة عن شركة سنترال بارك. كانت شركة سنترال بارك مملوكة من قبل شركة فايرستار حتى نهاية عام ٢٠٠٩ تقريباً، عندما نقلتها شركة فايرستار إلى شركة إف جي آي. تم استخدام شقة اسكس هاوس من قبل نيراف مودي و آمي مودي كمان للإقامة الشخصية.

٢٨٦. في كافة الأوقات ذات الصلة، عمل كل من ميهير بهنسالي وأجاي غاندي كمدير وأمين صندوق، على التوالي، لشركة سنترال بارك.

٢٨٧. في تاريخ ٥ ديسمبر ٢٠١٤، أرسل أجاي غاندي رسالة إلكترونية إلى هاورد هوف من ماركس بانيث، طالباً منه إعطاء المشورة في "[١] عملية بيع أو منح هدية محتملة من سنترال بارك ش.ذ.م.م إلى آمي مودي (زوجة نيراف) وهي مواطنة أمريكية [أو ٢] نقل فايرستار دايموند, انك / فنتازي, انك من مظلة مجموعة فايرستار إلى كيان فايرستار في الخارج. . . "

٢٨٨. في تاريخ ٢٢ فبراير ٢٠١٥، أرسل أجاي غاندي رسالة إلكترونية إلى هوارد هوف، مع نسخة إلى ميهير بهنسالي، تحتوي على جدول بيانات لتحليل السيناريوهات المختلفة لبيع

شركة فايرستار و شركة سنترال بارك. تضمن جدول البيانات أسئلة: "تأسيس صندوق من قبل بورفي مودي – مقيمة في هونج كونج [.] صناديق الائتمان في هونج كونج نيراف مودي عبر منحة "هدية" أو قرض [.]" أجاب هوف، "يرجى أن تكون أكثر تحديداً في مشاركة الصناديق الائتمانية في المعالمة. هل سيتم فقط إقراض المال أم امتلاكه قبل التحويل النهائي. ما هو نوع الائتمان، من هم المستفيدون؟ هل هو ائتمان بورفي أم أن بورفي هي المنفذة، ما هو بلد الإقامة والمواطنة لبورفي؟ " رد غاندي قائلاً: "بورفي مقيمة في هونج كونج وستكون مالكة الائتمان ما لم يكن لديك فكرة أو أفكار أفضل لجعل آمي تقوم بعملية تمويل عملية الشراء."

٢٨٩. في تاريخ ٤ مارس ٢٠١٥، أوضح أجاي غاندي خطوات نقل شركة سنترال بارك خارج متناول الدائنين في رسالة إلكترونية إلى راغو ايير، "١. نقل ١.٨ مليون دولار أمريكي و ٣ ملايين دولار أمريكي من الالتزامات الأخرى من سي بيه [آر إي] إلى مجموعة فايرستار إنك من خلال المدخلات اليومية. . . سيتم إبقاء الالتزامات بقيمة ٣ مليون دولار أمريكي لـ إتش إس بي سي فقط. . . . تحتاج آمي إلى تحويل مبلغ ١.٩٣٥ مليون دولار أمريكي عند إغلاق عملية شراء سي بيه [آر إي] وستحصل آمي على منحة "هدية" في الولايات المتحدة الأمريكية من بورفي. . . والآن سيتم استخدام ١.٩٣٥ مليون دولار أمريكي لتسديد ديون شركة إف جي آي (فايرستار دايموند إنك) بحاجة إلى توضيح من هوارد بشأن مقدار الأموال التي يجب أن تأتي من فايرستار هولدينجز ليمتد هونج كونج لشراء فايرستار دايموند/فنتازي إنك. وكيفية إعادة الأموال إلى هونج كونج أو أي مكان آخر."

٢٩٠. في تاريخ ٣١ مارس ٢٠١٥، طلب راغو ايير من أجاي غاندي تحديث حالة إعادة الهيكلة. رد غاندي قائلاً: "لست متأكداً مما إذا كنت قد تحدثت مع شيام وادوا لأنه لا يريد

تسريع تغيير الملكية إذ يوجد لديه مشاكل تتعلق بكيفية إنشاء رأس المال في إف إس، هونج كونج ومشكلات مع تعهدات البنوك في هونج كونج وبالتالي فإنه يقترح القيام بذلك في وقت متأخر قدر الإمكان من ١٦-٢٠١٥." رد راغو مع نسخة إلى ميهير بهنسالي، "ميهير [،] لم أكن على علم بهذه القضايا [.] هل يمكنك تناولها مع إن دي إم؟" رد بهنسالي، مع نسخة إلى وادوا، "لقد تحدث السيد وادوا بالفعل إلى نيراف".

٢٩١. وهكذا، تم تعليق خطط إعادة الهيكلة حتى تتوفر أموال كافية لتنفيذ جميع المعاملات اللازمة.

٢٩٢. عادت خطط إعادة الهيكلة إلى الواجهة في أواخر عام ٢٠١٦، على الأرجح بسبب التقاعد الوشيك لـ جوكولناث شيتي، الموظف في مصرف بنجاب الوطني، الذي وافق على خطابات التفاهم الاحتيالية إلى كيانات نيراف مودي وميهول تشوكسي، والتي حدثت في مايو ٢٠١٧.

٢٩٣. في تاريخ ٣ نوفمبر ٢٠١٦، أرسل مانيش مودي عبر البريد الإلكتروني إلى أجاي غاندي طلباً لتحديث الحالة وسأل "بالنسبة إلى شركة سنترال بارك، هل يجب على نيراف بهاي دفع أموال لـ شركة سنترال بارك (عبر آمي مودي) [؟] يجب التخطيط لهذا التدفق النقدي." رد غاندي قائلاً: "تحدث إلى هوارد. إذا قامت آمي مودي بشراء شركة سنترال بارك وتحملت القرض بمبلغ ٣ ملايين دولار أمريكي من إنتش إس بي سي، فستحتاج إلى دفع مليوني دولار أمريكي بافتراض تقييم شركة سنترال بارك بقيمة ٥ ملايين دولار أمريكي".

٢٩٤. في تاريخ ١٤ نوفمبر ٢٠١٦، أرسل غاندي رسالة إلكترونية إلى إنتش إس بي سي قائلاً: "نحن نخطط لتغيير ملكية شركة سنترال بارك ريل استيت ذ. م. م، التي تمتلكها حالياً

شركة مجموعة فايرستار إنك، إلى آمي مودي (وهي مواطنة أمريكية وزوجة نيراف مودي). لا توجد تغييرات أخرى على الاتفاق الحالي. هل هناك أي شيء يجب القيام به؟"

٢٩٥. وخلال الأشهر القليلة التالية، طلب إتش إس بي سي في العديد من المرات معلومات إضافية تتعلق بهيكل ملكية شركة سنترال بارك وكيانات فايرستار الأخرى ومصدر ثروة بورفي ميهتا.

٢٩٦. عندما قام غاندي بإخبار نيراف مودي عن طلبات إتش إس بي سي، قال غاندي أنه "تجنب إعطاء هذه المعلومات [كذا] وأخبرهم أننا قد نقوم بإعادة هيكلة سنترال بارك وقد نغير الملكية وما إلى ذلك." لكن "الطريقة الوحيدة التي يمكننا تجنبها هي فقط إذا دفعنا الرهن العقاري البالغ قيمته ٣ ملايين دولار أمريكي في الأشهر القليلة المقبلة". أجاب مودي، "سيكون هناك تغيير في الملكية في نهاية مايو لذا من الأفضل شرح ذلك."

٢٩٧. انطوى غسل الأموال من خلال إعادة الهيكلة المؤسسية لكيانات فايرستار على عدة خطوات. أولاً، أن تقوم شركات وهمية في الجزر العذراء البريطانية وجزيرة كايمان وموريشيوس، تمتلكها عائلة مودي سراً، باستثمار ما يصل إلى ٧٥ مليون دولار أمريكي في إف آي بيه إل. ومن ثم ستقدم إف آي بيه إل مساهمة رأسمالية قدرها ١١٥ مليون دولار أمريكي إلى إف إتش إل.

٢٩٨. من هذا المبلغ ١١٥ مليون دولار أمريكي، ستستخدم إف إتش إل ٦٥ مليون دولار أمريكي لاسترداد أسهم إف إتش إل غير المخولة للتصويت المملوكة من قبل بورفي ميهتا (شخصياً ومن خلال فاين كلاسيك)، و ٢٣ مليون دولار أمريكي لسداد قروض مختلفة من بورفي ميهتا و فاين كلاسيك، و ٢٠ مليون دولار أمريكي لضخ رأس المال في شركة سينيرجيز.

٢٩٩. ستستخدم شركة سينيرجيز بعد ذلك ١٤.٥٧٥.٠٠٠ دولار أمريكي من رأس المال الجديد "للسداد" إلى بورفي ميهتا مقابل "القروض" التي قام نيراف مودي بالأصل بتقديمها إلى شركة سينيرجيز في ٢٠١٠ و ٢٠١١ ثم تم التنازل عنها لاحقاً إلى بورفي ميهتا في ٢٠١٦.

٣٠٠. لتأمين التمويل الإضافي اللازم لهذه المعاملات، حصل نيراف مودي والمتآمرين معه على ١٥٠ خطاب تعهد بقيمة إجمالية تزيد عن مليار دولار أمريكي في الفترة ما بين فبراير ومايو ٢٠١٧.

٣٠١. كما استخدم "الاستثمار" في إف آي بيه إل الأموال التي تم سحبها من كيانات الظل في السنوات السابقة.

٣٠٢. على سبيل المثال، في نوفمبر ٢٠١٣، فإن كيان الظل جعل باسفيك ينقل مبلغ وقدره ٣٠.٠٠٠.٠٠٠ دولار أمريكي إلى مايانك ميهتا، زوج بورفي ميهتا. وُصفت دفعات كيان الظل إلى مايانك ميهتا بأنها "مدفوعات" أو "أرباح المساهمين".

٣٠٣. قام مايانك ميهتا بتحويل المبلغ وقدره ٣٠ مليون دولار أمريكي الذي تم استلامه من باسفيك في نوفمبر ٢٠١٣ إلى بورفي ميهتا كهدية. ثم استخدمت بورفي ميهتا هذه الأموال كضمان للقروض إلى راداشير، كيان يتحكم فيه مودي في الهند وشارك أيضاً في الاحتيال المصرفي، حتى عام ٢٠١٦ عندما أعيدت الأموال إلى بورفي ميهتا. ثم نقلت بورفي ميهتا مبلغ وقدره 23 مليون دولار أمريكي إلى حسابها في موريشيوس.

٣٠٤. في الفترة ما بين ١٤ ديسمبر ٢٠١٦ و ١٢ يناير ٢٠١٧، نقلت فاين كلاسيك ما مجموعه ٢٥.٧٠٠.٥٠٠ دولار أمريكي إلى حساب بورفي ميهتا في موريشيوس. وفقاً

لكوريان ماثيوز وشيام وادوا ونيليش ميستري، الذين أشرفوا على العمليات المالية اليومية لـ فاين كلاسيك وعملياتها، كانت معاملات الاستيراد والتصدير الدورية بين فاين كلاسيك وغيرها من كيانات الظل منظمة بحيث تولد هوامش ربح عالية بشكل متعمد لـ فاين كلاسيك، مع الخسائر المقابلة في كيانات الظل الأخرى. وفقاً للإدارة التنفيذية في الهند، تلقت فاين كلاسيك حوالي ٨٩ مليون دولار أمريكي من كيانات الظل الأخرى في الفترة ما بين عآمي ٢٠١١ إلى ٢٠١٧.

٣٠٥. قامت بورفي ميهتا بعد ذلك بتحويل ٤٠ مليون دولار أمريكي من حسابها المصرفي في موريشيوس إلى شركة نوفيلار انترناشيونال هولدينجز ليمتد (**"نوفيلار"**)، وهي كيان في الجزر العذراء البريطانية وهي المالك النهائي له.

٣٠٦. تمتلك شركة نوفيلار شركة ايسلينجتون انترناشيونال هولدينجز برايفت ليمتد، وهو كيان يقع مقره في سنغافورة. في يناير أو فبراير ٢٠١٧، قامت نوفيلار بتحويل ٤٠ مليون دولار أمريكي إلى ايسلينجتون. وفي ذلك الوقت تقريباً، قامت بورفي ميهتا أيضاً بتحويل ٤٢٥,٠٠٠ دولار أمريكي مباشرة إلى ايسلينجتون. في فبراير ٢٠١٧، استثمرت ايسلينجتون ٤٥ مليون دولار أمريكي، بما في ذلك الأموال الواردة من نوفيلار و بورفي ميهتا، في إف آي بيه إل.

٣٠٧. وهكذا، بحلول فبراير ٢٠١٧، كانت بورفي ميهتا قد قامت باستثمار ٤٥ مليون دولار أمريكي في استثمارات جديدة مزعومة بشكل غير مباشر في إف آي بيه إل باستخدام عائدات الاحتيال المصرفي.

٣٠٨. في ٢٢ مارس ٢٠١٧، اشترى بهنسالي وزوجته الشقة ٢٤ أ في ٥٠ ريفرسايد بوليفارد في مدينة نيويورك مقابل حوالي ٧.١ مليون دولار أمريكي، تم دفع حوالي ٥.٣

مليون دولار أمريكي نقداً. قبل أسابيع فقط، تلقى ميهير بهنسالي مبلغ وقدره ١.٥ مليون دولار أمريكي في حسابه الشخصي في إتش إس بي سي من بورفي ميهتا في ٢٤ فبراير ٢٠١٧. كان راتب بهنسالي السنوي من المدينين حوالي ١٥٤.٠٠٠ دولار أمريكي. في ٢٩ يونيو ٢٠١٧، قامت بورفي ميهتا بتحويل ٧٥٠.٠٠٠ دولار أمريكي إلى حساب التحقق الشخصي لـ ميهير بهنسالي في إتش إس بي سي.

٣٠٩. بعد يومين فقط من تقديم المدينين طلباً للإفلاس، نقل بهنسالي مصالحه في الشقة إلى زوجته، راخي بهنسالي، مقابل مبلغ رمزي.

٣١٠. استناداً إلى توقيت هذه المعاملات ودور بورفي ميهتا كقناة أساسية لعائدات الاحتيال المصرفي، من بين أمور أخرى، يبدو أن هذه الشقة تم شراؤها باستخدام عائدات الاحتيال المصرفي.

٣١١. ووفقاً للسلطات الهندية، اشترت بورفي ميهتا أيضاً شقة جديدة في هونغ كونغ لنفسها في أبريل ٢٠١٧ مقابل ١٩.٥ كرور روبية هندية (حوالي ٢.٧ مليون دولار أمريكي). وقع نيشال مودي الاتفاقية نيابة عن بورفي ميهتا بموجب توكيل معتمد من القنصلية الهندية في هونغ كونغ.

٣١٢. وفي مارس ٢٠١٧، كان نيراف مودي وآمي مودي يتطلعان أيضاً إلى شراء سكن آخر في نيويورك مقابل ٢٥ إلى ٣٠ مليون دولار أمريكي. خططوا في البداية لشراء وحدة في ريفر هاوس، وهو مبنى شقق سكنية تعاونية يقع في شارع ٤٣٥ إي. ٥٢ في مانهاتن.

٣١٣. وفي مايو ويونيو ٢٠١٧، قامت بورفي ميهتا، "بإقراض"، آمي مودي إجمالي مبلغ حوالي ٣٤ مليون دولار أمريكي لتمويل شراء ريفر هاوس.

٣١٤. وفقاً للإدارة التنفيذية في الهند، فقد تم الحصول على ١٨ مليون دولار أمريكي على الأقل من أموال بورفي ميهتا التي تم إقراضها إلى آمي مودي في مايو ٢٠١٧ من التحويلات إلى بورفي ميهتا من قبل فاين كلاسيك، كيان الظل الذي تملكه بورفي ميهتا وتسيطر عليه بشكل مباشر، في الفترة ما بين ٧ مارس ٢٠١٧ و ٢٧ أبريل ٢٠١٧. في الفترة ما بين ٩ يوليو ٢٠١٧ و ٤ أكتوبر ٢٠١٧، قامت فاين كلاسيك بتحويل مبلغ إضافي قدره ١٦.٣٠٠.٠٠٠ دولار أمريكي إلى بورفي ميهتا من حسابات مختلفة.

٣١٥. وعندما فشلت عملية بيع ريفر هاوس في منتصف يونيو ٢٠١٧، توجه انتباه نيراف مودي وآمي مودي إلى شقة في فندق ريتز كارلتون تقع في ٥٠ سنترال بارك ساوث في مانهاتن ("**شقة ريتز كارلتون**").

٣١٦. في ٧ يوليو ٢٠١٧، أبرمت بورفي ميهتا عقداً لشراء شقة ريتز كارلتون مقابل ٢٥ مليون دولار أمريكي. في نفس اليوم، قامت آمي مودي بتحويل مبلغ وقدره ٢.٥ مليون دولار أمريكي، كدفعة مقدمة، من الأموال التي قامت بورفي ميهتا بتحويلها إليها في مايو ويونيو ٢٠١٧ إلى حساب ضمان كاتز آند ماتز إل إل بيه. اعتبرت آمي مودي وبورفي ميهتا أن هذا التحويل يمثل "سداد جزئي" للقرض من بورفي ميهتا.

٣١٧. وفي اليوم نفسه، لخص المحاسب هوارد هوف من ماركس بانيث إل إل بيه المعاملة المخطط لها في رسالة إلكترونية إلى نيراف مودي ومستشار عائلة مودي في الائتمانات والعقارات من داي بيتني إل إل بيه ومستشارهم العقاري كاتز آند ماتز إل إل بيه على النحو التالي:

مؤسسة الكيان:

١) إنشاء شركة ذات مسؤولية محدودة في نيويورك تملكها بورفي. ستكون هي المشتري للشقة. التوقيت سيكون بعد بضعة أيام.

٢) بمجرد إنشاء الائتمان، ستقوم بورفي بنقل / التنازل عن الملكية في الشركة ذات المسؤولية المحدودة إلى الائتمان (التوقيت هو بعد بضعة أسابيع من إنجاز اتفاقيات الائتمان تقريباً)

تدفق الأموال:

١) ستطلب بورفي من آمي أن تسدد جزئياً القرض الذي قدمته لها مباشرة إلى حساب الضمان ستيفن ماتز نيابة عن الشركة ذات المسؤولية المحدودة. (سيحدث هذا غداً)

٢) ستقوم آمي بعد ذلك بسداد ما تبقى من القرض إلى بورفي في الخارج.

٣) سيتعين على بورفي تحويل الرصيد المستحق على الشقة مباشرة إلى حساب ستيفن لإغلاقه.


٣١٨. في ١١ يوليو ٢٠١٧، تم تأسيس المدعى عليه شركة سنترال بارك ساوث ٥٠، وفي ٢ أغسطس ٢٠١٧، تم تنفيذ اتفاقية التشغيل الخاصة به بحيث كانت بورفي ميهتا العضو الوحيد وعم/خال نيراف مودي، ديباك شيث المدير في الشركة.

٣١٩. في ١٠ يوليو ٢٠١٧، أبرمت شركة سينيرجيز و إف آي بيه إل اتفاقية شراء الأسهم التي اشترت بموجبها شركة سينيرجيز ما نسبته ١٠٠٪ من الأسهم العادية المعلقة لـ شركة

إف جي آي مقابل ٣.٦٩٤.٠٠٠ دولار أمريكي. وقع اجاي غاندي الاتفاقية بالنيابة عن شركة سينيرجيز .

٣٢٠. في ١٣ يوليو ٢٠١٧، قامت إف إتش إل بتحويل مبلغ وقدره ٢٠.٠٠٠.٠٠٠ دولار أمريكي "ضخ رأس المال" إلى شركة سينيرجيز. وفي نفس اليوم، قامت شركة سينيرجيز بتحويل مبلغ وقدره ٦٥٠.٠٠٠ دولار أمريكي إلى جافي (التي استخدمتها جافي لتسديد الفواتير من إف آي بيه إل)، ومبلغ وقدره ١.٠٤٧.٠٠٠ دولار أمريكي إلى بريليانت (كدفعة سداد لقرض مزعوم)، ومبلغ وقدره ٣.٦٩٤.٠٠٠ دولار أمريكي إلى إف آي بيه إل (كسعر شراء لـ شركة إف جي آي، التي حصلت عليها شركة سينيرجيز كجزء من عملية "إعادة الهيكلة" عام ٢٠١٧)، ومبلغ وقدره ١٤.٥٧٥.٠٠٠ دولار أمريكي إلى بورفي ميهتا. تم دفع المبلغ ١٤.٥٧٥.٠٠٠ دولار أمريكي إلى بورفي ميهتا ("عملية التحويل سينيرجيز-ميهتا") بذريعة سداد القرض الذي تنازلت عنه مودي إلى ميهتا.

٣٢١. في تاريخ ١٤ يوليو ٢٠١٧، قامت إف إل بتحويل مبلغ آخر وقدره ٢٠ مليون دولار أمريكي إلى بورفي ميهتا لاسترداد أسهمها المفضلة غير المخولة للتصويت في إف إتش إل. وهكذا، على مدى يومين، تم تحويل أكثر من ٣٤ مليون دولار أمريكي من عائدات الاحتيال المصرفي إلى بورفي ميهتا.

٣٢٢. في تاريخ ٢٣ أغسطس ٢٠١٧ أو حوالي ذلك التاريخ، قامت بورفي ميهتا، بصفتها الشخص المكلف بالتسوية، بتنفيذ سند ("اتفاقية إيثاكا ترست") لإنشاء إيثاكا ترست كصندوق تأمين لا رجعة فيه بموجب قانون ديلاوير .

٣٢٣. وقد عينت اتفاقية ايثاكا ترست شركة كومنولث ترست (**"كومنولث"**) بصفتها الوصي (**"الوصي على إيثاكا"**)، وآمي مودي وأطفالها هم المستفيدون، وديباك شيث بصفة الحارس الأول (**"حارس إيثاكا"** أو **" الحارس "**) لإيثاكا ترست. كما تم تعيين والدي بورفي ميهتا ونيراف مودي، ديباك مودي وبراجنيا مودي، وابن عمهما ميهير بهنسالي، كمستفيدين متبقين لأي "ممتلكات لم يتم توزيعها خلاف ذلك".

٣٢٤. بموجب شروط اتفاقية إيثاكا ترست، لا يمكن لوصي إيثاكا استثمار أو إدارة أي من أصول إيثاكا تراست دون توجيه خطي مكتوب من مستشار الاستثمار في إيثاكا تراست (**"مستشار استثمار إيثاكا"** أو **"مستشار الاستثمار"**)

٣٢٥. بموجب شروط اتفاقية إيثاكا ترست، يتمتع الحارس بسلطة من بين أمور أخرى للقيام بما يلي: (أ) عزل وتعيين الوصي على إيثاكا، و(ب) عزل مستشار الاستثمار وتعيينه، و(ج) إنهاء إيثاكا ترست، و(د) تغيير موقع إيثاكا ترست، و(ه) تعديل الأحكام الإدارية لاتفاقية إيثاكا ترست، و(و) إضافة أو استبعاد المستفيدين، و(ز) تعيين خلف ليحل محل الحارس في حالة استقالة الحارس أو عزله.

٣٢٦. وبموجب أحكام اتفاقية إيثاكا ترست، في حال عدم وجود حارس يعمل في اي وقت من الأوقات ولم يعيّن خلفه لقبول التعيين في غضون ٣٠ يوماً من حدوث الشاغر، يكون أبهاي جافيري هو الحارس. وإذا كان أبهاي جافيري غير قادر أو غير راغب في العمل بصفة حارس، يمكن تعيين حارس من قبل بورفي ميهتا أو، إذا لم تكن بورفي ميهتا متاحة أو متوفاة، بواسطة آمي مودي.

٣٢٧. بموجب أحكام اتفاقية إيثاكا ترست، يجوز لتعيين حارس أن يفرض مؤهلات أو متطلبات أو يحدد الشروط والأحكام التي يتعين الوفاء بها قبل دخول هذا التعيين حيز التنفيذ.

٣٢٨. ويموجب أحكام اتفاقية إيثاكا ترست، يحق لنيراف مودي إزالة الحارس من جانب واحد. إذا كان نيراف مودي "غير متاح أو متوفى"، فإن بورفي ميهتا ترث هذه السلطة. إذا كانت بورفي ميهتا "غير متاحة أو متوفاة"، فإن آمي مودي ترث هذه السلطة.

٣٢٩. نظراً إلى أن نيراف مودي لديها السلطة لعزل حارس إيثاكا، والذي بدوره له سيطرة كاملة تقريباً على الوصي على إيثاكا، ومستشار استثمار إيثاكا، واتفاقية إيثاكا ترست، وأصول إيثاكا تراست، يتمتع نيراف مودي بسيطرة كاملة بحكم الواقع على إيثاكا ترست وأصولها.

٣٣٠. في ٢٣ أغسطس ٢٠١٧ أو حوالي ذلك التاريخ، وقع ديباك شيث وسلم إلى الوصي على إيثاكا خطابات منفصلة: (أ) قبول تعيينه بصفة حارس إيثاكا، و(ب) تعيين نفسه بصفة مستشار استثمار إيثاكا، و(ج) قبول تعيينه بصفة مستشار استثمار إيثاكا.

٣٣١. في ٢٤ أغسطس ٢٠١٧، قام نيراف مودي بإبلاغ داي بيتني بأن "الأموال موجودة مع بورفي" وطلب تعليمات تحويل لحساب كومنولث الائتماني لـ إيثاكا ترست.

٣٣٢. في ٢٥ أغسطس ٢٠١٧، نفذت بورفي ميهتا، بالنيابة عنها، وديباك شيث، بصفته مدير شركة سنترال بارك ساوث ٥٠ بروبرتيز ذ.م.م، اتفاقية قامت بموجبها ميهتا بالتنازل عن حصتها في عقد بيع ريتز كارلتون إلى شركة سنترال بارك ساوث ٥٠ بروبرتيز ذ.م.م.

٣٣٣. في تاريخ ٢٨ أغسطس ٢٠١٧، قام ديباك شيث، بصفته مستشار استثمار إيثاكا ترست، بتوقيع وتسليم خطاب يعطي بموجبه التوجيهات إلى كومنولث بصفته الوصي على إيثاكا للقيام بما يلي: (أ) قبول التنازل من بورفي ميهتا عن حصة العضوية بنسبة ١٠٠٪ في شركة سنترال بارك ساوث ٥٠، و (ب) تنفيذ اتفاقية التشغيل المعدلة والمعاد صياغتها لـ شركة سنترال بارك ساوث ٥٠، و (ج) تقديم مساهمة رأسمالية أولية بمبلغ ٢٣.٠٠٠.٠٠٠ دولار أمريكي إلى شركة سنترال بارك ساوث ٥٠ عن طريق تحويل ذلك المبلغ إلى حساب ضمان كاتز آند ماتز إل إل بيه لتمويل شراء شقة ريتز كارلتون.

٣٣٤. وفي اليوم نفسه، قام ديباك شيث، بصفته مديراً في شركة سنترال بارك ساوث ٥٠، بتنفيذ اتفاقية التشغيل المعدلة والمعاد صياغتها لـ شركة سنترال بارك ساوث ٥٠.

٣٣٥. في ٢٩ أغسطس ٢٠١٧، تنازلت بورفي ميهتا عن حصة العضوية في شركة سنترال بارك ساوث ٥٠ إلى إيثاكا ترست.

٣٣٦ في ٣٠ أغسطس ٢٠١٧، أرسل مودي رسالة إلكترونية لمحامي داي بيتني وغيرهم من المهنيين لإبلاغهم بأنه تم تحويل ٢٣ مليون دولار أمريكي من ميهتا إلى كومنولث وتوجيه كومنولث لتحويل الأموال إلى المحامين في كاتز آند ماتز لتنفيذ شراء شقة ريتز كارلتون. لم يكن ميهتا جزءاً من الرسائل الإلكترونية.

٣٣٧. وفي تاريخ ٣٠ أغسطس ٢٠١٧ أيضاً، أرسل المحامي ستيفن ماتز في كاتز آند ماتز رسالة إلكترونية إلى نيراف مودي وآخرين مع تعليمات لإغلاق شراء إيثاكا تراست لشقة ريتز كارلتون في ٠٧ سبتمبر ٢٠١٧. مرة أخرى، لم يكن ميهتا جزءاً من الرسائل الإلكترونية.

٣٣٨. في تاريخ ٣١ أغسطس ٢٠١٧، قام ميهتا بتحويل ٢٣ مليون دولار أمريكي إلى كومنولث، بصفته الوصي على إيثاكا ترست. ثم قامت كومنولث بتحويل تلك الأموال إلى حساب ضمان كاتز آند ماتز، حيث تم استخدامها لاحقاً لشراء شقة ريتز كارلتون.

٣٣٩. في تاريخ ٠١ سبتمبر ٢٠١٧، أعادت آمي مودي إلى بورفي ميهتا ٢٥ مليون دولار أمريكي من الأموال التي "أقرضتها" بورفي ميهتا لها في مايو ٢٠١٧ (التي كانت موجودة في حساب آمي مودي المصرفي لدى إتش إس بي سي).

٣٤٠. في تاريخ ٠٦ سبتمبر ٢٠١٧، أصدرت كاتز آند ماتز شيكاً بقيمة ٢٢.٥٦٧.٤٦٥.٩٢ دولار أمريكي لبائعي شقة ريتز كارلتون فيما يتعلق بإغلاق البيع.

٣٤١. في تاريخ ٢٥ سبتمبر ٢٠١٧، قامت آمي مودي بتحويل مبلغ آخر بقيمة ٦.٥٠٠.٠٠٠ دولار أمريكي إلى بورفي ميهتا كدفعة سداد قرض مزعومة.

٣٤٢. في تاريخ ٢٩ سبتمبر ٢٠١٧، قامت إف إل بتحويل مبلغ وقدره ٨.٨٦٠.٠٠ دولار أمريكي إلى بورفي ميهتا بمثابة دفعة "سداد قرض".

٣٤٣. في تاريخ ٠٥ أكتوبر ٢٠١٧، استلمت آمي مودي مبلغ وقدره ٧٠.٠٠٠ دولار أمريكي من ميهير بهنسالي وقامت أيضاً بتحويل مبلغ آخر بقيمة ٤٠٦.١٨٨ دولار أمريكي إلى بورفي ميهتا كدفعة سداد قرض مزعومة.

٣٤٤. في تاريخ ١٨ أكتوبر ٢٠١٧، قامت إف إتش بتحويل مبلغ وقدره ٣٠.٠٠٠.٠٠٠ دولار أمريكي إلى بورفي ميهتا لاسترداد الأسهم الممتازة غير المخولة للتصويت.

٣٤٥. في تاريخ ١٠ نوفمبر ٢٠١٧، قامت إف إتش إل بتحويل مبلغ وقدره ١٥.٠٠٠.٠٠٠ دولار أمريكي إلى بورفي ميهتا لاسترداد الأسهم الممتازة غير المخولة للتصويت. وهكذا، من سبتمبر حتى نوفمبر ٢٠١٧، تقريباً تم تحويل مبالغ بقيمة ٨٥.٠٠٠.٠٠٠ دولار أمريكي من عائدات الاحتيال المصرفي إلى بورفي ميهتا.

٣٤٦. في ديسمبر ٢٠١٧، قام آجاي غاندي بفتح حساب في سيتي بنك لـ شركة سنترال بارك ساوث ٥٠. وسجل غاندي نفسه أنه "رئيس" شركة سنترال بارك ساوث ٥٠ في مواد الطلب. تصرف أجاي غاندي وأبهاي جافيري بصفتهما مفوضين بالتوقيع على الحساب.

٣٤٧. في تاريخ ٨ نوفمبر ٢٠١٧، قام ديباك شيث، بصفته مستشار استثمار إيثاكا، بتوجيه كومنولث، بصفته الوصي على إيثاكا، لعزل ديباك شيث من منصبه كمدير ورئيس ورئيس تنفيذي لـ شركة سنترال بارك ساوث ٥٠ وتعيين أبهاي جافيري كبديل له في تلك المناصب. في نفس اليوم، استقال ديباك شيث أيضاً كمستشار الاستثمار (ولكن ليس حارساً) من إيثاكا ترست وعين أبهاي جافيري بديلاً له.

٣٤٨. مع اكتمال صفقة شقة ريتز كارلتون، أعاد نيراف مودي والمتعاونون معه اهتمامهم بتصفية ملكية شركة إف جي آي لـ شركة سنترال بارك واسكس هاوس.

٣٤٩. في تاريخ ٠٤ ديسمبر ٢٠١٧، عبر البريد الإلكتروني، قام نيراف مودي بإخبار أجاي غاندي بسداد الرهن العقاري لـ إتش إس بي سي على شقة اسكس هاوس بالكامل.

٣٥٠. اتصل غاندي بـ إتش إس بي سي مشيراً إلى أن هناك حاجة ملحة لأن تتحمل إيثاكا ترست الرهن العقاري على اسكس هاوس وتحويل المسؤولية من شركة إف جي آي إلى

إيثاكا ترست. سرعان ما وجد غاندي أنه لا يمكن نقل الرهن العقاري بسرعة كافية وقرر بدلاً من ذلك ترتيب سداد الرهن العقاري بالكامل.

٣٥١. في تاريخ ٠٥ ديسمبر ٢٠١٧، قام غاندي بتحويل ٣ ملايين دولار أمريكي من شركة فايرستار إلى إتش إس بي سي لأداء الرهن العقاري لـ إتش إس بي سي على اسكس هاوس باستخدام أموال بالأصل من جافي و فنتازي وكذلك من حساب شركة فايرستار الخاص ومن خط ائتمان إتش إس بي سي.

٣٥٢. بالإضافة إلى سداد الرهن العقاري، فقد دفعت شركة فايرستار ما لا يقل عن ٨٥٦.٣٣٥ دولار أمريكي من الدفعات الشهرية على الرهن العقاري لشقة اسكس هاوس في الفترة ما بين عآمي ٢٠١١ و ٢٠١٨، ودفعت أيضاً إلى جيه دبليو ماريوت اسكس هاوس إن واي مبلغ وقدره ١٥,٨٢٥.٣٥ دولار أمريكي في يناير ٢٠١٨، بعد نقل شركة سنترال بارك من شركة إف جي آي إلى إيثاكا ترست.

٣٥٣. وبعد إنهاء الرهن العقاري، طلب نيراف مودي من ماركس بانيث وداي بيتني إعطاء المشورة باستراتيجية لنقل الممتلكات غير المحملة بالأعباء (تبلغ قيمتها حوالي ٦ ملايين دولار أمريكي) إلى إيثاكا ترست.

٣٥٤. في تاريخ ١٥ ديسمبر ٢٠١٧، أرسل أحد المحاسبين لدى مودي رسالة إلكترونية إلى مودي بثلاثة خيارات محتملة لتقليل ضرائب التحويل على "حركة شركة سنترال بارك". كان الخيار الأول هو أن يقوم نيراف مودي بشراء شركة سنترال بارك بشكل مباشر من شركة إف جي آي، والخيار الثاني هو أن تقوم آمي مودي بشراء شركة سنترال بارك بشكل مباشر، أما الخيار الثالث فهو استخدام إيثاكا ترست لإجراء عملية الشراء بعد أن ساهمت بورفي ميهتا بمزيد من النقد في الصندوق. وأوضح المحاسب أنه "بما أن مودي يفضل التسريع في إجراء

المعاملة"، يمكن استخدام الصندوق الموجود ومن ثم يمكن للوصي "نقل الشركة ذات المسؤولية المحدودة إلى صندوق آخر في الوقت المناسب". سيقوم الصندوق باستخدام الأموال من بورفي ميهتا لشراء شركة سنترال بارك من شركة إف جي آي، وبالتالي تصبح المالك غير المباشر لشقة اسكس هاوس. اختار مودي الخيار الثالث.

٣٥٥. في تاريخ ٢٧ ديسمبر ٢٠١٧، قام أبهاي جافيري، بصفته مستشار استثمار إيثاكا، بتوقيع وتسليم خطاب إلى كومنولث بصفته الوصي على إيثاكا يعطي بموجبه التعليمات إلى كومنولث لكي "تصبح العضو الوحيد في [شركة سنترال بارك] عن طريق شراء حصة عضوية بنسبة ١٠٠٪ في [شركة سنترال بارك ] مقابل ٦.٠٠٠.٠٠٠ دولار أمريكي".

٣٥٦. في تاريخ ٢٨ ديسمبر ٢٠١٧، قام أجاي غاندي، نيابة عن شركة إف جي آي، بصفته أمين الخزانة، وبالنيابة عن شركة سنترال بارك، بصفته المدير المالي، وكومنولث، بصفته الوصي على إيثاكا، بتنفيذ اتفاقية بيع شركة سنترال بارك إلى إيثاكا ترست.

٣٥٧. في تاريخ ٢٩ ديسمبر ٢٠١٧، أرسل نيراف مودي رسالة إلكترونية إلى المهنيين من داي بيتي و ماركس بانيث وآخرين للإعلان عن أنه "تم تحويل الأموال اليوم".

٣٥٨. لم يتم تسوية الأموال للحساب المصرفي لبورفي ميهتا في سنغافورة حتى ١ يناير ٢٠١٨. ثم قامت إيثاكا تراست بتحويل مبلغ وقدره ٦ ملايين دولار أمريكي إلى حساب شركة إف جي آي لدى إنتش إس بي سي لشراء شركة سنترال بارك. بعد ذلك قامت شركة إف جي آي بنقل حقوق الملكية في شركة سنترال بارك إلى إيثاكا ترست (**"نقل حقوق الملكية في شركة سنترال بارك"**).

٣٥٩. في ١٧ يناير ٢٠١٨، بعد أن قامت إيثاكا ترست بشراء شركة سنترال بارك ش.ذ.م.م، قام آجاي غاندي باستشارة داي بيتني حول تحويل أموال إضافية إلى إيثاكا ترست للاستخدام فيما يتعلق بشقة اسكس هاوس وشقة ريتز كارلتون.

٣٦٠. قام محامو داي بيتني بإخبار آجاي غاندي و نيراف مودي و بورفي ميهتا أنه "لتمويل أي من حسابات الشركة ذات المسؤولية المحدودة، يجب أولاً تحويل الأموال إلى حساب إيثاكا ترست، ويقوم أبهاي جافيري، بصفته مستشار استثمار إيثاكا ترست، بإعطاء التوجيهات إلى الوصي بناء على ذلك." وتابع إيميك شميدت من داي بيتني، "وستقوم بورفي، بصفتها الشخص المكلف بتسوية الصندوق، بتمويل الصندوق بأصولها الخاصة من حساب غير أمريكي باسمها". رد نيراف، طالباً الحصول على تعليمات لتحويل الأموال إلى إيثاكا ترست، حيث قام أحد محامي داي بيتني بإعطاء تلك التعليمات رداً على الطلب.

٣٦١. في تاريخ ١٧ يناير ٢٠١٨، نفذ آجاي غاندي، بالنيابة عن شركة سنترال بارك ساوث ٥٠، اتفاقية مع شركة إيزيو، شركة فرنسية للتصميم الداخلي، والتي بموجبها قدمت إيزيو خدمات التصميم الداخلي لشقة ريتز كارلتون.

٣٦٢. في تاريخ ١٨ يناير ٢٠١٨، تم تحويل ١ مليون دولار أمريكي من حساب بورفي ميهتا المصرفي في سنغافورة إلى كومنولث. في نفس اليوم، أرسل أبهاي جافيري، بصفته مستشار استثمار إيثاكا ترست، رسالة إلى كومنولث يعطي فيها التوجيهات إلى كومنولث لتقديم مساهمة رأسمالية قدرها مليون دولار أمريكي إلى شركة سنترال بارك ساوث ٥٠. في اليوم التالي، قامت كومنولث بتحويل ١ مليون دولار أمريكي إلى حساب شركة سنترال بارك ساوث ٥٠ لدى سيتي بنك. في نفس اليوم، تم القيام بتحويل دولي بمبلغ وقدره ٨٤.٦٦٥.٢٥ دولار أمريكي من حساب شركة سنترال بارك ساوث ٥٠ لدى سيتي بنك إلى

شركة إيزيو. وفي ١٣ فبراير ٢٠١٨، تم القيام بتحويل دولي بمبلغ إضافي وقدره ٢٣٧.١٧٦.٧٥ دولار أمريكي إلى شركة إيزيو.

٣٦٣. وبحلول مارس ٢٠١٨، كانت كومنولث قد وضعت علامة على إيثاكا ترست باعتبارها "صندوق عالي المخاطر" وأعربت عن قلق داخلي بشأن العمل بصفة الوصي على إيثاكا. في تاريخ ١٣ مارس ٢٠١٨، أرسلت كومنولث إشعارات إلى ديباك شيث، بصفته الحارس على إيثاكا ترست، وبورفي ميهتا، بصفتها الشخص المكلف بتسوية إيثاكا ترست، لإبلاغهم أن كومنولث سوف تستقيل من منصبها الوصي على إيثاكا اعتباراً من ١٣ أبريل ٢٠١٨.

٣٦٤. في وقت ما خلال الفترة ما بين ١٣ مارس ٢٠١٨ و ٢٥ مايو ٢٠١٨، استقال ديباك شيث أو تم عزله بصفة الحارس على إيثاكا.

٣٦٥. في تاريخ ٢٥ مايو ٢٠١٨، قامت آمي مودي بتنفيذ سند تعيين نهال مودي بصفة الحارس على إيثاكا. تضمن السند نصاً يشير لما يلي: (أ) التخلي عن تعيين أبهاي جافيري من منصب الخلف للحارس على إيثاكا ترست، و (ب) "إعفاء بورفي ميهتا من سلطة تعيين الحارس في ٢٣ أغسطس ٢٠١٧".

٣٦٦. وفي اليوم نفسه، قام نهال مودي بالتوقيع والإقرار على قبوله لتعيينه بصفة الحارس على إيثاكا، وقام بتنفيذ سند لعزل أبهاي جافيري من منصب مستشار استثمار إيثاكا وتعيين نفسه كبديل، وقام بتنفيذ سند لتعيين ترايدنت بصفة الوصي على إيثاكا، كما قام بتنفيذ سند لتعديل اتفاقية إيثاكا ترست لتغيير القانون الحاكم من قانون ديلاوير إلى قانون ساوث داكوتا.

٣٦٧. وفي اليوم نفسه، قام أبهاي جافيري، بصفته مستشار استثمار إيثاكا، بتوقيع وتسليم خطاب توجيه تعليمات إلى ترايدنت، بصفتها الوصي على إيثاكا، لعزل أبهاي جافيري من منصب مدير شركة سنترال بارك ساوث ٥٠ وتعيين نيتين داتاني كبديل له.

٣٦٨. كما هو مزعوم أعلاه، في نفس الوقت تقريباً، كان نيتين داتاني يعمل مع أنجلينا ييما، وميهر بهنسالي، وأجاي غاندي، وأنتوني أليكوك لتحويل أصول إن إم إل يو كيه إلى هونغ كونغ وكان أيضاً نيراف مودي في إنشاء دايموندز هولدينجز ليمتد. بينما كان نيراف مودي مختبئًا في لندن.

٣٦٩. وبناءً على المعلومات والمعتقدات، تبقى ترايدنت الوصي على إيثاكا، ويبقى نهال مودي الحارس على إيثاكا، وأبهاي جافيري مستشار استثمار إيثاكا، ويبقى نيتين داتاني مدير شركة سنترال بارك ساوث ٥٠. وبناءً على المعلومات والمعتقدات، يبقى كلاً من ميهر بهنسالي وأجاي غاندي المدير وأمين الخزانة على التوالي، في شركة سنترال بارك.

٣٧٠. باختصار ، عمل العديد من أفراد عائلة نيراف مودي وآمي مودي، بما في ذلك بورفي ميهتا، وميهر بهنسالي، وديباك شيث، وأبهاي جافيري معاً ومع أجاي غاندي والمتآمرين الآخرين لإنجاز المعاملات السابقة بشأن الممتلكات العقارية الشخصية لنيراف مودي وآمي مودي كجزء من الجهود لعزل ملايين الدولار أمريكيات في الأصول غير الشرعية من الدائنين.

**مطالبات الانتصاف**


**التهمة ١**


**التآمر لانتهاك قانون المنظمات الفاسدة المتأثرة بالابتزاز ("قانون المنظمات الفاسدة المتأثرة بالابتزاز") قانون الولايات المتحدة الأمريكية رقم ٢٨، البند ١٩٦٢(د)**

**(مطالبة المدينون ضد كافة المدعى عليهم)**


٣٧١. يؤكد المدعي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٣٧٠ من هذه الشكوى كما هي موضحة بالكامل هنا.

٣٧٢. كل من نيراف مودي وميهير بهنسالي وأجاي غاندي، هو "شخص" قادر على امتلاك مصلحة قانونية أو منفعية في الممتلكات بالمعنى المقصود في قانون الولايات المتحدة رقم ١٨، البند ١٩٦٢(ج) و قانون الولايات المتحدة رقم ١٨، البند ١٩٦١(٣).

٣٧٣. كما هو مزعوم أدناه، فقد انتهك كل من المدعى عليهم قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(د) بالموافقة على الانضمام إلى مؤامرة أو المشاركة فيها أو دعمها، وفي إطارها قام شخص أو أكثر، بما في ذلك نيراف مودي، وميهير بهنسالي، وأجاي

غاندي، بإدارة أو المشاركة بإدارة شؤون مؤسسة بنمط نشاط الابتزاز ما يشكل انتهاكاً لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(ج).

## الانتهاك الجوهري من نيراف مودي وميهير بهنسالي وأجاي غاندي لقانون المنظمات الفاسدة المتأثرة بالابتزاز

٣٧٤. انتهك كل من نيراف مودي وميهير بهنسالي وأجاي غاندي قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(ج) بسبب تصرفاتهم الموصوفة في الفقرات السابقة وكما هو موضح أكثر أدناه.

٣٧٥. كان لكل من نيراف مودي وميهير بهنسالي وأجاي غاندي النية المحددة لانتهاك قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(ج) وارتكاب كل فعل أصيل أساسي مزعوم أدناه.

٣٧٦. ارتكب كل من نيراف مودي وميهير بهنسالي وأجاي غاندي فعلين أصليين على الأقل من أفعال الابتزاز، على نحو أكثر تحديداً أدناه. لم تكن أعمال الابتزاز منفصلة، بل كانت مرتبطة، حيث كانت لها الهدف والنتيجة أو المشاركين أو الضحايا أو طريقة الارتكاب نفسها أو مماثلة لها. علاوة على ذلك، كانت أعمال الابتزاز مستمرة، وامتدت طوال الفترة من عام ٢٠١٠ إلى منتصف ٢٠١٨ على الأقل.

## المؤسسات المندرجة في إطار المنظمات الفاسدة والمتأثرة بالابتزاز

٣٧٧. كل من الكيانات الأمريكية شركة. وبالتالي، فإن كل من الكيانات الأمريكية "مؤسسة" بالمعنى المقصود في قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦١(٤).

٣٧٨. وبدلاً من ذلك، تشكل كيانات فايرستار، مجتمعةً، مجموعة في الواقع تشارك وتؤثر في التجارة بين الولايات والتجارة الخارجية لغرض مشترك ومستمر هو تصميم وتصنيع وبيع الألماس والمجوهرات.

٣٧٩. وبدلاً من ذلك، يشكل نيراف مودي وميهر بهنسالي وأجاي غاندي مع المتآمرين المعروفين وغير المعروفين، مجموعة في الواقع تشارك وتؤثر في التجارة بين الولايات والتجارة الخارجية لغرض مشترك ومستمر لتشكيل وتنفيذ الخطة المشتركة للاحتيال على بنك بنجاب الوطني لحيازة ثروة شخصية من خلال نمط من الاحتيال والأكاذيب والخداع والفساد. كان هذا الغرض المشترك موجوداً قبل عام ٢٠١٠، عندما قام كلاً من نيراف مودي وميهر بهنسالي وأجاي غاندي والمتآمرون معهم بتنفيذ خطة للاحتيال على بنك بنجاب الوطني عن طريق الحصول على خطابات التعهد بالاحتيال عن طريق استغلال شبكة كيانات الظل، وكيانات خطابات التعهد، وغيرها من الكيانات الخاضعة لسيطرة مودي.

٣٨٠. سواء تم تصوره بالطريقة الموضحة في الفقرة ٣٧٧ أو الفقرة ٣٧٨  أو الفقرة ٣٧٩، كان هناك أثناء وبعد الفترة ذات الصلة مؤسسة واحدة أو أكثر بالمعنى المقصود في قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٤(٤) ("**مؤسسة مندرجة في إطار المنظمات الفاسدة والمتأثرة بالابتزاز**").

٣٨١. في كافة الأوقات ذات الصلة، تم توظيف كل من نيراف مودي و ميهر بهنسالي و أجاي غاندي من قبِل مؤسسة مندرجة في إطار المنظمات الفاسدة والمتأثرة بالابتزاز أو المرتبطين بها، وقام كل منهم أو شارك، بشكل مباشر أو غير مباشر، في إدارة شؤون المؤسسة المندرجة في إطار المنظمات الفاسدة والمتأثرة بالابتزاز من خلال شكل من أشكال الابتزاز.

٣٨٢. ولدى المؤسسة المندرجة في إطار المنظمات الفاسدة والمتأثرة بالابتزاز هيكل يمكن التحقق منه مستقل ومنفصل عن نمط نشاط الابتزاز الذي ينخرط فيه المدعى عليهم.

٣٨٣. تشكل المؤسسة المندرجة في إطار المنظمات الفاسدة والمتأثرة بالابتزاز "مؤسسة" بالمعنى المقصود في قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦١(٤)، وقد شاركت أو تشارك، وأثرت أنشطتها في التجارة بين الولايات والتجارة الخارجية.

٣٨٤. تشكل الانتهاكات المتكررة والمستمرة للقانون الجنائي الفيدرالي المزعومة في هذه الشكوى "نمطاً من أنشطة الابتزاز" في انتهاك لقانون المنظمات الفاسدة والمتأثرة بالابتزاز وقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦١ وغيرها.

٣٨٥. يعتبر كل من نيراف مودي و ميهير بهنسالي و أجاي غاندي هم شخصيات مركزية ومسيطرة في المؤسسة المندرجة في إطار المنظمات الفاسدة والمتأثرة بالابتزاز، وقد وجَّهوا الآخرين لاتخاذ الإجراءات اللازمة لتحقيق الأهداف العامة للمؤسسة المندرجة في إطار المنظمات الفاسدة والمتأثرة بالابتزاز.

**نمط نشاط الابتزاز**

٣٨٦. قام كلاً من نيراف مودي، وميهير بهنسالي، وأجاي غاندي، بإدارة، أو شاركوا بشكل مباشر أو غير مباشر في إدارة شؤون المؤسسة المندرجة في إطار المنظمات الفاسدة والمتأثرة بالابتزاز من خلال نمط من نشاط الابتزاز، على النحو المحدد في قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦١(٤) و (٥)، وتتألف من عدة أعمال ابتداع مترابطة وغير منفصلة، وتم ارتكابها لنفس الأغراض أو لأغراض مماثلة من قبل نفس الأشخاص (**"نمط مندرج في إطار المنظمات الفاسدة والمتأثرة بالابتزاز"**).

**الأفعال الأصلية: الاحتيال عبر البريد والبرقيات، انتهاكات لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٣٤١، ١٣٤٣**

٣٨٧. تضمن النمط المندرج في إطار المنظمات الفاسدة والمتأثرة بالابتزاز العديد من أعمال الاحتيال عبر البريد في انتهاك لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٣٤١ والاحتيال عبر البرقيات في انتهاك لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٣٤٣.

٣٨٨. قام نيراف مودي، وميهر بهنسالي، وأجاي غاندي، طواعية وبصورة متعمدة، بوضع خطة إجرامية أو أكثر والمشاركة فيها لارتكاب عمليات نقل احتيالية فعلية لأصول المدينين والشركات التابعة في الولايات المتحدة أثناء الفترة ذات الصلة وبعدها، بما في ذلك على سبيل المثال لا الحصر، عمليات النقل المبينة أعلاه، في الملحق أ، وفي الجداول من أ إلى ل.

٣٨٩. ولتعزيز هذه الخطة أو الخطط، قام نيراف مودي، وميهر بهنسالي، وأجاي غاندي بإرسالها عن قصد وعن علم، أو تسبب في إرسالها، عن طريق (١) التسبب في وضع الأمور والأشياء في أي مكتب بريد أو وديعة مرخصة، أو إيداع أو التسبب في إيداع الأمور أو الأشياء المراد إرسالها أو تسليمها من قبل شركة نقل خاصة أو تجارية بين الولايات أو (٢) عن طريق الاتصالات البرقية في التجارة بين الولايات أو التجارة الخارجية، والكتابات، والإشارات، والعلامات، والصور، والأصوات.

٣٩٠. وشملت هذه الاتصالات البريدية والبرقية التي تدعم هذه الخطة أو الخطط للاحتيال التحويلات النقدية البرقية، وشحنات المخزون، والاتصالات الهاتفية والإلكترونية، والبريد المادي للخطابات والوثائق والاتصالات الأخرى.

٣٩١. كان من المتوقع استخدام الإرسالات البريدية والبرقية بين الولايات والدولية للقيام بعمليات نقل احتيالية فعلية ولربط هذه المؤامرة الدولية للابتزاز.

٣٩٢. وبناءً على ذلك، ارتكب نيراف مودي، وميهر بهنسالي، وأجاي غاندي العديد من الانتهاكات في الاحتيالات البريدية و/أو البرقية في انتهاك لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٣٤١ وقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٣٤٣.

٣٩٣. تسببت انتهاكات نيراف مودي، وميهر بهنسالي، وأجاي غاندي لقانون الولايات المتحدة الأمريكية رقم ١٨، البندين ١٣٤١ و١٣٤٣ بشكل مباشر وقريب في إلحاق الضرر بأعمال وممتلكات كل كيان في الولايات المتحدة عن طريق استنفاد أصولها بشكل غير مبرر ولا رجعة فيه في مبلغ هذه التحويلات.

**الأفعال الأصلية: قانون الملكية الوطنية المسروقة، انتهاكات لقانون الولايات المتحدة الأمريكية رقم ١٨ البندين ٢٣١٤، ٢٣١٥**

٣٩٤. اشتمل النمط المدرج في المنظمات الفاسدة والمتأثرة بالابتزاز على العديد من الانتهاكات لقانون الملكية الوطنية المسروقة، قانون الولايات المتحدة الأمريكية رقم ١٨ البندين ٢٣١٤، ٢٣١٥.

٣٩٥. وفي كثير من الحالات، تسبب نيراف مودي، وأجاي غاندي، وميهر بهنسالي في قيام الشركات التابعة في الولايات المتحدة، عند تلقي تحويلات احتيالية فعلية من المدينين، بنقل عائدات التحويلات الاحتيالية الفعلية هذه إلى كيانات الظل أو الكيانات الأخرى التي يسيطر عليها مودي. ويرد وصف أمثلة محددة لهذه المعاملات في الملحق أ–٣٩٥ لهذه الوثيقة.

٣٩٦. استناداً إلى تحويلات الشركات التابعة في الولايات المتحدة للأموال المستلمة بطريقة احتيالية من المدينين إلى كيانات أجنبية خاضعة لسيطرة مودي المزعومة في الفقرة ٣٩٥ من هذه الشكوى (**"التحويلات اللاحقة"**)، فقد قام نيراف مودي، وميهر بهنسالي، وأجاي غاندي عن قصد وعن علم بعمليات النقل أو الإرسال أو التحويل في التجارة بين الولايات أو التجارة الخارجية – أو الاستلام أو الامتلاك أو الإخفاء أو التخزين أو المبادلة أو البيع أو التخلص من أو الرهن كضمان لقرض – للسلع أو البضائع أو المواد أو الأوراق المالية أو الأموال العابرة للولايات أو الحدود الدولية بعد سرقتها أو تحويلها أو أخذها عن طريق الاحتيال.

٣٩٧. بالنسبة إلى كل عملية تحويل لاحقة، كان يعرف كل من نيراف مودي، وميهر بهنسالي، وأجاي غاندي، أن الأموال ذات الصلة قد تم تحويلها بطريقة احتيالية من المدين المعني إلى الشركة التابعة في الولايات المتحدة المعنية أو تم سرقتها أو تحويلها أو أخذها عن طريق الاحتيال.

٣٩٨. كل عملية تحويل لاحقة تضمنت أموالاً أو ممتلكات بقيمة ٥٠٠٠ دولار أمريكي أو أكثر.

٣٩٩. وبناءً على ذلك، ارتكب نيراف مودي وميهر بهنسالي وأجاي غاندي العديد من الانتهاكات لقانون الملكية الوطنية المسروقة، قانون الولايات المتحدة الأمريكية رقم ١٨ البندين ٢٣١٤، ٢٣١٥.

٤٠٠. تسببت انتهاكات نيراف مودي، وميهر بهنسالي، وأجاي غاندي قانون الولايات المتحدة الأمريكية رقم ١٨ البندين ٢٣١٤، ٢٣١٥ بشكل مباشر وقريب في إلحاق الضرر

بأعمال وممتلكات كل مدين من خلال إضعاف قدرة المدينين على استرداد قيمة التحويلات اللاحقة.

**الأفعال الأصلية: غسيل الأموال، انتهاكات قانون الولايات المتحدة الأمريكية رقم ١٨، البندين ١٩٥٦، ١٩٥٧.**

٤٠١. اشتمل النمط المدرج في المنظمات الفاسدة والمتأثرة بالابتزاز على العديد من أعمال غسيل الأموال بما ينتهك قانون الولايات المتحدة الأمريكية رقم ١٨ البندين ١٩٥٦، ١٩٥٧.

٤٠٢. كل عملية تحويل احتيالية فعلية وكل عملية تحويل لاحقة تدعم وتعزز الاحتيال المصرفي، كحد أدنى من خلال: (أ) تسهيل تخفيض المبالغ المستحقة الدائنة والمدينة بين الكيانات التي تسيطر عليها مودي لتفادي اكتشاف الاحتيال المصرفي (ب) ترتيب حركة الأموال بحيث يصعب تعقبها.

٤٠٣. وقد جرت كل عملية تحويل احتيالية فعلية وكل عملية تحويل لاحقة في الولايات المتحدة سواء كلياً أو جزئياً.

٤٠٤. وإن كل عملية تحويل احتيالية فعلية وكل عملية تحويل لاحقة منطوية أو ناتجة عن عمل أو أكثر من عمليات الاحتيال البرقي.

٤٠٥. وبناءً على ذلك، فإن كل عملية تحويل احتيالية فعلية وكل عملية تحويل لاحقة كانت تشكل أو تنطوي على أو تنتج عن مخالفة ضد الهند، وهي دولة أجنبية، وتشمل الاحتيال، أو التخطيط للاحتيال أو محاولة الاحتيال، ضد بنك بنجاب الوطني، وهو بنك أجنبي.

٤٠٦. بالإضافة إلى ذلك، فقد تم التخطيط لكل عملية تحويل احتيالية فعلية لاستفاد أصول المدين المعني من خلال عمل أو أكثر من عمليات الاحتيال البرقية من أجل عرقلة أو تأخير دائني هذا المدين أو الاحتيال عليهم.

٤٠٧. بالإضافة إلى ذلك، فقد تم التخطيط لكل عملية تحويل لاحقة لاستفاد أصول الشركة التابعة المعنية في الولايات المتحدة من خلال عمل واحد أو أكثر من عمليات الاحتيال البرقية وذلك من أجل عرقلة أو تأخير دائني الشركة التابعة في الولايات المتحدة أو الاحتيال عليهم، بما في ذلك المدين أو المدينون المعنيون.

٤٠٨. وبناءً على ذلك، فإن كل عملية تحويل احتيالية فعلية وكل عملية تحويل لاحقة تشكل أو تنطوي أو كانت نتيجة نشاط غير قانوني محدد بالمعنى المقصود في قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٥٦(ج)(٧).

٤٠٩. وقد أثرت كل عملية تحويل لاحقة على التجارة بين الولايات أو التجارة الخارجية وشملت حركة الأموال عن طريق التحويل البرقي أو بوسائل أخرى من مكان في الولايات المتحدة إلى أو من خلال مكان خارج الولايات المتحدة.

٤١٠. اشتملت كل عملية تحويل لاحقة على أموال مستمدة من أو تم الحصول عليها أو الاحتفاظ بها، بشكل مباشر أو غير مباشر، من عملية تحويل احتيالية فعلية ونشاط غير قانوني يتعلق بعملية التحويل الاحتيالية الفعلية هذه.

٤١١. قام نيراف مودي، وميهر بهنسالي، وأجاي غاندي بتنسيق أو إجراء كل عملية تحويل لاحقة بقصد الدفع في الاستمرار بنشاط غير قانوني محدد، بما في ذلك ما يتعلق بما يلي:

(أ) استفاد أصول المدينين المعنيين والشركات التابعة المعنية في الولايات المتحدة بصورة احتيالية، (ب) الاحتيال المصرفي بشكل عام أكثر.

٤١٢. كان نيراف مودي، وميهر بهنسالي، وأجاي غاندي على معرفة بأن كل عملية تحويل لاحقة تم التخطيط لها كلياً أو جزئياً لإخفاء أو تمويه الطبيعة أو الموقع أو المصدر أو الملكية أو السيطرة الخاصة بالأموال التي تم الحصول عليها من عملية التحويل الاحتيالية الفعلية التي سبقت عملية التحويل اللاحقة هذه.

٤١٣. كان نيراف مودي، وميهر بهنسالي، وأجاي غاندي على معرفة بأن الممتلكات المشمولة في كل عملية تحويل لاحقة تمثل عوائد شكل ما من أشكال النشاط غير القانوني.

٤١٤. انطوت كل عملية تحويل لاحقة على معاملة نقدية في ممتلكات مشتقة من أعمال جنائية/إجرامية تزيد قيمتها عن ١٠،٠٠٠ دولار أمريكي ومشتقة من نشاط غير قانوني محدد.

٤١٥. اتفق نيراف مودي، وميهر بهنسالي، وأجاي غاندي، بشكل صريح أو ضمني، على ما يلي:

(أ) تنفيذ كل عملية تحويل احتيالية فعلية وكل عملية تحويل لاحقة، و (ب) استفاد أصول المدينين والشركات التابعة في الولايات المتحدة بطريقة احتيالية، و (ج) ارتكاب الاحتيال المصرفي.

٤١٦. وبناءً على ذلك، ارتكب نيراف مودي، وميهر بهنسالي، وأجاي غاندي، وتآمروا في ارتكاب، العديد من أعمال غسيل الأموال بما ينتهك قانون الولايات المتحدة الأمريكية رقم ١٨، البندين ١٩٥٦ و١٩٥٧.

٤١٧. وقد تسببت انتهاكات نيراف مودي، وميهر بهنسالي، وأجاي غاندي لقانون الولايات المتحدة الأمريكية رقم ١٨، البندين ١٩٥٦ و١٩٥٧ بشكل مباشر وقريب في إلحاق الضرر بأعمال وممتلكات كل مدين من خلال إضعاف قدرة المدينين على استرداد قيمة التحويلات اللاحقة.

**الأفعال الأصلية: عرقلة العدالة، انتهاكات لقانون الولايات المتحدة الأمريكية رقم ١٨،**
**البندين ١٥٠٣، ١٥١٢**

٤١٨. اشتمل النمط المدرج في إطار المنظمات الفاسدة والمتأثرة بالابتزاز على أكثر من عمل واحد من عرقلة العدالة في انتهاك لقانون الولايات المتحدة الأمريكية رقم ١٨، البندين ١٥٠٣ و ١٥١٢.

٤١٩. بناءً على الادعاءات المنصوص عليها في الفقرة ٢٧٥ من هذه الشكوى بخصوص موظفي كيان الظل في دبي، وبناءً على المعلومات والمعتقدات، فقد قام نيراف مودي وبهنسالي، أو غيرهم ممن يعملون بتوجيه منهم، بتخويف هؤلاء الموظفين في الكيان الظل أو تهديدهم أو إقناعهم بصورة فاسدة، أو انخرطوا في سلوك مضلل تجاه هؤلاء الموظفين في كيان الظل، وذلك بقصد التأثير على شهادة هؤلاء الموظفين في كيان الظل أو تأخيرها أو منعها في إجراء رسمي، بما في ذلك قضايا الفصل ١١ هذه، وإعطاء الإيعاز لهؤلاء الموظفين في كيان الظل أو حثّهم على حجب شهادة، أو حجب سجل أو وثيقة أو أي شيء آخر، من إجراء رسمي، بما في ذلك قضايا الفصل ١١ هذه.

٤٢٠. بالإضافة إلى ذلك، قام ميهير بهنسالي بتعديل أو إتلاف أو تشويه أو إخفاء السجلات أو الوثائق أو غيرها من الأشياء أو حاول القيام بذلك، كما يتضح من الأفعال التالية، المزعومة بمزيد من التفصيل أعلاه، والتي يدعي ميهير بهنسالي، أو غيره من

العاملين بتوجيه منه أو من نيراف مودي، أنه تم إخذها في الأسابيع السابقة لتاريخ الالتماس وبعده:

(١) البحث الذي قام ميهير بهنسالي بإجرائه فيما يتعلق بطرق حذف تاريخ الإنترنت، وتصفح الإنترنت بشكل مجهول، والتواصل من خلال الرسائل المشفرة والحذف الذاتي، وتشفير بيانات الحاسوب.

(٢) تنزيل ميهير بهنسالي وتثبيته، وبناءً على المعلومات والمعتقدات، استخدامه البرامج المصممة لهذه الأغراض.

(٣) بناءً على المعلومات والمعتقدات، قام ميهير بهنسالي بحذف أو محاولة حذف كافة نسخ جداول البيانات الموضحة في الفقرة ١٠٦ من هذه الشكوى.

(٤) قام ميهير بهنسالي بإعطاء التوجيهات إلى ساجو بولوسي من أجل "إرسال كافة الحواسيب غير العائدة لـ فايرستار إلى هونج كونج [.]"

(ت) قيام نهال مودي، الذي يعمل بتوجيه من نيراف مودي وميهير بهنسالي أو بالتنسيق معهما، بإتلاف الهواتف المحمولة لمختلف موظفي كيان الظل والخوادم والوثائق والسجلات الأخرى.

٤٢١. وعلاوة على ذلك، فإن ميهير بهنسالي قام بصورة فاسدة بإعاقة إجراء رسمي أو التأثير عليه أو عرقلته، بما في ذلك قضايا المدينين في الفصل ١١، وذلك عن طريق القيام عن معرفة وعن قصد، كما هو مزعوم بمزيد من التفاصيل أعلاه، بإعطاء بيانات غير صحيحة وتعهدات كاذبة والإغفال تحت عقوبة الحنث باليمين فيما يتعلق بقضايا المدينين

في الفصل ١١ بخصوص علاقة المدينين مع كيانات الظل ومشاركة المدينين في الاحتيال المصرفي.

٤٢٢. وعلاوة على ذلك، واستناداً إلى نفس الادعاءات، فقد سعى ميهير بهنسالي على نحو فاسد للتأثير على مسؤول في هذه المحكمة والحيلولة دون أن يقوم بأداء واجبه، بما في ذلك المحقق والوصي.

٤٢٣. وعلاوة على ذلك، واستناداً إلى نفس الادعاءات، سعى ميهير بهنسالي بشكل فاسد للتأثير على أو عرقلة أو الحيلولة دون إقامة العدل على النحو الواجب.

٤٢٤. وبالمثل، عرقل أجاي غاندي الإجراء الرسمي أو أثر عليه أو أعاقه بشكل فاسد، بما في ذلك قضايا المدينين في الفصل ١١، عن طريق، كما هو مزعوم بمزيد من التفصيل أعلاه، (أ) التوقيع عن عمد وبشكل مقصود على جداول وبيانات الشؤون المالية الخاصة بكل مدين تحت عقوبة الحنث باليمين دون الكشف عن تورط المدينين في الاحتيال المصرفي، وعلاقتهم مع كيانات الظل المختلفة، وأرصدة القروض الكبيرة المستحقة من قبل إن إم آي إلى جافي، أو عمليات النقل الكبيرة لأصول المدينين إلى كيانات الظل وغيرها من الكيانات التي تسيطر عليها مودي التي يجب الكشف عنها في جداول وبيانات الشؤون المالية، و (ب) التظاهر بالجهل والكذب التام أمام المحقق فيما يتعلق بالمدينين ومشاركته الشخصية في المعاملات التي تدعم الاحتيال المصرفي.

٤٢٥. وعلاوة على ذلك، واستناداً إلى نفس الادعاءات، سعى آجاي غاندي على نحو فاسد للتأثير على مسؤول في هذه المحكمة والحيلولة دون أن يقوم بأداء واجبه، بما في ذلك المحقق والوصي.

٤٢٦. وعلاوة على ذلك، واستناداً إلى نفس الادعاءات، سعى آجاي غاندي بشكل فاسد للتأثير على أو عرقلة أو الحيلولة دون إقامة العدل على النحو الواجب.

٤٢٧. كان الغرض من ميهير بهنسالي و أجاي غاندي في اتخاذ مثل هذه الإجراءات هو إضعاف صحة أو توافر الأدلة لاستخدامها في إجراء رسمي، بما في ذلك هذه القضايا في ١١، أو عرقلة إجراء رسمي أو التأثير عليه أو إعاقته، بما في ذلك هذه القضايا في الفصل ١١.

٤٢٨. اتفق نيراف مودي، وميهر بهنسالي، وأجاي غاندي، بشكل صريح أو ضمني، مع بعضهم البعض ومع الآخرين، بما في ذلك نهال مودي، لارتكاب كل من جرائم عرقلة سير العدالة المزعومة في هذه الشكوى.

٤٢٩. وبناءً على ذلك، ارتكب نيراف مودي، وميهر بهنسالي، وأجاي غاندي، والمتآمرون الآخرون، بما في ذلك نهال مودي، وتآمروا لارتكاب العديد من أعمال عرقلة سير العدالة بما يشكل انتهاكاً لقانون الولايات المتحدة الأمريكية رقم ١٨، البندين ١٥٠٣ و ١٥١٢.

٤٣٠. لقد تسببت انتهاكات نيراف مودي، وميهير بهنسالي، وأجاي غاندي لقانون الولايات المتحدة الأمريكية رقم ١٨، البندين ١٥٠٣ و ١٥١٢ بشكل مباشر وقريب في إلحاق الضرر بأعمال وممتلكات كل مدين، من بين أمور أخرى، من خلال إضعاف قدرة جافي على بيع أصوله بقيمة المنشأة الناجحة، وتأخير تعيين الوصي وإضعاف قدرته على الاسترداد من الشركات التابعة في الولايات المتحدة والتسبب في تكبد ممتلكات المدينين لنفقات إدارية كبيرة تتعلق بالتحقيق في المعلومات التي أخفق ميهير بهنسالي و أجاي غاندي في الكشف عنها، وبناءً على المعلومات أو المعتقدات، وسعيا بقوة لإخفائها أو إتلافها أو جعلها غير متاحة للاستخدام فيما يتعلق بهذه القضايا في الفصل ١١.

**الأفعال الأصلية: الإفلاس الاحتيالي، انتهاكات بقانون الولايات المتحدة الأمريكية رقم ١٨،**
**البند ١٥٢**

٤٣١. اشتمل النمط المدرج في إطار المنظمات الفاسدة والمتأثرة بالابتزاز على أكثر من فعل إفلاس احتيالي، بما ينتهك قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٥٢.

٤٣٢. استناداً إلى الادعاءات الواردة من بين أمور أخرى في الفقرتين ٤٢١ و ٤٢٤ من هذه الشكوى، فقد قام كل من ميهير بهنسالي وأجاي غاندي عن علم وعلى نحو احتيالي بأداء قسم أو أكثر بصورة كاذبة وإعطاء حساباً أو أكثر بصورة زائفة في هذه القضايا من الفصل ١١ أو فيما يتعلق بها.

٤٣٣. واستناداً إلى تلك الادعاءات نفسها، فقد قام كل من ميهير بهنسالي وأجاي غاندي عن علم أو احتيال بتقديم واحدة أو أكثر من التصريحات أو الشهادات أو التأكيدات أو البيانات الكاذبة أو المزورة تحت عقوبة الحنث باليمين في هذه القضايا من الفصل ١١ أو فيما يتعلق بها.

٤٣٤. وبناءً على هذه الادعاءات نفسها، فقد قام كل من ميهير بهنسالي و أجاي غاندي عن علم وبصورة احتيالية بعد رفع هذه القضايا من الفصل ١١ بحجب المعلومات المسجلة فيما يتعلق بممتلكات المدينون وشؤونهم المالية عن القيم أو الوصي أو المارشال أو المسؤولين الآخرين لهذه المحكمة، بما في ذلك المحقق.

٤٣٥. واستناداً إلى هذه الادعاءات نفسها، أخفى ميهير بهنسالي وأجاي غاندي عن علم واحتيال عن الدائنين، والوصي في الولايات المتحدة، والوصي، وهذه المحكمة ممتلكات المدينين، بما في ذلك القرض الكبير المستحق على إن آي إم آي إلى جافي.

٤٣٦. وبناءً على ذلك، ارتكب ميهير بهنسالي وأجاي غاندي أعمال إفلاس احتيالية بما ينتهك قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٥٢.

٤٣٧. لقد تسببت انتهاكات ميهير بهنسالي وأجاي غاندي لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٥٢ بشكل مباشر وقريب في إلحاق الضرر بأعمال وممتلكات كل مدين، من بين أمور أخرى، من خلال إضعاف قدرة جافي على بيع أصوله بقيمة المنشأة الناجحة، وتأخير تعيين الوصي وإضعاف قدرته على الاسترداد من الشركات التابعة في الولايات المتحدة، والتسبب في تكبد ممتلكات المدينين نفقات إدارية كبيرة تتعلق بالتحقيق في المعلومات التي أخفق بهنسالي و غاندي في الكشف عنها وسعيا بقوة لإخفائها أو إتلافها أو جعلها غير متاحة للاستخدام فيما يتعلق بهذه القضايا في الفصل ١١.

**استمرارية السلوك**

٤٣٨. إن انتهاكات نيراف مودي، وميهر بهنسالي، وأجاي غاندي للقانون على النحو الوارد في هذه الوثيقة، والتي أدى كل منها إلى إلحاق الضرر بالمدينين والشركات التابعة في الولايات المتحدة بشكل مباشر وقريب، شكّلت مساراً مستمراً للسلوك في الولايات المتحدة يبدأ في موعد أقصاه ٢٠١٠ ويستمر حتى أكتوبر ٢٠١٨ على الأقل، حيث كان الهدف من ذلك هو الحصول على مكاسب اقتصادية من خلال التأكيدات الكاذبة والاحتيال والخداع وغير ذلك من الوسائل غير المشروعة وغير القانونية. لذلك، كانت الانتهاكات جزءاً من نمط نشاط الابتزاز بموجب قانون الولايات المتحدة الأمريكية رقم ١٨ البندين ١٩٦١(١) و (٥).

**تسبب النمط المدرج في إطار المنظمات الفاسدة والمتأثرة بالابتزاز في إلحاق الضرر بالمدينين والشركات التابعة في الولايات المتحدة**

٤٣٩. لقد تم إلحاق الضرر بكل مدين في أعماله أو ممتلكاته كنتيجة مباشرة ونتيجة قريبة لانتهاكات مودي، وبهنسالي، وغاندي، المذكورة أعلاه، لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(ج)، بما في ذلك أي ضرر بسبب الأفعال الأصلية التي تشكل النمط المدرج في إطار المنظمات الفاسدة والمتأثرة بالابتزاز .

٤٤٠. قبل أنشطة الابتزاز للمدعى عليهم، عمل كل من المدينين كشركة مشروعة مبنية على علاقات مثمرة مع عملاء محترمين.

٤٤١. تأسست شركة فايرستار في عام ٢٠٠٤ لأغراض الاستحواذ على شركة فريدريك غولدمان، التي كانت عملاء أحد عملاء إف آي إل في الولايات المتحدة. عملت شركة فايرستار تاريخياً في التوزيع وتجارة الجملة للمجوهرات المصنوعة من الذهب والألماس. تألفت قاعدة عملائها من تجار المجوهرات الشرعيين مثل زاليس وجي سي بيني ومايسيز .

٤٤٢. تأسست فنتازي في عام ٢٠١٢ لأغراض الحصول على ترخيص حصري من شركة فنتازي دايموند التي يقع مقرها في شيكاغو لتوريد العلامة التجارية ايندلس دايموند إلى تجار التجزئة في الولايات المتحدة. تم إنشاء فنتازي بشكل أساسي لإجراء الأعمال التجارية مع شركة كوستكو هولسيل استناداً إلى المبيعات المنسوبة إلى العلامة التجارية ايندلس دايموند. من بين عملاء فنتازي الآخرين زاليس وسامس كلوب ووالمارت. باعت شركة فنتازي المجوهرات الجاهزة، بشكل عام بسعر أعلى من سعر فايرستار .

٤٤٣. جافي هي خليفة شركة ساندبرج آند سيكورسي التي يقع مقرها في نيويورك، ويعود تاريخ أسلافها إلى عام ١٨٩٢. تألفت ساندبرج آند سيكورسكي تاريخياً من قسمين، أحدهما تم بيعه لكبار تجار التجزئة في الولايات المتحدة و إيه جافي، في مجال مجوهرات العرائس الفاخرة التي قامت بتوريد قطع مركبة من المجوهرات لتجار المجوهرات رفيعي المستوى

المستقلين. في عام ٢٠٠٧، اشترت إف آي إل حصة ٩٥٪ في ساندبرج آند سيكورسكي. وفي عام ٢٠١١ تم تغيير اسم ساندبرج آند سيكورسكي إلى شركة إيه جافي ولم تصبح مندمجة تماماً ضمن عمليات كيانات فايرستار الأخرى حتى عام ٢٠١٦.

٤٤٤. لقد أدت انتهاكات نيراف مودي وميهر بهنسالي وأجاي غاندي للقانون الاتحادي في سعيهم لتنفيذ مخططهم أو مخططاتهم لنهب أصول المدينين والشركات التابعة في الولايات المتحدة من خلال سلسلة من عمليات التحويل الاحتيالية الفعلية ولإخفاء طبيعة هذه التحويلات عن طريق الإعاقة أو التأثير على أو العرقلة لهذه القضايا في الفصل ١١ لما يلي: (أ) استنفاد أصول كل مدين وشركة تابعة في الولايات المتحدة بشكل غير مبرر ولا رجعة فيه بمبلغ التحويلات الاحتيالية الفعلية ذات الصلة، و(ب) تكبد ممتلكات كل مدين في الفصل ١١ مصاريف إدارية كبيرة ناجمة عن قيام نيراف مودي و ميهير بهنسالي و أجاي غاندي بعرقلة تحقيقات المحقق والوصي التي ما كانت لتتكبدها لولا ذلك، و(ج) ضعف قدرة كل مدين على بيع أصوله بقيمة المنشأة الناجحة، و (د) إحباط قدرة المدينين والشركات التابعة في الولايات المتحدة على تحصيل ديون كبيرة مستحقة لهم من كيانات الظل وكيانات فايرستار الخارجية.

**اتفاق المدعى عليهم على انتهاك قانون المنظمات الفاسدة والمتأثرة بالابتزاز**

٤٤٥. في كافة الأوقات ذات الصلة، اجتمع وتآمر وتحالف واتفق كل مدعى عليه، مع بعضهم البعض ومع نيراف مودي، وميهير بهنسالي، وأجاي غاندي، وغيرهم من الأشخاص المعروفين والمجهولين، سواء كانوا أشخاص موظفين أو مرتبطين بالمؤسسة المندرجة في إطار المنظمات الفاسدة والمتأثرة بالابتزاز، بشكل غير قانوني وعن معرفة وعمداً لانتهاك قانون الولايات المتحدة الأمريكية رقم ١٨ البند ١٩٦٢ (ج)، حيث اتفقوا على إدارة،

والمشاركة بشكل مباشر أو غير مباشر في إدارة شؤون المؤسسة المندرجة في إطار المنظمات الفاسدة والمتأثرة بالابتزاز من خلال نمط من نشاط الابتزاز الذي ينتهك قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(د) ("مؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز").

٤٤٦. يمكن إثبات موافقة المدعى عليها بورفي ميهتا على الانضمام في مؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز ودعمها، أو استنتاج ذلك من خلال، من بين عدة أمور أخرى، ما يلي:

أ. كانت ميهتا المالكة المستفيدة للعديد من كيانات الظل، وتوين فيلدز، والعديد من الشركات الوهمية الخارجية الأخرى المستخدمة من أجل تنفيذ عمليات الاحتيال المصرفي وغسل عوائده.

ب. استثمرت ميهتا، من خلال ايسلينجتون، ٤٥ مليون دولار أمريكي من عوائد الاحتيال المصرفي في إف آي بيه إل لتمويل "إعادة هيكلة" عام ٢٠١٧ لكيانات فايرستار التي تلقت ميهتا بخصوصها فيما بعد أكثر من ٨٥ مليون دولار أمريكي من عوائد الاحتيال البنكي.

ج. قامت ميهتا بتسوية وتمويل إيثاكا ترست لغسل عوائد الاحتيال المصرفي لصالح نيراف مودي و آمي مودي ولحماية الأصول غير المشروعة من الدائنين.

د. قامت ميهتا بتحويل ١.٥ مليون دولار أمريكي إلى ميهير بهنسالي كقرض مزعوم قبل أسابيع فقط من شراء بهنسالي لشقة بقيمة ٧.١ مليون دولار أمريكي.

٤٤٧. يمكن إثبات موافقة المدعى عليها آمي جافيري على الانضمام في مؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز ودعمها، أو استنتاج ذلك من خلال، من بين عدة أمور أخرى، ما يلي:

أ. عملت جافيري كشريك لجميع كيانات خطاب التعهد الثلاثة، وفي عام ٢٠١٠، فتحت حسابات مصرفية لـ سولار وسيتلار المستخدمة للاحتيال على بنك بنجاب الوطني.

ب. جافيري هي المستفيد الأساسي من إيثاكا ترست والمالك المستفيد لشقة ريتز كارلتون وشقة اسكس هاوس.

ج. تلقت جافيري أكثر من ٣٠ مليون دولار أمريكي من عوائد الاحتيال المصرفي من بورفي ميهتا في مايو ويونيو ٢٠١٧.

د. قامت جافيري بتحويل أكثر من ٣٠ مليون دولار أمريكي من عوائد الاحتيال المصرفي إلى بورفي ميهتا بين سبتمبر ونوفمبر ٢٠١٧.

هـ. هربت جافيري من الهند قبل أسابيع فقط من استحقاق خطاب التفاهم الاحتيالي الصادر عام ٢٠١٧ ومن الكشف عن الاحتيال المصرفي.

و. قامت جافيري بتعيين نيهال مودي بصفة الحارس على إيثاكا ترست في مايو ٢٠١٧.

٤٤٨. يمكن إثبات موافقة المدعى عليه نيهال مودي على الانضمام في مؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز ودعمها، أو استنتاج ذلك من خلال، من بين عدة أمور أخرى، ما يلي:

أ. سافر نهال مودي إلى الخارج مع ميهير بهنسالي بعد الكشف عن عمليات الاحتيال المصرفي لتهديد ورشوة الشهود وإتلاف الأدلة وإزالة الأصول.

ب. قام نيهال مودي بتجنيد أصدقائه الشخصيين، بما في ذلك أنتوني أليكوك، وروشيل ميللر، وتامر أبو العطا، لتحويل أصول الشركات التابعة في الولايات المتحدة إلى هونغ كونغ بعد الكشف عن الاحتيال المصرفي.

ج. أصبح نيهال مودي الحارس على إيثاكا ترست بعد الكشف عن الاحتيال المصرفي.

د. قام نيهال مودي، إلى جانب ميهير بهنسالي، بإدارة مجموعة بي بي بي كواجهة لجهود غسل أموال عائلة مودي.

هـ. قام نيهال مودي بإدارة جيتنجالي يو إس إيه وساموبلز ودياملينك وغيرها من الكيانات الأخرى الخاضعة لسيطرة تشوكسي المستخدمة للاحتيال على بنك بنجاب الوطني.

٤٤٩. يمكن إثبات موافقة المدعى عليه نيشال مودي على الانضمام في مؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز ودعمها، أو استنتاج ذلك من خلال، من بين عدة أمور أخرى، ما يلي:

أ. عمل نيشال مودي كشريك لجميع كيانات خطاب التعهد الثلاثة، وفي عام ٢٠١٦، قام باختيار وتعيين شركاء "وهميين" إضافيين لكيانات خطاب التعهد.

ب. كان نيشال مودي المالك المستفيد للعديد من كيانات الظل، والشركات الوهمية الخاريجة الأخرى المستخدمة للمساعدة في عمليات الاحتيال المصرفي وغسل عوائده.

ج. قام نيشال مودي، إلى جانب ميهير بهنسالي، باختيار واستئجار العديد من موظفي كيان الظل طوال الفترة ذات الصلة.

د. قام نيشال مودي بتنسيق العديد من المعاملات الاحتيالية بين إف دي  بي في بي إيه و كيانات الظل للمساعدة في عمليات الاحتيال المصرفي طوال الفترة ذات الصلة.

هـ . حصل نيشال مودي على توكيل لشركة بورفي ميهتا ووقع اتفاقيات بالنيابة عنها، بما في ذلك شراء بورفي ميهتا لشقة في هونغ كونغ في أبريل ٢٠١٧ مقابل حوالي ٢.٧ مليون دولار أمريكي.

٤٥٠. يمكن إثبات موافقة إيثاكا ترست على الانضمام   في مؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز ودعمها، أو استنتاج ذلك من خلال، من بين عدة أمور أخرى، ما يلي:

أ. يتمتع نيراف مودي بالسيطرة الكاملة على إيثاكا ترست، والوصي على إيثاكا، والحارس على إيثاكا، ومستشار استثمار إيثاكا، واتفاقية إيثاكا ترست، وكافة الأصول الموجودة في إيثاكا ترست.

ب. تمت تسوية صندوق إيثاكا ترست من قبل بورفي ميهتا، إحدى القنوات الرئيسية لغسل الأموال لدى عائلة مودي.

ج. قامت إيثاكا ترست بشراء شقة ريتز كارلتون باستخدام عوائد الاحتيال المصرفي التي حصلت عليها من بورفي ميهتا.

د. قامت إيثاكا ترست بشراء حصص العضوية في شركة سنترال بارك، التي تمتلك شقة اسكس هاوس، باستخدام عوائد الاحتيال المصرفي التي حصلت عليها من بورفي ميهتا.

هـ. شارك ديباك شيث، الحارس الأصلي على إيثاكا ومستشار استثمار إيثاكا، في عمليات الاحتيال المصرفي من خلال كيانات شيث طوال الفترة ذات الصلة

و. شارك أبهاي جافيري، الذي خلف ديباك شيث كمستشار استثما إيثاكا وعمل بصفة الحارس الافتراضي على إيثاكا، في عمليات الاحتيال المصرفي من خلال كيانات إس دي سي طوال الفترة ذات الصلة.

ز. قام نيهال مودي، الذي تم تعيينه من قبل آمي مودي بصفة الحارس على إيثاكا في مايو ٢٠١٨، بتنظيم جهود عائلة مودي لإتلاف الأدلة، والتلاعب بالشهود، وإبعاد الأصول عن متناول الدائنين بعد الكشف عن الاحتيال المصرفي.

٤٥١. يمكن إثبات موافقة المدعى عليه شركة سنترال بارك ساوث ٥٠ على الانضمام في مؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز ودعمها، أو استنتاج ذلك من خلال، من بين عدة أمور أخرى، ما يلي:

أ. يتمتع نيراف مودي بالسيطرة الكاملة على شركة سنترال بارك ساوث ٥٠ من خلال سيطرته الكاملة على إيثاكا على إيثاكا ترست.

ب. شارك ديباك شيث، مدير شركة سنترال بارك ساوث ٥٠ الأصلي، في عمليات الاحتيال المصرفي من خلال كيانات شيث طوال الفترة ذات الصلة.

ج. شارك أبهاي جافيري، الذي خلف ديباك شيث كمدير لـ شركة سنترال بارك ساوث ٥٠، في عمليات الاحتيال المصرفي من خلال كيانات إس دي سي طوال الفترة ذات الصلة.

د. عمل نيتين داتاني، الذي خلف أبهاي جافيري كمدير شركة سنترال بارك ساوث ٥٠ في مايو ٢٠١٨، مع أجاي غاندي وأنجلينا يبما وميهر بهنسالي لتحويل أموال ومخزون إن إم إل يو كيه إلى هونغ كونغ بعد الكشف عن الاحتيال المصرفي. كما قام داتاني بمساعدة نيراف مودي على تأسيس شركة جديدة بينما كان مودي مختبئاً في لندن.

هـ. شارك أجاي غاندي، الذي عمل كرئيس لـ شركة سنترال بارك ساوث ٥٠ ومفوضاً بالتوقيع على حسابها المصرفي، على نطاق واسع في عمليات الاحتيال المصرفي وفي الجهود الاحتيالية بعد الكشف عن ذلك، على النحو المزعوم أعلاه.

و. اشترت شركة سنترال بارك ساوث ٥٠ شقة ريتز كارلتون باستخدام عوائد الاحتيال المصرفي.

ز. تأسست شركة سنترال بارك ساوث ٥٠ لغرض غسيل أموال عوائد الاحتيال المصرفي لصالح نيراف مودي وآمي مودي.

٤٥٢. يمكن إثبات موافقة المدعى عليه شركة سنترال بارك على الانضمام في مؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز ودعمها، أو استنتاج ذلك من خلال، من بين عدة أمور أخرى، ما يلي:

أ. يتمتع نيراف مودي بالسيطرة الكاملة على شركة سنترال بارك من خلال سيطرته الكاملة على إيثاكا ترست.

ب. شارك ميهير بهنسالي، الذي شغل منصب المدير الوحيد والرئيس التنفيذي لشركة سنترال بارك، على نطاق واسع في الاحتيال المصرفي وفي الجهود الرامية إلى عرقلة العدالة وإبعاد

الأصول عن متناول الدائنين بعد الكشف عن الاحتيال المصرفي، على النحو المزعوم أعلاه.

ج. شارك أجاي غاندي، الذي شغل منصب المدير المالي لشركة سنترال بارك، على نطاق واسع في الاحتيال المصرفي وفي الجهود الرامية إلى عرقلة العدالة وإبعاد الأصول عن متناول الدائنين بعد الكشف عن الاحتيال المصرفي، على النحو المزعوم أعلاه.

٤٥٣. يمكن إثبات موافقة المدعى عليه توين فيلدز على الانضمام في مؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز ودعمها، أو استنتاج ذلك من خلال، من بين عدة أمور أخرى، ما يلي:

أ. شارك بورفي ميهتا، الذي يمتلك توين فيلدز بشكل غير مباشر من خلال شركات وهمية في الجزر العذراء البريطانية، على نطاق واسع في عمليات الاحتيال المصرفي وفي الجهود الاحتيالية الرامية لغسل عوائده بعيداً عن متناول الدائنين.

ب. شارك ميهير بهنسالي، الذي عمل كمدير قانوني أو فعلي لشركة توين فيلدز، على نطاق واسع في الاحتيال المصرفي وفي الجهود الرامية إلى عرقلة العدالة وإبعاد الأصول عن متناول الدائنين بعد الكشف عن الاحتيال المصرفي، على النحو المزعوم أعلاه.

ج. يتمتع نيراف مودي بالسيطرة الكاملة على توين فيلدز من خلال هيمنته وسيطرته على بورفي ميهتا و ميهير بهنسالي و نيهال مودي.

د. عملت توين فيلدز كقناة لغسل عوائد الاحتيال المصرفي، بما في ذلك أكثر من ٢٥ مليون دولار أمريكي من شركة فاين كلاسيك، شركة الظل التي يملكها ويديرها بشكل مباشر بورفي ميهتا.

٤٥٤. يمكن إثبات موافقة كل كيان ظل مدعى عليه على الانضمام في مؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز ودعمها، أو استنتاج ذلك من خلال، من بين عدة أمور أخرى، ما يلي:

أ. يتمتع نيراف مودي بالسيطرة الكاملة على كل كيان ظل مدعى عليه من خلال هيمنته وسيطرته على بورفي ميهتا، ونيشال مودي، وغيرهم من المالكين الاسميين والمدراء والمسؤولين في تلك الكيانات.

ب. شارك كل كيان ظل مدعى عليه بملايين الدولار أمريكيات في معاملات استيراد وتصدير احتيالية مع كيانات خطاب التعهد، وكيانات فايرستار، وكيانات ظل أخرى خلال الفترة ذات الصلة للمساعدة في الاحتيال المصرفي وغسل عوائده.

ج. تم إنشاء كل كيان ظل مدعى عليه وتشغيله لغرض وحيد وهو المساعدة في عمليات الاحتيال المصرفي وغسل عوائده.

٤٥٥. كان كل مدعى عليه على علم بتورطه في مؤامرة لارتكاب أفعال أصلية وعلى علم أيضاً أن الأفعال أصلية تشكل جزء من نشاط الابتزاز هذا، وأن مشاركة كل منهم والموافقة على ذلك ضرورية للسماح بارتكاب هذا النمط من نشاط الابتزاز. يشكل هذا السلوك مؤامرة تنتهك قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(ج)، وتنتهك قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(د).

٤٥٦. وافق كل مدعى عليه على إدارة أو المشاركة، بشكل مباشر أو غير مباشر، في إدارة أو تسيير شؤون أو تشغيل المؤسسة المندرجة ضمن نطاق المنظمات الفاسدة والمتأثرة

بالابتزاز من خلال نمط من نشاط الابتزاز، بما في ذلك على سبيل المثال لا الحصر أعمال الابتزاز المبينة أعلاه.

٤٥٧. وكجزء من المؤامرة، ارتكب كل مدعى عليه، في بعض الأحيان من خلال وكلاء معينين، وممثلين، أو متآمرين، عملاء أصليين على الأقل تتمثل في الابتزاز في إدارة شؤون المؤسسة المندرجة ضمن نطاق المنظمات الفاسدة والمتأثرة بالابتزاز.

٤٥٨. وكنتيجة مباشرة وقريبة لمؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز من المدعى عليهم، فإن نمط نشاط الابتزاز الذي اتفقوا من خلاله على إدارة شؤون المؤسسة المندرجة ضمن نطاق المنظمات الفاسدة والمتأثرة بالابتزاز، والأفعال الأصلية وغيرها من الأعمال العلنية المتخذة دعماً لتلك المؤامرة، والانتهاكات لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(د)، تم إلحاق الضرر بكل من المدينين في أعمالهم وممتلكاتهم.

٤٥٩. بموجب قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٤(ج)، يحق للمدعي استرداد ثلاثة أضعاف تعويضات الأضرار العامة والخاصة التي لحقت بكل مدين، بالإضافة إلى الفوائد والتكاليف وأتعاب المحاماة المتكبدة بسبب انتهاكات المدعى عليهم لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(د).

**التهمة ٢**

**التآمر لانتهاك قانون المنظمات الفاسدة المتأثرة بالابتزاز ("المنظمات الفاسدة والمتأثرة بالابتزاز") قانون الولايات المتحدة الأمريكية ١٨، البند ١٩٦٢(د)**

**(دعوى الشركات التابعة في الولايات المتحدة ضد كافة المدعى عليهم)**

٤٦٠. يؤكد المدعي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٤٥٩ من هذه الشكوى كما هو موضح بالكامل هنا.

٤٦١. لدى المدعي، بصفته المتنازل إليه عن الشركات التابعة في الولايات المتحدة، الأهلية لرفع أي وجميع الدعاوى أو أسباب الدعوى للشركات التابعة في الولايات المتحدة.

٤٦٢. وكنتيجة مباشرة وقريبة لمؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز من المدعى عليهم، فإن نمط نشاط الابتزاز الذي اتفقوا من خلاله على إدارة شؤون المؤسسة المندرجة ضمن نطاق المنظمات الفاسدة والمتأثرة بالابتزاز، والأفعال الأصلية وغيرها من الأعمال العلنية المتخذة دعماً لتلك المؤامرة، والانتهاكات لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(د)، تم إلحاق الضرر بكل من الشركات التابعة في الولايات المتحدة في أعمالهم وممتلكاتهم.

٤٦٣. كل إرسال عبر البريد أو شحنة من مخزون الشركات التابعة في الولايات المتحدة أو أصولها الأخرى دعماً لمؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز يشكل انتهاكاً لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٣٤١.

٤٦٤. كل تحويل برقي أو إلكتروني آخر لأموال الشركات التابعة في الولايات المتحدة دعماً لمؤامرة المنظمات الفاسدة والمتأثرة بالابتزاز يشكل انتهاكاً لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٣٤٣.

٤٦٥. كل انتهاك لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٣٤١ أو ١٣٤٣ ينطوي على عمليات نقل أصول الشركات التابعة في الولايات المتحدة قد تسبب في إلحاق الضرر بهذه الشركة التابعة في الولايات المتحدة بشكل مباشر وقريب من خلال استنفاد أصولها.

٤٦٦. بموجب قانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٤(ج)، يحق للمدعي استرداد ثلاثة أضعاف تعويضات الأضرار العامة والخاصة التي لحقت بكل شركة تابعة في الولايات المتحدة، بالإضافة إلى الفوائد والتكاليف وأتعاب المحاماة التي تكبدتها بسبب انتهاكات المدعى عليهم لقانون الولايات المتحدة الأمريكية رقم ١٨، البند ١٩٦٢(د).


**التهمة ٣**

**تجنب واسترداد التحويلات الاحتيالية الفعلية بموجب  قانون المدين والدائن في نيويورك، البنود ٢٧٦ و٢٧٨ و٢٧٩**

**(عملية التحويل سينيرجيز – ميهتا)**

٤٦٧. يؤكد المدعي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٣٧٠ من هذه الشكوى كما هو موضح بالكامل هنا.

٤٦٨. كما هو مزعوم ومعرّف أعلاه على أنها عملية تحويل سينيرجيز-ميهتا، في ١٣ يوليو ٢٠١٧، قامت شركة سينيرجيز بتحويل مبلغ وقدره ١٤.٥٧٥.٠٠٠ دولار أمريكي إلى بورفي ميهتا كجزء من عملية غسيل الأموال الاحتيالية من خلال كيانات فايرستار إلى ميهتا في ٢٠١٧.

٤٦٩. شكلت عملية تحويل سينيرجيز – ميهتا نقلاً لحصة في ممتلكات شركة سينيرجيز.

٤٧٠. تم القيام بعملية تحويل سينيرجيز-ميهتا، مباشرة أو على الفور، بواسطة شركة سينيرجيز إلى بورفي ميهتا.

٤٧١. يتمسك المدعي بحكم ضد شركة سينيرجيز.

٤٧٢. تم القيام بعملية تحويل سينيرجيز – ميهتا بقصد فعلي لإعاقة الدائنين، بما في ذلك الوصي، أو تأخيرهم أو الاحتيال عليهم بالمعنى المقصود في المادة ٢٧٦ من قانون المدين والدائن في نيويورك ("قانون المدين والدائن في نيويورك"). وافق نيراف مودي و ميهير بهنسالي و أجاي غاندي والمتعاونين معهم على عملية تحويل سينيرجيز-ميهتا من أجل غسل وسحب العوائد غير المشروعة من الاحتيال المصرفي وغيرها من الأصول ذات القيمة لصالح بورفي ميهتا و آمي مودي و نيراف مودي و الآخرين.

٤٧٣. يجوز للمدَّعي، بصفته دائناً لشركة سينيرجيز، أن ينقض عملية تحويل سينيرجيز-ميهتا، وأن يتجاهل عملية تحويل سينيرجيز-ميهتا، وأن يعلق أو يفرض التنفيذ على الممتلكات المنقولة بموجب المادتين ٢٧٨ و ٢٧٩ من قانون المدين والدائن في نيويورك.

٤٧٤. وبدلاً من ذلك، يحق للمدعي الحصول على تعويضات نقدية بمبلغ عملية تحويل سينيرجيز – ميهتا.

٤٧٥. يحق للوصي الحصول على تكاليفه المعقولة ونفقاته المتكبدة في متابعة هذه المطالبة، بما في ذلك أتعاب المحامي بموجب القسم ٢٧٦-أ من قانون المدين والدائن في نيويورك، وعلى النحو الذي يسمح به القانون غير ذلك.

**التهمة ٤**

**تجنب واسترداد التحويلات الاحتيالية الضمنية بموجب  قانون المدين والدائن في نيويورك،**

**البنود ٢٧٣ و٢٧٨ و٢٧٩**

**(عملية التحويل سينيرجيز – ميهتا)**

٤٧٦. يؤكد المدعي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٣٧٠ من هذه الشكوى كما هو موضح بالكامل هنا.

٤٧٧. شكلت عملية تحويل سينيرجيز – ميهتا نقلاً لحصة في ممتلكات شركة سينيرجيز.

٤٧٨. تم القيام بعملية تحويل سينيرجيز–ميهتا، مباشرة أو على الفور، بواسطة شركة سينيرجيز إلى بورفي ميهتا.

٤٧٩. يتمسك المدعي بحكم ضد شركة سينيرجيز.

٤٨٠. تم القيام بعملية تحويل سينيرجيز–ميهتا دون مقابل عادل.

٤٨١. في تاريخ عملية تحويل سينيرجيز – ميهتا، كانت شركة سينيرجيز في حالة إعسار أو أصبحت في حالة إعسار نتيجة لعملية التحويل هذه.

٤٨٢. يجوز للمدَّعي، بصفته دائناً لشركة سينيرجيز، أن ينقض عملية تحويل سينيرجيز–ميهتا، وأن يتجاهل عملية تحويل سينيرجيز–ميهتا، وأن يعلق أو يفرض التنفيذ على الممتلكات المنقولة بموجب المادتين ٢٧٨ و ٢٧٩ من قانون المدين والدائن في نيويورك.

٤٨٣. وبدلاً من ذلك، يحق للمدعي الحصول على تعويضات نقدية بمبلغ عملية تحويل سينيرجيز – ميهتا.

## التهمة ٥

**تجنب واسترداد التحويلات الاحتيالية الفعلية بموجب قانون المدين والدائن في نيويورك، البنود ٢٧٦ و٢٧٨ و٢٧٩**

**(نقل حقوق الملكية في شركة سنترال بارك)**

٤٨٤. يؤكد المدعي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٣٧٠ من هذه الشكوى كما هو موضح بالكامل هنا.

٤٨٥. كما هو مزعوم ومعرّف أعلاه بخصوص نقل حقوق الملكية في شركة سنترال بارك، في ١ يناير ٢٠١٨ أو حوالي ذلك التاريخ، قامت شركة إف جي آي بنقل حصة حقوق الملكية بنسبة ١٠٠٪ في شركة سنترال بارك إلى إيثاكا ترست كجزء من الجهود الأوسع لغسل عوائد عملية الاحتيال المصرفي وحماية الأصول من الدائنين.

٤٨٦. شكلت عملية نقل حقوق الملكية في شركة سنترال بارك نقلاً لحصة في ممتلكات شركة إف جي آي.

٤٨٧. قامت شركة إف جي آي بنقل حقوق الملكية في شركة سنترال بارك إلى إيثاكا ترست في سبيل المنفعة النهائية لـ آمي مودي.

٤٨٨. يتمسك المدعي بحكم ضد شركة إف جي آي.

٤٨٩. تمت عملية نقل حقوق الملكية في شركة سنترال بارك بقصد فعلي لعرقلة الدائنين أو تأخيرهم أو الاحتيال عليهم بالمعنى المقصود في القسم ٢٧٦ من قانون المدين والدائن، وكان نيراف مودي، وميهر بهنسالي، وأجاي غاندي، والمتآمرون معهم قد وافقوا على عملية نقل حقوق الملكية في شركة سنترال بارك من أجل غسل وسحب العوائد غير مشروعة من الاحتيال المصرفي وغيرها من الأصول ذات القيمة لصالح آمي مودي و نيراف مودي والآخرين.

٤٩٠. يجوز للمدَّعي، بصفته دائناً لشركة إف جي آي، أن ينقض عملية نقل حقوق الملكية في شركة سنترال بارك، وأن يتجاهل عملية نقل حقوق الملكية في شركة سنترال بارك، وأن يعلق أو يفرض التنفيذ على الممتلكات المنقولة بموجب المادتين ٢٧٨ و ٢٧٩ من قانون المدين والدائن في نيويورك.

٤٩١. وبدلاً من ذلك، يحق للمدعي الحصول على تعويضات نقدية بمبلغ عملية نقل حقوق الملكية في شركة سنترال بارك.

٤٩٢. يحق للمدعي الحصول على تكاليفه المعقولة ونفقاته المتكبدة في متابعة هذه المطالبة، بما في ذلك أتعاب المحامي بموجب القسم ٢٧٦–أ من قانون المدين والدائن في نيويورك، وعلى النحو الذي يسمح به القانون غير ذلك.

## التهمة ٦

**تجنب واسترداد التحويلات الاحتيالية الضمنية بموجب  قانون المدين والدائن في نيويورك،**
**البنود ٢٧٣ و٢٧٨ و٢٧٩**

**(نقل حقوق الملكية في شركة سنترال بارك)**

٤٩٣. يؤكد المدعي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٣٧٠ من هذه الشكوى كما هو موضح بالكامل هنا.

٤٩٤. شكلت عملية نقل حقوق الملكية في شركة سنترال بارك نقلاً لحصة في ممتلكات شركة إف جي آي.

٤٩٥. قامت شركة إف جي آي بنقل حقوق الملكية في شركة سنترال بارك إلى إيثاكا ترست في سبيل المنفعة النهائية لـ آمي مودي.

٤٩٦. يتمسك المدعي بحكم ضد شركة إف جي آي.

٤٩٧. تم نقل حقوق الملكية في شركة سنترال بارك دون مقابل عادل.

٤٩٨. في تاريخ عملية نقل حقوق الملكية في شركة سنترال بارك، كانت شركة إف جي آي في حالة إعسار أو أصبحت في حالة إعسار نتيجة لعملية النقل هذه.

٤٩٩. يجوز للمدَّعي، بصفته دائناً لشركة إف جي آي، أن ينقض عملية نقل حقوق الملكية في شركة سنترال بارك، وأن يتجاهل عملية نقل حقوق الملكية في شركة سنترال بارك، وأن يعلق أو يفرض التنفيذ على الممتلكات المنقولة بموجب المادتين ٢٧٨ و ٢٧٩ من قانون المدين والدائن في نيويورك.

٥٠٠. وبدلاً من ذلك، يحق للمدعي الحصول على تعويضات نقدية بمبلغ يعادل قيمة عملية نقل حقوق الملكية في شركة سنترال بارك.

**التهمة ٧**

**تجنب واسترداد التحويلات الاحتيالية الفعلية بموجب قانون الولايات المتحدة الأمريكية**

**رقم ١١، البندين ٥٤٨(أ)(١)(أ) و ٥٥٠(أ)**

**(شركة سنترال بارك)**

٥٠١. يؤكد الوصي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٣٧٠ من هذه الشكوى كما هو موضح بالكامل هنا.

٥٠٢. قامت شركة فايرستار بالعديد من التحويلات النقدية لصالح شركة سنترال بارك في غضون سنتين من بدء قضية شركة فايرستار من الفصل ١١، على النحو المحدد في الجدول أ، المرفق بهذه الوثيقة (يُشار إليها جميعها معاً باسم "**تحويلات شركة سنترال بارك خلال سنتين**").

٥٠٣. شكلت تحويلات شركة سنترال بارك خلال سنتين عمليات نقل لمصالح شركة فايرستار في الممتلكات.

٥٠٤. أجريت تحويلات شركة سنترال بارك خلال سنتين لصالح شركة سنترال بارك.

٥٠٥. أجريت تحويلات شركة سنترال بارك خلال سنتين بقصد فعلي لإعاقة دائني شركة فايرستار أو تأخيرهم أو الاحتيال عليهم. وافق نيراف مودي و ميهير بهنسالي و أجاي غاندي والمتآمرون معهم على عمليات تحويل شركة سنترال بارك خلال سنتين لتكريس الاحتيال المصرفي وغسل وسحب عوائده غير المشروعة لصالح مودي وأسرته والآخرين.

وكانت النتيجة الطبيعية لتحويلات شركة سنترال بارك خلال سنتين أن جرى استنفاد ممتلكات شركة فايرستار وإحباط أداء الالتزامات المشروعة على شركة فايرستار.

٥٠٦. يجوز للوصي تجنب تحويلات شركة سنترال بارك خلال سنتين بموجب المادة ٥٤٨(أ)(أ)(١)(أ) من قانون الإفلاس.

٥٠٧. بموجب البند ٥٥٠(أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات شركة سنترال بارك خلال سنتين لصالح ملكية شركة فايرستار من شركة سنترال بارك، والكيان الذي أجريت تحويلات شركة سنترال بارك خلال سنتين إليه أو لصالحه، و من أي جهات تم التحويل إليها لاحقاً.

٥٠٨. يحق للوصي الحصول على التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحامي بموجب المادة ٢٧٦–أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون غير ذلك.

**العد ٨**

**تجنب واسترداد التحويلات الاحتيالية الفعلية بموجب قانون المدين والدائن في نيويورك، البنود ٢٧٦ و٢٧٨ و٢٧٩ وقانون الولايات المتحدة الأمريكية رقم ١١، البندين ٥٤٤(ب)(١) و ٥٥٠(أ)**

**(شركة سنترال بارك)**

٥٠٩. يؤكد الوصي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٣٧٠ من هذه الشكوى كما هو موضح بالكامل هنا.

٥١٠. قامت شركة فايرستار بالعديد من التحويلات النقدية لصالح شركة سنترال بارك في غضون ٦ سنوات من بدء قضية شركة فايرستار من الفصل ١١، على النحو المحدد في الجدول أ، المرفق بهذه الوثيقة (يُشار إليها جميعها معاً باسم "**تحويلات شركة سنترال بارك خلال ست سنوات**").

٥١١. أجريت تحويلات شركة سنترال بارك خلال ست سنوات لصالح شركة سنترال بارك.

٥١٢. أجريت تحويلات شركة سنترال بارك خلال ست سنوات بقصد فعلي لإعاقة أو تأخير الدائنين الحاليين أو المستقبليين لدى شركة فايرستار بالمعنى المقصود في المادة ٢٧٦ من قانون المدين والدائن. وافق نيراف مودي و ميهير بهنسالي و أجاي غاندي والمتآمرين معهم على تحويلات شركة سنترال بارك خلال ست سنوات من أجل تكريس الاحتيال المصرفي وغسل وسحب عوائده غير المشروعة لصالح مودي وأسرته والآخرين. وكانت النتيجة الطبيعية لتحويلات شركة سنترال بارك خلال ست سنوات ان جرى استنفاد ممتلكات شركة فايرستار وإحباط الوفاء بالالتزامات المشروعة على شركة فايرستار.

٥١٣. يمكن للدائنين الفعليين الحاليين، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو شركة فايرستار، أن ينقضوا تحويلات شركة سنترال بارك خلال ست سنوات، وأن يتجاهلوا تحويلات شركة سنترال بارك خلال ست سنوات، وأن يعلقوا أو يفرضوا التنفيذ على الممتلكات المنقولة بموجب المادتين ٢٧٨ و/أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٥١٤. يجوز للوصي تجنب تحويلات شركة سنترال بارك خلال ست سنوات بموجب القسم ٥٤٤ (ب)(١) من قانون الإفلاس.

٥١٥. بموجب القسم ٥٥٠(أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات شركة سنترال بارك خلال ست سنوات لصالح ملكية شركة فايرستار من شركة سنترال بارك، والكيان الذي أجريت تحويلات شركة سنترال بارك خلال ست سنوات إليه أو لصالحه، و من أي جهات تم التحويل إليها لاحقاً.

٥١٦. يحق للوصي الحصول على التكاليف والمصاريف المعقولة التي تكبدها لمتابعة هذه المطالبة، بما في ذلك أتعاب المحامي بموجب المادة ٢٧٦-أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون غير ذلك.


## التهمة ٩

**تجنب واسترداد التحويلات الاحتيالية الضمنية بموجب قانون الولايات المتحدة الأمريكية**

**رقم ١١، البندين ٥٤٤(أ)(١) و ٥٥٠(أ)**

**(شركة سنترال بارك)**

٥١٧. يؤكد الوصي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٣٧٠ من هذه الشكوى كما هو موضح بالكامل هنا.

٥١٨. شكلت تحويلات شركة سنترال بارك خلال سنتين عمليات نقل لمصالح شركة فايرستار في الممتلكات.

٥١٩. أجريت تحويلات شركة سنترال بارك خلال سنتين لصالح شركة سنترال بارك.

٥٢٠. حصلت شركة فايرستار قيمة أقل من القيمة المعادلة بشكل معقول في مقابل تحويلات شركة سنترال بارك خلال سنتين.

٥٢١. كانت شركة فايرستار في حالة إعسار في تاريخ كل عملية من تحويلات شركة سنترال بارك خلال سنتين، أو أصبحت في حالة إعسار نتيجة لهذه التحويلات.

٥٢٢. يجوز للوصي تجنب تحويلات شركة سنترال بارك خلال سنتين بموجب المادة ٥٤٨(أ)(١)(ب) من قانون الإفلاس.

٥٢٣. بموجب البند ٥٥٠(أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات شركة سنترال بارك خلال سنتين لصالح ملكية شركة فايرستار من شركة سنترال بارك، والكيان الذي أجريت تحويلات شركة سنترال بارك خلال سنتين إليه أو لصالحه، و من أي جهات تم التحويل إليها لاحقاً.

**التهمة ١٠**

**تجنب واسترداد التحويلات الاحتيالية الضمنية بموجب قانون المدين والدائن في نيويورك،**
**البنود ٢٧٦ و٢٧٨ و٢٧٩  وقانون الولايات المتحدة الأمريكية رقم ١١، البندين**
**٥٤٤(ب)(١) و٥٥٠(أ)**

**(شركة سنترال بارك)**

٥٢٤. يؤكد الوصي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٣٧٠ من هذه الشكوى كما هو موضح بالكامل هنا.

٥٢٥. شكلت تحويلات شركة سنترال بارك خلال ست سنوات عمليات نقل لمصالح شركة فايرستار في الممتلكات.

٥٢٦. أجريت تحويلات شركة سنترال بارك خلال ست سنوات لصالح شركة سنترال بارك.

٥٢٧. أجريت تحويلات شركة سنترال بارك خلال ست سنوات دون مقابل عادل.

٥٢٨. في تاريخ كل تحويل من تحويلات شركة سنترال بارك خلال ست سنوات، كانت شركة فايرستار في حالة إعسار أو أصبحت في حالة إعسار نتيجة لهذا التحويل.

٥٢٩. يمكن للدائنين الفعليين الحاليين، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو شركة فايرستار، أن ينقضوا تحويلات شركة سنترال بارك خلال ست سنوات، وأن يتجاهلوا تحويلات شركة سنترال بارك خلال ست سنوات، وأن يعلقوا أو يفرضوا التنفيذ على الممتلكات المنقولة بموجب المادتين ٢٧٨ و/أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٥٣٠. يجوز للوصي تجنب تحويلات شركة سنترال بارك خلال ست سنوات بموجب القسم ٥٤٤(ب)(١) من قانون الإفلاس.

٥٣١. بموجب القسم ٥٥٠(أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات شركة سنترال بارك خلال ست سنوات لصالح ملكية شركة فايرستار من شركة سنترال بارك، والكيان الذي أجريت تحويلات شركة سنترال بارك خلال ست سنوات إليه أو لصالحه، ومن أي جهات تم التحويل إليها لاحقاً.

**التهمة ١١**

**تجنب واسترداد التحويلات الاحتيالية الفعلية بموجب قانون المدين والدائن في نيويورك،
البنود ٢٧٦ و٢٧٨ و٢٧٩ وبموجب قانون الولايات المتحدة الأمريكية رقم ١١ البندين
٥٥٤(ب)(١) و٥٥٠(أ)**

**(شركة أوراجيم)**

٥٣٢. يؤكد الوصي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٣٧٠ من هذه
الشكوى كما هو موضح بالكامل هنا.

٥٣٣. قامت شركة فايرستار بتحويلات نقدية إلى شركة أوراجيم خلال ست سنوات منذ بدء
فضية شركة فايرستار في الفصل ١١، على النحو المحدد في الجدول ب، المرفق بهذه
الوثيقة (يُشار إليها جميعها معاً باسم "**تحويلات شركة أوراجيم**").

٥٣٤. أجريت تحويلات شركة أوراجيم إلى أو لصالح شركة أوراجيم.

٥٣٥. أُجريت تحويلات شركة أوراجيم بقصد فعلي لإعاقة أو تأخير الدائنين الحاليين أو
المستقبليين لدى شركة فايرستار بالمعنى المقصود في المادة ٢٧٦ من قانون المدين والدائن.
وافق نيراف مودي و ميهير بهنسالي و أجاي غاندي والمتآمرين معهم على تحويلات شركة
أوراجيم لتكريس الاحتيال المصرفي وغسل وسحب عوائده غير المشروعة لصالح مودي
وأسرته والآخرين. وكانت النتيجة الطبيعية لتحويلات شركة أوراجيم هي استنفاد ممتلكات
شركة فايرستار وإحباط الوفاء بالالتزامات المشروعة على شركة فايرستار.

٥٣٦. يمكن للدائنين الفعليين الحاليين، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو شركة فايرستار، أن ينقضوا تحويلات شركة أوراجيم، وأن يتجاهلوا تحويلات شركة أوراجيم، وأن يعلقوا أو يفرضوا التنفيذ على الممتلكات المنقولة بموجب المادتين ٢٧٨ و/أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٥٣٧. يجوز للوصي تجنب تحويلات شركة أوراجيم بموجب البند ٥٤٤(ب)(١) من قانون الإفلاس.

٥٣٨. بموجب القسم ٥٥٠(أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات شركة أوراجيم لصالح شركة ملكية شركة فايرستار من شركة أوراجيم، والكيان الذي أجريت تحويلات شركة أوراجيم إليه أو لصالحه، و من أي جهات تم التحويل إليها لاحقاً.

٥٣٩. يحق للوصي الحصول على تكاليفه المعقولة ونفقاته المتكبدة في متابعة هذه المطالبة، بما في ذلك أتعاب المحامي بموجب القسم ٢٧٦–أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون غير ذلك.

**التهمة ١٢**

**تجنب واسترداد التحويلات الاحتيالية الفعلية بموجب قانون المدين والدائن في نيويورك، البنود ٢٧٦ و٢٧٨ و٢٧٩ وبموجب قانون الولايات المتحدة الأمريكية رقم ١١ البندين ٥٤٤(ب)(١) و٥٥٠(أ)**

**(شركة أوراجيم)**

٥٤٠. يؤكد الوصي على ادعاءاته ومزاعمه الواردة في الفقرات من ١ إلى ٣٧٠ من هذه الشكوى كما هو موضح بالكامل هنا.

٥٤١. شكلت تحويلات شركة أوراجيم نقلاً لمصالح شركة فايرستار في الممتلكات.

٥٤٢. أجريت تحويلات شركة أوراجيم إلى شركة أوراجيم أو لصالحها.

٥٤٣. أجرت شركة فايرستار تحويلات شركة أوراجيم دون مقابل عادل.

٥٤٤. كانت شركة فايرستار بحالة إفلاس في تاريخ كل تحويلات ست سنوات لأوراجيم، أو أصبحت بحالة الإفلاس نتيجة لهذا النقل.

٥٤٥. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو شركة فايرستار ، الذين يمكنهم إلغاء تحويلات أوراجيم، أو الذين قد يتجاهلون تحويلات أوراجيم ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٥٤٦. يمكن للوصي أن يتجنب تحويلات أوراجيم بموجب المادة ٥٤٤ (ب) (١) من قانون الإفلاس.

٥٤٧. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات أوراجيم لصالح ملكية شركة فايرستار من أوراجيم، والكيان الذي تم إجراء تحويلات أوراجيم إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ١٣
### تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (أ) و ٥٥٠ (أ)

(بريليانت)

٥٤٨. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٥٤٩. أجرت شركة فايرستار العديد من عمليات التحويل النقدية إلى بريليانت في غضون عامين من بدء قضية شركة فايرستار الفصل ١١، على النحو المحدد في الملحق ج، المرفق بهذه الوثيقة (يُشار إليها معاً بـ "**تحويلات عامين لبريليانت**").

٥٥٠. شكّلت تحويلات عامين لبريليانت تحويلات لمصالح شركة فايرستار في الممتلكات.

٥٥١. أجريت تحويلات عامين لبريليانت إلى شركة بريليانت أو لصالحها.

٥٥٢. أجريت تحويلات عامين لبريليانت بقصد فعلي لإعاقة أو تأخير أو الاحتيال على دائني شركة فايرستار. وافق نيراف مودي ومهير بهنسالي وآجاي غاندي والمتآمرين معهم على تحويلات عامين لبريليانت من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات عامين لبريليانت هي استنزاف ممتلكات شركة فايرستار وإحباط وفاء شركة فايرستار بالتزاماتها المشروعة.

٥٥٣. يمكن للوصي تجنب تحويلات عامين لبريليانت بموجب المادة ٥٤٨ (أ) (١) (أ) من قانون الإفلاس.

٥٥٤. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لبريليانت لصالح ملكية شركة فايرستار من بريليانت، الكيان الذي تم إجراء تحويلات عامين لبريليانت إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

٥٥٥. يحق للوصي التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب القسم ٢٧٦-أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

**التهمة ١٤**

**تلافي واسترداد عمليات التحويل الاحتيالية الفعلية بموجب المواد ٢٧٦، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك ويموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ)**

**(بريليانت)**

٥٥٦. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٥٥٧. قامت شركة فايرستار بتحويلات عديدة للنقد والمخزون إلى بريليانت في غضون ست سنوات من بدء قضية شركة فايرستار الفصل ١١، على النحو المحدد في <u>الملحق ج</u>، المرفق بهذه الوثيقة (يُشار إليها معاً بـ " **تحويلات ست سنوات لبريليانت**").

٥٥٨. أجريت تحويلات ست سنوات لبريليانت إلى شركة بريليانت أو لصالحها.

٥٥٩. أجريت تحويلات ست سنوات لبريليانت بهدف عرقلة أو تأخير الدائنين الحاليين أو المستقبليين لشركة فايرستار بالمعنى المقصود في المادة ٢٧٦ من قانون الدائن والمدين. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات ست سنوات لبريليانت من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات ست سنوات لبريليانت هي استنزاف ممتلكات شركة فايرستار وإحباط وفاء شركة فايرستار بالتزاماتها المشروعة.

٥٦٠. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو شركة فايرستار، الذين يمكنهم إلغاء تحويلات ست سنوات لبريليانت، أو الذين قد يتجاهلون تحويلات ست سنوات لبريليانت ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٥٦١. يجوز للوصي تجنب تحويلات ست سنوات لبريليانت بموجب قانون الإفلاس القسم ٥٤٤ (ب) (١).

٥٦٢. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لبريليانت لصالح شركة ملكية فايرستار من بريليانت، الكيان الذي تم إجراء تحويلات ست سنوات لبريليانت إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

٥٦٣. يحق للوصي التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب المادة ٢٧٦-أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

## التهمة ١٥

**تلافي واسترداد عمليات التحويل الاحتيالية التقديرية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (ب) و ٥٥٠ (أ) (بريليانت)**

٥٦٤. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٥٦٥. شكلت تحويلات عامين لبريليانت تحويلات لمصالح شركة فايرستار في الممتلكات.

٥٦٦. أجريت تحويلات عامين لبريليانت إلى شركة بريليانت أو لصالحها.

٥٦٧. تلقت شـركة فايرسـتار أقـل مـن القيمـة المعادلـة المعقولـة مقابـل تحـويلات عـامين لبريليانت.

٥٦٨. كانت شركة فايرستار بحالة إفلاس في كل تاريخ أجريت فيه كل عملية من تحويلات عامين لبريليانت، أو أصبحت بحالة الإفلاس نتيجة لهذا النقل.

٥٦٩. يجوز للوصي تجنب تحويلات عامين لبريليانت بموجب المـادة ٥٤٨ (أ) (١) (ب) من قانون الإفلاس.

٥٧٠. بموجب البند ٥٥٠ (أ) من قـانون الإفلاس، يجوز للوصي استرداد قيمـة تحويلات عامين لبريليانت لصالح ملكية شركة فايرستار من بريليانت، الكيان الذي تم إجراء تحويلات عامين لبريليانت إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

<div align="center">

**التهمة ١٦**

**تلافي واسترداد عمليات التحويل الاحتيالية التقديرية بموجب المواد ٢٧٣، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك وبموجب ١ قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ)**

**(بريليانت)**

</div>

٥٧١. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٥٧٢. شـكلت تحـويلات سـت سـنوات لبريليانـت تحـويلات لمصـالح شـركة فايرسـتار فـي الممتلكات.

٥٧٣. أجريت تحويلات ست سنوات لبريليانت إلى شركة بريليانت أو لصالحها.

٥٧٤. قامت شركة فايرستار بتحويلات ست سنوات لبريليانت دون مراعاة عادلة.

٥٧٥. كانت شركة فايرستار بحالة إفلاس في كل تاريخ أجريت فيه كل عملية من تحويلات ست سنوات لبريليانت، أو أصبحت بحالة الإفلاس نتيجة لهذا النقل.

٥٧٦. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو شركة فايرستار، الذين يمكنهم إلغاء تحويلات ست سنوات لبريليانت، أو الذين قد يتجاهلون تحويلات ست سنوات لبريليانت ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و/ أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٥٧٧. يمكن للوصي أن يتجنب تحويلات ست سنوات لبريليانت بموجب قانون الإفلاس القسم ٥٤٤ (ب) (١).

٥٧٨. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لبريليانت لصالح ملكية شركة فايرستار من بريليانت، الكيان الذي تم إجراء تحويلات ست سنوات لبريليانت إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ١٧

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب المواد ٢٧٦، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ) (دياجيمز)**

٥٧٩. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٥٨٠. قامت شركة فايرستار بتحويلات نقدية عديدة إلى دياجيمز في غضون ست سنوات من بدء قضية شركة فايرستار الفصل ١١، على النحو المحدد في الملحق ج، المرفق بهذه الوثيقة (يُشار إليها معاً بـ "**تحويلات دياجيمز**").

٥٨١. أجريت تحويلات دياجيمز إلى شركة دياجيمز أو لصالحها.

٥٨٢. أجريت تحويلات دياجيمز بهدف عرقلة أو تأخير الدائنين الحاليين أو المستقبليين لشركة فايرستار بالمعنى المقصود في المادة ٢٧٦ من قانون الدائن والمدين. وافق نيراف مودي ومهير بهنسالي وآجاي غاندي والمتآمرين معهم على تحويلات دياجيمز من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات دياجيمز هي استنزاف ممتلكات شركة فايرستار وإحباط وفاء شركة فايرستار بالتزاماتها المشروعة.

٥٨٣. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو شركة فايرستار، الذين يمكنهم إلغاء تحويلات دياجيمز، أو الذين قد يتجاهلون تحويلات دياجيمز ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و/أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٥٨٤. يمكن للوصي تجنب تحويلات دياجيمز بموجب قانون الإفلاس القسم ٥٤٤ (ب) (١).

٥٨٥. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات دياجيمز لصالح ملكية شركة فايرستار من دياجيمز، الكيان الذي تم إجراء تحويلات دياجيمز إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

٥٨٦. يحق للوصي التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب المادة ٢٧٦-أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

## التهمة ١٨

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب المواد ٢٧٣، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و ٥٥٠ (أ) (دياجيمز)**

٥٨٧. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٥٨٨. شكلت تحويلات دياجيمز تحويلات لمصالح شركة فايرستار في الممتلكات.

٥٨٩. أجريت تحويلات دياجيمز إلى شركة دياجيمز أو لصالحها.

٥٩٠. قامت شركة فايرستار بتحويلات دياجيمز دون مراعاة عادلة.

٥٩١. كانت شركة فايرستار بحالة إفلاس في كل تاريخ أجريت فيه كل عملية من تحويلات دياجيمز أو أصبحت بحالة الإفلاس نتيجة لهذا النقل.

٥٩٢. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو شركة فايرستار، الذين يمكنهم إلغاء عمليات تحويل دياجيمز، أو الذين قد يتجاهلون تحويلات دياجيمز ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٥٩٣. يجوز للوصي أن يتجنب تحويلات دياجيمز بموجب قانون الإفلاس القسم ٥٤٤ (ب) (١).

٥٩٤. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات دياجيمز لصالح ملكية شركة فايرستار من دياجيمز، الكيان الذي تم إجراء تحويلات عامين لبريليانت إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

**التهمة ١٩**

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب قانون الولايات المتحدة رقم ١١**

**البند ٥٤٨ (أ) (١) (أ) و٥٥٠ (أ)**

**(امباير)**

٥٩٥. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٥٩٦. قام المدينون بتحويلات إلى امباير في غضون سنتين من بدء قضايا المدينين الفصل ١١، على النحو المحدد في الملحق هـ، المرفق بهذه الوثيقة (يُشار إليها معاً بـ "**تحويلات عامين لامباير**").

٥٩٧. شكلت تحويلات عامين لامباير تحويلات لمصالح المدينين في الممتلكات.

٥٩٨. أجريت تحويلات عامين لامباير إلى شركة امباير أو لصالحها.

٥٩٩. أجريت تحويلات عامين لامباير بهدف عرقلة، تأخير أو الاحتيال على دائني المدينين. وافق نيراف مودي ومهير بهنسالي وآجاي غاندي والمتآمرين معهم على تحويلات عامين لامباير من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات عامين لامباير هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٦٠٠. يجوز للوصي أن يتجنب تحويلات عامين لامباير بموجب قانون الإفلاس المادة ٥٤٨ (أ) (١) (أ).

٦٠١. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لامباير لصالح ملكية المدينين من امباير، الكيان الذي تم إجراء تحويلات عامين لامباير إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

**التهمة ٢٠**

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب المواد ٢٧٦، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك ويموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ) (امباير)**

٦٠٢. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦٠٣. قام المدينون بتحويلات عديدة للنقد والمخزون إلى امباير في غضون ست سنوات من بدء قضايا المدينين الفصل ١١، على النحو المحدد في الملحق هـ، المرفق بهذه الوثيقة (يُشار إليها معاً بـ "**تحويلات ست سنوات لامباير**").

٦٠٤. أجريت تحويلات ست سنوات لامباير إلى شركة امباير أو لصالحها.

٦٠٥. أجريت تحويلات ست سنوات لامباير بهدف عرقلة أو تأخير دائني المدينين الحاليين أو المستقبليين بالمعنى المقصود في المادة ٢٧٦ من قانون الدائن والمدين. وافق نيراف مودي ومهير بهنسالي وآجاي غاندي والمتآمرين معهم على تحويلات ست سنوات لامباير من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات ست سنوات لامباير هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٦٠٦. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لامباير، أو الذين قد يتجاهلون تحويلات ست سنوات لامباير ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و/ أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٦٠٧. يمكن للوصي أن يتجنب تحويلات ست سنوات لامباير بموجب قانون الإفلاس المادة ٥٤٤ (ب) (١).

٦٠٨. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لامباير لصالح ملكية المدينين من امباير، الكيان الذي تم إجراء تحويلات ست سنوات لامباير إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

٦٠٩. يحق للوصي التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب المادة ٢٧٦-أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

## التهمة ٢١

## تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (ب) و ٥٥٠ (أ)

## (امباير)

٦١٠. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦١١. شكلت تحويلات عامين لامباير تحويلات لمصالح المدينين في الممتلكات.

٦١٢. أجريت تحويلات عامين لامباير إلى شركة امباير أو لصالحها.

٦١٣. تلقى المدينون أقل من القيمة المعادلة المعقولة مقابل تحويلات عامين لامباير.

٦١٤. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات عامين لامباير، أو أصبحوا معسرين نتيجة لهذا النقل.

٦١٥. يجوز للوصي أن يتجنب تحويلات عامين لامباير بموجب قانون الإفلاس المـادة ٥٤٨ (أ) (١) (ب).

٦١٦. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمـة تحويلات عامين لامباير لصالح ملكية المدينين من امباير، الكيان الذي تم إجراء تحويلات عامين لامباير إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ٢٢

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب المواد ٢٧٣، ٢٧٨ و ٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و ٥٥٠ (أ) (امباير)**

٦١٧. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦١٨. شكلت تحويلات ست سنوات لامباير تحويلات لمصالح المدينين في الممتلكات.

٦١٩. أجريت تحويلات ست سنوات لامباير إلى شركة امباير أو لصالحها.

٦٢٠. قام المدينون بتحويلات ست سنوات لامباير دون مراعاة عادلة.

٦٢١. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات ست سنوات لامباير أو أصبحوا معسرين نتيجة لهذا النقل.

٦٢٢. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لامباير، أو الذين قد يتجاهلون تحويلات ست سنوات لامباير ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٦٢٣. يجوز للوصي أن يتجنب تحويلات ست سنوات لامباير بموجب قانون الإفلاس القسم ٥٤٤ (ب) (١).

٦٢٤. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لامباير لصالح ملكية المدينين من امباير، الكيان الذي تم إجراء تحويلات ست سنوات لامباير إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ٢٣
## تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (أ) و ٥٥٠ (أ)
## (اتيرنال)

٦٢٥. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦٢٦. أجرى المدينون عمليات تحويل المخزون إلى اتيرنال في غضون عامين من بدء قضية المدينين الفصل ١١، على النحو المحدد في الملحق و، المرفق بهذه الوثيقة (يُشار إليها معاً بـ "**تحويلات عامين لاتيرنال**").

٦٢٧. شكلت تحويلات عامين لاتيرنال تحويلات لمصالح المدينين في الممتلكات.

٦٢٨. أجريت تحويلات عامين لاتيرنال إلى شركة اتيرنال أو لصالحها.

٦٢٩. أجريت تحويلات عامين لاتيرنال بقصد فعلي لإعاقة أو تأخير أو الاحتيال على دائني المدينين. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات عامين لاتيرنال من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات عامين لاتيرنال هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٦٣٠. يمكن للوصي تجنب تحويلات عامين لاتيرنال بموجب المادة ٥٤٨ (أ) (١) (أ) من قانون الإفلاس.

٦٣١. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لاتيرنال لصالح ملكية المدينين من اتيرنال، الكيان الذي تم إجراء تحويلات عامين لاتيرنال إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

**التهمة ٢٤**

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب المواد ٢٧٦، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ)**

**(اتيرنال)**

٦٣٢. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦٣٣. أجرى المدينون عمليات تحويل النقد والمخزون إلى اتيرنال في غضون ست سنوات من بدء قضية المدينين الفصل ١١، على النحو المحدد في الملحق و، المرفق بهذه الوثيقة (يُشار إليها معاً بـ "**تحويلات ست سنوات لاتيرنال**").

٦٣٤. أجريت تحويلات ست سنوات لاتيرنال إلى شركة اتيرنال أو لصالحها.

٦٣٥. أجريت تحويلات ست سنوات لاتيرنال بقصد فعلي لإعاقة أو تأخير دائني المدينين الحاليين أو المستقبليين بالمعنى المقصود في المادة ٢٧٦ من قانون الدائن والمدين. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات ست سنوات لاتيرنال من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات ست سنوات لاتيرنال هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٦٣٦. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لاتيرنال، أو الذين قد يتجاهلون تحويلات ست سنوات لاتيرنال ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٦٣٧. يمكن للوصي تجنب تحويلات ست سنوات لاتيرنال بموجب المادة ٥٤٤ (ب) (١) من قانون الإفلاس.

٦٣٨. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لاتيرنال لصالح ملكية المدينين من اتيرنال، الكيان الذي تم إجراء تحويلات ست سنوات لاتيرنال إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

٦٣٩. يحق للوصي التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب المادة ٢٧٦-أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

**التهمة ٢٥**

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب قانون الولايات المتحدة رقم ١١**

**البند ٥٤٨ (أ) (١) (ب) و٥٥٠ (أ)**

**(اتيرنال)**

٦٤٠. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦٤١. شكلت تحويلات عامين لاتيرنال تحويلات لمصالح المدينين في الممتلكات.

٦٤٢. أجريت تحويلات عامين لاتيرنال إلى شركة اتيرنال أو لصالحها.

٦٤٣. تلقى المدينون أقل من القيمة المعادلة المعقولة مقابل تحويلات عامين لاتيرنال.

٦٤٤. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات عامين لاتيرنال أو أصبحوا معسرين نتيجة لهذا النقل.

٦٤٥. يجوز للوصي أن يتجنب تحويلات عامين لاتيرنال بموجب قانون الإفلاس القسم ٥٤٨ (أ) (١) (ب).

٦٤٦. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لاتيرنال لصالح ملكية المدينين من اتيرنال، الكيان الذي تم إجراء تحويلات عامين لاتيرنال إليه أو لصالحها ومن أي من المنقول إليهم اللاحقين.

**التهمة ٢٦**

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب المواد ٢٧٣، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤**

**(ب) (١) و٥٥٠ (أ)**

**(اتيرنال)**

٦٤٧. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦٤٨. شكلت تحويلات ست سنوات لاتيرنال تحويلات لمصالح المدينين في الممتلكات.

٦٤٩. أجريت تحويلات ست سنوات لاتيرنال إلى شركة اتيرنال أو لصالحها.

٦٥٠. قام المدينون بتحويلات ست سنوات لاتيرنال دون مراعاة عادلة.

٦٥١. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات ست سنوات لاتيرنال أو أصبحوا معسرين نتيجة لهذا النقل.

٦٥٢. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لاتيرنال، أو الذين قد يتجاهلون تحويلات ست سنوات لاتيرنال ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٦٥٣. يمكن للوصي أن يتجنب تحويلات ست سنوات لاتيرنال بموجب قانون الإفلاس القسم ٥٤٤ (ب) (١).

٦٥٤. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لاتيرنال لصالح ملكية المدينين من اتيرنال، الكيان الذي تم إجراء تحويلات ست سنوات لاتيرنال إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ٢٧

### تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (أ) و ٥٥٠ (أ)

(فانسي كرييشنز)

٦٥٥. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦٥٦. أجرى المدينون عمليات تحويل عديدة للنقد والمخزون إلى فانسي كرييشنز في غضون عامين من بدء قضية المدينين الفصل ١١، على النحو المحدد في الملحق ز، المرفق بهذه الوثيقة (يُشار إليها معاً بـ "**تحويلات عامين لفانسي كرييشنز**").

٦٥٧. شكلت تحويلات عامين لفانسي كرييشنز عمليات تحويل لمصالح المدينين في الممتلكات.

٦٥٨. أجريت تحويلات عامين لفانسي كرييشنز إلى شركة فانسي كرييشنز أو لصالحها.

٦٥٩. أجريت تحويلات عامين لفانسي كرييشنز بقصد فعلي لإعاقة أو تأخير أو الاحتيال على دائني المدينين. وافق نيراف مودي ومهير بهنسالي وآجاي غاندي والمتآمرين معهم على تحويلات عامين لفانسي كرييشنز من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات عامين لفانسي كرييشنز هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٦٦٠. يمكن للوصي تجنب تحويلات عامين لفانسي كرييشنز بموجب المادة ٥٤٨ (أ) (١) (أ) من قانون الإفلاس.

٦٦١. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لفانسي كرييشنز لصالح ملكية المدينين من فانسي كرييشنز، الكيان الذي تم إجراء تحويلات عامين لفانسي كرييشنز إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

**التهمة ٢٨**

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب المواد ٢٧٦، ٢٧٨ و٢٧٩ من**
**قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤**
**(ب) (١) و٥٥٠ (أ) (فانسي كرييشنز)**

٦٦٢. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦٦٣. قام المدينون بتحويلات عديدة للنقد والمخزون إلى فانسي كرييشنز في غضون ست سنوات من بدء قضايا المدينين الفصل ١١، على النحو المحدد في الملحق ز، المرفق بهذه الوثيقة (يُشار إليها معاً بـ " **تحويلات ست سنوات لفانسي كرييشنز** ").

٦٦٤. أجريت تحويلات ست سنوات لفانسي كرييشنز إلى شركة فانسي كرييشنز أو لصالحها.

٦٦٥. أجريت تحويلات ست سنوات لفانسي كرييشنز بهدف عرقلة أو تأخير دائني المدينين الحاليين أو المستقبليين بالمعنى المقصود في المادة ٢٧٦ من قانون المدين والدائن. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات ست سنوات لفانسي كرييشنز من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات ست سنوات لفانسي كرييشنز هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٦٦٦. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو ومورّدو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لفانسي كرييشنز، أو الذين قد يتجاهلون تحويلات ست سنوات لفانسي كرييشنز ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و/ أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٦٦٧. يمكـن للوصـي أن يتجنـب تحويلات سـت سنوات لفانسـي كرييشـنز بموجـب قـانون الإفلاس المادة ٥٤٤ (ب) (١).

٦٦٨. بموجب البند ٥٥٠ (أ) من قـانون الإفـلاس، يجوز للوصـي اسـترداد قيمـة تحويلات ست سنوات لفانسـي كرييشـنز لصـالح ملكيـة المدينين من فانسـي كرييشـنز، الكيان الذي تم إجراء تحويلات ست سنوات لفانسـي كرييشـنز إليه أو لصـالحه، ومن أي من المنقول إليهم اللاحقين.

٦٦٩. يحق للوصـي التكاليف والمصـاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب المادة ٢٧٦-أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

## التهمة ٢٩

تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (ب) و ٥٥٠ (أ) (فانسي كرييشنز)

٦٧٠. يعيد الوصـي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦٧١. شكلت تحويلات عامين لفانسي كرييشنز تحويلات لمصالح المدينين في الممتلكات.

٦٧٢. أجريت تحويلات عامين لفانسي كرييشنز إلى شركة فانسي كرييشنز أو لصالحها.

٦٧٣. تلقـى المـدينون أقـل مـن القيمـة المعادلـة المعقولـة مقابل تحويلات عـامين لفانسـي كرييشنز.

٦٧٤. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات عامين لفانسي كرييشنز أو أصبحوا معسرين نتيجة لهذا النقل.

٦٧٥. يجوز للوصي أن يتجنب تحويلات عامين لفانسي كرييشنز بموجب قانون الإفلاس القسم ٥٤٨ (أ) (١) (ب).

٦٧٦. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لفانسي كرييشنز لصالح ملكية المدينين من فانسي كرييشنز، الكيان الذي تم إجراء تحويلات عامين لفانسي كرييشنز إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ٣٠

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب المواد ٢٧٣، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ) (فانسي كرييشنز)**

٦٧٧. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦٧٨. شكلت تحويلات ست سنوات لفانسي كرييشنز تحويلات لمصالح المدينين في الممتلكات.

٦٧٩. أجريت تحويلات ست سنوات لفانسي كرييشنز إلى شركة فانسي كرييشنز أو لصالحها.

٦٨٠. قام المدينون بتحويلات ست سنوات لفانسي كرييشنز دون مراعاة عادلة.

٦٨١. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات ست سنوات لفانسي كرييشنز أو أصبحوا معسرين نتيجة لهذا النقل.

٦٨٢. يوجد دائنـون فعليـون، بمـا فـي ذلـك علـى سـبيل المثال لا الحصـر بـائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لفانسي كريبشنز، أو الذين قد يتجاهلون تحويلات ست سنوات لفانسي كريبشنز ويقومون بمصادرة أو فرض الحجز علـى الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٦٨٣. يجـوز للوصـي أن يتجنـب تحـويلات سـت سـنوات لفانسـي كريبشـنز بموجب قـانون الإفلاس القسم ٥٤٤ (ب) (١).

٦٨٤. بموجب البند ٥٥٠ (أ) من قـانون الإفلاس، يجوز للوصـي اسـترداد قيمـة تحـويلات ست سنوات لفانسي كريبشنز لصالح ملكية المدينين من فانسي كريبشنز ، الكيان الذي تم إجراء تحويلات ست سنوات لفانسي كريبشنز إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ٣١

## تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب قانون الولايات المتحدة رقم ١١
## البند ٥٤٨ (أ) (١) (أ) و٥٥٠ (أ)
## (باسفيك)

٦٨٥. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦٨٦. أجرى المدينون عمليات تحويل عديدة للنقد والمخزون إلى باسفيك في غضون عامين من بدء قضية المدينين الفصل ١١، على النحو المحدد في الملحق ح، المرفق بهذه الوثيقة (يُشار إليها معاً بـ "تحويلات عامين لباسفيك").

٦٨٧. شكلت تحويلات عامين لباسفيك عمليات تحويل لمصالح المدينين في الممتلكات.

٦٨٨. أجريت تحويلات عامين لباسفيك إلى شركة باسفيك أو لصالحها.

٦٨٩. أجريت تحويلات عامين لباسفيك بقصد فعلي لإعاقة أو تأخير أو الاحتيال على دائني المدينين. وافق نيراف مودي ومهير بهنسالي وآجاي غاندي والمتآمرين معهم على تحويلات عامين لباسفيك من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات عامين لباسفيك هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٦٩٠. يمكن للوصي تجنب تحويلات عامين لباسفيك بموجب المادة ٥٤٨ (أ) (١) (أ) من قانون الإفلاس.

٦٩١. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لباسفيك لصالح ملكية المدينين من باسفيك، الكيان الذي تم إجراء تحويلات عامين لباسفيك إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ٣٢

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب المواد ٢٧٦، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ)**

**(باسفيك)**

٦٩٢. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٦٩٣. قام المدينون بتحويلات عديدة للنقد والمخزون إلى باسفيك في غضون ست سنوات من بدء قضايا المدينين الفصل ١١، على النحو المحدد في الملحق ح، المرفق بهذه الوثيقة (يُشار إليها معاً بـ " **تحويلات ست سنوات لباسفيك**").

٦٩٤. أجريت تحويلات ست سنوات لباسفيك إلى شركة باسفيك أو لصالحها.

٦٩٥. أجريت تحويلات ست سنوات لباسفيك بهدف عرقلة أو تأخير دائني المدينين الحاليين أو المستقبليين بالمعنى المقصود في المادة ٢٧٦ من قانون المدين والدائن. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات ست سنوات لباسفيك من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات ست سنوات لباسفيك هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٦٩٦. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لباسفيك، أو الذين قد يتجاهلون تحويلات ست سنوات لباسفيك ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و/ أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٦٩٧. يمكن للوصي أن يتجنب تحويلات ست سنوات لباسفيك بموجب قانون الإفلاس المادة ٥٤٤ (ب) (١).

٦٩٨. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لباسفيك لصالح ملكية المدينين من باسفيك، الكيان الذي تم إجراء تحويلات ست سنوات لباسفيك إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

٦٩٩. يحق للوصي التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب المادة ٢٧٦-أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

## التهمة ٣٣

## تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (ب) و٥٥٠ (أ)

## (باسفيك)

٧٠٠. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٠١. شكلت تحويلات عامين لباسفيك تحويلات لمصالح المدينين في الممتلكات.

٧٠٢. أجريت تحويلات عامين لباسفيك إلى شركة باسفيك أو لصالحها.

٧٠٣. تلقى المدينون أقل من القيمة المعادلة المعقولة مقابل تحويلات عامين لباسفيك.

٧٠٤. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات عامين لباسفيك أو أصبحوا معسرين نتيجة لهذا النقل.

٧٠٥. يجوز للوصي أن يتجنب تحويلات عامين لباسفيك بموجب قانون الإفلاس القسم ٥٤٨ (أ) (١) (ب).

٧٠٦. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لباسفيك لصالح ملكية المدينين من باسفيك، الكيان الذي تم إجراء تحويلات عامين لباسفيك إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ٣٤

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب المواد ٢٧٣، ٢٧٨ و ٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و ٥٥٠ (أ)**

**(باسفيك)**

٧٠٧. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٠٨. شكلت تحويلات ست سنوات لباسفيك تحويلات لمصالح المدينين في الممتلكات.

٧٠٩. أجريت تحويلات ست سنوات لباسفيك إلى شركة باسفيك أو لصالحها.

٧١٠. قام المدينون بتحويلات ست سنوات لباسفيك دون مراعاة عادلة.

٧١١. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات ست سنوات لباسفيك أو أصبحوا معسرين نتيجة لهذا النقل.

٧١٢. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لباسفيك، أو الذين قد يتجاهلون تحويلات ست سنوات لباسفيك ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٧١٣. يجوز للوصي أن يتجنب تحويلات ست سنوات لباسفيك بموجب قانون الإفلاس القسم ٥٤٤ (ب) (١).

٧١٤. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لباسفيك لصالح ملكية المدينين من باسفيك، الكيان الذي تم إجراء تحويلات ست سنوات لباسفيك إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ٣٥

## تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (أ) و ٥٥٠ (أ)
## (صن شاين)

٧١٥. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧١٦. حولت شركة فايرستار مبلغاً وقدره ٩٦٥.٠٠٠,٠٠ دولار أمريكي في المخزون إلى صن شاين في ١٧ مارس ٢٠١٦ (يُشار إليها بـ "**تحويلات صن شاين**").

٧١٧. أجريت تحويلات صن شاين في غضون عامين من بدء قضية شركة فايرستار الفصل ١١.

٧١٨. شكلت تحويلات صن شاين تحويلات لمصالح شركة فايرستار في الممتلكات.

٧١٩. أجريت تحويلات صن شاين إلى شركة صن شاين أو لصالحها.

٧٢٠. أجريت تحويلات صن شاين بقصد فعلي لإعاقة أو تأخير أو الاحتيال على دائني شركة فايرستار. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات صن شاين من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات صن شاين هي استنزاف ممتلكات شركة فايرستار وإحباط وفاء شركة فايرستار بالتزاماتها المشروعة.

٧٢١. يمكن للوصي تجنب تحويلات صن شاين بموجب المادة ٥٤٨ (أ) (١) (أ) من قانون الإفلاس.

٧٢٢. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات صن شاين لصالح ملكية شركة فايرستار من صن شاين، الكيان الذي تم إجراء تحويلات صن شاين إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ٣٦

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب المواد ٢٧٦، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ) (صن شاين)**

٧٢٣. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٢٤. أجريت تحويلات صن شاين في غضون ست سنوات من بدء قضية شركة فايرستار الفصل ١١.

٧٢٥. شكلت تحويلات صن شاين تحويلات لمصالح شركة فايرستار في الممتلكات.

٧٢٦. أجريت تحويلات صن شاين إلى شركة صن شاين أو لصالحها.

٧٢٧. أجريت تحويلات صن شاين بقصد فعلي لإعاقة أو تأخير دائني شركة فايرستار الحاليين أو المستقبليين بالمعنى المقصود في المادة ٢٧٦ من قانون المدين والدائن. وافق

نيراف مودي ومهير بهنسالي وآجاي غاندي والمتآمرين معهم على تحويلات صن شاين من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات صن شاين هي استنزاف ممتلكات شركة فايرستار وإحباط وفاء شركة فايرستار بالتزاماتها المشروعة.

٧٢٨. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو شركة فايرستار ، الذين يمكنهم إلغاء تحويلات صن شاين، أو الذين قد يتجاهلون تحويلات صن شاين ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و/ أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٧٢٩. يمكن للوصي أن يتجنب تحويلات صن شاين بموجب قانون الإفلاس المادة ٥٤٤ (ب) (١).

٧٣٠. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات صن شاين لصالح ملكية شركة فايرستار من صن شاين، الكيان الذي تم إجراء تحويلات صن شاين إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

٧٣١. يحق للوصي التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب المادة ٢٧٦–أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

## التهمة ٣٧
## تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب قانون الولايات المتحدة رقم ١١
## البند ٥٤٨ (أ) (١) (ب) و ٥٥٠ (أ)
## (صن شاين)

٧٣٢. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٣٣. شكلت تحويلات صن شاين تحويلات لمصالح شركة فايرستار في الممتلكات.

٧٣٤. أجريت تحويلات صن شاين إلى شركة صن شاين أو لصالحها.

٧٣٥. تلقت شركة فايرستار أقل من القيمة المعادلة المعقولة مقابل تحويلات صن شاين.

٧٣٦. كانت شركة فايرستار بحالة إفلاس في كل تاريخ أجريت فيه كل عملية من تحويلات صن شاين أو أصبحت بحالة الإفلاس نتيجة لهذا النقل.

٧٣٧. يجوز للوصي أن يتجنب تحويلات صن شاين بموجب قانون الإفلاس القسم ٥٤٨ (أ) (١) (ب).

٧٣٨. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات صن شاين لصالح ملكية شركة فايرستار من صن شاين، الكيان الذي تم إجراء تحويلات صن شاين إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

**التهمة ٣٨**

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب المواد ٢٧٣، ٢٧٨ و ٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و ٥٥٠ (أ)**

**(صن شاين)**

٧٣٩. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٤٠. شكلت تحويلات صن شاين تحويلات لمصالح شركة فايرستار في صن شاين.

٧٤١. أجريت تحويلات صن شاين إلى شركة صن شاين أو لصالحها.

٧٤٢. قامت شركة فايرستار بتحويلات صن شاين دون مراعاة عادلة.

٧٤٣. كانت شركة فايرستار بحالة إفلاس في كل تاريخ أجريت فيه كل عملية من تحويلات صن شاين أو أصبحت بحالة الإفلاس نتيجة لهذا النقل.

٧٤٤. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو شركة فايرستار ، الذين يمكنهم إلغاء تحويلات صن شاين، أو الذين قد يتجاهلون تحويلات صن شاين ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٧٤٥. يمكن للوصي أن يتجنب تحويلات صن شاين بموجب قانون الإفلاس القسم ٥٤٤ (ب) (١).

٧٤٦. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات صن شاين لصالح ملكية شركة فايرستار من صن شاين، الكيان الذي تم إجراء تحويلات صن شاين إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

**التهمة ٣٩**

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب قانون الولايات المتحدة رقم ١١**

**البند ٥٤٨ (أ) (١) (أ) و٥٥٠ (أ) (تراي كلر)**

٧٤٧. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٤٨. قـام المدينون بتحويلات نقديـة إلـى تـراي كلـر فـي غضـون عـامين مـن بـدء قضـايا المدينين الفصل ١١، على النحو المحدد في الملحق ط، المرفق بهذه الوثيقة (يُشار إليها معاً بـ " **تحويلات عامين لتراي كلر**").

٧٤٩. شكلت تحويلات عامين لتراي كلر تحويلات لمصالح المدينين في الممتلكات.

٧٥٠. أجريت تحويلات عامين لتراي كلر إلى شركة تراي كلر أو لصالحها.

٧٥١. أجريت تحويلات عامين لتراي كلر بقصد فعلي لإعاقة أو تأخير أو الاحتيال على دائن المدينين. وافق نيراف مودي ومهير بهنسالي وأجـاي غانـدي والمتـآمرين معهـم علـى تحويلات عامين لتراي كلـر مـن أجـل إطالـة احتيـال البنـك وغسـل عائداتـه غيـر المشـروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجـة الطبيعيـة لتحـويلات عـامين لتـراي كلر هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٧٥٢. يمكن للوصي تجنب تحويلات عامين لتراي كلر بموجب المادة ٥٤٨ (أ) (١) (أ) من قانون الإفلاس.

٧٥٣. بموجب البنـد ٥٥٠ (أ) مـن قـانون الإفلاس، يجـوز للوصـي اسـترداد قيمـة تحـويلات عامين لتراي كلر لصالح ملكية المدينين من تراي كلر، الكيان الذي تم إجراء ت تحويلات عامين لتراي كلر إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.


**التهمة ٤٠**

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب المواد ٢٧٦، ٢٧٨ و ٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و ٥٥٠ (أ)**

(تراي كلر)

٧٥٤. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٥٥. قام المدينون بتحويلات عديدة للنقد والمخزون إلى تراي كلر في غضون ست سنوات من بدء قضايا المدينين الفصل ١١، على النحو المحدد في الملحق ط، المرفق بهذه الوثيقة (يُشار إليها معاً بـ " **تحويلات ست سنوات لتراي كلر**").

٧٥٦. شكلت تحويلات ست سنوات لتراي كلر تحويلات لمصالح المدينين في الممتلكات.

٧٥٧. أجريت تحويلات ست سنوات لتراي كلر إلى شركة تراي كلر أو لصالحها.

٧٥٨. أجريت تحويلات ست سنوات لتراي كلر بقصد فعلي لإعاقة أو تأخير دائني المدينين الحاليين أو المستقبليين بالمعنى المقصود في المادة ٢٧٦ من قانون المدين والدائن. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات ست سنوات لتراي كلر من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات ست سنوات لتراي كلر هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٧٥٩. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لتراي كلر، أو الذين قد يتجاهلون تحويلات ست سنوات لتراي كلر ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و/ أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٧٦٠. يمكن للوصي أن يتجنب تحويلات ست سنوات لتراي كلر بموجب قانون الإفلاس المادة ٥٤٤ (ب) (١).

٧٦١. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لتراي كلر لصالح ملكية المدينين من تراي كلر، الكيان الذي تم إجراء تحويلات ست سنوات لتراي كلر إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

٧٦٢. يحق للوصي التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب المادة ٢٧٦.أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

## التهمة ٤١

## تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب قانون الولايات المتحدة رقم ١١

## البند ٥٤٨ (أ) (١) (ب) و ٥٥٠ (أ) (تراي كلر)

٧٦٣. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٦٤. شكلت تحويلات عامين لتراي كلر تحويلات لمصالح المدينين في الممتلكات.

٧٦٥. أجريت تحويلات عامين لتراي كلر إلى شركة تراي كلر أو لصالحها.

٧٦٦. تلقى المدينون أقل من القيمة المعادلة المعقولة مقابل تحويلات عامين لتراي كلر.

٧٦٧. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات عامين لتراي كلر أو أصبحوا معسرين نتيجة لهذا النقل.

٧٦٨. يجوز للوصي أن يتجنب تحويلات عامين لتراي كلر بموجب قانون الإفلاس القسم ٥٤٨ (أ) (١) (ب).

٧٦٩. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لتراي كلر لصالح ملكية المدينين من تراي كلر، الكيان الذي تم إجراء تحويلات عامين لتراي كلر إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.


## التهمة ٤٢

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب المواد ٢٧٣، ٢٧٨ و ٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و ٥٥٠ (أ) (تراي كلر)**

٧٧٠. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٧١. شكلت تحويلات ست سنوات لتراي كلر تحويلات لمصالح المدينين في الممتلكات.

٧٧٢. أجريت تحويلات ست سنوات لتراي كلر إلى شركة تراي كلر أو لصالحها.

٧٧٣. قام المدينون بتحويلات ست سنوات لتراي كلر دون مراعاة عادلة.

٧٧٤. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات ست سنوات لتراي كلر أو أصبحوا معسرين نتيجة لهذا النقل.

٧٧٥. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لتراي كلر، أو الذين قد يتجاهلون تحويلات ست سنوات لتراي كلر ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٧٧٦. يمكن للوصي أن يتجنب تحويلات ست سنوات لتراي كلر بموجب قانون الإفلاس القسم ٥٤٤ (ب) (١).

٧٧٧. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لتراي كلر لصالح ملكية المدينين من تراي كلر، الكيان الذي تم إجراء تحويلات ست سنوات لتراي كلر إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.


**التهمة ٤٣**

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (أ) و ٥٥٠ (أ) (يونيك)**

٧٧٨. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٧٩. قامت شركة فايرستار بتحويلات في النقد والمخزون إلى يونيك في غضون عامين من بدء قضايا شركة فايرستار الفصل ١١، على النحو المحدد في <u>الملحق ي</u>، المرفق بهذه الوثيقة (يُشار إليها معاً بـ " **تحويلات عامين ليونيك**").

٧٨٠. شكلت تحويلات عامين ليونيك تحويلات لمصالح شركة فايرستار في الممتلكات.

٧٨١. أجريت تحويلات عامين ليونيك إلى شركة يونيك أو لصالحها.

٧٨٢. أجريت تحويلات عامين ليونيك بقصد فعلي لإعاقة أو تأخير أو الاحتيال على دائني شركة فايرستار. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات عامين ليونيك من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها

لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات عامين ليونيك هي استنزاف ممتلكات شركة فايرستار وإحباط وفاء شركة فايرستار بالتزاماتها المشروعة.

٧٨٣. يمكن للوصي تجنب تحويلات عامين ليونيك بموجب المادة ٥٤٨ (أ) (١) (أ) من قانون الإفلاس.

٧٨٤. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين ليونيك لصالح ملكية شركة فايرستار من يونيك، الكيان الذي تم إجراء تحويلات عامين ليونيك إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

<div align="center">التهمة ٤٤</div>

<div align="center">تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب المواد ٢٧٦، ٢٧٨ و ٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و ٥٥٠ (أ) (يونيك)</div>

٧٨٥. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٨٦. قام المدينون بتحويلات عديدة للنقد والمخزون إلى يونيك في غضون ست سنوات من بدء قضايا المدينين الفصل ١١، على النحو المحدد في الملحق ي، المرفق بهذه الوثيقة (يُشار إليها معاً بـ "**تحويلات ست سنوات ليونيك**").

٧٨٧. أجريت تحويلات ست سنوات ليونيك إلى شركة يونيك أو لصالحها.

٧٨٨. أجريت تحويلات ست سنوات ليونيك بقصد فعلي لإعاقة أو تأخير دائني المدينين الحاليين أو المستقبليين بالمعنى المقصود في المادة ٢٧٦ من قانون المدين والدائن. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات ست سنوات

ليونيك من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات ست سنوات ليونيك هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٧٨٩. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات ليونيك، أو الذين قد يتجاهلون تحويلات ست سنوات ليونيك ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و/ أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٧٩٠. يمكن للوصي أن يتجنب تحويلات ست سنوات ليونيك بموجب قانون الإفلاس المادة ٥٤٤ (ب) (١).

٧٩١. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات ليونيك لصالح ملكية المدينين من يونيك، الكيان الذي تم إجراء تحويلات ست سنوات ليونيك إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

٧٩٢. يحق للوصي التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب المادة ٢٧٦-أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

**التهمة ٤٥**
**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب قانون الولايات المتحدة رقم ١١**
**البند ٥٤٨ (أ) (١) (ب) (١) و ٥٥٠ (أ)**
**(يونيك)**

٧٩٣. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٧٩٤. شكلت تحويلات عامين ليونيك تحويلات لمصالح شركة فايرستار في الممتلكات.

٧٩٥. أجريت تحويلات عامين ليونيك إلى شركة يونيك أو لصالحها.

٧٩٦. تلقت شركة فايرستار أقل من القيمة المعادلة المعقولة مقابل تحويلات عامين ليونيك.

٧٩٧. كانت شركة فايرستار بحالة إفلاس في كل تاريخ أجريت فيه كل عملية من تحويلات عامين ليونيك أو أصبحت بحالة الإفلاس نتيجة لهذا النقل.

٧٩٨. يمكن للوصي أن يتجنب تحويلات عامين ليونيك بموجب قانون الإفلاس القسم ٥٤٨ (أ) (١) (ب).

٧٩٩. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين ليونيك لصالح ملكية شركة فايرستار من يونيك، الكيان الذي تم إجراء تحويلات عامين ليونيك إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

**التهمة ٤٦**

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب المواد ٢٧٣، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ)**

**(يونيك)**

٨٠٠. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٨٠١. شكلت تحويلات ست سنوات ليونيك تحويلات لمصالح المدينين في الممتلكات.

٨٠٢. أجريت تحويلات ست سنوات ليونيك إلى شركة يونيك أو لصالحها.

٨٠٣. قام المدينون بتحويلات ست سنوات ليونيك دون مراعاة عادلة.

٨٠٤. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات ست سنوات ليونيك أو أصبحوا معسرين نتيجة لهذا النقل.

٨٠٥. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات ليونيك، أو الذين قد يتجاهلون تحويلات ست سنوات ليونيك ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٨٠٦. يمكن للوصي أن يتجنب تحويلات ست سنوات ليونيك بموجب قانون الإفلاس القسم ٥٤٤ (ب) (١).

٨٠٧. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات ليونيك لصالح ملكية المدينين من يونيك، الكيان الذي تم إجراء تحويلات ست سنوات ليونيك إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

**التهمة ٤٧**

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب قانون الولايات المتحدة رقم ١١**

**البند ٥٤٨ (أ) (١) (أ) و ٥٥٠ (أ)**

**(وورلد دياموند)**

٨٠٨. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٨٠٩. قامت شركة فايرستار بتحويلات في المخزون إلى وورلد دياموند في غضون عامين من بدء قضايا شركة فايرستار الفصل ١١، على النحو المحدد في الملحق ك، المرفق بهذه الوثيقة (يُشار إليها معاً بـ " **تحويلات عامين لوورلد دياموند**").

٨١٠. شكلت تحويلات عامين لوورلد دياموند تحويلات لمصالح شركة فايرستار في الممتلكات.

٨١١. أجريت تحويلات عامين لوورلد دياموند إلى شركة وورلد دياموند أو لصالحها.

٨١٢. أجريت تحويلات عامين لوورلد دياموند بقصد فعلي لإعاقة أو تأخير أو الاحتيال على دائني شركة فايرستار. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات عامين لوورلد دياموند من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات عامين لوورلد دياموند هي استنزاف ممتلكات شركة فايرستار وإحباط وفاء شركة فايرستار بالتزاماتها المشروعة.

٨١٣. يمكن للوصي تجنب تحويلات عامين لوورلد دياموند بموجب المادة ٥٤٨ (أ) (١) (أ) من قانون الإفلاس.

٨١٤. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لوورلد دياموند لصالح ملكية شركة فايرستار من وورلد دياموند، الكيان الذي تم إجراء تحويلات عامين لوورلد دياموند إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.


**التهمة ٤٨**

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب المواد ٢٧٦، ٢٧٨ و ٢٧٩ من**
**قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٤٤٥**
**(ب) (١) و ٥٥٠ (أ) (وورلد دياموند)**

٨١٥. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما
هو موضح بالكامل هنا.

٨١٦. قام المدينون بتحويلات عديدة للمخزون إلى وورلد دياموند في غضون ست سنوات
من بدء قضايا المدينين الفصل ١١، على النحو المحدد في الملحق ك، المرفق بهذه الوثيقة
(يُشار إليها معاً بـ " **تحويلات ست سنوات لوورلد دياموند**").

٨١٧. أُجريت تحويلات ست سنوات لوورلد دياموند إلى شركة وورلد دياموند أو لصالحها.

٨١٨. أُجريت تحويلات ست سنوات لوورلد دياموند بقصد فعلي لإعاقة أو تأخير دائني
المدينين الحاليين أو المستقبليين بالمعنى المقصود في المادة ٢٧٦ من قانون المدين
والدائن. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات
ست سنوات لوورلد دياموند من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة
وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات ست سنوات لوورلد
دياموند هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٨١٩. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو
المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لوورلد دياموند، أو الذين قد يتجاهلون
تحويلات ست سنوات لوورلد دياموند ويقومون بمصادرة أو فرض الحجز على الممتلكات
المنقولة، بموجب المادتين ٢٧٨ و/ أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٨٢٠. يمكن للوصي أن يتجنب تحويلات ست سنوات لوورلد دياموند بموجب قانون الإفلاس المادة ٥٤٤ (ب) (١).

٨٢١. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لوورلد دياموند لصالح ملكية المدينين من وورلد دياموند، الكيان الذي تم إجراء تحويلات ست سنوات لوورلد دياموند إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

٨٢٢. يحق للوصي التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب المادة ٢٧٦–أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

<div align="center">

**التهمة ٤٩**

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (ب) و ٥٥٠ (أ)**

**(وورلد دياموند)**

</div>

٨٢٣. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٨٢٤. شكلت تحويلات عامين لوورلد دياموند تحويلات لمصالح المدينين في الممتلكات.

٨٢٥. أجريت تحويلات عامين لوورلد دياموند إلى شركة وورلد دياموند أو لصالحها.

٨٢٦. تلقى المدينون أقل من القيمة المعادلة المعقولة مقابل تحويلات عامين لوورلد دياموند.

٨٢٧. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات عامين لوورلد دياموند أو أصبحوا معسرين نتيجة لهذا النقل.

٨٢٨. يمكن للوصي أن يتجنب تحويلات عامين لوورلد دياموند بموجب قانون الإفلاس القسم ٥٤٨ (أ) (١) (ب).

٨٢٩. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لوورلد دياموند لصالح ملكية المدينين من وورلد دياموند، الكيان الذي تم إجراء تحويلات عامين لوورلد دياموند إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.


## التهمة ٥٠

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب المواد ٢٧٣، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ) (وورلد دياموند)**

٨٣٠. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٨٣١. شكلت تحويلات عامين لوورلد دياموند تحويلات لمصالح شركة فايرستار في الممتلكات.

٨٣٢. أجريت تحويلات عامين لوورلد دياموند إلى شركة وورلد دياموند أو لصالحها.

٨٣٣. تلقت شركة فايرستار أقل من القيمة المعادلة المعقولة مقابل تحويلات عامين لوورلد دياموند.

٨٣٤. كانت شركة فايرستار بحالة إفلاس في كل تاريخ أجريت فيه كل عملية من تحويلات عامين لوورلد دياموند أو أصبحت بحالة الإفلاس نتيجة لهذا النقل.

٨٣٥. يمكن للوصي أن يتجنب تحويلات عامين لوورلد دياموند بموجب قانون الإفلاس القسم ٥٤٨ (أ) (١) (ب).

٨٣٦. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لوورلد دياموند لصالح ملكية شركة فايرستار من وورلد دياموند، الكيان الذي تم إجراء تحويلات عامين لوورلد دياموند إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

## التهمة ٥١
### تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (أ) و ٥٥٠ (أ)
### (توين فيلدز)

٨٣٧. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٨٣٨. قامت جافي بتحويلات نقدية عديدة إلى توين فيلدز في غضون عامين من بدء قضايا جافي الفصل ١١، على النحو المحدد في الملحق ل، المرفق بهذه الوثيقة (يُشار إليها معاً بـ " **تحويلات عامين لتوين فيلدز**").

٨٣٩. شكلت تحويلات عامين لتوين فيلدز تحويلات لمصالح جافي في الممتلكات.

٨٤٠. أجريت تحويلات عامين لتوين فيلدز إلى شركة توين فيلدز أو لصالحها.

٨٤١. أجريت تحويلات عامين لتوين فيلدز بقصد فعلي لإعاقة أو تأخير أو الاحتيال على دائني جافي. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات عامين لتوين فيلدز من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة

وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات عامين لتوين فيلدز هي استنزاف ممتلكات جافي وإحباط وفاء جافي بالتزاماتها المشروعة.

٨٤٢. يمكن للوصي تجنب تحويلات عامين لتوين فيلدز بموجب المادة ٥٤٨ (أ) (١) (أ) من قانون الإفلاس.

٨٤٣. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لتوين فيلدز لصالح ملكية جافي من توين فيلدز، الكيان الذي تم إجراء تحويلات عامين لتوين فيلدز إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

**التهمة ٥٢**

**تلافي واسترداد عمليات النقل الاحتيالية الفعلية بموجب المواد ٢٧٦، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك وبموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ)**

**(توين فيلدز)**

٨٤٤. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٨٤٥. قام المدينون بتحويلات نقدية عديدة إلى توين فيلدز في غضون ست سنوات من بدء قضايا المدينين الفصل ١١، على النحو المحدد في الملحق ل، المرفق بهذه الوثيقة (يُشار إليها معاً بـ " **تحويلات ست سنوات لتوين فيلدز**").

٨٤٦. أجريت تحويلات ست سنوات لتوين فيلدز إلى شركة توين فيلدز أو لصالحها.

٨٤٧. أجريت تحويلات ست سنوات لتوين فيلدز بقصد فعلي لإعاقة أو تأخير دائني المدينين الحاليين أو المستقبليين بالمعنى المقصود في المادة ٢٧٦ من قانون المدين

والدائن. وافق نيراف مودي ومهير بهنسالي وأجاي غاندي والمتآمرين معهم على تحويلات ست سنوات لتوين فيلدز من أجل إطالة احتيال البنك وغسل عائداته غير المشروعة وسحبها لصالح مودي وأسرته وغيرهم. وكانت النتيجة الطبيعية لتحويلات ست سنوات لتوين فيلدز هي استنزاف ممتلكات المدينين وإحباط وفاء المدينين بالتزاماتهم المشروعة.

٨٤٨. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لتوين فيلدز، أو الذين قد يتجاهلون تحويلات ست سنوات لتوين فيلدز ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و/ أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٨٤٩. يمكن للوصي أن يتجنب تحويلات ست سنوات لتوين فيلدز بموجب قانون الإفلاس المادة ٥٤٤ (ب) (١).

٨٥٠. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لتوين فيلدز لصالح ملكية المدينين من توين فيلدز، الكيان الذي تم إجراء تحويلات ست سنوات لتوين فيلدز إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

٨٥١. يحق للوصي التكاليف والمصاريف المعقولة التي تكبدها في متابعة هذه المطالبة، بما في ذلك أتعاب المحاماة بموجب المادة ٢٧٦–أ من قانون المدين والدائن، وعلى النحو الذي يسمح به القانون.

## التهمة ٥٣
## تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٨ (أ) (١) (ب) و ٥٥٠ (أ)

(توين فيلدز)

٨٥٢. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٨٥٣. شكلت تحويلات عامين لتوين فيلدز تحويلات لمصالح جافي في الممتلكات.

٨٥٤. أجريت تحويلات عامين لتوين فيلدز إلى شركة توين فيلدز أو لصالحها.

٨٥٥. تلقت جافي أقل من القيمة المعادلة المعقولة مقابل تحويلات عامين لتوين فيلدز.

٨٥٦. كانت جافي بحالة إفلاس في كل تاريخ أجريت فيه كل عملية من تحويلات عامين لتوين فيلدز أو أصبحت بحالة الإفلاس نتيجة لهذا النقل.

٨٥٧. يمكن للوصي أن يتجنب تحويلات عامين لتوين فيلدز بموجب قانون الإفلاس القسم ٥٤٨ (أ) (١) (ب).

٨٥٨. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات عامين لتوين فيلدز لصالح ملكية جافي من توين فيلدز، الكيان الذي تم إجراء تحويلات عامين لتوين فيلدز إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

**التهمة ٥٤**

**تلافي واسترداد عمليات النقل الاحتيالية التقديرية بموجب المواد ٢٧٣، ٢٧٨ و٢٧٩ من قانون المدين والدائن في نيويورك ويموجب قانون الولايات المتحدة رقم ١١ البند ٥٤٤ (ب) (١) و٥٥٠ (أ)**

(توين فيلدز)

٨٥٩. يعيد الوصي بيان الفقرات من ١ إلى ٣٧٠ من هذه الشكوى ويعيد المطالبة بها كما هو موضح بالكامل هنا.

٨٦٠. شكلت تحويلات ست سنوات لتوين فيلدز تحويلات لمصالح المدينين في الممتلكات.

٨٦١. أجريت تحويلات ست سنوات لتوين فيلدز إلى شركة توين فيلدز أو لصالحها.

٨٦٢. قام المدينون بتحويلات ست سنوات لتوين فيلدز دون مراعاة عادلة.

٨٦٣. كان المدينون معسرين في كل تاريخ أجريت فيه كل عملية من تحويلات ست سنوات لتوين فيلدز أو أصبحوا معسرين نتيجة لهذا النقل.

٨٦٤. يوجد دائنون فعليون، بما في ذلك على سبيل المثال لا الحصر بائعو وموردو المدينين، الذين يمكنهم إلغاء تحويلات ست سنوات لتوين فيلدز، أو الذين قد يتجاهلون تحويلات ست سنوات لتوين فيلدز ويقومون بمصادرة أو فرض الحجز على الممتلكات المنقولة، بموجب المادتين ٢٧٨ و / أو ٢٧٩ من قانون المدين والدائن في نيويورك.

٨٦٥. يمكن للوصي أن يتجنب تحويلات ست سنوات لتوين فيلدز بموجب قانون الإفلاس القسم ٥٤٤ (ب) (١).

٨٦٦. بموجب البند ٥٥٠ (أ) من قانون الإفلاس، يجوز للوصي استرداد قيمة تحويلات ست سنوات لتوين فيلدز لصالح ملكية المدينين من توين فيلدز، الكيان الذي تم إجراء تحويلات ست سنوات لتوين فيلدز إليه أو لصالحه، ومن أي من المنقول إليهم اللاحقين.

**استرحام الانتصاف**

لهذا السبب، يطلب الوصي من المحكمة بكل احترام، بصفته وصي الفصل ١١ للمدينين وبصفته وكيل الدائن المحكوم له في الشركات التابعة للولايات المتحدة:

أ– في التهمة ١، إصدار الحكم لصالح الوصي وضد جميع المدعى عليهم، بالتضامن والتكافل، بثلاث أضعاف مقدار الأضرار التي يتعين إثباتها في المحاكمة، ولكن ليس أقل من ١٧٥.٠٠٠.٠٠٠ دولار التي عانى منها المدينون وعقاراتهم نتيجة انتهاك المدعى عليهم لقانون المؤسسات الفاسدة المتأثرة بالابتزاز، بالإضافة إلى الفوائد والتكاليف وأتعاب المحاماة، وغيرها من التعويضات المعادلة على النحو العادل والمناسب.

ب– في التهمة ٢، إصدار الحكم لصالح الوصي، بصفته وكيل للشركات التابعة للولايات المتحدة، وضد جميع المدعى عليهم، بالتضامن والتكافل، بثلاث أضعاف مقدار الأضرار التي يتعين إثباتها في المحاكمة، ولكن ليس أقل من ٥٠.٠٠٠.٠٠٠ دولار، التي تكبدتها الشركات التابعة للولايات المتحدة نتيجة لانتهاك المدعى عليهم لقانون المؤسسات الفاسدة المتأثرة بالابتزاز، بالإضافة إلى الفوائد والتكاليف وأتعاب المحاماة، وغيرها من التعويضات المعادلة على النحو العادل والمناسب.

ج– في التهمة ٣، تلافي تحويل سينيرجيز –ميهتا وإصدار الحكم لصالح الوصي وضد المدعى عليه بورفي ميهتا بمبلغ ١٤.٥٧٥.٠٠٠ دولار.

د– في التهمة ٤، تلافي تحويل سينيرجيز –ميهتا وإصدار الحكم لصالح الوصي وضد المدعى عليه بورفي ميهتا بمبلغ ١٤.٥٧٥.٠٠٠ دولار.

هـ– في التهمة ٥، تلافي تحويل أسهم سنترال بارك ريل استيت ذ.م.م وإصدار الحكم لصالح الوصي وضد إيثاكا ترست وآمي مودي، بالتضامن والتكافل، بمبلغ ٦.٠٠٠.٠٠٠ دولار.

و – في التهمة ٦، تلافي تحويل أسهم سنترال بارك ريل استيت ذ.م.م وإصدار الحكم لصالح الوصي ضد إيثاكا ترست وآمي مودي، بالتضامن والتكافل، بمبلغ ٦.٠٠٠.٠٠٠ دولار .

ز – في التهمة ٧، تلافي كل من تحويلات عامين لسنترال بارك ريل استيت ذ.م.م وإصدار الحكم لصالح الوصي ضد سنترال بارك ريل استيت ذ.م.م، بمبلغ ٣.٦٠٣.٦٨٣,٦٩ دولار .

ح – في التهمة ٨، تلافي كل من تحويلات ست سنوات لسنترال بارك ريل استيت ذ.م.م وإصـدار الحكـم لصـالح الوصـي وضـد سـنترال بـارك ريـل اسـتيت ذ.م.م، بمبلـغ ٤.٥٩٤.٥٥٩,٧٨ دولار .

ط – في التهمة ٩، تلافي كل من تحويلات عامين لسنترال بارك ريل استيت ذ.م.م وإصدار الحكم لصالح الوصي ضد سنترال بارك ريل استيت ذ.م.م، بمبلغ ٣.٦٠٣.٦٨٣,٦٩ دولار .

ي – في التهمة ١٠، تلافي كل من تحويلات ست سنوات لسنترال بارك ريل استيت ذ.م.م وإصـدار الحكـم لصـالح الوصـي وضـد سـنترال بـارك ريـل اسـتيت ذ.م.م، بمبلـغ ٤.٥٩٤.٥٥٩,٧٨ دولار .

ك – في التهمة ١١، تلافي كل من تحويلات أوراجيم وإصدار حكم لصالح الوصي وضد أوراجيم بمبلغ ٢.٣٤٠.٩٦٨,٩٤ دولار .

ل – في التهمة ١٢، تلافي كل من تحويلات أوراجيم وإصدار حكم لصالح الوصي وضد أوراجيم بمبلغ ٢.٣٤٠.٩٦٨,٩٤ دولار .

م – في التهمة ١٣، تلافي كل من تحويلات عامين لبريليانت وإصدار حكم لصالح الوصي وضد بريليانت بمبلغ ٥.٢٦٤.٣٩٧,١٣ دولار .

ن – في التهمة ١٤، تلافي كل من تحويلات ست سنوات لبريليانت وإصدار حكم لصالح الوصي وضد بريليانت بمبلغ ١٠.٤٩١.٢٨٧,١١ دولار .

س‌- في التهمة ١٥، تلافي كل من تحويلات عامين لبريليانت وإصدار حكم لصالح الوصي وضد بريليانت بمبلغ ٥.٢٦٤.٣٩٧,١٣ دولار.

ع‌- في التهمة ١٦، تلافي كل من تحويلات ست سنوات لبريليانت وإصدار حكم لصالح الوصي وضد بريليانت بمبلغ ١٠.٤٩١.٢٨٧,١١ دولار.

ف‌- في التهمة ١٧، تلافي كل من تحويلات دياجيمز وإصدار حكم لصالح الوصي وضد دياجيمز بمبلغ ٢.٩٦٦.٤٠٦,١٥ دولار.

ص‌- في التهمة ١٨، تلافي كل من تحويلات دياجيمز وإصدار حكم لصالح الوصي وضد دياجيمز بمبلغ ٢.٩٦٦.٤٠٦,١٥ دولار.

ق‌- في التهمة ١٩، تلافي كل من تحويلات عامين لامباير وإصدار حكم لصالح الوصي وضد امباير بمبلغ ١.٠٦٩.٠٠٦,٠٧ دولار.

ر‌- في التهمة ٢٠، تلافي كل من تحويلات ست سنوات لامباير وإصدار حكم لصالح الوصي وضد امباير بمبلغ ١٢.١١٣.١٢٦,٥٧ دولار.

ش‌- في التهمة ٢١، تلافي كل من تحويلات عامين لامباير وإصدار حكم لصالح الوصي وضد امباير بمبلغ ١.٠٦٩.٠٠٦,٠٧ دولار.

ت‌- في التهمة ٢٢، تلافي كل من تحويلات ست سنوات لامباير وإصدار حكم لصالح الوصي وضد امباير بمبلغ ١٢.١١٣.١٢٦,٥٧ دولار.

ث‌- في التهمة ٢٣، تلافي كل من تحويلات عامين لاتيرنال وإصدار حكم لصالح الوصي وضد اتيرنال بمبلغ ١.٤٣٣.٨١٥,٦١ دولار.

خ‏– في التهمة ٢٤، تلافي كل من تحويلات ست سنوات لاتيرنال وإصدار حكم لصالح الوصي وضد اتيرنال بمبلغ ١.٧٣٣.٨١٥,٦١ دولار.

ذ‏– في التهمة ٢٥، تلافي كل من تحويلات عامين لاتيرنال وإصدار حكم لصالح الوصي وضد اتيرنال بمبلغ ١.٤٣٣.٨١٥,٦١ دولار.

ض‏– في التهمة ٢٦، تلافي كل من تحويلات ست سنوات لاتيرنال وإصدار حكم لصالح الوصي وضد اتيرنال بمبلغ ١.٧٣٣.٨١٥,٦١ دولار.

ظ‏– في التهمة ٢٧، تلافي كل من تحويلات عامين لفانسي كرييشنز وإصدار حكم لصالح الوصي وضد فانسي كرييشنز بمبلغ ٣.٩٠٠.٩١٦,٩٣ دولار.

غ‏– في التهمة ٢٨، تلافي كل من تحويلات ست سنوات لفانسي كرييشنز وإصدار حكم لصالح الوصي وضد فانسي كرييشنز بمبلغ ١٠.٨٢٧.٨٠٢,٥٧ دولار.

أأ‏– في التهمة ٢٩، تلافي كل من تحويلات عامين لفانسي كرييشنز وإصدار حكم لصالح الوصي وضد فانسي كرييشنز بمبلغ ٣.٩٠٠.٩١٦,٩٣ دولار.

ب ب‏– في التهمة ٣٠، تلافي كل من تحويلات ست سنوات لفانسي كرييشنز وإصدار حكم لصالح الوصي وضد فانسي كرييشنز بمبلغ ١٠.٨٢٧.٨٠٢,٥٧ دولار.

ج ج‏– في التهمة ٣١، تلافي كل من تحويلات عامين لباسفيك وإصدار حكم لصالح الوصي وضد باسفيك بمبلغ ١٢.٤٩٤.٧٦٥,٦٣ دولار.

د د‏– في التهمة ٣٢، تلافي كل من تحويلات ست سنوات لباسفيك وإصدار حكم لصالح الوصي وضد باسفيك بمبلغ ٤١.٧٧١.٤١٥,٣٧ دولار.

هـ هـ– في التهمة ٣٣، تلافي كل من تحويلات عامين لباسفيك وإصدار حكم لصالح الوصي وضد باسفيك بمبلغ ١٢.٤٩٤.٧٦٥,٦٣ دولار.

و و– في التهمة ٣٤، تلافي كل من تحويلات ست سنوات لباسفيك وإصدار حكم لصالح الوصي وضد باسفيك بمبلغ ٤١.٧٧١.٤١٥,٣٧ دولار.

ز ز– في التهمة ٣٥، تلافي تحويلات صن شاين وإصدار حكم لصالح الوصي وضد صن شاين بمبلغ ٩٦٥.٠٠٠,٠٠ دولار.

ح ح– في التهمة ٣٦، تلافي تحويلات صن شاين وإصدار حكم لصالح الوصي وضد صن شاين بمبلغ ٩٦٥.٠٠٠,٠٠ دولار.

ي ي– في التهمة ٣٧، تلافي تحويلات صن شاين وإصدار حكم لصالح الوصي وضد صن شاين بمبلغ ٩٦٥.٠٠٠,٠٠ دولار.

ح ح– في التهمة ٣٨، تلافي تحويلات صن شاين وإصدار حكم لصالح الوصي وضد صن شاين بمبلغ ٩٦٥.٠٠٠,٠٠ دولار.

ط ط– في التهمة ٣٩ تلافي كل من تحويلات عامين لتراي كلر وإصدار حكم لصالح الوصي وضد تراي كلر بمبلغ ١.٤٩٣.٦٤٥,٥٥ دولار.

ي ي– في التهمة ٤٠، تلافي كل من تحويلات ست سنوات لتراي كلر وإصدار حكم لصالح الوصي وضد تراي كلر بمبلغ ١٢.٣٩٥.٠٨٢,٨٦ دولار.

ك ك– في التهمة ٤١ تلافي كل من تحويلات عامين لتراي كلر وإصدار حكم لصالح الوصي وضد تراي كلر بمبلغ ١.٤٩٣.٦٤٥,٥٥ دولار.

ل ل– في التهمة ٤٢، تلافي كل من تحويلات ست سنوات لتراي كلر وإصدار حكم لصالح الوصي وضد تراي كلر بمبلغ ١٢.٣٩٥.٠٨٢,٨٦ دولار.

م م– في التهمة ٤٣ تلافي كل من تحويلات عامين ليونيك وإصدار حكم لصالح الوصي وضد يونيك بمبلغ ٣.٤٧٥.٠٣١,٤٢ دولار.

ن ن– في التهمة ٤٤، تلافي كل من تحويلات ست سنوات ليونيك وإصدار حكم لصالح الوصي وضد يونيك بمبلغ ١١.٤٩٤.٣٩٥,٠٢ دولار.

س س– في التهمة ٤٥ تلافي كل من تحويلات عامين ليونيك وإصدار حكم لصالح الوصي وضد يونيك بمبلغ ٣.٤٧٥.٠٣١,٤٢ دولار.

ع ع– في التهمة ٤٦، تلافي كل من تحويلات ست سنوات ليونيك وإصدار حكم لصالح الوصي وضد يونيك بمبلغ ١١.٤٩٤.٣٩٥,٠٢ دولار.

ف ف– في التهمة ٤٧ تلافي كل من تحويلات عامين لوورلد دياموند وإصدار حكم لصالح الوصي وضد وورلد دياموند بمبلغ ١٠.٦٠٧.٧٩٢,٩٨ دولار.

ص ص– في التهمة ٤٨، تلافي كل من تحويلات ست سنوات لوورلد دياموند وإصدار حكم لصالح الوصي وضد وورلد دياموند بمبلغ ٢١.١٧٥.٨٠٥,٧٤ دولار.

ق ق– في التهمة ٤٩ تلافي كل من تحويلات عامين لوورلد دياموند وإصدار حكم لصالح الوصي وضد وورلد دياموند بمبلغ ١٠.٦٠٧.٧٩٢,٩٨ دولار.

ر ر– في التهمة ٥٠، تلافي كل من تحويلات ست سنوات لوورلد دياموند وإصدار حكم لصالح الوصي وضد وورلد دياموند بمبلغ ٢١.١٧٥.٨٠٥,٧٤ دولار.

ش ش– في التهمة ٥١ تلافي كل من تحويلات عامين لتوين فيلدز وإصدار حكم لصالح الوصي وضد توين فيلدز بمبلغ ٣.٢٦٥.٠٠٠,٠٠ دولار.

ت ت– في التهمة ٥٢، تلافي كل من تحويلات ست سنوات لتوين فيلدز وإصدار حكم لصالح الوصي وضد توين فيلدز بمبلغ ٢١.٣٦١.٥٤٢,٢٨ دولار.

ث ث– في التهمة ٥٣ تلافي كل من تحويلات عامين لتوين فيلدز وإصدار حكم لصالح الوصي وضد توين فيلدز بمبلغ ٣.٢٦٥.٠٠٠,٠٠ دولار.

خ خ– في التهمة ٥٤، تلافي كل من تحويلات ست سنوات لتوين فيلدز وإصدار حكم لصالح الوصي وضد توين فيلدز بمبلغ ٢١.٣٦١.٥٤٢,٢٨ دولار.

ذ ذ– منح الوصي التكاليف والنفقات المعقولة التي تكبدها في هذا الاجراء، بما في ذلك أتعاب المحاماة بموجب قانون المدين والدائن في نيويورك في المادة ٢٧٦–أ وحسب المسموح به بموجب القانون.

التاريخ: فبراير ٢٥، ٢٠٢٠

نيويورك، نيويورك

قدمها بكل احترام،

**جينير  & بلوك ش.ذ.م.م**

من قبل: / إس / فنسنت إي. لازار

فنسنت إي. لازار

أنجيلا إم. ألن (معترف به لهذا الحدث)

ويليام ايه. ويليامز (معترف به لهذا الحدث)

٣٥٣ شارع نورث كلارك

شيكاغو، ايلينوي ٦٠٦٥٤

(٣١٢) ٢٢٢–٩٣٥٠

vlazar@jenner.com

aallen@jenner.com

كارل إن. ويدوف

٩١٩ الجادة الثالثة

نيويورك، نيويورك ١٠٠٢٢

(٢١٢) ٨٩١–١٦٠٠

cwedoff@jenner.com

*محامي وصي الفصل ١١*

<div dir="rtl">

# الــمــلــحق  أ

## الملحق أ-١٢٤

خلال الفترة ذات الصلة، مارس نيراف مودي، بهنسالي، وغاندي الرقابة المباشرة والتحكم في المعاملات بين الكيانات الأمريكية وكيانات الظل. فعلى سبيل المثال:

١- أرسل غاندي في ٨ يونيو ٢٠١٢ بريداً إلكترونياً إلى بهافيش باتل وشيام وادهوا وفيه؛ "يرجى إرسال بريد إلكتروني بالمستحقات إلى كافة الشركات في هونج كونج ودبي. فايرستار وفايرستار دايموند إنترناشيونال وجافي. تحتاج إلى دفع مليون دولار إلى هونج كونج أو دبي، ومن ثم تحتاج إلى الاسم والمبالغ فقط". رد بهافيش: "لا يوجد شيء مفتوح في دبي، لكن هونج كونج تفتح حسابات الدفع المرفقة لمراجعتك". رد غاندي، "يمكن أن تكون باسفيك، وورلد دايموند، وغيرها" في نفس اليوم، قامت فايرستار بتحويل ١٠٠٠٠٠٠٠ دولار إلى فانسي كريشنز. توصف هذه الصفقة بأنها "مقدمة" في كشف الحساب المصرفي لفايرستار.

٢- أرسل أجاي غاندي في ٢٣ يوليو ٢٠١٢ رسالة إلى نيراف مودي من خلال باينميل، وهي خدمة بريد إلكتروني تستند إلى الويب والتي تقوم بحذف الرسائل تلقائياً، "نيرافبهاي، يرجى الاطلاع على خطة الدفع المرفقة في ٥ أجزاء لتصفية الحسابات الدائنة والحسابات المدينة لفايرستار إنترناشيونال لهونج كونج ودبي وبلجيكا ونيويورك. ينبغي أن تأتي الأموال من الشركات المعنية. ١- ٤٥٢ ألف دولار أمريكي. ٢- ١،١٢٩ مليون دولار أمريكي. ٣- ١،٥ مليون دولار. ٤- ٨٢٨ ألف دولار. ٥- ١،٠٥ مليون دولار. إذا تم تنفيذ ذلك، يمكن تصفية الحسابات الدائنة والمدينة المرفقة بقيمة ٤،٣ مليون دولار. يرجى إعلامي إذا كان لديك فكرة أخرى". أعاد غاندي في ٣ أغسطس ٢٠١٢ إرسال البريد الإلكتروني إلى هيمانت بهات، ونسخة إلى بهنسالي، قائلاً "سأتصل بك يوم الاثنين للمناقشة. نحن بحاجة إلى نقل

</div>

الأموال في فايرستار دايموند إنترناشيونال انك لكل حجز. إن نيراف مودي/ ميهير بهنسالي
بخير طالما أن الأموال تتدفق من إس دي سي/ تريستار وديماملينك إلى أي من كيانات
هونج كونج أو دبي". وتابع غاندي في ٤أغسطس ٢٠١٢، "هيمانت، متى أتوقع مدفوعات
للدورة التي تحدثنا عنها أدناه؟". رد بهات على غاندي في ٢٧أغسطس ٢٠١٢، مع ارسال
نسخة إلى بهنسالي، "سددت باسفيك ويونيك وفق ما ورد أعلاه. يُرجى الدفع وفقاً لذلك".

تضـمنت الرسـالة قائمـة تبـين بـأن باسـفيك ويونيـك تـدين لفايرسـتار إنترناشـيونال بمبلـغ
٧٧٩.٥٧٩ دولار أمريكي و٤١٨.٤٩٨ دولار أمريكي بالترتيب، في الحسابات المدينة، وأن
فايرسـتار إنترناشـيونال تـدين لفانسـي كرييشـنز وفايرسـتار دايمونـد ليمتـد ودياجيمز بمبلـغ
١.٠٦٣.٣٦٩ دولار امريكـي، و١٢١.١٢٩ دولار أمريكـي و١٤.٠٣٣ دولار أمريكـي علـى
الترتيب، في الحسابات الدائنة. أرسل هيمانت بهات في ٢٨أغسطس ٢٠١٢، إلى أجاي
غاندي عن طريق باينميل "دفعت أوراجيم ٢٠٠.٠٠٠,٠٠ دولار أمريكي ودفعت بريليانت
مبلـغ ٢٣١.١٧٥,٠٣ دولار أمريكـي. ولـذلك، الرجـاء تأكيـد الاسـتلام والتسـديد لفانسـي".
أوضحت كشوفات الحسابات المصرفية لفايرستار إنترناشيونال: (أ) تحويلات الكترونية واردة
بمبلـغ ٧٧٩.٥٤٤,١١ دولار أمريكـي و٤١٨.٤٦٣,٠٠ دولار أمريكـي فـي ٢٧أغسـطس
٢٠١٢ من باسفيك ويونيك، بالترتيب؛ (ب) تحويلات الكترونية واردة بمبلغ ٢٣١.١٥٠,٠٣
دولار أمريكي من بريليانت ١٩٩.٩٧٥,٠٠ دولار أمريكي من أوراجيم في أغسطس ٢٨،
٢٠١٢؛ و(ج) تحـــويلات الكترونيــة صـــادرة بمبلـــغ ١.٠٦٣.٣٦٩ دولار أمريكـــي،
١٢١.١٢٩,٢١ دولار أمريكي، و١٤.٠٣٢,٨٠ دولار أمريكي في ٢٨ أغسطس ٢٠١٢ إلى
فانسي كرييشنز وفايرستار دايموند ليمتد ودياجيمز على التوالي.

٣- أرسل غاندي في ٢٨ أغسطس ٢٠١٢ بريداً الكترونياً إلى بهافيش باتل "الرجاء تحويل
مبلغ ٤٣١.١٧٥ دولار أمريكي غداً تحويلاً الكترونياً إلى فانسي كرييشنز من حساب رأس
المال القديم لفايرستار إنترناشيونال". وبيَن كشف الحساب المصرفي لفايرستار إنترناشيونال

تحـويلاً الكترونيـاً صـادراً بمبلـغ ٤٣١.١٧٥ دولار أمريكـي إلـى فانسـي كرييشـنز فـي ٢٩أغسطس ٢٠١٢.

٤- أرسل غاندي في ١٢سبتمبر ٢٠١٢ بريداً الكترونياً إلى بهافيش باتل، مـع نسخة إلى هيمانت بهات "الرجاء تحويل مبلغ ١٥٠.٠٠٠ دولار أمريكي إلى يونيك دياموند مقابل نفقات مكتب الدعم من يناير ٢٠١٢ لغاية يونيو ٢٠١٢- فاتورة رقم UD-FI-004 و UD-FI-001". وفي نفس اليوم، أرسل باتل بريداً الكترونياً إلى غاندي وبهات "الرجاء الاطلاع على التحويل المرفق من إف إس آي إلى يونيك حسب تفاصيل البنك الجديدة مقابل ١٥٠ ألف دولار أمريكي". أجاب غاندي بمفرده على باتل: "هل تحدثت مـع هيمانت بهات من أجل إعادة المبالغ؟"، فرد باتل: "لقد اتصلت به صباح اليوم. وأكد لي وأبلغني بأنه بحاجة إلى تفاصيل الفاتورة إن وجدت / التي سيحول منها مبلغ الموقع وما إلى ذلك [.] حتى يقوم بالترتيبات وفقاً لمتطلباتك في نيويورك". رد غاندي: "اسأله من أين يمكن أن يحول وأعطه تفاصيل. يمكن أن يكون في فايرستار أو إنترناشيونال".

٥- أرسل سريدهار كريشنان في ٤ ديسمبر ٢٠١٢ من إس دي سي ديساينز بريداً الكترونياً إلى غاندي يقول فيه: "ستتلقى مبلغاً قدره ١.٧٣٧.١٥٥... من امباير جيمز م.م.ح في فايرسـتار دايمونـد إنترناشـيونال، دفعـة جزئيـة مقابـل فاتورتك رقـم ٧٣١١٢ المؤرخة فـي ٢٠١٢/٣١/٧ [.] الرجـاء التسـديد لإس دي سـي ديسـاينز ذ.م.م مقابـل فـاتورتهم رقـم ٦٢٩٩٦٦ المؤرخة في ٢٠١٢/٣٠/٧". رد غاندي: "متى؟". أجاب كريشنان: "سأحول المبلغ اليوم إلى يونيفيرسال م.م.ح، لذلك أعتقد بأنك ستتسلمها من امباير جيمز غداً". ثم أعاد غاندي إرسال سلسلة البريد الالكتروني إلى ميهير بهنسالي وسأله: "هل توافق على المتابعة وفق الـوارد أدنـاه بمجرد استلام المبالـغ؟". ثم وفي نفس اليوم، أعـاد غانـدي إرسـال بريد كريشنان الالكتروني إلى هيمانت بهات وسأله: "هل هذا مناسب بمجرد استلام المبالغ؟".

وتابع غاندي مع بهات بعد عدة ساعات "لا ترسل بريداً الكترونياً. الرجاء الاتصال بي لتأكيد ذلك في الصباح".

٦- أرسل غاندي في ١٠ ديسمبر ٢٠١٢ بريداً الكترونياً إلى بهافيش باتل "سدد ١ مليون دولار أمريكي مقابل الفاتورة أعلاه إلى امباير جيمز غداً من إتش إس بي سي  حسب تعليمات التحويل الإلكتروني المرفقة. وكذلك، أبلغ هيمانت بهات بأنه قد تم تسديد مبلغ ٧٣٣ ألف دولار أمريكي مقابل هذه الفاتورة. بناء على المعلومات والمعتقد يشير الاختصار "إتش بي" إلى هيمانت بهات. حولت فايرستار في ١١ ديسمبر ٢٠١٢ مبلغ ١.١٨٥.٠٢٥,٠٥ دولار أمريكي إلى إمباير.

٧- أرسل غاندي في ١٣ ديسمبر ٢٠١٢ تعليمات إلى بهافيش باتل بما يلي: "إعداد التحويلات الالكترونية التالية اليوم: ١- مبلغ ٢٣١.٠٠٠ دولار أمريكي إلى يونيك مقابل نفقات مكتب الدعم من فايرستار دايموند انك. ٢- مبلغ ٣٩١.٦١١ دولار أمريكي إلى سينيرجيز كورب من فايرستار دايموند انك مقابل الفائدة. ٣- مبلغ ٣٠٠.٠٠٠ دولار أمريكي إلى يونيك من سينيرجيز كورب مقابل تسديد قرض. ٤- مبلغ ٩١.٠٠٠ دولار أمريكي إلى بريليانت من سينيرجيز كورب مقابل تسديد قرض. ٥- مبلغ الرصيد غداً إلى دياجيم بمجرد وصول المبالغ إلى هنا في فايرستار دايموند انك". لاحقاً ذلك اليوم، تابع غاندي: "المبلغ آت في أي لحظة، لذلك حوّل مبلغ ٥٥٢.١٣٣,١٠ دولار أمريكي إلى دياجيم من فايرستار دايموند. انك. (مقابل فاتورة مفتوحة)...". في اليوم التالي، رد باتل: "بناء على تفاصيل التي قدمها هيمانت بهات، الرجاء الاطلاع على التحويل الالكتروني من إف إس آي إلى دياجيمز لمبلغ ٥٥٢.١٣٣,١٠ دولار أمريكي. رد غاندي: "الرجاء إبلاغ هيمانت بهات عن التحويلات الالكترونية البارحة إن استلمها. بناء على المعلومات والاعتقاد، يشير اختصار "إتش بي" إلى هيمانت بهات.

٨– بتاريخ ٢٠ ديسمبر ٢٠١٢، أرسل بافيش باتل بريداً إلكترونياً إلى أجاي غاندي "تجدون مرفقاً تحويل [من فايرستار دايموند إنك] إلى دياجيمز (١١٩ ألف دولار) وباسفيك (٦٥٢ ألف دولار) حسب التعليمات." ورد غاندي "قم بتغيير مبلغ إمباير كما ناقشنا".

٩– في بريد إلكتروني عام ٢٠١٢، أعاد كوريان ماثيوز محادثة أجراها مع بهنسالي حددا فيها معاملة دائرية تبدأ عند فنتازي، وتعبر من راداشير جولري كو برايفيت ليمتد (وهي كيان تسيطر عليه مودي والذي كان متورطاً في الاحتيال المصرفي)، فايرستون انترناشونال برايفيت ليمتد، وفاير ستار وتنتهي بالعودة إلى فنتازي. وكان الهدف "إبراء الفواتير القديمة لراداشير على FDC" لأن مصرفاً كان يستفسر حول الفواتير القديمة. وبشكل مشابه، في ديسمبر ٢٠١٢، ناقش بهنسالي وكوريان ماثيوز تحويل الأموال إلى راداشير والعودة إلى المدينين مقابل ذمم حسابات راداشير لـ "استخدام [المال] لنيراف مودي [مودي]".

١٠– في ٤ فبراير ٢٠١٣، كتب سريدار كريشنان، مدير إس دي سي ديزاينز ذ.م.م إلى بهنسالي وشريك مودي هيرمانت بات مستخدماً عناوين البريد الإلكتروني الشخصية. وأخبر كريشمان بات وبهنسالي "عليكم توقع ١،٤ مليون في يونيفرسال م.م.ح اليوم. الرجاء تحويلها إلى ايه جافي". وبعد يومين، أكد بات أن يونيفرسال فاين جولري م.م.ح قد استلمت الأموال وأن "إمباير دفعت ١.٣٩١.٥٧٠ دولار إلى ايه جافي بتاريخ ٠٥ فبراير ١٣".

١١– بتاريخ ٦ فبراير ٢٠١٣، أرسل أجاي غاندي بريداً إلكترونياً إلى نيراف مودي، يسمح فيه ميهير بهنسالي "السيد نيراف، بعد الحفاظ على حاجز ٣ مليون دولار، يمكنني دفع ١ مليون دولار للهند في فبراير ٢٠١٣. الرجاء إعلامي إن كان عليّ طلب إدراج الدفع من مانيش/أميت". فرد مودي "أجل رجاءً". وقبل يوم، أرسل غاندي بريداً إلكترونياً إلى مانيش بوسامية، ميتين بانديا، وأميت ماجيا "يمكننا دفع ١،٠ مليون دولار إلى الهند في شهر فبراير ٢٠١٣. الرجاء إرسال لائحة الدفع إليّ عبر البريد الإلكتروني". وكما زُعم أعلاه، كان مانيش بوسامية وميتين بانديا من ضمن الأفراد المشاركين مباشرة في الحصول على تمويل

خطابات التعهد من بنك البنجاب الوطني. وبالتالي، وحسب المعلومات والاعتقاد، فإن هدف رسائل البريد الإلكتروني لغاندي هي إعلام مودي، بوسامية، وبانديا المبلغ الذي مكن لغاندي إرساله لتسهيل إعادة دفع خطابات التعهد.

١٢- بتاريخ ١٩ فبراير ٢٠١٣، أرسل شيام وادوا بريداً إلكترونياً إلى أجاني غاندي "الرجاء توضيح تفاصيل فواتير البائع المفتوحة التي تم تطبيق إيصال التحويل الداخلي بقيمة ٢،٠٠٦،٩٨٧,٢٥[.] دولار بتاريخ ٢٩ مايو ٢٠١٢ عليها. فرد غاندي "تم استلام ٢ مليون دولار وتحويلها إلى فايرستون انترناشونال برايفيت ليمتد وراداشير." وقد تضمن بريده الإلكتروني جدولاً يعكس أنه بتاريخ ١٩ مايو ٢٠١٢ تم إرسال ٢،٠٠٦،٩٤٩,٢٥ دولار المستلمة من باسفيك إلى فايرستون انترناشونال برايفيت ليمتد (١،٩٥٣،٩٩٠ دولار) وراداشير (١٢٦،٠١٠ دولار).

١٣- بتاريخ ٢٢ فبراير ٢٠١٣، أرسل بافيش باتل إلى أجاي غاندي تأكيداً لاسلكياً يعكس تحويلاً بقيمة ٥٠٣،٥٠١ دولار من فايرستار دايموند إنك إلى باسفيك.

١٤- بتاريخ ٢٣ أكتوبر ٢٠١٣، أرسل أجاي غاندي بريداً إلكترونياً إلى بافيش باتل "ادفع ١٥٠،٠٠٠ دولار إلى باسفيك دايموندز حسب المرفق من فايرستار دايموند إنك – HSBC". فرد باتل بتأكيد التحويل وصرح "تجدون مرفقاً تحويلاً من FSI إلى باسفيك كرسوم احترافية".

١٥- بتاريخ ٣٠ أكتوبر ٢٠١٣، أرسل بافيش باتل بريداً إلكترونياً إلى أجاني غاندي، ينسخ ما أرسله ألتماش أنصاري وشيام وادوا "تجدون مرفقاً تحويلاً داخلياً بالإضافة إلى وثيقة التحويل للمرجع. ١- FSI إلى جافي، بقيمة ١،٧٦٨،٣٨٥,٠٠ دولار (داخلي) ٢- جافي إلى باسفيك، بقيمة ٢،٤٥٥،٠٣٦,٠٠ دولار (مصرف أبو ظبي). وبعد عدة ساعات، تابع باتل ليطلب من غاندي "الرجاء الموافقة على التحويلات المرفقة كما ناقشنا".

١٦– بتاريخ ٣١ ديسمبر ٢٠١٣، أرسل ميهير بهنسالي بريداً إلكترونياً إلى أجاي غاندي
"كما ناقشنا، سندفع FSI إلى شركة سانغام دايموندز بالنيابة عن فانسي كريشنز كومباني
ليمتد (هونغ كونغ) (فاتورة# ١٠٠٧٧٣ تاريخ ٢٠١٣/١٢/١٩). مرفقاً فواتير مبيعات شركة
سانغام دايموندز إلى مصرف فانسي وسانغام. الرجاء القيام بالتحويل اليوم". فرد غاندي،
بالنسخ من بافيش بافل "بافيش، الرجاء تحديد التحويل من فاير ستار إلى سانغام دايموندز –
نيويورك". فرد باتل عندها بتأكيد تحويل يعكس دفع مبلغ ١.٢٤٧.٧٤٦ دولار إلى شركة
سانغام دايموندز. وبتاريخ ٨ يناير ٢٠١٤، أرسل غاندي بريد بهنسالي الإلكتروني بتاريخ
٣١ ديسمبر ٢٠١٣ إلى هيمانت بات، يقول فيه "لقد دفعت ١.٢٤ مليون دولار بتاريخ
١٣/٣١/١٢ إلى فانسي حسب المرفق. وهذه الأموال لم ترجع أبداً لذلك سأدفع اليوم مبلغ
٥٧٥ ألفاً. الرجاء الاتصال بي إن كانت هناك حاجة لذلك."

١٧– بتاريخ ٥ فبراير ٢٠١٤، أرسل ألتماش أنصاري بريداً إلكترونياً إلى أجاي غاندي، مع
نسخة إلى شيام وادوا وبافيش باتل، فيه جدول بـ "إيصالات ودفعات الشهر الذي استلم فيه
[جافي] المال من باسفيك". وقد أدرج الجدول مبالغ استلمها جافي من باسفيك ودفعها إليها
والى إمباير، توين فيلدز وهيئات متعددة لفاير ستار. وقد أشار غاندي، في رد على شيام
وادوا فقط "لقد تم الدفع لباسفيك أكثر مما ترسل أموالاً!!!!" فرد وادوا، "الرجاء تجاهل البريد
الإلكتروني أدناه. وللإجابة على سؤالك، استلم ايه جافي أموالاً عبر باسفيك كانت مقيدة
كدفعة مسبقة في الدفاتر. وبعد شحن الألماس، تم تعديل الدفعة المسبقة". وبتاريخ ١٢ فبراير
٢٠١٤، رد غاندي "هل هناك ما عليّ القيام بـه؟" فرد وادوا "سيطلب مانيش بوسامية ٤
مليـون دولار مقابل فـاتورة الهنـد علـى ايـه جـافي". وكمـا هو مشـار إليـه أعـلاه، وحسـب
المعلومات والاعتقاد، كان مانيش بوسامية أحد الافراد المشاركين مباشرة في الحصول على
خطابات التعهد الممولة من بنك البنجاب الوطني، والتي تشير إلى أن الـ ٤ ملايين دولار
التي طلبها وادوا من جافي كانت مرتبطة بشكل مباشر بإعادة دفع خطاب تعهد. فرد غاندي

"تحدثت إلى إم بي [حسب المعلومات والاعتقاد، ميهير بهنسالي]. لنتحدث غداً أو الجمعة. إنه يفضل الشحن الخارجي من جافي إلى فاير ستار بي في ايه مقارنة بأي مكان".

١٨– بتاريخ ١٨ مارس ٢٠١٤، أرسل أجاي غاندي بريداً إلكترونياً إلى بافيش باتل، ينسخ فيه من هيمانت بات، فيه تعليمات بتحويل ١٥٠٠٠٠ دولار من فايرستار دايموند إنك إلى يونيك لأجل "مصاريف المكتب الخلفي"، و١٢٣٠٩٧ دولار من فايرستار دايموند إنك إلى سينيرجيز لأجل "فائدة"، و١٢٣٠٠٠ دولار من سينيرجيز إلى بريليانت لأجل "إعادة دفع قرض". فرد باتل بتأكيد التحويلات.

١٩– بتاريخ ٢٥ مارس ٢٠١٤، أرسل شيام وادوا بريداً إلكترونياً إلى أجاي غاندي، مع نسخة إلى بافيش باتل "حولت FHL أموال الدين من الباطن [بقيمة] ٤٠٥٨٥٠٠ دولار إلى فايرستار دايموند إنك و١٨٠٠٠٠٠ دولار إلى مجموعة فاير ستار. الرجاء تحويل الأموال إلى بريليانت من كلا الشركتين والتأكيد". أرسل بعدها باتل إلى غاندي تأكيداً بالتحويلات يعكس فيه تحويلاً بقيمة ٤٠٥٨٥٠٠ دولار من فايرستار دايموند إنك إلى بريليانت وتحويلاً بقيمة ١٨٠٠٠٠٠ دولار من FGI إلى بريليانت.

٢٠– بتاريخ ٤ أغسطس ٢٠١٤، أرسل سريدار كريشنان من إس دي سي ديزاينز بريداً إلكترونياً إلى أجاي غاندي "هل قمتم بالتحويل إلى إمباير. الرجاء الإعلام". فرد غاندي "أحتاج للدفع في الخارج. لقد طلبت لائحة بالدفع. سأعلمكم حالما يتم التحويل". فرد كريشنان "أنا بحاجة للأموال بحلول الغد. الرجاء الإسراع."

٢١– بتاريخ ١٨ سبتمبر ٢٠١٤، أرسل مانيش بوسامية أجاي غاندي بريداً إلكترونياً، مع نسخة إلى بافيش باتل "ستستلم فايرستار دايموند إنك الدولية ٥٥٠٠٠٠٫٠٠ دولار من فاير ستار دايموند المحدودة (هونغ كونغ) في مصرف كابيتال ون". أرسل بعدها باتل بريداً إلكترونياً إلى غاندي "الرجاء الموافقة على التحويل أدناه من كابيتال أولد [أحد حسابات

كابيتـال ون التابعـة لـ فايرسـتار دايمونـد إنك انترناشـونال المصـرفية] إلـى باسـفيك بقيمـة ٥٥٠٠٠٠,٠٠ دولار كوكالة عامة."

٢٢- بتاريخ ١٦ ديسمبر ٢٠١٤، أرسل غاندي بريداً إلكترونياً إلى أفيناش أوزا وألتمـاش أنصاري "الرجاء دفع مبلغ ١.٢٤٠.٢٧٣,٥٤ دولار إلى أوراجيم، هونغ كونغ غداً لفاتورتهم# ٢٥٨٠٠٠١٣١٤ من فـاير سـتار دايمونـد، (دفعـة جزئيـة)." فرد أوزا بتأكيد التحويل. فرد غاندي "هل تم تأكيد معلومات البنك مع سانديب؟" وحسب المعلومات والاعتقاد، كان غاندي يشير إلى سانديب ميستري، أحد المتآمرين المشاركين الأساسيين في الاحتيال المصرفي.

٢٣- بتاريخ ١٩ فبراير ٢٠١٥، أرسل أجاي غاندي بريداً إلكترونياً إلى هيمانت بات، "أود دفع مبلغ ٣٠٠ ألف دولار لمصاريف المكتب الخلفي. هل أدفع ليونيك؟ الرجاء إرسال تأكيد التحويل لي عبر البريد الإلكتروني. وأيضاً، أود دفع مبلغ ١٨٠ ألف دولار من سينيرجيز إلى بريليانت. الرجـاء إرسـال تأكيـد التحويـل لـي عبـر البريـد الإلكتروني". وبتاريخ ٢٠ فبراير ٢٠١٥، أرسل أجاي غانـدي بريـداً إلكترونيـاً إلـى أربان دوشـي وأفينـاش أوزا فيـه تعليمـات بتحويـل ١٨٦.٨٧١ دولار مـن فايرسـتار دايمونـد إنـك إلـى سـينيرجيز علـى أنهـا "فائـدة"، ٣٠٠.٠٠٠ دولار مـن فايرسـتار دايمونـد إنـك إلـى إيتيرنـال دايمونـد علـى أنهـا "مصـاريف المكتـب الخلفي"، و ١٨٠.٠٠٠ دولار من سينيرجيز إلى بريليانت على أنها "إعادة دفع قرض". فرد دوشي بتأكيد التحويل.

٢٤- بتاريخ ٢ مارس ٢٠١٥، أرسل غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشي فيـه تعليمـات بتحويـل ٣٠٠.٠٠٠ دولار مـن فايرسـتار دايمونـد إنـك إلـى يونيـك و ١٨٠.٠٠٠ دولار من سينيرجيز إلى بريليانت. فرد دوشي بتأكيد التحويل.

٢٥- بتاريخ ٢٦ يونيو ٢٠١٥ أرسل أجاي غاندي بريداً إلكترونياً إلى أربان دوشي وأفيناش أوزا فيه تعليمـات بتحويـل ٣٠٠.٠٠٠ دولار من فايرسـتار دايمونـد إنك إلى باسـفيك. ويعكس

البيان المصرفي لـ فايرستار دايموند إنك تحويلاً من فايرستار دايموند إنك إلى باسفيك بقيمة ١.٤٣٨.٢٧٠,٦٠ دولار في ذلك اليوم.

٢٦– بتاريخ ٢٨ سبتمبر ٢٠١٥، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا "الرجاء تحويل مبلغ ١.٠١٧.٠٠٠ دولار مـن فاير ستار دايموند إلـى باسفيك دايموند – علـى الحساب". فرد أوزا بتأكيد التحويل. فرد غاندي، الرجاء تحويل ٥٤.٠٠٠ دولار إلى باسفيك دي من فاير ستار دايموند". فأرسل غاندي بريداً إلكترونياً للعملية ١ رداً على بريد إلكتروني سابقاً ذلك اليوم أرسل فيه العملية ١ تفاصيل مصرف باسفيك الخاص بغاندي "تم تحويل ١.٠١٧ مليون دولار. لقد اعتقدت أنها ١.٠١٧ مليون دولار ولكنني استلمت ١.٠٧١ مليون دولار. سأقوم بتحويل الرصيد غداً – ٥٤ ألف دولار". ويعكس الكشف المصرفي لـ فايرستار دايموند إنك هذه التحويلات.

٢٧– بتاريخ ٢٦ فبراير ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشي فيه تعليمات بتحويل ١.١٩٢.١٠٥,٥٥ دولار من فايرستار دايموند إنك إلى تراي كلر. فرد دوشي بتأكيد التحويل.

٢٨– في مارس ٢٠١٦، سألت إيفلين كوسيك، مدير عمليات جافي، بهنسالي أي ستقوم بإعادة تصدير الألماس السائب، وبعد ساعة أرسلت بريداً إلكترونياً إلى غاندي "تم إعلام ميهير بشحن هذه إلى إيتيرنال دايموندز في هونغ كونغ، نفس السعر مدوراً إلى أقرب ٥ بمدة ١٢٠ يوماً"

٢٩– بتاريخ ٤ مارس ٢٠١٦، أرسل غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشي فيه تعليمات بتحويل ٣٠٠.٠٠٠ دولار من فايرستار دايموند إنك إلى يونيك. فرد أوزا بتأكيد التحويل.

٣٠– بتاريخ ٩ مارس ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشي فيه تعليمـات بتحويل ٢٤٧.٥٥١ دولار مـن فايرسـتار دايمونـد إنـك إلـى سينيرجيز و ٢٥٠.٠٠٠ دولار من سينيرجيز إلى بريليانت. فرد دوشي بتأكيد التحويل.

٣١– بتاريخ ١٥ مارس ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشي فيـه تعليمـات بتحويـل ٧٠٠.٠٠٠ دولار مـن جـافي إلـى باسـفيك. فـرد أوزا بتأكيـد التحويل.

٣٢– بتاريخ ٢١ مارس ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشي فيه تعليمات بتحويل مليون دولار من جافي إلى باسفيك. فرد دوشي بتأكيد التحويل.

٣٣– بتاريخ ٢٤ مارس ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشي فيه تعليمات بتحويل مليون دولار من جافي إلى باسفيك. فرد أوزا بتأكيد التحويل.

٣٤– بتاريخ ٢٥ مارس ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشي فيـه تعليمـات بتحويـل ١،٤ مليون دولار مـن جـافي إلـى شركة نيراف مودي، ومن ثم ٦١٣.٠٦٩ دولار من شركة نيراف مودي إلى أوراجيم و ٧٨٧.٠٠٠ دولار من شركة نيراف مودي إلى نيراف مودي ليمتد. فرد دوشي بتأكيد التحويلات.

٣٥– بتاريخ ٣١ مارس ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشي فيـه تعليمـات بتحويـل ٣٠١.٥٤٠ دولار مـن فنتازي إلـى تراي كلر جيمـز. فرد أوزا بتأكيد التحويل.

٣٦– بتاريخ ٥ أبريل ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشـي فيـه تعليمـات بتحويـل ٥٠٠.٠٠٠ دولار مـن جـافي إلـى باسـفيك. فـرد دوشـي بتأكيـد التحويل.

٣٧– بتاريخ ٦ مايو ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشي فيه تعليمات بتحويل ٢ مليون دولار من جافي إلى باسفيك. فرد أوزا بتأكيد التحويل.

٣٨– بتاريخ ١ يونيو ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا وأربان دوشي فيه تعليمات بتحويل ٨١٥.٠٠٠ دولار من جافي إلى باسفيك. فرد دوشي بتأكيد التحويل. وتعكس كشوفات جافي المصرفية هذا التحويل.

٣٩– بتاريخ ٢٩ يونيو ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى ألتماش أنصاري وفيشال بوبات فيه كشف مصرفي يعكس تحويلاً لاسلكياً بقيمة ٥٩٩.٩٧٢ دولار من باسفيك إلى جافي بتاريخ ٢٩ يونيو ٢٠١٦. فوجههم غاندي بـ "إظهارها بصفة دفعة مسبقة إن لم يكن هناك حسابات مدينة مفتوحة من باسفيك".

٤٠– بتاريخ ١٨ يوليو ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا فيه تعليمات بتحويل ٢٠٠.٠٠٠ دولار من فايرستار دايموند إنك إلى جافي، ٢٠٠.٠٠٠ دولار من جافي إلى فانسي كريبشنز، ١٥٠.٠٠٠ دولار من فايرستار دايموند إنك إلى فايرستار دايموند إنك انترناشونال، و ١٥٠.٠٠٠ دولار من فايرستار دايموند إنك انترناشونال إلى فانسي كريبشنز. فرد أوزا بتأكيد التحويل.

٤١– بتاريخ ١٩ يوليو ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى افانيش أوزا فيه تعليمات بتحويل ١.٨٠٩.٥٢٨ من فايرستار دايموند إنك إلى فانسي كريبشنز. فرد أوزا بتأكيد التحويل.

٤٢– بتاريخ ٢٢ يوليو ٢٠١٦، أرسل غاندي بريداً إلكترونياً إلى افيناش أوزا وأربان دوشي فيه تعليمات بتحويل "٧١٥ ألف دولار من فاير ستار إلى فانسي – عمليات شراء [٤] ٢٠٠ ألف كيلو من فاير ستار إلى جافي [٤] ٢٠٠ ألف دولار من جافي إلى فانسي – عمليات شراء [.]" فرد أوزا بتأكيد التحويلات.

٤٣- بتاريخ ٢٢ مارس ٢٠١٧، أرسل أجاي غاندي بريداً إلكترونياً إلى أفيناش أوزا وكونال باتل فيه تعليمـات بتحويل ٣٠٠.٠٠٠ دولار من فايرستار دايموند إنك إلـى يونيك لأجل "مصاريف المكتب الخلفي" و ٢٤٠.٠٠٠ دولار من سينيرجيز إلى بريليانت لأجل "إعادة دفع قرض". فرد أوزا بتأكيد التحويلات.

٤٤- بتاريخ ٣ يناير ٢٠١٨، أرسل غاندي بريداً إلكترونياً إلى افيناش أوزا فيه تعليمـات بتحويل ٤٨٣.٦٢٠,٠٥ دولار من فايرستار دايموند إنك إلـى باسفيك، ٢.١٨٨.٧٦٩,٤٣ دولار من فايرستار دايموند إنك انترناشونال إلى باسفيك، و ٥٣٠.٠٠٠ دولار من جافي إلى باسفيك. فرد أوزا بتأكيد التحويلات. أعاد بعدها غاندي إرسال هذا البريد الإلكتروني إلى سوبهاش باراب وشيام وادوا يصرح فيه، فيما يتعلق بتحويل بقيمة ٢.١٨٨.٧٦٩,٤٣ دولار إلى باسفيك "لقد قمنا بتحويل هذه الأموال من FSI ولكن الرجاء تطبيق هذا المبلغ إلى FSII (باسفيك) بسبب أخطاء مصرفية في كابيتال ون". وبالتوافق مـع بريد غاندي الإلكتروني، أكدت كشـوفات فايرستار دايموند إنك المصرفية أن فايرستار دايموند إنك حولت كـلاً من ٤٨٣.٦٢٠,٠٥ دولار و ٢.١٨٨.٧٦٩,٤٣ دولار إلى باسفيك بتاريخ ٣ يناير ٢٠١٨.

٤٥- بتاريخ ٣١ يناير ٢٠١٨، أرسل افيناش أوزا بريداً إلكترونياً إلى أجاي غاندي فيه تأكيد التحويلات وتعكس تحويلات بقيمـة ٢.٤٦٦.٠١٥ دولار و ٥٢٥.٠٠٠ دولار مـن فايرستار دايموند إنك انترناشونال إلى فانسي كرييشنز. فأعاد غاندي إرسال هذه التأكيدات إلى شيام وادوا وقال "الرجاء إعلام بائعكم بهذه الدفعة وتحرير أي حسابات مدينة من هونغ كونغ."

<u>الملحق أ –١٢٥</u>

لطالما أبلغ أجاي غاندي نيراف مودي، ميتين باندیا، مانيش بوسامية، أميت ماجيا، وشيام وادوا بقدرته على تحويل الأموال من كيانات أمريكية إلى الهند في توسيع للاحتيال المصرفي طوال الفترة ذات الصلة. فعلى سبيل المثال:

١– بتـاريخ ١٤ أغسطس ٢٠٠٩، وجـه نيـراف مـودي غانـدي بالقيـام بـدفعات بإجمـالي ٢.٢٩٣.٣٢٦ دولار إلى بريليانت ودياجيم. وفي ١٦ يونيو ٢٠١٠، قام نيراف مودي بتوجيه غاندي بأن "يونيك قامت بتحويل مبلغ ٢٥.٠٠٠ دولار اليوم إلى سينيرجيز. الرجاء التحويل إلى الحساب الذي يريده السيد ميهول".

٢– بتاريخ ٢٦ أغسطس ٢٠١٠، أرسل نيراف مودي بريداً إلكترونياً إلى أجاي غاندي يسأل فيه: "ما ستكون خطة الدفع الأسبوعية لشهر سبتمبر إلى الهند؟" وفي ٢٧ أغسطس ٢٠١٠، رد غاندي، مرفقاً ورقتين تحتويان على سيناريوهات محتملة، وأشار "لتغطية قاعدة الاقتراض في أغسطس – طلب من الهند تحويل مبلغ ١ مليون دولار ليوم واحد وسأقوم بتحويلها في ١ سبتمبر. وقد تم شحن المبلغ الأساسي للمخزون إلى الهند وهونغ كونغ وهكذا يكون المخزون والحسـابات المدينـة قد أصبحا غيـر صـالحين". وفـي ٢٩ أغسطس ٢٠١٠، أعاد غاندي إرسال سلسلة البريد الإلكتروني هذه إلى ميهير بهنسالي.

٣– بتاريخ ٢١ أكتوبر ٢٠١٠، وفي توسيع لتجارة دائرية، أبلغ نيراف مودي وغاندي بالبريد الإلكتروني هيئة ظل بشحنة ألماس. وأشار مودي "أرسل الصفراء الحيوية ذات الـ ٧٠ قيراطاً إلى فاير ستون دبي بـ ٥١.٥٠٠ وليس إلى فاير ستون هونغ كونغ". فرد غاندي "تأكيد فاير ستون دبي، (وليس يونيك)[،]" فوضح مودي "آسف يونيك[،]" في إشارة إلى الهيئة الظل. فرد غاندي "جيد أنني سألت!!!".

٤- بتاريخ ٢٠ ديسمبر ٢٠١٣، أرسل أجاي غاندي بريداً إلكترونياً إلى مانيش بوسامية، ميتين بانديا وأميت مايش "يمكنني دفع ٦٠٠ ألف دولار من كابيتال ون – قسم الألماس أو ايه جافي – HSBC". وفي ٢٣ ديسمبر ٢٠١٣، رد بوسامية "تجدون مرفقاً فاتورة مفتوحة بقيمة ٦٠٢.٧٦١,٣٩ دولار من FSI". فرد باتل على غاندي "إنهم لا يملكون شيئاً، الافتتاح الأحدث من جافي أو قسم الألماس لذا يعطون لائحة من FSI بقيمة ٦٠٣ ألف دولار. الرجاء إعلامي إن كان بإمكاننا الدفع من FSI لأقوم بتحضير التحويلات وفقاً لذلك." فرد غاندي "قم بالتحويل إلى H[s]bc ولكن لا تدفع من هذه اللائحة بل من اللائحة الأخرى الخاصة بمانيش حوالي ١,٨ مليون دولار".

٥- بتاريخ ٩ يناير ٢٠١٤، أرسل أجاي غاندي بريداً إلكترونياً إلى ميتين بانديا، مانيش بوسامية وأميت مايش "يمكنني دفع ٥ مليون دولار في يناير ٢٠١٤ إلى الهند. الرجاء إرسال لائحة الفواتير إليّ بالبريد الإلكتروني لأتمكن من تحويل الأموال على أساس أسبوعي أو ما شابه." فرد بوسامية بتخصيص مبلغ ٥ مليون دولار على عدة كيانات لفاير ستار. وبتاريخ ١٣ يناير ٢٠١٤، رد غاندي، تم تحويل ٥ مليون دولار حسب ما هو وارد أدناه. الرجاء الإقرار باستلام هذه التحويلات". وفي ٢١ يناير ٢٠١٤، رد بوسامية، ناسخاً من بافيش باتل، "أبلغ Boi-لندن [حسب المعلومات والاعتقاد، تشير Boi إلى "بنك الهند"] أمس بأنهم لم يستلموا مبلغ ٢.١٥٧.٣٥٩,٩٠ دولار حيث أن الشخص المعني [كما وردت] كان في إجازة الأسبوع الماضي وأنهم استلموا فقط رسالة بأن الأموال في طريقها ولكن لم يتم قيد نوسترو. الرجاء تزويد رسالة السويفت." لاحقاً ذلك اليوم، رد باتل على غاندي "اتصل بي السيد مانيش وقد استلموا الأموال". عندها رد غاندي على بوسامية "أرسل إليّ بافيش قائلاً بأنه قد تم استلام الأموال. الرجاء إعلامي إن كان الأمر غير ذلك."

٦- بتاريخ ١ أبريل ٢٠١٤، أرسل غاندي بريداً إلكترونياً إلى مانيش بوسامية "يمكنني دفع ٤ مليون دولار في أبريل ٢٠١٤ إلى الهند. الرجاء إرسال لائحة الفواتير إليّ بالبريد

الإلكتروني لأتمكن من تحويل الأموال على أساس أسبوعي أو ما شابه." فرد بوسامية بتعليمات بتحويل مبلغ ١.٧٦٣.٦٤٤,٦٠ دولار من فايرستار دايموند إنك إلى فاير ستار انترناشونال ليمتد و ٢.٢٥٠.٨٥٨,٣٦ دولار من فايرستار دايموند إنك إلى فاير ستار دايموند انترناشونال برايفيت ليمتد. وفي ٢ أبريل ٢٠١٤، رد غاندي "تم تحويل ١,٠٧٦ مليون اليوم". وبتاريخ ١٤ أبريل ٢٠١٤، تابع غاندي "تم تحويل ٢٤٠ ألف دولار و ٣٤١ ألف دولار اليوم".

٧– بتاريخ ٦ أبريل ٢٠١٦، أرسل شيام وادوا بريداً إلكترونياً إلى أجاي غاندي وميهير بهنسالي يطلب فيه منهما إرسال ٢,٧ مليون دولار من جافي إلى فاير ستار انترناشونال ليمتد لإبراء الحسابات المدينة المعلقة وقال "إن موقفنا المالي حرج في الهند، وإلا لكنا حولنا الأموال إليكم مقابل حساباتنا الدائنة بقيمة ١ مليون دولار تقريباً من فاير ستار دايموند انترناشونال برايفيت ليمتد لإبراء الحسابات الدائنة/الحسابات المدينة بين الهند ونيويورك". فرد غاندي، مع نسخة إلى بهنسالي "لدينا الحسابات المدينة في الخارج بحوالي ٨,٥ مليون دولار في فايرستار دايموند– إن حصلت على الأموال في فايرستار دايموند إنك، عندها يمكننا تحويل الأموال إلى الهند هذا الشهر." وفي اليوم التالي تابع غاندي "يمكنني تحويل ١ مليون دولار هذا الشهر من جافي عبر فاير ستار. هل يمكنها أن تعود إلى فاير ستار؟

<u>الملحق أ – ١٣١</u>

إن الطبيعة السرية للعمليات المالية "العادية" موضـحة في المراسـلات بـين نيراف مـودي، أجاي غاندي، ميهير بهنسالي، ومتآمرين آخرين. فعلى سبيل المثال:

١– بتاريخ ٢٤ سبتمبر ٢٠٠٩، أرسل أجاي غاندي بريداً إلكترونياً إلى راغو آير "لقد نظرت إلـى إجمـالي التدفق النقدي وهنـاك اختلافات كبيرة بـين ملخـص إجمـالي التدفق النقدي والتفاصيل لكل شهر. والسبب الأساسي هو أنني أحسب الإيصالات النقدية غير الأساسية والدفعات غير الأساسية عبر التدفق النقدي دون زيادة المبيعات وعمليات الشراء ذات الصلة (الألماس السائب)." فرد آير "هل يمكنك القيام بهذا التطابق رجاءً[.] حتى يصبح التدفق النقدي السنوي صحيحاً[.]"

٢– بتاريخ ٨ مارس ٢٠١٠، أرسل ديباك غوبتا بريداً إلكترونياً إلى أجاي غاندي وميهير بهنسالي يطلب فيه الكشوفات المالية لجافي وفايرستار دايموند إنك. فأعاد غاندي إرسال البريد الإلكتروني إلى بهنسالي وسأل "من هو ديباك غوبتا وهل يمكننا إرسال FS إليه؟" فرد بهنسالي "أجل، يمكننا الإرسال إليه. وسأشرح عندما نتحدث." فرد غاندي "هل عليّ إرسال كل من الأساسي وغير الأساسي إليه؟" فرد بهنسالي "أجل، أرسل كليهما إليه، حتى تتوافق مع الأرقام المدققة. تحدث إليه على الهاتف واشرح له الاختلافات."

٣– بتاريخ ١٧ أكتوبر ٢٠١٢، أرسل أجاي غاندي بريداً إلكترونياً إلى نيراف مودي، ميهير بهنسالي، راغو آير وساجو بولوز فيه "الأعمال الأساسية والكشوفات المالية العادية اعتباراً من ٣٠ سبتمبر ٢٠١٢ للمراجعة". وبتاريخ ٢٥ أكتوبر ٢٠١٢، أرسل ساجو بولوز بريداً إلكترونياً لأجاي غاندي "أحتاج لمساعدتك لفهم أرقام "مبيعات" النسخة "الثالثة" لـ [فايرستار دايمونـد إنـك انترناشــونال] اعتبــاراً مـن ســبتمبر ٢٠١٢...١– مبيعـات قسـم جـوش

٤.٨٩٨.٢٥٧ دولار – هذه مبيعات ألماس جوش فقط من العمليات المالية[؟] ٢– عمليات سـبتمبر الماليــة ٨.٣٣٣.٨٤٢ دولار – هـذا يتضـمن مبيعــات جــوش + مبيعــات الشـركة/المبيعات الأكبـر لـ NDM[؟] ٣– عمليـات سـبتمبر الماليـة قسـم جـوش للـدمج ٩.٥٩٩.٦٢٧ دولار = ماذا يتضمن [كما وردت] هذا الرقم؟" فرد غاندي "١– يتضمن قسم جوش لسبتمبر في هونغ كونغ العمليات التي تمت للشركة الداخلية مثل فايرستار دايموند إنك، ايه جافي، فاير ستار هونغ كونغ، فاير ستار دبي والشركات التابعة الأخرى في هونغ كونغ ودبي (٩.٥٥ مليون دولار). ٢– عمليات جوش المالية – ٤.٨٩ مليون دولار تتضمن أي مبيعات تابعة قد يكون بها هامشاً. وكافة مبيعات بينك والمبيعات التابعة دون هامش غير متضمنة. ٣– مبيعات الشركة – لا تتضمن الـ ٨.٣٣ مليون دولار أي مبيعات تابعة ولكن فقط المبيعات للعملاء الخارجيين بمن فيهم مبيعات بينك لديه دايموند."

٤– بتاريخ ١٦ سبتمبر ٢٠١٣، أرسل أجاي غاندي بريداً إلكترونياً إلى سمير شاه وريبيكا تشـو بموضـوع "مبيعـات الألمـاس السـائب"، "خسـارة ١٩٦ ألـف دولار للمبيعـات المرفقـة لأغسطس ٢٠١٣. الرجاء التأكيد بأسرع ما يمكن." فرد شاه "أتت البضائع بالأسعار الخاطئة من سانديب. وهذا سبب إظهارها كخسارة." فأعاد غاندي إرسال هذه الرسالة إلى ميهير بهنسالي وقال "نحتاج لإيقاف هذا. إنني أفقد السيطرة على العمليات المالية الأساسية. أين أظهر هذه الخسارة لأغسطس الآن – في الأساسية أم غير الأساسية؟ هل يمكننا عكسها في سبتمبر ٢٠١٣ رجاءً حيث إنها تؤثر على المصارف للعمليات المالية ذات الـ ٦ أشهر.." وتابع غاندي "تم استثناء خسارة الـ ١٩٦ ألف دولار من العمليات المالية الأساسية لشهر أغسطس ٢٠١٣ ولكنها جزء من العمليات المالية العادية." فرد بهنسالي، مـع نسخة إلى ساجو بولوز "حسناً. ساجو – الرجاء التحدث إليّ"

٥– بتاريخ ١٥ أكتوبر ٢٠١٣، أرسل أجاي غاندي بريداً إلكترونياً إلى ساجو بولوز، مـع نسخة إلى كونتال ديساي "الأساسية – غير الأساسية – عبر سبتمبر ٢٠١٣ – كم عليّ

تحريك؟ ١٦٧ ألف دولار أم ١٧٧ ألف دولار التي ناقشناها الأسبوع الماضي؟" فرد بولوز
"مرحباً سيد أجاي، قمنا بالتناقش مع كونتال وراجعنا ملف عمله بالتفصيل. وسيقوم بإرسال
(كما وردت) بريد إلكتروني مفصل إليك". فرد غاندي "كم كان المبلغ وكونتال – هل أرسلته
[كمـــا وردت]؟ فــرد ديســـاي "أجـــل، الرجـــاء التحقـــق مـــن البريـــد الآخـــر."

<u>الملحق أ – ١٤٤</u>

كجزء من عملية التدقيق، يرسل المدققون بريداً إلكترونياً للأطراف المدرجين حول حسابات الشركة المدققة سجلات الحسابات المدينة والدائنة لطلب تأكيد خطي بالمبالغ المنعكسة في دفاتر وسجلات الشركة المدققة. وبالنسبة لعمليات تدقيق الكيانات الأمريكية، والتي حسب المعلومات والاعتقاد تم إجراؤها معاً، تم وضع أجاي غاندي ليحصل على نسخة من رسائل المدققين الإلكترونية إلى الكيانات الظل، والتي كان غاندي غالباً ما يعيد إرسالها إلى العملية ١ ليطلب من العملية ١ جعل الكيان الظل يرسل تأكيداً إلى المدققين. فعلى سبيل المثال:

١– بتاريخ ٧ يونيو ٢٠١٧، أعاد أجاي غاندي إرسال إلى العملية ١ طلب المدققين لفانسي كريبشنز. فرد العملية ١ "اليوم أو غداً سيقوم العميل بالتأكيد حسب الاتفاق". فرد غاندي "كان هناك عدة رسائل بريد إلكتروني..." وكان غاندي يحيل طلبات المدققين إلى عدة كيانات ظل أخرى، والتي أعاد غاندي إرسالها أيضاً إلى العملية ١.

٢– بتاريخ ١١ يوليو ٢٠١٧، أرسل غاندي بريداً إلكترونياً إلى العملية ١ يسأل "هل يمكنك رجاءً الطلب من عميلك [بريليانت] توقيع التأكيد المرفق لشركة سينيرجيز؟" ولم يكن المرفق هو ورقة طلب تأكيد المدققين العادية، بل كان مستند أجل لقرض غير مضمون من بريليانت إلى سينيرجيز بقيمة ١.٢٨٧.٠٠٠ دولار. وقد أشارت الورقة إلى أن القرض سيكون دون فائدة، قابل لإعادة الدفع عند الطلب، مؤرخ اعتباراً من ٣٠ سبتمبر ٢٠١٦ – قبل سنة تقريباً – وسيتم استخدامه "لأغراض أعمال الشركة". وفي ١٩ يوليو ٢٠١٧، أرسل غاندي بريداً إلكترونياً مباشرة إلى <u>accounts@brilliantdiamonds.hk</u> مع نسخة إلى العملية ١ قائلاً "انظر تأكيد سينيرجيز المرفق وقم بالتوقيع وإرساله إليّ بأسرع ما يمكن. إنك تعيق تدقيقي. هذا تأكيد للرصيد اعتباراً من ١٦/٣٠/٩." وبعد ساعة تقريباً، أعاد غاندي إرسال

هذه الرسالة إلى كوريان ماثيوز يسأل فيه "كوريان – هل يمكنك رجاءً الطلب من عميلك الاعتناء بهذا بأسرع ما يمكن حسب البريد الإلكتروني أدناه؟" وفي ٢٣ يوليو ٢٠١٧، رد موظف في بريليانت على رسالة غاندي، مع نسخة إلى العملية ١، مرفقاً ورقة القرض الموقعة.

٣- بتاريخ ١٠ نوفمبر ٢٠١٧، أعاد غاندي إرسال إلى العملية ١ طلب المدققين إلى إيتيرنال وطلب من العملية ١ "الرجاء ملاحقة بائعك لتأكيدها [كما وردت]. التدقيق معلق". وفي نفس ذلك اليوم، أرسل غاندي رسائل إلكترونية مطابقة إلى حد كبير إلى العملية ١ معيداً إرسال طلبات المدققين إلى فانسي كرييشنز وسينو ترايدرز.

<u>الملحق أ –١٤٥</u>

تم استخدام حساب العملية ١ أيضاً لتنظيم عمليات تحويل الأموال والمجوهرات بين كيانات فاير ستار والكيانات الظل. فعلى سبيل المثال:

١– بتاريخ ٦ مارس ٢٠١٥، أرسلت ريبيكا تشو بريداً إلكترونياً إلى سانديب ميستري، مع نسخة إلى سمير شاه وباريش ميهتا "الرجاء أخذ العلم أن ١.٦٨.٥٢ قيراطاً لـ ٢/١ قيراط مقابل الألماس السائب أصبحت جاهزة للشحن. الرجاء تزويد عنوان الشحن لنتمكن من المتابعة." لاحقاً ذلك اليوم، أعادت تشو إرسال البريد الإلكتروني إلى العملية ١ وقالت "مرحباً سانديب، أرجو أن تصل هذه الرسالة [كما وردت] إليك! الرجاء الإبلاغ عما هو وارد أدناه مع الشكر ."

٢– بتاريخ ٢٨ سبتمبر ٢٠١٥، أرسل أجاي غاندي إلى العملية ١ تعليمات بالتحويل إلى حساب جافي المصرفي لدى HSBC ينهي ٢٤٦٠. وفي اليوم التالي، رد العملية ١ "قامت يونيفرسال بدفع ١،٤ مليون دولار دفعة مقدمة مقابل الفاتورة [.]" وبعد عدة ساعات، رد غاندي "استلمتها وأرسلتها إلى إس دي سي". وتعكس كشوفات جافي المصرفية أنه، بتاريخ ٢٩ سبتمبر ٢٠١٥، استلمت جافي مبلغ ١.٣٩٩.٩٦٢ دولار من يونيفرسال فاين جولري م.م.ح. وفي نفس ذلك اليوم، قامت جافي بتحويل ٤٦٤.٠٥٠ دولار إلى إس دي سي ديزاينز ذ.م.م و ٩٥٠.٠٠٠ دولار إلى فايرستار دايموند إنك انترناشونال. وتعكس كشوفات فايرستار دايموند إنك انترناشونال المصرفية أنـه، بتاريخ ٢٩ سبتمبر ٢٠١٥، حولـت فايرستار دايموند إنك انترناشونال مبلغ ٩٤٣.٨٢٧،٥٠ دولار إلى إس دي سي ديزاينز ذ.م.م. وبالتالي، ومتوافقاً مع تبادلات الرسائل الإلكترونية بين أجاي غاندي والعملية ١، فقد

تم في النهاية إرسال كامل المبلغ الذي يقارب ١,٤ مليون دولار التي استلمتها جافي من يونيفرسال إلى إس دي سي ديزاينز .

٣- بتاريخ ٢٩ يناير ٢٠١٦، أرسل ديناكاران بيلاي، وهو مدير مالي في شركة فاير ستار انترناشونال الخاصة، بريداً إلكترونياً إلى أجاي غاندي "قمنا اليوم بتحويل ٤٠٥,١٨٠,٨٣ دولار في FSI من فايرستون انترناشونال برايفيت ليمتد، وتفاصيل الفاتورة كما هي مدرجة أدنـاه... وحالمـا تصـبح الدفعـة فـي حسـابك، الرجـاء تحويـل المسـتحقات المعلقـة بقيمـة ٦٥٠,٨٨٠,٠٠ دولار مقابل فواتيرنا، وقد تم إرفاق التفاصيل لمرجعكم." وقد أرفق البريد الإلكتروني فاتورتين من فايرستون انترناشونال برايفيت ليمتد إلى فايرستار دايموند إنك بتاريخ ٢٢ أكتـوبر ٢٠١٥ و٢٣ أكتـوبر ٢٠١٥، علـى التـوالي. وفـي ٣ فبرايـر ٢٠١٦، أعـاد سوبهاش باراب، الذي تم وضعه ليتلقى نسخة من بريد بيلاي إلى غاندي، إرسال الرسالة إلى العملية ١ مع عبارة "لأخذ العلم". فأرسل عندها العملية ١ بريداً إلكترونياً إلى غاندي "سيد أجاي، أكد فريق الهند [كما وردت] بأن مبلغ ٦٥٠ ألف دولار ضد خطته ٤٠٥ ألف دولار، لذا الرجاء إرسال ٦٥٠ ألف دولار إلى فايرستار دبي، والتي تحدثنا معها أمس [كما وردت]. مـع فائق الاحترام والتقدير، سانديب[.]" فرد غاندي، مـع نسخة إلى سوبهاش بـاراب "سأدفع ٤٢٥ ألف دولار . الرجاء إعلامي إلى أين أو إلى أي شركة".

٤- بتاريخ ١ فبراير ٢٠١٦، أرسل العملية ١ بريداً إلكترونياً إلى ريبيكا تشو وسمير شاه "ستقومين باستلام [كما وردت] البضائع من تراي كلر [.] الرجاء التنسيق مـع السيد سمير بالتفصيل [.]" وقد تضمنت الرسالة جدولاً يدرج إجمالي ٣٧٩,٠٢ قيراطاً مـن الألمـاس المختلط من مواصفات مختلفة. ويعكس دفتر مشتريات فايرستار دايموند إنك عملية شراء في ٢٢ فبراير ٢٠١٦ لـ ٣٧٩,٠٢ قيراطاً مـن الألمـاس السـائب مـن تـراي كلـر جيمـز بسـعر إجمالي ٤٠٠,١٣١ دولار .

٥- بتاريخ ٩ فبراير ٢٠١٦، أرسلت ريبيكا تشو بريداً إلكترونياً إلى العملية ١، مع نسخة إلى أجاي غاندي "مرحباً سانديب، حسب محادثتنا الهاتفية، الجراء أخذ العلم بأنه قد تم استلام كلاً من الحزمتين RE-117 و RE-119 في نيويورك. بالإضافة لذلك، تم استلام شحنة واحدة ليس لها أي أوراق على الإطلاق."

٦- بتاريخ ٣ مارس ٢٠١٦، أرسل سوبهاش باراب بريداً إلكترونياً إلى أجاي غاندي، مع نسخة إلى العملية ١ وشيام وادوا "السيد أجاي المحترم، الرجاء تحويل دفعة ٢٬٠٠٠ مليون دولار [كما وردت] من ايه. جافي إلى فايرستون انترناشونال برايفيت ليمتد حسب اللائحة المرفقة". وقد كان المرفق ورقة تدرج عدة فواتير صادرة من قبل فايرستون انترناشونال برايفيت ليمتد إلى جافي بين ٢٠ مارس ٢٠١٥ و ٩ سبتمبر ٢٠١٥ بإجمالي ٢٠٠٤٬٨٧٩٬٧٠ دولار. فرد غاندي "لقد لاحظت للتو بأنه لا يمكنني الدفع لجافي (جزء من الـ ٣ مليون) إلا إذا جاءت الأموال من الخارج."

٧- بتاريخ ٢٩ مارس ٢٠١٧، أرسل العملية ١ بريداً إلكترونياً إلى أجاي غاندي "السيد أجاي، قمنا ببيع البضائع إلى باسفيك دايموندز م.م.ح، وسيقوم الطرف بتحويل دفعة مسبقة بقيمة ١٬٩ مليون دولار [.] الرجاء إرسال فاتورة مبدئية إليهم حسب التفاصيل أدناه... مع فائق الاحترام والتقدير [،] المبيعات". فرد غاندي بفاتورة رقم ٠٣٢٠١٧، تاريخ ٢٠ مارس ٢٠١٧، تعكس عملية بيع من جافي إلى باسفيك لـ ١٬٦٩١٬٢٥ قيراطاً من "الألماس المختلط" بسعر إجمالي ٢٬١١٤٬٠٦٢٬٥٠ دولار. وبتاريخ ٣ أبريل ٢٠١٧، استلمت جافي تحويلاً بقيمة ١٬٤٩٩٬٩٧٢ دولار من باسفيك بإشارة "دفعة مسبقة مقابل الفاتورة المبدئية رقم ٠٣٢٠١٧". وفي نفس ذلك اليوم، قامت جافي بتحويل ١٬٥١٠٬٢٦٧٬٧٧ دولار إلى شركة فاير ستار انترناشونال الخاصة.

٨- بتاريخ ٢٢ سبتمبر ٢٠١٧، أرسل غاندي بريداً إلكترونياً إلى العملية ١ مرفقاً تقريراً يعكس الحسابات المدينة من بريليانت، يونيك وورلد دايموند إلى فايرستار دايموند إنك ويسأل

العملية ١ "هل قام عميلك بإبراء هذه الـ الحسابات المدينة – ٥،٥ مليون دولار بتاريخ ٣٠
سبتمبر ٢٠١٧ أو قبله."

<u>الملحق أ –١٥٣</u>

في عدة حالات، كان ميهير بهنسالي وأجاي غاندي يقومان على الفور بتحويل الأموال المستلمة من قبل كيانات أمريكية من كيانات شيث إلى كيانات الظل وكيانات فورين فاير ستار (متضمنة عبر خدمة تحصيلات خطابات الاعتماد)، كما كانوا يفعلون عادة بالأموال المستلمة من كيانات الظل وكيانات فاير ستار، ولكن ليس من العملاء الموثوقين. فعلى سبيل المثال:

١– بتاريخ ٢٩ أبريل ٢٠١١، قامت إيكسيلانت فاسيتس بتحويل ٧٦٩.٤٨٠ دولار إلى فايرستار دايموند إنك. وبتاريخ ٢ مايو ٢٠١١، دفعت فايرستار دايموند إنك ٧٤٩.٠٢٦,٧٥ دولار عبر خدمة تحصيل خطابات الاعتماد.

٢– بتاريخ ٧ سبتمبر ٢٠١٢، قامت إيكسيلانت فاسيتس بتحويل ٥٩٤.٠١٣,٨٥ دولار إلى فايرستار دايموند إنك. وفي نفس اليوم، دفعت فايرستار دايموند إنك ٣٨١.٢٩٠,٧٠ دولار عبر خدمة تحصيل خطابات الاعتماد ودفعت ٢٧٢.٠٧١,٥٩ دولار إلى حساب فايرستون انترزناشونال برايفيت ليمتد لدى بنك البنجاب الوطني. وكان مجموع هذه التحويلات اللاحقة ٦٥٣.٣٦٢,٢٩ دولار.

٣– بتاريخ ١٨ يوليو ٢٠١٣، استلمت إيكسيلانت فاسيتس ٧٥١.٨٩٥ دولار على الأقل من فانسي كريبشنز. وفي نفس اليوم قامت إيكسيلانت فاسيتس بتحويل ٩٤٩.٩٨٠ دولار إلى فايرستار دايموند إنك. ودفعت بعدها فايرستار دايموند إنك مبلغ ٤٨٩.٩٤٣,٣٥ دولار عبر تحصيل خطابات الاعتماد وحولت ٦٢٨.٤٤٤,٧٩ دولار إلى فايرستون انترزناشونال برايفيت ليمتد.

٤- بتـاريخ ٢٤ يوليـو ٢٠١٣، حولـت إيكسـيلانت فاسـيتس ٦١٣.٦٣٧,٦٨ دولار إلـى فايرستار دايموند إنك. وفي نفس اليوم، دفعت فايرستار دايموند إنك مبلغ ٧٠٠.٠٠٠ دولار لأحد مقرضيها، مصرف HSBC.

٥- بتـاريخ ١٠ نـوفمبر ٢٠١٤، حولـت إيكسـيلانت فاسـيتس ١.١١٢.٠٦٠,٥٠ دولار إلـى فنتازي، بعد ذلك حولت فنتازي ١.١٠٠.٠٠٠ دولار إلـى فايرستار دايموند إنك، وحولت فايرسـتار دايمونـد إنك ١.١٠٠.٠٠٠ دولار إلى جافي، وحولت جافي ١.١١٧.١١٣,١٦ إلى فايرستون انترناشونال برايفيت ليمتد.

٦- بتـاريخ ١٩ نـوفمبر ٢٠١٥، حولـت إيكسـيلانت فاسـيتس ٩٧٦.٨٦٤,٨٥ دولار إلـى فايرسـتار دايمونـد إنك. وفـي اليـوم التـالين اسـتلمت فايرسـتار دايمونـد إنك ايضـاً مبلـغ ١.٥٠٠.٠٠٠ دولار من فنتازي. بعدها حولت فايرستار دايموند إنك مبلغ ٢.١٠٠.٠٠٠ دولار إلى بنك الخصم الإسرائيلي لحساب نيويورك ودفعت "خدمات تجارية" – وهي خدمـة مشابهة لـ "تحصيل خطابات الاعتماد" والتي كانت كيانات فاير ستار الأخرى عبرها هي المستفيد النهائي من التحويلات.

٧- بتاريخ ٢٣ ديسمبر ٢٠١٥، حولت إيكسيلانت فاسيتس ٩٦٩.٩٨٠ دولار إلى فايرستار دايموند إنك. وبتاريخ ٢٨ ديسمبر ٢٠١٥، سددت فايرستار دايموند إنك دفعة مبلغ أساسي بقيمة ٩٠٠.٠٠٠ دولار إلى بنك HSBC.

٨- بتاريخ ٢١ أبريل ٢٠١٥، أرسل ميهير بهنسالي بريداً إلكترونياً إلى أجاي غاندي "الرجاء تحويل ٢٥٠ ألف دولار إلى ش[ركة] [إيكسيلانت] ف[اسيتس] من جافي كدفعة مسبقة." فأعاد غاندي إرسال الرسالة إلى أفينـاش أوزا وأربـان دوشـي ووجههمـا "٢٠٠.٠٠٠ دولار مـن فايرسـتار دايمونـد إنك إلـى ايـه جافي. ٢٥٠.٠٠٠ دولار مـن ايـه جافي إلـى إيكسيلانت فاسيتس حسب المرفق". فرد أوزا بتأكيد التحويلات. وفي نفس ذلك اليوم، أرسل غاندي بريداً

إلكترونياً إلى شيام وادوا موضوعه "جافي/توين فيلد. إيكسيلانت فاسيتس" وأرفق شيكاً بقيمة

٢٥٠،٠٠٠ دولار من جافي إلى فايرستار دايموند إنك، وشيكاً بقيمة ٢٥٠،٠٠٠ دولار من

توين فيلدز إلى جافي، وتأكيد بتحويل ٢٥٠،٠٠٠ دولار من جافي إلى توين فيلدز، وتأكيداً

بتحويل ٢٥٠،٠٠٠ دولار من جافي إلى إيكسيلانت فاسيتس. وقال غاندي "الرجاء الاتصال

بي غداً وسأقوم بالتفسير. لقد حولنا إلى توين فيلد بالخطأ وأعادت توين فيلد المال. وأخيراً

حولنا إلى إيكسيلانت فاسيتس كقرض. وقد مولت فايرستار دايموند إنك العملية". وفي ٢١

يونيو ٢٠١٦، أرسلت جاسمين برادان من إيكسيلانت فاسيتس بريداً إلكترونياً إلى أجاي

غاندي "لقد استلمنا دفعة القرض المسبقة بتاريخ ٢٠١٥/٢١/٤ من ايه جافي إنك. ونخطط

اليوم لإعادة ذلك المبلغ. لقد كنت أتساءل إن كان بإمكانك إرسال التفاصيل المصرفية مع

تعليمات الدفعة المحولة". وبعد عدة ساعات، بعد إنجاز التحويل، أعاد غاندي إرسال سلسلة

الرسائل إلى ميهير بهنسالي وقال "تم استلام ٢٥٠ ألف دولار. ودفعنا ١،٢٥٠ مليون دولار

إلى الهند اليوم. (٢٥٠ ألف زائد ١ مليون بناءً على شحنة الشهر)".

٩- بتاريخ ١٣ ديسمبر ٢٠١٢، أرسل ممثل خدمة العملاء في HSBC بريداً إلكترونياً إلى

أجاي غاندي "لقد تم إعلامي للتور بأنـه هنـاك تحويلاً مرسـل مـن حسـاب [سينيرجيز]

×××××٣٦٩ بقيمـة ٩٠.٩٧٠,٠٠ دولار. وليس هناك حالياً أموال كافية متوافرة في هذا

الحساب لإرسال هذا التحويل. أيضاً، هناك تحويلين مرسلين من حساب [فايرستار دايموند

إنك] ×××××٠٠٤ بإجمالي ٦٢٢.٥٩١,٠٠ دولار. وليس هناك حالياً أموال كافية متاحـة

في هذا الحساب لإرسال هذا التحويل. الرجاء الإعلام". فرد غاندي "إنني أتوقع ١،١٧٥

مليون دولار في فاير ستار دايموند وحالما تصل، ستكون كافة التحويلات بخير. يجب أن

تكون قد وصلت بحلول هذا الوقت..." وأرفق غاندي تأكيد بالتحويل من سيتي بانك يظهر

تحويلاً بقيمة ١.١٧٥.٢١٣,٤٥ دولار من حساب التحقق الخاص بإس دي سي ذ.م.م لدى

سيتي بانك إلى فايرستار دايموند إنك "مقابل الفاتورة ١٥٢٠٦٩٩٦". ويشير هذا التأكيد بأن

التحويل قد تم من قبل سريدار كريشنان وموافق عليه من قبل أبهاي جافيري. وتعكس كشوفات فايرستار إنك المصرفية تحويلاً داخلياً بقيمة ١.١٧٥.٢١٣٫٤٥ دولار من إس دي سي بتاريخ ١٣ ديسمبر ٢٠١٢ وتحويلات خارجية في ذلك اليوم بقيمة ٣٩١.٦١١ دولار إلــى ســينيرجيز و ٢٣١.٠٠٠ دولار إلـى يونيـك. وقـد أظهـرت كشـوفات سـينيرجيز المصرفية أن سينيرجيز قد استخدمت الأموال المستلمة من فايرستار دايموند إنك فوراً لتحويل ٩١.٠٠٠ دولار إلى بريليانت و ٣٠٠.٠٠٠ دولار إلى يونيك.

١٠- بتاريخ ٢٦ ديسمبر ٢٠١٣، استلمت فايرستار دايموند إنك تحويلات من شركة إس دي ســي ديزاينــز وإس دي ســي ديزاينــز ذ.م.م بقيمــة ٢٥٠.٠٠٠ دولار و ٣٢٣.٧٤٥ دولار علـى التوالي. وفي ٣٠ ديسمبر ٢٠١٣، أرسل أجاي غاندي بريداً إلكترونياً إلى مانيش بوسامية وميتين بانديا "يمكنني أن أدفع ١٫٦ مليون دولار من فاير ستار إنك قبل ٣١ ديسمبر. الرجاء إرسال لائحة إليّ بالبريد الإلكتروني". بعد ذلك أعاد غاندي إرسال الرسالة إلى هيمانت بات وقال "لأخذ العلم. تم استلام بعض الأموال من إس دي سي. ولدى بافيش التفاصيل". فرد بوسامية بورقة تدرج فاتورتين صادرتين عن فاير ستار دايموند انترناشونال برايفيت ليمتدإلى فايرستار دايموند إنك بإجمالي ١.٥٤٧.٩٠٠٫٨١ دولار وسبع فـواتير صـادرة عن فايرسـتون انترناشـونال برايفيت ليمتد إلى تينكس هونغ كونغ ليمتد، إيليفانت كوليكشن، ومجوهرات دي نافينشاندرا والتي تكون فايرستار دايموند إنك مدرجة فيها كطرف الإخطار بقيمة ٥٠.٩٦١.٢٦ دولار. كما تضمنت الورقة أيضاً أعمدة تحدد "المصرف" ذو الصلة لكل فاتورة "رقم مرجع البنك" و"تاريخ استحقاق البنك". وقد أعاد غاندي إرسال الورقة إلى بافيش باتل، نيسخ من ميهير بهنسالي، "الرجاء إعداد هذه التحويلات". فطلب باتل عندها موافقة غاندي وحصل عليها لتحويل ١ مليون دولار من جافي إلى فايرستار دايموند إنك لتمويل التحويلات الأخرى. ولاحقاً ذلك اليوم، رد غاندي على بوسامية وبانديا "تم تحويل الأمـوال. الرجـاء الإقـرار بالاسـتلام". فرد بوسامية "تم اسـتلام الأمـوال". وتعكس كشـوفات

فايرستار دايموند إنك المصرفية تحويلين خارجيين إلى "تحصيل خطابات الاعتماد" بالنيابة عن فاير ستار دايموند انترناشونال برايفيت ليمتد بإجمالي ٨١,٩٠٠,٥٤٧.١ دولار وتحويل آخر بقيمة ٩٦١.٥٠ دولار إلى فايرستون انترناشونال برايفيت ليمتد في ٣٠ ديسمبر ٢٠١٣.

١١– بتاريخ ١٩ يوليو ٢٠١٤، أرسل مانيش بوسامية بريداً إلكترونياً إلى هيمانت بات وميتين بانديا فيه لائحة بفواتير تدين بموجبها فايرستار دايموند إنك بمبلغ ١٢,١٩٧.٦٦٠ دولار إلى فايرستون انترناشونال برايفيت ليمتد. فأعاد بات إرسال هذه الرسالة إلى أجاي غاندي وقال "الرجاء الدفع حسب المرفق". عندها غاندي إرسال الرسالة إلى بافيش باتل ووجه "ابقها جاهزة. الأموال قادمة من إس دي سي". وتعكس الكشوفات المصرفية لكل من فايرستار دايموند إنك وفنتازي أنه، بتاريخ ٢١ يوليو ٢٠١٤، حولت إس دي سي ديزاينز ذ.م.م ٥٠,٩٨٩.٧٧٥.١ دولار إلى فايرستار دايموند إنك وأن فايرستار دايموند إنك وفنتازي حولتا مبلغاً بإجمالي ٤٩,٣٠١.١١٩.١ دولار لدفع خطابات الاعتماد الصادرة إلى FDPL وفاير ستار دايموند انترناشونال برايفيت ليمتد.

١٢– بتاريخ ٢٦ فبراير ٢٠١٤، أرسل أجاي غاندي بريداً إلكترونياً إلى سريدار كريشنان، مع نسخة إلى شيام وادوا، "سريدار: بعد دفعة اليوم من جافي إليك، هل يمكنك رجاءً تحويل مبلغ ٧٠,٠٦٣ دولار إلى جافي من شركة إس سي ديزاينز وسأقوم بتحويل ٦٩.٦٤٠ دولار إلى إس دي سي ديزاينز ذ.م.م ليتم إبراء الحسابات الدائنة/الحسابات المدينة الخاص بنا مع جافي؟" وفي ٢٤ أبريل ٢٠١٤، أرسل أجاي غاندي بريداً إلكترونياً إلى شيام وادوا "أحتاج لتحويل بعض الأموال إلى إس دي سي. ما هي المبالغ الواجبة الدفع الخاصة بنا إليهم في ايه جافي؟" فرد وادوا بأن جافي تحتاج لاستلام ٧٠,٠٦٣ دولار من شركة إس دي سي ديزاينز، ودفع مبلغ ٦٩.٦٤٠ دولار إلى إس دي سي ديزاينز ذ.م.م. فقال "هذه أرصدة قديمة تمت مناقشتها معك سابقاً أيضاً لأجل إبراء دفاترنا". عندها أعاد غاندي إرسال رسالة وادوا إلى ميهير بهنسالي قائلاً "ليس هناك أي أموال واجبة الدفع إلى إس دي سي في

جافي". وفي ١٧ يونيو ٢٠١٤، رد وادوا "ما زال هذا المتطلب مفتوحاً بين ايه جافي وإس دي سي. الرجاء إغلاقه". فرد غاندي "الرجاء إرسال رسالة لسريدار ونسخة إليَّ". وفي ٢٣ يونيو ٢٠١٤، رد وادوا "الرجاء فتح بند إس دي سي في دفاتر ايه جافي مبرأ من الحسابات المدينة والحسابات الدائنة. لأخذ العلم – لقد تجاهل سريدار رسالتك في فبراير ٢٠١٤ بالإضافة إلى رسائلي التذكيرية". فأعاد غاندي إرسال سلسلة الرسائل هذه إلى كريشنان وسأل "هل يمكنك التخليص؟" فرد كريشنان "أهلاً أجاي، هل ميهير في البلاد؟"

<u>الملحق أ –١٦٣</u>

تتضـمن الأمثلـة الإضـافية علـى وثـائق ومراسـلات توضـح ممارسـات حسـابية مشـبوهة للمعاملات التي تتضمن كيانات إس دي سي وكيانات شيث:

١– بتاريخ ٣ أبريل ٢٠١٢، أرسل ساجو بولوز بريداً إلكترونياً إلى أجاي غاندي، مـع نسـخة إلى عنوان بريد راغو آير الإلكتروني الشخصي، "أحتاج لمساعدتك في فهم تشـعبات مبيعـات العميل بمجملها اعتباراً من يناير ٢٠١٢... الملف الأول هو تقرير العميل الذي نأخذه بعين الاعتبار لأجل الدمج. فلأجل إيقاف المبيعات الداخلية، نأخذ المبيعات بمجملها. وبعد رصيد الإيقاف، نعتبرها مبيعـات خارجيـة... مـن تقرير المبيعات، (دون عميل إس دي سي وتري ستار – فهي متضمنة في عملكم الإجمالي) يصل إجمالي الرقم إلى ٤٩ مليون دولار. وهذا يعني أن مبيعات شركة FS يجب أن تكون ٣٦ مليون دولار بدلاً من ٣٣ مليون دولار؟" فرد غاندي "الرجاء استخدام الملف المرفق للأعمال الأساسية وعمليات التجزئة الأخرى." وأرفق تقريراً يدرج فيه إجمالي مبيعات فايرستار دايموند إنك حسب العميل من أبريل ٢٠١١ إلى يناير ٢٠١٢. حيث تم إدراج عملاء مثل سامز كلوب، زايلز، مايسيز، والجيش الأمريكي والبحرية الأمريكية على أنها "أساسية". بينما تم إدراج عملاء مثل إس دي سي، إيكسيلانت فاسيتس، تري ستار وشركة ديا جيم على أنها "غير أساسية".

٢– بتاريخ ١٣ يونيو ٢٠١٣، أرسل أجاي غاندي بريداً إلكترونياً إلى ميهير بهنسالي فيه قاعدة اقتراض مقدرة لأجل فايرستار دايموند إنك اعتباراً من ٣١ مايو ٢٠١٣. وشرح غاندي بأن ٣،٨ مليون دولار في الحسابات المدينة غير مؤهلة نتألف من "إس دي سي ديزاينز ذ.م.م – ١.٣٩٥.٦٦٧ دولار، وورلد دايموند – ١.٥٠٧.٨١٦ دولار والبقية داخل الشركة". ولاحقاً ذلك اليوم، أرسل غاندي بريداً إلكترونياً إلى بهنسالي قاعدة اقتراض مقدرة اعتباراً من

٢٠ يونيو ٢٠١٣. وشرح بأن ٥،٢٦ مليون دولار في الحسابات المدينة غير مؤهلة تتألف من "إس دي سي ديزاينز ذ.م.م – ١.٣٩٥.٦٦٧ دولار، وورلد دايموند – ١.٥٠٧.٨١٦ دولار، آر إن إنتربرايز – ٥٠٩.٤١٥ دولار، شركة إس دي سي ديزاينز ٢١٥.٢٤٣ دولار والبقية داخل الشركة".

٣– بتاريخ ١٠ يوليو ٢٠١٣، أرسل أجاي غاندي بريداً إلكترونياً إلى ميهير بهنسالي "ستقع الحسابات المدينة التالية بعد ١٢٠ يوماً وهذه الحسابات المدينة ستؤثر بشدة على قاعدة الاقتـــراض. ١– ديامينـــك – ١.٠٧٧.٥٧١ دولار [؟] ٢– إيكســـيلانت فاســـيتس – ١.٥٦٣.٦٧٨ دولار [؟] ٣– آر إن إنتربرايـــز – ٥٠٩.١٤٦ دولار [؟] ٤– شـــركة إس دي سي ديزاينز – ٢٢٣.٦٧٠ دولار [؟] ٥– إس دي سي ديزاينز ذ.م.م – ١٩٥.٦٦٧ دولار [؟] ٦– إس دي سي ديزاينز ذ.م.م – ١٩٥.٦٦٧ دولار [؟] ٧– شركة سانغام دايموندز – ٥٠٩.٥٢٨ دولار".

٤– بتاريخ ١٩ يوليو ٢٠١٣، أرسل أجاي غاندي بريداً إلكترونياً إلى شيام وادوا "الرجاء إرسال معلومات حول الحسابات المدينة والحسابات الدائنة الخاص بإس دي سي وسأقوم بالتواصل معهم لتخليصها." وفي ٢٤ يوليو ٢٠١٣، أرسل أجاي غاندي بريداً إلكترونياً إلى شياموادوا، بافيش باتل، وألتماش أنصاري "أحتاج إلى الحسابات المدينة والحسابات الدائنة الخاص بجافي لأطرافنا بأسرع ما يمكن". (تمت إضافة التشديد). فرد أنصاري بورقة تدرج أرصدة الحسابات الدائنة والمدينة لشركة إس دي سي ديزاينز، إمباير، فانسي كريشنز، وعدة كيانات لفاير ستار. وكان رصيد الحسابات المدينة الإجمالي للأطراف الثمانية المدرجة هو ١.٨٧٨.٨٣٠ دولار وإجمالي أرصدة الحسابات الدائنة ٧.٣٢٨.٤٢١ دولار. فرد غاندي "وادوا: اختلاف ٥ مليـون دولار؟ أيـن بقيـة الحسـابات المدينـة؟ هـل نسـينا أي أسـماء أو حسابات؟" بعد ذلك طلب غاندي "كامل اللائحة" ورد أنصاري بورقة تدرج كل من الحسابات المدينة والدائنة داخل الشركة وللأطراف الثالثة. فرد غاندي "الحسابات المدينة لتوين فيلدز؟

أين هي؟" فرد أنصاري "هناك ١،٥ مليون في قروض مدينة". عندها طلب غاندي تأكيداً بعدم تسجيل أي حسابات مدينة أخرى في الدفتر بأنها قروض مدينة وحصل على ذلك.

٥- بتاريخ ١٣ فبراير ٢٠١٦، أرسل ساغار تكار بريداً إلكترونياً إلى أجاي غاندي فيه تقرير بمبيعات جافي والحسابات المدينة الخاص بها اعتباراً من ١٢ أغسطس ٢٠١٦، مع نسخة إلى ميهير بهنسالي، افيناش أوزا وصامويئل ساندبيرج. فرد بهنسالي، مع نسخة إلى غاندي وأوزا ولكن لدون ساندبيرج "الرجاء العناية بباسفيك وسانغام دايموندز، حيث إنها مبيعات حرة وليست مبيعات مجوهرات. وبالمتابعة، الرجاء الانتباه لنوع المنتج قبل إرسالك MIS".

٦- بتاريخ ١٨ أغسطس ٢٠١٦، أرسل أجاي غاندي بريداً إلكترونياً إلى ديبيكا ديفروخكار، أفيناش أوزا وأربان دوشي يطلب فيه الحسابات المدينة والحسابات الدائنة الخاص بكل من فايرستار دايموند إنك وشركة نيراف مودي اعتباراً من ٣١ يوليو ٢٠١٦ بـ "صيغة ساجو". فرد ديفروخكار بالتقارير. فرد غاندي فقط على أوزا ووجه "الرجاء تقسيمها بين الأساسي وغير الأساسي. غير الأساسي هي كافة الشركات الخارجية التي ليست فاير ستار + إس دي سي. والبقية كلها أساسي." وقد تضمنت "الشركات الخارجية التي ليست فاير ستار" في اللائحة بريليانت، إمباير، فانسي كريشنز، باسفيك، تراي كلر، فيستا، يونيك وورلد دايموند ديستريبيوشن.

٧- بتاريخ ١٧ أبريل ٢٠١٧، أعاد كونال باتل إرسال أحد طلبات المدققين لنسخ عن فواتير ووثائق أخرى تتعلق بمبيعات محددة من قبل شركة نيراف مودي في السنة المالية ٢٠١٦ – ٢٠١٧ إلى آيزاك ساندبيرج، مع نسخة إلى أجاي غاندي. فرد غاندي "اترك مبالغ كبيرة لأجلي". وكانت أكبر معاملة مدرجة هي: عملية بيع بقيمة ٢.٣٥٠.٠٠٠ دولار إلى مجموعة غلوبال دايموندز بتاريخ ٣٠ يونيو ٢٠١٦، عملية بيع بقيمة ١.٤٠٠.٠٠٠ دولار إلى شركة إس دي سي ديزاينز بتاريخ ٢٤ فبراير ٢٠١٧، وعملية بيع بقيمة ١.٠٠٠.٠٠٠ دولار إلى شركة إس دي سي ديزاينز بتاريخ ١ مارس ٢٠١٧، عملية بيع بقيمة ٨٥٠.٠٠٠

دولار إلى أمادينا للاستثمار ذ.م.م بتاريخ ٣١ مارس ٢٠١٧، وعملية بيع بقيمة ٨٠٠٠٠٠
دولار إلى شركة إيكسيلانت فاسيتس بتاريخ ٢٣ ديسمبر ٢٠١٦.

<u>الملحق أ – ١٦٤</u>

تتضمن المعاملات والمراسلات الإضافية المشبوهة التي تورط دييـاك شـيث، نينـا شـيث
وكيانات شيث:

١– بتاريخ ١٣ سبتمبر ٢٠١٠، أرسل براكاش راو من دياملينك بريداً إلكترونياً إلى أجاي
غاندي، مع نسخة على نينا شيث، "اليوم قمنا بتحويل ٢٥ ألف دولار إلى حساب HSBC،
تجدون مرفقاً نسخة السويفت لأخذ العلم."

٢– بتاريخ ٢٠ أغسطس ٢٠١٢، أرسل شيام وادوا بريداً إلكترونياً إلى اجاي غاندي فيه
العمليات المالية الخاصة بفايرستار دايموند إنك ليمتد لعام ٢٠١٢ وأشار "بالنسبة للهوامش،
تتزامن كور بوليش ترايدينج مـع نموذج الأعمال، وهامش الأعمال الأخرى التي تتضمن
مبيعات الجملة معتمد على أسعار الفوترة. وتقر المساحة الاستثنائية بـ ١٤١ ألف دولار من
الدخل مستلمة من إيكسيلانت فاسيتس لكل مراسلة من NDM." فرد غاندي "تبدو الحسابات
المدينة بقيمة ٧٣٫٨ مليون دولار مرتفعة جداً... وتبدو الحسابات الدائنة بقيمة ٤٠ مليون
دولار مرتفعة جداً أيضاً... هل نقوم بأي شيء لإبراء الحسابات المدينة/الحسابات الدائنة؟
هل تطابق الحسابات المدينة والحسابات الدائنة داخل الشركة الدفاتر الأخرى؟"

٣– بتاريخ ٢٠ ديسمبر ٢٠١٣، أرسل أجاي غاندي بريداً إلكترونياً إلى نيراف مودي "السيد
نيراف: قسم ألماس جوش – استلمنا أمس مبلغ ١٫٦ مليون دولار مستحقة لبضع عمليات
بيع قام بإنهائها. (إيداع بقيمة ١ مليون دولار لمبيعات بقيمة ٣٫١ مليون دولار و ٦٠٠ ألف
دولار لعملية بيع أخرى). يمكنني سؤول مانيش/أميت للحصول على لائحة للدفع للهند.
الرجاء إعلامي." فرد نيراف مودي، مع نسخة إلى ميهير بهنسالي "ستذهب إجراءات عملية

البيع بقيمة ٣٫٠١ مليون [دولار] إلى إيكسيلانت فاسيتس (اسأل جوش عن الوقت). أما الرصيد، فاسأل مانيش." وفي نفس ذلك اليوم، أرسل جوش واينمان رسالة إلكترونية إلى ديباك شيث "هل تريد مني إرسال ١ مليون كدفعة مسبقة؟ الرجاء إرسال تعليمات التحويل". فرد شيث، "يمكن الانتظار حتى الأسبوع الأول من يناير." فأعاد عندها واينمان إرسال رسالة شيث إلى غاندي وأشار "لأخذ العلم".

٤- بتاريخ ٢ يناير ٢٠١٤، أرسل شيام وادوا بريداً إلكترونياً إلى جوش واينمان، مع نسخة إلى أجاي غاندي وبافيش باتل، "اشترت نيويورك ٧٠٬١٩ قيراطاً EM من الحجر المقطوع من إيكسيلانت فاسيتس بقيمة ٣٫١٠ مليون دولار وباعت إلى شركة شيفمان بقيمة ٣٫١٠ مليون دولار. ولا يوجد هناك أي هامش إجمالي منعكس في هذه المعاملة. الرجاء تأكيد العمولة إن كانت موجودة والتي ستتراكم في دفاتر نيويورك عن هذا الحجر." فرد واينمان "١٪ على مبلغ البيع حسب نيراف". فأعاد وادوا إرسال رسالة واينمان إلى أفيناش أوزا، مع نسخة إلى أجاي غاندي وأشار "١- لأخذ العلم والدمج في MIS الخاص بجوش. ٢- الرجاء أيضاً استبدال آخر إيصال لتكلفة عملية الشراء من هونغ كونغ بتكلفة الشراء الفعلية من الأحجار الوردية بناءً على الفاتورة الفعلية لأرجيل في ورقة عمل الخصومة". وفي ١٤ يناير ٢٠١٤، أرسل ساجو بولوز بريداً إلكترونياً إلى أجاي غاندي "تظهر عمليات البيع إلى شركة شيفمان بقيمة ٣٫٠١ مليون دولار تكلفة عملية شراء قيمة البيع من إيكسيلانت فاسيتس. هل هذه المعاملات لأجل NDM؟ ألم تحصلوا على ربح؟ هل يمكنك رجاء الشرح إن كنت مدركاً للتفاصيل[؟]" فرد غاندي "هذا صحيح. إنها بضائع شخص آخر تلك التي قمنا ببيعها". فرد بولوز "هذا يعني أنها قيد بكل بساطة؟ ليس هناك ربح ولا خسارة. لا يجب أن آخذ هذه في الدمج؟" فرد غاندي "ما زالت عملية بيع وقد تأثر المخزن والحسابات المدينة. أعتقد أنها تعود إلى إيكسيلانت فاسيتس – تتعلق بـ NM وهذا ما أعرفه [كما وردت]..."

٥– بتاريخ ٦ يناير ٢٠١٤، أرسل ديباك شيث بريداً إلكترونياً إلى جوش واينمان "يمكنك عندما تستطيع إرسال تحويل بقيمة ٧٥٠،٠٠٠ دولار مقابل دفعة مسبقة حسب التفاصيل المرفقة." فأعاد واينمان إرسال تعليمات التحويل إلى أجاي غاندي، الذي قام عندها بتوجيه بافيش باتل بترتيب التحويل.

٦– بتاريخ ٤ نوفمبر ٢٠١٤، أرسل أجاي غاندي بريداً إلكترونياً إلى بافيش باتل وأفيناش أوزا "الرجاء عدم تضمين مبيعات إيكسيلانت فاسيتس بتاريخ ١٤/٤/١١ في فنتازي إنك وتقارير المبيعات اليومية والحسابات المدينة التي ترسلونها بالبريد الإلكتروني للجميع." وفي ١٠ نوفمبر ٢٠١٤، أرسل أجاي غاندي بريداً إلكترونياً إلى ديباك شيث "تجدون مرفقاً تعليمات تحويل فنتازي إنك لتتمكنوا من تحويل المبيعات الحالية بقيمة ١،١١٢ مليون دولار". فرد شيث "سنقوم بتحويل التحويل لعملية الشراء هذه اليوم وأرسل لك نسخة التحويل".

٧– بتاريخ ١٥ أبريل ٢٠١٥، أرسل ميهير بهنسالي بريداً إلكترونياً إلى نينا شيث ونيهال مودي "أحتاج لكافة معلومات الحساب، وفاتورة رجاءً قبل أن نتمكن من التحويل." فرد جون ميتشل بفاتورة بقيمة ٣٠،٠٠٠ دولار صادرة عن مجموعة فانتوم لاكشوري إلى جافي لأجل "رسوم استشارة المبيعات". فأعاد بهنسالي إرسال الفاتورة إلى أجاي غاندي ووجه "الرجاء تحويل هذه، من جافي". فأعاد غاندي عندها إرسال الفاتورة إلى أفيش أوزا وأربان دوشي، مع نسخة على شيام وادوا، ووجه "الرجاء تحويل ٣٠،٠٠٠ دولار وفق ما هو وارد أدناه والمرفق من جافي في الغد." فرد وادوا "هل يجب تسجيل هذه الدفعة في الدفاتر على أنها دفعة مسبقة قابلة للإعادة/دفعة مسبقة مقابل الخدمات؟" فرد غاندي "٣٠ ألف دولار سيتم شطبها على مدار ٦ أشهر؟"

٨– بتاريخ ٢٨ مارس ٢٠١٧، أرسل ميهير بهنسالي بريداً إلكترونياً إلى أجاي غاندي فيه تعليمات بالتالي "الرجاء فوترة التالي من [شركة نيراف مودي]. أدرج عندها بهنسالي ثلاث خواتم مباعة إلى شركة إس دي سي ديزاينز بإجمالي ٢،٣٠٠،٠٠٠ دولار وخاتم آخر مباع

إلى أمادينا بقيمة ٨٥٠.٠٠٠ دولار. وفي اليوم التالي، قام بهنسالي بتوجيه غاندي لأجل "إضافة تفصيلية إضافية [خاتم بقيمة ٣٥٠.٠٠٠ دولار]، إلى إيكسيلانت فاسيتس[.] الرجاء إرسال كلا القطعتين إلى ديباك ماسا بمذكرة (وليس فاتورة] قبل الغد". فرد غاندي "هل هناك أي عمولة على ذلك؟" أرسل هذه القطعة بمذكرة إلى إيكسيلانت/ديباك شيث". فرد بهنسالي، "١٠٪ عمولة من كل من أمادينا و إيكسيلانت فاسيتس. إس دي سي ديزاينز ٣٪ (كما هو موضح أدناه)". فرد غاندي بفواتير ومذكرات ائتمان العمولة.

٩– بتاريخ ١١ يوليو ٢٠١٧، أرسل اجاي غاندي بريداً إلكترونياً إلى شيام وادوا "الأموال إلى وين وهاواي؟ متى يمكنني توقعها؟ هناك حاجة مستعجلة لدفع حوالي ٥٠٠ ألف دولار هذا الأسبوع". فرد وادوا "دعنا [كما وردت] نتحدث اليوم. لقد رتبت ١ مليون دولار عبر بضائع مشحونة من فاير ستار دايموند ليمتد– هونغ كونغ والتي قامت شركة FJ ببيعها. الرجاء تأكيد استلام إجراءات مبيعات مجوهرات مرتفعة بقيمة ١ مليون دولار في شركة FJ." وتابع وادوا "نتوقع ٥٧٥ ألف دولار من إيكسيلانت فاسيتس إما الخميس أو الجمعة حد أقصى في شركة فاير ستار للمجوهرات" فرد غاندي "أحتاج إلى ٢٠٠ ألف دولار بأسرع ما يمكن".

١٠– بتاريخ ٤ أغسطس ٢٠١٧، أرسل أحد الموظفين لغاندي لائحة بمبيعات نيراف مودي ليوليو ٢٠١٧. وقد تضمنت اللائحة ثلاثة بنود: أقراط مباعة لأحد الافراد بقيمة ٦.٠٠٠ دولار، قلادة مباعة لفرد آخر بقيمة ٦.٥٠٠ دولار، وخاتم مباع لأمادينا بقيمة ٥٧٥.٠٠٠ دولار (أي، مبيعات أمادينا كانت بقيمة ٩٨٪ من إجمالي المبيعات الثلاث). وقد قام غاندي بمراجعة الوثيقة لتعكس "عمولة" أكبر لأمادينا. ومن ثم سأل موظف شركة نيراف مودي إن كان غاندي سيرسل اللائحة إلى ميهير بهنسالي. فأجاب غاندي بأن اللائحة كانت "فقط لأجلي ولن تذهب لأي مكان".

١١– بتاريخ ٢٢ يناير ٢٠١٨، نفذ ديباك شيث، بالنيابة عن إيكسيلانت فاسيتس، وميهير بهنسالي، بالنيابة عن نفسه، سند إذني توافق إيكسيلانت فاسيتس بموجبه على إعادة دفع

قرض مزعوم بقيمة ١٠٠.٠٠٠ دولار بإخطار مدته يوم واحد من بهنسالي بمعدل فائدة سنوية ١٢٪. وفي نفس ذلك اليوم، نفذ ديباك شيث، بالنيابة عن أمادينا للاستثمار ذ.م.م، ونينا شيث، بالنيابة عن نفسها، سنداً إذنياً توافق بموجبه أمادينا للاستثمار بموجبه على إعادة دفع قرض مزعوم بقيمة ٦١٥.٠٠٠ دولار بإخطار مدته يوم واحد من نينا شيث بمعدل فائدة سنوية ١،٩٧٪.

## الملحق أ –١٦٥

تتضمن المعاملات والمراسلات الإضافية المشبوهة التي تورط أبهاي جافيري وكيانات إس دي سي:

١– بتاريخ ١٠ أبريل ٢٠١٢، أرسل روشاب جيثوا بريداً إلكترونياً إلى أجاي غاندي، مع نسخة إلى كوريان ماثيوز، يطلب من غاندي تأكيد أرصدة الحسابات المدينة والحسابات الدائنة بين فاير ستار دايموند م.م.ح وكل من جافي، فايرستار دايموند إنك، إس دي سي و JMC. فرد غاندي "أنا لست مسؤولاً عن JMC. سأقوم بإرسال البقية اليوم." تابع بعدها غاندي "بالنسبة لـ JMC الرجاء إرسالها إلى براكاش راو ... بالنسبة لإس دي سي أرسلها إلى سريدار [كريشنان" وزوده بعناوين البريد الإلكتروني لكل من راو وكريشنان. وبعد عدة ساعات، رد غاندي بتأكيد أرصدة فايرستار دايموند إنك وجافي وكانت تحمل توقيعه.

٢– بتاريخ ٢٣ أبريل ٢٠١٢، طلب محاسب لدى ماركس من غاندي معلومات الاتصال ببعض الأطراف المقابلة المختارة لأجل تأكيد الحسابات المدينة. وبتاريخ ٣٠ أبريل ٢٠١٢، رد غاندي بعنوان بريد سريدار كريشنان لأجل إس دي سي ديزاينز ذ.م.م وشركة سانغام داياموندز . وتابع "تم دفع تري ستار، نيبور بي في ايه وايه جافي إنك بالكامل. يمكننا إعطاؤكم إيصالات لاحقة لهؤلاء العملاء. الرجاء عدم إزعاج نفسك بإرسال رسائل

إلكترونية إليهم. فقد لا يقومون بالرد [كما وردت]". وفي ١ مايو ٢٠١٢، تابع غاندي بعناوين البريد الإلكتروني لإمباير (روشاب جيثوا)، يونيك، باسفيك، وراداشير (كوريان ماثيوز).

٣- بتاريخ ١ أغسطس ٢٠١٢، أرسل أجاي غاندي بريداً إلكترونياً إلى ريبيكا تشو "الرجاء إنشاء أمر مبيعات لأجل [إس دي سي ديزاينز ذ.م.م] من شركة فاير ستار دايموند بأسرع ما يمكن – تسليم باليد". ومن ثم أدرج غاندي كميات وأسعار محددة لألماس مختلط من درجات مختلفة بإجمالي ٤.١٠٢,٣٧ قيراطاً و ٢.٥٠٠.٢١٣,٤٥ دولار.

٤- بتاريخ ١٠ سبتمبر ٢٠١٢، أرسل شيام وادوا بريداً إلكترونياً إلى أجاي غاندي "الرجاء إعلامي [كما وردت] بالشخص المناسب للتواصل مع لأجل فواتير الألماس المتعلقة بترايدينج في ايه جافي. وحيث أن هذه الفواتير ذات قيمة عالية، سينتج عن التأخر في استلام فواتير البائع تضخماً في أرقام إيصالات البضائع/إيصالات الفواتير. الرجاء ترتيب الأمر لإرسال نسخة بالبريد مصورة من فاتورة إس دي سي ٢.٦٨٠.٩٩٧ دولار من الألماس المشترى في يوليو ٢٠١٢". فرد غاندي، مرفقاً الفاتورة، "عادة أملك أنا وريبيكا هذه الفاتورة" بعدها رد غاندي "الرجاء إرسال نسخ فاتورة بصيغة PDF من إس دي سي لأجل الحسابات المدينة والحسابات الدائنة لتسوية محتملة". فرد أنصاري بالتالي: (١) فاتورة بقيمة ٢.٦٨٠.٩٩٦,٥٠ دولار من إس دي سي إلى جافي بتاريخ ٢٥ يوليو ٢٠١٢ لـ ٢.٧٤٩,٧٤ قيراطاً من "مجموعة مختلطة" من الألماس السائب من "اشكال وأحجام متنوعة" بتاريخ استحقاق ٢٢ نوفمبر ٢٠١٢، و(٢) فاتورة بقيمة ٧٠.٠٦٢,٥٠ دولار من جافي إلى إس دي سي بتاريخ ٢٥ يوليو ٢٠١٢ لأجل ١١٢,١ قيراطاً من الألماس المختلط بتاريخ استحقاق ٢٤ أغسطس ٢٠١٢.

٥- بتاريخ ٢٩ أغسطس ٢٠١٢، أرسل اجاي غاندي بريداً إلكترونياً فيه تعليمات بالتحويل من فايرستار دايموند إنك انترناشونال إلى سريدار كريشنان في إس دي سي. فرد كريشنان "آسف أجاي، سأدفع لفايرستار دايموند إنك. الرجاء عدم التحويل، سأرسل مرسولي اليوم بعد

الظهر لإحضار الشيك". وبعد عدة ساعات، رد غاندي "لم يتم استلام الأموال أبداً". وفي اليوم التالي، رد كريشنان "يجب أن تحصل عليها اليوم. فقط وافق عليها أبهاي في وقت متأخر في العصر". فرد غاندي "حسناً، سأتصل بك أو أرسل لك رسالة إلكترونية حالما يصبح الشيك جاهزاً".

٦– بتاريخ ٣١ يوليو ٢٠١٤، أرسل شيام وادوا بريداً إلكترونياً إلى ريبيكا تشو فيه تعليمات بإرسال فاتورة بقيمة ٦٦٤.٠٣٢,٢٩ دولار إلى ألتماش أنصاري صادرة عن إس دي سي ديزاينز ذ.م.م إلى جافي ليتمكن أنصاري من تسجيل عملية الشراء في دفاتر جافي. وفي ٤ أغسطس ٢٠١٤، أعاد أنصاري إرسال الرسالة إلى غاندي، مع نسخة إلى وادوا، وأشار "ريبيكا لا تجيب على البريد أدناه، أطلب فاتورة إس دي سي لتسجيل عملية الشراء في جافي". أرسل عندها غاندي بريداً إلكترونياً إلى سريدار كريشنان "هل يمكنك رجاءً نسخ فاتورتكم إلى ايه جافي بقيمة ٦٦٤ ألف دولار؟ وبعد استلام الفاتورة من كريشنان، أرسلها غاندي إلى أنصاري ووادوا. وعكست الفاتورة عملية بيع لـ ٥١٢،٠٢ قيراطاً من الألماس السائب إلى جافي بقيمة ٦٦٤.٠٣٠ دولار بتاريخ ٢١ يوليو ٢٠١٤. وبعد عدة ساعات، سأل كريشنان غاندي "هل يمكنك رجاءً إرسال كشوفاتكم اعتباراً من ٣٠ يونيو ٢٠١٤ لإس دي سي ديزاينز ذ.م.م، شركة إس دي سي ديزاينز وشركة سانغام دايموندز [؟]" فرد غاندي بقرير يظهر أن إس دي سي ديزاينز ذ.م.م، شركة إس دي سي ديزاينز تدينان لجافي بمبلغ إجمالي قيمته ٢.٤٠٣.٠٦٢,٥٥ دولار منها ٦٢٧.٠٧٣,٥٠ دولار متأخرة.

٧– بتاريخ ١٠ مارس ٢٠١٥، أرسل أجاي غاندي بريداً إلكترونياً إلى سريدار كريشنان، "الرجاء إرسال تفاصيل التحويل إلينا لدفعات محتملة إلى إس دي سي ديزاينز ذ.م.م وشركة إس دي سي ديزاينز" فرد كريشنان بمعلومات حساب مصرفي ولكنه قال "الرجاء عدم تحويل أي شيء هذا الأسبوع. فأبهاي في مومباي ولا يوجد أحد يمكنه الموافقة على التحويلات".

٨– بتاريخ ١٩ مـارس ٢٠١٥، أرسل سـريدار كريشـنان بريداً إلكترونياً إلـى أجـاي غانـدي "الرجاء تحويل أموال بقيمة ٢٠٠ ألف دولار إلى إس دي سي ديزاينز ذ.م.م[.]" فأعاد غاندي إرسال هذه الرسالة إلى أريان دوشي وأفيناش أوزا، مـع نسـخة إلى شيام وادوا، ووجه "الرجاء تحويل ٢٠٠.٠٠٠ دولار علـى الحسـاب مـن جـافي إلـى إس سـي ديزاينـز ذ.م.م مقابـل الحسابات الدائنة بقيمة ٦٦٤ ألف دولار". فرد دوشي بتأكيد التحويل.

٩– بتاريخ ٩ يونيو ٢٠١٥، أرسل غانـدي بريداً إلكترونياً إلـى ابهاي جافيري فيـه تعليمـات بتحويل ١٠.٠٠٠ دولار إلى حساب التحقق الشخصي الخاص بـآمي مودي لدى HSBC. وفي اليوم التالي، تابع غاندي، "مرحباً أبهاي: هل تم التحويل؟" وفي ١٢ يونيو ٢٠١٥، رد جافيري "مرحباً أجاي، هل يمكنك تأكيد الاستلام؟" وفي ٧ فبراير ٢٠١٧، أعاد أجاي غاندي إرسال سلسلة الرسائل إلى نافيتا مانكيكار، المساعدة الشخصية لنيراف مودي، وقال "كافيتا: هذا ما وجدته في بريدي الإلكتروني ولست متأكداً إن كان ذو صلة باتصالك الهاتفي أمس". فردت مانكيكار، مـع نسـخة إلى ميهير بهنسالي "هل يمكنك معرفة إن كان هذا الحساب باسم آمـي ومسـاعدتنا فـي الحصـول علـى تفاصـيل هـذا التحويل؟" فرد بهنسـالي "الحسـاب أدنـاه مغلق. الرجاء سؤال آمـي بشـكل مباشـر عـن المعلومـات، فالمصـرفيون لـن يعطونـا إياهـا. يمكنها الاتصال بمدير العلاقات الخاص بها".

١٠– بتاريخ ٢٨ مارس ٢٠١٧، أرسل سمير شاه بريداً إلكترونياً إلى ريبيكا تشو، مـع نسـخة إلـى ميهير بهنسالي وأجـاي غانـدي "مرفقـاً التفاصـيل المتعلقـة بالبضـائع التـي شـحنتها يـوم الجمعة. وقد ذكرت أي البضـائع التـي يجب تركهـا فـي نيويـورك وأي البضـائع التـي يجب شحنها لبائعين آخرين. وشروط البائعين الآخرين هي [:] سانغام دايموند ذ.م.م – التحصيل عند الاستلام [؛] باسفيك دايمونـدز – ١٢٠ يومـاً." وتحتوي جـداول البيانـات المرفقـة علـى أســـطر تـــدرج ٢٠٥ أوزان ألمـــاس بإجمـــالي ١.٩٦٥,٨٧ قيراطـــاً بقيمـــة إجماليـــة ١.٤٧٢.٩٨٨,٠٤ دولار. كمـا تحتوي علـى عمـود يشـير إلـى مـا إذا كانـت كـل ألماسة قد

شحنت إلى سانغام دايموندز ذ.م.م، شحنت إلى باسفيك، أو بقيت في نيويورك. فسأل غاندي ما إذا كانت القيم المشار إليها تعكس سعر البيع أو سعر التكلفة. فردت تشو "هذه البضائع بسعر البيع. سمير، الرجاء تزويد فاتورة بالتكلفة (لا يوجد وثيقة داخل العلبة) [.] نحتاج إلى تسجيلها في الدفتر قبل أي معاملة". عندها أرسلت تشو بريداً إلكترونياً إلى قسم التوريد لدى فايرستار دايموند إنك، مع نسخة إلى شاه وغاندي، فيه تعليمات بإنشاء أمر بيع وفاتورة إلى سانغام دايموندز لـ ١.٤٧٠,٧٢ قيراطاً لألماس سائب بسعر إجمالي ٩٤٢.٨٧٨,٥٩ دولار .

١١– بتاريخ ٦ أبريل ٢٠١٧، أرسلت ريبيكا تشو بريداً إلكترونياً إلى أجاي غاندي موضوعه "الهامش – مبيعات مارس" تقول فيه "لأخذ العلم. سانغام – ٥٦٪ [؛] إس دي سي – ١٨٪ [؛] باسفيك – ١٦٪ [؛] وورلد – ٠ [%]".

١٢– بتاريخ ٩ أغسطس ٢٠١٧، أرسل نيخيل باتيا بريداً إلكترونياً إلى كونا باتل، مع نسخة إلى غاندي وشريرام فانسي "استلمت ملفات الحسابات المدينة لـ ٣٠ يونيو من رينا. هل يمكنك مساعدتي في فهم الأرصدة السلبية في ملفات الحسابات المدينة؟ مثال في [شركة نيراف مودي]، هناك عدة عملاء (... إس دي سي ديزاينز) لديهم رصيد ائتماني في الذمم المدينة. وبشكل مشابه في FSII، فانسي كريبيشنز، أوراجيم وإمباير جيمز لديها أرصدة ائتمانية كبيرة." فرد باتل "هذه دفعات مسبقة من العملاء، لهذا تظهر بأنها أرصدة سلبية. وستتم تسويتها مقابل معاملاتهم المستقبلية."

<u>الملحق أ – ٣٩٥</u>

في العديد من الحالات، تسبب نيراف مودي، أجاي غاندي وميهير بهنسالي للشركات التابعة الأمريكية، عند استلام التحويلات الاحتيالية الفعلية من المدينين، بتحويل إجراءات هذه التحويلات الاحتيالية الفعلية إلى كيانات ظل أو كيانات أخرى تسيطر عليها مودي. فعلى سبيل المثال:

١– بتاريخ ٣٠ أغسطس ٢٠١٢، قامت فايرستار دايموند إنك بتحويل ١.٥٠١.٠٠٠ دولار إلى فايرستار دايموند إنك انترناشونال. وفي نفس اليوم، أرسل غاندي بريداً إلكترونياً إلى بافيش باتل "قم بتحويل ١.٥٠١.٠٠٠ دولار من [فايرستار دايموند إنك إلى فايرستار دايموند إنك انترناشونال]. وادفع ٢١.٧٧٤ دولار من [فايرستار دايموند إنك انترناشونال] إلى فانسي كريشنز". وفي نفس ذلك اليوم، أرسل غاندي بريداً إلكترونياً إلى سريدار كريشنان من إس دي سي ديزاينز ليعلمه بأن فايرستار دايموند إنك انترناشونال ستقوم بإصدار شيك بقيمة ١.٥٠٠.٣٩٥ دولار إلى إس دي سي ديزاينـز. وفـي ٣١ أغسـطس ٢٠١٢، أصـدرت فايرستار دايموند إنك انترناشونال شيكاً بقيمة ١.٥٠٠.٣٩٥ دولار إلى إس دي سي ديزاينز.

٢– بتاريخ ١١ ديسمبر ٢٠١٢، أرسل غاندي بريداً إلكترونياً إلى بافيش باتل "الرجاء إبقاء التحويل جاهزاً بقيمة ٦٠٢.٨٦٢ دولار إلى إس دي سي ديزاينز ذ.م.م من حساب كابيتال أولد الخـاص بـ [فايرستار دايموند إنك انترناشونال] للفاتورة ٦٣٩٦٦". وفي ١٢ ديسـمبر ٢٠١٢، أرسـل غانـدي بريـداً إلكترونيـاً إلـى مصـرفي فـي IDB فيـه طلـب لقـرض بقيمـة ٥٠٠.٠٠٠ دولار، كانت فايرستار دايموند إنك فيـه هـي الملتزم وفايرستار دايموند إنك انترناشونال هي المستفيد. وفي نفس ذلك اليوم، تم دفع إجراءات قرض الـ ٥٠٠.٠٠٠ دولار إلى حساب كابيتال ون المصرفي الخاص بـ فايرستار دايموند إنك انترناشونال. وفي نفس

ذلك اليوم، حولت فايرستار دايموند إنك انترناشونال مبلغ ٦٠٢.٨٦٢ دولار إلى إس دي سي ديزاينز.

٣- بتاريخ ١٣ ديسمبر ٢٠١٢، حولت فاير ستار مبلغ ٣٩١.٦١١ دولار إلى سينيرجيز. وفي نفس ذلك اليوم، حولت سينيرجيز مبلغ ٩١.٠٠٠ دولار إلى بريليانت. وفي ١٤ ديسمبر ٢٠١٢، حولت سينيرجيز ٣٠٠.٠٠٠ دولار إلى يونيك. وفي ١٣ ديسمبر ٢٠١٢، أرسل أجاي غاندي بريداً إلكترونياً إلى بافيش باتل فيه تعليمات للقيام بهذه التحويلات.

٤- بتاريخ ١٩ فبراير ٢٠١٣، حولت فايرستار دايموند إنك مبلغ ٦٢٧.٠٠٠ دولار إلى فايرستار دايموند إنك انترناشونال. وأرسل بافيش باتل بريداً إلكترونياً فيه تأكيد تحويل هذا المبلغ إلى أجاي غاندي. وفي نفس ذلك اليوم، حولت فايرستار دايموند إنك انترناشونال مبلغ ١.٢٦٦.٤٣٠ دولار إلى فانسي كريبشنز و ٣٣٢.٣٠٠ دولار إلى دياجيمز. وفي نفس ذلك اليوم، أرسل شيام وادوا بريداً إلكترونياً إلى بافيش باتل فيه تعليمات بالقيام بهذين التحويلين وقال "حيث إن السيد أجاي سيكون مسافراً الليلة.... الرجاء أخذ توقيع السيد أجاي على وثيقة التحويل وأرسلها إلى السيد ميهير للحصول على توقيعه". وفي نفس ذلك اليوم، أرسل بافيش باتل بريداً إلكترونياً إلى غاندي فيه وثائق التحويل لهذه التحويلات. فأعاد غاندي إرسالها إلى بهنسالي قائلاً "الرجاء طباعتها، توقيعها وإرسالها ثانية إليّ" فرد بهنسالي "تم القيام بذلك وإرسالها".

٥- بتاريخ ٢٥ أبريل ٢٠١٣، حولت فايرستار دايموند إنك مبلغ ٣٥٠.٠٠٠ دولار إلى فايرستار دايموند إنك انترناشونال. وفي نفس ذلك اليوم، حولت جافي مبلغ ٤٨٠.٠٠٠ دولار إلى فايرستار دايموند إنك انترناشونال. وفي نفس ذلك اليوم، حولت فايرستار دايموند إنك انترناشونال مبلغ ٨١٢.٠٣٠ دولار إلى دياجيمز.

٦- بتاريخ ٦ مايو ٢٠١٣، حولت فايرستار دايموند إنك مبلغ ٦٥٢.٢٣٩ دولار إلى فايرستار دايموند إنك انترناشونال. وفي نفس ذلك اليوم، حولت فايرستار دايموند إنك انترناشونال مبلغ ٤٦٣.٣٨٩ دولار إلى تري كولوز. وفي اليوم التالي، حولت فايرستار دايموند إنك انترناشونال مبلغ ٢٨٠.٠٠٥ دولار إلى إمباير.

٧- بتاريخ ١٨ يونيو ٢٠١٣، حولت فايرستار دايموند إنك مبلغ ١.٥٢٥.٠٠٠ دولار إلى فايرستار دايموند إنك انترناشونال. وفي نفس ذلك اليوم، أرسل بافيش باتل بريداً إلكترونياً إلى غاندي فيه تأكيد هذا التحويل قائلاً "تجدون مرفقاً تحويلات حسب التعليمات". وفي نفس ذلك اليوم، حولت فايرستار دايموند إنك انترناشونال مبلغ ١.٦١٥.٤٦٣.٩٣ دولار إلى فانسي كريبشنز. وفي ١٧ يونيو ٢٠١٨، أرسل بافيش باتل بريداً إلكترونياً إلى غاندي فيه وثيقة تحويل هذا التحويل. فأعاد غاندي إرسالها إلى ميهير بهنسالي لتوقيعها وإعادتها.

٨- بتاريخ ٩ يوليو ٢٠١٣، حولت فايرستار دايموند إنك مبلغ ٦٠٠.٠٠٠ دولار إلى فايرستار دايموند إنك انترناشونال. وفي نفس ذلك اليوم، حولت فايرستار دايموند إنك انترناشونال مبلغ ٦٠٠.٠٢٤ دولار إلى فانسي كريبشنز. وفي نفس ذلك اليوم، أرسل بافيش باتل بريداً إلكترونياً إلى غاندي فيه تأكيد هذا التحويل.

٩- بتاريخ ٢٣ أكتوبر ٢٠١٣، حولت فاير ستار ١٢٣.٧٤٤ دولار إلى سينيرجيز. وفي ٢٤ أكتوبر ٢٠١٣، حولت سينيرجيز ١٢٥.٠٠٠ دولار إلى بريليانت. وفي ٢٣ أكتوبر ٢٠١٣، أرسل غاندي بريداً إلكترونياً إلى بافيش باتل فيه تعليمات للقيام بهذه التحويلات.

١٠- بتاريخ ١٨ مارس ٢٠١٤، حولت فاير ستار ١٢٣.٠٩٧ دولار إلى سينيرجيز. وفي نفس ذلك اليوم، حولت سينيرجيز مبلغ ١٢٥.٠٠٠ دولار إلى بريليانت. وفي ٢٣ أكتوبر ٢٠١٣، أرسل غاندي بريداً إلكترونياً إلى بافيش باتل فيه تعليمات للقيام بهذه التحويلات.

١١- بتاريخ ٢٠ فبراير ٢٠١٥، حولت فاير ستار ١٨٦.٨٧١ دولار إلى سينيرجيز. وفي نفس ذلك اليوم، حولت سينيرجيز مبلغ ١٨٠.٠٠٠ دولار إلى بريليانت. وفي نفس ذلك اليوم، أرسل غاندي بريداً إلكترونياً إلى أربان دوشي وأفيناش أوزا فيه تعليمات للقيام بهذه التحويلات.

١٢- بتاريخ ٢٩ سبتمبر ٢٠١٥، حولت جافي ٩٥٠.٠٠٠ دولار إلى فايرستار دايموند إنك انترناشـونال. وفـي نفس ذلـك الوقـت، حولـت فايرسـتار دايمونـد إنـك انترناشـونال مبلـغ ٩٤٣.٨٢٧ دولار إلـى إس دي سـي ديزاينـز. وفـي نفس ذلك اليـوم، أرسـل غانـدي بريـداً إلكترونياً إلى أربان دوشي وأفيناش أوزا فيه تعليمات للقيام بهذه التحويلات.

١٣- بتـاريخ ٩ مـارس ٢٠١٦، حولـت فايرسـتار دايمونـد إنـك ٢٤٧.٥٥١ دولار إلـى سينيرجيز. وفي نفس ذلك اليوم، حولت سينيرجيز مبلغ ٢٥٠.٠٠٠ دولار إلى بريليانت. وفي نفس ذلك اليوم، أرسل غانـدي بريـداً إلكترونياً إلـى أربـان دوشـي وأفيناش أوزا فيه تعليمـات للقيام بهذه التحويلات.

١٤- بتاريخ ٢٥ مارس ٢٠١٦، حولت جافي مبلغ ١.٤٠٠.٠٠٠ دولار إلى شركة نيراف مودي. وفي نفس ذلك اليوم، حولت شركة نيراف مودي مبلغ ٦١٣.٠٦٩ دولار إلى أوراجيم و ٧٨٧.٠٠٠ دولار إلـى نيـراف مـودي ليمتـد. وفـي نفس ذلـك اليـوم، أرسـل غانـدي بريـداً إلكترونياً إلى أربان دوشي وأفيناش أوزا فيه تعليمات للقيام بهذه التحويلات.

١٥- بتاريخ ٢٠ مارس ٢٠١٧، حولت فاير ستار ٢٤٦.٨٧١ دولار إلى سينيرجيز. وفي نفس ذلك اليوم، أرسل غانـدي بريـداً إلكترونياً إلـى أفينـاش أوزا فيـه تعليمـات للقيـام بهـذا التحويل. وفي ٢٢ مارس ٢٠١٧، حولت سينيرجيز ٢٤٠.٠٠٠ دولار إلى بريليانت. وفي نفس ذلك اليوم أرسل غاندي بريداً إلكترونياً إلى كونا باتل وأفيناش أوزا فيه تعليمات للقيام بهذا التحويل.

**الملحق أ – تحويلات من المدينين لمصلحة سنترال بارك للعقارات ذ.م.م (سنترال بارك)**

| التاريخ | المحول | الملكية المحولة | القيمة (بالدولار) | المحول له | المستفيد | الوصف |
|---|---|---|---|---|---|---|
| ٢٠١٢/١/٣ | فايرستار دايموند إنك | مال نقدي | ١٠.٦٢٢,١٨ | شركة HSBC للرهن العقاري (أمريكا) | سنترال بارك | دفعة لرهن إيسيكس هاوس |
| ٢٠١٢/٨/٣ | فايرستار دايموند إنك | مال نقدي | ٦.٥٩٨,٦٢ | جيه دبليو ماريوت إيسيكس هاوس نيويورك | سنترال بارك | رسوم صيانة شقة إيسيكس هاوس |
| ٢٠١٢/٢/٤ | فايرستار دايموند إنك | مال نقدي | ١٠.٦٢٢,١٨ | شركة HSBC للرهن العقاري (أمريكا) | سنترال بارك | دفعة لرهن إيسيكس هاوس |
| ٢٠١٢/٦/٤ | فايرستار دايموند إنك | مال نقدي | ٦.٥٩٨,٦٢ | جيه دبليو ماريوت إيسيكس هاوس نيويورك | سنترال بارك | رسوم صيانة شقة إيسيكس هاوس |
| ٢٠١٢/١/٥ | فايرستار دايموند إنك | مال نقدي | ١٠.٦٢٢,١٨ | شركة HSBC للرهن العقاري (أمريكا) | سنترال بارك | دفعة لرهن إيسيكس هاوس |
| ٢٠١٢/١٠/٥ | فايرستار دايموند إنك | مال نقدي | ٦.٦٤٤,٩٩ | جيه دبليو ماريوت إيسيكس هاوس نيويورك | سنترال بارك | رسوم صيانة شقة إيسيكس هاوس |
| ٢٠١٢/١/٦ | فايرستار دايموند إنك | مال نقدي | ١٠.٦٢٢,١٨ | شركة HSBC للرهن العقاري (أمريكا) | سنترال بارك | دفعة لرهن إيسيكس هاوس |
| ٢٠١٢/١٤/٦ | فايرستار دايموند إنك | مال نقدي | ٨.٠٤٦,٣٧ | جيه دبليو ماريوت إيسيكس هاوس نيويورك | سنترال بارك | رسوم صيانة شقة إيسيكس هاوس |
| ٢٠١٢/٢٢/٦ | فايرستار دايموند إنك | مال نقدي | ١٣.٣١٤,٩١ | وزارة المالية نيويورك | سنترال بارك | تم تسجيل المصاريف إلى FGI/CP |
| ٢٠١٢/٢/٧ | فايرستار دايموند إنك | مال نقدي | ١٠.٦٢٢,١٨ | شركة HSBC للرهن العقاري (أمريكا) | سنترال بارك | دفعة لرهن إيسيكس هاوس |
| ٢٠١٢/١/٨ | فايرستار دايموند إنك | مال نقدي | ١٠.٦٢٢,١٨ | شركة HSBC للرهن العقاري (أمريكا) | سنترال بارك | دفعة لرهن إيسيكس هاوس |
| ٢٠١٢/١٠/٨ | فايرستار دايموند إنك | مال نقدي | ١١.٧٠١,٨٠ | جيه دبليو ماريوت إيسيكس هاوس نيويورك | سنترال بارك | رسوم صيانة شقة إيسيكس هاوس |
| ٢٠١٢/١٦/٨ | فايرستار دايموند إنك | مال نقدي | ٦٥.٣٢ | تاو ستوديوز للهندسة المعمارية | سنترال بارك | تم تسجيل المصاريف إلى FGI/CP |
| ٢٠١٢/٤/٩ | فايرستار دايموند إنك | مال نقدي | ١٠.٦٢٢,١٨ | شركة HSBC للرهن العقاري (أمريكا) | سنترال بارك | دفعة لرهن إيسيكس هاوس |
| ٢٠١٢/١٩/٩ | فايرستار دايموند إنك | مال نقدي | ٧.٣٠١,٤٨ | جيه دبليو ماريوت إيسيكس هاوس نيويورك | سنترال بارك | رسوم صيانة شقة إيسيكس هاوس |
| ٢٠١٢/١/١٠ | فايرستار دايموند إنك | مال نقدي | ١٠.٦٢٢,١٨ | شركة HSBC للرهن العقاري (أمريكا) | سنترال بارك | دفعة لرهن إيسيكس هاوس |

| | | | | | |
|---|---|---|---|---|---|
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٦٦٨٫٦٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٢/٢٦/١٠ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٢/١/١١ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | شركة تصليح السيارات | ٢٧.٠٠٠٫٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٢/١٦/١١ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٦٦٨٫٦٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٢/١٦/١١ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٢/٣/١٢ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٦٦٨٫٦٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٢/٢١/١٢ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٢/١ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٦٦٨٫٦٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٢٤/١ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١/٢ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١/٣ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٦٦٨٫٦٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٢١/٣ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١/٤ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٦٦٨٫٦٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١١/٤ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | شركة تصليح المركبات | ٩.١٤٥٫٥٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٣/٥ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٨/٥ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٧٤٩٫٤٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٢٠/٥ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٣/٦ |
| رسوم صيانة شقة إيسيكس | سنترال | جيه دبليو ماريوت | ٦.٦٦٨٫٦٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٤/٦ |

| | | | | | | |
|---|---|---|---|---|---|---|
| هاوس | بازك | إيسيكس هاوس نيويورك | | | | |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بازك | وزارة المالية نيويورك | ٣.٥٩٣,٠٤ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١٩/٦ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٦٦٨,٦٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١٩/٦ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١/٧ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٦٧٥,١٧ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١٩/٧ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١/٨ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٦٦٨,٦٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١٤/٨ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٣/٩ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بازك | وزارة المالية نيويورك | ١٣.٤٥٣,٣٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٥/٩ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ١٢.٦٩٨,٨٧ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٢٠/٩ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١/١٠ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٩٨٢,٥٤ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١٧/١٠ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١/١١ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٩٨٢,٥٤ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١٤/١١ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٢/١٢ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٩٨٢,٥٤ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١٢/١٢ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢/١ |
| رسوم صيانة شقة إيسيكس | سنترال | جيه دبليو ماريوت | ٦.٩٩٦,٧٢ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢١/١ |

| | | | | | |
|---|---|---|---|---|---|
| هاوس | بارك | إيسيكس هاوس نيويورك | | | |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠،٦٢٢،١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٣/٢ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦،٩٨٢،٥٤ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/١٣/٢ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠،٦٢٢،١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٤/٣ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧،٦٢٢،٠٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢٥/٣ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠،٦٢٢،١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/١/٤ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | وزير الخارجية ديلاوير | ٢٥٠،٠٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/١/٤ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧،٦٢٢،٠٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢٥/٤ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠،٦٢٢،١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/١/٥ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧،٦٢٢،٠٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢٠/٥ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠،٦٢٢،١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢/٦ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٩،٥٩٣،٠٢ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢٦/٦ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | وزارة المالية نيويورك | ٤،٥٨٥،٥٢ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢٧/٦ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠،٦٢٢،١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/١/٧ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧،٦٢٢،٠٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢٥/٧ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠،٦٢٢،١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/١/٨ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧،٦٢٢،٠٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢٥/٨ |
| تم تسجيل المصاريف إلى | سنترال | وزارة المالية نيويورك | ١٣،٧٩٩،٧٧ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢٨/٨ |

| | | | | | | |
|---|---|---|---|---|---|---|
| FGI/CP | بازك | | | | | |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢/٩ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/١/١٠ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ١٥.٢٤٤,١٦ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢١/١٠ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٣/١١ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢/١٢ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ١٥.٢٤٤,١٦ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/١٩/١٢ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بازك | تاو استيوز للهندسة العقارية | ٢.٥٠٠,٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/١٩/١٢ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٢/١ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧.٦٢٦,٦٦ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١٢/١ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٢/٢ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧.٦٢٢,٠٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٩/٢ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٢/٣ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١/٤ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بازك | ديلاوير وزير الخارجية | ٣٠٠,٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٢/٤ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧.٦٤٠,٨٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١٤/٤ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بازك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧.٦٤٠,٨٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٢٢/٤ |
| دفعة لرهن إيسيكس هاوس | سنترال بازك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١/٥ |
| رسوم صيانة شقة إيسيكس | سنترال | جيه دبليو ماريوت | ٧.٦٤٠,٨٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١٢/٥ |

| | | | | | | |
|---|---|---|---|---|---|---|
| هاوس | بارك | إيسيكس هاوس نيويورك | | | | |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠٠٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١/٦ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | وزارة المالية نيويورك | ١٨٠٤٩٥٫٦٢ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١٢/٦ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠٠٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١/٧ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ١٨٠٧٣٠٫٧٩ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٩/٧ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | كليسناد وينترز جورنلير | ١٠٩٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١٠/٧ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | كليسناد وينترز جورنلير | ١٦٣٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١/٨ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠٠٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٣/٨ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠٠٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١/٩ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧٠٦٤٠٫٨٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١٥/٩ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠٠٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٥/١٠ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | تاو استديوز للهندسة العقارية | ٢٠٥٠٠٠٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١٣/١٠ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ١٥٠٢٨١٫٧٦ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٢٠/١٠ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠٠٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٣/١١ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧٠٧٣٦٫٦٩ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٢٤/١١ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | شركة تصليح المركبات | ٩٠١٤٥٫٥٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٣/١٢ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠٠٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٤/١٢ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧٠٦٤٠٫٨٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١٥/١٢ |
| تم تسجيل المصاريف إلى | سنترال | وزارة المالية نيويورك | ٤٠٠٤١ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٢٢/١٢ |

| | | | | | | |
|---|---|---|---|---|---|---|
| FGI/CP | سنترال بارك | | | | | |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٤/١ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧.٦٤٠,٨٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/١٥/١ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٢/٢ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٢/٣ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ١٣.٧٢٧,٠٤ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/١٧/٣ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٤/٤ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | ديلاوير وزير الخارجية | ٣٠٠.٠٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٢١/٤ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٣/٥ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ١٣.٧٤٣,٧٥ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/١١/٥ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٢/٦ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ١.٤٨٢,٥١ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٨/٦ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | وزارة المالية نيويورك | ٥.٢١٧,١٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/١٣/٦ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٥/٧ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٩٣٠,٤٦ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٢٨/٧ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٢/٨ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٨٤١,٢٩ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/١٠/٨ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٢/٩ |
| تم تسجيل المصاريف إلى | سنترال | وزارة المالية نيويورك | ٥.٢١٧,١٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٨/٩ |

| | | | | | | |
|---|---|---|---|---|---|---|
| FGI/CP | بارك | | | | | |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٨٤١,٢٩ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/١٩/٩ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٤/١٠ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | شركة تصليح المركبات | ٤.٤٦٣,٨٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٦/١٠ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٨٤١,٢٩ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/١٤/١٠ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٢/١١ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٨٤١,٢٩ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٩/١١ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | وزارة المالية نيويورك | ٥.٢٢٤,٤١ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/١/١٢ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٢/١٢ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | مجموعة فاير ستار | ٣٠.٠٠٠,٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/١٤/١٢ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٨٤١,٢٩ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/١٩/١٢ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | كليسناد وينتيرز جورييلر | ٧.٣٦٢,٥٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/١٩/١٢ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٤/١ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٢/٢ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٦.٨٥٤,٥٦ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٨/٢ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | كليسناد وينتيرز جورييلر | ٤.٠٧٨,٢١ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/١٦/٢ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢,١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٢/٣ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧.٠٠٠,٨٢ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٩/٣ |
| تم تسجيل المصاريف إلى | سنترال | وزارة المالية نيويورك | ٥.٢٢٤,٤١ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٢٤/٣ |

| | | | | | | |
|---|---|---|---|---|---|---|
| FGI/CP | بارك | | | | | |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | روبينسون وكول ذ.م.م | ٢.٠٦٤٫٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٢٤/٣ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٤/٤ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٢/٥ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧.٨٦١٫٥٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٣/٥ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | ديلاوير وزير الخارجية | ٣٠٠٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/١٢/٥ |
| تحويل إلى FGI لدفعة لماركس بانيث | سنترال بارك | مجموعة فاير ستار | ٧٥.٠٠٠٫٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٢٦/٥ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٢/٦ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ١١.٦٢٧٫٦٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٨/٦ |
| تحويل إلى FGI لدفعة لـ MR لاستشارة التقييم | سنترال بارك | مجموعة فاير ستار | ٨.٠٠٠٫٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/١٢/٦ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧.٨٦١٫٥٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٢٠/٦ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | وزارة المالية نيويورك | ٥.٩٤٨٫١٤ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٢٦/٦ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٥/٧ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/١/٨ |
| رسوم صيانة شقة إيسيكس هاوس | سنترال بارك | جيه دبليو ماريوت إيسيكس هاوس نيويورك | ٧.٨٦١٫٥٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/١٨/٨ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٥/٩ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | وزارة المالية نيويورك | ٥.٩٤٨٫١٤ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٢٠/٩ |
| تم تسجيل المصاريف إلى FGI/CP | سنترال بارك | الخزانة الأمريكية | ٣٢.٥٩٢٫٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٢٦/٩ |
| دفعة لرهن إيسيكس هاوس | سنترال بارك | شركة HSBC للرهن العقاري (أمريكا) | ١٠.٦٢٢٫١٨ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٣/١٠ |
| رسوم صيانة شقة إيسيكس | سنترال | جيه دبليو ماريوت | ١٥.٧٢٣٫٠٦ | مال نقدي | فايرستار دايموند إنك | ٢٠١٧/٥/١٠ |

| ٢٠١٧/١٩/١٠ | فايرستار دايموند إنك | مال نقدي | ٧.٨٦١,٥٣ | جيه دبليو ماريوت إيسيكس هاوس نيويورك | سنترال بارك | رسوم صيانة شقة إيسيكس هاوس |
|---|---|---|---|---|---|---|
| | | | | إيسيكس هاوس نيويورك | بارك | هاوس |
| ٢٠١٧/٢/١١ | فايرستار دايموند إنك | مال نقدي | ١٠.٦٢٢,١٨ | شركة HSBC للرهن العقاري (أمريكا) | سنترال بارك | دفعة لرهن إيسيكس هاوس |
| ٢٠١٧/٩/١١ | فايرستار دايموند إنك | مال نقدي | ٨.٠٥٤,٥٥ | جيه دبليو ماريوت إيسيكس هاوس نيويورك | سنترال بارك | رسوم صيانة شقة إيسيكس هاوس |
| ٢٠١٧/٤/١٢ | فايرستار دايموند إنك | مال نقدي | ١٠.٦٢٢,١٨ | شركة HSBC للرهن العقاري (أمريكا) | سنترال بارك | دفعة لرهن إيسيكس هاوس |
| ٢٠١٧/٥/١٢ | فايرستار دايموند إنك | مال نقدي | ٣.٠٠٠.٦٤٢,٠٠ | شركة HSBC للرهن العقاري (أمريكا) | سنترال بارك | دفع كامل رهن شقة إيسيكس هاوس |
| ٢٠١٧/٥/١٢ | فايرستار دايموند إنك | مال نقدي | ٥.٧٨٨,٥١ | وزارة المالية نيويورك | سنترال بارك | تم تسجيل المصاريف إلى FGI/CP |
| ٢٠١٨/٢٤/١ | فايرستار دايموند إنك | مال نقدي | ١٥.٨٢٨,٣٥ | جيه دبليو ماريوت إيسيكس هاوس نيويورك | سنترال بارك | دفعة غير معروفة لجيه دبليو ماريوت إيسيكس هاوس |

| إجمالي تحويلات سنتين إلى سنترال بارك | ٣.٦٠٣.٦٨٣,٦٩ |
|---|---|
| إجمالي تحويلات ست سنوات إلى سنترال بارك | ٤.٥٩٤.٥٥٩,٧٨ |

## الملحق ب – التحويلات من المدينين إلى أوراجيم

| التاريخ | المحول | الملكية المحولة | القيمة (بالدولار) | المحول له |
|---|---|---|---|---|
| ٢٠١٢/١١/١٠ | فايرستار دايموند إنك | مال نقدي | ٥٠٠٠٠٠,٠٠ | شركة أوراجيم المحدودة |
| ٢٠١٥/٢٤/٩ | فايرستار دايموند إنك | مال نقدي | ١٠٨٤٠٠٩٦٨,٩٤ | شركة أوراجيم المحدودة |

| إجمالي تحويلات أوراجيم | ٢٠٣٤٠٠٩٦٨,٩٤ |
|---|---|

## الملحق ج – التحويلات من المدينين إلى بريليانت

| المحول له | القيمة (بالدولار) | الملكية المحولة | المحول | التاريخ |
|---|---|---|---|---|
| بريليانت دايموندز المحدودة | ٤.٠٥٨.٥٠٠,٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/٢٥/٣ |
| بريليانت دايموندز المحدودة | ١.١٦٨.٣٨٩,٩٨ | مخزون | فايرستار دايموند إنك | ٢٠١٥/٢٣/٦ |
| بريليانت دايموندز المحدودة | ٨٤٠.٥٣٣,١٨ | مخزون | فايرستار دايموند إنك | ٢٠١٦/٢٧/٦ |
| بريليانت دايموندز المحدودة | ١.٠٠١.٣٥٤,٧٥ | مخزون | فايرستار دايموند إنك | ٢٠١٦/١٥/٧ |
| بريليانت دايموندز المحدودة | ٧٦٢.٤٣٢,١٢ | مخزون | فايرستار دايموند إنك | ٢٠١٦/٢٧/٧ |
| بريليانت دايموندز المحدودة | ٥٣٤.٠٩٥,٠١ | مخزون | فايرستار دايموند إنك | ٢٠١٧/١٢/٩ |
| بريليانت دايموندز المحدودة | ٨٦٤.٥٨٧,٥٧ | مخزون | فايرستار دايموند إنك | ٢٠١٧/١١/١٠ |
| بريليانت دايموندز المحدودة | ٥٧٤.٩٨٠,٩٥ | مخزون | فايرستار دايموند إنك | ٢٠١٧/١٥/١١ |
| بريليانت دايموندز المحدودة | ٦٨٦.٤١٣,٥٥ | مخزون | فايرستار دايموند إنك | ٢٠١٧/٢٠/١١ |

| | |
|---|---|
| ٥.٢٦٤.٣٩٧,١٣ | إجمالي تحويلات سنتين إلى بريليانت |
| ١٠.٤٩١.٢٨٧,١١ | إجمالي تحويلات ست سنوات إلى بريليانت |

## الملحق د – التحويلات من المدينين إلى دياجيمز

| التاريخ | المحول | الملكية المحولة | القيمة (بالدولار) | المحول له |
|---|---|---|---|---|
| ٢٠١٢/١٤/١٢ | فايرستار دايموند إنك | مال نقدي | ٥٥٢.١٣٣,١٠ | دياجيمز م.م.ح |
| ٢٠١٢/١٨/١٢ | فايرستار دايموند إنك | مال نقدي | ١.٣٢٥.٠٠٠,٠٠ | دياجيمز م.م.ح |
| ٢٠١٢/٢١/١٢ | فايرستار دايموند إنك | مال نقدي | ١١٩.٠٠٠,٠٠ | دياجيمز م.م.ح |
| ٢٠١٣/١٥/٣ | فايرستار دايموند إنك | مال نقدي | ٣٢٢.٨٤١,٠٠ | دياجيمز م.م.ح |
| ٢٠١٣/٢٠/٣ | فايرستار دايموند إنك | مال نقدي | ٦٤٧.٤٣٢,٠٥ | دياجيمز م.م.ح |

| إجمالي تحويلات دياجيمز | ٢.٩٦٦.٤٠٦,١٥ |
|---|---|

## الملحق هـ – التحويلات من المدينين إلى إمباير

| التاريخ | المحول | الملكية المحولة | القيمة (بالدولار) | المحول له |
|---|---|---|---|---|
| ٢٠١٢/١٤/٣ | فايرستار دايموند إنك | مال نقدي | ٧٣٣.٠٠٠,٠٠ | امباير جيمز م.م.ح |
| ٢٠١٢/٢٦/٧ | ايه جافي إنك | مخزون | ٢.٦١١.٢٦٣,٦٠ | امباير جيمز م.م.ح |
| ٢٠١٢/٣/٨ | ايه جافي إنك | مخزون | ١.٨١٩.٩٦٧,٣٥ | امباير جيمز م.م.ح |
| ٢٠١٢/٦/١١ | فايرستار دايموند إنك | مخزون | ١.٠٨٦.٣١٥,٨٣ | امباير جيمز م.م.ح |
| ٢٠١٢/٣٠/١١ | فايرستار دايموند إنك | مخزون | ١.٩٣٣.٠٩٠,٦٠ | امباير جيمز م.م.ح |
| ٢٠١٢/١١/١٢ | فايرستار دايموند إنك | مال نقدي | ١.١٨٥.٠٢٥,٠٥ | امباير جيمز م.م.ح |
| ٢٠١٣/٢٠/٦ | ايه جافي إنك | مخزون | ٦٧٣.٤٣٢,٥٧ | امباير جيمز م.م.ح |
| ٢٠١٥/٣٠/١ | فنتازي إنك | مخزون | ١.٠٠٢.٠٢٥,٥٠ | امباير جيمز م.م.ح |
| ٢٠١٦/٣١/٣ | فايرستار دايموند إنك | مخزون | ١.٠١٤.٩١٥,٠٧ | امباير جيمز م.م.ح |
| ٢٠١٦/١٢/٨ | ايه جافي إنك | مخزون | ١١.١٥٠,٠٠ | امباير جيمز م.م.ح |
| ٢٠١٦/٢/٩ | ايه جافي إنك | مخزون | ٤٢.٩٠٥,٠٠ | امباير جيمز م.م.ح |

| | |
|---|---|
| إجمالي تحويلات سنتين إلى إمباير | ٣.٩٠٠.٩١٦,٩٣ |
| إجمالي تحويلات ست سنوات إلى إمباير | ١٠.٨٢٧.٨٠٢,٥٧ |

## الجدول و – التحويلات من المدينين إلى اتيرنال

| التاريخ | المحول | الملكية المحولة | القيمة (بالدولار) | المحول له |
|---|---|---|---|---|
| ٢٠١٥/٢٠/٢ | فايرستار دايموند إنك | مال نقدي | ٣٠٠.٠٠٠.٠٠ | اتيرنال دايموند كوربوريشن ليمتد |
| ٢٠١٦/١٦/٣ | ايه جافي إنك | مخزون | ٢١٨.٣٥٤.٢٢ | اتيرنال دايموند كوربوريشن ليمتد |
| ٢٠١٨/٢٣/١ | فايرستار دايموند إنك | مخزون | ٤٢٦.٣٢٠.٩٧ | اتيرنال دايموند كوربوريشن ليمتد |
| ٢٠١٨/٦/٢ | فايرستار دايموند إنك | مخزون | ٧٨٩.١٤٠.٤٢ | اتيرنال دايموند كوربوريشن ليمتد |

| | |
|---|---|
| إجمالي تحويلات سنتين إلى اتيرنال | ٣.٩٠٠.٩١٦.٩٣ |
| إجمالي تحويلات ست سنوات إلى اتيرنال | ١٠.٨٢٧.٨٠٢.٥٧ |

## الجدول ز – التحويلات من المدينين إلى فانسي كريبشنز

| التاريخ | المحول | الملكية المحولة | القيمة (بالدولار) | المحول له |
|---|---|---|---|---|
| ٢٠١٢/٨/٦ | فايرستار دايموند إنك | مال نقدي | ١.٠٠٠.٠٠٠,٠٠ | فانسي كريبشنز كومباني ليمتد |
| ٢٠١٣/١٣/١٢ | فايرستار دايموند إنك | مخزون | ١.٥٤٥.٧٧٤,٨٧ | فانسي كريبشنز كومباني ليمتد |
| ٢٠١٤/٢٣/٧ | فايرستار دايموند إنك | مخزون | ١.٨٠٠.٨٧٩,٩٩ | فانسي كريبشنز كومباني ليمتد |
| ٢٠١٥/١/٩ | فايرستار دايموند إنك | مخزون | ١.١٨٠.٢٣٠,٧٨ | فانسي كريبشنز كومباني ليمتد |
| ٢٠١٥/٢٤/٩ | فايرستار دايموند إنك | مال نقدي | ١.٤٠٠.٠٠٠,٠٠ | فانسي كريبشنز كومباني ليمتد |
| ٢٠١٦/١٨/٥ | فايرستار دايموند إنك | مخزون | ١.٠٣١.٣٥٣,٤٣ | فانسي كريبشنز كومباني ليمتد |
| ٢٠١٦/٢٠/٥ | فايرستار دايموند إنك | مخزون | ٨١.٤٥٥,٥٠ | فانسي كريبشنز كومباني ليمتد |
| ٢٠١٦/١٨/٧ | فايرستار دايموند إنك | مال نقدي | ١.٨٠٩.٥٢٨,٠٠ | فانسي كريبشنز كومباني ليمتد |
| ٢٠١٦/٢١/٧ | ايه جافي إنك | مال نقدي | ٢٠٠.٠٠٠,٠٠ | فانسي كريبشنز كومباني ليمتد |
| ٢٠١٦/٢١/٧ | فايرستار دايموند إنك | مال نقدي | ٧١٥.٠٠٠,٠٠ | فانسي كريبشنز كومباني ليمتد |
| ٢٠١٧/٢٧/٦ | فايرستار دايموند إنك | مخزون | ٦٣.٥٨٠,٠٠ | فانسي كريبشنز كومباني ليمتد |

| | |
|---|---|
| إجمـالي تحـويلات سـنتين إلـى فانسـي كريبشنز | ٣.٩٠٠.٩١٦,٩٣ |
| إجمالي تحويلات ست سنوات إلى فانسي كريبشنز | ١٠.٨٢٧.٨٠٢,٥٧ |

**الجدول ح – التحويلات من المدينين إلى باسفيك**

| التاريخ | المحول | الملكية المحولة | القيمة (بالدولار) | المحول له |
|---|---|---|---|---|
| ٢٠١٢/٢٨/٢ | فايرستار دايموند إنك | المخزون | ٢٥١.٣٧٩,٦٨ | باسفيك دايموندز م.م.ح |
| ٢٠١٢/١/٣ | فايرستار دايموند إنك | المخزون | ١.٦٢٨.٤٣٣,٥٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٢/٢/٣ | فايرستار دايموند إنك | المخزون | ١٧٧.٣٥٠,٠٧ | باسفيك دايموندز م.م.ح |
| ٢٠١٢/٥/٣ | ايه جافي إنك | المخزون | ٢٨٠.٣٣٤,٦٢ | باسفيك دايموندز م.م.ح |
| ٢٠١٢/١٥/٣ | ايه جافي إنك | المخزون | ٦٩.٩٨١,٦٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٢/٢/٥ | فايرستار دايموند إنك | المخزون | ٧٦٢.٥٢٨,٩٥ | باسفيك دايموندز م.م.ح |
| ٢٠١٢/٣١/٥ | فايرستار دايموند إنك | المخزون | ٢٥٦.٦٥٧,٢٥ | باسفيك دايموندز م.م.ح |
| ٢٠١٢/٧/٦ | فايرستار دايموند إنك | المخزون | ١.٩٧٧.٧٦٨,٦٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٢/٢٨/٩ | فايرستار دايموند إنك | المخزون | ١.٩١٢.٨٤٠,٠٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٢/٢١/١٢ | فايرستار دايموند إنك | مال نقدي | ٥٦٠.٠٠٠,٠٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٣/٢٢/٢ | فايرستار دايموند إنك | مال نقدي | ٥٠٣.٥٠١,٤١ | باسفيك دايموندز م.م.ح |
| ٢٠١٣/١٥/٣ | فايرستار دايموند إنك | مال نقدي | ٦٧٠.٠٠٠,٠٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٣/٢٦/٣ | فايرستار دايموند إنك | مال نقدي | ٤٠٧.١٢٠,٠٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٣/٢٦/٣ | فايرستار دايموند إنك | مال نقدي | ٤٠٧.١٢٠,٠٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٣/٣٠/٨ | فايرستار دايموند إنك | المخزون | ١.٧٦٨.٤٢٣,٠٨ | باسفيك دايموندز م.م.ح |
| ٢٠١٣/٣٠/٩ | ايه جافي إنك | المخزون | ٩٨٥.٨٤٣,٠٤ | باسفيك دايموندز م.م.ح |
| ٢٠١٣/١٠/١٠ | ايه جافي إنك | المخزون | ١.٠٤٧.٣١١,٧٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٣/١٠/١٠ | ايه جافي إنك | المخزون | ١.٣٧٤.٢٠١,٦٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٣/٢٣/١٠ | فايرستار دايموند إنك | مال نقدي | ١٥٠.٠٠٠,٠٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٣/٢٥/١٠ | ايه جافي إنك | المخزون | ٧٣١.٨٤٦,٦٦ | باسفيك دايموندز م.م.ح |
| ٢٠١٣/٣٠/١٠ | ايه جافي إنك | مال نقدي | ٢.٤٥٥.٠٣٦,٠٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٤/١١/٤ | فايرستار دايموند إنك | المخزون | ١.٣٠١.١٣٣,٩٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٥/٢٣/١ | فنتازي إنك | المخزون | ١.٥٥٢.٤٨٢,٩٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٥/٢٠/٣ | فايرستار دايموند إنك | المخزون | ١.٦٦٦.٠٧٢,٤٦ | باسفيك دايموندز م.م.ح |
| ٢٠١٥/٢٣/٦ | فايرستار دايموند إنك | مال نقدي | ١.١٣٨.٢٧٠,٦٠ | باسفيك دايموندز م.م.ح |
| ٢٠١٥/٢٦/٦ | فايرستار دايموند إنك | مال نقدي | ١.٤٣٨.٢٧٠,٦٠ | باسفيك دايموندز م.م.ح |

| | | | | |
|---|---|---|---|---|
| باسفيك دايموندز م.م.ح | ٥٤.٠٠٠,٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٢٥/٩ |
| باسفيك دايموندز م.م.ح | ١.٠١٧.٠٠٠,٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٢٨/٩ |
| باسفيك دايموندز م.م.ح | ١.٠٧١.٠٠٠,٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/٧/١٠ |
| باسفيك دايموندز م.م.ح | ٥٦٠.٧٤١,٥٢ | مال نقدي | فايرستار دايموند إنك | ٢٠١٥/١٣/١١ |
| باسفيك دايموندز م.م.ح | ١.١٠٠.٠٠٠,٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٦/٢٣/٢ |
| باسفيك دايموندز م.م.ح | ٢٩٦.٦٥٩,٤٦ | المخزون | فايرستار دايموند إنك | ٢٠١٦/٢٦/٢ |
| باسفيك دايموندز م.م.ح | ٨٧٣.٩٩٦,٥٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٣/٣ |
| باسفيك دايموندز م.م.ح | ٥٣.٨٦٣,٤٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٣/٣ |
| باسفيك دايموندز م.م.ح | ٧٠٠.٠٠٠,٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٦/١٥/٣ |
| باسفيك دايموندز م.م.ح | ١.٠٠٠.٠٠٠,٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٦/٢١/٣ |
| باسفيك دايموندز م.م.ح | ٩٠٠.٠٠٠,٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٦/٢٣/٣ |
| باسفيك دايموندز م.م.ح | ١.٠٠٠.٠٠٠,٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٦/٢٤/٣ |
| باسفيك دايموندز م.م.ح | ٥٠٠.٠٠٠,٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٦/٥/٤ |
| باسفيك دايموندز م.م.ح | ٢.٠٠٠.٠٠٠,٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٦/٦/٥ |
| باسفيك دايموندز م.م.ح | ٨١٥.٠٠٠,٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٦/١/٦ |
| باسفيك دايموندز م.م.ح | ٦٩٣.٣٤٨,٢٤ | المخزون | فايرستار دايموند إنك | ٢٠١٦/١٧/٦ |
| باسفيك دايموندز م.م.ح | ٤٥٩.٥٠٨,٥٥ | المخزون | فايرستار دايموند إنك | ٢٠١٧/٢٨/٣ |
| باسفيك دايموندز م.م.ح | ٥٣٠.٠٠٠,٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٨/٣/١ |
| باسفيك دايموندز م.م.ح | ٤٨٣.٦٢٠,٠٥ | مال نقدي | فايرستار دايموند إنك | ٢٠١٨/٣/١ |
| باسفيك دايموندز م.م.ح | ٢.١٨٨.٧٦٩,٤٣ | مال نقدي | فايرستار دايموند إنك | ٢٠١٨/٣/١ |

| | |
|---|---|
| إجمالي تحويلات سنتين إلى باسفيك | ١٢.٤٩٤.٧٦٥,٦٣ |
| إجمالي تحويلات ست سنوات إلى باسفيك | ٤١.٧٧١.٤١٥,٣٧ |

## الملحق ط – التحويلات من المدينين إلى تراي كلر

| المحول له | القيمة (بالدولار) | الملكية المحولة | المحول | التاريخ |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| تراي كلر جيمز م.م.ح | ١.٨٠٥.٧٢٠,١٦ | مخزون | فايرستار دايموند إنك | ٢٠١٢/١/٣ |
| تراي كلر جيمز م.م.ح | ١.٠٠٠.٠٠٠,٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١٨/٣ |
| تراي كلر جيمز م.م.ح | ٢٠٠.٠٢٤,٩٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١٩/٣ |
| تراي كلر جيمز م.م.ح | ١.٠١٣.١٦٥,٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٢١/٣ |
| تراي كلر جيمز م.م.ح | ٦٠٠.٠٠٠,٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/١/٥ |
| تراي كلر جيمز م.م.ح | ١.٦٠٠.٠٠٠,٠٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٣/٦/٥ |
| تراي كلر جيمز م.م.ح | ١.٩١٤.٧٢١,٢٠ | مخزون | ايه جافي إنك | ٢٠١٣/١٠/١٠ |
| تراي كلر جيمز م.م.ح | ٤١٤.٤٠٥,٢٠ | مال نقدي | فايرستار دايموند إنك | ٢٠١٤/١١/٧ |
| تراي كلر جيمز م.م.ح | ١.٦١٠.٠٨٨,٠٠ | مخزون | فايرستار دايموند إنك | ٢٠١٥/٢٩/٩ |
| تراي كلر جيمز م.م.ح | ٧٤٣.٣١٢,٨٥ | مخزون | فايرستار دايموند إنك | ٢٠١٦/٢٤/٢ |
| تراي كلر جيمز م.م.ح | ١.١٩٢.١٠٥,٥٥ | مال نقدي | فايرستار دايموند إنك | ٢٠١٦/٢٦/٢ |
| تراي كلر جيمز م.م.ح | ٣٠١.٠٤٠,٠٠ | مال نقدي | فنتازي إنك | ٢٠١٦/٣٠/٣ |

| | |
|---|---|
| إجمالي تحويلات سنتين إلى تراي كلر | ١.٤٩٣.٦٤٥,٥٥ |
| إجمالي تحويلات ست سنوات إلى تراي كلر | ١٢.٣٩٥.٠٨٢,٨٦ |

## الملحق ي – التحويلات من المدينين إلى يونيك

| التاريخ | المحول | الملكية المحولة | القيمة (بالدولار) | المحول له |
|---|---|---|---|---|
| ٢٠١٢/٢٩/٣ | فايرستار دايموند إنك | مخزون | ٣.١٤٤.٤٧٧,٣٨ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٢/١٣/٧ | ايه جافي إنك | مخزون | ٨٧٤.٨٦٧,٥٢ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٢/١٢/٩ | فايرستار دايموند إنك | مال نقدي | ١٥٠.٠٠٠,٠٠ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٢/١٣/١٢ | فايرستار دايموند إنك | مال نقدي | ٢٣١.٠٠٠,٠٠ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٣/٢٤/٩ | فايرستار دايموند إنك | مخزون | ٩٢١.٠٢٧,١٠ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٤/١٨/٣ | فايرستار دايموند إنك | مال نقدي | ١٥٠.٠٠٠,٠٠ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٥/١٩/١ | فايرستار دايموند إنك | مخزون | ١٢٥.٥٩٠,٠٠ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٥/٢/٣ | فايرستار دايموند إنك | مال نقدي | ٣٠.٠٠٠,٠٠ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٥/٣٠/٩ | فايرستار دايموند إنك | مخزون | ٢.١٢٢.٤٠١,٦٠ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٦/٤/٣ | فايرستار دايموند إنك | مال نقدي | ٣٠٠.٠٠٠,٠٠ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٧/١٧/٦ | فايرستار دايموند إنك | مخزون | ٣٣١.٠٢٨,٥٤ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٧/٢٢/٣ | فايرستار دايموند إنك | مال نقدي | ٣٠٠.٠٠٠,٠٠ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٧/٢٣/٥ | فايرستار دايموند إنك | مخزون | ٦٣٨.٩٣٤,٢٣ | يونيك دايموند أند جولري م.م.ح |
| ٢٠١٧/١٧/٧ | فايرستار دايموند إنك | مخزون | ١.٩٠٥.٠٦٨,٦٥ | يونيك دايموند أند جولري م.م.ح |

| | |
|---|---|
| إجمالي تحويلات سنتين إلى يونيك | ٣.٤٧٥.٠٣١,٤٢ |
| إجمالي تحويلات ست سنوات إلى يونيك | ١١.٤٩٤.٣٩٥,٠٢ |

## الملحق ك – التحويلات من المدينين إلى وورلد دايموند

| التاريخ | المحول | الملكية المحولة | القيمة (بالدولار) | المحول له |
|---|---|---|---|---|
| ٢٠١٢/٢/٥ | ايه جافي إنك | مخزون | ١.٤٥٤.٨٢١,٤٥ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٣/٢٨/٣ | فايرستار دايموند إنك | مخزون | ٩٥٩.٠٩٧,٥٥ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٣/٢/٥ | فايرستار دايموند إنك | مخزون | ٥٤٨.٧١٨,٣٠ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٣/٢١/٦ | فايرستار دايموند إنك | مخزون | ١.٤٧٩.٥٦٥,٣٠ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٣/٢٦/٧ | فايرستار دايموند إنك | مخزون | ٤٨٠.٤٨٧,١٣ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٣/٢٤/٩ | فايرستار دايموند إنك | مخزون | ٥٢٢.٤٨٣,١٥ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٣/٢٥/١٠ | فايرستار دايموند إنك | مخزون | ٩١١.٤٠٨,٩٨ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٤/٢١/٢ | فايرستار دايموند إنك | مخزون | ١.٩٦٨.٨٣٩,٦٠ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٥/٦/١٠ | فايرستار دايموند إنك | مخزون | ٦٨٢.٢١٩,٠٥ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٥/٧/١٠ | فايرستار دايموند إنك | مخزون | ٢٨٥.٠٧١,٩٥ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٥/١٠/١٢ | فايرستار دايموند إنك | مخزون | ١.٢٧٥.٣٠٠,٣٠ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٦/٧/٩ | فايرستار دايموند إنك | مخزون | ٦٤٧.٠٣١,٨٨ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٦/١٨/١٠ | فايرستار دايموند إنك | مخزون | ٩٤٦.٣٩٧,٢٤ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٧/٢٠/١ | فايرستار دايموند إنك | مخزون | ٩٨٤.٠٥٨,١٢ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٧/١٥/٢ | فايرستار دايموند إنك | مخزون | ٦٣٣.١١١,٨٩ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٧/٣/٣ | فايرستار دايموند إنك | مخزون | ٦٨٧.٥٢٠,٢٢ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٧/٢٧/٤ | فايرستار دايموند إنك | مخزون | ٨٢١.٦٧١,٥٠ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٧/١٢/٥ | فايرستار دايموند إنك | مخزون | ١.١٢٢.٠٨٣,٠٨ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٧/٣١/٥ | فايرستار دايموند إنك | مخزون | ٧٩٠.٩٩٩,١٦ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٧/١/٦ | فايرستار دايموند إنك | مخزون | ٩٤٥.٩١١,٤٥ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٧/١١/٧ | فايرستار دايموند إنك | مخزون | ٨١٩.٤٢٠,٠٠ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٧/٢٨/٧ | فايرستار دايموند إنك | مخزون | ٥٧٧.٠٨٧,٩١ | وورلد دايموند ديستريبيوشن م.م.ح |
| ٢٠١٧/٥/١٢ | فايرستار دايموند إنك | مخزون | ١.٦٣٢.٥٠٠,٥٣ | وورلد دايموند ديستريبيوشن م.م.ح |

| | |
|---|---|
| إجمالي تحويلات سنتين إلى وورلد دايموند | ١٠.٢٦٠.٧٩٢,٩٨ |
| إجمالي تحويلات ست سنوات إلى وورلد دايموند | ٢١.١٧٥.٨٠٥,٧٤ |

## الملحق ل – التحويلات من المدينين إلى توين فيلدز

| المحول له | القيمة (بالدولار) | الملكية المحولة | المحول | التاريخ |
|---|---|---|---|---|
| توين فيلدز انفستمنتس ليمتد | ٤٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/١/٢ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/١٤/٣ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/١٠/٤ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/١٧/٥ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/٢٨/٥ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/٢٩/٥ |
| توين فيلدز انفستمنتس ليمتد | ١٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/٢٦/٧ |
| توين فيلدز انفستمنتس ليمتد | ٣٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/٥/٨ |
| توين فيلدز انفستمنتس ليمتد | ٤٥٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/٤/٩ |
| توين فيلدز انفستمنتس ليمتد | ٧٥٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/١٢/٩ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/٢٥/٩ |
| توين فيلدز انفستمنتس ليمتد | ٣٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/١/١٠ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/٧/١٠ |
| توين فيلدز انفستمنتس ليمتد | ١٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/٣٠/١٠ |
| توين فيلدز انفستمنتس ليمتد | ٦١٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/١٢/١١ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٣/٣/١٢ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٤/٣/٣ |
| توين فيلدز انفستمنتس ليمتد | ٤٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٤/٢١/٤ |
| توين فيلدز انفستمنتس ليمتد | ٢٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٤/٢٢/٥ |
| توين فيلدز انفستمنتس ليمتد | ٢٥٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٤/٩/٦ |
| توين فيلدز انفستمنتس ليمتد | ٢٥٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٤/١٢/٦ |
| توين فيلدز انفستمنتس ليمتد | ٦٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٤/٢٥/٧ |
| توين فيلدز انفستمنتس ليمتد | ٢٥٥٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٤/٤/٨ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٤/٢٠/٨ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٤/٢٦/٩ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٤/١٩/١١ |
| توين فيلدز انفستمنتس ليمتد | ٥٠٠٫٠٠٠٫٠٠ | مال نقدي | ايه جافي إنك | ٢٠١٥/١٠/٢ |

| ٢٠١٥/٧/٤ | ايه جافي إنك | مال نقدي | ٥٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/٢١/٤ | ايه جافي إنك | مال نقدي | ٢٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/٢٢/٥ | ايه جافي إنك | مال نقدي | ٥٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/٣/٦ | ايه جافي إنك | مال نقدي | ٥٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/٢٢/٦ | فاير ستار دايموند إنك | مال نقدي | ٣١٬٥٤٢٬٢٨ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/٢٢/٦ | ايه جافي إنك | مال نقدي | ٥٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/١/٧ | ايه جافي إنك | مال نقدي | ٥٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/١٥/٧ | ايه جافي إنك | مال نقدي | ١٬٠٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/٢٩/٧ | ايه جافي إنك | مال نقدي | ٢٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/٢٦/٨ | ايه جافي إنك | مال نقدي | ٣٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/١٦/٩ | ايه جافي إنك | مال نقدي | ٢٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/٢٩/٩ | ايه جافي إنك | مال نقدي | ٢٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/٢٦/١٠ | ايه جافي إنك | مال نقدي | ٥٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/٦/١١ | ايه جافي إنك | مال نقدي | ٥٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٥/٣/١٢ | ايه جافي إنك | مال نقدي | ٢٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٦/٢/٢ | ايه جافي إنك | مال نقدي | ١٬٠٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٦/١٤/٤ | ايه جافي إنك | مال نقدي | ١٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٦/٨/٦ | ايه جافي إنك | مال نقدي | ٢٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٦/١٤/٦ | ايه جافي إنك | مال نقدي | ١٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٦/١٤/٧ | ايه جافي إنك | مال نقدي | ١٤٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٦/١١/١٠ | ايه جافي إنك | مال نقدي | ٢٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٧/١٨/١ | ايه جافي إنك | مال نقدي | ٣٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٧/١/٢ | ايه جافي إنك | مال نقدي | ٥٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٧/١٠/٢ | ايه جافي إنك | مال نقدي | ٥٠٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٧/١/٣ | ايه جافي إنك | مال نقدي | ٢٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٧/١٠/٣ | ايه جافي إنك | مال نقدي | ٢٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٧/١٦/٣ | ايه جافي إنك | مال نقدي | ٢٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٧/٣٠/٣ | ايه جافي إنك | مال نقدي | ١٥٠٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |
| ٢٠١٧/٤/٥ | ايه جافي إنك | مال نقدي | ١٢٥٬٠٠٠٬٠٠ | توين فيلدز انفستمنتس ليمتد |

| | |
|---|---|
| إجمالي تحويلات سنتين إلى توين فيلدز | ٣.٢٦٥.٠٠٠,٠٠ |
| إجمالي تحويلات ست سنوات إلى توين فيلدز | ٢١.٣٦١.٥٤٢,٢٨ |

**<u>Letter Rogatory - Exhibit 2</u>**
**Summons**

# UNITED STATES BANKRUPTCY COURT
## Southern District of New York

In re: Firestar Diamond, Inc. and Fantasy, Inc.

Bankruptcy Case No.:
18–10509–shl

Richard Levin Chapter 11 Trustee of Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc.

Plaintiff(s),

–against–

Adversary Proceeding No.
20–01054–shl

Ami JaveriA/K/A Ami Modi
Purvi MehtaA/K/A Purvi Modi
Nehal Modi
Neeshal Modi
Central Park Real Estate, LLC
Central Park South 50 Properties, LLC
Trident Trust Company (South Dakota) Inc.solely as Trustee of the Ithaca Trust
Twin Fields Investments Ltd.
Auragem Company Ltd.
Brilliant Diamonds Ltd.
Eternal Diamonds Corporation Ltd.
Fancy Creations Company Ltd.
Hamilton Precious Traders Ltd.
Sino Traders Ltd.
Sunshine Gems Ltd.
Unique Diamond and Jewellery FZC
World Diamond Distribution FZE
Vista Jewelry FZE
Empire Gems FZE
Universal Fine Jewelry FZE
Diagems FZC
Tri Color Gems FZE
Pacific Diamonds FZE
Himalayan Traders FZE
Unity Trading FZE
Fine Classic FZE
DG Brothers FZE

Defendant(s)

## SECOND
## SUMMONS AND NOTICE OF PRETRIAL CONFERENCE
## IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to submit a motion or answer to the complaint which is attached to this summons to the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall submit a motion or answer to the complaint within 35 days, to:

| Address of Clerk: |
|---|
| **Clerk of the Court**<br>**United States Bankruptcy Court**<br>**Southern District of New York**<br>**One Bowling Green**<br>**New York, NY 10004–1408** |

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

| Name and Address of Plaintiff's Attorney: |
|---|
| **Vincent Edward Lazar**<br>**Jenner & Block LLP**<br>**353 N. Clark Street**<br>**Chicago, IL 60654** |

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place:

| | |
|---|---|
| United States Bankruptcy Court<br>Southern District of New York<br>One Bowling Green<br>New York, NY 10004−1408 | Room: Courtroom 701, One Bowling Green,<br>New York, NY 10004−1408<br><br>Date and Time: 6/23/20 at 10:00 AM |

IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

Dated: 4/22/20

Vito Genna
_____

*Clerk of the Court*

By: /s/ Carmen Ortiz
_____

*Deputy Clerk*

**محكمة الإفلاس في الولايات المتحدة**

**المنطقة الجنوبية من نيويورك**

| | |
|---|---|
| قضية الإفلاس رقم:<br>18-10509-shl | فيما يتعلق: بشركة فايرستار دايموند, انك, و فنتازي, انك. |
| | ريتشــارد ليفـين وصــي الفصـل ١١ عـن شـركة فايرستار دايموند, انك, فنتازي, انك, وأولد أيه جيه, انك, المعروفة مسبقاً بـ أيه. جافي, إنك.<br><br>**المدعي (المدعون)** |
| الإجراء المضاد رقم:<br>20-01054-shl | **ضد** |
| | أمي جافيري (المعروفة مسبقاً آمي مودي)<br><br>بورفي, ميثا (المعروفة مسبقاً بورفي مودي)<br><br>نهال مودي<br><br>نيشال مودي<br><br>سنترال بارك ريل استيت ذ. م. م<br><br>سنترال بارك ساوث ٥٠ بروبرتيز, ذ.م.م<br><br>ترايدنت تراست (ساوث داكوتا) انك, فقط بصفة الوصي عن شركة إيثاكا ترست<br><br>تروين فيلدز انفستمنتس ليمتد<br><br>أوراجيم كومباني ليمتد<br><br>بريليانت دايموندز ليمتد<br><br>اتيرنال دايموندز كوربوريشن ليمتد |

فانسي كرييشنز كومباني ليمتد

هاميلتون بريشوس تريدرز ليمتد

سينو تريدرز ليمتد

صن شاين جيمس ليمتد

يونيك دايموند أند جولري م.م.ح

وورلد دايموند ديستريبيوشن م.م.ح

فيتسا جولري م.م.ح

امباير جيرم م.م.ح

يونيفرسال فاين جولري م.م.ح

دياجيمز م.م.ح

تري كولور جيمز م.م.ح

باسفيك دايموندز م.م.ح

هيمالايان تريدرز م.م.ح

يونيتي تريدينجز م.م.ح

فاين كلاسيك م.م.ح

دي جي برذرز م.م.ح


المدعى عليه/عليهم

<div dir="rtl">

**ثانياً**

**الاستدعاءات وإشعار اجتماع ما قبل المحاكمة في الإجراء المضاد**

تم استدعاؤكم ويطلب منكم تقديم استدعاء أو رد على الشكوى المرفقة بهذه الاستدعاءات إلى كاتب محكمة الإفلاس خلال ٣٠ يوماً بعد تاريخ إصدار هذه الاستدعاءات، باستثناء تقديم الولايات المتحدة ووزاراتها ووكالاتها استدعاء أو رد على الشكوى خلال ٣٥ يوماً، إلى:

عنوان الكاتب:

كاتب المحكمة

محكمة الإفلاس في الولايات المتحدة

المنطقة الجنوبية من نيويورك

ون بولينج جرين

نيويورك، إن واي ١٤٠٨–١٠٠٠٤

في الوقت ذاته، عليكم أيضاً إرسال نسخة من الاستدعاء أو الرد على محامي المدعي.

اسم محامي المدعي وعنوانه:

فنسنت إدوارد لازار

جينير آند بلوك ذ.م.م.

٣٥٣ إن. شارع كلارك

شيكاغو، آي إل ٦٠٦٥٤

إن قمتم بالاستدعاء، يخضع وقتكم للرد إلى القانون الاتحادي بانكر. بيه. ٧٠١٢.

</div>

تم إبلاغكم أن اجتماع ما قبل المحاكمة للإجراءات التي بدأت بملأ الشكوى سينعقد في المكان والزمان التاليين:

| | |
|---|---|
| الغرفة: قاعة المحكمة ٧٠١، | محكمة الإفلاس في الولايات المتحدة |
| ون بولينج جرين | المنطقة الجنوبية من نيويورك |
| نيويورك، إن واي ١٤٠٨–١٠٠٠٤ | ون بولينج جرين |
| التاريخ والوقت: ٢٠/٢٣/٦ عند ١٠:٠٠ ص | نيويورك، إن واي ١٤٠٨–١٠٠٠٤ |

إن تخلفتم عن الرد على الاستدعاءات، فسيعتبر تخلفكم موافقتكم على إصدار حكم من قبل محكمة الإفلاس ويمكن إصدار حكم غيابي ضدكم بالانتصاف المطلوب في الشكوى.

فيتو جينا                                              التاريخ: ٢٠/٢٢/٤

كاتب المحكمة

من قبل: /س/ كارمين أورتيز

نائب الكاتب

## **<u>Letter Rogatory - Exhibit 3</u>**
### **Service Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors.[1] | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | |
| Plaintiff, | |
| v. | Adv. Proc. No. 20-1054 (SHL) |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of THE ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Firestar Diamond, Inc. (2729), Fantasy, Inc. (1673), and Old AJ, Inc. f/k/a A. Jaffe, Inc. (4756).

## ORDER (I) DIRECTING ISSUANCE OF AN ADDITIONAL SUMMONS; (II) SETTING FOREIGN DEFENDANTS' TIME TO RESPOND TO THE COMPLAINT; (III) ADJOURNING THE PRETRIAL CONFERENCE; AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Richard Levin, not individually but solely in his capacity as chapter 11 trustee (the "**Trustee**") for Firestar Diamond, Inc. ("**Firestar**") for an order (i) directing the Clerk of Court to issue an additional summons under Bankruptcy Rule 7004(e), (ii) authorizing service of the Complaint [Dkt. 1] on the UAE Defendants by international registered mail under Civil Rule 4(f)(3), made applicable in this adversary proceeding by Bankruptcy Rule 7004(a), (iii) setting each Foreign Defendant's deadline to respond to the Complaint to 45 days from the date the Trustee effects service on each respective Defendant under Bankruptcy Rule 7012(a), (iv) adjourning *sine die* the initial pretrial conference, and (v) granting related relief; and the Court having conducted a hearing on the Motion on April 7, 2020 (the "**Hearing**"); and the Court having considered the Motion, all responses filed thereto, if any, as well as any evidence presented at the hearing; and the Court having jurisdiction to consider and determine the Motion in accordance with 28 U.S.C. §§ 157 and 1334; and appropriate notice under the circumstances of the Motion having been provided, and it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor; and recognizing that service may be substantially delayed on account of the COVID-19 pandemic,

IT IS ORDERED:

1.      The Clerk of Court shall issue an additional summons in accordance with Bankruptcy Rule 7004(e).

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

2.      The deadline for the Foreign Defendants to file with the clerk of the bankruptcy court a response to the Complaint is 60 days after the Trustee effects service of the Complaint and Summons.

3.      The Pretrial Conference in this adversary proceeding, currently scheduled for April 30, 2020 at 10:00 a.m., is adjourned *sine die*.

4.      A hearing on the portion of the Motion requesting authority to serve the Complaint and Summons on the UAE Defendants is adjourned to April 30, 2020.

Dated: April 10, 2020

*/s/ Sean H. Lane*
The Honorable Sean H. Lane
United States Bankruptcy Judge

**محكمة الإفلاس في الولايات المتحدة**

**المنطقة الجنوبية من نيويورك**

| | |
|---|---|
| الفصل ١١ | فيما يتعلق: |
| رقــم: ١٨– ١٠٥٠٩ (إس. إتـش. إل) | بشركة فايرستار دايموند, انك, وآخرون |
| (إدارة مشتركة) | **المدينين** [1] |
| | ريتشارد ليفين وصي الفصل ١١ عن شركة فايرستار دايمونـد, انـك, فنتـازي, انـك, وأولـد أبـه جيـه, انـك, المعروفة مسبقاً بـ أيه. جافي, إنك. |
| | **المدعي** |
| | **ضد** |
| الإجـراء المضـاد رقـم ١٠٥٤–٢٠ (إس. إتش. إل) | آمي جافيري (المعروفة مسبقاً آمـي مودي), بـورفي, ميثا (المعروفة مسبقاً بـورفي مودي), نهـال مـودي, نيشـال مـودي, سـنترال بـارك ريـل اسـتيت ذ. م. م, سنترال بارك ساوث ٥٠ بروبرتيز, ذ. م. م, ترايدنت تراست (ساوث داكوتا) انك, فقط بصفة الوصي عـن شـركة إيثاكا ترسـت, تـوين فيلـدز انفسـتمنتس ليمتـد, أوراجيم كومبـاني ليمتـد, بريليانـت دايمونـد ليمتـد, اتيرنـال دايمونـدز كوربوريشـن ليمتـد, فانسـي كرييشنز |

---

[1] المدينون وآخر أربعة أرقام من أرقام التعريف الضريبي الخاصة بهم كالآتي: فايرستار دايموند, انك (٢٧٢٩), فنتازي إنك (١٦٧٣), و أولد إيه جيه, إنك. المعروفة مسبقاً أيه. جافي, إنك (٤٧٥٦).

| | |
|---|---|
| | كومبـاني ليمتـد, هـاميلتون بريشـوس تريـدرز ليمتـد, سينو تريدرز ليمتد, صن شاين جيمس ليمتد, يونيك دايمونــد أنــد جــولري م.م.ح, وورلــد دايمونــد ديستريبيوشـن م.م.ح, فيتسـا جـولري م.م.ح, امبـاير جيرم م.م.ح, يونيفرسال فاين جولري م.م.ح, دياجيمز م.م.ح, تري كولور جيمز م.م.ح, باسفيك دايموندز م.م.ح, هيمالايـان تريـدرز م.م.ح, يـونيتي تريـدينجز م.م.ح, فاين كلاسيك م.م.ح, دي جي برذرز م.م.ح المدعى عليه |

<u>أمر (١) بتوجيه إصدار استدعاءات إضافية؛ (٢) تحديد وقت المدعى عليهم الأجانب للرد على الشكوى؛ (٣) تأجيل اجتماع ما قبل المحاكمة؛ و (٤) منح الانتصاف ذي الصلة</u>

لدى استدعاء ("**الاستدعاء**")٢ السيد ريتشارد ليفين، ليس فردياً وإنما وحده ضمن صلاحيته بصفته وصي الفصل ١١ ("**الوصي**") عن شركة فايرستار دايموند، انك (**فايرستار**") لأمر (١) توجيه كاتب المحكمة لإصدار استدعاءات إضافية بموجب قاعدة الإفلاس ٧٠٠٤(إي)؛ (٢) تفويض إبلاغ المدعي (دي كيه تي. ١) للمدعى عليهم الإماراتيين عن طريق البريد المسجل الدولي بموجب القانون المدني ٤(إف)(٣)، والذي أصبح مطبقاً في هذا الإجراء المضاد بموجب قاعدة الإفلاس ٧٠٠٤(إيه)؛ (٣) تحديد الموعد النهائي لكل من المدعى عليهم الأجانب للرد على المدعي بـ ٤٥ يوماً من تاريخ إنفاذ الوصي إبلاغ كل مدعى عليه بموجب قاعدة الإفلاس ٧٠١٢(إيه)؛ (٤) تأجيل اجتماع ما قبل المحاكمة الأولي إلى أجل غير مسمى؛ و(٥) منح الانتصاف ذي الصلة، ومع إجراء المحكمة لجلسة استماع بشأن الاستدعاء بتاريخ ٠٧ أبريل ٢٠٢٠ (**جلسة الاستماع**")، ودراسة المحكمة للاستدعاء، وجميع الردود المرفوعة إليها، إن وجدت، بالإضافة إلى أي أدلة مقدمة في جلسة الاستماع؛ وتمتع المحكمة بالاختصاص القضائي لدراسة وإقرار الاستدعاء بموجب ٢٣ يو.إس.سي.§§ ١٥٧ و١٣٣٤؛ وإشعار ملائم في ظل ظروف توجيه الاستدعاء، ويبدو أنه لا داعي لتوجيه استدعاء آخر أو إضافي؛ وبعد التداول المناسب والسبب الكافي للمثول لأجله، وإدراك أن هذا الأمر يمكن أن يتأخر كثيراً بسبب جائحة كوفيد–١٩،

تقرر :

١. يصدر كاتب المحكمة استدعاءات إضافية بموجب قاعدة الإفلاس ٧٠٠٤(إي)؛

---

٢ تحمل المصطلحات بالأحرف الكبيرة طيه المعنى المحدد لها في الاستدعاء.

٢. الموعد النهائي للمدعى عليهم الأجانب لتقديم رد لدى كاتب محكمة الإفلاس على المدعي هو ٦٠ يوماً من بعد قيام الوصي بإرسال الشكوى والاستدعاءات؛

٣. تأجيل اجتماع ما قبل المحاكمة في هذا الإجراء المضاد، المجدول حالياً ليكون في ٣٠ أبريل ٢٠٢٠ عند الساعة ١٠:٠٠ ص؛ إلى أجل غير مسمى؛

٤. تأجيل جلسة استماع لجزء من الاستدعاء تتطلب من السلطة إرسال الشكوى والاستدعاءات للمدعى عليهم الإماراتيين إلى ٣٠ أبريل ٢٠٢٠.


بتاريخ: ١٠ أبريل ٢٠٢٠                          /يوجد توقيع/

                                   الموقر شون إتش. لين

                                   قاضي الإفلاس في الولايات المتحدة