UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

In re:                                              Chapter 11

FIRESTAR DIAMOND, Inc., et al.,                     No. 18-10509(SHL)

        Debtors,                             (Jointly Administered)

Richard Levin, Chapter 11 Trustee of FIRESTAR
DIAMOND, INC., FANTASY, INC., and OLD AJ,           Adv. Proc. No. 20-01054(SHL)
INC., f/k/a A. JAFFE, INC.,

        Plaintiff,

   vs.

AMI JAVERI (A/K/A AMI MODI), et al.,

        Defendants.

-----------------------------------------------------------------X

## DEFENDANT NEESHAL MODI'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

Paykin Krieg & Adams, LLP
2500 Westchester Avenue, Suite 107
Purchase, New York 10557
(212) 725-4423
Attorneys for defendant Neeshal Modi

## Table of Contents

Preliminary Statement ................................................................................................ 1

Allegations and Omissions of Fact ............................................................................. 2

   A.   Allegations Relating to Personal Jurisdiction over Neeshal ................................ 2

   B.   Relevant Allegations Relating to the Bank Fraud .............................................. 3

   C.   Allegations Relating to Neeshal's Involvement in the Bank Fraud .................................... 4

   D.   Neeshal's was not Involved in the Bank Fraud ................................................. 9

Argument .................................................................................................................... 14

I.    There is no Personal Jurisdiction over Neeshal Modi ........................................... 14

   A.   Jurisdiction over Neeshal does not comport with Due Process ......................... 14

      i.   There is no general jurisdiction over Neeshal .............................................. 15

      ii.   There is no specific jurisdiction over Neeshal ............................................. 15

         a.   Neeshal does not have minimum contacts with New York ...................... 16

         b.   Neeshal is not subject to jurisdiction for corporate acts ........................... 20

         c.   Jurisdiction over Neeshal would be unreasonable .................................... 21

   B.   Neeshal is not subject to jurisdiction under the RICO statutes........................... 21

   C.   Neeshal is not subject to jurisdiction under New York's long-arm statute .................... 22

      i.   There is no jurisdiction under CPLR 302(a)(1) because
Neeshal does not transact business within New York ....................................... 23

      ii.   There is no jurisdiction under CPLR 302(a)(2) on a conspiracy theory or otherwise .... 24

      iii.   There is no jurisdiction under CPLR 302(a)(3) on an "effects" theory .......................... 26

   D.   Jurisdictional discovery is not appropriate ....................................................... 26

II.   The RICO Claims should be Dismissed for Failure to State a Cause of Action ............... 27

   A.   The Complaint fails to allege Neeshal's agreement ......................................... 28

   B.   The Complaint fails to allege a RICO claim..................................................... 32

III.   The Complaint is Time-Barred ............................................................................. 32

IV.   Adoption of Additional Grounds for Dismissal as Asserted by Co-Defendants .............. 33

   A.   The Trustee lacks standing................................................................................ 33

   B.   The Complaint is barred by the *in pari delicto* doctrine and Wagoner rule .................... 33

   C.   The Debtors did not sustain a direct injury....................................................... 34

   D.   The Complaint fails to allege domestic injury ................................................. 35

Conclusion .................................................................................................................. 36

# **Table of Authorities**

**Cases**

*4 K & D Corp. v. Concierge Auctions, LLC*, 2 F.Supp.3d 525 (S.D.N.Y. 2014) ......................... 32

*Aero-Bocker Knitting Mills, Inc. v. Allied Fabrics Corp.*, 54 A.D.2d 647 (1st Dept. 1976)......... 25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................................... 28, 29

*Baisch v. Gallina*, 346 F.3d 336 (2d Cir. 2003)............................................................................. 29

*Bakken Resources, Inc. v. Edington*, 15 Civ. 8686 (ALC),

  2019 WL 1437273 (S.D.N.Y. Mar. 29, 2019) ........................................................................ 23

*Bascuñán v. Elsaca*, 874 F.3d 806 (2d Cir. 2017) ........................................................................ 36

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................. 28, 29

*Bristol-Meyers Squibb Co. v. Superior Court of California*, 137 S.Ct. 1773 (2017) ................... 16

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)................................................................. 17

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018).................................... 15

*Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 90 F. Supp. 3d 97 (S.D.N.Y.2015) .............. 22

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991)............... 26

*City of Almaty v. Ablyazov*, 226 F. Supp. 3d 272 (S.D.N.Y. 2016) .............................................. 36

*Clerc v. Cantoni, Inc.*, No. 01 CIV 2481 (RO), 2002 WL 1482769 (S.D.N.Y. Jul. 10, 2002) .... 20

*Daimler AG v. Bauman*, 134 S.Ct. 746 (2014) ............................................................................. 16

*Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122 (S.D.N.Y. 2018)................................... 30

*Duravest, Inc. v. Viscardi, A.G.*, 581 F.Supp.2d 628 (S.D.N.Y. 2008) ....................................... 21

*Elsevier, Inc. v. Grossman*, 77 F.Supp.3d 331 (S.D.N.Y.2015) ................................................... 23

*Feltman v. Kossoff & Kossoff LLP (In re TS Emp't, Inc.)*,

  597 B.R. 543 (Bankr. S.D.N.Y. 2019) ................................................................................... 35

*First Capital Asset Management, Inc. v. Brickellbush, Inc.*,

  218 F.Supp.2d 369 (S.D.N.Y.2002).......................................................................................... 23

*First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ............................... 33

*Fischbarg v. Doucet*, 9 N.Y.3d 375 (2007) ................................................................................... 24

*Foster v. 2001 Real Estate*, 2015 WL 7587360 (S.D.N.Y. 2015) ................................................ 29

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank N.A.*,

  No. 16-cv-5263 (AKH), 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ................................. 19

*Gear, Inc. v. Gear California, Inc.*, 637 F.Supp. 1323 (S.D.N.Y.1986) ...................................... 19

*Ghazoul v. International Management Services, Inc.*, 398 F.Supp. 307 (S.D.N.Y. 1975)........... 23

*Gmurzynska v. Hutton*, 257 F. Supp. 621 (S.D.N.Y. 2004).........................................................30

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)............................16, 17

*Great Western Insurance Co. v. Graham*, 18-CV-6249 (VSB),
2020 WL 3415026 (S.D.N.Y. Jun. 22, 2020) ...........................................................28

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir.1990) .....................................29

*Hemi Group, LLC. v. City of New York*, 559 U.S. 1 (2010). .......................................................35

*In re Adelphia Communications Corp.*, 48 Bankr. Ct. Dec. 191,
2007 WL 2403553, (Bankr. S.D.N.Y. 2007) .........................................................29

*In re Granite Partners*, 194 B.R. 318 (S.D.N.Y. 1996).................................................................35

*In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11-mdl-2262 (NRB),
2019 WL 1331830 (S.D.N.Y. March 25, 2019)..........................................................21

*In re: Lehman Brothers Holdings Inc.*, 535 B.R. 608 (Bankr.S.D.N.Y.2015) ................16, 17, 22

*Ingraham v. Carroll*, 90 N.Y.2d 592 (1997)..................................................................................27

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).....................................................................22

*Jazini v. Nissan Motor Company, Ltd.*, 148 F.3d 181 (2d Cir. 1998)..........................................21

*Jonas v. Estate of Leven*, 116 F.Supp.3d 314 (S.D.N.Y.2015)..............................................24, 25

*Koch v. Christie's Int'l Pub. Ltd. Co.*, 699 F.3d 141 (2d Cir. 2012) ...........................................33

*Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460 (1988) .......................................................21, 25

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 26 F.Supp.2d 593
(S.D.N.Y.1998) ...............................................................................................................23

*LaMarr v. Klein*, 35 A.D.2d 248 (1st Dept. 1970) .......................................................................23

*Lehigh Valley Indus., Inc. v. Birenbaum*, 389 F.Supp. 798 (S.D.N.Y.1975)...............................27

*Lehigh Valley Industries v. Birenbaum*, 527 F.2d 87 (2d Cir.1975)............................................26

*Levant Line, S.A. v. Marine Enters. Corp. (In re Levant Line, S.A.)*,
166 B.R. 221 (Bankr. S.D.N.Y. 1994) .....................................................................19

*Malvar Egerique v. Chowaiki*, 2020 WL 1974228 (S.D.N.Y. Apr. 24, 2020)............................29

*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F.Supp.2d 402 (S.D.N.Y.2006)....20

*Metro Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir.1996) ..................................16

*Nasik Breeding & Research Farm Ltd. v. Merck & Co.*,
165 F. Supp. 2d 514 (S.D.N.Y. 2001).....................................................................33

*Newmont Mining Corporation v. Anglogold Ashanti Limited*,
344 F.Supp.3d 724 (S.D.N.Y.2018)........................................................................20

*Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370 (2014) ...................................................................24

*PC Com, Inc. v. Proteon, Inc.*, 906 F.Supp. 894 (S.D.N.Y. 1995) .................................................. 27

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30 (2d Cir. 2010) ......................................... 15

*Picard v. JPMorgan Chase & Co.*, 460 B.R. 84 (S.D.N.Y. 2011) ................................................. 34

*PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65 (2d Cir. 1998) ................. 23

*Qantel Corporation v. Niemuller*, 771 F.Supp. 1361 (S.D.N.Y.1991) .................................... 26, 27

*Reich v. Lopez*, 858 F.3d 55 (2d Cir.2017) ................................................................................ 16

*Republic of Iraq v. ABB AG*, 768 F.3d 145 (2d Cir. 2014) ......................................................... 35

*Retail Software Servs., Inc. v. Lashlee,* 854 F.2d 18 (2d Cir.1988) .......................................... 27

*RJR Nabisco, Inc. v. European Community*, 136 S.Ct. 2090 (2016) ........................................... 36

*Rush v. Savchuk*, 444 U.S. 320 (1980) ...................................................................................... 18

