Hearing Date and Time: TBD

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | |
| Plaintiff, | |
| v. | Adv. Proc. No. 20-1054 |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; *et al.* | |
| Defendants. | |

### TRUSTEE'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**JENNER & BLOCK LLP**
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
aallen@jenner.com

Richard B. Levin
Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600
rlevin@jenner.com
cwedoff@jenner.com

*Counsel for the Chapter 11 Trustee*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................iii

PRELIMINARY STATEMENT ...................................................................................... 1

SUMMARY OF ALLEGATIONS.................................................................................... 3

APPLICABLE STANDARDS........................................................................................ 12

      I.      Rule 12(b)(6) Standard. ................................................................. 12

      II.     Rule 9(b) Standard............................................................................ 12

      III.    Rule 12(b)(2) Standard ..................................................................... 13

ARGUMENT................................................................................................................... 14

      I.      The Trustee Adequately Alleged that the Substantive Conspirators Conducted or Participated in the Conduct of an Enterprise's Affairs Through a Pattern of Racketeering Activity................................................. 14

            A.     The Trustee Adequately Alleged Mail and Wire Fraud............................ 15

            B.     The Trustee Adequately Alleged Obstruction of Justice............................ 18

            C.     The Trustee Adequately Alleged Bankruptcy Fraud. ................................ 20

      II.     The Trustee Adequately Alleged that the Substantive Conspirators' Violation of 18 U.S.C. § 1962(c) Inflicted Direct, Domestic, and Readily Provable Injuries on the Debtors and U.S. Affiliates. ............................................. 21

      III.    The Trustee Adequately Alleged That Each Defendant Knowingly Assented to the General Criminal Objective of the Substantive Conspirators' Violations of 18 U.S.C. § 1962(c). ........................................ 25

            A.     The Trustee Adequately Alleged that Purvi Mehta Knowingly Assented to the RICO Conspiracy. ................................................. 28

            B.     The Trustee Adequately Alleged that Ami Javeri Knowingly Assented to the RICO Conspiracy. ................................................. 31

            C.     The Trustee Adequately Alleged that Nehal Modi Knowingly Assented to the RICO Conspiracy. ................................................. 35

D.    The Trustee Adequately Alleged that Neeshal Modi Knowingly
      Assented to the RICO Conspiracy. ............................................................. 38

E.    The Trustee Adequately Alleged that Central Park Real Estate
      LLC and Central Park South 50 Properties LLC Knowingly
      Assented to the RICO Conspiracy. ............................................................. 40

IV.   The Defendants Cannot Rely on Agency-Based Imputation Principles
      Because They Are Not Innocent Third Parties. ....................................................... 42

A.    Under Both Delaware and New York Law, Imputation Operates
      Only to Protect Innocent Third Parties. ...................................................... 44

B.    No Wrongdoing Can Be Imputed to the Debtors or U.S. Affiliates
      For Purposes of *In Pari Delicto*, the *Wagoner* Rule, or the Timeliness
      of the Trustee's RICO Claims. ...................................................................... 47

V.    Neither *In Pari Delicto* Nor the *Wagoner* Rule Bars the Trustee's Claims. ............. 50

VI.   The U.S. Affiliates Validly Assigned Their RICO Claims to the Trustee. ............. 52

VII.  The Trustee's RICO Claims are Timely ....................................................................... 53

VIII. The Trustee Stated Valid Fraudulent Transfer Claims. ........................................... 55

A.    The Synergies-Mehta Transfer. ..................................................................... 57

B.    The CPRE Equity Transfer and the CPRE Mortgage Transfers. ................. 62

IX.   Purvi Mehta and Neeshal Modi Are Subject to the Personal Jurisdiction of
      this Court........................................................................................................................ 65

A.    The Complaint Adequately Alleges the Defendants' Minimum
      Contacts with the United States. ................................................................... 65

B.    The Complaint Sufficiently Alleges the Defendants' Minimum
      Contacts Under New York's Long-Arm Jurisdiction Statute. ................... 73

C.    The Exercise of Personal Jurisdiction Over the Defendants Would
      Comport with Fair Play and Substantial Justice. ....................................... 77

D.    At a Minimum, Jurisdictional Discovery Is Warranted. ........................... 79

X.    Purvi Mehta Was Properly Served. ............................................................................. 80

CONCLUSION ............................................................................................................................. 80

## TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*287 Franklin Ave. v. Meisels*,
   2015 WL 5457959 (E.D.N.Y. July 20, 2015) ................................................................. 23

*4 K&D Corp. v. Concierge Auctions, LLC*,
   2 F.Supp.3d 525, 543 (S.D.N.Y. 2014) ........................................................ 22, 24, 41, 42

*Air China Ltd. v. Nelson Li*,
   2009 WL 857611 (S.D.N.Y. March 31, 2009) ............................................................... 41

*Alfandary v. Nikko Asset Mgmt. Co., Ltd.*,
   337 F. Supp. 3d 343 (S.D.N.Y. 2018) .......................................................................... 77

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
   782 F. Supp. 215 (S.D.N.Y. 1992) .......................................................................... 69, 70

*Alsco, Inc. v. Premier Outsourcing Plus, LLC*,
   2020 WL 4209192 (D. Del. July 22, 2020) ................................................................... 49

*Alto Prod. Corp. v. Ratek Indus. Ltd.*,
   1996 WL 497027 (S.D.N.Y. Sept. 3, 1996) ................................................................... 74

*Anhui Konka Green Lighting Co., Ltd. v. Green Logic LED Electrical Supply, Inc.*,
   2019 WL 6498094 (S.D.N.Y. Dec. 3, 2019) ................................................................. 12

*Armstrong v. McAlpin*,
   699 F.2d 79 (2d Cir. 1983) ........................................................................................... 54

*Ash v. Georgia-Pacific Corp.*,
   957 F.2d 432 (7th Cir. 1992) ........................................................................................ 46

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................... 12

*Ayyash v. Bank Al-Madina*,
   2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ................................................................... 79

*B.A.S.S. Group, LLC v. Coastal Supply Co., Inc.*,
   2009 WL 1743730 (Del. Ch. Ct. June 19, 2009) .......................................................... 41

*Baisch v. Gallina*,
   346 F.3d 366 (2d Cir. 2003) .................................................................................... 22, 24

*Baker O'Neal Holdings, Inc. v. Ernst & Young LLP,*
    2004 WL 771230 (S.D. Ind. March 24, 2004) ............................................ 46

*Ball v. Metallurgie Hoboken-Overpelt, S.A.,*
    902 F.2d 194 (2d Cir. 1990) ...................................................................... 13

*Banco Ambrosiano v. Artoc Bank & Trust Ltd.,*
    62 N.Y.2d 65 (1984) ................................................................................. 73

*Bankers Trust Co. v. Rhoades,*
    859 F.2d 1096 (2d Cir. 1988) .................................................................... 23

*Barnet v. Drawbridge Special Opportunities Fund LP,*
    2014 WL 4393320 (S.D.N.Y. Sept. 5, 2014) ............................................ 54

*Bascuñán v. Elsaca,*
    874 F.3d 806 (2d Cir. 2017) ...................................................................... 24

*Bateman Eichler, Hill Richards, Inc. v. Berner,*
    472 U.S. 299 (1985) ................................................................................. 50

*Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo,*
    346 F. Supp. 3d 432 (S.D.N.Y. 2018) ............................................26, 28, 32

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................. 12

*Berman v. Labonte,*
    2020 WL 5849633 (D. Conn. Sept. 30, 2020) ..................................... 27, 28

*Best Van Lines, Inc. v. Walker,*
    490 F.3d 239 (2d Cir. 2007) ...................................................................... 68

*Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.,*
    140 F.3d 898 (11th Cir. 1998) .................................................................. 23

*Brown v. Ins. Equities Corp.,*
    187 A. 18 (Del. Ch. 1936) ......................................................................... 45

*Carrier Corp. v. Outokumpu Oyj,*
    673 F.3d 430 (6th Cir. 2012) ..................................................................... 40

*Charles Schwab Corp. v. Bank of Am. Corp.,*
    883 F.3d 68 (2d Cir. 2018) ........................................................................ 69

*Chartered Bank v. Am. Tr. Co.,*
    263 N.Y.S.2d 53 (N.Y. Sup. Ct. 1965) ..................................................... 46

*Chloe v. Queen Bee of Beverly Hills, LLC*,
   616 F.3d 158 (2d Cir. 2010) ............................................................................................. 75

*Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*,
   271 F.3d 374 (2d Cir. 2001) ............................................................................................. 25

*Cooke v. Berkshire Farm Ctr. & Servs. for Youth*,
   2012 WL 668612 (E.D.N.Y. Feb. 29, 2012) ..................................................................... 80

*Cornale v. Stewart Stamping Corp.*,
   129 N.Y.S.2d 808 (N.Y. Sup. Ct. 1954) ........................................................................... 44

*Crabhouse of Douglaston Inc. v. Newsday Inc.*,
   801 F.Supp.2d 64 (E.D.N.Y. 2011) ................................................................................. 30

*D'Addario v. D'Addario*,
   901 F.3d 80 (2d Cir. 2018) ............................................................................................... 23

*DDR Const. Servs., Inc. v. Siemens Indus., Inc.*,
   770 F. Supp. 2d 627 (S.D.N.Y. 2011) ......................................................................... 22, 24

*Egerique v. Chowaiki*,
   2020 WL 1974228 (S.D.N.Y. April 24, 2020) ................................................................. 42

*Elsevier, Inc. v. Grossman*,
   77 F. Supp. 3d 331 (S.D.N.Y. 2015) ..................................................................... 73, 75, 77

*Epstein v. Epstein*,
   966 F.Supp. 260 (S.D.N.Y. 1997) ................................................................................... 53

*Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*,
   2014 WL 2594340 (E.D.N.Y. June 10, 2014) ................................................................. 56

*Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
   783 F.3d 395 (2d Cir. 2015) ............................................................................................. 12

*First Capital Asset Management Inc. v. Brickellbush, Inc.*,
   218 F.Supp.2d 369 (S.D.N.Y. 2002) ............................................................................... 23

*Friedl v. City of New York*,
   210 F.3d 79 (2d Cir. 2000) ............................................................................................... 39

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
   2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018) ..................................................................... 71

*GICC Capital Corp. v. Technology Finance Group, Inc.*,
   30 F.3d 289 (2d Cir. 1994) ......................................................................................... 23, 53

*Gov't Employees Ins. Co. v. Gateva,*
    2014 WL 1330846 (E.D.N.Y. March 30, 2014) ........................................................... 22

*Hemi Group, LLC v. City of New York,*
    559 U.S. 1 (2010) .......................................................................................................... 21

*Hwang v. Grace Rd. Church (in New York),*
    2016 WL 1060247 (E.D.N.Y. March 14, 2016) ........................................................... 76

*In re 1031 Tax Group, LLC,*
    439 B.R. 47 (Bankr. S.D.N.Y. 2010) ........................................................................... 61

*In re 45 John Lofts, LLC,*
    599 B.R. 730 (Bankr. S.D.N.Y. 2019) ..................................................................... 56, 58

*In re Adelphia Commc'ns Corp.,*
    365 B.R. 24 (Bankr. S.D.N.Y. 2007) ............................................................................ 54

*In re Ahead by a Length, Inc.,*
    100 B.R. 157 (Bankr. S.D.N.Y. 1989) ..................................................................... 23, 54

*In re Aluminum Warehousing Antitrust Litig.,*
    2020 WL 2036716 (S.D.N.Y. Apr. 28, 2020) ................................................... 66, 68, 69

*In re Am. Int'l Grp., Inc.,*
    965 A.2d 763 (Del. Ch. 2009) ................................................................................ 44, 45

*In re Automotive Parts Antitrust Litig.,*
    2013 WL 2456613 (E.D. Mich. June 6, 2013) ............................................................. 40

*In re Bernard L. Madoff Inv. Sec. LLC,*
    418 B.R. 75 (Bankr. S.D.N.Y. 2009) ...................................................................... 66, 67

*In re Bernard L. Madoff Inv. Sec. LLC,*
    445 B.R. 206 (Bankr. S.D.N.Y. 2011) ................................................................. 55, 56, 58

*In re Capmark Fin. Grp. Inc.,*
    479 B.R. 330 (Bankr. D. Del. 2012) ............................................................................. 66

*In re Cassandra Grp.,*
    338 B.R. 583 (Bankr. S.D.N.Y. 2006) .......................................................................... 58

*In re CBI Holding Co., Inc.,*
    529 F.3d 432 (2d Cir. 2008) ......................................................................................... 43

*In re Currency Conversion Fee Antitrust Litigation,*
    265 F.Supp.2d 385 (S.D.N.Y. 2003) ............................................................................ 34

*In re Dreier LLP,*
    452 B.R. 391 (Bankr. S.D.N.Y. 2011)................................................................. 61, 63

*In re Enron Corp.,*
    316 B.R. 434 (Bankr. S.D.N.Y. 2004)................................................................. 66, 73

*In re Everfresh Beverages, Inc.,*
    238 B.R. 558 (Bankr. S.D.N.Y. 1999)....................................................................... 54

*In re Food Management Group, LLC,*
    380 B.R. 677 (Bankr. S.D.N.Y. 2008)....................................................................... 52

*In re Hoang,*
    449 B.R. 850 (Bankr. D. Md. 2011) .......................................................................... 52

*In re Jamuna Real Estate LLC,*
    365 B.R. 540 (Bankr. E.D. Pa. 2007)......................................................................... 52

*In re Kaiser,*
    722 F.2d 1574 (2d Cir. 1983) ............................................................................. 56, 58

*In re Lehman Bros. Holdings Inc.,*
    469 B.R. 415 (Bankr. S.D.N.Y. 2012)....................................................................... 58

*In re Lehman Bros. Holdings Inc.,*
    535 B.R. 608 (Bankr. S.D.N.Y. 2015)....................................................................... 73

*In re Lehr Construction Corp.,*
    551 B.R. 732 (S.D.N.Y. 2016)................................................................................... 51

*In re Lyondell Chem. Co.,*
    567 B.R. 55 (Bankr. S.D.N.Y. 2017) ......................................................................... 56

*In re Med-Atlantic Petroleum Corp.,*
    233 B.R. 644 (Bankr. S.D.N.Y. 1999)................................................................. 74, 76

*In re Merrill Lynch Ltd. Partnerships Litig.,*
    154 F.3d 56 (2d Cir. 1998) ........................................................................................ 53

*In re Millennium Lab Holdings II, LLC,*
    2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019)................................................ 56, 58

*In re Motel 6 Securities Litigation,*
    1997 WL 154011 (S.D.N.Y. April 2, 1997)............................................................... 35

*In re Motors Liquidation Co.,*
    565 B.R. 275 (Bankr. S.D.N.Y. 2017)............................................................. 66, 73, 75

*In re N. Sea Brent Crude Oil Futures Litig.*,
  2016 WL 8650460 (S.D.N.Y. Mar. 17, 2016) ........................................................ 79

*In re National Mortg. Equity Corp. Mortg. Pool Certificates Securities Litig.*,
  636 F. Supp. 1138 (C.D. Cal. 1986) ...................................................................... 53

*In re Parlamat Securities Litigation*,
  412 F.Supp.2d 392 (S.D.N.Y. 2006) ...................................................................... 51

*In re Pitt Penn Holding Co.*,
  484 B.R. 25 (Bankr. D. Del. 2012) .................................................................. 49, 51

*In re Platinum-Beechwood Litigation*,
  2019 WL 2569653 (S.D.N.Y. June 21, 2019) .................................................. 50, 51

*In re Platinum-Beechwood Litigation*,
  427 F.Supp.3d 395 (S.D.N.Y. 2019) ...................................................................... 51

*In re Saba Enterprises, Inc.*,
  421 B.R. 626 (Bankr. S.D.N.Y. 2009) ................................................................... 56

*In re Schick*,
  246 B.R. 41 (Bankr. S.D.N.Y. 2000) ..................................................................... 62

*In re Sharp Int'l Corp.*,
  403 F.3d 43 (2d Cir. 2005) .................................................................................... 56

*In re Signature Apparel Group LLC*,
  2015 WL 1009452 (Bankr. S.D.N.Y. March 4, 2015) ............................................ 52

*In re Syntax-Brillian Corp.*,
  2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016) .................................................. 58

*In re Tronox Inc.*,
  429 B.R. 73 (Bankr. S.D.N.Y. 2010) ............................................................... 56, 58

*In re Vivaro Corp.*,
  524 B.R. 536 (Bankr. S.D.N.Y. 2015) ................................................................... 59

*In re Welspun Litig.*,
  2019 WL 2174089 (S.D.N.Y. May 20, 2019) ........................................................ 13

*In re Wonderwork, Inc.*,
  611 B.R. 169 (Bankr. S.D.N.Y. 2020) ............................................................. 64, 65

*Jackson Nat. Life. Ins. Co. v. Litigator*,
  949 F.Supp. 200 (S.D.N.Y. 1996) ................................................................... 23, 53

viii

*Karrat v. Merhib*,
    307 N.Y.S.2d 915 (N.Y. Sup. Ct. 1970) ............................................................................ 76

*KE Property Management Inc. v. 275 Madison Management Corp.*,
    1993 WL 285900 (Del. Ch. July 27, 1993) ......................................................................... 45

*Kim v. Ji Sung Yoo*,
    311 F. Supp. 3d 598 (S.D.N.Y. 2018) ................................................................ 57, 60, 61, 64

*Kirch v. Sheid*,
    126 N.Y.S. 624 (N.Y. App. Term 1911) ........................................................................... 45

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) ...................................................................................................... 46

*Kreutter v. McFadden Oil Corp.*,
    71 N.Y.2d 460 (1988) ...................................................................................................... 75

*Levin v. Bank of New York Mellon*,
    2019 WL 564341 (S.D.N.Y. Feb. 12, 2019) ..................................................................... 38

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ................................................................................ 65, 68, 77

*Lincoln Nat. Life Ins. Co. v. Snyder*,
    722 F.Supp.2d 546 (D. Del. 2010) .................................................................................. 44

*Manhattan Life Ins. Co. v. A.J. Stratton Syndicate (No. 782)*,
    731 F. Supp. 587 (S.D.N.Y. 1990) .................................................................................. 79

*Manson v. Stacescu*,
    11 F.3d 1127 (2d Cir. 1993) ............................................................................................ 23

*Mauro v. McCrindle*,
    419 N.Y.S.2d 710 (N.Y. App. Div. 1979) ........................................................................ 44

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*,
    23 F. Supp. 2d 439 (S.D.N.Y. 1998) ............................................................................... 54

*Morrison v. Berry*,
    2019 WL 7369431 (Del. Ch. Dec. 31, 2019) ................................................................... 46

*Moviecolor Limited v. Eastman Kodak Co.*,
    288 F.2d 80 (2d Cir. 1961) .............................................................................................. 54

*Munroe v. Harriman*,
    85 F.2d 493 (2d Cir. 1936) .............................................................................................. 42

*Mut. Life Ins. Co. of New York v. Hilton-Green,*
    241 U.S. 613 (1916) ................................................................................ 43

*New York Dist. Council of Carpenters Pension Fund v. Forde,*
    939 F. Supp. 2d 268 (S.D.N.Y. 2013) ................................................... 26

*Nicolls Pointing Coulson, Ltd. v. Transportation Underwriters of Louisiana, Inc.,*
    777 F.Supp. 493 (E.D. La. 1991) .......................................................... 53

*Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v.*
    *PriceWaterhouseCoopers, LLP,*
    605 Pa. 269, 989 A.2d 313 (2010) ........................................................ 46

*Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank,*
    549 B.R. 56 (S.D.N.Y. 2016) .................................................. 13, 66, 68, 78

*OneBeacon Ins. Grp. v. Tylo AB,*
    731 F. Supp. 2d 250 (D. Conn. 2010) ................................................... 78

*Palatkevich v. Choupak,*
    2014 WL 1509236 (S.D.N.Y. Jan. 24, 2014) ................................... 22, 26

*Pennington v. Commonwealth Hotel Const. Corp.,*
    156 A. 259 (Del. Ch. 1931) ................................................................... 45

*People v. Salko*
    47 N.Y.2d 230 (1979) ............................................................................ 43

*Petition of Mulco Products, Inc.,*
    123 A.2d 95 (Del. Super. Ct. 1956) ...................................................... 45

*Plotkin v. Republic-Franklin Ins. Co.,*
    113 N.Y.S.3d 133 (N. Y. App. Div. 2019) ............................................ 43

*Priestley v. Panmedix Inc.,*
    18 F. Supp. 3d 486 (S.D.N.Y. 2014) ............................................... 60, 63

*Ray v. Ray,*
    108 A.D.3d 449, 970 N.Y.S.2d 9 (N.Y. App. Div. 2013) ................. 60, 63

*Related Companies, L.P. v. Ruthling,*
    2017 WL 6507759 (S.D.N.Y. 2017) ............................................ 23, 41, 53

*Related Companies, L.P. v. Ruthling,*
    2019 WL 10947100 (July 23, 2019) ............................................ 26, 28, 32

*Rennaker Co. Consulting, Inc. v. TLM Grp., LLC,*
    2017 WL 2240235 (S.D.N.Y. Mar. 29, 2017) ...................................... 80

*Resolution Trust Corp. v. Fleischer,*
 826 F.Supp. 1273 (D. Kan. 1993) .................................................................................. 54

*Retail Software Servs. v. Lashlee,*
 854 F.2d 18 (2d Cir. 1988) ........................................................................................... 76

*Rosalie Estates, Inc. v. Colonia Ins. Co.,*
 643 N.Y.S.2d 59 (N.Y. App. Div. 1996) ....................................................................... 44

*Rosner v. Peregrine Finance Ltd.,*
 1998 WL 249197 (S.D.N.Y. May 18, 1998) ................................................................. 54

*Rothstein v. UBS AG,*
 708 F.3d 82 (2d Cir. 2013) ........................................................................................... 12

*Salinas v. United States,*
 522 U.S. 52 (1997) ........................................................................................................ 25

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff),*
 460 B.R. 106 (Bankr. S.D.N.Y. 2011) .......................................................................... 13

*Securities Investor Protection Corp. v. Stratton Oakmont, Inc.,*
 234 B.R. 293 (Bankr. S.D.N.Y. 1999) .......................................................................... 12

*Serin v. Northern Leasing Systems, Inc.,*
 2009 WL 7823216 (S.D.N.Y. Dec. 18, 2009) .............................................................. 41

*Smith v. John Hancock Mut. Life Ins. Co.,*
 23 N.Y.S.2d 331 (N.Y. App. Div. 1940) ....................................................................... 45

*Southern Indus., Inc. v. Jeremias,*
 66 A.D.2d 178 (N.Y. App. Div. 2d Dept. 1978) ............................................... 57, 60, 64

*St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,*
 884 F.2d 688 (2d Cir. 1989) ......................................................................................... 23

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.,*
 375 F. Supp. 2d 141 (E.D.N.Y. 2005) .................................................................... 22, 26

*Steginsky v. Xcelera Inc.,*
 741 F.3d 365 (2d Cir. 2014) ......................................................................................... 26

*Stewart v. Wilmington Trust SP Services, Inc.,*
 112 A.3d 271 (Del. Ch. 2015) ................................................................................. 46, 47

*Teneyck, Inc. v. Rosenberg,*
 957 N.Y.S.2d 845 (N.Y. Sup. Ct. 2013) ....................................................................... 51

*Terminate Control Corp. v. Horowitz,*
    28 F.3d 1335 (2d Cir. 1994) ............................................................................. 22, 24

*Tilden v. Barber,*
    268 F. 587 (D.N.J. 1920) .................................................................................. 46

*Town of Kearny v. Hudson Meadows Urban Renewal Corp.,*
    829 F.2d 1263 (3d Cir. 1987) ........................................................................... 22, 24

*Trenwick America Litig. Trust v. Ernst & Young, L.L.P.,*
    906 A.2d 168 (Del. Ch. 2006) ........................................................................... 45

