JENNER & BLOCK LLP
Marc Hankin
Carl Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600

Angela Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350

*Counsel for the Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | |
| Plaintiff, | |
| v. | Adv. Proc. No. 20-1054 |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

## AFFIRMATION OF ANGELA M. ALLEN IN SUPPORT OF REQUEST FOR A CERTIFICATE OF DEFAULT AGAINST DEFENDANTS TWIN FIELDS INVESTMENTS LTD. AND SINO TRADERS, LTD.

Angela M. Allen affirms, under penalty of perjury, the following:

1.    I am an attorney at law licensed by the State of Illinois and admitted to practice before this Court in connection with the above-captioned case and adversary proceeding.  I am a partner in the Chicago office of Jenner & Block LLP, 353 N. Clark Street, Chicago, Illinois, 60654 and am counsel to plaintiff Richard Levin, as Chapter 11 Trustee of Firestar Diamond, Inc., *et al.* (the "**Trustee**" or "**Plaintiff**").

2.    I submit this affirmation in support of the Plaintiff's request for the issuance of a certificate of default from the Clerk (the "**Clerk**") of the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), in accordance with Rule 55(a) of the Federal Rules of Civil Procedure (the "**Federal Rules**"), Rule 7055 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Bankruptcy Rule 7055-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), against defendants Auragem Company Ltd. ("**Auragem**"), Brilliant Diamonds Ltd. ("**Brilliant**"), Eternal Diamonds Corporation Ltd. ("**Eternal**"), Sino Traders, Ltd. ("**Sino**"), Sunshine Gems Ltd. ("**Sunshine**"), Twin Fields Investments Ltd. ("**Twin Fields,**" and together with Auragem, Brilliant, Eternal, Sino, and Sunshine, the "**Default Judgment Parties**") in the above-captioned adversary proceeding.

3.    On February 25, 2020, the Trustee commenced this adversary proceeding by filing a complaint (the "**Complaint**") against the above-captioned defendants. (Adv. Dkt. 1.) The Complaint seeks to recover damages suffered as a result of the Modi family's nearly decade-long racketeering conspiracy and to avoid numerous fraudulent transfers of the Debtors' assets made to the Defendants, and in his capacity as judgment creditor of certain non-debtor U.S. affiliates for which the Trustee holds a joint and several judgment (the "**U.S. Affiliates**").

4.      On April 10, 2020, the Court issued an order setting the Defendants' deadline to respond to the Complaint to 60 days after the Trustee effects service of the Complaint and Summons ("**Response Deadline Order**"). (Adv. Dkt. 8.)

5.      On April 22, 2020, the Clerk issued a Second Summons and Notice of Pretrial Conference in an Adversary Proceedings (the "**Summons**").  (Adv. Dkt. 9.)

6.      On April 23, 2020, the Trustee caused service of the Complaint and Summons to be effected on Twin Fields, to the attention of an officer or general/managing agent, via first-class mail, postage pre-paid. (Adv. Dkt. 10.)

7.      Service on Twin Fields was effective under Rule 7004(b)(3) of the Federal Rules of Bankruptcy Procedure, which authorizes first-class mail service "[u]pon a domestic or foreign corporation or upon a partnership or other unincorporated association, by mailing a copy of the summons and complaint to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant." Fed. R. Bankr. P. 7004(b)(3).

8.      On May 12, 2020, the Trustee caused service of the Complaint, Summons, and Response Deadline Order to be effected on Auragem, Brilliant, Eternal, Sino, and Sunshine in Hong Kong via hand delivery by a Hong Kong judicial officer in accordance with Article 10(b) of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("**Hague Service Convention**"). (Adv. Dkt. 12, 13, 14, 16, 17.).

9.      Service on Auragem, Brilliant, Eternal, Sino, and Sunshine was effective under Rule 4(f)(1) of the Federal Rules of Civil Procedure, made applicable in this adversary proceeding under Rule 7004(a)(1) of the Federal Rules of Bankruptcy Procedure. Rule 4(f)(1) authorizes service "by any internationally agreed means of service that is reasonably calculated to give

2

notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. " Fed. R. Civ. P. 4(f)(1). Hong Kong is a signatory to the Hague Service Convention.

10.     True and correct copies of the Summons, Complaint, Response Deadline Order, and related Affidavits of Service are attached as **Exhibit A**.

11.     Twin Fields had until May 27, 2020 to answer or otherwise respond to the Complaint.

12.     Auragem, Brilliant, Eternal, Sino, and Sunshine had until July 13, 2020 to answer or otherwise respond to the Complaint.

13.     To date, no appearances have been filed on behalf of either Default Judgment Party.

14.     By letter dated May 20, 2020 (the "**Auragem-Eternal Letter**"), Auragem and Eternal's joint and several liquidators notified the Trustee that they had "no objection the complaint" and would not attend the scheduled pretrial conference.

15.     By letter dated May 26, 2020 (the "**Brilliant Letter**"), Brilliant's joint and several liquidators notified the Trustee that they were in receipt of the Complaint and would not defend the action, make a submission in this adversary proceeding, or attend the scheduled pretrial conference. A copy of the letter was filed on the docket by the Clerk of Court on June 10, 2020. (Adv. Dkt. 30.)

16.     By letter dated May 26, 2020 (the "**Sunshine Letter,**" and together with the Auragem-Eternal Letter and the Brilliant Letter, the "**Letters**"), Sunshine's joint and several liquidators notified the Trustee that they were in receipt of the Complaint and would not defend the action, make a submission in this adversary proceeding, or attend the scheduled pretrial

conference. A copy of the letter was filed on the docket by the Clerk of Court on June 15, 2020. (Adv. Dkt. 31.)

17.     The Default Judgment Parties have failed to plead or otherwise defend this adversary proceeding, and other than the above-referenced Letters, the Default Judgment Parties have failed to respond to the Complaint.

18.     A copy of the docket maintained by the Clerk evidencing these facts is attached as **Exhibit B**.

19.     There is no indication or reason to believe that any of the Default Judgment Parties is a minor, mentally incompetent, or in the military service of the United States of America.

20.     Federal Rule 55(a), made applicable here by Bankruptcy Rule 7055, provides that a default judgment is warranted "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." Fed. R. Civ. P. 55(a).

21.     Local Bankruptcy Rule 7055-1 provides: "A party applying for a certificate of default from the Clerk pursuant to Bankruptcy Rule 7055 shall submit an affidavit showing that (i) the party against whom a default is sought is not an infant, in the military, or an incompetent person, (ii) the party has failed to plead or otherwise defend the action, and (iii) the pleading to which no response has been made was properly served." Bankr. S.D.N.Y. Rule 7055-1.

22.     Here, entry of certificates of default is warranted because Plaintiff has satisfied all of the criteria of Rule 55(a) — the copies of the Summons, Complaint, Response Deadline Order, and Certificates of Service, annexed as Exhibit A, establish that proper notice of this Adversary Proceeding was provided to each of the Default Judgment Parties. Plaintiff has also satisfied all requirements of Local Rule 7055-1 (*see* ¶¶ 6-9, 17, 19 above).

23.     Accordingly, Plaintiff requests that the Clerk enter a certificate of default, in accordance with Bankruptcy Rule 7055 and Local Rule 7055-1, against each Default Judgment Party.

Dated: December 21, 2020
        Chicago, Illinois

By: /s/ Angela M. Allen

Angela Allen (admitted *pro hac vice*)
Jenner & Block LLP
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
aallen@jenner.com

*Counsel for the Chapter 11 Trustee*

**Exhibit A**

# UNITED STATES BANKRUPTCY COURT
## Southern District of New York

In re: Firestar Diamond, Inc. and Fantasy, Inc.

Bankruptcy Case No.:
18−10509−shl

Richard Levin Chapter 11 Trustee of Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc.

Plaintiff(s),

−against−

Adversary Proceeding No.
20−01054−shl

Ami JaveriA/K/A Ami Modi
Purvi MehtaA/K/A Purvi Modi
Nehal Modi
Neeshal Modi
Central Park Real Estate, LLC
Central Park South 50 Properties, LLC
Trident Trust Company (South Dakota) Inc.solely as Trustee of the Ithaca Trust
Twin Fields Investments Ltd.
Auragem Company Ltd.
Brilliant Diamonds Ltd.
Eternal Diamonds Corporation Ltd.
Fancy Creations Company Ltd.
Hamilton Precious Traders Ltd.
Sino Traders Ltd.
Sunshine Gems Ltd.
Unique Diamond and Jewellery FZC
World Diamond Distribution FZE
Vista Jewelry FZE
Empire Gems FZE
Universal Fine Jewelry FZE
Diagems FZC
Tri Color Gems FZE
Pacific Diamonds FZE
Himalayan Traders FZE
Unity Trading FZE
Fine Classic FZE
DG Brothers FZE

Defendant(s)

# SECOND
# SUMMONS AND NOTICE OF PRETRIAL CONFERENCE
# IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to submit a motion or answer to the complaint which is attached to this summons to the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall submit a motion or answer to the complaint within 35 days, to:

| Address of Clerk: | |
| --- | --- |
| | **Clerk of the Court** |
| | **United States Bankruptcy Court** |
| | **Southern District of New York** |
| | **One Bowling Green** |
| | **New York, NY 10004−1408** |

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

| Name and Address of Plaintiff's Attorney: | |
| --- | --- |
| | **Vincent Edward Lazar** |
| | **Jenner & Block LLP** |
| | **353 N. Clark Street** |
| | **Chicago, IL 60654** |

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place:

| | |
|---|---|
| United States Bankruptcy Court<br>Southern District of New York<br>One Bowling Green<br>New York, NY 10004–1408 | Room: Courtroom 701, One Bowling Green,<br>New York, NY 10004–1408<br><br>Date and Time: 6/23/20 at 10:00 AM |

IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

Dated: 4/22/20

Vito Genna
_____

*Clerk of the Court*

By: /s/  Carmen Ortiz
_____

*Deputy Clerk*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. _____ |
| Plaintiff, | |
| v. | |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

**COMPLAINT TO AVOID AND RECOVER ACTUAL FRAUDULENT TRANSFERS AND FOR DAMAGES FOR CONSPIRACY TO VIOLATE THE RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT**

# **TABLE OF CONTENTS**

NATURE OF THE ACTION ............................................................................................. 1

JURISDICTION AND VENUE ........................................................................................ 3

THE PARTIES & OTHER RELEVANT ENTITIES ...................................................... 4

   I.   The Debtors and Trustee ....................................................................................... 4

   II.  The U.S. Affiliates .................................................................................................. 4

   III. The Defendants ....................................................................................................... 5

BACKGROUND ................................................................................................................ 7

   I.   The Bank Fraud. .................................................................................................. 10

      A.   Mechanics of the Bank Fraud ..................................................................... 10

      B.   The Debtors' and U.S. Affiliates' Role in the Bank Fraud ................................. 16

      C.   Involvement of U.S. Entities' Directors and Officers in the Bank Fraud ...................... 17

      D.   Involvement of Mehul Choksi, Nehal Modi, Neena Sheth, Deepak Sheth, and Abhay Javeri, and the Sheth Entities and SDC Entities in the Bank Fraud. ................. 27

      E.   Laundering of Funds Through Twin Fields and Bailey Banks & Biddle ...................... 30

      F.   Detection and Exposure of the Bank Fraud ...................................................... 33

   II.  Criminal Efforts Shortly Before and Following Exposure of the Bank Fraud ................. 36

      A.   Looting of the Debtors, U.S. Affiliates, and Other Firestar Entities ...................... 36

      B.   Fraudulent Omissions, Misstatements, and Misrepresentations Made in Connection With The Debtors' Chapter 11 Cases .............................................. 46

      C.   Other Efforts to Cover Up and Frustrate Investigation of the Bank Fraud ................. 50

      D.   Money Laundering to Modi Family Members Prior to Exposure of the Bank Fraud .. 54

CLAIMS FOR RELIEF ................................................................................................... 70

COUNTS .......................................................................................................................... 70

PRAYER FOR RELIEF ................................................................................................ 139

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or

"**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc.

(collectively, the "**Debtors**") and as holder of a judgment jointly and severally against, and as

assignee of all claims of, Synergies Corporation ("**Synergies**"), Firestar Group, Inc. ("**FGI**"),

Firestar Diamond International, Inc. ("**FDII**"), Nirav Modi, Inc. ("**NMI**"), and AVD Trading, Inc.

("**AVD**") (collectively, the "**U.S. Affiliates**," together with the Debtors, the "**U.S. Entities**") for

his Complaint alleges as follows:

## NATURE OF THE ACTION

1.      The Trustee brings this action, consisting of both estate claims and claims assigned

to the Trustee by U.S. affiliates, to recover damages suffered as a result of the Modi family's nearly

decade-long racketeering conspiracy lasting from at least 2010 to mid-2018 (the "**Relevant**

**Period**").  The conspiracy resulted in the diversion of hundreds of millions of dollars of assets for

the benefit of the Modi family members and other conspirators, the collapse of the U.S. Entities,

and the resulting loss of the value of the U.S. Entities' businesses. Each of the Defendants joined

and supported the Modi family's racketeering conspiracy as it morphed from bank fraud and

money laundering to obstruction of justice and looting.

2.      Nirav Modi's sister, Purvi Mehta, agreed to act as the beneficial owner of

numerous shell companies Nirav Modi used to commit the largest bank fraud in Indian history.

Mehta then personally laundered over $100 million of the ill-gotten proceeds through the Modi

family's web of shell companies, family trusts, family members, and otherwise-legitimate

businesses—destroying those businesses in the process.

3.      Nirav Modi's wife, Ami Javeri, agreed to serve as a partner of the three India-based

the companies in whose name Nirav Modi obtained nearly $3.5 billion in fraudulent loans

(defined below as the LOU Entities). Javeri then managed and facilitated the Modi family's

systematic efforts to launder and shield from creditors the proceeds of the fraud, including over $30 million in real estate.

4.      Nirav Modi's brother, Nehal Modi, traveled around the world after exposure of the fraud destroying evidence, tampering with witnesses, and securing assets from seizure by government authorities and creditors. Early in these chapter 11 cases before the Trustee's appointment, Nehal Modi also enlisted several of his personal friends to loot the U.S. Affiliates' more than $40 million in inventory and cash so that those funds could not be used to pay the U.S. Affiliates' substantial debts to the Debtors.

5.      Nirav Modi's other brother, Neeshal Modi, also served as a partner of the three LOU Entities, as beneficial owner of numerous Shadow Entities and other shell companies, and as one of the key day-to-day managers of the fraudulent import and export transactions supporting the bank fraud. Neeshal Modi also personally selected and hired various "dummy" directors, officers, and other personnel for the web of companies secretly owned by his family. He also played his part in the family money laundering operation, including by holding a power of attorney for his sister Purvi Mehta, in whose name the ill-gotten proceeds were held in bank accounts across the globe.

6.      The Ithaca Trust, Central Park South 50 Properties, LLC, and Central Park Real Estate LLC, which together hold the Modi family's two Manhattan apartments, are nothing more than contrivances used by the Modi family to shield more than $30 million of their ill-gotten wealth from creditors.

7.      Twin Fields Investments Ltd. is the Delaware shell company through which the Modi family secretly owned and operated *Bailey Banks & Biddle* retail stores as another front for its money laundering operations. The Modi family laundered over $80 million through Twin Fields during the Relevant Period.

2

8.      The remaining Defendants, defined below as Shadow Entities, comprise the numerous Hong Kong and Dubai-based companies the Modi family secretly owned, yet represented as independent vendors and customers to banks, auditors, and even this Court.

9.      The Trustee also seeks to avoid numerous fraudulent transfers of the Debtors' assets made to the Defendants, and in his capacity as judgment creditor of the U.S. Affiliates, seeks to avoid fraudulent transfers of the U.S. Affiliates' assets made to the Defendants.

## JURISDICTION AND VENUE

10.      The United States District Court for this district (the "**District Court**") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under title 11 of the United States Code and arises in and is related to these chapter 11 cases and under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because this adversary proceeding arises under the laws of the United States, including 18 U.S.C. § 1962, and seeks recovery for injuries by reason of a violation of 18 U.S.C. § 1962. This Court has authority to hear this adversary proceeding by reason of the District Court's referral under 28 U.S.C. § 157(a) and under General Order M-431 (Amended Standing Order of Reference).

11.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(H) and (O) with respect to Counts 7 to 54, which this Court has authority to hear and determine, and is not a core proceeding with respect to Counts 1 to 6.

12.      To the extent that this Court does not have authority to determine the claims asserted in this adversary proceeding and to enter final judgment thereon, the Trustee consents to the issuance and entry of a final judgment or order by this Court.

13.      Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

3

## THE PARTIES & OTHER RELEVANT ENTITIES

### I.    The Debtors and Trustee

14.    Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) ("**FDI**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, FDI principally operated a wholesale jewelry business.

15.    Debtor Fantasy, Inc. ("**Fantasy**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy was principally a wholesale jewelry business. At all relevant times, FDI owned 100% of the equity interests in Fantasy.

16.    Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) ("**Jaffe**") is a privately-held New York corporation, with its principal place of business in New York. While in operation, Jaffe was principally a wholesale bridal jewelry business.

17.    Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered that same day. The Trustee brings this action, not individually, but solely in his capacity as Trustee.

### II.    The U.S. Affiliates

18.    FGI, a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in FDI. Samuel Sandberg owns the remaining approximately 5% of FDI.

19.    Synergies, a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in Jaffe and 100% of the equity interests in FGI. Samuel Sandberg owns the remaining approximately 5% of Jaffe.

20.    FDII, a Delaware corporation, operated primarily as a loose diamond trading business.

4

21.    NMI, a Delaware corporation, operated *Nirav Modi*-branded retail boutiques in New York, Los Angeles, Las Vegas, and Honolulu.

22.    On January 15, 2020, the Trustee and the U.S. Affiliates entered into a settlement agreement under which the U.S. Affiliates assigned to the Trustee any and all claims or causes of action then-owned or subsequently acquired by the U.S. Affiliates and consented to entry of a judgment jointly and severally against the U.S. Affiliates in the amount of $23,116,505.44. (*See* Dkt. 1366.)

23.    Judgment in that amount was entered on February 18, 2020. (Adv. No. 20-01014; Dkt. 3.)

## III.    The Defendants

24.    Defendant Ami Javeri (a/k/a Ami Modi) is a New York resident and is Nirav Modi's wife.

25.    Defendant Purvi Mehta (a/k/a Purvi Modi) is a Hong Kong resident and is Nirav Modi's sister.

26.    Defendant Nehal Modi is a Texas resident and is Nirav Modi's second-youngest brother.

27.    Defendant Neeshal Modi is a Belgium resident and is Nirav Modi's youngest brother.

28.    Defendant Trident Trust Company (South Dakota) Inc., solely as trustee of the Ithaca Trust ("**Trident**"), is a South Dakota corporation and is the Trustee of The Ithaca Trust. The Ithaca Trust is an irrevocable trust governed by South Dakota law.

29.    Defendant Central Park Real Estate LLC ("**CPRE**") is a Delaware limited liability company.

5

30.     Defendant Central Park South 50 Properties LLC ("**CPS50**") is a New York limited liability company.

31.     Defendant Twin Fields Investments Ltd. ("**Twin Fields**") is a Delaware corporation.

32.     Defendant Auragem Company Ltd. ("**Auragem**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

33.     Defendant Brilliant Diamonds Ltd. ("**Brilliant**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

34.     Defendant Eternal Diamonds Corporation Ltd. ("**Eternal**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

35.     Defendant Fancy Creations Company Ltd. ("**Fancy Creations**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

36.     Defendant Hamilton Precious Traders Ltd. ("**Hamilton**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

37.     Defendant Sino Traders Ltd. ("**Sino**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

38.     Defendant Sunshine Gems Ltd. ("**Sunshine**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

39.     Defendant Unique Diamond and Jewellery FZC ("**Unique**") is a UAE company and is alleged herein to be a Shadow Entity.

40.     Defendant World Diamond Distribution FZE ("**World Diamond**") is a UAE company and is alleged herein to be a Shadow Entity.

41.     Defendant Vista Jewelry FZE ("**Vista**") is a UAE company and is alleged herein to be a Shadow Entity.

42.     Defendant Empire Gems FZE ("**Empire**") is a UAE company and is alleged herein to be a Shadow Entity.

43.     Defendant Universal Fine Jewelry FZE ("**Universal**") is a UAE company and is alleged herein to be a Shadow Entity.

44.     Defendant Diagems FZE ("**Diagems**") is a UAE company and is alleged herein to be a Shadow Entity.

45.     Defendant Tri Color Gems FZE ("**Tri Color**") is a UAE company and is alleged herein to be a Shadow Entity.

46.     Defendant Pacific Diamonds FZE ("**Pacific**") is a UAE company and is alleged herein to be a Shadow Entity.

47.     Defendant Himalayan Traders FZE ("**Himalayan**") is a UAE company and is alleged herein to be a Shadow Entity.

48.     Defendant Unity Trading FZE ("**Unity**") is a UAE company and is alleged herein to be a Shadow Entity.

49.     Defendant Fine Classic FZE ("**Fine Classic**") is a UAE company and is alleged herein to be a Shadow Entity.

50.     Defendant DG Brothers FZE ("**DG Brothers**") is a UAE company and is alleged herein to be a Shadow Entity.

## BACKGROUND

51.     Nirav Modi entered the diamond business around 2000 under the name Diamonds 'R' Us, an India partnership formed by Modi, Modi's uncle Mehul Choksi, and Modi's business partner Hemant Bhatt.

52.     In 2004, Nirav Modi founded Firestone International Private Ltd. ("**FIL**" or "**FIPL**," together with all of its direct and indirect subsidiaries, the "**Firestar Entities**"), later known as

7

Firestar International Private Ltd., and now known as Firestar International Ltd. FIPL operated

as a diamond trading business in India and the parent of the global Firestar corporate umbrella.

Nirav Modi has at all relevant times been the owner of substantially all of the equity interests in

FIPL.

53.     In 2006, Nirav Modi formed India-based Firestar Diamond International Pvt. Ltd.

("**FDIPL**") as a wholly owned subsidiary of FIPL. FDIPL operated diamond and jewelry

manufacturing operations from factories in India. FDIPL manufactured a substantial portion of

the inventory sold by other Firestar Entities.

54.     Over time, Nirav Modi expanded the Firestar Entities' operations to the U.S., Hong

Kong, Dubai, and Europe. Nirav Modi, acting through FIL and its subsidiaries, acquired the

company that became FDI (then known as Firestone, Inc.) in 2005, acquired a 95% interest in Jaffe

(then known as Sandberg & Sikorski Corp.) from Samuel Sandberg and Stanley Sikorski in 2007,

and incorporated Fantasy in 2012. In connection with Nirav Modi's indirect acquisition of Jaffe,

Samuel Sandberg received an equity interest in FDI.

55.     The U.S. Entities' operations were managed and controlled by Nirav Modi's

cousin, Mihir Bhansali. At all relevant times, Mihir Bhansali served as the sole director and Chief

Executive Officer of FDI and Fantasy, and as the sole director and President of Jaffe. Bhansali also

served as the sole director of each U.S. Affiliate, as well as the Chief Executive Officer of

Synergies, FGI, and NMI. Bhansali also served as a director of FIPL. In the context of both the

Firestar Entities' legitimate operations and the fraudulent schemes described below, Mihir

Bhansali served as Nirav Modi's second-in-command.

56.     Mihir Bhansali's own top lieutenant, Ajay Gandhi, served as the Chief Financial

Officer of each of the Debtors and U.S. Affiliates for the entirety of the Relevant Period with the

8

exception of a brief 3-month departure in 2013. As alleged below, Mihir Bhansali and Ajay Gandhi managed the fraudulent aspects of Nirav Modi's U.S. operations.

57.     The Hong Kong-based Firestar Entities included Firestar Holdings Ltd. ("**FHL**"), Firestar Diamond Ltd. ("**FDL**"), Firestar Jewelry Ltd. ("**FJL**") and Nirav Modi Ltd. ("**NML**"). FHL, a wholly owned subsidiary of FIPL, had no operations of its own and instead acted as the primary holding company for the Hong Kong, Dubai, Europe, and eventually U.S.-based Firestar Entities.

58.     FDL and FJL, both wholly owned subsidiaries of FHL, each operated as a polished diamond trading business analogous to FDII in New York. FDL and FJL were managed by Aditya Nanavati, the Head of Asia-Pacific in the global Firestar umbrella. Shyam Wadhwa, FIPL's vice president of finance, served as the de facto chief financial officer of the Hong Kong-based Firestar Entities. Nanavati exercised general oversight over the Hong Kong-based Shadow Entities and Wadhwa managed their bank accounts and finances.

59.     NML, a wholly owned subsidiary of FHL, is the principal holding company for subsidiaries operating *Nirav Modi*-branded boutiques around the globe, including New York-based NMI (which operated the U.S. boutiques) and UK-based Nirav Modi Ltd. ("**NMLUK**") (which operated the London boutique). Angelina Ypma (a/k/a Angelina Nguyen) served as global president of the *Nirav Modi* brand and as a director of NML and FIPL. Purvi Mehta was also involved in the operations of NML and its subsidiaries as creative director of the *Nirav Modi* brand.

60.     The Dubai-based Firestar Entities included Firestar Diamond FZE ("**FDFZE**"), which operated as a polished diamond trading business, and Firestar Diamond FZCO ("**FDFZCO**"), which manufactured jewelry. FHL is the 100% owner of both FDFZE and FDFZCO. Satyendra Shukla, the Head of Middle East within the global Firestar umbrella, managed FDFZCO. Kurian Mathews ran FDFZE's operations as general manager. Saju Poulose managed

9

the Dubai-based Firestar Entities' finances, books and records, and bank accounts as the de facto

chief financial officer. Shukla, Mathews, and Poulose also exercised broad oversight over the

Dubai-based Shadow Entities' operations and finances.

61.    Firestar Diamond BVBA ("**FDBVBA**"), a Belgium company, operated as a rough

diamond trading and manufacturing business. FDBVBA was managed by Nirav Modi's youngest

brother, Neeshal Modi, in Antwerp, Belgium. Neeshal Modi was also involved with the Dubai

Firestar Entities. Throughout the Relevant Period, FDBVBA traded extensively with Shadow

Entities in Hong Kong and Dubai in furtherance of the fraudulent scheme alleged below.

I.    **The Bank Fraud.**

   A.    *Mechanics of the Bank Fraud*

62.    From no later than 2010 to early 2018, Nirav Modi orchestrated and directed a

scheme to obtain loans, credits, or other funds under false pretenses and without collateral from

numerous banks, including Punjab National Bank ("**PNB**"), a publicly-owned Indian bank

majority owned by the central government of India (as set forth in more detail below, the "**Bank**

**Fraud**").

63.    The Bank Fraud involved the fraudulent procurement of buyer's credit issued

under letters of undertaking ("**LOU**s"), a financial instrument unique to India designed to

facilitate efficient import transactions.

64.    When used legitimately, LOUs allow an importer to forego the expense an

importer would otherwise incur by borrowing Indian currency and then converting it to a foreign

currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank

in India, secured by invoices for the to-be imported goods. The issuing bank, in turn, enters into

the foreign currency transaction: it requests a foreign branch of another Indian bank to transmit

funds into the issuing bank's own account (referred to as its nostro—"our"—account) at the

foreign branch of a third bank to pay the exporter in its local currency. The issuing bank then

repays the intermediary bank and recoups the loan from the importer (or the imported goods

serving as its collateral).

65.    Since each LOU requires an import transaction, an importer's LOU borrowing

capacity is tied directly to its import volume—the more imports, the more LOU funding available.

66.    Nirav Modi and his co-conspirators conspired to take advantage of this feature by

artificially inflating the import volume of Nirav Modi's India-based companies—most notably

Diamonds 'R' Us ("**DRUS**"), Solar Export ("**Solar**"), and Stellar Diamond ("**Stellar**") (collectively,

the "**LOU Entities**")—with sham transactions so as to obtain more and more LOU funding.

67.    Nirav Modi, Ami Modi, Neeshal Modi, and Mehul Choksi, among others, each

served as partner of each LOU Entity during the Relevant Period.

68.    In 2016, Neeshal Modi selected and appointed additional "dummy" partners for

the LOU Entities. Neeshal Modi, together with Mihir Bhansali, also selected and hired various

Shadow Entity personnel during the Relevant Period.

69.    Ami Modi served as a partner of Solar and Stellar and, in 2010, opened bank

accounts Solar and Stellar used to defraud PNB.

70.    PNB and other banks advanced amounts equal to over $1 billion under LOUs for

the benefit of entities under Modi's control in connection with imports to India without the

ordinarily-required collateral.

71.    To carry out this scheme, Nirav Modi and his co-conspirators utilized a web of

shadow entities to engage in fraudulent and fictitious import transactions, including Defendants

Auragem, Brilliant, Eternal, Fancy Creations, Sino, Sunshine, Unique, World Diamond, Vista,

Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, Unity, and Fine Classic (collectively,

11

the "**Shadow Entities**," together with the Firestar Entities, LOU Entities, and all other entities
controlled by Nirav Modi and his family members, the "**Modi-Controlled Entities**").

72.     Though designed to look like legitimate independent businesses, the Shadow
Entities were no more than shell companies controlled by Modi and his co-conspirators. They
conducted virtually no legitimate business, but instead existed only to further the Bank Fraud by
conducting bogus transactions with the LOU Entities, Firestar Entities, and other Modi-
Controlled Entities and laundering the ill-gotten proceeds.

73.     The two primary clusters of Shadow Entities operated from Hong Kong and
Dubai. The Hong Kong-based Shadow Entities included Auragem, Brilliant, Eternal, Fancy
Creations, Sino, and Sunshine. The Dubai-based Shadow Entities included Unique, World
Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, and Unity.

74.     The Shadow Entities were mostly registered at either small, unoccupied offices or
at single, leased desks within shared offices. They had almost identical websites with similar
backgrounds, fonts, contact pages, and language.

75.     An Indian consultant told Indian authorities that around 2010, Mihir Bhansali
sought assistance setting up two layers of British Virgin Island ("**BVI**") holding companies for
the Dubai-based Shadow Entities that would be owned by Purvi Modi and Neeshal Modi.

76.     The top layer consisted of Madison Capital Private Limited ("**Madison**") and
Moore Private Investments Ltd. ("**Moore**"). Mihir Bhansali completed all of the paperwork
relating to the formation of these two entities. Purvi Mehta and Neeshal Modi were declared the
ultimate beneficial owners of these companies to the BVI authorities.

77.     Madison and Moore each held 50% of the shares of each of ten second-layer BVI
entities: Global Investing Group Ltd., Xclusive Consultants Ltd., Ashmoore Developments Ltd.,
Beacon Horizon Investments Ltd., Century Group Global Investments Ltd., Pushpin Trading

Ltd., Royce Group Private Ltd., Integrated Investing Ltd., Panera Assets Inc., and Ideal Star

Consultants Ltd. Mihir Bhansali chose all of these entities' names. Moore served as the director

of each of these entities. Purvi Mehta and Neeshal Modi were also declared the ultimate beneficial

owners of these companies to the BVI authorities.

78.    These second-layer BVI entities then served as holding companies for Dubai-based

Shadow Entities Tri Color, Diagems, Empire, Unique, World Diamond, Pacific, Universal; and

Vista.

79.    Mihir Bhansali maintained a spreadsheet tracking the operational status of the

Dubai-based Shadow Entities.

80.    The LOU Entities and Shadow Entities traded exclusively or nearly exclusively

with other Modi-Controlled Entities. The following table reflects the extent to which the LOU

Entities traded exclusively with Shadow Entities and Firestar Entities:

| LOU Entity | Fiscal Year 2012 - 2017 | | | | | |
|---|---|---|---|---|---|---|
| | Sales to Listed Modi-Controlled Entities as % of Gross Sales | | | Purchases from Listed Modi-Controlled Entities as % of Total Costs of Goods Sold | | |
| | *Shadow Entities* | *Firestar Entities* | *Total* | *Shadow Entities* | *Firestar Entities* | *Total* |
| DRUS | 88.4% | 7.5% | 95.9% | 99.7% | 0.4% | 100.1% |
| Stellar | 98.7% | 0.5% | 99.2% | 100.1% | 0.3% | 100.3% |
| Solar | 98.9% | 0.7% | 99.6% | 99.9% | 0.1% | 100.0% |

81.    From around 2013 onward, Nirav Modi and his co-conspirators used the Shadow

Entities as an intermediary between the LOU Entities and Firestar Entities. PNB and other banks

were aware of Nirav Modi's affiliation with the LOU Entities and the Firestar Entities, but his

affiliation with the Shadow Entities was hidden from the banks.

82.    The Shadow Entity import and export transactions purported to involve arm's-

length sales of highly valuable loose diamonds, pearls, gold, silver, and other jewelry. In truth,

these transactions had no legitimate economic purpose and routinely involved goods that (i) did

not exist, (ii) were never transferred, (iii) were transferred at prices having nothing to do with market value, but instead based on whatever amounts were necessary to reconcile the Shadow Entities' and Firestar Entities' books and records so as to conceal other transfers made for illegitimate purposes, or (iv) were transferred in "circular transactions," in which the same goods were exported from and re-imported among Modi-Controlled Entities multiple times at varying and often inflated prices to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

83.     According to statements made by various Firestar Entity and Shadow Entity employees to Indian authorities:

(i)     FIL, FDIPL, and other India-based Firestar Entities would export jewelry to Shadow Entities in Dubai and Hong Kong, where, at least in some instances, the diamonds would be removed and then subsequently re-exported for further import and the precious metals melted.

(ii)    None of jewelry exported from India to the Shadow Entities was ever returned as defective, substandard, or otherwise noncompliant, as would be expected in the course of an arm's length vendor-customer relationship.

(iii)   Orders placed by Shadow Entities frequently lacked the formality, exactness, and diligence that ordinarily would be expected of transactions with a bona fide third party. For example, V. Suresh Ramnath Naidu, a director of Diagems, told Indian authorities that he signed blank invoices, but never actually saw any of the diamonds or jewelry.

84.     Modi-Controlled Entities also obtained additional funding through packing credit loans, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods. In the context of the Bank Fraud, the India-based Modi-Controlled Entities would obtain packing credit loans on the basis of purported orders from other Modi-Controlled Entities overseas. However, packing credit loan proceeds were frequently diverted for other purposes, including the repayment of outstanding LOUs.

14

85.     Many of the Shadow Entities' directors were current or former employees of Firestar Entities. In addition, many Shadow Entity employees were current or former employees of Firestar Entities.

86.     The transactions between and among Firestar Entities, LOU Entities, and Shadow Entities furthered the Bank Fraud by: (1) inflating the Indian entities' LOU borrowing capacity by artificially inflating their import volumes for LOUs and export volume for packing credit loans; (2) facilitating the repayment of some but not all outstanding LOUs and packing credit loans; (3) laundering the fraudulent proceeds by making them difficult to trace and siphoning them to Modi and his co-conspirators; and (4) making it difficult for auditors, lenders, and regulatory bodies to detect the Bank Fraud.

87.     Transfers for these purposes were concealed in various ways, including: (a) round trip transactions of gems, jewelry, or funds in which Modi-Controlled Entities transferred assets amongst themselves without any legitimate economic purpose; (b) buying and selling gems at inflated or deflated prices; (c) characterizing transfers as loans or loan repayments or advances against future purchases or returns of such advances; and (d) in some instances, fraudulently doctoring books and records outright.

88.     To facilitate the continuing flow of LOUs and to prevent detection, Modi and others at his direction, including Manish Bosamiya, Subhash Parab, and Miten Pandya, worked with certain PNB employees, including Gokulnath Shetty, who authorized LOUs without securing collateral and without properly recording the LOUs in PNB's records.

89.     According to a forensic report issued by BDO in December 2019, PNB issued over 1,500 fraudulent LOUs to Modi-Controlled Entities during the Relevant Period involving approximately $3.5 billion.

### B. The Debtors' and U.S. Affiliates' Role in the Bank Fraud

90.    Nirav Modi, Mihir Bhansali, Ajay Gandhi, and other co-conspirators funneled millions of dollars in funds, precious gems, and jewelry through the U.S. Entities and their offices in furtherance of the Bank Fraud.

91.    In the early stages of the Bank Fraud scheme, from around 2010 to 2012 when the LOU Entities were still trading directly with Firestar Entities, the U.S. Entities were directly involved in import and export transactions underlying fraudulently procured LOUs. For example, in 2011, FDI and Jaffe were the exporters under and direct beneficiaries of five LOUs and one LOU, respectively, totaling $10,192,303.

92.    As an example of the Debtors' involvement in circular transactions, from August 8, 2011 to September 13, 2011, a period of five weeks, the Debtors exported the same 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once to and from various LOU Entities and Shadow Entities at widely divergent prices.

93.    Later in 2011, the Debtors engaged in another circular trading of a diamond that was recorded as a 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond. The diamond appeared in the Debtors' records in three transactions within six weeks of each other and was valued at a different price each time.

94.    From around 2013 onward, the Shadow Entities were used as intermediaries between the Firestar Entities and LOU Entities. PNB and other banks were aware of Nirav Modi's affiliation with the Firestar Entities and LOU Entities, but his affiliation with the Shadow Entities was hidden from them.

95.    During this period, the Debtors made numerous transfers to Shadow Entities linked to the repayment of outstanding LOUs so that the Bank Fraud could continue undisturbed.

96.    For example, on September 24, 2015, FDI transferred $1,840,969 to Auragem and $1,400,000 to Fancy Creations. A portion of these funds were used to repay an LOU issued to DRUS that became due on September 30, 2015.

97.    As another example, on February 26, 2016, FDI transferred $1,192,106 to Tri Color. On March 9, 2016, Tri Color transferred $1,647,000 to Solar. That same day, Solar transferred $2,087,000 to repay an LOU that became due on March 11, 2016.

98.    Consistent with these examples and others alleged herein, the Debtors' and U.S. Affiliates' Shadow Entity-linked transactions from 2013 onwards were effectuated for purposes related the Bank Fraud including to: (a) facilitate repayment of LOUs and packing credit loans so that the Bank Fraud could continue undisturbed; (b) provide Shadow Entities with the goods and funds the Shadow Entities needed to transact with the LOU Entities; (c) clear the Shadow Entities', Firestar Entities', and LOU Entities' accounts receivable and accounts payable so as to avert questions from auditors, lenders, and other third parties; and (d) divert the proceeds of the Bank Fraud for the benefit of Nirav Modi, Mihir Bhansali, their families and other co-conspirators.

99.    The U.S. Entities' records reflect hundreds of millions of dollars in cash transfers and inventory shipments among the U.S. Entities and Shadow Entities during the Relevant Period.

### C. Involvement of U.S. Entities' Directors and Officers in the Bank Fraud

100.    Certain of U.S. Entities' directors and officers, including Mihir Bhansali and Ajay Gandhi, participated in and advanced the Bank Fraud. As described below, Bhansali and Gandhi, in coordination with Nirav Modi, controlled all aspects of the Debtors' internal and external operations and affairs at all relevant times.

101.    As the ultimate controlling shareholder of all of the Firestar Entities, Nirav Modi, in coordination with Bhansali and Gandhi, orchestrated and oversaw fraudulent transactions

17

among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

102.    As the sole director of each of the U.S. Entities, and as CEO of FDI, Fantasy, Synergies, FGI, and NMI, Mihir Bhansali coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

103.    As CFO of each of the U.S. Entities, and in coordination with Nirav Modi and Mihir Bhansali, Ajay Gandhi coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

104.    At all relevant times, Ajay Gandhi and Mihir Bhansali controlled the finances of the Debtors. Each had authority to approve loose diamond transactions among the U.S. Entities and the Shadow Entities totaling hundreds of millions of dollars. Gandhi and Bhansali were also each a signatory on each of the U.S. Entities' bank accounts, and their authorization was required to effectuate transfers from the U.S. Entities' accounts.

   *i.*    *Oversight and Control of Shadow Entities and LOU Entities*

105.    Nirav Modi and Mihir Bhansali, with the assistance of other co-conspirators coordinated and directed the operations of the Shadow Entities and LOU Entities to further the Bank Fraud. The following are some examples of that activity.

106.    Mihir Bhansali's prominent role in orchestrating the Bank Fraud is illustrated by several spreadsheets recovered from his work computer. Each of these spreadsheets was saved by Microsoft Excel's "AutoRecover" feature. Bhansali's computer did not contain any other versions of these spreadsheets, suggesting that he deleted them at some point. These spreadsheets are summarized as follows:

18

(i)   One spreadsheet, last modified on February 16, 2018, tracked millions of dollars in payables and receivables as between each of the LOU Entities, Firestar Entities, and Shadow Entities.

(ii)  Another spreadsheet, last modified on February 18, 2018, appears to be a step-by-step guide to the mechanics and economics of circular transactions between Firstar Entities and Shadow Entities. Another auto-saved version of this spreadsheet, saved eleven minutes earlier, contains only a portion of the guide, demonstrating that Bhansali himself created the spreadsheet.

(iii) Another spreadsheet, created on February 12, 2018 and last modified on February 13, 2018, appears to be a "to do" list for various co-conspirators after the exposure of the Bank Fraud. The tasks included researching their potential criminal liability, "cleaning up" outstanding A/R and A/P balances among Firestar Entities and Shadow Entities, and sending the Dubai-based Shadow Entities' computers to Hong Kong.

(iv)  Another spreadsheet, last modified on January 8, 2018, shows, for the fiscal years 2012 through 2017, each LOU Entity's (a) profits & losses, (b) outstanding bank loans, (c) cash flow to trusts benefitting Nirav Modi's family, and (d) volume of transactions with various Shadow Entities and Firestar Entities.

107.   Bhansali personally oversaw the creation of the Shadow Entities and LOU Entities and the selection of their principals, directors, officers, and employees.

108.   Bhansali also personally completed employee performance appraisals for individuals involved in the operations of Shadow Entities and LOU Entities.

109.   Bhansali's electronic calendar contained several entries, which, upon information and belief, refer to his discussions in the course of managing the operations of the LOU Entities (i.e. **S**olar, **S**tellar, and **D**iamonds R Us), including: (a) a meeting scheduled for April 4, 2016 with the subject "SSD conversation;" and (b) a meeting scheduled for April 6, 2016 with the subject "SSD infrastructure," with an invite to Saju Paulose.

110.   On January 19, 2010, Ajay Gandhi directed Bhavesh Patel to prepare an aging report for accounts receivables owed to FDI excluding "affiliates such as . . . Unique", demonstrating that Gandhi knew Unique was a related party.

19

111.    On May 27, 2010, Mihir Bhansali directed Aditya Nanivati to make Bhansali, Nanivati, Purvi Mehta, and Neeshal Modi authorized users of FDL's Standard Chartered Bank account. With respect to the physical devises necessary to approve transfers, he instructed Nanivati to send Purvi Mehta's device to Hemant Bhatt and Neeshal Modi's device to Ajay Gandhi. These devices enabled Bhatt and Gandhi to transfer funds out of FDL's bank account even though neither had any role at FDL or any of the other Hong Kong Firestar Entities.

112.    On September 7, 2011, Kurian Mathews asked for Mihir Bhansali's approval of fee quotes from accountants for proposed audits of Auragem and Fancy Creations.

113.    Mihir Bhansali required at least two of Kurian Mathews, Satyendra Shukla, and Saju Poulose to be present in Dubai at all times to monitor Shadow Entity operations. On April 27, 2013, Kurian Mathews asked Mihir Bhansali for permission to break this rule so that he could arrive in Hong Kong early to prepare for an audit of the Hong Kong Shadow Entities. Mathews explained, "We have to arrange all documents of 4 entities as Fancy's office which is very far from the offices of Brilliant and Eternal. After the same we have to check all of the purchases and sales documents with the book entries to see that correct documents are in place before the commencement of the audit." Bhansali replied, "Fine. Go ahead this time."

114.    On June 10, 2013, to hide their involvement in the Bank Fraud, Modi's personal assistant instructed Gandhi, from her personal email address to Gandhi's personal email address, to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Firestar Entities' regular email system.

115.    On August 6, 2013, Gandhi sent an email to a back-office employee containing purchase and sales ledgers of four Shadow Entities—Fancy Creations, Brilliant, Eternal, and Unique—showing these entities' accounting for transactions with FDI.

20

116.    On April 3, 2017, an India-based consultant emailed Mihir Bhansali a spreadsheet summarizing sales from various foreign Firestar Entities, including FIPL and FDIPL, to Dubai-based Shadow Entities, including World Diamond, Universal, Empire, Vista, Unique, and Diagems. The spreadsheet reflected a total of $770,730,000 in sales of rough stones, polished stones, and jewelry by various foreign Firestar Entities to these six Shadow Entities during fiscal year 2015 to 2016, and a total of $454,910,000 in such sales from April 2016 to February 2017.

117.    On May 5, 2017, Gandhi sent a list of Shadow Entities, and contact information for each, to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)."

118.    On July 1, 2017, FIPL CFO Ravi Gupta emailed Nirav Modi a spreadsheet containing fictitious biographical profiles for Brilliant, Eternal, Fancy Creations, Empire, Unique, Universal, Vista, and World Diamond and asked, "Last year someone had created the enclosed file for top 8 customers[.] Can u let me know who had helped in creation of this? We would like to do for few more customers like Augragen [sic], Eurostar, Diagem, Saumil, and Pannadium." Modi forwarded the email to Mihir Bhansali, who then directed Shyam Wadhwa, Aditya Nanivati, and Neeshal Modi to create additional fictitious profiles for Shadow Entities in their respective regions.

119.    On July 8, 2017, Satyendra Shukla asked for Mihir Bhansali's input on a proposed itinerary for FIPL CFO Ravi Gupta's and FIPL Independent Director Suresh Senapaty's upcoming visit to Dubai. The itinerary included multiple meetings with purported "owners" of Shadow Entities.

120.    Between July 31, 2017 and August 7, 2017, Satyendra Shukla and Kurian Mathews, copied Mihir Bhansali on numerous emails concerning the collection of know-your-customer and know-your-supplier documentation for Shadow Entities Unique, World Diamond, Unity,

Himalayan, DG Brothers, and Hamilton. Bhansali advised, "Gentlemen – please avoid copying me on transactional emails. Thank you."

121.    On August 19, 2017, a manager of Universal emailed Bhansali enclosing a profile of three Shadow Entities—Universal, Empire, and Diagems—and asking Bhansali to "review and advice [sic]." The manager's email signature stated he was also the General Manager of a Firestar Entity in Dubai.

122.    On October 24, 2017, Saju Poulose advised Mihir Bhansali that an independent director of FIPL had asked about the variance in profit margins between the Firestar Entities' transactions with Shadow Entity as opposed to other customers. Bhansali instructed Poulose to warn Aditya Nanivati and Satyendra Shukla so that they could prepare an explanation. Nanavati then asked Bhansali, "How are we answering this? For me it is simple, some are higher volume wholesale clients and some are smaller clients/shops. Not sure if that's the right approach."

123.    On April 23, 2018, Ajay Gandhi asked a back-office employee to send him the open accounts receivable and accounts payable between Jaffe and Empire, Vista, Eternal, Tri Color, and Universal as of April 22, 2018. Gandhi referred to these parties as "overseas non-affiliates."

124.    During the Relevant Period, Nirav Modi, Mihir Bhansali, and Ajay Gandhi exercised direct oversight and control over numerous transactions between the U.S. Entities and Shadow Entities, as illustrated by the specific examples described in Appendix A-124.

125.    Ajay Gandhi regularly advised Nirav Modi, Miten Pandya, Manish Bosamiya, Amit Magia, and Shyam Wadhwa, concerning wires of funds from the U.S. Entities to India in furtherance of the Bank Fraud, as illustrated by the specific examples described in Appendix A-125.

22

iii.    *Suspicious Accounting, Finance, and Inventory Management Practices*

126.    Gandhi and Bhansali engaged in and oversaw suspicious accounting, corporate finance, and inventory management practices for the purpose of furthering and concealing the Bank Fraud.

127.    Gandhi and Bhansali maintained two sets of books and records for the U.S. Entities: "core" financials, which did not include loose diamond and other high-value transactions outside the normal course of the U.S. Entities' business, and "regular" financials, which reflected transactions with Shadow Entities and other Firestar Entities to further the Bank Fraud.

128.    Jaffe's federal tax return for the fiscal year ending March 31, 2012 listed sales of $9,090,661. However, Jaffe's sales journal, as well as the Jaffe financial statements originally provided by Ajay Gandhi to the Examiner, indicates that, during that same time period, Jaffe's sales totaled $49,628,873.

129.    After Gandhi was questioned by the Examiner about the significant difference between the tax return sales of around $9 million and the "original" financial statements and sales journal which both reflected $49 million of sales, Gandhi produced a second set of financial statements, which he called the "core" set. This "core" set reflected sales at $10 million. Gandhi did not provide any real explanation as to why he maintained two sets of financial statements. The difference between these financials was primarily loose diamond sales between Jaffe and various Shadow Entities.

130.    Bhansali managed the Debtors' "house accounts," the accounts in which proceeds of loose diamond sales were segregated from regular sales accounts for purposes of computing commissions. Upon information and belief, the difference between the amounts reported in the

23

Jaffe's tax returns versus the amounts reflected in its sales journals primarily relates to such transactions.

131.     The secretive nature of the "regular" financials is further demonstrated by the communications between Nirav Modi, Ajay Gandhi, Mihir Bhansali, and other co-conspirators described in Appendix A-131.

132.     Mihir Bhansali and Ajay Gandhi also oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers.

133.     For example, each diamond or gem received by the Debtors for use in an ordinary retail transaction would be unpacked, compared to its packing slip, scanned for quality control, and logged as "ready to ship."

134.     These practices were not employed with respect to Shadow Entity-related transactions. For those transactions, a Shadow Entity or foreign Firestar Entity would often send bulk shipments of loose diamonds accompanied by email instructions to export them immediately upon receipt to either another Firestar Entity or a Shadow Entity at specified prices and quantities. Packing slips and invoices for the subsequent exports often accompanied these email instructions. Consistent with instructions from overseas Modi-Controlled Entities, these goods were either immediately re-shipped without being opened or, if they were opened, they were inventoried in bulk, not individually.

    *iv.*         *Efforts to Manipulate or Deceive Auditors and Lenders*

135.     On numerous occasions, Bhansali and Gandhi sidestepped auditors' inquiries concerning the U.S. Entities' dealings with Shadow Entities by offering farfetched explanations, feigning ignorance, or, in some cases, ignoring the questions altogether.

24

136.     For example, on July 2, 2010, a banker asked Ajay Gandhi whether FDI and Eternal were related. Ajay Gandhi forwarded the email to Mihir Bhansali and stated, "I am ignoring that question but I may not be able to avoid the same." Bhansali replied, "Speak to Nirav when he is in NY next week." The next day, Gandhi told the banker that Nirav Modi's father, Deepak Modi, owned Eternal.

137.     As another example, on June 16, 2011, an HSBC Bank representative asked Ajay Gandhi why Synergies would be wiring funds to Unique. Gandhi explained that Unique had loaned funds to Synergies, which loaned the same funds to Twin Fields, and that both loans were subsequently repaid. The representative then asked, "Unique is affiliated correct? Does Nirav own it? Is this why there are loans back and forth?" Gandhi replied, "Unique is not an affiliated company but Nirav has a very good relationship with them." The representative then asked, "Why is each company lending to the other?" Gandhi replied, "I am sure there were business reasons. What is the concern for the bank?"

138.     As another example, on September 7, 2011, a banker at Standard Chartered Bank asked Ajay Gandhi, "We understand that Firestar in NY sales [sic] mostly to big retailers in the US but the recent A/R outstanding shows more concentration on companies such as Unique Diamond, Empire Gem and SDC Designs. Can we get YTD sales data of 2010 and 2011 of the top 10 accounts for each year on year comparison?" She further stated, "Also, in the AR ageing it shows Firstar has given Steller [sic] diamonds and Unique diamonds $11m limits each—and Brilliant, Fancy creations $2m each. We understand that these foreign bills we are not discounting them, but we'd like to get more background info on these accounts given the size of exposures."

139.     On September 12, 2011, Gandhi replied, "Various overseas companies that you have mentioned are not our customers. We buy unique large diamonds/jewelry pieces from various vendors in India and sometimes these goods need to be returned, but due to the terms of

the original sale, the vendors instruct us to ship these goods to another companies [sic], that they select, who are not located in India. We record these transfers as a reduction to purchases and an increase to accounts receivable at the original purchase cost of the diamonds/ jewelry."

140.    Mihir Bhansali, who was included on the email from Gandhi, forwarded this response to Modi, stating "Nirav, Please read this email below from SCB last week, and Ajay's reply. Just an FYI." Modi then forwarded the email to the former deputy managing director of Axis Bank's corporate banking division, and stated, "As SC is a common bank in India, Antwerp and NY. It might be a good idea that Ajay and you discuss all responses."

141.    As another example, on April 22, 2017, an auditor asked Ajay Gandhi why FDI had recorded a payable for an invoice issued by Fancy Creations to NMI. Gandhi replied, "Vendor error." A few minutes later, apparently deciding that excuse was not sufficient, he equivocated, "Also to save freight, they ship together as one invoice. Difficult to fight with them."

142.    And as yet another example, on April 26, 2017, Ajay Gandhi asked Mihir Bhansali how he should respond to an auditor's inquiries into the U.S. Entities' multi-million-dollar A/R and A/P balances with Shadow Entities Auragem and Fancy Creations. Bhansali directed Gandhi to discuss the issue with Shyam Wadhwa and asked when the Shadow Entity balances could be cleared.

143.    At least some of the coordination of the various Shadow Entities' involvement in manipulating audits, and the Bank Fraud more generally, was conducted through an operation1@firestardiamond.com ("**Operation 1**") email address. The Operation 1 account was used by Sandeep Mistry and possibly others.

144.    As part of the audit process, auditors would email parties listed on the audited company's accounts receivable and accounts payable records to request written confirmation of the amounts reflected in the audited company's books and records. For audits of the U.S. entities,

26

which were conducted together, Ajay Gandhi would be copied on the auditor's emails to Shadow Entities, which Gandhi would often forward to Operation 1 to ask that Operation 1 cause the Shadow Entity to provide confirmation the auditors. Specific examples of such emails are described in Appendix A-144

145.     The Operation 1 account was also used to orchestrate transfers of funds and jewels among Firestar Entities and Shadow Entities, as demonstrated by the specific examples described in Appendix A-145.

>    **D.     Involvement of Mehul Choksi, Nehal Modi, Neena Sheth, Deepak Sheth, and Abhay Javeri, and the Sheth Entities and SDC Entities in the Bank Fraud.**

146.     Mehul Choksi is Nirav Modi's uncle. Choksi is accused of orchestrating his own bank fraud scheme through his India-based company Gitanjali Gems Ltd., its U.S.-based subsidiaries including Gitanjali USA, Samuels Jewelers, Inc. ("**Samuels**"), Aston Luxury Group (NY), Diamlink, Inc., Diamlink Jewelry, Inc., Jewelry Marketing Company, Tristar Worldwide LLC, and Phantom Luxury Group, along with a web of fictitious vendors and customers analogous to the Shadow Entities.

147.     Although Nirav Modi's and Mehul Choksi's fraud schemes primarily operated in parallel from a corporate standpoint, members of their family participated on both sides. For example, Nehal Modi, Nirav Modi's brother, was in charge of Gitanjali USA, Samuels, and Diamlink on the Choksi-side and BBB Group on the Modi side. Similarly, Mehul Choksi's sister and Nirav Modi's aunt, Neena Sheth, served as a director of Diamlink.

148.     Neena Sheth's husband, Deepak Sheth, (i.e. Nirav Modi's uncle and Mehul Choksi's brother-in-law), owns New York-based Excellent Facets, Inc. and Amadena Investments Inc. (collectively, the "**Sheth Entities**"). As alleged below, Deepak Sheth also served as the initial

Protector and Investment Advisor of the Ithaca Trust and as Manager of CPS50 in connection

with

149.     Also involved was Ami Modi's brother and Nirav Modi's brother-in-law, Abhay

Javeri. Javeri owns SDC Designs, Inc., SDC Designs LLC, Sangam Diamonds Corporation, and

Sangam Diamonds LLC (collectively, the "**SDC Entities**"). Abhay Javeri also served as Protector

and Investment Advisor of the Ithaca Trust and as Manager of CPS50.

150.     Deepak Sheth, Neena Sheth, Nehal Modi, Abjay Javeri, and their respective

companies participated in the Bank Fraud throughout the Relevant Period.

151.     Deepak Sheth and the Sheth Entities participated in direct transactions with

Shadow Entities totaling over $19 million during the Relevant Period.

152.     For example, in March 2016, Deepak Sheth instructed Mihir Bhansali and Ajay

Gandhi to have NMI bill Excellent Facets $965,000 for a 15.21-carat diamond necklace and a 10.71-

carat diamond ring, but to ship the pieces to Shadow Entity Sunshine in Hong Kong. Sheth

referred to Sunshine as "his customer."

153.     Abhay Javeri and the SDC Entities participated in direct transactions with Shadow

Entities involving millions of dollars during the Relevant Period.

154.     For example, on December 4, 2012, the SDC Entities' CFO Sridhar Krishnan

advised Ajay Gandhi that Shadow Entity Empire would be wiring $2.7 million to FDII as partial

payment against a July 2012 invoice and instructed Gandhi to use the funds to pay SDC Designs

LLC against another July 2012 invoice. Gandhi forwarded the email to Hemant Bhatt and asked,

"Is this OK once funds are received?" Bhatt replied, "Do not send email. Please call me to confirm

in the morning."

155.     As another example, on February 4, 2013, Sridhar Krishnan advised Mihir Bhansali

and Hemant Bhatt over personal email that he had wired $1.4 million from an SDC Entity to

Shadow Entity Universal and asked Bhatt to wire those funds to Jaffe. On February 6, 2013, Bhatt

confirmed that Universal had received the funds and that Empire had paid US $1,391,570 to Jaffe.

That same day, Jaffe wired $1,391,997 to SDC.

156.     As another example, on February 11, 2013, Sridhar Krishnan advised Mihir

Bhansali and Hemant Bhatt over personal email that he had wired $1.2 million from SDC Designs

LLC to Shadow Entity Empire and instructed Bhatt to wire those funds to Jaffe and FDI. Jaffe and

FDI then wired the funds to SDC Designs LLC.

157.     As yet another example, on December 31, 2013, Mihir Bhansali directed Ajay

Gandhi to wire $1.2 million from FDI to Sangam Diamonds Corp. to pay off an invoice issued to

Shadow Entity Fancy Creations. On January 8, 2014, Gandhi forwarded Bhansali's December 31,

2013 email to Hemant Bhatt, stating "I paid $1.24m on 12/31/13 to Fancy per attached. This funds

never came back hence I will pay $575k today. Please call me if needed."

158.     On May 25, 2018, an accountant at Marks Paneth emailed Sridhar Krishnan a

request for information relating to SDC Entities' customers with outstanding A/R balances more

than 90 days old, including Empire, a Shadow Entity, and Diamlink, a Mehul Choksi-owned

company managed by Neena Sheth and Nehal Modi.

159.     Sridhar Krishnan could not transfer funds from the SDC Entities' bank accounts

without Abhay Javeri's personal authorization. For example, on March 10, 2015, Ajay Gandhi

asked Sridhar Krishnan to provide wire details for potential payments to SDC Designs Inc. and

SDC Designs LLC. Krishnan replied with the bank account information but stated, "Please do not

wire anything this week. **Abhay is in Mumbai and no one can approve wires**."

160.     Moreover, on many occasions, Mihir Bhansali and Ajay Gandhi would

immediately transfer funds received by the U.S. Entities from the Sheth Entities and SDC Entities

to Shadow Entities and Foreign Firestar Entities (including to pay off letters of credit issued to

Foreign Firestar Entities through HSBC's L/C Collections service), as they commonly did with funds received from Shadow Entities and Firestar Entities, but not from *bona fide* customers. Specific examples of such transactions are described in Appendix A-153.

161.     Ajay Gandhi, Saju Poulose, Shyam Wadhwa, and other co-conspirators treated transactions with the Sheth Entities and SDC Entities as "non-core" as they did with the Shadow Entity transactions and other transactions linked to the Bank Fraud.

162.     For example, Ajay Gandhi and Shyam Wadhwa maintained a spreadsheet summarizing the gross margin for "various divisions" for the 2012 – 2013 fiscal year. The spreadsheet contained separate columns for "core business" and "large pieces." The spreadsheet listed gross sales of $35,035,180 at a 12.03% gross margin for the "core business" column and gross sales of $17,711,569 at a 5.51% gross margin for the "large pieces" column. The spreadsheet also contained an itemized list of transactions comprising the $17,711,569 in "larger pieces" sales, including a total of $7,758,454 in sales to SDC entities, $1,253,254 to Excellent Facets, $1,912,840 to Pacific, and $3,019,406 to Empire.

163.     Additional examples illustrating the suspicious accounting practices for transactions involving SDC Entities and Sheth Entities are described in Appendix A-163.

164.     Additional suspicious transactions and communications involving the Deepak Sheth, Neena Sheth, and the Sheth Entities are described in Appendix A-164.

165.     Additional suspicious transactions and communications involving Abhay Javeri and the SDC Entities are described in Appendix A-165.

**E.     Laundering of Funds Through Twin Fields and Bailey Banks & Biddle**

166.     Throughout the Relevant Period, tens of millions of dollars in proceeds of the Bank Fraud were funneled to or through Twin Fields and BBB Group, Inc. ("**BBB Group**").

167.    On November 4, 2009, Ajay Gandhi, acting on behalf of Synergies, successfully bid on the intellectual property rights of Bailey Banks & Biddle, an established U.S. jewelry retailer, at a bankruptcy auction.

168.    Nirav Modi formed Switzerland-based Diamonds Holdings SA to serve as Synergies' nominee to purchase the *Bailey Banks & Biddle* intellectual property.

169.    On March 16, 2010, Twin Fields Investments Ltd. ("**Twin Fields**") was incorporated in Delaware. At all relevant times, Purvi Mehta and Deepak Modi indirectly owned 100% of the equity in Twin Fields through two layers of BVI shell companies, including Link High International ("**Link High**").

170.    On May 13, 2010, BBB Group, Inc., d/b/a as Bailey Banks & Biddle, was incorporated in Delaware. Twin Fields owned 100% of the equity of BBB Group.

171.    Diamonds Holdings SA licensed the *Bailey Banks & Biddle* intellectual property to Twin Fields, which in turn sublicensed it to BBB Group.

172.    Mihir Bhansali and Nehal Modi managed and controlled Twin Fields and BBB Group throughout the Relevant Period as the *de jure* or *de facto* directors of Twin Fields and BBB Group, respectively.

173.    The law firm that managed registrations for the *Bailey Banks & Biddle* intellectual property directed communications to Mihir Bhansali, sent their invoices to Bhansali, and otherwise treated Bhansali as the representative of Diamond Holdings, Twin Fields, and BBB Group.

174.    In 2010, BBB Group opened several retail locations under the Bailey Banks & Biddle name, which it continued to operate throughout the Relevant Period.

175.    Between November 2010 and March 2018, approximately $80 million flowed through Twin Fields. From 2010 to early 2013, Link High was the primary source of funds for the

31

Twin Fields' account, transferring $23,602,660.00. According to Indian authorities, Link High received millions of dollars of in fraudulent LOU proceeds.

176. Between February 2013 and May 2017, Jaffe transferred at least $21,330,000.00 to Twin Fields. Jaffe maintained relatively small balances in its operating account and did not have sufficient capital to make large loan payments to Twin Fields. Most of the disbursements from A. Jaffe to Twin Fields were funded on or around the day of the payments from other sources, including FDI and known Shadow Entities Pacific Diamonds and Universal Fine Jewelry.

177. On or about June 22, 2015, FDI transferred an additional $31,542.28 to Twin Fields.

178. Between 2016 and 2017, Shadow Entity Fine Classic, of which Purvi Mehta was the 100% owner, transferred at least $26,864,056.00 to Twin Fields. In an email chain dated January 11, 2017, Mihir Bhansali told Marks Paneth, Twin Fields's accountant, that Fine Classic was an overseas company that lent money to Twin Fields to fund BBB Group.

179. Between 2011 and 2017, Twin Fields transferred at least $42,748,000 to BBB Group. BBB Group made no repayments or other transfers to Twin Fields during the Relevant Period.

180. The Twin Fields account was closed on February 21, 2018 with a balance of $13,281.

181. Mills Menser, the manager of the *Bailey Banks & Biddle* store in Austin from July 2017 until March 2018, sent Nehal Modi and Mihir Bhansali weekly updates on the businesses' operations and performance. Bhansali would then pass these updates along to Nirav Modi.

182. On May 1, 2018, Mills Menser proposed several options for winding down the business for Nehal Modi and Mihir Bhansali's consideration. He concluded by stating he would "support any decision ownership feels is the best fit for them."

183. Based on, among other things, Purvi Mehta and Deepak Modi's undisclosed ownership of Twin Fields through BVI shell companies, the more than $60 million laundered through Twin Fields from Fine Classic, Link High, and Jaffe, and Mihir Bhansali and Nehal

32

Modi's involvement in its management and operations, it appears that Twin Fields and BBB Group constituted another front for Nirav Modi and his family's massive money laundering efforts.

### F.    Detection and Exposure of the Bank Fraud

184.    In late May 2017, Golkunath Shetty, the PNB employee who approved fraudulent LOUs for the benefit of Nirav Modi's companies, retired. In the months leading up to his retirement, between February and May 2017, Shetty approved nearly 150 new LOUs totaling over $1 billion to the LOU Entities. These LOUs became due on or around January 25, 2018.

185.    According to Indian authorities, Nirav Modi and his brother Neeshal Modi fled India on January 1, 2018, and Ami Modi and Mehul Choksi did so on January 6, 2018 and January 4, 2018, respectively.

186.    On January 5, 2018, Nirav Modi purchased a London apartment for £7,950,000 in cash under the name "Richard Beattie" which appears to be an alias or surrogate of Nirav Modi. Modi was living in this apartment when he was arrested in March 2019. It is was also the registered office of Diamond Holdings Ltd., a UK company Nirav Modi formed in May 2018.

187.    On or around January 20, 2018, a representative of one of the LOU Entities asked PNB to roll-over the 2017 LOU balances into new LOUs. On January 22, 2018, PNB refused to issue new LOUs without a 100% cash margin deposit, among other requirements. The Modi representative refused to furnish any margin on the grounds that PNB had never before required a margin to issue an LOU. PNB immediately began investigating the borrowing practices of the Modi-Controlled Entities.

188.    The Bank Fraud has resulted in several investigations and criminal enforcement actions against Nirav Modi, Mihir Bhansali, and Defendants Ami Modi, Purvi Mehta, Mayank Mehta, Nehal Modi, Neeshal Modi, and others by Indian governmental authorities, including the

Central Bureau of Investigation ("**CBI**"); the Directorate of Enforcement ("**ED**"); the Income Tax Department; and the Serious Fraud Investigation Office.

189.    On January 29, 2018, PNB lodged a criminal complaint against Nirav Modi with India's CBI. On February 13, 2018, PNB lodged a complaint against Nirav Modi with India's ED, which subsequently attached various movable and immovable properties belonging to Nirav Modi and various Modi-Controlled Entities.

190.    On July 3, 2018, PNB filed Application No. 119/2018 in the Debts Recovery Tribunal No. I at Mumbai (the "**Indian Debt Tribunal**") against, *inter alia*, Nirav Modi and certain of his family members, each LOU Entity, FIL, and FDIPL.

191.    In early 2019, Nirav Modi was found living in London under the alias "Edmond Dantes."

192.    On or about March 12, 2019, the Indian government issued an extradition request to the government of the United Kingdom on the basis of an arrest warrant issued against Nirav Modi by an Indian court. Modi was arrested in London on or about March 20, 2019 and is currently incarcerated in London.

193.    On July 6, 2019, the presiding officer of the Indian Debt Tribunal issued a judgment against Nirav Modi, Ami Modi, Nehal Modi, Neeshal Modi, Purvi Mehta, the LOU Entities, FIL, and others based on the following factual findings, among others (capitalized terms in original):

(i)    Nirav Modi has floated Overseas Companies in Hong Kong and U.A.E. which are dummy/shell Companies. The Directors and share-holders of these Companies are either ex-employees or employees acting under instructions of Nirav Modi.

(ii)    The Overseas Companies and Hong Kong and Dubai deals with the Firestar Group directly or indirectly owned by Nirav Modi who has full control over these Companies through the dummy Directors. The Enforcement Directorate in its Complaint has recorded that the list of top 8 borrowers and top 8 suppliers are none else but the ex-employees of Firestar Group and acting and implementing the instructions given by Nirav Modi and Mihir Bhansali.

34

(iii)    The fraud has been perpetrated by Nirav Modi in collusion, connivance and with the aid and assistance of the group companies i.e. Firestar International Limited and Firestar Diamond International Pvt. Ltd. along with their affiliates, subsidiaries, Nirav Family Trust, Nirav Modi Family Trust, directors and key managerial personnel.

(iv)    The investigation conducted by the Enforcement Directorate further reveals that the dummy Companies were set up in Hong Kong and Dubai along with the regular Firestar Group Companies [and] acted as nodes for circular transactions to layer and launder money generated by the fraudulent LOUs.

(v)    [Nirav Modi and his family members] are the mastermind[s] behind the perpetration of the fraud. Defendants have laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purposes of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs.

(vi)    All of the aforesaid dates and events reveal the systematic fraud was perpetrated by Nirav Modi and moving the US Court for insolvency to avoid the liability. Nirav Modi and his accomplishes [sic] have taken prompt steps before the US Court to avoid the seizer [sic] and attachment of the properties purchased and acquired by Nirav Modi from the proceeds of the fraudulent debt.

The Bank Fraud resulted in a total loss to PNB and other banks in excess of $1 billion. As a result of the Bank Fraud, PNB has asserted claims against each of the Debtors in excess of $1 billion on the grounds, among others, that a substantial portion of the proceeds of the Bank Fraud were transferred to or through the Debtors. In addition, the Bank Fraud and its exposure and the seizure by Indian authorities of Modi-Controlled Entities in India resulted in the collapse of the Debtors' businesses and the filing of these chapter 11 cases.

35

## II.    Criminal Efforts Shortly Before and Following Exposure of the Bank Fraud

194.    In the weeks leading up to and following exposure of the Bank Fraud in January 2018 when the last LOUs Golkunath Shetty authorized before retiring became due, Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators shifted their focus to shielding assets from creditors.

### A.    Looting of the Debtors, U.S. Affiliates, and Other Firestar Entities

195.    Nirav Modi, Mihir Bhansali, Ajay Gandhi, and other co-conspirators diverted substantial amounts of the Debtors' cash and inventory to overseas Modi-Controlled Entities in the weeks leading up to the Debtors' bankruptcy filing. For example:

(i)    On or around December 5, 2017, FDI shipped inventory with a declared value of $1,632,500.53 to World Diamond.

(ii)    On January 3, 2018, FDI wired $2,672,389.48 to Pacific. That same day, Jaffe wired $530,000 to Pacific. Ajay Gandhi was directly involved in these transfers.

(iii)    On or around January 23, 2018, FDI shipped 2,319.64 carats of loose diamonds with a declared value of $426,320.97 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi and Mihir Bhansali were directly involved in this shipment.

(iv)    On January 25, 2018, FDI wired $910,278.70 to Dubai-based Firestar Diamond FZE, which was managed by co-conspirators Kurian Mathews and Satyendra Shukla. Ajay Gandhi was again directly involved in this transfer.

(v)    On January 26, 2018, FDI shipped inventory having a declared value of $85,150 to Nirav Modi Ltd. in Hong Kong.

(vi)    On February 6, 2018, FDI wired $1,002,836.77 to FIPL, Jaffe wired $505,610.51 to FIPL and Fantasy wired $401,471.08 to FIPL. That same day, Subhash Parab emailed Ajay Gandhi, copying Shyam Wadhwa, "Please pay following bills to FIPL . . . We have some urgent re-payment from IDBI bank for that [sic] require below bills in IDBI bank[.]"

(vii)    On or around February 6, 2018, FDI shipped 4,474.15 carats of loose diamonds with a declared value of $789,140.42 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi was directly involved in this shipment.

196.    Additionally, in the weeks leading up to and following the Petition Date, Nirav

Modi, Mihir Bhansali, and Ajay Gandhi caused NMI and FDII to move significant amounts of

cash and inventory overseas where their creditors, including the Debtors, could not reach them.

For example:

(i)    On December 22, 2017, FDII shipped inventory with a declared value of $1,418,549 through Malca Amit to Fancy Creations in Hong Kong.

(ii)    On January 4, 2018, NMI shipped two packages of inventory, with declared values of $585,000 and $65,000, respectively, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(iii)    On January 5, 2018, FDII shipped inventory with a declared value of $167,810.65 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(iv)    On January 10, 2018, NMI shipped inventory with declared value of $108,550, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(v)    On January 10, 2018, FDII shipped inventory with a declared value of $239,871.29 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(vi)    On January 11, 2018, NMI shipped inventory with declared value of $32,370, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(vii)    On January 15, 2018, FDII shipped inventory with a declared value of $781,882.38 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(viii)    On January 16, 2018, NMI shipped inventory with declared value of $943,800, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(ix)    On January 19, 2018, NMI shipped three packages of inventory, with declared values of $273,000, $409,500, and $771,680, respectively, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(x)    On January 24, 2018, NMI shipped inventory with a declared value of $1,075,200 through Malca Amit to FDIPL in India.

(xi)    On January 25, 2018, FDII shipped inventory with a declared value of $1,886,922.67 through Malca Amit to Fancy Creations in Hong Kong.

(xii)    On January 26, 2018, NMI shipped inventory with a declared value of $198,750 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xiii)    On January 29, 2018, NMI shipped inventory with a declared value of $75,050 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xiv)    On January 30, 2018, FDII shipped inventory with a declared value of $570,104.37 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(xv)    On January 31, 2018, NMI shipped inventory with a declared value of $660,500 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xvi)    On January 31, 2018, FDII wired $2,466,015 and $525,000 to Fancy Creations. That same day, Ajay Gandhi forwarded the wire confirmations to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

(xvii)    On February 2, 2018, FDII wired $400,000 to Fancy Creations. That same day, Ajay Gandhi emailed Avinash Oza and Kunal Patel, copying Shyam Wadhwa, "Please wire $400,000 to Fancy from Capital One – Advance Refund." Oza replied with the wire confirmation.

(xviii)    On February 13, 2018, NMI shipped inventory with a declared value of $154,440 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xix)    On March 6, 2018, FDII shipped inventory with a declared value of $4,325,472.34 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

197.    Around this time, Mihir Bhansali promised to use the NMI inventory to repay FDI's secured creditors, including Israel Discount Bank of New York ("**IDB**"), after transferring it to the Debtors to offset NMI's debts to FDI and Jaffe. IDB's counsel attempted to enforce this promise during negotiations regarding the Debtors' use of cash collateral by seeking to require the Debtors to collect the amounts owed to them by NMI. As alleged below, however, this never occurred, and instead, Mihir Bhansali was involved in diverting those assets to Hong Kong, beyond the Debtors' reach.

198.    Between late February and early March 2018, the NMI boutiques in Las Vegas, Honolulu, Los Angeles, and New York shipped substantially all of their inventory to New York. The inventory, which had a total value of approximately $40 million, was held in storage by Malca

38

Amit because its value exceeded the amount of available insurance coverage on items stored in the Debtors' vault.

199.    Around this time, Mihir Bhansali, Ajay Gandhi, and Angelina Ypma, in their capacity as directors and officers of Nirav Modi Ltd. ("**NMLUK**"), the UK-based subsidiary of NML that operated the London *Nirav Modi* boutique, were also working together to shut down the London store and divert its assets to Hong Kong.

200.    Nitin Dattani of Dattani Chartered Accounts, the London based accounting firm that had been advising NMLUK since 2016, was also heavily involved in shuttering the London boutique. Dattani assisted Nirav Modi in forming Diamonds Holdings Ltd., the company Nirav Modi established while he was hiding out in London. Additionally, as alleged below, in May 2018, Abhay Javeri appointed Nitin Dattani to replace Nehal Modi as manager of Central Park South 50 Properties LLC, which owned Nirav Modi and Ami Modi's New York Ritz Carlton apartment.

201.    On March 2, 2018, Francois-Xavier Derricks, the manager of the London boutique sent a letter to Mihir Bhansali and Angelina Ypma in their capacity as directors of NML UK. In the letter, Derricks acknowledged that Bhansali and Ypma had previously instructed him to communicate by WhatsApp and private email, but stated that he was "concerned by the recent lack of information and guidance in relation to the management of the London boutique's affairs."

202.    On March 4, 2018, Ajay Gandhi instructed Derricks to ship substantially all of the London boutique's inventory, a total of 404 pieces of jewelry, having a total value of $5,974,614, to FDL in Hong Kong. This shipment occurred shortly thereafter.

203.    On March 11, 2018, Angelina Ypma instructed Ajay Gandhi to ship a fancy pink diamond ring from NMI to the "H[ong] K[ong] office." She told Gandhi she had sent him a

picture of the ring over WhatsApp. Nirav Modi confirmed his approval from his personal email account, which Ypma copied on her email to Gandhi.

204.    Around this time, Nehal Modi and Mihir Bhansali brought in Anthony Allicock, Nehal Modi's personal friend and former colleague at Diamlink, to "manage the wind down" of the Hong Kong Firestar Entities. Allicock, a New York retail store manager, had no prior insolvency or finance experience.

205.    On March 19, 2018, Anthony Allicock was appointed the sole director of FHL, NML, and FDL.

206.    On March 22, 2018, Mihir Bhansali executed corporate resolutions on behalf of each of the U.S. Affiliates authorizing the U.S. Affiliates to indemnify Mihir Bhansali and advance his legal costs.

207.    On March 23, 2018, Mihir Bhansali, as sole director of each U.S. Affiliate, appointed Jacen Dinoff and Michael Goldman of KCP Advisory Group as directors and President and Chief Financial Officer, respectively, of each of the U.S. Affiliates.

208.    On March 26, 2018, Mihir Bhansali and Ajay Gandhi resigned from their positions with the U.S. Affiliates.

209.    On April 5, 2018, Angelina Ypma, the global president of the *Nirav Modi* brand and a director of FIL, emailed Ajay Gandhi, copying Mihir Bhansali, "Nirav has instructed me to work with you to move all of NM US inventory (HJ and core back to HK ASAP.) HK will pay Malca in advance to move the jewels." In response, Gandhi, copying Jacen Dinoff, Michael Goldman, and shipping manager Shaneeza Singh, stated that he and Bhansali had resigned from NMI "due to conflict of interest" and that she should work with Dinoff, Goldman, and Singh to coordinate the shipments. Gandhi further noted that he and Bhansali were "happy to assist as needed should [Ypma] hit any bottleneck."

210.    Ypma then instructed Dinoff and Goldman to send her a detailed inventory of NMI inventory in New York and stated, "We need to ship all products to HK." Goldman replied to Singh, "we are NOT shipping anything right now. I will let you know when it is okay to do this."

211.    That same day, Anthony Allicock emailed Goldman and Dinoff, "In my capacity as Director of Firestar Holdings Limited, I am relieving you of your duties and directorship of the New York subsidiaries effective immediately. Please confirm in writing your acceptance of the same." When interviewed by the Trustee, Allicock indicated that Mihir Bhansali or Nehal Modi directed him to terminate Goldman and Dinoff, but that he could not recall the details.

212.    Goldman forwarded the email to Mihir Bhansali and Ajay Gandhi and stated, "[W]e were attempting to verify with outside parties the position and authority of Anthony Allicock before sending him almost $7 million of diamonds. We did not move quickly enough for him and he sent us the email below. Is it your understanding that he has the authority to do this, and that his declaration is enough to make it official? Upon review of Anthony's email, do you also consider our positions and responsibilities to be terminated?" Bhansali replied, "Neither Ajay nor I will be able to comment on the below."

213.    That same day, Anthony Allicock appointed himself sole director and president of each of the U.S. Affiliates.

214.    On April 6, 2018, FDII inventory having a total declared value of $6,804,210.49 was shipped through Malca Amit to Firestar Diamond Ltd. in Hong Kong. This shipment appears to involve the "almost $7 million" in diamonds Dinoff and Goldstein refused to ship.

215.    Nehal Modi then approached Mark Motes and Eddy Friedfeld as potential replacements for Dinoff and Goldman. Mark Motes, the former chief operating officer of Maryland-based Smyth Jewelers, was a diamond industry veteran. Eddy Friedfeld was a

41

turnaround consultant who had managed Diamlink's out-of-court restructuring in 2015 and 2016. Nehal Modi had previously worked with both Motes and Friedfeld.

216.    Mihir Bhansali then interviewed Motes and Friedfeld. He told them he was looking for two industry professionals he could trust.

217.    On April 13, 2018, Anthony Allicock, at Mihir Bhansali's and Nehal Modi's direction, appointed Mark Motes the sole director and president, and Eddy Friedfeld the chief liquidation officer, of each U.S. Affiliate.

218.    On April 25, 2018, 45 pieces of NMI inventory, with a total declared value of $6,315,615, were shipped via Malca Amit to NML in Hong Kong.  Ajay Gandhi signed the packing lists included in the shipping instructions.

219.    On April 30, 2018, 93 pieces of NMI inventory, with a total declared value of $13,108,072, were shipped via Malca Amit to NML in Hong Kong. Ajay Gandhi signed the packing list included in the shipping instructions.

220.    On or around May 3, 2018, FDII inventory with a declared value of $3,200,000 was moved to Malca Amit to be held in storage.

221.    Around the same time, Anthony Allicock, Mihir Bhansali, Ajay Gandhi, Angelina Ypma, and Nitin Dattani were trying to divert NMLUK's remaining cash to Hong Kong. Gandhi, Bhansali, and Ypma officially resigned their NMLUK positions on March 12, 2018, but as with the U.S. Affiliates, their resignations were on paper only and they remained in control of NMUK and its assets.

222.    On April 9, 2018, Angelina Ypma instructed Ajay Gandhi and Mihir Bhansali to "transfer the funds available in Nirav Modi Ltd. in London to Nirav Modi Ltd. in Macau." On April 29, 2018, Anthony Allicock asked Ajay Gandhi whether the more than £ 1,000,000 in NMLUK's Barclays account had been transferred to Hong King. Gandhi replied that a portion of

42

the funds had been wired, but that the account had been blocked. Allicock, Gandhi, Bhansali, Ypma, and Dattani worked together over the next few weeks to unblock the account so they could move the remaining funds to Hong Kong.

223.     On May 4, 2018, Ypma emailed Gandhi and Bhansali, "I shall be coming to NY from Monday 7 till Thursday 10 May to review the NM inventory. Nirav told me that I can work with [FDI employee Shanna Singh] to count the inventory . . . Thank you to give me the support." Gandhi reiterated that he and Bhansali had resigned from NMI and directed Ypma to work with NMI's new management "on the logistics."

224.     During Angelina Ypma's visit to New York in May 2018, Ajay Gandhi and Mihir Bhansali gave her permission to remove several million dollars' worth of the inventory in storage at Malca Amit. According an employee who accompanied Ypma to Malca Amit, Ypma selected approximately $5 million from various parcels. The pieces Ypma selected were then shipped to Hong Kong in two shipments.

225.     First, on May 9, 2018, inventory with a declared value of $2,700,000 was shipped through Malca Amit to Fancy Creations in Hong Kong. (The Malca Amit documentation listed FDII as the shipper, but this shipment might have involved NMI inventory as well.)

226.     Then, on May 15, 2018, 122 pieces of NMI inventory with a declared value of $2,516,470.79 were shipped to NML in Hong Kong through Malca Amit. Ajay Gandhi signed the packing list included in the shipping instructions.

227.     On May 23, 2018, NML "sold" the 122 pieces of NMI inventory to FDL. That same day, FDL "sold" the same pieces to Shadow Entity Sino Traders. Anthony Allicock signed the invoices for both of these purported sales. Yet, on June 19, 2018, Allicock told attorneys for the Hong Kong Firestar Entities that the May 15 shipment was sent from New York without Allicock's authorization and asked them to attempt to locate the shipment.

228.    Throughout May 2018, Anthony Allicock pressured Eddy Friedfeld and Mark Motes to ship the remaining NMI and FDII inventory to Hong Kong. They refused to do so until all of the U.S. Affiliates' creditors were paid. When Friedfeld and Motes discovered the May 15, 2018 shipment, they demanded that Allicock arrange for the return of the shipment. Allicock refused.

229.    On June 1, 2018, at Nehal Modi's direction, Anthony Allicock terminated Friedfeld and Motes and appointed Rochelle Miller, another personal friend of Nehal Modi, as CEO and sole director of each U.S. Affiliate. Prior to her appointment, Rochelle Miller worked as an event planner and had no jewelry industry, insolvency, management, or financial experience.

230.    That same day, Anthony Allicock introduced Rochelle Miller to Angelina Ypma. Allicock and Ypma instructed Miller to retrieve the NMI and FDII inventory from Malca Amit and ship it to Hong Kong.

231.    At the time of Rochelle Miller's appointment, the U.S. Affiliates' bank accounts held a total of $1,283,454.05.

232.    On June 2, 2018, Rochelle Miller, acting in her capacity as director/CEO of NMI, contacted Malca-Amit to request shipment to Hong Kong of two sets of NMI inventory: 1) 208 pieces at a declared value of $5,063,914.01; and (2) 53 pieces at a declared value of $2,846,545. Malca Amit refused to do so until it could verify Miller's authority.

233.    On September 5 and 7, 2018, after confirming Rochelle Miller's appointment as director and CEO of NMI and FDII, Malca Amit released nine parcels containing the remaining NMI and FDII inventory to the custody of Rochelle Miller.

234.    Rochelle Miller, on information and belief, at the direction of Nehal Modi, shipped all of the NMI and FDII inventory to be appraised by Independent Gemological Laboratories ("**IGL**"), a purportedly independent diamond grading laboratory. However, according to the

44

Samuels examiner's report, IGL is secretly owned by Mehul Choksi through a BVI shell company. The Samuels examiner found that Choksi's secret ownership of IGL permitted Samuels to conceal from consumers the fact that its jewelry products were not independently evaluated. IGL's offices were directly next to Diamlink's offices.

235.    On October 2, 2018, IGL's president Curtis Lowrey advised Rochelle Miller that IGL had completed its inspection and appraisal of the NMI and FDII inventory, which Lowrey described as "17 bags and trunks of merchandise." IGL appraised the NMI and FDII inventory at a "scrap value" of approximately $1.5 million. Lowrey further noted that, "as this is a 'fire sale' . . . I made deeper discounts than would normally be customary in pricing a closeout inventory." Rochelle Miller paid IGL a total of $81,943 from June 2018 to June 2019 from FDII's and Synergies' bank accounts.

236.    Rochelle Miller then purported to sell the NMI and FDII inventory to the "highest bidders" for a total purchase price of $1,593,550. It appears that most, and possibly all, of the purportedly arms-length purchasers were surrogates of Nirav Modi and his family.

237.    For example, under an invoice October 4, 2018, Rochelle Miller sold an unspecified quantity of "mixed jewelry" to Hong Kong-based Alchemist Global Trading & Consulting Ltd. ("**Alchemist**") for a total price of $420,300. Alchemist was formed on May 16, 2018 and is owned by Tamer Abou El Ata, who on information and belief, is a personal friend of Nehal Modi.

238.    Under an invoice dated October 8, 2018, Rochelle Miller sold 296.56 carats of "loose diamonds" for $605,000 to Diamonds Village USA Corp., the California-based subsidiary of Dubai-based Diamonds Village DMCC. In July 2018, the owner of Diamonds Village, Naresh Mehta, was accused of running his own import-export scam using a *modus operandi* similar to Nirav Modi. The Firestar Entities' books and records reflect numerous transactions with Diamonds Village over the years.

45

239.    On October 9, 2018, Rochelle Miller paid herself a "one-time bonus" of $50,000 from FDII's bank account. On October 17, 2018, Rochelle Miller wired $75,000 to Anthony Allicock from Synergies' bank account. These payments appear to be incentive compensation tied to Miller's sale of the FDII and NMI inventory.

240.    Between June 2018 and June 2019, Rochelle Miller received a total of $807,203 in compensation, bonuses, and expense reimbursements from the U.S. Affiliates. Miller also paid an additional $535,763 to Mint Holdings, LLC, a Miami-based "luxury concierge service" company with ties to the Modi family, for "expense reimbursements" for which she received the benefit. Miller also paid a company owned by her husband, North Star Land Services, a total of $49,060 for unknown "sales."

241.    Rochelle Miller spent the remainder of the U.S. Affiliates' funds on legal and financial advisors, taxes, office space leases, director & officer insurance premiums, and other miscellaneous expenses.

242.    The systematic diversion of the U.S. Entities' assets to overseas Modi-Controlled Entities described in the foregoing paragraphs, in combination with the fraudulent omissions and misrepresentations Ajay Gandhi and Mihir Bhansali made in the context of these chapter 11 cases, constituted millions of dollars in actual fraudulent transfers and impaired recovery of loan receivables of the Debtors and the U.S. Affiliates.

**B.    Fraudulent Omissions, Misstatements, and Misrepresentations Made in Connection With The Debtors' Chapter 11 Cases**

243.    On February 26, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. During the early weeks of the chapter 11 cases, Bhansali and Gandhi, as the Debtors' CEO and CFO, respectively, made fraudulent omissions, misstatements, and misrepresentations, formally and informally, explicitly and implicitly, to this Court, to the United

46

States Trustee, and to creditors, regarding the Debtors' involvement in the Bank Fraud and their relationship to various Shadow Entities.

244.    In his Declaration filed with this Court on February 28, 2018, Bhansali stated under penalty of perjury, "A list setting forth the twenty (20) largest unsecured creditors, of each of FDI, [Fantasy] and [Jaffe], excluding those persons who constitute 'insiders' under Bankruptcy Code section 101(31), is attached hereto as Exhibit B."

245.    Exhibit B to Bhansali's declaration, which purported to list the top 20 unsecured non-affiliated creditors of each Debtor, included: World Diamond as a creditor of FDI in the amount of $79,918.70; Fancy Creations as a creditor of FDI in the amount of $19,617.50; Tri Color as a creditor of Jaffe in the amount of $3,356,165.99; Pacific as a creditor of Jaffe in the amount of $2,922,239.31; Universal as a creditor of Jaffe in the amount of $42,905.00; and Eternal as a creditor of Jaffe in the amount of $31,645.39. Each of these entities was in fact an insider.

246.    Moreover, Bhansali led the bankruptcy court and other parties to believe that the Debtors were not involved in the Bank Fraud and that they were innocently caught up in an overseas matter. In a declaration filed shortly after the petition date, Bhansali declared under penalty of perjury: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to: (i) procure alternate sources of supply, (ii) establish alternate back office and support service functions; (iii) reassure their vendors and customers that they had no involvement in the alleged wrongful conduct; and (iv) reassure their customers that they were committed to carrying on their business and that swift action was being taken to mitigate the damage caused by the actions in India."

247.    On March 27, 2018, the Debtors filed their bankruptcy schedules and statements of financial affairs ("**SOFA**"), all of which Ajay Gandhi signed under penalty of perjury. The

Debtors' statements of financial affairs contained numerous misstatements, misrepresentations, and omissions.

248.    FDI's SOFA did not list any transfers to Shadow Entities in response to Question No. 3, which asks for payments made to creditors within 90 days prior to the petition date, Question No. 4, which asks for transfers of property to insiders of the debtor within 1 year prior to the petition date, or Question No. 13, which asks for any other transfers made outside the ordinary course of business within 2 years prior to the petition date.

249.    In truth, there were substantial transfers by FDI to Shadow Entities that Gandhi personally directed or otherwise participated in during the relevant periods. For example, Gandhi did not disclose FDI's transfers of $483,620.05 and $2,188,769.43 and Jaffe's transfer of $530,000 to Pacific on January 3, 2018—only a few weeks prior to the Petition Date. Nor did Gandhi disclose FDI's payment of $300,000 to Unique on March 22, 2017, less than a year prior to the Petition Date.

250.    Additionally, neither Jaffe's bankruptcy schedules nor SOFA disclosed any amounts owed by NMI to Jaffe.

251.    However, Jaffe's and NMI's books and records each reflected an $11,216,467 loan balance owed by NMI to Jaffe as of the Petition Date, which have not been repaid.

252.    On March 23, 2018, the Debtors moved for approval of bidding and sale procedures for the sale of substantially all of their assets under section 363 of the Bankruptcy Code. On March 29, 2018, the Court approved the Debtors' bidding and sale procedures.

253.    On April 20, 2018, the Court appointed John J. Carney as examiner (the "**Examiner**") to investigate the nature and extent of the Debtors' involvement in the Bank Fraud.

254.    Shortly after the Examiner's appointment, the Examiner attempted to interview Bhansali. Bhansali flatly refused to cooperate. When pressed by the Examiner's counsel,

48

Bhansali's counsel acknowledged that Bhansali was in communication with Modi as late as March 15, 2018, and that he and Modi discussed the Debtors' sale and bankruptcy process. As alleged above, Ajay Gandhi and Angelina Ypma also communicated with Nirav Modi in March 2018.

255.    On May 1, 2018, the Debtors adjourned the auction for FDI and Fantasy's assets indefinitely. On May 3, 2018, Parag Diamonds, Inc. was the successful bidder for Jaffe's assets.

256.    On May 15, 2018, at a hearing to approve the Jaffe sale, the Debtors' chief restructuring officer Mark Samson testified that Mihir Bhansali had been in communication with Nirav Modi between the commencement of the Debtors' chapter 11 cases and March 15, 2018, and that Bhansali continued to be involved "on a daily basis" as "a key employee" in the sale process after that date.

257.    Following this revelation, the Court asked for the record to be supplemented with additional detail concerning the nature and extent of Bhansali's post-petition communications with Modi, and adjourned the sale hearing to May 23, 2018. On May 19, 2018, the Debtors withdrew the sale motion without prejudice. (Dkt. 177.) At a hastily-arranged Chambers conference on May 18, 2018, Bhansali's counsel advised the Court that Bhansali resigned as director and officer of the Debtors that same day and that Bhansali refused to submit a declaration and appear for cross-examination concerning his post-petition communications with Modi.

258.    On May 17, 2018, Ajay Gandhi sat for an interview with the Examiner's team. In that interview, Gandhi stated that the only thing he knew about the Shadow Entities was that they were Bhansali's customers. In subsequent interviews, Gandhi continued to insist he was not aware that any Shadow Entity was owned or controlled by Nirav Modi. When confronted by the Examiner's team with emails indicating that Gandhi was aware that numerous Shadow Entities

49

were related parties, Gandhi repeatedly maintained he did not remember these emails, nor that the Shadow Entities were in any way controlled by Modi.

259.    Additionally, in response to the Examiner's questions regarding Gandhi's involvement in hundreds of millions of dollars in loose diamond transactions, Gandhi told the Examiner that he merely signed packing slips with no verification of the contents of the shipment, its valuation, the profitability, or propriety of such transaction.

260.    Additionally, when the Examiner asked Gandhi whether he ever used his personal email accounts for Firestar business, Gandhi stated that he did not. In fact, during the Relevant Period, Gandhi sent numerous emails pertaining to the Debtors and other Modi-Controlled Entities to and from several personal email accounts.

261.    On June 14, 2018, the Court approved the Trustee's appointment, at which time the Trustee assumed control of the Debtors' estates and operations.

262.    On August 7, 2018, the Examiner conducted a deposition of Mihir Bhansali. Bhansali's knowledge, intent, and culpability with respect to the Bank Fraud and other misdeeds alleged in this Complaint can be inferred from the fact that Bhansali invoked his Fifth Amendment right against self-incrimination in response to every question except his name.

### C.    *Other Efforts to Cover Up and Frustrate Investigation of the Bank Fraud*

263.    Nirav Modi, Bhansali, and Gandhi, and their co-conspirators researched and implemented various tactics to conceal and destroy evidence of their involvement in the Bank Fraud both prior to and after the Bank Fraud's exposure.

264.    Pradeep Mhatre, a member of FIPL's information technology department, told Indian authorities that in 2010 or 2011, Mihir Bhansali instructed him to set up a secret closed email server in the Dubai office using the domain "panemail.com." The Panemail server restricted emails from being sent to or received from outside email servers, nor was it possible to download

emails and attachments from the server. The server was limited to 25 – 30 users, including Nirav Modi, Mihir Bhansali, Ajay Gandhi, Neehsal Modi, Hemant Bhatt, Aditya Nanavati, Shyam Wadhwa, Satyendra Shukla, Kurian Mathews, and Sridnar Krishnan. Mihir Bhansali instructed and approved adding users to the server.

265.    Mhatre further told Indian authorities that, in 2017, Bhansali instructed him to create a new secret server on the domain "cricketnow.live" with restrictions similar to the Panemail server. This server automatically deleted emails after one week. In this server, users were assigned generic IDs such as "user1, DOE1, DOE2, DXB1, HK1, etc." to enhance secrecy.

266.    On February 13, 2018, an attorney at Day Pitney LLP emailed Ajay Gandhi to suggest that bank statements for CPS50, which owned the 50 Central Park South property, be sent directly to Abhay Javeri as manager of CPS Properties LLC. Gandhi forwarded the email to "ajaycpa@yahoo.com", which upon information and belief is Gandhi's personal email address, and stated, "Niravbhai, OK to have CPS 50 Properties LLC bank statement from Citibank sent to Abhay Javeri to his email address or Abby's mailing address?" The fact that Gandhi addressed this email to "Niravbhai" shows that Nirav Modi and Ajay Gandhi were using Gandhi's personal email account to communicate in the weeks following the exposure of the Bank Fraud.

267.    Similarly, on March 13, 2018, Ajay Gandhi sent his own Yahoo email account an email addressed to "Niravbhai" summarizing transactions in and out of NMLUK's Barclays Bank account for Modi's review, including a £2,000,000 deposit from Nirav Modi personally on January 29, 2018. As alleged below, only a few weeks earlier, Nirav Modi purchased a £7,950,000 London apartment after fleeing India.

268.    Ajay Gandhi also coordinated with Purvi Mehta during this time. On February 16, 2018, Purvi Mehta emailed Ajay Gandhi, "Where can I reach u on WhatsApp?" Gandhi replied with his personal phone number.

51

269.     On March 11, 2018, Ajay Gandhi ran internet searches on the *Adelphia Communications* fraud case and related bankruptcy. These searches included: "how did adelphia get caught"; "how rigas family were caught in the fraud of adelphia"; and "how adelphia fraud was discovered?"

270.     On March 9, 2018, Bhansali visited an internet article entitled "14 Signal App Tips for Secure Chats," which described tips for sending and erasing secure communications through Signal, an end-to-end encryption application.

271.     On March 12, 2018, Mihir Bhansali visited an internet article entitled "How to Clear Your Cache on Any Browser." The article described methods of deleting internet browsing history on various web browsers. That same day, Bhansali visited an internet article entitled "How to Hack Wi-Fi Passwords." This article described methods of obtaining access to wireless networks without the required password.

272.     Mihir Bhansali's laptop contained a software program called "Hide My Ass! Pro VPN." Upon information and belief, the purpose of this program is to facilitate anonymous internet usage through virtual private network technology. The software's logs indicate that the program was used as recently as February 11, 2018.

273.     Bhansali's laptop also contained a program called SecurStar DriveCrypt. Upon information and belief, the purpose of this program is to encrypt data on computers.

274.     As alleged above, Bhansali created what appears to be a "to-do" list for the various co-conspirators following exposure of the Bank Fraud. The list included instructions to "Send all non-Firestar Dubai comps to HK." Upon information and belief, "comps" refers to "computers."

275.     According to statements made by various Firestar Entity and Shadow Entity directors and employees to Indian authorities, around February or March 2018:

52

(i)     Nehal Modi and Mihir Bhansali removed approximately 50 kilograms of gold and 2.5 Lac Dirhams (worth approximately $68,000) from a Dubai-based Firestar Entity;

(ii)    Neeshal Modi diverted diamonds from Dubai-based Modi-Controlled Entities to Hong Kong.

(iii)   Nehal Modi removed over $6 million in diamonds and 150 boxes of pearls from one of the Hong Kong-based Modi-Controlled Entities. In the "to do" list spreadsheet recovered from Mihir Bhansali's computer, the tasks listed under "MB" included "Pearls – where to keep the inventory?" and "Pearls – original purchase entries."

(iv)    Mihir Bhansali, Nehal Modi, and Nirav Modi intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities. For example, Ashish Lad, a director of Shadow Entity Unity, told Indian authorities that Nirav Modi threatened to kill or falsely implicate Lad if he revealed anything to the investigative authorities.

(v)     Nehal Modi destroyed cell phones of Shadow Entity directors. He told the directors that their "mobile phones are easy to track and they are evidence." Modi also oversaw the destruction of accounts, records, and servers of various Modi-Controlled Entities.

(vi)    Nehal Modi bribed Ashish Lad with INR 2,000,000 (approximately $28,000) to give false testimony to judicial authorities in Europe.

(vii)   Nirav Modi told Shadow Entity personnel that "it was not safe for [them] in Dubai and [they] must shift to Cairo[, Egypt.]" Once in Cairo, Modi, or others operating at his behest, confiscated the Shadow Entity personnel's passports "on the pretext of some residency permission."

(viii)  Nirav Modi, or others operating at his behest, instructed Shadow Entity personnel to sign affidavits before they left Cairo stating that the Shadow Entities were owned by the directors and were in no way related to Nirav Modi.

**D.    *Money Laundering to Modi Family Members Prior to Exposure of the Bank Fraud***

276.    As early as 2014, Nirav Modi and his co-conspirators began developing plans to "restructure" the Firestar Entities' global corporate structure in contemplation of an eventual initial public offering. The initial public offering appeared to be their exit strategy from the fraud scheme.

277.    The planned restructuring served the dual purpose of (a) sanitizing any trace of the Modi family's self-dealing during the Relevant Period from the Firstar Entities' books and records and ownership structure, and (b) providing a pretext for funneling assets to Ami Modi and Purvi Mehta.

278.    For example, one issue the planned restructuring aimed to resolve was the dubious record of Synergies' capitalization and ownership.

279.    Synergies was originally formed in April 2007 to serve as the purchaser entity in connection with the acquisition of Jaffe later that year.

280.    On October 11, 2007, Mihir Bhansali and Ajay Gandhi executed a stock certificate reflecting FIPL as the holder of 10,000 shares in Synergies.

281.    Between October 20, 2010 and March 11, 2011, Nirav Modi personally transferred a total of $14,575,000 to Synergies, which Synergies used to pay off purported loans from FIPL. The "loans" from FIPL consisted of earlier circular transactions in which FIPL wired funds to Synergies and Synergies immediately wired the funds back to FIPL, or in on other instances, to FDIPL, Brilliant, Eternal, or other Modi-Controlled Entities.

282.    On October 1, 2016, even though FIPL remained the sole owner of Synergies, Nirav Modi and FHL entered into an Agreement for Purchase of Shares in Synergies Corporation under which Nirav Modi, in his personal capacity, purported to sell 100% of the outstanding shares of

Synergies to FHL in exchange for a price of $100. The agreement was signed by Mihir Bhansali and Ajay Gandhi on behalf of Synergies, by Nirav Modi on his own behalf and by FHL's then-director Himanshu Trivedi. That same day, Mihir Bhansali and Ajay Gandhi executed a stock certificate reflecting FHL as the holder of 10,000 shares in Synergies.

283.    In December 2016, Nirav Modi assigned to Purvi Mehta his interest in the $14,575,000 Synergies "loan" under an assignment agreement retroactively dated as of April 1, 2012. This assignment was described as a gift in numerous emails. As alleged below, in July 2017, Synergies ultimately used a purported capital infusion from FHL to pay off the loan to Purvi Mehta as part of a broader diversion of funds to Mehta under the guise of the broader restructuring.

284.    Another aspect of the restructuring was developing a means to divest CPRE, which was the record owner of Nirav Modi and Ami Modi's personal residence in New York, so that those properties could not be reached by creditors.

285.    CPRE was formed under Delaware law on February 15, 2007. On March 26, 2007, CPRE purchased an apartment at the Essex House, 160 Central Park South in New York City (the "**Essex House Apartment**") for $4.995 million, of which FDII paid $2 million. The balance was funded by HSBC, which was granted a mortgage on the Essex House Apartment. Bhansali signed the deed on behalf of CPRE. CPRE was owned by FDI until approximately the end of 2009, when FDI transferred it to FGI. The Essex House Apartment was used by Nirav Modi and Ami Modi as a personal residence.

286.    At all relevant times, Mihir Bhansali and Ajay Gandhi served as the manager and treasurer, respectively of CPRE.

287.    On December 5, 2014, Ajay Gandhi emailed Howard Hoff of Marks Paneth, asking for input on "[1] Potential Sale or Gift of Central Park LLC to Ami Modi (Nirav's wife) who is a

US Citizen [and 2] Moving Firestar Diamond, Inc. / Fantasy, Inc. from Firestar Group's umbrella to an overseas Firestar entity . . ."

288.    On February 22, 2015, Ajay Gandhi emailed Howard Hoff, copying Mihir Bhansali, a spreadsheet analyzing various scenarios for selling FDI and CPRE. The spreadsheet included as questions: "Trust set-up by Purvi Modi –HK Resident[.] HK Trust funds Nirav Modi via Gift or Loan[.]" Hoff replied, "Please be more specific on the trusts [sic] involvement in the transaction. Is it just going to loan the money or is it going to have ownership prior to an eventual transfer. What type of trust is it, who are the beneficiaries? Is it Purvi's trust or is Purvi the executor, what country is Purvi a resident and a citizen of?" Gandhi replied, "Purvi is a HK resident and she will be owner of the trust unless you have a better thought or ideas to have Ami fund the purchase."

289.    On March 4, 2015, Ajay Gandhi outlined the steps for moving CPRE beyond the reach of creditors in an email to Raghu Iyer, "1. Move $1.8m and $3m of other liabilities from CP[RE] to Firestar Group, Inc. thru J[ournal]E[ntrie]s . . . Only HSBCs $3m liability will be left. . . . Ami needs to wire $1.935m at the closing to buy CP[RE]. . . . Ami will get Gift in USA from Purvi . . . $1.935m will now be used to pay off FGI debts (Firestar Diamond, Inc.) . . . Need clarity from Howard if how much funds should come from Firestar Holdings Ltd HK to buyout Firestar Diamond/Fantasy, Inc. and how to move funds back to HK or somewhere."

290.    On March 31, 2015, Raghu Iyer asked Ajay Gandhi for a status update on the restructuring. Gandhi replied, "Not sure if you spoke to Shyam Wadhwa as he does not want to speed-up change of ownership as he has issues of how to create capital in FS, HK and issues with bank covenants in HK hence he suggest to do as late as possible in 2015-16." Raghu replied, copying Mihir Bhansali, "Mihir[,] I was not aware of these issues[.] Can you take it up with NDM?" Bhansali replied, copying Wadhwa, "Mr. Wadhwa has already spoken to Nirav."

56

291.    Thus, the restructuring plans were put on hold until sufficient funds were available to effectuate all of the necessary transactions.

292.    The restructuring planning ramped up in late 2016, likely prompted by the looming retirement of Gokulnath Shetty, the PNB employee who approved the fraudulent LOUs to Nirav Modi's and Mehul Choksi's entities, which occurred in May 2017.

293.    On November 3, 2016, Manish Modi emailed Ajay Gandhi a request for a status update and asked "[F]or CPRE, does Nirav Bhai have to pay money to CPRE (via Ami Modi)[?] That cash flow has to be planned." Gandhi replied, "Spoke to Howard. If Ami Modi buys CPRE and assumes $3m of HSBC loan then she needs to pay $2m for CPRE assuming valuation of $5m."

294.    On November 14, 2016, Gandhi emailed HSBC, "We are planning change of ownership of Central Park Real Estate, LLC, which [is] currently owned by Firestar Group, Inc., to Ami Modi (She is US Citizen and wife of Nirav Modi). No other changes to existing agreement. Anything to be done?"

295.    For the next several months, HSBC repeatedly requested additional information relating to the ownership structure of CPRE and other Firestar Entities and the source of Purvi Mehta's wealth.

296.    When Gandhi told Nirav Modi about HSBC's requests, Gandhi said he "avoided giving these [sic] information and told them that we may do restructuring of Central Park and may change ownership etc." but that the "only way we can avoid is only if we pay-off the $ 3 m mortgage in next few months." Modi responded, "There will be a change in ownership in May end so better to explain that."

297.    The laundering of funds through the Firestar Entities' corporate restructuring involved several steps. First, various British Virgin Island, Cayman Island, and Mauritius shell

companies secretly owned by the Modi family would invest up to $75 million in FIPL. FIPL would

then make a $115 million capital contribution to FHL.

298.     Of this $115 million, FHL would use $65 million to redeem non-voting FHL shares

owned by Purvi Mehta (both personally and through Fine Classic), $23 million to repay various

loans from Purvi Mehta and Fine Classic, and $20 million to infuse capital in Synergies.

299.     Synergies would then use $14,575,000 of the new capital to "repay" Purvi Mehta

for the "loans" Nirav Modi originally made to Synergies in 2010 and 2011 and subsequently

assigned to Purvi Mehta in 2016.

300.     To secure the additional funding needed for these transactions, Nirav Modi and

his co-conspirators obtained 150 LOUs totaling over $1 billion between February and May 2017.

301.     The "investment" in FIPL also used funds siphoned from Shadow Entities in

earlier years.

302.     For example, in November 2013, Shadow Entity had Pacific transferred

$30,000,000 to Mayank Mehta, Purvi Mehta's husband. These Shadow Entity payments to

Mayank Mehta were characterized as "payouts" or "shareholder dividends."

303.     Mayank Mehta transferred the $30 million received from Pacific in November 2013

to Purvi Mehta as a gift. Purvi Mehta then used these funds as collateral for loans to Radashir, a

Modi-Controlled Entity in India that also participated in the Bank Fraud, until 2016 when the

funds were returned to Purvi Mehta. Purvi Mehta then moved $23 million to her account in

Mauritius.

304.     Between December 14, 2016 and January 12, 2017, Fine Classic transferred a total

of $25,700,500 to Purvi Mehta's Mauritius account. According to Kurian Mathews, Shyam

Wadhwa, and Nilesh Mistry, who oversaw Fine Classic's day-to-day finances and operations, the

circular import and export transactions between Fine Classic and other Shadow Entities were

58

structured so as to generate deliberately high profit margins for Fine Classic, with corresponding losses in other Shadow Entities. According to the India ED, Fine Classic received approximately $89 million from other Shadow Entities from 2011 to 2017.

305.     Purvi Mehta then transferred $40 million from her Mauritius bank account to Novelar International Holdings Ltd. ("**Novelar**"), a BVI entity of which she is the ultimate beneficial owner.

306.     Novelar owns Islington International Holdings Pvt. Ltd., a Singapore-based entity. In January or February 2017, Novelar transferred $40 million to Islington. Around this time, Purvi Mehta also transferred $425,000 directly into Islington. In February 2017, Islington invested $45 million, including the funds received from Novelar and Purvi Mehta, in FIPL.

307.     Thus, by February 2017, $45 million in purported new investments had been indirectly made by Purvi Mehta in FIPL using the proceeds of the Bank Fraud.

308.     On March 22, 2017, Bhansali and his wife purchased apartment 24A at 50 Riverside Boulevard in New York City for approximately $7.1 million, of which approximately $5.3 million was paid in cash. Just weeks earlier, Mihir Bhansali had received a $1.5 million wire into his personal HSBC checking account from Purvi Mehta on February 24, 2017. Bhansali's annual salary from the Debtors was approximately $154,000. On June 29, 2017, Purvi Mehta wired another $750,000 to Mihir Bhansali's personal checking account at HSBC.

309.     Only two days after the Debtors filed for bankruptcy, Bhansali transferred his interests in the apartment to his wife, Rakhi Bhansali for nominal consideration.

310.     Based on, among other things, the timing of these transactions and Purvi Mehta's role as a primary conduit for proceeds of the Bank Fraud, it appears this apartment was purchased using proceeds of the Bank Fraud.

311.    According to Indian authorities, Purvi Mehta also purchased a new Hong Kong apartment for herself in April 2017 for 19.5 crore INR (approximately $2.7 million). Neeshal Modi signed the agreement on Purvi Mehta's behalf under a power of attorney certified by the Indian consulate of Hong Kong.

312.    In March 2017, Nirav Modi and Ami Modi also were looking to purchase another New York residence for $25–$30 million. They initially planned to purchase a unit at the River House, a cooperative apartment building located at 435 E. 52nd Street in Manhattan.

313.    In May and June 2017, Purvi Mehta, "loaned" Ami Modi a total of approximately $34 million to fund the River House purchase.

314.    According to the India ED, at least $18 million of the funds Purvi Mehta loaned to Ami Modi in May 2017 were sourced from transfers to Purvi Mehta by Fine Classic, the Shadow Entity Purvi Mehta directly owned and controlled, between March 7, 2017 and April 27, 2017. Between July 9, 2017 and October 4, 2017, Fine Classic wired an additional $16,300,000 to Purvi Mehta from various accounts.

315.    When the River House sale fell through in mid-June 2017, Nirav Modi and Ami Modi turned their attention to an apartment at the Ritz Carlton located at 50 Central Park South in Manhattan (the "**Ritz Carlton Apartment**").

316.    On July 7, 2017, Purvi Mehta entered into a contract to purchase the Ritz Carlton Apartment for $25 million. That same day, Ami Modi wired, as a down payment, $2.5 million of the funds Purvi Mehta had transferred to her in May and June 2017 to a Katz & Matz LLP escrow account. Ami Modi and Purvi Mehta accounted for this transfer as a "partial repayment" of the loan from Purvi Mehta.

317.    That same day, accountant Howard Hoff at Marks Paneth LLP summarized the

planned transaction in an email to Nirav Modi and the Modi family's trust & estate counsel at

Day Pitney LLP and their real estate counsel Katz & Matz LLP as follows:

> Entity Establishment:
> 1) Create a NY LLC owned by Purvi. This will be the purchaser of the condo. Timing is a few to days to open.
> 2) Once the trust is established, Purvi will transfer/assign ownership of the LLC to the trust (Timing is a few weeks since the trust agreements are almost complete)
>
> Flow of Funds:
> 1) Purvi will instruct Ami to partially repay the loan she made to her directly to Steven [Matz]'s escrow account on behalf of the LLC. (This will happen tomorrow)
> 2) Ami will then repay the remainder of the loan to Purvi overseas.
> 3) Purvi will have to wire directly to Steven's escrow account the balance due on the condo in order to close.

318.    On July 11, 2017, Defendant CPS50 was formed and, on August 2, 2017, its

operating agreement was executed with Purvi Mehta as sole member and Nirav Modi's uncle

Deepak Sheth as its manager.

319.    On July 10, 2017, Synergies and FIPL entered into a Stock Purchase Agreement

under which Synergies purchased 100% of the outstanding common stock of FGI for a price of

$3,694,000. Ajay Gandhi signed the agreement on behalf of Synergies.

320.    On July 13, 2017, FHL wired a $20,000,000 "capital infusion" to Synergies. The

same day, Synergies wired $650,000 to Jaffe (which Jaffe used to pay off invoices from FIPL),

$1,047,000 to Brilliant (as repayment of a purported loan), $3,694,000 to FIPL (as the purchase

price for FGI, which Synergies acquired as part of the 2017 "restructuring"), and $14,575,000 to

Purvi Mehta. The $14,575,000 payment to Purvi Mehta (the "**Synergies-Mehta Transfer**") was

made under the pretext of paying off the loan Modi had assigned to Mehta.

321.    On July 14, 2017, FHL wired another $20 million to Purvi Mehta for redemption of her non-voting preference shares in FHL. Thus, over a two-day period, more than $34 million in proceeds of the Bank Fraud were wired to Purvi Mehta.

322.    On or around August 23, 2017, Purvi Mehta, as settlor, executed an instrument (the "**Ithaca Trust Agreement**") creating the Ithaca Trust as an irrevocable trust under Delaware law.

323.    The Ithaca Trust Agreement named Commonwealth Trust Company ("**Commonwealth**") as the trustee (the "**Ithaca Trustee**"), Ami Modi and her children as the beneficiaries, and Deepak Sheth as the initial protector (the "**Ithaca Protector**" or "**Protector**") of the Ithaca Trust. It also named Purvi Mehta and Nirav Modi's parents, Deepak Modi and Pragnya Modi, and cousin, Mihir Bhansali, as residual beneficiaries for any "property not otherwise distributed."

324.    Under the terms of the Ithaca Trust Agreement, the Ithaca Trustee cannot invest or manage any of the Ithaca Trust's assets without the express written direction of the investment advisor of the Ithaca Trust (the "**Ithaca Investment Advisor**" or "**Investment Advisor**")

325.    Under the terms of the Ithaca Trust Agreement, the Protector has the power to, among other things: (a) remove and appoint the Ithaca Trustee; (b) remove and appoint the Investment Advisor; (c) terminate the Ithaca Trust; (d) change the situs of the Ithaca Trust; (e) amend administrative provisions of the Ithaca Trust Agreement; (f) add or exclude beneficiaries; and (g) designate a successor to replace the Protector in the event the Protector resigns or is removed.

326.    Under the terms of the Ithaca Trust Agreement, if at any time there is no Protector serving and no successor named who accepts appointment within 30 days of the occurrence of the vacancy, Abhay Javeri shall be the Protector. If Abhay Javeri is unable or unwilling to serve

as Protector, a Protector may be appointed by Purvi Mehta or, if Purvi Mehta is not available or is deceased, by Ami Modi.

327.    Under the terms of the Ithaca Trust Agreement, an appointment of a Protector may impose qualifications or requirements or specify terms and conditions to be fulfilled prior to such appointment taking effect.

328.    Under the terms of the Ithaca Trust Agreement, Nirav Modi has the power to unilaterally remove the Protector. If Nirav Modi "is not available or is deceased," Purvi Mehta inherits this power. If Purvi Mehta "is not available or is deceased," Ami Modi inherits this power.

329.    Since Nirav Modi has the power to remove the Ithaca Protector, which in turn has virtually complete control over the Ithaca Trustee, the Ithaca Investment Advisor, the Ithaca Trust Agreement, and the Ithaca Trust's assets, Nirav Modi enjoys *de facto* total control over the Ithaca Trust and its assets.

330.    On or around August 23, 2017, Deepak Sheth signed and delivered to the Ithaca Trustee separate letters: (a) accepting his appointment as the Ithaca Protector; (b) appointing himself as the Ithaca Investment Advisor; and (c) accepting his appointment as the Ithaca Investment Advisor.

331.    On August 24, 2017, Nirav Modi advised Day Pitney that "the funds are in place with Purvi" and asked for wire instructions for Commonwealth's fiduciary account for the Ithaca Trust.

332.    On August 25, 2017, Purvi Mehta, on her own behalf, and Deepak Sheth, as manager of CPS50P LLC, executed an agreement under which Mehta assigned her interest in the Ritz Carlton sale contract to CPS50P LLC.

333. On August 28, 2017, Deepak Sheth, in his capacity as Investment Advisor of the Ithaca Trust, signed and delivered a letter directing Commonwealth as Ithaca Trustee to: (a) accept an assignment from Purvi Mehta of the 100% membership interest in the CPS50; (b) execute an Amended and Restated Operating Agreement for CPS50; and (c) make an initial capital contribution in the amount of $23,000,000 to CPS50 by wiring that amount to the Katz & Matz LLP escrow account to fund the purchase of the Ritz Carlton Apartment.

334. That same day, Deepak Sheth, in his capacity as manager of CPS50, executed CPS50's amended and restated operating agreement.

335. On August 29, 2017, Purvi Mehta assigned the membership interest in CPS50 to the Ithaca Trust.

336. On August 30, 2017, Modi emailed Day Pitney attorneys and other professionals informing them that $23 million had been wired from Mehta to Commonwealth and directing Commonwealth to further wire the funds to attorneys at Katz & Matz to execute the purchase of the Ritz Carlton Apartment. Mehta was not on the email thread.

337. Also on August 30, 2017, Katz & Matz attorney Steven Matz emailed Nirav Modi and others with instructions for the September 7, 2017 closing of the Ithaca Trust's purchase of the Ritz Carlton Apartment. Once again, Mehta was not on the email thread.

338. On August 31, 2017, Mehta transferred $23 million to Commonwealth, as trustee of The Ithaca Trust. Commonwealth then transferred those funds to the Katz & Matz escrow account, where they were subsequently used to buy the Ritz Carlton Apartment.

339. On September 1, 2017, Ami Modi returned $25 million of the funds Purvi Mehta had "loaned" to her in May 2017 (which had been sitting in Ami Modi's HSBC bank account) to Purvi Mehta.

64

340.     On September 6, 2017, Katz & Matz issued a $22,567,465.92 check to the sellers of the Ritz Carlton Apartment in connection with the closing of the sale.

341.     On September 25, 2017, Ami Modi wired another $6,500,000 to Purvi Mehta as a purported loan repayment.

342.     On September 29, 2017 FHL wired $8,860,000 to Purvi Mehta as a "loan repayment."

343.     On October 5, 2017, Ami Modi received $70,000 from Mihir Bhansali and wired another $406,188 to Purvi Mehta as a purported loan repayment.

344.     On October 18, 2017, FHL wired $30,000,000 to Purvi Mehta to redeem non-voting preference shares.

345.     On November 10, 2017, FHL wired $15,000,000 to Purvi Mehta to redeem non-voting preference shares. Thus, from September through November 2017, approximately $85,000,000 in proceeds of the Bank Fraud were transferred to Purvi Mehta.

346.     In December 2017, Ajay Gandhi opened a CitiBank account for CPS50. Gandhi listed himself as "president" of CPS50 in the application materials. Ajay Gandhi and Abhay Javeri served as the authorized signors on the account.

347.     On November 8, 2017, Deepak Sheth, as Ithaca Investment Advisor, directed Commonwealth, as Ithaca Trustee, to remove Deepak Sheth as manager, president, and chief executive officer of CPS50 and appoint Abhay Javeri as his replacement in those positions. That same day, Deepak Sheth also resigned as investment advisor (but not protector) of the Ithaca Trust and appointed Abhay Javeri as his replacement.

348.     With the Ritz Carlton Apartment transaction complete, Nirav Modi and his co-conspirators returned their attention to divesting FGI's ownership of CPRE and the Essex House Apartment.

65

349.     On December 4, 2017, by email, Nirav Modi told Ajay Gandhi to pay off the HSBC mortgage on the Essex House Apartment in full.

350.     Gandhi contacted HSBC indicating that there was an urgent need to for the Ithaca Trust to assume the mortgage on the Essex House and transfer the liability from FGI to the Ithaca Trust. Gandhi soon determined the mortgage could not be transferred quickly enough and decided instead to arrange to have the mortgage paid off completely.

351.     On December 5, 2017, Gandhi wired $3 million from FDI to HSBC in satisfaction of HSBC's mortgage on the Essex House using funds originally from Jaffe and Fantasy as well as from FDI's own account and from an HSBC line of credit.

352.     In addition to the mortgage payoff, FDI had made at least $856,335 of the monthly payments on the Essex House Apartment mortgage between 2011 and 2018, and also paid JW Marriott Essex House NY $15,828.35 in January 2018, after CPRE was transferred from FGI to the Ithaca Trust.

353.     With the mortgage retired, Nirav Modi asked Marks Paneth and Day Pitney to devise a strategy to transfer the unencumbered property (worth approximately $6 million) to the Ithaca Trust.

354.     On December 15, 2017, one of Modi's accountants emailed Modi with three potential options for minimizing transfer taxes on "the movement of CPRE." The first option was for Nirav Modi to purchase CPRE directly from FGI, the second for Ami Modi to purchase CPRE directly, and the third was using the Ithaca Trust to make the purchase after Purvi Mehta contributed more cash to the trust. The accountant explained that, "since [Modi] prefer[red] to fast track the transaction," the existing trust could be used and then the trustee could "move the LLC to another trust in due time." The trust would use the funds from Purvi Mehta to purchase

66

CPRE from FGI, thus becoming the indirect owner of the Essex House Apartment. Modi chose the third option.

355.    On December 27, 2017, Abhay Javeri, as Ithaca Investment Advisor, signed and delivered to Commonwealth as Ithaca Trustee a letter of direction instructing Commonwealth to "become the sole member of [CPRE] by purchasing a 100% membership interest in [CPRE] for $6,000,000."

356.    On December 28, 2017, Ajay Gandhi, on behalf of FGI, as treasurer, and on behalf of CPRE, as chief financial officer, and Commonwealth, as Ithaca Trustee, executed the agreement for the sale of CPRE to the Ithaca Trust.

357.    On December 29, 2017, Nirav Modi emailed professionals from Day Pitney and Marks Paneth and others to announce that "[t]he funds have been wired value today."

358.    The funds did not clear Purvi Mehta's Singapore bank account until January 1, 2018. The Ithaca Trust then wired $6 million to FGI's HSBC account for the purchase of CPRE. FGI then transferred the equity interests in CPRE to the Ithaca Trust (the "**CPRE Equity Transfer**").

359.    On January 17, 2018, after the Ithaca Trust purchased CPRE LLC, Ajay Gandhi consulted Day Pitney about transferring additional funds to the Ithaca Trust for use in connection with the Essex House Apartment and Ritz Carlton Apartment.

360.    Day Pitney lawyers told Ajay Gandhi, Nirav Modi, and Purvi Mehta that "to fund either of the LLC accounts, the funds will first have to be transferred to the Ithaca Trust account, and Abhay Javeri, as Investment Advisor of the Ithaca Trust, will have to direct the trustee accordingly." Immeke Schmidt of Day Pitney followed up, "Purvi, as settlor of the trust, would fund the trust with her own assets from a non-US account in her name." Nirav responded, asking

67

for the instructions to wire funds to the Ithaca Trust, which a Day Pitney attorney provided in response.

361. On January 17, 2018, Ajay Gandhi, on behalf of CPS50, executed an agreement with Izeu, a French interior design firm, under which Izeu provided interior design services for the Ritz Carlton Apartment.

362. On January 18, 2018, $1 million was wired from Purvi' Mehta's Singapore bank account to Commonwealth. That same day, Abhay Javeri, as investment advisor of the Ithaca Trust, sent Commonwealth a letter instructing Commonwealth to make a $1 million capital contribution to CPS50. The next day, Commonwealth wired $1 million to CPS50's Citibank account. That same day, an international wire in the amount of $84,665.25 was made from CPS50's Citibank account to Izeu. On February 13, 2018, an additional $237,176.75 was wired internationally to Izeu.

363. By March 2018, Commonwealth had flagged the Ithaca Trust as a "high risk trust" and internally expressed concern about serving as Ithaca Trustee. On March 13, 2018, Commonwealth sent notices to Deepak Sheth, as Protector of the Ithaca Trust, and Purvi Mehta, as settlor of the Ithaca Trust, informing them that Commonwealth was resigning as Ithaca Trustee effective as of April 13, 2018.

364. At some point between March 13, 2018 and May 25, 2018, Deepak Sheth resigned or was removed as Ithaca Protector.

365. On May 25, 2018, Ami Modi executed a deed appointing Nehal Modi as Ithaca Protector. The deed contained recital indicating that: (a) Abhay Javeri had renounced his appointment as successor Protector of the Ithaca Trust; and (b) Purvi Mehta "released the power to appoint a Protector on August 23, 2017."

68

366.    That same day, Nehal Modi signed and delivered his acceptance of his appointment as Ithaca Protector; executed a deed removing Abhay Javeri as Ithacha Investment Advisor and appointing himself as the replacement; executed a deed appointing Trident as Ithaca Trustee.; and executed a deed amending the Ithaca Trust Agreement to change the governing law from Delaware law to South Dakota law.

367.    That same day, Abhay Javeri, as Ithaca Investment Advisor, signed and delivered a letter of direction instructing Trident, as Ithaca Trustee, to remove Abhay Javeri as manager of CPS50 and appoint Nitin Dattani as his replacement.

368.    As alleged above, around this same time, Nitin Dattani was working with Angelina Ypma, Mihir Bhansali, Ajay Gandhi, and Anthony Allicock to divert NMLUK's assets to Hong Kong and was also helping Nirav Modi establish Diamonds Holdings Ltd. while Nirav Modi was in hiding in London.

369.    On information and belief, Trident remains Ithaca Trustee, Nehal Modi remains Ithaca Protector, Abhay Javeri remains Ithaca Investment Advisor, and Nitin Dattani remains manager of CPS50. On information and belief, Mihir Bhansali and Ajay Gandhi remain manager and treasurer, respectively, of CPRE.

370.    In sum, numerous members of Nirav Modi's and Ami Modi's family, including Purvi Mehta, Mihir Bhansali, Deepak Sheth, and Abhay Javeri worked together and with Ajay Gandhi and other co-conspirators to effectuate the foregoing transactions concerning Nirav Modi's and Ami Modi's personal real estate holdings as part of an effort to insulate millions of dollars in ill-gotten assets from creditors.

## CLAIMS FOR RELIEF

## COUNT 1

## Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act ("RICO")
## 18 U.S.C. § 1962(d)
## (Debtors' Claim Against All Defendants)

371.     Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

372.     Nirav Modi, Mihir Bhansali, Ajay Gandhi, and each Defendant are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

373.     As alleged below, each Defendant violated 18 U.S.C. § 1962(d) by agreeing to join, participate in, or support a conspiracy under which one or more persons, including Nirav Modi, Mihir Bhansali, and Ajay Gandhi, would conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

### Nirav Modi, Mihir Bhansali, and Ajay Gandhi's Substantive RICO Violation

374.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi each violated 18 U.S.C. § 1962(c) by their respective acts, described in the prior paragraphs and as further described below.

375.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged below.

376.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi each committed at least two predicate acts of racketeering, as more specifically alleged below. The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participants, victims, or method of commission. Further, the acts of racketeering were continuous, spanning the period from at least 2010 to mid-2018.

70

## The RICO Enterprise

377.    Each of the U.S. Entities is a corporation. Each of the U.S. Entities is therefore an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

378.    Alternatively, the Firestar Entities, collectively, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of designing, manufacturing, and selling diamonds and jewelry.

379.    Alternatively, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, together with their known and unknown co-conspirators, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of formulating and implementing a common scheme to defraud PNB for their personal enrichment through a pattern of fraud, lies, deceit, and corruption. Such common purpose came into existence no later than 2010, when Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators implemented a scheme to defraud PNB by fraudulently obtaining LOUs by exploiting the web of Shadow Entities, LOU Entities, and other Modi-Controlled Entities.

380.    Whether conceptualized in the manner described in paragraph 377, paragraph 378, or paragraph 379, there existed during and after the Relevant Period one or more enterprises within the meaning of 18 U.S.C. § 1964(4) (the "**RICO Enterprise**").

381.    At all relevant times, Nirav Modi, Mihir Bhansali, and Ajay Gandhi each were employed by or associated with the RICO Enterprise, and each conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity.

382.    The RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

383.     The RICO Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and its activities affected, interstate and foreign commerce.

384.     The repeated and continuous violations of federal criminal law alleged in this Complaint constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq*.

385.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi are central and controlling figures in the RICO Enterprise, and have directed others to take actions necessary to accomplish the overall aims of the RICO Enterprise.

### The Pattern of Racketeering Activity

386.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons (the "**RICO Pattern**").

### Predicate Acts: Mail and Wire Fraud, Violations of 18 U.S.C. § 1341, 1343

387.     The RICO Pattern included numerous acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

388.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi voluntarily and intentionally devised and participated in one or more criminal schemes to perpetrate actual fraudulent transfers of the Debtors' and U.S. Affiliates' assets during and after the Relevant Period, including without limitation, the transfers described above, in Appendix A, and in Schedules A through L.

389.     In furtherance of such scheme or schemes, Nirav Modi, Mihir Bhansali, and Ajay Gandhi willfully and knowingly transmitted, or caused to be transmitted, by means of (1) causing matters and things to be placed in any post office or authorized depository, or deposited or

caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds.

390.     The wires and mailings supporting such scheme or schemes to defraud included monetary wire transfers, shipments of inventory, telephone and electronic communications, and physical mailings of letters and other documents and communications.

391.     The use of interstate and international mail and wires to perpetrate these actual fraudulent transfers and to connect this international racketeering conspiracy was foreseeable.

392.     Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi committed numerous violations of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

393.     Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 1341 and 1343 directly and proximately caused injury to each U.S. Entity's business and property by unjustifiably and irrevocably depleting their assets in the amount of such transfers.

**Predicate Acts: National Stolen Property Act, Violations of 18 U.S.C. §§ 2314, 2315**

394.     The RICO Pattern included numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

395.     In many cases, Nirav Modi, Ajay Gandhi, and Mihir Bhansali caused the U.S. Affiliates, upon receiving actual fraudulent transfers from the Debtors, to subsequently transfer the proceeds of such actual fraudulent transfers to Shadow Entities or other Modi-Controlled Entities. Specific examples of such transactions are described in Appendix A-395 hereto.

396.     Based on the transfers by U.S. Affiliates of funds fraudulently received from the Debtors to foreign Modi-Controlled Entities alleged in paragraph 395 of this Complaint (the "**Subsequent Transfers**"), Nirav Modi, Mihir Bhansali, and Ajay Gandhi willfully and knowingly transported, transmitted, or transferred in interstate or foreign commerce—or received,

possessed, concealed, stored, bartered, sold, disposed of, or pledged as security for a loan — goods, wares, merchandise, securities, or money that crossed an interstate or international boundary after being stolen, converted, or taken by fraud.

397.　For each Subsequent Transfer, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, knew that the funds involved had been fraudulently transferred from the applicable Debtor to the applicable U.S. Affiliate or had otherwise been stolen, converted, or taken by fraud.

398.　Each Subsequent Transfer involved money or property having a value of $5,000 or more.

399.　Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, committed numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

400.　Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 2314 and 2315 directly and proximately caused injury to each Debtor's business and property by impairing the Debtors' ability to recover the value of the Subsequent Transfers.

**Predicate Acts: Money Laundering, Violations of 18 U.S.C. §§ 1956, 1957.**

401.　The RICO Pattern included numerous acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957.

402.　Each actual fraudulent transfer and each Subsequent Transfer supported and furthered the Bank Fraud by, at a minimum: (a) facilitating the reduction of outstanding payables and receivables among Modi-Controlled Entities so as to avert detection of the Bank Fraud; (b) layering the movement of funds so as to make them difficult to trace.

403.　Each actual fraudulent transfer and each Subsequent Transfer occurred, in whole or in part, in the United States.

404.　Each actual fraudulent transfer and each Subsequent Transfer involved or resulted from one or more acts of wire fraud.

74

405.    Accordingly, each actual fraudulent transfer and each Subsequent Transfer constituted, involved, or resulted from an offense against India, a foreign nation, involving fraud, or a scheme or attempt to defraud, against PNB, a foreign bank.

406.    Additionally, each actual fraudulent transfer was designed to deplete the applicable Debtor's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such Debtor's creditors.

407.    Additionally, each Subsequent Transfer was designed to deplete the applicable U.S. Affiliate's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such U.S. Affiliate's creditors, including the applicable Debtor or Debtors.

408.    Accordingly, each actual fraudulent transfer and each Subsequent Transfer constituted, involved, or was the result of specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7).

409.    Each Subsequent Transfer affected interstate or foreign commerce and involved the movement of funds by wire or other means from a place in the United States to or through a place outside of the United States.

410.    Each Subsequent Transfer involved funds that were derived from or obtained or retained, directly or indirectly, from an actual fraudulent transfer and unlawful activity related to such actual fraudulent transfer.

411.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi orchestrated or conducted each Subsequent Transfer with the intent to promote the carrying on of specified unlawful activity, including in relation to: (a) fraudulently depleting the applicable Debtor's and U.S. Affiliate's assets; and (b) the Bank Fraud more generally.

412.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi knew that each Subsequent Transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the

75

ownership, or the control of the funds derived from the actual fraudulent transfer preceding such Subsequent Transfer.

413.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi knew that the property involved in each Subsequent Transfer represented the proceeds of some form of unlawful activity.

414.    Each Subsequent Transfer involved a monetary transaction in criminally derived property of a value of greater than $10,000 and derived from specified unlawful activity.

415.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi agreed, expressly or implicitly, to: (a) effectuate each actual fraudulent transfer and each Subsequent Transfer; (b) fraudulently deplete the Debtors' and U.S. Affiliates' assets; and (c) perpetrate the Bank Fraud.

416.    Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi committed, and conspired to commit, numerous acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

417.    Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 1956 and 1957 directly and proximately caused injury to each Debtor's business and property by impairing the Debtors' ability to recover the value of the Subsequent Transfers.

### Predicate Acts: Obstruction of Justice, Violations of 18 U.S.C. §§ 1503, 1512

418.    The RICO Pattern included more than one act of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

419.    Based on the allegations set forth in paragraph 275 of this Complaint concerning the Dubai-based Shadow Entity personnel, upon information and belief, Nirav Modi and Bhansali, or others operating at their direction, knowingly intimidated, threatened, or corruptly persuaded such Shadow Entity personnel, or engaged in misleading conduct toward such Shadow Entity personnel, with the intent to influence, delay, or prevent the testimony of such Shadow Entity personnel in an official proceeding, including these chapter 11 cases, and to cause

76

or induce such Shadow Entity personnel to withhold testimony, or withhold a record, document or other object, from an official proceeding, including these chapter 11 cases.

420.    Additionally, Mihir Bhansali corruptly altered, destroyed, mutilated, or concealed records, documents or other objects, or attempted to do so, as demonstrated by the following actions, alleged in more detail above, which Mihir Bhansali, or others operating at his or Nirav Modi's direction, took in the weeks prior to and following the Petition Date:

(i)     Mihir Bhansali researched methods for deleting internet history, browsing the internet anonymously, communicating through encrypted and self-deleting messages, and encrypting computer data;

(ii)    Mihir Bhansali downloaded, installed, and, upon information and belief, used software designed for such purposes;

(iii)   Upon information and belief, Mihir Bhansali deleted or attempted to delete all copies of the spreadsheets described in paragraph 106 of this Complaint.

(iv)    Mihir Bhansali directed Saju Poulose to "send all non-Firestar comp[uter]s to HK[.]"

(v)     Nehal Modi, operating at the direction of or in coordination with Nirav Modi and Mihir Bhansali, destroyed mobile phones of various Shadow Entity personnel and other servers, documents, and records.

421.    Moreover, Mihir Bhansali corruptly obstructed, influenced, or impeded an official proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above, knowingly and intentionally making material misstatements, misrepresentations, and omissions under penalty of perjury in connection with the Debtors' chapter 11 cases concerning the Debtors' relationship with Shadow Entities and the Debtors' involvement in the Bank Fraud.

422.    Moreover, based on the same allegations, Mihir Bhansali corruptly endeavored to influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the discharge of his duty.

423.    Moreover, based on the same allegations, Mihir Bhansali corruptly endeavored to influence, obstruct, or impede the due administration of justice.

424.    Similarly, Ajay Gandhi corruptly obstructed, influenced, or impeded an official proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above, (a) knowingly and intentionally signing the Debtors' respective SOFAs under penalty of perjury without disclosing the Debtors' involvement in the Bank Fraud, their relationship with various Shadow Entities, and the substantial loan balances owed by NMI to Jaffe, or the significant transfers of the Debtors' assets to Shadow Entities and other Modi-Controlled Entities that were required to be disclosed in the SOFAs; and (b) feigning ignorance and outright lying to the Examiner concerning the Debtors' and his personal involvement in the transactions supporting the Bank Fraud.

425.    Moreover, based on the same allegations, Ajay Gandhi corruptly endeavored to influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the discharge of his duty.

426.    Moreover, based on the same allegations, Ajay Gandhi corruptly endeavored to influence, obstruct, or impede the due administration of justice.

427.    In taking such actions, Mihir Bhansali's and Ajay Gandhi's purpose was to impair the integrity or availability of evidence for use in an official proceeding, including these chapter 11 cases, or to otherwise obstruct, influence, or impede an official proceeding, including these chapter 11 cases.

428.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi agreed, expressly or implicitly, with each other and others, including Nehal Modi, to commit each of the obstruction of justice offenses alleged in this Complaint.

78

429. Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, and other co-conspirators, including Nehal Modi, committed, and conspired to commit, numerous acts of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

430. Nirav Modi, Mihir Bhansali, and Ajay Gandhi's violations of 18 U.S.C. §§ 1503 and 1512 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Mihir Bhansali and Ajay Gandhi failed to disclose and, upon information and belief, actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

**Predicate Acts: Bankruptcy Fraud, Violations of 18 U.S.C. § 152**

431. The RICO Pattern included more than one act of bankruptcy fraud in violation of 18 U.S.C. § 152.

432. Based on the allegations set forth in, *inter alia*, paragraphs 421 and 424 of this Complaint, Mihir Bhansali and Ajay Gandhi each knowingly and fraudulently made one or more false oaths or accounts in or relation to these chapter 11 cases.

433. Based on those same allegations, Mihir Bhansali and Ajay Gandhi each knowingly and fraudulently made one or more false declarations, certificates, verifications, or statements under penalty of perjury in or in relation to these chapter 11 cases.

434. Based on those same allegations, Mihir Bhansali and Ajay Gandhi, after the filing of these chapter 11 cases, knowingly and fraudulently withheld from a custodian, trustee, marshal, or other officer of this Court, including the Examiner, recorded information relating to the property or financial affairs of the Debtors.

79

435.     Based on those same allegations, Mihir Bhansali and Ajay Gandhi knowingly and fraudulently concealed from creditors, the United States Trustee, the Trustee, and this Court property belonging to the Debtors' estates, including the substantial loan receivable owed by NMI to Jaffe.

436.     Accordingly, Mihir Bhansali and Ajay Gandhi committed acts of bankruptcy fraud in violation of 18 U.S.C. § 152.

437.     Mihir Bhansali's and Ajay Gandhi's violations of 18 U.S.C. § 152 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Bhansali and Gandhi failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

**Continuity of Conduct**

438.     Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of law as set forth herein, each of which directly and proximately injured the Debtors and U.S. Affiliates, constituted a continuous course of conduct in the United States beginning no later than 2010 and continuing at least through October 2018, which was intended to obtain economic gain through false representations, fraud, deceit, and other improper and unlawful means. Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

**The RICO Pattern Caused Injury to the Debtors and U.S. Affiliates**

439.     Each Debtor has been injured in its business or property as a direct result and proximate result of Modi, Bhansali, and Gandhi's violations, described above, of 18 U.S.C. § 1962(c), including any injury by reason of the predicate acts constituting the RICO Pattern.

80

440.   Prior to Defendants' racketeering activities, each of the Debtors operated as a legitimate business built on fruitful relationships with reputable customers.

441.   Firestar was incorporated in 2004 for the purposes of acquiring Frederick Goldman, Inc., which was one of FIL's U.S. customers. Firestar historically operated as a distributor and wholesaler of finished gold and diamond jewelry. Its customer base consisted of legitimate jewelry retailers such as Zales, JCPenney, and Macy's.

442.   Fantasy was incorporated in 2012 for the purpose of holding the exclusive license from Chicago-based Fantasy Diamond Corp. to supply the Endless Diamond Brand to U.S. retailers. Fantasy was created primarily to conduct business with Costco Wholesale Corporation based on sales attributable to the Endless Diamond Brand. Fantasy's other customers include Zales, Sam's Club, and Walmart. Fantasy sold finished jewelry, generally at a higher price point than Firestar.

443.   Jaffe is the successor to New York-based Sandberg & Sikorksi Corporation, whose predecessors date back to 1892. Sandberg & Sikorski historically consisted of two divisions, one that sold to major U.S. retailers and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers. In 2007, FIL purchased a 95% stake in Sandberg & Sikorski. Sandberg & Sikorski was renamed A. Jaffe, Inc. in 2011. It did not become fully integrated within the operations of the other Firestar Entities until 2016.

444.   Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of federal law in furtherance of their scheme or schemes to loot the Debtors' and U.S. Affiliates' assets through a series of actual fraudulent transfers and to conceal the nature of such transfers by corruptly impeding, influencing, or obstructing these chapter 11 cases resulted in: (a) each Debtor's and each U.S. Affiliate's assets being unjustifiably and irrevocably depleted in the amount of the applicable actual fraudulent transfers, (b) each Debtor's chapter 11 estate incurring substantial

81

administrative expenses stemming from Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's obstruction of the Examiner's and Trustee's investigations that would not otherwise have been incurred, (c) the impairment of each Debtor's ability to sell their assets at going-concern value, and (d) the frustration of the Debtors' and U.S. Affiliates' ability to collect substantial debts owed to them by Shadow Entities and overseas Firestar Entities.

### Defendants' Agreement to Violate RICO

445. At all relevant times, each Defendant, together with each other and with Nirav Modi, Mihir Bhansali, and Ajay Gandhi, and others known and unknown, being persons employed by or associated with the RICO Enterprise, have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) (the "**RICO Conspiracy**").

446. Defendant Purvi Mehta's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Mehta was the beneficial owner of numerous Shadow Entities, Twin Fields, and numerous other offshore shell companies used to further the Bank Fraud and launder its proceeds.

b. Mehta, through Islington, invested $45 million in proceeds of the Bank Fraud in FIPL to fund the 2017 "restructuring" of the Firestar Entities in connection with which Mehta subsequently received over $85 million in proceeds of the Bank Fraud.

c. Mehta settled and funded the Ithaca Trust to launder proceeds of the Bank Fraud for the benefit of Nirav Modi and Ami Modi and to shield ill-gotten assets from creditors.

d. Mehta wired Mihir Bhansali $1.5 million as a purported loan just weeks before Bhansali purchased a $7.1 million apartment.

447.    Defendant Ami Javeri's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Javeri served as a partner of all three LOU entities and, in 2010, opened bank accounts for Solar and Stellar used to defraud PNB.

b. Javeri is the primary beneficiary of the Ithaca Trust and the beneficial owner of the Ritz Carlton Apartment and the Essex House Apartment.

c. Javeri received more than $30 million in proceeds of the Bank Fraud from Purvi Mehta in May and June 2017.

d. Javeri wired more than $30 million in proceeds of the Bank Fraud to Purvi Mehta between September and November 2017.

e. Javeri fled India just weeks before the fraudulent LOUs issued in 2017 became due and the Bank Fraud was exposed.

f. Javeri appointed Nehal Modi as Ithaca Trust Protector in May 2017.

448.    Defendant Nehal Modi's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Nehal Modi traveled overseas with Mihir Bhansali after exposure of the Bank Fraud to threaten and bribe witnesses, destroy evidence, and remove assets.

b. Nehal Modi enlisted his personal friends, including Anthony Allicock, Rochelle Miller, and Tamer Abou El Ata, to divert the U.S. Affiliates' assets to Hong Kong following exposure of the Bank Fraud.

c. Nehal Modi became Ithaca Trust Protector following exposure of the Bank Fraud.

d. Nehal Modi, along with Mihir Bhansali, managed BBB Group as a front for the Modi family's money laundering efforts.

e. Nehal Modi managed Gitanjali USA, Samuels, Diamlink, and other Choksi-controlled entities used to defraud PNB.

449.    Defendant Neeshal Modi's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Neeshal Modi served as a partner of all three LOU Entities and, in 2016, selected and appointed additional "dummy" partners for the LOU Entities.

83

    b. Neeshal Modi was the beneficial owner of numerous Shadow Entities, other offshore shell companies used to further the Bank Fraud and launder its proceeds.

    c. Neeshal Modi, along with Mihir Bhansali, selected and hired various Shadow Entity personnel throughout the Relevant Period.

    d. Neeshal Modi orchestrated numerous fraudulent transactions among FD BVBA and Shadow Entities to further the Bank Fraud throughout the Relevant Period.

    e. Neeshal Modi had a power of attorney for Purvi Mehta and signed agreements on her behalf, including for Purvi Mehta's purchase of a Hong Kong apartment in April 2017 for approximately $2.7 million.

450. The Ithaca Trust's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

    a. Nirav Modi enjoys complete control over the Ithaca Trust, the Ithaca Trustee, the Ithaca Protector, the Ithaca Investment Advisor, the Ithaca Trust Agreement, and all of the assets in the Ithaca Trust.

    b. The Ithaca Trust was settled by Purvi Mehta, one of the Modi family's primary money laundering conduits.

    c. The Ithaca Trust purchased the Ritz Carlton Apartment using the proceeds of the Bank Fraud received from Purvi Mehta.

    d. The Ithaca Trust purchased the membership interests on CPRE, which owns the Essex House Apartment, using proceeds of the Bank Fraud received from Purvi Mehta.

    e. Deepak Sheth, the original Ithaca Protector and Ithaca Investment Advisor, participated in the Bank Fraud through the Sheth Entities throughout the Relevant Period.

    f. Abhay Javeri, who succeeded Deepak Sheth as Ithaca Investment Advisor and served as the default Ithaca Protector, participated in the Bank Fraud through the SDC Entities throughout the Relevant Period.

    g. Nehal Modi, who Ami Modi appointed Ithaca Protector in May 2018, orchestrated the Modi family's efforts to destroy evidence, tamper with witnesses, and divert assets from the reach of creditors following exposure of the Bank Fraud.

451.    Defendant CPS50's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Nirav Modi enjoys complete control over CPS50 through his complete control over the Ithaca Trust.

b. Deepak Sheth, the CPS50's original manager, participated in the Bank Fraud through the Sheth Entities throughout the Relevant Period.

c. Abhay Javeri, who succeeded Deepak Sheth as CPS50's manager, participated in the Bank Fraud through the SDC Entities throughout the Relevant Period.

d. Nitin Dattani, who succeeded Abhay Javeri as CPS50's manager in May 2018, worked with Ajay Gandhi, Angelina Ypma, and Mihir Bhansali to divert NMLUK's cash and inventory to Hong Kong following exposure of the Bank Fraud. Dattani also helped Nirav Modi set up a new company while Modi was hiding in London.

e. Ajay Gandhi, who served as president of CPS50 and as a signatory on its bank account, participated extensively in the Bank Fraud and in the fraudulent efforts following its exposure, as alleged above.

f. CPS50 purchased the Ritz Carlton Apartment using proceeds of the Bank Fraud.

g. CPS50 was formed for the purpose of laundering proceeds of the Bank Fraud to and for the benefit of Nirav Modi and Ami Modi.

452.    Defendant CPRE's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Nirav Modi enjoys complete control over CPRE through his complete control over the Ithaca Trust.

b. Mihir Bhansali, who served as sole director and CEO of CPRE, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

c. Ajay Gandhi, who served as chief financial officer of CPRE, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

453.    Defendant Twin Fields' agreement to join and support the RICO Conspiracy is

demonstrated by or can be inferred from, among other things, the following:

    a.    Purvi Mehta, who indirectly owns Twin Fields through BVI shell companies,
    participated extensively in the Bank Fraud and in fraudulent efforts to launder
    its proceeds beyond the reach of creditors.

    b.    Mihir Bhansali, who acted as the de jure or de facto director of Twin Fields,
    participated extensively in the Bank Fraud and in the efforts to obstruct justice
    and divert assets from the reach of creditors following its exposure, as alleged
    above.

    c.    Nirav Modi enjoys complete control over Twin Fields through his dominance
    and control over Purvi Mehta, Mihir Bhansali, and Nehal Modi.

    d.    Twin Fields served as a conduit for laundering proceeds of the Bank Fraud,
    including more than $25 million from Fine Classic, the Shadow Entity directly
    owned and controlled by Purvi Mehta.

454.    Each Shadow Entity Defendant's agreement to join and support the RICO

Conspiracy is demonstrated by or can be inferred from, among other things, the following:

    a.    Nirav Modi enjoys complete control over each Shadow Entity Defendant
    through his dominance and control over Purvi Mehta, Neeshal Modi, and
    other nominal owners, directors, and officers.

    b.    Each Shadow Entity Defendant engaged in millions of dollars in fraudulent
    import and export transactions with LOU Entities, Firestar Entities, and other
    Shadow Entities during the Relevant Period to further the Bank Fraud and to
    launder its proceeds.

    c.    Each Shadow Entity Defendant was established and operated for the sole
    purpose of furthering the Bank Fraud and laundering its proceeds.

455.    Each Defendant knew that they were engaged in a conspiracy to commit the

predicate acts and knew that the predicate acts were part of such racketeering activity, and the

participation and agreement of each of them was necessary to allow the commission of this

pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C.

§ 1962(c), in violation of 18 U.S.C. § 1962(d).

456.     Each Defendant agreed to conduct or participate in, directly or indirectly, the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above.

457.     As part of the conspiracy, each Defendant, at times acting through certain of their agents, and representatives, or co-conspirators, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

458.     As a direct and proximate result of the Defendants' RICO Conspiracy, the pattern of racketeering activity through which they agreed the affairs of the RICO Enterprise would be conducted, the predicate acts and other overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), each of the Debtors has been injured in its business and property.

459.     Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the general and special compensatory damages suffered by each Debtor, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

## COUNT 2

**Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act ("RICO")
18 U.S.C. § 1962(d)
(U.S. Affiliates' Claim Against All Defendants)**

460.     Plaintiff restates and re-alleges paragraphs 1 through 459 of this Complaint as though fully set forth herein.

461.     Plaintiff, as assignee of the U.S. Affiliates, has standing to bring any and all claims or causes of action of the U.S. Affiliates.

462.     As a direct and proximate result of the Defendants' RICO Conspiracy, the pattern of racketeering activity through which they agreed the affairs of the RICO Enterprise would be conducted, the predicate acts and other overt acts taken in furtherance of that conspiracy, and

violations of 18 U.S.C. § 1962(d), each of the U.S. Affiliates has been injured in its business and property.

463.    Each mailing or shipment of the U.S. Affiliates' inventory or other assets in furtherance of the RICO Conspiracy constituted a violation of 18 U.S.C. § 1341.

464.    Each wire or other electronic transfer of the U.S. Affiliates' funds in furtherance of the RICO Conspiracy constituted a violation of 18 U.S.C. § 1343.

465.    Each violation of 18 U.S.C. § 1341 or 1343 involving transfers of a U.S. Affiliate's assets directly and proximately injured such U.S. Affiliate by depleting its assets.

466.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the general and special compensatory damages suffered by each U.S. Affiliate, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

## COUNT 3

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279
### (Synergies-Mehta Transfer)

467.    Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

468.    As alleged and defined above as the Synergies-Mehta Transfer, on July 13, 2017, Synergies wired $14,575,000 to Purvi Mehta as part of the fraudulent laundering of funds through the Firestar Entities to Mehta in 2017.

469.    The Synergies-Mehta Transfer constituted a transfer of an interest in Synergies' property.

470.    The Synergies-Mehta Transfer was made, mediately or immediately, by Synergies to Purvi Mehta.

471.    Plaintiff holds a judgment against Synergies.

88

472.   The Synergies-Mehta Transfer was made with the actual intent to hinder or delay or defraud creditors, including the Trustee, within the meaning of section 276 of the New York Debtor & Creditor Law ("**N.Y. DCL**"). Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Synergies-Mehta Transfer in order to launder and siphon illicit proceeds of the Bank Fraud and other valuable assets for the benefit of Purvi Mehta, Ami Modi, Nirav Modi, and others.

473.   Plaintiff, as a creditor of Synergies, may set aside the Synergies-Mehta Transfer, disregard the Synergies-Mehta Transfer, and attach or levy execution upon the property conveyed under sections 278 and 279 of the New York Debtor & Creditor Law.

474.   Alternatively, Plaintiff is entitled to a monetary damages in the amount of the Synergies-Mehta Transfer.

475.   The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under N.Y. DCL section 276-a, and as otherwise permitted by law.

## COUNT 4

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279
### (Synergies-Mehta Transfer)

476.   Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

477.   The Synergies-Mehta Transfer constituted a transfer of an interest in Synergies' property.

478.   The Synergies-Mehta Transfer was made, mediately or immediately, by Synergies to Purvi Mehta.

479.   Plaintiff holds a judgment against Synergies.

480.   The Synergies-Mehta Transfer was made without fair consideration.

89

481.     On the date the Synergies-Mehta Transfer was made, Synergies was insolvent or was rendered insolvent as a result of such transfer.

482.     Plaintiff, as a creditor of Synergies, may set aside the Synergies-Mehta Transfer, disregard the Synergies-Mehta Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

483.     Alternatively, Plaintiff is entitled to a monetary damages in the amount of the Synergies-Mehta Transfer.

## COUNT 5

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279
### (CPRE Equity Transfer)

484.     Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

485.     As alleged and defined above as the CPRE Equity Transfer, on or around January 1, 2018, FGI transferred a 100% equity interest in CPRE to the Ithaca Trust as part of broader efforts to launder the proceeds of the Bank Fraud and shield assets from creditors.

486.     The CPRE Equity Transfer constituted a transfer of an interest in FGI's property.

487.     The CPRE Equity Transfer was made by FGI to the Ithaca Trust for the ultimate benefit of Ami Modi.

488.     Plaintiff holds a judgment against FGI.

489.     The CPRE Equity Transfer was made with the actual intent to hinder or delay or defraud creditors within the meaning of DCL section 276.  Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Equity Transfer to launder and siphon illicit proceeds of the Bank Fraud and other valuable assets for the benefit of Ami Modi, Nirav Modi, and others.

490.     Plaintiff, as a judgment creditor of FGI, may set aside the CPRE Equity Transfer, disregard the CPRE Equity Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

491.     Alternatively, Plaintiff is entitled to monetary damages in the amount of the CPRE Equity Transfer.

492.     Plaintiff is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 6

**Avoidance and Recovery of Constructive Fraudulent Transfers**
**Under N.Y. DCL §§ 273, 278, and 279**
**(CPRE Equity Transfer)**

493.     Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

494.     The CPRE Equity Transfer constituted a transfer of an interest in FGI's property.

495.     The CPRE Equity Transfer was made by FGI to the Ithaca Trust for the ultimate benefit of Ami Modi.

496.     Plaintiff holds a judgment against FGI.

497.     The CPRE Equity Transfer was made without fair consideration.

498.     On the date the CPRE Equity Transfer was made, FGI was insolvent or was rendered insolvent as a result of such transfer.

499.     Plaintiff, as creditor of FGI, may set aside the CPRE Equity Transfer, disregard the CPRE Equity Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

500.     Alternatively, Plaintiff is entitled to monetary damages equal to the value of the CPRE Equity Transfer.

## COUNT 7

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)**
**(CPRE)**

501.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

502.    FDI made numerous cash transfers for the benefit of CPRE within two years of the commencement of FDI's chapter 11 case, as identified on Schedule A, attached hereto (collectively, the "**CPRE Two-Year Transfers**").

503.    The CPRE Two-Year Transfers constituted transfers of interests of FDI in property.

504.    The CPRE Two-Year Transfers were made for the benefit of CPRE.

505.    The CPRE Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the CPRE Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

506.    The Trustee may avoid the CPRE Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

507.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Two-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Two-Year Transfers were made, and from any subsequent transferees.

508.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

92

## COUNT 8

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (CPRE)

509.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

510.     FDI made numerous cash transfers for the benefit of CPRE within six years of the commencement of FDI's chapter 11 case, as identified on <u>Schedule A</u>, attached hereto (collectively, the "**CPRE Six-Year Transfers**").

511.     The CPRE Six-Year Transfers were made for the benefit of CPRE.

512.     The CPRE Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the CPRE Six-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

513.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the CPRE Six-Year Transfers set aside, or who could disregard the CPRE Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

514.     The Trustee may avoid the CPRE Six-Year Transfers under Bankruptcy Code section 544(b)(1).

515.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Six-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Six-Year Transfers were made, and from any subsequent transferees.

93

516.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 9

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (CPRE)

517.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

518.    The CPRE Two-Year Transfers constituted transfers of interests of FDI in property.

519.    The CPRE Two-Year Transfers were made for the benefit of CPRE.

520.    FDI received less than reasonably equivalent value in exchange for the CPRE Two-Year Transfers.

521.    FDI was insolvent on the date each CPRE Two-Year Transfer was made, or became insolvent as a result of such transfer.

522.    The Trustee may avoid the CPRE Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

523.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Two-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 10

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (CPRE)

524.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

525.    The CPRE Six-Year Transfers constituted transfers of interests of FDI in property.

526.     The CPRE Six-Year Transfers were made for the benefit of CPRE.

527.     The CPRE Six-Year Transfers were made by FDI without fair consideration.

528.     On the date of each CPRE Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

529.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the CPRE Six-Year Transfers set aside, or who could disregard the CPRE Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

530.     The Trustee may avoid the CPRE Six-Year Transfers under Bankruptcy Code section 544(b)(1).

531.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Six-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 11

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Auragem)

532.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

533.     FDI made cash transfers to Auragem within six years of the commencement of FDI's chapter 11 case, as identified on Schedule B, attached hereto (collectively, the "**Auragem Transfers**").

534.     The Auragem Transfers were made to or for the benefit of Auragem.

535.     The Auragem Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi,

Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Auragem Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Auragem Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

536.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Auragem Transfers set aside, or who could disregard the Auragem Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

537.     The Trustee may avoid the Auragem Transfers under Bankruptcy Code section 544(b)(1).

538.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Auragem Transfers for the benefit of FDI's estate from Auragem, the entity to or for whose benefit the Auragem Transfers were made, and from any subsequent transferees.

539.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 12

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Auragem)

540.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

541.     The Auragem Transfers constituted transfers of interests of FDI in property.

542.     The Auragem Transfers were made to or for the benefit of Auragem.

543.     The Auragem Transfers were made by FDI without fair consideration.

96

544.    On the date of each Auragem Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

545.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Auragem Transfers set aside, or who could disregard the Auragem Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

546.    The Trustee may avoid the Auragem Transfers under Bankruptcy Code section 544(b)(1).

547.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Auragem Transfers for the benefit of FDI's estate from Auragem, the entity to or for whose benefit the Auragem Transfers were made, and from any subsequent transferees.

## COUNT 13

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Brilliant)

548.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

549.    FDI made numerous cash transfers to Brilliant within two years of the commencement of FDI's chapter 11 case, as identified on Schedule C, attached hereto (collectively, the "**Brilliant Two-Year Transfers**").

550.    The Brilliant Two-Year Transfers constituted transfers of interests of FDI in property.

551.    The Brilliant Two-Year Transfers were made to or for the benefit of Brilliant.

552.    The Brilliant Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-

conspirators approved the Brilliant Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Brilliant Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

553.    The Trustee may avoid the Brilliant Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

554.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Two-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Two-Year Transfers were made, and from any subsequent transferees.

555.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 14

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Brilliant)

556.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

557.    FDI made numerous transfers of cash and inventory to Brilliant within six years of the commencement of FDI's chapter 11 case, as identified on Schedule C, attached hereto (collectively, the "**Brilliant Six-Year Transfers**").

558.    The Brilliant Six-Year Transfers were made to or for the benefit of Brilliant.

559.    The Brilliant Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Brilliant Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for

the benefit of Modi, his family, and others. The natural consequence of the Brilliant Six-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

560.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Brilliant Six-Year Transfers set aside, or who could disregard the Brilliant Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

561.    The Trustee may avoid the Brilliant Six-Year Transfers under Bankruptcy Code section 544(b)(1).

562.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Six-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Six-Year Transfers were made, and from any subsequent transferees.

563.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 15

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Brilliant)

564.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

565.    The Brilliant Two-Year Transfers constituted transfers of interests of FDI in property.

566.    The Brilliant Two-Year Transfers were made to or for the benefit of Brilliant.

567.    FDI received less than reasonably equivalent value in exchange for the Brilliant Two-Year Transfers.

568.     FDI was insolvent on the date each Brilliant Two-Year Transfer was made, or became insolvent as a result of such transfer.

569.     The Trustee may avoid the Brilliant Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

570.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Two-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Two-Year Transfers were made, and from any subsequent transferees.

### COUNT 16

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Brilliant)**

571.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

572.     The Brilliant Six-Year Transfers constituted transfers of interests of FDI in property.

573.     The Brilliant Six-Year Transfers were made to or for the benefit of Brilliant.

574.     The Brilliant Six-Year Transfers were made by FDI without fair consideration.

575.     On the date of each Brilliant Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

576.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Brilliant Six-Year Transfers set aside, or who could disregard the Brilliant Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

577.     The Trustee may avoid the Brilliant Six-Year Transfers under Bankruptcy Code section 544(b)(1).

578.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Six-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Six-Year Transfers were made, and from any subsequent transferees.

### COUNT 17

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(Diagems)**

579.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

580.     FDI made numerous cash transfers to Diagems within six years of the commencement of FDI's chapter 11 case, as identified on Schedule D, attached hereto (collectively, the "**Diagems Transfers**").

581.     The Diagems Transfers were made to or for the benefit of Diagems.

582.     The Diagems Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Diagems Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Diagems Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

583.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Diagems Transfers set aside, or who could disregard the Diagems Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

584.     The Trustee may avoid the Diagems Transfers under Bankruptcy Code section 544(b)(1).

585. Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Diagems Transfers for the benefit of FDI's estate from Diagems, the entity to or for whose benefit the Diagems Transfers were made, and from any subsequent transferees.

586. The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 18

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Diagems)

587. The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

588. The Diagems Transfers constituted transfers of interests of FDI in property.

589. The Diagems Transfers were made to or for the benefit of Diagems.

590. The Diagems Transfers were made by FDI without fair consideration.

591. On the date of each Diagems Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

592. Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Diagems Transfers set aside, or who could disregard the Diagems Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

593. The Trustee may avoid the Diagems Transfers under Bankruptcy Code section 544(b)(1).

594. Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Diagems Transfers for the benefit of FDI's estate from Diagems, the entity to or for whose benefit the Diagems Transfers were made, and from any subsequent transferees.

## COUNT 19

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Empire)

595.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

596.    The Debtors made transfers of inventory to Empire within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule E, attached hereto (collectively, the "**Empire Two-Year Transfers**").

597.    The Empire Two-Year Transfers constituted transfers of interests of the Debtors in property.

598.    The Empire Two-Year Transfers were made to or for the benefit of Empire.

599.    The Empire Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Empire Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Empire Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

600.    The Trustee may avoid the Empire Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

601.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Two-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 20

## Avoidance and Recovery of Actual Fraudulent Transfers
## Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
## (Empire)

602.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

603.     The Debtors made numerous transfers of cash and inventory to Empire within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule E, attached hereto (collectively, the "**Empire Six-Year Transfers**").

604.     The Empire Six-Year Transfers were made to or for the benefit of Empire.

605.     The Empire Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Empire Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Empire Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

606.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Empire Six-Year Transfers set aside, or who could disregard the Empire Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

607.     The Trustee may avoid the Empire Six-Year Transfers under Bankruptcy Code section 544(b)(1).

608.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Six-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Six-Year Transfers were made, and from any subsequent transferees.

609.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 21

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Empire)

610.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

611.    The Empire Two-Year Transfers constituted transfers of interests of the Debtors in property.

612.    The Empire Two-Year Transfers were made to or for the benefit of Empire.

613.    The Debtors received less than reasonably equivalent value in exchange for the Empire Two-Year Transfers.

614.    The Debtors were insolvent on the date each Empire Two-Year Transfer was made, or became insolvent as a result of such transfer.

615.    The Trustee may avoid the Empire Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

616.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Two-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Two-Year Transfers were made, and from any subsequent transferees.

105

## COUNT 22

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Empire)

617.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

618.    The Empire Six-Year Transfers constituted transfers of interests of the Debtors in property.

619.    The Empire Six-Year Transfers were made to or for the benefit of Empire.

620.    The Empire Six-Year Transfers were made by the Debtors without fair consideration.

621.    On the date of each Empire Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

622.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Empire Six-Year Transfers set aside, or who could disregard the Empire Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

623.    The Trustee may avoid the Empire Six-Year Transfers under Bankruptcy Code section 544(b)(1).

624.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Six-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Six-Year Transfers were made, and from any subsequent transferees.

106

## COUNT 23

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)**
**(Eternal)**

625.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

626.    The Debtors made transfers of inventory to Eternal within two years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule F</u>, attached hereto (collectively, the "**Eternal Two-Year Transfers**").

627.    The Eternal Two-Year Transfers constituted transfers of interests of the Debtors in property.

628.    The Eternal Two-Year Transfers were made to or for the benefit of Eternal.

629.    The Eternal Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Eternal Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Eternal Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

630.    The Trustee may avoid the Eternal Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

631.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Two-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 24

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Eternal)

632.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

633.    The Debtors made transfers of cash and inventory to Eternal within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule F, attached hereto (collectively, the "**Eternal Six-Year Transfers**").

634.    The Eternal Six-Year Transfers were made to or for the benefit of Eternal.

635.    The Eternal Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Eternal Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Eternal Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

636.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Eternal Six-Year Transfers set aside, or who could disregard the Eternal Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

637.    The Trustee may avoid the Eternal Six-Year Transfers under Bankruptcy Code section 544(b)(1).

638.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Six-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Six-Year Transfers were made, and from any subsequent transferees.

639.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 25

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Eternal)

640.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

641.     The Eternal Two-Year Transfers constituted transfers of interests of the Debtors in property.

642.     The Eternal Two-Year Transfers were made to or for the benefit of Eternal.

643.     The Debtors received less than reasonably equivalent value in exchange for the Eternal Two-Year Transfers.

644.     The Debtors were insolvent on the date each Eternal Two-Year Transfer was made, or became insolvent as a result of such transfer.

645.     The Trustee may avoid the Eternal Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

646.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Two-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Two-Year Transfers were made, and from any subsequent transferees.

109

## COUNT 26

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Eternal)

647.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

648.    The Eternal Six-Year Transfers constituted transfers of interests of the Debtors in property.

649.    The Eternal Six-Year Transfers were made to or for the benefit of Eternal.

650.    The Eternal Six-Year Transfers were made by the Debtors without fair consideration.

651.    On the date of each Eternal Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

652.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Eternal Six-Year Transfers set aside, or who could disregard the Eternal Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

653.    The Trustee may avoid the Eternal Six-Year Transfers under Bankruptcy Code section 544(b)(1).

654.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Six-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 27

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Fancy Creations)

655.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

656.     The Debtors made numerous transfers of cash and inventory to Fancy Creations within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule G, attached hereto (collectively, the "**Fancy Creations Two-Year Transfers**").

657.     The Fancy Creations Two-Year Transfers constituted transfers of interests of the Debtors in property.

658.     The Fancy Creations Two-Year Transfers were made to or for the benefit of Fancy Creations.

659.     The Fancy Creations Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Fancy Creations Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Fancy Creations Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

660.     The Trustee may avoid the Fancy Creations Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

661.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Two-Year Transfers for the benefit of the Debtors' estates from Fancy Creations, the entity to or for whose benefit the Fancy Creations Two-Year Transfers were made, and from any subsequent transferees.

111

## COUNT 28

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Fancy Creations)

662.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

663.    The Debtors made numerous transfers of cash and inventory to Fancy Creations within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule G, attached hereto (collectively, the "**Fancy Creations Six-Year Transfers**").

664.    The Fancy Creations Six-Year Transfers were made to or for the benefit of Fancy Creations.

665.    The Fancy Creations Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Fancy Creations Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Fancy Creations Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

666.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Fancy Creations Six-Year Transfers set aside, or who could disregard the Fancy Creations Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

667.    The Trustee may avoid the Fancy Creations Six-Year Transfers under Bankruptcy Code section 544(b)(1).

112

668.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Six-Year Transfers for the benefit of the Debtors' estates from Fancy Creations, the entity to or for whose benefit the Fancy Creations Six-Year Transfers were made, and from any subsequent transferees.

669.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 29

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Fancy Creations)

670.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

671.    The Fancy Creations Two-Year Transfers constituted transfers of interests of the Debtors in property.

672.    The Fancy Creations Two-Year Transfers were made to or for the benefit of Fancy Creations.

673.    The Debtors received less than reasonably equivalent value in exchange for the Fancy Creations Two-Year Transfers.

674.    The Debtors were insolvent on the date each Fancy Creations Two-Year Transfer was made, or became insolvent as a result of such transfer.

675.    The Trustee may avoid the Fancy Creations Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

676.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Two-Year Transfers for the benefit of the Debtors' estates from Fancy Creations,

113

the entity to or for whose benefit the Fancy Creations Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 30

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Fancy Creations)

677.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

678.    The Fancy Creations Six-Year Transfers constituted transfers of interests of the Debtors in property.

679.    The Fancy Creations Six-Year Transfers were made to or for the benefit of Fancy Creations.

680.    The Fancy Creations Six-Year Transfers were made by the Debtors without fair consideration.

681.    On the date of each Fancy Creations Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

682.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Fancy Creations Six-Year Transfers set aside, or who could disregard the Fancy Creations Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

683.    The Trustee may avoid the Fancy Creations Six-Year Transfers under Bankruptcy Code section 544(b)(1).

684.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Six-Year Transfers for the benefit of the Debtors' estates from Fancy Creations,

the entity to or for whose benefit the Fancy Creations Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 31

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Pacific)

685.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

686.    The Debtors made numerous transfers of cash and inventory to Pacific within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule H, attached hereto (collectively, the "**Pacific Two-Year Transfers**").

687.    The Pacific Two-Year Transfers constituted transfers of interests of the Debtors in property.

688.    The Pacific Two-Year Transfers were made to or for the benefit of Pacific.

689.    The Pacific Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Pacific Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Pacific Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

690.    The Trustee may avoid the Pacific Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

691.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Two-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 32

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Pacific)

692.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

693.    The Debtors made numerous transfers of cash and inventory to Pacific within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule H, attached hereto (collectively, the "**Pacific Six-Year Transfers**").

694.    The Pacific Six-Year Transfers were made to or for the benefit of Pacific.

695.    The Pacific Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Pacific Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Pacific Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

696.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Pacific Six-Year Transfers set aside, or who could disregard the Pacific Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

697.    The Trustee may avoid the Pacific Six-Year Transfers under Bankruptcy Code section 544(b)(1).

116

698.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Six-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Six-Year Transfers were made, and from any subsequent transferees.

699.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 33

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Pacific)

700.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

701.    The Pacific Two-Year Transfers constituted transfers of interests of the Debtors in property.

702.    The Pacific Two-Year Transfers were made to or for the benefit of Pacific.

703.    The Debtors received less than reasonably equivalent value in exchange for the Pacific Two-Year Transfers.

704.    The Debtors were insolvent on the date each Pacific Two-Year Transfer was made, or became insolvent as a result of such transfer.

705.    The Trustee may avoid the Pacific Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

706.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Two-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 34

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Pacific)

707.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

708.    The Pacific Six-Year Transfers constituted transfers of interests of the Debtors in property.

709.    The Pacific Six-Year Transfers were made to or for the benefit of Pacific.

710.    The Pacific Six-Year Transfers were made by the Debtors without fair consideration.

711.    On the date of each Pacific Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

712.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Pacific Six-Year Transfers set aside, or who could disregard the Pacific Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

713.    The Trustee may avoid the Pacific Six-Year Transfers under Bankruptcy Code section 544(b)(1).

714.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Six-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Six-Year Transfers were made, and from any subsequent transferees.

118

## COUNT 35

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Sunshine)

715.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

716.    FDI transferred $965,000.00 in inventory to Sunshine on March 17, 2016 (the "**Sunshine Transfer**").

717.    The Sunshine Transfer was made within two years of the commencement of FDI's chapter 11 case.

718.    The Sunshine Transfer constituted a transfer of interest of FDI in property.

719.    The Sunshine Transfer was made to or for the benefit of Sunshine.

720.    The Sunshine Transfer was made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Sunshine Transfer in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Sunshine Transfer was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

721.    The Trustee may avoid the Sunshine Transfer under section 548(a)(1)(A) of the Bankruptcy Code.

722.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

119

## COUNT 36

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Sunshine)

723.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

724.     The Sunshine Transfer was made within six years of the commencement of FDI's chapter 11 case.

725.     The Sunshine Transfer constituted a transfer of an interest of FDI in property.

726.     The Sunshine Transfer was made to or for the benefit of Sunshine.

727.     The Sunshine Transfer was made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Sunshine Transfer in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Sunshine Transfer was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

728.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Sunshine Transfer set aside, or who could disregard the Sunshine Transfer and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

729.     The Trustee may avoid the Sunshine Transfer under Bankruptcy Code section 544(b)(1).

730.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

731.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this

claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

**COUNT 37**

**Avoidance and Recovery of Constructive Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)**
**(Sunshine)**

732.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as

though fully set forth herein.

733.    The Sunshine Transfer constituted a transfer of an interest of FDI in property.

734.    The Sunshine Transfer was made to or for the benefit of Sunshine.

735.    FDI received less than reasonably equivalent value in exchange for the Sunshine

Transfer.

736.    FDI was insolvent on the date the Sunshine Transfer was made, or became

insolvent as a result of such transfer.

737.    The Trustee may avoid the Sunshine Transfer under section 548(a)(1)(B) of the

Bankruptcy Code.

738.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit

the Sunshine Transfer was made, and from any subsequent transferees.

## COUNT 38

**Avoidance and Recovery of Constructive Fraudulent Transfers**
**Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(Sunshine)**

739.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

740.    The Sunshine Transfer constituted a transfer of an interest of FDI in property.

741.    The Sunshine Transfer was made to or for the benefit of Sunshine.

742.    The Sunshine Transfer was made by FDI without fair consideration.

743.    On the date the Sunshine Transfer was made, FDI was insolvent or was rendered insolvent as a result of such transfer.

744.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Sunshine Transfer set aside, or who could disregard the Sunshine Transfer and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

745.    The Trustee may avoid the Sunshine Transfer under Bankruptcy Code section 544(b)(1).

746.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

## COUNT 39

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)**
**(Tri Color)**

747.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

122

748.     The Debtors made cash transfers to Tri Color within two years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule I</u>, attached hereto (collectively, the "**Tri Color Two-Year Transfers**").

749.     The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors in property.

750.     The Tri Color Two-Year Transfers were made to or for the benefit of Tri Color.

751.     The Tri Color Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Tri Color Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Tri Color Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

752.     The Trustee may avoid the Tri Color Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

753.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Two-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Two-Year Transfers were made, and from any subsequent transferees.

### COUNT 40

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(Tri Color)**

754.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

755.     The Debtors made numerous transfers of cash and inventory to Tri Color within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule I, attached hereto (collectively, the "**Tri Color Six-Year Transfers**").

756.     The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors in property.

757.     The Tri Color Six-Year Transfers were made to or for the benefit of Tri Color.

758.     The Tri Color Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Tri Color Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Tri Color Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

759.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Tri Color Six-Year Transfers set aside, or who could disregard the Tri Color Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

760.     The Trustee may avoid the Tri Color Six-Year Transfers under Bankruptcy Code section 544(b)(1).

761.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Six-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Six-Year Transfers were made, and from any subsequent transferees.

124

762.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 41

**Avoidance and Recovery of Constructive Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)**
**(Tri Color)**

763.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

764.     The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors in property.

765.     The Tri Color Two-Year Transfers were made to or for the benefit of Tri Color.

766.     The Debtors received less than reasonably equivalent value in exchange for the Tri Color Two-Year Transfers.

767.     The Debtors were insolvent on the date each Tri Color Two-Year Transfer was made, or became insolvent as a result of such transfer.

768.     The Trustee may avoid the Tri Color Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

769.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Two-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 42

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Tri Color)

770.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

771.    The Tri Color Six-Year Transfers constituted transfers of interests of the Debtors in property.

772.    The Tri Color Six-Year Transfers were made to or for the benefit of Tri Color.

773.    The Tri Color Six-Year Transfers were made by the Debtors without fair consideration.

774.    On the date of each Tri Color Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

775.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Tri Color Six-Year Transfers set aside, or who could disregard the Tri Color Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

776.    The Trustee may avoid the Tri Color Six-Year Transfers under Bankruptcy Code section 544(b)(1).

777.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Six-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Six-Year Transfers were made, and from any subsequent transferees.

126

## COUNT 43

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Unique)

778.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

779.    FDI made numerous transfers of cash and inventory to Unique within two years of the commencement of FDI's chapter 11 case, as identified on <u>Schedule J</u>, attached hereto (collectively, the "**Unique Two-Year Transfers**").

780.    The Unique Two-Year Transfers constituted transfers of interests of FDI in property.

781.    The Unique Two-Year Transfers were made to or for the benefit of Unique.

782.    The Unique Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Unique Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Unique Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

783.    The Trustee may avoid the Unique Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

784.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Two-Year Transfers for the benefit of FDI's from Unique, the entity to or for whose benefit the Unique Two-Year Transfers were made, and from any subsequent transferees.

127

## COUNT 44

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Unique)

785.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

786.    The Debtors made numerous transfers of cash and inventory to Unique within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule J, attached hereto (collectively, the "**Unique Six-Year Transfers**").

787.    The Unique Six-Year Transfers were made to or for the benefit of Unique.

788.    The Unique Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Unique Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Unique Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

789.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Unique Six-Year Transfers set aside, or who could disregard the Unique Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

790.    The Trustee may avoid the Unique Six-Year Transfers under Bankruptcy Code section 544(b)(1).

128

791.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Six-Year Transfers for the benefit of the Debtors' estates from Unique, the entity to or for whose benefit the Unique Six-Year Transfers were made, and from any subsequent transferees.

792.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

**COUNT 45**

**Avoidance and Recovery of Constructive Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)**
**(Unique)**

793.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

794.     The Unique Two-Year Transfers constituted transfers of interests of FDI in property.

795.     The Unique Two-Year Transfers were made to or for the benefit of Unique.

796.     FDI received less than reasonably equivalent value in exchange for the Unique Two-Year Transfers.

797.     FDI was insolvent on the date each Unique Two-Year Transfer was made, or became insolvent as a result of such transfer.

798.     The Trustee may avoid the Unique Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

799.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Two-Year Transfers for the benefit of FDI's estate from Unique, the entity to or for whose benefit the Unique Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 46

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Unique)

800.    The Trustee restates and re-alleges paragraphs 1 through 382 of this Complaint as though fully set forth herein.

801.    The Unique Six-Year Transfers constituted transfers of interests of the Debtors in property.

802.    The Unique Six-Year Transfers were made to or for the benefit of Unique.

803.    The Unique Six-Year Transfers were made by the Debtors without fair consideration.

804.    On the date of each Unique Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

805.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Unique Six-Year Transfers set aside, or who could disregard the Unique Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

806.    The Trustee may avoid the Unique Six-Year Transfers under Bankruptcy Code section 544(b)(1).

807.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Six-Year Transfers for the benefit of the Debtors' estates from Unique, the entity to or for whose benefit the Unique Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 47

**Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(World Diamond)**

808.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

809.    FDI made numerous transfers of inventory to World Diamond within two years of the commencement of FDI's chapter 11 case, as identified on Schedule K, attached hereto (collectively, the "**World Diamond Two-Year Transfers**").

810.    The World Diamond Two-Year Transfers constituted transfers of interests of FDI in property.

811.    The World Diamond Two-Year Transfers were made to or for the benefit of World Diamond.

812.    The World Diamond Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the World Diamond Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the World Diamond Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

813.    The Trustee may avoid the World Diamond Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

814.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the World Diamond Two-Year Transfers for the benefit of FDI's from World Diamond, the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 48

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (World Diamond)

815.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

816.    The Debtors made numerous transfers of inventory to World Diamond within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule K, attached hereto (collectively, the "**World Diamond Six-Year Transfers**").

817.    The World Diamond Six-Year Transfers were made to or for the benefit of World Diamond.

818.    The World Diamond Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the World Diamond Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the World Diamond Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

819.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the World Diamond Six-Year Transfers set aside, or who could disregard the World Diamond Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

820.    The Trustee may avoid the World Diamond Six-Year Transfers under Bankruptcy Code section 544(b)(1).

132

821.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the World Diamond Six-Year Transfers for the benefit of the Debtors' estates from World Diamond, the entity to or for whose benefit the World Diamond Six-Year Transfers were made, and from any subsequent transferees.

822.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 49

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(World Diamond)**

823.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

824.    The World Diamond Two-Year Transfers constituted transfers of interests of the Debtors in property.

825.    The World Diamond Two-Year Transfers were made to or for the benefit of World Diamond.

826.    The Debtors received less than reasonably equivalent value in exchange for the World Diamond Two-Year Transfers.

827.    The Debtors were insolvent on the date each World Diamond Two-Year Transfer was made, or became insolvent as a result of such transfer.

828.    The Trustee may avoid the World Diamond Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

829.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the World Diamond Two-Year Transfers for the benefit of the Debtors' estates from World Diamond,

the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 50

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (World Diamond)

830.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

831.    The World Diamond Two-Year Transfers constituted transfers of interests of FDI in property.

832.    The World Diamond Two-Year Transfers were made to or for the benefit of World Diamond.

833.    FDI received less than reasonably equivalent value in exchange for the World Diamond Two-Year Transfers.

834.    FDI was insolvent on the date each World Diamond Two-Year Transfer was made, or became insolvent as a result of such transfer.

835.    The Trustee may avoid the World Diamond Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

836.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the World Diamond Two-Year Transfers for the benefit of FDI's estate from World Diamond, the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 51

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Twin Fields)

837.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

838.    Jaffe made numerous cash transfers to Twin Fields within two years of the commencement of Jaffe's chapter 11 case, as identified on <u>Schedule L</u>, attached hereto (collectively, the "**Twin Fields Two-Year Transfers**").

839.    The Twin Fields Two-Year Transfers constituted transfers of interests of Jaffe in property.

840.    The Twin Fields Two-Year Transfers were made to or for the benefit of Twin Fields.

841.    The Twin Fields Two-Year Transfers were made with the actual intent to hinder, delay, or defraud Jaffe's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Twin Fields Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Twin Fields Two-Year Transfers was to deplete Jaffe's property and frustrate satisfaction of Jaffe's legitimate obligations.

842.    The Trustee may avoid the Twin Fields Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

843.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Two-Year Transfers for the benefit of Jaffe's estate from Twin Fields, the entity to or for whose benefit the Twin Fields Two-Year Transfers were made, and from any subsequent transferees.

135

## COUNT 52

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Twin Fields)

844.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

845.    The Debtors made numerous cash transfers to Twin Fields within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule L, attached hereto (collectively, the "**Twin Fields Six-Year Transfers**").

846.    The Twin Fields Six-Year Transfers were made to or for the benefit of Twin Fields.

847.    The Twin Fields Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Twin Fields Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others.  The natural consequence of the Twin Fields Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

848.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Twin Fields Six-Year Transfers set aside, or who could disregard the Twin Fields Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

849.    The Trustee may avoid the Twin Fields Six-Year Transfers under Bankruptcy Code section 544(b)(1).

850.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Six-Year Transfers for the benefit of the Debtors' from Twin Fields, the entity to or

136

for whose benefit the Twin Fields Six-Year Transfers were made, and from any subsequent transferees.

851.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 53

**Avoidance and Recovery of Constructive Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)**
**(Twin Fields)**

852.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

853.    The Twin Fields Two-Year Transfers constituted transfers of interests of Jaffe in property.

854.    The Twin Fields Two-Year Transfers were made to or for the benefit of Twin Fields.

855.    Jaffe received less than reasonably equivalent value in exchange for the Twin Fields Two-Year Transfers.

856.    Jaffe was insolvent on the date each Twin Fields Two-Year Transfer was made, or became insolvent as a result of such transfer.

857.    The Trustee may avoid the Twin Fields Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

858.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Two-Year Transfers for the benefit of Jaffe's estate from Twin Fields, the entity to or for whose benefit the Twin Fields Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 54

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Twin Fields)

859.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

860.     The Twin Fields Six-Year Transfers constituted transfers of interests of the Debtors in property.

861.     The Twin Fields Six-Year Transfers were made to or for the benefit of Twin Fields.

862.     The Twin Fields Six-Year Transfers were made by the Debtors without fair consideration.

863.     On the date of each Twin Fields Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

864.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Twin Fields Six-Year Transfers set aside, or who could disregard the Twin Fields Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

865.     The Trustee may avoid the Twin Fields Six-Year Transfers under Bankruptcy Code section 544(b)(1)

866.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Six-Year Transfers for the benefit of the Debtors' estates from Twin Fields, the entity to or for whose benefit the Twin Fields Six-Year Transfers were made, and from any subsequent transferees.

138

**PRAYER FOR RELIEF**

WHEREFORE, the Trustee, as chapter 11 trustee of the Debtors and as assignee and judgment creditor of the U.S. Affiliates, respectfully requests that the Court:

a.  On Count 1, enter judgment in favor of the Trustee and against all Defendants, jointly and severally, in treble the amount of damages to be proven at trial, but no less than $175,000,000 that were suffered by the Debtors and their estates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

b.  On Count 2, enter judgment in favor of the Trustee, as assignee of the U.S. Affiliates, and against all Defendants, jointly and severally, in treble the amount of damages to be proven at trial, but no less than $50,000,000, that were suffered by the U.S. Affiliates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

c.  On Count 3, avoid the Synergies-Mehta Transfer and enter judgment in favor of the Trustee and against Defendant Purvi Mehta in the amount of $14,575,000.

d.  On Count 4, avoid the Synergies-Mehta Transfer and enter judgment in favor of the Trustee and against Defendant Purvi Mehta in the amount of $14,575,000.

e.  On Count 5, avoid the CPRE Equity Transfer and enter judgment in favor of the Trustee and against the Ithaca Trust and Ami Modi, jointly and severally, in the amount of $6,000,000.

f.  On Count 6, avoid the CPRE Equity Transfer and enter judgment in favor of the Trustee and against the Ithaca Trust and Ami Modi, jointly and severally, in the

139

amount of $6,000,000.

g.   On Count 7, avoid each of the CPRE Two-Year Transfers and enter judgment in
     favor of the Trustee and against CPRE in the amount of $3,603,683.69.

h.   On Count 8, avoid each of the CPRE Six-Year Transfers and enter judgment in
     favor of the Trustee and against CPRE in the amount of $4,594,559.78.

i.   On Count 9, avoid each of the CPRE Two-Year Transfers and enter judgment in
     favor of the Trustee and against CPRE in the amount of $3,603,683.69.

j.   On Count 10, avoid each of the CPRE Six-Year Transfers and enter judgment in
     favor of the Trustee and against CPRE in the amount of $4,594,559.78.

k.   On Count 11, avoid each of the Auragem Transfers and enter judgment in favor of
     the Trustee and against Auragem in the amount of $2,340,968.94.

l.   On Count 12, avoid each of the Auragem Transfers and enter judgment in favor of
     the Trustee and against Auragem in the amount of $2,340,968.94.

m.   On Count 13, avoid each of the Brilliant Two-Year Transfers and enter judgment
     in favor of the Trustee and against Brilliant in the amount of $5,264,397.13.

n.   On Count 14, avoid each of the Brilliant Six-Year Transfers and enter judgment in
     favor of the Trustee and against Brilliant in the amount of $10,491,287.11.

o.   On Count 15, avoid each of the Brilliant Two-Year Transfers and enter judgment
     in favor of the Trustee and against Brilliant in the amount of $5,264,397.13.

p.   On Count 16, avoid each of the Brilliant Six-Year Transfers and enter judgment in
     favor of the Trustee and against Brilliant in the amount of $10,491,287.11.

q.   On Count 17, avoid each of the Diagems Transfers and enter judgment in favor of
     the Trustee and against Diagems in the amount of $2,966,406.15.

r.   On Count 18, avoid each of the Diagems Transfers and enter judgment in favor of

the Trustee and against Diagems in the amount of $2,966,406.15.

s.  On Count 19, avoid each of the Empire Two-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $1,069,006.07.

t.  On Count 20, avoid each of the Empire Six-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $12,113,126.57.

u.  On Count 21, avoid each of the Empire Two-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $1,069,006.07.

v.  On Count 22, avoid each of the Empire Six-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $12,113,126.57.

w.  On Count 23, avoid each of the Eternal Two-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,433,815.61.

x.  On Count 24, avoid each of the Eternal Six-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,733,815.61.

y.  On Count 25, avoid each of the Eternal Two-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,433,815.61.

z.  On Count 26, avoid each of the Eternal Six-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,733,815.61.

aa. On Count 27, avoid each of the Fancy Creations Two-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $3,900,916.93.

bb. On Count 28, avoid each of the Fancy Creations Six-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $10,827,802.57.

cc. On Count 29, avoid each of the Fancy Creations Two-Year Transfers and enter

141

judgment in favor of the Trustee and against Fancy Creations in the amount of $3,900,916.93.

dd. On Count 30, avoid each of the Fancy Creations Six-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $10,827,802.57.

ee. On Count 31, avoid each of the Pacific Two-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $12,494,765.63.

ff. On Count 32, avoid each of the Pacific Six-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $41,771,415.37.

gg. On Count 33, avoid each of the Pacific Two-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $12,494,765.63.

hh. On Count 34, avoid each of the Pacific Six-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $41,771,415.37.

ii. On Count 35, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

jj. On Count 36, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

kk. On Count 37, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

ll. On Count 38, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

mm. On Count 39, avoid each of the Tri Color Two-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $1,493,645.55.

nn. On Count 40, avoid each of the Tri Color Six-Year Transfers and enter judgment

142

in favor of the Trustee and against Tri Color in the amount of $12,395,082.86.

oo. On Count 41, avoid each of the Tri Color Two-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $1,493,645.55.

pp. On Count 42, avoid each of the Tri Color Six-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $12,395,082.86.

qq. On Count 43, avoid each of the Unique Two-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $3,475,031.42.

rr. On Count 44, avoid each of the Unique Six-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $11,494,395.02.

ss. On Count 45, avoid each of the Unique Two-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $3,475,031.42.

tt. On Count 46, avoid each of the Unique Six-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $11,494,395.02.

uu. On Count 47, avoid each of the World Diamond Two-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $10,607,792.98.

vv. On Count 48, avoid each of the World Diamond Six-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $21,175,805.74.

ww. On Count 49, avoid each of the World Diamond Two-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $10,607,792.98.

xx. On Count 50, avoid each of the World Diamond Six-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of

$21,175,805.74.

yy. On Count 51, avoid each of the Twin Fields Two-Year Transfers and enter
judgment in favor of the Trustee and against Twin Fields in the amount of
$3,265,000.00.

zz. On Count 52, avoid each of the Twin Fields Six-Year Transfers and enter judgment
in favor of the Trustee and against Twin Fields in the amount of $21,361,542.28.

aaa. On Count 53, avoid each of the Twin Fields Two-Year Transfers and enter
judgment in favor of the Trustee and against Twin Fields in the amount of
$3,265,000.00.

bbb. On Count 54, avoid each of the Twin Fields Six-Year Transfers and enter judgment
in favor of the Trustee and against Twin Fields in the amount of $21,361,542.28.

ccc. Award the Trustee his reasonable costs and expenses incurred in this action,
including counsel fees under New York Debtor & Creditor Law section 276-a and
as otherwise permitted by law.

Dated: February 25, 2020
      New York, New York                   Respectfully submitted,

**JENNER & BLOCK LLP**

By: /s/ Vincent E. Lazar
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
aallen@jenner.com

Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600
cwedoff@jenner.com

*Counsel for the Chapter 11 Trustee*

145

# APPENDIX A

<u>**Appendix A-124**</u>

During the Relevant Period, Nirav Modi, Bhansali, and Gandhi exercised direct oversight and control over transactions between the U.S. Entities and Shadow Entities. For example:

(i) On June 8, 2012, Gandhi emailed Bhavesh Patel and Shyam Wadhwa, "Please email payables to HK and Dubai – all the companies. Firestar, Firestar Diamond Int'l and Jaffe. Need to pay $1m to HK or Dubai hence need name and amounts only." Bhavesh replied, "There is nothing open in Dubai however HK open payables attached herewith for your review." Gandhi replied, "It could be Pacific, World Diamond, etc too." That same day, FDI transferred $1,000,000 to Fancy Creations. This transaction is described as an "advance" in FDI's bank statement.

(ii) On July 23, 2012, Ajay Gandhi sent a message to Nirav Modi through Panemail, which is a web-based email service that automatically deletes messages, "Niravbhai, please see attached payment plan in 5 parts to clean-up AR and AP of [FDII] for HK, Dubai, Belgium and NY. Funds should come from respective companies. 1. $452k. 2. $1.129m. 3. $1.5m. 4. $828k. 5. $1.05m. If implemented, the attached AR and AP of $4.3 million can be cleaned up. Please let me know if you have different thought." On August 3, 2012, Gandhi forwarded the email to Hemant Bhatt, copying Bhansali, and stated, "I will call you Monday to discuss. We need to move funds in Firestar Diamond International, Inc. per attached. NM/MB is fine so long as money flows from SDC/Tristar and Diamlink to any of HK or Dubai entities." On August 14, 2012, Gandhi followed up, "Hemant, When can I expect payments for the below cycle that we spoke about?" On August 27, 2012, Bhatt replied to Gandhi, copying Bhansali, "Pacific and Unique paid as above. Please pay accordingly."

The message contained a list reflecting that Pacific and Unique owed FDII $779,579 and $418,498, respectively, in accounts receivable, and that FDII owed Fancy Creations, FDL, and Diagems $1,063,369, $121,129, and $14,033, respectively, in accounts payable. On August 28, 2012, Hemant Bhatt messaged Ajay Gandhi on Panemail, "Auragem paid $200,000.00 and Brilliant paid $231,175.03. Pleeasse [sic] confirm receipt and pay to Fancy." FDII's bank statements reflect: (a) incoming wires of $779,544.11 and $418,463.00 on August 27, 2012 from Pacific and Unique, respectively; (b) incoming wires of $231,150.03 from Brilliant and $199,975.00 from Auragem on August 28, 2012; and (c) outgoing wires of $1,063,369, $121,129.21, and $14,032.80 on August 28, 2012 to Fancy Creations, FDL, and Diagems, respectively.

1

(iii)    On August 28, 2012, Gandhi emailed Bhavesh Patel, "Tomorrow, please wire $431,175 to Fancy Creations from [FDII's] Capital Old Account." FDII's bank statement reflects an outgoing wire in the amount of $431,175 to Fancy Creations on August 29, 2012.

(iv)    On September 12, 2012, Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, "Please wire $150,000 to Unique Diamond for back office expenses from January 2012 thru June 2012 – invoice #'s UD-FI-004 & UD-FI-001." That same day, Patel emailed Gandhi and Bhatt, "Please find attached wire from FSI to Unique as per new bank details for $150k." Gandhi replied solely to Patel, "Spoke to HB for return of funds?" Patel replied, "I called him today morning. He confirmed and told that, he will require invoice details if any / from which location amount will remit etc[.] so that he will arrange as per your requirement in NY." Gandhi replied, "Ask him from where he can remit and give him details. It could be in FS or Intl."

(v)    On December 4, 2012, Sridhar Krishnan of SDC Designs emailed Gandhi, "You shall receive payment of $1,737,155 . . . from Empire Gems FZE in Firestar Diamond International, part payment against your invoice # 73112 dt 7/31/12[.] Please make payment to SDC Designs LLC against their invoice # 629966 dt 7/30/12." Gandhi replied, "When?" Krishnan replied, "I am wiring today to Universal FZE, so I guess you would get it from Empire gems tomorrow." Gandhi then forwarded the email chain to Mihir Bhansali and asked, "Ok to proceed per below once funds are received?" That same day, Gandhi separately forwarded Krishnan's email to Hemant Bhatt and asked, "Is this OK once funds are received?" Gandhi followed up with Bhatt several hours later, "Do not send email. Please call me to confirm in the morning."

(vi)    On December 10, 2012, Gandhi emailed Bhavesh Patel, "Pay $1m against above invoice to Empire Gems tomorrow from HSBC per attached wire instruction. Also let HB know that $733k is already paid against this invoice. Upon information and belief, "HB" refers to Hemant Bhatt. On December 11, 2012, FDI wired $1,185,025.05 to Empire.

(vii)    On December 13, 2012, Gandhi instructed Bhavesh Patel to "prepare the following wires today: 1. Pay $231,000 to Unique for Back Office expenses from Firestar Diamond Inc. 2. Pay $391,611 to Synergies Corp from Firestar Diamond, Inc. for Interest. 3. Pay $300,000 to Unique from Synergies Corp. for Loan Repayment. 4. Pay $91,000 to Brilliant from Synergies Corp for Loan Repayment. 5. Balance amount tomorrow to Diagem once funds are here in Firestar Diamond, Inc." Later that day, Gandhi followed up, "Money is coming any minute hence wire $552,133.10 to Diagem from Firestar Diamond, Inc. (against open invoice) . . ." The next day, Patel replied, "Based o[n] HB's details, please find wire from FSI to Diagems for $552,133.10. Gandhi replied, "Please tell HB about wires from yesterday

2

and ask if he receives it. Upon information and belief, "HB" refers to Hemant Bhatt.

(viii)    On December 20, 2012, Bhavesh Patel emailed Ajay Gandhi, "Please find attached wire [from FDI] to Diagems ($119k) and Pacific ($652k) as per instructions." Gandhi replied, "Change Empire amount as discussed."

(ix)    In a 2012 email, Kurian Matthews relayed a conversation he had with Bhansali in which they set up a circular transaction starting at Fantasy, going through Radashir Jewelry Co. Pvt. Ltd. (a Modi-Controlled Entity that has been implicated in the Bank Fraud), FIL, and Firestar and ending back at Fantasy. The purpose was to "clear the old invoices of Radashir on FDC" because a bank was inquiring about the old invoices. Similarly, in December 2012, Bhansali and Kurian Mathews discussed wiring money to Radashir and back to the Debtors against Radashir's accounts payables to "use [the money] for NM [Modi]."

(x)    On February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, LLC wrote to Bhansali and Modi partner Hemant Bhatt using personal email addresses. Krishman told Bhatt and Bhansali, "You should expect 1.4 million in Universal fze today. Please wire the same to A Jaffe." Two days later, Bhatt confirmed that Universal Fine Jewelry FZE had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."

(xi)    On February 6, 2013, Ajay Gandhi emailed Nirav Modi, copying Mihir Bhansali, "Niravbhai, After keeping $3 million buffer, I can pay $1 million to India in February 2013. Please let me know if I should ask Manish/Amit for listing to pay." Modi replied, "Yes pls." One day earlier, Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "We can pay $1.0 million to India in the month of February 2013. Please email me a list to pay." As alleged above, Manish Bosamiya and Miten Pandya were among the individuals directly involved in obtaining LOU funding from PNB. Thus, upon information and belief, the purpose of Gandhi's emails was to inform Modi, Bosamiya, and Pandya the amount Gandhi would be able to send to facilitate repayment of LOUs.

(xii)    On February 19, 2013, Shyam Wadhwa emailed Ajay Gandhi, "Kindly clarify details of open vendor bills against which inward wire receipt of $2[,]006,987.25 on 29th May '12 has been applied. Gandhi replied, "$2m was received & wired back to FIPL and Radashir." His email included a table reflecting that, on May 19, 2012, $2,006,949.25 received from Pacific was sent to FIPL ($1,953,990) and Radashir ($126,010).

(xiii)     On February 22, 2013, Bhavesh Patel emailed Ajay Gandhi a wire confirmation reflecting a $503,501.41 transfer from FDI to Pacific.

(xiv)     On October 23, 2013, Ajay Gandhi emailed Bhavesh Patel, "Pay $150,000 to Pacific Diamonds per the attached from Firestar Diamond, Inc. – HSBC." Patel replied with the wire confirmation and stated, "Please find attached wire from FSI to Pacific as Professional Fees."

(xv)     On October 30, 2013, Bhavesh Patel emailed Ajay Gandhi, copying Altamash Ansari and Shyam Wadhwa, "Please find attached internal transfer as well as wire document for your reference. 1. FSI to Jaffe, Amount $1,768,385.00 (Internal) 2. Jaffe to Pacific, Amount $2,455,036.00 (Abu Dhabi Bank). A few hours later, Patel followed up to ask Gandhi to "please approve attached wires as discussed."

(xvi)     On December 31, 2013, Mihir Bhansali emailed Ajay Gandhi, "As discussed, FSI will pay to Sangam Diamonds Corp. on behalf of Fancy Creation Company Limited (HK) (Invoice # 100773 Dt. 19.12.2013). Attached are Invoice of Sangam Diamonds Corp Sale to Fancy and Sangam's bank info. Please make wire today." Gandhi replied, copying Bhavesh Patel, "Bhavesh, please set-up wire from Firestar to Sangam Diamond – NY." Patel then replied with the wire confirmation reflecting a $1,247,746 payment to Sangam Diamonds Corp. On January 8, 2014, Gandhi forwarded Bhansali's December 31, 2013 email to Hemant Bhatt, stating "I paid $1.24m on 12/31/13 to Fancy per attached. This funds never came back hence I will pay $575k today. Please call me if needed."

(xvii)     On February 5, 2014, Altamash Ansari emailed Ajay Gandhi, with a copy to Shyam Wadhwa and Bhavesh Patel, a table of "Receipts & Payments for the month in which [Jaffe] received money from Pacific." The table listed amounts Jaffe received from and paid to Pacific, Empire, Twin Fields, and various Firestar Entities. Replying solely to Shyam Wadhwa, Gandhi stated, "Pacific got paid more than they send funds !!!!!" Wadhwa replied, "Please ignore below email. To answer your question, A. Jaffe had received Funds through Pacific which were lying as ADVANCE in books. Post shipment of diamonds, advance has got adjusted." On February 12, 2014, Gandhi replied, "Anything I need to do?" Wadhwa replied, "Manish Bosamiya would be requiring $ 4M funds against India billing on A. Jaffe." As noted above, upon information and belief, Manish Bosamiya was one of the individuals directly involved in obtaining LOU funding from PNB, which suggests that the $4 million Wadhwa requested from Jaffe was directly related to repaying an LOU. Gandhi replied, "Spoke to MB [upon information and belief, Mihir Bhansali]. Let's talk tomorrow or Friday. He prefers outgoing shipment from Jaffe to Firestar BVBA as oppose to anywhere."

4

(xviii)   On March 18, 2014, Ajay Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, instructions to wire $150,000 from FDI to Unique for "back office expenses," $123, 097 from FDI to Synergies for "Interest," and $123,000 from Synergies to Brilliant for "Loan repayment." Patel replied with the wire confirmations.

(xix)   On March 25, 2014, Shyam Wadhwa emailed Ajay Gandhi, copying Bhavesh Patel, "FHL has remitted sub-debt funds [of] USD [$]4,058,500 to Firestar Diamond Inc and USD [$]1,800,000 to Firestar Group Inc. Please remit funds to Brilliant from both companies and confirm." Patel then sent Gandhi wire confirmations reflecting a transfer of $4,058,500 from FDI to Brilliant and a transfer of $1,800,000 from FGI to Brilliant.

(xx)   On August 4, 2014, Sridhar Krishnan of SDC Designs emailed Ajay Gandhi, "Did you wire to Empire. Please advise." Gandhi replied, "I need to pay overseas. I have asked for a listing to pay. I will let you know once it is wired." Krishnan replied, "I need the funds by tomorrow. Please expedite."

(xxi)   On September 18, 2014, Manish Bosamiya emailed Ajay Gandhi, copying Bhavesh Patel, "Firestar Diamond Intl Inc will receive US $550,000.00 from Firestar Diamond Ltd (HK) in Capital One Bank." Patel then emailed Gandhi, "Please approve below wire from Capital Old [one of FDII's Capital One bank accounts] to Pacific for $550,000.00 as POA."

(xxii)   On December 16, 2014, Gandhi emailed Avinash Oza and Altamash Ansari, "Please pay $1,240,273.54 to Auragem, HK tomorrow for their invoice #2580001314 from Firestar Diamond, Inc. (Part payment)." Oza replied with the wire confirmation. Gandhi replied, "Bank information confirmed with Sandeep?" Upon information and belief, Gandhi was referring to Sandeep Mistry, one of the key co-conspirators in the Bank Fraud.

(xxiii)   On February 19, 2015, Ajay Gandhi emailed Hemant Bhatt, "I would like to pay $300k for back-office expenses. Pay to Unique? Please email me wire information. Also, I would like to pay $180k from Synergies to Brilliant. Please email me wire confirmation." On February 20, 2015, Ajay Gandhi emailed Arpan Doshi and Avinash Oza instructions to wire $186,871 from FDI to Synergies as "Interest", $300,000 from FDI to Eternal as "Back Office Expense," and $180,000 from Synergies to Brilliant as "Loan Repayment." Doshi replied with the wire confirmations.

(xxiv)   On March 2, 2015, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $300,000 from FDI to Unique and $180,000 from Synergies to Brilliant. Doshi replied with the wire confirmations.

5

(xxv)     On June 26, 2015 Ajay Gandhi emailed Arpan Doshi and Avinash Oza instructions to wire $300,000 from FDI to Pacific. FDI's bank statement reflects a transfer from FDI to Pacific of $1,438,270.60 on that day.

(xxvi)    On September 28, 2015, Ajay Gandhi emailed Avinash Oza, "Please wire $1,017,000 from Firestar Diamond, Inc to Pacific Diamond – on account." Oza replied with the wire confirmation. Gandhi replied, please wire $54,000 to Pacific D from Firestar Diamond, Inc." Gandhi then emailed Operation 1, in reply to an email earlier that day in which Operation 1 sent Gandhi Pacific's bank details, "$1.017m wired. I thought it was $1.017m but I received $1.071m. Will wire balance tomorrow - $54k." FDI's bank statements reflect these transfers.

(xxvii)   On February 26, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1,192,105.55 from FDI to Tri Color. Doshi replied with the wire confirmation.

(xxviii)  In March 2016, Evelyn Kosiec, the Jaffe operations manager, asked Bhansali where to re-export loose diamonds, and an hour later she emailed Gandhi, "Mihir informed to ship this to Eternal diamonds in Hong Kong, the same price, rounded to the nearest 5 120 day terms."

(xxix)    On March 4, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $300,000 from FDI to Unique. Oza replied with the wire confirmation.

(xxx)     On March 9, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $247,551 from FDI to Synergies and $250,000 from Synergies to Brilliant. Doshi replied with the wire confirmations.

(xxxi)    On March 15, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $700,000 from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxii)   On March 21, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1 million from Jaffe to Pacific. Doshi replied with the wire confirmation.

(xxxiii)  On March 24, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1 million from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxiv)   On March 25, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1.4 million from Jaffe to NMI, and then $613,069 from NMI to Auragem and $787,000 from NMI to Nirav Modi Ltd. Doshi replied with the wire confirmations.

(xxxv)     On March 31, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $301,540 from Fantasy to Tri Color Gems. Oza replied with the wire confirmation.

(xxxvi)    On April 5, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $500,000 from Jaffe to Pacific. Doshi replied with the wire confirmation.

(xxxvii)   On May 6, 2016, Gandhi emailed Avinash Oza, Arpan Doshi, and Altamash Ansari instructions to wire $2 million from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxviii)  On June 1, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $815,000 from Jaffe to Pacific. Doshi replied with the wire confirmation. Jaffe's bank statements reflect this wire transfer.

(xxxix)    On June 29, 2016, Ajay Gandhi emailed Altamash Ansari and Vishal Popat a bank statement reflecting a $599,972 wire transfer from Pacific to Jaffe on June 29, 2016. Gandhi instructed them to "show as advance if no open AR from Pacific."

(xl)       On July 18, 2016, Ajay Gandhi emailed Avinash Oza instructions to wire $200,000 from FDI to Jaffe, $200,000 from Jaffe to Fancy Creations, $150,000 from FDI to FDII, and $150,000 from FDII to Fancy Creations. Oza replied with the wire confirmations.

(xli)      On July 19, 2016, Ajay Gandhi Emailed Avinash Oza instructions to wire $1,809,528 from FDI to Fancy Creations. Oza replied with the wire confirmation.

(xlii)     On July 22, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire "$715k from Firestar to Fancy – Purchases[;] $200k from Firestar to Jaffe[;] $200k from Jaffe to Fancy – Purchases[.]" Oza replied with the wire confirmations.

(xliii)    On March 22, 2017, Ajay Gandhi emailed Avinash Oza and Kunal Patel instructions to wire $300,000 from FDI to Unique for "Back-Office expenses" and $240,000 from Synergies to Brilliant for "Repayment of Loan." Oza replied with the wire confirmations.

(xliv)    On January 3, 2018, Gandhi emailed Avinash Oza instructions to wire $483,620.05 from FDI to Pacific, $2,188,769.43 from FDII to Pacific, and $530,000 from Jaffe to Pacific. Oza replied with the wire confirmations. Gandhi then forwarded this email to Subhash Parab and Shyam Wadhwa stating, with respect to the $2,188,769.43 transfer to Pacific, "We have wired these funds from FSI but please apply this amount to FSII (Pacific) due to bank error in Capital One." Consistent with Gandhi's email, FDI's bank statements confirm that FDI wired both $483,620.05 and $2,188,769.43 to Pacific on January 3, 2018.

(xlv)    On January 31, 2018, Avinash Oza emailed Ajay Gandhi wire confirmations reflecting transfers of $2,466,015 and $525,000 from FDII to Fancy Creations. Gandhi forwarded the wire confirmations to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

Ajay Gandhi regularly advised Nirav Modi, Miten Pandya, Manish Bosamiya, Amit Magia, and Shyam Wadhwa, of his ability to wire funds from the U.S. Entities to India in furtherance of the Bank Fraud throughout the Relevant Period. For example:

(i)  On August 14, 2009, Nirav Modi directed Gandhi to make payments totaling $2,293,326 to Brilliant and Diagem. On June 16, 2010, Nirav Modi instructed Gandhi, "Unique has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants."

(ii)  On August 26, 2010, Nirav Modi emailed Ajay Gandhi to ask, "What will be the week-by-week payment plan for September to India?" On August 27, 2010, Gandhi replied, attaching two spreadsheets containing two possible scenarios, and noting "to cover August borrowing base – I have asked India to remit $1 m for one day & I will remit back on September 1. Substantial amount of inventory was shipped to India & HK hence inventory & AR became ineligible." On August 29, 2010, Gandhi forwarded this email chain to Mihir Bhansali.

(iii)  On October 21, 2010, in furtherance of a circular trade, Nirav Modi and Gandhi communicated by email about the shipment of a diamond to a Shadow Entity. Modi stated, "Send the 70 ct vivid yellow to Firestone Dubai @$51,500 and not Firestone HK." Gandhi responded, "Firestone, Dubai confirmed (Not Unique)[,]" to which Modi clarified, "Sorry Unique[,]" in reference to the Shadow Entity. Gandhi responded with "Glad I asked!!!"

(iv)  On December 20, 2013, Ajay Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "I can pay $600k from Capital One – Diamond Division or A. Jaffe – HSBC." On December 23, 2013, Bosamiya replied, "Please find attached open invoice of $602,761.39 from FSI." Patel replied to Gandhi, "They don't have anything most recent open from Jaffe or diamond division so they gave listing from FSI for $603k. Please let me know if we can pay from FSI so that I will prepare wires as per that." Gandhi replied, "Transfer to H[s]bc but do not pay from this list but pay other list [o]f Manish around $1.8m."

(v)  On January 9, 2014, Ajay Gandhi emailed Miten Pandya, Manish Bosamiya, and Amit Magia, "I can pay $5 million in January 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with the allocation of the $5 million among various Firestar Entities. On January 13, 2014, Gandhi replied, "$5m wired per below. Please acknowledge receipt of these wires." On January 21, 2014, Bosamiya replied, copying Bhavesh Patel, "Boi – London [upon

information and belief, "Boi" refers to "Bank of India] informed yesterday that they have not received $2,157,359.90 as the concern [sic] person was on leave last week and they have only received the message that funds are coming but Nostro is not credited. Please provide the swift message." Later that day, Patel replied to Gandhi, "Manishbhai called me and they received fund." Gandhi then replied to Bosamiya, "Bhavesh emailed me that funds were received. Please let me know otherwise."

(vi)  On April 1, 2014, Gandhi emailed Manish Bosamiya, "I can pay $4 million in April 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with instructions to wire $1,763,644.60 from FDI to FIL and $2,250,858.36 from FDI to FDIPL. On April 2, 2014, Gandhi replied, "1.76m wired today." On April 14, 2014, Gandhi followed up, "$240k and $341k wired today."

(vii)  On April 6, 2016, Shyam Wadhwa emailed Ajay Gandhi and Mihir Bhansali asking them to send $2.7 million from Jaffe to FIL to clear outstanding accounts receivable and stating "our fund position is tight in India, else would have wired funds to you against our payables of about USD 1M from FDIPL for clearing AR/AP between India and NY." Gandhi replied, copying Bhansali, "We have Overseas AR of around $8.5m in Firestar Diamond, Inc. – If I get funds in FD, Inc then we can wire funds to India this month." The next day, Gandhi followed up, "I can wire $1m this month from Jaffe thru FS. Can it come back to FS?

2

The secretive nature of the "regular" financials is demonstrated by the communications between Nirav Modi, Ajay Gandhi, Mihir Bhansali, and other co-conspirators.  For example:

(i)   On September 24, 2009, Ajay Gandhi emailed Raghu Iyer, "I looked at cash flow totals and there are major differences in the total cash flow summary versus details by month. The main reason is that I am accounting for non-core cash receipts and non-core payments thru cash flow without increasing the corresponding sales & purchases (Loose diamonds)." Iyer replied, "Can u make this match pls[.] So we will get the annual cash flow properly[.]"

(ii)  On March 8, 2010, Deepak Gupta emailed Ajay Gandhi and Mihir Bhansali asking for Jaffe and FDI's financial statements. Gandhi forwarded the email to Bhansali and asked, "Who is Deepak Gupta and OK to send FS to him?" Bhansali replied, "Yes, ok to send to him. Will explain when we talk." Gandhi replied, "Should I send him both core and non-core?" Bhansali replied, "Yes, send him both, so that they correspond with the audited numbers. Speak to him on the phone and explain to him the difference."

(iii) On October 17, 2012, Ajay Gandhi emailed Nirav Modi, Mihir Bhansali, Raghu Iyer, and Saju Poulose the "Core Business and Regular Financial Statements as of September 30, 2012 for your review." On October 25, 2012, Saju Poulose emailed Ajay Gandhi, "Need your help to understand 'third' version 'sales' number of [FDII] as on Sep 2012 . . . 1. Josh Division Sales $4,898,257 - This is only Josh diamond sales from the financials[?] 2. September Financials $8,333,842 -This is including Josh + NDM larger/corporate sales[?] 3. September Financials Josh Division for Consolidation $9,599,627 = what are [sic] this numbers include?" Gandhi replied, "1. September Josh's division of HK will include sales made to inter-company such as Firestar Diamond, Inc., A. Jaffe, Firestar HK, Firestar Dubai and other affiliated companies in HK and Dubai ($9.55 million). 2. Josh's financial - $4.89 million will include any of the affiliated sales that he may be earning margins. All Pink sales and affiliated sales without margin are not included. 3. Corporate Sales - $8.33 million will not include AN[Y] affiliated sales but only sales to outside customers including Pink diamond sales."

(iv)  On September 16, 2013, Ajay Gandhi emailed Samir Shah and Rebecca Chow with the subject "Loose Diamond Sales", "$196k loss for the attached sales of August 2013. Please confirm ASAP." Shah replied, "The goods came in at the wrong prices from Sandeep. This is the reason it is showing as a loss." Gandhi forwarded the email to Mihir Bhansali and stated, "We need to stop this. I am losing control on the Core Financials. Whre do I

show such loss for August now – Core or Non-Core? Can we reverse in September 2013 please as it is affecting banks for 6 month financials…" Gandhi followed up, "$196k loss was excluded from Core Financials of August 2013 but it is part of Regular Financials." Bhansali replied, copying Saju Poulose, "Ok. Saju – pls speak to me."

(v)     On October 15, 2013, Ajay Gandhi emailed Saju Poulose, copying Kuntal Desai, "Core-Non-Core – Thru September 2013 – How much am I moving? $167k or $177k that we discussed last week?" Poulose replied, "Hi Ajaybhai, Have discussed with Kuntal and gone thru his working file in detail. He will sent [sic] you the detailed mail." Gandhi replied, "How much was the amount and Kuntal – did you sent [sic] it?" Desai replied, "Yes. Please check other mail."

Appendix A-144

As part of the audit process, the auditors would email parties listed on the audited company's accounts receivable and accounts payable records to request written confirmation of the amounts reflected in the audited company's books and records. For audits of the U.S. entities, which upon information and belief were conducted together, Ajay Gandhi would be copied on the auditor's emails to Shadow Entities, which Gandhi would often forward to Operation 1 to ask that Operation 1 cause the Shadow Entity to provide confirmation the auditors. For example:

(i) On June 7, 2017, Ajay Gandhi forwarded to Operation 1 an auditor's request to Fancy Creations. Operation 1 replied, "Today or tomorrow customer will confirm as discussed." Gandhi replied, "There were several emails…" Gandhi was referencing the auditor's requests to several other Shadow Entities, which Gandhi had also forwarded to Operation 1.

(ii) On July 11, 2017, Gandhi sent an email to Operation 1 asking "Can you please have your customer [Brilliant] sign the attached confirmation for Synergies Corp?" The attachment was not the typical auditor's confirmation request sheet; instead, it was a term sheet for an unsecured loan from Brilliant to Synergies in the amount of $1,287,000. The term sheet indicated that the loan would be interest free, repayable on demand, dated as of September 30, 2016—nearly one year earlier—and was to be used "for the business purpose of the Company." On July 19, 2017, Gandhi sent an email directly to "accounts@brilliantdiamonds.hk", copying Operation 1, stating, "Please see attached Synergies Confirmation and sign and email to me ASAP. You are holding up my audit. This is balance confirmation as of 9/30/16." Approximately an hour later, Gandhi forwarded the email to Kurian Matthews asking, "Kurian – can you please have your customer take care of it ASAP per below email?" On July 23, 2017, an employee of Brilliant replied to Gandhi's email, copying Operation 1, attaching the signed loan term sheet.

(iii) On November 10, 2017, Gandhi forwarded to Operation 1 an auditor's request to Eternal and asked Operation 1 to "Please chase your vendor to confirmed [sic] it. Audit is on hold." That same day, Gandhi sent substantively identical emails to Operation 1 forwarding auditor requests to Fancy Creations and Sino Traders.

## Appendix A-145

The Operation 1 account was also used to orchestrate transfers of funds and jewels among

Firestar Entities and Shadow Entities. For example:

(i)   On March 6, 2015, Rebecca Chow emailed Sandeep Mistry, copying Samir Shah and Paresh Mehta, "Please be informed that 1.68.52cts of 1/2ct VS loose diamond that's ready to be shipped. Please provide shipping address so we can process." Later that day, Chow forwarded the email to Operation 1 and stated, "Hi Sandeep, Hope this email reach [sic] you! Please advise below and thanks."

(ii)  On September 28, 2015, Ajay Gandhi sent Operation 1 remittance instructions for Jaffe's HSBC bank account ending 2460. The next day, Operation 1 replied, "Universal made payment of 1.4 m Advance Against Invoice[.]" A few hours later, Gandhi replied, "Received and wired to SDC." Jaffe's bank statements reflect that, on September 29, 2015, Jaffe received $1,399,962 from Universal Fine Jewelry FZE. That same day, Jaffe transferred $464,050 to SDC Designs LLC and $950,000 to FDII. FDII's bank statements reflect that, on September 29, 2015, FDII transferred $943,827.50 to SDC Designs LLC. Thus, consistent with the email exchange between Ajay Gandhi and Operation 1, the entire approximately $1.4 million Jaffe received from Universal was ultimately paid to SDC Designs, LLC.

(iii) On January 29, 2016, Dhinakaran Pillai, a finance manager at Firestar International Pvt. Ltd., emailed Ajay Gandhi, "We have remitted today US $405,180.83 in FSI from FIPL invoice details as listed below . . . Once the payment as has been realized in your account, kindly remit the overdue outstanding of US $650,880.00 against our invoices, details as attached for your reference." The email referenced two invoices from FIPL to FDI dated October 22, 2015 and October 23, 2015, respectively. On February 3, 2016, Subhash Parab, who was copied on Pillai's email to Gandhi, forwarded the email to Operation 1 with the note "FYI". Operation 1 then emailed Gandhi, "Ajaybhai, India Team conformed [sic] that $650k is against his plan $405k, so that Please send to Firestar Dubai $650k, which we yesterday talk [sic]. Regards, Sandeep[.]" Gandhi replied, copying Subhash Parab, "I will pay $425k. Please let me know where or what company."

(iv)  On February 1, 2016, Operation 1 emailed Rebecca Chow and Samir Shah, "You will be received [sic] the goods from Tricolor[.] Please coordinate with Samir Bhai in details[.]" The email included a table listing a total of 379.02 carats of mixed diamonds of varying specifications. FDI's purchase ledger reflects a February 22, 2016 purchase of 379.02 carats of loose diamonds from Tri Color Gems for a total price of $400,131.

(v)     On February 9, 2016, Rebecca Chow emailed Operation 1, copying Ajay Gandhi, "Hi Sandeep, as per our phone conversation, please be informed that package of RE-117 & RE-119 both has [sic] been received in NY. Additionally, there is one shipment received that has no paper work at all."

(vi)    On March 3, 2016, Subhash Parab emailed Ajay Gandhi, copying Operation 1 and Shyam Wadhwa, "Dear Ajaybhai, Kindly wire USD2.00 Mio [sic] payment from A. Jaffe to FIPL as per attached listing." The attachment was a spreadsheet listing several dozen invoices issued by FIPL to Jaffe between March 20, 2015 and September 9, 2015 totaling $2,004,879.70. Gandhi replied, "Just realized cannot pay to Jaffe (Part of $3 m) unless funds are coming in from overseas."

(vii)    On March 29, 2017, Operation 1 emailed Ajay Gandhi, "Ajaybhai, We sold goods to Pacific Diamond FZE, and party will wire advice $1.9m[.] Please send to them Proforma Invoice as below details . . . Regards[,] Sales". Gandhi replied with invoice no. 032017, dated March 20, 2017, reflecting a sale by Jaffe to Pacific of 1,691.25 carats of "Mix Diamonds" at a total price of $2,114,062.50. On April 3, 2017, Jaffe received a $1,499,972 transfer from Pacific with a wire reference of "ADVANCE AGAINST PROFORMA INV N032017." That same day, Jaffe transferred $1,510,267.77 to Firestar International Pvt. Ltd.

(viii)    On September 22, 2017, Gandhi sent an email to Operation 1 attaching a report reflecting accounts receivable owed by Brilliant, Unique, and World Diamond to FDI and asking Operation 1 to "Please have your customer clear these AR - $5.5m on or before September 30, 2017."

**Appendix A-153**

On many occasions, Mihir Bhansali and Ajay Gandhi would immediately transfer funds received by the U.S. Entities from the Sheth Entities to Shadow Entities and Foreign Firestar Entities (including through the L/C Collections service), as they commonly did with funds received from Shadow Entities and Firestar Entities, but not from *bona fide* customers.  For example:

(i)  On April 29, 2011, Excellent Facets wired $769,480 to FDI. On May 2, 2011, FDI paid $749,026.75 through the L/C Collections service.

(ii)  On September 7, 2012, Excellent Facets wired $594,013.85 to FDI. The same day, FDI paid $381,290.70 through L/C Collections and paid $272,071.59 to the PNB account of FIPL. These subsequent transfers totaled $653,362.29.

(iii)  On July 18, 2013, Excellent Facets received at least $751,895 from Fancy Creations. On the same day, Excellent Facets wired $949,980 to FDI. FDI then paid $489,943.35 through L/C Collections and wired $628,444.79 to FIPL.

(iv)  On July 24, 2013, Excellent Facets wired $613,637.68 to FDI. The same day, FDI paid $700,000 to one of its lenders, HSBC Bank.

(v)  On November 10, 2014, Excellent Facets wired $1,112,060.50 to Fantasy, after which Fantasy wired $1,100,000 to FDI, FDI transferred $1,100,000 to Jaffe, and Jaffe wired $1,117,113.16 to FIPL.

(vi)  On November 19, 2015, Excellent Facets wired $976,864.85 to FDI. The next day, FDI also received $1,500,000 from Fantasy. FDI then transferred $2,100,000 to its Israel Discount Bank of New York account and paid "Trade Services"—a service similar to "L/C Collections" and through which other Firestar Entities were the ultimate beneficiaries of the transfers.

(vii)  On December 23, 2015, Excellent Facets wired $969,980 to FDI. On December 28, 2015, FDI made a principal payment of $900,000 to HSBC Bank.

(viii)  On April 21, 2015, Mihir Bhansali emailed Ajay Gandhi, "Please wire $250k to E[xcellent]F[acets]I[nc.] from Jaffe, as an advance." Gandhi forwarded the email to Avinash Oza and Arpan Doshi and instructed, "$200,000 from Firestar Diamond Inc. to A. Jaffe. $250,000 from A. Jaffe to Excellent Facet per attached." Oza replied with the wire confirmations. That same day,

1

Gandhi emailed Shyam Wadhwa with the subject "Jaffe/Twin Field/ Excellent Fac[e]t" and attaching $250,000 check from Jaffe to FDI, a $250,000 check from Twin Fields to Jaffe, confirmation of a $250,000 wire from Jaffe to Twin Fields, and confirmation of the $250,000 wire from Jaffe to Excellent Facets. Gandhi stated, "Please call me tomorrow and I will explain. We wired to Twin Field in error and Twin Field gave money back. We finally wired to Excellent Facet as Loan. Firestar Diamond, Inc. funded the transaction." On June 21, 2016, Jasmine Pradhan of Excellent Facets emailed Ajay Gandhi, "We received loan advance on 4/21/2015 from A. Jaffe Inc[.] [T]oday we are planning to return that amount. I was wondering if you could send me the bank details with wire payment instructions." Several hours later, after the wire was complete, Gandhi forwarded the email chain to Mihir Bhansali and stated, "$250k received. Paying $1.250m to India today. ($250k plus $1m based on shipment for the month)."

(ix)   On December 13, 2012, an HSBC customer service representative emailed Ajay Gandhi, "I have just been notified that there is a wire being sent from [Synergies'] account xxxxx369 in the amount of $90,970.00. There are currently not enough funds available in this account to send out this wire. Also, there are 2 wires being sent from [FDI's] account xxxxx004 totaling $622,591.00. There are currently not enough funds available in this account to send out this wire. Please advise." Gandhi replied, "I am expecting $1.175 million in Firestar Diamond and once it hits then all the wires should be fine. It should have come by now…" Gandhi attached a CitiBank wire confirmation printout showing a $1,175,213.45 wire from SDC LLC's CitiBank checking account to FDI "against invoice 15206996." The printout indicated that the wire was set up by Sridhar Krishnan and approved by Abhay Javeri. FDI's bank statements reflect an inward wire of $1,175,213.45 wire from SDC on December 13, 2012 and outward wires on that day of $391,611 to Synergies and $231,000 to Unique. Synergies' bank statements show that Synergies immediately used the funds received from FDI to wire $91,000 to Brilliant and $300,000 to Unique.

(x)   On December 26, 2013, FDI received wires from SDC Designs Inc. and SDC Designs LLC of $250,000 and $323,745, respectively. On December 30, 2013, Ajay Gandhi emailed Manish Bosamiya and Miten Pandya, "I can pay $1.6m from Firestar before December 31. Please email me a list." Gandhi then forwarded the email to Hemant Bhatt and stated, "FYI. Received some funds from SDC. Bhavesh has details." Bosamiya replied with a spreadsheet listing two invoices issued by FDIPL to FDI totaling $1,547,900.81 and seven invoices issued by FIPL to Tinex H.K. Ltd., Elegant Collection, and D. Navinchandra Jewels for which FDI was listed as the notification party totaling $50,961.26. The spreadsheet also included columns specifying for each invoice the relevant "Bank," "Bank Ref[erence No.], and "Bank Due Date." Gandhi forwarded the spreadsheet to Bhavesh Patel, copying Mihir Bhansali, and stated, "Please setup these wires." Patel then asked for and obtained Gandhi's approval to wire $1 million from

2

Jaffe to FDI to fund the other wires. Later that day, Gandhi replied to Bosamiya and Pandya, "Funds wired. Please acknowledge receipt." Bosamiya replied, "Funds received." FDI's bank statements reflect two outgoing wires to "L/C Collections" on behalf of FDIPL totaling $1,547,900.81 and another $50,961.26 wire to FIPL on December 30, 2013.

(xi)     On July 19, 2014, Manish Bosamiya emailed Hemant Bhatt and Miten Pandya a list of invoices under which FDI owed $660,197.12 to FIPL, FDI owed $731,979.58 to FDIPL, and Fantasy owed $610,268.88 to FIPL. Bhatt forwarded the email to Ajay Gandhi and stated "Please pay as per attachment." Gandhi then forwarded the email to Bhavesh Patel and instructed, "Keep it ready. Funds coming from SDC." FDI's and Fantasy's bank statements reflect that, on July 21, 2014, SDC Designs LLC wired $1,775,989.50 to FDI and that FDI and Fantasy wired a total of $1,119,301.49 to pay down letters of credit issued to FDPL and FDIPL.

(xii)    On February 26, 2014, Ajay Gandhi emailed Sridhar Krishnan, copying Shyam Wadhwa, "Sridhar: After today's payment from Jaffe to you, can you please wire $70,063 to Jaffe from SDC Design Inc. and I will wire back $69,640 to SDC Design LLC so that our AR/AP with Jaffe gets cleaned up?" On April 24, 2014, Ajay Gandhi emailed Shyam Wadhwa, "I need to wire some funds to SDC. What is our payables to them in A. Jaffe?" Wadhwa replied that Jaffe needed to receive $70,063 from SDC Designs, Inc. and to pay SDC Designs LLC $69,640. He stated "These are old balances which have been discussed with you earlier also for clearing our books." Gandhi then forwarded Wadhwa's email to Mihir Bhansali and stated "We do not have any payables to SDC in Jaffe." On June 17, 2014, Wadhwa replied, "This requirement is still open between A. Jaffe and SDC. Please have it closed." Gandhi replied, "Please email Sridhar and copy me." On June 23, 2014, Wadhwa replied, "Pl[ease] have open item wrt SDC in A. Jaffe books cleared from AR and A[P]. FYI – Sridhar has ignored your Feb '14 mail as well as my recent reminder mail." Gandhi forwarded the email chain to Krishnan and asked, "can we clean up?" Krishnan replied, "Hi Ajay[,] Is Mihir in town?"

## Appendix A-163

Additional examples of documents and communications illustrating suspicious accounting practices for transactions involving SDC Entities and Sheth Entities include:

(i)     On April 3, 2012, Saju Poulose emailed Ajay Gandhi, copying Raghu Iyer's personal email address, "Need your help to understand the bifurcation of customer wise sales in totality as on Jan 2012 . . . First file is the customer wise report which we consider for consolidation. In order to knockoff the inter sales we take sales in totality. After knock off balance we consider as external sales. . . . From the sales report, (without customer of SDC and Tri star—these are included in your gross working) the total number comes to $49m. That means FS Inc. sale should be $36m instead of $33m?" Gandhi replied, "Please used the attached file for Core Business and other breakdown." He attached a report listing FDI's total sales by customer from April 2011 to January 2012. Customers such as Sams Club, Zales, Macy's, and the U.S. Army and U.S. Navy were listed as "core." Customers such as SDC, Excellent Facets, Tri-Star, and Diagem Inc. were listed as "non-core."

(ii)    On June 13, 2013, Ajay Gandhi emailed Mihir Bhansali an estimated borrowing base for FDI as of May 31, 2013. Gandhi explained that the $3.8 million in ineligible AR consisted of "SDC Designs LLC - $1,395,667, World Diamond - $1,507,816 and the rest are inter-company." Later that day, Gandhi emailed Bhansali an estimated borrowing base as of June 20, 2013. He explained that the $5.26 million in ineligible AR consisted of "SDC Designs LLC - $1,395,667, World Diamond - $1,507,816, RN Enterprise - $509,415, SDC Designs Inc. - $215,243, and the rest are inter-company."

(iii)   On July 10, 2013, Ajay Gandhi emailed Mihir Bhansali, "The following AR will fall-off over 120 days and these AR will severely affect the borrowing base. 1. Diamlink - $1,077,571[;] 2. Excellent Facet - $1,563,678[;] 3. R.N. Enterprise - $509,146[;] 4. SDC Designs, Inc. - $223,670[;] 5. SDC Designs LLC - $195,667[;] 6. SDC Designs, LLC - $195,667[;] 7. Sangam Diamonds, Inc. - $509,528."

(iv)    On July 19, 2013, Ajay Gandhi emailed Shyam Wahdwha, "Please email information on SDC AR and AP and I will contact them to get it cleared." On July 24, 2013, Ajay Gandhi emailed Shyam Wadhwa, Bhavesh Patel, and Alatamsh Ansari, "Need Jaffe AR and AP for *our parties* ASAP" (emphasis added). Ansari replied with a spreadsheet listing the accounts receivable and accounts payable balances for SDC Designs, Inc., Empire, Fancy Creations, and several Firestar Entities. For the eight parties listed, the total receivable balance was $1,878,830 and the total payable balance was $7,328,421. Gandhi replied, "Wadhwa: $5m gap? Where is the

balance AR? Are we missing any names or amounts?" Gandhi then asked for the "full listing" and Ansari replied with a spreadsheet listing both intercompany and third-party receivables and payables. Gandhi replied, "Twin Field A[R]? Where is it?" Ansari replied, "$1.5m lying in Loans receivable." Gandhi then asked for and received confirmation that no other accounts receivable were booked as loans receivable.

(v)    On August 13, 2016, Sagar Thakkar emailed Ajay Gandhi a report of Jaffe's sales and AR as of August 12, 2016, copying Mihir Bhansali, Avinash Oza, and Samuel Sandberg. Bhansali replied, copying Gandhi and Oza but leaving out Sandberg, "Please take out Pacific and Sangam Diamonds, as they are loose sales and not jewelry sales. Going forward, please be mindful of the product type before you send the MIS."

(vi)   On August 18, 2016, Ajay Gandhi emailed Dipika Devrukhkar, Avinash Oza, and Arpan Dosi a request for FDI and NMI's AR and AP as of July 31, 2016 in "Saju['s] format." Devrukhkar replied with the reports. Gandhi replied solely to Oza and instructed, "Please split between Core and Non-Core. **Non-Core are all overseas non-Firestar companies + SDC**. Rest are all core." The "overseas non-Firestar companies" in the list included Brilliant, Empire, Fancy Creations, Pacific, Tri Color, Vista, Unique, and World Diamond Distribution.

(vii)  On April 17, 2017, Kunal Patel forwarded an auditor's request for copies of invoices and other documentation relating to certain sales by NMI in the 2016-2017 fiscal year to Isaac Sandberg, copying Ajay Gandhi. Gandhi replied, "Leave out large amounts for me." The largest transactions listed were: a $2,350,000 sale to Global Diamonds Group on June 30, 2016, a $1,400,000 sale to SDC Designs Inc. on February 24, 2017, a $1,000,000 sale to SDC Designs Inc. on March 1, 2017, an $850,000 sale to Amadena Investments LLC on March 31, 2017, and an $800,000 sale to Excellent Facets Inc. on December 23, 2016.

Additional suspicious transactions and communications involving the Deepak Sheth, Neena Sheth, and the Sheth Entities include:

(i)    On September 13, 2010, Prakash Rao of Diamlink emailed Ajay Gandhi, copying Neena Sheth, "Today we remitted $25k to HSBC account, for your information attached swift copy."

(ii)    On August 20, 2012, Shyam Wadhwa emailed Ajay Gandhi FDL's July 2012 financials and noted, "In terms of margins, Core Polish Trading is in sync with the business model, margin of other businesses including wholesale are dependent on billing rates. Exceptional area is recognition of $141k of income received from Excellent Facet per communication from NDM." Gandhi replied, "AR of $73.8m seems too high . . . AP of $40m seems too high too . . . Are we doing anything to clean-up AR / AP? Is inter-company AR and AP matching with other books?"

(iii)    On December 20, 2013, Ajay Gandhi emailed Nirav Modi, "Niravbhai: Josh's Diamond division – yesterday we received $1.6m due to couple sales that he closed. ($1m deposit for $3.1m sales and $600k for other sale). I can ask Manish/Amit for a list to pay India. Please let me know." Nirav Modi replied, copying Mihir Bhansali, "The [$]3.1m sale proceeds will go to Excellent Facet (ask Josh when). Balance, ask Manish." That same day, Josh Weinman emailed Deepak Sheth, "Would you like me to send 1m as advance? Please send wire instructions." Sheth replied, "It can wait till first week of January." Weinman then forwarded Sheth's email to Gandhi and noted, "FYI."

(iv)    On January 2, 2014, Shyam Wadhwa emailed Josh Weinman, copying Ajay Gandhi and Bhavesh Patel, "NY has purchased 70.19 cts EM cut stone from Excellent Facets for $3.10m and sold to Shifman Inc. for $3.10m. No gross margin is reflected in this transaction. Kindly confirm commission if any to be accrued in NY books for this stone." Weinman replied, "1% on sale amount as per Nirav." Wadhwa forwarded Weinman's email to Avinash Oza, copying Ajay Gandhi, and noted, "1. FYI and incorporation in Josh's MIS. 2. Please also replace last receipt purchase cost from HK with actual purchase cost of pink stones based on actual bill of Argyle in the Commission working sheet." On January 14, 2014, Saju Poulose emailed Ajay Gandhi, "Sales to Shifman Inc. for $3.1 million shows cost of sale value purchase from Excellent Facet. Is this transactions for NDM? Have not made profit? Can you please explain if you aware the details[?]" Gandhi replied, "That is correct. It is somebody's goods that we sold." Poulose replied, "That means this is simple an entry? No profit and loss. I should not take this in consolidation?" Gandhi replied, "It is still a sale and inventory and AR

1

are affected. I think it belongs to Excellent Facet – related to NM that I know off [sic]…"

(v)    On January 6, 2014, Deepak Sheth emailed Josh Weinman, "At your convenience you can send wire for $750,000 towards advance as per attached details." Weinman forwarded the wire instructions to Ajay Gandhi, who then instructed Bhavesh Patel to arrange the transfer.

(vi)    On November 4, 2014, Ajay Gandhi emailed Bhavesh Patel and Avinash Oza, "Please do not include Excellent Fac[e]t sale of 11/4/14 in Fantasy, Inc. and Daily Sales and AR Reports that you email to everyone." On November 10, 2014, Ajay Gandhi emailed Deepak Sheth, "Attached please find wire instruction of Fantasy, Inc. so that you can wire recent sale of $1.112m." Sheth replied, "We will wire transfer for this purchase today and email you wire transfer copy."

(vii)    On April 15, 2015, Mihir Bhansali emailed Neena Sheth and Nehal Modi, "Need all account info, and an invoice please, before we can make a wire." Jon Mitchell replied with a $30,000 invoice issued by Phantom Luxury Group to Jaffe for "sales consulting fees." Bhansali forwarded the invoice to Ajay Gandhi and instructed, "Please have this wired, from JAFFE." Gandhi then forwarded the invoice to Avinash Oza and Arpan Doshi, copying Shyam Wadhwa, and instructed, "Please wire $30,000 per below and attached from Jaffe tomorrow." Wadhwa replied, "Is this payment to be booked as Returnable Advance/Advance against services?" Gandhi replied, "$30k to be written-off over 6 months?"

(viii)    On March 28, 2017, Mihir Bhansali emailed Ajay Gandhi instructions to "Please bill the following from [NMI]. Bhansali then listed three ring settings sold to SDC Designs Inc. for a total of $2,300,000 and another ring setting sold to Amadena for $850,000. The next day, Bhansali instructed Gandhi to "ADD 1 more style [a $350,000 ring setting], to Excellent Facets[.] Please send both pieces to Deepak masa on MEMO (not billing) no later than tomorrow." Gandhi replied, "Any commission on this? Send this piece on memo to Excellent / Deepak Sheth." Bhansali replied, "Both Amadena and Excellent Facets to be at 10% commission. SDC Designs to be at 3% (as below)." Gandhi replied with the invoices and commission credit memoranda.

(ix)    On July 11, 2017, Ajay Gandhi emailed Shyam Wadhwa, "Funds for Wynn and Hawaii? When can I expect? There is urgency to pay this week of around $500k." Wadhwa replied, "Let [sic] speak today. I had arranged $1m through goods shipped from FDL-HK which have been sold by FJ Inc. Please confirm receipt of high jewels sales proceeds of US 1 Mio in FJ Inc." Wadhwa followed up, "US $575k expected from Excellent Facets either Thursday or latest by Friday in Firestar Jewelry, Inc." Gandhi replied, "Need $200k for ASAP."

(x)    On August 4, 2017, an employee sent Gandhi a list of NMI's sales for July 2017. The list included three items: an earring sold to an individual for $6,000, a pendant sold to another individual for $6,500, and a ring sold to Amadena for $575,000 (*i.e.*, the Amadena sale was worth 98% of the combined total of the three sales). Gandhi revised the document to reflect a larger "commission" to Amadena. The NMI employee then asked if Gandhi would send the list to Mihir Bhansali. Gandhi responded that the list was "only for me and it does not go anywhere."

(xi)   On January 22, 2018, Deepak Sheth, on behalf of Excellent Facets, and Mihir Bhansali, on behalf of himself, executed a promissory note under which Excellent Facets agreed to repay on one day's notice a purported $100,000 loan from Bhansali at a 12% annual interest rate. That same day, Deepak Sheth, on behalf of Amadena Investments LLC, and Neena Sheth, on behalf of herself, executed a promissory note under which Amadena Investments agreed to repay on one day's notice a purported $615,000 loan from Neena Sheth at a 1.97% annual interest rate.

<u>Appendix A-165</u>

Additional suspicious transactions and communications involving Abhay Javeri and the

SDC Entities include:

(i)     On April 10, 2012, Rushabh Jethwa emailed Ajay Gandhi, copying Kurian Mathews, asking Gandhi to confirm AR and AP balances between FDFZE and each of Jaffe, FDI, SDC, and JMC. Gandhi replied, "I am not responsible for JMC. I will send you others today." Gandhi then followed up, "for JMC please email Prakash Rao . . . for SDC email Sridhar [Krishnan" and provided Rao's and Krishnan's email addresses. Several hours later, Gandhi replied with FDI and Jaffe balance confirmations bearing his signature.

(ii)    On April 23, 2012, an accountant at Marks Paneth asked Gandhi for contact information for certain counterparties selected for AR confirmation. On April 30, 2012, Gandhi replied with Sridhar Krishnan's email address for SDC Designs LLC and Sangam Diamond, Inc. He followed up, "Tri-Star, Nipur BVBA and A. Jaffe, Inc. were paid in full. We can give you subsequent receipts for these customers. Please do not bother sending emails or mail to them. They may not response [sic]." On May 1, 2012, Gandhi followed up with email addresses for Empire (Rushabh Jethwa's), Unique, Pacific, and Radashir (Kurian Mathews').

(iii)   On August 1, 2012, Ajay Gandhi emailed Rebecca Chow, "Please create a Sales Order for [SDC Designs LLC] from Firestar Diamond Inc. ASAP – Hand Delivery." Gandhi then listed specific quantities and prices of varying grades of mixed diamonds totaling 4,102.37 carats and $2,500,213.45.

(iv)    On September 10, 2012, Shyam Wadhwa emailed Ajay Gandhi, "Kindly advice [sic] right person to be contacted for Diamond Invoices relating to Trading in A. Jaffe. Since these invoices are of high value, delay in receipt of vendor invoices results in bloating of GR/IR figure. Please arrange to mail scanned copy of SDC Invoice $2,680,997 of diamond purchased in July '12." Gandhi replied, attaching the invoice, "Usually Rebecca but I have this invoice." Gandhi then replied, "Please email, PDF invoice copies of SDC of AR and AP for possible off-set." Ansari replied with: (i) a $2,680,996.50 invoice from SDC to Jaffe dated July 25, 2012 for 2,749.74 carats of "Mix Lot" loose diamonds of "Assorted Shapes & Sizes" with a due date of November 22, 2012; and (ii) a $70,062.50 invoice from Jaffe to SDC dated July 25, 2012 for 112.1 carats of mixed diamonds with a due date of August 24, 2012.

1

(v)     On August 29, 2012, Ajay Gandhi emailed wire instructions for FDII to
        Sridhar Krishan at SDC. Krishnan replied, "Sorry Ajay, I shall be paying
        to Firestar Diamond Inc. from Sangam Diamonds Corp., You need to give
        me a check for $1,500,395 favoring SDC Designs LLC from Firestar
        Diamond International Inc. Pls do not wire, I shall send my messenger
        today afternoon to pickup the check." Several hours later, Gandhi
        replied, "funds never received." The next day, Krishnan replied, "You
        should have got it today. Abhay approved it late in afternoon." Gandhi
        replied, "Received. I will call you or email you once check is ready."

(vi)    On July 31, 2014, Shyam Wadhwa emailed Rebecca Chow instructions to
        send Altamash Ansari a $664,032.29 invoice issued by SDC Designs LLC
        to Jaffe so that Ansari could record the purchase in Jaffe's books. On
        August 4, 2014, Ansari forwarded the email to Gandhi, copying
        Wadhwa, and stated, "Rebecca is not responding on below mail, require
        SDC invoice to record purchase in Jaffe." Gandhi then emailed Sridhar
        Krishnan, "Can you please scan me your invoice to A.Jaffe of $664k?
        After receiving the invoice from Krishnan, Gandhi sent it to Ansari and
        Wadhwa. The invoice reflected a sale of 512.02 carats of loose diamonds
        to Jaffe for $664,030 on July 21, 2014. Several hours later, Krishnan asked
        Gandhi, "Can you please send your statements as of June 30, 2014 for
        SDC Designs LLC, SDC Designs Inc. and Sangam Diamonds Corp.[?]"
        Gandhi replied with a report showing that SDC Designs Inc. and SDC
        Designs LLC owed Jaffe a total of $2,403,062.55, of which $627,073.50 was
        overdue.

(vii)   On March 10, 2015, Ajay Gandhi emailed Sridhar Krishnan, "Please email
        us wire details for potential payments to SDC Designs Inc and LLC."
        Kirshnan replied with the bank account information, but stated, "Please
        do not wire anything this week. Abhay is in Mumbai and no one can
        approve wires."

(viii)  On March 19, 2015, Sridhar Krishnan emailed Ajay Gandhi, "Please wire
        funds of $200k to SDC Designs LLC[.]" Gandhi forwarded the email to
        Arpan Doshi and Avinash Oza, copying Shyam Wadhwa, and
        instructed, "Please wire $200,000 on account from Jaffe to SDC Designs
        LLC against accounts payable of $664k." Doshi replied with the wire
        confirmation.

(ix)    On June 9, 2015, Ajay Gandhi emailed Abhay Javeri instructions to wire
        $10,000 to Ami Modi's personal HSBC checking account. The next day,
        Gandhi followed up, "Hi Abhay: Wire done?" On June 12, 2015, Javeri
        replied, "Hi Ajay, Can you confirm receipt?" On February 7, 2017, Ajay
        Gandhi forwarded the email chain to Nirav Modi's personal assistant
        Navita Mankikar and stated, "Kavita: This is what I found in my email
        and not sure if it is relevant to your phone call from yesterday." Mankikar
        replied, copying Mihir Bhansali, "Can you find out if this account is in

2

Ami's name and help us get the wire details of the same?" Bhansali replied, "Below account is closed. Please ask Ami directly for info, bankers will not give us. She can call her relationship manager."

(x)    On March 28, 2017, Samir Shah emailed Rebecca Chow, copying Mihir Bhansali and Ajay Gandhi, "Attached are the lot wise details of the goods that I shipped on Friday. I have mentioned as to what goods to keep in NY and what goods to ship to other vendors. The terms for other vendors are[:] Sangam Diamonds LLC – C.O.D.[;] Pacific Diamonds – 120 days." The attached spreadsheet contained rows listing 205 diamonds weighing a total of 1,965.87 carats and having a total value of $1,472,988.04. It also contained a column indicating whether each diamond was shipped to Sangam Diamonds LLC, shipped to Pacific, or kept in New York. Gandhi asked whether the indicated values reflected the sale price or the cost price. Chow replied, "Understood these goods are at sell price. Samir, please provide invoice at cost (no document inside box)[.] [W]e need to book it in before any transaction." Chow then emailed FDI's sourcing department, copying Shah and Gandhi, instructions to create a sales order and invoice to Sangam Diamonds for 1,470.72 carats of loose diamonds for a total price of $942,878.59.

(xi)    On April 6, 2017, Rebecca Chow sent an email to Ajay Gandhi with the subject "Margin – Sales in March" stating: "FYI. Sangam – 56%[;] SDC – 18%[;] Pacific – 16%[;] World – 0[%.]"

(xii)    On August 9, 2017, Nikhil Bhatia emailed Kunal Patel, copying Ajay Gandhi and Shreeram Phanse, "I received the June 30th AR files from Reena. Could you help me in understanding the negative balances in the AR files? Eg in [NMI], there are a couple of clients (. . . SDC Designs) that have credit balance in receivables. Similarly in FSII, Fancy Creations, Auragem & Empire Gems have huge credit balances." Patel replied, "These are advances from customers, that's why it shows with negative balance. It would be settled against their future transactions."

3

Appendix A-395

In many cases, Nirav Modi, Ajay Gandhi, and Mihir Bhansali caused the U.S. Affiliates, upon receiving actual fraudulent transfers from the Debtors, to subsequently transfer the proceeds of such actual fraudulent transfers to Shadow Entities or other Modi-Controlled Entities. For example:

(i)   On August 30, 2012, FDI wired $1,501,000 to FDII. That same day, Gandhi emailed Bhavesh Patel, "Transfer $1,501,000 from [FDI to FDII]. Pay $21,774 from [FDII] to Fancy Creation." That same day, Gandhi emailed Sridhar Krishnan of SDC Designs to let him know that FDII would issue a check in the amount of $1,500,395 to SDC Designs. On August 31, 2012, FDII issued a check in the amount of $1,500,395 to SDC Designs.

(ii)   On December 11, 2012, Gandhi emailed Bhavesh Patel, "Please keep wire ready for $602,862 to SDC Designs LLC from [FDII's} Capital Old account for invoice 63966." On December 12, 2012, Gandhi emailed a banker at IDB a request for a $500,000 loan, with respect to which FDI was the obligor and FDII the beneficiary. That same day, the $500,000 loan proceeds were disbursed to FDII's Capital One Bank account. That same day, FDII wired $602,862 to SDC Designs.

(iii)   On December 13, 2012, Firestar wired $391,611 to Synergies. That same day, Synergies wired $91,000 to Brilliant. On December 14, 2012, Synergies wired $300,000 to Unique. On December 13, 2012, Ajay Gandhi emailed Bhavesh Patel instructions to make these wires.

(iv)   On February 19, 2013, FDI wired $627,000 to FDII. Bhavesh Patel emailed a wire confirmation for this transfer to Ajay Gandhi. That same day, FDII wired $1,266,430 to Fancy Creations and $332,300 to Diagems. That same day, Shyam Wadhwa emailed Bhavesh Patel instructions to make these two wires and stating, "Since Ajaybhai would be traveling tonight . . . please take Ajaybhai signature on wire transfer doc and send it to Mihirbhai for his signature." That same day, Bhavesh Patel emailed Gandhi the wire documents for these transfers. Gandhi forwarded them to Bhansali, stating, "Please print, sign and scan back to me." Bhansali replied, "Done and sent."

(v)   On April 25, 2013, FDI wired $350,000 to FDII. That same day, Jaffe wired $480,000 to FDII. That same day, FDII wired $812,030 to Diagems.

(vi)   On May 6, 2013, FDI wired $652,239 to FDII. That same day, FDII wired $463,389 to Tri Color. The next day, FDII wired $280,005 to Empire.

1

(vii)    On June 18, 2013, FDI wired $1,525,000 to FDII. That same day, Bhavesh Patel emailed Gandhi the confirmation for this wire, stating "Please find attached wires as per instructions." That same day, FDII wired $1,615,463.93 to Fancy Creations. On June 17, 2018, Bhavesh Patel emailed Gandhi wire documents for this transfer. Gandhi forwarded them to Mihir Bhansali to sign and return.

(viii)   On July 9, 2013, FDI wired $600,000 to FDII. That same day, FDII wired $600,024 to Fancy Creations. That same day, Bhavesh Patel emailed the wire confirmation for this transfer to Gandhi.

(ix)     On October 23, 2013, Firestar transferred $123,744 to Synergies. On October 24, 2013, Synergies transferred $125,000 to Brilliant. On October 23, 2013, Gandhi emailed Bhavesh Patel instructions to make these transfers.

(x)      On March 18, 2014, Firestar transferred $123,097 to Synergies. That same day, Synergies transferred $123,000 to Brilliant. That same day, Gandhi emailed Bhavesh Patel instructions to make these wires.

(xi)     On February 20, 2015, Firestar transferred $186,871 to Synergies. That same day, Synergies transferred $180,000 to Brilliant. That same day, Gandhi emailed instructions to Arpan Doshi and Avinash Oza to make these wires.

(xii)    On September 29, 2015, Jaffe wired $950,000 to FDII. That same day, FDII wired $943,827 to SDC Designs. That same day, Gandhi emailed Avinash Oza and Arpan Doshi instructions to make these transfers.

(xiii)   On March 9, 2016, FDI transferred $247,551 to Synergies. That same day, Synergies transferred $250,000 to Brilliant. That same day, Gandhi emailed Avinash Oza and Arpan Doshi instructions to make these wires.

(xiv)    On March 25, 2016, Jaffe transferred $1,400,000 to NMI. That same day, NMI transferred $613,069 to Auragem and $787,000 to Nirav Modi Ltd. That same day, Gandhi sent an email to Avinash Oza and Arpan Doshi instructing them to make these wires.

(xv)     On March 20, 2017, Firestar transferred $246,871 to Synergies. That same day, Gandhi emailed Avinash Oza instructions to make this wire. On March 22, 2017, Synergies transferred $240,000 to Brilliant. That same day, Gandhi emailed Avinash Oza and Kunal Patel instructions to make this wire.

Schedule A - Transfers from Debtors for the Benefit of CPRE

| Date | Transferor | Property Transferred | Value | Transferee | Beneficiary | Description |
|---|---|---|---|---|---|---|
| 3/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/8/2012 | Firestar Diamond, Inc. | Cash | $ 6,598.62 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/2/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/6/2012 | Firestar Diamond, Inc. | Cash | $ 6,598.62 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/10/2012 | Firestar Diamond, Inc. | Cash | $ 6,644.99 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/14/2012 | Firestar Diamond, Inc. | Cash | $ 8,046.57 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/22/2012 | Firestar Diamond, Inc. | Cash | $ 13,314.91 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/2/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/10/2012 | Firestar Diamond, Inc. | Cash | $ 11,701.80 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/16/2012 | Firestar Diamond, Inc. | Cash | $ 65.32 | TOW STUDIOS ARCHITECT PLLC | CPRE | Expense Recorded to FGI/CP |
| 9/4/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/19/2012 | Firestar Diamond, Inc. | Cash | $ 7,301.48 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/26/2012 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/16/2012 | Firestar Diamond, Inc. | Cash | $ 27,000.00 | VICHIHEL RESTORATION INC. | CPRE | Expense Recorded to FGI/CP |
| 11/16/2012 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/3/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/21/2012 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 1/2/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/24/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/21/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/11/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/3/2013 | Firestar Diamond, Inc. | Cash | $ 9,145.50 | VICHIHEL RESTORATION INC | CPRE | Expense Recorded to FGI/CP |
| 5/8/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/20/2013 | Firestar Diamond, Inc. | Cash | $ 6,749.40 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/3/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/4/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/19/2013 | Firestar Diamond, Inc. | Cash | $ 5,593.04 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 6/19/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 7/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/19/2013 | Firestar Diamond, Inc. | Cash | $ 6,675.17 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/14/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 9/3/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/5/2013 | Firestar Diamond, Inc. | Cash | $ 13,455.36 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/30/2013 | Firestar Diamond, Inc. | Cash | $ 12,698.87 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/17/2013 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/14/2013 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/2/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/12/2013 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 1/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/21/2014 | Firestar Diamond, Inc. | Cash | $ 6,996.72 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/3/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/13/2014 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 3/4/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/1/2014 | Firestar Diamond, Inc. | Cash | $ 250.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 4/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/20/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/26/2014 | Firestar Diamond, Inc. | Cash | $ 9,593.02 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/27/2014 | Firestar Diamond, Inc. | Cash | $ 4,585.52 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/28/2014 | Firestar Diamond, Inc. | Cash | $ 13,799.77 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/21/2014 | Firestar Diamond, Inc. | Cash | $ 15,244.16 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/3/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/19/2014 | Firestar Diamond, Inc. | Cash | $ 15,244.16 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/19/2014 | Firestar Diamond, Inc. | Cash | $ 2,500.00 | TOW STUDIOS ARCHITECT PLLC | CPRE | Expense Recorded to FGI/CP |
| 1/2/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/12/2015 | Firestar Diamond, Inc. | Cash | $ 7,626.66 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/2/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/9/2015 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 3/2/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/2/2015 | Firestar Diamond, Inc. | Cash | $ 300.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 4/14/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/22/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/12/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/12/2015 | Firestar Diamond, Inc. | Cash | $ 18,495.62 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/9/2015 | Firestar Diamond, Inc. | Cash | $ 18,730.79 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 7/10/2015 | Firestar Diamond, Inc. | Cash | $ 109.00 | KLIESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |

| Date | Transferor | Property Transferred | Value | Transferee | Beneficiary | Description |
|---|---|---|---|---|---|---|
| 8/1/2015 | Firestar Diamond, Inc. | Cash | $ 163.00 | KLESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |
| 8/3/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/15/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/5/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/13/2015 | Firestar Diamond, Inc. | Cash | $ 2,555.11 | TOW STUDIOS ARCHITECT PLLC | CPRE | Expense Recorded to FGI/CP |
| 10/20/2015 | Firestar Diamond, Inc. | Cash | $ 15,281.76 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/3/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/24/2015 | Firestar Diamond, Inc. | Cash | $ 7,736.69 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/3/2015 | Firestar Diamond, Inc. | Cash | $ 22,646.00 | VICHIHEL RESTORATION INC. | CPRE | Expense Recorded to FGI/CP |
| 12/4/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/15/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/22/2015 | Firestar Diamond, Inc. | Cash | $ 40.41 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 1/4/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/15/2016 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/17/2016 | Firestar Diamond, Inc. | Cash | $ 13,727.04 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/4/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/21/2016 | Firestar Diamond, Inc. | Cash | $ 300.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 5/3/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/11/2016 | Firestar Diamond, Inc. | Cash | $ 13,745.75 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/8/2016 | Firestar Diamond, Inc. | Cash | $ 1,482.51 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/13/2016 | Firestar Diamond, Inc. | Cash | $ 5,217.13 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/5/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/28/2016 | Firestar Diamond, Inc. | Cash | $ 6,930.46 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/10/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 9/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/8/2016 | Firestar Diamond, Inc. | Cash | $ 5,217.13 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/19/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/4/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/6/2016 | Firestar Diamond, Inc. | Cash | $ 4,463.88 | VICHIHEL RESTORATION INC. | CPRE | Expense Recorded to FGI/CP |
| 10/14/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/9/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/1/2016 | Firestar Diamond, Inc. | Cash | $ 5,224.41 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 12/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/14/2016 | Firestar Diamond, Inc. | Cash | $ 30,000.00 | Firestar Group Inc. | CPRE | Expense Recorded to FGI/CP |
| 12/19/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/19/2016 | Firestar Diamond, Inc. | Cash | $ 7,362.50 | KLESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |
| 1/4/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/8/2017 | Firestar Diamond, Inc. | Cash | $ 6,854.56 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/16/2017 | Firestar Diamond, Inc. | Cash | $ 4,078.21 | KLESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |
| 3/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/9/2017 | Firestar Diamond, Inc. | Cash | $ 7,000.82 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 3/24/2017 | Firestar Diamond, Inc. | Cash | $ 5,224.41 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 3/24/2017 | Firestar Diamond, Inc. | Cash | $ 2,064.00 | ROBINSON & COLE LLP | CPRE | Expense Recorded to FGI/CP |
| 4/4/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/3/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/12/2017 | Firestar Diamond, Inc. | Cash | $ 300.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 5/26/2017 | Firestar Diamond, Inc. | Cash | $ 75,000.00 | Firestar Group Inc. | CPRE | Transfer to FGI for Payment to Marks Paneth |
| 6/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/8/2017 | Firestar Diamond, Inc. | Cash | $ 11,627.60 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/12/2017 | Firestar Diamond, Inc. | Cash | $ 8,000.00 | Firestar Group Inc. | CPRE | Transfer to FGI for Payment to MR Valuation Consulting |
| 6/20/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/26/2017 | Firestar Diamond, Inc. | Cash | $ 5,948.14 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/5/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/1/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/18/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 9/5/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/20/2017 | Firestar Diamond, Inc. | Cash | $ 5,948.14 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/26/2017 | Firestar Diamond, Inc. | Cash | $ 32,992.00 | UNITED STATES TREASURY | CPRE | Expense Recorded to FGI/CP |
| 10/5/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/5/2017 | Firestar Diamond, Inc. | Cash | $ 15,723.06 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/19/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/9/2017 | Firestar Diamond, Inc. | Cash | $ 8,054.55 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/4/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/5/2017 | Firestar Diamond, Inc. | Cash | $ 3,000,642.00 | HSBC MORTGAGE CORPORATION (USA | CPRE | Pay-off of Essex House Apartment Mortgage |
| 12/5/2017 | Firestar Diamond, Inc. | Cash | $ 5,788.51 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 1/24/2018 | Firestar Diamond, Inc. | Cash | $ 15,828.35 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Unknown JW Marriott Essex House Payment |

| | | |
|---|---|---|
| Total Two-Year CPRE Transfers | $ | 3,603,683.69 |
| Total Six-Year CPRE Transfers | $ | 4,594,559.78 |

## Schedule B - Transfers from Debtors to Auragem

| Date | Transferor | Property Transferred | Value | Transferee |
|------|-----------|---------------------|-------|-----------|
| 10/11/2012 | Firestar Diamond, Inc. | Cash | $ 500,000.00 | Auragem Company Limited |
| 9/24/2015 | Firestar Diamond, Inc. | Cash | $ 1,840,968.94 | Auragem Company Limited |

| | |
|---|---|
| **Total Auragem Transfers** | $ 2,340,968.94 |

**Schedule C - Transfers from Debtors to Brilliant**

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 3/25/2014 | Firestar Diamond, Inc. | Cash | $ 4,058,500.00 | Brilliant Diamonds Limited |
| 6/23/2015 | Firestar Diamond, Inc. | Inventory | $ 1,168,389.98 | Brilliant Diamonds Ltd. |
| 6/27/2016 | Firestar Diamond, Inc. | Inventory | $ 840,533.18 | Brilliant Diamonds Ltd. |
| 7/15/2016 | Firestar Diamond, Inc. | Inventory | $ 1,001,354.75 | Brilliant Diamonds Ltd. |
| 7/27/2016 | Firestar Diamond, Inc. | Inventory | $ 762,432.12 | Brilliant Diamonds Ltd. |
| 9/12/2017 | Firestar Diamond, Inc. | Inventory | $ 534,095.01 | Brilliant Diamonds Ltd. |
| 10/11/2017 | Firestar Diamond, Inc. | Inventory | $ 864,587.57 | Brilliant Diamonds Ltd. |
| 11/15/2017 | Firestar Diamond, Inc. | Inventory | $ 574,980.95 | Brilliant Diamonds Ltd. |
| 11/20/2017 | Firestar Diamond, Inc. | Inventory | $ 686,413.55 | Brilliant Diamonds Ltd. |

| | |
|---|---|
| **Total Two-Year Brilliant Transfers** | **$ 5,264,397.13** |
| **Total Six-Year Brilliant Transfers** | **$ 10,491,287.11** |

**Schedule D - Transfers from Debtors to Diagems**

| Date | Transferor | Property Transferred | Value | | Transferee |
|------|-----------|---------------------|-------|---|-----------|
| 12/14/2012 | Firestar Diamond, Inc. | Cash | $ | 552,133.10 | Diagems FZC |
| 12/18/2012 | Firestar Diamond, Inc. | Cash | $ | 1,325,000.00 | Diagems FZC |
| 12/21/2012 | Firestar Diamond, Inc. | Cash | $ | 119,000.00 | Diagems FZC |
| 3/15/2013 | Firestar Diamond, Inc. | Cash | $ | 322,841.00 | Diagems FZC |
| 3/20/2013 | Firestar Diamond, Inc. | Cash | $ | 647,432.05 | Diagems FZC |

| Total Diagems Transfers | $ 2,966,406.15 |
|------------------------|----------------|

| | Schedule E - Transfers from Debtors to Empire | | | |
|---|---|---|---|---|

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 3/14/2012 | Firestar Diamond, Inc. | Cash | $ 733,000.00 | Empire Gems FZE |
| 7/26/2012 | A. Jaffe, Inc. | Inventory | $ 2,611,263.60 | Empire Gems FZE |
| 8/3/2012 | A. Jaffe, Inc. | Inventory | $ 1,819,967.35 | Empire Gems FZE |
| 11/6/2012 | Firestar Diamond, Inc. | Inventory | $ 1,086,315.83 | Empire Gems FZE |
| 11/30/2012 | Firestar Diamond, Inc. | Inventory | $ 1,933,090.60 | Empire Gems FZE |
| 12/11/2012 | Firestar Diamond, Inc. | Cash | $ 1,185,025.05 | Empire Gems FZE |
| 6/20/2013 | A. Jaffe, Inc. | Inventory | $ 673,432.57 | Empire Gems FZE |
| 1/30/2015 | Fantasy, Inc. | Inventory | $ 1,002,025.50 | Empire Gems FZE |
| 3/31/2016 | Firestar Diamond, Inc. | Inventory | $ 1,014,951.07 | Empire Gems FZE |
| 8/12/2016 | A. Jaffe, Inc. | Inventory | $ 11,150.00 | Empire Gems FZE |
| 9/2/2016 | A. Jaffe, Inc. | Inventory | $ 42,905.00 | Empire Gems FZE |

| Total Two-Year Empire Transfers | $ 1,069,006.07 |
|---|---|
| Total Six-Year Empire Transfers | $ 12,113,126.57 |

**Schedule F -  Transfers from Debtors to Eternal**

| Date | Transferor | Property Transferred | Value | | Transferee |
|---|---|---|---|---|---|
| 2/20/2015 | Firestar Diamond, Inc. | Cash | $ | 300,000.00 | Eternal Diamond Corporation Ltd. |
| 3/16/2016 | A. Jaffe, Inc. | Inventory | $ | 218,354.22 | Eternal Diamonds Corporation Ltd. |
| 1/23/2018 | Firestar Diamond, Inc. | Inventory | $ | 426,320.97 | Eternal Diamonds Corporation Ltd. |
| 2/6/2018 | Firestar Diamond, Inc. | Inventory | $ | 789,140.42 | Eternal Diamonds Corporation Ltd. |

| | | |
|---|---|---|
| **Total Two-Year Eternal Transfers** | $ | **1,433,815.61** |
| **Total Six-Year Eternal Transfers** | $ | **1,733,815.61** |

| | Schedule G -  Transfers from Debtors to Fancy Creations | | | |
|---|---|---|---|---|

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 6/8/2012 | Firestar Diamond, Inc. | Cash | $ 1,000,000.00 | Fancy Creations Company Limited |
| 12/13/2013 | Firestar Diamond, Inc. | Inventory | $ 1,545,774.87 | Fancy Creations Company Limited |
| 7/23/2014 | Firestar Diamond, Inc. | Inventory | $ 1,800,879.99 | Fancy Creations Company Limited |
| 9/1/2015 | Firestar Diamond, Inc. | Inventory | $ 1,180,230.78 | Fancy Creations Company Limited |
| 9/24/2015 | Firestar Diamond, Inc. | Cash | $ 1,400,000.00 | Fancy Creations Company Limited |
| 5/18/2016 | Firestar Diamond, Inc. | Inventory | $ 1,031,353.43 | Fancy Creations Company Limited |
| 5/20/2016 | Firestar Diamond, Inc. | Inventory | $ 81,455.50 | Fancy Creations Company Limited |
| 7/18/2016 | Firestar Diamond, Inc. | Cash | $ 1,809,528.00 | Fancy Creations Company Limited |
| 7/21/2016 | A. Jaffe, Inc. | Cash | $ 200,000.00 | Fancy Creations Company Limited |
| 7/21/2016 | Firestar Diamond, Inc. | Cash | $ 715,000.00 | Fancy Creations Company Limited |
| 6/27/2017 | Firestar Diamond, Inc. | Inventory | $ 63,580.00 | Fancy Creations Company Limited |

| | | |
|---|---|---|
| Total Two-Year Fancy Creations Transfers | $ | 3,900,916.93 |
| Total Six-Year Fancy Creations Transfers | $ | 10,827,802.57 |

| | Schedule H - Transfers from Debtors to Pacific | | | |
|---|---|---|---|---|

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 2/28/2012 | Firestar Diamond, Inc. | Inventory | $ 251,379.68 | Pacific Diamonds FZE |
| 3/1/2012 | Firestar Diamond, Inc. | Inventory | $ 1,628,433.50 | Pacific Diamonds FZE |
| 3/2/2012 | Firestar Diamond, Inc. | Inventory | $ 177,350.07 | Pacific Diamonds FZE |
| 3/5/2012 | A. Jaffe, Inc. | Inventory | $ 280,334.62 | Pacific Diamonds FZE |
| 3/15/2012 | A. Jaffe, Inc. | Inventory | $ 69,981.60 | Pacific Diamonds FZE |
| 5/2/2012 | Firestar Diamond, Inc. | Inventory | $ 762,528.95 | Pacific Diamonds FZE |
| 5/31/2012 | Firestar Diamond, Inc. | Inventory | $ 256,657.25 | Pacific Diamonds FZE |
| 6/7/2012 | Firestar Diamond, Inc. | Inventory | $ 1,977,768.60 | Pacific Diamonds FZE |
| 9/28/2012 | Firestar Diamond, Inc. | Inventory | $ 1,912,840.00 | Pacific Diamonds FZE |
| 12/21/2012 | Firestar Diamond, Inc. | Cash | $ 560,000.00 | Pacific Diamonds FZE |
| 2/22/2013 | Firestar Diamond, Inc. | Cash | $ 503,501.41 | Pacific Diamonds FZE |
| 3/15/2013 | Firestar Diamond, Inc. | Cash | $ 670,000.00 | Pacific Diamonds FZE |
| 3/26/2013 | Firestar Diamond, Inc. | Cash | $ 407,120.00 | Pacific Diamonds FZE |
| 3/26/2013 | Firestar Diamond, Inc. | Cash | $ 407,120.00 | Pacific Diamonds FZE |
| 8/30/2013 | Firestar Diamond, Inc. | Inventory | $ 1,768,423.08 | Pacific Diamonds FZE |
| 9/30/2013 | A. Jaffe, Inc. | Inventory | $ 985,843.04 | Pacific Diamonds FZE |
| 10/10/2013 | A. Jaffe, Inc. | Inventory | $ 1,047,311.70 | Pacific Diamonds FZE |
| 10/10/2013 | A. Jaffe, Inc. | Inventory | $ 1,374,201.60 | Pacific Diamonds FZE |
| 10/23/2013 | Firestar Diamond, Inc. | Cash | $ 150,000.00 | Pacific Diamonds FZE |
| 10/25/2013 | A. Jaffe, Inc. | Inventory | $ 731,846.66 | Pacific Diamonds FZE |
| 10/30/2013 | A. Jaffe, Inc. | Cash | $ 2,455,036.00 | Pacific Diamonds FZE |
| 4/11/2014 | Firestar Diamond, Inc. | Inventory | $ 1,301,133.90 | Pacific Diamonds FZE |
| 1/23/2015 | Fantasy, Inc. | Inventory | $ 1,552,482.90 | Pacific Diamonds FZE |
| 3/20/2015 | Firestar Diamond, Inc. | Inventory | $ 1,666,072.46 | Pacific Diamonds FZE |
| 6/23/2015 | Firestar Diamond, Inc. | Cash | $ 1,138,270.60 | Pacific Diamonds FZE |
| 6/26/2015 | Firestar Diamond, Inc. | Cash | $ 1,438,270.60 | Pacific Diamonds FZE |
| 9/25/2015 | Firestar Diamond, Inc. | Cash | $ 54,000.00 | Pacific Diamonds FZE |
| 9/28/2015 | Firestar Diamond, Inc. | Cash | $ 1,017,000.00 | Pacific Diamonds FZE |
| 10/7/2015 | Firestar Diamond, Inc. | Cash | $ 1,071,000.00 | Pacific Diamonds FZE |
| 11/13/2015 | Firestar Diamond, Inc. | Cash | $ 560,741.52 | Pacific Diamonds FZE |
| 2/23/2016 | A. Jaffe, Inc. | Cash | $ 1,100,000.00 | Pacific Diamonds FZE |
| 2/26/2016 | Firestar Diamond, Inc. | Inventory | $ 296,659.46 | Pacific Diamonds FZE |
| 3/3/2016 | Firestar Diamond, Inc. | Cash | $ 873,996.50 | Pacific Diamonds FZE |
| 3/3/2016 | Firestar Diamond, Inc. | Cash | $ 53,863.40 | Pacific Diamonds FZE |
| 3/15/2016 | A. Jaffe, Inc. | Cash | $ 700,000.00 | Pacific Diamonds FZE |
| 3/21/2016 | A. Jaffe, Inc. | Cash | $ 1,000,000.00 | Pacific Diamonds FZE |
| 3/23/2016 | A. Jaffe, Inc. | Cash | $ 900,000.00 | Pacific Diamonds FZE |
| 3/24/2016 | A. Jaffe, Inc. | Cash | $ 1,000,000.00 | Pacific Diamonds FZE |
| 4/5/2016 | A. Jaffe, Inc. | Cash | $ 500,000.00 | Pacific Diamonds FZE |
| 5/6/2016 | A. Jaffe, Inc. | Cash | $ 2,000,000.00 | Pacific Diamonds FZE |
| 6/1/2016 | A. Jaffe, Inc. | Cash | $ 815,000.00 | Pacific Diamonds FZE |

Sch. H

| Date | Transferor | Property Transferred | Value | | Transferee |
|---|---|---|---|---|---|
| 6/17/2016 | Firestar Diamond, Inc. | Inventory | $ | 693,348.24 | Pacific Diamonds FZE |
| 3/28/2017 | Firestar Diamond, Inc. | Inventory | $ | 459,508.55 | Pacific Diamonds FZE |
| 1/3/2018 | A. Jaffe, Inc. | Cash | $ | 530,000.00 | Pacific Diamonds FZE |
| 1/3/2018 | Firestar Diamond, Inc. | Cash | $ | 483,620.05 | Pacific Diamonds FZE |
| 1/3/2018 | Firestar Diamond, Inc. | Cash | $ | 2,188,769.43 | Pacific Diamonds FZE |

| | |
|---|---|
| **Total Two-Year Pacific Transfers** | **$ 12,494,765.63** |
| **Total Six-Year Pacific Transfers** | **$ 41,771,415.37** |

| | Schedule I - Transfers from Debtors to Tri Color | | | | |
|---|---|---|---|---|---|

| Date | Transferor | Property Transferred | | Value | Transferee |
|---|---|---|---|---|---|
| 3/1/2012 | Firestar Diamond, Inc. | Inventory | $ | 1,805,720.16 | Tri Color Gems FZE |
| 3/18/2013 | Firestar Diamond, Inc. | Cash | $ | 1,000,000.00 | Tri Color Gems FZE |
| 3/19/2013 | Firestar Diamond, Inc. | Cash | $ | 200,024.90 | Tri Color Gems FZE |
| 3/21/2013 | Firestar Diamond, Inc. | Cash | $ | 1,013,165.00 | Tri Color Gems FZE |
| 5/1/2013 | Firestar Diamond, Inc. | Cash | $ | 600,000.00 | Tri Color Gems FZE |
| 5/6/2013 | Firestar Diamond, Inc. | Cash | $ | 1,600,000.00 | Tri Color Gems FZE |
| 10/10/2013 | A. Jaffe, Inc. | Inventory | $ | 1,914,721.20 | Tri Color Gems FZE |
| 7/11/2014 | Firestar Diamond, Inc. | Cash | $ | 414,405.20 | Tri Color Gems FZE |
| 9/29/2015 | Firestar Diamond, Inc. | Inventory | $ | 1,610,088.00 | Tri Color Gems FZE |
| 2/24/2016 | Firestar Diamond, Inc. | Inventory | $ | 743,312.85 | Tri Color Gems FZE |
| 2/26/2016 | Firestar Diamond, Inc. | Cash | $ | 1,192,105.55 | Tri Color Gems FZE |
| 3/30/2016 | Fantasy, Inc. | Cash | $ | 301,540.00 | Tri Color Gems FZE |

| | | |
|---|---|---|
| Total Two-Year Tri Color Transfers | $ | 1,493,645.55 |
| Total Six-Year Tri Color Transfers | $ | 12,395,082.86 |

**Schedule J - Transfers from Debtors to Unique**

| Date | Transferor | Property Transferred | Value | Transferee |
|------|-----------|------------|-------|-----------|
| 3/29/2012 | Firestar Diamond, Inc. | Inventory | $ 3,144,477.38 | Unique Diamond & Jewellery FZC |
| 7/13/2012 | A. Jaffe, Inc. | Inventory | $ 874,867.52 | Unique Diamond & Jewellery FZC |
| 9/12/2012 | Firestar Diamond, Inc. | Cash | $ 150,000.00 | Unique Diamond & Jewellery FZC |
| 12/13/2012 | Firestar Diamond, Inc. | Cash | $ 231,000.00 | Unique Diamond & Jewellery FZC |
| 9/24/2013 | Firestar Diamond, Inc. | Inventory | $ 921,027.10 | Unique Diamond & Jewellery FZC |
| 3/18/2014 | Firestar Diamond, Inc. | Cash | $ 150,000.00 | Unique Diamond & Jewellery FZC |
| 1/19/2015 | Firestar Diamond, Inc. | Inventory | $ 125,590.00 | Unique Diamond & Jewellery FZC |
| 3/2/2015 | Firestar Diamond, Inc. | Cash | $ 300,000.00 | Unique Diamond & Jewellery FZC |
| 9/30/2015 | Firestar Diamond, Inc. | Inventory | $ 2,122,401.60 | Unique Diamond & Jewellery FZC |
| 3/4/2016 | Firestar Diamond, Inc. | Cash | $ 300,000.00 | Unique Diamond & Jewellery FZC |
| 6/17/2016 | Firestar Diamond, Inc. | Inventory | $ 331,028.54 | Unique Diamond & Jewellery FZC |
| 3/22/2017 | Firestar Diamond, Inc. | Cash | $ 300,000.00 | Unique Diamond & Jewellery FZC |
| 5/23/2017 | Firestar Diamond, Inc. | Inventory | $ 638,934.23 | Unique Diamond & Jewellery FZC |
| 7/17/2017 | Firestar Diamond, Inc. | Inventory | $ 1,905,068.65 | Unique Diamond & Jewellery FZC |

| | |
|---|---|
| **Total Two-Year Unique Transfers** | **$ 3,475,031.42** |
| **Total Six-Year Unique Transfers** | **$ 11,494,395.02** |

<table>
<tr><td colspan="5" align="center"><b>Schedule K - Transfers from Debtors to World Diamond</b></td></tr>
</table>

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 5/2/2012 | A. Jaffe, Inc. | Inventory | $ 1,454,821.45 | World Diamond Distribution FZE |
| 3/28/2013 | Firestar Diamond, Inc. | Inventory | $ 959,097.55 | World Diamond Distribution FZE |
| 5/2/2013 | Firestar Diamond, Inc. | Inventory | $ 548,718.30 | World Diamond Distribution FZE |
| 6/21/2013 | Firestar Diamond, Inc. | Inventory | $ 1,479,565.30 | World Diamond Distribution FZE |
| 7/26/2013 | Firestar Diamond, Inc. | Inventory | $ 480,487.13 | World Diamond Distribution FZE |
| 9/24/2013 | Firestar Diamond, Inc. | Inventory | $ 522,483.15 | World Diamond Distribution FZE |
| 10/25/2013 | Firestar Diamond, Inc. | Inventory | $ 911,408.98 | World Diamond Distribution FZE |
| 2/21/2014 | Firestar Diamond, Inc. | Inventory | $ 1,968,839.60 | World Diamond Distribution FZE |
| 10/6/2015 | Firestar Diamond, Inc. | Inventory | $ 682,219.05 | World Diamond Distribution FZE |
| 10/7/2015 | Firestar Diamond, Inc. | Inventory | $ 285,071.95 | World Diamond Distribution FZE |
| 12/10/2015 | Firestar Diamond, Inc. | Inventory | $ 1,275,300.30 | World Diamond Distribution FZE |
| 9/7/2016 | Firestar Diamond, Inc. | Inventory | $ 647,031.88 | World Diamond Distribution FZE |
| 10/18/2016 | Firestar Diamond, Inc. | Inventory | $ 946,397.24 | World Diamond Distribution FZE |
| 1/20/2017 | Firestar Diamond, Inc. | Inventory | $ 984,058.12 | World Diamond Distribution FZE |
| 2/15/2017 | Firestar Diamond, Inc. | Inventory | $ 633,111.89 | World Diamond Distribution FZE |
| 3/3/2017 | Firestar Diamond, Inc. | Inventory | $ 687,520.22 | World Diamond Distribution FZE |
| 4/27/2017 | Firestar Diamond, Inc. | Inventory | $ 821,671.50 | World Diamond Distribution FZE |
| 5/12/2017 | Firestar Diamond, Inc. | Inventory | $ 1,122,083.08 | World Diamond Distribution FZE |
| 5/31/2017 | Firestar Diamond, Inc. | Inventory | $ 790,999.16 | World Diamond Distribution FZE |
| 6/1/2017 | Firestar Diamond, Inc. | Inventory | $ 945,911.45 | World Diamond Distribution FZE |
| 7/11/2017 | Firestar Diamond, Inc. | Inventory | $ 819,420.00 | World Diamond Distribution FZE |
| 7/28/2017 | Firestar Diamond, Inc. | Inventory | $ 577,087.91 | World Diamond Distribution FZE |
| 12/5/2017 | Firestar Diamond, Inc. | Inventory | $ 1,632,500.53 | World Diamond Distribution FZE |

| | |
|---|---|
| **Total Two-Year World Diamond Transfers** | **$ 10,607,792.98** |
| **Total Six-Year World Diamond Transfers** | **$ 21,175,805.74** |

| | | | | |
|---|---|---|---|---|
| | | **Schedule L -  Transfers from Debtors to Twin Fields** | | |

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 2/1/2013 | A. Jaffe, Inc. | Cash | $    400,000.00 | Twin Fields Investment |
| 3/14/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/10/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 5/17/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 5/28/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 5/29/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 7/26/2013 | A. Jaffe, Inc. | Cash | 100,000.00 | Twin Fields Investment |
| 8/5/2013 | A. Jaffe, Inc. | Cash | 300,000.00 | Twin Fields Investment |
| 9/4/2013 | A. Jaffe, Inc. | Cash | 450,000.00 | Twin Fields Investment |
| 9/12/2013 | A. Jaffe, Inc. | Cash | 750,000.00 | Twin Fields Investment |
| 9/25/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 10/1/2013 | A. Jaffe, Inc. | Cash | 300,000.00 | Twin Fields Investment |
| 10/17/2013 | A. Jaffe, Inc. | Cash | 50,000.00 | Twin Fields Investment |
| 10/30/2013 | A. Jaffe, Inc. | Cash | 100,000.00 | Twin Fields Investment |
| 11/12/2013 | A. Jaffe, Inc. | Cash | 610,000.00 | Twin Fields Investment |
| 12/3/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 3/3/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/21/2014 | A. Jaffe, Inc. | Cash | 400,000.00 | Twin Fields Investment |
| 5/22/2014 | A. Jaffe, Inc. | Cash | 200,000.00 | Twin Fields Investment |
| 6/9/2014 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 6/12/2014 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 7/25/2014 | A. Jaffe, Inc. | Cash | 600,000.00 | Twin Fields Investment |
| 8/4/2014 | A. Jaffe, Inc. | Cash | 255,000.00 | Twin Fields Investment |
| 8/20/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 9/26/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 11/19/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 2/10/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/7/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/21/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 5/22/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 6/3/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 6/22/2015 | Firestar Diamond, Inc. | Cash | 31,542.28 | Twin Fields Investment |
| 6/22/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 7/1/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 7/15/2015 | A. Jaffe, Inc. | Cash | 1,000,000.00 | Twin Fields Investment |
| 7/29/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 8/26/2015 | A. Jaffe, Inc. | Cash | 350,000.00 | Twin Fields Investment |
| 9/16/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 9/29/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 10/26/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 11/6/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 12/3/2015 | A. Jaffe, Inc. | Cash | 200,000.00 | Twin Fields Investment |
| 2/2/2016 | A. Jaffe, Inc. | Cash | 1,000,000.00 | Twin Fields Investment |
| 4/14/2016 | A. Jaffe, Inc. | Cash | 150,000.00 | Twin Fields Investment |
| 6/8/2016 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 6/14/2016 | A. Jaffe, Inc. | Cash | 150,000.00 | Twin Fields Investment |

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 7/14/2016 | A. Jaffe, Inc. | Cash | 140,000.00 | Twin Fields Investment |
| 10/11/2016 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 1/18/2017 | A. Jaffe, Inc. | Cash | 300,000.00 | Twin Fields Investment |
| 2/1/2017 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 2/10/2017 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 3/1/2017 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 3/10/2017 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 3/16/2017 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 3/30/2017 | A. Jaffe, Inc. | Cash | 150,000.00 | Twin Fields Investment |
| 5/4/2017 | A. Jaffe, Inc. | Cash | 125,000.00 | Twin Fields Investment |

| | |
|---|---|
| **Total Two-Year Twin Fields Transfers** | $  3,265,000.00 |
| **Total Six-Year Twin Fields Transfers** | $  21,361,542.28 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors.[1] | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | |
| Plaintiff, | |
| v. | Adv. Proc. No. 20-1054 (SHL) |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of THE ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Firestar Diamond, Inc. (2729), Fantasy, Inc. (1673), and Old AJ, Inc. f/k/a A. Jaffe, Inc. (4756).

**ORDER (I) DIRECTING ISSUANCE OF AN ADDITIONAL
SUMMONS; (II) SETTING FOREIGN DEFENDANTS'
TIME TO RESPOND TO THE COMPLAINT; (III) ADJOURNING
THE PRETRIAL CONFERENCE; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of Richard Levin, not individually but solely in his capacity as chapter 11 trustee (the "**Trustee**") for Firestar Diamond, Inc. ("**Firestar**") for an order (i) directing the Clerk of Court to issue an additional summons under Bankruptcy Rule 7004(e), (ii) authorizing service of the Complaint [Dkt. 1] on the UAE Defendants by international registered mail under Civil Rule 4(f)(3), made applicable in this adversary proceeding by Bankruptcy Rule 7004(a), (iii) setting each Foreign Defendant's deadline to respond to the Complaint to 45 days from the date the Trustee effects service on each respective Defendant under Bankruptcy Rule 7012(a), (iv) adjourning *sine die* the initial pretrial conference, and (v) granting related relief; and the Court having conducted a hearing on the Motion on April 7, 2020 (the "**Hearing**"); and the Court having considered the Motion, all responses filed thereto, if any, as well as any evidence presented at the hearing; and the Court having jurisdiction to consider and determine the Motion in accordance with 28 U.S.C. §§ 157 and 1334; and appropriate notice under the circumstances of the Motion having been provided, and it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor; and recognizing that service may be substantially delayed on account of the COVID-19 pandemic,

IT IS ORDERED:

1.    The Clerk of Court shall issue an additional summons in accordance with Bankruptcy Rule 7004(e).

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

2.      The deadline for the Foreign Defendants to file with the clerk of the bankruptcy court a response to the Complaint is 60 days after the Trustee effects service of the Complaint and Summons.

3.      The Pretrial Conference in this adversary proceeding, currently scheduled for April 30, 2020 at 10:00 a.m., is adjourned *sine die*.

4.      A hearing on the portion of the Motion requesting authority to serve the Complaint and Summons on the UAE Defendants is adjourned to April 30, 2020.

Dated: April 10, 2020                                       */s/ Sean H. Lane*
                                                            The Honorable Sean H. Lane
                                                            United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
                        :

In re:                         :        Chapter 11
                              :

FIRESTAR DIAMOND, INC. *et al.*    :        Case No. 18-10509 (SHL)
                              :

           Debtors. [1]      :        (Jointly Administered)
                              :

---------------------------------------------------------- x
                        :

RICHARD LEVIN, Chapter 11 Trustee of   :
FIRESTAR DIAMOND, INC.,       :     Adv. Proc. No. 20-01054 (SHL)
                              :

          Plaintiff,      :
     v.                     :

AMI JAVERI (A/K/A AMI MODI); PURVI   :
MEHTA (A/K/A PURVI MODI); NEHAL   :
MODI; NEESHAL MODI; CENTRAL PARK  :
REAL ESTATE, LLC; CENTRAL PARK SOUTH :
50 PROPERTIES, LLC; TRIDENT TRUST   :
COMPANY (SOUTH DAKOTA) INC., solely as
Trustee of the ITHACA TRUST; TWIN FIELDS
INVESTMENTS LTD.; AURAGEM COMPANY
LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL
DIAMONDS CORPORATION LTD.; FANCY
CREATIONS COMPANY LTD.; HAMILTON
PRECIOUS TRADERS LTD.; SINO TRADERS
LTD.; SUNSHINE GEMS LTD.; UNIQUE
DIAMOND AND JEWELLERY FZC; WORLD
DIAMOND DISTRIBUTION FZE; VISTA
JEWELRY FZE; EMPIRE GEMS FZE;
UNIVERSAL FINE JEWELRY FZE; DIAGEMS
FZC; TRI COLOR GEMS FZE; PACIFIC
DIAMONDS FZE; HIMALAYAN TRADERS
FZE; UNITY TRADING FZE; FINE CLASSIC
FZE; DG BROTHERS FZE,

          Defendants.
---------------------------------------------------------- x

## **AFFIDAVIT OF SERVICE**

       I, Colin Linebaugh, am employed in the county of Los Angeles, State of California. I hereby certify that on April 23, 2020, at my direction and under my supervision, employees of Omni Management Group caused true and correct copies of the following document to be served via first-class mail, postage pre-paid, to the parties listed in **Exhibit A** attached hereto:

---

[1] The Debtors in these jointly administered chapter 11 cases, along with each Debtor's respective chapter 11 case number and the last four digits of each Debtor's federal tax identification number are: (i) Firestar Diamond, Inc. (Case No. 18-10509) (2729); (ii) A. Jaffe, Inc. (Case No. 18-10510) (4756); and (iii) Fantasy, Inc. (Case No. 18-10511) (1673).

- **Complaint to Avoid and Recover Actual Fraudulent Transfers and for Damages for Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act [Adv. Docket No. 1].**
- **Second Summons and Notice of Pretrial Conference in an Adversary Proceeding [Adv. Docket No. 9].**

Dated: April 24, 2020

_____
Colin Linebaugh
Omni Management Group
5955 DeSoto Avenue, Suite #100
Woodland Hills, CA 91367
(818) 906-8300

{State of California     }
{                        } ss.
{County of Los Angeles   }

Subscribed and sworn to (or affirmed) before me on this 24th day of April, 20 20, by Colin Linebaugh, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____
Notary Public

DARLEEN SAHAGUN
Notary Public – California
Los Angeles County
Commission # 2230950
My Comm. Expires Feb 11, 2022

Firestar Diamond, Inc., et al. - U.S. Mail                                                                      Served 4/23/2020

AMI JAVERI
160 CENTRAL PARK SOUTH
SUITE 3601
NEW YORK, NY 10019

AMI JAVERI
50 CENTRAL PARK SOUTH, UNIT 33,
NEW YORK, NY 10019

CENTRAL PARK REAL ESTATE LLC
160 CENTRAL PARK SOUTH
SUITE 3601
NEW YORK, NY 10019

CENTRAL PARK REAL ESTATE LLC
C/O CORPORATE SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

CENTRAL PARK SOUTH 50 PROPERTIES LLC
ATTN: OFFICER OR GENERAL/MANAGING AGENT
50 CENTRAL PARK SOUTH, UNIT 33
NEW YORK, NY 10019

CENTRAL PARK SOUTH 50 PROPERTIES LLC
C/O DAY PITNEY LLP
7 TIMES SQUARE, 20TH FLOOR
NEW YORK, NY 10036

NEHAL MODI
5 GEORGE LANGELOH COURT,
RYE, NY 10580

NEHAL MODI
7702 SANDIA LOOP
AUSTIN, TX 78735

TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC.,
ATTN: ALICE ROKAHR, PRESIDENT
200 NORTH PHILIPS AVENUE
SIOUX FALLS, SD 57104

TWIN FIELDS INVESTMENTS LTD.
ATTN: OFFICER OR GENERAL/MANAGING AGENT
40 E. DIVISION STREET, APARTMENT #A,
DOVER, DELAWARE 19901

Parties Served: 10

Page 1 of 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 20-1054 |
| Plaintiff, | |
| v. | |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

**CERTIFICATE OF SERVICE**

I, Ho Kin Yiu, caused the *Complaint* [Adv. Dkt. 1], *Second Summons* [Adv. Dkt. 9], and *Order Setting Foreign Defendants' Time to Respond to Complaint* [Adv. Dkt. 8] to be served on Auragem Company Limited via hand delivery on May 12, 2020 at the following address:

> AURAGEM COMPANY LIMITED
> UNITS 1405-1406, DOMINION CENTRE
> 43-59 QUEEN'S ROAD EAST
> WAN CHAI, HONG KONG
> HONG KONG, SAR

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 12, 2020, Hong Kong, China.

By:    /s/
      Ho Kin Yiu

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 20-1054 |
| Plaintiff, | |
| v. | |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Ho Kin Yiu, caused the *Complaint* [Adv. Dkt. 1], *Second Summons* [Adv. Dkt. 9], and *Order Setting Foreign Defendants' Time to Respond to Complaint* [Adv. Dkt. 8] to be served on Brilliant Diamonds Limited via hand delivery on May 12, 2020 at the following address:

> BRILLIANT DIAMONDS LIMITED
> 22/F, CITIC TOWER
> 1 TIM MEI AVENUE
> CENTRAL, HONG KONG
> HONG KONG, SAR

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 12, 2020, Hong Kong, China.

By:  /s/
     Ho Kin Yiu

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 20-1054 |
| Plaintiff, | |
| v. | |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Ho Kin Yiu, caused the *Complaint* [Adv. Dkt. 1], *Second Summons* [Adv. Dkt. 9], and *Order Setting Foreign Defendants' Time to Respond to Complaint* [Adv. Dkt. 8] to be served on Eternal Diamonds Corporation Limited via hand delivery on May 12, 2020 at the following address:

> ETERNAL DIAMONDS CORPORATION LIMITED
> UNITS 1405-1406, DOMINION CENTRE
> 43-59 QUEEN'S ROAD EAST
> WAN CHAI, HONG KONG
> HONG KONG, SAR

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 12, 2020, Hong Kong, China.

By:    /s/ _____
       Ho Kin Yiu

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 20-1054 |
| Plaintiff, | |
| v. | |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Ho Kin Yiu, caused the *Complaint* [Adv. Dkt. 1], *Second Summons* [Adv. Dkt. 9], and *Order*

*Setting Foreign Defendants' Time to Respond to Complaint* [Adv. Dkt. 8] to be served on Sunshine

Gems Limited via hand delivery on May 12, 2020 at the following address:

> SUNSHINE GEMS LIMITED
> 22/F, CITIC TOWER
> 1 TIM MEI AVENUE
> CENTRAL, HONG KONG
> HONG KONG, SAR

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on May 12, 2020, Hong Kong, China.

By:    /s/_____
       Ho Kin Yiu

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. 20-1054 |
| Plaintiff, | |
| v. | |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

**CERTIFICATE OF SERVICE**

I, Ho Kin Yiu, caused the *Complaint* [Adv. Dkt. 1], *Second Summons* [Adv. Dkt. 9], and *Order Setting Foreign Defendants' Time to Respond to Complaint* [Adv. Dkt. 8] to be served on Sino Traders Limited via hand delivery on May 12, 2020 at the following address:

SINO TRADERS LIMITED
UNIT 201, 2ND FLOOR, TESBURY CENTRE
28 QUEEN'S ROAD EAST
WAN CHAI, HONG KONG
HONG KONG, SAR

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 12, 2020, Hong Kong, China.

By:    /s/
       Ho Kin Yiu

2

**Exhibit B**

# U.S. Bankruptcy Court
## Southern District of New York (Manhattan)
## Adversary Proceeding #: 20-01054-shl

*Assigned to:* Judge Sean H. Lane                                    *Date Filed:* 02/25/20
*Lead BK Case:* 18-10509
*Lead BK Title:* Firestar Diamond, Inc. and Fantasy, Inc.
*Lead BK Chapter:* 11
*Demand:*

*Nature[s] of Suit:*  13 Recovery of money/property - 548 fraudulent transfer
                      02 Other (e.g. other actions that would have been brought in state court if unrelated to
                      bankruptcy)

### *Plaintiff*
-----------------------
**Richard Levin,** *Chapter 11 Trustee of Firestar*        represented by **Marc B. Hankin**
*Diamond, Inc., Fantasy, Inc., and Old AJ, Inc.*                           Jenner & Block LLP
*f/k/a A. Jaffe, Inc.*                                                     919 Third Avenue
                                                                          39th Floor
                                                                          New York, NY 10022
                                                                          (212) 891-1647
                                                                          Fax : (212) 909-0864
                                                                          Email: mhankin@jenner.com

                                                                          **Vincent Edward Lazar**
                                                                          Jenner & Block LLP
                                                                          353 N. Clark Street
                                                                          Chicago, IL 60654
                                                                          (312) 923-2989
                                                                          Fax : (312) 840-7389
                                                                          Email: vlazar@jenner.com

                                                                          **Richard B. Levin**
                                                                          Jenner & Block LLP
                                                                          919 Third Avenue
                                                                          38th Floor
                                                                          New York, NY 10022
                                                                          (212) 891-1601
                                                                          Fax : (212) 891-1699
                                                                          Email: rlevin@jenner.com

                                                                          **Carl N Wedoff**
                                                                          Jenner & Block LLP
                                                                          919 Third Avenue
                                                                          New York, NY 10022
                                                                          (212)891-1600
                                                                          Fax : (212)891-1699

Email: cwedoff@jenner.com

V.

*Defendant*
----------------------
**Ami Javeri, *A/K/A Ami Modi***           represented by **Roger J Bernstein**
Roger J Bernstein
535 Fifth Ave
23rd Floor
New York, NY 10017
212-748-7400
Email: rjblaw@gmail.com

*Defendant*
----------------------
**Purvi Mehta, *A/K/A Purvi Modi***           represented by **Frederick D. Hyman**
Duane Morris LLP
1540 Broadway
New York, NY 10036
212-692-1000
Fax : 212-692-1020
Email: RHyman@duanemorris.com

**Evangelos Michailidis**
Duane Morris LLP
1540 Broadway
New York, NY 10036
212-471-1864
Email: emichailidis@duanemorris.com

**Sarah Fehm Stewart**
Duane Morris LLP
One Riverfront Plaza
1037 Raymond Blvd.
Suite 1800
Newark, NJ 07102
973-424-2061
Fax : 973-556-1464
Email: sfstewart@duanemorris.com

**Mauro Wolfe**
Duane Morris LLP
1540 Broadway
New York, NY 10036
212-692-1017
Email: mmwolfe@duanemorris.com

*Defendant*
----------------------

**Nehal Modi**

**Roger J Bernstein**
represented by (See above for address)

*Defendant*
-----------------------
**Neeshal Modi**

represented by **Benjamin Suess**
Paykin Krieg & Adams, LLP
2500 Westchester Avenue
Suite 107
Purchase, NY 10577
917-400-2984
Email: bsuess@pka-law.com

*Defendant*
-----------------------
**Central Park Real Estate, LLC**

represented by **Beth L. Kaufman**
Schoeman Updike Kaufman & Gerber LLP
551 Fifth Avenue
New York, NY 10176
212-661-5030
Email: ksaletto@schoeman.com

**Patricia O'Prey**
Schoeman Updike Kaufman & Gerber LLP
551 Fifth Avenue
New York, NY 10176
212-661-5030
Email: poprey@schoeman.com

*Defendant*
-----------------------
**Central Park South 50 Properties, LLC**

represented by **Beth L. Kaufman**
(See above for address)

**Patricia O'Prey**
(See above for address)

*Defendant*
-----------------------
**Trident Trust Company (South Dakota) Inc.,**
*solely as Trustee of the Ithaca Trust*

represented by **Marc Rowin**
Lynch Rowin LLP
50 Main Street, Suite 1000
White Plains, NY 10606
212-682-4001
Email: mrowin@lynchrowin.com

*Defendant*
-----------------------

**Twin Fields Investments Ltd.**

**Twin Fields Investments Ltd.**
represented by PRO SE

*Defendant*
-----------------------
**Auragem Company Ltd.**

represented by **Auragem Company Ltd.**
PRO SE

*Defendant*
-----------------------
**Brilliant Diamonds Ltd.**

represented by **Brilliant Diamonds Ltd.**
PRO SE

*Defendant*
-----------------------
**Eternal Diamonds Corporation Ltd.**

represented by **Eternal Diamonds Corporation Ltd.**
PRO SE

*Defendant*
-----------------------
**Fancy Creations Company Ltd.**

represented by **Fancy Creations Company Ltd.**
PRO SE

*Defendant*
-----------------------
**Hamilton Precious Traders Ltd.**

represented by **Hamilton Precious Traders Ltd.**
PRO SE

*Defendant*
-----------------------
**Sino Traders Ltd.**

represented by **Sino Traders Ltd.**
PRO SE

*Defendant*
-----------------------
**Sunshine Gems Ltd.**                          represented by **Sunshine Gems Ltd.**
PRO SE

*Defendant*
-----------------------
**Unique Diamond and Jewellery FZC**            represented by **Unique Diamond and Jewellery FZC**
PRO SE

*Defendant*
-----------------------
**World Diamond Distribution FZE**              represented by **World Diamond Distribution FZE**
PRO SE

*Defendant*
-----------------------
**Vista Jewelry FZE**                           represented by **Vista Jewelry FZE**
PRO SE

*Defendant*
-----------------------
**Empire Gems FZE**                             represented by **Empire Gems FZE**
PRO SE

*Defendant*
-----------------------
**Universal Fine Jewelry FZE**                  represented by **Universal Fine Jewelry FZE**
PRO SE

*Defendant*
-----------------------
**Diagems FZC**                                 represented by **Diagems FZC**
PRO SE

*Defendant*
------------------------
**Tri Color Gems FZE**                              represented by **Tri Color Gems FZE**
                                                                   PRO SE


*Defendant*
------------------------
**Pacific Diamonds FZE**                            represented by **Pacific Diamonds FZE**
                                                                   PRO SE


*Defendant*
------------------------
**Himalayan Traders FZE**                           represented by **Himalayan Traders FZE**
                                                                   PRO SE


*Defendant*
------------------------
**Unity Trading FZE**                               represented by **Unity Trading FZE**
                                                                   PRO SE


*Defendant*
------------------------
**Fine Classic FZE**                                represented by **Fine Classic FZE**
                                                                   PRO SE


*Defendant*
------------------------
**DG Brothers FZE**                                 represented by **DG Brothers FZE**
                                                                   PRO SE

| Filing Date | # | Docket Text |
|---|---|---|
|  |  |  |

| | | |
|---|---|---|
| 02/25/2020 | [1](#)<br>(190 pgs; 3 docs) | Adversary case 20-01054. Complaint against Ami Javeri, Purvi Mehta, Nehal Modi, Neeshal Modi, Central Park Real Estate, LLC, Central Park South 50 Properties, LLC, Trident Trust Company (South Dakota) Inc., Twin Fields Investments Ltd., Auragem Company Ltd., Brilliant Diamonds Ltd., Eternal Diamonds Corporation Ltd., Fancy Creations Company Ltd., Hamilton Precious Traders Ltd., Sino Traders Ltd., Sunshine Gems Ltd., Unique Diamond and Jewellery FZC, World Diamond Distribution FZE, Vista Jewelry FZE, Empire Gems FZE, Universal Fine Jewelry FZE, Diagems FZC, Tri Color Gems FZE, Pacific Diamonds FZE, Himalayan Traders FZE, Unity Trading FZE, Fine Classic FZE, DG Brothers FZE (Fee Amount $ 350.). Nature(s) of Suit: (13 (Recovery of money/property - 548 fraudulent transfer)), (02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) Filed by Vincent Edward Lazar on behalf of Richard Levin. (Attachments: # [1](#) Appendix A # [2](#) Schedules) (Lazar, Vincent) (Entered: 02/25/2020) |
| 02/25/2020 | | Receipt of Complaint( [20-01054-shl](#) ) [cmp,cmp] ( 350.00) Filing Fee. Receipt number A13794268. Fee amount 350.00. (Re: Doc # [1](#)) (U.S. Treasury) (Entered: 02/25/2020) |
| 02/26/2020 | [2](#)<br>(2 pgs) | Summons with Notice of Pre-Trial Conference issued by Clerk's Office with Pre-Trial Conference set for 4/30/2020 at 10:00 AM at Courtroom 701 (SHL), Answer due by 3/27/2020, (Ortiz, Carmen) (Entered: 02/26/2020) |
| 02/28/2020 | [3](#)<br>(4 pgs; 2 docs) | Application for Pro Hac Vice Admission *of Angela M. Allen* filed by Vincent Edward Lazar on behalf of Richard Levin. (Attachments: # [1](#) Proposed Order) (Lazar, Vincent) (Entered: 02/28/2020) |
| 02/28/2020 | [4](#)<br>(4 pgs; 2 docs) | Application for Pro Hac Vice Admission *of William A. Williams* filed by Vincent Edward Lazar on behalf of Richard Levin. (Attachments: # [1](#) Proposed Order) (Lazar, Vincent) (Entered: 02/28/2020) |
| 02/28/2020 | | Receipt of Application for Pro Hac Vice Admission( [20-01054-shl](#)) [motion,122] ( 200.00) Filing Fee. Receipt number A13804416. Fee amount 200.00. (Re: Doc # [3](#)) (U.S. Treasury) (Entered: 02/28/2020) |
| 02/28/2020 | | Receipt of Application for Pro Hac Vice Admission( [20-01054-shl](#)) [motion,122] ( 200.00) Filing Fee. Receipt number A13804416. Fee amount 200.00. (Re: Doc # [4](#)) (U.S. Treasury) (Entered: 02/28/2020) |
| 03/10/2020 | [5](#)<br>(2 pgs) | Order Signed On 3/10/2020, Granting Application For Pro Hac Vice Re: Angela M. Allen. (Related Doc # [3](#)) (Ebanks, Liza) (Entered: 03/10/2020) |
| 03/10/2020 | [6](#)<br>(2 pgs) | Order Signed On 3/10/2020, Granting Application For Pro Hac Vice Re: William A. Williams. (Related Doc # [4](#)) (Ebanks, Liza) (Entered: 03/10/2020) |
| 03/24/2020 | [7](#)<br>(16 pgs; 2 docs) | Motion to Authorize *Notice of Chapter 11 Trustee's Motion for Entry of an Order (I) Directing Issuance of an Additional Summons; (II) Authorizing Service on the UAE Defendants by International Registered Mail; (III) Setting Foreign Defendants' Time to Respond to the Complaint; (IV) Adjourning the Pretrial Conference; and (V) Granting Related Relief* (related document(s)[1](#)) filed by Vincent Edward Lazar on behalf of Richard Levin with hearing to be held on 4/7/2020 at 02:00 PM |

| | | |
|---|---|---|
| | | at Courtroom 701 (SHL) Responses due by 3/31/2020,. (Attachments: # 1 Exhibit A - Proposed Order) (Lazar, Vincent) (Entered: 03/24/2020) |
| 04/10/2020 | 8 (3 pgs) | Order Signed On 4/10/2020, (I) Directing Issuance of an Additional Summons; (II) Setting Foreign Defendants' Time to Respond to the Complaint; (III) Adjourning the Pretrial Conference; and (IV) Granting Related Relief (Related Doc 7) (Ebanks, Liza) **Docket Text Modified on 4/10/2020 (Bush, Brent)** (Entered: 04/10/2020) |
| 04/20/2020 | | Request for a Second Summons filed by Vincent Edward Lazar on behalf of Richard Levin. (Lazar, Vincent) (Entered: 04/20/2020) |
| 04/22/2020 | 9 (2 pgs) | **Second**Summons with Notice of Pre-Trial Conference issued by Clerk's Office with Pre-Trial Conference set for 6/23/2020 at 10:00 AM at Courtroom 701 (SHL), Answer due by 5/22/2020, (Ortiz, Carmen) (Entered: 04/22/2020) |
| 04/28/2020 | 10 (4 pgs) | Affidavit of Service *re: Complaint to Avoid and Recover Actual Fraudulent Transfers and for Damages for Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act [Adv. Docket No. 1] and Second Summons and Notice of Pretrial Conference in an Adversary Proceeding [Adv. Docket No. 9]* (related document(s)1, 9) filed by Omni Agent Solutions.(Osborne, Brian) (Entered: 04/28/2020) |
| 05/13/2020 | 11 (2 pgs) | Certificate of Service *re: Fancy Creations Company Limited* (related document(s)1, 8, 9) filed by Carl N Wedoff on behalf of Richard Levin. (Wedoff, Carl) (Entered: 05/13/2020) |
| 05/13/2020 | 12 (2 pgs) | Certificate of Service *re: Auragem Company Limited* (related document(s)1, 8, 9) filed by Carl N Wedoff on behalf of Richard Levin. (Wedoff, Carl) (Entered: 05/13/2020) |
| 05/13/2020 | 13 (2 pgs) | Certificate of Service *re: Brilliant Diamonds Limited* (related document(s)1, 8, 9) filed by Carl N Wedoff on behalf of Richard Levin. (Wedoff, Carl) (Entered: 05/13/2020) |
| 05/13/2020 | 14 (2 pgs) | Certificate of Service *re: Eternal Diamonds Corporation Limited* (related document(s)1, 8, 9) filed by Carl N Wedoff on behalf of Richard Levin. (Wedoff, Carl) (Entered: 05/13/2020) |
| 05/13/2020 | 15 (2 pgs) | Certificate of Service *re: Purvi Mehta (Also Known As Purvi Modi)* (related document(s)1, 8, 9) filed by Carl N Wedoff on behalf of Richard Levin. (Wedoff, Carl) (Entered: 05/13/2020) |
| 05/13/2020 | 16 (2 pgs) | Certificate of Service *re: Sunshine Gems Limited* (related document(s)1, 8, 9) filed by Carl N Wedoff on behalf of Richard Levin. (Wedoff, Carl) (Entered: 05/13/2020) |
| 05/13/2020 | 17 (2 pgs) | Certificate of Service *re: Sino Traders Limited* (related document(s)1, 8, 9) filed by Carl N Wedoff on behalf of Richard Levin. (Wedoff, Carl) (Entered: 05/13/2020) |
| 05/20/2020 | 18 (5 pgs) | Answer to Complaint (Related Doc # 1) filed by Marc Rowin on behalf of Trident Trust Company (South Dakota) Inc.. (Rowin, Marc) (Entered: 05/20/2020) |

| | | |
|---|---|---|
| 05/20/2020 | [19](#)<br>(2 pgs) | Corporate Ownership Statement . Filed by Marc Rowin on behalf of Trident Trust Company (South Dakota) Inc.. (Rowin, Marc) (Entered: 05/20/2020) |
| 05/21/2020 | | Request for a Third Summons *as to Central Park Real Estate, LLC* filed by Vincent Edward Lazar on behalf of Richard Levin. (Lazar, Vincent) (Entered: 05/21/2020) |
| 05/22/2020 | [20](#)<br>(2 pgs) | **Third**Summons with Notice of Pre-Trial Conference issued by Clerk's Office with Pre-Trial Conference set for 7/13/2020 at 10:00 AM at Courtroom 701 (SHL), Answer due by 6/22/2020, (Ortiz, Carmen) (Entered: 05/22/2020) |
| 05/22/2020 | [21](#)<br>(2 pgs) | Notice of Adjournment of Hearing */Pretrial Conference* filed by Vincent Edward Lazar on behalf of Richard Levin. (Lazar, Vincent) (Entered: 05/22/2020) |
| 05/22/2020 | [22](#)<br>(2 pgs) | Corporate Ownership Statement *Amended Corporate Ownership Statement*. Filed by Marc Rowin on behalf of Trident Trust Company (South Dakota) Inc.. (Rowin, Marc) (Entered: 05/22/2020) |
| 05/28/2020 | [23](#)<br>(4 pgs) | Affidavit of Service *re: Third Summons and Notice of Pretrial Conference in an Adversary Proceeding [Adv. Docket No. 20]* (related document(s)[20](#)) filed by Omni Agent Solutions.(Osborne, Brian) (Entered: 05/28/2020) |
| 05/28/2020 | [24](#)<br>(5 pgs) | Affidavit of Service *re: Notice of Adjournment of Pretrial Conference [Adv. Docket No. 21]* (related document(s)[21](#)) filed by Omni Agent Solutions.(Osborne, Brian) (Entered: 05/28/2020) |
| 05/29/2020 | [25](#)<br>(494 pgs; 3 docs) | Notice of Presentment */ Chapter 11 Trustee's Application for Issuance of a Letter Rogatory for Judicial Assistance in Service of Process* filed by Vincent Edward Lazar on behalf of Richard Levin. with presentment to be held on 6/5/2020 at 12:00 PM at Courtroom 701 (SHL) Objections due by 6/5/2020, (Attachments: # [1](#) Exhibit A # [2](#) Exhibit B)(Lazar, Vincent) (Entered: 05/29/2020) |
| 06/09/2020 | [26](#)<br>(6 pgs) | Amended Answer to Complaint filed by Marc Rowin on behalf of Trident Trust Company (South Dakota) Inc..(Rowin, Marc) (Entered: 06/09/2020) |
| 06/10/2020 | [30](#)<br>(5 pgs) | Answer to Complaint (Related Doc # [1](#)) filed by Brilliant Diamonds Ltd.. (Braithwaite, Kenishia) (Entered: 06/15/2020) |
| 06/12/2020 | [27](#)<br>(1 pg) | Notice of Appearance in Adversary Proceeding filed by Beth L. Kaufman on behalf of Central Park Real Estate, LLC, Central Park South 50 Properties, LLC. (Kaufman, Beth) (Entered: 06/12/2020) |
| 06/12/2020 | [28](#)<br>(1 pg) | Notice of Appearance in Adversary Proceeding filed by Patricia O'Prey on behalf of Central Park Real Estate, LLC, Central Park South 50 Properties, LLC. (O'Prey, Patricia) (Entered: 06/12/2020) |
| 06/12/2020 | [29](#)<br>(2 pgs) | Stipulation *and Order Extending Time to Respond to Complaint* Filed by Beth L. Kaufman on behalf of Central Park Real Estate, LLC, Central Park South 50 Properties, LLC. (Kaufman, Beth) (Entered: 06/12/2020) |

| | | |
|---|---|---|
| 06/15/2020 | **31**<br>(5 pgs) | Answer to Complaint (Related Doc # 1) filed by Sunshine Gems Ltd.. (Braithwaite, Kenishia) (Entered: 06/15/2020) |
| 06/17/2020 | **32**<br>(2 pgs) | Order Signed On 6/17/2020, Issuing Request For Judicial Assistance In Service Of Process (Letter Rogatory) (related document(s)25) (Ebanks, Liza) (Entered: 06/17/2020) |
| 07/01/2020 | **33**<br>(2 pgs) | So Ordered Stipulation And Order Signed On 7/1/2020, Regarding Scheduling Of Briefing. (Ebanks, Liza) (Entered: 07/01/2020) |
| 07/02/2020 | **34**<br>(2 pgs) | So Ordered Stipulation And Order Signed On 7/2/2020, Extending Time To Respond To Complaint Re: CPRE And CPS50 (Ebanks, Liza) (Entered: 07/02/2020) |
| 07/13/2020 | **35**<br>(1 pg) | Notice of Appearance filed by Roger J Bernstein on behalf of Ami Javeri, Nehal Modi. (Bernstein, Roger) (Entered: 07/13/2020) |
| 07/14/2020 | **36**<br>(2 pgs) | So Ordered Stipulation And Order Signed On 7/14/2020, Extending Time To Respond To Complaint Re: Javeri And Nehal Modi. (Ebanks, Liza) (Entered: 07/14/2020) |
| 08/04/2020 | **37**<br>(4 pgs) | Certificate of Service (related document(s)1, 8, 9) filed by Marc B. Hankin on behalf of Richard Levin. (Hankin, Marc) (Entered: 08/04/2020) |
| 09/15/2020 | **38**<br>(2 pgs) | First Motion to Dismiss Adversary Proceeding (related document(s)1) filed by Frederick D. Hyman on behalf of Purvi Mehta. (Hyman, Frederick) (Entered: 09/15/2020) |
| 09/15/2020 | **39**<br>(49 pgs) | Memorandum of Law (related document(s)38) filed by Frederick D. Hyman on behalf of Purvi Mehta. (Hyman, Frederick) (Entered: 09/15/2020) |
| 09/15/2020 | **40**<br>(3 pgs) | Declaration *of Purvi Modi a/k/a Purvi Mehta* (related document(s)38) filed by Frederick D. Hyman on behalf of Purvi Mehta. (Hyman, Frederick) (Entered: 09/15/2020) |
| 09/15/2020 | **41**<br>(3 pgs; 2 docs) | Certificate of Service (related document(s)38) filed by Frederick D. Hyman on behalf of Purvi Mehta. (Attachments: # 1 Exhibit Proposed Order) (Hyman, Frederick) (Entered: 09/15/2020) |
| 09/15/2020 | **42**<br>(41 pgs; 4 docs) | Motion to Dismiss Adversary Proceeding filed by Beth L. Kaufman on behalf of Central Park Real Estate, LLC, Central Park South 50 Properties, LLC. (Attachments: # 1 Memorandum of Law in Support of the Motion to Dismiss of Defendants Central Park Real Estate LLC and Central Park South 50 Properties LLC # 2 Declaration of Beth L. Kaufman # 3 Proposed Order) (Kaufman, Beth) (Entered: 09/15/2020) |
| 09/15/2020 | **43**<br>(4 pgs) | Motion to Dismiss Case *(Counts 1 and 2)* filed by Roger J Bernstein on behalf of Ami Javeri. (Bernstein, Roger) (Entered: 09/15/2020) |
| 09/15/2020 | **44**<br>(21 pgs) | Motion to Dismiss Case -*Memorandum of Law In Support of Ami Javeri's Motion to Dismiss* (related document(s)43) filed by Roger J Bernstein on behalf of Ami Javeri. (Bernstein, Roger) (Entered: 09/15/2020) |

| 09/15/2020 | 45 (2 pgs) | Motion to Dismiss Case - *Proposed Order Granting Motion* (related document(s)43, 44) filed by Roger J Bernstein on behalf of Ami Javeri. (Bernstein, Roger) (Entered: 09/15/2020) |
|---|---|---|
| 09/15/2020 | 46 (3 pgs; 2 docs) | Motion to Dismiss Case *for Failure to State Claim* filed by Roger J Bernstein on behalf of Nehal Modi. (Attachments: # 1 Exhibit Proposed Order Granting Motion) (Bernstein, Roger) (Entered: 09/15/2020) |
| 09/15/2020 | 47 (23 pgs) | Memorandum of Law *i/s/o Nehal Modi's Motion to Dismiss* filed by Roger J Bernstein on behalf of Nehal Modi. (Bernstein, Roger) (Entered: 09/15/2020) |
| 09/17/2020 | 48 (1 pg) | Notice of Appearance in Adversary Proceeding filed by Sarah Fehm Stewart on behalf of Purvi Mehta. (Stewart, Sarah) (Entered: 09/17/2020) |
| 09/17/2020 | 49 (1 pg) | Certificate of Service *of Motion to Dismiss* (related document(s)42) Filed by Beth L. Kaufman on behalf of Central Park Real Estate, LLC, Central Park South 50 Properties, LLC. (Kaufman, Beth) (Entered: 09/17/2020) |
| 09/21/2020 | 50 (1 pg) | Notice of Appearance filed by Benjamin Suess on behalf of Neeshal Modi. (Suess, Benjamin) (Entered: 09/21/2020) |
| 09/23/2020 | 51 (1 pg) | Notice of Appearance in Adversary Proceeding filed by Mauro Wolfe on behalf of Purvi Mehta. (Wolfe, Mauro) (Entered: 09/23/2020) |
| 09/23/2020 | 52 (1 pg) | Notice of Appearance in Adversary Proceeding filed by Evangelos Michailidis on behalf of Purvi Mehta. (Michailidis, Evangelos) (Entered: 09/23/2020) |
| 10/02/2020 | 53 (2 pgs) | So Ordered Stipulation And Order Signed On 10/2/2020, Extending Time For Neeshal Modi To Respond To Complaint. (Ebanks, Liza) (Entered: 10/02/2020) |
| 10/02/2020 | 54 (4 pgs) | So Ordered Stipulation Signed On 10/2/2020, Regarding Scheduling Of Briefing. (Ebanks, Liza) (Entered: 10/02/2020) |
| 10/15/2020 | 55 (2 pgs) | Motion to Dismiss Case filed by Benjamin Suess on behalf of Neeshal Modi Responses due by 12/4/2020,. (Suess, Benjamin) (Entered: 10/15/2020) |
| 10/15/2020 | 56 (410 pgs; 9 docs) | Motion to Dismiss Adversary Proceeding filed by Benjamin Suess on behalf of Neeshal Modi. Responses due by 12/4/2020, (Attachments: # 1 Exhibit Proposed Order # 2 Exhibit Neeshal Declaration # 3 Exhibit Ex A - Complaint # 4 Exhibit Ex B - resignation letters and resolutions # 5 Exhibit Ex C - VDK Forensic # 6 Exhibit Ex D - PWC Forensic # 7 Exhibit Ex E - CBI email # 8 Memorandum of Law) (Suess, Benjamin) (Entered: 10/15/2020) |
| 10/23/2020 | 57 (7 pgs) | Certificate of Service (related document(s)1, 8, 9) filed by Marc B. Hankin on behalf of Richard Levin. (Hankin, Marc) (Entered: 10/23/2020) |
| 11/25/2020 | 58 (6 pgs; 2 docs) | Motion to Allow- *Trustee's Motion For Leave To Exceed Page Limit For Omnibus Brief In Opposition To Defendants' Motions To Dismiss* filed by Vincent Edward Lazar on behalf of Richard Levin. (Attachments: # 1 Exhibit A - Proposed Order) (Lazar, Vincent) (Entered: 11/25/2020) |

| | | |
|---|---|---|
| 12/02/2020 | <u>59</u><br>(2 pgs) | Order Signed On 12/2/2020, Granting Trustee's Motion For Leave To Exceed Page Limit For Omnibus Brief In Opposition To Defendants' Motion To Dismiss. (Related Doc # <u>58</u>) (Ebanks, Liza) (Entered: 12/02/2020) |
| 12/04/2020 | <u>60</u><br>(96 pgs) | Omnibus Opposition / *Trustee's Omnibus Opposition to Defendants' Motions to Dismiss* (related document(s)<u>47</u>, <u>56</u>, <u>39</u>, <u>44</u>, <u>42</u>) filed by Richard B. Levin on behalf of Richard Levin. (Levin, Richard) (Entered: 12/04/2020) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/21/2020 16:25:46 | | | |
| **PACER Login:** | jb0014 | **Client Code:** | 56637-10078 |
| **Description:** | Docket Report | **Search Criteria:** | 20-01054-shl Fil or Ent: filed From: 12/7/2000 To: 12/21/2020 Doc From: 0 Doc To: 99999999 Headers: included Format: html Page counts for documents: included |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |