UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                        :      Case No. 18-10509 (SHL)
In re                                                   :
                                                        :
FIRESTAR DIAMOND, INC., et al  :                               Jointly Administered
                                                        :
                   Debtors.                             :
_____x
RICHARD LEVIN, Chapter 11 Trustee of:                   :
FIRESTAR DIAMOND, INC., FANTASY INC,                    :
And OLD AJ, INC. f/k/a A. JAFFE, INC.:                  :      Adv. Proc. No. 20-01054 (SHL)
                                                        :
                                                        :
                                                        :
                             Plaintiff,                 :
                                                        :
v.                                                      :
                                                        :
AMI JAVERI (A/K/A AMI MODI), et al                      :
                                                        :
                                                        :
_____                :


# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION TO DISMISS OF DEFENDANTS CENTRAL PARK REAL ESTATE LLC AND CENTRAL PARK SOUTH 50 PROPERTIES LLC


**DUFFYAMEDEO LLP**
275 Seventh Avenue, 7th Floor
New York, NY 10001
Tel: (212) 729-5832
Todd E. Duffy
Douglas A. Amedeo
*Counsel to Central Park Real Estate LLC and*
*Central Park South 50 Properties LLC*

## TABLE OF CONTENTS

*PRELIMINARY STATEMENT*......................................................................................................*1*

*LEGAL ARGUMENT* .................................................................................................................*2*

   **A.**   **The RICO Claims Against the LLCs Fail to Satisfy the Pleading Standards**..............2

   **B.**   **The Complaint's Fraudulent Transfer Claims Against CPRE Fail to State a  Claim Upon which Relief May be Granted**......................................................................................14

   **C.**   **Additional Legal Bases for Dismissal**.........................................................................18

*CONCLUSION* .........................................................................................................................*19*

# TABLE OF AUTHORITIES

## Cases

*Amusement Indus. v. Stern*, 293. F.R.D. 420, 438 (S.D.N.Y. 2013) .................................................8

*Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)........................................................................9, 11

*Cadle Co. v. Newhouse*, 74 F. App'x 152, 153 (2d Cir. 2003) ...................................................19

*Capmark Fin. Group Inc. v. Goldman Sachs Credit L.P.*, 491 B.R. 335, 349 (S.D.N.Y. 2013) ...............13

*Chiomenti Studio Legale, LLC v. Prodos Capital Mgt. LLC*, 2015 N.Y. Misc. LEXIS 688 at *9 (Sup. Ct. N.Y. Co.) (March 5, 2015) ............................................................................................................14

*Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F. Supp. 435, 451 (E.D.N.Y. 1997).......5

*De la Rouche v. Calcagnini*,  1997 U.S. Dist LEXIS 7664 at * (S.D.N.Y. 1997)....................................10

*Hecht v. Commerce Clearing House, Inc*., 897 F.2d 21, 25 (2d Cir. 1990) ...............................................5

*McCord v. Ally Fin. Inc*., 559 B.R. 41, 64 (E.D.N.Y. 2016) ...................................................................20

*O'Toole v. Karnani*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011) ..........................................................19

*Salinas v. United States*, 522 U.S. 52, 65 (1997)....................................................................................5

*Sears, Roebuck & Co. v. Sears PLC*, 744 F. Supp. 1297, 1304-05 (D. Del. 1990) ..................................15

*Tae H. Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 619 (S.D.N.Y. 2018) ..................................................19

*United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994) ............................................5, 13

*United States v. Stephenson*, 183 F.3d  110, 121 (2d Cir. 1999) ........................................................8, 13

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Woods*, 752 A.2d 1175, 1883-84 (1999) ..................................................................................................................................................14, 15

## Statutes

18 U.S.C. §§ 1956, 1957 ...........................................................................................................4

18 U.S.C. §§ 2314, 2315 ...........................................................................................................4

Defendants Central Park Real Estate LLC ("CPRE") and Central Park South 50 Properties LLC ("CPS50") (collectively, the "LLC's" or the "Central Park Defendants") respectfully submit this Response in further support of their initial memorandum of law for their motion to dismiss (Dkt. No. 42) (the "Initial Brief" or "Int. Br.") and in response to the Trustee's Omnibus Opposition to Defendant's Motions to Dismiss ("Pl. Op. Br.") filed by the chapter 11 trustee, Richard Levin (the "Trustee") on behalf of Debtors FDI, Fantasy, and Jaffee.[1]

