**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, trustee for the liquidating trusts of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC., | Adv. Proc. No. 20-1054 (SHL) |
| Plaintiff, | |
| v. | |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD., | |
| Defendants. | |

**DECLARATION OF RICHARD LEVIN IN SUPPORT OF**
**PLAINTIFF'S MOTION TO CONFIRM ORDER OF ATTACHMENT**

REDACTED PURSUANT TO PENDING MOTION TO SEAL [ADV. DKT. 105]

I, Richard Levin, declare under penalty of perjury under 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the trustee ("**Trustee**") of the liquidating trusts of the estates of the Debtors in the above-captioned chapter 11 cases.

2.      I submit this Declaration in support of my *Motion to Confirm Order of Attachment* (the "**Confirmation Motion**"), which seeks confirmation of the *ex parte* order of attachment that this Court entered on February 22, 2022 [Adv. Dkt. 104] (the "**Order of Attachment**"). Service of the Order of Attachment levied certain property of Defendant Ami Javeri ("**Javeri**") and all of the property of Defendants Central Park South 50 Properties, LLC ("**CPS50**"), Central Park Real Estate, LLC ("**CPRE**"), and Trident Trust Company, solely as Trustee of the Ithaca Trust ("**Trident**" and, together with CPS50 and CPRE, the "**Ithaca Trust Defendants**"), pending confirmation of the attachment as requested under the Confirmation Motion and entry and satisfaction of any judgment in this action.

3.      The statements in this Declaration are based on my personal knowledge, information supplied or verified by my professionals, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called as a witness, I could and would testify competently to the facts set forth herein.

4.      Based upon my investigation to date, and as set forth in the allegations contained in the Confirmation Motion and in the Complaint, Defendant Javeri was directly involved in Nirav Modi's years-long and multibillion-dollar bank fraud. In concert with Modi, Javeri laundered proceeds of the bank fraud with the effect of removing assets from the reach of creditors. These efforts included contributing two LLCs that hold valuable real estate to the Ithaca Trust in the months before the exposure of the bank fraud (Apartment 33 at the Ritz Carlton Central Park and Unit 3601 at the Essex House (the "**Apartments**")). Attaching certain of Javeri's

property and all of the property of the Ithaca Trust Defendants is necessary to secure any judgment the Court may enter on the claims asserted in my Complaint in this Action.

5.      The Apartments are likely the assets that I will look to first to recover if I prevail in this action. They were originally purchased for the aggregate purchase price of approximately $30 million. Because I have not yet conducted discovery of the assets of Javeri and the Ithaca Trust Defendants, I do not know yet if they own other material assets that may contribute to satisfaction of a judgment. If the Apartments are transferred or encumbered, or if the proceeds from any sale of the Apartments are depleted, my ability to collect on a judgment may be substantially impaired, if not eliminated, as the Apartments are assets in which Javeri has a beneficial interest with significant value and likely are the only significant assets of the Ithaca Trust Defendants. Accordingly, an order attaching any direct and indirect interests of Javeri in the Apartments and the property of the Ithaca Trust Defendants, including the Apartments and any proceeds from their sale, is necessary to provide security in this action. *See* N.Y. C.P.L.R. § 6223(b).

6.      Finally, attached hereto are true and correct copies of the exhibits cited in the *Memorandum of Law* submitted in support of the Confirmation Motion.

7.      **Exhibit 1** is a true and correct copy of the *Complaint to Avoid and Recover Actual Fraudulent Transfers and for Damages for Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act* [Adv. Dkt. 1], filed in the above-captioned adversary proceeding on February 25, 2020.

8.      **Exhibit 2** is a true and correct copy of ████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████

9.      **Exhibit 3** is a true and correct copy of ████████████████████████████
████████████████████████████████████████████

2

10.     **Exhibit 4** is a true and correct copy of ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████

11.     **Exhibit 5** is a true and correct copy of an article entitled *How a Bank Clerk's Alert Led to the Arrest of Nirav Modi*, published in the Times of India on March 20, 20219 and available at https://timesofindia.indiatimes.com/business/india-business/how-a-bank-clerks-alert-led-to-the-arrest-of-nirav-modi/articleshow/68501893.cms.

12.     **Exhibit 6** is a true and correct copy of ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████

13.     **Exhibit 7** is a true and correct copy of the *Application for and on Behalf of Purvi Mehta Bringing Additional Facts on Record for Seeking Directions to the Responses to Ensure Speedy and Just Recovery of Assets*, filed by Purvi Mehta in the Bombay City Civil and Sessions Court, Case No. 2021-0100462, on January 25, 2022.

14.     **Exhibit 8** is a true and correct copy of an email sent by Sankalp Sharma, counsel to Purvi Mehta, to my counsel in this action on January 26, 2022.

15.     **Exhibit 9** is a true and correct copy of the *Report of John J. Carney, Examiner* [Bankr. Dkt. 394], filed in the Debtors' chapter 11 cases on August 25, 2018.

16.     **Exhibit 10** is a true and correct copy of the provisional attachment order and complaint of the India Enforcement Directorate against Nirav Modi, Ami Javeri, and Purvi Mehta, dated September 17, 2018 and filed in the Adjudicating Authority Under the Prevention of Money Laundering Act in Mumbai, India.

17.     **Exhibit 11** is a true and correct copy of the provisional attachment order and complaint of the India Enforcement Directorate against Nirav Modi, Mihir Bhansali, and Rakhi

REDACTED PURSUANT TO PENDING MOTION TO SEAL [ADV. DKT. 105]

Bhansali, dated October 5, 2018 and November 1, 2018 and filed in the Adjudicating Authority Under the Prevention of Money Laundering Act in Mumbai, India.

18.    **Exhibit 12** is a true and correct copy of the judgment entered on Punjab National Bank's complaint against Nirav Modi, Ami Javeri, and Purvi Mehta, among others, asserting claims arising from the bank fraud, dated July 6, 2019 and entered by the Debts Recovery Tribunal No. 1 at Mumbai.

19.    **Exhibit 13** is a true and correct copy of the order issuing a pardon to Purvi Mehta, filed in the Court of Special Judge Under the Prevention of Money Laundering Act at Greater Bombay, Case No. 3 of 2019, filed on January 4, 2021.

20.    **Exhibit 14** is a true and correct copy of the *Stipulated Judgment* [Dkt. 3], filed in *Levin v. Synergies Corp., et al.*, No. 20-1014 (Bankr. S.D.N.Y.) on February 18, 2020.

21.    **Exhibit 15** is a true and correct copy of the search results for "Trident Trust Company" in the New York Secretary of State's corporation registration database, retrieved on February 24, 2022.

22.    **Exhibit 16** is a true and correct copy of the search results for "Central Park Real Estate, LLC" in the New York Secretary of State's corporation registration database, retrieved on February 24, 2022.

23.    **Exhibit 17** is a true and correct copy of ███████████████████████

████████████████

Dated: February 25, 2022            */s/ Richard Levin*
New York, New York                  Richard Levin

REDACTED PURSUANT TO PENDING MOTION TO SEAL [ADV. DKT. 105]

# Exhibit 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. _____ |
| Plaintiff, | |
| v. | |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

**COMPLAINT TO AVOID AND RECOVER ACTUAL FRAUDULENT TRANSFERS AND FOR DAMAGES FOR CONSPIRACY TO VIOLATE THE RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT**

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................... 3

THE PARTIES & OTHER RELEVANT ENTITIES ............................................................ 4

   I.    The Debtors and Trustee .............................................................................................. 4

   II.   The U.S. Affiliates ....................................................................................................... 4

   III.  The Defendants ............................................................................................................ 5

BACKGROUND ....................................................................................................................... 7

   I.    The Bank Fraud. ........................................................................................................ 10

     A.   Mechanics of the Bank Fraud ............................................................................... 10

     B.   The Debtors' and U.S. Affiliates' Role in the Bank Fraud ................................... 16

     C.   Involvement of U.S. Entities' Directors and Officers in the Bank Fraud ............ 17

     D.   Involvement of Mehul Choksi, Nehal Modi, Neena Sheth, Deepak Sheth, and
         Abhay Javeri, and the Sheth Entities and SDC Entities in the Bank Fraud. ........ 27

     E.   Laundering of Funds Through Twin Fields and Bailey Banks & Biddle ............... 30

     F.   Detection and Exposure of the Bank Fraud .......................................................... 33

   II.   Criminal Efforts Shortly Before and Following Exposure of the Bank Fraud ............ 36

     A.   Looting of the Debtors, U.S. Affiliates, and Other Firestar Entities .................... 36

     B.   Fraudulent Omissions, Misstatements, and Misrepresentations Made in
         Connection With The Debtors' Chapter 11 Cases ................................................. 46

     C.   Other Efforts to Cover Up and Frustrate Investigation of the Bank Fraud .......... 50

     D.   Money Laundering to Modi Family Members Prior to Exposure of the Bank Fraud .. 54

CLAIMS FOR RELIEF .......................................................................................................... 70

COUNTS .................................................................................................................................. 70

PRAYER FOR RELIEF ....................................................................................................... 139

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**" or

"**Plaintiff**") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc.

(collectively, the "**Debtors**") and as holder of a judgment jointly and severally against, and as

assignee of all claims of, Synergies Corporation ("**Synergies**"), Firestar Group, Inc. ("**FGI**"),

Firestar Diamond International, Inc. ("**FDII**"), Nirav Modi, Inc. ("**NMI**"), and AVD Trading, Inc.

("**AVD**") (collectively, the "**U.S. Affiliates**," together with the Debtors, the "**U.S. Entities**") for

his Complaint alleges as follows:

## NATURE OF THE ACTION

1.     The Trustee brings this action, consisting of both estate claims and claims assigned

to the Trustee by U.S. affiliates, to recover damages suffered as a result of the Modi family's nearly

decade-long racketeering conspiracy lasting from at least 2010 to mid-2018 (the "**Relevant**

**Period**").  The conspiracy resulted in the diversion of hundreds of millions of dollars of assets for

the benefit of the Modi family members and other conspirators, the collapse of the U.S. Entities,

and the resulting loss of the value of the U.S. Entities' businesses. Each of the Defendants joined

and supported the Modi family's racketeering conspiracy as it morphed from bank fraud and

money laundering to obstruction of justice and looting.

2.     Nirav Modi's sister, Purvi Mehta, agreed to act as the beneficial owner of

numerous shell companies Nirav Modi used to commit the largest bank fraud in Indian history.

Mehta then personally laundered over $100 million of the ill-gotten proceeds through the Modi

family's web of shell companies, family trusts, family members, and otherwise-legitimate

businesses—destroying those businesses in the process.

3.     Nirav Modi's wife, Ami Javeri, agreed to serve as a partner of the three India-based

the companies in whose name Nirav Modi obtained nearly $3.5 billion in fraudulent loans

(defined below as the LOU Entities). Javeri then managed and facilitated the Modi family's

systematic efforts to launder and shield from creditors the proceeds of the fraud, including over $30 million in real estate.

4.      Nirav Modi's brother, Nehal Modi, traveled around the world after exposure of the fraud destroying evidence, tampering with witnesses, and securing assets from seizure by government authorities and creditors. Early in these chapter 11 cases before the Trustee's appointment, Nehal Modi also enlisted several of his personal friends to loot the U.S. Affiliates' more than $40 million in inventory and cash so that those funds could not be used to pay the U.S. Affiliates' substantial debts to the Debtors.

5.      Nirav Modi's other brother, Neeshal Modi, also served as a partner of the three LOU Entities, as beneficial owner of numerous Shadow Entities and other shell companies, and as one of the key day-to-day managers of the fraudulent import and export transactions supporting the bank fraud. Neeshal Modi also personally selected and hired various "dummy" directors, officers, and other personnel for the web of companies secretly owned by his family. He also played his part in the family money laundering operation, including by holding a power of attorney for his sister Purvi Mehta, in whose name the ill-gotten proceeds were held in bank accounts across the globe.

6.      The Ithaca Trust, Central Park South 50 Properties, LLC, and Central Park Real Estate LLC, which together hold the Modi family's two Manhattan apartments, are nothing more than contrivances used by the Modi family to shield more than $30 million of their ill-gotten wealth from creditors.

7.      Twin Fields Investments Ltd. is the Delaware shell company through which the Modi family secretly owned and operated *Bailey Banks & Biddle* retail stores as another front for its money laundering operations. The Modi family laundered over $80 million through Twin Fields during the Relevant Period.

2

8.      The remaining Defendants, defined below as Shadow Entities, comprise the numerous Hong Kong and Dubai-based companies the Modi family secretly owned, yet represented as independent vendors and customers to banks, auditors, and even this Court.

9.      The Trustee also seeks to avoid numerous fraudulent transfers of the Debtors' assets made to the Defendants, and in his capacity as judgment creditor of the U.S. Affiliates, seeks to avoid fraudulent transfers of the U.S. Affiliates' assets made to the Defendants.

## JURISDICTION AND VENUE

10.     The United States District Court for this district (the "**District Court**") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under title 11 of the United States Code and arises in and is related to these chapter 11 cases and under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because this adversary proceeding arises under the laws of the United States, including 18 U.S.C. § 1962, and seeks recovery for injuries by reason of a violation of 18 U.S.C. § 1962. This Court has authority to hear this adversary proceeding by reason of the District Court's referral under 28 U.S.C. § 157(a) and under General Order M-431 (Amended Standing Order of Reference).

11.     This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(H) and (O) with respect to Counts 7 to 54, which this Court has authority to hear and determine, and is not a core proceeding with respect to Counts 1 to 6.

12.     To the extent that this Court does not have authority to determine the claims asserted in this adversary proceeding and to enter final judgment thereon, the Trustee consents to the issuance and entry of a final judgment or order by this Court.

13.     Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

## THE PARTIES & OTHER RELEVANT ENTITIES

### I.    The Debtors and Trustee

14.    Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) ("**FDI**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, FDI principally operated a wholesale jewelry business.

15.    Debtor Fantasy, Inc. ("**Fantasy**") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy was principally a wholesale jewelry business. At all relevant times, FDI owned 100% of the equity interests in Fantasy.

16.    Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) ("**Jaffe**") is a privately-held New York corporation, with its principal place of business in New York. While in operation, Jaffe was principally a wholesale bridal jewelry business.

17.    Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered that same day. The Trustee brings this action, not individually, but solely in his capacity as Trustee.

### II.    The U.S. Affiliates

18.    FGI, a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in FDI. Samuel Sandberg owns the remaining approximately 5% of FDI.

19.    Synergies, a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in Jaffe and 100% of the equity interests in FGI. Samuel Sandberg owns the remaining approximately 5% of Jaffe.

20.    FDII, a Delaware corporation, operated primarily as a loose diamond trading business.

4

21.     NMI, a Delaware corporation, operated *Nirav Modi*-branded retail boutiques in New York, Los Angeles, Las Vegas, and Honolulu.

22.     On January 15, 2020, the Trustee and the U.S. Affiliates entered into a settlement agreement under which the U.S. Affiliates assigned to the Trustee any and all claims or causes of action then-owned or subsequently acquired by the U.S. Affiliates and consented to entry of a judgment jointly and severally against the U.S. Affiliates in the amount of $23,116,505.44. (*See* Dkt. 1366.)

23.     Judgment in that amount was entered on February 18, 2020. (Adv. No. 20-01014; Dkt. 3.)

## III.    The Defendants

24.     Defendant Ami Javeri (a/k/a Ami Modi) is a New York resident and is Nirav Modi's wife.

25.     Defendant Purvi Mehta (a/k/a Purvi Modi) is a Hong Kong resident and is Nirav Modi's sister.

26.     Defendant Nehal Modi is a Texas resident and is Nirav Modi's second-youngest brother.

27.     Defendant Neeshal Modi is a Belgium resident and is Nirav Modi's youngest brother.

28.     Defendant Trident Trust Company (South Dakota) Inc., solely as trustee of the Ithaca Trust ("**Trident**"), is a South Dakota corporation and is the Trustee of The Ithaca Trust. The Ithaca Trust is an irrevocable trust governed by South Dakota law.

29.     Defendant Central Park Real Estate LLC ("**CPRE**") is a Delaware limited liability company.

30.    Defendant Central Park South 50 Properties LLC ("**CPS50**") is a New York limited liability company.

31.    Defendant Twin Fields Investments Ltd. ("**Twin Fields**") is a Delaware corporation.

32.    Defendant Auragem Company Ltd. ("**Auragem**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

33.    Defendant Brilliant Diamonds Ltd. ("**Brilliant**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

34.    Defendant Eternal Diamonds Corporation Ltd. ("**Eternal**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

35.    Defendant Fancy Creations Company Ltd. ("**Fancy Creations**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

36.    Defendant Hamilton Precious Traders Ltd. ("**Hamilton**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

37.    Defendant Sino Traders Ltd. ("**Sino**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

38.    Defendant Sunshine Gems Ltd. ("**Sunshine**") is a Hong Kong company and is alleged herein to be a Shadow Entity.

39.    Defendant Unique Diamond and Jewellery FZC ("**Unique**") is a UAE company and is alleged herein to be a Shadow Entity.

40.    Defendant World Diamond Distribution FZE ("**World Diamond**") is a UAE company and is alleged herein to be a Shadow Entity.

41.    Defendant Vista Jewelry FZE ("**Vista**") is a UAE company and is alleged herein to be a Shadow Entity.

6

42.     Defendant Empire Gems FZE ("**Empire**") is a UAE company and is alleged herein to be a Shadow Entity.

43.     Defendant Universal Fine Jewelry FZE ("**Universal**") is a UAE company and is alleged herein to be a Shadow Entity.

44.     Defendant Diagems FZE ("**Diagems**") is a UAE company and is alleged herein to be a Shadow Entity.

45.     Defendant Tri Color Gems FZE ("**Tri Color**") is a UAE company and is alleged herein to be a Shadow Entity.

46.     Defendant Pacific Diamonds FZE ("**Pacific**") is a UAE company and is alleged herein to be a Shadow Entity.

47.     Defendant Himalayan Traders FZE ("**Himalayan**") is a UAE company and is alleged herein to be a Shadow Entity.

48.     Defendant Unity Trading FZE ("**Unity**") is a UAE company and is alleged herein to be a Shadow Entity.

49.     Defendant Fine Classic FZE ("**Fine Classic**") is a UAE company and is alleged herein to be a Shadow Entity.

50.     Defendant DG Brothers FZE ("**DG Brothers**") is a UAE company and is alleged herein to be a Shadow Entity.

## BACKGROUND

51.     Nirav Modi entered the diamond business around 2000 under the name Diamonds 'R' Us, an India partnership formed by Modi, Modi's uncle Mehul Choksi, and Modi's business partner Hemant Bhatt.

52.     In 2004, Nirav Modi founded Firestone International Private Ltd. ("**FIL**" or "**FIPL**," together with all of its direct and indirect subsidiaries, the "**Firestar Entities**"), later known as

Firestar International Private Ltd., and now known as Firestar International Ltd. FIPL operated as a diamond trading business in India and the parent of the global Firestar corporate umbrella. Nirav Modi has at all relevant times been the owner of substantially all of the equity interests in FIPL.

53.     In 2006, Nirav Modi formed India-based Firestar Diamond International Pvt. Ltd. ("**FDIPL**") as a wholly owned subsidiary of FIPL. FDIPL operated diamond and jewelry manufacturing operations from factories in India. FDIPL manufactured a substantial portion of the inventory sold by other Firestar Entities.

54.     Over time, Nirav Modi expanded the Firestar Entities' operations to the U.S., Hong Kong, Dubai, and Europe. Nirav Modi, acting through FIL and its subsidiaries, acquired the company that became FDI (then known as Firestone, Inc.) in 2005, acquired a 95% interest in Jaffe (then known as Sandberg & Sikorski Corp.) from Samuel Sandberg and Stanley Sikorski in 2007, and incorporated Fantasy in 2012. In connection with Nirav Modi's indirect acquisition of Jaffe, Samuel Sandberg received an equity interest in FDI.

55.     The U.S. Entities' operations were managed and controlled by Nirav Modi's cousin, Mihir Bhansali. At all relevant times, Mihir Bhansali served as the sole director and Chief Executive Officer of FDI and Fantasy, and as the sole director and President of Jaffe. Bhansali also served as the sole director of each U.S. Affiliate, as well as the Chief Executive Officer of Synergies, FGI, and NMI. Bhansali also served as a director of FIPL. In the context of both the Firestar Entities' legitimate operations and the fraudulent schemes described below, Mihir Bhansali served as Nirav Modi's second-in-command.

56.     Mihir Bhansali's own top lieutenant, Ajay Gandhi, served as the Chief Financial Officer of each of the Debtors and U.S. Affiliates for the entirety of the Relevant Period with the

exception of a brief 3-month departure in 2013. As alleged below, Mihir Bhansali and Ajay Gandhi managed the fraudulent aspects of Nirav Modi's U.S. operations.

57.     The Hong Kong-based Firestar Entities included Firestar Holdings Ltd. ("**FHL**"), Firestar Diamond Ltd. ("**FDL**"), Firestar Jewelry Ltd. ("**FJL**") and Nirav Modi Ltd. ("**NML**"). FHL, a wholly owned subsidiary of FIPL, had no operations of its own and instead acted as the primary holding company for the Hong Kong, Dubai, Europe, and eventually U.S.-based Firestar Entities.

58.     FDL and FJL, both wholly owned subsidiaries of FHL, each operated as a polished diamond trading business analogous to FDII in New York. FDL and FJL were managed by Aditya Nanavati, the Head of Asia-Pacific in the global Firestar umbrella. Shyam Wadhwa, FIPL's vice president of finance, served as the de facto chief financial officer of the Hong Kong-based Firestar Entities. Nanavati exercised general oversight over the Hong Kong-based Shadow Entities and Wadhwa managed their bank accounts and finances.

59.     NML, a wholly owned subsidiary of FHL, is the principal holding company for subsidiaries operating *Nirav Modi*-branded boutiques around the globe, including New York-based NMI (which operated the U.S. boutiques) and UK-based Nirav Modi Ltd. ("**NMLUK**") (which operated the London boutique). Angelina Ypma (a/k/a Angelina Nguyen) served as global president of the *Nirav Modi* brand and as a director of NML and FIPL. Purvi Mehta was also involved in the operations of NML and its subsidiaries as creative director of the *Nirav Modi* brand.

60.     The Dubai-based Firestar Entities included Firestar Diamond FZE ("**FDFZE**"), which operated as a polished diamond trading business, and Firestar Diamond FZCO ("**FDFZCO**"), which manufactured jewelry. FHL is the 100% owner of both FDFZE and FDFZCO. Satyendra Shukla, the Head of Middle East within the global Firestar umbrella, managed FDFZCO. Kurian Mathews ran FDFZE's operations as general manager. Saju Poulose managed

the Dubai-based Firestar Entities' finances, books and records, and bank accounts as the de facto chief financial officer. Shukla, Mathews, and Poulose also exercised broad oversight over the Dubai-based Shadow Entities' operations and finances.

61.     Firestar Diamond BVBA ("**FDBVBA**"), a Belgium company, operated as a rough diamond trading and manufacturing business. FDBVBA was managed by Nirav Modi's youngest brother, Neeshal Modi, in Antwerp, Belgium. Neeshal Modi was also involved with the Dubai Firestar Entities. Throughout the Relevant Period, FDBVBA traded extensively with Shadow Entities in Hong Kong and Dubai in furtherance of the fraudulent scheme alleged below.

I.      **The Bank Fraud.**

        A.      *Mechanics of the Bank Fraud*

62.     From no later than 2010 to early 2018, Nirav Modi orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from numerous banks, including Punjab National Bank ("**PNB**"), a publicly-owned Indian bank majority owned by the central government of India (as set forth in more detail below, the "**Bank Fraud**").

63.     The Bank Fraud involved the fraudulent procurement of buyer's credit issued under letters of undertaking ("**LOU**s"), a financial instrument unique to India designed to facilitate efficient import transactions.

64.     When used legitimately, LOUs allow an importer to forego the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank in India, secured by invoices for the to-be imported goods. The issuing bank, in turn, enters into the foreign currency transaction: it requests a foreign branch of another Indian bank to transmit funds into the issuing bank's own account (referred to as its nostro—"our"—account) at the

10

foreign branch of a third bank to pay the exporter in its local currency. The issuing bank then repays the intermediary bank and recoups the loan from the importer (or the imported goods serving as its collateral).

65.     Since each LOU requires an import transaction, an importer's LOU borrowing capacity is tied directly to its import volume—the more imports, the more LOU funding available.

66.     Nirav Modi and his co-conspirators conspired to take advantage of this feature by artificially inflating the import volume of Nirav Modi's India-based companies—most notably Diamonds 'R' Us ("**DRUS**"), Solar Export ("**Solar**"), and Stellar Diamond ("**Stellar**") (collectively, the "**LOU Entities**")—with sham transactions so as to obtain more and more LOU funding.

67.     Nirav Modi, Ami Modi, Neeshal Modi, and Mehul Choksi, among others, each served as partner of each LOU Entity during the Relevant Period.

68.     In 2016, Neeshal Modi selected and appointed additional "dummy" partners for the LOU Entities. Neeshal Modi, together with Mihir Bhansali, also selected and hired various Shadow Entity personnel during the Relevant Period.

69.     Ami Modi served as a partner of Solar and Stellar and, in 2010, opened bank accounts Solar and Stellar used to defraud PNB.

70.     PNB and other banks advanced amounts equal to over $1 billion under LOUs for the benefit of entities under Modi's control in connection with imports to India without the ordinarily-required collateral.

71.     To carry out this scheme, Nirav Modi and his co-conspirators utilized a web of shadow entities to engage in fraudulent and fictitious import transactions, including Defendants Auragem, Brilliant, Eternal, Fancy Creations, Sino, Sunshine, Unique, World Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, Unity, and Fine Classic (collectively,

the "**Shadow Entities**," together with the Firestar Entities, LOU Entities, and all other entities controlled by Nirav Modi and his family members, the "**Modi-Controlled Entities**").

72.     Though designed to look like legitimate independent businesses, the Shadow Entities were no more than shell companies controlled by Modi and his co-conspirators. They conducted virtually no legitimate business, but instead existed only to further the Bank Fraud by conducting bogus transactions with the LOU Entities, Firestar Entities, and other Modi-Controlled Entities and laundering the ill-gotten proceeds.

73.     The two primary clusters of Shadow Entities operated from Hong Kong and Dubai. The Hong Kong-based Shadow Entities included Auragem, Brilliant, Eternal, Fancy Creations, Sino, and Sunshine. The Dubai-based Shadow Entities included Unique, World Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, and Unity.

74.     The Shadow Entities were mostly registered at either small, unoccupied offices or at single, leased desks within shared offices. They had almost identical websites with similar backgrounds, fonts, contact pages, and language.

75.     An Indian consultant told Indian authorities that around 2010, Mihir Bhansali sought assistance setting up two layers of British Virgin Island ("**BVI**") holding companies for the Dubai-based Shadow Entities that would be owned by Purvi Modi and Neeshal Modi.

76.     The top layer consisted of Madison Capital Private Limited ("**Madison**") and Moore Private Investments Ltd. ("**Moore**"). Mihir Bhansali completed all of the paperwork relating to the formation of these two entities. Purvi Mehta and Neeshal Modi were declared the ultimate beneficial owners of these companies to the BVI authorities.

77.     Madison and Moore each held 50% of the shares of each of ten second-layer BVI entities: Global Investing Group Ltd., Xclusive Consultants Ltd., Ashmoore Developments Ltd., Beacon Horizon Investments Ltd., Century Group Global Investments Ltd., Pushpin Trading

Ltd., Royce Group Private Ltd., Integrated Investing Ltd., Panera Assets Inc., and Ideal Star

Consultants Ltd. Mihir Bhansali chose all of these entities' names. Moore served as the director

of each of these entities. Purvi Mehta and Neeshal Modi were also declared the ultimate beneficial

owners of these companies to the BVI authorities.

78.     These second-layer BVI entities then served as holding companies for Dubai-based

Shadow Entities Tri Color, Diagems, Empire, Unique, World Diamond, Pacific, Universal; and

Vista.

79.     Mihir Bhansali maintained a spreadsheet tracking the operational status of the

Dubai-based Shadow Entities.

80.     The LOU Entities and Shadow Entities traded exclusively or nearly exclusively

with other Modi-Controlled Entities. The following table reflects the extent to which the LOU

Entities traded exclusively with Shadow Entities and Firestar Entities:

| LOU Entity | Fiscal Year 2012 - 2017 | | | | | |
|---|---|---|---|---|---|---|
| | Sales to Listed Modi-Controlled Entities as % of Gross Sales | | | Purchases from Listed Modi-Controlled Entities as % of Total Costs of Goods Sold | | |
| | Shadow Entities | Firestar Entities | Total | Shadow Entities | Firestar Entities | Total |
| DRUS | 88.4% | 7.5% | 95.9% | 99.7% | 0.4% | 100.1% |
| Stellar | 98.7% | 0.5% | 99.2% | 100.1% | 0.3% | 100.3% |
| Solar | 98.9% | 0.7% | 99.6% | 99.9% | 0.1% | 100.0% |

81.     From around 2013 onward, Nirav Modi and his co-conspirators used the Shadow

Entities as an intermediary between the LOU Entities and Firestar Entities. PNB and other banks

were aware of Nirav Modi's affiliation with the LOU Entities and the Firestar Entities, but his

affiliation with the Shadow Entities was hidden from the banks.

82.     The Shadow Entity import and export transactions purported to involve arm's-

length sales of highly valuable loose diamonds, pearls, gold, silver, and other jewelry. In truth,

these transactions had no legitimate economic purpose and routinely involved goods that (i) did

13

not exist, (ii) were never transferred, (iii) were transferred at prices having nothing to do with market value, but instead based on whatever amounts were necessary to reconcile the Shadow Entities' and Firestar Entities' books and records so as to conceal other transfers made for illegitimate purposes, or (iv) were transferred in "circular transactions," in which the same goods were exported from and re-imported among Modi-Controlled Entities multiple times at varying and often inflated prices to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

83.    According to statements made by various Firestar Entity and Shadow Entity employees to Indian authorities:

(i)    FIL, FDIPL, and other India-based Firestar Entities would export jewelry to Shadow Entities in Dubai and Hong Kong, where, at least in some instances, the diamonds would be removed and then subsequently re-exported for further import and the precious metals melted.

(ii)    None of jewelry exported from India to the Shadow Entities was ever returned as defective, substandard, or otherwise noncompliant, as would be expected in the course of an arm's length vendor-customer relationship.

(iii)    Orders placed by Shadow Entities frequently lacked the formality, exactness, and diligence that ordinarily would be expected of transactions with a bona fide third party. For example, V. Suresh Ramnath Naidu, a director of Diagems, told Indian authorities that he signed blank invoices, but never actually saw any of the diamonds or jewelry.

84.    Modi-Controlled Entities also obtained additional funding through packing credit loans, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods. In the context of the Bank Fraud, the India-based Modi-Controlled Entities would obtain packing credit loans on the basis of purported orders from other Modi-Controlled Entities overseas. However, packing credit loan proceeds were frequently diverted for other purposes, including the repayment of outstanding LOUs.

14

85. Many of the Shadow Entities' directors were current or former employees of Firestar Entities. In addition, many Shadow Entity employees were current or former employees of Firestar Entities.

86. The transactions between and among Firestar Entities, LOU Entities, and Shadow Entities furthered the Bank Fraud by: (1) inflating the Indian entities' LOU borrowing capacity by artificially inflating their import volumes for LOUs and export volume for packing credit loans; (2) facilitating the repayment of some but not all outstanding LOUs and packing credit loans; (3) laundering the fraudulent proceeds by making them difficult to trace and siphoning them to Modi and his co-conspirators; and (4) making it difficult for auditors, lenders, and regulatory bodies to detect the Bank Fraud.

87. Transfers for these purposes were concealed in various ways, including: (a) round trip transactions of gems, jewelry, or funds in which Modi-Controlled Entities transferred assets amongst themselves without any legitimate economic purpose; (b) buying and selling gems at inflated or deflated prices; (c) characterizing transfers as loans or loan repayments or advances against future purchases or returns of such advances; and (d) in some instances, fraudulently doctoring books and records outright.

88. To facilitate the continuing flow of LOUs and to prevent detection, Modi and others at his direction, including Manish Bosamiya, Subhash Parab, and Miten Pandya, worked with certain PNB employees, including Gokulnath Shetty, who authorized LOUs without securing collateral and without properly recording the LOUs in PNB's records.

89. According to a forensic report issued by BDO in December 2019, PNB issued over 1,500 fraudulent LOUs to Modi-Controlled Entities during the Relevant Period involving approximately $3.5 billion.

### B. The Debtors' and U.S. Affiliates' Role in the Bank Fraud

90.     Nirav Modi, Mihir Bhansali, Ajay Gandhi, and other co-conspirators funneled millions of dollars in funds, precious gems, and jewelry through the U.S. Entities and their offices in furtherance of the Bank Fraud.

91.     In the early stages of the Bank Fraud scheme, from around 2010 to 2012 when the LOU Entities were still trading directly with Firestar Entities, the U.S. Entities were directly involved in import and export transactions underlying fraudulently procured LOUs. For example, in 2011, FDI and Jaffe were the exporters under and direct beneficiaries of five LOUs and one LOU, respectively, totaling $10,192,303.

92.     As an example of the Debtors' involvement in circular transactions, from August 8, 2011 to September 13, 2011, a period of five weeks, the Debtors exported the same 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once to and from various LOU Entities and Shadow Entities at widely divergent prices.

93.     Later in 2011, the Debtors engaged in another circular trading of a diamond that was recorded as a 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond. The diamond appeared in the Debtors' records in three transactions within six weeks of each other and was valued at a different price each time.

94.     From around 2013 onward, the Shadow Entities were used as intermediaries between the Firestar Entities and LOU Entities. PNB and other banks were aware of Nirav Modi's affiliation with the Firestar Entities and LOU Entities, but his affiliation with the Shadow Entities was hidden from them.

95.     During this period, the Debtors made numerous transfers to Shadow Entities linked to the repayment of outstanding LOUs so that the Bank Fraud could continue undisturbed.

16

96.     For example, on September 24, 2015, FDI transferred $1,840,969 to Auragem and $1,400,000 to Fancy Creations. A portion of these funds were used to repay an LOU issued to DRUS that became due on September 30, 2015.

97.     As another example, on February 26, 2016, FDI transferred $1,192,106 to Tri Color. On March 9, 2016, Tri Color transferred $1,647,000 to Solar. That same day, Solar transferred $2,087,000 to repay an LOU that became due on March 11, 2016.

98.     Consistent with these examples and others alleged herein, the Debtors' and U.S. Affiliates' Shadow Entity-linked transactions from 2013 onwards were effectuated for purposes related the Bank Fraud including to: (a) facilitate repayment of LOUs and packing credit loans so that the Bank Fraud could continue undisturbed; (b) provide Shadow Entities with the goods and funds the Shadow Entities needed to transact with the LOU Entities; (c) clear the Shadow Entities', Firestar Entities', and LOU Entities' accounts receivable and accounts payable so as to avert questions from auditors, lenders, and other third parties; and (d) divert the proceeds of the Bank Fraud for the benefit of Nirav Modi, Mihir Bhansali, their families and other co-conspirators.

99.     The U.S. Entities' records reflect hundreds of millions of dollars in cash transfers and inventory shipments among the U.S. Entities and Shadow Entities during the Relevant Period.

### C.  Involvement of U.S. Entities' Directors and Officers in the Bank Fraud

100.    Certain of U.S. Entities' directors and officers, including Mihir Bhansali and Ajay Gandhi, participated in and advanced the Bank Fraud. As described below, Bhansali and Gandhi, in coordination with Nirav Modi, controlled all aspects of the Debtors' internal and external operations and affairs at all relevant times.

101.    As the ultimate controlling shareholder of all of the Firestar Entities, Nirav Modi, in coordination with Bhansali and Gandhi, orchestrated and oversaw fraudulent transactions

among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

102.    As the sole director of each of the U.S. Entities, and as CEO of FDI, Fantasy, Synergies, FGI, and NMI, Mihir Bhansali coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

103.    As CFO of each of the U.S. Entities, and in coordination with Nirav Modi and Mihir Bhansali, Ajay Gandhi coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

104.    At all relevant times, Ajay Gandhi and Mihir Bhansali controlled the finances of the Debtors. Each had authority to approve loose diamond transactions among the U.S. Entities and the Shadow Entities totaling hundreds of millions of dollars. Gandhi and Bhansali were also each a signatory on each of the U.S. Entities' bank accounts, and their authorization was required to effectuate transfers from the U.S. Entities' accounts.

   i.    *Oversight and Control of Shadow Entities and LOU Entities*

105.    Nirav Modi and Mihir Bhansali, with the assistance of other co-conspirators coordinated and directed the operations of the Shadow Entities and LOU Entities to further the Bank Fraud. The following are some examples of that activity.

106.    Mihir Bhansali's prominent role in orchestrating the Bank Fraud is illustrated by several spreadsheets recovered from his work computer. Each of these spreadsheets was saved by Microsoft Excel's "AutoRecover" feature. Bhansali's computer did not contain any other versions of these spreadsheets, suggesting that he deleted them at some point. These spreadsheets are summarized as follows:

18

(i) One spreadsheet, last modified on February 16, 2018, tracked millions of dollars in payables and receivables as between each of the LOU Entities, Firestar Entities, and Shadow Entities.

(ii) Another spreadsheet, last modified on February 18, 2018, appears to be a step-by-step guide to the mechanics and economics of circular transactions between Firstar Entities and Shadow Entities. Another auto-saved version of this spreadsheet, saved eleven minutes earlier, contains only a portion of the guide, demonstrating that Bhansali himself created the spreadsheet.

(iii) Another spreadsheet, created on February 12, 2018 and last modified on February 13, 2018, appears to be a "to do" list for various co-conspirators after the exposure of the Bank Fraud. The tasks included researching their potential criminal liability, "cleaning up" outstanding A/R and A/P balances among Firestar Entities and Shadow Entities, and sending the Dubai-based Shadow Entities' computers to Hong Kong.

(iv) Another spreadsheet, last modified on January 8, 2018, shows, for the fiscal years 2012 through 2017, each LOU Entity's (a) profits & losses, (b) outstanding bank loans, (c) cash flow to trusts benefitting Nirav Modi's family, and (d) volume of transactions with various Shadow Entities and Firestar Entities.

107.    Bhansali personally oversaw the creation of the Shadow Entities and LOU Entities and the selection of their principals, directors, officers, and employees.

108.    Bhansali also personally completed employee performance appraisals for individuals involved in the operations of Shadow Entities and LOU Entities.

109.    Bhansali's electronic calendar contained several entries, which, upon information and belief, refer to his discussions in the course of managing the operations of the LOU Entities (i.e. **S**olar, **S**tellar, and **D**iamonds R Us), including: (a) a meeting scheduled for April 4, 2016 with the subject "SSD conversation;" and (b) a meeting scheduled for April 6, 2016 with the subject "SSD infrastructure," with an invite to Saju Paulose.

110.    On January 19, 2010, Ajay Gandhi directed Bhavesh Patel to prepare an aging report for accounts receivables owed to FDI excluding "affiliates such as . . . Unique", demonstrating that Gandhi knew Unique was a related party.

111. On May 27, 2010, Mihir Bhansali directed Aditya Nanivati to make Bhansali, Nanivati, Purvi Mehta, and Neeshal Modi authorized users of FDL's Standard Chartered Bank account. With respect to the physical devises necessary to approve transfers, he instructed Nanivati to send Purvi Mehta's device to Hemant Bhatt and Neeshal Modi's device to Ajay Gandhi. These devices enabled Bhatt and Gandhi to transfer funds out of FDL's bank account even though neither had any role at FDL or any of the other Hong Kong Firestar Entities.

112. On September 7, 2011, Kurian Mathews asked for Mihir Bhansali's approval of fee quotes from accountants for proposed audits of Auragem and Fancy Creations.

113. Mihir Bhansali required at least two of Kurian Mathews, Satyendra Shukla, and Saju Poulose to be present in Dubai at all times to monitor Shadow Entity operations. On April 27, 2013, Kurian Mathews asked Mihir Bhansali for permission to break this rule so that he could arrive in Hong Kong early to prepare for an audit of the Hong Kong Shadow Entities. Mathews explained, "We have to arrange all documents of 4 entities as Fancy's office which is very far from the offices of Brilliant and Eternal. After the same we have to check all of the purchases and sales documents with the book entries to see that correct documents are in place before the commencement of the audit." Bhansali replied, "Fine. Go ahead this time."

114. On June 10, 2013, to hide their involvement in the Bank Fraud, Modi's personal assistant instructed Gandhi, from her personal email address to Gandhi's personal email address, to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Firestar Entities' regular email system.

115. On August 6, 2013, Gandhi sent an email to a back-office employee containing purchase and sales ledgers of four Shadow Entities—Fancy Creations, Brilliant, Eternal, and Unique—showing these entities' accounting for transactions with FDI.

116.    On April 3, 2017, an India-based consultant emailed Mihir Bhansali a spreadsheet summarizing sales from various foreign Firestar Entities, including FIPL and FDIPL, to Dubai-based Shadow Entities, including World Diamond, Universal, Empire, Vista, Unique, and Diagems. The spreadsheet reflected a total of $770,730,000 in sales of rough stones, polished stones, and jewelry by various foreign Firestar Entities to these six Shadow Entities during fiscal year 2015 to 2016, and a total of $454,910,000 in such sales from April 2016 to February 2017.

117.    On May 5, 2017, Gandhi sent a list of Shadow Entities, and contact information for each, to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)."

118.    On July 1, 2017, FIPL CFO Ravi Gupta emailed Nirav Modi a spreadsheet containing fictitious biographical profiles for Brilliant, Eternal, Fancy Creations, Empire, Unique, Universal, Vista, and World Diamond and asked, "Last year someone had created the enclosed file for top 8 customers[.] Can u let me know who had helped in creation of this? We would like to do for few more customers like Augragen [sic], Eurostar, Diagem, Saumil, and Pannadium." Modi forwarded the email to Mihir Bhansali, who then directed Shyam Wadhwa, Aditya Nanivati, and Neeshal Modi to create additional fictitious profiles for Shadow Entities in their respective regions.

119.    On July 8, 2017, Satyendra Shukla asked for Mihir Bhansali's input on a proposed itinerary for FIPL CFO Ravi Gupta's and FIPL Independent Director Suresh Senapaty's upcoming visit to Dubai. The itinerary included multiple meetings with purported "owners" of Shadow Entities.

120.    Between July 31, 2017 and August 7, 2017, Satyendra Shukla and Kurian Mathews, copied Mihir Bhansali on numerous emails concerning the collection of know-your-customer and know-your-supplier documentation for Shadow Entities Unique, World Diamond, Unity,

Himalayan, DG Brothers, and Hamilton. Bhansali advised, "Gentlemen – please avoid copying me on transactional emails. Thank you."

121.    On August 19, 2017, a manager of Universal emailed Bhansali enclosing a profile of three Shadow Entities—Universal, Empire, and Diagems—and asking Bhansali to "review and advice [sic]." The manager's email signature stated he was also the General Manager of a Firestar Entity in Dubai.

122.    On October 24, 2017, Saju Poulose advised Mihir Bhansali that an independent director of FIPL had asked about the variance in profit margins between the Firestar Entities' transactions with Shadow Entity as opposed to other customers. Bhansali instructed Poulose to warn Aditya Nanivati and Satyendra Shukla so that they could prepare an explanation. Nanavati then asked Bhansali, "How are we answering this? For me it is simple, some are higher volume wholesale clients and some are smaller clients/shops. Not sure if that's the right approach."

123.    On April 23, 2018, Ajay Gandhi asked a back-office employee to send him the open accounts receivable and accounts payable between Jaffe and Empire, Vista, Eternal, Tri Color, and Universal as of April 22, 2018. Gandhi referred to these parties as "overseas non-affiliates."

124.    During the Relevant Period, Nirav Modi, Mihir Bhansali, and Ajay Gandhi exercised direct oversight and control over numerous transactions between the U.S. Entities and Shadow Entities, as illustrated by the specific examples described in Appendix A-124.

125.    Ajay Gandhi regularly advised Nirav Modi, Miten Pandya, Manish Bosamiya, Amit Magia, and Shyam Wadhwa, concerning wires of funds from the U.S. Entities to India in furtherance of the Bank Fraud, as illustrated by the specific examples described in Appendix A-125.

iii.     *Suspicious Accounting, Finance, and Inventory Management Practices*

126.    Gandhi and Bhansali engaged in and oversaw suspicious accounting, corporate finance, and inventory management practices for the purpose of furthering and concealing the Bank Fraud.

127.    Gandhi and Bhansali maintained two sets of books and records for the U.S. Entities: "core" financials, which did not include loose diamond and other high-value transactions outside the normal course of the U.S. Entities' business, and "regular" financials, which reflected transactions with Shadow Entities and other Firestar Entities to further the Bank Fraud.

128.    Jaffe's federal tax return for the fiscal year ending March 31, 2012 listed sales of $9,090,661. However, Jaffe's sales journal, as well as the Jaffe financial statements originally provided by Ajay Gandhi to the Examiner, indicates that, during that same time period, Jaffe's sales totaled $49,628,873.

129.    After Gandhi was questioned by the Examiner about the significant difference between the tax return sales of around $9 million and the "original" financial statements and sales journal which both reflected $49 million of sales, Gandhi produced a second set of financial statements, which he called the "core" set. This "core" set reflected sales at $10 million. Gandhi did not provide any real explanation as to why he maintained two sets of financial statements. The difference between these financials was primarily loose diamond sales between Jaffe and various Shadow Entities.

130.    Bhansali managed the Debtors' "house accounts," the accounts in which proceeds of loose diamond sales were segregated from regular sales accounts for purposes of computing commissions. Upon information and belief, the difference between the amounts reported in the

Jaffe's tax returns versus the amounts reflected in its sales journals primarily relates to such transactions.

131.    The secretive nature of the "regular" financials is further demonstrated by the communications between Nirav Modi, Ajay Gandhi, Mihir Bhansali, and other co-conspirators described in Appendix A-131.

132.    Mihir Bhansali and Ajay Gandhi also oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers.

133.    For example, each diamond or gem received by the Debtors for use in an ordinary retail transaction would be unpacked, compared to its packing slip, scanned for quality control, and logged as "ready to ship."

134.    These practices were not employed with respect to Shadow Entity-related transactions. For those transactions, a Shadow Entity or foreign Firestar Entity would often send bulk shipments of loose diamonds accompanied by email instructions to export them immediately upon receipt to either another Firestar Entity or a Shadow Entity at specified prices and quantities. Packing slips and invoices for the subsequent exports often accompanied these email instructions. Consistent with instructions from overseas Modi-Controlled Entities, these goods were either immediately re-shipped without being opened or, if they were opened, they were inventoried in bulk, not individually.

*iv.        Efforts to Manipulate or Deceive Auditors and Lenders*

135.    On numerous occasions, Bhansali and Gandhi sidestepped auditors' inquiries concerning the U.S. Entities' dealings with Shadow Entities by offering farfetched explanations, feigning ignorance, or, in some cases, ignoring the questions altogether.

24

136.    For example, on July 2, 2010, a banker asked Ajay Gandhi whether FDI and Eternal were related. Ajay Gandhi forwarded the email to Mihir Bhansali and stated, "I am ignoring that question but I may not be able to avoid the same." Bhansali replied, "Speak to Nirav when he is in NY next week." The next day, Gandhi told the banker that Nirav Modi's father, Deepak Modi, owned Eternal.

137.    As another example, on June 16, 2011, an HSBC Bank representative asked Ajay Gandhi why Synergies would be wiring funds to Unique. Gandhi explained that Unique had loaned funds to Synergies, which loaned the same funds to Twin Fields, and that both loans were subsequently repaid. The representative then asked, "Unique is affiliated correct? Does Nirav own it? Is this why there are loans back and forth?" Gandhi replied, "Unique is not an affiliated company but Nirav has a very good relationship with them." The representative then asked, "Why is each company lending to the other?" Gandhi replied, "I am sure there were business reasons. What is the concern for the bank?"

138.    As another example, on September 7, 2011, a banker at Standard Chartered Bank asked Ajay Gandhi, "We understand that Firestar in NY sales [sic] mostly to big retailers in the US but the recent A/R outstanding shows more concentration on companies such as Unique Diamond, Empire Gem and SDC Designs. Can we get YTD sales data of 2010 and 2011 of the top 10 accounts for each year on year comparison?" She further stated, "Also, in the AR ageing it shows Firstar has given Steller [sic] diamonds and Unique diamonds $11m limits each—and Brilliant, Fancy creations $2m each. We understand that these foreign bills we are not discounting them, but we'd like to get more background info on these accounts given the size of exposures."

139.    On September 12, 2011, Gandhi replied, "Various overseas companies that you have mentioned are not our customers. We buy unique large diamonds/jewelry pieces from various vendors in India and sometimes these goods need to be returned, but due to the terms of

the original sale, the vendors instruct us to ship these goods to another companies [sic], that they

select, who are not located in India. We record these transfers as a reduction to purchases and an

increase to accounts receivable at the original purchase cost of the diamonds/ jewelry."

140.    Mihir Bhansali, who was included on the email from Gandhi, forwarded this

response to Modi, stating "Nirav, Please read this email below from SCB last week, and Ajay's

reply. Just an FYI." Modi then forwarded the email to the former deputy managing director of

Axis Bank's corporate banking division, and stated, "As SC is a common bank in India, Antwerp

and NY. It might be a good idea that Ajay and you discuss all responses."

141.    As another example, on April 22, 2017, an auditor asked Ajay Gandhi why FDI

had recorded a payable for an invoice issued by Fancy Creations to NMI. Gandhi replied,

"Vendor error." A few minutes later, apparently deciding that excuse was not sufficient, he

equivocated, "Also to save freight, they ship together as one invoice. Difficult to fight with them."

142.    And as yet another example, on April 26, 2017, Ajay Gandhi asked Mihir Bhansali

how he should respond to an auditor's inquiries into the U.S. Entities' multi-million-dollar A/R

and A/P balances with Shadow Entities Auragem and Fancy Creations. Bhansali directed Gandhi

to discuss the issue with Shyam Wadhwa and asked when the Shadow Entity balances could be

cleared.

143.    At least some of the coordination of the various Shadow Entities' involvement in

manipulating audits, and the Bank Fraud more generally, was conducted through an

operation1@firestardiamond.com ("**Operation 1**") email address. The Operation 1 account was

used by Sandeep Mistry and possibly others.

144.    As part of the audit process, auditors would email parties listed on the audited

company's accounts receivable and accounts payable records to request written confirmation of

the amounts reflected in the audited company's books and records. For audits of the U.S. entities,

which were conducted together, Ajay Gandhi would be copied on the auditor's emails to Shadow Entities, which Gandhi would often forward to Operation 1 to ask that Operation 1 cause the Shadow Entity to provide confirmation the auditors. Specific examples of such emails are described in Appendix A-144

145.    The Operation 1 account was also used to orchestrate transfers of funds and jewels among Firestar Entities and Shadow Entities, as demonstrated by the specific examples described in Appendix A-145.

      *D.*     *Involvement of Mehul Choksi, Nehal Modi, Neena Sheth, Deepak Sheth, and Abhay Javeri, and the Sheth Entities and SDC Entities in the Bank Fraud.*

146.    Mehul Choksi is Nirav Modi's uncle. Choksi is accused of orchestrating his own bank fraud scheme through his India-based company Gitanjali Gems Ltd., its U.S.-based subsidiaries including Gitanjali USA, Samuels Jewelers, Inc. ("**Samuels**"), Aston Luxury Group (NY), Diamlink, Inc., Diamlink Jewelry, Inc., Jewelry Marketing Company, Tristar Worldwide LLC, and Phantom Luxury Group, along with a web of fictitious vendors and customers analogous to the Shadow Entities.

147.    Although Nirav Modi's and Mehul Choksi's fraud schemes primarily operated in parallel from a corporate standpoint, members of their family participated on both sides. For example, Nehal Modi, Nirav Modi's brother, was in charge of Gitanjali USA, Samuels, and Diamlink on the Choksi-side and BBB Group on the Modi side. Similarly, Mehul Choksi's sister and Nirav Modi's aunt, Neena Sheth, served as a director of Diamlink.

148.    Neena Sheth's husband, Deepak Sheth, (i.e. Nirav Modi's uncle and Mehul Choksi's brother-in-law), owns New York-based Excellent Facets, Inc. and Amadena Investments Inc. (collectively, the "**Sheth Entities**"). As alleged below, Deepak Sheth also served as the initial

Protector and Investment Advisor of the Ithaca Trust and as Manager of CPS50 in connection

with

149.    Also involved was Ami Modi's brother and Nirav Modi's brother-in-law, Abhay

Javeri. Javeri owns SDC Designs, Inc., SDC Designs LLC, Sangam Diamonds Corporation, and

Sangam Diamonds LLC (collectively, the "**SDC Entities**"). Abhay Javeri also served as Protector

and Investment Advisor of the Ithaca Trust and as Manager of CPS50.

150.    Deepak Sheth, Neena Sheth, Nehal Modi, Abjay Javeri, and their respective

companies participated in the Bank Fraud throughout the Relevant Period.

151.    Deepak Sheth and the Sheth Entities participated in direct transactions with

Shadow Entities totaling over $19 million during the Relevant Period.

152.    For example, in March 2016, Deepak Sheth instructed Mihir Bhansali and Ajay

Gandhi to have NMI bill Excellent Facets $965,000 for a 15.21-carat diamond necklace and a 10.71-

carat diamond ring, but to ship the pieces to Shadow Entity Sunshine in Hong Kong. Sheth

referred to Sunshine as "his customer."

153.    Abhay Javeri and the SDC Entities participated in direct transactions with Shadow

Entities involving millions of dollars during the Relevant Period.

154.    For example, on December 4, 2012, the SDC Entities' CFO Sridhar Krishnan

advised Ajay Gandhi that Shadow Entity Empire would be wiring $2.7 million to FDII as partial

payment against a July 2012 invoice and instructed Gandhi to use the funds to pay SDC Designs

LLC against another July 2012 invoice. Gandhi forwarded the email to Hemant Bhatt and asked,

"Is this OK once funds are received?" Bhatt replied, "Do not send email. Please call me to confirm

in the morning."

155.    As another example, on February 4, 2013, Sridhar Krishnan advised Mihir Bhansali

and Hemant Bhatt over personal email that he had wired $1.4 million from an SDC Entity to

28

Shadow Entity Universal and asked Bhatt to wire those funds to Jaffe. On February 6, 2013, Bhatt

confirmed that Universal had received the funds and that Empire had paid US $1,391,570 to Jaffe.

That same day, Jaffe wired $1,391,997 to SDC.

156.    As another example, on February 11, 2013, Sridhar Krishnan advised Mihir

Bhansali and Hemant Bhatt over personal email that he had wired $1.2 million from SDC Designs

LLC to Shadow Entity Empire and instructed Bhatt to wire those funds to Jaffe and FDI. Jaffe and

FDI then wired the funds to SDC Designs LLC.

157.    As yet another example, on December 31, 2013, Mihir Bhansali directed Ajay

Gandhi to wire $1.2 million from FDI to Sangam Diamonds Corp. to pay off an invoice issued to

Shadow Entity Fancy Creations. On January 8, 2014, Gandhi forwarded Bhansali's December 31,

2013 email to Hemant Bhatt, stating "I paid $1.24m on 12/31/13 to Fancy per attached. This funds

never came back hence I will pay $575k today. Please call me if needed."

158.    On May 25, 2018, an accountant at Marks Paneth emailed Sridhar Krishnan a

request for information relating to SDC Entities' customers with outstanding A/R balances more

than 90 days old, including Empire, a Shadow Entity, and Diamlink, a Mehul Choksi-owned

company managed by Neena Sheth and Nehal Modi.

159.    Sridhar Krishnan could not transfer funds from the SDC Entities' bank accounts

without Abhay Javeri's personal authorization. For example, on March 10, 2015, Ajay Gandhi

asked Sridhar Krishnan to provide wire details for potential payments to SDC Designs Inc. and

SDC Designs LLC. Krishnan replied with the bank account information but stated, "Please do not

wire anything this week. **Abhay is in Mumbai and no one can approve wires**."

160.    Moreover, on many occasions, Mihir Bhansali and Ajay Gandhi would

immediately transfer funds received by the U.S. Entities from the Sheth Entities and SDC Entities

to Shadow Entities and Foreign Firestar Entities (including to pay off letters of credit issued to

Foreign Firestar Entities through HSBC's L/C Collections service), as they commonly did with funds received from Shadow Entities and Firestar Entities, but not from *bona fide* customers. Specific examples of such transactions are described in Appendix A-153.

161.    Ajay Gandhi, Saju Poulose, Shyam Wadhwa, and other co-conspirators treated transactions with the Sheth Entities and SDC Entities as "non-core" as they did with the Shadow Entity transactions and other transactions linked to the Bank Fraud.

162.    For example, Ajay Gandhi and Shyam Wadhwa maintained a spreadsheet summarizing the gross margin for "various divisions" for the 2012 – 2013 fiscal year. The spreadsheet contained separate columns for "core business" and "large pieces." The spreadsheet listed gross sales of $35,035,180 at a 12.03% gross margin for the "core business" column and gross sales of $17,711,569 at a 5.51% gross margin for the "large pieces" column. The spreadsheet also contained an itemized list of transactions comprising the $17,711,569 in "larger pieces" sales, including a total of $7,758,454 in sales to SDC entities, $1,253,254 to Excellent Facets, $1,912,840 to Pacific, and $3,019,406 to Empire.

163.    Additional examples illustrating the suspicious accounting practices for transactions involving SDC Entities and Sheth Entities are described in Appendix A-163.

164.    Additional suspicious transactions and communications involving the Deepak Sheth, Neena Sheth, and the Sheth Entities are described in Appendix A-164.

165.    Additional suspicious transactions and communications involving Abhay Javeri and the SDC Entities are described in Appendix A-165.

**E.    Laundering of Funds Through Twin Fields and Bailey Banks & Biddle**

166.    Throughout the Relevant Period, tens of millions of dollars in proceeds of the Bank Fraud were funneled to or through Twin Fields and BBB Group, Inc. ("**BBB Group**").

167.    On November 4, 2009, Ajay Gandhi, acting on behalf of Synergies, successfully bid on the intellectual property rights of Bailey Banks & Biddle, an established U.S. jewelry retailer, at a bankruptcy auction.

168.    Nirav Modi formed Switzerland-based Diamonds Holdings SA to serve as Synergies' nominee to purchase the *Bailey Banks & Biddle* intellectual property.

169.    On March 16, 2010, Twin Fields Investments Ltd. ("**Twin Fields**") was incorporated in Delaware.  At all relevant times, Purvi Mehta and Deepak Modi indirectly owned 100% of the equity in Twin Fields through two layers of BVI shell companies, including Link High International ("**Link High**").

170.    On May 13, 2010, BBB Group, Inc., d/b/a as Bailey Banks & Biddle, was incorporated in Delaware.  Twin Fields owned 100% of the equity of BBB Group.

171.    Diamonds Holdings SA licensed the *Bailey Banks & Biddle* intellectual property to Twin Fields, which in turn sublicensed it to BBB Group.

172.    Mihir Bhansali and Nehal Modi managed and controlled Twin Fields and BBB Group throughout the Relevant Period as the *de jure* or *de facto* directors of Twin Fields and BBB Group, respectively.

173.    The law firm that managed registrations for the *Bailey Banks & Biddle* intellectual property directed communications to Mihir Bhansali, sent their invoices to Bhansali, and otherwise treated Bhansali as the representative of Diamond Holdings, Twin Fields, and BBB Group.

174.    In 2010, BBB Group opened several retail locations under the Bailey Banks & Biddle name, which it continued to operate throughout the Relevant Period.

175.    Between November 2010 and March 2018, approximately $80 million flowed through Twin Fields.  From 2010 to early 2013, Link High was the primary source of funds for the

31

Twin Fields' account, transferring $23,602,660.00.  According to Indian authorities, Link High received millions of dollars of in fraudulent LOU proceeds.

176.    Between February 2013 and May 2017, Jaffe transferred at least $21,330,000.00 to Twin Fields.  Jaffe maintained relatively small balances in its operating account and did not have sufficient capital to make large loan payments to Twin Fields.  Most of the disbursements from A. Jaffe to Twin Fields were funded on or around the day of the payments from other sources, including FDI and known Shadow Entities Pacific Diamonds and Universal Fine Jewelry.

177.    On or about June 22, 2015, FDI transferred an additional $31,542.28 to Twin Fields.

178.    Between 2016 and 2017, Shadow Entity Fine Classic, of which Purvi Mehta was the 100% owner, transferred at least $26,864,056.00 to Twin Fields.  In an email chain dated January 11, 2017, Mihir Bhansali told Marks Paneth, Twin Fields's accountant, that Fine Classic was an overseas company that lent money to Twin Fields to fund BBB Group.

179.    Between 2011 and 2017, Twin Fields transferred at least $42,748,000 to BBB Group. BBB Group made no repayments or other transfers to Twin Fields during the Relevant Period.

180.    The Twin Fields account was closed on February 21, 2018 with a balance of $13,281.

181.    Mills Menser, the manager of the *Bailey Banks & Biddle* store in Austin from July 2017 until March 2018, sent Nehal Modi and Mihir Bhansali weekly updates on the businesses' operations and performance. Bhansali would then pass these updates along to Nirav Modi.

182.    On May 1, 2018, Mills Menser proposed several options for winding down the business for Nehal Modi and Mihir Bhansali's consideration. He concluded by stating he would "support any decision ownership feels is the best fit for them."

183.    Based on, among other things, Purvi Mehta and Deepak Modi's undisclosed ownership of Twin Fields through BVI shell companies, the more than $60 million laundered through Twin Fields from Fine Classic, Link High, and Jaffe, and Mihir Bhansali and Nehal

Modi's involvement in its management and operations, it appears that Twin Fields and BBB Group constituted another front for Nirav Modi and his family's massive money laundering efforts.

### F. Detection and Exposure of the Bank Fraud

184.    In late May 2017, Golkunath Shetty, the PNB employee who approved fraudulent LOUs for the benefit of Nirav Modi's companies, retired. In the months leading up to his retirement, between February and May 2017, Shetty approved nearly 150 new LOUs totaling over $1 billion to the LOU Entities. These LOUs became due on or around January 25, 2018.

185.    According to Indian authorities, Nirav Modi and his brother Neeshal Modi fled India on January 1, 2018, and Ami Modi and Mehul Choksi did so on January 6, 2018 and January 4, 2018, respectively.

186.    On January 5, 2018, Nirav Modi purchased a London apartment for £7,950,000 in cash under the name "Richard Beattie" which appears to be an alias or surrogate of Nirav Modi. Modi was living in this apartment when he was arrested in March 2019. It is was also the registered office of Diamond Holdings Ltd., a UK company Nirav Modi formed in May 2018.

187.    On or around January 20, 2018, a representative of one of the LOU Entities asked PNB to roll-over the 2017 LOU balances into new LOUs. On January 22, 2018, PNB refused to issue new LOUs without a 100% cash margin deposit, among other requirements. The Modi representative refused to furnish any margin on the grounds that PNB had never before required a margin to issue an LOU. PNB immediately began investigating the borrowing practices of the Modi-Controlled Entities.

188.    The Bank Fraud has resulted in several investigations and criminal enforcement actions against Nirav Modi, Mihir Bhansali, and Defendants Ami Modi, Purvi Mehta, Mayank Mehta, Nehal Modi, Neeshal Modi, and others by Indian governmental authorities, including the

Central Bureau of Investigation ("**CBI**"); the Directorate of Enforcement ("**ED**"); the Income Tax

Department; and the Serious Fraud Investigation Office.

189.    On January 29, 2018, PNB lodged a criminal complaint against Nirav Modi with

India's CBI. On February 13, 2018, PNB lodged a complaint against Nirav Modi with India's ED,

which subsequently attached various movable and immovable properties belonging to Nirav

Modi and various Modi-Controlled Entities.

190.    On July 3, 2018, PNB filed Application No. 119/2018 in the Debts Recovery

Tribunal No. I at Mumbai (the "**Indian Debt Tribunal**") against, *inter alia*, Nirav Modi and certain

of his family members, each LOU Entity, FIL, and FDIPL.

191.    In early 2019, Nirav Modi was found living in London under the alias "Edmond

Dantes."

192.    On or about March 12, 2019, the Indian government issued an extradition request

to the government of the United Kingdom on the basis of an arrest warrant issued against Nirav

Modi by an Indian court. Modi was arrested in London on or about March 20, 2019 and is

currently incarcerated in London.

193.    On July 6, 2019, the presiding officer of the Indian Debt Tribunal issued a judgment

against Nirav Modi, Ami Modi, Nehal Modi, Neeshal Modi, Purvi Mehta, the LOU Entities, FIL,

and others based on the following factual findings, among others (capitalized terms in original):

(i)     Nirav Modi has floated Overseas Companies in Hong Kong and U.A.E. which
        are dummy/shell Companies. The Directors and share-holders of these
        Companies are either ex-employees or employees acting under instructions of
        Nirav Modi.

(ii)    The Overseas Companies and Hong Kong and Dubai deals with the Firestar
        Group directly or indirectly owned by Nirav Modi who has full control over
        these Companies through the dummy Directors. The Enforcement Directorate
        in its Complaint has recorded that the list of top 8 borrowers and top 8
        suppliers are none else but the ex-employees of Firestar Group and acting and
        implementing the instructions given by Nirav Modi and Mihir Bhansali.

(iii)    The fraud has been perpetrated by Nirav Modi in collusion, connivance and with the aid and assistance of the group companies i.e. Firestar International Limited and Firestar Diamond International Pvt. Ltd. along with their affiliates, subsidiaries, Nirav Family Trust, Nirav Modi Family Trust, directors and key managerial personnel.

(iv)    The investigation conducted by the Enforcement Directorate further reveals that the dummy Companies were set up in Hong Kong and Dubai along with the regular Firestar Group Companies [and] acted as nodes for circular transactions to layer and launder money generated by the fraudulent LOUs.

(v)     [Nirav Modi and his family members] are the mastermind[s] behind the perpetration of the fraud. Defendants have laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purposes of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs.

(vi)    All of the aforesaid dates and events reveal the systematic fraud was perpetrated by Nirav Modi and moving the US Court for insolvency to avoid the liability. Nirav Modi and his accomplishes [sic] have taken prompt steps before the US Court to avoid the seizer [sic] and attachment of the properties purchased and acquired by Nirav Modi from the proceeds of the fraudulent debt.

The Bank Fraud resulted in a total loss to PNB and other banks in excess of $1 billion. As a result of the Bank Fraud, PNB has asserted claims against each of the Debtors in excess of $1 billion on the grounds, among others, that a substantial portion of the proceeds of the Bank Fraud were transferred to or through the Debtors. In addition, the Bank Fraud and its exposure and the seizure by Indian authorities of Modi-Controlled Entities in India resulted in the collapse of the Debtors' businesses and the filing of these chapter 11 cases.

## II.    Criminal Efforts Shortly Before and Following Exposure of the Bank Fraud

194.    In the weeks leading up to and following exposure of the Bank Fraud in January 2018 when the last LOUs Golkunath Shetty authorized before retiring became due, Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators shifted their focus to shielding assets from creditors.

### A.    Looting of the Debtors, U.S. Affiliates, and Other Firestar Entities

195.    Nirav Modi, Mihir Bhansali, Ajay Gandhi, and other co-conspirators diverted substantial amounts of the Debtors' cash and inventory to overseas Modi-Controlled Entities in the weeks leading up to the Debtors' bankruptcy filing. For example:

(i)    On or around December 5, 2017, FDI shipped inventory with a declared value of $1,632,500.53 to World Diamond.

(ii)    On January 3, 2018, FDI wired $2,672,389.48 to Pacific. That same day, Jaffe wired $530,000 to Pacific. Ajay Gandhi was directly involved in these transfers.

(iii)    On or around January 23, 2018, FDI shipped 2,319.64 carats of loose diamonds with a declared value of $426,320.97 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi and Mihir Bhansali were directly involved in this shipment.

(iv)    On January 25, 2018, FDI wired $910,278.70 to Dubai-based Firestar Diamond FZE, which was managed by co-conspirators Kurian Mathews and Satyendra Shukla. Ajay Gandhi was again directly involved in this transfer.

(v)    On January 26, 2018, FDI shipped inventory having a declared value of $85,150 to Nirav Modi Ltd. in Hong Kong.

(vi)    On February 6, 2018, FDI wired $1,002,836.77 to FIPL, Jaffe wired $505,610.51 to FIPL and Fantasy wired $401,471.08 to FIPL. That same day, Subhash Parab emailed Ajay Gandhi, copying Shyam Wadhwa, "Please pay following bills to FIPL . . . We have some urgent re-payment from IDBI bank for that [sic] we require below bills in IDBI bank[.]"

(vii)    On or around February 6, 2018, FDI shipped 4,474.15 carats of loose diamonds with a declared value of $789,140.42 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi was directly involved in this shipment.

196.    Additionally, in the weeks leading up to and following the Petition Date, Nirav Modi, Mihir Bhansali, and Ajay Gandhi caused NMI and FDII to move significant amounts of cash and inventory overseas where their creditors, including the Debtors, could not reach them. For example:

(i)    On December 22, 2017, FDII shipped inventory with a declared value of $1,418,549 through Malca Amit to Fancy Creations in Hong Kong.

(ii)    On January 4, 2018, NMI shipped two packages of inventory, with declared values of $585,000 and $65,000, respectively, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(iii)    On January 5, 2018, FDII shipped inventory with a declared value of $167,810.65 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(iv)    On January 10, 2018, NMI shipped inventory with declared value of $108,550, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(v)    On January 10, 2018, FDII shipped inventory with a declared value of $239,871.29 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(vi)    On January 11, 2018, NMI shipped inventory with declared value of $32,370, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(vii)    On January 15, 2018, FDII shipped inventory with a declared value of $781,882.38 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(viii)    On January 16, 2018, NMI shipped inventory with declared value of $943,800, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(ix)    On January 19, 2018, NMI shipped three packages of inventory, with declared values of $273,000, $409,500, and $771,680, respectively, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(x)    On January 24, 2018, NMI shipped inventory with a declared value of $1,075,200 through Malca Amit to FDIPL in India.

(xi)    On January 25, 2018, FDII shipped inventory with a declared value of $1,886,922.67 through Malca Amit to Fancy Creations in Hong Kong.

(xii)    On January 26, 2018, NMI shipped inventory with a declared value of $198,750 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xiii)  On January 29, 2018, NMI shipped inventory with a declared value of $75,050 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xiv)  On January 30, 2018, FDII shipped inventory with a declared value of $570,104.37 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(xv)  On January 31, 2018, NMI shipped inventory with a declared value of $660,500 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xvi)  On January 31, 2018, FDII wired $2,466,015 and $525,000 to Fancy Creations. That same day, Ajay Gandhi forwarded the wire confirmations to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

(xvii)  On February 2, 2018, FDII wired $400,000 to Fancy Creations. That same day, Ajay Gandhi emailed Avinash Oza and Kunal Patel, copying Shyam Wadhwa, "Please wire $400,000 to Fancy from Capital One – Advance Refund." Oza replied with the wire confirmation.

(xviii)  On February 13, 2018, NMI shipped inventory with a declared value of $154,440 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xix)  On March 6, 2018, FDII shipped inventory with a declared value of $4,325,472.34 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

197.    Around this time, Mihir Bhansali promised to use the NMI inventory to repay FDI's secured creditors, including Israel Discount Bank of New York ("**IDB**"), after transferring it to the Debtors to offset NMI's debts to FDI and Jaffe. IDB's counsel attempted to enforce this promise during negotiations regarding the Debtors' use of cash collateral by seeking to require the Debtors to collect the amounts owed to them by NMI. As alleged below, however, this never occurred, and instead, Mihir Bhansali was involved in diverting those assets to Hong Kong, beyond the Debtors' reach.

198.    Between late February and early March 2018, the NMI boutiques in Las Vegas, Honolulu, Los Angeles, and New York shipped substantially all of their inventory to New York. The inventory, which had a total value of approximately $40 million, was held in storage by Malca

Amit because its value exceeded the amount of available insurance coverage on items stored in the Debtors' vault.

199.    Around this time, Mihir Bhansali, Ajay Gandhi, and Angelina Ypma, in their capacity as directors and officers of Nirav Modi Ltd. ("**NMLUK**"), the UK-based subsidiary of NML that operated the London *Nirav Modi* boutique, were also working together to shut down the London store and divert its assets to Hong Kong.

200.    Nitin Dattani of Dattani Chartered Accounts, the London based accounting firm that had been advising NMLUK since 2016, was also heavily involved in shuttering the London boutique. Dattani assisted Nirav Modi in forming Diamonds Holdings Ltd., the company Nirav Modi established while he was hiding out in London. Additionally, as alleged below, in May 2018, Abhay Javeri appointed Nitin Dattani to replace Nehal Modi as manager of Central Park South 50 Properties LLC, which owned Nirav Modi and Ami Modi's New York Ritz Carlton apartment.

201.    On March 2, 2018, Francois-Xavier Derricks, the manager of the London boutique sent a letter to Mihir Bhansali and Angelina Ypma in their capacity as directors of NML UK. In the letter, Derricks acknowledged that Bhansali and Ypma had previously instructed him to communicate by WhatsApp and private email, but stated that he was "concerned by the recent lack of information and guidance in relation to the management of the London boutique's affairs."

202.    On March 4, 2018, Ajay Gandhi instructed Derricks to ship substantially all of the London boutique's inventory, a total of 404 pieces of jewelry, having a total value of $5,974,614, to FDL in Hong Kong. This shipment occurred shortly thereafter.

203.    On March 11, 2018, Angelina Ypma instructed Ajay Gandhi to ship a fancy pink diamond ring from NMI to the "H[ong] K[ong] office." She told Gandhi she had sent him a

picture of the ring over WhatsApp. Nirav Modi confirmed his approval from his personal email account, which Ypma copied on her email to Gandhi.

204.    Around this time, Nehal Modi and Mihir Bhansali brought in Anthony Allicock, Nehal Modi's personal friend and former colleague at Diamlink, to "manage the wind down" of the Hong Kong Firestar Entities. Allicock, a New York retail store manager, had no prior insolvency or finance experience.

205.    On March 19, 2018, Anthony Allicock was appointed the sole director of FHL, NML, and FDL.

206.    On March 22, 2018, Mihir Bhansali executed corporate resolutions on behalf of each of the U.S. Affiliates authorizing the U.S. Affiliates to indemnify Mihir Bhansali and advance his legal costs.

207.    On March 23, 2018, Mihir Bhansali, as sole director of each U.S. Affiliate, appointed Jacen Dinoff and Michael Goldman of KCP Advisory Group as directors and President and Chief Financial Officer, respectively, of each of the U.S. Affiliates.

208.    On March 26, 2018, Mihir Bhansali and Ajay Gandhi resigned from their positions with the U.S. Affiliates.

209.    On April 5, 2018, Angelina Ypma, the global president of the *Nirav Modi* brand and a director of FIL, emailed Ajay Gandhi, copying Mihir Bhansali, "Nirav has instructed me to work with you to move all of NM US inventory (HJ and core back to HK ASAP.) HK will pay Malca in advance to move the jewels." In response, Gandhi, copying Jacen Dinoff, Michael Goldman, and shipping manager Shaneeza Singh, stated that he and Bhansali had resigned from NMI "due to conflict of interest" and that she should work with Dinoff, Goldman, and Singh to coordinate the shipments. Gandhi further noted that he and Bhansali were "happy to assist as needed should [Ypma] hit any bottleneck."

210.    Ypma then instructed Dinoff and Goldman to send her a detailed inventory of NMI inventory in New York and stated, "We need to ship all products to HK." Goldman replied to Singh, "we are NOT shipping anything right now. I will let you know when it is okay to do this."

211.    That same day, Anthony Allicock emailed Goldman and Dinoff, "In my capacity as Director of Firestar Holdings Limited, I am relieving you of your duties and directorship of the New York subsidiaries effective immediately. Please confirm in writing your acceptance of the same." When interviewed by the Trustee, Allicock indicated that Mihir Bhansali or Nehal Modi directed him to terminate Goldman and Dinoff, but that he could not recall the details.

212.    Goldman forwarded the email to Mihir Bhansali and Ajay Gandhi and stated, "[W]e were attempting to verify with outside parties the position and authority of Anthony Allicock before sending him almost $7 million of diamonds. We did not move quickly enough for him and he sent us the email below. Is it your understanding that he has the authority to do this, and that his declaration is enough to make it official? Upon review of Anthony's email, do you also consider our positions and responsibilities to be terminated?" Bhansali replied, "Neither Ajay nor I will be able to comment on the below."

213.    That same day, Anthony Allicock appointed himself sole director and president of each of the U.S. Affiliates.

214.    On April 6, 2018, FDII inventory having a total declared value of $6,804,210.49 was shipped through Malca Amit to Firestar Diamond Ltd. in Hong Kong. This shipment appears to involve the "almost $7 million" in diamonds Dinoff and Goldstein refused to ship.

215.    Nehal Modi then approached Mark Motes and Eddy Friedfeld as potential replacements for Dinoff and Goldman. Mark Motes, the former chief operating officer of Maryland-based Smyth Jewelers, was a diamond industry veteran. Eddy Friedfeld was a

41

turnaround consultant who had managed Diamlink's out-of-court restructuring in 2015 and 2016. Nehal Modi had previously worked with both Motes and Friedfeld.

216.    Mihir Bhansali then interviewed Motes and Friedfeld. He told them he was looking for two industry professionals he could trust.

217.    On April 13, 2018, Anthony Allicock, at Mihir Bhansali's and Nehal Modi's direction, appointed Mark Motes the sole director and president, and Eddy Friedfeld the chief liquidation officer, of each U.S. Affiliate.

218.    On April 25, 2018, 45 pieces of NMI inventory, with a total declared value of $6,315,615, were shipped via Malca Amit to NML in Hong Kong.  Ajay Gandhi signed the packing lists included in the shipping instructions.

219.    On April 30, 2018, 93 pieces of NMI inventory, with a total declared value of $13,108,072, were shipped via Malca Amit to NML in Hong Kong. Ajay Gandhi signed the packing list included in the shipping instructions.

220.    On or around May 3, 2018, FDII inventory with a declared value of $3,200,000 was moved to Malca Amit to be held in storage.

221.    Around the same time, Anthony Allicock, Mihir Bhansali, Ajay Gandhi, Angelina Ypma, and Nitin Dattani were trying to divert NMLUK's remaining cash to Hong Kong. Gandhi, Bhansali, and Ypma officially resigned their NMLUK positions on March 12, 2018, but as with the U.S. Affiliates, their resignations were on paper only and they remained in control of NMUK and its assets.

222.    On April 9, 2018, Angelina Ypma instructed Ajay Gandhi and Mihir Bhansali to "transfer the funds available in Nirav Modi Ltd. in London to Nirav Modi Ltd. in Macau." On April 29, 2018, Anthony Allicock asked Ajay Gandhi whether the more than £ 1,000,000 in NMLUK's Barclays account had been transferred to Hong King. Gandhi replied that a portion of

42

the funds had been wired, but that the account had been blocked. Allicock, Gandhi, Bhansali, Ypma, and Dattani worked together over the next few weeks to unblock the account so they could move the remaining funds to Hong Kong.

223.     On May 4, 2018, Ypma emailed Gandhi and Bhansali, "I shall be coming to NY from Monday 7 till Thursday 10 May to review the NM inventory. Nirav told me that I can work with [FDI employee Shanna Singh] to count the inventory . . . Thank you to give me the support." Gandhi reiterated that he and Bhansali had resigned from NMI and directed Ypma to work with NMI's new management "on the logistics."

224.     During Angelina Ypma's visit to New York in May 2018, Ajay Gandhi and Mihir Bhansali gave her permission to remove several million dollars' worth of the inventory in storage at Malca Amit. According an employee who accompanied Ypma to Malca Amit, Ypma selected approximately $5 million from various parcels. The pieces Ypma selected were then shipped to Hong Kong in two shipments.

225.     First, on May 9, 2018, inventory with a declared value of $2,700,000 was shipped through Malca Amit to Fancy Creations in Hong Kong. (The Malca Amit documentation listed FDII as the shipper, but this shipment might have involved NMI inventory as well.)

226.     Then, on May 15, 2018, 122 pieces of NMI inventory with a declared value of $2,516,470.79 were shipped to NML in Hong Kong through Malca Amit. Ajay Gandhi signed the packing list included in the shipping instructions.

227.     On May 23, 2018, NML "sold" the 122 pieces of NMI inventory to FDL. That same day, FDL "sold" the same pieces to Shadow Entity Sino Traders. Anthony Allicock signed the invoices for both of these purported sales. Yet, on June 19, 2018, Allicock told attorneys for the Hong Kong Firestar Entities that the May 15 shipment was sent from New York without Allicock's authorization and asked them to attempt to locate the shipment.

228.     Throughout May 2018, Anthony Allicock pressured Eddy Friedfeld and Mark Motes to ship the remaining NMI and FDII inventory to Hong Kong. They refused to do so until all of the U.S. Affiliates' creditors were paid. When Friedfeld and Motes discovered the May 15, 2018 shipment, they demanded that Allicock arrange for the return of the shipment. Allicock refused.

229.     On June 1, 2018, at Nehal Modi's direction, Anthony Allicock terminated Friedfeld and Motes and appointed Rochelle Miller, another personal friend of Nehal Modi, as CEO and sole director of each U.S. Affiliate. Prior to her appointment, Rochelle Miller worked as an event planner and had no jewelry industry, insolvency, management, or financial experience.

230.     That same day, Anthony Allicock introduced Rochelle Miller to Angelina Ypma. Allicock and Ypma instructed Miller to retrieve the NMI and FDII inventory from Malca Amit and ship it to Hong Kong.

231.     At the time of Rochelle Miller's appointment, the U.S. Affiliates' bank accounts held a total of $1,283,454.05.

232.     On June 2, 2018, Rochelle Miller, acting in her capacity as director/CEO of NMI, contacted Malca-Amit to request shipment to Hong Kong of two sets of NMI inventory: 1) 208 pieces at a declared value of $5,063,914.01; and (2) 53 pieces at a declared value of $2,846,545. Malca Amit refused to do so until it could verify Miller's authority.

233.     On September 5 and 7, 2018, after confirming Rochelle Miller's appointment as director and CEO of NMI and FDII, Malca Amit released nine parcels containing the remaining NMI and FDII inventory to the custody of Rochelle Miller.

234.     Rochelle Miller, on information and belief, at the direction of Nehal Modi, shipped all of the NMI and FDII inventory to be appraised by Independent Gemological Laboratories ("**IGL**"), a purportedly independent diamond grading laboratory. However, according to the

44

Samuels examiner's report, IGL is secretly owned by Mehul Choksi through a BVI shell company. The Samuels examiner found that Choksi's secret ownership of IGL permitted Samuels to conceal from consumers the fact that its jewelry products were not independently evaluated. IGL's offices were directly next to Diamlink's offices.

235.    On October 2, 2018, IGL's president Curtis Lowrey advised Rochelle Miller that IGL had completed its inspection and appraisal of the NMI and FDII inventory, which Lowrey described as "17 bags and trunks of merchandise." IGL appraised the NMI and FDII inventory at a "scrap value" of approximately $1.5 million. Lowrey further noted that, "as this is a 'fire sale' . . . I made deeper discounts than would normally be customary in pricing a closeout inventory." Rochelle Miller paid IGL a total of $81,943 from June 2018 to June 2019 from FDII's and Synergies' bank accounts.

236.    Rochelle Miller then purported to sell the NMI and FDII inventory to the "highest bidders" for a total purchase price of $1,593,550. It appears that most, and possibly all, of the purportedly arms-length purchasers were surrogates of Nirav Modi and his family.

237.    For example, under an invoice October 4, 2018, Rochelle Miller sold an unspecified quantity of "mixed jewelry" to Hong Kong-based Alchemist Global Trading & Consulting Ltd. ("**Alchemist**") for a total price of $420,300. Alchemist was formed on May 16, 2018 and is owned by Tamer Abou El Ata, who on information and belief, is a personal friend of Nehal Modi.

238.    Under an invoice dated October 8, 2018, Rochelle Miller sold 296.56 carats of "loose diamonds" for $605,000 to Diamonds Village USA Corp., the California-based subsidiary of Dubai-based Diamonds Village DMCC. In July 2018, the owner of Diamonds Village, Naresh Mehta, was accused of running his own import-export scam using a *modus operandi* similar to Nirav Modi. The Firestar Entities' books and records reflect numerous transactions with Diamonds Village over the years.

45

239.    On October 9, 2018, Rochelle Miller paid herself a "one-time bonus" of $50,000 from FDII's bank account. On October 17, 2018, Rochelle Miller wired $75,000 to Anthony Allicock from Synergies' bank account. These payments appear to be incentive compensation tied to Miller's sale of the FDII and NMI inventory.

240.    Between June 2018 and June 2019, Rochelle Miller received a total of $807,203 in compensation, bonuses, and expense reimbursements from the U.S. Affiliates. Miller also paid an additional $535,763 to Mint Holdings, LLC, a Miami-based "luxury concierge service" company with ties to the Modi family, for "expense reimbursements" for which she received the benefit. Miller also paid a company owned by her husband, North Star Land Services, a total of $49,060 for unknown "sales."

241.    Rochelle Miller spent the remainder of the U.S. Affiliates' funds on legal and financial advisors, taxes, office space leases, director & officer insurance premiums, and other miscellaneous expenses.

242.    The systematic diversion of the U.S. Entities' assets to overseas Modi-Controlled Entities described in the foregoing paragraphs, in combination with the fraudulent omissions and misrepresentations Ajay Gandhi and Mihir Bhansali made in the context of these chapter 11 cases, constituted millions of dollars in actual fraudulent transfers and impaired recovery of loan receivables of the Debtors and the U.S. Affiliates.

**B.    *Fraudulent Omissions, Misstatements, and Misrepresentations Made in Connection With The Debtors' Chapter 11 Cases***

243.    On February 26, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. During the early weeks of the chapter 11 cases, Bhansali and Gandhi, as the Debtors' CEO and CFO, respectively, made fraudulent omissions, misstatements, and misrepresentations, formally and informally, explicitly and implicitly, to this Court, to the United

46

States Trustee, and to creditors, regarding the Debtors' involvement in the Bank Fraud and their

relationship to various Shadow Entities.

244.      In his Declaration filed with this Court on February 28, 2018, Bhansali stated under

penalty of perjury, "A list setting forth the twenty (20) largest unsecured creditors, of each of FDI,

[Fantasy] and [Jaffe], excluding those persons who constitute 'insiders' under Bankruptcy Code

section 101(31), is attached hereto as Exhibit B."

245.      Exhibit B to Bhansali's declaration, which purported to list the top 20 unsecured

non-affiliated creditors of each Debtor, included: World Diamond as a creditor of FDI in the

amount of $79,918.70; Fancy Creations as a creditor of FDI in the amount of $19,617.50; Tri Color

as a creditor of Jaffe in the amount of $3,356,165.99; Pacific as a creditor of Jaffe in the amount of

$2,922,239.31; Universal as a creditor of Jaffe in the amount of $42,905.00; and Eternal as a creditor

of Jaffe in the amount of $31,645.39. Each of these entities was in fact an insider.

246.      Moreover, Bhansali led the bankruptcy court and other parties to believe that the

Debtors were not involved in the Bank Fraud and that they were innocently caught up in an

overseas matter. In a declaration filed shortly after the petition date, Bhansali declared under

penalty of perjury: "The Debtors and their dedicated employees have worked tirelessly over the

past week or so to: (i) procure alternate sources of supply, (ii) establish alternate back office and

support service functions; (iii) reassure their vendors and customers that they had no

involvement in the alleged wrongful conduct; and (iv) reassure their customers that they were

committed to carrying on their business and that swift action was being taken to mitigate the

damage caused by the actions in India."

247.      On March 27, 2018, the Debtors filed their bankruptcy schedules and statements

of financial affairs ("**SOFA**"), all of which Ajay Gandhi signed under penalty of perjury. The

Debtors' statements of financial affairs contained numerous misstatements, misrepresentations, and omissions.

248.    FDI's SOFA did not list any transfers to Shadow Entities in response to Question No. 3, which asks for payments made to creditors within 90 days prior to the petition date, Question No. 4, which asks for transfers of property to insiders of the debtor within 1 year prior to the petition date, or Question No. 13, which asks for any other transfers made outside the ordinary course of business within 2 years prior to the petition date.

249.    In truth, there were substantial transfers by FDI to Shadow Entities that Gandhi personally directed or otherwise participated in during the relevant periods. For example, Gandhi did not disclose FDI's transfers of $483,620.05 and $2,188,769.43 and Jaffe's transfer of $530,000 to Pacific on January 3, 2018—only a few weeks prior to the Petition Date. Nor did Gandhi disclose FDI's payment of $300,000 to Unique on March 22, 2017, less than a year prior to the Petition Date.

250.    Additionally, neither Jaffe's bankruptcy schedules nor SOFA disclosed any amounts owed by NMI to Jaffe.

251.    However, Jaffe's and NMI's books and records each reflected an $11,216,467 loan balance owed by NMI to Jaffe as of the Petition Date, which have not been repaid.

252.    On March 23, 2018, the Debtors moved for approval of bidding and sale procedures for the sale of substantially all of their assets under section 363 of the Bankruptcy Code. On March 29, 2018, the Court approved the Debtors' bidding and sale procedures.

253.    On April 20, 2018, the Court appointed John J. Carney as examiner (the "**Examiner**") to investigate the nature and extent of the Debtors' involvement in the Bank Fraud.

254.    Shortly after the Examiner's appointment, the Examiner attempted to interview Bhansali. Bhansali flatly refused to cooperate. When pressed by the Examiner's counsel,

48

Bhansali's counsel acknowledged that Bhansali was in communication with Modi as late as March 15, 2018, and that he and Modi discussed the Debtors' sale and bankruptcy process. As alleged above, Ajay Gandhi and Angelina Ypma also communicated with Nirav Modi in March 2018.

255. On May 1, 2018, the Debtors adjourned the auction for FDI and Fantasy's assets indefinitely. On May 3, 2018, Parag Diamonds, Inc. was the successful bidder for Jaffe's assets.

256. On May 15, 2018, at a hearing to approve the Jaffe sale, the Debtors' chief restructuring officer Mark Samson testified that Mihir Bhansali had been in communication with Nirav Modi between the commencement of the Debtors' chapter 11 cases and March 15, 2018, and that Bhansali continued to be involved "on a daily basis" as "a key employee" in the sale process after that date.

257. Following this revelation, the Court asked for the record to be supplemented with additional detail concerning the nature and extent of Bhansali's post-petition communications with Modi, and adjourned the sale hearing to May 23, 2018. On May 19, 2018, the Debtors withdrew the sale motion without prejudice. (Dkt. 177.) At a hastily-arranged Chambers conference on May 18, 2018, Bhansali's counsel advised the Court that Bhansali resigned as director and officer of the Debtors that same day and that Bhansali refused to submit a declaration and appear for cross-examination concerning his post-petition communications with Modi.

258. On May 17, 2018, Ajay Gandhi sat for an interview with the Examiner's team. In that interview, Gandhi stated that the only thing he knew about the Shadow Entities was that they were Bhansali's customers. In subsequent interviews, Gandhi continued to insist he was not aware that any Shadow Entity was owned or controlled by Nirav Modi. When confronted by the Examiner's team with emails indicating that Gandhi was aware that numerous Shadow Entities

49

were related parties, Gandhi repeatedly maintained he did not remember these emails, nor that the Shadow Entities were in any way controlled by Modi.

259.    Additionally, in response to the Examiner's questions regarding Gandhi's involvement in hundreds of millions of dollars in loose diamond transactions, Gandhi told the Examiner that he merely signed packing slips with no verification of the contents of the shipment, its valuation, the profitability, or propriety of such transaction.

260.    Additionally, when the Examiner asked Gandhi whether he ever used his personal email accounts for Firestar business, Gandhi stated that he did not. In fact, during the Relevant Period, Gandhi sent numerous emails pertaining to the Debtors and other Modi-Controlled Entities to and from several personal email accounts.

261.    On June 14, 2018, the Court approved the Trustee's appointment, at which time the Trustee assumed control of the Debtors' estates and operations.

262.    On August 7, 2018, the Examiner conducted a deposition of Mihir Bhansali. Bhansali's knowledge, intent, and culpability with respect to the Bank Fraud and other misdeeds alleged in this Complaint can be inferred from the fact that Bhansali invoked his Fifth Amendment right against self-incrimination in response to every question except his name.

C.    *Other Efforts to Cover Up and Frustrate Investigation of the Bank Fraud*

263.    Nirav Modi, Bhansali, and Gandhi, and their co-conspirators researched and implemented various tactics to conceal and destroy evidence of their involvement in the Bank Fraud both prior to and after the Bank Fraud's exposure.

264.    Pradeep Mhatre, a member of FIPL's information technology department, told Indian authorities that in 2010 or 2011, Mihir Bhansali instructed him to set up a secret closed email server in the Dubai office using the domain "panemail.com." The Panemail server restricted emails from being sent to or received from outside email servers, nor was it possible to download

emails and attachments from the server. The server was limited to 25 – 30 users, including Nirav Modi, Mihir Bhansali, Ajay Gandhi, Neehsal Modi, Hemant Bhatt, Aditya Nanavati, Shyam Wadhwa, Satyendra Shukla, Kurian Mathews, and Sridnar Krishnan. Mihir Bhansali instructed and approved adding users to the server.

265.    Mhatre further told Indian authorities that, in 2017, Bhansali instructed him to create a new secret server on the domain "cricketnow.live" with restrictions similar to the Panemail server. This server automatically deleted emails after one week. In this server, users were assigned generic IDs such as "user1, DOE1, DOE2, DXB1, HK1, etc." to enhance secrecy.

266.    On February 13, 2018, an attorney at Day Pitney LLP emailed Ajay Gandhi to suggest that bank statements for CPS50, which owned the 50 Central Park South property, be sent directly to Abhay Javeri as manager of CPS Properties LLC. Gandhi forwarded the email to "ajaycpa@yahoo.com", which upon information and belief is Gandhi's personal email address, and stated, "Niravbhai, OK to have CPS 50 Properties LLC bank statement from Citibank sent to Abhay Javeri to his email address or Abby's mailing address?" The fact that Gandhi addressed this email to "Niravbhai" shows that Nirav Modi and Ajay Gandhi were using Gandhi's personal email account to communicate in the weeks following the exposure of the Bank Fraud.

267.    Similarly, on March 13, 2018, Ajay Gandhi sent his own Yahoo email account an email addressed to "Niravbhai" summarizing transactions in and out of NMLUK's Barclays Bank account for Modi's review, including a £2,000,000 deposit from Nirav Modi personally on January 29, 2018. As alleged below, only a few weeks earlier, Nirav Modi purchased a £7,950,000 London apartment after fleeing India.

268.    Ajay Gandhi also coordinated with Purvi Mehta during this time. On February 16, 2018, Purvi Mehta emailed Ajay Gandhi, "Where can I reach u on WhatsApp?" Gandhi replied with his personal phone number.

269.     On March 11, 2018, Ajay Gandhi ran internet searches on the *Adelphia Communications* fraud case and related bankruptcy. These searches included: "how did adelphia get caught"; "how rigas family were caught in the fraud of adelphia"; and "how adelphia fraud was discovered?"

270.     On March 9, 2018, Bhansali visited an internet article entitled "14 Signal App Tips for Secure Chats," which described tips for sending and erasing secure communications through Signal, an end-to-end encryption application.

271.     On March 12, 2018, Mihir Bhansali visited an internet article entitled "How to Clear Your Cache on Any Browser." The article described methods of deleting internet browsing history on various web browsers. That same day, Bhansali visited an internet article entitled "How to Hack Wi-Fi Passwords." This article described methods of obtaining access to wireless networks without the required password.

272.     Mihir Bhansali's laptop contained a software program called "Hide My Ass! Pro VPN." Upon information and belief, the purpose of this program is to facilitate anonymous internet usage through virtual private network technology. The software's logs indicate that the program was used as recently as February 11, 2018.

273.     Bhansali's laptop also contained a program called SecurStar DriveCrypt. Upon information and belief, the purpose of this program is to encrypt data on computers.

274.     As alleged above, Bhansali created what appears to be a "to-do" list for the various co-conspirators following exposure of the Bank Fraud. The list included instructions to "Send all non-Firestar Dubai comps to HK." Upon information and belief, "comps" refers to "computers."

275.     According to statements made by various Firestar Entity and Shadow Entity directors and employees to Indian authorities, around February or March 2018:

(i)     Nehal Modi and Mihir Bhansali removed approximately 50 kilograms of gold and 2.5 Lac Dirhams (worth approximately $68,000) from a Dubai-based Firestar Entity;

(ii)    Neeshal Modi diverted diamonds from Dubai-based Modi-Controlled Entities to Hong Kong.

(iii)   Nehal Modi removed over $6 million in diamonds and 150 boxes of pearls from one of the Hong Kong-based Modi-Controlled Entities. In the "to do" list spreadsheet recovered from Mihir Bhansali's computer, the tasks listed under "MB" included "Pearls – where to keep the inventory?" and "Pearls – original purchase entries."

(iv)    Mihir Bhansali, Nehal Modi, and Nirav Modi intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities. For example, Ashish Lad, a director of Shadow Entity Unity, told Indian authorities that Nirav Modi threatened to kill or falsely implicate Lad if he revealed anything to the investigative authorities.

(v)     Nehal Modi destroyed cell phones of Shadow Entity directors. He told the directors that their "mobile phones are easy to track and they are evidence." Modi also oversaw the destruction of accounts, records, and servers of various Modi-Controlled Entities.

(vi)    Nehal Modi bribed Ashish Lad with INR 2,000,000 (approximately $28,000) to give false testimony to judicial authorities in Europe.

(vii)   Nirav Modi told Shadow Entity personnel that "it was not safe for [them] in Dubai and [they] must shift to Cairo[, Egypt.]" Once in Cairo, Modi, or others operating at his behest, confiscated the Shadow Entity personnel's passports "on the pretext of some residency permission."

(viii)  Nirav Modi, or others operating at his behest, instructed Shadow Entity personnel to sign affidavits before they left Cairo stating that the Shadow Entities were owned by the directors and were in no way related to Nirav Modi.

**D.**    *Money Laundering to Modi Family Members Prior to Exposure of the Bank Fraud*

276.    As early as 2014, Nirav Modi and his co-conspirators began developing plans to "restructure" the Firestar Entities' global corporate structure in contemplation of an eventual initial public offering. The initial public offering appeared to be their exit strategy from the fraud scheme.

277.    The planned restructuring served the dual purpose of (a) sanitizing any trace of the Modi family's self-dealing during the Relevant Period from the Firstar Entities' books and records and ownership structure, and (b) providing a pretext for funneling assets to Ami Modi and Purvi Mehta.

278.    For example, one issue the planned restructuring aimed to resolve was the dubious record of Synergies' capitalization and ownership.

279.    Synergies was originally formed in April 2007 to serve as the purchaser entity in connection with the acquisition of Jaffe later that year.

280.    On October 11, 2007, Mihir Bhansali and Ajay Gandhi executed a stock certificate reflecting FIPL as the holder of 10,000 shares in Synergies.

281.    Between October 20, 2010 and March 11, 2011, Nirav Modi personally transferred a total of $14,575,000 to Synergies, which Synergies used to pay off purported loans from FIPL. The "loans" from FIPL consisted of earlier circular transactions in which FIPL wired funds to Synergies and Synergies immediately wired the funds back to FIPL, or in on other instances, to FDIPL, Brilliant, Eternal, or other Modi-Controlled Entities.

282.    On October 1, 2016, even though FIPL remained the sole owner of Synergies, Nirav Modi and FHL entered into an Agreement for Purchase of Shares in Synergies Corporation under which Nirav Modi, in his personal capacity, purported to sell 100% of the outstanding shares of

Synergies to FHL in exchange for a price of $100. The agreement was signed by Mihir Bhansali and Ajay Gandhi on behalf of Synergies, by Nirav Modi on his own behalf and by FHL's then-director Himanshu Trivedi. That same day, Mihir Bhansali and Ajay Gandhi executed a stock certificate reflecting FHL as the holder of 10,000 shares in Synergies.

283.    In December 2016, Nirav Modi assigned to Purvi Mehta his interest in the $14,575,000 Synergies "loan" under an assignment agreement retroactively dated as of April 1, 2012. This assignment was described as a gift in numerous emails. As alleged below, in July 2017, Synergies ultimately used a purported capital infusion from FHL to pay off the loan to Purvi Mehta as part of a broader diversion of funds to Mehta under the guise of the broader restructuring.

284.    Another aspect of the restructuring was developing a means to divest CPRE, which was the record owner of Nirav Modi and Ami Modi's personal residence in New York, so that those properties could not be reached by creditors.

285.    CPRE was formed under Delaware law on February 15, 2007. On March 26, 2007, CPRE purchased an apartment at the Essex House, 160 Central Park South in New York City (the "**Essex House Apartment**") for $4.995 million, of which FDII paid $2 million. The balance was funded by HSBC, which was granted a mortgage on the Essex House Apartment. Bhansali signed the deed on behalf of CPRE. CPRE was owned by FDI until approximately the end of 2009, when FDI transferred it to FGI. The Essex House Apartment was used by Nirav Modi and Ami Modi as a personal residence.

286.    At all relevant times, Mihir Bhansali and Ajay Gandhi served as the manager and treasurer, respectively of CPRE.

287.    On December 5, 2014, Ajay Gandhi emailed Howard Hoff of Marks Paneth, asking for input on "[1] Potential Sale or Gift of Central Park LLC to Ami Modi (Nirav's wife) who is a

US Citizen [and 2] Moving Firestar Diamond, Inc. / Fantasy, Inc. from Firestar Group's umbrella to an overseas Firestar entity . . .″

288.    On February 22, 2015, Ajay Gandhi emailed Howard Hoff, copying Mihir Bhansali, a spreadsheet analyzing various scenarios for selling FDI and CPRE. The spreadsheet included as questions: "Trust set-up by Purvi Modi –HK Resident[.] HK Trust funds Nirav Modi via Gift or Loan[.]" Hoff replied, "Please be more specific on the trusts [sic] involvement in the transaction. Is it just going to loan the money or is it going to have ownership prior to an eventual transfer. What type of trust is it, who are the beneficiaries? Is it Purvi's trust or is Purvi the executor, what country is Purvi a resident and a citizen of?" Gandhi replied, "Purvi is a HK resident and she will be owner of the trust unless you have a better thought or ideas to have Ami fund the purchase."

289.    On March 4, 2015, Ajay Gandhi outlined the steps for moving CPRE beyond the reach of creditors in an email to Raghu Iyer, "1. Move $1.8m and $3m of other liabilities from CP[RE] to Firestar Group, Inc. thru J[ournal]E[ntrie]s . . . Only HSBCs $3m liability will be left. . . . Ami needs to wire $1.935m at the closing to buy CP[RE]. . . . Ami will get Gift in USA from Purvi . . . $1.935m will now be used to pay off FGI debts (Firestar Diamond, Inc.) . . . Need clarity from Howard if how much funds should come from Firestar Holdings Ltd HK to buyout Firestar Diamond/Fantasy, Inc. and how to move funds back to HK or somewhere."

290.    On March 31, 2015, Raghu Iyer asked Ajay Gandhi for a status update on the restructuring. Gandhi replied, "Not sure if you spoke to Shyam Wadhwa as he does not want to speed-up change of ownership as he has issues of how to create capital in FS, HK and issues with bank covenants in HK hence he suggest to do as late as possible in 2015-16." Raghu replied, copying Mihir Bhansali, "Mihir[,] I was not aware of these issues[.] Can you take it up with NDM?" Bhansali replied, copying Wadhwa, "Mr. Wadhwa has already spoken to Nirav."

291.     Thus, the restructuring plans were put on hold until sufficient funds were available to effectuate all of the necessary transactions.

292.     The restructuring planning ramped up in late 2016, likely prompted by the looming retirement of Gokulnath Shetty, the PNB employee who approved the fraudulent LOUs to Nirav Modi's and Mehul Choksi's entities, which occurred in May 2017.

293.     On November 3, 2016, Manish Modi emailed Ajay Gandhi a request for a status update and asked "[F]or CPRE, does Nirav Bhai have to pay money to CPRE (via Ami Modi)[?] That cash flow has to be planned." Gandhi replied, "Spoke to Howard. If Ami Modi buys CPRE and assumes $3m of HSBC loan then she needs to pay $2m for CPRE assuming valuation of $5m."

294.     On November 14, 2016, Gandhi emailed HSBC, "We are planning change of ownership of Central Park Real Estate, LLC, which [is] currently owned by Firestar Group, Inc., to Ami Modi (She is US Citizen and wife of Nirav Modi). No other changes to existing agreement. Anything to be done?"

295.     For the next several months, HSBC repeatedly requested additional information relating to the ownership structure of CPRE and other Firestar Entities and the source of Purvi Mehta's wealth.

296.     When Gandhi told Nirav Modi about HSBC's requests, Gandhi said he "avoided giving these [sic] information and told them that we may do restructuring of Central Park and may change ownership etc." but that the "only way we can avoid is only if we pay-off the $ 3 m mortgage in next few months." Modi responded, "There will be a change in ownership in May end so better to explain that."

297.     The laundering of funds through the Firestar Entities' corporate restructuring involved several steps. First, various British Virgin Island, Cayman Island, and Mauritius shell

companies secretly owned by the Modi family would invest up to $75 million in FIPL. FIPL would then make a $115 million capital contribution to FHL.

298.    Of this $115 million, FHL would use $65 million to redeem non-voting FHL shares owned by Purvi Mehta (both personally and through Fine Classic), $23 million to repay various loans from Purvi Mehta and Fine Classic, and $20 million to infuse capital in Synergies.

299.    Synergies would then use $14,575,000 of the new capital to "repay" Purvi Mehta for the "loans" Nirav Modi originally made to Synergies in 2010 and 2011 and subsequently assigned to Purvi Mehta in 2016.

300.    To secure the additional funding needed for these transactions, Nirav Modi and his co-conspirators obtained 150 LOUs totaling over $1 billion between February and May 2017.

301.    The "investment" in FIPL also used funds siphoned from Shadow Entities in earlier years.

302.    For example, in November 2013, Shadow Entity had Pacific transferred $30,000,000 to Mayank Mehta, Purvi Mehta's husband. These Shadow Entity payments to Mayank Mehta were characterized as "payouts" or "shareholder dividends."

303.    Mayank Mehta transferred the $30 million received from Pacific in November 2013 to Purvi Mehta as a gift. Purvi Mehta then used these funds as collateral for loans to Radashir, a Modi-Controlled Entity in India that also participated in the Bank Fraud, until 2016 when the funds were returned to Purvi Mehta. Purvi Mehta then moved $23 million to her account in Mauritius.

304.    Between December 14, 2016 and January 12, 2017, Fine Classic transferred a total of $25,700,500 to Purvi Mehta's Mauritius account. According to Kurian Mathews, Shyam Wadhwa, and Nilesh Mistry, who oversaw Fine Classic's day-to-day finances and operations, the circular import and export transactions between Fine Classic and other Shadow Entities were

structured so as to generate deliberately high profit margins for Fine Classic, with corresponding losses in other Shadow Entities. According to the India ED, Fine Classic received approximately $89 million from other Shadow Entities from 2011 to 2017.

305.    Purvi Mehta then transferred $40 million from her Mauritius bank account to Novelar International Holdings Ltd. ("**Novelar**"), a BVI entity of which she is the ultimate beneficial owner.

306.    Novelar owns Islington International Holdings Pvt. Ltd., a Singapore-based entity. In January or February 2017, Novelar transferred $40 million to Islington. Around this time, Purvi Mehta also transferred $425,000 directly into Islington. In February 2017, Islington invested $45 million, including the funds received from Novelar and Purvi Mehta, in FIPL.

307.    Thus, by February 2017, $45 million in purported new investments had been indirectly made by Purvi Mehta in FIPL using the proceeds of the Bank Fraud.

308.    On March 22, 2017, Bhansali and his wife purchased apartment 24A at 50 Riverside Boulevard in New York City for approximately $7.1 million, of which approximately $5.3 million was paid in cash. Just weeks earlier, Mihir Bhansali had received a $1.5 million wire into his personal HSBC checking account from Purvi Mehta on February 24, 2017. Bhansali's annual salary from the Debtors was approximately $154,000. On June 29, 2017, Purvi Mehta wired another $750,000 to Mihir Bhansali's personal checking account at HSBC.

309.    Only two days after the Debtors filed for bankruptcy, Bhansali transferred his interests in the apartment to his wife, Rakhi Bhansali for nominal consideration.

310.    Based on, among other things, the timing of these transactions and Purvi Mehta's role as a primary conduit for proceeds of the Bank Fraud, it appears this apartment was purchased using proceeds of the Bank Fraud.

311.    According to Indian authorities, Purvi Mehta also purchased a new Hong Kong apartment for herself in April 2017 for 19.5 crore INR (approximately $2.7 million). Neeshal Modi signed the agreement on Purvi Mehta's behalf under a power of attorney certified by the Indian consulate of Hong Kong.

312.    In March 2017, Nirav Modi and Ami Modi also were looking to purchase another New York residence for $25–$30 million. They initially planned to purchase a unit at the River House, a cooperative apartment building located at 435 E. 52nd Street in Manhattan.

313.    In May and June 2017, Purvi Mehta, "loaned" Ami Modi a total of approximately $34 million to fund the River House purchase.

314.    According to the India ED, at least $18 million of the funds Purvi Mehta loaned to Ami Modi in May 2017 were sourced from transfers to Purvi Mehta by Fine Classic, the Shadow Entity Purvi Mehta directly owned and controlled, between March 7, 2017 and April 27, 2017. Between July 9, 2017 and October 4, 2017, Fine Classic wired an additional $16,300,000 to Purvi Mehta from various accounts.

315.    When the River House sale fell through in mid-June 2017, Nirav Modi and Ami Modi turned their attention to an apartment at the Ritz Carlton located at 50 Central Park South in Manhattan (the "**Ritz Carlton Apartment**").

316.    On July 7, 2017, Purvi Mehta entered into a contract to purchase the Ritz Carlton Apartment for $25 million. That same day, Ami Modi wired, as a down payment, $2.5 million of the funds Purvi Mehta had transferred to her in May and June 2017 to a Katz & Matz LLP escrow account. Ami Modi and Purvi Mehta accounted for this transfer as a "partial repayment" of the loan from Purvi Mehta.

317.    That same day, accountant Howard Hoff at Marks Paneth LLP summarized the

planned transaction in an email to Nirav Modi and the Modi family's trust & estate counsel at

Day Pitney LLP and their real estate counsel Katz & Matz LLP as follows:

> Entity Establishment:
> 1) Create a NY LLC owned by Purvi. This will be the purchaser of the
>    condo. Timing is a few to days to open.
> 2) Once the trust is established, Purvi will transfer/assign ownership
>    of the LLC to the trust (Timing is a few weeks since the trust
>    agreements are almost complete)
>
> Flow of Funds:
> 1) Purvi will instruct Ami to partially repay the loan she made to her
>    directly to Steven [Matz]'s escrow account on behalf of the LLC.
>    (This will happen tomorrow)
> 2) Ami will then repay the remainder of the loan to Purvi overseas.
> 3) Purvi will have to wire directly to Steven's escrow account the
>    balance due on the condo in order to close.

318.    On July 11, 2017, Defendant CPS50 was formed and, on August 2, 2017, its

operating agreement was executed with Purvi Mehta as sole member and Nirav Modi's uncle

Deepak Sheth as its manager.

319.    On July 10, 2017, Synergies and FIPL entered into a Stock Purchase Agreement

under which Synergies purchased 100% of the outstanding common stock of FGI for a price of

$3,694,000. Ajay Gandhi signed the agreement on behalf of Synergies.

320.    On July 13, 2017, FHL wired a $20,000,000 "capital infusion" to Synergies. The

same day, Synergies wired $650,000 to Jaffe (which Jaffe used to pay off invoices from FIPL),

$1,047,000 to Brilliant (as repayment of a purported loan), $3,694,000 to FIPL (as the purchase

price for FGI, which Synergies acquired as part of the 2017 "restructuring"), and $14,575,000 to

Purvi Mehta. The $14,575,000 payment to Purvi Mehta (the "**Synergies-Mehta Transfer**") was

made under the pretext of paying off the loan Modi had assigned to Mehta.

321.    On July 14, 2017, FHL wired another $20 million to Purvi Mehta for redemption of her non-voting preference shares in FHL. Thus, over a two-day period, more than $34 million in proceeds of the Bank Fraud were wired to Purvi Mehta.

322.    On or around August 23, 2017, Purvi Mehta, as settlor, executed an instrument (the "**Ithaca Trust Agreement**") creating the Ithaca Trust as an irrevocable trust under Delaware law.

323.    The Ithaca Trust Agreement named Commonwealth Trust Company ("**Commonwealth**") as the trustee (the "**Ithaca Trustee**"), Ami Modi and her children as the beneficiaries, and Deepak Sheth as the initial protector (the "**Ithaca Protector**" or "**Protector**") of the Ithaca Trust. It also named Purvi Mehta and Nirav Modi's parents, Deepak Modi and Pragnya Modi, and cousin, Mihir Bhansali, as residual beneficiaries for any "property not otherwise distributed."

324.    Under the terms of the Ithaca Trust Agreement, the Ithaca Trustee cannot invest or manage any of the Ithaca Trust's assets without the express written direction of the investment advisor of the Ithaca Trust (the "**Ithaca Investment Advisor**" or "**Investment Advisor**")

325.    Under the terms of the Ithaca Trust Agreement, the Protector has the power to, among other things: (a) remove and appoint the Ithaca Trustee; (b) remove and appoint the Investment Advisor; (c) terminate the Ithaca Trust; (d) change the situs of the Ithaca Trust; (e) amend administrative provisions of the Ithaca Trust Agreement; (f) add or exclude beneficiaries; and (g) designate a successor to replace the Protector in the event the Protector resigns or is removed.

326.    Under the terms of the Ithaca Trust Agreement, if at any time there is no Protector serving and no successor named who accepts appointment within 30 days of the occurrence of the vacancy, Abhay Javeri shall be the Protector. If Abhay Javeri is unable or unwilling to serve

as Protector, a Protector may be appointed by Purvi Mehta or, if Purvi Mehta is not available or is deceased, by Ami Modi.

327.    Under the terms of the Ithaca Trust Agreement, an appointment of a Protector may impose qualifications or requirements or specify terms and conditions to be fulfilled prior to such appointment taking effect.

328.    Under the terms of the Ithaca Trust Agreement, Nirav Modi has the power to unilaterally remove the Protector. If Nirav Modi "is not available or is deceased," Purvi Mehta inherits this power. If Purvi Mehta "is not available or is deceased," Ami Modi inherits this power.

329.    Since Nirav Modi has the power to remove the Ithaca Protector, which in turn has virtually complete control over the Ithaca Trustee, the Ithaca Investment Advisor, the Ithaca Trust Agreement, and the Ithaca Trust's assets, Nirav Modi enjoys *de facto* total control over the Ithaca Trust and its assets.

330.    On or around August 23, 2017, Deepak Sheth signed and delivered to the Ithaca Trustee separate letters: (a) accepting his appointment as the Ithaca Protector; (b) appointing himself as the Ithaca Investment Advisor; and (c) accepting his appointment as the Ithaca Investment Advisor.

331.    On August 24, 2017, Nirav Modi advised Day Pitney that "the funds are in place with Purvi" and asked for wire instructions for Commonwealth's fiduciary account for the Ithaca Trust.

332.    On August 25, 2017, Purvi Mehta, on her own behalf, and Deepak Sheth, as manager of CPS50P LLC, executed an agreement under which Mehta assigned her interest in the Ritz Carlton sale contract to CPS50P LLC.

333.    On August 28, 2017, Deepak Sheth, in his capacity as Investment Advisor of the Ithaca Trust, signed and delivered a letter directing Commonwealth as Ithaca Trustee to: (a) accept an assignment from Purvi Mehta of the 100% membership interest in the CPS50; (b) execute an Amended and Restated Operating Agreement for CPS50; and (c) make an initial capital contribution in the amount of $23,000,000 to CPS50 by wiring that amount to the Katz & Matz LLP escrow account to fund the purchase of the Ritz Carlton Apartment.

334.    That same day, Deepak Sheth, in his capacity as manager of CPS50, executed CPS50's amended and restated operating agreement.

335.    On August 29, 2017, Purvi Mehta assigned the membership interest in CPS50 to the Ithaca Trust.

336.    On August 30, 2017, Modi emailed Day Pitney attorneys and other professionals informing them that $23 million had been wired from Mehta to Commonwealth and directing Commonwealth to further wire the funds to attorneys at Katz & Matz to execute the purchase of the Ritz Carlton Apartment.  Mehta was not on the email thread.

337.    Also on August 30, 2017, Katz & Matz attorney Steven Matz emailed Nirav Modi and others with instructions for the September 7, 2017 closing of the Ithaca Trust's purchase of the Ritz Carlton Apartment. Once again, Mehta was not on the email thread.

338.    On August 31, 2017, Mehta transferred $23 million to Commonwealth, as trustee of The Ithaca Trust. Commonwealth then transferred those funds to the Katz & Matz escrow account, where they were subsequently used to buy the Ritz Carlton Apartment.

339.    On September 1, 2017, Ami Modi returned $25 million of the funds Purvi Mehta had "loaned" to her in May 2017 (which had been sitting in Ami Modi's HSBC bank account) to Purvi Mehta.

340.   On September 6, 2017, Katz & Matz issued a $22,567,465.92 check to the sellers of the Ritz Carlton Apartment in connection with the closing of the sale.

341.   On September 25, 2017, Ami Modi wired another $6,500,000 to Purvi Mehta as a purported loan repayment.

342.   On September 29, 2017 FHL wired $8,860,000 to Purvi Mehta as a "loan repayment."

343.   On October 5, 2017, Ami Modi received $70,000 from Mihir Bhansali and wired another $406,188 to Purvi Mehta as a purported loan repayment.

344.   On October 18, 2017, FHL wired $30,000,000 to Purvi Mehta to redeem non-voting preference shares.

345.   On November 10, 2017, FHL wired $15,000,000 to Purvi Mehta to redeem non-voting preference shares. Thus, from September through November 2017, approximately $85,000,000 in proceeds of the Bank Fraud were transferred to Purvi Mehta.

346.   In December 2017, Ajay Gandhi opened a CitiBank account for CPS50. Gandhi listed himself as "president" of CPS50 in the application materials. Ajay Gandhi and Abhay Javeri served as the authorized signors on the account.

347.   On November 8, 2017, Deepak Sheth, as Ithaca Investment Advisor, directed Commonwealth, as Ithaca Trustee, to remove Deepak Sheth as manager, president, and chief executive officer of CPS50 and appoint Abhay Javeri as his replacement in those positions. That same day, Deepak Sheth also resigned as investment advisor (but not protector) of the Ithaca Trust and appointed Abhay Javeri as his replacement.

348.   With the Ritz Carlton Apartment transaction complete, Nirav Modi and his co-conspirators returned their attention to divesting FGI's ownership of CPRE and the Essex House Apartment.

349.    On December 4, 2017, by email, Nirav Modi told Ajay Gandhi to pay off the HSBC mortgage on the Essex House Apartment in full.

350.    Gandhi contacted HSBC indicating that there was an urgent need to for the Ithaca Trust to assume the mortgage on the Essex House and transfer the liability from FGI to the Ithaca Trust. Gandhi soon determined the mortgage could not be transferred quickly enough and decided instead to arrange to have the mortgage paid off completely.

351.    On December 5, 2017, Gandhi wired $3 million from FDI to HSBC in satisfaction of HSBC's mortgage on the Essex House using funds originally from Jaffe and Fantasy as well as from FDI's own account and from an HSBC line of credit.

352.    In addition to the mortgage payoff, FDI had made at least $856,335 of the monthly payments on the Essex House Apartment mortgage between 2011 and 2018, and also paid JW Marriott Essex House NY $15,828.35 in January 2018, after CPRE was transferred from FGI to the Ithaca Trust.

353.    With the mortgage retired, Nirav Modi asked Marks Paneth and Day Pitney to devise a strategy to transfer the unencumbered property (worth approximately $6 million) to the Ithaca Trust.

354.    On December 15, 2017, one of Modi's accountants emailed Modi with three potential options for minimizing transfer taxes on "the movement of CPRE." The first option was for Nirav Modi to purchase CPRE directly from FGI, the second for Ami Modi to purchase CPRE directly, and the third was using the Ithaca Trust to make the purchase after Purvi Mehta contributed more cash to the trust. The accountant explained that, "since [Modi] prefer[red] to fast track the transaction," the existing trust could be used and then the trustee could "move the LLC to another trust in due time." The trust would use the funds from Purvi Mehta to purchase

66

CPRE from FGI, thus becoming the indirect owner of the Essex House Apartment. Modi chose the third option.

355.    On December 27, 2017, Abhay Javeri, as Ithaca Investment Advisor, signed and delivered to Commonwealth as Ithaca Trustee a letter of direction instructing Commonwealth to "become the sole member of [CPRE] by purchasing a 100% membership interest in [CPRE] for $6,000,000."

356.    On December 28, 2017, Ajay Gandhi, on behalf of FGI, as treasurer, and on behalf of CPRE, as chief financial officer, and Commonwealth, as Ithaca Trustee, executed the agreement for the sale of CPRE to the Ithaca Trust.

357.    On December 29, 2017, Nirav Modi emailed professionals from Day Pitney and Marks Paneth and others to announce that "[t]he funds have been wired value today."

358.    The funds did not clear Purvi Mehta's Singapore bank account until January 1, 2018. The Ithaca Trust then wired $6 million to FGI's HSBC account for the purchase of CPRE. FGI then transferred the equity interests in CPRE to the Ithaca Trust (the "**CPRE Equity Transfer**").

359.    On January 17, 2018, after the Ithaca Trust purchased CPRE LLC, Ajay Gandhi consulted Day Pitney about transferring additional funds to the Ithaca Trust for use in connection with the Essex House Apartment and Ritz Carlton Apartment.

360.    Day Pitney lawyers told Ajay Gandhi, Nirav Modi, and Purvi Mehta that "to fund either of the LLC accounts, the funds will first have to be transferred to the Ithaca Trust account, and Abhay Javeri, as Investment Advisor of the Ithaca Trust, will have to direct the trustee accordingly." Immeke Schmidt of Day Pitney followed up, "Purvi, as settlor of the trust, would fund the trust with her own assets from a non-US account in her name." Nirav responded, asking

67

for the instructions to wire funds to the Ithaca Trust, which a Day Pitney attorney provided in response.

361.    On January 17, 2018, Ajay Gandhi, on behalf of CPS50, executed an agreement with Izeu, a French interior design firm, under which Izeu provided interior design services for the Ritz Carlton Apartment.

362.    On January 18, 2018, $1 million was wired from Purvi' Mehta's Singapore bank account to Commonwealth. That same day, Abhay Javeri, as investment advisor of the Ithaca Trust, sent Commonwealth a letter instructing Commonwealth to make a $1 million capital contribution to CPS50. The next day, Commonwealth wired $1 million to CPS50's Citibank account. That same day, an international wire in the amount of $84,665.25 was made from CPS50's Citibank account to Izeu. On February 13, 2018, an additional $237,176.75 was wired internationally to Izeu.

363.    By March 2018, Commonwealth had flagged the Ithaca Trust as a "high risk trust" and internally expressed concern about serving as Ithaca Trustee. On March 13, 2018, Commonwealth sent notices to Deepak Sheth, as Protector of the Ithaca Trust, and Purvi Mehta, as settlor of the Ithaca Trust, informing them that Commonwealth was resigning as Ithaca Trustee effective as of April 13, 2018.

364.    At some point between March 13, 2018 and May 25, 2018, Deepak Sheth resigned or was removed as Ithaca Protector.

365.    On May 25, 2018, Ami Modi executed a deed appointing Nehal Modi as Ithaca Protector. The deed contained recital indicating that: (a) Abhay Javeri had renounced his appointment as successor Protector of the Ithaca Trust; and (b) Purvi Mehta "released the power to appoint a Protector on August 23, 2017."

68

366. That same day, Nehal Modi signed and delivered his acceptance of his appointment as Ithaca Protector; executed a deed removing Abhay Javeri as Ithacha Investment Advisor and appointing himself as the replacement; executed a deed appointing Trident as Ithaca Trustee.; and executed a deed amending the Ithaca Trust Agreement to change the governing law from Delaware law to South Dakota law.

367. That same day, Abhay Javeri, as Ithaca Investment Advisor, signed and delivered a letter of direction instructing Trident, as Ithaca Trustee, to remove Abhay Javeri as manager of CPS50 and appoint Nitin Dattani as his replacement.

368. As alleged above, around this same time, Nitin Dattani was working with Angelina Ypma, Mihir Bhansali, Ajay Gandhi, and Anthony Allicock to divert NMLUK's assets to Hong Kong and was also helping Nirav Modi establish Diamonds Holdings Ltd. while Nirav Modi was in hiding in London.

369. On information and belief, Trident remains Ithaca Trustee, Nehal Modi remains Ithaca Protector, Abhay Javeri remains Ithaca Investment Advisor, and Nitin Dattani remains manager of CPS50. On information and belief, Mihir Bhansali and Ajay Gandhi remain manager and treasurer, respectively, of CPRE.

370. In sum, numerous members of Nirav Modi's and Ami Modi's family, including Purvi Mehta, Mihir Bhansali, Deepak Sheth, and Abhay Javeri worked together and with Ajay Gandhi and other co-conspirators to effectuate the foregoing transactions concerning Nirav Modi's and Ami Modi's personal real estate holdings as part of an effort to insulate millions of dollars in ill-gotten assets from creditors.

## CLAIMS FOR RELIEF

### COUNT 1

### Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act ("RICO")
### 18 U.S.C. § 1962(d)
### (Debtors' Claim Against All Defendants)

371.     Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

372.     Nirav Modi, Mihir Bhansali, Ajay Gandhi, and each Defendant are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

373.     As alleged below, each Defendant violated 18 U.S.C. § 1962(d) by agreeing to join, participate in, or support a conspiracy under which one or more persons, including Nirav Modi, Mihir Bhansali, and Ajay Gandhi, would conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

#### Nirav Modi, Mihir Bhansali, and Ajay Gandhi's Substantive RICO Violation

374.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi each violated 18 U.S.C. § 1962(c) by their respective acts, described in the prior paragraphs and as further described below.

375.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged below.

376.     Nirav Modi, Mihir Bhansali, and Ajay Gandhi each committed at least two predicate acts of racketeering, as more specifically alleged below. The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participants, victims, or method of commission. Further, the acts of racketeering were continuous, spanning the period from at least 2010 to mid-2018.

## The RICO Enterprise

377.     Each of the U.S. Entities is a corporation. Each of the U.S. Entities is therefore an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

378.     Alternatively, the Firestar Entities, collectively, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of designing, manufacturing, and selling diamonds and jewelry.

379.     Alternatively, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, together with their known and unknown co-conspirators, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of formulating and implementing a common scheme to defraud PNB for their personal enrichment through a pattern of fraud, lies, deceit, and corruption. Such common purpose came into existence no later than 2010, when Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators implemented a scheme to defraud PNB by fraudulently obtaining LOUs by exploiting the web of Shadow Entities, LOU Entities, and other Modi-Controlled Entities.

380.     Whether conceptualized in the manner described in paragraph 377, paragraph 378, or paragraph 379, there existed during and after the Relevant Period one or more enterprises within the meaning of 18 U.S.C. § 1964(4) (the "**RICO Enterprise**").

381.     At all relevant times, Nirav Modi, Mihir Bhansali, and Ajay Gandhi each were employed by or associated with the RICO Enterprise, and each conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity.

382.     The RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

383.    The RICO Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it was or is engaged in, and its activities affected, interstate and foreign commerce.

384.    The repeated and continuous violations of federal criminal law alleged in this Complaint constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq*.

385.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi are central and controlling figures in the RICO Enterprise, and have directed others to take actions necessary to accomplish the overall aims of the RICO Enterprise.

### The Pattern of Racketeering Activity

386.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons (the "**RICO Pattern**").

### Predicate Acts: Mail and Wire Fraud, Violations of 18 U.S.C. § 1341, 1343

387.    The RICO Pattern included numerous acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

388.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi voluntarily and intentionally devised and participated in one or more criminal schemes to perpetrate actual fraudulent transfers of the Debtors' and U.S. Affiliates' assets during and after the Relevant Period, including without limitation, the transfers described above, in Appendix A, and in Schedules A through L.

389.    In furtherance of such scheme or schemes, Nirav Modi, Mihir Bhansali, and Ajay Gandhi willfully and knowingly transmitted, or caused to be transmitted, by means of (1) causing matters and things to be placed in any post office or authorized depository, or deposited or

caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds.

390.     The wires and mailings supporting such scheme or schemes to defraud included monetary wire transfers, shipments of inventory, telephone and electronic communications, and physical mailings of letters and other documents and communications.

391.     The use of interstate and international mail and wires to perpetrate these actual fraudulent transfers and to connect this international racketeering conspiracy was foreseeable.

392.     Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi committed numerous violations of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

393.     Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 1341 and 1343 directly and proximately caused injury to each U.S. Entity's business and property by unjustifiably and irrevocably depleting their assets in the amount of such transfers.

**Predicate Acts: National Stolen Property Act, Violations of 18 U.S.C. §§ 2314, 2315**

394.     The RICO Pattern included numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

395.     In many cases, Nirav Modi, Ajay Gandhi, and Mihir Bhansali caused the U.S. Affiliates, upon receiving actual fraudulent transfers from the Debtors, to subsequently transfer the proceeds of such actual fraudulent transfers to Shadow Entities or other Modi-Controlled Entities. Specific examples of such transactions are described in Appendix A-395 hereto.

396.     Based on the transfers by U.S. Affiliates of funds fraudulently received from the Debtors to foreign Modi-Controlled Entities alleged in paragraph 395 of this Complaint (the "**Subsequent Transfers**"), Nirav Modi, Mihir Bhansali, and Ajay Gandhi willfully and knowingly transported, transmitted, or transferred in interstate or foreign commerce—or received,

73

possessed, concealed, stored, bartered, sold, disposed of, or pledged as security for a loan—goods, wares, merchandise, securities, or money that crossed an interstate or international boundary after being stolen, converted, or taken by fraud.

397.    For each Subsequent Transfer, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, knew that the funds involved had been fraudulently transferred from the applicable Debtor to the applicable U.S. Affiliate or had otherwise been stolen, converted, or taken by fraud.

398.    Each Subsequent Transfer involved money or property having a value of $5,000 or more.

399.    Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, committed numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

400.    Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 2314 and 2315 directly and proximately caused injury to each Debtor's business and property by impairing the Debtors' ability to recover the value of the Subsequent Transfers.

**Predicate Acts: Money Laundering, Violations of 18 U.S.C. §§ 1956, 1957.**

401.    The RICO Pattern included numerous acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957.

402.    Each actual fraudulent transfer and each Subsequent Transfer supported and furthered the Bank Fraud by, at a minimum: (a) facilitating the reduction of outstanding payables and receivables among Modi-Controlled Entities so as to avert detection of the Bank Fraud; (b) layering the movement of funds so as to make them difficult to trace.

403.    Each actual fraudulent transfer and each Subsequent Transfer occurred, in whole or in part, in the United States.

404.    Each actual fraudulent transfer and each Subsequent Transfer involved or resulted from one or more acts of wire fraud.

74

405.    Accordingly, each actual fraudulent transfer and each Subsequent Transfer constituted, involved, or resulted from an offense against India, a foreign nation, involving fraud, or a scheme or attempt to defraud, against PNB, a foreign bank.

406.    Additionally, each actual fraudulent transfer was designed to deplete the applicable Debtor's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such Debtor's creditors.

407.    Additionally, each Subsequent Transfer was designed to deplete the applicable U.S. Affiliate's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such U.S. Affiliate's creditors, including the applicable Debtor or Debtors.

408.    Accordingly, each actual fraudulent transfer and each Subsequent Transfer constituted, involved, or was the result of specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7).

409.    Each Subsequent Transfer affected interstate or foreign commerce and involved the movement of funds by wire or other means from a place in the United States to or through a place outside of the United States.

410.    Each Subsequent Transfer involved funds that were derived from or obtained or retained, directly or indirectly, from an actual fraudulent transfer and unlawful activity related to such actual fraudulent transfer.

411.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi orchestrated or conducted each Subsequent Transfer with the intent to promote the carrying on of specified unlawful activity, including in relation to: (a) fraudulently depleting the applicable Debtor's and U.S. Affiliate's assets; and (b) the Bank Fraud more generally.

412.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi knew that each Subsequent Transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the

ownership, or the control of the funds derived from the actual fraudulent transfer preceding such Subsequent Transfer.

413.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi knew that the property involved in each Subsequent Transfer represented the proceeds of some form of unlawful activity.

414.    Each Subsequent Transfer involved a monetary transaction in criminally derived property of a value of greater than $10,000 and derived from specified unlawful activity.

415.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi agreed, expressly or implicitly, to: (a) effectuate each actual fraudulent transfer and each Subsequent Transfer; (b) fraudulently deplete the Debtors' and U.S. Affiliates' assets; and (c) perpetrate the Bank Fraud.

416.    Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi committed, and conspired to commit, numerous acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

417.    Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 1956 and 1957 directly and proximately caused injury to each Debtor's business and property by impairing the Debtors' ability to recover the value of the Subsequent Transfers.

### Predicate Acts: Obstruction of Justice, Violations of 18 U.S.C. §§ 1503, 1512

418.    The RICO Pattern included more than one act of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

419.    Based on the allegations set forth in paragraph 275 of this Complaint concerning the Dubai-based Shadow Entity personnel, upon information and belief, Nirav Modi and Bhansali, or others operating at their direction, knowingly intimidated, threatened, or corruptly persuaded such Shadow Entity personnel, or engaged in misleading conduct toward such Shadow Entity personnel, with the intent to influence, delay, or prevent the testimony of such Shadow Entity personnel in an official proceeding, including these chapter 11 cases, and to cause

76

or induce such Shadow Entity personnel to withhold testimony, or withhold a record, document

or other object, from an official proceeding, including these chapter 11 cases.

420.    Additionally, Mihir Bhansali corruptly altered, destroyed, mutilated, or concealed

records, documents or other objects, or attempted to do so, as demonstrated by the following

actions, alleged in more detail above, which Mihir Bhansali, or others operating at his or Nirav

Modi's direction, took in the weeks prior to and following the Petition Date:

    (i)    Mihir Bhansali researched methods for deleting internet history, browsing the internet anonymously, communicating through encrypted and self-deleting messages, and encrypting computer data;

    (ii)    Mihir Bhansali downloaded, installed, and, upon information and belief, used software designed for such purposes;

    (iii)    Upon information and belief, Mihir Bhansali deleted or attempted to delete all copies of the spreadsheets described in paragraph 106 of this Complaint.

    (iv)    Mihir Bhansali directed Saju Poulose to "send all non-Firestar comp[uter]s to HK[.]"

    (v)    Nehal Modi, operating at the direction of or in coordination with Nirav Modi and Mihir Bhansali, destroyed mobile phones of various Shadow Entity personnel and other servers, documents, and records.

421.    Moreover, Mihir Bhansali corruptly obstructed, influenced, or impeded an official

proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above,

knowingly and intentionally making material misstatements, misrepresentations, and omissions

under penalty of perjury in connection with the Debtors' chapter 11 cases concerning the Debtors'

relationship with Shadow Entities and the Debtors' involvement in the Bank Fraud.

422.    Moreover, based on the same allegations, Mihir Bhansali corruptly endeavored to

influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the

discharge of his duty.

423.    Moreover, based on the same allegations, Mihir Bhansali corruptly endeavored to influence, obstruct, or impede the due administration of justice.

424.    Similarly, Ajay Gandhi corruptly obstructed, influenced, or impeded an official proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above, (a) knowingly and intentionally signing the Debtors' respective SOFAs under penalty of perjury without disclosing the Debtors' involvement in the Bank Fraud, their relationship with various Shadow Entities, and the substantial loan balances owed by NMI to Jaffe, or the significant transfers of the Debtors' assets to Shadow Entities and other Modi-Controlled Entities that were required to be disclosed in the SOFAs; and (b) feigning ignorance and outright lying to the Examiner concerning the Debtors' and his personal involvement in the transactions supporting the Bank Fraud.

425.    Moreover, based on the same allegations, Ajay Gandhi corruptly endeavored to influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the discharge of his duty.

426.    Moreover, based on the same allegations, Ajay Gandhi corruptly endeavored to influence, obstruct, or impede the due administration of justice.

427.    In taking such actions, Mihir Bhansali's and Ajay Gandhi's purpose was to impair the integrity or availability of evidence for use in an official proceeding, including these chapter 11 cases, or to otherwise obstruct, influence, or impede an official proceeding, including these chapter 11 cases.

428.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi agreed, expressly or implicitly, with each other and others, including Nehal Modi, to commit each of the obstruction of justice offenses alleged in this Complaint.

429.    Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, and other co-conspirators, including Nehal Modi, committed, and conspired to commit, numerous acts of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

430.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi's violations of 18 U.S.C. §§ 1503 and 1512 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Mihir Bhansali and Ajay Gandhi failed to disclose and, upon information and belief, actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

## Predicate Acts: Bankruptcy Fraud, Violations of 18 U.S.C. § 152

431.    The RICO Pattern included more than one act of bankruptcy fraud in violation of 18 U.S.C. § 152.

432.    Based on the allegations set forth in, *inter alia*, paragraphs 421 and 424 of this Complaint, Mihir Bhansali and Ajay Gandhi each knowingly and fraudulently made one or more false oaths or accounts in or relation to these chapter 11 cases.

433.    Based on those same allegations, Mihir Bhansali and Ajay Gandhi each knowingly and fraudulently made one or more false declarations, certificates, verifications, or statements under penalty of perjury in or in relation to these chapter 11 cases.

434.    Based on those same allegations, Mihir Bhansali and Ajay Gandhi, after the filing of these chapter 11 cases, knowingly and fraudulently withheld from a custodian, trustee, marshal, or other officer of this Court, including the Examiner, recorded information relating to the property or financial affairs of the Debtors.

79

435.     Based on those same allegations, Mihir Bhansali and Ajay Gandhi knowingly and fraudulently concealed from creditors, the United States Trustee, the Trustee, and this Court property belonging to the Debtors' estates, including the substantial loan receivable owed by NMI to Jaffe.

436.     Accordingly, Mihir Bhansali and Ajay Gandhi committed acts of bankruptcy fraud in violation of 18 U.S.C. § 152.

437.     Mihir Bhansali's and Ajay Gandhi's violations of 18 U.S.C. § 152 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Bhansali and Gandhi failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

## Continuity of Conduct

438.     Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of law as set forth herein, each of which directly and proximately injured the Debtors and U.S. Affiliates, constituted a continuous course of conduct in the United States beginning no later than 2010 and continuing at least through October 2018, which was intended to obtain economic gain through false representations, fraud, deceit, and other improper and unlawful means. Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

## The RICO Pattern Caused Injury to the Debtors and U.S. Affiliates

439.     Each Debtor has been injured in its business or property as a direct result and proximate result of Modi, Bhansali, and Gandhi's violations, described above, of 18 U.S.C. § 1962(c), including any injury by reason of the predicate acts constituting the RICO Pattern.

440.    Prior to Defendants' racketeering activities, each of the Debtors operated as a legitimate business built on fruitful relationships with reputable customers.

441.    Firestar was incorporated in 2004 for the purposes of acquiring Frederick Goldman, Inc., which was one of FIL's U.S. customers. Firestar historically operated as a distributor and wholesaler of finished gold and diamond jewelry. Its customer base consisted of legitimate jewelry retailers such as Zales, JCPenney, and Macy's.

442.    Fantasy was incorporated in 2012 for the purpose of holding the exclusive license from Chicago-based Fantasy Diamond Corp. to supply the Endless Diamond Brand to U.S. retailers. Fantasy was created primarily to conduct business with Costco Wholesale Corporation based on sales attributable to the Endless Diamond Brand. Fantasy's other customers include Zales, Sam's Club, and Walmart. Fantasy sold finished jewelry, generally at a higher price point than Firestar.

443.    Jaffe is the successor to New York-based Sandberg & Sikorksi Corporation, whose predecessors date back to 1892. Sandberg & Sikorski historically consisted of two divisions, one that sold to major U.S. retailers and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers. In 2007, FIL purchased a 95% stake in Sandberg & Sikorski. Sandberg & Sikorski was renamed A. Jaffe, Inc. in 2011. It did not become fully integrated within the operations of the other Firestar Entities until 2016.

444.    Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of federal law in furtherance of their scheme or schemes to loot the Debtors' and U.S. Affiliates' assets through a series of actual fraudulent transfers and to conceal the nature of such transfers by corruptly impeding, influencing, or obstructing these chapter 11 cases resulted in: (a) each Debtor's and each U.S. Affiliate's assets being unjustifiably and irrevocably depleted in the amount of the applicable actual fraudulent transfers, (b) each Debtor's chapter 11 estate incurring substantial

administrative expenses stemming from Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's obstruction of the Examiner's and Trustee's investigations that would not otherwise have been incurred, (c) the impairment of each Debtor's ability to sell their assets at going-concern value, and (d) the frustration of the Debtors' and U.S. Affiliates' ability to collect substantial debts owed to them by Shadow Entities and overseas Firestar Entities.

### Defendants' Agreement to Violate RICO

445.    At all relevant times, each Defendant, together with each other and with Nirav Modi, Mihir Bhansali, and Ajay Gandhi, and others known and unknown, being persons employed by or associated with the RICO Enterprise, have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) (the "**RICO Conspiracy**").

446.    Defendant Purvi Mehta's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.    Mehta was the beneficial owner of numerous Shadow Entities, Twin Fields, and numerous other offshore shell companies used to further the Bank Fraud and launder its proceeds.

b.    Mehta, through Islington, invested $45 million in proceeds of the Bank Fraud in FIPL to fund the 2017 "restructuring" of the Firestar Entities in connection with which Mehta subsequently received over $85 million in proceeds of the Bank Fraud.

c.    Mehta settled and funded the Ithaca Trust to launder proceeds of the Bank Fraud for the benefit of Nirav Modi and Ami Modi and to shield ill-gotten assets from creditors.

d.    Mehta wired Mihir Bhansali $1.5 million as a purported loan just weeks before Bhansali purchased a $7.1 million apartment.

447.    Defendant Ami Javeri's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.   Javeri served as a partner of all three LOU entities and, in 2010, opened bank accounts for Solar and Stellar used to defraud PNB.

b.   Javeri is the primary beneficiary of the Ithaca Trust and the beneficial owner of the Ritz Carlton Apartment and the Essex House Apartment.

c.   Javeri received more than $30 million in proceeds of the Bank Fraud from Purvi Mehta in May and June 2017.

d.   Javeri wired more than $30 million in proceeds of the Bank Fraud to Purvi Mehta between September and November 2017.

e.   Javeri fled India just weeks before the fraudulent LOUs issued in 2017 became due and the Bank Fraud was exposed.

f.   Javeri appointed Nehal Modi as Ithaca Trust Protector in May 2017.

448.    Defendant Nehal Modi's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.   Nehal Modi traveled overseas with Mihir Bhansali after exposure of the Bank Fraud to threaten and bribe witnesses, destroy evidence, and remove assets.

b.   Nehal Modi enlisted his personal friends, including Anthony Allicock, Rochelle Miller, and Tamer Abou El Ata, to divert the U.S. Affiliates' assets to Hong Kong following exposure of the Bank Fraud.

c.   Nehal Modi became Ithaca Trust Protector following exposure of the Bank Fraud.

d.   Nehal Modi, along with Mihir Bhansali, managed BBB Group as a front for the Modi family's money laundering efforts.

e.   Nehal Modi managed Gitanjali USA, Samuels, Diamlink, and other Choksi-controlled entities used to defraud PNB.

449.    Defendant Neeshal Modi's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.   Neeshal Modi served as a partner of all three LOU Entities and, in 2016, selected and appointed additional "dummy" partners for the LOU Entities.

83

b. Neeshal Modi was the beneficial owner of numerous Shadow Entities, other offshore shell companies used to further the Bank Fraud and launder its proceeds.

c. Neeshal Modi, along with Mihir Bhansali, selected and hired various Shadow Entity personnel throughout the Relevant Period.

d. Neeshal Modi orchestrated numerous fraudulent transactions among FD BVBA and Shadow Entities to further the Bank Fraud throughout the Relevant Period.

e. Neeshal Modi had a power of attorney for Purvi Mehta and signed agreements on her behalf, including for Purvi Mehta's purchase of a Hong Kong apartment in April 2017 for approximately $2.7 million.

450.    The Ithaca Trust's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Nirav Modi enjoys complete control over the Ithaca Trust, the Ithaca Trustee, the Ithaca Protector, the Ithaca Investment Advisor, the Ithaca Trust Agreement, and all of the assets in the Ithaca Trust.

b. The Ithaca Trust was settled by Purvi Mehta, one of the Modi family's primary money laundering conduits.

c. The Ithaca Trust purchased the Ritz Carlton Apartment using the proceeds of the Bank Fraud received from Purvi Mehta.

d. The Ithaca Trust purchased the membership interests on CPRE, which owns the Essex House Apartment, using proceeds of the Bank Fraud received from Purvi Mehta.

e. Deepak Sheth, the original Ithaca Protector and Ithaca Investment Advisor, participated in the Bank Fraud through the Sheth Entities throughout the Relevant Period.

f. Abhay Javeri, who succeeded Deepak Sheth as Ithaca Investment Advisor and served as the default Ithaca Protector, participated in the Bank Fraud through the SDC Entities throughout the Relevant Period.

g. Nehal Modi, who Ami Modi appointed Ithaca Protector in May 2018, orchestrated the Modi family's efforts to destroy evidence, tamper with witnesses, and divert assets from the reach of creditors following exposure of the Bank Fraud.

451.    Defendant CPS50's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Nirav Modi enjoys complete control over CPS50 through his complete control over the Ithaca Trust.

b. Deepak Sheth, the CPS50's original manager, participated in the Bank Fraud through the Sheth Entities throughout the Relevant Period.

c. Abhay Javeri, who succeeded Deepak Sheth as CPS50's manager, participated in the Bank Fraud through the SDC Entities throughout the Relevant Period.

d. Nitin Dattani, who succeeded Abhay Javeri as CPS50's manager in May 2018, worked with Ajay Gandhi, Angelina Ypma, and Mihir Bhansali to divert NMLUK's cash and inventory to Hong Kong following exposure of the Bank Fraud. Dattani also helped Nirav Modi set up a new company while Modi was hiding in London.

e. Ajay Gandhi, who served as president of CPS50 and as a signatory on its bank account, participated extensively in the Bank Fraud and in the fraudulent efforts following its exposure, as alleged above.

f. CPS50 purchased the Ritz Carlton Apartment using proceeds of the Bank Fraud.

g. CPS50 was formed for the purpose of laundering proceeds of the Bank Fraud to and for the benefit of Nirav Modi and Ami Modi.

452.    Defendant CPRE's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Nirav Modi enjoys complete control over CPRE through his complete control over the Ithaca Trust.

b. Mihir Bhansali, who served as sole director and CEO of CPRE, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

c. Ajay Gandhi, who served as chief financial officer of CPRE, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

453.     Defendant Twin Fields' agreement to join and support the RICO Conspiracy is

demonstrated by or can be inferred from, among other things, the following:

a.  Purvi Mehta, who indirectly owns Twin Fields through BVI shell companies,
    participated extensively in the Bank Fraud and in fraudulent efforts to launder
    its proceeds beyond the reach of creditors.

b.  Mihir Bhansali, who acted as the de jure or de facto director of Twin Fields,
    participated extensively in the Bank Fraud and in the efforts to obstruct justice
    and divert assets from the reach of creditors following its exposure, as alleged
    above.

c.  Nirav Modi enjoys complete control over Twin Fields through his dominance
    and control over Purvi Mehta, Mihir Bhansali, and Nehal Modi.

d.  Twin Fields served as a conduit for laundering proceeds of the Bank Fraud,
    including more than $25 million from Fine Classic, the Shadow Entity directly
    owned and controlled by Purvi Mehta.

454.     Each Shadow Entity Defendant's agreement to join and support the RICO

Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.  Nirav Modi enjoys complete control over each Shadow Entity Defendant
    through his dominance and control over Purvi Mehta, Neeshal Modi, and
    other nominal owners, directors, and officers.

b.  Each Shadow Entity Defendant engaged in millions of dollars in fraudulent
    import and export transactions with LOU Entities, Firestar Entities, and other
    Shadow Entities during the Relevant Period to further the Bank Fraud and to
    launder its proceeds.

c.  Each Shadow Entity Defendant was established and operated for the sole
    purpose of furthering the Bank Fraud and laundering its proceeds.

455.     Each Defendant knew that they were engaged in a conspiracy to commit the

predicate acts and knew that the predicate acts were part of such racketeering activity, and the

participation and agreement of each of them was necessary to allow the commission of this

pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C.

§ 1962(c), in violation of 18 U.S.C. § 1962(d).

456.    Each Defendant agreed to conduct or participate in, directly or indirectly, the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above.

457.    As part of the conspiracy, each Defendant, at times acting through certain of their agents, and representatives, or co-conspirators, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

458.    As a direct and proximate result of the Defendants' RICO Conspiracy, the pattern of racketeering activity through which they agreed the affairs of the RICO Enterprise would be conducted, the predicate acts and other overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), each of the Debtors has been injured in its business and property.

459.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the general and special compensatory damages suffered by each Debtor, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

## COUNT 2

**Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act ("RICO")**
**18 U.S.C. § 1962(d)**
**(U.S. Affiliates' Claim Against All Defendants)**

460.    Plaintiff restates and re-alleges paragraphs 1 through 459 of this Complaint as though fully set forth herein.

461.    Plaintiff, as assignee of the U.S. Affiliates, has standing to bring any and all claims or causes of action of the U.S. Affiliates.

462.    As a direct and proximate result of the Defendants' RICO Conspiracy, the pattern of racketeering activity through which they agreed the affairs of the RICO Enterprise would be conducted, the predicate acts and other overt acts taken in furtherance of that conspiracy, and

violations of 18 U.S.C. § 1962(d), each of the U.S. Affiliates has been injured in its business and property.

463.    Each mailing or shipment of the U.S. Affiliates' inventory or other assets in furtherance of the RICO Conspiracy constituted a violation of 18 U.S.C. § 1341.

464.    Each wire or other electronic transfer of the U.S. Affiliates' funds in furtherance of the RICO Conspiracy constituted a violation of 18 U.S.C. § 1343.

465.    Each violation of 18 U.S.C. § 1341 or 1343 involving transfers of a U.S. Affiliate's assets directly and proximately injured such U.S. Affiliate by depleting its assets.

466.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the general and special compensatory damages suffered by each U.S. Affiliate, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

## COUNT 3

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279
### (Synergies-Mehta Transfer)

467.    Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

468.    As alleged and defined above as the Synergies-Mehta Transfer, on July 13, 2017, Synergies wired $14,575,000 to Purvi Mehta as part of the fraudulent laundering of funds through the Firestar Entities to Mehta in 2017.

469.    The Synergies-Mehta Transfer constituted a transfer of an interest in Synergies' property.

470.    The Synergies-Mehta Transfer was made, mediately or immediately, by Synergies to Purvi Mehta.

471.    Plaintiff holds a judgment against Synergies.

472.    The Synergies-Mehta Transfer was made with the actual intent to hinder or delay or defraud creditors, including the Trustee, within the meaning of section 276 of the New York Debtor & Creditor Law ("**N.Y. DCL**"). Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Synergies-Mehta Transfer in order to launder and siphon illicit proceeds of the Bank Fraud and other valuable assets for the benefit of Purvi Mehta, Ami Modi, Nirav Modi, and others.

473.    Plaintiff, as a creditor of Synergies, may set aside the Synergies-Mehta Transfer, disregard the Synergies-Mehta Transfer, and attach or levy execution upon the property conveyed under sections 278 and 279 of the New York Debtor & Creditor Law.

474.    Alternatively, Plaintiff is entitled to a monetary damages in the amount of the Synergies-Mehta Transfer.

475.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under N.Y. DCL section 276-a, and as otherwise permitted by law.

## COUNT 4

**Avoidance and Recovery of Constructive Fraudulent Transfers**
**Under N.Y. DCL §§ 273, 278, and 279**
**(Synergies-Mehta Transfer)**

476.    Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

477.    The Synergies-Mehta Transfer constituted a transfer of an interest in Synergies' property.

478.    The Synergies-Mehta Transfer was made, mediately or immediately, by Synergies to Purvi Mehta.

479.    Plaintiff holds a judgment against Synergies.

480.    The Synergies-Mehta Transfer was made without fair consideration.

89

481.     On the date the Synergies-Mehta Transfer was made, Synergies was insolvent or was rendered insolvent as a result of such transfer.

482.     Plaintiff, as a creditor of Synergies, may set aside the Synergies-Mehta Transfer, disregard the Synergies-Mehta Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

483.     Alternatively, Plaintiff is entitled to a monetary damages in the amount of the Synergies-Mehta Transfer.

## COUNT 5

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279
### (CPRE Equity Transfer)

484.     Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

485.     As alleged and defined above as the CPRE Equity Transfer, on or around January 1, 2018, FGI transferred a 100% equity interest in CPRE to the Ithaca Trust as part of broader efforts to launder the proceeds of the Bank Fraud and shield assets from creditors.

486.     The CPRE Equity Transfer constituted a transfer of an interest in FGI's property.

487.     The CPRE Equity Transfer was made by FGI to the Ithaca Trust for the ultimate benefit of Ami Modi.

488.     Plaintiff holds a judgment against FGI.

489.     The CPRE Equity Transfer was made with the actual intent to hinder or delay or defraud creditors within the meaning of DCL section 276.  Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Equity Transfer to launder and siphon illicit proceeds of the Bank Fraud and other valuable assets for the benefit of Ami Modi, Nirav Modi, and others.

490.     Plaintiff, as a judgment creditor of FGI, may set aside the CPRE Equity Transfer, disregard the CPRE Equity Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

491.     Alternatively, Plaintiff is entitled to monetary damages in the amount of the CPRE Equity Transfer.

492.     Plaintiff is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 6

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279
### (CPRE Equity Transfer)

493.     Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

494.     The CPRE Equity Transfer constituted a transfer of an interest in FGI's property.

495.     The CPRE Equity Transfer was made by FGI to the Ithaca Trust for the ultimate benefit of Ami Modi.

496.     Plaintiff holds a judgment against FGI.

497.     The CPRE Equity Transfer was made without fair consideration.

498.     On the date the CPRE Equity Transfer was made, FGI was insolvent or was rendered insolvent as a result of such transfer.

499.     Plaintiff, as creditor of FGI, may set aside the CPRE Equity Transfer, disregard the CPRE Equity Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

500.     Alternatively, Plaintiff is entitled to monetary damages equal to the value of the CPRE Equity Transfer.

## COUNT 7

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)**
**(CPRE)**

501.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

502.     FDI made numerous cash transfers for the benefit of CPRE within two years of the commencement of FDI's chapter 11 case, as identified on Schedule A, attached hereto (collectively, the "**CPRE Two-Year Transfers**").

503.     The CPRE Two-Year Transfers constituted transfers of interests of FDI in property.

504.     The CPRE Two-Year Transfers were made for the benefit of CPRE.

505.     The CPRE Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the CPRE Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

506.     The Trustee may avoid the CPRE Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

507.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Two-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Two-Year Transfers were made, and from any subsequent transferees.

508.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 8

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (CPRE)

509.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

510.    FDI made numerous cash transfers for the benefit of CPRE within six years of the commencement of FDI's chapter 11 case, as identified on <u>Schedule A</u>, attached hereto (collectively, the "**CPRE Six-Year Transfers**").

511.    The CPRE Six-Year Transfers were made for the benefit of CPRE.

512.    The CPRE Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the CPRE Six-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

513.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the CPRE Six-Year Transfers set aside, or who could disregard the CPRE Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

514.    The Trustee may avoid the CPRE Six-Year Transfers under Bankruptcy Code section 544(b)(1).

515.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Six-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Six-Year Transfers were made, and from any subsequent transferees.

516.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 9

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(CPRE)**

517.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

518.    The CPRE Two-Year Transfers constituted transfers of interests of FDI in property.

519.    The CPRE Two-Year Transfers were made for the benefit of CPRE.

520.    FDI received less than reasonably equivalent value in exchange for the CPRE Two-Year Transfers.

521.    FDI was insolvent on the date each CPRE Two-Year Transfer was made, or became insolvent as a result of such transfer.

522.    The Trustee may avoid the CPRE Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

523.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Two-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Two-Year Transfers were made, and from any subsequent transferees.

### COUNT 10

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(CPRE)**

524.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

525.    The CPRE Six-Year Transfers constituted transfers of interests of FDI in property.

526.     The CPRE Six-Year Transfers were made for the benefit of CPRE.

527.     The CPRE Six-Year Transfers were made by FDI without fair consideration.

528.     On the date of each CPRE Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

529.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the CPRE Six-Year Transfers set aside, or who could disregard the CPRE Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

530.     The Trustee may avoid the CPRE Six-Year Transfers under Bankruptcy Code section 544(b)(1).

531.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Six-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 11

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Auragem)

532.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

533.     FDI made cash transfers to Auragem within six years of the commencement of FDI's chapter 11 case, as identified on Schedule B, attached hereto (collectively, the "**Auragem Transfers**").

534.     The Auragem Transfers were made to or for the benefit of Auragem.

535.     The Auragem Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi,

Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Auragem Transfers in order

to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi,

his family, and others. The natural consequence of the Auragem Transfers was to deplete FDI's

property and frustrate satisfaction of FDI's legitimate obligations.

536.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist

who could have the Auragem Transfers set aside, or who could disregard the Auragem Transfers

and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or

279.

537.    The Trustee may avoid the Auragem Transfers under Bankruptcy Code section

544(b)(1).

538.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

Auragem Transfers for the benefit of FDI's estate from Auragem, the entity to or for whose benefit

the Auragem Transfers were made, and from any subsequent transferees.

539.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this

claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 12

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Auragem)

540.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as

though fully set forth herein.

541.    The Auragem Transfers constituted transfers of interests of FDI in property.

542.    The Auragem Transfers were made to or for the benefit of Auragem.

543.    The Auragem Transfers were made by FDI without fair consideration.

96

544.    On the date of each Auragem Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

545.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Auragem Transfers set aside, or who could disregard the Auragem Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

546.    The Trustee may avoid the Auragem Transfers under Bankruptcy Code section 544(b)(1).

547.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Auragem Transfers for the benefit of FDI's estate from Auragem, the entity to or for whose benefit the Auragem Transfers were made, and from any subsequent transferees.

### COUNT 13

**Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(Brilliant)**

548.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

549.    FDI made numerous cash transfers to Brilliant within two years of the commencement of FDI's chapter 11 case, as identified on Schedule C, attached hereto (collectively, the "**Brilliant Two-Year Transfers**").

550.    The Brilliant Two-Year Transfers constituted transfers of interests of FDI in property.

551.    The Brilliant Two-Year Transfers were made to or for the benefit of Brilliant.

552.    The Brilliant Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-

conspirators approved the Brilliant Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Brilliant Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

553.     The Trustee may avoid the Brilliant Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

554.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Two-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Two-Year Transfers were made, and from any subsequent transferees.

555.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 14

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Brilliant)

556.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

557.     FDI made numerous transfers of cash and inventory to Brilliant within six years of the commencement of FDI's chapter 11 case, as identified on Schedule C, attached hereto (collectively, the "**Brilliant Six-Year Transfers**").

558.     The Brilliant Six-Year Transfers were made to or for the benefit of Brilliant.

559.     The Brilliant Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Brilliant Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for

the benefit of Modi, his family, and others. The natural consequence of the Brilliant Six-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

560.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Brilliant Six-Year Transfers set aside, or who could disregard the Brilliant Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

561.    The Trustee may avoid the Brilliant Six-Year Transfers under Bankruptcy Code section 544(b)(1).

562.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Six-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Six-Year Transfers were made, and from any subsequent transferees.

563.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 15

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Brilliant)

564.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

565.    The Brilliant Two-Year Transfers constituted transfers of interests of FDI in property.

566.    The Brilliant Two-Year Transfers were made to or for the benefit of Brilliant.

567.    FDI received less than reasonably equivalent value in exchange for the Brilliant Two-Year Transfers.

99

568.    FDI was insolvent on the date each Brilliant Two-Year Transfer was made, or became insolvent as a result of such transfer.

569.    The Trustee may avoid the Brilliant Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

570.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Two-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 16

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Brilliant)

571.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

572.    The Brilliant Six-Year Transfers constituted transfers of interests of FDI in property.

573.    The Brilliant Six-Year Transfers were made to or for the benefit of Brilliant.

574.    The Brilliant Six-Year Transfers were made by FDI without fair consideration.

575.    On the date of each Brilliant Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

576.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Brilliant Six-Year Transfers set aside, or who could disregard the Brilliant Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

577.    The Trustee may avoid the Brilliant Six-Year Transfers under Bankruptcy Code section 544(b)(1).

578.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Six-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 17

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Diagems)

579.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

580.     FDI made numerous cash transfers to Diagems within six years of the commencement of FDI's chapter 11 case, as identified on Schedule D, attached hereto (collectively, the "**Diagems Transfers**").

581.     The Diagems Transfers were made to or for the benefit of Diagems.

582.     The Diagems Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Diagems Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Diagems Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

583.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Diagems Transfers set aside, or who could disregard the Diagems Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

584.     The Trustee may avoid the Diagems Transfers under Bankruptcy Code section 544(b)(1).

585.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Diagems Transfers for the benefit of FDI's estate from Diagems, the entity to or for whose benefit the Diagems Transfers were made, and from any subsequent transferees.

586.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 18

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Diagems)

587.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

588.    The Diagems Transfers constituted transfers of interests of FDI in property.

589.    The Diagems Transfers were made to or for the benefit of Diagems.

590.    The Diagems Transfers were made by FDI without fair consideration.

591.    On the date of each Diagems Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

592.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Diagems Transfers set aside, or who could disregard the Diagems Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

593.    The Trustee may avoid the Diagems Transfers under Bankruptcy Code section 544(b)(1).

594.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Diagems Transfers for the benefit of FDI's estate from Diagems, the entity to or for whose benefit the Diagems Transfers were made, and from any subsequent transferees.

## COUNT 19

**Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(Empire)**

595.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

596.    The Debtors made transfers of inventory to Empire within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule E, attached hereto (collectively, the "**Empire Two-Year Transfers**").

597.    The Empire Two-Year Transfers constituted transfers of interests of the Debtors in property.

598.    The Empire Two-Year Transfers were made to or for the benefit of Empire.

599.    The Empire Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Empire Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Empire Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

600.    The Trustee may avoid the Empire Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

601.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Two-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 20

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Empire)

602.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

603.    The Debtors made numerous transfers of cash and inventory to Empire within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule E, attached hereto (collectively, the "**Empire Six-Year Transfers**").

604.    The Empire Six-Year Transfers were made to or for the benefit of Empire.

605.    The Empire Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Empire Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Empire Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

606.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Empire Six-Year Transfers set aside, or who could disregard the Empire Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

607.    The Trustee may avoid the Empire Six-Year Transfers under Bankruptcy Code section 544(b)(1).

608.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

Empire Six-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for

whose benefit the Empire Six-Year Transfers were made, and from any subsequent transferees.

609.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this

claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 21

**Avoidance and Recovery of Constructive Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)**
**(Empire)**

610.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as

though fully set forth herein.

611.    The Empire Two-Year Transfers constituted transfers of interests of the Debtors in

property.

612.    The Empire Two-Year Transfers were made to or for the benefit of Empire.

613.    The Debtors received less than reasonably equivalent value in exchange for the

Empire Two-Year Transfers.

614.    The Debtors were insolvent on the date each Empire Two-Year Transfer was made,

or became insolvent as a result of such transfer.

615.    The Trustee may avoid the Empire Two-Year Transfers under section 548(a)(1)(B)

of the Bankruptcy Code.

616.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

Empire Two-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or

for whose benefit the Empire Two-Year Transfers were made, and from any subsequent

transferees.

## COUNT 22

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Empire)

617.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

618.     The Empire Six-Year Transfers constituted transfers of interests of the Debtors in property.

619.     The Empire Six-Year Transfers were made to or for the benefit of Empire.

620.     The Empire Six-Year Transfers were made by the Debtors without fair consideration.

621.     On the date of each Empire Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

622.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Empire Six-Year Transfers set aside, or who could disregard the Empire Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

623.     The Trustee may avoid the Empire Six-Year Transfers under Bankruptcy Code section 544(b)(1).

624.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Six-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Six-Year Transfers were made, and from any subsequent transferees.

106

## COUNT 23

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Eternal)

625.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

626.    The Debtors made transfers of inventory to Eternal within two years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule F</u>, attached hereto (collectively, the "**Eternal Two-Year Transfers**").

627.    The Eternal Two-Year Transfers constituted transfers of interests of the Debtors in property.

628.    The Eternal Two-Year Transfers were made to or for the benefit of Eternal.

629.    The Eternal Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Eternal Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Eternal Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

630.    The Trustee may avoid the Eternal Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

631.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Two-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 24

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Eternal)

632.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

633.    The Debtors made transfers of cash and inventory to Eternal within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule F, attached hereto (collectively, the "**Eternal Six-Year Transfers**").

634.    The Eternal Six-Year Transfers were made to or for the benefit of Eternal.

635.    The Eternal Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Eternal Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Eternal Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

636.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Eternal Six-Year Transfers set aside, or who could disregard the Eternal Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

637.    The Trustee may avoid the Eternal Six-Year Transfers under Bankruptcy Code section 544(b)(1).

638.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Six-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Six-Year Transfers were made, and from any subsequent transferees.

639.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 25

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Eternal)

640.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

641.     The Eternal Two-Year Transfers constituted transfers of interests of the Debtors in property.

642.     The Eternal Two-Year Transfers were made to or for the benefit of Eternal.

643.     The Debtors received less than reasonably equivalent value in exchange for the Eternal Two-Year Transfers.

644.     The Debtors were insolvent on the date each Eternal Two-Year Transfer was made, or became insolvent as a result of such transfer.

645.     The Trustee may avoid the Eternal Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

646.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Two-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 26

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Eternal)

647.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

648.    The Eternal Six-Year Transfers constituted transfers of interests of the Debtors in property.

649.    The Eternal Six-Year Transfers were made to or for the benefit of Eternal.

650.    The Eternal Six-Year Transfers were made by the Debtors without fair consideration.

651.    On the date of each Eternal Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

652.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Eternal Six-Year Transfers set aside, or who could disregard the Eternal Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

653.    The Trustee may avoid the Eternal Six-Year Transfers under Bankruptcy Code section 544(b)(1).

654.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Six-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 27

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Fancy Creations)

655.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

656.    The Debtors made numerous transfers of cash and inventory to Fancy Creations within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule G, attached hereto (collectively, the "**Fancy Creations Two-Year Transfers**").

657.    The Fancy Creations Two-Year Transfers constituted transfers of interests of the Debtors in property.

658.    The Fancy Creations Two-Year Transfers were made to or for the benefit of Fancy Creations.

659.    The Fancy Creations Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Fancy Creations Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Fancy Creations Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

660.    The Trustee may avoid the Fancy Creations Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

661.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Two-Year Transfers for the benefit of the Debtors' estates from Fancy Creations, the entity to or for whose benefit the Fancy Creations Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 28

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Fancy Creations)

662.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

663.    The Debtors made numerous transfers of cash and inventory to Fancy Creations within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule G, attached hereto (collectively, the "**Fancy Creations Six-Year Transfers**").

664.    The Fancy Creations Six-Year Transfers were made to or for the benefit of Fancy Creations.

665.    The Fancy Creations Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Fancy Creations Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Fancy Creations Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

666.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Fancy Creations Six-Year Transfers set aside, or who could disregard the Fancy Creations Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

667.    The Trustee may avoid the Fancy Creations Six-Year Transfers under Bankruptcy Code section 544(b)(1).

112

668.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Six-Year Transfers for the benefit of the Debtors' estates from Fancy Creations, the entity to or for whose benefit the Fancy Creations Six-Year Transfers were made, and from any subsequent transferees.

669.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 29

**Avoidance and Recovery of Constructive Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)**
**(Fancy Creations)**

670.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

671.    The Fancy Creations Two-Year Transfers constituted transfers of interests of the Debtors in property.

672.    The Fancy Creations Two-Year Transfers were made to or for the benefit of Fancy Creations.

673.    The Debtors received less than reasonably equivalent value in exchange for the Fancy Creations Two-Year Transfers.

674.    The Debtors were insolvent on the date each Fancy Creations Two-Year Transfer was made, or became insolvent as a result of such transfer.

675.    The Trustee may avoid the Fancy Creations Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

676.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Two-Year Transfers for the benefit of the Debtors' estates from Fancy Creations,

the entity to or for whose benefit the Fancy Creations Two-Year Transfers were made, and from

any subsequent transferees.

## COUNT 30

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Fancy Creations)

677.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as

though fully set forth herein.

678.     The Fancy Creations Six-Year Transfers constituted transfers of interests of the

Debtors in property.

679.     The Fancy Creations Six-Year Transfers were made to or for the benefit of Fancy

Creations.

680.     The Fancy Creations Six-Year Transfers were made by the Debtors without fair

consideration.

681.     On the date of each Fancy Creations Six-Year Transfer, the Debtors were insolvent

or were rendered insolvent as a result of such transfer.

682.     Actual creditors, including but not limited to the Debtors' vendors and suppliers,

exist who could have the Fancy Creations Six-Year Transfers set aside, or who could disregard

the Fancy Creations Six-Year Transfers and attach or levy execution upon the property conveyed,

under N.Y. DCL sections 278 and/or 279.

683.     The Trustee may avoid the Fancy Creations Six-Year Transfers under Bankruptcy

Code section 544(b)(1).

684.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

Fancy Creations Six-Year Transfers for the benefit of the Debtors' estates from Fancy Creations,

the entity to or for whose benefit the Fancy Creations Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 31

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Pacific)

685.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

686.    The Debtors made numerous transfers of cash and inventory to Pacific within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule H, attached hereto (collectively, the "**Pacific Two-Year Transfers**").

687.    The Pacific Two-Year Transfers constituted transfers of interests of the Debtors in property.

688.    The Pacific Two-Year Transfers were made to or for the benefit of Pacific.

689.    The Pacific Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Pacific Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Pacific Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

690.    The Trustee may avoid the Pacific Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

691.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Two-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 32

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Pacific)

692.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

693.    The Debtors made numerous transfers of cash and inventory to Pacific within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule H, attached hereto (collectively, the "**Pacific Six-Year Transfers**").

694.    The Pacific Six-Year Transfers were made to or for the benefit of Pacific.

695.    The Pacific Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Pacific Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Pacific Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

696.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Pacific Six-Year Transfers set aside, or who could disregard the Pacific Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

697.    The Trustee may avoid the Pacific Six-Year Transfers under Bankruptcy Code section 544(b)(1).

116

698.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Six-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Six-Year Transfers were made, and from any subsequent transferees.

699.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 33

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Pacific)

700.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

701.    The Pacific Two-Year Transfers constituted transfers of interests of the Debtors in property.

702.    The Pacific Two-Year Transfers were made to or for the benefit of Pacific.

703.    The Debtors received less than reasonably equivalent value in exchange for the Pacific Two-Year Transfers.

704.    The Debtors were insolvent on the date each Pacific Two-Year Transfer was made, or became insolvent as a result of such transfer.

705.    The Trustee may avoid the Pacific Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

706.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Two-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 34

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Pacific)

707.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

708.     The Pacific Six-Year Transfers constituted transfers of interests of the Debtors in property.

709.     The Pacific Six-Year Transfers were made to or for the benefit of Pacific.

710.     The Pacific Six-Year Transfers were made by the Debtors without fair consideration.

711.     On the date of each Pacific Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

712.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Pacific Six-Year Transfers set aside, or who could disregard the Pacific Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

713.     The Trustee may avoid the Pacific Six-Year Transfers under Bankruptcy Code section 544(b)(1).

714.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Six-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Six-Year Transfers were made, and from any subsequent transferees.

118

## COUNT 35

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Sunshine)

715.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

716.    FDI transferred $965,000.00 in inventory to Sunshine on March 17, 2016 (the "**Sunshine Transfer**").

717.    The Sunshine Transfer was made within two years of the commencement of FDI's chapter 11 case.

718.    The Sunshine Transfer constituted a transfer of interest of FDI in property.

719.    The Sunshine Transfer was made to or for the benefit of Sunshine.

720.    The Sunshine Transfer was made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Sunshine Transfer in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Sunshine Transfer was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

721.    The Trustee may avoid the Sunshine Transfer under section 548(a)(1)(A) of the Bankruptcy Code.

722.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

119

## COUNT 36

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Sunshine)**

723.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

724.     The Sunshine Transfer was made within six years of the commencement of FDI's chapter 11 case.

725.     The Sunshine Transfer constituted a transfer of an interest of FDI in property.

726.     The Sunshine Transfer was made to or for the benefit of Sunshine.

727.     The Sunshine Transfer was made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Sunshine Transfer in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Sunshine Transfer was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

728.     Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Sunshine Transfer set aside, or who could disregard the Sunshine Transfer and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

729.     The Trustee may avoid the Sunshine Transfer under Bankruptcy Code section 544(b)(1).

730.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

731.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 37

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(Sunshine)**

732.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

733.    The Sunshine Transfer constituted a transfer of an interest of FDI in property.

734.    The Sunshine Transfer was made to or for the benefit of Sunshine.

735.    FDI received less than reasonably equivalent value in exchange for the Sunshine Transfer.

736.    FDI was insolvent on the date the Sunshine Transfer was made, or became insolvent as a result of such transfer.

737.    The Trustee may avoid the Sunshine Transfer under section 548(a)(1)(B) of the Bankruptcy Code.

738.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

## COUNT 38

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Sunshine)

739.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

740.    The Sunshine Transfer constituted a transfer of an interest of FDI in property.

741.    The Sunshine Transfer was made to or for the benefit of Sunshine.

742.    The Sunshine Transfer was made by FDI without fair consideration.

743.    On the date the Sunshine Transfer was made, FDI was insolvent or was rendered insolvent as a result of such transfer.

744.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Sunshine Transfer set aside, or who could disregard the Sunshine Transfer and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

745.    The Trustee may avoid the Sunshine Transfer under Bankruptcy Code section 544(b)(1).

746.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

## COUNT 39

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Tri Color)

747.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

748.    The Debtors made cash transfers to Tri Color within two years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule I</u>, attached hereto (collectively, the "**Tri Color Two-Year Transfers**").

749.    The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors in property.

750.    The Tri Color Two-Year Transfers were made to or for the benefit of Tri Color.

751.    The Tri Color Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Tri Color Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Tri Color Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

752.    The Trustee may avoid the Tri Color Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

753.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Two-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 40

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Tri Color)

754.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

755.     The Debtors made numerous transfers of cash and inventory to Tri Color within six years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule I</u>, attached hereto (collectively, the "**Tri Color Six-Year Transfers**").

756.     The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors in property.

757.     The Tri Color Six-Year Transfers were made to or for the benefit of Tri Color.

758.     The Tri Color Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Tri Color Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Tri Color Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

759.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Tri Color Six-Year Transfers set aside, or who could disregard the Tri Color Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

760.     The Trustee may avoid the Tri Color Six-Year Transfers under Bankruptcy Code section 544(b)(1).

761.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Six-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Six-Year Transfers were made, and from any subsequent transferees.

762.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 41

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(Tri Color)**

763.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

764.     The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors in property.

765.     The Tri Color Two-Year Transfers were made to or for the benefit of Tri Color.

766.     The Debtors received less than reasonably equivalent value in exchange for the Tri Color Two-Year Transfers.

767.     The Debtors were insolvent on the date each Tri Color Two-Year Transfer was made, or became insolvent as a result of such transfer.

768.     The Trustee may avoid the Tri Color Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

769.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Two-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 42

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Tri Color)

770.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

771.    The Tri Color Six-Year Transfers constituted transfers of interests of the Debtors in property.

772.    The Tri Color Six-Year Transfers were made to or for the benefit of Tri Color.

773.    The Tri Color Six-Year Transfers were made by the Debtors without fair consideration.

774.    On the date of each Tri Color Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

775.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Tri Color Six-Year Transfers set aside, or who could disregard the Tri Color Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

776.    The Trustee may avoid the Tri Color Six-Year Transfers under Bankruptcy Code section 544(b)(1).

777.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Six-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Six-Year Transfers were made, and from any subsequent transferees.

126

## COUNT 43

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Unique)

778.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

779.     FDI made numerous transfers of cash and inventory to Unique within two years of the commencement of FDI's chapter 11 case, as identified on <u>Schedule J</u>, attached hereto (collectively, the "**Unique Two-Year Transfers**").

780.     The Unique Two-Year Transfers constituted transfers of interests of FDI in property.

781.     The Unique Two-Year Transfers were made to or for the benefit of Unique.

782.     The Unique Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Unique Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Unique Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

783.     The Trustee may avoid the Unique Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

784.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Two-Year Transfers for the benefit of FDI's from Unique, the entity to or for whose benefit the Unique Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 44

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Unique)

785.   The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

786.   The Debtors made numerous transfers of cash and inventory to Unique within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule J, attached hereto (collectively, the "**Unique Six-Year Transfers**").

787.   The Unique Six-Year Transfers were made to or for the benefit of Unique.

788.   The Unique Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Unique Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Unique Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

789.   Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Unique Six-Year Transfers set aside, or who could disregard the Unique Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

790.   The Trustee may avoid the Unique Six-Year Transfers under Bankruptcy Code section 544(b)(1).

791.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Six-Year Transfers for the benefit of the Debtors' estates from Unique, the entity to or for whose benefit the Unique Six-Year Transfers were made, and from any subsequent transferees.

792.     The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 45

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Unique)

793.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

794.     The Unique Two-Year Transfers constituted transfers of interests of FDI in property.

795.     The Unique Two-Year Transfers were made to or for the benefit of Unique.

796.     FDI received less than reasonably equivalent value in exchange for the Unique Two-Year Transfers.

797.     FDI was insolvent on the date each Unique Two-Year Transfer was made, or became insolvent as a result of such transfer.

798.     The Trustee may avoid the Unique Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

799.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Two-Year Transfers for the benefit of FDI's estate from Unique, the entity to or for whose benefit the Unique Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 46

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Unique)

800.    The Trustee restates and re-alleges paragraphs 1 through 382 of this Complaint as though fully set forth herein.

801.    The Unique Six-Year Transfers constituted transfers of interests of the Debtors in property.

802.    The Unique Six-Year Transfers were made to or for the benefit of Unique.

803.    The Unique Six-Year Transfers were made by the Debtors without fair consideration.

804.    On the date of each Unique Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

805.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Unique Six-Year Transfers set aside, or who could disregard the Unique Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

806.    The Trustee may avoid the Unique Six-Year Transfers under Bankruptcy Code section 544(b)(1).

807.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Six-Year Transfers for the benefit of the Debtors' estates from Unique, the entity to or for whose benefit the Unique Six-Year Transfers were made, and from any subsequent transferees.

130

## COUNT 47

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (World Diamond)

808.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

809.    FDI made numerous transfers of inventory to World Diamond within two years of the commencement of FDI's chapter 11 case, as identified on Schedule K, attached hereto (collectively, the "**World Diamond Two-Year Transfers**").

810.    The World Diamond Two-Year Transfers constituted transfers of interests of FDI in property.

811.    The World Diamond Two-Year Transfers were made to or for the benefit of World Diamond.

812.    The World Diamond Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the World Diamond Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the World Diamond Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

813.    The Trustee may avoid the World Diamond Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

814.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the World Diamond Two-Year Transfers for the benefit of FDI's from World Diamond, the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

131

## COUNT 48

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(World Diamond)**

815.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

816.    The Debtors made numerous transfers of inventory to World Diamond within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule K, attached hereto (collectively, the "**World Diamond Six-Year Transfers**").

817.    The World Diamond Six-Year Transfers were made to or for the benefit of World Diamond.

818.    The World Diamond Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the World Diamond Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the World Diamond Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

819.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the World Diamond Six-Year Transfers set aside, or who could disregard the World Diamond Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

820.    The Trustee may avoid the World Diamond Six-Year Transfers under Bankruptcy Code section 544(b)(1).

821.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

World Diamond Six-Year Transfers for the benefit of the Debtors' estates from World Diamond,

the entity to or for whose benefit the World Diamond Six-Year Transfers were made, and from

any subsequent transferees.

822.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this

claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 49

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(World Diamond)**

823.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as

though fully set forth herein.

824.    The World Diamond Two-Year Transfers constituted transfers of interests of the

Debtors in property.

825.    The World Diamond Two-Year Transfers were made to or for the benefit of World

Diamond.

826.    The Debtors received less than reasonably equivalent value in exchange for the

World Diamond Two-Year Transfers.

827.    The Debtors were insolvent on the date each World Diamond Two-Year Transfer

was made, or became insolvent as a result of such transfer.

828.    The Trustee may avoid the World Diamond Two-Year Transfers under section

548(a)(1)(B) of the Bankruptcy Code.

829.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

World Diamond Two-Year Transfers for the benefit of the Debtors' estates from World Diamond,

the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 50

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (World Diamond)

830.　The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

831.　The World Diamond Two-Year Transfers constituted transfers of interests of FDI in property.

832.　The World Diamond Two-Year Transfers were made to or for the benefit of World Diamond.

833.　FDI received less than reasonably equivalent value in exchange for the World Diamond Two-Year Transfers.

834.　FDI was insolvent on the date each World Diamond Two-Year Transfer was made, or became insolvent as a result of such transfer.

835.　The Trustee may avoid the World Diamond Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

836.　Under Bankruptcy Code section 550(a), the Trustee may recover the value of the World Diamond Two-Year Transfers for the benefit of FDI's estate from World Diamond, the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 51

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Twin Fields)

837.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

838.    Jaffe made numerous cash transfers to Twin Fields within two years of the commencement of Jaffe's chapter 11 case, as identified on Schedule L, attached hereto (collectively, the "**Twin Fields Two-Year Transfers**").

839.    The Twin Fields Two-Year Transfers constituted transfers of interests of Jaffe in property.

840.    The Twin Fields Two-Year Transfers were made to or for the benefit of Twin Fields.

841.    The Twin Fields Two-Year Transfers were made with the actual intent to hinder, delay, or defraud Jaffe's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Twin Fields Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Twin Fields Two-Year Transfers was to deplete Jaffe's property and frustrate satisfaction of Jaffe's legitimate obligations.

842.    The Trustee may avoid the Twin Fields Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

843.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Two-Year Transfers for the benefit of Jaffe's estate from Twin Fields, the entity to or for whose benefit the Twin Fields Two-Year Transfers were made, and from any subsequent transferees.

135

## COUNT 52

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(Twin Fields)**

844.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

845.     The Debtors made numerous cash transfers to Twin Fields within six years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule L</u>, attached hereto (collectively, the "**Twin Fields Six-Year Transfers**").

846.     The Twin Fields Six-Year Transfers were made to or for the benefit of Twin Fields.

847.     The Twin Fields Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Twin Fields Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others.  The natural consequence of the Twin Fields Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

848.     Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Twin Fields Six-Year Transfers set aside, or who could disregard the Twin Fields Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

849.     The Trustee may avoid the Twin Fields Six-Year Transfers under Bankruptcy Code section 544(b)(1).

850.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Six-Year Transfers for the benefit of the Debtors' from Twin Fields, the entity to or

136

for whose benefit the Twin Fields Six-Year Transfers were made, and from any subsequent

transferees.

851.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this

claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 53

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Twin Fields)

852.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as

though fully set forth herein.

853.    The Twin Fields Two-Year Transfers constituted transfers of interests of Jaffe in

property.

854.    The Twin Fields Two-Year Transfers were made to or for the benefit of Twin

Fields.

855.    Jaffe received less than reasonably equivalent value in exchange for the Twin

Fields Two-Year Transfers.

856.    Jaffe was insolvent on the date each Twin Fields Two-Year Transfer was made, or

became insolvent as a result of such transfer.

857.    The Trustee may avoid the Twin Fields Two-Year Transfers under section

548(a)(1)(B) of the Bankruptcy Code.

858.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

Twin Fields Two-Year Transfers for the benefit of Jaffe's estate from Twin Fields, the entity to or

for whose benefit the Twin Fields Two-Year Transfers were made, and from any subsequent

transferees.

## COUNT 54

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Twin Fields)

859.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

860.    The Twin Fields Six-Year Transfers constituted transfers of interests of the Debtors in property.

861.    The Twin Fields Six-Year Transfers were made to or for the benefit of Twin Fields.

862.    The Twin Fields Six-Year Transfers were made by the Debtors without fair consideration.

863.    On the date of each Twin Fields Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

864.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Twin Fields Six-Year Transfers set aside, or who could disregard the Twin Fields Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

865.    The Trustee may avoid the Twin Fields Six-Year Transfers under Bankruptcy Code section 544(b)(1)

866.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Six-Year Transfers for the benefit of the Debtors' estates from Twin Fields, the entity to or for whose benefit the Twin Fields Six-Year Transfers were made, and from any subsequent transferees.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee, as chapter 11 trustee of the Debtors and as assignee and judgment creditor of the U.S. Affiliates, respectfully requests that the Court:

a. On Count 1, enter judgment in favor of the Trustee and against all Defendants, jointly and severally, in treble the amount of damages to be proven at trial, but no less than $175,000,000 that were suffered by the Debtors and their estates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

b. On Count 2, enter judgment in favor of the Trustee, as assignee of the U.S. Affiliates, and against all Defendants, jointly and severally, in treble the amount of damages to be proven at trial, but no less than $50,000,000, that were suffered by the U.S. Affiliates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

c. On Count 3, avoid the Synergies-Mehta Transfer and enter judgment in favor of the Trustee and against Defendant Purvi Mehta in the amount of $14,575,000.

d. On Count 4, avoid the Synergies-Mehta Transfer and enter judgment in favor of the Trustee and against Defendant Purvi Mehta in the amount of $14,575,000.

e. On Count 5, avoid the CPRE Equity Transfer and enter judgment in favor of the Trustee and against the Ithaca Trust and Ami Modi, jointly and severally, in the amount of $6,000,000.

f. On Count 6, avoid the CPRE Equity Transfer and enter judgment in favor of the Trustee and against the Ithaca Trust and Ami Modi, jointly and severally, in the

139

amount of $6,000,000.

g.  On Count 7, avoid each of the CPRE Two-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $3,603,683.69.

h.  On Count 8, avoid each of the CPRE Six-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $4,594,559.78.

i.  On Count 9, avoid each of the CPRE Two-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $3,603,683.69.

j.  On Count 10, avoid each of the CPRE Six-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $4,594,559.78.

k.  On Count 11, avoid each of the Auragem Transfers and enter judgment in favor of the Trustee and against Auragem in the amount of $2,340,968.94.

l.  On Count 12, avoid each of the Auragem Transfers and enter judgment in favor of the Trustee and against Auragem in the amount of $2,340,968.94.

m.  On Count 13, avoid each of the Brilliant Two-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $5,264,397.13.

n.  On Count 14, avoid each of the Brilliant Six-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $10,491,287.11.

o.  On Count 15, avoid each of the Brilliant Two-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $5,264,397.13.

p.  On Count 16, avoid each of the Brilliant Six-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $10,491,287.11.

q.  On Count 17, avoid each of the Diagems Transfers and enter judgment in favor of the Trustee and against Diagems in the amount of $2,966,406.15.

r.  On Count 18, avoid each of the Diagems Transfers and enter judgment in favor of

the Trustee and against Diagems in the amount of $2,966,406.15.

s.  On Count 19, avoid each of the Empire Two-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $1,069,006.07.

t.  On Count 20, avoid each of the Empire Six-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $12,113,126.57.

u.  On Count 21, avoid each of the Empire Two-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $1,069,006.07.

v.  On Count 22, avoid each of the Empire Six-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $12,113,126.57.

w.  On Count 23, avoid each of the Eternal Two-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,433,815.61.

x.  On Count 24, avoid each of the Eternal Six-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,733,815.61.

y.  On Count 25, avoid each of the Eternal Two-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,433,815.61.

z.  On Count 26, avoid each of the Eternal Six-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,733,815.61.

aa. On Count 27, avoid each of the Fancy Creations Two-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $3,900,916.93.

bb. On Count 28, avoid each of the Fancy Creations Six-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $10,827,802.57.

cc. On Count 29, avoid each of the Fancy Creations Two-Year Transfers and enter

141

judgment in favor of the Trustee and against Fancy Creations in the amount of $3,900,916.93.

dd. On Count 30, avoid each of the Fancy Creations Six-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $10,827,802.57.

ee. On Count 31, avoid each of the Pacific Two-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $12,494,765.63.

ff. On Count 32, avoid each of the Pacific Six-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $41,771,415.37.

gg. On Count 33, avoid each of the Pacific Two-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $12,494,765.63.

hh. On Count 34, avoid each of the Pacific Six-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $41,771,415.37.

ii. On Count 35, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

jj. On Count 36, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

kk. On Count 37, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

ll. On Count 38, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

mm. On Count 39, avoid each of the Tri Color Two-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $1,493,645.55.

nn. On Count 40, avoid each of the Tri Color Six-Year Transfers and enter judgment

in favor of the Trustee and against Tri Color in the amount of $12,395,082.86.

oo. On Count 41, avoid each of the Tri Color Two-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $1,493,645.55.

pp. On Count 42, avoid each of the Tri Color Six-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $12,395,082.86.

qq. On Count 43, avoid each of the Unique Two-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $3,475,031.42.

rr. On Count 44, avoid each of the Unique Six-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $11,494,395.02.

ss. On Count 45, avoid each of the Unique Two-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $3,475,031.42.

tt. On Count 46, avoid each of the Unique Six-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $11,494,395.02.

uu. On Count 47, avoid each of the World Diamond Two-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $10,607,792.98.

vv. On Count 48, avoid each of the World Diamond Six-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $21,175,805.74.

ww. On Count 49, avoid each of the World Diamond Two-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $10,607,792.98.

xx. On Count 50, avoid each of the World Diamond Six-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of

$21,175,805.74.

yy. On Count 51, avoid each of the Twin Fields Two-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $3,265,000.00.

zz. On Count 52, avoid each of the Twin Fields Six-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $21,361,542.28.

aaa. On Count 53, avoid each of the Twin Fields Two-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $3,265,000.00.

bbb. On Count 54, avoid each of the Twin Fields Six-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $21,361,542.28.

ccc. Award the Trustee his reasonable costs and expenses incurred in this action, including counsel fees under New York Debtor & Creditor Law section 276-a and as otherwise permitted by law.

Dated: February 25, 2020
       New York, New York             Respectfully submitted,

**JENNER & BLOCK LLP**

By: /s/ Vincent E. Lazar
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
aallen@jenner.com

Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600
cwedoff@jenner.com

*Counsel for the Chapter 11 Trustee*

## APPENDIX A

### Appendix A-124

During the Relevant Period, Nirav Modi, Bhansali, and Gandhi exercised direct oversight and control over transactions between the U.S. Entities and Shadow Entities. For example:

(i) On June 8, 2012, Gandhi emailed Bhavesh Patel and Shyam Wadhwa, "Please email payables to HK and Dubai – all the companies. Firestar, Firestar Diamond Int'l and Jaffe. Need to pay $1m to HK or Dubai hence need name and amounts only." Bhavesh replied, "There is nothing open in Dubai however HK open payables attached herewith for your review." Gandhi replied, "It could be Pacific, World Diamond, etc too." That same day, FDI transferred $1,000,000 to Fancy Creations. This transaction is described as an "advance" in FDI's bank statement.

(ii) On July 23, 2012, Ajay Gandhi sent a message to Nirav Modi through Panemail, which is a web-based email service that automatically deletes messages, "Niravbhai, please see attached payment plan in 5 parts to clean-up AR and AP of [FDII] for HK, Dubai, Belgium and NY. Funds should come from respective companies. 1. $452k. 2. $1.129m. 3. $1.5m. 4. $828k. 5. $1.05m. If implemented, the attached AR and AP of $4.3 million can be cleaned up. Please let me know if you have different thought." On August 3, 2012, Gandhi forwarded the email to Hemant Bhatt, copying Bhansali, and stated, "I will call you Monday to discuss. We need to move funds in Firestar Diamond International, Inc. per attached. NM/MB is fine so long as money flows from SDC/Tristar and Diamlink to any of HK or Dubai entities." On August 14, 2012, Gandhi followed up, "Hemant, When can I expect payments for the below cycle that we spoke about?" On August 27, 2012, Bhatt replied to Gandhi, copying Bhansali, "Pacific and Unique paid as above. Please pay accordingly."

The message contained a list reflecting that Pacific and Unique owed FDII $779,579 and $418,498, respectively, in accounts receivable, and that FDII owed Fancy Creations, FDL, and Diagems $1,063,369, $121,129, and $14,033, respectively, in accounts payable. On August 28, 2012, Hemant Bhatt messaged Ajay Gandhi on Panemail, "Auragem paid $200,000.00 and Brilliant paid $231,175.03. Pleeasse [sic] confirm receipt and pay to Fancy." FDII's bank statements reflect: (a) incoming wires of $779,544.11 and $418,463.00 on August 27, 2012 from Pacific and Unique, respectively; (b) incoming wires of $231,150.03 from Brilliant and $199,975.00 from Auragem on August 28, 2012; and (c) outgoing wires of $1,063,369, $121,129.21, and $14,032.80 on August 28, 2012 to Fancy Creations, FDL, and Diagems, respectively.

1

(iii)    On August 28, 2012, Gandhi emailed Bhavesh Patel, "Tomorrow, please wire $431,175 to Fancy Creations from [FDII's] Capital Old Account." FDII's bank statement reflects an outgoing wire in the amount of $431,175 to Fancy Creations on August 29, 2012.

(iv)    On September 12, 2012, Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, "Please wire $150,000 to Unique Diamond for back office expenses from January 2012 thru June 2012 – invoice #'s UD-FI-004 & UD-FI-001." That same day, Patel emailed Gandhi and Bhatt, "Please find attached wire from FSI to Unique as per new bank details for $150k." Gandhi replied solely to Patel, "Spoke to HB for return of funds?" Patel replied, "I called him today morning. He confirmed and told that, he will require invoice details if any / from which location amount will remit etc[.] so that he will arrange as per your requirement in NY." Gandhi replied, "Ask him from where he can remit and give him details. It could be in FS or Intl."

(v)    On December 4, 2012, Sridhar Krishnan of SDC Designs emailed Gandhi, "You shall receive payment of $1,737,155 . . . from Empire Gems FZE in Firestar Diamond International, part payment against your invoice # 73112 dt 7/31/12[.] Please make payment to SDC Designs LLC against their invoice # 629966 dt 7/30/12." Gandhi replied, "When?" Krishnan replied, "I am wiring today to Universal FZE, so I guess you would get it from Empire gems tomorrow." Gandhi then forwarded the email chain to Mihir Bhansali and asked, "Ok to proceed per below once funds are received?" That same day, Gandhi separately forwarded Krishnan's email to Hemant Bhatt and asked, "Is this OK once funds are received?" Gandhi followed up with Bhatt several hours later, "Do not send email. Please call me to confirm in the morning."

(vi)    On December 10, 2012, Gandhi emailed Bhavesh Patel, "Pay $1m against above invoice to Empire Gems tomorrow from HSBC per attached wire instruction. Also let HB know that $733k is already paid against this invoice. Upon information and belief, "HB" refers to Hemant Bhatt. On December 11, 2012, FDI wired $1,185,025.05 to Empire.

(vii)    On December 13, 2012, Gandhi instructed Bhavesh Patel to "prepare the following wires today: 1. Pay $231,000 to Unique for Back Office expenses from Firestar Diamond Inc. 2. Pay $391,611 to Synergies Corp from Firestar Diamond, Inc. for Interest. 3. Pay $300,000 to Unique from Synergies Corp. for Loan Repayment. 4. Pay $91,000 to Brilliant from Synergies Corp for Loan Repayment. 5. Balance amount tomorrow to Diagem once funds are here in Firestar Diamond, Inc." Later that day, Gandhi followed up, "Money is coming any minute hence wire $552,133.10 to Diagem from Firestar Diamond, Inc. (against open invoice) . . ." The next day, Patel replied, "Based o[n] HB's details, please find wire from FSI to Diagems for $552,133.10. Gandhi replied, "Please tell HB about wires from yesterday

and ask if he receives it. Upon information and belief, "HB" refers to Hemant Bhatt.

(viii)    On December 20, 2012, Bhavesh Patel emailed Ajay Gandhi, "Please find attached wire [from FDI] to Diagems ($119k) and Pacific ($652k) as per instructions." Gandhi replied, "Change Empire amount as discussed."

(ix)    In a 2012 email, Kurian Matthews relayed a conversation he had with Bhansali in which they set up a circular transaction starting at Fantasy, going through Radashir Jewelry Co. Pvt. Ltd. (a Modi-Controlled Entity that has been implicated in the Bank Fraud), FIL, and Firestar and ending back at Fantasy. The purpose was to "clear the old invoices of Radashir on FDC" because a bank was inquiring about the old invoices. Similarly, in December 2012, Bhansali and Kurian Mathews discussed wiring money to Radashir and back to the Debtors against Radashir's accounts payables to "use [the money] for NM [Modi]."

(x)    On February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, LLC wrote to Bhansali and Modi partner Hemant Bhatt using personal email addresses. Krishman told Bhatt and Bhansali, "You should expect 1.4 million in Universal fze today. Please wire the same to A Jaffe." Two days later, Bhatt confirmed that Universal Fine Jewelry FZE had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."

(xi)    On February 6, 2013, Ajay Gandhi emailed Nirav Modi, copying Mihir Bhansali, "Niravbhai, After keeping $3 million buffer, I can pay $1 million to India in February 2013. Please let me know if I should ask Manish/Amit for listing to pay." Modi replied, "Yes pls." One day earlier, Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "We can pay $1.0 million to India in the month of February 2013. Please email me a list to pay." As alleged above, Manish Bosamiya and Miten Pandya were among the individuals directly involved in obtaining LOU funding from PNB. Thus, upon information and belief, the purpose of Gandhi's emails was to inform Modi, Bosamiya, and Pandya the amount Gandhi would be able to send to facilitate repayment of LOUs.

(xii)    On February 19, 2013, Shyam Wadhwa emailed Ajay Gandhi, "Kindly clarify details of open vendor bills against which inward wire receipt of $2[,]006,987.25 on 29th May '12 has been applied. Gandhi replied, "$2m was received & wired back to FIPL and Radashir." His email included a table reflecting that, on May 19, 2012, $2,006,949.25 received from Pacific was sent to FIPL ($1,953,990) and Radashir ($126,010).

(xiii)    On February 22, 2013, Bhavesh Patel emailed Ajay Gandhi a wire confirmation reflecting a $503,501.41 transfer from FDI to Pacific.

(xiv)    On October 23, 2013, Ajay Gandhi emailed Bhavesh Patel, "Pay $150,000 to Pacific Diamonds per the attached from Firestar Diamond, Inc. – HSBC." Patel replied with the wire confirmation and stated, "Please find attached wire from FSI to Pacific as Professional Fees."

(xv)    On October 30, 2013, Bhavesh Patel emailed Ajay Gandhi, copying Altamash Ansari and Shyam Wadhwa, "Please find attached internal transfer as well as wire document for your reference. 1. FSI to Jaffe, Amount $1,768,385.00 (Internal) 2. Jaffe to Pacific, Amount $2,455,036.00 (Abu Dhabi Bank). A few hours later, Patel followed up to ask Gandhi to "please approve attached wires as discussed."

(xvi)    On December 31, 2013, Mihir Bhansali emailed Ajay Gandhi, "As discussed, FSI will pay to Sangam Diamonds Corp. on behalf of Fancy Creation Company Limited (HK) (Invoice # 100773 Dt. 19.12.2013). Attached are Invoice of Sangam Diamonds Corp Sale to Fancy and Sangam's bank info. Please make wire today." Gandhi replied, copying Bhavesh Patel, "Bhavesh, please set-up wire from Firestar to Sangam Diamond – NY." Patel then replied with the wire confirmation reflecting a $1,247,746 payment to Sangam Diamonds Corp. On January 8, 2014, Gandhi forwarded Bhansali's December 31, 2013 email to Hemant Bhatt, stating "I paid $1.24m on 12/31/13 to Fancy per attached. This funds never came back hence I will pay $575k today. Please call me if needed."

(xvii)    On February 5, 2014, Altamash Ansari emailed Ajay Gandhi, with a copy to Shyam Wadhwa and Bhavesh Patel, a table of "Receipts & Payments for the month in which [Jaffe] received money from Pacific." The table listed amounts Jaffe received from and paid to Pacific, Empire, Twin Fields, and various Firestar Entities. Replying solely to Shyam Wadhwa, Gandhi stated, "Pacific got paid more than they send funds !!!!!" Wadhwa replied, "Please ignore below email. To answer your question, A. Jaffe had received Funds through Pacific which were lying as ADVANCE in books. Post shipment of diamonds, advance has got adjusted." On February 12, 2014, Gandhi replied, "Anything I need to do?" Wadhwa replied, "Manish Bosamiya would be requiring $ 4M funds against India billing on A. Jaffe." As noted above, upon information and belief, Manish Bosamiya was one of the individuals directly involved in obtaining LOU funding from PNB, which suggests that the $4 million Wadhwa requested from Jaffe was directly related to repaying an LOU. Gandhi replied, "Spoke to MB [upon information and belief, Mihir Bhansali]. Let's talk tomorrow or Friday. He prefers outgoing shipment from Jaffe to Firestar BVBA as oppose to anywhere."

4

(xviii)  On March 18, 2014, Ajay Gandhi emailed Bhavesh Patel, copying Hemant Bhatt, instructions to wire $150,000 from FDI to Unique for "back office expenses," $123, 097 from FDI to Synergies for "Interest," and $123,000 from Synergies to Brilliant for "Loan repayment." Patel replied with the wire confirmations.

(xix)  On March 25, 2014, Shyam Wadhwa emailed Ajay Gandhi, copying Bhavesh Patel, "FHL has remitted sub-debt funds [of] USD [$]4,058,500 to Firestar Diamond Inc and USD [$]1,800,000 to Firestar Group Inc. Please remit funds to Brilliant from both companies and confirm." Patel then sent Gandhi wire confirmations reflecting a transfer of $4,058,500 from FDI to Brilliant and a transfer of $1,800,000 from FGI to Brilliant.

(xx)  On August 4, 2014, Sridhar Krishnan of SDC Designs emailed Ajay Gandhi, "Did you wire to Empire. Please advise." Gandhi replied, "I need to pay overseas. I have asked for a listing to pay. I will let you know once it is wired." Krishnan replied, "I need the funds by tomorrow. Please expedite."

(xxi)  On September 18, 2014, Manish Bosamiya emailed Ajay Gandhi, copying Bhavesh Patel, "Firestar Diamond Intl Inc will receive US $550,000.00 from Firestar Diamond Ltd (HK) in Capital One Bank." Patel then emailed Gandhi, "Please approve below wire from Capital Old [one of FDII's Capital One bank accounts] to Pacific for $550,000.00 as POA."

(xxii)  On December 16, 2014, Gandhi emailed Avinash Oza and Altamash Ansari, "Please pay $1,240,273.54 to Auragem, HK tomorrow for their invoice #2580001314 from Firestar Diamond, Inc. (Part payment)." Oza replied with the wire confirmation. Gandhi replied, "Bank information confirmed with Sandeep?" Upon information and belief, Gandhi was referring to Sandeep Mistry, one of the key co-conspirators in the Bank Fraud.

(xxiii)  On February 19, 2015, Ajay Gandhi emailed Hemant Bhatt, "I would like to pay $300k for back-office expenses. Pay to Unique? Please email me wire information. Also, I would like to pay $180k from Synergies to Brilliant. Please email me wire confirmation." On February 20, 2015, Ajay Gandhi emailed Arpan Doshi and Avinash Oza instructions to wire $186,871 from FDI to Synergies as "Interest", $300,000 from FDI to Eternal as "Back Office Expense," and $180,000 from Synergies to Brilliant as "Loan Repayment." Doshi replied with the wire confirmations.

(xxiv)  On March 2, 2015, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $300,000 from FDI to Unique and $180,000 from Synergies to Brilliant. Doshi replied with the wire confirmations.

5

(xxv)     On June 26, 2015 Ajay Gandhi emailed Arpan Doshi and Avinash Oza instructions to wire $300,000 from FDI to Pacific. FDI's bank statement reflects a transfer from FDI to Pacific of $1,438,270.60 on that day.

(xxvi)     On September 28, 2015, Ajay Gandhi emailed Avinash Oza, "Please wire $1,017,000 from Firestar Diamond, Inc to Pacific Diamond – on account." Oza replied with the wire confirmation. Gandhi replied, please wire $54,000 to Pacific D from Firestar Diamond, Inc." Gandhi then emailed Operation 1, in reply to an email earlier that day in which Operation 1 sent Gandhi Pacific's bank details, "$1.017m wired. I thought it was $1.017m but I received $1.071m. Will wire balance tomorrow - $54k." FDI's bank statements reflect these transfers.

(xxvii)     On February 26, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1,192,105.55 from FDI to Tri Color. Doshi replied with the wire confirmation.

(xxviii)     In March 2016, Evelyn Kosiec, the Jaffe operations manager, asked Bhansali where to re-export loose diamonds, and an hour later she emailed Gandhi, "Mihir informed to ship this to Eternal diamonds in Hong Kong, the same price, rounded to the nearest 5 120 day terms."

(xxix)     On March 4, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $300,000 from FDI to Unique. Oza replied with the wire confirmation.

(xxx)     On March 9, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $247,551 from FDI to Synergies and $250,000 from Synergies to Brilliant. Doshi replied with the wire confirmations.

(xxxi)     On March 15, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $700,000 from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxii)     On March 21, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1 million from Jaffe to Pacific. Doshi replied with the wire confirmation.

(xxxiii)     On March 24, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1 million from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxiv)     On March 25, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $1.4 million from Jaffe to NMI, and then $613,069 from NMI to Auragem and $787,000 from NMI to Nirav Modi Ltd. Doshi replied with the wire confirmations.

(xxxv)  On March 31, 2016, Ajay Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $301,540 from Fantasy to Tri Color Gems. Oza replied with the wire confirmation.

(xxxvi)  On April 5, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $500,000 from Jaffe to Pacific. Doshi replied with the wire confirmation.

(xxxvii)  On May 6, 2016, Gandhi emailed Avinash Oza, Arpan Doshi, and Altamash Ansari instructions to wire $2 million from Jaffe to Pacific. Oza replied with the wire confirmation.

(xxxviii)  On June 1, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire $815,000 from Jaffe to Pacific. Doshi replied with the wire confirmation. Jaffe's bank statements reflect this wire transfer.

(xxxix)  On June 29, 2016, Ajay Gandhi emailed Altamash Ansari and Vishal Popat a bank statement reflecting a $599,972 wire transfer from Pacific to Jaffe on June 29, 2016. Gandhi instructed them to "show as advance if no open AR from Pacific."

(xl)  On July 18, 2016, Ajay Gandhi emailed Avinash Oza instructions to wire $200,000 from FDI to Jaffe, $200,000 from Jaffe to Fancy Creations, $150,000 from FDI to FDII, and $150,000 from FDII to Fancy Creations. Oza replied with the wire confirmations.

(xli)  On July 19, 2016, Ajay Gandhi Emailed Avinash Oza instructions to wire $1,809,528 from FDI to Fancy Creations. Oza replied with the wire confirmation.

(xlii)  On July 22, 2016, Gandhi emailed Avinash Oza and Arpan Doshi instructions to wire "$715k from Firestar to Fancy – Purchases[;] $200k from Firestar to Jaffe[;] $200k from Jaffe to Fancy – Purchases[.]" Oza replied with the wire confirmations.

(xliii)  On March 22, 2017, Ajay Gandhi emailed Avinash Oza and Kunal Patel instructions to wire $300,000 from FDI to Unique for "Back-Office expenses" and $240,000 from Synergies to Brilliant for "Repayment of Loan." Oza replied with the wire confirmations.

(xliv)    On January 3, 2018, Gandhi emailed Avinash Oza instructions to wire $483,620.05 from FDI to Pacific, $2,188,769.43 from FDII to Pacific, and $530,000 from Jaffe to Pacific. Oza replied with the wire confirmations. Gandhi then forwarded this email to Subhash Parab and Shyam Wadhwa stating, with respect to the $2,188,769.43 transfer to Pacific, "We have wired these funds from FSI but please apply this amount to FSII (Pacific) due to bank error in Capital One." Consistent with Gandhi's email, FDI's bank statements confirm that FDI wired both $483,620.05 and $2,188,769.43 to Pacific on January 3, 2018.

(xlv)    On January 31, 2018, Avinash Oza emailed Ajay Gandhi wire confirmations reflecting transfers of $2,466,015 and $525,000 from FDII to Fancy Creations. Gandhi forwarded the wire confirmations to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

Ajay Gandhi regularly advised Nirav Modi, Miten Pandya, Manish Bosamiya, Amit Magia, and Shyam Wadhwa, of his ability to wire funds from the U.S. Entities to India in furtherance of the Bank Fraud throughout the Relevant Period. For example:

(i) On August 14, 2009, Nirav Modi directed Gandhi to make payments totaling $2,293,326 to Brilliant and Diagem. On June 16, 2010, Nirav Modi instructed Gandhi, "Unique has wired $250,000 today to Synergies. Please wire to the account Mehul bhai wants."

(ii) On August 26, 2010, Nirav Modi emailed Ajay Gandhi to ask, "What will be the week-by-week payment plan for September to India?" On August 27, 2010, Gandhi replied, attaching two spreadsheets containing two possible scenarios, and noting "to cover August borrowing base – I have asked India to remit $1 m for one day & I will remit back on September 1. Substantial amount of inventory was shipped to India & HK hence inventory & AR became ineligible." On August 29, 2010, Gandhi forwarded this email chain to Mihir Bhansali.

(iii) On October 21, 2010, in furtherance of a circular trade, Nirav Modi and Gandhi communicated by email about the shipment of a diamond to a Shadow Entity. Modi stated, "Send the 70 ct vivid yellow to Firestone Dubai @$51,500 and not Firestone HK." Gandhi responded, "Firestone, Dubai confirmed (Not Unique)[,]" to which Modi clarified, "Sorry Unique[,]" in reference to the Shadow Entity. Gandhi responded with "Glad I asked!!!"

(iv) On December 20, 2013, Ajay Gandhi emailed Manish Bosamiya, Miten Pandya, and Amit Magia, "I can pay $600k from Capital One – Diamond Division or A. Jaffe – HSBC." On December 23, 2013, Bosamiya replied, "Please find attached open invoice of $602,761.39 from FSI." Patel replied to Gandhi, "They don't have anything most recent open from Jaffe or diamond division so they gave listing from FSI for $603k. Please let me know if we can pay from FSI so that I will prepare wires as per that." Gandhi replied, "Transfer to H[s]bc but do not pay from this list but pay other list [o]f Manish around $1.8m."

(v) On January 9, 2014, Ajay Gandhi emailed Miten Pandya, Manish Bosamiya, and Amit Magia, "I can pay $5 million in January 2014 to India. Please email me a listing of invoices so that I can wire funds on a weekly basis or so." Bosamiya replied with the allocation of the $5 million among various Firestar Entities. On January 13, 2014, Gandhi replied, "$5m wired per below. Please acknowledge receipt of these wires." On January 21, 2014, Bosamiya replied, copying Bhavesh Patel, "Boi – London [upon

information and belief, "Boi" refers to "Bank of India] informed yesterday
that they have not received $2,157,359.90 as the concern [sic] person was
on leave last week and they have only received the message that funds are
coming but Nostro is not credited. Please provide the swift message." Later
that day, Patel replied to Gandhi, "Manishbhai called me and they received
fund." Gandhi then replied to Bosamiya, "Bhavesh emailed me that funds
were received. Please let me know otherwise."

(vi)    On April 1, 2014, Gandhi emailed Manish Bosamiya, "I can pay $4 million
in April 2014 to India. Please email me a listing of invoices so that I can
wire funds on a weekly basis or so." Bosamiya replied with instructions to
wire $1,763,644.60 from FDI to FIL and $2,250,858.36 from FDI to FDIPL.
On April 2, 2014, Gandhi replied, "1.76m wired today." On April 14, 2014,
Gandhi followed up, "$240k and $341k wired today."

(vii)   On April 6, 2016, Shyam Wadhwa emailed Ajay Gandhi and Mihir
Bhansali asking them to send $2.7 million from Jaffe to FIL to clear
outstanding accounts receivable and stating "our fund position is tight in
India, else would have wired funds to you against our payables of about
USD 1M from FDIPL for clearing AR/AP between India and NY." Gandhi
replied, copying Bhansali, "We have Overseas AR of around $8.5m in
Firestar Diamond, Inc. – If I get funds in FD, Inc then we can wire funds to
India this month." The next day, Gandhi followed up, "I can wire $1m this
month from Jaffe thru FS. Can it come back to FS?

<u>Appendix A-131</u>

The secretive nature of the "regular" financials is demonstrated by the communications between Nirav Modi, Ajay Gandhi, Mihir Bhansali, and other co-conspirators.  For example:

(i)    On September 24, 2009, Ajay Gandhi emailed Raghu Iyer, "I looked at cash flow totals and there are major differences in the total cash flow summary versus details by month. The main reason is that I am accounting for non-core cash receipts and non-core payments thru cash flow without increasing the corresponding sales & purchases (Loose diamonds)." Iyer replied, "Can u make this match pls[.] So we will get the annual cash flow properly[.]"

(ii)    On March 8, 2010, Deepak Gupta emailed Ajay Gandhi and Mihir Bhansali asking for Jaffe and FDI's financial statements. Gandhi forwarded the email to Bhansali and asked, "Who is Deepak Gupta and OK to send FS to him?" Bhansali replied, "Yes, ok to send to him. Will explain when we talk." Gandhi replied, "Should I send him both core and non-core?" Bhansali replied, "Yes, send him both, so that they correspond with the audited numbers. Speak to him on the phone and explain to him the difference."

(iii)    On October 17, 2012, Ajay Gandhi emailed Nirav Modi, Mihir Bhansali, Raghu Iyer, and Saju Poulose the "Core Business and Regular Financial Statements as of September 30, 2012 for your review." On October 25, 2012, Saju Poulose emailed Ajay Gandhi, "Need your help to understand 'third' version 'sales' number of [FDII] as on Sep 2012 . . . 1. Josh Division Sales $4,898,257 - This is only Josh diamond sales from the financials[?] 2. September Financials $8,333,842 -This is including Josh + NDM larger/corporate sales[?] 3. September Financials Josh Division for Consolidation $9,599,627 = what are [sic] this numbers include?" Gandhi replied, "1. September Josh's division of HK will include sales made to inter-company such as Firestar Diamond, Inc., A. Jaffe, Firestar HK, Firestar Dubai and other affiliated companies in HK and Dubai ($9.55 million). 2. Josh's financial - $4.89 million will include any of the affiliated sales that he may be earning margins. All Pink sales and affiliated sales without margin are not included. 3. Corporate Sales - $8.33 million will not include AN[Y] affiliated sales but only sales to outside customers including Pink diamond sales."

(iv)    On September 16, 2013, Ajay Gandhi emailed Samir Shah and Rebecca Chow with the subject "Loose Diamond Sales", "$196k loss for the attached sales of August 2013. Please confirm ASAP." Shah replied, "The goods came in at the wrong prices from Sandeep. This is the reason it is showing as a loss." Gandhi forwarded the email to Mihir Bhansali and stated, "We need to stop this. I am losing control on the Core Financials. Whre do I

show such loss for August now – Core or Non-Core? Can we reverse in
September 2013 please as it is affecting banks for 6 month financials…"
Gandhi followed up, "$196k loss was excluded from Core Financials of
August 2013 but it is part of Regular Financials." Bhansali replied, copying
Saju Poulose, "Ok. Saju – pls speak to me."

(v)    On October 15, 2013, Ajay Gandhi emailed Saju Poulose, copying Kuntal
Desai, "Core-Non-Core – Thru September 2013 – How much am I moving?
$167k or $177k that we discussed last week?" Poulose replied, "Hi
Ajaybhai, Have discussed with Kuntal and gone thru his working file in
detail. He will sent [sic] you the detailed mail." Gandhi replied, "How
much was the amount and Kuntal – did you sent [sic] it?" Desai replied,
"Yes. Please check other mail."

As part of the audit process, the auditors would email parties listed on the audited company's accounts receivable and accounts payable records to request written confirmation of the amounts reflected in the audited company's books and records. For audits of the U.S. entities, which upon information and belief were conducted together, Ajay Gandhi would be copied on the auditor's emails to Shadow Entities, which Gandhi would often forward to Operation 1 to ask that Operation 1 cause the Shadow Entity to provide confirmation the auditors. For example:

(i)     On June 7, 2017, Ajay Gandhi forwarded to Operation 1 an auditor's request to Fancy Creations. Operation 1 replied, "Today or tomorrow customer will confirm as discussed." Gandhi replied, "There were several emails…" Gandhi was referencing the auditor's requests to several other Shadow Entities, which Gandhi had also forwarded to Operation 1.

(ii)    On July 11, 2017, Gandhi sent an email to Operation 1 asking "Can you please have your customer [Brilliant] sign the attached confirmation for Synergies Corp?"   The attachment was not the typical auditor's confirmation request sheet; instead, it was a term sheet for an unsecured loan from Brilliant to Synergies in the amount of $1,287,000. The term sheet indicated that the loan would be interest free, repayable on demand, dated as of September 30, 2016—nearly one year earlier—and was to be used "for the business purpose of the Company." On July 19, 2017, Gandhi sent an email directly to "accounts@brilliantdiamonds.hk", copying Operation 1, stating, "Please see attached Synergies Confirmation and sign and email to me ASAP. You are holding up my audit. This is balance confirmation as of 9/30/16."  Approximately an hour later, Gandhi forwarded the email to Kurian Matthews asking, "Kurian – can you please have your customer take care of it ASAP per below email?" On July 23, 2017, an employee of Brilliant replied to Gandhi's email, copying Operation 1, attaching the signed loan term sheet.

(iii)   On November 10, 2017, Gandhi forwarded to Operation 1 an auditor's request to Eternal and asked Operation 1 to "Please chase your vendor to confirmed [sic] it. Audit is on hold."  That same day, Gandhi sent substantively identical emails to Operation 1 forwarding auditor requests to Fancy Creations and Sino Traders.

<u>Appendix A-145</u>

The Operation 1 account was also used to orchestrate transfers of funds and jewels among

Firestar Entities and Shadow Entities. For example:

(i)    On March 6, 2015, Rebecca Chow emailed Sandeep Mistry, copying Samir Shah and Paresh Mehta, "Please be informed that 1.68.52cts of 1/2ct VS loose diamond that's ready to be shipped. Please provide shipping address so we can process." Later that day, Chow forwarded the email to Operation 1 and stated, "Hi Sandeep, Hope this email reach [sic] you! Please advise below and thanks."

(ii)    On September 28, 2015, Ajay Gandhi sent Operation 1 remittance instructions for Jaffe's HSBC bank account ending 2460. The next day, Operation 1 replied, "Universal made payment of 1.4 m Advance Against Invoice[.]" A few hours later, Gandhi replied, "Received and wired to SDC." Jaffe's bank statements reflect that, on September 29, 2015, Jaffe received $1,399,962 from Universal Fine Jewelry FZE. That same day, Jaffe transferred $464,050 to SDC Designs LLC and $950,000 to FDII. FDII's bank statements reflect that, on September 29, 2015, FDII transferred $943,827.50 to SDC Designs LLC. Thus, consistent with the email exchange between Ajay Gandhi and Operation 1, the entire approximately $1.4 million Jaffe received from Universal was ultimately paid to SDC Designs, LLC.

(iii)    On January 29, 2016, Dhinakaran Pillai, a finance manager at Firestar International Pvt. Ltd., emailed Ajay Gandhi, "We have remitted today US $405,180.83 in FSI from FIPL invoice details as listed below . . . Once the payment as has been realized in your account, kindly remit the overdue outstanding of US $650,880.00 against our invoices, details as attached for your reference." The email referenced two invoices from FIPL to FDI dated October 22, 2015 and October 23, 2015, respectively. On February 3, 2016, Subhash Parab, who was copied on Pillai's email to Gandhi, forwarded the email to Operation 1 with the note "FYI". Operation 1 then emailed Gandhi, "Ajaybhai, India Team conformed [sic] that $650k is against his plan $405k, so that Please send to Firestar Dubai $650k, which we yesterday talk [sic]. Regards, Sandeep[.]" Gandhi replied, copying Subhash Parab, "I will pay $425k. Please let me know where or what company."

(iv)    On February 1, 2016, Operation 1 emailed Rebecca Chow and Samir Shah, "You will be received [sic] the goods from Tricolor[.] Please coordinate with Samir Bhai in details[.]" The email included a table listing a total of 379.02 carats of mixed diamonds of varying specifications. FDI's purchase ledger reflects a February 22, 2016 purchase of 379.02 carats of loose diamonds from Tri Color Gems for a total price of $400,131.

1

(v)     On February 9, 2016, Rebecca Chow emailed Operation 1, copying Ajay Gandhi, "Hi Sandeep, as per our phone conversation, please be informed that package of RE-117 & RE-119 both has [sic] been received in NY. Additionally, there is one shipment received that has no paper work at all."

(vi)    On March 3, 2016, Subhash Parab emailed Ajay Gandhi, copying Operation 1 and Shyam Wadhwa, "Dear Ajaybhai, Kindly wire USD2.00 Mio [sic] payment from A. Jaffe to FIPL as per attached listing." The attachment was a spreadsheet listing several dozen invoices issued by FIPL to Jaffe between March 20, 2015 and September 9, 2015 totaling $2,004,879.70. Gandhi replied, "Just realized cannot pay to Jaffe (Part of $3 m) unless funds are coming in from overseas."

(vii)   On March 29, 2017, Operation 1 emailed Ajay Gandhi, "Ajaybhai, We sold goods to Pacific Diamond FZE, and party will wire advice $1.9m[.] Please send to them Proforma Invoice as below details . . . Regards[,] Sales". Gandhi replied with invoice no. 032017, dated March 20, 2017, reflecting a sale by Jaffe to Pacific of 1,691.25 carats of "Mix Diamonds" at a total price of $2,114,062.50. On April 3, 2017, Jaffe received a $1,499,972 transfer from Pacific with a wire reference of "ADVANCE AGAINST PROFORMA INV N032017." That same day, Jaffe transferred $1,510,267.77 to Firestar International Pvt. Ltd.

(viii)  On September 22, 2017, Gandhi sent an email to Operation 1 attaching a report reflecting accounts receivable owed by Brilliant, Unique, and World Diamond to FDI and asking Operation 1 to "Please have your customer clear these AR - $5.5m on or before September 30, 2017."

<u>Appendix A-153</u>

On many occasions, Mihir Bhansali and Ajay Gandhi would immediately transfer funds received by the U.S. Entities from the Sheth Entities to Shadow Entities and Foreign Firestar Entities (including through the L/C Collections service), as they commonly did with funds received from Shadow Entities and Firestar Entities, but not from *bona fide* customers. For example:

(i)     On April 29, 2011, Excellent Facets wired $769,480 to FDI. On May 2, 2011, FDI paid $749,026.75 through the L/C Collections service.

(ii)    On September 7, 2012, Excellent Facets wired $594,013.85 to FDI. The same day, FDI paid $381,290.70 through L/C Collections and paid $272,071.59 to the PNB account of FIPL. These subsequent transfers totaled $653,362.29.

(iii)   On July 18, 2013, Excellent Facets received at least $751,895 from Fancy Creations. On the same day, Excellent Facets wired $949,980 to FDI. FDI then paid $489,943.35 through L/C Collections and wired $628,444.79 to FIPL.

(iv)    On July 24, 2013, Excellent Facets wired $613,637.68 to FDI. The same day, FDI paid $700,000 to one of its lenders, HSBC Bank.

(v)     On November 10, 2014, Excellent Facets wired $1,112,060.50 to Fantasy, after which Fantasy wired $1,100,000 to FDI, FDI transferred $1,100,000 to Jaffe, and Jaffe wired $1,117,113.16 to FIPL.

(vi)    On November 19, 2015, Excellent Facets wired $976,864.85 to FDI. The next day, FDI also received $1,500,000 from Fantasy. FDI then transferred $2,100,000 to its Israel Discount Bank of New York account and paid "Trade Services"—a service similar to "L/C Collections" and through which other Firestar Entities were the ultimate beneficiaries of the transfers.

(vii)   On December 23, 2015, Excellent Facets wired $969,980 to FDI. On December 28, 2015, FDI made a principal payment of $900,000 to HSBC Bank.

(viii)  On April 21, 2015, Mihir Bhansali emailed Ajay Gandhi, "Please wire $250k to E[xcellent]F[acets]I[nc.] from Jaffe, as an advance." Gandhi forwarded the email to Avinash Oza and Arpan Doshi and instructed, "$200,000 from Firestar Diamond Inc. to A. Jaffe. $250,000 from A. Jaffe to Excellent Facet per attached." Oza replied with the wire confirmations. That same day,

Gandhi emailed Shyam Wadhwa with the subject "Jaffe/Twin Field/ Excellent Fac[e]t" and attaching $250,000 check from Jaffe to FDI, a $250,000 check from Twin Fields to Jaffe, confirmation of a $250,000 wire from Jaffe to Twin Fields, and confirmation of the $250,000 wire from Jaffe to Excellent Facets. Gandhi stated, "Please call me tomorrow and I will explain. We wired to Twin Field in error and Twin Field gave money back. We finally wired to Excellent Facet as Loan. Firestar Diamond, Inc. funded the transaction." On June 21, 2016, Jasmine Pradhan of Excellent Facets emailed Ajay Gandhi, "We received loan advance on 4/21/2015 from A. Jaffe Inc[.] [T]oday we are planning to return that amount. I was wondering if you could send me the bank details with wire payment instructions." Several hours later, after the wire was complete, Gandhi forwarded the email chain to Mihir Bhansali and stated, "$250k received. Paying $1.250m to India today. ($250k plus $1m based on shipment for the month)."

(ix)   On December 13, 2012, an HSBC customer service representative emailed Ajay Gandhi, "I have just been notified that there is a wire being sent from [Synergies'] account xxxxx369 in the amount of $90,970.00. There are currently not enough funds available in this account to send out this wire. Also, there are 2 wires being sent from [FDI's] account xxxxx004 totaling $622,591.00. There are currently not enough funds available in this account to send out this wire. Please advise." Gandhi replied, "I am expecting $1.175 million in Firestar Diamond and once it hits then all the wires should be fine. It should have come by now…" Gandhi attached a CitiBank wire confirmation printout showing a $1,175,213.45 wire from SDC LLC's CitiBank checking account to FDI "against invoice 15206996." The printout indicated that the wire was set up by Sridhar Krishnan and approved by Abhay Javeri. FDI's bank statements reflect an inward wire of $1,175,213.45 wire from SDC on December 13, 2012 and outward wires on that day of $391,611 to Synergies and $231,000 to Unique. Synergies' bank statements show that Synergies immediately used the funds received from FDI to wire $91,000 to Brilliant and $300,000 to Unique.

(x)   On December 26, 2013, FDI received wires from SDC Designs Inc. and SDC Designs LLC of $250,000 and $323,745, respectively. On December 30, 2013, Ajay Gandhi emailed Manish Bosamiya and Miten Pandya, "I can pay $1.6m from Firestar before December 31. Please email me a list." Gandhi then forwarded the email to Hemant Bhatt and stated, "FYI. Received some funds from SDC. Bhavesh has details." Bosamiya replied with a spreadsheet listing two invoices issued by FDIPL to FDI totaling $1,547,900.81 and seven invoices issued by FIPL to Tinex H.K. Ltd., Elegant Collection, and D. Navinchandra Jewels for which FDI was listed as the notification party totaling $50,961.26. The spreadsheet also included columns specifying for each invoice the relevant "Bank," "Bank Ref[erence No.], and "Bank Due Date." Gandhi forwarded the spreadsheet to Bhavesh Patel, copying Mihir Bhansali, and stated, "Please setup these wires." Patel then asked for and obtained Gandhi's approval to wire $1 million from

2

Jaffe to FDI to fund the other wires. Later that day, Gandhi replied to Bosamiya and Pandya, "Funds wired. Please acknowledge receipt." Bosamiya replied, "Funds received." FDI's bank statements reflect two outgoing wires to "L/C Collections" on behalf of FDIPL totaling $1,547,900.81 and another $50,961.26 wire to FIPL on December 30, 2013.

(xi)    On July 19, 2014, Manish Bosamiya emailed Hemant Bhatt and Miten Pandya a list of invoices under which FDI owed $660,197.12 to FIPL, FDI owed $731,979.58 to FDIPL, and Fantasy owed $610,268.88 to FIPL. Bhatt forwarded the email to Ajay Gandhi and stated "Please pay as per attachment." Gandhi then forwarded the email to Bhavesh Patel and instructed, "Keep it ready. Funds coming from SDC." FDI's and Fantasy's bank statements reflect that, on July 21, 2014, SDC Designs LLC wired $1,775,989.50 to FDI and that FDI and Fantasy wired a total of $1,119,301.49 to pay down letters of credit issued to FDPL and FDIPL.

(xii)    On February 26, 2014, Ajay Gandhi emailed Sridhar Krishnan, copying Shyam Wadhwa, "Sridhar: After today's payment from Jaffe to you, can you please wire $70,063 to Jaffe from SDC Design Inc. and I will wire back $69,640 to SDC Design LLC so that our AR/AP with Jaffe gets cleaned up?" On April 24, 2014, Ajay Gandhi emailed Shyam Wadhwa, "I need to wire some funds to SDC. What is our payables to them in A. Jaffe?" Wadhwa replied that Jaffe needed to receive $70,063 from SDC Designs, Inc. and to pay SDC Designs LLC $69,640. He stated "These are old balances which have been discussed with you earlier also for clearing our books." Gandhi then forwarded Wadhwa's email to Mihir Bhansali and stated "We do not have any payables to SDC in Jaffe." On June 17, 2014, Wadhwa replied, "This requirement is still open between A. Jaffe and SDC. Please have it closed." Gandhi replied, "Please email Sridhar and copy me." On June 23, 2014, Wadhwa replied, "Pl[ease] have open item wrt SDC in A. Jaffe books cleared from AR and A[P]. FYI – Sridhar has ignored your Feb '14 mail as well as my recent reminder mail." Gandhi forwarded the email chain to Krishnan and asked, "can we clean up?" Krishnan replied, "Hi Ajay[,] Is Mihir in town?"

## Appendix A-163

Additional examples of documents and communications illustrating suspicious accounting practices for transactions involving SDC Entities and Sheth Entities include:

(i) On April 3, 2012, Saju Poulose emailed Ajay Gandhi, copying Raghu Iyer's personal email address, "Need your help to understand the bifurcation of customer wise sales in totality as on Jan 2012 . . . First file is the customer wise report which we consider for consolidation. In order to knockoff the inter sales we take sales in totality. After knock off balance we consider as external sales. . . . From the sales report, (without customer of SDC and Tri star—these are included in your gross working) the total number comes to $49m. That means FS Inc. sale should be $36m instead of $33m?" Gandhi replied, "Please used the attached file for Core Business and other breakdown." He attached a report listing FDI's total sales by customer from April 2011 to January 2012. Customers such as Sams Club, Zales, Macy's, and the U.S. Army and U.S. Navy were listed as "core." Customers such as SDC, Excellent Facets, Tri-Star, and Diagem Inc. were listed as "non-core."

(ii) On June 13, 2013, Ajay Gandhi emailed Mihir Bhansali an estimated borrowing base for FDI as of May 31, 2013. Gandhi explained that the $3.8 million in ineligible AR consisted of "SDC Designs LLC - $1,395,667, World Diamond - $1,507,816 and the rest are inter-company." Later that day, Gandhi emailed Bhansali an estimated borrowing base as of June 20, 2013. He explained that the $5.26 million in ineligible AR consisted of "SDC Designs LLC - $1,395,667, World Diamond - $1,507,816, RN Enterprise - $509,415, SDC Designs Inc. - $215,243, and the rest are inter-company."

(iii) On July 10, 2013, Ajay Gandhi emailed Mihir Bhansali, "The following AR will fall-off over 120 days and these AR will severely affect the borrowing base. 1. Diamlink - $1,077,571[;] 2. Excellent Facet - $1,563,678[;] 3. R.N. Enterprise - $509,146[;] 4. SDC Designs, Inc. - $223,670[;] 5. SDC Designs LLC - $195,667[;] 6. SDC Designs, LLC - $195,667[;] 7. Sangam Diamonds, Inc. - $509,528."

(iv) On July 19, 2013, Ajay Gandhi emailed Shyam Wahdwha, "Please email information on SDC AR and AP and I will contact them to get it cleared." On July 24, 2013, Ajay Gandhi emailed Shyam Wadhwa, Bhavesh Patel, and Alatamsh Ansari, "Need Jaffe AR and AP for *our parties* ASAP" (emphasis added). Ansari replied with a spreadsheet listing the accounts receivable and accounts payable balances for SDC Designs, Inc., Empire, Fancy Creations, and several Firestar Entities. For the eight parties listed, the total receivable balance was $1,878,830 and the total payable balance was $7,328,421. Gandhi replied, "Wadhwa: $5m gap? Where is the

balance AR? Are we missing any names or amounts?" Gandhi then asked for the "full listing" and Ansari replied with a spreadsheet listing both intercompany and third-party receivables and payables. Gandhi replied, "Twin Field A[R]? Where is it?" Ansari replied, "$1.5m lying in Loans receivable." Gandhi then asked for and received confirmation that no other accounts receivable were booked as loans receivable.

(v)   On August 13, 2016, Sagar Thakkar emailed Ajay Gandhi a report of Jaffe's sales and AR as of August 12, 2016, copying Mihir Bhansali, Avinash Oza, and Samuel Sandberg. Bhansali replied, copying Gandhi and Oza but leaving out Sandberg, "Please take out Pacific and Sangam Diamonds, as they are loose sales and not jewelry sales. Going forward, please be mindful of the product type before you send the MIS."

(vi)  On August 18, 2016, Ajay Gandhi emailed Dipika Devrukhkar, Avinash Oza, and Arpan Dosi a request for FDI and NMI's AR and AP as of July 31, 2016 in "Saju['s] format." Devrukhkar replied with the reports. Gandhi replied solely to Oza and instructed, "Please split between Core and Non-Core. **Non-Core are all overseas non-Firestar companies + SDC**. Rest are all core." The "overseas non-Firestar companies" in the list included Brilliant, Empire, Fancy Creations, Pacific, Tri Color, Vista, Unique, and World Diamond Distribution.

(vii) On April 17, 2017, Kunal Patel forwarded an auditor's request for copies of invoices and other documentation relating to certain sales by NMI in the 2016-2017 fiscal year to Isaac Sandberg, copying Ajay Gandhi. Gandhi replied, "Leave out large amounts for me." The largest transactions listed were: a $2,350,000 sale to Global Diamonds Group on June 30, 2016, a $1,400,000 sale to SDC Designs Inc. on February 24, 2017, a $1,000,000 sale to SDC Designs Inc. on March 1, 2017, an $850,000 sale to Amadena Investments LLC on March 31, 2017, and an $800,000 sale to Excellent Facets Inc. on December 23, 2016.

Appendix A-164

Additional suspicious transactions and communications involving the Deepak Sheth,

Neena Sheth, and the Sheth Entities include:

(i) On September 13, 2010, Prakash Rao of Diamlink emailed Ajay Gandhi, copying Neena Sheth, "Today we remitted $25k to HSBC account, for your information attached swift copy."

(ii) On August 20, 2012, Shyam Wadhwa emailed Ajay Gandhi FDL's July 2012 financials and noted, "In terms of margins, Core Polish Trading is in sync with the business model, margin of other businesses including wholesale are dependent on billing rates. Exceptional area is recognition of $141k of income received from Excellent Facet per communication from NDM." Gandhi replied, "AR of $73.8m seems too high . . . AP of $40m seems too high too . . . Are we doing anything to clean-up AR / AP? Is inter-company AR and AP matching with other books?"

(iii) On December 20, 2013, Ajay Gandhi emailed Nirav Modi, "Niravbhai: Josh's Diamond division – yesterday we received $1.6m due to couple sales that he closed. ($1m deposit for $3.1m sales and $600k for other sale). I can ask Manish/Amit for a list to pay India. Please let me know." Nirav Modi replied, copying Mihir Bhansali, "The [$]3.1m sale proceeds will go to Excellent Facet (ask Josh when). Balance, ask Manish." That same day, Josh Weinman emailed Deepak Sheth, "Would you like me to send 1m as advance? Please send wire instructions." Sheth replied, "It can wait till first week of January." Weinman then forwarded Sheth's email to Gandhi and noted, "FYI."

(iv) On January 2, 2014, Shyam Wadhwa emailed Josh Weinman, copying Ajay Gandhi and Bhavesh Patel, "NY has purchased 70.19 cts EM cut stone from Excellent Facets for $3.10m and sold to Shifman Inc. for $3.10m. No gross margin is reflected in this transaction. Kindly confirm commission if any to be accrued in NY books for this stone." Weinman replied, "1% on sale amount as per Nirav." Wadhwa forwarded Weinman's email to Avinash Oza, copying Ajay Gandhi, and noted, "1. FYI and incorporation in Josh's MIS. 2. Please also replace last receipt purchase cost from HK with actual purchase cost of pink stones based on actual bill of Argyle in the Commission working sheet." On January 14, 2014, Saju Poulose emailed Ajay Gandhi, "Sales to Shifman Inc. for $3.1 million shows cost of sale value purchase from Excellent Facet. Is this transactions for NDM? Have not made profit? Can you please explain if you aware the details[?]" Gandhi replied, "That is correct. It is somebody's goods that we sold." Poulose replied, "That means this is simple an entry? No profit and loss. I should not take this in consolidation?" Gandhi replied, "It is still a sale and inventory and AR

are affected. I think it belongs to Excellent Facet – related to NM that I know off [sic]…"

(v)    On January 6, 2014, Deepak Sheth emailed Josh Weinman, "At your convenience you can send wire for $750,000 towards advance as per attached details." Weinman forwarded the wire instructions to Ajay Gandhi, who then instructed Bhavesh Patel to arrange the transfer.

(vi)    On November 4, 2014, Ajay Gandhi emailed Bhavesh Patel and Avinash Oza, "Please do not include Excellent Fac[e]t sale of 11/4/14 in Fantasy, Inc. and Daily Sales and AR Reports that you email to everyone." On November 10, 2014, Ajay Gandhi emailed Deepak Sheth, "Attached please find wire instruction of Fantasy, Inc. so that you can wire recent sale of $1.112m." Sheth replied, "We will wire transfer for this purchase today and email you wire transfer copy."

(vii)    On April 15, 2015, Mihir Bhansali emailed Neena Sheth and Nehal Modi, "Need all account info, and an invoice please, before we can make a wire." Jon Mitchell replied with a $30,000 invoice issued by Phantom Luxury Group to Jaffe for "sales consulting fees." Bhansali forwarded the invoice to Ajay Gandhi and instructed, "Please have this wired, from JAFFE." Gandhi then forwarded the invoice to Avinash Oza and Arpan Doshi, copying Shyam Wadhwa, and instructed, "Please wire $30,000 per below and attached from Jaffe tomorrow." Wadhwa replied, "Is this payment to be booked as Returnable Advance/Advance against services?" Gandhi replied, "$30k to be written-off over 6 months?"

(viii)    On March 28, 2017, Mihir Bhansali emailed Ajay Gandhi instructions to "Please bill the following from [NMI]. Bhansali then listed three ring settings sold to SDC Designs Inc. for a total of $2,300,000 and another ring setting sold to Amadena for $850,000. The next day, Bhansali instructed Gandhi to "ADD 1 more style [a $350,000 ring setting], to Excellent Facets[.] Please send both pieces to Deepak masa on MEMO (not billing) no later than tomorrow." Gandhi replied, "Any commission on this? Send this piece on memo to Excellent / Deepak Sheth." Bhansali replied, "Both Amadena and Excellent Facets to be at 10% commission. SDC Designs to be at 3% (as below)." Gandhi replied with the invoices and commission credit memoranda.

(ix)    On July 11, 2017, Ajay Gandhi emailed Shyam Wadhwa, "Funds for Wynn and Hawaii? When can I expect? There is urgency to pay this week of around $500k." Wadhwa replied, "Let [sic] speak today. I had arranged $1m through goods shipped from FDL-HK which have been sold by FJ Inc. Please confirm receipt of high jewels sales proceeds of US 1 Mio in FJ Inc." Wadhwa followed up, "US $575k expected from Excellent Facets either Thursday or latest by Friday in Firestar Jewelry, Inc." Gandhi replied, "Need $200k for ASAP."

(x)      On August 4, 2017, an employee sent Gandhi a list of NMI's sales for July 2017. The list included three items: an earring sold to an individual for $6,000, a pendant sold to another individual for $6,500, and a ring sold to Amadena for $575,000 (*i.e.*, the Amadena sale was worth 98% of the combined total of the three sales). Gandhi revised the document to reflect a larger "commission" to Amadena. The NMI employee then asked if Gandhi would send the list to Mihir Bhansali. Gandhi responded that the list was "only for me and it does not go anywhere."

(xi)     On January 22, 2018, Deepak Sheth, on behalf of Excellent Facets, and Mihir Bhansali, on behalf of himself, executed a promissory note under which Excellent Facets agreed to repay on one day's notice a purported $100,000 loan from Bhansali at a 12% annual interest rate. That same day, Deepak Sheth, on behalf of Amadena Investments LLC, and Neena Sheth, on behalf of herself, executed a promissory note under which Amadena Investments agreed to repay on one day's notice a purported $615,000 loan from Neena Sheth at a 1.97% annual interest rate.

<u>Appendix A-165</u>

Additional suspicious transactions and communications involving Abhay Javeri and the

SDC Entities include:

(i) On April 10, 2012, Rushabh Jethwa emailed Ajay Gandhi, copying Kurian Mathews, asking Gandhi to confirm AR and AP balances between FDFZE and each of Jaffe, FDI, SDC, and JMC. Gandhi replied, "I am not responsible for JMC. I will send you others today." Gandhi then followed up, "for JMC please email Prakash Rao . . . for SDC email Sridhar [Krishnan" and provided Rao's and Krishnan's email addresses. Several hours later, Gandhi replied with FDI and Jaffe balance confirmations bearing his signature.

(ii) On April 23, 2012, an accountant at Marks Paneth asked Gandhi for contact information for certain counterparties selected for AR confirmation. On April 30, 2012, Gandhi replied with Sridhar Krishnan's email address for SDC Designs LLC and Sangam Diamond, Inc. He followed up, "Tri-Star, Nipur BVBA and A. Jaffe, Inc. were paid in full. We can give you subsequent receipts for these customers. Please do not bother sending emails or mail to them. They may not response [sic]." On May 1, 2012, Gandhi followed up with email addresses for Empire (Rushabh Jethwa's), Unique, Pacific, and Radashir (Kurian Mathews').

(iii) On August 1, 2012, Ajay Gandhi emailed Rebecca Chow, "Please create a Sales Order for [SDC Designs LLC] from Firestar Diamond Inc. ASAP – Hand Delivery." Gandhi then listed specific quantities and prices of varying grades of mixed diamonds totaling 4,102.37 carats and $2,500,213.45.

(iv) On September 10, 2012, Shyam Wadhwa emailed Ajay Gandhi, "Kindly advice [sic] right person to be contacted for Diamond Invoices relating to Trading in A. Jaffe. Since these invoices are of high value, delay in receipt of vendor invoices results in bloating of GR/IR figure. Please arrange to mail scanned copy of SDC Invoice $2,680,997 of diamond purchased in July '12." Gandhi replied, attaching the invoice, "Usually Rebecca but I have this invoice." Gandhi then replied, "Please email, PDF invoice copies of SDC of AR and AP for possible off-set." Ansari replied with: (i) a $2,680,996.50 invoice from SDC to Jaffe dated July 25, 2012 for 2,749.74 carats of "Mix Lot" loose diamonds of "Assorted Shapes & Sizes" with a due date of November 22, 2012; and (ii) a $70,062.50 invoice from Jaffe to SDC dated July 25, 2012 for 112.1 carats of mixed diamonds with a due date of August 24, 2012.

(v)    On August 29, 2012, Ajay Gandhi emailed wire instructions for FDII to Sridhar Krishan at SDC. Krishnan replied, "Sorry Ajay, I shall be paying to Firestar Diamond Inc. from Sangam Diamonds Corp., You need to give me a check for $1,500,395 favoring SDC Designs LLC from Firestar Diamond International Inc. Pls do not wire, I shall send my messenger today afternoon to pickup the check." Several hours later, Gandhi replied, "funds never received." The next day, Krishnan replied, "You should have got it today. Abhay approved it late in afternoon." Gandhi replied, "Received. I will call you or email you once check is ready."

(vi)    On July 31, 2014, Shyam Wadhwa emailed Rebecca Chow instructions to send Altamash Ansari a $664,032.29 invoice issued by SDC Designs LLC to Jaffe so that Ansari could record the purchase in Jaffe's books. On August 4, 2014, Ansari forwarded the email to Gandhi, copying Wadhwa, and stated, "Rebecca is not responding on below mail, require SDC invoice to record purchase in Jaffe." Gandhi then emailed Sridhar Krishnan, "Can you please scan me your invoice to A.Jaffe of $664k? After receiving the invoice from Krishnan, Gandhi sent it to Ansari and Wadhwa. The invoice reflected a sale of 512.02 carats of loose diamonds to Jaffe for $664,030 on July 21, 2014. Several hours later, Krishnan asked Gandhi, "Can you please send your statements as of June 30, 2014 for SDC Designs LLC, SDC Designs Inc. and Sangam Diamonds Corp.[?]" Gandhi replied with a report showing that SDC Designs Inc. and SDC Designs LLC owed Jaffe a total of $2,403,062.55, of which $627,073.50 was overdue.

(vii)    On March 10, 2015, Ajay Gandhi emailed Sridhar Krishnan, "Please email us wire details for potential payments to SDC Designs Inc and LLC." Kirshnan replied with the bank account information, but stated, "Please do not wire anything this week. Abhay is in Mumbai and no one can approve wires."

(viii)    On March 19, 2015, Sridhar Krishnan emailed Ajay Gandhi, "Please wire funds of $200k to SDC Designs LLC[.]" Gandhi forwarded the email to Arpan Doshi and Avinash Oza, copying Shyam Wadhwa, and instructed, "Please wire $200,000 on account from Jaffe to SDC Designs LLC against accounts payable of $664k." Doshi replied with the wire confirmation.

(ix)    On June 9, 2015, Ajay Gandhi emailed Abhay Javeri instructions to wire $10,000 to Ami Modi's personal HSBC checking account. The next day, Gandhi followed up, "Hi Abhay: Wire done?" On June 12, 2015, Javeri replied, "Hi Ajay, Can you confirm receipt?" On February 7, 2017, Ajay Gandhi forwarded the email chain to Nirav Modi's personal assistant Navita Mankikar and stated, "Kavita: This is what I found in my email and not sure if it is relevant to your phone call from yesterday." Mankikar replied, copying Mihir Bhansali, "Can you find out if this account is in

Ami's name and help us get the wire details of the same?" Bhansali replied, "Below account is closed. Please ask Ami directly for info, bankers will not give us. She can call her relationship manager."

(x)     On March 28, 2017, Samir Shah emailed Rebecca Chow, copying Mihir Bhansali and Ajay Gandhi, "Attached are the lot wise details of the goods that I shipped on Friday. I have mentioned as to what goods to keep in NY and what goods to ship to other vendors. The terms for other vendors are[:] Sangam Diamonds LLC – C.O.D.[;] Pacific Diamonds – 120 days." The attached spreadsheet contained rows listing 205 diamonds weighing a total of 1,965.87 carats and having a total value of $1,472,988.04. It also contained a column indicating whether each diamond was shipped to Sangam Diamonds LLC, shipped to Pacific, or kept in New York. Gandhi asked whether the indicated values reflected the sale price or the cost price. Chow replied, "Understood these goods are at sell price. Samir, please provide invoice at cost (no document inside box)[.] [W]e need to book it in before any transaction." Chow then emailed FDI's sourcing department, copying Shah and Gandhi, instructions to create a sales order and invoice to Sangam Diamonds for 1,470.72 carats of loose diamonds for a total price of $942,878.59.

(xi)    On April 6, 2017, Rebecca Chow sent an email to Ajay Gandhi with the subject "Margin – Sales in March" stating: "FYI. Sangam – 56%[;] SDC – 18%[;] Pacific – 16%[;] World – 0[%.]"

(xii)   On August 9, 2017, Nikhil Bhatia emailed Kunal Patel, copying Ajay Gandhi and Shreeram Phanse, "I received the June 30th AR files from Reena. Could you help me in understanding the negative balances in the AR files? Eg in [NMI], there are a couple of clients (. . . SDC Designs) that have credit balance in receivables. Similarly in FSII, Fancy Creations, Auragem & Empire Gems have huge credit balances." Patel replied, "These are advances from customers, that's why it shows with negative balance. It would be settled against their future transactions."

**Appendix A-395**

In many cases, Nirav Modi, Ajay Gandhi, and Mihir Bhansali caused the U.S. Affiliates, upon receiving actual fraudulent transfers from the Debtors, to subsequently transfer the proceeds of such actual fraudulent transfers to Shadow Entities or other Modi-Controlled Entities. For example:

(i)  On August 30, 2012, FDI wired $1,501,000 to FDII. That same day, Gandhi emailed Bhavesh Patel, "Transfer $1,501,000 from [FDI to FDII]. Pay $21,774 from [FDII] to Fancy Creation." That same day, Gandhi emailed Sridhar Krishnan of SDC Designs to let him know that FDII would issue a check in the amount of $1,500,395 to SDC Designs. On August 31, 2012, FDII issued a check in the amount of $1,500,395 to SDC Designs.

(ii)  On December 11, 2012, Gandhi emailed Bhavesh Patel, "Please keep wire ready for $602,862 to SDC Designs LLC from [FDII's} Capital Old account for invoice 63966." On December 12, 2012, Gandhi emailed a banker at IDB a request for a $500,000 loan, with respect to which FDI was the obligor and FDII the beneficiary. That same day, the $500,000 loan proceeds were disbursed to FDII's Capital One Bank account. That same day, FDII wired $602,862 to SDC Designs.

(iii)  On December 13, 2012, Firestar wired $391,611 to Synergies. That same day, Synergies wired $91,000 to Brilliant. On December 14, 2012, Synergies wired $300,000 to Unique. On December 13, 2012, Ajay Gandhi emailed Bhavesh Patel instructions to make these wires.

(iv)  On February 19, 2013, FDI wired $627,000 to FDII. Bhavesh Patel emailed a wire confirmation for this transfer to Ajay Gandhi. That same day, FDII wired $1,266,430 to Fancy Creations and $332,300 to Diagems. That same day, Shyam Wadhwa emailed Bhavesh Patel instructions to make these two wires and stating, "Since Ajaybhai would be traveling tonight . . . please take Ajaybhai signature on wire transfer doc and send it to Mihirbhai for his signature." That same day, Bhavesh Patel emailed Gandhi the wire documents for these transfers. Gandhi forwarded them to Bhansali, stating, "Please print, sign and scan back to me." Bhansali replied, "Done and sent."

(v)  On April 25, 2013, FDI wired $350,000 to FDII. That same day, Jaffe wired $480,000 to FDII. That same day, FDII wired $812,030 to Diagems.

(vi)  On May 6, 2013, FDI wired $652,239 to FDII. That same day, FDII wired $463,389 to Tri Color. The next day, FDII wired $280,005 to Empire.

(vii)    On June 18, 2013, FDI wired $1,525,000 to FDII. That same day, Bhavesh Patel emailed Gandhi the confirmation for this wire, stating "Please find attached wires as per instructions." That same day, FDII wired $1,615,463.93 to Fancy Creations. On June 17, 2018, Bhavesh Patel emailed Gandhi wire documents for this transfer. Gandhi forwarded them to Mihir Bhansali to sign and return.

(viii)   On July 9, 2013, FDI wired $600,000 to FDII. That same day, FDII wired $600,024 to Fancy Creations. That same day, Bhavesh Patel emailed the wire confirmation for this transfer to Gandhi.

(ix)     On October 23, 2013, Firestar transferred $123,744 to Synergies. On October 24, 2013, Synergies transferred $125,000 to Brilliant. On October 23, 2013, Gandhi emailed Bhavesh Patel instructions to make these transfers.

(x)      On March 18, 2014, Firestar transferred $123,097 to Synergies. That same day, Synergies transferred $123,000 to Brilliant. That same day, Gandhi emailed Bhavesh Patel instructions to make these wires.

(xi)     On February 20, 2015, Firestar transferred $186,871 to Synergies. That same day, Synergies transferred $180,000 to Brilliant. That same day, Gandhi emailed instructions to Arpan Doshi and Avinash Oza to make these wires.

(xii)    On September 29, 2015, Jaffe wired $950,000 to FDII. That same day, FDII wired $943,827 to SDC Designs. That same day, Gandhi emailed Avinash Oza and Arpan Doshi instructions to make these transfers.

(xiii)   On March 9, 2016, FDI transferred $247,551 to Synergies. That same day, Synergies transferred $250,000 to Brilliant. That same day, Gandhi emailed Avinash Oza and Arpan Doshi instructions to make these wires.

(xiv)    On March 25, 2016, Jaffe transferred $1,400,000 to NMI. That same day, NMI transferred $613,069 to Auragem and $787,000 to Nirav Modi Ltd. That same day, Gandhi sent an email to Avinash Oza and Arpan Doshi instructing them to make these wires.

(xv)     On March 20, 2017, Firestar transferred $246,871 to Synergies. That same day, Gandhi emailed Avinash Oza instructions to make this wire. On March 22, 2017, Synergies transferred $240,000 to Brilliant. That same day, Gandhi emailed Avinash Oza and Kunal Patel instructions to make this wire.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Schedule A - Transfers from Debtors for the Benefit of CPRE | | |
| Date | Transferor | Property Transferred | Value | Transferee | Beneficiary | Description |
| 3/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/8/2012 | Firestar Diamond, Inc. | Cash | $ 6,598.62 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/2/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/6/2012 | Firestar Diamond, Inc. | Cash | $ 6,598.62 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/10/2012 | Firestar Diamond, Inc. | Cash | $ 6,644.99 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/14/2012 | Firestar Diamond, Inc. | Cash | $ 8,046.57 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/22/2012 | Firestar Diamond, Inc. | Cash | $ 13,314.91 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/2/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/10/2012 | Firestar Diamond, Inc. | Cash | $ 11,701.80 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/16/2012 | Firestar Diamond, Inc. | Cash | $ 65.32 | TOW STUDIOS ARCHITECT PLLC | CPRE | Expense Recorded to FGI/CP |
| 9/4/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/19/2012 | Firestar Diamond, Inc. | Cash | $ 7,301.48 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/26/2012 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/1/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/16/2012 | Firestar Diamond, Inc. | Cash | $ 27,000.00 | VICHIHEL RESTORATION INC. | CPRE | Expense Recorded to FGI/CP |
| 11/16/2012 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/3/2012 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/21/2012 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 1/2/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/24/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/21/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/11/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/3/2013 | Firestar Diamond, Inc. | Cash | $ 9,145.50 | VICHIHEL RESTORATION INC. | CPRE | Expense Recorded to FGI/CP |
| 5/8/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/20/2013 | Firestar Diamond, Inc. | Cash | $ 6,749.40 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/3/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/4/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/19/2013 | Firestar Diamond, Inc. | Cash | $ 5,593.04 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 6/19/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 7/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/19/2013 | Firestar Diamond, Inc. | Cash | $ 6,673.17 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/14/2013 | Firestar Diamond, Inc. | Cash | $ 6,668.63 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 9/3/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/5/2013 | Firestar Diamond, Inc. | Cash | $ 13,455.36 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/20/2013 | Firestar Diamond, Inc. | Cash | $ 12,698.87 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/17/2013 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/1/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/14/2013 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/2/2013 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/12/2013 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 1/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/21/2014 | Firestar Diamond, Inc. | Cash | $ 6,996.72 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/3/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/13/2014 | Firestar Diamond, Inc. | Cash | $ 6,982.54 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 3/4/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/1/2014 | Firestar Diamond, Inc. | Cash | $ 250.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 4/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/20/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/26/2014 | Firestar Diamond, Inc. | Cash | $ 9,593.02 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/27/2014 | Firestar Diamond, Inc. | Cash | $ 4,585.52 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/25/2014 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/28/2014 | Firestar Diamond, Inc. | Cash | $ 13,799.77 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/1/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/21/2014 | Firestar Diamond, Inc. | Cash | $ 15,244.16 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/3/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/2/2014 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/19/2014 | Firestar Diamond, Inc. | Cash | $ 15,244.16 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/19/2014 | Firestar Diamond, Inc. | Cash | $ 2,500.00 | TOW STUDIOS ARCHITECT PLLC | CPRE | Expense Recorded to FGI/CP |
| 1/2/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/12/2015 | Firestar Diamond, Inc. | Cash | $ 7,626.66 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/2/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/9/2015 | Firestar Diamond, Inc. | Cash | $ 7,622.08 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 3/2/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/2/2015 | Firestar Diamond, Inc. | Cash | $ 300.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 4/14/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/22/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/12/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/12/2015 | Firestar Diamond, Inc. | Cash | $ 18,495.62 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/9/2015 | Firestar Diamond, Inc. | Cash | $ 18,730.79 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 7/10/2015 | Firestar Diamond, Inc. | Cash | $ 109.00 | KLIESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |

| Date | Transferor | Property Transferred | Value | Transferee | Beneficiary | Description |
|------|-----------|---------------------|-------|-----------|-------------|-------------|
| 8/1/2015 | Firestar Diamond, Inc. | Cash | $ 163.00 | KLESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |
| 8/3/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/1/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/15/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/5/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/13/2015 | Firestar Diamond, Inc. | Cash | $ 2,555.11 | TOW STUDIOS ARCHITECT PLLC | CPRE | Expense Recorded to FGI/CP |
| 10/20/2015 | Firestar Diamond, Inc. | Cash | $ 15,281.76 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/3/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/24/2015 | Firestar Diamond, Inc. | Cash | $ 7,736.69 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/3/2015 | Firestar Diamond, Inc. | Cash | $ 22,646.00 | VICHIHEL RESTORATION INC. | CPRE | Expense Recorded to FGI/CP |
| 12/4/2015 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/15/2015 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/22/2015 | Firestar Diamond, Inc. | Cash | $ 40.41 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 1/4/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 1/15/2016 | Firestar Diamond, Inc. | Cash | $ 7,640.88 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/17/2016 | Firestar Diamond, Inc. | Cash | $ 13,727.04 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 4/4/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 4/21/2016 | Firestar Diamond, Inc. | Cash | $ 300.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 5/3/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/11/2016 | Firestar Diamond, Inc. | Cash | $ 13,743.75 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/8/2016 | Firestar Diamond, Inc. | Cash | $ 1,482.51 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/13/2016 | Firestar Diamond, Inc. | Cash | $ 5,217.13 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/5/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 7/28/2016 | Firestar Diamond, Inc. | Cash | $ 6,930.46 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 8/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/10/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 9/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/8/2016 | Firestar Diamond, Inc. | Cash | $ 5,217.13 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/19/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/4/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/6/2016 | Firestar Diamond, Inc. | Cash | $ 4,463.88 | VICHIHEL RESTORATION INC. | CPRE | Expense Recorded to FGI/CP |
| 10/14/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/9/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/1/2016 | Firestar Diamond, Inc. | Cash | $ 5,224.41 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 12/2/2016 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/14/2016 | Firestar Diamond, Inc. | Cash | $ 30,000.00 | Firestar Group Inc. | CPRE | Expense Recorded to FGI/CP |
| 12/19/2016 | Firestar Diamond, Inc. | Cash | $ 6,841.29 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/19/2016 | Firestar Diamond, Inc. | Cash | $ 7,362.50 | KLESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |
| 1/4/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 2/8/2017 | Firestar Diamond, Inc. | Cash | $ 6,854.56 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 2/16/2017 | Firestar Diamond, Inc. | Cash | $ 4,078.21 | KLESTADT WINTERS JURELLER | CPRE | Expense Recorded to FGI/CP |
| 3/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 3/9/2017 | Firestar Diamond, Inc. | Cash | $ 7,000.82 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 3/24/2017 | Firestar Diamond, Inc. | Cash | $ 5,224.41 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 3/24/2017 | Firestar Diamond, Inc. | Cash | $ 2,064.00 | ROBINSON & COLE LLP | CPRE | Expense Recorded to FGI/CP |
| 4/4/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 5/3/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 5/12/2017 | Firestar Diamond, Inc. | Cash | $ 300.00 | DELAWARE SECRETARY OF STATE | CPRE | Expense Recorded to FGI/CP |
| 5/26/2017 | Firestar Diamond, Inc. | Cash | $ 75,000.00 | Firestar Group Inc. | CPRE | Transfer to FGI for Payment to Marks Paneth |
| 6/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 6/8/2017 | Firestar Diamond, Inc. | Cash | $ 11,627.60 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/12/2017 | Firestar Diamond, Inc. | Cash | $ 8,000.00 | Firestar Group Inc. | CPRE | Transfer to FGI for Payment for MR Valuation Consulting |
| 6/20/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 6/26/2017 | Firestar Diamond, Inc. | Cash | $ 5,948.14 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 7/5/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/1/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 8/18/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 9/5/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 9/20/2017 | Firestar Diamond, Inc. | Cash | $ 5,948.14 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 9/26/2017 | Firestar Diamond, Inc. | Cash | $ 32,992.00 | UNITED STATES TREASURY | CPRE | Expense Recorded to FGI/CP |
| 10/5/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 10/5/2017 | Firestar Diamond, Inc. | Cash | $ 15,723.06 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 10/19/2017 | Firestar Diamond, Inc. | Cash | $ 7,861.53 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 11/2/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 11/9/2017 | Firestar Diamond, Inc. | Cash | $ 8,054.55 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Essex House Apartment Maintenance Fees |
| 12/4/2017 | Firestar Diamond, Inc. | Cash | $ 10,622.18 | HSBC MORTGAGE CORPORATION (USA | CPRE | Essex House Mortgage Payment |
| 12/5/2017 | Firestar Diamond, Inc. | Cash | $ 3,000,642.00 | HSBC MORTGAGE CORPORATION (USA | CPRE | Pay-off of Essex House Apartment Mortgage |
| 12/5/2017 | Firestar Diamond, Inc. | Cash | $ 5,788.51 | NYC DEPARTMENT OF FINANCE | CPRE | Expense Recorded to FGI/CP |
| 1/24/2018 | Firestar Diamond, Inc. | Cash | $ 15,828.35 | JW MARRIOTT ESSEX HOUSE N.Y | CPRE | Unknown JW Marriott Essex House Payment |

| | | |
|---|---|---|
| Total Two-Year CPRE Transfers | $ | 3,603,683.69 |
| Total Six-Year CPRE Transfers | $ | 4,594,559.78 |

## Schedule B - Transfers from Debtors to Auragem

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 10/11/2012 | Firestar Diamond, Inc. | Cash | $ 500,000.00 | Auragem Company Limited |
| 9/24/2015 | Firestar Diamond, Inc. | Cash | $ 1,840,968.94 | Auragem Company Limited |

| Total Auragem Transfers | $ 2,340,968.94 |
|---|---|

**Schedule C -  Transfers from Debtors to Brilliant**

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 3/25/2014 | Firestar Diamond, Inc. | Cash | $  4,058,500.00 | Brilliant Diamonds Limited |
| 6/23/2015 | Firestar Diamond, Inc. | Inventory | $  1,168,389.98 | Brilliant Diamonds Ltd. |
| 6/27/2016 | Firestar Diamond, Inc. | Inventory | $     840,533.18 | Brilliant Diamonds Ltd. |
| 7/15/2016 | Firestar Diamond, Inc. | Inventory | $  1,001,354.75 | Brilliant Diamonds Ltd. |
| 7/27/2016 | Firestar Diamond, Inc. | Inventory | $     762,432.12 | Brilliant Diamonds Ltd. |
| 9/12/2017 | Firestar Diamond, Inc. | Inventory | $     534,095.01 | Brilliant Diamonds Ltd. |
| 10/11/2017 | Firestar Diamond, Inc. | Inventory | $     864,587.57 | Brilliant Diamonds Ltd. |
| 11/15/2017 | Firestar Diamond, Inc. | Inventory | $     574,980.95 | Brilliant Diamonds Ltd. |
| 11/20/2017 | Firestar Diamond, Inc. | Inventory | $     686,413.55 | Brilliant Diamonds Ltd. |

| | |
|---|---|
| **Total Two-Year Brilliant Transfers** | **$  5,264,397.13** |
| **Total Six-Year Brilliant Transfers** | **$  10,491,287.11** |

**Schedule D - Transfers from Debtors to Diagems**

| Date | Transferor | Property Transferred | Value | | Transferee |
|---|---|---|---|---|---|
| 12/14/2012 | Firestar Diamond, Inc. | Cash | $ | 552,133.10 | Diagems FZC |
| 12/18/2012 | Firestar Diamond, Inc. | Cash | $ | 1,325,000.00 | Diagems FZC |
| 12/21/2012 | Firestar Diamond, Inc. | Cash | $ | 119,000.00 | Diagems FZC |
| 3/15/2013 | Firestar Diamond, Inc. | Cash | $ | 322,841.00 | Diagems FZC |
| 3/20/2013 | Firestar Diamond, Inc. | Cash | $ | 647,432.05 | Diagems FZC |

| Total Diagems Transfers | $ | 2,966,406.15 |
|---|---|---|

## Schedule E - Transfers from Debtors to Empire

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 3/14/2012 | Firestar Diamond, Inc. | Cash | $ 733,000.00 | Empire Gems FZE |
| 7/26/2012 | A. Jaffe, Inc. | Inventory | $ 2,611,263.60 | Empire Gems FZE |
| 8/3/2012 | A. Jaffe, Inc. | Inventory | $ 1,819,967.35 | Empire Gems FZE |
| 11/6/2012 | Firestar Diamond, Inc. | Inventory | $ 1,086,315.83 | Empire Gems FZE |
| 11/30/2012 | Firestar Diamond, Inc. | Inventory | $ 1,933,090.60 | Empire Gems FZE |
| 12/11/2012 | Firestar Diamond, Inc. | Cash | $ 1,185,025.05 | Empire Gems FZE |
| 6/20/2013 | A. Jaffe, Inc. | Inventory | $ 673,432.57 | Empire Gems FZE |
| 1/30/2015 | Fantasy, Inc. | Inventory | $ 1,002,025.50 | Empire Gems FZE |
| 3/31/2016 | Firestar Diamond, Inc. | Inventory | $ 1,014,951.07 | Empire Gems FZE |
| 8/12/2016 | A. Jaffe, Inc. | Inventory | $ 11,150.00 | Empire Gems FZE |
| 9/2/2016 | A. Jaffe, Inc. | Inventory | $ 42,905.00 | Empire Gems FZE |

| | |
|---|---|
| Total Two-Year Empire Transfers | $ 1,069,006.07 |
| Total Six-Year Empire Transfers | $ 12,113,126.57 |

**Schedule F - Transfers from Debtors to Eternal**

| Date | Transferor | Property Transferred | Value | | Transferee |
|------|-----------|---------------------|-------|--|-----------|
| 2/20/2015 | Firestar Diamond, Inc. | Cash | $ | 300,000.00 | Eternal Diamond Corporation Ltd. |
| 3/16/2016 | A. Jaffe, Inc. | Inventory | $ | 218,354.22 | Eternal Diamonds Corporation Ltd. |
| 1/23/2018 | Firestar Diamond, Inc. | Inventory | $ | 426,320.97 | Eternal Diamonds Corporation Ltd. |
| 2/6/2018 | Firestar Diamond, Inc. | Inventory | $ | 789,140.42 | Eternal Diamonds Corporation Ltd. |

| | | |
|---|---|---|
| **Total Two-Year Eternal Transfers** | $ | **1,433,815.61** |
| **Total Six-Year Eternal Transfers** | $ | **1,733,815.61** |

| | Schedule G - Transfers from Debtors to Fancy Creations | | | |
|---|---|---|---|---|

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 6/8/2012 | Firestar Diamond, Inc. | Cash | $ 1,000,000.00 | Fancy Creations Company Limited |
| 12/13/2013 | Firestar Diamond, Inc. | Inventory | $ 1,545,774.87 | Fancy Creations Company Limited |
| 7/23/2014 | Firestar Diamond, Inc. | Inventory | $ 1,800,879.99 | Fancy Creations Company Limited |
| 9/1/2015 | Firestar Diamond, Inc. | Inventory | $ 1,180,230.78 | Fancy Creations Company Limited |
| 9/24/2015 | Firestar Diamond, Inc. | Cash | $ 1,400,000.00 | Fancy Creations Company Limited |
| 5/18/2016 | Firestar Diamond, Inc. | Inventory | $ 1,031,353.43 | Fancy Creations Company Limited |
| 5/20/2016 | Firestar Diamond, Inc. | Inventory | $ 81,455.50 | Fancy Creations Company Limited |
| 7/18/2016 | Firestar Diamond, Inc. | Cash | $ 1,809,528.00 | Fancy Creations Company Limited |
| 7/21/2016 | A. Jaffe, Inc. | Cash | $ 200,000.00 | Fancy Creations Company Limited |
| 7/21/2016 | Firestar Diamond, Inc. | Cash | $ 715,000.00 | Fancy Creations Company Limited |
| 6/27/2017 | Firestar Diamond, Inc. | Inventory | $ 63,580.00 | Fancy Creations Company Limited |

| | | |
|---|---|---|
| Total Two-Year Fancy Creations Transfers | $ | 3,900,916.93 |
| Total Six-Year Fancy Creations Transfers | $ | 10,827,802.57 |

### Schedule H - Transfers from Debtors to Pacific

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 2/28/2012 | Firestar Diamond, Inc. | Inventory | $ 251,379.68 | Pacific Diamonds FZE |
| 3/1/2012 | Firestar Diamond, Inc. | Inventory | $ 1,628,433.50 | Pacific Diamonds FZE |
| 3/2/2012 | Firestar Diamond, Inc. | Inventory | $ 177,350.07 | Pacific Diamonds FZE |
| 3/5/2012 | A. Jaffe, Inc. | Inventory | $ 280,334.62 | Pacific Diamonds FZE |
| 3/15/2012 | A. Jaffe, Inc. | Inventory | $ 69,981.60 | Pacific Diamonds FZE |
| 5/2/2012 | Firestar Diamond, Inc. | Inventory | $ 762,528.95 | Pacific Diamonds FZE |
| 5/31/2012 | Firestar Diamond, Inc. | Inventory | $ 256,657.25 | Pacific Diamonds FZE |
| 6/7/2012 | Firestar Diamond, Inc. | Inventory | $ 1,977,768.60 | Pacific Diamonds FZE |
| 9/28/2012 | Firestar Diamond, Inc. | Inventory | $ 1,912,840.00 | Pacific Diamonds FZE |
| 12/21/2012 | Firestar Diamond, Inc. | Cash | $ 560,000.00 | Pacific Diamonds FZE |
| 2/22/2013 | Firestar Diamond, Inc. | Cash | $ 503,501.41 | Pacific Diamonds FZE |
| 3/15/2013 | Firestar Diamond, Inc. | Cash | $ 670,000.00 | Pacific Diamonds FZE |
| 3/26/2013 | Firestar Diamond, Inc. | Cash | $ 407,120.00 | Pacific Diamonds FZE |
| 3/26/2013 | Firestar Diamond, Inc. | Cash | $ 407,120.00 | Pacific Diamonds FZE |
| 8/30/2013 | Firestar Diamond, Inc. | Inventory | $ 1,768,423.08 | Pacific Diamonds FZE |
| 9/30/2013 | A. Jaffe, Inc. | Inventory | $ 985,843.04 | Pacific Diamonds FZE |
| 10/10/2013 | A. Jaffe, Inc. | Inventory | $ 1,047,311.70 | Pacific Diamonds FZE |
| 10/10/2013 | A. Jaffe, Inc. | Inventory | $ 1,374,201.60 | Pacific Diamonds FZE |
| 10/23/2013 | Firestar Diamond, Inc. | Cash | $ 150,000.00 | Pacific Diamonds FZE |
| 10/25/2013 | A. Jaffe, Inc. | Inventory | $ 731,846.66 | Pacific Diamonds FZE |
| 10/30/2013 | A. Jaffe, Inc. | Cash | $ 2,455,036.00 | Pacific Diamonds FZE |
| 4/11/2014 | Firestar Diamond, Inc. | Inventory | $ 1,301,133.90 | Pacific Diamonds FZE |
| 1/23/2015 | Fantasy, Inc. | Inventory | $ 1,552,482.90 | Pacific Diamonds FZE |
| 3/20/2015 | Firestar Diamond, Inc. | Inventory | $ 1,666,072.46 | Pacific Diamonds FZE |
| 6/23/2015 | Firestar Diamond, Inc. | Cash | $ 1,138,270.60 | Pacific Diamonds FZE |
| 6/26/2015 | Firestar Diamond, Inc. | Cash | $ 1,438,270.60 | Pacific Diamonds FZE |
| 9/25/2015 | Firestar Diamond, Inc. | Cash | $ 54,000.00 | Pacific Diamonds FZE |
| 9/28/2015 | Firestar Diamond, Inc. | Cash | $ 1,017,000.00 | Pacific Diamonds FZE |
| 10/7/2015 | Firestar Diamond, Inc. | Cash | $ 1,071,000.00 | Pacific Diamonds FZE |
| 11/13/2015 | Firestar Diamond, Inc. | Cash | $ 560,741.52 | Pacific Diamonds FZE |
| 2/23/2016 | A. Jaffe, Inc. | Cash | $ 1,100,000.00 | Pacific Diamonds FZE |
| 2/26/2016 | Firestar Diamond, Inc. | Inventory | $ 296,659.46 | Pacific Diamonds FZE |
| 3/3/2016 | Firestar Diamond, Inc. | Cash | $ 873,996.50 | Pacific Diamonds FZE |
| 3/3/2016 | Firestar Diamond, Inc. | Cash | $ 53,863.40 | Pacific Diamonds FZE |
| 3/15/2016 | A. Jaffe, Inc. | Cash | $ 700,000.00 | Pacific Diamonds FZE |
| 3/21/2016 | A. Jaffe, Inc. | Cash | $ 1,000,000.00 | Pacific Diamonds FZE |
| 3/23/2016 | A. Jaffe, Inc. | Cash | $ 900,000.00 | Pacific Diamonds FZE |
| 3/24/2016 | A. Jaffe, Inc. | Cash | $ 1,000,000.00 | Pacific Diamonds FZE |
| 4/5/2016 | A. Jaffe, Inc. | Cash | $ 500,000.00 | Pacific Diamonds FZE |
| 5/6/2016 | A. Jaffe, Inc. | Cash | $ 2,000,000.00 | Pacific Diamonds FZE |
| 6/1/2016 | A. Jaffe, Inc. | Cash | $ 815,000.00 | Pacific Diamonds FZE |

Sch. H

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 6/17/2016 | Firestar Diamond, Inc. | Inventory | $ 693,348.24 | Pacific Diamonds FZE |
| 3/28/2017 | Firestar Diamond, Inc. | Inventory | $ 459,508.55 | Pacific Diamonds FZE |
| 1/3/2018 | A. Jaffe, Inc. | Cash | $ 530,000.00 | Pacific Diamonds FZE |
| 1/3/2018 | Firestar Diamond, Inc. | Cash | $ 483,620.05 | Pacific Diamonds FZE |
| 1/3/2018 | Firestar Diamond, Inc. | Cash | $ 2,188,769.43 | Pacific Diamonds FZE |

| | |
|---|---|
| **Total Two-Year Pacific Transfers** | **$ 12,494,765.63** |
| **Total Six-Year Pacific Transfers** | **$ 41,771,415.37** |

**Schedule I - Transfers from Debtors to Tri Color**

| Date | Transferor | Property Transferred | Value | Transferee |
|------|-----------|---------------------|-------|-----------|
| 3/1/2012 | Firestar Diamond, Inc. | Inventory | $ 1,805,720.16 | Tri Color Gems FZE |
| 3/18/2013 | Firestar Diamond, Inc. | Cash | $ 1,000,000.00 | Tri Color Gems FZE |
| 3/19/2013 | Firestar Diamond, Inc. | Cash | $ 200,024.90 | Tri Color Gems FZE |
| 3/21/2013 | Firestar Diamond, Inc. | Cash | $ 1,013,165.00 | Tri Color Gems FZE |
| 5/1/2013 | Firestar Diamond, Inc. | Cash | $ 600,000.00 | Tri Color Gems FZE |
| 5/6/2013 | Firestar Diamond, Inc. | Cash | $ 1,600,000.00 | Tri Color Gems FZE |
| 10/10/2013 | A. Jaffe, Inc. | Inventory | $ 1,914,721.20 | Tri Color Gems FZE |
| 7/11/2014 | Firestar Diamond, Inc. | Cash | $ 414,405.20 | Tri Color Gems FZE |
| 9/29/2015 | Firestar Diamond, Inc. | Inventory | $ 1,610,088.00 | Tri Color Gems FZE |
| 2/24/2016 | Firestar Diamond, Inc. | Inventory | $ 743,312.85 | Tri Color Gems FZE |
| 2/26/2016 | Firestar Diamond, Inc. | Cash | $ 1,192,105.55 | Tri Color Gems FZE |
| 3/30/2016 | Fantasy, Inc. | Cash | $ 301,540.00 | Tri Color Gems FZE |

| | |
|---|---|
| **Total Two-Year Tri Color Transfers** | **$ 1,493,645.55** |
| **Total Six-Year Tri Color Transfers** | **$ 12,395,082.86** |

## Schedule J - Transfers from Debtors to Unique

| Date | Transferor | Property Transferred | Value | Transferee |
|------|------------|----------------------|-------|------------|
| 3/29/2012 | Firestar Diamond, Inc. | Inventory | $ 3,144,477.38 | Unique Diamond & Jewellery FZC |
| 7/13/2012 | A. Jaffe, Inc. | Inventory | $ 874,867.52 | Unique Diamond & Jewellery FZC |
| 9/12/2012 | Firestar Diamond, Inc. | Cash | $ 150,000.00 | Unique Diamond & Jewellery FZC |
| 12/13/2012 | Firestar Diamond, Inc. | Cash | $ 231,000.00 | Unique Diamond & Jewellery FZC |
| 9/24/2013 | Firestar Diamond, Inc. | Inventory | $ 921,027.10 | Unique Diamond & Jewellery FZC |
| 3/18/2014 | Firestar Diamond, Inc. | Cash | $ 150,000.00 | Unique Diamond & Jewellery FZC |
| 1/19/2015 | Firestar Diamond, Inc. | Inventory | $ 125,590.00 | Unique Diamond & Jewellery FZC |
| 3/2/2015 | Firestar Diamond, Inc. | Cash | $ 300,000.00 | Unique Diamond & Jewellery FZC |
| 9/30/2015 | Firestar Diamond, Inc. | Inventory | $ 2,122,401.60 | Unique Diamond & Jewellery FZC |
| 3/4/2016 | Firestar Diamond, Inc. | Cash | $ 300,000.00 | Unique Diamond & Jewellery FZC |
| 6/17/2016 | Firestar Diamond, Inc. | Inventory | $ 331,028.54 | Unique Diamond & Jewellery FZC |
| 3/22/2017 | Firestar Diamond, Inc. | Cash | $ 300,000.00 | Unique Diamond & Jewellery FZC |
| 5/23/2017 | Firestar Diamond, Inc. | Inventory | $ 638,934.23 | Unique Diamond & Jewellery FZC |
| 7/17/2017 | Firestar Diamond, Inc. | Inventory | $ 1,905,068.65 | Unique Diamond & Jewellery FZC |

| | |
|---|---|
| Total Two-Year Unique Transfers | $ 3,475,031.42 |
| Total Six-Year Unique Transfers | $ 11,494,395.02 |

**Schedule K - Transfers from Debtors to World Diamond**

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 5/2/2012 | A. Jaffe, Inc. | Inventory | $ 1,454,821.45 | World Diamond Distribution FZE |
| 3/28/2013 | Firestar Diamond, Inc. | Inventory | $ 959,097.55 | World Diamond Distribution FZE |
| 5/2/2013 | Firestar Diamond, Inc. | Inventory | $ 548,718.30 | World Diamond Distribution FZE |
| 6/21/2013 | Firestar Diamond, Inc. | Inventory | $ 1,479,565.30 | World Diamond Distribution FZE |
| 7/26/2013 | Firestar Diamond, Inc. | Inventory | $ 480,487.13 | World Diamond Distribution FZE |
| 9/24/2013 | Firestar Diamond, Inc. | Inventory | $ 522,483.15 | World Diamond Distribution FZE |
| 10/25/2013 | Firestar Diamond, Inc. | Inventory | $ 911,408.98 | World Diamond Distribution FZE |
| 2/21/2014 | Firestar Diamond, Inc. | Inventory | $ 1,968,839.60 | World Diamond Distribution FZE |
| 10/6/2015 | Firestar Diamond, Inc. | Inventory | $ 682,219.05 | World Diamond Distribution FZE |
| 10/7/2015 | Firestar Diamond, Inc. | Inventory | $ 285,071.95 | World Diamond Distribution FZE |
| 12/10/2015 | Firestar Diamond, Inc. | Inventory | $ 1,275,300.30 | World Diamond Distribution FZE |
| 9/7/2016 | Firestar Diamond, Inc. | Inventory | $ 647,031.88 | World Diamond Distribution FZE |
| 10/18/2016 | Firestar Diamond, Inc. | Inventory | $ 946,397.24 | World Diamond Distribution FZE |
| 1/20/2017 | Firestar Diamond, Inc. | Inventory | $ 984,058.12 | World Diamond Distribution FZE |
| 2/15/2017 | Firestar Diamond, Inc. | Inventory | $ 633,111.89 | World Diamond Distribution FZE |
| 3/3/2017 | Firestar Diamond, Inc. | Inventory | $ 687,520.22 | World Diamond Distribution FZE |
| 4/27/2017 | Firestar Diamond, Inc. | Inventory | $ 821,671.50 | World Diamond Distribution FZE |
| 5/12/2017 | Firestar Diamond, Inc. | Inventory | $ 1,122,083.08 | World Diamond Distribution FZE |
| 5/31/2017 | Firestar Diamond, Inc. | Inventory | $ 790,999.16 | World Diamond Distribution FZE |
| 6/1/2017 | Firestar Diamond, Inc. | Inventory | $ 945,911.45 | World Diamond Distribution FZE |
| 7/11/2017 | Firestar Diamond, Inc. | Inventory | $ 819,420.00 | World Diamond Distribution FZE |
| 7/28/2017 | Firestar Diamond, Inc. | Inventory | $ 577,087.91 | World Diamond Distribution FZE |
| 12/5/2017 | Firestar Diamond, Inc. | Inventory | $ 1,632,500.53 | World Diamond Distribution FZE |

| | |
|---|---|
| **Total Two-Year World Diamond Transfers** | **$ 10,607,792.98** |
| **Total Six-Year World Diamond Transfers** | **$ 21,175,805.74** |

## Schedule L -  Transfers from Debtors to Twin Fields

| Date | Transferor | Property Transferred | Value | Transferee |
|------|-----------|---------------------|-------|-----------|
| 2/1/2013 | A. Jaffe, Inc. | Cash | $    400,000.00 | Twin Fields Investment |
| 3/14/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/10/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 5/17/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 5/28/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 5/29/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 7/26/2013 | A. Jaffe, Inc. | Cash | 100,000.00 | Twin Fields Investment |
| 8/5/2013 | A. Jaffe, Inc. | Cash | 300,000.00 | Twin Fields Investment |
| 9/4/2013 | A. Jaffe, Inc. | Cash | 450,000.00 | Twin Fields Investment |
| 9/12/2013 | A. Jaffe, Inc. | Cash | 750,000.00 | Twin Fields Investment |
| 9/25/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 10/1/2013 | A. Jaffe, Inc. | Cash | 300,000.00 | Twin Fields Investment |
| 10/17/2013 | A. Jaffe, Inc. | Cash | 50,000.00 | Twin Fields Investment |
| 10/30/2013 | A. Jaffe, Inc. | Cash | 100,000.00 | Twin Fields Investment |
| 11/12/2013 | A. Jaffe, Inc. | Cash | 610,000.00 | Twin Fields Investment |
| 12/3/2013 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 3/3/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/21/2014 | A. Jaffe, Inc. | Cash | 400,000.00 | Twin Fields Investment |
| 5/22/2014 | A. Jaffe, Inc. | Cash | 200,000.00 | Twin Fields Investment |
| 6/9/2014 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 6/12/2014 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 7/25/2014 | A. Jaffe, Inc. | Cash | 600,000.00 | Twin Fields Investment |
| 8/4/2014 | A. Jaffe, Inc. | Cash | 255,000.00 | Twin Fields Investment |
| 8/20/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 9/26/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 11/19/2014 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 2/10/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/7/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 4/21/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 5/22/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 6/3/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 6/22/2015 | Firestar Diamond, Inc. | Cash | 31,542.28 | Twin Fields Investment |
| 6/22/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 7/1/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 7/15/2015 | A. Jaffe, Inc. | Cash | 1,000,000.00 | Twin Fields Investment |
| 7/29/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 8/26/2015 | A. Jaffe, Inc. | Cash | 350,000.00 | Twin Fields Investment |
| 9/16/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 9/29/2015 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 10/26/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 11/6/2015 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 12/3/2015 | A. Jaffe, Inc. | Cash | 200,000.00 | Twin Fields Investment |
| 2/2/2016 | A. Jaffe, Inc. | Cash | 1,000,000.00 | Twin Fields Investment |
| 4/14/2016 | A. Jaffe, Inc. | Cash | 150,000.00 | Twin Fields Investment |
| 6/8/2016 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 6/14/2016 | A. Jaffe, Inc. | Cash | 150,000.00 | Twin Fields Investment |

| Date | Transferor | Property Transferred | Value | Transferee |
|---|---|---|---|---|
| 7/14/2016 | A. Jaffe, Inc. | Cash | 140,000.00 | Twin Fields Investment |
| 10/11/2016 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 1/18/2017 | A. Jaffe, Inc. | Cash | 300,000.00 | Twin Fields Investment |
| 2/1/2017 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 2/10/2017 | A. Jaffe, Inc. | Cash | 500,000.00 | Twin Fields Investment |
| 3/1/2017 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 3/10/2017 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 3/16/2017 | A. Jaffe, Inc. | Cash | 250,000.00 | Twin Fields Investment |
| 3/30/2017 | A. Jaffe, Inc. | Cash | 150,000.00 | Twin Fields Investment |
| 5/4/2017 | A. Jaffe, Inc. | Cash | 125,000.00 | Twin Fields Investment |

| | |
|---|---|
| **Total Two-Year Twin Fields Transfers** | $  3,265,000.00 |
| **Total Six-Year Twin Fields Transfers** | $  21,361,542.28 |

# Exhibit 2
# (Filed Under Seal)

# Exhibit 3
# (Filed Under Seal)

# Exhibit 4
# (Filed Under Seal)

# Exhibit 5

Printed from

# THE TIMES OF INDIA

# How a bank clerk's alert led to the arrest of Nirav Modi

PTI | Mar 20, 2019, 08.07 PM IST



LONDON: Nirav Modi, the main accused in the $2 billion PNB scam case, has been arrested in London and remanded in custody by a court till March 29.

His arrest came days after a London court issued an arrest warrant against him in response to a request by the Enforcement Directorate (ED) for his extradition in a money laundering case.

> **ALSO READ**
>
> PNB scam: Nirav Modi arrested in London, remanded in custody till March 29

Congratulations!

You have successfully cast your vote

[ Login to view result ]

It emerged in court that Nirav Modi was arrested from a Metro Bank branch in London by uniformed officers on Tuesday when he went there to open a new bank account.

A bank clerk alerted Scotland Yard as a result of the "high publicity" surrounding the case and Metropolitan Police officers arrived to execute the arrest. This over-rode a previous arrangement made between Scotland Yard's extradition unit and Nirav Modi's lawyers for him to surrender "by appointment" at a central London police station on Monday, something his legal team

2/14/22, 11:36 AM

blamed on the "nature of publicity" surrounding the case.

Read Also: Nirav Modi arrested in London, remanded in custody till March 29

The location of the arrest indicates that Nirav, wanted in India in connection with the Rs 13,500 crore Punjab National Bank scam case, was arrested from the area where he was reportedly living.

A British daily had recently published a report and video showing Nirav Modi walking on the streets of London and said the fugitive diamantaire was living in a swanky £8 million apartment in the city's West End.
It also emerged in court that Nirav Modi was in possession of at least three passports, all revoked by India.

The court was told that Nirav Modi arrived in London in January last year before any of the allegations emerged and has maintained a very "visible" presence in the country and offered to cooperate with the UK authorities since his arrival.

Read Also: Opposition questions the timing of Nirav Modi's arrest, links it to LS polls

He is currently employed by Diamond Holdings Ltd in London for a monthly salary of 20,000 pounds and pays his council tax regularly, his lawyers stressed in support of his defence.

Nirav Modi and his uncle, Mehul Choksi, are the main accused in the PNB scam and they both left India before the details of the fraud came to light in January 2018.

Nirav Modi had launched his own eponymous brand in 2010 and he soon opened stores across India, as well as in New York, London and Hong Kong.

His diamond-encrusted designs were worn by noted Hollywood as well as Bollywood stars.

His jewellery shops were raided and his assets frozen after the allegations emerged last year.

# Exhibit 6
# (Filed Under Seal)

# Exhibit 7

IN THE COURT OF THE HON'BLE JUDGE

CITY CIVIL COURT AND ADDITIONAL SESSIONS JUDGE

GREATER BOMBAY

[DESIGNATED COURT FOR THE FUGITIVE ECONOMIC
OFFENDERS ACT, 2018]

CRIMINAL MISC. APPLICATION NO. 462 OF 2021

IN

CRIMINAL MISCELLANEOUS APPLICATION NO. 998 OF 2018

PURVI MODI                                 ...INTERESTED PERSON
                            NO. 3

VERSUS

Deputy Director, Director of Enforcement      ...Respondent

AND

Punjab National Bank                       ...Respondent

AND

Richard Levin, Trustee of Firestar Diamond, Inc., Fantasy, Inc., and Old AJ,
Inc. f/k/a A. Jaffe Inc                    ...Respondent

IN

Deputy Director, Directorate of Enforcement

VERSUS

Nirav Deepak Modi            ...Declared Fugitive Economic Offender

Index

| Sr No | Particulars | Page No |
|-------|-------------|---------|
|       |             |         |

| 1. | Application for an on behalf of Purvi Mehta bringing additional facts on record for seeking directions to the Respondents to ensure speedy and just recovery of assets | 1-9 |
|---|---|---|
| 2. | **Exhibit A**<br><br>Order dated 4 January 2021 in Special PMLA Case No 4 of 2018 and 3 of 2019 | 10-21 |
| 3. | **Exhibit B**<br><br>List of Offerings by the Applicant. | 22-28 |
| 4. | **Exhibit C**<br><br>List of Creditors in the ongoing Bankruptcy Proceedings before US Court. | 29-36 |
| 5. | **Exhibit D**<br><br>Complaint to avoid and recover actual fraudulent transfers for damages for conspiracy to violate the Racketeering Influenced Corrupt Organisations Act dated 25 February 2020 filed by the Trustee before the United States Bankruptcy Court, Southern District of New York. | 37-183 |

IN THE COURT OF THE HON'BLE JUDGE

CITY CIVIL COURT AND ADDITIONAL SESSIONS JUDGE

GREATER BOMBAY

[DESIGNATED COURT FOR THE FUGITIVE ECONOMIC OFFENDERS ACT, 2018]

CRIMINAL MISC. APPLICATION NO. 462 OF 2021

IN

CRIMINAL MISCELLANEOUS APPLICATION NO. 998 OF 2018


**PURVI MODI**                              **...INTERESTED PERSON NO. 3**

VERSUS

**Deputy Director, Director of Enforcement**       **...Respondent**

AND

**Punjab National Bank**                     **...Respondent**

AND

**Richard Levin, Trustee of Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe Inc**                     **...Respondent**

IN

**Deputy Director, Directorate of Enforcement**

VERSUS

**Nirav Deepak Modi**          **...Declared Fugitive Economic Offender**

---

AN APPLICATION FOR AND ON BEHALF OF PURVI MODI BRINGING ADDITIONAL FACTS ON RECORD FOR SEEKING DIRECTIONS TO THE RESPONDENTS TO ENSURE SPEEDY AND JUST RECOVERY OF ASSETS

---

**2**

**MOST RESPECTFULLY SHOWETH:**

1.    That the present application is being filed on behalf of Mrs. Purvi Modi ("**Applicant**") in her individual capacity to apprise this Hon'ble Court about the events that could act as an impediment in the rightful recovery of assets by the Respondent Number 1; the Directorate of Enforcement, ("**ED**") under the provisions of Fugitive Economic Offenders Act, 2018 ("**FEO**") and Prevention of Money Laundering Act, 2002 ("**PMLA**") for seeking directions from the Hon'ble Court to effectively direct respondents for the purpose of restraining the ongoing parallel bankruptcy proceedings in the matter *Levin v Javeri* filed under Chapter 11 of the United States Bankruptcy Code initiated by the companies owned by Mr. Nirav Modi, namely Firestar Diamond Inc., Fantasy Inc. and Old AJ Inc ("**Debtors**"), currently being pursued by the appointed Trustee, Mr. Richard Levin, in the United States Bankruptcy Court, Southern District of New York ("**SDNY Court**").

2.    That this Hon'ble Special Court has already granted a pardon to the Applicant under Sections 306/307 of the Criminal Procedure Code, 1973 ("**CrPC**") in Special PMLA Case No 4 of 2018 and 3 of 2019 by an order dated 4 January 2021. Thus, the Applicant is no longer an accused in any of the prosecution cases filed by the ED under the PMLA. Furthermore, it is an undisputed fact that the Applicant is not arrayed as an accused under the predicate offence registered by the CBI. Copy of the order is annexed and marked hereto as Exhibit- A.

3.    It is well known that the conduct of the Applicant with respect to the investigation is appreciated by ED as it is reasonably clear without any doubts that the onus has been fully discharged by the Applicant by cooperating with the repatriation of proceeds of crime. The Applicant has exhibited a remarkable conduct and cooperated with the ED as an approver at every stage, to an extent that even during the peak of pandemic, the Applicant would virtually record her statement under Section 50 of the PMLA. The Applicant, right from the very

outset, has never intended to project the proceeds of crime as untainted. The list of offerings by the Applicant is annexed and marked as Exhibit -B.

4.     It is stated that the present proceedings before this Hon'ble Special Court emanates from its judgment dated 5 December 2019, declaring Mr. Nirav Modi as a Fugitive Economic Offender under Section 12(1) of the FEO Act. Subsequently, on 8 June 2020, this Hon'ble Special Court passed an order in terms of Section 12(2) of the FEO Act (**"Confiscation Order"**) in relation to the properties mentioned in the Main Application filed by ED.

5.     The bankruptcy proceedings before the SDNY Court are overlapping with the present and other proceedings in India related to the Applicant. The Applicant is made a defendant in the said proceedings which is understood to be for the purpose of recovering the properties held by the Defendants including the Applicant. On 15 January 2020, the Trustee and other entities incorporated in the USA but owned by Nirav Modi, namely Synergies Corporation ("Synergies"), Firestar Group, Inc. ("FGI"), Firestar Diamond International, Inc. ("FDII"), Nirav Modi, Inc. ("NMI") and AVD Trading, Inc. ("AVD") (Collectively together with the Debtors to be referred as **"US Affiliates"**) entered into a settlement agreement under which the U.S. Affiliates assigned to the Trustee any and all claims or causes of action then-owned or subsequently acquired by the U.S. Affiliates and consented to entry of a judgment jointly and severally against the U.S. Affiliates to the tune of US $23,116,505.44.

6.     The Punjab National Bank (**"PNB"**), being the victim of the bank fraud commissioned by Nirav Modi and his affiliates, has appeared in the said bankruptcy proceedings, and filed claims against the Debtors and sought discovery and release, thereby actively pursuing relief. PNB being a creditor in US proceedings is pursuing multiple proceedings for the same assets which is oppressive and vexatious especially as the Applicant is now an approver who has already informed and filed affidavit before this Hon'ble Court informing that they can deal with the US assets subject matter of the FEO in any manner this Hon'ble court deems to. PNB has filed an application seeking the US assets in the instant proceedings. PNB is also a creditor and is in tacit discussion with

**4**

the trustee in US to attach assets under US proceedings which is causing grave hardship and is, indeed, double jeopardy for the Applicant. The list of Creditors including PNB is annexed and marked hereto as Exhibit – C.

7.  Further, it is brought to your attention that on 25 February 2020, a Complaint titled *"Complaint to avoid and recover actual fraudulent transfers for damages for conspiracy to violate the Racketeering Influenced Corrupt Organisations Act"* was filed by the Trustee for the Debtors and U.S. Affiliates. The complaint states that it is to "recover damages suffered as a result of the Modi family's nearly decade long racketeering conspiracy lasting from at least 2010 to mid-2018." Annexed hereto is a copy of the said Complaint as Exhibit – D.

8.  It is important to highlight that the Debtors and US. Affiliates, for whom the Trustee is seeking recovery, participated in the Bank Fraud. The Complaint set forth the details of their involvement beginning at Para 90 of the Complaint. The Trustee alleges: "Nirav Modi, Mihir Bhansali, Ajay Gandhi, and other co-conspirators funnelled millions of dollars in funds, precious gems, and jewellery through the U.S. Entities and their offices in furtherance of the Bank Fraud."

9.  The said Complaint, allegations therein, its adjudication along with that of the original Bankruptcy Proceedings before the SDNY Court are substance enough to indicate that the same is duplicity of proceedings happening before Courts in India including this Hon'ble Court. The proceedings may prove to be counterproductive and countering the interests of the proceedings in the Courts in India including the present proceedings and not only hamper the ongoing recovery process of monies and properties of the Fugitive Economic Offender that the Applicant is facilitating the ED with but can even possibly amount to double jeopardy due to misinterpretation of the cause of action that lies in India undisputedly. This may also lead to outright frustration of the instant proceedings as no proceeds of crime may ever be repatriated to India by the ED.

Thus, it is compelling for ED to intervene in those proceedings to seek the rightful claim of the Proceeds of Crime.

10.  The similarities and duplicity involved have been mentioned herein below in an indicative form:

a.  The Complaint in paras 62-22 extensively alleges overseas acts and transactions, all directed at India, where PNB is located, not the United States. For instance, the Complaint explains that the gravamen of the conspiracy was to obtain fraudulent LOUs, an instrument that is unique to India, from PNB, inflating the import volume of Nirav Modi's companies in India that are involved in the present proceedings. The Complaint also explains that the conspiracy was effectuated by "utilizing a web of shadow entities to engage in fraudulent and fictitious import transactions".

b.  Furthermore, the Complaint states the largest creditor of the Debtors in the U.S Proceedings to be PNB, rather than the Debtors or U.S. Affiliates. Specifically, the complaint claims conspiracy to violate the provisions of RICO and allege that the target of their conspiracy was PNB. It also states that in para 379 of the Complaint, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, together with their known and unknown co-conspirators, form an association engaged in and affecting interstate and foreign commerce for a common and continuing purpose of formulating and implementing a common scheme to defraud PNB for their personal enrichment through a pattern of fraud, lies, deceit, and corruption. It also acknowledges that the entire case came into existence and thereby the knowledge of the Trustee due to the media revelation about the scheme of Nirav Modi and his affiliates to defraud PNB. Likewise, the Complaint seeks to avoid and recover fraudulent transfers and allege that the purpose of these transfers was to defraud PNB.

c.  Accordingly, even as per the Complaint, the proceedings in SDNY Court refer and root from actual fraudulent transfers and subsequent

transfers constituted, involved, or resulted from an offense committed in India, involving fraud, or a scheme or attempt to defraud PNB.

d. Furthermore, para 6 of the Complaint mentions about the subject properties as in the present case including two apartments in Manhattan, New York held by Nirav Modi's family.

11. Evidently, the proceedings before the SDNY Court, are entirely an overlap of the proceedings before this Hon'ble Court or proceedings before the Debt Recovery Tribunal and other forums involving the same cause of action relating the fraud committed by the Fugitive Economic Offender and his affiliates in India.

12. Given the factual backdrop, the continuation of the proceedings with respect to the Applicant are not only arbitrary and lacks logic or *locus standi*, but certainly amount to multiplicity of proceedings and wrongly encroaches the well settled principle of law of '*forum non conveniens*', gravely affecting the interest of ED pursuant to the Confiscation Order and other investigative agencies in India in the recovery of the monies and properties of the Fugitive Economic Offender and his affiliates.

13. The same is further reflected in Para 15 of the Rejoinder dated 7 January 2022 to an application moved by an Interested Person Number 14; Pavilion Point Corporation, wherein the ED states: "*It is submitted that the ED has rightly recognised that PNB is the victim of a mammoth fraud committed by the Fugitive Offender which has resulted in huge losses to the Claimants but to decide their bonafide rights, title and interests in the properties which are subject to confiscation and attachment as mentioned in the Application filed by ED shall be decided by this Court in PMLA Cases bearing nos. 04/2018 and 03/2019 and not under FEO Act.*"

14. **INEVITABLE CONCLUSIONS**

A bare glance at the entire undisputed facts on record in the chronological order when seen in juxtaposition with the allegations levelled against the Applicant

in the complaint, the following illustrative (not exhaustive) conclusions/inferences can well be drawn :-

I. The Applicant has been cooperative with the investigative agencies by dispensing the peripheral understanding it had acquired due to its association as a jewellery designer with Nirav Modi and his companies,

II. The perusal of the complaint filed in the SDNY Court makes it abundantly clear that there are no allegations against the Applicant with respect to siphoning of funds or manipulation of accounts. The Complaint does not allege that Applicant's involvement in any of the shadow entities extend beyond mere ownership.

III. Even in such adverse circumstances and surcharge atmosphere created by the Investigating Agencies, the Applicant has been granted pardon more than a year ago and is still in operation for the remarkable and cooperative conduct of the Applicant;

IV. It cannot thus, even remotely be countenanced that there would be any foul play.

15. The present case involves a fraud perpetrated using an Indian bank, with transfers occurring across the globe. Therefore, the dispute is more local to India than New York and a considerable headway has been made in the proceedings in India.

16. As per the settled position of law in India *(TV, Independent News Service (P) Ltd. v. India Broadcast Live LLC, 2007 SCC OnLine Del 960)*, this Hon'ble Court can reject such reasoning, assume personal jurisdiction over the matter and provide injunctive relief if warranted, if the activities of the defendants have a sufficient connection with the forum state, India. Undisputedly, the cause of action arose out of the defendant's activities within the forum here in India.

17. Additionally, as mentioned above, the Trustee as part of its allegations in Para 188 of the said Complaint, acknowledges and admits that properties of PNB were located in India during the commission of fraud by the Fugitive Economic

7 | 9

Offender and his affiliates. Moreover, the present ongoing proceedings were initiated considering all the factors for the purpose of assuming jurisdiction.

18. That the directions of this Hon'ble Court to order the ED to intervene in the proceedings in U.S would be imperative as the same has legitimate interest in the recovery of the proceeds of crime which would be impacted if an injunction on the U.S proceedings is not granted. It would also be relevant here to note that as per the settled judicial precedents in U.S, when two courts are engaged in the same task of resolving the same issue, a stay or dismissal is warranted as it would advance the interests of judicial economy by avoiding duplicative litigation of an identical issue. (*Ole Media Mgmt., L.P. v. EMI Apr. Music, Inc., No. 12 CIV. 7249 PAE, 2013 WL 2531277 (S.D.N.Y. June 10, 2013)*)

19. Furthermore, PNB being the victim, whose implied interest is being represented by the Trustee in the U.S. Proceedings, it is even more critical and compelling that directions are issued to PNB to communicate to the Trustee to restrain from continuing the proceedings against the Applicant, at least, till the disposal of the proceedings in this Hon'ble Court related to the fraud by the Fugitive Economic Offender and his affiliates in India.

**9**

## PRAYER

In light of the circumstances enumerated above, it is humbly prayed:

A. That the ED be directed to take appropriate steps to intervene in the US Proceedings and seek injunction, at least with respect to the assets relating to the Applicant;

B. That the PNB be directed to communicate to the Trustee of the US Proceedings to refrain from continuing the U.S Proceedings to avoid multiplicity of proceedings and possible double jeopardy;

C. That the Notice be issued to the Trustee of the U.S. Proceedings;

D. That the Trustee be directed to withdraw the recovery proceedings with respect to the assets relating to the Applicant;

E. That interim relief for the same be granted pending adjudication of the present Application.

This Hon'ble Court be pleased to pass any other or further orders it deems fit in the interest of justice.

Purvi Modi

(Applicant)

Through

Khaitan & Co.

(Advocates for the Applicant)

PMLA.MA.No.1056/2020            : 1 :

### IN THE COURT OF SPECIAL JUDGE UNDER
### THE PREVENTION OF MONEY LAUNDERING ACT
### AT GREATER BOMBAY
### P.M.L.A. MISCELLANEOUS APPLICATION EXHIBIT NO.1056 OF 2020
### IN
### P.M.L.A. SPECIAL CASE NO.3 OF 2019

Ms. Purvi Modi/ Mrs Purvi Mehta
Belgian National,
Residing at 2610 Antwerp,
Eekhoornlaan 44.                           .. Applicant/Accused No.4.
            V E R S U S
Enforcement Directorate
Through the Deputy Director,
Kaiser-e-Hind Building, Ballard Estate,
Fort, Mumbai-400 001.                      .. Respondent/Complainant.

Ld. Senior Counsel Mr. Amit Desai a/w Ld. Advocate Mr. Manavendra Mishra and Ld. Advocate Mr. Akash Karmarkar i/b. Khaitan and Co. for the Applicant/Accused No.4.

Ld. P.P. Mr. Arvind Aghav for Respondent/Complainant.

> CORAM : HIS HONOUR SPECIAL JUDGE
> SHRI. V.C. BARDE
> SPECIAL COURT
> (Court Room No. 50)
> DATE : 04th January, 2021.

### O R D E R

This is an application filed by applicant/accused no.4-Ms. Purvi Modi/Mrs. Purvi Mehta residing at Belgium, being accused in case filed under Prevention of Money Laundering Act, 2002 (for short, 'P.M.L.A.') against her by Enforcement Directorate (for short, 'E.D.'), seeking tender of pardon under Sections 306 and 307 of the Code of Criminal Procedure, 1973 (for short, 'Cr.P.C.). It is contended in the application that case has been filed under the P.M.L.A. against accused no.1-Mr.

**PMLA.MA.No.1056/2020**               **: 2 :**

Nirav Modi, the prime accused in the Punjab National Bank (for short, 'PNB') scam and other accused persons for offences which are punishable under Section 4 of P.M.L.A. by imprisonment for a period upto seven years. The applicant is the younger sister of accused no.1, and has been made an accused in the present case under P.M.L.A. The applicant is not an accused in the predicate offence filed by C.B.I. E.D. is conducting further investigation in relation to the allegations pertaining to offence of money laundering arising from PNB scam being investigated by C.B.I. In the complaint filed before the Court, E.D. alleged that the applicant has participated in the crime of money laundering and layering of money so acquired, and was also a beneficiary of the proceedings. It is further alleged that various entities, bank accounts, trusts that stand in the name of the applicant are used to launder the proceeds of crimes. It is further alleged that various laundered assets both in India as well as abroad, stand in the name of the applicant. The applicant contended that she is not one of the prime accused and has been attributed only a limited role. Throughout the course of the investigation and legal proceedings in the matter, the applicant has always fully co-operated with E.D. by providing all requisite information and documents, voluntarily disclosing information on assets, etc. On account of the applicant being Mr. Nirav Modi's (the principal offender in the present case) sister/sibling, the applicant is in a unique position to be able to provide substantial and important evidence, information, proof, and documents and access to bank accounts/assets/companies and entities that are relevant to Nirav Modi and his actions/dealings. Such information will significantly aid the further investigation of E.D. and will prove critical to conclusively establish the facts against Mr. Nirav Modi and other key

12

PMLA.MA.No.1056/2020          : 3 :

accused persons. The applicant's entire personal and professional life has now been brought to a standstill because of Mr. Nirav Modi's alleged criminal activities. The applicant has also distanced herself from Nirav Modi. The applicant undertakes to be examined as a witness in this Court and submits that she will make true and full disclosure of the whole of the circumstances and events as known to her, without concealing any evidence and will provide complete information regarding the same, which is true according to her and within her knowledge. The applicant submits that on account of Covid-19 pandemic, there are strict restrictions on international and even domestic travel around the world and therefore, she is unable to currently travel to India. The applicant is willing to provide her statement as a witness, over video conference or any other electronic means convenient at such time and in such manner as may be directed by the Court. The applicant requests that her statement under Section 164 as a witness may be recorded *via* video conference in the interest of justice and expediency. The applicant submits that she will make true and full disclosure of the whole of the circumstances and events in question without concealing any evidence and provide complete information regarding the same which is true according to her and in her knowledge. She submits that she is making the present application voluntarily without any kind of fear, presence, coercion and the said application has been made out of her free will. The applicant undertakes that she shall not violate any conditions of pardon as laid down by this Court. The information to be provided by the applicant is crucial and significant and will enable the Court to effectively adjudicate the present case and help the prosecution in furtherance of their case against the other accused persons.



PMLA.MA.No.1056/2020                :4:

2.    The respondent-E.D. appeared and filed reply submitting no objection for examining the applicant-accused as an approver subject to co-operation.    However, they objected for allowing Pavilion Point Corporation or any other entity as approver.  They further submitted not to withdraw the name of the applicant or any one as accused from the present case.   However, they have denied the averments and allegations in the application not specifically admitted.  The respondent submitted that after thorough investigation, two prosecution complaints have been filed by the Directorate on 24.05.2018 and 28.02.2019 before the Hon'ble Special PMLA Court.   In both the prosecution complaints, Ms. Purvi Modi has been arrayed as accused along with others.  During the course of investigation, summons were issued to her on 24.04.2018, 04.05.2018 and 15.05.2018.  However, she did not join the investigation.  After taking cognizance of the said prosecution complaints, the Court issued process by way of Non-Bailable Warrant to the applicant on 12.06.2018.  It is also brought to the notice of the Court that Red Corner Notice issued by Interpol is also in force in respect of the said applicant.   During the course of investigation, the Directorate provisionally attached following properties in Singapore belonging to the accused under Section 5(1) of P.M.L.A., being proceeds of crime in terms and by virtue of definition of Section 2(1) (u) of P.M.L.A.

| Sr.No. | Asset Details | Value |
|--------|---------------|-------|
| 1. | Flat No.02, 2nd floor, Diamond Head Building, Bhulabhai Desai Road, Mumbai-400 026. | INR 19,50,00,000 |
| 2. | SG06775997-01 maintained in Julius Baer Bank, Singapore, Pavilion Point Corporation | USD 6,122,017.13 (Approx INR 43 |

**14**

PMLA.MA.No.1056/2020          : 5 :

| Sr.No. | Asset Details | Value |
|--------|---------------|-------|
|  | (Beneficial Owners-Mr Maiank Mehta & Mrs Purvi Modi) | Crore) |
| 3. | The Essex House 160, Central Park South, New York, NY Central Park Real Estate LLC (Beneficially owned by the Ithaca Trust Settlor: Purvi Modi | USD 4,995,000 (approx. INR 36 Crore) |
| 4. | 50, Central Park South, Unit No. 33, New York, NY Central Park South 50 Properties LLC (Beneficially owned by The Ithaca Trust) Settlor: Purvi Modi | USD 25,000,000 (Approx. INR 180 Crore) |
| 5. | 567796/EFG Bank AG, Purvi Deepak Modi | CHF 20,201,500.00 Approx INR 161, Crore) |
| 6. | 567854/EFG Bank AG, Belvedere Holdings Group Ltd Beneficial Owner: Purvi Modi | CHF 13,009,200.00 (Approx INR 104 Crore) |
| 7. | 103, Marathon House, 200, Marylebone Road, London, NW15PL, UK. Owned by Belvedere Holdings Group Ltd. Benefically owned by Purvi Modi | GBP 6,250,000 (Approx INR 60 Crore) |
| 8. | 50372040020228 maintained in Syndicate Bank, Nariman Point, India | INR 1,96,55,369.78 |

The applicant did not contest the above attachments before the Adjudicating Authority except the attachment mentioned at Serial No.2 and vide letter dated 15.01.2020, the applicant expressed her willingness to co-operate with the Directorate and on 14.10.2020, her

**15**

**PMLA.MA.No.1056/2020** : 6 :

statement was recorded under Section 50 of P.M.L.A. In her statement, she expressed her commitment to extend full co-operation to the Directorate in the investigation. Vide the subject application, the applicant prayed before the Court for allowing her to become the approver under Section 306 and 307 of Cr.P.C. The Directorate submits that the applicant as an approver can help E.D. to prosecute the mastermind, to identify and attach more proceeds of crime in India and abroad, to repatriate the proceeds of crime to India, to obtain more evidences against the mastermind, etc. It is admitted that the applicant is not prime accused, but contended that as most of the proceeds of crime has gone in her account it cannot be said at this stage that she has a limited role to play.

3.      Heard the learned Advocates for applicant/accused and learned P.P. for Respondents. Perused the record of the case.

4.      The learned Advocate for the applicant submitted that the respondent-E.D. has already recorded statement of the applicant and has no objection for granting pardon to the applicant. He submitted that cognizance is already taken on complaint filed by the respondent against the accused person. He submitted earlier in oral arguments that statement of the accused/applicant may be recorded under Section 164 of Cr.P.C. *via* video conferencing, as the accused is staying abroad and that tender of pardon shall be granted under Section 306 of Cr.P.C. In brief written submissions filed later on, it is submitted that Section 307 of Cr.P.C. is applicable which deals with grant of pardon to accomplice and that in view of recording of statement of applicant already under Section 50 of P.M.L.A. on oath, there is no need to record

**PMLA.MA.No.1056/2020**              **: 7 :**

statement again.  He submitted that to grant pardon to the applicant as per law to proceed further in the case.

5.       The learned Advocate for the applicant relied on following citations :

i)       In **State through Central Bureau of Investigation Vs. Arul Kumar [(2016) 11 Supreme Court Cases 733]**, it is held by Hon'ble Supreme Court that:

> *"In those cases where charge-sheet is filed before the Magistrate, he will have to commit it to the Special Judge.  In this situation, the provisions of Section 306 of the Code would be applicable and the Magistrate would be empowered to exercise the power under the said provision.  In contrast, in those cases where Special Judge takes cognizance of offence directly, as he is authorised to do so in view of Section 5(2) of P.C. Act, 1988, Section 306 of the Code would get bypassed and as the Special Judge has taken cognizance, it is Section 307 of the Code which would become applicable......In that case, this Court held that once the proceedings are committed to the Court of Session, it is that court only to which commitment is made which can grant pardon to the approver.  The view taken by us is, rather, in tune with the said judgment."*

ii)      In **Santosh Kumar Satishbhushan Bariyar Vs. State of Maharashtra, [(2009) 6 Supreme Court Cases 498]**, it is observed by Hon'ble Appex Court that:

> *"31.  Sub-Section (4) of Section 306 of the Code of Criminal Procedure mandates that such a person accepting tender of pardon must be examined as a witness in the trial.  Sub-section (5) of Section 306 of the Code of Criminal Procedure provides that where a person has accepted tender of pardon made under sub-section (1) and has been examined under sub-section (4), the Magistrate taking cognizance of the offence shall commit it for trial, without making any further inquiry in the case.*

**17**

PMLA.MA.No.1056/2020              : 8 :

> 32.    Whether the terms "on the same condition" occurring
> in Section 307 of the Code of Criminal Procedure refer to sub-
> section (4) of Section 306 thereof and as in the instant case
> apart from the purported statement made by Kumar Gaurav
> (P.W.1) under Section 164 of the Code of Criminal Procedure,
> which had been retracted, as no other statement had been
> taken from him by the learned Magistrate, the order granting
> pardon in his favour was illegal, is the question.
>
> 33.    In our opinion, the submission of Mr. Sushil Kumar
> does not merit acceptance.
>
> 34.    Sub-section (4) of Section 306 is procedural in nature.
> It is necessary to be followed only by a Magistrate as he
> would not have any jurisdiction to try the case himself. The
> learned Sessions Judge before whom the case is committed
> for trial must be informed as to on what basis pardon had
> been tendered.    Section 307 does not contain any such
> condition.    The power of the learned Sessions Judge is
> independent of the provisions contained in Section 306
> thereof. The condition mentioned in Section 307 refers to the
> condition laid down in sub-section (1) of Section 306,
> namely, that the person in whose favour the pardon has been
> tendered, will make a full and true disclosure of the whole of
> the circumstances within his knowledge.    The power of a
> Sessions Court is not hedged with any other condition."

6.    On the other hand, the learned P.P. for respondent-E.D. submitted
that in view of reply filed by the respondent, the tender of pardon as
sought may be granted.    He submitted that the accused shall not be
dropped from the proceeding.    The accused must make true and fair
disclosure of facts within knowledge.    He submitted that the tender of
pardon may be granted to the accused strictly as per provisions of law.
He submitted to allow the application as per the contentions in reply.

7.    The instant application is moved by the applicant-accused under
Sections 306 and 307 of Cr.P.C. praying to grant pardon and examine
her as approver/prosecution witness, to which the respondent-E.D. has

**18**

**PMLA.MA.No.1056/2020**        : 9 :

given no objection and submitted to examine the applicant as approver. The respondent further submitted not to drop name of anyone from the list of accused. The present application is moved by the applicant-accused in her individual capacity, and as such, it is being considered in the said capacity of the applicant.

8.    Section 306 of Cr.P.C. deals with tender of pardon to accomplice. In the case of **C.B.I. Vs. Arul Kumar** (*supra*), the case was under Section 5(2) of the Prevention of Corruption Act, 1988, wherein the Hon'ble Apex Court held that Section 306 of Cr.P.C. would get bypassed in Special Cases, and the Special Judge taking cognizance of the offence has power to direct tender of pardon under Section 307 of Cr.P.C.

9.    Further, in case of **Santosh Kumar Vs. State of Maharashtra** (*supra*), the Hon'ble Apex Court held that Section 306(4), being procedural in nature, shall be followed only by a Magistrate and the Sessions Judge must be informed as to on what basis pardon was tendered, and that Section 307 does not contain any such condition.

10.    Section 307 of Cr.P.C. runs as under:

> **"Power to direct tender of pardon-** At any time after commitment of a case but before judgment is passed, the Court to which the commitment is made may, with a view to obtaining at the trial the evidence of any person supposed to have been directly or indirectly concerned in, or privy to, any such offence, tender a pardon on the same condition to such person."

Keeping in view the aforegoing provisions of law, in the instant case the tender of pardon is sought to be granted by the accused herself unconditionally, to which the prosecution-E.D. has given no objection,

**19**

**PMLA.MA.No.1056/2020**          **: 10 :**

subject to continuing the accused in the case. Statement of the accused is already stated to have been recorded under Section 50 of P.M.L.A. The requirement of Section 307 is that the Court may direct tender of pardon with a view to obtaining at trial, evidence of any person supposed to have been directly or indirectly concerned in, or privy to any offence. On the same contentions, the application is made by the accused herself, which has not been objected by prosecution-complainant. Therefore, there is nothing on record not to grant the tender of pardon as sought by the accused-applicant.

11.    Insofar as the position of the accused in this case after tender of pardon, in view of the provision of Sections 307 and 308 of Cr.P.C. the accused shall be marked as approver, and the proceeding shall continue inaccordance with the provisions laid down therein. The application of the applicant-accused for tender of pardon is being allowed for herself only in her individual capacity as arrayed in the complaint filed by complainant/prosecution. The accused is at present staying abroad, who shall be directed to present herself before the Court, for which purpose the prosecution shall take necessary steps to facilitate the approach of accused to India to take part in the proceeding as soon as may be, in the facts and circumstances prevailing currently. Accordingly, I allow the application of the applicant-accused and pass the following order.

## Order

Miscellaneous Application No.1056 of 2020 is allowed as under:

i)    The application of applicant no.4-Ms. Purvi Modi/Mrs. Purvi Mehta in P.M.L.A. Case No.3 of 2019 for grant of tender of pardon under Sections 306 and 307 of Cr.P.C. is allowed, on condition of making full and true disclosure of the whole of the circumstances

**20**

PMLA.MA.No.1056/2020 : 11 :

within knowledge relative to offence and every other person concerned, and accused shall be marked as approver in this case.

ii) The applicant-accused shall appear before the Court by returning to India, for which purpose the complainant-prosecution shall facilitate the approach of accused at earliest, and shall take suitable steps accordingly.

Miscellaneous Application No.1056 of 2020 stands disposed of.



Vijay
Chandrashekhar
Barde

Digitally signed
by Vijay
Chandrashekhar
Barde
Date: 2021.01.04
15:49:30 +0530

Date : 04/01/2021

(V. C. BARDE)
Special Judge
City Civil & Sessions Court,
Gr. Bombay.

Dictated on : 04/01/2021
Typed on : 04/01/2021
Signed by HHJ. : 04/01/2021

**2)**

**PMLA.MA.No.1056/2020**               **: 12 :**

" CERTIFIED TO BE TRUE AND CORRECT COPY OF THE ORIGINAL
SIGNED JUDGMENT/ORDER."

04.01.2021/ 03.37 p.m.          Mrs. Pradnya S. Naik
UPLOAD DATE AND TIME          NAME OF STENOGRAPHER  (S.G.)

| Name of the Judge (with Court Room No.) | Shri. V.C. BARDE (CR.No.50) |
|---|---|
| Date of Pronouncement of JUDGEMENT/ORDER | 04.01.2021 |
| JUDGEMENT/ORDER signed by P.O. on | 04.01.2021 |
| JUDGEMENT/ORDER uploaded on | 04.01.2021 |

| | |
|---|---|
| **From:** | Purvi <purvim1610@gmail.com> |
| **Sent:** | Tuesday, August 10, 2021 1:45 AM |
| **To:** | efaxMpm@justice.ge.ch; ofaxMP.avocats@lustico.go.ch |
| **Subject:** | Reference No. B-18- 10002-3 |
| **Attachments:** | Communication with Swiss Authorities.eml |

**22**

To

Mr. Sylvie Bertrand- Curreli (Attorney)

Public Prosecutors Office

Route de Chancy 6B

PO Box 3565

1211 Geneva 3

Efax: efaxMPm@justice.ge.eh

Efax Lawyers: ofaxMP.avocats@lustico.go.ch


Mrs. Julia Voken

Federal Office of Justice

Judicial Assistance Unit 1

Bundesrain 20

3003 Bern


Subject: Reference No. B-18-10002-3- Informed and Irrevocable consent to transfer balance funds in A/c No. 567796 and EFG Bank SA and A/c No. 567854, EFG Bank SA to the Directorate of Enforcement, Government of India in terms of Article 80c EIMP (Federal Act on International Mutual Assistance in Criminal Matters (SR.351.1)


Dear Mr. Bertrand-Curreli/ Mrs. Volken

1

I am addressing the present email to you in view of a communication I have received from the Directorate of Enforcement, Government of India which is attached herewith and is self-explanatory. Pursuant to the order of the Hon'ble PMLA Special Court, Mumbai, Maharashtra, India, vide order dated 4 January 2021, in PMLA Special Case No. 4 of 2018 and 3 of 2019, titled as Directorate of Enforcement vs Nirav Modi and others, in Criminal Misc. Application No. 1056 of 2020, I have been pardoned under Section 306 and 307 of the Code of Criminal Procedure of India. The condition precedent for grant of pardon was my full and true disclosure and my cooperation in the investigation, inquest and trial of the above captioned case and the proceedings emanating therefrom.

In pursuance of the said order of grant of pardon by the Special Court and the instructions received from the Directorate of Enforcement, I would request you to transfer the balance amount in the following two accounts:

a) A/c No. 567796, EFG Bank SA Ms. Purvi Modi (USD 20,352,188.66)

b) A/c No. 567854, EFG Bank SA Belvedere Holdings (USD 13,108,836.16)

I am granting the said authorization to transfer the funds into the account of the Directorate of Enforcement as the accounts stand in my name. I hereby give my informed and irrevocable consent in terms of Article 80c EIMP ( Federal Act on International Mutual Assistance in Criminal Matters (SR.351.1)) to transfer the balance amounts in the abovementioned two accounts to the Directorate of Enforcement, Government of India at the earliest. The details of the bank account of the Directorate of Enforcement are as under:

Bank Name : Punjab National Bank
Account no. : 1232005500000943
Branch : Raheja Chambers, Nariman Point
Branch Code : PUNB012300
IFSC Code. -. PUNB0123200
Swift code  - PUNBINBBBFR

Account Name - Directorate of Enforcement

Warm Regards

Purvi Modi

2

| | |
|---|---|
| **From:** | Purvi <purvim1610@gmail.com> |
| **Sent:** | Tuesday, August 10, 2021 1:45 AM |
| **To:** | efaxMpm@justice.ge.ch; ofaxMP.avocats@lustico.go.ch |
| **Subject:** | Reference No. B-18- 10002-3 |
| **Attachments:** | Communication with Swiss Authorities.eml |

To

Mr. Sylvie Bertrand- Curreli (Attorney)

Public Prosecutors Office

Route de Chancy 6B

PO Box 3565

1211 Geneva 3

Efax: efaxMPm@justice.ge.eh

Efax Lawyers: ofaxMP.avocats@lustico.go.ch


Mrs. Julia Voken

Federal Office of Justice

Judicial Assistance Unit 1

Bundesrain 20

3003 Bern


Subject: Reference No. B-18-10002-3- Informed and Irrevocable consent to transfer balance funds in A/c No. 567796 and EFG Bank SA and A/c No. 567854, EFG Bank SA to the Directorate of Enforcement, Government of India in terms of Article 80c EIMP (Federal Act on International Mutual Assistance in Criminal Matters (SR.351.1)


Dear Mr. Bertrand-Curreli/ Mrs. Volken


1

I am addressing the present email to you in view of a communication I have received from the Directorate of Enforcement, Government of India which is attached herewith and is self-explanatory. Pursuant to the order of the Hon'ble PMLA Special Court, Mumbai, Maharashtra, India, vide order dated 4 January 2021, in PMLA Special Case No. 4 of 2018 and 3 of 2019, titled as Directorate of Enforcement vs Nirav Modi and others, in Criminal Misc. Application No. 1056 of 2020, I have been pardoned under Section 306 and 307 of the Code of Criminal Procedure of India. The condition precedent for grant of pardon was my full and true disclosure and my cooperation in the investigation, inquest and trial of the above captioned case and the proceedings emanating therefrom.

In pursuance of the said order of grant of pardon by the Special Court and the instructions received from the Directorate of Enforcement, I would request you to transfer the balance amount in the following two accounts:

a) A/c No. 567796, EFG Bank SA Ms. Purvi Modi (USD 20,352,188.66)

b) A/c No. 567854, EFG Bank SA Belvedere Holdings (USD 13,108,836.16)

I am granting the said authorization to transfer the funds into the account of the Directorate of Enforcement as the accounts stand in my name. I hereby give my informed and irrevocable consent in terms of Article 80c EIMP ( Federal Act on International Mutual Assistance in Criminal Matters (SR.351.1)) to transfer the balance amounts in the abovementioned two accounts to the Directorate of Enforcement, Government of India at the earliest. The details of the bank account of the Directorate of Enforcement are as under:

Bank Name : Punjab National Bank
Account no. : 1232005500000943
Branch : Raheja Chambers, Nariman Point
Branch Code : PUNB012300
IFSC Code. -. PUNB0123200
Swift code - PUNBINBBBFR

Account Name - Directorate of Enforcement

Warm Regards

Purvi Modi

2

<u>Suggested Communication</u>

To

Mr. Sylvie Bertrand-Curreli (Attorney)
Public Prosecutor's Office
Route de Chancy 6B
PO Box 3565
1211 Geneva 3
Efax: efaxMPm@justice.ge.ch
Efax lawyers: efaxMP.avocats.ge.ch

Mrs. Julia Volken
Federal Office of Justice
Judicial Assistance Unit I
Bundesrain 20
3003 Bern

Sub: Your Reference No. B-18-10002-3

Dear Mr. Bertrand-Curreli/ Mrs Volken,

Pursuant to the decision of the Hon'ble PMLA Special Court, Mumbai on the Application No. 1056/2020 filed by me wherein the Hon'ble Special Court has allowed for grant of tender of pardon under Sections 306 and 307 of the Code of Criminal Procedure 1973, to the myself on the condition of making full and true disclosure, it is requested that the balance amount in my following two accounts, being proceeds of crime, be transferred to the Directorate of Enforcement, India:

| S.No. | Account No. | Bank Name | Account holder | Balance amount (in USD) |
|-------|-------------|-----------|----------------|-------------------------|
| 1 | 567796 | EFG SA | Purvi Modi | 20,352,188.66 |
| 2 | 567854 | EFG SA | Belvedere Holdings * | 13,108,836.16 |

Since the above mentioned bank accounts are held by me and M/s Belvedere Holdings (...........relationship of Purvi Modi to Belvedere Holdings to be mentioned), I hereby give my informed and irrevocable consent, under the terms of section 80c EIMP (Federal Act on International Mutual Assistance in Criminal Matters (SR.351.1)) to transfer the balance amounts in the above mentioned two accounts to the Account no ..............(Bank, branch, swift code) of the Directorate of Enforcement, immediately.

Yours sincerely,

Purvi Modi

Copy to: Investigation Officer, ECIR ......, Directorate of Enforcement, Mumbai.

*Relationship of Purvi Modi and Belvedere Holdings may be mentioned along with necessary supporting documents.

**27**

| | |
|---|---|
| From: | Purvi <purvim1610@gmail.com>804 |
| Sent: | Tuesday, August 10, 2021 1:45 AM |
| To: | efaxMpm@justice.ge.ch; ofaxMP.avocats@lustico.go.ch |
| Subject: | Reference No. B-18- 10002-3 |
| Attachments: | Communication with Swiss Authorities.eml |

To

Mr. Sylvie Bertrand- Curreli (Attorney)

Public Prosecutors Office

Route de Chancy 6B

PO Box 3565

1211 Geneva 3

Efax: efaxMPm@justice.ge.eh

Efax Lawyers: ofaxMP.avocats@lustico.go.ch


Mrs. Julia Voken

Federal Office of Justice

Judicial Assistance Unit 1

Bundesrain 20

3003 Bern


Subject: Reference No. B-18-10002-3- Informed and Irrevocable consent to transfer balance funds in A/c No. 567796 and EFG Bank SA and A/c No. 567854, EFG Bank SA to the Directorate of Enforcement, Government of India in terms of Article 80c EIMP (Federal Act on International Mutual Assistance in Criminal Matters (SR.351.1)


Dear Mr. Bertrand-Curreli/ Mrs. Volken

1

I am addressing the present email to you in view of a communication I have received from the Directorate of Enforcement, Government of India which is attached herewith and is self-explanatory. Pursuant to the order of the Hon'ble PMLA Special Court, Mumbai, Maharashtra, India, vide order dated 4 January 2021, in PMLA Special Case No. 4 of 2018 and 3 of 2019, titled as Directorate of Enforcement vs Nirav Modi and others, in Criminal Misc. Application No. 1056 of 2020, I have been pardoned under Section 306 and 307 of the Code of Criminal Procedure of India. The condition precedent for grant of pardon was my full and true disclosure and my cooperation in the investigation, inquest and trial of the above captioned case and the proceedings emanating therefrom.

In pursuance of the said order of grant of pardon by the Special Court and the instructions received from the Directorate of Enforcement, I would request you to transfer the balance amount in the following two accounts:

a) A/c No. 567796, EFG Bank SA Ms. Purvi Modi (USD 20,352,188.66)

b) A/c No. 567854, EFG Bank SA Belvedere Holdings (USD 13,108,836.16)

I am granting the said authorization to transfer the funds into the account of the Directorate of Enforcement as the accounts stand in my name. I hereby give my informed and irrevocable consent in terms of Article 80c EIMP ( Federal Act on International Mutual Assistance in Criminal Matters (SR.351.1)) to transfer the balance amounts in the abovementioned two accounts to the Directorate of Enforcement, Government of India at the earliest. The details of the bank account of the Directorate of Enforcement are as under:

Bank Name : Punjab National Bank
Account no. : 1232005500000943
Branch : Raheja Chambers, Nariman Point
Branch Code : PUNB012300
IFSC Code. -. PUNB0123200
Swift code - PUNBINBBBFR

Account Name - Directorate of Enforcement

Warm Regards

Purvi Modi

2

Label Matrix for local noticing
0208-1
Case 18-10509-shl
Southern District of New York
Manhattan
Mon Jan 24 11:11:41 EST 2022

AmTrust North America, Inc. on behalf of Tec
c/o Maurice Wutscher LLP
2000 Auburn Drive Suite 200
One Chagrin Highlands
Beachwood, OH 44122

Argo Partners
12 West 37th Street, 9th Floor
New York, NY 10018-7381

Bank of India (Antwerp Branch)

Bank of India (London branch)
63 Queen Victoria Street
4th Floor
LondonEC4N 4UA United Kingdom

Bank of India, Bharat Diamond Bourse Branch

CRG Financial LLC
100 Union Avenue
Cresskill, NJ 07626-2141

CRG Financial, LLC as Assignee for C.a Schna
100 Union Avenue
Cresskill, NJ 07626-2141

CRG Financial, LLC as Assignee of Barbara Ha
100 Union Avenue
Cresskill, NJ 07626-2141

CRG Financial, LLC as Assignee of CCAJ
100 Union Avenue
Cresskill, NJ 07626-2141

CRG Financial, LLC as Assignee of Jewelex Ne
100 Union Avenue
Cresskill, NJ 07626-2141

CRG Financial, LLC as Assignee of Mameres, L
100 Union Avenue
Cresskill, NJ 07626-2141

Department Of Finance
375 Pearl Street
New York, NY 10038-1444

Fair Harbor Capital, LLC
PO Box 237037
New York, NY 10023-0028

Fantasy, Inc.
592 Fifth Avenue
3rd Floor
New York, NY 10036-4707

Firestar Diamond, Inc.
592 Fifth Avenue
3rd Floor
New York, NY 10036-4707

Forchelli Deegan Terrana LLP
333 Earle Ovington Blvd., Suite 1010
Uniondale, NY 11553-3645

Harris County
Linebarger Goggan Blair & Sampson LLP
c/o John P. Dillman
Post Office Box 3064
Houston, TX 77253-3064

Illinois Department of Employment Security
33 S. State Street Bankruptcy Unit
10th FL
Chicago, IL 60603-2808

Israel Discount Bank of New York

Jewelex New York, Ltd.
c/o Steven J. Cohen
Wachtel Missry LLP
885 2nd Ave., 47 Fl.
NY, NY 10017-2229

Malca-Almit USA and Malca Amit-CHB, Inc.
c/o Pryor & Mandelup, LLP
675 Old Country Road
Westbury, NY 11590-4503

NYS Department of Taxation & Finance
15 MetroTech Center
Brooklyn, NY 11201-3818

Old AJ, Inc.
592 Fifth Avenue
3rd Floor
New York, NY 10036-4707

Oracle America, Inc.
Buchalter, A Professional Corporation
Shawn M. Christianson
55 2nd St., 17th Fl.
San Francisco, Ca 94105-3493

Rust Consulting/Omni Bankruptcy
5955 DeSoto Avenue, Suite 100
Woodland Hills, CA 91367-5100

TR Capital Management, LLC
PO Box 633
Woodmere, NY 11598-0633

UOB Realty (USA) Limited Partnership
592 Fifth Avenue
New York, NY 10036-4707

Union Bank of India (UK) Ltd.
Senator House
85, Queen Victoria Street
LondonEC4V 4AB United Kingdom

Vendor Recovery Fund IV, LLC
PO Box 669
SMITHTOWN, NY 11787-0710

Manhattan Division
One Bowling Green
New York, NY 10004-1415

22 ROCK PLAZA LLC
989 SIXTH AVENUE, 15TH FLOOR
NEW YORK, NY 10018-5450

A. JAFFE, INC.
592 FIFTH AVENUE, 3RD FLOOR
NEW YORK, NY 10036-4707

ALLEN & OVERY LLP
Attorneys for HSBC Bank USA,
National Association
1221 Avenue of the Americas
New York, New York 10020-1001

ALMAT FORMS & SYSTEMS, INC.
ONE MAIN STREET, SUITE 2
KINGS PARK, NY 11754-2723

AMERICAN EXPRESS - PLATINUM #1008
P.O. BOX 1270
NEWARK, NJ 07101-1270

AMERICAN EXPRESS, INC.
P.O. BOX 360001
FORT LAUDERDALE, FL 33336-0001

AMERICAN TRANS PLASTIC
P.O. BOX 703
EDISON, NJ 08818-0703

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-7649

AUDI FINANCIAL SERVICES
P.O. BOX 5215
CAROL STREAM, IL 60197-5215

AXIAM PRINTING
2165 MORRIS AVENUE
UNION, NJ 07083-5919

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern  PA 19355-0701

American Express Travel Related Services Com
Inc.
c/o Becket and Lee LLP
PO Box 3001
Malvern  PA 19355-0701

BK JEWELRY CONTRACTORS, INC.
71 WEST 47TH STREET, ROOM 1100
NEW YORK, NY 10036-2819

BRETT D. GOODMAN
TROUTMAN SANDERS
875 THIRD AVENUE
NEW YORK, NY 10022-6225

Baker & Hostetler LLP
Attorneys for the Examiner
45 Rockefeller Plaza
New York, New York 10111-1099

Bank of India, Antwerp Branch
18-20 Schupstraat
2018 Antwerpen, Belgium

Bank of India, Bharat Diamond Bourse Branch
C-5 Star House 2, BKC Bandra East
Mumbai, Maharashtra, India 400050

Borges & Associates, LLC
Attorneys for Saumil Diam LLC
575 Underhill Blvd., Ste. 118
Syosset, NY 11791-3438

Buchalter, A Professional Corporation
Attorneys for Oracle America, Inc.
Attn:  Shawn M. Christianson
55 2nd St., 17th Fl.
San Francisco, CA 94105-3493

CAI SOFTWARE LLC
36 THURBER BOULEVARD
SMITHFIELD, RI 02917-1858

CHASE CARD SERVICE #1860
P.O. BOX 15153
WILMINGTON, DE 19886-5153

CHASE CARD SERVICE #4864
P.O. BOX 1423
CHARLOTTE, NC 28201-1423

COLONY GROUP, INC.
1096 LAUREL COURT
MANSFIELD, TX 76063-1818

COOK GROUP SOLUTIONS, LLC
253 WEST 35TH STREET, 12TH FLOOR
NEW YORK, NY 10001-1909

CROWN FINDINGS COMPANY, INC.
44 WEST 47TH STREET, GF #12
NEW YORK, NY 10036-8676

CYRUS D. MEHTA & ASSOCIATES
2 WALL STREET, 6TH FLOOR
NEW YORK, NY 10005-2051

Cleary Gottlieb Steen & Hamilton LLP
Attorneys for Punjab National Bank
One Liberty Plaza
New York, New York 10006-1404

Condon & Forsyth LLP
7 Times Square, 18th Floor
New York, NY 10036-6554

Cruser, Mitchell, Novitz, Sanchez, Gaston
and Zimet, LLP
Attorneys for Ajay Gandhi
341 Conklin Street
Second Floor
Farmingdale, New York 11735-2658

DIKAMS INC.
2 WEST 46TH STREET
NEW YORK, NY 10036-4811

DISTINCTIVE OFFICES, INC.
250 WEST 40TH STREET, 9TH FLOOR
NEW YORK, NY 10018-4750

DONNA CUTILLO
1447 OTTAWA COURT
TOMS RIVER, NJ 08753-2962

DOSHI LEGAL GROUP, P.C.
Attorneys for Oracle America, Inc.
Attn:  Amish R. Doshi, Esq.
1979 Marcus Avenue, Suite 210E
Lake Success, NY 11042-1076

Department of the Treasury
Internal Revenue Service
Post Office Box 7346
Philadelphia, PA 19101-7346

FANCY CREATIONS COMPANY LTD.
UNIT B03, 2/F, SUMMIT BUILDING
30 MAN YUE STREET
HUNGHOM, KOWLOON, HONG KONG

FANTASY DIAMOND CORP.
1550 WEST CARROLL AVENUE
CHICAGO, IL 60607-1035

FEDERAL EXPRESS
ATTN: JOHAN SNAGGS
P.O. BOX 371741
PITTSBURGH, PA 15250-7461

FIRESTAR DIAMOND FZE (DUBAI)
5EA-513 DUBAI AIRPORT FREE ZONE
DUBAI, UNITED ARAB EMIRATES

FIRESTAR DIAMOND INTERNATIONAL, INC.
580 FIFTH AVENUE, SUITE 601
NEW YORK, NY 10036-4701

FIRESTAR FINE JEWELRY
592 FIFTH AVENUE, 3RD FLOOR
NEW YORK, NY 10036-4707

FIRESTAR HOLDINGS LTD., HK
21-23 2ND FLOOR, HENRY HOUSE
10 ICE HOUSE STREET
CENTRAL, HONG KONG

FIRESTAR INTERNATIONAL P LTD.
PLOT NO. 118, ROAD NO. 18
MIDC, ANDHERI (EAST)
MUMBAI, MAHARASHTRA 400093 INDIA

FIRESTAR INTERNATIONAL PVT. LTD.
11110, PRASAD CHAMBERS
OPERA HOUSE
MUMBAI 400004, INDIA

FIRESTAR INTERNATIONAL PVT. LTD.
AE-4050, BHARAT DIAMOND BOURSE BKC
BANDRA (E), MUMBAI 400051, INDIA

FIRESTAR INTERNATIONAL PVT. LTD.
PART B, UNIT NO. 24, TOWER II, WING B
KOHINOOR CITYKIROL ROAD KURLA (W)
MUMBAI 400070, INDIA

FIRESTAR INTERNATIONAL PVT. LTD.
PLOT # G-1-181, SEZ-II
SITAPURA INDUSTRIAL AREA
JAIPUR 302022, INDIA

FIRST INSIGHT, INC.
2000 ERICSSON DRIVE, SUITE 200
WARRENDALE, PA 15086-6507

FISHER HOUSE FOUNDATION INC.
111 ROCKVILLE PIKE, SUITE 420
ROCKVILLE, MD 20850-5168

FULLER BOX CO.
P.O. BOX 198
CENTRAL FALLS, RI 02863-0198

GAIL STERN CONSULTING, LLC
69 HAWTHORNE WAY
HARTSDALE, NY 10530-3020

GEMEX SYSTEMS INC.
6040 WEST EXECUTIVE DRIVE, SUITE A
MEQUON, WI 53092-4481

GEMOLOGICAL SCIENCE INTERNATIONAL
581 FIFTH AVENUE, 4TH FLOOR
NEW YORK, NY 10017-8827

GS LABORATORIES OF AMERICA
141114 N. DALLAS PARKWAY, SUITE 475
DALLAS, TX 75254

GSI
581 FIFTH AVENUE, 4TH FLOOR
NEW YORK, NY 10017-8827

GUARDIAN INSURANCE
P.O. BOX 677458
DALLAS, TX 75267-7458

GXS
29144 NETWORK PLACE
CHICAGO, IL 60673-1291

HARRIS B. WINSBERG
TROUTMAN SANDERS LLP
600 PEACHTREE STREET, NE SUITE 3000
ATLANTA, GA 30308-2216

HILL RIVKINS LLP
Attn:  John J. Sullivan
45 Broadway  Suite 1500
New York, NY 10006-3007

HOOVER & STRONG, INC.
P.O. BOX 677458
DALLAS, TX 75267-7458

HSBC BANK
452 FIFTH AVENUE
NEW YORK, NY 10018-2736

HSBC BANK USA
SARAH SEIMENS
452 FIFTH AVENUE
NEW YORK, NY 10018-2736

HSBC BANK USA, N.A.
P.O. BOX 735
BUFFALO, NY 14240-0735

I & C CREATION JEWELRY LLC
37 WEST 47TH STREET, SUITE 705
NEW YORK, NY 10036-2809

IBM CORPORATION
P.O. BOX 643600
PITTSBURGH, PA 15264-3600

IDB BANK
511 FIFTH AVENUE
NEW YORK, NY 10017-4908

IDB BANK
C/O DAVID HERZOG
511 FIFTH AVENUE
NEW YORK, NY 10017-4908

INTERNATIONAL GEMOLOGICAL INSTITUTE
551 FIFTH AVENUE
NEW YORK, NY 10176-0001

INTERNATIONAL PACKAGING CORP.
P.O. BOX 845241
BOSTON, MA 02284-5241

JENNER & BLOCK LLP
Attorneys for Chapter 11 Trustee
919 Third Avenue
New York, New York 10022-3902

JOSEPH CASTINGS, INC.
25 BROOK AVENUE
MAYWOOD, NJ 07607-1130

James P. Pagano, Esq.
Attorney for Gail Stern Consulting LLC.
217 Broadway, Suite 603
New York, New York 10007-2917

KARIZIA S.P.A.
VIA PEROSI, 18/20 36067
T. CASSOLA (VI), ITALY

KASSOY
101 COMMERICAL STREET, SUITE 200
PLAINVIEW, NY 11803-2408

LEWIS BRISBOIS BISGAARD & SMITH LLP
Attorneys for Klestadt Winters
Jureller Southard & Stevens, LLP
77 Water Street, Suite 2100
New York, New York 10005-4403

LISA SHAMUS & ASSOCIATES
350 EAST 79TH STREET, APT. 38B
NEW YORK, NY 10075-9209

Law Office of Albert Talero, P.C.
Attorneys for Saumil Diam LLC
71-50 Austin Street, Suite 207
Forest Hills, New York 11375-4708

Linebarger Goggan Blair & Sampson LLP
P.O. Box 3064
Houston, Tx 77253-3064

(p)MALCA AMIT USA LLC
153-66 ROCKAWAY BLVD
JAMAICA NY 11434-3621

METLIFE - GROUP BENEFITS
P.O. BOX 804466
KANSAS CITY, MO 64180-4466

MIDAS CHAIN, INC.
50 MCDERMOTT PLACE
BERGENFIELD, NJ 07621-3723

MIG MANUFACTURING INC.
19 WEST 36TH STREET, 5TH FLOOR
NEW YORK, NY 10018-7974

MUTUAL SECURITY SERVICES
10 WEST 46TH STREET
NEW YORK, NY 10036-4515

Malca-Amit Custom House Brokers, Inc.
Pryor & Mandelup, LLP
675 Old Country Road
Westbury, NY 11590-4513

Maurice Wutscher LLP
Attorneys for AmTrust
North America, Inc.
2000 Auburn Drive, Suite 200
Beachwood, OH 44122-4328

Michael L. Schein, Esq.
Vedder Price P.C.
1633 Broadway, 31st Floor
New York, New York 10019-6764

NATASHA SCHENK
DIAMOND IN GLASS
FELDKIRCHENSTRASSE 30
KALSDORF, AT 8401

NATIONAL CHAIN GROUP
55 ACCESS ROAD
WARWICK, RI 02886-1000

NEW YORK CITY DEPARTMENT OF FINANCE
ONE CENTRE STREET
NEW YORK, NY 10007-1602

NEW YORK STATE DEPARTMENT OF LABOR
STATE OFFICE CAMPUS
BUILDING #12 ROOM #256
ALBANY NY 12240-0001

**33**

NOBLE GIFT PACKAGING INC.
20 SAND PARK ROAD
CEDAR GROVE, NJ 07009-1210

NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019-6022

NYS DEPARTMENT OF TAXATION & FINANCE
W A HARRIMAN CAMPUS, #855
ALBANY, NY 12227-0001

OFFICE OF THE UNITED STATES ATTORNEY
86 CHAMBERS STREET
3RD FLOOR
NEW YORK, NY 10007-2632

PIERCING PAGODA
3000 GRAPEVINE MILLS K1113
GRAPEVINE, TX 76051-2008

Polsinelli, PC
Attorneys for J. C. Penney
Corporation, Inc.
600 Third Avenue, 42nd Floor
New York, NY 10016-1924

Pryor & Mandelup, LLP
Attn: Anthony F. Giuliano, Esq.
675 Old Country Road
Westbury, NY 11590-4513

RAM JEWELRY, INC.
7 WEST 54TH STREET, 6TH FLOOR
NEW YORK, NY 10019-5404

REBECCA ENIS
3619 BOWNE STREET, APT. 2F
FLUSHING, NY 11354-4522

ROCKET RED BOX, INC.
375 EXECUTIVE BOULEVARD, SUITE W-4
ELMSFORD, NY 10523-1228

ROSEN & ASSOCIATES, P.C.
Attorneys for UOB Realty (USA)
Limited Partnership
747 Third Avenue
New York, NY 10017-2803

ROSS METALS
54 WEST 47TH STREET
NEW YORK, NY 10036-8604

ROYAL CHAIN
2 WEST 46TH STREET, 2ND FLOOR
NEW YORK, NY 10036-4525

Receivers of Firestar Diamond BVBA, by I. Me
Mertens I & Van Camp E.
52-54 Molenstraat
Antwerp 2018 Belgium

S. BICHACHI BLUEMENFELD DIAMOND CO.
580 FIFTH AVENUE, SUITE 608
NEW YORK, NY 10036-4725

S. Bichachi Blumenfeld Diamond Corp.
580 5th Ave. Suite 608
New York, NY 10036-4725

SAMUEL SANDBERG
310 RIVERSIDE DRIVE, APT. 315
NEW YORK, NY 10025-4116

SHARON THOMSON
600 N. DEARBORN STREET, APT. #1802
CHICAGO, IL 60654-6328

SIGNATURE B&B COMPANIES
501 FRANKLIN AVENUE
GARDEN CITY, NY 11530-5807

STAPLES BUSINESS ADVANTAGE
DEPT. NY, P.O. BOX 415256
BOSTON, MA 02241-5256

SYNERGIES CORP.
592 FIFTH AVENUE, 3RD FLOOR
NEW YORK, NY 10036-4707

Saul Ewing Arnstein & Lehr LLP
Attorneys for Fantasy Diamond, Inc.
1270 Avenue of the Americas
Suite 2005
New York, NY 10020-1719

Saumil Diam LLC
c/o Borges & Associates, LLC
575 Underhill Blvd., Ste. 118
Syosset, NY 11791-3438

Serpe Ryan LLP
Attorneys for Ajay Gandhi
16 Madison Square West, 10th Floor
New York, New York 10010-1629

TESSLER & WEISS
2389 VAUXHALL ROAD
P.O. BOX 3114
UNION, NJ 07083-1914

THE PLUMB CLUB ASSOCIATION
157 ENGLE STREET
ENGLEWOOD, NJ 07631-2508

TRC Master Fund LLC
PO Box 633
Woodmere, NY 11598-0633

TROUTMAN SANDERS LLP
Attorneys for Israel Discount
Bank of New York
875 Third Avenue
New York, NY 10022-6225

ULINE
2200 S. LAKESIDE DRIVE
WAUKEGAN, IL 60085-8311

UNITED PARCEL SERVICE
P.O. BOX 7247-0244
PHILADELPHIA, PA 19170-0001

(p) INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATIONS
PO BOX 7346
PHILADELPHIA PA 19101-7346

UOB Realty (USA) Limited Partnership
c/o Rosen & Associates, P.C.
Attn: Sanford P. Rosen, Esq.
747 Third Ave.
New York, NY 10017-2850

US INTERNAL REVENUE SERVICE
1 CLINTON AVENUE
ALBANY, NY 12207-2335


United States Trustee
Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10014-7016

Vedder Price P.C.
Attorneys for Marks Paneth LLP
1633 Broadway, 31st Floor
New York, New York 10019-6764

W.R. COBB COMPANY
800 WATERMAN AVENUE
EAST PROVIDENCE, RI 02914-1728


WHITE AND WILLIAMS, LLP
7 Times Square, Suite 2900
New York, NY 10036-6516

WINTER MANAGEMENT CORP.
680 FIFTH AVENUE, 23RD FLOOR
NEW YORK, NY 10019-5429

WORLD DIAMOND DISTRIBUTION FZE
OFFICE #D-3, PHASE-II, BOX #50
FUJAIRAH FREE ZONE, FUJAIRAH
UNITED ARAB EMIRATES


Wachtel Missry LLP
Attorneys for Jewelex New York, Ltd.
885 2nd Ave., 47th Fl.
NY, NY 10017-2229

White & Case LLP
Attorneys for the Ministry of Corporate
Affairs of the Union of India
1221 Avenue of the Americas
New York, NY 10020-1001

Ajay Gandhi
Cruser, Mitchell, Novitz, Sanchez, Gasto
341 Conklin Street, Second Floor
Farmingdale, NY 11735-2658


Brendan M. Scott
Klestadt Winters Jureller
Southard & Stevens, LLP
200 West 41st Street
17th Floor
New York, NY 10036-7219

Christopher J Reilly
Klestadt Winters Jureller Southard & Ste
200 West 41st Street
17th Floor
New York, NY 10036-7219

Gerard R. Luckman
Forchelli Deegan Terrana
333 Earle Ovington Boulevard
Ste 1010
Uniondale, NY 11553-3645


Ian R. Winters
Klestadt Winters Jureller
Southard & Stevens, LLP
200 West 41st Street
17th Floor
New York, NY 10036-7219

Joseph Corneau
Klestadt Winters et al.
200 West 41st Street
17th Floor
New York, NY 10036-7219

Marc B. Hankin
Jenner & Block LLP
1155 Avenue of the Americas
New York, NY 10036-2711


Mihir Bhansali
c/o White and Williams, LLP
Attn: Thomas E. Butler, Esq.
7 Times Square, Suite 2900
New York, NY 10036-6516

Rakhi Bhansali
c/o White and Williams, LLP
Attn: Thomas E. Buttler, Esq.
7 Times Square, Suite 2900
New York, NY 10036-6516

Richard B. Levin
1155 Avenue of the Americas
New York, NY 10036-2711


Scott Gurtman
Cruser, Mitchell, Novitz, Sanchez, Gasto
341 Conklin Street, Second Floor
Farmingdale, NY 11735-2658

Sean C. Southard
Klestadt Winters Jureller Southard
& Stevens, LLP
200 West 41st Street
17th Fl.
New York, NY 10036-7219

Stephanie R Sweeney
Klestadt Winters Jureller Southard & Ste
200 West 41st Street
17th Floor
New York, NY 10036-7219


The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


MALCA-AMIT CHB, INC.
153-66 ROCKAWAY BOULEVARD
JAMAICA, NY 11434

(d)MALCA-AMIT USA, LLC
ATTN: SHLOMO MALKA
153-66 ROCKAWAY BOULEVARD
JAMAICA, NY 11434

UNITED STATES TREASURY
C/O EXTRACTING STOP 312
201 W. RIVER CENTER BOULEVARD
COVINGTON, KY 41011

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

| | | |
|---|---|---|
| (u)Acutus Advisory Limited | (u)Alvarez and Marsal Disputes and Investigat | (u)Baker & Hostetler LLP |
| (u)Costco Wholesale Corporation | (u)Fantasy Diamond, Inc. | (u)Fasken Martineau DuMoulin LLP |
| (u)Firestar Diamond Interational, Inc. | (u)Firestar Group, Inc. | (u)Frankfurt Kurnit Klein & Selz P.C. |
| (u)Gail Stern Consulting LLC. | (u)Gem Certification & Assurance Lab | (u)Getzler Henrich & Associates LLC |
| (u)HSBC BANK USA, N.A. | (u)J. C. Penney Corporation, Inc. | (u)Jenner & Block LLP |
| (u)Klestadt Winters Jureller Southard & Steve | (u)Lackenbach Siegel, LLP | (u)Liberty Mutual Insurance Company |
| (u)Marks Paneth LLP | (u)Ministry of Corporate Affairs of the Union | (u)Paramount Jewels, LLC d/b/a Paramount Gems |
| (u)Punjab National Bank | (u)Receivers of Firestar Diamond BVBA | (u)Saumil Diam LLC |
| (u)Synergies Corp. | (u)Whitley Penn, LLP | (u)Bank of India (London Branch)<br>63 Queen Victoria Street<br>4th Floor<br>London EC4N 4UA<br>United Kingdom |

(d)FANTASY, INC.
592 FIFTH AVENUE, 3RD FLOOR
NEW YORK, NY 10036-4707

(u)FIRESTAR DIAMOND BVBA
ANTWERP DIAMOND HOUSE, 4TH FLOOR
HOOVENIERSSTRAAT 30, BUS 119, #441
ANTWERPEN 2018

(u)FIRESTAR DIAMOND INT'L P LTD.
PLOT #17/18/19, UNIT #2
1ST FLOOR, SURAT SPECIAL ECONOMI
SACHIN, SURAT  394230

(u)FIRESTAR INTERNATIONAL P LTD.
PLOT #17/18/19, UNIT #2, 1ST F
SURAT SPECIAL ECONOMI
SACHIN, SURAT 394230

(d)NYS Department of Taxation & Finance
15 MetroTech Center
Brooklyn, NY 11201-3818

(u)Union Bank of India (UK) Ltd.
85 Queen Victorial Street
London EC4V 4AB
United Kingdom

(u)John J. Carney

(u)Mark G. Samson

(u)Michael J. Agusta

(u)Neil Bivona

(u)Richard Levin

End of Label Matrix
Mailable recipients    173
Bypassed recipients     38
Total                  211

EXHIBIT D

38
37

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| FIRESTAR DIAMOND, INC., *et al.* | No. 18-10509 (SHL) |
| Debtors. | (Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of FIRESTAR DIAMOND, INC., FANTASY, INC., and OLD AJ, INC. f/k/a A. JAFFE, INC., | Adv. Proc. No. _____ |
| Plaintiff, | |
| v. | |
| AMI JAVERI (A/K/A AMI MODI); PURVI MEHTA (A/K/A PURVI MODI); NEHAL MODI; NEESHAL MODI; CENTRAL PARK REAL ESTATE, LLC; CENTRAL PARK SOUTH 50 PROPERTIES, LLC; TRIDENT TRUST COMPANY (SOUTH DAKOTA) INC., solely as Trustee of the ITHACA TRUST; TWIN FIELDS INVESTMENTS LTD.; AURAGEM COMPANY LTD.; BRILLIANT DIAMONDS LTD.; ETERNAL DIAMONDS CORPORATION LTD.; FANCY CREATIONS COMPANY LTD.; HAMILTON PRECIOUS TRADERS LTD.; SINO TRADERS LTD.; SUNSHINE GEMS LTD.; UNIQUE DIAMOND AND JEWELLERY FZC; WORLD DIAMOND DISTRIBUTION FZE; VISTA JEWELRY FZE; EMPIRE GEMS FZE; UNIVERSAL FINE JEWELRY FZE; DIAGEMS FZC; TRI COLOR GEMS FZE; PACIFIC DIAMONDS FZE; HIMALAYAN TRADERS FZE; UNITY TRADING FZE; FINE CLASSIC FZE; DG BROTHERS FZE, | |
| Defendants. | |

COMPLAINT TO AVOID AND RECOVER ACTUAL FRAUDULENT TRANSFERS AND
FOR DAMAGES FOR CONSPIRACY TO VIOLATE THE RACKETEERING INFLUENCED
CORRUPT ORGANIZATIONS ACT



## TABLE OF CONTENTS

NATURE OF THE ACTION.................................................................................................1

JURISDICTION AND VENUE............................................................................................3

THE PARTIES & OTHER RELEVANT ENTITIES .............................................................4

    I.    The Debtors and Trustee.........................................................................................4

    II.   The U.S. Affiliates ...................................................................................................4

    III.  The Defendants .......................................................................................................5

BACKGROUND...................................................................................................................7

    I.    The Bank Fraud. ...................................................................................................10

        A.    Mechanics of the Bank Fraud.....................................................................10

        B.    The Debtors' and U.S. Affiliates' Role in the Bank Fraud.........................16

        C.    Involvement of U.S. Entities' Directors and Officers in the Bank Fraud...17

        D.   Involvement of Mehul Choksi, Nehal Modi, Neena Sheth, Deepak Sheth, and
              Abhay Javeri, and the Sheth Entities and SDC Entities in the Bank Fraud.........27

        E.    Laundering of Funds Through Twin Fields and Bailey Banks & Biddle........30

        F.    Detection and Exposure of the Bank Fraud...............................................33

    II.   Criminal Efforts Shortly Before and Following Exposure of the Bank Fraud.........36

        A.    Looting of the Debtors, U.S. Affiliates, and Other Firestar Entities ...........36

        B.    Fraudulent Omissions, Misstatements, and Misrepresentations Made in
              Connection With The Debtors' Chapter 11 Cases.......................................46

        C.    Other Efforts to Cover Up and Frustrate Investigation of the Bank Fraud...........50

        D.   Money Laundering to Modi Family Members Prior to Exposure of the Bank Fraud ..54

CLAIMS FOR RELIEF .....................................................................................................70

COUNTS............................................................................................................................70

PRAYER FOR RELIEF.....................................................................................................139

40
39

Plaintiff Richard Levin, not individually but solely as chapter 11 trustee ("Trustee" or "Plaintiff") for Debtors Firestar Diamond, Inc., Fantasy, Inc., and Old AJ, Inc. f/k/a A. Jaffe, Inc. (collectively, the "Debtors") and as holder of a judgment jointly and severally against, and as assignee of all claims of, Synergies Corporation ("Synergies"), Firestar Group, Inc. ("FGI"), Firestar Diamond International, Inc. ("FDII"), Nirav Modi, Inc. ("NMI"), and AVD Trading, Inc. ("AVD") (collectively, the "U.S. Affiliates," together with the Debtors, the "U.S. Entities") for his Complaint alleges as follows:

### NATURE OF THE ACTION

1.    The Trustee brings this action, consisting of both estate claims and claims assigned to the Trustee by U.S. affiliates, to recover damages suffered as a result of the Modi family's nearly decade-long racketeering conspiracy lasting from at least 2010 to mid-2018 (the "Relevant Period"). The conspiracy resulted in the diversion of hundreds of millions of dollars of assets for the benefit of the Modi family members and other conspirators, the collapse of the U.S. Entities, and the resulting loss of the value of the U.S. Entities' businesses. Each of the Defendants joined and supported the Modi family's racketeering conspiracy as it morphed from bank fraud and money laundering to obstruction of justice and looting.

2.    Nirav Modi's sister, Purvi Mehta, agreed to act as the beneficial owner of numerous shell companies Nirav Modi used to commit the largest bank fraud in Indian history. Mehta then personally laundered over $100 million of the ill-gotten proceeds through the Modi family's web of shell companies, family trusts, family members, and otherwise-legitimate businesses — destroying those businesses in the process.

3.    Nirav Modi's wife, Ami Javeri, agreed to serve as a partner of the three India-based the companies in whose name Nirav Modi obtained nearly $3.5 billion in fraudulent loans (defined below as the LOU Entities). Javeri then managed and facilitated the Modi family's

**40**

systematic efforts to launder and shield from creditors the proceeds of the fraud, including over $30 million in real estate.

4.    Nirav Modi's brother, Nehal Modi, traveled around the world after exposure of the fraud destroying evidence, tampering with witnesses, and securing assets from seizure by government authorities and creditors. Early in these chapter 11 cases before the Trustee's appointment, Nehal Modi also enlisted several of his personal friends to loot the U.S. Affiliates' more than $40 million in inventory and cash so that those funds could not be used to pay the U.S. Affiliates' substantial debts to the Debtors.

5.    Nirav Modi's other brother, Neeshal Modi, also served as a partner of the three LOU Entities, as beneficial owner of numerous Shadow Entities and other shell companies, and as one of the key day-to-day managers of the fraudulent import and export transactions supporting the bank fraud. Neeshal Modi also personally selected and hired various "dummy" directors, officers, and other personnel for the web of companies secretly owned by his family. He also played his part in the family money laundering operation, including by holding a power of attorney for his sister Purvi Mehta, in whose name the ill-gotten proceeds were held in bank accounts across the globe.

6.    The Ithaca Trust, Central Park South 50 Properties, LLC, and Central Park Real Estate LLC, which together hold the Modi family's two Manhattan apartments, are nothing more than contrivances used by the Modi family to shield more than $30 million of their ill-gotten wealth from creditors.

7.    Twin Fields Investments Ltd. is the Delaware shell company through which the Modi family secretly owned and operated *Bailey Banks & Biddle* retail stores as another front for its money laundering operations. The Modi family laundered over $80 million through Twin Fields during the Relevant Period.

2

42
41

8.    The remaining Defendants, defined below as Shadow Entities, comprise the numerous Hong Kong and Dubai-based companies the Modi family secretly owned, yet represented as independent vendors and customers to banks, auditors, and even this Court.

9.    The Trustee also seeks to avoid numerous fraudulent transfers of the Debtors' assets made to the Defendants, and in his capacity as judgment creditor of the U.S. Affiliates, seeks to avoid fraudulent transfers of the U.S. Affiliates' assets made to the Defendants.

JURISDICTION AND VENUE

10.    The United States District Court for this district (the "District Court") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) because this adversary proceeding arises under title 11 of the United States Code and arises in and is related to these chapter 11 cases and under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because this adversary proceeding arises under the laws of the United States, including 18 U.S.C. § 1962, and seeks recovery for injuries by reason of a violation of 18 U.S.C. § 1962. This Court has authority to hear this adversary proceeding by reason of the District Court's referral under 28 U.S.C. § 157(a) and under General Order M-431 (Amended Standing Order of Reference).

11.    This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(H) and (O) with respect to Counts 7 to 54, which this Court has authority to hear and determine, and is not a core proceeding with respect to Counts 1 to 6.

12.    To the extent that this Court does not have authority to determine the claims asserted in this adversary proceeding and to enter final judgment thereon, the Trustee consents to the issuance and entry of a final judgment or order by this Court.

13.    Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

3

43

42

## THE PARTIES & OTHER RELEVANT ENTITIES

### I.    The Debtors and Trustee

14.    Debtor Firestar Diamond, Inc. (f/k/a Firestone, Inc.) ("FDI") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, FDI principally operated a wholesale jewelry business.

15.    Debtor Fantasy, Inc. ("Fantasy") is a privately-held Delaware corporation, with its principal place of business in New York. While in operation, Fantasy was principally a wholesale jewelry business. At all relevant times, FDI owned 100% of the equity interests in Fantasy.

16.    Debtor Old AJ, Inc. (f/k/a A. Jaffe, Inc., f/k/a Sandberg & Sikorski Corp.) ("Jaffe") is a privately-held New York corporation, with its principal place of business in New York. While in operation, Jaffe was principally a wholesale bridal jewelry business.

17.    Plaintiff Richard Levin is the chapter 11 trustee for the Debtors, duly appointed under section 1104(a) of the Bankruptcy Code by the United States Trustee for Region 2 on June 14, 2018, whose appointment was approved by this Court by order entered that same day. The Trustee brings this action, not individually, but solely in his capacity as Trustee.

### II.    The U.S. Affiliates

18.    FGI, a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in FDI. Samuel Sandberg owns the remaining approximately 5% of FDI.

19.    Synergies, a Delaware corporation, is a holding company that owns approximately 95% of the equity interests in Jaffe and 100% of the equity interests in FGI. Samuel Sandberg owns the remaining approximately 5% of Jaffe.

20.    FDII, a Delaware corporation, operated primarily as a loose diamond trading business.

4

44
43

21.    NML a Delaware corporation, operated *Nirav Modi*-branded retail boutiques in New York, Los Angeles, Las Vegas, and Honolulu.

22.    On January 15, 2020, the Trustee and the U.S. Affiliates entered into a settlement agreement under which the U.S. Affiliates assigned to the Trustee any and all claims or causes of action then-owned or subsequently acquired by the U.S. Affiliates and consented to entry of a judgment jointly and severally against the U.S. Affiliates in the amount of $23,116,505.44. (*See* Dkt. 1366.)

23.    Judgment in that amount was entered on February 18, 2020. (Adv. No. 20-01014; Dkt. 3.)

III.    **The Defendants**

24.    Defendant Ami Javeri (a/k/a Ami Modi) is a New York resident and is Nirav Modi's wife.

25.    Defendant Purvi Mehta (a/k/a Purvi Modi) is a Hong Kong resident and is Nirav Modi's sister.

26.    Defendant Nehal Modi is a Texas resident and is Nirav Modi's second-youngest brother.

27.    Defendant Neeshal Modi is a Belgium resident and is Nirav Modi's youngest brother.

28.    Defendant Trident Trust Company (South Dakota) Inc., solely as trustee of the Ithaca Trust ("Trident"), is a South Dakota corporation and is the Trustee of The Ithaca Trust. The Ithaca Trust is an irrevocable trust governed by South Dakota law.

29.    Defendant Central Park Real Estate LLC ("CPRE") is a Delaware limited liability company.

5

45

44

30.    Defendant Central Park South 50 Properties LLC ("CPS50") is a New York limited liability company.

31.    Defendant Twin Fields Investments Ltd. ("Twin Fields") is a Delaware corporation.

32.    Defendant Auragem Company Ltd. ("Auragem") is a Hong Kong company and is alleged herein to be a Shadow Entity.

33.    Defendant Brilliant Diamonds Ltd. ("Brilliant") is a Hong Kong company and is alleged herein to be a Shadow Entity.

34.    Defendant Eternal Diamonds Corporation Ltd. ("Eternal") is a Hong Kong company and is alleged herein to be a Shadow Entity.

35.    Defendant Fancy Creations Company Ltd. ("Fancy Creations") is a Hong Kong company and is alleged herein to be a Shadow Entity.

36.    Defendant Hamilton Precious Traders Ltd. ("Hamilton") is a Hong Kong company and is alleged herein to be a Shadow Entity.

37.    Defendant Sino Traders Ltd. ("Sino") is a Hong Kong company and is alleged herein to be a Shadow Entity.

38.    Defendant Sunshine Gems Ltd. ("Sunshine") is a Hong Kong company and is alleged herein to be a Shadow Entity.

39.    Defendant Unique Diamond and Jewellery FZC ("Unique") is a UAE company and is alleged herein to be a Shadow Entity.

40.    Defendant World Diamond Distribution FZE ("World Diamond") is a UAE company and is alleged herein to be a Shadow Entity.

41.    Defendant Vista Jewelry FZE ("Vista") is a UAE company and is alleged herein to be a Shadow Entity.

6

46

45

42.   Defendant Empire Gems FZE ("Empire") is a UAE company and is alleged herein to be a Shadow Entity.

43.   Defendant Universal Fine Jewelry FZE ("Universal") is a UAE company and is alleged herein to be a Shadow Entity.

44.   Defendant Diagems FZE ("Diagems") is a UAE company and is alleged herein to be a Shadow Entity.

45.   Defendant Tri Color Gems FZE ("Tri Color") is a UAE company and is alleged herein to be a Shadow Entity.

46.   Defendant Pacific Diamonds FZE ("Pacific") is a UAE company and is alleged herein to be a Shadow Entity.

47.   Defendant Himalayan Traders FZE ("Himalayan") is a UAE company and is alleged herein to be a Shadow Entity.

48.   Defendant Unity Trading FZE ("Unity") is a UAE company and is alleged herein to be a Shadow Entity.

49.   Defendant Fine Classic FZE ("Fine Classic") is a UAE company and is alleged herein to be a Shadow Entity.

50.   Defendant DG Brothers FZE ("DG Brothers") is a UAE company and is alleged herein to be a Shadow Entity.

**BACKGROUND**

51.   Nirav Modi entered the diamond business around 2000 under the name Diamonds 'R' Us, an India partnership formed by Modi, Modi's uncle Mehul Choksi, and Modi's business partner Hemant Bhatt.

52.   In 2004, Nirav Modi founded Firestone International Private Ltd. ("FIL" or "FIPL," together with all of its direct and indirect subsidiaries, the "Firestar Entities"), later known as

7



Firestar International Private Ltd., and now known as Firestar International Ltd. FIPL operated as a diamond trading business in India and the parent of the global Firestar corporate umbrella. Nirav Modi has at all relevant times been the owner of substantially all of the equity interests in FIPL.

53.    In 2006, Nirav Modi formed India-based Firestar Diamond International Pvt. Ltd. ("FDIPL") as a wholly owned subsidiary of FIPL. FDIPL operated diamond and jewelry manufacturing operations from factories in India. FDIPL manufactured a substantial portion of the inventory sold by other Firestar Entities.

54.    Over time, Nirav Modi expanded the Firestar Entities' operations to the U.S., Hong Kong, Dubai, and Europe. Nirav Modi, acting through FIL and its subsidiaries, acquired the company that became FDI (then known as Firestone, Inc.) in 2005; acquired a 95% interest in Jaffe (then known as Sandberg & Sikorski Corp.) from Samuel Sandberg and Stanley Sikorski in 2007, and incorporated Fantasy in 2012. In connection with Nirav Modi's indirect acquisition of Jaffe, Samuel Sandberg received an equity interest in FDI.

55.    The U.S. Entities' operations were managed and controlled by Nirav Modi's cousin, Mihir Bhansali. At all relevant times, Mihir Bhansali served as the sole director and Chief Executive Officer of FDI and Fantasy, and as the sole director and President of Jaffe. Bhansali also served as the sole director of each U.S. Affiliate, as well as the Chief Executive Officer of Synergies, FGI, and NMI. Bhansali also served as a director of FIPL. In the context of both the Firestar Entities' legitimate operations and the fraudulent schemes described below, Mihir Bhansali served as Nirav Modi's second-in-command.

56.    Mihir Bhansali's own top lieutenant, Ajay Gandhi, served as the Chief Financial Officer of each of the Debtors and U.S. Affiliates for the entirety of the Relevant Period with the

8

48
47

exception of a brief 3-month departure in 2013. As alleged below, Mihir Bhansali and Ajay Gandhi managed the fraudulent aspects of Nirav Modi's U.S. operations.

57.   The Hong Kong-based Firestar Entities included Firestar Holdings Ltd. ("FHL"), Firestar Diamond Ltd. ("FDL"), Firestar Jewelry Ltd. ("FJL") and Nirav Modi Ltd. ("NML"). FHL, a wholly owned subsidiary of FIPL, had no operations of its own and instead acted as the primary holding company for the Hong Kong, Dubai, Europe, and eventually U.S.-based Firestar Entities.

58.   FDL and FJL, both wholly owned subsidiaries of FHL, each operated as a polished diamond trading business analogous to FDI in New York. FDL and FJL were managed by Aditya Nanavati, the Head of Asia-Pacific in the global Firestar umbrella. Shyam Wadhwa, FIPL's vice president of finance, served as the de facto chief financial officer of the Hong Kong-based Firestar Entities. Nanavati exercised general oversight over the Hong Kong-based Shadow Entities and Wadhwa managed their bank accounts and finances.

59.   NML, a wholly owned subsidiary of FHL, is the principal holding company for subsidiaries operating Nirav Modi-branded boutiques around the globe, including New York-based NMI (which operated the U.S. boutiques) and UK-based Nirav Modi Ltd. ("NMLUK") (which operated the London boutique). Angelina Ypma (a/k/a Angelina Nguyen) served as global president of the Nirav Modi brand and as a director of NML and FIPL. Purvi Mehta was also involved in the operations of NML and its subsidiaries as creative director of the Nirav Modi brand.

60.   The Dubai-based Firestar Entities included Firestar Diamond FZE ("FDFZE"), which operated as a polished diamond trading business, and Firestar Diamond FZCO ("FDFZCO"), which manufactured jewelry. FHL is the 100% owner of both FDFZE and FDFZCO. Satyendra Shukla, the Head of Middle East within the global Firestar umbrella, managed FDFZCO. Kurian Mathews ran FDFZE's operations as general manager. Saju Poulose managed

9

the Dubai-based Firestar Entities' finances, books and records, and bank accounts as the de facto chief financial officer. Shukla, Mathews, and Poulose also exercised broad oversight over the Dubai-based Shadow Entities' operations and finances.

61.     Firestar Diamond BVBA ("FDBVBA"), a Belgium company, operated as a rough diamond trading and manufacturing business. FDBVBA was managed by Nirav Modi's youngest brother, Neeshal Modi, in Antwerp, Belgium. Neeshal Modi was also involved with the Dubai Firestar Entities. Throughout the Relevant Period, FDBVBA traded extensively with Shadow Entities in Hong Kong and Dubai in furtherance of the fraudulent scheme alleged below.

I.     The Bank Fraud.

   A.     *Mechanics of the Bank Fraud*

62.     From no later than 2010 to early 2018, Nirav Modi orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from numerous banks, including Punjab National Bank ("PNB"), a publicly-owned Indian bank majority owned by the central government of India (as set forth in more detail below, the "Bank Fraud").

63.     The Bank Fraud involved the fraudulent procurement of buyer's credit issued under letters of undertaking ("LOUs"), a financial instrument unique to India designed to facilitate efficient import transactions.

64.     When used legitimately, LOUs allow an importer to forego the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank in India, secured by invoices for the to-be imported goods. The issuing bank, in turn, enters into the foreign currency transaction: it requests a foreign branch of another Indian bank to transmit funds into the issuing bank's own account (referred to as its nostro—"our"—account) at the

10

**49**

foreign branch of a third bank to pay the exporter in its local currency. The issuing bank then repays the intermediary bank and recoups the loan from the importer (or the imported goods serving as its collateral).

65.  Since each LOU requires an import transaction, an importer's LOU borrowing capacity is tied directly to its import volume—the more imports, the more LOU funding available.

66.  Nirav Modi and his co-conspirators conspired to take advantage of this feature by artificially inflating the import volume of Nirav Modi's India-based companies—most notably Diamonds 'R' Us ("DRUS"), Solar Export ("Solar"), and Stellar Diamond ("Stellar") (collectively, the "LOU Entities")—with sham transactions so as to obtain more and more LOU funding.

67.  Nirav Modi, Ami Modi, Neeshal Modi, and Mehul Choksi, among others, each served as partner of each LOU Entity during the Relevant Period.

68.  In 2016, Neeshal Modi selected and appointed additional "dummy" partners for the LOU Entities. Neeshal Modi, together with Mihir Bhansali, also selected and hired various Shadow Entity personnel during the Relevant Period.

69.  Ami Modi served as a partner of Solar and Stellar and, in 2010, opened bank accounts Solar and Stellar used to defraud PNB.

70.  PNB and other banks advanced amounts equal to over $1 billion under LOUs for the benefit of entities under Modi's control in connection with imports to India without the ordinarily-required collateral.

71.  To carry out this scheme, Nirav Modi and his co-conspirators utilized a web of shadow entities to engage in fraudulent and fictitious import transactions, including Defendants Auragem, Brilliant, Eternal, Fancy Creations, Sino, Sunshine, Unique, World Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, Unity, and Fine Classic (collectively,

11



the "Shadow Entities," together with the Firestar Entities, LOU Entities, and all other entities
controlled by Nirav Modi and his family members, the "Modi-Controlled Entities").

72.    Though designed to look like legitimate independent businesses, the Shadow
Entities were no more than shell companies controlled by Modi and his co-conspirators. They
conducted virtually no legitimate business, but instead existed only to further the Bank Fraud by
conducting bogus transactions with the LOU Entities, Firestar Entities, and other Modi-
Controlled Entities and laundering the ill-gotten proceeds.

73.    The two primary clusters of Shadow Entities operated from Hong Kong and
Dubai. The Hong Kong-based Shadow Entities included Auragem, Brilliant, Eternal, Fancy
Creations, Sino, and Sunshine. The Dubai-based Shadow Entities included Unique, World
Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, and Unity.

74.    The Shadow Entities were mostly registered at either small, unoccupied offices or
at single, leased desks within shared offices. They had almost identical websites with similar
backgrounds, fonts, contact pages, and language.

75.    An Indian consultant told Indian authorities that around 2010, Mihir Bhansali
sought assistance setting up two layers of British Virgin Island ("BVI") holding companies for
the Dubai-based Shadow Entities that would be owned by Purvi Modi and Neeshal Modi.

76.    The top layer consisted of Madison Capital Private Limited ("Madison") and
Moore Private Investments Ltd. ("Moore"). Mihir Bhansali completed all of the paperwork
relating to the formation of these two entities. Purvi Mehta and Neeshal Modi were declared the
ultimate beneficial owners of these companies to the BVI authorities.

77.    Madison and Moore each held 50% of the shares of each of ten second-layer BVI
entities: Global Investing Group Ltd., Xclusive Consultants Ltd., Ashmoore Developments Ltd.,
Beacon Horizon Investments Ltd., Century Group Global Investments Ltd., Pushpin Trading

12

51

Ltd., Royce Group Private Ltd., Integrated Investing Ltd., Panera Assets Inc., and Ideal Star

Consultants Ltd. Mihir Bhansali chose all of these entities' names. Moore served as the director

of each of these entities. Purvi Mehta and Neeshal Modi were also declared the ultimate beneficial

owners of these companies to the BVI authorities.

78.     These second-layer BVI entities then served as holding companies for Dubai-based

Shadow Entities Tri Color, Diagems, Empire, Unique, World Diamond, Pacific, Universal, and

Vista.

79.     Mihir Bhansali maintained a spreadsheet tracking the operational status of the

Dubai-based Shadow Entities.

80.     The LOU Entities and Shadow Entities traded exclusively or nearly exclusively

with other Modi-Controlled Entities. The following table reflects the extent to which the LOU

Entities traded exclusively with Shadow Entities and Firestar Entities:

| | Fiscal Year 2012 - 2017 | | | | | |
|---|---|---|---|---|---|---|
| LOU Entity | Sales to Listed Modi-Controlled Entities as % of Gross Sales | | | Purchases from Listed Modi-Controlled Entities as % of Total Costs of Goods Sold | | |
| | Shadow Entities | Firestar Entities | Total | Shadow Entities | Firestar Entities | Total |
| DRUS | 88.4% | 7.5% | 95.9% | 99.7% | 0.4% | 100.1% |
| Stellar | 98.7% | 0.5% | 99.2% | 100.1% | 0.3% | 100.3% |
| Solar | 98.9% | 0.7% | 99.6% | 99.9% | 0.1% | 100.0% |

81.     From around 2013 onward, Nirav Modi and his co-conspirators used the Shadow

Entities as an intermediary between the LOU Entities and Firestar Entities. PNB and other banks

were aware of Nirav Modi's affiliation with the LOU Entities and the Firestar Entities, but his

affiliation with the Shadow Entities was hidden from the banks.

82.     The Shadow Entity import and export transactions purported to involve arm's-

length sales of highly valuable loose diamonds, pearls, gold, silver, and other jewelry. In truth,

these transactions had no legitimate economic purpose and routinely involved goods that (i) did

13



not exist, (ii) were never transferred, (iii) were transferred at prices having nothing to do with market value, but instead based on whatever amounts were necessary to reconcile the Shadow Entities' and Firestar Entities' books and records so as to conceal other transfers made for illegitimate purposes, or (iv) were transferred in "circular transactions," in which the same goods were exported from and re-imported among Modi-Controlled Entities multiple times at varying and often inflated prices to give the appearance of multiple distinct transactions for the sole purpose of artificially increasing the entities' import volume.

83.    According to statements made by various Firestar Entity and Shadow Entity employees to Indian authorities:

(i)    FIL, FDIPL, and other India-based Firestar Entities would export jewelry to Shadow Entities in Dubai and Hong Kong, where, at least in some instances, the diamonds would be removed and then subsequently re-exported for further import and the precious metals melted.

(ii)    None of jewelry exported from India to the Shadow Entities was ever returned as defective, substandard, or otherwise noncompliant, as would be expected in the course of an arm's length vendor-customer relationship.

(iii)    Orders placed by Shadow Entities frequently lacked the formality, exactness, and diligence that ordinarily would be expected of transactions with a bona fide third party. For example, V. Suresh Ramnath Naidu, a director of Diagems, told Indian authorities that he signed blank invoices, but never actually saw any of the diamonds or jewelry.

84.    Modi-Controlled Entities also obtained additional funding through packing credit loans, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods. In the context of the Bank Fraud, the India-based Modi-Controlled Entities would obtain packing credit loans on the basis of purported orders from other Modi-Controlled Entities overseas. However, packing credit loan proceeds were frequently diverted for other purposes, including the repayment of outstanding LOUs.

14

**53**

85.    Many of the Shadow Entities' directors were current or former employees of Firestar Entities. In addition, many Shadow Entity employees were current or former employees of Firestar Entities.

86.    The transactions between and among Firestar Entities, LOU Entities, and Shadow Entities furthered the Bank Fraud by: (1) inflating the Indian entities' LOU borrowing capacity by artificially inflating their import volumes for LOUs and export volume for packing credit loans; (2) facilitating the repayment of some but not all outstanding LOUs and packing credit loans; (3) laundering the fraudulent proceeds by making them difficult to trace and siphoning them to Modi and his co-conspirators; and (4) making it difficult for auditors, lenders, and regulatory bodies to detect the Bank Fraud.

87.    Transfers for these purposes were concealed in various ways, including: (a) round trip transactions of gems, jewelry, or funds in which Modi-Controlled Entities transferred assets amongst themselves without any legitimate economic purpose; (b) buying and selling gems at inflated or deflated prices; (c) characterizing transfers as loans or loan repayments or advances against future purchases or returns of such advances; and (d) in some instances, fraudulently doctoring books and records outright.

88.    To facilitate the continuing flow of LOUs and to prevent detection, Modi and others at his direction, including Manish Bosamiya, Subhash Parab, and Miten Pandya, worked with certain PNB employees, including Gokulnath Shetty, who authorized LOUs without securing collateral and without properly recording the LOUs in PNB's records.

89.    According to a forensic report issued by BDO in December 2019, PNB issued over 1,500 fraudulent LOUs to Modi-Controlled Entities during the Relevant Period involving approximately $3.5 billion.

15



### B. The Debtors' and U.S. Affiliates' Role in the Bank Fraud

90.    Nirav Modi, Mihir Bhansali, Ajay Gandhi, and other co-conspirators funneled millions of dollars in funds, precious gems, and jewelry through the U.S. Entities and their offices in furtherance of the Bank Fraud.

91.    In the early stages of the Bank Fraud scheme, from around 2010 to 2012 when the LOU Entities were still trading directly with Firestar Entities, the U.S. Entities were directly involved in import and export transactions underlying fraudulently procured LOUs. For example, in 2011, FDI and Jaffe were the exporters under and direct beneficiaries of five LOUs and one LOU, respectively, totaling $10,192,303.

92.    As an example of the Debtors' involvement in circular transactions, from August 8, 2011 to September 13, 2011, a period of five weeks, the Debtors exported the same 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once to and from various LOU Entities and Shadow Entities at widely divergent prices.

93.    Later in 2011, the Debtors engaged in another circular trading of a diamond that was recorded as a 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond. The diamond appeared in the Debtors' records in three transactions within six weeks of each other and was valued at a different price each time.

94.    From around 2013 onward, the Shadow Entities were used as intermediaries between the Firestar Entities and LOU Entities. PNB and other banks were aware of Nirav Modi's affiliation with the Firestar Entities and LOU Entities, but his affiliation with the Shadow Entities was hidden from them.

95.    During this period, the Debtors made numerous transfers to Shadow Entities linked to the repayment of outstanding LOUs so that the Bank Fraud could continue undisturbed.

16

55

96.    For example, on September 24, 2015, FDI transferred $1,840,969 to Auragem and $1,400,000 to Fancy Creations. A portion of these funds were used to repay an LOU issued to DRUS that became due on September 30, 2015.

97.    As another example, on February 26, 2016, FDI transferred $1,192,106 to Tri Color. On March 9, 2016, Tri Color transferred $1,647,000 to Solar. That same day, Solar transferred $2,087,000 to repay an LOU that became due on March 11, 2016.

98.    Consistent with these examples and others alleged herein, the Debtors' and U.S. Affiliates' Shadow Entity-linked transactions from 2013 onwards were effectuated for purposes related the Bank Fraud including to: (a) facilitate repayment of LOUs and packing credit loans so that the Bank Fraud could continue undisturbed; (b) provide Shadow Entities with the goods and funds the Shadow Entities needed to transact with the LOU Entities; (c) clear the Shadow Entities', Firestar Entities', and LOU Entities' accounts receivable and accounts payable so as to avert questions from auditors, lenders, and other third parties; and (d) divert the proceeds of the Bank Fraud for the benefit of Nirav Modi, Mihir Bhansali, their families and other co-conspirators.

99.    The U.S. Entities' records reflect hundreds of millions of dollars in cash transfers and inventory shipments among the U.S. Entities and Shadow Entities during the Relevant Period.

C.    *Involvement of U.S. Entities' Directors and Officers in the Bank Fraud*

100.    Certain of U.S. Entities' directors and officers, including Mihir Bhansali and Ajay Gandhi, participated in and advanced the Bank Fraud. As described below, Bhansali and Gandhi, in coordination with Nirav Modi, controlled all aspects of the Debtors' internal and external operations and affairs at all relevant times.

101.    As the ultimate controlling shareholder of all of the Firestar Entities, Nirav Modi, in coordination with Bhansali and Gandhi, orchestrated and oversaw fraudulent transactions

17



among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

102.    As the sole director of each of the U.S. Entities, and as CEO of FDI, Fantasy, Synergies, FGI, and NMI, Mihir Bhansali coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

103.    As CFO of each of the U.S. Entities, and in coordination with Nirav Modi and Mihir Bhansali, Ajay Gandhi coordinated and directed fraudulent transactions among the U.S. Entities, Shadow Entities, and other Modi-Controlled Entities involving hundreds of millions of dollars in funds and diamonds. These transactions were integral to the Bank Fraud.

104.    At all relevant times, Ajay Gandhi and Mihir Bhansali controlled the finances of the Debtors. Each had authority to approve loose diamond transactions among the U.S. Entities and the Shadow Entities totaling hundreds of millions of dollars. Gandhi and Bhansali were also each a signatory on each of the U.S. Entities' bank accounts, and their authorization was required to effectuate transfers from the U.S. Entities' accounts.

   *i.    Oversight and Control of Shadow Entities and LOU Entities*

105.    Nirav Modi and Mihir Bhansali, with the assistance of other co-conspirators coordinated and directed the operations of the Shadow Entities and LOU Entities to further the Bank Fraud. The following are some examples of that activity.

106.    Mihir Bhansali's prominent role in orchestrating the Bank Fraud is illustrated by several spreadsheets recovered from his work computer. Each of these spreadsheets was saved by Microsoft Excel's "AutoRecover" feature. Bhansali's computer did not contain any other versions of these spreadsheets, suggesting that he deleted them at some point. These spreadsheets are summarized as follows:



(i)    One spreadsheet, last modified on February 16, 2018, tracked millions of dollars in payables and receivables as between each of the LOU Entities, Firestar Entities, and Shadow Entities.

(ii)   Another spreadsheet, last modified on February 18, 2018, appears to be a step-by-step guide to the mechanics and economics of circular transactions between Firstar Entities and Shadow Entities. Another auto-saved version of this spreadsheet, saved eleven minutes earlier, contains only a portion of the guide, demonstrating that Bhansali himself created the spreadsheet.

(iii)  Another spreadsheet, created on February 12, 2018 and last modified on February 13, 2018, appears to be a "to do" list for various co-conspirators after the exposure of the Bank Fraud. The tasks included researching their potential criminal liability, "cleaning up" outstanding A/R and A/P balances among Firestar Entities and Shadow Entities, and sending the Dubai-based Shadow Entities' computers to Hong Kong.

(iv)   Another spreadsheet, last modified on January 8, 2018, shows, for the fiscal years 2012 through 2017, each LOU Entity's (a) profits & losses, (b) outstanding bank loans, (c) cash flow to trusts benefitting Nirav Modi's family, and (d) volume of transactions with various Shadow Entities and Firestar Entities.

107.   Bhansali personally oversaw the creation of the Shadow Entities and LOU Entities and the selection of their principals, directors, officers, and employees.

108.   Bhansali also personally completed employee performance appraisals for individuals involved in the operations of Shadow Entities and LOU Entities.

109.   Bhansali's electronic calendar contained several entries, which, upon information and belief, refer to his discussions in the course of managing the operations of the LOU Entities (i.e. Solar, Stellar, and Diamonds R Us), including: (a) a meeting scheduled for April 4, 2016 with the subject "SSD conversation;" and (b) a meeting scheduled for April 6, 2016 with the subject "SSD infrastructure," with an invite to Saju Paulose.

110.   On January 19, 2010, Ajay Gandhi directed Bhavesh Patel to prepare an aging report for accounts receivables owed to FDI excluding "affiliates such as . . . Unique", demonstrating that Gandhi knew Unique was a related party.

19

111.    On May 27, 2010, Mihir Bhansali directed Aditya Nanivati to make Bhansali, Nanivati, Purvi Mehta, and Neeshal Modi authorized users of FDL's Standard Chartered Bank account. With respect to the physical devises necessary to approve transfers, he instructed Nanivati to send Purvi Mehta's device to Hemant Bhatt and Neeshal Modi's device to Ajay Gandhi. These devices enabled Bhatt and Gandhi to transfer funds out of FDL's bank account even though neither had any role at FDL or any of the other Hong Kong Firestar Entities.

112.    On September 7, 2011, Kurian Mathews asked for Mihir Bhansali's approval of fee quotes from accountants for proposed audits of Auragem and Fancy Creations.

113.    Mihir Bhansali required at least two of Kurian Mathews, Satyendra Shukla, and Saju Poulose to be present in Dubai at all times to monitor Shadow Entity operations. On April 27, 2013, Kurian Mathews asked Mihir Bhansali for permission to break this rule so that he could arrive in Hong Kong early to prepare for an audit of the Hong Kong Shadow Entities. Mathews explained, "We have to arrange all documents of 4 entities as Fancy's office which is very far from the offices of Brilliant and Eternal. After the same we have to check all of the purchases and sales documents with the book entries to see that correct documents are in place before the commencement of the audit." Bhansali replied, "Fine. Go ahead this time."

114.    On June 10, 2013, to hide their involvement in the Bank Fraud, Modi's personal assistant instructed Gandhi, from her personal email address to Gandhi's personal email address, to communicate with her regarding Shadow Entities only on Gmail or Panemail, a program that automatically deletes messages, rather than on the Firestar Entities' regular email system.

115.    On August 6, 2013, Gandhi sent an email to a back-office employee containing purchase and sales ledgers of four Shadow Entities—Fancy Creations, Brilliant, Eternal, and Unique—showing these entities' accounting for transactions with FDI.

20

**59**

116.   On April 3, 2017, an India-based consultant emailed Mihir Bhansali a spreadsheet summarizing sales from various foreign Firestar Entities, including FIPL and FDIPL, to Dubai-based Shadow Entities, including World Diamond, Universal, Empire, Vista, Unique, and Diagems. The spreadsheet reflected a total of $770,730,000 in sales of rough stones, polished stones, and jewelry by various foreign Firestar Entities to these six Shadow Entities during fiscal year 2015 to 2016, and a total of $454,910,000 in such sales from April 2016 to February 2017.

117.   On May 5, 2017, Gandhi sent a list of Shadow Entities, and contact information for each, to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific & Tri Color. (Do not share this pdf with anyone.)."

118.   On July 1, 2017, FIPL CFO Ravi Gupta emailed Nirav Modi a spreadsheet containing fictitious biographical profiles for Brilliant, Eternal, Fancy Creations, Empire, Unique, Universal, Vista, and World Diamond and asked, "Last year someone had created the enclosed file for top 8 customers[.] Can u let me know who had helped in creation of this? We would like to do for few more customers like Augragen [sic], Eurostar, Diagem, Saumil, and Pannadium." Modi forwarded the email to Mihir Bhansali, who then directed Shyam Wadhwa, Aditya Nanivati, and Neeshal Modi to create additional fictitious profiles for Shadow Entities in their respective regions.

119.   On July 8, 2017, Satyendra Shukla asked for Mihir Bhansali's input on a proposed itinerary for FIPL CFO Ravi Gupta's and FIPL Independent Director Suresh Senapaty's upcoming visit to Dubai. The itinerary included multiple meetings with purported "owners" of Shadow Entities.

120.   Between July 31, 2017 and August 7, 2017, Satyendra Shukla and Kurian Mathews, copied Mihir Bhansali on numerous emails concerning the collection of know-your-customer and know-your-supplier documentation for Shadow Entities Unique, World Diamond, Unity,

21

*60*

Himalayan, DG Brothers, and Hamilton. Bhansali advised, "Gentlemen – please avoid copying me on transactional emails. Thank you."

121. On August 19, 2017, a manager of Universal emailed Bhansali enclosing a profile of three Shadow Entities—Universal, Empire, and Diagems—and asking Bhansali to "review and advice [sic]." The manager's email signature stated he was also the General Manager of a Firestar Entity in Dubai.

122. On October 24, 2017, Saju Poulose advised Mihir Bhansali that an independent director of FIPL had asked about the variance in profit margins between the Firestar Entities' transactions with Shadow Entity as opposed to other customers. Bhansali instructed Poulose to warn Aditya Nanivati and Satyendra Shukla so that they could prepare an explanation. Nanavati then asked Bhansali, "How are we answering this? For me it is simple, some are higher volume wholesale clients and some are smaller clients/shops. Not sure if that's the right approach."

123. On April 23, 2018, Ajay Gandhi asked a back-office employee to send him the open accounts receivable and accounts payable between Jaffe and Empire, Vista, Eternal, Tri Color, and Universal as of April 22, 2018. Gandhi referred to these parties as "overseas non-affiliates."

124. During the Relevant Period, Nirav Modi, Mihir Bhansali, and Ajay Gandhi exercised direct oversight and control over numerous transactions between the U.S. Entities and Shadow Entities, as illustrated by the specific examples described in Appendix A-124.

125. Ajay Gandhi regularly advised Nirav Modi, Miten Pandya, Manish Bosamiya, Amit Magia, and Shyam Wadhwa, concerning wires of funds from the U.S. Entities to India in furtherance of the Bank Fraud, as illustrated by the specific examples described in Appendix A-125.

22

iii.    *Suspicious Accounting, Finance, and Inventory Management Practices*

126.    Gandhi and Bhansali engaged in and oversaw suspicious accounting, corporate finance, and inventory management practices for the purpose of furthering and concealing the Bank Fraud.

127.    Gandhi and Bhansali maintained two sets of books and records for the U.S. Entities: "core" financials, which did not include loose diamond and other high-value transactions outside the normal course of the U.S. Entities' business, and "regular" financials, which reflected transactions with Shadow Entities and other Firestar Entities to further the Bank Fraud.

128.    Jaffe's federal tax return for the fiscal year ending March 31, 2012 listed sales of $9,090,661. However, Jaffe's sales journal, as well as the Jaffe financial statements originally provided by Ajay Gandhi to the Examiner, indicates that, during that same time period, Jaffe's sales totaled $49,628,873.

129.    After Gandhi was questioned by the Examiner about the significant difference between the tax return sales of around $9 million and the "original" financial statements and sales journal which both reflected $49 million of sales, Gandhi produced a second set of financial statements, which he called the "core" set. This "core" set reflected sales at $10 million. Gandhi did not provide any real explanation as to why he maintained two sets of financial statements. The difference between these financials was primarily loose diamond sales between Jaffe and various Shadow Entities.

130.    Bhansali managed the Debtors' "house accounts," the accounts in which proceeds of loose diamond sales were segregated from regular sales accounts for purposes of computing commissions. Upon information and belief, the difference between the amounts reported in the

23

62

Jaffe's tax returns versus the amounts reflected in its sales journals primarily relates to such transactions.

131.    The secretive nature of the "regular" financials is further demonstrated by the communications between Nirav Modi, Ajay Gandhi, Mihir Bhansali, and other co-conspirators described in Appendix A-131.

132.    Mihir Bhansali and Ajay Gandhi also oversaw and directed the use of different sales and inventory practices for Debtors' transactions with Shadow Entities as compared to those used with retailer customers.

133.    For example, each diamond or gem received by the Debtors for use in an ordinary retail transaction would be unpacked, compared to its packing slip, scanned for quality control, and logged as "ready to ship."

134.    These practices were not employed with respect to Shadow Entity-related transactions. For those transactions, a Shadow Entity or foreign Firestar Entity would often send bulk shipments of loose diamonds accompanied by email instructions to export them immediately upon receipt to either another Firestar Entity or a Shadow Entity at specified prices and quantities. Packing slips and invoices for the subsequent exports often accompanied these email instructions. Consistent with instructions from overseas Modi-Controlled Entities, these goods were either immediately re-shipped without being opened or, if they were opened, they were inventoried in bulk, not individually.

iv.      *Efforts to Manipulate or Deceive Auditors and Lenders*

135.    On numerous occasions, Bhansali and Gandhi sidestepped auditors' inquiries concerning the U.S. Entities' dealings with Shadow Entities by offering farfetched explanations, feigning ignorance, or, in some cases, ignoring the questions altogether.

24

**63**

136.   For example, on July 2, 2010, a banker asked Ajay Gandhi whether FDI and Eternal were related. Ajay Gandhi forwarded the email to Mihir Bhansali and stated, "I am ignoring that question but I may not be able to avoid the same." Bhansali replied, "Speak to Nirav when he is in NY next week." The next day, Gandhi told the banker that Nirav Modi's father, Deepak Modi, owned Eternal.

137.   As another example, on June 16, 2011, an HSBC Bank representative asked Ajay Gandhi why Synergies would be wiring funds to Unique. Gandhi explained that Unique had loaned funds to Synergies, which loaned the same funds to Twin Fields, and that both loans were subsequently repaid. The representative then asked, "Unique is affiliated correct? Does Nirav own it? Is this why there are loans back and forth?" Gandhi replied, "Unique is not an affiliated company but Nirav has a very good relationship with them." The representative then asked, "Why is each company lending to the other?" Gandhi replied, "I am sure there were business reasons. What is the concern for the bank?"

138.   As another example, on September 7, 2011, a banker at Standard Chartered Bank asked Ajay Gandhi, "We understand that Firestar in NY sales [sic] mostly to big retailers in the US but the recent A/R outstanding shows more concentration on companies such as Unique Diamond, Empire Gem and SDC Designs. Can we get YTD sales data of 2010 and 2011 of the top 10 accounts for each year on year comparison?" She further stated, "Also, in the AR ageing it shows Firstar has given Steller [sic] diamonds and Unique diamonds $11m limits each—and Brilliant, Fancy creations $2m each. We understand that these foreign bills we are not discounting them, but we'd like to get more background info on these accounts given the size of exposures."

139.   On September 12, 2011, Gandhi replied, "Various overseas companies that you have mentioned are not our customers. We buy unique large diamonds/jewelry pieces from various vendors in India and sometimes these goods need to be returned, but due to the terms of

25

*64*

the original sale, the vendors instruct us to ship these goods to another companies [sic], that they select, who are not located in India. We record these transfers as a reduction to purchases and an increase to accounts receivable at the original purchase cost of the diamonds/ jewelry."

140. Mihir Bhansali, who was included on the email from Gandhi, forwarded this response to Modi, stating "Nirav, Please read this email below from SCB last week, and Ajay's reply. Just an FYI." Modi then forwarded the email to the former deputy managing director of Axis Bank's corporate banking division, and stated, "As SC is a common bank in India, Antwerp and NY. It might be a good idea that Ajay and you discuss all responses."

141. As another example, on April 22, 2017, an auditor asked Ajay Gandhi why FDI had recorded a payable for an invoice issued by Fancy Creations to NMI. Gandhi replied, "Vendor error." A few minutes later, apparently deciding that excuse was not sufficient, he equivocated, "Also to save freight, they ship together as one invoice. Difficult to fight with them."

142. And as yet another example, on April 26, 2017, Ajay Gandhi asked Mihir Bhansali how he should respond to an auditor's inquiries into the U.S. Entities' multi-million-dollar A/R and A/P balances with Shadow Entities Auragem and Fancy Creations. Bhansali directed Gandhi to discuss the issue with Shyam Wadhwa and asked when the Shadow Entity balances could be cleared.

143. At least some of the coordination of the various Shadow Entities' involvement in manipulating audits, and the Bank Fraud more generally, was conducted through an operation1@firestardiamond.com ("Operation 1") email address. The Operation 1 account was used by Sandeep Mistry and possibly others.

144. As part of the audit process, auditors would email parties listed on the audited company's accounts receivable and accounts payable records to request written confirmation of the amounts reflected in the audited company's books and records. For audits of the U.S. entities,

26

65

which were conducted together, Ajay Gandhi would be copied on the auditor's emails to Shadow

Entities, which Gandhi would often forward to Operation 1 to ask that Operation 1 cause the

Shadow Entity to provide confirmation the auditors. Specific examples of such emails are

described in Appendix A-144

145.    The Operation 1 account was also used to orchestrate transfers of funds and jewels

among Firestar Entities and Shadow Entities, as demonstrated by the specific examples described

in Appendix A-145.

D.    *Involvement of Mehul Choksi, Nehal Modi, Neena Sheth, Deepak Sheth, and
Abhay Javeri, and the Sheth Entities and SDC Entities in the Bank Fraud.*

146.    Mehul Choksi is Nirav Modi's uncle. Choksi is accused of orchestrating his own

bank fraud scheme through his India-based company Gitanjali Gems Ltd., its U.S.-based

subsidiaries including Gitanjali USA, Samuels Jewelers, Inc. ("Samuels"), Aston Luxury Group

(NY), Diamlink, Inc., Diamlink Jewelry, Inc., Jewelry Marketing Company, Tristar Worldwide

LLC, and Phantom Luxury Group, along with a web of fictitious vendors and customers

analogous to the Shadow Entities.

147.    Although Nirav Modi's and Mehul Choksi's fraud schemes primarily operated in

parallel from a corporate standpoint, members of their family participated on both sides. For

example, Nehal Modi, Nirav Modi's brother, was in charge of Gitanjali USA, Samuels, and

Diamlink on the Choksi-side and BBB Group on the Modi side. Similarly, Mehul Choksi's sister

and Nirav Modi's aunt, Neena Sheth, served as a director of Diamlink.

148.    Neena Sheth's husband, Deepak Sheth, (i.e. Nirav Modi's uncle and Mehul

Choksi's brother-in-law), owns New York-based Excellent Facets, Inc. and Amadena Investments

Inc. (collectively, the "Sheth Entities"). As alleged below, Deepak Sheth also served as the initial

27

Protector and Investment Advisor of the Ithaca Trust and as Manager of CPS50 in connection with

149.    Also involved was Ami Modi's brother and Nirav Modi's brother-in-law, Abhay Javeri. Javeri owns SDC Designs, Inc., SDC Designs LLC, Sangam Diamonds Corporation, and Sangam Diamonds LLC (collectively, the "SDC Entities"). Abhay Javeri also served as Protector and Investment Advisor of the Ithaca Trust and as Manager of CPS50.

150.    Deepak Sheth, Neena Sheth, Nehal Modi, Abjay Javeri, and their respective companies participated in the Bank Fraud throughout the Relevant Period.

151.    Deepak Sheth and the Sheth Entities participated in direct transactions with Shadow Entities totaling over $19 million during the Relevant Period.

152.    For example, in March 2016, Deepak Sheth instructed Mihir Bhansali and Ajay Gandhi to have NMI bill Excellent Facets $965,000 for a 15.21-carat diamond necklace and a 10.71-carat diamond ring, but to ship the pieces to Shadow Entity Sunshine in Hong Kong. Sheth referred to Sunshine as "his customer."

153.    Abhay Javeri and the SDC Entities participated in direct transactions with Shadow Entities involving millions of dollars during the Relevant Period.

154.    For example, on December 4, 2012, the SDC Entities' CFO Sridhar Krishnan advised Ajay Gandhi that Shadow Entity Empire would be wiring $2.7 million to FDII as partial payment against a July 2012 invoice and instructed Gandhi to use the funds to pay SDC Designs LLC against another July 2012 invoice. Gandhi forwarded the email to Hemant Bhatt and asked, "Is this OK once funds are received?" Bhatt replied, "Do not send email. Please call me to confirm in the morning."

155.    As another example, on February 4, 2013, Sridhar Krishnan advised Mihir Bhansali and Hemant Bhatt over personal email that he had wired $1.4 million from an SDC Entity to

28

*67*

Shadow Entity Universal and asked Bhatt to wire those funds to Jaffe. On February 6, 2013, Bhatt

confirmed that Universal had received the funds and that Empire had paid US $1,391,570 to Jaffe.

That same day, Jaffe wired $1,391,997 to SDC.

156.    As another example, on February 11, 2013, Sridhar Krishnan advised Mihir

Bhansali and Hemant Bhatt over personal email that he had wired $1.2 million from SDC Designs

LLC to Shadow Entity Empire and instructed Bhatt to wire those funds to Jaffe and FDI. Jaffe and

FDI then wired the funds to SDC Designs LLC.

157.    As yet another example, on December 31, 2013, Mihir Bhansali directed Ajay

Gandhi to wire $1.2 million from FDI to Sangam Diamonds Corp. to pay off an invoice issued to

Shadow Entity Fancy Creations. On January 8, 2014, Gandhi forwarded Bhansali's December 31,

2013 email to Hemant Bhatt, stating "I paid $1.24m on 12/31/13 to Fancy per attached. This funds

never came back hence I will pay $575k today. Please call me if needed."

158.    On May 25, 2018, an accountant at Marks Paneth emailed Sridhar Krishnan a

request for information relating to SDC Entities' customers with outstanding A/R balances more

than 90 days old, including Empire, a Shadow Entity, and Diamlink, a Mehul Choksi-owned

company managed by Neena Sheth and Nehal Modi.

159.    Sridhar Krishnan could not transfer funds from the SDC Entities' bank accounts

without Abhay Javeri's personal authorization. For example, on March 10, 2015, Ajay Gandhi

asked Sridhar Krishnan to provide wire details for potential payments to SDC Designs Inc. and

SDC Designs LLC. Krishnan replied with the bank account information but stated, "Please do not

wire anything this week. Abhay is in Mumbai and no one can approve wires."

160.    Moreover, on many occasions, Mihir Bhansali and Ajay Gandhi would

immediately transfer funds received by the U.S. Entities from the Sheth Entities and SDC Entities

to Shadow Entities and Foreign Firestar Entities (including to pay off letters of credit issued to

29

68

Foreign Firestar Entities through HSBC's L/C Collections service), as they commonly did with funds received from Shadow Entities and Firestar Entities, but not from *bona fide* customers. Specific examples of such transactions are described in Appendix A-153.

161.    Ajay Gandhi, Saju Poulose, Shyam Wadhwa, and other co-conspirators treated transactions with the Sheth Entities and SDC Entities as "non-core" as they did with the Shadow Entity transactions and other transactions linked to the Bank Fraud.

162.    For example, Ajay Gandhi and Shyam Wadhwa maintained a spreadsheet summarizing the gross margin for "various divisions" for the 2012 – 2013 fiscal year. The spreadsheet contained separate columns for "core business" and "large pieces." The spreadsheet listed gross sales of $35,035,180 at a 12.03% gross margin for the "core business" column and gross sales of $17,711,569 at a 5.51% gross margin for the "large pieces" column. The spreadsheet also contained an itemized list of transactions comprising the $17,711,569 in "larger pieces" sales, including a total of $7,758,454 in sales to SDC entities, $1,253,254 to Excellent Facets, $1,912,840 to Pacific, and $3,019,406 to Empire.

163.    Additional examples illustrating the suspicious accounting practices for transactions involving SDC Entities and Sheth Entities are described in Appendix A-163.

164.    Additional suspicious transactions and communications involving the Deepak Sheth, Neena Sheth, and the Sheth Entities are described in Appendix A-164.

165.    Additional suspicious transactions and communications involving Abhay Javeri and the SDC Entities are described in Appendix A-165.

E.    *Laundering of Funds Through Twin Fields and Bailey Banks & Biddle*

166.    Throughout the Relevant Period, tens of millions of dollars in proceeds of the Bank Fraud were funneled to or through Twin Fields and BBB Group, Inc. ("BBB Group").

30

*69*

167.    On November 4, 2009, Ajay Gandhi, acting on behalf of Synergies, successfully bid on the intellectual property rights of Bailey Banks & Biddle, an established U.S. jewelry retailer, at a bankruptcy auction.

168.    Nirav Modi formed Switzerland-based Diamonds Holdings SA to serve as Synergies' nominee to purchase the *Bailey Banks & Biddle* intellectual property.

169.    On March 16, 2010, Twin Fields Investments Ltd. ("Twin Fields") was incorporated in Delaware. At all relevant times, Purvi Mehta and Deepak Modi indirectly owned 100% of the equity in Twin Fields through two layers of BVI shell companies, including Link High International ("Link High").

170.    On May 13, 2010, BBB Group, Inc., d/b/a as Bailey Banks & Biddle, was incorporated in Delaware. Twin Fields owned 100% of the equity of BBB Group.

171.    Diamonds Holdings SA licensed the *Bailey Banks & Biddle* intellectual property to Twin Fields, which in turn sublicensed it to BBB Group.

172.    Mihir Bhansali and Nehal Modi managed and controlled Twin Fields and BBB Group throughout the Relevant Period as the *de jure* or *de facto* directors of Twin Fields and BBB Group, respectively.

173.    The law firm that managed registrations for the *Bailey Banks & Biddle* intellectual property directed communications to Mihir Bhansali, sent their invoices to Bhansali, and otherwise treated Bhansali as the representative of Diamond Holdings, Twin Fields, and BBB Group.

174.    In 2010, BBB Group opened several retail locations under the Bailey Banks & Biddle name, which it continued to operate throughout the Relevant Period.

175.    Between November 2010 and March 2018, approximately $80 million flowed through Twin Fields. From 2010 to early 2013, Link High was the primary source of funds for the

31

*70*

Twin Fields' account, transferring $23,602,660.00. According to Indian authorities, Link High received millions of dollars of in fraudulent LOU proceeds.

176.     Between February 2013 and May 2017, Jaffe transferred at least $21,330,000.00 to Twin Fields. Jaffe maintained relatively small balances in its operating account and did not have sufficient capital to make large loan payments to Twin Fields. Most of the disbursements from A. Jaffe to Twin Fields were funded on or around the day of the payments from other sources, including FDI and known Shadow Entities Pacific Diamonds and Universal Fine Jewelry.

177.     On or about June 22, 2015, FDI transferred an additional $31,542.28 to Twin Fields.

178.     Between 2016 and 2017, Shadow Entity Fine Classic, of which Purvi Mehta was the 100% owner, transferred at least $26,864,056.00 to Twin Fields. In an email chain dated January 11, 2017, Mihir Bhansali told Marks Paneth, Twin Fields's accountant, that Fine Classic was an overseas company that lent money to Twin Fields to fund BBB Group.

179.     Between 2011 and 2017, Twin Fields transferred at least $42,748,000 to BBB Group. BBB Group made no repayments or other transfers to Twin Fields during the Relevant Period.

180.     The Twin Fields account was closed on February 21, 2018 with a balance of $13,281.

181.     Mills Menser, the manager of the *Bailey Banks & Biddle* store in Austin from July 2017 until March 2018, sent Nehal Modi and Mihir Bhansali weekly updates on the businesses' operations and performance. Bhansali would then pass these updates along to Nirav Modi.

182.     On May 1, 2018, Mills Menser proposed several options for winding down the business for Nehal Modi and Mihir Bhansali's consideration. He concluded by stating he would "support any decision ownership feels is the best fit for them."

183.     Based on, among other things, Purvi Mehta and Deepak Modi's undisclosed ownership of Twin Fields through BVI shell companies, the more than $60 million laundered through Twin Fields from Fine Classic, Link High, and Jaffe, and Mihir Bhansali and Nehal

32

*71*

Modi's involvement in its management and operations, it appears that Twin Fields and BBB Group constituted another front for Nirav Modi and his family's massive money laundering efforts.

### F.   Detection and Exposure of the Bank Fraud

184.    In late May 2017, Golkunath Shetty, the PNB employee who approved fraudulent LOUs for the benefit of Nirav Modi's companies, retired. In the months leading up to his retirement, between February and May 2017, Shetty approved nearly 150 new LOUs totaling over $1 billion to the LOU Entities. These LOUs became due on or around January 25, 2018.

185.    According to Indian authorities, Nirav Modi and his brother Neeshal Modi fled India on January 1, 2018, and Ami Modi and Mehul Choksi did so on January 6, 2018 and January 4, 2018, respectively.

186.    On January 5, 2018, Nirav Modi purchased a London apartment for £7,950,000 in cash under the name "Richard Beattie" which appears to be an alias or surrogate of Nirav Modi. Modi was living in this apartment when he was arrested in March 2019. It is was also the registered office of Diamond Holdings Ltd., a UK company Nirav Modi formed in May 2018.

187.    On or around January 20, 2018, a representative of one of the LOU Entities asked PNB to roll-over the 2017 LOU balances into new LOUs. On January 22, 2018, PNB refused to issue new LOUs without a 100% cash margin deposit, among other requirements. The Modi representative refused to furnish any margin on the grounds that PNB had never before required a margin to issue an LOU. PNB immediately began investigating the borrowing practices of the Modi-Controlled Entities.

188.    The Bank Fraud has resulted in several investigations and criminal enforcement actions against Nirav Modi, Mihir Bhansali, and Defendants Ami Modi, Purvi Mehta, Mayank Mehta, Nehal Modi, Neeshal Modi, and others by Indian governmental authorities, including the

33

*72*

Central Bureau of Investigation ("CBI"); the Directorate of Enforcement ("ED"); the Income Tax

Department; and the Serious Fraud Investigation Office.

189.    On January 29, 2018, PNB lodged a criminal complaint against Nirav Modi with

India's CBI. On February 13, 2018, PNB lodged a complaint against Nirav Modi with India's ED,

which subsequently attached various movable and immovable properties belonging to Nirav

Modi and various Modi-Controlled Entities.

190.    On July 3, 2018, PNB filed Application No. 119/2018 in the Debts Recovery

Tribunal No. I at Mumbai (the "Indian Debt Tribunal") against, *inter alia,* Nirav Modi and certain

of his family members, each LOU Entity, FIL, and FDIPL.

191.    In early 2019, Nirav Modi was found living in London under the alias "Edmond

Dantes."

192.    On or about March 12, 2019, the Indian government issued an extradition request

to the government of the United Kingdom on the basis of an arrest warrant issued against Nirav

Modi by an Indian court. Modi was arrested in London on or about March 20, 2019 and is

currently incarcerated in London.

193.    On July 6, 2019, the presiding officer of the Indian Debt Tribunal issued a judgment

against Nirav Modi, Ami Modi, Nehal Modi, Neeshal Modi, Purvi Mehta, the LOU Entities, FIL,

and others based on the following factual findings, among others (capitalized terms in original):

    (i)    Nirav Modi has floated Overseas Companies in Hong Kong and U.A.E. which
            are dummy/shell Companies. The Directors and share-holders of these
            Companies are either ex-employees or employees acting under instructions of
            Nirav Modi.

    (ii)   The Overseas Companies and Hong Kong and Dubai deals with the Firestar
            Group directly or indirectly owned by Nirav Modi who has full control over
            these Companies through the dummy Directors. The Enforcement Directorate
            in its Complaint has recorded that the list of top 8 borrowers and top 8
            suppliers are none else but the ex-employees of Firestar Group and acting and
            implementing the instructions given by Nirav Modi and Mihir Bhansali.

34

*73*

(iii)    The fraud has been perpetrated by Nirav Modi in collusion, connivance and with the aid and assistance of the group companies i.e. Firestar International Limited and Firestar Diamond International Pvt. Ltd. along with their affiliates, subsidiaries, Nirav Family Trust, Nirav Modi Family Trust, directors and key managerial personnel.

(iv)    The investigation conducted by the Enforcement Directorate further reveals that the dummy Companies were set up in Hong Kong and Dubai along with the regular Firestar Group Companies [and] acted as nodes for circular transactions to layer and launder money generated by the fraudulent LOUs.

(v)    [Nirav Modi and his family members] are the mastermind[s] behind the perpetration of the fraud. Defendants have laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purposes of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs.

(vi)    All of the aforesaid dates and events reveal the systematic fraud was perpetrated by Nirav Modi and moving the US Court for insolvency to avoid the liability. Nirav Modi and his accomplishes [sic] have taken prompt steps before the US Court to avoid the seizer [sic] and attachment of the properties purchased and acquired by Nirav Modi from the proceeds of the fraudulent debt.

The Bank Fraud resulted in a total loss to PNB and other banks in excess of $1 billion. As a result of the Bank Fraud, PNB has asserted claims against each of the Debtors in excess of $1 billion on the grounds, among others, that a substantial portion of the proceeds of the Bank Fraud were transferred to or through the Debtors. In addition, the Bank Fraud and its exposure and the seizure by Indian authorities of Modi-Controlled Entities in India resulted in the collapse of the Debtors' businesses and the filing of these chapter 11 cases.

35

*74*

II.    **Criminal Efforts Shortly Before and Following Exposure of the Bank Fraud**

194.    In the weeks leading up to and following exposure of the Bank Fraud in January 2018 when the last LOUs Golkunath Shetty authorized before retiring became due, Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators shifted their focus to shielding assets from creditors.

### A.  *Looting of the Debtors, U.S. Affiliates, and Other Firestar Entities*

195.    Nirav Modi, Mihir Bhansali, Ajay Gandhi, and other co-conspirators diverted substantial amounts of the Debtors' cash and inventory to overseas Modi-Controlled Entities in the weeks leading up to the Debtors' bankruptcy filing. For example:

    (i)   On or around December 5, 2017, FDI shipped inventory with a declared value of $1,632,500.53 to World Diamond.

    (ii)   On January 3, 2018, FDI wired $2,672,389.48 to Pacific. That same day, Jaffe wired $530,000 to Pacific. Ajay Gandhi was directly involved in these transfers.

    (iii)   On or around January 23, 2018, FDI shipped 2,319.64 carats of loose diamonds with a declared value of $426,320.97 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi and Mihir Bhansali were directly involved in this shipment.

    (iv)   On January 25, 2018, FDI wired $910,278.70 to Dubai-based Firestar Diamond FZE, which was managed by co-conspirators Kurian Mathews and Satyendra Shukla. Ajay Gandhi was again directly involved in this transfer.

    (v)   On January 26, 2018, FDI shipped inventory having a declared value of $85,150 to Nirav Modi Ltd. in Hong Kong.

    (vi)   On February 6, 2018, FDI wired $1,002,836.77 to FIPL, Jaffe wired $505,610.51 to FIPL and Fantasy wired $401,471.08 to FIPL. That same day, Subhash Parab emailed Ajay Gandhi, copying Shyam Wadhwa, "Please pay following bills to FIPL . . . We have some urgent re-payment from IDBI bank for that [sic] we require below bills in IDBI bank[.]"

    (vii)   On or around February 6, 2018, FDI shipped 4,474.15 carats of loose diamonds with a declared value of $789,140.42 through Malca Amit to Eternal in Hong Kong. Ajay Gandhi was directly involved in this shipment.

36



196.    Additionally, in the weeks leading up to and following the Petition Date, Nirav

Modi, Mihir Bhansali, and Ajay Gandhi caused NMI and FDII to move significant amounts of

cash and inventory overseas where their creditors, including the Debtors, could not reach them.

For example:

(i)    On December 22, 2017, FDII shipped inventory with a declared value of $1,418,549 through Malca Amit to Fancy Creations in Hong Kong.

(ii)    On January 4, 2018, NMI shipped two packages of inventory, with declared values of $585,000 and $65,000, respectively, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(iii)    On January 5, 2018, FDII shipped inventory with a declared value of $167,810.65 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(iv)    On January 10, 2018, NMI shipped inventory with declared value of $108,550, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(v)    On January 10, 2018, FDII shipped inventory with a declared value of $239,871.29 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(vi)    On January 11, 2018, NMI shipped inventory with declared value of $32,370, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(vii)    On January 15, 2018, FDII shipped inventory with a declared value of $781,882.38 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(viii)    On January 16, 2018, NMI shipped inventory with declared value of $943,800, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(ix)    On January 19, 2018, NMI shipped three packages of inventory, with declared values of $273,000, $409,500, and $771,680, respectively, through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(x)    On January 24, 2018, NMI shipped inventory with a declared value of $1,075,200 through Malca Amit to FDIPL in India.

(xi)    On January 25, 2018, FDII shipped inventory with a declared value of $1,886,922.67 through Malca Amit to Fancy Creations in Hong Kong.

(xii)    On January 26, 2018, NMI shipped inventory with a declared value of $198,750 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

76

(xiii)   On January 29, 2018, NMI shipped inventory with a declared value of $75,050 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xiv)   On January 30, 2018, FDII shipped inventory with a declared value of $570,104.37 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

(xv)   On January 31, 2018, NMI shipped inventory with a declared value of $660,500 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xvi)   On January 31, 2018, FDII wired $2,466,015 and $525,000 to Fancy Creations. That same day, Ajay Gandhi forwarded the wire confirmations to Shyam Wadhwa and stated, "Please let your vendor know of this payment and clear any AR from HK."

(xvii)   On February 2, 2018, FDII wired $400,000 to Fancy Creations. That same day, Ajay Gandhi emailed Avinash Oza and Kunal Patel, copying Shyam Wadhwa, "Please wire $400,000 to Fancy from Capital One – Advance Refund." Oza replied with the wire confirmation.

(xviii)   On February 13, 2018, NMI shipped inventory with a declared value of $154,440 through Malca Amit to Nirav Modi Ltd. in Hong Kong.

(xix)   On March 6, 2018, FDII shipped inventory with a declared value of $4,325,472.34 through Malca Amit to Firestar Diamond Ltd. in Hong Kong.

197.   Around this time, Mihir Bhansali promised to use the NMI inventory to repay FDI's secured creditors, including Israel Discount Bank of New York ("IDB"), after transferring it to the Debtors to offset NMI's debts to FDI and Jaffe. IDB's counsel attempted to enforce this promise during negotiations regarding the Debtors' use of cash collateral by seeking to require the Debtors to collect the amounts owed to them by NMI. As alleged below, however, this never occurred, and instead, Mihir Bhansali was involved in diverting those assets to Hong Kong, beyond the Debtors' reach.

198.   Between late February and early March 2018, the NMI boutiques in Las Vegas, Honolulu, Los Angeles, and New York shipped substantially all of their inventory to New York. The inventory, which had a total value of approximately $40 million, was held in storage by Malca

38

**77**

Amit because its value exceeded the amount of available insurance coverage on items stored in the Debtors' vault.

199.    Around this time, Mihir Bhansali, Ajay Gandhi, and Angelina Ypma, in their capacity as directors and officers of Nirav Modi Ltd. ("NMLUK"), the UK-based subsidiary of NML that operated the London *Nirav Modi* boutique, were also working together to shut down the London store and divert its assets to Hong Kong.

200.    Nitin Dattani of Dattani Chartered Accounts, the London based accounting firm that had been advising NMLUK since 2016, was also heavily involved in shuttering the London boutique. Dattani assisted Nirav Modi in forming Diamonds Holdings Ltd., the company Nirav Modi established while he was hiding out in London. Additionally, as alleged below, in May 2018, Abhay Javeri appointed Nitin Dattani to replace Nehal Modi as manager of Central Park South 50 Properties LLC, which owned Nirav Modi and Ami Modi's New York Ritz Carlton apartment.

201.    On March 2, 2018, Francois-Xavier Derricks, the manager of the London boutique sent a letter to Mihir Bhansali and Angelina Ypma in their capacity as directors of NML UK. In the letter, Derricks acknowledged that Bhansali and Ypma had previously instructed him to communicate by WhatsApp and private email, but stated that he was "concerned by the recent lack of information and guidance in relation to the management of the London boutique's affairs."

202.    On March 4, 2018, Ajay Gandhi instructed Derricks to ship substantially all of the London boutique's inventory, a total of 404 pieces of jewelry, having a total value of $5,974,614, to FDL in Hong Kong. This shipment occurred shortly thereafter.

203.    On March 11, 2018, Angelina Ypma instructed Ajay Gandhi to ship a fancy pink diamond ring from NML to the "H[ong] K[ong] office." She told Gandhi she had sent him a

39

**78**

picture of the ring over WhatsApp. Nirav Modi confirmed his approval from his personal email account, which Ypma copied on her email to Gandhi.

204.     Around this time, Nehal Modi and Mihir Bhansali brought in Anthony Allicock, Nehal Modi's personal friend and former colleague at Diamlink, to "manage the wind down" of the Hong Kong Firestar Entities. Allicock, a New York retail store manager, had no prior insolvency or finance experience.

205.     On March 19, 2018, Anthony Allicock was appointed the sole director of FHL, NML, and FDL.

206.     On March 22, 2018, Mihir Bhansali executed corporate resolutions on behalf of each of the U.S. Affiliates authorizing the U.S. Affiliates to indemnify Mihir Bhansali and advance his legal costs.

207.     On March 23, 2018, Mihir Bhansali, as sole director of each U.S. Affiliate, appointed Jacen Dinoff and Michael Goldman of KCP Advisory Group as directors and President and Chief Financial Officer, respectively, of each of the U.S. Affiliates.

208.     On March 26, 2018, Mihir Bhansali and Ajay Gandhi resigned from their positions with the U.S. Affiliates.

209.     On April 5, 2018, Angelina Ypma, the global president of the *Nirav Modi* brand and a director of FIL, emailed Ajay Gandhi, copying Mihir Bhansali, "Nirav has instructed me to work with you to move all of NM US inventory (HJ and core back to HK ASAP.) HK will pay Malca in advance to move the jewels." In response, Gandhi, copying Jacen Dinoff, Michael Goldman, and shipping manager Shaneeza Singh, stated that he and Bhansali had resigned from NMI "due to conflict of interest" and that she should work with Dinoff, Goldman, and Singh to coordinate the shipments. Gandhi further noted that he and Bhansali were "happy to assist as needed should [Ypma] hit any bottleneck."

40

79

210.    Ypma then instructed Dinoff and Goldman to send her a detailed inventory of NMI inventory in New York and stated, "We need to ship all products to HK." Goldman replied to Singh, "we are NOT shipping anything right now. I will let you know when it is okay to do this."

211.    That same day, Anthony Allicock emailed Goldman and Dinoff, "In my capacity as Director of Firestar Holdings Limited, I am relieving you of your duties and directorship of the New York subsidiaries effective immediately. Please confirm in writing your acceptance of the same." When interviewed by the Trustee, Allicock indicated that Mihir Bhansali or Nehal Modi directed him to terminate Goldman and Dinoff, but that he could not recall the details.

212.    Goldman forwarded the email to Mihir Bhansali and Ajay Gandhi and stated, "[W]e were attempting to verify with outside parties the position and authority of Anthony Allicock before sending him almost $7 million of diamonds. We did not move quickly enough for him and he sent us the email below. Is it your understanding that he has the authority to do this, and that his declaration is enough to make it official? Upon review of Anthony's email, do you also consider our positions and responsibilities to be terminated?" Bhansali replied, "Neither Ajay nor I will be able to comment on the below."

213.    That same day, Anthony Allicock appointed himself sole director and president of each of the U.S. Affiliates.

214.    On April 6, 2018, FDII inventory having a total declared value of $6,804,210.49 was shipped through Malca Amit to Firestar Diamond Ltd. in Hong Kong. This shipment appears to involve the "almost $7 million" in diamonds Dinoff and Goldstein refused to ship.

215.    Nehal Modi then approached Mark Motes and Eddy Friedfeld as potential replacements for Dinoff and Goldman. Mark Motes, the former chief operating officer of Maryland-based Smyth Jewelers, was a diamond industry veteran. Eddy Friedfeld was a

41



turnaround consultant who had managed Diamlink's out-of-court restructuring in 2015 and 2016. Nehal Modi had previously worked with both Motes and Friedfeld.

216.    Mihir Bhansali then interviewed Motes and Friedfeld. He told them he was looking for two industry professionals he could trust.

217.    On April 13, 2018, Anthony Allicock, at Mihir Bhansali's and Nehal Modi's direction, appointed Mark Motes the sole director and president, and Eddy Friedfeld the chief liquidation officer, of each U.S. Affiliate.

218.    On April 25, 2018, 45 pieces of NMI inventory, with a total declared value of $6,315,615, were shipped via Malca Amit to NML in Hong Kong. Ajay Gandhi signed the packing lists included in the shipping instructions.

219.    On April 30, 2018, 93 pieces of NMI inventory, with a total declared value of $13,108,072, were shipped via Malca Amit to NML in Hong Kong. Ajay Gandhi signed the packing list included in the shipping instructions.

220.    On or around May 3, 2018, FDII inventory with a declared value of $3,200,000 was moved to Malca Amit to be held in storage.

221.    Around the same time, Anthony Allicock, Mihir Bhansali, Ajay Gandhi, Angelina Ypma, and Nitin Dattani were trying to divert NMLUK's remaining cash to Hong Kong. Gandhi, Bhansali, and Ypma officially resigned their NMLUK positions on March 12, 2018, but as with the U.S. Affiliates, their resignations were on paper only and they remained in control of NMUK and its assets.

222.    On April 9, 2018, Angelina Ypma instructed Ajay Gandhi and Mihir Bhansali to "transfer the funds available in Nirav Modi Ltd. in London to Nirav Modi Ltd. in Macau." On April 29, 2018, Anthony Allicock asked Ajay Gandhi whether the more than £ 1,000,000 in NMLUK's Barclays account had been transferred to Hong King. Gandhi replied that a portion of

42

the funds had been wired, but that the account had been blocked. Allicock, Gandhi, Bhansali, Ypma, and Dattani worked together over the next few weeks to unblock the account so they could move the remaining funds to Hong Kong.

223.    On May 4, 2018, Ypma emailed Gandhi and Bhansali, "I shall be coming to NY from Monday 7 till Thursday 10 May to review the NM inventory. Nirav told me that I can work with [FDI employee Shanna Singh] to count the inventory . . . Thank you to give me the support." Gandhi reiterated that he and Bhansali had resigned from NMI and directed Ypma to work with NMI's new management "on the logistics."

224.    During Angelina Ypma's visit to New York in May 2018, Ajay Gandhi and Mihir Bhansali gave her permission to remove several million dollars' worth of the inventory in storage at Malca Amit. According an employee who accompanied Ypma to Malca Amit, Ypma selected approximately $5 million from various parcels. The pieces Ypma selected were then shipped to Hong Kong in two shipments.

225.    First, on May 9, 2018, inventory with a declared value of $2,700,000 was shipped through Malca Amit to Fancy Creations in Hong Kong. (The Malca Amit documentation listed FDII as the shipper, but this shipment might have involved NMI inventory as well.)

226.    Then, on May 15, 2018, 122 pieces of NMI inventory with a declared value of $2,516,470.79 were shipped to NML in Hong Kong through Malca Amit. Ajay Gandhi signed the packing list included in the shipping instructions.

227.    On May 23, 2018, NML "sold" the 122 pieces of NMI inventory to FDL. That same day, FDL "sold" the same pieces to Shadow Entity Sino Traders. Anthony Allicock signed the invoices for both of these purported sales. Yet, on June 19, 2018, Allicock told attorneys for the Hong Kong Firestar Entities that the May 15 shipment was sent from New York without Allicock's authorization and asked them to attempt to locate the shipment.

43

82

228.    Throughout May 2018, Anthony Allicock pressured Eddy Friedfeld and Mark Motes to ship the remaining NMI and FDII inventory to Hong Kong. They refused to do so until all of the U.S. Affiliates' creditors were paid. When Friedfeld and Motes discovered the May 15, 2018 shipment, they demanded that Allicock arrange for the return of the shipment. Allicock refused.

229.    On June 1, 2018, at Nehal Modi's direction, Anthony Allicock terminated Friedfeld and Motes and appointed Rochelle Miller, another personal friend of Nehal Modi, as CEO and sole director of each U.S. Affiliate. Prior to her appointment, Rochelle Miller worked as an event planner and had no jewelry industry, insolvency, management, or financial experience.

230.    That same day, Anthony Allicock introduced Rochelle Miller to Angelina Ypma. Allicock and Ypma instructed Miller to retrieve the NMI and FDII inventory from Malca Amit and ship it to Hong Kong.

231.    At the time of Rochelle Miller's appointment, the U.S. Affiliates' bank accounts held a total of $1,283,454.05.

232.    On June 2, 2018, Rochelle Miller, acting in her capacity as director/CEO of NMI, contacted Malca-Amit to request shipment to Hong Kong of two sets of NMI inventory: 1) 208 pieces at a declared value of $5,063,914.01; and (2) 53 pieces at a declared value of $2,846,545. Malca Amit refused to do so until it could verify Miller's authority.

233.    On September 5 and 7, 2018, after confirming Rochelle Miller's appointment as director and CEO of NMI and FDII, Malca Amit released nine parcels containing the remaining NMI and FDII inventory to the custody of Rochelle Miller.

234.    Rochelle Miller, on information and belief, at the direction of Nehal Modi, shipped all of the NMI and FDII inventory to be appraised by Independent Gemological Laboratories ("IGL"), a purportedly independent diamond grading laboratory. However, according to the

44

**83**

Samuels examiner's report, IGL is secretly owned by Mehul Choksi through a BVI shell company. The Samuels examiner found that Choksi's secret ownership of IGL permitted Samuels to conceal from consumers the fact that its jewelry products were not independently evaluated. IGL's offices were directly next to Diamlink's offices.

235.    On October 2, 2018, IGL's president Curtis Lowrey advised Rochelle Miller that IGL had completed its inspection and appraisal of the NMI and FDII inventory; which Lowrey described as "17 bags and trunks of merchandise." IGL appraised the NMI and FDII inventory at a "scrap value" of approximately $1.5 million. Lowrey further noted that, "as this is a 'fire sale' . . . I made deeper discounts than would normally be customary in pricing a closeout inventory." Rochelle Miller paid IGL a total of $81,943 from June 2018 to June 2019 from FDII's and Synergies' bank accounts.

236.    Rochelle Miller then purported to sell the NMI and FDII inventory to the "highest bidders" for a total purchase price of $1,593,550. It appears that most, and possibly all, of the purportedly arms-length purchasers were surrogates of Nirav Modi and his family.

237.    For example, under an invoice October 4, 2018, Rochelle Miller sold an unspecified quantity of "mixed jewelry" to Hong Kong-based Alchemist Global Trading & Consulting Ltd. ("Alchemist") for a total price of $420,300. Alchemist was formed on May 16, 2018 and is owned by Tamer Abou El Ata, who on information and belief, is a personal friend of Nehal Modi.

238.    Under an invoice dated October 8, 2018, Rochelle Miller sold 296.56 carats of "loose diamonds" for $605,000 to Diamonds Village USA Corp., the California-based subsidiary of Dubai-based Diamonds Village DMCC. In July 2018, the owner of Diamonds Village, Naresh Mehta, was accused of running his own import-export scam using a *modus operandi* similar to Nirav Modi. The Firestar Entities' books and records reflect numerous transactions with Diamonds Village over the years.

45

**84**

239.    On October 9, 2018, Rochelle Miller paid herself a "one-time bonus" of $50,000 from FDII's bank account. On October 17, 2018, Rochelle Miller wired $75,000 to Anthony Allicock from Synergies' bank account. These payments appear to be incentive compensation tied to Miller's sale of the FDII and NMI inventory.

240.    Between June 2018 and June 2019, Rochelle Miller received a total of $807,203 in compensation, bonuses, and expense reimbursements from the U.S. Affiliates. Miller also paid an additional $535,763 to Mint Holdings, LLC, a Miami-based "luxury concierge service" company with ties to the Modi family, for "expense reimbursements" for which she received the benefit. Miller also paid a company owned by her husband, North Star Land Services, a total of $49,060 for unknown "sales."

241.    Rochelle Miller spent the remainder of the U.S. Affiliates' funds on legal and financial advisors, taxes, office space leases, director & officer insurance premiums, and other miscellaneous expenses.

242.    The systematic diversion of the U.S. Entities' assets to overseas Modi-Controlled Entities described in the foregoing paragraphs, in combination with the fraudulent omissions and misrepresentations Ajay Gandhi and Mihir Bhansali made in the context of these chapter 11 cases, constituted millions of dollars in actual fraudulent transfers and impaired recovery of loan receivables of the Debtors and the U.S. Affiliates.

**B.    Fraudulent Omissions, Misstatements, and Misrepresentations Made in Connection With The Debtors' Chapter 11 Cases**

243.    On February 26, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. During the early weeks of the chapter 11 cases, Bhansali and Gandhi, as the Debtors' CEO and CFO, respectively, made fraudulent omissions, misstatements, and misrepresentations, formally and informally, explicitly and implicitly, to this Court, to the United

46

**85**

States Trustee, and to creditors, regarding the Debtors' involvement in the Bank Fraud and their relationship to various Shadow Entities.

244.    In his Declaration filed with this Court on February 28, 2018, Bhansali stated under penalty of perjury, "A list setting forth the twenty (20) largest unsecured creditors, of each of FDI, [Fantasy] and [Jaffe], excluding those persons who constitute 'insiders' under Bankruptcy Code section 101(31), is attached hereto as Exhibit B."

245.    Exhibit B to Bhansali's declaration, which purported to list the top 20 unsecured non-affiliated creditors of each Debtor, included: World Diamond as a creditor of FDI in the amount of $79,918.70; Fancy Creations as a creditor of FDI in the amount of $19,617.50; Tri Color as a creditor of Jaffe in the amount of $3,356,165.99; Pacific as a creditor of Jaffe in the amount of $2,922,239.31; Universal as a creditor of Jaffe in the amount of $42,905.00; and Eternal as a creditor of Jaffe in the amount of $31,645.39. Each of these entities was in fact an insider.

246.    Moreover, Bhansali led the bankruptcy court and other parties to believe that the Debtors were not involved in the Bank Fraud and that they were innocently caught up in an overseas matter. In a declaration filed shortly after the petition date, Bhansali declared under penalty of perjury: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to: (i) procure alternate sources of supply, (ii) establish alternate back office and support service functions; (iii) reassure their vendors and customers that they had no involvement in the alleged wrongful conduct; and (iv) reassure their customers that they were committed to carrying on their business and that swift action was being taken to mitigate the damage caused by the actions in India."

247.    On March 27, 2018, the Debtors filed their bankruptcy schedules and statements of financial affairs ("SOFA"), all of which Ajay Gandhi signed under penalty of perjury. The

47

86

Debtors' statements of financial affairs contained numerous misstatements, misrepresentations, and omissions.

248.    FDI's SOFA did not list any transfers to Shadow Entities in response to Question No. 3, which asks for payments made to creditors within 90 days prior to the petition date, Question No. 4, which asks for transfers of property to insiders of the debtor within 1 year prior to the petition date, or Question No. 13, which asks for any other transfers made outside the ordinary course of business within 2 years prior to the petition date.

249.    In truth, there were substantial transfers by FDI to Shadow Entities that Gandhi personally directed or otherwise participated in during the relevant periods. For example, Gandhi did not disclose FDI's transfers of $483,620.05 and $2,188,769.43 and Jaffe's transfer of $530,000 to Pacific on January 3, 2018—only a few weeks prior to the Petition Date. Nor did Gandhi disclose FDI's payment of $300,000 to Unique on March 22, 2017, less than a year prior to the Petition Date.

250.    Additionally, neither Jaffe's bankruptcy schedules nor SOFA disclosed any amounts owed by NMI to Jaffe.

251.    However, Jaffe's and NMI's books and records each reflected an $11,216,467 loan balance owed by NMI to Jaffe as of the Petition Date, which have not been repaid.

252.    On March 23, 2018, the Debtors moved for approval of bidding and sale procedures for the sale of substantially all of their assets under section 363 of the Bankruptcy Code. On March 29, 2018, the Court approved the Debtors' bidding and sale procedures.

253.    On April 20, 2018, the Court appointed John J. Carney as examiner (the "Examiner") to investigate the nature and extent of the Debtors' involvement in the Bank Fraud.

254.    Shortly after the Examiner's appointment, the Examiner attempted to interview Bhansali. Bhansali flatly refused to cooperate. When pressed by the Examiner's counsel,

48

**87**

Bhansali's counsel acknowledged that Bhansali was in communication with Modi as late as March 15, 2018, and that he and Modi discussed the Debtors' sale and bankruptcy process. As alleged above, Ajay Gandhi and Angelina Ypma also communicated with Nirav Modi in March 2018.

255.    On May 1, 2018, the Debtors adjourned the auction for FDI and Fantasy's assets indefinitely. On May 3, 2018, Parag Diamonds, Inc. was the successful bidder for Jaffe's assets.

256.    On May 15, 2018, at a hearing to approve the Jaffe sale, the Debtors' chief restructuring officer Mark Samson testified that Mihir Bhansali had been in communication with Nirav Modi between the commencement of the Debtors' chapter 11 cases and March 15, 2018, and that Bhansali continued to be involved "on a daily basis" as "a key employee" in the sale process after that date.

257.    Following this revelation, the Court asked for the record to be supplemented with additional detail concerning the nature and extent of Bhansali's post-petition communications with Modi, and adjourned the sale hearing to May 23, 2018. On May 19, 2018, the Debtors withdrew the sale motion without prejudice. (Dkt. 177.) At a hastily-arranged Chambers conference on May 18, 2018, Bhansali's counsel advised the Court that Bhansali resigned as director and officer of the Debtors that same day and that Bhansali refused to submit a declaration and appear for cross-examination concerning his post-petition communications with Modi.

258.    On May 17, 2018, Ajay Gandhi sat for an interview with the Examiner's team. In that interview, Gandhi stated that the only thing he knew about the Shadow Entities was that they were Bhansali's customers. In subsequent interviews, Gandhi continued to insist he was not aware that any Shadow Entity was owned or controlled by Nirav Modi. When confronted by the Examiner's team with emails indicating that Gandhi was aware that numerous Shadow Entities

49

were related parties, Gandhi repeatedly maintained he did not remember these emails, nor that the Shadow Entities were in any way controlled by Modi.

259.    Additionally, in response to the Examiner's questions regarding Gandhi's involvement in hundreds of millions of dollars in loose diamond transactions, Gandhi told the Examiner that he merely signed packing slips with no verification of the contents of the shipment, its valuation, the profitability, or propriety of such transaction.

260.    Additionally, when the Examiner asked Gandhi whether he ever used his personal email accounts for Firestar business, Gandhi stated that he did not. In fact, during the Relevant Period, Gandhi sent numerous emails pertaining to the Debtors and other Modi-Controlled Entities to and from several personal email accounts.

261.    On June 14, 2018, the Court approved the Trustee's appointment, at which time the Trustee assumed control of the Debtors' estates and operations.

262.    On August 7, 2018, the Examiner conducted a deposition of Mihir Bhansali. Bhansali's knowledge, intent, and culpability with respect to the Bank Fraud and other misdeeds alleged in this Complaint can be inferred from the fact that Bhansali invoked his Fifth Amendment right against self-incrimination in response to every question except his name.

C.    *Other Efforts to Cover Up and Frustrate Investigation of the Bank Fraud*

263.    Nirav Modi, Bhansali, and Gandhi, and their co-conspirators researched and implemented various tactics to conceal and destroy evidence of their involvement in the Bank Fraud both prior to and after the Bank Fraud's exposure.

264.    Pradeep Mhatre, a member of FIPL's information technology department, told Indian authorities that in 2010 or 2011, Mihir Bhansali instructed him to set up a secret closed email server in the Dubai office using the domain "panemail.com." The Panemail server restricted emails from being sent to or received from outside email servers, nor was it possible to download

**89**

emails and attachments from the server. The server was limited to 25 – 30 users, including Nirav Modi, Mihir Bhansali, Ajay Gandhi, Neeshal Modi, Hemant Bhatt, Aditya Nanavati, Shyam Wadhwa, Satyendra Shukla, Kurian Mathews, and Sridnar Krishnan. Mihir Bhansali instructed and approved adding users to the server.

265.    Mhatre further told Indian authorities that, in 2017, Bhansali instructed him to create a new secret server on the domain "cricketnow.live" with restrictions similar to the Panemail server. This server automatically deleted emails after one week. In this server, users were assigned generic IDs such as "user1, DOE1, DOE2, DXB1, HK1, etc." to enhance secrecy.

266.    On February 13, 2018, an attorney at Day Pitney LLP emailed Ajay Gandhi to suggest that bank statements for CPS50, which owned the 50 Central Park South property, be sent directly to Abhay Javeri as manager of CPS Properties LLC. Gandhi forwarded the email to "ajaycpa@yahoo.com", which upon information and belief is Gandhi's personal email address, and stated, "Niravbhai, OK to have CPS 50 Properties LLC bank statement from Citibank sent to Abhay Javeri to his email address or Abby's mailing address?" The fact that Gandhi addressed this email to "Niravbhai" shows that Nirav Modi and Ajay Gandhi were using Gandhi's personal email account to communicate in the weeks following the exposure of the Bank Fraud.

267.    Similarly, on March 13, 2018, Ajay Gandhi sent his own Yahoo email account an email addressed to "Niravbhai" summarizing transactions in and out of NMLUK's Barclays Bank account for Modi's review, including a £2,000,000 deposit from Nirav Modi personally on January 29, 2018. As alleged below, only a few weeks earlier, Nirav Modi purchased a £7,950,000 London apartment after fleeing India.

268.    Ajay Gandhi also coordinated with Purvi Mehta during this time. On February 16, 2018, Purvi Mehta emailed Ajay Gandhi, "Where can I reach u on WhatsApp?" Gandhi replied with his personal phone number.

51

90

269.    On March 11, 2018, Ajay Gandhi ran internet searches on the *Adelphia Communications* fraud case and related bankruptcy. These searches included: "how did adelphia get caught"; "how rigas family were caught in the fraud of adelphia"; and "how adelphia fraud was discovered?"

270.    On March 9, 2018, Bhansali visited an internet article entitled "14 Signal App Tips for Secure Chats," which described tips for sending and erasing secure communications through Signal, an end-to-end encryption application.

271.    On March 12, 2018, Mihir Bhansali visited an internet article entitled "How to Clear Your Cache on Any Browser." The article described methods of deleting internet browsing history on various web browsers. That same day, Bhansali visited an internet article entitled "How to Hack Wi-Fi Passwords." This article described methods of obtaining access to wireless networks without the required password.

272.    Mihir Bhansali's laptop contained a software program called "Hide My Ass! Pro VPN." Upon information and belief, the purpose of this program is to facilitate anonymous internet usage through virtual private network technology. The software's logs indicate that the program was used as recently as February 11, 2018.

273.    Bhansali's laptop also contained a program called SecurStar DriveCrypt. Upon information and belief, the purpose of this program is to encrypt data on computers.

274.    As alleged above, Bhansali created what appears to be a "to-do" list for the various co-conspirators following exposure of the Bank Fraud. The list included instructions to "Send all non-Firestar Dubai comps to HK." Upon information and belief, "comps" refers to "computers."

275.    According to statements made by various Firestar Entity and Shadow Entity directors and employees to Indian authorities, around February or March 2018:

52

*91*

(i)     Nehal Modi and Mihir Bhansali removed approximately 50 kilograms of gold and 2.5 Lac Dirhams (worth approximately $68,000) from a Dubai-based Firestar Entity;

(ii)    Neeshal Modi diverted diamonds from Dubai-based Modi-Controlled Entities to Hong Kong.

(iii)   Nehal Modi removed over $6 million in diamonds and 150 boxes of pearls from one of the Hong Kong-based Modi-Controlled Entities. In the "to do" list spreadsheet recovered from Mihir Bhansali's computer, the tasks listed under "MB" included "Pearls – where to keep the inventory?" and "Pearls – original purchase entries."

(iv)    Mihir Bhansali, Nehal Modi, and Nirav Modi intimidated and coerced directors and employees of Shadow Entities not to cooperate with investigative authorities. For example, Ashish Lad, a director of Shadow Entity Unity, told Indian authorities that Nirav Modi threatened to kill or falsely implicate Lad if he revealed anything to the investigative authorities.

(v)     Nehal Modi destroyed cell phones of Shadow Entity directors. He told the directors that their "mobile phones are easy to track and they are evidence." Modi also oversaw the destruction of accounts, records, and servers of various Modi-Controlled Entities.

(vi)    Nehal Modi bribed Ashish Lad with INR 2,000,000 (approximately $28,000) to give false testimony to judicial authorities in Europe.

(vii)   Nirav Modi told Shadow Entity personnel that "it was not safe for [them] in Dubai and [they] must shift to Cairo[, Egypt.]" Once in Cairo, Modi, or others operating at his behest, confiscated the Shadow Entity personnel's passports "on the pretext of some residency permission."

(viii)  Nirav Modi, or others operating at his behest, instructed Shadow Entity personnel to sign affidavits before they left Cairo stating that the Shadow Entities were owned by the directors and were in no way related to Nirav Modi.

53

92

### D.    *Money Laundering to Modi Family Members Prior to Exposure of the Bank Fraud*

276.    As early as 2014, Nirav Modi and his co-conspirators began developing plans to "restructure" the Firestar Entities' global corporate structure in contemplation of an eventual initial public offering. The initial public offering appeared to be their exit strategy from the fraud scheme.

277.    The planned restructuring served the dual purpose of (a) sanitizing any trace of the Modi family's self-dealing during the Relevant Period from the Firstar Entities' books and records and ownership structure, and (b) providing a pretext for funneling assets to Ami Modi and Purvi Mehta.

278.    For example, one issue the planned restructuring aimed to resolve was the dubious record of Synergies' capitalization and ownership.

279.    Synergies was originally formed in April 2007 to serve as the purchaser entity in connection with the acquisition of Jaffe later that year.

280.    On October 11, 2007, Mihir Bhansali and Ajay Gandhi executed a stock certificate reflecting FIPL as the holder of 10,000 shares in Synergies.

281.    Between October 20, 2010 and March 11, 2011, Nirav Modi personally transferred a total of $14,575,000 to Synergies, which Synergies used to pay off purported loans from FIPL. The "loans" from FIPL consisted of earlier circular transactions in which FIPL wired funds to Synergies and Synergies immediately wired the funds back to FIPL, or in on other instances, to FDIPL, Brilliant, Eternal, or other Modi-Controlled Entities.

282.    On October 1, 2016, even though FIPL remained the sole owner of Synergies, Nirav Modi and FHL entered into an Agreement for Purchase of Shares in Synergies Corporation under which Nirav Modi, in his personal capacity, purported to sell 100% of the outstanding shares of

54

**93**

Synergies to FHL in exchange for a price of $100. The agreement was signed by Mihir Bhansali and Ajay Gandhi on behalf of Synergies, by Nirav Modi on his own behalf and by FHL's then-director Himanshu Trivedi. That same day, Mihir Bhansali and Ajay Gandhi executed a stock certificate reflecting FHL as the holder of 10,000 shares in Synergies.

283.   In December 2016, Nirav Modi assigned to Purvi Mehta his interest in the $14,575,000 Synergies "loan" under an assignment agreement retroactively dated as of April 1, 2012. This assignment was described as a gift in numerous emails. As alleged below, in July 2017, Synergies ultimately used a purported capital infusion from FHL to pay off the loan to Purvi Mehta as part of a broader diversion of funds to Mehta under the guise of the broader restructuring.

284.   Another aspect of the restructuring was developing a means to divest CPRE, which was the record owner of Nirav Modi and Ami Modi's personal residence in New York, so that those properties could not be reached by creditors.

285.   CPRE was formed under Delaware law on February 15, 2007. On March 26, 2007, CPRE purchased an apartment at the Essex House, 160 Central Park South in New York City (the "Essex House Apartment") for $4.995 million, of which FDII paid $2 million. The balance was funded by HSBC, which was granted a mortgage on the Essex House Apartment. Bhansali signed the deed on behalf of CPRE. CPRE was owned by FDI until approximately the end of 2009, when FDI transferred it to FGI. The Essex House Apartment was used by Nirav Modi and Ami Modi as a personal residence.

286.   At all relevant times, Mihir Bhansali and Ajay Gandhi served as the manager and treasurer, respectively, of CPRE.

287.   On December 5, 2014, Ajay Gandhi emailed Howard Hoff of Marks Paneth, asking for input on "[1] Potential Sale or Gift of Central Park LLC to Ami Modi (Nirav's wife) who is a

55

94

US Citizen [and 2] Moving Firestar Diamond, Inc. / Fantasy, Inc. from Firestar Group's umbrella to an overseas Firestar entity . . ."

288.    On February 22, 2015, Ajay Gandhi emailed Howard Hoff, copying Mihir Bhansali, a spreadsheet analyzing various scenarios for selling FDI and CPRE. The spreadsheet included as questions: "Trust set-up by Purvi Modi – HK Resident[.] HK Trust funds Nirav Modi via Gift or Loan[.]" Hoff replied, "Please be more specific on the trusts [sic] involvement in the transaction. Is it just going to loan the money or is it going to have ownership prior to an eventual transfer. What type of trust is it, who are the beneficiaries, is it Purvi's trust or is Purvi the executor, what country is Purvi a resident and a citizen of?" Gandhi replied, "Purvi is a HK resident and she will be owner of the trust unless you have a better thought or ideas to have Ami fund the purchase."

289.    On March 4, 2015, Ajay Gandhi outlined the steps for moving CPRE beyond the reach of creditors in an email to Raghu Iyer, "1. Move $1.8m and $3m of other liabilities from CP[RE] to Firestar Group, Inc. thru J[ournal]E[ntrie]s . . . Only HSBCs $3m liability will be left . . . Ami needs to wire $1.935m at the closing to buy CP[RE], . . . Ami will get Gift in USA from Purvi . . . $1.935m will now be used to pay off FGI debts (Firestar Diamond, Inc.) . . . Need clarity from Howard if how much funds should come from Firestar Holdings Ltd HK to buyout Firestar Diamond/Fantasy, Inc. and how to move funds back to HK or somewhere."

290.    On March 31, 2015, Raghu Iyer asked Ajay Gandhi for a status update on the restructuring. Gandhi replied, "Not sure if you spoke to Shyam Wadhwa as he does not want to speed-up change of ownership as he has issues of how to create capital in FS, HK and issues with bank covenants in HK hence he suggest to do as late as possible in 2015-16." Raghu replied, copying Mihir Bhansali, "Mihir[,] I was not aware of these issues[.] Can you take it up with NDM?" Bhansali replied, copying Wadhwa, "Mr. Wadhwa has already spoken to Nirav."

56

*95*

291.    Thus, the restructuring plans were put on hold until sufficient funds were available to effectuate all of the necessary transactions.

292.    The restructuring planning ramped up in late 2016, likely prompted by the looming retirement of Gokulnath Shetty, the PNB employee who approved the fraudulent LOUs to Nirav Modi's and Mehul Choksi's entities, which occurred in May 2017.

293.    On November 3, 2016, Manish Modi emailed Ajay Gandhi a request for a status update and asked "[F]or CPRE, does Nirav Bhai have to pay money to CPRE (via Ami Modi)[?] That cash flow has to be planned." Gandhi replied, "Spoke to Howard. If Ami Modi buys CPRE and assumes $3m of HSBC loan then she needs to pay $2m for CPRE assuming valuation of $5m."

294.    On November 14, 2016, Gandhi emailed HSBC, "We are planning change of ownership of Central Park Real Estate, LLC, which [is] currently owned by Firestar Group, Inc., to Ami Modi (She is US Citizen and wife of Nirav Modi). No other changes to existing agreement. Anything to be done?"

295.    For the next several months, HSBC repeatedly requested additional information relating to the ownership structure of CPRE and other Firestar Entities and the source of Purvi Mehta's wealth.

296.    When Gandhi told Nirav Modi about HSBC's requests, Gandhi said he "avoided giving these [sic] information and told them that we may do restructuring of Central Park and may change ownership etc." but that the "only way we can avoid is only if we pay-off the $ 3 m mortgage in next few months." Modi responded, "There will be a change in ownership in May end so better to explain that."

297.    The laundering of funds through the Firestar Entities' corporate restructuring involved several steps. First, various British Virgin Island, Cayman Island, and Mauritius shell

57

*96*

companies secretly owned by the Modi family would invest up to $75 million in FIPL. FIPL would

then make a $115 million capital contribution to FHL.

298.    Of this $115 million, FHL would use $65 million to redeem non-voting FHL shares

owned by Purvi Mehta (both personally and through Fine Classic), $23 million to repay various

loans from Purvi Mehta and Fine Classic, and $20 million to infuse capital in Synergies.

299.    Synergies would then use $14,575,000 of the new capital to "repay" Purvi Mehta

for the "loans" Nirav Modi originally made to Synergies in 2010 and 2011 and subsequently

assigned to Purvi Mehta in 2016.

300.    To secure the additional funding needed for these transactions, Nirav Modi and

his co-conspirators obtained 150 LOUs totaling over $1 billion between February and May 2017.

301.    The "investment" in FIPL also used funds siphoned from Shadow Entities in

earlier years.

302.    For example, in November 2013, Shadow Entity had Pacific transferred

$30,000,000 to Mayank Mehta, Purvi Mehta's husband. These Shadow Entity payments to

Mayank Mehta were characterized as "payouts" or "shareholder dividends."

303.    Mayank Mehta transferred the $30 million received from Pacific in November 2013

to Purvi Mehta as a gift. Purvi Mehta then used these funds as collateral for loans to Radashir, a

Modi-controlled Entity in India that also participated in the Bank Fraud, until 2016 when the

funds were returned to Purvi Mehta. Purvi Mehta then moved $23 million to her account in

Mauritius.

304.    Between December 14, 2016 and January 12, 2017, Fine Classic transferred a total

of $25,700,500 to Purvi Mehta's Mauritius account. According to Kurian Mathews, Shyam

Wadhwa, and Nilesh Mistry, who oversaw Fine Classic's day-to-day finances and operations, the

circular import and export transactions between Fine Classic and other Shadow Entities were

97

structured so as to generate deliberately high profit margins for Fine Classic, with corresponding losses in other Shadow Entities. According to the India ED, Fine Classic received approximately $89 million from other Shadow Entities from 2011 to 2017.

305.    Purvi Mehta then transferred $40 million from her Mauritius bank account to Novelar International Holdings Ltd. ("Novelar"), a BVI entity of which she is the ultimate beneficial owner.

306.    Novelar owns Islington International Holdings Pvt. Ltd., a Singapore-based entity. In January or February 2017, Novelar transferred $40 million to Islington. Around this time, Purvi Mehta also transferred $425,000 directly into Islington. In February 2017, Islington invested $45 million, including the funds received from Novelar and Purvi Mehta, in FIPL.

307.    Thus, by February 2017, $45 million in purported new investments had been indirectly made by Purvi Mehta in FIPL using the proceeds of the Bank Fraud.

308.    On March 22, 2017, Bhansali and his wife purchased apartment 24A at 50 Riverside Boulevard in New York City for approximately $7.1 million, of which approximately $5.3 million was paid in cash. Just weeks earlier, Mihir Bhansali had received a $1.5 million wire into his personal HSBC checking account from Purvi Mehta on February 24, 2017. Bhansali's annual salary from the Debtors was approximately $154,000. On June 29, 2017, Purvi Mehta wired another $750,000 to Mihir Bhansali's personal checking account at HSBC.

309.    Only two days after the Debtors filed for bankruptcy, Bhansali transferred his interests in the apartment to his wife, Rakhi Bhansali for nominal consideration.

310.    Based on, among other things, the timing of these transactions and Purvi Mehta's role as a primary conduit for proceeds of the Bank Fraud, it appears this apartment was purchased using proceeds of the Bank Fraud.

*98*

311.    According to Indian authorities, Purvi Mehta also purchased a new Hong Kong apartment for herself in April 2017 for 19.5 crore INR (approximately $2.7 million). Neeshal Modi signed the agreement on Purvi Mehta's behalf under a power of attorney certified by the Indian consulate of Hong Kong.

312.    In March 2017, Nirav Modi and Ami Modi also were looking to purchase another New York residence for $25–$30 million. They initially planned to purchase a unit at the River House, a cooperative apartment building located at 435 E. 52nd Street in Manhattan.

313.    In May and June 2017, Purvi Mehta, "loaned" Ami Modi a total of approximately $34 million to fund the River House purchase.

314.    According to the India ED, at least $18 million of the funds Purvi Mehta loaned to Ami Modi in May 2017 were sourced from transfers to Purvi Mehta by Fine Classic, the Shadow Entity Purvi Mehta directly owned and controlled, between March 7, 2017 and April 27, 2017. Between July 9, 2017 and October 4, 2017, Fine Classic wired an additional $16,300,000 to Purvi Mehta from various accounts.

315.    When the River House sale fell through in mid-June 2017, Nirav Modi and Ami Modi turned their attention to an apartment at the Ritz Carlton located at 50 Central Park South in Manhattan (the "Ritz Carlton Apartment").

316.    On July 7, 2017, Purvi Mehta entered into a contract to purchase the Ritz Carlton Apartment for $25 million. That same day, Ami Modi wired, as a down payment, $2.5 million of the funds Purvi Mehta had transferred to her in May and June 2017 to a Katz & Matz LLP escrow account. Ami Modi and Purvi Mehta accounted for this transfer as a "partial repayment" of the loan from Purvi Mehta.

60

*99*

317.    That same day, accountant Howard Hoff at Marks Paneth LLP summarized the

planned transaction in an email to Nirav Modi and the Modi family's trust & estate counsel at

Day Pitney LLP and their real estate counsel Katz & Matz LLP as follows:

> Entity Establishment:
> 1) Create a NY LLC owned by Purvi. This will be the purchaser of the
>    condo. Timing is a few to days to open.
> 2) Once the trust is established, Purvi will transfer/assign ownership
>    of the LLC to the trust (Timing is a few weeks since the trust
>    agreements are almost complete)
>
> Flow of Funds:
> 1) Purvi will instruct Ami to partially repay the loan she made to her
>    directly to Steven [Matz]'s escrow account on behalf of the LLC.
>    (This will happen tomorrow)
> 2) Ami will then repay the remainder of the loan to Purvi overseas.
> 3) Purvi will have to wire directly to Steven's escrow account the
>    balance due on the condo in order to close.

318.    On July 11, 2017, Defendant CPS50 was formed and, on August 2, 2017, its

operating agreement was executed with Purvi Mehta as sole member and Nirav Modi's uncle

Deepak Sheth as its manager.

319.    On July 10, 2017, Synergies and FIPL entered into a Stock Purchase Agreement

under which Synergies purchased 100% of the outstanding common stock of FGI for a price of

$3,694,000. Ajay Gandhi signed the agreement on behalf of Synergies.

320.    On July 13, 2017, FHL wired a $20,000,000 "capital infusion" to Synergies. The

same day, Synergies wired $650,000 to Jaffe (which Jaffe used to pay off invoices from FIPL),

$1,047,000 to Brilliant (as repayment of a purported loan), $3,694,000 to FIPL (as the purchase

price for FGI, which Synergies acquired as part of the 2017 "restructuring"), and $14,575,000 to

Purvi Mehta. The $14,575,000 payment to Purvi Mehta (the "Synergies-Mehta Transfer") was

made under the pretext of paying off the loan Modi had assigned to Mehta.

61

*100*

321.    On July 14, 2017, FHL wired another $20 million to Purvi Mehta for redemption of her non-voting preference shares in FHL. Thus, over a two-day period, more than $34 million in proceeds of the Bank Fraud were wired to Purvi Mehta.

322.    On or around August 23, 2017, Purvi Mehta, as settlor, executed an instrument (the "Ithaca Trust Agreement") creating the Ithaca Trust as an irrevocable trust under Delaware law.

323.    The Ithaca Trust Agreement named Commonwealth Trust Company ("Commonwealth") as the trustee (the "Ithaca Trustee"), Ami Modi and her children as the beneficiaries, and Deepak Sheth as the initial protector (the "Ithaca Protector" or "Protector") of the Ithaca Trust. It also named Purvi Mehta and Nirav Modi's parents, Deepak Modi and Pragnya Modi, and cousin, Mihir Bhansali, as residual beneficiaries for any "property not otherwise distributed."

324.    Under the terms of the Ithaca Trust Agreement, the Ithaca Trustee cannot invest or manage any of the Ithaca Trust's assets without the express written direction of the investment advisor of the Ithaca Trust (the "Ithaca Investment Advisor" or "Investment Advisor")

325.    Under the terms of the Ithaca Trust Agreement, the Protector has the power to, among other things: (a) remove and appoint the Ithaca Trustee; (b) remove and appoint the Investment Advisor; (c) terminate the Ithaca Trust; (d) change the situs of the Ithaca Trust; (e) amend administrative provisions of the Ithaca Trust Agreement; (f) add or exclude beneficiaries; and (g) designate a successor to replace the Protector in the event the Protector resigns or is removed.

326.    Under the terms of the Ithaca Trust Agreement, if at any time there is no Protector serving and no successor named who accepts appointment within 30 days of the occurrence of the vacancy, Abhay Javeri shall be the Protector. If Abhay Javeri is unable or unwilling to serve

62

*101*

as Protector, a Protector may be appointed by Purvi Mehta or, if Purvi Mehta is not available or
is deceased, by Ami Modi.

327.    Under the terms of the Ithaca Trust Agreement, an appointment of a Protector may
impose qualifications or requirements or specify terms and conditions to be fulfilled prior to such
appointment taking effect.

328.    Under the terms of the Ithaca Trust Agreement, Nirav Modi has the power to
unilaterally remove the Protector. If Nirav Modi "is not available or is deceased," Purvi Mehta
inherits this power. If Purvi Mehta "is not available or is deceased," Ami Modi inherits this
power.

329.    Since Nirav Modi has the power to remove the Ithaca Protector, which in turn has
virtually complete control over the Ithaca Trustee, the Ithaca Investment Advisor, the Ithaca Trust
Agreement, and the Ithaca Trust's assets, Nirav Modi enjoys *de facto* total control over the Ithaca
Trust and its assets.

330.    On or around August 23, 2017, Deepak Sheth signed and delivered to the Ithaca
Trustee separate letters: (a) accepting his appointment as the Ithaca Protector; (b) appointing
himself as the Ithaca Investment Advisor; and (c) accepting his appointment as the Ithaca
Investment Advisor.

331.    On August 24, 2017, Nirav Modi advised Day Pitney that "the funds are in place
with Purvi" and asked for wire instructions for Commonwealth's fiduciary account for the Ithaca
Trust.

332.    On August 25, 2017, Purvi Mehta, on her own behalf, and Deepak Sheth, as
manager of CPS50P LLC, executed an agreement under which Mehta assigned her interest in the
Ritz Carlton sale contract to CPS50P LLC.

63

*102*

333.    On August 28, 2017, Deepak Sheth, in his capacity as Investment Advisor of the Ithaca Trust, signed and delivered a letter directing Commonwealth as Ithaca Trustee to: (a) accept an assignment from Purvi Mehta of the 100% membership interest in the CPS50; (b) execute an Amended and Restated Operating Agreement for CPS50; and (c) make an initial capital contribution in the amount of $23,000,000 to CPS50 by wiring that amount to the Katz & Matz LLP escrow account to fund the purchase of the Ritz Carlton Apartment.

334.    That same day, Deepak Sheth, in his capacity as manager of CPS50, executed CPS50's amended and restated operating agreement.

335.    On August 29, 2017, Purvi Mehta assigned the membership interest in CPS50 to the Ithaca Trust.

336.    On August 30, 2017, Modi emailed Day Pitney attorneys and other professionals informing them that $23 million had been wired from Mehta to Commonwealth and directing Commonwealth to further wire the funds to attorneys at Katz & Matz to execute the purchase of the Ritz Carlton Apartment. Mehta was not on the email thread.

337.    Also on August 30, 2017, Katz & Matz attorney Steven Matz emailed Nirav Modi and others with instructions for the September 7, 2017 closing of the Ithaca Trust's purchase of the Ritz Carlton Apartment. Once again, Mehta was not on the email thread.

338.    On August 31, 2017, Mehta transferred $23 million to Commonwealth, as trustee of The Ithaca Trust. Commonwealth then transferred those funds to the Katz & Matz escrow account, where they were subsequently used to buy the Ritz Carlton Apartment.

339.    On September 1, 2017, Ami Modi returned $25 million of the funds Purvi Mehta had "loaned" to her in May 2017 (which had been sitting in Ami Modi's HSBC bank account) to Purvi Mehta.

*103*

340. On September 6, 2017, Katz & Matz issued a $22,567,465.92 check to the sellers of the Ritz Carlton Apartment in connection with the closing of the sale.

341. On September 25, 2017, Ami Modi wired another $6,500,000 to Purvi Mehta as a purported loan repayment.

342. On September 29, 2017, FHL wired $8,860,000 to Purvi Mehta as a "loan repayment."

343. On October 5, 2017, Ami Modi received $70,000 from Mihir Bhansali and wired another $406,188 to Purvi Mehta as a purported loan repayment.

344. On October 18, 2017, FHL wired $30,000,000 to Purvi Mehta to redeem non-voting preference shares.

345. On November 10, 2017, FHL wired $15,000,000 to Purvi Mehta to redeem non-voting preference shares. Thus, from September through November 2017, approximately $85,000,000 in proceeds of the Bank Fraud were transferred to Purvi Mehta.

346. In December 2017, Ajay Gandhi opened a CitiBank account for CPS50. Gandhi listed himself as "president" of CPS50 in the application materials. Ajay Gandhi and Abhay Javeri served as the authorized signors on the account.

347. On November 8, 2017, Deepak Sheth, as Ithaca Investment Advisor, directed Commonwealth, as Ithaca Trustee, to remove Deepak Sheth as manager, president, and chief executive officer of CPS50 and appoint Abhay Javeri as his replacement in those positions. That same day, Deepak Sheth also resigned as investment advisor (but not protector) of the Ithaca Trust and appointed Abhay Javeri as his replacement.

348. With the Ritz Carlton Apartment transaction complete, Nirav Modi and his co-conspirators returned their attention to divesting FGI's ownership of CPRE and the Essex House Apartment.

65

*104*

349.    On December 4, 2017, by email, Nirav Modi told Ajay Gandhi to pay off the HSBC mortgage on the Essex House Apartment in full.

350.    Gandhi contacted HSBC indicating that there was an urgent need to for the Ithaca Trust to assume the mortgage on the Essex House and transfer the liability from FGI to the Ithaca Trust. Gandhi soon determined the mortgage could not be transferred quickly enough and decided instead to arrange to have the mortgage paid off completely.

351.    On December 5, 2017, Gandhi wired $3 million from FDI to HSBC in satisfaction of HSBC's mortgage on the Essex House using funds originally from Jaffe and Fantasy as well as from FDI's own account and from an HSBC line of credit.

352.    In addition to the mortgage payoff, FDI had made at least $856,335 of the monthly payments on the Essex House Apartment mortgage between 2011 and 2018, and also paid JW Marriott Essex House NY $15,828.35 in January 2018, after CPRE was transferred from FGI to the Ithaca Trust.

353.    With the mortgage retired, Nirav Modi asked Marks Paneth and Day Pitney to devise a strategy to transfer the unencumbered property (worth approximately $6 million) to the Ithaca Trust.

354.    On December 15, 2017, one of Modi's accountants emailed Modi with three potential options for minimizing transfer taxes on "the movement of CPRE." The first option was for Nirav Modi to purchase CPRE directly from FGI, the second for Ami Modi to purchase CPRE directly, and the third was using the Ithaca Trust to make the purchase after Purvi Mehta contributed more cash to the trust. The accountant explained that, "since [Modi] prefer[red] to fast track the transaction," the existing trust could be used and then the trustee could "move the LLC to another trust in due time." The trust would use the funds from Purvi Mehta to purchase

66

*105*

CPRE from FGI, thus becoming the indirect owner of the Essex House Apartment. Modi chose the third option.

355.    On December 27, 2017, Abhay Javeri, as Ithaca Investment Advisor, signed and delivered to Commonwealth as Ithaca Trustee a letter of direction instructing Commonwealth to "become the sole member of [CPRE] by purchasing a 100% membership interest in [CPRE] for $6,000,000."

356.    On December 28, 2017, Ajay Gandhi, on behalf of FGI, as treasurer, and on behalf of CPRE, as chief financial officer, and Commonwealth, as Ithaca Trustee, executed the agreement for the sale of CPRE to the Ithaca Trust.

357.    On December 29, 2017, Nirav Modi emailed professionals from Day Pitney and Marks Paneth and others to announce that "[t]he funds have been wired value today."

358.    The funds did not clear Purvi Mehta's Singapore bank account until January 1, 2018. The Ithaca Trust then wired $6 million to FGI's HSBC account for the purchase of CPRE. FGI then transferred the equity interests in CPRE to the Ithaca Trust (the "CPRE Equity Transfer").

359.    On January 17, 2018, after the Ithaca Trust purchased CPRE LLC, Ajay Gandhi consulted Day Pitney about transferring additional funds to the Ithaca Trust for use in connection with the Essex House Apartment and Ritz Carlton Apartment.

360.    Day Pitney lawyers told Ajay Gandhi, Nirav Modi, and Purvi Mehta that "to fund either of the LLC accounts, the funds will first have to be transferred to the Ithaca Trust account, and Abhay Javeri, as Investment Advisor of the Ithaca Trust, will have to direct the trustee accordingly." Immeke Schmidt of Day Pitney followed up, "Purvi, as settlor of the trust, would fund the trust with her own assets from a non-US account in her name." Nirav responded, asking

67

106

for the instructions to wire funds to the Ithaca Trust, which a Day Pitney attorney provided in response.

361.    On January 17, 2018, Ajay Gandhi, on behalf of CPS50, executed an agreement with Izeu, a French interior design firm, under which Izeu provided interior design services for the Ritz Carlton Apartment.

362.    On January 18, 2018, $1 million was wired from Purvi' Mehta's Singapore bank account to Commonwealth. That same day, Abhay Javeri, as investment advisor of the Ithaca Trust, sent Commonwealth a letter instructing Commonwealth to make a $1 million capital contribution to CP550. The next day, Commonwealth wired $1 million to CPS50's Citibank account. That same day, an international wire in the amount of $84,665.25 was made from CPS50's Citibank account to Izeu. On February 13, 2018, an additional $237,176.75 was wired internationally to Izeu.

363.    By March 2018, Commonwealth had flagged the Ithaca Trust as a "high risk trust" and internally expressed concern about serving as Ithaca Trustee. On March 13, 2018, Commonwealth sent notices to Deepak Sheth, as Protector of the Ithaca Trust, and Purvi Mehta, as settlor of the Ithaca Trust, informing them that Commonwealth was resigning as Ithaca Trustee effective as of April 13, 2018.

364.    At some point between March 13, 2018 and May 25, 2018, Deepak Sheth resigned or was removed as Ithaca Protector.

365.    On May 25, 2018, Ami Modi executed a deed appointing Nehal Modi as Ithaca Protector. The deed contained recital indicating that: (a) Abhay Javeri had renounced his appointment as successor Protector of the Ithaca Trust; and (b) Purvi Mehta "released the power to appoint a Protector on August 23, 2017."

68

*107*

366.    That same day, Nehal Modi signed and delivered his acceptance of his appointment as Ithaca Protector; executed a deed removing Abhay Javeri as Ithacha Investment Advisor and appointing himself as the replacement; executed a deed appointing Trident as Ithaca Trustee.; and executed a deed amending the Ithaca Trust Agreement to change the governing law from Delaware law to South Dakota law.

367.    That same day, Abhay Javeri, as Ithaca Investment Advisor, signed and delivered a letter of direction instructing Trident, as Ithaca Trustee, to remove Abhay Javeri as manager of CPS50 and appoint Nitin Dattani as his replacement.

368.    As alleged above, around this same time, Nitin Dattani was working with Angelina Ypma, Mihir Bhansali, Ajay Gandhi, and Anthony Allicock to divert NMLUK's assets to Hong Kong and was also helping Nirav Modi establish Diamonds Holdings Ltd. while Nirav Modi was in hiding in London.

369.    On information and belief, Trident remains Ithaca Trustee, Nehal Modi remains Ithaca Protector, Abhay Javeri remains Ithaca Investment Advisor, and Nitin Dattani remains manager of CPS50. On information and belief, Mihir Bhansali and Ajay Gandhi remain manager and treasurer, respectively, of CPRE.

370.    In sum, numerous members of Nirav Modi's and Ami Modi's family, including Purvi Mehta, Mihir Bhansali, Deepak Sheth, and Abhay Javeri worked together and with Ajay Gandhi and other co-conspirators to effectuate the foregoing transactions concerning Nirav Modi's and Ami Modi's personal real estate holdings as part of an effort to insulate millions of dollars in ill-gotten assets from creditors.

69

*108*

## CLAIMS FOR RELIEF

### COUNT 1

### Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act ("RICO")
### 18 U.S.C. § 1962(d)
### (Debtors' Claim Against All Defendants)

371.    Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

372.    Nirav Modi, Mihir Bhansali, Ajay Gandhi, and each Defendant are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

373.    As alleged below, each Defendant violated 18 U.S.C. § 1962(d) by agreeing to join, participate in, or support a conspiracy under which one or more persons, including Nirav Modi, Mihir Bhansali, and Ajay Gandhi, would conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

### Nirav Modi, Mihir Bhansali, and Ajay Gandhi's Substantive RICO Violation

374.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi each violated 18 U.S.C. § 1962(c) by their respective acts, described in the prior paragraphs and as further described below.

375.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged below.

376.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi each committed at least two predicate acts of racketeering, as more specifically alleged below. The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participants, victims, or method of commission. Further, the acts of racketeering were continuous, spanning the period from at least 2010 to mid-2018.

70

**109**

### The RICO Enterprise

377.    Each of the U.S. Entities is a corporation. Each of the U.S. Entities is therefore an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

378.    Alternatively, the Firestar Entities, collectively, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of designing, manufacturing, and selling diamonds and jewelry.

379.    Alternatively, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, together with their known and unknown co-conspirators, form an association-in-fact engaged in and affecting interstate and foreign commerce for a common and continuing purpose of formulating and implementing a common scheme to defraud PNB for their personal enrichment through a pattern of fraud, lies, deceit, and corruption. Such common purpose came into existence no later than 2010, when Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators implemented a scheme to defraud PNB by fraudulently obtaining LOUs by exploiting the web of Shadow Entities, LOU Entities, and other Modi-Controlled Entities.

380.    Whether conceptualized in the manner described in paragraph 377, paragraph 378, or paragraph 379, there existed during and after the Relevant Period one or more enterprises within the meaning of 18 U.S.C. § 1964(4) (the "RICO Enterprise").

381.    At all relevant times, Nirav Modi, Mihir Bhansali, and Ajay Gandhi each were employed by or associated with the RICO Enterprise, and each conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity.

382.    The RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

71

*110*

383.    The RICO Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C.
§ 1961(4), and it was or is engaged in, and its activities affected, interstate and foreign commerce.

384.    The repeated and continuous violations of federal criminal law alleged in this
Complaint constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et
seq.*

385.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi are central and controlling figures
in the RICO Enterprise, and have directed others to take actions necessary to accomplish the
overall aims of the RICO Enterprise.

### The Pattern of Racketeering Activity

386.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi conducted or participated, directly
or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering
activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering that
are interrelated, not isolated, and perpetrated for the same or similar purposes by the same
persons (the "RICO Pattern").

### Predicate Acts: Mail and Wire Fraud, Violations of 18 U.S.C. § 1341, 1343

387.    The RICO Pattern included numerous acts of mail fraud in violation of 18 U.S.C.
§ 1341 and wire fraud in violation of 18 U.S.C. § 1343.

388.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi voluntarily and intentionally
devised and participated in one or more criminal schemes to perpetrate actual fraudulent
transfers of the Debtors' and U.S. Affiliates' assets during and after the Relevant Period, including
without limitation, the transfers described above, in Appendix A, and in Schedules A through L.

389.    In furtherance of such scheme or schemes, Nirav Modi, Mihir Bhansali, and Ajay
Gandhi willfully and knowingly transmitted, or caused to be transmitted, by means of (1) causing
matters and things to be placed in any post office or authorized depository, or deposited or

72

*|||*

caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier or (2) by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds.

390.    The wires and mailings supporting such scheme or schemes to defraud included monetary wire transfers, shipments of inventory, telephone and electronic communications, and physical mailings of letters and other documents and communications.

391.    The use of interstate and international mail and wires to perpetrate these actual fraudulent transfers and to connect this international racketeering conspiracy was foreseeable.

392.    Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi committed numerous violations of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

393.    Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 1341 and 1343 directly and proximately caused injury to each U.S. Entity's business and property by unjustifiably and irrevocably depleting their assets in the amount of such transfers.

Predicate Acts: National Stolen Property Act, Violations of 18 U.S.C. §§ 2314, 2315

394.    The RICO Pattern included numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

395.    In many cases, Nirav Modi, Ajay Gandhi, and Mihir Bhansali caused the U.S. Affiliates, upon receiving actual fraudulent transfers from the Debtors, to subsequently transfer the proceeds of such actual fraudulent transfers to Shadow Entities or other Modi-Controlled Entities. Specific examples of such transactions are described in Appendix A-395 hereto.

396.    Based on the transfers by U.S. Affiliates of funds fraudulently received from the Debtors to foreign Modi-Controlled Entities alleged in paragraph 395 of this Complaint (the "Subsequent Transfers"), Nirav Modi, Mihir Bhansali, and Ajay Gandhi willfully and knowingly transported, transmitted, or transferred in interstate or foreign commerce—or received,

73

*112*

possessed, concealed, stored, bartered, sold, disposed of, or pledged as security for a loan—goods, wares, merchandise, securities, or money that crossed an interstate or international boundary after being stolen, converted, or taken by fraud.

397.    For each Subsequent Transfer, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, knew that the funds involved had been fraudulently transferred from the applicable Debtor to the applicable U.S. Affiliate or had otherwise been stolen, converted, or taken by fraud.

398.    Each Subsequent Transfer involved money or property having a value of $5,000 or more.

399.    Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, committed numerous violations of the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

400.    Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 2314 and 2315 directly and proximately caused injury to each Debtor's business and property by impairing the Debtors' ability to recover the value of the Subsequent Transfers.

Predicate Acts: Money Laundering, Violations of 18 U.S.C. §§ 1956, 1957.

401.    The RICO Pattern included numerous acts of money laundering in violation of 18 U.S.C. §§ 1956, 1957.

402.    Each actual fraudulent transfer and each Subsequent Transfer supported and furthered the Bank Fraud by, at a minimum: (a) facilitating the reduction of outstanding payables and receivables among Modi-Controlled Entities so as to avert detection of the Bank Fraud; (b) layering the movement of funds so as to make them difficult to trace.

403.    Each actual fraudulent transfer and each Subsequent Transfer occurred, in whole or in part, in the United States.

404.    Each actual fraudulent transfer and each Subsequent Transfer involved or resulted from one or more acts of wire fraud.

74

*113*

405. Accordingly, each actual fraudulent transfer and each Subsequent Transfer constituted, involved, or resulted from an offense against India, a foreign nation, involving fraud, or a scheme or attempt to defraud, against PNB, a foreign bank.

406. Additionally, each actual fraudulent transfer was designed to deplete the applicable Debtor's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such Debtor's creditors.

407. Additionally, each Subsequent Transfer was designed to deplete the applicable U.S. Affiliate's assets through one or more acts of wire fraud so as to hinder, delay, or defraud such U.S. Affiliate's creditors, including the applicable Debtor or Debtors.

408. Accordingly, each actual fraudulent transfer and each Subsequent Transfer constituted, involved, or was the result of specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7).

409. Each Subsequent Transfer affected interstate or foreign commerce and involved the movement of funds by wire or other means from a place in the United States to or through a place outside of the United States.

410. Each Subsequent Transfer involved funds that were derived from or obtained or retained, directly or indirectly, from an actual fraudulent transfer and unlawful activity related to such actual fraudulent transfer.

411. Nirav Modi, Mihir Bhansali, and Ajay Gandhi orchestrated or conducted each Subsequent Transfer with the intent to promote the carrying on of specified unlawful activity, including in relation to: (a) fraudulently depleting the applicable Debtor's and U.S. Affiliate's assets; and (b) the Bank Fraud more generally.

412. Nirav Modi, Mihir Bhansali, and Ajay Gandhi knew that each Subsequent Transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the

75

**114**

ownership, or the control of the funds derived from the actual fraudulent transfer preceding such Subsequent Transfer.

413.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi knew that the property involved in each Subsequent Transfer represented the proceeds of some form of unlawful activity.

414.    Each Subsequent Transfer involved a monetary transaction in criminally derived property of a value of greater than $10,000 and derived from specified unlawful activity.

415.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi agreed, expressly or implicitly, to: (a) effectuate each actual fraudulent transfer and each Subsequent Transfer; (b) fraudulently deplete the Debtors' and U.S. Affiliates' assets; and (c) perpetrate the Bank Fraud.

416.    Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi committed, and conspired to commit, numerous acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

417.    Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of 18 U.S.C. §§ 1956 and 1957 directly and proximately caused injury to each Debtor's business and property by impairing the Debtors' ability to recover the value of the Subsequent Transfers.

**Predicate Acts: Obstruction of Justice, Violations of 18 U.S.C. §§ 1503, 1512**

418.    The RICO Pattern included more than one act of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

419.    Based on the allegations set forth in paragraph 275 of this Complaint concerning the Dubai-based Shadow Entity personnel, upon information and belief, Nirav Modi and Bhansali, or others operating at their direction, knowingly intimidated, threatened, or corruptly persuaded such Shadow Entity personnel, or engaged in misleading conduct toward such Shadow Entity personnel, with the intent to influence, delay, or prevent the testimony of such Shadow Entity personnel in an official proceeding, including these chapter 11 cases, and to cause

76

**115**

or induce such Shadow Entity personnel to withhold testimony, or withhold a record, document or other object, from an official proceeding, including these chapter 11 cases.

420.    Additionally, Mihir Bhansali corruptly altered, destroyed, mutilated, or concealed records, documents or other objects, or attempted to do so, as demonstrated by the following actions, alleged in more detail above, which Mihir Bhansali, or others operating at his or Nirav Modi's direction, took in the weeks prior to and following the Petition Date:

(i)    Mihir Bhansali researched methods for deleting internet history, browsing the internet anonymously, communicating through encrypted and self-deleting messages, and encrypting computer data;

(ii)    Mihir Bhansali downloaded, installed, and, upon information and belief, used software designed for such purposes;

(iii)    Upon information and belief, Mihir Bhansali deleted or attempted to delete all copies of the spreadsheets described in paragraph 106 of this Complaint.

(iv)    Mihir Bhansali directed Saju Poulose to "send all non-Firestar comp[uter]s to HK[.]"

(v)    Nehal Modi, operating at the direction of or in coordination with Nirav Modi and Mihir Bhansali, destroyed mobile phones of various Shadow Entity personnel and other servers, documents, and records.

421.    Moreover, Mihir Bhansali corruptly obstructed, influenced, or impeded an official proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above, knowingly and intentionally making material misstatements, misrepresentations, and omissions under penalty of perjury in connection with the Debtors' chapter 11 cases concerning the Debtors' relationship with Shadow Entities and the Debtors' involvement in the Bank Fraud.

422.    Moreover, based on the same allegations, Mihir Bhansali corruptly endeavored to influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the discharge of his duty.

77

423.    Moreover, based on the same allegations, Mihir Bhansali corruptly endeavored to influence, obstruct, or impede the due administration of justice.

424.    Similarly, Ajay Gandhi corruptly obstructed, influenced, or impeded an official proceeding, including the Debtors' chapter 11 cases, by, as alleged in more detail above, (a) knowingly and intentionally signing the Debtors' respective SOFAs under penalty of perjury without disclosing the Debtors' involvement in the Bank Fraud, their relationship with various Shadow Entities, and the substantial loan balances owed by NMI to Jaffe, or the significant transfers of the Debtors' assets to Shadow Entities and other Modi-Controlled Entities that were required to be disclosed in the SOFAs; and (b) feigning ignorance and outright lying to the Examiner concerning the Debtors' and his personal involvement in the transactions supporting the Bank Fraud.

425.    Moreover, based on the same allegations, Ajay Gandhi corruptly endeavored to influence or impede an officer in or of this Court, including the Examiner and the Trustee, in the discharge of his duty.

426.    Moreover, based on the same allegations, Ajay Gandhi corruptly endeavored to influence, obstruct, or impede the due administration of justice.

427.    In taking such actions, Mihir Bhansali's and Ajay Gandhi's purpose was to impair the integrity or availability of evidence for use in an official proceeding, including these chapter 11 cases, or to otherwise obstruct, influence, or impede an official proceeding, including these chapter 11 cases.

428.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi agreed, expressly or implicitly, with each other and others, including Nehal Modi, to commit each of the obstruction of justice offenses alleged in this Complaint.

78

*117*

429.    Accordingly, Nirav Modi, Mihir Bhansali, and Ajay Gandhi, and other co-conspirators, including Nehal Modi, committed, and conspired to commit, numerous acts of obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

430.    Nirav Modi, Mihir Bhansali, and Ajay Gandhi's violations of 18 U.S.C. §§ 1503 and 1512 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Mihir Bhansali and Ajay Gandhi failed to disclose and, upon information and belief, actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

### Predicate Acts: Bankruptcy Fraud, Violations of 18 U.S.C. § 152

431.    The RICO Pattern included more than one act of bankruptcy fraud in violation of 18 U.S.C. § 152.

432.    Based on the allegations set forth in, *inter alia,* paragraphs 421 and 424 of this Complaint Mihir Bhansali and Ajay Gandhi each knowingly and fraudulently made one or more false oaths or accounts in or relation to these chapter 11 cases.

433.    Based on those same allegations, Mihir Bhansali and Ajay Gandhi each knowingly and fraudulently made one or more false declarations, certificates, verifications, or statements under penalty of perjury in or in relation to these chapter 11 cases.

434.    Based on those same allegations, Mihir Bhansali and Ajay Gandhi, after the filing of these chapter 11 cases, knowingly and fraudulently withheld from a custodian, trustee, marshal, or other officer of this Court, including the Examiner, recorded information relating to the property or financial affairs of the Debtors.

79

**118**

435.  Based on those same allegations, Mihir Bhansali and Ajay Gandhi knowingly and fraudulently concealed from creditors, the United States Trustee, the Trustee, and this Court property belonging to the Debtors' estates, including the substantial loan receivable owed by NMI to Jaffe.

436.  Accordingly, Mihir Bhansali and Ajay Gandhi committed acts of bankruptcy fraud in violation of 18 U.S.C. § 152.

437.  Mihir Bhansali's and Ajay Gandhi's violations of 18 U.S.C. § 152 directly and proximately caused injury to each Debtor's business and property by, among other things, impairing Jaffe's ability to sell its assets at going-concern value; delaying the Trustee's appointment and impairing his ability to recover from U.S. Affiliates; and causing the Debtors' estates to incur substantial administrative expenses related to the investigation of information Bhansali and Gandhi failed to disclose and actively endeavored to conceal, destroy, or otherwise render unavailable for use in connection with these chapter 11 cases.

### Continuity of Conduct

438.  Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of law as set forth herein, each of which directly and proximately injured the Debtors and U.S. Affiliates, constituted a continuous course of conduct in the United States beginning no later than 2010 and continuing at least through October 2018, which was intended to obtain economic gain through false representations, fraud, deceit, and other improper and unlawful means. Therefore, the violations were a part of pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

### The RICO Pattern Caused Injury to the Debtors and U.S. Affiliates

439.  Each Debtor has been injured in its business or property as a direct result and proximate result of Modi, Bhansali, and Gandhi's violations, described above, of 18 U.S.C. § 1962(c), including any injury by reason of the predicate acts constituting the RICO Pattern.

80

**119**

440.    Prior to Defendants' racketeering activities, each of the Debtors operated as a legitimate business built on fruitful relationships with reputable customers.

441.    Firestar was incorporated in 2004 for the purposes of acquiring Frederick Goldman, Inc., which was one of FIL's U.S. customers. Firestar historically operated as a distributor and wholesaler of finished gold and diamond jewelry. Its customer base consisted of legitimate jewelry retailers such as Zales, JCPenney, and Macy's.

442.    Fantasy was incorporated in 2012 for the purpose of holding the exclusive license from Chicago-based Fantasy Diamond Corp. to supply the Endless Diamond Brand to U.S. retailers. Fantasy was created primarily to conduct business with Costco Wholesale Corporation based on sales attributable to the Endless Diamond Brand. Fantasy's other customers include Zales, Sam's Club, and Walmart. Fantasy sold finished jewelry, generally at a higher price point than Firestar.

443.    Jaffe is the successor to New York-based Sandberg & Sikorksi Corporation, whose predecessors date back to 1892. Sandberg & Sikorski historically consisted of two divisions, one that sold to major U.S. retailers and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers. In 2007, FIL purchased a 95% stake in Sandberg & Sikorski. Sandberg & Sikorski was renamed A. Jaffe, Inc. in 2011. It did not become fully integrated within the operations of the other Firestar Entities until 2016.

444.    Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's violations of federal law in furtherance of their scheme or schemes to loot the Debtors' and U.S. Affiliates' assets through a series of actual fraudulent transfers and to conceal the nature of such transfers by corruptly impeding, influencing, or obstructing these chapter 11 cases resulted in: (a) each Debtor's and each U.S. Affiliate's assets being unjustifiably and irrevocably depleted in the amount of the applicable actual fraudulent transfers, (b) each Debtor's chapter 11 estate incurring substantial

81



administrative expenses stemming from Nirav Modi's, Mihir Bhansali's, and Ajay Gandhi's obstruction of the Examiner's and Trustee's investigations that would not otherwise have been incurred, (c) the impairment of each Debtor's ability to sell their assets at going-concern value, and (d) the frustration of the Debtors' and U.S. Affiliates' ability to collect substantial debts owed to them by Shadow Entities and overseas Firestar Entities.

Defendants' Agreement to Violate RICO

445.    At all relevant times, each Defendant, together with each other and with Nirav Modi, Mihir Bhansali, and Ajay Gandhi, and others known and unknown, being persons employed by or associated with the RICO Enterprise, have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) (the "RICO Conspiracy").

446.    Defendant Purvi Mehta's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.  Mehta was the beneficial owner of numerous Shadow Entities, Twin Fields, and numerous other offshore shell companies used to further the Bank Fraud and launder its proceeds.

b.  Mehta, through Islington, invested $45 million in proceeds of the Bank Fraud in FIPL to fund the 2017 "restructuring" of the Firestar Entities in connection, with which Mehta subsequently received over $85 million in proceeds of the Bank Fraud.

c.  Mehta settled and funded the Ithaca Trust to launder proceeds of the Bank Fraud for the benefit of Nirav Modi and Ami Modi and to shield ill-gotten assets from creditors.

d.  Mehta wired Mihir Bhansali $1.5 million as a purported loan just weeks before Bhansali purchased a $7.1 million apartment.

82

*121*

447. Defendant Ami Javeri's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Javeri served as a partner of all three LOU entities and, in 2010, opened bank accounts for Solar and Stellar used to defraud PNB.

b. Javeri is the primary beneficiary of the Ithaca Trust and the beneficial owner of the Ritz Carlton Apartment and the Essex House Apartment.

c. Javeri received more than $30 million in proceeds of the Bank Fraud from Purvi Mehta in May and June 2017.

d. Javeri wired more than $30 million in proceeds of the Bank Fraud to Purvi Mehta between September and November 2017.

e. Javeri fled India just weeks before the fraudulent LOUs issued in 2017 became due and the Bank Fraud was exposed.

f. Javeri appointed Nehal Modi as Ithaca Trust Protector in May 2017.

448. Defendant Nehal Modi's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Nehal Modi traveled overseas with Mihir Bhansali after exposure of the Bank Fraud to threaten and bribe witnesses, destroy evidence, and remove assets.

b. Nehal Modi enlisted his personal friends, including Anthony Allicock, Rochelle Miller, and Tamer Abou El Ata, to divert the U.S. Affiliates' assets to Hong Kong following exposure of the Bank Fraud.

c. Nehal Modi became Ithaca Trust Protector following exposure of the Bank Fraud.

d. Nehal Modi, along with Mihir Bhansali, managed BBB Group as a front for the Modi family's money laundering efforts.

e. Nehal Modi managed Gitanjali USA, Samuels, Diamlink, and other Choksi-controlled entities used to defraud PNB.

449. Defendant Neeshal Modi's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Neeshal Modi served as a partner of all three LOU Entities and, in 2016, selected and appointed additional "dummy" partners for the LOU Entities.

83

122

b. Neeshal Modi was the beneficial owner of numerous Shadow Entities, other offshore shell companies used to further the Bank Fraud and launder its proceeds.

c. Neeshal Modi, along with Mihir Bhansali, selected and hired various Shadow Entity personnel throughout the Relevant Period.

d. Neeshal Modi orchestrated numerous fraudulent transactions among FD BVBA and Shadow Entities to further the Bank Fraud throughout the Relevant Period.

e. Neeshal Modi had a power of attorney for Purvi Mehta and signed agreements on her behalf, including for Purvi Mehta's purchase of a Hong Kong apartment in April 2017 for approximately $2.7 million.

450.    The Ithaca Trust's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a. Nirav Modi enjoys complete control over the Ithaca Trust, the Ithaca Trustee, the Ithaca Protector, the Ithaca Investment Advisor, the Ithaca Trust Agreement, and all of the assets in the Ithaca Trust.

b. The Ithaca Trust was settled by Purvi Mehta, one of the Modi family's primary money laundering conduits.

c. The Ithaca Trust purchased the Ritz Carlton Apartment using the proceeds of the Bank Fraud received from Purvi Mehta.

d. The Ithaca Trust purchased the membership interests on CPRE, which owns the Essex House Apartment, using proceeds of the Bank Fraud received from Purvi Mehta.

e. Deepak Sheth, the original Ithaca Protector and Ithaca Investment Advisor, participated in the Bank Fraud through the Sheth Entities throughout the Relevant Period.

f. Abhay Javeri, who succeeded Deepak Sheth as Ithaca Investment Advisor and served as the default Ithaca Protector, participated in the Bank Fraud through the SDC Entities throughout the Relevant Period.

g. Nehal Modi, who Ami Modi appointed Ithaca Protector in May 2018, orchestrated the Modi family's efforts to destroy evidence, tamper with witnesses, and divert assets from the reach of creditors following exposure of the Bank Fraud.

84

t5
123

451.   Defendant CPS50's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.   Nirav Modi enjoys complete control over CPS50 through his complete control over the Ithaca Trust.

b.   Deepak Sheth, the CPS50's original manager, participated in the Bank Fraud through the Sheth Entities throughout the Relevant Period.

c.   Abhay Javeri, who succeeded Deepak Sheth as CPS50's manager, participated in the Bank Fraud through the SDC Entities throughout the Relevant Period.

d.   Nitin Dattani, who succeeded Abhay Javeri as CPS50's manager in May 2018, worked with Ajay Gandhi, Angelina Ypma, and Mihir Bhansali to divert NMLUK's cash and inventory to Hong Kong following exposure of the Bank Fraud. Dattani also helped Nirav Modi set up a new company while Modi was hiding in London.

e.   Ajay Gandhi, who served as president of CPS50 and as a signatory on its bank account, participated extensively in the Bank Fraud and in the fraudulent efforts following its exposure, as alleged above.

f.   CPS50 purchased the Ritz Carlton Apartment using proceeds of the Bank Fraud.

g.   CPS50 was formed for the purpose of laundering proceeds of the Bank Fraud to and for the benefit of Nirav Modi and Ami Modi.

452.   Defendant CPRE's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.   Nirav Modi enjoys complete control over CPRE through his complete control over the Ithaca Trust.

b.   Mihir Bhansali, who served as sole director and CEO of CPRE, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

c.   Ajay Gandhi, who served as chief financial officer of CPRE, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

85

124

453.    Defendant Twin Fields' agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.  Purvi Mehta, who indirectly owns Twin Fields through BVI shell companies, participated extensively in the Bank Fraud and in fraudulent efforts to launder its proceeds beyond the reach of creditors.

b.  Mihir Bhansali, who acted as the de jure or de facto director of Twin Fields, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

c.  Nirav Modi enjoys complete control over Twin Fields through his dominance and control over Purvi Mehta, Mihir Bhansali, and Nehal Modi.

d.  Twin Fields served as a conduit for laundering proceeds of the Bank Fraud, including more than $25 million from Fine Classic, the Shadow Entity directly owned and controlled by Purvi Mehta.

454.    Each Shadow Entity Defendant's agreement to join and support the RICO Conspiracy is demonstrated by or can be inferred from, among other things, the following:

a.  Nirav Modi enjoys complete control over each Shadow Entity Defendant through his dominance and control over Purvi Mehta, Neeshal Modi, and other nominal owners, directors, and officers.

b.  Each Shadow Entity Defendant engaged in millions of dollars in fraudulent import and export transactions with LOU Entities, Firestar Entities, and other Shadow Entities during the Relevant Period to further the Bank Fraud and to launder its proceeds.

c.  Each Shadow Entity Defendant was established and operated for the sole purpose of furthering the Bank Fraud and laundering its proceeds.

455.    Each Defendant knew that they were engaged in a conspiracy to commit the predicate acts and knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).



456.   Each Defendant agreed to conduct or participate in, directly or indirectly, the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity, including but not limited to the acts of racketeering set forth above.

457.   As part of the conspiracy, each Defendant, at times acting through certain of their agents, and representatives, or co-conspirators, committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

458.   As a direct and proximate result of the Defendants' RICO Conspiracy, the pattern of racketeering activity through which they agreed the affairs of the RICO Enterprise would be conducted, the predicate acts and other overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), each of the Debtors has been injured in its business and property.

459.   Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the general and special compensatory damages suffered by each Debtor, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

## COUNT 2

**Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act ("RICO")**
**18 U.S.C. § 1962(d)**
**(U.S. Affiliates' Claim Against All Defendants)**

460.   Plaintiff restates and re-alleges paragraphs 1 through 459 of this Complaint as though fully set forth herein.

461.   Plaintiff, as assignee of the U.S. Affiliates, has standing to bring any and all claims or causes of action of the U.S. Affiliates.

462.   As a direct and proximate result of the Defendants' RICO Conspiracy, the pattern of racketeering activity through which they agreed the affairs of the RICO Enterprise would be conducted, the predicate acts and other overt acts taken in furtherance of that conspiracy, and

87

126

violations of 18 U.S.C. § 1962(d), each of the U.S. Affiliates has been injured in its business and property.

463.    Each mailing or shipment of the U.S. Affiliates' inventory or other assets in furtherance of the RICO Conspiracy constituted a violation of 18 U.S.C. § 1341.

464.    Each wire or other electronic transfer of the U.S. Affiliates' funds in furtherance of the RICO Conspiracy constituted a violation of 18 U.S.C. § 1343.

465.    Each violation of 18 U.S.C. § 1341 or 1343 involving transfers of a U.S. Affiliate's assets directly and proximately injured such U.S. Affiliate by depleting its assets.

466.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble the general and special compensatory damages suffered by each U.S. Affiliate, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of 18 U.S.C. § 1962(d).

### COUNT 3

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279
(Synergies-Mehta Transfer)**

467.    Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

468.    As alleged and defined above as the Synergies-Mehta Transfer, on July 13, 2017, Synergies wired $14,575,000 to Purvi Mehta as part of the fraudulent laundering of funds through the Firestar Entities to Mehta in 2017.

469.    The Synergies-Mehta Transfer constituted a transfer of an interest in Synergies' property.

470.    The Synergies-Mehta Transfer was made, mediately or immediately, by Synergies to Purvi Mehta.

471.    Plaintiff holds a judgment against Synergies.

88

**127**

472. The Synergies-Mehta Transfer was made with the actual intent to hinder or delay or defraud creditors, including the Trustee, within the meaning of section 276 of the New York Debtor & Creditor Law ("N.Y. DCL"). Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Synergies-Mehta Transfer in order to launder and siphon illicit proceeds of the Bank Fraud and other valuable assets for the benefit of Purvi Mehta, Ami Modi, Nirav Modi, and others.

473. Plaintiff, as a creditor of Synergies, may set aside the Synergies-Mehta Transfer, disregard the Synergies-Mehta Transfer, and attach or levy execution upon the property conveyed under sections 278 and 279 of the New York Debtor & Creditor Law.

474. Alternatively, Plaintiff is entitled to a monetary damages in the amount of the Synergies-Mehta Transfer.

475. The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under N.Y. DCL section 276-a, and as otherwise permitted by law.

### COUNT 4

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279
(Synergies-Mehta Transfer)**

476. Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

477. The Synergies-Mehta Transfer constituted a transfer of an interest in Synergies' property.

478. The Synergies-Mehta Transfer was made, mediately or immediately, by Synergies to Purvi Mehta.

479. Plaintiff holds a judgment against Synergies.

480. The Synergies-Mehta Transfer was made without fair consideration.

89

128

481.    On the date the Synergies-Mehta Transfer was made, Synergies was insolvent or was rendered insolvent as a result of such transfer.

482.    Plaintiff, as a creditor of Synergies, may set aside the Synergies-Mehta Transfer, disregard the Synergies-Mehta Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

483.    Alternatively, Plaintiff is entitled to a monetary damages in the amount of the Synergies-Mehta Transfer.

## COUNT 5

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279
### (CPRE Equity Transfer)

484.    Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

485.    As alleged and defined above as the CPRE Equity Transfer, on or around January 1, 2018, FGI transferred a 100% equity interest in CPRE to the Ithaca Trust as part of broader efforts to launder the proceeds of the Bank Fraud and shield assets from creditors.

486.    The CPRE Equity Transfer constituted a transfer of an interest in FGI's property.

487.    The CPRE Equity Transfer was made by FGI to the Ithaca Trust for the ultimate benefit of Ami Modi.

488.    Plaintiff holds a judgment against FGI.

489.    The CPRE Equity Transfer was made with the actual intent to hinder or delay or defraud creditors within the meaning of DCL section 276. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Equity Transfer to launder and siphon illicit proceeds of the Bank Fraud and other valuable assets for the benefit of Ami Modi, Nirav Modi, and others.

90

**129**

490.    Plaintiff, as a judgment creditor of FGI, may set aside the CPRE Equity Transfer, disregard the CPRE Equity Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

491.    Alternatively, Plaintiff is entitled to monetary damages in the amount of the CPRE Equity Transfer.

492.    Plaintiff is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 6

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279
(CPRE Equity Transfer)**

493.    Plaintiff restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

494.    The CPRE Equity Transfer constituted a transfer of an interest in FGI's property.

495.    The CPRE Equity Transfer was made by FGI to the Ithaca Trust for the ultimate benefit of Ami Modi.

496.    Plaintiff holds a judgment against FGI.

497.    The CPRE Equity Transfer was made without fair consideration.

498.    On the date the CPRE Equity Transfer was made, FGI was insolvent or was rendered insolvent as a result of such transfer.

499.    Plaintiff, as creditor of FGI, may set aside the CPRE Equity Transfer, disregard the CPRE Equity Transfer, and attach or levy execution upon the property conveyed under N.Y. DCL sections 278 and 279.

500.    Alternatively, Plaintiff is entitled to monetary damages equal to the value of the CPRE Equity Transfer.

91

130

## COUNT 7

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (CPRE)

501.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

502.    FDI made numerous cash transfers for the benefit of CPRE within two years of the commencement of FDI's chapter 11 case, as identified on Schedule A, attached hereto (collectively, the "CPRE Two-Year Transfers").

503.    The CPRE Two-Year Transfers constituted transfers of interests of FDI in property.

504.    The CPRE Two-Year Transfers were made for the benefit of CPRE.

505.    The CPRE Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the CPRE Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

506.    The Trustee may avoid the CPRE Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

507.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Two-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Two-Year Transfers were made, and from any subsequent transferees.

508.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

92

131

## COUNT 8

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (CPRE)

509.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

510.    FDI made numerous cash transfers for the benefit of CPRE within six years of the commencement of FDI's chapter 11 case, as identified on Schedule A, attached hereto (collectively, the "CPRE Six-Year Transfers").

511.    The CPRE Six-Year Transfers were made for the benefit of CPRE.

512.    The CPRE Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the CPRE Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the CPRE Six-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

513.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the CPRE Six-Year Transfers set aside, or who could disregard the CPRE Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

514.    The Trustee may avoid the CPRE Six-Year Transfers under Bankruptcy Code section 544(b)(1).

515.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Six-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Six-Year Transfers were made, and from any subsequent transferees.

93

132

516.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 9

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (CPRE)

517.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

518.    The CPRE Two-Year Transfers constituted transfers of interests of FDI in property.

519.    The CPRE Two-Year Transfers were made for the benefit of CPRE.

520.    FDI received less than reasonably equivalent value in exchange for the CPRE Two-Year Transfers.

521.    FDI was insolvent on the date each CPRE Two-Year Transfer was made, or became insolvent as a result of such transfer.

522.    The Trustee may avoid the CPRE Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

523.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Two-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Two-Year Transfers were made, and from any subsequent transferees.

## COUNT 10

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (CPRE)

524.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

525.    The CPRE Six-Year Transfers constituted transfers of interests of FDI in property.

94

133

526.    The CPRE Six-Year Transfers were made for the benefit of CPRE.

527.    The CPRE Six-Year Transfers were made by FDI without fair consideration.

528.    On the date of each CPRE Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

529.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the CPRE Six-Year Transfers set aside, or who could disregard the CPRE Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

530.    The Trustee may avoid the CPRE Six-Year Transfers under Bankruptcy Code section 544(b)(1).

531.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the CPRE Six-Year Transfers for the benefit of FDI's estate from CPRE, the entity to or for whose benefit the CPRE Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 11

### Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Auragem)

532.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

533.    FDI made cash transfers to Auragem within six years of the commencement of FDI's chapter 11 case, as identified on Schedule B, attached hereto (collectively, the "Auragem Transfers").

534.    The Auragem Transfers were made to or for the benefit of Auragem.

535.    The Auragem Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi,

95

134

Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Auragem Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Auragem Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

536.   Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Auragem Transfers set aside, or who could disregard the Auragem Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

537.   The Trustee may avoid the Auragem Transfers under Bankruptcy Code section 544(b)(1).

538.   Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Auragem Transfers for the benefit of FDI's estate from Auragem, the entity to or for whose benefit the Auragem Transfers were made, and from any subsequent transferees.

539.   The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 12

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Auragem)

540.   The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

541.   The Auragem Transfers constituted transfers of interests of FDI in property.

542.   The Auragem Transfers were made to or for the benefit of Auragem.

543.   The Auragem Transfers were made by FDI without fair consideration.

96

135

544.    On the date of each Auragem Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

545.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Auragem Transfers set aside, or who could disregard the Auragem Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

546.    The Trustee may avoid the Auragem Transfers under Bankruptcy Code section 544(b)(1).

547.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Auragem Transfers for the benefit of FDI's estate from Auragem, the entity to or for whose benefit the Auragem Transfers were made, and from any subsequent transferees.

### COUNT 13

#### Avoidance and Recovery of Actual Fraudulent Transfers
#### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
#### (Brilliant)

548.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

549.    FDI made numerous cash transfers to Brilliant within two years of the commencement of FDI's chapter 11 case, as identified on Schedule C, attached hereto (collectively, the "Brilliant Two-Year Transfers").

550.    The Brilliant Two-Year Transfers constituted transfers of interests of FDI in property.

551.    The Brilliant Two-Year Transfers were made to or for the benefit of Brilliant.

552.    The Brilliant Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-

97

conspirators approved the Brilliant Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Brilliant Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

553.    The Trustee may avoid the Brilliant Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

554.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Two-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Two-Year Transfers were made, and from any subsequent transferees.

555.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

COUNT 14

Avoidance and Recovery of Actual Fraudulent Transfers<br>Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)<br>(Brilliant)

556.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

557.    FDI made numerous transfers of cash and inventory to Brilliant within six years of the commencement of FDI's chapter 11 case, as identified on Schedule C, attached hereto (collectively, the "Brilliant Six-Year Transfers").

558.    The Brilliant Six-Year Transfers were made to or for the benefit of Brilliant.

559.    The Brilliant Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Brilliant Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for

98

137

the benefit of Modi, his family, and others. The natural consequence of the Brilliant Six-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

560.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Brilliant Six-Year Transfers set aside, or who could disregard the Brilliant Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

561.    The Trustee may avoid the Brilliant Six-Year Transfers under Bankruptcy Code section 544(b)(1).

562.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Six-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Six-Year Transfers were made, and from any subsequent transferees.

563.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 15

### Avoidance and Recovery of Constructive Fraudulent Transfers Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a) (Brilliant)

564.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

565.    The Brilliant Two-Year Transfers constituted transfers of interests of FDI in property.

566.    The Brilliant Two-Year Transfers were made to or for the benefit of Brilliant.

567.    FDI received less than reasonably equivalent value in exchange for the Brilliant Two-Year Transfers.

99

**138**

568.    FDI was insolvent on the date each Brilliant Two-Year Transfer was made, or became insolvent as a result of such transfer.

569.    The Trustee may avoid the Brilliant Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

570.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Brilliant Two-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose benefit the Brilliant Two-Year Transfers were made, and from any subsequent transferees.

### COUNT 16

#### Avoidance and Recovery of Constructive Fraudulent Transfers
#### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
#### (Brilliant)

571.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

572.    The Brilliant Six-Year Transfers constituted transfers of interests of FDI in property.

573.    The Brilliant Six-Year Transfers were made to or for the benefit of Brilliant.

574.    The Brilliant Six-Year Transfers were made by FDI without fair consideration.

575.    On the date of each Brilliant Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

576.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Brilliant Six-Year Transfers set aside, or who could disregard the Brilliant Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

577.    The Trustee may avoid the Brilliant Six-Year Transfers under Bankruptcy Code section 544(b)(1).

100

139

578.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

Brilliant Six-Year Transfers for the benefit of FDI's estate from Brilliant, the entity to or for whose

benefit the Brilliant Six-Year Transfers were made, and from any subsequent transferees.

### COUNT 17

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Diagems)**

579.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as

though fully set forth herein.

580.    FDI made numerous cash transfers to Diagems within six years of the

commencement of FDI's chapter 11 case, as identified on Schedule D, attached hereto

(collectively, the "Diagems Transfers").

581.    The Diagems Transfers were made to or for the benefit of Diagems.

582.    The Diagems Transfers were made with the actual intent to hinder or delay present

or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir

Bhansali, Ajay Gandhi, and their co-conspirators approved the Diagems Transfers in order to

perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi,

his family, and others. The natural consequence of the Diagems Transfers was to deplete FDI's

property and frustrate satisfaction of FDI's legitimate obligations.

583.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist

who could have the Diagems Transfers set aside, or who could disregard the Diagems Transfers

and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or

279.

584.    The Trustee may avoid the Diagems Transfers under Bankruptcy Code section

544(b)(1).

101

*140*

585.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Diagems Transfers for the benefit of FDI's estate from Diagems, the entity to or for whose benefit the Diagems Transfers were made, and from any subsequent transferees.

586.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 18

#### Avoidance and Recovery of Constructive Fraudulent Transfers
#### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
#### (Diagems)

587.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

588.    The Diagems Transfers constituted transfers of interests of FDI in property.

589.    The Diagems Transfers were made to or for the benefit of Diagems.

590.    The Diagems Transfers were made by FDI without fair consideration.

591.    On the date of each Diagems Six-Year Transfer, FDI was insolvent or was rendered insolvent as a result of such transfer.

592.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Diagems Transfers set aside, or who could disregard the Diagems Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

593.    The Trustee may avoid the Diagems Transfers under Bankruptcy Code section 544(b)(1).

594.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Diagems Transfers for the benefit of FDI's estate from Diagems, the entity to or for whose benefit the Diagems Transfers were made, and from any subsequent transferees.

*141*

### COUNT 19

Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(Empire)

595.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

596.    The Debtors made transfers of inventory to Empire within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule E, attached hereto (collectively, the "Empire Two-Year Transfers"),

597.    The Empire Two-Year Transfers constituted transfers of interests of the Debtors in property.

598.    The Empire Two-Year Transfers were made to or for the benefit of Empire.

599.    The Empire Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Empire Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Empire Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

600.    The Trustee may avoid the Empire Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

601.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Two-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Two-Year Transfers were made, and from any subsequent transferees.

103



## COUNT 20

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Empire)

602.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

603.    The Debtors made numerous transfers of cash and inventory to Empire within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule E, attached hereto (collectively, the "Empire Six-Year Transfers").

604.    The Empire Six-Year Transfers were made to or for the benefit of Empire.

605.    The Empire Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Empire Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Empire Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

606.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Empire Six-Year Transfers set aside, or who could disregard the Empire Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

607.    The Trustee may avoid the Empire Six-Year Transfers under Bankruptcy Code section 544(b)(1).

104

*143*

608.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Six-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Six-Year Transfers were made, and from any subsequent transferees.

609.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 21

#### Avoidance and Recovery of Constructive Fraudulent Transfers
#### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
#### (Empire)

610.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

611.    The Empire Two-Year Transfers constituted transfers of interests of the Debtors in property.

612.    The Empire Two-Year Transfers were made to or for the benefit of Empire.

613.    The Debtors received less than reasonably equivalent value in exchange for the Empire Two-Year Transfers.

614.    The Debtors were insolvent on the date each Empire Two-Year Transfer was made, or became insolvent as a result of such transfer.

615.    The Trustee may avoid the Empire Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

616.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Two-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Two-Year Transfers were made, and from any subsequent transferees.

105

**144**

## COUNT 22

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Empire)**

617.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

618.    The Empire Six-Year Transfers constituted transfers of interests of the Debtors in property.

619.    The Empire Six-Year Transfers were made to or for the benefit of Empire.

620.    The Empire Six-Year Transfers were made by the Debtors without fair consideration.

621.    On the date of each Empire Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

622.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Empire Six-Year Transfers set aside, or who could disregard the Empire Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

623.    The Trustee may avoid the Empire Six-Year Transfers under Bankruptcy Code section 544(b)(1).

624.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Empire Six-Year Transfers for the benefit of the Debtors' estates from Empire, the entity to or for whose benefit the Empire Six-Year Transfers were made, and from any subsequent transferees.

106

145

## COUNT 23

Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(Eternal)

625.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

626.    The Debtors made transfers of inventory to Eternal within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule E, attached hereto (collectively, the "Eternal Two-Year Transfers").

627.    The Eternal Two-Year Transfers constituted transfers of interests of the Debtors in property.

628.    The Eternal Two-Year Transfers were made to or for the benefit of Eternal.

629.    The Eternal Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Eternal Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Eternal Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

630.    The Trustee may avoid the Eternal Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

631.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Two-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Two-Year Transfers were made, and from any subsequent transferees.

107

146

## COUNT 24

### Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Eternal)

632.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

633.    The Debtors made transfers of cash and inventory to Eternal within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule F, attached hereto (collectively, the "Eternal Six-Year Transfers").

634.    The Eternal Six-Year Transfers were made to or for the benefit of Eternal.

635.    The Eternal Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Eternal Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Eternal Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

636.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Eternal Six-Year Transfers set aside, or who could disregard the Eternal Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

637.    The Trustee may avoid the Eternal Six-Year Transfers under Bankruptcy Code section 544(b)(1).

108



638.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Six-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Six-Year Transfers were made, and from any subsequent transferees.

639.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 25

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Eternal)

640.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

641.    The Eternal Two-Year Transfers constituted transfers of interests of the Debtors in property.

642.    The Eternal Two-Year Transfers were made to or for the benefit of Eternal.

643.    The Debtors received less than reasonably equivalent value in exchange for the Eternal Two-Year Transfers.

644.    The Debtors were insolvent on the date each Eternal Two-Year Transfer was made, or became insolvent as a result of such transfer.

645.    The Trustee may avoid the Eternal Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

646.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Two-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Two-Year Transfers were made, and from any subsequent transferees.

148

## COUNT 26

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Eternal)

647.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

648.    The Eternal Six-Year Transfers constituted transfers of interests of the Debtors in property.

649.    The Eternal Six-Year Transfers were made to or for the benefit of Eternal.

650.    The Eternal Six-Year Transfers were made by the Debtors without fair consideration.

651.    On the date of each Eternal Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

652.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Eternal Six-Year Transfers set aside, or who could disregard the Eternal Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

653.    The Trustee may avoid the Eternal Six-Year Transfers under Bankruptcy Code section 544(b)(1).

654.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Eternal Six-Year Transfers for the benefit of the Debtors' estates from Eternal, the entity to or for whose benefit the Eternal Six-Year Transfers were made, and from any subsequent transferees.

149

## COUNT 27

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)**
**(Fancy Creations)**

655.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

656.    The Debtors made numerous transfers of cash and inventory to Fancy Creations within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule G, attached hereto (collectively, the "Fancy Creations Two-Year Transfers").

657.    The Fancy Creations Two-Year Transfers constituted transfers of interests of the Debtors in property.

658.    The Fancy Creations Two-Year Transfers were made to or for the benefit of Fancy Creations.

659.    The Fancy Creations Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Fancy Creations Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Fancy Creations Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

660.    The Trustee may avoid the Fancy Creations Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

661.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Two-Year Transfers for the benefit of the Debtors' estates from Fancy Creations, the entity to or for whose benefit the Fancy Creations Two-Year Transfers were made, and from any subsequent transferees.

111



### COUNT 28

**Avoidance and Recovery of Actual Fraudulent Transfers**
**Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)**
**(Fancy Creations)**

662.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

663.    The Debtors made numerous transfers of cash and inventory to Fancy Creations within six years of the commencement of the Debtors' chapter 11 cases, as identified on <u>Schedule G</u>, attached hereto (collectively, the "Fancy Creations Six-Year Transfers").

664.    The Fancy Creations Six-Year Transfers were made to or for the benefit of Fancy Creations.

665.    The Fancy Creations Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Fancy Creations Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Fancy Creations Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

666.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Fancy Creations Six-Year Transfers set aside, or who could disregard the Fancy Creations Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

667.    The Trustee may avoid the Fancy Creations Six-Year Transfers under Bankruptcy Code section 544(b)(1).

151

668.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Six-Year Transfers for the benefit of the Debtors' estates from Fancy Creations, the entity to or for whose benefit the Fancy Creations Six-Year Transfers were made, and from any subsequent transferees.

669.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 29

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(Fancy Creations)**

670.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

671.    The Fancy Creations Two-Year Transfers constituted transfers of interests of the Debtors in property.

672.    The Fancy Creations Two-Year Transfers were made to or for the benefit of Fancy Creations.

673.    The Debtors received less than reasonably equivalent value in exchange for the Fancy Creations Two-Year Transfers.

674.    The Debtors were insolvent on the date each Fancy Creations Two-Year Transfer was made, or became insolvent as a result of such transfer.

675.    The Trustee may avoid the Fancy Creations Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

676.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Two-Year Transfers for the benefit of the Debtors' estates from Fancy Creations,

113



the entity to or for whose benefit the Fancy Creations Two-Year Transfers were made, and from any subsequent transferees.

### COUNT 30

**Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Fancy Creations)**

677.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

678.    The Fancy Creations Six-Year Transfers constituted transfers of interests of the Debtors in property.

679.    The Fancy Creations Six-Year Transfers were made to or for the benefit of Fancy Creations.

680.    The Fancy Creations Six-Year Transfers were made by the Debtors without fair consideration.

681.    On the date of each Fancy Creations Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

682.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Fancy Creations Six-Year Transfers set aside, or who could disregard the Fancy Creations Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

683.    The Trustee may avoid the Fancy Creations Six-Year Transfers under Bankruptcy Code section 544(b)(1).

684.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Fancy Creations Six-Year Transfers for the benefit of the Debtors' estates from Fancy Creations,

114

153

the entity to, or for whose benefit the Fancy Creations Six-Year Transfers were made, and from any subsequent transferees.

## COUNT 31

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Pacific)

685.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

686.    The Debtors made numerous transfers of cash and inventory to Pacific within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule H, attached hereto (collectively, the "Pacific Two-Year Transfers").

687.    The Pacific Two-Year Transfers constituted transfers of interests of the Debtors in property.

688.    The Pacific Two-Year Transfers were made to or for the benefit of Pacific.

689.    The Pacific Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Pacific Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Pacific Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

690.    The Trustee may avoid the Pacific Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

691.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Two-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Two-Year Transfers were made, and from any subsequent transferees.

115



## COUNT 32

Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Pacific)

692.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

693.    The Debtors made numerous transfers of cash and inventory to Pacific within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule H, attached hereto (collectively, the "Pacific Six-Year Transfers").

694.    The Pacific Six-Year Transfers were made to or for the benefit of Pacific.

695.    The Pacific Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Pacific Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Pacific Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

696.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Pacific Six-Year Transfers set aside, or who could disregard the Pacific Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

697.    The Trustee may avoid the Pacific Six-Year Transfers under Bankruptcy Code section 544(b)(1).

116

155

698.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Six-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Six-Year Transfers were made, and from any subsequent transferees.

699.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 33

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Pacific)

700.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

701.    The Pacific Two-Year Transfers constituted transfers of interests of the Debtors in property.

702.    The Pacific Two-Year Transfers were made to or for the benefit of Pacific.

703.    The Debtors received less than reasonably equivalent value in exchange for the Pacific Two-Year Transfers.

704.    The Debtors were insolvent on the date each Pacific Two-Year Transfer was made, or became insolvent as a result of such transfer.

705.    The Trustee may avoid the Pacific Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

706.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Two-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Two-Year Transfers were made, and from any subsequent transferees.

117

156

## COUNT 34

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Pacific)

707.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

708.    The Pacific Six-Year Transfers constituted transfers of interests of the Debtors in property.

709.    The Pacific Six-Year Transfers were made to or for the benefit of Pacific.

710.    The Pacific Six-Year Transfers were made by the Debtors without fair consideration.

711.    On the date of each Pacific Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

712.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Pacific Six-Year Transfers set aside, or who could disregard the Pacific Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

713.    The Trustee may avoid the Pacific Six-Year Transfers under Bankruptcy Code section 544(b)(1).

714.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Pacific Six-Year Transfers for the benefit of the Debtors' estates from Pacific, the entity to or for whose benefit the Pacific Six-Year Transfers were made, and from any subsequent transferees.

118

157

## COUNT 35

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
### (Sunshine)

715.     The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

716.     FDI transferred $965,000.00 in inventory to Sunshine on March 17, 2016 (the "Sunshine Transfer").

717.     The Sunshine Transfer was made within two years of the commencement of FDI's chapter 11 case.

718.     The Sunshine Transfer constituted a transfer of interest of FDI in property.

719.     The Sunshine Transfer was made to or for the benefit of Sunshine.

720.     The Sunshine Transfer was made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Sunshine Transfer in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Sunshine Transfer was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

721.     The Trustee may avoid the Sunshine Transfer under section 548(a)(1)(A) of the Bankruptcy Code.

722.     Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

119

158

### COUNT 36

Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Sunshine)

723.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

724.    The Sunshine Transfer was made within six years of the commencement of FDI's chapter 11 case.

725.    The Sunshine Transfer constituted a transfer of an interest of FDI in property.

726.    The Sunshine Transfer was made to or for the benefit of Sunshine.

727.    The Sunshine Transfer was made with the actual intent to hinder or delay present or future creditors of FDI within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Sunshine Transfer in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Sunshine Transfer was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

728.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Sunshine Transfer set aside, or who could disregard the Sunshine Transfer and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

729.    The Trustee may avoid the Sunshine Transfer under Bankruptcy Code section 544(b)(1).

730.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

120

159

731.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this

claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 37

Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(Sunshine)

732.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as

though fully set forth herein.

733.    The Sunshine Transfer constituted a transfer of an interest of FDI in property.

734.    The Sunshine Transfer was made to or for the benefit of Sunshine.

735.    FDI received less than reasonably equivalent value in exchange for the Sunshine

Transfer.

736.    FDI was insolvent on the date the Sunshine Transfer was made, or became

insolvent as a result of such transfer.

737.    The Trustee may avoid the Sunshine Transfer under section 548(a)(1)(B) of the

Bankruptcy Code.

738.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit

the Sunshine Transfer was made, and from any subsequent transferees.

121

160

## COUNT 38

Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Sunshine)

739.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

740.    The Sunshine Transfer constituted a transfer of an interest of FDI in property.

741.    The Sunshine Transfer was made to or for the benefit of Sunshine.

742.    The Sunshine Transfer was made by FDI without fair consideration.

743.    On the date the Sunshine Transfer was made, FDI was insolvent or was rendered insolvent as a result of such transfer.

744.    Actual creditors, including but not limited to FDI's vendors and suppliers, exist who could have the Sunshine Transfer set aside, or who could disregard the Sunshine Transfer and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

745.    The Trustee may avoid the Sunshine Transfer under Bankruptcy Code section 544(b)(1).

746.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Sunshine Transfer for the benefit of FDI's estate from Sunshine, the entity to or for whose benefit the Sunshine Transfer was made, and from any subsequent transferees.

## COUNT 39

Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(Tri Color)

747.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

122

*161*

748.    The Debtors made cash transfers to Tri Color within two years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule I, attached hereto (collectively, the "Tri Color Two-Year Transfers").

749.    The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors in property.

750.    The Tri Color Two-Year Transfers were made to or for the benefit of Tri Color.

751.    The Tri Color Two-Year Transfers were made with the actual intent to hinder, delay, or defraud the Debtors' creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Tri Color Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Tri Color Two-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

752.    The Trustee may avoid the Tri Color Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

753.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Two-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Two-Year Transfers were made, and from any subsequent transferees.

### COUNT 40

**Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Tri Color)**

754.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

123

(62

755.    The Debtors made numerous transfers of cash and inventory to Tri Color within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule I, attached hereto (collectively, the "Tri Color Six-Year Transfers").

756.    The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors in property.

757.    The Tri Color Six-Year Transfers were made to or for the benefit of Tri Color.

758.    The Tri Color Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Tri Color Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Tri Color Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

759.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Tri Color Six-Year Transfers set aside, or who could disregard the Tri Color Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

760.    The Trustee may avoid the Tri Color Six-Year Transfers under Bankruptcy Code section 544(b)(1).

761.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Six-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Six-Year Transfers were made, and from any subsequent transferees.

124

**163**

762.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this

claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 41

**Avoidance and Recovery of Constructive Fraudulent Transfers**
**Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)**
**(Tri Color)**

763.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as

though fully set forth herein.

764.    The Tri Color Two-Year Transfers constituted transfers of interests of the Debtors

in property.

765.    The Tri Color Two-Year Transfers were made to or for the benefit of Tri Color.

766.    The Debtors received less than reasonably equivalent value in exchange for the Tri

Color Two-Year Transfers.

767.    The Debtors were insolvent on the date each Tri Color Two-Year Transfer was

made, or became insolvent as a result of such transfer.

768.    The Trustee may avoid the Tri Color Two-Year Transfers under section

548(a)(1)(B) of the Bankruptcy Code.

769.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the

Tri Color Two-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to

or for whose benefit the Tri Color Two-Year Transfers were made, and from any subsequent

transferees.

125

164

## COUNT 42

Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(Tri Color)

770.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

771.    The Tri Color Six-Year Transfers constituted transfers of interests of the Debtors in property.

772.    The Tri Color Six-Year Transfers were made to or for the benefit of Tri Color.

773.    The Tri Color Six-Year Transfers were made by the Debtors without fair consideration.

774.    On the date of each Tri Color Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

775.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Tri Color Six-Year Transfers set aside, or who could disregard the Tri Color Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

776.    The Trustee may avoid the Tri Color Six-Year Transfers under Bankruptcy Code section 544(b)(1).

777.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Tri Color Six-Year Transfers for the benefit of the Debtors' estates from Tri Color, the entity to or for whose benefit the Tri Color Six-Year Transfers were made, and from any subsequent transferees.

126

165

### COUNT 43

#### Avoidance and Recovery of Actual Fraudulent Transfers
#### Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
#### (Unique)

778.   The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

779.   FDI made numerous transfers of cash and inventory to Unique within two years of the commencement of FDI's chapter 11 case, as identified on Schedule I, attached hereto (collectively, the "Unique Two-Year Transfers").

780.   The Unique Two-Year Transfers constituted transfers of interests of FDI in property.

781.   The Unique Two-Year Transfers were made to or for the benefit of Unique.

782.   The Unique Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Unique Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Unique Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

783.   The Trustee may avoid the Unique Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

784.   Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Two-Year Transfers for the benefit of FDI's from Unique, the entity to or for whose benefit the Unique Two-Year Transfers were made, and from any subsequent transferees.

127

**166**

## COUNT 44

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Unique)

785. The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

786. The Debtors made numerous transfers of cash and inventory to Unique within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule I, attached hereto (collectively, the "Unique Six-Year Transfers").

787. The Unique Six-Year Transfers were made to or for the benefit of Unique.

788. The Unique Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Unique Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Unique Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

789. Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Unique Six-Year Transfers set aside, or who could disregard the Unique Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

790. The Trustee may avoid the Unique Six-Year Transfers under Bankruptcy Code section 544(b)(1).

128

167

791.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Six-Year Transfers for the benefit of the Debtors' estates from Unique, the entity to or for whose benefit the Unique Six-Year Transfers were made, and from any subsequent transferees.

792.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 45

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
### (Unique)

793.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

794.    The Unique Two-Year Transfers constituted transfers of interests of FDI in property.

795.    The Unique Two-Year Transfers were made to or for the benefit of Unique.

796.    FDI received less than reasonably equivalent value in exchange for the Unique Two-Year Transfers.

797.    FDI was insolvent on the date each Unique Two-Year Transfer was made, or became insolvent as a result of such transfer.

798.    The Trustee may avoid the Unique Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

799.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Two-Year Transfers for the benefit of FDI's estate from Unique, the entity to or for whose benefit the Unique Two-Year Transfers were made, and from any subsequent transferees.

129

168

## COUNT 46

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Unique)

800.    The Trustee restates and re-alleges paragraphs 1 through 382 of this Complaint as though fully set forth herein.

801.    The Unique Six-Year Transfers constituted transfers of interests of the Debtors in property.

802.    The Unique Six-Year Transfers were made to or for the benefit of Unique.

803.    The Unique Six-Year Transfers were made by the Debtors without fair consideration.

804.    On the date of each Unique Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

805.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Unique Six-Year Transfers set aside, or who could disregard the Unique Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

806.    The Trustee may avoid the Unique Six-Year Transfers under Bankruptcy Code section 544(b)(1).

807.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Unique Six-Year Transfers for the benefit of the Debtors' estates from Unique, the entity to or for whose benefit the Unique Six-Year Transfers were made, and from any subsequent transferees.

130

169

## COUNT 47

**Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(World Diamond)**

808.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

809.    FDI made numerous transfers of inventory to World Diamond within two years of the commencement of FDI's chapter 11 case, as identified on Schedule K, attached hereto (collectively, the "World Diamond Two-Year Transfers").

810.    The World Diamond Two-Year Transfers constituted transfers of interests of FDI in property.

811.    The World Diamond Two-Year Transfers were made to or for the benefit of World Diamond.

812.    The World Diamond Two-Year Transfers were made with the actual intent to hinder, delay, or defraud FDI's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the World Diamond Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the World Diamond Two-Year Transfers was to deplete FDI's property and frustrate satisfaction of FDI's legitimate obligations.

813.    The Trustee may avoid the World Diamond Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

814.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the World Diamond Two-Year Transfers for the benefit of FDI's from World Diamond, the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

**170**

### COUNT 48

Avoidance and Recovery of Actual Fraudulent Transfers
Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(World Diamond)

815.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

816.    The Debtors made numerous transfers of inventory to World Diamond within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule K, attached hereto (collectively, the "World Diamond Six-Year Transfers").

817.    The World Diamond Six-Year Transfers were made to or for the benefit of World Diamond.

818.    The World Diamond Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the World Diamond Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the World Diamond Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

819.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the World Diamond Six-Year Transfers set aside, or who could disregard the World Diamond Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

820.    The Trustee may avoid the World Diamond Six-Year Transfers under Bankruptcy Code section 544(b)(1).

132

171

821. Under Bankruptcy Code section 550(a), the Trustee may recover the value of the
World Diamond Six-Year Transfers for the benefit of the Debtors' estates from World Diamond,
the entity to or for whose benefit the World Diamond Six-Year Transfers were made, and from
any subsequent transferees.

822. The Trustee is entitled to his reasonable costs and expenses incurred pursuing this
claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

## COUNT 49

### Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(World Diamond)

823. The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as
though fully set forth herein.

824. The World Diamond Two-Year Transfers constituted transfers of interests of the
Debtors in property.

825. The World Diamond Two-Year Transfers were made to or for the benefit of World
Diamond.

826. The Debtors received less than reasonably equivalent value in exchange for the
World Diamond Two-Year Transfers.

827. The Debtors were insolvent on the date each World Diamond Two-Year Transfer
was made, or became insolvent as a result of such transfer.

828. The Trustee may avoid the World Diamond Two-Year Transfers under section
548(a)(1)(B) of the Bankruptcy Code.

829. Under Bankruptcy Code section 550(a), the Trustee may recover the value of the
World Diamond Two-Year Transfers for the benefit of the Debtors' estates from World Diamond,

133

172

the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

COUNT 50

Avoidance and Recovery of Constructive Fraudulent Transfers
Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
(World Diamond)

830.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

831.    The World Diamond Two-Year Transfers constituted transfers of interests of FDI in property.

832.    The World Diamond Two-Year Transfers were made to or for the benefit of World Diamond.

833.    FDI received less than reasonably equivalent value in exchange for the World Diamond Two-Year Transfers.

834.    FDI was insolvent on the date each World Diamond Two-Year Transfer was made, or became insolvent as a result of such transfer.

835.    The Trustee may avoid the World Diamond Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

836.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the World Diamond Two-Year Transfers for the benefit of FDI's estate from World Diamond, the entity to or for whose benefit the World Diamond Two-Year Transfers were made, and from any subsequent transferees.

134

173

## COUNT 51

Avoidance and Recovery of Actual Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(A) and 550(a)
(Twin Fields)

837.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

838.    Jaffe made numerous cash transfers to Twin Fields within two years of the commencement of Jaffe's chapter 11 case, as identified on Schedule L, attached hereto (collectively, the "Twin Fields Two-Year Transfers").

839.    The Twin Fields Two-Year Transfers constituted transfers of interests of Jaffe in property.

840.    The Twin Fields Two-Year Transfers were made to or for the benefit of Twin Fields.

841.    The Twin Fields Two-Year Transfers were made with the actual intent to hinder, delay, or defraud Jaffe's creditors. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Twin Fields Two-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Twin Fields Two-Year Transfers was to deplete Jaffe's property and frustrate satisfaction of Jaffe's legitimate obligations.

842.    The Trustee may avoid the Twin Fields Two-Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code.

843.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Two-Year Transfers for the benefit of Jaffe's estate from Twin Fields, the entity to or for whose benefit the Twin Fields Two-Year Transfers were made, and from any subsequent transferees.

135



## COUNT 52

### Avoidance and Recovery of Actual Fraudulent Transfers
### Under N.Y. DCL §§ 276, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Twin Fields)

844.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

845.    The Debtors made numerous cash transfers to Twin Fields within six years of the commencement of the Debtors' chapter 11 cases, as identified on Schedule L, attached hereto (collectively, the "Twin Fields Six-Year Transfers").

846.    The Twin Fields Six-Year Transfers were made to or for the benefit of Twin Fields.

847.    The Twin Fields Six-Year Transfers were made with the actual intent to hinder or delay present or future creditors of the Debtors within the meaning of section 276 of the DCL. Nirav Modi, Mihir Bhansali, Ajay Gandhi, and their co-conspirators approved the Twin Fields Six-Year Transfers in order to perpetuate the Bank Fraud and to launder and siphon its illicit proceeds for the benefit of Modi, his family, and others. The natural consequence of the Twin Fields Six-Year Transfers was to deplete the Debtors' property and frustrate satisfaction of the Debtors' legitimate obligations.

848.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Twin Fields Six-Year Transfers set aside, or who could disregard the Twin Fields Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL section 278 and/or 279.

849.    The Trustee may avoid the Twin Fields Six-Year Transfers under Bankruptcy Code section 544(b)(1).

850.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Six-Year Transfers for the benefit of the Debtors' from Twin Fields, the entity to or

175

for whose benefit the Twin Fields Six-Year Transfers were made, and from any subsequent transferees.

851.    The Trustee is entitled to his reasonable costs and expenses incurred pursuing this claim, including counsel fees under DCL section 276-a, and as otherwise permitted by law.

### COUNT 53

Avoidance and Recovery of Constructive Fraudulent Transfers
Under 11 U.S.C. §§ 548(a)(1)(B) and 550(a)
(Twin Fields)

852.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

853.    The Twin Fields Two-Year Transfers constituted transfers of interests of Jaffe in property.

854.    The Twin Fields Two-Year Transfers were made to or for the benefit of Twin Fields.

855.    Jaffe received less than reasonably equivalent value in exchange for the Twin Fields Two-Year Transfers.

856.    Jaffe was insolvent on the date each Twin Fields Two-Year Transfer was made, or became insolvent as a result of such transfer.

857.    The Trustee may avoid the Twin Fields Two-Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code.

858.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Two-Year Transfers for the benefit of Jaffe's estate from Twin Fields, the entity to or for whose benefit the Twin Fields Two-Year Transfers were made, and from any subsequent transferees.

137



## COUNT 54

### Avoidance and Recovery of Constructive Fraudulent Transfers
### Under N.Y. DCL §§ 273, 278, and 279 and 11 U.S.C. §§ 544(b)(1) and 550(a)
### (Twin Fields)

859.    The Trustee restates and re-alleges paragraphs 1 through 370 of this Complaint as though fully set forth herein.

860.    The Twin Fields Six-Year Transfers constituted transfers of interests of the Debtors in property.

861.    The Twin Fields Six-Year Transfers were made to or for the benefit of Twin Fields.

862.    The Twin Fields Six-Year Transfers were made by the Debtors without fair consideration.

863.    On the date of each Twin Fields Six-Year Transfer, the Debtors were insolvent or were rendered insolvent as a result of such transfer.

864.    Actual creditors, including but not limited to the Debtors' vendors and suppliers, exist who could have the Twin Fields Six-Year Transfers set aside, or who could disregard the Twin Fields Six-Year Transfers and attach or levy execution upon the property conveyed, under N.Y. DCL sections 278 and/or 279.

865.    The Trustee may avoid the Twin Fields Six-Year Transfers under Bankruptcy Code section 544(b)(1)

866.    Under Bankruptcy Code section 550(a), the Trustee may recover the value of the Twin Fields Six-Year Transfers for the benefit of the Debtors' estates from Twin Fields, the entity to or for whose benefit the Twin Fields Six-Year Transfers were made, and from any subsequent transferees.

138



## PRAYER FOR RELIEF

WHEREFORE, the Trustee, as chapter 11 trustee of the Debtors and as assignee and judgment creditor of the U.S. Affiliates, respectfully requests that the Court:

a. On Count 1, enter judgment in favor of the Trustee and against all Defendants, jointly and severally, in treble the amount of damages to be proven at trial, but no less than $175,000,000 that were suffered by the Debtors and their estates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

b. On Count 2, enter judgment in favor of the Trustee, as assignee of the U.S. Affiliates, and against all Defendants, jointly and severally, in treble the amount of damages to be proven at trial, but no less than $50,000,000, that were suffered by the U.S. Affiliates as a result of the Defendants' violation of the Racketeering Influenced Corrupt Organizations Act, plus interest, costs and attorneys' fees, and such other equitable relief as may be just and proper.

c. On Count 3, avoid the Synergies-Mehta Transfer and enter judgment in favor of the Trustee and against Defendant Purvi Mehta in the amount of $14,575,000.

d. On Count 4, avoid the Synergies-Mehta Transfer and enter judgment in favor of the Trustee and against Defendant Purvi Mehta in the amount of $14,575,000.

e. On Count 5, avoid the CPRE Equity Transfer and enter judgment in favor of the Trustee and against the Ithaca Trust and Ami Modi, jointly and severally, in the amount of $6,000,000.

f. On Count 6, avoid the CPRE Equity Transfer and enter judgment in favor of the Trustee and against the Ithaca Trust and Ami Modi, jointly and severally, in the

139



amount of $6,000,000.

g.  On Count 7, avoid each of the CPRE Two-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $3,603,683.69.

h.  On Count 8, avoid each of the CPRE Six-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $4,594,559.78.

i.  On Count 9, avoid each of the CPRE Two-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $3,603,683.69.

j.  On Count 10, avoid each of the CPRE Six-Year Transfers and enter judgment in favor of the Trustee and against CPRE in the amount of $4,594,559.78.

k.  On Count 11, avoid each of the Auragem Transfers and enter judgment in favor of the Trustee and against Auragem in the amount of $2,340,968.94.

l.  On Count 12, avoid each of the Auragem Transfers and enter judgment in favor of the Trustee and against Auragem in the amount of $2,340,968.94.

m.  On Count 13, avoid each of the Brilliant Two-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $5,264,397.13.

n.  On Count 14, avoid each of the Brilliant Six-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $10,491,287.11.

o.  On Count 15, avoid each of the Brilliant Two-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $5,264,397.13.

p.  On Count 16, avoid each of the Brilliant Six-Year Transfers and enter judgment in favor of the Trustee and against Brilliant in the amount of $10,491,287.11.

q.  On Count 17, avoid each of the Diagems Transfers and enter judgment in favor of the Trustee and against Diagems in the amount of $2,966,406.15.

r.  On Count 18, avoid each of the Diagems Transfers and enter judgment in favor of

140



the Trustee and against Diagems in the amount of $2,966,406.15.

s.  On Count 19, avoid each of the Empire Two-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $1,069,006.07.

t.  On Count 20, avoid each of the Empire Six-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $12,113,126.57.

u.  On Count 21, avoid each of the Empire Two-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $1,069,006.07.

v.  On Count 22, avoid each of the Empire Six-Year Transfers and enter judgment in favor of the Trustee and against Empire in the amount of $12,113,126.57.

w.  On Count 23, avoid each of the Eternal Two-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,433,815.61.

x.  On Count 24, avoid each of the Eternal Six-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,733,815.61.

y.  On Count 25, avoid each of the Eternal Two-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,433,815.61.

z.  On Count 26, avoid each of the Eternal Six-Year Transfers and enter judgment in favor of the Trustee and against Eternal in the amount of $1,733,815.61.

aa. On Count 27, avoid each of the Fancy Creations Two-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $3,900,916.93.

bb. On Count 28, avoid each of the Fancy Creations Six-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $10,827,802.57.

cc. On Count 29, avoid each of the Fancy Creations Two-Year Transfers and enter

141

180

judgment in favor of the Trustee and against Fancy Creations in the amount of $3,900,916.93.

dd. On Count 30, avoid each of the Fancy Creations Six-Year Transfers and enter judgment in favor of the Trustee and against Fancy Creations in the amount of $10,827,802.57,.

ee. On Count 31, avoid each of the Pacific Two-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $12,494,765.63.

ff. On Count 32, avoid each of the Pacific Six-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $41,771,415.37.

gg. On Count 33, avoid each of the Pacific Two-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $12,494,765.63.

hh. On Count 34, avoid each of the Pacific Six-Year Transfers and enter judgment in favor of the Trustee and against Pacific in the amount of $41,771,415.37.

ii. On Count 35, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

jj. On Count 36, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

kk. On Count 37, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

ll. On Count 38, avoid the Sunshine Transfer and enter judgment in favor of the Trustee and against Sunshine in the amount of $965,000.00.

mm. On Count 39, avoid each of the Tri Color Two-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $1,493,645.55.

nn. On Count 40, avoid each of the Tri Color Six-Year Transfers and enter judgment

142

\181\

in favor of the Trustee and against Tri Color in the amount of $12,395,082.86.

oo. On Count 41, avoid each of the Tri Color Two-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $1,493,645.55.

pp. On Count 42, avoid each of the Tri Color Six-Year Transfers and enter judgment in favor of the Trustee and against Tri Color in the amount of $12,395,082.86.

qq. On Count 43, avoid each of the Unique Two-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $3,475,031.42.

rr. On Count 44, avoid each of the Unique Six-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $11,494,395.02.

ss. On Count 45, avoid each of the Unique Two-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $3,475,031.42.

tt. On Count 46, avoid each of the Unique Six-Year Transfers and enter judgment in favor of the Trustee and against Unique in the amount of $11,494,395.02.

uu. On Count 47, avoid each of the World Diamond Two-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $10,607,792.98.

vv. On Count 48, avoid each of the World Diamond Six-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $21,175,805.74.

ww. On Count 49, avoid each of the World Diamond Two-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of $10,607,792.98.

xx. On Count 50, avoid each of the World Diamond Six-Year Transfers and enter judgment in favor of the Trustee and against World Diamond in the amount of

143

182

$21,175,805.74.

yy. On Count 51, avoid each of the Twin Fields Two-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $3,265,000.00.

zz. On Count 52, avoid each of the Twin Fields Six-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $21,361,542.28.

aaa. On Count 53, avoid each of the Twin Fields Two-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $3,265,000.00.

bbb. On Count 54, avoid each of the Twin Fields Six-Year Transfers and enter judgment in favor of the Trustee and against Twin Fields in the amount of $21,361,542.28.

ccc. Award the Trustee his reasonable costs and expenses incurred in this action, including counsel fees under New York Debtor & Creditor Law section 276-a and as otherwise permitted by law.

144

183

Dated: February 25, 2020
New York, New York

Respectfully submitted,

JENNER & BLOCK LLP

By:  /s/ Vincent E. Lazar
Vincent E. Lazar
Angela M. Allen (admitted *pro hac vice*)
William A. Williams (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
vlazar@jenner.com
aallen@jenner.com

Carl N. Wedoff
919 Third Avenue
New York, New York 10022
(212) 891-1600
cwedoff@jenner.com

*Counsel for the Chapter 11 Trustee*

145

# Exhibit 8

**Swingle, Adam T.**

| | |
|---|---|
| **Subject:** | FW: Service of Application filed on behalf of Purvi Modi before the Special Judge in the FEO Proceedings in India |
| **Attachments:** | Ordersheet - 27 January 2022.pdf |

**From:** Sankalp Sharma <sankalp.sharma@khaitanco.com>
**Sent:** Thursday, January 27, 2022 4:43 AM
**To:** Allen, Angela M. <AAllen@jenner.com>
**Cc:** Wolfe, Mauro M. <MMWolfe@duanemorris.com>; SStewart@duanemorris.com; KCO | Project | BNP <project.bnp@khaitanco.com>; Allen, Angela M. <AAllen@jenner.com>
**Subject:** RE: Service of Application filed on behalf of Purvi Modi before the Special Judge in the FEO Proceedings in India

External Email – Exercise Caution
Dear Angela

We write to update you about the hearing in the captioned application filed by Ms. Purvi Modi.

The matter was taken up by court for hearing today. After taking cognizance of the facts, the Court was pleased to pass the attached order and allow the Enforcement Directorate(Respondent Number 1) and Punjab National Bank(Respondent Number 2) to file their respective Reply to the present Application.

As mentioned above, while granting respondents time to file the reply, the Court listed the matter next on 8 February 2022.

Please reach out if any doubts. Would be happy to assist and resolve.

Thanks and Regards

Sankalp

**From:** Levin, Richard <RLevin@jenner.com>
**Sent:** Wednesday, January 26, 2022 9:10 PM
**To:** Sankalp Sharma <sankalp.sharma@khaitanco.com>
**Cc:** Wolfe, Mauro M. <MMWolfe@duanemorris.com>; SStewart@duanemorris.com; KCO | Project | BNP <project.bnp@khaitanco.com>; Allen, Angela M. <AAllen@jenner.com>
**Subject:** RE: Service of Application filed on behalf of Purvi Modi before the Special Judge in the FEO Proceedings in India

External communication. Exercise caution in accessing contents and attachments.

Dear Sankalp,

In the future, please direct these communications to my counsel. Angela Allen, who is copied on this email.

Regards,
Richard

**From:** Sankalp Sharma <sankalp.sharma@khaitanco.com>
**Sent:** Wednesday, January 26, 2022 8:37 AM
**To:** Levin, Richard <RLevin@jenner.com>
**Cc:** Wolfe, Mauro M. <MMWolfe@duanemorris.com>; SStewart@duanemorris.com; KCO | Project | BNP <project.bnp@khaitanco.com>
**Subject:** RE: Service of Application filed on behalf of Purvi Modi before the Special Judge in the FEO Proceedings in India

External Email – Exercise Caution

Dear Mr. Levin

We write to update you about the hearing in the application filed by Ms. Purvi Modi, an approver in the proceedings before the Special Court.

We refer to the mail below and the attached application served thereof. The matter was taken up for hearing and upon taking cognizance of the facts in brief, the Court was pleased to issue notice and place the matter for hearing on the 27 January 2022.

Taking into account the cooperation shown by Ms. Purvi Modi, this Court granted pardon to Ms. Purvi Modi under Section 306 of the Indian Criminal Procedure Code 1973 by an order dated 4 January 2021.

Ms. Purvi Modi has been and will continue to cooperate with the Indian Authorities, including in helping the Indian Authorities in recovery of assets under her control in favor of the Government of India.  The assets sought by you are also the subject matter of the ongoing Attachment Proceedings before this Court under the provisions of the Indian Fugitive Economic Offenders Act 2018 **('FEO')**, causing not only multiplicity but consequently, frustration of the claims by the Enforcement Directorate and other Interested Persons herein.

The Approver, Ms. Purvi Modi, also being an Interested Person in the FEO proceedings, had filed an Affidavit in Reply to the application filed by the Enforcement Directorate authorising the Indian Court to confiscate the subject assets in her control which were linked to Nirav Modi and his companies and associates.

Considering the above mentioned, we request you to kindly restrain any coercive measures for recovery of subject assets with respect to the Approver as they are already the subject matter of various proceedings in India initiated by the Enforcement Directorate and PNB, the primary creditor.


With Best Regards
Sankalp


---

**From:** Pranjal Agarwal <pranjal.agarwal@khaitanco.com>
**Sent:** Tuesday, January 25, 2022 12:56 PM
**To:** rlevin@jenner.com
**Cc:** KCO | Project | BNP <project.bnp@khaitanco.com>
**Subject:** Service of Application filed on behalf of Purvi Modi before the Special Judge in the FEO Proceedings in India

Dear Sir

We write under instructions and on behalf of Ms. Purvi Modi, Interested Party and Approver in the Fugitive Economic Offender Proceedings ongoing in Mumbai, India.

Please find attached herewith an application, the contents whereof are self explanatory, which is being served on you herein.

We request you not to take any coercive measures against the Applicant until the same is pending adjudication.


Regards
Khaitan & Co.
**Pranjal Agarwal**
Associate

One Forbes                                   T: +91 22 6636 5000
3ʳᵈ & 4ᵗʰ Floors, No. 1                      F: +91 22 6636 5050
Dr. V. B. Gandhi Marg                        M: +91 99206 27181
Fort, Mumbai 400 001, India                  E: pranjal.agarwal@khaitanco.com

**www.khaitanco.com**

| **Chambers and Partners Asia Pacific 2020** | **IFLR 1000 2020** | **Legal 500 Asia Pacific 2020** |
| Top Ranked Leading Firm | Top Tier Firm | Top Ranked Firm |

Please don't print this email unless you really need to.

This message (including any attachment(s) hereto) is confidential and may also be privileged. It is intended solely for the addressee. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this information is strictly prohibited and may be unlawful. If you have received this message in error you are requested to delete it from your system. Khaitan & Co is not liable for the improper transmission of this message nor for any damage sustained as a result of this message.

This message (including any attachment(s) hereto) is confidential and may also be privileged. It is intended solely for the addressee. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this information is strictly prohibited and may be unlawful. If you have received this message in error you are requested to delete it from your system. Khaitan & Co is not liable for the improper transmission of this message nor for any damage sustained as a result of this message.


This message (including any attachment(s) hereto) is confidential and may also be privileged. It is intended solely for the addressee. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this information is strictly prohibited and may be unlawful. If you have received this message in error you are requested to delete it from your system. Khaitan & Co is not liable for the improper transmission of this message nor for any damage sustained as a result of this message.

This message (including any attachment(s) hereto) is confidential and may also be privileged. It is intended solely for the addressee. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this information is strictly prohibited and may be unlawful. If you have received this message in error you are requested to delete it from your system. Khaitan & Co is not liable for the improper transmission of this message nor for any damage sustained as a result of this message. & Co is not liable for the improper transmission of this message nor for any damage sustained as a result of this message.

---

## Richard Levin

**Jenner & Block LLP**
1155 Avenue of the Americas, New York, NY 10036-2711  |  jenner.com
+1 212 891 1601 | TEL
+1 646 468 9700 | MOBILE
RLevin@jenner.com
Download V-Card  |  View Biography

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

This message (including any attachment(s) hereto) is confidential and may also be privileged. It is intended solely for the addressee. If you are not the intended recipient you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this information is strictly prohibited and may be unlawful. If you have received this message in error you are requested to delete it from your system. Khaitan & Co is not liable for the improper transmission of this message nor for any damage sustained as a result of this message. & Co is not liable for the improper transmission of this message nor for any damage sustained as a result of this message.

# Exhibit 9

20-01054-shl   Doc 109   Filed 09/25/22   Entered 09/25/23 20:35:19   Main Document
Pg 397 of 804

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

In re                                      Chapter 11

                                         Case No. 18-10509 (SHL)

FIRESTAR DIAMOND, INC., *et al.*,[1]

                                         (Jointly Administered)

Debtors.
-------------------------------------------------------------------x

# REPORT OF JOHN J. CARNEY, EXAMINER

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Tel: 212.589.4200
*Counsel to the Examiner*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Firestar Diamond, Inc. (2729), Fantasy, Inc. (1673), and A. Jaffe, Inc. (4756).

**TABLE OF CONTENTS CONTINUED**

Page

I.     EXECUTIVE SUMMARY ................................................................................1

II.    KEY ENTITIES, INDIVIDUALS AND TERMS..............................................4

III.   BACKGROUND ...........................................................................................8

    **A.**   The Commencement of the Chapter 11 Cases .......................................8

    **B.**   The Examiner's Appointment...............................................................11

    **C.**   The Examiner's Work Plan...................................................................13

    **D.**   The Examiner's Legal and Forensic Team ...........................................15

    **E.**   The Examiner's Investigation ..............................................................15

    **F.**   Appointment of the Chapter 11 Trustee...............................................20

IV.  THE ALLEGED FRAUDULENT CIRCUMSTANCES .................................24

    **A.**   An Explanation of Letters of Undertaking ("LOUs")...........................25

    **B.**   The Alleged Fraudulent LOU Scheme .................................................27

V.    DEBTORS' STRUCTURE AND REPORTED BUSINESS ..........................33

    **A.**   Modi and Debtors' Origins ................................................................33

    **B.**   Firestar Diamond, Inc. ......................................................................35

    **C.**   Fantasy Inc. ......................................................................................36

    **D.**   A. Jaffe..............................................................................................37

    **E.**   Debtors' Capital Structure .................................................................38

    **F.**   Non-debtor US parents and affiliates..................................................40

VI.  INVESTIGATIVE FINDINGS REGARDING DEBTORS' BUSINESS PRACTICES..44

    **A.**   Debtors Engaged in High Volume Transactions with Shadow Entities Identified in the Alleged Fraud ..........................................................46

    **B.**   Debtors Treated the Shadow Entities as Related Affiliates Internally While Accounting for Them as Independent "Customers" or "Vendors" For Transaction Purposes .......................................................................47

    **C.**   Anomalies in Debtors' Financial Reporting of Transactions With Shadow Entities ...........................................................................................64

    **D.**   Debtors' Loose Diamond Transactions with Shadow Entities Appear Fraudulent ......................................................................................70

VII.  FUNDS ALLEGEDLY OBTAINED THROUGH THE FRAUDULENT LOU DIAMOND SCHEME FLOWED THROUGH THE DEBTORS....................82

    **A.**   Example of Fraudulent LOU Transaction Traced by the Examiner .....83

    **B.**   Confirmed Debtor Involvement in Alleged LOU Diamond Scheme ..................86

**C.** Officer/Director Involvement in Alleged LOU Diamond Scheme ...................... 122

**VIII.** USE OF POTENTIALLY FRAUDULENT FUNDS ..................................................... 136

    **A.** Suspicious Transfers to Bailey, Banks & Biddle ................................................. 136

    **B.** Real Estate Transactions .................................................................................. 150

**IX.** ADDITIONAL MISSTATEMENTS AND DISCLOSURE ISSUES ............................ 157

    **A.** Misstatements In Loan Disclosures ................................................................... 157

    **B.** Disclosure Issues in Connection with Chapter 11 Cases ................................... 159

**X.** CONCLUSION ............................................................................................................ 164

RED HIGHLIGHTS ARE "HIGHLY CONFIDENTIAL" DOCUMENTS

## I.  EXECUTIVE SUMMARY

On January 29, 2018, Punjab National Bank ("PNB") lodged a complaint with Indian authorities against Nirav Modi and several entities controlled by him—alleging what has been described as the largest bank fraud in Indian history.  As charged by both the criminal and civil authorities in India, Modi and his co-conspirators are alleged to have fraudulently borrowed approximately $4 billion over a period of years by manufacturing sham transactions purportedly to "import" diamonds and other gems into India using a web of more than twenty secretly controlled shell entities.   On April 13, 2018, the Bankruptcy Court appointed the Examiner to determine if the three U.S. corporations indirectly owned by Nirav Modi, Firestar Diamond, Inc. ("FDI"), Fantasy, Inc. ("FI") and A. Jaffe, Inc. ("A. Jaffe," collectively with FDI and FI, the "Debtors") and their officers and directors were involved in the criminal conduct alleged in India. After conducting an intensive 120-day investigation, the Examiner finds substantial evidence to support the knowledge and involvement by the Debtors and their senior officers and directors, namely Mihir Bhansali and Ajay Gandhi, in the criminal conduct alleged by the Indian authorities.

*Background*

On February 26, 2018, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, on the basis that the interruption of their supply chain and back office support provided by Modi-affiliated entities made it impossible to continue their respective businesses.  The Debtors led the Bankruptcy Court and parties in these chapter 11 cases (the "Chapter 11 Cases") to believe that they were innocent victims of the fraud.  The prepetition CEO of the Debtors, Mihir Bhansali, remained on as the Debtors' President and their prepetition CFO, Ajay Gandhi, retained his role for the first three months of the Chapter 11 Cases.

The Court appointed the Examiner to, among other things, determine the extent, if any, of the Modi conspirators' influence on the Debtors as well as whether any current officer or director

had actively and knowingly participated in fraud or dishonesty involving the affairs of the Debtors. While the Examiner was conducting his investigation, the Court held a hearing to approve the sale of certain assets held by A. Jaffe. Based on testimony at the hearing, the Court raised concerns about approving the proposed sale. At a subsequent telephonic conference, Bhansali's counsel represented that his client would assert his Fifth Amendment right against self-incrimination if compelled to testify about the issues raised during the hearing. Following this conference, the motion to sell the assets was withdrawn, Bhansali resigned all positions with the Debtors, and the Court later appointed a Chapter 11 Trustee.

### *Summary of Investigative Findings*

The Debtors are in the business of selling finished jewelry to major retailers, including Costco, J.C. Penny, Army/Navy Stores, Macy's and Zales, among others. The Examiner has uncovered that in addition to conducting their stated wholesale business, the Debtors conducted transactions totaling hundreds of millions of dollars with the foreign shell companies alleged to have been created and secretly controlled by Modi for the purpose of furthering the fraudulent banking scheme (the "Shadow Entities"). These transactions were primarily structured as purchases and sales of loose diamonds, at a volume and in a manner that is not consistent with the stated business of the Debtors.

In the limited time available, the Examiner has identified tens of millions of dollars of purported diamond sales by the Debtors to various Shadow Entities, where payment can be traced to proceeds from the alleged bank fraud. The Examiner's investigation has confirmed that criminally derived proceeds from these sales flowed from India into the U.S. and in numerous instances were returned to Firestar in India or used to fund Debtors' operations, including making payments on loans made by banks in the U.S.

In addition to linking the Debtors' transactions to specific Letters of Undertaking (LOUs),

2

the Examiner has identified numerous indicia of fraud involving the Debtors' financial reporting, inventory valuation, and operational practices surrounding these transactions.  Specifically:

- Diamonds sold to or purchased from Shadow Entities were routinely shipped out the same day or within days after arrival, without ever being opened or inspected by employees to ascertain the contents of the packets, in contrast to shipments that were made to or received from non-Shadow Entities.

- Certain specific high-value diamonds appear to have been "round tripped":  the same diamond seems to have been bought and sold multiple times at varying prices, often wildly inflated above market prices, in order to create the appearance of millions of dollars in purportedly legitimate transactions and to facilitate the movement of funds.

- The Debtors were in possession of internal financial records that appeared to be the property of numerous supposedly independent Shadow Entities.

- The Debtors' records indicate the Debtors paid back office expenses of numerous supposedly independent Shadow Entities.

- Both the Debtors' CEO and CFO were in possession of internal documents that appeared to track and harmonize accounts receivable and payable between the Debtor entities and the Shadow Entities to foster the appearance of legitimate transactions.

- The volume of sales reported in FDI's tax returns from 2011 – 2017, and in A. Jaffe's returns from 2011- 2012, is millions of dollars (and in some cases tens of millions of dollars) lower than the volume of sales reported in the entities' sales journals, and neither the Debtors' CFO nor any other of the Debtors' employees

3

could explain the source of the figures reported on the tax returns.

- Despite maintaining low balances in their bank accounts, and their stated business of selling finished jewelry to retailers, the Debtors purchased and sold loose diamonds supposedly valued at more than $280 million to Shadow Entities, as reported in their sales journals from 2011 to 2017.

- The Examiner also traced millions of dollars from the Shadow Entities that were funneled through the Debtors to fund the operations of a diamond retail company, Bailey, Banks & Biddle, which relationship was not disclosed to its lenders or to the Bankruptcy Court.

- Money from the Shadow Entities was used to purchase an approximately $6 million apartment on Central Park South for the sole use of Modi and his family in the U.S.

- Throughout the investigation, both Mihir Bhansali, the former CEO of the Debtors, and Ajay Gandhi, the CFO of the Debtors, were questioned about many of the suspicious transactions and irregularities described above.  Bhansali asserted his Fifth Amendment right against self-incrimination as to both interviews and the provision of documents.  Other than identifying himself at the deposition, Bhansali asserted his Fifth Amendment right against self-incrimination as to every question asked by the Examiner.  Gandhi provided documents and participated in multiple interviews, and admitted that at some point he was told by Firestar India employees that the purpose of the loose diamond transactions was to obtain financing in India, specifically LOUs.

## II.   KEY ENTITIES, INDIVIDUALS AND TERMS

### A.  Entities

### *Debtors*

- **Firestar Diamond, Inc. (FDI)**: A debtor in the chapter 11 bankruptcy. proceeding.

- **Fantasy Inc. (FI)**: A debtor in the chapter 11 bankruptcy proceeding.

- **A. Jaffe, Inc.**: A debtor in the chapter 11 bankruptcy proceeding.

### *Affiliates From Corporate Organizational Charts*

- **Firestar Diamond International, Inc. ("FD International")**: U.S. entity that traded high value loose diamonds.

- **Firestar India**: All Firestar entities located in India.

- **Firestar Holdings Ltd., Hong Kong**: Holding company that owned Synergies Corporation.

- **Synergies Corporation**: A U.S. holding company in the Firestar corporate structure; owner of A. Jaffe.

- **Firestar Group, Inc.**: Parent company of FDI and FI. Wholly owned by Synergies Corporation.

- **Central Park Real Estate LLC ("CPRE")**: Entity formed to hold real estate; was 100% owned by Firestar Group Inc. and sold in 2018 to The Ithaca Trust.

- **Nirav Modi Inc.**: Entity that sold high-end jewelry designed.

### *The Modi Firms*

- **Diamonds 'R' Us**: Entity name under which Nirav Modi started his business.

- **Solar Exports**: Entity in India controlled by Nirav Modi.

- **Stellar Diamonds**: Entity in India controlled by Nirav Modi.

### *Other Entities*

- **Twin Fields Investments Ltd. ("Twin Fields")**: A Delaware registered investment company with ties to Mihir Bhansali.

- **Punjab National Bank (PNB)**: Bank in India that gave Letters of Understanding to Modi entities.

- **HSBC Bank, USA N.A. ("HSBC")**: Lender to FDI and FI.

- **Israel Discount Bank of New York ("IDB")**: Lender to FDI and FI.

- **Standard Chartered Bank ("SCB")**: Former lender to FDI and FI.

- **Marks Paneth LLP**: Auditors for U.S. Firestar entities.

- **Sampat & Mehta**: Indian auditors for Firestar entities.

- **Malca-Amit USA, LLC and Malca-Amit CHB, Inc.**: Companies that provided shipping services to the Debtors.

- **Reserve Bank of India ("RBI"):** India's national bank.

- **Central Bureau of Investigation ("CBI"):** India's primary investigative law enforcement agency.

- **National Company Law Tribunal ("NCLT"):** A quasi-judicial body charged with adjudicating civil disputes between Indian companies.

- **Ministry of Corporate Affairs (the "Ministry"):** Indian governmental authority charged with the administration of the Companies Act of 2013, the Companies Act 1956, the Limited Liability Partnership Act, 2008 and other regulations governing the corporate sector in India.

### *Shadow Entities (Most Cited)*

- **Auragem Company Ltd (Hong Kong)**

- **Brilliant Diamonds Ltd (Hong Kong)**

- **World Diamond Distribution FZE (UAE)**

- **Pacific Diamonds FZE (UAE)**

- **Eternal Diamonds Corporation Ltd (Hong Kong)**

- **Universal Fine Jewelry FZE (UAE)**

- **Tri Color Gems FZE (UAE)**

- **Fancy Creations Company Ltd (Hong Kong)**

- **Unique Diamond and Jewelry FZC (UAE)**

- **Vista Jewelry RJE (UAE)**

- **Empire Gems FZE (UAE)**

- **Fine Classic FZE**

## B. Individuals

- **Nirav Modi**: Owner of the Firestar Entities.

- **Mihir Bhansali**: CEO of FDI and FI.

- **Ajay Gandhi**: CFO of all Firestar U.S. entities, including FDI, FI and A. Jaffe.

- **Sumay Bhansali**: CEO of A. Jaffe.

- **Joshua Weinman**: CEO and certified diamond trader at FD International.

- **Bankim Mehta**: Diamond division manager at Firestar Diamond International Inc. and Director of Firestar Holdings Ltd. Hong Kong,

- **Samuel Sandberg**: 5% owner of A. Jaffe and Chief Creative Officer of A. Jaffe.

- **Connie Wong**: Shipping Manager for A. Jaffe.

- **Rebecca Chow**: Diamond Sourcing Manager for FDI.

- **Evelyn Kosiec**: Operations manager for A. Jaffe.

- **Kunal Patel**: Senior Manager for FDI.

- **Hemant Bhatt**: Modi's business partner.

- **Kurian Mathews**: Firestar Dubai employee.

- **Shyam Whadhwa**: Vice President of Accounts for Firestar India.

- **Satyendra Shukla**: Head of the Middle East Firestar entities.

- **Purvi Modi (Mehta)**: Nirav Modi's sister. Managed the Hong Kong Firestar business.

- **Ami Modi**: Nirav Modi's wife.

- **Kavita Mankikar**: Nirav Modi's personal assistant located in India.

## C. Terms

- **Core Banking Solution ("CBS")**: Helps automate front-end and back-end processes of banks to achieve centralized and smooth processing.

7

- **Letter of Undertaking ("LOU")**: Financial instruments unique to India that allows Indian companies to borrow funds from an Indian bank to facilitate imports with international customers and vendors.

- **Nostro Account**: An account that a bank holds in a foreign currency in another bank.

- **Importer**: In an LOU transaction, an entity that obtains short-term credit from Indian banks.

- **Exporter:** Beneficiary of LOU funds and entity that ships goods to overseas importer.

- **Packing Credit:** Short-term working capital loans obtained by vendors to fulfill upcoming orders of goods.

- **SWIFT System:** Network that enables financial institutions worldwide to send and receive information about financial transactions.

## III.    BACKGROUND

### A.    The Commencement of the Chapter 11 Cases

On February 26, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing these Chapter 11 Cases. The Debtors operated their businesses and managed their properties as debtors in possession under section 1107 of the Bankruptcy Code from the Petition Date until the Court entered an order directing the appointment of a chapter 11 trustee on June 7, 2018.

Several weeks before the commencement of the Chapter 11 Cases, governmental authorities in India launched an investigation into Modi, the ultimate owner of the Debtors, several entities owned or controlled by Modi, and persons associated with him for allegedly orchestrating a massive fraud upon PNB in India and other banks around the world.[2] Indian news outlets reported that Modi and others had fraudulently obtained letters of undertaking ("LOUs"), guarantees under

---

[2] *See* Declaration of Mihir Bhansali, President of the Debtors, Containing Information Required Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Debtors' First Day Motions ("First Day Declaration") at 4, 7 (ECF No. 2).

which a qualified bank allows its customers to use money from another Indian bank's foreign

branch in the form of short-term credit to engage in foreign import transactions into India.  They

used these fraudulently obtained LOUs to defraud PNB and other banks by borrowing billions of

dollars over the course of several years.[3]

On January 29, 2018, PNB lodged a complaint with the Indian Central Bureau of

Investigation ("CBI"), India's primary investigative law enforcement agency, against Modi and

his co-conspirators alleging a massive fraud against PNB.[4]   The CBI subsequently issued a First

Information Report ("FIR"), dated January 31, 2018, identifying criminal statutes Modi and his

co-conspirators allegedly violated and basic facts supporting PNB's allegations.   This FIR

specifically alleges that Modi and his co-conspirators "cheat[ed] . . . Punjab National Bank and

caused a wrongful loss."[5]   PNB subsequently filed another criminal complaint against certain

companies and persons associated with Modi, also for defrauding PNB. The CBI issued a FIR in

connection with this complaint as well. This FIR not only details the alleged fraud against PNB

and the criminal statutes allegedly violated by the additional parties, but also lists fraudulently

issued LOUs that were used to perpetrate the fraud.[6] The Indian government subsequently charged

Modi and others alleged to have participated in the fraud with various crimes.[7]  On May 24, 2018,

the Directorate of Enforcement, Ministry of Finance for the Department of Revenue of India

---

[3] Manoj Kumar and Krishna N. Das, *India's PNB Seeks to Soothe Investors After Uncovering Massive Fraud*, REUTERS (February 15, 2018), https://www.reuters.com/article/us-punjab-natl-bank-fraud/indias-pnb-seeks-to-soothe-investors-after-uncovering-massive-fraud-idUSKCN1FZ0OR.
[4] Central Bureau of Investigation, http://cbi.gov.in/ (last visited August 23, 2018).
[5] First Information Report, Book No. 971, Serial No. 10 (January 31, 2018), available at
http://cbi.gov.in/firs/2018/2018_pdf/2018_bsnfc_mumbai_firs/RC0772018E0001.pdf.
[6] First Information Report, Book No. 971, Serial No. 13 (March 4, 2018), available at
http://cbi.gov.in/firs/2018/2018_pdf/2018_bsnfc_mumbai_firs/RC0772018E0003.pdf.
[7] Charge Sheet in Case Ref: RC.1(E)/2018-CBI/BS&FC/MUMBAI before The Court Of Honorable Special Judge for CBI Cases, Court No.51, Mumbai (May 14, 2018) ("CBI Charge Sheet"); Abhirup Roy and Devidutta Tripathy,
 India Police Expand Probe Against Jeweler Modi in PNB Fraud Case, REUTERS (Mar. 8, 2018)
https://www.reuters.com/article/us-punjab-natl-bank-fraud/india-police-expand-probe-against-jeweler-modi-in-pnb-fraud-case-idUSKCN1GK0YM.

commenced proceedings before the City Civil Court of Greater Bombay for violations of the Prevention of Money Laundering Act of 2002 ("ED Complaint").The Ministry of Corporate Affairs simultaneously commenced civil proceedings[8] before India's National Company Law Tribunal ("NCLT"), a quasi-judicial body charged with adjudicating civil disputes between Indian companies.[9] On February 23, 2018, three days before the Petition Date, the NCLT issued an order freezing Modi's and his affiliates' assets in India, and authorizing the seizure of those assets.[10] Modi fled India and, as of the date of this report, he remains a fugitive from the Indian authorities.

Following the revelation of the fraud allegations, businesses and factories owned and operated by Modi and his affiliates ceased operations because their assets were seized and several employees were incarcerated. Several of these businesses produced jewelry sold by the Debtors and provided back office support to the Debtors. According to the Debtors, the sudden loss of their supply chain and back office support had a severe impact on their operations, leaving the Debtors with no choice but to seek relief under chapter 11.[11]

The Debtors also made other representations formally and informally, explicitly and implicitly, as the Debtors entered chapter 11 regarding their involvement in the events in India. The Debtors led this Court and other parties to believe that they were not involved in the fraud alleged in India and they were innocently caught up in an overseas matter.[12]   For example, at the outset of the cases the Debtors stated: "The Debtors and their dedicated employees have worked tirelessly over the past week or so to…reassure their vendors and customers that they had no

---

[8] *Union of India, Ministry of Corporate Affairs v. Gitanjali Gems Ltd., et al.*, C.P. No. 277/2018, Petition dated February 23, 2018, annexed to the Declaration of James L. Bromley as Exhibit F (ECF No. 151).
[9] *See* Section 408 of the Indian Companies Act of 2013.
[10] *Union of India, Ministry of Corporate Affairs v. Gitanjali Gems Ltd., et al.*, C.P. No. 277/2018, Order dated February 23, 2018, annexed to the Declaration of James L. Bromley as Exhibit A (ECF No. 76).
[11] *See* First Day Declaration at 8.
[12] In a meeting that took place on or about the Petition Date, at which the Debtors' management and counsel were present, the Debtors implied to HSBC and IDB that the Debtors were not involved in the alleged fraud in India.

involvement in the alleged wrongful conduct…and …reassure their customers and vendors that they were committed to carrying on their business and that swift action was being taken to mitigate the damage caused by the actions in India."[13]

### B.    The Examiner's Appointment

On March 23, 2018, the Debtors filed a motion requesting that the Court approve certain bidding and sale procedures for the sale of substantially all of the Debtors' assets free and clear of liens, claims, interests and encumbrances under section 363(f) of the Bankruptcy Code (the "Sale Motion").[14] PNB objected on a number of grounds, citing concerns that Modi's potential connections with the Debtors may chill the bidding process and compromise the rights of parties to the sales proceedings.[15]

In light of these concerns, and based on the reported events in India, on March 30, 2018, the United States Trustee filed a motion to appoint an examiner to investigate and report on the conduct of the Debtors pursuant to section 1104(c) of the Bankruptcy Code[16] and the Debtors consented to the appointment of an examiner.

The Court granted the U.S. Trustee's motion and on April 13, 2018, entered an order (the

---

[13] First Day Declaration at 11.

[14] Debtors' Motion for Entry of an Orders Pursuant to 11 U.S.C. §§ 105, 363 and 365, and Bankruptcy Rules 2002, 6004 and 6006: (A) Fixing the Time, Date and Place for Hearing to Consider Bidding Procedures in connection with the Debtors' Sale of Substantially All of Their Assets; (B)(i) Establishing Bidding Procedures; (ii) Approving the Form and Manner of Notices and; (iii) Setting Hearing Date for the Hearing on Approval of the Sale of Substantially All Of the Debtors' Assets and Preliminary Objection of Punjab National Bank to Debtors' Motion for Entry of an Order (A)(i) Approving the Sale and Assignment of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and (ii) Granting Related Relief (ECF No. 60).

[15] Objection of Punjab National Bank to Debtors' Motion for Entry of an Orders Pursuant to 11 U.S.C. §§ 105, 363 and 365, and Bankruptcy Rules 2002, 6004 and 6006: (A) Fixing the Time, Date and Place for Hearing to Consider Bidding Procedures in connection with the Debtors' Sale of Substantially All of Their Assets; (B)(i) Establishing Bidding Procedures; (ii) Approving the Form and Manner of Notices and; (iii) Setting Hearing Date for the Hearing on Approval of the Sale of Substantially All Of the Debtors' Assets and Preliminary Objection of Punjab National Bank to Debtors' Motion for Entry of an Order (A)(i) Approving the Sale and Assignment of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and (ii) Granting Related Relief (ECF No. 75 at 5).

[16] Memorandum of Law in Support of Motion of the United States Trustee for the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code (ECF No. 87).

"First Examiner Order")[17] directing the appointment of an Examiner under section 1104(c) of the

Bankruptcy Code and directing the Examiner to:

> investigate the circumstances surrounding the alleged fraud involving the
> individual known as Nirav Modi, certain persons or entities affiliated with Nirav
> Modi (the "Modi Entities") and certain employees of Punjab National Bank (the
> "Alleged Fraud Circumstances") for the purpose and to the extent necessary to
> determine: (1) whether and to what extent, if any, the Modi Entities have the ability
> to direct and/or influence the conduct, decisions or actions taken by the Debtors in
> these Cases; (2) whether any current officer or director of the Debtors actively and
> knowingly participated in fraud or dishonesty in the management of the affairs of
> the Debtors; (3) whether any claims or causes of action in favor of the Debtors may
> arise from the Alleged Fraud Circumstances; (items (1) through (3) referred to as
> the "Determinations") and (4) otherwise perform the duties of an examiner as
> contained within the scope of 11 U.S.C 1106(a)(3)&(4) of the Bankruptcy Code
> solely to the extent required or necessary to the foregoing Determinations
> (collectively, the "Investigation").

The First Examiner Order further directed the Examiner to prepare and file a written report

(the "Report") setting forth his conclusions regarding the Determinations within 120 days of his

appointment by the U.S. Trustee.[18] Until the filing of his Report, neither the Examiner nor his

professionals were authorized to make any public disclosures concerning the performance of the

Investigation.[19]

To facilitate the Investigation, the First Examiner Order specifically directed the Debtors

to "provide to the Examiner all non-privileged documents and information within its possession

that the Examiner deems relevant to perform the Investigation."[20] If a dispute arose concerning

whether the Debtors could properly assert a claim of privilege, the Court authorized the Examiner

to bring the matter before the Court for resolution. The First Examiner Order also required the

Examiner to take reasonable efforts to avoid taking steps that would unnecessarily impact or delay

---

[17] Order Pursuant to 11 U.S.C. § 1104(c) Directing the Appointment of an Examiner (ECF No. 103).
[18] Examiner Order at 3.
[19] *Id.*
[20] *Id.*

the Debtors' sale process.[21]

In addition, the First Examiner Order directed the Examiner to cooperate fully with any governmental authorities in the United States or India who may be investigating the Debtors, and to the extent possible, avoid any duplication of efforts associated with any such investigations.[22]

On April 19, 2018, the U.S. Trustee appointed John J. Carney, who previously has served as Securities Fraud chief, assistant United States attorney, U.S. Securities and Exchange Commission (SEC) senior counsel and certified public accountant at a "Big Four" accounting firm, as Examiner and filed notice of his appointment.[23] Also on April 19, 2018, the United States Trustee filed an application to approve the Examiner's appointment,[24] and the Court subsequently entered an order approving the appointment.[25]

### C.    The Examiner's Work Plan

On May 4, 2018, the Examiner filed a preliminary work plan and budget (the "Work Plan") as directed by the Court, outlining his proposal for conducting the Investigation and issuing this Report.[26] To fulfill his charge, the Examiner described his intention to divide the Investigation into the following categories: (a) conduct initial interviews to understand the Debtors' operations and the Debtors' respective roles in the diamond/jewelry industry; (b) interview key witnesses in the United States, and if necessary in India, who are or were employed in functions relevant to the Investigation, i.e. sales, finance and accounting, operations, and contracting; (c) identify and review documents and communications relevant to the subject matter of the Investigation; (d) conduct a forensic financial analysis of the books and records of the Debtors, bank records, vendor

---

[21] *Id.*
[22] *Id.* at 4.
[23] Notice of Appointment of Examiner (ECF No. 114).
[24] Application for Order Approving Appointment of Examiner (ECF No. 115).
[25] Order Approving Appointment of Examiner (ECF No. 118).")
[26] Preliminary Work Plan and Budget of John J. Carney, Examiner (ECF No. 139).

20-01054-shl   Doc 399   Filed 08/25/22   Entered 08/25/22 20:35:19   Main Document
Pg 413 of 916

records, and any and all relevant information of other entities consistent with the Investigation, and trace the movement of monies obtained under the Alleged Fraud Circumstances against Punjab National Bank to the Debtors, and related entities and individuals; and (e) engage with the Ministry (and other agencies within the Government of India if needed) for information and documents relevant to this Investigation.

Crucial to the scope of the Examiner's Investigation was the need to balance the breadth of the Alleged Fraudulent Circumstances with the scope of the Chapter 11 Cases, to operate within the timeframe established by the Court to conduct the Investigation and to minimize costs to the estates. The Alleged Fraudulent Circumstances involve a sophisticated multibillion dollar international fraud over a multi-year period across countries including the United States, India, Belgium, China, and the UAE, among others. The Examiner's role in investigating this complex international fraud is limited to the extent relevant to the administration of the Debtors' estates, which is located entirely within the U.S. and lacks apparent substantial assets.

With these considerations in mind, in the Work Plan, the Examiner stated his intention to rely primarily on the voluntary cooperation of the Debtors, their key staff and current and former accounting and auditing professionals who performed services for the Debtors, as well as the cooperation of other interested parties. This cooperation would encompass the voluntary production of relevant documents as well as the participation in informal interviews with the Examiner and his professionals. Although the Examiner contemplated full cooperation, he reserved the right to conduct formal discovery as he deemed necessary to fulfill his duties to the Court.

On May 28, 2018, the Court entered an order approving the Examiner's Work Plan.[27]

---

[27] Order Approving the Preliminary Work Plan and Budget of John J. Carney, Examiner (ECF No. 189).

D.        **The Examiner's Legal and Forensic Team**

Because of the financially complex and highly specialized nature of the appointment, the

Examiner engaged Baker & Hostetler LLP ("BH"), led by Jorian Rose, to serve as counsel.  He

also retained global consulting firm Alvarez & Marsal Disputes and Investigations, LLC ("A&M"

led by retired FBI special agent William B. Waldie, CPA, CFE to assist with fraud investigation

and analysis.[28]

E.        **The Examiner's Investigation**

To fulfill his charge, and within its limitations, the Examiner and his professionals have

conducted a forensic investigation into the Debtors' financial and business operations from the

period 2011 through the filing date. The Examiner conducted numerous interviews of the Debtors'

employees and other parties in interest, sought cooperation from parties in interest to share

documents and information voluntarily, and served 41 document and deposition subpoenas.

Upon appointment, the Examiner conducted initial meetings and telephone conferences

with the Debtors' counsel, the Chief Restructuring Officer, HSBC Bank USA, National

Association ("HSBC"), Israel Discount Bank of New York ("IDB"), PNB, and the Ministry

regarding the known facts and evidence supporting the LOU diamond fraud scheme alleged by the

Indian authorities. Following these sessions, the Examiner and his professionals made more than

a dozen site visits to the Debtors' facilities at 592 5th Avenue in New York City to examine the

Debtors' books and records, interview the Debtors' employees and other witnesses, and to

otherwise investigate the Debtors' operations.

The Examiner's access to evidence held by the Debtors was limited in four notable

respects.  First, the Debtors did not have U.S. computer servers; the vast majority of the Debtors'

---

[28] The Court entered orders approving BH's retention on May 18, 2018 (ECF No. 175) and A&M's retention on June 11, 2018 (ECF No. 219).

files, e-mails, and other electronic information had been stored on computer servers in India, which

the Indian authorities seized before the Petition Date. Second, certain data, and information stored

on Mihir Bhansali's computer may have been deleted by use of a software program designed to

make erased data unrecoverable.  Notwithstanding these limitations, the Examiner's team was able

to compile significant evidence from, the laptops of fourteen employees in the United States, their

cell phones and flash drives, their saved voicemails, and other information created and stored by

third parties.[29]  Third, as discussed below, Bhansali refused to cooperate and asserted his Fifth

Amendment privilege against self-incrimination with respect to both documents and testimony.[30]

Fourth, the Debtors' financial and shipping records were incomplete.   The Examiner's

professionals imaged and forensically reviewed the laptops of the following fourteen employees:

| | |
|---|---|
| Ajay Gandhi | Chief Financial Officer (Debtors) |
| Dhaval Mehta | Sourcing (A. Jaffe) |
| Evelyn Kosiec | Operations Manager (A. Jaffe) |
| Isaac Sandberg | Accounting Assistant (A. Jaffe) |
| Janeth Garcia | Accounts Payable Supervisor (Firestar) |
| Kaushal Javeri | Operations Manager (A. Jaffe) |
| Kunal Patel | Controller (Debtors) |
| Mihir Bhansali | President (Debtors) |
| Rebecca Chow | Head of Production & Diamonds (Firestar) |
| Samuel Sandberg | Chief Creative Officer (A. Jaffe) |
| Sameer Ghadge | Operations Manager (A. Jaffe) |
| Shanna Singh | Head of Distribution (Firestar) |
| Sumay Bhansali | Chief Executive Officer (A. Jaffe) |
| Zaheer Khan | Head of Quality Control (Firestar) |

Generally, the parties in interest in the Chapter 11 Cases readily cooperated with the

Examiner's informal requests for documents and information. For example, the Debtors provided

---

[29] On July 27, 2018, the Examiner sent letters via Federal Express and by e-mail to the CBI and the Indian
Enforcement Directorate ("ED") seeking the data from the seized Indian servers, among other information, and a
telephonic meeting.  As of the date of this report, the Examiner has not received a response.
[30] Bhansali's counsel contacted the Examiner and requested that Bhansali's position regarding his assertion of his
Fifth Amendment right be included in the Examiner's report.  His letter is attached as Exhibit 1.

the Examiner with access to a data room established for parties interested in placing a bid for the

Debtors' assets and shared documents that the Indian authorities did not seize. Likewise, PNB and

the Ministry provided the Examiner documents and information relevant to the Debtors'

connections to India. Moreover, PNB sent its forensic auditors, BDO (India) to the U.S. to meet

with and assist the Examiner's forensic team with its investigation.

To address the possibility that parties would withhold their cooperation, on May 8, 2018,

the Examiner filed a motion for pre-authorization to conduct examinations under Rule 2004 of the

Federal Rules of Bankruptcy Procedure,[31] which the Court granted on May 29, 2018.[32]

Since his appointment, the Examiner has conducted approximately forty-five interviews

and meetings with Debtor and non-debtor parties, many of which were multiple interviews.   The

Examiner interviewed, among others, the following parties:

1. Ajay Gandhi, Chief Financial Officer, Firestar Diamond, Inc., Fantasy Inc., A. Jaffe and each of the non-debtor U.S. companies under the Firestar umbrella of companies[33]
2. Bankim Mehta, Diamond Trader, Firestar Diamond International Inc.
3. BDO (India), Forensic Consultant for PNB[34]
4. Connie Wong, Shipping Manager, A. Jaffe
5. David Herzog, Loan Officer from IDB
6. Deepak Rao, Former CFO
7. Evelyn Kosiec, Operations Manager, A. Jaffe
8. Howard Hoff, CPA, Partner, Marks Paneth, Auditor of Firestar Diamond, Inc., Fantasy Inc., and A. Jaffe
9. Indian Ministry of Corporate Affairs (through U.S. counsel, White & Case LLP)
10. Joshua Weinman, Diamond Trader, Firestar Diamond International Inc. (Non-

---

[31] Notice of Presentment of Order Granting Motion of the Examiner for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Examiner to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities (ECF No. 145).

[32] Order Granting Motion of the Examiner for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Examiner to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities (ECF No. 191).

[33] *See infra* for a description of the Firestar group of companies and a chart depicting the companies' organizational structure.

[34] PNB, through its U.S. counsel, Cleary Gottlieb, worked cooperatively with BDO (India) LLP to satisfy the Examiner's request for an in-person meeting.  As the Examiner did not have access to financial records of the global entities charged in the fraud, PNB and BDO (India)'s analyses were instrumental in linking transfers in India with transfers in the U.S.

debtor U.S. entity)

11. Kunal Patel, Controller, Debtors
12. Mark Sampson, Chief Restructuring Officer, Firestar Diamond, Inc., Fantasy Inc., and A. Jaffe
13. Mihir Bhansali, CEO, Firestar Diamond, Inc., Fantasy Inc., and A. Jaffe [35]
14. Patrick Hanley, Loan Officer from HSBC
15. Rakhi Bhansali, Wife of Mihir Bhansali
16. Raul Echeverz, Nirav Modi's U.S. architect and designer
17. Rebecca Chow, Head of Production & Diamonds, Firestar Diamond, Inc.
18. Samuel Sandberg, Chief Creative Officer, A. Jaffe
19. Steven Velasquez, Former CEO of BBB Group, Inc.
20. Sumay Bhansali, Chief Executive Officer, A. Jaffe

The Examiner demanded additional documents and information during and after the interviews as he deemed necessary to the Investigation. All document demands were made through Rule 2004 subpoenas, and all parties complied. Mihir Bhansali and Rakhi Bhansali each asserted the Fifth Amendment right against self-incrimination and spousal privilege, respectively.

In total, in response to the forty-one document and deposition subpoenas he served, the Examiner received more than five million documents consisting of tens of millions of pages. Most of these documents were hosted on a document management system, across which the Examiner's professionals conducted searches of key terms most likely to be relevant to the Investigation. The documents, including with voicemails and images, exceeded 1.8 terabytes of data.

The Examiner also negotiated stipulated protective orders to govern the use of confidential materials produced to him by PNB and the Ministry;[36] the Debtors' secured lenders, HSBC and IDB;[37] companies that provided shipping services to the Debtors, Malca-Amit USA, LLC and Malca-Amit CHB, Inc. ("Macla-Amit");[38] one of the Debtors' customers, BBB Group Inc.;[39]

---

[35] In response to most of the Examiner's document requests, Rakhi Bhansali invoked her spousal privilege.
[36] Stipulation and Order Governing Examiner Discovery (ECF No. 218).
[37] Stipulation and Order Governing Examiner Discovery (ECF No. 252).
[38] Stipulation and Order Governing Examiner Discovery (ECF No. 253).
[39] Stipulation and Order Governing Examiner Discovery (ECF No. 341).

Debtors' auditors, Marks Paneth LLP;[40] and the non-debtor U.S. Firestar entities,[41] Firestar Group

Inc., Synergies Corporation, Nirav Modi Inc., AVD Trading, Inc., Firestar Diamond International,

Inc. ("FD International") (collectively, the "Protective Orders"). As required by the Protective

Orders, several days before the submission of this Report the Examiner provided a list of

documents on which the Examiner intended to rely. The producing parties were given an

opportunity to object to the Examiner's reliance on a designated document and the Examiner to

contest the designation or to move to seal the Report. The Examiner believes he has resolved all

such objections.[42]

The Examiner's forensic investigation was conducted in conjunction with A&M.  Among

other forensic procedures, A&M analyzed relevant documents including, but not limited to, all

available bank statements, the Debtors' sales and purchase records, the Debtors' tax returns,

Debtor and key employee loan documents, key employee investment account activity and credit

reports. In addition, A&M tested certain suspect diamond imports and exports, evaluated audit

workpapers relating to the Debtors, reviewed emails, assisted in interviewing certain key

individuals, analyzed certain real estate transactions with links to the Debtor entities or their

employees, and conducted global intelligence research of certain entities and individual alleged to

have been involved in the fraud.  A&M also performed site visits to certain entities in Hong Kong,

Dubai, and India that persons connected to Modi managed, owned, and/or operated.

In addition, the Examiner consulted with the chapter 11 trustee's retained experts, Donald

and Angelo Palmieri ("Palmieri") of Gem Certification & Assurance Lab, Inc. ("GCAL").  Donald

Palmieri is an internationally recognized gems and jewelry forensic expert, appraiser, publisher,

---

[40] Stipulation and Order Governing Examiner Discovery (ECF No. 340).
[41] Stipulation and Order Governing Examiner Discovery (ECF No. 346).
[42] The Examiner has prepared a compendium of relevant documents, certain of which were designated confidential under the Protective Orders.

and consultant.[43]   The chapter 11 trustee retained Palmieri to, among other things, inspect the

Debtors' diamonds and to provide expert testimony regarding the value of the Debtors' assets.[44]

### F.      Appointment of the Chapter 11 Trustee

On April 3, 2018, the Court entered an order establishing bidding and sales' procedures for

the sale of the Debtors' assets.[45] Parties expressed an interest in bidding only for the assets of A.

Jaffe, and as a result, the Debtors held a business line auction for only A. Jaffe's assets on May 3,

2018.[46] PNB filed an objection to the sale,[47] urging that the Court deny or adjourn the sale until

the Examiner has had the opportunity to evaluate the Debtors' involvement, if any, in the Alleged

Fraudulent Circumstances.

On April 21, 2018, the President of India issued The Fugitive Economic Offenders

Ordinance, which provided for, among other things, the confiscation of property in India belonging

to fugitives evading the jurisdiction of the Indian courts to avoid criminal prosecution.[48] According

to the Debtors, the issuance of the Ordinance chilled interested bidders from bidding on the

Debtors' assets at the auction.[49]

The Examiner took steps, to the extent consistent with his ability at the outset of his

investigation, to cause disclosure to the Bankruptcy Court of the bidders' connections with Modi.

---

[43] Chapter 11 Trustee's Application For an Order Authorizing The Employment of Gem Certification & Assurance, Inc. as Appraiser *Nunc Pro Tunc* As of June 29, 2018 (ECF 259).

[44] *Id.*

[45] Order Establishing Bidding Procedures and Related Relief Regarding the Sale of Substantially All of the Debtors' Assets (ECF No. 95).

[46] Notice of Results of Business Line Auction for A. Jaffe Assets (ECF No. 141).

[47] Objection of Punjab National Bank to Debtors' Motion for Entry of an Order Approving the Sale and Assignment of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, And Encumbrances and Granting Related Relief (ECF No. 148).

[48] THE FUGITIVE ECONOMIC OFFENDERS ORDINANCE, 2018, NO. 1 OF 2018.

[49] *See* Debtors' Omnibus Reply to (I) Objection of Punjab National Bank to Debtors' Motion for Entry of an Order Approving the Sale and Assignment of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and Granting Related Relief; and (II) Joinder of The Ministry of Corporate Affairs of the Union of India to Objection of Punjab National Bank to Debtors' Motion for Entry of Order Approving Sale and Assignment of Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances (ECF No. 162).

Prior to the auction, which his counsel attended, the Examiner requested that each of the bidders declare at the auction its connections with Modi or any related entity. The Debtors acquiesced and asked each bidder to disclose any such connections by email,[50] and again at the auction itself. The Examiner's counsel then attended the auction to monitor the bidders' compliance with his request. All bidders complied.[51]

Upon the conclusion of the auction and selection of a winning bidder, the Examiner requested that the winner represent to the Bankruptcy Court that: (i) other than the Debtors, it neither had any connections nor communications with Modi or any entity under his control (specifically including entities that were identified by authorities investigating the Alleged Fraudulent Circumstances as being connected to Modi and his alleged fraud), and (ii) neither Modi nor any of the related entities had any expectation of involvement or compensation from the proposed sale.[52] For the Debtors' part, the Examiner requested that each of the Debtors' officers and directors provide a parallel representation that the Debtors' directors and officers had no reason to know that the potential purchaser had connections, communications, or an on-going relationship with Modi or any entity under his control as described above. The Examiner, among other things, also asked Debtors' directors and officers to represent the extent of their own recent communications with Modi. The Debtors' counsel worked with each of the Debtors' directors and officers, other than Bhansali who had independent counsel. Bhansali's counsel represented to the Examiner that Bhansali had discussions with Modi that ended March 15, 2018, regarding the sale and bankruptcy process, but Mr. Modi had no influence or control over the process.[53]

On May 15, 2018, the Court conducted a hearing to approve the sale (the "Sale Hearing").

---

[50] *Id*. at 9.
[51] *Id*.; *see* Auction Tr. 16:5-17 (ECF No. 158).
[52] *See* Emails between counsel to the Examiner and counsel to the Debtors, dated May 11, 2018.
[53] *See* Emails between counsel to the Examiner and counsel to Bhansali, dated May 11-14, 2018.

Mark Samson, the Debtors' chief restructuring officer, testified at the Sale Hearing on several matters relevant to the sale process. First, Mr. Samson testified that Mihir Bhansali had spoken with Modi sometime between the Petition Date and March 15, 2018, on at least one occasion.[54] Second, Mr. Samson testified that he had not established any protocols for employee communication with Modi, nor had he expressly prohibited such communication.[55] Third, Mr. Samson further testified that he was aware of conversations between potential bidders and Bhansali regarding Bhansali's prospective employment with the winning bidder, but that he did not know whether any of those conversations concerned Bhansali's future compensation.[56]

At the end of the Sale Hearing, the Court expressed reservations about approving the sale without further information and requested additional evidence before closing the record. Among other things, the Court expressed concern that Modi had contact with anyone involved in the sale process and regarding the communications between Bhansali and potential bidders concerning prospective employment.[57]

Upon the request of the Debtors, the Court subsequently conducted an emergency telephonic conference to determine how these developments would affect the Sale Motion. At that conference, Bhansali's counsel represented to the Court that Bhansali would assert his Fifth Amendment right against self-incrimination if compelled to testify about the issues raised during the Sale Hearing. Following this revelation, the Debtors filed a withdrawal of the Sale Motion.[58] Several days later, Bhansali resigned as CEO of the Debtors.

In light of these events, PNB and the U.S. Trustee each filed a motion seeking the

---

[54] Sale Hearing Tr. at 21:6-8.
[55] *Id.* at 24-26.
[56] *Id.* at 30:11-18.
[57] *See id.* at 141-143.
[58] Notice of Withdrawal, Without Prejudice, of Sale Motion (ECF No. 177).

appointment of a chapter 11 trustee.[59] The Ministry filed a joinder to PNB's motion.[60] The Debtors filed a response disputing PNB's allegations that the sale process was tainted and mismanaged by the Debtors' CRO and independent director, but did not oppose the appointment of a chapter 11 trustee.[61]

After a hearing on the motions, on June 7, 2018, the Court entered an order directing the appointment of a chapter 11 trustee.[62] On June 14, 2018, the U.S. Trustee appointed Richard Levin, Esq. as chapter 11 trustee (the "Trustee") in the Chapter 11 Cases and filed notice of his appointment.[63] That same day, the United States Trustee filed an application to approve the Trustee's appointment,[64] and the Court subsequently entered an order approving the appointment.[65]

Following this development, the Examiner and the Trustee conferred on their respective roles and duties in the Chapter 11 Cases to avoid duplication of effort and jointly act in the best interest of the Debtors' estates and administration of the Chapter 11 Cases.  The Examiner and the Trustee determined that, given the progress of the Examiner's Investigation, the Examiner would complete those investigative steps that were at the core of his responsibilities as set forth in the Examiner Order, while the Trustee would take responsibility outside of the Examiner's charge,

---

[59] Punjab National Bank's Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant To 11 U.S.C. § 1104(A) (ECF No. 181); Memorandum of Law in Support of Motion of the United States Trustee for the Appointment of a Chapter 11 Trustee Pursuant to Section 1104 of the Bankruptcy Code or, Alternatively, for Conversion of These Cases to Chapter 7 (ECF No. 185).

[60] The Ministry of Corporate Affairs of the Union of India's Joinder to Punjab National Bank's Motion for Entry of Order Directing Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a) (ECF No. 194).

[61] Debtors' Omnibus Response to (I) Punjab National Bank's Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a), (II) The Ministry of Corporate Affairs of the Union of India's Joinder to Punjab National Bank's Motion for Entry of Order Directing Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. 1104(a), and (III) Motion of the United State Trustee for the Appointment of a Chapter 11 Trustee Pursuant to Section 1104 of the Bankruptcy Code or, Alternatively, for Conversion of These Cases to Chapter 7 (ECF No. 195).

[62] Order Pursuant to 11 U.S.C. § 1104(d) Directing the Appointment of a Chapter 11 Trustee (ECF No. 216).

[63] Notice of Appointment of Chapter 11 Trustee (ECF No. 222).

[64] Application for Order Approving Appointment of Chapter 11 Trustee (ECF No. 226).

[65] Order Approving Appointment of Chapter 11 Trustee (ECF No. 227).

such as determining what claims may be brought by the estates. The revised scope of the

Examiner's role[66] was approved by the Court on July 26, 2018.  Under the revised scope, Examiner

was directed to:

> investigate the circumstances surrounding the alleged fraud involving the
> individual known as Nirav Modi, certain persons or entities affiliated with Nirav
> Modi (the "Modi Entities") and certain employees of Punjab National Bank (the
> "Alleged Fraud Circumstances") for the purpose and to the extent necessary to
> determine: (1) the nature and extent of any involvement (if any) of the Debtors and
> any current or former officer or director of the Debtors in the Alleged Fraud
> Circumstances; (2) the involvement of such parties in any fraudulent, avoidable or
> suspect transactions related to the Alleged Fraud Circumstances; and (3) otherwise
> perform the duties of an examiner as contained within the scope of 11 U.S.C
> 1106(a)(3)&(4) of the Bankruptcy Code solely to the extent required or necessary
> to the foregoing Determinations (collectively, the "Investigation").[67]

## IV.    THE ALLEGED FRAUDULENT CIRCUMSTANCES

The Debtors' ultimate parent company and its principal have been charged by Indian

authorities with orchestrating a multi-billion dollar fraud against PNB and other banks.  The CBI

has charged that commencing on or before 2011, Modi obtained approximately $4 billion from

PNB through fraudulently issued LOUs.  LOUs are financial instruments unique to India that allow

Indian companies to borrow funds from an Indian bank to facilitate imports with international

customers and vendors.[68]  LOUs operate like a working capital arrangement.  The alleged scheme

involved obtaining LOUs to fund Modi's entities and lifestyle, using the funds from new LOUs to

repay old LOUs as they became due, and moving gemstones and/or money among a network of

related shell entities to simulate real import transactions.[69]  Although complex and layered, the

scheme alleged by the Indian authorities is a typical bank fraud and money laundering operation.

Because the Examiner's charge is focused on investigating the extent of involvement, if

---

[66] Examiner's Motion to Modify Order Appointing Examiner (ECF No. 276).
[67] Order Granting Examiner's Motion to Modify Order Appointing Examiner (ECF No. 326).
[68] ED Complaint ¶ 3.1.2.
[69] ED Complaint ¶¶ 3.1.8; 3.1.13; 11.7.

any, by the Debtors and their officers and directors in the Alleged Fraudulent Circumstances, the key allegations charged by Indian authorities are summarized below. The Examiner did not investigate the truth of the allegations involving solely Firestar India or overseas operations except to the extent necessary and for the purpose of his investigative directive.

### A.    An Explanation of Letters of Undertaking ("LOUs")

The LOUs at issue in this case are functionally similar to many other forms of vendor financing: they are guarantees by an Indian bank to pay the face amount to a vendor. LOUs allow for an importer to avoid incurring the expense an importer would otherwise incur by borrowing Indian currency and then converting it to a foreign currency to pay foreign suppliers. Instead, the importer obtains short-term credit from its bank in India. The issuing bank, in turn, enters into the foreign currency transaction: it requests a foreign branch or another Indian bank to transmit funds into the issuing bank's own account (referred to as its nostro – "our"—account) at the foreign branch of a third bank to pay the supplier in its local foreign currency. A legitimate LOU transaction is conducted as follows:

25



The charged fraud in India involves misrepresentations made to PNB in obtaining the LOUs, misuse of the issued LOUs, and misreporting the LOUs in the bank's recording system. Seemingly because of this fraud, the Reserve Bank of India ("RBI"), India's national bank, in March 2018, issued a Directive ordering the immediate discontinuance of LOUs.[70] However, the RBI still permits Letters of Credit, which are separate instruments that are traditionally used in the international banking system.

### B.    The Alleged Fraudulent LOU Scheme

Modi and several co-conspirators are alleged to have fraudulently obtained LOUs by manufacturing false transactions in India and elsewhere involving the sale of diamonds, pearls and gold bars and other goods.[71]  Bhansali, the Debtors' former CEO, is among those charged. The Indian authorities alleged that the co-conspirators created and managed a global network of related shell companies that posed as independent third parties in sham transactions to import gemstones and other jewelry related goods valued at billions of dollars in order to obtain bank financing in the form of LOUs.[72]

Modi and his entities in India are alleged to have shipped stones back and forth among themselves and other Modi controlled entities around the world, generating shipping invoices that were provided to PNB to secure the LOUs.[73]  These related entities included: entities in the global Firestar organizational structure ("Firestar Global Entities"); three Modi-related entities in India, Solar Exports, Stellar Diamonds, Diamonds 'R' Us (the "Modi Firms"); and the more than twenty

---

[70] Reserve Bank of India, Discontinuance of Letters of Undertaking (LoUs) and Letters of Comfort (LoCs) for Trade Credits dated March 13, 2018, RBI/2017-18/139 (available at https://rbidocs.rbi.org.in/rdocs/notification/PDFs/NOTI139F15274F2540046CE9C14E9DFEAA60941.PDF).
[71] ED Complaint ¶¶ 11.1-11.6.
[72] ED Complaint ¶ 11.7.
[73] *See* ED Complaint ¶¶ 11.6-11.7.

20-01054-shl    Doc 309    Filed 09/25/22    Entered 09/25/22 20:30:44    Main Document
Pg 231 of 804

Shadow Entities, Firestar-controlled shells that were falsely represented as independent third

parties in connection with certain diamond transactions.  These shipments often created records in

India's national customs database to correspond with the manufactured shipment invoices. [74]

Alleged co-conspirators at PNB assisted the scheme by issuing the LOUs without securing

collateral and without recording them in the Core Banking Solution ("CBS").  As LOUs came due,

they were paid with the funds from more recently obtained LOUs or improperly utilized packing

credits.[75]

### 1.    PNB and the Importer Accounts

PNB is a publicly-owned Indian bank, which is majority owned by the central government

of India, and PNB employees are legally considered public servants.[76]  Of its many branches, the

Brady House branch in Mumbai is one of its largest, and the RBI has designated it an Authorized

Dealer of Foreign Exchange, meaning it can issue LOUs.   Two Brady House employees,

Gokulnath Shetty, the Deputy Manager of the Brady House branch, and Manoj Kharat, a Single

Window Operator (a clerk), allegedly conspired with Modi and three of his companies to issue

LOUs fraudulently for the benefit of other companies that were secretly Modi affiliates.[77]   Other

PNB employees charged with aiding Modi and Mihir Bhansali in the fraud include Yashwant

Joshi, Shetty's successor; Bechu Tiwari, Manager of PNB's foreign exchange department; and

Prafful Sawant, a loan officer responsible for reconciling SWIFT messages with CBS entries. [78]

These conspirators are charged with facilitating and concealing the issuance of the LOUs.

---

[74] Meetings with BDO (India), July 2018.
[75] CBI Charge Sheet ¶¶ 26, 30.
[76] Punjab National Bank, *Heritage: Saga of Excellence in Banking*,
https://www.pnbindia.in/heritage.html?page=heritage.html.
[77] CBI Charge Sheet ¶¶ 27-28.
[78] *Id*. at ¶¶ 29-30. Joshi was Gokulnath Shetty's subordinate who aided him in issuing the false LOUs.  Upon Shetty's
retirement in 2017, Joshi assumed Shetty's role and reported the LOU scheme.

The Modi Firms as well as Firestar India maintained accounts at PNB.[79]  The Modi Firms were the importers for approximately 93% of the total value of issued LOUs with Firestar India entities serving as the remainder.[80]  The majority of LOUs issued had at least two exporters each.[81]

Diamonds 'R' Us is a partnership that was formed by Modi, his uncle Mehul Choksi, and Modi's business partner Hemant Bhatt.[82]  Diamonds 'R' Us opened account ending in 6123 at PNB's Brady House branch in 1998 and maintains account ending in 7161.[83]

Solar Exports is a partnership formed by the Nirav Modi Family Trust and the Nirav Family Trust.[84]  The partners of Solar Exports, Ami Modi (Nirav Modi's wife), Hemant Bhatt, and Kavita Mankikar (Modi's secretary at Firestar India) opened account ending in 3609 in 2010 at PNB on behalf of Solar Exports.[85]

Stellar Diamonds is a partnership that was also formed by the Modi Family Trust and the Nirav Family Trust.[86]  Ami Modi, Hemant Bhatt and Kavita Mankikar opened PNB Brady House account ending in 3593 in 2010.[87]

Based on information obtained from the Indian authorities, over the years, individuals unconnected to the jewelry industry were brought in as partners of the Modi Firms simply to act as unwitting signatories, seemingly to transfer money and to act as legitimate participants in import transactions.[88]

Indian authorities alleged these accounts did not meet the requirements or have the proper

---

[79] ED Complaint, ¶ 6.43. Ownership and management of these entities is further described below.
[80] Meetings with BDO (India), July 2018.
[81] Id.
[82] Indenture of Partnership for Diamonds 'R' Us, dated May 10, 2000 (ROI-MCA-00000209); see also CBI Charge Sheet ¶ 7.
[83]  CBI Charge Sheet ¶ 7.
[84] Indenture of Partnership for Solar Exports, dated January 16, 2010 (ROI-MCA-00000220).
[85] CBI Charge Sheet ¶ 8.
[86] Indenture of Partnership for Stellar Diamond, dated January 16, 2010 (ROI-MCA-00000229).
[87] CBI Charge Sheet ¶ 9.
[88] ED Complaint ¶ 3.1.4.

authorizations for LOU eligibility.[89]  To obtain legitimate LOUs, the Modi Firms were required to

furnish 100% cash as collateral so PNB could repay the overseas, receiving banks that extended

the credit based on the validity of the LOUs.[90]  Instead, Shetty and Kharat are charged to have

conspired with Modi and the Modi Firms to issue LOUs without the required collateral and made

false records in the CBS.

### 2.    The Scope of the Fraud Alleged by Indian Authorities

Modi, his co-conspirators and their PNB accomplices are charged with fraudulently

obtaining and issuing LOUs on behalf of the Modi Firms from 2011 to 2018.  According to the

CBI charge sheet, 1208 LOUs were fraudulently issued to Diamonds 'R' Us, Stellar Diamonds,

and Solar Exports.  The chart below identifies the number of allegedly fraudulent LOUs issued per

year:[91]

| Year | Number of LOUs Opened Fraudulently |
|------|------|
| 2011 | 43 |
| 2012 | 115 |
| 2013 | 236 |
| 2014 | 123 |
| 2015 | 185 |
| 2016 | 356 |
| 2017 | 150 |
| **Total** | **1208** |

The U.S. Debtors were identified as the exporter entities for six LOUs.   Shadow Entities are

alleged to have received hundreds of millions of dollars in direct LOU payments under the guise

of legitimate exports/imports.[92]

---

[89] CBI Charge Sheet ¶ 26.
[90] *See, e.g.,* CBI Charge Sheet ¶¶ 21, 35.
[91] CBI Charge Sheet ¶ 36.
[92] ED Complaint ¶ 4.7.

The CBI has stated that over the course of seven years, PNB issued approximately $4 billion worth of fraudulently obtained LOUs.  According to the charges, Modi used more recently issued LOUs to repay previous LOUs issued up to one year prior:  Instead of using the LOU funds to pay overseas suppliers, the money was partially used to repay the receiving banks to which the old LOUs were originally presented.[93]  The result was that Modi and his co-conspirators enjoyed the use of the money issued under each LOU and the extended payment terms that were granted.[94]

For example, the CBI has charged that an LOU issued on February 10, 2017 on behalf of Solar Exports was presented to the Hong Kong branch of Allahabad Bank for payment to exporters Auragems Company Ltd., Sunshine Gems Ltd, and Pacific Diamonds FZE.  Although each of these entities was represented to be an independent third party exporter, the CBI alleges that each of them was in fact an entity connected to Modi. The funds that were supposed to pay the "exporters" were allegedly diverted to four accounts at Allahabad Bank and applied to four outstanding LOUs.[95]  The first payment of approximately $2.7 million repaid an LOU dated April 11, 2016; the second payment of $1.4 million repaid an LOU dated April 7, 2016; the third payment of $1.4 million repaid an LOU dated April 6, 2016; and the final payment of $1.3 million repaid an LOU dated April 2, 2016.

The chart below represents an example of an allegedly fraudulent LOU transaction and the fraudulent repayment of the LOU.

---

[93] ED Complaint ¶ 3.1.8.
[94] *Id.*
[95] CBI Charge Sheet, ¶ 48.



Flow of the Fraudulent Funds to the US

KEY

Funds Transfer

SWIFT Message

Diamonds Transfer

Firestar Entity or Known Affiliate

*Shadow Entity Affiliated with Modi*

1. Loose diamonds with a stated value of $1,921,079 shipped from A. Jaffe, Inc. to Diamonds-R-Us via Malca-Amit courier service.

2. Diamonds-R-Us (Importer) obtained LOU from PNB-Brady House. The transaction was input outside the OES and not properly collateralized.

3. LOU Application message authorized by Gokulnath Shetty sent from PNB-Brady House to PNB-Hong Kong.

4. Upon receipt of the LOU Application message, PNB-Hong Kong funded PNB's Nostro Account at Deutsche Bank Trust Co. (4 A), and sent a LOU Acknowledgement message back to PNB-Brady House confirming the funding (4 B).

5. A. Jaffe, Inc. (Exporter) is paid $1,921,079 from PNB's Nostro Account to A. Jaffe, Inc.'s HSBC account.

6. Firestar International Pvt. Ltd. obtained Packing Credit loans from PNB and Vijaya Bank and improperly utilized the funds by diverting them to the Diamonds-R-Us current account at PNB-Brady House through Neeshal Merchandising.

7. On the LOU due date, Diamonds-R-Us current account is debited and funds are repaid to Nostro Account (7 A) and PNB-Hong Kong (7 B).

As of the date of this report, approximately 150 LOUs remain outstanding and unpaid. At an exchange rate of 64 Indian Rupees to one US Dollar, these unpaid LOUs approximate $1 billion.[96]

## V.    DEBTORS' STRUCTURE AND REPORTED BUSINESS

The Debtors all primarily operate as wholesalers of finished gold and diamond jewelry out of one office at 592 5th Avenue in New York.[97] Until February 2013, the Debtors operated out of 154 West 14th Street.[98] Each of the Debtors is a subsidiary of entities that are ultimately owned and managed by Modi in India.

### A.    Modi and Debtors' Origins

Modi began his business by operating a diamond trading company in India during 1999 or 2000 under the name Diamonds 'R' Us.[99] At that time, the company's main customers included U.S. jewelry manufacturers that created finished pieces of jewelry for U.S. retailers.[100] The company distinguished itself from other diamond businesses by seeking to supply loose diamonds and gems specifically purposed for customers' final, assembled products as opposed to supplying large, loose-stone parcels.[101] This manner of supply was designed to eliminate customers' residual inventory and return of diamonds.

Diamonds 'R' Us was renamed Firestone International Private Limited in 2004, then Firestar International Private Limited, and was eventually renamed Firestar International Limited ("Firestar India"), the ultimate holding company of all the Firestar entities.[102]

---

[96] ED Complaint ¶ 2.3.
[97] FD International operated out of a separate office in New York.
[98] Email exchange between Ajay Gandhi and customers, dated August 6, 2015 (FIRE-REL0000286102).
[99] Firestar business write up dated November 17, 2017 (FIRE-REL0000393692.0001).
[100] Draft Firestar promotional materials, undated (FIRE-REL0002671869.0002).
[101] *Id.*
[102] The corporate name changed frequently between 2006 and 2011. To avoid confusion, the term "Firestar India," includes the antecedent corporate names of Firestar International Limited.as well as all affiliates located in India.

Over time, Firestar India and its subsidiaries expanded their business to include jewelry manufacturing and product design. They developed rough and polished-diamond trading businesses in Dubai, Antwerp, Armenia, and Hong Kong and diamond cutting and polishing businesses in Surat, Johannesburg, and Moscow. Firestar India also maintained manufacturing facilities in Dubai and throughout India. In 2010, Modi entered the luxury retail business and started to sell his own high-end finished jewelry. He became a well-known designer whose designs were worn by celebrities such as Kate Winslet, Amy Adams and Priyanka Chopra. Modi sold these specialty pieces at well-known auction houses such as Sotheby's and Christies, and due to the success of these auctions, opened retail stores in India, the U.S., London, Hong Kong, Paris, Macau, and Beijing, each held in its own corporate entity under the Hong Kong holding company, Nirav Modi Limited.

While Firestar India was steadily growing across the world, Modi made inroads in the U.S. through several acquisitions starting in 2005, using another Hong Kong holding company, Firestar Holdings Limited ("FHL"). Modi used wholly-owned subsidiaries of FHL, Synergies Corporation and Firestar Group Inc., which he controlled, to make the U.S. acquisitions that ultimately resulted in the ownership of the Debtors: FDI, FI, and A. Jaffe.

Modi actively oversaw the establishment of the Debtors and controlled their day-to-day operations until at least 2012. He appears to have been responsible for implementing their procedures and operational processes. Subsequently, Modi became focused on his retail brand rather than the Debtors, and delegated operational responsibility to Bhansali. Modi became focused again on the Debtors in approximately 2015 in connection with the Debtors' restructuring.

The Examiner found numerous emails in which Modi directed the Debtors to make payments to the Shadow Entities and other Firestar affiliates. It appears that Modi was the ultimate

authority for the Debtors.

    **B.**    **Firestar Diamond, Inc.**

In 2005, Firestar India acquired one of its U.S. customers, Frederick Goldman, Inc., which ultimately became FDI.[103]  FDI was incorporated in 2004 under the name Jewelry Solutions International, Inc.,[104] which name was changed to Next Diamond, Inc., then to Firestone, Inc.[105] and finally to FDI in 2011.[106]  Mihir Bhansali was the sole director and chief executive officer of FDI until 2018.[107]  FDI averaged approximately $63 million in reported sales per year.[108]

FDI operates as a distributor and wholesaler of finished gold and diamond jewelry.[109]  Its customer base consists of traditional jewelry retailers including Zales, JC Penny, and Macy's.[110]  Although FDI deals in loose diamonds, it does so to create finished pieces of jewelry.  Transactions for these purposes are limited to specific stones identified as needed for a particular jewelry item.  As part of its business model, FDI does not purchase or sell fancy colored loose diamonds in bulk.[111]

Most of the manufacturing and sourcing of gems used by FDI occurs in India and Belgium at the parent Firestar entities, which also set the price of the finished jewelry sold to the U.S. Debtors.[112]  A Firestar non-U.S. affiliate supplied approximately 70% to 80% of FDI's finished jewelry.[113]  CEO and President Bhansali worked with the sourcing team in India to manage

---

[103] *Id.*

[104] Certificate of Incorporation, Jewelry Solutions International, Inc., February 3, 2004.

[105] Certificate of Amendment of Application for Authority of Next Diamond, Inc., March 23, 2007.

[106] Certificate of Amendment of Application for Authority of Firestone, Inc., March 29, 2011. Throughout the report, the Examiner references "sales" and "sales journals." Those references are to the Debtors' gross sales.

[107] Unanimous Written Consent of the Board of Directors of Firestar Group, Inc., July 1, 2013.

[108] *See* FDI sales journal for 2011-2017.

[109] Israel Discount Bank of New York, Credit Memorandum, February 23, 2018 (ExaminerIDB00000620).

[110] *Id.;* Interview of Ajay Gandhi, May 17, 2018.

[111] Interview of Rebecca Chow, June 1, 2018.  Fancy colored diamonds are rare diamonds that present with colors not on the normal colorless to light yellow spectrum.  They range from darker yellow to blue, pink, and purple, and their price can range in the high thousands of dollars per carat.

[112] Israel Discount Bank of New York, Credit Memorandum, February 23, 2018 (ExaminerIDB00000620).

[113] *See* First Day Declaration ¶ 37.

35

pricing.[114]   Thus, he had full visibility into the Indian operations and their influence on FDI. Bhansali controlled the prices for both the internal sale of jewelry from Firestar India to FDI and the final sale to the ultimate customer.[115]

### C.    Fantasy Inc.

In 2011 or 2012, Chicago-based Fantasy Diamond Corp. selected FDI to be its exclusive licensee to supply the Endless Diamond Brand to U.S. retailers.[116]   In August 2012, FI was incorporated under the laws of Delaware as a wholly-owned subsidiary of FDI to handle the sales of Endless Diamond jewelry.[117]   Until 2018, Mihir Bhansali was the sole director of FI and Ajay Gandhi was its CFO.[118]

FI was created primarily to acquire business from Costco Wholesale Corporation based on sales attributable to the Endless Diamond Brand.[119]   Other customers include Zales, Sam's Club, and Walmart.   According to the CFO, FI was formed as a separate entity specifically to create a separate vendor number, because the name "Fantasy" generates additional business.[120]   The operations of FI were otherwise substantially the same as FDI.   FI sold finished jewelry ranging in value from moderately priced items up to $30,000, generally at a higher price point than FDI.[121]   Like FDI, the majority of FI's jewelry was manufactured in India or partially manufactured in India and sent to the U.S. where the diamonds were set in the jewelry.[122]   FI bought loose diamonds from various entities to use in its own finished jewelry products,[123]   for which it totaled

---

[114] Interview of Ajay Gandhi, May 17, 2018.
[115] Interview of Sumay Bhansali, May 17, 2018.
[116] Israel Discount Bank of New York, Credit Memorandum, November 26, 2014 (ExaminerIDB00000381).
[117] Certificate of Incorporation, Fantasy, Inc., August 13, 2012.
[118] Unanimous Written Consent of the Board of Directors of Firestar Diamond, Inc., July 1, 2013.
[119] Interview of Ajay Gandhi, July 19, 2018.
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] *Id.*

approximately $24 – 27 million in reported sales, in fiscal years 2015, 2016 and 2017.[124]

FDI and FI received the vast majority of their inventory from Firestar's Indian factories. These factories sent finished jewelry, semi-finished jewelry and loose diamonds.[125]   Whether a piece of jewelry should be finished in India or should be semi-finished and have diamonds set in the U.S. was decided by the sourcing team in India, whose decision was largely driven by the cost of import duties.[126]

    **D.**    **A. Jaffe**

In 2007, Firestar India purchased a 95% stake in New York-based Sandberg & Sikorski (S&S).[127]   S&S was founded in 1892 and had two divisions, one that sold to major US retailers and A. Jaffe, a luxury bridal line that supplied assembled pieces of jewelry to high-end independent jewelry retailers.[128]   A. Jaffe was originally incorporated as Sandberg & Sikorski Diamond, a New York corporation, in 1975[129] and changed its name to Sandberg & Sikorski Corporation in 1995.[130] S&S changed its name to A. Jaffe in 2011[131] and was fully integrated into Firestar India in fiscal year 2016.[132]   While Synergies Corporation owned 95% of A. Jaffe, Samuel Sandberg retained an approximate 5% ownership in A. Jaffe when Firestar India acquired it.  A. Jaffe has no bank loan, and therefore is the only Debtor entity that is not audited.[133]   Mihir Bhansali was A. Jaffe's director, Sumay Bhansali was its CEO, Ajay Gandhi was its CFO and its Creative Director was Samuel

---

[124] Fantasy, Inc. tax returns for fiscal years 2015, 2016 and 2017.
[125] Interview of Ajay Gandhi, July 19, 2018.
[126] *Id.*
[127] Interview of Samuel Sandberg, May 7, 2018.
[128] *Id.*
[129] Certificate of Incorporation, Sandberg & Sikorski Diamond Corporation, July 14, 1975.
[130] Certificate of Amendment of Application for Authority of Sandberg & Sikorski Diamond Corporation, November 3, 1995.
[131] Certificate of Amendment of Application for Authority of Sandberg & Sikorski Corporation, April 20, 2011.
[132] Firestar business write up dated November 17, 2017 (FIRE-REL0000393692.0001).
[133] However, in the years prior to the filing of the petition, A. Jaffe attempted to secure financing for. Email from Sumay Bhansali to Samuel Sandberg, Ajay Gandhi and Mihir Bhansali, dated December 6, 2017 (FIRE-REL0000392461).

Sandberg.

A. Jaffe's only business is to manufacture and sell finished bridal jewelry to independent retailers. While it purchases diamonds for use in particular pieces of jewelry, it generally does not keep diamonds in inventory or sell loose diamonds. It therefore had no business reason to purchase or sell bulk loose diamonds prior to losing its supplier, Firestar India, in early 2018.[134] When Firestar India first acquired A. Jaffe, the business struggled and only had approximately $6 to $7 million in sales per year and was not profitable/losing money. However, the past three years have seen growth and A. Jaffe had approximately $20 million in sales each of the past two years.[135]

Operating in a "made-to-order" model, Firestar India's factories in India predominantly supplied A. Jaffe with finished jewelry on a piece-by-piece basis. Bhansali and the team in India would set the price of the finished jewelry between Firestar India and A. Jaffe and between A. Jaffe and the ultimate customer. When a customer placed an order, it did so through the customer service email address or by telephone. Customer service then processed the order and entered it into the system. Thereafter, the sourcing department in India determined which Firestar factory would manufacture the order. The sourcing department also created a sales order for the purchase of the finished jewelry by A. Jaffe from the factory and another form for the customer's purchase of the final product.[136]

### E.    Debtors' Capital Structure

As of the Petition Date, FDI and FI were co-borrowers under a co-lending facility with IDB and HSBC (together, the "Lenders") in the aggregate amount of $28,000,000 (the "Credit Facility").[137] The Credit Facility consists of two individual revolving credit facilities, one issued

---

[134] Interview of Sumay Bhansali, May 24, 2018; Interview of Bankim Mehta, June 6, 2018.
[135] Interview of Sumay Bhansali, May 24, 2018; *see also* A. Jaffe sales journal 2016 – 2017.
[136] Interview of Evelyn Kosiec, May 29, 2018.
[137] First Day Declaration at 5; *see also* Motion of Debtors Firestar Diamond, Inc. and Fantasy, Inc. for Entry of Interim and Final Orders (I) Authorizing Debtors Firestar Diamond, Inc. and Fantasy, Inc.'s Use of Cash Collateral, (II)

by IDB (the "IDB Credit Facility"), in the maximum principal amount of $12,000,000, and the

other by HSBC (the "HSBC Credit Facility") in the maximum principal amount of $16,000,000.[138]

Each facility is secured by senior pre-petition liens in substantially all of FDI's and FI's assets,

including their respective inventory and accounts receivables, as more specifically defined in the

operative loan documents.[139]

The IDB Credit Facility is governed by a Line Letter, dated October 11, 2013, as amended

from time to time, which had amended and replaced earlier Line Letters, dated December 13, 2012,

and September 4, 2008 (collectively, the "IDB Loan Documents").[140] The IDB Credit Facility is

guaranteed by Modi, FGI and FIL.[141]

The HSBC Credit Facility is governed by an Amended and Restated Loan Agreement,

dated as of September 4, 2008, as amended from time to time, which had amended and replaced

an earlier Loan Agreement, dated September 5, 2007 (collectively, the "HSBC Loan Documents"

and together with the IDB Loan Documents, the "Loan Documents").[142] The HSBC Credit Facility

is guaranteed by Modi, FGI and FIL.[143]

A. Jaffe is neither a borrower nor guarantor under the credit facilities.[144] As of the Petition

---

Granting Adequate Protection Claims and Liens, (III) Modifying the Automatic Stay, (IV) Scheduling A Final
Hearing, And (V) Granting Related Relief (ECF No. 13).
[138] First Day Declaration at 5.
[139] *Id.* at 5-6.
[140] First Day Declaration at 5; *see also* IDB Line Letter for $12,000,000 Line of Credit, dated October 11, 2013
(ExaminerIDB00001355).
[141] First Day Declaration at 6; *see also* IDB Line Letter for $12,000,000 Line of Credit, dated October 11, 2013
(ExaminerIDB00001355); Guaranty of Firestar Group, Inc., dated October 11, 2013 (ExaminerIDB00001164);
Guaranty of Firestar International Private Ltd., dated March 24, 2016 (ExaminerIDB00001076); Guaranty of Nirav
Modi, dated March 24, 2016 (ExaminerIDB00001587).
[142] First Day Declaration at 6; *see also* Amended and Restated Loan Agreement, dated September 4, 2008
(HBUS0005341- HBUS0005396).
[143] *See* Amended and Restated Guaranty Agreement of Nirav Modi, dated September 4, 2008 (HBUS0005425);
Guaranty Agreement of Firestone International Private Ltd., dated February 23, 2011 (HBUS0005596); Amended and
Restated Guaranty of Firestar Group, Inc., dated March 17, 2016 (HBUS0005845).
[144] First Day Declaration at 7.

Date, A. Jaffe had no secured debt.[145] Although A. Jaffe and IDB explored the possibility of

funding A. Jaffe's operations post-petition, that arrangement never materialized.[146]

The Lenders are parties to an Amended and Restated Intercreditor Agreement, dated March

22, 2013, as subsequently amended by the First Amendment to Amended and Restated

Intercreditor Agreement, dated October 17, 2013, relating to their relative priorities against FDI's

and FI's assets.[147]

### F.    Non-debtor US parents and affiliates

#### 1.    Firestar Diamond International, Inc.

FD International, incorporated in the state of Delaware in June 2011, is a non-debtor U.S.

affiliate whose business was to trade in high-end loose diamonds.[148]  On an annual basis, it traded

inventory valued between $6 and $10 million.  Bhansali was the sole director of FD International.

The company's financials were consolidated with a Firestar entity in Hong Kong that also traded

diamonds and reported to Firestar India.  FD International operated separately from the Debtors

and had its own offices and bank accounts.  Ajay Gandhi served as the CFO for this company as

well as for the Debtors.

Modi recruited Joshua Weinman in 2010 to operate this business as he was well-versed in

the diamond trading market.[149]  Weinman reported directly to Modi, meaning that Modi ultimately

controlled FD International.  Weinman's duties consisted of purchasing and trading large white

---

[145] *Id.*

[146] Interview of Sumay Bhansali, May 24, 2018.

[147] *See* Amended and Restated Intercreditor Agreement, dated March 22, 2013 (HBUS0005743); First Amendment to Amended and Restated Intercreditor Agreement, dated October 17, 2013 (HBUS0006283). Standard Chartered Bank ("SCB") was a party to the Amended and Restated Intercreditor Agreement. In 2011, SCB had extended a line of credit to FDI and FI. In connection with the First Amendment to Amended and Restated Intercreditor Agreement, IDB advanced sufficient funds to FDI and FI to pay off the indebtedness to SCB, which effectively terminated SCB's credit facility. (*See* Israel Discount Bank of New York Credit Memoranda dated, November 13, 2012 and November 26, 2014 (ExaminerIDB00000250, ExaminerIDB00000381)).

[148] Firestar Diamond International, Inc. Delaware Certificate of Incorporation, dated June 8, 2011 (FIRE-REL0000112034.0003).

[149] Interview of Joshua Weinman, July 17, 2018.

diamonds and fancy-colored diamonds[150] ranging in value from approximately $10,000 to well in excess of $200,000 in value. The company would buy these loose diamonds opportunistically if specific customers requested a particular diamond or if FD International identified a particular diamond that might appeal to a customer.[151] It also traded Modi's diamonds from time to time.[152] The company usually tried to turn inventory in 90 days by trading the diamonds and capitalizing on the changes in worldwide value. Weinman indicated that to the extent any of the U.S. Firestar companies purchased or sold loose fancy-colored diamonds for profit, as opposed to for the purpose of selling manufactured jewelry, he would have expected these transactions to have been performed with his involvement or through FD International.[153] Moreover, he stated he is generally familiar with the companies that would trade in diamonds at this level and volume, and that he was unfamiliar with the Shadow Entities.[154]

## 2.    Firestar Group, Inc. and Synergies Corporation

Firestar Group, Inc. ("FGI") is the parent company of FDI and FI. It was incorporated under the laws of Delaware on May 1, 2008[155] and is owned by Firestar International Private Limited. Mihir Bhansali was its director and Ajay Gandhi was its CFO.[156] Its sole purpose is to act as a holding company for FDI and FI. FGI also held real estate assets through a wholly-owned entity called Central Park Real Estate LLC ("CPRE"), which held and made monthly payments on a corporate apartment located at the Essex House, 160 Central Park South, New York, NY 10019, which was reportedly used exclusively by Modi and his family as Modi's primary U.S. residence. As discussed below, in January 2018, FGI sold CPRE.

---

[150] Interview of Bankim Mehta, June 6, 2018.
[151] Interview of Josh Weinman, July 17, 2018.
[152] Id.
[153] Id.
[154] Id.
[155] Draft Firestar promotional materials, undated (FIRE-REL0002671869.0002).
[156] Unanimous Written Consent of the Board of Directors of Firestar Gioup, Inc., July 1, 2013.

By 2016, Modi had met with investment bankers to assess a potential global initial public offering for all of the Firestar related companies. In discussions with the investment bankers and his accounting consultants, Modi was advised to reorganize his ownership structure. Specifically, he was advised that the U.S. entities should be held by a Hong Kong entity rather than an Indian entity.[157] Accordingly, in 2017, Firestar India sold FGI's stock to Synergies Corporation for $3,694,000, making Synergies Corporation the parent company to A. Jaffe and FGI.[158]

As noted above, Synergies owns the 95% of A. Jaffe that was not retained by its original founder.[159] Synergies was incorporated under the laws of Delaware on February 9, 2007 and its sole purpose is to act as an investment holding company.[160] Mihir Bhansali was the sole director of Synergies.[161]

FHL is the parent company of Synergies and is a wholly owned subsidiary of Firestar India.[162] Modi's sister, Purvi Mehta, manages the Hong Kong operations of FHL.[163]

The organizational structure of the Firestar group of companies as of October 2012 is detailed below:

---

[157] Interview of Howard Hoff, August 2, 2018.
[158] Stock Purchase Agreement Between Firestar International Private Limited and Synergies Corporation, dated July 10, 2017 (FIRE-REL0002684253.0001).
[159] *Id.*
[160] Draft Firestar promotional materials, undated (FIRE-REL0002671869.0002). Initially, Firestar India owned Synergies; however, after Synergies suffered significant losses because of its ownership of A. Jaffe, Modi assumed ownership. Email between Ajay Gandhi and Mihir Bhansali, dated January 11, 2017 (FIRE-REL0000272604). Modi paid $14,575,000 to purchase Synergies, but this payment was classified as a loan. *Id.* Modi assigned the loan to Purvi Modi on April 1, 2012. While Modi was seen as the owner of Synergies, Purvi Modi was the sole shareholder from 2011 to October 1, 2016 when she sold 10,000 shares to FHL for $100. *Id.*; Agreement for Purchases of Shares of Synergies Corporation, dated October 1, 2016 (FIRE-REL0000222643.0001).
[161] Unanimous Written Consent of the Board of Directors of Synergies Corporation, July 1, 2013.
[162] Interview of Ajay Gandhi, May 17, 2018; Email from Shyam Wadhwa to Ajay Gandhi, dated December 22, 2016 (FIRE-REL0000220570); Share Certificate for Synergies Corporation (FIRE-REL0000203266.0001).
[163] *Id.*



The company restructured in 2017.  The organizational structure of the Firestar group of

companies as of January 2018 is below (debtors are in red):



## VI.  INVESTIGATIVE FINDINGS REGARDING DEBTORS' BUSINESS PRACTICES

The diamond industry is viewed as highly susceptible to fraud. Diamonds are internationally traded in high volumes through several hubs around the globe, including India, Belgium, Dubai, and China.[164] Because diamonds have high value, are difficult to trace, are easy to move and conceal, and are subjectively valued, diamonds are increasingly identified as attractive vehicles for money laundering and other fraudulent schemes.[165]

---

[164] *See* FINANCIAL ACTION TASK FORCE, *Money Laundering and Terrorist Financing Through Trade in Diamonds*, 32 (October 2013) https://www.mf.gov.pl/c/document_library/get_file?uuid=11c4814a-300f-4c26-a349-f6734a1ba79d&groupId=764034.
[165] *Id*. at 49-50.

The crux of the Alleged Fraudulent Circumstances involves Modi's alleged creation of sham import transactions to support requests for financing in the form of LOUs from PNB bank. These transactions allegedly involved the transfer of stones and money at Modi's direction and without any economic purpose, in order to create the appearance of import transactions to support the fraud.[166]  Indian authorities have alleged that these transactions took place between Firestone entities and certain Shadow Entities:  shell entities that posed as independent third parties, but were in fact entities created by the conspirators only "in order to facilitate layering and for laundering of funds so obtained fraudulently from PNB and to camouflage the real usage and identity of beneficiaries of the funds siphoned off [from PNB]."[167]  To ascertain the extent of the Debtors' involvement, if any, in this alleged fraud, the Examiner's team analyzed the Debtors' sales records, tax records, bank records and other financial and operating records for evidence of whether Debtors engaged in similar transactions.   Specifically, the Examiner analyzed information including whether and to what extent Debtors' transacted with Shadow Entities; whether these transactions appeared consistent with a legitimate business purpose, particularly the business purpose reported by Debtors; whether the transactions and the relationships among relevant parties were accurately and consistently reported; and whether the Debtors' books and records revealed other indicia of fraud.  As discussed below, the Examiner's investigation disclosed that the Debtors engaged in a large volume of suspect transactions with Shadow Entities that bear hallmarks of fraud.  The circumstances of these transactions are consistent with the allegations made by Indian authorities regarding the Alleged Fraudulent Circumstances.

---

[166] ED Complaint ¶ 3.1.10.

[167] *Id.*

## A.  Debtors Engaged in High Volume Transactions with Shadow Entities Identified in the Alleged Fraud

Of the Shadow Entities identified by Indian authorities, the Examiner's investigation centered on those that conducted the highest volume transactions with the Debtors, as well as those identified by the CBI as having received the largest transfers of LOU money:

- Auragem Company Ltd,
- Brilliant Diamonds Ltd,
- Empire Gems FZE
- Eternal Diamonds Corporation Ltd,
- Fancy Creations Company Ltd,
- Pacific Diamonds FZE,
- Tri Color Gems FZE,
- Unique Diamond and Jewelry FZC,
- Universal Fine Jewelry FZE and
- Vista Jewelry RJE, World Diamond Distribution FZE

The Debtors engaged in substantial transactions with these entities; indeed, the Examiner flagged certain such transactions at the outset of his investigation because of the large dollar amount relative to the Debtors' sales.

According to their sales journals, during the seven year period between 2011 and 2017, FDI recorded $167,668,835 in total sales to Shadow Entities and A. Jaffe made $46,136,094 in total sales to these entities.[168]  Combined, the total sales from FDI and A. Jaffe to Shadow Entities were $213,804,929. A breakdown of the sales recorded by each entity to each Shadow Entity during the relevant period is below:

---

[168] *See* FDI sales journal from 2011 – 2017; A. Jaffe sales journal from 2011-2017.

**A. Jaffe Sales Journal**

| Shadow Entity | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total Sales to Shadow Entity |
|---|---|---|---|---|---|---|---|---|
| Auragem Company LTD | | $ 1,018,737 | | | | | | $ 1,018,737 |
| Diamonds "R" Us | | 3,746,646 | | | | | | 3,746,646 |
| Empire Gems FZE | | 11,305,298 | $ 4,431,231 | | | | $ 11,000 | 15,747,529 |
| Eternal Diamonds Corp LTD | | | | | | $ 218,355 | | 218,355 |
| FANCY CREATIONS CO. LTD | | 1,333,777 | | | | | | 1,333,777 |
| Neeshal Merchandising Pvt LTD | 1,097,543 | | | | | | | 1,097,543 |
| Pacific Diamond FZE | | 350,316 | | 3,153,291 | | | | 3,503,607 |
| Radashir Jewelry Co. Pvt. LTD | 3,557 | 113,965 | (351) | | | | | 117,171 |
| Solar Exports | 2,200,743 | 4,227,609 | | | | | | 6,428,351 |
| Stellar Diamonds | 1,133,779 | 933,005 | | | | | | 2,066,784 |
| Tri Color Gems FZE | | | | 1,914,721 | | | | 1,914,721 |
| Unique Diamond & Jewellery FZC | | | 874,868 | | | | | 874,868 |
| Vista Jewelery FZE | | 1,637,834 | | | $ 66,610 | | | 1,704,444 |
| World Diamond Distribution FZE | | 4,908,740 | 1,454,821 | | | | | 6,363,562 |
| **Total** | **$ 4,435,621** | **$ 29,575,927** | **$ 6,760,569** | **$ 5,068,012** | **$ 66,610** | **$ 218,355** | **$ 11,000** | **$ 46,136,094** |

[1] Though the "Bill to" customer name is Stella, the "Invoice name" is Stellar, and this appears to be the Shadow Entity Stellar Diamonds.  The two sales shown here are both loose diamond sales.

**Firestar Diamond, Inc. Sales Journal**

| Shadow Entity | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total Sales to Shadow Entity |
|---|---|---|---|---|---|---|---|---|
| Brilliant Diamonds LTD | $ 1,706,390 | $ 29,598 | | | | $ 1,168,390 | $ 2,602,481 | $ 5,506,858 |
| Diagem Inc. | | 138,676 | | | | | | 138,676 |
| Diamonds "R" Us | 18,612,061 | 2,064,845 | | | | | | 20,676,907 |
| Empire Gems FZE | | 4,184,984 | $ 3,019,406 | | | 1,014,951 | | 8,219,341 |
| Eternal Diamonds Corp LTD | 45,389 | 1,824,085 | | | | | | 1,869,473 |
| Fair Sino Trading LTD | 48,001 | | | | | | | 48,001 |
| Fancy Creations Co. LTD | 1,728,000 | 7,523,771 | | $ 1,545,775 | $ 1,800,880 | 1,180,231 | 1,031,353 | 14,810,010 |
| Neeshal Merchandising Pvt LTD | 14,803,219 | | 238,947 | | | | | 15,042,166 |
| Pacific Diamond FZE | | 9,341,440 | 4,909,795 | 1,768,433 | 2,967,209 | 296,659 | 1,152,857 | 20,436,394 |
| Radashir Jewelry Co. Pvt. LTD | 74,752 | | | | | | | 74,752 |
| Solar Exports | 11,072,809 | 2,931,077 | | | | | | 14,003,886 |
| Stellar Diamonds | 12,216,057 | 5,848,540 | | | | | | 18,064,597 |
| Tri Color Gems FZE | | 1,805,722 | | | | 2,353,401 | | 4,159,123 |
| Unique Diamond & Jewellery FZC | 17,123,002 | 4,149,213 | | 921,026 | 125,246 | 2,122,402 | 331,029 | 24,771,917 |
| Vista Jewelery FZE | | 1,599,574 | | | | 4,892,792 | | 6,492,366 |
| World Diamond Distribution FZE | | | 959,098 | 5,911,502 | | 2,585,648 | 3,898,118 | 13,354,366 |
| **Total** | **$ 77,429,679** | **$ 41,441,526** | **$ 9,127,246** | **$ 10,146,736** | **$ 4,893,335** | **$ 15,614,474** | **$ 9,015,838** | **$ 167,668,835** |

As discussed more fully below, while the Debtors' sales journals matched their shipping records, the Examiner was unable reconcile the volumes of sales reported in the sales reported in the sales journal with any of FDI's tax returns for the relevant period or with certain of A. Jaffe's tax returns.

**B.    Debtors Treated the Shadow Entities as Related Affiliates Internally While Accounting for Them as Independent "Customers" or "Vendors" For Transaction Purposes**

The Shadow Entities are textbook shell entities.  They have minimal physical presence.

They are mostly registered at either small, unoccupied offices or at single, leased desks within shared offices.  They share managers and directors with each other and with Firestar India.  Furthermore, they have almost identical websites with similar backgrounds, fonts, contact pages, and language.[169]  They are located in Special Economic Zones ("SEZ") and Free Trade Zones ("FTZ"), which are areas within a country that enjoy trade incentives, such as reductions in trade controls and enforcement, and whose reduced oversight makes them havens for fraudulent schemes and money launderers.[170]

The Examiner's investigation confirmed that these Shadow Entities were controlled by or affiliated with the Firestar Global Entities and the Debtors treated them as such.  First, current or former Firestar India employees managed many of the Shadow Entities' operations.  The following chart lists these entities and the former and current employees of Firestar, some of whom simultaneously managed these entities while working at Firestar India.[171]

| Shadow Entity | Firestar Employee & Manager of Shadow Entity |
|---|---|
| Auragem Company ltd (Hong Kong) | Divyesh Kumar, Naresh Gandhi, Sonu Mehta – Accountants at Firestar India |
| Brilliant Diamonds Ltd (Hong Kong) | Bhavik Jayesh Shah - Firestar India diamond sorter |
| World Diamond Distribution FZE (UAE) | Sandeep Mistry – Firestar India employee (position unknown) |
| Pacific Diamonds FZE (UAE) | Jinesh Shah – Firestar India employee (position unknown) |
| Eternal Diamonds Corporation Ltd (Hong Kong) | Ashish Bagaria – Data entry operator at Firestar India |
| Universal Fine Jewelry FZE (UAE) | Jubin Jose, Sonu Mehta, Satyendra Shukla – Jose worked in admin department at Firestar India |
| Tri Color Gems FZE (UAE) | Jinesh Shah – Firestar India employee (position unknown) |

---

[169] *See e.g.*  http://www.empiregemsuae.com/about_us.html; http://www.worlddiamonddistribution.com/about_us.html,; http://universalfinejewelry.com; http://www.vistajewellery.com/ourvision.html.

[170] *See* FINANCIAL ACTION TASK FORCE, *Money Laundering Vulnerabilities of Free Trade Zones*, 4 (March 2010) http://www.fatf-gafi.org/media/fatf/documents/reports/ML%20vulnerabilities%20of%20Free%20Trade%20Zones.pdf.

[171]ED Complaint ¶ 3.1.7.; ROI-MCA-00000433

| Fancy Creations Company Ltd (Hong Kong) | Nilesh Valjibha Khetani – <br> Data entry operator at Firestar related party |
| Unique Diamond and Jewelry FZC (UAE) | Jayesh Doshi, Sheedhar Mayekar, Chetan Chauhan – <br> Firestar India employee (position unknown) |
| Vista Jewelry RJE (UAE) | Netaji Mohite, Ashish Lad – <br> Firestar India employee (position unknown) |
| Empire Gems FZE (UAE) | Rushabh Jethwa – <br> Firestar India employee (position unknown) |

Second, the Examiner's review of email correspondence and other documents prepared by various parties within the Modi Firms confirmed that these entities were affiliated with either the Modi Firms or Modi himself, and that Debtors were aware of this affiliation.

In an email dated August 6, 2013, Ajay Gandhi, the CFO of the Debtors sent an email to Bhavesh Patel, a Firestar back-office employee in India, attaching a spreadsheet titled "FS-Inc from Kurian June 2013."[172]   The spreadsheet contained purchase and sales ledgers of Fancy Creations Company Limited, Brilliant Diamonds Limited, Eternal Diamond Limited and Unique Diamond & Jewelry showing these entities accounting for transactions with FDI.[173]  The Examiner's team traced and agreed purchases, sales and cash movement from the ledgers to FDI's purchase and sales journals and bank statements, confirming that these ledgers in fact represent records of the Shadow Entities and reflect the relevant transactions from their perspective.  Gandhi not only had possession of a supposed third party's books, but he had access to four sets of books for supposed third parties all compiled in one spreadsheet.

Tellingly, Mihir Bhansali, the CEO of FDI and director of the Debtors, was in possession of a spreadsheet entitled "AR-AP (Jan'18)" with a document date in early February 2018 identifying payables and receivables as between each of the Modi Firms, the Firestar entities and

---

[172] Email from Ajay Gandhi to Bhavesh Patel, dated August 6, 2013 (FIRE-REL0000102654; FIRE-REL0000102654.0001).

[173] Attachment to email from Ajay Gandhi to Bhavesh Patel titled "FS-Inc from Kurian June 2013," dated August 6, 2013 (FIRE-REL0000102654.00001).

49

the Shadow Entities in "HK" (Hong Kong) and "DXB" (Dubai).[174]   The Modi Firms and the

Firestar entities were listed on the horizontal axis and the Shadow Entities on the vertical axis.

Solar [Exports], Stellar [Diamonds], and DRUS [Diamonds 'R' Us], the Modi Firms, were grouped

on the same axis as the Firestar entities.[175]   One of the Firestar entities is labeled "FS INC." The

Examiner team performed targeted searches of the "Payables" and "Receivables" listed under this

Firestar entity, and reconciled six out of the nine amounts listed to underlying accounts receivable

and accounts payable amounts of various Firestar U.S. entities with Shadow Entities around the

January-February 2018 timeframe.[176]   While it shows one snapshot in time, the spreadsheet

appears to show many millions in accounts receivable and accounts payable balances between the

Shadow Entities and Firestar entities being tracked.   The Examiner found this spreadsheet

significant in that it listed no customers known to be legitimate, foreign or otherwise, but only

Shadow Entities. The spreadsheet also contains a column identifying many Shadow Entity

employees that were current or former Firestar employees.[177]

In an email dated March 1, 2013, Shyam Wadhwa[178] sent Ajay Gandhi a spreadsheet

containing reconciliations between various Shadow Entities' books, referred to as vendors or

customers, and FDI and FD International's books.[179]   The spreadsheet was categorized into four

categories: 1) matching "vendor" and Firestar books; 2) old balances that did not match up; 3)

"correction entries required in NY books as well as Customer Vendor books;" and 4) "Purchase

---

[174] Spreadsheet titled "AR-AP (Jan '18)" (FIRE-REL0001797347).

[175] *Id.*

[176] Spreadsheet titled "AR Ageing Report" dated February 12, 2018 (FIRE-REL0000410560.001); Email from Ajay Gandhi to accounts@fancycreations.hk, dated February 3, 2018 (FIRE-REL0000290860); House Airway Bill and Firestar Jewelry, Inc. Invoice to Fancy Creations Co. Ltd. (FIRE-REL0000258366.001), House Airway Bill and Firestar Jewelry, Inc. dated July 8, 2016 (FIRE-REL0000258366.002).

[177] *See* ED Complaint ¶ 3.1.7.

[178] Shyam Wadwha was charged by the Indian Authorities and was described as a key person who got directives from Bhansali (ROI-MCA-00000434).  Wadwha admitted to the Indian authorities that he placed many Firestar employees in jobs with the Shadow Entities (ROI-MCA-00000439).

[179] Email from Shyam Wadwha to Ajay Gandhi, dated March 1, 2013 (FIRE-REL0000068259).

Invoice values to be Reconciled with Physical Vendor Invoices."[180]   In the "action required"
column, there were notes relating to the books of the Shadow Entities such as "Remittance from
Aura[gem] on behalf of Pacific [Diamonds] accounted by Aura as paid on its account instead of
Pacific."[181]

Correspondence suggests that these entities were under the shared control of the Firestar
Global Entities. Like entities within the Firestar organizational structure, the accounts payable for
one entity appear to have been available to clear the accounts receivable of another entity, as
needed to satisfy inquiries by auditors or banks.  The Debtors' President and CFO appear to have
referred to such practices as "pruning the AR" and "the around the horn."[182]   At the same time,
the Debtors described the Shadow Entities as independent customers or vendors, treating what was
essentially internal circulation of funds as legitimate third party business.

For example, in an email dated June 8, 2012, Ajay Gandhi asked Bhavesh Patel and Shyam
Wadwha, two Firestar employees, for "payables to HK and Dubai – all the companies. Firestar,
Firestar Diamond Int'l and Jaffe." because he "need[ed] to pay $1 m to HK or Dubai hence need
name and amounts only."[183]   Bhavesh Patel replied "There is nothing open with Dubai however
HK open payable is attached herewith." Gandhi responded "It could be Pacific, World Diamond
etc too."[184]   The email documents that Gandhi's goal was to send $1 million from the Debtors or
FD International to Hong Kong or Dubai, and that he considered the Shadow Entities (and
transactions with them) as fungible sources to legitimize such a payment.

---

[180] Attachment to email from Shyam Wadwha to Ajay Gandhi titled "NY balance comparison of select vendors /
customer as of 15th Feb '13" dated February 13, 2013 (FIRE-REL0000068259.00001).
[181] Id.
[182] Email from Kurian Matthews to Ajay Gandhi, dated November 4, 2013 ("Kindly let me know whether there is
any payable from Firestar NY to Fantasy in order enable us to do the **around the horn** to clear outstanding in our
books." (emphasis added) ((FIRE-REL0000099797)).  *See also* email chain between Ajay Gandhi and Shyam
Wadwha, dated October 1, 2013 ("Plan to prune the AR/AP of NY books") (FIRE-REL0000100701).
[183] Email chain between Ajay Gandhi and Bhavesh Patel, dated June 8, 2012 (FIRE-REL0000111796).
[184] Id.

51

Firestar employees also directed payment of certain of the Shadow Entities' back office expenses by the Debtors—a very unlikely practice among unaffiliated entities. For example, on March 18, 2014, Ajay Gandhi requested that $150,000 be wired from FDI's account to Unique for the payment of back office expenses for the period of October 2013 to March 2014.[185] The Examiner identified a $150,000 disbursement from FDI to Unique on the same day. In October 2010, Gandhi wired $220,000 for Unique's back office expenses.[186] On October 24, 2013 a wire was sent from Synergies to Brilliant for $125,000 for "back office expenses."[187] Both Unique and Brilliant were reported on the Debtors' books to be customers of the Debtors.[188]

Critically, although the Debtors' CFO Ajay Gandhi engaged in regular correspondence with these entities over a period of at least seven years, he refused in multiple interviews to acknowledge that he was familiar with them beyond their status as customers of the Debtors.[189] When confronted with his emails Gandhi stated he could not remember these correspondences, a denial that was not credible given his general level of recall, or that he authorized the payment of back office expenses of such entities, or held copies of their internal books. In other conversations with the Examiner, Gandhi recalled that many of the Shadow Entities were "clients of Mihir" Bhansali.[190] After engaging counsel, Gandhi provided statements that he had no knowledge as to the legitimacy or relatedness of these Shadow Entities – including those entities that he has previously represented to auditors and banks as related parties.[191] The Examiner's investigation

---

[185] Email chain from Ajay Gandhi to Bhavesh Patel, copying Hemant Bhatt, dated March 18, 2014 (FIRE-REL0000152658).
[186] Email chain between Ajay Gandhi, Hemant Bhatt and Bhavesh Patel, dated April 15, 2010 (FIRE-REL0000073216).
[187] Email chain between Ajay Gandhi and Bhavesh Patel, dated October 24, 2013 (FIRE-REL0000060554).
[188] Both shadow entities appear in the A. Jaffe Customer-Vendors listing ("AX_AJAFFE_CUSTOMERS-VENDORS.xlsx") and the Firestar Diamond Inc. customer listing ("NAV_NDI_CUSTOMERS.xlsx").
[189] Interview of Ajay Gandhi, May 17, 2018.
[190] Id.
[191] Interview of Ajay Gandhi, dated July 19, 2018.

with respect to the most utilized Shadow Entities are summarized below.

### (a) "Shadow Entities" Registered in the United Arab Emirates ("UAE")

The UAE Shadow Entities are EZ companies.  All are single shareholder entities except for Unique Diamond and Jewelry FZC, which has multiple shareholders.  The Examiner reviewed each companies' registrations and conducted site visits to obtain evidence relevant to whether these entities were shell entities controlled or affiliated with Modi and Firestar.

### i.   Universal Fine Jewelry FZE ("Universal Fine")

Universal Fine was incorporated in 2010 and is located at Suite #Q1-05-068/A, Saif Zone, Sharjah, UAE.  The Universal Fine office consists of a single desk space in a two-floor building. The site visit revealed that Apollo Energy FZE occupies the office listed for Universal Fine.  It was locked, and the investigators learned from the EZ licensing department that Universal Fine ceased operations in May 2018.  According to PNB's financial advisor BDO (India) LLP and as listed in the accounts receivable and accounts payable analysis in possession of Bhansali, Jubin Jose Varghese is Universal's sole shareholder[192] and a 2016 document created by a Firestar employee identifies Jubin Jose as Universal's owner. [193]   In a 2012 Firestar document drafted to analyze salary increases, "Jubin Jose" was listed as a Firestar Employee.[194]

Similarly, another manager of Universal, according to a public records search performed by the Examiner's team, was Satyendra Shukla.  Shukla sent an email to Mihir Bhansali on August 19, 2017, enclosing a profile of three Shadow Entities, Universal, Empire and Diagems, and asking Bhansali to "review and advice [sic]."  Shukla's email signature indicated he was the General Manager of Firestar Diamond in Dubai.[195]

---

[192] Spreadsheet titled "AR-AP (Jan '18)" (FIRE-REL0001797347).
[193] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).
[194] Spreadsheet titled "Dubai Increment," dated 2012 (FIRE-REL0002648082.0001).
[195] Email from Satyendra Shukla to Mihir Bhansali, dated August 19, 2017 (FIRE-REL0000399723); Attachment to

Internal documents indicate that Modi's partners exercised control over both Universal and A. Jaffe. For example, on February 4, 2013, Sridhar Krishnan, the manager of SDC Designs, a New York entity with connections to the Modi family,[196] wrote to Bhansali and Modi Firm partner Hemant Bhatt using personal email addresses. Krishman told Bhatt and Bhansali "you should expect 1.4 million in Universal fze today. Please wire the same to A Jaffe."[197] Two days later, Bhatt confirmed that Universal had received the funds and that "Empire paid US $1,391,570 to A Jaffe value 05 Feb 13."[198] "Empire" appears to be a reference to Empire Gems, another mann on whose behalf Bhatt corresponded. A. Jaffe, Universal and Empire Gems appear to be treated as interchangeable sources through which funds for the benefit of Modi and his entities were transacted.

Photographs of the Universal Fine offices are below:



Figure 13: Photo of Universal Fine Jewelry FZE registered office door taken at 1:40 PM on 19th of June 2018.



Figure 14: Photo of Universal Fine Jewelry FZE registered office board label in the ground floor taken at 1:36 PM on 19th of June 2018.

### ii.    Empire Gems FZE ("Empire Gems")

Empire Gems commenced operations in 2010 and is registered at Executive Desk Q1-05-

---

email from Satyendra Shukla to Mihir Bhansali, dated August 19, 2017 (FIRE-REL0000399723.0001).

[196] SDC Designs was not the subject of the Examiner's investigation and the Examiner has drawn no inferences or conclusions about that entity.

[197] Email chain between Mihir Bhansali, Sridhar Krishnan and Hemant Bhatt, dated February 4, 2013 (FIRE-REL0000069235).

[198] *Id.*

010-B, Suite Q1-05-010/B, Saif Zone, Sharjah, UAE.  This address is for a desk in a two-floor building.  Leasing such a desk in this EZ permits the lease-holder two visas.[199]

Signage on site indicated another company named Medrect International FZE occupied the office but referred visitors to Rushabh Jethwa,[200] the listed managing director of Empire Gems and, as of 2011, a Firestar Diamond (Dubai) "Executive."[201]  Jethwa was an authorized signatory of the Firestar Diamond (Dubai) HSBC account.[202]  In 2012, Ajay Gandhi, informed the Debtors' auditors, Marks Paneth LLP, that the email for the authorized contact person for Empire Gems was Rushabh@empiregemsuae.com, presumably Rushabh Jethwa's email address.[203]  At the time, Jethwa was also a Firestar employee in Dubai.[204]

The licensing department of the EZ told the A&M investigators that Empire Gems was closed by request as of May 2018.

On February 11, 2015 Rebecca Chow, an A. Jaffe employee, emailed Sandeep Mistry, a Firestar employee and director of World Diamond that "[r]ecently (end of Jan, 2015) NY made two shipment, one to EMPIRE GEMS FZE and the other to PACIFIC DIAMOND FZE. Please arrange to have goods ship to Belgium for Samir."[205]  This email suggests that Firestar employees had control over, and could determine the fate of, diamonds that had been sent to Empire and Pacific.  On November 6, 2017, Evelyn Kosiec told Mehul Doshii, another Firestar employee, to remove Empire Gems from a list of vendor performance because Empire was not actually a

---

[199] See http://www.sreebusinessconsultants.com/saif-free-zone-cost-calculator.html.
[200] Rushabh Jethwa was listed as the contact person for Empire Gems in a chart in the possession of Mihir Bhansali. Spreadsheet titled "AR-AP (Jan '18)" (FIRE-REL0001797347).
[201] Spreadsheet titled "Salary ranges in Dubai (Collated from Internet Sources)," undated (FIRE-REL0002640832.0001).
[202] Email from Kurian Mathews to Mihir Bhansali, dated August 20, 2011 (FIRE-REL0002641288).
[203] Email from Ajay Gandhi to Jessica Belnavis, dated May 1, 2012 (FIRE-REL0000112794).
[204] Attachment to email from Jennifer D'souza to Mihir Bhansali, dated May 30, 2012 (FIRE-REL0002646426); Spreadsheet titled "CVs online" attached to email from Jennifer D'souza to Mihir Bhansali, dated May 30, 2012 (FIRE-REL0002646426.0001).
[205] Email from Rebecca Chow to Sandeep Mistry, dated February 11, 2015 (FIRE-REL0000045835).

vendor.[206]

Below are images taken outside Empire Gems' registered office:



Figure 1: Photo of Empire Gems registered office door taken at
1:38 PM on 19th of June 2018.



Figure 2: Photo of Empire Gems registered office board label at
the entrance of the building taken at 1:36 PM on 19th June 2018.

### iii.    Unique Diamond Jewelry FZC ("Unique")

Unique was incorporated in 2008 with a registered address of Building # C-1, Office #620,

Ajman Free Zone, Ajman, UAE.  Unlike the other UAE entities, Unique is an FZC, which means

that it has more than one shareholder.

Another company, Royal Gypsum Products FZC, occupies the address.  The investigators

observed that the inside of the office seems to have been abandoned. Upon questioning, occupants

of neighboring offices in the same building stated they had not heard of Unique.  The EZ licensing

department stated that Unique's owners requested to cancel its license as of April 2018.

The Examiner has identified emails that suggest Unique is a Modi affiliated entity.  On

January 19, 2010, Ajay Gandhi asked for an aging report from the back office in India.  Gandhi

stated in his request, "You can exclude affiliates such as FIPL, FS, FC, JS, Sandberg, *Unique*."[207]

---

[206] Email from Eveleny Kosiec to Mehul Doshi, dated November 6, 2017 (FIRE-REL0000676153).
[207] Email from Ajay Gandhi to FSI INDIA Accounts & MIS, dated January 19, 2010 (FIRE-REL0000365497)
(emphasis added).

On March 18, 2014, Ajay Gandhi request that $150,000 be wired from FDI's account to Unique for the payment of back office expenses for the period of October 2013 to March 2014.[208]  This was only one of several instances in which Firestar related entities, including the debtors, paid Unique money for its back office expenses.  On June 20, 2012, Kurian Matthews, an employee of Firestar Dubai, stated "[a]ccording to the books of Unique Diamond net balance is zero" suggesting he had access to Unique's books.[209] A similar inference may be drawn from an April 2012 email from Miten Pandya, a Firestar India employee, to Firestar Hong Kong employees, including Ashish Bagaria the director of Eternal Diamonds, copying Unique's manager and attaching "the Export Collection Document for Unique for US $463,127.75 thru BOI."[210]

In 2010, Modi and Gandhi exchanged emails about the shipment of a diamond.  Modi stated, "send the 70 ct vivid yellow to Firestone Dubai @51,500 and not Firestone HK."  Gandhi responded, "Firestone, Dubai confirmed (Not Unique)" to which Modi clarified, "Sorry Unique." Gandhi concluded the conversation with "Glad I asked!!!"[211]  This internal confusion among entities is consistent with employees treating these supposedly unrelated entities as affiliated with the Debtors.

Below are images of the offices:

---

[208] Email from Ajay Gandhi to Bhavesh Patel and Hemant Bhatt, dated March 18, 2014 (FIRE-REL0000152658).
[209] Email from Kurian Mathews to Judy Ormond dated June 20, 2012 (FIRE-REL0002646890).
[210] Email from Miten Pandya to Ashish Bagaria, dated April 30, 2012 (FIRE-REL0001207752).
[211] Email exchange between Nirav Modi and Ajay Gandhi, dated October 21, 2010 (FIRE-REL0000072963).






Figure 15: Photo of Unique Diamond and Jewelry FZC
registered office door taken at 11:12 AM on 19th of June 2018.

Figure 16: Photo of Unique Diamond and Jewelry FZC
registered office door taken at 11:12 AM on 19th of June 2018.

### iv.    World Diamond Distribution FZE ("World Diamond")

World Diamond was incorporated in 2010 and is registered at Office D-3, Phase II, Fujairah Free Zone, Fujairah, UAE.  It is a single shareholder entity operated by Sandeep Mistry, who as of 2011 was a Firestar Diamond (Dubai) employee.[212]  In a document created in 2016 by a Firestar employee, Sandeep Mistry is listed as the owner and manager of World after leaving Firestar in 2009-2010.[213]   During a site visit to the Fujairah Free Zone, the security guard at the gate of the EZ denied the Examiner's investigators access and indicated that World Diamond does not exist on the security list of companies.  Interestingly, World Diamond does exist on the EZ's online registry.[214]

### v.    Pacific Diamonds FZE ("Pacific Diamonds")

Pacific Diamonds was incorporated in 2010 and is located at Office 608, Desk A, Building Number B1, Ajman Free Zone, Ajman, UAE.  This address is a specific desk in a building at the Ajman EZ in the UAE.  The site visit revealed that Pacific Diamonds shares a small office with

---

[212] Email from Pradeep Mhatre to Mihir Bhansali, dated February 9, 2011 (FIRE-REL0002668460).
[213] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).
[214] *See* https://www.fujairahfreezone.com/investors-corner/listed-companies--investors.

seven companies. The entirety of each company is one desk in office 608. The drawers of Desk A, which is Pacific Diamonds, were empty. Signs on the office door note Jinesh Shah as the company's contact person. Shah was also a Firestar India "Executive."[215] Additionally, the bank account number for Pacific Diamonds matches that of another LOU beneficiary, Himalayan Traders FZE.[216]

Below are images taken during the Pacific Diamonds site visit:



Figure 3: Photo of Pacific Diamonds FZE registered office door taken at 11:17 AM on 19th of June 2018.



Figure 4: Photo of Pacific Diamonds office from the inside taken at 11:18 AM on 19th of June 2018.



Figure 4: Photo of Pacific Diamonds FZE registered office door taken at 11:17 AM on 19th of June 2018.



Figure 5: Photo of Pacific Diamonds FZE registered office door taken at 11:17 AM on 19th of June 2018.

---

[215] ROI-MCA-00000433-444; Spreadsheet titled "Salary ranges in Dubai (Collated from Internet Sources)", undated (FIRE-REL0002640832.0001).
[216] Meetings with BDO (India), July 2018.

### vi.   Tri Color Gems FZE ("Tri Color Gems")

Tri Color Gems FZE (was incorporated in 2010 and is located at E-LOB Office No: E-86G-32, Al Ettehad Street, (Near Burj Eiffel), Hamriya Free Zone, Sharjah, UAE, which is a small modular cabin-style building.  Jinesh Shah is the sole shareholder and director as he is for Pacific Diamonds.  In 2011, Jinesh Shah was listed as an executive in the accounts department of Firestar Dubai.[217]  During the site visit, the A&M investigators were unable to enter the locked office.  However, they entered the cabin and spoke to the personnel from the neighboring office, Mena Energy, who were not familiar with the name Tri Color Gems.

### vii.   Vista Jewelry FZE ("Vista")

Vista was incorporated in June 2010 and is registered at Office No D-16, (Phase-II), Fujairah Free Zone, Fujairah, UAE.  Netaji Mohite is the company's sole shareholder and, as of 2013, was a Firestar India "Executive."[218]  In 2014, he was still receiving business emails at his Firestar email address.[219]  A 2016 document created by a Firestar employee states that Netaji Mohite started Vista in or around 2011.[220]

Like World Diamond, the gate guard outside the EZ never heard of Vista and never saw a company representative.  However, the security gate list includes Vista, suggesting that the company could be virtual. Without a gate pass, the investigators were unable to view the registration building.

### (b)   "Shadow Entities" Registered in Hong Kong ("HK")

---

[217] Spreadsheet titled "Salary ranges in Dubai (Collated from Internet Sources)", undated (FIRE-REL0002640832.0001).
[218] Spreadsheet titled "AR-AP (Jan '18)" (FIRE-REL0001797347).; Spreadsheet titled "Salary ranges in Dubai (Collated from Internet Sources)", undated (FIRE-REL0002640832.0001).
[219] Email from Arjun Patil to Firestar employees, dated January 25, 2014 (FIRE-REL0001723370).
[220] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).

The HK Shadow Entities are structured similarly to the UAE companies in that they seem to operate as shells with Firestar employees as management. The Examiner reviewed each companies' registrations and conducted site visits.

### i.    Eternal Diamonds Corporation Ltd. ("Eternal")

Eternal was formed in 2002 and has an office at its registered address of Unit 2A, 2/F, Focal Industrial Centre, Block A, 21 Man Lok Street, Hung Hom, Kowloon. Ashish Bagaria, a former Firestar India and Hong Kong employee is Eternal's Director. In a document created by a Firestar employee in 2016, Ashish Bagaria is listed as the owner and manager and states that he joined Eternal in 2011.[221] However, in 2014, Ashish Bagaria was still being emailed for business purposes at his Firestar email address.[222] The company's shareholder is a British Virgin Islands company, Everstar Capital Ltd. From the site visit, it seems that Eternal ceased operations although the company signage still exists. Building staff indicated that someone visited monthly to collect mail. Otherwise, they did not observe activity at the office. Investigators visited two alternate addresses without luck.

Based on emails, it is clear that Eternal was affiliated with Modi. On July 3, 2010, Ajay Gandhi replied to a question from the credit department at Standard Chartered Bank, a former lender to FDI, asking how Eternal Diamonds was related to Firestar and why it was not included in the group structure. Gandhi responded that Eternal Diamonds was owned by Deepak Modi, Modi's father and thus only a related party.[223] Gandhi also explained that Eternal was an investor in FDI and had leant a portion of its $12 million in the form of a subordinated loan.[224]

### ii.    Fancy Creations Company Ltd ("Fancy Creations")

---

[221] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).
[222] Email from Asha Shetty to Bhavesh Patel, dated February 24, 2014 (FIRE-REL0000819123).
[223] Email from Ajay Gandhi to Oakley Champine, dated July 2, 2010 (FIRE-REL0000077897).
[224] *Id.*

Fancy Creations has an office at its registered address of Unit B03, 2/F, Summit Building, 30 Man Yue Street, Hung Hom, Kowloon. Francy Creations was registered in June 2010 with Nilesh Khetani as the sole director. In a document created by a Firestar employee in 2016, Nilesh Khetani is also listed as Fancy's owner and manager, and a former Firestar employee.[225] Khetani was a Firestar employee until at least February 2016.[226] The office seems to be permanently closed. Investigators confirmed by the pile of junk mail on the floor that the office is unused. Building staff indicated that on rare occasion a Pakistani or Indian person visited the office. The investigators experienced similar results at three alternate addresses. At each location, the security guards did not recognize the company name, and Fancy Creations did not appear on the building directories.

On September 7, 2011, Firestar Dubai employee Kurian Mathews forwarded an email to Mihir Bhansali containing fee quotes from accountants for proposed audits of Auragems and Fancy. Mathews stated the fees may have been higher than Firestar Diamond in Hong Kong "due to the complexity of the transactions in these entities."[227] Mathews went on to say "[p]lease advise me how to proceed further on this,"[228] suggesting that a Firestar employee, Bhansali, should be concerned with the audit costs for Auragems and Fancy.

### iii.   Brilliant Diamonds Limited ("Brilliant")

Brilliant's office is registered at Room 8, 7/F, Fu Hang Industrial Building, 1 Hok Yuen Street East, Hung Hom, Kowloon. It was registered in December 2002 and is in the wind-up process. Brilliant's director is Bhavik Shah, a Firestar India employee, and its shareholder is Pacific Regent Trading Limited. In a document created by Firstar employees, Brilliant is described

---

[225] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).
[226] Bombino Express Worldwide Inc. Invoice, dated February 15, 2016 (FIRE-REL0001444993.0001).
[227] Email from Kurian Mathews to Mihir Bhansali, dated September 7, 2011 (FIRE-REL0002640762).
[228] *Id.*

as being owned and managed by Bhavik Shah, who previously worked for Firestar and joined Brilliant in 2011.[229]  Brilliant, Fancy Creations, and Eternal share the same Corporate Secretary and founding shareholders.

An inspection of the office revealed that although there was a Brilliant sign on the wall, the office appeared unused as the entrance was dusty and the presence of junk mail on the floor indicated lack of use.  There was an electricity bill notice next to the door.

Like Fancy Creations and Eternal, Brilliant has another listed address, but a visit to the location confirmed there was no signage, and the reception staff did not recognize the name "Brilliant."

Brilliant provided a loan of $1.8 million to FDI in order to purchase a $6 million apartment on Central Park South for personal use for Nirav Modi and his family.[230] In an email from Reena Shah to the Indian auditors dated July 13, 2017, Shah asks Kunal Patel to follow up with Ajay Gandhi to get loan confirmations for BBB Group and Brilliant Diamonds.  Patel then forwards the email to Gandi and states "Shyam will give email id tomorrow for follow up (Brilliant Diamond and BBB)."[231]

### iv.    Fine Classic FZE

Fine Classic FZE is a Hong Kong entity owned by Purvi Mehta, Modi's sister. According to Firestar Dubai employee Kurian Mathews, he coordinated with Shyam Wadhwa at the direction of Mihir Bhansali, a Firestar Hong Kong employee to form Fine Classic in 2014.[232] Mathews also appointed a former "office boy / driver" as manager of Fine Classic at Mihir

---

[229] Spreadsheet titled "Customer Details," undated (FIRE-REL0000403003.0001).
[230] Email chain between Nirav Modi, Ajay Gandhi and Mihir Bhansali, dated December 4, 2008 (FIRE-REL0000174545).
[231] Email from Kunal Patel to Ajay Gandhi, dated July 13, 2017 (FIRE-REL0000201061).
[232] ROI-MCA-00000437.

Bhansali's direction.[233]

In a document containing financial information for FDI, Fine Classic is listed as a related

party.[234] In a spreadsheet titled "Annexure A – Related Parties," Fine Classic was listed as an entity

owned or significantly controlled by key management personnel or their relatives.[235] It appears

this document was created for an audit of Firestar International Private Limited in India.

### C.    Anomalies in Debtors' Financial Reporting of Transactions With Shadow Entities

In addition to corroborating the allegations that the Shadow Entities are Modi-related shell

entities, the evidence obtained by the Examiner is consistent with the allegations by Indian

authorities that the Shadow Entities were created to facilitate and layer transfers of funds.

The Debtors' books and records reflect that a substantial portion of their business for the years

2011 and 2017 was with the Shadow Entities.   Based on the Examiner's forensic investigation,

the Debtors received approximately $155.1 in cash transfers from Shadow Entities during the

relevant period, and paid approximately $72.4 out to Shadow Entities, for a total stated aggregate

transaction value of $227.5 million.[236] The vast majority of these transactions involved the

purchase and sale of tens of millions of dollars-worth of loose diamonds per year, which is not

consistent with Debtors' stated business purpose.

Notably, the sales volume reported in FDI's tax returns and A. Jaffe's tax returns cannot

be reconciled with the sales volume reflected in Debtors' sales journals in all years.   One of the

most stark discrepancies is provided by A. Jaffe's books for fiscal year ending March 2012.  In its

tax return for that year, A. Jaffe reported $9,090,661 in sales, primarily from its stated business of

---

[233] *Id.*
[234] Spreadsheet titled "FD Inc. Reporting Pack 2012-15 information updated April 21, 2016" (FIRE-REL0000235265.0003).
[235] Spreadsheet titled "Annexure A – Related Parties" (FIRE-REL0000209627.0002).
[236] The Examiner's team analyzed A. Jaffe account ending 2460 and FDI account ending 3004 for activity involving a Shadow Entity and over a $500,000 threshold and recorded those and surrounding transactions.

finished jewelry sales. Its sales journals, however, reflected $49,628,873 in total sales, of which $38,845,724 were classified as loose diamonds. The breakdown of A. Jaffe's reported sales for FY 2012, as reflected in its sales journals, is:

| Column "SA" | Count | Sum of $ Amount |
|---|---|---|
| Accomodation | 1,046 | 48,495 |
| Anniversary DAR | 55 | 300,835 |
| Beautiful Beginnings | 17 | 56,874 |
| Bridal Shows | 14 | 12,735 |
| Closeout | 5 | 7,626 |
| DAR | 27 | 156,516 |
| DAR modified | 81 | 365,833 |
| Donation | 15 | 31,402 |
| Employee Sale | 8 | 28,981 |
| Heritage Modified | 4 | 25,896 |
| Loose Diamond | 66 | 38,845,724 |
| Melting | 9 | 765,503 |
| Men's DAR | 19 | 115,204 |
| Other | 115 | 735,913 |
| Regular stock | 524 | 2,877,876 |
| Reorder | 128 | 554,822 |
| Repair | 357 | 57,234 |
| Special | 3,123 | 4,637,135 |
| Standard Heritage | 4 | 4,270 |
| **Total** | **5,617** | **49,628,873** |

Of the 19 categories of sales making up the approximately $49.6 million total, more than $38.8 million were categorized as "loose diamond" sales. To date, and limited by the information and time available to the Examiner's team, more than $29.5 of these loose diamond sales have been traced to Shadow Entities. Notably, the highest level of total sales reported by A. Jaffe on its tax return for any year during 2011 – 2017 is $21,904,545, in 2017.

The Examiner's team asked the Debtors' CFO for an explanation of the approximately $40 million discrepancy between A. Jaffe's sales journals and tax returns for FY 2012. The Debtors' CFO was unable to offer a coherent explanation. Moreover, despite repeated attempts, Firestar employees have been unable to explain to the Examiner's team how the Debtors arrived

at the numbers reported in the tax return. [237]

The sales journals of FDI cannot be reconciled with its tax returns for the entire period
2011 – 2017.  As detailed below, FDI's sales journal reflected a total of $350 million more in sales
than were evinced in its tax returns for the same period.  The Examiner has been unable to obtain
a credible explanation for this discrepancy.

The Examiner analyzed the Debtors' bank records for, among other things, consistency
with reported information in either their sales journals or tax returns.  The Examiner did not have
access to A. Jaffe's complete bank account records for FY 2013. However, for each of the other
years during this period A. Jaffe's bank records show between about $30,000,000 and $49,000,000
in cash flowing in and out of A. Jaffe's while the beginning and ending account balance for each
year remains minimal, between $140,000 and $260.000.

| | A. Jaffe, Inc. Sales and Profitability vs. Bank Statement Activity | | | | | |
| FYE 3/31: | Gross Sales Per Sales Journals | Gross Sales Per Tax Returns | Gross Profit Per Tax Returns | Taxable Income Before NOL Per Tax Returns | Bank Statement Debits | Bank Statement Credits |
|---|---|---|---|---|---|---|
| 2012 | $ 49,628,873 | $ 9,090,661 | $ 1,210,841 | $ (5,387,199) | $ (38,832,026) | $ 38,301,847 |
| 2013 | 18,259,257 | 17,852,268 | 2,311,934 | (764,870) | (3,626,710) | 3,818,933 |
| 2014 | 21,921,391 | 21,904,545 | 3,039,394 | 976,300 | (35,691,359) | 35,465,815 |
| 2015 | 11,219,613 | 11,259,695 | 3,195,215 | (495,204) | (29,658,938) | 29,601,007 |
| 2016 | 21,230,523 | 20,877,218 | 4,370,195 | 221,682 | (49,442,114) | 49,438,796 |
| 2017 | 19,652,106 | 19,217,725 | 4,939,527 | 1,478,379 | (46,101,292) | 46,245,197 |
| 2012 - 2017 | $ 141,911,763 | $ 100,202,112 | $ 19,067,106 | $ (3,970,912) | $ (203,352,439) | $ 202,871,594 |

FDI's bank records similarly reflect cash inflows and outflows each year that are double or
sometimes triple the volume of sales reported on their tax returns.   In contrast to A. Jaffe, at no
point during the relevant period does the volume of sales reported in FDI's sales journals match

---

[237] As recently as August 17, 2018, the Debtors remaining financial professionals (including one of the professionals
that provided the previous numbers) attempted to provide an explanation between the sales journal number provided
and the tax return.  They provided yet a new sales journal number that was materially different than the previously
supplied sales journal number.  This new number also did not match the tax return.

that reported in its tax returns. The discrepancy ranges from a shortfall on FDI's 2016 tax returns of $9 million to a difference of more than $79 million – more than the total $64,016,991 in sales reported on the return—for FY 2012. Firestar employees were unable to explain how the sales volume reported on the tax returns were calculated.

As with A. Jaffe, the Examiner did not have access to a complete set of bank records for FDI for FY 2013. As a finished jewelry retailer that reported a maximum of $69 million in sales on its tax returns during the relevant period, FDI's pattern of cash transfers of more than double this amount annually is unusual and suggestive of suspicious activity.

| FYE 3/31: | Firestar Diamond, Inc. Sales and Profitability vs. Bank Statement Activity | | | | | |
| | Gross Sales Per Sales Journals | Gross Sales Per Tax Returns | Gross Profit Per Tax Returns | Taxable Income Before NOL Per Tax Returns | Bank Statement Debits | Bank Statement Credits |
|---|---|---|---|---|---|---|
| 2012 | $ 143,760,998 | $ 64,016,991 | $ 7,754,523 | $ 434,714 | $ (200,490,596) | $ 200,576,829 |
| 2013 | 95,923,998 | 60,363,156 | 7,489,410 | 106,924 | (128,039,152) | 128,359,814 |
| 2014 | 110,279,603 | 63,498,768 | 8,039,584 | 205,344 | (173,779,476) | 173,913,854 |
| 2015 | 81,792,312 | 56,978,320 | 6,747,178 | (920,265) | (172,081,424) | 171,836,915 |
| 2016 | 69,631,791 | 60,948,200 | 6,372,066 | (122,427) | (202,301,776) | 202,167,743 |
| 2017 | 86,271,944 | 69,264,575 | 6,317,014 | (1,171,842) | (196,406,121) | 196,753,334 |
| 2012 - 2017 | $ 587,660,647 | $ 375,070,010 | $ 42,719,775 | $ (1,467,552) | $ (1,073,098,545) | $ 1,073,608,490 |

In addition, the Examiner's team reviewed the Debtors' bank accounts for cash transfers made to Shadow Entities, and compared those transfers to the sales transactions reported in the Debtors' sales journals. Specifically, the Examiner's team analyzed the Debtors' available bank statements for the period 2011 to 2017 and identified the source and recipient of each transfer exceeding $500,000.[238] In total, FDI and A. Jaffe made a combined $71,352,387 in disbursements to the Shadow Entities, and received $155,124,064 in deposits for a total of $227,476,451 in cash transactions between the Debtors and the Shadow Entities. A breakdown of these transactions by Debtor is below:

---

[238] The Debtors' bank statements from the period 2011 to 2017. This data is based on incomplete bank statements for the calendar years 2011 and 2012. The Examiner's team only analyzed transactions over $500,000 and recorded those and surrounding transactions.

| A. Jaffe, Inc. [FY 2011 - 2018] | | |
|---|---|---|
| Shadow Entity | Debits/Disbursements | Credits/Receipts |
| Diamonds R Us | $ - | $ 3,746,576 |
| Empire Gems FZE | - | 12,097,627 |
| Eternal Diamonds | 1,900,000 | - |
| Fancy Creations | - | 1,265,752 |
| Neeshal Merchandising | - | 406,853 |
| Pacific Diamonds | 11,700,036 | 9,985,498 |
| Radhashir Jewelry | 1,858,110 | - |
| Solar Exports | - | 6,042,232 |
| Stellar Diamonds | - | 2,066,734 |
| Universal Fine Jewelry | - | 1,399,962 |
| Vista Jewelry | - | 1,637,774 |
| Total | $ 15,458,146 | $ 38,649,008 |

| Firestar Diamond, Inc. [FY 2011 - 2018] | | |
|---|---|---|
| Shadow Entity | Debits/Disbursements | Credits/Receipts |
| Auragem | $ 3,351,496 | $ 3,437,706 |
| Brilliant Diamonds | 17,315,979 | 4,938,578 |
| Diagems | 647,432 | |
| Diamonds R Us | 4,798,825 | 11,860,112 |
| Empire Gems FZE | 733,000 | 3,364,151 |
| Eternal Diamonds | | 1,869,448 |
| Fancy Creations | 4,924,528 | 12,315,735 |
| Neeshal Merchandising | 420,479 | 752,894 |
| Pacific Diamonds | 12,311,942 | 14,858,147 |
| Radhashir Jewelry | 168,760 | |
| Solar Exports | 3,714,175 | 7,307,982 |
| Stellar Diamonds | 48,170 | 7,571,383 |
| Tri Color Gems | 6,019,701 | 4,158,979 |
| Unique Diamond | 300,000 | 15,354,666 |
| Universal Fine Jewelry | 1,728,000 | |
| Vista Jewelry | | 4,628,588 |
| World Diamond | | 21,502,243 |
| Total | $ 56,482,487 | $ 113,920,612 |

| Debtor Entity | Debits/Disbursements | Credits/Receipts |
|---|---|---|
| A. Jaffe, Inc. | $ 15,458,146 | $ 38,649,008 |
| Firestar Diamond, Inc. | $ 56,482,487 | $ 113,920,612 |
| A. Jaffe & FDI Total | $ 71,940,633 | $ 152,569,620 |

68

Finally, the Examiner analyzed Debtors' shipping records to determine whether they corroborated either the volume of sales reported in Debtors' tax returns or sales journals. Bonded diamond courier Malca-Amit maintained an independent transaction log of diamond shipments involving the Debtors for the majority of the relevant period, specifically fiscal years 2012 - 2017.[239] This log generally corroborates that the Debtors contemporaneously reported $129,000,689 in sales to Shadow Entities during this period for the purposes of obtaining insurance, versus a reported $131,939,628 sold per the sales journal during the corresponding period.

Below is a breakdown of Malca-Amit's shipment records for each year as compared to the sales recorded in the sales journals, both in shipments to Shadow Entities from A. Jaffe and FDI, and shipments from Shadow Entities.

| | A | B | C | D = B + C | E = D - A |
|---|---|---|---|---|---|
| Fiscal Year | Export to Shadow Entity per Malca-Amit | FDI Sale to a Shadow Entity | A. Jaffe Sale to a Shadow Entity | Combined FDI/Jaffe Sales to Shadow Entity per Sales Journals | Difference between Combined Shadow Entity Sales and Export per Malca-Amit |
| 2012 | 66,860,309 | 41,441,526 | 29,575,927 | 71,017,453 | 4,157,144 |
| 2013 | 15,888,166 | 9,127,246 | 6,760,569 | 15,887,815 | (351) |
| 2014 | 16,874,084 | 10,146,736 | 5,068,012 | 15,214,748 | (1,659,336) |
| 2015 | 4,960,516 | 4,893,335 | 66,610 | 4,959,945 | (572) |
| 2016 | 15,264,425 | 15,614,474 | 218,355 | 15,832,829 | 568,404 |
| 2017 | 9,153,189 | 9,015,838 | 11,000 | 9,026,838 | (126,350) |
| Total | $ 129,000,689 | $ 90,239,156 | $ 41,700,473 | $ 131,939,628 | $ 2,938,940 |

**Notes:**

[1] Table excludes exports from Fantasy, Inc. in order to make a direct comparison to the Sales Journal analysis, which includes FDI and A. Jaffe only.

---

[239] The Malca-Amit log began in calendar year 2011, but because these logs did not capture Debtors' FY 2011, which began in April 2010, it is not included in this analysis.

This comparison suggests that the Debtors in fact purported to ship loose diamonds to the Shadow Entities at a volume consistent with that recorded in their sales journals, regardless of what was reported on their tax return. Notably, the shipping records do not perfectly correspond to the sales journals. There is evidence that on at least some occasions, diamonds shipped by the Debtors may have been uninsured, did not exist or were incorrectly valued. For example, the investigation disclosed examples of transactions in which Debtors purported to ship high value stones not via a bonded courier, but via Federal Express. On February 24, 2011, FDI exported a 17.28 carat Emerald Fancy Intense Yellow VVS2 diamond to Fancy Creations Co. Limited, priced at $1,728,000. The invoice is billed to Fancy Creations Company Limited, and identifies the shipper as FedEx.[240] FDI's records confirm a diamond valued at $1,728,000 was indeed shipped via FedEx.

Mr. Palmieri confirms that industry practice is never to ship gems of this value via Federal Express, which insures packages only up to $75,000 to $150,000 at most, and that there is no legitimate business reason to ship diamonds worth millions of dollars without obtaining appropriate insurance. He also stated that the value of the diamond at that time was approximately $28,000 to $30,000 per carat or $518,400 at auction for the stone.

To the extent the Shadow Entities existed to perpetuate the alleged LOU Diamond scheme, as alleged by the Indian authorities, it appears that hundreds of millions of dollars of transactions did run through the Debtors in a pattern and through processes that were consistent with the Alleged Fraudulent Circumstances. This conclusion is supported both by diamond sales to Shadow Entities reported in Debtors' sales journals (totaling $213,804,929) as corroborated by shipping records, and reported cash transfers to and from the Shadow Entities (totaling $227,476,451).

### D.    Debtors' Loose Diamond Transactions with Shadow Entities Appear

---

[240] Invoice from Firestone, Inc. to Fancy Creations Co. Ltd., dated February 24, 2011 (FIRE-REL0002673818.0001).

## Fraudulent

Despite the volume of loose jewelry sales reported by Debtors in their sales and shipping documents, Sumay Bhansali, the CEO of A. Jaffe told the Examiner under questioning that A. Jaffe sold very few loose diamonds pre-petition, advising that he had learned of many such transactions only after the bankruptcy filing on account of the loss of Firestar India as its supplier.[241] Internal records of the Debtors confirm that bulk transactions of loose diamonds with Shadow Entities were recorded and tracked separately from transactions with retail customers. For example, in 2012, A. Jaffe appeared to create and maintain two sets of financial sales records: "core" financials, which did not include the loose diamond sales and "regular" financials, which did. The difference between the reported gross sales of $9,090,661 on A. Jaffe's tax return and the $49,628,873 reflected in A. Jaffe's sales journals for 2012 was described by CFO Ajay Gandhi as the difference between "core" and "regular" financials.[242] A. Jaffe's sales to Shadow Entities in FY 2012 was reported in its sales journals as totaling $29,575,927. This number was generally supported by A. Jaffe's bank records and shipment logs from bonded diamond courier Malca-Amit, whose log reflects $28,408,545 worth of loose diamonds being shipped from A. Jaffe to various Shadow Entities—as well as $17,390,358 worth being shipped from Shadow entities to A. Jaffe.[243]

Based on the Examiner's interview of multiple employees and a review of business records, it has been established that the Debtors regularly received international shipments of what were reported to be loose diamonds, often having invoice amounts driven by expensive fancy colored diamonds, and that these diamonds were shipped back out within three days or less, often to the

---

[241] Interview of Sumay Bhansali, May 17, 2018.
[242] Interview of Ajay Gandhi, June 13, 2018.
[243] *See* Malca-Amit Transaction Log for Debtors and Other Modi Entities.

71

country from which they originated. As discussed below, no employee reported examining a single diamond in connection with these transactions over the entire seven year period.[244] This process stands in stark contrast to the same employees' description of their ordinary inventory practices for transactions with retail customers like Zales or J.C. Penny.

### 1. Regular sales and inventory practices for transactions with retail customers.

According to interviews with relevant employees at FDI and A. Jaffe, and as corroborated by documents, the process for a retail sale transaction is as follows. It starts when a customer places an order with customer service through the phone or email. The order is processed by customer service and entered into the inventory system, then emailed to the sourcing department in India and to the debtor entity. The customer service department then creates a sales order. The sourcing department creates a purchase order for the purchase of the finished product by the Debtor, generally from the Firestar India factory. When a Debtor receives the finished goods, they are added to the Debtor's inventory by the back office in India, working for the Debtors.[245] The receiving department in New York receives the finished goods from India. Importantly, the receiving department removes the contents of the package, checks the packing slip with each item in the package, scans each item from the package for quality control and then scans as completed and "ready to ship."[246] The receiving department also creates the sales order invoice for the customer.

### 2. Sales and Inventory Practices for Sham Transactions with Shadow Entities

---

[244] Interview of Rebecca Chow, May 30, 2018.

The Examiner identified that Firestar affiliates in India and Belgium regularly sent the Debtors bulk fancy loose diamonds accompanied by email instructions to export them immediately upon receipt to either the Modi Firms in India or certain Shadow Entities at prices and quantities that Firestar India defined.[247]   Packing slips and invoices for the subsequent exports often accompanied these email instructions.[248]   Sandeep Mistry, a Firestar India employee who doubled as the Owner/Manager of World Diamond, a Shadow Entity, sent most of these emails.[249]   Mistry, who has been charged in India in connection with the fraud, worked under Mihir Bhansali, who ultimately controlled the remittances and imports and exports of goods with many of the Shadow Entities and Firestar entities.[250] The Debtors' employees typically executed the instructions.[251]   As such, the diamonds would only remain with the Debtors for a few days before being exported back to India, Dubai, or Hong Kong.

According to employee interviews, and corroborated by available records, employees processed these shipments as follows:  The diamond department received an email from the back office in India containing instructions, shipping documents and invoices for a shipment of loose diamonds. [252]   The instructions would include the originating entity that sent the diamonds and how the diamonds should be allocated for subsequent shipment outside the U.S.  The diamonds were then sent from the Debtors in New York to either an overseas Firestar entity or a Shadow Entity.

According to Debtors' diamond division and shipping/receiving employees, Rebecca

---

[247] Interview of Rebecca Chow, June 1, 2018.
[248] *Id.*
[249] ROI-MCA-00000430-441; Email chain and attachments between Rebecca Chow, Evelyn Kosiec, Connie Wong, M. Patel, and Sandeep Mistry, dated September 13, 2011 (FIRE-REL0000736349; FIRE-REL0002249979).
[250] ROI-MCA-00000430-441.
[251] Email from Sandeep Mistry to Rebecca Chow and Manish Zalawadia dated October 3, 2011(FIRE-REL0000737527).
[252] Interview of Connie Wong, May 29, 2018.

Chow, Connie Wong, and Evelyn Kosiec, the imports consisted of small metal boxes containing

diamonds wrapped in opaque parcel paper.[253]  The paper had descriptions of the diamonds (number

of diamonds and total carats) apparently made by the exporter.[254]  Chow informed the Examiner

that she and her team would remove the packets from the metal container but leave the parcel paper

wrapping intact.[255]  Chow stated that she did not open the parcel paper because doing so would

open her team up to liability should anything happen to the inventory.[256]  Thus, the employees

verified the content of the imports solely by reading the handwriting on the paper and cross-

referencing to the invoice/packing list received with the shipment.[257]  Unlike imports of jewelry

for retail sale, which are entered individually into inventory, Chow and her team would inventory

these parcels at a bulk carat and value without opening the individual packets.[258]  They would not

track these diamonds individually because they were shipped out almost immediately upon receipt.

[259]  Once inventoried, Chow's team would allocate the diamonds per Firestar India's instructions

and ship them to their respective recipients.[260]

### 3. Evidence that the Debtors "Round-Tripped" Loose Diamonds Across India EZs, UAE EZs, and Hong Kong

Circular trading, also known as "round-tripping," occurs when the same goods, in this case

diamonds, are traded repeatedly to give the appearance of multiple, distinct transactions.

The Examiner has obtained evidence of a number of transactions that appear to constitute

round-tripping of loose diamonds among the Firestar Global Entities, Modi Firms, and the Shadow

---

[253] *Id.*

[254] *Id.*

[255] Interview of Rebecca Chow, May 30, 2018.

[256] Interview of Rebecca Chow, June 1, 2018.

[257] *Id.*; Interview of Evelyn Kosiec, May 29, 2018.

[258] Interview of Rebecca Chow on June 1, 2018.

[259] Interview of Rebecca Chow, June 1, 2018.

[260] *Id.*; email chain and attachments between Rebecca Chow, Evelyn Kosiec, Connie Wong, M. Patel, and Sandeep Mistry, dated September 13, 2011 (FIRE-REL0000736349; FIRE-REL0002249979); Interview of Ajay Gandhi, July 26, 2018.

Entities in the EZ. Specifically, the Examiner reviewed numerous Debtor export invoices and packing lists for diamond transactions that contained expensive fancy-color loose diamonds[261] showing the same fancy color diamonds appear in multiple shipments among the Debtors, international Firestar companies, and the Shadow Entities. These diamonds have a high and subjective value, and the shipments at issue often exceeded $1 million.[262]

Notably, the Examiner did not have access to a substantial portion of the Debtors' inventory packing slips, making a complete analysis impossible. The Debtors produced packing slips for A. Jaffe only, although the Examiner was able to locate a sampling of other packing slips from FDI as indicated below. Many of the Debtors' packing slips described diamonds that were not sufficiently distinct to perform any analysis, while others lacked sufficient descriptions to identify the value of the diamonds.

None of the imports or exports reviewed included references to certifications attesting to characteristics such as regarding quality, size, finish, or grade. The diamond expert explained that such certifications accompany virtually all valuable fancy-colored diamond transactions[263] if for no other reason than a certification confirming a diamond has not been treated and is not synthetic adds value to any transaction.[264] The exclusion of such certifications among the loose diamond transactions that the Examiner analyzed is an independent red flag suggesting a lack of legitimate business purpose. Despite the lack of certifications attached to the fancy-colored diamonds in the loose diamond transactions reviewed, the distinctiveness of the diamond descriptions and carat amounts in the invoices and packing slips provided the Examiner with a high degree of confidence

---

[261] Examples of invoices that were comprised mainly of expensive, fancy loose diamonds can be found at FIRE-REL0002641611; FIRE-REL0002249979; FIRE-REL000736349; FIRE-REL0000684565.002; FIRE-REL0001837926; FIRE-REL0000737723.001; FIRE-REL0002249982; FIRE-REL0000727922.001; FIRE-REL0002249993; and FIRE-REL0000224777.0001.
[262] Angelo Palmieri, President, Gemprint Corp.; COO GCal Inc.
[263] *Id.*
[264] *Id.*

that certain "high-value" fancy-colored diamonds were in fact being round-tripped.  The diamond expert corroborated that this sampling of diamonds is likely round-tripped or non-existent given exaggerated prices and the likelihood that the same diamonds were used in connections with multiple transactions.  Moreover, based on the market at the time of the transactions, the expert explained the volume of such diamonds from one entity not well known for their trading in fancy-colored diamonds could not exist in their market to generate as many sales.[265]  In his opinion, the values for over ten of the specific diamond descriptions across multiple invoices he reviewed should have been hundreds of percent lower that listed in the shipments.[266]

The Examiner has identified several specific diamonds that appear to have been round-tripped in 2011-12.[267]  The Examiner's investigation has determined that these transactions are consistent with the LOU scheme alleged by the Indian authorities as being used to inflate diamond inventory and accounts receivables artificially, to justify the need for LOU financing, and to create purchases and sales to validate the movement of money obtained through fraudulent LOUs.

### i.    Fancy Vivid Yellow Orange Cushion Cut SI1 - 3.27 carats

The Debtors reportedly exported a 3.27 carat Fancy Vivid Yellow Orange Cushion Cut SI1 diamond three times and imported it once between August 8 and September 13, 2011, a period of five weeks.  According to the diamond expert, between January 1, 2011 and June 30, 2018, only one diamond matching these characteristics was sold internationally at public auction.[268]  The value at the relevant time approximated $188,000, [269]

---

[265] *Id.*

[266] *Id.*

[267] The Examiner's forensic accountants could not trace diamonds to round-tripping in later years because the packing lists did not contain diamonds unique enough to say with certainty that the diamonds were round-tripped. In later years the diamonds were mostly white diamonds with no unique characteristics.  The Examiner also did not receive FDI's invoices and packing lists.

[268] Angelo Palmieri, President, Gemprint Corp.; COO GCal Inc.

[269] *Id.*

Records reviewed indicate that the instructions on how to move the diamond came from

Firestar India employee Sandeep Mistry[270] to FDI stating "Please Ship Attached as per below

Instructions."[271]  The email from India came with a spreadsheet identifying each diamond in the

shipment and the destination to which it was to be shipped from FDI.[272]  Invoices for these

exports accompanied the spreadsheet.  The documents indicate that on August 8, 2011, FDI (then

Firestone, Inc.) sold the stone to Fancy Creations Company, Ltd.[273] from Firestone, Inc. (now,

FDI) for $1,098,802.[274]  Approximately three weeks later, Solar Exports, a Modi Firm, exported

the diamond to FDI for $183,087—approximately $900,000 less, although much closer to its

actual value.[275]  Six days later, FDI exported the diamond back to Fancy Creations Company,

Ltd for $1,156,043, now in excess of the original inflated price.[276]  Finally, two weeks later, A.

Jaffe sold it to Sandeep Mistry's company, World Diamond for $1,218,991.[277]

| # | Total Invoice Amount | Date | Consignee/ Buyer | Consignor/ Seller | Description | Carats | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| 1 | $ 1,653,015 | 8/8/2011 | Fancy Creations Company Ltd. | Firestar Diamond, Inc. | FANCY VIVID YELLOW ORANGE  CUSHION CUT SI1 | 3.27 | $ 336,025 | $ 1,098,802 |
| 2 | $ 1,824,172 | 8/24/2011 | Firestar Diamond Inc. | Solar Export | NATURAL FANCY VIVID YELLOW ORANGE CUSHION SI1 | 3.27 | $ 55,990 | $ 183,087 |
| 3 | $ 1,475,353 | 8/30/2011 | Fancy Creations Company Ltd. | Firestar Diamond, Inc. | FANCY VIVID YELLOW ORANGE  CUSHION CUT SI1 | 3.27 | $ 353,530 | $ 1,156,043 |
| 4 | $ 1,384,179 | 9/13/2011 | World Diamond Distribution FZE | A. Jaffe, Inc. | FANCY VIVID YELLOW ORANGE  CUSHION CUT SI1 | 3.27 | $ 372,780 | $ 1,218,991 |

The Examiner matched these transactions to the internal FDI and A. Jaffe sales journals, which

---

[270] Mistry doubled as an officer/manager of World Diamond Distribution FZE, a Shadow Entity. Sandeep Mistry was an employee at an overseas Firestar entity and supervised remittances and exports and imports of goods to and from many of the Shadow Entities. Mistry also provided input to Bhansali regarding who to appoint as managers, and directors for Shadow Entities. ROI-MCA-00000430-441; *see* ED Complaint.

[271] *Id.*

[272] Invoice of consignment to Fancy Creations Company, Ltd. from Firestone, Inc. (FIRE-REL0002641611.001).

[273] A Shadow Entity.

[274] Invoice of consignment to Fancy Creations Company, Ltd. from Firestone, Inc. (FIRE-REL0002641611.001).

[275] Spreadsheet containing export documents for Firestar Diamond, Inc. to SDC Designs LLC, Fancy Creations Company Ltd. and Eternal Diamonds Corporation Ltd., dated August 23, 2011 (FIRE-REL0002249979).

[276] *Id.*

[277] Email from Manish Patel to Rebecca Chow, dated September 13, 2011 (FIRE-REL000736349);  Export from A. Jaffe to World Diamond Distribution, dated September 13, 2011 (FIRE-REL000736349.001).

indicated that the diamond transfers occurred, and that the Debtors booked them improperly as legitimate sales.[278]

### ii.  Fancy Intense Pink Emerald Cut SI2 - 1.04 carats

The Debtors reportedly exported a 1.04 carat Fancy Intense Pink Emerald Cut SI2 twice and imported it once within six-weeks.  The diamond's first trip occurred on August 19, 2011, Firestar India sent it to FDI for $608,400.[279]  As with the 3.27 carat Yellow Orange Cushion Cut, Sandeep Mistry sent shipping instructions and a spreadsheet accompanied by invoices created in India.[280]  Consistent with Mistry's instructions, FDI sold it to SDC Designs LLC for $642,200.[281]  Without any sign of a return shipment to the Debtors, A. Jaffe shipped the same diamond one month later to Diamonds 'R' Us for $682,760.[282]

| # | Total Invoice Amount | Date | Consignee/ Buyer | Consignor/ Seller | Description | Carats | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| 1 | $ 738,711 | 8/19/2011 | Firestar Diamond, Inc. | Firestar Diamond International Private Limited (FDIPL) | Fancy Intense Pink Emerald Cut SI2 | 1.04 | $ 585,000 | $ 608,400 |
| 2 | $ 1,824,985 | 9/1/2011 | SDC Designs LLC | Firestar Diamond, Inc. | Fancy Intense Pink Emerald Cut SI2 | 1.04 | $ 617,500 | $ 642,200 |
| 3 | $ 1,921,079 | 10/4/2011 | Diamonds "R" Us | A. Jaffe, Inc. | Fancy Intense Pink Emerald Cut SI2 | 1.04 | $ 656,500 | $ 682,760 |

These shipments were recorded in the Debtors' sales and purchase journals.[283]  According to the diamond expert, between January 1, 1981 and June 30, 2018, at international auction, there haven't been any emerald cut, fancy intense pink SI2 diamonds greater than 1 carat.  The only comparable stone was less than 1 carat.  In 2011, the expert estimates that the maximum value of

---

[278] See Firestar Diamond Sales Journal for 2011; A. Jaffe, Inc. Sales Journal for FYE 3/31/2012.
[279] Spreadsheet containing export documents for Firestar Diamond, Inc. to SDC Designs LLC, Fancy Creations Company Ltd. and Eternal Diamonds Corporation Ltd., dated August 23, 2011 (FIRE-REL0002249979).
[280] Id.
[281] Id.
[282] Email from Manish Patel to Rebecca Chow, dated October 4, 2011 (FIRE-REL0000737723); Spreadsheet containing consignment document for A. Jaffe to Diamonds 'R' Us (FIRE-REL0000737729.0001).
[283] Firestar Diamond Inc. Purchases Journal for 2011 and Firestar Diamond Sales Journal for 2011.

this stone would have been $300,000 per carat.

As detailed below, the Examiner uncovered, with BDO (India), six LOU's in which the Debtors were direct beneficiaries of the loaned funds.  Notably, the Examiner identified the final sale to Diamonds 'R' Us as part of a shipment made in connection with one of six LOUs issued in favor of the Debtors and alleged as part of the fraudulent LOU scheme. [284]

### iii.   Fancy Vivid Yellow Cushion VS1 - 15.55 carats

On two occasions, the Debtors exported a 15.55 carat Fancy Vivid Yellow Cushion VS1 diamond and imported it once over the course of approximately 27 days.  Records reveal that the diamond was shipped through FDI, Firestar India, a Modi Firm, and Shadow Entity Eternal Diamonds.

| # | Type | Total Invoice Amount | Identifiable Date | Consignee/ Buyer | Consignor/ Seller | Description | Carats | Rate | Amount | Change in Value from Previous Identification |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 [A] | Export | $ 1,499,736 | 8/3/2011 | Firestone Diamond Pvt. Ltd. | Firestar Diamond, Inc. | Fancy Vivid Yellow Cushion VS1 | 15.55 | $ 90,900 | $1,413,495 | $     - |
| 2 [B] | Import | $ 1,849,410 | 8/24/2011 | Firestar Diamond, Inc. | Solar Export | Fancy Vivid Yellow VS1 | 15.55 | $ 44,311 | $ 689,028 | $    (724,467) |
| 3 [A] | Export | $ 1,824,085 | 9/1/2011 | Eternal Diamonds Corporation Ltd. | Firestar Diamond, Inc. | Fancy Vivid Yellow Cushion VS1 | 15.55 | $ 80,390 | $1,250,065 | $      561,036 |

A – The date was obtained from the Invoice, the shipment instructions received by the Debtors, the file name recorded in the Relativity Document repository, and/or by agreeing the Total Invoice Amount to the Malca-Amit Transaction Log for Debtors and Other Modi Entities, if available.

B – The file name for FIRE-REL0002249979 is "Export from FSINC Date-23-AUG-11 (1) Rebccas.xlsx".  The "Master" tab of this file shows the breakout of the diamond imports received by Firestar Diamond, Inc. and the entities they are to be subsequently exported and shipped to.  Though the description of the diamond differs slightly in name, it is the only other diamond at 15.55 carats, and is further indicated to be sold to Eternal Diamonds Corporation, Ltd., which one week later.  Thus, it can be concluded to be the same diamond.  This file shows

---

[284] Malca-Amit Transaction Log for Debtors and Other Modi Entities; Malca-Amit Shipping documents for Diamonds-R-Us & A. Jaffe - $1,921,078.65 (Reference # 156-1296); BDO-00000480; Additional discussion on this LOU *infra*.

the diamond being invoiced by Solar Exports to Firestar Diamond, Inc. at a value considerably lower than other sales transactions.

On August 3, 2011, FDI sold the diamond to Firestar India for $1,413,495. Importantly, the Examiner identified this transaction as being tied to a fraudulently obtained LOU in which FDI was the listed beneficiary.[285]   Somehow, the diamond lost over 50% value and made its way to Solar Exports.   On August 24, 2011, Solar Exports shipped it to FDI for $689,028.[286]  And one week later, FDI exported the diamond to Eternal Diamonds, a Shadow Entity for an 82% markup, at, $1,250,065.[287]

The spreadsheet, which identified the source entity of each diamond, instructions as to the diamond's allocation, and invoices for subsequent exports, included this diamond.[288]  Furthermore, each of these purchases and sales was booked and tracked in the respective Debtors' journals.[289]

Although the Examiner does not have visibility into all the transfers, this diamond appeared in many Firestar-related documents from February 13, 2012 through August 21, 2012.   On February 13, 2012, Jigar Shah sent an email at the direction of Sandeep Mistry with directions "for Diamond Price and Export," including instructions to "Send [this diamond] to Eternal Diamond (HK) From Firestone" at a rate of $46,880 per carat and a total price of $728,984.[290]  Two days later, the diamond appeared to have been set on a gold pendent necklace priced at $933,000.[291]  Six months later, non-debtor US entity, Firestar International Inc.[292] reported the diamond in its

---

[285] Meetings with BDO (India), July 2018.
[286] Spreadsheet containing export documents for Firestar Diamond, Inc. to SDC Designs LLC, Fancy Creations Company Ltd. and Eternal Diamonds Corporation Ltd., dated August 23, 2011 (FIRE-REL0002249979).
[287] *Id.*
[288] *Id.*
[289] *See* Firestar Diamond Inc. Purchases Journal for 2011; Firestar Diamond Sales Journal for 2011.
[290] Email from Sandeep Mistry to Jigar Shah, dated February 13, 2012 (FIRE-REL0001241930); Attachment to email from Sandeep Mistry to Jigar Shah, dated February 13, 2012 (FIRE-REL0001241930.0001).
[291] Spreadsheet titled "Export" (FIRE-REL0001237056.0001).
[292] As mentioned above, Firestar International Inc. is the U.S. Firestar Entities' trading arm that sells one-off loose diamonds.

inventory valued at $728,984.[293]  Finally, on August 21, 2012, an email concerning the Firestar
International Inc. sales commissions noted the diamond was sold to the Shadow Entity Fancy
Creations Co., Ltd. for $838,332.[294]

### iv.    Princess Blue Diamond Intense SI1 – 0.72 carats

Originally, in October 2010, FDI sold a 0.72 carat Princess Blue Diamond Intense SI1
diamond to a Firestar Affiliate.  Over the course of seven days, FDI imported this stone from Solar
Exports for $52,113.96 and exported the same to SDC Designs LLC for $331,740.  From August
24, 2011 to August 30, 2011 this diamond experienced an almost 700% markup.  Finally, in
January 2012, A. Jaffe somehow came into possession of the stone and sold it to Shadow Entity
World Diamond.

| # | Total Invoice Amount | Date | Consignee/ Buyer | Consignor/ Seller | Description | Carats | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| 1 | $  252,000 | 10/1/2010 | Firestone Diamond Ltd. | Firestar Diamond, Inc. | PRINCESS BLUE DIAMOND INTENSE SI1 | 0.72 | $  350,000 | $  252,000 |
| 2 | $  1,824,172 | 8/24/2011 | Firestar Diamond, Inc. | Solar Export | PRINCESS BLUE DIAMOND INTENSE SI1 | 0.72 | $  72,381 | $  52,114 |
| 3 | $  1,824,985 | 8/30/2011 | SDC DESIGNS LLC | Firestar Diamond, Inc. | PRINCESS BLUE DIAMOND INTENSE SI1 | 0.72 | $  460,750 | $  331,740 |
| 4 | $  1,676,135 | 1/12/2012 | World Diamond Distribution FZE | A. Jaffe, Inc. | FANCY INTENSE GREEN BLUE PRINCESS SI1 | 0.72 | $  523,895 | $  377,204 |

A  The *Transaction Date* was obtained from the Invoice, the shipment
   instructions received by the Debtors and/or by agreeing the Total Invoice
   Amount to the Malca-Amit Transaction Log for Debtors and Other Modi
   Entities, if available.

B  The file name for FIRE-REL0002249982 is "FANCY INV 08-30-
   2011.xlsx".  The "Master" tab of this file shows the breakout of the diamond
   imports received by Firestar Diamond, Inc. and the entities they are to be
   subsequently exported and shipped to.  The Princess Blue Diamond Intense
   SI1 diamond is noted to be received from "Solar".  This listing shows the
   diamond being invoiced to Firestar Diamond, Inc. at a value considerably
   lower than other sales transactions.

---

[293] Email from Bhavesh Patel to Ajay Gandhi, dated August 4, 2012 (FIRE-REL0000173831); Attachment to email
from Bhavesh Patel to Ajay Gandhi, dated August 4, 2012 titled "Inventory Valuation," dated August 4, 2012 (FIRE-
REL0000173831.002).
[294] Email from Shyam Wadhwa to Ajay Gandhi, dated July 7, 2013 (FIRE-REL0000066693); Attachment to email
from Shyam Wadhwa to Ajay Gandhi, dated July 7, 2013, titled "Josh's commission income backup required for
select months" (FIRE-REL0000066693.001).

C   The transaction date and total invoice amount were agreed to the Malca-Amit Transaction Log for Debtors and Other Modi Entities.

D   The file name for FIRE-REL0000727922.001 is "Export from A Jaffe Date 11-Jan-2012 Final.xls".  The "Master" tab of this file shows the breakout of the diamond imports received by Firestar Diamond, Inc. and the entities they are to be subsequently exported and shipped to.  The Master tab lists a 0.72 carat Princess Blue Diamond Intense SI1 being sold from A. Jaffe, Inc. to World Diamond Distribution FZE.  The subsequent invoice of diamonds to be sold to World Diamond Distribution FZE by A. Jaffe, Inc. lists a 0.72 carat diamond with the description Fancy Intense Green Blue Princess SI1.  Though the description of the diamond differs slightly in name, it is the only other diamond at 0.72 carats, and can be concluded to be the same diamond.

Similar to the other round-tripped diamonds described above, a spreadsheet detailed instructions to ship the diamond.[295]  Separate shipping logs support the fact that said shipments occurred.[296]

## VII. FUNDS ALLEGEDLY OBTAINED THROUGH THE FRAUDULENT LOU DIAMOND SCHEME FLOWED THROUGH THE DEBTORS

Six of the LOUs that were issued as part of the Alleged Fraudulent Circumstances were issued for the benefit of the Debtors:  a Debtor was the exporting entity and direct beneficiary of the LOU funds.  The Examiner has confirmed that the funds issued in connection with each of these LOUs were received and deposited by the Debtors, and in each case were either returned to Firestar India or used by the Debtors or Shadow Entities.  In addition, the Examiner's team has traced funds generated by numerous of the relevant LOUs through the Debtors, who received the funds as transfers from one or more of the Shadow Entities.

Based on the results of the tracing analyses performed to date, it is likely that access to additional records, such as bank or other financial records for the Shadow Entities or bank and other Debtor records in India, would result in the identification of numerous additional funds that

---

[295] Spreadsheet containing export documents for Firestar Diamond, Inc. to SDC Designs LLC, Fancy Creations Company Ltd. and Eternal Diamonds Corporation Ltd., dated August 23, 2011 (FIRE-REL0002249979).
[296] Malca-Amit Transaction Log for Debtors and Other Modi Entities.

could be traced back to the alleged fraudulent LOU scheme.  Regardless, the evidence obtained

to date is sufficient to demonstrate that tens of millions of dollars obtained through allegedly

fraudulent LOUs flowed through the Debtors' accounts.  Moreover, the indicia of fraud evident

in Debtors' operations with Shadow Entities are present, and appear designed to enable, certain

relevant transactions.

### A.      Example of Fraudulent LOU Transaction Traced by the Examiner

The following transaction appears to be an example of the Debtors' involvement in the

alleged fraudulent LOU scheme. In this instance, an overvalued diamond appears to have been

round-tripped between two Modi entities for no purpose other than to obtain LOU financing.  This

fraudulent purpose is evinced by several indicators.  First, the diamond—a 1.04 carat Fancy Intense

Pink Emerald Cut SI2 diamond—appeared in three international transactions with the Debtors

within six weeks of each other, when no such diamond is known to have existed in the most

probable public auctions from June 1, 1982 and June 30, 2018.[297]  Second, this diamond was valued

at three different prices averaging $619,666 over the three purported transactions.  If such a

diamond existed, in 2011 the stone's maximum market value would have been $300,000 per carat,

approximately 50% its reported value.[298]  Third, the transaction consisted of a bulk export by A.

Jaffe of fancy colored loose diamonds,[299] which is not consistent with A. Jaffe's reported business.

Fourth, a related party requested the LOU naming A. Jaffe as the beneficiary for an amount greater

than 20% of A. Jaffe's reported fiscal year in 2012 sales,[300] which A. Jaffe immediately transferred

back to its Firestar affiliate. Finally, while the LOU was used to make a false shipment and to fund

---

[297] Angelo Palmieri, President, Gemprint Corp.; COO GCal Inc.
[298] *Id.*
[299] Malca-Amit Shipping Document Packet Including Invoice and Packing List for Export from A. Jaffe, Inc. to Diamonds 'R' Us.
[300] *See* Internal Revenue Service Form 1120: U.S. Corporation Income Tax Return: Synergies Corporation Synergies Corporation, tax year 2012. A. Jaffe's reported gross sales for fiscal year 2012 was $9.1 million.

Firestar and Modi, Diamonds 'R' Us repaid the LOU using a loan from another Indian bank. The specifics of this example are as follows.

A 1.04 carat Fancy Intense Pink Emerald Cut SI2 diamond was among a package of twenty-six fancy-colored loose diamonds that shipped on October 4, 2011[301] from A. Jaffe to Diamonds 'R' Us in India. Although A. Jaffe does not transact in bulk fancy colored loose diamonds for its business, it purported to do so in this case to transact with Diamonds 'R' Us, a related party.[302] Diamonds 'R' Us sought an LOU from PNB for $1,921,079 to purchase the stones.[303] Gokulnath Shetty, the PNB insider charged with aiding Modi in the Alleged Fraudulent Circumstances[304] authorized the issuance of this LOU at the PNB Brady House branch. He did not record the LOU in the CBS,[305] and Diamonds 'R' Us did not provide the required collateral.[306] PNB coordinated with its Hong Kong branch via SWIFT message, which deposited money into PNB's Deutsche Bank nostro account in New York, New York. PNB paid A. Jaffe from the nostro account on October 13, 2011 for exporting the diamonds.[307]

On the same day A. Jaffe received the $1,921,079 from the bank, it transferred $1,832,700 to L/C Collections, which, as noted above, is an HSBC payment mechanism that acts as an intermediary between transacting parties. The Firestar U.S. Entities would use this payment mechanism to pay overseas affiliates.[308] Per supporting documents received for these specific disbursements to L/C Collections, the LOU funds were sent to India for the benefit of Firestar

---

[301] Malca-Amit Transaction Log for Debtors and Other Modi Entities.
[302] Indenture of Partnership for Diamonds 'R' Us, dated May 10, 2000 (ROI-MCA-00000209).
[303] ED Complaint ¶ 11.4.
[304] CBI Charge Sheet ¶ 27.
[305] Meetings with BDO (India), July 2018; *see also* ED Complaint ¶ 6.25.
[306] Meetings with BDO (India), July 2018.
[307] A. Jaffe October 2011 bank statement for HSBC account ending in 2460.
[308] Interview of Ajay Gandhi, August 10, 2018 (Money from L/C Collections went to Firestar India 95% of the time, while it went to Firestar Belgium or Firestar Dubai for the remainder of the time.).

India entities.[309]   Thus, a Modi entity received the LOU money under the pretext of legitimate

transactions with HSBC and A. Jaffe.  The same diamond was purportedly transacted among Modi

entities in two other transactions within six weeks.

The Examiner determined with the help of BDO (India) that Diamonds 'R' Us did not

repay the LOU with money earned from the disposition of the diamonds.  Instead, it repaid the

nostro account, and ultimately, PNB with other misappropriated funds.  Firestar India obtained

packing credit loans, which are short-term working capital loans obtained by vendors to fulfill

upcoming orders of goods. These packing credit funds were improperly utilized, and were diverted

to Diamonds 'R' Us from Neeshal Merchandising, an Indian company controlled by Nirav Modi's

brother, to Diamonds 'R' Us on the due date of the outstanding LOU.[310]   The diagram below

identifies the movement of the money and the process by which the LOU was issued:

---

[309] HSBC Bill Retirement Advice for account ending in 2460, dated October 13, 2011 (IBCCOR383544MTN.pdf);
HSBC Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383543MTN.pdf); HSBC
Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383499MTN.pdf).
[310] Meetings with BDO (India), July 2018.



## B.   Debtor Involvement in Alleged LOU Diamond Scheme

In addition to six LOUs that have been identified as directly funding the Debtors, funds generated by an additional 11 LOUs have been traced indirectly to the Debtors. These seventeen LOUs are:

| # | Date of Receipt / Disbursement | US Debtor Who Received / Disbursed Funds | Amount Deposited | Amount Disbursed | Link to LOU / Packing Credit Funds |
|---|---|---|---|---|---|
| 1 | 3/8/2011 | Firestone, Inc. (Firestar Diamond Inc.) | $ 1,863,256 | $ - | Direct - US Debtors Exporters on LOU |
| 2 | 5/6/2011 | Firestar Diamond, Inc. | 1,858,219 | - | Direct - US Debtors Exporters on LOU |
| 3 | 8/22/2011 | Firestar Diamond, Inc. | 1,499,736 | - | Direct - US Debtors Exporters on LOU |
| 4 | 10/4/2011 | Firestar Diamond, Inc. | 1,803,249 | - | Direct - US Debtors Exporters on LOU |
| 5 | 10/4/2011 | Firestar Diamond, Inc. | 1,246,766 | - | Direct - US Debtors Exporters on LOU |
| 6 | 10/13/2011 | A. Jaffe, Inc. | 1,921,079 | - | Direct - US Debtors Exporters on LOU |
| 7 | 2/7/2013 | Firestar Diamond, Inc. | 931,965 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 8 | 2/11/2013 | Firestar Diamond, Inc. | 980,805 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 9 | 3/19/2013 | Firestar Diamond, Inc. | 191,501 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 10 | 3/19/2013 | Firestar Diamond, Inc. | 236,078 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 11 | 5/6/2013 | Firestar Diamond, Inc. | 21,394 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 12 | 3/27/2015 | Fantasy, Inc. | 1,552,451 | - | Indirect - Remittances to US Debtors Linked to Packing Credit Loan Funds |
| 13 | 9/24/2015 | Firestar Diamond, Inc. | - | 1,840,969 | Indirect - Disbursements from US Debtors Linked to LOU Repayment |
| 14 | 2/26/2016 | Firestar Diamond, Inc. | - | 1,192,106 | Indirect - Disbursements from US Debtors Linked to LOU Repayment |
| 15 | 3/3/2016 | Firestar Diamond, Inc. | - | 873,997 | Indirect - Disbursements from US Debtors Linked to LOU Repayment |
| 16 | 5/3/2016 | Firestar Diamond, Inc. | 399,962 | - | Indirect - Remittances to US Debtors Linked to LOU |
| 17 | 12/19/2016 | Firestar Diamond, Inc. | 599,972 | - | Indirect - Remittances to US Debtors Linked to LOU |
| | | | $ 15,106,432 | $ 3,907,071 | |

In addition, days before submitting his report, the Examiner was notified of evidence that funds from an additional LOUs alleged to have been issued in connection with the fraud scheme can be traced to the Debtors. While this is consistent with the Examiner's expectation, the Examiner's team has not independently verified this tracing analysis and the Examiner does not rely upon it for his conclusions.[311] The Examiner's analysis is limited to the seventeen LOUs identified above.

### 1.    LOUs of Which Debtors Were Beneficiaries

[311] On August 9, 2018, BDO (India) provided the Examiner with additional remittances to the U.S. Debtors that they linked to LOUs. The remittances consisted of $5,946,656 being sent to A. Jaffe and $3,752,480 being sent to FDI for a total of $9,699,136 in additional indirect LOU funds that passed through the U.S. Debtors. Due to the date these linked remittances were received by the Examiner, no analysis has been performed to verify the flow of funds into the U.S. Debtors.

In connection with the Chapter 11 Cases, BDO (India), on behalf of PNB, filed a Declaration[312] identifying five LOUs issued in favor of the Debtors that are alleged to be part of the LOU scheme.  Subsequently, BDO (India) identified a sixth LOU issued to FDI.[313]  The total value of these LOUs, which were remitted to the Debtors between March and October of 2011, is approximately $10 million.  Firestar India and the Modi Firms are identified as importers while the Debtors were identified as the exporters.  The chart below details these six LOUs.

| # | LOU Remittance Date | Importer | Exporter (US Debtor) | LOU Value Amount | Remitting Entity | Sender Institution | Overseas Corresponding Bank | Receiver Institution (PNB Nostro Account) | US Debtor Bank Account in Which Funds are Deposited |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 3/8/2011 | Firestone International Pvt. Ltd. | Firestone, Inc. (Firestar Diamond, Inc.) | $ 1,863,256 | Firestone International Pvt. Ltd. | Punjab National Bank, Brady House Branch, India | PNB - Hong Kong Branch | Deutsche Bank Trust Company, New York | Firestar Diamond, Inc. HSBC (006-06300-4) |
| 2 | 5/6/2011 | Solar Exports | Firestar Diamond, Inc. | $ 1,858,219 | Solar Exports | Punjab National Bank, Brady House Branch, India | Bank of India - Hong Kong Branch | Deutsche Bank Trust Company, New York | Firestar Diamond, Inc. HSBC (006-06300-4) |
| 3 | 8/22/2011 | Firestone Diamond Pvt. Ltd. | Firestar Diamond, Inc. | $ 1,499,736 | Firestone Diamond Pvt. Ltd. | Punjab National Bank, Brady House Branch, India | PNB - Dubai Branch | Deutsche Bank Trust Company, New York | Firestar Diamond, Inc. HSBC (006-06300-4) |
| 4 | 10/4/2011 | Firestone International Pvt. Ltd. | Firestar Diamond, Inc. | $ 1,803,249 | Firestone International Pvt. Ltd. | Punjab National Bank, Brady House Branch, India | Bank of India - Hong Kong Branch | Deutsche Bank Trust Company, New York | Firestar Diamond, Inc. HSBC (006-06300-4) |
| 5 | 10/4/2011 | Firestone Diamond Pvt. Ltd. | Firestar Diamond, Inc. | $ 1,246,766 | Firestone Diamond Pvt. Ltd. | Punjab National Bank, Brady House Branch, India | Bank of India - Hong Kong Branch | Deutsche Bank Trust Company, New York | Firestar Diamond, Inc. HSBC (006-06300-4) |
| 6 | 10/13/2011 | Diamonds-R-Us | A. Jaffe, Inc. | $ 1,921,079 | Diamonds-R-Us | Punjab National Bank, Brady House Branch, India | PNB - Hong Kong Branch | Deutsche Bank Trust Company, New York | A. Jaffe, Inc. HSBC (054-00246-0) |
| | | | | $ 10,192,303 | | | | | |

Of the six LOUs, four (highlighted in red) allegedly were not properly recorded in the CBS.[314]  As

---

[312] Declaration of Mansi Mehta (ECF No. 150).
[313] Meetings with BDO (India), July 2018.
[314] Meetings with BDO (India), July 2018.

a result, no record of the LOUs issued were recognized by PNB, no margin or collateral was posted by the importer, and no Bank Guarantee Number was generated. Another fraudulent characteristic of these transactions identified was the entering of LOU transaction information, the LOU Value Date, and the payment to the exporter occurred on the same day.[315]    In the normal course of business, such transactions would generally require two days to be completed.[316]    As discussed above, two of the diamonds reflected on the export packing lists related to certain of these LOUs appear to have been the subject of "round tripping," or circular trading.

### a.    Suspect transactions underlying LOUs

The Examiner reviewed available records relating to the transactions to determine the representation made to the banks about the underlying import/export transactions presented to obtain the LOU financing; to trace the flow of funds into the US debtor; and, to the extent possible, place these transactions within the context of the overall Modi fraud. The Examiner obtained invoices and packing lists for five of the six LOUs.[317]    Email instructions from India detailing shipping information were identified for three of the LOUs.[318]    Malca-Amit, a courier that specializes in the shipment of valuable items, was used by the US Debtors to export the diamonds to overseas entities in all six of the LOUs, and the Examiner independently confirmed these shipments to a Transaction Log provided by Malca-Amit.[319]

The applications for all six LOUs described the goods to be imported into India as "cut and polished diamonds."[320]    On the five invoices and packing slips available to the Examiner, the

---

[315] *Id.*

[316] *Id.*

[317] One invoice and packing list was obtained from the US Debtors and four were obtained via Relativity email searches.

[318] *See, e.g.,* email from Sandeep Mistry to Rebecca Chow and Manish Zalawadia dated October 3, 2011(FIRE-REL0000737527); *see also* packing list for export between Firestar Diamond, Inc. and Firestone Diamond Pvt. Ltd. (FIRE-REL0002249993); Packing list for export between Firestone, Inc. and Solar Export (FIRE-REL0002247437).

[319] Malca-Amit Transaction Log for Debtors and Other Modi Entities provided by Malca-Amit.

[320] LOU Application SWIFT Messages.

quantity of diamonds underlying the application ranged from four[321] to twenty-six loose diamonds, most of which were fancy colored.

The diamond expert noted that such shipments of diamonds were unusual due to the diamonds' high price and lower turnover in the market.[322]  The fancy colored loose diamonds that appeared on the invoices were overvalued and so large in quantity that the packing slips alone should have raised suspicion.  Taking, for example, the October 4, 2011 $1,246,765.60 LOU transaction between Firestar India and FDI, shipping records and related packing lists show that FDI shipped nineteen fancy colored diamonds to Firestar India with a total carat count of 73.70.[323]  The export from FDI to Firestar India occurred on September 19, 2011 for $1,246,765.60,[324] and FDI received the payment on October 4, 2011 with the LOU funds.  Two days before this export, FDI imported the same diamonds from Fancy Creations, a Hong Kong Shadow Entity, for $1,233,965.[325]  In other words, the records reflect a shipment of more than $1.2 million worth of the same loose diamonds from Hong Kong to the U.S., then to India over a period of two weeks among Modi-related entities for a $12,800 profit less shipping and other transactional costs that would further reduce the profit.

These transactions identified by the Examiner bear indicia of fraud.  The diamond expert reviewed three of the five invoices/packing slips as well as other documents accompanying the shipments.  He identified multiple items related to the transactions that are inconsistent with

---

[321] Malca-Amit Shipping Document Packet including Invoice and Packing List, $1,803,248.75 Transaction between Firestar International Pvt. Ltd. and Firestar Diamond, Inc., dated September 20, 2011 (FIRE-REL0002249985).

[322] Malca-Amit Shipping Document Packet including Invoice and Packing List, $1,921,078.65 Transaction between Diamonds-R-Us and A. Jaffe, Inc., dated October 4, 2011 provided by Debtors; As per Angelo Palmieri, President, Gemprint Corp.; COO GCAL Inc.

[323] Malca-Amit Shipping Document Packet including Invoice and Packing List, $1,246,765.60 Transaction between Firestone International Pvt. Ltd. and Firestar Diamond, Inc. dated September 20, 2011 (FIRE-REL0002249983).

[324] Malca-Amit Transaction Log for Debtors and Other Modi Entities provided by Malca-Amit.

[325] Invoice and Packing List from Fancy Creations Company Limited to Firestar Diamond, Inc., dated September 17, 2011 (FIRE-REL0002250136); Malca-Amit Transaction Log for Debtors and Other Modi Entities. The total stated value of the import of diamonds into Firestar Diamond, Inc, from Fancy Creations Company Ltd. was $1,972,744, but the specific diamonds used in the subsequent LOU transaction had a stated value of $1,233,965.

standard industry practices.   First, none of the LOU export invoices had references to certifications.[326]  Second, he confirmed it is unusual for large quantities of fancy colored diamonds to be sold at one time due to their high price tag and lower turnover rate in the market.[327]

Finally, the diamond expert stated that the prices of diamonds he reviewed appeared to be highly exaggerated, and based on the values of certain fancy colored loose diamonds at the time of these transactions, the rates and values here would be much lower.[328]  As shown below, the stated rates and values of three fancy colored diamonds identified on the packing list used in the LOU transactions appear to be artificially inflated by at least $705,562:

**Variance between Diamond Rates/Values on Debtor LOU Export Invoice and Independent Diamond Expert**

| | | | | A | | B | A - B |
|---|---|---|---|---|---|---|---|
| **Per LOU Export Invoice** | | | | | **Per Independent Diamond Expert** | | |
| **LOU Invoice** | **Diamond Description** | **Carats** | **Rate Per Invoice** | **Amount Per Invoice** | **Max Rate Per Expert** | **Amount Using Expert's Rate** | **Variance** |
| FSI - FDPL | Fancy Deep Pink Heart Cut I1 | 1.12 | $ 277,145.00 | $ 310,402.40 | $ 150,000.00 | $ 168,000.00 | $ 142,402.40 |
| A. Jaffe - DRUS | Fancy Intense Pink Emerald Cut S12 | 1.04 | $ 656,500.00 | $ 682,760.00 | $ 300,000.00 | $ 312,000.00 | $ 370,760.00 |
| A. Jaffe - DRUS | Fancy Intense Purplish Pink Radiant S12 | 0.52 | $ 505,000.00 | $ 262,600.00 | $ 135,000.00 | $ 70,200.00 | $ 192,400.00 |
| | | | | | | | $ 705,562.40 |

These anomalies identified by the diamond expert are consist with other evidence that the loose diamonds lack legitimacy.

**b.    Tracing the LOU Funds**

The Examiner traced the destination of LOU funds after the Debtors received the money. Funds related to five LOUs in which FDI was named as the exporter and beneficiary were

---

[326] None of the LOU export invoices were accompanies by Gemological Institute of America ("GIA") Reports.  GIA Reports are Diamond Grading Reports verifying key characteristics of the diamonds such as shape and cutting style, measurements, carat weight, color, clarity, and cut grade, finish, polish, symmetry and fluorescence. According to the diamond expert, GIA Reports are attached to virtually any valuable fancy colored diamond transaction worldwide because of the possibility of synthetics and treatments in the diamond that could drive the value of the diamond down. A GIA Report stating a fancy diamond was natural and untreated would add value to the transaction. The diamond expert also confirmed that you do not routinely see large quantities of fancy diamonds being sold at one time due to their high price tag and lower turnover rate in the market.
[327] Angelo Palmieri, President, Gemprint Corp.; COO GCAL Inc.
[328] *Id*.

deposited into FDI's HSBC account ending 3004. Money related to the one LOU in which A. Jaffe was the exporter was deposited into A. Jaffe's HSBC accounting ending 2460. Based on the related accounts' opening balances as well as the bank statement activity on or around the dates of the deposits, the tracing of some LOU funds is more direct, while others are less so. Importantly, most of the money obtained through LOU financing was used to pay L/C Collections, which was a payment mechanism to pay vendors, and which the Debtors used to pay Firestar affiliates overseas (Firestar India, Firestar Belgium, or Firestar Dubai).

### i. LOU 1: March 8, 2011- $1,863,256 LOU Transaction between Firestone, Inc. (FDI) and Firestar India

Funds from this LOU were deposited into FDI's account on March 8, 2011. As the account's opening balance on March 8, 2011 was $788,125 and there were $1,680,510 in other deposits, the funds used for disbursements on the same day included LOU funds. However, LOU funds were utilized for at least a portion of the disbursements to Auragem Company Limited (a Shadow Entity) and L/C Collections. Documents reviewed by the Examiner corroborate that the funds disbursed to L/C Collections in this case were for the benefit of Firestar India.[329]

Excerpts of the relevant FDI bank statements are below:



---

[329] HSBC Bill Retirement Advice for account ending in 2460, dated October 13, 2011 (IBCCOR383544MTN.pdf); HSBC Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383543MTN.pdf); HSBC Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383499MTN.pdf).

ANALYZED BUSINESS CHKG
Statement of Account
Account Number ███ 300-4

FIRESTONE INC
A-R ACCOUNT
FKA NEXT DIAMOND INC

March 1, 2011 - March 31, 2011
Page 4 of 23

**TRANSACTION DETAIL**

**Total Deposits on 3/8/2011: $3,543,731**

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 03/08/11 | 33RECD CHIP BANK OF AMERICA N.A.*ORG:SOLAR EXPORTS,MUMB AI 400 004, INDIA.*OGB:PUNJAB NATIONAL BANK,FORT MUMBAI 400 001, INDIA*BNF:FIRESTONE INC,NEW YORK, NY 10011, US A*OBI:PART PAYMENT INV.NO.1516745/4 DATED14.09.2010 FOR U SD 1,378,512.00.25.00 FEE DEDUCTED*STCHIPSEQ:0165785*TIM E:0717*YR REF:3731FIBC36110/11*MMB REF:067384816 | | 378,487.00 | |
| 03/08/11 | 45BOOK DEBIT FIRESTONE INC*BNF:AURAGEM COMPANY LIMITED,H UNGHOM, KOWLOON, HONG KONG*BBI:/REC/REF:854835†00I.EU*STB OOK*TIME:0903*YR REF:INVOICE - 028*MMB REF:067395417 | 1,010,527.00 | | |
| 03/08/11 | TRANID:HIK *YR REF: 2630D50740810   MMB REF:IBC COR681482MTN   TYPE:L/C COLLECTIONS BTA 00057 | 762,607.87 | | |
| 03/08/11 | TRANID:HIK *YR REF: 2630D50760210.   MMB REF:IBC COR382690MTN   TYPE:L/C COLLECTIONS BTA 00026 | 697,470.00 | | |
| 03/08/11 | TRANID:HIK *YR REF: 2630C50761510   MMB REF:IBC COR859415MTN   TYPE:L/C COLLECTIONS BTA 00060 | 276,110.00 | | |
| 03/08/11 | TRANID:HIK *YR REF: 2630C50746910   MMB REF:IBC COR857105MTN   TYPE:L/C COLLECTIONS BTA 00062 | 219,520.00 | | |
| 03/08/11 | TRANID:HIK *YR REF: 2630D50746810   MMB REF:IBC COR056854MTN   TYPE:L/C COLLECTIONS BTA 00061 | 150,575.59 | | |
| 03/08/11 | TRANID:HIK *YR REF: 2010D830696   MMB REF:IBC COR057874MTN   TYPE:L/C COLLECTIONS BTA 00072 | 88,515.00 | | |
| 3/11 | 38SEND CHIP BANK OF NEW YORK*BBK:UNION BANK OF INDIA,MUM BAI*BNF:FIRESTONE DIAMOND PVT. LTD.,GUJARAT INDIA*BBI:/R EC/REF:397235P0118B*STCHIPSEQ:0236085*TIME:1023*YRREF:3 0106293 / 294*MMB REF:067408810 | 34,440.00 | | |
| 03/08/11 | CHECK #19335 | 26,909.75 | | |
| 03/08/11 | CHECK #19321 | 16,313.67 | | |
| 03/08/11 | CHECK #19337 | 3,325.90 | | |
| 03/08/11 | CHECK #19306 | 1,062.24 | | |
| 03/08/11 | CHECK #19283 | 722.94 | | 1,043,756.87 |
| 03/09/11 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006301430 | | 3,349.27 | |
| 03/09/11 | DEPOSIT | | 2,558.00 | |
| 03/09/11 | 45BOOK DEBIT FIRESTONE INC*BNF:SANDBERG AND SIKORSKI COR PORATION*BBI:/REC/REF:156035Q00LKW*STBOOK*TIME:1027*YRR EF:LOAN*MMB REF:068413339 | 200,000.00 | | |
| 03/09/11 | CHECK #19340 | 29,503.09 | | |
| 03/09/11 | CHECK #19329 | 14,298.20 | | |
| 03/09/11 | CHECK #19339 | 6,250.00 | | |
| 03/09/11 | CHECK #19328 | 3,465.00 | | |
| 03/09/11 | CHECK #19332 | 1,480.00 | | |
| 03/09/11 | CHECK #19334 | 376.93 | | |
| 03/09/11 | CHECK #19331 | 315.74 | | |
| 03/09/11 | CHECK #19343 | 287.19 | | 793,687.99 |
| 03/10/11 | DEPOSIT | | 78,497.08 | |
| 03/10/11 | CORP TRADE PAY NEXCOM WO A... | | 455.68 | |

**Total Disbursements on 3/8/2011**
| | |
|---|---|
| Auragem Company Limited: | $1,010,527 |
| L/C Collections: | $2,194,798 |
| Firestone Int'l Pvt. Ltd.: | $   34,440 |
| Checks: | $   48,334 |
| | $3,288,099 |

## ii.   LOU 2:  May 6, 2011 - $1,858,219 LOU Transaction between FDI and Solar Exports

Funds from this LOU were deposited into the FDI account on May 6, 2011.  As the account's opening balance on May 6, 2011 was $366,813 and there were $1,251,072 in other deposits, the funds used for disbursements on or around the same day included LOU funds. The LOU funds were used for at least a portion of the $1,809,131 in disbursements to L/C Collections and $47,566 to Firestar India and possibly to subsequent disbursements in the account on following days.

Excerpts of the relevant FDI bank statements are below:

93



| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 05/09/11 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006326405 | | 79,362.15 | |
| 05/09/11 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006336691 | | 459.00 | |
| 05/09/11 | 33 RECD CHIP CITIBANK N.A.*ORG:SOLAR EXPORTS,B J.S.S. ROA D, OPERA HOUSE, MUMBAI*OGB:ORIENTAL BANK OF COMMERCE,MUM BAI*BNF:FIRESTAR DIAMOND INC,NEW YORK*OBI:FINAL PYMENT OF INV. NO.15172338AND 15172334*ST:CHIPSEQ:0309475*TIME:110 7*YR REF:NONREF*MMB REF:129441798 | | 1,460,830.57 | |
| 05/09/11 | 33 RECD CHIP CITIBANK N.A.*ORG:STELLAR DIAMOND,MUMBAI 400 *OGB:ORIENTAL BANK OF COMMERCE,MUMBAI*BNF:FIRESTAR DI AMOND INC,NEW YORK*OBI:PART PYMENT OF INV. NO.15172335 DT .3.12.2010*ST:CHIPSEQ:0311735*TIME:1153*YR REF:NONREF*MMB REF:129442694 | | 530,676.90 | |
| 05/09/11 | 33 RECD CHIP KBC BANK NV*ORG:DIANET BVBA,2018 ANTWERPEN*O GB:ANTWERPE DIAMANTBANK N.V.,ANTWERPEN*BNF:FIRESTAR DIA MOND INC,NEW YORK*OBI:INVOICE 15182630*BBI:LESS CHARGES: USD 28.00*ST:CHIPSEQ:0313865*TIME:1149*YR REF:000EOIN111 26004?*MMB REF:129443522 | | 123,347.00 | |
| 05/09/11 | 575 SEND FED BANK LEUMI USA*BNF:PACIFIC M INTERNATIONAL CO RPORATION,TEL: 213-488-1465*BBI:/REC/REF:32493?F00G8G*ST FEDSEQ:B1Q6982C002273*TIME:1042*YR REF:INV 32630*MMB REF :129424400 | 723,600.00 | | |
| 05/09/11 | TRANID:HIE *YR REF: 3731C750931/10   MMB REF:IBC COR8317831MTN   TYPE:L/C COLLECTIONS BTA 00029 | 549,850.95 | | |
| 05/09/11 | TRANID:HIE *YR REF: 3731C750930/10   MMB REF:IBC COR8317833MTN   TYPE:L/C COLLECTIONS BTA 00030 | 549,732.30 | | |
| 05/09/11 | TRANID:HIE *YR REF: 3731C750995/10   MMB REF:IBC COR8382955MTN   TYPE:L/C COLLECTIONS BTA 00031 | 340,800.00 | | |
| 05/09/11 | TRANID:HIE *YR REF: 3731C750995/10   MMB REF:IBC COR8382954MTN   TYPE:L/C COLLECTIONS BTA 00022 | 269,110.00 | | |
| 05/09/11 | TRANID:HIE *YR REF: 0010410C341569   MMB REF:IBC COR8382412MTN   TYPE:L/C COLLECTIONS BTA 00019 | 143,360.78 | | |
| 05/09/11 | TRANID:HIE *YR REF: 0010410C341569   MMB REF:IBC COR8382412MTN   TYPE:L/C COLLECTIONS BTA 00019 | 25.00 | | |
| 05/09/11 | 375 SEND CHIP ISRAEL DISCOUNT BANK OF NEW YORK*BNF:FIRESTO NE, INC,NEW YORK NY 10011*BBI:/REC/REF:84343?F018YJ*ST CHIPSEQ:0300281*TIME:1045*YR REF:TRANSFER*MMB REF:129437 909 | 500,000.00 | | |
| 05/09/11 | 38 SEND CHIP BANK OF AMERICA N.A.*BBK:PUNJAB NATIONAL BAN K,MUMBAI*BNF:FIRESTONE INTERNATIONAL PVT LTD,MUMBAI 4000 23*BBI:/REC/REF:18193?F00JQ8*ST:CHIPSEQ:0258680*TIME:0923 *YR REF:INV 50614*MMB REF:129424408 | 46,085.06 | | 1,042,714.71 |
| 05/10/11 | CASH CONCENTRATION AAFES-VEN PAY | | 24,598.11 | |

### iii.    LOU 3:  August 22, 2011 - $1,499,736 LOU between FDI and Firestar India

Funds from this fraudulently obtained LOU were deposited into FDI's account on August 22, 2011.  As the accounts' opening balance on August 22, 2011 was $272,083 and there was $142,200 in other deposits, the $1,480,091 in disbursements to L/C Collections and $5,692 in checks written can largely be attributed to the LOU funds received.  Excerpts of the relevant FDI bank statements are below:

| | | | | |
|---|---|---|---|---|
| 08/19/11 | CASH CONCENTRATION AAFES-VEN PAY AAFES   VEN PAY  1502544514 | | C767851 | 8/22/2011 Opening Balance |
| 08/19/11 | DEPOSIT | | 173.00 | |
| 08/19/11 | CASH CONCENTRATION FEDERATED DEPART-VENDOR PYT FEDERATED VENDOR PYT 00001172811 | | | |
| 08/19/11 | CHECK #20135 | 1,216.61 | | |
| 08/19/11 | CHECK #20138 | 348.94 | | |
| 08/19/11 | CHECK #20172 | 60.07 | | 272,082.57 |

95

**TRANSACTION DETAIL**

**Total Deposits on 8/22/2011: $1,641,901**

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 08/22/11 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0006370444 | | 85,348.91 | |
| 08/22/11 | DEPOSIT | | 32,294.48 | |
| 08/22/11 | DEPOSIT | | 18,410.00 | |
| 08/22/11 | CASH CONCENTRATION AAFES-VEN PAY AAFES VEN PAY 1502545689 | | 3,318.27 | |
| 08/22/11 | 41BOOK CREDIT FIRESTAR DIAMOND INC*ORG:UNITED PRECIOUS M ETAL REFINING INC,ALDEN*OGB:HSBC BANK USA - HEXAGON PAYM ENTS*BNF:FIRESTAR DIAMOND INC,NEW YORK*BBI:REC/REF:0757 3AC00TT0*STBOOK*TIME:1501*YR REF:9757JAC00TT0*MMB REF:23 4461654 | | 2,828.31 | |
| 08/22/11 | 35RECD CHIP DEUTSCHE BANK TRUST CO AMERICAS*ORG:FIRESTON E DIAMOND PVT LTD.,INDIA *OGB:PUNJAB NATIONAL BANK,MUMBA I, INDIA*BNF:FIRESTAR DIAMOND INC,NEW YORK*OBI:FULL PMT. OF INV.NO.1518719*IDTD 03.08.11 FOR USD 1,499,735.75 *STC HIPSEQ:0143407*TIME:0852*YR REF:NONREF*MMB REF:234414653 | | 1,499,700.75 | ← LOU Deposit |
| 08/22/11 | TRAND-HIE *YR REF: 2630D50856531 MMB REF:IBC COR383189MTN TYPE:L/C COLLECTIONS BTA 00089 | 714,089.00 | | |
| 08/22/11 | TRAND-HIE *YR REF: 5291302225849-A MMB REF:IBC COR383268MTN TYPE:L/C COLLECTIONS BTA 00092 | 221,140.00 | | |
| 08/22/11 | TRAND-HIE *YR REF: 104207505850111 MMB REF:IBC COR383271MTN TYPE:L/C COLLECTIONS BTA 00094 | 194,990.00 | | |
| 08/22/11 | TRAND-HIE *YR REF: 2630C50961811 MMB REF:IBC COR383216MTN TYPE:L/C COLLECTIONS BTA 00107 | 148,514.48 | | |
| 08/22/11 | TRAND-HIE *YR REF: 104207507450111 MMB REF:IBC COR383334MTN TYPE:L/C COLLECTIONS BTA 00095 | 87,015.00 | | |
| 08/22/11 | TRAND-HIE *YR REF: 104207506900111 MMB REF:IBC COR383270MTN TYPE:L/C COLLECTIONS BTA 00093 | 70,520.00 | | |
| 08/22/11 | TRAND-HIE *YR REF: 2630D50856611 MMB REF:IBC COR383394MTN TYPE:L/C COLLECTIONS BTA 00090 | 43,822.31 | | |
| 08/22/11 | CHECK #1034 | 3,367.12 | | |
| 08/22/11 | CHECK #20210 | 2,074.16 | | |
| 08/22/11 | CHECK #20147 | 193.50 | | |
| 08/22/11 | CHECK #20209 | 58.00 | | 428,199.72 |
| 08/23/11 | CHECK #2035 | 70,000.00 | | |
| 08/23/11 | AUTOMATIC TRANSFER TO CREDIT ACCOUNT #6711007740 BANKCARD PAYMENT 5405806711007740 | 27,352.84 | | |
| 08/23/11 | CHECK #20205 | 2,042.20 | | |
| 08/24/11 | CASH CONCENTRA | | 2 | |
| 08/24/11 | 45BOOK DEBIT FI NC,NEW YORK* R REF:INTERNA AAFES VEN PA | 10,000.00 | | |
| 08/24/11 | CHECK #20233 | 50,717.55 | | |
| 08/24/11 | CHECK #20226 | 6,983.71 | | |

**Total Disbursements on 8/22/2011**
L/C Collections: $1,480,091
Checks: $  5,692
$1,485,784

← 8/22/2011 Closing Balance

iv.   **LOUs 4 and 5:  October 4, 2011 - $1,803,249 LOU between FDI and Firestar India and $1,246,731 LOU between FDI and Firestar India**

Funds related to both of these fraudulently obtained LOUs were remitted to FDI on October 4, 2011, resulting in $3,049,944 of total LOU funds deposited into the same FDI account on the same day.  The account's opening balance on October 4, 2011 was $103,084 and there were only $1,636 in other deposits.  Therefore, the $3,134,892 in disbursements to L/C Collections on the same day can be directly linked to the LOU funds received.



The Examiner, in cooperation with BDO (India), determined that Firestar India repaid these LOUs. It did so through a financing mechanism called packing credits, which are short-term working capital loans obtained by vendors to fulfill upcoming orders of goods.  The Reserve Bank of India defines packing credit loans as a:

> loan or advance granted or any other credit provided by a bank to an
> exporter for financing the purchase, processing, manufacturing or

> packing of goods prior to shipment/working capital expenses
> towards rendering of services on the basis of letter of credit opened
> in his favor or in favor of some other person, by an overseas buyer
> or a confirmed and irrevocable order for the export of goods /
> services from India or any other evidence of an order for export from
> India having been placed on the exporter or some other person,
> unless lodgement of export orders or letter of credit with the bank
> has been waived.[330]

Rather than use Packing Credit Loans for their intended purpose, and to finance the purchase, processing, manufacturing, and shipment of an upcoming export, funds from the packing credit loans obtained by Firestar India were improperly utilized and diverted to the current accounts of the importers to repay the LOUs.[331]

### v.   LOU 6:  October 13, 2011 - $1,921,079 LOU between A. Jaffe, Inc. and Diamonds 'R' Us

Funds from this fraudulently obtained LOU were deposited into A. Jaffe's account on October 13, 2011.  The account's opening balance was $136,696 with only $1,585 in other deposits.  Therefore, the $1,832,700 in disbursements to L/C Collections and the $57,994 transfer to Firestar India can be attributed to the LOU funds.  The money deposited with L/C Collections was then transferred to Firestar India.[332]

---

[330] RESERVE BANK OF INDIA, Master Circular on Rupee / Foreign Currency Export Credit & Customer Service to Exporters, July 2, 2012 (https://rbi.org.in/scripts/BS_ViewMasCirculardetails.aspx?id=7377)./
[331] Meetings with BDO (India), July 2018.
[332] HSBC Bill Retirement Advice for account ending in 2460, dated October 13, 2011 (IBCCOR383544MTN.pdf); HSBC Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383543MTN.pdf); HSBC Bill Retirement Advice for account ending 2460, dated October 13, 2011 (IBCCOR383499MTN.pdf).

Similar to LOUs 4 and 5 described above, Firestar obtained packing credit from Vijaya Bank in India and misapplied the funds to repay this LOU.[333]

### 2. LOU Funds Sent To Shadow Entities and Then Through the Debtors

In addition to being named as the exporters and direct beneficiaries in connection with the six LOU transactions described above, funds from numerous other LOUs can be traced from the Shadow Entities and through the Debtors' bank accounts during the period from 2013 - 2016.[334] Approximately 1,425 LOUs issued by PNB were primarily for the benefit of Shadow Entities posing as exporters.[335] The fraudulent nature of these LOUs stems from the fact that they were issued without collateral, were not recorded in the CBS, were largely repaid through improper means, and were usually transacted with the following Shadow Entities:[336]

---

[333] Meetings with BDO (India), July 2018.
[334] Meetings with BDO (India), July 2018.
[335] *Id*. at 17.
[336] Meetings with BDO (India), July 2018.

**LOUs Issued by PNB to Nirav Modi Controlled Entities**

| Exporter Entity | Country | Count of LOUs |
|---|---|---|
| Auragems Company Limited | Hong Kong | 517 |
| Pacific Diamonds FZE | UAE | 370 |
| Sino Traders Limited | Hong Kong | 333 |
| Tri Color Gems FZE | UAE | 320 |
| Sunshine Gems Limited | Hong Kong | 273 |
| Diagems FZC | UAE | 243 |
| Fancy Creations Company Limited | Hong Kong | 168 |
| Unity Trading FZE | UAE | 167 |
| Brilliant Diamonds Ltd | Hong Kong | 85 |
| Universal Fine Jewelry FZE | UAE | 20 |
| Diagems FZE | UAE | 16 |
| Hamilton Precious Traders Ltd Fzco | UAE | 11 |
| Himalayan Traders FZE | UAE | 11 |
| Eternal Diamond Corporation Limited | Hong Kong | 7 |
| DG Brothers FZE | UAE | 6 |
| Unique Diamond And Jewellery FZC | UAE | 5 |
| Firestar Diamond, Inc. | USA | 4 |
| Vista Jewelry FZE | UAE | 2 |
| A. Jaffe, Inc. | USA | 1 |
| Firestone, Inc. | USA | 1 |
| Nipur BVBA | Belgium | 1 |
| Pacific Gems FZE | UAE | 1 |
| Solar Exports Limited | Hong Kong | 1 |
| **Total:** | | **2,563** |

**Source:**
Meeting with BDO (India)

**Notes:**
[1] According to the BDO India team engaged by PNB, there were 1,561 total LOUs issued by PNB to the Nirav Modi Group. Of these 1,561 LOUs issued, there were multiple exporters for the majority of the LOUs. This is the why the count of exporters above is greater than 1,561.
[2] Blue highlight was added by the Examiner team to show 6 LOUs issued in which the US debtors were the exporters. Note that Firestone, Inc. was the previous name of Firestar Diamond, Inc.

Many of these exporters appeared in the Debtors' records as customers. Upon inspection of the FDI customer list provided to the Examiner by the Debtors, high, multi- million-dollar credit limits for accounts receivable were listed for many of the alleged Shadow Entities.[337] Also, the salesperson for these customers was stated as "MIHIR" or "001". "MIHIR" was the code used for customers whose salesperson was Mihir Bhansali and "001" was the code used for the House account.[338] According to the Gandhi, the accounts with the "001" House account code were also Mihir's customers based on how they appear in the Debtors' books. [339]  According to the ED Complaint, these companies "were only created in order to facilitate layering and laundering of funds obtained fraudulently from PNB and to camouflage the real intention and identity of beneficiaries of the funds siphoned off from PNB."[340]

The Examiner analyzed the bank statements for each of the Debtors, to the extent available. The review documented receipts and disbursements into/out of the Debtors accounts in excess of $500,000 that were linked to a Shadow Entity.  BDO (India), with its access to the accounts of certain Shadow Entities, assisted the Examiner in linking money from LOUs to the Debtors and vice versa.  Either the Debtors received money from fraudulent LOUs through the Shadow Entities, or the Debtors paid money to a Shadow Entity to aid in repaying an LOU.  This analysis resulted in tracing approximately $5 million from specific LOUs to the Debtors[341] between 2013 and 2016 (Table 1 below) and $4 million from the Debtors to Shadow Entities[342] that ultimately repaid

---

[337]  Debtor document titled "Firestar Diamond Inc. Customer Listing with address.pdf"; Debtor document titled "Firestar Vendor – Listing.pdf"; Debtor document titled "Fantasy Customer Listing with address.pdf, Fantasy Vendor – Listing.pdf"; Debtor document titled "AJAFFE CUSTOMER LIST.pdf"; Debtor document titled "Jaffe – Vendor Master List.xlsx.".
[338]  Interview of Ajay Gandhi, July 19, 2018.
[339]  *Id*.
[340]  ED Complaint ¶3.1.4.
[341]  *See* Table 1, below.
[342]  *See* Table 2, below.

specific LOUs (Table 2 below).[343]

It should be noted that the Examiner did not have access to the Shadow Entities' bank statements, which are located in foreign jurisdictions and from which acquiring such information would be challenging and take many months.   Thus, while the Examiner was able to trace certain payments, a more extensive tracing analysis would require significant additional time and cost.

### Table 1[344]

**Receipts of Funds into US Debtors Linked to LOUs Obtained by Modi Affiliates**

| Date Posted | Transacting Entity | Deposit Amount |
|---|---|---|
| 2/7/2013 | Pacific Diamonds FZE | $        931,965 |
| 2/11/2013 | Pacific Diamonds FZE | 980,805 |
| 3/19/2013 | Auragems Company Limited | 191,501 |
| 3/19/2013 | Fancy Creations Company Limited | 236,078 |
| 5/6/2013 | Fancy Creations Company Limited | 21,394 |
| 3/27/2015 | Pacific Diamonds FZE | 1,552,451 |
| 5/3/2016 | Tri Color Gems FZE | 399,962 |
| 12/19/2016 | Pacific Diamonds FZE | 599,972 |
|  |  | $        4,914,129 |

### Table 2[345]

**Disbursements of Funds from US Debtors Linked to Repayment of LOUs**

| Date Posted | Transacting Entity | Disbursement Amount |
|---|---|---|
| 9/24/2015 | Auragems Company Limited | $        1,840,969 |
| 2/26/2016 | Tri Color Gems FZE | 1,192,106 |
| 3/3/2016 | Pacific Diamonds FZE | 873,997 |
|  |  | $        3,907,071 |

**a)      Tracing Receipts of Funds Linked to LOUs into Debtors' Accounts**[346]

---

[343] Meetings with BDO (India), July 2018.

[344] Meetings with BDO (India), July 2018; Bank statements for Firestar Diamond, Inc. HSBC account ending 3004 and Fantasy, Inc. account ending 9441

[345] Id.

[346] Meetings with BDO (India), July 2018  See Bank statement for Firestar Diamond, Inc. HSBC account ending 3004 and Fantasy, Inc. account ending 9441 bank statements and A. Jaffe HSBC account ending 2460.

### 1)        Pacific Diamonds to FDI

Pacific Diamonds transferred $931,965 to FDI on February 7, 2013.  The Examiner, in conjunction with BDO (India) and PNB, through its counsel, Cleary, Gottlieb, Steen & Hamilton LLP ("Cleary"), discovered this deposit was linked to a fraudulent LOU that Diamonds 'R' Us obtained in which Pacific Diamonds was the exporter. The total transaction amount was $3.097 million, and the LOU date was February 8, 2013. The disbursement of $931,965 from Pacific Diamonds to FDI occurred on February 7, 2013, one day before the LOU funds were sent to Pacific Diamonds.  The total movement of funds is depicted below:



The FDI bank statement shows the transfer of money upon receipt from Pacific Diamonds:[347]

---

[347] Firestar Diamond, Inc. February 2013 HSBC account statement for account ending 3004.

It appears that, like the LOUs in which the Debtors were beneficiaries, much of the funds

went to pay the majority of the money here went to pay L/C Collections, and thus an overseas

Firestar affiliate. Four days after this deposit, FDI received another transfer from the same LOU.

On February 11, 2013, Pacific Diamonds deposited $980,805 into the FDI account.[348] The

relevant portion of the FDI bank statement is below:

---

348 *Id.*

104

| | | | | |
|---|---|---|---|---|
| | | /ACC/A/C NO. 541-1100743-72*STCHIPSEQ:0386892*TIME:1 | | | |
| 02/08/13 | | 689*YR REF:111210231P / 89P*MMB REF **Total Deposits on 2/11/2013: $1,421,536** | | **2/11/2013 Opening Balance** | |
| | | 57SEND FED NAVY FCU*BNF:CHARITO | | | |
| | | 1883P9000SID0*STFEDSEQ:B1Q8983C301870*TIME:0921*YR REF:01/ | | | |
| | | 29 - 92/92/13*MMB REF:03940722 | | | |
| 02/08/13 | | CHECK #22109 | 600.00 | | 102,956.86 |
| 02/11/13 | | CASH CONCENTRATION AMAZON.COM-RETAIL DIS | | 221.61 | |
| | | AMAZON.CO Retail dk ECHM1O84B5QTXB | | | |
| 02/11/13 | | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE | | 1,673.00 | |
| | | NEXCOM WO AP PAYMENT 0006595674 | | | |
| 02/11/13 | | DEPOSIT | | 7,868.92 | |
| 02/11/13 | | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE | | 72,820.02 | |
| | | NEXCOM WO AP PAYMENT 0006595320 | | | |
| 02/11/13 | | DEPOSIT | | 136,719.06 | |
| 02/11/13 | | CASH CONCENTRATION AAFES-VEN PAY | | 221,428.46 | |
| | | AAFES   VEN PAY  1591831943 | | | |
| 02/11/13 | | 33RECD CHIP MASHREQ BANK*ORG:PACIFIC DIAMONDS FZE,DUBAI | | 580,805.00 | **Funds traced** |
| | | AIRPORT FZE,DUBAI*OGB:MASHREQBANK PSC,DUBAI, UNITED ARAB | | | ← **to LOU** |
| | | EMIRATES*BNF:FIRESTAR DIAMOND INC,NEW YORK*OBI:INV NO.: | | | |
| | | 15209752 DT. 28.09.2012 PURCHASE OF DIAMOND*STCHIPSEQ:0 | | | |
| | | 240752*TIME:1111*YR REF:NONREF*MMB REF:042394367 | | | |
| 02/11/13 | | TRANID:HIF *YR REF: 104207524300112    MMB REF:IBC | 857,130.21 | | |
| | | COR684461MTN   TYPE:L/C COLLECTIONS  BTA 00067 | | | |
| 02/11/13 | | CHECK #22104 | 82.50 | | |

| | | | | |
|---|---|---|---|---|
| FRA NEXT DIAMOND INC | | | Page 4 of 10 | |

**TRANSACTION DETAIL**



Again, it appears that the LOU money was used to pay L/C Collections and to operate the

business of FDI and A. Jaffe.

### 2)   Auragem Company to FDI

On March 19, 2013, Auragem Company Ltd. transferred $191,501 to FDI, and BDO

(India) linked the money to an LOU fraudulently-obtained by Diamonds 'R' Us in which Auragem

Company was the exporter.[349]   The total LOU transaction was $3.949 million and the LOU date

was March 19, 2013. The disbursement of $191,501 from Auragem Company to FDI occurred on

March 19, 2013, the same day as the LOU funds transfer to Auragem Company.[350]   The relevant

portion of the FDI bank statement is below:



The account's opening balance on March 19, 2013 was $259,212, and there were $260,715 in other

deposits including a $236,078 deposit from another LOU (discussed below).  The funds used for

the disbursements appear to include LOU funds.  Money from the account was paid to Tri Color

Gems, a Shadow Entity; a non-debtor U.S. Firestar entity; and other jewelry businesses.

### 3)   Fancy Creations Company to FDI

From the same LOU dated March 19, 2013, FDI received an additional $236,078 from

---

[349] Meetings with BDO (India), July 2018.
[350] Firestar Diamond, Inc. March 2013 HSBC account statement for account ending 3004.

Fancy Creations Company Limited at the same time as the transfer mentioned above.[351]  The
following bank account excerpt[352] depicts this flow of money into the FDI account, and reflects
the same disbursements as the section immediately above:



#### 4)      Fancy Creations Company to FDI

On May 6, 2013, FDI received $21,393.98 from Fancy Creations linked to an allegedly
fraudulent LOU obtained by Stellar Diamonds.[353]  Three days after the money went to Fancy
Creations, FDI received the transfer.  Upon receipt, the money was added to the account which
already contained over $350,000.  Total disbursements from the account that day totaled over $2.4
million.  Recipients included Tri Color Gems, another FDI account, and FD International.  As the

---

[351] Id.
[352] Id.
[353] Firestar Diamond, Inc. May 2013 HSBC account statement for account ending 3004.

ending balance on May 6, 2013 was $160,825, the indirect LOU funds can be attributed to these

disbursements.  The FDI bank statement is below:[354]



### 5)    Pacific Diamonds to FI, FI to FDI, FDI to FDI's IDB Account, FDI-IDB to Trade Services

This chain of transfers starts with an LOU payments to Pacific Diamonds from which it

transferred $1,522,451 to FI on March 27, 2015.[355]  The account statements below depict the

March 2015 balances for FI (9441), Firestar Diamond, Inc. (3004), and Firestar Diamond, Inc.

(1657). The money ultimately made its way to IDB to pay for the Trade Services Account, which

---

[354] Firestar Diamond, Inc. May 2013 HSBC account statement for account ending 3004.
[355] Meetings with BDO (India), July, 2018.

was a payment program similar to L/C Collections used to pay Firestar overseas affiliates.[356]

### Fantasy, Inc.[357]



### Firestar Diamond, Inc. – HSBC Account[358]

### Firestar Diamond, Inc – IDB Account[359]

---

[356] Trade Services is the IDB version of HSBC's L/C Collections. The use was confirmed through conversations with counsel for Gandhi on August 10, 2018.
[357] Fantasy, Inc. March 2015 HSBC account statement for account ending 9441
[358] Firestar Diamond, Inc. March 2015 HSBC account statement for account ending 3004.
[359] Firestar Diamond, Inc. March 2015 IDB account statement for account ending 1657.

| DATE | DESCRIPTION | DEBITS | CREDITS | BALANCE |
|------|-------------|--------|---------|---------|
| | BALANCE FORWARD | | | 22,950.36 |
| 3-25 | F003350000ISSC   AIR | | | 22,790.36 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | REF DATE 032715 | | 1,009,980.00 | 3,032,770.36 |
| | /DAS/REF:58294AW00XHI   NTRF | | | |
| | FIRESTAR DIAMOND NEW YORK | | | |
| 3-27 | I083483001PAY | 314,921.28 | | 2,717,849.08 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | I083483001PAYC | 160.00 | | 2,717,689.08 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | I083349001PAY | 564,996.10 | | 2,152,692.98 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | I083349001PAYC | 160.00 | | 2,152,532.98 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | I083539001PAY | 748,720.86 | | 1,403,812.12 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | I083539001PAYC | 160.00 | | 1,403,652.12 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | I083350001PAY | 433,534.69 | | 970,117.43 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | I083350001PAYC | 160.00 | | 969,957.43 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | I083180001PAY | 738,172.91 | | 231,784.52 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | I083180001PAYC | 160.00 | | 231,624.52 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | I083148001PAY | 212,326.78 | | 19,297.74 |
| | | FDCR | | |
| | TRADE SERVICES | | | |
| 3-27 | I083148001PAYC | 160.00 | | 19,137.74 |
| | | FDCR | | |
| | TRADE SERVICES | | | CONTINUED |

$3,009,980 deposit from Firestar Diamond, Inc.

$3,013,033 in disbursements to Trade Services on same day as deposit from Firestar Diamond, Inc.

As the FI account's opening balance on March 27, 2015, was $89,810, there appears to be a direct link between the $1,552,451 funds received from Pacific Diamonds on the one hand and the $2,550,000 disbursement to FDI on the other. The $2,550,000 transfer into FDI from FI appears to constitute the majority of the total $2,561,696 deposits into FDI's account that day. This amount was included in the subsequent $3,010,000 disbursement to FDI's account. On the same day the $3,010,000 was deposited into FDI's account, $3,013,033 was disbursed to "Trade Services," which was transferred to a Firestar overseas affiliates.

111

### 6)   Tri Color Gems to FDI

On May 3, 2016, FDI received $399,962 from Tri Color Gems.  An LOU was issued to Solar Exports in which Tri Color Gems was the exporter.  The total LOU amount was $1.612 million, and the LOU date was May 2, 2016.  FDI received the $399,962 the day Tri Color Gems received the LOU funds. The account statement is below:



As the account's opening balance on May 3, 2016, was $772,616, and there were $304,598 in other deposits, the funds used for disbursements appear to include LOU funds. It appears the funds linked to the LOU were used for a portion of a $650,000 disbursement to FDI's account

(which was used for "Trade Services" payments), a $65,681 disbursement to Firestar Diamond
BVBA, a $51,680 disbursement to Firestar Diamond International Pvt. Ltd., and a $10,622 Essex
House apartment mortgage payment all on the same day.

### 7)   Pacific Diamonds to FDI

A $599,972 deposit from Pacific Diamonds to FDI was linked to an alleged fraudulently-
obtained LOU by Stellar Diamonds in which Tri Color Gems was the exporter. The total LOU
amount was $2.707 million and the LOU date was December 8, 2016. BDO (India) identified a
$1.384M payment made to Tri Color Gems on December 9, 2016.  That same day, Auragem
Company transferred $1.459 million to Stellar Diamond.  On December 13, 2016, four days after
the receipt of LOU funds, Tri Color Gems transferred $1.119 million to Stellar Diamonds.  On
December 15, 2016, Stellar Diamonds transferred $1.42 million to Pacific Diamonds.  On
December 19, 2016, Pacific Diamonds transferred $599,972 to FDI.  Based on the bank account
snapshots below,[360] it is possible that LOU funds were utilized for at least a portion of the $300,000
payment to FDI's IDB account,[361] which was then paid out to the IDB Trade Services account or
for payment to other Firestar international entities.

---

[360] Firestar Diamond, Inc. December 2016 HSBC account statement for account ending 3004.
[361] Firestar Diamond, Inc. December 2016 IDB account statement for account ending 1657.

113



| 12/16/16 | ,INDIA*BBI:/DAS/REF:09784SF00Y5X*STCHIPSEQ:0437729*TIME:1436*YR REF:715916096- 16583*MMB REF:351524198 | | | 310,593.75 | |
| 12/16/16 | 38SEND CHIP BANK OF NEW YORK*BBK:UNION BANK OF INDIA,MUM BAI*BNF:FIRESTAR INTERNATIONAL PVT LTD.,MUMBAI - 400 004 *BBI:/DAS/REF:12314SF01FBI*STCHIPSEQ:0437685*TIME:1435*Y R REF:92177- 92190*MMB REF:351524213 | | | | |
| 12/16/16 | 38SEND CHIP BANK OF NEW YORK*BBK:UNION BANK OF INDIA,MUM BAI*BNF:FIRESTAR DIAMOND INTL. PVT. LTD.,GUJARAT INDIA*BB I:/DAS/REF:i63434SF00R1C*STCHIPSEQ:0437689*TIME:1436*YR R EF:710016619-RE-121*MMB REF:351524195 | | | 655,638.06 | 512,635.94 |
| 12/19/16 | CASH CONCENTRATION OVERSTOCK.COM-VENDORPYMT | | | 352.64 | |
| 12/19/16 | CORP TRADE PAYMENT FROM NEXCOM WORLDWIDE NEXCOM WO AP PAYMENT 0007202503 | | | 900.00 | |
| 12/19/16 | CASH CONCENTRATION OVERSTOCK.COM-VENDORPYMT | | | 2,604.24 | |
| 12/19/16 | CASH CONCENTRATION ROGERS ENTERPRIS-DE121416-2 ROGERS EN DE121416-2 67743 | | | 3,000.00 | |
| 12/19/16 | CASH CONCENTRATION AMZNIWTROJ9Z-MARKETPLAC AMZNIWTRO Marketplac U1208ATVWWZDID4 | | | 8,049.14 | |
| 12/19/16 | CASH CONCENTRATION JCPENNEY CO.,INC-PAYMENT JCPENNEY PAYMENT 547218 | | | 9,942.51 | |
| 12/19/16 | CASH CONCENTRATION AAFES-VEN PAY AAFES VEN PAY 1503624176 | | | 35,854.68 | |
| 12/19/16 | DEPOSIT | | | 41,267.00 | |
| 12/19/16 | CORP TRADE PAYMENT FROM JCPENNEY CO.,INC JCPENNEY PAYMENT 547217 | | | 553,817.35 | |
| 12/19/16 | 41BOOK CREDIT FIRESTAR DIAMOND INC*ORG:FANTASY INC,NEW Y ORK NY 10036 4707 US*OGB:HSBC BANK USA -HSBCNE T PAYMENT* BNF:FIRESTAR DIAMOND INC,NEW YORK NY 10036 4707 US*BBI:/ DAS/REF:60004SI01TVY*STBOOK*TIME:1527*YR REF:92195*MMB R EF:354548113 | | | 216,663.32 | |

TRANSACTION DETAIL.

**Total Deposits on 12/19/2016: $3,396,813**

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 12/19/16 | 33RECD CHIP CITIBANK NA*ORG:1/UNIQUE DIAMOND AND JEWELLE RY FZC,UAE/UNITED ARAB EMIR*OGB:NOOR BANK P.J.S.C.,DUBA I*BNF:FIRESTAR DIAMOND INC,NEW YORK NY 10036 4707 US*OBI /:REF/INV 15296187 DT19062016*STCHIPSEQ:0279871*TIME:063 3*YR REF:NONREF*MMB REF:354456807 | | 330,998.54 | |
| 12/19/16 | 33RECD CHIP JPMORGAN CHASE BANK*ORG:PACIFIC DIAMONDS - F Z E,OFFICE NO 1019 7WA WEST WING NE*OGB:ABU DHABI ISLAM IC BANK,ABU DHABI*BNF:FIRESTAR DIAMOND INC,NEW YORK NY 1 0036 4707 US*OBI:/RFB/REM FOR INV 15296193 DT     2786 286*STCHIPSEQ:0304687*TIME:0733*YR REF:SWF OF 16/12/19*M MB REF:354467327 | | 599,972.00 | |
| 12/19/16 | 33RECD CHIP BANK OF AMERICA N.A.*ORG:WORLD DIAMOND DISTR IBUTION FZE,RATES*OGB:ABU DHABI COMMERCIAL BANK,ABU DHAB I*BNF:FIRESTAR DIAMOND INC,NEW YORK NY 10036 4707 US*OBI :INV NO INV 15300194 DT 10092016 AND15302471 DT22102016 38.00 FEE DEDUCTED*STCHIPSEQ:0204039*TIME :0334*YR REF:5000000033316696*MMB REF:354423758 | | 1,593,391.12 | |
| 12/19/16 | MONTHLY ANALYSIS CHARGE | 457.08 | | |
| 12/19/16 | 58SEND FED BANK OF INDIA, NEW YORK BRANCH*BBK:BANK OF IN DIA,ANTWERPEN*BNF:FIRESTAR DIAMOND BVBA,ANTWERPEN*BBI:/D AS/REF:169645I00SY3*STFEDSEQ:B1Q8983C002692*TIME:1222*YR REF:111610266 P*MMB REF:354525834 | 997,514.96 | | |
| 12/19/16 | CASH DISBURSEMENT VA DEPT TAXATION-TAX PAYMEN VA DEPT T TAX PAYMEN *****2729 | 400.00 | | |
| 12/19/16 | 37SEND CHIP ISRAEL DISCOUNT BANK OF NEW YORK*BNF:FIRESTA R DIAMOND, INC.,NY 10036*BBI:/DAS/REF:50464SI00YI5*STCHI PSEQ:0444089*TIME:1225*YR REF:INTERNAL*MMB REF:354525833 | 300,000.04 | | |
| 12/19/16 | 38SEND CHIP BANK OF AMERICA N.A.*BBK:PUNJAB NATIONAL BAN K BRADY HOUSE,MUMBAI*BNF:FIRESTAR DIAMOND INTL PVT. LTD. ,INDIA*BBI:/DAS/REF:06924SI01GG3*STCHIPSEQ:0451371*TIME: 1249*YR REF:710016483*MMB REF:354530045 | 1,889,810.00 | | 721,266.44 |
| 12/20/16 | DEPOSIT FROM BLUESTEM BRANDS,-INVRTY AC BLUESTEM INVRTY AC 308871 | | 1,117.07 | |
| 12/20/16 | COR... NE... | | 170,115.65 | |
| 12/20/16 | 33RE... Z E... IC... 0036... HIP... 5554... | | 93,320.00 | |
| 12/20/16 | 57SE... LC... | 795.00 | | |

**Total Disbursements on 12/19/2016**
Firestar Diamond Intl Pvt. Ltd.:     $1,889,810
Firestar Diamond, Inc. IDB Account:   $300,000
Firestar Diamond BVBA:                $997,515
Other Disbursments:                   $     857
                                      $3,188,182

As the account's opening balance on March 19, 2013, was $512,636, and there were

$2,796,841 in other deposits, LOU funds were likely used for at least a portion of the $1,889,810

18-10509-shl Doc 894 Filed 08/25/18 Entered 08/25/18 10:35:19 Main Document
Pg 514 of 804

disbursement to Firestar Diamond International Pvt. Ltd., the $997,515 disbursement to Firestar

Diamond BVBA, the $300,000 disbursement to the Firestar Diamond, Inc. IDB account and/or the

$857 in checks written all on the same day.

### 2. Tracing Disbursement of Funds from Debtors to Repay Fraudulently-Obtained LOUs

#### 1) FDI to Auragem Company

A disbursement of $1,840,969 made from FDI to Auragem on September 24, 2015 has

been linked by BDO (India) and Cleary to the repayment of a fraudulently-obtained LOU.  To

identify the source of these funds, the Examiner reviewed the related bank statement activity on or

around the date of this disbursement.  Below is the September 2015 FDI bank statement excerpt

detailing the activity on and around the date of the disbursement that appear to be linked to the

LOU funds:



The account's opening balance on September 24, 2015, was $607,733. Deposits into the account on September 24, 2015 were $1,500,000 from the HSBC Bank Loan, $1,414,865 from the Firestar Diamond International Pvt. Ltd., and $100,000 from A. Jaffe. The $1,840,969 disbursement to Auragem thus can be traced to FDI funds including the existing funds that were in the account prior to September 24, 2014 as well as the various deposits noted above.

With the assistance of BDO (India) and Cleary, the Examiner was able to identify how this money was used to repay an LOU:

20-01051-shl   Doc 109-4   Filed 02/25/22   Entered 02/25/22 20:00:44   Main Document
18-10509-shl   Doc 894   Filed 06/25/18   Entered 06/25/18 10:35:19   Report of
John J. Carney   Examiner   Part 2 of 2   Pg 4 of 52
Pg 516 of 804



### 2)   FDI to Tricolor Gems

A disbursement of $1,192,106 made from FDI's HSBC (3004) account to Tri Color Gems on February 26, 2016 has been linked by BDO (India) to the repayment of fraudulently-obtained LOUs. The Examiner reviewed the related bank statement activity on or around the date of this disbursement to determine the source of FDI's funds disbursed to Tri Color Gems. The primary source of funds for this disbursement to Tri Color Gems was traced to funds sent from Twin Fields Investments Ltd.  ("Twin Fields")[362] to A. Jaffe as repayment towards an outstanding A. Jaffe – Twin Fields loan balance.  On February 25, 2016, Twin Fields received a deposit from Fine Classic [363] for $1,199,968. On the same day, A. Jaffe received a check from Twin Fields for $1,230,000. The flow of funds is depicted below:[364]

### Twin Fields Account

---

[362] As discussed in detail below, Twin Fields is an investment entity created solely to invest in Bailey, Banks, and Biddle, an independent jewelry retailer.
[363] Fine Classic is a Shadow Entity managed by Modi's sister, Purvi Mehta.
[364] February 2016 Twin Fields Investments Ltd. Bank of America account statement for account ending 5160.

| Deposits and other credits | | |
|---|---|---|
| Date | Description | Amount |
| 02/02/16 | WIRE TYPE:WIRE IN DATE: 160202 TIME:0920 ET TRN:2016020200184677 SEQ:033434220/286779 ORIG:A JAFFE INC FKA SANDBERG ID:054002460 SND BK: HSBC BANK USA, NA ID:0108 PMT DET:JAFFE TO TWIN /D AS/REF:73214JL000A9 | 1,000,000.00 |
| 02/18/16 | WIRE TYPE:WIRE IN DATE: 160218 TIME:0526 ET TRN:2016021800082302 SEQ:S0660480BE9C01/116977 ORIG:FINE CLASSIC FZE P.O.BOX ID:AE69034000001450 SND BK:CITIBANK, N.A. ID:0008 PMT DET:REMITTANCE A S A LOAN | 9,974.00 |
| 02/23/16 | WIRE TYPE:WIRE IN DATE: 160223 TIME:0512 ET TRN:2016022300083780 SEQ:S0660531F43A01/110944 ORIG:FINE CLASSIC FZE P.O.BOX ID:AE69034000001450 SND BK:CITIBANK, N.A. ID:0008 PMT DET:REMITTANCE A S A LOAN | *Deposit from Fine Classic FZE on 2/25/2016.* |
| 02/25/16 | WIRE TYPE:WIRE IN DATE: 160225 TIME:0513 ET TRN:2016022500110855 SEQ:S0660551028B01/185448 ORIG:FINE CLASSIC FZE P.O.BOX ID:AE69034000001450 SND BK:CITIBANK, N.A. ID:0008 PMT DET:REMITTANCE A S A LOAN | 1,199,968.00 |
| **Total deposits and other credits** | | **$3,359,910.00** |

| TWIN FIELDS INVESTMENT LTD | Account # ████ 5160 | February 1, 2016 to February 29, 2016 | | | |
|---|---|---|---|---|---|
| **Checks** | | | *Check to A. Jaffe, Inc. on the same day as deposit from Fine Classic FZE.* | | |
| Date | Check # | Amount | Date | Check # | Amount |
| 02/02/16 | 1104 | -1,000,000.00 | 02/25/16 | 1107* | -1,230,000.00 |
| | | | **Total checks** | | **-$2,230,000.00** |

The opening balance in the A. Jaffe, Inc. account on the day of the $1,230,000 Twin Fields check deposit (February 25, 2016) was $56,407. On the day after the deposit, $1,250,000 was transferred from A. Jaffe to FDI. Due to the small account balance before the check deposit, there is a direct link between the funds from the Twin Fields check and the amount transferred to FDI See below an excerpt of the A. Jaffe February 2016 account:

20-01051-shl Doc 109 Filed 02/25/22 Entered 02/25/22 20:00:44 Main Document
18-10509-shl Doc 994-1 Filed 06/25/18 Entered 06/25/18 10:35:19 Report of
John J. Carney    Examiner Part 2 of 2    Pg 6 of 52
Pg 518 of 804



On the same day that FDI received the $1,250,000 deposit from A.Jaffe, FDI made a

$1,192,106 disbursement to Tri Color Gems. As the opening balance in the FDI account was

insufficient for the disbursements, there is a direct link between the funds received from A. Jaffe

and the FDI disbursement to Tri Color Gems. Below is the bank statement excerpt for FDI:[365]

---

[365] Firestar Diamond, Inc. February 2016 HSBC account statement for account ending 3004.



According to BDO (India), the disbursements from FDI to Tri Color Gems were subsequently traced to the repayment of allegedly fraudulently-obtained LOUs.

### c)    FDI to Pacific Diamonds

A disbursement of $873,997 from FDI to Pacific Diamonds on March 3, 2016 has been linked by BDO (India) to the repayment of an alleged fraudulently-obtained LOU.  The Examiner reviewed the related bank statement activity on or around the date of this disbursement and identified that part, if not all, of the money used to pay Pacific Diamonds came from an internal transfer from FD International the same day.  The money moved from FDI to Pacific Diamonds to repay the LOU.  The flow of money is depicted below:[366]

---

[366] Firestar Diamond, Inc. March 2016 HSBC account statement for account ending 3004.

120



According to BDO (India) and Cleary, the funds were subsequently traced to the repayment

of a fraudulently obtained LOU.  The transactions from FDI to Pacific Diamonds and Tri Color

Gems is demonstrated below:

20-01054-shl Doc 109-4 Filed 02/25/22 Entered 02/25/22 20:00:48 Main Document
18-10509-shl Doc 894 Filed 08/25/18 Entered 08/25/18 10:35:19 Report of
John J. Carney Examiner Part 2 of 2 Pg 9 of 52
Pg 521 of 804



## C. Officer/Director Involvement in Alleged LOU Diamond Scheme

Included in the Examiner's charge was ascertaining the involvement, if any, of the Debtors' officers and directors in the Alleged Fraudulent Circumstances. The Debtors' director and former CEO of FI and FDI Mihir Bhansali invoked his Fifth Amendment right against self-incrimination rather than answering any questions posed by the Examiner. Documentary and witness evidence suggests that Bhansali was a key participant in the Alleged Fraudulent Circumstances and worked closely with Modi to accomplish its execution. His involvement was not limited to control of the Debtors and other U.S. Firestar entities but extended to oversight of the Shadow Entities, Firestar overseas affiliates and the Modi Firms. He appears to have been involved in, and aware of, the key aspects of the alleged LOU diamond scheme.

The CFO of the Debtors, Ajay Gandhi, initially appeared cooperative with the Examiner's investigation. However, he was not forthcoming and made statements that were later contradicted by other evidence. He also appears to have made misrepresentations to banks, auditors and others

regarding the relationships among the various entities. Specifically, he appears to have denied Modi's control over the various entities and their relatedness to each other and to the Debtors. By virtue of his role with the Debtors, Gandhi was necessarily involved in the flow of funds stemming from the alleged LOU diamond fraud. His lack of candor regarding a key aspect of the alleged fraud—the relatedness among entities that pretended to engage in arms-length transactions— suggests some level of intent.

### 1.    **Mihir Bhansali.**

Mihir Bhansali is Modi's distant cousin[367] and was the sole director of the U.S. Firestar entities.[368] He was also the CEO of FI and FDI. He held equity shares in Firestar Diamond International Private Limited, the entity that operated the Firestar factories in India[369] and was listed in a document as the CEO of the ultimate parent company, Firestar International Private Limited.[370] Another document refers to him as the CEO of Firestar Diamond (Dubai). [371]

Bhansali graduated from HR College of Commerce and Economics in 1995 in Mumbai, India. He then received a B.Sc. in business from Babson College in 1998 in the United States. He began working in Mumbai, India and rose to the position of Managing Director for Firestone International Private Limited.

Bhansali became CEO of the FDI and FI in 2005, from which time forward he managed the Firestar Debtors' U.S. businesses.[372] His role included overseeing the sales team at FDI and

---

[367] Interview of Howard Hoff , August 2, 2018; Interview of Ajay Gandhi; *see also* email from Sumay Bhansali to Samuel Sandberg, dated February 14, 2018 (FIRE-REL0001128996) (Sumay Bhansali refers to Bhansali as "Nirav's cousin").
[368] Document titled "2018 01 10 Company Structure_3.pdf," undated (FIRE-REL0000000130.0001).
[369] ROI-MCA-00000362.
[370] *See* spreadsheet titled "Delegation of Authority Matrix," (FIRE-REL0000396424.0001).
[371] Firestar Diamond International Private Ltd and Firestar International Private Ltd, Internal Audit Report on Order to Dispatch for April 2016 to January 2017, dated June 2017 (FIRE-REL0000403762.0001).
[372] Interview of Ajay Gandhi, May 17, 2018.

20-01054-shl   Doc 109-4   Filed 02/25/15   Entered 02/25/22 20:00:43   Main Document
John J. Carney      Examiner - Part 2 of 2      Pg 11 of 52
Pg 523 of 804      Report of

FI including controlling internal and external pricing.[373]   He also negotiated payment terms with customers.[374]   Tellingly, he exercised specific oversight of loose diamond sales in that he managed the Debtors' "house accounts,"[375] the accounts in which loose diamond sales (primarily with Shadow Entities) were segregated from regular sales accounts for purposes of computing commissions.[376]

### (a)      Bhansali's Control Over Non-U.S. Firestar entities

As discussed above, Bhansali has been described as Modi's "*de facto* number 2," and is alleged by authorities in India to have had significant control over the operations of the entire Firestar entities.   He is alleged to have controlled Firestar entities by hiring placeholder employees who simply follow his direction.   For example, Saju Poulose Parokaran, the general manager of accounts at Firestar India stated in interviews with authorities that Bhansali requested he "select some of the trusted employees from the company who do not apply much brain" to work for Firestar overseas entities.[377]   Indeed, in May 2017, Bhansali allegedly directed Shyam Wadwha, an alleged Modi confidant and Firestar India employee,[378] to replace the sitting Firestar Hong Kong director with Bankim Mehta, a diamond trader working in New York at non-debtor FD International.[379]   Bankim Mehta admitted that he did not do anything as a director except sign paperwork when asked.[380]   The Examiner's examination corroborates Bhansali's involvement with the operations of numerous overseas Firestar entities including in Hong Kong, Dubai and India.

---

[373] *Id.*
[374] Interview of Ajay Gandhi, July 19, 2018.
[375] Interview of Ajay Gandhi, May 17, 2018. (House accounts are the records of sales for employees who are not in a sales function, and therefore do not earn sales commissions.)  Interview of Howard Hoff, August 2, 2018.
[376] *Id.*
[377] Interview of Ajay Gandhi, May 17, 2018.
[378] ED Complaint ¶ 3.2.4; ROI-MCA00000439.
[379] Email from Mihir Bhansali to Shyam Wadwha, Kurian Mathews, Reena Shah and Ajay Gandhi, copying Nirav Modi, Ravi Gupta and Vipul Ambani, dated May 25, 2017 (FIRE-REL0000404657).
[380] Interview of Bankim Mehta, June 6, 2018.

20-01051-shl Doc 109-4 Filed 02/25/22 Entered 02/25/22 20:00:41 Main Document
Pg 524 of 804
18-10509-shl Doc 894 Filed 06/25/18 Entered 06/25/18 10:35:19 Main Document
Pg 12 of 52

John J. Carney    Examiner    Part 2 of 2    Report of

Moreover, emails indicate Firestar employees sought Bhansali's approval on even the most ministerial matters. For example, in one instance, a Dubai employee seeking a new computer directed his request to Bhansali, while another former Firestar employee asked Bhansali's approval before changing the authorized signatory for the Firestar Hong Kong holding company.[381] Other emails seek Bhansali's permission to execute wire transfers from Firestar Diamond, Hong Kong to FDI and Brilliant Diamonds.[382]

### (b) Bhansali's Oversight of Shadow Entities

According to statements by non-U.S. Firestar employees to authorities in India, Bhansali and Modi created and controlled the Shadow Entities, including among others, Empire Gems, Unique Diamond and Jewellery, Pacific Diamonds, Universal Fine Jewellery, Vista Jewelry and Tri Color Gems.[383] A former director of Firestar International Pvt. Ltd. stated, "Mihir Bhansali was having financial control over these companies through his trusted associates."[384] Bhansali is alleged to have assigned Firestar employees in Dubai and Hong Kong and to employ them at Shadow Entities.[385] As the Examiner's investigation corroborates, many of the directors put in place at the Shadow Entities are current or former Firestar employees.[386]

Bhansali is alleged to have been an architect of the scheme to transfer diamonds with Shadow Entities. According to an interview provided to authorities in India by the General Manager of Firestar Diamond FZE,[387] Bhansali allegedly asked him to accompany an auditor and provided pre-written answers to anticipated questions about the Shadow Entities.[388] Bhansali

---

[381] Email from Kurian Mathews to Mihir Bhansali, dated September 14, 2017 (FIRE-REL0000398015).
[382] Email from Pushpa Singh to Mihir Bhansali, dated April 26, 2011 (FIRE-REL0002670292); Email from Satyendra Shukla to Mihir Bhansali, dated December 14, 2017 (FIRE-REL0000391909).
[383] ROI-MCA-00000432.
[384] ROI-MCA-00000439.
[385] ED Complaint ¶ 6.34.; Lad and Gandhi are also directors/managers of Shadow Entities.
[386] Meetings with BDO (India), July 2018.
[387] Shukla was also a manager of Shadow Entity Universal Fine Jewelry FZE (UAE).
[388] ROI-MCA-00000436.

20-01054-shl   Doc 109   Filed 02/25/23   Entered 02/25/23 20:00:45   Main Document
18-10509-shl   Doc 894-1   Filed 06/25/18   Entered 06/25/18 10:35:19   Report of
John J. Carney   Examiner   Part 2 of 2   Pg 13 of 52
Pg 525 of 804

allegedly told the managers to state they had three to four generations of experience in the jewelry business when in fact they were simply Firestar employees.[389]

Employees have stated to authorities in India that Bhansali was involved in a scheme to "rotate the transaction again and again to increase turnover by Shri Mihir Bhansali and Shri Nirav Modi."[390]  The Examiner's investigation is consistent with this characterization, as demonstrated by the massive round-tripping transactions and volume of loose diamond sales without apparent business purpose that occurred in the U.S. companies under his control.  Bhansali appears to have been directly involved in at least some circular transactions involving the Debtors.  For example, in a 2012 email Kurian Matthews relays a conversation he had with Bhansali in which they set up a circular transaction starting at "FDC" (FI), going through Radashir, FIPL, FDI and ending back at FI.  The purpose was to "clear the old invoices of Radashir on FDC"[391] because a bank was inquiring about the old invoices.  Similarly, in December 2012, Bhansali and Kurian Mathews discuss wiring money to Radashir and back to the Debtors against Radashir's accounts payables in order to "use [the money] for NM [Modi]."[392]  Even as recently as March 2016, Evelyn Kosiec, the operations manager at A. Jaffe, asked Bhansali where to re-export loose diamonds, and an hour later she told Gandhi, "Mihir informed to ship this to Eternal diamonds in Hong Kong, the same price, rounded to the nearest 5 120 day terms."[393]

Bhansali was also involved in the Twin Fields transactions described below, in which tens of millions of dollars were funneled through one of the Debtor entities to fund the operations of BBB Group.  According to the former CEO of BBB Group, Bhansali and Nehal Modi were the

---

[389] Id.
[390] ROI-MCA-00000439.
[391] FIRE-REL0000107436.
[392] Email chain between Ajay Gandhi, Mihir Bhansali and Kurian Mathews, dated November 20, 2012 (FIRE-REL0000107436).
[393] Email from Evelyn Kosiec to Ajay Gandhi, dated March 14, 2016 (FIRE-REL0000207530).

18-10509-shl   Doc 994-1   Filed 02/25/22   Entered 02/25/22 20:00:41   Main Document
Pg 526 of 804

20-01054-shl   Doc 109   Filed 02/25/19   Entered 02/25/18 10:35:19   Main Document
John J. Carney      Examiner   Part 2 of 2    Pg 14 of 52   Report of

ultimate decision makers for BBB Group, and when BBB Group needed money, the CEO would

ask Bhansali.[394]   Gandhi confirmed that Bhansali managed and operated the Twin Fields

relationship from Firestar's perspective.[395]   When A. Jaffe did not have the cash to fund Twin

Fields, Bhansali would tell Gandhi when to expect an influx of funds into the A. Jaffe accounts.[396]

The Examiner's team has identified at least one transaction in which funds flowed through Twin

Fields to A. Jaffe to repay an outstanding LOU alleged to have been issued in connection with the

fraudulent scheme.

Evidence obtained by the Examiner corroborates Bhansali's involvement in the loose

diamond sales to Shadow Entities.   Specifically, as discussed above, the Examiner's investigation

documented tens of millions of dollars in loose diamond sales between the Shadow Entities and

A. Jaffe despite the fact that A. Jaffe's business was not to trade loose diamonds.   In an interview,

Gandhi acknowledged the unusual nature of these transactions and explained that the loose

diamond sales with the Shadow Entities were run through A. Jaffe at the direction of Bhansali.

### (c)      Bhansali's Conduct with Respect To The Bankruptcy Proceeding and the Examiner's Investigation.

Bhansali remained the CEO of the Debtors through the filing of the Chapter 11 Cases in

February 2018.   In connection with his charge of, among other things, ascertaining any influence

of the Modi Firms on the Debtors, the Examiner attempted to interview Bhansali. Bhansali, who

at that time was the President of the Debtors, flatly refused to cooperate. When pressed by

Examiner's counsel, Bhansali's counsel acknowledged that Bhansali was in communication with

Modi as late as March 15, 2018, and that he and the fugitive Modi discussed the Debtors' sale and

bankruptcy process.   When the Court demanded additional information from Bhansali relating to

---

[394] Interview with Steve Velasquez, June 21, 2018.
[395] Interview of Ajay Gandhi June 13, 2018.
[396] *Id.*

127

his contact with Modi and communication with potential bidders regarding his potential future employment, Bhansali's counsel represented Bhansali would assert his Fifth Amendment right against self-incrimination rather than testify regarding these issues. Bhansali ultimately resigned from all roles with the Debtors rather than answer questions. In response to the Examiner's subsequent subpoena, Bhansali asserted his Fifth Amendment right against self-incrimination and refused to provide either documents or testimony. At his deposition, Bhansali asserted the Fifth Amendment as to every question other than his name.

In addition to refusing to cooperate with the Examiner even as he remained an officer of the Debtors, it appears Bhansali may earlier have taken steps to hide or destroy information. Indian authorities have alleged that Bhansali managed Shadow Entity operations using Panemail, which according to the ED Complaint is a form of electronic communication that automatically deletes messages.[397] The use of Panemail by key conspirators is corroborated by emails obtained by the Examiner, including an email from Modi's secretary requesting that another employee, Gandhi, communicate about Shadow Entities only over personal email or Panemail in the future.[398] As discussed above, Bhansali's computer appears to have used a software program designed to prevent the recovery of deleted data.

Notwithstanding Bahnsali's lack of cooperation, the Examiner recovered from Bhansali's computer a document that essentially appears to be the control board of the fraudulent LOU diamond scheme itself. As described above, a spreadsheet dated early February 2018 sets forth in one place the total payables and receivables among the Modi Firms, the Firestar entities, and the Shadow Entities in Hong Kong and Dubai, as well as the Firestone contact person acting as the principal of the various shadow entities. This single page would assist the reader to determine, as

---

[397] ED Complaint, ¶¶ 6.26; 6.45.
[398] Email from Kavita Mankikar to Ajay Gandhi, dated June 10, 2013 (FIRE-REL0000067694).

20-01052-shl   Doc 109-4   Filed 02/25/23   Entered 02/25/23 20:00:45   Main Document
John J. Carney      Examiner   Part 2 of 2      Pg 16 of 52
18-10509-shl   Doc 894   Filed 06/25/18   Entered 06/25/18 10:35:19   Report of
Pg 528 of 804

of the appropriate date, the exact status of the flow of funds among the Modi-controlled entities, broken down by transaction, and would provide sufficient information to enter into new transactions to meet their cash needs—including whom to contact to accomplish the transaction. There appears to be no legitimate business explanation for this document or for Bhansali to possess it absent his direct involvement in Shadow Entity transactions. Rather, this document corroborates Gandhi's assertion that Bhansali exercised oversight over the loose diamond sales.

The authorities in India, who are conducting the global investigation and have access to a full range of witnesses and documents, have alleged that Bhansali was a co-conspirator who helped Modi orchestrate the alleged LOU fraud.  During Bhansali's tenure as Debtors' CEO, hundreds of millions of dollars passed through the Debtors in connection with purported loose diamond transactions without apparent economic purpose.  Bhansali controlled the Debtors, and evidence corroborates the allegation that he also exercised control over other Firestar entities and Shadow Entities.  The evidence obtained by the Examiner is consistent with the allegations that Bahnsali was a participant in the fraudulent LOU scheme.

## 2.    Ajay Gandhi

Ajay Gandhi was the Chief Financial Officer of the U.S. Firestar entities. Gandhi received a B.B.A. in accounting and economics in India and attended Baruch College and York College to qualify for the CPA exam, and became a licensed CPA in November 1994.[399]  Gandhi had control and oversight over all financial transactions relating to any U.S. Firestar entity including managerial sign off on loose diamond transactions totaling hundreds of millions of dollars with the Shadow Entities. Gandhi was the liaison with the auditors, Marks Paneth, and the banks that

---

[399] Resume of Ajay Gandhi, February 2018 (FIRE-REL0000040437.0001).

provided financing to FDI and FI, HSBC and IDB.

Gandhi regularly communicated with Modi, Bhansali and numerous employees of Firestar entities in India, Hong Kong and Dubai regarding various financial transactions. Gandhi had control over certain foreign Firestar entities, including acting in the role of Firestar Asia Pacific CFO.[400] Because the U.S. entities relied on back office services located in India, Gandhi was also in regular communication with back office financial professionals in India. Indeed, Gandhi stated that Firestar India controlled most of the Debtors' financial records and Gandhi had to go through Firestar India to get certain financial information.[401]

Gandhi's day–to-day role at the U.S. entities included checking all account balances, monitoring the cash flow, reviewing and approving payments, managing payables and receivables and reviewing inputs from the sales team to ensure they matched the financials.[402] Gandhi would also sign the monthly borrowing certificates for the lending banks, HSBC and IDB. Based on the documents reviewed by the Examiner's team, it is clear that Gandhi controlled the finances of the Debtor entities.

During numerous interviews with the Examiner, Gandhi was asked about his knowledge of the Shadow Entities and their relationship to the Debtors. In his first interview with the Examiner's team, Gandhi stated that the only thing he knew about the Shadow Entities was that they were Bhansali's customers.[403] In subsequent interviews, Gandhi continued to insist he was not aware that any Shadow Entity was owned or controlled by Modi.[404] When confronted by the Examiner' team with emails indicating that Gandhi was aware that numerous Shadow Entities

---

[400] *See* Email from Priyesh Malkan to Mihir Bhansali, dated September 25, 2017 (FIRE-REL0000397385); Email from Ajay Gandhi to Shyam Wadhwa, dated November 5, 2010 (FIRE-REL0000072200).
[401] Interview of Ajay Gandhi, May 17, 2018.
[402] *Id.*
[403] *Id.*
[404] Interview of Ajay Gandhi June 13, 2018; June 7, 2018; July 19, 2018.

were related parties, Gandhi repeatedly maintained he did not remember these emails nor that the Shadow Entities were in any way controlled by Modi.

Despite Gandhi's insistence that he did not know who owned or controlled the Shadow Entities, the Examiner identified numerous documents that suggest Gandhi knew or should have known that many of the entities were in fact related parties controlled or owned by Modi. As described in the Shadow Entities section above, numerous emails reviewed by the Examiner team uncovered not only the involvement of the Debtor Entities in the Alleged Fraudulent Circumstances, but knowledge on behalf of Gandhi. With respect to Gandhi's knowledge the following emails seem most probative:

- On August 6, 2013, Gandhi sent an email to Bhavesh Patel with an attachment titled "FS-Inc from Kurian June 2013," transmitting a series of internal purchase and sales ledgers of numerous Shadow Entities located in Dubai.[405] These sales ledgers, which were the internal accounting records of the Dubai Shadow Entities, which appear to list the sales and purchases with FDI. There appears to be no legitimate reason why Gandhi would be in possession of the internal books and records of multiple Shadow Entities, absent having control or orchestration of their records.

- On March 1, 2013, Shyam Wadhwa, an overseas Firestar employee, emailed Gandhi a spreadsheet titled "Recon Summary –FSI andFDIntln Inc with Diamond vendors and customers."[406] The spreadsheet compared the books of "vendors" and "customers" to the books of FDI and FD International. All the vendors and

---

[405] Email from Ajay Gandhi to Bhavesh Patel, dated August 6, 2013 (FIRE-REL0000102654; FIRE-REL0000102654.0001). According to Indian authorities, Kurian Mathews has been arrested for his involvement in the Alleged Fraudulent Circumstances. Mathews was also alleged to have supervised the accounting for the Shadow Entities referenced in the ledgers (ROI-MCA-00000437).

[406] Email from Shyam Wadhwa to Ajay Gandhi, dated March 1, 2013 (FIRE-REL0000068259); Attachment to email from Shyam Wadhwa to Ajay Gandhi titled "NY balance comparison of select vendors / customer as of 15th Feb '13" dated February 13, 2013 (FIRE-REL0000068259.00001).

customers were Shadow Entities, except for one Firestar affiliate. One category of comparisons was titled "Correction entries required in NY books as well as Customer/Vendor books." One comment stated "Booked by Pacific in Firestar Diamond Inc to be corrected as FSIntn Inc." The Examiner is unaware of a situation where an entity would have access to the internal books of its customers unless its customer was an affiliate, subsidiary or otherwise controlled by such entity.

- In one of his first interviews with Gandhi, the Examiner questioned Gandhi's involvement in hundreds of millions of dollars of loose diamond sales. Gandhi gave the dubious explanation that he merely signed packing slips with no verification of the contents of the shipment, its valuation, the profitability or propriety of such transaction.

- On January 19, 2010, Ajay Gandhi emailed the Firestar India back office and asked for the detailed aging report. Gandhi stated "You can exclude affiliates such as FIPL, FS, FC, JS, Sandberg and Unique."[407] This email documents that Unique, a Shadow Entity, was not at arms-length but was operated as an affiliate. This is contrary to Gandhi's statements to the Examiner.

- In 2012 and 2014, Gandhi requested that $150,000 be wired to Unique Diamond for back office expenses.[408] In the 2014 email, Gandhi also requested that $123,000 be wired from Synergies Corporation to Brilliant Diamond for a loan repayment.[409] This is contrary to statements Gandhi made to the Examiner and suggests Gandhi knew that Unique as a related party. Gandhi could not explain why a Debtor was

---

[407] Email from Ajay Gandhi to FSI INDIA Accounts & MIS, dated January 19, 2010 (FIRE-REL0000365497).
[408] Email from Ajay Gandhi to Bhavesh Pate, dated September 12, 2012 (FIRE-REL0000109391); Email from Ajay Gandhi to Bhavesh Patel, dated March 18, 2014 (FIRE-REL0000139572).
[409] Email from Ajay Gandhi to Bhavesh Patel and Hemant Bhatt, dated March 18, 2014 (FIRE-REL0000152658).

paying the back office expenses for an allegedly independent customer.

- On February 15, 2015, Gandhi emailed two Firestar India back office employees and instructed them to pay "$300,000 from Firestar Diamond, Inc to Eternal Diamond. (Back office Expense)."[410]   This email demonstrates that Gandhi understood that Eternal Diamond, a Shadow Entity, was not truly an arms-length entity, but rather an affiliate so close that FDI was willing to pay hundreds of thousands of dollars in back office expenses.

- In an email dated June 8, 2012, Ajay Gandhi asked Bhavesh Patel and Shyam Wadhwa, two Firestar employees, for "payables to HK and Dubai – all the companies. Firestar, Firestar Diamond Int'l and Jaffe." because he "need[ed] to pay $1 m to HK or Dubai hence need name and amounts only."[411]  Bhavesh Patel replied "There is nothing open with Dubai however HK open payable is attached herewith." Gandhi responded "It could be Pacific, World Diamond etc too."[412]  On the same day there was a $1 million disbursement to Fancy Creations, labeled in the bank statement as an advance.[413]  The email documents that Gandhi wanted to move $1 million outside the United States, and considered the Shadow Entities (and transactions with them) as a vehicle to create a false justification for the movement of the funds.

- On May 5, 2017, Gandhi sent a list of Shadow Entities to Altamash Ansari, a back office employee in India, and stated "Use names from attached for Eternal, Pacific

---

[410] Email from Ajay Gandhi to Arpan Doshi and Avinash Oza, dated February 20, 2015 (FIRE-REL0000163907).
[411] Email chain between Ajay Gandhi and Bhavesh Patel, dated June 8, 2012 (FIRE-REL0000111796).
[412] Id.
[413] June 8, 2012 disbursement from Firestar Diamond Inc.'s HSBC account ending 3004.

& Tri Color. (Do not share this pdf with anyone.).”[414]   This email evidences

conscious acts to conceal information with respect to Shadow Entities.

- On February 16, 2017, Gandhi sent an email with the subject "Foreign Customers

  plus affiliated customers".[415]   The only entities that were listed were Shadow

  Entities. It does not list any legitimate international customers. This email

  evidences the fact that Gandhi understood that the listed entities were not

  independent customers but rather affiliated.

While Gandhi has refused to admit he has any knowledge of the Shadow Entities beyond

the fact that they were customers, the documentation supports a conclusion that Gandhi knew or

should have known that the Shadow Entities were owned, controlled or at the minimum affiliated

with Modi.  During the Examiner's review of documents, there were emails from or to Gandhi's

personal email account.  When the Examiner asked Gandhi was asked if he ever used personal

email for Firestar business he stated he did not.[416]  This is directly contrary to an email Gandhi

received on his personal email account from Modi's personal assistant in India where he was

instructed to only communicate with her regarding Shadow Entities on gmail or Panemail.[417]

Gandhi also used outside email, "panemail" to communicate with overseas Firestar employees,

including Modi's personal assistant.

Gandhi helped facilitate the financial transactions related to the round-tripping of

diamonds.  In an interview with Gandhi on July 19, 2018, the Examiner's forensic accountant

asked Gandhi a line of questions about the accounts receivables and payables related to the Shadow

---

[414] Email from Ajay Gandhi to Altamash Ansari, dated May 4, 2017 (FIRE-REL0000268041).
[415] Email from Ajay Gandhi to Kunal Patel, dated February 16, 2017 (FIRE-REL0000271311).
[416] Interview of Ajay Gandhi, June 13, 2018.
[417] Email from Kavita Mankikar to Ajay Gandhi, dated June 10, 2013 (FIRE-REL0000067694). Kavita Mankikar was alleged to have participated in the Alleged Fraudulent Circumstances.

Entities.  When the Examiner's team pressed Gandhi why the U.S. entities, including the debtors, would receive shipments of loose diamonds from foreign entities which were then immediately reshipped to another foreign entity, Gandhi responded that the purpose of the importing and exporting of diamonds was so the overseas Firestar entities could get financing.  The Examiner's team asked if financing was the same as an LOU and Gandhi replied, "yes."  Gandhi stated that he had been told this by Shyam Wadhwa, although Gandhi did not specify when this conversation took place, whether before or after the fraud was alleged.[418]

There also exists evidence that Gandhi, along with Modi and other key senior officials, took steps to coordinate their communication with banks to avoid detection.  Specifically, in addressing an inquiry from Standard Chartered Bank regarding transactions with certain Shadow Entities who the bank believed were customers, Gandhi stated that these entities were not in fact customers but that Firestar would buy large diamonds from them as vendors.  Gandhi, trying to address the unusual movement of diamonds, explained "sometimes these goods need to be returned but due to the terms of the original sale, the vendors instruct us to ship these goods to another companies, that they select who are not located in India. We record these transfers as a reduction to purchases and an increase to accounts receivable at the original purchase cost of the diamonds / jewelry."[419]  Importantly, Bhansali, who was included on the email from Gandhi, forwarded this response to Modi.  Modi then responded, noting "As SC is a common bank in India, Antwerp and NY. It might be a good idea that Ajay and you discuss all responses [sic]."[420]

In an interview, Gandhi admitted that there were unusual transactions running through A. Jaffe that were contrary to A. Jaffe's business.  Specifically, Gandhi acknowledged that at least in

---

[418] Interview of Ajay Gandhi, July 19, 2018.
[419] Email chain between Ajay Gandhi, Mihir Bhansali and Claire Hsieh, datedSeptember 7, 2011 (FIRE-REL0002640619).
[420] *Id*.

18-10509-shl  Doc 994-4  Filed 08/25/18  Entered 08/25/18 10:35:19  Main Document
Pg 535 of 804

20-01054-shl  Doc 109-4  Filed 02/25/22  Entered 02/25/22 20:00:44  Examiner Report Part 2 of 2  Pg 23 of 52
John J. Carney     Examiner

2012, sales of loose diamonds were not sales for the purposes of commission, they were contrary to A. Jaffe's core business, required him to keep separate records in order to account for those sales and in 2012 constituted about 80% of gross sales. Gandhi further explained that it was Bhansali's decision to run the loose diamond sales through A. Jaffe. A&M performed forensic procedures and determined a majority of the loose diamond sales at issue in 2012 were in fact sold to Shadow Entities.

Gandhi also assisted Modi in using the Debtors funds in connection with large real estate purchases shortly before the fraud charges were brought in India. Gandhi assisted Modi by paying approximately $3 million from FDI to pay off an HSBC mortgage to transfer an apartment valued at approximately $6 million from a Firestar affiliate to a trust established by his sister for the benefit of Modi and his family. The real estate transactions are discussed below.

The documentary evidence uncovered by the Examiner's team and the statements of the witnesses and Gandhi himself provide a factual basis to conclude that he assisted Bhansali and Modi in creating the appearance of transactions when in fact they lacked economic substance.

## VIII.  USE OF POTENTIALLY FRAUDULENT FUNDS

### A.  Suspicious Transfers to Bailey, Banks & Biddle

The Examiner has identified a series of transactions in which $21 million was transferred from A. Jaffe to a Delaware company,[421] Twin Fields Investments Ltd. ("Twin Fields"). Twin Fields is the parent company of retail jewelry company Bailey Banks & Biddle. It appears to have funded Bailey Banks & Biddle's operations through the Debtors, other Firestar entities, and Shadow Entities. As discussed above, the Examiner has traced the repayment of at least one allegedly fraudulent LOU from Shadow Entity Fine Classic as flowing through Twin Fields, A.

---

[421] Twin Fields Investments Ltd. was incorporated in the State of Delaware on March 16, 2010, and lists the Hamburger Law Firm, LLC in Englewood, New Jersey as its principal place of business (FIRE-REL0000445831.001)

Jaffe and FDI.   In addition, notable features of this investment include the lack of public disclosure

of the Debtor's connection to Bailey Banks & Biddle and that A. Jaffe made several loans to Twin

Fields without enough funds.

Twin Fields Investments Ltd. was incorporated in the State of Delaware on March 16,

2010, and lists the Hamburger Law Firm, LLC in Englewood, New Jersey as its principal place of

business.   According to Ajay Gandhi, Twin Fields was managed by Mihir Bhansali.[422]

### 1.   Bailey Banks & Biddle Background

Founded in 1832 as Bailey and Co., Bailey Banks & Biddle is a well-established operator

of specialty retail jewelry stores located in regional shopping malls and outlet centers.[423]  Bailey

Banks & Biddle was owned by Finlay Fine Jewelry Company as of 2009 when, as a result of the

financial crisis, Finlay Enterprises and certain affiliated debtors filed voluntary petitions for relief

under chapter 11 of the Bankruptcy Code in the Southern District of New York on August 5,

2009.[424]

On November 4, 2009, Synergies Corporation successfully bid $555,000 for the

intellectual property rights of Bailey Banks & Biddle.[425]   Synergies acquired their e-commerce

business, including, but not limited to, all hardware and software dedicated to the business, and

other assets including select jewelry pieces.[426]   Ajay Gandhi attended the auction and Klestadt

Winters Jureller Southard & Stevens, LLP (under a prior name) represented Synergies in that

acquisition.[427]

---

[422] Interview of Ajay Gandhi, June 7, 2018.
[423] Bailey Banks & Biddle, available at https://baileybanksandbiddle.com/pages/about-us.
[424] Voluntary Petition for Chapter 11 Bankruptcy , *In re Finlay Enterprises Inc.*, Case No. 09-14873 (REG),(ECF No. 1).
[425] Notice of Selection of Successful Bids at Auction, *In re Finlay Enterprises, Inc.*, Case No. 09-14873 (REG) (ECF No. 357).
[426] *See id.*
[427] *See* email exchange between Ajay Gandhi and Samuel Sandberg, dated November 5, 2009 (FIRE-REL0001422625).

137

18-10509-shl  Doc 894-4  Filed 02/25/19  Entered 02/25/19 20:00:41  Main Document
Pg 537 of 804

20-01054-shl  Doc 109-4  Filed 06/25/19  Entered 06/25/19 10:35:19  Report of
John J. Carney  Examiner  Part 2 of 2  Pg 25 of 52

BBB Group, Inc. d/b/a Bailey Banks & Biddle ("BBB Group") was incorporated in the state of Delaware on May 13, 2010.[428]  After receiving funding from Twin Fields, Bailey Banks & Biddle began operations under the new BBB Group entity.[429]  A Wall Street Journal Article described Twin Fields as a "private-equity firm,"[430] and a stock certificate dated July 11, 2012, identifies Twin Fields Investments Ltd. as the owner of BBB Group, together with other corroborating confidential information received by the Examiner.[431]  The stock certificate appears to be signed by Twin Fields' director Adam Budgor and Mihir Bhansali.[432]

Other sources corroborate the connection between BBB Group and Twin Fields. Marks Paneth, the Debtors' financial advisor, formerly provided accounting services for BBB Group. In certain accounting reports and financial statements prepared by Marks Paneth.[433]  Steve Velasquez, the former CEO of BBB Group from June 2014 to September 2017, stated that he was told that Twin Fields owned BBB Group and he understood Twin Fields to be a venture capital group set up to make investments in the company.[434]  According to a statement made by Raghuraman Iyer, a financial consultant that worked on Firestar matters, "BBB Retail" is owned by Nirav Modi/Firestar.[435]

## 2.  <u>Twin Fields Funding Arrangement with BBB Group</u>

Former CEO of BBB Group, Steve Velasquez told the Examiner that his understanding was that Twin Fields had agreed to fund BBB Group with the goal of the latter becoming self-

---

[428] *See* Department of State: Division of Corporation for the State of Delaware, Entity Details, available at https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx.
[429] Melanie Cohen, Bankruptcy Beat, Bailey Banks & Biddle Ready to Glimmer Again, November 1, 2010, available at https://blogs.wsj.com/bankruptcy/2010/11/01/bailey-banks-biddle-ready-to-glimmer-again/.
[430] Id.
[431] Twin Fields Investments Ltd. Stock Certificate for shares of BBB Group, Inc., dated July 11, 2012 (FIRE-REL0002647462.0001).
[432] *Id*.
[433] BBB000041-68.
[434] Interview of Steve Velasquez, June 21, 2018.
[435] ED Complaint ¶ 6.18.

138

18-10509-shl    Doc 994-4    Filed 08/25/18    Entered 08/25/18 20:00:45    Main Document
Pg 538 of 804

20-01054-shl    Doc 109-4    Filed 05/25/18    Entered 05/25/18 20:00:45    Main Report of
John J. Carney    Examiner    Part 2 of 2    Pg 26 of 52

sustaining.  Velasquez prepared financial updates with assistance from Marks Paneth, and these were reviewed and approved by Nehal Modi, Bhansali, and Nirav Modi.[436] Nirav Modi was kept apprised of the hiring of Mills Menser as President and CEO including a memorandum written by Menser before his hiring about what he saw as Bailey, Banks & Biddle's deficiencies.[437]

During Steve Velasquez's time as CEO, BBB Group never repaid any funds to Twin Fields, whose funding Velasquez described as a "one way street."[438]   Steve Velasquez further noted that the funding arrangement with Twin Fields appeared to be in place prior to him serving as CEO, and there was an outstanding loan balance of tens of millions of dollars that had accumulated throughout its ownership of BBB Group.

### 3.    Twin Fields Bank Statement Activity

Twin Fields main operating account was a Bank of America Business Checking account (ending in 5160).  The Examiner's team reviewed account statements produced by Bank of America for this account from the period of November 1, 2010 to March 31, 2018, addressed to Twin Fields Investments Ltd. C/O Ian Winters.[439]  Twin Fields was primarily funded by A. Jaffe, Fine Classic, a Shadow Entity controlled by Purvi Modi (Nirav Modi's sister) that is discussed above, and a British Virgin Islands entity, Link High International ("Link High").  At least $42 million of the approximately $80 million of funds that flowed out from Twin Fields went to BBB Group.  As there were 8 checks identified on the bank statements totaling $12.5 million that were outside of Bank of America's document retention window, the destination of these funds could not

---

[436] Interview of Steve Velasquez, June 21, 2018.
[437] *See* email and memorandum by Mills Menser forwarded from Mihir Bhansali to Nirav Modi, dated June 13, 2017 (FIRE-REL0000422008); and -email exchange between Nehal Modi to Nirav Modi and Mihir Bhansali, dated June 28, 2017 (FIRE-REL0000421346).
[438] Interview of Steve Velasquez, June 21, 2018.
[439]  *See* Twin Fields Investment LTD bank account statements for account ending 5160, dated November 1, 2010 - March 31, 2018 (BOA_TWI_0000001 - BOA-TWI_0000611).

20-81054-shl Doc 109 Filed 02/25/22 Entered 02/25/22 20:00:44 Main Document
John J. Carney Examiner Part 2 of 2 Pg 27 of 52
18-10509-shl Doc 894 Filed 06/25/18 Entered 06/25/18 10:35:19 Report of
Pg 539 of 804

be determined by the Examiner. It is possible that some or all of these funds were also disbursed

to BBB Group.[440]  Below is a diagram demonstrating the flow of funds through Twin Fields:



A review of Twin Fields' bank statements for the period November 1, 2010 to March 21,

2018 revealed the following entities as sources and beneficiaries of the approximately $80 million

in funds that flowed through Twin Fields:[441]

---

[440] Bank of America informed the Examiner's team that its corporate policy is to retain copies of checks for a period
of seven years.

[441] Deposits/disbursements in which the transacting entity is not evident per the bank statements and check details
received are classified as "No Entity Information."  Check disbursements identified on the bank statements in which
no check detail was received from Bank of America are classified as "Records Not Available."

**Companies that Funded Twin Fields**

| Entity | Total |
|---|---|
| Fine Classic FZE | $ 26,864,056 |
| Link High International | 23,602,660 |
| A. Jaffe Inc. | 21,330,000 |
| No Detail | 4,253,623 |
| Synergies Corporation | 4,000,000 |
| Firestar Diamond, Inc. | 31,542 |
| **Total** | **$ 80,081,881** |

**Recipients of Twin Fields Funds**

| Entity | Total |
|---|---|
| BBB Group, Inc. | $ 42,748,000 |
| A. Jaffe Inc. | 21,467,521 |
| Check Records Not Available | 12,502,606 |
| TRS Diaco, Inc. | 2,910,000 |
| Other Disbursements | 385,332 |
| Lend-A-Hand India | 74,600 |
| **Total** | **$ 80,088,059** |

Below is a year-by-year summary of Twin Fields' source of funds and recipients of funds per the Bank of America account statements:

**Twin Fields Sources of Funds Details**

| Entity | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fine Classic FZE | | | | | | | 19,164,366 | 7,699,690 | $26,864,056 |
| Link High International | 1,500,000 | 9,802,860 | 10,799,800 | 1,500,000 | | | | | 23,602,660 |
| A. Jaffe Inc. | | | | 6,560,000 | 3,955,000 | 6,550,000 | 1,940,000 | 2,325,000 | 21,330,000 |
| No Detail | | 4,001,644 | | | 250,800 | 1,179 | | | 4,253,623 |
| Synergies Corporation | | 4,000,000 | | | | | | | 4,000,000 |
| Firestar Diamond, Inc. | | | | | | 31,542 | | | 31,542 |
| | $ 1,500,000 | $17,804,504 | $10,799,800 | $ 8,060,000 | $ 4,205,800 | $ 6,582,721 | $21,104,366 | $10,024,690 | $80,081,881 |

**Twin Fields Recipients of Funds Details**

| Entity | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| BBB Group, Inc. | | 6,750,000 | 10,750,000 | 3,753,000 | 3,655,000 | 6,275,000 | 4,265,000 | 7,300,000 | | $42,748,000 |
| A. Jaffe Inc. | | | | 1,400,000 | 250,000 | 250,000 | 16,863,531 | 2,703,990 | | 21,467,521 |
| Check Records Not Available | 1,500,000 | 11,002,606 | | | | | | | | 12,502,606 |
| TRS Diaco, Inc. | | | | 2,610,000 | 300,000 | | | | | 2,910,000 |
| Other Disbursements | 12 | 222 | 18,993 | 305,620 | 6,230 | 21,081 | 8,261 | 4,132 | 20,781 | 385,332 |
| Lend-A-Hand India | | 53,000 | 21,600 | | | | | | | 74,600 |
| | $ 1,500,012 | $17,805,828 | $10,790,593 | $ 8,068,620 | $ 4,211,230 | $ 6,546,081 | $21,136,792 | $10,008,122 | $ 20,781 | $80,088,059 |

Over this period, Twin Fields maintained small bank account balances. Large deposits into the account would often correspond with disbursements out of the account for similar amounts in

141

an "in-and-out" pattern. Monthly and annual cash inflows and outflows were substantially the same. Twin Fields did not appear to have any other significant business operations outside of being an intermediary to pass funds to BBB Group and the other entities listed in the table above. For example, in a series of transactions in June 2014, $500,000 was received from A. Jaffe and two checks for BBB Group were written for $250,000 each.[442] The accounts' June 1, 2014 opening balance was $211.51, and the ending balance on June 30, 2014 was $168.51. The only activity was the movement of the $500,000.[443] No repayments from BBB Group to Twin Fields were identified during the period under review. This was corroborated by statements made by the former BBB Group CEO.[444]

### 4. Entities that Funded Twin Fields

The bank records reviewed by the Examiner's team demonstrate that from 2010 to early 2013, Link High was the primary source of funds for the Twin Fields' account, depositing $23,602,600. No funds were identified as being disbursed from Twin Fields to Link High at any time during the period under review. Howard Hoff, Twin Field's former accountant, stated that Twin Fields was established by British Virgin Island entity Link High approximately seven years ago.[445] Bhansali told Howard Hoff that Link High was owned by an investor group.[446] Indian authorities have alleged that Link High was a beneficiary of millions of dollars of proceeds from fraudulently obtained LOUs. [447]

From early 2013 to the end of 2015, A. Jaffe took the lead as the primary source of funds

---

[442] *See* Twin Fields Investment LTD June 2014 account statement for account ending 5160, (BOA_TWI_0000386-389).

[443] *Id.*

[444] Interview of Steve Velasquez, June 21, 2018.

[445] Interview of Howard Hoff, August 2, 2018. During his interview with the Examiner, Howard Hoff, Twin Field's former accountant, stated that Twin Fields was established by Link High approximately seven years ago. According to Hoff, Mihir Bhansali informed him that Link High was owned by an unidentified investor group.

[446] *Id.*

[447] ED Complaint ¶ 10.4.

20-10105-shl   Doc 109   Filed 02/25/22   Entered 02/25/22 20:00:44   Main Document
Pg 542 of 804
18-10509-shl   Doc 894-1   Filed 08/25/18   Entered 08/25/18 10:35:19   Report of
John J. Carney   Examiner Part 2 of 2   Pg 30 of 52

that were deposited into the Twin Fields' account. By March 2017 A. Jaffe had transferred a total of $21,330,000.

From early 2016 until the end of 2017, Fine Classic was the primary source of funds that were deposited into the Twin Fields' account.  As discussed above, Fine Classic is owned by Purvi Mehta, Nirav Modi's sister.[448]  In an email chain dated January 11, 2017, Mihir Bhansali told Marks Paneth, Twin Fields' accountant, that Fine Classic is an overseas company that lent money to Twin Fields to fund BBB Group.[449]  A total of $26,864,056 was deposited by Fine Classic into the Twin Fields' account.  Fine Classic was the only other entity besides A. Jaffe to fund the Twin Fields account in 2016 and 2017.  Of the three entities that were the primary source of funds to Twin Fields, A. Jaffe is the only entity in which repayments were made by Twin Fields.  A total of $21,467,521 in payments from Twin Fields to A. Jaffe was identified, with the large majority of these disbursements taking place in 2016 ($16,863,531).

Due to the low bank balances maintained and the "in-and-out" activity described above, the Examiner believes that a large amount of funds Twin Fields used to repay A. Jaffe came from Fine Classic.  When Marks Paneth asked if the overseas funds were coming in as a loan that would be repaid and if there was a loan agreement/interest, Bhansali responded that the loan would be repaid and asked for a loan agreement to be drafted for the arrangement.[450]

The Twin Fields' Bank of America account was closed on February 21, 2018 with a balance of $13,281 – five days before the debtors filed for bankruptcy.[451]

    **(d)**        **A. Jaffe Loan to Twin Fields**

---

[448] *See supra*.
[449] Email chain between Richard Jania and Mihir Bhansali regarding Twin Fields – Fine Classic FZE Loan Arrangement dated January 12, 2017 (MP053022).
[450] *Id.*
[451] *See* Twin Fields Investment LTD February 2018 account statement for account ending 5160, (BOA_TWI_0000574-577).

The $21 million in payments made from A. Jaffe to Twin Fields were pursuant to a loan agreement entered into between A. Jaffe and Twin Fields. The loan agreement provided to the Examiner by Ajay Gandhi was a one-page document dated April 1, 2017 that appears to be signed by Gandhi and Adam Budgor, Twin Fields Director, and is for a loan of $828,990 at an annual interest rate of 4% that had a maturity date of June 30, 2017.[452] Based on the A. Jaffe and Twin Fields bank statement activity the Examiner's team reviewed, the loan payments begin much earlier than April 1, 2017 and exceed the $828,990 stated loan amount.[453] According to Ajay Gandhi, Mihir Bhansali instructed him to enter into the loan agreement.[454] The Examiner immediately identified these in need of further review because A. Jaffe did not have the funds on hand or consistent earnings to makes loans to other entities. Before 2016, A. Jaffe was carrying a loan receivable from Twin Fields as high as $16 million.[455]

A. Jaffe maintained relatively small balances, and often did not have sufficient capital to make large loan payments to Twin Fields. A. Jaffe's net income from operations for fiscal years ending 2013 to 2017 ranged from -$640,675 to $277,250.[456] A large majority of the 55 disbursements from A. Jaffe to Twin Fields were funded on or around the day of the payments from various sources. Below are the sources of funds linked to payments from A. Jaffe to Twin Fields.

**(e)      Firestar Diamond, Inc.**

At least thirteen of the fifty-five payments from A. Jaffe to Twin Fields can be traced in part or in total to FDI's bank loans with HSBC and IDB. FDI was credited with funds from HSBC

---

[452] A. Jaffe – Twin Fields Loan Agreement dated April 1, 2017 provided to the Examiner by Ajay Gandhi.
[453] *See* A. Jaffe HSBC (2460) bank account statement and Twin Fields Investment LTD Bank of America (5160) bank account statements (November 1, 2010 - March 31, 2018).
[454] Interview with Ajay Gandhi, June 7, 2018.
[455] 120200 Loans Receivable – Twin Fields General Ledger Account Detail.
[456] A. Jaffe, Inc. has a fiscal year end of March 31.

and IDB on or around the date of transfers from FDI to A. Jaffe. Based on the insufficient opening balance of FDI's account on the days of the payments to A. Jaffe that were used for Twin Fields payments, a link can be established between FDI's receipt of bank loans and the funds sent from FDI to A. Jaffe to Twin Fields.

For example, on April 7, 2015 FDI received a deposit from HSBC in the amount of $2,700,000. The opening balance that day was $186,016.[457] On the same day, $650,000 was transferred from FDI to A. Jaffe. The same day A. Jaffe received the funds, A. Jaffe made a $500,000 payment to Twin Fields.[458]

### (f)    Shadow Entities

Funds sent from A. Jaffe to Twin Fields can be traced to deposits in A. Jaffe's or FDI's accounts from Shadow Entities. Based on the related accounts' opening balances on or around the date of the payments to Twin Fields, as well as the volume of different deposits into the related accounts, the link to some deposits from Shadow Entities is more direct while others are more comingled. Funds received from Shadow Entities were not received in round-dollar amounts, which indicates they were likely received as payments for loose diamond sales with the debtors. The payment of funds into A. Jaffe was often more than the amount sent to Twin Fields.

Pacific Diamonds deposited funds into the Debtors in seven of the nine Shadow Entity transactions identified. Universal Fine Jewelry also deposited funds. Most of the deposits from Pacific Diamonds and Universal Fine Jewelry were received directly into A. Jaffe's HSBC account. Both Pacific Diamond and Universal Fine Jewelry have been cited as beneficiaries of LOUs by PNB.[459] Pacific Diamonds sent $3.6 million to A. Jaffe on or around the date that A.

---

[457] Firestar Diamond, Inc. April 2015 bank statement for HSBC account (3004) and A. Jaffe April 2014 bank statement for HSBC account (2460).

[458] *See* Twin Fields Investment LTD February 2018 account statement for account ending 5160, (BOA_TWI_0000428-431).

[459] Meetings with BDO (India), July 2018.

20-81105-shl  Doc 1094-2  Filed 02/25/22  Entered 02/25/22 20:00:41  Main Document
Pg 545 of 804
18-10509-shl  Doc 894  Filed 06/25/18  Entered 06/25/18 10:35:19  Report of
John J. Carney     Examiner     Part 2 of 2     Pg 33 of 52

Jaffe sent funds to Twin Fields.  Universal Fine Jewelry paid $1.4 million to A. Jaffe on or around the same date A. Jaffe sent $250,000 to Twin Fields.  The balances in the A. Jaffe HSBC (2460) bank account on these transfer dates were insufficient to account for the whole disbursement from A. Jaffe to Twin Fields, therefore at least some, or all, of the funds received from the Shadow Entity was likely passed through from A. Jaffe to Twin Fields.[460]

### (g)     Intercompany Transfers and Sales

Funds sent from A. Jaffe to Twin Fields can also be linked to intercompany transfers and sales between Firestar entities.  The Examiner identified intercompany transfers and sales from FD International, FI., Firestar Diamond FZE and Firestar Diamond Limited, HK.  Most of the intercompany transfers and sales are interspersed with other funds that are traced to Twin Fields payments.  These transfers and sales were recorded against the U.S. debtors' intercompany receivable and payable balances with other Firestar entities.  The affiliate entities would transfer a large amount into A. Jaffe's account the same day that A. Jaffe sent money to Twin Fields.  For example, on July 15, 2015 A. Jaffe paid Twin Fields $1 million, and the source of the funds in the A. Jaffe account was a $1 million deposit from FD International.[461] The available funds in the A. Jaffe account would have been insufficient to pay Twin Fields without the deposit from the affiliate entity.  The Examiner's team did not have access to non-debtor entity records and therefore the source of FD International's funds is not able to be determined at this time.

### (h)     Repayment of A. Jaffe Loan

Twin Fields repaid its loan from A. Jaffe through a total of 25 payments consisting of eighteen checks and seven wire transfers.  Twin Fields repaid the $21,330,000 it borrowed from

---

[460] A. Jaffe HSBC account (2460) bank statements for 2013 and September 2015.
[461] A. Jaffe July 2015 HSBC account (2460) bank statement.

20-10053-shl Doc 109 Filed 02/25/19 Entered 02/25/19 20:00:14 Main Document
Pg 546 of 804

18-10509-shl Doc 894-1 Filed 08/25/18 Entered 08/25/18 10:35:19 Report of
John J. Carney    Examiner   Part 2 of 2    Pg 34 of 52

A. Jaffe plus $137,521 in additional funds related to journal adjustments and interest payments.[462]

Mihir Bhansali appeared the sign the checks from Twin Fields to A. Jaffe.[463]  Emails indicate that

the A. Jaffe employee who typically processed checks did not process these payments.[464]  Fine

Classic was the only entity to fund Twin Fields when the repayments from Twin Fields to A. Jaffe

were made, and were thus the entity that funded the repayment of the loan.[465]

For example, in March 2016, Fine Classic deposited $10,999,712 into Twin Fields'

account.  The opening balance of the account at the beginning of March was $36,409.[466]  The

deposits from Fine Classic were the only deposits in the Twin Fields' account in March 2016.

From March 2, 2016 to March 24, 2016, Twin Fields paid A. Jaffe $10 million.[467]  The A. Jaffe

HSBC account shows $11,806,536 in disbursements in March 2016 to various entities including

affiliated and Shadow Entities:

| A. Jaffe, Inc. HSBC (2460) March 2016 Disbursements | Amount |
|---|---|
| Firestar Jewelry Inc. NY | $   4,100,000 |
| Pacific Diamonds FZE | 3,600,000 |
| Firestar Diamond International Inc. NY | 2,250,000 |
| Firestar Diamond, Inc. | 571,170 |
| RJ O'Brien | 455,000 |
| Related Bank Transfer | 418,698 |
| Firestone International Pvt Ltd. | 245,918 |
| Firestar Diamond BVBA | 107,790 |
| Vendor Payment | 40,907 |
| Return | 15,154 |
| Bank Fee | 1,899 |
| | $  11,806,536 |

---

[462] 120200 Loans Receivable – Twin Fields general ledger

[463] *See, e.g.,* Check No. 1128 from Twin Fields Investment Ltd. payable to A. Jaffe, in the amount of $1,000,000 (BOA_TWI_0000007).

[464] Email exchange between Firestar Ajay Gandhi, Shyam Wadhwa and other FDI employees, dated February 19, 2016 (FIRE-REL0000287466); Email exchange between Ajay Gandhi, Shyam Wadhwa and other FDI employees, dated February 23, 2016 (FIRE-REL0000287326).

[465] *See* Twin Fields Investment LTD March 2016 account statement for account ending 5160, (BOA_TWI_0000476-481).

[466] *Id.*

[467] *Id.*

18-10509-shl Doc 994-1 Filed 06/25/18 Entered 06/25/18 10:35:19 Report of
John J. Carney Examiner Part 2 of 2 Pg 35 of 52

20-01054-shl Doc 109-4 Filed 02/25/22 Entered 02/25/22 20:00:41 Main Document
Pg 547 of 804

As discussed above, the Examiner has identified at least one LOU repayment from FDI that can be traced through Twin Fields. The funds that ultimately repaid this LOU flowed from Fine Classic to Twin Fields to A. Jaffe to FDI. Funds disbursed from FDI to Shadow Entities were linked by BDO (India) to the repayment of two LOUs. On February 25, 2016, Twin Fields received a deposit from Fine Classic for $1,199,968[468] and the same day a check was written from Twin Fields to A. Jaffe for $1,230,000 as repayment on its outstanding loan balance.[469] On the same day that FDI received the $1,250,000 from A. Jaffe, a $1,192,106 disbursement was sent to Tri Color Gems, a Shadow Entity. According to BDO (India), the forensic accountants retained by PNB in India, the payment to Tri Color Gems can be traced, in part, to the repayment of an outstanding fraudulently-obtained LOU.[470]

### (i)    A. Jaffe, Inc. and BBB Group, Inc. Loan Agreement

A. Jaffe had a separate loan agreement directly with BBB Group signed by Ajay Gandhi and Steve Velasquez.[471] The loan to BBB Group was an interest free unsecured loan payable on demand in the amount of $150,000 for "the business purpose of the Company."[472] While only one loan agreement was located by the Examiner, the general ledger account detail for A. Jaffe had indicated that $750,000 was loaned from A. Jaffe to BBB Group and was repaid by March 31, 2017. This transaction is suspect because A. Jaffe was not in the business of loaning money, because there is no apparent business purpose for transferring money through A. Jaffe and because A. Jaffe did not have adequate funds to provide loans.

### (j)    BBB Group, Inc. Bank Account Statements

---

[468] A. Jaffe February 2016 HSBC account (2460) bank statement.
[469] Check No. 1107 from Twin Fields Investment Ltd. payable to A. Jaffe, in the amount of $1,230,000 (BOA_TWI_0000208).
[470] Meeting with BDO (India), July 2018.
[471] Term Sheet between A. Jaffe and BBB Group, Inc., dated September 30, 2016 (FIRE-REL0000265595.0001).
[472] *Id.*

18-10509-shl Doc 994 Filed 02/25/22 Entered 02/25/22 20:00:45 Main Document
Pg 548 of 804
20-01054-shl Doc 109-4 Filed 06/25/18 Entered 06/25/18 10:35:19 Report of
John J. Carney    Examiner    Part 2 of 2    Pg 36 of 52

The Examiner received bank account statements of BBB Group for the period from January 1, 2016 to June 30, 2018 from Bank of America pursuant to a Rule 2004 subpoena. During this period, the Examiner also identified four deposits from Auragem Company Limited into BBB Group's accounts totaling $5,312,900.[473] Auragem has been identified as a Shadow Entity formed in the British Virgin Islands, operated out of Hong Kong and controlled by Modi.[474] The CBI identified Auragem as an overseas exporter in Modi LOU transactions.[475]

On or around the dates of the four deposits from Auragems, BBB Group made large disbursements to Firestar Jewelry, Inc. Firestar Jewelry, Inc. is a non-debtor entity that did business as Nirav Modi Inc. and was Nirav Modi's high end retail jewelry business. According to Ajay Gandhi, Nirav Modi Inc. was not a profitable business and was losing money. Gandhi stated that he needed to infuse cash just to keep the operations of the company running.[476]

The Examiner also identified 49 disbursements from January 1, 2016 to June 30, 2018 from BBB Group's Bank of America account to Firestar U.S. entities, totaling $7,358,894. According to Ajay Gandhi, the U.S. entities sold merchandise and goods to BBB Group for its Bailey Banks & Biddle stores. The Examiner has identified transactions to Firestar Jewelry Inc. and Firestar Diamond Inc. on or around the dates of the Auragem deposits. Below is a table of the payments from BBB Group to Firestar Jewelry Inc. and FDI on or around the date of payments from Auragems to BBB Group.

---

[473] *See* BBB Group Inc. account statements for account ending 2973 for the period of January 1, 2016 to June 30, 2018 (BBB000069-001182).
[474] *See* ED Complaint ¶3.1.4.
[475] *See* CBI Charge Sheet ¶¶ 3, 5, 37.
[476] Interview of Ajay Gandhi, June 2018.

18-10509-shl    Doc 894    Filed 08/25/18    Entered 08/25/18 10:35:19    Main Document
Pg 549 of 804
20-01054-shl    Doc 109-2    Filed 02/25/22    Entered 02/25/22 20:00:04    Main Document Report of
John J. Carney    Examiner    Part 2 of 2    Pg 37 of 52

| Date | Transacting Entity | Deposit | Disbursement |
|------|-------------------|---------|--------------|
| 7/25/2017 | Auragem Company Limited | 1,260,725 | - |
| 7/25/2017 | Firestar Jewelry, Inc. | - | 600,000 |
| 10/16/2017 | Auragem Company Limited | 1,501,475 | - |
| 10/16/2017 | Firestar Jewelry, Inc. | - | 1,410,000 |
| 1/26/2018 | Auragem Company Limited | 1,250,725 | - |
| 1/30/2018 | Firestar Jewelry, Inc. | - | 1,175,725 |
| 2/21/2018 | Auragem Company Limited | 1,299,975 | - |
| 2/22/2018 | Firestar Jewelry, Inc. | - | 1,225,000 |
| 2/22/2018 | Firestar Diamond, Inc. | - | 75,000 |
| | | **$  5,312,900** | **$  4,485,725** |

## B.    Real Estate Transactions

### 1.    The Essex House – 160 Central Park South

An apartment at the Essex House, located at 160 Central Park South, was Nirav Modi's personal residence in New York.[477]  The Essex House Apartment was purchased through a Firestar entity in 2007 and held by a Firestar affiliate until January 2018.  In January 2018, approximately one month before the filing of the Chapter 11 Cases, the property was transferred to a trust outside of the Firestar corporate structure.  The beneficiaries of the trust were Modi and his wife and children.  Because of the timing of this insider transaction so close in time to the bankruptcy filing, the backdrop of this fraud-related case, and the ease of using luxury real estate as a means to launder money, the Examiner views the ownership of the apartment and subsequent sale in January 2018 as suspect.

### (a)    Purchase of the Essex House Apartment

The Essex House Apartment was purchased through an LLC, Central Park Real Estate LLC ("CPRE"), which was formed on February 15, 2007 in Delaware to acquire the apartment.[478] CPRE was initially owned by FDI and ownership was then transferred to Firestar Group, Inc.

---

[477] Email exchange between Ajay Gandhi and Kavita Mankikar, dated March 6, 2017 (FIRE-REL0000270527).
[478] Central Park Real Estate, LLC, Delaware Certificate of Incorporation, dated February 15, 2007 (COTR00002288).

around the end of 2009.[479]

On February 22, 2007, CPRE agreed to purchase the Essex House Apartment from Raymond Smith for approximately $5 million, with $499,500 to be paid at signing and $4,995,000 to be paid upon delivery of the deed.[480]  CPRE took out a $3 million mortgage on March 26, 2007 from HSBC to finance the purchase.[481]  According to an email from Gandhi to Modi, the remaining $2 million was financed by Shadow Entity Brilliant Diamonds and FDI.[482]  Based on this email, it seems that Brilliant Diamond paid $1.8 million to FDI and a portion of that amount was used to fund the purchase of the apartment and FDI funded the remainder of the purchase price.[483]  The Essex House Apartment was ultimately purchased on March 26, 2007 for $4,995,000.  The deed appears to be signed by Mihir Bhansali.[484]

### (b)     HSBC Mortgage Payments

The Examiner's team reviewed certain bank statements for FDI's HSBC bank account[485] to identify mortgage payments for the Essex House Apartment, and identified at least $856,335 in mortgage payments paid by FDI. In 2017, FDI made at least three payments of $10,622.18 each, and, in 2011, FDI made at least two payments of $12,184.26.  FDI also made out a check for $15,828.35 payable to JW Marriott Essex House NY on January 29, 2018, 29 days after the

---

[479] Email exchange between Ajay Gandhi and Marc Weiss of Antwerp Diamond Bank, dated July 2 (FIRE-REL0000077822); Email exchange between Ajay Gandhi, Nirav Modi and Mihir Bhansali, dated December 6, 2008 (FIRE-REL0000174545).
[480] FIRE-REL0000184811.0002.
[481] HSBC Letter of Commitment dated March 15, 2007 and Letter to CPRE from HSBC Cash Management Department dated December 5, 2017.
[482] Email exchange between Ajay Gandhi, Nirav Modi and Mihir Bhansali, dated December 6, 2008 (FIRE-REL0000174545).
[483] *Id.*; Email exchange between Ajay Gandhi and FDI employees, dated December 22, 2016 (FIRE-REL0000273073).
[484] Bargain and Sale Deed for property location 160 Central Park South Unit 3601, dated March 26, 2007. Exhibit G to the Declaration of Rahul Mukhi in Support of Punjab National Bank's Ex Parte Motion for an Order, Pursuant to Fed. R. Bankr. 2004, Authorizing Punjab National Bank to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons (ECF No. 225).
[485] Firestar Diamond, Inc. HSBC bank statements for the account ending (3004), April 2011, June 2011, April 2012, July 2012, and September – November 2017.

apartment was sold to The Ithaca Trust. The Examiner was unable to determine the purpose of this payment.

| Summary HSBC Mortgage Payments Made by FDI for the Essex House Apartment | | |
|---|---|---|
| Year | # of Payments Made | Amount |
| 2011 | 10 | $ 121,843 |
| 2012 | 11 | 118,406 |
| 2013 | 11 | 116,844 |
| 2014 | 12 | 127,466 |
| 2015 | 12 | 127,466 |
| 2016 | 11 | 116,844 |
| 2017 | 12 | 127,466 |
| Total | 79 | $ 856,335 |

**(c)    Discussions to Restructure, Payoff or Transfer Essex House**

On March 25, 2014, a $1.8 million payment was made from Firestar Group Inc.'s HSBC account to Brilliant Diamonds' account as a "Loan Repayment."[486]  While the Examiner did not have access to the accounts of Firestar Holdings Limited, Hong Kong, the Examiner believes the $1.8 million payment came from Firestar Holdings Limited, Hong Kong and the Hong Kong entity became the lender.[487]  The Firestar Group Inc. balance sheet as of September 30, 2016 showed a $1.8 million loan payable to Firestar Holdings Limited.[488]

In December 2014, Ajay Gandhi approached Howard Hoff to discuss the best way to transfer, sell or gift the Essex House Apartment to Modi's wife Ami.[489]  Gandhi's primary concern appeared to be how a sale or transfer would affect Firestar's and Modi's taxes.[490]

On December 5, 2017, Ajay Gandhi gave Nirav Modi three options to transfer ownership

---

[486] HSBC Priority Payment Acknowledgment dated March 25, 2014 (FIRE-REL000015207.00001).
[487] *See, e.g.,* Email exchange between A. Gandhi and Howard Hoff, dated December 22, 2014 (FIRE-REL0000114839).
[488] FGI Balance Sheet and Income Statement as of September 30, 2016 (revised October 21, 2016) (FIRE-REL000275156.0003).
[489] *See* Email exchange between Ajay Gandhi and Howard Hoff, dated December 22, 2014 (FIRE-REL0000114839).
[490] *See* Email exchange between Ajay Gandhi and Howard Hoff, dated December 19, 2017 (FIRE-REL0000254005).

20-01054-shl Doc 109 Filed 02/25/25 Entered 02/25/25 20:00:45 Main Document
18-10509-shl Doc 894-1 Filed 06/25/18 Entered 06/25/18 10:35:19 Report of
John J. Carney Examiner Part 2 of 2 Pg 40 of 52
Pg 552 of 804

the Essex House. Modi told Gandhi to pay off the HSBC mortgage that day.[491] In 2017, Gandhi emailed Modi that HSBC, as the mortgage holder, needed more information on the ownership structure of CPRE. Gandhi stated that he "avoided giving these [sic] information and told them that we may do restructuring of Central Park and may change ownership etc."[492]

### (d) Transfer of Essex House to The Ithaca Trust

Modi ultimately decided to transfer CPRE to The Ithaca Trust. As part of this transfer, the $3 million HSBC mortgage was paid off. In a December 4, 2017 email, Modi instructed Gandhi to pay off the mortgage and Gandhi asked if he should "[u]se funds from the bank line." [493]

An analysis performed by the Examiner's forensic accountants of FDI's HSBC account shows that funds, including from the HSBC bank line, were transferred into the FDI account to pay off the mortgage.[494] On December 5, 2017, the opening balance in the FDI HSBC account was $415,485.37. A transfer of $1.3 million was made from the HSBC bank loan, while $700,000 was transferred from FD International, A. Jaffe and FI.[495] The latter transfers appear to be sourced from customer payments into the entities' accounts.[496] Later that same day, after additional funds were deposited in the account, FDI paid off the mortgage by transferring $3,000,642 from its account to HSBC.[497] In a December 6, 2017 email, Gandhi stated: "FSI – I just paid $ 3 m yesterday from FSI for Niravbhai to settle for his HSBC mortgage of Central Park hence December will be tight…"[498] confirming that FDI paid the balance of the mortgage.

---

[491] Email exchange between Ajay Gandhi and Nirav Modi, dated December 5, 2017 (FIRE-REL0000288209).
[492] Email exchange between Nirav Modi and Mihir Bhansali, dated March 24–25, 2017 FIRE-REL0000408496).
[493] Email exchange between Ajay Gandhi and Nirav Modi, dated December 5, 2017 (FIRE-REL0000288209).
[494] *See* Firestar Diamond, Inc. HSBC bank statement for the account ending (3004), dated December, 2017.
[495] *Id.*
[496] *See* December, 2017, bank statements for the following accounts: Firestar Diamond International Inc. Capital One account ending (4593), Firestar Diamond, Inc.'s HSBC account ending (3004), Fantasy, Inc. HSBC account ending (9411), and A. Jaffe, Inc. HSBC account (2460) ending.
[497] *Id.*
[498] Email exchange between Ajay Gandhi and Shyam Wadhwa, dated December 6, 2017 (FIRE-REL0000288275).

20-01054-shl  Doc 109-4  Filed 02/25/22  Entered 02/25/22 20:00:45  Main Document
Pg 553 of 804
18-10509-shl  Doc 894  Filed 06/25/18  Entered 06/25/18 10:35:19  Report of
John J. Carney    Examiner    Part 2 of 2    Pg 41 of 52

With the HSBC mortgage paid off, CPRE was sold to The Ithaca Trust. The Ithaca Trust was established on August 23, 2017 as a revocable trust.[499] The settlor was Purvi Mehta and the beneficiaries of the trust are Nirav Modi's wife and three children.[500] The Trustee of the The Ithaca Trust was Commonwealth Trust Corporation until May 2018 when it was replaced by Trident Trust Company. The investment advisor of The Ithaca Trust was Abhay Dinesh Javeri, Ami Modi's brother.[501] Nehal Modi became the protector and investment advisor of the Ithaca Trust in May 2018.[502]

On December 29, 2017, The Ithaca Trust agreed to purchase CPRE, the owner of the Essex House Apartment, for $6 million pursuant to a Membership Interest Purchase Agreement.[503] Ajay Gandhi, as the CFO of CPRE, signed the agreement. Purvi Modi transferred $6 million to the Commonwealth Trust Company on January 2, 2018.[504] The funds came from Purvi Modi's account at the Bank of Singapore Limited.[505] An email dated December 8, 2017 from Immeke Smith to Purvi Modi confirms that transfer came from Purvi Modi as settlor of The Ithaca Trust.[506] On January 2, 2018, the Ithaca Trust wired $6 million to Firestar Group, Inc.'s HSBC account to for the purchase of CPRE.[507]

When Firestar Group, Inc. received the $6 million payment from The Ithaca Trust, Firestar Group Inc. sent a $4,200,000 transfer to FDI on January 3, 2018.[508] FDI's books accounted for

---

[499] Declaration Letter by the Trustee for the Commonwealth Trust Company, dated August 29, 2017 (COTR00000013).

[500] *See* Email exchange between Immeke Schmidt and Nirav Modi, dated January 18, 2018 (FIRE-REL0000256480).

[501] *See* The Ithaca Trust Consent to Earlier Resignation of Investment Advisor, dated November 8, 2017 (FIRE-REL0001518157).

[502] *See* The Ithaca Trust, Deed of Appointment of Successor Protector, dated May 25, 2018 (COTR00002487); The Ithaca Trust, Deed of Removal of Investment Advisor, dated May 25, 2018 (COTR00002490).

[503] *See* Membership Interest Purchase Agreement, December 2017 (COTR00000468).

[504] Wire Detail from Account ending in 5331 to Account ending in 0102 (COTR00000003).

[505] *Id*; Porftolio Summary for the Bank of Singapore Limited account ending 3551, dated July 2017 (COTR00000102).

[506] Email exchange between Immeke Schmidt and Purvi Modi, dated December 28, 2017 (FIRE-REL0000004201)..

[507] Letter from Abhay Javeri, Investment Advisor for the Ithaca Trust, addressed to "To whom it may concern," dated December 27, 2017 (COTR00002381).

[508] Firestar Diamond, Inc. HSBC bank statement for the account ending 3004, dated January 2018.

this payment as "FG- Loan Repayment."

## 2. 50 Central Park South

On September 7, 2017, The Ithaca Trust bought an apartment located in the Ritz Carlton residences at 50 Central Park South, Unit 33 in New York, NY (the "Ritz Carlton Apartment").[509] The apartment was purchased for $25 million in cash by Central Park South 50 Properties LLC, an entity owned by The Ithaca Trust.[510] Purvi Modi, Modi's sister signed the contract of sale.[511]

In email correspondence, Modi discusses a transfer of $2.5 million from HSBC to the Law Offices of Katz and Matz, PC, the law firm handling the sale of the property.[512] Ami Modi's HSBC bank account statement for the account ending in 3742 shows a $2.5 million wire to Katz and Matz on July 7, 2017.[513] The source of the funds in Ami Modi's HSBC account (3742) was transfers from Purvi Modi.[514]

Purvi Modi paid the remaining $23 million of the purchase price through a transfer of funds from her account at Singapore Limited to the fiduciary account at the Commonwealth Trust Company.[515] A portfolio statement for Purvi Mehta's account at Bank of Singapore Limited provided to Commonwealth Trust Corporation shows that the total value of the account increased by $39.97 million at some point during July 2017 indicating that the transfer of the funds into Purvi Meha's account for the apartment took place at some point in July 2017.[516] The funds were then wired from the fiduciary account to Katz & Matz and were held in escrow until closing.[517] Because

---

[509] Interview of Ajay Gandhi, dated June 13, 2018; *see* Email exchange between Ajay Gandhi and Aaron Toben of HSBC, dated September 6, 2017 (FIRE-REL0000204781)

[510] Contract of Sale for 50 Central Park South, New York, NY, dated July 7, 2017 (FIRE-REL0000205492.0001).

[511] *Id.*

[512] Email exchange between Nirav Modi and Yung Huang of HSBC dated July 6, 2017 and Wiring Instructions (FIRE-REL0000200406; FIRE-REL0000200406.0001).

[513] HSBC Premier Statement of Account for the account ending 3742, July 2017 (FIRE-REL0000263087.0001).

[514] HSBC Premier Statement of Account for the account ending 3742, April 2017 (FIRE-REL0001199373.0001).

[515] Porftolio Summary for the Bank of Singapore Limited account ending 3551, dated July 2017 (COTR00000102).

[516] *Id.*

[517] Email exchange between Steven Matz and Katelynn A. Lee of the Commonwealth Trust Company, dated August

the Examiner did not have access to Purvi Modi's account, the source of these funds are unknown.

According to an interview of Raul Echeverz, Nirav Modi's designer, the purchase of the apartment was Modi's decision and was to be for his personal use.[518]  Modi used lawyers in India to complete the purchase.[519]

On January 18, 2018, Purvi Mehta made an additional $1 million transfer to the Commonwealth Trust Corporation for the Ithaca Trust.  The funds were then sent to Central Park South 50 Properties LLC.[520]  The purpose of the transfer is unknown.

### 3.     50 Riverside Boulevard

Mihir Bhansali and Rakhi Bhansali purchased an apartment on March 13, 2017 located at 50 Riverside Blvd in New York, NY.  Bhansali purchased the property for $7.1 million.  Bhansali paid a $5.4 million down payment and took out a $1,830,000 mortgage with HSBC.[521]  On February 28, 2018, just two days after the bankruptcy filing, Mihir Bhansali granted his ownership interest in the apartment to Rakhi Bhansali for $10.00.[522]  Mihir Bhansali asserted his Fifth Amendment right against self-incrimination when asked about the transfer of property in his deposition.[523]  For the same reason, Bhansali did not produce any documents in response to the Examiner's document subpoena.  The timing of the transfer of the apartment is suspect, and further information is needed to determine if the apartment was funded by fraudulent proceeds.

---

31, 2017 (COTR00000615).
[518] Interview with Raul Echeverz, June 19, 2018.
[519] *Id.*
[520] Letter from Abhja Javeri, Investment Advisor for the Ithaca Trust, to Katelynn A. Lee of the Commonwealth Trust Company (COTR00001579).
[521] Closing Disclosure for the account ending 3141, dated February 15, 2017 (BH_PHH_0000010); Mortgage in favor of HSBC for the property located at 50 Riverside Blvd in New York, NY, dated March 13, 2017 (BH_PHH_0000042).
[522] Tower Unit Deed, dated February 28, 2018 (BH_PHH_0000057).
[523] Mihir Bhansali Dep. Tr. 40:22-41:5, dated August 7, 2018.

20-01051-shl Doc 109-4 Filed 02/25/22 Entered 02/25/22 20:00:41 Main Document
Pg 556 of 804
18-10509-shl Doc 894 Filed 06/25/18 Entered 06/25/18 10:35:19 Report of
John J. Carney Examiner Part 2 of 2 Pg 44 of 52

## IX. ADDITIONAL MISSTATEMENTS AND DISCLOSURE ISSUES

### A. Misstatements In Loan Disclosures

The Loan Documents establish a borrowing formula for determining the maximum amount the Lenders would lend to FDI and FI based upon the value of certain assets included in the borrowing base of the Lenders' respective credit facilities.[524] The Loan Documents authorize the Lenders to amend the borrowing formula in their sole discretion based upon their examination of, among other things, FDI's and FI's "financial condition" and assets, whether included in the borrowing base or not.[525] To that end, the Loan Documents require FDI and FI to submit monthly borrowing base reports to the Lenders to report on such information.[526] The Loan Documents further require FDI and FI to prepare and certify the truthfulness of the contents of such reports.[527] Any false or misleading representation in a report triggers a default.[528]

The Loan Documents establish detailed eligibility criteria for determining which assets are included in the borrowing base. Receivables from affiliates of FDI and FI and from accounts outside the United States are specifically excluded.[529] Importantly, the HSBC Loan Documents define an "affiliate" as:

> singly and collectively, any Person [which includes a corporation or individual] (including a Subsidiary) which, directly or indirectly, is in control of, is controlled by, or is under common control with the Company [FDI and FI], and the legal representative, successor or assign of any such Person. For purposes of this definition, (a) a Person shall be deemed to be in "control of" the Company if the Person possesses, directly or indirectly, power either to (i) vote 10% or more of the securities having ordinary voting power for the election of directors of the Company, or (ii) direct or cause the direction of the management and policies of the Company whether by contract or otherwise; (b) a Person shall be deemed to be

---

[524] Sections 1.11, 2.1 of the Amended and Restated Loan Agreement, dated September 4, 2008 (HBUS0005341-HBUS0005396); pages 2, 3 of the IDB Line Letter for $12,000,000 Line of Credit, dated October 11, 2013 (ExaminerIDB00001355- ExaminerIDB00001365).
[525] See Sections 1.10, 1.40, 1.60 of 1.11, 2.1 of the HSBC Loan Agreement; page 3 of the IDB Line Letter.
[526] See Sections 4.1(i), 7.4(d) of the HSBC Loan Agreement; page 6 of the IDB Line Letter.
[527] See Section 7.4(d) of the HSBC Loan Agreement,; page 6 of the IDB Line Letter.
[528] See Section 8.1(b) of the HSBC Loan Agreement,; page 8 of the IDB Line Letter.
[529] See Sections 1.2, 1.24(e), (g) of the HSBC Loan Agreement,; page 3 of the IDB Line Letter.

157

"controlled by" the Company if the Company possesses, directly or indirectly, power either to (i) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person, or (ii) direct or cause the direction of the management and policies of such Person whether by contract or otherwise; and (c) a Person shall be deemed to be under common control with the Company if any Person possesses, directly or. indirectly, power either to (i) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person and the Company, or (ii) direct or cause the direction of the management and policies of such Person and the Company whether by contract or otherwise.[530]

Gandhi, the Debtors' CFO, sent monthly borrowing base reports to the Lenders representing the amount of FDI's and FI's accounts receivables, including ineligible receivables from foreign and affiliated entities.[531] He often consulted Bhansali in deciding what information should go in the borrowing base reports.[532] Gandhi certified such reports under the penalty of perjury.[533] The Lenders' respective loan officers confirmed to the Examiner that they had received and reviewed the Debtors' borrowing base reports,[534] and documents produced to the Examiner show that based on the information in the reports, the Lenders periodically adjusted the borrowing formula.[535] At times, the Lenders adjusted the borrowing formula based on the amount of credit support from foreign and affiliate receivables excluded from the borrowing base.[536]

In the borrowing base reports, Gandhi represented that FDI and FI were owed legitimate foreign accounts receivables from the Shadow Entities.[537] Gandhi also represented that BBB

---

[530] *See* Section 1.2 of the HSBC Loan Agreement. The IDB Loan Documents do not define the term.

[531] *See, e.g.*, Borrowing Base Certificate, dated September 30, 2014 (FIRE-REL00001306040001, FIRE-REL00001326950004); Borrowing Base Certificate, dated September 30, 2012 (FIRE-REL00001079580002, FIRE-REL00001079580003).

[532] *See, e.g.,* Email exchange between Mihir Bhansali and Ajay Gandhi, dated October 12, 2017 (FIRE-REL0000437653); Email exchange between Mihir Bhansali and Ajay Gandhi, dated October 9-10, 2013 (FIRE-REL0000061410).

[534] Interview of David Herzog, Senior Vice President, IDB, July 31, 2018; Interview of Patrick M. Hanley, Senior Vice President & Commercial Executive, Loan Management Unit, HSBC, August 6, 2018.

[535] Se*e, e.g.,* HSBC Internal Memorandum, dated November 4, 2015, (HBUS0015221); IDB Internal Memorandum, dated November 26, 2014 (ExaminerIDB00000388).

[536] *See, e.g.,* HSBC Credit Memorandum, dated March, 2, 2011, (1HBUS0015007; HBUS0015009); IDB Officer Approved Loan Line Request, dated December 1, 2014 (ExaminerIDB00000363); IDB Internal Discussion Summary, dated November 13, 2012 (ExaminerIDB00000250).

[537] *See, e.g.*, Borrowing Base Certificate, dated February 28, 2017 (FIRE-REL00001976420001, FIRE-

18-10509-shl Doc 994-1 Filed 02/25/19 Entered 02/25/19 20:00:44 Main Document
Pg 558 of 804

20-01054-shl Doc 109-4 Filed 06/25/18 Entered 06/25/18 10:35:19 Report of
John J. Carney    Examiner   Part 2 of 2    Pg 46 of 52

Group was not an affiliate of FDI or FI as defined in the Loan Documents.[538] As discussed above, the Debtors' transactions with the Shadow Entities appear to be manufactured transactions designed to obtain fraudulent LOUs, and that lacked any economic substance. Moreover, the Shadow Entities were in fact "affiliates" in that they were under common control with the Debtors, if not under the control of the Debtors, including Bhansali.  As to BBB Group, during an interview with the Examiner, Gandhi advised that he was aware that Modi, to some extent, managed BBB Group. He also stated he knew Bhansali was involved in BBB Group, but he did not indicate that he knew of Bhansali's control over BBB Group.[539] This is corroborated by BBB Group's former CEO, Mr. Velasquez, who told the Examiner that Bhansali was the ultimate decision maker for BBB Group.[540]   It is therefore likely that Bhansali and potentially Gandhi knew that the representations in the borrowing base reports regarding the Shadow Entities and BBB Group were false.

**B.**     **Disclosure Issues in Connection with Chapter 11 Cases**

**1.**     **Bhansali**

Bhansali engaged in certain behavior post- and immediately pre-petition consistent with an attempt to cover up his involvement in the Alleged Fraudulent Circumstances.  Shukla stated to the Indian authorities that in February 2018, Bhansali visited Dubai and asked the employees there not to return to India.  He asked them not to give his name to any authorities.  Specifically, Shukla described Bhansali's behavior and tone: "With folded hands [Bhansali] bowed before us and requested not to take his name before any government agencies or authorities . . . .  [and] directed

---

REL00002704510001); Borrowing Base Certificate, dated January 31, 2014 (FIRE-REL00001409450001, FIRE-REL00001409450002).
[538]  *See, e.g.,* Borrowing Base Certificate, dated September 30, 2014 (FIRE-REL00001306040001, FIRE-REL00001306040002); Borrowing Base Certificate, dated April 30, 2012 (FIRE-REL00001082240001, FIRE-REL00001082240003).
[539]  Interview of Ajay Gandhi, July 19, 2018.
[540]  Interview of Steve Velasquez, June 21, 2018.

us not to be in touch with him (Mihir) in any way as he has filed bankruptcy in US court and there

he has informed that he (Mihir) has no connection with these companies."[541]  When he left Dubai,

Bhansali allegedly took Firestar Diamond FZE's hundreds of thousands of dollars in cash.[542]

Bhansali also allegedly took 50 Kg of gold in February or March 2018 from Firestar Diamond and

Jewellery FZCO.[543]

On the Petition Date, the Debtors filed the First Day Declaration of Bhansali, in which he

made various representations under the penalty of perjury regarding the Debtors' financial

statements. According to Bhansali, his knowledge of the Debtors' finances was based on his own

familiarity with the Debtors' businesses and information shared with him by Gandhi, the Debtors'

CFO.[544]  Relevant here, Bhansali specifically represented that the Shadow Entities were

unaffiliated unsecured creditors of the Debtors.[545]  Bhansali represented in his Declaration that

World Diamond and Fancy Creations were not affiliated with FDI in the exhibit listing the "Top

20 Unsecured Creditors (Non-Affiliates)."[546]  For A. Jaffe, Tri-Colored Gems, Pacific Diamonds,

Universal Fine Jewelry, Empire Gems, and Eternal Diamond are each a Shadow Entity but are

listed as the "Top 20 Unsecured Creditors (Non-Affiliates)".[547]  As to materiality, the A. Jaffe

representations are difficult to overlook since each of the three largest creditors are Shadow

Entities, and each have substantial claims relative to the remaining creditors.

As discussed above, there is substantial evidence that is inconsistent with the treatment of

these Shadow Entities as unaffiliated creditors in the Bhansali Declaration and elsewhere in the

schedules and statement of financial affairs.

---

[541] ROI-MCA-00000440.
[542] *Id.*
[543] *Id.*
[544] First Day Declaration at 2.
[545] *See id.* at Ex. B.
[546] *Id.*
[547] *Id.*

## 2.    The Debtors' Professionals' Disclosure of their Connections to the Debtors, Creditors and other Parties in Interest

### (e)    Marks Paneth LLP

On March 16, 2018, the Debtors filed an application to retain Marks Paneth LLP as their financial advisors in the Chapter 11 Cases[548] which the Court subsequently approved.[549] Howard Hoff, a partner with Marks Paneth, submitted a declaration in support of the application, which he later supplemented.[550] In Mr. Hoff's original and supplemental declaration, Mr. Hoff disclosed certain services Marks Paneth had performed for the Debtors and their affiliates. With respect to real estate transactions involving the Debtors, Mr. Hoff disclosed  "general advice" he had provided "during the fall of 2017 to Nirav Modi, individually related to a potential purchase of certain US residential real estate and involving a family trust and trust counsel[.]"[551] This disclosure appears to relate to the purchase and sale of the $25 million Ritz Carlton apartment by the Modi family trust on Central Park South described above.  While this transaction included an actual, as opposed to a potential, purchase of real estate, the actual purchase had been preceded by a potential purchase that did not materialize as to which Mr. Huff apparently provided advice.

Mr. Hoff was also involved in providing advice in connection with the sale of the Essex House Apartment. As discussed above, this apartment belonged to Central Park Real Estate LLC ("CPRE"), a special purpose entity owned by Firestar Group, Inc. ("FGI"), the parent company to FDI and FI.   This apartment was reportedly used exclusively by Modi and was worth

---

[548] Application for an Order Approving the Retention of Marks Paneth LLP as Financial Advisor to the Debtors Nunc Pro Tunc to the Petition Date (ECF No. 45).

[549] Order Authorizing the Retention of Marks Paneth LLP as Financial Advisor to the Debtors Nunc Pro Tunc to the Petition Date (ECF No. 88).

[550] Application for an Order Approving the Retention of Marks Paneth LLP as Financial Advisor to the Debtors Nunc Pro Tunc to the Petition Date (ECF No. 45); Supplemental Declaration of Howard Hoff in Connection with Order Retaining Marks Paneth LLP as Financial Advisors to Debtors (ECF No. 112).

[551] Declaration of Howard Hoff in Support of Application for an Order Approving the Retention of Marks Paneth LLP as Financial Advisors to the Debtors (ECF No. 45, Ex. B).

approximately $6 million.[552]  Gandhi had first broached the subject of selling the apartment with

Mr. Hoff in 2014, and contacted Mr. Hoff again in 2016.[553]  Mr. Hoff provided services on the

structure of the transaction in December of 2017.[554]  The transaction closed in January of 2018.[555]

The Debtors (FDI and Jaffe) paid off the mortgage to HSBC for the benefit of Modi's family

members in the approximate amount of approximately $3 million.[556]

Marks Paneth's disclosure that it provided advice regarding a potential purchase involving

a family trust does not appear to describe its involvement in the Essex House transaction or the

Debtors' connections to that sale.

Mr. Hoff explained to the Examiner that he had discussed the Essex House transaction with

Modi in 2015 and that its business purpose was to remove the apartment from the corporate

enterprise should the Firestar entities move forward with an IPO.  Mr. Hoff informed the Examiner

that he was not aware that the Debtors' funds were used to pay off the mortgage on the apartment

shortly before the Petition Date.   While the Examiner has no reason to question Mr. Hoff's

statements, Marks Paneth assisted in preparing the Debtors' schedules and statements of financial

affairs.[557]  FDI's Statement of Financial Affairs discloses that a $3,000,642 payment was made to

"FGI/CP" on December 5, 2017, and that the relationship of the transferee is that of a "Major

---

[552] Email exchange between Ajay Gandhi and Kavita Mankikar, dated March 6, 2017 (FIRE-REL0000270527); Email exchange between Purvi Modi and counsel for the purchaser of the property, dated December 28-29, 2017 (FIRE-REL0000004201).

[553] Email exchange between Ajay Gandhi and Howard Hoff, dated December 22, 2014 (FIRE-REL0000114839); Email exchange between Ajay Gandhi and Howard Hoff, dated November 10, 2016 (FIRE-REL0000232427).

[554] Email exchange between Ajay Gandhi and Howard Hoff, dated December 19, 2017 (FIRE-REL0000254005).

[555] Email exchange between Ajay Gandhi and Katelynn A. Lee of the Commonwealth Trust Company, dated January 2, 17-18, 2018 (FIRE-REL0000256545).

[556] *See* Firestar Diamond, Inc. HSBC bank statement for the account ending in 3004, December 2017. Email exchange between Ajay Gandhi and Nirav Modi, dated December 5, 2017 (FIRE-REL0000288209); Email exchange between Ajay Gandhi and Shyam Wadhwa, dated December 6, 2017 (FIRE-REL0000288275).

[557] *See, e.g.*, First Monthly Statement of Fees and Expenses of Marks Paneth LLP, Financial Advisors to the Debtors and Debtors-in-Possession, Pursuant to Bankruptcy Code Sections 330 and 331 for the Period from February 26, 2018 through March 31, 2018, at 17-20 (ECF No. 110).

18-10509-shl   Doc 894   Filed 08/25/18   Entered 08/25/18 10:35:19   Main Document
Pg 562 of 804

18-10509-shl   Doc 1094-2   Filed 02/25/22   Entered 02/25/22 20:00:45   Report of
John J. Carney   Examiner   Part 2 of 2   Pg 50 of 52

Shareholder."[558]   In Marks Paneth's retention application, the Debtors specifically requested approval to retain Marks Paneth for assistance with "[a]nalyzing transactions with vendors, insiders, related and/or affiliated entities, subsequent and prior to the date of the filing of the petitions under Chapter 11."[559]

Mr. Hoff did not disclose that Bhansali was a common control person for both Twin Fields, and the Debtors. As explained above, the Examiner learned that Debtors and their CEO were involved with Twin Fields. Mr. Hoff denied knowledge regarding the transfers between the Debtors and Twin Fields, which the Examiner has no reason to doubt.   However, Mr. Hoff confirmed his knowledge of Bhansali's relationship to both Twin Fields and BBB Group.[560]

**(f)      Klestadt Jureller Winters Southard & Stevens, LLP**

The Debtors filed an application to retain Klestadt Jureller Winters Southard & Stevens, LLP (the "Klestadt Firm") as their general bankruptcy counsel in the Chapter 11 Cases on March 16, 2018,[561] which the Court approved.[562] In support of the application, the Debtors attached the declaration of Ian Winters, Esq., a partner with the Klestadt Firm. The Klestadt Firm subsequently filed two additional declarations of Mr. Winters to supplement the disclosures made to the Court in his initial declaration.[563]

During the course of discovery, the Examiner learned that Twin Fields maintained a bank

---

[558] *See* page 23, no. 4 of the Firestar Diamond, Inc. Statement of Financial Affairs at 23, no. 4 (ECF No. 70).

[559] *See* Application for an Order Approving the Retention of Marks Paneth LLP as Financial Advisor to the Debtors Nunc Pro Tunc to the Petition Date at 3 (ECF No. 45); *see generally* March 28, 2018 Hearing Tr. 108:1-6 (the Debtors' CRO testified that the Debtors' financial advisors and CFO drafted the Debtors' schedules).

[560] Interview of Howard Hoff, August 2, 2018.

[561] Application for an Order Approving the Retention of Klestadt Winters Jureller Southard & Stevens, LLP as General Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the Petition Date (ECF No. 44).

[562] Order Authorizing the Retention of Klestadt Winters Jureller Southard & Stevens, LLP as General Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the Petition Date (ECF No. 86).

[563] First Supplemental Affidavit and Disclosure of Ian R. Winters in Support of Application for an Order Approving the Retention of Klestadt Winters Jureller Southard & Stevens, LLP as General Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the Petition Date (ECF No. 111); Second Supplemental Affidavit and Disclosure of Ian R. Winters in Support of Application for an Order Approving the Retention of Klestadt Winters Jureller Southard & Stevens, LLP as General Bankruptcy Counsel to the Debtors Nunc Pro Tunc to the Petition Date (ECF No. 190).

account at Bank of America.  The Twin Fields bank statements were sent to the Klestadt Firm's

address c/o Ian Winters.[564]  Counsel to the Examiner spoke with the Klestadt Firm to discern the

nature of its relationship to Twin Fields and to BBB Group. The Klestadt Firm confirmed receipt

of occasional bank documents and staed that it forwarded such documents unopened to Twin

Fields.  The Klestadt firm also denied knowing Bhansali's control relationship to BBB Group and

Twin Fields.  The Examiner had no reason to question these statements by the Klestadt Firm.

## X.   CONCLUSION

Based on the detailed forensic analyses of available financial records, interviews of

knowledgeable witnesses, email reviews and analysis of materials provided by Indian authorities,

the Examiner has determined that the Debtors were directly involved in the transactions related to

the Alleged Fraudulent Circumstances.

The Examiner also has determined that it is highly likely that the Debtors' CEO and CFO

were involved, at least in some part, in assisting in transactions necessary to the success of the

Alleged Fraudulent Circumstances.

---

[564] *See, e.g.,* Twin Field Investment Ltd. Bank of America Bank Statement, November 2010 (BOA_TWI_0000582).

20-01054-shl Doc 109-1 Filed 02/25/22 Entered 02/25/22 20:00:44 Main Document
18-10509-shl Doc 894 Filed 08/25/18 Entered 08/25/18 10:35:19 Report of
John J. Carney Examiner Part 2 of 2 Pg 52 of 52
Pg 564 of 804

Dated: New York, New York                    Respectfully submitted,
      August 24, 2018

                                          */s/ John J. Carney*
                                          John J. Carney, Examiner

**BAKER & HOSTETLER LLP**

Jorian L. Rose
Tracy Cole
Susrut A. Carpenter
Jason I. Blanchard
Lauren P. Berglin
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Counsel to the Examiner*

# EXHIBIT 1

August 22, 2018

**VIA EMAIL**

John J. Carney, Esq.
BakerHostetler
45 Rockefeller Plaza
New York, NY  10111-0100

**NORTON ROSE FULBRIGHT**

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
United States

**Thomas J. McCormack**
**Partner**
Direct line +1 212 408 5182
thomas.mccormack@nortonrosefulbright.com

Tel +1 212 408 5100
Fax +1 212 541 5369
nortonrosefulbright.com

Re:    Firestar/Examiner Report

Dear Mr. Carney:

We are counsel to Mr. Mihir Bhansali.  We write concerning the report that we understand you will issue at the end of this week.

Over the past few months, while your examination was pending, Mr. Bhansali was the subject of a number of allegations, suggesting that he took part in a criminal scheme involving Nirav Modi. By this letter, we wanted to make clear that Mr. Bhansali categorically rejects the allegation that he engaged in any criminal wrongdoing.

During your examination, you required Mr. Bhansali to appear for a deposition.  (It is our understanding that he was the only witness that you required to appear under oath.)  Mr. Bhansali, with the advice of counsel, asserted his Fifth Amendment rights and declined to answer your questions.  Given the allegations that have been made about Mr. Bhansali over the past few months, this should not have been surprising to anyone.  The Fifth Amendment is designed to protect individuals when they are confronted with such allegations, and the assertion of one's Fifth Amendment rights in these situations is commonplace.

You certainly understand that the assertion of one's Fifth Amendment rights is not an admission, and does not in any way suggest or imply that the witness is guilty of anything.  Concluding otherwise would be a serious error, and gravely unfair to the witness.  In some circumstances, a Court may allow an "adverse inference" to be drawn from an assertion of one's rights in a civil case.  Perhaps you intend to draw such inferences in your report.  We remind you, however, that the law is clear that such an adverse inference can only be drawn, if at all, if there were other evidence sufficient to corroborate the adverse conclusion.  Because the Fifth Amendment protects an individual's civil liberties and is not an admission of anything, it would be improper to draw any inference from the assertion of Mr. Bhansali's rights in and of itself.

*Norton Rose Fulbright and Chadbourne & Parke – A Powerful Combination*

Norton Rose Fulbright US LLP is a limited liability partnership registered under the laws of Texas.

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

John J. Carney, Esq.
August 22, 2018
Page 2

NORTON ROSE FULBRIGHT

If your report reaches any negative conclusions about Mr. Bhansali, we would ask that the contents of this letter be included (and a copy attached as an exhibit) so our position is fairly reflected on the record.

Very truly yours,

Thomas J. McCormack

cc:  Jorian L. Rose, Esq.

# Exhibit 10

## CERTIFICATE

This is to certify that

1) Each and every page of the relied upon documents, the PAO and the OC along with the annexure have been numbered and certified.

2) Each document is bearing the signature with official stamp of the complainant and a certificate to that effect that "This annexure is the true copy of the document relied upon"

3) All documents furnished to the Adjudicating Authority PMLA are duly indexed and page numbered.

4) The statements of the Defendant have been recorded under Section 50 of PMLA, 2002.

5) 3 CDs having PAO, Complaint, and list of Annexure in word format is enclosed.

(C. Mahesh Chandra Reddy)

DEPUTY DIRECTOR
DIRECTORATE OF ENFORCEMENT
MUMBAI ZONAL OFFICE
COMPLAINANT

BEFORE THE CHAIRPERSON, ADJUDICATING AUTHORITY UNDER THE

PREVENTION OF MONEY LAUNDERING ACT, 2002

ORIGINAL COMPLAINT NO. ⬤ of 2018

IN

PROVISIONAL ATTACHMENT ORDER NO. 15 /2018 DATED 17.09.2018 IN

FILE NO. ECIR/MBZO-I/03/2018

## Schedule of the Property

| Sr. | Property Description | In the name of | Beneficial Owner | Value (USD) |
|-----|----------------------|----------------|------------------|-------------|
| 1 | The Essex House 160, Central Park South, New York, NY | Central Park Real Estate LLC (Beneficially owned by The Ithaca Trust) | Nirav Deepak Modi through his wife Ami Nirav Modi | USD 4,995,000 |
| 2 | 50, Central Park South, Unit No 33, New York, NY | Central Park South 50 Properties LLC (Beneficially owned by The Ithaca Trust) | Nirav Deepak Modi through his wife Ami Nirav Modi | USD 25 Million |

Total Value of Attached Assets= USD 29.995 Million (Twenty-Nine Million Ninety-Nine Hundred five thousand Dollars only) (Approx INR 217,34,37,700/- Rupees two hundred seventeen crores thirty-four lacs thirty-seven thousand and seven hundred only. (@INR 72.46 per USD)

**Deputy Director,**

**Directorate of Enforcement,**

**Prevention of Money Laundering Act, 2002,**

**4th floor, Kaiser-I-Hind, Currim Bhoy Road,**

**Ballard Estate, Mumbai**

...............Complainant

V/s

1) Shri Nirav Modi,
   4, Grosvenor House,
   Peddar Road, Mumbai-26

2) Purvi Modi
   4, Grosvenor House,
   Peddar Road, Mumbai-26

3)  Ami Nirav Modi
    4, Grosvenor House,
    Peddar Road, Mumbai-26                    ...................... **Defendants**

## COMPLAINT UNDER SECTION 5(5) OF THE PREVENTION OF MONEY LAUNDERING ACT, 2002 FOR CONFIRMATION OF PAO NO. 15 /2018 DATED 17.09.2018

**May it please the Hon'ble Chairperson and Members of the Adjudicating Authority.**

That, in exercise of the powers conferred under sub-section (1) of Section 5 of the Prevention of Money Laundering Act, 2002 (15 of 2003), (hereinafter referred to as the 'Act'), read with Notification No. GSR.441(E) dated 1st July, 2005 and in terms of authorization dated 7th February, 2007 issued by the Director of Enforcement, New Delhi and its addendum No. DLA(A)/AUT/S.8(4)/03/2010 dated 12.10.2011, Deputy Director, Directorate of Enforcement, Mumbai, has issued order for provisional attachment of the Immovable and moveable properties as mentioned in the scheduled above vide Provisional Attachment Order No.15 /2018 dated 17.09.2018 in ECIR/MBZO-I/03/2018.

2.     On the basis of material placed before the Complainant and on the reasonable belief as recorded in the Provisional Attachment Order No 15/2018 dated 17.09.2018, the Deputy Director, Directorate of Enforcement, Mumbai has provisionally attached the abovementioned properties. Copy of the Provisional Attachment Order No. 15 /2018    dated 17.09.2018 is enclosed as **Annexure–I**.

3.    The **said** Provisional Attachment Order has **been forwarded** to the Defendants by registered Speed Post. The said Provisional Attachment Order was also forwarded to the other concerned parties by registered Speed Post. Copy of the Provisional Attachment Order along with the material was also forwarded to the Adjudicating Authority in a sealed envelope as required under Section 5 (2) of the said Act read with The Prevention of Money Laundering (The Manner of Forwarding a Copy of the Order of Provisional Attachment of Property along with the Material, and Copy of the Reasons along with the Material in Respect of Survey to the Adjudicating Authority and its period of retention) Rules, 2005.

4.      By virtue of Section 5 (5) of the said Act, the Complainant herein is required to file complaint before the Adjudicating Authority within 30 days from the date of issue of Provisional Attachment Order stating the facts of such attachment before the Adjudicating Authority. This complaint is being filed in furtherance thereto.

5.      **PREDICATE OFFENCE-**

On the basis of complaint dated 29.01.2018, filed by Punjab National Bank, Zonal Office, Mumbai, the CBI, BS & FC, Mumbai registered an FIR No. RCBSM2018E0001 dated 31.01.2018. It has been alleged in the FIR that; On 16th January 2018, M/s Diamond R US, M/s Solar Exports and M/s Stellar Diamonds (Partners: - Shri Nirav Modi, Shri Neeshal Modi, Smt. Ami Nirav Modi and Shri Mehul Chinubhai Choksi) approached the branch office of the Punjab National Bank at Mid Corporate Branch, Brady House, Mumbai and presented a set of import documents to the branch with request to allow buyers credit for making payment to the overseas suppliers. Since there was no sanctioned limit in the name of the above firms, the branch officials requested the firms to furnish at least 100% cash margin for issuing Letter of Undertakings (LOU) for raising buyer's credit. At this, the firms contested that they have been availing this facility in the past also but the branch records did not reveal details of any such facility having been granted to the said firms.

5.1     The complainant Bank  has further stated that on preliminary checking of records, it was observed that Shri Gokulnath Shetty, the Dy. Manager (PF No. 107272, since retired 31.05.2017), who was posted at the said branch (Mid Corporate Branch, Brady House, Mumbai) since 31.03.2010 and was working in the Foreign Exchange Department looking after the Import Section and Shri Manoj Hanumant Kharat, Single Window Operator, Punjab National Bank had fraudulently issued LOUs without following prescribed procedure by obtaining required request applications, documents and approval of the authorities thereto and without making entries in the Bank system avoiding detection of the transactions, so made, transmitted SWIFT instructions to the overseas branches of Indian Banks for raising Buyers Credit & funding the Nostro Accounts of PNB. The funds so raised for payment of Import Bills have not been utilized for such purposes in many cases.

5.2     The complainant Bank also stated that on scrutiny of the records of SWIFT messages, it was revealed that the above-named accused Shri Gokulnath Shetty and Shri Manoj Hanumant Kharat on 09:02.2017 issued 2 LOUs for & on behalf of



M/s Diamond R US and M/s Solar Exports for USD 4415791.96 and USD 4335391.38 respectively, having due date of payment on 25.01.2018 favoring Allahabad Bank at Hong Kong. The accused again on 10.02.2017 had issued 3 LOUs for & on behalf of M/s Diamond R US, M/s Solar Exports and M/s Stellar Diamond for USD 5942017.70, USD 5843161.93 and USD 6093321.10 respectively having due date of payment thereof on 25.01.2018 favoring Allahabad Bank at Hong Kong. Shri Gokulnath Shetty and Shri Manoj Hanumant Kharat further on 14.02.2017 had issued 3 LOUs for & on behalf of M/s Diamond R US, M/s Solar Exports and M/s Stellar Diamond for USD 5856885.00 USD 5862251.03 and USD 5877064.00 respectively having due date of payment thereof on 25.01.2018 favoring Axis Bank at Hong Kong. They had, thereby, fraudulently issued 8 LOUs total amounting to USD 44225812.10 which is equivalent to Rs. 280,70,12,293.98 at the notional exchange rate of a Dollar @ Rs. 63.47 per USD.

5.3    Thus, the above facts and circumstances prima facie disclosed that Shri Nirav Modi, Shri Neeshal Modi, Smt. Ami Nirav Modi, Shri Mehul Chinubhai Choksi, all partners of M/s Diamond R US, M/s Solar Exports and M/s Stellar Diamond in conspiracy with Sri Gokulnath Shetty, Deputy Manager (retd.), Punjab National Bank, Manoj Hanumant Kharat, Single Window Operator, Punjab National Bank and other unknown persons committed the offence of cheating against Punjab National Bank and caused it wrongful loss. The public servants committed abuse of official position to cause pecuniary advantage to M/s Diamond R US, M/s Solar Exports and M/s Stellar Diamond and wrongful loss of Rs. 280.70 crore to Punjab National Bank.

5.4    In view of the above, the FIR has been registered under sections 120-B r/w 420 of IPC, 1860 read with Section 13(2) read with 13(1)(d) of PC Act, 1988 against following persons/individuals/entities:-

(a) Shri Nirav Modi, Partner of M/s Diamond R US, M/s Solar Exports & M/s Stellar Diamonds.

(b) Shri Neeshal Modi, Partner of M/s Diamond R US, M/s Solar Exports & M/s Stellar Diamonds.

(c) Smt. Ami Nirav Modi, Partner of M/s Diamond R US, M/s Solar Exports & M/s Stellar Diamonds.

(d) Shri Mehul Chinubhai Choksi, Partner of M/s Diamond R US, M/s Solar Exports & M/s Stellar Diamonds.

(e) Shri Gokulnath Shetty, Dy. Manager (retd.), Punjab National Bank,

     (f)    Shri Manoj Hanumant Kharat, Single Window Operator, Punjab National Bank& Ors.

**5.5**    It appeared that the above named accused persons/entities have prima facie committed Offences under Section 120(B), 420 of IPC and Sections 13 of the Prevention of Corruption Act, 1988, which are Scheduled Offences under Paragraph 1 and Paragraph 8 respectively of Para 'A' of the Schedule to the Prevention of Money Laundering Act, 2002 (as amended).

**5.6**    On the basis of the aforesaid information/documents, an ECIR No. MBZO-1/03/2018 dated 14.02.2018 was recorded for investigation under the provisions of Prevention of Money Laundering Act, 2002 against the above named accused persons/entities mentioned in the FIR and also against following persons/entities:-

a)    Aura Gem Company Limited, Hong Kong
(b)    Sino Traders Limited, Hong Kong
(c)    Tri Colour Gems FZE, UAE
(d)    Unity Trading FZE, UAE
(e)    Sunshine Gems Ltd.
(f)    Pacific Diamonds FZE, UAE& Ors

## 6.    Investigation under PMLA

    Investigations are being carried out by the Directorate of Enforcement, Mumbai Zonal Office under the provisions of the PMLA. During the course of investigation in the matter, PNB, vide letter dated 13.02.2018 written in continuance of its earlier complaint dated 29.01.2018 (on the basis of which the subject FIR has been registered), has further informed that the above said partnership firms i.e. M/s Diamond R US, M/s Solar Exports and M/s Stellar Diamonds have got fraudulently issued a total of 150 LOUs aggregating to USD 1015.35 million equivalent to Rs. 6498.20 crores during the period from Feb, 2017 to May, 2017 by using the above modus operandi, as mentioned in the FIR. The said amount includes the LOU amounts mentioned in the subject FIR. The firm/entities wise breakup of the above mentioned LOUs amount is as under:-

| Sr. No. | Name of the firm/entity | Total amount of LOUs (Rs. in crores) |
|---------|-------------------------|--------------------------------------|
| 1.      | M/s Diamond R US        | 2210.61                              |
| 2.      | M/s Solar Export        | 2152.88                              |
| 3.      | M/s Stellar Diamond     | 2134.71                              |
|         | Total                   | 6498.20                              |



Thus, the total proceeds of crime found so far in the matter appear to be Rs. 2210.61 crores in respect of M/s Diamond R US, Rs. 2152.88 crore in respect of M/s Solar Export, Rs. 2134.71 crore in respect of M/s Stellar Diamond as the said funds were obtained by these firms/entities by cheating the PNB bank to fraudulently obtain LOUs as mentioned in the subject FIR No. RCBSM2018E0001 dated 31.01.2018 registered by the CBI. The total proceeds of crime in respect of all the said three firms/entities appear to be Rs. 6498.20 crore, in terms of Section 2(1)(u) of the PMLA,2002. Further, vide letter dated 14.02.2018 PNB informed that there were remittances from the said three firms to other Nirav Modi group Companies.

**6.1**    During the course of investigation, Statement of Shri Avneesh Nepalia, Complainant, working as Deputy General Manager at PNB Zonal office, Mumbai was recorded on 20.02.2018 u/s 50(2) of the PMLA, 2002. During his statement, Shri Nepalia reiterated the facts of the FIR. He stated that Shri Nirav Modi, who is promoter of Firestar Group of Companies, is partner of M/s Solar Exports, M/s Stellar Diamonds and M/s Diamond R US; that all the three firms are having current accounts in PNB, Brady House Branch. On being asked about LOU, Shri Nepalia stated that:-

> *"LOU is a Letter of Undertaking issued by the applicant importer's bank to an overseas bank or overseas branches of Indian Banks, for obtaining Buyer's Credit for underlying import transaction/s of the importer client. The applicant scouts the overseas banks for best quotes of rate of interest for buyer's credit and accepts the most competitive offer. Thereafter the importer client approaches his banker in India with a request to issue Letter of Undertaking on his behalf to the overseas bank, for obtaining the buyer's credit from the funding bank overseas. The LOU for buyer's credit can only be issued if the client has adequate credit facility (Non-Fund based) and/or given sufficient cash margin (approx. 110% of the amount of buyer's credit). Once sanctioned against limit and/or cash margin by the authorities, the LOU is issued through SWIFT messaging system to overseas banks and branches (in format MT-799). On receipt of the LOU from the importer's banker in India, the Overseas lending bank will fund the Nostro account of the Indian Bank and send a return confirmatory message by SWIFT (again MT-799 is used). This message contains amount of funds remitted, date of funding, Rate of interest of the Buyer's Credit, Period of the credit, the maturity date and the Nostro account of the overseas bank in which funds have to be returned on due date of*

*maturity with interest. Once funds are received in the applicant Bank's NOSTRO account with reference to buyer's credit sought, the applicant branch makes debits and pays the overseas exporter who has drawn the bill on the importer. On maturity of the above-mentioned buyer's credit the applicant (Importer) needs to either provide funds in his current account maintained at the branch or submit debit authority utilizing his credit limits if any sanctioned with regards to buyers credit. From this the bank offset/repay with interest the buyers credit on due date to the overseas funding bank."*

**6.2**    Shri Nepalia further, stated that the said three entities (the Nirav Modi Group firms) approached the Bank with a request to send a Letter of Undertaking (LoU) on their behalf to the overseas branch of Indian Banks, against certain import documents raised by the overseas supplier; that then Officer of the branch fraudulently & by cheating the bank, in connivance with the said three firms, without proper sanction/cash margin, etc. and without taking any import documents, bypassed the CBS accounting system of the Bank and sent LOU to the Overseas branch of the Indian Banks with request to fund the Bank's Nostro account; that the LOUs were sent through SWIFT system of the PNB; that the overseas branch of the Indian Banks used to fund the PNB's Nostro account immediately the next day and in many cases the same day (on which they received the LOUs' from PNB); that the money received by the Bank in the Nostro account is supposed to be used for making payment directly to the overseas supplier in retirement of the underlying import bills; that however in the present case, it is seen that the money was mostly used for paying directly to the Overseas Branches of Other Indian Banks for meeting the previous buyer's credit obligations of the Nirav Modi Group firms; that in effect, most of the transactions were for extinguishing the existing buyer's credit liabilities, availed earlier from Indian bank branches abroad; that it has been noticed that since 28.04.2017, the proceeds of such buyer's credit funding were also used to pay overseas firms.

**6.3**    Shri Avneesh Nepalia further gave details of the firms' wise exposure on account of fraudulent LOUs as mentioned in Table at Para No 6.

**6.4**    Investigation in the matter is being carried out regarding issuance of all the LOUs to the said three Nirav Modi entities by PNB. From the investigation, it is revealed that the first LOU was issued by PNB to the said three entities in the year 2011 using the same modus operandi i.e. by cheating the bank in connivance with the bank officers, without proper sanction/cash margin, etc. and without taking any import documents. It further revealed that the said three entities (Nirav Modi group

firms) have initially obtained 43 LOUs amounting to USD 116 million from PNB in the year 2011 through the above mentioned fraudulent modes. The said LOUs amounts were utilized for making payment to their alleged overseas suppliers/companies. In the following years also i.e. 2012, 2013, 2014, 2015, 2016, the said *modus operandi* was adopted by the said **three entities and** therefore, funds of LOUs obtained fraudulently were siphoned off through their alleged overseas suppliers/companies. The details of LOUs obtained by the said three entities since 2011 along with their utilization is as under:-

| Year | Details of LOUs along with utilization | | | | |
|------|-------------------|-------------------|----------------------|------------------------|-------|
| | No of LOUs Opened | Amount USD Million | Amount in Rs. Crore | Utilization (Rs. In Crore) | |
| | | | | Companies | Banks |
| 2011 | 43 | 116.00 | 742.40 | 742.40 | 0.00 |
| 2012 | 115 | 352.43 | 2255.55 | 2255.55 | 0.00 |
| 2013 | 237 | 640.24 | 4097.54 | 4097.54 | 0.00 |
| 2014 | 123 | 301.19 | 1927.62 | 1927.62 | 0.00 |
| 2015 | 185 | 438.53 | 2806.59 | 2697.66 | 108.93 |
| 2016 | 353 | 875.9 | 5605.73 | 4505.80 | 1099.93 |
| 2017 | 150 | 1015.34 | 6498.18 | 1448.16 | 5064.60 |
| Total | 1206 | 3739.63 | 23933.61 | 17674.73 | 6273.46 |

6.5      It can also be observed from the table above that 2015 onwards, part of the funds was also being used for repayment of earlier dues of LOUs of the banks. Therefore, the funds so obtained by said three entities were utilized for payment to various overseas companies & also for offsetting earlier LOUs. Company-wise detail of payment made to these alleged overseas entities since 2011 is as under:-

| Sr.No | Name of Company | Amount (In USD) |
|-------|-----------------|-----------------|
| 1 | Al Jaffe INC NY, USA | 1921078.65 |
| 2 | Auragem Company Limited, Hong Kong | 565363872.85 |
| 3 | Brilliant Diamonds Ltd | 63396876.15 |
| 4 | Diagems FZC, UAE | 293830399.11 |
| 5 | Eternal Diamonds Corporation Limited HK | 16204159.99 |



| 6 | Firestar Diamond Inc USA | 3050014.35 |
| 7 | Pacific Diamonds | 424809285.04 |
| 8 | Tri Color Gems | 364661398.98 |
| 9 | Universal Fine Jewellery | 18818402.10 |
| 10 | Fancy Creations Company Ltd | 240768300.40 |
| 11 | Unique Diamond And Jewellery FZC, Ajman | 6793674.25 |
| 12 | Vista Jewellery RZE, Fujairah | 1725084.94 |
| 13 | Sino Traders Limited, Hong Kong | • 346349430.96 |
| 14 | Sunshine Gems Ltd, HK | 242594180.98 |
| 15 | Unity Trading Company | 157823698.85 |
| 16 | Hamilton Precious Traders, UAE | 7995934.77 |
| 17 | Himalayan Traders FZE, Ajman | 9340251.65 |
|  | Total | 2765446044.02 |

6.6    Therefore, from the above, it is found that the said three entities, since 2011, used to obtain the LOUs through the fraudulent modes from PNB and siphon off the funds of said LOUs out of the country through their alleged overseas suppliers. From the year 2015, funds so obtained were also used for settling the dues of earlier LOUs. The said cycle of issuance of LOUs and its utilization has continued till 2017. In the year 2018, the said three firm entities approached the PNB with request for issuance of further LOUs, amounts of which were likely to be utilized for settling the outstanding LOUs of 2017. However, after filing of complaint by PNB, the 150 LOUs issued to the said three entities in the year 2017 amounting to Rs. 6498.20 crore remained outstanding and to be paid by the said three entities to PNB.

6.7    Investigations are being carried out with regard to utilization/trail of the proceeds of crime to the tune of Rs. 6498.20 crore which remains outstanding. The PNB was asked to provide the debits of the Nostro Account with respect to the said 150 LOUs which were fraudulently issued to the said three entities/firms. The PNB submitted details of debits of the funds received by PNB in its Nostro account against fraudulently issued LOUs on behalf of the said three entities/firms. On scrutiny of the said details, it is revealed that the said total amount of Rs. 6498.20 crore (USD 1015.35 million), which were received against fraudulent LOUs were utilized during the period from Feb, 2017 to May, 2017 for settling earlier buyer's credit obligations

of the Nirav Modi Group firms and also for paying overseas firms, allegedly the suppliers of the said three entities/firms. In effect, the funds were utilized for extinguishing the existing buyer's credit liabilities, availed earlier from Indian bank branches abroad and also for paying overseas firms allegedly being the suppliers of the said three entities/firms. The details of utilization of said proceeds of crime are as under:-

(i)     The said total amount of USD 1015.35 million (Rs. 6498.20 crores), which were received against fraudulent LOUs along with USD 2.12 million obtained from its current accounts by the said entities, were utilized during the period from Feb, 2017 to May, 2017 for settling earlier credit obligations of the buyers by the Nirav Modi Group firms and also for paying overseas firms allegedly being the suppliers of the said three entities/firms. In effect, most of the transactions appear to have been utilized for extinguishing the existing credit liabilities of the buyers, availed earlier from Indian bank branches abroad. The details gathered regarding pending dues of Overseas branches of Indian banks which were utilized for settling past credit of buyers by the said three entities so far are as under:-

| Sr. No. | Name of the beneficiary | Total amount debited from Nostro Account of PNB (USD) |
|---|---|---|
| 1. | Allahabad Bank, Hong Kong | 303775833.00 |
| 2. | Axis Bank Limited, Hong Kong | 211542106.90 |
| 3. | Bank of India, Belgium | 276025962.70 |
| | Total (@Rs. 64 per USD)] | 791343902.60 [INR 5064 crores approx. |

(ii)     Further, out of the said amount of Rs. 6498.20 crore (USD 1015.35 million), rest of the funds were used during the period from Feb, 2017 to May, 2017 for paying overseas firms allegedly the suppliers of the said three entities/firms. The details of payment made to the alleged overseas supplier/companies of the said three entities are as under:-

| Sr. No. | Name of the beneficiary | Address of the beneficiary | Total amount debited from Nostro Account of PNB (USD) |
|---|---|---|---|
| a. | Auragem Company Ltd., Hong Kong | Unit No 10-P, 1/F Block A, Focal Industrial Centre, 21 Man Lok Street, Hunghom, Kowloon, Hong Kong | 55163755.57 |

| b. | Diagems FZC, U.A.E. | E-Lob Office, E 49G26, Hamriyan Free Zone, P.O.Box-49220, Sharjah, UAE. | 10523158.15 |
|---|---|---|---|
| c. | Hamilton Precious Traders Ltd FZCO, Dubai | Dubai, UAE | 2201995.00 |
| d. | Pacific Diamonds FZE, U.A.E. | Building No B1, Office No 608 Po Box No 40359, Ajman Free Zone, Ajman, UAE | 28895765.82 |
| e. | Sino Traders Limited, Hong Kong | 13B, World Trust Tower, 50, Stanley Street, Central, Hong Kong | 49174781.66 |
| f. | Sunshine Gems Ltd., Hong Kong | 360-A, 208, 3/F, Harbour Centre Tower, 1 Hokj Cheung Street, Hunghom, Kowloon, Hong Kong | 47165498.28 |
| g. | Tri Color Gems FZE, U.A.E. | P.O Box 51425, E-Lob Office No E-86g-32, Hamriyan Free Zone, U.A.E | 19590202.41 |
| h. | Unity Trading FZE, U.A.E. | Dubai, UAE | 13560738.67 |
| | Total | | 226275898.56 (INR 1448 crore approx.) |

Thus, the PoC to the tune of Rs. 6498.20 crore (USD 1015.35 million) generated through criminal activities relating to the scheduled offences by the said three entities i.e. M/s Diamond R US, M/s Solar Export and M/s Stellar Diamond were ultimately utilized by them overseas for settling the buyer's credit (INR 5064 crores) obtained by them earlier from overseas banks. Part of the Proceeds of crime (INR 1448 crore) were also used for making payment to their alleged foreign suppliers/exporter of goods. Further, they have failed to repay the amount so obtained fraudulently from the overseas banks against LOUs of PNB making the PNB liable for payment of the said funds to the overseas bank on account of LOUs which were obtained by the said three entities through fraudulent modes.

7.1    From the above statement of Shri Nepalia and during the course of investigation, it is found that an LOU is a guarantee of buyer's credit (loan) which is issued by the Indian bank to overseas bank, on request of its Indian customer who has to acquire buyer's credit (loan) from the said overseas bank against import bills for making payment to its overseas supplier. In this case, the said three entities obtained LOUs amounting to Rs. 6498.20 crore from PNB, Brady House Branch,

Mumbai fraudulently by cheating the bank in connivance with the bank officials and without giving any cash margin and without submitting any import document and without putting the transaction through the CBS of the Bank. On receipt of LOUs by the overseas banks from PNB, the overseas banks sanctioned the buyer's credit (loan) amounts to the said three entities and therefore, the said amounts were credited to the Nostro Account of PNB, as PNB had issued LOU on behalf of the said three entities. Thereafter, the said buyer's credit amount credited in the Nostro Account of PNB were utilized by the said three entities in connivance with the bank officials for settling earlier buyer's credit obligations of the Nirav Modi Group firms and also used for paying overseas firms/companies allegedly being the suppliers of the said three entities/firms. The said modus operandi was used by the said three entities since 2011. However, after filing of complaint by PNB, the 150 LOUs of the year 2017 amounting to Rs. 6498.20 crore remained outstanding and yet to be settled by the said three accused entities. The investigation in respect of utilization of the said proceeds of crime to the tune of Rs. 6498.20 crores revealed that the funds so obtained by said three accused entities of Nirav Modi group through fraudulent issue of LOUs, were siphoned off by utilizing the same for making payment to above mentioned overseas suppliers/companies.

7.2    During further investigation, it was revealed that all these overseas companies are dummy companies of Mr. Nirav Modi; that he is controlling them and is final beneficiary of all these companies. The directors/shareholders on these companies were dummy directors and were employees of Firestar group of companies. All the dummy directors were working as per the directions of Mr. Nirav Modi and his other trusted officials such as Mr. Shyamsunder Wadhwa, Mr. Aditya Nanavati, Mr. Mihir Bhansali, Mr. Kurien Mathews, Mr. Saju Poulose etc.

7.3    Further it has come on the record in the statements of many related individuals; recorded under section 50 of PMLA, 2002, as mentioned in preceding paras, that the modus operandi of fraudulent import/export wherein there was no manufacturing activities in any of the dummy overseas companies, only import and export and sale amongst themselves (among group companies) were carried out. The invoices of export/import were overvalued to the huge extent, so as inflate the balance sheets and procure high credit facilities from the banks. The export/import were also not genuine and were just rotational transactions. The jewelry exported from India was dismantled and diamonds/pearls taken out of it and gold/silver were sent for melting. The melted metal was re-exported to Dubai or India and diamonds/pearls were also separately re-exported to India. The whole process was carried out without any substantial value addition and was only for inflating the

turnover of Indian companies, so as to acquire maximum credit facilities from the banks.

8. During Further investigation, it has been revealed that

8.1      Mr. Nirav Modi alias Nirav Deepak Modi, the Partner of Diamond R US, Solar Exports & Stellar Diamond, the firms which defrauded the Punjab National Bank, a public sector bank was the master mind of the fraud. He was the controlling authority and the decision maker during the material period when the said fraud was perpetrated. He is the prime conspirator who devised the entire manner and mode of the fraud, conspiring with the other accused to cheat the bank in the manner explained hereinabove. The proceeds of crime or property involved in money laundering so generated through the said criminal activity have been siphoned off and laundered by him through various entities to other overseas companies and countries for concealment, layering and integration into main financial system through acquisition of properties or through investment in financial assets. He is the mastermind behind this behemoth scam, designing the entire scheme of fraud and the movement of the monies under the garb of export/import of diamonds & other jewelry.

He has malafidely rotated the money received on the basis of fraudulent LoUs, to his own companies for further use and concealment, through a circuitous web of transactions. Through his calculated plan, he not only rotated the money but also the jewellery and precious stones, while inflating their value in order to justify the transactions made by him. He has actively concealed his role and involvement in the scam by conducting the business through dummy directors and his other employees, to hoodwink the law enforcement authorities. He has also made efforts to obfuscate the proceeds of crime and its end use. Sh. Nirav Modi, having full knowledge of the nature and origin of the proceeds, intentionally and deliberately used, projected and claimed the same as untainted, laundering the same for his own personal gain.

8.2      Mr Nirav Modi was personally benefitted from the scam. The tainted money from the scam was transferred to the accounts of persons/entities controlled by him. Several immovable properties were also purchased from this tainted money on his/ his family member's name. Substantial amount of tainted funds were also transferred to his personal accounts from the dummy beneficiaries of the scam. In his statement recorded u/s 50 of PMLA, Mr. Kurian Mathews, the supervisory of accounts of Dubai based dummy companies of Nirav Modi, stated

than more than USD 100 million were transferred to the personal accounts of Nirav Modi in guise of loan from Pacific Diamond FZE, a major beneficiary of the scam.

### 8.3    Essex House 160, Central Park South, New York:

In his statement dated 24/04/18, Shri Raghuraman Iyer informed: " In around 2015, Mihir Bhansali discussed about transfer of residential flat in New York from one company Central Park to Ami Modi ( Wife of Nirav Modi). I don't know whether this transfer was effected or not. But during discussion, I came to know that the company named Central Park was owned by Nirav Modi/ Firestar Group"

8.4    From the seized data a mortgage agreement of Central Park LLC was found to be executed on date 26/03/2007 with HSBC bank. The Central Park LLC took out USD 3 Million mortgage from HSBC, USA. This transaction was carried out by Mr Mihir Bhansali a trusted associate of Mr Nirav Modi. The relevant snap shot    of    the    said    agreement    is    as    under:-

Return To:

ADLER, BLASS AND BLASS
89 FIFTH AVENUE, SUITE 902,
NEW YORK, NY 10003

Prepared By:
BACKUS, MARYANN, ,

———————————— [Space Above This Line For Recording Data] ————————————

## MORTGAGE MIN 100022408394101742

WORDS USED OFTEN IN THIS DOCUMENT
(A) "Security Instrument." This document, which is dated March 26, 2007 together with all Riders to this document, will be called the "Security Instrument."
(B) "Borrower." CENTRAL PARK REAL ESTATE, LLC, A DELAWARE LIMITED LIABILTY COMPANY

whose address is 154 WEST 14TH STREET, 12TH FL, NEW YORK, NY 10011

DESCRIPTION OF THE PROPERTY
    I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:
(A) The Property which is located at 160. CENTRAL PARK SOUTH, Unit 3601

                                                                                [Street]
NEW YORK                        (City, Town or Village), New York 10019        [Zip Code].
This Property is in NEW YORK                                                County. It has the following legal
description: SEE SCHEDULE A ATTACHED HERETO
THIS PROPERTY IS IMPROVED BY A 1 OR 2 FAMILY DWELLING
THIS IS A PURCHASE MONEY MORTGAGE

STATE OF NEW YORK,        *New York*            County ss:

On the *26* day of *MARCH 2007*                before me, the undersigned, a notary
public in and for said state, personally appeared

*Mihir Bhansali*

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the
individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

SABINA FIRESTONE
Notary Public, State of New York
No. 01FI6075811
Qualified in New York County
Commission Expires June 10, 20*10*

Tax Map Information:

*Section 4*
*Block 1011*
*Lot 1749*
*County New York*

**8.5** From the land records Publicly available on the website of New York Land
Department, it was found that this property (Essex House, 160 Central Park South)
was purchased in 2007 in value USD 4,99,500 and in the name of M/s Central Park
Real Estate LLC, a company controlled by Mr Nirav Modi. The deal was carried
out by Mr Mihir Bhansali through Power of Attorney.

**8.6** As per John J Carney's report on Bankruptcy proceedings of companies
owned by Firestar Group in USA some of the mortgage payments were done from
the accounts of Firestar Diamond Inc. The details of the subject payments given
by the Mr. John J Carney is as under:-

| Summary HSBC Mortgage Payments Made by FDI for the Essex House Apartment | | |
|---|---|---|
| Year | # of Payments Made | Amount |
| 2011 | 10 | $ 121,843 |
| 2012 | 11 | 118,406 |
| 2013 | 11 | 116,844 |
| 2014 | 12 | 127,466 |
| 2015 | 12 | 127,466 |
| 2016 | 11 | 116,844 |
| 2017 | 12 | 127,466 |
| Total | 79 | $ 856,335 |

As per the said report, later on the entity Central Park Real Estate LLC holding the
ownership of Essex House has been transferred to "The Ithaca Trust" whose
beneficial owner is Ami Nirav Modi (Wife of Nirav Modi) and the settler of this trust

is Ms. Purvi Nirav Modi. As per the examiner's report, the mortgage of HSBC of around USD 3 Million was settled by Firestar Diamond Inc, a group company of Firestar Group.

8.7     Investigations revealed that, Proceeds of Crime was also transferred to the USA based Group companies of Firestar Group. At least 126 Million USD were diverted to these USA based companies including Firestar Diamond Inc from Hong Kong based dummy companies of Nirav Modi which were the direct beneficiaries of the fraudulent LOUs fund. In addition to this, Firestar Diamond Inc Directly received proceeds of Crime to the tune of USD 3,050,014.35 from the Fraudulent LoUs as per details below:

| Txn. Part. | Debit | Value Date | Counter Party |
|---|---|---|---|
| 3731FIBC/FIDL/11 | 1246765.6 | 04.10.2011 | FIRESTAR DIAMOND INC USA |
| 3731FIBC/FIDL/11 | 1803248.75 | 04.10.2011 | FIRESTAR DIAMOND INC USA |

8.8     From the above discussion, it is clear that the ultimate source of the funds to purchase the above property namely Essex House 160, Central Park South, New York is the tainted funds generated from fraudulently issued LoUs from Punjab National Bank. The funds were layered in a very complex manner to camouflage the ultimate source of money. The property was purchase in the name of a trust and payment for HSBC Mortgage was done from the USA based subsidiaries of Firestar Group which were recipient of proceeds of crime after complex layering. Therefore, the property Essex House 160, Central park South, New York is nothing but the proceeds of crime in view of section 2(i) (u) of Prevention of Money Laundering Act, 2002.



1.  *Purchased in the name of Central Park Real Estate LLC*
    *A Shell entity formed for sole purpose of holding the apartment*

Brilliant Diamonds
Firestar Diamond Inc

(USD 2 Million)

HSBC Bank Mortgage

(USD 3 Million)

Essex House, 160, Central Park Real Estate

(Purchased by Firestar Diamond Inc. in the name of subsidiary Central Park Real Estate Llc in 2007)



### 9.     Property- 50, Central Park South

**9.1**    Ms. Purvi Modi alias Ms. Purvi Maiank Mehta alias Ms. Purvi Deepak Modi, the sister of Mastermind Nirav Modi is the owner/director of a company namely M/s Fine Classic FZE in which at least USD 89 Million were transferred from the UAE and Hong Kong based dummy companies of Mr. Nirav Modi. These entities are recipients of illegal funds from the PNB. She actively participated in the crime of money laundering and layering of the money thus acquired and was also the beneficiary of the proceeds of crime.

**9.2**    As per the statements recorded U/S 50 of Vipin Sanith. Manager of Fine Classic FZE, Mr. Nilesh Mistry, accountant of Fine Classic FZE and Kurian Mathews, supervisor of accounts of Fine Classic, it was revealed that funds in Fine Classic FZE were generated as the trade outstanding to these other Dubai and Hong Kong based companies of Nirav Modi and huge outstanding of creditors is there in the books of Fine Classic FZE and these Creditors are other Dubai and Hong Kong based dummy companies of Nirav Modi. Similarly, Mr. Shyam Sunder Wadhwa, Vice President of Firestar Group who was instrumental in incorporating Fine Classic FZE stated that the funds in Fine Classic FZE were generated because of trade outstanding of Dubai and Hong Kong based dummy companies of Nirav Modi and deliberately high profit margin of Fine Classic FZE was projected.

A sample account statement showing the transfer of tainted funds to Fine Classic FZE and subsequent transfer to Purvi Deepak Modi is placed as under:-

BRANCH : FI BUR DUBAI

16-01-2017 12:27 42

STATEMENT OF ACCOUNT

Page : 2 of 4

FINE CLASSIC FZE          -FINE CLASSIC FZ

999,FINE CLASSIC FZE          PO BOX

371809 DUBAI  United Arab.Emirates

| Account Number: | 3527310213004 . | USD |
|---|---|---|
| Account Name: | FINE CLASSIC FZE | -FINE CLASSIC FZ |
| Account Type | INV-SAVINGS | |
| IBAN: | AE080340003527310213004 | |

STATEMENT OF ACCOUNT FOR THE PERIOD
: 01-12-2016 to 15-01-2017

| DATE | PARTICULARS | WITHDRAWALS | DEPOSITS | BALANCE |
|---|---|---|---|---|
| 22-12-2016 | INWARD REMITTANCE CR 2016127100772369 TRI COLOR GEMS FZE REF/B/590026 /CSWFT/NCP/N00000082712 /003336150/INV FC/015/2016 /01060222018 PAR1 | | 1 450,500 00 | 3,350,483 58Cr |
| 22-12-2016 | SB TRANSFER SD REF 9221531 BEING USD 10 AED TRANSFER BY FINE CLASSIC FZ | | 1,800,000.00 | 5,150 483 58Cr |
| 24-12-2016 | INWARD REMITTANCE CR C0/033/6030401 TRI COLOR GEMS FZE /REF/OT/030320 /CSWF T/NNCP/N000000096968 16 ISN E62300 OSN 0603 04 BSN 0437290 /REF/B/SWF OF | | 1,705,786.67 | 6,856,270 25Cr |
| 24-12-2016 | INWARD REMITTANCE CR 2016122200207156 PACIFIC DIAMONOS FZE /RFB/5000 /CSWFT/NCP/N0000000986602 /000333-36436=INV FC/078/2 015 /0119112015 INV FC | | 2,113,692.00 | 8 969 962 25Cr |
| 24-12-2016 | OUTWARD REMITTANCE REF NUM : OX0000090618 PURVI DEEPAK MODI /CSWFT/ONCP/N000000090618 | 1,600,000.00 | | 7,369,962.25Cr |
| 24-12-2016 | OUTWARD REMITTANCE REF NUM : OX0000090619 PURVI DEEPAK MODI /CSWFT/ONCP/N000000090619 | 1,700,000.00 | | 5,669,962.25Cr |
| 26-12-2016 | OUTWARD REMITTANCE REF NUM : OX0000091280 PURVI DEEPAK MODI /CSWFT/ONCP/N000000091280 | 2,000,000.00 | | 3,669,962.25Cr |
| 27-12-2016 | INWARD REMITTANCE CR 2016127100092961 PACIFIC DIAMONOS FZE RFB/5000 /CSWFT/NCP/N000092541 | | 1 099,962.00 | 4,769,924.25Cr |

**9.3**   Funds to the tune of USD 26 million were received during the period March 2017 to May 2017 in the personal Account 1030200012010101 of Purvi Modi maintained in Amicorp Trust & Bank Limited. Barbados  The breakup of the said credit of funds are as under:-

| Sr No | Amount | Credited from | Debited to |
|---|---|---|---|
| 1 | USD 18 Million | Fine Classic FZE , beneficially owned by Purvi Modi | |
| 2 | USD 4 Million | Purvi Modi personal account 101000007497 in BANYANTREE BANK LIMITED CYBER CITY | |



| 3 | USD 4.4 Million | Purvi Modi personal account in 309634-11745352 DINOSAUR MERCHANT BANK LIMITED UK | |
| 4 | USD 26.3 Million | | Ami Nirav Modi HSBC Account No 134-87374-2 |

As mentioned above the said amount was transferred to the account of Ami Nirav Modi (Wife of Nirav Modi) to her HSBC Account no 134-87374-2 maintained in United States of America.The relevant statement of the Account **1030200012010101** maintained in Amicorp Trust & Bank Limited is as under :-



Carleton Court,
High Street,
Bridgetown,
Barbados  BB11128

Customer Name                  : PURVI DEEPAK MODI

Account Description            : PURVI DEEPAK MODIHOLDING ACCOUNT

Account Class Description   : NON RESIDENT INDIVIDUAL

Customer Account Number  : 1030200012010101        Date Produced        : 10-Jul-18

Currency                           : USD

Account Statement for the period from 1-Jan-2009 to 10-Jul-2018

| TXN Date | Value Date | Debit | Credit | Transaction Description |
|---|---|---|---|---|
| | | | | INDRBNR201704270007 |
| 27-Apr-17 | 27-Apr-17 | | 1,800,000 00 | INWARD CUSTOMER TRANSFER-FINE CLASSIC FZE - PURVI DEEPAK MODI - FT00182006434251 - INDRBNR201704270003 |
| 27-Apr-17 | 1-May-17 | 25 00 | | Monthly Maintenance Fee- |
| 2-May-17 | 2-May-17 | 50 00 | | SERVICE CHARGE-MRS MODI PURVI DEEPAK - PURVI DEEPAK MODI - FT00182309018251 - INDRBNR201705020002 |
| 2-May-17 | 2-May-17 | | 4,400,000 00 | INWARD CUSTOMER TRANSFER-MRS MODI PURVI DEEPAK - PURVI DEEPAK MODI - FT00182309018251 - INDRBNR201705020002 |
| 4-May-17 | 4-May-17 | 21,906,582 00 | | OUTWARD CUSTOMER TRANSFER-PURVI DEEPAK MODI - AMI NIRAV MODI - 001R103171240009 - OTTXXXX201704280002 |
| 23-May-17 | 23-May-17 | 25 00 | | SERVICE CHARGE-BANK STATEMENT CHARGES |
| 31-May-17 | 1-Jun-17 | 25.00 | | Monthly Maintenance Fee- |
| 9-Jun-17 | 9-Jun-17 | 400 00 | | SERVICE CHARGE-PURVI DEEPAK MODI - AMI NIRAV MODI - 001R103171600006 - OTTXXXX201706090001 |
| 9-Jun-17 | 9-Jun-17 | 4,400,000 00 | | OUTWARD CUSTOMER TRANSFER-PURVI DEEPAK MODI - AMI NIRAV MODI - 001R103171600006 - OTTXXXX201706090001 |



**9.4**    From the HSBC account of Ms. Ami Nirav Modi, funds to the tune of USD 25 Million were transferred to A/C no 683351 of Ms. Purvi Deepak Modi maintained in Bank of Singapore on 01/09/17. The SWIFT message for this transaction was recovered from the seized data and is as under:-

"*BBK: BANK OF SINGAPORE LIMITED (FORMERLY SINGAPORE*BNF:MODI, PURVI DEEPAK,HONG KONG, HK*OBI:REF: PARTIAL REPAYMENT OF THE LOAN    FOR    PURVI    MODI*MECHIPSEQ:0377399*TIME:1544*YR REF:DPBBUF1241*MMB REF:244485415"

Further from the HSBC account of Ms Ami Nirav Modi a sum of USD 2.5 Million was transferred to a legal firm "Katz and Matz PC New York" on 07/07/17. The relevant    account    statement    of    the    said    transaction    is    as    under:-

# HSBC ◆X◆ PREMIER

HSBC Premier
Statement of Account
Account Number 134-87374-2

July 1, 2017 - July 31, 2017
Page 1 of 1

AMI NIRAV MODI                    10-00134P
300 E 56TH ST APT 9D
NEW YORK NY 10022-4126

Questions?
Call 1-888-662-HSBC or write
HSBC
US Private Bank
452 14th Avenue, 6th Floor
New York, NY 10018
Your Relationship Manager
Kevin J Roth
1-212-525-3887

DEPOSIT ACCOUNT SUMMARY FOR PERIOD ENDING 07/31/2017

| ACCOUNT | ACCOUNT NUMBER | INTEREST CREDITED YEAR TO DATE | BEGINNING BALANCE | DEPOSITS AND OTHER ADDITIONS | CHECKS WITHDRAWALS AND OTHER SUBTRACTIONS | ENDING BALANCE |
|---|---|---|---|---|---|---|
| CHECKING ACCOUNTS | | | | | | |
| HSBC PREMIER | 134-87374-2 | 665.87 | 34,406,578.77 | 275.10 | 2,500,000.00 | 31,906,853.87 |
| TOTAL CHECKING | | | | | | $31,906,853.87 |

TOTAL OF ALL REPORTED DEPOSIT BALANCES AS OF JUL 31:                    $31,906,853.87

ACCOUNT DETAIL

HSBC PREMIER                    134-87374-2         US Private Bank
                                                AMI NIRAV MODI

ADD THIS AMOUNT TO YOUR RECORDS:  $275.10
(INTEREST POSTED TO YOUR ACCOUNT DURING THIS PERIOD)
DATE OF YOUR LAST STATEMENT WAS:  JUN 30, 2017

| DATE POSTED | DESCRIPTION OF TRANSACTIONS | CHECKS AND OTHER SUBTRACTIONS | DEPOSITS AND OTHER ADDITIONS | BALANCE |
|---|---|---|---|---|
| 07/07/17 | SEND FED SIGNATURE BANK*BNF:LAW OFFICES OF KATZ AND MATZ, PC, NEW YORK, NY, USA*ORG:CONTACT : ROMMEL DELAROSA - 646-822-1948*MTERDSEQ:B1Q9983C902361*TIME:1120*YBREF: DPBB F10456*MMB REF:1842*3598 | 2,500,000.00 | | 31,906,578.77 |
| 07 31 17 | INTEREST EARNED AND PAID FROM 07 01 17 THROUGH 07/31/17INCLUSIVE AVERAGE DAILY LEDGER BALANCE L.   $32,390,449.74 ANNUAL PERCENTAGE YIELD EARNED  0.01% | | 275.10 | 31,906,853.87 |



9.5   From the seized data, it is revealed the instructions were given to Commonwealth Trust Company by the advisor of The Ithaca Trust to transfer USD 23 Million in relation to the subject property. The said directions were forwarded to Mr..Ajay Gandhi by Mr. Nirav Modi. The same is as under :-

28 August    2017

Commonwealth Trust Company
29 Bancroft Mills Road
Wilmington, DE 19806

Re:    The Ithaca Trust

To whom it may concern:

In my capacity as Investment Advisor of the Ithaca Trust (the "Trust"):

1.   I hereby direct Commonwealth Trust Company, solely in its capacity as Trustee of the Trust and not in its individual capacity, to take the following actions with respect to Central Park South 50 Properties, LLC (the "LLC"):

   a.   Accept the assignment of a 100 % interest in the LLC by executing the attached Assignment Agreement:

   b.   Execute the attached Amended and Restated Operating Agreement of the LLC (the "LLC Agreement");and

   c.   Make an initial capital contribution in the amount of $ 23,000,000        to the LLC per the wire instructions listed below.

On 09/07/17, the below Draft assignment agreement was forwarded by Mr Nirav Modi to Mr. Ajay Gandhi through Email and the same was recovered from the seized data by the Directorate of Enforcement.

**ASSIGNMENT AGREEMENT**

The undersigned, Purvi Modi (the "Assignor"), hereby assigns a 100% membership interest (the "Interest") in Central Park South 50 Properties LLC, a New York limited liability company (the "Company"), to The Ithaca Trust (the "Assignee"). This assignment includes the right to participate in the Company's income, losses, distributions, the right to vote on matters submitted to the members for consideration and any and all other rights, benefits and obligations to which a member of the Company may be entitled, including the right to become a member of the Company. Upon consummation of the assignment of the Interest, the Assignor shall withdraw as a member of the Company.

Date:                                    _____
                                         Purvi Modi

The undersigned Assignee hereby accepts the assignment of the Interest in the Company. The undersigned acknowledges that the Interest in the Company have not been registered under the Securities Act of 1933, or any applicable state securities laws, in reliance upon exemptions therefrom, and covenants, represents, and warrants that the undersigned is acquiring the Interest in the Company for investment only and not with a view to the resale or distribution thereof. Upon consummation of the assignment of the Interest, the Assignee shall be admitted as a member of the Company.

                                         THE ITHACA TRUST

Date:                                    By:_____
                                            Name:
                                            Title:

9.6   The John J Carney's report on Bankruptcy proceedings of companies owned by Firestar Group in USA confirmed that on September 7, 2017, The Ithaca Trust bought an apartment located in the Ritz Carlton residences at 50 Central Park South, Unit 33 in New York, NY (the "Ritz Carlton Apartment"); The apartment was purchased for $25 million in cash by Central Park South 50 Properties LLC, an entity owned by The Ithaca Trust, Purvi Modi, Modi's sister, which signed the contract of sale; In email correspondence, Nirav Modi discussed a transfer of $2.5 million from HSBC to the Law Offices of Katz and Matz, PC, the law firm handling the sale of the property; Ami Modi's HSBC bank account statement for the account ending in 3742 shows a $2.5 million wire transfer to Katz and Matz on July 7, 2017; Purvi Modi paid the remaining $23 million of the purchase price through a transfer of funds from her account at Singapore Limited to the fiduciary account at the Commonwealth Trust Company. The fund flow to the said transaction is detailed below:



**9.7** From the above discussion and money trail formed, it is clear that the ultimate source of the funds to purchase the above property namely 50, Central Park South is stolen funds from Punjab National Bank. The funds were layered in a very complex manner to camouflage the ultimate source of money. The property was purchase on the name of a trust and payment for that was also done from the fiduciary accounts. Therefore, the property 50, Central park South, New York is nothing but proceeds of crime in view of section 2(1) (u) of Prevention of Money Laundering Act, 2002.

**10.** Therefore, from the above discussion, it is clear that following properties have been purchased from the funds illegally obtained fromf PNB and beneficially owned by Nirav Modi in United States of America.

| Sr. | Property Description | In the name of | Beneficial Owner | Value (USD) |
|---|---|---|---|---|
| 1 | The Essex House 160, Central Park South, New York, NY | Central Park Real Estate LLC (Beneficially owned by The Ithaca Trust) | Nirav Deepak Modi through his wife Ami Nirav Modi | USD 4,995,000 |
| 2 | 50, Central Park South, Unit No 33, New York, NY | Central Park South 50 Properties LLC (Beneficially owned by The Ithaca Trust) | Nirav Deepak Modi through his wife Ami Nirav Modi | USD 25 Million |

**11.** As per Section 2 (1)(u) of the PMLA, 2002,

'*Proceeds of crime means any property derived or obtained, directly or indirectly, by any person as a result of criminal activity relating to a scheduled offence or the value of any such property or where such property is taken or held outside the country then the property equivalent in value held within the country or abroad.*'



12.    As per the definition, proceeds of crime are either the property derived or obtained as a result of criminal activities relating to a scheduled offence or the value of such property or where such property is taken or held outside the country then the property equivalent in value held within the country or abroad. The statute thus entitles the attachment of proceeds of crime which are either generated as a result of criminal activity relating to a scheduled offence or the equivalent value or where such proceeds of crime is taken or held outside the country then the property equivalent in value held within the country or abroad. As detailed above, Mr Nirav Modi was illegally benefitted from the proceeds of crime generated from the fraud personally and through the entities controlled by him. He is an accused in the Prosecution complaint filed by the Enforcement Directorate on 24.5.2018. Therefore, the properties purchased by him in the name of "The Ithaca Trust" from the stolen funds is nothing but Proceeds of Crime as per section 2(1) (u) of Prevention of Money Laundering act, 2002. Therefore, the above-mentioned immovable properties owned by "The Ithaca Trust", represents the value of proceeds of crime in terms of definition of Section 2 (1) (u) of PMLA, 2002 as *'the value of any such property or where such property is taken or held outside the country then the property equivalent in value held within the country'* are liable for attachment under PMLA, 2002.

13.    In view of the definition of proceeds of crime under section 2 (1) (u) of PMLA, 2002, it is evident that the Directorate of Enforcement can attach properties in India and abroad of equivalent value of POC in case where there is evidence to the effect that a person has engaged in money laundering and generated POC through criminal activities related to scheduled offence, and such POC is not available for attachment in the country.

14.    Section 23 of the PMLA prescribes that where money laundering involves two or more interconnected transactions and one or more such transactions is or are proved to be involved in money laundering then for the purposes of the adjudication or confiscation (under Section 8 for the trial of the money laundering offence it shall unless otherwise proved to the satisfaction of the Adjudicating Authority or the Special Court) be presumed that the remaining transactions form part of such interconnected transactions.

15.    Section 24 of PMLA 2002 prescribe that in any proceedings relating to proceeds of crime under the Act-

a) In the case of a person charged with the offence of money laundering under the section 3 the Authority or Court shall unless

the contrary is proved presume that such proceeds of crime are involved in the money-laundering; and

b) In the case of any other person the Authority or Court may presume that such proceeds of crime are involved in money laundering.

16.     On the basis of above material placed before the Complainant, procured during the course of investigations against the above said entities/firms and persons and on its examination and analysis as discussed in above paras, the Complainant had reason to believe that M/s Diamond R US, M/s Solar Export and M/s Stellar Diamond have obtained LOUs amounting to Rs. 6498.20 crore from PNB, Brady House Branch, Mumbai fraudulently by cheating the bank in connivance with the bank officials and without giving any cash margin and without submitting any import document, as mentioned in the subject FIR No. RCBSM2018E0001 dated 31.01.2018 registered by the CBI. Hence the entire amount of Rs 6498.20 crore is the Proceeds of Crime.  On receipt of LOUs by the overseas banks from PNB, the overseas banks sanctioned the buyer's credit (loan) amounts to the said three entities and therefore, the said amounts were credited to the Nostro Account of PNB, as PNB has issued LOU on behalf of the said three entities. Thereafter, the said buyer's credit amount credited in the Nostro Account of PNB were utilized by the said three entities in connivance with the bank officials for settling earlier buyer's credit obligations of the Nirav Modi Group firms and in effect, most of the transactions were for extinguishing the existing buyer's credit liabilities, availed earlier from Indian bank branches abroad. However, after settling of earlier buyer's credit, the funds obtained from LOUs, were also used for paying oversea firms allegedly the suppliers of the said three entities/firms. Further, they have failed to repay the amount so obtained from the overseas banks making PNB liable for payment of the said funds to the overseas bank on account of LOUs which were obtained by the said three entities through fraudulent modes for the above stated reasons. The entire POC is not available in India for attachment. However, the properties purchased by Nirav Modi in USA with the active help of his sister Ms Purvi Modi and as mentioned in para 10 from the tainted funds represent the value of Proceeds of Crime as substantial amount of POC has been diverted to them from the Dubai based beneficiaries of the Fraudulent LoUs. In view of the same and the provisions of the PMLA, the said properties as mentioned in para 10 above represent the value of proceeds of crime in terms of definition of Section 2 (1) (u) of PMLA, 2002 as *'value of any such property or where such property is taken or held outside the country then the property equivalent in value held within the country or abroad'*. As such, said properties mentioned at para 10 are deemed to

be proceeds of crime generated as a result of criminal activities alleged by the CBI FIR No. RCBSM2018E0001 dated 31.01.2018. Therefore, the said Properties mentioned at Para 10 were provisionally attached by the Complainant vide PAO no. 15/2018 dated 17.09.2018. under section 5(1) of the PMLA, 2002. By their acts of using and utilizing the fraudulently obtained funds i.e. proceeds of crime from PNB, it appears that Mr Nirav Modi and Ms Purvi Modi has indulged in money laundering activities in terms of Section 3 of PMLA, 2002.

17.    Investigation has revealed that the monies have been transferred out of India were utilized overseas for settlement of LOUs earlier obtained by the said entities , for making payment to alleged overseas suppliers and for purchasing immovable/movable properties outside India. Mr Nirav Modi and Mrs Purvi Modi are not co-operating with the investigation at all as they have not attended this office despite of many summons issued to them under the provisions of the PMLA, 2002. Non bailable warrants by the competent courts and Red Corner Notices by Interpol have also been issued against both the above named persons. The likelihood of transferring and/or concealing of the said properties are extremely high. Therefore, the Complainant had reason to believe that immovable properties as mentioned at para 10 supra i.e. the proceeds of crime are likely to be concealed, transferred or dealt with in such a manner which may result in frustrating any proceedings relating to confiscation of such proceeds of crime under Chapter III of the Prevention of Money Laundering Act, 2002 (15 of 2003).

18.    The CBI authorities have filed a charge-sheet under Section 173 of the Criminal Procedure Code, 1973, with respect to the Scheduled Offences on 14.05.2018 before Special Court for CBI Cases, Sessions Court, Mumbai and the same is pending trial.  As per the said charge sheet, 24 entities/persons have been charged.
As per the said charge sheet, the accused therein have been charged under section 120-B r/w.420,409 of IPC & section 13(2) r/w 13(1)(c) & (d) of Prevention of Corruption Act, 1988 which are the scheduled offences under Para 1 & 8 of part-A of schedule of PMLA, 2002. Further, the said accused have been charged for conspiring and cheating the PNB & thereby causing a wrongful loss to the bank.

19.    A Prosecution Complaint vide Special case no 04/2018 was filed before the PMLA special court Mumbai on 24th Of May 2018 wherein Mr. Nirav Modi and 23 others including Ms Purvi Modi, have been made accused. Cognizance of the prosecution Complaint has been taken by the Special Court and Non Bailable Warrants dated 21.06.2018 have been issued against Mr. Nirav Modi & Ms Purvi Modi.

20.      For the reasons detailed above, it is submitted that the above mentioned defendants, namely Nirav Modi, Purvi Modi and Ami Modi appear to have committed an offence under Section 3 of PMLA, 2002, and that the said properties mentioned at para 10 .purchased from the funds illegally obtained from PNB and beneficially owned by Nirav Modi in United States of America which are under orders of Provisional Attachment vide PAO no 15/2018 dated 17.09.2018 valued at  USD 29.995 Million (Twenty-Nine Million Ninety-Nine Hundred five thousand Dollars only) (Approx INR 217,34,37,700/- Rupees two hundred seventeen crores thirty-four lacs thirty-seven thousand and seven hundred only. (@INR 72.46 per USD) are deemed to be part of the value representing the proceeds of crime, involved in money laundering which have been taken out of the country and thereby, the same are liable for confirmation of attachment under Section 8 (3) of the Act. The investigation under PMLA, 2002 is still in progress. The present complaint is filed without prejudice to the provisional attachment of any other properties likely to be made as outcome of the ongoing investigation.

21.    The list of relied upon documents along with copies of documents are enclosed with this complaint.

### PRAYER

22.    In the facts and circumstances stated hereinabove, it is most humbly prayed that the Hon'ble Adjudicating Authority be pleased to-:

(a)    Take this Complaint on record for the purpose of adjudication under Section 8 of the Act; and

(b)    Order confirmation of the Provisional Attachment Order No. 15 /2018 dated 17.09.2018 in ECIR/MBZO-I/03/2018 under Section 8(3) of the Prevention of Money Laundering Act, 2002 (amended Act).

Signed this 12 Day of October, 2018 at Mumbai.

(C. Mahesh Chandra Reddy)
DEPUTY DIRECTOR
DIRECTORATE OF ENFORCEMENT
MUMBAI ZONAL OFFICE-I
COMPLAINANT

## DOCUMENTS RELIED UPON TO PAO NO. 15 /2018 DATED 17.09.2018

| Sr. No | Particulars | Page Nos From | To |
|---|---|---|---|
| 1 | Copy of PAO No. 15/2018 dated 17.09.2018. | 01 | 23 |
| 2 | Copy of FIR No. RCBSM2018E0001 dated 31.01.2018 registered by CBI, BS & FC, Mumbai | 24 | 33 |
| 3 | Copy of Prosecution Complaint filed by CBI on 14.05.2018 before the Court of Hon'ble Special Judge for CBI cases Greater Mumbai. | 34 | 104 |
| 4 | Copy of ECIR No. ECIR/MBZO-I/03/2018 dated 14.02.2018 recorded by Directorate of Enforcement, Mumbai. | 105 | 107 |
| 5 | Copy of letters dated 13.02.2018 and 14.02.2018 of the Punjab National Bank | 108 | 116 |
| 6 | Copy of Prosecution Complaint No.4/2018 dated 24.05.2018 filed before Hon'ble Judge City Civil Court and Additional Sessions Judge Greater Bombay (Designated Court for the Prevention of Money Laundering Act, 2002). | 117 | 207 |
| 7 | Copy of Statement of Shri Avneesh Nepalia, Complainant, working as Deputy General Manager at PNB Zonal office, Mumbai recorded on 20.02.2018 under section 50(2) of the PMLA, 2002. | 208 | 217 |
| 8 | Copy of Statement of Shri Raghuraman Iyer dated 24/04/18 under section 50(2) of the PMLA, 2002 | 218 | 220 |
| 9 | Copy of mortgage agreement of Central Park LLC executed on date 26/03/2007 with HSBC bank recovered from the seized data | 221 | 249 |
| 10 | Copy of property document for Essex House, 160 Central Park South purchased in 2007 for USD 4,99,500 held in the name of M/s Central Park Real Estate LLC, a company controlled by Mr Nirav Modi. (downloaded from land records Publicly available on the website of New York Land Department) | 250 | 256 |
| 11 | John J Carney's report on Bankruptcy proceedings of companies owned by Firestar Group in USA. | 257 | 427 |
| 12 | Copy of Statements of Vipin Sanith Manager of Fine Classic FZE recorded u/s. 50 (2) & (3) of PMLA, | 428 | 433 |

| 13 | Copy of Statement of Nilesh Mistry, Accountant of Fine Classic FZE, recorded u/s. 50 (2) & (3) of PMLA, | 434 | 441 |
|----|----|----|----|
| 14 | Copy of Statement of Kurian Mathews, Supervisor of Accounts of Fine Classic FZE recorded u/s. 50 (2) & (3) of PMLA, | 442 | 446 |
| 15 | Copy of Statement recorded U/S 50 of PMLA by Mr. Shyam Sunder Wadhwa, Vice President of Firestar Group | 447 | 450 |
| 16 | Copy of Account statement showing the transfer of tainted funds to Fine Classic FZE and subsequent transfer to Purvi Deepak Modi | 451 | 464 |
| 17 | Copy of personal Account 1030200012010101 of Purvi Modi maintained in Amicorp Trust & Bank Limited, Barbados. | 465 | 470 |
| 18 | Copy of SWIFT message showing transfer of USD 25 million from the HSBC account of Ms. Ami Nirav Modi, to A/C no 683351 of Ms. Purvi Deepak Modi maintained in Bank of Singapore on 01/09/17 | 471 | 492 |
| 19 | Copy of Account statement of Ami Modi HSBC Bank 134-87374 showing a $2.5 million wire transfer to Katz and Matz on July 7, 2017; | 473 | 474 |
| 20 | Copy of instructions given to Commonwealth Trust Company by the advisor of The Ithaca Trust to transfer USD 23 Million | 475 | 477 |
| 21 | Copy of Draft assignment agreement dated 09/07/17 forwarded by Mr Nirav Modi to Mr. Ajay Gandhi through Email | 478 | 479 |
| 22 | Copy of Email correspondence, Nirav Modi discussing a transfer of $2.5 million from HSBC to the Law Offices of Katz and Matz, PC, the law firm handling the sale of the property; | 480 | 482 |
| 23 | Copy of property document for 50, Central Park South (downloaded from land records Publicly available on the website of New York Land Department) | 483 | 494 |

(C. Mahesh Chandra Reddy)
DEPUTY DIRECTOR
MUMBAI ZONAL OFFICE-I

# Exhibit 11

1050

## CERTIFICATE

This is to certify that;

1) Each and every page of the relied upon documents, the PAO and the OC along with the annexure have been numbered and certified.

2) Each document is bearing the signature with official stamp of the complainant and a certificate to that effect that "This annexure is the true copy of the document relied upon"

3) All documents furnished to the Adjudicating Authority PMLA are duly indexed and page numbered.

4) The statements of the Defendant have been recorded under Section 50 of PMLA, 2002.

5) 3 CDs having PAO, Complaint, and list of Annexure in word format is enclosed.

(C. Mahesh Chandra Reddy)
DEPUTY DIRECTOR
DIRECTORATE OF ENFORCEMENT
MUMBAI ZONAL OFFICE
COMPLAINANT

**BEFORE THE CHAIRPERSON, ADJUDICATING AUTHORITY UNDER THE**

**PREVENTION OF MONEY LAUNDERING ACT, 2002**

**ORIGINAL COMPLAINT NO.    of 2018**

IN

**PROVISIONAL ATTACHMENT ORDER NO.  17/2018 DATED 05.10.2018 IN**

**ECIR/MBZO-I/03/2018**

**Schedule of the Property**

| Sr. No. | Name of the Property | Owners | Market Value (In INR) |
|---------|---------------------|--------|----------------------|
| 1 | 50, Riverside Boulevard, New York, 10069 (Flat 24-A) | Mr. Mihir Bhansali and Mrs. Rakhi Bhansali (earlier) Presently owned by Mrs. Rakhi Bhansali (w.e.f. 28, Feb, 2018) | USD 7.1 Million |

Total Value of Attached Asset= USD 7.1 Million (USD. Seven Million Hundred Thousand only equivalent to Rs. 52,24,18,000 Rupees Fifty-two Crores Twenty-Four Lacs Eighteen Thousand only (@ INR 73.58 per USD as on 05.10.2018).

**Deputy Director,**

**Directorate of Enforcement,**

**Prevention of Money Laundering Act, 2002,**

**4th floor, Kaiser-I-Hind, Currim Bhoy Road,**

**Ballard Estate, Mumbai**                                     ...............**Complainant**

V/s

1) Shri Nirav Modi,
   4, Grosvenor House,
   Peddar Road, Mumbai-26

2) Mihir Bhansali s/o Sh. Rashmi Bhansali
3) Rakhi Bhansali w/o Sh. Mihir Bhansali

   USA: 50, Riverside Boulevard,
        New York, 10069 (Flat 24-A)

   India: 211, Casa Blanca,
          39, Cuff Parade, Mumbai-05    .........................**Defendants**



**COMPLAINT UNDER SECTION 5(5) OF THE PREVENTION OF MONEY LAUNDERING ACT, 2002 FOR CONFIRMATION OF PAO NO. 17/2018 DATED 05.10.2018**

**May it please the Hon'ble Chairperson and Members of the Adjudicating Authority.**

That, in exercise of the powers conferred under sub-section (1) of Section 5 of the Prevention of Money Laundering Act, 2002 (15 of 2003), (hereinafter referred to as the 'Act'), read with Notification No. GSR.441(E) dated 1st July, 2005 and in terms of authorization dated 7th February, 2007 issued by the Director of Enforcement, New Delhi and its addendum No. DLA(A)/AUT/S.8(4)/03/2010 dated 12.10.2011, Deputy Director, Directorate of Enforcement, Mumbai, has issued order for provisional attachment of the Immovable and moveable properties as mentioned in the scheduled above vide Provisional Attachment Order No.17/2018 dated 05.10.2018 in ECIR/MBZO-I/03/2018.

2.      On the basis of material placed before the Complainant and on the reasonable belief as recorded in the Provisional Attachment Order No. 17/2018 dated 05.10.2018, the Complainant, Directorate of Enforcement, Mumbai has provisionally attached the abovementioned properties. The copy of the Provisional Attachment Order No. 17/2018 dated 05.10.2018 is enclosed as **Annexure–I.**

3.      The said Provisional Attachment Order has been served upon the Defendants by registered Speed Post. Copy of the Provisional Attachment Order along with the material was also forwarded to the Adjudicating Authority in á sealed envelope as required under Section 5 (2) of the said Act read with The Prevention of Money Laundering (The Manner of Forwarding a Copy of the Order of Provisional Attachment of Property along with the Material, and Copy of the Reasons along with the Material in Respect of Survey to the Adjudicating Authority and its period of retention) Rules, 2005.

4.      By virtue of Section 5 (5) of the said Act, the Complainant herein is required to file complaint before the Adjudicating Authority within 30 days from the date of issue of Provisional Attachment Order stating the facts of such attachment before the Adjudicating Authority. This complaint is being filed in furtherance thereto.

**5.    PREDICATE OFFENCE-**

On the basis of complaint dated 29.01.2018, filed by Punjab National Bank, Zonal Office, Mumbai, the CBI, BS & FC, Mumbai registered an FIR No. RCBSM2018E0001 dated 31.01.2018. It has been alleged in the FIR that:-

(i)      On 16th January 2018, M/s Diamond R US, M/s Solar Exports and M/s Stellar Diamonds (Partners: - Shri Nirav Modi, Shri Neeshal Modi, Smt. Ami Nirav Modi and Shri Mehul Chinubhai Choksi) approached the branch office of the Punjab National Bank at Mid Corporate Branch, Brady House, Mumbai and presented a set of import documents to the branch with request to allow buyers credit for making payment to the overseas suppliers. Since there was no sanctioned limit in the name of the above firms, the branch officials requested the firms to furnish at least 100% cash margin for issuing Letter of Undertakings (LOU) for raising buyer's credit. At this, the firms contested that they have been availing this facility in the past also but the branch records did not reveal details of any such facility having been granted to the said firms.

(ii)     The complainant Bank has further stated that on preliminary checking of records, it was observed that Shri Gokulnath Shetty, the Dy. Manager (PF No. 107272, since retired 31.05.2017), who was posted at the said branch (Mid Corporate Branch, Brady House, Mumbai) since 31.03.2010 and was working in the Foreign Exchange Department looking after the Import Section and Shri Manoj Hanumant Kharat, Single Window Operator, Punjab National Bank had fraudulently issued LOUs without following prescribed procedure by obtaining required request applications, documents and approval of the authorities thereto and without making entries in the Bank system avoiding detection of the transactions, so made, transmitted SWIFT instructions to the overseas branches of Indian Banks for raising Buyers Credit & funding the Nostro Accounts of PNB. The funds so raised for payment of Import Bills have not been utilized for such purposes in many cases.

(iii)    The complainant also stated that on scrutiny of the records of SWIFT messages, it was revealed that the above-named accused Shri Gokulnath Shetty and Shri Manoj Hanumant Kharat on 09.02.2017 issued 2 LOUs for & on behalf of M/s Diamond R US and M/s Solar Exports for USD 4415791.96 and USD 4335391.38 respectively, having due date of payment on 25.01.2018 favoring Allahabad Bank at Hong Kong. The accused again on 10.02.2017 had issued 3 LOUs for & on behalf of M/s Diamond R US, M/s Solar Exports and M/s Stellar



Diamond for USD 5942017.70, USD 5843161.93 and USD 6093321.10 respectively having due date of payment thereof on 25.01.2018 favoring Allahabad Bank at Hong Kong. Shri Gokulnath Shetty and Shri Manoj Hanumant Kharat further on 14.02.2017 had issued 3 LOUs for & on behalf of M/s M/s Diamond R US, M/s Solar Exports and M/s Stellar Diamond for USD 5856885.00 USD 5862251.03 and USD 5877064.00 respectively having due date of payment thereof on 25.01.2018 favouring Axis Bank at Hong Kong. They had, thereby, fraudulently issued 8 LOUs total amounting to USD 44225812.10 which is equivalent to Rs. 280,70,12,293.98 at the notional exchange rate of a Dollar @ Rs. 63.47 per USD.

(iv)    Thus, the above facts and circumstances prima facie disclosed that Shri Nirav Modi, Shri Neeshal Modi, Smt. Ami Nirav Modi, Shri Mehul Chinubhai Choksi, all partners of M/s Diamond R US, M/s Solar Exports and M/s Stellar Diamond in conspiracy with Sri Gokulnath Shetty, Deputy Manager (retd.), Punjab National Bank, Manoj Hanumant Kharat, Single Window Operator, Punjab National Bank and other unknown persons committed the offence of cheating against Punjab National Bank and caused a wrongful loss. The public servants committed abuse of official position to cause pecuniary advantage to M/s Diamond R US, M/s Solar Exports and M/s Stellar Diamond and wrongful loss of Rs. 280.70 crore to Punjab National Bank.

(v)    In view of the above, the FIR has been registered under sections 120-B r/w 420 of IPC, 1860 read with Section 13(2) read with 13(1)(d) of PC Act, 1988 against following persons/individuals/entities:-

    (a)  Shri Nirav Modi, Partner of M/s Diamond R US, M/s Solar Exports & M/s  Stellar Diamonds.

    (b)  Shri Neeshal Modi, Partner of M/s Diamond R US, M/s Solar Exports & M/s Stellar Diamonds.

    (c)  Smt. Ami Nirav Modi, Partner of M/s Diamond R US, M/s Solar Exports & M/s Stellar Diamonds.

    (d)  Shri Mehul Chinubhai Choksi, Partner of M/s Diamond R US, M/s Solar Exports & M/s Stellar Diamonds.

    (e)  Shri Gokulnath Shetty, Dy. Manager (retd.), Punjab National Bank,

    (f)   Shri Manoj Hanumant Kharat, Single Window Operator, Punjab National Bank & Ors.



It appeared that the above named accused persons/entities have prima facie committed Offences under Section 120(B), 420 of IPC and Sections 13 of the Prevention of Corruption Act, 1988, which are Scheduled Offences under Paragraph 1 and Paragraph 8respectively of Para 'A' of the Schedule to the Prevention of Money Laundering Act, 2002 (as amended).

vi.    On the basis of the aforesaid information/documents, an ECIR No. MBZO-1/03/2018 dated 14.02.2018 was recorded for investigation under the provisions of Prevention of Money Laundering Act, 2002 against the above named accused persons/entities mentioned in the FIR and also against following persons/entities:-

a)    Aura Gem Company Limited, Hong Kong

(b)    Sino Traders Limited, Hong Kong

(c)    Tri Colour Gems FZE, UAE

(d)    Unity Trading FZE, UAE

(e)    Sunshine Gems Ltd.

(f)    Pacific Diamonds FZE, UAE& Ors

## 6.    Investigation under PMLA

Investigations are being carried out by the Directorate of Enforcement, Mumbai Zonal Office under the provisions of the PMLA. During the course of investigation in the matter, PNB, vide letter dated 13.02.2018 written in continuance of its earlier complaint dated 29.01.2018 (on the basis of which the subject FIR has been registered), has further informed that the above said partnership firms i.e. M/s Diamond R US, M/s Solar Exports and M/s Stellar Diamonds have got fraudulently issued a total of 150 LOUs aggregating to USD 1015.35 million equivalent to Rs. 6498.20 crores during the period from Feb, 2017 to May, 2017 by using the above modus operandi, as mentioned in the FIR. The said amount includes the LOU amounts mentioned in the subject FIR. The firm/entities wise breakup of the above mentioned LOUs amount is as under:-



| Sr. No. | Name of the firm/entity | Total amount of LOUs (Rs. in crores) |
|---------|-------------------------|--------------------------------------|
| 1. | M/s Diamond R US | 2210.61 |
| 2. | M/s Solar Export | 2152.88 |
| 3. | M/s Stellar Diamond | 2134.71 |
| | Total | 6498.20 |

Thus, the total proceeds of crime found so far in the matter appear to be Rs. 2210.61 crores in respect of M/s Diamond R US, Rs. 2152.88 crore in respect of M/s Solar Export, Rs. 2134.71 crore in respect of M/s Stellar Diamond as the said funds were obtained by these firms/entities by cheating the PNB bank to fraudulently obtain LOUs as mentioned in the subject FIR No. RCBSM2018E0001 dated 31.01.2018 registered by the CBI. The total proceeds of crime in respect of all the said three firms/entities appear to be Rs. 6498.20 crore, in terms of Section 2(1) (u) of the PMLA, 2002. Further, vide letter dated 14.02.2018 PNB informed that there were remittances from the said three firms to other Nirav Modi group Companies.

**6.1** During the course of investigation, Statement of Shri Avneesh Nepalia, Complainant, working as Deputy General Manager at PNB Zonal office, Mumbai was recorded on 20.02.2018 u/s 50(2) of the PMLA, 2002. During his statement, Shri Nepalia reiterated the facts of the FIR. He stated that Shri Nirav Modi, who is promoter of Firestar Group of Companies, is partner of M/s Solar Exports, M/s Stellar Diamonds and M/s Diamond R US; that all the three firms are having current accounts in PNB, Brady House Branch. On being asked about LOU, Shri Nepalia stated that:-

"LOU is a Letter of Undertaking issued by the applicant importer's bank to an overseas bank or overseas branches of Indian Banks, for obtaining Buyer's Credit for underlying import transaction/s of the importer client. The applicant scouts the overseas banks for best quotes of rate of interest for buyer's credit and accepts the most competitive offer. Thereafter the importer client approaches his banker in India with a request to issue Letter of Undertaking on his behalf to the overseas bank, for obtaining the buyer's credit from the funding bank overseas. The LOU for buyer's

credit can only be issued if the client has adequate credit facility (Non-Fund based) and/or given sufficient cash margin (approx. 110% of the amount of buyer's credit). Once sanctioned against limit and/or cash margin by the authorities, the LOU is issued through SWIFT messaging



system to overseas banks and branches (in format MT-799). On receipt of the LOU from the importer's banker in India, the Overseas lending bank will fund the Nostro account of the Indian Bank and send a return confirmatory message by SWIFT (again MT-799 is used). This message contains amount of funds remitted, date of funding, Rate of interest of the Buyer's Credit, Period of the credit, the maturity date and the Nostro account of the overseas bank in which funds have to be returned on due date of maturity with interest. Once funds are received in the applicant Bank's NOSTRO account with reference to buyer's credit sought, the applicant branch makes debits and pays the overseas exporter who has drawn the bill on the importer. On maturity of the above-mentioned buyer's credit the applicant (Importer) needs to either provide funds in his current account maintained at the branch or submit debit authority utilizing his credit limits if any sanctioned with regards to buyers credit. From this the bank offset/repay with interest the buyers credit on due date to the overseas funding bank."

**6.2**    Shri Nepalia further, stated that the said three entities (the Nirav Modi Group firms)  approached the Bank with a request to send a Letter of Undertaking on their behalf to the overseas branch of Indian Banks, against certain import documents raised by the overseas supplier; that then Officer of the branch fraudulently & by cheating the bank, in connivance with the said three firms, without proper sanction/cash margin, etc. and without taking any import documents, bypassed the CBS accounting system of the Bank and sent LOU to the Overseas branch of the Indian Banks with request to fund the Bank's Nostro account; that the LOUs were sent through SWIFT system of the PNB; that the overseas branch of the Indian Banks used to fund the PNB's Nostro account immediately the next day and in many cases the same day (on which they received the LOUs' from PNB); that the money received by the Bank in the Nostro account is supposed to be used for making payment directly to the overseas supplier in retirement of the underlying import bills; that however in the present case, it is seen that the money was mostly used for paying directly to the Overseas Branches of other Indian Banks for meeting the previous buyer's credit obligations of the Nirav Modi Group firms; that in effect, most of the transactions were for extinguishing the existing buyer's credit liabilities, availed earlier from Indian bank branches abroad; that it has been noticed that since 28.04.2017, the proceeds of such buyer's credit funding were also used to pay overseas firms.

**6.3**    Shri Avneesh Nepalia further gave details of the firms' wise exposure on account of fraudulent LOUs as mentioned in Table at Para No.6.



**6.4**    Investigation in the matter is being carried out regarding issuance of all the LOUs to the said three Nirav Modi entities by PNB. From the investigation, it is revealed that the first LOU was issued by PNB to the said three entities in the year 2011 using the same modus operandi i.e. by cheating the bank in connivance with the bank officers, without proper sanction/cash margin, etc. and without taking any import documents. It further revealed that the said three entities (Nirav Modi group firms) have initially obtained 43 LOUs amounting to USD 116 million from PNB in the year 2011 through the above mentioned fraudulent modes. The said LOUs amounts were utilized for making payment to their alleged overseas suppliers/companies. In the following years also i.e. 2012, 2013, 2014, 2015, 2016, the said modus operandi was adopted by the said three entities and therefore, funds of LOUs obtained fraudulently were siphoned off through their alleged overseas suppliers/companies. The details of LOUs obtained by the said three entities since 2011 along with their utilization is as under:-

| Year | Details of LOUs along with utilization | | | | |
|------|-------|-------|-------|-------|-------|
| | No of LOUs Opened | Amount USD Million | Amount in Rs. Crore | Utilization (Rs. In Crore) | |
| | | | | Companies | Banks |
| 2011 | 43 | 116.00 | 742.40 | 742.40 | 0.00 |
| 2012 | 115 | 352.43 | 2255.55 | 2255.55 | 0.00 |
| 2013 | 237 | 640.24 | 4097.54 | 4097.54 | 0.00 |
| 2014 | 123 | 301.19 | 1927.62 | 1927.62 | 0.00 |
| 2015 | 185 | 438.53 | 2806.59 | 2697.66 | 108.93 |
| 2016 | 353 | 875.9 | 5605.73 | 4505.80 | 1099.93 |
| 2017 | 150 | 1015.34 | 6498.18 | 1448.16 | 5064.60 |
| Total | 1206 | 3739.63 | 23933.61 | 17674.73 | 6273.46 |

**6.5**    It can also be observed from the table above that 2015 onwards, part of the funds were also being used for repayment of earlier dues of LOUs of the banks. Therefore, the funds so obtained by said three entities were utilized for payment to various overseas companies & also for offsetting earlier LOUs. Company-wise detail of payment made to these alleged overseas entities since 2011 is as under:-

| Sr.No | Name of Company | Amount (In USD) |
|-------|-----------------|-----------------|
| 1 | Al Jaffe INC NY, USA | 1921078.65 |
| 2 | Auragem Company Limited, Hong Kong | 565363872.85 |
| 3 | Brilliant Diamonds Ltd | 63396876.15 |
| 4 | Diagems FZC, UAE | 293830399.11 |



| 5 | Eternal Diamonds Corporation Limited HK | 16204159.99 |
| 6 | Firestar Diamond Inc USA | 3050014.35 |
| 7 | Pacific Diamonds | 424809285.04 |
| 8 | Tri Color Gems | 364661398.98 |
| 9 | Universal Fine Jewellery | 18818402.10 |
| 10 | Fancy Creations Company Ltd | 240768300.40 |
| 11 | Unique Diamond And Jewellery FZC, Ajman | 6793674.25 |
| 12 | Vista Jewellery RZE, Fujairah | 1725084.94 |
| 13 | Sino Traders Limited, Hong Kong | 346349430.96 |
| 14 | Sunshine Gems Ltd, HK | 242594180.98 |
| 15 | Unity Trading Company | 157823698.85 |
| 16 | Hamilton Precious Traders, UAE | 7995934.77 |
| 17 | Himalayan Traders FZE, Ajman | 9340251.65 |
| | **Total** | **2765446044.02** |

**6.6**    Therefore, from the above, it is found that the said three entities, since 2011, used to obtain the LOUs through the fraudulent modes from PNB and siphon off the funds of said LOUs out of the country through their alleged overseas suppliers. From the year 2015, funds so obtained were also used for settling the dues of earlier LOUs. The said cycle of issuance of LOUs and its utilization has continued till 2017. In the year 2018, the said three firm entities approached the PNB with request for issuance of further LOUs, amounts of which were likely to be utilized for settling the outstanding LOUs of 2017. However, after filing of complaint by PNB, the 150 LOUs issued to the said three entities in the year 2017 amounting to Rs. 6498.20 crore remained outstanding and to be paid by the said three entities to PNB.

**6.7**    Investigations are being carried out with regard to utilization/trail of the proceeds of crime to the tune of Rs. 6498.20 crore which remains outstanding. The PNB was asked to provide the debits of the Nostro Account with respect to the said 150 LOUs which were fraudulently issued to the said three entities/firms. The PNB submitted details of debits of the funds received by PNB in its Nostro account against fraudulently issued LOUs on behalf of the said three entities/firms. On scrutiny of the said details, it is revealed that the said total amount of Rs. 6498.20 crore (USD 1015.35 million), which were received against fraudulent LOUs were utilized during the period from Feb, 2017 to May, 2017 for



Settling earlier buyer's credit obligations of the Nirav Modi Group firms and also for paying overseas firms, allegedly the suppliers of the said three entities/firms. In effect, the funds were utilized for extinguishing the existing buyer's credit liabilities, availed earlier from Indian bank branches abroad and also for paying overseas firms allegedly being the suppliers of the said three entities/firms. The details of utilization of said proceeds of crime are as under:-

(i)    The said total amount of USD 1015.35 million (Rs. 6498.20 crores), which were received against fraudulent LOUs along with USD 2.12 million obtained from its current accounts by the said entities, were utilized during the period from Feb, 2017 to May, 2017 for settling earlier credit obligations of the buyers by the Nirav Modi Group firms and also for paying overseas firms allegedly being the suppliers of the said three entities/firms. In effect, most of the transactions appear to have been utilized for extinguishing the existing credit liabilities of the buyers, availed earlier from Indian bank branches abroad. The details gathered regarding pending dues of Overseas branches of Indian banks which were utilized for settling past credit of buyers by the said three entities so far are as under:-

| Sr. No. | Name of the beneficiary | Total amount debited from Nostro Account of PNB (USD) |
|---------|-------------------------|--------------------------------------------------------|
| 1. | Allahabad Bank, Hong Kong | 303775833.00 |
| 2. | Axis Bank Limited, Hong Kong | 211542106.90 |
| 3. | Bank of India, Belgium | 276025962.70 |
| | Total (@Rs. 64 per USD)] | **791343902.60** [INR 5064 crores approx. |

(ii)    Further, out of the said amount of Rs. 6498.20 crore (USD 1015.35 million), rest of the funds were used during the period from Feb, 2017 to May, 2017 for paying overseas firms allegedly the suppliers of the said three entities/firms. The details of payment made to the alleged overseas supplier/companies of the said three entities are as under:-

| Sr. No. | Name of the beneficiary | Address of the beneficiary | Total amount debited from Nostro Account of PNB (USD) |
|---------|--------------------------|-----------------------------|--------------------------------------------------------|
| a. | Auragem Company Ltd., Hong Kong | Unit No 10-P, 1/F Block A, Focal Industrial Centre, 21 Man Lok Street, Hunghom, Kowloon, Hong Kong | 55163755.57 |



| b. | Diagems FZC, U.A.E. | E-Lob Office, E 49G26, Hamriyan Free Zone, P.O.Box-49220, Sharjah, UAE. | 10523158.15 |
|---|---|---|---|
| c. | Hamilton Precious Traders Ltd FZCO, | Dubai, UAE | 2201995.00 |
| d. | Pacific Diamonds FZE, U.A.E. | Building No B1, Office No 608 Po Box No 40359, Ajman Free Zone, Ajman, UAE | 28895765.82 |
| e. | Sino Traders Limited, Hong Kong | 13B, World Trust Tower, 50, Stanley Street, Central, Hong Kong | 49174781.66 |
| f. | Sunshine Gems Ltd., Hong Kong | 360-A, 208, 3/F, Harbour Centre Tower, 1 Hokj Cheung Street, Hunghom, Kowloon, Hong Kong | 47165498.28 |
| g. | Tri Color Gems FZE, U.A.E. | P.O Box 51425, E-Lob Office No E-86g-32, Hamriyan Free Zone, U.A.E | 19590202.41 |
| h. | Unity Trading FZE, U.A.E. | Dubai, UAE | 13560738.67 |
| | **Total** | **(INR 1448 crore approx.)** | **226275898.56** |

Thus, the PoC to the tune of Rs. 6498.20 crore (USD 1015.35 million) generated through criminal activities relating to the scheduled offences by the said three entities i.e. M/s Diamond R US, M/s Solar Export and M/s Stellar Diamond were ultimately utilized by them overseas for settling the buyer's credit (INR 5064 crores) obtained by them earlier from overseas banks. Part of the Proceeds of crime (INR 1448 crore) were also used for making payment to their alleged foreign suppliers/exporter of goods. Further, they have failed to repay the amount so obtained fraudulently from the overseas banks against LOUs of PNB making the PNB liable for payment of the said funds to the overseas bank on account of LOUs which were obtained by the said three entities through fraudulent modes.

7.      From the above statement of Shri Nepalia and during the course of investigation, it is found that LOU is a guarantee of buyer's credit (loan) which is issued by the Indian bank to overseas bank, on request of its Indian customer who has to acquire buyer's credit (loan) from the said overseas bank against import bills for making payment to its overseas supplier. In this case, the said three entities obtained LOUs amounting to Rs. 6498.20 crore from PNB, Brady House Branch, Mumbai fraudulently by cheating the bank in connivance with the bank officials and without giving any cash margin and without submitting any import document and without putting the transaction through the CBS of the Bank. On receipt of LOUs by the overseas banks from PNB, the overseas banks sanctioned the buyer's credit (loan) amounts to the said three entities and therefore, the said amounts were credited to the Nostro Account of PNB, as PNB



had issued LOU on behalf of the said three entities. Thereafter, the said buyer's credit amount credited in the Nostro Account of PNB were utilized by the said three entities in connivance with the bank officials for settling earlier buyer's credit obligations of the Nirav Modi Group firms and also used for paying overseas firms/companies allegedly being the suppliers of the said three entities/firms. The said modus operandi was used by the said three entities since 2011. However, after filing of complaint by PNB, the 150 LOUs of the year 2017 amounting to Rs. 6498.20 crore remained outstanding and yet to be settled by the said three accused entities. The investigation in respect of utilization of the said proceeds of crime to the tune of Rs. 6498.20 crores revealed that the funds so obtained by said three accused entities of Nirav Modi group through fraudulent issue of LOUs, were siphoned off by utilizing the same for making payment to above mentioned overseas suppliers/companies.

**8.** (i)  Investigation revealed that Mr. Mihir Bhansali was de facto authority number 2 in the entire controlling system and was actively involved in the diversion and laundering of the funds received from PNB LOUs. In his statement dated 15.06.2018 recorded us/ 50 (2) & (3) of PMLA 2002, Shri Shailesh Chautala, Ex Manager of Firestar International Pvt Limited, inter-alia stated that, Mihir Bhansali asked him to arrange 6-7 people for "Jokham" work in SACHIN Surat on salary of about 10-12 Thousand INR; "Jokham" means transferring, counting, weighing etc of Diamonds/Gold as per the wish of company; He (Shailesh Chotala) was not told about the name of company in which these people are going to be appointed; For this salary, he could not arrange any sufficiently educated person; He had communicated the same to Mihir Bhansali; Mihir told him (Shailesh Chotala) that any type of people will be suffice provided they should have ID proofs; These 6 persons arranged by Mr. Shailesh Chotala were made the partners in the firms M/s Solar Exports, M/s Stellar Diamonds and M/s Diamond R US. On the name of these three firms fraudulent LOUs were issued and money was siphoned off from the Punjab National bank.

(ii)    Mihir Bhansali was instrumental in setting up the scheme of transferring and layering of funds generated from the fraudulent LOUs. With his active involvement several dummy companies were formed all over the world including Dubai and Hong Kong to camouflage the real transactions. Mr. Mihir Bhansali also formed the necessary façade of overseas companies for layering the proceeds of crime generated from the fraudulent LOUs issued. He also appointed the employees/ex-employees as dummy directors in these companies. He ensured that the directors should be trust worthy and in the words of Shri Himanshu Trivedi, Ex-Director of Firestar Group "who do not apply much brain". A secure internal email communication system was also developed at his instance and its



server was deliberately kept in Dubai for any eventuality. Apart from fund transfer and setting of shadow entities, he was actively involved in rotation of goods, melting of precious metal extracted from dismantling of jewelery and low-quality jeweler production/export-import with artificially high value declaration. In their statements, Mr. Kurian Mathews (General Manager, accounts of Firestar Diamond FZE), Mr. Saju Paulose (General Manager, accounts, Firestar Diamond Pvt Limited), Mr. Satyendra Shukla General Manager of Firestar Diamond FZE), Mr. Shyamsunder Wadhwa (Vice President, Firestar Group) and more than 10 Dummy Directors of shadow entities based in Hongkong and Dubai confirmed the above role of Mr. Mihir Bhansali in formation of shadow entities, fund movement and other affairs of Nirav Modi controlled shadow entities.

(iii)    Mihir Bhansali is the director in many USA companies including Nirav Modi INC, Firestar Diamond International Inc., Synergies Corporation, A. Jaffe, AVD Trading Inc. Firestar Group Inc. Firestar Diamond Inc. Fantasy Inc, Sandberg & Sikorski Corporation, Central Park Real Estate LLC, Firestar Group Inc, Firestar Fine jewelry Inc, Firestar jewelry Inc. Firestone Inc & Twin Field Investment Amongst others.

(iv)    According to the Report of John J. Carney, Examiner appointed by the United States Bankruptcy Court Southern District of New York in bankruptcy case filed by Firestar Group of Companies USA, Mihir Bhansali is associated with and the Director of Twin Fields Investments Limited. The report further confirmed the diversion of funds to the tune of USD 26.9 Million to Twin Fields Investment Limited from Fine Classic FZE.M/s Fine Classic FZE is a Dubai Based company owned/controlled by M/s Purvi Modi which received monies from the Dubai and Hong Kong based beneficiaries of fraudulent LOUs in guise of trade outstanding. This fact is also corroborated in the statement recorded u/s 50 (2) & (3) of PMLA, 2002 of Mr. Nilesh Mistry (Accountant of Fine Classic FZE, UAE) dated 30.06.18 that USD 50 Million was diverted to Twin Fields Investments Limited from Fine Classic FZE. During the investigation, Bank statement of account of Fine Classic FZE (a shell company owned by Purvi Modi) maintained in Emirates NBD Bank, has been obtained. The sample entries pertaining to the transfer of Money to Twin Field Investments is as under:





(v)    In his statement u/s 50 (2) & (3) of PMLA, Mr. Satyendra Shukla, General Manager of Firestar Diamond FZE stated that 50 Kg gold (Approximately worth INR 150 Million, USD 2.14 Million) was taken away by Nehal Modi and Mihir Bhansali in Feb-March 2018 from Firestar Diamond and jewelry FZCO. Mihir Bhansali also took 2, 50,000 lac Dirham from the petty cash of Firestar Diamond FZE.

(vi)    After the scam broke out, he along with Mr. Nehal Modi visited Dubai and tried their best by way of creating fear of agencies/inducement/threatening in the minds of Directors/owners of shadow entities to discourage them from joining the investigation.

(vii)    After the initiation of investigation in India, he transferred the ownership of his immovable property as mentioned in para 10 to his wife's name for the consideration of merely 10 USD. This transfer of the ownership of immovable property was done with the intention to avoid the clutches of the US agencies or Indian Agencies on this property.

(viii)    In view of the preceding paras, it is revealed that Mihir Bhansali was co-conspirator and beneficiary of the scam. Twin Fields Investments Limited in which he is the Director & benefitted from the scam to the tunc of at least USD 50 Million. Mr. Mihir Bhansali alongwith Mr. Nehal Modi had taken away proceeds of crime in form of the Gold having value USD 2.14 Million from the Dubai office of Firestar. He also took substantial amount of cash from Dubai Firestar office illegally.

(ix)    It is pertinent to mention here that the cash and Gold taken away by Mihir Bhansali is the part of Proceeds of Crime as substantial amount of LOU funds were diverted to Firestar FZE in guise of circular or rotational transactions from Hong Kong and Dubai based beneficiaries. From Hong Kong based beneficiaries of LoUs, the amount to the tune approx.  USD 550 Million was diverted to Firestar Diamond FZE and similarly, from Dubai Based beneficiaries of LoUs, atleast 30 Million USD was diverted to Firestar Diamond FZE. These facts were brought out in the statements of Shri Divyesh Gandhi, Accountant of Hong Kong based dummy companies and beneficiaries of LoUs and Mr. Kurian Mathews, Supervisor of Accounts of Firestar Diamond FZE and Dubai Based dummy companies and beneficiaries of LoUs.





**9.** During the course of investigation, it has been found that Mrs. Rakhi Bhansali, the wife of Mr Mihir Bhansali is homemaker and her wealth is derived from her husband Mr. Mihir Bhansali. A snapshot of her declaration for opening the bank account no 00011010014264 on her name in HDFC Bank, India is as under: -



**Declaration: Housewife**

**10.** During the course of investigation, it is revealed that a property as mentioned below in table, has been purchased by Mr. Mihir Bhansali in USA on March 13, 2017. The property was initially purchased jointly in the name of Mihir

Bhansali and Rakhi Bhansali. Later, after the criminal case was registered, Mihir Bhansali transferred ownership to his wife Mrs. Rakhi Bhansali for nominal value USD 10 only (w.e.f. 28, Feb, 2018). Mrs. Rakhi Mihir Bhansali is the wife of Mr. Mihir Bhansali and she is a home maker, stays with her husband in USA and her wealth is derived from his husband Mr. Mihir Bhansali.

| Sr. | Property | Owner | Purchase Price |
|-----|----------|-------|----------------|
| 1 | 50, Riverside Boulevard, New York, 10069 (Flat 24-A) | Rakhi Bhansali | USD 7.1 Million |

**11. As per Section 2 (1) (u) of the PMLA, 2002,**

'Proceeds of crime means any property derived or obtained, directly or indirectly, by any person as a result of criminal activity relating to a scheduled offence <u>or the value of any such property or where such property is taken or held outside the country then the property equivalent in value held within the country or abroad.</u>'

As per the definition, proceeds of crime are either the property derived or obtained as a result of criminal activities relating to a scheduled offence or the value of such property or where such property is taken or held outside the country then the property equivalent in value held within the country or abroad. The statute thus entitles the attachment of proceeds of crime which are either generated as a result of criminal activity relating to a scheduled offence or the equivalent value or where such proceeds of crime is taken or held outside the country then the property equivalent in value held within the country.

**12.** As mentioned above, substantial amount of proceeds of crime has been transferred to Mihir Bhansali and his company in form of Gold, cash and transfer of funds which are not available for attachment directly. Mrs. Rakhi Mihir Bhansali is the wife of Mr. Mihir Bhansali and she is a home maker and her wealth is derived from his husband Mr. Mihir Bhansali. After registration of the case, Mihir Bhansali transferred ownership to his wife Mrs. Rakhi Bhansali for nominal value USD 10 only (w.e.f. 28, Feb, 2018. Therefore, the above-mentioned property presently owned by Mrs. Rakhi Bhansali (Wife of Mr Mihir Bhansali) represents the value of proceeds of crime in terms of definition of Section 2 (1) (u) of PMLA, 2002 as 'the value of any such property is liable for attachment under PMLA, 2002.

**13.** In view of the orders of the Hon'ble Adjudicating Authority and the definition of proceeds of crime under section 2 (1) (u) of PMLA, 2002, it is evident that the Directorate of Enforcement can attach properties of equivalent value of Proceeds Of Crime in case where there is evidence to the effect that a person has engaged in money laundering and generated POC through criminal activities related to scheduled offence, and such POC is not available for attachment in the country.

**14.** Section 23 of the PMLA prescribes that where money laundering involves two or more interconnected transactions and one or more such transactions is or are proved to be involved in money laundering then for the purposes of the adjudication or confiscation (under Section 8 for the trial of the money laundering offence it shall unless otherwise proved to the satisfaction of the Adjudicating Authority or the Special Court) be presumed that the remaining transactions form part of such interconnected transactions.

**15.** Section 24 of PMLA 2002 prescribe that in any proceedings relating to proceeds of crime under the Act-

    a) In the case of a person charged with the offence of money laundering under the section 3 the Authority or Court shall unless the contrary is proved presume that such proceeds of crime are involved in the money-laundering; and

    b) In the case of any other person the Authority or Court may presume that such proceeds of crime are involved in money laundering.

**16.** On the basis of above material placed before the complainant procured during the course of investigations against the above said entities/firms and persons and on its examination and analysis as discussed in PAO, the complainant had reason to believe that M/s Diamond R US, M/s Solar Export and M/s Stellar Diamond have obtained LOUs amounting to Rs. 6498.20 crore from PNB, Brady House Branch, Mumbai fraudulently, by cheating the bank in connivance with the bank officials and without giving any cash margin and without submitting any import document, as mentioned in the subject FIR No. RCBSM2018E0001 dated 31.01.2018 registered by the CBI. Hence, the entire amount of Rs 6498.20 crores is the Proceeds of Crime. On receipt of LOUs by the overseas banks from PNB, the overseas banks sanctioned the buyer's credit (loan) amounts to the said three entities and therefore, the said amounts were credited to the Nostro Account of PNB, as PNB has issued LOU on behalf of the said three entities. Thereafter, the said buyer's credit amount credited in the



Nostro Account of PNB were utilized by the said three entities in connivance with the bank officials. Further, they have failed to repay the amount so obtained from the overseas banks making PNB liable for payment of the said funds to the overseas bank on account of LOUs which were obtained by the said three entities through fraudulent modes for the above stated reasons. The entire POC is not available in India for attachment. The PoC was disbursed through the alleged suppliers of Nirav Modi Group & later diverted/rotated to dummy companies beneficially owned by Nirav Modi. However, the property mentioned at Para 10, is presently owned by Mrs. Rahki Bhansali (earlier owned jointly by Mihir Bhansali & Rakhi Bhansali) is beneficially owned by Mihir Bhansali and represents the value of Proceeds of Crime as substantial amount of POC has been diverted to Mihir Bhansali and to entities controlled by him mainly from Ms. Fine Classic FZE. Fine Classic FZE got these funds from the Hong Kong and Dubai based beneficiaries of LOUs in form of trade outstanding. Mr. Mihir Bhansali also directly took 50 KG Gold having value around USD 2.2 Million and cash to the tune of 2,50,000 dirham from Dubai based companies of Nirav Modi. In view of the same and the provisions of the PMLA, the said property beneficially owned by Mr. Mihir Bhansali in the name of his wife Mrs. Rakhi Bhansali represents the value of proceeds of crime in terms of definition of Section 2 (1) (u) of PMLA, 2002 as value thereof route. As such, said property mentioned at para 10 is deemed to be proceeds of crime generated as a result of criminal activities alleged by the CBI FIR No. RCBSM2018E0001 dated 31.01.2018. Therefore, the said property is liable for provisional attachment under section 5(1) of the PMLA, 2002. By their acts of using the utilizing the fraudulently obtained funds i.e. proceeds of crime from PNB, it appears that Nirav Modi along with Mr. Mihir Bhansali have indulged in money laundering activities in terms of Section 3 of PMLA, 2002.

**17.** Investigation has revealed that the monies have been transferred out of India were utilized overseas for settlement of LOUs earlier obtained by the said entities and also for making payment to alleged overseas suppliers. Shri Nirav Modi, and Mihir Bhansali are not co-operating with the investigation at all as they have not attended this office despite summons being issued to them under the provisions of the PMLA, 2002. The likelihood of selling and/or disposing of the said property is extremely high. Therefore, the complainant had reason to believe that the property mentioned at para 10 supra i.e. the proceeds of crime is likely to be concealed, transferred or dealt with in such a manner which may result in frustrating any proceedings relating to confiscation of such proceeds of



crime under Chapter III of the Prevention of Money Laundering Act, 2002 (15 of 2003) and hence issued Provisional Attachment Order No. 17/2018 dated 05.10.2018 attaching the following property:

| Sr. | Property | Owner | Purchase Price |
|---|---|---|---|
| 1 | 50, Riverside Boulevard, New York, 10069 (Flat 24-A) | Rakhi Bhansali | USD 7.1 Million equivalent to Rs. equivalent to Rs. 52,24,18,000 |

(@ INR 73.58 per USD as 05.10.2018).

**18.** The CBI authorities have filed a charge sheet under Section 173 of the Criminal Procedure Code, 1973, with respect to the Scheduled Offences on 14.05.2018 before Special Court for CBI Cases, Sessions Court, Mumbai and the same is pending trial. As per the said charge sheet, 24 entities/persons have been charged.

As per the said charge sheet, the accused therein have been charged under section 120-B r/w.420,409 of IPC & section 13(2) r/w 13(1)(c) & (d) of Prevention of Corruption Act, 1988 which are the scheduled offences under Para 1 & 8 of part-A of schedule of PMLA, 2002. Further, the said accused have been charged for conspiring and cheating the PNB & thereby causing a wrongful loss to the bank.

**19.** A Prosecution Complaint 04/2018 has been filed before Hon'ble Spl. PMLA Court, Mumbai against Nirav Modi, Mr. Mihir Bhansali and others on 24.05.2018. Hon'ble court has taken cognizance of the complaint on 12.06.2018 and issued Process by way of issuance of open ended non bailable warrant against 9 accused including Mr. Nirav Modi and Mr. Mihir Bhansali. Further, Interpol has issued Red Corner Notice against Mr. Mihir Bhansali.

**20.** For the reasons detailed above, it is submitted that the above-mentioned defendants, namely Nirav Modi, Mihir Bhansali and Rakhi Bhansali appear to have committed an offence under Section 3 of PMLA, 2002, and that the funds in the bank account presently under orders of Provisional Attachment to the extent of USD 7.1 million equivalent to Rs. 52,24,18,000 (@ INR 73.58 per USD as on PAO Date 05.10.2018) are deemed to be part of the value representing the proceeds of crime, involved in money laundering which have been taken out of the country and thereby, the same are liable for confirmation of attachment



under Section 8 (3) of the Act. The investigation under PMLA, 2002 is still in progress. The present complaint is

filed without prejudice to the provisional attachment of any other properties likely to be made as outcome of the ongoing investigation.

21.   The list of relied upon documents along with copies of documents are enclosed with this complaint.

**PRAYER**

22.   In the facts and circumstances stated hereinabove, it is most humbly prayed that the Hon'ble Adjudicating Authority be pleased to-:

(a)   Take this Complaint on record for the purpose of adjudication under Section 8 of the Act; and

(b)   Order confirmation of the Provisional Attachment Order No.17/2018 dated 05.10.2018 in ECIR/MBZO-I/03/2018 under Section 8(3) of the Prevention of Money Laundering Act, 2002 (amended Act).

Signed this 1st Day of November, 2018 at Mumbai.

(C. Mahesh Chandra Reddy)
DEPUTY DIRECTOR
DIRECTORATE OF ENFORCEMENT
MUMBAI ZONAL OFFICE-I
COMPLAINANT

**DOCUMENTS RELIED UPON TO OC IN PAO NO. 17 /2018 DATED 05.10.2018**

| Sr. No | Particulars | Page Nos. From | To |
|---|---|---|---|
| 1 | Copy of PAO No. 17/2018 dated 05.10.2018. | 1 | 19 |
| 2 | Copy of FIR No. RCBSM2018E0001 dated 31.01.2018 registered by CBI, BS & FC, Mumbai | 20 | 29 |
| 3 | Copy of Prosecution Complaint filed by CBI on 14.05.2018 before the Court of Hon'ble Special Judge for CBI cases Greater Mumbai. | 30 | 100 |
| 4 | Copy of ECIR No. ECIR/MBZO-I/03/2018 dated 14.02.2018 recorded by Directorate of Enforcement, Mumbai. | 101 | 103 |
| 5 | Copy of letters dated 13.02.2018 and 14.02.2018 of the Punjab National Bank | 104 | 112 |
| 6 | Copy of Prosecution Complaint No.4/2018 dated 24.05.2018 filed before Hon'ble Judge City Civil Court and Additional Sessions Judge Greater Bombay (Designated Court for the Prevention of Money Laundering Act, 2002). | 113 | 203 |
| 7 | Copy of Statement of Mr. Avneesh Nepalia, Complainant, working as Deputy General Manager at PNB Zonal office, Mumbai recorded on 20.02.2018 under section 50(2) of the PMLA, 2002. | 204 | 213 |
| 8 | Copy of Statement of Mr. Shailesh Chautala, Ex-Manager of Firestar International Private Limited dated 15.06.2018 recorded under section 50(2) of the PMLA, 2002. | 214 | 216 |
| 9 | Copy of Statement of Mr. Himanshu Trivedi Ex-Director of Firestar Group dated 28.03.2018 recorded under section 50(2) of the PMLA, 2002. | 217 | 223 |
| 10 | Report of John J. Carney, Examiner appointed by the United States Bankruptcy Court Southern District of New York | 224 | 396 |
| 11 | Copy of Statement of Mr. Nilesh Mistry Accountant of Fine Classic FZE dated 30.06.2018 recorded under section 50(2) of the PMLA, 2002. | 397 | 409 |
| 12 | Bank Statement of account of Fine Classic FZE Nov-Dec 2017 showing transfers to Twin Field Investments | 410 | 414 |
| 13 | Copy of Statement of Mr. Stayendra Shukla General Manager of Firestar Diamond FZE dated 17.05.2018 recorded under section 50(2) of the PMLA, 2002. | 415 | 423 |
| 14 | Copy of Statement of Mr. Divyesh Gandhi Accountant of Hong Kong based dummy company dated 17.04.2018 recorded under section 50(2) of the PMLA, 2002.and Kurian Mathews | 424 | 432 |
| 15 | Copy of Statement of Mr. Kurian Mathews, Supervisor of Dubai based Firestar and dummy companies dated 13.04.2018 recorded under section 50(2) of the PMLA, 2002.and | 433 | 437 |
| 16 | Declaration of Housewife in Account Opening Form for the Bank account no. 00011010014264 in HDFC Bank in the name of Rakhi Mihir Bhansali | 438 | 464 |
| 17 | Documents of Property of Mihir Bhansali under attachment retrieved from Publicly available Land records of New York Property Website ARCIS (https://a836-acris.nyc.gov/CP/). | 465 | 545 |
| 18 | Certificates u/s 65B on Indian Evidence Act, 1872 in respect of Documents at Sr. 12 (Bank account statement of Fine classic FZE) and Sr. 16 (KYC and Account Opening Form of Rakhi Mihir Bhansali) received over email | 546 | 549 |

(C. Mahesh Chandra Reddy)
DEPUTY DIRECTOR
MUMBAI ZONAL OFFICE-I

**Reason to Believe (PAO No.17/2018 dated 05.10.2018) ECIR/03/MBZO-I/2018**

On the basis of above material placed before me procured during the course of investigation against the above said entities/firms and persons and on its examination and analysis as discussed in the PAO, I have reason to believe that M/s Diamond R US, M/s Solar Export and M/s Stellar Diamond have obtained LOUs amounting to Rs. 6498.20 crore from Punjab National Bank, Brady House Branch, Mumbai fraudulently, by cheating the bank in connivance with the bank officials and without giving any cash margin and without submitting any import document, as mentioned in the subject FIR No. RCBSM2018E0001 dated 31.01.2018 registered by the CBI. Hence, the entire amount of Rs. 64982 Million is the Proceeds of Crime. On receipt of LOUs by the overseas banks from PNB, the overseas banks sanctioned the buyer's credit (loan) amounts to the said three Entities and therefore, the said amounts were credited to the Nostro Account of PNB, as PNB has issued LOU on behalf of the said three entities. Thereafter, the said buyer's credit amount credited in the Nostro Account of PNB were utilized by the said three entities in connivance with the bank officials. Further, they have failed to repay the amount so obtained from the overseas banks making PNB liable for payment of the said funds to the overseas bank on account of LOUs which were obtained by the said three entities through fraudulent modes. The entire POC is not available in India for attachment. The PoC was disbursed through the alleged supplier of Nirav Modi Group & Later diverted/rotated to dummy companies beneficially owned by Nirav Modi. However, the property at, Flat 24-A, 50, Riverside Boulevard, New York, 10069 is presently owned by Mrs. Rahki Bhansali (earlier owned jointly by Mihir Bhansali & Rakhi Bhansali) is beneficially owned by Mihir Bhansali and represents the value of Proceeds of Crime as substantial amount of POC has been diverted to Mihir Bhansali and to entities controlled by him mainly from Ms. Fine Classic FZE. Fine Classic FZE got these funds from the Hong Kong and Dubai based beneficiaries of LOUs in form of trade outstanding. Mr. Mihir Bhansali also directly took 50 KG Gold having value around USD 2.2 Million and cash to the tune of 2,50,000 dirham from Dubai based companies of Nirav Modi. In view of the same and the provisions of the PMLA, the said property beneficially owned by Mr. Mihir Bhansali in the name of his wife Mrs. Rakhi Bhansali represents the value of proceeds of crime in terms of definition of Section 2 (1) (u) of PMLA, 2002 as the said property represents Proceeds of Crime in terms of "the value of any such property or where such property is taken or held outside the country then the property equivalent in value held within the country or abroad". As such, said property is deemed to be proceeds of crime generated as a result of criminal

activities alleged by the CBI FIR No. RCBSM2018E0001 dated 31.01.2018. Therefore, the said property is liable for provisional attachment under section 5(1) of the PMLA, 2002. By their acts of using the utilizing the fraudulently obtained funds i.e. proceeds of crime from PNB, it appears that Nirav Modi along with Mr. Mihir Bhansali have indulged in money laundering activities in terms of Section 3 of PMLA, 2002.

2.     Shri Nirav Modi, and Mihir Bhansali are not co-operating with the investigation at all as they have not attended this office despite summons being issued to them under the provisions of the PMLA, 2002. The likelihood of selling and/or disposing of the said property is extremely high. Therefore, I have reason to believe that the property mentioned supra i.e. the proceeds of crime is likely to be concealed, transferred or dealt with in such a manner which may result in frustrating any proceedings relating to confiscation of such proceeds of crime under Chapter III of the Prevention of Money Laundering Act, 2002 (15 of 2003).

3.     The CBI authorities have filed a charge sheet under Section 173 of the Criminal Procedure Code, 1973, with respect to the Scheduled Offences on 14.05.2018 before Special Court for CBI Cases, Sessions Court, Mumbai and the same is pending trial.   As per the said charge sheet, 24 entities/persons have been charged.

As per the said charge sheet, the accused therein have been charged under section 120-B r/w.420,409 of IPC & section 13(2) r/w 13(1)(c) & (d) of Prevention of Corruption Act, 1988 which are the scheduled offences under Para 1 & 8 of part-A of schedule of PMLA, 2002. Further, the said accused have been charged for conspiring and cheating the PNB & thereby causing a wrongful loss to the bank.

4.   A Prosecution Complaint 04/2018 has been filed before Hon'ble Spl. PMLA Court, Mumbai against Nirav Modi, Mr. Mihir Bhansali and others on 24.05.2018. Hon'ble court has taken cognizance of the complaint on 12.06.2018 and issued Process by way of issuance of open ended non bailable warrant against 9 accused including Mr. Nirav Modi and Mr. Mihir Bhansali. Further, Interpol has issued Red Corner Notice against Mr. Mihir Bhansali.

5.     In view of above, I have reasons to believe that the said property is likely to be concealed, transferred or dealt with in such a manner that if no Provisional Attachment Order is passed in the case at this crucial stage, it may result in





frustrating proceedings relating to confiscation under Chapter III of the Prevention of Money Laundering Act, 2002 (15 of 2003).

6.    Hence, I order that the property mentioned below is provisionally attached under sub section (1) of Section 5 of Prevention of Money Laundering Act, 2002, for a period of 180 days from the date of this order. I further order that the said property shall not be removed, part with or otherwise dealt with without my prior permission.

| Sr. | Property | Owner | Purchase Price |
|-----|----------|-------|----------------|
| 1 | 50, Riverside Boulevard, New York, 10069 (Flat 24-A) | Mr. Mihir Bhansali and Mrs. Rakhi Bhansali (earlier) Presently owned by Mrs Rakhi Bhansali (w.e.f. 28, Feb, 2018) | USD 7.1 Million |

Total Value of Attached Asset= USD 7.1 Million (USD. Seven Million Hundred Thousand only)





# Exhibit 12

| | |
|---|---|
| Presented on: | 03.07.2018 |
| Registered on: | 24.09.2018 |
| Decided on: | 06.07.2019 |
| Duration: | Y   M   D |
| | 01   00   03 |

# IN THE DEBTS RECOVERY TRIBUNAL NO.I AT MUMBAI

## ORIGINAL APPLICATION NO.119/2018

**TOTAL CLAIM AMOUNT** – **INR 7029,06,87,951/-**

Punjab National Bank, (a) Registered

office at: Plot No.4, Sector-10, Dwarka,

New Delhi-110 075 (b) Branch address at:

Mid Corporate Branch, Brady House, Fort,

Mumbai-400 023.                                **…Applicant**

**Versus**

1.    M/s. Stellar Diamonds (Represented

      through its partners), 15, Nagindas

      Mansion, 4th Floor, 61-B.J.S.S. Road,

      Opera House, Mumbai-400 004.

2.    M/s. Solar Exports (Represented through its partners), 15, Nagindas Mansion, 4th Floor, 61-B.J.S.S. Road, Opera House, Mumbai-400 004.

3.    M/s. Diamond R US (Represented through its partners), 1110 Prasad Chambers, Opera House, Mumbai-400 004.

4.    Firestar International Limited (formerly known as Firestar International Private Limited), a Company incorporated and registered under the Companies Act, 1956 and having its Registered Office at 2001 & 2002, 20th Floor, Peninsula Business Park, Tower B, Ganpatrao Kadamrao Kadam Marg, Lower Parel, Mumbai-400 013.

5.   Firestar    Diamond    International
     Private    Limited,    a    Company
     incorporated and registered under
     the Companies Act, 1956 and having
     its Registered Office at Unit No.23,
     3rd Floor, Tower II, Wing B,
     Kohinoor City, Kirol Road, Off LBS
     Marg, Kurla West, Mumbai-400 070.

6.   Nirav Deepak Modi, residing at
     4-Grosvenor House, 2nd Floor,
     Peddar Road, Mumbai-400 026 and
     also at Flat No.2202, A L Shera
     Tower, J.L.T. Dubai AE.

7.   Ami Nirav Modi, residing at
     Samudra Mahal Premises CHS Ltd.,
     Dr. Annie Besant Road, Worli,
     Mumbai and also at 4-Grosvenor
     House, 2nd floor, Peddar Road,

Mumbai-400 026.

8.    ANM   Enterprises   Private   Ltd.,   a
      Company      incorporated      and
      registered under the Companies Act,
      1956   and   having   its   Registered
      Address  at  15,  Nagindas  Mansion,
      57/61,        Jagannath        Shanker
      Sheth    Road,    Opera    House,
      Mumbai-400 004.

9.    NDM  Enterprises  Private  Ltd.,  a
      Company      incorporated      and
      registered under the Companies Act,
      1956   and   having   its   Registered
      Address  at  15,  Nagindas  Mansion,
      57/61,        Jagannath        Shanker
      Sheth    Road,    Opera    House,
      Mumbai-   400 004.

10.   Neeshal Deepak Modi, residing at
      4-Grosvenor House, 2nd Floor,
      Peddar Road, Mumbai-400 026.

11.   Deepak Keshavlal Modi, C/o. Nirav
      Family Trust, having its Registered
      Address at 15 Nagindas Mansion,
      4th Floor, J.S.S. Road, Opera House,
      Mumbai-400 004.

12.   Nehal Deepak Modi, residing at 271,
      West 47 St, 47A, New York-10036.

13.   Rohin Nirav Modi, residing at C/o.
      Mr. Nirav Modi, 4-Grosvenor
      House, 2nd Floor, Peddar Road,
      Mumbai-400 026.

14.   Ananya Nirav Modi, residing at
      C/o. Mr. Nirav Modi, 4-Grosvenor
      House, 2nd Floor, Peddar Road,

Mumbai-400 026.

15.   Apasha  Nirav  Modi,  residing  at
      C/o.  Mr.  Nirav  Modi,  4-Grosvenor
      House,  2nd  Floor,  Peddar  Road,
      Mumbai-400 026.

16.   Purvi  Mayank  Mehta,  residing  at
      Atlas  Apt,  A  Wing,  2nd  Floor,
      Flat    No.21    J    Mehta    Road,
      Mumbai-400 006.                        **… Defendants**

*APPEARANCES*

| For the Applicant | Mr.  Nitesh  Jain  a/w  Mr. Aditya  Malhotra  and  Mr. Adrish  Majumdar  i/b  Shardul Amarchand  Mangaldas-Advocates |
|---|---|
| | Officer of the applicant Bank |
| Mr. Amit Tyagi For Defendant Nos.1 to 16 | None |

**Shri Deepak M Thakkar**
**I/c Presiding Officer**

| | |
|---|---|
| JUDGMENT RESERVED ON: | 12th June, 2019 |
| JUDGMENT PRONOUNCED ON: | 06th July, 2019 |

## JUDGMENT

1. ### *INTRODUCTION*:

   i.  The applicant has filed the Original Application under sub-section (1) of Section 19 of the Recovery of Debts Due to Banks and Financial Institutions Act, 1993 (for short "***The 1993 Act***") for the recovery of the dues in the sum of INR 7029,06,87,951/- (INR Seven thousand twenty-nine crore six lakh eighty-seven thousand nine hundred and fifty-one only) together with interest thereon from 30th June, 2018 till repayment/realization.

   ii. Fraud unravels everything.  It is an act of deceit, omission or commission, consciously, deliberately or dishonestly concealing the truth to induce the other to part with the valuable property or to induce the other to

surrender the legal rights.  It is an act of taking or gaining unlawful advantage of the other.  It is an act of inflicting willful, conscious and deliberate injury.

iii.   The present law suit narrates the modus operandi of Nirav Modi a luxury diamond jewellery designer and others (***the Economic Offenders/the fraudsters'***) made fraudulent and unauthorized transactions with the applicant which is one of the largest Public Sector Banks in India in collusion and connivance with the applicant's employees viz. Gokul Nath Shetty (Deputy Manager) and Manoj Hanumant Kharat (Single Window Operator) (for short "***the delinquent employees***").  Nirav Modi enjoyed the credit facilities by unlawful means, conspiracy and deceit.

iv.   The recent press release on G20 summit at Osaka, Japan held on 28th/29th June, 2019 where the Heads of various

G20 countries met reveals that on behalf of the Indian Government one of the issues addressed was to deal with economic offenders fleeing from one Country to another. The Indian Government strongly urged the global community to fight the menace of fugitive economic offenders running away. It was further urged that all G20 countries should combat and ensure that each country has the law to enforce preventing the fugitive economic offenders from fleeing the Country. The issue addressed at G20 summit by the Indian Government was the pointing of finger at Nirav Modi and his Uncle Mehul Choksi.

v.   The white-collar fugitive economic offenders living outside India are not far behind. Nirav Modi is one amongst them. The Central Bureau of Investigation and the Enforcement Directorate have initiated legal action

to bring the Indian fugitive economic offender back to India.

vi. Nirav Modi managed the delinquent employees and obtained 150 Letters of Undertaking (for short "***the LOUs***") in favour of Nirav Modi Firms without any sanction or approval or requisite authority. The fraud was systematically perpetrated in breach and open defiance of the SWIFT System and Core Banking System. Nirav Modi and others in collusion with the delinquent employees have taken the advantage of single reference bearing Nos. 3731/STELLAR/17, 3731/SOLAR/17 and 3731/FIBC/17. These references are repeated in all MT 79 SWIFT Messages went to various Overseas Funding Banks confirming the issuance of numerous LOUs.

vii. The NOSTRO account of the applicant bank was

misused and misutilised to settle the buyer's credit by making payment of the previously issued unauthorized LOUs.

viii.   No entry was made in the Trade Finance Module of Core Banking System and therefore, the fraud went undetected.  The fraudulent transaction was circulated between Nirav Modi Firms and Nirav Modi Companies.

ix.   Nirav Modi admitted in the communication exchanged between him and the applicant that the LOUs were obtained. Nirav Modi admitted the liability and suggested the sale of assets of Nirav Modi Firms, Firestar International Ltd. and Firestar Diamond International Pvt. Ltd. to recover the debt claimed by the applicant.

x.   Complaint has been lodged by the applicant with Central Bureau of Investigation against Nirav Modi,

Nirav Modi Firms and Nirav Modi Companies for cheating, fraud and causing loss to the applicant.

xi. Complaint has also been lodged by the applicant with Enforcement Directorate who has acted promptly against Nirav Modi and others.

xii. First Information Report is also filed by the applicant against Nirav Modi, Nirav Modi Firms and Nirav Modi Companies.

xiii. Ministry of Corporate Affairs directed investigation by Serious Fraud Investigation Office into the affairs of Nirav Modi Group.

xiv. A Jaggle Inc., Fantasy Inc. and Firestar Diamond Inc. initiated voluntary bankruptcy proceedings before the United States Bankruptcy Court for the Southern District of New York.

xv. Despite admission of the liability, Nirav Modi has no intention to repay the debt obtained by fraudulent means. Therefore, the applicant issued demand notice calling upon Nirav Modi Firms, its partners, trustees, beneficiaries and Nirav Modi Companies to liquidate the entire outstanding with interest @ 14.3 % per annum on account of the LOUs.

xvi. The present law suit is filed for recovery of debt obtained by fraudulent means. The fraudulent debt is legally recoverable debt from defendant nos.1 to 16 who have received direct and/or indirect benefit either in India or in any other countries.

xvii. I have heard Mr. Jain, defendants set ex-parte. I have scrutinized and examined the voluminous material placed before me. I am convinced that the applicant has made out the case of fraud perpetrated by Nirav Modi

and others to obtain LOUs. The allegations of fraud are satisfactorily explained as required under Order VI Rule 4 of the Code of Civil Procedure, 1908. I have also considered the submissions that despite the admission made by Nirav Modi in obtaining the LOUs, defendant nos.1 to 16 have failed and neglected to repay the debt. I have therefore, allowed the application with costs and ordered issuance of the Recovery Certificate.

### *The factual matrix of the case is as under*:

2.    Defendant no.1 i.e. M/s. Stellar Diamonds is a partnership firm. Defendant no.6 i.e. Nirav Deepak Modi, defendant no.7 i.e. Ami Nirav Modi, defendant no.10 i.e. Neeshal Deepak Modi and Nirav Modi Family Trust represented by defendant nos.6, 7 and 10 are the partners.

3.    Defendant no.2 i.e. M/s. Solar Exports is also a partnership

firm. Defendant no.6 i.e. Nirav Deepak Modi, defendant no.7 i.e. Ami Nirav Modi, defendant no.10 and Neeshal Deepak Modi and Nirav Modi Family Trust are the partners.

4.   Defendant no.3 i.e. M/s. Diamond R US is also a partnership firm. Defendant no.6 i.e. Nirav Deepak Modi, defendant no.8 i.e. ANM Enterprises Private Ltd., defendant no.9 i.e. NDM Enterprises Private Ltd. and Mehul Chinubhai Choksey are the partners of defendant no.3.

5.   Mehul Choksey retired from the partnership firm vide Indenture of Retirement Deed dated 10th May, 2000. Thus, defendant nos.6, 8 and 9 are the present partners of defendant no.3.

6.   Defendant no.4 i.e. Firestar International Limited is a Company incorporated under the provisions of the Companies Act, 1956 which belongs to Nirav Modi Group of

Companies controlled by Nirav Deepak Modi i.e. defendant

no.6. The shareholders of defendant no.4 are Nirav Deepak

Modi i.e. defendant no.6, ANM Enterprises Private Ltd. i.e.

defendant no.8, NDM Enterprises Private Ltd. i.e. defendant

no.9 and Nirav Modi Family Trust.

7.   Defendant no.5 is the Firestar Diamond International Private

Limited is also a Company incorporated under the provisions

of the Companies Act, 1956 which belongs to Nirav Modi

Group of Companies. The shareholders of defendant no.5 are

Firestar International Limited i.e. defendant no.4 and Nirav

Deepak Modi i.e. defendant no.6.

8.   Defendant no.6 i.e. Nirav Deepak Modi is a son of Deepak

Keshavlal Modi i.e. defendant no.11 and husband of

defendant no.7 i.e. Ami Nirav Modi. Defendant no.6 is the

partner of defendant no.3 i.e. M/s. Diamond R US. Nirav

Modi is the trustee in Nirav Modi Trust and partner of defendant nos.1 and 2. Nirav Deepak Modi is also the promoter of defendant nos.4, 5, 8 and 9. Nirav Deepak Modi is the controlling authority of Nirav Modi Firms and Nirav Modi Companies and Nirav Modi Family Trust. Nirav Modi owns and hold 99.9% shareholding of defendant no.8 i.e. ANM Enterprises Private Ltd. Nirav Modi also owns 99.9% shares of defendant no.9 i.e. NDM Enterprises Private Ltd. Nirav Modi is the mastermind behind the perpetration of fraud upon the applicant by obtaining the LOUs in complete defiance of the Banking norms and practices. Nirav Modi managed to obtain the LOUs from Brady House Branch in collusion and connivance with the delinquent employees of the applicant. Nirav Modi obtained the LOUs for raising buyer's credit to import diamonds, fresh water pearls, semi-precious stones, jewellery and precious stones.

9.   Defendant no.7 i.e. Ami Nirav Modi is the wife of defendant
no.6 i.e. Nirav Deepak Modi and daughter of Dinesh Saralal
Jhaveri. Ami Nirav Modi is the trustee and beneficiary in the
Nirav Modi Family Trust.

10.   Defendant no.8 i.e. ANM Enterprises Private Ltd. is
registered under the Old Companies Act. Defendant no.8 is a
partner in defendant no.3 i.e. M/s. Diamond R US.
Defendant no.6 owns 99.9% share of defendant no.8.

11.   Defendant no.9 i.e. NDM Enterprises Private Ltd. is also a
company incorporated under the Old Companies Act.
Defendant no.9 is a partner of defendant no.3 i.e. M/s.
Diamond R US.  Nirav Modi is the shareholder of defendant
no.9 i.e. NDM Enterprises Private Ltd. and owns 99.9%
shareholding.

12.   Defendant no.10 i.e. Neeshal Deepak Modi is the son of

Deepak Keshavlal Modi.  Defendant no.10 is the trustee and beneficiary in the Nirav Modi Family Trust.

13. Defendant no.11 i.e. Deepak Keshavlal Modi is the son of Keshavlal Modi. Defendant no.11 is the beneficiary of Nirav Modi Family Trust.

14. Defendant no.12 i.e. Nehal Deepak Modi is a son of Deepak Keshavlal Modi i.e. defendant no.11. Defendant no.12 is a beneficiary of the Nirav Modi Family Trust.

15. Defendant no.13 i.e. Rohin Nirav Modi is a son of Nirav Deepak Modi. Defendant no.13 is a beneficiary of the Nirav Modi Family Trust.

16. Defendant no.14 i.e. Ananya Nirav Modi is the daughter of Nirav Deepak Modi. Defendant no.14 is a beneficiary in the Nirav Modi Family Trust.

17. Defendant no.15 i.e. Apasha Nirav Modi is the daughter of

Nirav Deepak Modi. Defendant no.15 is a beneficiary in the Nirav Modi Family Trust.

18. Defendant no.16 i.e. Purvi Mayank Mehta is the daughter of defendant no.11. Defendant no.16 is a beneficiary in the Nirav Modi Family Trust.

19. The partnership structure of Nirav Modi Firms and their respective related parties are shown below:

| Nirav Modi Firms | Partners | Related Parties |
|---|---|---|
| M/s. Stellar Diamonds (Defendant no.1) | (i) Nirav Family Trust<br>(ii) Nirav Modi Family Trust | (i) Firestar International Limited (Defendant no.4)<br>(ii) Firestar Diamond International Private Limited (Defendant no.5) |
| M/s. Solar Exports (Defendant no.2) | (i) Nirav Family Trust<br>(ii) Nirav Modi Family Trust | (i) Firestar International Limited (Defendant no.4)<br>(ii) Firestar Diamond International Private Limited (Defendant no.5) |

| M/s. Diamond R US (Defendant no.3) | (i) Nirav Deepak Modi (Defendant no.6) <br><br> (ii) ANM Enterprises Private Limited (Defendant no.8) <br><br> (iii) NDM Enterprises Private Limited (Defendant no.9) | (i) Firestar International Limited (Defendant no.4) <br><br> (ii) Firestar Diamond International Private Limited (Defendant no.5) |

20.   The structure of Nirav Modi Trust is shown below :

|  | **Nirav Family Trust** | **Nirav Modi Family Trust** |
|---|---|---|
| Trustees | (i) Nirav Deepak Modi (Defendant no.6) <br><br> (ii) Ami Nirav Modi (Defendant no.7) <br><br> (iii) Neeshal Deepak Modi (Defendant no.10) | (i) Nirav Deepak Modi (Defendant no.6) <br><br> (ii) Ami Nirav Modi (Defendant no.7) <br><br> (iii) Neeshal Deepak Modi (Defendant no.10) |
| Beneficiaries | (i) Deepak Keshavlal Modi (Defendant no. 11) <br><br> (ii) Ami Nirav Modi (Defendant no.7) <br><br> (iii) Neeshal Deepak Modi (Defendant no.10) <br><br> (iv) Nehal Deepak Modi (Defendant no.12) <br><br> (v) Rohin Nirav Modi (Defendant no.13) <br><br> (vi) Ananya Nirav Modi | (i) Ami Nirav Modi (Defendant no.7) <br><br> (ii) Neeshal Deepak Modi (Defendant no.10) <br><br> (iii) Nehal Deepak Modi (Defendant no.12) <br><br> (iv) Rohin Nirav Modi (Defendant no.13) <br><br> (v) Ananya Nirav Modi (Defendant no.14) <br><br> (vi) Apasha Nirav Modi (Defendant no.15) |

| | (Defendant no.14)<br><br>(vii) Apasha Nirav Modi (Defendant no.15) | (vii) Purvi Mayant Mehta (Defendant no.16) |
|---|---|---|

Defendant nos.7, 10 to 16 are the beneficiaries of Nirav Family Trust and Nirav Modi Family Trust respectively and are therefore, jointly and severally liable for the debt arising out of the fraudulent LOUs.

21. The details of availment of fraudulent debt by way LOUs of the respective NM Firms as on 29th June, 2018 are set out below:

| Defendants | Total No. of LOUs | Total Amount in INR | Interest in INR | Principal in INR |
|---|---|---|---|---|
| Stellar Diamond (Defendant no.1) | 49 | 23,09,14,08,900.40 | 75,80,82,413.40 | 22,33,33,26,487.00 |
| Solar Exports (Defendant No.2 | 50 | 23,28,77,10,253.79 | 76,62,71,970.79 | 22,52,14,38,283.00 |
| Diamond R US (Defendant no.3) | 51 | 23,91,15,68,796.46 | 78,49,24,284.36 | 23,12,66,44,512.10 |

| Total debt in relation to unauthorized LOUs | 150 | 70,29,06,87,950.65 | 2,30,92,78,668.54 | 67,98,14,09,282.10 |
|---|---|---|---|---|

22.  Defendant nos.1 to 3, their partners, trustees and beneficiaries defrauded the applicant, as on 29th June, 2018 in the sum of INR 7029,06,87,950.65 comprising of principal amount of INR 6798,14,09,282.10 and interest in the sum of INR 230,92,78,668.54 by obtaining unauthorized LOUs. The fraud has been perpetrated by Nirav Modi in collusion, connivance and with the aid and assistance of the group companies i.e. Firestar International Limited and Firestar Diamond International Pvt. Ltd. alongwith their affiliates, subsidiaries, Nirav Family Trust, Nirav Modi Family Trust, directors and key managerial personnel.  The Nirav Modi Firms, the Nirav Modi Companies and defendant nos.6 to 16 is the Nirav Modi Group.

23.  The partnership Firms and the Nirav Modi Companies forms

part of the Nirav Modi Group controlled by Nirav Modi and his family members. They are the mastermind behind the perpetration of the fraud. Defendants have laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purpose of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs.

### *No Sanction for LOUs:*

24. The applicant never sanctioned any credit facility to Nirav Modi Group for issuance of the LOUs. However, Nirav Modi and others in collusion and connivance with the delinquent employees managed to obtain the LOUs illegally and unauthorisedly.

25. Nirav Modi Group and others in collusion and connivance with the delinquent employees openly flouted the

guidelines/regulations for issuance of LOUs including Loans and Advance Circular No.131 dated 19th October, 2009 and Loans and Advance Circular No.35 dated 26th March, 2014. The guidelines require the importer to make an application in prescribed format. Upon careful scrutiny of the importer's application and satisfaction thereof, the LOU issuing bank issues LOU in favour of the Overseas Funding Bank. This is done through MT 799 SWIFT message being the format of the LOUs correspondence.

26. The LOUs once accepted by the Overseas Funding Bank credits the amount to the designated NOSTRO account of LOU issuing Bank. The confirmation is then sent to the Bank issuing the LOUs via MT 799 SWIFT messaging system. It contains the details such as buyer's credit, period of credit, rate of interest, maturity date, value and the details of NOSTRO account of Overseas Funding Bank. The LOU

transactions are to be routed through the Trade Finance Module of Core Banking System. The system then generates reference number, the liability and charges against the importer. This reference number is to be quoted between the LOUs issuing Bank and Overseas Funding Bank respectively. The Overseas Funding Bank credits the amount to the NOSTRO account of LOUs issuing Bank who in turn credits the account of the overseas supplier of the importer for payment with regard to the genuine import transactions. These transactions are communicated through MT 103 SWIFT message for direct transfer of funds to the account of entities other than banks in international locations.

### *Fraudulent LOUs:*

27. These LOUs were issued in collusion and connivance with the delinquent employees of the applicant using the SWIFT System. The delinquent employees issued LOUs to Nirav

Modi Group without any sanction limits, requisite authority and approval, necessary loan documents, requisite import documents, deposit of cash and margin money and without making entries in the Core Banking System.

28. The unauthorized LOUs were used for facilitating the import of diamonds, semi-precious stones, fresh water pearls, jewellery and precious stones. The funds were not used for the genuine transactions but were siphoned away in a systematic and planned manner.

**_Detection of fraud:_**

29. In January, 2018 the fraud perpetrated by defendant nos.1 to 16 got exposed after the retirement of the delinquent employees.

30. The Nirav Modi Group through its representatives had approached the applicant after the retirement of the

delinquent employees. The Nirav Modi Group approached the applicant with the ulterior motive and malafide intention to continue using the unauthorized LOUs. However, the new officers who took charge after the retirement of the delinquent employees at Brady House Branch called upon the representatives of Nirav Modi Group to furnish 100% cash margin for issuance of LOUs by raising buyers' credit. The representatives of Nirav Modi Group refused to furnish any cash margin by justifying that they were doing so in the past without any such requirements.

31. This was the trigger point which alarmed the applicant and raised suspicion to the modus operandi of the Nirav Modi Firms, their partners and beneficiaries to investigate and examine the case thoroughly.

32. Upon scrutinizing and investigating the matter of the Nirav

Modi Group, it came to the notice of the applicant that the delinquent employees had colluded with defendant nos.1 to 16 and had issued the LOUs fraudulently through its SWIFT messaging system. The funds availed by the Nirav Modi Group were not entered into the trade finance module of the Core Banking System of the applicant. It was for this reason that the applicant could not detect the fraud perpetrated by the Nirav Modi Group.

33.   The Nirav Modi Firms and their partners had approached the delinquent employees for issuance of the LOUs to enable them to avail the unauthorized funds for import of diamonds, fresh water pearls, jewellery and precious stones and semi-precious gems, etc.

34.   The Nirav Modi Group did not make any application for the loan by way of fund based or non-fund based credit

facilities. The Nirav Modi Group did not furnish any requisite import documents, the counter guarantee, the agreement of hypothecation of goods etc.

35. The Nirav Modi Group managed the delinquent employees not to make any entry in the trade finance module i.e. the Core Banking System to avoid detection. The Nirav Modi Group managed the delinquent employees by taking them into confidence to use one single reference number for each fraudulent transaction so that the fraudsters can remain outside the Core Banking System.  In the present case, the Nirav Modi Group used the advantage of single reference bearing   Nos.3731/STELLAR/17,   3731/SOLAR/17   and 3731/FIBC/17 respectively.  These references are repeated in all MT 799 SWIFT Messages sent to various Overseas Funding Banks confirming the issuance of numerous LOUs

on behalf of these entities.

36.   The Nirav Modi Group perpetrated fraud in the manner that
      only the name of overseas supplier entities was replaced
      from time to time.  These systematic planning was done by
      the fraudsters to enable the buyers' credit to be utilized by
      making the remittances to different overseas suppliers.  The
      common reference in all the SWIFT Messages demonstrates
      and indicates that these were surreptitiously issued in a
      fraudulent manner.

37.   The NOSTRO Account of the applicant bank was misused by
      the fraudsters to make the payments to various Overseas
      Funding Banks instead of using/utilizing the NOSTRO
      Account for payment to genuine overseas suppliers of goods.
      The funds were diverted to fictitious or shell companies of
      Nirav Modi.  The LOU no.3731/FIBC/17 dated 17th March,

2017 was issued on behalf of defendant no.3. However, the
fraudsters managed the delinquent employees to transfer
amount from the NOSTRO account of the applicant to Axis
Bank, Hong Kong and Allahabad Bank, Hong Kong to settle
the buyers' credit with regard to the previously obtained
unauthorized LOUs obtained by defendant no.3. Thereafter,
the NOSTRO Account of the applicant was misused to make
the payment with regard to the unauthorized LOU
no.3731/SOLAR/17 dated 27th April, 2017 issued on behalf of
defendant no.2. In the above mentioned LOU the amount
was transferred from the NOSTRO Account to the entities not
mentioned in the LOU. The NOSTRO Account was also
misused and misutilised for unauthorized transfer of amount
to the account with regard to the unauthorized LOU
no.3731/STELLAR/17 dated 27th April, 2017 issued on behalf
of defendant no.1.

38. Upon coming to know the fraud perpetrated by Nirav Modi the applicant conducted internal enquiry, investigation to scrutinize the fraud which involved the issuance of the unauthorized LOUs to the Nirav Modi Group. Accordingly, on 27th March, 2018 the Final Investigation Report ('***Investigation Report***") was made. The investigation report reveals that the Nirav Modi Group commenced the obtaining of the fraudulent LOUs from 10th March, 2011 till 31st May, 2017 the fraud amount was crystallized at INR 6498.18 Crore (excluding interest and calculated @ 1 USD = INR 64). The amount of fraud increased to INR 7029,06,87,950.65 (comprising of the principal amount of INR 6798,14,09,282.10 and interest component amounting to INR 230,92,78,668.54. The aggregate amount in the sum of INR 7029,06,87,950.65 under the fraudulent LOUs became forthwith due and payable. The investigation report reveals that the Nirav Modi

Group obtained fraudulent LOUs which were issued through the SWIFT system.  The report further reveals that no entry was made in the Trade Finance Module of Core Banking System to avoid detection.  The investigation report further reveals that the amount in the NOSTRO account deposited by the Overseas Funding Banks was wrongfully used for the payment of earlier buyers for the fraudulent LOUs issued in the past.  The investigation report further reveals that there is no documentary evidence to show that the transactions are bonafide. The investigation report further reveals that the transactions were circulated between Nirav Modi Firms and Nirav Modi Companies.  However, the proceeds of fraud may have been utilized by these entities. Therefore, the applicant was left with no other alternate but to file the criminal complaint on 4th March, 2018 with the Central Bureau of Investigation by filing the First Information Report

against Nirav Modi Companies.

39. The applicant also took immediate steps by way of internal investigation by setting up the internal investigation team to conduct investigation in the matter.  Since the fraud was of a very huge magnitude, the applicant complied with the requirement of RBI Master Direction No.RBI/DBS/2016-17/28 with regard to the classification and reporting by the commercial banks and to declare the account of defendant nos.1 to 5 as fraud accounts.

40. The LOUs are in the nature of guarantee in favour of the Overseas Funding Bank against which the buyer's credit was provided to the Nirav Modi Group.  The credits by way of LOUs were misutilised and have remained unpaid. Consequently, the applicant was first compelled to make the payment amounting to INR 6798,14,09,282.10 to the Overseas

Funding Bank between the period from March and April, 2018 against the unauthorized/fraudulent LOUs. Defendant nos.1 to 16 caused the substantial loss to the applicant which is recoverable from them as a fraudulent debt.

***Correspondences exchanged with the Nirav Modi Firms and defendant no.6:***

41.   On 20th January, 2018 the Nirav Modi Firm addressed letter to the applicant requesting it to issue the LOUs to the Nirav Modi Firms which were enjoying the LOUs relating facilities since last several years. On 22nd January, 2018 the applicant replied to the letter of the Nirav Modi Firms stating that the Nirav Modi Firms were never sanctioned any facilities in this regard. The applicant further informed that 100% cash margin was required for issuance of the LOUs.

42.   Thereafter, the applicant made correspondence with Nirav

Modi by drawing his attention to the outstanding liabilities of
the Nirav Modi Group.  The applicant informed Nirav Modi
of severe consequences of his illegal act and actions as well as
of the Nirav Modi Group.

43.  On 23rd January, 2018 and 30th January, 2018 Nehal Deepak
Modi sent an E-mail to the applicant requesting a meeting to
discuss how to resolve the matter pertaining to the Nirav
Modi Group.  E-mails were exchanged between the applicant
and Nehal Deepak Modi between 30th January, 2018 and
2nd February, 2018.  Thereafter, various meetings were held
with the representatives of the Nirav Modi Group including
Nehal Modi.  These meetings were held at Delhi and Mumbai
to pay the outstanding of the LOU debt.  On 5th February,
2018 Nirav Modi expressed his willingness and
responsibilities to resolve the issue and liabilities of the Nirav
Modi Group.  On 6th February, 2018 follow-up email was sent

by Nirav Modi to the applicant. On 7th February, 2018 the applicant responded to the email dated 6th February, 2018 stating that the so-called resolution offered by Nehal Modi was unacceptable as it was not back by any concrete timeline and cash flow etc.  By this e-mail the applicant also called upon Nirav Modi to provide in writing the intention to repay the admitted liabilities of the Nirav Modi Group. On 8th February, 2018 Firestar International Ltd. sent an e-mail to the applicant and consortium of other banks which has granted credit facilities to it. By this e-mail Firestar International Ltd. recorded that Nirav Modi would be available for video conferencing with the banks.  The video conferencing was held on the same day from the registered office of Firestar International Ltd. Nirav Modi participated in this video conference. In this meeting Nirav Modi admitted and acknowledged the issuance of the LOUs to

Nirav Modi Firms. On 12th February, 2018 the applicant circulated and sent by email, the minutes of the video conference to Firestar International Ltd. and other banks.

44.   On 13th February, 2018 Nirav Modi sent an e-mail stating that the amount claimed from SOLAR exports, STELLAR Diamonds and Diamond R US, will be paid by these Firms to the applicant whatever amounts are available with them. Nirav Modi further admitted that "I must add that my intent is to honour all the obligations on my part, Firestar's part and whatever the firms are liable to pay".  On 14th February, 2018 the applicant sent an e-mail recording the discussion held on 24th January, 2018 with Nirav Modi.  The applicant expressed displeasure that Nirav Modi failed to make the payment despite acknowledging the outstanding claim of the applicant.  By this e-mail the applicant once again called

upon Nirav Modi to provide the timeline and bankable plan to repay the substantial amount upfront. On 15th February, 2018 Nirav Modi replied to the applicant showing his willingness to co-operate with the applicant. Nirav Modi made false assurances stating that the source of funds for the amount found to be due to the applicant by the three Firms are receivable from the buyers of the product of these Firms. On the same day i.e. 15th February, 2018 the applicant bank responded to Nirav Modi stating that the applicant never sanctioned any credit facilities to the Nirav Modi Firms. The applicant reiterated that the LOUs issued were unauthorized and obtained fraudulently by the Nirav Modi Group. It further recorded that the ultimate benefit has gone to the Group. The applicant also advised Nirav Modi to disclose the approximate value of the inventory lying at the various geographical locations belonging to the Nirav

Modi Group.

45.   On 17th February, 2018 Nirav Modi sent an e-mail to the applicant.   By this e-mail, for the first time, Nirav Modi sought to escape the liability of the applicant.   Nirav Modi made frivolous allegations and assertions in an entirely volte-face manner.   Nirav Modi stated that the LOUs were authorisedly issued in a genuine manner.   The action of the applicant has affected the Nirav Modi Group adversely. Nirav Modi continued to acknowledge the liability owed to the applicant.   Nirav Modi suggested that the sale of the assets of Nirav Modi Firms, Firestar International Ltd. and Firestar Diamond International Pvt. Ltd. will be sufficient to settle the claim made by the applicant.   On 20th February, 2018 the applicant bank replied to the e-mail of Nirav Modi. By this e-mail the applicant once again recorded that no facility was sanctioned to the Nirav Modi Firms.   Applicant

further recorded that Nirav Modi, the Nirav Modi Group and their affiliates were fully aware of the unauthorized issuance of LOUs. It was further recorded that the money obtained through the illegal / unauthorized of LOUs was misutilised. The applicant was very clear in its mind that the LOUs were illegally and unauthorisedly obtained. Therefore, the entire liability to these LOUs was upon the group entities, affiliates and of all concerned persons. The applicant also criticized Nirav Modi for his lackadaisical approach in giving the feasible resolution plan. On 27th February, 2018 Nirav Modi once again made an attempt to avoid the liability arising out of the fraud perpetrated by him. Nirav Modi attributed the action faced by Nirav Modi Group as a consequence of the fraud, on the applicant rather than on the Nirav Modi Firms and their partners. Even on that day Nirav Modi did not deny the liability and therefore, offered a hollow repayment

plan.  On 3rd March, 2018 the applicant replied to the e-mail
of Nirav Modi stating that events consequent to fraud
including seizure of the assets of the Nirav Modi Group is to
be attributed to the Nirav Modi Firms and their partners who
are involved in the perpetration of the fraud. The e-mail
further recorded that the loss suffered by Nirav Modi Group
is entirely attributed to the Nirav Modi Firms and their
partners.  The applicant further recorded that it has acted in a
fair, reasonable and lawful manner to recover the amount of
fraudulent debt.  The applicant brought to the notice of Nirav
Modi his vague proposal to repay the outstanding of the
fraudulent debt which lacked bonafide and genuineness.  The
applicant further recorded that Nirav Modi was not serious
about repaying the debt to the applicant.  On 11th March, 2018
Nirav Modi responded to the applicant's e-mail.   By this
e-mail, Nirav Modi made an attempt to find fault with the

applicant that the proposal given by him is not accepted by the applicant. Nirav Modi acknowledged and admitted the financial obligations the Nirav Modi Group owe to the applicant.

46. All the schemes proposed by Nirav Modi on behalf of Nirav Modi Group to repay the fraudulent debt under the illegal/unauthorized LOUs were neither sincere nor workable. The applicant therefore, rejected the schemes proposed by Nirav Modi as it lacked credibility and was very vague. Nirav Modi adopted the dilatory tactics using the proposal for settlement as a tool. It is evident from the communications made between the applicant and Nirav Modi that he has failed to give the details and description of the immovable properties, fixed deposits, current Accounts etc. The inconsistency and contradictions made by Nirav Modi in his communication clearly reveal that he had no

intention to repay the debt obtained by fraudulent means.

47.   Since there was no fruitful deliberations on behalf of Nirav
Modi, the applicant was left with no other alternate but to
issue the demand notice on 14th May, 2018 calling upon Nirav
Modi Firms, its partners, trustees, beneficiaries and Nirav
Modi Companies to liquidate the entire outstanding on
account of LOUs. The applicant called upon defendant nos.1
to 16 to make the payment of the entire outstanding with
interest @14.30% per annum until payment/realization. The
applicant clarified that the interest @14.30% is charged in
clean overdraft facilities in the normal course and therefore,
the applicant justified it by claiming under the demand
notice. The payment under demand notice was to be made
within 10 days. However, defendant nos.1 to 16 failed and
neglected to make the payment claimed under the demand
notice. On 30th May, 2018 Nirav Modi replied to the demand

notice by e-mail. Nirav Modi made an attempt to avoid the liability. Nirav Modi also attempted to distance himself from Nirav Modi Firms.  Nirav Modi, for the first time, denied that the debt claimed under LOUs is due, payable and recoverable by the applicant. Defendant nos.1 to 16 did not deny that the LOUs were issued to the Nirav Modi Firms. Therefore, Nirav Modi could not have denied that the debt claimed under the fraudulent LOUs is not due, payable and recoverable.

48.   On 18th June, 2018 the applicant replied to the e-mail sent by Nirav Modi. By this e-mail, the applicant had drawn the attention of Nirav Modi to various replies given by him to the demand notice. Firstly, the applicant pointed out that the denial by Nirav Modi with regard to the LOU debt as not due and payable to the applicant is an afterthought and in contradiction to the admission of liability and

acknowledgement of debt made by Nirav Modi in his earlier e-mails.

### *Complaint against Nirav Modi and others:*

49. Upon detection of the fraudulent transaction, the applicant took prompt action and measures to the investigation report with the concerned investigative agencies. On 29th January, 2018 the applicant had already filed the Criminal Complaint with Central Bureau of Investigation against Nirav Modi and the Nirav Modi Firms having committed offence of cheating and fraud thereby causing loss to the applicant amounting to INR 280.70 crores.

50. The quantum of fraud was revealed in the further investigation was in fact larger than initially reported. Therefore, the applicant involved the Central Bureau of Investigation by Criminal Complaint dated 13th February,

2018 against Nirav Modi and Nirav Modi Firms for cheating, committing fraud and causing loss to the applicant amounting to INR 6498.20 crore.

51. On 13th February, 2018 the applicant also lodged Complaint with the Enforcement Directorate who has commenced the investigation against Nirav Modi and others. The Enforcement Directorate provisionally attached various movable and immovable properties belonging to the Nirav Modi Group.

52. The applicant apprehends that the Nirav Modi Group has purchased and acquired the assets both movable and immovable Worldwide from the proceeds of the fraudulent debt.

53. On 4th March, 2018 the applicant had also filed Complaint with Central Bureau of Investigation against Nirav Modi,

Firestar International Limited and Firestar Diamond International Private Limited, their Directors, officials and others for cheating the applicant for INR 321.88 crores.

54. On 9th March, 2018 the applicant addressed letter to the Joint Secretary, Department of Financial Services, Government of India and appraised the complete case of fraud.

55. On 11th April, 2018 Non-bailable Warrants were issued against Nirav Modi and Neeshal Deepak Modi. The investigation by various regulatory authorities and investigative agencies is going on. The Enforcement Directorate and Central Bureau of Investigation respectively have filed their charge-sheet.

56. On 14th May, 2018 the applicant obtained the charge-sheet from Central Bureau of Investigation which reveals that the

Nirav Modi Firms and their partners have unauthorisedly obtained 150 LOUs by defrauding the applicant. The charge sheet also reveals that defendant nos.1 to 3, Nirav Modi and Neeshal Modi have committed various offences concerning fraud.

57.  The applicant has referred to and relied upon the Complaint filed by the Directorate of Enforcement against Nirav Modi and 23 others in IA/391/2018.  The Complaint is filed under the Prevention of Money Laundering Act, 2002 (for short, the "PML Act") before the City Civil and Sessions Court, Mumbai (Designated Court).  The Complaint reveals the following facts inter-alia amongst others :

   (a)  Gokulnath Shetty was posted at Mid Corporate Branch, Brady House, Fort, Mumbai, from 31st March, 2010 to 31st May, 2017 (since retired).

(b) On 09th February, 2017, 10th February, 2017 and 14th February, 2017 Gokulnath Shetty and Manoj Hanumant Kharat issued unauthorisedly 8 LOUs to Nirav Modi and Nirav Modi Firms amounting to USD 442,25,812.10 equivalent to INR 280,70,12,293.98 (1USD is equal to INR 63.47).  The due date of 8 LOUs was 25th January, 2018.   Out of total 8 LOUs, 5 LOUs were issued in favour of Allahabad Bank, Hong Kong, and remaining 3 LOUs were issued in favour of Axis Bank, Hong Kong.

(c) On 13th February, 2018 the applicant made Complaint for issuance of 150 unauthorised LOUs aggregating to USD 1015.35 million equivalent to INR 6498.20 crores. 150 LOUs were issued between February, 2017 to May, 2017 the break-up of which is given in paragraph no.21 above.

(d)  In the course of investigation and initial scrutiny, it was found that Nirav Modi and Nirav Modi Firms had obtained the unauthorized LOUs from 2011 to 2017 the details of which are set out below :

| Year | Details of LOUs alongwith utilisation | | | | |
|------|-------------|----------------|-------------|-----------|-------------------|
| | No. of LOUs opened | Amount USD Million | Amount in Rs. Crore | Utilisation (Rs. In crore) | |
| | | | | Companies | Foreign Branches of Indian Banks for repayment of earlier LOUs |
| 2011 | 43 | 116.00 | 742.40 | 742.40 | 0.00 |
| 2012 | 115 | 352.43 | 2255.55 | 2255.55 | 0.00 |
| 2013 | 237 | 640.24 | 4097.54 | 4097.54 | 0.00 |
| 2014 | 123 | 301.19 | 1927.62 | 1927.62 | 0.00 |
| 2015 | 185 | 438.53 | 2806.59 | 2697.66 | 108.93 |
| 2016 | 353 | 875.9 | 5605.73 | 4505.80 | 1099.93 |
| 2017 | 150 | 1015.34 | 6498.18 | 1448.16 | 5064.60 |
| Total | 1206 | 3739.63 | 23933.61 | 17674.73 | 6273.46 |

### *Correspondence with Ministry of Corporate Affairs*:

58.  On 19th February, 2018 the applicant also made correspondence with regard to the fraud perpetrated by

defendant nos.1 to 16 with the Ministry of Corporate Affairs, Government of India.

59.   On 17th February, 2018 the Ministry of Corporate Affairs vide Order No.3/106/2018-CL-II(WR) directed investigation by Serious Fraud Investigation Office into the affairs of Nirav Modi Group.

60.   On 21st February, 2018 the Ministry of Corporate Affairs directed the Regional Director (Western Region) to file petition under Sections 221, 241, 246 and 339 of the Companies Act, 2013. The investigation by serious fraud in investigation office is going on.

61.   On 21st February, 2018 the applicant informed the Ministry of Corporate Affairs giving the details of the outstanding fraudulent LOUs.

62.   ***National Company Law Tribunal proceedings***:

The Union of India, Ministry of Corporate Affairs has filed Company Petition No.277 of 2018 against Geetanjali Gems Ltd.  It is a company promoted by Mehul Choksi, Uncle of Nirav Modi and 67 others. The Company Petition is filed before the National Company Law Tribunal, Mumbai Bench. The principal prayer in the petition is to compensate the applicant for the loss suffered due to the fraudulent LOUs.

63.   On 23rd February, 2018 an ex-parte injunction order was passed by the National Company Law Tribunal by invoking Section 221 of the Companies Act, 2013 and Section 43 of the LLP Act, 2008. By the aforesaid order, all the respondents therein who are defendants in the present law suit are injuncted from removal, transfer or disposal of funds, assets and properties. The independent Directors of Geetanjali Gems Ltd. filed Miscellaneous Application Nos.180, 182, 183,

184, 217, 218 and 219 of 2018 to vacate the order dated 23rd February, 2018 against them.

64. On 2nd April, 2018, National Company Law Tribunal modified the order by vacating the injunction order dated 23rd February, 2018 qua the independent Directors. The vacating/modification of the order dated 2nd April, 2018 is challenged by the Union of India, Ministry of Corporate Affairs before the National Company Law Appellate Tribunal by filing Company Appeal(AT) No.103 of 2018.

65. On 9th April, 2018 National Company Law Appellate Tribunal reserved the Company Appeal for Judgment. In the interregnum period, the applicant was impleaded as party to the Company Petition as Respondent No.68 being proper and necessary party. Further, Miscellaneous Application Nos.311, 222, 282, 220, 246, 247 and 250 of 2018 were filed by other

independent Directors. These applications are pending for final hearing.

### *Bankruptcy Proceedings in New York***:**

66. Subsidiaries of Firestar International Ltd. in United States, namely A. Jaffe Inc., Fantasy Inc. and Firestar Diamond Inc. (for short "***U.S. Debtors***") have initiated voluntary Bankruptcy Proceedings (***U.S. Proceedings***) on 26th February, 2018 under Chapter 11 of the United States Bankruptcy Code (***U.S. Bankruptcy Code***). The applicant and Ministry of Corporate Affairs have filed notices of appearance and are participating in the U.S. Proceedings. The applicant has filed various motions/applications in the U.S. Proceedings.

67. On 22nd March, 2018 the United States Trustee, United States Department of Justice filed a Motion seeking investigation by an examiner to investigate amongst other things, the U.S.

Debtors' connections to the LOU fraud.

68. On 13th April, 2018 the United States Bankruptcy Court for the Southern District of New York passed an order directing the United States Trustee to appoint an examiner "to investigate the circumstances surrounding the (Modi fraud) for the purpose and to the extent necessary to determine (1) whether and to what extent, if any, (certain persons or entities affiliated with Modi) have the ability to direct and/or influence the conduct, decisions or actions taken by the Debtors in these Cases; (2) whether any current officer or director of the Debtors actively and knowingly participated in fraud or dishonesty in the management of the affairs of the Debtors; (3) whether any claims or causes of action in favour of the Debtors may arise from the (circumstances surrounding the Modi fraud).

69. On 20th April, 2018 the U.S. Court approved the appointment of John J. Carney as the examiner in the U.S. Proceedings.

70. In the interregnum period i.e. on 23rd March, 2018 U.S. Debtors' filed a sale motion requesting the U.S. Court to approve bidding and sale procedures for the sale of U.S. debtors' assets free and clear of liens, claims, interests and encumbrances. The U.S. Debtors' requested the U.S. Court to expedite the sale process as it was necessary to realize maximum sale proceeds of the assets, to give successful bidders sufficient time for preparation of industry trade show which was set to be held in early 2018. The sale process was expedited with the bidders' deadline given on 27th April, 2018 and the auction was proposed to be held on 2nd May, 2018.

71. On 1st May, 2018 the U.S. Debtors' adjourned the auction to

be held on 3rd May, 2018.  Parag Diamonds Inc. made the winning bid for the purchase price of USD 6.95 Million in cash plus USD 1.05 Million secured note payable in 12 months.

72.  The applicant raised objection to the sale which was proclaimed of A. Jaffe's to Parag Diamond.  The objection was raised as the sale was propounded at a significant discount.  The Ministry of Corporate Affairs also joined the applicant.  The auction process could not have achieved a significant value and therefore, the sale was adjourned for clarification by the U.S. Debtors for the fraud perpetrated by defendant nos.1 to 16 including the U.S. Debtors receiving at least USD 6 Millions in the proceeds obtained by way of fraudulent LOUs.  On 14th May, 2018 U.S. Debtors filed their reply to the applicant's objections to the sale.

73.   On 15th May, 2018 U.S. Court held hearing to consider the request of U.S. Debtors for approval and granting permission to sell the A. Jaffe's assets to Parag Diamond.  The Debtors' Chief Restructuring Officer was cross-examined by the applicants U.S. Counsel.   The Chief Restructuring Officer admitted that amongst other things, the U.S. Debtors did not investigate into the LOU fraud.  Mihir Bhansali was in communication with Nirav Modi during the course of U.S. Proceedings.  Upon hearing the parties, the U.S. Court held that it was not inclined to approve the sale without U.S. Debtors providing additional evidence by way of value of the A. Jaffe's assets.   On 19th May, 2018 the counsel of Mihir Bhansali informed the U.S. Bankruptcy Court that Mihir Bhansali refused to testify and instead invoke his U.S. constitutional rights not to incriminate himself, the U.S. Debtors  withdrew their aforesaid sale motion on a without

prejudice basis.

74. The applicant and U.S. Trust filed motion for appointment of trustee under Chapter 11 as provided under Section 1104(a) and (b) of the U.S. Bankruptcy Code.   The Ministry of Corporate Affairs joined the applicant in the Trustee Motion. On 31st May, 2018 the U.S. Debtor Counsel did not choose to contest the appointment of the trustee.   Therefore, on 07th June, 2018 the U.S. Court passed the order directing the appointment of the Trustee. Richard Levin, a leading U.S Bankruptcy Lawyer was appointed as the Trustee on 15th June, 2018.  The U.S. Proceedings are ongoing and is pending for final hearing.

75. ***Legally recoverable debt*:**

Defendant nos.1 to 16 by their deliberate act of omission and commission obtained the LOUs illegally and unauthorisedly.

Nirav Modi Group caused the issuance of unauthorized LOUs by the applicant which were put to use by them for buyers' credit. Thus, Nirav Modi Group have misutilised the funds and have unjustly enriched them. Defendant nos.1 to 16 have directly and/or indirectly benefitted from the fraud perpetrated by them through the unauthorized issuance of the LOUs. Defendant nos.1 to 16 have financially and monetarily benefitted from the proceeds obtained from the fraudulent transactions. These fraudulent LOUs were issued by the applicant during the regular banking business activities. The financial assistance was unauthorisedly and illegally availed by defendant nos.1 to 16 which is wrongfully used by the entities belonging to the Nirav Modi Group including their subsidiaries, affiliates, group companies all over the world purportedly towards their business activities. Thus, the LOU debt is legally recoverable debt by the

applicant from defendant nos.1 to 16.  The LOU debt is also legally recoverable debt by the applicant from defendant nos.1 to 16, their group companies, affiliates, subsidiaries, officials and all such entities and other persons who have received direct and/or indirect benefits either in India or outside India.

76. The applicant is claiming the repayment of the fraudulent debt on account of the fraud played by defendant nos.1 to 16 in collusion and connivance with the delinquent employees. The fraud is the ultimate result of the issuance of unauthorized LOUs which were used and utilized to illegally procure the funds from Overseas Funding Banks.  Therefore, the LOU debt constitutes a 'debt' under the 1993 Act legally recoverable by the applicant from defendant nos.1 to 16 who are the debtors within the meaning of the 1993 Act.

77.   ***Admitted liability***:

Nirav Modi made various admissions in the communication exchanged between him and the applicant. By the communication, Nirav Modi has admitted that the LOU debt is due and payable to the applicant.  On 13th February, 2018 Nirav Modi sent e-mail stating that "I refer to the ongoing discussions regarding the amounts claimed from Solar Exports, Stellar Diamonds and Diamonds R US.  These Firms will pay to you whatever amounts are available with them and they are pursuing best efforts to their debtors to pay at the earliest."

78.   On 15th February, 2018 Nirav Modi referred to the sale of the assets of Firestar International Ltd. which will enable repaying the amounts owed by three Firms.  Thereafter, on 17th February, 2018 Nirav Modi once again sent e-mail to the

applicant stating that the inventory of Firestar International

Ltd. and Firestar Diamond International Pvt. Ltd. and these

entities other assets could have settled all the amounts due to

the banks. Once again on 27th February, 2018 Nirav Modi sent

e-mail to the applicant stating that their office is taking steps

to recover the assets seized/attached by the Enforcement

Directorate to recover the dues not just from Firestar Group

but also from three Firms.

79. On 11th March, 2018 Nirav Modi once again sent e-mail

stating that he is making an attempt to make good his

financial and commercial obligations.

80. On 30th May, 2018 Nirav Modi once again sent e-mail stating

that the LOUs availed by three Firms were not unauthorized.

81. As on 31st March, 2017 Nirav Modi Firms balance sheet

recorded the short-term borrowings by showing the entry as

"Loan from bank-Buyers Credit".  The balance sheet of the

Nirav Modi Firms as on 31st March, 2017 shows the following

admission of liability :

| Defendants | Amount in INR |
|---|---|
| Steller Diamond (Defendant no.1) | 1699,36,04,075/- |
| Solar Exports (Defendant no.2) | 1709,65,15,106/- |
| Diamond R US (Defendant no.3) | 1741,04,47,554/- |
| **Total :** | **5150,05,66,735/-** |

82.   Defendant nos.1 to 16 are liable to pay to the applicant the

aggregate amount of INR 7029,06,87,950.65 comprising of the

principal amount of INR 6798,14,09,282.10 and interest

component amounting to INR 230,92,78,668.54.

83.   Based on the aforesaid facts, the applicant seeks issuance of

the Recovery Certificate, publication of the notice under

Rule 15(A) and prohibition against the assets belonging to the

Nirav Modi Firms.

84. The summons is served upon defendant nos.1 to 16. I have perused the order sheet dated 12th October, 2018 which reveals the issuance of summons. The order sheet dated 20th November, 2018 reveals that the packet containing summons was returned unserved with the remarks "Left, not known & closed". The applicant therefore, made application for substituted service by paper publication. The applicant was also directed to serve the summons through e-mail also. The order sheet dated 27th November, 2018 reveals that the summons was duly served upon defendant nos.1 to 16 by e-mail. The order sheet dated 08th February, 2019 reveals that defendants were also served by way of paper publication in Times of India (English) and Maharashtra Times (Marathi).

### *Absconder:*

85. I have gone through the affidavit of service alongwith the material placed on record. I have examined and scrutinized it. I am satisfied that the applicant actually attempted to serve upon defendant nos.1 to 16 as stated in the affidavit. Defendant nos.1 to 16 purposely and intentionally avoided or evaded the service of summons. Defendant nos.1 to 16 absconded from the last known address, by absconding from their place does not mean to hide but would mean to evade the service also. Here, I would like to take the assistance of the judicial pronouncement in the case of **_K.T.M.S. Abdul Cader & Others vs. Union of India reported in 1977 Cri.L.J. 1708 (Madras High Court, Full Bench)_** dealing with the meaning of absconding which is held as follows:

The words "absconding debtor" with reference to Bankruptcy Laws, according to Stroud's Judicial Dictionary of words & phrases, 3rd Edn., means one who

departs for distant countries before the necessary proceedings can be taken to make, him bankrupt or being outside the country continues to remain there with intent to defeat or delay his creditors. The primary meaning of the word `abscond' is to hide and when a person is hiding from his place of residence, he is said to abscond. A person may hide even in his place of residence or away from it and in either case he would be absconding when he hides himself.  In Wharton's Law Lexicon 14th Edn., "abscond" has been taken to mean to fly the country in order to escape, arrest for crime. Therefore, persons who get scent of the action to be taken by the detaining authorities and leave the country in order to escape the arm of the law can be said to abscond.  Similarly, persons who have already left the country without the knowledge of any action to be

taken against them under the Act, but who continue to remain outside the country with a view to avoid any detention order that may be passed under Section 3 can also taken to be absconding. It cannot be disputed that a person committing an offence in a particular country would ordinarily be liable to be tried according to the law of that country. If he leaves the country with a view to avoid or escape the arm of the law, he can be said to abscond so far as that country and its laws are concerned. In Chamber's Twentieth Century Dictionary, the word "abscond" has been defined as to hide or to quit the country in order to escape a legal process. Therefore, if a person, before the legal process could be issued somehow or the other comes to know of the issue of such a process or anticipates the issue of the process and quits the country he can be said to have absconded.

86.   In the present case, defendant nos.1 to 16 smelt action coming

their way. There is no ordinary place of residence or business

where the service of summons could have been affected upon

defendant nos.1 to 16.

87.   The proof of service of summons (including e-mail)

demonstrates that defendant nos.1 to 16 had the notice of

hearing of the original application. Defendant nos.1 to 16 had

sufficient time to appear and answer the claim made by the

applicant. I am convinced that defendant nos.1 to 16 had the

knowledge of the proceedings and had the sufficient time to

answer the claim made by the applicant. However, defendant

nos.1 to 16 did not choose to answer the claim. Nirav Modi

and others are absconding debtors having avoided or evaded

the service of legal process. The reason for Nirav Modi and

others to abscond is very clear to delay or protract the legal

proceedings. The ratio of "abscond" and "absconders"

squarely applies to the fact and circumstances of the present case. Defendant nos.1 to 16 is rightly proceeded ex-parte.

88.   The applicant has filed evidence affidavit (Exhibit-24) of Mr. Rajendra Prasad Keshri s/o Mr. Shivnath Keshri and list of documents (Exhibit-25) thereby adducing in evidence the documents at serial nos.AW-1/1 to AW-1/88 which are admitted in evidence, read, recorded and exhibited.

89.   I have scrutinized and examined the allegations contained in the Original Application and analyzed the evidence adduced by the applicant which has gone unchallenged, uncontroverted and unrebutted.

90.   ***Secondary evidence :***

The applicant has filed evidence affidavit (Exhibit-24) of Mr. Rajendra Prasad Keshri s/o Mr. Shivnath Keshri seeking permission to lead secondary evidence with regard to the

documents produced by way of photocopies in evidence. The deponent has deposed that these documents are produced alongwith the evidence affidavit through mechanical process by taking print-outs of the scanned copies of the original documents maintained by the applicant in its electronic record.  The deponent has further stated that the original documents are seized by the CBI vide seizer memo dated 24th February, 2018.  The original documents are in power, possession and custody of the CBI for the purpose of ongoing investigation.  Understood thus, the documents in question are the print-outs from the scanned copies of the original documents maintained by the applicant in its electronic record.  The applicant has made out the case of existence of the original documentary evidence which is in power, possession and custody of the CBI.  In my view, the applicants have satisfied the conditions provided under

Section 65(a) of the Indian Evidence Act.  I, therefore, accept the documents tendered in evidence by the applicant as secondary evidence.

91.   I will now deal with the issues raised in the present original application.

**_Fraud_**:

92.   On 20th January, 2018 the representative of Nirav Modi Firms approached the applicant to grant the extension of the LOUs. Until that time the delinquent employees of the applicant used to aid and abet in issuance of unauthorized LOUs. But Nirav Modi and others were unaware that after the retirement of the delinquent employees of the applicant, they will have to face the severe consequences that were to give rise thereafter.  The applicant noticed that the conduct of defendant nos.1 to 16 was absolutely dishonest. The

officers/employees who had taken the charge after retirement of the delinquent employees point blank refused to entertain the request made the representative of Nirav Modi and Nirav Modi Firms. The applicant rightly asked for 100% cash margin for issuance of the LOUs. The applicant rightly pointed out the guidelines and regulations for issuance of the LOUs including Loans and Advance Circular No.131 dated 19th October, 2009 and the Loans and Advance Circular No.35 dated 26th March, 2014. The applicant was also right in calling upon Nirav Modi and others to make proper application for issuance of LOUs in prescribed format. The applicant also asked for counter guarantee/indemnity in the prescribed format. The applicant also informed that the guideline requires the importer to sign and execute the agreement of hypothecation of goods in the prescribed format. Since Nirav Modi and others were avoiding the

adherence of the guidelines and regulations which gave rise to suspicion of the issuance of the earlier LOUs. The applicant therefore, ordered to conduct scrutiny and internal investigation of the issuance of LOUs to Nirav Modi and others.

93. On 27th March, 2018 the internal investigation report of the applicant was ready and was placed before the competent authority. This report revealed that Nirav Modi Group started obtaining unauthorized LOUs from 10th March, 2011 which continued upto 31st May, 2017. The report further disclosed that Nirav Modi and others perpetrated fraud the amount of the Nirav Modi Firms which crystallized (excluding interest and calculated at the rate of $1 = INR 64) at INR 6798,14,09,282.10 crore (principal amount) and INR 230,92,78,668.54 crore (interest) aggregating in all to INR 7029,06,87,950.65 which was due and payable under

the LOUs.

94.   The report further reveals that the unauthorized LOUs were issued through SWIFT system without making any entry in the Trade Finance Module of the Core Banking System. The investigator realized that this was well orchestrated fraud using the delinquent employees to aid and abet for the perpetration of fraud. The LOUs were purposely and intentionally not entered into the Core Banking System to avoid the detection of fraud.

95.   Upon detection of the fraud perpetrated by the fraudsters, the applicant promptly complied with the requirements of the RBI Master Circular Direction No.RBI/DBS/2016-17/28 for classification of accounts as fraud accounts. Accordingly, the applicant classified, declared and reported the accounts of defendant nos.1 to 5 as fraud accounts.

96. The investigation report further reveals that the amounts of the Overseas Funding Bank which was deposited by it with the applicant's NOSTRO account was illegally and wrongfully used for payment of earlier buyers' credit for the unauthorized LOUs issued in the past.

97. There is no direct evidence with the applicant to prove fraud but the correspondence exchanged between Nirav Modi, Nirav Modi Firms and others clearly demonstrates the issuance of LOUs. The communication adduced in evidence proves beyond reasonable doubts the issuance of LOUs. Nirav Modi and Nirav Modi Firms admitted the issuance of LOUs by letter dated 20th January, 2018. Then there is email dated 23rd January, 2018 of Nehal Modi to discuss and resolve the issue of LOUs. Then by email dated 5th February, 2018 Nirav Modi admitted the liability and undertook the responsibility to repay the debts of Nirav Modi Firms. The

follow-up email sent on 6th February, 2018 also shows that

Nirav Modi admitted the issuance of LOUs. Then Nirav

Modi through Firestar International Limited made request

for video conference. The video conference was held on the

same day between Nirav Modi and the applicant. In the

video conference meeting Nirav Modi once again admitted

the issuance of LOUs. The minutes of the meeting was

recorded and circulated by the applicant by email dated

12th February, 2018. The minutes of the meeting was sent to

Firestar International Limited and other concerned Banks.

Then there is email dated 15th February, 2018 by which Nirav

Modi admitted to co-operate with the applicant with regards

the LOU debt. The applicant took consistent stand that there

was no approval or sanction to the LOUs issued to Nirav

Modi, Nirav Modi Firms, etc. All these communication shows

that Nirav Modi, Nirav Modi Firms, admitted the issuance of

LOUs. Though Nirav Modi and Nirav Modi Firms claimed

that the LOUs were issued validly, no documentary evidence

in the form of sanction letter, etc. was either referred to in any

communication or sent to the applicant.

98. Under Section 58 of the Indian Evidence Act, 1872, admitted

facts need not be proved. Section 58 of the Indian Evidence

Act, 1872 is reproduced hereunder:

"(58) **Facts admitted need not be proved :** No fact need to be

proved in any proceeding which the parties thereto or their

agents agree to admit at the hearing, or which, before the

hearing, they agree to admit by any writing under their

hands, or which by any rule of pleading in force at the time

they are deemed to have admitted by their pleadings:

Provided that the Court may, in its discretion, require the

facts    admitted    to    be    proved    otherwise    than    by

such admissions."

99.   In the present the fact with regard to issuance of LOUs is admitted by Nirav Modi and Nirav Modi Firms. Therefore, as per the provisions contained in section 58 of the Indian Evidence Act, 1872 the admitted facts need not be proved. Further, the applicant is not required to lead evidence on admitted facts. In my view, statements made in the communication in the form of letter and emails by person are admissions made by him. The admission made by Nirav Modi and Nirav Modi Firms in the letters and emails amounts to corroborative evidence. Admissions are substantive evidence by themselves in view of Section 17 of the Evidence Act. Nirav Modi and Nirav Modi Firms have voluntarily made the admission of the fact with the knowledge such an admission if not retracted before being acted upon by the opponents the same operate as an estoppel

against the person making it. Admission, as is well known, is the best proof of a claim. I once again reiterate that Section 58 of the Evidence Act states that the facts admitted need not be proved.

100. It is in the discretion of the Court to require a person to prove the admitted facts otherwise than by admission of a person. Such proof of admitted facts is required only in case plea of fraud taken or there exits any other sufficient cause to call upon party to prove the admitted facts even. The applicant in the present case has pleaded, established and proved beyond reasonable doubt the intention of Nirav Modi, Nirav Modi Firms, etc. in perpetrating fraud. The applicant has pleaded and established the fraud from the statements and conduct of Nirav Modi and Nirav Modi Firms. The applicant has also successfully established how Nirav Modi and Nirav Modi Group obtained LOUs without there being any approval or

sanction. The applicant has also filed complaint against defendant nos.1 to 16 for intention to defraud and having defrauded it.

101. The issuance and reissuance of the LOUs was done at the instance of Nirav Modi and Nirav Modi Group knowingly that the applicant will be the victim of the fraud. The continued operation of the business despite the knowledge clearly demonstrates the existence of systematic fraud. The applicant has further demonstrated the fraudulent intent of Nirav Modi and Nirav Modi Group which was made with reckless indifference to its truth.

102. The fraudulent intent was further demonstrated and can now be easily inferred from the modus operandi of Nirav Modi and Nirav Modi Group.  The modus operandi is that the fraudulent transactions were made outside the Core Banking

System. A single reference number 3731/STELLAR/17, 3731/SOLAR/ 17 and 3731/FIBC/17 was repeated in all the MT 799 SWIFT messages sent to various Overseas Funding Banks confirming the issuance of numerous LOUs. Nirav Modi and others are seen to have adopted these patterns or conduct to design to deceive and victimize the Bank by exposing it to actual or potential loss. The applicant is the actual victim of the fraud and therefore, it can be inferred that it is a good evidence of the fraud perpetrated by Nirav Modi and Nirav Modi Group. The applicant has further demonstrated that Nirav Modi and Nirav Modi Firms had intent to deceive coupled with injury by way of loss.

103. I am convinced by the pleading and material placed on record that defendant nos.1 to 16 directed against victimizing the applicant bank. I am also convinced by the applicant's pleading and evidence about the falsity of the statements

made knowingly with intent to execute the scheme to defraud the applicant and obtained money through fraudulent means. Nirav Modi and Nirav Modi Group not only obtained funds under unauthorized LOUs but targeted the applicant bank in the scheme of fraud.

104. The applicant realized that prior to 20th January, 2018 defendant nos.1 to 16 had made false representation and obtained benefit from the LOUs. Defendant nos.1 to 16 knew that the representation made by them earlier was false. Defendant nos.1 to 16 are seen to have actively and knowingly involved in committing financial irregularities. They are involved in perpetrating fraud in collusion and connivance with the delinquent employees. Defendant nos.1 to 16 have cheated the applicant and thousands of depositors by siphoning of funds in a systematic manner. Defendant nos.1 to 16 could do so as they were assisted by the

delinquent employees, who were acting as the trustee of the

public money. Defendant nos.1 to 16 in collusion and

connivance with the delinquent employees laid a trap to

cheat the applicant of thousands of crore of Rupees.

Defendant nos.1 to 16 made dishonest financial transaction.

105. ***Modus operandi :***

(a) The applicant has referred to and relied upon the PMLA

Complaint being filed before the Learned City Civil &

Sessions Court, Greater Bombay.  The Complaint is filed

by the Directorate of Enforcement against Nirav Modi

and 23 others.  The applicant has relied upon the

statement made by Mr. Avneesh Nepalia, which reads

as under:

"LOU is a Letter of Undertaking issued by the applicant

importer's bank to an overseas bank or overseas branches

of Indian Banks, for obtaining Buyer's Credit for underlying import transaction/s of the importer client. The applicant scouts the overseas banks for best quotes of rate of interest for buyer's credit and accepts the most competitive offer.   Thereafter, the importer client approaches his banker in India with a request to issue Letter of Undertaking on his behalf to the overseas bank, for obtaining the buyer's credit from the funding bank overseas.  The LOU for buyer's credit can only be issued if the client has adequate credit facility (Non-Fund based) and/or given sufficient cash margin (approx. 110% of the amount of buyer's credit).  Once sanctioned against limit and/or cash margin by the authorities, the LOU is issued through SWIFT messaging system to overseas banks and branches (in format MT-799).  On receipt of the LOU from the importer's banker in India, the Overseas lending bank

will fund the Nostro account of the Indian Bank and send

a return confirmatory message by SWIFT (again MT-799 is

used).  This message contains amount of funds remitted,

date of funding, Rate of interest of the Buyer's Credit,

Period of the credit, the maturity date and the Nostro

account of the overseas bank in which funds have to be

returned on due date of maturity with interest.   Once

funds are received in the applicant Bank's NOSTRO

account with reference to buyers credit sought, the

applicant branch makes debits and pays the overseas

exporter who has drawn the bill on the importer. On

maturity of the above mentioned buyer's credit, the

applicant (Importer) needs to either provide funds in his

current account maintained at the branch or submit debit

authority utilizing his credit limits if any sanctioned with

regards to buyers credit.  From this the bank offset/repay

with interest the buyers credit on due date to the overseas

funding bank."

(b) The applicant has also relied upon the investigation

made by the Enforcement Directorate which reveals that

the staff working in the Companies referred to in

paragraph no.3.1.4 of the Complaint was the same.  The

Companies were opened by Nirav Modi only to acquire

the properties.   The details of the share holding pattern

of the Companies established by Nirav Modi is set out in

paragraph no.3.1.4 of the Complaint.

(c) The Directors of the so-called customers/vendors of the

Foreign Companies of Nirav Modi Group are infact the

employees of the Firestar Group. These dummy Directors

were drawing the salary from Firestar Group Companies

as set out in paragraph no.3.1.6 of  the Complaint.

(d) The LOUs issued in 2017 became due in January, 2018.  It is at this juncture that the scam came to the notice of the applicant since the new officials posted at the PNB Brady House Branch refused to issue new LOUs without requisite documents and sanctions.  The refusal by the new officials resulted in the default committed by the Nirav Modi Group.  The applicant also came to know that the huge economic scam was brewing since 2011.

(e) The modus operandi of issuance of LOUs through fraud was done with criminal intent of illegally enjoying the credit facility without any requisite sanction, etc.

(f) Nirav Modi has floated Overseas Companies in Hong Kong and U.A.E. which are dummy/shell Companies.  The Directors and share-holders of these Companies are either ex-employees or employees acting under

instructions of Nirav Modi.

(g) The Complaint of the Enforcement of Directorate further reveals that Nirav Modi is the Promoter, Director and dominant share-holder of Firestar Group of Companies. Nirav Modi is supported by his brothers Neeshal Modi and Nehal Modi.   Nirav Modi is also supported by his sister Ms. Purvi Deepak Modi (Mrs. Purvi Maiank Mehta) and other relatives/close aides.   Firestar Diamond International Pvt. Ltd. and Firestar International Pvt. Ltd. are flagship companies of Firestar Group of Companies of Nirav Modi.   These Companies were used in export and import of diamond Jewellery of Gitanjali and Firestar Group Companies.

(h) The Overseas Companies  and Hong Kong and Dubai deals with the Firestar Group directly or indirectly

owned by Nirav Modi who has full control over these Companies through the dummy Directors. The Enforcement Directorate in its Complaint has recorded that the list of top 8 borrowers and 8 suppliers are none else but the ex-employees of Firestar Group and acting and implementing the instructions given by Nirav Modi and Mihir Bhansali.  The list of 8 buyers and 8 suppliers are set out in paragraph no.3.2.4 of the Complaint.

(i) The investigation conducted by the Enforcement Directorate further reveals that the dummy Companies were set up in Hong Kong and Dubai alongwith the regular Firestar Group Companies acted as nodes for circular transactions to layer and launder money generated by fraudulent LOUs.  It further reveals that Nirav Modi floated these dummy Companies in Hong

Kong as set out in paragraph no.4.2.1 of the Complaint.

(j) M/s. Stellar Diamond, M/s. Solar Export and M/s. Diamonds R US have their accounts maintained with Axis Bank, Andheri Branch, and PNB, Brady House Branch, have fraudulently rotated the amount from Dubai and Hong Kong Companies as set out in paragraph no.4.13 and 4.13.1 of the Complaint.

(k) Understood thus, the well planned and orchestrated fraud was perpetrated by Nirav Modi upon the applicant.

106. The applicant has made the averments demonstrating and indicating financial irregularities, dishonest and fraudulent transaction that have taken place in the affairs of the applicant Bank. The number of diamond import Firms are associated with Nirav Modi who have orchestrated a massive

financial fraud. The fraud perpetrated by Nirav Modi is of a very huge magnitude which cannot be ignored or overlooked. I remember the judicial pronouncement in the case of **Nimmogadda Prasad v. CBI reported in (2013) 7 SCC 466** where the Hon'ble Supreme Court observed as follows:

23. Unfortunately, in the last few years, the country has been seeing an alarming rise in white-collar crimes, which has affected the fiber of the country's economic structure. Incontrovertibly, economic offences have serious repercussions on the development of the country as a whole. In **State of Gujarat v. Mohanlal Jitamalji Porwal [(1987) 2 SCC 364 : 1987 SCC (Cri) 364]** this Court, while considering a request of the prosecution for adducing additional evidence, inter alia, observed as under: (SCC p. 371, paragraph 5)

"5. ... The entire community is aggrieved if the economic

offenders who ruin the economy of the State are not brought

to book. A murder may be committed in the heat of moment

upon passions being aroused. An economic offence is

committed with cool calculation and deliberate design with

an eye on personal profit regardless of the consequence to the

community. A disregard for the interest of the community

can be manifested only at the cost of forfeiting the trust and

faith of the community in the system to administer justice in

an even-handed manner without fear of criticism from the

quarters which view white-collar crimes with a permissive

eye unmindful of the damage done to the national economy

and national interest."

The Hon'ble Supreme Court further observed that "the

economic offence having deep-rooted conspiracies and

involving huge loss of public funds needs to be viewed

seriously and considered as a grave offence affecting the

economy of the country a whole and thereby posing serious

threats to the financial health of the country".

107.   I am in respectful agreement with the observations in the

aforesaid judicial pronouncement that the concern for

economic offence, are more dangerous and having far

reaching impact on society than bodily offences. The judicial

pronouncement in the case of Nimmogadda Prasad (Supra)

squarely applies to the fact and circumstances of the present

case and in particular to Nirav Modi who is the mastermind

of fraud. Nirav Modi has perpetrated the calculated fraud

and has refused to repay the amount back to the applicant. In

the case of Nimmogadda Prasad (Supra), it is observed that

such person is an imminent threat to the financial economy of

the country.   The applicant has successfully proved the

allegations of fraud which is very serious, premeditated and

carefully planned and executed the fraud.

***Fraudulent debt is a debt:***

108.   Section 2(g) of the 1993 Act defines "debt" means any liability (inclusive of interest) which is claimed as due from any person by a bank or a financial institution or by a consortium of banks or financial institutions during the course of any business activity undertaken by the bank or the financial institution or the consortium under any law for the time being in force, in cash or otherwise, whether secured or unsecured, or assigned, or whether payable under a decree or order of any civil Court or any arbitration award or otherwise or under a mortgage and subsisting on, and legally recoverable on, the date of the application [and includes any liability towards debt securities which remains unpaid in full or part after notice of ninety days served upon the borrower by the debenture trustee or any other authority in whose

favour security interest is created for the benefit of holders of

debt securities or].

109. Undoubtedly, the debt would include fraudulent debt

obtained by the debtor in collusion and connivance with the

bank employees. The issuance of LOUs is clearly the business

activity of the applicant bank. The essence of the definition of

debt under section 2(g) is the existence of the liability which

is claimed to be due by the applicant which is legally

recoverable. The applicant has made necessary averments in

the application alleging the specific amount is due to it by

defendant nos.1 to 16. It is further pleaded by the applicant

bank that the liability of defendant nos.1 to 16 has arisen

during the course of business activity by unauthorized

issuance of LOUs. The applicant has successfully pleaded

and established that the claim made by it is still subsisting

and is legally recoverable. The amount claimed by the

applicant though fraudulent in nature is a debt within the provisions of the 1993 Act. The liability arisen out of the unauthorized LOUs issued during the course of business activity of the applicant bank constitutes "debt". This Tribunal therefore, has the jurisdiction to entertain and try the present application.

110.   In support of its case, the applicant has placed reliance upon the Judgment **_in the case of Amit H. Jhaveri and another vs Bank Of Baroda, Mumbai,_** reported in **_2011(1) Mh.L.J. 55_** relying upon the proposition of fraudulent debt. The Hon'ble Bombay High Court observed with regard to fraudulent debt as under:

"15.    However, as pointed out earlier, misappropriation or theft by a bank employee, stands on a different footing, as the employees can be subjected to disciplinary proceedings, but

the principle laid down in the above referred case, cannot be made applicable so far as the person who has taken benefits of financial assistance, may be in a fraudulent manner for the purpose of his business is concerned. He can surely said to be a debtor of the bank so far as the amount payable to the bank is concerned.

18.    As pointed out above, in the present case, the suit was transferred long back from this Court to the Tribunal. The petitioners were the direct beneficiaries of the aforesaid so-called fraudulent transaction and the money was utilized by the petitioners for their business. It is required to be noted that the petitioners have categorically admitted the aspect about taking benefits arising out of the said transaction at the time when the proceedings are pending before the Magistrate. Considering the facts and circumstances of the case, we are not in a position to accept the submission of the

learned counsel for the petitioners that the debt which arises

only out of a transaction carried out in a lawful manner and

by executing appropriate documents, that the same should be

construed as debt. In our view, when a person takes financial

benefits for the purpose of business and by utilizing the bank

money for the business, even if such benefits were taken in a

fraudulent manner, still such a person can be said to be a

debtor of the bank and even so called alleged fraudulent

transaction can also be covered under the definition of debt.

It is not mandatory that in every case, unless and until all

necessary documents are executed at the time of taking

financial help or benefits or assistance, in whatever manner

one may get, yet such a transaction cannot be treated as a

debt. In the instant case, the petitioners have utilized

considerable money of the bank for the purpose of business

and the said benefit had taken with the help of the officers of

the bank. The amount was utilized for the purpose of business of the petitioners. Considering the said aspect, the petitioners can always be said to be a debtor of the bank and the bank is a creditor so far as the amount of the bank is concerned.

21.    Considering the aforesaid judgments of the Supreme Court, in our view, it cannot be said that the petitioners are not liable to pay back the amount, which they have received may be in a fraudulent manner. It cannot be disputed that the amount in question can be said to be a genuine claim of the Bank against the present petitioners. Considering the matter from the aforesaid angle, in our view, the Appellate Tribunal has rightly taken a view that the alleged transaction in question is covered under the provisions of the DRT Act, and the proceedings were held to be maintainable before the Tribunal, which proceedings as stated earlier, were

transferred long back by transferring the suit from the Original Side of this Court to the Debts Recovery Tribunal.

23.      Considering the said aspect, we do not find any justification in the arguments of Mr. Kamdar. It is an unfortunate case that the officers of the Bank fraudulently helped the petitioner in securing the considerable loan amount which is a public money. Ultimately, on the basis of a complaint lodged with C.B.I., Mumbai, the things came to light. In our view, considering the facts and circumstances of the case and the fact that the petitioners were the ultimate beneficiaries in getting the financial assistance for their business, may be in a wrongful manner, cannot escape of repaying the amount to the respondent Bank. It is not possible for us to construe the definition of debt in a narrow manner, as suggested by Mr. Kamdar. Since the Appellate Tribunal has given cogent reasons, to which we are totally

agreeable, we see no infirmity in the order passed by the Appellate Tribunal and this is not a case in which we would like to interfere with the order passed Appellate Tribunal in our extra-ordinary jurisdiction under Article 226 of the Constitution of India, which interference is otherwise, also not called for in view of what is stated above. The writ petition is accordingly dismissed with no order as to costs. Rule discharged."

111.   The applicant has then placed reliance on the judicial pronouncement in the case of **_State Bank Of India vs Madhumita Construction (Pvt.) Ltd. and others reported in 2002 SCC Online Cal 410 = AIR 2003 Cal 7_** for the proposition of recovery of fraudulent debt and jurisdiction of Debts Recovery Tribunal.

"15.4    Thus, the question is now raised in this case is a matter, which relates to the merit depending on the facts,

which are to be gone into. Until this Court holds that this Court has jurisdiction, it cannot examine the same.

15.5 Fraudulent debt in Black's Laws Dictionary has been defined as "a debt created by fraud. Such a debt implies confidence and deception. It implies that it arose out of a contract, express or implied, and that fraudulent practices were implied by the debtor by which the creditor was defrauded. It had also defined debt as a sum of money due by certain and express agreement. A specific sum of money owing to one person from another, including not only obligation of debtor to pay but right of creditor to receive and enforce payment (State v. Ducey, 25 Ohio App 2d 266 NE 2d 233, 235). A fixed and certain obligation to pay money or some other valuable thing or things, either in the present or in the future. In a still more general sense, that which is due from one person to another, whether money, goods or

services. Also, sometimes an aggregate of separate debts, or the total sum of the existing claims against a person or company."

15.6   The definition of debt as defined in Section 2(g) means, "debt means any liability (inclusive of interest) which is alleged as due from any person by a bank or a financial institution or by a consortium of banks or financial institution during the course of any business activity undertaken by the bank or the financial institution or the consortium under any law for the time being in force, in cash or otherwise, whether secured or unsecured, or whether payable under a decree or order of any Civil Court or otherwise and subsisting on, and legally recoverable on, the date of the application". This definition has undergone a change by virtue of an amendment by Act 1 of 2000, which reads as follows :--

"2(g)  "debt" means any liability (inclusive of interest) which
is claimed as due from any person by a bank or a financial
institution or by a consortium of banks or financial
institutions during the course of any business activity
undertaken by the bank or the financial institution or the
consortium under any law for the time being in force, in cash
or otherwise, whether secured or unsecured, or assigned, or
whether payable under a decree or order of any civil Court or
any arbitration award or otherwise or under a mortgage and
subsisting on, and legally recoverable on, the date of the
application [and includes any liability towards debt securities
which remains unpaid in full or part after notice of ninety
days served upon the borrower by the debenture trustee or
any other authority in whose favour security interest is
created for the benefit of holders of debt securities or].

15.7   The change that has been brought about is highlighted

above. Having regard to the definition of debt as given above, the following ingredients are to be fulfilled in order to bring a claim within the definition of debt : (i) it is to be a liability (including interest) due from any person; (ii) claimed a bank or financial institution or consortium of bank or financial institution; (iii) during the course of any business activity undertaken by such bank or financial institution or consortium under any law for the time being in force; (iv) in cash or otherwise whether secured or unsecured or assigned or whether payable under a decree or order of any Civil Court or any arbitration award or otherwise or under a mortgage; and (v) subsisting on and legally recoverable on the date of application.

15.8   As we have seen that debt includes fraudulent debts. Whether the debt is fraudulent or not can very well be ascertained before the DRT. Even if it is alleged that the debt

is fraudulent, it does not take away the jurisdiction of the DRT. Neither it creates a jurisdiction to a Court, the jurisdiction whereof is otherwise barred by reason of Section 18. Admittedly, it is a liability as in this case of defendant No.53 to 57 towards SBI. At the same time, it is a liability of SBI towards the respondent No. 53 to 57 respectively the proceedings before DRT. Admittedly, each of these respondent No. 53 to 57 and SBI are either banks or financial institutions. The LCs were issued during the course of business activity undertaken by the SBI. Even if it is said that the LCs were issued fraudulently and SBI may not have undertaken this exercise during the course of its business, but it cannot be denied that the respondent No.53 to 57 had undertaken this exercise during the course of its business activities. Admittedly, such business activities are permissible by virtue of the respective law in force,

governing the respective business activities of the respective

banks and financial institutions. Therefore, the ground that

the LCs were fraudulent and were not issued during the

course of business activities of SBI, cannot be sustained to

oust the jurisdiction of DRT and create jurisdiction of this

Court when it had none by reason of Section 18. The dues or

liabilities is definitely payable in cash. The decree is also

asked for in terms of money either liquidated or un-

liquidated as the ease may be, the debt includes cash or

otherwise. Expression "cash" includes both liquidated and

un-liquidated cash. The expression "cash or otherwise" is of

wide amplitude. It is immaterial whether it is secured or

unsecured. The liability is legally recoverable when it is not

barred by limitation. Nowhere limitation is being pleaded.

Even if it is to be pleaded, it is to be pleaded before the DRT,

since this Court is not supposed to enter into the merits of the

case, until it comes to a finding that it has jurisdiction. A finding with regard to limitation is also a finding with regard to merits of the case, which cannot be undertaken, unless the Court has jurisdiction over the subject matter."

112. I am in respectful agreement with the law laid down by the Hon'ble Bombay High Court in the case of **_Amit H. Jhaveri_** **_(supra)_** that even for the purpose of fraudulent debt which is legally recoverable from the person having obtained money by fraudulent means is a debtor. Nirav Modi and Nirav Modi Firms, partners, Nirav Modi Companies, trust, beneficiaries have taken financial benefits for the purpose of business and by utilizing the bank money for the business. The benefits so taken in a fraudulent manner, still such a person can be said to be a debtor of the bank. Defendant nos.1 to 16 though have not signed and executed the loan and security documents have enjoyed the benefit of the amount under the LOUs are

nevertheless, debtor as per the judicial pronouncement. Defendant nos.1 to 16 cannot escape the liability to repay the debt in any manner whatsoever. Defendant nos.1 to 16 were the ultimate beneficiaries in getting the financial assistance though in fraudulent manner, cannot escape the repayment of the liability to the applicant.

113. I am also in respectful agreement with the law laid down by the Hon'ble Calcutta High Court in the case of State Bank of India (supra) that debt includes fraudulent debt and whether the debt is fraudulent or not can very well be ascertained before this Tribunal. The LOUs were issued during the course of business activity undertaken by the applicant. The LOUs may have been issued fraudulently but the applicant's business activity of issuing LOUs is permissible by virtue of the law in force.

114. The law is well settled with regards to the expression "debt" that it has to be given widest amplitude. The allegations made in the application are also required to be seen for the purpose of jurisdiction. It would be appropriate to take note of the observation made by the Hon'ble Supreme Court in the case of **_United Bank of India versus Debts Recovery Tribunal reported in (1999) 4 SCC 69 at page 75_**:

"15.   In the case in hand, there cannot be any dispute that the expression "debt" has to be given the widest amplitude to mean any liability which is alleged as due from any person by a bank during the course of any business activity undertaken by the bank either in cash or otherwise, whether secured or unsecured, whether payable under a decree or order of any court or otherwise and legally recoverable on the date of the application. In ascertaining the question whether any particular claim of any bank or financial

institution would come within the purview of the tribunal created under the Act, it is imperative that the entire averments made by the plaintiff in the plaint be looked into and then find out whether notwithstanding the specially-created tribunal having been constituted, the averments are such that it is possible to hold that the jurisdiction of such a Tribunal is ousted. With the aforesaid principle in mind, on examining the averments made in the plaint, we have no hesitation to come to the conclusion that the claim in question made by the plaintiff is essentially one for recovery of a debt due to it from the defendants and, therefore, it is the Tribunal which has the exclusive jurisdiction to decide the dispute and not the ordinary civil court. In this view of the matter the High Court was in error to hold that the dispute in question is not entertainable by the Tribunal under Section 17 of the Act. We accordingly set aside the impugned order of the

Calcutta High Court and direct that the suit in question which stood transferred to the Tribunal constituted under the Act and was registered as Transferred Application No. 163 of 1996 be disposed of by the Tribunal in accordance with law. These appeals are allowed but in the circumstances, without any order as to costs."

115. There is no dispute that the LOUs were issued by the delinquent employees from their Mid Corporate Branch, Brady House, Fort, Mumbai. There is also no dispute that the LOUs were issued by the delinquent employees in collusion and connivance with Nirav Modi and Nirav Modi Group from time to time as set out in the original application. There is also no dispute that Nirav Modi and Nirav Modi Group are the recipient of the LOUs. The transactions though fraudulent in nature is covered by the definition of "debt" as provided under section 2(g) of the 1993 Act. The amount

under the unauthorized LOUs is due and payable by defendant nos.1 to 16. Thus, the jural relationship between the debtor and creditor is established by the applicant bank.

116.   In the present law suit Nirav Modi and Nirav Modi Group have admitted the issuance of LOUs in the communication made by them. Understood thus, the LOUs were issued by the delinquent employees during the course of business activities undertaken by the applicant bank. The applicant has very specifically pleaded the fraud perpetrated by defendant nos.1 to 16 in collusion and connivance with the delinquent employees. Defendant nos.1 to 16 are the beneficiaries under the unauthorized LOUs. Defendant nos.1 to 16 are therefore, bound to repay the debt with interest to the applicant bank. Therefore, the applicant is well within its right to file the application for the legally recoverable debt. This Tribunal has the exclusive jurisdiction under Section 17

of the 1993 Act to entertain and try the present application.

The law laid down in the case of United Bank of India (supra)

squarely applies to the facts and circumstances of the

present case.

### ***Admission of Liability***:

117.   It is also pertinent to note that Nirav Modi by various

communications has unconditionally, unequivocally and

voluntarily admitted the liability as stated hereinafter.

(a)   By email dated 13th February, 2018 Nirav Modi

recorded that "I refer to the ongoing discussions

regarding the amounts claimed from Solar Exports,

Stellar Diamonds and Diamond R Us. These firms will

pay to you whatever amounts are available with them

and they are pursuing best efforts to their debtors to

pay at the earliest."

(b) On 15th February, 2018 Nirav Modi by his email recorded that the sale of the assets of Firestar International Limited will enable repaying the amounts owed by the three firms.

(c) Thereafter, by email dated 17th February, 2018 Nirav Modi specifically made reference that the inventory and other assets of Firestar International Limited and Firestar Diamond International Private Limited could have settled all the amounts due to the bank.

(d) Then there is email dated 27th February, 2018 sent by Nirav Modi suggesting and stating "Further, your good office should also be taking steps to recover the assets seized and attached by the Enforcement Directorate, so as to have your recoverable due satisfied, not just from Firestar Group but also from

these three firms."

(e)  Nirav Modi by his email dated 11th March, 2018 very specifically stated "However, I continue to work and strive toward making good my financial and commercial obligations, and I request your support in my endeavour."

(f)  The balance sheet of Nirav Modi Firms as on 31st March, 2017 records the short term borrowings viz. Loan from banks-Buyers Credit. It further records that "During the financial year, the Firm has availed buyer's credit from the overseas bank branch, for payment of overseas payable for goods".  It further records that Nirav Modi Firms has not provided or given any security or guarantee for availing buyer's credit facility. M/s. Stellar Diamond has admitted the liability in the

sum of INR 1699,36,04,075/-. M/s. Solar Exports has also admitted the liability in the sum of INR 1709,65,15,106/-. M/s. Diamond R US has admitted the liability in the sum of INR 1741,04,47,554/-.

(g) The copy of the aforesaid balance sheet of defendant nos.1 to 3 respectively was sent to the applicant which is adduced in evidence by it.

118. The communication addressed by Nirav Modi and the balance sheets amounts to unequivocal admission of the documents as well as the quantum of the liability more particularly stated in the balance sheet of defendant nos.1 to 3. It would be appropriate to take note of the observations made by the Hon'ble Supreme Court in the case of **_Uttam Singh Duggal & Co. Ltd. versus United Bank of India and others reported in (2000) 7 SCC 120 at page 127_**:

"**13.**   The next contention canvassed is that the resolutions or

minutes of the meeting of the Board of Directors, resolution

passed thereon and the letter sending the said resolution to

the respondent Bank cannot amount to a pleading or come

within the scope of the Rule as such statements are not made

in the course of the pleadings or otherwise. When a statement

is made to a party and such statement is brought before the

court showing admission of liability by an application filed

under Order 12 Rule 6 and the other side has sufficient

opportunity to explain the said admission and if such

explanation is not accepted by the court, we do not think the

trial court is helpless in refusing to pass a decree. We have

adverted to the basis of the claim and the manner in which

the trial court has dealt with the same. When the trial Judge

states that the statement made in the proceedings of the

Board of Directors' meeting and the letter sent as well as the

pleadings when read together, leads to unambiguous and clear admission with only the extent to which the admission is made in dispute, and the court had a duty to decide the same and grant a decree, we think this approach is unexceptionable."

119. It is pertinent to note that M/s. Stellar Diamond has unconditionally, unequivocally and voluntarily made admission in Note No.22 of the Balance Sheet as on 31st March, 2017 which is reproduced hereunder:

"(22) During the financial year, the Firm has availed buyer's credit from overseas banks branch, for payment of overseas payable for goods based on letter of undertaking from the local banks.  Buyer's credit are for the period of 130 days to 361 days as permissible under FEMA.  These loan carry interest rate of Libor plus 0.70 to 1.5 basis points.  The Firm

has not provided or arranged any security/guarantee for availing buyers credit facility."

It is pertinent to note that M/s. Solar Exports has unconditionally, unequivocally and voluntarily made admission in Note No.22 of the Balance Sheet as on 31st March, 2017 which is reproduced hereunder:

"(22) During the financial year, the Firm has availed buyer's credit for payment of overseas payable for goods based on letter of undertaking from the local banks. Buyer's credit are for the period of 130 days to 360 days as permissible under FEMA. These loan carry interest rate of Libor plus 0.80 to 1.4 basis points. The Firm has not provided or arranged any security/guarantee for availing buyers credit facility."

It is pertinent to note that M/s. Diamonds R US has unconditionally, unequivocally and voluntarily made

admission in Note No.25 of the Balance Sheet as on 31st March, 2017 which is reproduced hereunder:

"(25) The Firm has availed buyer's credit for payment of overseas payable for goods based on letter of comfort from the local banks.  Buyer's credit are for the period 130 days to 358 days as permissible under FEMA.   These loan carry interest rate of Libor plus 0.75 to 1.15 basis points.  The Firm has not provided or arranged any security/guarantee for availing buyers credit facility."

120. The averments made in the pleading clearly demonstrate that the admission of liability made by defendant nos.1 to 3 in their respective balance sheet and the written communications made by Nirav Modi. All the documents read together constitutes unequivocal admission. In view of the admission of liability also, the applicant is entitled for the

issuance of recovery certificate.

121. ***SWIFT & Core Banking System:***

SWIFT is the collectively messaging software used for transaction by the financial entities. A Core Banking System is the software used to support a Bank's most common transactions. In the present case, defendant nos.1 to 16 managed the delinquent employees of the applicant Bank not to enter the LOUs in the Core Banking System. The delinquent employees in collusion with the dishonest defendants who purposely and intentionally with ulterior motive and malafide intention to dupe public money did not integrate the Core Banking System with the SWIFT messaging network. It appears that the two technical systems, i.e. SWIFT and the Core Banking System did not communicate with each other resulting in the failure to detect the fraud.  Consequently, the applicant had no opportunity to

reconcile the SWIFT messaging sheet for trade finance on behalf of defendant nos.1 to 16. It was under these circumstances that the prior the fraud was triggered only upon issuance of letter dated 20th January, 2018 for rolling over the LOUs. The magnitude of fraud perpetrated by Nirav Modi reminds me of the judicial pronouncement in the case of ***Central Bureau of Investigation v. Jagjit Singh reported in (2013) 10 SCC 686***. The Hon'ble Supreme Court observed that the offence when committed by the borrowers and the Bank employees, it has the harmful effect on the public and threatens the well-being of the society. These offences fall under the category of the offence involving turpitude committed by public servant while working in that capacity. Prima facie, one may state that the Bank is the victim in such cases but, in fact, the society and the customers of the Bank are sufferer.

122.   In nutshell, the date-wise events of the fraud perpetrated by Nriav Modi is narrated herebelow:

(a)   Between 10th March, 2011 and 31st May, 2017 Nirav Modi and Nirav Modi Group managed to obtained unauthorized LOUs from the delinquent employees.

(b)   On 20th January, 2018 Nirav Modi Group approached the applicant for renewal of the LOUs.

(c)   On 22nd January, 2018 the applicant responded to Nirav Modi Group that there is no sanction granted with regard to the LOUs and without any cash margin it cannot be renewed.

(d)   On 29th January, 2018 a Complaint was filed by the applicant with CBI for the fraud perpetrated by Nirav Modi in INR 280.70 crores.

(e)   On 13th February, 2018 a Complaint was filed by the

applicant with CBI that Nirav Modi has perpetrated the

aggregate fraud in INR 6498.20 crores.

(f)   On 17th February, 2018 Ministry of Corporate Affairs

directed the Serious Fraud Investigation Office to

investigate into the affairs of Nirav Modi.

(g)   On 21st February, 2018 Ministry of Corporate Affairs

directed the Regional Director (Western Region) to file

Petition under Section 221, 241, 246 and 339 of the

Companies Act, 2013.

(h)   On 21st February, 2018 the applicant informed the

Ministry of Corporate Affairs with regard to the fraud

perpetrated by Nirav Modi.

(i)   On 23rd February, 2018 ex-parte injunction order was

passed by the National Company Law Tribunal.

(j)   On 26th February, 2018 the US debtors filed US

Proceedings.

(k)   On 04th March, 2018  a Complaint was made to the CBI.

(l)   On  04th  March,  2018  the  applicant  again  filed  a
Complaint with CBI for the fraud perpetrated by Nirav
Modi in INR 321.88 crores.

(m)   On  22nd  March,  2018  the  US  Trustee  filed  a  motion
seeking  appointment  of  an  Examiner  to  investigate
fraud with regard to the LOUs.

(n)   On 27th March, 2018 investigation report was presented
before the competent authority.

(o)    On 02nd  April,  2018  order  dated  23rd  February,  2018
passed  by  the  National  Company  Law  Tribunal  was
vacated/modified qua independent Directors.

(p)   On 09th April, 2018 National Company Law Appellate
Tribunal reserved the Company Appeal for orders.

(q)   On 20th April, 2018 US Court passed order approving appointment of John J Carney as Examiner in the US Proceedings.

(r)   On 01st May, 2018 the US debtors adjourned the auction to 03rd May, 2018.

(s)   On 14th May, 2018 a charge sheet was filed by CBI with regard to LOUs.

(t)   On 14th May, 2018 US debtors filed the reply to the applicant's sale objections.

(u)    On 15th May, 2018 US Court held a hearing to consider approval of the US debtors request to sell the A Jaffe assets to Parag Diamonds.

(v)   On 19th May, 2018 Mihir Bhansali refused to testify and instead invoked his US constitutional rights not to incriminate himself.

(w)   On 31st May, 2018 US debtors did not contest the appointment of Trustees.

(x)   On 07th June, 2018 US Court passed order directing appointment of Richard Levin, a leading US bankruptcy lawyer, as Trustee.

(y)   On 15th June, 2018 Richard Levin was appointed as Trustee.

(z)   All the aforesaid dates and events reveal the systematic fraud was perpetrated by Nirav Modi and moving the US Court for insolvency to avoid the liability. Nirav Modi and his accomplishes have taken prompt steps before the US Court to avoid the seizer and attachment of the properties purchased and acquired by Nirav Modi from the proceeds of the fraudulent debt.

123.   ***Acquisition of properties:***

The applicant has pleaded that it is very likely that defendant nos.1 to 16 may have purchased and acquired the movable and/or immovable properties worldwide from the proceeds of the fraudulent debt. These properties may have been acquired in the name(s) of other person(s) or Firms or Companies or its Subsidiaries or Entities affiliated, owned and controlled by Nirav Modi. The statements and averments also find place in the Complaint filed by the Enforcement Directorate before the City Civil & Sessions Court. In my view, the applicant is therefore, fully justified in seeking orders and reliefs in this regard also. Accordingly, I have granted the order for attachment of the properties and to recover the claim made by the applicant.

124. **_Claim against defendant no.1:_**

In particulars of claim, the applicant has shown the total outstanding in INR 2309,04,08,900.40 whereas in prayer

clause 6(A)(i) of the Original Application, the applicant has claimed the sum of INR 2309,14,08,900.40.  There is apparent inconsistency of the claim made by the applicant in the prayer clause and the particulars of claim.  Nevertheless, the applicant is entitled to recover the sum of INR 2309,04,08,900.40 as shown in the particulars of claim.

125.  ***Claim of interest:***

No indulgence can be shown to the business person like defendant nos.1 to 16 with regard to grant of interest. It was the duty of defendant nos.1 to 16 to return the money which they have unauthorisedly used and utilized for their business purpose. Nirav Modi by his e-mail has admitted the liability but at the same time, has abused the process of law by fleeing from the country. The applicant as an instrumentality of the State deals with the public money. It would be appropriate to note the observations made in the judicial pronouncement

with regard the public money in the case of **State Bank of Travancore vs. Mathew K.C. reported in (2008) 3 SCC 85**. It is observed by the Hon'ble Supreme Court that the "loans by financial institutions are granted from public money generated at the tax-payers' expenses. Such loan does not become the property of the person taking loan but retains it character of public money given in a fiduciary capacity as entrustment by the public. The timely repayment also ensures liquidity to facilitate loan to another in need by circulation of the money and cannot be permitted to be blocked by frivolous litigation by those who cannot afford the luxury of the same".

126. It is pertinent to note that on 14th May, 2018 the applicant issued demand notice calling upon defendant nos.1 to 16 to repay the debt obtained fraudulently and unauthorisedly. By the demand notice the applicant placed on record that in a

similar circumstances, interest at the rate of 14.30% per annum is charged in Clean Over Draft facilities in normal course. Nirav Modi by email dated 30th May, 2018 made and attempt to avoid or evade the liability admitted by his previous emails. However, Nirav Modi did not choose to reply in context to the repayment of the fraudulent debt due and payable with interest at the rate of 14.30% per annum. The applicant has claimed relief for interest at the rate of 14.30% per annum with monthly rest. The prayer is contrary to the pleading as regards monthly rest. In the facts and circumstances of the present case, I am inclined to grant interest at the rate of 14.30% per annum from 30th June, 2018 till payment/realization.

127. **_Reasonable restriction_**:

There has to be some deterrent to the business person like defendant nos.1 to 16 and specifically Nirav Modi. In the first

Quarter of 2017, I had come across the press release of the Judgment passed by the Hon'ble Supreme People's Court, China. I was fortified by the views of the Hon'ble Supreme Court by extending the penalty restrictions against the defaulters keeping them away from travelling by plane, high speed plane, serving as corporate executives and representatives, applying for loans, credit cards etc. To implement such deterrent, the advancement in artificial intelligence is also necessary and the need of the hour.

128. ***Publication of Order and names of defaulters***:

The applicant has prayed for the publication of the order and notification of names of the defaulters under Rule 15A of the Debts Recovery Tribunal (Procedure) Rules, 1993. The permission is granted to the applicant to notify the names of defendant nos.1 to 16 in the newspaper or otherwise at their

own cost, charges and expenses.

129.   Upon careful scrutiny and the examination of the Original Application, analyzing the evidence and giving due weightage to the documentary evidence adduced by the applicant, I am of the view that there is no reason to disbelieve the claim made by the applicant bank.

130.   In view of the observations hereinabove, the Original Application filed by the applicant deserves to be granted. Hence, I pass the following order:

## ORDER

(A)   Original Application No.119/2018 is allowed with costs.

(B)   Defendant nos.1, its partners, trustees and beneficiaries including defendant nos.6, 7, 10 to 16 are ordered and directed to pay to the

applicant either jointly and severally the aggregate sum of INR 2309,04,08,900.40 (INR two thousand three hundred nine crore four lakh eight thousand nine hundred and paise forty only) with interest @ 14.30% per annum from 30th June, 2018 till payment/realization.

(C)   Defendant no.2 its partners, trustees and beneficiaries including defendant nos.6, 7, 10 to 16 are ordered and directed to pay to the applicant either jointly and severally the aggregate sum of INR 2328,77,10,253.79 (INR two thousand three hundred twenty-eight crore seventy-seven lakh ten thousand two hundred fifty-three and paise seventy nine only) with interest @ 14.30% per annum from

30th June, 2018 till payment/realization.

(D)   Defendant no.3 its partners and beneficiaries including defendant nos.6, 8 and 9 are ordered and directed to pay to the applicant either jointly and severally the aggregate sum of INR 2391,15,68,796.46 (INR two thousand three hundred ninety-one crore fifteen lakh sixty-eight thousand seven hundred ninety-six and paise forty-six only) with interest @ 14.30% per annum from 30th June, 2018 till payment/realization.

(E)   Defendant nos.1 to 3 their partners and beneficiaries, Defendant nos.4 and 5 are ordered and directed to pay to the applicant either jointly and severally the aggregate sum

of INR 7029,06,87,950.65 (INR seven thousand

twenty-nine crore six lakh eighty-seven

thousand nine hundred fifty and paise sixty-

five only) with interest @ 14.30% per annum

from 30th June, 2018 till payment/realization.

(F) Defendant nos.1 to 16 are ordered and

directed to disclose on oath the properties and

assets, both movable and immovable,

belonging to them and their subsidiaries

affiliates, related parties, directors, partners,

officials and KMPs, group companies, situated

worldwide within one month from the date

hereof.

(G) The applicant is granted liberty to apply for

appointment of the Receiver to implement the

judgment in execution before the Recovery

Officer as per prayer clause 6(C)(ii) of the

Original Application.

(H)     Issue Recovery Certificate.

(I)     The Registrar is directed to send the copy of

Judgment and Recovery Certificate to the

applicant and defendants by email also.

(J)     The applicant is also granted liberty to publish

the names of defendant nos.1 to 16 as per rule

15(A) of the Debts Recovery Tribunal

(Procedure) Rules, 1993.

**Sd/-**
**(Deepak M Thakkar)**
**I/c Presiding Officer**
**Debts Recovery Tribunal-I, Mumbai**

# Exhibit 13

PMLA.MA.No.1056/2020                    : 1 :

## IN THE COURT OF SPECIAL JUDGE UNDER

## THE PREVENTION OF MONEY LAUNDERING ACT

## AT GREATER BOMBAY

## P.M.L.A. MISCELLANEOUS APPLICATION EXHIBIT NO.1056 OF 2020

## IN

## P.M.L.A. SPECIAL CASE NO.3 OF 2019

Ms. Purvi Modi/ Mrs Purvi Mehta
Belgian National,
Residing at 2610 Antwerp,
Eekhoornlaan 44.                              .. Applicant/Accused No.4.
            V E R S U S
Enforcement Directorate
Through the Deputy Director,
Kaiser-e-Hind Building, Ballard Estate,
Fort, Mumbai-400 001.                    .. Respondent/Complainant.

Ld. Senior Counsel Mr. Amit Desai a/w Ld. Advocate Mr. Manavendra
Mishra and Ld. Advocate Mr. Akash Karmarkar i/b. Khaitan and Co. for
the Applicant/Accused No.4.

Ld. P.P. Mr. Arvind Aghav for Respondent/Complainant.

CORAM : HIS HONOUR SPECIAL JUDGE
SHRI. V.C. BARDE
SPECIAL COURT
(Court Room No. 50)
DATE : 04th January, 2021.

## O R D E R

    This is an application filed by applicant/accused no.4-Ms. Purvi
Modi/Mrs. Purvi Mehta residing at Belgium, being accused in case filed
under Prevention of Money Laundering Act, 2002 (for short, 'P.M.L.A.')
against her by Enforcement Directorate (for short, 'E.D.'), seeking
tender of pardon under Sections 306 and 307 of the Code of Criminal
Procedure, 1973 (for short, 'Cr.P.C.).  It is contended in the application
that case has been filed under the P.M.L.A. against accused no.1-Mr.

PMLA.MA.No.1056/2020                    : 2 :

Nirav Modi, the prime accused in the Punjab National Bank (for short, 'PNB') scam and other accused persons for offences which are punishable under Section 4 of P.M.L.A. by imprisonment for a period upto seven years.  The applicant is the younger sister of accused no.1, and has been made an accused in the present case under P.M.L.A.  The applicant is not an accused in the predicate offence filed by C.B.I.  E.D. is conducting further investigation in relation to the allegations pertaining to offence of money laundering arising from PNB scam being investigated by C.B.I.  In the complaint filed before the Court, E.D. alleged that the applicant has participated in the crime of money laundering and layering of money so acquired, and was also a beneficiary of the proceedings.  It is further alleged that various entities, bank accounts, trusts that stand in the name of the applicant are used to launder the proceeds of crimes.  It is further alleged that various laundered assets both in India as well as abroad, stand in the name of the applicant.  The applicant contended that she is not one of the prime accused and has been attributed only a limited role. Throughout the course of the investigation and legal proceedings in the matter, the applicant has always fully co-operated with E.D. by providing all requisite information and documents, voluntarily disclosing information on assets, etc.  On account of the applicant being Mr. Nirav Modi's (the principal offender in the present case) sister/sibling, the applicant is in a unique position to be able to provide substantial and important evidence, information, proof, and documents and access to bank accounts/assets/companies and entities that are relevant to Nirav Modi and his actions/dealings.  Such information will significantly aid the further investigation of E.D. and will prove critical to conclusively establish the facts against Mr. Nirav Modi and other key

PMLA.MA.No.1056/2020                    : 3 :

accused persons.  The applicant's entire personal and professional life has now been brought to a standstill because of Mr. Nirav Modi's alleged criminal activities.  The applicant has also distanced herself from Nirav Modi.  The applicant undertakes to be examined as a witness in this Court and submits that she will make true and full disclosure of the whole of the circumstances and events as known to her, without concealing any evidence and will provide complete information regarding the same, which is true according to her and within her knowledge.  The applicant submits that on account of Covid-19 pandemic, there are strict restrictions on international and even domestic travel around the world and therefore, she is unable to currently travel to India.  The applicant is willing to provide her statement as a witness, over video conference or any other electronic means convenient at such time and in such manner as may be directed by the Court.  The applicant requests that her statement under Section 164 as a witness may be recorded *via* video conference in the interest of justice and expediency.  The applicant submits that she will make true and full disclosure of the whole of the circumstances and events in question without concealing any evidence and provide complete information regarding the same which is true according to her and in her knowledge. She submits that she is making the present application voluntarily without any kind of fear, presence, coercion and the said application has been made out of her free will.  The applicant undertakes that she shall not violate any conditions of pardon as laid down by this Court.  The information to be provided by the applicant is crucial and significant and will enable the Court to effectively adjudicate the present case and help the prosecution in furtherance of their case against the other accused persons.

PMLA.MA.No.1056/2020            : 4 :

2.     The respondent-E.D. appeared and filed reply submitting no objection for examining the applicant-accused as an approver subject to co-operation.     However, they objected for allowing Pavilion Point Corporation or any other entity as approver.  They further submitted not to withdraw the name of the applicant or any one as accused from the present case.   However, they have denied the averments and allegations in the application not specifically admitted.  The respondent submitted that after thorough investigation, two prosecution complaints have been filed by the Directorate on 24.05.2018 and 28.02.2019 before the Hon'ble Special PMLA Court.   In both the prosecution complaints, Ms. Purvi Modi has been arrayed as accused along with others.  During the course of investigation, summons were issued to her on 24.04.2018, 04.05.2018 and 15.05.2018.   However, she did not join the investigation.  After taking cognizance of the said prosecution complaints, the Court issued process by way of Non-Bailable Warrant to the applicant on 12.06.2018.  It is also brought to the notice of the Court that Red Corner Notice issued by Interpol is also in force in respect of the said applicant.   During the course of investigation, the Directorate provisionally attached following properties in Singapore belonging to the accused under Section 5(1) of P.M.L.A., being proceeds of crime in terms and by virtue of definition of Section 2(1) (u) of P.M.L.A.

| Sr.No. | Asset Details | Value |
|---|---|---|
| 1. | Flat No.02, 2nd floor, Diamond Head Building, Bhulabhai Desai Road, Mumbai-400 026. | INR 19,50,00,000 |
| 2. | SG06775997-01 maintained in Julius Baer Bank, Singapore, Pavilion Point Corporation | USD 6,122,017.13 (Approx INR 43 |

PMLA.MA.No.1056/2020              : 5 :

| Sr.No. | Asset Details | Value |
|--------|---------------|-------|
| | (Beneficial Owners-Mr Maiank Mehta & Mrs Purvi Modi) | Crore) |
| 3. | The Essex House 160, Central Park South, New York, NY Central Park Real Estate LLC (Beneficially owned by the Ithaca Trust Settlor: Purvi Modi | USD 4,995,000 (approx. INR 36 Crore) |
| 4. | 50, Central Park South, Unit No. 33, New York, NY Central Park South 50 Properties LLC (Beneficially owned by The Ithaca Trust) Settlor: Purvi Modi | USD 25,000,000 (Approx. INR 180 Crore) |
| 5. | 567796/EFG Bank AG, Purvi Deepak Modi | CHF 20,201,500.00 Approx INR 161, Crore) |
| 6. | 567854/EFG Bank AG, Belvedere Holdings Group Ltd Beneficial Owner: Purvi Modi | CHF 13,009,200.00 (Approx INR 104 Crore) |
| 7. | 103, Marathon House, 200, Marylebone Road, London, NW15PL, UK. Owned by Belvedere Holdings Group Ltd. Benefically owned by Purvi Modi | GBP 6,250,000 (Approx INR 60 Crore) |
| 8. | 50372040020228 maintained in Syndicate Bank, Nariman Point, India | INR 1,96,55,369.78 |

The applicant did not contest the above attachments before the Adjudicating Authority except the attachment mentioned at Serial No.2 and vide letter dated 15.01.2020, the applicant expressed her willingness to co-operate with the Directorate and on 14.10.2020, her

PMLA.MA.No.1056/2020                : 6 :

statement was recorded under Section 50 of P.M.L.A.  In her statement, she expressed her commitment to extend full co-operation to the Directorate in the investigation.  Vide the subject application, the applicant prayed before the Court for allowing her to become the approver under Section 306 and 307 of Cr.P.C.  The Directorate submits that the applicant as an approver can help E.D. to prosecute the mastermind, to identify and attach more proceeds of crime in India and abroad, to repatriate the proceeds of crime to India, to obtain more evidences against the mastermind, etc.  It is admitted that the applicant is not prime accused, but contended that as most of the proceeds of crime has gone in her account it cannot be said at this stage that she has a limited role to play.

3.       Heard the learned Advocates for applicant/accused and learned P.P. for Respondents.  Perused the record of the case.

4.       The learned Advocate for the applicant submitted that the respondent-E.D. has already recorded statement of the applicant and has no objection for granting pardon to the applicant.  He submitted that cognizance is already taken on complaint filed by the respondent against the accused person.  He submitted earlier in oral arguments that statement of the accused/applicant may be recorded under Section 164 of Cr.P.C. *via* video conferencing, as the accused is staying abroad and that tender of pardon shall be granted under Section 306 of Cr.P.C. In brief written submissions filed later on, it is submitted that Section 307 of Cr.P.C. is applicable which deals with grant of pardon to accomplice and that in view of recording of statement of applicant already under Section 50 of P.M.L.A. on oath, there is no need to record

PMLA.MA.No.1056/2020                : 7 :

statement again.  He submitted that to grant pardon to the applicant as per law to proceed further in the case.

5.     The learned Advocate for the applicant relied on following citations :

i)     In **State through Central Bureau of Investigation Vs. Arul Kumar [(2016) 11 Supreme Court Cases 733]**, it is held by Hon'ble Supreme Court that:

> *"In those cases where charge-sheet is filed before the Magistrate, he will have to commit it to the Special Judge.  In this situation, the provisions of Section 306 of the Code would be applicable and the Magistrate would be empowered to exercise the power under the said provision.  In contrast, in those cases where Special Judge takes cognizance of offence directly, as he is authorised to do so in view of Section 5(2) of P.C. Act, 1988, Section 306 of the Code would get bypassed and as the Special Judge has taken cognizance, it is Section 307 of the Code which would become applicable......In that case, this Court held that once the proceedings are committed to the Court of Session, it is that court only to which commitment is made which can grant pardon to the approver.  The view taken by us is, rather, in tune with the said judgment."*

ii)    In **Santosh Kumar Satishbhushan Bariyar Vs. State of Maharashtra, [(2009) 6 Supreme Court Cases 498]**, it is observed by Hon'ble Appex Court that:

> *"31.  Sub-Section (4) of Section 306 of the Code of Criminal Procedure mandates that such a person accepting tender of pardon must be examined as a witness in the trial.  Sub-section (5) of Section 306 of the Code of Criminal Procedure provides that where a person has accepted tender of pardon made under sub-section (1) and has been examined under sub-section (4), the Magistrate taking cognizance of the offence shall commit it for trial, without making any further inquiry in the case.*

PMLA.MA.No.1056/2020               : 8 :

> 32.    Whether the terms "on the same condition" occurring in Section 307 of the Code of Criminal Procedure refer to sub-section (4) of Section 306 thereof and as in the instant case apart from the purported statement made by Kumar Gaurav (P.W.1) under Section 164 of the Code of Criminal Procedure, which had been retracted, as no other statement had been taken from him by the learned Magistrate, the order granting pardon in his favour was illegal, is the question.
>
> 33.    In our opinion, the submission of Mr. Sushil Kumar does not merit acceptance.
>
> 34.    Sub-section (4) of Section 306 is procedural in nature. It is necessary to be followed only by a Magistrate as he would not have any jurisdiction to try the case himself.  The learned Sessions Judge before whom the case is committed for trial must be informed as to on what basis pardon had been tendered.   Section 307 does not contain any such condition.   The power of the learned Sessions Judge is independent of the provisions contained in Section 306 thereof.  The condition mentioned in Section 307 refers to the condition laid down in sub-section (1) of Section 306, namely, that the person in whose favour the pardon has been tendered, will make a full and true disclosure of the whole of the circumstances within his knowledge.   The power of a Sessions Court is not hedged with any other condition."

6.    On the other hand, the learned P.P. for respondent-E.D. submitted that in view of reply filed by the respondent, the tender of pardon as sought may be granted.  He submitted that the accused shall not be dropped from the proceeding.  The accused must make true and fair disclosure of facts within knowledge.  He submitted that the tender of pardon may be granted to the accused strictly as per provisions of law. He submitted to allow the application as per the contentions in reply.

7.    The instant application is moved by the applicant-accused under Sections 306 and 307 of Cr.P.C. praying to grant pardon and examine her as approver/prosecution witness, to which the respondent-E.D. has

PMLA.MA.No.1056/2020                : 9 :

given no objection and submitted to examine the applicant as approver. The respondent further submitted not to drop name of anyone from the list of accused. The present application is moved by the applicant-accused in her individual capacity, and as such, it is being considered in the said capacity of the applicant.

8.    Section 306 of Cr.P.C. deals with tender of pardon to accomplice. In the case of **C.B.I. Vs. Arul Kumar** (*supra*), the case was under Section 5(2) of the Prevention of Corruption Act, 1988, wherein the Hon'ble Apex Court held that Section 306 of Cr.P.C. would get bypassed in Special Cases, and the Special Judge taking cognizance of the offence has power to direct tender of pardon under Section 307 of Cr.P.C.

9.    Further, in case of **Santosh Kumar Vs. State of Maharashtra** (*supra*), the Hon'ble Apex Court held that Section 306(4), being procedural in nature, shall be followed only by a Magistrate and the Sessions Judge must be informed as to on what basis pardon was tendered, and that Section 307 does not contain any such condition.

10.    Section 307 of Cr.P.C. runs as under:

> "**Power to direct tender of pardon-** At any time after commitment of a case but before judgment is passed, the Court to which the commitment is made may, with a view to obtaining at the trial the evidence of any person supposed to have been directly or indirectly concerned in, or privy to, any such offence, tender a pardon on the same condition to such person."

Keeping in view the aforegoing provisions of law, in the instant case the tender of pardon is sought to be granted by the accused herself unconditionally, to which the prosecution-E.D. has given no objection,

PMLA.MA.No.1056/2020                : 10 :

subject to continuing the accused in the case.  Statement of the accused
is already stated to have been recorded under Section 50 of P.M.L.A.
The requirement of Section 307 is that the Court may direct tender of
pardon with a view to obtaining at trial, evidence of any person
supposed to have been directly or indirectly concerned in, or privy to
any offence.  On the same contentions, the application is made by the
accused herself, which has not been objected by prosecution-
complainant.  Therefore, there is nothing on record not to grant the
tender of pardon as sought by the accused-applicant.

11.    Insofar as the position of the accused in this case after tender of
pardon, in view of the provision of Sections 307 and 308 of Cr.P.C.  the
accused shall be marked as approver, and the proceeding shall continue
inaccordance with the provisions laid down therein.  The application of
the applicant-accused for tender of pardon is being allowed for herself
only in her individual capacity as arrayed in the complaint filed by
complainant/prosecution.  The accused is at present staying abroad,
who shall be directed to present herself before the Court, for which
purpose the prosecution shall take necessary steps to facilitate the
approach of accused to India to take part in the proceeding as soon as
may be, in the facts and circumstances prevailing currently.
Accordingly, I allow the application of the applicant-accused and pass
the following order.

<u>O r d e r</u>

Miscellaneous Application No.1056 of 2020 is allowed as under:

i)    The application of applicant no.4-Ms. Purvi Modi/Mrs. Purvi
Mehta in P.M.L.A. Case No.3 of 2019 for grant of tender of pardon
under Sections 306 and 307 of Cr.P.C. is allowed, on condition of
making full and true disclosure of the whole of the circumstances

PMLA.MA.No.1056/2020                : 11 :

within knowledge relative to offence and every other person concerned, and accused shall be marked as approver in this case.

ii)    The applicant-accused shall appear before the Court by returning to India, for which purpose the complainant-prosecution shall facilitate the approach of accused at earliest, and shall take suitable steps accordingly.

Miscellaneous Application No.1056 of 2020 stands disposed of.



Vijay Chandrashekhar Barde

Digitally signed by Vijay Chandrashekhar Barde
Date: 2021.01.04 15:49:30 +0530

Date : 04/01/2021                              (V. C. BARDE)
                                               Special Judge
                                        City Civil & Sessions Court,
                                               Gr. Bombay.

Dictated on       : 04/01/2021
Typed on          : 04/01/2021
Signed by HHJ.  : 04/01/2021

PMLA.MA.No.1056/2020 : 12 :

" CERTIFIED TO BE TRUE AND CORRECT COPY OF THE ORIGINAL
SIGNED JUDGMENT/ORDER."

04.01.2021/ 03.37 p.m.           Mrs. Pradnya S. Naik
UPLOAD DATE AND TIME           NAME OF STENOGRAPHER  (S.G.)

| Name of the Judge (with Court Room No.) | Shri. V.C. BARDE (CR.No.50) |
|---|---|
| Date of Pronouncement of JUDGEMENT/ORDER | 04.01.2021 |
| JUDGEMENT/ORDER signed by P.O. on | 04.01.2021 |
| JUDGEMENT/ORDER uploaded on | 04.01.2021 |

# Exhibit 14

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FIRESTAR DIAMOND, INC., *et al.*<br><br>        Debtors. | Chapter 11<br><br>No. 18-10509 (SHL)<br><br>(Jointly Administered) |
| RICHARD LEVIN, Chapter 11 Trustee of<br>FIRESTAR DIAMOND, INC., FANTASY, INC.,<br>and OLD AJ, INC. f/k/a A. JAFFE, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>SYNERGIES CORP., FIRESTAR GROUP, INC.,<br>FIRESTAR DIAMOND INTERNATIONAL,<br>INC., NIRAV MODI, INC., and<br>AVD TRADING, INC.<br><br>        Defendants. | Adv. Proc. No. 20-1014 (SHL) |

## STIPULATED JUDGMENT

Pursuant to the Settlement Agreement between Synergies Corporation, Firestar Group, Inc., Firestar Diamond International, Inc., Nirav Modi, Inc., and AVD Trading, Inc. (collectively, the "**U.S. Affiliates**"), and Richard Levin, not individually but solely as chapter 11 trustee ("**Trustee**") for the bankruptcy estates of Firestar Diamond, Inc., Old AJ, Inc. (f/k/a A. Jaffe, Inc.), and Fantasy Inc., IT IS HEREBY ORDERED, ADJUDGED, and DECREED:

1. The Trustee shall have judgment against each of the U.S. Affiliates on Counts 1, 2, 5, and 6 (actual fraudulent transfers) and Counts 3, 4, 7, and 8 (constructive fraudulent transfers) of the Complaint avoiding each of the transfers listed on <u>Schedule A</u>.

2. The Trustee shall have judgment against each of the U.S. Affiliates, jointly and

severally, on Counts 1, 2, 5, and 6 (actual fraudulent transfers) and Counts 3, 4, 7, and 8 (constructive fraudulent transfers) for recovery of avoided transfers under 11 U.S.C. § 550, and on Counts 9, 10, and 11 (turnover) for turnover under 11 U.S.C. § 542, in the aggregate amount of $23,116,505.44.

3.      Post-judgment interest shall run from the date of this Stipulated Judgment at the rate established by 28 U.S.C. § 1961.

4.      Nothing contained in this judgment shall constitute a finding of fact or conclusion of law as to any of the allegations made in the Complaint.


Dated: New York New York

February 18, 2020

                            SO ORDERED:


                            */s/ Sean H. Lane*
                            HON. SEAN H. LANE
                            UNITED STATES BANKRUPTCY JUDGE

APPROVED AS TO FORM AND CONTENT:

**JENNER & BLOCK LLP**

Marc Hankin
Carl Wedoff
919 Third Avenue, 37th Floor
New York, New York 10022-3908
(212) 891-1600
mhankin@jenner.com
cwedoff@jenner.com

Angela Allen (admitted *pro hac vice*)
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
aallen@jenner.com

*Counsel for the Chapter 11 Trustee*

**REED SMITH LLP**

Michael P. Cooley
2501 N. Harwood Street, Suite 1700
Dallas, Texas 75201
(469) 680-4200
MPCooley@reedsmith.com

*Counsel for the U.S. Affiliates*

**Schedule A**

**Cash Transfers from Firestar Diamond, Inc. to U.S. Non-Debtors - February 26, 2012 - February 26, 2018 (Petition Date)**

| Transaction Date | Debtor Transferor | U.S. Non-Debtor Transferee | Transfer Amount |
|---|---|---|---|
| 2/27/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 222,975.00 |
| 3/16/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 30,490.26 |
| 3/20/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 22,971.00 |
| 3/30/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 42,704.86 |
| 4/2/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 4/4/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 300,000.00 |
| 4/11/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 10,000.00 |
| 5/2/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,000,000.00 |
| 5/4/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 5,584.50 |
| 5/16/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 3,300.00 |
| 6/8/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 800,000.00 |
| 6/18/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 6/22/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 210,000.00 |
| 6/25/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 6/28/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 375,000.00 |
| 6/28/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 250,000.00 |
| 7/18/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 325,000.00 |
| 7/19/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 350,000.00 |
| 8/7/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 550,000.00 |
| 8/8/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 700,000.00 |
| 8/20/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 742,000.00 |
| 8/20/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 3,000.00 |
| 8/20/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 2,000.00 |
| 8/30/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,501,000.00 |
| 10/18/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 500,000.00 |
| 11/30/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 12/6/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 40,000.00 |
| 12/6/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 717,000.00 |
| 12/10/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 280,000.00 |
| 12/12/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 500,000.00 |
| 12/13/2012 | Firestar Diamond, Inc. | Synergies Corporation | $ 391,611.00 |
| 12/17/2012 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 1/7/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 1/8/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 500,000.00 |
| 1/9/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,000,000.00 |
| 1/11/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 1/17/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 2/4/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 584,000.00 |
| 2/5/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 643,000.00 |
| 2/19/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 627,000.00 |
| 3/19/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 315,000.00 |
| 3/28/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 760,000.00 |
| 3/28/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 750,000.00 |
| 4/2/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 350,000.00 |
| 4/8/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,050,000.00 |
| 4/25/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 350,000.00 |
| 4/29/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 400,000.00 |

| Transaction Date | Debtor Transferor | U.S. Non-Debtor Transferee | Transfer Amount |
|---|---|---|---|
| 5/6/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 652,239.00 |
| 5/8/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,300,000.00 |
| 5/17/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 6/11/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 225,000.00 |
| 6/11/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 6/18/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,525,000.00 |
| 6/19/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 20,000.00 |
| 6/24/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 6/24/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 10,000.00 |
| 6/28/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 10,000.00 |
| 6/28/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 10,000.00 |
| 7/9/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 600,000.00 |
| 7/9/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 25,000.00 |
| 7/11/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 7/19/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 325,000.00 |
| 7/22/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 745,000.00 |
| 7/23/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 460,000.00 |
| 7/23/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 7/29/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 525,000.00 |
| 7/31/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 8/14/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 9/10/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,608,000.00 |
| 9/16/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 10/2/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 10/9/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 10/15/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 300,000.00 |
| 10/23/2013 | Firestar Diamond, Inc. | Synergies Corporation | $ 123,774.00 |
| 10/24/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 10/28/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 400,000.00 |
| 11/4/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 11/12/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 11/12/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 11/14/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 25,000.00 |
| 12/18/2013 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 1/8/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 500,000.00 |
| 1/10/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 125,000.00 |
| 1/10/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 1/13/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 900,000.00 |
| 1/16/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 1/17/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 400,000.00 |
| 2/5/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,000,000.00 |
| 2/11/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 375,000.00 |
| 3/13/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 102,000.00 |
| 3/18/2014 | Firestar Diamond, Inc. | Synergies Corporation | $ 123,097.00 |
| 3/20/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 250,000.00 |
| 4/9/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 400,000.00 |
| 5/2/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 450,000.00 |
| 5/2/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 75,000.00 |
| 6/10/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 250,000.00 |
| 6/13/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |

| Transaction Date | Debtor Transferor | U.S. Non-Debtor Transferee | Transfer Amount |
|---|---|---|---|
| 6/13/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 75,000.00 |
| 6/16/2014 | Firestar Diamond, Inc. | Synergies Corporation | $ 10,000.00 |
| 6/19/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 6/27/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 25,000.00 |
| 7/7/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 561,000.00 |
| 7/9/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 175,000.00 |
| 7/9/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 20,000.00 |
| 8/6/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 8/11/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 80,000.00 |
| 8/14/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 8/14/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 5,000.00 |
| 8/27/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 90,000.00 |
| 10/15/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 10/22/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 10/27/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 12/5/2014 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 12/12/2014 | Firestar Diamond, Inc. | Synergies Corporation | $ 25,000.00 |
| 12/23/2014 | Firestar Diamond, Inc. | Synergies Corporation | $ 25,000.00 |
| 1/23/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 500,000.00 |
| 2/2/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,000,000.00 |
| 2/5/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 2/20/2015 | Firestar Diamond, Inc. | Synergies Corporation | $ 186,871.00 |
| 3/19/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 270,000.00 |
| 3/27/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 14,496.00 |
| 4/8/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 259,980.00 |
| 4/20/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 4/28/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 5/6/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 400,000.00 |
| 5/8/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 2,454,000.00 |
| 5/8/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 60,000.00 |
| 6/3/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 200,000.00 |
| 6/8/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,200,000.00 |
| 6/15/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 9,980.00 |
| 7/2/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 175,000.00 |
| 7/23/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 224,980.00 |
| 7/29/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,947,000.00 |
| 7/30/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 9,980.00 |
| 8/11/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 20,000.00 |
| 8/12/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 8/14/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 24,980.00 |
| 8/17/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 75,000.00 |
| 8/20/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 8/24/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 110,000.00 |
| 8/25/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 8/25/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 8/27/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 99,980.00 |
| 8/31/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 199,980.00 |
| 9/3/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 300,000.00 |
| 9/3/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 99,980.00 |
| 9/4/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 99,980.00 |

| Transaction Date | Debtor Transferor | U.S. Non-Debtor Transferee | Transfer Amount |
|---|---|---|---|
| 9/16/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 350,000.00 |
| 9/16/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 124,980.00 |
| 9/21/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 54,980.00 |
| 10/9/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 175,000.00 |
| 10/16/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 1,249,980.00 |
| 10/20/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 25,000.00 |
| 10/21/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 30,000.00 |
| 10/26/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 149,980.00 |
| 10/27/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 319,980.00 |
| 11/10/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 225,000.00 |
| 11/10/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 99,980.00 |
| 11/16/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 49,980.00 |
| 11/24/2015 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 280,000.00 |
| 12/16/2015 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 99,980.00 |
| 1/4/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 250,000.00 |
| 1/4/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 1/6/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 1/11/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 99,980.00 |
| 1/29/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 2/2/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,000,000.00 |
| 2/4/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 149,980.00 |
| 2/8/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 49,980.00 |
| 2/17/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 99,980.00 |
| 2/19/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 149,980.00 |
| 2/22/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 500,000.00 |
| 3/4/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 300,000.00 |
| 3/9/2016 | Firestar Diamond, Inc. | Synergies Corporation | $ 247,551.00 |
| 3/11/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 75,000.00 |
| 3/23/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 8,800.00 |
| 4/13/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 700,000.00 |
| 5/2/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 1,200,000.00 |
| 5/2/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 499,980.00 |
| 5/4/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 200,000.00 |
| 5/11/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 300,000.00 |
| 6/30/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 6,948.00 |
| 7/11/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 300,000.00 |
| 7/22/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 7/27/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 7/28/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 8/4/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 3,000,000.00 |
| 8/25/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 399,980.00 |
| 8/25/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 249,980.00 |
| 9/15/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 534,980.00 |
| 9/16/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 38,419.11 |
| 9/16/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 535,000.00 |
| 9/27/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 300,000.00 |
| 9/27/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 33,000.00 |
| 11/7/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 100,000.00 |
| 11/8/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 2,573.74 |
| 11/29/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 205.30 |

Firestar Diamond, Inc. et al Debtors

| Transaction Date | Debtor Transferor | U.S. Non-Debtor Transferee | Transfer Amount |
|---|---|---|---|
| 12/1/2016 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 3,245.00 |
| 12/6/2016 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 12/14/2016 | Firestar Diamond, Inc. | Firestar Group, Inc. | $ 30,000.00 |
| 2/1/2017 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 5,449.35 |
| 2/15/2017 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 3/10/2017 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 300,000.00 |
| 3/20/2017 | Firestar Diamond, Inc. | Synergies Corporation | $ 246,871.00 |
| 3/21/2017 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 250,000.00 |
| 4/13/2017 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 300,000.00 |
| 5/1/2017 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 5/1/2017 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 5/26/2017 | Firestar Diamond, Inc. | Firestar Group, Inc. | $ 75,000.00 |
| 6/12/2017 | Firestar Diamond, Inc. | Firestar Group, Inc. | $ 8,000.00 |
| 7/11/2017 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 500,000.00 |
| 8/8/2017 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 1,500.00 |
| 9/12/2017 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 9,750.00 |
| 9/18/2017 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 100,000.00 |
| 10/5/2017 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 500,000.00 |
| 10/17/2017 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 250,000.00 |
| 10/17/2017 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 3,266.25 |
| 10/25/2017 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 122,000.00 |
| 11/15/2017 | Firestar Diamond, Inc. | Firestar Jewelry, Inc. | $ 1,471.17 |
| 11/22/2017 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 11/22/2017 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 75,000.00 |
| 1/3/2018 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 2,200,000.00 |
| 1/11/2018 | Firestar Diamond, Inc. | Firestar Diamond International, Inc. | $ 418,943.12 |

| Total Direct Transfers from Firestar Diamond, Inc. to U.S. Non-Debtors (2/26/2012-2/26/2018) | $ 67,643,586.66 |
|---|---|

**Cash Transfers from Firestar Diamond, Inc. to 3rd Parties on Behalf of U.S. Non-Debtors - February 26, 2012 - February 26, 2018 (Petition Date)**

| Transaction Date | Debtor Transferor | 3rd Party Transferee | U.S. Non-Debtor Transferee | Transfer Amount |
|---|---|---|---|---|
| 3/1/2012 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 3/19/2012 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,598.62 |
| 4/2/2012 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 4/18/2012 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,598.62 |
| 5/1/2012 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 6/1/2012 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 6/28/2012 | Firestar Diamond, Inc. | NYC Department Of Finance | Firestar Group, Inc. | $ 13,314.91 |
| 6/29/2012 | Firestar Diamond, Inc. | Kashikey Company Ltd. | Firestar Diamond International, Inc. | $ 28,464.00 |
| 7/2/2012 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 8/1/2012 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 9/4/2012 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 9/5/2012 | Firestar Diamond, Inc. | Tow Studios Architect PLLC | Firestar Group, Inc. | $ 65.32 |
| 10/1/2012 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 11/1/2012 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 11/9/2012 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,668.63 |
| 11/23/2012 | Firestar Diamond, Inc. | Vichihel Restoration Inc. | Firestar Group, Inc. | $ 27,000.00 |
| 11/27/2012 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,668.63 |
| 12/3/2012 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 12/31/2012 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,668.63 |
| 1/2/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 1/31/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,668.63 |
| 2/1/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 3/1/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 3/29/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,668.63 |
| 4/1/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 4/25/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,668.63 |
| 5/8/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 5/9/2013 | Firestar Diamond, Inc. | Vichihel Do Not Use See 51014 | Firestar Group, Inc. | $ 8,601.13 |
| 5/30/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,749.40 |
| 6/3/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 6/11/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,668.63 |
| 6/25/2013 | Firestar Diamond, Inc. | NYC Department Of Finance | Firestar Group, Inc. | $ 3,593.04 |
| 6/26/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,668.63 |
| 7/1/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 7/30/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,675.17 |
| 8/1/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 8/22/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,668.63 |
| 9/3/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 9/10/2013 | Firestar Diamond, Inc. | NYC Department Of Finance | Firestar Group, Inc. | $ 13,453.38 |
| 9/27/2013 | Firestar Diamond, Inc. | Firestar Diamond Int'L P Ltd | Firestar Diamond International, Inc. | $ 14,740.00 |
| 10/1/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 10/2/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 12,698.87 |
| 10/22/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,982.54 |
| 11/1/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 11/22/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,982.54 |
| 12/2/2013 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 12/20/2013 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,982.54 |
| 1/2/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 1/31/2014 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,996.72 |
| 2/3/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 2/21/2014 | Firestar Diamond, Inc. | CSC | Firestar Group, Inc. | $ 402.00 |
| 2/24/2014 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,982.54 |
| 3/4/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 4/1/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 4/2/2014 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,622.08 |
| 5/1/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 5/5/2014 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,622.08 |
| 5/27/2014 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,622.08 |
| 6/2/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 6/23/2014 | Firestar Diamond, Inc. | Madison Avenue Venture LLC | Firestar Jewelry, Inc. | $ 121,856.25 |
| 7/1/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 7/3/2014 | Firestar Diamond, Inc. | NYC Department Of Finance | Firestar Group, Inc. | $ 4,585.52 |
| 7/7/2014 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 9,593.02 |
| 8/1/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 8/4/2014 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,622.08 |
| 8/25/2014 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,622.08 |

| Transaction Date | Debtor Transferor | 3rd Party Transferee | U.S. Non-Debtor Transferee | Transfer Amount |
|---|---|---|---|---|
| 9/2/2014 | Firestar Diamond, Inc. | NYC Department Of Finance | Firestar Group, Inc. | $ 13,799.77 |
| 9/2/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 10/1/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 11/3/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 12/2/2014 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 12/2/2014 | Firestar Diamond, Inc. | Hayon Studio | Firestar Jewelry, Inc. | $ 50,152.25 |
| 1/2/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 1/5/2015 | Firestar Diamond, Inc. | Hayon Studio | Firestar Jewelry, Inc. | $ 48,215.62 |
| 1/9/2015 | Firestar Diamond, Inc. | Shawmut Design And Construction | Firestar Jewelry, Inc. | $ 7,239.00 |
| 1/16/2015 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,626.66 |
| 1/16/2015 | Firestar Diamond, Inc. | Kugler Ning Lighting Design | Firestar Jewelry, Inc. | $ 5,582.69 |
| 1/21/2015 | Firestar Diamond, Inc. | Mutual Security Services | Firestar Jewelry, Inc. | $ 30,000.00 |
| 1/21/2015 | Firestar Diamond, Inc. | Search With Imagination LLC | Firestar Jewelry, Inc. | $ 14,300.00 |
| 1/21/2015 | Firestar Diamond, Inc. | Winter Management Corp | Firestar Jewelry, Inc. | $ 525.00 |
| 1/26/2015 | Firestar Diamond, Inc. | Belkin Burden Wenig & Goldman | Firestar Jewelry, Inc. | $ 212.50 |
| 1/28/2015 | Firestar Diamond, Inc. | Patterson, Flynn & Martin | Firestar Jewelry, Inc. | $ 2,381.78 |
| 2/2/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 2/18/2015 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,622.08 |
| 2/24/2015 | Firestar Diamond, Inc. | Hamida Belkadi | Firestar Jewelry, Inc. | $ 259.04 |
| 3/2/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 3/5/2015 | Firestar Diamond, Inc. | Wasserman & Wexler LLC D/B/A | Firestar Jewelry, Inc. | $ 108.99 |
| 3/9/2015 | Firestar Diamond, Inc. | Klestadt Winters Jureller | Firestar Jewelry, Inc. | $ 124.00 |
| 3/17/2015 | Firestar Diamond, Inc. | New York City Department Of Buildings | Firestar Jewelry, Inc. | $ 8,344.90 |
| 3/17/2015 | Firestar Diamond, Inc. | New York City Department Of Buildings | Firestar Jewelry, Inc. | $ 165.00 |
| 3/17/2015 | Firestar Diamond, Inc. | New York City Department Of Buildings | Firestar Jewelry, Inc. | $ 160.00 |
| 3/17/2015 | Firestar Diamond, Inc. | Spectra Fabrications Inc. | Firestar Jewelry, Inc. | $ 3,346.27 |
| 3/17/2015 | Firestar Diamond, Inc. | Tuvia Usa, Inc. | Firestar Jewelry, Inc. | $ 683.91 |
| 3/26/2015 | Firestar Diamond, Inc. | Vista Visual Group | Firestar Jewelry, Inc. | $ 1,492.95 |
| 4/1/2015 | Firestar Diamond, Inc. | S. Juwal And Co | Firestar Diamond International, Inc. | $ 595,340.00 |
| 4/1/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 4/6/2015 | Firestar Diamond, Inc. | De Gournay Inc. | Firestar Jewelry, Inc. | $ 3,322.89 |
| 4/6/2015 | Firestar Diamond, Inc. | Outsource Consultants | Firestar Jewelry, Inc. | $ 269.32 |
| 4/7/2015 | Firestar Diamond, Inc. | Shawmut Design And Construction | Firestar Jewelry, Inc. | $ 51,450.00 |
| 4/8/2015 | Firestar Diamond, Inc. | M & C Saatchi Pr LLP | Firestar Jewelry, Inc. | $ 27,500.00 |
| 4/13/2015 | Firestar Diamond, Inc. | Alignment Development Services | Firestar Jewelry, Inc. | $ 388.10 |
| 4/13/2015 | Firestar Diamond, Inc. | Tuvia Usa, Inc. | Firestar Jewelry, Inc. | $ 525.00 |
| 4/13/2015 | Firestar Diamond, Inc. | Winter Management Corp | Firestar Jewelry, Inc. | $ 121,926.25 |
| 4/22/2015 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,640.88 |
| 4/27/2015 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,640.88 |
| 5/1/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 5/13/2015 | Firestar Diamond, Inc. | New York City Department Of Buildings | Firestar Jewelry, Inc. | $ 2,975.00 |
| 5/18/2015 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Jewelry, Inc. | $ 7,640.88 |
| 6/1/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 6/19/2015 | Firestar Diamond, Inc. | NYC Department Of Finance | Firestar Group, Inc. | $ 18,495.62 |
| 6/19/2015 | Firestar Diamond, Inc. | Franchise Tax Board | Firestar Diamond International, Inc. | $ 814.00 |
| 6/22/2015 | Firestar Diamond, Inc. | Higgins Quasebarth & Partners | Firestar Jewelry, Inc. | $ 3,212.00 |
| 6/22/2015 | Firestar Diamond, Inc. | Hayon Studio | Firestar Jewelry, Inc. | $ 29,863.25 |
| 6/24/2015 | Firestar Diamond, Inc. | World Wide Safe | Firestar Jewelry, Inc. | $ 19,000.00 |
| 6/26/2015 | Firestar Diamond, Inc. | NYFC | Firestar Jewelry, Inc. | $ 25,000.00 |
| 6/26/2015 | Firestar Diamond, Inc. | ECI Communications | Firestar Jewelry, Inc. | $ 10,050.80 |
| 7/1/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 7/10/2015 | Firestar Diamond, Inc. | Expert Printing Inc. | Firestar Jewelry, Inc. | $ 54.44 |
| 7/20/2015 | Firestar Diamond, Inc. | Klestadt Winters Jureller | Firestar Group, Inc. | $ 109.00 |
| 8/3/2015 | Firestar Diamond, Inc. | Klestadt Winters Jureller | Firestar Group, Inc. | $ 163.00 |
| 8/3/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 8/10/2015 | Firestar Diamond, Inc. | Outsource Consultants | Firestar Jewelry, Inc. | $ 1,096.00 |
| 8/10/2015 | Firestar Diamond, Inc. | ECI Communications | Firestar Jewelry, Inc. | $ 4,578.00 |
| 8/11/2015 | Firestar Diamond, Inc. | Winter Management Corp | Firestar Jewelry, Inc. | $ 122,201.25 |
| 8/17/2015 | Firestar Diamond, Inc. | Lax Express Travel | Firestar Jewelry, Inc. | $ 834.10 |
| 8/17/2015 | Firestar Diamond, Inc. | T-Mobile | Firestar Jewelry, Inc. | $ 581.23 |
| 8/24/2015 | Firestar Diamond, Inc. | Brevalex | Firestar Jewelry, Inc. | $ 3,310.00 |
| 9/1/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 9/11/2015 | Firestar Diamond, Inc. | Preveyor | Firestar Jewelry, Inc. | $ 10,000.00 |
| 9/21/2015 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,640.88 |
| 9/25/2015 | Firestar Diamond, Inc. | Dr. Christian Hannke | Firestar Jewelry, Inc. | $ 722.00 |
| 9/25/2015 | Firestar Diamond, Inc. | Deqi Intellectual Property Law Review | Firestar Jewelry, Inc. | $ 600.00 |
| 9/25/2015 | Firestar Diamond, Inc. | Krishna And Saurastri Associates | Firestar Jewelry, Inc. | $ 380.00 |
| 9/25/2015 | Firestar Diamond, Inc. | Arnold Siedsma | Firestar Jewelry, Inc. | $ 1,388.00 |

| Transaction Date | Debtor Transferor | 3rd Party Transferee | U.S. Non-Debtor Transferee | Transfer Amount |
|---|---|---|---|---|
| 9/25/2015 | Firestar Diamond, Inc. | Brevalex | Firestar Jewelry, Inc. | $ 170.00 |
| 9/29/2015 | Firestar Diamond, Inc. | Search With Imagination LLC | Firestar Jewelry, Inc. | $ 16,500.00 |
| 9/29/2015 | Firestar Diamond, Inc. | Curtco Robb Media | Firestar Jewelry, Inc. | $ 26,000.00 |
| 10/5/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 11/3/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 11/30/2015 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,736.69 |
| 12/4/2015 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 12/10/2015 | Firestar Diamond, Inc. | Vichihel Restoration Inc. | Firestar Group, Inc. | $ 22,646.00 |
| 12/24/2015 | Firestar Diamond, Inc. | NYC Department Of Finance | Firestar Jewelry, Inc. | $ 14,265.36 |
| 12/28/2015 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,640.88 |
| 12/29/2015 | Firestar Diamond, Inc. | NYC Department Of Finance | Firestar Jewelry, Inc. | $ 40.41 |
| 12/30/2015 | Firestar Diamond, Inc. | CSC | Firestar Group, Inc. | $ 427.00 |
| 1/4/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 1/4/2016 | Firestar Diamond, Inc. | Travel Wings | Firestar Jewelry, Inc. | $ 1,665.00 |
| 1/4/2016 | Firestar Diamond, Inc. | Dr. Christian Hannke | Firestar Jewelry, Inc. | $ 320.00 |
| 1/4/2016 | Firestar Diamond, Inc. | Krishna And Saurastri Associates | Firestar Jewelry, Inc. | $ 304.00 |
| 1/4/2016 | Firestar Diamond, Inc. | Patrafee | Firestar Jewelry, Inc. | $ 474.00 |
| 1/4/2016 | Firestar Diamond, Inc. | Deqi Intellectual Property Law Review | Firestar Jewelry, Inc. | $ 269.00 |
| 1/19/2016 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,640.88 |
| 2/2/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 3/2/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 4/4/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 5/3/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 6/2/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 6/14/2016 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 1,482.51 |
| 7/5/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 8/1/2016 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,930.46 |
| 8/2/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 8/15/2016 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,841.29 |
| 9/2/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 9/23/2016 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,841.29 |
| 9/29/2016 | Firestar Diamond, Inc. | Firestar Diamond Int'L P Ltd | Firestar Jewelry, Inc. | $ 98,658.00 |
| 10/4/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 10/13/2016 | Firestar Diamond, Inc. | Vichihel Restoration Inc. | Firestar Group, Inc. | $ 4,463.88 |
| 10/13/2016 | Firestar Diamond, Inc. | I & C Creation Jewelry LLC | Firestar Group, Inc. | $ 2,736.00 |
| 10/21/2016 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,841.29 |
| 11/2/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 11/15/2016 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,841.29 |
| 11/22/2016 | Firestar Diamond, Inc. | NY Times | Firestar Jewelry, Inc. | $ 130,000.00 |
| 11/22/2016 | Firestar Diamond, Inc. | Dow Jones | Firestar Jewelry, Inc. | $ 44,440.47 |
| 11/22/2016 | Firestar Diamond, Inc. | Oxford Health Plans | Firestar Jewelry, Inc. | $ 963.60 |
| 11/23/2016 | Firestar Diamond, Inc. | Yasmeine Domond | Firestar Jewelry, Inc. | $ 1,464.00 |
| 11/23/2016 | Firestar Diamond, Inc. | MR Valuation | Firestar Jewelry, Inc. | $ 3,000.00 |
| 11/23/2016 | Firestar Diamond, Inc. | Wolverine Lessee LLC | Firestar Jewelry, Inc. | $ 7,978.80 |
| 11/28/2016 | Firestar Diamond, Inc. | BJM Security, Inc. | Firestar Jewelry, Inc. | $ 15,010.45 |
| 11/29/2016 | Firestar Diamond, Inc. | Kerwin Communications | Firestar Jewelry, Inc. | $ 13,267.85 |
| 11/29/2016 | Firestar Diamond, Inc. | Liverpool Carting Co., Inc | Firestar Jewelry, Inc. | $ 299.41 |
| 11/29/2016 | Firestar Diamond, Inc. | Eric Buterbaugh Design | Firestar Jewelry, Inc. | $ 5,160.00 |
| 12/1/2016 | Firestar Diamond, Inc. | Jorge Pruna | Firestar Jewelry, Inc. | $ 432.00 |
| 12/2/2016 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 12/5/2016 | Firestar Diamond, Inc. | Louisa Barranca | Firestar Jewelry, Inc. | $ 241.73 |
| 12/6/2016 | Firestar Diamond, Inc. | Liverpool Carting Co., Inc | Firestar Jewelry, Inc. | $ 299.41 |
| 12/7/2016 | Firestar Diamond, Inc. | CSC | Firestar Group, Inc. | $ 328.44 |
| 12/7/2016 | Firestar Diamond, Inc. | CSC | Firestar Jewelry, Inc. | $ 328.44 |
| 12/7/2016 | Firestar Diamond, Inc. | Curtco Robb Media | Firestar Jewelry, Inc. | $ 13,633.00 |
| 12/7/2016 | Firestar Diamond, Inc. | Rosa Rosa | Firestar Jewelry, Inc. | $ 1,088.25 |
| 12/8/2016 | Firestar Diamond, Inc. | Liazon | Firestar Jewelry, Inc. | $ 597.09 |
| 12/12/2016 | Firestar Diamond, Inc. | BJM Security, Inc. | Firestar Jewelry, Inc. | $ 16,329.22 |
| 12/14/2016 | Firestar Diamond, Inc. | Winter Management Corp | Firestar Jewelry, Inc. | $ 125,715.72 |
| 12/28/2016 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,841.29 |
| 12/28/2016 | Firestar Diamond, Inc. | Klestadt Winters Jureller | Firestar Group, Inc. | $ 7,362.50 |
| 1/4/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 2/2/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 2/14/2017 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 6,854.56 |
| 2/21/2017 | Firestar Diamond, Inc. | CSC | Firestar Group, Inc. | $ 441.00 |
| 2/22/2017 | Firestar Diamond, Inc. | Klestadt Winters Jureller | Firestar Group, Inc. | $ 4,078.21 |
| 3/2/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 3/14/2017 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,000.82 |

| Transaction Date | Debtor Transferor | 3rd Party Transferee | U.S. Non-Debtor Transferee | Transfer Amount |
|---|---|---|---|---|
| 3/23/2017 | Firestar Diamond, Inc. | Marks Paneth | Firestar Group, Inc. | $ 75,000.00 |
| 3/29/2017 | Firestar Diamond, Inc. | Robinson & Cole LLP | Firestar Group, Inc. | $ 2,064.00 |
| 3/29/2017 | Firestar Diamond, Inc. | TSG Global Management Inc | Firestar Jewelry, Inc. | $ 2,041.41 |
| 3/30/2017 | Firestar Diamond, Inc. | Lackenbach Siegel, LLP | Firestar Jewelry, Inc. | $ 16,654.00 |
| 3/31/2017 | Firestar Diamond, Inc. | HI Group Partners, LLC | Firestar Jewelry, Inc. | $ 941.49 |
| 4/4/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 5/2/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 5/9/2017 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,861.53 |
| 5/17/2017 | Firestar Diamond, Inc. | NYC Department Of Finance | Firestar Group, Inc. | $ 1,109.02 |
| 6/2/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 6/20/2017 | Firestar Diamond, Inc. | NYC Department Of Finance | Firestar Group, Inc. | $ 2,259.00 |
| 6/26/2017 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,861.53 |
| 7/5/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 8/2/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 8/18/2017 | Firestar Diamond, Inc. | Chase | Firestar Jewelry, Inc. | $ 11,176.75 |
| 8/25/2017 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,861.53 |
| 9/5/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 9/5/2017 | Firestar Diamond, Inc. | Nancy N. Lopes | Firestar Jewelry, Inc. | $ 3,675.00 |
| 9/15/2017 | Firestar Diamond, Inc. | Nancy N. Lopes | Firestar Jewelry, Inc. | $ 4,200.00 |
| 9/26/2017 | Firestar Diamond, Inc. | Lance Oaten | Firestar Jewelry, Inc. | $ 4,000.00 |
| 10/2/2017 | Firestar Diamond, Inc. | United States Treasury | Firestar Group, Inc. | $ 32,592.00 |
| 10/3/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 10/10/2017 | Firestar Diamond, Inc. | R.N. Enterprises | Firestar Jewelry, Inc. | $ 140,000.00 |
| 10/24/2017 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 7,861.53 |
| 11/2/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 11/3/2017 | Firestar Diamond, Inc. | Elliot Greenoeaf. PC | Firestar Group, Inc. | $ 7,500.00 |
| 11/9/2017 | Firestar Diamond, Inc. | GGP Ala Moana LLC | Firestar Jewelry, Inc. | $ 60,381.39 |
| 11/13/2017 | Firestar Diamond, Inc. | JW Marriott Essex House N.Y. | Firestar Group, Inc. | $ 8,054.55 |
| 11/20/2017 | Firestar Diamond, Inc. | Foodland | Firestar Jewelry, Inc. | $ 540.98 |
| 11/20/2017 | Firestar Diamond, Inc. | Winter Management Corp | Firestar Jewelry, Inc. | $ 129,684.11 |
| 12/4/2017 | Firestar Diamond, Inc. | HSBC Mortgage Corporation | Firestar Group, Inc. | $ 10,622.18 |
| 12/5/2017 | Firestar Diamond, Inc. | Bureau Of Conveyances | Firestar Jewelry, Inc. | $ 31,934.30 |
| 12/5/2017 | Firestar Diamond, Inc. | PHH Mortgage Services | Firestar Group, Inc. | $ 3,000,642.00 |
| 12/8/2017 | Firestar Diamond, Inc. | Nancy N. Lopes | Firestar Jewelry, Inc. | $ 4,200.00 |
| 12/12/2017 | Firestar Diamond, Inc. | NYC Department Of Finance | Firestar Group, Inc. | $ 5,788.51 |
| 12/12/2017 | Firestar Diamond, Inc. | Winter Management Corp | Firestar Jewelry, Inc. | $ 129,684.11 |
| 12/15/2017 | Firestar Diamond, Inc. | Donnenfeld Law PLLC | Firestar Jewelry, Inc. | $ 4,187.50 |
| 12/15/2017 | Firestar Diamond, Inc. | Michael Malherek | Firestar Jewelry, Inc. | $ 1,650.00 |
| 12/15/2017 | Firestar Diamond, Inc. | TSG Global Management Inc | Firestar Jewelry, Inc. | $ 6,878.45 |
| 12/18/2017 | Firestar Diamond, Inc. | New York State Corporation Tax | Firestar Group, Inc. | $ 3,500.00 |
| 12/18/2017 | Firestar Diamond, Inc. | Swati Jain | Firestar Jewelry, Inc. | $ 2,000.00 |
| 12/18/2017 | Firestar Diamond, Inc. | Village Print And Media | Firestar Jewelry, Inc. | $ 1,845.43 |
| 12/19/2017 | Firestar Diamond, Inc. | Panalpina, Inc. - Chi I721 | Firestar Jewelry, Inc. | $ 2,015.88 |
| 12/20/2017 | Firestar Diamond, Inc. | Security Industry Specialists | Firestar Jewelry, Inc. | $ 7,370.08 |
| 12/21/2017 | Firestar Diamond, Inc. | Imperial Commercial Cleaning | Firestar Jewelry, Inc. | $ 2,796.70 |
| 12/21/2017 | Firestar Diamond, Inc. | Nancy N. Lopes | Firestar Jewelry, Inc. | $ 5,250.00 |
| 12/22/2017 | Firestar Diamond, Inc. | Ala Moana Center Association | Firestar Jewelry, Inc. | $ 164.84 |
| 12/27/2017 | Firestar Diamond, Inc. | Universal Multilink Inc | Firestar Jewelry, Inc. | $ 157.87 |
| 12/29/2017 | Firestar Diamond, Inc. | NYC Dept Of Finance | Firestar Group, Inc. | $ 15,173.04 |
| 1/2/2018 | Firestar Diamond, Inc. | Jacquelin Seuh | Firestar Jewelry, Inc. | $ 2,400.00 |
| 1/3/2018 | Firestar Diamond, Inc. | Pacific Diamond FZE | Firestar Diamond International, Inc. | $ 2,188,769.43 |
| 1/9/2018 | Firestar Diamond, Inc. | Desert Rose Florist | Firestar Jewelry, Inc. | $ 841.46 |
| 1/9/2018 | Firestar Diamond, Inc. | Nevada Department Of Taxation | Firestar Jewelry, Inc. | $ 15.00 |
| 1/10/2018 | Firestar Diamond, Inc. | Winter Management Corp | Firestar Jewelry, Inc. | $ 129,684.11 |
| 1/12/2018 | Firestar Diamond, Inc. | Jewelex India Pvt. Ltd. | Firestar Diamond International, Inc. | $ 239,257.79 |
| 1/22/2018 | Firestar Diamond, Inc. | United States Treasury | Firestar Group, Inc. | $ 3,917.72 |
| 1/23/2018 | Firestar Diamond, Inc. | Department Of Commerce | Firestar Jewelry, Inc. | $ 25.00 |
| 2/20/2018 | Firestar Diamond, Inc. | Nancy N. Lopes | Firestar Jewelry, Inc. | $ 2,100.00 |
| 2/20/2018 | Firestar Diamond, Inc. | Jorge Pruna | Firestar Jewelry, Inc. | $ 648.00 |
| 2/20/2018 | Firestar Diamond, Inc. | Int'l Environmental Management | Firestar Jewelry, Inc. | $ 1,031.71 |
| 2/20/2018 | Firestar Diamond, Inc. | Jewelers Mutual | Firestar Jewelry, Inc. | $ 454.00 |
| 2/20/2018 | Firestar Diamond, Inc. | Terminix Commercial | Firestar Jewelry, Inc. | $ 78.39 |

| | | |
|---|---|---|
| **Payroll Expenses Paid by Firestar Diamond, Inc. on Behalf of Firestar Jewelry, Inc.'s (2/26/2012-2/26/2018)** | $ | **5,167,502.64** |

| | | |
|---|---|---|
| **Total Transfers from Firestar Diamond, Inc. 3rd Parties on Behalf of U.S. Non-Debtors (2/26/2012-2/26/2018)** | $ | **14,606,827.25** |

Firestar Diamond, Inc. et al Debtors

**Cash Transfers from A. Jaffe, Inc. to U.S. Non-Debtors - February 26, 2012 - February 26, 2018 (Petition Date)**

| Transaction Date | Debtor Transferor | U.S. Non-Debtor Transferee | Transfer Amount |
|---|---|---|---|
| 5/2/2012 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 4,646.25 |
| 5/23/2012 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 6/27/2012 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 7/24/2012 | A. Jaffe, Inc. | Firestar Group, Inc. | $ 15,000.00 |
| 11/28/2012 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 12/12/2012 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 56,400.53 |
| 12/17/2012 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 80,000.00 |
| 1/9/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 1/16/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 3/29/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 4/25/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 480,000.00 |
| 5/8/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 7/8/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 7/31/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 25,000.00 |
| 8/6/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 170,000.00 |
| 8/13/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 8/14/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 8/20/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 9/27/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 10/1/2013 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 1/10/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 188,218.74 |
| 1/23/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 130,000.00 |
| 3/12/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 220,000.00 |
| 3/20/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 104,000.00 |
| 4/9/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 6/6/2014 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 1,000.00 |
| 6/10/2014 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 2,925,000.00 |
| 6/10/2014 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 147,000.00 |
| 6/18/2014 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 35,000.00 |
| 7/14/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 7/15/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 7/21/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 35,000.00 |
| 7/21/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 15,000.00 |
| 7/29/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 40,000.00 |
| 8/28/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 30,000.00 |
| 8/28/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 5,000.00 |
| 9/3/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 5,500.00 |
| 10/30/2014 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 150,000.00 |
| 2/6/2015 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 20,000.00 |
| 2/6/2015 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 2/24/2015 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 125,000.00 |
| 7/14/2015 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 9,740.00 |
| 9/29/2015 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 950,000.00 |
| 11/9/2015 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 12/2/2015 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 100,000.00 |
| 12/8/2015 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 19,500.00 |
| 1/12/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 100,000.00 |

| Transaction Date | Debtor Transferor | U.S. Non-Debtor Transferee | Transfer Amount |
|---|---|---|---|
| 1/20/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 150,000.00 |
| 3/3/2016 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 1,500,000.00 |
| 3/9/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 1,850,000.00 |
| 3/15/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 250,000.00 |
| 3/25/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 1,400,000.00 |
| 3/28/2016 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 3/29/2016 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 250,000.00 |
| 3/30/2016 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 300,000.00 |
| 3/30/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 600,000.00 |
| 4/4/2016 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 950,000.00 |
| 5/9/2016 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 10,000.00 |
| 5/11/2016 | A. Jaffe, Inc. | Synergies Corporation | $ 80,000.00 |
| 5/31/2016 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 450,000.00 |
| 5/31/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 100,000.00 |
| 6/15/2016 | A. Jaffe, Inc. | Synergies Corporation | $ 10,000.00 |
| 6/29/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 400,000.00 |
| 7/19/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 100,000.00 |
| 7/27/2016 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 8/1/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 14,164.50 |
| 8/4/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 150,000.00 |
| 8/26/2016 | A. Jaffe, Inc. | Synergies Corporation | $ 26,000.00 |
| 9/16/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 3,758.05 |
| 9/19/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 18,868.35 |
| 9/26/2016 | A. Jaffe, Inc. | Synergies Corporation | $ 15,000.00 |
| 10/17/2016 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 200,000.00 |
| 11/8/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 75,000.00 |
| 11/15/2016 | A. Jaffe, Inc. | Synergies Corporation | $ 10,000.00 |
| 11/16/2016 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 50,000.00 |
| 5/2/2017 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 50,000.00 |
| 5/10/2017 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 100,000.00 |
| 5/25/2017 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 250,000.00 |
| 6/12/2017 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 125,000.00 |
| 6/12/2017 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 25,000.00 |
| 7/14/2017 | A. Jaffe, Inc. | Synergies Corporation | $ 50,000.00 |
| 8/3/2017 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 8,881.25 |
| 8/3/2017 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 4,500.00 |
| 8/3/2017 | A. Jaffe, Inc. | Firestar Diamond International, Inc. | $ 127.50 |
| 9/6/2017 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 100,000.00 |
| 9/18/2017 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 100,000.00 |
| 12/15/2017 | A. Jaffe, Inc. | Synergies Corporation | $ 15,000.00 |
| 2/2/2018 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 200,000.00 |
| 2/13/2018 | A. Jaffe, Inc. | Firestar Jewelry, Inc. | $ 2,940.07 |

| | | | |
|---|---|---|---|
| **Total Direct Transfers from A. Jaffe, Inc. to U.S. Non-Debtors (2/26/2012-2/26/2018)** | | **$** | **18,580,245.24** |

**Firestar Diamond, Inc. et al Debtors**

**Cash Transfers from Fantasy, Inc. to U.S. Non-Debtors - February 26, 2012 - February 26, 2018 (Petition Date)**

| Transaction Date | Debtor Transferor | U.S. Non-Debtor Transferee | Transfer Amount | |
|---|---|---|---|---|
| 11/3/2014 | Fantasy, Inc. | Firestar Diamond International, Inc. | $ | 79,550.75 |
| 9/16/2016 | Fantasy, Inc. | Firestar Jewelry, Inc. | $ | 2,382.73 |
| 2/1/2017 | Fantasy, Inc. | Firestar Jewelry, Inc. | $ | 20,520.65 |

| Total Direct Transfers from Fantasy, Inc. to U.S. Non-Debtors (2/26/2012-2/26/2018) | $ | 102,454.13 |
|---|---|---|

# Exhibit 15

**February 24, 2022** | 4:20 pm

## COVID-19 Vaccines

Children ages 5+ are eligible for the COVID-19 vaccine and children ages 12+ are eligible for a booster. Parents and guardians: make sure your child gets vaccinated and stays up to date with all recommended doses.

**VAX FOR KIDS ›**

# Department of State
## Division of Corporations

## Entity Search Results

**No business entities were found. Please refine your search criteria. To continue please do the following: Tab to Ok and press the Enter key or Click Ok.**



# Exhibit 16

**February 24, 2022** | 4:20 pm

## COVID-19 Vaccines

Children ages 5+ are eligible for the COVID-19 vaccine and children ages 12+ are eligible for a booster. Parents and guardians: make sure your child gets vaccinated and stays up to date with all recommended doses.

**VAX FOR KIDS** ❯

# Department of State
## Division of Corporations

## Entity Search Results

**No business entities were found. Please refine your search criteria. To continue please do the following: Tab to Ok and press the Enter key or Click Ok.**



# Exhibit 17
# (Filed Under Seal)