**ROGER J. BERNSTEIN**
ATTORNEY AT LAW

551 FIFTH AVENUE, 12TH FLOOR
NEW YORK, NEW YORK 10176
TELEPHONE: (212) 748-4800
TELECOPIER: (646) 964-6633
E-MAIL: rbernstein@rjblaw.com

August 15, 2022

**BY E-MAIL**
The Honorable Sean Lane
United States Bankruptcy Court for the
 Southern District of New York
One Bowling Green
New York, New York 10004

        Re:    Levin v. Javeri, Adv. Proc. 20-1054
                  (In re Firestar Diamond, Inc., No. 18-10509)

Dear Judge Lane:

      First, this will confirm that the parties presently engaged in certain negotiations in the attachment proceeding do not request a delay in the Court's resolution of the pending motions to dismiss.

      Second, I am submitting without argument the post-submission decision in *General Motors, LLC v. FCA US, LLC*, No. 20-1791, ___ F.4th ___, 2022 WL 3274123 (6th Cir Aug. 11, 2022). Part III of this decision addresses the issue of absence of direct injury raised in Part IV-B of defendant Ami Javeri's Memoranda of Law in Support of Motion to Dismiss (Dkt. No. 44) and in Part IV-B of defendant Nehal Modi's Memoranda of Law in Support of Motion to Dismiss (Dkt. No. 47).

      Third, as discussed in the status conference on August 2, 2022, this will memorialize that counsel for the Trustee and counsel for defendants Ami Javeri, Central Park South 50 Properties, LLC ("CPS50"), and Central Park Real Estate, LLC ("CPRE") have agreed that in the absence of a settlement defendants' papers in opposition to the motion to confirm will be due on September 2, 2022, and the

Trustee's reply papers will be due on September 16, 2022.

                                                                         Respectfully submitted,

                                                                         *Roger Bernstein*

                                                                         Roger J. Bernstein
                                                                         *Counsel for Ami Javeri*

cc.    Angela M. Allen & William Williams,
          *Counsel for Trustee Richard Levin*
      Todd Duffy and Douglas Amadeo,
          *Counsel for CP50, LLC and CPRE, LLC*
      Marc Rowin,
          *Counsel for Trident Trust Co.*

**MEMORANDUM ENDORSED ORDER:**

**The parties proposed briefing schedule is hereby approved.**

**SO ORDERED:**

**Date: August 18, 2022**

<u>*/s/ Sean H. Lane*</u>
**United States Bankruptcy Judge**

2022 WL 3274123
Only the Westlaw citation is currently available.
United States Court of Appeals, Sixth Circuit.

GENERAL MOTORS, LLC; General Motors Company, Plaintiffs-Appellants,
v.
FCA US, LLC; Fiat Chrysler Automobiles N.V.; Alphons Iacobelli; Jerome Durden; Michael Brown, Defendants-Appellees.

No. 20-1791
|
Argued: March 4, 2021
|
Decided and Filed: August 11, 2022

Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 2:19-cv-13429—Paul D. Borman, District Judge.

**Attorneys and Law Firms**

ARGUED: Paul D. Clement, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellants. Steven L. Holley, SULLIVAN & CROMWELL LLP, New York, New York, for FCA Appellees.

ON BRIEF: Paul D. Clement, Erin E. Murphy, Matthew D. Rowen, Julie M.K. Siegal, KIRKLAND & ELLIS LLP, Washington, D.C., Hariklia Karis, Jeffrey Willian, KIRKLAND & ELLIS LLP, Chicago, Illinois, for Appellants. Steven L. Holley, Matthew J. Porpora, Jacob E. Cohen, Samantha F. Hynes, SULLIVAN & CROMWELL LLP, New York, New York, Thomas W. Cranmer, MILLER, CANFIELD, PADDOCK & STONE, PLC, Troy, Michigan, for FCA Appellees. Michael A. Nedelman, NEDELMAN LEGAL GROUP, PLLC, Farmington Hills, Michigan, for Appellee Iacobelli. Judith S. Gracey, THE GRACEY LAW FIRM, PLLC, Keego Harbor, Michigan, for Appellee Durden.

Before: STRANCH, LARSEN, and NALBANDIAN, Circuit Judges.

**OPINION**

LARSEN, Circuit Judge.

*1 For almost a decade, executives at FCA US, LLC and its parent company, Fiat Chrysler Automobiles N.V.,[1] engaged in a pattern of racketeering, involving bribery and corrupt labor relations with the United Auto Workers (UAW). General Motors (GM) believes that it was the intended victim of the scheme and says it has suffered billions of dollars in damages because of it. GM accordingly sued FCA, Fiat, and various executives under the Racketeer Influenced and Corrupt Organizations Act (RICO). The district court granted defendants' motions to dismiss, concluding that GM had failed to establish that the alleged RICO violations proximately caused its injuries. For the reasons stated, we AFFIRM.

[1] Fiat Chrysler changed its name to Stellantis N.V. on January 17, 2021, after merging with Peugeot S.A. Because the briefing and the lower court use Fiat and FCA, we do the same.

I.

Because the case is at the motion to dismiss stage, the factual allegations in the complaint are what matter, and we accept them as true. *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 382–83 (6th Cir. 2016).

In 2008, the country was facing a financial crisis. As losses mounted, some U.S. auto companies looked to the federal government for help. The government gave financial relief to General Motors Corporation (Old GM) and Chrysler through the Troubled Asset Relief Program. That did not work, and Chrysler and Old GM filed for Chapter 11 bankruptcy in 2009. In Europe, Fiat faced similar troubles. Fiat CEO Sergio Marchionne determined that Fiat had to secure a partnership with one of the U.S. auto companies to survive. Marchionne determined that "the UAW was Fiat's bridge to establish a domestic footprint given the UAW's significance in the U.S. automotive market." Complaint, R. 1, PageID 25.

