```
                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| In re: | Case No. 18-10509-shl |
| | White Plains, New York |
| FIRESTAR DIAMOND, INC. AND FANTASY, INC., | October 26, 2022 |
| Debtor. | 11:04 a.m. - 2:53 p.m. |

- AP: 20-01054-SHL LEVIN VS. JAVERI ET AL, DOC 107 (ORAL
  ARGUMENT) MOTION TO APPROVE ORDER OF ATTACHMENT
- DOC 97 (ORAL ARGUMENT) MOTION FOR ATTACHMENT AND OTHER
  PROVISIONAL RELIEF AGAINST DEFENDANT MIHIR BHANSALI

## - A P P E A R A N C E S -

| | |
|---|---|
| For the Trustee: | CARL N. WEDOFF, ESQ. |
| | RICHARD LEVIN, ESQ. (Trustee) |
| | ANGELA ALLEN, ESQ. (IL Office) |
| | WILLIAM WILLIAMS, ESQ. (IL office) |
| | Jenner Block LLP |
| | 1155 Avenue of the Americas |
| | New York, New York 10036 |
| | 212-891-1600 |
| For Ami Javeri, CPRE, CPS50: | BIJAN AMINI, ESQ. |
| | REECE DAMERON, ESQ. |
| | Amini LLC |
| | 131 West 35th Street, Suite 12th Floor |
| | New York, New York 10001 |
| | 212-490-4700 |
| For Ajay Gandhi: | EDWARD L. SCHNITZER, ESQ. |
| | DAVID DORMONT, ESQ. (PA office) |
| | MARC PHILLIPS, ESQ. |
| | Montgomery McCracken Walker Rhoads LLP |
| | 437 Madison Avenue |
| | New York, New York 10022 |
| | 212-867-9500 |
| For Mihir Bhansali: | NICOLE A. SULLIVAN, ESQ. |
| | THOMAS BUTLER, ESQ. |
| | MATTHEW J. PRUTTING, ESQ. |
| | White and Williams, LLP |
| | 7 Times Square, Suite 2900 |
| | New York, New York 10036 |
| | 212-244-5500 |
| Transcriber: | AA EXPRESS TRANSCRIPTS |
| | 195 Willoughby Avenue |
| | Brooklyn, New York 11205 |
| | 888-456-9716 |
| | contact@aaexpresstranscripts.com |

(Proceedings recorded by electronic sound recording)

1          THE COURT:  Okay.  It's 11 o'clock.  Oral argument in

2     motions dealing with attachment in two different adversary

3     proceedings.  The first of one of which is Levin v. Javeri et al

4     and the second is Levin v. Modi et al.  So, I think it makes

5     sense to get all the appearances at one time, and then I think

6     we'll take the matters in the order in which they appear on the

7     calendar.  We'll address Levin v. Javeri first, and then Levin

8     v. Modi.  So, let me find out who's here on behalf of the

9     trustee.

10          MR. WEDOFF:  Good morning, Your Honor, Carl Wedoff,

11    Jenner & Block on behalf of the liquidating trustee for the

12    Firestar Diamond liquidating trust.  I'm also joined by Bill

13    Williams in our Chicago office, Angela Allen, and the trustee,

14    Richard Levin, is also on the line.  And he has put in

15    declarations in support of the motions in both adversary

16    proceedings.

17          THE COURT:  All right.  And let me find out who is

18    here on behalf of the various defendants in the Ami Javeri case.

19          MR. AMINI:  Good morning, Your Honor, Bijan Amini,

20    Amini LLC, together with my colleague, Reece Dameron, who's

21    sitting next to me, but not on screen, Your Honor, for Ami

22    Javeri and the two LLCs, real estate LLCs, CPRE LLC and CPS50

23    LLC.

24          THE COURT:  All right.  Let me get other appearances

25    as well.

1        MR. BERNSTEIN:  Roger Bernstein, I'm co-counsel with

2   Mr. Amini's firm.

3        THE COURT:  All right.  Good to have you.  Any other

4   appearances as to the Javeri case?

5        (No response.)

6        THE COURT:  All right.  And I know the trustee is

7   obviously here for the other adversary proceeding.  So, let me

8   get appearances from the defendants in the Levin v. Modi case.

9        MR. BUTLER:  Good morning, Your Honor, it's Thomas

10  Butler from White and Williams for Mihir Bhansali.  And I'm here

11  with my colleague, Nicole Sullivan.

12       THE COURT:  Good morning.  Are there other

13  appearances?

14       MR. SCHNITZER:  Edward Schnitzer, on behalf of Ajay

15  Gandhi.  And I'm here with my colleagues, David Dormont and Marc

16  Phillips.

17       THE COURT:  Good morning.  Anyone else?

18       (No response.)

19       THE COURT:  All right.  So, before we begin, I didn't

20  know if there were any preliminary matters that we need to

21  discuss or if we should dive right into the action motions,

22  responses and legal arguments, starting with the Javeri case.

23  Anybody have any --

24       MR. Good morning.  I'm sorry, Your Honor.  Good

25  morning, Your Honor, Carl Wedoff.  We do have a couple of

Firestar Diamond - 10/26/22                    4

1  housekeeping matters, and I leave it to Your Honor whether you'd

2  rather deal with those now or later, but I'm happy to address

3  them right off the back.

4         THE COURT:  Let's deal with them now, just so we don't

5  have to remember to deal with them later.

6         MR. WEDOFF:  Okay.  Thank you, Your Honor.  The last

7  time I was before Your Honor, you asked about the Levin v.

8  Bhansali matter.  That's adversary proceeding 20-1052.  And in

9  sum, you asked whether we needed to schedule oral argument on

10 the pending motions to dismiss by Mr. Bhansali and Mr. Gandhi;

11 (2) whether the matter had been consolidated with adversary

12 proceeding 19-1102, that's Levin v. Modi; and (3) whether it

13 would be appropriate for a Manhattan based bankruptcy judge to

14 take over the 20-1052 adversary proceeding, which I believe you

15 referred to as the faithless servant adversary proceeding.

16        We have confirmed with our counterparties, who I

17 believe are on the line, and we agree, and I believe we

18 previously informed the Court.  But to the extent there's any

19 misunderstanding, we agree that the motions to dismiss can be

20 heard without oral argument.  So, they are ready to be decided;

21 they are fully briefed.  Second, the two actions have been

22 consolidated for purposes of discovery, but they have not been

23 fully consolidated.  And (4) for purposes of efficiency, the

24 trustee would ask that you keep the 20-1052 case.  The

25 counterparties take no position on that.  I do note, however,

Firestar Diamond - 10/26/22                    5

1   that Mr. Gandhi has moved to withdraw the reference of both

2   adversary proceedings, and that motion or motions are currently

3   pending before Judge McMahon in the district court.

4          THE COURT:  All right.  Thank you.  I wasn't sure if

5   other counsel involved in that case wanted to chime in or not.

6          MS. SULLIVAN:  Your Honor, it's Nicole Sullivan from

7   White and Williams for Mr. Bhansali.  That was mostly accurate

8   by Mr. Wedoff, and maybe there was just a miscommunication

9   between me and him, but to the extent that the trustee is asking

10  for one adversary proceeding to stay with Your Honor, we think

11  the adversary proceedings against Mr. Bhansali and I believe Mr.

12  Gandhi should stay together, whether they get referred to a

13  district court or they stay with Your Honor, or Your Honor

14  chooses to have them stay in Manhattan.  We took no position on

15  what this Court wants to do as far as keeping the matters or

16  not.  We'd leave that to your discretion, but they should

17  definitely travel together.

18         THE COURT:  All right.  Fair point.  Is there anyone

19  else who wishes to be heard?

20         MR. DORMONT:  Yes, Your Honor.  This is David Dormont

21  on behalf of defendant Ajay Gandhi.  We believe two things.

22  One, we obviously believe that the two cases, which really are

23  almost identical, except I think the first 175 paragraphs,

24  should obviously stay together.  We also believe that they

25  should really be substantively consolidated.  They really are

Firestar Diamond - 10/26/22                                    6

1   one case.  We really, other than tactical reasons, have no

2   understanding of why they were filed separately, and why an

3   amended complaint wasn't filed.  Other than the fact that there

4   might have been a motion to dismiss already pending with and the

5   trustee wanted to move things forward.  But we certainly think

6   it's appropriate to leave this case in Manhattan and not take it

7   with you up to Westchester.

8          These really are separate cases from the bankruptcy

9   itself.  They grow out of the bankruptcy.  We really think,

10  given where the parties are located and for the convenience.

11  This case is just beginning as far as substantively and it may

12  be removed to the district court, which my client has filed

13  motion for, which has been joined.  But it should stay in

14  Manhattan.  It should not go up to Westchester.

15         THE COURT:  All right.  So, just a couple of things.

16  I just want to make it clear that this entire inquiry is driven

17  by the question of document management.  As a judge that I

18  clerked for, a dc judge, which he used to love to say, justice

19  delayed is justice denied, and I have inherited an entire

20  calendar up here.  And so, I'm still sorting through getting to

21  know that calendar.  Obviously, it's a fascinating case with

22  high quality lawyers, I'm just trying to figure out what the

23  appropriate bandwidth is, so that you all get prompt attention

24  on any and all issues that you need addressed.  You all know

25  that, but I think it's important enough to say out loud.

1        And the other thing is, as you know judges, when they

2   do transfer cases, certainly, I like to transfer things as tidy

3   and up-to-date kind of circumstance as I can.  So, regardless of

4   what I do, I certainly would go through and deal with the

5   attachment motions, because everything is hopefully ready to go,

6   and certainly there feels like a certain time element to that.

7   And certainly they're also somewhat tied to pending motions to

8   dismiss in the Javeri case which we've been working on in

9   chambers.

10       And last but not least, you shouldn't trouble yourself

11  on the consolidation question all that much.  The point is that

12  the parties are getting along and know what they're doing.  And

13  you all have essentially dealt with them together for purposes

14  of discovery which makes eminent sense.  And so, the real

15  question there was whether there was anything that needed to be

16  done for purposes of the parties making the cases work.  But you

17  all have taken that matter into your own hands and addressed

18  that, and I appreciate that.

19       And last, but not least on the question of oral

20  argument and the motions to dismiss, what I'll refer to as the

21  faithful servant case, the 20-1052, I will say that the parties'

22  positions, sometimes judges will schedule an oral argument

23  anyway.  And so, there's a certain order of operations.

24  Obviously, they'll give you what we have on for today, and so my

25  intention is to turn to this, and address this first and see

Firestar Diamond - 10/26/22                               8

1   where things end up.  So, to keep you in the loop in terms of

2   how this all plays out, if you have any questions or if there's

3   something that you're going to do or not do, it becomes

4   important to know more details about that, just reach out to

5   chambers.  Discuss it among yourselves and we'll get you

6   whatever we can.  So, thank you for your wisdom and thoughts on

7   that.  It's much appreciated.  And with that, I think we will

8   turn to the Levin v. Javeri, 20-1054.  It's on for oral argument

9   on the motion to approve order of attachment.  Normally, the

10  trustee, who's the movant, has the burden of proof.  But there

11  are times when folks say it makes sense to hear more from the

12  objecting parties and then respond.  Mr. Wedoff, I'll leave it

13  to you on how much of an extensive presentation you want to make

14  at this point.  Certainly, I have all the briefing, and I'm not

15  a stranger to this case in any way, shape or form, so I'll hand

16  it over to you, Mr. Wedoff.

17        MR. WEDOFF:  Thank you, Your Honor.  And if Your Honor

18  will oblige me, I do have one housekeeping matter on this

19  motion.  And I hope this isn't anticlimactic.  So, when we filed

20  our moving brief for the motion to confirm attachment and the

21  original Levin declaration, we filed a motion to seal those

22  documents.  There is a standing protective order int his case

23  that covers much of the material that was redacted.  However,

24  some of the material involves South Dakota Trust Law and we did

25  not want to run afoul of that.  So, there are redactions that

Firestar Diamond - 10/26/22                    9

1  are not contemplated by a protective order in the original

2  motion and declaration.  We requested a sealing order; the Court

3  entered a sealing order.

4         We also redacted a reply brief in our supplemental

5  Levin declaration, along the same lines.  We have not filed a

6  separate sealing motion.  I do not if Your Honor has a

7  preference on how we handle that.  I see --

8         THE COURT:  I think my preference is that you're doing

9  exactly what you're doing now.  The point is to protect

10 appropriate information.  I don't want to make it, when there's

11 no dispute about that, anymore difficult a process than it to

12 be.  My question really goes to the merits of it.  I understand

13 the South Dakota Trust Law, like things that are confidential

14 under applicable state law, I understand why the sealing would

15 follow form.  But since we're diving in today, I did have a

16 couple of questions about that.  I'm glad you reminded me.  One

17 is, is there any concern about discussing things frankly and

18 candidly essentially in open court here today?  I don't think

19 there's anybody on this Zoom who isn't involved in this case.

20 But when we're in person, I can see you all, and I can ask

21 somebody who's sitting in the back who they're affiliated with.

22 It's a little bit more cumbersome on Zoom.  So, are there any

23 suggestions on that particular question?

24        MR. WEDOFF:  Yes, Your Honor.  That was going to be my

25 next point.  We have confirmed with Mr. Javeri's counsel, and

Firestar Diamond - 10/26/22                          10

1   Mr. Javeri has no objection to a full open discussion on the

2   record today.  Perhaps if we start reading line by line from

3   documents, there could be an issue, but we don't anticipate

4   doing that.  So, Mr. Javeri has stated, no objection to a full,

5   open hearing.  However, Mr. Javeri has asked that the documents

6   we redacted remain so.  So, my view is that we could do one of

7   three things.  One is, we could just proceed without an

8   additional sealing order.  Two is we could submit an amended

9   order that basically has the same content and just adds our

10  reply brief and our supplemental declaration.  Third is we could

11  move on the record with a written motion that Your Honor could

12  consider --

13          THE COURT:  I'll take three off the table.  I don't

14  think its necessary.  I'm happy to address this on the record

15  today in terms of not needing an additional order.  That said, I

16  remember having clients, and sometimes addressing things on the

17  record did not give people the peace of mind that they wanted.

18  So, if you all think it's important to follow up with an order,,

19  a written order, a stipulation written order, I'm fine with

20  that.  But certainly, if you just say, judge, you know, we just

21  need you say the right things on the record to address the

22  concerns, I'm happy to do that as well and save you all the

23  additional sort of belts and suspenders step.  So, I'll leave it

24  to you.

25          I did represent an intelligence agency in my former

Firestar Diamond - 10/26/22                    11

1  life, and they would want an order because they would say, it's

2  nice of you, judge.  Thanks.  But he or she could say those

3  things, but we want an order.  So, I'll leave it to you all.

4  One other thing, if we're going to do it on the record, is to

5  just briefly reiterate what the basis is for the sealing.

6  Obviously, you mentioned the South Dakota Trust Law.  I totally

7  get it.  And just briefly, in three sentences or less, just

8  repeat what the basis is for the sealing, so that we have an

9  appropriate record.

10       MR. WEDOFF:  Thank you, Your Honor.  I do not have the

11  South Dakota statute in front of me, and I apologize for that,

12  but my understanding --

13       THE COURT:  I think that's in the record, and I think

14  that's already in the prior sealing of papers, so I think we're

15  good on that.

16       MR. WEDOFF:  Great.  I would refer back to our prior

17  sealing motion, and the grounds are exactly the same.  We are

18  sealing the exact same type of information, the exact same

19  documents.  There are additional documents in the Levin

20  declaration but the basis is wholly the same.  So, I would refer

21  back to the original sealing motion.  And I believe the docket

22  number for that is 105 from the 20-1054 adversary proceeding.

23       THE COURT:  All right.  Does any defendant want to

24  weigh in on the sealing question?

25       UNKNOWN:  No, Your Honor.

Firestar Diamond - 10/26/22                    12

1        THE COURT:  All right.  So, I'm happy to so order the

2   record and seal the matters that have been recently submitted,

3   and they've been actually submitted as a redacted matter on the

4   docket with only the sealed matters redacted.  And consistent

5   with the prior sealings order and the basis for the prior order

6   that's already on the docket rather than require a separate

7   motion.  I'm not hearing any objection to proceeding that way.

