UNITED STATES BANKRUPTCY COURT      <u>FOR PUBLICATION</u>
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:      Chapter 11

Firestar Diamond, Inc., *et al.*,      Case No. 18-10509 (SHL)

           Debtors.      (Jointly Administered)
------------------------------------------------------------x
Richard Levin,
Chapter 11 Trustee of Firestar Diamond, Inc., *et al.*,

           Plaintiff,

        v.      Adv. No. 20-01054 (SHL)

Ami Javeri (A/K/A Ami Modi); Purvi Mehta
(A/K/A Purvi Modi); Nehal Modi; Neeshal
Modi; Central Park Real Estate, LLC; Central
Park South 50 Properties, LLC; Trident Trust
Company (South Dakota) Inc., solely as
Trustee of the Ithaca Trust; *et al.,*

           Defendants.
------------------------------------------------------------x

<u>MEMORANDUM OF DECISION</u>

**A P P E A R A N C E S :**

**JENNER & BLOCK LLP**
*Attorneys for the Chapter 11 Trustee, Richard Levin, Esq.*
919 Third Avenue
New York, New York 10022
By:    Richard B. Levin, Esq.
       Carl N. Wedoff, Esq.

       -and-

353 North Clark Street
Chicago, Illinois 60654
By:    Vincent E. Lazar, Esq.
       Angela M. Allen, Esq.
       William A. Williams, Esq.
       Adam T. Swingle, Esq.

**DUANE MORRIS LLP**
*Attorneys for Purvi Mehta*
1540 Broadway
New York, New York 10036
By:   Frederick D. Hyman, Esq.
      Mauro M. Wolfe, Esq.
      Evangelos Michailidis, Esq.
      Sarah Fehm Stewart, Esq.

**ROGER J. BERNSTEIN, ESQ.**
*Attorney for Ami Javeri and Nehal Modi*
535 Fifth Avenue, 23rd Floor
New York, New York 10017
By:   Roger J. Bernstein, Esq.

**SCHOEMAN UPDIKE KAUFMAN & GERBER LLP**
*Attorneys for Central Park Real Estate LLC and*
*Central Park 50 Real Estate LLC*
551 Fifth Avenue
New York, New York 10176
By:   Beth L. Kaufman, Esq.
      Patricia C. O'Prey, Esq.

**DUFFY AMADEO**
*Counsel for Central Park Real Estate LLC and*
*Central Park 50 Real Estate LLC*
275 Seventh Avenue, 7th Floor
New York, New York 10001

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are motions to dismiss filed by Defendants Ami Javeri a/k/a Ami Modi,

[ECF No. 44],[1] Purvi Mehta a/k/a Purvi Modi [ECF No. 39], Nehal Modi [ECF No. 47]

(collectively, the "Family Defendants") as well as motions to dismiss filed by Central Park Real

Estate, LLC, and Central Park South 50 Properties, LLC [ECF No. 42], (collectively, the "LLC

Defendants," and together with the Family Defendants, the "Moving Defendants"). Richard

---

[1]     Unless otherwise noted, all Case Management/Electronic Case Filing ("ECF") references are to Adv.
Pro. No. 20-01054.

Levin, Chapter 11 Trustee of Firestar Diamond, Inc., et al. ("Trustee") filed an omnibus

opposition to all the motions [ECF No. 60] and each of the Moving Defendants filed a reply.

[ECF Nos. 84, 83, 85, 89].[2]

The Moving Defendants seek dismissal for a variety of reasons.  Most notably, the

Moving Defendants argue that the Trustee has failed to adequately plead that the Moving

Defendants participated in, consented to, or had knowledge of the conspiracy to violate the

Racketeering Influence and Corrupt Organizations Act ("RICO") as alleged in the Trustee's

Complaint [ECF No. 1] (the "Complaint").  Defendants Purvi Mehta and Central Park Real

Estate, LLC also dispute the allegations that they received fraudulently conveyed assets.  For the

reasons set forth below, the Court largely agrees with the Trustee that these claims have been

adequately plead and, therefore, the Moving Defendants' motions to dismiss are denied, with the

exception of the LLC Defendants' motion to dismiss the Trustee's state law claim to avoid

constructively fraudulent conveyances, Compl. ¶¶ 517-23 (Count IX), which is granted without

prejudice.

## **BACKGROUND**

As is required by the case law, the allegations of the Complaint are taken as true when

assessing motions to dismiss.  *Tanvir v. Tanzin*, 894 F.3d 449, 458 (2d Cir. 2018), *aff'd*, 141 S.

Ct. 486 (2020) ("When reviewing the dismissal of a complaint for failure to state a claim, we

accept as true the factual allegations in the complaint and draw all reasonable inferences in

plaintiff's favor").  Additional background is drawn from the history of the underlying Chapter

---

[2]    Defendant Neeshal Modi also filed a motion to dismiss [ECF No. 56].  *See also* Trustee's Omnibus
Opposition To Defendants' Motions To Dismiss [ECF No. 60]; Defendant Neeshal Modi's Reply Memorandum Of
Law In Further Support Of Motion To Dismiss [ECF No. 90].  However, the Trustee and Neeshal Modi stipulated to
dismiss the action against Neeshal Modi with prejudice on or about November 4, 2022.  *See* ECF No. 136.
Accordingly, the motion to dismiss filed by Neeshal Modi is moot.  The Clerk of Court is respectfully directed to
amend the caption to remove Neeshal Modi.

11 cases here, of which the Court can take judicial notice. *Teamsters Nat'l Freight Indus. Negotiating Comm. v. Howard's Express, Inc. (In re Howard's Exp., Inc.)*, 151 F. App'x 46, 48 (2d Cir. 2005).

In January 2018, Punjab National Bank ("PNB") filed a complaint in India against Nirav Modi and several associated entities, alleging "the largest bank fraud in Indian history" against PNB and other banks (the "Bank Fraud"). *See In re Firestar Diamond, Inc.*, 615 B.R. 161, 162–64 (Bankr. S.D.N.Y. 2020); Report of John J. Carney, Examiner [ECF No. 394, Case No. 18-10509] at 4. Approximately one month later, three U.S. corporations indirectly owned by Nirav Modi filed for Chapter 11 protection in the Southern District of New York: Firestar Diamond, Inc. ("FDI"), Fantasy, Inc. ("FI") and A. Jaffe, Inc. ("A. Jaffe," and together with FDI and FI, the "Debtors"). S*ee* ECF No. 1, Case No. 18-10509. The Court subsequently appointed an examiner to investigate whether the Debtors—or their senior officers and directors—were involved in the alleged Bank Fraud, and the examiner found substantial evidence to support their knowledge and involvement. *See* Report of John J. Carney, Examiner at 4. Indeed, a pending sale of the Debtors' assets was cancelled when it was learned that Nirav Modi, the alleged mastermind of the Bank Fraud, had been in contact with the Debtors' Chief Executive Officer Mihir Bhansali while Nirav Modi was a fugitive from authorities and living under a false name in England. S*ee* Notice of Withdrawal, Without Prejudice, of Debtors' Motion for Entry of Orders Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006 [ECF No. 177, Case No. 18-10509]; *see also* Hr'g Tr. (March 18, 2018) [ECF No. 187, Case No. 18-10509], Compl. ¶¶ 185-86, 191, 368. The Court subsequently appointed Richard Levin as Chapter 11 Trustee of the Debtors in June 2018, and he has administered the Debtors' estates since that time. *See* ECF No. 227, Case No. 18-10509. After confirmation of a Chapter 11

4

liquidation plan in 2020, Mr. Levin was appointed as the Liquidating Trustee with all of the

Chapter 11 Trustee's rights and defenses, including the right to prosecute any causes of action

belonging to the Debtors. *See* Trustee's Modified First Amended Plan § 5.5 (the "Plan") [ECF

No. 1539, Case No. 18-10509].

### I. <u>The Allegations of Bank Fraud and the Fraud against the Debtors</u>

The Trustee filed this action on behalf of the Debtors and as the assignee of all claims

held by Synergies Corporation ("Synergies"), Firestar Group, Inc. ("FGI"), Firestar Diamond

International, Inc. ("FDII"), Nirav Modi, Inc. ("NMI"), and AVD Trading Inc. ("AVD")

(collectively, the "U.S. Affiliates").[3] *See* Compl., introductory paragraph & ¶¶ 18–23. Broadly

speaking, the Trustee alleges that from at least 2010 to mid-2018 (the "Relevant Period"),

members of Nirav Modi's family engaged in a racketeering conspiracy that "morphed from bank

fraud and money laundering to obstruction of justice and looting," injuring the Debtors and the

U.S. Affiliates. *Id.* ¶ 1. These family members include: Nirav Modi's sister, Purvi Mehta; Nirav

Modi's wife, Ami Javeri; and Nirav Modi's brother, Nehal Modi. *Id.* ¶¶ 2–5, 24–27. The

Trustee also sued Trident, in its capacity as Trustee for the Ithaca Trust, Central Park South 50

Properties, LLC ("CPS50"), and Central Park Real Estate LLC ("CPRE"), which together hold

the Modi family's two Manhattan apartments;[4] the Trustee alleges these entities "are nothing

more than contrivances used by the Modi family to shield more than $30 million of their ill-

gotten wealth from creditors." *Id.* ¶ 6.

---

[3]   Pursuant to a stipulated judgment in a separate Adversary Proceeding, the U.S. Affiliates assigned all claims they possessed to the Trustee. *See* ECF No. 1366, Adv. No. 18-10509. As their name suggests, these entities are United States based affiliates of the Debtors. *See* Compl. ¶¶ 18-22.

[4]   The apartments owned by the Modi family are located at 160 Central Park South, New York, New York (the "Essex House Apartment") and 50 Central Park South, New York, New York (the "Ritz Carlton Apartment"). Compl. ¶¶ 285, 315.

The details of the alleged misconduct are extensive.  The Complaint alleges that, between 2004 and 2006, Nirav Modi founded the parent company of the Debtors, Firestar International Limited (f/k/a Firestone International Private Ltd.) ("FIPL"), which operated as a diamond trading business in India; during the same period he also formed its India-based subsidiary Firestar Diamond International Pvt. Ltd ("FDIPL"), which manufactured a substantial portion of the diamond and jewelry inventory for the broader group of the so called "Firestar Entities."  *Id.* ¶¶ 52–53.  As alleged by the Trustee, the Firestar Entities are comprised of the Debtors, the U.S. Affiliates identified above, and various foreign affiliates.[5]  Between 2006 and 2012, Nirav Modi expanded the Firestar Entities' operations to the U.S., Hong Kong, Dubai, and Europe, and formed or acquired controlling interests in the Debtors.  *Id.* ¶ 54.  The Debtors' Chief Executive Officer (and Nirav Modi's cousin) Mihir Bhansali and Chief Financial Officer Ajay Gandhi "managed the fraudulent aspects of Nirav Modi's U.S. operations" during the Relevant Period, with Mr. Bhansali managing and controlling the Debtors and U.S. Affiliates in his capacities as CEO, sole director, and/or president, and Mr. Gandhi serving as CFO of the Debtors and U.S. Affiliates.  *Id.* ¶ 55–56.

From approximately 2010 to early 2018, Nirav Modi "orchestrated and directed a scheme to obtain loans, credits, or other funds under false pretenses and without collateral from

---

[5]    The Debtors' foreign affiliates are based in India, Hong Kong, Dubai, and Belgium.  The Indian affiliates include (1) Firestar International Limited ("FIL" or "FIPL"), which is the parent company of the global Firestar umbrella, *Id.* ¶ 52, which acquired FDI, a 95% interest in Jaffe, and incorporated Fantasy in 2012, Compl. ¶ 52, 54 and  (2) Firestar Diamond International Private Limited ("FDIPL"), an Indian wholly owned subsidiary of FIPL that operated jewelry factories in India, Compl. ¶ 53.  The Hong Kong affiliates include (1) Firestar Holdings Ltd. ("FHL"), (2) Firestar Diamond Ltd. ("FDL"), (3) Firestar Jewelry Ltd. ("FJL"), and (4) Nirav Modi Ltd. ("NML").  *Id.*  ¶ 57.  NML, FDL, and FJL are wholly owned subsidiaries of FHL.  *Id.* ¶59.  The Dubai affiliates include (1) Firestar Diamond FZE ("FDFZE"), which operated a as a polished diamond trading business and (2) Firestar Diamond FZCO ("FZFZCO"), which manufactured jewelry.  Compl. ¶ 60.  FHL is the 100% owner of FDFZE and FDFCO.  *Id.*  The Belgian affiliate is Firestar Diamond BVBA ("FDBVBA") and operated a rough diamond trading and manufacturing business.  *Id.* ¶ 61.

numerous banks, including [PNB]," which is majority owned by the Indian government. *Id.* ¶ 62. The Bank Fraud involved the use of letters of undertaking ("LOUs"),[6] a financial instrument unique to India designed to facilitate efficient import transactions. *Id.* ¶ 63. Nirav Modi and other co-conspirators sought to artificially inflate the import volumes of three of Nirav Modi's India-based companies with sham transactions so as to obtain more and more LOU funding in order to obtain even more LOU bank financing.[7] *Id.* ¶¶ 64–66. Nirav Modi and his co-conspirators worked with employees of PNB, including Gokulnath Shetty—who authorized and issued these LOUs to the three India-based companies—to prevent detection. *Id.* ¶¶ 66, 88. Nirav Modi, Ms. Javeri, Neeshal Modi (Nirav Modi's brother), and Mehul Choksi (Nirav Modi's uncle and business partner) each served as partner of each of these three Indian based LOU entities during the Relevant Period. *Id.* ¶¶ 51, 67. PNB and the other defrauded banks are reported to have lost in excess of $1 billion as a result of the Bank Fraud. *Id.* ¶ 70.

To carry out this scheme, Nirav Modi and his co-conspirators used a web of shell companies based in Hong Kong and Dubai that posed as legitimate businesses to create fake import transactions and launder the proceeds of the Bank Fraud. *See id.* ¶¶ 71–73. In addition to these so-called "Shadow Entities",[8] Mr. Bhansali created two layers of holding companies in the

---

[6]     See *In re Firestar Diamond, Inc.*, 615 B.R. 161, 163 n.2 (Bankr. S.D.N.Y. 2020) for a more detailed explanation of the mechanics of LOUs.

[7]     These India-based companies allegedly used fraudulently obtain LOU funding are: (1) Diamonds 'R' Us; (2) Solar Export; and (3) Stellar Diamond. Compl. ¶ 66.

[8]     The Shadow Entities are named as Defendants in the instant action. They include: Auragem Company Ltd. ("Auragem"), Brilliant Diamonds Ltd. ("Brilliant"), Eternal Diamonds Corporation Ltd. ("Eternal"), Fancy Creations Company Ltd. ("Fancy Creations"), Hamilton Precious Traders Ltd. ("Hamilton"), Sino Traders Ltd. ("Sino"), Sunshine Gems Ltd. ("Sunshine"), Unique Diamond and Jewellery FZC ("Unique"), World Diamond Distribution FZE ("World Diamond"), Vista Jewelry FZE ("Vista"), Empire Gems FZE ("Empire"), Universal Fine Jewelry FZE ("Universal"), Diagems FZC ("Diagems"), Tri Color Gems FZE ("Tri Color"), Pacific Diamonds FZE ("Pacific"), Himalayan Traders FZE ("Himalayan"), Unity Trading, FZE ("Unity"), Fine Classic FZE ("Fine Classic"), and DG Brothers FZE ("DG Brother"). Compl. ¶¶ 32-50. The Hong Kong-based Shadow Entities included Auragem, Brilliant, Eternal, Fancy Creations, Hamilton, Sino, and Sunshine. *Id.* ¶¶ 32–38. The Dubai-based Shadow Entities included Unique, World Diamond, Vista, Empire, Universal, Diagems, Tri Color, Pacific,

British Virgin Islands ("BVI") that acted as holding companies for the Dubai-based Shadow

Entities.  *Id.*  ¶ 75.[9]   As the Complaint explains, the Shadow Entities "had no legitimate

economic purpose" but instead their transactions

> routinely involved goods that (i) did not exist, (ii) were never transferred, (iii)
> were transferred at prices having nothing to do with market value, but instead
> based on whatever amounts were necessary to reconcile the Shadow Entities' and
> Firestar Entities' books and records so as to conceal other transfers made for
> illegitimate purposes, or (iv) were transferred in "circular transactions," in which
> the same goods were exported from and re-imported among Modi-Controlled
> Entities multiple times at varying and often inflated prices to give the appearance
> of multiple distinct transactions for the sole purpose of artificially increasing the
> entities' import volume.

*Id.* ¶ 82.

Nirav Modi, Mr. Gandhi, and Mr. Bhansali, along with other co-conspirators, allegedly

funneled millions of dollars in funds and diamonds through the Debtors and U.S. Affiliates in

furtherance of the Bank Fraud.  *Id.* ¶ 90.  The Trustee lists examples of how the Debtors directly

benefited from fraudulently issued LOUs and were involved in circular transactions between

2010 and 2012.  *See id.* ¶¶ 91–93.  After 2012, the Debtors no longer directly participated in

import and export transactions underlying LOU issuances and instead received LOU proceeds

indirectly through Shadow Entities; at that point, the Shadow Entities themselves acted as

intermediaries between the Firestar Entities and the LOU entities.  *Id.* ¶ 94.  The Debtors would

---

Himalayan, Unity, Fine Classic and DG Brothers.  *Id.* ¶¶ 39-50.  The Shadow Entities have not appeared in this
action.  Default Judgments were entered against Auragem, Brilliant, and Eternal on or about February 14, 2021.  *See*
ECF No. 99. The Trustee voluntarily discontinued the actions against Hamilton, Unique, World Dimond, Vista,
Empire, Universal, Diagems, Tri Color, Pacific, Himalayan, Unity, Fine Classic, and DG Brothers without prejudice
on or about February 3, 2022.  *See* ECF No. 96.

[9]        The BVI holding companies consisted of two layers of companies.  The first layer was comprised of
Madison Capital Private Limited and Moore Private Investment Limited; these companies in turn held 50% of the
shares of ten other BVI entities that comprised the second layer of companies. The second layer of companies served
as holding companies for Shadow Entities Tri Color, Diagems, Empire, Unique, World Diamond, Pacific, Universal,
and Vista.  Complaint  ¶¶ 76–78.  Neeshal Modi and Ms. Mehta were declared the beneficial owners of the first
layer BVI companies. *Id.* ¶ 76.

also make payments directly to Shadow Entities, ostensibly for the repayment of outstanding

LOUs. *Id.* ¶¶ 95–97. The Debtors and U.S. Affiliates' records reflect cash transfers and

inventory shipments to and from the Debtors and U.S. Affiliates and the Shadow Entities totaling

hundreds of millions of dollars during the Relevant Period. *Id.* ¶ 99. The purpose of these

transactions was improper, as the transactions sought to

> (a) facilitate repayment of LOUs . . . so that the Bank Fraud could continue
> undisturbed; (b) provide Shadow Entities with the goods and funds the Shadow
> Entities needed to transact with the [three Indian based entities receiving the
> LOUs]; (c) clear the Shadow Entities', Firestar Entities', and [LOU entities']
> accounts receivable and accounts payable so as to avert questions from auditors,
> lenders, and other third parties; and (d) divert the proceeds of the Bank Fraud for
> the benefit of Nirav Modi, Mihir Bhansali, their families and other co-
> conspirators.

*Id.* ¶ 98.

Mr. Bhansali and Mr. Gandhi acted in concert with Nirav Modi with respect to the

Debtors' participation in the Bank Fraud. *See id.* ¶¶ 100–01. In addition to his role as CEO of

two Debtors and three of the U.S. Affiliates, Mr. Bhansali served as the sole director of each the

Debtors and U.S. Affiliates while Mr. Gandhi served as CFO. *Id.* ¶¶ 102–03. With Nirav

Modi's oversight, Mr. Bhansali and Mr. Gandhi together were able to coordinate and direct

fraudulent transfers among the Debtors, U.S. Affiliates, Shadow Entities, and other entities

controlled by Nirav Modi "involving hundreds of millions of dollars in funds and diamonds." *Id.*

Mr. Bhansali and Mr. Gandhi controlled the finances of the Debtor, and each had authority to

approve loose diamond transactions among the Debtors, U.S. Affiliates and the Shadow Entities

and were also signatories on the bank accounts of the Debtors and U.S. Affiliates.[10] *Id.* ¶ 104.

The Trustee also generally alleges that Nirav Modi, Mr. Gandhi, and Mr. Bhansali exercised

---

[10]     According to the Trustee, Mr. Bhansali's and Mr. Gandhi's authorization was required to effectuate
transfers from the Debtors' and U.S. Affiliates' accounts. *Id.* ¶ 104.

9

oversight and control of the Shadow Entities and the entities receiving the LOUs; exercised

oversight and control over transactions between the Debtors and Shadow Entities; engaged in

suspicious accounting, finance, and inventory practices; engaged in efforts to deceive or

manipulate auditors and lenders; orchestrated transactions to divert assets from the Bank Fraud

and the Debtors for the benefit of Nirav Modi's and Mr. Bhansali's families; and attempted to

stonewall and disrupt investigations of the Bank Fraud before and after the Debtors' bankruptcy

filing. *See id.* ¶¶ 105–45.

　　Against the backdrop of this alleged Bank Fraud scheme, the Trustee alleges that the

Nirav Modi, Mr. Gandhi, and Mr. Bhansali carried out several specific fraudulent schemes that

directly harmed the Debtors. As one example, the Trustee alleges that the assets of the Debtors

were transferred to the Shadow Entities; those transferred funds were then used to repay LOUs.

*Id.* ¶¶ 95-99, 124-125, 145, Appendix A-124. These transfers of the Debtors' assets did not

benefit the Debtors and instead "were effectuated for purposes related to the Bank Fraud"

including repayment of LOUs and "clear[ing] the Shadow Entities', Firestar Entities', and [LOU

entities'] accounts receivable and accounts payable so as to avert questions from auditors,

lenders, and third parties. *Id.* ¶ 98.

