**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK** **FOR PUBLICATION**

---------------------------------------------------------x

In re: Chapter 11

Firestar Diamond, Inc., *et al.*, Case No. 18-10509 (SHL)

Debtors. (Jointly Administered)

---------------------------------------------------------x

Richard Levin,
Chapter 11 Trustee of Firestar Diamond, Inc., *et al*
Plaintiff,

v. Adv. No. 20-01054 (SHL)

Ami Javeri (A/K/A Ami Modi); Purvi Mehta (A/K/A Purvi Modi); Nehal Modi; Neeshal Modi; Central Park Real Estate, LLC; Central Park South 50 Properties, LLC; Trident Trust Company (South Dakota) Inc., solely as Trustee of the Ithaca Trust; et al.,
Defendants.

---------------------------------------------------------x

Richard Levin,
Chapter 11 Trustee of Firestar Diamond, Inc., *et al.*,
Plaintiff,

v. Adv. No. 19-01102 (SHL)

Nirav Deepak Modi, Mihir Bhansali, and Ajay Gandhi,
Defendants.

---------------------------------------------------------x

# MEMORANDUM OF DECISION

**A P P E A R A N C E S:**

**JENNER & BLOCK LLP**
*Attorneys for the Chapter 11 Trustee, Richard Levin, Esq.*
919 Third Avenue
New York, New York 10022
By: Carl N. Wedoff, Esq.

-and-

353 North Clark Street
Chicago, Illinois 60654
By: Angela M. Allen, Esq.
William A. Williams, Esq.
Vincent E. Lazar, Esq.

**ROGER J. BERNSTEIN**
*Attorney for Ami Javeri*
535 Fifth Avenue, 23rd Floor
New York, New York 10017
By: Roger J. Bernstein, Esq.

**AMINI LLC**
*Attorneys for Ami Javeri*
131 West 35th Street, 12th Floor
New York, New York 10001
By: Bijan Amini, Esq.
Avery Samet, Esq.
Reece Dameron, Esq.[1]

**WHITE & WILLIAMS LLP**
*Attorneys for Mihir Bhansali*
7 Times Square, Suite 2900
New York, NY 10036
By: Thomas Butler, Esq.
Nicole A. Sullivan, Esq.

**LYNCH ROWIN LLP**
*Attorneys for Trident Trust Company (South Dakota) Inc., Solely as Trustee of the Ithaca Trust*
50 Main Street, Suite 1000
White Plains, New York 10606
By: Marc Rowin, Esq.

[1] Amini LLC and Roger J. Bernstein appeared on the brief on behalf of Ami Javeri; however, both have since withdrawn as counsel. *See* Order on Amini LLC's and Roger Bernstein's Motions to Withdraw [ECF No. 186, Adv. Pro. 20-1054]. Ms. Javeri is now represented by Morritt Hock & Hamroff LLP. *See* ECF No. 194, Adv. Pro. 20-1054.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are two motions filed by Richard Levin ("Trustee"), as Trustee for the Liquidating Trust of Firestar Diamond, Inc., Old AJ, Inc. f/k/a A. Jaffe, and Fantasy, Inc. (collectively, the "Debtors") seeking the attachment of the property of two Defendants in the above-captioned adversary proceedings.[2] In one, the Trustee seeks to attach the personal residence of Defendant Mihir Bhansali located at 50 Riverside Boulevard, Apt. 24A, New York, New York 10069 (the "Bhansali Residence") and for authorization to conduct discovery as to Mr. Bhansali's assets under N.Y. C.P.L.R. §§ 6212 and 6220. *See* Plaintiff's Motion for an Order of Attachment and Other Provisional Relief against Defendant Mihir Bhansali [ECF No. 97, Adv. Pro. 19-1102] ("the Bhansali Attach. Motion"). In the second, the Trustee invokes N.Y. C.P.L.R. § 6211(b) to confirm the attachment of a variety of properties and interests that Defendant Ami Javeri a/k/a Ami Modi (together with Mr. Bhansali, the "Defendants") owns, controls, or from which she benefits, including real property located at 50 Central Park South, Unit 33, New York, NY 10019 (the "Ritz Carlton Apartment") and 160 Central Park South, Unit 3601, New York, NY 10019 (the "Essex House Apartment," and together with the Ritz Carlton Apartment, the "Apartments"); the assets at issue also include financial assets held by other entities. *See* Plaintiff's Motion to Confirm Order of Attachment [ECF No. 107, Adv. Pro. 20-1054] (the "Javeri Motion to Confirm"). The Trustee argues that attachment of both

[2] Certain information submitted in connection with the motions was filed under seal. To avoid divulging any confidential information, a copy of the full Memorandum of Decision in this case was filed under seal. *See* ECF No. 207, Adv. Pro. 20-1054; ECF No. 138, Adv. Pro 19-1102. The Court then requested that the parties identify any confidential information in that sealed version of the Memorandum of Decision. After the parties submitted letters to the Court containing proposed redactions, the Court held a hearing on February 7, 2024, at which time the Court ruled on the redaction requests. This public version of this Memorandum of Decision reflects the redactions approved at that hearing.

Defendants' property is necessary to prevent the dissipation of assets needed to pay any judgment obtained against these Defendants in these adversary proceedings, both of which contain expansive and related allegations of fraud. *See* Memorandum of Law in Support of Plaintiff's Motion to Confirm Order of Attachment at 2 [ECF No. 108, Adv. Pro. 20-1054] ("Confirm Mem."); Memorandum of Law in Support of Plaintiff's Motion for an Order of Attachment Against Mihir Bhansali at 1 [ECF No. 98, Adv. Pro 19-1102] ("Attach. Mem.").

For the reasons set forth below, the Bhansali Attachment Motion is granted. The Javeri Motion to Confirm is granted in large part but denied in part.

## I. Background and Procedural History

Familiarity with the underlying facts of the Debtors' bankruptcy case and these adversary proceedings is presumed given the Court's prior extensive written decisions. *See Levin v. Modi (In re Firestar Diamond Inc.),* 634 B.R. 265 (Bankr. S.D.N.Y. 2021) (decision denying the motion to dismiss RICO claims against executives who worked at the Debtors) ("Executive RICO Decision"); *Levin v. Javeri (In re Firestar Diamond, Inc.),* 654 B.R. 836 (Bankr. S.D.N.Y. 2023) (decision denying in large part the motions to dismiss RICO conspiracy claims against family members of the Debtors' beneficial owner Nirav Modi) ("Family RICO Decision").[3] But a brief overview is necessary to understand the pending motions.

The Debtor Firestar Diamond Inc. operated a wholesale jewelry business in New York. Claims Decision II at 534. Firestar Diamond Inc. and the two other corporations constituting the Debtors—Old AJ, f/k/a A. Jaffe, Inc. and Fantasy, Inc.—were wholesalers of finished jewelry to major retailers including Macy's, Zales, and Kay's, among others. Claims Decision I at 163.

---

[3] Additional background for these cases is set forth in other decisions previously issued by this Court, including *In re Firestar Diamond, Inc.*, 615 B.R. 161 (Bankr. S.D.N.Y. 2020) (addressing claims objections) ("Claims Decision I"); *In re Firestar Diamond, Inc.*, 643 B. R. 528 (Bankr. S.D.N.Y 2022) (same) ("Claims Decision II").

The Debtors were part of the international diamond and jewelry business of Nirav Modi, who owned and controlled the Debtors and numerous other affiliated diamond and jewelry businesses in the United States, India, Belgium, Hong Kong, the United Kingdom, and the United Arab Emirates. Claims Decision II at 534. Mr. Modi is alleged to have utilized the Debtors and the other entities that he controlled to run a years long, international scheme to "obtain loans, credits, or other funds under false pretenses and without collateral" and siphon the proceeds for the benefit of himself and his co-conspirators (the "Bank Fraud"). Executive RICO Decision at 277-78. The alleged Bank Fraud involved Mr. Modi and his co-conspirators fraudulently obtaining Letters of Understanding ("LOUs") and siphoning those funds for their own benefit.[4] *Id.* at 277. According to Indian authorities, the perpetrators used a series of entities (the "Shadow Entities") that "posed as independent third parties in sham transactions to import gemstones and other jewelry related goods valued at billions of dollars in order to obtain bank financing in the form of LOUs." Claims Decision I at 163 (citing the Report of John J. Carney, Examiner at 28-30 [ECF No. 394, Case No. 18-10509] (the "Examiner Rep.").[5] The Indian Central Bureau of Investigation contends that Mr. Modi and his co-conspirators obtained approximately $4 billion from Punjab National Bank through the fraudulently issued LOUs, with approximately $1 billion worth of LOUs remaining unpaid. *Id*. (citing the Examiner Rep. at 27, 36).

The Trustee further alleges that Mr. Modi and his co-conspirators' actions in connection with the Bank Fraud also defrauded the Debtors. Specifically, the Trustee alleges that Mr. Modi (the beneficial owner), Mr. Bhansali (the Debtors' Chief Executive Officer), and Ajay Gandhi

---

4 *See* Claim Decision I at 163, n. 2 for a more detailed explanation of the mechanics of LOUs.

5 The Examiner Report is annexed to the Declaration of Richard Levin In Support of Plaintiff's Motion To Confirm Order Of Attachment [ECF 109, Adv. No. 20-1054] as Exhibit 9 and is also annexed to the Declaration of Richard Levin In Support of Plaintiff's Motion for an Order of Attachment and Other Provisional Relief against Defendant Mihir Bhansali [ECF No. 99, Adv. Pro. 19-1102] as Exhibit 3.

(the Debtors' Chief Financial Officer) conducted several fraudulent schemes to defraud the Debtors. Family RICO Decision at 856; *see also* Executive RICO Decision at 277. For example, the Trustee alleges that Mr. Modi and his co-conspirators "depleted the Debtors' tangible assets through fraudulent transfers to overseas entities" through a scheme to "restructure" the entities controlled by Mr. Modi. Executive RICO Decision at 285; Family RICO Decision at 859.

Once the Bank Fraud was uncovered, Punjab National Bank—which had provided LOUs to entities controlled by Mr. Modi—filed a complaint against Mr. Modi and several of his associated entities; that complaint alleged "the largest bank fraud in Indian history" against Punjab National Bank and other banks. Claims Decision II at 538 (citing the Examiner Rep. at 4). Less than a month after that complaint was filed, the Debtors filed for Chapter 11 protection in February 2018. *Id.; see also* ECF No. 1, Case No. 18-10509. The exposure of the Bank Fraud directly resulted in the Debtors' bankruptcy, as the Indian authorities seized assets and properties belonging to Mr. Modi, including the factories that produced the merchandise sold by the Debtors and the businesses that provided back office and support functions for the Debtors. Declaration of Mihir Bhansali, President of the Debtors, Containing Information Required Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Debtors' First Day Motion ¶¶ 33-42 [ECF No. 2, Case No. 18-10509] ("Bhansali 1007-2 Decl."). This Court appointed Mr. Carney to investigate whether the Debtors and their senior officers and directors were involved in the alleged fraud. *See* Order Pursuant to 11 U.S.C. § 1104(c) Directing the Appointment of an Examiner, dated April 13, 2018 [ECF No. 103, Case No. 18-10509]. After a four month investigation, Mr. Carney issued his Examiner Report of over 170 pages. The Examiner Report was based on approximately 45 interviews with Debtors' employees and other parties in interest, site visits to the Debtors' facilities, and review of more than five million documents provided in

response to document and deposition subpoenas. Examiner Rep. at 15, 17-18. It found substantial evidence that the Debtors and their officers were involved in the Bank Fraud. *See generally*, Examiner Rep.; *see also* Claims Decision II at 538. The Examiner Report detailed the Bank Fraud scheme, the role that the Debtors and the Debtors' executives played in the scheme, and the ultimate impact of the fraud on the Debtors' businesses. *Id.*

When the Debtors' assets were scheduled for sale, it came to light that Mr. Bhansali had been in contact with Mr. Modi, who at the time was a fugitive from justice. Examiner Rep. at 10, 21-22. When Mr. Bhansali represented that he would assert his Fifth Amendment rights in response to questions about these communications, the Court appointed a Chapter 11 Trustee to administer these cases. *See* ECF No. 216, Case No. 18-10509. The Chapter 11 Trustee then proceeded to administer the Debtors' cases. Claims Decision II at 538-39. After confirmation of a Chapter 11 liquidation plan in 2020, the Chapter 11 Trustee was appointed as the Liquidating Trustee and retained all the Chapter 11 Trustee's rights and defenses. *Id.* at 539.