*Sayles Biltmore Bleacheries, Inc. v. Soft-Fab Textile Processors, Inc.*, 440 F.Supp. 1010
    (S.D.N.Y.1977) ..................................................................................................................... 24

*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) .................................. 34

*Singer v. Bell*, 585 F.Supp.300 (S.D.N.Y. 1984) ......................................................................... 28

*SPV OSUS*, 882 F.3d 333 (2d Cir. 2018) .................................................................................... 17

*Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004) ................................................. 24

*Targum v. Citrin Cooperman & Co., LLP*, No. 12-CV-6909,

    2013 WL 6087400 (S.D.N.Y. Nov. 19, 2013) ........................................................................ 29

*Tera Group, Inc. v. Citigroup, Inc.*, No. 17-cv-4302 (RJS), 2018 WL 4732426 (S.D.N.Y. Sep.
    28, 2018) ............................................................................................................................. 18

*Tese-Milner*, 613 F. Supp. 2d 404 (S.D.N.Y. 2009) .................................................................... 28

*Vista Food Exchange, Inc. v. Champion Foodservice, LLC*,

    124 F.Supp.3d 301 (S.D.N.Y.2015) ................................................................................. 20, 27

*Walden v. Fiore,* 571 U.S. 277 (2014) ........................................................................................ 17

*Wang v. Yien-Koo King*, 2019 WL 1763230 (S.D.N.Y. 2019) ....................................................... 33

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486 (S.D.N.Y. 2007) ............ 33

*World–Wide Volkswagen,* 444 U.S. 286 (1980) .......................................................................... 16

**Statutes**

18 U.S.C. § 1965 ....................................................................................................................... 25

CPLR 302(a) .............................................................................................................................. 25

Fed. R. Bankr.P. 7004(f) ............................................................................................................ 17

Defendant Neeshal Modi ("Neeshal") submits this memorandum of law in support of his motion to dismiss the Complaint of plaintiff Richard Levin on behalf of debtors Firestar Diamond, Inc., Fantasy, Inc. and Old AJ, Inc. f/k/a A. Jaffe, Inc. (collectively, the "Debtors"), and U.S. Affiliates Synergies Corporation ("Synergies"), Firestar Group, Inc., Firestar Diamond International, Inc., Nirav Modi, Inc. and AVD Trading, Inc. (collectively, the "U.S. Affiliates"), pursuant to Federal Rules of Civil Procedure 12(b)(1), (2) and (6).

## **Preliminary Statement**

The Complaint against Neeshal should be dismissed for lack of personal jurisdiction and failure to state a RICO cause of action and is barred by the statute of limitation. Neeshal has no minimum contacts with the forum (New York) for the assertion of personal jurisdiction. Neeshal is a defendant only because he is Nirav Modi's ("Nirav") younger brother and worked for a company under his domination and control. Neeshal and Firestar Diamonds Belgium ("FDB"), the company in which he was a director and one of several employees, are on the outermost periphery of the vast and labyrinthine Bank Fraud[1] alleged in the Complaint. The threadbare allegations against Neeshal comprise a mere 17 of 866 paragraphs. FDB is mentioned a total of 4 times in 2 paragraphs and notably is not even a defendant. The 17 allegations against Neeshal are nearly equally divided into (a) hearsay and innuendo, (b) admissions that the acts were performed by, or at the direction of others, and (c) conclusory allegations as to Neeshal's agreement to joint and support the Bank Fraud. There is not a single allegation of any knowing or intentional act, communication, transaction or other interaction between Neeshal and any defendant or co-conspirator, which demonstrates Neeshal's agreement to join or participate in the Bank Fraud.

---

[1] Capitalized terms such as Bank Fraud, RICO Conspiracy, Shadow Entities, etc. are as defined in the Complaint.

Guilt by association is insufficient to state a cause of action or assert personal jurisdiction. The RICO statutes are not appropriate to assert a claim against Neeshal in these circumstances.

Neeshal's Declaration and exhibits make clear he has no minimum contacts with New York and he was nothing but a convenient strawman for Nirav and his co-conspirators to hide behind. Neeshal never agreed to participate in the alleged conspiracy; never knowingly or intentionally committed any acts in furtherance of the conspiracy; immediately resigned from the affiliated entities when he discovered Nirav had unknowingly made him a beneficiary; received a letter from Nirav confirming his resignation; was never knowingly or intentionally an owner or otherwise involved in any capacity with any other entities; except for his salary, never received any money or benefits from the alleged conspiracy; and was not involved in purchasing the Hong Kong apartment (and if any document says otherwise it is a forgery).

### Allegations and Omissions of Fact

The following allegations and omissions of fact, as relating to Neeshal Modi's involvement in the alleged Bank Fraud, are set forth in the Complaint [Dkt. 1410] and Declaration of Neeshal Modi dated October 15, 2020 ("Neeshal Decl.").

### A.    Allegations Relating to Personal Jurisdiction over Neeshal

The Complaint admits defendant Neeshal Modi is a Belgium resident and is defendant Nirav Modi's ("Nirav") youngest brother. Neeshal Decl. Ex. A (Complaint) at ¶ 27. Neeshal was born, grew up and has resided in Belgium his entire life, except for attending university in England. Neeshal Decl. ¶ 16. Neeshal has no personal contacts with the State of New York, or the entire United States for that matter, in both his personal and corporate capacities. *Id.*

Neeshal is not domiciled in, and is not a resident of, New York or the United States now or at any time previously. *Id.* at ¶¶ 17, 18. Neeshal does not own or lease any property, real or otherwise, in New York or the United States. *Id.* at ¶ 19. Neeshal does not have any telephone

listings, bank accounts or other investments (active or passive) in New York or the United States. *Id.* at ¶¶ 23, 24. Neeshal does not pay taxes in New York or the United States. *Id.* at ¶ 25.

Neeshal has never been employed in New York or the United States and does not own, nor has he conducted any business here in his personal capacity. *Id.* at ¶¶ 20, 21. Even in his corporate capacity, Neeshal has never conducted any business in New York or the United States. *Id.* at ¶ 22. Except for attending a trade show in Las Vegas in 2015 for research, during which he neither solicited nor conducted any business, Neeshal has never travelled to New York or the United States for business. *Id.* Neeshal never signed any contracts in New York or the United States, or otherwise obligated FDB to perform any acts in New York or the United States. *Id.* Neeshal have never sent money to New York or the United States, or called with any regularity. *Id.* Neeshal's only business contacts with New York or the United States is that he signed approximately 10% of FDB's invoices, about 10% of which (1% of total) involved transactions in New York. *Id.*

### B.    Relevant Allegations Relating to the Bank Fraud

From no later than 2010 to early 2018, Nirav orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from numerous banks, including Punjab National Bank ("PNB"). Complaint ¶ 62.

The Bank Fraud involved the fraudulent procurement of buyer's credit issued under letters of undertaking ("LOUs") to facilitate efficient import transactions. *Id.* at ¶ 63. Nirav and his co-conspirators artificially inflated the import volume of Nirav's India-based companies with sham transactions to obtain more and more LOU funding. *Id.* at ¶ 66.

To carry out this scheme, Nirav and his co-conspirators utilized a web of shadow entities in Dubai and Hong Kong to engage in fraudulent and fictitious import transactions. *Id.* at ¶ 71. Though designed to look like legitimate independent businesses, the Shadow Entities were no more than shell companies controlled by Nirav and his co-conspirators. *Id.* at ¶ 72.

3

Nirav, Mihir Bhansali ("Bhansali"), Ajay Gandhi ("Gandhi"), and other co-conspirators funneled millions of dollars in funds, precious gems, and jewelry through the U.S. Entities and their offices in furtherance of the Bank Fraud. *Id.* at ¶ 90.

### C.    Allegations Relating to Neeshal's Involvement in the Bank Fraud

The allegations against Neeshal are almost equally divided between (a) hearsay and innuendo,[2] (b) admissions that acts were performed by, or at the direction of others,[3] and (c) conclusory allegations as to Neeshal's agreement to participate in the Bank Fraud.[4] None of the Complaint's 866 paragraphs contain a single allegation of any communication among Neeshal and any defendant, Debtor, Shadow Entity, Modi-Controlled Entity, or other person or entity relating to the Bank Fraud. There is no allegation Neeshal performed any specific acts in furtherance of the Bank Fraud, received anything of value or otherwise benefitted from the Bank Fraud.

The Complaint alleges Neeshal's agreement to join and support the RICO Conspiracy is demonstrated by, or can be "inferred" from, the following:

a.    Neeshal served as a partner of all three LOU Entities and, in 2016, selected and appointed additional "dummy" partners for the LOU Entities. Complaint ¶¶ 5, 449.

b.    Neeshal was the beneficial owner of numerous Shadow Entities, other offshore shell companies used to further the Bank Fraud and launder its proceeds. *Id.*

---

[2] Complaint ¶ 75 ("An Indian consultant told Indian authorities …"); ¶ 118 ("Modi forwarded the email to Mihir Bhansali, who then directed…"); ¶ 185 ("According to Indian Authorities…"); ¶ 188 ("The Bank Fraud has resulted in several investigations and criminal enforcement actions…"); ¶ 193 ("On July 6, 2019, the presiding officer of the Indian Debt Tribunal issued a judgment…"); ¶ 275(ii) ("According to statements made by various Firestar Entity and Shadow Entity directors and employees to Indian authorities…"); ¶311 ("According to Indian authorities…").

[3] Complaint ¶ 76 ("Mihir Bhansali completed all of the paperwork relating to the formation of these two entities."); ¶ 77 ("Mihir Bhansali chose all of these entities' names."); ¶ 111 ("Mihir Bhansali directed …"); ¶ 454 ("Nirav Modi enjoys complete control over each Shadow Entity Defendant through his dominance and control over Purvi Mehta, Neeshal Modi, and other nominal owners, directors, and officers.").