*U.S. v. Autuori,*
    212 F.3d 105 (2d Cir. 2000) ............................................................................. 15

*U.S. v. Bahel,*
    662 F.3d 610 (2d Cir. 2011) ............................................................................. 15

*U.S. v. Binday,*
    804 F.3d 558 (2d Cir. 2015) ............................................................................. 15

*U.S. v. Chas. Pfizer & Co.,*
    281 F.Supp. 837 (S.D.N.Y. 1968) ..................................................................... 34

*U.S. v. Gordon,*
    987 F.2d 902 (2d Cir. 1993) ............................................................................. 33

*U.S. v. Huezo,*
    546 F.3d 174 .................................................................................................... 31

*U.S. v. Maricle,*
    2010 WL 5139420 (E.D. Ky. Dec. 10, 2010) .................................................... 35, 36

*U.S. v. Navarrete,*
    113 F.3d 1230, 1997 WL 265249 (2d Cir. 1997) .............................................. 33

*U.S. v. Pugh,*
    945 F.3d 9 (2d Cir. 2019) ................................................................................. 19, 20, 36

*U.S. v. Sampson,*
    898 F.3d 287 (2d Cir. 2018) ............................................................................. 20

*U.S. v. Teitler,*
    802 F.2d 606 (2d Cir. 1986) ............................................................................. 33

*U.S. v. Zichettello,*
    208 F.3d 72 (2d Cir.2000) ................................................................................ 26, 31, 34, 37

xii

*Union Bank v. Mott*,
   1863 WL 4108 (N.Y. Gen. Term. 1863) ...........................................................47, 48, 49

*United States v. Ciccone*,
   312 F.3d 535 (2d Cir.2002) ........................................................................................ 25

*United States v. Zemlyansky*,
   908 F.3d 1 (2d Cir. 2018) ........................................................................................... 25

*Wafios Mach. Corp. v. Nucoil Indus. Co.*,
   2004 WL 1627168 (S.D.N.Y. July 21, 2004) ............................................................ 80

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
   752 A.2d 1175 (1999) ................................................................................................. 40

*Wenske v. Blue Bell Creameries, Inc.*,
   2018 WL 3337531 (Del. Ch. July 6, 2018)................................................................ 43

*Whalen v. Carter*,
   954 F.2d 1087 (5th Cir. 1992) ................................................................................... 23

*Wooten v. Loshbough*,
   951 F.2d 768 (7th Cir. 1991) ..................................................................................... 23

## STATUTES

11 U.S.C. § 108 ................................................................................................................. 55

11 U.S.C. § 544 ................................................................................................................. 55

11 U.S.C. § 548 ............................................................................................................ 55, 56

18 U.S.C. § 152 ............................................................................................................ 20, 21

18 U.S.C. § 1512 ......................................................................................................18, 19, 36

18 U.S.C. § 1515 ........................................................................................................ 19, 36

18 U.S.C. § 1962 ..............................................................................................14, 21, 25, 26

18 U.S.C. § 1965 ............................................................................................................... 73

28 U.S.C. § 1334 .......................................................................................................... 66, 73

28 U.S.C. § 2075 ............................................................................................................... 66

NY DCL § 272 ..........................................................................................................57, 60, 64

NY DCL § 273 ................................................................................................................... 56

NY DCL § 276 ................................................................................................................... 55

NY CPLR § 302 ........................................................................................................... passim

Fed. R. Civ. P. 4 .......................................................................................................... 66, 80

Fed. R. Civ. P. 8 ................................................................................................................ 26

Fed. R. Civ. P. 9 ...................................................................................................12, 13, 26

Fed R. Civ. P. 12 ......................................................................................................... passim

Fed. R. Bankr. P. 7004 .................................................................................................. 66, 73

**OTHER AUTHORITIES**

Restatement (Third) Of Agency (2006) ........................................................................... 43

3 Am. Jur. 2d Agency ....................................................................................................... 43

2A C.J.S. Agency .............................................................................................................. 43

SIEGEL, N.Y. PRAC. (6th ed.) ........................................................................................ 76

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or

"**Plaintiff**") for Debtors Firestar Diamond, Inc. ("**FDI**"), Fantasy, Inc. (**"Fantasy"**), and Old AJ,

Inc. f/k/a A. Jaffe, Inc. ("**Jaffe**") (collectively, the "**Debtors**"),[1] in opposition to the motions to

dismiss (the "**Motions to Dismiss**") filed by Defendants Purvi Mehta (Adv. Dkt. 39), Central Park

Real Estate LLC and Central Park South 50 Properties LLC (Adv. Dkt. 42), Ami Javeri (Adv. Dkt.

44), Nehal Modi (Adv. Dkt. 47), and Neeshal Modi (Adv. Dkt. 56) (collectively, the "**Moving**

**Defendants**"),[2] respectfully states:

## PRELIMINARY STATEMENT

This adversary proceeding represents the continuation of the Trustee's efforts to recover

for the injuries the Debtors and U.S. Affiliates (collectively, the "**U.S. Entities**")[3] sustained as a

result of the Modi family's nearly decade-long racketeering conspiracy. While Nirav Modi was

the face of that conspiracy, his wife Ami, his sister Purvi, and his brothers Nehal and Neeshal

each played a key role—both personally and through the corporate Defendants they controlled—

in what was truly a family-wide effort.

The Modi family's racketeering conspiracy and the injuries it inflicted on the Debtors and

U.S. Affiliates alleged in this case is the same as the conspiracy alleged in the Trustee's adversary

proceeding against Nirav Modi, Mihir Bhansali, and Ajay Gandhi. [Adv. Proc. 19-1102.] In this

---

[1] Unless otherwise defined, all capitalized terms shall have the meaning ascribed to them in the Complaint. Additionally, with respect to allegations made on information and belief in the Complaint, the Trustee will treat such allegations as true for the purposes of this Opposition. However, nothing in this Opposition should be construed as negating or limiting such qualifications in the Complaint.

[2] Since each of the individual Moving Defendants are members of the Modi family, after initial identification, the Trustee will refer to them by their first names only to avoid confusion.

[3] On January 15, 2020, the Trustee and the U.S. Affiliates entered into a settlement agreement under which the U.S. Affiliates assigned to the Trustee any and all claims or causes of action then-owned or subsequently acquired by the U.S. Affiliates and consented to entry of judgment jointly and severally against each U.S. Affiliate in the amount of $23,116,505.44, which was entered on February 18, 2020. (Compl. ¶¶ 22-23).

case, the Trustee seeks to hold the family members and related entities who joined and actively supported the racketeering conspiracy liable for the racketeering conspiracy arising with Nirav, Bhansali, and Gandhi's substantive RICO violations. None of the Moving Defendants seriously contests the validity of the Trustee's substantive RICO claims. Rather, each Moving Defendant argues that the Complaint does not sufficiently tie them to the racketeering conspiracy. Most of their arguments incorrectly assume that the Trustee must allege they personally knew of or agreed to the specific predicate acts forming the alleged pattern of racketeering activity. But the Second Circuit has repeatedly made clear that, to properly plead a civil RICO conspiracy claim, the plaintiff need allege only a single concrete fact that plausibly supports a reasonable inference that the defendant adopted the overarching criminal objectives of the conspiracy and that the situation would logically lead the defendant to believe that the conspiracy extended beyond their personal involvement. The fact that a defendant received or stood to receive the profits of the conspiracy is sufficient by itself to support a RICO conspiracy claim. So too are facts showing the primary conspirators trusted the defendant with knowledge or evidence of their crimes or that the defendant's conduct after learning of their alleged co-conspirator's crimes was inconsistent with how an innocent person would be expected to react.

As detailed below, the Trustee alleges numerous facts sufficient to satisfy this standard with respect to each individual Defendant. For example, the Trustee alleged, among other things: (a) that Purvi and Ami each received profits of the conspiracy in connection with their role as the primary conduits through which the Modi family laundered its illicit wealth; (b) that Nehal traveled overseas with Mihir Bhansali after the Bank Fraud was exposed to frustrate investigation of the conspiracy and then continued working with Bhansali, Gandhi, and other co-conspirators to loot the U.S. Affiliates; and (c) that Neeshal worked with Mihir Bhansali to select and hire

2

dummy directors, officers, and employees for Shadow Entities and LOU Entities and that Bhansali trusted him to create fictitious biographical profiles for various Shadow Entities.

Moreover, each entity Defendant's conspiratorial intent can be imputed directly to them from Nirav (under alter ego principles) or from Bhansali and Gandhi (under agency law principles). The Trustee can also use imputation, along with the traditional badges of fraud, to avoid and recover the numerous actual fraudulent transfers of the Debtors and U.S. Affiliates' assets in furtherance of the racketeering conspiracy. However, the Defendants cannot impute Nirav, Bhansali, or Gandhi's knowledge or conduct to the Debtors or U.S. Affiliates for any purpose because, under longstanding agency law principles recognized under both New York and Delaware law, imputation operates only to protect <u>innocent</u> third parties, not those who transact with agents in bad faith. For this reason (among others), the Defendants' *in pari delicto*, *Wagoner* rule, and statute of limitations arguments must fail.

Finally, despite Purvi's and Neeshal's arguments to the contrary, this Court has personal jurisdiction over each of the Moving Defendants by virtue of both (i) their personal contacts with the State of New York or the United States as a whole; and (ii) the jurisdictional contacts of their co-conspirators under the conspiratorial doctrine of personal jurisdiction. For all of these reasons, each Motion to Dismiss should be denied in full.

## SUMMARY OF ALLEGATIONS

The Debtors and their non-debtor U.S. Affiliates are the U.S. subsidiaries of Nirav Modi's India-based flagship company Firestar International Limited (f/k/a Firestar International Private Ltd) ("**FIPL**"). (Compl. ¶ 52). FIPL and its subsidiaries (collectively, the "**Firestar Entities**") operated several different legitimate business lines, including wholesale diamond and jewelry sales, speculative loose diamond trading, and eventually jewelry design and retail through *Nirav Modi*-branded boutiques in major cities around the world. (*Id.* ¶¶ 53-54, 58-59).

3

Beginning around 2010, Punjab National Bank employee Gokulnath Shetty began approving cross-border trade financing in the form of letters of undertaking ("**LOU**") to companies owned by Nirav (and his uncle Mehul Choksi who operated a parallel scheme through his own firms) without securing collateral and without properly recording them in PNB's records. (*Id.* ¶¶ 62, 88, 184, 146-47, 194). By the time Gokulnath Shetty retired in May 2017, PNB had issued over 1,500 fraudulent LOUs, totaling approximately $3.5 billion, mostly to three India-based partnerships Diamonds 'R' Us ("**DRUS**"), Solar Exports ("**Solar**"), and Stellar Diamond ("**Stellar**") (collectively, the "**LOU Entities**"), in which Nirav Modi, Ami Modi, and Neeshal Modi, among others, each served as partner during the Relevant Period. (*Id.* ¶¶ 66-67).

To maximize the LOU Entities' borrowing capacity, Modi and his co-conspirators (particularly his cousin Mihir Bhansali who served as director and CEO of each U.S. Entity) set up numerous fictitious companies in Hong Kong and Dubai that were purportedly independent diamond and jewelry businesses, but were in fact secretly owned and controlled by the Modi family (the "**Shadow Entities**") (*Id.* ¶¶ 71-73). Precious gems, metals, and jewelry were then transferred in a "loop" between LOU Entities and Shadow Entities to fraudulently inflate the LOU Entities' import volume so that they could obtain more LOUs. (*Id.* ¶ 84).

To support this primary loop, Nirav, Bhansali, Ajay Gandhi (the CFO of each of the U.S. Entities), and their co-conspirators also moved substantial amounts of cash and inventory among Shadow Entities and Firestar Entities (including the U.S. Entities). (*Id.* ¶¶ 81-83). The purpose of these transactions was to provide Shadow Entities with the goods and funds they needed to transact with the LOU Entities, to divert and launder the fraudulent proceeds for the benefit of the Modi family and their co-conspirators, and to clear the Firestar Entities' and Shadow Entities' respective accounts payable and accounts receivable so as to avert suspicion from auditors, lenders, and other third parties. (*Id.* ¶ 98). The transactions were deliberately structured to

4

concentrate profits in certain Shadow Entities, especially Fine Classic, the Shadow Entity Nirav's

sister Purvi directly owned and personally controlled. (*Id.* ¶¶ 178, 314). Fine Classic and other

Shadow Entities would then make substantial payments to Purvi under the guise of shareholder

dividends. (*Id.* ¶ 302). Purvi would then hold the siphoned funds in personal bank accounts and

through various other offshore shell companies she owned. Between November 2013 and

November 2017, Purvi personally received nearly $90 million in "shareholder dividends" from

Fine Classic and Empire (another Shadow Entity). (*Id.* ¶¶ 303-304).

The conspirators' ultimate plan was to raise outside capital through an initial public

offering of FIPL, which they would then use to pay off the outstanding LOUs before they got

caught. (*Id.* ¶ 276.) Before they could do that, they needed to sanitize years of Modi family self-

dealing from the Firestar Entities' organizational and capital structure through a "corporate

restructuring," including by divesting CPRE, which held Nirav and Ami Modi's personal New

York residence. (*Id.* ¶¶ 276-77.) The restructuring involved FIPL making a $115 million capital

contribution to FHL (the Hong Kong-based holding company that directly or indirectly owns

most of the other Firestar Entities, including the U.S. Entities). (*Id.* ¶ 297). Of that $115 million,

FHL would use $65 million to redeem non-voting FHL shares owned by Purvi (directly and

through Fine Classic), $23 million to repay various loans from Purvi and Fine Classic, and $20

million to infuse capital into Synergies (the U.S. holding company for FDI and Jaffe). (*Id.* ¶ 298).

Of that $20 million, Synergies would use $14,575,000 pay off a "loan" based on funds

Nirav had routed through Synergies in 2010 and 2011 from his personal bank account to pay off

earlier "loans" from FIPL, which were themselves based on circular transactions in which FIPL

wired funds to Synergies and Synergies immediately returned them to FIPL or to other Firestar

Entities or Shadow Entities. (*Id.* ¶¶ 281, 299). In December 2016, in connection with the

restructuring, Nirav gifted his interest in the loan to Purvi under an assignment agreement

5

backdated as of April 2012. (*Id.* ¶ 283). Purvi would then create and fund a trust for the benefit of Ami, which would purchase CPRE from FGI (the other U.S. holding company). (*Id.* ¶¶ 288-289). Of the $5,425,000 in remaining new capital, Synergies would use $1,047,000 to repay a purported loan from Shadow Entity Brilliant, $3,394,000 to acquire FGI from FIPL, and $650,000 to pay off Jaffe's outstanding trade debt to FIPL. (*Id.* ¶¶ 319-20).

While planning began in 2014, the restructuring was put on hold until sufficient funds were available to implement it. (*Id.* ¶¶ 276-291). The planning ramped back up in late 2016, likely prompted by Gokulnath Shetty's looming retirement in May 2017. (*Id.* ¶ 292). In February 2017, to finance the restructuring, Purvi "invested" $45 million of the Shadow Entity "dividends" into FIPL in the name of a purportedly independent investment company she secretly owned (*Id.* ¶¶ 305-07). To secure the additional funding needed to complete the restructuring, the co-conspirators obtained 150 additional LOUs between February and May 2017 (when Shetty retired) totaling over $1 billion, which became due in late January 2018 (*Id.* ¶¶ 184, 300).

Meanwhile, Purvi bought herself a $2.7 million apartment in April 2017 under an agreement Neeshal signed for her under a power of attorney she had granted him (*Id.* ¶ 311). Around that same time, Purvi also "loaned" $34 million to Ami (at least $18 million of which Purvi had received from Fine Classic) and $1.5 million to Bhansali so that they could upgrade their own family residences. (*Id.* ¶¶ 308-13). In July 2017, after Nirav and Ami's first choice fell through, Purvi entered into a contract to purchase an apartment at the Ritz Carlton (the "**Ritz Carlton Apartment**") for $25 million. (*Id.* ¶¶ 312-15). Ami wired $2.5 million of the funds she had received from Purvi to cover the down payment. (*Id.* ¶ 316). Purvi then formed CPS50, a Delaware LLC, and the Ithaca Trust, an irrevocable trust under Delaware law. (*Id.* ¶¶ 318, 323).

The Ithaca Trust Agreement named Ami as the primary beneficiary, Commonwealth Trust Company as trustee (the "**Ithaca Trustee**"), and Deepak Sheth (Nirav's uncle) as protector

(the "**Ithaca Protector**"). (*Id.* ¶ 323). The Ithaca Protector has the power to, among other things, remove and appoint the trustee, remove and appoint the investment advisor (the "**Ithaca Investment Advisor**") (whose written direction is required before the trustee can invest or manage any of the trust assets), add or exclude beneficiaries, and even terminate the trust altogether. (*Id.* ¶¶ 324-25). Since the Ithaca Trust Agreement gave Nirav Modi the power to unilaterally remove the Ithaca Trust Protector, he effectively enjoys complete control over the Ithaca Trust and its assets. (*Id.* ¶¶ 328-29). Purvi then assigned her interest in the purchase contract for the Ritz Carlton Apartment to CPS50, assigned her 100% interest in CPS50 to the Ithaca Trust, and contributed $23 million to the Ithaca Trust to fund the closing of the Ritz Carlton apartment. (*Id.* ¶¶ 315 -18, 322-340). In late December 2017, after all of the other restructuring transactions had already occurred as planned (resulting in Purvi receiving nearly $90 million of the $115 million funneled through FHL and Synergies), Purvi contributed an additional $6 million to the Ithaca Trust to finance its acquisition of CPRE from FGI. (*Id.* ¶¶ 284-96, 348-58).

During the first week of January 2018, Nirav, Ami, Neeshal, and Mehul Choksi fled India before the more than $1 billion in outstanding LOUs came due at the end of the month. (*Id.* ¶¶ 184-85). On January 5, 2018, Nirav purchased a London apartment for nearly £8 million, where he evaded authorities under a false name until he was arrested in March 2019. (¶ 186). On January 18, 2018, Purvi contributed an additional $1 million to the Ithaca Trust to fund renovations to the Ritz Carlton Apartment. (*Id.* ¶¶ 359-62). On January 20, 2018, a representative of one of the LOU Entities asked PNB to roll-over the 2017 LOU balances into new LOUs, presumably to buy additional time to launch the IPO. (*Id.* ¶ 187) When the Modi representative refused to furnish any margin on the grounds that PNB had never previously required it, PNB immediately began investigating the Modi firms' borrowing history, which resulted in criminal charges being filed against Nirav, Ami, Purvi, Nehal, Neeshal, Bhansali, and numerous others. (*Id.* ¶¶ 188-89).

In early February 2018, Bhansali and Nehal traveled together to Dubai where they looted the Dubai-based Shadow Entities, coerced the directors of the Dubai-based Shadow Entities to relocate to Cairo, Egypt, and threatened them to prevent their cooperation with investigative authorities. (*Id.* ¶ 275). Around this same time, Nehal also bribed a Shadow Entity director to testify falsely, destroyed cell phones, and removed additional assets from the Hong Kong offices; and Nirav threatened to kill or falsely implicate one of the Shadow Entity directors if he cooperated in the investigation. (*Id.*) In the meantime, Bhansali and Gandhi diverted millions of dollars of the Debtors' and U.S. Affiliates' funds and inventory to Shadow Entities and other overseas Modi-Controlled Entities, particularly in Hong Kong. (*Id.* ¶¶ 195-96).

Around this time, to mollify the Debtors' secured lenders, Bhansali promised he would transfer all of the inventory from the NMI retail stores to the Debtors as an offset against NMI's substantial intercompany debts to Jaffe and NMI and then use that inventory to pay off the secured debt. (*Id.* ¶ 197). Consistent with this promise, in late February 2018, each of the *Nirav Modi* retail boutiques throughout the U.S. shipped all of their inventory (totaling approximately $40 million) to New York, where it was held in storage at Malca Amit because its value exceeded the amount of available insurance coverage on items stored in the Debtors' vault . (*Id.* ¶ 198). At that time, Bhansali, Gandhi, and Angelina Ypma (the Hong Kong-based global head of the *Nirav Modi* brand) also closed down the London boutique and diverted its nearly $6 million in inventory and £1 million in cash to Hong Kong. (*Id.* ¶ 199).

On February 26, 2018, Bhansali and Gandhi filed bankruptcy petitions for FDI (along with its subsidiary Fantasy) and Jaffe. Early in the case, Bhansali and Gandhi made numerous fraudulent omissions, misstatements, and misrepresentations under penalty of perjury, including: (a) listing various Shadow Entities as non-affiliated creditors (*id.* ¶¶ 244-45), (b) stating in a declaration that "the Debtors and their dedicated employees have worked tirelessly over the

past week or so to . . . reassure their vendors and customers that they had no involvement in the alleged wrongful conduct" (*id.* ¶ 246); (c) failing to disclose in the Debtors' SOFAs substantial transfers to Shadow Entities during the preference period (*id.* ¶¶ 248-49); and (d) omitting from Jaffe's bankruptcy schedules and SOFA the $11.2 million NMI owed Jaffe (*id.* ¶¶ 250-51).

Bhansali and Gandhi did not file bankruptcy petitions for the other four U.S. Entities (NMI, FDII, FGI, or Synergies), presumably because, unlike the Debtors, those entities had no secured debt or minority shareholders. Instead, Bhansali and Nehal enlisted Nehal's personal friend Anthony Allicock to help them shutter the U.S. Affiliates and send all of their assets to Modi operatives in Hong Kong. (*Id.* ¶ 204). To do this, they appointed Allicock as the sole director of the three primary Hong Kong-based Firestar Entities[4] to "manage their wind-down," even though he had no prior insolvency or finance experience. (*Id.* ¶¶ 204-05). On March 26, 2018, to avoid conflicts of interest related to the Debtors' bankruptcy filing (a full month earlier), Bhansali and Gandhi nominally resigned from their positions with the U.S. Affiliates and NMUK (which operated the London boutique) (*Id.* ¶ 208). Before resigning, Bhansali appointed consultants from KCP Advisory Group as directors and officers of each U.S. Affiliate. (*Id.* ¶ 207).

On April 5, 2018, Angelina Ypma told Bhansali, Gandhi, and the KCP consultants "Nirav has instructed me to work with you to" ship all of the NMI inventory "back to HK ASAP." (*Id.* ¶ 209). That same day, after the KCP consultants refused to send either the $40 million in NMI inventory or $6.8m in separate FDII inventory to Hong Kong, Anthony Allicock (as director of FHL) fired them and appointed himself the sole director and president of each of the U.S. Affiliates. (*Id.* ¶¶ 210-213). When the KCP consultants asked Bhansali and Gandhi (who they

---

[4] FHL (the holding company that owns all of the U.S. and Hong Kong Firestar Entities), NML (the holding company for NMI, NMUK, and other subsidiaries operating *Nirav Modi* boutiques), and FDL (a loose diamond trading company analogous to FDII). (*Id.* ¶ 205).

apparently viewed as their true bosses) whether the termination was valid, Bhansali and Gandhi refused to comment. (*Id.* ¶ 212). The next day, the $6.8 million in FDII inventory was shipped to FDL in Hong Kong. (*Id.* ¶ 214). On April 13, 2018, Nehal and Bhansali directed Anthony Allicock to appoint diamond industry veteran Mark Motes as sole director and president, and turnaround consultant Eddy Friedfeld as chief liquidation officer, of each U.S. Affiliate. Nehal had previously worked with both Motes and Friedfeld. (*Id.* ¶¶ 215-17). On April 25 and April 30, two shipments of NMI inventory totaling over $19.4 million were sent to NML in Hong Kong, both accompanied by packing lists signed by Gandhi. (*Id.* ¶¶ 218-19).