## PRELIMINARY STATEMENT

The Complaint tells the tale at complex length of an allegedly massive scam against one purported victim, PNB, a foreign bank controlled by the government of India. Throughout the Complaint's one hundred pages of allegations, the Central Park Defendants play the smallest role imaginable among the Defendants. They are not alleged to have conducted any business other than to hold passively a single real estate asset each, while others transferred those assets, purportedly with intent to further a RICO scheme. Both assets are located in New York City, far from the alleged LOU fraud alleged in the Complaint, which largely involve India and other places in Asia. The assets are residences held for the benefit of Nirav Modi ("Modi") and his wife, Ami Javeri ("Javeri").  Modi is the alleged mastermind of the purported RICO scheme. The assets exist within the Court's jurisdiction, and have not unexpectantly drawn the interest of the Trustee. For the reasons discussed in the Central Park Defendants' Initial Brief and detailed below, the RICO and state law claims against these passive entities fail at the pleading stage and must be dismissed.

Dismissing the LLCs as defendants would cause no prejudice to the Trustee. Naming them makes no more sense than naming individual bank accounts or other assets as individual

---

[1] Capitalized terms not defined herein will have the meanings ascribed to them in the LLC's Initial Memorandum or the Trustee's Memorandum.

1

defendants. In fact, it makes less sense, for real estate assets are not in danger of being transported out of the Court's jurisdiction. Their inclusion merely necessitates a longer caption, produces additional complications for this Court, and creates needless legal expense for all parties.

## **LEGAL ARGUMENT**

### A.      The RICO Claims Against the LLCs Fail to Satisfy the Pleading Standards

Count 1 of the Complaint, the primary RICO claim against all Defendants based upon a RICO conspiracy (18 U.S.C. § 1962(d), essentially encompasses all of the Complaint's allegations into a single RICO enterprise involving money laundering (18 U.S.C. §§ 1956, 1957) and violations of the National Stolen Property Act (18 U.S.C. §§ 2314, 2315). The RICO allegations against CPS50 are summarized in Paragraph 451 of Count 1, while those against CPRE are summarized in Paragraph 452 of Count 1. Other than "guilt by association" allegations (discussed below) equating control by alleged RICO perpetrators with *de facto* involvement in the entire enterprise, the allegations involving the LLCs solely involve the transfer of the two residential properties that each entity held as legal title holders.

The Complaint is a long rendition of myriad other transfers allegedly conducted as predicate acts of money laundering. The LLCs are not alleged to have any involvement with these, events even as fellow conspirators, and for the overwhelming part, these acts are alleged to have preceded the transactions in which the LLCs were allegedly implicated. The fact that money may have been laundered by "Shadow Entities" or repeatedly laundered *prior* to any use involving the LLCs has no bearing upon the liabilities of the LLCs.

As to each LLC, the law requires that the Trustee show *each entity's* liability in connection with money laundering as to those specific transactions in which *each entity's* involvement is

2

alleged.   As discussed below, that remains true even when the claim asserted is limited to conspiracy. That is, the Trustee "must prove that *the specific transactions in question* were designed, at least in part, to launder money, not that the transactions involved money that was previously laundered through other means." *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994) [emphasis added].

This follows as well for a RICO conspiracy claim. "Congress intended the 'to conspire' phrase [in the RICO statute] to have its ordinary meaning…a conspirator must intend to further an endeavor which, if completed, would satisfy all the elements of a substantial criminal offense [.]" *Salinas v. United States*, 522 U.S. 52, 65 (1997), *see also*, *Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F. Supp. 435, 451 (E.D.N.Y. 1997) (stating that properly pleaded RICO conspiracy complaint must specify the predicate acts that an individual defendant agreed to commit.).  Accordingly, "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Commerce Clearing House, Inc*., 897 F.2d 21, 25 (2d Cir. 1990)

No allegations as to the LLCs are made in the Complaint as to direct evidence of conspiratorial intent to commit any crime. In his opposition, the Trustee does not deny this.  Rather, he doubles down on more of the same, making plain that  the evidence as alleged against the LLCs is solely circumstantial, and founded upon only two elements: (1) that the control persons of the LLCs were participants in other aspects of the alleged RICO enterprise, in which the LLCs were not alleged and that (2) the transactions involving the LLCs furthered the criminal intentions of the enterprise.  Complaint, ¶¶ 451, 452; *see also*, Tr. Op. Br. at 40 ("[T]he Trustee alleged facts sufficient to treat…BPRE and CPS50 as alter egos or mere instrumentalities of Nirav Modi, which is itself sufficient to trigger conspiratorial liability.").