Marchionne began to cultivate a relationship with the UAW, "quickly ma[king] the head of the union's Chrysler Department, [General] Holiefield, a strategic partner and soon thereafter 'a true friend.' " *Id.* Marchionne sought to convince the UAW that a Fiat-Chrysler partnership would be good for the union, hoping that when it came time for Fiat to negotiate over a purchase of Chrysler, the UAW would "throw its weight behind Fiat." *Id.* at 25–26.

Fiat began to negotiate a partial purchase of Chrysler. As part of the purchase, Marchionne demanded that the UAW support World Class Manufacturing (WCM), a system that would make the Fiat/Chrysler facilities flexible, jettisoning "the union's rigid job classification system with its strict hierarchy and boundaries about who could do what." *Id.* at 26–27. Chrysler and the UAW agreed to Marchionne's request to implement WCM. Similarly, the UAW agreed to hire more temporary employees in place of hourly workers. And UAW leadership agreed that, until 2015, it would "lift any cap or restraint on Tier Two workers"—"a less expensive labor source," comprising less-senior employees with a lower wage structure and fewer benefits. *Id.* at 27. "Marchionne's goal overall was to have as few constraints as possible in his ability to operate Chrysler when it came out of bankruptcy." *Id.* GM alleges that "Marchionne implemented a bribery scheme to achieve this goal and help revive Chrysler and, relatedly, harm GM." *Id.*

**\*2** Chrysler emerged from bankruptcy in June 2009 with Fiat owning 20 percent of its equity, and the UAW owning 55 percent. Fiat had the right to purchase 40 percent of the UAW's equity interest in Chrysler.[2] GM also emerged from bankruptcy, with the UAW owning 17.5 percent equity in the new company, making it the largest shareholder.

2   By 2013, Fiat had acquired a 58.5 percent stake in Chrysler, with the UAW owning the rest. In 2014, Fiat acquired the UAW's remaining stake in Chrysler. That is when the business entity officially became "FCA." GM's complaint, however, uses "FCA" instead of Fiat when discussing all events after Fiat first acquired an interest in Chrysler in 2009. We do the same for ease. And we use "FCA" to refer to all defendants, including the individual defendants, when discussing the arguments presented to this court, and differentiate only when necessary.

GM says the scheme began the following month, in July 2009, with a series of bribes. Defendant Alphons Iacobelli, the former Vice President of Employee Relations at FCA, "and other FCA officials began to transfer hundreds of thousands of dollars of Chrysler funds to Holiefield." *Id.* at 28. FCA paid for Holiefield's wedding to Monica Morgan in Venice and showered Holiefield with gifts, including a "custom-made Terra Cielo Mare watch worth several thousand dollars." *Id.* at 29.

From there, "FCA began a long-running intentional scheme of improper payments to certain UAW officials, funneled primarily through the [UAW-FCA National Training Center (NTC)], made by FCA senior executives and agents (including with the knowledge and approval of Marchionne) to influence the collective bargaining process." *Id.* at 31. FCA used NTC's credit card and bank accounts to conceal payments and gifts to UAW officers and employees worth over $1.5 million. The goal was "to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW." *Id.* at 32. Defendant Michael Brown, FCA's Director of Employee Relations and NTC Co-Director, pleaded guilty to criminal charges for his role in the fraud. He explained that "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials." *Id.*

FCA funneled money to Holiefield and his wife, Morgan, through charitable organizations and false front businesses, including Morgan's photography business. Defendant Jerome Durden, an FCA executive who served on the board of one of Holiefield's charities, assisted in these payments. The amounts were staggering. For example, FCA funneled $425,000 to one business; Holiefield and Morgan used the money for personal expenses, including closing costs on a house. The couple spent other payments made to these businesses—in amounts of $386,400; $350,000; and $200,000 and so-on— to finish an in-ground pool, buy clothes, and visit nightclubs and restaurants. On another occasion, the NTC directly paid off the mortgage on Holiefield's personal residence, sending a wire transfer for over $250,000.

FCA also encouraged UAW officials to use credit cards issued by the NTC. UAW officials happily complied, "charging, for example, $1,259.17 for luxury luggage; $2,182 for a[n] Italian-made Beretta shotgun; $2,130 for Disney World theme park tickets; over $1,000 for a pair of Christian Louboutin designer shoes; and thousands of dollars in electronics and many more such personal items." *Id.* at 35. Other UAW officials, including former President Dennis Williams, used FCA funds for lavish dinners and golf outings.

**\*3** What did Chrysler get from the bribery scheme? GM says that because of FCA's bribes, "certain corrupt members of UAW's leadership began providing Chrysler with labor peace and competitive advantages to propel Chrysler's performance without regard to the interests of UAW membership." *Id.* at 36. The bribes "were made for this very purpose: to obtain 'benefits, concessions, and advantages' not only in labor negotiations but also the implementation and administration of at least the post-2009 CBAs, in 2011 and 2015." *Id.* at 36–37. Also, "through its bribery, FCA ensured that while these special advantages were conferred on FCA, the same or similar advantages were not provided to ... GM despite it seeking similar programs and concessions." *Id.* at 37. This, says GM, inflicted "massive direct damage on GM in the form of higher costs." *Id.*

FCA's bribes secured the UAW's agreement to FCA's preferred WCM system. GM had a similar, but inferior, program of its own (the Global Manufacturing System [GMS]). But despite having "worked closely" with FCA to ensure the success of its system and to bring the program on par with WCM, UAW leaders rebuffed GM's "repeated efforts to collaborate ... on improvements to" GMS. *Id.* at 38–39. Without "buy-in" from the Union, GMS could not be as successful as FCA's WCM. *Id.* at 39. So, GM says that because of the bribes, the UAW never "fully embraced" GM's efforts to implement GMS. *Id.*