8   And again, in the fullness of time, and with additional

9   contemplation, you decide you'd like to have something more

10  formal, feel free to submit anything, but otherwise, I'm fine

11  with proceeding this way.  I do appreciate that you all talked

12  ahead of time for purposes of the argument today, so I'm happy

13  to proceed that way.  I will essentially look to you to police

14  the outer bounds of anything that might be problematic to say on

15  the record.  If we stumble upon something, you'll let me know,

16  and we can essentially work out that that part of the transcript

17  is sealed.  But frankly, for most arguments of this type, we can

18  work around those things because it's the details that are

19  relevant.  So, with that, is there anything else on sealing?

20       MR. WEDOFF  Not from the trustee, Your Honor.  Thank

21  you.

22       THE COURT:  All right.  So, Mr. Wedoff, we can turn to

23  the merits of the motion.

24       MR. WEDOFF:  Thank you, Your Honor.  And to answer

25  your question, the trustee would like to make a few remarks

Firestar Diamond - 10/26/22                    13

1  before turning it over, but I appreciate that you are familiar

2  with the briefing.  I realize there's a lot of paper.

3  Particularly with the declarations and exhibits, and I don't

4  want to belabor anything.  But I do want to make a few points

5  before we turn it over to the defendants.  Your Honor, this is

6  an important motion.  The trustee believes it is imperative that

7  the Court confirm a previously entered attachment order.  The

8  property involved here, two luxury apartments in Manhattan, and

9  approximately $10 million in cash in a revocable trust are

10 likely the primary source of recovery in this adversary

11 proceeding.  And one of the primary sources of recovery in all

12 remaining Firestar litigation.

13         Respondents' have been transparent.  Their intention

14 to rapidly dissipate these assets if the attachment is

15 dissolved.  They will sell the apartments, use the proceeds for

16 personal expenses, and they will immediately draw millions of

17 dollars from the Frost Trust, plus an additional $75,000 per

18 month for further unspecified personal expenses.  And Your

19 Honor, respondents underscore this point saying that even if

20 Your Honor confirms the attachment that respondents should still

21 be allowed personal expenses.  And respondents do not specify or

22 quantify these expenses, but the limited number of documents we

23 have received from Ms. Javeri demonstrate profligate spending to

24 support an opulent lifestyle.  And this is continued years after

25 Firestar filed for bankruptcy.  And because the damages the

Firestar Diamond - 10/26/22                    14

1  trustee seeks far exceed the value of the property, every dollar

2  that goes out the door is one dollar less that the trustee will

3  ultimately be able to recover on a judgment.  Now, obviously,

4  that's not good enough.  The trustee needs to substantiate his

5  entitlement to an attachment, and the trustee has done that.

6          As Your Honor knows, and as we set forth in our brief,

7  and I'm not going to read the brief out loud.  I'll be very

8  brief here.  No pun intended.  CPLR 6212(a) governs attachment

9  in this proceeding under 7064 of Bankruptcy Rules.  It has four

10 steps, four elements that the trustee needs to show, and the

11 trustee has shown each of those.  The first element, is there

12 cause of action?  The second element, is it probable that the

13 trustee will succeed on the merits?  The third element, are one

14 or more grounds for attachment present under CPLR 6201.3?  The

15 fourth, does the amount demanded from the defendant exceed all

16 counterclaims known to the plaintiff?  Each of these elements is

17 satisfied and I'll address them briefly.

18         First, has the trustee stated a cause of action.  Yes.

19 That's where the complaint comes in.  The trustee has stated

20 claims for RICO conspiracy against each of the respondents, and

21 the trustee has stated claims for fraudulent transfer against

22 Ms. Javeri and CPRE.  Curiously, respondents challenge this

23 cause of action element because they have moved to dismiss the

24 complaint.  Obviously, moving to dismiss the complaint doesn't

25 defeat attachment or there would be no attachment.  Defendants

Firestar Diamond - 10/26/22                    15

1    would just lose.  Second, they raise a factual dispute between

2    the examiner's report and our briefing in response to motions to

3    dismiss.  At most, this is a factual dispute, and it involves

4    one claim with one defendant.  It doesn't mean we didn't state a

5    cause of action.  That element is satisfied; that element is

6    easily satisfied in all the cases I have seen and I have never

7    seen a case where the first element wasn't satisfied but the

8    others were.  It's essentially a fait accompli.

9         The second element, and this is where the respondents

10   spend much of their time and efforts.  The likelihood of success

11   on the merits.  So, the respondents' arguments here, I think are

12   flawed on two grounds.  One, they overstate what the trustee

13   needs to show, and they two, they minimize or misconstrue what

14   the trustee has shown.  So, first, and I think the standard here

15   is very important to keep in mind.  What the trustee needs to

16   show is that he will ultimately succeed on the merits at trial.

17   What the trustee does not need to show is that the evidenced

18   adduced today is sufficient to establish by preponderance of the

19   evidence the defendant's liability and his entitlement to a

20   judgment.  If the trustee needed to show that, there would never

21   be an attachment.  We would just proceed to trial.

22        Moreover, and this is a point I think the respondents

23   allied, is that all legitimate inferences should be drawn in

24   favor of the party seeking attachment.  Now, it doesn't operate

25   the way that a complaint would in a motion to dismiss, there

Firestar Diamond - 10/26/22                           16

1   still needs to be evidence.  But when you look at that evidence,

2   you need to draw inferences in favor of the trustee.  You cannot

3   give respondents the benefit of the doubt when they poke holes

4   or make excuses for the evidence that the trustee adduces.  So,

5   the evidence that --

6           THE COURT:  Well, let me back up for a second.  So,

7   you just drew a distinction between what you have to show at

8   trial, and what you have to show here.  Then you went on to talk

9   about inferences.  And as you explained, the inferences, in your

10  view, are different, right?  So, that's a difference from trial,

11  right?  Who gets the benefit of what inferences.  And it sort of

12  shows that this is neither fish nor fowl.  It's neither trial

13  nor summary judgment, but it is its own special procedural

14  vehicle.  But putting the inferences aside, you seem to draw a

15  distinction between what you have to show here and at trial, but

16  as a practical matter, I'm trying to sort of tease through what

17  that actually means because your papers say in reply,

18  probability of prevailing on the merits is better than 50

19  percent to demonstrate a likelihood of success.  And 51 percent,

20  and then you've got a footnote saying, preponderance of evidence

21  standard applies in civil RICO cases.  Is the difference really

22  that we're just at a different procedural spot in the case and

23  the inferences are different, rather than the actual standard?

24          MR. WEDOFF:  I have a thought on that.  Your Honor,

25  discovery is not completed.  For example, there is a U.K.

Firestar Diamond - 10/26/22                    17

1   judgment, and a lot of content in there that substantiates the

2   underlying fraud, and some of the actions that are at issue in

3   our adversary proceeding.  Statements in that judgment --

4   there's a Firestar employee, an employee of the enterprise says

5   something that's cited in that judgment.  Your Honor can look at

6   that hearsay and find that it supports an ultimate likelihood of

7   success on the merits even if we don't have that statement in

8   admissible form.  And perhaps there's a hearsay exception where

9   we could get it in; perhaps we could take a deposition of that

10  individual; but we haven't done it today.  But if Your Honor

11  feels that this is evidence that the trustee will be able to

12  substantiate, or if there is a hole in the evidence, or if we

13  can substantiate parts of a RICO conspiracy claim, but there's

14  one element that's not there, but it looks, based on the other

15  evidence, that we will get there, then you can attach the

16  property.  You don't need --

17          THE COURT:  I guess I'm thinking in a slightly

18  different way, and I welcome all parties' views on this.  But if

19  we don't have the standard squared away before we get out of

20  here, then we really haven't accomplished what we need to

21  accomplish.  I think of it as, there may be different

22  evidentiary rules for what you consider non-conspirator rights.

23  Summary judgment has its own rules, trials have its own rules.

24  But what you're saying is that there are rules about hearsay

25  that are different given the procedural posture of things, and

Firestar Diamond - 10/26/22                    18

1   you're saying the inferences are different.  But it seems like

2   the standard is the same.  Right?  It's still a probability;

3   it's still the preponderance standard, 51 percent, but rather,

4   there are things about how you go about that inquiry that are

5   different.  And again, I'm sort of parsing what the standard is

6   versus what the Court can consider in assessing that standard.

7           MR. WEDOFF:  Exactly.

8           THE COURT:  How you view what's submitted to who gets

9   what.  You know, in summary judgment, you always take inferences

10  in favor of the non-moving party.  Every procedural mechanism

11  has its own set of construction, a sort of procedural way of

12  looking at the world.  So, I think your view of the inferences

13  here are different, the evidentiary rules here are different,

14  but it's still the same standard.  I guess that's where I'm

15  slicing it.  Preponderance to the evidence is preponderance of

16  the evidence, and I haven't seen anything anywhere that changes

17  that for purposes of this second prong.

18          MR. WEDOFF:  No.  So, Your Honor, I think what our

19  point is, is that at trial, we need to show, by a preponderance

20  of the evidence that the defendants are liable for RICO

21  conspiracy and fraudulent transfer.  Right now, we need to show

22  it is more likely than not that we'll ultimately be able to make

23  that showing, and I that's a different standard.  There's less

24  of an evidentiary burden to show that we'll eventually reach

25  that 51 percent threshold at the attachment stage than at the

Firestar Diamond - 10/26/22                    19

1    end of the day.

2            So, we need to show enough that Your Honor thinks

3    you'll get there at trial.  Yes, the inferences are different,

4    what can be admissible for provisional relief is different, but

5    I think the key point is that we have to show a better than 50

6    percent chance that we'll ultimately show a greater than 51

7    percent preponderance of the evidence shown.  So, that's the

8    key.  It's that you think we'll ultimately get there.  That the

9    evidence is good enough to show a likelihood that we will arrive

10   at that point.

11           THE COURT:  All right.  So, speaking of standards and

12   various things, for purposes of the two different motions, one

13   obviously already has a provisional order attachment and one

14   doesn't.  So, for purposes of considering each of these motions,

15   is there anything different about how I should be viewing things

16   in the different motions for purposes of today?

17           MR. WEDOFF:  Your Honor, I don't believe there is.  It

18   is the same statute, it's 6212(a), same standards.  Now,

19   obviously confirming the attachment with the benefit of an

20   opposition, you know, that's obviously a different circumstance.

21           THE COURT:  Yes.  It's a different animal, but it

22   sounds like the standard is not different.

23           MR. WEDOFF:  Correct.  There are no separate elements

24   or a separate statute that you look to.  It's the same thing.

25           THE COURT:  Well, in that way, it sort of echoes like

Firestar Diamond - 10/26/22                    20

1  a TRO and a preliminary injunction.

2           MR. WEDOFF:  Exactly.

3           THE COURT:  It's the same standard, but it's not the

4  same exercise.  All right.  And moving along to talking about

5  the evidentiary showing and the probability of success on the

6  merits, you have some cases that you cite for the discussion

7  about hearsay, and I have two things that I want to ask you

8  about.  One is that the cases talk about foreign documents, and

9  I wasn't sure if you were citing it for purposes of,

10 essentially, hey, there are different kinds of hearsay

11 exceptions that are out there for official proceedings in

12 foreign countries, etcetera, or if you were just saying, no,

13 it's just hearsay in general that's permissible.  And two, and I

14 apologize for throwing both these questions at you at the same

15 time, but I don't want to forget them.  But then, I'll get out

16 of your way, so you can answer them.  Two is, if you put the

17 hearsay question to the side, and say, well, the trustee thinks

18 that he can satisfy the burdens here without resorting to

19 hearsay because there is direct evidence, there are

20 implications, there's the Fifth Amendment, there are various

21 things.  I didn't know if  you wanted to tackle that question.

22 So, with those two questions, I'll get out of your way and let

23 you address them.

24          MR. WEDOFF:  So, on the first question, yes, I think

25 the case we cite addresses hearsay from a foreign judgment, and

1   we do have a U.K. judgment that we're relying on.  So, I do

2   think that's directly on point there  And it's something I maybe

3   should have mentioned with a standard.  When there's no rebuttal

4   evidence, that also, I think affects how you view evidence.  And

5   we cite (inaudible) Distributors for that.  So, to the extent

6   there is hearsay, but nothing to counter or contradict it, we do

7   think that has some bearing.  And that's (inaudible)

8   Distributors, which we cited, on page 6 of the reply brief.  But

9   I don't think the rule is limited to foreign judgments.

10          Now, turning to your second question, do we have good

11   enough direct evidence?  At the attachment stage, yes, I do

12   think we do.  But I think the foreign judgments in particular

13   help tell the bigger picture, the bigger story that we tell in

14   our complaint.  They echo a lot of the same things, they reach

15   findings that are consummate with our complaint, so we think

16   that those are important.  But the direct evidence we have, and

17   I'm happy to turn to the particular items, we think is

18   compelling and we think it's sufficient for Your Honor to

19   confirm the attachment order with respect to the respondents.

20          So, again, with a RICO conspiracy, and that's our

21   primary concern here, first you need to establish a conspiracy.

22   And in our complaint, we do not allege that the respondents were

23   the principals of the RICO activities.  But we do allege that

24   they conspired with the RICO participants.  So, first, we need

25   to show that there was a RICO conspiracy.  We think this is

1   thoroughly supported by the foreign judgments, but we also have

2   documents from Mihir Bhansali creating fictitious background

3   stories for shadow entities, emailing with the LOU and Modi

4   controlled entities, planning roundtrip transactions.  Those are

5   at Group Exhibits 7 and 8.  I mislabeled them in the brief as

6   Group Exhibits 6 and 7, but those are Group Exhibits 7 and 8.

7   That's direct evidence that we obtained earlier in the case.

8   And again, the foreign judgments, which Your Honor can rely on

9   here, establish the underlying fraud in great detail.  And I

10  know you are familiar with the underlying fraud, and I don't

11  know that we need to belabor that point.

12          Turning to the second point, which is, how are the

13  respondents involved.  And I think that really the key here is

14  that Ami Javeri, and sometimes I've heard her referred to as Omi

15  or Ami, well, let's call her Ms. Javeri.  Ms. Javeri was a

16  partner in one of these fictitious entities, an LOU entity.  And

17  those are the entities that interfaced with PNB and obtained

18  approximately, $3.5 billion.  She was a partner in one of those

19  entities.  The respondents' challenged that saying that she was

20  actually a trustee of trust that was a partner in one of the

21  entities.  But Your Honor I think that's a distinction without a

22  difference.  She still was in a control position of a fictitious

23  entity.

24          More to the point, Ms. Javeri received $34 million

25  from Purvi Mehta.  To remind, Your Honor, Purvi Mehta is Nirav

Firestar Diamond - 10/26/22                     23

1   Modi's sister.  And Purvi Mehta confessed to being the conduit

2   for the fraud.  So, we have a confession from Purvi Mehta that's

3   admissible evidence here saying, I was the conduit for the

4   fraud.  The proceeds ran through me, and a shadow entity called,

5   Fine Classic FZE, that was under her control.  And that same

6   conduit sent Ms. Javeri $34 million.  And receiving funds of a

7   conspiracy establishes liability for a RICO conspiracy.  That's

8   one of the primary ways it's established.  So, we have several

9   exhibits, both Mehta's confession, which is Exhibit 13 to the

10  original Levin declaration, and then a letter from Ms. Javeri's

11  counsel, that's Exhibit 4 to the supplemental Levin declaration,

12  saying that Trident Funds were properly sourced because they

13  came from this shadow entity, Fine Classic.  Exhibit 5 to the

14  supplemental declaration is Ms. Mehta saying that she is the

15  owner of Fine Classic, this fictitious shadow entity.  And then

16  Exhibit 6 is the Frost Trust agreement that Ms. Mehta settled.

17          So, she has confessed to the conduit for fraud

18  proceeds going out from the enterprise to the Modi family.  And

19  we have a bank statement showing $34 million coming into Ms.

20  Javeri's account.  That's a lot of money.  That is not an amount

21  of money that you miss on your money checking statement.

22  Moreover, Ms. Javeri appointed her brother-in-law, Nehal Modi,

23  to be the protector of the Ithaca Trust.  Nehal was heavily

24  involved in the fraud, which is set forth in the other

25  judgments.  Turning to the LLCs, CPS50 and CPRE, both of those

Firestar Diamond - 10/26/22                    24

1   are controlled by Nirav Modi.  That's set forth in Exhibit 11 to

2   the supplemental Levin declaration.