　　Also part of the alleged fraud was the purported "restructuring" of the Firestar Entities'

global corporate structure in contemplation of an initial public offering that would allow them to

exit the fraud. *Id.* ¶ 276. The Trustee alleges that this restructuring "served the dual purpose of

(a) sanitizing any trace of the Modi family's self-dealing during the Relevant Period from the

Firestar Entities' books and records and ownership structure, and (b) providing a pretext for

funneling assets to Ami [Javeri] and Purvi Mehta." *Id.* ¶ 277. The Trustee identifies several

transfers designed to divest the Debtors of their assets for the benefit of the Modi Family and to

10

further the eventual goal of the initial public offering.  For example, The Trustee alleges that Nirav Modi created an obligation to U.S. Affiliate Synergies by transferring $14,575,000 to Synergies, which Synergies then used to pay off purported loans from FIPL, which were themselves the result of a circular transaction between FIPL and Synergies.  Compl. ¶ 281. Nirav Modi, Mr. Gandhi, and Mr. Bhansali then fabricated a sale of the outstanding shares of Synergies from Nirav Modi to FHL (despite the fact that FIPL was the sole owner of Synergies) to create a capital infusion for Synergies.  *Id*. ¶ 282.  Nirav Modi then assigned the loan between himself and Synergies to Ms. Mehta as a "gift."  *Id*. ¶ 283.  Synergies then used the funds from a capital infusion received from FHL to pay off the loan that had been assigned to Ms. Mehta "as part of a broader diversion of funds to [Ms.] Mehta under the guise of the broader restructuring." *Id*.  The Trustee alleges the "restructuring" efforts ramped up just prior to the retirement of Gokulnath Shetty, the insider at PNB who participated in the conspiracy, in May 2017.  *Id.* ¶ 292.

The Trustee alleges that each Moving Defendant assented to the general criminal objective of the scheme and took actions to further the scheme.  *See e.g., id.* ¶ 445.  For example, the Trustee alleges that Ms. Mehta was "a primary conduit for proceeds of the Bank Fraud."  *Id.* ¶ 310.  Ms. Mehta directly owned and controlled one of the Shadow Entities allegedly used to funnel proceeds of the Bank Fraud, Fine Classic, and she indirectly owned other Shadow Entities.  *Id.* ¶¶ 75–78, 169, 178, 314.  According to the Complaint, Ms. Mehta received at least $56 million—either directly or indirectly—from Fine Classic and another Shadow Entity between 2013 and 2017.  *See id.* ¶¶ 303–304, 314.  Ms. Mehta also allegedly indirectly invested $45 million in the Debtor's parent company, FIPL, to ultimately help finance the "restructuring." *Id.* ¶¶ 305–07, 446.  Allegedly as a result of the "restructuring", Ms. Mehta later received

approximately $85 million that had been funneled through Firestar Entities back to Ms. Mehta. *See id.* ¶¶ 283, 314, 320–21, 342, 344–45, 446.

Additionally, in July 2017, and as part of the "restructuring", Ms. Mehta used proceeds of the Bank Fraud to purchase the Ritz Carlton Apartment for $25 million. *Id.* ¶¶ 315–16. Ms. Mehta also formed CPS50 and the Ithaca Trust, an irrevocable trust formed under Delaware law, to hold the Ritz Carlton Apartment for the benefit of Ms. Javeri, subject to Nirav Modi's ultimate control. *See id.* ¶¶ 316–40, 446. Ms. Mehta also loaned $34 million, at least $18 million of which she received from Fine Classic, to Ms. Javeri; Ms. Javeri then wired $2.5 million of those funds back to Ms. Mehta as a down payment on the Ritz Carlton Apartment and then later wired another $25 million back to Ms. Mehta in repayment of this loan. *Id.* ¶¶ 314, 316, 339. Ms. Mehta also contributed toward the divestment of CPRE from a U.S. Affiliate. *See id.* ¶¶ 284–96, 348–358. The Trustee alleges that to remove CPRE (and by extension, the value of the Essex House Apartment) from the reach of the Debtors' creditors, Mr. Gandhi utilized FDI funds to pay off the mortgage on the apartment so that ownership of CPRE could be transferred from FGI to the Ithaca Trust. Comp. ¶¶ 349–385.[11] The Trustee alleges that the Ithaca trust was formed to hold the Modi family's "ill-gotten wealth." *Id.* ¶ 6.[12]

CPS50, the Ithaca Trust, and CPRE, were all under the "complete control" of Nirav Modi and were allegedly used to launder proceeds of the Bank Fraud and to shield real estate—some of which was purchased with proceeds of the Bank Fraud—from creditors. *See id.* ¶¶ 3, 6, 329, 446, 450, 451, 452. The Trustee also alleges that Ms. Javeri "managed and facilitated the Modi

---

[11]    This transfer is also the basis for some of the Trustee's claims of fraudulent conveyance, the specific details of which are discussed infra § V(c).

[12]    Ms. Javeri and her children were designated as the beneficiaries of the Ithaca Trust, and Purvi Mehta, Deepak Modi (Nirav Modi's father), Pragnya Modi (Nirav Modi's mother), and Mihir Bhansali were designated as residual beneficiaries. *Id.* ¶ 322-23.

family's systematic efforts to launder and shield from the creditors the proceeds of the fraud, including over $30 million in real estate." *Id.* ¶ 3.

By May 2018, the Bank Fraud had been exposed, criminal charges were pending against Nirav Modi, Nehal Modi, Ms. Mehta, and Neeshal Modi in India, and Nirav Modi, had absconded to London. Compl. ¶¶ 188-90. At that time, Ms. Javeri appointed Nehal Modi as the Ithaca Protector of the Ithaca Trust. *See id.* ¶¶ 186–89, 191, 365. The Ithaca Protector has the power to "(a) remove and appoint the Ithaca Trustee; (b) remove and appoint the Investment Advisor; (c) terminate the Ithaca Trust; (d) change the situs of the Ithaca Trust; (e) amend administrative provisions of the Ithaca Trust Agreement; (f) add or exclude beneficiaries; and (g) designate a successor to replace the Protector." *Id.* ¶ 325. On the same day of his appointment, Nehal Modi further appointed himself as the Ithaca Investment Advisor,[13] appointed Trident Trust Company (South Dakota) Inc. ("Trident") as the Ithaca Trustee, and directed Trident to appoint Nitin Dattani as the manager of CPS50. *Id.* ¶ 366. Around this same time, Nehal Modi and Mr. Dattani were allegedly working to frustrate the Bank Fraud investigation and fraudulently divert assets to Hong Kong while Nirav Modi was in hiding. *See id.* ¶¶ 200, 204–37, 275, 368. Nehal Modi also jointly managed and controlled Twin Fields Investments Ltd. ("Twin Fields") and the BBB Group, Inc. (the "BBB Group") with Mr. Bhansali. *Id*. ¶ 172. Ms. Mehta and her father indirectly owned 100% of the equity in Twin Fields. *Id*. ¶ 169. The Trustee further alleges that Twin Fields and the BBB Group "constituted another front for Nirav Modi and his family's massive money laundering efforts." *Id*. ¶ 183. The Trustee also alleges that Ms. Javeri was a partner in the three LOU entities that obtained fraudulent loans. *Id.* ¶¶ 3,

---

[13]     Pursuant to the terms of the Agreement governing the Ithaca Trust, the Investment Advisor controls the management of the trust's assets; the Trustee of the Ithaca Trust cannot invest or manage any of the trust's assets without the express written direction of the Investment Advisor. Compl. ¶ 324.

67.  Additionally, Ms. Javeri opened bank accounts for two of these LOU entities in the same

year that the Bank Fraud began.  *Id*. ¶ 69.

Based on all of these allegations the Trustee contends that the Family Defendants as well

as the LLC Defendants participated in a RICO conspiracy in violation of 18 U.S.C. § 1962(d).

The Trustee also seeks the avoidance of various alleged fraudulent transfers under the

Bankruptcy Code and the New York Debtor and Creditor Law.  *See generally* Compl.

## II.    The Lawsuit against the Executives

The instant complaint is the second action filed by the Trustee alleging, among other

things, violations of RICO related to the fraud allegedly masterminded by Nirav Modi.  In the

first case, the Trustee sued Nirav Modi, Mr. Gandhi, and Mr. Bhansali (collectively, the

"Executive Defendants"), alleging that they participated in a RICO enterprise; engaged in a

pattern of racketeering activity; committed the predicate acts of mail and wire fraud, violations

of the National Stolen Property Act, money laundering, obstruction of justice, and bankruptcy

fraud; and participated in a conspiracy to commit RICO violations, all of which caused injury to

the Debtors.  *See id.* ¶¶ 233–313.  The Trustee also asserted state law claims for breaches of

fiduciary duty and corporate waste.  *See generally* Complaint [ECF No. 1, Adv. No. 19-01102];

*see also* Amended Complaint [ECF No. 28, Adv. No. 19-01102] (the "Executive Defendants

Complaint").  The facts alleged in the Executive Defendants Complaint largely mirror those of

the Complaint here.  *See* Executive Defendants Complaint.  More specifically, the Executive

Defendants Complaint seeks damages from harm allegedly inflicted by the Executive Defendants

on the Debtors and their estates as a result of

> the [Executive Defendants'] six-year, extensive international fraud, money
> laundering, and embezzlement scheme that resulted in accrual of claims against
> the Debtors of over $1 billion in favor of [PNB], the diversion of millions of
> dollars of the Debtors' assets for the benefit of the family of Nirav Modi and

Mihir Bhansali, and the collapse of the Debtors and the resulting loss of value of
their businesses.

Executive Defendants Compl. ¶ 1.  The Trustee further alleges that, from approximately 2011 to

2018, the Executive Defendants orchestrated the Bank Fraud scheme and funneled millions of

dollars in funds and diamonds through the Debtors and certain of the U.S. Affiliates to further

the Bank Fraud.  *Id.* ¶¶ 23, 53, 175.

The Executive Defendants filed motions to dismiss that adversary proceeding, which

were denied.  *See Levin v. Modi (In re Firestar Diamond, Inc.)*, 634 B.R. 265 (Bankr. S.D.N.Y.

2021).  The Court rejected the Executive Defendants' argument that the Trustee lacked standing

under RICO because the direct harm caused by the Bank Fraud scheme was suffered by non-

Debtor PNB and, thus, the Debtors were only derivatively, or indirectly, injured.  *Id.* at 282.  The

Court observed that the Bank Fraud was laid out in the Executive Defendants Complaint as a

"backdrop to understanding the specific predicate acts set forth in [that complaint]," which "all

resulted in direct injuries to the Debtors."  *Id.* at 284.  The Court concluded that the Debtors were

a party directly injured by the alleged predicate acts because the "predicate acts directly (1)

depleted the Debtors' tangible assets through fraudulent transfers to overseas entities, (2) caused

the Debtors to expend millions of dollars in professional fees related to the Trustee's and

Examiner's investigations in the bankruptcy proceedings, and (3) impaired the Debtors' ability to

sell its assets."  *Id.* at 285.[14]  Consequently, the Court held that the Trustee has standing under

RICO because the predicate acts were the proximate cause of the Debtors' injuries.  *Id.* at 286.

The Court further rejected the Executive Defendants' argument that dismissal was required

---

[14]      *See also id.* at 288 (the predicate acts "all caus[ed] injury to the Debtors by depleting their assets through
Actual Fraudulent Transfers and diverting the Debtors' assets to the Shadow Entities overseas; diverting the U.S.
Affiliates' assets—including assets received from the Debtors through the Actual Fraudulent Transactions—to
Shadow Entities, thereby impairing the Debtor's claims against the U.S. Affiliates; and causing the Debtors to spend
millions of dollars in professional expenses related to the Bankruptcy proceedings").

because PNB was the initial "intended target" of the RICO enterprise, because such an "intended target" defense was at odds with the case law of this Circuit. *See id.* at 286–87 (discussing *In re Am. Express Co. Shareholder Litig.*, 39 F.3d 395, 400 (2d Cir. 1994) and *Baisch v. Gallina*, 346 F.3d 366, 375 n.1 (2d Cir. 2003)).

Next, the Court found that the Trustee adequately plead predicate acts under RICO of mail and wire fraud, violations of the National Stolen Property Act, money laundering, obstruction of justice, and bankruptcy fraud. *See id.* at 289–93. The Court also rejected the Executive Defendants' contention that the Trustee's RICO claims based on actions before March 2015 were time barred because the statute of limitations was tolled under the adverse domination doctrine as the Executive Defendants allegedly dominated and controlled the Debtors until May 2018. *Id.* at 293–94. Lastly, the Executive Defendants argued that the Trustee's claims were barred under the doctrine of *in pari delicto* due to the Debtors' own wrongful conduct in the Bank Fraud scheme. *Id.* at 294. But the Court found that the *in pari delicto* defense was unavailable to the Executive Defendants as it was inappropriate to impute their conduct to the Debtors under the "insider exception," because the Trustee had sufficiently alleged that, among other things, Nirav Modi was a statutory insider. *Id.* at 295–96.[15]

## DISCUSSION

The Moving Defendants seek dismissal of counts one and two of the Complaint, which encompass both the Debtors' and the U.S. Affiliates' claims against the Defendants for conspiracy to violate RICO, 18 U.S.C. § 1962(d), Comp. ¶¶ 371–466. Ms. Mehta also moves to dismiss counts three and four, which seek avoidance and recovery of actual and constructive

---

[15]    For similar reasons, the Court also denied the Executed Defendants' request to dismiss the Trustee's state law claims. *Firestar,* 634 B.R. at 296-307.

fraudulent transfers under New York State Law. Comp. ¶¶ 467–83. Finally, CPRE and CPS50 move to dismiss counts five through ten, which seek avoidance and recovery of actual and constructive fraudulent transfers under both New York State and Federal law.[16]  Compl. ¶¶ 484–531.

### III.    Legal Standard on a Motion to Dismiss Pursuant to Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6), applicable to bankruptcy proceedings under Federal Rule of Bankruptcy Procedure 7012(b), provides for dismissal if a complaint fails to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b).  To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  A claim has facial plausibility when the court may reasonably infer that the defendant is liable for the misconduct alleged. *See id.*; *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007).  Whether a claim is facially plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 US at 679.  A pleading offering only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," however, "will not do." *Twombly,* 550 U.S. at 555; *see Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir. 2013) (discrediting "legal conclusions couched as factual allegations").  In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, drawing all reasonable inferences in favor of the plaintiff. *See BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 320 (S.D.N.Y. 2016).  In sum, the court must determine whether the "well-pleaded factual

---

[16]    Although CPRE moves to dismiss counts five through ten, counts five and six actually seek recovery from the Ithaca Trust and Ms. Javeri for those alleged violations.  However, the Ithaca Trust has not filed a motion to dismiss and Ms. Javeri does not address the fraudulent conveyance claims in her motion.

allegations," assumed to be true, "plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679.

A Rule 12(b)(6) motion is addressed to the face of the pleading. *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir. 1985). Pursuant to Federal Rule of Civil Procedure 10(c), the pleading is deemed to include any document attached to it as an exhibit or any document incorporated in it by reference. *Id.*; *see also Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir. 1991).

## IV.    Arguments Related to the RICO Conspiracy Claims

### A.  Legal Standard

The Trustee alleges that the Moving Defendants conspired with the Executive Defendants to violate 18 U.S.C. § 1962(c) by committing acts of mail and wire fraud, money laundering, obstruction of justice, bankruptcy fraud, and violating the National Stolen Property Act. *See* Compl. ¶¶ 371–437; Trustee's Omnibus Opposition to Defendant's Motion to Dismiss (the "Trustee Opposition") at 14–21, 25–42.

Section 1962(d) provides that, "[i]It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of [18 U.S.C. § 1962]." 18 U.S.C. § 1962(d). Subsection (c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). "The elements [of] a subsection (c) violation are: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997) (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985)). "'Pattern of racketeering activity' is a defined term and requires at least two acts of 'racketeering activity,'

18

the so-called predicate acts." *Id.* (quoting 18 U.S.C. § 1961(5)).  Predicate acts include, among

other things, mail and wire fraud, money laundering, obstruction of justice, bankruptcy fraud,

and National Stolen Property Act violations.  *See* 18 U.S.C. §§ 1341, 1343 (mail and wire fraud),

§§ 1956, 1957 (money laundering), §§ 1503, 1512 (obstruction of justice), § 152 (bankruptcy

fraud), §§ 2314, 2315 (National Stolen Property Act).

Separate from the elements of a substantive RICO violation, RICO conspiracy under 18

U.S.C. § 1962(d) requires proof "(a) of an agreement to join a racketeering scheme, (b) of the

defendant's knowing engagement in the scheme with the intent that its overall goals be

effectuated, and (c) that the scheme involved, or by agreement between any members of the

conspiracy was intended to involve, two or more predicate acts of racketeering." *United States v.

Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018).

"To prove the agreement element, the [plaintiff] must show that the defendant 'knew

about and agreed to facilitate [a racketeering] scheme.'" *Id.* (quoting *Salinas*, 522 U.S. at 66);

*see also United States v. Pizzonia*, 577 F.3d 455, 459 (2d Cir. 2009) ("[T]he object of a

racketeering conspiracy is to conduct the affairs of a charged enterprise through a pattern of

racketeering, not to commit discrete predicate acts.").  As to the intent element, "RICO

conspiracy does not require proof that the defendant intended that specific criminal acts be

accomplished.  Instead, it suffices to show that he intended that the broad goals of the

racketeering scheme be realized, along with evidence that some (or any) members of the

conspiracy intended that specific criminal acts be accomplished." *Zemlyansky*, 908 F.3d at 11.

To prove the pattern element—that two or more predicate acts were involved—it "need

not [be] establish[ed] that the defendant 'committed or agreed to commit two predicate acts

himself.'" *Id.* (quoting *Salinas*, 522 U.S. at 63).  Rather, the pattern element may be established

"through evidence that 'the co-conspirators, not solely the defendant, agreed to conduct the affairs of the enterprise through a pattern of racketeering.'" *Id.* (quoting *United States v. Yannotti*, 541 F.3d 112, 129 n.11 (2d Cir. 2008)). Indeed, "a conspirator charged with racketeering conspiracy need not commit or even agree to commit the predicate acts that are elements of a substantive count[,] . . . for 'it suffices that he adopt[ed] the goal of furthering or facilitating the criminal endeavor.'" *Id.* at 10 (quoting *United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002)); *Salinas*, 522 U.S. at 65 ("It makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense."); *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 727 (S.D.N.Y. 2021) ("Plaintiff need not prove that the defendant committed any predicate act.") (citing *United States v. Arrington*, 941 F.3d 24, 36 (2d Cir. 2019)).

Indeed, courts have recognized that not only are "Section 1962(d) conspiracies . . . easier to prove than violations of [Section] 1962(c)," *Palatkevich v. Choupak*, 2014 WL 1509236, at *22 (S.D.N.Y. Jan. 24, 2014), but RICO conspiracies are also easier to demonstrate than "basic" conspiracies, as RICO conspiracies "do[] not require proof that a defendant knowingly agreed to facilitate a specific crime (*e.g.*, mail fraud)" and "ha[ve] a more removed *mens rea* requirement" than "basic" conspiracies. *Zemlyanksy*, 908 F.3d at 11, n.7; *see also Salinas*, 522 U.S. at 63 ("There is no requirement of some overt act or specific act in the statute before us, unlike the general conspiracy provision applicable to federal crimes, which requires that at least one of the conspirators have committed an 'act to effect the object of the conspiracy.'") (internal citation omitted); *Arrington*, 941 F.3d at 36–37 ("To prove a RICO conspiracy . . . [the plaintiff] need

only prove that the defendant knew of, and agreed to, the general criminal objective of a jointly

undertaken scheme.") (internal citations omitted); *Zemlyansky*, 908 F.3d at 11 ("[U]nlike 'basic'

conspiracy, RICO conspiracy does not require proof that the defendant intended that specific

criminal acts be accomplished.").

Moreover, courts analyze complaints alleging RICO conspiracies under the more liberal

pleading requirements of Rule 8(a).  *Bd. of Managers of Trump Tower at City Ctr. Condo. v.

Palazzolo*, 346 F. Supp. 3d 432, 463 (S.D.N.Y. 2018) (citing *Hecht v. Commerce Clearing

House, Inc.*, 897 F.2d 21, 26, n.4 (2d Cir. 1990)).  Rule 8(a) applies because "it is the sufficiency

of the conspiracy allegation rather than the underlying fraud allegation which is being

challenged."  *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 153

(E.D.N.Y. 2005) (quoting *Hecht*, 897 F.2d at 26 n.4).  "The Second Circuit has held that for a

RICO conspiracy claim, the Court must limit its focus to 'whether an alleged conspirator knew

what the other conspirators were up to or whether the situation would logically lead an alleged

conspirator to suspect he was part of a larger enterprise.'"  *Id.* (quoting *United States v.

Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000)).

## B.  Parties' Disagreement about the RICO Conspiracy Standard

As a threshold matter, the parties disagree as to the appropriate standard for establishing a

RICO conspiracy claim under Section 1962(d).  All four Moving Defendants argue that the

Trustee must adequately allege that there was an agreement to specifically commit at least two

predicate acts.  *See* Memorandum of Law in Support of Ami Javeri's Motion to Dismiss [ECF

No. 44] ("Javeri Memo") at 5-6; Reply Memorandum of Law in Support of Ami Javeri's Motion

to Dismiss [ECF No. 84] ("Javeri Reply") at 2; Memorandum of Law in Support of Nehal

Modi's Motion to Dismiss [ECF No. 47] ("Nehal Modi Memo) at 5-7; Memorandum of Law in

Support of the Motion to Dismiss of Defendants Central Park Real Estate LLC and Central Park

South 50 Properties LLC [ECF No. 42] ("LLC Memo") at 7.[17]  But the Court disagrees.