As part of his obligations to pursue all claims owned by the Debtors' estates, the Trustee commenced two adversary proceedings. The first adversary proceeding alleges that Mr. Modi, Mr. Bhansali, and Mr. Gandhi, (together, the "Executive Defendants") engaged in a widespread fraud and money laundering scheme in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), as well as various state law claims. *See* First Amended Complaint Against Insiders for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, Corporate Waste, and Violations of the Racketeering Influenced Corrupt Organizations Act [ECF No. 28, Adv. No. 19-01102] (the "Executive Defendants Complaint"). The second adversary proceeding alleges that various members of Mr. Modi's family—and their entities—conspired to participate in the RICO conspiracy and helped to fraudulently convey assets away from the Debtors. The defendants in this second adversary include Purvi Mehta

(Mr. Modi's sister), Ms. Javeri (Mr. Modi's wife), Nehal Modi (Mr. Modi's brother), Central Park Real Estate, LLC ("CPRE") and Central Park South 50 Properties, LLC ("CPS50") (collectively the "Modi Family Defendants"). *See* Complaint to Avoid and Recover Actual Fraudulent Transfers and for Damages for Conspiracy to Violate the Racketeering Influenced Corrupt Organizations Act [ECF No. 1, Adv. Pro. 20-1054] (the "Modi Family Complaint").

The Executive Defendants moved to dismiss the Executive Defendants Complaint, generally alleging, *inter alia*, that the Trustee had not adequately plead predicate acts necessary to establish a RICO claim, that the Trustee lacked standing to assert a RICO claim, and that the Trustee was barred from recovery under the Wagoner Rule[6] and the *In Pari Delicto*[7] doctrine. *See generally* Executive RICO Decision. That motion was denied. *Id.* The Modi Family Defendants similarly moved to dismiss the Modi Family Complaint, raising many of the same arguments but also asserting that the Trustee had failed to adequately allege that they had conspired to participate in the RICO scheme. *See generally*, Family RICO Decision. That motion was also denied in large part. *Id.*

After the Court denied the Executive Defendants' motions to dismiss, the Trustee filed the Bhansali Attachment Motion. *See* Bhansali Attach. Motion. It seeks to attach the Bhansali Residence, which was purchased in March 2017 by Mr. Bhansali and his wife, Rakhi Bhansali.

---

6 "The *Wagoner* rule stands for the 'well-settled proposition that a bankrupt corporation, and by extension, an entity that stands in the corporation's shoes, lacks standing to assert claims against third parties for defrauding the corporation where the third parties assisted corporate managers in committing the alleged fraud.'" *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 444 (S.D.N.Y. 2019) (quoting *Cobalt Multifamily Inv'rs I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 425 (S.D.N.Y. 2012)).

7 The doctrine's full name is *in pari delicto potior est conditio defendentis*, meaning "[i]n a case of equal or mutual fault, the position of the [defending party] is the better one." *Baena v. KPMG LLP*, 453 F.3d 1, 6, n.5 (1st Cir. 2006) (internal citations and quotations omitted). "*In pari delicto* is a state law equitable defense analogous to unclean hands 'rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct.'" *In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008) (quoting *Pinter v. Dahl*, 486 U.S. 622, 632 (1988)).

*See* Declaration of Richard Levin in Support of Plaintiff's Motion for an Order of Attachment and Other Provisional Relief against Defendant Mihir Bhansali, Ex. 12 [ECF No. 99, Adv. Pro. 19-1102] ("Bhansali Tr. Decl."). Mr. Bhansali allegedly transferred his interest in the Bhansali Residence to Ms. Bhansali for no consideration in February 2018. *See* Bhansali Tr. Decl., Ex. 13. The Trustee now seeks to attach Mr. Bhansali's interest in the Bhansali Residence, alleging that the Trustee is able to attach this property notwithstanding the purported transfer because Mr. Bhansali's interest was fraudulently conveyed to his wife. *See* Bhansali Attach. Motion. Mr. Bhansali opposed the motion. S*ee* Defendant Mihir Bhansali's Memorandum of Law in Opposition to Plaintiff's Motion for an Order of Attachment Against the Bhansali Residence [ECF No. 104, Adv. Pro. 19-1102] ("Bhansali Opp."). The Trustee filed a reply as well as a supplemental Declaration. *See* Reply in Support of Plaintiff's Motion for an Order of Attachment against Mihir Bhansali [ECF No. 111, Adv. Pro. 19-1102] ("Tr. Reply to Bhansali"); *see also* Supplemental Declaration of Richard Levin in Support of Plaintiff's Motion for an Order of Attachment and Other Provisional Relief against Defendant Mihir Bhansali [ECF No. 112, Adv. Pro. 19-1102] ("Tr. Supp. Decl. to Bhansali").

The second adversary proceeding has followed a similar path. After the Modi Family Defendants moved to dismiss the Modi Family Complaint but before this Court rendered a decision on that motion, the Trustee filed an *ex parte* motion for preliminary attachment against Defendants Ms. Javeri, CPRE, CPS50 and Trident. That motion was granted. *See* ECF No. 102, 104, Adv. Pro. 20-1054.[8] The property subject to the preliminary order of attachment included Ms. Javeri's interests in: (i) the Ritz Carlton Apartment; (ii) the Essex House Apartment; (iii) Ms. Javeri's beneficial interests in the Ithaca Trust; (iv) Ms. Javeri's interest in her role as

8 The motion for an *ex parte* order of attachment was filed under seal.

Investment Advisor of the Ithaca Trust; and (v) Ms. Javeri's interests as manager of CPS50 and as manager of CPRE as well as the interests of CPS50 and CPRE. *See* ECF No. 102, Adv. Pro. 20-1054. The preliminary attachment motion also sought to attach her interests in Defendant Trident Trust Company (South Dakota) Inc., solely as Trustee of the Ithaca Trust ("Trident"), in various assets, including: (i) CPS50's legal title to the Ritz Carlton Apartment; (ii) Trident's ownership interest in CPS50 (including any membership units, shares, or other certificates or securities evidencing such ownership interest); (iii) CPRE's legal title to the Essex House Apartment; and (iv) Trident's ownership interest in CPRE (including any membership units, shares, or other certificates or securities evidencing such ownership interest).[9] *Id.*

Pursuant to N.Y. C.P.L.R. § 6211(b), the Trustee now seeks to confirm the preliminary order of attachment.[10] *See* Javeri Motion to Confirm. In addition to the property subject the preliminary attachment order, the Trustee now also seeks to attach various interests of Ms. Javeri associated with another trust, the Frost Trust, which include: Ms. Javeri's beneficial interests in the Frost Trust; Javeri's interests as Investment Advisor of the Frost Trust; and Javeri's interests as manager of [redacted] LLC (f/k/a [redacted] LLC) ("[redacted]"), which is a South Dakota LLC held by the Frost Trust. *See* Trustee's Supplement to Motion to Confirm Order of Attachment [ECF 116, AP 20-1054] ("Tr. Supp. to Motion to Confirm"). In support of the motion to confirm the preliminary attachment, the Trustee filed a Declaration annexing

---

[9] Property sought to be attached by the Trustee—namely, the Essex House Apartment and the Ritz Carlton apartment—is also the subject of attachment proceedings in India based on a complaint by the Indian Directorate of Enforcement. *See* Declaration of Richard Levin in Support of Plaintiff's Motion To Confirm Order Of Attachment, Ex. 10. While the Court notes the potential for a conflict based on competing claims to the property, none of the parties have raised this as an issue that needs to be addressed at this time.

[10] Many of the documents filed in support of this motion were filed under seal pursuant to an order of this Court [ECF 119, Adv. Pro, 20-1054] to address concerns about confidentiality and to comply with South Dakota law mandating that court proceedings in South Dakota regarding trusts remain private. *See* S.D. Codified Laws § 21-22-28. The Ithaca Trust is an irrevocable trust governed by South Dakota law. Modi Family Complaint ¶ 28.

documents to support the claim for attachment. Declaration of Richard Levin in Support of Plaintiff's Motion to Confirm Order of Attachment [ECF 109, Adv. No. 20-1054] ("Javeri Tr. Decl."). The assets of the Frost Trust consist of a bank account with a balance of approximately $[REDACTED] held at [REDACTED], and membership interest in [REDACTED], an LLC formed under South Dakota law. Tr. Supp. to Motion to Confirm. Ms. Javeri opposed the motion, with CPRE and CPS50 joining her opposition. Memorandum of Law in Opposition to Plaintiff's Motion to Confirm Ex Parte Order of Attachment [ECF 132, Adv. Pro. 20-1054] ("Javeri Opp.").[11] However, Trident takes no position on the attachment, other than to disavow any wrongdoing on its part. Memorandum of Trident Trust Company (South Dakota) Inc. Regarding Plaintiff's Motion to Confirm the Order of Attachment [ECF No. 113 Adv. Pr. 20-1054]. The Trustee filed a reply, *see* Reply in Support of Plaintiff's Motion to Confirm Order of Attachment [ECF No. 134, Adv. Pro. 20-1054] ("Tr. Reply to Javeri"), as well as a Supplemental Declaration of Richard Levin in Support of Plaintiff's Motion to Confirm Order of Attachment [ECF No. 135, Adv. Pro. 20-1054] ("Tr. Supp. Decl. to Javeri").

The Court held a hearing on the Bhansali Attachment Motion and the Javeri Motion to Confirm on October 22, 2022 and the motions were taken under advisement. *See* Hearing Transcript (October 26, 2022) [ ECF No. 137, Adv. Pro. 20-1054] ("Hr'g Tr.").

## II. Legal Standard

Attachment is available under Rule 64 of the Federal Rules of Civil Procedure, which is made applicable to bankruptcy proceedings by Rule 7064 of the Federal Rules

[11] Neither CPRE nor CPS50 filed a formal joinder to the Javeri Opposition. However, a footnote in the Javeri Opposition indicates that the Javeri Opposition is also submitted on behalf of CPS50 and CPRE. Javeri Opp. at 1, fn. 1.

of Bankruptcy Procedure. Attachment is available under the laws of the state where the court is located, *see* Fed. R. Civ. P. 64(a), which means that New York law applies here.