[4] Complaint ¶¶ 5, 67, 68, 77, 449.

c.   Neeshal, along with Mihir, selected and hired various "dummy" directors, officers, and other Shadow Entity personnel throughout the Relevant Period. *Id.*

d.   Neeshal orchestrated numerous fraudulent transactions among FDB and Shadow Entities to further the Bank Fraud throughout the Relevant Period, and was one of the key day-to-day managers of the fraudulent import and export transactions supporting the Bank Fraud. *Id.*

e.   Neeshal had a power of attorney for Purvi Mehta ("Purvi") and signed agreements on her behalf, including for her purchase of a Hong Kong apartment in April 2017 for approximately $2.7 million. *Id.*

All the allegations relating to Neeshal and FDB in the Complaint's 19 paragraphs are as follows. FDB operated as a rough diamond trading and manufacturing business. *Id.* at ¶ 61. FDB was managed by Neeshal in Antwerp, Belgium. Neeshal was also involved with the Dubai Firestar Entities. *Id.* Throughout the Relevant Period, FDB traded extensively with Shadow Entities in Hong Kong and Dubai in furtherance of the fraudulent scheme. *Id.* The Complaint fails to provide any further facts in support of these allegations.

Nirav, Ami Modi ("Ami"), Neeshal, and Mehul Choksi ("Choksi"), among others, each served as partner of each LOU Entity during the Relevant Period. *Id.* at ¶ 67. The Complaint does not allege that Neeshal received any compensation or other benefits from being an owner. This allegation also is contradicted by documentary evidence.

In 2016, Neeshal selected and appointed additional "dummy" partners for the LOU Entities. *Id.* at ¶ 68. Except for this allegation, the Complaint does not allege that Neeshal signed any documents for any LOU Entity, or was otherwise involved in any business transactions and performed any acts on behalf of any LOU Entity.

Neeshal, together with Bhansali, also selected and hired various Shadow Entity personnel during the Relevant Period. *Id.* The Complaint does not allege that any such hires were improper, fraudulent or otherwise involved in the Bank Fraud.

An Indian consultant told Indian authorities that around 2010, Bhansali sought assistance setting up two layers of British Virgin Island ("BVI") holding companies for the Dubai-based Shadow Entities that would be owned by Purvi and Neeshal. *Id.* at ¶ 75. This allegation is based on hearsay. The Complaint does not identify the maker of the statements or the "authorities" the statement was made to; the source for the speaker's statement; the "assistance", whether a person, procedure or otherwise; and does not state whether such "assistance" was refused, provided, or otherwise achieved by the person asked, if any, or a third-party.

The top layer consisted of Madison Capital Private Limited ("Madison") and Moore Private Investments Ltd. ("Moore"). *Id.* at ¶ 76. Bhansali completed all the paperwork relating to the formation of these two entities. *Id.* Purvi and Neeshal were declared – by Bhansali; not Neeshal – to be the ultimate beneficial owners of these companies to the BVI authorities. *Id.* The Complaint does not identify the source of its information for this allegation.

Madison and Moore each held 50% of the shares of each of ten second-layer BVI entities: Global Investing Group Ltd., Xclusive Consultants Ltd., Ashmoore Developments Ltd., Beacon Horizon Investments Ltd., Century Group Global Investments Ltd., Pushpin Trading Ltd., Royce Group Private Ltd., Integrated Investing Ltd., Panera Assets Inc., and Ideal Star Consultants Ltd. *Id.* at ¶ 77. Bhansali chose all these entities' names. *Id.* Moore served as the director of each of these entities. *Id.* Purvi and Neeshal were also declared by Bhansali the ultimate beneficial owners of these companies to the BVI authorities. *Id.* The Complaint does not allege that Neeshal was named a beneficial owner with his knowledge or consent, or otherwise benefitted from the alleged

ownership interest, that he signed any documents for any entity, or was otherwise involved in any business transactions and performed any acts on behalf of any entity.

On May 27, 2010, Bhansali directed Aditya Nanivati to make Bhansali, Nanivati, Purvi, and Neeshal authorized users of FDL's Standard Chartered Bank account. *Id.* at ¶ 111. With respect to the physical devises necessary to approve transfers, he instructed Nanivati to send Purvi's device to Hemant Bhatt and Neeshal's device to Gandhi. *Id.* These devices enabled Bhatt and Gandhi to transfer funds out of FDL's bank account even though neither had any role at FDL or any of the other Hong Kong Firestar Entities. *Id.* The Complaint does not allege that Neeshal had any knowledge of being appointed an authorized user of the account, consented to the appointment, performed any transactions on the account, or benefitted from the account. This allegation is not included in Plaintiff's allegations as to evidence of Neeshal's participation in the Bank Fraud. *See* Complaint ¶ 449.

On July 1, 2017, FIPL CFO Ravi Gupta purportedly emailed Nirav a spreadsheet containing fictitious biographical profiles for certain Shadow Entities and asked, "Last year someone had created the enclosed file for top 8 customers[.] Can u let me know who had helped in creation of this? We would like to do for few more customers like Augragen [sic], Eurostar, Diagem, Saumil, and Pannadium." *Id.* at ¶ 118. Nirav forwarded the email to Bhansali, who directed Shyam Wadhwa, Aditya Nanivati, and Neeshal to create additional fictitious profiles for Shadow Entities in their respective regions. *Id.* The Complaint does not allege that Neeshal ever created any such profiles. There also were no Shadow Entities in Belgium, which is where Neeshal worked for FDB, and the Complaint does not allege any. This also is not included in Plaintiff's allegations as to evidence of Neeshal's participation in the Bank Fraud. *See* Complaint ¶ 449.

Per Indian authorities, Nirav and his brother Neeshal fled India on January 1, 2018, and Ami and Choksi did so on January 6, 2018 and January 4, 2018, respectively. *Id.* at ¶ 185.

The Bank Fraud has resulted in several investigations and criminal enforcement actions against Nirav, Bhansali, Ami, Purvi, Mayank Mehta, Nehal Modi, Neeshal, and others by Indian governmental authorities, including Central Bureau of Investigation ("CBI"); the Directorate of Enforcement ("ED"); the Income Tax Department; and the Serious Fraud Investigation Office. *Id.* at ¶ 188. No facts relating to this allegation are included in Plaintiff's allegations as to evidence of Neeshal's participation in the Bank Fraud. *See* Complaint ¶ 449.

On July 6, 2019, the presiding officer of the Indian Debt Tribunal issued a judgment against Nirav, Ami, Nehal, Neeshal, Purvi, the LOU Entities, FIL, and others. *Id.* at ¶ 193. The Complaint does not identify the proceedings or any facts issued therein. The Complaint only alleges the tribunal held that "[Nirav Modi and his family members] are the mastermind[s] behind the perpetration of the fraud." *Id.* at ¶ 193(iv) (brackets in Complaint). Notably, the Complaint has substituted the judgment's actual identification of the party(ies) in the bracket with self-serving, yet vague, Modi "family members." No facts relating to this allegation are included in Plaintiff's allegations as to evidence of Neeshal's participation in the Bank Fraud. *See* Complaint ¶ 449.

According to statements made by various Firestar Entity and Shadow Entity directors and employees to Indian authorities, around February or March 2018, Neeshal diverted diamonds from Dubai-based Modi-Controlled Entities to Hong Kong. *Id.* at ¶ 275(ii). The statements are hearsay and the Complaint fails to identify the makers of the statements or describe any facts supporting such allegations. While the Complaint elsewhere describes in detail extensive alleged fraudulent transactions among the Shadow Entities by others, *see*, *e.g.*, Complaint ¶¶ 195-242, none are alleged to involve either Neeshal or FDB. The transactions identified in Appendix A and Schedule

A to the Complaint also do not identify any transactions involving Neeshal and FDB directly; only certain of the BVI entities as recipients at best. Notably, this allegation is not included in Plaintiff's allegations as to evidence of Neeshal's participation in the Bank Fraud. *See* Complaint ¶ 449.

According to Indian authorities, Purvi purchased a new Hong Kong apartment in April 2017 for 19.5 [million] crore INR (approximately $2.7 million). *Id.* at ¶ 311. Neeshal signed the agreement on Purvi Mehta's behalf under a power of attorney certified by the Indian consulate of Hong Kong. *Id.* These allegations are based on hearsay. The Complaint does not allege that Neeshal accepted the Power of Attorney ("POA") in connection with, or to further, the Bank Fraud; that he received anything of value from the transaction, other benefit; or that the transaction had any affect on or relation to New York or the United States. In point of fact, the POA was for an apartment in Mumbai. Neeshal Decl. ¶¶ 14, 15.

### D.     Neeshal's was not Involved in the Bank Fraud

Neeshal never agreed to join the RICO enterprise alleged in the Complaint. Neeshal Decl. ¶ 2. After graduating from Sir John Cass Business School at The City University London in March 2007 (B.A., Finance, Investment & Risk Management), Neeshal began learning the diamond and gem trade. *Id.* In 2009, Neeshal began working at FDB, which was set up by his older brother, defendant Nirav Modi, as an employee and director. *Id.* Neeshal's primary responsibilities were sourcing raw material, selling raw material, diamond manufacturing and quality control. *Id.* Neeshal also set up Russian, South African and Armenian subsidiaries. *Id.* Although not mentioned anywhere in the Complaint, Neeshal also was a director of Firestar Diamond LLC ("FD Armenia"), the subsidiary in Yerevan, Armenia, and Firestar ARC BVBA ("FD ARC"), which was involved in a joint venture with a third party and was dissolved on June 24, 2013. *Id.* Neeshal did not contribute any capital and, to his knowledge, was never an owner of FDB, FD Armenia, or

Firestar ARC. *Id.* Neeshal's only compensation was a gross salary of €220,000.00 per annum on which he paid all required taxes. *Id.* at ¶ 3.