Throughout May 2018, Allicock pressured Friedfeld and Motes to ship the remaining NMI and FDII inventory to Hong Kong, but they refused to do so until all of the U.S. Affiliates' creditors were paid. (*Id.* ¶ 228). In early May 2018, Angelina Ypma met with Bhansali and Ajay Gandhi in New York. Gandhi and Bhansali gave her permission to remove approximately $5.2 million in inventory from storage at Malca Amit. (*Id.* ¶ 224). On May 9, Ypma shipped $2.7 million of this inventory to Shadow Entity Fancy Creations in Hong Kong and, on May 15, shipped the remaining $2.5 million (comprising 122 pieces) to NML in Hong Kong. (*Id.* ¶¶ 224-226). When Friedfeld and Motes discovered the May 15 shipment, they demanded that Allicock return the 122 pieces, but he refused. (*Id.* ¶ 228). To the contrary, a few days later, under invoices signed by Anthony Allicock, NML "sold" the exact same 122 pieces to FDL, which immediately sold those same pieces to Shadow Entity Sino Traders. (*Id.* ¶¶ 227). Strangely, several weeks later, after Allicock fired Friedfeld and Motes, Allicock told attorneys for the Hong Kong Firestar Entities that he did not authorize the shipment of the 122 pieces from New York on May 15 and asked them to attempt to locate that shipment. (*Id.*)

On June 1, at Nehal's direction, Allicock fired Friedfeld and Motes and appointed, as CEO and sole director of each U.S. Affiliate, Rochelle Miller, another personal friend of Nehal who

worked as an event planner and had no jewelry industry, insolvency, management, or financial experience. (*Id.* ¶ 229) Allicock and Ypma instructed Miller to retrieve the remaining NMI and FDII inventory (totaling approximately $8 million) and send it to Hong Kong. (*Id.* ¶ 230). In early September, after confirming Rochelle Miller's appointment, Mala Amit released the remaining inventory to Miller's custody. (*Id.* ¶ 233.) Miller then (presumably at Nehal's direction), sent all of the inventory to be appraised by Independent Gemological Laboratories, a purportedly independent diamond grading laboratory secretly owned by Mehul Choksi through an offshore shell company whose offices were directly next to Diamlink—the Choksi-owned company Nehal Modi formerly managed. (*Id.* ¶ 234). IGL appraised the "17 bags and trunks of merchandise" at only $1.5 million (¶ 235). Miller then sold the inventory in various lots for a total of approximately $1.6 million to purported "highest bidders," who appear to actually be surrogates of the Modi family. (*Id.* ¶¶ 236-38). For example, Miller sold an unspecified quantity of "mixed jewelry" for $420,300 to Hong Kong-based Alchemist Global Trading & Consulting Ltd., which was formed in May 2018 and is owned by Tamer Abou El Ata, another personal friend of Nehal. (*Id.* ¶ 237).

After selling the inventory, Miller paid herself a $50,000 bonus from FDII's bank account and paid Allicock $75,000 from Synergies' bank account, apparently as incentive compensation for successfully diverting the inventory (*Id.* ¶ 239). In total, Rochelle Miller received a total of $807,203 in compensation, bonuses, and expense reimbursements from the U.S. Affiliates over a period of twelve months. (*Id.* ¶ 240). She also paid an additional $535,763 to Mint Holdings, LLC, a Miami-based "luxury concierge service" company with ties to the Modi family, for "expense reimbursements for which she received the benefit. (*Id.*). She also paid a company owned by her husband nearly $50,000 for unknown "sales." (*Id.*) Miller spent the remainder of the U.S. Affiliates' funds on legal and financial advisors, taxes, office space leases, director & officer

insurance premiums, and other miscellaneous expenses. (*Id.* ¶ 241). When she was appointed, the

U.S. Affiliates' bank accounts held nearly $1.3 million. (*Id.* ¶ 231).

## APPLICABLE STANDARDS

### I.      Rule 12(b)(6) Standard.

The Court must deny a motion to dismiss where the complaint contains "enough facts to

state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."*Id.*

For a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must

similarly "accept[] all allegations in the complaint as true, and draw[] all reasonable inferences in

plaintiffs' favor." *Rothstein v. UBS AG*, 708 F.3d 82, 90 (2d Cir. 2013). "Detailed factual allegations"

are not required, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555), and

factual disputes are not resolved on a motion to dismiss. *Financial Guar. Ins. Co. v. Putnam Advisory

Co., LLC*, 783 F.3d 395, 405 (2d Cir. 2015).

### II.      Rule 9(b) Standard.

Rule 9(b) requires plaintiffs averring fraud to "state with particularity the circumstances

constituting fraud[.]" Fed. R. Civ. P. 9(b). "Although Rule 9(b) contains a heightened particularity

standard, it also relaxes the standard for pleading fraudulent intent: 'Malice, intent, knowledge,

and other conditions of a person's mind may be alleged generally.'" *Anhui Konka Green Lighting

Co., Ltd. v. Green Logic LED Electrical Supply, Inc.*, 2019 WL 6498094, at *4 (S.D.N.Y. Dec. 3, 2019).

A complaint alleges facts sufficient to give rise to a strong inference of fraudulent intent by either

(a) alleging facts showing that the defendant had both motive and opportunity to commit fraud,

or (b) alleging facts which constitute strong circumstantial evidence of conscious misbehavior or

recklessness. *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr.

12

S.D.N.Y. 1999) (citing *Acito v. IMCERA Grp, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). Rule 9(b) "does not require factual pleadings that demonstrate the probability of wrongdoing . . . . At the pleading stage, the alleged fraud need only be plausible based on the complaint, it need not be more likely than other possibilities." *In re Welspun Litig.*, 2019 WL 2174089, at *15 (S.D.N.Y. May 20, 2019).

### III.     Rule 12(b)(2) Standard

A plaintiff may defeat a motion challenging personal jurisdiction under Federal Rule of Civil Procedures 12(b)(2) "by pleading in good faith . . . legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990) (citation omitted). Although a court may consider materials outside the pleadings, it must credit plaintiffs' allegations of jurisdictional facts, construe all pleadings and affidavits in the light most favorable to the plaintiff, and resolve all doubts resolved in the plaintiff's favor. *See Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 63 (S.D.N.Y. 2016).

Bankruptcy courts evaluate personal jurisdiction over a foreign defendant in two steps. First, the court assesses whether the defendant has "the requisite minimum contacts with the United States at large." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011). Second, the court determines the reasonableness of exercising personal jurisdiction over the defendant, considering "traditional notions of fair play and substantial justice." *AmTrust Fin. Servs., Inc.*, 260 F. Supp. 3d 316, 328 (S.D.N.Y. 2017). Courts assess "the minimum contacts and the reasonableness inquiry in tandem, such that a lesser showing as to one may be tolerated if the other strongly favors an exercise of jurisdiction, and vice-versa." *Id.* at 329.

13

**ARGUMENT**

I. **The Trustee Adequately Alleged that the Substantive Conspirators Conducted or Participated in the Conduct of an Enterprise's Affairs Through a Pattern of Racketeering Activity.**

The Trustee's RICO conspiracy claims against the Defendants are based on each Defendant's agreement to the substantive RICO violations committed by Nirav Modi, Mihir Bhansali, and Ajay Gandhi (the "**Substantive Conspirators**").[5] To that end, the Trustee alleged that Nirav Modi, Mihir Bhansali, and Ajay Gandhi each committed two or more related and continuous predicate acts of mail and wire fraud,[6] obstruction of justice, and bankruptcy fraud in the course of conducting the affairs of an enterprise. *See* 18 U.S.C. § 1962(c). None of the Defendants seriously challenges the sufficiency of the Trustee's allegations supporting the Substantive Conspirators' substantive RICO violations. CPRE and CPS50 do not even address them; Ami Javeri, Nehal Modi, Purvi Mehta, and Neeshal Modi each submitted substantially identical versions of a single paragraph perfunctorily claiming that the alleged predicate acts are insufficiently particularized or time barred. None of them discusses the legal requirements for each predicate act or explain why the Trustee's allegations are purportedly deficient. The Court should therefore treat these arguments as waived. Even so, the Trustee will explain why his allegations support the asserted predicate acts to ensure that all parties have a complete and accurate understanding of the Trustee's theory of the case.

---

[5] Since the Trustee is separately pursuing substantive RICO claims against the Substantive Conspirators in Adv. No. 19-1102 (SHL) (the "**D&O Lawsuit**"), and because all of the injuries the Trustee seeks to recover on account of resulted from predicate acts committed by the Substantive Conspirators, the Trustee had no reason to include separate counts for substantive RICO claims against the Defendants in this case.

[6] Since the alleged money laundering and National Stolen Property Act violations are based on the same underlying transactions as the alleged mail and wire fraud, the Trustee will focus on mail and wire fraud for the sake of brevity.

### A.    The Trustee Adequately Alleged Mail and Wire Fraud.

The Trustee adequately alleged numerous acts of mail and wire fraud. "Because the mail and wire fraud statutes use the same relevant language, [courts] analyze them the same way." *U.S. v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015). "The essential elements of both offenses are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *Id.* (internal quotations omitted). Though not defined by the statutes, a "scheme to defraud" has been described as "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching . . . and is characterized by a departure from community standards of fair play and candid dealings." *U.S. v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (internal quotations and citations omitted). "[I]t is not necessary for the defendant to participate personally in the wire transmission [or mailing], as long as it is reasonably foreseeable that the [alleged wire or mailing] would occur in the execution of the scheme." *U.S. v. Bahel*, 662 F.3d 610, 641-42 (2d Cir. 2011) (quoting *Schumuck v. United States*, 489 U.S. 705, 710-11 (1989)).

The Trustee adequately alleged these elements. He alleged numerous examples of the conspirators developing and implementing—as part of their overarching goal of amassing illicit wealth without getting caught—"plans to deprive a person of something of value by trick, deceit, chicane or overreaching" including: (a) their plans to obtain loans from PNB under the false pretense that the LOU Entities were trading at arm's length (the "**Bank Fraud Scheme**"); (b) their plans to deceive the Debtors' innocent stakeholders (which are tantamount to the Debtors themselves) by saddling the Debtors with bogus liabilities to other Modi Controlled Entities and then diverting the Debtors' legitimate profits to satisfy those liabilities (the "**Fake Payables Scheme**") (c) their plans for the Firestar Entities' bogus "corporate restructuring" and initial public offering, through which they shielded their ill-gotten wealth from their victims and sought to trick innocent investors into paying off the LOU Entities' fraudulent debts (the "**Restructuring**

15

Scheme"); and (d) their plans to loot the Debtors and U.S. Affiliates in the weeks leading up to

the petition date and then concealing key information and assets from the bankruptcy process so

that their purportedly independent surrogates could continue looting the U.S. Affiliates after the

petition date (the "**Looting Scheme**").[7]

      The Trustee identified hundreds of cash wire transfers and inventory shipments from the

Debtors in furtherance of the Fake Payables Scheme before it was exposed (the "**Fake Payables**

**Transfers**"). (*See* Compl. ¶¶ 95-99, 124-125, 145, 160, 176-77, Appx. A-124; Appx. A-125; Appx. A-

145; Appx. A-153; Appx. A-395; Schedules A–L). The Court can reasonably infer the fraudulent

nature of these transfers from the fact that they were made to Shadow Entities—either directly

or, in some instances, indirectly through another Firestar Entity or other companies controlled by

Nirav Modi and his family members (including the SDC Entities and Sheth Entities). The Court

can reasonably infer that all transactions involving Shadow Entities are fraudulent from the

Trustee's allegation that the Shadow Entities, "[t]hough designed to look like legitimate

independent businesses, . . . were nothing more than shell companies controlled by [Nirav] Modi

and his co-conspirators. *They conducted virtually no legitimate business, but instead existed only to*

*further the Bank Fraud by conducting bogus transactions with the LOU Entities, Firestar Entities, and*

*other Modi-Controlled Entities and laundering the ill-gotten proceeds.*" (*Id.* ¶ 72). That allegation is, in

turn, supported by allegations of numerous concrete facts, including *inter alia* that:

- Mihir Bhansali personally oversaw the creation of the Shadow Entities and LOU Entities (*Id.* ¶ 107) and, along with Neeshal Modi, the selection of their principals directors, officers, and employees, many of whom were current or former employees of Firestar Entities (*Id.* ¶¶ 68, 85, 107). Bhansali also completed employee performance appraisals for individuals involved in the operations of Shadow Entities and LOU Entities. (*Id.* ¶ 108).

---

[7] These defined terms are intended only as shorthand to facilitate concise references to various aspects of the alleged pattern of racketeering activity. They should not be construed as alleging new "schemes" or new "conspiracies" or otherwise modifying the substance of the Trustee's allegations in any respect.

- Mihir Bhansali set up Purvi Mehta and Neeshal Modi's secret ownership of the Dubai-based Shadow Entities through two layers of British Virgin Island shell companies (*Id.* ¶¶ 75-78)

- Shadow Entities transferred more than $90 million to Purvi Mehta and her husband's personal bank accounts under the guise of "payouts" or "shareholder dividends" (*Id.* ¶¶ 303-04, 314).

- Mihir Bhansali maintained a spreadsheet tracking millions of dollars in payables and receivables as between each of the LOU Entities, Firestar Entities, and Shadow Entities (*Id.* ¶ 106(i)). He also created a step-by-step guide to the mechanics and economics of circular transactions between Firestar Entities and Shadow Entities (*Id.* ¶ 106(ii)).

- The Shadow Entities were mostly registered at either small, unoccupied offices or at single, leased desks within shared offices (*id.* ¶ 74) and had almost identical websites with similar backgrounds, fonts, contact pages, and language (*id.* ¶ 75).

- Nirav Modi and Mihir Bhansali directed other co-conspirators, including Neeshal Modi, to create fictitious biographical profiles for the Shadow Entities. (*Id.* ¶¶ 118, 121).

- The LOU Entities, in whose name the fraudulent LOUs were obtained, transacted nearly exclusively with Shadow Entities. (*Id.* ¶ 80).

- Mihir Bhansali and Ajay Gandhi managed audits of the Shadow Entities and "sidestepped auditor inquiries concerning the U.S. Entities' dealings with Shadow Entities by offering farfetched explanations, feigning ignorance, or ignoring the questions altogether." (*Id.* ¶¶ 112-113, 135-45).

- Many of the Shadow Entity transactions were coordinated over personal email and secret closed email servers whose membership was limited to members of the conspiracy, including Bhansali and Gandhi (*Id.* ¶¶ 114, 155-56, 203, 264-65, Appx. A-124(ii), (x); Appx. A-163(i)). Bhansali, Gandhi, and other co-conspirators emphasized the secretive nature of Shadow Entity transactions on numerous occasions. (*Id.* ¶¶ 114, 120, 154, Appx. A-164 (vi)).

- Bhansali and Gandhi maintained two sets of books and records for the U.S. Entities, only one of which reflected Shadow Entity-related transactions. (*Id.* ¶¶ 126-131; Appx. A-131).

- Unlike inventory received by the Debtors for resale to legitimate customers, Shadow Entity-related inventory would be accompanied by instructions from overseas co-conspirators to immediately export the packages to either another Firestar Entity or a Shadow Entity at specified prices and quantities. These

packages were frequently re-shipped without being opened, or if they were opened, they were inventoried in bulk, not individually. (*Id.* ¶¶ 132-34).

- None of the jewelry exported to Shadow Entities was ever returned as defective, substandard, or otherwise non-compliant, as would be expected in the ordinary course of an arm's length vendor-customer relationship. (*Id.* ¶ 83(ii)).

- Bhansali coached the regional heads of the Shadow Entities on how to explain away the variance in profit margins between the Firestar Entities' transactions with Shadow Entities versus other customers. (*Id.* ¶¶ 117, 122).

The Trustee also alleged that each of the Fake Payable Transfers furthered the Fake Payables Scheme (and, indirectly, the Bank Fraud Scheme and Restructuring Scheme) by clearing the bogus payables and replenishing the Shadow Entities' assets, which in turn were used to facilitate the Bank Fraud Scheme and Restructuring Scheme. (*Id.* ¶ 98). The Trustee also alleged several wires of the U.S. Entities' funds that directly supported the Restructuring Scheme, including the $14,575,000 Synergies-Mehta Transfer, the CPRE Equity Transfer, and the CPRE Mortgage Transfers (the "**Restructuring Transfers**"), and numerous wires and shipments of the U.S. Entities' assets as part of the Looting Scheme (the "**Looting Transfers**," together with the Fake Payables Transfers, Restructuring Transfers, and Looting Transfers, the "Fraudulent Transfers"). The Trustee therefore adequately alleged that each Fraudulent Transfer constituted an act of mail or wire fraud by Nirav, Bhansali, Gandhi, and their co-conspirators.

## B.    *The Trustee Adequately Alleged Obstruction of Justice.*

The Trustee also alleged predicate acts of obstruction of justice. 18 U.S.C. § 1512(b) criminalizes "knowingly us[ing] intimidation, threaten[ing], or corruptly persuad[ing] another person, or attempting to do so, or engaging win misleading conduct toward another person, with intent to" among other things:

(1)  influence, delay, or prevent the testimony of any person in an official proceeding; or

18

(2) cause or induce any person to (among other things):

    (a) withhold testimony, or withhold a record, document, or other object from an official proceeding; or

    (b) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding.

*See* 18 U.S.C. § 1512(b). Section 1512(c) criminalizes "corruptly altering, destroying, mutilating, or concealing a record, document, or other object, or attempting to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructing, influencing, or impeding any official proceeding, or attempting to do so." 18 U.S.C. § 1512(c).

In the context of section 1512, the term "official proceeding" includes any proceeding before a bankruptcy judge. *See* 18 U.S.C. § 1515(a)(1). The official proceeding "need not be pending or about to be instituted at the time of the offense[,]" but must be "reasonably foreseeable to the defendant." *See U.S. v. Pugh*, 945 F.3d 9, 22 (2d Cir. 2019); 18 U.S.C. § 1512(f)(1). While the plaintiff must show a "nexus" between the defendant's conduct and the pending or foreseeable official proceeding, such nexus "does not depend on the defendant's knowledge" but instead whether the defendant's acts have "a relationship in time, causation, or logic with the judicial proceedings." *Id.* "In other words, the endeavor must have the natural and probable effect of interfering with the due administration of justice." *Id.* Section 1512 applies to conduct that occurs outside of the United States and also criminalizes conspiring to commit any offense under section 1512. *See* 18 U.S.C. § 1512(h)-(k).

The Complaint plausibly alleges the Substantive Conspirators committed and conspired to commit violations of these provisions. The Trustee alleges that in February and March 2018, Nirav Modi, Mihir Bhansali, and Nehal Modi (as applicable): (a) intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities, including by confiscating their passports (Compl. ¶ 275(vii); (b) destroyed cell phones of Shadow

19

Entity Directors (*id.* ¶ 275(v)); (c) bribed a Shadow Entity director to give false testimony (*id.* ¶ 275(vi)); and (d) directed Shadow Entity personnel to sign false affidavits (*id.* ¶ 275(viii)).

Additionally, the Trustee alleged that Bhansali and Gandhi (a) made false and misleading statements under penalty of perjury in the Debtors' bankruptcy cases (*id.* ¶¶ 152-61); (b) concealed assets in the Debtors' bankruptcy cases, including the $11.2 million loan owed by NMI to Jaffe (*id.*); (c) lied to the Examiner (*id.* ¶¶ 168-70); and (d) researched and implemented means of permanently deleting or encrypting electronic data (*id.* ¶¶ 142-49, 279). Nirav Modi's complicity in these acts can be plausibly inferred from the Trustee's allegations that Modi: (a) communicated with Bhansali about the Debtors' bankruptcy proceedings (*id.* ¶¶ 256-57); (b) directed Angelina Ypma to work with Bhansali and Gandhi to divert assets to Hong Kong in the weeks after the Debtors' bankruptcy filing (*id.* ¶¶ 199-203, 209-210, 221-224); and (c) covertly used Gandhi's personal email account in February 2018 (*id.* ¶ 226).

The Substantive Conspirators were therefore aware of or at least could have foreseen these Chapter 11 Cases at the time they engaged in the conduct alleged. *See Pugh*, 945 F.3d at 22. Moreover, the natural and foreseeable consequence of the alleged misconduct was to impede and obstruct the administration of the Debtors' bankruptcy proceedings and the Court's, U.S. Trustee's, Trustee's, and Examiner's discharge of their duties. *See U.S. v. Sampson*, 898 F.3d 287, 299 (2d Cir. 2018). Thus, the Trustee adequately pleaded obstruction of justice.

### C.    *The Trustee Adequately Alleged Bankruptcy Fraud.*

Finally, the Trustee adequately alleged acts of bankruptcy fraud. 18 U.S.C. § 152 criminalizes, among other things, knowingly and fraudulently (1) concealing any property belonging to the estate of a debtor; (2) making a false oath or account in or in relation to a bankruptcy case; and (3) making a false declaration, certificate, verification, or statement under penalty of perjury in or in relation to a bankruptcy case. *See* 18 U.S.C. § 152. The Trustee satisfied

these elements by: (1) alleging Bhansali knowingly and fraudulently declared under penalty of perjury that certain Shadow Entities listed in the Debtors' lists of largest creditors were not insiders of the Debtors and that the Debtors had no involvement in the alleged wrongful misconduct; and (2) alleging Bhansali and Gandhi knowingly and fraudulently concealed property belonging to the Debtors' estates, including the $11.2 million loan owed by NMI to Jaffe.

Thus, the Trustee alleged that each Substantive Conspirator committed numerous predicate acts of wire/mail fraud, obstruction of justice, and bankruptcy fraud from 2010 to 2018. Those predicate acts' shared perpetrators (i.e. the Substantive Conspirators) and victims (the U.S. Entities and their innocent stakeholders), their mutual interdependence (e.g., the Fake Payables Transfers facilitated the Restructuring Transfers and the obstruction of justice and bankruptcy fraud enabled the post-petition Looting Transfers), and their shared overarching purpose of amassing and shielding the Modi family's illicit wealth show that the predicate acts were sufficiently related so as to constitute a pattern of racketeering activity. Finally, the Substantive Conspirators committed those predicate acts in the course of conducting the affairs of the otherwise-legitimate Firestar Entities or the illicit association-in-fact enterprise comprising the Substantive Conspirators and their co-conspirators (including the Defendants). (Compl. ¶¶ 378-79). The Trustee therefore adequately alleged each Substantive Conspirator violated § 1962(c).

## II. The Trustee Adequately Alleged that the Substantive Conspirators' Violations of 18 U.S.C. § 1962(c) Inflicted Direct, Domestic, and Readily Provable Injuries on the Debtors and U.S. Affiliates.

Having adequately pled the Substantive Conspirators' substantive RICO violations, the Trustee is entitled to damages for each injury the U.S. Entities sustained as a direct and proximate result of the conduct underlying any of the predicate acts forming the Substantive Conspirators' pattern of racketeering activity. *See Hemi Group, LLC v. City of New York*, 559 U.S. 1, 8, 12 (2010). The Trustee is not required to prove injuries from the pattern as a whole: "[s]o long as a plaintiff

has adequately pleaded a 'pattern of racketeering activity,' for the purposes of damages, the plaintiff need only allege that it has suffered an injury from at least one or more of the predicate acts comprising the RICO violation." *4 K&D Corp. v. Concierge Auctions, LLC*, 2 F.Supp.3d 525, 543 (S.D.N.Y. 2014); *accord Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1347 (2d Cir. 1994); *Town of Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1268 (3d Cir. 1987).