3

The circumstantial evidence provided in the Complaint certainly does not allege that every action by the participants must be viewed, as a matter of law, as steps in furtherance of the RICO fraud. Far from being a criminal enterprise, the jewelry business that allegedly supported the "RICO enterprise" is, as described in the Complaint's own narrative, a legitimate business.

Prior to the alleged "racketeering activities" it was for a long time, according to the Trustee, "a legitimate business built on fruitful relationships with reputable customers." Complaint, ⁋ 440. "[T]he Firestar Entities operated several legitimate business lines, including wholesale diamond and jewelry sales, speculative loose diamond trading, and eventually jewelry design and retail through Nirav Modi-branded boutiques in major cities around the world." Trustee's Opposition Brief ("Tr.. Op. Br") at 3.

The Complaint must point this out because the interests of the Debtors require that each be seen as Firestar Entities that conducted legitimate businesses in order to qualify to claim legitimate damages. For example, the Complaint details allegedly duplicate accounting practices for Jaffe in 2012, in which legitimate sales of $9,090,661 were booked for tax purposes, while other books were allegedly shown to the bank examiner reflecting inflated sales of $49,628,873. Complaint, ⁋ 128. The Complaint avers that such double bookkeeping to reflect actual sales and fictitious sales to mislead banking officials was an established practice for Firestar Entities. Complaint, ⁋ 127. Indeed, these allegations indicate that activities of the Firestar Entities concurrently produced many millions of dollars of *legitimate* business.

Nor were the Firestar Entities conducting a business of phantom assets. The Complaint describes alleged looting prior to the Debtor's bankruptcy filing of tens or even hundreds of millions of dollars in actual jewelry inventory. Complaint ⁋⁋ 195-196. According to the Complaint, in early 2018, four American boutiques alone shipped out inventory that had "a total

value of approximately $40 million." Complaint, ¶ 198. Also, according to the Complaint, tens of millions of dollars in jewelry inventory were shipped between points in Asia between December 2017 and January 2018.  *See, e.g.* Complaint ¶¶ 195, 196.  In addition, the Trustee represents that, as the end neared, active Nirav Modi-branded retail boutiques conducting legitimate sales were closed in "major cities around the world." Tr. Op. Br. at 3.

The Complaint makes no effort to quantify the proceeds of "legitimate business lines" versus the fruits of alleged bank fraud.  It may be that the picture the Trustee wishes to paint is that every dollar generated by the Firestar Entities was suspect.  However, the Trustee does not, and cannot, reconcile that with his assertion of the continuance of the legitimate business *at all stages* of the alleged RICO enterprise. *See, e.g.*, Tr. Op. Br. at 21 ("[T]he Substantive Conspirators committed these predicate acts in the course of conducting the affairs of the otherwise-legitimate Firestar Entities [.]").  It may serve the Trustee's pleading convenience to blur the crucial distinction between business-generated and fraud-generated money; however, it is this lack of clarity that broadcasts the fallibility of his complaint.

The picture is further muddied by the fact that the Complaint alleges strenuous efforts were also being made to conceal *all assets* from creditors, a situation where the nature of the source of the proceeds involved in transfers would logically not matter, since the point would be concealment not of the source but of the existence of such funds.  *See, e.g.*, Complaint, ¶¶ 195, 196 (describing efforts to conceal both funds and jewelry).

The complex transactions set forth in the Complaint involving funds connected to the purchase of the Ritz Carlton Apartment (see, Complaint ¶¶ 313-348)—the basis for the RICO conspiracy claim against CPS50—allegedly recount steps taken by various Defendants in order to purchase the residence and serially transfer the ownership of that residence in steps to the Ithaca

5

Trust, a family trust. The dark recounting of this series of transactions with quotation marks placed around words like "loan" and invocations of the "Shadow Entities" cannot make up for the Complaint's failure to allege, as a first step, the necessary fact relating to the origin of those funds as *criminal proceeds*.

The claim of "money laundering" requires "proof of intent to conceal…*ill-gotten gains*." *United States v. Stephenson*, 183 F.3d  110, 121 (2d Cir. 1999) [emphasis added].  Here, the Complaint alleges that "according to the India ED" a significant portion of the funds used in the subject transactions came indirectly from Fine Classic, a "Shadow Entity". Complaint ¶ 314. Accordingly, the Trustee's crucial allegation that the money utilized was "ill-gotten gains" turns only upon a statement of the India ED, while no factual basis for that conclusion is alleged.