FCA's bribes also secured it an advantage with respect to the hiring of lower cost workers. A prior agreement had limited both FCA and GM in terms of the number of lower-wage, Tier Two employees they could hire. But in 2009, the UAW and the auto companies agreed to lift the cap, with an understanding that the cap would be reinstated in 2015. Because of the bribes, the UAW privately told FCA that it would not actually reinstate the cap for either auto company in 2015. Without this knowledge, GM stayed below the cap on Tier Two workers between 2009 and 2015, while "FCA hired Tier Two workers with abandon, possessing the incredibly valuable foreknowledge that it would not be penalized." *Id.* at 40. "This difference purchased through the bribery scheme provided FCA with a dramatic advantage with respect to average labor costs." *Id.* Similarly, because the UAW did not hold FCA to the contractual limits on temporary workers (who are entitled to substantially less compensation than unionized employees), FCA was able to lower its average hourly labor costs. GM received no such concession on temporary workers. In addition, bribed UAW officials oversaw the UAW's grievance process. "Instead of zealously pursuing union grievances and health and safety issues," corrupt UAW grievance officials, "effectively" gave FCA "control" of "potentially costly and disruptive labor grievances." *Id.* at 41. "GM was denied any such corresponding benefit." *Id.* Moreover, in 2014, through " 'side letter' agreements" "outside of the traditional bargaining process," FCA obtained a favorable prescription drug agreement with the UAW, which significantly reduced FCA's healthcare costs. A similar prescription agreement would have saved GM up to $20 million per year, but the UAW refused to agree to terms with GM.

Add this all up and the bribes bought FCA "a wage advantage to take FCA from worst to first among the Detroit-based automakers" in terms of its labor costs. *Id.* at 42. "By 2015, FCA [had] slashed its labor costs to $47 [per hour]—in the range of non-unionized foreign automakers operating in the U.S.— and $8 less on average per hour than GM ($55)." *Id.* According to GM, "FCA directed key UAW officials to deny similar labor advantages to GM, inflicting significant additional costs on GM." *Id.* at 43. The bribery continued when Dennis Williams took over as president of the UAW in 2014. "Williams specifically directed his lieutenants and other corrupt officials to accelerate their fraud, and use NTC funds and credit cards for travel, dining, and other illegal purposes to improve the UAW's budget." *Id.* at 48. Williams would be a willing participant in the rest of the scheme.

**\*4**  Marchionne also had long sought a merger with a U.S. auto company. "With Marchionne as the lead, FCA schemed that it could effectively take over GM through a merger (code-named 'Operation Cylinder'), have Marchionne remain CEO of the combined companies, and oversee the largest auto company in the world." *Id.* at 49. It was in part for this reason that Marchionne "had authorized the bribery of UAW leaders." *Id.* Their "support was essential to the success of Operation Cylinder" because "the UAW could effectively block a merger under certain terms in the CBA." *Id.* at 49–50. Marchionne approached GM about a merger in 2015, but GM rejected the offer, even after bribed UAW executives pressed GM to move forward.

Bargaining over the 2015 collective bargaining agreements began in July 2015. By early September, the UAW and GM had inched closer to a framework for a new agreement. Though the UAW had initially demanded "nearly $1 billion" in total cost increases over the 2011 CBA, the "new potential deal" reduced those costs by more than 20 percent. *Id.* at 54. But that agreement never materialized.

The auto companies and the UAW use "pattern bargaining, a strategy in which unionized workers across an industry attempt to bargain uniform terms in their contracts." *Id.* at 55. "[T]he UAW selects one of the automakers as a 'lead' or 'target' company, with which the UAW negotiates a CBA. Then, the UAW exerts pressure on the other two companies to use the first agreement as a 'pattern' for negotiations." *Id.* at 56. The UAW usually chooses the largest and best performing automaker as the target because it allows the UAW to maximize its gains by locking in favorable wage increases and signing bonuses. GM thought it would be chosen as the target. Industry analysts agreed; they also believed FCA was not a viable target because it was the smallest and least profitable of the companies.

Nevertheless, in September 2015, the UAW unexpectedly chose FCA as the target, a position, according to GM, "secured through the years-long bribery scheme between FCA Group and UAW leaders." *Id.* at 58. Two days after selecting FCA as the target, "FCA and the UAW reported that an agreement had been reached that, in Marchionne's words, was a 'transformational deal.'" *Id.* at 59. The UAW bargaining team celebrated the deal with a $7,000 dinner in Detroit—paid for with NTC funds.

The UAW's FCA workforce rejected the agreement, however, sending the parties back to the bargaining table. In early October, FCA and the UAW reached a new agreement. According to GM, the terms of this deal "were structured to force enormous costs on GM." *Id.* at 61. "[A]s a pattern for a GM agreement, it would be vastly more expensive than the agreement GM had negotiated prior to FCA's selection as lead." *Id.* In fact, it was twice as costly as the UAW's initial demands of GM, which GM had successfully negotiated down. FCA-UAW members ratified the revised deal.

By this time, FCA and UAW leaders knew that the government had become suspicious. GM says that "[t]hrough this 'rich' FCA-UAW labor contract, Williams and corrupt UAW leaders were able to claim to the public, UAW members, and government investigators that UAW leadership had obtained significant FCA concessions that could then be used in pattern negotiation." *Id.* at 62. "Marchionne, in turn, structured and agreed to these CBA terms to force unanticipated higher costs on GM, which had a higher degree of more costly Tier One workers, and further his takeover scheme." *Id.*

The UAW selected GM as the next target for negotiations, using "the fraudulently tainted FCA-UAW pattern." *Id.* "[T]he economic force of pattern bargaining and threat of strike forced GM to largely concede FCA's agreement as a pattern"; in November 2015, UAW workers ratified the new agreement with GM. *Id.* at 63. "[A]lthough GM was able to reduce the immediate cost impact of the FCA pattern by about $400 million, the final CBA between GM and the UAW cost approximately $1.9 billion in incremental labor charges over four years—over $1 billion more than the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead." *Id.* And "[a]lthough GM was able to successfully resist the FCA-UAW leadership takeover scheme, substantial damage from the racketeering scheme had been inflicted: direct injuries to GM that continue to reverberate and compound to this day, including higher costs and lost investment initiatives." *Id.*