3          So, all of this evidence, Your Honor, substantiates

4   the respondents' conspiracy and agreement to enter into the RICO

5   conspiracy.  Your Honor, does not need to decide today whether

6   this evidence is good enough to prevail at trial.  And again, I

7   want to stress something, Your Honor, respondents spent a lot of

8   time saying that this is not evidence; that this evidence

9   doesn't show what we say it shows.  But they do not put in a

10  scintilla of rebuttal evidence; they do not explain where the

11  money came from.  There's not a declaration; there's not an

12  exhibit.  So, the utter absence of any rebuttal evidence further

13  underscores the likelihood that the trustee will ultimately

14  prevail.  And again, Your Honor, discovery is not completed.  A

15  lot of the evidence is oversees, it's difficult to obtain, but

16  what we have obtained, I think shows a very stark picture that

17  we are highly likely to succeed on the RICO conspiracy claims.

18         And I move to the next two prongs, the next two

19  elements of CPLR 6212(a) quickly.  Third prong.  The defendants

20  here who are not --

21         THE COURT:  Hold on.  Let me ask you one or two other

22  questions before you go on.  The last two things I just want to

23  cover with you.  One is that there is a lot of discussion about

24  things being purchased with the proceeds of the fraud.  And I

25  want to make sure I understand the significance of that

1   statement in the context of how you connect the dots.  My

2   understanding, and this may even be incomplete, or it could be

3   correct entirely, is that it really is trying to establish the

4   intent element, as well as the substantive element.  So,

5   basically, the second and third prongs.  Theoretically, you

6   could you say that there's money available.  You could say that

7   you have this claim against so and so.  separate and apart from

8   anything, they have assets, and we're seeking to attach those

9   assets, that have nothing to do with the actual fraud, and

10  there's our substantive complaint.  And so, you don't

11  necessarily, as matter of going through the attachment

12  standards, have to make that connection.  So, in terms of

13  understanding the reason that you do, there could be a number of

14  reasons driven by the facts here.  It helps to establish a

15  number of different points.  But I want to be clear in

16  understanding what you want me to take out of the fact that

17  those two are in fact linked when you could seek attachment when

18  they aren't linked.

19          MR. WEDOFF:  Yes, Your Honor.  That's a fair point.

20  So, I think for the second point, the likelihood of success of

21  the merits, the receipt of the funds, whether or not they're the

22  funds we are seeking to attach, establishes the substantive

23  liability for RICO conspiracy.  Now, when you're talking about,

24  are the funds subject to attachment, that's another point.

25  That's another point as to whether they were fraudulently

Firestar Diamond - 10/26/22                    26

1   transferred there.  And then, the third point is that we need to

2   attach this stuff because it will be dissipated.  So, I think it

3   goes to the second prong in establishing the substantive

4   liability, the third prong, in that it's going to be dissipated

5   with the intent to deprive the trustee, and then there's yet

6   another prong that's really outside of 6212(a), which is just

7   whether the assets are subject to attachment.  And I think it's

8   really relevant to all three things.

9           But turning to the third element of 6212 --

10          THE COURT:  I'm sorry.  One other question I have to

11  ask you before you move on from a merits kind of discussion.

12  Included in your submission, and I forget exactly which

13  submission it was, the deposition of Mr. Bhansali where the

14  Fifth Amendment is invoked.  Obviously, that's more relevant to

15  the other motion, but you mentioned it here, so before I forget,

16  I'm going to ask.  And maybe it makes sense to wait until we get

17  to arguing the other motion, but the Fifth Amendment is often

18  invoked in a very sloppy way where people invoke it in a blanket

19  way, and that's not how it's supposed to work at all.  It's a

20  link in the chain of evidence, and so it really matters what the

21  specific question is, and therefore, when somebody invokes the

22  Fifth Amendment there's entitlement to an adversary civil

23  inference as to that question.  So, I wasn't sure if there were

24  particular invocations in that deposition or elsewhere Fifth

25  Amendment invocations that are particularly relevant to the

Firestar Diamond - 10/26/22                    27

1   inquiry here.  And again, it may be a better question to deal

2   with when we get to the second motion, particularly when Mr.

3   Bhansali's counsel will be on the other side of that.  But it

4   did get mentioned here as part of the direct evidence, so that's

5   why I throw it out there now.

6          MR. WEDOFF:  Yes, thank you, Your Honor.  I do think

7   it's better addressed in the other motion.  We did cite to Mr.

8   Bhansali's records in our motion, but we did not, unless I'm

9   misunderstanding something, cite to his deposition.  We cited to

10  his email records and some spreadsheets taken from his computer

11  just to sort buttress the -- it's to provide direct evidence and

12  not just to rely on this U.K. judgment and the Indian judgments

13  to say that, yes, there was a fraud.

14         THE COURT:  Okay.

15         MR. WEDOFF:  That the fraud was real.  But we did not

16  include his deposition with this motion, so I think it's better

17  handled by my colleague, who will be arguing the Bhansali

18  motion.

19         THE COURT:  Okay.

20         MR. WEDOFF:  And when his counsel, when Mr. Bhansali's

21  counsel has a proper --

22         THE COURT:  Fair enough.  All right.  Thank you.  All

23  right, so you can go to the third prong.

24         MR. WEDOFF:  Okay.  So, again, the third prong,

25  dissipating assets available for judgment.  Again, Ms. Javeri

1   attempted to sell the apartments.  And frankly, Ms. Javeri has

2   been fairly transparent about what she intends to do.  She

3   intends to sell the apartments.  I understand, buy less

4   expensive apartments and then use the balance for her personal

5   expenses.  What she has not been transparent about the Frost

6   Trust, which we did not even know about when this motion was

7   originally filed.  It only came out in discovery from Trident

8   Trust.  And there is $10 million sitting in a revocable trust

9   where Ami Javeri is the investment advisor.  And she is seeking

10  to have $75,000 a month backdated to early 2018, I believe,

11  which would something along the lines of $4 million immediately

12  disbursed with an additional $75,000 per month to be disbursed

13  from this $10 million account.  That was completely hidden from

14  the trustee.  But in both cases, it's clear that the defendant

15  is trying to use these funds and they will not be available for

16  the trustee to satisfy a judgment.  It's not a situation where

17  they're trying to move a piece of personal property from one

18  place to another where the trustee would still be able to reach

19  it.  It's not a situation where there are ample funds available

20  to satisfy a judgment.  This would absolutely deplete what's

21  available to the trustee.  They challenge our entitlement on

22  this element by saying that the Frost Trust is not a

23  domiciliary, but it is property that Ami controls.  They

24  challenge it because the Frost Trust was not named, but we

25  didn't know about the Frost Trust.  And they also challenge

Firestar Diamond - 10/26/22                    29

1    attachment of the Frost Trust because she needs it for personal

2    expenses.  We're not aware of any authority that allows for

3    that.  So, we think the third prong is satisfactory for the

4    apartments and the Frost Trust.

5           The fourth prong is whether the damages exceed the

6    judgment, essentially.  They point out that the attachment order

7    does not specify the amount of damages.  There are several

8    categories of damages set forth in our complaint.  They're

9    unliquidated.  But they include diminution of the debtor's

10   business value of what the enterprise was worth, diminution in

11   the sales that were realized by the trustee.  As Your Honor may

12   recall, we executed a great number of sales that the Court

13   approved.  And those were done on, essentially, a fire sale

14   basis.  So, but for the fraud, that inventory would have

15   realized a greater value.  That's the second category.

16          The third category, the professional fees that were

17   incurred by virtue of the fraud.  Me sitting here and talking to

18   Your Honor this morning, and all of the other counsel, and

19   financial advisors that were employed by the Firestar debtors.

20   But the one category we think is readily ascertainable is the

21   amount of judgment against the U.S. affiliates.  That judgment

22   was attached as an exhibit to the original declaration and that

23   is approximately $23 million.  And that was for inventory that

24   would otherwise have been available to satisfy a judgment

25   against the U.S. affiliates but was sent out from the U.S.

Firestar Diamond - 10/26/22                    30

1  affiliates by virtue of the RICO conspiracy.  And because we are

2  seeking RICO conspiracy liability, those damages are tripled.

3  That gets you to approximately $69 million, which is far in

4  excess of the value of the apartments and the Frost Trust.  So,

5  we think the fourth element is easily satisfied.  So, that's

6  6212(a).

7          But there is another argument that the defendants

8  raise which is that the property is not attachable.  In that

9  respect we don't think the arguments are very strong.  First of

10 all, they argue that because the apartments are held in a trust

11 that we can't reach them through Ms. Javeri.  But these

12 apartments are owned by two LLCs which are defendants in this

13 action.  If we establish liability against those defendants, we

14 can reach the apartments.  But notwithstanding that, because

15 these asses were fraudulent transferred and we do make those

16 allegations, any protection of a trust would not exist for the

17 assets.  And again, there's further argument in our brief.  But

18 we think, by and large, we can reach the assets any number of

19 ways.

20         And a third and final argument is that both the

21 undertaken should be increased and that living expenses should

22 be allowed out of these assets.  We don't either argument has

23 merit.  We think the undertaken is appropriate, and we think

24 that there is no basis for allowing living expenses.  And I do

25 want to stress one thing.  The trustee agrees and has always

Firestar Diamond - 10/26/22                      31

1   agreed that costs associated with maintaining the apartment

2   should be allowed.  So, maintenance fees, maybe security, but

3   nothing to support Ms. Javeri and her family.  That just doesn't

4   come out of attached property.  We're not aware of any basis for

5   it.  That was longer than I had hoped by that's the long and

6   short of our argument, and I'm happy to reserve a little

7   rebuttal for anything that respondents raise.  Because, like you

8   said, sometimes the respondents go first in this circumstance,

9   and I don't want to stop there.

10          THE COURT:  All right.  Let me hear from the other

11  side.

12          MR. AMINI:  Bijan Amini, Your Honor, for Ms. Javeri

13  and the two LLCs.  First, I'd like to put a little bit of this

14  in context.  Ms. Javeri was married to Mr. Modi in 1995.  She

15  comes from her own wealthy family involved in the jewelry

16  business.  I believe they're still involved in the jewelry

17  business.  Mr. Modi was, at the time, part of a family that was

18  also successfully involved in the jewelry business.  And much of

19  that family remains in the jewelry worldwide.  So, they're still

20  working and they still at it.  And she's been married to him

21  continuously since 1995.  And I know it sounds good for the

22  tape, but these expenses that she spends are part of her normal

23  day-to-day living and have been since she was an infant.  So,

24  she's done nothing extraordinary.  As my adversary pointed out,

25  her activities have been very transparent.

1              In fact, he pointed out that faced with these

2   circumstances, she said, let's sell the expensive apartments and

3   downsize.  They prevented her from doing so.  Her realtor now

4   tells her, forget it, you're not going get that money.  And by

5   the way, I don't want to lose track of the fact of a $50,000

6   bond.  If this apartment ends up being not worth $29 million,

7   which is what they were going to list it for, but instead, $12

8   million at the end of this mess, there's something to be said

9   for that if they lose.  They're responsible for that.  And

10  that's something that hasn't been addressed.  But I think,

11  maybe, we don't need to ever get to that.

12             I agree with Your Honor's view of what I think Your

13  Honor was coming at in terms of what they have to show.  All

14  right?  In order to succeed on this attachment motion, they have

15  to establish both a cause of action and a ground for attachment

16  against that particular defendant.  I only represent Ms. Javeri.

17  And I only represent her so that she can live in the residences

18  that have been hers for some time and have the expenses that she

19  needs for her living expenses.  That's what this is about.  Can

20  we shut her down?  She doesn't have anything else to give these

21  people.  So, that's what they're after.

22             In order to do that, they have to come forward with

23  proof, and all the cases say this, that is stronger than that

24  required to establish a prima facie case.  And the companion to

25  that is, a complaint is never enough.  And it has to be

Firestar Diamond - 10/26/22                    33

1   competent proof.  Judge Furman, I think, said at some point.  He

2   said, given the drastic and harshness that this is.  Because

3   you're effectively saying, if you give them what they want, I'm

4   sorry, Ms. Javeri, I don't care how you've spent your whole

5   life, at this moment in time, go figure out how you're going to

6   make ends meet.  I am shutting you down.  That's pretty drastic,

7   that's pretty harsh.  And I'm prepared today to discuss in

8   minute detail, the evidence upon which that is being asked for.

9        But before we get to that, the statement is, there

10  needs to be competent evidence that it is likely to prevail on

11  the merits of the claim, and that it can also serve as a basis

12  for the attachment.  Competent is the word.  Your Honor, as a

13  jurist, I'm sure you know what competent evidence is.  I will

14  suggest to Your Honor that there's not one piece, not even one

15  piece, of competent evidence in this record.  Not one.  You can

16  try to pull one out, and I'm prepared to discuss every piece of

17  paper.  One of my favorite ones is number 5, I think, for the

18  supplement.  Yes.  Purvi Modi's application for commonwealth

19  trust company.  Her trust will be funded.  This is a piece of

20  paper.  I don't know who wrote it.  Her secretary?  She's in

21  Belgium, apparently.  Wealthy, doing well, and doing whatever

22  she does.  But her trust will be funded with dividends from Fine

23  Classic FZE, as well as her investment income from equity/fix

24  income portfolio.  That's a statement that's attributed,

25  attached by the trustee.  I don't know where it comes from, I

Firestar Diamond - 10/26/22                    34

1   don't know who made it, I don't know where they got it from.

2   But they say, that show that the money came from FZE.  We showed

3   you elsewhere.

4        If you read this whole judgment, I love the

5   statements.  Judgments and confessions.  We have constant

6   statements about judgments and confessions.  I live in this

7   country, I come from Iraq, but I know what a judgment and a real

8   confession is in this country.  I don't see anything here that

9   says it's a judgment or a confessional.  There's the word

10  judgment on a couple of things, but when you read them

11  carefully, they certainly don't qualify as judgments in the

12  United States of America.

13       The judgment in the English court is the court's

14  determination that the government of India, and this is on the

15  reply, so we don't respond to it.  But the Government of India

16  had succeeded convincing a magistrate judge in India that Mr.

17  Modi should be extradited in accordance with the Indian

18  government's request.  Ask my adversary to read through the

19  paragraphs that support his claim against Ms. Modi.  She is Ms.

20  Modi.  She's had to change her name because of all of this

21  publicity to Ami Javeri.  But she is not hiding from the fact

22  that she is Ms. Modi; she's been married to him for 28 years.

23  So, ask them to read to you from that judgment what it is that

24  gives the authority to this Court for harsh and extreme remedy

25  of this money --

Firestar Diamond - 10/26/22                    35

1        THE COURT:  I think it's a tad over the top, counsel.

2   It's not the way it works,  So, it's submitted as evidence in

3   the context of other things that have been submitted in the

4   record that I have.  And obviously, there will be arguments

5   about the sufficiency of that, and the trustee has his.  But the

6   idea is that you're saying, I can consider it for what it's

7   worth, and then I have to figure out what appropriate inferences

8   are or not.  The trustee did, in reply, proffer some cases that

9   talk about the ability to consider those kinds of documents.

10  But separate from the inferences, what I can reasonably draw

11  from those.  But let's take first things first, which is my

12  ability to actually consider them.  So, what's your view on

13  that?

14       MR. AMINI:  You see, I think there are two levels.

15  These documents end up being hearsay within hearsay, as we like

16  to say when we go to trial.  On the first level, you have to

17  have competent evidence of the document itself.  In this case,

18  all they've proffered is Mr. Levin.  He's not an expert in

19  either English law or Indian law to my knowledge.

20       THE COURT:  But are we talking about document

21  custodians?  Is that where we are?

22       MR. AMINI:  I think, for example, with the Indian

23  documents, ordinarily those cases that they've given you with

24  hearsay, if you look at the cases carefully, everyone of them

25  have people with knowledge submitting affidavits.  Every one of

Firestar Diamond - 10/26/22                          36

1   them.

2            THE COURT:  I'm not giving away anything, but federal

3   judges don't tend to be fans of -- if we're going to go the mat

4   on it, we'll go to the mat on it.  But if you want me to start

5   dragging in document custodians, we'll do that.  But if we're

6   talking about, I can't consider it because we don't know what it

7   is --

8            MR. AMINI:  Yes.  It's not the custodian.  I'm not

9   saying that if I go to the court record of that court, I won't

10  find that document in the clerk's file.  That's not my argument.