The cases relied upon by the Defendants to support their argument that RICO

conspirators must agree to commit specific predicate acts are all either decided before  the

seminal and controlling cases of *Salinas* and *Zemlyanski*, or cite to case law that pre-dates

*Salinas* and *Zemlyanki*.  See, e.g., *Hecht,*  897 F.2d at 25 (decided pre-*Salinas*); *U1IT4less, Inc.*

*v. FedEx Corp.*, 896 F. Supp. 2d 275, 291 (S.D.N.Y. 2012) (quoting *Hecht* for the proposition

that a plaintiff "must plausibly allege facts that imply an 'agreement . . . to commit at least two

predicate acts'"); *Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F. Supp. 435,

451 (E.D.N.Y. 1997) (issued three months before *Salinas*); *Foster v. 2001 Real Est.*, 2015 WL

7587360, at *6 (S.D.N.Y. Nov. 24, 2015) (citing cases that all trace back to and rely on *Hecht*);

*Malvar Egerique v. Chowaiki*, 2020 WL 1974228, at *21 (S.D.N.Y. Apr. 24, 2020) (relying on

*Foster* and another pre-*Salinas* case), *vacated in part on other grounds sub nom., Weiss v. David*

*Benrimon Fine Art LLC*, 2021 WL 6128437 (2d Cir. Dec. 28, 2021). As explained above,

however, the cases relied upon by Defendants do not reflect the current state of the law.  *See,*

*e.g.. Zichettello*, 208 F.3d at 99 n.13 (noting that "the Supreme Court ruled in *Salinas* that

Section 1962(d) does not require proof that each co-conspirator agreed to commit two predicate

acts"); *Zemlyansky*, 908 F.3d at 10–11. [18]

---

[17]      For example, Ms. Javeri argues that the Trustee fails to adequately allege "any contact between Ami Javeri
and the alleged predicate acts of bank fraud, mail and wire fraud, money laundering, and obstruction of justice."
Javeri Memo at 6; s*ee also* Javeri Reply at 1 (arguing that "a RICO conspiracy cause of action must be predicated
upon agreement to the commission of two or more predicate acts.").

[18]      The Moving Defendants cite a string of cases that all rely on *Curi*, 978 F. Supp. at 451 in support of their
argument that "mere knowledge of the scheme, even coupled with personal benefit, is not enough to impose liability
for a RICO conspiracy."  *See* Javeri Reply at 3 (quoting *Abbott Labs. v. Adelphia Supply USA*, 2017 WL 57802, at
*9 (E.D.N.Y. Jan. 4, 2017)).  But as already noted, *Curi* predates *Salinas* and *Zemlyanski* and, moreover, the case on
which *Curi* relies for this proposition—*Neibel v. Trans World Assur. Co.*, 108 F.3d 1123, 1128 (9th Cir. 1997)—was
subsequently overturned in *United States v. Fernandez*, 388 F.3d 1199, 1228 (9th Cir. 2004), *modified*, 425 F.3d

Rather than requiring that a defendant commit or agree to commit two specific predicate

acts, a RICO conspiracy can be established instead by providing assistance to the conspiracy:

> for example [it may] be proven by evidence that the defendant agreed to facilitate
> a scheme by providing tools, equipment, cover, or space; that the facilitation was
> knowing because the defendant was aware of the broader scheme, even if he was
> unaware of the particulars, or because the defendant knowingly benefitted from
> the scheme; and that other members of the enterprise intended to accomplish
> specific predicates.

*Zemlyansky*, 908 F.3d at 11 n.6.  Of specific relevance to this case, "evidence of a defendant's

receipt of diverted or stolen funds, and/or facilitation of another's receipt of such funds, may

support an inference that the defendant knowingly participated in a claimed RICO conspiracy."

*Related Companies, L.P. v. Ruthling*, 2019 WL 10947100, at *7 (S.D.N.Y. July 23, 2019) (citing

*Palazzolo*, 346 F. Supp. 3d at 464).

### C.  The Trustee's Standing to Pursue RICO Claims

The Moving Defendants assert that the Trustee lacks standing to pursue RICO claims on

behalf of the Debtors.  *See* Nehal Modi Memo at 15 (joining in the Executive Defendants'

arguments regarding the Trustee's standing, and asserting that the Trustee cannot assert claims

that belong to creditors, specifically PNB); Javeri Memo at 13-14 (same); LLC Memo at 26-27

(asserting that the Debtors are indirect victims and that PNB is better situation to pursue RICO

claims); Memorandum of Law in Support of Purvi Mehta's Motion to Dismiss the Complaint

("Mehta Memo") at 20-25 (asserting that the Trustee lacks a direct injury and that the claims

belong to PNB.)  The Court rejects these arguments for the same reasons the arguments were

rejected in its decision denying dismissal of the Executive Defendants' case.  *See In re Firestar*

*Diamond, Inc.*, 634 B.R. at 282-88 (holding that the predicate acts alleged directly harmed the

---

1248 (9th Cir. 2005), because the Ninth Circuit found that "*Neibel* is no longer good law because it is inconsistent
with subsequent Supreme Court precedent [in] *Salinas*."  *Fernandez*, 388 F.3d at 1128.

Debtors and rejecting the Executive Defendants' arguments that the Debtors had to be the

"intended target" of the fraud).

### D. The Trustee's Pleading as to Each Defendant's Participation in the RICO Conspiracy

The Moving Defendants next argue that the Trustee has not adequately alleged their

involvement in the RICO conspiracy.  To assess these arguments, the Court needs to separately

evaluate the RICO conspiracy allegations as to each of the Moving Defendants.

#### 1.  Purvi Mehta

The Trustee contends that Ms. Mehta's agreement to join and support the RICO

conspiracy can be inferred from allegations that include the following:

a. Ms. Mehta was the beneficial owner of numerous Shadow Entities, Twin Fields,[19] and numerous other offshore shell companies used to further the Bank Fraud and launder its proceeds.

b. Ms. Mehta, through Islington,[20] invested $45 million in proceeds of the Bank Fraud in FIPL to fund the 2017 "restructuring" of the Firestar Entities in connection with which Ms. Mehta subsequently received over $85 million in proceeds of the Bank Fraud.

c. Ms. Mehta settled and funded the Ithaca Trust to launder proceeds of the Bank Fraud for the benefit of Nirav Modi and Ami Modi and to shield ill-gotten assets from creditors.

d. Ms. Mehta wired Mr. Bhansali $1.5 million as a purported loan just weeks before Bhansali purchased a $7.1 million apartment.

Compl. ¶ 446.

---

[19]    Twin Fields is a Delaware shell company through which "the Modi family secretly owned and operated Bailey Banks & Biddle retail stores as another front for its money laundering operations."  Compl. ¶ 7.  The Trustee alleges that the Modi family laundered over $80 million through Twin Fields during the relevant period.

[20]    Islington International Holdings Pvt. Ltd ("Islington") is a Singapore based entity owned by Novelar International Holdings Ltd., a BVI entity of which Ms. Mehta is the ultimate beneficial owner.  Compl. ¶¶ 305-06.

In the face of these allegations, Ms. Mehta argues that her ownership of the Shadow

Entities and other shell companies was "indirect, partial, and passive" because these entities were

actually "formed, controlled and operated" by Nirav Modi, Mr. Bhansali, and Mr. Gandhi. *See*

Mehta Memo at 3–4, 34–35. She further contends that the transactions outlined above, among

others, were "tangential foreign transactions with no ties to the United States" that were directed

by others; and that the Complaint "makes clear that third parties used Ms. Mehta to advance the

conspiracy without her knowledge or direct involvement." *Id.* To support this assertion that Ms.

Mehta was "used" by third parties to advance the conspiracy, she cites various allegations of

complaint, including: 1) Neeshal Modi held a Power of Attorney for Ms. Mehta; 2) Ms. Mehta

was declared the ultimate beneficial owner of the BVI holding companies; 3) Ms. Mehta's

device that enabled the transfer of funds out of FDL's bank account was directed to be sent to

another individual; 4) Neeshal Modi signed the agreement to purchase Ms. Mehta's Hong Kong

apartment on Ms. Mehta's behalf using the Power of Attorney. *See* Mehta Memo at 34-35

(citing Compl. ¶¶ 5, 75–77, 111, 311). By stringing together facts as to Ms. Mehta's relationship

with these entities, Ms. Mehta complains that the Trustee's opposition attempts to re-write the

Complaint "to infer wrongdoing where none exists." Reply Memorandum of Law in Further

Support of Purvi Mehta's Motion to Dismiss the Complaint [ECF No. 89] ("Mehta Reply") at

10.

But the Court rejects Ms. Mehta's position as inconsistent with the scope of the

allegations in the Complaint. The Complaint asserts that Ms. Mehta—Nirav Modi's sister—was

the primary conduit for laundering proceeds of the Bank Fraud. *Id.* ¶¶ 310, 450(b). For

example, between November 2013 and January 2017, Ms. Mehta allegedly received nearly $56

million in "shareholder dividends" from two Shadow Entities. *Id.* ¶¶ 303–04. In February 2017,

she invested $45 million of those funds in FIPL—the Debtor's parent company. *See id.* ¶¶ 305–07, 446(b). These investments, along with proceeds from LOUs, financed the "restructuring" of the Firestar Entities, including the effort to sanitize the ownership structure of Synergies.[21] *Id.* ¶¶ 279-283, 297-299, 320. By November 2017, Ms. Mehta had received approximately $85 million in allegedly funneled proceeds of the Bank Fraud back into her personal account through various "purported loan repayment[s]," and for the redemption of her non-voting preference shares in a subsidiary of the Debtor. *See id.* ¶¶ 281–83, 320–21, 342, 344–45.

Additionally, Ms. Mehta entered a contract to purchase the Ritz Carlton Apartment on behalf of Nirav Modi and Ami Javeri and also formed CPS50 and the Ithaca Trust to hold—and allegedly to shield from creditors—the property for Ms. Javeri. *Id.* ¶¶ 315–18, 322–40. The money used to purchase the Ritz Carlton Apartment originated, at least in part, from a $34 million loan from Ms. Mehta to Ms. Javeri; according to Indian authorities, at least $18 million of this amount was transferred to Ms. Mehta from the Shadow Entity, Fine Classic. *Id.* ¶¶ 313–14.[22] In January 2018, Ms. Mehta contributed another $1 million, funneled through CPS50, to fund renovations of the Ritz Carlton Apartment held by CPS50. *Id.* ¶¶ 359–62. Ms. Mehta also contributed $6 million to the Ithaca Trust to fund the Ithaca Trust's purchase of CPRE from the U.S. Affiliate FGI, again with the intent to place the Essex House Apartment held by CPRE outside of the reach of creditors. *Id.* ¶¶ 284–96, 348–58.

Taking these allegations in the light most favorable to the Trustee, as is required, the Trustee has satisfied its obligations under Rule 8(a). At the very least, the Trustee has

---

[21]    The details of the transfer of funds from Synergies to Ms. Mehta is discussed *infra* §V(b).

[22]    This loan was originally intended to fund the purchase of another apartment in Manhattan but, when that purchase fell through, Nirav Modi and Ami Javeri purchased the Ritz Carlton Apartment. *Id.* ¶¶ 312–15.

sufficiently pled that Ms. Mehta "facilitate[ed] . . . another's receipt of [fraudulent] funds," which can be sufficient to "support an inference that [she] knowingly participated in [the] claimed RICO conspiracy." *See Ruthling*, 2019 WL 10947100, at *7. For example, the Complaint alleges that Ms. Mehta funneled proceeds received from Shadow Entities (entities that are alleged to have served no legitimate business purposes), provided assistance in laundering proceeds of the Bank Fraud, and benefitted from the scheme. *See, e.g.*, Compl. ¶¶ 302–307, 311. These allegations, combined with Ms. Mehta's extensive connections to the Executive Defendants, support an inference that she was aware of the broader scheme.[23] *See Zemlyansky*, 908 F.3d at 11 n.6 (RICO conspiracy can "be proven by evidence that the defendant agreed to facilitate a scheme by providing tools, equipment, cover, or space; that the facilitation was knowing because the defendant was aware of the broader scheme, even if he was unaware of the particulars, or because the defendant knowingly benefitted from the scheme; and that other members of the enterprise intended to accomplish specific predicates.").

In reaching this conclusion, the decision in *Berman, Tr. for Est. of Michael S. Goldberg, LLC v. LaBonte*, 622 B.R. 503 (D. Conn. 2020) is instructive. In *Berman*, the underlying involuntary bankruptcy proceeding was commenced after it was discovered that the individual debtor had been operating a Ponzi scheme. *Id.* at 510. Subsequently, the Chapter 7 trustee brought civil RICO claims against the "net-winners" of the scheme, including an investor in the scheme and his family members. *Id.* The complaint alleged that these individuals conspired to hinder the Chapter 7 trustee's attempts to collect on judgements that the trustee had obtained against them following the debtor's guilty plea. *Id.* The court in *Berman* determined that the plaintiff had sufficiently alleged that the investor and his wife had participated in the underlying

---

[23] This is particularly true given that the Court has already found the Trustee's RICO allegations against the Executive Defendants to be sufficient. *See In re Firestar Diamond, Inc.*, 634 B.R. 265.

RICO enterprise. *Id.* at 523–30, 532. Relevant to the dispute here, the *Berman* court concluded that "the Trustee's claims against [the investor's wife] pass[ed] muster under the less demanding standard for conspiracy allegations under § 1962(d)" based on allegations that she engaged in affirmative acts facilitating the establishment of a family trust used to secrete her husband's assets from the Chapter 11 Trustee. *Id.* at 532. Similar in kind to the allegations here, the affirmative acts sufficient for RICO conspiracy in *Berman* included false sworn testimony as to the purpose for the creation of the family trust, executing assumption agreements and assignments, endorsing checks to transfer money to her personal bank account for her husband's use, and executing a transfer of the family's real estate firm that allowed her husband to loot the family assets formerly managed by this firm. *Id.* at 514, 529, 532, 536.

### 2. Ami Javeri

The Trustee contends that Ms. Javeri's agreement to join and support the RICO conspiracy can be inferred from allegations that include the following:

a. Ms. Javeri served as a partner of all three Indian LOU entities used to defraud PNB entities and, in 2010, opened bank accounts for Solar Export and Stellar Diamond used to defraud PNB.

b. Ms. Javeri is the primary beneficiary of the Ithaca Trust and the beneficial owner of the Ritz Carlton Apartment and the Essex House Apartment.

c. Ms. Javeri received more than $30 million in proceeds of the Bank Fraud from Ms. Mehta in May and June 2017.

d. Ms. Javeri wired more than $30 million in proceeds of the Bank Fraud to Ms. Mehta between September and November 2017.

e. Ms. Javeri fled India just weeks before the fraudulent LOUs issued in 2017 became due and the Bank Fraud was exposed.

f. Ms. Javeri appointed Nehal Modi as Ithaca Trust Protector in May 2017.

*See* Compl. ¶ 447.

The Trustee also alleges that Ms. Javeri—Nirav Modi's wife—received a $34 million
loan from Ms. Mehta, of which at least $18 million was originally transferred from Shadow
Entity Fine Classic.  *Id.*  ¶¶ 313–14.  As "partial repayment" of this loan, Ms. Javeri later wired
Ms. Mehta $2.5 million to be used as a down payment for Ms. Mehta's purchase of the Ritz
Carlton Apartment.  *Id.* ¶ 316.  Ms. Javeri purportedly repaid the remainder of this loan in
September 2017, part of which was used to fund the closing of the apartment purchase.  *Id.* ¶¶
338–41.  The Trustee alleges that Ms. Javeri also benefited from the $7 million that Ms. Mehta
contributed to the Ithaca Trust to fund the purchase of CPRE—which allegedly shielded Ms.
Javeri and Nirav Modi's personal residence from creditors—and the renovations to Nirav Modi's
and Ms. Javeri's Ritz Carlton Apartment.  *Id.* ¶¶ 348–62.

Ms. Javeri argues that all of the Trustee's allegations amount to "lawful actions" by Ms.
Javeri.  Javeri Memo at 6-7.  Specifically, Ms. Javeri argues (1) that serving as a partner in and
opening bank accounts for the three LOU entities does not amount to knowledge of the ongoing
Bank Fraud or an allegation that she had knowledge of how Nirav Modi ran the companies; (2)
that her "spouse's largesse" in purchasing the two apartments and naming her the beneficial
owner of the apartments—and the beneficiary of the trusts holding those apartments—is not "a
basis for inferring knowledge of the fraud;" (3) that the Complaint does not allege that Ms. Javeri
knew the origin of the $34 million loan that she received from Ms. Mehta, or that it was derived
through fraudulent means; and (4) that there is "nothing illegal or even untoward about
appointing one's brother-in-law as Trust Protector for a trust of which one is the beneficiary" and
that there are no allegations that she knew of, or agreed to, her brother-in-law's alleged efforts to
frustrate the investigation and divert assets.  *See id.* at 7–8; *see also* Javeri Reply at 4–8.
Challenging the Trustee's contention that she knew, or had reason to know, "what the other

conspirators 'were up to,'" Ms. Javeri argues that "[f]avorable inferences are not a magic balm" and that reaching the conclusion pushed for by the Trustee would be "nothing more than a guess."  Javeri Reply at 4 (citing *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 474 (S.D.N.Y. 1996)).

But Ms. Javeri mistakenly views these allegations in isolation from the remainder of the Complaint.  It is well established that a court must view specific facts in the context of all of the allegations in the complaint.  *See Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) ("The application of th[e] 'plausibility' standard to particular cases is 'context-specific,' and requires assessing 'the allegations of the complaint as a whole.'") (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 123 n.7 (2d Cir.2013)) (internal quotations and citations omitted); *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief  . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").   In short, context is key.  And the context here is damning.  The Trustee alleges that the Shadow Entities "were no more than shell companies controlled by Modi and his co-conspirators" that "conducted virtually no legitimate business, but instead existed only to further the Bank Fraud by conducting bogus transactions with LOU [e]ntities, Firestar Entities, and other [entities controlled by Nirav Modi] and laundering the ill-gotten proceeds."  Compl. ¶ 72.  This allegation gives context to the alleged actions of Ms. Javeri, her connections to the Executive Defendants, the LOU entities, as well as her receipt of very large amounts of money—through Ms. Mehta, the primary conduit of Bank Fraud funds—from the Shadow Entity Fine Classic.  Taken all together, these allegations satisfy the pleading standards under Rule 8(a) to sufficiently allege Ms. Javeri knew, or had reason to know, of the

30

underlying RICO violations and that she "adopt[ed] the goal of furthering or facilitating the criminal endeavor." *Zemlyansky*, 908 F.3d at 10. Circumstantial evidence of a defendant's knowing and willing participation in a conspiracy may include "evidence that the defendant participated in conversations directly related to the substance of the conspiracy; possessed items important to the conspiracy; *or received or expected to receive a share of the profits from the conspiracy.*" *Ruthling*, 2019 WL 10947100, at *7 (quoting *United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002) (emphasis in original). Taken in the context of the entirety of the Complaint, the Trustee has more than plausibly alleged that Ms. Javeri's actions indicate that she knew "what the other conspirators 'were up to' [and] the situation would logically lead [Ms. Javeri] to suspect [s]he was part of a larger enterprise." *Zichettello,* 208 F.3d at 99. A good illustration of why Ms. Javeri's argument fails can be found in the specific allegations that Ms. Javeri appointed her brother-in-law, Nehal Modi, as the Ithaca Protector. Ms. Javeri argues that she had no knowledge of his alleged attempts to frustrate the investigation of the Bank Fraud and, thus, his activities cannot be considered in evaluating the allegations against her. Javeri Reply at 5. But again, this ignores the larger context of the allegations in the Complaint— namely Ms. Javeri appointed Nehal Modi as the Protector of the Ithaca Trust *after* the Bank Fraud had been exposed, after Nehal Modi, Nirav Modi, Ms. Mehta, and Neeshal Modi had been charged criminally, and after her husband had absconded to London using a false name, rendering the appointment highly suspect. Compl. ¶¶ 185–89, 191, 365. [24]

Ms. Javeri also attempts to distinguish several cases relied on by the Trustee, asserting that the Trustee "relies upon snippets from the cases that do not reveal the actual grounds for the

---

[24]    Similarly, and as discussed at greater length *infra*, the context around the change in ownership of the LLC Defendants and the actions of the persons in control of the real estate held by the LLC Defendants render otherwise neutral actions suspect when considered in conjunction with the remainder of the Trustee's allegations.

decision." Javeri Reply at 6.  For example, Ms. Javeri argues that *U.S. v. Teitler*, 802 F.2d 606, 614 (2d Cir. 1986) does not support the Trustee's contention that "partner status alone suffice[s] to establish agreement to engage in a RICO conspiracy." Javeri Reply at 6.  But this is not an accurate representation of the Trustee's contention.  The Trustee actually asserts that it is "reasonable to infer that a partner or other high-ranking corporate official *who personally sets up the key infrastructure underlying an illicit corporate conspiracy and who stands to receive a substantial share of the illicit profits* is an active member of that conspiracy."  Trustee Opposition at 33 (emphasis added).  Indeed, this comports with the court's determination in *Teitler*, where the court concluded:

> the jury had before it circumstantial evidence tending to show that Jay Teitler played a role in the fraud. This evidence included his statements made to Dunbar indicating knowledge of wrongdoing, his status as a partner in the Teitler firm, and Dunbar's testimony concerning Jay Teitler's role in the firm. The jury could reasonably infer from this evidence Jay's agreement to participate in the fraud.