To succeed on a motion for attachment under New York law, a plaintiff must show: (1) that there is a cause of action, (2) that it is probable that the plaintiff will succeed on the merits, (3) that one or more grounds for attachment provided in Section 6201 exist, and (4) that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff. N.Y. C.P.L.R. § 6212(a). In addition to this four prong test, a plaintiff must also show an ongoing need for attachment. *Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 221 (2d Cir. 2006)

The plaintiff has the burden of proof in a motion for attachment. *Asdourian v. Konstantin*, 50 F. Supp. 2d 152, 158 (E.D.N.Y. 1999). Attachment is an extraordinary remedy. *Id.* at 159. When attachment is sought as security—as it is here—attachment is considered a particularly drastic remedy. *Buy This, Inc. v MCI Worldcom Communs., Inc.*, 178 F. Supp. 2d 380, 383 (S.D.N.Y. 2001). Therefore, the burden of proof is "high" and "the New York attachment statutes are construed strictly against those who seek to invoke the remedy." *In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d 301, 306 (S.D.N.Y. 2010) (internal citations and quotations omitted). Notwithstanding this high burden, "the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the facts." *Bank Leumi Tr. Co. of New York v. Istim, Inc.*, 892 F. Supp. 478, 482 (S.D.N.Y. 1995) (citing *National Bank & Trust Co. v. J.L.M. Int'l, Inc.*, 421 F.Supp. 1269, 1272 (S.D.N.Y.1976)). Thus, "[t]here is a tension between the requirement that the attachment statutes be 'construed strictly against those who seek to invoke the remedy' and the notion that when evaluating the probability of success on the merits, 'all legitimate inferences should be drawn in favor of the party seeking

attachment.'" *In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. at 306, n. 25 (citing *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F.Supp.2d 482, 485 (S.D.N.Y.2004)).

**III. Discussion**

**A. The Requirements for Attachment**

**1. The Trustee has Stated a Cause of Action**

To succeed on a motion for attachment, the Trustee must first state a cause of action. N.Y. C.P.L.R. § 6212(a). The Trustee here asserts a civil RICO claim against Bhansali under 18 U.S.C. § 1962(c). *See* Executive Defendants Complaint ¶¶ 233-306. As for Ms. Javeri, the Trustee asserts a claim under 18 U.S.C. § 1962(d), alleging that she participated in a conspiracy to violate RICO. *See* Modi Family Complaint ¶¶ 371 – 459.

As the Court has already found, the Trustee has stated a claim against Mr. Bhansali for RICO violations, as well as other state law claims. *See* Executive RICO Decision. While Ms. Javeri disputes that the Trustee has adequately stated a cause of action, *see* Javeri Opp. at 7-8, the Court has also denied motions to dismiss the Modi Family Complaint, concluding that the Trustee has stated a claim against Ms. Javeri, CPRE, and CPS50 for conspiracy to commit RICO violations in violation of 18 U.S.C. §1962(d). *See* Family RICO Decision. Accordingly, the Court finds that the Trustee easily satisfies this first requirement.

**2. Likelihood of Success on the Merits**

The more contentious issue, and where parties focus the majority of their briefing, is whether the Trustee can demonstrate a likelihood of success of the merits. "Probability of success on the merits for purposes of an order of attachment requires that the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that required to make a prima facie case." *Musket Corp. v. PDSVA Petroleo, S.A.*,

512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007); *see also Perrotta v. Giannoccaro*, 141 Misc. 2d 155, 157 (N.Y. Sup. Ct. 1988) (noting that the showing required is comparable to that required when evaluating a preliminary injunction, "a clear showing of likelihood of ultimate success on the merits"); *Thornapple Assocs. v. Sahagen*, 2007 WL 747861 at *4 (S.D.N.Y. March 12, 2007). In other words, the burden is higher than the showing necessary to state a prima facie case but lower than the showing needed to prove a case at trial. *See O'Connell v. Pincus (In re Our Distribution Co., Inc.),* 110 B.R. 658, 664 (Bankr. S.D.N.Y. 1990) ("The court need not decide the ultimate merits of the controversy . . . ."); *cf. Citibank, N.A. v. Bombshell Taxi LLC (In Re Hypnotic Taxi LLC),* 543 B.R. 365, 372-73 (Bankr. E.D.N.Y. 2016) ("[A] a plaintiff must show that it is more likely than not that it will succeed on the merits of its claim."). In assessing the likelihood of success on the merits here, the Court may rely on hearsay documents. *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (concluding that hearsay evidence may be considered in determining whether to grant a preliminary injunction). Indeed, courts have routinely relied on hearsay documents in evaluating whether attachment is appropriate. *See CF 135 Flat LLC v. Triadou SPV N.A.*, 2016 U.S. Dist. LEXIS 82821 at *6, n.3 (S.D.N.Y. June 24, 2016) (using a foreign United Kingdom judgment as evidence of fraud to award an attachment to plaintiff); *see also Fratelli Italiani LLC v. Mironova*, 2019 WL 3759160 at *10 (S.D.N.Y. April 11, 2019) (stating that "evidence need not be admissible at trial to be considered on a motion for provisional relief").

To establish liability for a civil RICO claim under 18 U.S.C. § 1962(c), a plaintiff must demonstrate that "a person engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)). To establish a RICO enterprise, there must be "a purpose, relationships among those associated with the enterprise, and longevity

sufficient to permit these associates to pursue the enterprise's purpose . . . [and] an association-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981) (internal quotations omitted)). A pattern of racketing requires the commission of "at least two predicate acts of racketeering activity that are related and continuous." *Boneta v. Rolex Watch USA, Inc.*, 232 F. Supp. 3d 354, 358 (S.D.N.Y. 2017); *see also DeFalco*, 244 F.3d at 306; 18 U.S.C. § 1961(1) (listing predicate acts of racketeering).[12]

Conspiracy to violate RICO constitutes its own offense. *See* 18 U.S.C. § 1962(d). A RICO conspiracy requires proof "(a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering." *United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018). "To prove the agreement element, the [plaintiff] must show that the defendant 'knew about and agreed to facilitate [a racketeering] scheme.'" *Id.* (quoting *Salinas v. United States*, 522 U.S. 52, 66 (1997)); *see also United States v. Pizzonia*, 577 F.3d 455, 459 (2d Cir. 2009) ("[T]he object of a racketeering conspiracy is to conduct the affairs of a charged enterprise through a pattern of racketeering, not to commit discrete predicate acts.").

a. Evidence in Support

Considering the totality of evidence presented here, the Trustee has met his evidentiary burden of showing that his "'probability of . . . prevailing [on the merits] is better than fifty percent'

[12] Predicate acts include, among other things, mail and wire fraud, money laundering, obstruction of justice, bankruptcy fraud, and National Stolen Property Act violations. *See* 18 U.S.C. §§ 1341, 1343 (mail and wire fraud), 1956, 1957 (money laundering), 1503, 1512 (obstruction of justice), 152 (bankruptcy fraud), 2314, 2315 (National Stolen Property Act).

to demonstrate a likelihood of success on the merits." *Gluco Perfect, LLC v. Perfect Gluco Prod., Inc.*, 2014 WL 4966102, at *17 (E.D.N.Y. Oct. 3, 2014) (citing *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir.1988)). The claims against Mr. Bhansali and Ms. Javeri arise from the same racketeering scheme, namely, the Bank Fraud and related fraud on the Debtors. As a threshold matter, the Court notes that none of the parties have seriously contested the existence of the Bank Fraud, nor have they contested Mr. Modi's role as the mastermind of the scheme that led to one of the largest frauds in Indian history. The evidence presented by the Trustee here only further corroborates the existence of the Bank Fraud, as well as the related fraud against the Debtors.

For both the Javeri Motion to Confirm and the Bhansali Attachment Motion, the Trustee relies on a variety of documents filed in foreign proceedings,[13] direct evidence,[14] and the Examiner

---

[13] Some documents from foreign proceedings are offered in support of both the Javeri Motion to Confirm and Bhansali Attachment Motion, including: Judgment in the Westminster Magistrates' Court dated February 25, 2021 (Tr. Supp. Decl. to Javeri, Ex. 2; Bhansali Tr. Decl., Ex 4); Supp. Complaint filed in the City Civil Court and Additional Sessions Judge, Greater Bombay (Designated Court for the Prevention of Money Laundering Act, 2002) by the Directorate of Enforcement against Nirav Modi, Mihir Bhansali et. al dated February 28, 2019 (Bhansali Tr. Decl., Ex. 6; Tr. Supp. Decl. to Javeri, Ex. 9); Application for and on Behalf of Purvi Modi Bringing Additional Facts on Record for Seeking Directions to the Respondents to Ensure Speedy and Just Recovery of Assets filed in the City Civil Court and Additional Sessions Judge Greater Bombay (Designated Court for the Fugitive Economic Offenders Act, 2018) (Bhansali Tr. Decl., Ex. 10; Javeri Tr. Decl., Ex. 7) ("Application for Asset Recovery"); Provisional Attachment Order No. 17/2018 Dated October 5, 2018 entered by the Adjudicating Authority under the Prevention of Money Laundering Act, 2002 (Bhansali Tr. Decl., Ex. 14; Javeri Tr. Decl., Ex. 11); Judgment of the Debts Recovery Tribunal dated July 5, 2019 in favor of Punjab National Bank against Nirav Modi et al (Bhansali Tr. Decl., Ex. 5; Javeri Tr. Decl., Ex. 12).

Other documents from the foreign proceedings are offered in support of one or the other attachment requests. For the Bhansali Attachment Motion, these documents include: Judgment of the Debts Recovery Tribunal dated July 5, 2019 in favor of Punjab National Bank against Nirav Modi et al (Bhansali Tr. Decl., Ex. 5); Order entered by the Court of Special Judge for PMLA for Greater Bombay in PMLA Case No. 04 of 2018 on June 12, 2018 (Bhansali Tr. Decl., Ex. 15). For the Javeri Motion to Confirm, these documents include: Provisional Attachment Order No. 15/2018 Dated September 17, 2018 entered by the Adjudicating Authority under the Prevention of Money Laundering Act, 2002 (Javeri Tr. Decl., Ex. 10); Order entered in the Court of Special Judge Under the Prevention of Money Laundering Act at Greater Bombay dated January 4, 2021 awarding a pardon to Purvi Mehta (Javeri Tr. Decl., Ex. 13); Judgment in Debts Recovery Tribunal in the matter of PNB v. LOU entities, Firestar Entities, Ami Modi, et. al. (Javeri Tr. Decl., Ex. 12); Order dated June 12, 2018 in matter of Directorate of Enforcement v. Nirav Modi et al alleging PMLA violations (Tr. Supp. Decl. to Javeri Ex. 1).

[14] Such direct evidence includes auto-recovered versions of deleted spreadsheets retrieved from Bhansali's computer (Bhansali Tr. Decl., Ex. 7; Tr. Supp. Decl. to Javeri Ex. 7) and Mr. Bhansali's email correspondence (Javeri Supp. Decl. to Javeri Ex. 8; Bhansali Tr. Decl., Ex. 8). The Trustee also offered Mr. Bhansali's passport data retrieved from his computer. *See* Bhansali Tr. Decl., Ex. 9.

Report. These documents easily establish that the Trustee is likely to succeed on the merits of its RICO claims. The Court will briefly walk through some of this evidence as to the various aspects of the claims.