FDB had another 4 employees, who were involved in handling day-to-day operations such as fulfilling orders, importing and distribution. *Id.* A virtual back office in India handled all payroll and bookkeeping matters. *Id.*

Except for his limited association with FDB, FD Armenia and FD ARC, Neeshal is not now, and has never been, a knowing or intentional owner, partner, shareholder, member, officer, director, employee or otherwise, of any of the other corporate entities named in the Complaint – Debtors, defendants, U.S. Entities, LOU Entities, Firestar Entities, Shadow Entities, Modi-Controlled Entities – or otherwise. *Id.* at ¶ 4. To Neeshal's knowledge, he has never received anything of value from any entity described in the Complaint except his salary from FDB. *Id.*

In or around late 2015, Neeshal received legal correspondence stating he was a trustee and beneficiary of the Nirav Family Trust and Nirav Modi Family Trust (jointly, the "Trusts"). *Id.* at ¶ 5. Although not mentioned in the Complaint, according to Indian authorities in the same documents the Trustee apparently has based its Complaint on, the Trusts are alleged to be the owners of the LOU Entities – Diamonds 'R' Us, Solar Export and Stellar Diamond. *Id.* When Neeshal asked Shayam Wadha, Nirav's company secretary, about the Trusts, he received a vague explanation it was in connection with a business venture and that he put Neeshal down as a Trustee. *Id.* Neeshal said immediately and without hesitation he wanted no part in whatever Nirav and his associates had planned and demanded he remove Neeshal as a trustee and beneficiary of the Trusts and any other trust, entity or company of which he was unaware. *Id.* Shortly after, Neeshal received two trust resolutions and countersigned letters from Nirav dated December 15, 2015, resigning from the Trusts with immediate effect. *Id.*; Ex. B (resignation letters and Trust resolutions).

10

Every act Neeshal ever undertook in his capacity as a manager and employee of FDB was with the intention, understanding and assumption that it was legitimate and legal. *Id.* at ¶ 6. Neeshal never agreed to be a party to the alleged fraudulent activities of Nirav and his co-conspirators described in the Complaint. *Id.* Neeshal had no suspicion, let alone knowledge, of the alleged extensive bank fraud perpetrated on Punjab National Bank and the decision to inflate the sales volume of the companies involved. *Id.* Neeshal never appointed any "dummy" directors or received instruction to inflate FDB's sales volume, deliver gems and stones, or transfer money among any of the alleged Modi-Controlled Companies. *Id.* All instructions relating to same were delivered to other employees of FDB presumably with the understanding that such acts were arms' length and legitimate. *Id.* No employees ever came to Neeshal with concerns or complaints that they were asked to perform an illegitimate or illegal act. *Id.*

After the disclosure and collapse of the alleged Bank Fraud, FDB filed for bankruptcy in the Commercial Court of Antwerp. *Id.* at ¶ 7. To clear his name, Neeshal personally retained an independent auditing firm, Van Den Keybus Van Der Jeught, to investigate the company's accounts for any sign of malfeasance and whether he benefitted in any way. *Id.* The *Forensic Audit of Firestar Diamond, BE 0817 647 147, Concerning Purchased and Sold Goods and this from 01/04/2011 Until 20/03/2018*, dated February 28, 2019 ("Keybus Report"), confirms that all transactions between FDB and the Hong Kong entities were "genuine and for appropriate consideration" and supported by genuine documentation. *Id.* at ¶ 8; Ex. C (Keybus Audit) at p. 7. More importantly, the Forensic Report confirms, "No funds have been diverted or siphoned of [*sic*] by Mr. Neeshal Modi. The only amounts paid to Mr. Neeshal Modi was his salary and no other amounts were ever paid by the Company to Mr. Neeshal Modi." *Id.*

11

After FDB was declared bankrupt in the Commercial Court of Antwerp on March 19, 2018, the company's trustees commissioned PriceWaterhouseCooper ("PWC") to investigate the company's accounts as well. *Id.* at ¶ 9. Seven months after the Keybus Report, PWC issued its Forensic Report dated October 31, 2018 ("PWC Report"). *Id.*; Ex. D (PWC Report). Neeshal cooperated fully with PWC in its investigation. *Id.* at ¶ 9; Ex. D (PWC Report) at §§ 1.1 (Scope & Approach), p. 4; § 2.11 (Interviews)(Neeshal Modi – managing director Firestar Diamond BVBA), pp. 9-10, which confirms the findings of the Keybus Report. *Id.* at ¶ 9, 10.

PWC concluded specifically, "we did not identify any indication that the transactions between Firestar Diamond BVBA and the 6 Hong Kong-based companies were not genuine." Neeshal Decl. Ex. D (PWC Report) at § 1.3 (Executive Summary), p. 8; *see also* § 3.1.3.3 (Conclusion unpredictability testing), p. 43 ("…we have no indication that the selected transactions with other supplier and clients are not genuine.").

With respect to any improper benefit Neeshal may have accrued, the PWC Report stated, "We did not identify any indication that the operational expenses were used to siphon off funds to Neeshal Modi." *Id.* at § 1.3 (Executive Summary), p. 8. The PWC Report further concluded, "we did not identify any indication that fund transfers occurred to Neeshal Modi's personal bank account, nor that any amount is due by Neeshal Modi to Firestar Diamond BVBA on the current account he held within the Company." *Id.* at § 1.3 (Executive Summary), p. 8; *see also* § 3.3.3.5 (Conclusion) ("we did not identify any indication that fund transfers occurred to Neeshal Modi's personal bank account, nor that any amount is due by Neeshal Modi to Firestar Diamond BVBA on the current account he held within the Company.").

12

FDB's accountant, Tom Panis, declared "that he believes that Neeshal Modi is a victim in the whole situation. He was only a small part of the whole family network where everything is based on trust." *Id.* at § 2.1.2.3 (Key Points), p. 11.

Neeshal never fled India or any other country to escape justice. Neeshal Decl. ¶ 13. The Modi family gathers every year in Mumbai for end-of-year festivities. *Id.* Neeshal returned to Belgium on his scheduled flight. *Id.* Only after returning to Antwerp from this vacation did Neeshal learn of the alleged fraud and corresponding investigations into the companies. *Id.* Almost immediately, Neeshal offered to fully cooperate with Indian authorities to clear his name. *Id.* Since February 21, 2018 – only weeks after the disclosure of the Bank Fraud – Neeshal has made no fewer than 5 offers to assist the Directorate of Enforcement and Central Bureau of Investigation in India with its investigation of and proceedings related to the Bank Fraud. *Id.*; *see also* Ex. E (CBI email). With the approval of the Commercial Court of Antwerp, Neeshal also has assisted the Belgian Trustees collect millions of dollars in outstanding debts owed to FDB. Neeshal Decl. ¶ 13. Neeshal has frequently used his own money to fund these investigations and collections for which he has been compensated by the Belgian Trustee. *Id.*

Neeshal did not knowingly accept a POA from Purvi to further the alleged Bank Fraud. *Id.* at ¶ 14. Neeshal also did not accept a POA to purchase a house for Purvi in Hong Kong, but rather, Mumbai. *Id.*; *see also* Ex. A (Complaint) at ¶ 311. The alleged 19.5 million krore purchase price was the sales price for the apartment in Mumbai. *Id.* at ¶ 14. Neeshal does not know anything about purchasing an apartment in Hong Kong. *Id.* To the extent there is a POA issued to Neeshal relating to the purchase of an apartment in Hong Kong, it is news to him and likely a forgery. *Id.*

Neeshal only accepted the POA to help Purvi – as his sister – close on an apartment in Mumbai, India because she was not available and he was in the country for the annual family

holiday. *Id.* at ¶ 15. No money passed through Neeshal's hands or accounts. *Id.* Neeshal did not benefit from the purchase in any way. *Id.* Neeshal simply went to a notary's office one morning to sign papers, which took all of 10 minutes or less, and that was the end of his involvement. *Id.*

**Argument**

The Complaint should be dismissed against Neeshal Modi for lack of personal jurisdiction and failure to state a claim and is further barred by the statute of limitation. The RICO claim fails to allege essential elements to state a claim against Neeshal as a co-conspirator.

**I.    There is no Personal Jurisdiction over Neeshal Modi**

The Complaint should be dismissed pursuant to Rule 12(b)(2) because the Court lacks personal jurisdiction over Neeshal Modi in New York and anywhere else in the United States. A "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010). The Complaint "must make a prima facie showing" of jurisdiction, *id.* at 35-36, as to each defendant and "with respect to each claim asserted." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (citation omitted). The Complaint's handful of conclusory allegations against Neeshal fail to provide a prima facie basis for jurisdiction in New York and with respect to the RICO claims. Also unclear is whether the Complaint asserts jurisdiction and claims over Neeshal in his individual and/or corporate capacity. Neeshal has no contacts with New York to assert either general or specific jurisdiction under any claim, statute or other basis.

**A.    Jurisdiction over Neeshal does not comport with Due Process**

The exercise of personal jurisdiction over Neeshal does not comport with Due Process. A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States." Fed. R. Bankr.P. 7004(f); *In re: Lehman Brothers Holdings Inc.*, 535 B.R. 608, 619

(Bankr.S.D.N.Y.2015). Either general or specific jurisdiction may be exercised pursuant to the Due Process Clause. In determining jurisdiction, the "primary concern is the burden on the defendant." *Bristol-Meyers Squibb Co. v. Superior Court of California*, 137 S.Ct. 1773, 1780 (2017) citing *World–Wide Volkswagen,* 444 U.S. 286, 292 (1980).

### i.        There is no general jurisdiction over Neeshal

Neeshal is not subject to general jurisdiction in New York. General jurisdiction requires a defendant's contacts were so "continuous and systematic" that the exercise of jurisdiction over claims unrelated to those contacts is warranted. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923-25 (2011). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Id.* at 924. Absent "exceptional' cases," an individual will not be subjected to jurisdiction in a forum where he is not domiciled. *Reich v. Lopez*, 858 F.3d 55, 63 (2d Cir.2017) citing *Daimler AG v. Bauman*, 134 S.Ct. 746, 761 n. 19 (2014).