Nor is the causation analysis affected in any way by what the Substantive Conspirators knew or intended when they committed the predicate acts. *Baisch v. Gallina*, 346 F.3d 366, 375 n.1 (2d Cir. 2003); *DDR Const. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 654 (S.D.N.Y. 2011). Moreover, regardless of whether the defendant agreed to, participated in, or even knew about the specific act that injured the plaintiff, conspiratorial liability can be established by showing that any predicate act committed in furtherance of the conspiracy caused the injury, as long as the injury is sufficiently direct. *See, e.g., Gov't Employees Ins. Co. v. Gateva*, 2014 WL 1330846, at *10 (E.D.N.Y. Mar. 30, 2014) ("In a RICO conspiracy, defendants are jointly and severally liable for all of the plaintiff['s] damages, even those with which an individual defendant was not personally involved."). In other words, the causation requirement for a RICO conspiracy claim is no more onerous than for a substantive RICO claim. *See, e.g., Fischbein v.* Sayers, 2009 WL 2170349, at *7 (S.D.N.Y. July 16, 2009); *Palatkevich*, 2014 WL 1509236 at *21–22; *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 150-52 (E.D.N.Y. 2005).

The Trustee's RICO claims seek damages for two categories of injuries. First, the Fraudulent Transfers injured the U.S. Entities by "unjustifiably and permanently depleting their assets." (Compl. ¶ 444). In evaluating RICO claims based on looting or fraudulent transfers, courts uniformly attribute the direct injury to the entity whose assets were transferred and characterize the harm to creditors and other indirect stakeholders as merely derivative of that injury. *See, e.g., D'Addario v. D'Addario*, 901 F.3d 80, 96-97 (2d Cir. 2018) (finding injury suffered

22

by beneficiary of looted probate estate unripe); *Manson v. Stacescu*, 11 F.3d 1127, 1130-31 (2d Cir.

1993) ("The alleged looting of the Company only harmed the [creditor plaintiffs] indirectly.");

*Wooten v. Loshbough*, 951 F.2d 768, 771 (7th Cir. 1991) ("The first level of injury is to the corporation,

and the creditor only suffers because he has a claim against it."); *accord Bivens Gardens Office Bldg.,*

*Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 908 (11th Cir. 1998); *Whalen v. Carter*, 954 F.2d

1087, 1092-93 (5th Cir. 1992); *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 702 (2d

Cir. 1989); *Jackson Nat. Life. Ins. Co. v. Litigator*, 949 F.Supp. 200, 205 (S.D.N.Y. 1996); *In re Ahead by*

*a Length, Inc.*, 100 B.R. 157, 172-73 (Bankr. S.D.N.Y. 1989).[8]

Second, the Substantive Conspirators' obstruction of justice and bankruptcy fraud injured

the Debtors' estates by requiring them to pay millions of dollars in unnecessary professional fees.

(Compl. ¶ 444). Payment of professional fees can constitute a valid RICO injury as long as they

are a direct and proximate result of the defendant's RICO violation. *See D'Addario v. D'Addario*,

901 F.3d 80, 96-97 (2d Cir. 2018); *Bankers Trust Co.*, 859 F.2d at 1106; *287 Franklin Ave. v. Meisels*,

2015 WL 5457959, at *9 (E.D.N.Y. July 20, 2015); *First Capital Asset Management Inc. v. Brickellbush,*

*Inc.*, 218 F.Supp.2d 369, 383 (S.D.N.Y. 2002). The Complaint alleges that the Substantive

Conspirators' acts of obstruction of justice and bankruptcy fraud (including Nirav and Bhansali's

conspiracy with Nehal to commit perjury, witness tampering, and destroy of evidence) caused

the Debtors' estates to pay substantial professional fees in connection with the Trustee's and

Examiner's investigation of information Bhansali, Gandhi, and Nehal lied about, concealed,

---

[8] As the Trustee more fully briefed in the D&O Lawsuit (*see* Tr. D&O Br. 24-25), despite this rule, courts permit creditors of a looted entity to recover civil RICO damages from the looters based on the creditors' derivative injuries when the looters remain in control of the looted entity or it is otherwise not reasonable to expect the looted entity to assert its own RICO claim. *See, e.g., GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988); *Related Companies, L.P. v. Ruthling*, 2017 WL 6507759, at *16 (S.D.N.Y. 2017); *Jackson National Life Insurance Company v. Litigator*, 949 F.Supp. 200, 205 (S.D.N.Y. 1996).

destroyed, or otherwise actively endeavored to render unavailable for use in these proceedings. (Compl. ¶ 289).

Thus, the Trustee's RICO claims are based on direct and proximate injuries. Each of these injuries occurred in the United States because all of the Fraudulent Transfers and payments of professional fees were made from the U.S. Entities' New York offices and bank accounts. *See Bascuñán v. Elsaca*, 874 F.3d 806, 819 (2d Cir. 2017) ("We ultimately conclude that an injury to tangible property is generally a domestic injury only if the property was physically located in the United States."). And they are readily provable, as illustrated by the exact dates and dollar amounts set forth in Schedules A through L of the Complaint. (Comp. at Sch. A-L).

Each Defendant also recycles the same standing and RICO causation and arguments Nirav Modi, Bhansali, and Gandhi previously asserted, urging the Court to accept their narrative that PNB was the primary intended target of their wrongdoing as a whole, so no other entity has standing to recover from them. (Purvi Br. 20-29; Ami Br. 13-15; Nehal Br. 15-16); Neeshal Br. 33-35; CPRE/CPS50 Br. 26-28). The Trustee responded to these arguments (and distinguished substantially all of the cases on which they rely) at length in his opposition briefs in the D&O Lawsuit, which the Trustee incorporates by reference here. (*See, e.g.,* Case No. 19-1102 (SHL), Dkt. 51 (the "**Tr. D&O Br.**") at 9-12, 20-28).

The Trustee will therefore not belabor the point. Again, it does not matter who the conspirators intended to harm. *See Baisch v. Gallina*, 346 F.3d 366, 375 n.1 (2d Cir. 2003); *DDR Const. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 654 (S.D.N.Y. 2011). The inquiry is whether the plaintiff's injury can be traced to any specific predicate act, not the entire pattern of racketeering activity. *4 K&D Corp.*, 2 F.Supp.3d at 543; *Terminate Control Corp*, 28 F.3d at 1347; *Town of Kearny*, 829 F.2d at 1268. And the "who is better situated to sue" analysis is relevant only where a single act directly injures one party and derivatively injures others; when an act (or, as

here, separate acts) directly injures multiple parties, all of them have standing to pursue their own RICO claims. *See, e.g., Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*, 271 F.3d 374, 383-84 (2d Cir. 2001). ("If a defendant's illegal acts caused direct injury to more than one category of plaintiffs, the defendant may well be obligated to compensate different plaintiffs for different injuries."). Had the Modi family robbed PNB with a stolen gun, the robbery would not shield them from the wrath of the gun's owner. Their use of the U.S. Entities' stolen assets to defraud PNB is no different.

III.  **The Trustee Adequately Alleged That Each Defendant Knowingly Assented to the General Criminal Objective of the Substantive Conspirators' Violations of 18 U.S.C. § 1962(c).**

Having adequately alleged his right to recover against the Substantive Conspirators, the Trustee adequately alleged facts sufficient to extend conspiracy liability to the Defendants in this case. A "RICO conspiracy claim requires proof: (a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering." *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018). In *Salinas v. United States*, 522 U.S. 52, (1997), the Supreme Court made clear that the plaintiff need not prove that the defendant knew of or agreed to any specific predicate acts, so long as they knew of and adopted "the general criminal objective of a jointly undertaken scheme. *Id.* at 63-64; *see also United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir.2002) (stating that "a conspirator charged with racketeering conspiracy need not commit or even agree to commit the predicate acts ... to be found guilty of the racketeering conspiracy, for it suffices that he adopt[ ] the goal of furthering or facilitating the criminal endeavor" (internal citations and quotations omitted)). Thus, "[s]ection 1962(d) conspiracies are easier to prove than

violations of § 1962(c)." *Palatkevich v. Choupak*, 2014 WL 1509236, at *21–22 (S.D.N.Y. Jan. 24, 2014)

(citing *U.S. v. Zichettello*, 208 F.3d 72, 99 (2d Cir.2000)).

The agreement to join a conspiracy need not be express; it "can be inferred from the circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing." *New York Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 281–83 (S.D.N.Y. 2013); *accord Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*, 346 F. Supp. 3d 432, 463–64 (S.D.N.Y. 2018). In evaluating circumstantial evidence of a RICO conspiracy, the Court "need inquire only whether . . . the situation would logically lead an alleged conspirator to suspect he was part of a larger enterprise." *Zichettello*, 208 F.3d at 99. And while the plaintiff must allege some factual basis from which an agreement can be inferred, conspiracy allegations are not subject to the heightened pleading requirements of Rule 9(b). *See, e.g., State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 150-52 (E.D.N.Y. 2005) ("Since it is the sufficiency of the conspiracy allegation rather than the underlying fraud allegation which is being challenged, the more liberal standard of Fed.R.Civ.P. 8(a) applies."). For example:

> A defendant's knowing and willing participation in a conspiracy may be inferred from, for example, her presence at critical stages of the conspiracy that could not be explained by happenstance, or a lack of surprise when discussing the conspiracy with others. Additional circumstantial evidence might include evidence that the defendant participated in conversations directly related to the substance of the conspiracy, possessed items important to the conspiracy, or *received or expected to receive a share of the profits from the conspiracy*.

*Related Companies, L.P. v. Ruthling*, 2019 WL 10947100, at *7 (July 23, 2019) (quoting *United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002)) (emphasis in original).[9]

---

[9] While *Related Companies* involved a motion for entry of default judgment, rather than a motion to dismiss, the applicable standards are identical in both contexts. *See, e.g., Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014) (noting that "[t]he district court properly applied an identical standard in assessing" a motion for default judgment and motion to dismiss).

A recent opinion from another court in the Second Circuit, *Berman v. Labonte*, 2020 WL 5849633 (D. Conn. Sept. 30, 2020), is instructive on how these principles operate in the context of family members working together to shield assets from creditors. In *Berman*, a chapter 7 trustee for an individual debtor who had operated a Ponzi scheme asserted large fraudulent transfer claims against an investor in the Ponzi scheme, along with the investor's family-owned real estate management company. *Id.* at *1-2. While the adversary case was pending, the investor executed backdated instruments transferring most of his real and personal property (worth $13.1 million) into an irrevocable trust in exchange for a $1 million "sham" promissory note to shield his assets from the bankruptcy trustee. *Id.* at *2-3. The trustees of the trust, including the investor's wife and father, permitted the investor to control the trust property. *Id.* The investor and his family members also diverted the real estate management entity's assets to a new entity managed by the investor's father and owned by trusts settled by the investor's father and mother. *Id.* at *4-5.

When the bankruptcy trustee discovered these transactions, he brought RICO conspiracy claims against the investor's wife, father, and mother (both individually and as trustees of the various trusts) based on predicate acts of mail and wire fraud related to transfers in and out of the trusts during the several years the lawsuits were pending. *Id.* at *5-6. The court held that the trustee's RICO conspiracy claims "pass[ed] muster under the less demanding standard for conspiracy allegations under § 1962(d)" based on the allegations that the investor's wife and parents (a) executed various documents in connection with creating and funding the trusts and corporate entities through which the investor sought to shield his assets; and (b) relinquished control of the trust property to the investor. *Id.* at 20-21, 27. The court found these allegations supported a reasonable inference that the investor's wife and parents each adopted the general criminal objective of shielding the investor from liability to the trustee and other creditors. *Id.*

27

Here, the Trustee similarly alleged that the overarching goal of the RICO conspiracy was to fraudulently obtain loans and to launder the proceeds for the permanent benefit of the Modi family. (Compl. ¶¶ 98, 379). The Complaint alleges facts directly and circumstantially supporting an inference that each Defendant knowingly assented to this general criminal objective.

### A. The Trustee Adequately Alleged that Purvi Mehta Knowingly Assented to the RICO Conspiracy.

Purvi Mehta's involvement in the RICO conspiracy can be inferred from numerous allegations demonstrating that she acted as the primary conduit for laundering proceeds of the Bank Fraud. (¶ 310). *See, e.g., Related Companies*, 2019 WL 10947100 at *7; *Palazzolo*, 346 F. Supp.3d at 464; *Berman*, 2020 WL 5849633, at *21. For example, Purvi Mehta directly owned and controlled Fine Classic (Compl. ¶¶ 314, 453(d)), the Shadow Entity that acted as the "profit center" for the circular Shadow Entity transactions (*id.* ¶ 304), and indirectly owned many of the other Shadow Entities and other shell companies used to perpetrate the Bank Fraud and launder its proceeds (*id.* ¶¶ 75-78, 169). Between November 2013 and January 2017, Purvi personally received nearly $56 million in "shareholder dividends" from Fine Classic and Empire (another Shadow Entity). (*Id.* ¶¶ 303-304). In February 2017, Purvi "invested" $45 million of those funds in FIPL through a purportedly independent investment company she secretly owned. (*Id.* ¶¶ 305-07). That bogus investment, along with proceeds of new LOUs (*id.* ¶ 300), financed a long-planned "restructuring" of the Firestar Entities' organizational and capital structure through which nearly $90 million was funneled through the Firestar Entities right back to Purvi Mehta's personal bank account under the guise of redeeming stock and repaying questionable "loans" Nirav Modi had

28

gifted to Purvi Mehta in December 2016 under an agreement backdated (just like in *Berman*) to April 2012. (*Id.* ¶¶ 281-83, 320-21, 342, 344-45).[10]

While all of that was happening, Purvi Mehta bought herself a $2.7 million apartment in April 2017 (*id.* ¶ 311) and, around that same time, "loaned" $34 million to Ami and $1.5 million to Bhansali so that they could upgrade their own family residences. (*Id.* ¶¶ 308-13). When Nirav and Ami's initial River House transaction fell through, Purvi bought the $25 million Ritz Carlton Apartment and formed CPS50 and the Ithaca Trust to hold it for the nominal benefit of Ami, subject to Nirav's ultimate control. (*Id.* ¶¶ 315 -18, 322-340). A few months later, Purvi contributed an additional $6 million to the Ithaca Trust to finance the divestment of CPRE (which held Nirav and Ami's Essex House Apartment) from FGI—another long-planned aspect of the Firestar Entities' restructuring. (*Id.* ¶¶ 284-96, 348-58). And in January 2018, Purvi contributed an additional $1 million to fund renovations to the Ritz Carlton Apartment. (*Id.* ¶¶ 359-62).

Based on these facts, among others, the Trustee alleged that the restructuring's true purpose was to "sanitiz[e] any trace of the Modi Family's self-dealing" and "provid[e] a pretext for funneling assets to Ami and Purvi" before an initial public offering the conspirators hoped would raise sufficient capital to pay off the last batch of fraudulent LOUs became due in January 2018. (*Id.* ¶¶ 276-77, 290-92, 297, 301-307). Moreover, on February 16, 2018, several weeks <u>after</u> the fraud was exposed, Purvi asked Gandhi how she could reach him on WhatsApp (*id.* ¶ 268), one of the messaging services the co-conspirators used to conceal their communications. (*see, e.g., id.* ¶¶ 201, 203).

---

[10] After Purvi Mehta made the bogus investment in FIPL, she also received an additional $34.3 million from Fine Classic between March and October 2017 (*Id.* ¶ 314).

Purvi argues that "mere ownership of a shell company is not nefarious and is often done for legitimate corporate and tax reasons" and "[l]ikewise, discrete investments and real estate transactions are commonplace." (Purvi Br. 18). But the Trustee is not asking the Court to infer Purvi's complicity in the conspiracy solely from the fact that she owned shell companies, made investments, or purchased real estate. Rather, her involvement is illustrated by, among other things, how those shell companies were used (*e.g.*, to funnel tens of millions of dollars of fraud proceeds into her personal bank accounts), the secretive and contrived nature of her investments (*e.g.*, why invest in FIPL through a fictitious third-party investor?), and the fact that she used funds she received from Shadow Entities and Firestar Entities to acquire the Essex House Apartment and Ritz Carlton Apartment for Nirav and Ami through an asset-protection trust controlled by Nirav just before the last batch of LOUs became due and the fraud was exposed.

Purvi also attempts to portray herself as a "passive owner" of entities "controlled, managed, or overseen by other individuals" who "used Ms. Mehta to advance the conspiracy without her knowledge or direct involvement." (Purvi Br. 34-35). That might be an appropriate issue for an answer of for trial, but her motion to dismiss must take the Trustee's allegations as true. The Trustee alleged Purvi personally participated in each of the transactions highlighted above, most of which required her to either sign a document or move funds from her personal bank accounts. And even if she was merely carrying out her brother's instructions and did not fully understand where the money was coming from, it does not take a criminal mastermind to realize that law-abiding businessmen do not normally divert tens of millions of dollars of corporate funds to their siblings' personal bank accounts just as their business is starting to take off, and then ask their siblings to invest those funds back into their company in the name of a fake offshore investment fund and to buy ultra-luxury real estate for them through asset-protection trusts. *See, e.g., Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F.Supp.2d 64, 90 (E.D.N.Y. 2011)

(denying motion to dismiss RICO conspiracy claim against defendant "who operated solely at the behest of his superiors, [yet] would have known that the purpose behind his task" was to further the fraudulent scheme).

It is much more reasonable to infer that Purvi knew exactly what her brother was doing when he entrusted her with the bulk of his ill-gotten wealth. *See, e.g., Zichettello*, 208 F.3d at 99 ("[W]e need inquire only whether . . . the situation would logically lead an alleged conspirator to suspect he was part of a larger enterprise."); *U.S. v. Huezo*, 546 F.3d 174, 182 ("[C]ommon sense and experience would support an inference that the principals in the conspiracy would not have trusted an outsider (with no knowledge of their criminal purpose) to transport $1 million in laundered funds . . ."). The Trustee's allegations therefore support a plausible inference that Purvi knowingly assented to the general criminal objective of the alleged RICO conspiracy.

### B.     The Trustee Adequately Alleged that Ami Javeri Knowingly Assented to the RICO Conspiracy.

The Trustee also adequately alleged that Ami knowingly assented to the RICO conspiracy. Like Purvi, Ami also personally received a substantial share of the illicit profits. Ami received approximately $34 million in loans from Purvi, of which at least $18 million was sourced directly from Fine Classic, the Shadow Entity Purvi directly owned and controlled. (Compl. ¶ 314) Ami spent $2.5 million of those funds on the down payment on the Ritz Carlton Apartment. (*Id.* ¶ 316). She then wired an additional $25 million back to Purvi to fund the closing of the Ritz Carlton Apartment. (*Id.* ¶¶ 317, 338-340). As the primary beneficiary of the Ithaca Trust (*id.* ¶¶ 323, 447(b)), Ami also benefitted from the $7 million Purvi contributed to the Ithaca Trust in January 2018 to fund the acquisition of CPRE and renovations to the Ritz Carlton Apartment. (*id* ¶¶ 348-62). Ami argues—without citing any case law— that these transfers "stop far short of being a basis for inferring agreement to engage in a scheme to defraud" and that "if a spouse's largesse

were a basis for inferring knowledge of fraud, then every spouse who benefits from the efforts of

a higher-earning spouse would be part of a RICO conspiracy." (Ami Br. 7). Yet courts routinely

infer conspiratorial intent from the fact that a defendant received illicit proceeds. *See, e.g., Related*

*Companies*, 2019 WL 10947100 at *7; *Palazzolo*, 346 F. Supp.3d at 464.

Ami's complicity can also be inferred from her actions leading up to and following the

scheme's exposure. For example, in late May 2018, after Commonwealth resigned as Ithaca

Trustee to distance itself from what it flagged as a "high risk trust" (Compl. ¶ 363) and her brother

Abhay Javeri resigned as Ithaca Protector (*id.* ¶ 365), it fell on Ami to appoint a replacement

Protector (*id.* ¶ 326). At this point, the fraud had been exposed (*id.* ¶ 187), criminal charges were

pending against Nirav, Nehal, Purvi, and Neeshal (among others) (*id.* ¶ 188), and her husband

was hiding in London under a false name. (*Id.* ¶¶ 186, 191). If Ami were truly surprised by the

revelation that her husband and his siblings were running a global fraud scheme, she presumably

would not have risked entrusting control of her family's two penthouse apartments to anyone

with any possible involvement in the fraud. Yet that is exactly what she did when, on May 25,

2018, she appointed Nehal as Ithaca Protector (*id.* ¶ 365),[11] who then (after appointing himself as

Ithaca Investment Advisor and Trident as Ithaca Trustee) directed Trident to appoint Nitin

Dattani as manager of CPS50 (*id.* ¶¶ 366-67). As it so happens, around this time, Nehal and

Dattani were also leading efforts to frustrate investigation of the Bank Fraud and fraudulently

divert assets to Hong Kong while Nirav was in hiding. (*Id.* ¶¶ 200, 204, 211, 215, 217, 221, 229,

234, 237, 275, 368). These allegations therefore support a plausible inference that Ami was

---

[11] Ami claims her brother Abhay Javeri appointed Nehal as Ithaca Protector and calls the allegations that she did so "an apparent drafting error." (Ami Br. 11-12). Not true. This allegation is based on a notarized deed of appointment signed by Ami, not Abhay. And in any event, for the purposes of her motion to dismiss, she must accept the Complaint's allegation as true.

complicit in the scheme. *See U.S. v. Gordon*, 987 F.2d 902, 907 (2d Cir. 1993) (inferring conspiratorial intent from defendant's lack of surprise and failure to dissociate from alleged co-conspirators upon learning of their criminal activities).

Finally, the Trustee also alleged that Ami was a partner of the three LOU Entities in whose name the conspirators obtained $3.5 billion in fraudulent loans (Compl. ¶¶ 3, 67) and that in 2010—the same year the Bank Fraud began (*id.* ¶ 62)—Ami personally opened the bank accounts two of the LOU Entities used to defraud PNB. (*Id.* ¶ 69). It is perfectly reasonable to infer that a partner or other high-ranking corporate official who personally sets up the key infrastructure underlying an illicit corporate conspiracy and who stands to receive a substantial share of the illicit profits is an active member of that conspiracy. *See, e.g., U.S. v. Teitler*, 802 F.2d 606, 614 (2d Cir. 1986) (upholding RICO conspiracy conviction where "the jury had before it circumstantial evidence tending to show that [the defendant] played a role in the fraud . . . includ[ing] . . . *his status as a partner* in the Teitler firm[.]" (emphasis added)). At a minimum, these allegations show that Ami knew the LOU Entities existed and that she was trusted with access to their bank accounts and other corporate records from which she could have deduced their illicit purpose and interfered with the scheme had she not been complicit. *See, e.g., U.S. v. Navarrete*, 113 F.3d 1230 (Table), 1997 WL 265249, at *2 (2d Cir. 1997) ("'It runs counter to human experience to suppose that criminal conspirators would welcome innocent non-participants as witnesses to their crimes.'" quoting *U.S. v. Batista-Polanco*, 927 F.2d 14, 18 (1st Cir. 1991)).

Ami argues that these allegations "do[ ] not translate into knowledge of how [her husband] ran the companies in the following eight years, let alone into knowledge of inflated loan applications he allegedly created after 2010"—echoing her broader argument the Trustee's allegations do not sufficiently tie her to specific predicate acts. (Ami Br. 5-6 ("Absent knowledge of any of the alleged predicate acts, there is no basis for RICO conspiracy liability.")). But, again,

the Trustee is not required to prove that Javeri committed, assented to, or even knew about any specific crime; he only needs to show that she "knew what the other conspirators 'were up to'" or that "the situation would logically lead [her] to suspect she was part of a larger enterprise." *Zichettello*, 208 F.3d at 99. Even giving Ami the benefit of the doubt, she knew (or, based on her status as partner of the LOU Entities, had reason to know) that her husband created new companies to do the exact same thing FIPL was already doing, that these companies were trading virtually exclusively with a handful of obscure Hong Kong and Dubai-based companies, and that they were incurring massive amounts of *unsecured* debt—which she should and would have known should have been secured—to fund those trades. Javeri also should have been skeptical of the fact that Purvi (whose official involvement in the family business was limited to designing jewelry) suddenly had the financial wherewithal to loan her over $34 million, or the fact that she and Nirav (the principal owner of a multi-billion dollar global conglomerate) needed to rely on loans or gifts from Purvi to acquire their personal residences.