Even if accepted as a pleaded fact, rather than a mere second-hand conclusory statement, it is insufficient. Indeed, the Complaint itself admits that hundreds of millions of dollars of legitimate business flowed through the constituent businesses.  The allegation that such money was believed by the India ED to have come from a "Shadow Entity" or from a combination of Shadow Entities, does not in and of itself  rule out that the funds were proceeds of legitimate business. The Complaint itself alleges constant "circular" transactions between the Shadow Entities and the legitimate Firestar Entities. *See, e.g*., Complaint ¶ 106.

Similarly, the money to retire the mortgage on the Essex House apartment as part of the scheme allegedly involving CPRE is simply identified in the Complaint as "funds originally from Jaffee and Fantasy as well as FDI's own account and from an HSBC line of credit."  Complaint, ¶ 351.  Were the funds "ill-gotten gains"?  The allegation does not allege that to be a fact.

While the Trustee describes these transactions as "complex", that characterization is immaterial.  A complex series of transactions does not in and of itself, *per se*, equate to a money

laundering chain.  *See, e.g., Amusement Indus. v. Stern*, 293. F.R.D. 420, 438 (S.D.N.Y. 2013) ("Amusement points to a number of transfers from and back to the escrow account that appear suspicious and unnecessary. However, Amusement has not shown probable cause to believe that Stern designed these transfers in whole or in part to conceal or disguise the source, ownership, or control of the proceeds." [citations omitted]).

The Complaint itself provides support for the position that mere complexity alone does not equate to active concealment, for it details the multi-step ownership transactions involving CPRE and the Essex House Apartment during the period 2007-2009. Complaint, ¶ 285. Because the Complaint does not date the onset of the alleged bank fraud until 2010, these earlier steps are admitted not to be part of the alleged scheme to launder money. Complaint, ¶ 62.  Accordingly, the Trustee himself illustrates that complexity in such transactions can be perfectly legitimate.

Nor are the purchase of multimillion dollar real estate through corporate nominees nor the transfer into a family trust of the interest in residential real estate the kind of steps that in themselves could have no legitimate purpose. Nor are such steps *per se* "badges" of fraud.

Because the mere form the transactions took fail to indicate an "intent to conceal", the Trustee assumes the Debtor's motives to conceal and then relies upon those same assumed motives as the telling indicators. Thus, the Court is being asked first to accept the Trustee's fictional motives and then to deem those same motives as sufficient indicators of an intent to conceal assets in the transactions involving the LLCs.  These attempts as alleged fall far short of the plausibility requirements set down by the U.S. Supreme Court.

To survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is *plausible* on its face."  *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007) [emphasis added].  In the context of a RICO claim alleging money laundering, those *plausible* allegations

must "raise the required strong inference of fraudulent intent." *De la Rouche v. Calcagnini*, 1997 U.S. Dist LEXIS 7664 at * (S.D.N.Y. 1997). The motives alleged by the Trustee on their face completely fail because they lack plausibility.

One purported motive suggested by the Trustee for the transactions involving the LLCs is that a massive restructuring of the Firestar Entities was undertaken in order to arrange an IPO, with the proceeds to pay off the Indian bank loans Tr. Opp. Br. at 5 ("The conspirators' ultimate plan was to raise outside capital through an initial public offering of FIPL, which they would then use to pay off the outstanding LOU's before they got caught.")  According to the Trustee, the transfers involving the LLCs were allegedly engineered solely because the perpetrators were in fear that PNB would soon discover the fraud due to the imminent retirement of their PNB inside agent.  *Id*. at 29, 30 ("[Purvi] used funds she received from the Shadow Entities and Firestar Entities to acquire the Essex House Apartment and Ritz Carlton Apartment for Nirav and Ami through an asset-protection trust controlled by Nirav just before the last batch of LOU's became due and the fraud was exposed.").

This IPO theory is nonsensical. The Trustee fails to explain why individuals committing a massive fraud, supposedly fearing imminent discovery of their machinations, would arrange as their "escape plan" a huge multi-billion dollar Initial Public Offering.  This is especially confusing because an IPO would necessarily subject them to a notoriously protracted process which would bring intense independent scrutiny to their books, records, and business dealings.  This would not achieve the alleged purpose of avoiding scrutiny.  No facts are pled as to the existence of this escape plan motive–other than merely conclusory allegations in "factual dress" describing the alleged secrecy of the planning, such as the allegation that discussions concerning the restructuring were conducted using WhatsApp "one of the messaging services the co-conspirators used to

conceal their communications." Tr. Op. Br. at 29. Would the communications have been less suspect if the alleged perpetrators utilized WeChat?