**\*5** By 2017, the jig was up. The Department of Justice criminally charged numerous FCA executives and UAW officials for their roles in the conspiracy. "One by one, each of the FCA and UAW co-conspirators entered guilty pleas admitting to a brazen scheme to enrich themselves and corrupt the collective bargaining process through the FCA Control and FCA-NTC Enterprises." *Id.* at 66. That includes Iacobelli, Durden, and Brown, the three individual defendants in this case. FCA also pleaded guilty for its role in the corruption scandal and agreed to pay a $30 million fine. *See* David Shepardson, *Fiat Chrysler to plead guilty, pay $30 million to resolve U.S. criminal labor probe*, Reuters (Jan. 27, 2021, 10:45 AM), https://www.reuters.com/article/us-usa-autos-labor/fiat-chrysler-to-plead-guilty-pay-30-million-to-resolve-u-s-criminal-labor-probe-idUSKBN29W1ZA. For its part, the UAW agreed to a consent decree that would put the union under federal monitoring for six years; a judge approved the consent decree. *See* Breana Noble & Robert Snell, *Judge approves UAW consent decree; union has 30 days to propose monitors*, The Detroit News (Jan. 29, 2021, 7:35 PM), https://www.detroitnews.com/story/business/autos/2021/01/29/federal-judge-approved-united-auto-workers-consent-decree/4317725001/.

On November 20, 2019, GM sued FCA, Fiat, Iacobelli, Durden, and Brown, asserting three RICO claims against all defendants, one claim each under 18 U.S.C. § 1962(b), (c), and (d); a claim for unfair competition under Michigan law against FCA and Fiat; and a claim for civil conspiracy against all defendants. The district court declined to exercise supplemental jurisdiction over GM's state law claims.[3]

3   A Michigan state court dismissed all of GM's claims against FCA. *See* David Shepardson, *Michigan judge tosses GM lawsuit against Fiat Chrysler*, Reuters (Oct. 18, 2021, 5:55 AM), https://www.reuters.com/business/autos-transportation/michigan-judge-tosses-gm-lawsuit-against-fiat-chrysler-2021-10-17/.

All defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The district court granted the motions. Assuming that FCA had committed the alleged RICO violations, the district court held that FCA's alleged RICO violations were either indirect or too remote to have proximately caused GM's alleged injuries. All of GM's RICO claims therefore failed. The district court dismissed GM's complaint with prejudice.

GM filed a motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e), arguing that newly discovered evidence showed that the scheme directly and intentionally targeted it. GM asked the court to vacate its order or, in the alternative, allow it to file an amended complaint. The court denied the motion, concluding that GM's new evidence was too speculative to warrant reopening the case and that there were no other clear legal errors. GM timely appealed.

II.

We must first assess whether this case is properly before us. FCA argues that the National Labor Relations Board (NLRB) has exclusive jurisdiction over GM's claims because they are based on conduct that arguably constitutes an unfair labor practice. FCA invokes the doctrine of *Garmon* preemption, which gets its name from the Supreme Court's decision in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).[4] Because FCA's *Garmon* argument potentially implicates the court's subject matter jurisdiction, we address it before proceeding to the merits. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 608 (6th Cir. 2004); *Int'l Longshoremen's Ass'n. v. Davis*, 476 U.S. 380, 393, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986); *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 299 (6th Cir. 2011); *but see Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004) (holding that, when "[a]pplied to claims in federal court, and arising under federal law," *Garmon* does not affect a court's subject-matter jurisdiction but is instead an abstention doctrine, "allocating to an administrative agency the first crack at certain matters").

4   As this court explained in *Trollinger v. Tyson Foods, Inc.*, the use of the word "preemption" to describe the doctrine is a bit of a misnomer. 370 F.3d 602, 608 (6th Cir. 2004). "*Garmon* is more than a traditional preemption doctrine ... because when properly invoked it tells us not just what

law applies (federal law, not state law) but who applies it (the National Labor Relations Board, not the state courts or federal district courts)." *Id.*

**\*6** "Sections 7 and 8 of the National Labor Relations Act protect certain labor practices (such as organizing or joining a labor union, bargaining collectively, and engaging in concerted activity, or refraining from engaging in any of these activities) and prohibit certain others (such as interfering with a protected activity or coercing employees to join a union)." *Trollinger*, 370 F.3d at 608. Because Congress vested the NLRB "with primary jurisdiction to determine what is or is not an unfair labor practice" under the NLRA, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), federal courts generally may not resolve claims based on "activity which 'is arguably subject to § 7 or § 8 of the [NLRA],' and they 'must defer to the exclusive competence of the [NLRB],' " *id.* (quoting *Garmon*, 359 U.S. at 245, 79 S.Ct. 773).

But there are exceptions to the NLRB's primary jurisdiction. For example, "federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies" as "long as the statute does not conflict with §§ 7 or 8 of the NLRA and ... litigants do not circumvent the primary jurisdiction of the NLRB simply by casting statutory claims [under §§ 7 or 8 of the NLRA] as violations of [an independent federal law]." *Trollinger*, 370 F.3d at 609–10 (citations omitted). And Congress may also "expressly carve[ ] out an exception to the [NLRB's] jurisdiction." *Brennan v. Chestnut*, 973 F.2d 644, 646 (8th Cir. 1992) (citing *Vaca v. Sipes*, 386 U.S. 171, 179–80, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (citing cases)). Here, Congress has done just that.

GM's RICO claims are predicated on violations of a labor law—namely, 29 U.S.C. § 186 (also known as Section 302 of the Labor Management Relations Act (LMRA)), which prohibits certain financial transactions between employers, employees and unions.**5** It is one of two labor laws listed as RICO predicates in 18 U.S.C. § 1961(1).**6** So the question is whether, by naming a labor law as a RICO predicate, Congress "expressly carved out an exception to" the NLRB's jurisdiction. We answer: yes.