11  No, no.  No, no.

12           THE COURT:  All right.

13           MR. AMINI:  Competency requires that the document be

14  presented by somebody who's competent as to what it really

15  consists of.

16           THE COURT:  No, no, no, no.  So, we are.  Because

17  that's not how business records or record custodians work.  The

18  way it works is, somebody says, this is what it purports to be

19  on the docket of this court.  And then I look at it, I simply

20  figure out what it actually means or what inferences I can

21  reasonably take from it.  Lawyers differ greatly on that, and

22  that's fine.  But I don't know that I have somebody who sits and

23  walks me through the document.  Because that person, when you

24  put them on the stand at trial to walk me through the document,

25  what they think it means, and you immediately in trial, and I've

1   had this happen repeatedly in over 12 years plus on the bench,

2   people object and say, judge, the document is the document.  Who

3   in God's name are they to tell us what it means?  So, I part

4   company with you -- and I'm just trying to be candid as to how

5   I'm viewing this stuff.  So, I'll break out my inner procedural

6   and evidentiary geek because that was my former life.  So,

7   that's why I want to understand exactly what it is you're

8   objecting to.

9           If you're objecting to the inferences, I get it.  You

10  just say, judge, this is what it says, this is what they say, we

11  disagree.  I get that.  I know arguments are laid out in the

12  papers, but if we're talking about what it means, if we're not

13  talking about inferences, we're talking about something else,

14  that's where I'm confused, and I want to understand exactly what

15  your argument is.

16          MR. AMINI:  All right.  Ordinarily, for example, if

17  you had a complaint in a case, you would have the person who

18  verified the complaint before you, telling you, I'm the verifier

19  of this complaint.  I've sworn under oath in accordance with

20  both the federal rules and the state rule, both of them have

21  specific rules.  And these are the facts upon which I want you

22  to --

23          THE COURT:  Yeah, but it's still on information and

24  belief on a complaint.  I understand what a verified complaint

25  is, but here, I have my own standard.  By standard, we talked

1   about competent evidence.  So, what is it that needs to come

2   along with these documents that isn't here?  We're talking about

3   foreign court records here.  Let's be precise because it's not a

4   verified complaint.  That's really the first aspect, whether

5   there's a cause of action.  So, now I take evidence.  The

6   trustee says, here is a document from a foreign proceeding.

7   This is what it says, this is what we think it means.  You

8   present arguments, and say, it doesn't mean that, judge.  We've

9   looked at it and understand what the inferences are.  But other

10  than the inferences argument, what the relevance is, I'm having

11  trouble understanding what you're arguing.

12          MR. AMINI:  Well, the competence of it.  Let's take

13  the "confession."  It's not sworn.  It's nothing.  It's just a

14  piece of paper.  I grant you, maybe that piece of paper is in

15  that court file, but what it says --

16          THE COURT:  But that's an inference, right, --

17          MR. AMINI:  Okay.

18          THE COURT:  -- as to what I can take from that

19  document.

20          MR. AMINI:  Then I'll give you the inference, but I

21  would believe that in order to even begin to take the inferences

22  from the substance --

23          THE COURT:  But then you're asking me for a foreign

24  document custodian.  Somebody who can say, this is in the court

25  record, it is what it purports to be.

1      MR. AMINI:  Or this is what it is.  Because I'm not

2    even sure what some of this stuff is.

3      THE COURT:  But that's the document custodian.  So,

4    exactly what you said you didn't want is what you're objecting

5    to.

6      MR. AMINI:  Here's where I draw the distinction.  I'm

7    not going to object, Your Honor, that it's in the court file.

8    That's not what I'm saying.  So, Your Honor can find that

9    counsel for the defendant conceded that these are in those court

10   files.  Or I'll take Mr. Levin at his word.  I haven't gone to

11   look at it, but he says they are, and I would be surprised,

12   beyond surprised if he were to write an affidavit that he

13   somebody hadn't check that court file, said, no, this comes from

14   it.  So, I will give you that on that basis.

15     THE COURT:  And he does have a declaration that

16   attaches those and says, I represent these are what they are.

17     MR. AMINI:  In terms of representing what they are,

18   all he's done is regurgitate something that's written on them.

19   He hasn't really told you, you know --

20     THE COURT:  The document is what it is.  And so,

21   again, I'm really not following your argument, counsel.

22     MR. AMINI:  Here's my argument.

23     THE COURT:  I have his papers, and the papers are what

24   matter.  I'm obviously not hearing new arguments made for the

25   first time at oral argument, so I can just take your papers and

Firestar Diamond - 10/26/22                    40

1   sort through them, and that's fine.  We may be talking past each

2   other.

3        MR. AMINI:  And I don't mean to talk past you.  I'm

4   not trying to disagree with you.  I fine with --

5        THE COURT:  No, you can disagree with me.  I expect

6   people to disagree with me.  That's part of this.  But what I'm

7   trying to do is to understand.  What judges always want to do

8   before they make a ruling, and we always hope to get it right,

9   but the important part of getting it right is to understand what

10  people are arguing.  And other than an inference, I haven't

11  heard anything that you're objecting to, other than essentially

12  a document custodian.  But then I'm hearing you're not.  So, I

13  got it.

14       MR. AMINI:  If you'll permit, let me get to the

15  inference, and let me get past that if Your Honor will permit

16  me.  Let me get to the issue of the inferences in these

17  documents and the specifics.  What's being alleged here very

18  simply is, certain monies were the fruits of the crime, stolen

19  from Punjabi National Bank and funneled through Purvi Mehta to

20  Ami Javeri, to use them to buy her personal residence, and as

21  her expense money.  That's the allegation.  I think everybody

22  would agree, that's what at the heart of what they're trying to

23  go after Ami Javeri and these two entities for.

24       And in terms of the inferences, the first thing I

25  would say is, one has to show what that has to do with these

Firestar Diamond - 10/26/22                    41

1   debtors.  The two $5 million payments that consists of the Frost

2   Trust, as far as I know, the only evidence about them is in the

3   reply.  There's an affidavit from then counsel, at Patterson

4   Belknap, that says that Purvi Mehta transferred these monies

5   from two EFG accounts, which are in Switzerland, I believe, to

6   what ultimately became the Frost Trust.  That's all that's in

7   the record.  There's nothing that all these massive documents

8   they've given you that can connect those two payments to

9   anything.  Other than, of course, Purvi Mehta had among other

10  things, a company that we refer to as FZE, I think it's Steinman

11  something, and that that company was the recipient over a long

12  period of time, 2011 to 2017, of some of the funds that were

13  improperly taken through this bank.  That company was a

14  legitimate company; it also operated the jewelry business.

15  Those are the two pieces of it.  And on that basis, you should

16  have an attachment to this money against this person.  That's

17  it.  That's the sum total of the evidence on that.  There's not

18  a single other reference to anything.

19          And now you're digging into a judgment, I guess you'll

20  call it, in India that speaks about the fraud, principally of

21  the husband and his two lieutenants.  That's what comes over.

22  And I'll give you an even more minute part.  She was a

23  "partner."  We don't even have that document.  You know, they've

24  been the trustee for four years.  The Indians have been

25  investigating this for five years.  And she signed something,

1   they're claiming.  When you ask her, she'll tell you, what did I

2   sign in 2010.  She signed something in 2010.  That's the one

3   act, the overt at that they allege is that she was a partner and

4   signed for a bank account.  I heard Mr. Wedoff say it was one,

5   but the papers actually say two.  Two of the three LOUs.  It's

6   not clear to me if the trust is a member of all three of the

7   LOUs, or only two of the LOUs.  It's not clear to me what being

8   a member means.  It's not clear what signing something means.

9   And by the way, it's in 2010, all of the allegations about the

10  wrongdoing are subsequent to that.  They have detailed emails

11  and they claim financial transactions subsequent to that.  And

12  there is not one piece of paper with her name on it.  Nothing.

13  She was a housewife, who ran after charitable things.  She had

14  an online presence.  Everybody can see it.  You can go out and

15  make fun of her if you want, that was her life.  And she had

16  nothing to do with the business.  And they don't claim

17  otherwise.  She's being held here because she's the recipient of

18  these funds.  So, let's get to where these funds come from.

19  That would be my thinking.

20          The most critical part for Your Honor is decision

21  making.  I just told you that the two 5 million, they came from

22  two EFG accounts.  And if you read the papers about Purvi, Purvi

23  actually then gave $33 million in those accounts back to the

24  Indian government.  Okay.  And is cooperating with the Indian

25  Government and has been declared as someone who's no longer

Firestar Diamond - 10/26/22                    43

1  being sought after for any of the crimes or any recovery, but is

2  a cooperating witness, yet, I have nothing from her in this

3  case.  It's PNB's claim for this money and no affidavit.

4  Nothing.  But I'm supposed to put in what?  I'm supposed to put

5  in an affidavit from Ami that says, I'm the sister-in-law, these

6  are my family members.  I've always lived this way.  I've gotten

7  this money.  I'm living in the same apartment I've lived in

8  since 2006.  That's the Essex House.  And then I brought myself

9  a bigger one in 2017 and the funds came from my sister-in-law.

10 She's not denying any of that.  What else is she supposed to

11 tell you in this affidavit in response?

12         So, they have this $10 million and nothing else about

13 it, and you should attach it.  Your Honor, is there no

14 circumstance under which Purvi Mehta, who lives in Belgium,

15 doesn't have her own funds?  I can't tell you that.  But I can't

16 give you anything in this record that traces these funds to

17 anyone.

18         By the way, I want to emphasize to the Court that if

19 Your Honor doesn't grant the motion to dismiss, I join in the

20 other counsel's request earlier this morning, which was, let's

21 get to it then.  Let's get to this case because this woman's

22 life hangs on it, and if she's just a housewife and really not

23 responsible for this, she's entitled to move on.  She's living

24 there with her kids.  Nothing is going to disappear.  These

25 apartments are not going to disappear if we get this case done

Firestar Diamond - 10/26/22                    44

1    in the next year, Your Honor.  They're no longer even reasonably

2    thought to be worth selling in this market.  The brokers have

3    told them, don't bother.  Mr. Wedoff has agreed that he will pay

4    the expenses of the apartment.  The $10 million that's there,

5    the family is complaining that if we invested it, and again, we

6    don't have a bond for this, that we would earn 9-10 percent on

7    it, and 9 percent is what the trust itself designates she's

8    entitled to.  That's it.  No more.  The trust isn't going to pay

9    her anything.

10        In terms of the control she has over the trust, the

11   board should consider the fact that the trustee in South Dakota

12   is not letting any of this money go to anybody.  They haven't

13   even paid the last three months of apartment expenses until Mr.

14   Wedoff and his team signoff on that kind of thing.  We'll work

15   that out.  I can tell from the smile.  Neither one of us is here

16   to fight with Your Honor about that today.  So, we'll fix that

17   part.  So, that's to put this in context.  So, now, what you're

18   saying is, I want to enter an attachment order against her and

19   deem all of this as locked under the trustee.  And for that $10

20   million, that's all they have.

21        So, there are the two apartments.  The Essex House is

22   the easy one.  2006 it was purchased where it was a family held

23   corporation and as many of these families do, it was the New

24   York City residence of the Modi's.  And it was brought for that

25   purpose, and Ms. Modi had lived in it from 2006 till 2017 when

1   she moved into the larger apartment.  In 2014, not '18 or '17,

2   when they say they were about to get caught.  That's a whole

3   complicated story of it's own.  But in 2014, by their own

4   admission, they're talking internally, can we move the apartment

5   into the family's personal name.  It eventually happens, and

6   yes, the critical paragraphs are in their own complaint.

7          In their own complaint, there are two paragraphs in

8   which one of the paragraphs says, and now, of course, I've lost

9   it, one of the paragraphs says, the apartment is worth $6

10  million.  It's in the 340s.  And one of the paragraphs in the

11  350s says, and on such and such date, Purvi Mehta paid the

12  debtor $6 million for it.  Now, there's a lot of noise about a

13  lot of other things, but what's the claim.  The only claim I can

14  think of is, okay, the 6 million that Purvi paid, I want that

15  back.  Good.  Then I would expect the debtor to be able to show

16  you chapter and verse of where that 6 million came from and how

17  it went through these accounts after four years of all these

18  Indian complaints, and investigators, and the trustee's work.

19  But I have nothing.  I have handwaving that Mr. Modi's and his

20  two lieutenants were committing, I don't know, if it was a

21  Ponzi.  They were moving jewelry around and they were selling

22  it, I call it, to producers.  They were selling the same piece

23  from their own description.  I have no other description of it.

24  Several times to different people and then claiming the

25  receivables of actual receivables.  Something like that.  I

Firestar Diamond - 10/26/22                    46

1   haven't figured that part out.  It had nothing to do with her.

2   And at some point they say $89 million went through.  And then

3   when you read it carefully, it's 89 million went through a dozen

4   or more companies over seven years and Purvi Mehta's company was

5   one of them.  And so, when she gave this 6 million, and then the

6   additional 25 million to buy the larger apartment, and from a

7   separate account gave 10 million and $33 million back to the

8   Indian government, somewhere in there is our money and you

9   should attach it.  Because this woman signed something in 2010

10  that's not in this record that makes her a participant in this

11  crime.  And she hasn't put in an affidavit that says, the thing

12  I signed in 2010, which I don't remember, I don't know what it

13  is.  Harsh and drastic shows up in every decision where they

14  grant these attachments.  And I will commit to Your Honor, as

15  par for this argument today, that I will work with the trustee

16  if Your Honor doesn't want to dismiss the complaint.  I didn't

17  make the motion to dismiss, Mr. Bernstein did.  I think it's

18  very well written.  And if Your Honor were to grant it, there

19  would be no attachment because this defendant wouldn't be here.

20  But if Your Honor is not inclined to grant the motion, I will

21  commit to Your Honor, that's why I've been brought in.  We're

22  the guys who try the case when nothing else works.  I will

23  commit to Your Honor to work efficiently.  So, that at the end

24  of the day, the two apartments are still there.  We'll work

25  something out.  Eight of it is still there, and Your Honor

Firestar Diamond - 10/26/22                    47

1  doesn't have to put in a draconian order against a human being

2  that in this record, I suggest to Your Honor, ask my adversary,

3  please read to me.  They have one thing that they say is an

4  admission, a "judgment".  I don't know what that judgment is.

5  Ms. Modi is defendant number 7.  Every other allegation in that

6  "judgment" is defendants 1 through 16, collectively did 'X'.

7  When you go to Mr. Levin's complaint, some of those 1 through

8  16's are there.  There it literally nothing that includes number

9  7.  So, the Indians have 1 through 16 that does something

10 different than the complaint in this case.  There's just no

11 evidence to back it up.

12       And when Your Honor asked initially, can you just tell

13 me the story?  You might as well just watch the 60 Minutes

14 version of it, and say, well, these guys are fraudsters and any

15 money that's going to the mother and the three children for

16 support, the kids are in school, the mother is living in the

17 same place she's lived always.  And as my adversary says, her

18 life is transparent.  Nobody is hiding.

19       And the bond, you know, you, ex parte, gave them

20 50,000.  You know, it's not worth spending the money at this

21 point if we're really going to get through this case.  But I'll

22 bring in real estate experts to tell you how much value has gone

23 out of that apartment since then.  And they haven't bonded any

24 of that.  Now, as I said, the family has realized that selling

25 these things right now in this market is crazy.  There's too

Firestar Diamond - 10/26/22                              48

1  much value in their circumstance to let it go.  So, thank you,

2  Your Honor.  If you have any questions, I'm happy to answer

3  them.

4          THE COURT:  All right.

5          MR. AMINI:  And I'm really happy to go through each of

6  the exhibits minutely to try to find which paragraphs bring us

7  to the conclusion that she's made an agreement to get into a

8  RICO conspiracy, and that these monies come directly from that

9  conspiracy related I hope to these entities that are before you.

10         THE COURT:  All right.  Thank you very much.  I

11 appreciate the argument.  Does the trustee have any brief

12 rebuttal?