*Teitler*, 802 F.2d at 614.  Similar to Teitler, this Court is not being asked to infer Ms. Javeri's agreement based solely on her status as a partner in the LOU entities.  The Trustee has alleged far more. This includes allegations that Ms. Javeri opened bank accounts for these LOU entities around the time the Bank Fraud began; received proceeds tied to the Bank Fraud; was the beneficiary of the Ithaca Trust and beneficial owner of apartments alleged to have been purchased with proceeds of the Bank Fraud and used to launder proceeds of the Bank Fraud; and appointed Nehal Modi as the Ithaca Trust Protector after the fraud was exposed, after Nehal Modi had been charged criminally, and while her husband was absconding from authorities. These allegations are far from mere allegations of partner status and are of the kind that support an inference that she agreed to join the conspiracy.  *See Zemlyansky*, 908 F.3d at 11 n.6; *Ruthling*, 2019 WL 10947100, at *7.

### 3.  Nehal Modi

The Trustee contends that Nehal Modi's agreement to join and support the RICO

conspiracy can be inferred from allegations including the following:

a.  Nehal Modi traveled overseas with Mihir Bhansali after exposure of the Bank
    Fraud to threaten and bribe witnesses, destroy evidence, and remove assets.

b.  Nehal Modi enlisted his personal friends, including Anthony Allicock, Rochelle
    Miller, and Tamer Abou El Ata, to divert the U.S. Affiliates' assets to Hong Kong
    following exposure of the Bank Fraud.

c.  Nehal Modi became Ithaca Trust Protector following exposure of the Bank Fraud

d.  Nehal Modi, along with Mihir Bhansali, managed the BBB Group as a front for
    the Modi family's money laundering efforts.

e.  Nehal Modi managed entities controlled by Mehul Choksi that were used to
    defraud PNB.

Compl. ¶ 448.

Specifically, the Trustee alleges that Nehal Modi—Nirav Modi's brother—and Mr.

Bhansali managed and controlled Twin Fields and the BBB Group, both of which were allegedly

used to launder over $60 million in proceeds of the Bank Fraud.  *Id.*  ¶¶ 166, 169, 172–183.  The

Trustee also alleges that Nehal Modi enlisted several of his personal friends to loot the U.S.

Affiliates of more than $40 million in inventory and cash so those funds could not be used to pay

the U.S. Affiliates' debts owed to the Debtors.  *Id.* ¶¶ 4, 275 (i, iii–vi), 448(a).

In seeking dismissal of the RICO conspiracy claim, Nehal Modi primarily contends that

the Trustee is required to establish a "basis for inferring knowledge on [Nehal Modi's] part of the

predicate acts alleged to constitute the pattern of racketeering in this case."  Nehal Modi Memo

at 7.  But again, for the reasons discussed *supra,* this misconstrues the standard applicable for a

RICO conspiracy claim.  The Trustee's allegations, taken together, plausibly allege that Nehal

Modi had a management role in entities alleged to have laundered proceeds of the Bank Fraud

and that he travelled overseas with Mr. Bhansali in an effort to cover up the Bank Fraud. Indeed, the Trustee's allegations that Nehal Modi travelled overseas and tampered with witnesses and destroyed evidence is more than sufficient—standing alone—to establish Nehal Modi's consent to the conspiracy. Moreover, amidst this backdrop, the Trustee's allegations that Nehal Modi was appointed by Ms. Javeri as the Ithaca Trust Protector to help shield the Firestar Entities' assets from creditors also support the RICO conspiracy claims against Nehal Modi. Accordingly, the allegations in the Complaint are sufficient to draw an inference that Nehal Modi agreed to join the RICO conspiracy.

### 4. CPS50 and CPRE

Central to the Trustee's conspiracy allegations against the LLC Defendants is its contention that CPS50, CPRE, and the Ithaca Trust are all alter egos or mere instrumentalities of Nirav Modi, and therefore, Nirav Modi's actions can be imputed to the LLC Defendants. *See* Trustee Opposition at 40. The Trustee further contends that, under agency-based imputation principals, the fraudulent actions and intent of Mr. Bhansali (as CPRE's manager), Mr. Gandhi (as CPRE's and CPS50's CFO), Ms. Mehta (as CPS50's founder and original manager), Abhay Javeri (as CPS50's former manager), Nehal Modi (as CPS50's former manager), and Mr. Dattani (as CPS50's current manager) can be imputed to CPRE and CPS50. *Id.* at 41.

With that backdrop, the Trustee contends that CPS50's agreement to join and support the RICO conspiracy can be inferred from allegations including the following:

a. Nirav Modi enjoyed complete control over CPS50 through his complete control over the Ithaca Trust.

b. Deepak Sheth, CPS50's original manager, participated in the Bank Fraud through the Sheth Entities throughout the Relevant Period. [25]

---

[25]    Deepak Sheth is Nirav Modi's uncle and is alleged to own Excellent Facets, Inc. and Amadena Investments Inc. (the "Sheth Entities"). Compl. ¶ 148. Both Mr. Sheth and the Sheth Entities are alleged to have participated in direct transactions with the Shadow Entities totaling over $19 million during the Relevant Period. *Id.* ¶ 151.

    c. Abhay Javeri, who succeeded Deepak Sheth as CPS50's manager, participated in the Bank Fraud through ownership of the SDC Entities throughout the Relevant Period. [26]

    d. Mr. Dattani, who succeeded Abhay Javeri as CPS50's manager in May 2018, worked with Mr. Gandhi, Angelina Ypma, and Mr. Bhansali to divert to Hong Kong the cash and inventory of a subsidiary of one of the Firestar Entities following exposure of the Bank Fraud. Mr. Dattani also helped Nirav Modi set up a new company while Nirav Modi was hiding in London.

    e. Mr. Gandhi, who served as president of CPS50 and as a signatory on its bank account, participated extensively in the Bank Fraud and in the fraudulent efforts following its exposure, as alleged above.

    f. CPS50 purchased the Ritz Carlton Apartment using proceeds of the Bank Fraud.

    g. CPS50 was formed for the purpose of laundering proceeds of the Bank Fraud to and for the benefit of Nirav Modi and Ms. Javeri.

Compl. ¶ 451.

       The Trustee contends that CPRE's agreement to join and support the RICO conspiracy

can be inferred from allegations including the following:

    a. Nirav Modi enjoyed complete control over CPRE through his complete control over the Ithaca Trust.

    b. Mr. Bhansali, who served as sole director and CEO of CPRE, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

    c. Mr. Gandhi, who served as chief financial officer of CPRE, participated extensively in the Bank Fraud and in the efforts to obstruct justice and divert assets from the reach of creditors following its exposure, as alleged above.

Compl. ¶ 452.

---

[26]      The SDC entities consist of four companies, SDC Designs, Inc., SDC Designs LLC, Sangam Diamonds Corporation, and Sangam Diamonds LLC, that are owned by Abhay Javeri, Ms. Javeri's brother and Nirav Modi's brother-in-law. Compl. ¶ 149. The SDC entities participated in direct transactions with the Shadow Entities involving millions of dollars during the relevant period. *Id.* ¶ 153.

For the Trustee's RICO conspiracy allegations to survive dismissal, the Trustee must allege facts sufficient to pierce the corporate veil between the LLC Defendants and Nirav Modi. *See* Trustee Opposition at 40, Reply Memorandum of Law in Further Support of the Motion to dismiss of Defendants Central Park Real Estate LLC and Central Park South 50 Properties LLC [ECF No. 83] ("LLC Reply") at 11-12 (agreeing that a corporate veil can be disregarded only when an entity is exclusively dominated and controlled by its alleged alter ego and exists for no other purpose than as a vehicle for fraud.)  The Trustee and the LLC Defendants both cite to the corporate veil piercing standard set forth by the Delaware Chancery Court in *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183–84 (Del. Ch. 1999). *See* Trustee Opposition at 40; Reply Memorandum of Law in Further Support of the Motion to Dismiss of Defendants Central Park Real Estate LLC and Central Park South 50 Properties LLC at 12-13.  But the parties did not actually analyze which states' laws should apply to the Trustee's veil piercing arguments, which is a threshold determination.  "Except in circumstances where a 'significant federal policy [justifies] the imposition of a federal conflicts[] rule exists,' bankruptcy courts apply the choice-of-law rules of the forum state to determine which state's substantive law governs."  *In re Cinque Terre Fin. Grp. Ltd.*, 2017 WL 4843738, at *13 (Bankr. S.D.N.Y. Oct. 24, 2017) (quoting *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 607 (2d Cir. 2001)).  "New York applies the law of the state of incorporation for purposes of veil piercing."  *Carotek, Inc. v. Kobayashi Ventures, LLC*, 875 F. Supp. 2d 313, 350 (S.D.N.Y. 2012) (citing *Marino v. Grupo Mundial Tenedora, S.A.,* 810 F.Supp. 2d 601, 609 (S.D.N.Y.2011)). CPRE is a Delaware company and CPS50 is a New York company.  Compl. ¶¶ 29–30. Therefore, Delaware law governs the veil piercing claims involving CPRE and New York law governs the claims involving CPS50.  *See Capmark Fin. Grp. Inc. v. Goldman Sachs Credit*

36

*Partners L.P.*, 491 B.R. 335, 346–47 (S.D.N.Y. 2013). As it turns out, the standards under New

York and Delaware law are substantially similar. *See Chiomenti Studio Legale, L.L.C. v. Prodos*

*Capital Mgt. LLC*, 2015 N.Y. Misc. LEXIS 688, at \*9 (Sup. Ct., N.Y. Co. March 5, 2015)

("[T]he court finds that the standards regarding the piercing of the corporate veil under Delaware

law are not so different from those under New York law.") (citing *Wallace*, 752 A.2d at 1183–

84), *aff'd sub nom., Chiomenti Studio Legale, L.L.C. v. Prodos Capital Mgt. LLC*, 2016 N.Y.

App. Div. LEXIS 4935 (N.Y. App. Div. 1st Dept June 28, 2016). Accordingly, the Court will

look to Delaware law in its veil piercing analysis, citing New York law where helpful.

Under both Delaware and New York law, piercing the corporate veil is a "difficult task."

*Wallace*, 752 A.2d at 1183 (quoting *Harco Nat. Ins. Co. v. Green Farms*, 1989 WL 110537 at \*4

(Del. Ch. Sept. 19, 1989)); *Capmark Fin.*, 491 B.R. at 347 ("[T]he standard for veil-piercing is

very demanding" under both Delaware and New York law). "[T]o state a cognizable claim to

pierce the corporate veil . . . plaintiffs must allege facts that, if taken as true, demonstrate the

Officers' and/or the Parents' complete domination and control of the [subsidiary]." *Wallace,* 752

A.2d at 1183–84 (citing *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 271 (D. Del.

1989)). Specifically, "[t]he degree of control required to pierce the veil is 'exclusive domination

and control . . . to the point that [the subsidiary] no longer ha[s] legal or independent significance

of [its] own.'" *Id.* at 1184 (quoting *Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, 1992

WL 127567 at \*11 (Del. Ch., May 28, 1992)). Moreover, "[p]iercing the corporate veil under

the alter ego theory 'requires that the corporate structure cause fraud or similar injustice.'" *Id.*

(quoting *Outokumpu Eng'g Enter., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del.

Supr. 1996)); *see also Capmark Fin.*, 491 B.R. at 347 (under Delaware law, "[a] claim premised

on veil piercing can survive a motion to dismiss if the complaint alleges facts sufficient to show

that (1) the parent exercised 'complete domination and control' over the subsidiary such that the subsidiary had no 'legal or independent significance of [its] own,' and (2) the corporate form was used to perpetrate some form of injustice or fraud.") (quoting *Wallace,* 752 A.2d at 1183); *Capmark Fin.*, 491 B.R. at 347 ("[U]nder New York law, a court may pierce the corporate veil where 1) the owner exercised complete domination over the corporation with respect to the transaction at issue and 2) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.") (quoting *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC,* 268 F.3d 58, 63 (2d Cir. 2001)).

With these principles as guide, the LLC Defendants argue that the Trustee does not meet the requirements to pierce the corporate veil here for several reasons. First, the LLC Defendants argue that the Trustee has both failed to cite any case law to support the use of alter ego status to establish membership in a RICO conspiracy and, in any event, the Trustee has failed to make the allegations "necessary to a veil-piercing claim." LLC Reply at 11-12. But the LLC Defendants have not cited any legal authority for their position that alter ego status, and corresponding imputation, cannot be used to establish an agreement to join a RICO conspiracy. The Court is unaware of any such authority or of any reason why this should be the case. Indeed, at least one court has found that alter ego status may be used as a basis for a RICO conspiracy claim. *See, e.g.*, *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 664–69 (S.D.N.Y. 2015).[27] The Court concludes that the allegations here are sufficient to state a claim for alter ego liability. The

---

[27]     The plaintiffs in *Knoedler* asserted both substantive RICO claims and RICO conspiracy against the sole member of the corporate defendant. *See generally Knoedler,* 139 F. Supp. 3d 618. The *Knoedler* court denied summary judgment to that sole member, finding that veil piercing was appropriate because there was evidence of commingled operations between the sole member of the corporate defendants and the corporate defendants, a disregard of corporate forms, a siphoning of funds from the corporate defendant to the sole member, and an overall element of injustice if the entities were treated separately. *Id.* at 664-69. In light of this evidence, the *Knoedler* court concludes that the member could be considered an alter ego of the corporate defendant and it would therefore be possible to find that the sole member was liable for the RICO violations of the corporate defendant. *Id.*

Complaint alleges that Nirav Modi "enjoys complete control over the Ithaca Trust, . . . CPS50[,] . . . [and] CPRE." Compl. ¶¶ 450(a), 451(a), 452(a). As the Complaint further explains, Nirav Modi has the power to unilaterally remove the Ithaca Trust Protector, "which in turn has virtually complete control over the Ithaca Trust" and, among other things, the Ithaca Trust's assets, which include CPS50 and CPRE. Compl. ¶¶ 328–329. In addition, the Complaint alleges that the LLC Defendants, along with the Ithaca Trust, are "nothing more than contrivances used by the Modi Family to shield . . . their ill-gotten wealth from creditors." *Id.* ¶ 6. These allegations are sufficient to survive a motion to dismiss. *See Wallace*, 752 A.2d at 1183–84; *De Sole*, 139 F. Supp. 3d at 664–69.

The LLC Defendants further argue that *Wallace* applies the alter ego theory only to a limited partnership but that the theory should not apply in the same way to these closely-held LLCs. *See* LLC Reply at 12-13. But the LLC Defendants cite to no cases that support this distinction. Instead, they make a policy argument, arguing that applying the rule in *Wallace* to closely-held LLCs "would likely sweep in a majority of closely-held family LLCs." *Id.* at 13. But once again, the Court is unconvinced. Closely held entities such as the LLC Defendants here would only be swept in if they were "sham[s] and exist[ed] for no other purpose than as . . . vehicle[s] for fraud." *Wallace*, 752 A.2d at 1184. The Court does not find such a result to be problematic as a matter of policy, nor has the Court seen any case law supporting this result.

The LLC Defendants emphasize that as CPRE existed before the Bank Fraud began—in 2010—CPRE's purpose cannot be that of a vehicle of fraud. LLC Reply at 13. But once again, the allegations here undercut the Defendants' position. The Trustee alleges that the Ithaca Trust, using proceeds of the Bank Fraud obtained from Ms. Mehta, purchased CPRE from a U.S. Affiliate of the Debtor in late 2017 for the purpose of placing the Essex House Apartment

outside of the reach of creditors.  So while CPRE existed prior to 2010, the reason for purchasing

CPRE—and its alleged sole purpose after its purchase by the Ithaca Trust—was to shield

proceeds of the Bank Fraud.  *See* Compl. ¶¶ 6, 284–96, 348–58.  The same is true for CPS50.

The Trustee alleges that CPS50 was formed for the purpose of laundering proceeds of the Bank

Fraud and that, consistent with that purpose, it purchased the Ritz Carlton Apartment using fraud

proceeds.  Compl. ¶¶ 313–18, 322–40, 361–62; *see also* Compl ¶ 451(g) ("CPS50 was formed

for the purpose of laundering proceeds of the Bank Fraud to and for the benefit of Nirav Modi

and Ami Modi").

Having already determined that the substantive RICO conspiracy was adequately plead,

*see In re Firestar Diamond*, 634 B.R. at 289–93, the Complaint alleges that CPS50 and CPRE

were integral to—and indeed were created or acquired for the sole purpose of—laundering

proceeds of the Bank Fraud and shielding the apartments from creditors.  Moreover, the

Complaint alleges that LLC Defendants were controlled by Modi and managed by the Executive

Defendants and several of the Family Defendants.[28]  *See, e.g.* Compl.  ¶¶ 369-70.  Of course, the

Defendants may challenge these factual allegations at trial but the allegations are taken as true

for the purpose of these motions.  *See In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp.

2d 556, 567 (S.D.N.Y. 2012) (on a motion to dismiss, "all allegations are construed in the light

---

[28]    The Court notes that the LLC Defendants did not specifically address the Trustee's agency-based
imputation argument.  *See* Trustee Memo at 41.  As noted above, the Trustee argues that the Court can also impute
the fraudulent actions and intent of Mr. Bhansali, Mr. Gandhi, Ms. Mehta, Abhay Javeri, Nehal Modi, and Mr.
Dattani to the LLC Defendants.  *Id.*  At least as to the Family Defendants and the Executive Defendants—*i.e.*, Mr.
Bhansali, Mr. Gandhi, Ms. Mehta, and Nehal Modi—the Court agrees.  For the reasons discussed above, and under
the liberal pleading standards of Rule 8(a), the knowledge of these Defendants "can be imputed to the corporate
entity they allegedly controlled and utilized to further the conspiracy."  *Serin v. N. Leasing Sys., Inc.,* 2009 WL
7823216, at *14 (S.D.N.Y. Dec. 18, 2009); *see also Ruthling*, 2018 WL 3315728, at *12 (same).  This imputation
of wrongdoing by the LLC Defendants' members provides an independent basis for denying the LLC Defendants'
argument.

most favorable to the plaintiff.").[29]  Accordingly, the Court rejects the LLC Defendants'

argument that the Trustee's allegations amount to assertions of "mere association" and "mere

close ownership" that are insufficient to show the requisite "domination" for veil-piercing.   LLC

Reply at 13.

At oral argument, the LLC Defendants complained that there is no mention of alter ego

and the underlying imputation in paragraphs 451 and 452 of the Complaint, which summarize

the RICO conspiracy allegations, and thus the LLC Defendants had no notice that "conduct is

being imputed onto the client."  Hr. Tr. 88:4–14 (Feb. 2, 2022); *see also id.* at 103:14–16

(counsel for LLC Defendants asserting that he was unaware of the Trustee's alter ego claims

until now).  But the Trustee's complaint makes fairly clear the factual basis for imputation.  *See*

Compl. ¶¶ 451-52 (alleging that "Nirav Modi enjoys complete control over" CPRE and CPS50

and that CPS50 was formed for the purpose of laundering proceeds of the Bank Fraud).  Such

allegations gave sufficient notice of the Trustee's contentions, particularly given that "an alter

ego claim is not a separate cause of action independent of the claim against the corporation."

*Picard v. Magnify Inc. (In re Bernard L. Madoff Inv. Sec. LLC)*, 583 B.R. 829, 848 (Bankr.

S.D.N.Y. 2018). [30]  In any event, the Trustee set forth this legal theory in detail in its opposition,

---

[29]     The LLC Defendants' reliance on *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 545
(S.D.N.Y. 2014) and *Chowaiki*, 2020 WL 1974228, at *21 does not change this result. Aside from the fact that both
these precedents are no longer good law (as discussed above), the cases are factually distinguishable.  The *4 K & D
Corp.* case only involved a single allegation that the defendant company was small and that the individual
defendants "work[ed] interchangeably, with each of them taking part in the control and direction of [the company]"
were insufficient to establish a conspiracy.  *4 K & D Corp.*, 2 F. Supp. 3d at 545.  Similarly, the *Chowaiki* court
found the RICO conspiracy claim defective because the plaintiff only pled "one act," contained conclusory
allegations that failed to show a "meeting of the minds" as to the alleged RICO scheme, and alleged that the
remaining defendants and Chowaiki did business together on only two separate occasions.  *Chowaiki*, 2020 WL
1974228, at *21.  Here, the Trustee has clearly plead a more expansive role for the LLC Defendants' integral role in
the conspirators' money laundering efforts and as a mechanism to shield assets from creditors.

[30]     Allegations that Nirav Modi and the other Executive Defendants controlled the LLC Defendants can be
found throughout the Complaint.  *See, e.g.* Compl. ¶ 329 (alleging that, since Nirav Modi has the power to remove
the Ithaca Protector, Nirav Modi "enjoys de facto total control over the Ithaca Trust and its assets" including CPRE;
Compl. ¶ 289 (discussing Mr. Gandhi's plans to remove CPRE the reach of creditors to the detriment of the

thus giving these Defendants an opportunity to respond in their reply to the Trustee's specific arguments. *See* Trustee Opposition at 40-42 (asserting that the Complaint contains sufficient allegations to permit treating the LLC Defendants as alter egos of Nirav Modi and discussing the basis on which the corporate veil can be disregarded); LLC Reply at 11-14.

The LLC Defendants further complain that the Trustee makes no effort to quantify the proceeds of the Firestar Entities' legitimate business versus the proceeds of the Bank Fraud. LLC Reply at 5. The LLC Defendants appear to argue that the alter ego assertion must fail unless the Court concludes that every dollar generated by the Firestar Entities was suspect or that all the actions taken by the co-conspirators were, as a matter of law, actions taken in furtherance of the RICO enterprise. *Id.* at 3–5. In the same vein, the LLC Defendants intimate that the Complaint must trace the source of the funds used to purchase the Ritz Carlton Apartment and to acquire CPRE and shield the Essex House Apartment to the criminal endeavor. *Id.* at 5–6. But neither of these arguments are a basis to dismiss this action. This matter is at the pleading stage and thus the Court cannot decide the merits of arguments based on the evidence. As this Court made clear in its previous decision, "[t]o the extent that it is ever necessary to parse which commingled funds are proceeds of the Bank Fraud and which are the profits of the Debtors' legitimate business transactions, this would be a question for the factfinder at trial or at the summary judgment stage." *In re Firestar Diamond, Inc.*, 634 B.R. at 286 n.15 (internal citation omitted).[31]

---

Debtors). All these allegations together are sufficient to state an alter ego claim. *See Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd*., 475 F. Supp. 2d 456, 459 (S.D.N.Y. 2007) (Piercing a corporate veil based on an alter ego theory "requires 'a showing of ... complete control by the dominating corporation that leads to a wrong against third parties.'") (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc*., 933 F.2d 131, 138 (2d Cir.1991)).