First, the Trustee demonstrated a likelihood that he will be able to establish the conduct of a RICO enterprise in the form of the Bank Fraud and related looting of the Debtors. The Trustee has provided ample evidence that Mr. Modi, Mr. Bhansali, and Mr. Gandhi, as well as the entities they controlled, constituted a "union or group of individuals associated in fact" that held the "common purpose" of having a "common intent to violate RICO or to act unlawfully." *Black v. Ganieva*, 619 F. Supp. 3d 309, 330-31 (S.D.N.Y. 2022), *aff'd*, 2023 WL 2317173 (2d Cir. Mar. 2, 2023) (internal citations omitted); *see also Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 426 (S.D.N.Y. 2010) ("A RICO enterprise must have a common purpose of engaging in a course of conduct, and its existence is proven by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.") (internal citations and quotations omitted).

For example, the Examiner Report extensively details the role of the Executive Defendants—including Mr. Bhansali— in the Bank Fraud, detailing the role of the Executive Defendants in obtaining fraudulent LOUs as well as the use of funds obtained during the Bank Fraud for the benefit of the Executive Defendants and their families. *See generally*, Examiner Rep. The Examiner Report is full of examples about the role that the Executive Defendants played in the Bank Fraud and specific actions taken to further the schemes' goals. *Id.* Significantly, the Examiner Report is the result of a comprehensive investigation and is reliant on extensive documentary and testamentary evidence. *Id.* To reach the conclusion that the Debtors were involved in the Bank Fraud, the Examiner's team "analyzed the Debtors' sales records, tax records, bank records, and other financial and operating records for evidence of

whether Debtor engaged in similar transactions . . . [and] the Examiner's investigation disclosed that the Debtors engaged in a large volume of suspect transactions with Shadow Entities that bear hallmarks of fraud." *Id.* at 45.

In addition to the Examiner's investigation, numerous foreign judicial bodies have found the existence of the Bank Fraud in a nearly identical form as that plead here by the Trustee. For example, the Indian Debts Recovery Tribunal in 2019 awarded judgment to Punjab National Bank against Mr. Modi and others and described the exact mechanism of the scheme to fraudulently obtain LOUs. Bhansali Tr. Decl., Ex. 5; Javeri Tr. Decl., Ex. 12. More specifically, this judgment found that "[d]efendants' have laid a complex structure or façade involving several layers of partnership Firms, companies and trusts for the purpose of perpetrating fraud and to isolate themselves from the liability that has arisen from unauthorized LOUs."[15] *Id.* ¶ 23. Similarly, when considering the Government of India's request to extradite Mr. Modi, the Westminster Magistrates' Court in the United Kingdom found that the Indian Government had established a prima facie case of fraud on Punjab National Bank and money laundering, describing the exact same frame scheme as detailed by the Trustee in the instant action. *See generally*¸ Bhansali Tr. Decl., Ex. 4; Tr. Supp. Decl. to Javeri, Ex. 2.[16] Significantly, this finding was reached in a contested proceeding after consideration of extensive evidence and witness testimony. *Id.* ¶ 11. The essence of the Trustee's allegations is also supported by pleadings filed by Mr. Modi's sister—Purvi Mehta—in criminal proceedings against Mr. Modi in India. *See* Application for Asset Recovery. In that proceeding, the Indian Enforcement Directorate granted

---

[15] The Defendants in this Indian action include Mr. Modi, Ms. Javeri, Neeshal Modi (Mr. Modi's brother), Deepak Modi (Mr. Modi's father), Nehal Modi (Mr. Modi's brother), and Ms. Mehta.

[16] When considering the request to extradite Mr. Modi from England to India, the British court was required to find whether there was sufficient evidence to support a criminal case against the person whose extradition is sought so as to determine whether extradition was proper. *See* Bhansali Tr. Decl., Ex. 4 ¶ 27-28.

Ms. Mehta a pardon in relation to the charges brought under the Indian Prevention of Money Laundering Act, with the pardon granted in exchange for Ms. Mehta's testimony about the scheme to launder money led by Mr. Modi. *Id.* The order granting Ms. Mehta's pardon rejected the notion that Ms. Mehta had a limited role in the Bank Fraud, finding that most of the proceeds of the Bank Fraud had gone through her account. Application for Asset Recovery, Ex. A.

Second, the Trustee has sufficient evidence to show a likelihood of success as to his allegations that the Executive Defendants such as Mr. Bhansali participated in a number of different predicate acts including obstruction of justice in violation of 18 U.S.C. §§ 1503, 1512; bankruptcy fraud in violation of 18 U.S.C. § 152; money laundering in violation of 18 U.S.C. §§ 1956, 1957; violations of the National Stolen Property Act in contravention of 18 U.S.C. §§ 2314, 2315; and mail and wire fraud in violation of 18 U.S.C. § 1341, 1343. *See* Executive Defendants Complaint ¶¶ 233-313. For example, the documents retrieved from Mr. Bhansali's computer demonstrate a likelihood that the Trustee will establish that the Executive Defendants engaged in money laundering. The Trustee attaches what appears to be a "to do" list for the money laundering scheme. Bhansali Tr. Decl., Ex. 7-3. This document alone strongly supports the likelihood of success for the predicate act of money laundering. The Application for Asset Recovery further supports this conclusion given that Ms. Mehta—whom the Trustee alleges was a primary conduit of laundered funds—admitted that a scheme to launder funds existed and given that the Indian authorities concluded that most of the Bank Fraud proceeds went through her bank account. *See* Application for Asset Recovery. The Trustee is also likely to be able to show that the purchase of the Ritz Carlton Apartment was an act of money laundering. The Examiner Report details how Ms. Mehta transferred money from her accounts to the attorneys handling the purchase and that the Ritz Carlton Apartment was purchased at Mr. Modi's direction and for his personal use. *See* Examiner Rep. at 155-56. Again, these statements are

based on documentary evidence obtained by the Trustee as well as witness interviews. *Id.* In the same vein, the evidence here establishes the likelihood that Ms. Mehta funded both the Ithaca Trust and Frost Trust from funds derived from the Shadow Entity Fine Classic. Javeri Tr. Decl., Ex. 13 ¶ 2; Tr. Supp. Decl. to Javeri, Ex. 4, 5, 6.

Third, the Trustee has also demonstrated a likelihood of being able to prove that a pattern of racketeering exists. "For [a pattern of racketeering] to exist, the acts of racketeering activity 'must be related and continuous.'" *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 406 (S.D.N.Y. 2013) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). The Examiner Report makes clear that the Bank Fraud and Executive Defendants' activities in support of the Bank Fraud were continuous as the Report details activities over the course of an eight year long period related to the Bank Fraud. *See, e.g.*, Examiner Rep. at 46-47 (stating that between 2011 and 2017, Debtor Firestar Diamond, Inc. recorded more than $167 million dollars in sales to Shadow Entities).[17]

Ms. Javeri challenges the type of evidence submitted by the Trustee, complaining that the documents submitted in support of the motion do not constitute the "affidavit[s] and such other written evidence" that is required by the statute. N.Y. C.P.L.R. § 6212(a). Ms. Javeri contends that the Trustee's declarations and attached exhibits amount to nothing more than allegations. Ms. Javeri specifically challenges the Trustee's reliance on the Examiner Report, contending that it is hearsay. Javeri Opp. at 13-14. But the Court rejects Ms. Javeri's argument for several

---

[17] Defendants' papers reference their objection to the Trustee's standing to bring these RICO claims. *See, e.g.*, Bhansali Opp. at 18. But the Court has already ruled that the Trustee has standing for the RICO claims as plead in the cases. *See* Executive RICO Decision at 288; Family RICO Decision at 867; *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) ("The plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."). Moreover, the Trustee has now provided evidentiary support for the injury to the Debtors, most notably in the Examiner Report's discussion of how the Bank Fraud harmed the Debtors. *See e.g.,* Examiner Rep. at 52 (stating that the Debtors' paid the back office expenses of purportedly unrelated Shadow Entities); *id.* at 151 (describing how Debtor Firestar Diamond Inc. paid the mortgage on the Essex House Apartment).

reasons. As a threshold matter, these reports and documents from foreign proceedings are not merely allegations, but rather are based on significant evidence. For example, the Examiner Report is based on approximately 45 interviews with Debtors' employees and other parties in interest, site visits to the Debtors' facilities, and review of more than five million documents provided in response to document and deposition subpoenas. Examiner Rep. at 15, 17-18. The same is true for other documents submitted by the Trustee. For example, Exhibit 10 to the Javeri Trustee Declaration consists of a Provisional Attachment Order from the Indian Adjudicating Authority, which attaches the same property at issue here based on similar allegations. The complaint underlying the Provisional Attachment Order identifies the documents on which it relied, such as a mortgage agreement, financial statements demonstrating the transfer of funds, and copies of trust documents. *Id.* at 30-31. Clearly, these allegations are based on substantive evidence that strongly supports that the RICO scheme existed as alleged and could be brought forth at trial to support the Trustee's claims.

In any event, the Court may consider hearsay evidence in deciding these attachment motions. The cases relied on by Ms. Javeri are distinguishable as they considered documents in a procedural posture different than attachment or they rejected a document based on its substantive content. *See In re Refco Inc. Sec. Litig.*, 2013 WL 12191891, at *11 (S.D.N.Y. Mar. 11, 2013) (declining to consider a bankruptcy examiner's report in support of summary judgment, where evidence must be presented in an admissible form); *Silverman Partners, L.P. v. First Bank*, 687 F. Supp. 2d 269, 293-94 (E.D.N.Y. 2010) (finding the testimony of the forensic accountant to be "inconclusive at best."). Neither circumstance applies here. And far from being inconclusive, the Examiner Report clearly shows an ongoing, pervasive fraud scheme with myriad references to the evidence justifying that conclusion. *See supra* Section I.

Finally, the Court notes that the Defendants have raised the defenses of *in pari delicto* and the *Wagoner* doctrine. The Court has already found that these defenses do not warrant dismissal. *See* Executive RICO Decision at 294-96; Family RICO Decision at 881-84. Defendants now have the burden of providing these defenses, which are opposed by the Trustee. *See*, e.g. Family RICO Decision at 881-84 (discussing the Trustee's invocation of the adverse interest exception to argue that these defenses do not apply because these corporate officers totally abandoned the corporation's interests and were acting entirely for their own or another's purposes). Indeed, the Trustee has provided evidence in support of the adverse interest exception. More specifically, the Examiner Report's discusses the role that Mr. Bhansali and Mr. Gandhi, the Debtors' executives, played in the Bank Fraud, and how the Debtors were utilized to further the Bank Fraud, all of which supports the Trustee's contention that the Executive Defendants totally abandoned the Debtors' interest. *See* Examiner Rep. at 44-136. As the Court cannot conclude that Mr. Bhansali is likely to prevail on these defenses, the defenses of *in pari delicto* and the *Wagoner* doctrine do not provide a basis to deny attachment.

In sum, the evidence presented by the Trustee undeniably supports a conclusion that the Trustee is likely to succeed on the claims that he has asserted here. The abundance of documents cited by the Trustee—and the extensive evidence on which they rely—establish a likelihood of success that justifies attachment here.

b. Mr. Bhansali's Additional Arguments

Having reviewed the likelihood of success generally, the Court turns to the specific arguments raised by Mr. Bhansali. His primary focus is on the Trustee's ability to prove the specific claims advanced by the Trustee against Mr. Bhansali. *See, e.g.* Hr'g Tr. at 71:2-13. Mr. Bhansali protests that the Trustee's allegations are primarily based on information and belief with the Trustee benefitting from the lower pleading standards afforded to a trustee as an

outsider without immediate access to comprehensive information about the debtor. Bhansali Opp. at 15. Mr. Bhansali also minimizes the evidence presented by the Trustee, asserting that the Trustee relies on pleadings filed in foreign jurisdictions in which Bhansali did not appear, and which only have a passing reference to him and the allegations in the complaint. *Id.* at 18-19. Mr. Bhansali contends that, even if the Trustee can establish the existence of the Bank Fraud generally, the Trustee does not demonstrate that he is likely to succeed in proving the specific claims asserted against him. *Id.* at 15-18.