Neeshal is not subject to general jurisdiction based upon the allegations in the Complaint. Neeshal does not reside in New York or anywhere else in the United States. Neeshal Decl. ¶¶ 17, 18. The Complaint even admits he is a Belgian resident. Complaint ¶ 27. The Complaint also does not allege, nor does Neeshal have, any "continuous and systematic" contacts with New York and the United States. The Complaint only alleges limited, albeit vague and conclusory, contacts in the context of the Bank Fraud, which is insufficient to assert general jurisdiction.

### ii.        There is no specific jurisdiction over Neeshal

Neeshal also is not subject to specific jurisdiction, which is based on "whether the defendant has sufficient "minimum contacts" with the forum state and whether the exercise of jurisdiction over that defendant would be reasonable." *Lehman*, 535 B.R. at 69 citing *Metro Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.1996).

To assert specific jurisdiction, the Complaint must allege that Neeshal's suit-related contacts created "'a substantial connection with the forum'" and identify "'some act by which the defendant purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *SPV OSUS*, 882 F.3d 333, 344 (2d Cir. 2018) quoting *Walden v. Fiore,* 571 U.S. 277, 284 (2014) and *Goodyear*, 564 U.S. at 924. Crucially, this nexus "must arise out of contacts the 'defendant *himself* creates.' " *Lehman*, 535 B.R. at 620 (quoting *Walden*, 571 U.S. at 284) (emphasis in original).

"Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the "random, fortuitous, or attenuated" contacts he makes by interacting with other persons affiliated with the State." *Walden*, 571 U.S. at 286 quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

### a.   <u>Neeshal does not have minimum contacts with New York</u>

The Complaint fails to allege sufficient minimum contacts between Neeshal and New York. The entire allegations against Neeshal as to his involvement in the Bank Fraud are:

a.   Neeshal served as a partner of all three LOU Entities and, in 2016, selected and appointed additional "dummy" partners for the LOU Entities. Complaint ¶¶ 5, 67, 68, 449.

b.   Neeshal was the beneficial owner of numerous Shadow Entities, other offshore shell companies used to further the Bank Fraud and launder its proceeds. *Id.* at ¶¶ 5, 75, 76, 77, 449.

c.   Neeshal, along with Mihir Bhansali ("Bhansali"), selected and hired various "dummy" directors, officers, and other Shadow Entity personnel throughout the Relevant Period. *Id.* at ¶¶ 5, 68, 449.

d.   Neeshal orchestrated numerous fraudulent transactions among FD BVBA and Shadow Entities to further the Bank Fraud throughout the Relevant Period, and was one of the key day-to-day managers of the fraudulent import and export transactions supporting the bank fraud. *Id.* at ¶¶ 5, 275(ii), 449.

e.   Neeshal had a power of attorney for Purvi Mehta ("Purvi") and signed agreements on her behalf, including for her purchase of a

16

Hong Kong apartment in April 2017 for approximately $2.7 million. *Id.* at ¶¶ 5, 311, 449.

Aside from being conclusory, these allegations are insufficient to assert specific personal jurisdiction over Neeshal. There are no allegations of physical presence or knowing and deliberate acts performed in New York or elsewhere with the intent, or even foreseeability, of having an effect within New York or anywhere else in the United States.

First, the Complaint fails to allege any specific transaction involving Neeshal and any person or entity that might arguably comprise minimum contacts with New York. The Complaint alleges only that "Neeshal orchestrated numerous fraudulent transactions among FD BVBA and Shadow Entities to further the Bank Fraud . . . and was one of the key day-to-day managers of the fraudulent import and export transactions supporting the bank fraud." Complaint ¶¶ 5, 275(ii), 449. As to those transactions, the Complaint alleges only that FDB "traded extensively with Shadow Entities in Hong Kong and Dubai in furtherance of the fraudulent scheme;" not New York or the United States. *Id.* at ¶ 61.

The Complaint's allegations as to Neeshal's involvement are conclusory at best and fail entirely to allege any forum-based transactions. While the Complaint elsewhere describes in detail extensive alleged fraudulent transactions, *see* Complaint ¶¶ 195-242, none are alleged to involve either Neeshal or FDB. The transactions identified in Appendix A and Schedule A to the Complaint also do not involve Neeshal and FDB directly; only certain of the BVI entities as recipients at best.

Second, the Complaint's failure to ascribe any transactions that might involve Neeshal to any particular entity, rather than the "Shadow Entities" in general, also is fatal. Group pleading in this context is insufficient to assert personal jurisdiction over an individual defendant. *See Tera Group, Inc. v. Citigroup, Inc.*, No. 17-cv-4302 (RJS), 2018 WL 4732426 *2 (S.D.N.Y. Sep. 28, 2018) citing *Rush v. Savchuk*, 444 U.S. 320, 332 (1980) ("This group pleading – conflating UBS

17

AG and UBS Securities LLC as "UBS" – fails to establish personal jurisdiction over "each defendant."), and *FrontPoint Asian Event Driven Fund, L.P. v. Citibank N.A.*, No. 16-cv-5263 (AKH), 2017 WL 3600425, at *6 (S.D.N.Y. Aug. 18, 2017) (personal jurisdiction lacking because plaintiffs did not "specify which of the three Barclay defendants" were involved in alleged acts).

Third, Neeshal's alleged ownership of an entity involved in the Bank Fraud also is insufficient to assert personal jurisdiction. *See Gear, Inc. v. Gear California, Inc.*, 637 F.Supp. 1323, 1328 (S.D.N.Y.1986) citing *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft*, 751 F.2d 117, 120 ("Common ownership or control" of a nondomiciliary alone is "not enough" to establish jurisdiction); *Levant Line, S.A. v. Marine Enters. Corp. (In re Levant Line, S.A.)*, 166 B.R. 221, 230 (Bankr. S.D.N.Y. 1994) (indirect ownership, absent allegations that the parent corporation dominated and controlled the subsidiary, are insufficient to establish personal jurisdiction). Moreover, the Complaint alleges that Neeshal was a nominal owner only; not a controlling owner. Complaint ¶ 454(a) ("Nirav Modi enjoys complete control over each Shadow Entity Defendant through his dominance and control over Purvi Mehta, Neeshal Modi, and other *nominal* owners, directors, and officers.") (emphasis supplied).

The allegations of Neeshal's ownership also are conclusory and do not demonstrate any New York contacts. *Id.* at ¶¶ 67, 75-77. The Complaint does not allege Neeshal was named a beneficial owner with his knowledge or consent; received any compensation or other benefits from being an owner of any entity; signed any documents for any Shadow Entity; or was otherwise involved in any business transactions and performed any acts on behalf of any entity in New York.

Fourth, the Complaint's conclusory allegation that Neeshal was a beneficial owner of any Shadow Entity, as asserted by an unnamed "Indian consultant", also is insufficient to assert personal jurisdiction. Complaint ¶ 75. Hearsay is an insufficient ground to assert personal

jurisdiction. *Clerc v. Cantoni, Inc.*, No. 01 CIV 2481 (RO), 2002 WL 1482769 (S.D.N.Y. Jul. 10, 2002) (allegation that painting was in hotel lobby based upon unattributed third-person statement constituting hearsay was insufficient to assert personal jurisdiction).

Fifth, the allegations of hiring "dummy" personnel for LOU Entities are insufficient because they also fail to identify any New York -based activity. Complaint ¶ 68. Except for this, the Complaint does not allege that Neeshal signed any documents for any LOU Entity, or was otherwise involved in any business transactions and performed any acts on behalf of any LOU Entity in New York or elsewhere. Likewise, using a POA in India to purchase an apartment in Hong Kong (erroneously) fails to involve New York-based activity. *Id.* at ¶ 311. Notably, the Complaint does not allege that Neeshal knowingly accepted the POA in connection with, or to further, the Bank Fraud, or that he benefitted in any way from the transaction.

All together, these allegations are too conclusory, attenuated and isolated to assert personal jurisdiction over Neeshal. *See, e.g., Vista Food Exchange, Inc. v. Champion Foodservice, LLC*, 124 F.Supp.3d 301, 308-09 (S.D.N.Y.2015) (allegations that individual – who never entered, had no contractual relationship, and no business with New York – was president, formed the company "as a vehicle for creating fraudulent invoices;" authorized invoices based on "fabricated costs;" and directed the preparation of a spreadsheet with inflated prices are "too vague to be credited for the purposes of establishing personal jurisdiction.."); *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F.Supp.2d 402, 419-20 (S.D.N.Y.2006) (no jurisdiction over officer of Canadian defendant who did not transact business in individual capacity and there was no allegation he was "primary actor"); *cf. Newmont Mining Corporation v. Anglogold Ashanti Limited*, 344 F.Supp.3d 724, 743 (S.D.N.Y.2018) (specific jurisdiction over executive who

attended meetings in New York, negotiated agreement, attended closing and had "fair warning" his activities could subject him to suit in New York).

### b.    Neeshal is not subject to jurisdiction for corporate acts

Personal jurisdiction cannot be asserted over Neeshal individually for acts performed in his corporate capacity. "[A] an individual defendant may be subject to specific personal jurisdiction (but not general jurisdiction) based on his actions in his corporate capacity only where the plaintiff can show that the corporation was acting as the agent of the officer (rather than vice versa, as would usually be the case)." *Duravest, Inc. v. Viscardi, A.G.*, 581 F.Supp.2d 628, 634-35 (S.D.N.Y. 2008) (citation omitted).

"[F]or a corporation to be considered an agent of an officer for personal jurisdiction purposes, a plaintiff must allege: (1) that the corporation engaged in purposeful activities in New York in relation to the transaction; (2) that the corporation's activities were performed for the benefit of the individual defendant; (3) that the corporation's activities were performed with the knowledge and consent of the individual defendant; and (4) that the individual defendant exercised some control over the corporation." *Id.* citing *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467 (1988). "[L]egal conclusions that defendants "knew of," "directed," and/or "benefitted" from their subsidiaries or affiliates' transactions with plaintiffs, are insufficient[.]" *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11-mdl-2262 (NRB), 2019 WL 1331830 at *10 (S.D.N.Y. March 25, 2019) citing *Jazini v. Nissan Motor Company, Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998).