Ami also argues that the concrete allegations evidencing her conspiratorial intent constituted "entirely lawful actions." (Ami Br. 3, 6, 8). But "[t]hat a particular action is consistent with lawful . . . behavior does not mean that it . . . may not support an inference of conspiracy." *U.S. v. Chas. Pfizer & Co.*, 281 F.Supp. 837, 850-51 (S.D.N.Y. 1968), *rev'd on other grounds*, 426 F.2d 32 (2d Cir. 1970); *accord In re Currency Conversion Fee Antitrust Litigation*, 265 F.Supp.2d 385, 419 (S.D.N.Y. 2003) ("Defendants essentially argue that the Court should adopt the inferences that they believe should be drawn and provide alternative, lawful explanations for their conduct. While these contentions may supply the grounds for a motion for summary judgment, they are out of place in a motion to dismiss." (internal quotations omitted)). Moreover, the alleged pattern of racketeering activity includes the acts of wire fraud and money laundering Javeri committed when she used fraud proceeds to pay for the Ritz Carlton Apartment and "repay" Purvi. While

the Trustee seeks to recover only on account of predicate acts that directly injured the Debtors and U.S. Affiliates, Ami's predicate acts are still relevant to show her membership in the conspiracy. *See, e.g.*, *U.S. v. Maricle*, 2010 WL 5139420, at *5 (E.D. Ky. Dec. 10, 2010) ("Thus, although honest-services mail fraud is no longer a valid RICO predicate act under the facts of this case, evidence of the acts alleged in the honest-services charges would still be relevant . . . to prove the existence of the conspiracy.").

Ami claims that, in ruling on her motion to dismiss, "the Court is not called upon to choose between competing inferences favor of one party or the other." (Ami Br. 12). But the law in fact requires the Court to view the Trustee's allegations in the light most favorable to him and to draw all reasonable inferences in his favor. *See, e.g.*, *In re Motel 6 Securities Litigation*, 1997 WL 154011, at *4-5 (S.D.N.Y. April 2, 1997). For all of the foregoing reasons, the Trustee's allegations support a reasonable inference that Ami knowingly assented to the RICO conspiracy.

### C.      *The Trustee Adequately Alleged that Nehal Modi Knowingly Assented to the RICO Conspiracy.*

The Trustee also adequately alleged facts plausibly suggesting that Nehal Modi assented to the conspiracy. First, Nehal managed Gitanjali USA, Samuels, and Diamlink, which are the Choksi-owned equivalents of the U.S. Entities through which Mehul Choksi orchestrated a parallel scheme to defraud PNB (Compl. ¶¶ 146-47) Since Nehal—as the U.S. head of those firms—effectively played the role of Mihir Bhansali in Choksi's businesses and fraud scheme, it can be inferred that Nehal also knew what his brother Nirav Modi and cousin Mihir Bhansali were up to (*Id*.) Moreover, Nehal and Bhansali jointly managed and controlled Twin Fields and

BBB Group (*id.* ¶ 172),[12] which the Trustee alleged was "another front for Nirav Modi and his family's massive money laundering efforts" (*id.* ¶ 183).[13] And dispelling any remaining doubt, after the fraud was exposed, Nehal traveled overseas with Bhansali in early 2018 to threaten and bribe witnesses, destroy evidence, and remove assets. Around that time, he enlisted his personal friends, including Anthony Allicock, Rochelle Miller, and Tamer Abou El Ata, to divert the U.S. Affiliates' assets to Hong Kong (*id.* ¶¶ 229-41) and was appointed by Ami as Protector of the Ithaca Trust (*id.* ¶ 365). These allegations support a reasonable inference that Nehal was complicit.

None of his other arguments have merit. For example, he tries to undermine the allegations that he tampered with witnesses and destroyed evidence by arguing that he could not be prosecuted for those acts under U.S. law because they occurred overseas and were "not related to potential legal proceedings in the United States." (Nehal Br. 7). But that point, in addition to being wrong,[14] is irrelevant. Nehal's efforts to cover-up and frustrate investigation of the fraud demonstrate that he was complicit in the scheme, regardless of whether they independently trigger U.S. criminal liability. *See, e.g., Maricle*, 2010 WL 5139420 at *5. Similarly, to neutralize the

---

[12] Nehal's "management and control" over BBB Group is supported by the allegation that Mills Menser, the manager of the *Bailey Banks & Biddle* store in Austin, sent Nehal weekly updates on the business' operations and performance (*id.* ¶ 181) and proposed several options for winding down the business for Nehal's consideration (*id.* ¶ 182).

[13] This allegation is based on, among other things, "Purvi Mehta and Deepak Modi's undisclosed ownership of Twin Fields through BVI shell companies" (in the exact same manner as the Shadow Entities), "the more than $60 million laundered through Twin Fields from Fine Classic, Link High, and Jaffe, and Mihir Bhansali and Nehal Modi's involvement in its management and operations[.]" (*Id.* ¶ 183).

[14] Overseas conduct can trigger U.S. criminal liability for obstruction of *U.S. justice, see* 18 U.S.C. § 1512(h), and the Debtors' bankruptcy cases constitute an "official proceeding" for the purposes of section 1512. *See* 18 U.S.C. § 1515(a)(1). And even if Nehal's primary aim was frustrating foreign investigations, Nehal was still aware of the Debtors' bankruptcy cases, and his acts of witness tampering and destroying evidence had a "natural and probable effect of interfering with the due administration of justice" in the Debtors' bankruptcy cases by, among other things, delaying the discovery of Mihir Bhansali's (and, to a lesser extent, Ajay Gandhi's) leading role in the conspiracy. *See Pugh*, 945 F.3d at 22.

allegations demonstrating his leading role in looting the U.S. Affiliates, he argues "there is not

even an allegation that th[eir] assets actually resulted from the alleged bank fraud." (Nehal Br.

12). But the Trustee does not need to trace the looted assets to the bank fraud to prove even a

substantive RICO violation (the intent to defraud the U.S. Entities and their creditors is

independently sufficient to trigger predicate acts of wire/mail fraud), let alone to prove that

Nehal adopted the overarching goal of shielding his family's ill-gotten wealth from creditors.

Nehal also argues the Trustee failed to allege Nehal "was the manager who carried out"

the money laundering transactions involving BBB Group or Twin Fields. (Nehal Br. 6-7). But,

again, the Trustee does not need to prove Nehal personally laundered funds through these

entities or even that he knew funds were being laundered through them—only that "the situation

would logically lead [him] to suspect" that Twin Fields and BBB Group were being used for illicit

purposes. *See Zichettello*, 208 F.3d at 99. The lengths the Modi family went to conceal their

ownership and control of the longstanding and prestigious *Bailey Banks & Biddle* brand should

have been a sufficient red flag for Nehal Modi even if the Trustee had not alleged anything more.

And if there were any remaining doubt, Nehal Modi's leading role in the cover-up and looting

efforts after the fraud was exposed strongly suggest he was complicit all along— why would an

otherwise innocent person join a criminal conspiracy that has already been exposed?

On that note, Nehal argues that there was "nothing improper" about his appointment as

Ithaca Protector. (Nehal Br. 5). But the Trustee is not asking the Court to infer anything from

Nehal's appointment in a vacuum. Its significance stems from the fact that Nehal and Nitin

Dattani (whom Nehal immediately appointed manager of CPS50) were independently leading

analogous efforts to shield assets from the Firestar Entities' creditors at the same time they were

vested with authority over the Ithaca Trust and CPS50, respectively. (Compl. ¶¶ 200, 204-237,

275, 368). For all of these reasons, the Trustee properly alleged Nehal joined the RICO conspiracy.

> **D.**     ***The Trustee Adequately Alleged that Neeshal Modi Knowingly Assented
> to the RICO Conspiracy.***

The Trustee also adequately alleged facts showing that Neeshal Modi assented to the

conspiracy. Neeshal was, along with Purvi, the indirect owner of the Dubai-based Shadow

Entities (Compl. ¶¶ 5, 75-78); a partner of the LOU Entities (*id.* ¶¶ 5, 67); and the head of Firestar

Diamond BVBA ("**BVBA**"), the Belgium-based Firestar Entity that itself heavily transacted with

Shadow Entities. (*id.* ¶¶ 5, 61). Neeshal personally selected dummy partners for the LOU Entities

(*id.* ¶ 68), and he worked with Bhansali to select and hire the Shadow Entities' dummy directors,

officers, and employees. (*Id.* ¶¶ 5, 68). In July 2017, Bhansali asked Neeshal (along with two of

other central figures in the fraud, Shyam Wadhwa and Aditya Nanivati) to create fictitious

biographical profiles for various Shadow Entities (*id.* ¶ 118), which shows that Bhansali trusted

Neeshal and considered Neeshal to be a member of the conspiracy at recently as mid-2017. He

held a power of attorney for Purvi, which he used as recently as April 2017 when he signed the

contract to purchase her $2.7 million apartment. (*Id.* ¶ 311). The Trustee therefore alleged much

more than mere "guilt by association" based on Neeshal's status as Nirav's younger brother and

employee. (*See* Neeshal Br. 1-2).[15]

Neeshal tries to refute the Trustee's allegations by submitting a Declaration denying any

wrongdoing and offering additional facts he claims proves his innocence, along with two

investigatory reports he purportedly commissioned to clear his name. As a threshold matter, the

---

[15] Neeshal also argues that BVBA is only "mentioned a total of 4 times in 2 paragraphs and notably is not
even a defendant." (Neeshal Br. 1). This argument ignores that the Trustee separately sued BVBA and other
foreign Firestar Entities in *Levin v. Firestar Int'l Ltd.*, Adv. No. 20-1053 (SHL) and that the Trustee alleged a
specific instance in 2014 in which Mihir Bhansali directed Ajay Gandhi to clean up Jaffe's receivables and
payables with various Shadow Entities and facilitate repayment of an LOU by routing an "outgoing
shipment" from Jaffe through "Firestar BVBA as oppose[d] to anywhere [else]." (Compl. at Appx. A-
124(xvii)). The Trustee requests the Court take judicial notice of the complaint in Adv. No. 20-1053. *See
Levin v. Bank of New York Mellon*, 2019 WL 564341, at *2 (S.D.N.Y. Feb. 12, 2019) (a court may take judicial
notice of "its own records").

Court should disregard Neeshal's Declaration and investigatory reports because, for the purposes

of his motion to dismiss, Neeshal must accept the truth of the Trustee's allegations and may not

introduce additional facts to refute them. *See, e.g., Friedl v. City of New York*, 210 F.3d 79, 84 (2d

Cir. 2000) ("[A] district court errs when it considers affidavits and exhibits submitted by

defendants . . . in ruling on a 12(b)(6) motion to dismiss.").

Nor do the extraneous materials Neeshal submitted actually prove his innocence, though

they do highlight a telling distinction between Neeshal's litigation strategy versus that of his

alleged co-conspirators. Whereas every other Defendant in this case (and in the D&O Lawsuit)

would have the Court believe this is all just a big conspiracy theory, Neeshal openly

acknowledges his family members were running a fraud scheme. (*See, e.g.,* Neeshal Br. 7

("Neeshal's Declaration and exhibits make clear . . . he was nothing but a convenient strawman

for Nirav and his co-conspirators to hide behind."). For example, Neeshal volunteers in his

Declaration that when he found out in 2015 that Shyam Wadhwa had made him a trustee of

certain other family trusts, he "immediately and without hesitation [said] he wanted no part in

whatever Nirav and his associates had planned and demanded he remove Neeshal as a trustee

and beneficiary of the trusts and any other entity or company of which he was unaware."

(Neeshal Br. 10). While Neeshal points to this episode as evidence that he never joined the

conspiracy, he is in fact only inviting more scrutiny. If Neeshal knew Nirav was enlisting his

businesses and family members in a fraud scheme, why did he agree to sign for Purvi's $2.7

million apartment in 2017? Why did he continue to work for Nirav at BVBA?

Nor do Neeshal's investigatory reports do much to undermine the Trustee's theory of the

case. Notably, both reports evaluated only BVBA's transactions with Hong Kong-based Shadow

Entities. They do not even mention the Dubai-based Shadow Entities, with which Neeshal was

more closely associated (Compl. ¶¶ 61, 75-68). Nor is it surprising that they did not find evidence

that Neeshal improperly received funds from FDBVBA. (Neeshal Br. 11.) The conspirators' *modus operandi* was to extract wealth from Shadow Entities (especially through Purvi), not directly from the regularly-audited Firestar Entities they were preparing for an IPO. In short, none of Neeshal's arguments compel dismissal of the Trustee's claims against him. The facts alleged support a reasonable inference that he agreed to the conspiracy.

> **E.      The Trustee Adequately Alleged that Central Park Real Estate LLC and Central Park South 50 Properties LLC Knowingly Assented to the RICO Conspiracy.**

Finally, the Trustee adequately alleged that CPRE and CPS50 knowingly assented to the RICO conspiracy. First, the Trustee alleged facts sufficient to treat the Ithaca Trust, CPRE and CPS50 as alter egos or mere instrumentalities of Nirav Modi, which is itself sufficient to trigger conspiratorial liability. *See Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446 (6th Cir. 2012) (holding that conspiratorial intent can be imputed to a conspirator's corporate alter ego); *In re Automotive Parts Antitrust Litig.*, 2013 WL 2456613, at *4 (E.D. Mich. June 6, 2013) (same). Under Delaware law, courts disregard the corporate veil when an entity is exclusively dominated and controlled by its alleged alter ego and exists for no other purpose than as a vehicle for fraud. *See Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1883-84 (1999). The Trustee alleges that Nirav Modi "enjoys complete control" over the Ithaca Trust, CPRE, and CPS50 by virtue of his unlimited power to remove the Ithaca Protector, which in turn controls the Ithaca Trustee and Ithaca Investment Advisor, and thus CPRE and CPS50. (Compl. ¶¶ 329, 450(a), 451(a), 452(a)). The Trustee further alleges that the Ithaca Trust, CPRE, and CPS50 are "nothing more than contrivances used by the Modi Family to shield . . . their ill-gotten wealth from creditors" (*Id.* ¶¶ 6, 451(g)). These allegations are sufficient to trigger imputation of Nirav Modi's wrongdoing to each of the entity Defendants. *See Wallace*, 752 A.2d at 1183-84.

Moreover, under the agency-based imputation principles discussed below, the fraudulent

actions and intent of Bhansali (as CPRE's manager), Gandhi (as CPRE's and CPS50's CFO), Purvi

Mehta (as CPS50's founder and original manager), Abhay Javeri (as CPS50's former manager),

Nehal Modi (as CPS50's former manager) and Nitin Dattani (as CPS50's current manager) can be

imputed to CPRE and CP50 as well. *See, e.g., Related Companies*, 2018 WL 3315728 at *12 (holding

that a conspirator's knowledge and intent "can be imputed to the corporate entity they allegedly

controlled and utilized to further the conspiracy"); *accord Serin v. Northern Leasing Systems, Inc.*,

2009 WL 7823216, at *14 (S.D.N.Y. Dec. 18, 2009); *Air China Ltd. v. Nelson Li*, 2009 WL 857611, at

*6 (S.D.N.Y. March 31, 2009).

This is particularly true with respect to the Trustee's allegations that the Modi family and

their co-conspirators used funds laundered through Purvi Mehta to purchase the Ritz Carlton

Apartment through CPS50 (Compl. ¶¶ 313-16, 321, 336-40) and to acquire CPRE and the Essex

House Apartment from FGI (*id.* ¶¶ 334-35, 348-58). *See, e.g., B.A.S.S. Group, LLC v. Coastal Supply

Co., Inc.*, 2009 WL 1743730, at *7 (Del. Ch. June 19, 2009) (finding a Delaware LLC "equally

culpable" where individual conspirator purchased real property with "embezzled funds on

behalf of" the LLC). These allegations demonstrate that CPRE and CPS50 are not just random

entities the Modi family happen to own separate and apart from any wrongdoing; rather, CPRE

and CPS50 (along with the Ithaca Trust) are the vessels through which the Modi family

effectuated a key aspect of their alleged racketeering conspiracy.

Ignoring basic principles of corporate liability, CPRE and CPS50 argue that they "were, at

best passive bystanders in the alleged conspiracy" and that the Trustee cannot plead the CPRE's

and CPS50's agreement to the RICO conspiracy "simply by virtue of the fact that individuals

associated with the underlying alleged RICO violations were associated with" or "held official

roles in" or "controlled" CPRE and CPS50. (CPRE/CPS50 Br. 10-11). Yet none of the cases they

41

cite actually support their position. For example, in *4 K&D Corp. v. Concierge Auctions, LLC*, 2 F.Supp.3d 525 (S.D.N.Y. 2014), the plaintiffs asked the court to infer the <u>individual</u> defendants' conspiratorial intent solely from "the lone allegation that, 'as Concierge is a small company, the individual defendants work interchangeably with each of them taking part in the control and direction of Concierge.'" *Id.* at 545. The court declined to do so on the grounds that that "such a general allegation about the structure of the business [wa]s not sufficient to establish that each defendant consciously agreed" to the conspiracy. *Id.* CPRE and CPS50 take this quote out of context to mean that a conspiracy claim against a corporate defendant can never be based on the wrongdoing of the individuals who control it. Yet, the court was referring only to the individual defendants; it did not purport to change black letter principles of corporate liability.

CPRE and CPS50 also call the claims against them "similar to those in" *Egerique v. Chowaiki*, 2020 WL 1974228 (S.D.N.Y. April 24, 2020). (CPRE/CPS50 Br. 12). But, in that case, the RICO conspiracy claims were based solely on the fact that the defendants (most of whom were individuals) did business with the substantive RICO violator on two occasions. *Id.* at *18, 21. The court held that those transactions were not enough to infer a conspiratorial agreement. *Id.* Here, by contrast, the Trustee properly alleged grounds for imputing the Substantive Conspirators' knowledge and intent directly to CPRE and CPS50, which is sufficient by itself to support the Trustee's RICO conspiracy claims against CPRE and CPS50.

### IV.    The Defendants Cannot Rely on Agency-Based Imputation Principles Because They Are Not Innocent Third Parties.

While both the Trustee and the Moving Defendants rely on agency-based imputation for various purposes, only the Trustee is entitled to do so in this case. Agency-based imputation is a legal fiction courts developed to prevent parties from hiding behind their agents to escape liability to third parties. *See, e.g., Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir. 1936). The doctrine

achieves this by presuming that an agent faithfully discharges his duty to disclose to his principal all the material facts coming to his knowledge with reference to the subject of his agency. *See id.*; *In re CBI Holding Co., Inc.*, 529 F.3d 432, 448 (2d Cir. 2008). Since a corporate entity lacks any inherent capacity to know or do anything, the knowledge or conduct of an individual must be imputed to the entity—typically that of a director, officer, or employee or other agent—before the entity can be held responsible for the legal consequences of that conduct or knowledge. *See, e.g.*, *Plotkin v. Republic-Franklin Ins. Co.*, 113 N.Y.S.3d 133, 137 (N. Y. App. Div. 2019).

Importantly, however, *imputation operates only to protect innocent third parties*. It is irrelevant "for purposes of determining rights and liabilities as between principal and agent" and therefore "does not furnish a basis on which an agent may defend against a claim by the principal." Restatement (Third) Of Agency § 5.03 (2006). Nor does imputation protect a third party who colludes with an agent or otherwise knows or has reason to know that the agent acts adversely to the principal. *Id.* at § 5.04; *accord* 2A C.J.S. Agency § 483; 3 Am. Jur. 2d Agency § 266. Indeed, as the U.S. Supreme Court explained more than a century ago:

> The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest. But this general rule does not apply when the third party knows there is no foundation for the ordinary presumption,—when he is acquainted with circumstances plainly indicating that the agent will not advise his principal. The rule is intended to protect those who exercise good faith, and not as a shield for unfair dealing.

*Mut. Life Ins. Co. of New York v. Hilton-Green*, 241 U.S. 613, 622-23 (1916). This exception is especially strong when the third party's involvement rises to the level of co-conspirator because "co-conspirators are properly considered agents of each other when acting in furtherance of their common unlawful objective." *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *16 n. 132 (Del. Ch. July 6, 2018); *accord People v. Salko*, 47 N.Y.2d 230, 237 (1979).

For the reasons discussed below, (i) this continues to be the law in New York and Delaware; and (ii) none of the Moving Defendants are innocent third parties, so none of them may rely on imputation to support their *in pari delicto*, *Wagoner* rule, or statute of limitations arguments, even though the Trustee may impute Bhansali and Gandhi's fraudulent intent to the Debtors to support his own claims.

> ### A. Under Both Delaware and New York Law, Imputation Operates Only to Protect Innocent Third Parties.

Courts applying both New York and Delaware law have long adhered to the important threshold principle recognized in *Hilton-Green*. For example, New York appellate courts have emphasized that "[t]he rule which imputes an agent's knowledge to his or her principal is intended to protect those who exercise good faith and, as a result, will not apply in favor of one acquainted with circumstances plainly indicating that the agent would not advise his principal[,]" *Rosalie Estates, Inc. v. Colonia Ins. Co.*, 643 N.Y.S.2d 59, 60 (N.Y. App. Div. 1996) (internal quotations omitted), and that "the imputation of absolute liability, insofar as it exists, *continues to be a doctrine intended to benefit the innocent victim*, rather than a mechanism for releasing the primary tort-feasor from culpability." *Mauro v. McCrindle*, 419 N.Y.S.2d 710, 715 (N.Y. App. Div. 1979). As another New York court put it, "[a] faithless fiduciary may not reap the fruits of his misconduct to the exclusion of his principal regardless of whether the profits reaped exceed the losses caused . . . *[and a third party] stands in no better position than [the agent if] he had knowledge of the breach of duty and wrongfully participated therein*." *Cornale v. Stewart Stamping Corp.*, 129 N.Y.S.2d 808, 814 (N.Y. Sup. Ct. 1954) (emphasis added).

The law is no different in Delaware. For example, in *Lincoln Nat. Life Ins. Co. v. Snyder*, 722 F.Supp.2d 546 (D. Del. 2010), the court emphasized that "[w]here the third party . . . has dealt with [the agent] to his benefit rather than detriment, the principal should not bear the burden of

the agent's fraud or misrepresentation." *Id.* at 556. Similarly, in *In re Am. Int'l Grp., Inc.*, 965 A.2d 763 (Del. Ch. 2009), the Delaware Chancery Court pointed out that, "[t]here are many situations where the behavior of faithless fiduciaries is imputed to the corporation when the corporation faces liability to *innocent third-parties who have dealt with it in good faith*. This, of course, has never prevented the corporation from recovering against those faithless fiduciaries in a derivative suit." *Id.* at 806. Just as in *Hilton-Green*, the court reasoned that "officers and directors [who] have disabling conflicts [have] an interest in *hiding information*" from the company. *Id.* at 831. The Delaware Chancery Court also acknowledged this distinction in *Trenwick America Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006), when it noted that collusive auditors would not be able to rely on imputation, "even though a third party relying reasonably on the company's false financial statements might have a basis to sue the company and charge it with its insiders' knowledge." *Id.* at 212 n. 132.