Even assuming an IPO was in the works, the transfer of ownership interests in residential apartments hardly equated to *per se* suspect acts. The transactions reflect removal of non-income producing family residences from a family-owned business into a family trust prior to packaging the business for an IPO—if in fact such an IPO was contemplated.

Since an IPO, in effect, is a sale of assets to the public, there is simply no basis to legally *infer* criminal intent in a family's decision not to include their non-incoming producing, personal homes in the sale of that business to the public. In fact, the transfers were exactly what might be expected to take place legitimately in such a situation.

Another motive suggested by the Trustee is that the LLCs' transactions were part of a looting scheme to deny assets from the U.S. Affiliates and their bankruptcy process.  Tr. Op. Br. at 16.  To fit the LLC's transactions into what the Trustee terms the "Looting Scheme", the Court would need to give credence to the Trustee's version of how the perpetrators planned to protect the assets from detection and capture. First, the assets, in the form of money secreted in bank accounts in Asia controlled by Shadow Entities was transferred to the US to secretly finance certain allegedly sham "loan" transactions among members of Nirav Modi's family, resulting in the transfer of the LLCs' two residential apartments away from all legal connections to the Firestar Entities and into the Ithaca Trust. Complaint ¶¶ 313-338.

As motive, this is absurd on its face and accordingly fails to meet the *Twombly* instruction that, to avoid dismissal, a complaint must allege facts facially "plausible." *Twombly,* 550 U.S. at 570.  The Trustee's alleged transaction begins with money allegedly hidden in Asia in alleged Shadow Entities, that is, in bank accounts of entities created allegedly for the express purpose of

concealing their connections with the Firestar Entities.  Presumably, by being (1) in Asia; and (2) being secreted in the accounts of disguised entities this money was insulated and beyond the ordinary reach of the U.S. bankruptcy process.

Yet, instead of keeping that money secluded in carefully disguised shells, the Debtors transferred that money from the Shadow Entities in Asia, which is out of this Court's jurisdiction, to the U.S., which is within this Court's jurisdiction.  It also lost the protection of its legal identification with the Shadow Entities and became expressly connected to members of Nirav Modi's family in the process.  It was then, according to the Complaint, transformed from a liquid asset into Manhattan real estate.  The ownership interests of that Manhattan real estate were then transferred into a trust for the benefit of Nirav Modi family; with Modi's own parents as residual beneficiaries (Complaint, ¶ 323) a fact expressly stated in legal papers prepared by a large reputable New York law firm hired by Modi and duly filed with state authorities.  Complaint, ¶¶ 317-334. Finally, the properties were expressly utilized and held out to the world as personal residences of Nirav Modi, the alleged head of the RICO enterprise.

Thus, according to the Trustee, the LLCs joined a conspiracy of criminal intent to conceal assets from the U.S. bankruptcy process by participating in a series of open and public transactions that *at every step* of "concealment" made those assets more readily concentrated, identifiable, and reachable by the very bankruptcy process that the Trustee claims the participants wished to frustrate.  No sensible "plausibility" can be ascribed to such allegations as satisfying the pleading requirements for stating a claim of intent to conceal sufficient to allege money laundering.

Lacking allegations relating to any plausible predicate act involving the LLCs, the Trustee cannot now tie them to a RICO conspiracy involving predicate acts.  That the Complaint alleges predicate acts without the alleged participation of the LLCs is of no moment to pleading a RICO

conspiracy claim against the LLCs.  That the transactions involving the LLCs involved tens of millions of dollars flowing in from the Firestar Entities and possibly involved funds from LOU's does not by itself state a claim for conspiracy involving money laundering against the LLCs. "[T]he money laundering statute does not criminalize the mere spending of proceeds from specified unlawful activity."  *United States v. Stephenson*, 183 F.3d 110, 120 (2d Cir. 1999), *see also, United States v. Garcia-Emanuel*, 14 F. 3d 1469, 1476 (10th Cir. 1991)(observing that money laundering statute "is a concealment statute—not a spending statute.").

In its Opposition, the Trustee also asserts as part of his RICO conspiracy claim a sort of catch-all argument that the LLCs were mere "instrumentalities" and thus all acts of their controllers essentially become adopted as intended actions joined in by the LLCs and thus all acts, even those facially legitimate, taken by the LLCs were acts of concealment[2].  Tr. Op. Br. at 40.