---

5   Section 186 of the LMRA is a criminal statute. *Ohlendorf v. United Food & Comm. Workers Int'l Union, Local 876*, 883 F.3d 636, 640 (6th Cir. 2018). It does not create a private right of action, and the Attorney General has the authority to enforce it. *See id.* at 640–43; *In re WKYC-TV, Inc.*, 359 N.L.R.B. 286, 289 n.13 (2012). The NLRB, however, has jurisdiction over unfair labor charges premised on a violation of § 186. *See WKYC-TV, Inc.*, 359 NLRB at 289 n.13; *see also Ohlendorf*, 883 F.3d at 643; *Swanigan v. FCA US LLC*, 938 F.3d 779, 785–86 (6th Cir. 2019).

6   The other is 29 U.S.C. § 501(c), which pertains to the embezzlement of union funds.

No circuit court has authoritatively addressed whether the NLRB retains primary jurisdiction over RICO claims predicated on violations of § 186. Two have suggested in dictum, however, that it does not. *See Brennan*, 973 F.2d at 646 ("[A] claimed violation of 29 U.S.C. § 186 would not be preempted because RICO includes violations of § 186 within the definition of 'racketeering activity' "); *Tamburello v. Comm-Tract Corp.*, 67 F.3d 973, 977 (1st Cir. 1995) ("The specific exceptions carved out in §§ 186 and 501(c) support the conclusion that Congress intended that violations of labor laws other than § 186 [or § 501(c)] alleged as predicate acts are preempted." (alteration in original) (citation omitted)); *see also Teamsters Local 372 v. Detroit Newspapers*, 956 F. Supp. 753, 759 (E.D. Mich. 1997) (stating that *Garmon* preemption does not apply when "Congress has expressly carved out an exception to the NLRB's jurisdiction," such as when it added § 186 as a RICO predicate). We agree.

Like our sister circuits, we are persuaded by a well-reasoned district court opinion that confronted this very issue—*Butchers' Union, Local No. 498 v. SDC Investment, Inc.*, 631 F. Supp. 1001 (E.D. Cal. 1986). *See Brennan*, 973 F.2d at 646 (calling *Butchers' Union* the "leading case" on whether federal courts may resolve RICO claims predicated on violations of § 186). Like the court in *Butchers' Union*, we find it "hard to imagine that Congress would have made § 186 a RICO predicate act without the intention of making violations of § 186, which necessarily arise in the labor context, the basis of a RICO action brought in the district court." 631 F. Supp. at 1007. Undoubtedly, a RICO claim predicated on § 186 violations will

require the resolution of labor law questions, "but that is simply a consequence of Congress making § 186 violations predicate acts for RICO purposes." *Id.* at 1008. When it comes to the jurisdiction of the NLRB, "Congress gets to make the rules—and change them." *Id.* at 1006. Although Congress designated the NLRB as the exclusive forum for consideration of most labor law questions, it "can and does create exceptions to that exclusivity." *Id.* at 1006–07. This is one of them.

**\*7** FCA focuses on this court's decision in *Trollinger*, which explained that "when a RICO action depends upon a federal-law predicate offense and a violation of that predicate law may be found only if the defendant's conduct violates the NLRA, the federal district courts lack jurisdiction under *Garmon* because the NLRA issues in the case would be anything but collateral." 370 F.3d at 610–11. Because the labor law issues in this case are hardly "collateral," FCA argues that *Garmon* preemption applies. But *Trollinger* did not address the question here—whether, by expressly designating § 186 as a RICO predicate, Congress "has expressly carved out an exception to the" NLRB's jurisdiction. *Brennan*, 973 F.2d at 646. We hold that it has. Accordingly, GM's claims were properly before the district court.

III.

We turn to the merits. We review de novo the district court's order dismissing for failure to state a claim under Rule 12(b)(6). *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002). "We construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 382–83 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

RICO provides a civil cause of action for treble damages to anyone injured "by reason of" certain racketeering activity. 18 U.S.C. §§ 1964(c), 1962. To state such a claim, the plaintiff must allege that the defendant's violation was both a factual and proximate cause of his injury. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 266–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Factual cause is established "whenever a particular outcome would not have happened 'but-for' the purported cause." *Bostock v. Clayton County*, ––– U.S. ––––, 140 S. Ct. 1731, 1739, 207 L.Ed.2d 218 (2020); *see also UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010). And in the RICO context, proximate cause asks whether "the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006); *accord Holmes*, 503 U.S. at 268–69, 112 S.Ct. 1311. The directness requirement rests on three premises: the difficulty of "ascertain[ing] the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors"; the risk of duplicative recoveries; and the availability of a more suitable plaintiff. *Anza*, 547 U.S. at 458–60, 126 S.Ct. 1991 (quoting *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008).

GM's allegations can be grouped into three distinct categories of injuries. First, GM alleges that from 2009–2015, FCA bribed the UAW to secure "unique competitive advantages." R.1, PageID 90. Second, GM alleges that, during the same period, FCA directed the UAW to withhold those same benefits from GM. Finally, GM alleges that, through its bribes, FCA weaponized the 2015 pattern-bargaining process to harm GM. We begin with the competitive-advantage injuries.

A.

The Supreme Court's opinion in *Anza* illustrates how to apply the directness requirement to competitive-advantage injuries. In *Anza*, the Court considered a RICO claim brought by Ideal Steel Supply against its competitor, National Steel Supply. 547 U.S. at 453–55, 126 S.Ct. 1991. Ideal alleged that National had cheated the State of New York by failing to charge sales taxes on some of its transactions; that enabled National to unfairly lower its prices, which in turn cost Ideal sales. *Id.* Those allegations, the Court held, were insufficient to establish proximate cause under RICO. *Id.* at 461, 126 S.Ct. 1991. "The cause of Ideal's asserted harms ... is a set of actions (offering

lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 458, 126 S.Ct. 1991. Ideal's theory of causation, the Court explained, raised two of the concerns underlying the directness requirement. First, delineating the extent to which the fraud, rather than other factors, caused Ideal's lost sales would be particularly complex; and second, there was a more directly injured plaintiff, the State. *Id.* at 458–60, 126 S.Ct. 1991.