13         MR. WEDOFF:  Yes, briefly, Your Honor.  First of all,

14 there's nothing in the record about Ms. Javeri coming from a

15 wealthy family.  And if she did come from a wealthy family and

16 has other assets available, I don't understand the need for her

17 to use these assets that subject to the attachment order.  But

18 again, that's not in the record.

19         Second, the judgment from the United Kingdom is about

20 the co-conspirators, it's not about Ms. Javeri.  We're not

21 introducing that to say, oh, here's Ms. Javeri being a principal

22 in the fraud.  We introduce that judgment to show, hey, here's a

23 judgment from another tribunal that came to the same conclusion

24 that we are alleging in the complaint to establish the

25 underlying RICO conspiracy to which Ms. Javeri joined.

Firestar Diamond - 10/26/22                          49

1          Third, --

2          THE COURT:  I took your invocation of the judgment to

3   be the first step of many in proving up a RICO claim that you

4   need a conspiracy, and your focus with Ms. Javeri is on what

5   happened with the proceeds, and not the actual allegations of

6   carrying out the various frauds, the bank fraud, and I forget

7   the name you used in the complaint for the other fraud dealing

8   with essentially taking the value out of the U.S. entities.

9          MR. WEDOFF:  Similarly, problems with the LOU

10  partnership and the allegations there.  Again, we have evidence.

11  The question is whether what we presented about her involvement

12  with the LOUs is sufficient to show that.  At trial, we'll be

13  able to show her role there.  That's the inquiry we're asking

14  the Court to make.  The key connection with Ms. Javeri to the

15  fraud is the receipt of the proceeds.  We allege that was the

16  goal of the fraud.  To take money out indirectly from PNB and

17  ultimately get it to the Modi family.  That's exactly what

18  happened here.  And between Ms. Mehta's admitted role as a

19  conduit for the fraud, and Ms. Javeri's receipt of $34 million

20  from her sister-in-law, we think that is what establishes her

21  involvement in the RICO conspiracy.  And if you draw the

22  inferences in the trustee's favor from that evidence, which you

23  must, we think that it establishes the likelihood of success on

24  the merits.

25          The notion that she is a housewife and therefore

1  insulated from liability somehow, again, is not supported.  She

2  can certainly be a participant in a RICO conspiracy even if she

3  wasn't pulling all the levers.  If she's accepting this money,

4  she's a participant, she can be liable.  The $6 million from

5  Purvi for CPRE, for the Essex House apartment, that immediately

6  went out the door to the shadow entities.  I don't think you

7  need to reach that issue here for purposes of attachment, but I

8  do want to note that on the record.  So, unless the Court has

9  anything else, we are --

10     THE COURT:  I only had one question.  Counsel and I

11  spent some time going back and forth about what I can consider

12  and how I can consider documents from foreign tribunals, and I

13  think I've already beat a dead horse on that, so I'll just ask a

14  quick question.  Whether you have, based on that colloquy back

15  and forth, any comments from the trustee's view?  Or are you

16  content to let sleeping dogs lie?

17     MR. WEDOFF:  No, Your Honor, we'll rest on our papers

18  on that point.

19     THE COURT:  All right.  Thank you very much everyone

20  for your useful arguments.  I see it is just about 12:30.  And

21  I'm trying to figure out how best to handle the next argument

22  that we have.  And so, it would be my suggestion that we take a

23  lunch break and then come back and do that other argument

24  starting at 1:30, quarter to 2:00, 2 o'clock just because I

25  don't want anyone to feel like they're crammed in terms of

1    presenting their arguments.  But let me ask the trustee if the

2    trustee has a view one way or the other?

3          MR. WEDOFF:  My only request, Your Honor, is if we can

4    begin at 1:30, rather than 2:00.

5          THE COURT:  All right.

6          MR. AMINI:  May I ask Your Honor if we can actually

7    push it to 1:15?  I have another hearing at 2 o'clock and I'd

8    like to be available for this one if possible.  I might not be

9    able to stay for the whole thing, but 1:15 would cover a lot of

10   it.

11         THE COURT:  Well, you're certainly in competent hands.

12   I will also say, I also have a judge's meeting.  It goes from

13   12:30 to some indeterminate time.

14         MR. AMINI:  Oh, okay.

15         THE COURT:  And I'm not trying to attend the entire

16   thing, but I'd like to essentially jump on that train while it's

17   moving and then jump off.  So, I'm flexible, but it would

18   probably be good if I can pop in.  So, let me ask the other side

19   if you have any preference.

20         MR. AMINI:  In that case, Your Honor, 1:30 is okay

21   with me.

22         THE COURT:  All right.  Mr. Butler, do you have a

23   thought?

24         MR. BUTLER:  We're fine starting at 1:30, Your Honor,

25   if that works.

Firestar Diamond - 10/26/22                    52

1          THE COURT:  All right.  So, if that's okay, let's do

2    it at 1:30.  I think if we went now, I don't think we'd finish

3    before 2:00.  And again, who knows, but I don't want people to

4    feel like they're being jammed.  So, let's get back together at

5    1:30 and we'll take it from there, and I think we'll follow the

6    same MO, which is, if the trustee wants to make some brief

7    comments.  The questions that I, as you can tell, I sort of

8    tried to flag my questions generally.  I asked you actually a

9    specific one that's really more appropriate here in this

10   argument to come than the one we just had.  I mentioned that

11   because I think you have a pretty good sense of what I'm

12   interested in asking about from my comments already.  So, all

13   right.  So, anything else before we take an adjournment for just

14   about an hour?

15         MR. WEDOFF:  Your Honor, I have one question.  If

16   during the next section, we end up going through documents, do

17   you have the documents handy, or should we, in the next hour or

18   so, get them ready to share a screen so that we can do that as

19   we walk through them?

20         THE COURT:  I have them.  I don't have them all handy.

21   I'll leave it to you.  I will say, I've looked at everything.

22   So, for the most part, you probably can talk me through rather

23   than show me.

24         MR. WEDOFF:  Okay.

25         THE COURT:  So, as long as your cites are there, then

Firestar Diamond - 10/26/22                    53

1   I'll break down the cites, and if I need to find it, I'll find

2   it, but if there's a particular thing you can probably read it.

3   I want to tell you how to present your case, but I will say that

4   I think that that's probably fine.  I will say that the larger

5   the binders get, the more they're wrestling a lion.  So, I think

6   at this point, I don't have one of the larger binders, I don't

7   have it actually in a binder, I have it in piles that are

8   marked.  But you can feel free to just identify it, explain what

9   it is that you're citing to and I think that's probably fine.

10  There may be one or two instances where you'd want to actually

11  show me your screen.  But again, I've looked at it all, and I

12  will go back after the argument and make sure to look at the

13  specific things that people have cited to me on all sides.

14            MR. WEDOFF:  Perfect.  Okay.  Thank you.

15            THE COURT:  All right.  Anything else before we break?

16            MR. AMINI:  No, Your Honor.

17            THE COURT:  All right.  Thank you very much, and we'll

18  see you all in just about an hour.

19            MR. WEDOFF:  Thank you, Your Honor.

20            THE COURT:  Thank you.

21            (Off the record.)

22            THE COURT:  Good afternoon.  This Judge Sean Lane in

23  the United States Bankruptcy Court for the Southern District of

24  New York, and we are back for a continued hearing in the

25  Firestar Diamond case.  More particularly, in two adversary

Firestar Diamond - 10/26/22                    54

1  proceedings that have attachment motions in them.  This morning

2  we heard the one is the Javeri case, and now, we're segueing to

3  the other adversary proceeding, which includes the order of

4  attachment that's been requested against Mihir Bhansali.  So,

5  let me make sure we've got everybody who needs to be here.  I

6  see trustee's counsel here and Mr. Wedoff.  And let me ask and

7  make sure that I've got counsel for defendant Mr. Bhansali here.

8          MR. BUTLER:  Yes, Your Honor, you have Thomas Butler,

9  Nicole Sullivan, and our colleague, Matthew Prutting, is on as

10 well.

11         THE COURT:  All right.  And I do see the trustee,

12 Richard Levin, on the line.  Is there anybody else who needs to

13 make an appearance?

14         MR. WILLIAMS:  Your Honor, this is Bill Williams from

15 Jenner & Block for the trustee as well.

16         THE COURT:  Okay.  Good.  Thank you very much.  I was

17 trying to move things forward quickly, and in fact, it

18 backfired.  So, good to have you here as well.  All right.  So,

19 my proposal would be to proceed the same way we did this morning

20 in terms of the trustee, who's the movant to set the stage and

21 then we'll go from there.  And unless there's any other matters

22 that we should address, I hear from Mr. Wedoff.

23         MR. DORMONT  Your Honor?

24         THE COURT:  Yes?

25         MR. DORMONT:  This is David Dormont on behalf of Ajay

1   Gandhi.  We're not here directly, but obviously since this case

2   involves my client, we are also here.  We were here this morning

3   and we're also here today.  So, I just wanted to state that for

4   the record.

5          THE COURT:  Good to have you.

6          MR. DORMONT:  And my colleague, Marc Phillips is also

7   present.

8          THE COURT:  All right.  Thank you very much for that.

9   All right.  So, Mr. Wedoff?

10          MR. WEDOFF:  Your Honor, I'm going to hand the virtual

11   podium over to my colleague, Bill Williams in Chicago.  Thank

12   you.

13          THE COURT:  All right.  Mr. Williams.

14          MR. WILLIAMS:  Good afternoon, Your Honor.  Bill

15   Williams appearing on behalf of the trustee again.  Your Honor,

16   this is the trustee's motion seeking attachment of Mr.

17   Bhansali's residence, which he transferred to his wife two days

18   after the petition date, and a few weeks after the alleged fraud

19   was exposed.  Your Honor, since we've already had a pretty

20   fulsome discussion of the elements of the attachment, I will

21   dispense with that and focus my discussion right now just on two

22   different pieces of the argument.  First, just on the success on

23   the merits because I do think it will be helpful for both

24   motions to be able to walk through some of the evidence and

25   explain in a little bit more detail the sorts of evidence that

Firestar Diamond - 10/26/22                              56

1    we're relying on to establish both motions, but with respect to

2    this one, the evidence against Mr. Bhansali.  And the only other

3    thing I'll add, I know three was a discussion this morning about

4    the extent to which Your Honor can rely on the foreign

5    materials.  And I also just want to back up and just say that

6    the trustee is not necessarily relying on those pieces of

7    evidence as the primary evidence in these cases.  We submitted

8    those materials because we think they provide a helpful picture

9    to sort of connect the dots and sort of save us from having to

10   go find documents for every single pieced of it.  So, we

11   encourage Your Honor to view those as background materials and

12   focus more on the actual primary evidence that we're submitting

13   as what we expect Your Honor to actually be ruling on.

14        So, with all that said, I'm going to jump into the

15   likelihood of success on the merits as the first piece.  Your

16   Honor, I'll start by just going through the specific pieces of

17   the U.K. judgment that I think provides sort of the roadmap and

18   then I'll walk through the pieces of evidence that we think

19   corroborates the specific factual findings and other pieces of

20   the U.K. judgment, so that it's clear why we think these things

21   are all related to each other.

22        From that standpoint, jumping right into page 34 of

23   the U.K. judgment, it's paragraph 14 of the factual findings.

24   The U.K. court, this is after a lengthy trial where they had

25   witness statements, and it was heavily litigated, he included

Firestar Diamond - 10/26/22                        57

1   that, I do not accept the submissions that NDM, Nirav Modi, was

2   involved in legitimate business and using the LOUs in a

3   permissible fashion.  Suggestions that buyers credit obtained by

4   the Nirav Modi first, and here they're referring to the three

5   LOUs entities, Solar Exports, Stella Diamonds, and Diamonds R

6   Us, was required from making payments for genuine imports from

7   suppliers mentioned in the LOUs is not borne out by statements

8   from the dummy directors in Hong Kong and Dubai-based companies.

9   Their evidence is that these companies were not genuine supplies

10  and were shadow companies controlled by Nirav Modi through

11  several employees who were represented as directors of the

12  companies.  The firm's business transactions were primarily with

13  these dummy companies.  The statement demonstrates that the

14  circulation of pearls, diamonds and gold between the Indian

15  firms, meaning the LOU entities, and the Dubai and Hong Kong

16  based companies, was not genuine business and the companies were

17  being used to transferring funds generated in the guise of

18  sales, purchase/export/import of goods, colloquially referred to

19  as roundtrip transactions.

20          And then later on, that court concludes the

21  combination of evidence taken as a whole create an enable

22  conclusion that Nirav Modi, his brother, among others, Mr.

23  Bhansali, and others were operating together dishonestly and

24  with other associates and banking officials to defraud PNB.

25          So, those high level snapshots provide the general

Firestar Diamond - 10/26/22                                    58

1   story of the underlying fraud.  The reason that we introduced

2   this piece of evidence is just to sort of lay that groundwork,

3   so that when we tie in other specific pieces that corroborate

4   those facts, it's clear why each piece is relevant.

5          One other thing I wanted to point to in the findings,

6   this isn't a finding itself, this is a discussion of one of the

7   witness statements.  It's on page 26 and 27 of the judgment,

8   paragraphs 56 and 57.  There is this gentleman named

9   Shaitaiandra Shugla (ph), who was one of the individuals in

10  Dubai who was running Dubai-based shadow entities and he

11  explains that Mr. Mr. Bhansali was the one that basically

12  recruited him to come run these companies.  He talked about Mr.

13  Bhansali also having a similar complex structure of the

14  companies formed in Hong Kong.  And the one thing that I

15  seriously want to point to here is that he mentioned that

16  communication regarding the functioning of the dummy companies

17  was done on or Painmill (ph) or Cricket.  And I'll explain why

18  that's relevant in just a moment as well.

19         So, having established the roadmap for how the

20  underlying fraud operated, we can now get into the specific

21  pieces of the trustee's direct evidence that corroborates those

22  general findings.  I'd like to begin by referring to Exhibit

23  7.1, which is this -- we call it the control board, but it's

24  essentially a spreadsheet in which several of the Hong Kong

25  based shadow entities are listed on one column along with

1   several of the Dubai-based shadow entities.  A potentially

2   noteworthy thing about this document is that whereas the U.K.

3   findings don't specifically identify the names of the Hong Kong

4   companies and the Dubai-based companies, this document provides

5   the actual names that we can then link those up to specific

6   examples of those companies being named elsewhere in other

7   documents.  It lists Eternal, Origen Brilliant, Fancy Creations,

8   Ceno.  Sunshine, as a Hong Kong entity.  And it lists Unique

9   World Diamond Distribution, Empire, Nista, Universal Fine

10  Jewelry, Digium Specific, Tricolor Unity, and several others as

11  the Dubai companies.

12          And on the other axis it has the three LOU entities

13  Solar Exports, Stella Diamonds, and Diamonds R Us and then it

14  has five or six different Firestar entities, which were the

15  otherwise legitimate businesses, including the debtor, Firestar

16  Inc.  They're referred to as Firestar Inc in here, but Firestar

17  Diamond Inc is the official name.  And with respect to each of

18  those entities, it list the accounts payable and accounts

19  receivable for each shadow entity, for each of the LOU entities,

20  as well as each of the Firestar entities.  So, there is really

21  reason that this document would exist if these were in fact just

22  companies that were arm's length.  Why would it matter

23  specifically to track them all across the range of Firestar

24  companies and these three LOU entities if not because they were

25  all somehow related to each other.

1        So, turning next to Exhibit 7.3 is another spreadsheet

2   recovered from Mr. Bhansali's computer that lists -- I

3   apologize, it's 7.2.  It's a step by step guide where literally

4   it says, step one, Firestar India buys from Hong Kong supplier.

5   Step two, Firestar sells to Dubai customer.  And step three,

6   Dubai customer sells to Hong Kong supplier.  And then it goes

7   through and has an example of a roundtrip transaction where the

8   purchase price and the sale price show the profit margin for

9   each leg of the transaction, and certain of the entities are

10  taking losses, and other ones are taking profits.  So, the fact

11  that Mr. Bhansali had this document on his computer, there's no

12  real reason why it would exist.  It fully corroborates the idea

13  that these were roundtrip transactions in which certain entities

14  were making money and other entities were not.  And then the

15  trustee's alleged that the profitable entities would then take

16  that money and send it off to Purvi Mehta, for example, under

17  the guise of a shareholder distribution.