[31]    The LLC Defendants also appear to argue that the Trustee must plausibly allege a strong inference of fraudulent intent under Fed. R. Civ. P. 9(b)—specifically an intent to conceal, which is an element of money

The LLC Defendants next contend that the conspirators' alleged plan to arrange an initial public offering to raise capital to pay off the LOUs before the Bank Fraud scheme was uncovered is "nonsensical" and would not achieve the alleged goal of avoiding scrutiny. LLC Reply at 8–9. In doing so, the LLC Defendants ask the Court to construe certain facts in their favor such as the efficacy of such an initial public offering in accomplishing the alleged fraud. But this is akin to asking the court to draw inferences in favor of the LLC Defendants based on their alternative explanation of the allegations. That is not appropriate on a motion to dismiss. *See In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 419 (S.D.N.Y. 2003) ("Defendants essentially argue that the Court should adopt the inferences that they believe should be drawn and provide alternative, lawful explanations for their conduct. While these contentions may supply the grounds for a motion for summary judgment, they are out of place in a motion to dismiss.") (internal quotations and citation omitted). For purposes of plausibility under Rule 12(b)(6), the Court does not find these allegations to be implausible given the vast extent of the purported fraud when the allegations are viewed in a light most favorable to the Trustee. *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (holding that all reasonable inferences should be drawn in favor of the plaintiff on a motion to dismiss).[32]

### E.  In Pari Delicto, the Wagoner Rule, and Imputation

The Defendants invoke that the *in pari delicto* doctrine, the *Wagoner* rule, and agency-based imputation principles as reasons to bar the Trustee's RICO claims. *See* LLC Memo at 23–

---

laundering. LLC Reply at 6-8 (citing *United States v. Stephenson*, 183 F.3d 110, 121 (2d Cir. 1999); *de La Rouche v. Calcagnini*, 1997 U.S. Dist. LEXIS 7664 (S.D.N.Y. June 3, 1997)). But, as previously explained, RICO conspiracy pleading requirements are governed by the more lenient Rule 8, not Rule 9(b). *See Palazzolo*, 346 F. Supp. 3d at 463.

[32]    In any event, this alleged plan is but one of the many specific factual allegations supporting the RICO conspiracy claims, and those claims would survive dismissal even without these allegations.

25; Mehta Memo at 25–26; Javeri Memo at 8-12; Nehal Modi Memo at 9-14; LLC Reply at 18

(joining the Family Defendants' *in pari delicto* defense).

"*In pari delicto* is a state law equitable defense analogous to unclean hands 'rooted in the

common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct.'" *In

re Food Mgmt. Grp., LLC*, 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008) (quoting *Pinter v. Dahl,*

486 U.S. 622, 632 (1988)).[33]   The doctrine serves the dual purposes of preventing courts from

settling disputes between wrongdoers and deterring illegality by so abstaining.  *See Bateman*

*Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985).  *In pari delicto* is available as a

defense to RICO causes of action where (1) "as a direct result of his own actions, the plaintiff

bears at least substantially equal responsibility for the violations he seeks to redress," and (2)

recognition of the *in pari delicto* defense "comport[s] with the purposes of the [RICO] statute."

*Republic of Iraq v. ABB AG*, 768 F.3d 145, 162, 167 (2d Cir. 2014) (internal citations and

quotations omitted).  The first prong "captures the essential elements of the *in pari delicto*

doctrine," *id.* at 162, and is met when

> the plaintiff was (1) "an active, voluntary participant in the unlawful activity that is
> the subject of the suit," and (2) either the degrees of fault between the plaintiff and
> defendant are "essentially indistinguishable," or the "plaintiff's responsibility [is]
> clearly greater."

*In re Lehr Constr. Corp.*, 528 B.R. 598, 608 (Bankr. S.D.N.Y. 2015), *aff'd*, 551 B.R. 732

(S.D.N.Y. 2016), *aff'd*, 666 F. App'x 66 (2d Cir. 2016) (quoting *Republic of Iraq*, 768 F.3d at

162).  As to the second prong, the Second Circuit concluded that "it is consistent with the

purpose of RICO to recognize an *in pari delicto* defense in cases where, as a direct result of the

plaintiff's 'affirmative wrongdoing,' the plaintiff bears 'at least substantially equal

---

[33]     The doctrine's full name is *in pari delicto potior est conditio defendentis*, meaning "[i]n a case of equal or mutual fault, the position of the [defending party] is the better one."  *Baena v. KPMG LLP*, 453 F.3d 1, 6, n.5 (1st Cir. 2006) (internal citations and quotations omitted).

44

responsibility,' for the RICO violations of which it complains." *Republic of Iraq*, 768 F.3d at

167–68 (quoting *Bateman Eichler,* 472 U.S. at 310).

In bankruptcy proceedings, a trustee "stands in the shoes" of the debtor corporation; it

can only bring actions that could have been brought by the debtor prior to the bankruptcy

proceeding. "Because a bankruptcy trustee stands in the shoes of the bankrupt corporation, *in

pari delicto* prevents the trustee from recovering in tort if the corporation, acting through

authorized employees in their official capacities, participated in the tort." *DeAngelis v. Corzine

(In re MF Global Holdings Ltd. Inv. Litig.),* 998 F. Supp. 2d 157, 189 (S.D.N.Y. 2014), *aff'd sub

nom. In re MF Glob. Holdings Ltd. Inv. Litig. (DeAngelis v. Corzine)*, 611 Fed. Appx. 34 (2d

Cir. 2015) (internal citations omitted); *see also Picard v. JP Morgan Chase & Co. (In re Bernard

L. Madoff Inv. Sec. LLC.),* 721 F.3d 54, 58–59, 64 n.13 (2d Cir. 2013), *cert. denied,* 573 U.S. 945

(2014) (for purposes of *in pari delicto,* the trustee stood in the shoes of the debtor, Bernard L.

Madoff Investment Securities LLC, a brokerage firm used by Madoff to perpetuate a vast Ponzi

scheme, and could not assert claims against the defendants for participating in the scheme that

the debtor orchestrated).

Similar to the *in pari delicto* doctrine, "[t]he *Wagoner* rule stands for the 'well-settled

proposition that a bankrupt corporation, and by extension, an entity that stands in the

corporation's shoes, lacks standing to assert claims against third parties for defrauding the

corporation where the third parties assisted corporate managers in committing the alleged

fraud.'" *Cyganowski v. Beechwood Re Ltd. (In re Platinum-Beechwood Litig.)* ("Platinum-

Beechwood II"), 427 F. Supp. 3d 395, 444 (S.D.N.Y. 2019) (quoting *Cobalt Multifamily Inv'rs I,

LLC v. Shapiro*, 857 F. Supp. 2d 419, 425 (S.D.N.Y. 2012)). The Wagoner rule applies to

bankruptcy trustees. *Id.* (citing *Bullmore v. Ernst & Young Cayman Islands*, 861 N.Y.S.2d 578,

45

586–87 (N.Y. Sup. Ct. 2008)).  While the doctrine of *in pari delicto* is an affirmative defense

under New York and Delaware law, the *Wagoner* rule is a prudential rule of standing.  *Id.*

(citing *Picard v. HSBC Bank PLC*, 454 B.R. 25, 29 (S.D.N.Y. 2011), *amended sub nom., In re*

*Bernard L. Madoff Inv. Sec. LLC*, 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011), *aff'd sub nom., In*

*re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54 (2d Cir. 2013)); *cf. In re Trib. Co. Fraudulent*

*Conv. Litig.*, 10 F.4th 147, 167 (2d Cir. 2021), *cert. denied sub nom., Kirschner v. FitzSimons*,

142 S. Ct. 1128 (2022) (under Delaware law "[t]he *in pari delicto* doctrine acts as an affirmative

defense to an aiding and abetting claim . . . .").

Additionally, under New York and Delaware agency law principles, "managers'

misconduct within the scope of their employment is imputed and 'bars a trustee from suing to

recover for a wrong that he himself essentially took part in.'"  *Kirschner v. KPMG LLP*, 15

N.Y.3d 446, 465 (2010) (quoting *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86–87 (2d Cir.

2000)); *see also Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 302–03 (Del. Ch.

2015), *aff'd*, 126 A.3d 1115 (Del. 2015)) ("A basic tenet of corporate law, derived from

principles of agency law, is that the knowledge and actions of the corporation's officers and

directors, acting within the scope of their authority, are imputed to the corporation

itself.  Delaware law adheres to this general rule of imputation—of holding a corporation liable

for the acts and knowledge of its agents—even when the agent acts fraudulently or causes injury

to third persons through illegal conduct.").

The Moving Defendants contend that under *in pari delicto*, the Trustee's claims fail

because the Debtors and the U.S. Affiliates are at least as responsible as, if not more responsible

than, the Moving Defendants for the alleged Bank Fraud scheme.  *See* Javeri Memo at 9; Nehal

Modi Memo at 10; LLC Memo at 24; Mehta Memo at 26.  For similar reasons, some of the

Defendants also argue that the Trustee lacks standing under the *Wagoner* rule because "the

Debtors and U.S. Affiliates and their management were integral co-conspirators in the [B]ank

[F]raud." Mehta Memo at 26; Nehal Modi Memo at 15; Nehal Modi Reply at 1; Javeri Memo at

13–14. Under both theories, the Moving Defendants essentially contend that the Trustee's RICO

claims must be dismissed because the Debtors and the U.S. Affiliates are alleged to have

engaged in the Bank Fraud while the Defendants are not. *See, e.g.*, Nehal Modi Memo at 10-11

(asserting that Nehal is not alleged to have participated in any fraudulent LOU transactions at all

and that the remainder of the allegations against him do not outweigh those against the Debtors

and U.S. Affiliates); Javeri Memo at 9 (asserting that Ms. Javeri is not alleged to have engaged in

any fraudulent actions or violated any laws at all); Mehta Memo at 26 (focusing on the Debtors'

and U.S. Affiliates involvement in the Bank Fraud); Mehta Reply at 18 (same); LLC Memo at 25

(asserting that the LLC Defendants are not alleged to have engaged in any fraudulent actions or

violated any laws at all).

The Trustee offers several reasons why the *in pari delicto* doctrine and related defenses

should not apply to bar the RICO claims here, the first of which is the adverse interest exception.

*See* Trustee Opposition at 51. "Under the adverse interest exception, the *Wagoner* rule and *in*

*pari delicto* doctrine will not apply where a corporate officer 'totally abandoned the

corporation's interests and [is] acting entirely for his own or another's purposes.'" *Platinum-*

*Beechwood II*, 427 F. Supp. 3d at 446 (quoting *Kirschner*, 15 N.Y.3d at 466); *see also Stewart*,

112 A.3d at 309. [34] "The adverse interest exception 'cannot be invoked merely because [the

officer] has a conflict of interest or because [the officer] is not acting primarily for his

---

[34]    The adverse interest exception applies to both the *in pari delicto* and *Wagoner* doctrines. *See McHale v.*
*Citibank* (*In re 1031 Tax Grp., LLC*), 420 B.R. 178 (Bankr. S.D.N.Y. 2009) (discussing the adverse interest
exception to imputation in the context of both *in pari delicto* and *Wagoner*.)

principal.'" *Platinum-Beechwood II*, 427 F. Supp. 3d at 446 (quoting *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 830 (1985)).  "Indeed, New York law 'reserves this most narrow of exceptions for those cases—outright theft or looting or embezzlement—where the insider's misconduct benefits only himself or a third party; i.e., where the fraud is committed *against* a corporation rather than on its behalf.'" *Id.* (quoting *Kirschner*, 15 N.Y.3d at 466–67) (emphasis in original); *see also In re Lehr Constr. Corp.*, 551 B.R. 732, 739 (S.D.N.Y.), *aff'd*, 666 F. App'x 66 (2d Cir. 2016) ("[B]ecause the [adverse interest] exception requires adversity, it cannot apply unless the scheme that benefited the insider operated at the corporation's expense.") (quoting *Kirschner*, 15 N.Y.3d at 467).  In these circumstances, "the applicability of the adverse interest exception must be evaluated with respect to specific instances of alleged misconduct"—such as "outright theft or looting or embezzlement"—as opposed to whether a fiduciary duty was violated.  *Id.*  Of course, if "there is no wrongdoing on [a plaintiff's] part, . . . the *Wagoner* rule and the doctrine of *in pari delicto* are not applicable."  *Platinum-Beechwood II*, 427 F. Supp. 3d at 445.  And even "[i]f . . . allegedly fraudulent conduct by the officers and controllers of [a corporate plaintiff] are imputed to [that corporate plaintiff], the adverse interest exception [can still] apply."  *Id.* at 445 n.4 (citing *Kirschner*, 15 N.Y.3d 466).

The Trustee alleges that the Executive Defendants, whose conduct as the Debtors' principals would normally be imputed to the Debtors and U.S. Affiliates, completely abandoned the Debtors' interests.  The Trustee specifically contends that the predicate acts alleged in the Complaint—not the Bank Fraud—injured the Debtors and the U.S. Affiliates.  *See generally* Compl.  ¶¶ 387-444.  For example, the Trustee alleges that from 2013 onward, the Debtors transferred hundreds of millions of dollars to Shadow Entities linked to the repayment of outstanding LOUs; these transfers were made for no apparent purpose and do not appear to have

benefitted the Debtors in any way.  Compl. ¶¶ 95-99, schedules B through L.  The Debtors also transferred significant funds to Twin Fields to launder funds from sources that included FDI and certain Shadow Entities.  Compl. ¶¶ 175-76.  Even if the Bank Fraud created some short lived, illusory benefit for the Debtors and U.S. Affiliates, the alleged RICO violations in this Complaint and the Executive Defendants Complaint, including the looting of the Debtors and U.S. Affiliates leading up to and following the bankruptcy petition, were committed directly against the Debtors and the U.S. Affiliates and not on their behalf.  *See* Compl. ¶¶ 194–242, 387-444; *see also In re Firestar Diamond*, 634 B.R. at 284–85, 288.  In one such example, FDI wired over $2.6 million to a Shadow Entity in January 2018 with no legitimate business reason and without receiving anything in return.  Compl. ¶ 195(ii).  Indeed, the predicate acts underling the RICO violations here amount to the "'total[ ] abandon[ment] [of] the corporation's interests and [the Executive Defendants] acting entirely for [their] own or another's purposes.'"  *Platinum-Beechwood II*, 427 F. Supp. 3d at 446.

Ms. Javeri and Nehal Modi both acknowledge the existence of the adverse interest exception.  Javeri Memo at 12; Nehal Modi Memo at 13.  But they argue that the actions of the Executive Defendants benefited the Debtors, the U.S. Affiliates, and the Executive Defendants, and therefore the adverse interest exception cannot be utilized here.  *See* Javeri Memo at 12; Nehal Modi Memo at 13-14.  More specifically, they argue that the Mr. Bhansali and Mr. Gandhi did not "totally abandon" the Debtors' interests because the Complaint only alleges that they were involved in actions integral to the Bank Fraud, but not that they were stealing from or defrauding the Debtors.  Javeri Memo at 12; Nehal Modi Memo at 13–14.  Nehal Modi, in his reply, specifically challenges the timing of the alleged harm to the Debtors, asserting that the looting only began in December 2017 and lasted for less than a year, while the Bank Fraud began

49

in 2010 and lasted for approximately seven years. Reply Memorandum of Law in Support of Nehal Modi's Motion to Dismiss [ECF No. 85] ("Nehal Modi Reply") at 3. As a result, Nehal Modi argues, the Bank Fraud was highly profitable to the Debtors, and the Court cannot disregard this period of profitably and focus only on the year of looting. Additionally, Ms. Mehta contends that the adverse interest exception does not apply because "the Debtors and U.S. Affiliates were created to perpetrate the alleged fraud; [and] they cannot be separated from their fraudulent management." Mehta Reply at 18.

Courts have differed significantly over how much of a benefit to a corporation is needed to defeat the adverse interest exception. *Compare Am. Int'l Grp., Inc. v. Greenberg (In re Am. Int'l Grp.), Inc.*, 965 A.2d 763 (Del. Ch. 2009), *aff'd sub nom,. Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) ("New York courts have stated that knowledge is imputed as long as a corporation benefited 'to any extent' from an agent's actions.") (quoting *Bullmore v. Ernst & Young Cayman Islands*, 20 Misc. 3d 667, 672 (Sup. Ct. NY Cty. 2008)) *with Schacht v. Brown*, 711 F.2d 1343, 1348 (7th Cir. 1983) (finding that the "Pyrrhic benefit" of artificially prolonging the existence of the corporation past the point of insolvency to be insufficient to overcome application of the adverse interest exception). Other courts look to the intent of the wrongdoer, finding imputation inapplicable if the managers engaged in the misconduct intended to benefit themselves rather than the corporation. "[I]t is important to remember that the "total abandonment" standard looks principally to the intent of the managers engaged in misconduct. '[T]he issue [is] whether mismanagement of [the company] was the vehicle by which [the manager] *intended* to advance his own interest or whether it was simply incidental to his continued efforts to retain some economic viability in the company.'" *Bankruptcy Services, Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d

432, 451–52 (2d Cir. 2008) (quoting *Capital Wireless Corp. v. Deloitte & Touche*, 216 A.D.2d

663, 666 (App. Div. 3d Dep't 1995) (emphasis in original)).

Without parsing exactly how the principles apply to the facts here, the Court finds that

the Complaint's allegations are sufficient to invoke the adverse interest exception—because the

Trustee alleges that the Defendants' conduct benefited the Defendants while also ultimately

driving the Debtors into bankruptcy.  The Complaint sets forth in great detail the various ways in

which Mr.  Bhansali and Mr. Gandhi looted the Debtors and U.S. Affiliates.  *See* Compl. ¶¶ 195–

242.  In previously holding that the Trustee had standing to pursue RICO claims against the

Executive Defendants, this Court had concluded that the effect of the conduct of the RICO

enterprise was to loot the Debtors and U.S. Affiliates and not to confer any benefit. *See In re*

*Firestar Diamond,* 634 B.R. at 285-86.  Even looking at the allegations in this Complaint

pertaining to the Bank Fraud—as Defendants urge—the Trustee alleges that any proceeds from

the Bank Fraud that the Debtors may have received were ultimately laundered to or through the

Shadow Entities using "transactions [that] had no legitimate economic purpose," for the ultimate

"benefit of Nirav Modi, Mihir Bhansali, their families and other co-conspirators."  Compl. ¶¶

70–72, 82, 94–99.  Thus, there are no allegations in the Complaint—or inferences that can be

drawn—that the Bank Fraud benefited the Debtors and U.S. Affiliates. [35]  Indeed, the Defendants

point to none.[36]

---

[35]      Ms. Mehta argues that the Debtors and U.S. Affiliates were created to perpetrate the Bank Fraud.  But as
this Court found in its prior decision, the premise that the Debtors had no legitimate economic business "is squarely
at odds with the allegations in the [Executive Defendants Complaint] and the bankruptcy itself."  *In re Firestar*, 634
B.R. at 286.  It is similarly at odds with the Complaint here.  *See* Compl. ¶¶ 14–23, 54–55, 126–34, 440–3.

[36]      Even if the Court found that the Debtors and U.S. Affiliates had unclean hands, any claims that arose post-
petition (e.g., the claims related to post-petition looting and bankruptcy fraud) would not be barred as the in pari
delicto doctrine and Wagoner rule would be inapplicable to such claims.  See In re Signature Apparel Grp. LLC,
2015 WL 1009452, at *8 (Bankr. S.D.N.Y. Mar. 4, 2015) ("[W]hen a debtor participates in wrongful conduct that
occurs entirely postpetition, the in pari delicto doctrine does not bar the trustee from asserting claims against third
parties arising out of that conduct.") (citing In re Food Mgmt. Grp., 380 B.R. at 698).  And in fact, the Complaint

Finally, the determination of whether agents wholly abandoned their principals is a factual question that cannot be determined on a motion to dismiss. *See Oppenheimer–Palmieri Fund, L.P. v. Peat Marwick Main & Co.* (*In re Crazy Eddie Sec. Litig.),* 802 F. Supp. 804, 818 (E.D.N.Y. 1992) (holding that the question of whether the adverse interest exception applies to bar the invocation of *in pari delicto* should be decided by a jury); *accord Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 64, 79 (S.D.N.Y. 2008), *adhered to on reconsideration*, 2008 WL 1959542 (S.D.N.Y. May 5, 2008) ("[T]he applicability of the 'adverse interest exception' to the *in pari delicto* defense presents an issue of fact.")  Thus, given the Trustee's invocation of the adverse interest exception and the allegations here, the Defendants' *in pari delicto*, and *Wagoner* rule defenses fail at the pleading stage.[37]

---

does make allegations of wrongdoing after the filing of these bankruptcy cases. See, e.g., Compl. ¶ 196(xix) (alleging that on March 6, 2018, Nirav Modi, Mr. Bhansali, and Mr. Gandhi caused a U.S. Affiliate to divert more than $4 million in inventory to Hong Kong); id. ¶ 214 (alleging that on April 6, 2018, over $6 million in inventory belonging to a U.S. Affiliate was shipped to Hong Kong.)