But the Court disagrees. It is true that to establish liability under 18 U.S.C. § 1962(c), "one must have some part in directing [the enterprise's] affairs . . . ". *Baisch*, 346 F.3d at 376 (internal citations and quotations omitted). But RICO liability is not limited to those with primary responsibility for the enterprise's affairs; one is liable under RICO if he or she has "discretionary authority in carrying out the instructions of the [conspiracy's] principals." *Id*. The evidence produced by the Trustee here demonstrates that Mr. Bhansali had significant authority to carry out Mr. Modi's instructions and played a significant part in directing the enterprise's affairs. Mr. Bhansali was the President of each of the Debtors. *See* Bhansali 1007-2 Decl. ¶ 1. The Examiner Report alleges that Mr. Bhansali acted as Mr. Modi's "de facto number 2" with significant control over the operation of the Firestar entities. Examiner Rep. at 124. For example, Bhansali is alleged to be the mastermind behind the scheme to "round trip" diamonds, and the Trustee cites to evidence that Mr. Bhansali was directly involved in at least some circular transactions. Examiner Rep. at 126. Moreover, the Trustee alleges that Mr. Bhansali played a significant role in overseeing and directing the use of different sales and inventory practices for the Debtors' transactions with the Shadow Entities, entities that had no legitimate business purpose. *See* Executive Defendants Complaint ¶ 89. The Trustee substantiates these allegations with Exhibits 7, 8 and 9 to the Bhansali Trustee Declaration, which consist of documents either

created by or directed to Mr. Bhansali. Specifically, a spreadsheet retrieved from Mr. Bhansali's computer shows an overview of accounts payable and receivable between the Shadow Entities, the LOU entities, and Firestar entities. *See* Bhansali Tr. Decl., Ex. 7-1. Significantly, the Examiner refers to this spreadsheet as an example of the overall structure of the Bank Fraud, noting that the finances of the Debtors, LOU entities, and other Firestar entities listed only Shadow Entities rather than legitimate customers. Examiner Rep. at 49-50. Exhibits 7, 8, and 9 to the Bhansali Trustee Declaration also strongly support the Trustee's allegations that Mr. Bhansali was a primary driver of both the Bank Fraud and the related fraud on the Debtors. *See, e.g.* Bhansali Tr. Decl., Ex. 7-3 (describing a "to do" list for tasks related to the fraud, including stating the Debtors' role in selling to Shadow Entities); Bhansali Tr. Decl., Ex. 7-4 (showing the finances of each LOU entity).

Far from being conclusory, the totality of evidence provided by the Trustee creates a comprehensive picture of the Bank Fraud, Bhansali's role therein, and the impact on the Debtors. *See United States v. Porter*, 881 F.2d 878, 887 (10th Cir. 1989) (citing McCormick on Evidence § 185, at 542–43 (E. Cleary 3d Ed. 1984)) ("An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not even make that proposition appear more probable th[a]n not . . . It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence . . . A brick is not a wall.").

Finally, the Court notes that Mr. Bhansali invoked his Fifth Amendment rights in response to every question asked by the Examiner as to these matters. Bhansali Tr. Decl., Ex. 16. He is well within his rights to do so. It is well settled that the Fifth Amendment right against self-incrimination applies to both criminal and civil proceedings. "The [Fifth] Amendment not only protects the individual against being involuntarily called as a witness against himself in a

criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973) (citing *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924)). Unlike criminal cases, however, the Court may take a negative inference from the invocation of 5th Amendment privilege in civil cases such as this one. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *see also U.S. S.E.C. v. Suman*, 684 F. Supp. 2d 378, 386–87 (S.D.N.Y. 2010), *aff'd*, 421 F. App'x 86 (2d Cir. 2011). Such a negative inference is appropriate here and further supports the Trustee's motion. *S.E.C. v. Inv. Better 2001*, 2005 WL 2385452, at *2 (S.D.N.Y. May 4, 2005) (finding that a negative inference is permissible given that invocation of Fifth Amendment rights prejudices the party seeking the information).[18]

c. Ms. Javeri's Additional Arguments

In challenging attachment, Ms. Javeri takes a similar tact as Mr. Bhansali. She contends that none of the evidence discusses her in sufficient detail for the Trustee to prove his claims against her. But once again, this argument is unpersuasive.

The Trustee has offered evidence here to show that Ms. Javeri conspired to participate in the RICO conspiracy. Agreement to participate in a RICO conspiracy can be shown by evidence of a defendant's receipt of diverted or stolen funds. *Related Companies, L.P. v. Ruthling*, 2019 WL 10947100, at *7 (S.D.N.Y. July 23, 2019). The evidence here ties Ms. Mehta's participation in the laundering of funds from the fraud to Ms. Javeri. *See* Javeri Tr. Decl., Ex. 13. For example, the order granting a pardon to Ms. Mehta identifies both the Essex House Apartment

---

[18] Mr. Bhansali also reiterates arguments already rejected by this Court in deciding Mr. Bhansali's motion to dismiss the complaint against him, such as the argument that the "intended target" of the fraudulent activities was Punjab National Bank, not the Debtors. *See* Hr'g Tr. 75:6-9; *see also* Executive RICO Decision at 286–87. The Court will not address those arguments again.

and the Ritz Carlton Apartment as "proceeds of crime." *Id.* The Trustee then submits bank statements showing that Ms. Javeri received three transfers of funds from Ms. Mehta totaling more than $34 million. Tr. Supp. Decl. to Javeri, Ex. 3. This evidence strongly supports a finding that Ms. Javeri received proceeds of the fraud sufficient to establish conspiracy to participate in a RICO violation.[19]

**3. Grounds for Attachment Exist Under N.Y. C.P.L.R. § 6201**

The third attachment requirement is a showing that grounds for attachment exists. *See* N.Y. C.P.L.R. § 6201. The Court will assess the grounds for attachment as to each party separately.

For the attachment of Trident and CPRE's property, the Trustee relies upon N.Y. C.P.L.R. § 6201(1), which provides for attachment where "the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state." The Trustee here demonstrates, and Defendants do not dispute, that Trident and CPRE are foreign corporations not qualified to do business in the state. *See* Javeri Tr. Decl., Ex. 15 and 16 (showing that neither CPRE nor Trident are registered with the New York Department of State). Their lack of registration with the New York Department of State satisfies Section 6201(1). *See In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d at 312. Similarly, there is no dispute that that Frost Trust is a foreign corporation. Tr. Supp. to Motion to Confirm, Ex. A. Thus, grounds for attachment exist for assets where legal title is held by non-domiciliaries Frost Trust, Trident, and CPRE.

[19] The Court has considered Defendants' other arguments concerning the Trustee's likelihood of success on the merits and finds them unavailing.

For the attachment of Ms. Javeri and Mr. Bhansali's property, the Trustee relies on N.Y. C.P.L.R. § 6201(3), which provides that attachment is warranted when "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." To establish this ground for attachment, "the plaintiff must prove both that the defendant (1) has assigned, disposed of, encumbered, or secreted property, or removed it from the state, or is about to do any of these acts; and (2) has acted or will act with the intent to defraud creditors or to frustrate the enforcement of a judgment that might be rendered in plaintiff's favor." *DLJ Mortg. Cap., Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 319 (E.D.N.Y. 2009) (citing *Encore Credit Corp. v. LaMattina*, 2006 WL 148909, at *3 (E.D.N.Y. Jan. 18, 2006)).

When determining whether an intent to defraud exists, direct proof is rarely readily available so it "must ordinarily be inferred from the circumstances." *Bank of Leumi Tr. Co.*, 892 F. Supp. at 483. Badges of fraud can be used to infer an intent to defraud. *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citing *Wall St. Assocs. v. Brodsky*, 684 N.Y.S.2d 244, 247 (App. Div. 1st Dep't 1999)). Common badges of fraud are: (1) lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction. *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 809 (Bankr.

S.D.N.Y. 2005). The presence or absence of any single badge of fraud is not conclusive; rather, the inquiry focuses on what factors are present, as well as the context for the badges of fraud. *Halperin v. Morgan Stanley Inv. Mgmt. (In re Tops Holding II Corp.)*, 646 B.R. 617, 675 (Bankr. S.D.N.Y. 2022), *leave to appeal denied*, 2023 WL 119445 (S.D.N.Y. Jan. 6, 2023).

Applying these principles here, the Court finds that the Trustee has established that Mr. Bhansali assigned his property with the intent to frustrate the enforcement of a judgment in this case. Mr. Bhansali does not dispute that he transferred his interest in the Bhansali Residence to his wife for no consideration. *See* Bhansali Tr. Decl., Ex. 13; Declaration of Rakhi Bhansali In Opposition To The Trustee's Motion For Attachment [ECF No. 106, Adv. Pro. 19-1102] ("Rakhi Decl.") ¶ 5. Moreover, his wife, Ms. Bhansali, has admitted that the transfer of the apartment was done to protect this asset from creditors. Rakhi Decl., Ex. A ¶ 20 ("[Ms. Bhansali] decided that the [Bhansali Residence] had to be protected . . . Accordingly, she insisted that Mr. Mihir Bhansali forthwith, legally transfer in her favour whatever interest he had in the [Bhansali Residence] . . . thereby preventing her only home from being forcibly dragged in any controversy . . . ") (spelling in original). These two facts—standing alone—satisfy the requirements of Section 6201(3).

Moreover, several of the "badges of fraud" are present. Notwithstanding purporting to transfer his interest, Mr. Bhansali continues to live in the Bhansali Residence. The timing of the transfer is also suspicious, occurring very shortly after the Bank Fraud was exposed and just two days after the Firestar Entities filed their bankruptcy petitions. And once again, these events exist against the backdrop of Mr. Bhansali's invocation of his Fifth Amendment rights—and the

resulting negative inference— to questioning by the Examiner regarding the transfer of the Bhansali Residence.[20]

Mr. Bhansali disputes the characterization of the timing of the transfer as fraudulent, asserting that fraud is not shown by the mere transfer to a family member or the temporal proximity to the filing of the Debtors' bankruptcy proceeding. Bhansali Opp. at 22, 24. But unlike the cases relied upon by Mr. Bhansali, the Trustee is not relying on one fact in isolation. Rather, the Trustee has relied on all the facts regarding the transaction as a whole, including the timing of the transfer, the lack of consideration, and the surrounding events of the underlying alleged fraud (including the bankruptcy filing), as well as evidence of Mr. Bhansali's primary role in the fraud. All of these easily satisfy the requirements for attachment.

Mr. Bhansali also specifically disputes the Trustee's allegation that the Bhansali Residence was purchased with funds stemming from the Bank Fraud—alleging instead that the Bhansali Residence was purchased using funds provided by his wife's family—thus making the transfer to her a return of property to its rightful owner. *See* Bhansali Opp. at 4, 22; Rakhi Decl. ¶¶ 3-4, Ex. A. But Mr. Bhansali's argument ignores that, regardless of how his ownership came to be, he owned the Bhansali Residence and then transferred that interest with an intent to frustrate his creditors. Moreover, Mr. Bhansali's invocation of the purported fairness of the transfer does not save him here. *Cf. In re Guerrera*, 225 B.R. 32, 36 (Bankr. D. Conn. 1998) ("It has been determined that 'intangible, psychological benefits' [associated with a transfer] do not constitute reasonably equivalent value.") (quoting *Dietz v. St. Edward's Catholic Church (In re Bargfrede)*, 117 F.3d 1078, 1080 (8th Cir.1997)).