The Complaint fails to meet this burden. There are no allegations that Neeshal or FDB performed any acts in New York. As set forth above, none of the limited transactions identified in the Complaint allege direct involvement by Neeshal, let alone his knowledge and consent. In addition, any benefit inured to Nirav, co-conspirators, unspecified entities, and Modi family members generally. *See, e.g.,* Complaint ¶¶ 1, 70, 98, 106(iv), 184, 240, 446(c), 451(g). The

Complaint does not identify any specific benefits earned by Neeshal, but rather alleges that Nirav

was the ultimate beneficiary through his "dominance and control over…Neeshal Modi, and other

nominal owners, directors, and officers." *Id.* at ¶ 454(a).

### c.    Jurisdiction over Neeshal would be unreasonable

Asserting personal jurisdiction over Neeshal would be unreasonable under the

circumstances. "Even if a court finds that the defendant has the requisite minimum contacts, it can

refuse to exercise jurisdiction if the exercise of jurisdiction would not be reasonable." *Lehman*,

535 B.R. at 621 (citation omitted). "Reasonableness hinges on whether the assertion of jurisdiction

comports with 'traditional notions of fair play and substantial justice.'" *Chatwal Hotels & Resorts
LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 107 (S.D.N.Y.2015) quoting *Int'l Shoe Co. v.
Washington*, 326 U.S. 310 (1945).

The Complaint makes clear that Neeshal's role in the Bank Fraud is *de minimis*. As a

Belgian citizen, it is unreasonable for Neeshal to defend this matter in New York where the

Complaints fails to allege his contacts with the forum and involvement in the Bank Fraud. Neeshal

resigned from the Trusts on his own initiative and played no part in the Bank Fraud. The Complaint

does not allege he knowingly or intentionally agreed to perform any acts in furtherance of the Bank

Fraud; transacted any business to further the Bank Fraud; or benefitted from any of the alleged

transactions. Neeshal Decl. ¶¶ 2, 4, 5, 6, 8, 10, 11, 14, 15. It also is unreasonable because the

Complaint alleges that the object of the fraud is in India with PNB and all relevant and material

acts relating to the Bank Fraud occurred primarily in Dubai and Hong Kong.

### B.    Neeshal is not subject to jurisdiction under the RICO statutes

The Complaint fails to allege personal jurisdiction over Neeshal under the RICO statutes.

Contrary to Plaintiff's contention, "The Court must focus on the defendants' contacts with the

forum state, not the United States as a whole" in determining RICO jurisdiction. *First Capital*

*Asset Management, Inc. v. Brickellbush, Inc.*, 218 F.Supp.2d 369, 392 (S.D.N.Y.2002) citing *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 26 F.Supp.2d 593, 601 (S.D.N.Y.1998). It is well-settled that, "18 U.S.C. § 1965 does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found." *Bakken Resources, Inc. v. Edington*, 15 Civ. 8686 (ALC), 2019 WL 1437273 *3 (S.D.N.Y. Mar. 29, 2019) citing *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 71 (2d Cir. 1998); 18 U.S.C. § 1965. A court "relying on § 1965 may only exert this jurisdictional pull over defendants "residing in any other district," 18 U.S.C. § 1965(b), not foreign defendants." *Elsevier, Inc. v. Grossman*, 77 F.Supp.3d 331 (S.D.N.Y.2015). "Instead, "[p]laintiffs asserting RICO claims against foreign defendants must rely on the long-arm statute of the state in which they filed suit," which in this case is New York's CPLR 302. *Id.* (citations omitted).

### C.    Neeshal is not subject to jurisdiction under New York's long-arm statute

The Complaint also fails to allege personal jurisdiction over Neeshal under CPLR 302, New York's long-arm statute, for the RICO claim. The Complaint fails to meet its burden at the outset. "[T]o subject an out-of-state defendant to jurisdiction in New York, it is necessary to do more than put forward an unsupported allegation. The plaintiff must come forward with some definite evidentiary facts to connect the defendant with transactions occurring in New York." *Ghazoul v. International Management Services, Inc.*, 398 F.Supp. 307, 311 (S.D.N.Y. 1975) citing *LaMarr v. Klein*, 35 A.D.2d 248 (1st Dept. 1970). As discussed above, the Complaint's conclusory, contradictory and attenuated allegations are insufficient to pass this test. The Complaint also fails to satisfy its statutory obligations.[5]

---

[5] New York's long-arm statute provides, "a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state...; or 3. commits a tortious act without the state causing injury to person or property within the state, ... if he (i)  regularly does or solicits

i.    **There is no jurisdiction under CPLR 302(a)(1) because Neeshal does not transact business within New York**

Except for conclusory allegations, the Complaint fails to assert any facts remotely alleging that Neeshal transacted business in New York. The Complaint has a high hurdle in this regard. Jurisdiction under CPLR 302(a)(1) "is a fact based determination, and requires a finding that the non-domiciliary's activities were purposeful and established 'a *substantial* relationship between the transaction and the claim asserted.' " *Jonas v. Estate of Leven*, 116 F.Supp.3d 314, 325 (S.D.N.Y.2015) (emphasis supplied) citing *Paterno v. Laser Spine Inst.,* 24 N.Y.3d 370, 376 (2014). "Purposeful activities are volitional acts by which the non-domiciliary 'avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Id.* quoting *Fischbarg v. Doucet,* 9 N.Y.3d 375, 380 (2007). A non-domiciliary transacts business in New York when it "projects [itself] into this state to engage in a sustained and substantial transaction of business," such as by "seek[ing] out and initiat[ing] contact with New York, solicit[ing] business in New York, and establish[ing] a continuing relationship." *Paterno*, 24 N.Y.3d at 377. Courts examine the totality of a defendant's conduct and activities in New York, including contacts via contract, to determine the "transacts business" element. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004).

In this case there is no sustained or substantial business activity alleged against Neeshal, let alone any contract. The Complaint only asserts a conclusory allegation that Neeshal was involved in unspecified "fraudulent transactions." Complaint ¶¶ 5, 449. Signing an insignificant number of invoices (less than 1% of FDB's business) does not qualify. *See Sayles Biltmore Bleacheries, Inc. v. Soft-Fab Textile Processors, Inc.*, 440 F.Supp. 1010, 1013 (S.D.N.Y.1977)

---

business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce. CPLR 302(a).

(less than one tenth of one percent of material processed was not a "sustained and substantial transaction of business" in New York); *Aero-Bocker Knitting Mills, Inc. v. Allied Fabrics Corp.*, 54 A.D.2d 647, 649 (1st Dept. 1976) (approximately one percent of sales in New York are "insufficient contacts to classify defendant as doing business in New York."). The Complaint also fails to distinguish whether any of the alleged acts were performed in Neeshal's personal or corporate capacity and does not allege a New York nexus.

Under CPLR 302(a)(1), "corporate acts may be attributable to an individual under an agency theory where (1) the corporation engages in purposeful activity in the forum state that relates to the transaction underlying the lawsuit, (2) the corporation's activity was taken for the benefit of and with the knowledge and consent of the defendant, and (3) the defendant exercised some control over the purposeful activity." *Leven*, 116 F.Supp.3d at 328 citing *Kreutter*, 71 N.Y.2d at 467. "To make a *prima facie* showing of control," a complaint must "persuade a court that the defendant was a primary actor in the specific matter in question[,]" rather than conclusory allegations. *Id.* (citation omitted).

The Complaint fails to satisfy any of these requirements. Except for conclusory allegations, the Complaint does not allege any specific corporate acts were undertaken for Neeshal's benefit, or that he controlled any aspects of the entities involved therein. Rather, the Complaint alleges that Nirav was the ultimate beneficiary through his "dominance and control over…Neeshal Modi, and other nominal owners, directors, and officers." Complaint ¶ 454(a).

### ii.    There is no jurisdiction under CPLR 302(a)(2) on a conspiracy theory or otherwise

The Complaint does not allege Neeshal committed any tort in New York either himself or through an agent. To establish personal jurisdiction under CPLR 302(a)(2) on a conspiracy theory, the Complaint must allege (i) Neeshal had an awareness of the effects in New York of his activity;

(ii) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (iii) the co-conspirators acting in New York acted "at the direction or under the control," or "at the request of or on behalf of" the out-of-state defendant. *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1269 (S.D.N.Y. 1991).

"To allege a conspiracy, facts must be alleged showing an agreement to enter into the conspiracy, the non-domiciliary's participation in the conspiracy and acts in furtherance thereof, and a connection between the non-domiciliary and the allegedly tortious acts committed in New York." *Qantel Corporation v. Niemuller*, 771 F.Supp. 1361, 1365 (S.D.N.Y.1991) (citations omitted). "It is well settled that " 'the bland assertion of conspiracy or agency is insufficient to establish jurisdiction for the purposes of section 302(a)(2).' " *Id.* quoting *Lehigh Valley Industries v. Birenbaum*, 527 F.2d 87, 93–94 (2d Cir.1975).

The Complaint fails these requirements in every single regard. First, the Complaint does not allege any co-conspirators in New York. Moreover, the Complaint alleges that the object of the Bank Fraud was PNB in India, which was facilitated by entities operating in Dubai and Hong Kong. Complaint ¶¶ 62, 66, 71-73.

Second, even assuming *arguendo* that co-conspirators acted in New York, the Complaint does not allege Neeshal was aware his out-of-state conduct would have an effect in New York, or that he controlled or provided direction to the New York conspirators. As set forth above, the Complaint does not allege any specific transactions by Neeshal to further the Bank Fraud, let alone to demonstrate conspiracy. The Complaint simply alleges that Neeshal "orchestrated numerous fraudulent transactions among FD BVBA and Shadow Entities to further the Bank Fraud throughout the Relevant Period, and was one of the key day-to-day managers of the fraudulent import and export transactions supporting the bank fraud." Complaint ¶¶ 5, 275(ii), 449.