New York and Delaware courts have consistently recognized this distinction in many other cases over the past century. *See, e.g., KE Property Management Inc. v. 275 Madison Management Corp.*, 1993 WL 285900 at *5 (Del. Ch. July 27, 1993). (imputation protects "third persons who had no connection whatever with such agent in relation to the perpetration of the fraud, and no knowledge that any such fraud had been perpetrated.'"); *Petition of Mulco Products, Inc.*, 123 A.2d 95, 103-04 (Del. Super. Ct. 1956) (imputation protects "any person who believes and has reasonable grounds to believe that the agent has [valid] authority and in good faith deals with him."); *Brown v. Ins. Equities Corp.*, 187 A. 18, 20 (Del. Ch. 1936) (same); *Pennington v. Commonwealth Hotel Const. Corp.*, 156 A. 259, 262 (Del. Ch. 1931) (refusing to permit third parties to recover against principal where they had reason to know of agent's misconduct); *Smith v. John Hancock Mut. Life Ins. Co.*, 23 N.Y.S.2d 331, 332–33 (N.Y. App. Div. 1940) (same); *Kirch v. Sheid*, 126

45

N.Y.S. 624, 625-26 (N.Y. App. Term 1911) (reversing judgment and ordering new trial to

determine whether third party knew or had reason to know of agent's fraud).[16]

The New York Court of Appeals' and the Delaware Chancery Court's decisions in

*Kirschner v. KPMG LLP*, 15 N.Y.3d 446 (2010) and *Stewart v. Wilmington Trust SP Services, Inc.*, 112

A.3d 271 (Del. Ch. 2015) further illustrate the enduring force of this doctrine in the *in pari delicto*

context. Notably, the accounting firms at issue in *Kirschner* were accused only of negligence, not

collusion, *id.* at 463, so the New York Court of Appeals had no reason to expressly raise the

longstanding agency law distinction between innocent third parties versus those who transact

with an agent in bad faith. *See, e.g., Chartered Bank v. Am. Tr. Co.*, 263 N.Y.S.2d 53, 56 (N.Y. Sup.

Ct. 1965), *aff'd*, 272 N.Y.S.2d 102 (1966) ("Bad faith is not mere carelessness or negligence" (citing

*Coopersmith v. Maunz*, 237 N.Y.S. 1, 5 (N.Y. App. Div. 1929)); *Morrison v. Berry*, 2019 WL 7369431,

at *13 (Del. Ch. Dec. 31, 2019) ("Even gross negligence, without more, does not

constitute bad faith.").[17] Even so, the court effectively based its decision on that distinction when

it pointed out that, just as AIG and Refco had innocent stakeholders, so too did PWC and KMPG.

*Id.* at 476. Thus, consistent with longstanding agency law principles, imputation was necessary to

---

[16] Other courts agree as well. *See, e.g., Ash v. Georgia-Pacific Corp.*, 957 F.2d 432, 436 (7th Cir. 1992) (limiting the "sole actor" rule to cases involving innocent third parties); *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 605 Pa. 269, 307, 989 A.2d 313, 336 (2010) ("Imputation rules justly operate to protect third parties on account of their reliance on an agent's actual or apparent authority. . .. Accordingly, such principles do not (and should not) apply in circumstances in which the agent's authority is neither actual nor apparent, as where both the agent and the third party know very well that the agent's conduct goes unsanctioned by one or more of the tiers of corporate governance."); *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP*, 2004 WL 771230, at *10 (S.D. Ind. March 24, 2004) ("Outside of a fraudulent conveyance scenario, the best case for *not* applying the *in pari delicto* defense is where the insider and the third-party tortfeasor were essentially acting as co-conspirators." (emphasis in original)); *Tilden v. Barber*, 268 F. 587, 605 (D.N.J. 1920).

[17] Moreover, nothing in *Kirschner* suggests that it changed the law in any respect; just the opposite, the Court of Appeals emphasized that it was applying "fundamental principle[s] that ha[ve] informed the law of agency and corporations for centuries" and that it was not "depart[ing] from [those] carefully developed legal principles." 15 N.Y.3d at 465, 477.

protect innocent third parties. In *Stewart*, the Delaware Chancery Court applied the same principles. There, the receiver sued auditors and other professional services firms for negligence, breach of contract, and aiding and abetting breach of fiduciary duty, but did not accuse them of being complicit in the fraud outright. 112 A.3d at 278. Echoing *Kirschner*, the court reasoned that imputation was necessary to protect the "innocent residual claimants" of the defendant firms. *Id.* at 317. Thus, under both New York and Delaware law, imputation continues to protect only innocent third parties.

> **B.      No Wrongdoing Can Be Imputed to the Debtors or U.S. Affiliates For Purposes of In Pari Delicto, the Wagoner Rule, or the Timeliness of the Trustee's RICO Claims.**

Accordingly, while Bhansali's and Gandhi's knowledge and conduct can be imputed to the U.S. Entities for the purposes of the Trustee's actual fraudulent transfer claims (whose inherent purpose is to benefit innocent creditors), imputation is not available for the Defendants to use in connection with their *in pari delicto*, *Wagoner* rule, or statute of limitations arguments. *Union Bank v. Mott*, 1863 WL 4108 (N.Y. Gen. Term. 1863), is instructive on this point.

In *Union Bank*, a bank sued one of its customers, Mott, to recover overdrafts from Mott's account. *Id.* at *1. Unbeknownst to either, the overdrafts arose from a series of collusive transactions over a four-year period between Mott's agent and rogue book-keeper at the bank. Mott's agent would deposit funds in Mott's account; the book-keeper would make false book entries overstating the amount deposited; and then Mott's agent would withdraw the inflated balance. *Id.* Neither Mott nor the bank's management knew of or agreed to the fraud. *Id.*

The primary issue was whether the parties were bound by their respective agents' misdeeds. First, the court found that, although Mott had authorized his agent to withdraw funds from Mott's account, the agent lacked authority to borrow—and therefore overdraw—funds from the bank on Mott's behalf. *Id.* at 2. The court therefore declined to impute wrongdoing to Mott

absent evidence Mott actually received any of the funds, reasoning that the bank—more so than Mott—should have known how much was in Mott's account, and was therefore better positioned than Mott to prevent fraudulent overdrafts. *Id.* By contrast, the court found the bank "was misled and deceived by the fraudulent and false entries of its own book-keeper" and that "if these fraudulent entries had not been made, the checks would not have been paid." *Id.* The court thus found that the bank's loss was "occasioned by the fraud of an agent, clerk, and servant of the bank . . . in regard to his legitimate business, in his appropriate department in the bank, and [was] therefore obligatory on the bank, *so far as respects innocent third persons.*" *Id.* at *2-3 (emphasis added). Instead, the court concluded that "the bank must look for redress to its book-keeper . . . *and to those who participated in the frauds* [i.e. Mott's agent]." *Id.* at *3 (emphasis added). In other words, even though the book-keeper's wrongdoing was imputed to the bank to protect Mott (an innocent third party), imputation would not bar the bank's claims against its faithless book-keeper or his co-conspirator, Mott's agent. *See id.*

This case resembles *Union Bank* in many important respects. Just as the rogue book-keeper in *Union Bank* acted within the scope of his employment when he falsified the bank's records, Bhansali and Gandhi acted within their otherwise-legitimate employee functions when they effectuated the fraudulent inventory shipments and wire transfers. (*See* Compl. ¶¶ 102-04.) Bhansali's and Gandhi's fraudulent intent as to those transactions can therefore be imputed to the U.S. Entities when necessary to protect the Debtors' innocent claimants (*e.g.,* in the context of the fraudulent transfer claims).

At the same time, however, the Defendants cannot rely on imputation for any purpose because none of them are innocent. The individual Defendants, as natural persons, are inherently responsible for their personal involvement in the fraud, as detailed above. So too are CPRE and CPS50 to whom Nirav Modi's (among others) wrongdoing can be imputed, as discussed above,

And, unlike the accounting firm defendants in *Kirschner* and *Stewart*, the CPRE and CPS50 lack any "innocent residual claimants" because Nirav Modi constitutes their sole beneficial owner (again, he could unilaterally dissolve them or force them to sell the two apartments at any time). Thus, as none of the Defendants are innocent third parties, none of them can invoke imputation to support their arguments.

Moreover, even if the Defendants were innocent, the adverse interest exception would still preclude imputation because the Trustee alleges precisely the sort of corporate looting the exception exists to address—especially the allegations concerning the systematic diversion of the U.S. Entities' funds and inventory to Modi operatives in Hong Kong after the fraud was exposed. (Compl. ¶¶ 195-242). And even before the fraud was exposed, the fact that the conspirators routed tainted inventory through the U.S. Entities' offices does not preclude the adverse interest exception. *See, e.g., Alsco, Inc. v. Premier Outsourcing Plus, LLC*, 2020 WL 4209192, at * (D. Del. July 22, 2020) (applying the adverse interest exception even though the debtor received proceeds of stolen goods laundered through the plaintiff); *In re Pitt Penn Holding Co.*, 484 B.R. 25, 41-42 (Bankr. D. Del. 2012) (holding that "incidental infusions of illegally obtained funds" into the plaintiff's account "for the purpose of concealing and perpetuating the fraud" did not destroy the adverse interest exception). That is no different from Mott's agent depositing money into Mott's bank account before withdrawing the same funds and more; neither the bank nor Mott received any benefit from those deposits because they never had an opportunity to use those funds for their own legitimate purposes. *See Union Bank*, 1863 WL 4108 at *2. The Trustee similarly alleges that, unlike inventory received by the Debtors for resale to their ordinary retail customers, the Debtors would immediately export inventory received from Shadow Entities to another Shadow Entity or foreign Firestar Entity. (Compl. ¶¶ 134-35).

49

Ami and Nehal—the only Defendants to address the adverse interest exception—argue

that "total abandonment" is lacking because Bhansali and Gandhi "'controlled the finances of the

Debtors' and 'coordinated and directed fraudulent transactions' that were 'integral to the Bank

Fraud', but nowhere alleges that Bhansali and Gandhi were stealing from the Debtors." (Ami Br.

12; Nehal Br. 14.) But, again, the Trustee does allege that Bhansali and Gandhi looted the Debtors

and U.S. Affiliates (Compl. ¶¶ 195-242), and none of the allegations Javeri and Modi reference

suggest the Debtors or U.S. Affiliates benefitted in any way from Bhansali and Gandhi's

wrongdoing; just the opposite, they show that Bhansali and Gandhi abused their managerial

authority to facilitate transactions lacking any "legitimate economic purpose" (Compl. ¶ 82)

solely for the benefit of the Modi family and their co-conspirators.

## V.    Neither In Pari Delicto Nor the Wagoner Rule Bars the Trustee's Claims.

Each Defendant argues that the Trustee's RICO claims are barred by *in pari delicto* and the

*Wagoner* Rule. (Purvi Br. 25-26; Ami Br. 8-12; Nehal Br. 9-11; Neeshal Br. 33-34; CPS50/CPRE Br.

23-25). Courts analyze the availability of *in pari delicto* as a defense to claims arising under RICO

and other federal statutes under the two-prong test derived from *Bateman Eichler, Hill Richards,*

*Inc. v. Berner*, 472 U.S. 299, 306 (1985), in which the Supreme Court considered whether: (1) "as a

direct result of his own actions, the plaintiff bears at least substantially equal responsibility for

the violations he seeks to redress[;]" and (2) "preclusion of the suit would not significantly

interfere with the effective enforcement of the [relevant substantive] laws and the protection of

the . . . public." *Id.* at 310-11. The *Wagoner* rule is similar to *in pari delicto*, only instead of

functioning as an affirmative defense, it constitutes a prudential rule of standing. *See In re*

*Platinum-Beechwood Litigation*, 2019 WL 2569653, at *2-3 (S.D.N.Y. June 21, 2019) ("***Platinum-***

***Beechwood I***").

Since both doctrines require the plaintiff to be culpable, neither operates to bar claims asserted by a corporate plaintiff unless wrongdoing is imputed. Since, as discussed above, the Defendants are not innocent third parties, they cannot rely on imputation, so their *in pari delicto* and *Wagoner* rule arguments must fail. Even if wrongdoing were imputed to the Debtors and U.S. Affiliates, the Trustee's RICO claims would still survive under the separate insider and adverse interest exceptions to the *in pari delicto* doctrine itself.[18] Notably, several courts have extended the insider exception to *in pari delicto* to *alter egos* and family members of insiders. *See Platinum-Beechwood I*, 2019 WL 2569653 at *7 (refusing to dismiss RICO claims because "the [defendants] cannot claim the protections of *Wagoner* and *in pari delicto* insofar as they are found to be alter egos of [an insider]"); *Pitt Penn Holding Co.*, 484 B.R. at 41 (finding that plaintiff adequately alleged insider status of relatives of the company's officers and directors, and entities controlled by the officers, directors, or their relatives). The Trustee's RICO claims also qualify for the adverse interest exception to *in pari delicto* because they are based on actual fraudulent transfers of the U.S. Entities' assets. *See, e.g., In re Platinum-Beechwood Litigation*, 427 F.Supp.3d 395, 445 n.4 (S.D.N.Y. 2019) ("**Platinum-Beechwood II**") (finding *in pari delicto* and *Wagoner* rule inapplicable to RICO claims based on actual fraudulent transfers); *In re Parlamat Securities Litigation*, 412 F.Supp.2d 392, 400-01 (S.D.N.Y. 2006) (same).

Moreover, under the second prong of the *Bateman* test, dismissing the Trustee's claims on *in pari delicto* grounds would not serve the policy of the RICO statute. There is no threat of shifting

---

[18] While the exceptions to *in pari delicto* function similarly to and derive from the same policy rationales as the exceptions to imputation, they are analytically distinct. This distinction matters in cases where imputation is not needed to establish the plaintiff's wrongdoing, *see, e.g., In re Lehr Construction Corp.*, 551 B.R. 732, 742 (S.D.N.Y. 2016) (imputation was unnecessary because plaintiff corporation had already been criminally convicted); *Teneyck, Inc. v. Rosenberg*, 957 N.Y.S.2d 845, 848-49 (N.Y. Sup. Ct. 2013) (same), or where imputation is governed by the law of one state and *in pari delicto* is governed by the law of another (or federal law).

ill-gotten assets from one conspirator to another because this Court has already disallowed all

claims filed by any party complicit in the wrongdoing, so any recoveries will be paid solely to the

Debtors' innocent creditors. *See, e.g., In re Jamuna Real Estate LLC*, 365 B.R. 540, 559 (Bankr. E.D.

Pa. 2007) (finding that applying *in pari delicto* to RICO claim asserted by bankruptcy trustee would

not comport with RICO's purpose because any recovery would be paid to innocent creditors).

Finally, *in pari delicto* and the *Wagoner* rule cannot possibly prevent the Trustee from

recovering on account of injuries resulting from post-petition conduct, including the post-petition

looting and acts of obstruction of justice and bankruptcy fraud alleged in paragraphs 195 to 276

of the Complaint. *See, e.g., In re Signature Apparel Group LLC*, 2015 WL 1009452, at *8 (Bankr.

S.D.N.Y. March 4, 2015); *In re Food Management Group, LLC*, 380 B.R. 677, 693-96 (Bankr. S.D.N.Y.

2008); *In re Hoang*, 449 B.R. 850, 855-56 (Bankr. D. Md. 2011).

### VI.     The U.S. Affiliates Validly Assigned Their RICO Claims to the Trustee.

Ami and Nehal also challenge the assignment of the U.S. Affiliates' RICO claims. (Ami Br.

13; Nehal Br. 14). Despite conceding that "a significant body of case law, including in this judicial

district, holds that RICO claims are assignable[,]" they argue that RICO treble damages are

punitive in nature (citing a case from the Northern District of Illinois) and that causes of action in

the nature of a penalty are generally not assignable (citing a case from the Eastern District of

Pennsylvania). (*Id.*) They then argue that, because the "U.S. Affiliates, as members of the alleged

racketeering conspiracy, are precluded from compensation[,] their only claims for damages are

punitive in nature and not assignable." (*Id.*) This argument lacks merit.

First, the U.S. Affiliates would not be barred from asserting the RICO claims they assigned

to the Trustee because, as discussed above, no wrongdoing can be imputed to them, especially in

relation to the looting of their assets. Second, this is a moot issue because—even if the U.S.

Affiliates were barred from asserting RICO claims based on the injuries they sustained when they

were looted—the Trustee could still recover on account of the identical injuries the Debtors sustained as creditors of their looted affiliates. *See, e.g., GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289, 293 (2d Cir. 1994) (holding that a creditor of looted entity has standing to bring a RICO claim based on such looting where the looted entity itself cannot recover on account of its direct injury); *accord Related Companies, L.P. v. Ruthling*, 2017 WL 6507759, at *16 (S.D.N.Y. 2017); *Jackson National Life Insurance Company v. Litigator*, 949 F.Supp. 200, 205 (S.D.N.Y. 1996).

Second, Ami and Nehal did not cite a single case endorsing their reasoning in the RICO context. By contrast, numerous courts have rejected identical challenges to the assignability of RICO claims. *See, e.g., In re National Mortg. Equity Corp. Mortg. Pool Certificates Securities Litig.*, 636 F. Supp. 1138, 1155-56 (C.D. Cal. 1986); *Nicolls Pointing Coulson, Ltd. v. Transportation Underwriters of Louisiana, Inc.*, 777 F.Supp. 493, 495-96 (E.D. La. 1991). And even if their argument were valid in other jurisdictions, it would still not be valid here because "both the Supreme Court and the Second Circuit have repeatedly described RICO's private right of action as remedial in nature." *Epstein v. Epstein*, 966 F.Supp. 260, 262 (S.D.N.Y. 1997) (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 240-41 (1987)).

## VII.   The Trustee's RICO Claims are Timely.

The Defendants next argue that the Trustee's RICO claims are time-barred to the extent they are based on injuries sustained before February 25, 2016 (*i.e.* four years before the filing of this adversary proceeding). (Purvi Br. 29-30; Ami Br. 16-17; Nehal Br. 18; Neeshal Br. 32-33; CPRE/CPS50 Br. 20-23). They are wrong for several reasons. First, a RICO claim does not accrue until the plaintiff discovers or should have discovered the RICO injury. *See In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998). Because, for all of the reasons discussed above, none of the conspirators' knowledge with respect to the transactions that injured the Debtors can

be imputed, the Debtors did not discover any of the injuries underlying the Trustee's claims until the Trustee was appointed in June 2018.

Second, even if knowledge of the injuries could be imputed to the Debtors, the adverse domination doctrine or similar equitable tolling principles would freeze the limitations period until the Trustee was appointed in June 2018. "Under the doctrine of adverse domination, the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers." *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 58-59 (Bankr. S.D.N.Y. 2007); *accord Armstrong v. McAlpin*, 699 F.2d 79, 87 (2d Cir. 1983); *Moviecolor Limited v. Eastman Kodak Co.*, 288 F.2d 80, 88 (2d Cir. 1961); *Barnet v. Drawbridge Special Opportunities Fund LP*, 2014 WL 4393320, at *13-14 (S.D.N.Y. Sept. 5, 2014); *In re Everfresh Beverages, Inc.*, 238 B.R. 558, 577 (Bankr. S.D.N.Y. 1999); *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 447-48 (S.D.N.Y. 1998); *Rosner v. Peregrine Finance Ltd.*, 1998 WL 249197, at *8 (S.D.N.Y. May 18, 1998); *In re Ahead by a Length, Inc.*, 100 B.R. 157, 163 (Bankr. S.D.N.Y. 1989). Courts have applied the adverse domination doctrine to claims against non-control persons who conspire with or assist the controlling wrongdoers in committing wrongful acts, reasoning that "a corporation . . . cannot reasonably be expected to pursue a claim against those who aided and abetted the controlling wrongdoers, or acted in concert with them, until the controlling wrongdoers are no longer in control." *In re Adelphia Communications Corp.*, 365 B.R. 24, 58-59 (Bankr. S.D.N.Y. 2007); *accord Resolution Trust Corp. v. Fleischer*, 826 F.Supp. 1273, 1278-79 (D. Kan. 1993).

The Complaint alleges that Nirav Modi, Mihir Bhansali, and Ajay Gandhi dominated and controlled the Debtors and were key figures in the fraud scheme (Compl. ¶¶ 100-04). It further alleges and that each Defendant conspired with and assisted Modi, Bhansali, and Gandhi in furtherance of that scheme (*id.* ¶¶ 445-52). On the basis of these allegations, even if claims asserted in the Complaint had accrued, the statute of limitations would have been tolled until Modi and

54

his co-Defendants relinquished control over the Debtors in 2018. *See, e.g., Adelphia*, 365 B.R. at 58-59. Since all of the misconduct and injuries alleged in the Complaint occurred while Nirav Modi and his co-conspirators controlled the Debtors and U.S. Affiliates, even injuries sustained in 2010 and 2011 remain actionable.

The Defendants also ignore section 108(a) of the Bankruptcy Code, under which any claim that was timely as of the petition date (*i.e.* February 26, 2018) remains timely if brought within two years after the petition date. *See* 11 U.S.C. § 108(a). Thus, since the Trustee filed this case within the two-year period under section 108, the applicable cutoff period would be February 26, 2014—not February 25, 2016—for any claims that accrued and were not equitably tolled. CPRE and CPS50 also incorrectly use the filing of the Complaint to calculate the 6-year reach back period under New York law for the Trustee's claims to avoid the CPRE Mortgage Transfers. Since FDI made those transfers, the Trustee brought those claims under section 544 of the Bankruptcy Code, meaning the reach-back period extends six years before the petition date: February 26, 2012.

## VIII.   The Trustee Stated Valid Fraudulent Transfer Claims.

Finally, the Trustee stated valid fraudulent transfer claims. Under section 548(a)(1)(A) of the Bankruptcy Code, "the trustee may avoid any transfer . . . of an interest of the debtor in property . . . made or incurred on or within 2 years before the date of the filing of the petition, if the debtor . . . made such transfer . . . with actual intent to hinder, delay or defraud." 11 U.S.C. § 548(a)(1)(A). The rule under New York state law is the same, although the lookback period is six years under former section 276 of the New York Debtor and Creditor Law ("**DCL**").[19]

---

[19] New York recently adopted the Uniform Voidable Transactions Act, which came into force on April 4, 2020 but is not retroactive. Transactions that occurred before to April 4, 2020 continue to be governed by the former DCL, including the claims at issue in the Complaint.

To state an actual fraudulent transfer claim, the Trustee must first plead with particularity the "factual circumstances" concerning the fraudulent transfers subject to avoidance. *In re Bernard L. Madoff Inv. Sec. LLC*, 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011). These factual circumstances are: "(1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfer, and (3) the consideration paid with respect thereto." *In re 45 John Lofts, LLC*, 599 B.R. 730, 741 (Bankr. S.D.N.Y. 2019); *accord In re Kaiser*, 722 F.2d 1574, 1582-84 (2d Cir. 1983); *Madoff Inv. Sec. LLC*, 445 B.R. at 220-21; *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019) ("Allegations of 'date, place or time' fulfill the requirement to plead the circumstances constituting fraud or mistake with particularity"). By pleading these factual details, the Trustee "identifie[s] the allegedly fraudulent transfers with sufficient particularity such that [a defendant] has been apprised of the nature of its or his alleged participation [in fraudulent conduct] and, consequently, would be able to mount a defense with regard thereto." *In re Saba Enterprises, Inc.*, 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009); *accord In re Tronox Inc.*, 429 B.R. 73, 92 (Bankr. S.D.N.Y. 2010).

Section 548(a)(1)(B) of the Bankruptcy Code provides that a transfer of an interest of the debtor in property may be avoided as a constructive fraudulent transfer if: (i) the debtor did not receive "reasonably equivalent value" in exchange for the transfer, and (ii) the debtor was insolvent; engaged in business for which any property remaining with the debtor was unreasonably small capital; or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured. *In re Lyondell Chem. Co.*, 567 B.R. 55, 108 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018). It is the Trustee's burden to establish these elements by a preponderance of the evidence. *Id.* (citing *In re S.W. Bach & Co.*, 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010)).