This sweeping argument comes close to suggesting that all closely-held LLCs are alter egos, essentially automatically pierced once a claim of fraud exists against their control persons as to other entities they control. This "domino theory" of corporate piercing has no basis in law.  Nor is there a requirement in law that LLCs or family trusts have "independent" directors, or that the lack of independent directors equates to mere "alter ego" status.

While the Trustee cites no case law for the theory that alter ego status suffices to establish membership in a RICO conspiracy, this need not be decided as the Complaint falls short of alleging an alter ego relationship since the Trustee has not made the non-conclusory allegations actually "necessary to a veil-piercing claim" in law. *See, e.g*., *Capmark Fin. Group Inc. v. Goldman Sachs Credit L.P*., 491 B.R. 335, 349 (S.D.N.Y. 2013)(stating that the party seeking the "extraordinary

---

[2] Any implication in the Trustee's arguments that the LLCs were created solely to play their parts in the concealment of the subject fraud plainly fails in the case of CPRE, which the Complaint admits was created years before the alleged onset of the bank fraud.  Complaint, ¶ 285.  See, *infra*, at 13.

remedy" of veil-piercing must allege facts demonstrating corporate funds were improperly commingled, the entity was undercapitalized or other corporate formalities were regularly disregarded); *see also*, *Chiomenti Studio Legale, LLC v. Prodos Capital Mgt. LLC*, 2015 N.Y. Misc. LEXIS 688 at *9 (Sup. Ct. N.Y. Co.) (March 5, 2015) (finding that New York law comports with Delaware law on the standards for piercing the corporate veil).

The Trustee bases his RICO conspiracy claim against the LLCs almost exclusively upon the allegation that "CPRE and CPS50 knowingly assented to the RICO conspiracy." Tr. Op. Br. at 40. The basis for this conclusion, however, is merely *implied* consent—there is no direct proof alleged—because the LLCs are allegedly "alter egos or mere instrumentalities of Nirav Modi, which is itself sufficient to trigger conspiratorial liability" and because the LLC's are "nothing more than contrivances used by the Modi family to shield…their ill-gotten wealth from creditors." *Id*.; Complaint ¶ 6. The Complaint fails to articulate even the barest non-conclusory factual allegations to substantiate these conclusions.

According to the Trustee, "[u]nder Delaware law, courts disregard the corporate veil when an entity is exclusively dominated and controlled by its alleged alter ego and exists for no other purpose than as a vehicle for fraud." Tr. Op. Br. at 40. The Trustee cites to *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Woods*, 752 A.2d 1175, 1883-84 (1999) as support for this proposition. *Id*.

The Trustee's reliance on *Wallace* is to his detriment. *Wallace* was a case involving a limited partnership, where the court held that a limited partnership's veil might be pierced where the plaintiff accomplishes the "difficult task" of demonstrating that a parent or officer has "exclusive domination and control…to the point that the General Partner no longer has legal or independent significance of his own." *Id*. at 1184 [quotations omitted]. To apply the same standard

12

to a closely held LLC (a situation that *Wallace* does not involve) would likely sweep in a majority of closely-held family LLCs, especially of the kind here at issue, that exist as legal entities consisting of one or two members to hold a single real estate asset. Such entities do not conduct business, and were not created to conduct business, and hence no expectation exists of the kind of independence dealt with in *Wallace.* To enforce such a requirement *per se* would effectively render the corporate entity designation of LLC irrelevant in such cases.

That such entities may have perfectly legitimate existences is effectively conceded by the Complaint, which notes that CPRE's establishment predated the alleged bank fraud by several years. Complaint ⁋ 62. In fact, the Trustee correctly notes that domination in and of itself is not sufficient, but that it must also be shown that the entity "exists for no other purpose than as a vehicle for fraud." Tr. Op. Br. at 40. The Trustee does not – and cannot – assert such a claim. Moreover, the court in *Wallace* stated the standard more rigorously, instructing that to pierce the veil "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Wallace*, at 752 A.2d. at 1184. As noted, the Trustee has conceded that CPRE came into existence for legitimate purposes preceding any alleged fraud, and if its sole purpose then—to serve as the legal holder of title in a single real estate asset—was in itself, legitimate *then*—then the creation of CPS50 to perform the same sole function could not be illegitimate *per se*. Since the LLCs are alleged to have done no other act then to continue to serve as the legal forms of the ownerships, there simply was no fraud.