**\*8** Most of GM's injuries are, like Ideal's, assertions of an unfair competitive advantage. According to GM, FCA's bribes allowed it to commandeer the union grievance process, and to secure the more efficient WCM system, a higher proportion of low-cost workers, and a cheaper prescription-benefits program. In short, GM alleges that FCA's corruption "helped buy a wage advantage to take FCA from worst to first among the Detroit-based automakers" in terms of its labor costs. R. 1, PageID 42. GM does not say how FCA spent its wage savings: Did it slash its prices, pay off debt, or invest in research and development? Nor does GM say what specific harm resulted: Did it lose sales? Was it forced to cut profit margins? But the necessary inference is that FCA's unfair labor advantage hurt GM in the marketplace. That theory should sound familiar. It is precisely the one rejected in *Anza*. *See Anza*, 547 U.S. at 458–61, 126 S.Ct. 1991. As in *Anza*, GM's theory raises complex apportionment problems: What share of GM's (unspecified) marketplace injuries are attributable to FCA's unfair labor advantage, rather than to "other, independent[ ] factors"? *Id.* at 458, 126 S.Ct. 1991 (quoting *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311). Thus, it is impossible to "trace a straight line" from FCA's conduct in violation of RICO to these injuries, precluding a finding of proximate cause. *See Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 420 (6th Cir. 2013). And, of course, there is a more "immediate" victim: FCA workers. *Anza*, 547 U.S. at 460, 126 S.Ct. 1991. What didn't work in *Anza* can't work here.

Nor does it work under *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010) (plurality opinion). There, the City of New York taxed cigarette possession. *Id.* at 4, 130 S.Ct. 983. Hemi, an out-of-state supplier, sold cigarettes online to residents of the City. *Id.* Hemi was not required to collect the City tax, but the federal Jenkins Act required Hemi to submit its customer information to the State of New York. *Id.* at 5, 130 S.Ct. 983. Hemi didn't comply. *Id.* at 6, 130 S.Ct. 983. The City then sued Hemi under RICO, arguing that "[w]ithout the reports from Hemi, the State could not pass on the information to the City." *Id.* at 9, 130 S.Ct. 983. Lacking customer information, the City could not collect the tax from its residents. *Id.* The plurality found proximate cause lacking because the City's harm did not flow directly from the RICO predicate act (the failure to file Jenkins Act reports) but rather from "the customers' failure to pay their taxes." *Id.* at 11, 130 S.Ct. 983. And there was a more immediate victim (the State). *Id.* at 12, 130 S.Ct. 983. GM's competitive-advantage theory of proximate cause fails under *Hemi Group* for the same reasons that it fails under *Anza*.

GM argues that this case is different because FCA intended to harm GM. Whatever purchase that formulation of proximate cause had at common law, *see* Restatement (Second) of Torts § 435A; *Hemi Grp.*, 559 U.S. at 23–25, 130 S.Ct. 983 (Breyer, J., dissenting), the Supreme Court has squarely rejected it in this context. "A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense." *Anza*, 547 U.S. at 460, 126 S.Ct. 1991; *Hemi Grp.*, 559 U.S. at 13, 130 S.Ct. 983. That is true notwithstanding the Court's statement in *Bridge v. Phoenix Bond & Indemnity Co.* that "one who intentionally causes injury to another is subject to liability to the other for that injury." 553 U.S. at 657, 128 S.Ct. 2131 (alteration omitted) (quoting Restatement (Second) of Torts § 870). While a later portion of *Bridge* addressed RICO's directness requirement, *see id.* at 657–58, 128 S.Ct. 2131; *Hemi Grp.*, 559 U.S. at 14, 130 S.Ct. 983, the Court discussed intent only in explaining that common law liability for fraud extended beyond the party who relied on the defendant's misrepresentation. *See Bridge*, 553 U.S. at 656–57, 128 S.Ct. 2131. We are highly skeptical that the unanimous Court in *Bridge* was silently overruling a key holding of *Anza* in its discussion of traditional fraud principles. And if there were any room to question our skepticism, the plurality opinion in *Hemi Group* erased it. *See* 559 U.S. at 12–13, 130 S.Ct. 983 (noting that, although the dissent in *Anza* thought proximate cause should turn

on intent, "the dissent there did not carry the day"); *see also Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 145 (2d Cir. 2018) (after *Anza* and *Hemi Group*, "foreseeability and intention have little to no import for RICO's proximate cause test"); *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018) (focus of RICO inquiry is "directness," not "on whether the harm to the RICO plaintiff was a foreseeable result of the defendant's conduct or even whether it was 'the *intended* consequence[ ] of [the defendant's] behavior' " (first alteration in original) (quoting *Hemi Grp.*, 559 U.S. at 12, 130 S.Ct. 983)).[7]

[7] Nothing in *Wallace v. Midwest Financial and Mortgage Services. Inc.*, 714 F.3d at 416, suggests that an injury that is foreseeable could satisfy RICO proximate cause even if the injury were indirect. Instead, *Wallace* is best read consistently with *Trollinger*, which recognized that even if an injury is direct, "the causal link between the injury and the conduct may still be too weak to constitute proximate cause—because it is insubstantial, unforeseeable, speculative, or illogical, or because of intervening causes." *Trollinger*, 370 F.3d at 614. In other words, foreseeability may be necessary, but it is not sufficient.