18        The idea that they were doing these roundtrip

19  transactions is also corroborated by Exhibit 8.8 which is a

20  series of emails, including Mr. Shugla, the individual I

21  mentioned, who gave the statement in the trial in the United

22  Kingdom, in which they're discussing how the margins for shadow

23  buying transactions with the Firestar entities are anomalous in

24  comparison to their transactions with legitimate companies.  And

25  if you look at the attachments to Exhibit 8.8, there are

1   specific examples where it lists for example, the first one is a

2   transaction where this Firestar entity bought 771 carats of

3   diamonds presumably, it doesn't list what type of jewelry it

4   was, from Ceno traders, which is a Hong Kong based shadow

5   entity, for basically 1.1 million.  And then it sold the 771

6   carats in different tranches to four different shadow entities

7   with extreme variances in the amounts.  Like for some of the

8   transactions, it's an enormous loss, in other of the

9   transactions, it made an enormous profit.  And there are

10  examples of this throughout the entire attachment on Exhibit

11  8.8.

12          And then an outside auditor -- actually, I believe

13  this was an independent director inside the company -- was

14  asking why there was such variance in these margins, and he

15  forwarded the request to Mr. Bhansali and said, hey, how are we

16  explaining this.  And Mr. Bhansali then forwarded it along to

17  other members and had them basically come up with an explanation

18  so at least it would be consistent.  So, those are all just

19  examples of first-hand documents the trustee has that really

20  corroborates the idea that the fraud operated in the way that

21  the trustee has alleged, and as the U.K. court found that it

22  did.  Once we've established that Mr. Bhansali was really one of

23  the key players in this overarching fraud scheme, that is going

24  to be enough to satisfy all of the specific legal elements of

25  the breach of fiduciary duty (inaudible) of RICO claims.  To the

1   extent opposing counsel disagrees, I'm happy to address specific

2   arguments they want to make with respect to that.  But I think

3   really all the trustee's claims boil down to, can we prove that

4   Mr. Bhansali was knowingly involved in this, and if so, then

5   that should be enough to sustain liability.

6           And then you also asked about the specific questions

7   in the deposition transcript in which Mr. Bhansali asserted his

8   Fifth Amendment right against self-incrimination in response to

9   every question.  So, to quickly run through examples of

10  questions from this deposition transcript, on pages 14 and 15,

11  he was asked specifically if he was familiar with an entity

12  called Diamonds R Us, an entity called Stella Diamonds, and an

13  entity called Solar Exports, and he pled the Fifth Amendment for

14  each of those questions.  On page 18, he was specifically asked,

15  were you involved in assisting Modi or his entities in making

16  misrepresentations to PNB or other banks to obtain LOU

17  financing, and he pled the Fifth Amendment in response to that.

18  On page 21, he was specifically asked about each of the shadow

19  entities by name.  The question, I'm going to ask if you are

20  familiar with the following companies, any of these at all:

21  World Diamond Distribution, Pacific Diamond, Unique Diamonds,

22  Eternal Diamonds, Fancy Creations, Tricolor Unity, Nista,

23  Universal Fine Jewelry, Fine Classic and several others, Origem

24  Brilliant.  Including all of the ones that are identified in

25  that same chart recovered from his computer.  And he pled the

1   Fifth in response to that.

2        Page 22, he was specifically asked, did you assist in

3   forming these foreign companies, meaning the shadow entities, he

4   pled the Fifth.  On page 35, that's another document I want to

5   get to in a second.  On page 40-41, he was specifically asked

6   about his home and whether or not the transfer of his interest

7   in his apartment to his wife two days after the petition date.

8   Th question was, you recently transferred your home to the name

9   of your wife for approximately $1.8 million -- sorry.  The

10  question is phrased, you recently transferred $1.8 million to

11  prevent recovery of assets in legal proceedings.  And he pled

12  the Fifth in response to that.  But the question for some reason

13  incorporates the fact that there was 1.8 million in

14  consideration paid, which is not true.  So, I think the idea

15  was, specifically, did you transfer your apartment to your wife

16  to prevent recovery of assets in the legal proceedings, and he

17  pled the Fifth in response to that.

18       And then he also was specifically asked about certain

19  documents in the deposition transcript, including on page 26,

20  starting at line 7, he was asked specifically about the document

21  that we attached as Exhibit 7.1, which is the control board with

22  the two different axes.  And the question was, are you familiar

23  with this document, and he pled the Fifth.  Are you using this

24  spreadsheet to monitor the financials for those three companies,

25  so that you knew where to follow the money obtained from the

Firestar Diamond - 10/26/22                    64

1   LOUs, and he pled the Fifth.  To the right of the chart are

2   names that I mentioned earlier, do you recognize these names; he

3   pled the Fifth.  So, he refused to answer questions related to

4   that document.  And there are others, but I'll leave it at that.

5   Does Your Honor have any questions about those specific

6   documents?

7            THE COURT:  I was just curious to hear which ones of

8   the invocations where you thought were of particular relevance

9   for your attachment motion.

10           MR. WILLIAMS:  There was one snapshot -- I apologize.

11  If I see it as I'm looking through this more, I'll let you know.

12           THE COURT:  No, that's fine.

13           MR. WILLIAMS:  But there was specifically a question

14  where he was asked, were you involved in running the day-to-day

15  affairs of the shadow entities, and he pled the Fifth.  I was

16  going to point that out.  I don't need (inaudible), but I think

17  the rest of the documents pretty much show that.

18           And, Your Honor, there are so many other documents

19  that we attached as well.  There are examples of these -- we're

20  calling them fake bios, but they're essentially biographical,

21  know your customer profiles that were done that laid out these

22  elaborate histories for each shadow entities.  Given what we

23  know now, it's very clear those were just totally made up.  So,

24  those were all specific examples.

25           Notably, Mr. Bhansali is not interested in rebuttal

1   evidence for any of this on the question of liability.  The

2   evidence he submitted was limited to the fraudulent transfer of

3   his home question.  So, given the large amount of evidence that

4   the trustee has submitted, establishing that Mr. Bhansali was a

5   leading figure in this overarching fraud, and in the absence of

6   any rebuttal evidence, we believe that there is not only a

7   strong likelihood of success on the merits at trial, but I think

8   that if trial were occurring right now, I think the documents we

9   have would be pretty overwhelming.

10          THE COURT:  All right.  What else would you like to

11  address, counsel?

12          MR. WILLIAMS:  Sure.  Jumping now more into the

13  question of the transfer of the residence to his wife, we

14  certainly have to establish to obtain an attachment that he has

15  fraudulent transfer assets.  Again, the facts are pretty

16  straightforward.  He held this property with his wife, and then

17  transferred it to her two days after the petition date for no

18  consideration.  Ms. Bhansali, when she was challenging the

19  Indian attachment of the residence, essentially admitted that

20  the purpose of the transaction was to keep it out of the hands

21  of Mr. Bhansali's creditors.  Mr. Bhansali then submitted that

22  as his own evidence in trying to show that it wasn't a

23  fraudulent transfer, but it seems to be the exact opposite.  It

24  seems to hurt him ore than it helps him.  So, for that reason

25  alone, in addition to the fact that he pled the Fifth Amendment

Firestar Diamond - 10/26/22                              66

1   as I mentioned when specifically asked about the transcript.

2   That is probably enough to establish that it was a fraudulent

3   transfer and that it is subject to attachment under Section 278

4   of the New York Debit and Credit Law.  But if you did want to

5   get into the badges, obviously, they've got a close personal

6   relationship.  Again, there's no consideration, the timing on it

7   was right after the petition date, and just after he returned

8   from his trip to India, after the fraud was exposed, and he

9   continued to live in the house after the transfer occurred.  All

10  of those are Class A badges of fraudulent transfer that even if

11  we didn't have the admission or this amendment, adverse

12  inference, those facts by themselves would be sufficient to

13  establish that there was a fraudulent transfer.

14          And there was a question raised by Ms. Bhansali about

15  whether or not we need to bring a separate action to avoid the

16  fraudulent transfer before we can attach the property, but we

17  found two different cases, Helikind (ph) and Hypnotic Taxi where

18  the courts did not require that.  They said that a third party

19  is adequately protected by the fact that they can vacate the

20  judgment, vacate the attachment.  You don't actually need to go

21  avoid it first.  It's basically, just a procedural distinction,

22  but doesn't actually affect the substance.  And Ms. Bhansali

23  responded at that point, didn't cite any cases that involved

24  fraudulent transfer assets.  All the cases that she relied on

25  involve different fact situations.

Firestar Diamond - 10/26/22                    67

1          THE COURT:  All right.  Thank you very much.  Anything

2    else that you want to address, counsel?

3          MR. WILLIAMS:  Yes, I reserve the right to address

4    other points on rebuttal, but for the time being I think that

5    covers everything I wanted to cover.

6          THE COURT:  All right.  Thank you very much.  And I'll

7    turn it over then to I believe Mr. Butler is going to take the

8    laboring ore.

9          MR. BUTLER:  That is correct, Your Honor.  Thank you

10   very much.  Your Honor, one of the things that I want to

11   emphasize at the start, and I think in the last argument it was

12   referenced, but it needs to underlie this entire proceeding and

13   that is that attachment is a drastic remedy.  Everybody who has

14   acted for a plaintiff would love nothing more then to be able to

15   attach property and make sure if they get a judgement that

16   property will be available.  That is not the standard; it is an

17   extraordinary remedy; it is a remedy that is rarely granted; and

18   I think any consideration of the arguments here has to contain

19   or be about that backdrop.

20          Now, I want to start with the issue of the transfer of

21   the property and Ms. Bhansali's role in this.  And one of the

22   things that the trustee's counsel did not mention that was

23   included in the document that we included as part of her

24   declaration and that has not been challenged or contested is

25   that Ms. Bhansali's family paid for this apartment.  They paid

Firestar Diamond - 10/26/22                              68

1  for this apartment; we have proof that they paid for this

2  apartment.  No one is challenging that they paid for this

3  apartment.  Because Mr. and Ms. Bhansali were married at the

4  time, the apartment was put in their names, but when this

5  apartment was transferred, this was not some diabolical effort

6  to avoid a creditor's claim.  What this was, was Mr. Bhansali

7  returning title of the property to its rightful owner and

8  correct.  And I would --

9         THE COURT:  Well, let me ask you about that.  I

10 certainly understand the point that you're making in the sense

11 of the innocent essentially ownership and this came to be.  And

12 it was paid for by her family.  But you lost me a little bit

13 when you said, return it to its rightful owner.  It sounds like

14 they owned it.  I mean is there anything in the record that

15 implies that it was held by him and not owned and so it's just

16 returned to it's rightful owner?  Because the ownership seems to

17 have transferred to them and then that means it's theirs.  Now,

18 we all have families and we know that not all things that

19 families give freely are truly free.  With that caveat, but for

20 purposes of the law, if it's transferred and it's entitled in

21 their name, then isn't it theirs?  It might be a transfer back

22 as opposed to a transfer to somebody that has nothing to do with

23 anything.  But is it a transfer, as opposed to a return?

24        MR. BUTLER:  Yes.  And Your Honor, by return, I think

25 I was speaking more colloquially than legally, that he was

Firestar Diamond - 10/26/22                    69

1    giving the property back to the person whose money paid for it.

2    And in many areas of the law, and I certainly don't want to get

3    far afield here, if for example, they were in the course of a

4    divorce, and the equitable distribution laws were to apply, that

5    would be taken into consideration with respect to this

6    particular motion, and one of the things we addressed in our

7    papers, and I don't think has been addressed so far today, there

8    is a discretionary element to this as well, Your Honor. Even if

9    the standards were met fully and we certainly contest that they

10   were met, you would still ultimately have discretion as to

11   whether you think, given the circumstances, you should apply

12   this drastic remedy.  And we would submit that ultimately, the

13   party who paid for this is the party who is now holding this

14   would certainly be very relevant to that.

15           And with respect to the other point that was addressed

16   by Mr. Williams, the cases that he cited are very different

17   factual circumstances.  Extremely different.  I mean those

18   really were cases where the evidence, not a situation like our

19   situation, which was okay, yes, this transfer happened after the

20   bankruptcy was filed, but it was more than a year before this

21   lawsuit that we're in today was filed.  There was no imminent

22   threat at that time to Mr. Bhansali or any reason why Mr.

23   Bhansali believed that he had people coming after him or he was

24   trying to hide from the creditors.  It was all done in the light

25   of day.  And this was a public transfer; it was all registered.

Firestar Diamond - 10/26/22                    70

1   So, very different circumstances.  I don't think that the

2   trustee is arguing, I don't read their brief to argument or Mr.

3   Williams' comments to argue that the trustee can always seek

4   attachment.  That any time a trustee believes there was a

5   fraudulent conveyance, he can immediately seek attachment of

6   that property against the party to whom or to which it was

7   conveyed.  If that were the case, we wouldn't need a fraudulent

8   conveyance law.  You could just go in and you could get that

9   attachment and move forward.

10          So, as a threshold matter, Your Honor, we would submit

11   that under these circumstances, factual circumstances, most of

12   which are not contested that Ms. Bhansali is the owner of the

13   property in question.  As of right now she holds title.  Mr.

14   Bhansali is not.  To the extent the trustee believes that there

15   was an improper transfer, the appropriate remedy would be to see

16   a fraudulent conveyance.  I'll mention in that regard that Ms.

17   Bhansali is not a party to these proceedings.  I believe

18   documents were delivered to her or served upon her, but she is

19   not a party here.  And as someone who has a specific and pretty

20   real interest, financial and otherwise interest in this

21   property, she certainly should be a part of any proceeding that

22   seeks to take it away from her.

23          Now, even if the trustee could overcome what we think

24   is a fatal flaw, we think there are a couple of other very

25   significant problems here.  And the one I will address, which I

1  think was the bulk of the argument that Mr. Williams made is

2  this issue of likelihood of success on the merits.  And one of

3  the things I found most interesting about that and consistent

4  with what we've seen in all of the trustee's submissions

5  certainly on this motion, it appears on the prior motion Your

6  Honor was addressing, as well as in their complaint is that

7  there is a lot of talk about a global fraud.  I've heard all

8  about Hong Kong entities and Dubai entities and various other

9  shadow entities.  But the question Your Honor needs to evaluate

10 in determining whether they have satisfied the requirement of a

11 likelihood of success on the merits is, have they established a

12 likelihood that they're going to succeed on the particular

13 claims they've raised in this case.

14         The trustee is not the global police person.  The

15 analysis before the Court and the issue before the Court is not,

16 was there a global fraud that had various victims, in particular

17 PNB in India.  This is a multifaceted case, there are a number

18 of proceedings pending in various different jurisdictions around

19 the world.  This case is limited to specific claims brought by

20 the trustee against Mr. Bhansali and his co-defendants.  And

21 with respect to those, I would submit that the evidence that was

22 submitted doesn't come close to establishing that any of those

23 three claims, that there is a likelihood of success on the

24 merits of any of those three claims.

25         What we have heard is a lot of, well, we have various

Firestar Diamond - 10/26/22                    72

1   documents that tie Mr. Bhansali to this fraud.  In fact, I think

2   one of the things Mr. Williams said is, all we need to satisfy

3   is to show that he was involved in the fraud.  That's just not

4   true.  What they need to satisfy is the elements of those claims

5   under applicable law.  And the first one of those claims is

6   breach of fiduciary duty.  And one of the issues we raised in

7   our motion to dismiss was the question of, could Mr. Bhansali in

8   fact breach fiduciary duty to a corporation if he was acting

9   under the direction of Mr. Modi and Mr. Modi --

10          THE COURT:  Well, I understand that.  I think we've

11  had some discussions about that in other contexts, but I

12  understood the trustee to focus mainly on the RICO claims.

13  That's my understanding, and you can straighten me out if I'm

14  missing something.  But that's why they're offering some of

15  these documents like the judgment to say, we have the underlying

16  fraud, and we have predicate acts, and then we have people at

17  the next step, and this is sort of re-living the motions to

18  dismiss, is to look at how each individual, how tethered or not

19  they are to this for purposes of whatever it is we're looking

20  at.  So, the conspiracy that's alleged.

21          So, I understood that that was really more the focus

22  of the trustee than, say, the breach of fiduciary duty prong.

23          MR. BUTLER:  I agree, Your Honor.  I would note that

24  in the initial motion papers, I thought focus was more on

25  fiduciary duty, but let's talk about the racketeering case.