[37]      Given the conclusions above, the Court does not need to resolve the Trustee's other arguments regarding the *in pari delicto* and *Wagoner* doctrines. These include Trustee's contention that traditional agency principles prohibit the imputation of the Executive Defendants' misconduct to the Debtors because the Moving Defendants are not innocent third parties. Trustee Opposition at 51; *see also* Hr'g Tr. 94:4-19 (Feb. 2, 2022).  The Trustee also asserts that the Defendants cannot show that the "plaintiff bears at least substantially equal responsibility for the violations he seeks to redress," *Republic of Iraq*, 768 F.3d at 162, because the Debtors have not engaged in misconduct.  As stated by the Trustee's counsel during oral argument, "if, as a threshold issue, the plaintiff, the corporate entities, cannot be considered responsible for the bad acts of their officers and directors, then there is no mutual wrongdoing and therefore *in pari delicto* cannot apply." Hr'g Tr. 95:8-12 (Feb. 2, 2022).  Citing cases that address both Delaware and New York agency law, the Trustee asserts that third parties (here, the Moving Defendants) who collude with the agent of a principal against the principal's interests cannot then impute the agent's wrongdoing to the principal.  *See* Trustee Opposition at 43-44 (citing *Mut. Life Ins. Co. of New York v. Hilton-Green*, 241 U.S. 613, 622–23 (1916); *Rosalie Ests., Inc. v. Colonia Ins. Co.*, 227 A.D.2d 335 (1996); *Lincoln Nat. Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 555–56 (D. Del. 2010) (holding that "[u]nder agency law, the knowledge of an agent is generally imputed to his principal *except when the agent's own interests become adverse*." (internal citation omitted, emphasis in original).  But as the Massachusetts Supreme Judicial Court aptly noted, "where the parties are organizations that can act only through their agents, as here, the task [of imputing intent and measuring moral culpability] becomes more complicated." *Merrimack Coll. v. KPMG LLP*, 480 Mass. 614, 625 (2018).  As the *Merrimack* court observed, "the purpose of imputation is not to adjudicate fault.  As we have consistently recognized, imputing the wrongful actions of an agent to a principal does not mean that the principal itself has acted wrongfully . . . The rules of imputation are legal rules, not equitable principles, that are designed to allocate risk, not blame." *Id.* at 621.

**F.  Timeliness of Trustee's RICO Claims**

The Defendants contend that the Trustee's claims are time-barred to the extent the

Trustee's claims seek damages for injuries that occurred outside the four-year statute of

limitations applicable to civil RICO claims.[38]  *See generally* Javeri Memo at 16; LLC Memo at

22; Nehal Modi Memo at 18; Mehta Memo at 29.  Thus, Defendants contend that the Trustee is

unable to bring a claim for any injuries that occurred prior to February 26, 2016, four years

before this adversary proceeding was filed.  Nehal Modi Memo at 18; Javeri Memo at 16-17;

LLC Memo at 23; Mehta Memo at 30.

But there are several problems with Defendants' position.  First, a trustee may commence

an action that is timely as of the date of the filing of the bankruptcy petition within two years

after the order for relief.  *See* 11 U.S.C. § 108(a).  As the petition in this case was filed on

February 26, 2018,[39] the Trustee had two years to file suit on any claim that was timely as of the

petition date.  *Id.*  Therefore, a claim based on an injury that occurred within four years of the

petition date is timely, making February 26, 2014 the operative date for calculation of the statute

of limitations, rather that February 26, 2016.

Moreover, the statute of limitations period for a RICO claim does not begin to run until a

plaintiff has "actual or inquiry notice of the injury."  *Koch v. Christie's Int'l PLC*, 699 F.3d 141,

151 (2d Cir. 2012) (citing *Lanza v. Merrill Lynch & Co. (In re Merrill Lynch Ltd. P'ships Litig.*,

154 F.3d 56,59 (2d Cir. 1998)).  The Trustee alleges new injuries within four years of the

petition date.  *See, e.g.,* Compl. ¶ 97 (describing transfer of funds from FDI through a Shadow

Entity to an LOU entity that was used to repay an LOU in 2016); Compl. ¶ 195 (describing the

---

[38]      *See Agency Holding Corp. v. Malley-Duff & Associates, Inc.,* 483 U.S. 143, 156 (1987); *Frankel v. Cole,*
313 F. App'x 418, 419 (2d Cir. 2009).

[39]      *See* ECF 1, Case No. 18-10509.

looting of the Debtors in 2017 and 2018); *see also In re Merrill Lynch Partnerships Litig.*, 154 F.3d 5at (2d Cir. 1998) (the separate accrual rule provides that a new limitations period begins when a new injury is discovered).

Nevertheless, some alleged injuries did occur before 2014.  *See, e.g.*, Compl. ¶ 92 (describing the export of the same diamond three times during a five week period in 2011); Compl. ¶ 157 (describing a transaction on December 31, 2013 where Mr. Bhansali directed Mr. Gandhi to wire $1.2 million from FDI to a different entity to pay off an invoice issued to a Shadow Entity).  For the alleged misconduct outside the four year period, the Trustee relies on an equitable tolling principle called the adverse domination doctrine.  "Under the doctrine of adverse domination, the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers."  *Adelphia Commc'ns Corp. v. Bank of America, N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 58 (Bankr. S.D.N.Y. 2007), *aff'd in part sub nom.*, *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration*, 2008 WL 1959542 (S.D.N.Y. May 5, 2008) (quoting *RTC v. Farmer*, 865 F. Supp. 1143, 1151 (E.D. Pa. 1994)).  "[T]he doctrine is based on the theory that the corporation which can only act through the controlling wrongdoers cannot reasonably be expected to pursue a claim which it has against them until they are no longer in control."  *Id.* at 58–59 (quoting *RTC*, 865 F. Supp. at 1151).  The doctrine covers instances where, as here, a non-control party working in concert with the control party would not bring an action that exposes their own wrongdoing.  *See In re Adelphia*, 365 B.R. at 59 (observing that "a corporation likewise cannot reasonably be expected to pursue a claim against those who *aided and abetted* the controlling wrongdoers, or acted in concert with them, until the controlling wrongdoers are no longer in control.") (emphasis in original); *see also ADR Tr. Corp. v. Fleischer*, 826 F. Supp. 1273, 1278–

54

79 (D. Kan. 1993) (holding that the adverse domination doctrine logically applies to certain

"noncontrol" persons because if "these persons assisted or jointly participated with the

controlling directors in committing wrongful acts, the same self interest reasons that would

prevent a director from suing another director would prevent him or her from bringing an action

against the noncontrol person").  Relying on this doctrine, the Trustee here alleges that the

statute of limitations did not begin to run until the Executive Defendants relinquished control of

the Debtors.  Trustee Opposition at 54.  As it is well settled that the question of whether a statute

of limitations should be equitably tolled is factual, and the question of whether—and when—it

was tolled here is not ripe for consideration now given the allegations in the Complaint.  *See,*

*e.g.*, *Barr v. Charterhouse Group Int'l, Inc. (In re Everfresh Beverages, Inc*.), 238 B.R. 558, 577

(Bankr. S.D.N.Y. 1999) ("The question of whether a statute of limitations should be equitably

tolled is necessarily a factual one and is often not ripe for consideration on a motion to

dismiss.").[40]  For all these reasons, the statute of limitations does not require the dismissal of the

Complaint.

### G. Assignment of U.S. Affiliates' Claims to the Trustee

Ms. Javeri and Nehal Modi challenge the assignment of the RICO claims held by the U.S.

Affiliates to the Trustee, an assignment that was part of a settlement agreement between the

Trustee and the U.S. Affiliates.  Compl. ¶ 22; *see also* ECF No. 1366, Case No. 18-10509

(settlement agreement between the Trustee and the U.S. Affiliates).  Ms. Javeri and Nehal Modi

argue that the treble damages provision in RICO is punitive in nature and such punitive claims

---

[40]  As the Trustee has invoked the adverse domination doctrine to toll the statute of limitations, the Court need
not address the Trustee's argument that, because the conspirators' knowledge could not be imputed to the Debtors,
the Debtors did not discover any injuries underlying the Trustee's claims until the Trustee was appointed in 2018.
*See* Trustee Opposition at 53-54.

are not assignable.  Javeri Memo at 13 (citing *Feingold v. Liberty Mut. Grp*., 847 F. Supp. 2d

772, 776 (E.D. Pa. 2012), *aff'd*, 562 F. App'x 142 (3d Cir. 2014) ("[T]he court has declared that

causes of action in the nature of a penalty are not assignable."); Nehal Modi Memo at 14 (same).

However, the cases cited by Ms. Javeri and Nehal Modi ignore the fact that the Supreme Court

has held that the treble damages afforded by RICO are remedial in nature.  *See PacifiCare*

*Health Sys., Inc. v. Book*, 538 U.S. 401, 406, (2003) ("Indeed, we have repeatedly acknowledged

that the treble-damages provision contained in RICO itself is remedial in nature.")  In any event,

a multitude of other cases from a variety of jurisdictions also hold that RICO claims are

assignable, including case law in this district.  *See, e.g., Kalimantano GmbH v. Motion in Time,*

*Inc.*, 939 F. Supp. 2d 392, 400 n.2 (S.D.N.Y. 2013); *In re Nat'l Mortg. Equity Corp. Mortg. Pool*

*Certificates Sec. Litig.*, 636 F. Supp. 1138, 1155 (C.D. Cal. 1986) (finding RICO claims to be

assignable by analogizing the claims to those under antitrust law, noting that antitrust treble

damages have a similar hybrid nature but are clearly assignable); *Nicolls Pointing Coulson, Ltd.*

*v. Transportation Underwriters of Louisiana, Inc.*, 777 F. Supp. 493, 494–96 (E.D. La. 1991);

*Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 228 (E.D.N.Y.

1999), *disapproved of by Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip*

*Morris Inc.*, 196 F.3d 818 (7th Cir. 1999) ("RICO claims are assignable."); *see also Fund*

*Liquidation Holdings LLC v. UBS AG,* 2021 WL 4482826, at *4 (S.D.N.Y. Sept. 30, 2021),

*decision clarified on reconsideration,* 2022 WL 3904556 (S.D.N.Y. Aug. 30, 2022) (discussing

assignment of RICO claims).

## V.    Fraudulent Transfer Claims

In addition to its RICO claims, the Trustee asserts eight counts seeking recovery for

allegedly fraudulent conveyances against certain of the Moving Defendants.  The Trustee's

claims are based in three main transactions: (1) the transfer of $14,575,000 from Synergies to

Purvi Mehta (the "Synergies-Mehta Transfer"), Complaint ¶¶ 467–83; (2) the transfer from FGI

to the Ithaca Trust of the equity in CPRE (the "CPRE Equity Transfer"), *Id.* ¶¶ 484–500; and (3)

specified payments made by Debtor FDI on CPRE's behalf, *Id.* ¶¶ 501–31.[41]  The Court will

separately address the sufficiency of the allegations as to each transaction.

### A.  Legal Standard

#### 1.  Actual Fraudulent Conveyances

The Bankruptcy Code provides for the claw back of transfers made with "actual intent to

hinder, delay, or defraud" any entity to whom the debtor was or became obligated on the date the

transfer was made.  11 U.S.C. § 548(a)(1)(A).  This form of fraud is commonly referred to as

"actual fraud."  *See Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*, 452 B.R. 467, 477

(Bankr. S.D.N.Y. 2011).  Federal law allows a plaintiff to recover fraudulent transfers made

within two years of the petition date. 11 U.S.C. § 548(a)(1).

A plaintiff may establish fraud by "alleging facts showing either (1) a 'motive and

opportunity to commit the fraud'; or (2) 'strong circumstantial evidence of conscious

misbehavior or recklessness.'"  *Weisfelner v. Hofmann (In re Lyondell Chem. Co.)*, 554 B.R.

635, 652 (S.D.N.Y. 2016) (quoting *Employees' Ret. Sys. of Gov't of the Virgin Islands v.

Blanford*, 794 F.3d 297, 306 (2d Cir. 2015)) (securities law); *see also Picard v. Chais (In re

Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 221 (Bankr. S.D.N.Y. 2011).  "Due to the

difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to

rely on 'badges of fraud' to support his case, *i.e.*, circumstances so commonly associated with

---

[41]    The Trustee distinguishes between the transfers made by FDI during the two year period prior to the
bankruptcy (the "CPRE Two Year Transfers") and the transfers made by FDI during the six year period prior to the
bankruptcy filing (the "CPRE Six Year transfers"), asserting separate claims for these two categories of transfers.
*See generally* Compl. ¶¶ 501–531.

fraudulent transfers that their presence gives rise to an inference of intent." *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.),* 403 F.3d 43, 56 (2d Cir. 2005) (quoting *Wall St. Assocs. v. Brodsky*, 684 N.Y.S.2d 244, 247 (App. Div. 1st Dep't 1999)).[42]

Claims of actual fraudulent conveyance are subject to the heightened pleading standard of Fed. R. Civ. Pro. 9(b), made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7009. *Official Comm. of Unsecured Creditors of Verestar v. American Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 459–60 (Bankr. S.D.N.Y. 2006). However, "[m]alice, intent, knowledge, and other conditions of a person's mind" may be pled generally. *Chais*, 445 B.R. at 219 (quoting Fed. R. Civ. P. 9(b)). Courts take a "liberal" approach in construing allegations of actual fraud asserted by a bankruptcy trustee, and allegations of circumstantial evidence are sufficient to establish fraudulent intent. *Id.* This liberal view reflects that "a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." *Novator*, 452 B.R. at 477 (citing *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007)). A trustee may rely on circumstantial evidence to establish fraudulent intent because "the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time." *Id.* (citing *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999)).

In addition to seeking the avoidance of actual fraudulent transfers, the Trustee also asserts claims under Section 276 of the New York Debtor Creditor Law, which provides that: "Every

---

[42]     These badges of fraud include: 1) the lack or inadequacy of consideration; 2) the family, friendship or close associate relationship between the parties;  3) the retention of possession, benefit, or use of the property in question; 4) the financial condition of the party sought to be charged both before and after the transaction in question; 5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; 6) the general chronology of the events and transactions under inquiry; 7) a questionable transfer not in the usual course of business; and 8) the secrecy, haste, or unusualness of the transaction. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005).

conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276 (repealed 2019).[43]  The standard set forth in New York state law regarding actual fraudulent conveyances essentially overlaps with the Bankruptcy Code.  *Barnard v. Albert (In re Janitorial Close-Out City Corp.)*, 2013 Bankr. LEXIS 523, at *14 (Bankr. E.D.N.Y. Feb. 8, 2013).

### 2.   Constructive Fraudulent Conveyance

A transfer is avoidable under Section 548(a)(1)(B) if, among other things, the debtor received less than reasonably equivalent value for the transfer.  *Graham v Serafis (In re Vill. Red Rest. Corp.)*, 2021 Bankr. LEXIS 2377, at *22 (Bankr. S.D.N.Y. Aug. 31, 2021).  A transfer will be avoided as constructively fraudulent if the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation; and

- was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; or
- was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
- intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
- made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of ana insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

---

[43]        In December 2019, Article 10 ("Fraudulent Conveyances") of the N.Y. Debtor Creditor Law (the "D.C.L") was repealed and was replaced by the Uniform Voidable Transactions Act.  However, the Uniform Voidable Transactions Act only applies to transactions which occurred on or after April 4, 2020.  As the transfers in question all occurred prior to April 4, 2020, Complaint ¶¶ 477- 531, Schedule A, the Court applies the prior version of the D.C.L.

The N.Y. D.C.L., like Section 548(a)(1)(B) of the Bankruptcy Code, allows for recovery of a constructive fraudulent transfer where actual fraudulent intent is absent or cannot be proven. *See Am. Federated Title Corp. v. GFI Mgmt. Servs.*, 126 F. Supp. 3d 388, 400-01 (S.D.N.Y. 2015). Largely tracking federal law, New York requires that two elements are present: 1) the transfer must be without consideration, and 2) the debtor must either be left insolvent, left undercapitalized as a business venture, or in a position where the transferor incur debts beyond the transferor's ability to pay on maturity. *See* N.Y. D.C.L. §§ 273–275 (repealed 2019); *Aluminum Supply Co. v. Camelio*, 223 N.Y.S.2d 26, 28-29 (Sup. Ct., Monroe Cty. 1962). However, New York law adds the additional requirement of showing that a transfer is made without fair consideration. Under New York law, fair consideration requires showing both an equivalent exchange of value and that the asset transferred is received in good faith. *HBE Leasing Corp. v. Frank*, 61 F.3d 1054,1057–58 (2d Cir. 1995). Thus, "fair consideration has two components—the exchange of fair value and good faith—and both are required." *Kim v. Yoo*, 311 F.Supp. 3d 598, 611 (S.D.N.Y. 2018), *aff'd*, 776 Fed. Appx. 16 (2d Cir. 2019) (quoting *In re Khan*, 2014 WL 10474969, at *8 (E.D.N.Y. Dec. 24, 2014)). "Good faith is required of both the transferor and the transferee, and it is lacking when there is a failure to deal honestly, fairly, and openly." *Berner Trucking, Inc. v. Brown*, 722 N.Y.S.2d 656, 658 (App. Div. 4th Dep't 2001).

## B. The Synergies-Mehta Transfer

Counts three and four of the Complaint challenge the transfer of $14,575,000 from Synergies to Ms. Mehta, alleging that this transfer was actually fraudulent under New York state law (Count III) or constructively fraudulent under New York state law (Count IV). The Trustee

alleges that the Synergies–Mehta transfer was part of a broader diversion of funds to Ms. Mehta in furtherance of the conspiracy. Compl. ¶ 283.

Some background is required to understand the significance of this transfer. Synergies was formed in April 2007 to serve as a purchaser entity for the acquisition of Debtor Jaffe later that year. *Id.* ¶ 279. Mr. Bhansali was the CEO of Synergies, and Mr. Gandhi acted as the CFO. *Id.* ¶¶ 55-56. In late 2010, Mr. Bhansali and Mr. Gandhi executed a stock certificate designating FIPL, the Debtors' parent company, as sole owner of Synergies with 10,000 shares of stock. *Id.* ¶ 280. Over a period of nearly five months, Nirav Modi then transferred a total of $14,575,000 to Synergies, which was then used to pay off purported "loans" from FIPL. *Id.* ¶ 281. These "loans" arose out of earlier circular transactions wherein FIPL would wire funds to Synergies and Synergies would immediately wire the funds back to FIPL or other Modi-controlled Entities. *Id.* In October 2016, despite the fact that FIPL was already the sole owner of Synergies, Nirav Modi and FHL entered into an Agreement for Purchase of Shares in Synergies. *Id.* ¶ 282. Under that agreement, Nirav Modi—in his personal capacity—purported to sell 100% of the outstanding shares of Synergies to Foreign Affiliate FHL for $100; on the same day of the sale, Mr. Bhansali and Mr. Gandhi executed a stock certificate designating FHL as the holder of 10,000 shares in Synergies. *Id.* In December 2016, Nirav Modi assigned to Ms. Mehta his purported interest in the $14,575,000 Synergies "loan" under an agreement retroactively dated to April 1, 2012. *Id.* ¶ 283. Numerous emails described this assignment as a "gift." *Id.*

In July 2017, Synergies wired $14,575,000 to Ms. Mehta, purportedly in satisfaction of the loan that Modi had assigned to her. Compl. ¶ 320. The funds transferred from Synergies to Ms. Mehta were obtained as part of a purported "capital infusion" from FHL to Synergies.[44] *Id.*

---

[44] The Trustee alleges that this "capital infusion" involved laundering funds through a variety of entities in several steps. First, various foreign shell companies in the British Virgin Islands, Cayman Islands, and Mauritius

On the same day that Synergies wired $14,575,000 to Ms. Mehta, FHL had wired $20,000,000 to

Synergies; of the funds not wired to Ms. Mehta, the remainder were wired to Jaffe, Brilliant, and

FIPL. *Id.*

Ms. Mehta raises several challenges to these two counts of fraudulent transfer. As a

threshold matter, Ms. Mehta alleges that the Trustee lacks standing to pursue these fraudulent

conveyance claims. *See generally* Mehta Memo at 21–25. Ms. Mehta raises two related

arguments: first, that the Trustee lacks standing to recover transfers that harmed PNB, a creditor,

and second, that the fraudulent conveyance counts seek to recover funds that belong to PNB, not

the Debtors. *Id.*

Contrary to Ms. Mehta's assertion, a trustee is specifically empowered to act on behalf of

creditors who would otherwise be able to pursue avoidance claims. 11 USC § 544(b)(1)

provides in relevant part:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of
> the debtor in property or any obligation incurred by the debtor that is voidable under
> applicable law by a creditor holding an unsecured claim that is allowable under section
> 502 of this title or that is not allowable only under section 502(e) of this title.

11 USC § 544(b)(1)*; accord Tronox Inc. v. Anadarko Petroleum Corporation (In re Tronox*

*Inc.)*, 464 B.R. 606, 612–13 (Bankr. S.D.N.Y. 2012). Thus, Ms. Mehta's reliance on *Picard v.*

*JP Morgan Chase & Co..*, 460 B.R. 84 (S.D.N.Y 2011) is misplaced, as that case involved

common law claims that actually belonged to creditors rather than avoidance claim under the

Bankruptcy Code.

---

owned by the Modi family would invest up to $75 million in FIPL; FIPL would then in turn make a $115 million
capital contribution to FHL. FHL would then use $65 million to redeem non-voting FHL shares owned by Ms.
Mehta (both personally and through Fine Classic) and $20 million to infuse capital into Synergies. Synergies then
used those funds to repay the loan created by Nirav Modi's contributions to Synergies in 2010 and 2011 and
subsequently transferred to Ms. Mehta. Compl. ¶¶ 297–99.

Ms. Mehta's argument that the money the Trustee seeks to recover belongs to PNB, not

to Synergies, also fails.  Mehta Memo at 23-24 (arguing that these funds were "illicit proceeds"

of the Bank Fraud and are not property of the estate that can be recovered).  While the Complaint

contains significant allegations about the Bank Fraud against PNB, the Trustee has also alleged

that millions of dollars of value was diverted from the Debtors to the Shadow Entities.  Compl.