[20] For example, during the deposition, the Examiner asked, "You recently transferred your home to the name of your wife for approximately 1.8 million dollar sales price was this to prevent recovery of assets in the legal proceeding?" to which Mr. Bhansali responded, "For purposes of the examiners [sic] investigation and report only and on the advice of counsel I respectfully assert my fifth amendment right and decline to answer the question." Bhansali Tr. Decl., Ex. 16, 40:22 – 41:5.

Finally, Mr. Bhansali incorrectly asserts that that the transfer cannot be fraudulent because there were no creditors to defraud at the time the transfer was made. Bhansali Opp. at 19-20. More specifically, Mr. Bhansali complains that the Trustee does not identify a single creditor whom he could have defrauded at the time of the transfer. Bhansali Opp. at 19-20. But "[t]he plain language of the [N.Y. D.C.L] reaches conveyances intended to defraud future creditors, including conveyances which occurred prior to the time the [transferor's] obligation to the plaintiff arose." *JR & J Holding Co. v. Rabinowitz*, 607 N.Y.S.2d 724, 725 (1994).[21] Thus, "the actual intent to defraud 'need not target any particular entity or individual as long as the intent is generally directed toward present or future creditors of the debtor.'" *In re Quiroga*, 2022 WL 3363862, at *7 (Bankr. D. Conn. Aug. 12, 2022) (quoting *In re Bayou Grp., LLC*, 439 B.R. 284, 304 (S.D.N.Y. 2010)). That standard is clearly met given the facts here.

The Trustee has also satisfied the requirements for attachment under N.Y. C.P.L.R. § 6201(3) as to Ms. Javeri. Ms. Javeri clearly intends to dispose of property, as is demonstrated by her stated intention to sell the Ritz Carlton Apartment and use the sale proceeds to repay loans and meet her expenses. Javeri Opp. at 3; Javeri Tr. Decl., Ex. 2, 3. The Trustee also has presented evidence of other significant efforts by Ms. Javeri to secrete assets and remove them from the reach of the Trustee. Most significantly, the Trustee only recently learned about a second trust—the Frost Trust—containing assets worth nearly $[redacted], after the Trustee undertook discovery and was alerted to the existence of the Frost Trust by Trident. Tr. Supp. Decl. to Javeri ¶ 4. And a need to attach this trust exists given the evidence that Ms. Javeri intends to dispose of this asset. Shortly after the Court denied the Executive Defendants' motion

---

[21] N.Y. D.C.L. § 276 is the provision of New York State law providing for the avoidance of intentionally fraudulent transfers. In December 2019, Article 10 ("Fraudulent Conveyances") of the N.Y. Debtor Creditor Law (the "D.C.L") was repealed and was replaced by the Uniform Voidable Transactions Act. However, the Uniform Voidable Transactions Act only applies to transactions which occurred on or after April 4, 2020. As the transfers in question all occurred prior to April 4, 2020, the Court looks to the law in effect at the time of the transfers at issue here.

to dismiss, Ms. Javeri filed a petition in South Dakota state court to compel the Frost Trust to disburse over $[redacted] and resume making monthly $[redacted] distributions to her, which would deplete over [redacted] of the Frost Trust assets. *Id.* Indeed, the very discovery of this asset is noteworthy given Ms. Javeri's failure to fully respond to the Trustee's discovery requests about her assets. *See* Trustee's Motion for Entry of an Order (I) Confirming the Trustee's Authority to Take Discovery of Defendant Ami Javeri under CPLR § 6220; (II) Directing Defendant Ami Javeri to Respond to the Trustee's March 7, 2022 Document Requests; and (III) Granting Related Relief [ECF No. 142, Adv. Pro 20-1054] (the "Discovery Motion"). While Ms. Javeri now claims that the sale of the Apartments is being done in an effort to mitigate expenses, Javeri Opp. at 21, she lived in the Apartments for more than two years during the pendency of the instant litigation without undertaking any such efforts. *See* Tr. Supp. Decl. to Javeri, Ex. 12 and 13.[22]

Ms. Javeri argues that the sale of property, on its own, is not a badge of fraud when viewed in isolation. *Encore Credit Corp.*, 2006 WL 148909, at *3. But once again, the sale cannot be viewed in isolation from the full evidentiary record presented by the Trustee. *See* Javeri Opp. at 3. Ms. Javeri has claimed that she lacks other assets to pay her expenses, but this would mean that the assets at issue are the only ones that the Trustee could use to satisfy any judgment. *See* Declaration of Ami Javeri in Support of Her Motion for the Payment of Apartment Expenses ¶ 9 [ECF No. 157, Adv. Pro. 20-1054]. Of course, the Court cannot reach any conclusion on Ms. Javeri's claim about the extent of her assets without completion of discovery on that issue. *See infra* Section 7.

---

[22] Indeed, the Trustee has documented extensive expenditures by Ms. Javeri that appear to undercut her claimed desire to mitigate expenses. Tr. Supp. Decl. to Javeri, Ex. 12 and 13. Ms. Javeri's proffered explanation for the sudden desire to sell based on lack of income is undercut by her expenditure of $23,084.76 at luxury retail stores a month after listing the apartment for sale. *Id.*, Ex. 13.

**4. Defendants' Arguments about the Trustee's Ability to Attach Certain Property**

a. The Bhansali Residence

Mr. Bhansali challenges the Trustee's ability to attach the Bhansali Residence given that Mr. Bhansali has not owned the Bhansali Residence since he transferred his interest to his wife. *See generally*, Bhansali Opp. at 10-11. Mr. Bhansali correctly cites the general rule that "attachment will only lie against the property of the debtor, and that the right to attach the property is only the same as the defendant's own interest in it." *Bank of New York v. Nickel*, 14 A.D. 3d 140, 145 (2004) (internal quotations and citations omitted). But Mr. Bhansali ignores the exception to this general rule for property that was fraudulently transferred by that defendant. N.Y. D.C.L. § 278 (repealed 2020) ("Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may . . . [d]isregard the conveyance and attach or levy execution upon the property conveyed."); *see also Neshewat v. Salem*, 365 F. Supp. 2d 508, 521 (S.D.N.Y. 2005), *aff'd*, 194 F. App'x 24 (2d Cir. 2006) ("The purpose of the remedy fashioned by DCL § 278 is to grant the creditor the right 'to be paid out of assets to which he is actually entitled and to set aside the indicia of ownership which apparently contradict that right.'") (quoting *Gasser v. Infanti Int'l, Inc.*, 353 F. Supp. 2d 342, 356 (E.D.N.Y. 2005)). The Trustee's evidence satisfies this exception. Contrary to Mr. Bhansali's assertion, the Trustee need not commence a separate action to attach property that would be attachable had it not been fraudulently conveyed away from the Defendant. *Helicon Partners, LLC v. Kim's Provision Co.*, 2013 WL 1881744, at *8 (Bankr. S.D.N.Y. May 6, 2013) ("The relevant law does not, however, impose that requirement prior to levying on the non-party's property. To the contrary, the case law recognizes the plaintiff's right to levy on property held by a non-party garnishee pursuant to an order of attachment.").

b. The Frost Trust

Ms. Javeri challenges the Trustee's ability to attach the Frost Trust. She argues that the Frost Trust cannot be attached because it is an out-of-state entity that neither owns property in New York nor engages in business in New York. Javeri Opp. at 24. Relying on *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303 (2010), Ms. Javeri asserts that this Court lacks jurisdiction to adjudicate matters involving the Frost Trust. *Id*. But *Hotel 71* does not support Ms. Javeri's position. While it is true that *Hotel 71* holds that attachment cannot be used to confer *quasi in rem* jurisdiction over a nondomiciliary based solely on property found in New York—meaning jurisdiction based solely on the property—that is not the circumstance here. The Court already possesses jurisdiction over Ms. Javeri and attachment is serving instead as security. *Hotel 71 Mezz Lender LLC*, 14 N.Y.3d at 312. In the latter circumstance, attachment is appropriate. *Id.*

Ms. Javeri next asserts that the Frost Trust cannot be attached because it was not mentioned in other pleadings including the complaint, the Indian proceedings, the Trustee's initial *ex parte* motion for attachment, or the Trustee's memorandum of law in support of the motion to confirm the attachment. Javeri Opp. at 24-25. But Ms. Javeri does not cite any authority for the notion that the Trustee is barred from seeking attachment against assets not initially identified. In fact, the Trustee's belated identification of this asset did not prejudice Ms. Javeri. Ms. Javeri had ample opportunity to address the Trustee's arguments concerning the Frost Trust, as demonstrated by the lengthy discussion of the application to attach the Frost Trust in the Javeri Opposition. *See* Javeri Opp. at 24-25. The Trustee Supplement to the original Javeri Motion to Confirm was filed less than a month after the Javeri Motion to Confirm; Ms. Javeri's counsel then reached an agreement to extend Ms. Javeri's time to file an opposition to the motion, ensuring that Ms. Javeri had ample time to respond in full to both the Trustee's initial motion and the Trustee's Supplement to Javeri Motion. *See, e.g.* Memorandum Endorsed

Order, dated April 28, 2022, Re: Revised Briefing Schedule [ECF No. 121, Adv. Pro. 20-1054]. And as the Trustee rightly notes, Ms. Javeri should not be able to shield her assets simply because she has been successful in hiding them.

Ms. Javeri further asserts that the Trustee cannot attach the Frost Trust because the Trustee has not proven that the Frost Trust assets are derived from the Bank Fraud, and because the funds are needed to support her family. Javeri Opp. at 25. But once again, this argument ignores the scope of the evidentiary record that supports the Trustee's likelihood of success on the claims—as well as the other requirements of attachment—all of which justify attachment to ensure payment in the event the Trustee ultimately prevails. *See generally*, Confirm Mem. at 21. In any event, Ms. Javeri's argument fails because the Trustee is not required to show that the assets to be attached derived from the alleged wrongful conduct leading to the claim. *Cf. JSC Foreign Econ. Ass'n*, 306 F. Supp. 482 (granting attachment without any allegation that the assets sought to be attached were the product of fraud).

c. Assets Held in Trust

Ms. Javeri further challenges the Trustee's ability to attach property whose legal title is held by a trust entity and not by her as a "judgment debtor" under the relevant New York statute. As such, she challenges the attachment of any asset owned by a trust entity, including the legal title to the Essex House Apartment and the legal title to the Ritz Carlton Apartment (both of which are held by the Ithaca Trust); Trident's ownership interest in CPRE and CPS50; and the assets held in the Frost Trust. Javeri Opp. at 26, 28-29. Ms. Javeri relies on language in the Ithaca Trust on restrictions for transferring trust assets under applicable state law to argue that all

trust property here is exempt from attachment under N.Y. C.P.L.R. § 5205(c). Javeri Opp. at 28-29; *see also* Javeri Tr. Decl., Ex.17 § 11.