25

In these circumstances, the Complaint's "bland assertions of conspiracy" fail to assert jurisdiction over Neeshal. *See Qantel*, 771 F.Supp. at 1365 ("…the chain of inferences is too weak and too long to sustain the exercise of jurisdiction[.]").

### iii.    There is no jurisdiction under CPLR 302(a)(3) on an "effects" theory

The Complaint fails to allege personal jurisdiction over Neeshal on any effects-based acts performed outside New York. As set forth above, the Complaint does not allege any regular business in New York by Neeshal, or that he derives substantial revenue in the state. Notably, this limitation in CPLR 302(a)(3) "is more stringent than any constitutional requirement and requires a showing of contacts somewhere between the large quantity required for general jurisdiction under N.Y. C.P.L.R. 301 and the "one shot" single business transaction that can satisfy Section 302(a)(1)." *Vista*, 124 F.Supp.3d at 307 citing *Ingraham v. Carroll,* 90 N.Y.2d 592, 597 (1997).

Corporate revenues may not be attributed to an individual to establish personal jurisdiction. *PC Com, Inc. v. Proteon, Inc.*, 906 F.Supp. 894, 905 fn 10 (S.D.N.Y. 1995) citing *Lehigh Valley Indus., Inc. v. Birenbaum*, 389 F.Supp. 798, 805 (S.D.N.Y.1975) *aff'd*, 527 F.2d 87 (2d Cir.1975) ("Jurisdiction over [the corporation] and not over defendant as an individual could be obtained by demonstrating that [the corporation] received substantial revenues from interstate commerce.").

Likewise, "to show jurisdiction over an out-of-state officer for a corporation's actions, a plaintiff must show that the officer is a "primary actor[ ] in the transaction in New York." *Vista*, 124 F.Supp.3d at 307-08 citing *Retail Software Servs., Inc. v. Lashlee,* 854 F.2d 18, 22 (2d Cir.1988). Again, the Complaint utterly fails to assert such allegations.

### D.    Jurisdictional discovery is not appropriate

Plaintiff should not be granted jurisdictional discovery. Unlike here, jurisdictional discovery is appropriate where "plaintiff's jurisdictional allegations are neither sparse nor

insufficiently specific, but are simply insufficiently developed at this time to permit judgment as to whether personal jurisdiction is appropriate." *Tese-Milner*, 613 F. Supp. 2d 404, 417 (S.D.N.Y. 2009). In this case, Plaintiff's allegations are "insufficiently specific" rather than "insufficiently developed." Despite the Complaint's dozen of paragraphs describing the intricate and extensive mechanics of the Bank Fraud, the allegations as to Neeshal's involvement are conclusory, cursory and without substance and are based on nothing but the fact that Nirav is his older brother. Guilt by association is an insufficient ground to grant jurisdictional discovery. *See Singer v. Bell*, 585 F.Supp.300, 304 (S.D.N.Y. 1984) ("…, plaintiffs have come forward with no evidence linking Liebowitz and the firm to the alleged conspiracy, other than the allegations of guilt by association, and therefore cannot be said to have made the "sufficient start" required to justify discovery.").

## II.     The RICO Claims should be Dismissed for Failure to State a Cause of Action

The RICO claims should be dismissed because the Complaint fails to meet its Rule 12(b)(6) pleading burden with allegations of essential elements as to Neeshal's agreement, role and participation in the Bank Fraud. Plaintiff's inferences chiefly rely on impermissible group pleading. None of the limited, vague and conclusory allegations relating to Neeshal support a plausible claim for RICO conspiracy.

To survive a motion under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim will have 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Great Western Insurance Co. v. Graham*, 18-CV-6249 (VSB), 2020 WL 3415026 *8 (S.D.N.Y. Jun. 22, 2020) citing *Ashcroft*, 556 U.S. at 678. A complaint "that offers 'labels and conclusions' or 'a

formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft*, 556 U.S. at 678 quoting *Twombly*, 550 U.S. at 555.

A plaintiff's burden is high when pleading RICO allegations." *Targum v. Citrin Cooperman & Co., LLP*, No. 12-CV-6909, 2013 WL 6087400 at *5 (S.D.N.Y. Nov. 19, 2013). A civil complaint alleging a conspiracy under 18 U.S.C. § 1962(d) "must allege some factual basis for a finding of a conscious agreement among the defendants." *In re Adelphia Communications Corp.,* 48 Bankr. Ct. Dec. 191, 2007 WL 2403553, at *18 (Bankr. S.D.N.Y. 2007), citing *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir.1990). Crucially, the complaint must allege "agreement to commit predicate acts and knowledge that those acts were part of a pattern of racketeering activity in violation of section 1962(a)–(c)." *Hecht,* 897 F.2d at 25 (citations omitted). The Complaint requires "specific factual allegations to support the conclusion that each of the defendants consciously agreed to commit the predicate acts alleged." *Foster v. 2001 Real Estate*, 2015 WL 7587360, at *6 (S.D.N.Y. 2015).

## A.    The Complaint fails to allege Neeshal's agreement

The Complaint fails to allege a RICO conspiracy claim because it does not allege Neeshal's agreement with any co-conspirator to join and further the Bank Fraud. A complaint alleging a RICO conspiracy under § 1962(d) must allege that "each defendant "knew about and agreed to facilitate" a pattern of racketeering activity." *Baisch v. Gallina*, 346 F.3d 336, 337 (2d Cir. 2003) citing *Salinas v. United States,* 522 U.S. 52, 66 (1997). Specificity is paramount.

Conclusory statements about a defendant's knowledge are insufficient to demonstrate the required "meeting of the minds." *Malvar Egerique v. Chowaiki*, 2020 WL 1974228, at *21 (S.D.N.Y. Apr. 24, 2020) (citation omitted). "General allegations that the defendants 'conspired' " are insufficient. *Morin*, 711 F.Supp. 97, 111 (S.D.N.Y.1989). Likewise, "mere allegations that defendants knew one another, or had prior relationships unrelated to the wrongful acts alleged in

28

the Complaint, are insufficient, standing alone, to set forth a conspiracy claim." *Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 630 (S.D.N.Y. 2004). Allegations "simply that each defendant committed two or more acts that would qualify as predicate acts, without regard to whether those acts were committed in furtherance of the activity of the enterprise" are similarly insufficient. *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 187 (S.D.N.Y. 2018) (quotations and citation omitted).

As an initial matter, the Complaint's allegations as to Neeshal's agreement to participate are implausible. The resignation letters and Trust resolutions make clear that Neeshal expressly disclaimed any participation in the alleged Bank Fraud. Upon learning of his designation as trustee and beneficiary of the Trusts, Neeshal stated in no uncertain terms he wanted nothing to do with Nirav's plans and demanded and received a letter confirming his resignation. Neeshal Decl. ¶ 5; Ex. B (resignation letters and Trust resolutions).

From a pleading perspective, the Complaint also fails to meet its burden. There are no allegations of agreement between Neeshal and any co-conspirator to demonstrate a "meeting of the minds." The Complaint only alleges that Neeshal's involvement may be "inferred" from (a) being an owner or manager of certain entities, Complaint ¶¶ 5, 67, 75-77, 275(ii), 449; (b) selecting "dummy" partners and employees for certain entities, *Id.* at ¶¶ 5, 68, 449; (c) having a POA for Purvi to purchase an apartment in Hong Kong (not Mumbai), *Id.* at ¶¶ 5, 311, 449; and (d) orchestrating "numerous fraudulent transactions" in the Bank Fraud. *Id.* at ¶¶ 5, 275(ii), 449.

These allegations are divided between hearsay and innuendo; admissions that the acts were performed by, or at the direction of others; and conclusory allegations as to Neeshal's agreement to join and support the RICO Conspiracy. *See* fn 2-4. They also are insufficient to demonstrate any agreement among Neeshal and the other co-conspirators to participate in the Bank Fraud. The

allegations as to Neeshal reside in a vacuum. The Complaint does not allege Neeshal's relationship to any other co-conspirator with any specificity, or his performance of any acts in concert with or on behalf of any. The Complaint does not allege that Neeshal gave or received instructions from or among any co-conspirators, wired money to or from anyone, or even communicated in any fashion with anyone.

The only relationship Neeshal has to the Bank Fraud and its conspirators is familial. As described above, the Complaint does not allege any specific fraudulent transactions performed by, at the direction of, or on behalf of Neeshal. The Complaint relies on conclusory group pleading as to attach Neeshal to money laundering allegations with "co-conspirators" and Modi "family members". *See* fn 4, *supra*.

There is not a single allegation in the Complaint that Neeshal had or exercised the power to control any entity.[6] Neeshal only "managed" FDB, which is not a defendant and is not specifically alleged to have been involved in any transactions, fraudulent or otherwise. *Id.* at ¶ 61. There also is not a single allegation that Neeshal had or exercised the power to control any aspect of the purported enterprise; rather, Nirav controlled all facets of the enterprise in collaboration with his top lieutenants – Bhansali, Gandhi and Nanavati – and dominated and controlled Neeshal as well.[7] Neeshal is not even mentioned in the extensive list of transactions involving Modi family

---

[6] *See, e.g.,* Complaint ¶¶ 55 ("The U.S. Entities' operations were managed and controlled by Nirav Modi's cousin, Mihir Bhansali."); 56 ("Mihir Bhansali and Ajay Gandhi managed the fraudulent aspects of Nirav Modi's U.S. operations. "); 58 ("Nanavati exercised general oversight over the Hong Kong-based Shadow Entities and Wadhwa managed their bank accounts and finances."); 60 ("Shukla, Mathews, and Poulose also exercised broad oversight over the Dubai-based Shadow Entities' operations and finances."); 100 ("Bhansali and Gandhi, in coordination with Nirav Modi, controlled all aspects of the Debtors' internal and external operations and affairs at all relevant times.").