Liability for a constructive fraudulent transfer under DCL § 273 is established if the transfer is made without fair consideration and if the transferor is insolvent or will be rendered insolvent by the conveyance. *See In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005); *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 2014 WL 2594340, at *3 (E.D.N.Y. June 10, 2014). "The element of insolvency is presumed when a conveyance is made without fair consideration, and the burden of overcoming such presumption is on the transferee." *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 611 (S.D.N.Y. 2018) (citation omitted).[20]

## A.    The Synergies-Mehta Transfer.

The Trustee properly alleged that the $14,575,000 transfer from Synergies to Purvi Mehta on July 14, 2017 in connection with the "corporate restructuring" of the Firestar Entities is subject to avoidance as a fraudulent transfer under New York law. The Trustee alleged numerous facts demonstrating that the corporate restructuring as a whole was nothing more than a pretext for laundering money to Purvi and cleansing the Firestar Entities in advance for an initial public offering through which the conspirators would raise funds to repay the fraudulent LOUs before they got caught. (Compl. ¶¶ 276-77). The Trustee also alleged that the purported debt the Synergies-Mehta transfer satisfied was itself based on amounts funneled through Synergies to Shadow Entities and other Firestar Entities several years prior without any benefit to Synergies. (*Id.* ¶ 281) Moreover, fraud can also be inferred from the fact that Nirav gifted his interest in the $14,575,000 loan balance to Purvi in December 2016 (just before the corporate restructuring), yet

---

[20] The "fair consideration" standard applied under the DCL differs from the "reasonably equivalent value" standard used in the Bankruptcy Code in that "fair consideration" requires not only an exchange of adequate value, but also that the exchange be made in good faith. *See* DCL § 272. An allegation of lack of good faith does not require the plaintiff to prove fraudulent intent; rather, "[t]he lack of good faith imports a failure to deal honestly, fairly and openly." *Southern Indus., Inc. v. Jeremias*, 66 A.D.2d 178, 183 (N.Y. App. Div. 2d Dept. 1978). A plaintiff seeking to demonstrate lack of good faith must prove that the defendant (1) did not honestly believe in "the propriety of the activities in question," (2) intended "to take unconscionable advantage of others," or (3) knowledge that his actions would (or intent to) "hinder, delay, or defraud others." *Id.*

for some reason felt the need to backdate the assignment agreement to April 2012. (*Id.* ¶ 283).

These facts, along with the overwhelming evidence of the broader fraud alleged in the Complaint,

support a plausible inference that the Synergies-Mehta transfer was made with actual intent to

delay, hinder, or defraud creditors.

Purvi argues the Trustee did not properly allege badges of fraud. (Purvi Br. 37). But where

the plaintiff has alleged motive and opportunity to commit fraud, actual fraudulent intent is

sufficiently pled, and the "court need not make a finding with respect to these badges." *Madoff*

*Inv. Sec.*, 445 B.R. at 223 n.15; *accord 45 John Lofts*, 599 B.R. at 743-44. Indeed, the "badges of fraud

[are] just one substitute for direct evidence" of fraudulent intent. *Millennium Lab*, 2019 WL

1005657, at *3. "While the badges of fraud provide a basic rubric, courts examine the totality of

the circumstances to determine whether fraudulent intent exists." *In re Syntax-Brillian Corp.*, 2016

WL 1165634, at *5 (Bankr. D. Del. Feb. 8, 2016).

On this point, the Second Circuit's decision in *In re Kaiser* is instructive. 722 F.2d 1574 (2d

Cir. 1983). In *Kaiser*, the Second Circuit affirmed a finding that a debtor made actual fraudulent

transfers even though he asserted that the trustee failed to prove the existence of two traditional

badges of fraud. The Second Circuit rejected this argument: because "[f]raudulent acts are as

varied as the fish in the sea," the absence of certain badges of fraud is "insignificant" where the

debtor "establish[ed] a scheme of intent to defraud creditors" and "the intent to defraud is

obvious." *Kaiser*, 722 F.2d at 1582-83. As another court instructed, the "presence or absence of any

single badge of fraud is not conclusive." *Syntax-Brillian*, 2016 WL 1165634, at *5. Instead, the

"proper inquiry is whether the badges of fraud are present, not whether some factors are absent."

*Id.*; *accord In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 447-49 (Bankr. S.D.N.Y. 2012); *Tronox*, 429

B.R. at 94-95; *In re Cassandra Grp.*, 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006) (finding actual

fraudulent transfer where only one badge of fraud was present). Moreover, even analyzing the

circumstances surrounding the Synergies-Mehta Transfer under the badges of fraud listed in the

*Vivaro* case Purvi cites, the Trustee's allegations are more than sufficient, as demonstrated by the

following table:

| Badge of Fraud | Relevant Allegations |
| --- | --- |
| "a close relationship between the parties to the conveyance" | Purvi Mehta is the sister of Synergies' controlling shareholder, Nirav Modi. (*See* Compl. (Compl. ¶¶ 2, 52, 280-82). |
| "suspicious timing of the conveyance" and "the general chronology of the events and transactions under inquiry" | The Synergies-Mehta transfer (along with all of the other transactions underlying the "restructuring" of the Firestar Entities) occurred shortly after Gokulnath Shetty approved the last batch of fraudulent LOUs before he retired and approximately six months before those LOUs came due and the fraud was exposed. (*Id.* ¶¶ 184, 276-78, 283, 292, 297-300). |
| "the use of fictitious parties" | The Synergies-Mehta Transfer was funded by Purvi Mehta's investment in FIPL through fictitious arm's length investors she secretly owned and controlled (*id.* ¶¶ 297, 305-07), and that investment was itself sourced from the fictitious Shadow Entities (*id.* ¶¶ 301-304). |
| "the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suit by creditors" | After exposure of the fraud and the Debtors' Petition Date, the conspirators continued diverting the assets of Synergies and the other U.S. Affiliates until their assets were fully exhausted more than a year later. (*Id.* ¶¶ 196-242). |
| "a questionable transfer not in the usual course of business" | The Synergies-Mehta Transfer was made to pay off a questionable debt that Synergies had purportedly owed to Nirav Modi for the prior seven years as part of a broader corporate restructuring entirely outside of the usual course of Synergies' business whose purpose was to sanitize the Firestar Entities' organizational and capital structure before the planned IPO. (*Id.* ¶¶ 276-77, 281-83). |
| "the secrecy, haste, or unusualness of the transaction" | Nirav Modi and Purvi Mehta backdated the loan assignment agreement by over four years to hide the fact that it was directly connected to the restructuring. (*Id.* ¶¶ 281-83). Additionally, instead of simply waiving her interest in $45 million of the funds Synergies and FHL owed her, Mehta instead secretly invested $45 million into FIPL (i.e. in the name of fake arm's length investors) to provide the capital Synergies and FHL used to pay her. (*Id.* ¶¶ 297-299, 305-07, 320-21). |

*See In re Vivaro Corp.*, 524 B.R. 536, 554 (Bankr. S.D.N.Y. 2015). Purvi calls a lack of allegations concerning consideration and insolvency "fatal" to the Trustee's actual fraudulent transfer claim. (Purvi Br. 36-37). But the Trustee alleged that the Synergies-Mehta Transfer satisfied the questionable loan balance Nirav gifted to Purvi, so it is not clear what else she believes the Trustee needed to allege with respect to consideration. And, in any event, "a claim under the [New York] Debtor and Creditor Law for actual fraud, as opposed to constructive fraud, in making the conveyance alleged does not require proof of unfair consideration or insolvency[.]" *Ray v. Ray*, 108 A.D.3d 449, 451, 970 N.Y.S.2d 9, 11 (N.Y. App. Div. 2013); *accord Priestley v. Panmedix Inc.*, 18 F. Supp. 3d 486, 502 (S.D.N.Y. 2014) (A showing of actual fraud "does not require proof of unfair consideration or insolvency."). Purvi's argument that the Trustee failed to sufficiently allege badges of fraud is therefore misplaced.

Purvi attacks the Trustee's constructive fraudulent transfer claim on substantially the same grounds, arguing that "valid payment of an antecedent debt" constitutes fair consideration and that the Trustee did not sufficiently plead facts demonstrating that Synergies was insolvent. (Purvi Br. 39-40). Neither point has merit. First, the Synergies-Mehta Transfer was not made for "fair consideration" because (i) Purvi lacked good faith and (ii) the $14,575,000 "loan balance" was itself not a legitimate liability. *See* DCL § 272; *Southern Indus., Inc.*, 66 A.D.2d at 183. Purvi's lack of good faith is demonstrated by, among other things, the fact that she indirectly financed the Synergies-Mehta Transfer herself through her secret investment in FIPL (Compl. ¶¶ 297-299, 305-07, 320-21). And the illegitimacy of the loan balance the Synergies-Mehta Transfer paid off is supported by the allegation that the underlying loans were mere pretexts for funneling money to Shadow Entities and other Firestar Entities without any benefit to Synergies. (*Id.* ¶ 281). The Trustee therefore properly alleged a lack of fair consideration.

60

Second, having established a lack of fair consideration, "[t]he element of insolvency is presumed . . . and the burden of overcoming such presumption is on the transferee." *See Kim*, 311 F. Supp. 3d at 611. Since the Trustee's allegations are sufficient to trigger this presumption and shift the burden on the issue of insolvency to Purvi, the Trustee's allegation that Synergies was insolvent at the time or as a result of the Synergies-Mehta Transfer is therefore also supported. *See id.* Even without that presumption, Synergies' insolvency can reasonably be inferred from the fact that, before the Synergies-Mehta Transfer, Synergies purportedly owed $14,575,000 to Purvi and $1,047,000 to Shadow Entity Brilliant (Compl. ¶ 320). At that time, Synergies' sole asset was a 95% equity interest in Jaffe (¶ 19),[21] which was itself insolvent for the same reasons discussed below with respect to FDI. For all of these reasons, the Trustee properly alleged actual and constructive fraudulent transfer claims with respect to the Synergies-Mehta Transfer.

Purvi also argues that the Trustee lacks standing to avoid the Synergies-Mehta Transfer on the grounds that the funds transferred did not belong to Synergies. (Purvi Br. 23-24). As a preliminary matter, the Trustee alleged that the funds were wired into and out of Synergies' bank account (Compl. ¶ 320), and funds deposited into a bank account in the name of a debtor are presumed property of the debtor that could have been used to pay creditors. *See, e.g., In re 1031 Tax Group, LLC*, 439 B.R. 47, 70 (Bankr. S.D.N.Y. 2010); *accord In re Dreier LLP*, 452 B.R. 391, 419 (Bankr. S.D.N.Y. 2011). Purvi claims the funds belong to PNB based on the allegation that the purpose of the Synergies-Mehta Transfer was to "launder and siphon 'illicit proceeds' of the Bank Fraud" (Purvi Br. 23 (quoting Compl. ¶ 472)), but the Trustee was merely referring to the fact that the funds Purvi invested in FIPL to fund the corporate restructuring were sourced from Shadow Entities (*see* Compl. ¶¶ 303-07). The Trustee also alleged that millions of dollars of the Debtors'

---

[21] Synergies did not acquire FGI (and thus FDI and CPRE) until it paid the $3.7 million purchase price to FIPL on the same day as the Synergies-Mehta Transfer. (*Id.* ¶ 320).

cash and inventory were diverted to Shadow Entities (*see* Compl. at Sch. A-L), so it is not appropriate to equate "illicit proceeds" with PNB. And in any event, Purvi lacks standing to assert PNB's ownership over the funds. *See, e.g., 1031 Tax Group,* 439 B.R. at 62 (holding that fraudulent transfer defendant lacked standing to argue that transferred funds belonged to defrauded third party); *In re Schick*, 246 B.R. 41, 47 (Bankr. S.D.N.Y. 2000) (same).

##### *B.     The CPRE Equity Transfer and the CPRE Mortgage Transfers.*

The Trustee also adequately alleged that the CPRE Equity Transfer (through which FGI transferred its 100% equity interest in CPRE to the Ithaca Trust) and the CPRE 2-Year Transfers and CPRE 6-Year Transfers (the "**CPRE Mortgage Transfers**") (through which FDI paid CPRE's mortgage debt and other expenses related to the Essex House Apartment) are subject to avoidance as a fraudulent transfers under the Bankruptcy Code and/or New York law. Again, the CPRE Equity Transfer and CPRE Mortgage Transfers were a key part of the fraudulent "restructuring" of the Firestar Entities (Compl. ¶ 284).

In March 2015, when Gandhi discussed plans for the CPRE Equity Transfer, he specifically questioned "how to move funds back to HK or somewhere" after the sale was complete. (*Id.* ¶ 289). He also indicated that Shyam Wadwha, another key figure in the fraud, "does not want to speed-up change of ownership [of CPRE] as he has issues of how to create capital in FS, HK[.] (*Id.* ¶ 290). When Bhansali was asked whether he could "take it up with" Nirav Modi, he noted that "Mr. Wadwha has already spoken to Nirav." (*Id.*). After Gandhi informed FDI's lenders at HSBC in November 2016 that they intended to divest CPRE to Ami Modi, HSBC repeatedly asked about the source of Purvi's wealth and the ownership structure of the Firestar Entities. (*Id.* ¶¶ 294-95). Gandhi told Nirav "he avoided giving these [sic] information and told them that we may do restructuring of Central Park and may change ownership, etc." (*Id.* ¶ 296).

In December 2017—just weeks before the LOUs became due and the fraud was exposed—Nirav told Gandhi to pay off the HSBC mortgage on the Essex House in full. (*Id.* ¶ 349). Gandhi advised HSBC that there was an "urgent" need to transfer the Essex House mortgage liability to the Ithaca Trust, but when that could not be done quickly enough, they instead had FDI pay off the remaining $3 million balance. (*Id.* ¶ 351). Purvi, the primary money laundering conduit, then contributed $6 million to the Ithaca Trust on January 1, 2018 to fund the CPRE Equity Transfer. (*Id.* ¶ 358). These facts, along with the overwhelming evidence of the broader fraud alleged in the Complaint, support a plausible inference that the CPRE Equity Transfer and CPRE Mortgage Transfers were made with actual intent to delay, hinder, or defraud creditors.

CPRE argues that the Trustee failed to allege the customary badges of fraud with respect to the CPRE Mortgage Transfers (CPRE/CPS50 Br. 14). But, as detailed above, the circumstances surrounding the CPRE Equity Transfer and CPRE Mortgage Transfers include many of the traditional badges of fraud, including *inter alia*: (1) a close relationship between the transferor and beneficiaries of the transactions (all of which were controlled by the Modi family); (2) the Modi family's haste to pay off the Essex House Mortgage and divest CPRE before the LOUs came due and the fraud was exposed; (3) the fact that the Modi family retained control of CPRE and the Essex House Apartment after the mortgage was paid off and CPRE was divested; and (4) the fact that the mortgage payoff and divestment of CPRE were secretly financed with funds funneled through Purvi.

CPRE also argues that, because FGI received $6 million in exchange for the CPRE Equity Transfer, FDI received "fair consideration" and "reasonably equivalent value" for the CPRE Mortgage Transfers, which CPRE calls "the antithesis of fraud." (CPRE/CPS50 Br. 14). But, again, the fact that a transferor received fair consideration and/or reasonably equivalent value is not dispositive in the actual fraud context. *Ray*, 108 A.D.3d at 451; *Priestley*, 18 F. Supp. 3d at 502; *see*

*also In re Dreier LLP*, 452 B.R. 391, 435 n.39 (Bankr. S.D.N.Y. 2011) ("a conveyance made with the intent to hinder, delay or defraud creditors is fraudulent regardless of the consideration exchanged."). Even in the context of the Trustee's constructive fraudulent transfer claims, the $6 million the Ithaca Trust paid to FGI as consideration for the CPRE Equity Transfer did not constitute consideration for the CPRE Mortgage Transfers made by FDI. Nor does anything in the Complaint suggest FDI received any benefit from the $6 million the Ithaca Trust paid to FGI.

Moreover, because Nirav, Bhansali, and Gandhi's fraudulent intent as to the CPRE Mortgage Transfers can be imputed to CPRE, CPRE did not receive those transfers in good faith, which means they were not made for fair consideration. *See* DCL § 272; *Southern Indus., Inc.*, 66 A.D.2d at 183. This, in turn, also means that FDI was presumptively insolvent at the time those transfers occurred, *see Kim*, 311 F. Supp. 3d at 611, so the Trustee's constructive fraudulent transfer claim under New York law with respect to the CPRE Mortgage Transfers cannot be dismissed.

And while this presumption does not apply in the context of the Trustee's constructive fraudulent transfer claims under the Bankruptcy Code, the Trustee alleged facts sufficient to reasonably infer that FDI was (along with the U.S. Entities more generally) insolvent at the time of each CPRE Mortgage Transfer. For example, the Trustee alleged that that, as a result of the "hundreds of millions of dollars in cash transfers and inventory shipments among the U.S. Entities and Shadow Entities" from 2010 to 2018 (Compl. ¶ 99), each of the Debtors incurred a billion-dollar liability to PNB (*id.* ¶ 193), which had issued over 1,500 fraudulent LOUs totaling approximately $3.5 billion during that period (*id.* ¶ 89). The Trustee further alleged that "the Bank Fraud and its exposure and the seizure by Indian authorities of Modi-Controlled Entities in India resulted in the collapse of the Debtors' businesses" (*id.* ¶ 193), which demonstrates that the assets of all of the Firestar Entities combined—let alone FDI by itself—were not sufficient to discharge

their joint and several liability to PNB. Otherwise, Nirav presumably would have liquidated the

Firestar Entities' assets to repay PNB and avoid exposing the fraud.

While the Firestar Entities' liability to PNB might have remained contingent, unliquidated

or disputed until the fraud was exposed, it still must be considered in determining FDI's

insolvency. *See, e.g., In re Wonderwork, Inc.*, 611 B.R. 169, 211 (Bankr. S.D.N.Y. 2020) (declining to

dismiss a constructive fraudulent transfer claim for lack of insolvency where additional evidence

was needed to discount the debtor's contingent liabilities at the time of the transfer). The amount

of that liability, discounted by the likelihood that any applicable contingency will not occur, must

be separately analyzed at the time of each CPRE Mortgage Transfer. *See id.* As such, "the amount

of any discount, and hence, the question of solvency, presents an issue for trial," so the Trustee's

Bankruptcy Code constructive fraudulent transfer claims must survive as well. *Id.*

Finally, while the Trustee seeks to recover the $6,000,000 value of the CPRE Equity

Transfer from Ami as the beneficiary of that transfer (Compl. at Prayer for Relief ¶ (e)), she failed

to address Count 5 or the CPRE Equity Transfer at all in her motion to dismiss, thereby waiving

any argument on Count 5.

## IX.   Purvi Mehta and Neeshal Modi Are Subject to the Personal Jurisdiction of this Court.

Two defendants—Purvi Mehta and Neeshal Modi—move to dismiss under Rule 12(b)(2)

for lack of personal jurisdiction. Their claims lack merit. Purvi and Neeshal each have the

requisite minimum contacts with this forum—the United States—and the Court's exercise of

jurisdiction is consistent with traditional notions of fair play and substantial justice.

### A.   *The Complaint Adequately Alleges the Defendants' Minimum Contacts with the United States.*

"Minimum contacts necessary to support [specific] jurisdiction exist where the defendant

purposefully availed itself of the privilege of doing business in the forum and could foresee being

haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir.

2013).[22] In a bankruptcy adversary proceeding, the relevant forum is the United States. The

statutory basis for the court's jurisdiction is 28 U.S.C. § 1334 and Bankruptcy Rule 7004(f),[23] and

"only a federal 'minimum contacts' test is required." *In re Enron Corp.*, 316 B.R. 434, 444 (Bankr.

S.D.N.Y. 2004); *see also Arcapita*, 549 B.R. at 63 ("[T]he bankruptcy court must determine whether

the defendant has the requisite minimum contacts with the United States at large."); *In re Motors

Liquidation Co.*, 565 B.R. 275, 285 (Bankr. S.D.N.Y. 2017); *Capmark*, 479 B.R. at 339–40.

"In assessing a defendant's minimum contacts, a court evaluates the 'quality and nature'

of the defendant's contacts." *In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481 (PAE),

2020 WL 2036716, at *11 (S.D.N.Y. Apr. 28, 2020) (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d

239, 242 (2d Cir. 2007) and *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Minimum

contacts for a foreign defendant can be established through (i) in-forum conduct of a defendant,

or (ii) the "effects" of a defendant's out-of-forum conduct aimed at the forum. *See id.* at *13. "A

single transaction with the forum will suffice" to establish minimum contacts. *In re Bernard L.

Madoff Inv. Sec. LLC*, 418 B.R. 75, 80 (Bankr. S.D.N.Y. 2009) (citing *McGee v. Int'l Life Ins. Co.*, 355

U.S. 220, 223, (1957)).

---

[22] Minimum contacts can be demonstrated by general jurisdiction (general contact with the forum unrelated to the claims at issue) or specific jurisdiction (through specific contacts with the forum related to the claims). The Trustee does not contend that the Court has general jurisdiction over Mehta or Neeshal and does not address Defendants' arguments on this point. (*See* Mehta Br. 12-13; Neeshal Br. 15).

[23] Bankruptcy Rule 7004(f) provides in full: "If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule or the subdivisions of [Federal Rule of Civil Procedure 4] made applicable by these rules is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code." Fed. R. Bankr. P. 7004(f). "[B]ecause the Bankruptcy Rules have the force of federal law," and were "enacted pursuant to the Bankruptcy Rules Enabling Act, 28 U.S.C. § 2075," they are "tantamount to a statute." *In re Capmark Fin. Grp. Inc.*, 479 B.R. 330, 339–40 (Bankr. D. Del. 2012) (internal citation and quotation marks omitted).

Purvi and Neeshal engaged in sufficient conduct within or directed at the U.S. to establish the requisite minimum contacts for personal jurisdiction. Although both individuals currently reside in Belgium, the Trustee has adequately alleged that Purvi and Neeshal actively coordinated and participated in the alleged U.S. conduct from which the Trustee's claims arise.

             1.     Purvi's Conduct in the United States Creates Sufficient Minimum Contacts for Personal Jurisdiction.

The Trustee alleges that Purvi repeatedly and purposefully availed herself of the privilege of doing business in the United States. Though physically residing overseas, Purvi engaged in an extensive course of U.S. activity, facilitating numerous transactions within, to, or from the United States designed to funnel tens of millions of dollars in proceeds of the Bank Fraud for the benefit of herself and her co-conspirators. This conduct includes: (i) ownership of Delaware-based Twin Fields (Compl. ¶ 169); (ii) entry into a purchase contract, in her personal capacity, for the Ritz Carlton Apartment (*id.* ¶ 316), (iii) the creation of CPS50 and the Ithaca Trust, both U.S. entities, to launder fraud proceeds (*id.* ¶¶ 318, 322); (iv) funding the Ithaca Trust with proceeds of the Bank Fraud (*see id.* ¶ 338); and (v) receiving "loan repayments" from U.S.-based Synergies (*id.* ¶ 320) and Ami Modi (*id.* ¶ 339).

Purvi does not meaningfully challenge allegations of her U.S.-based activity. Instead, she attempts to downplay their significance. *First*, she argues claims that many of the allegations in the Complaint do not involve Purvi or are foreign in nature. (Purvi Br. 13-14.) The quantity and nature of allegations against *other* defendants and extensive allegations regarding Purvi's *foreign* fraudulent conduct do not alter the jurisdictional analysis or minimize the jurisdictional effect of Purvi's purposeful activity within the United States. *See Madoff*, 418 B.R. at 80 ("a single transaction with the forum will suffice" for jurisdictional purposes). The Trustee alleges that Purvi facilitated the Bank Fraud through a series of U.S. transactions, constituting "purposeful

and profitable activities [that] contributed to the massive losses suffered by victims of the [Bank Fraud] in the United States." *See id.* at 81.

*Second*, Purvi claims her U.S. activity is "too attenuated" to establish jurisdiction, arguing that jurisdiction is not created from "passive ownership" of in-forum assets (Purvi Br. 14) or "random, fortuitous, or attenuated" transactions with individuals in the forum. (*id.* at 14-15.) But the Trustee's allegations against Purvi go beyond these bare characterizations. He alleges that Purvi "personally laundered over $100 million of the ill-gotten proceeds through the Modi family's web of shell companies, family trusts, family members, and otherwise-legitimate businesses." (Compl. ¶ 2). The Complaint, construed "in the light most favorable to the plaintiff," *Arcapita*, 549 B.R. at 63, does not allege that Purvi "random[ly]" entered into a $25 million real estate contract in her personal capacity, "fortuitous[ly]" created, funded, and owned shell entities, or received an "attenuated" transfer of $14,575,000 from Synergies—it alleges she engaged in this U.S. conduct to launder proceeds of the billion-dollar Bank Fraud that was masterminded by her brother. Through a "choreography of transactions in the United States," *Aluminum Warehousing*, 2020 WL 2036716, at *13 n.21, Purvi purposefully availed herself of the privilege of doing business in the United States sufficient to create "a reasonable expectation that [she] might be haled into court" in an action based on her conduct, thereby establishing her minimum contacts with the forum for Counts 1-4 of the Complaint. *Best Van Lines*, 490 F.3d at 243.