Mere association cannot render a corporation pierceable. Nor is mere close ownership adequate by tself to show the legally necessary "domination." To show domination under Delaware law, a plaintiff must show that the defendant utilized its "corporate form" to commit fraud. *Sears, Roebuck & Co. v. Sears PLC*, 744 F. Supp. 1297, 1304-05 (D. Del. 1990). Moreover,

13

such act of fraud "must be *distinct* from the wrong alleged in the complaint." *Id*. at 1305 [emphasis added]. No distinct fraudulent act is attributed to either LLC. Rather, both are alleged to have done no more than serve as legal holders of the real estate transactions. These allegations fall far short of standard set in both *Wallace and Sears, Roebuck* above. Accordingly, the standard for alleging fraudulent domination sufficient for the "difficult task" of piercing the corporate veil has not been met. *Wallace*, 752 A. 2d. at 118.

### B.    The Complaint's Fraudulent Transfer Claims Against CPRE Fail to State a Claim Upon which Relief May be Granted[3]

As discussed in the Initial Brief, the claims the Trustee attempts to assert against CPRE upon theories of fraudulent transfer fail because the Complaint itself admits that the Debtors received fair consideration and because the Trustee's allegations that the Debtors were insolvent is not plausible. Int. Br. at 15-16.

In response, the Trustee argues that actual fraud has been adequately alleged. In supporting this, the Trustee seeks to label the surrounding circumstances of the subject transfers of ownership of the Essex House residence with the "traditional badges of fraud" and alleges that these transfers took place in the midst of the "broader fraud alleged in the Complaint." Tr. Op. Br. at 63. The Trustee summarizes "the traditional badges of fraud" in this case to include: (1) the close connections between the participants in the transfers ("all of which were controlled by the Modi family"), (2) the "haste" in which the transaction occurred "before the LOU's became due and the fraud was exposed", (3) the fact that the Modi family remained in control of the property after the transfers, and (4) "the fact that the mortgage payoff and divestment of CPRE were secretly

---

[3] The Complaint does not assert a fraudulent transfer claim against CPS50.

financed with funds funneled through Purvi." *Id*. This, however, is an oversimplification of complex facts.

The transfer at the heart of the claim against CPRE was a transfer expressly between a closely-held family business and a closely-held family trust. Accordingly, the fact that the parties were "controlled by the Modi family" or that the end result "remained" in control of the Modi family are not facially fraudulent facts. Rather, these facts are consistent with legitimate behavior and even comport with the Trustee's assertions that an IPO was ultimately intended.

Thus the transfer of ownership of a family residence essentially out of the assets to be conveyed by an IPO and to remain a family-owned asset is consistent with a legitimate purpose. The Trustee's attempts to link the IPO with a "broader fraud" is immaterial. In reality, the entirety of the allegations pled against CPRE involve a legitimate transfer within what the Complaint itself alleges were preparations to package an IPO. The "haste" in which the transactions occurred (2) is a nonsensical allegation. Is there a normal speed in which such transactions should occur? If so, the Complaint does not allege it, nor does it allege that the process was unusually expedited or suspiciously abbreviated.

Finally the alleged fact that "the mortgage payoff and divestment of CPRE were secretly financed with funds furnished through Purvi" (4), even if deemed true for purposes of this motion, fails to adequately allege an intent to commit actual fraud. As discussed above, the end result of the transfers was not the concealment of the Essex House ownership behind the Shadow Entities, but the channeling of that ownership into a family trust, while maintaining the residence overtly as the residence of Nirav Modi and his family. If, as the Trustee alleges, Nirav Modi and his alleged co-conspirators were at the time deeply panicked about the Bank Fraud coming apart and in "haste" to commit a new fraud involving CPRE and the ownership of the Essex House residence,

15

the *increased* identification of that ownership with Nirav Modi would not have provided insulation from the fallout generated by that fraud.  Yet that remains central to the Trustee's actual fraud claim.

As to the state law constructive fraud claim, the entirety of the Trustee's rationale that CPRE did not receive the transfers in good faith rests upon the alleged fraudulent intent that underlies his actual fraud claim (Tr. Op. Br. at 64) and thus fails for the reasons discussed above. The allegations as to FDI's insolvency at the time of the transfers rest entirely upon attenuated inference, based upon "the seizure by Indian authorities of the Modi-Controlled Entities in India [*i.e.* not FDI] [which] resulted in the collapse of the Debtors businesses." *Id.*  According to the Trustee, this fact "demonstrates that the assets of all the Firestar Entities—let alone FDI by itself— were not sufficient to discharge their joint and several liability to PNB.  Otherwise, Nirav presumably would have liquidated the Firestar Entities' assets to repay PNB and avoid exposing the fraud." *Id*. at 64-65.