**\*9** Still, GM is right in at least one respect: Using an intermediary in a RICO scheme does not alone preclude liability. *Bridge* held that the directness requirement was satisfied where a bidder in a county auction sued a rival bidder, even though the rival's scheme depended on first duping the county. 553 U.S. at 657–58, 128 S.Ct. 2131. The same was true when a mortgage company enlisted the help of a crooked home appraiser to perpetuate lending fraud, *Wallace*, 714 F.3d at 416, and when a political donor bribed a state's governor to sign favorable legislation into law, *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 725 (7th Cir. 2014). These schemes, like many at the heart of RICO conspiracies, use a middleman to accomplish their goals. *See* 18 U.S.C. § 1961(1) (bribery, extortion, money laundering, murder-for-hire). That fact alone does not foreclose relief. What makes this case different, however, is the presence of an intermediate *victim*. Despite falling prey to the defendant's trickery, the county in *Bridge* was not injured in any tangible, compensable way. 553 U.S. at 658, 128 S.Ct. 2131 (recognizing that any reputational injury to the county was too "speculative and remote"). The FCA workers, by contrast, are "more immediate victim[s]" who are "better situated to sue." *Id.* We join our sister circuits in recognizing this critical distinction. *Compare Empress Casino*, 763 F.3d at 734 (finding proximate cause where "[t]here was no more directly injured party standing between the [plaintiffs] and the alleged wrongdoer") *with Empire Merchs.*, 902 F.3d at 144 (finding lack of proximate cause where "New York State was a more direct victim of the smuggling operation"). GM's theory, therefore, is insufficient to establish RICO proximate cause.

B.

Perhaps sensing that its 2009–2015 injuries were doomed under *Anza* and *Hemi Group*, GM alleges that FCA bribed union executives not only to give FCA certain concessions but also to "deny similar labor advantages to GM." R. 1, PageID 43. That theory suffers from a different flaw—a lack of but-for causation.

FCA allegedly bribed the union to deny labor advantages to GM, but GM never asserts that it would have received those advantages absent FCA's bribes or that it was in any way entitled to the benefits FCA received. *Contra Bostock*, 140 S. Ct. at 1739 ("[A] but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause."). Nor does GM allege that pattern bargaining was at play with respect to these pre-2015 benefits. So even accepting as true GM's allegation that FCA officials directed UAW leaders to deny comparable benefits to GM, that fact doesn't change the causation analysis. GM has not alleged that it would have received such benefits absent the corruption. So FCA's bribes were not a but-for cause of the harm.

This may seem harsh to GM. While GM cleanly fought its way out of a once-in-a-generation economic downturn, FCA bribed its way out. But GM's inability to recover for the alleged denial of benefits follows from a straightforward application of elementary causation principles. And its inability to recover for FCA's illicit competitive advantage follows from

binding Supreme Court precedent. *See Anza*, 547 U.S. at 460, 126 S.Ct. 1991; *cf. id.* at 474–75, 126 S.Ct. 1991 (Thomas, J., concurring in part and dissenting in part) (criticizing the majority's "restrictive proximate-cause test" for foreclosing relief on competitive injuries that are "the principal concern of RICO").

C.

That leaves GM's allegations of injury stemming from the 2015 CBA negotiations. Recall that, according to GM, FCA bought its way into the coveted "target" position for pattern bargaining and negotiated two deals with the Union. The FCA workers rejected the first and ratified the second. Then, using the second FCA deal as a template, GM and its workers reached an agreement with GM that cost the company far more than its prior negotiations would have predicted.

There are two ways to look at these facts. On one view, FCA, recognizing its relatively weak financial position, wanted to be the target so that it could lock in a deal that kept its labor costs low. That would sensibly explain why FCA workers rejected the first deal; it was not labor-friendly enough. But if that is GM's theory, it fails to satisfy proximate cause for the same reasons as the other competitive-advantage injuries. *Anza* forecloses relief.

On the other hand, GM's complaint seems to put forward a different theory regarding the 2015 CBA. According to GM, Marchionne spent more than a decade fixated on the idea of merging with GM. In pursuit of that goal, FCA made several overtures to GM, used bought-and-paid-for Union executives to influence GM's Board, and amped up the pressure through the press and private-capital campaigns. And the 2015 CBA negotiations were to be Marchionne's coup de grâce: FCA would purchase the first seat at the bargaining table so that it could give away the farm, saddling GM with crippling labor costs and leaving it ripe for a takeover. Sure, the deal would hurt FCA in the short-term, but Marchionne would get his prize.

**\*10**  Color us skeptical. But for the purposes of a motion to dismiss, we are satisfied that GM's factual allegations, taken as true, are plausible. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. For one thing, Marchionne's overwhelming desire for an FCA–GM merger takes an otherwise irrational course of action "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). For another, these CBAs are undoubtedly quite complex, making it plausible that FCA could have structured the deal to hurt GM far worse than it hurt itself. Indeed, that seems like a reasonable inference from GM's allegation that FCA "structured and agreed to [concessions] to force unanticipated higher costs on GM, which had a higher degree of more costly Tier One workers." R. 1, PageID 62. The upshot is that while the competitive-advantage interpretation of these facts seems more likely, we are not convinced that it is such "an obvious alternative explanation," that GM's alternate theory cannot clear the plausibility bar. *Twombly*, 550 U.S. at 567, 127 S.Ct. 1955.

But GM isn't out of the woods yet. Even accepting GM's theory as true, the chain of causation between FCA's bribes and GM's injury is still too attenuated. *See Hemi Grp.*, 559 U.S. at 9, 130 S.Ct. 983. Consider what had to occur before the consequences of FCA's bribe could have reached GM: FCA had to buy the first seat at the bargaining table (that's the RICO predicate); but FCA workers rejected the first negotiated contract, so the UAW and FCA had to renegotiate a more worker-friendly contract; then FCA workers had to ratify the renegotiated deal; the UAW and GM then bargained on the basis of the renegotiated deal (GM admits it was able to partially lessen the burden of the FCA contract); GM had to agree to a sufficiently attractive contract for its workers, knowing that it was in a better financial position than FCA and could presumably offer *more* than FCA did; and GM workers had to ratify the new contract. The chain leading from FCA's bribe to GM's increased labor costs had to pass through the independent actions of at least two independent parties—the FCA and GM workforces. So GM's alleged harm rests on "separate actions carried out by separate parties." *Id.* at 11, 130 S.Ct. 983 (emphasis omitted). And that gives rise to difficulties in assessing and apportioning fault, concerns central to the Court's decisions in *Anza* and *Holmes*. Would GM's independent workforce have ratified the pre-negotiated deal if GM had been first to the table? How much did the FCA workers' rejection of the initial deal contribute to

GM's alleged damages? Difficult questions like these distinguish GM's theory from the "straightforward" one in *Bridge*, where there were no "independent factors that account[ed] for [the plaintiff's] injury." 553 U.S. at 658, 128 S.Ct. 2131. At bottom, the directness requirement "is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation" and has "particular resonance when applied to claims brought by economic competitors." *Anza*, 547 U.S. at 460, 126 S.Ct. 1991. GM has failed to show that the predicate acts directly caused its 2015 pattern-bargaining injuries. The district court did not err by dismissing GM's complaint on causation grounds.