Firestar Diamond - 10/26/22                     73

1   Again, as we all know, the RICO statute is very complex.  There

2   are a number of elements and they don't win or demonstrate

3   likelihood that we're going to succeed on a RICO claim merely by

4   saying, Mihir Bhansali, we have evidence that we think supports

5   the argument that Mr. Bhansali participated in a global fraud.

6   And one of the points I would raise specifically, again re-

7   living a little our motion to dismiss, one element of RICO is

8   that the plaintiff be the intended victim of the breach of

9   the --

10          THE COURT:  I've already rejected that in a prior

11   decision.

12          MR. BUTLER:  Your Honor, I would say you rejected the

13   argument that that was a threshold standing requirement.

14   There's no questioning an element of the RICO claim.  I mean as

15   I understood Your Honor's order was from a standing

16   perspective --

17          THE COURT:  well, I think the question was for

18   purposes of stating -- I mean I think we maybe --

19          MR. BUTLER:  Stating a claim.

20          THE COURT:  Right.  Stating a claim.  Again, I don't

21   have that in front of me, but I thought that was an argument

22   saying, judge, it has to be dismissed because there's no claim

23   here and to state a claim you have to be the intended victim.

24   So, that the standing question in stating a claim are really

25   just two labels for the same inquiry which is whether you have

Firestar Diamond - 10/26/22                    74

1  to be the intended victim, and I think I rejected it without

2  (inaudible) as narrowly as saying well, I'm talking about the

3  standing but not for his sufficiency of a claim, because I don't

4  know how I would do that on a motion to dismiss.  Right?

5  Because the very essence of a motion to dismiss is to have a

6  stated claim.  So, I would think that that (inaudible) is

7  exactly prong one here.

8        MR. BUTLER:  Again, Your Honor, I don't want to debate

9  that.  I mean, my reading of it had been again --

10       THE COURT:  I guess my point is, and I don't want to

11  be snarky, but I think we have debated that.  And you know,

12  there may come a day when the 2nd Circuit gets something and

13  tells me that I've got that part wrong, but you know, that

14  ruling I think is law of the case for the moment.

15       MR. BUTLER:  Well, yes.  And I'll only say, and I

16  agree that we have debated it, but I believe and continue to

17  believe it was debated in a pleading context and there is

18  certainly an element of the RICO statute, substantive

19  development is who is the victim.  I mean if the trustee or the

20  predecessor of the trustee, the companies were not the victims

21  of the intended victims, I think there is a problem.  There's

22  going to be a problem of proof, and I think that is a problem.

23       And one of the other things I will mention, if we look

24  again to the English --

25       THE COURT:  Well, why isn't that the first prong,

Firestar Diamond - 10/26/22                    75

1   failure to state a claim?  So, I can see you saying, it's not

2   the intended victim and they don't state a claim.  The evidence

3   or the merits in prong two is really which claim you're trying

4   to prove that it didn't state it.  Am I getting that correct?

5        MR. BUTLER:  I think you're getting that exactly

6   right, Your Honor.  But my point being, that ultimately to

7   prevail on a RICO claim, you have to establish this RICO

8   conspiracy, all this wrongdoing was intended to harm me and did

9   in fact harm me.  That's my argument.

10       THE COURT:  All right.

11       MR. BUTLER:  Again, we debated in our earlier context,

12  but that's the point.  And related to that, but I think eve more

13  broadly related to Mr. Bhansali, not so much Mr. Bhansali's

14  argument, but getting back to the trustee's position here, is if

15  you look at some of these documents, if you look at the United

16  Kingdom so called judgment, number one, I think it's been

17  conceded, but we'll say it again, the context in which that

18  arose was in the context of whether or not Mr. Modi should be

19  extradited.  And I think, if I may be so bold, that was what

20  counsel was attempting to argument this morning.  Defendant's

21  counsel did not, but hey, we don't think this thing really

22  exists, but we really need some context.  Some English law

23  context as to, what does this mean?  What did --

24       THE COURT:  I think I understand the way you just said

25  it, which is to say, that I have to understand the inferences I

1  can make or can't make from that document by understanding what

2  the proceeding was and what's necessarily decided or not.

3          MR. BUTLER:  Exactly.  100 percent.

4          THE COURT:  So, it's somewhat akin to a res

5  judicata/collateral estoppel kind of hat where you're thinking

6  about, what did some other court actually look at or is it a

7  straight comment that isn't really on the critical path of --

8          MR. BUTLER:  Exactly.  I think that's exactly right,

9  Your Honor.  And again, given that it is the trustee's burden

10  here to prove likelihood of success and the merits, I would

11  submit that the trustee has a burden not just to put a piece of

12  paper and say, look at what this piece of papers says, but to

13  put in some, give you that context.  Explain to you why.  And

14  this goes beyond the hearsay question we were talking before.

15  It really goes into the issue of what does this really mean and

16  what can you rightfully take from this.  And in that regard, I

17  would only say in commenting on it, again, the trustee and Mr.

18  Williams spent a lot of time talking about various points in

19  that mention various entities.  There were mentions of Mr.

20  Bhansali.  What seemed to be missing was any mention of these

21  New York debtors.  Again, I go back to the issue I mentioned

22  before of the trustee's role here.  He is a trustee of a

23  particular entities that have particular claims against

24  particular defendants.  He's not the global policeman trying to

25  effectuate justice.  So, I would submit for that reason as well,

Firestar Diamond - 10/26/22                    77

1   there's really very little in that document that someone can say

2   is real proof of any fraud directed toward the trustee.  Let

3   alone the kind of conclusive proof that Mr. Williams suggested.

4          Now, getting kind of beyond that, the likelihood of

5   success, I think our position again is, it needs to be evidence.

6   Notwithstanding, I think it was earlier today, the trustee's

7   counsel had mentioned the other argument about inferences, and I

8   don't really think the inferences' point is important, I think

9   the key point is evidence.  They need evidence to prove this.

10  No, they don't need to establish definitively and unequivocally

11  no question about it, they're going to win.  They have a summary

12  judgment motion, but they need evidence to establish a

13  likelihood of success on the merits.  And I would say, all they

14  have is evidence that something happened, there were some issues

15  out there.  Mr. Bhansali appears, based on some of these

16  submissions, to have participated in it, but I think that falls

17  woefully short.

18         THE COURT:  Well, why isn't that an inference?  Why

19  isn't that a question of what I can actually take from the

20  documents?  So, if you think about summary judgment, you take

21  all inferences in favor of the party who's opposing summary

22  judgment, and in other words, what something could mean.  And we

23  recognize that for summary judgment we put ourselves in the seat

24  of the jury to say, what a jury could reasonably infer from this

25  bit of evidence.  So, I think when I was using the term

Firestar Diamond - 10/26/22                    78

1   "inference", that's what I was meaning.  Like what can you

2   actually reasonably take from this, versus what's a stretch

3   further than you can.  Am I missing something on that?

4        MR. BUTLER:  No, I don't think you are, Your Honor.

5   But my point simply being, it has to be evidence.  It can be

6   supposition; it can't be hey, you know there's a document -- I

7   mean, the way I see the evidence that was put in is, here's a

8   spreadsheet, and I heard a couple of points about, well, it

9   could only mean this one thing.  It could only mean that one

10  thing.  And you have to again tie them into the particular

11  causes of action, and that's where I think the proof again is

12  woefully short.  It's a start.  It might be sufficient if we

13  were moving for summary judgment to get out from under summary

14  judgment but is it sufficient to establish.  Again, going back

15  to the severity of this remedy.  Is it sufficient to establish

16  that for the duration of this case they have an attachment on a

17  piece of property that Mr. Bhansali doesn't even own.  It's own

18  by his wife.  It works together.  And I think that's the

19  problem.

20       Now, unless Your Honor has further questions on that,

21  I'd like to move on to a couple of other points.  One of which

22  is, and again it's something I think I'd like to contrast this

23  morning's argument from this afternoon's argument, because Mr.

24  Wedoff, in opening this morning, I believe indicated we need

25  this attachment.  We need this attachment because the defendant

Firestar Diamond – 10/26/22                              79

1    in that case stated quite plainly that she is going to

2    dissipate.  She's going to sell these apartments, she's going to

3    dissipate the assets.  She's going to use them to support her

4    lifestyle.  We have the exact opposite situation here, Your

5    Honor.  We have situation where the trustee has been in place,

6    in fact brought this lawsuit three and a half years ago.  And

7    has known for three and a half years that this transfer of

8    ownership from Mr. Bhansali and Mr. Bhansali, jointly to Ms.

9    Bhansali took place. And in that three and a half years never

10   felt any need to run into the court and seek attachment.

11   There's no evidence, he's presented no evidence that Mr.

12   Bhansali and Ms. Bhansali have attempted to sell the apartment,

13   they haven't incumbered the apartment with any mortgage or

14   anything else.  He didn't do anything because there was no need

15   because this is their home.  They live there.  They own it.

16   they have a child.  They're in their home with their child,

17   living and seeing this through.  And I don't think it's a

18   coincidence that after three and a half years of being

19   completely passive about the whole issue of this apartment and

20   this transfer, this motion was made literally on the eve, I

21   think 10 or 11 days before a scheduled mediation.  So, I would

22   submit that what this really was, was an effort to bring

23   pressure.  Hey, you know, when you're thinking about whether to

24   settle, consider the fact that we might bet to attach your

25   apartment.  Now, why I that relevant?  Because again, Your Honor

1   has discretion here, number one.  And number two, this really is

2   a drastic remedy that's intended to protect a trustee or protect

3   any plaintiff and secure any plaintiff.  And I would submit that

4   it doesn't look like the plaintiff in this case was worried

5   about security or worried at all about this transfer, but rather

6   wanting to use this for tactical advantage.

7           And I might mention in that regard, the trustee has

8   also argued, well, we need this because we've tried to get at

9   Bhansali's assets, and he has not been forthcoming.  Now, Mr.

10  Bhansali is a defendant in a lawsuit in a relatively (inaudible)

11  state.  It's certainly not been my experience in my years of

12  practice that defendants tend to voluntarily come forward and

13  put forth information about their assets before a judgment is

14  entered against them, before the litigation has even gotten

15  going, and I believe what the trustee is referring to in that

16  regard are discussions that took place during the mediation,

17  which I think were settlement discussions.  In which there were

18  some discussions about providing information about assets and to

19  date that hasn't happened.  But I would also submit, Your Honor,

20  I don't believe there's any basis in law, that hey, if you don't

21  know what the defendant's assets are, or additional assets are

22  that you automatically an attachment.

23          THE COURT:  Well, I guess it comes in through the back

24  door in terms of the amount of assets available to satisfy a

25  potential judgment in numerators and denominations, things of

1  that sort.  But I guess my general take on that is that parties

2  can either chat and reach agreements on these sorts of things or

3  they don't and I'm the option of last resort to decide things.

4  I know there have been a lot of discussions over the course of

5  many months about the attachment issues, which is why they

6  weren't teed up earlier.  And that's (inaudible) and that's

7  good.  And certainly I've offered to help facilitate any

8  discussions to the extent that that's useful, but I guess at the

9  end of the day, it is what it is.  But is there anything in the

10 law that tells me that the delay in moving forward here is part

11 of the test that I have?  I mean, I guess it's part of the prong

12 dealing with dissipation of assets, and things of that sort.

13 Right?

14         MR. BUTLER:  It is, Your Honor, and I think it goes

15 directly to the issue of need.  Again, extraordinary remedy.  I

16 mean, as we all know, most attachments are people bring a

17 lawsuit, and a week later, they're running to court saying, got

18 to attach these assets.  That didn't happen here.  Why didn't

19 that happen here?  Because the trustee wasn't concerned about

20 dissipation.

21         And in that regard, I'd also mention if you look at

22 the attachment cases, including many of them that were cited for

23 both sides, a lot of them do involve situations where parties

24 are actively and continuously moving assets into different

25 entities.  A lot of them involve cases where parties are moving

1   assets over seas.  And Mr. and Ms. Bhansali live in New York.

2   They own this apartment.  This is where their life is.  This is

3   where their child goes to school.  This isn't a situation where,

4   if you don't act, and you don't jump in and prevent this, all of

5   a sudden, things are going to stream out the door to

6   Switzerland.  There's no evidence of that.  They haven't

7   established that or come close to.  In fact, they haven't really

8   even tried to establish that because there's really nothing

9   there.  And I think that the delay and those factors all do

10  factor into that issue of, do we have the kind of situation that

11  should cause me as a judge to worry enough about dissipation

12  that I should issue this kind of relief.  And I would submit

13  again that the evidence just isn't there.  And I would emphasize

14  again, Your Honor's discretion in that regard.  Even if you felt

15  that they somehow manage to meet this standard, Your Honor, can

16  still say, I don't think under these circumstances an attachment

17  is warranted.

18          The other thing I would want to, kind of in

19  conclusion, unless Your Honor has other questions, I want to

20  talk very briefly about the undertaken.  If Your Honor were to

21  grant an order of attachment, the plaintiff/trustee has

22  suggested $50,000 is sufficient.  And I know there was some

23  discussion of this earlier.  We're in difficult economic times.

24  You know there's going to be perhaps advantage times to sell

25  real estate or not in the coming months and years and generally

Firestar Diamond - 10/26/22                                    83

1   speaking, we have cases, a number of cases, that's we cited that

2   addressed this that show $50,000 is woefully inadequate for a

3   property that the trustee that was purchased I guess for 7.1 or

4   the trustee says it's worth 7.1 million, so we would certainly

5   submit, if an attachment were granted, there certainly should be

6   an adequate protection because we do believe that at the end of

7   the day we are going to prevail on this.  And particularly,

8   given, that's another Ms. Bhansali may need situation of an

9   attachment against property owned by a different party.  I thin

10  would certainly merit a sufficient undertaken, so as to protect

11  it.

12          And one last thing, Your Honor, I glossed over or

13  probably passed over when I discussed likelihood of success on

14  the merits, but it's critical.  There was a recent case and we

15  can certainly provide it in from the 2nd Circuit, Iraq v. IBEC

16  Bank, 43 F. 4th 253, that involved the question or touched on the

17  question of the amount of an attachment.  And I would submit

18  another factor or flaw in the trustee's argument regarding the

19  merits here is the trustee hasn't really established a modicum

20  of damages.  There's been vague discussion of well, the business

21  diminution, and professional fees, and other things, but I would

22  submit, and I think the law is clear, if you're going to attach

23  a piece of property you have to establish that those are your

24  damages.  Or your damages are greater.  And that a likely

25  remainder of that prong cannot simply be broad supposition or

Firestar Diamond - 10/26/22                    84

1  suggestions, you have to put forth proof, and I don't see proof.

2          THE COURT:  Well, let me ask you.  They cite a

3  judgment against the U.S. and then they triple that and end up

4  at 69, I think.

5          MR. BUTLER:  I don't see how that is -- again, that is

6  not tied to the specific causes of action in this case.  And

7  it's not tied specifically to Mr. Bhansali.  I would say it's a

8  clever number to throw out there, but how is that judgment

9  necessarily tied to the allegations against Mr. Bhansali.  I

10 think he's entitled to understand that.  And again, if this

11 extraordinary remedy is going to be applied here, there

12 certainly should be proof in the record.  Sufficient proof that

13 their claim is worth at least the amount of that property.

14         THE COURT:  All right.  thank you very much.

15         MR. BUTLER:  Thank you.

16         THE COURT:  Anything else, counsel?

17         MR. BUTLER:  I have nothing, unless Your Honor has any

18 questions.

19         THE COURT:  All right.  I do not at this time.  I

20 think I've asked (inaudible).  Thank you for the colloquy back

21 and forth.  And so with that, I'll turn it over to Mr. Williams

22 for a brief rebuttal.