¶¶ 99, 532–866 Schedules B-L.  In this sense, the Complaint mirrors the Executive Defendants

Complaint.  *See In re Firestar Diamond*, 634 B.R. at 284-85 (finding that while the Executive

Defendants Complaint describes the Bank Fraud against PNB, the Trustee also adequately plead

a direct fraud against the U.S. Affiliates wherein the predicate RICO acts depleted the Debtors'

assets through fraudulent transfers to overseas entities).  The Trustee's allegations regarding the

Synergies–Mehta transfer are another example of the depletion of the Debtors' and U.S.

Affliates' asset where assets belonging to a U.S. Affiliate were siphoned away from that entity

for the benefit of Nirav Modi's family.  Of course, the precise tracing of the proceeds of the

fraud is not an issue to be resolved as part of this motion but rather awaits future fact finding.

*See supra* Section IV(c)(4); *see also In re Firestar Diamond, Inc.*, 634 B.R. at 286 n.15 (internal

citation omitted.)

Ms. Mehta also asserts that the Trustee failed to plead lack of fair consideration and that

Synergies was solvent at the time of the transfer, preventing a finding that the transfer was

actually fraudulent.  Mehta Memo at 37-38.  As to fair consideration, Ms. Mehta's argument

ignores the ample case law that holds "where actual intent to defraud creditors is proven,

the conveyance will be set aside regardless of the adequacy of consideration given."  *Sharp Int'l

Corp.*, 403 F.3d at 56 (*citing United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994));

*accord Priestley v. Panmedix Inc.*, 18 F. Supp. 3d 486, 502 (S.D.N.Y. 2014).  A showing of

insolvency is also not required to state a claim for actual fraud under New York state law. *Ray v. Ray*, 108 A.D.3d 449, 451 (App. Div. 1st Dept. 2013).

In any event, the Trustee does allege a lack of fair consideration. While Ms. Mehta asserts that the transfer was made for fair consideration in satisfaction of an outstanding loan, Mehta Memo at 38, the Trustee alleges that the loan obligation was illusory and created only in furtherance of the "restructuring" of Synergies. *See* Compl. ¶ 278, 281-82. That allegation needs to be understood in the context of the Trustee's allegations regarding Ms. Mehta's role in the money laundering scheme, where the Trustee alleges that Ms. Mehta did not receive the funds in good faith. *See, e.g.*, Compl. ¶¶ 304-07 (describing the movement of money through overseas entity owned by Ms. Mehta into FIPL); Compl. ¶¶ 176 – 183 (describing Ms. Mehta's role in laundering money through Twin Fields, an entity owned by Ms. Mehta). In sum, therefore, the Trustee's Complaint here is sufficient to allege that the "loan repayment" was not actually an exchange for reasonably equivalent value or that it lacked the "good faith" required to establish reasonably equivalent value. *Southern Indus., Inc. v. Jeremias*, 411 N.Y.S.2d 945, 949 (App. Div. 2d Dep't 1978); *Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 443 (Bankr. S.D.N.Y. 2011). Taken in the context of the entirety of the allegations of the Complaint, the Synergies-Mehta transfer also was not an isolated transaction. Rather, the Trustee has plead that it was part of a broader scheme to defraud such that Ms. Mehta cannot establish that it was a good faith transaction and therefore one made for fair consideration. *Official Comm. of Unsecured Creditors of Vivaro Corp. v. Leucadia National Corporation (In re Vivaro Corp.)*, 524 B.R. 536, 550 (Bankr. S.D.N.Y. 2015) (Plaintiff "need only allege a lack of 'fair consideration' by pleading a lack of 'fair equivalent' value *or* a lack of good faith on the part of the transferee.") (emphasis added, internal quotations omitted.)

Having adequately pled that the transfer was made without fair consideration, the Trustee

is entitled to a presumption that Synergies was insolvent at the time of the transfer. *See In re*

*Vill. Red Rest. Corp.*, 2021 WL 3889793, at *12. Ms. Mehta nonetheless challenges insolvency,

alleging that the $20,000,000 capital infusion shows that Synergies "had sufficient capital on

hand to purchase 100% of the outstanding common stock of Firestar Group, Inc. and wire of $1

million to other entities to pay off invoices and loans." Mehta Memo at 38 (internal citations

omitted.) However, Synergies' solvency is a factual issue that cannot be resolved on this motion

to dismiss. *See Halperin v. Morgan Stanley Investment Management, Inc. (In re Tops Holding II*

*Corp.)*, 646 B.R. 617, 658 (Bankr. S.D.N.Y. 2022), *leave to appeal denied*, 2023 WL 119445

(S.D.N.Y. Jan. 6, 2023) (holding that "insolvency is ordinarily a question of fact, requiring the

court usually to weigh a significant amount of evidence.") (internal citations omitted).

Finally, Ms. Mehta attacks the sufficiency of the Trustee's pleadings on fraudulent intent,

characterizing the Trustee's allegations as "conclusory." Mehta Memo at 37. The Court

disagrees. Taken as a whole, the Trustee's allegations raise strong inferences of fraud sufficient

to survive a motion to dismiss. *See Pension Ben. Guar. Corp.*, 712 F.3d at 719. As plead by the

Trustee, the transaction itself possesses many of the so-called "badges of fraud" identified in

*Sharp*, 403 F.3d at 56. First, the "loan" itself that created the basis of the transfer appears to be

illusory. Mr. Modi is alleged to have funneled money into Synergies that was used to pay off

loans that were created as a result of circular transactions with no real economic purpose.

Compl. ¶ 281. Second, the timing of the transaction is also suspicious. The transfer occurred in

mid-2017 in the midst of significant other efforts to move funds between entities and move and

acquire assets beyond the reach of creditors. *See generally* Compl. ¶¶ 184, 276–370. The

suspect nature of the timing is further emphasized by the fact that the assignment agreement

transferring the loan from Nirav Modi to Ms. Mehta was backdated more than four years, presumably to distance the repayment of the loan from the restructuring. *Id.* ¶ 283; Trustee Opposition at 59. Third, the repayment of this loan also does not appear to have occurred in the ordinary course of business. Despite the fact that the "loan" was created in 2011, no repayment of any kind was made for more than six years, and the repayment was only made in conjunction with an influx of funds from FHL for no apparent reason. Compl. ¶¶ 281, 320. Fourth, the transaction occurred between parties with a close relationship, as Synergies' controlling shareholder is Nirav Modi. Compl. ¶¶ 52, 280 (stating that Nirav Modi is the owner of substantially all of the equity interests in FIPL, which in turn owned 10,000 shares of Synergies).

Motive and opportunity to commit fraud is also present in the transaction. The Synergies-Mehta transfer took place as part of a larger effort to restructure the Firestar Entities' global corporate structure amidst the broader allegations of fraud. Compl. ¶¶ 276, 278. More specifically, the Trustee's alleges that the Synergies-Mehta transfer was part of the larger fraud scheme, perpetrated by Mr. Bhansali and Nirav Modi with the cooperation of Ms. Mehta, to move funds to avoid detection and benefit the Modi family. *See Chais*, 445 B.R. at 221–22 (internal citations and quotations omitted) ("To adequately plead intent, the Trustee must allege facts that give rise to a strong inference of fraudulent intent. Such facts may either (1) demonstrate that defendants had both the motive and the opportunity to commit fraud; or (2) constitute strong circumstantial evidence of conscious misbehavior or recklessness"). This context casts a suspicious light on the Synergies-Mehta transaction, particularly in light of the fact that Mr. Bhansali and Mr. Gandhi, two of the three Executive Defendants, were officers of Synergies. Compl. ¶¶ 55-56. Mr. Bhansali's and Mr. Gandhi's intent in laundering funds can be imputed to Synergies, particularly in light of the asserted purpose of the stated aim of sanitizing

Synergies' record of capitalization and ownership. *See In re Lyondell Chem. Co.*, 554 B.R. at 649 (holding that a CEO's knowledge may be imputed to a corporation when determining that there was an intent to defraud).

### C. The CPRE Equity Transfer

On behalf of the U.S. Affiliate FGI, the Trustee challenges the transfer of the equity in CPRE from FGI to the Ithaca Trust as an actually fraudulent conveyance (Count V, Complaint ¶¶ 484-92) and a constructively fraudulent conveyance under New York state law (Count VI, Complaint ¶¶ 493-500).

CPRE is alleged to have been an integral part of the RICO conspiracy that, along with CPS50, was used to launder the proceeds of the Bank Fraud. *See generally* Compl. ¶¶ 284 – 96; 349-58. CPRE was formed in 2007. *Id.* ¶ 285. In March 2007, it purchased the Essex House apartment located at 160 Central Park South, which was used by Ms. Javeri and Nirav Modi as their personal residence. *Id.* At all times, Mr. Bhansali acted as CPRE's manager while Mr. Gandhi acted as its treasurer. *Id.* ¶ 286. Essex House was purchased for $4.995 million; FDII contributed $2 million to the purchase price and the remainder was funded through a mortgage loan issued by HSBC Bank. *Id.* ¶ 285. CPRE was owned by Debtor FDI until the end of 2009, when FDI transferred CPRE to U.S. Affiliate FGI. Id. ¶ 285.

In late 2016, Mr. Gandhi reached out to HSBC to communicate an intent to change CPRE's ownership from FGI to Ms. Javeri. *Id.* ¶ 293-94. In response HSBC repeatedly requested information concerning the ownership structure of CPRE and other Firestar Entities, as well as the source of Ms. Mehta's wealth. *Id.*¶ 295. Mr. Gandhi communicated HSBC's requests to Nirav Modi, informing Nirav Modi that the only way to avoid answering HSBC's questions would be to pay off the mortgage. *Id.*¶ 296. In December 2017, Nirav Modi emailed

Mr. Gandhi and directed him to pay off the HSBC mortgage in full. *Id.* ¶ 349. Mr. Gandhi then

contacted HSBC to indicate there was an urgent need for the Ithaca Trust to assume the mortgage

on Essex House, thus transferring the liability on the mortgage from FGI to Ithaca Trust. *Id.* ¶

350. However, Mr. Gandhi determined that the mortgage could not be transferred quickly

enough and instead decided to arrange to pay the mortgage in full. *Id.* A day after receiving

Nirav Modi's email directing payment of the HSBC mortgage, Mr. Gandhi wired $3 million

from FDI to HSBC in satisfaction of the Essex House mortgage; the wired funds were originally

obtained from Jaffe and Fantasy as well as from FDI's own account and from an HSBC line of

credit. *Id.* ¶ 351.

    With the mortgage satisfied, Nirav Modi devised a strategy to transfer Essex House—

now unencumbered and worth approximately $6 million—to the Ithaca Trust. Compl. ¶ 353. In

late December 2017, the Ithaca Investment Advisor, Abhay Javeri, delivered a letter of direction

to the Ithaca Trustee instructing the Ithaca Trust to become the sole member of CPRE by

purchasing a 100% interest in CPRE for $6 million. *Id.* ¶ 355. The agreement for the sale of

CPRE to the Ithaca Trust was executed the following day by Mr. Gandhi on behalf of FGI and

by the Ithaca Trustee. *Id.* ¶ 356. On December 29, 2017, Nirav Modi emailed various

professionals to inform them that the funds necessary for the purchase of CPRE had been wired

that day. *Id.* ¶ 357. The funds did not clear Ms. Mehta's account until January 1, 2018 when the

Ithaca Trust wired $6 million to FGI's HSBC account for the purchase of CPRE, and FGI

transferred the equity interest in CPRE to the Ithaca Trust. *Id.* ¶ 358.

    CPRE attempts to cast the transfer of CPRE's equity as a "legitimate transfer" between

different entities owned and controlled by the same family. LLC Reply at 15. CPRE argues that

no concealment or intent to commit fraud can be found because the asset remained in a family

trust and maintained its character as the family's primary residence. *Id.* But this argument again ignores the greater context for the transaction. The transfer of CPRE is alleged to be part of a larger plan to funnel assets to Ms. Javeri and Ms. Mehta and to restructure the Firestar Entities to eliminate traces of the Modi Family's self-dealing. Compl. ¶¶ 277, 284. This inference is supported by Mr. Gandhi's inquiries as to the best way to transfer CPRE's ownership to Ms. Javeri. Compl. ¶¶ 287-89. The suspect nature of the transaction is also underscored by the mortgage lender's inquiries as to the ownership structure of CPRE and other Firestar Entities as well as the source of Ms. Mehta's wealth and Mr. Gandhi's efforts to avoid providing this information to HSBC. *Id.* ¶¶ 295-96.

The complaint alleges many badges of fraud for this transaction. The unusual haste of the transaction is particularly notable. While an assumption of the mortgage had been discussed, Mr. Gandhi determined that the mortgage could not be transferred quickly enough and instead decided to pay off the mortgage in order to transfer the property. Compl. ¶¶ 350, 353; *id.* ¶ 354 (alleging that "Modi prefer[red] to fast track the transaction."). The close relationship between the transferor and transferee is also a badge of fraud, as is the fact that both FGI and the Ithaca Trust were controlled by the Executive Defendants. *Id.* ¶¶ 102-103, 284, 290, 329. The Modi family also retained control over the apartment and continued to reside there. *Id.* ¶ 285.

CPRE complains that the Trustee has failed to plead a lack of fair consideration and insolvency. *See generally* LLC Memo at 16-20. For the purposes of the Trustee's claim of actual fraud, however, a lack of consideration is irrelevant given that the allegations are sufficient to state an intent to hinder, delay, or defraud creditors. *See Patriot Grp.*, 452 B.R. at 435, n.39 ("[A] conveyance made with the intent to hinder, delay or defraud creditors is fraudulent regardless of the consideration exchanged."). The Court reaches a similar conclusion

for the Trustee's claim of constructive fraudulent conveyance.  A constructive fraudulent conveyance claim under New York State law considers a transfer to be made with fair consideration only when there is both an exchange of equal value and a transfer made in good faith.  *HBE Leasing Corp.* at 1057–58; *see Berner Trucking,* 722 N.Y.S.2d at 658 (good  faith requires that a party deal with a transaction "honestly, fairly, and openly").  As both FGI and the Ithaca Trust had imputed knowledge of the scheme to defraud creditors by virtue of Nirav Modi's control of the entities, *Serin*, 2009 WL 7823216, at *14, neither entity can be deemed to have received the transfer in good faith.   Without good faith, the transfer lacked consideration; insolvency is therefore presumed and need not be specifically plead at this stage.  *In re Vill. Red Rest. Corp.*, 2021 WL 3889793, at *12.

### D.  The CPRE Two- and Six- Year Transfers

The Trustee seeks to avoid additional transfers made from Debtor FDI to pay the mortgage debt, maintenance, and other expenses for the Essex House Apartment for the benefit of CPRE.  *See generally* Compl. ¶¶ 501–531. The Trustee segregates these transfers into two categories: 1) transfers totaling $3,603,683.69 that were made within two years of the commencement of FDI's bankruptcy proceedings and identified in Schedule A attached to the Complaint (the "CPRE Two-Year Transfers"), *Id.* ¶ 502;  and 2) transfers totaling $ 4,594,559.78 that were made within six years of the commencement of FDI's bankruptcy proceedings and identified in Schedule A attached to the complaint (the "CPRE Six-Year Transfers," and together with the CPRE Two-Year Transfers, "the CPRE Transfers"), *Id.* ¶ 510.  The Trustee asserts that the Two-Year Transfers were actually fraudulent under federal law (Count VII) and constructively fraudulent under federal law (Count IX).  The Trustee also alleges that the Six-

Year Transfers were actually fraudulent under New York State law (Count VIII) and

constructively fraudulent under New York State law (Count X).[45]

As a threshold matter, CPRE raises a statute of limitations defense as to the Six Year

Transfers, which are alleged to be fraudulent under New York State Law.  LLC Memo at 21-22.

"A cause of action based upon actual fraud under Debtor and Creditor Law § 276 must be

brought within six years of the date that the fraud or conveyance occurs, or within two years of

the date the fraud should have been discovered, whichever is longer." *Felshman v. Yamali*, 106

A.D.3d 948, 949 (App. Div. 2nd Dep't 2013) (citing *Ehrler v. Cataffo*, 42 A.D.3d 424, 425

(App. Div. 2nd Dep't 2007)).  Similarly, "a cause of action based upon constructive fraud

pursuant to N.Y. D.C.L. § 273 must be commenced within six years after the date that the fraud

occurred, irrespective of the date of discovery." *Id.*  As the Trustee does not seek to recover any

transfers made more than six years before the petition date, the Court rejects CPRE's assertions

that the claims concerning the Six Year Transfers are not timely under New York State law. [46]

CPRE also contends that that Trustee's allegations fail to satisfy the pleading standard for

actual fraud.  LLC Memo at 12-14.  The Court disagrees.  The Trustee alleges that both the

CPRE Transfers were made for the benefit of CPRE, and the transfers were approved by Nirav

Modi, Mr. Bhansali, Mr. Gandhi and their co-conspirators to perpetuate the Bank Fraud, launder

funds, and siphon proceeds for the benefit of the Modi family, the consequence of which was to

---

[45]     While the New York state and federal statutes allowing for the avoidance of actual and constructive
fraudulent conveyances are substantively similar, the New York state statutes provides a longer statute of limitations
for the Trustee to pursue his claims. 11 U.S.C. § 546 (establishing a two year limitation on actions); *Ren-Cris Litho,
Inc. v. Vantage Graphics, Inc.*, 194 A.D.2d 302, 302–03 (App. Div. 1st Dep't 1993) (discussing the six year statute
of limitations for fraudulent conveyance claims).

[46]     As discussed earlier, however, a bankruptcy trustee may commence an action that is timely as of the date of
the filing of the bankruptcy petition within two years after the order for relief under Section 108(a) of the
Bankruptcy Code.  As the petition in this case was filed on February 26, 2018 and the instant proceeding was filed
on February 25, 2020, the operative bar date for fraudulent conveyance claims under New York state law was
February 25, 2012, not February 25, 2014, as the LLC Defendants assert.  *See* LLC Memo at 20-22.

"deplete [the Debtor] FDI's property and frustrate satisfaction of FDI's legitimate obligations." Compl. ¶¶ 505, 512.

The bulk of the claim for the CPRE Transfers is based on the $3 million payment made to satisfy the mortgage held by HSBC. Compl. ¶ 351. As discussed in the context of the CPRE Equity Transfer, several badges of fraud surround this transaction including the unusual haste of the payment, the connection between the mortgage payoff necessary to transfer title and the creation of capital in other entities abroad, and the fact that Nirav Modi ultimately controlled FDI and continued to benefit from the Essex House Apartment. *See* Compl. ¶¶ 290, 350, 284. The Trustee also pleads that the payoff of the mortgage was a key element in bringing CPRE beyond the reach of creditors by facilitating the transfer of title from FGI to the Ithaca Trust. *See id.* ¶¶ 289, 350-51.

With respect to the remainder of the transfers—the vast majority of which constituted payments of the Essex House maintenance expenses—the relationship between FDI (Nirav Modi's company) and CPRE (the company that owned Nirav Modi's personal residence) raises a strong inference of fraud, particularly as there appears to be no business reason for a jewelry business to pay the expenses associated with a personal residence, and given that Nirav Modi retained possession of the apartment. *See* Compl. ¶¶ 14, 53, 284.

A factor that weighs heavily supports a of finding fraudulent intent is the lack of consideration for the transfers. CPRE Challenges that contention, arguing that that there was consideration for the CPRE transfers, stating "the transferor/Debtor paid $5,856,335 to or for the benefit of CPRE between 2011 and 2017 and received $6,000,000 for CPRE in 2017." LLC Memo at 17. But CPRE is conflating the money paid for the CPRE Equity Transfer with the other CPRE transfers. The Trustee pleads that the $6 million paid to FGI was paid for the *equity*

in CPRE. Complaint ¶ 358.  The fact that the $6 million payment is unrelated to the CPRE

Transfers is underscored by the fact that the pattern of payment of the Essex House expenses

continued after CPRE's equity had been transferred.  Compl. ¶ 352.  CPRE does not identify any

other consideration or value provided to FDI to rebut the allegations that such transfers lacked

consideration.

CPRE next argues that the Trustee has not sufficiently plead that the Debtors were

rendered insolvent by the CPRE transfers.  *Id.* at 17-20.  In assessing this argument, the Court is

mindful that a presumption of insolvency arises once a lack of fair consideration is shown for a

fraudulent conveyance claim under New York law but no such presumption exists for a claim of

fraudulent conveyance made pursuant to federal law.  *In re Vill. Red Rest. Corp.*, 2021 WL

3889793, at *12.  Applying these principles to here, the Court concludes that the Trustee is

entitled to a presumption of insolvency for his claim made pursuant to NY DCL § 273, because

the transfer is alleged to have been made without consideration.  *See supra* Section V(c); *see also*

*In re BICOM NY, LLC*, 633 B.R. 25, 46-47 (Bankr. S.D.N.Y. 2021).  But for the Trustee's

fraudulent conveyance claims under federal law, the Court concludes that the Trustee has not

met his burden to adequately plead the transferor's financial condition on the date of insolvency.