As the Trustee correctly notes, however, N.Y. C.P.L.R. § 5205(c)(5) provides that assets added to a trust are available for satisfaction of a money judgment if the transfer of the asset is deemed to be voidable transactions under the N.Y. D.C.L. *See* Tr. Reply to Javeri at 17 (citing N.Y. C.P.L.R. § 5205(c)(5)). The record supports that Trustee's position that the transfers were fraudulent and thus are subject to attachment under the carve out in Section 5205(c). *See Roedel Companies, LLC v. JNK Home Enter., LLC*, 145 N.Y.S.3d 330 (N.Y. Sup. Ct. 2021) (relying on financial records of transactions to find badges of fraud warranting a finding of a voidable transaction). It is undisputed that Ms. Mehta created and settled the Frost Trust. Tr. Supp. Decl. to Javeri, Ex. 5 and 6. Given Ms. Mehta's admission that she was the conduit for illicit proceeds of the fraud, Javeri Tr. Decl., Ex. 7, 13, the Trustee has provided sufficient evident that the funds in the Frost Trust were transferred with an intent to hinder, delay, and defraud creditors. This conclusion is buttressed by evidence showing the flow of funds from Ms. Mehta to Ms. Javeri, *see* Tr. Supp. Decl. to Javeri, Ex. 3, the timing of the transfer of CPRE and CPS50 into the Ithaca Trust, *see* Modi Family Complaint ¶¶ 333, 358, and the ongoing retention and control by Ms. Mehta of the property.[23]

d. Ms. Javeri's Management Roles

Ms. Javeri challenges the Trustee's ability to attach certain specific "interests" including: 1) Ms. Javeri's interests as Investment Advisor of the Ithaca Trust; 2) her interests as manager of CPS50 and as Manager of CPRE; and 3) her interests as manager of the [redacted].

---

[23] The Trustee also invokes N.Y. C.P.L.R §5205(1) to argue that the assets held in trust are attachable because they are owned by Ms. Mehta, who is a defendant here. The Trustee notes that the Frost Trust was settled by Ms. Mehta for all descendants of Deepak Modi, Nirav Modi and Purvi Mehta's father. Tr. Reply to Javeri at 16-17. However, the Trustee has not sought to attach the property of Ms. Mehta and therefore cannot avail himself of Section 5205(1). Of course, the Trustee is free do so in the future.

Javeri Opp. at 26. Pointing to the state laws governing limited liability companies in the states where these entities are incorporated, Ms. Javeri argues that her positions as manager and investment advisor cannot be unilaterally assigned or transferred, and thus these interests cannot be attached. *Id.* at 27; *see Mitchell v. Garrison Protective Servs*., Inc., 579 F. App'x 18, 21–22 (2d Cir. 2014) (holding that a money judgment can only be enforced against property that can be assigned or transferred). In response, the Trustee argues that the positions are assignable even though the assignment requires the participation of others, and the positions are therefore attachable. *See Moskin v. Midland Bank & Tr. Co.*, 96 Misc. 2d 600, 601–02, (N.Y. Sup. Ct. 1978) (finding a seat on the floor of the Stock Exchange to be subject to levy even though a purchaser of the seat would have to be approved by the Stock Exchange.) The Trustee argues that attachment of these interests is necessary to prevent Ms. Javeri, working in conjunction from her co-conspirators, from transferring the interests and putting the assets held by the Trusts at risk.

The Court concludes that it is unnecessary to resolve this discrete legal issue, given the state of the record in two areas. First, the beneficial interests in CPRE and CPS50 are held by the Ithaca Trust; in turn, the only assets held by CPRE and CPS50 are the Apartments. Javeri Tr. Decl., Ex. 4 ¶¶ 6-8. Given the Court's ruling above that the underlying assets of CPRE and CPS50—namely, the two Apartments—are attached, the Ithaca Trust assets are not at risk of being dissipated. *See supra* Section III(A)(4)(d). Second, Trident, as trustee of the Frost Trust, has represented to this Court that it will not disburse the assets held in the Frost Trust absent further order of this Court. *See* Declaration of Marc Rowin regarding Ami Javeri's Motion to Compel the Payment of Expenses [ECF No. 159, Adv. Pro. 20-1054]; *see also* Defendant Ami Javeri's Motion for an Order Directing the Payment of Expenses at 2 [ECF No. 156, Adv. Pro. 20-1054] (the "Expense Motion") ("Trident also decided it would no longer take direction from

any trust advisor, investment advisor, trust protector or other named beneficiary regarding the investments of either the Ithaca Trust or the Frost Trust. "). Said another way, the Court sees no reason why attachment of these interests—i.e. Ms. Javeri's roles in these entities—is necessary if the assets of the underlying entities are already attached or will not be moved without further order of this Court. Therefore, the Court will deny without prejudice the Trustee's request to attach Ms. Javeri's interests as Investment Advisor of the Ithaca Trust; Ms. Javeri's interests as manager of CPS50 and as manager of CPRE, and Ms. Javeri's interests as Investment advisor of Frost Trust and as manager of [REDACTED] The Trustee is free to renew his application to attach these positions if he can show that attachment is necessary in the future.

**5. Damages Exceed all Counterclaims**

Under the final statutory requirement for attachment under N.Y. C.P.L.R. § 6212, the Trustee must show that the damages claimed exceed any counterclaims. Neither of the Defendants have asserted any counterclaims in this action. *See* Defendant Mihir Bhansali's Answer and Defenses to the First Amended Complaint [ECF No. 87, Adv. Pro. 19-1102]; *see also* Defendants Ami Javeri, Central Park Real Estate, LLC, and Central Park South 50, LLC's Answer to Complaint and Jury Demand [ECF No. 194, Adv. Pro. 20-1054]. As the Trustee has sought extensive damages here, Section 6212 is satisfied.

Ms. Javeri asserts that the Trustee has not met this element because the Trustee has not provided evidence of damages. Javeri Opp. at 18-19. But Ms. Javeri misconstrues the requirements of the statute. The Trustee need not quantify his damages, only demonstrate that there are damages that exceed the amount of any counterclaims. As no counterclaims exist, the Trustee need only demonstrate that some damages exist. *JSC Foreign Econ. Ass'n*, 306 F. Supp. at 485. The Trustee easily satisfies that requirement here. As but one example of damages incurred by the Debtor, the Examiner Report contains evidence that Firestar Diamond, Inc. made

payments towards the mortgage on the Essex House Apartments in the amount of $856,335 despite the fact that Firestar Diamond, Inc. no longer had any interest in the Essex House Apartment. Examiner Rep. at 151-52; *see also id.* at 52 (identifying a payment of $150,000 from the Debtors to a Shadow Entity for payment of the Shadow Entity's back office expenses).

**6. Need for Attachment**

In addition to showing that the statutory elements of N.Y. C.P.L.R. § 6212 are met, the Trustee must also demonstrate a need for the requested attachment. *Cap. Ventures*, 443 F.3d at 221; *see also* Siegel, N.Y. Prac. § 317 (6th ed.) ("[I]f the judge should perceive from the papers that the plaintiff does not need an attachment, either for jurisdiction or security, discretion is appropriately exercised against it even though a CPLR 6201 showing has been made."). The Trustee has made such a showing here except as to those limited interests identified above. *See supra* Section III(A)(4)(d).

As to Ms. Javeri, the Trustee has established—given all the facts discussed above—that attachment of Ms. Javeri's subject property is necessary to secure payment on any judgment and to prevent the dissipation of assets. Ms. Javeri has already shown her desire to place assets outside the reach of creditors by seeking to force, through her petition for Court Supervision in South Dakota, the Frost Trust to disburse more than [REDACTED] Javeri Tr. Decl., Ex. 4. The Court has no reason to believe that the calculus is any different for the other assets here, such as the Apartments. Without an attachment then, the assets needed to pay a judgment would be dissipated. In considering whether to grant attachment, the Court may also consider the conduct of the Defendants. *See Thornapple Assocs.*, 2007 WL 747861, at *7. The Court finds attachment is supported by Ms. Javeri's failure to fully disclose assets while simultaneously seeking to dispose of such assets. *See* Tr. Supp. to Motion to Confirm ¶¶ 2-3, Exhibit A.

As to Mr. Bhansali, the Court also concludes that attachment of the Bhansali Residence is necessary. Mr. Bhansali contends that because he resides in New York, any steps to satisfy the judgment should wait until the Trustee obtains a judgment. Bhansali Opp. at 31. However, this ignores the very purpose of attachment. "[A] need for [the] "drastic action" [of attachment] may be shown by establishing, *inter alia*, that a defendant has insufficient assets within New York or that a defendant's financial condition poses the risk of enforcement of a future judgment. *Thornapple Assocs.*, 2007 WL 747861, at *8. Indeed, the very case Mr. Bhansali cites to challenge the need for attachment actually supports the need for an attachment. *See Ames*, 863 F. Supp. at 177 ("New York courts have required an additional showing that something, whether it is a defendant's *financial position or past and present conduct*, poses a real risk to the enforceability of a future judgment.") (emphasis added). Mr. Bhansali's conduct in seeking to shield his one significant asset from creditors demonstrates the Trustee's need for security here. *See In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d at 312 (finding that the dissipation of defendant's assets from $2.4 billion to $185 million in the face of a $6 billion dollar claim demonstrated a "strong need for security").

**7. The Exercise of the Court's Discretion**

Both Mr. Bhansali and Ms. Javeri argue that the Court should exercise its discretion to limit or deny attachment here. *See generally* Bhansali Opp. at 32–34 (requesting denial); Javeri Opp. at 30 (seeking limited attachment to allow payment of her expenses); *see also Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 272 (2d Cir. 2022) (holding that trial courts have discretion in deciding motions for attachment, which includes consideration of nonstatutory factors).

Considering all the facts and circumstances here, however, the Court does not find it appropriate to exercise its discretion to deny or limit attachment as to Mr. Bhansali. Considering

both his present financial condition and the entire record of his conduct, attachment is fully warranted. Contrary to Mr. Bhansali's assertion that there is no showing that he "has taken any steps to be 'judgment proof,'" Bhansali Opp. at 34, this is precisely what Mr. Bhansali has done. An exercise of the Court's discretion in Mr. Bhansali's favor is also unwarranted given the evidence of his role as a driver of the Bank Fraud. Lastly, a reduction in the amount of the attachment is not justified given that his interest in the Bhansali Residence is less than half of the potential damages identified by the Trustee in his complaint.[24]

As for Ms. Javeri, she is correct that courts will consider modifying an attachment order "to permit reasonable payments of personal living expenses and legal fees." *JSC Foreign Econ. Ass'n*, 306 F. Supp. 2d at 488; *see Wallkill Med. Dev., LLC v. Catskill Orange Orthopaedics, P.C.*, 131 A.D.3d 601, 605, 15 N.Y.S.3d 406 (2015) (granting a preliminary injunction enjoining Defendant from transferring or disposing of assets except in the ordinary course of business); *cf. Meridien Int'l Bank Ltd. v. Gov't of Republic of Liberia*, 1996 WL 22338, at *6 (S.D.N.Y. Jan. 22, 1996) (holding that attachment of the assets of a sovereign nation would irreparably harm its citizens who were in the process of recovering from a civil war).

But the facts here do not justify that relief. This is not the first time that the issue of Ms. Javeri's living expenses has come before the Court. When these attachment motions were being briefed, the Trustee consented to the payment of expenses associated with the Ritz Carlton and Essex House Apartments. Tr. Reply to Javeri at 18. The Trustee and Ms. Javeri then entered into several stipulations to allow the Frost Trust to pay expenses associated with the Apartments.[25] After January 31, 2023, however, the Trustee refused to consent to further

---

[24] As the Trustee notes, Mr. Bhansali and his family will be able to continue to live in the Bhansali Residence until the Trustee obtains a judgment. Tr. Reply to Bhansali at 14.