[7] *See, e.g.,* Complaint ¶¶ 62 ("Nirav Modi orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from numerous banks."); 90 ("Nirav Modi, Mihir Bhansali, Ajay Gandhi, and other co-conspirators funneled millions of dollars in funds, precious gems, and jewelry through the U.S. Entities and their offices in furtherance of the Bank Fraud."); 101 ("As the ultimate controlling shareholder of all of the Firestar Entities, Nirav Modi, in coordination with Bhansali and Gandhi, orchestrated and oversaw fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds."); 454 ("Nirav Modi enjoys complete control over each Shadow Entity Defendant

30

members who allegedly participated in the Bank Fraud. *Id.* at ¶¶ 146-165.

Although the Complaint asserts four types of racketeering activity – mail and wire fraud, violations of the NSPA, money laundering, and obstruction of justice – it only alleges that holding the POA to purchase the apartment in Hong Kong (or Mumbai) for Purvi was related to the "family money laundering operation." Complaint ¶¶ 5, 311, 449. The Complaint fails to assert any facts tying Neeshal and the POA to the extensive money laundering allegations or any other RICO predicate. *See Id.* at ¶¶ 275-370. The Complaint does not allege that Neeshal held the POA with the intent to launder money; directed, communicated or coordinated with any of the co-conspirators in connection with the transaction; provided or transferred money for the purchase; benefitted from the transaction; or otherwise performed any specific act relating to the Bank Fraud in connection with the POA. The Complaint simply alleges that Neeshal held a POA for his sister. Allegations that Neeshal was the "beneficial owner of numerous Shadow Entities…to further the Bank Fraud and launder its proceeds" and "orchestrated numerous fraudulent transactions" are not supported with any specificity or connection to the POA. *Id.* at ¶ 449(b), (d). The POA is simply an isolated and attenuated event.

The Complaint's vague and conclusory allegations as to Neeshal's agreement fail to state a claim for RICO conspiracy. *See, e.g., 4 K & D Corp. v. Concierge Auctions, LLC*, 2 F.Supp.3d 525, 544–45 (S.D.N.Y. 2014) (RICO conspiracy claim dismissed where plaintiffs alleged "no facts to show specifically that the defendants had any 'meeting of the minds' in the alleged violations").

---

through his dominance and control over Purvi Mehta, Neeshal Modi, and other nominal owners, directors, and officers.").

### B.     The Complaint fails to allege a RICO claim

The RICO conspiracy claim should be dismissed because the Complaint fails to allege an underlying RICO violation. "[T]here can be no RICO conspiracy without a substantive RICO violation." *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 540 (S.D.N.Y. 2001). The RICO conspiracy claim must fail because the Trustee fails to plead the required elements of the substantive RICO violations. *First Capital*, 385 F.3d at 182 (claim dismissed where "Plaintiffs did not adequately allege a substantive violation of RICO"). The mail and wire fraud claims are insufficiently particularized, fail to establish scienter, and are based on time-barred conduct occurring prior to February 20, 2016. *See* Nirav Modi Memo. of Law, at pp. 29-30 and 34-36. The fraud allegations supporting the National Stolen Property Act claims are equally deficient. *See id*. at pp. 31-32. The money laundering claims are merely conclusory. *See id.* at pp. 32-33.

### III.     The Complaint is Time-Barred

The Complaint should be dismissed because it is time barred. Civil RICO and related conspiracy claims are subject to a four-year statute of limitations. *Koch v. Christie's Int'l Pub. Ltd. Co.*, 699 F.3d 141, 148 (2d Cir. 2012) (civil RICO); *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 530 (S.D.N.Y. 2007) (civil RICO conspiracy). A RICO claim accrues when the plaintiff "discovered or should have discovered the injury" from the racketeering conduct. *Koch*, 699 F.3d at 150 (quotations omitted).

The Complaint is barred because documentary evidence makes clear that if Neeshal was not a member of the conspiracy, he had withdrawn as of December 15, 2015, which is more than four years before the filing of the Complaint. Neeshal Decl. ¶ 5; Ex. B (Trust resignation letters and resolutions). Claims against Neeshal must have been filed by December 15, 2019. The Complaint was filed on February 25, 2020, which is 69 days late. In addition, because the U.S.

32

Entities participated in the Bank Fraud, they either discovered or should have discovered their injuries from any pre-February 25, 2016 transfers on or before that date. If any claims survive, acts prior to that date are time-barred.

## IV. Adoption of Additional Grounds for Dismissal as Asserted by Co-Defendants

Neeshal adopts certain additional grounds for dismissal as asserted by his co-defendants in this adversary proceeding and the matter of *Levin, Trustee v. Nirav Deepak Modi, et al.*, Adv. Proc. No. 19-1102 (SHL), which also is pending before the Court. Neeshal respectfully refers the Court to the defendants' motion papers for a fuller recitation of applicable law.

### A. The Trustee lacks standing

The Complaint should be Dismissed pursuant to Rule 12(b)(1) because the Trustee lacks standing. The Complaint specifically asserts a claim belonging to PNB from the Bank Fraud; not the U.S. Entities, which the Trustee represents. *See, e.g.,* Complaint ¶¶ 379 (""Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators implemented a scheme to defraud PNB by fraudulently obtaining LOUs…"); 405 ("…each actual fraudulent transfer and each Subsequent Transfer constituted, involved, or resulted from an offense against India, a foreign nation, involving fraud, or a scheme or attempt to defraud, against PNB, a foreign bank.").

The Trustee does not have standing to assert claims that belong to the creditors of the U.S. Entities. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991); *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 91 (S.D.N.Y. 2011) (trustee lacked standing to bring claims inuring to the benefit of brokerage firm's customers).

### B. The Complaint is barred by the *in pari delicto* doctrine and Wagoner rule

The *in pari delicto* doctrine and *Wagoner Rule* bar the Debtors and U.S. Affiliates from recovering damages occasioned by their own wrongdoing. The *in pari delicto* doctrine is a complete defense to the RICO claims. *Republic of Iraq v. ABB AG*, 768 F.3d 145, 162-63 (2d Cir.

33

2014). The doctrine bars recovery by a plaintiff who was an "active, voluntary participant in the unlawful activity that is the subject of the suit," and whose fault is "essentially indistinguishable" from the defendant's. *Pinter v. Dahl*, 486 U.S. 622, 635-36 (1988). Relatedly, the *Wagoner* rule states that when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage. *Feltman v. Kossoff & Kossoff LLP (In re TS Emp't, Inc.)*, 597 B.R. 543, 548 (Bankr. S.D.N.Y. 2019).

Here, the Complaint alleges that the U.S. Entities and Debtors participated in the Bank Fraud by receiving and transferring diamonds and gems among the Shadow Entities. For this reason the Complaint is barred. *See In re Granite Partners,* 194 B.R. 318, 328 (S.D.N.Y. 1996) (bankruptcy trustee cannot sue third parties for injuries that a debtor suffered in connection with a fraudulent scheme in which it was involved).

## C.   <u>The Debtors did not sustain a direct injury</u>

The right to sue for damages under RICO is limited to direct victims of the alleged racketeering activity. *Hemi Group, LLC. v. City of New York*, 559 U.S. 1, 6 (2010). A party lacks standing to pursue an action under RICO where the direct cause of its alleged harm was a set of actions "distinct from the alleged RICO violation." *Id.* at 10. The Debtors here were not the direct "victim" of the Bank Fraud, but rather PNB. The Debtors' purported injuries (administrative costs and asset transfers) are secondary for which the RICO causes of action should be dismissed. *See* Defendant Nirav Deepak Modi's Memorandum of Law In Support of His Motion to Dismiss the First Amended Complaint in *Levin, Trustee v. Nirav Deepak Modi, et al.*, Adv. Proc. No. 19-1102 (SHL) ("Nirav Modi Memo. of Law"), at pp. 20-24.

The RICO claims also should be dismissed because PNB is a better-situated injured plaintiff with an incentive to sue. *Hemi*, 559 U.S. at 11-12. PNB already has appeared in this Court in order to assert RICO and fraud violations against the Debtors. *See* Proof of Claim of Punjab

National Bank Against Firestar Diamond, Inc., *In re Firestar Diamond, et al*., No. 18-bk-10509 (Bankr. S.D.N.Y. Nov. 29, 2018), ¶ 23. The Debtors do not have standing where "better situated plaintiffs would have an incentive to sue." *Id.*

D.      **The Complaint fails to allege domestic injury**

The Complaint should be dismissed because it fails to allege domestic injury. Recovery for foreign injuries is barred under the RICO statute because there is a presumption against extra-territoriality. *RJR Nabisco, Inc. v. European Community*¸136 S.Ct. 2090 (2016). Here, the target of the Bank Fraud was PNB in India; not the Debtors or U.S. Entities. Injury to tangible property is only domestic if the property "was located in the United States when it was stolen or harmed[.]" *Bascuñán v. Elsaca*, 874 F.3d 806, 820-21 (2d Cir. 2017). The "use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one." *Id.* at 818-19. Similarly, "the alleged investment of the stolen funds in New York real estate projects" does not transform foreign harm into domestic injury. *City of Almaty v. Ablyazov*, 226 F. Supp. 3d 272, 285 (S.D.N.Y. 2016). The Indian government also has initiated proceedings. Under these circumstances, it would cause "international friction" to allow the Trustee to recover for foreign injuries in this civil RICO action. *See RJR*, 136 S.Ct. at 2107; *see also* Memorandum of Law of Purvi Mehta in Support of Motion to Dismiss, Part IV(A)(4), at pp. 36-38.

## <u>Conclusion</u>

WHEREFORE, defendant Neeshal Modi respectfully requests that the Court grant his motion to dismiss, and for such other and further relief as is just and reasonable.

Dated: Purchase, New York
October 15, 2020

Paykin Krieg & Adams, LLP

/s/
By:_____
Benjamin Suess, Esq.
2500 Westchester Avenue, Suite 107
Purchase, New York 10577
(212) 725-4423
bsuess@pka-law.com

Attorneys for defendant Neeshal Modi