2.   *Purvi's Deliberate Efforts to Harm the Debtors and U.S. Affiliates Create Sufficient Minimum Contacts for Personal Jurisdiction.*

Minimum contacts also exist for Purvi under the "effects" theory of jurisdiction, where "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173. The effects test jurisdiction requires the defendant "expressly

aim[] its allegedly tortious conduct at the forum." *Id.* It is an "independent, if conceptually overlapping" method for establishing personal jurisdiction over a foreign defendant with the "purposeful availment" test. *Aluminum Warehousing*, 2020 WL 2036716, at *13.

The effects of Purvi's U.S.-based transactions discussed in section IX.A.1 above also establish minimum contacts with the United States. Purvi's conduct was targeted at the United States and harmed the Debtors and U.S. Affiliates, reinforcing the existence of minimum contacts with the United States. Purvi attempts to evade jurisdiction by claiming that her conduct did not proximately cause harm to the Debtors and U.S. Affiliates, claiming the harm stemmed from PNB's discovery of the fraud, which in turn led to the Debtors' collapse and "PNB's assertion of claims in excess of $1 billion." (Purvi Br. 15-16.) No fair reading of the Complaint leads to that conclusion. PNB's discovery of the fraud did not trigger the Defendants' tortious conduct or any independent injury to the Debtors and U.S. Affiliates—it merely alerted the world to the existence of the fraud after the fact. Thus, the Trustee sufficiently pleaded that the perpetration of the Bank Fraud had effects in the United States sufficient to establish minimum contacts.

3. Minimum Contacts Exist Based on Defendants' Co-Conspirators' Conduct.

The Court may also exercise jurisdiction over Purvi and Neeshal based on the minimum contacts of their co-conspirators. 'To establish jurisdiction on a conspiracy theory, a plaintiff must: (1) make a prima facie factual showing of a conspiracy; (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) show that the defendant's co-conspirator committed a tortious act pursuant to the conspiracy in this jurisdiction." *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992); *accord Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018). Purvi and Neeshal each challenge the Court's conspiracy jurisdiction. Purvi tacitly concedes the existence of a conspiracy under the first

element of test,[24] but argues that she was not a member of the conspiracy (Purvi Br. 17-18) and

that the Trustee failed to allege minimum contacts of her co-conspirators. (*Id.* at 18-19.)

The Complaint alleges "specific facts warranting the inference" that Purvi was a member

of the conspiracy to effectuate the Bank Fraud and "set[s] forth evidentiary facts to connect [Purvi]

with transactions occurring in the United States." *Allstate Life Ins.*, 782 F. Supp. at 222. It alleges

Purvi: (i) directly owned and controlled Fine Classic, the Shadow Entity that acted as the "profit

center" for the circular Shadow Entity transactions (Compl. ¶¶ 304, 314, 453(d)); (ii) indirectly

owned many of the other Shadow Entities and other shell companies used to perpetrate the Bank

Fraud and launder its proceeds (*id.* ¶¶ 75-78, 169); (iii) personally received nearly $56 million in

"shareholder dividends" from Fine Classic and Empire (another Shadow Entity) between 2013

and 2017 (*id.* ¶¶ 303-304); (iv) "invested" $45 million of fraud proceeds in FIPL through a

purportedly independent investment company she secretly owned (*id.* ¶¶ 305-07); (v) received

approximately $90 million of fraud proceeds in her personal bank account under the guise of

redeeming stock and repaying questionable "loans" Nirav Modi had gifted to her (*id.* ¶¶ 281-83,

320-21, 342, 344-45); (vi) purchased a $2.7 million Hong Kong apartment in April 2017 (*id.* ¶ 311);

(vii) "loaned" $34 million to Ami Modi and $1.5 million to Mihir Bhansali to upgrade their family

residences (*id.* ¶¶ 308-13); (viii) coordinated the purchase and renovation of the Ritz Carlton

Apartment by entering into a $25 million sale contract; (*id.* ¶ 316); and (ix) created and funded

CPS50 and the Ithaca Trust (*id.* ¶¶ 315-18, 322-340, 348-62). Purvi engaged in these transactions

"to launder[] over $100 million of … ill-gotten proceeds" from the Bank Fraud, (Compl. ¶ 2), an

allegation supported by the judgment of the Indian Enforcement Directorate. (Compl. ¶ 193(v)

---

[24] The Trustee asserts conspiracy jurisdiction against Mehta only with respect to Counts 1 and 2, and does not allege conspiracy jurisdiction extends to his fraudulent transfer claims asserted against Purvi in Counts 3 and 4 concerning the Synergies-Purvi Transfer. (*See* Purvi Br. 17 (disputing availability of conspiracy jurisdiction for Counts 3 and 4)).

(finding Nirav Modi's family members, including Purvi, "are the mastermind[s]" of the Bank Fraud and "laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purposes of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs." (emphasis added)). *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 CIV. 5263 (AKH), 2018 WL 4830087, at *8 (S.D.N.Y. Oct. 4, 2018) ("governmental investigations and findings, while not direct or conclusive proof that a conspiracy existed, provide circumstantial evidence from which an inference of coordinated conduct may be shown.").

Purvi contends that these allegations about her participation in the conspiracy amount to no more than "mere ownership of a shell compan[ies]," which "is not nefarious and is often done for legitimate corporate and tax reasons," and "discrete investments and real estate transactions," which are "commonplace." (Purvi Br. 17-18). These explanations do not overcome the Trustee's well-pled allegations. Purvi engaged in a years'-long series of highly-structured transfers of massive amounts of money with architects of the Bank Fraud, which went to the heart of the conspiracy and advanced its goal of laundering fraud proceeds for the benefit of Nirav Modi and his co-conspirators. *See FrontPoint*, 2018 WL 4830087, at *8 ("[T]he jurisdictional relevance of an act depends on the goal of the conspiracy.").

Purvi also disputes her co-conspirators' contacts with the United States, highlighting the Complaint's extensive allegations concerning "overseas acts and transactions," "miscellaneous transactions by the Debtors and U.S. Affiliates with the shadow entities, and random real estate transactions that have no substantive connection to the conspiracy." (Purvi Br. 18-19.) This argument misstates the scope and nature of the Bank Fraud, which caused hundreds of millions of damages to, and the destruction of the, the Debtors and U.S. Affiliates in the United States. It also ignores Purvi's New York-based co-conspirators, Mihir Bhansali and Ajay Gandhi, "who

71

managed the fraudulent aspects of Nirav Modi's U.S. operations," (Compl. ¶ 56), and co-defendant Ami Javeri, a resident of New York who engaged in extensive U.S. conduct in furtherance of the fraud (*see id.* ¶¶ 24, 447).

The Complaint also adequately alleges Neeshal's participation in the RICO conspiracy. Neeshal was "one of the key day-to-day managers of the fraudulent import and export transactions." (Compl. ¶ 5). Among other things, the Complaint alleges:

    a.  Neeshal Modi served as a partner of all three LOU Entities and, in 2016, selected and appointed additional "dummy" partners for the LOU Entities.

    b.  Neeshal Modi was the beneficial owner of numerous Shadow Entities and other offshore shell companies used to further the Bank Fraud and launder its proceeds.

    c.  Neeshal Modi, along with Mihir Bhansali, selected and hired various Shadow Entity personnel throughout the Relevant Period.

    d.  Neeshal Modi orchestrated numerous fraudulent transactions among FD BVBA and Shadow Entities to further the Bank Fraud throughout the Relevant Period.

    e.  Neeshal Modi had a power of attorney for Purvi Mehta and signed agreements on her behalf, including for Purvi Mehta's purchase of a Hong Kong apartment in April 2017 for approximately $2.7 million.

(*Id.* ¶ 449). Neeshal argues that he was merely a passive and innocent participant in the Bank Fraud, but this contradicts the Trustee's allegations regarding his knowing and active involvement in the fraud.[25] At this stage of the litigation, all inferences must be construed in the Trustee's favor. Neeshal's involvement, coupled with his co-conspirators' U.S. conduct, is

---

[25] Neeshal addresses conspiracy jurisdiction in the context of New York's long-arm statute, arguing that the Complaint fails to allege that *Neeshal* was "aware his out-of-state conduct would have an effect in New York," or "that he controlled or provided direction to the New York conspirators." (Neeshal Br. 24-26.) New York's long-arm statute does not govern, and New York recognizes narrower grounds for conspiracy jurisdiction than the federal standard discussed here. Accordingly, Neeshal's arguments are inapplicable.

sufficient to support a conspiracy theory of jurisdiction. Accordingly, the Trustee's allegations are sufficient to establish personal jurisdiction over Neeshal.

> **B.    The Complaint Sufficiently Alleges the Defendants' Minimum Contacts Under New York's Long-Arm Jurisdiction Statute.**

Neeshal contends that the "Court must focus on the defendants' contacts with the forum state, not the United States as a whole" in determining jurisdiction. (Neeshal Br. 21-22).[26] Neeshal misstates the jurisdictional inquiry. If a plaintiff brings a RICO claim against a foreign defendant in federal district court relying on RICO's statutory jurisdiction provision, 18 U.S.C. § 1965(b), jurisdiction would be measured by the law of the forum state. *See Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 343 (S.D.N.Y. 2015). But, as noted above, in an adversary proceeding brought in a bankruptcy case, the statutory basis for a bankruptcy court's jurisdiction is 28 U.S.C. § 1334 and Bankruptcy Rule 7004(f), so "only a federal 'minimum contacts' test is required." *Enron Corp.*, 316 B.R. at 444.; *accord In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015) ("Because valid service of process under [the Bankruptcy Rules] is sufficient to establish personal jurisdiction, state long-arm statutes are inapplicable . . . .").

Although jurisdiction here is not measured by New York's long-arm statute, bankruptcy courts have found analysis under the CPLR to be instructive in determining whether personal jurisdiction exists. Because "the New York long arm statute does not reach as far as the Constitution permits, if the New York statute is met, due process is generally considered to be satisfied." *Motors Liquidation*, 565 B.R. at 285 (citing *Picard v. Chais et al., (In re Madoff Inv. Secs., LLC)*, 440 B.R. 274, 280 (Bankr. S.D.N.Y. 2010)); *accord Banco Ambrosiano v. Artoc Bank & Trust Ltd.*, 62 N.Y.2d 65, 71 (1984) (CPLR § 302 "does not go as far as is constitutionally permissible.").

---

[26] Purvi does not argue New York long-arm jurisdiction applies.

In New York, jurisdiction over a non-domiciliary is governed by CPLR section 302(a), which provides in relevant part:

> [A] court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state . . . ; or
>
> 3. commits a tortious act without the state causing injury to person or property within the state, . . . if he
>
>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>>
>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or4. owns, uses or possesses any real property situated within the state.
>
> 4. owns, uses or possesses any real property situated within the state.

N.Y. CPLR 302(a). CPLR § 302(a) provides for jurisdiction over a non-domiciliary "through an agent" if the "the agent acted in New York for the benefit of, and with the knowledge and consent of the nonresident principal." *In re Med-Atlantic Petroleum Corp.*, 233 B.R. 644, 657 (Bankr. S.D.N.Y. 1999). No formal agency relationship is necessary to find personal jurisdiction over a non-domiciliary under an "agency" theory of jurisdiction, however. *See id.* Instead, courts "focus[] on the realities of the relationship in question rather than the formalities of agency law. To be considered an agent for jurisdictional purposes, the alleged agent must have acted in the state for the benefit of, and with the knowledge and consent of the non-resident principal." *Alto Prod. Corp. v. Ratek Indus. Ltd.*, 1996 WL 497027, at *3 (S.D.N.Y. Sept. 3, 1996) (citations omitted).

Section 302 "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, as long as the

defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010); *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460 (1988); *Motors Liquidation*, 565 B.R. at 286.

1.    NY CPLR 302(a)(1)

For specific jurisdiction under CPLR § 302(a)(1), a court may exercise jurisdiction over a foreign defendant who "transacted business in New York" that is "directly related" to the instant dispute. *Elsevier*, 77 F. Supp. 3d at 344. Here, the Trustee has alleged Purvi and Neeshal engaged in numerous fraudulent transactions in New York that were purposeful and substantially related to the Trustee's claim. As set forth in section IX.A.1 above, Purvi advanced the Bank Fraud in her individual capacity through contracting to purchase the Ritz Carlton Apartment in New York, receipt of the Synergies-Purvi transfer, and the creation and funding of CPS50 and the Ithaca Trust. This conduct is sufficient to establish a business transaction in New York.

Neeshal, through BVBA, also controlled transactions in New York that benefited Neeshal and his co-conspirators. Neeshal downplays his role in the Bank Fraud, arguing that transactions with New York represented less than 1% of BVBA's business (Neeshal Br. 23), and suggests that minimum contacts do not exist because he "never received any money or benefits from the alleged conspiracy" beyond his gross salary of €220,000.00 (Neeshal Br. 2, 10.). However, a single transaction in New York through a corporation under the defendant's control is sufficient to establish jurisdiction under CPLR 302(a)(1) if it is substantially related to the claim asserted against the defendant. *Elsevier*, 77 F. Supp. 3d at 345. Moreover, a direct economic benefit to the defendant is not required to establish jurisdiction under 302(a)(1). *See id.* (minimum contacts may be established over an individual defendant for corporate acts even over "employees with no direct economic stake in the underlying conduct."); *see also In Retail Software Servs. v. Lashlee*, 854 F.2d 18, 32 (2d Cir. 1988) (jurisdiction over out-of-forum defendants that exercised extensive

control over a defendant company that transacted business in New York and benefitted from those activities); *In re Med-Atlantic Petroleum*, 233 B.R. at 657 (personal jurisdiction over individual foreign defendant based on (i) in-state activities of corporation of which he was officer, director and shareholder, and (ii) defendant's personal participation in alleged fraud). BVBA received millions of dollars from the Debtors and U.S. Affiliates, thereby benefiting Neeshal through his oversight of BVBA. Accordingly, the Trustee's allegations are sufficient to establish jurisdiction over Purvi and Neeshal under CPLR 302(a)(1).

2.      NY CPLR 302(a)(4)

Personal jurisdiction over Purvi is present under CPLR 302(a)(4) because the Trustee's claims against Purvi arise out of the "fact of ownership, use or possession of New York realty." *Hwang v. Grace Rd. Church (in New York)*, 2016 WL 1060247, at *4 (E.D.N.Y. Mar. 14, 2016). The Trustee alleges that Purvi facilitated the purchase of the Ritz Carlton apartment to secrete proceeds of the Bank Fraud for the benefit of Nirav Modi and his family. Compl. ¶¶ 315-18. As such, this transaction is a "critical element" of the Trustee's claims. The fact that Purvi no longer owns the property does not alter the analysis. SIEGEL, N.Y. PRAC. § 89 (6th ed.) ("It is permissible for the cause of action to accrue after the [realty] has been disposed of. If the claim arises from the ownership, use, or possession of the [realty] and can be traced to just that, it should make no difference that at the moment of its arising the defendant no longer has an interest in the land."); *Karrat v. Merhib*, 307 N.Y.S.2d 915, 916 (N.Y. Sup. Ct. 1970) (finding jurisdiction after sale of real property).[27]

---

[27] The Court has jurisdiction over Purvi under CPLR 302(a)(2), which permits the Court to exercise jurisdiction over an out-of-state defendant if a plaintiff has alleged tortious conduct occurring within New York. *See Elsevier*, 77 F. Supp. 3d at 345–46. As set forth in section IX.A.1 above, Purvi engaged in a number of tortious acts in New York that advanced the Bank Fraud. The Court also has jurisdiction over the Defendants under CPLR 302(a)(3), which largely mirrors the "effects test" addressed above. Defendants' tortious conduct in the U.S. was primarily experienced in New York—e.g., the BVBA Transfers, the Ritz

C.      *The Exercise of Personal Jurisdiction Over the Defendants Would Comport with Fair Play and Substantial Justice.*

Because minimum contacts with the United States and New York exist, the Court must next determine whether "the assertion of personal jurisdiction would comport with fair play and substantial justice." "Relevant factors at this second step of the analysis may include: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; and (3) the plaintiff's interest in obtaining convenient and effective relief." *Licci*, 732 F.3d at 170 (citation and internal quotation marks omitted). It is a "rare case where the reasonableness analysis defeats the exercise of personal jurisdiction," *Alfandary v. Nikko Asset Mgmt. Co., Ltd.*, 337 F. Supp. 3d 343, 365 (S.D.N.Y. 2018).

Both Purvi and Neeshal downplay their connections to the United States, arguing that exercise of jurisdiction would be burdensome and would not further the interest of the United States. These claims are unpersuasive. First, litigating this action would not impose an undue burden on the Defendants. The Second Circuit has acknowledged that technological advances have minimized the burden of litigating oversea even if witnesses and documents are located overseas. *See Licci*, 732 F.3d at 174 ("the conveniences of modern communication and transportation ease any burden the defense of this case in New York might impose"). Moreover, claiming U.S. litigation presents an undue burden overlooks the allegations in the complaint. Purvi owned and controlled U.S. entities and purchased New York real estate—it would be eminently reasonable that these activities would lead to her being sued in a U.S. court. *See Arcapita*, 549 B.R at 68. ("when a defendant purposely selects and uses a correspondent bank account to effectuate a particular transaction, and a plaintiff later files a lawsuit asserting a cause

---

Carlton purchase and related transactions—and for the reasons set forth in section IX.A.2 above, it is sufficient to establish the requisite minimum contacts for personal jurisdiction under section 302(a)(3).

77

of action arising out of that transaction, the defendant can hardly claim that it could not have foreseen being haled into court in the forum in which the correspondent bank account it had selected is located"). Likewise, Neeshal, while downplaying the extent of his business in the U.S., admittedly signed invoices for BVBA transactions with the United States and managed BVBA, which conducted approximately 10% of its business with New York. Moreover, any burden imposed by this litigation should be considered in light of the fact that Purvi and Neeshal are sophisticated businesspeople who regularly transacted business around the globe over the course of the last decade.

Second, the United States has a substantial interest in adjudicating this case, as Defendants have looted and destroyed multiple American companies in violation of the U.S. RICO statute. Purvi and Neeshal argue exercise of personal jurisdiction would be unreasonable by downplaying the interest of the United States in this action. They contend that because much of the fraud was directed from India, Hong Kong, and Dubai, the U.S. interest is minimal. But the Trustee alleges hundreds of millions of dollars in damages, and that an even *greater* harm may have taken place elsewhere does not deprive a U.S. court from exercising jurisdiction to seek redress for substantial civil damages.

Third, because civil RICO claims are creatures of federal law, this Court is well suited to provide convenient and effective relief to the Trustee. Additionally, the Trustee has serious concerns about his ability to obtain "convenient and effective relief" in any other jurisdiction. If the Court dismissed these claims, the Trustee "would ostensibly be left without legal recourse in the United States, and would be forced to attempt to redress [his] loss" in a foreign jurisdiction, which would impose a significant burden. *OneBeacon Ins. Grp. v. Tylo AB*, 731 F. Supp. 2d 250, 261 (D. Conn. 2010). Accordingly, the Court's exercise of personal jurisdiction over the Defendants would be reasonable and wholly warranted.

### D.   At a Minimum, Jurisdictional Discovery Is Warranted.

To the extent the Court determines the Trustee has fallen short of a prima facie showing of personal jurisdiction against any Defendant, it should nonetheless authorize jurisdictional discovery. The Trustee's allegations, at a minimum, "support a colorable claim of jurisdiction," *Ayyash v. Bank Al-Madina*, 2006 WL 587342, at *5 (S.D.N.Y. Mar. 9, 2006), are "non-frivolous," *Manhattan Life Ins. Co. v. A.J. Stratton Syndicate (No. 782)*, 731 F. Supp. 587, 593 (S.D.N.Y. 1990), and constitute a "sufficient start" toward establishing jurisdiction, *id.*

Jurisdictional discovery would aid the Court's "ultimate determination as to jurisdiction." *Id.* While Purvi and Neeshal concede the existence of the Bank Fraud and do not dispute many of the Trustee's allegations, they downplay their knowledge and extent of participation in tortious conduct. (*See, e.g.*, Purvi Br. 16 (suggesting allegations show only "passive, indirect ownership of entities on the fringes of the alleged scheme," "discrete indirect investment," "receipt of a legitimate loan repayment," and "participation in remote real estate transactions"); Neeshal Br. 27 (claiming only "limited association" with BVBA and stating that "allegations as to Neeshal's involvement . . . are based on nothing but the fact that Nirav is his older brother.").) Discovery would, among other things, allow the Trustee to develop his allegations concerning elements of Defendants' participation in the Bank Fraud and identify additional contacts with the U.S. of which he is currently unaware. *See In re N. Sea Brent Crude Oil Futures Litig.*, 2016 WL 8650460, at *6 (S.D.N.Y. Mar. 17, 2016) (authorizing jurisdictional discovery to determine extent of foreign defendants' involvement in, and U.S. effects of, crude-oil price-fixing conspiracy); *Ayyash*, 2006 WL 587342, at *6 (authorizing jurisdictional discovery against foreign defendant in RICO action to "clarify[] the nature of . . . U.S. transactions that have already been identified, identify[] additional U.S. transactions in which [defendant] was involved . . . , and help[] to clarify the relationship between these transactions and the alleged conspiracy"). Discovery is also warranted

because Defendants' involvement in the Bank Fraud is largely within their knowledge. *See Wafios Mach. Corp. v. Nucoil Indus. Co.*, 2004 WL 1627168, at *5 (S.D.N.Y. July 21, 2004) (authorizing jurisdictional discovery "where the facts necessary to establish personal jurisdiction . . . lie exclusively within the defendant's knowledge"). Because the Complaint includes, at a minimum, colorable, non-frivolous jurisdictional allegations, discovery is warranted.

### X.      Purvi Mehta Was Properly Served.

A single Defendant, Purvi Mehta, moves to dismiss under Rule 12(b)(5), contending that she was not properly served in Hong Kong and was resident in Belgium when service was attempted on May 12, 2020. (*See* Purvi Br. 8-11, *see generally* Declaration of Purvi Mehta [Dkt. 40]). On October 1, 2020, the Trustee effected service of the Complaint and Summons upon Purvi via delivery by bailiff at Purvi's registered address in Belgium in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents [Adv. Dkt. 57]. Belgium is a signatory to the Hague Service Convention and this subsequent service was satisfactory under Federal Rule of Civil Procedure 4(f)(1). Regardless of whether the initial service on Purvi was effective, the Trustee has rendered her Rule 12(b)(5) argument moot through subsequent service in Belgium. *See Rennaker Co. Consulting, Inc. v. TLM Grp., LLC*, 2017 WL 2240235, at *2 (S.D.N.Y. Mar. 29, 2017); *Cooke v. Berkshire Farm Ctr. & Servs. for Youth*, 2012 WL 668612, at *4 (E.D.N.Y. Feb. 29, 2012).

### CONCLUSION

For reasons set forth in this Opposition, the Trustee respectfully requests the Court deny each Moving Defendant's Motion to Dismiss in its entirety.

Dated: December 4, 2020
      New York, New York

Respectfully submitted,

**JENNER & BLOCK LLP**

By:  /s/ *Richard B. Levin*
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
aallen@jenner.com

Richard B. Levin
Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600
rlevin@jenner.com
cwedoff@jenner.com

*Counsel for the Chapter 11 Trustee*