The Trustee's presumption here concerning Nirav's state of mind is not consistent with the Complaint's allegation of Nirav's alleged plan to displace the PNB indebtedness with proceeds from an IPO, which suggest Nirav believed the Firestar Entities could justify public funding sufficient to satisfy the LOU's.  It is also not supported by the Complaint's allegations that efforts were made to refinance the LOU's later by the prior avenue which did not require the collateral as cash margins.  Complaint ¶ 187.

These allegations also fall short of meeting the Trustee's burden on the issue of insolvency "which requires some sort of 'balance sheet' test or information provided to infer that the corporation's liabilities exceeded their assets *at the time the transfers took place*.  Rather, the 'present sale value of assets' requires there to be an evaluation of the market value of the assets *at*

*the time the transfer took place*…[a]dditionally, there should be information as to the level of liquidity of the transferor's assets." *O'Toole v. Karnani*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011) [emphasis added].   Here, the Trustee provides no balance sheet information on FDI and then improperly expects the Court to assume insolvency only as a result of a future event that brought down all the Firestar Entities.

Finally, at its heart, the Trustee's claim against CPRE is a forced-fit attempt to add an additional count against this defendant which does not accord with the legal nature of the claim. "Under New York law, a creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance." *Cadle Co. v. Newhouse*, 74 F. App'x 152, 153 (2d Cir. 2003). The Complaint asserts that CPRE was a participant but fails to allege the concomitant requirement that CPRE was a transferor or transferee, or otherwise benefited in some way.

Indeed, the entirety of what CPRE is being accused of consists of being the object of a transfer that was legally documented and in all ways comported with a conventional legal process for the transfer of real estate.   CPRE is not alleged to have designed the transfer, arranged the parties to the transfer, conspired to disguise the nature of the transfer, or provided the money for the transaction.

Accordingly, absent such allegations, CPRE cannot as a matter of law be alleged to have any "intent" to commit fraud. *See, Tae H. Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 619 (S.D.N.Y. 2018) ("[W]hile the Condo conveyance was made shortly after the DOL's investigation into Kum Kang, the transfer was not made in secret and no evidence adduced indicated that the transfer was performed in a hasty or otherwise unusual manner.   Taken together…the evidence does not establish…that the conveyance was made with fraudulent intent.").

17

Rather, CPRE is merely being accused of serving as the legal form, or conduit, around the transferred asset. "The mere conduit doctrine has been recognized and applied in many courts within and outside the Second Circuit." *McCord v. Ally Fin. Inc.*, 559 B.R. 41, 64 (E.D.N.Y. 2016).

Under the mere conduit theory, "the facts and circumstances, including the relationships among the parties, the roles performed by the parties, the economic substance of the transactions, and the presence or absence of a benefit to the defendant, among other considerations, should be weighed in determining whether the defendant should be subjected to liability." *Id*. at 65.

In effect, CPRE served as the asset being transferred, and accordingly, as neither transferor, transferee, and like a mere conduit, it was not the sort of participant meant to be caught in a claim of fraudulent transfer and should not be subject to liability.

## C.    Additional Legal Bases for Dismissal

As stated in the Initial Brief, the LLCs also adopt the following grounds for dismissal that have been expensively briefed by Modi, Bhansali and Gandhi in Richard A. Levin, Trustee v. Nirav Modi, et al., Adv. Proc. No. 19-1102 (SHL), and defendants Purvi Mehta, Nehal Modi, and Ami Javeri in this matter, and incorporate by reference the briefing on the issues of (i) the bar against the Trustee's claims imposed by the doctrine of in pari delicto; (ii) the Trustee's lacking of standing due to the lack of a direct injury as a result of the alleged violations; and (iii) the alleged direct victim here, PNB, is best situated to vindicate its claims.

18

## CONCLUSION

For the foregoing reasons, and the reasons set forth in their Initial Briefs as well as the

Initial and Reply briefs of defendants Modi, Bhansali. Mehta, Nehal Modi and Ami Javeri, as listed

in Point C above, the Court should dismiss the claims against CPRE and CPS50 in their entirety.

Dated: March 5, 2021
      New York, New York                         Respectfully submitted,

                                      **DUFFYAMEDEO LLP**

                                      By: /s/ Todd E. Duffy
                                              Todd E. Duffy
                                              Douglas A. Amedeo
                                    275 Seventh Avenue, 7th Floor
                                    New York, NY 10001
                                    Tel:    (212) 729-5832
                                    Fax:    (212) 208-2437

                                    Counsel to Central Park Real
                                    Estate LLC and Central Park
                                    South 50 Properties LLC