IV.

Finally, GM argues that the district court erred by denying its motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). We review an order denying such a motion for an abuse of discretion. *Clark v. United States*, 764 F.3d 653, 661 (6th Cir. 2014). "Under Rule 59, a court may alter the judgment based on: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Id.* (quotation marks omitted) (quoting *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010)).

GM argues that the district court erred by not allowing GM to amend its complaint based on newly discovered offshore bank accounts in the names of various individuals involved in the scheme. "To constitute 'newly discovered evidence,' the evidence must have been previously unavailable." *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999).

**\*11** GM says that the district court erred because leave to amend should be freely given and that, generally, a plaintiff must be given one chance to amend the complaint when a court dismisses based on purported pleading defects. But those conventions apply to pre-judgment motions under Federal Rule of Civil Procedure 15. GM's motion came after entry of the judgment, and that makes a difference. *Leisure Caviar*, 616 F.3d at 615–16. "If a permissive amendment policy applied after adverse judgments, plaintiffs could use the court as a sounding board to discover holes in their arguments, then reopen the case by amending their complaint to take account of the court's decision." *Id.* at 616 (citation omitted). So, "[w]hen a party seeks to amend a complaint after an adverse judgment, it ... must shoulder a heavier burden." *Id.* "Instead of meeting only the modest requirements of Rule 15, the claimant must meet the requirements for reopening a case established by Rules 59 or 60." *Id.*

GM argued before the district court that it was unable to obtain the evidence it now offers due to the district court's order denying limited discovery. We think that a fair point, and FCA does not challenge it. But, regardless, GM has not met its burden of showing that the district court abused its discretion in denying the motion. The purported new evidence does not move the needle. It confirms what we already knew—FCA was bribing UAW officials. The new information? UAW officials might have been hiding large sums in foreign bank accounts. So maybe the amounts of the bribes were more than originally thought. But that does not change the nature of the scheme, only its size.

One name bears mention. GM uncovered an offshore bank account in former UAW Vice President Joseph Ashton's name, and from there infers that FCA bribed Ashton to harm GM. Ashton was selected by former UAW President Dennis Williams and appointed by the UAW to serve on GM's Board from 2014 to 2017. GM characterizes the existence of the Ashton account as "reveal[ing] that from 2010 to 2014, FCA and FCA NV *likely* made substantial payments to Ashton." Motion to Amend or Alter Judgment, R. 84, PageID 3000 (emphasis added). GM alleges two separate theories of how Ashton harmed GM. First, GM says that Ashton, as lead negotiator with GM from 2010 to 2014, was crucial in withholding the competitive-advantage benefits from GM per FCA's instructions. Second, GM says that FCA bribed Ashton to infiltrate GM as a member of its Board and funnel GM's secrets to FCA.

It is worth noting that GM does not say how Ashton's account was funded, that there is any connection between the various offshore accounts it has uncovered, or that it has evidence that FCA bribed Ashton. Meanwhile, the Department of Justice has convicted Ashton for fraud unrelated to

FCA. *See Former UAW Vice President Sentenced to 30 Months for Taking $250,000 in Bribes and Kickbacks*, U.S. Dep't of Justice (Nov. 17, 2020), https://www.justice.gov/usao-edmi/pr/former-uaw-vice-president-sentenced-30-months-taking-250000-bribes-and-kickbacks.

Regardless, as for the allegations that Ashton harmed GM by withholding benefits from 2010 to 2014, at FCA's instruction, that theory is not new, only the name of the actor is. As for GM's allegations that Ashton harmed GM once he joined GM's Board, GM alleges only that FCA bribed Ashton from 2010 to 2014 when he was with the UAW. *See* Motion to Amend or Alter Judgment, R. 84, PageID 3000. GM does not say that it has evidence that FCA continued to bribe Ashton once he renounced his UAW affiliation and joined GM's Board. Any suggestion then that Ashton *infiltrated* GM and funneled its secrets to FCA is mere conjecture and not supported by GM's newly discovered evidence.

One last thing warrants attention. Above, we concluded that GM could not satisfy RICO proximate cause for its competitive-advantage injuries because it failed to allege that it had any right to, or legitimate expectation of, those benefits. GM's proposed amended complaint, when discussing Ashton's role in the scheme and throughout, now contains conclusory allegations that the UAW would have bestowed on a corruption-free GM the same competitive-advantage benefits that it alleges FCA obtained only through bribery, although it fails to explain why the UAW would have done so. So does this save GM? No, given the posture. These allegations seem to be a direct response to the district court's conclusion (like ours) that the complaint failed to allege that GM had any entitlement to the competitive-advantage benefits that the UAW withheld. As the district court explained, "[t]he allegations show that the 'unique competitive advantages' at issue would not have been available to a company unwilling to bribe UAW officials." R. 82, PageID 2969–71. Rule 59(e) does not allow a plaintiff to use the district court opinion "as a sounding board to discover holes in their arguments, then reopen the case by amending their complaint to take account of the court's decision." *Leisure Caviar*, 616 F.3d at 616 (citation omitted). That is exactly what GM tries do here. Accordingly, the district court did not abuse its discretion by denying GM's Rule 59(e) motion.

**\*12**
* * *

We AFFIRM.

**All Citations**

--- F.4th ----, 2022 WL 3274123

End of Document    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.    12