23         MR. WILLIAMS:  Absolutely.  So, just to respond to a

24 few points.  I'll try to be short.  First of all, with respect

25 to the notion that the trustee has conceded that Ms. Bhansali

Firestar Diamond - 10/26/22                          85

1  paid for the property, the trustee certainly has not conceded

2  that.  It just simply isn't relevant.  It's a totally separate

3  transaction.  And it's undisputed that Mr. Bhansali had a

4  property interest in it and transferred it in a separate

5  transaction a year later for no consideration.  The fact that --

6         THE COURT:  Well, I think he's mentioning it in the

7  context of a discretion the Court has, and it's a different area

8  of the law, which is a divorce case.  And those sorts of things

9  do come in, right?  I haven't seen enough divorce decrees in the

10 context of bankruptcy cases, but I don't know if there's any law

11 out there, and I suspect there probably isn't, about what the

12 nature of my discretion is, and what I should consider or not

13 consider in that context.  Certainly, the supreme court always

14 wants the bankruptcy court to exercise in their discretion to be

15 well tethered to .statutory framework.

16        MR. WILLIAMS:  Well, on that note, I'm happy to give

17 Your Honor some guidance.  Specifically, the 2nd Circuit has held

18 in a case called Capital Ventures Int'l vs. Republic of

19 Argentina, 443 F. 3d 214 (2d Cir. 2006), in which, I'm

20 quoting --

21        THE COURT:  Sorry, could you say that cite again?

22        MR. WILLIAMS:  Sure.  It's 443 F. 3d 214, 222.

23        THE COURT:  Okay.  Thank you.  And the court held

24 "whether a statutory ground for attachment exists and both a

25 need likelihood of success are established, a court's discretion

Firestar Diamond - 10/26/22                    86

1  doe not permit denial of the remedy for some other reason at

2  least absent extraordinary circumstances and perhaps even that."

3  So, to the extent there's any discretion, it's very limited to

4  some sort of extreme situation.  I don't think that there's

5  anything here that would approximate extraordinary circumstances

6  that would warrant an exercise of discretion to deny an

7  attachment if the trustee prevails in establishing all the other

8  factors.

9          THE COURT:  All right.

10          MR. WILLIAMS:  Mr. Butler argued that this doesn't

11 look like any of the other cases that the trustee cited.  I

12 would submit that it looks a whole lot like U.S. Fidelity case

13 in which the defendant was a corporate guarantor of his

14 company's debt.  The company was in financial distress and it

15 became clear that he was about to be sued on the guarantee

16 application, and before he was sued, he transferred his interest

17 in his house to his wife, exactly the situation here, for no

18 consideration.  That goes directly against his argument that the

19 lawsuit hadn't been happening at the time that the transfer

20 occurred.

21          Also, there was a discussion about the timing of the

22 trustee's request for an attachment, especially in comparison to

23 the attachment motion against Ms. Javeri and the LLCs in the

24 other adversary case.  The difference is that the trustee didn't

25 see to do this on an ex-parte basis.  Unlike the other situation

Firestar Diamond - 10/26/22                    87

1  where the trustee is concerned that Ms. Javeri is going to take

2  the assets that currently are subject to potential recovery and

3  move them out the door, so there's a rush to a have to do

4  something really quickly, here, the fraudulent transfer has

5  already occurred.  The apartment is not going anywhere in a

6  literal sense, so there's less of a rush to go get it done.  But

7  there's no requirement in the statute that you see an attachment

8  the second that you're aware of it.

9         THE COURT:  No, but I understand his point to be that

10  it factors into the need for an attachment.  So, not the first

11  prong, not the second prong, I think it's the third prong if I'm

12  remembering it correctly.  So, with Ms. Javeri, the trustee came

13  in and said, we have lots of reasons to b concerned given what

14  they've told us they want to do.  And so he's saying that

15  doesn't exist here, so that weighs in my favor on that prong.

16  And I hear you saying that that's not a requirement, but I guess

17  the question is, to the extent we're talking about a need for an

18  attachment, which is a prejudgment remedy, maybe you want to

19  give me a bigger context for --

20         MR. WILLIAMS:  Sure.

21         THE COURT:  Caselaw and the purposes of the statute on

22  that.  Go ahead.

23         MR. WILLIAMS:  I don't have a cite ready to go for

24  that point, but my understanding is that the need for an

25  attachment goes more to whether or not there are assets

Firestar Diamond - 10/26/22                          88

1   available to go attach.  And certainly, if there's evidence

2   they're about to immediately skirt out the door that would be

3   sufficient to establish that there's need for an attachment.

4   But it's not necessarily required to show a need for an

5   attachment, it's sort of an additional factor.  Really, the

6   focus of the need for attachment analysis is, does the defendant

7   have assets that the trustee would be able to recover if he

8   actually were to prevail on the matter and obtain a judgment.

9           THE COURT:  So, hold on one second; I just want to set

10  a different standard out here.  We're talking about 6201, right?

11          MR. WILLIAMS:  Yes.

12          THE COURT:  All right.  I think you've invoked one and

13  three in the stature.  "The defendant is a nondomiciliary

14  residing without the state, or is  a foreign corporation not

15  qualified to do business in the state."  Hold on one second.  I

16  think it's three that you're referencing.

17          MR. WILLIAMS:  Yes, Your Honor, it's three.

18          THE COURT:  Yes.  "The defendant, with intent to

19  defraud his creditors or frustrate the enforcement of a judgment

20  that might be rendered in plaintiff's favor, has assigned,

21  disposed of, encumbered or secreted property, or removed it from

22  the state or is about to do any of these acts."  Am I

23  understanding -- looking at that statute, it talks about that

24  happening in the past or potentially in the future.  So, my

25  understanding, and you can straighten me out if I'm wrong, that

Firestar Diamond - 10/26/22                89

1    in Ms. Javeri's case, we're about the last part of that.  Or is

2    about to do any of these acts.

3            MR. WILLIAMS:  Exactly.

4            THE COURT:  For Mr. Bhansali, you're talking about

5    "has assigned, disposed of, encumbered or secreted property, or

6    removed it from the state.  You're talking about something

7    that's already occurred, which is contemplated by number 3.

8            MR. WILLIAMS:  That's exactly right.  They're just two

9    alternative prongs.

10           THE COURT:  All right.  These are very meticulous, so

11   I just wanted to make sure I had that.  Anything else on that

12   particular question?

13           MR. WILLIAMS:  Not with respect to the need for

14   security.

15           THE COURT:  So, what about the undertaken question?

16           MR. WILLIAMS:  I'm not sure if there are any courts

17   that have actually recognized this, but the only cases that Mr.

18   Bhansali discussions these high attachments, none of these are

19   bankruptcy cases and I think that's potentially important

20   because Bankruptcy Rule 7065, if the trustee were to seek a

21   restraining order or preliminary injunction, which essentially,

22   i think Your Honor will agree, is mostly the same standards, it

23   requires the same showing.  We could just as easily do it that

24   way and achieve the same result.  And in that case, Rule 7065

25   explicitly says that the bankruptcy trustee is not required to

Firestar Diamond - 10/26/22                                    90

1   post any sort of undertaken.  Even though under regular Rule

2   7065 under the civil rules, an undertaken or a security would be

3   required.

4            So, because rule 7065 gives trustees a little bit more

5   leeway in terms of posting security in that context, and since

6   we could easily be styling this as a motion for a restraining

7   order or preliminary instruction instead of an attachment, it

8   really doesn't make sense to all of a sudden require the trustee

9   to post this enormous security just because procedurally we're

10  proceeding as an attachment versus a restraining order.  So,

11  that is the substantive reason why we believe that the non-

12  bankruptcy cases that he's relying on are distinguishable.

13           THE COURT:  Well, let's assume that I'm looking at

14  those, and I'm trying to do something consistent with the

15  principals, what's your view about putting 7065 to the side,

16  because after all, the trustee did agree to post a bond, right?

17  To post a bond for 50,000.  So, assuming that we are going to

18  take that at face value and say, well, there should be something

19  here as opposed to the nothing that's reported by the 7065, what

20  do you say about the proper amount?

21           MR. WILLIAMS:  So, I do think that it's sort of a

22  totality of the circumstances type of analysis.  I don't have a

23  great since of what the number should be if it's not 50,000.  We

24  just kind of pulled that number out of a hat since that's what

25  Your Honor permitted in context of the ex parte Javeri

Firestar Diamond - 10/26/22                    91

1   attachment.  I do think that where you have such a clear

2   likelihood success on the merits, as I believe you do here, the

3   sliding scale should tip more towards less of a security.  And

4   on the other hand, if it was more of a stretch, it would

5   potentially be more of a security required.  I think that's

6   consistent with the general balancing of the harms analysis that

7   you would be conducing in the preliminary injunction context, I

8   know that there's analysis for the balancing of the harms when

9   you have a strong likelihood of success on the merits.

10  Essentially the scale was already tipped in favor of the

11  plaintiff.  And I would submit that it makes sense to apply that

12  same sort of reasoning with respect to determining the amount of

13  the bond.  If you ask me to pick a different number, I don't

14  have a different number.

15          THE COURT:  No, no, no.  That's fine.  I was just

16  trying to figure out the general way you're thinking.

17          MR. WILLIAMS:  Sure.

18          THE COURT:  All right.  Anything else that you have on

19  your list, Mr. Williams, to address?

20          MR. WILLIAMS:  No, I think we covered it all.  I will

21  note that there wasn't much of a discussion at all actually with

22  respect to the specific documents we identified, which I believe

23  is noteworthy.  If Mr. Bhansali had a ready-to-go explanation

24  for some of these documents, it would have been interesting to

25  hear.  You know, why our view of them is incorrect.  With

Firestar Diamond - 10/26/22                               92

1   respect to damages, the reason we talked so much on just

2   liability here was because we thought that was really what was

3   in dispute.  If Your Honor wants to give us an opportunity to

4   attach a bunch of bank statements to show the money that went

5   out the door, we're happy to do that to just like check that box

6   to show that there is an actual basis to show that there are

7   millions of dollars in damages.

8        But the way we'd conceptualize essentially what we

9   thought was in dispute was more his involvement in the fraud

10  rather than the fact that this money was literally transferred.

11  It seems like that's going to be something we can easily show

12  just by tracing --

13       THE COURT:  I assumed that that was the reason why you

14  felt comfortable using the U.S. entities' judgment as a proxy.

15       MR. WILLIAMS:  Yes, exactly.  Well, that's one piece

16  of it, that's certainly not everything either, but since that by

17  itself would be more than enough to basically exceed the entire

18  value of the property, there's no need to necessarily go out and

19  proof every single bucket of damages we could.  And going to his

20  point about proving up the specific elements of a RICO claim or

21  a breach of fiduciary duty claim, when I said, look, it

22  basically boils down to proving up his involvement in the fraud,

23  the core of the RICO conspiracy claim, is a snippet of fraud,

24  and then he'd just show wires and inventory shipments that

25  further that snippet of fraud.  So, if we can show that there

1   was a snippet of fraud and he was knowingly part of it, that

2   would establish like the vast majority of the RICO case.  And

3   obviously, if we can show that he was actively involved in a

4   snippet of fraud that would also constitute a breach of

5   fiduciary duty.  You know it would certainly be a breach of the

6   duty of loyalty if he is putting the interest of the

7   conspirators ahead of the interest of the debtors.  And again,

8   he focuses again on the harm to PNB and who was the victim and

9   intended target.  We've already briefed that.  I won't say

10   anything further than what we've already said with respect to

11   the legal issue.  But if Your Honor is, for whatever reason,

12   concerned that we haven't actually provided you with a record to

13   be able to say that this stuff did actually affect the debtors,

14   we're happy to supplement it with additional evidence just to

15   check that box.

16         This kind of goes back to your question to Mr. Wedoff

17   this morning about when you're evaluating the standard on a

18   motion for an attachment, Your Honor, sitting here right now,

19   and this is a rhetorical question, are you able to conclude that

20   we will likely be able to show that the money went out the door

21   from the debtors.  And if it seems pretty clear that we have

22   those bank statements that we could submit into evidence if it

23   came to that, then that carries another factor that allows you

24   to kind of tip the scale to say, yes, I think they will actually

25   be able to prove that fact, even if they haven't done so right

Firestar Diamond - 10/26/22                          94

1  at this moment.

2          THE COURT:  All right.  Anything else, Mr. Williams?

3          MR. WILLIAMS:  That is all that I've got.  Thank you,

4  Your Honor.  Unless, Your Honor has any other questions.

5          THE COURT:  I do not.

6          MR. DAMERON:  Pardon me, Your Honor, this is Reece

7  Dameron.  I appeared earlier for Mr. Javeri.  Given that there's

8  an ongoing discussion over the argument earlier this morning,

9  I'd like to have a moment to respond if possible.

10         THE COURT:  Well, I think we had argument on that

11  motion and I don't know if Mr. Wedoff, I don't know if he's

12  still here or not.

13         MR. WILLIAMS:  I don't know that anything we discussed

14  this afternoon affects the Court's determination of this

15  morning's motion.

16         THE COURT:  First of all, again, it's folks commentary

17  on the arguments they made in their brief.

18         MR. DAMERON:  Well, Your Honor, I think they've

19  actually made an incorrect argument here, and I would like to

20  respond to that.  That's one of the issues.  And Mr. Williams

21  was just making it, which is that they can somehow --

22         THE COURT:  Well, wait.  You're either going to get

23  heard, or you're not going to et heard.  You're not going to

24  push your way through the door doing that.  So, that's the one

25  thing that's not going to happen.  So, consistent with federal

Firestar Diamond - 10/26/22                    95

1   courts, I don't take two steps back.  We had argument on the

2   motions.  If he's made an incorrect argument, he's made an

3   incorrect argument.  Everybody has had an opportunity to be

4   heard on it.  So, the first thing you're going to do is tell me

5   what subject matter you're referring to.

6          MR. DAMERON:  The first is the standard that must be

7   shown.

8          THE COURT:  So, wait a minute, you said the first.

9   You've got several things you want to get into?

10         MR. DAMERON:  Two.

11         THE COURT:  No.  We're not here to reargue a motion

12  that was already argued.  I don't know how I do that.  So, it's

13  a separate adversary proceeding, there's separate counsel.

14  Also, you want the counsel that actually argued that this

15  morning, and people make decisions about who's going to argue,

16  and who's not going to argue.  And the person who argued

17  actually wasn't the person is wrote the brief or whose name is

18  signed on the brief, which was Mr. Bernstein.  So, I'm not

19  comfortable doing this because frankly, I think we'll spend

20  another half an hour inevitably rehashing arguments that have

21  already been made and variations on the theme.  So, frankly, it

22  doesn't matter at the end of the day because what I have are

23  your papers.  And somebody can't raise an argument for the first

24  time in oral argument because that's not how that works.  So,

25  people have what they have; I'll look at the caselaw; and I'll

Firestar Diamond - 10/26/22                    96

1   figure out what the standards are and how they should be applied

2   here.  So, we're done with that motion.

3        MR. DAMERON:  Thank you, Your Honor.

4        THE COURT:  All right.  With that, these two motions

5   are submitted and to loop back to the beginning, if there's any

6   issue with the sealing motion, or anything else that's needed on

7   the record for that, people will let me know.  Otherwise, I will

8   endeavor to get an answer on these motions as soon as possible.

9   I reserve the rights before issuing a decision if I'm concerned

10  about any sealing issues that may be implicated in the written

11  decision to reach out to the parties and have you essentially

12  once the decision is put together to remind me what is and isn't

13  sealing concern.

14       The other thing that I've seen judges do is

15  essentially send the decision to the parties and not docket it

16  until they get a chance to take  look at it.  And so then people

17  can redact or tell me.  Or we'd have a conference and say, well

18  this should be redacted and here's why.  Obviously, there's an

19  interest in public proceedings, so we don't like to do that on

20  decisions.  At the same time, I just want to be respectful of

21  the sealing issues that have been raised here that will be the

22  subject of the order.  But we'll cross that bridge when we come

23  to it.  So, with that, the Court is concluded on these motions

24  taken under advisement, and you'll be in contact with folks in

25  chambers when we are in a position to get you either a written

Firestar Diamond - 10/26/22                    97

1   ruling or a bench ruling.  And with that, the Court is in recess

2   till three o'clock when the next matter is, in roughly eight

3   minutes.  Thank you very much.

4            ALL COUNSEL:  Thank you, Your Honor.

5                          - o0o -

6                       CERTIFICATION

7   I, Rochelle V. Grant, approved transcriber, certify that the

8   foregoing is a correct transcript from the official electronic

9   sound recording of the proceedings in this matter.

10  _Rochelle V. Grant_

11  November 12, 2022

12

13

14

15

16

17

18

19

20

21

22

23

24

25