The Trustee generally asserts that insolvency has been adequately plead, pointing to allegations

that the Debtors' businesses collapsed and Debtors had incurred a $1 billion liability to PNB,

Compl. ¶ 193, and the fact that hundreds of millions of dollars in cash transfers and inventory

shipments among the Debtors, U.S. Affiliates, and Shadow Entities occurred, Compl. ¶ 99.  But

these general allegations do not identify FDI's financial condition on these transfers, and do not

apply the "balance sheet" test required to show insolvency.  *See In re Vivaro Corp.*, 524 B.R. at

553 (finding that general assertions that a company had negative equity without the underlying

figures were insufficient to plead insolvency); *O'Toole v. Karnani (In re Trinsum Grp., Inc.)*, 460 B.R. 379, 392–93 (Bankr. S.D.N.Y. 2011) (finding that statements regarding net income figures and cash flow were insufficient to plead insolvency). While it is true that insolvency is typically a question of fact, *see, e.g., Tops Holding II Corp.,* 646 B.R. at 658, the trustee has failed to plead any facts regarding the debtors insolvency, thus failing to state a prima facie claim. Accordingly, CPRE's motion to dismiss Count IX is granted. *See Sama v. Mullaney (In re Wonderwork, Inc.)*, 611 B.R. 169, 219 (Bankr. S.D.N.Y. 2020) (granting dismissal without prejudice to re-plead.).[47]

## VI.   **Personal Jurisdiction**

Defendant Purvi Mehta moves to dismiss the complaint for lack of personal jurisdiction. For the reasons that follow, however, the Court rejects her request.[48]

### A.  **Standard**

Fed. R. Civ. P. 12(b)(2), incorporated through Bankruptcy Rule 7012(b), provides for dismissal for lack of personal jurisdiction. *See* Fed. R. Bankr.P. 7012(b). A "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *In re Platinum & Palladium Antitrust Litig.*, 2017 U.S. Dist. LEXIS 46624, at *122 (S.D.N.Y. Mar. 28, 2017) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d

---

[47]     In its Reply, CPRE also argues for the first time that CPRE cannot be held liable because it was neither the transferee of the asset nor the beneficiary of the transfer. LLC Reply at 17 (invoking the "mere conduit" doctrine). As it is well settled that arguments raised for the first time in reply briefs are waived, the Court declines to consider this argument. *Farmer v. United States*, 2017 WL 3448014, at *3 (S.D.N.Y. Aug. 10, 2017*); accord McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). In any event, "the 'mere conduit' defense is a fact-intensive inquiry, it is not properly resolved at the motion to dismiss stage where the affirmative defense is not clearly established on the face of the complaint." *Sec. Inv. Prot. Corp. V. Bernard L. Madoff Investment Sec. LLC*, 2023 WL 5671544, at *3 (S.D.N.Y. Sept. 1, 2023) (citing *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74–75 (2d Cir. 1998)). Accordingly, CPRE's invocation of the "mere conduit" defense does not defeat the Trustee's claims at the pleading stage.

[48]     Defendant Neeshal Mehta also moved to dismiss for lack of personal jurisdiction; however, as previously noted, the Trustee has discontinued the action as to Neeshal Mehta. *See supra* note 2.

Cir. 2010)).  To survive a Rule 12(b)(2) motion at the pleading stage, however, a plaintiff need

only make a *prima facie* showing that jurisdiction exists.  *Id.*; *see also SPV OSUS, Ltd. v. UBS

AG*, 882 F.3d 333, 342 (2d Cir. 2018).  To do so, a plaintiff must rely on its own affidavits and

supporting materials to make the *prima facie* showing and is required to include factual

allegations that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction

over the defendant.  *See Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,

418 B.R. 75, 79 (Bankr. S.D.N.Y. 2009) (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d

899, 904 (2d Cir. 1981)); *SPV OSUS*, 882 F.3d at 342–43 (citing *Chloe v. Queen Bee of Beverly

Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).  A court is permitted to consider materials outside

of the pleadings and all allegations are construed in the light most favorable to the plaintiff.  *In re

Stillwater Capital Partners.*, 851 F. Supp. 2d at 566–567. Doubts are resolved in the plaintiff's

favor, notwithstanding a controverting assertion by the moving parties.  *Id.*

Federal Rule of Bankruptcy Procedure 7004 sets forth the requirements of personal

jurisdiction in bankruptcy.  Specifically, Rule 7004(f) states that

> If the exercise of jurisdiction is consistent with the Constitution and laws of the
> United States, serving a summons or filing a waiver of service in accordance with
> this rule or the subdivisions of Rule 4 F.R.Civ.P. made applicable by these rules is
> effective to establish personal jurisdiction over the person of any defendant with
> respect to a case under the Code or a civil proceeding arising under the Code, or
> arising in or related to a case under the Code

Fed. R. Bankr. P. 7004(f).  In other words, under Rule 7004(f), a court has personal jurisdiction

over a defendant if three requirements are met: (1) service of process has been made in

accordance with Bankruptcy Rule 7004 or Civil Rule 4; (2) the court has subject matter

jurisdiction under Section 1334 of the Bankruptcy Code; and (3) exercise of jurisdiction is

consistent with the Constitution and the laws of the United States.  10 *Collier on Bankruptcy* ¶

7004.07 (16th ed. 2023).

In assessing whether the exercise of personal jurisdiction is consistent with the

Constitution, courts evaluate the quality and nature of the defendant's contacts with the forum

under a totality of the circumstances or, in other words, to determine whether or not the

defendant satisfies the "minimum contacts" test. *Charles Schwab Corp. v. Bank of Am. Corp.*,

883 F.3d 68, 82 (2d Cir. 2018) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732

F.3d 161, 170 (2d Cir. 2013)).  When determining whether a defendant has minimum contacts

with the forum state, a distinction is made between specific and general jurisdiction. *SPV OSUS*

882 F.3d at 343 (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.

1996)).  Specific jurisdiction exists when a court exercises personal jurisdiction over a defendant

in a suit arising out of or related to the defendants' contacts with the forum. *Id.*  A court's

general jurisdiction on the other hand is based on defendant's general business contacts with the

forum state and allows a court to exercise its power in a case where the subject matter of the suit

is unrelated to those contacts. *Metro. Life Ins. Co.*, 84 F.3d at 568 (citing *Helicopteros*

*Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 & nn.8–9 (1984).

The Trustee concedes that this Court does not have general jurisdiction over Ms. Mehta,

therefore, the Court will turn to specific jurisdiction.  Trustee Opposition at 66, n.22.  The parties

debate whether to evaluate Ms. Mehta's contacts only with New York state or her contacts with

the United States as a whole, addressing whether to apply the federal law on personal jurisdiction

or a state's particular jurisdictional rules. *In re Deak & Co., Inc.*, 63 B.R. 422, 430 n.8 (Bankr.

S.D.N.Y. 1999).  The Court concludes that it is the former, as a defendant's national contacts

"are appropriately considered a jurisdictional base because the [Bankruptcy] Code provides for

nationwide service." *Id.*  Indeed, bankruptcy courts have applied the federal minimum contacts

test to foreign corporations and persons. *Id.* at 430.  In *Enron Corp. v. Arora (In re Enron*

76

*Corp.)*, 316 B.R. 434 (Bankr. S.D.N.Y. 2004), for example, the Court held that only a *federal*

minimum contacts test is required.  *Id.* at 444 (emphasis added).  The Court in *Enron* recognized

that, even after the 1996 amendments to the bankruptcy rules for service, courts have continued

to recognize that only a federal "minimum contacts" analysis applies because

> the question of whether [the defendant] had minimum contacts with [the
> individual state] is irrelevant . . . because when an action is filed in federal court
> on 'related to' jurisdiction, the sovereign exercising authority is the United States,
> not the individual state where the federal court is sitting and, therefore, a court
> need only ask whether [the defendant] has the minimum contacts with the United
> States such that subjecting it to personal jurisdiction does not offend the Due
> Process Clause of the Fifth Amendment of the United States Constitution.

*Id.* (citing *Owens-Illinois, Inc. v. Rapid American Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630

(4th Cir. 1997)).  Moreover, a review of the Advisory Committee notes on the 1996 amendments

to the service rules led the *Enron* court to conclude that the "drafters' purpose with subdivision

(f) was to incorporate the service provisions of the 1993 amended Rule 4, not to create

limitations on personal jurisdiction such as Rule 4(k)(2)."  *Enron*, 316 B.R. at 446, n.9.[49]

     If sufficient minimum contacts with the United States exist, the Court turns to the

second part of the inquiry to examine the reasonableness of exercising personal jurisdiction over

the defendant under the circumstances.  The Court must determine whether exercising personal

jurisdiction over the defendant would "offend 'traditional notions of fair play and substantial

justice.'"  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 117

(Bankr.S.D.N.Y.2011) (quoting *Asahi Metal Indus. Co., Ltd. v. Super. Ct. Cal.*, 480 U.S. 102,

---

[49]      The *Enron* court did recognize an Eleventh Circuit opinion that may limit this governing principle.  *Enron*,
316 B.R. 446-47.  In *Republic of Panama v. BCCI Holding (Lux.) S.A.*, 119 F.3d 935 (11th Cir. 1997), the Eleventh
Circuit held that nationwide personal jurisdiction is presumptively necessary to further statutory objectives where
federal statutes provide for nationwide service of process, but that in "highly unusual cases," inconvenience caused
by a plaintiff's choice of forum might still rise to a violation of due process rights.  *Enron*, 316 B.R. at 443 (citing
*Republic of Panama*, 119 F.3d at 947-48).  Judge Gonzalez declined to adopt this limited exception, but also
concluded that the exception had not been met.  *Id.* at 446-47.  Similarly, the Court here concludes that the exception
does not apply but that, if it did, the exception has not been met given the analysis set forth above.

113, (1987) (internal quotations omitted); *Metro. Life Ins. Co.*, 84 F.3d at 567; *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) ("Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.") (internal quotations omitted).  In the international context, "the emphasis is on the fairness and reasonableness of requiring a defendant to appear in the United States."  *In re Deak & Co., Inc.*, 63 B.R. at 430.  In determining jurisdiction over an international alien, courts have used the following factors to assist in the analysis:

> a) the extent of the defendant's purposeful interjection into the forum state; b) the burden on the defendant of defending in the forum; c) the extent of conflict with the sovereignty of defendant's state; d) the forum state's interest in adjudicating the dispute; e) the most efficient judicial resolution of the controversy; f) the importance of the forum to plaintiff's interest in convenient and effective relief; and g) the existence of an alternative forum.

*Id.* (*citing Insurance Co. of North America v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir. 1981)).

Applying all these principles here, the Court concludes that there is personal jurisdiction based on Ms. Mehta's conduct in the United States relating to the claims in the Complaint and that the exercise of jurisdiction here is reasonable.

### B.  Minimum Contacts

Ms. Mehta argues that she has insufficient contacts to assert specific jurisdiction.  Mehta Memo at 13 (asserting that very few allegations in the Trustee's Complaint involve Ms. Mehta; the allegations that include Ms. Mehta are "overwhelmingly foreign in nature" and any United States-based allegations are too attenuated).  But the Court disagrees, concluding that there are

sufficient minimum contacts under a federal minimum contacts standard based on the RICO conspiracy alleged here.

The Trustee makes over fifty references to Ms. Mehta within his Complaint regarding her involvement with entities in the United States as part of the alleged wrongdoing.  A few of these most clearly make the jurisdictional case.  These include: 1) Ms. Mehta's integral role in financing and purchasing multiple apartments in New York City; 2) Ms. Mehta's creation of the Ithaca Trust, an irrevocable trust established under Delaware Law; and 3) Ms. Mehta's equity ownership of Twin Fields.

First, Ms. Mehta was involved in significant transfers of money used to purchase assets in the United States.  In March and June of 2017, Ms. Mehta wired over $2 million to Bhansali who then used those funds to purchase an apartment at 50 Riverside Boulevard in New York City ("Riverside Apartment").  Compl. ¶ 308.  In May and June of 2017, Ms. Mehta also loaned $34 million to Ami Modi, of which $18 million is alleged to have been sourced from transfers from Shadow Entity Fine Classic, to purchase another apartment located at 435 E. 52nd Street in New York City (the "River House Apartment").  Compl. ¶¶ 312-314. While the sale ultimately fell through, the transfer itself was made.  Compl. ¶ 315.

Ms. Mehta was also involved in transactions involving U.S. assets and entities.  In July 2017 Ms. Mehta personally contracted to purchase the Ritz Carlton Apartment for $25 million. Compl. ¶ 316.  Ms. Javeri wired $2.5 million to Ms. Mehta as a "partial repayment" for the loan previously made for the River House Apartment.  That same month, CPS50 (a New York LLC) was formed with Ms. Mehta as the sole member; the contract of sale for the Ritz Carlton Apartment was subsequently transferred from Ms. Mehta to CPS50.  Compl. ¶¶ 318, 332.

Second, Ms. Mehta executed an Ithaca Trust Agreement in August 2017, listing herself as a residual beneficiary, to create the Ithaca Trust as an irrevocable trust under Delaware law. Compl. ¶¶ 322-23.  Later that month, Ms. Mehta executed an agreement under which she assigned her interest in the Ritz Carlton Apartment to CPS50P LLC and then, subsequently, she assigned her membership interest in CPS50 to the Ithaca Trust. Compl. ¶¶ 332-335.A

Third, Ms. Mehta purposely availed herself of the privilege of doing business in the United States by virtue of her ownership of entities integral to laundering proceeds of the Bank Fraud, such as Twin Fields.  Along with Deepak Modi (Nirav Modi's father), Ms. Mehta owned 100% of the equity in Twin Fields, a Delaware Corporation.  Compl. ¶ 169.  Twin Fields is alleged to be a major conduit used to launder proceeds of the Bank Fraud, including a transfer of over $26 million from Fine Classic, the Shadow Entity owned by Ms. Mehta  *Id.*  ¶¶ 175-180.  It is alleged that more than $60 million was laundered through Twin Fields.  *Id.* at ¶ 183.[50]

While Ms. Mehta argues that her involvement in these entities is simply a passive one, the Trustee's allegations make clear that her involvement in these companies was part of a regular pattern of doing business in the United States.

The effects of Ms. Mehta's contact with the United States further supports a finding of minimum contacts sufficient to establish personal jurisdiction.  "The effects test is a theory of personal jurisdiction typically invoked where [ ] the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff.  In such circumstances, the exercise

---

[50] Moreover, the transactions recounted above are not isolated but instead reflect the type of activity Ms. Mehta engaged in throughout the course of a few years.  *See, e.g.*  Compl. ¶ 362 (in early 2018, Ms. Mehta wired $1 million to the Ithaca Trustee, which was used as a capital contribution to CPS50; those funds were eventually used to pay an interior design firm that provided services to the Ritz Carlton Apartment); Compl. ¶ 308, 310 (in early 2017 Ms. Mehta wired $1.5 million (funds that were likely proceeds of the Bank Fraud) to Mr. Bhansali; weeks later, Mr. Bhansali then purchased an apartment in New York City).

of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its

conduct at the forum." *Licci*, 732 F.3d at 173; *but see Gordon v Invisible Children, Inc.*, 2015

U.S. Dist. LEXIS 129047, at *16-17 (S.D.N.Y. Sep. 24, 2015) (citing *Tarsavage v. Citic Trust

Co., Ltd.*, 3 F. Supp. 3d 137, 145 (S.D.N.Y. 2014)) ("It is not sufficient that conduct incidentally

had an effect in the forum, or even that effects in the forum were foreseeable. Instead, the

defendant must have intentionally caused—i.e., expressly aimed to cause—an effect in the forum

through his conduct elsewhere.") The effects of Ms. Mehta's activities, whether directly

effectuated by her or conducted through the entities she owned, clearly had an impact on the

Debtors. In particular, the purchase of the Ritz Carlton Apartment and the divestment of CPRE

from a U.S. Affiliate to the Ithaca Trust directly harmed the Debtors (and, by extension, their

creditors). *See, e.g.*, Compl. ¶¶ 308-35.

### C. Conspiracy Jurisdiction

As another basis for personal jurisdiction, the Trustee relies on the conspiracy alleged in

the Complaint.[51] Under a conspiracy theory of jurisdiction, the plaintiff must allege that (1) a

conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's

overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-

conspirator to jurisdiction in that state. *Rudersdal v. Harris*, 2022 U.S. Dist. LEXIS 16004, at

*35 (S.D.N.Y. Jan. 28, 2022) (citing *Charles Schwab*, 883 F.3d at 87).

As already discussed, the Court concludes that the Trustee has adequately plead the

existence of a conspiracy and that Ms. Mehta participated in that conspiracy. *See supra* Sections

II, IV(c)(1). Ms. Mehta argues that the Complaint does not sufficiently allege that the co-

conspirators had sufficient contacts with the United States and the majority of the transactions

---

[51]     The Trustee asserts jurisdiction over Ms. Mehta based on the conspiracy theory of jurisdiction only as to
Counts one and two of the Complaint. Trustee Opposition at 70, n.24.

and acts underlying the conspiracy occurred overseas and were directed at India.  Mehta Memo

at 18.  But again, the Court disagrees.  As discussed above, the Trustee has more than adequately

plead that the fraud was aimed at the Debtors and U.S. Affiliates.  *See supra* Section I; *see also*

*In re Firestar Diamond, Inc.*, 634 B.R. at 284–85.  Ms. Mehta's argument also fails given the

extensive allegations of United States context associated with the conspiracy, as set forth in the

section of the Complaint entitled "Involvement of the [Debtors and U.S. Affiliates'] Directors

and Officers in the Bank Fraud" as well as the allegations that millions of dollars and inventory

flowed from the [Debtors and U.S. Affiliates] to India in furtherance of the Bank Fraud.  Compl.

¶¶ 100–104, 125.  And again, the Trustee has plead that Ms. Mehta engaged in actions targeted at

the United States in furtherance of the Bank Fraud, particularly with regard to the purchase of the

Ritz Carlton Apartment.  *See generally* Compl. ¶¶ 312–18; 322-347.[52]

---

[52]    The Trustee also cites to New York's long arm statute as a basis for asserting personal jurisdiction over Ms. Mehta.  *See* Trustee Opposition at 73.  *Cf. Motors Liquidation Co. Avoidance Action Trust v. JP Morgan Chase Bank* (*In re Motors Liquidation Co.*), 565 B.R. 275, 286 (Bankr. S.D.N.Y. 2017) ("As the New York long arm statute does not reach as far as the Constitution permits, if the New York statute is met, due process is generally considered to be satisfied.")  N.Y. C.P.L.R. § 302(a)(1) allows this Court to exercise jurisdiction over a defendant who "transacts any business within the state or contracts anywhere to supply goods or services in the state."  N.Y. C.P.L.R § 302.  To determine whether a non-domiciliary has "transacted business" in New York, the Second Circuit has identified four factors to guide this inquiry, which are: 1) whether the contract at issue requires parties "to send notices and payments into [New York] or subjects them to supervision" there, (2) whether the contract was negotiated and executed in New York, (3) whether the contract had a New York or some other choice of law provision, and (4) whether the defendant has "an on-going contractual relationship with a New York corporation".  *Hinrichsen v. Hinrichsen Found.*, 2018 U.S. Dist. LEXIS 4585, at * 4 (S.D.N.Y. Jan. 9, 2018) (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22-23 (2d Cir. 2004)).  Section 302(a)(1) is a "'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities [in New York] were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Nationsbank, N.A., v. Macoil, Inc. (In re Med-Atlantic Petroleum Corp.)*, 233 B.R. 644, 657 (Bankr. S.D.N.Y. 1999).

Applying these principles here, the Court concludes that Ms. Mehta's contact with New York also satisfies the long arm statute.  Ms. Mehta's contacts with New York primarily revolve around her contracting to purchase three apartments here, of which only two closed.  Compl. ¶¶ 308-318.  These real estate transactions in New York are sufficient to satisfy the "single act" requirement and demonstrate purposeful availment of the forum.  *See CNY Fair Hous., Inc. v. Welltower Inc*., 588 F. Supp. 3d 282, 294 (N.D.N.Y. 2022) (Purposeful availment occurs when a non-domiciliary "seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship.") (quoting *D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro,* 29 N.Y.3d 292 (2017)).

### D. Fair Play and Substantial Justice

In determining the second prong of the personal jurisdiction inquiry, this Court assesses the reasonableness of the Court exercising jurisdiction over Ms. Mehta. A defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Licci*, 732 F.3d at 173 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)); *see also Tymoshenko v. Firtash*, 2013 WL 1234943, at *5 (S.D.N.Y. Mar. 27, 2013). The relevant factors to consider include: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum . . . in adjudicating the case; and (3) the plaintiff's interest in obtaining convenient and effective relief." *Official Comm. of Unsecured Creditors of Arcapita, Bank. B.S.C. v. Bahr. Islamic Bank*, 549 B.R. 56, 64 (S.D.N.Y. 2016) (quoting *Licci*, 732 F.3d at 170). In assessing these factors, this Court finds exercise of personal jurisdiction over Purvi Mehta to be reasonable. *See generally Arcapita*, 549 B.R. at 71 (citing *Licci*, 732 F.3d at 170; *Bank Brussels*, 305 F.3d at 129).

Ms. Mehta complains that the exercise of jurisdiction over her would be a substantial burden, mainly due to her far distance from the United States. This first factor, however, is mitigated by the conveniences of modern communication and transportation. *Licci*, 732 F.3d at 174. Moreover, the mere fact that Ms. Mehta must defend herself in a foreign legal system does not render the exercise of personal jurisdiction here to be improper. *See Asahi* Metal, 480 U.S. at 114. The second and third factors weigh in favor of the Court's exercise of jurisdiction over Ms. Mehta. The United States has a strong interest in adjudicating claims that arise under its Bankruptcy Code so that both creditors and debtors can obtain the remedies and relief that the United States Congress has determined are fair and equitable. *Arcapita*, 549 B.R. at 71 (citing *Chais*, 440 B.R. at 281); *U.S. Lines, Inv. v. GAC Marine Fuels Ltd. (In re McLean Indus. Inc.)*,

68 B.R. 690, 699 (Bankr. S.D.N.Y. 1986). Additionally, the Trustee has a strong interest in obtaining convenient and effective relief. *Id*. at 72. Given that the balance of factors weigh in the Trustee's favor, the exercise of personal jurisdiction over Ms. Mehta comports with constitutional due process.[53]

## **CONCLUSION**

For the reasons stated above, the Defendants' motions to dismiss are denied, with the exception of the LLC Defendants' motion to dismiss Count IX, which is granted without prejudice. The Trustee should settle an order on five days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon opposing counsel.

Dated: White Plains, New York
        October 13, 2023

                                        */s/ Sean H. Lane*
                                        UNITED STATES BANKRUPTCY JUDGE

---

[53]    The Trustee raises additional bases to assert personal jurisdiction, which the Court need not address given the analysis above.