[25] *See* Stipulation and Order [ECF No. 122, Adv. Pro. 20-1054] (stating that the Trustee agrees to support a petition in South Dakota Circuit Court for a payment by the Frost Trust of certain expenses due on or before September

payment of such expenses. *See* ECF 149, Adv. Pro 20-1054 (letter dated March 21, 2023 from Ms. Javeri's Counsel seeking Court intervention regarding the Trustee's refusal to consent to extend the agreement to pay the Apartments' expenses). Ms. Javeri responded by filing a motion to seek an order directing the payment of the Apartments' expenses from the Frost Trust. *See* Expense Motion. After briefing and a hearing, the Court denied the Expense Motion. *See* Order Denying Ami Javeri's Motion for an Order Directing the Payment of Expenses [ECF No. 164, Adv. Pro. 20-1054]; *see also* Hr'g Tr. (June 5, 2023) [ECF No. 169, Adv. Pro. 20-1054].

For much the same reasons as this Court denied the Expense Motion, a carve out from the attachment for expenses is unwarranted. As the Court explained in its prior ruling on the Expense Motion, Ms. Javeri's request rests on the premise that she has no other assets available to maintain the Apartments and her family. That premise is questionable, however, given Ms. Javeri's failure to comply with the Trustee's outstanding discovery requests seeking information about other assets and financial resources. *See generally*, Discovery Motion; *see also* H'rg Tr 26:20-27:2 (June 5, 2023) ("But I don't think based on what I currently have, I have enough facts and evidence to justify essentially a ruling that there's a hardship in terms of the inability to make the payments based on this record. It is possible that I might get there, depending on what facts and circumstances are brought to me, but I'm not in the business [of] speculating . . . So, I could say, on this record I don't have it."). Without that information, the Court cannot determine whether a modification of the attachment is necessary to prevent unnecessary hardship. Moreover, there is evidence that Ms. Javeri does, in fact, possess assets of significant value other than the assets at issue in this motion. In the briefing related to the Expense Motion, Ms. Javeri admitted that she was in possession of a painting worth approximately $2 million. Supp. Decl.

1, 2022); Second Stipulation and Order [ECF No. 141, Adv. Pro. 20-1054] (Trustee agreeing to the Frost Trust's payment of expenses related to the Apartments through January 31, 2023).

of Ami Javeri in Support of her Motion for the Payment of Apartment Expenses [ECF No. 163, Adv. Pro. 20-1054] ¶10; Declaration of Angela M. Allen in Opposition to Ami Javeri's Motion for an Order Directing the Payment of Expenses [ECF No. 161, Adv. Pro. 20-1054], Ex. 6.[26]

**B. Undertaking**

When an attachment is sought, an undertaking of no less than $500 must be provided by the party seeking the attachment. N.Y. C.P.L.R. § 6212(b). The amount of the undertaking is to be fixed by the Court. *Id.* To determine the amount of the appropriate undertaking, the Court must look to the damages a party will suffer in the event the attachment is vacated or a party obtains a judgment in their favor. *Vermes*, 1986 WL 4896, at *3; *see also In re Schick*, 215 B.R. 13, 18 n.7 (Bankr. S.D.N.Y. 1997) (finding an undertaking of the statutory minimum appropriate in light of the fact that the plaintiff has already prevailed on the merits); *MyPart Software, Ltd. v Fluent Trade Tech. Ltd.*, 2017 NY Slip Op 32499[U], *3 (Sup Ct. NY County 2017) (An undertaking must be "sufficient to pay defendant damages, including attorney's fees, in the event . . . that plaintiff was found not entitled to an attachment."); *JSC VTB Bank, etc. v. Mavlyanov*, 154 A.D.3d 560, 563 (1st Dept. 2017) (an award must be "rationally related" to potential damages in the event the attachment is found to be unwarranted).

For both the Bhansali Attachment Motion and the Javeri Motion to Confirm, the Trustee seeks an undertaking of no more than $50,000.[27] Confirm Mem. at 24; Attach. Mem. at 18. To support his claim for this amount, the Trustee cites to a number of cases where a minimal undertaking was awarded. *See, e.g. NY Dist. Council of Carpenters Pension Fund v KW Constr.*,

---

[26] *See also* Declaration of Angela M. Allen in Opposition to Ami Javeri's Motion for an Order Directing the Payment of Expenses, Ex. 7-9 (identifying close to $200,000 in Ms. Javeri's bank account at various times in 2023 and at the end of 2022).

[27] The Trustee posted an initial bond of $50,000 in light of the preliminary order of attachment. *See* ECF No. 117, Adv. Pro. 20-1054.

*Inc.*, 2008 US Dist LEXIS 40517, at *20 (SDNY May 14, 2008) (providing for an undertaking of 4.5% of the amount sought to be attached); *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 305 F. Supp. 2d 340, 348 (S.D.N.Y. 2004) (providing for an undertaking of 0.04% of the value of the assets attached). Mr. Bhansali seeks a larger undertaking, asserting an undertaking of five to ten percent of the amounts sought to be attached is more typical. *See, e.g. Cargill, Inc. v. Sabine Trading & Shipping Co.*, 756 F.2d 224, 226 (2d Cir. 1985) (requiring an undertaking of 10% of the value of the assets sought to be attached); *Royal Bank & Tr. Co. v. Vermes*, 1986 WL 4896, at *3 (S.D.N.Y. Apr. 21, 1986) (same). In response, the Trustee argues that a minimal undertaking is sufficient here, particularly given that the Bankruptcy Code provides for no undertaking at all if a bankruptcy trustee obtains a preliminary injunction, *see* Fed. R. Bankr. Pro. 7065, Tr. Reply to Bhansali at 15.

On the one hand, the Court rejects the Trustee's reliance on the provision waiving an undertaking where a preliminary injunction exists. While the Trustee states that he "could just as easily" have obtained a preliminary injunction, Tr. Reply to Bhansali at 15, the Trustee has not actually done so. On the other hand, the Court is largely unconvinced by Mr. Bhansali's request for a larger undertaking. Mr. Bhansali's only articulated risk of damages is the attorneys' fees and costs he would incur in the event the attachment is vacated or he prevails in this action. While a passing reference is made to the increased value of the Bhansali Residence and Mr. Bhansali's inability to capitalize on that increased value through a sale, Bhansali Opp. at 37, Mr. Bhansali does not state he has any intention to sell the property. Given the current state of the record, therefore, a significant increase is inappropriate. But given the extent of attorney fees incurred in this heavily litigated case, the Court will increase the existing undertaking to $75,000 as to Mr. Bhansali.

As for Ms. Javeri, she complains that the $50,000 undertaking is insufficient to pay the damages that will likely flow from the attachment. Javeri Opp. at 30-31. She identifies the risk of the Apartments being foreclosed, and the increased difficulty in paying the expenses associated with the Apartments. *Id.* at 32. If the property is foreclosed upon, Ms. Javeri further asserts, damages would include diminution of the value of the property as well as any costs Ms. Javeri may incur to find new property. *Id.* Finally, Ms. Javeri also asserts that she has incurred attorney's fees in opposing the instant motion. Given the Court's conclusions about Ms. Javeri's expenses, the Court is not convinced that her purported financial situation justifies an increase in the undertaking. But given the length of the proceedings here and the larger monetary value of the attachments as to Ms. Javeri, the Court will increase the undertaking to $150,000 to better ensure that any potential damages can be paid.[28]

**C. Trustee's Request for Discovery**

In both attachment motions, the Trustee seeks discovery under N.Y. C.P.L.R. § 6220, which permits disclosure "by any person of information regarding any property in which the defendant has an interest, or any debts owing to the defendant." If a valid order of attachment exists, "a plaintiff is entitled to learn of assets to enable a sheriff to seize sufficient property to comply with the order." *Etalon Imob S.R.L. v. Schoenbach*, 2012 WL 4741595, at *5 (S.D.N.Y. Oct. 3, 2012) (citing *Heller Fin., Inc. v. Wall St. Imports, Ltd.*, 140 Misc. 2d 205, 207 (NY Sup. Ct. 1988)). The Trustee asserts that discovery is required to learn the nature and location of any other assets that Mr. Bhansali and Ms. Javeri may possess. Attach. Mem. at 17; Confirm Mem. at 22.

[28] It should be noted that liability for damages associated with a wrongful attachment is not limited to the amount of the undertaking. *NY Dist. Council of Carpenters Pension Fund*., 2008 US Dist LEXIS 40517, at *19-20.

In arguing against discovery, Mr. Bhansali asserts that it is inappropriate given that Mr. Bhansali does not own the Bhansali Residence. Bhansali Opp. at 34-45. But Mr. Bhansali does not cite any cases to support his reasoning, which is irrelevant to the purpose of discovery under the statute. Mr. Bhansali also unsuccessfully seeks to distinguish the cases cited by the Trustee in support of the request for discovery. Bhansali Opp. at 35. In fact, none of his cited cases justify a denial of discovery here. *See*, *e.g.*, *Heller Fin.* 140 Misc. 2d at 206-207 (noting that the provision for discovery is broad). Indeed, the statute is clear that, once an order of attachment is granted, a court may order discovery about other property owned by the defendant.

Ms. Javeri does not oppose the Trustee's discovery request, or indeed, address it at all. This is not surprising given that the Trustee has already discovered additional assets that Ms. Javeri possesses, *see* Tr. Supp. to Motion to Confirm ¶ 3, and the Court has already granted the Trustee's Discovery Motion to require Ms. Javeri to produce information related to her finances. *See* Order (I) Confirming the Trustee's Authority to Take Discovery of Defendant Ami Javeri Under CPLR § 6220; (II) Directing Defendant Ami Javeri to Respond to the Trustee's March 7, 2022 Document Requests; and (III) Granting Related Relief [ECF No. 148, Adv. Pro 20-1054]. Under these circumstances, the Court will grant the Trustee's request for discovery of any additional assets of Ms. Javeri.

## IV. Conclusion

For the reasons discussed above, the Trustee's motion to confirm the attachment is granted as to Ms. Javeri's interests in the Apartments, Ms. Javeri's beneficial interests in the Frost Trust and Ithaca Trust, as well as the interests of CPS50, CPRE, and Trident, solely as Trustee of the Ithaca Trust, in any and all of their assets. The Trustee's motion to attach the Bhansali Residence is also granted. The Trustee is directed to post an undertaking of $75,000 as to Mr. Bhansali and $150,000 as to Ms. Javeri, with the

Trustee's already posted bond of $50,000 being credited against these amounts. The motion to confirm attachment is denied without prejudice as to Ms. Javeri's position as the Investment Advisor of the Ithaca and Frost Trust and her position as manager of CPRE and CPS50. The Trustee's motion for discovery under N.Y. C.P.L.R. § 6220 is granted in full as to both Mr. Bhansali and Ms. Javeri.

The Trustee should settle an order on five days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon opposing counsel. Within five days business days, counsel to the Trustee and the Defendants shall provide letters to the Court, served on all parties, identifying any information in the Memorandum of Decision that counsel believes should be redacted and the basis for such redaction.

Dated: White Plains, New York
February 8, 2024

***/s/ Sean H. Lane***
UNITED STATES BANKRUPTCY JUDGE