```
                    UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF NEW YORK (NEW YORK)


                                    .
IN RE:                              .  Case No. 18-10509-dsj
                                    .  Chapter 11
FIRESTAR DIAMOND, INC and           .
FANTASY, INC.,                      .  One Bowling Green
                                    .  New York, NY  10004-1408
                                    .
              Debtor.               .
. . . . . . . . . . . . . . . . .   .
RICHARD LEVIN,                      .  Adv. Proc. No. 19-01102-dsj
                                    .
              Plaintiff,            .
                                    .
   v.                               .
                                    .
NIRAV DEEPAK MODI,                  .
MIHIR BHANSALI and                  .
AJAY GANDHI,                        .
                                    .
              Defendants.           .
. . . . . . . . . . . . . . . . .   .
RICHARD LEVIN,                      .  Adv. Proc. No. 20-01053-dsj
                                    .
              Plaintiff,            .
                                    .
   v.                               .
                                    .
FIRESTAR INTERNATIONAL LTD.,        .
et al,                              .
                                    .
              Defendants.           .
. . . . . . . . . . . . . . . . .   .
RICHARD LEVIN,                      .  Adv. Proc. No. 20-01054-dsj
                                    .
              Plaintiff,            .
                                    .
   v.                               .
                                    .
AMI JAVERI, et al,                  .
                                    .
              Defendants.           .
. . . . . . . . . . . . . . . . .   .
```

```
RICHARD LEVIN,                        .  Adv. Proc. No. 21-01141-dsj
                                      .
                Plaintiff,            .
                                      .
    v.                                .

ANTHONY ALLICOCK, et al,

                Defendants.
. . . . . . . . . . . . . . .
RICHARD LEVIN,                          Adv. Proc. No. 24-01321-dsj

                Plaintiff,

    v.

MIHIR BHANSALI, et al,

                Defendants.    Thursday, May 2, 2024
. . . . . . . . . . . . . . .  3:18 p.m.
```

TRANSCRIPT OF ADVERSARY PROCEEDING 19-01102-DSJ LEVIN V. MODI
ET AL, MOTION TO COMPEL PRODUCTION OF DOCUMENTS;
PRETRIAL CONFERENCE;
ADVERSARY PROCEEDING 20-01053-DSJ LEVIN V. FIRESTAR
INTERNATIONAL LTD. ET AL, PRETRIAL CONFERENCE;
ADVERSARY PROCEEDING 20-01054-DSJ LEVIN V. JAVERI ET AL,
PRETRIAL CONFERENCE;
ADVERSARY PROCEEDING 21-01141-DSJ LEVIN V. ALLICOCK ET AL,
PRETRIAL CONFERENCE;
ADVERSARY PROCEEDING 24-01321-DSJ LEVIN V. BHANSALI ET AL,
PRETRIAL CONFERENCE
BEFORE THE HONORABLE DAVID S. JONES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES CONTINUED.

Audio Operator:          Court ECR Personnel

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com


        Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

ZOOM APPEARANCES (Continued):

For the Trustee:                Jenner & Block LLP
                                By:  ANGELA M. ALLEN, ESQ.
                                353 N. Clark
                                Chicago, IL  60654
                                (312) 222-9350


                                Jenner & Block LLP
                                By:  CARL N. WEDOFF, ESQ.
                                1155 Avenue of the Americas
                                New York, NY  10036
                                (212) 891-1653


Chapter 11 Trustee:             Jenner & Block LLP
                                By:  RICHARD B. LEVIN, ESQ.
                                1155 Avenue of the Americas
                                New York, NY  10036
                                (212) 891-1653


For Mihir Bhansali:             White and Williams, LLP
                                By:  NICOLE A. SULLIVAN, ESQ.
                                     MARK E. NAKAHARA, ESQ.
                                7 Times Square, Suite 2900
                                New York, NY  10036
                                (212) 631-4420


For Nirav Modi:                 Morrit Hock Hamroff LLP
                                BY:  JAMES P. CHOU, ESQ.
                                     MARSHALL DWORKIN, ESQ.
                                1407 Broadway, Suite 3900
                                New York, NY  10018
                                (212) 239-2000


For Trident Trust              Lynch Rowin LLP
(South Dakota):                 BY:  MARC ROWIN, ESQ.
                                50 Main Street, Suite 1000
                                White Plains, NY  10606
                                (212) 682-4001


For Purvi Modi:                 Paykin Krieg Adams, LLP
                                BY:  BENJAMIN SEUSS, ESQ.
                                2500 Westchester Avenue, Suite 107
                                Purchase, NY  10577
                                (917) 400-2984


ALSO PRESENT:                   UDAY GORREPATI, ABI Project
                                AMIR TOOSSI, Akrivis Law Group

1        (Proceedings commenced)

2            THE COURT:  Next up is Firestar Diamond, Number

3    18-10509, and a number of adversaries under it.  So let me --

4    this case is still new enough to me that -- let me take

5    appearances just to remind me who's doing what for whom.  I'll

6    just call you in order I see you on the screen so that you

7    don't all have to guess which moment you should talk at.  And

8    I'm just going in the order you appear on my screen.

9            So first we have Mr. Wedoff.

10           MR. WEDOFF:  Good morning, Your Honor.  Carl Wedoff

11   on behalf of the trustee.

12           THE COURT:  Okay.  And Ms. Allen.

13           MS. ALLEN:  Good morning, Your Honor.  Angela Allen,

14   on behalf of the trustee.

15           THE COURT:  Okay.  Is one or the other of you more

16   taking a lead role today?

17           MS. ALLEN:  I will be taking the lead and the

18   trustee, Mr. Levin, is also on the line.

19           THE COURT:  Okay, great.  Nice to see you, Mr. Levin.

20           MR. LEVIN:  You as well, Your Honor

21           THE COURT:  Okay.  Ms. Sullivan.

22           MS. SULLIVAN:  Good morning, Your Honor.  Nicole

23   Sullivan from White and Williams for Mihir Bhansali.  I'm here

24   with my associate, Mark Nakahara.  I would ask the Court if

25   Mr. Nakahara could argue the motion to compel.  He's not

1  technically admitted in New York.  He put in a pro hoc

2  application today.  I spoke to trustee's counsel.  They have no

3  objection.  But of course it's up to Your Honor if you'll

4  permit it or not.

5         THE COURT:  Oh, does anyone object?  That's fine.

6  Let me say I'm -- welcome, Mr. Nakahara, and anyone whose title

7  is associate who is being given argument time, I'm very

8  welcoming towards and encourage the bar always to actually let

9  young lawyers do stuff.  So this is great.

10        Okay.  So I'm not going to call you if you've been

11 introduced, but I think we have to go with -- have to cover

12 Mr. Rowin still.

13        MR. ROWIN:  Good morning, Your Honor.  Mark Rowin of

14 Lynch Rowin LLP for Defendant Trident Trust, South Dakota.

15        THE COURT:  Nice to see you.  Are you going to be

16 active in argument today or are you just sort of covering?

17        MR. ROWIN:  No, the motion does not concern my

18 client.  Your Honor had, when we were last before you, wanted

19 an update on my client's request for permission to reimburse

20 itself for fees.  You wanted a report today and that's why I'm

21 on the line.

22        THE COURT:  Okay, hold off.  I'll lead off with you

23 so that if you want, you can hang up, but you're also welcome

24 to stick around and see what happens.

25        And Mr. Dworkin?

1             MR. DWORKIN:  Good morning, Your Honor.  Marshall

2    Dworkin for Ami Javeri and Nurav Modi.  My colleague, Mr. Chou,

3    will be leading the arguments today.

4             THE COURT:  Okay, great.  Okay.  Are you playing an

5    active role in the motion to compel?

6             UNIDENTIFIED:  No.

7             MR. DWORKIN:  No, sorry.

8             THE COURT:  Okay.  You both said no.  You must --

9    good, you're on the same page.  That was --

10            MR. DWORKIN:  Your Honor, we --

11            THE COURT:  And that covers the --

12            MR. DWORKIN:  Your Honor, I apologize.  We also

13   represent Central Park West Real Estate, LLC and Central Park

14   South 50 Properties LLC as well.

15            THE COURT:  Okay.

16            MR. DWORKIN:  They're often forgotten in the

17   appearances, but they are our clients as well.

18            THE COURT:  Okay.  Thanks for getting that on the

19   record.  Okay, so I think I just -- in general, I'm happy to go

20   in whatever order people think makes sense.  But I did just

21   promise Mr. Rowin to deal with that isolated issue if he wants

22   to talk about it, and then be free to go and not keep spending

23   his client's money.

24            MR. ROWIN:  Thank you, Your Honor.  When we were last

25   before you in mid-April, I raised this issue.  My client has

 1  incurred fees for administering the Ithaca Trust, which is

 2  controlled by Ms. Javari and her family.  The fees total about

 3  $146,000.  The assets of the trust were subject to -- they were

 4  seized pursuant to the CPLR.  And we have been trying to get

 5  permission to pay ourselves for this.

 6          As I've advised the Court, counsel for the bankruptcy

 7  trustee has no objection to this.  And I had forwarded

 8  information to Mr. Dworkin in advance of the last conference.

 9  If I can recapitulate, his position was that his client needed

10  to study the matter.  And that's when Your Honor said that when

11  this matter was on for today, for oral argument, that he would

12  report back as to his client's position.

13          So with that background, if I may turn it over to

14  Mr. Dworkin and to find out what his client's position is going

15  to be on this.

16          THE COURT:  Do we know?  Yeah.  Mr. Dworkin, do we

17  know?

18          MR. DWORKIN:  We don't have a definitive response,

19  but I think it's going to encapsulate some of the conversations

20  between us and the trustee.  Or it could potentially, as we

21  kind of get into the scheduling issue.  So it's certainly --

22  Mr. Rowin's issue is on the forefront of our mind.  We plan to

23  address it.  Our client is looking at it.  I think it can get

24  resolved here in the next few weeks, but as you'll see,

25  Mr. Chou, as he'll speak to, you know, we're in discussions

1   with the trustee on certain matters.

2          THE COURT:  Okay.  Look, let me just say I have

3   competing impulses, so I'll say both of them.  One is to tell

4   you, please just get this done.  It seems like an isolated

5   issue, and you said it was on the forefront of your mind, and

6   yet it hasn't happened since we were together last.  So please

7   make it happen.  On the other hand, if it -- I don't want to

8   get into whether it is or isn't legitimately bundled with the

9   other issues you're referencing or alluding to, I guess, but --

10  and so I don't want to mess up a productive approach you're

11  engaged in.

12          So I guess to try to harmonize those two impulses,

13  please hurry to the best of your ability without messing up a

14  broader thing that's happening sooner rather than later.  Okay?

15  But if it's -- but if the broader approach starts to drag and

16  Mr. Rowin and his client are suffering, let's just get that

17  taken care of.  The bundled approach makes less sense with the

18  passage of time.  Okay?

19          Does that make sense to you, Mr. Dworkin and

20  Mr. Chou?

21          MR. DWORKIN:  Yes, Your Honor.

22          THE COURT:  Okay.

23          MR. CHOU:  Yes.

24          THE COURT:  Great.  Okay.  Does that cover you for

25  now, Mr. Rowin?

1          MR. ROWIN:  It does.  But since counsel has advised

2    that my issue is sort of bound up with the other thing, I think

3    I will -- I'll turn my camera off, but I will be listening.

4          THE COURT:  Okay.  That's fine.  Everyone -- you

5    know, it's a public proceeding and you're more than welcome, so

6    I would not force your hand.

7          MR. CHOU:  Your Honor, if I may address the issue so

8    that, you know, Mr. Rowin doesn't necessarily have to stay on.

9          THE COURT:  Sure.  Just say your name for the

10   transcript.  Go ahead.

11         MR. CHOU:  James Chou on behalf of Mr. Modi,

12   Mr. Javeri, and the two LLs.  I'm happy to actually get back to

13   Mr. Rowin even as early as today.  I don't know that it's

14   really bundled with the discussions that we're having with the

15   trustee.  If the funds are going to just come out of the trust

16   to reimburse Mr. Rowin, I think it's really a matter of trying

17   to get a little bit more information and specificity on the

18   fees and the breakdown.  So if we can resolve that ourselves, I

19   think there's no reason to burden him to stay on.

20         THE COURT:  Okay.

21         MR. CHOU:  I'll get back to him this week, Your

22   Honor.

23         THE COURT:  Yeah, let me suggest -- yes, that's

24   great.  I was just going to say that.  Talk this week, try to

25   nail it down.  Let me just say I'm available on short notice

1   for a conference, if you can't get this taken care of.  It

2   seems like it should be achievable.  And no one's saying it's a

3   bad idea, it's just a question of how and buttoning things

4   down.  So try to get that done.  And if there's a problem,

5   anyone who wants can ask me for a conference and I can make

6   myself available on quite short notice, okay, if needed.  But

7   hopefully it won't be needed.

8            What's the outcome of this going to look like?  Is

9   it -- will there be a stipulation that you'll ask me to approve

10  or something else?

11           MR. CHOU:  I think in the circumstances, a

12  stipulation would probably be a good idea.

13           THE COURT:  Okay.  So let's just talk a minute about

14  how that should be submitted.  I mean, I guess probably the

15  most formally regular way to do that would be via a notice of

16  presentment with, like, five days or some modest amount of time

17  available to object, and after which I would review and

18  presumably approve it.  Does that work?

19           MR. CHOU:  Yes, Your Honor.

20           MS. ALLEN:  Okay.  You know, we did have some

21  previous stipulations with respect to stipulating to allow

22  certain expenses to be paid out of (indiscernible), so we can

23  follow that same structure here.

24           THE COURT:  Okay.

25           MS. ALLEN:  And, you know, I think the trustee and

1   Ms. Modi and Mr. Rowin would all be a party to that

2   stipulation.

3           THE COURT:  Okay, great.  That was Ms. Allen.  And

4   does the -- does anyone want to say, oh, Judge, you're being

5   too procedurally finicky, and just let us submit it already or

6   presentment works?  You know what I'm saying?

7           One thing you could do is say, email it to chambers

8   and say, Judge, here's a proposed stipulation, please approve

9   it without more formality than that.  Another thing is to tee

10  it up formally via a docketed notice of presentment so that

11  it's on notice to the world and there's a clear procedural

12  record.  And then I look at it, and then I would review and

13  presumably approve it after a requisite number of days passed.

14  Those are the two options.

15          MS. ALLEN:  As the party with the least, you know,

16  interest here, I'll defer to the other parties as to what --

17          THE COURT:  Okay.  Everyone's shaking their head and

18  pausing, so I won't make you speak to this.  I'll just tell you

19  to think about it.  I will tell you my own thought is, I mean,

20  I semi often will approve very routine stipulations without the

21  formality of a notice of presentment, because that just takes

22  time and I don't want to waste time or the little bit of effort

23  and money that's required.  It strikes me it's a little more

24  procedurally regular and visible on the docket sheet how an

25  order came to be if you do it via a notice of presentment.  So

1   my gut is that's my preference here, but if you think there's

2   reason not to do it that way, you can try me.  Okay?

3        (Simultaneous speaking)

4        MR. ROWIN:  Your Honor, if we get this deal done,

5   doing it with more formality and another five days for formal

6   notice is absolutely fine.

7        THE COURT:  Okay.  So let's just plan on that.  And

8   this presupposes that you'll actually get to yes, so focus on

9   that.  Okay?

10       MR. ROWIN:  Yes, it does, Your Honor.  That's my

11  major concern.  The procedure will be easy once we get to yes.

12       THE COURT:  Right.  Right.  Yeah.  Just while we're

13  all together, I thought I'd make sure we're on the same page

14  procedurally too.  Okay.

15       Does that cover you, Mr. Chou, on this issue?  And

16  then I'll come to Mr. Rowin.  I think we're good.

17       MR. CHOU:  Yes.

18       THE COURT:  Okay, great.  And Mr. Rowin?

19       MR. ROWIN:  Yes, it does, Your Honor.  Thank you very

20  much.

21       THE COURT:  My pleasure.

22       MR. ROWIN:  -- out.

23       THE COURT:  Okay, take care.  All right.  So let

24  me -- I guess I'll circle back to the trustee as to tee up the

25  hearing however you want.  I think we have -- I know we have a

 1  lot of status conferences calendared, and the major contested

 2  matter is the motion to compel, which I'm ready to hear

 3  argument on.  So I guess we can start with Ms. Allen and you

 4  can give me whatever updates you want and then let me know

 5  whatever else you want to accomplish today.  And then we can

 6  just get down to presumably culminate in the motion.

 7          MS. ALLEN:  Yes, Your Honor.  So one matter before we

 8  get to the argument on the motion to compel, and that is the

 9  scheduling and pretrial order.  When we were last before Your

10  Honor, the trustee was proposing a schedule that would allow

11  for fact discovery to continue six months, approximately six

12  months after your ruling on this gatekeeping motion to compel.

13  At that last hearing, counsel for Mr. and Ms. Modi expressed

14  that they thought that was potentially too long.  Counsel for

15  Mr. Bhansali thought it was too short.  We did meet and confer

16  with both of those parties, and we are still at the same spot,

17  from the trustee's view.

18          The trustee's position is still we think that six

19  months after your ruling is an adequate amount of time.  We do

20  not want it to stretch beyond that.  We actually agree with

21  Mr. and Ms. Modi's counsel that we very much want to keep to a

22  schedule and keep things moving and not have any further delays

23  in this matter.  And so we're still at six months, and I'll

24  leave it to the other parties to describe their position from

25  there.

 1          THE COURT:  Okay.  Let me ask you, Ms. Allen, are

 2   there other aspects?  Is the dispute purely about the length of

 3   the fact discovery period, or is there anything else that is in

 4   play?

 5          MS. ALLEN:  Well, so one note is the original

 6   scheduling and pretrial order, which is -- it was entered on

 7   August 11, 2022, that order provided for a close of fact

 8   discovery of December 31, 2023.  And then there were a number

 9   of dates that followed that, like expert discovery and a

10   pretrial conference.  It may be as Your Honor had described.

11   You know, the pretrial conference needs to be pushed back even

12   further than it was initially from the close of fact discovery.

13   But at this juncture, we're really at the dispute over how long

14   should fact discovery be, and then I think the rest of the

15   deadlines can kind of flow from there.

16          THE COURT:  Okay, got it.  That's helpful.  Okay, so

17   let me hear, I guess, for counsel for Mr. Modi and associated

18   parties first, and then I'll come to Mr. Bhansali's counsel.

19          MR. CHOU:  Thank you, Your Honor.  James Chou on

20   behalf of Mr. Modi, Ms. Javeri, and the two LLCs.

21          So we have met and conferred with the trustee.  As of

22   right now, we are holding the same position that the six months

23   is too long and we are eager to move forward for many of the

24   same reasons that Mr. Dworkin communicated to the Court the

25   last time.  We feel that we're in a different position from the

1   other defendants because we're further along in discovery.

2          That said, our meet and confer was, I would describe

3   as productive.  And we are moving toward a resolution that I

4   think will put us in a position to agree to the trustee's

5   schedule and then at that point withdraw our objection to the

6   motion for the scheduling order.  That resolution involves

7   largely a proposal that we made involving the availability of

8   some funds for Ms. Javeri to meet her basic living expenses and

9   other obligations, including maintaining the apartment that she

10  lives in, which is subject to liens at this point, and the

11  other property that's also been attached.

12         We've made, I would say, good progress on that.  We

13  got a counterproposal from the trustee which we are reviewing.

14  It was a quick turnaround by the trustee's council, so we

15  appreciate that, but we don't have, you know, a final agreement

16  yet.  We still need to confer with our clients and we're

17  hopeful that we are going to be able to do that this week and

18  maybe come to some resolution shortly so that we can then

19  withdraw our objection.

20         THE COURT:  So can I ask, if I just stick you all

21  with a date today, does that undermine your efforts in a way

22  that would be unwise of me to do?

23         MR. CHOU:  Respectfully, Your Honor, I would say yes

24  because we were still in discussions.  Even though I'm

25  optimistic and hopeful, I feel that I have to reserve my

1   client's position and rights on this.  So I would say to the

2   extent Your Honor can hold off on that, as I said, I think

3   we'll be close.  We should know by the middle of the month

4   whether or not we have an agreement, I would say.  I think, you

5   know, I'll also defer to --

6        THE COURT:  What if I -- if Ms. Allen promises that

7   they won't stiff you if I stick them with a six-month discovery

8   deadline, is that good enough if she would make that

9   representation.

10        MR. CHOU:  Can you clarify what you mean?

11        THE COURT:  Apparently, you're negotiating some

12   arrangement by which at least one of your clients is going to

13   get trustee consent to a release of sufficient funds to meet

14   living expenses.  And I don't know if this person is living a

15   fabulous lifestyle of excess or relatively modest or what, but

16   if the trustee tells you, look, we're going to work out

17   something reasonable here, but in the meantime, let's get a

18   schedule in place, could you live with that assurance or --

19        MR. CHOU:  I would rather have an agreement in place,

20   Your Honor.  I think we're going to get there and it's a

21   proposal I think that's reasonable because it preserves the

22   value of the assets that have been attached so that the trustee

23   will not be left in any worse position.  But this is important

24   to my client's ability to continue really sustaining herself

25   and her two minor children.  So I think it's important enough

 1 | that I hesitate to --

 2 |         THE COURT:  Okay.

 3 |         MR. CHOU:  -- you know, to concede to anything.

 4 |         THE COURT:  Yeah, all right, I understand.  I mean, I

 5 | will tell you, I may just impose a date anyway, but we'll see.

 6 | Just because --

 7 |         MR. CHOU:  Understood.

 8 |         THE COURT:  -- I hate to see case management

 9 | schedules languish over non-discovery issues.  But if I do

10 | that, I would tell you again, like I always tell people, I'm

11 | available on very short notice if you have -- if you're -- if

12 | you get to loggerheads and you need help, and I'm certainly

13 | open to a reasonable accommodation.

14 |         Okay.  Ms. Allen, do you want to say anything since

15 | that issue was directed at the trustee?

16 |         MS. ALLEN:  Yes.  And I mean, I would raise the same

17 | issue you raised previously, which this bundling issue of we're

18 | going to bundle this with that and then the more delay happens,

19 | the more the bundling doesn't make sense.  I don't know that it

20 | makes sense to bundle whether or not Ms. Javeri and Mr. Modi

21 | have a six-month schedule or, as they're urging, something

22 | earlier than that, we would have additional reasons as to why a

23 | schedule earlier than six months doesn't make sense and --

24 |         THE COURT:  Yeah.  No, I mean, look, I think you have

25 | me on that, honestly, from the prior -- I remember our

1  discussion pretty well from the prior session.  And I know that

2  Mr. Modi and associated parties are -- have less discovery

3  need, evidently, than I'll just say Mr. Bhansali, but I don't

4  want to create separate tracks in the case.  And so I think the

5  Modi parties are going to be stuck with a not leisurely

6  schedule on the Bhansali prong and then just everything can go

7  in tandem, which I think is basically what you want, Ms. Allen,

8  right?

9         MS. ALLEN:  Correct.  We very much want six months

10  and everyone on the same schedule and to stick to that to the

11  best of our abilities.

12         THE COURT:  Okay.  So I'm going to confess -- I'm

13  going to throw it to counsel for Mr. Bhansali, but I am going

14  to confess, as I do that, that I find the six-month date pretty

15  compelling.  That's a reasonable amount of time.  This case has

16  languished, to my mind, unacceptably.  And if people get

17  started on actually doing attentive discovery work, they may be

18  able to finish fact discovery in six months.  And if they

19  can't, they can come back for cause shown for more time at that

20  time.  And I think if I give more now, it's just a recipe for

21  continued languishing.  So with that thought articulated, let

22  me just offer counsel for Mr. Bhansali a chance to push back on

23  that thought.

24         MS. SULLIVAN:  Yeah, thank you.  It's Nicole Sullivan

25  for Mr. Bhansali, for the record.

1          You know, we anticipated that would be Your Honor's

2   position from the last conference.  We heard you clearly that

3   12 months was way too long.  You know, it's our position that

4   anything shorter than six months as Mr. Modi proposes would not

5   be something we'd be amenable to.  I don't see how this could

6   get done, all the discovery and depositions, in a few months,

7   especially with a summer schedule for people.

8          But we do think that nine months is a better

9   compromise from where the parties were, especially considering

10  that there is some foreign discovery.  Now it's only one party

11  and maybe PNB will be cooperative, you know, because they are a

12  creditor in the bankruptcy too, even though they're not based

13  here.

14          THE COURT:  Right.

15          MS. SULLIVAN:  So maybe look at that faster than not.

16  But I do think that that discovery is important because the PNB

17  piece is, you know the crux of the --

18          THE COURT:  That's Punjab National Bank, right?

19          MS. SULLIVAN:  Yes, correct.

20          THE COURT:  Oh, and did that -- I can't remember.

21  Did that letter of request that was talked about before happen?

22          MS. SULLIVAN:  We have it.  And I have the notice of

23  presentments to serve today and then we'll present it to Your

24  Honor on Monday.

25          THE COURT:  Okay.  Great

1          MS. SULLIVAN:  (Audio malfunction)  Because we've

2    already served it on the trustee's counsel but not the other

3    parties.  So we'll give everyone an opportunity to respond, to

4    the extent that they want to.

5          THE COURT:  Okay.  Got it.  All right.  Listen --

6          MS. SULLIVAN:  -- our compromise would be nine

7    months.

8          THE COURT:  Okay.  I got it.  I'm going to rule and

9    I'm sorry, Mr. Chou, I know you -- I hear you about your

10   concern about the circumstances of your client.  I very much

11   want that to be worked out.  I'll encourage the trustee to meet

12   in good faith and achieve something fair.  And I'm open for

13   applications if that doesn't happen on consent.

14         But in the meantime, I'm quite committed to getting

15   this case moving.  And so I conclude that the proposed

16   six-month fact discovery period, commencing on issuance of a

17   ruling on the motion to compel, is appropriate in the

18   circumstances of the case, given the amount of time that's gone

19   on before, the amount of work that has to be done yet,

20   including outstanding document discovery issues, which almost

21   surely have to be dealt with prior to depositions occurring,

22   but also given the need to bring this towards completion.

23         So my thought is that the six-month period is

24   somewhat ambitious, I hear you, Ms. Sullivan, on this, but not

25   impossible.  And I'd rather set you a target that inspires

1  action and diligence, and then I will be -- I mean, it's always

2  quite possible to extend discovery deadlines, but I would

3  expect, as the price of achieving that, that everyone have

4  engaged in serious effort in the next six months that's

5  demonstrated, so that you don't come to me saying, gosh, three

6  months went by without progress, and then we did some stuff,

7  and then we hit a bump.  That's no good.

8         So start now, or upon issuance of my decision on the

9  motion to compel, exhibit diligence, and then if, despite

10  diligence, you can't get where you need to be, I'll be

11  receptive to a further application.  But an absence of

12  diligence combined with a "whoops, give me more time" request

13  will be not so well received.  Okay?  So that's -- you can just

14  go ahead and paper that up.  You don't have to try to write out

15  some version of my admonition, but that's my thought.  You'll

16  have it to refer back to, and we can just get things on track

17  that way.  Okay?

18         I think what makes sense, while I'm still talking, is

19  let's just also have it state that there will be a further

20  whatever you want to call it, pretrial conference or case

21  management conference, to occur shortly after the expiration of

22  fact discovery time, at which date the Court will set

23  successive deadlines, as are appropriate.  And what I mean by

24  that is potentially expert discovery schedules, if expert

25  discovery is needed, or briefing schedules, or whatever needs

1   to be done.

2         Or, if through some miracle nobody wants to move for

3   summary judgment and nobody wants expert discovery, then we'll

4   set interim deadlines running up to trial.  Okay?  So that's

5   what I would contemplate.  That works for everybody?  Well, I

6   won't say for everybody.  Two people are unhappy.

7         Ms. Allen, does that -- is that implementable?  I

8   guess that's my question.

9         MS. ALLEN:  Yes, Your Honor.

10        THE COURT:  Okay..  So let's do that.  All right.

11   And I'll come back to you, Ms. Allen, because you were going to

12   be touching on an array of issues, or maybe it was just one

13   issue, before we turn to the motion.

14        MS. ALLEN:  Yes, maybe I should ask if anyone else

15   has anything else.  That's it for the trustee, aside from the

16   motion to compel.

17        THE COURT:  Okay, yeah, I'll circle the room.  So

18   does anyone else want to raise any general case management

19   issues beside -- before we turn to the motion?

20        MR. CHOU:  No, Your Honor.  Thank you.  I understand,

21   you know, Your Honor's reasoning on this.  I think the only

22   thing I would say is if we have difficulty, if Ms. Javeri has

23   difficulty with certain expenses or we're running into some

24   issues, for example, Your Honor, one thing I didn't share in my

25   remarks earlier is that her apartment is actually now under a

1   foreclosure proceeding, so this makes it all the more critical

2   that we reach some type of accommodation with trustee's counsel

3   and the trustee.  If we do run into an issue, I'd like the

4   opportunity to be able to come to Your Honor on it for

5   assistance.

6           THE COURT:  Yeah, I'm -- that was Mr. Chou.  Thanks.

7   I'm absolutely sincere in what I always tell people, which is

8   that I'm available for conferences on short notice or whatever

9   application you want to make.  I don't know enough to know what

10  authority or basis I have to compel relief on your client's

11  behalf, but you can explain that to me if necessary at the

12  appropriate time.  Okay?

13          MR. CHOU:  Thank you, Your Honor.

14          THE COURT:  Yep.  Okay.  So let's turn to the motion.

15  I think.  So let me see.  I'm going to remind myself; I believe

16  that Ms. Allen's going to argue the motion for the trustee.  Is

17  that right?  And Mr. Nakahara for the -- for Mr. Bhansali.  Do

18  I have that right?

19          MS. ALLEN:  Yes, Your Honor.

20          MR. NAKAHARA:  Yes, that's right.

21          THE COURT:  Okay.  So, yeah, I'll tell you, I read

22  the papers.  I've given some thought to it, and I often would

23  tell people, think sort of tentative rulings or thoughts I have

24  coming in to focus on, while also leaving -- letting you argue

25  whatever you want and call whatever you want to my attention.

1   Here I think I want to -- I guess I'd break it out into two

2   things.  One is Fifth Amendment assertion, and then the other

3   is walking just through the request-by-request objections.  And

4   you can do -- go in whichever order you want.

5          Consistent with what I've been telling you generally

6   about scheduling things, I want to try to cut to the chase and

7   get you going.  And so I'm not sure if I'm going to be able to

8   orally rule today, but I might.  And to the extent I can make

9   sort of granular rulings that answer some of the questions you

10  have, that's fine.  And so with that, I would let Ms. Allen

11  proceed, and you can really sort of sequence however you want

12  between.  I would think it would be -- you could either start

13  with Fifth Amendment or other, and whatever you were planning

14  on doing is going to be fine with me.

15         MS. ALLEN:  Yes.  So that is exactly where I was

16  going to start, is noting that there are some requests where

17  the Fifth Amendment is asserted, and there are others where

18  it's not.  So I'll start by focusing on the Fifth Amendment,

19  and specifically with respect to the waiver of that right.

20  Because if we -- if Your Honor agrees that Mr. Bhansali waived,

21  then there's no need to get to what they need to do in order to

22  prove up that Fifth Amendment right --

23         THE COURT:  Right.

24         MS. ALLEN:  -- category, so --.

25         THE COURT:  Yeah, I'll tell you honestly, I take your

1   waiver argument seriously, but I do want to hear about it from

2   both sides.  And I think their response is basically, gosh,

3   until -- we had trouble assembling documents and until we saw

4   the universe, we weren't in a position to do it.  I'm a little

5   skeptical of that, but I want to hear from both sides about

6   that.  But I do want to say, I think I also want to hear about

7   Fifth Amendment applicability.  Even if I conclude it's waived,

8   I at least would consider combining that with a merits ruling

9   on the Fifth Amendment.  And I also have to consider the

10  strength of the Fifth Amendment privilege in thinking about

11  waiver issues, as I understand it.  Okay, so go ahead with

12  those thoughts.

13          MS. ALLEN:  Starting with the waiver point, the

14  trustee's requests were initially served on September 28, 2022.

15  Since that date, and as detailed in our motion and our

16  exhibits, we have followed up and followed up and followed up.

17  We have requested meet and confer after meet and confer.  We

18  have had meet and confer after meet and confer.  We have

19  drafted letters.  We've had two discovery conferences before

20  Judge Lane.  At each one of those steps, that was months and

21  months, and at some point over a year, we were met with

22  assurances that documents would be produced such that the

23  parties could narrow, hopefully, the issues between them.  And

24  so we continued to wait for productions.

25          We understand that there was issues with a vendor, an

1   e-discovery vendor, but we also understand that that discovery

2   vendor wasn't even retained until many, many months after the

3   requests were initially served.  When the initial responses

4   were received by the trustee, there was no mention of the Fifth

5   Amendment.  We do believe that at that time, Mr. Bhansali, he

6   had already pled the Fifth Amendment to the examiner's

7   deposition.  The idea that he didn't understand that he may

8   have a Fifth Amendment to assert here cannot be true with that

9   chronology.

10          But also, you know, we spent a lot of time focusing

11  on those objections and those responses which did not mention

12  the Fifth Amendment, so we spent a lot of time focusing on

13  whether or not documents had been previously produced, whether

14  or not documents were captured on an image of a laptop that may

15  or may not be Mr. Bhansali's, according to Mr. Bhansali.  We

16  talked a lot about whether this was improper asset collection

17  discovery, which is now moot at this point, given that we have

18  the authority to issue asset discovery in connection with the

19  judge's -- the prior judge's attachment ruling.

20          So we spent a lot of time briefing issues, drafting

21  letters, appearing before the Court, and even before Judge Lane

22  at a hearing, which is attached to our motion at Exhibit J.

23  That hearing on September 12, 2023, Mr. Bhansali's counsel

24  again explained that documents are being reviewed.  There's an

25  additional search by the vendor, and the Court ordered

1  Mr. Bhansali to complete production by the end of that month

2  such that we could brief this motion to compel on the issues

3  that were remaining between us.  We did not get any production.

4  Instead, on October 3rd, after that deadline had expired, we

5  got amended responses that for the first time pled the Fifth.

6        So with respect to prejudice, the -- Mr. Bhansali

7  argued in his response that the discovery period has not

8  closed.  The parties have agreed to extend discovery.  No

9  depositions have occurred, and ample time exists to resolve the

10 issues raised by the trustee's motion.  Obviously, that was,

11 you know, many months ago, and now we are in a situation where

12 we have been prejudiced.  There's been months and months and

13 months of delay.  We have not been able to kick off

14 depositions.  We are -- I imagine that Mr. Modi and Ms. Javeri

15 would argue that they have been prejudiced by this delay.  And

16 so we have been, you know, unable to move past this gatekeeping

17 issue.  And it could have been briefed and argued many, many

18 times in all of those months rather than at the eleventh hour.

19        THE COURT:  So let me ask sort of a -- I guess it's a

20 mixed question of fact in law, which is, as a matter of law,

21 the DG Acquisition Corp case from the Second Circuit in 1998

22 tells me a tardy assertion of the privilege is likely to result

23 in loss where the delay was intentional and done for tactical

24 gain.  So is that the situation and why?

25        MS. ALLEN:  Well, I don't know why Mr. Bhansali

1   waited until --

2          THE COURT:  No, no, sorry.  Yeah, that is -- how can

3   I conclude that it's done for tactical gain and intentional?  I

4   guess that's the question.  I'm not asking you to comment on

5   their internal thought processes.

6          MS. ALLEN:  Yes.  And I don't know how to show that

7   other than the record of appearing before the judge numerous

8   times, many, many letters where we were told that documents

9   would be produced and then they were never produced.

10         THE COURT:  Right.  Okay.  And is that comparable to

11  waiver cases you've got?

12         MS. ALLEN:  Well, so the waiver -- I would have to

13  check and see if there's a specific waiver case along these

14  lines.  But the idea that there's been no prejudice here with

15  all of the time delay, legal fees across the entirety of this

16  case, not just with respect to Bhansali's schedule, is really

17  the prejudice here.

18         THE COURT:  Okay.  And that is expense and delay in

19  the trustee's efforts to make the trustee's case, right?

20         MS. ALLEN:  Correct.  And delay across the board that

21  impacts the other coconspirators and defendants as well.

22         THE COURT:  Okay.  All right.  I'm going to let you

23  continue now.

24         MS. ALLEN:  Okay.  Moving on, we also, you know, did

25  raise an issue with respect to the assertion of the Fifth

1   Amendment.  Mr. Bhansali asserts that there are foreign

2   criminal proceedings pending against him, but as we cited,

3   foreign proceedings do not count.  And so we believe that

4   Mr. Bhansali has to assert how it is that he has a Fifth

5   Amendment with respect to U.S. criminal actions.

6          That being said, to go, you know, specific category

7   by category, we believe that Mr. Bhansali first did not carry

8   his initial burden of showing why any of the documents or any

9   of the requests or any of the responses would fall within the

10  act of production document doctrine.  At this point, it's just

11  a blanket assertion of Fifth Amendment.  There is no category-

12  by-category explanation.  And there's also examples of requests

13  that very clearly would fall under an exception.

14          For example, the required records exception applies

15  to tax returns, passports, bank statements.  One of our

16  requests, request number 11, we asked for tax returns.  He

17  pleads the Fifth to that request.  There should be no Fifth

18  Amendment to a request for tax returns, pure and simple.  And

19  there's a number of other examples of that where we believe

20  it's difficult to even have a discussion because there is no --

21  they've not carried their initial burden of showing how it is

22  these documents fall into act of production.  But for the

23  documents that are clearly required records, bank statements,

24  tax returns, passports, the Fifth Amendment doesn't apply, and

25  they are still asserting it with respect to those requests.

1           THE COURT:  Okay.  Does the trustee concede there's

2    an -- a testimonial element to the production that would be

3    required?

4           MS. ALLEN:  We do agree that the act of production

5    doctrine would apply if those -- if the act of production would

6    be testimonial act and self-incriminating.  But, for example, a

7    tax return, the fact that he has tax returns that he himself

8    issued to the United States of America is not something that

9    would be a testimonial act.  They are records that he is

10   required to keep.  The existence that he has filed tax returns

11   doesn't incriminate him in any way.

12          THE COURT:  Right.  Well, you -- so -- yeah.  So the

13   elements, though, of act of production privilege are -- require

14   the existence of a testimonial act, right?  So that's the first

15   required showing, and then the other is that the subpoenaed

16   party, meaning Mr. Bhansali, must demonstrate that the summoned

17   documents are incriminating.  So I'm asking you, is there -- I

18   guess, when you tell me tax returns are required, so not

19   subject to this privilege, that's really an exception, right?

20   So I'm just asking is there agreement that turning over the

21   documents is in some sense testimonial?

22          I mean, I think it is to the extent it would

23   represent Mr. Bhansali's taking a position authenticating that

24   which is turned over as authentic copies of that which is in

25   his custody or control.  Right?  So it's sort of narrow, but

```
 1  that's testimonial.  Yes?

 2          MS. ALLEN:  Yes.  And we're not debating that there

 3  may be some documents where an assertion of the Fifth

 4  Amendment, assuming he has a Fifth Amendment with respect to

 5  U.S. criminal actions, where that would be appropriate.  But

 6  it's impossible to assess at this point, given their blanket

 7  assertion of the Fifth Amendment and their assertion of the

 8  Fifth Amendment --

 9          THE COURT:  Right.

10          MS. ALLEN:  -- falls under exceptions.

11          THE COURT:  Yeah, yeah.  I'm just breaking it down

12  into elements.  Right?  And so I think the testimonial isn't

13  where the action is on this, so I'm just trying to make sure

14  that's right.  So the action is does an exception apply, such

15  as required records or one of the others?  And then also, I

16  think actually, Mr. Bhansali's papers acknowledged that there's

17  a -- I think both sides agree that it's -- the burden is on

18  Mr. Bhansali to show a risk of self-incrimination or a risk of

19  incriminating effect.  And his papers include law saying that

20  the burden, in fact, is to show a, quote, "real and

21  substantial" risk of incrimination.  Right?  So I just want to

22  make sure we're looking at the same law.  Do I have this right?

23          MS. ALLEN:  Yes.  I don't think we have any

24  disagreement on the law, but rather whether they have carried

25  their initial burden and whether there are certain categories
```

1  where they could never carry their burden.

2       THE COURT:  Okay, got it.  That's fine.  And is it --

3  am I at liberty to rule today, based on a failure to meet their

4  burden because it's been noticed, briefed, they've had their

5  opportunity to make whatever showing they want?  Or should I be

6  waiting or ruling without prejudice to a more detailed or

7  granular showing once they actually complete their document-by-

8  document review?

9       MS. ALLEN:  Given the extensive delays and prejudice

10  to the trustee, we would ask for a ruling today.

11       THE COURT:  Okay.  Okay.  And is your understanding

12  that act of production Fifth Amendment privilege is the only

13  flavor of Fifth Amendment privilege being invoked or asserted?

14  That's what I understand.  Right?  This is all about whether

15  there's an act of production privilege?

16       MS. ALLEN:  That's my understanding as well.

17       THE COURT:  Okay.  Okay.  I keep peppering you with

18  questions and maybe moving you off of points you want to make,

19  so I want to give you a chance to circle back and tell me

20  anything else you want.

21       MS. ALLEN:  Yeah.  So I just wanted to follow up.

22  There are a few -- in terms of the categories that do not fall

23  under the Fifth Amendment, there are a few points that I want

24  to make there.  So with respect to those requests, again,

25  there's no production, zero pieces of paper responsive to those

1   requests.  Instead, they're objected to, pretty cut and paste

2   in terms of it's an undue burden and they've been previously

3   produced to the trustee, or the trustee already has them or he

4   has a laptop.

5           THE COURT:  Okay.

6           MS. ALLEN:  You know, we have had some disagreements

7   over what we mean by you don't have to produce things that we

8   already have, but what we have tried to make clear is we took

9   possession of all of the U.S. entities' corporate records,

10  email communications, files, bank statements, et cetera.  We

11  don't believe Mr. Bhansali would even have access to that

12  information at this point in time.  And we have an entire

13  database of it, and it was prepared before the trustee was even

14  appointed in connection with the examiner.

15          And in that production, there's also an image of a

16  laptop that we assert belongs to Mr. Bhansali and had, for

17  example, auto-recovered spreadsheets on that laptop.  I don't

18  believe Mr. Bhansali, at this point, has agreed that that is

19  his laptop and that the images taken from that belong to him.

20  But in any event, an image of a laptop doesn't give you

21  everything that was ever accessed on that laptop.  It doesn't

22  log into bank accounts, it doesn't log into email addresses, it

23  doesn't log into any of the various accounts that he may have

24  been using that may have records responsive to trustee's

25  request.

1          And in addition, we understand that over the course

2     of this conspiracy, there were a number of communications that

3     happened off of the Firestar records.  And so the fact that we

4     have all of the Firestar records doesn't give us all of

5     Mr. Bhansali's personal email accounts where he may have been

6     communicating with other members of this conspiracy.

7          There are also a number of objections to the number

8     of relevant entities and the number of relevant conspirators.

9     And on that, the fact that this civil RICO conspiracy involved

10    many, many shadow entities and a web of entities across the

11    world and a web of coconspirators across the world shouldn't be

12    held against the trustee.  And there is a case that we cite on

13    that point, <u>Canapco v. Wine</u>.  That's at 2007 Westlaw 2438390,

14    Southern District of New York, August 27, 2007.

15         There, that case involved hundreds of entities,

16    again, in a RICO enterprise.  And the fact that Mr. Bhansali

17    was at the helm with Mr. Modi of this enterprise and that there

18    happened to be a lot of entities and a lot of coconspirators to

19    be searched for shouldn't be -- is a burden that should be

20    placed on Mr. Bhansali.  That said, if at any point

21    Mr. Bhansali had said, can we work on search terms, we would

22    have been happy to do so to try to narrow.  But we're here at a

23    point where there has been a refusal to produce any records.

24    look for any records.

25         You know, I think the greatest examples of records

1   where, you know, they should have been turned over to the

2   trustee a long time ago are, for example, those tax returns,

3   passports.  We have requested his passport.  That is relevant

4   because there is allegations of the complaint that there were

5   travels overseas where witnesses were threatened and that there

6   was a coverup with respect to that travel.  We've asked for

7   copies of the passport, and there's an objection that we

8   already have that, we already have the debtors records, we

9   already have an image of his laptop.  Well, we don't have a

10  copy of his passport.

11          There's also a number of objections, like I

12  mentioned, on whether or not certain requests are improper

13  asset collection discovery.  As I mentioned, you know, given

14  the nature of this conspiracy, given the allegations of the --

15          THE COURT:  Yeah.  I think -- let me cut you off.  I

16  think I'm predisposed to agree with you on this.  I mean, it's

17  a massive financial and complex financial fraud, and you're

18  trying to trace money and behavior and transactions and

19  interactions.  Right?  That's basically what you're getting at.

20  And that's here -- in this case, that is not at least solely

21  for purposes of identifying assets for recovery purposes, it

22  also goes to the elements.  Right?

23          So I -- here -- so I think I would like to stay

24  focused on Fifth Amendment issues first for argument, and then

25  if we -- and then maybe pivot in some more detail to the

 1  non-Fifth Amendment topics you're talking, although you've just

 2  about -- although you've just given me a pretty good high-speed

 3  overview.  So are there more Fifth Amendment oriented comments

 4  you want to make at this time?

 5          MS. ALLEN:  That's all I have at this time.

 6          THE COURT:  Okay.  So I promise you'll get the floor

 7  again, at least a chance to rebut, and maybe we can go through

 8  more granularly on a request-by-request basis, if that's

 9  useful.  Okay?

10          All right.  Let me turn to Mr. Nakahara, and I don't

11  think I need to say anything by way of preface to you; I'll

12  just turn you loose.  So let me hear Mr. Bhansali's arguments.

13          MR. NAKAHARA:  Great, thank you, Your Honor.  This is

14  Mark Nakahara on behalf of Mihir Bhansali.

15          I guess I'll start with the waiver issue.  And

16  obviously it has taken us time to get to this point.  No

17  disputing that.  The reason we, first off, didn't raise the

18  Fifth Amendment in our initial responses is because we didn't

19  want to just have a blanket assertion over, you know,

20  potentially every request.  We needed to review what was out

21  there, then discuss with Mr. Bhansali's criminal counsel about

22  the possibility of invoking the Fifth.  And I would also point

23  out that the trustee was aware of the fact that the Fifth

24  Amendment could be raised, based not only on his deposition,

25  but I believe we also raised it in at least one meet and

1   confer.

2          THE COURT:  Why could you not raise it at least on a

3   request-by-request level earlier?

4          MR. NAKAHARA:  How do you mean?  I mean, we only

5   raised it, I think, in response to, I believe, 19 of the

6   40-something documents.

7          THE COURT:  No, no.  What I -- yeah.  No, what I mean

8   is the requests were served back in 2022, and Fifth Amendment

9   first bubbled up as an assertion by you more than a year later.

10  I shouldn't say you, by Mr. Bhansali more than a year later.

11  So why couldn't that have been raised at some point, you know,

12  within a month or two of receiving these receipts, just by

13  reading through the -- excuse me, these requests, just by

14  reading through each request and say, well, production of

15  whatever it is he has pertaining to X, Y, or Z would tend to be

16  self-incriminating.

17         MR. NAKAHARA:  I get that.  You know, we just wanted

18  to see what was actually out there in the world of potential

19  responsive documents that existed before making the Fifth

20  Amendment assertion, understanding, of course, that it wouldn't

21  be applicable to every request.

22         THE COURT:  Okay.  And did you, in that intervening

23  year -- I'll strike that.

24         When you did finally assert the Fifth Amendment

25  privilege, was that supported by a document-by-document review,

1   or was it just asserted request by request?

2          MR. NAKAHARA:  We went over potentially relevant

3   documents for the Fifth Amendment purpose with criminal

4   counsel.

5          MS. SULLIVAN:  I'm sorry, Your Honor, if I could jump

6   in.

7          THE COURT:  Sure.  Yeah, that's Ms. Sullivan.  Yeah,

8   go ahead.

9          MS. SULLIVAN:  Ms. Sullivan for the record.

10          You know, I want Mr. Nakahara to argue, but he wasn't

11   really privy to these facts and the things that were happening

12   at the time.  And I think your questions are probably being

13   posed to him, and he's not really sure how to answer.

14          To the first question, if I may, you know, when we

15   did our original requests, responses to their request, we did

16   list other applicable privileges.  I mean, no dispute here that

17   the Fifth Amendment has been an issue in this case since the

18   GATT, because he invoked it during his 2004 examination very

19   early in the process.  There was criminal proceedings pending

20   or threatened in the India -- I'm not fully familiar with all

21   the details in the India actions, and there's been threats of,

22   you know, an extradition proceeding here in the U.S.

23          We are not acting as criminal counsel.  He has a

24   separate criminal counsel.  That's Arnold and Porter.  Should

25   we have involved them in the responses to the requests

 1   initially in 2022?  In hindsight, that's probably something we

 2   should have done.  We did not do that.  We received the

 3   documents and then we -- and conferred with his criminal

 4   counsel to determine if producing documents would amount to any

 5   testimony or otherwise.  And so that would explain the delay.

 6          I don't think that delay had any real prejudice here,

 7   because the document -- the request that we asserted the Fifth

 8   Amendment on, we asserted other objections to, and we were not

 9   producing documents responsive to them.  Like, whether there

10   was a Fifth Amendment privilege or not, you know, to

11   Ms. Allen's point about tax returns, we were continuing to

12   object to producing tax returns or passports or financial

13   information.  So there was no delay in prejudice to the trustee

14   by asserting that in some untimely manner.

15          And the case law is very clear that, you know, waiver

16   of a Fifth Amendment privilege really has to be under a

17   compelling, compelling basis.  And I just don't think that

18   that's --

19          THE COURT:  Yeah, the case law says not to be lightly

20   inferred, I think, or words to that effect.

21          Let me ask this.  The trustee's reply cites the

22   Balsys case, B-A-L-S-Y-S, as squarely holding that only -- I'll

23   just put it, only U.S. or prosecutions count for Fifth

24   Amendment purposes.  Here the only thing that I've noticed

25   you've invoked is the actual or threatened Indian proceedings,

1 and you just mentioned, coupled with possible extradition.  Is

2 that legally sufficient?

3          MS. SULLIVAN:  I'm not sure what the U.S.

4 implications are or if the U.S. attorney's office or, you know,

5 the Manhattan district attorney's office is implicating

6 anything.  I think that, you know, they've alleged a massive

7 fraud here that could invoke other crimes, whether or not

8 there's being investigated in the U.S.  I mean, if the trustee

9 wants to affirmatively state that it's impossible for

10 Mr. Bhansali to be charged with a crime in the U.S., either

11 because they have knowledge that neither office is going to be

12 prosecuting it, or because like some statute of limitations.

13          But our understanding is that that is -- from

14 criminal counsel Arnold and Porter, that that's still a

15 possibility.  The foreign criminal proceedings, I think, is a

16 known quantity and there's no pending U.S. criminal proceeding.

17 But that doesn't mean that there's not an investigation that

18 we're not aware of.  And it's certainly --.

19          THE COURT:  Okay.  Well, hang on.

20          MS. SULLIVAN:  -- could be involved there, as well as

21 with the extradition process if India goes that way.

22          THE COURT:  So let me break it down.  My original

23 question was whether the actuality or potential of proceedings

24 in India are sufficient to support an invocation of the Fifth

25 Amendment.  And I think the answer is no under Balsys.  So if

1   that's wrong, I'd like to know.

2          And then my follow-up question will be, does the

3   potential for extradition proceedings change that answer, if

4   the answer is no to the first part, which is just whether an

5   Indian proceeding is a sufficient basis to invoke the Fifth

6   Amendment.

7          MS. SULLIVAN:  I'm just looking for the cite in

8   the -- sorry, in the reply.

9          THE COURT:  Oh, they cite the Balsys case on Page 3

10  of 10 of their reply.  And it's a Supreme Court case from 1998.

11  Their parenthetical characterizes it as holding that concern

12  with a foreign prosecution is beyond the scope of the Fifth

13  Amendment's privilege against self-incrimination.

14         MS. SULLIVAN:  Yeah, I'll -- you know, we -- this was

15  in their reply and we didn't have a surreply to that.  I mean,

16  assuming I --

17         THE COURT:  I'm sorry, but look, this was filed on

18  January 4th and we're arguing the motion.  So yeah, I guess

19  would be a way to put it --

20         MS. SULLIVAN:  I think that -- look, let's take it at

21  face value and say that the Indian proceedings don't count.

22  Like, there is no -- they have alleged so many different things

23  that would invoke different crimes in the U.S.  There's no --

24  Fifth Amendment does not require a pending criminal proceeding

25  for you to invoke it.  Right?  There was no pending criminal

1    proceeding when he invoked it in his 2004.

2         THE COURT:  Right.  So you're relying on -- right, I

3    get it.

4         MS. SULLIVAN:  Yeah.  If there's something they want

5    to affirmatively state that they know that's not going to

6    happen, then maybe it changes the Fifth Amendment assertion,

7    but I'm not aware of that as I sit here today.

8         THE COURT:  Yeah.  And no, I don't think they have

9    the power or ability to make that representation.

10         MS. SULLIVAN:  I'm sure.

11         THE COURT:  So.  Okay, so the premise for the -- the

12    proper premise for the Fifth Amendment assertion, if any, is

13    the risk of U.S.-based prosecution.  And you're just saying,

14    come on, in the face of alleged massive international financial

15    fraud, of course there's possibility of U.S. prosecution.

16    Right?

17         MS. SULLIVAN:  Yeah.  And the fact that there's

18    proceedings in India.

19         THE COURT:  Right.  And Mr. Bhansali is a U.S.

20    resident and/or citizen.

21         MS. SULLIVAN:  Yes.

22         THE COURT:  Yes.  Okay.

23         MS. SULLIVAN:  I shouldn't -- I never confirmed with

24    Mr. Bhansali that he's a U.S. citizen.

25         THE COURT:  No, I said, "or."  I didn't -- yeah.

1             MS. SULLIVAN:  Just making sure that --

2             THE COURT:  Resident or citizen.

3             MS. SULLIVAN:  I would have to confirm that if it was

4    important to Your Honor.

5             THE COURT:  No, no, no, I -- the thing that follows

6    from that is he's a person who's subject to U.S. jurisdiction.

7             MS. SULLIVAN:  That's correct.

8             THE COURT:  Okay.  Okay, so I'm --

9             MS. ALLEN:  Your Honor.

10            THE COURT:  Yeah.

11            MS. ALLEN:  -- weigh in briefly on that Fifth

12   Amendment point?  You know, we agree --

13            THE COURT:  Yeah, that's Ms. Allen.  Go ahead.

14            MS. ALLEN:  It would be difficult for the trustee to

15   determine whether or not --

16            THE COURT:  No, I know.

17            MS. ALLEN:  Mr. Bhansali faces charges, but at the

18   same time, it is his right to assert, and at the very least he

19   should be able to assert whether or not a statute of

20   limitations has been run on any of the criminal acts.

21            THE COURT:  Yeah, yeah.  Actually, hang on.  I'm

22   going to cut you off, Ms. Allen.  I'm sorry.  Because I don't

23   want to get into a ping pong match.  I will give you further

24   air time, but -- and I -- that's sort of the direction I was

25   going.  So I'll ask -- and I don't know who to direct this to.

1  I'm happy to come back to Mr. Nakahara.  So what degree -- so

2  the act -- like your papers say, act of production privilege,

3  requires a showing for which the objecting party bears the

4  burden of a real and substantial risk of prosecution,

5  essentially.  And so what -- in what -- how has Mr. Bhansali

6  met that burden?

7          MR. NAKAHARA:  Yeah, so our concern is the documents

8  requested would basically reveal his role in -- with certain of

9  these entities and in the alleged conspiracy, basically showing

10  that he had control over some of these entities, and would

11  basically, you know, kind of go to the fact that he was aware

12  of what was going on and could, you know, open him up for

13  criminal proceedings related to the bank fraud and the, you

14  know, alleged dispersal of assets.

15          THE COURT:  So what -- I think I have to focus on the

16  act of producing the documents as opposed to their content,

17  right, for purposes of act of production privilege.  So what

18  about the act of production in particular exposes him to that

19  risk?

20          MR. NAKAHARA:  Again, because the trustee is

21  requesting, you know, documents about transactions, financial

22  documents, you know, the act of producing those would show

23  that, you know, he has access to those, which I think would

24  implicitly confirm that, you know, he's a high level officer at

25  these entities, or at least had some level of control.

```
 1                THE COURT:  Okay.  And because of his access to them
 2   and control of them as opposed to what they say, and that
 3   they -- their contents reveal his activities, right?
 4                MR. NAKAHARA:  That's right, Your Honor.
 5                THE COURT:  Do you have a case supporting a similar
 6   conceptual underpinning of an assertion of act of privilege --
 7   act of production privilege?
 8                MR. NAKAHARA:  Yeah, so in -- I believe we cited to
 9   it on pages 6 and 7 of our brief, the In re:  Grand Jury
10   Subpoena Duces Tecum.  It's the -- it's from the Second
11   Circuit, 1983, where the Court there held that the act of
12   producing documents pursuant to subpoenas would basically show
13   that he had -- the subpoena recipient in that case had
14   possession, and therefore they could infer that he had
15   knowledge of the contents of these documents.
16                THE COURT:  Right.  Okay.  Okay.  So let me ask you
17   about waiver.  I mean, so, I mean, I'll just tell you, I find
18   the sequence of events here troubling.  And it sort of smells
19   like dilatory conduct by Mr. Bhansali, who's facing potential
20   criminal exposure, I guess, and at least in India, coupled with
21   very serious litigation challenges.  And the lateness of the
22   assertion just makes it kind of hard for me to credit that this
23   isn't a stalling tactic.  So in the case law cited by the
24   trustee talks a lot about being cautious to allow late
25   assertions because of the ease with which litigants can use
```

1  late-springing Fifth Amendment assertions to derail discovery

2  and delay things.  So why isn't that the situation here?

3  MR. NAKAHARA:  Right.  So I think the two points I'd

4  make here are, first, that, you know, it was always going to

5  take some time to make that assertion because again, we didn't

6  want to just assert it right off the bat over everything.  We

7  did want to see what was out there and confer with criminal

8  counsel.  But also the case law, I think, indicates that there

9  needs to be something more than just untimeliness to justify a

10 waiver, because this is a constitutional right we are talking

11 about.

12 There's one case from the Tenth Circuit.  It's United

13 States v. A&P Arora.  The citation is 46 F.3d 1152.  And again,

14 Tenth Circuit in 1995, which essentially says that untimeliness

15 alone does not justify a waiver of the privilege.  And again,

16 we don't believe that there's been any prejudice demonstrated

17 by the trustee.  Again, they've been aware that the Fifth

18 Amendment has been in place since Mr. Bhansali's deposition

19 and --

20 THE COURT:  Okay.  So, I mean, I'm in the Second

21 Circuit, so I would think I'd be applying -- I mean, I don't

22 disregard what the Tenth Circuit says, but I tend to look to

23 the pretty well developed body of Second Circuit law, including

24 the Grand Jury Subpoenas case you just referenced, as stating

25 the requirements of the doctrine.  Right?  I mean, isn't that

 1   the most authoritative statement for me?

 2           MR. NAKAHARA:  Well, yes.

 3           THE COURT:  Okay.  And -- okay.  So that's fine.  But

 4   I am -- I'm sorry.  Go ahead, Ms. Sullivan.

 5           MS. SULLIVAN:  Nicole Sullivan, for the record.

 6           Just on the stalling tactic, I think I made this

 7   point earlier, but in case it wasn't clear, like, even if we

 8   didn't assert the Fifth Amendment for these requests, we had

 9   other objections that were prevented -- precluding us from

10   providing the documents without a motion -- without an order

11   compelling us to do so.  So it wasn't like it further delayed

12   it.  And the motion to compel taking this long to get heard

13   isn't really through any fault of either party here.  And I

14   think we're in agreement on that.  It should have been heard

15   last year, much earlier than it was.  And there was some

16   confusion about a briefing, and then we had to brief it.  So I

17   don't think it can be implied to be a stalling tactic, because

18   whether we asserted it or not, we weren't producing documents

19   based on other objections.

20           THE COURT:  Okay.  But at the time even of the

21   conference before Judge Lane last, what was that, September,

22   there was not a mention of Fifth Amendment, was there?

23           MS. SULLIVAN:  We had already discussed it with the

24   trustee's counsel in the meet and confers that we had had with

25   them.

```
 1              THE COURT:  Was it --

 2              MS. SULLIVAN:  Whether it was mentioned at the

 3   hearing or not, I don't recall sitting here today, but we had

 4   discussed it with the trustee's council before the motion to

 5   compel, and that process started.  We had a couple of, maybe

 6   two or three hearings with the judge where we discussed motions

 7   to compel without the formal briefing, and we had already

 8   raised it with the trustee's council.

 9              THE COURT:  Okay.  All right.  I think that's --

10   maybe we've covered the landscape.  Let me look at my prep

11   notes.  Sorry for the rustling paper.

12       (Pause)

13              THE COURT:  Oh, let me ask this.  I'll try to stick

14   with Mr. Nakahara.  So you make the point that Mr. Bhansali

15   retired at some point, I think in 2018.  Right?  And that may

16   affect the applicability of the -- at least some of the

17   doctrines like the collective entity exception.

18              MR. NAKAHARA:  That's right.

19              THE COURT:  So you want to -- how does that play out?

20   Just -- and you know, the trustee points out, well, the mere

21   fact that someone resigned doesn't make corporate documents not

22   corporate.  And so how do you -- what's your response to that?

23   And then, and then what universe of things do you say is made

24   not susceptible to the collective entity exception?

25              MR. NAKAHARA:  Of course.  I think there's really a
```

1    major practical component to this, namely that since

2    Mr. Bhansali resigned in 2018, I don't remember the exact date,

3    I think it was in early March or maybe mid-March, but with that

4    resignation meant he would no longer have access to company

5    documents.  So I think large swaths of these would not even be

6    in his custody and control.

7            Moreover, because the bankruptcy was filed just

8    before his resignation and this laptop was imaged after that in

9    May, many documents of this nature, if not all, should probably

10   be already in the trustee's possession.

11           THE COURT:  Okay.  But I hear there's dispute about

12   authentication or acknowledgement that that which was found on

13   the laptop actually is Mr. Bhansali's, or at least a need to

14   nail that down.  What's the response to that?

15           MR. NAKAHARA:  I actually wasn't aware there was a

16   dispute over the authenticity of the laptop.

17           THE COURT:  Okay.  Well, are you able to say that

18   Mr. Bhansali would stipulate to the contents of his laptop as

19   imaged being records of him or to -- I guess, that were in his

20   possession during the time of his employment?  I guess that's

21   the question.

22           MS. SULLIVAN:  Nicole Sullivan, Your Honor, if I may.

23   I mean, the first -- this is the first time that I've heard

24   that from trustee's counsel despite countless meet and confers

25   about these document productions and copying the laptop.  I

```
 1   don't think either one of us is positioned to make that

 2   assertion today without --

 3             THE COURT:  I mean, I got it. Off the top of my head,

 4   let me say I think that question cuts two ways.  Because on the

 5   one hand, I see a legitimate need of the trustee to get a

 6   production from or on behalf of Mr. Bhansali to just nail down

 7   and eliminate any risk of facing authentication arguments or

 8   arguments that that thing isn't mine.  But on the other hand,

 9   that maybe strengthens Mr. Bhansali's act of production

10   privilege assertion because the trustee has identified a need

11   they have that's independent from that which appears on the

12   face of the document.  So --

13             MS. SULLIVAN:  That's correct, Your Honor.

14             THE COURT:  Yeah.  Okay.  So I guess -- so you like

15   part two of my observation.  Okay.

16             MS. SULLIVAN:  I disagree with it.  It's not

17   something we've had any discussions about because this is, like

18   I said, the first time we've heard this position.

19             THE COURT:  Okay.  I mean, you know, it's

20   foreseeable, right?  I mean, if  -- whatever -- the adversary

21   has my laptop, they have the contents of the laptop, but they

22   don't have me saying it's mine.

23             MS. SULLIVAN:  They haven't asked us to authenticate

24   it.  Right?

25             THE COURT:  Right.
```

1            MS. SULLIVAN:  We haven't received an interrogatory

2     or anything --

3            THE COURT:  Well --

4            MS. SULLIVAN:  -- authenticate it, so --

5            THE COURT:  But effectively -- yeah, I get it.  But

6     effectively, your objection -- you're raising the Fifth

7     Amendment now is, in part, based on the idea that saying it's

8     Mr. Bhansali's would be self-incriminating, right?

9            MS. SULLIVAN:  That's correct.  And I imagine that

10    would be the response to this inquiry as well.  But it's

11    something I would want to confer with his criminal counsel

12    about before I did anything or responded formally.

13           THE COURT:  Okay, got it.  Give me one second.  I'm

14    just looking through.

15        (Pause)

16           THE COURT:  I guess -- I don't think I got a direct

17    response from Mr. Bhansali's counsel on the part of the

18    trustee's response that says, look, the fact of his resignation

19    doesn't change corporate documents into non-corporate

20    documents.  And I think they're right about that, but is -- let

21    me just ask you, is there any disagreement about that?

22           MR. NAKAHARA:  I don't think so.  You know, a

23    corporate document is a corporate document.  But again, I think

24    it's more just Mr. Bhansali is not going to have those in his

25    custody or control post resolution.

 1              THE COURT:  Well, that doesn't matter, right?  I

 2    mean, for purposes of asserting a privilege, you're -- one

 3    asserts privilege over that which is in one's custody or

 4    control.  And if you don't have it, you just say I don't have

 5    it, right?

 6              MS. SULLIVAN:  If I may, you're on, Nicole Sullivan

 7    for the record.

 8              I think the disagreement we have with the trustee,

 9    and Ms. Allen can correct me if I misunderstood it, is that

10    they think that even after he resigned, any documents that

11    he -- may have been created by him or at his direction after

12    that time are corporate documents.  And our position is that he

13    wasn't acting as a corporate officer anymore and he resigned

14    and he wasn't acting on behalf of the corporations.  And so any

15    documents after his resignation, which I believe is March 26,

16    2018, wouldn't be corporate documents to the point you're

17    making, which I think is anything preceding that date, which

18    are corporate documents to the extent they're in his custody,

19    would still be corporate documents.

20              I don't think we disagree about that, but I don't

21    think that's what the trustee is seeking, because the trustee

22    has -- just so we're clear, the trustee has all of the debtors'

23    documents.  And I know there was a mention in the reply that

24    they're not sure that they have everything, but they have

25    produced their entire database to us on the premise that it's

1   all of the debtors' documents, the multiple debtors.  So, I

2   mean, that was the first time hearing about it in that reply,

3   but -- so I think that's where the disagreement comes in and

4   why the issue is being raised in the motion.

5         THE COURT:  Okay.  So let me ask one follow-up, which

6   is, mightn't he also possess post resignation documents that

7   are corporate documents if they were just given to him or sent

8   to him?

9         MS. SULLIVAN:  In theory, that's possible.  Sitting

10  here today, I'm not aware of any, but in theory, it's possible.

11  If there's a corporate document created by Firestar that was

12  sent to him, yes, would probably fall under the exemption.  But

13  I don't think that's what they were talking about.

14        THE COURT:  Okay, fine.  Okay.  I think we've kind of

15  covered the landscape, but I want to make sure I haven't short

16  changed you.  I do plan to -- on the Fifth Amendment set of

17  issues only, is there anything else you want to raise that

18  pertains to Fifth Amendment?  I'm going to deal separately with

19  a sort of granular request-by-request type issues.

20        MR. LEVIN:  Your Honor, this is Richard Levin.  If I

21  just might state for the record, recalling when I was appointed

22  trustee in this case, Mr. Bhansali actually resigned from the

23  debtors in mid-May 2018, not March.

24        THE COURT:  Okay.  Yeah, it's in the papers, and I --

25  that was my memory, too, but thank you.

```
 1              All right.  Yeah, let me just come back to

 2   Mr. Bhansali's counsel and see.  Is there any other Fifth

 3   Amendment point you want to raise before I come back to

 4   Ms. Allen on -- for a quick response on that?

 5              MR. NAKAHARA:  I don't believe so.

 6              THE COURT:  Okay.  Great.

 7              All right.  So, Ms. Allen, yeah, let me hear from you

 8   restricted to Fifth Amendment issues, and I guess part of the

 9   issue -- I think your citation of Balsys is right and the

10   specific risk they identified was -- or thing they pointed to

11   was the Indian proceedings.  But is there something you can

12   tell me that can give me comfort either that there's no risk of

13   a U.S. proceeding, criminal proceeding against Mr. Bhansali, or

14   that for some reason that's not adequately raised?

15              MS. ALLEN:  Yes.  And on that point, you know, we do

16   believe it is Mr. Bhansali's right to assert and establish, and

17   it should be Mr. Bhansali's burden to show that criminal

18   actions in the United States, that the statute of limitations

19   wouldn't have run on those potential criminal actions.  For

20   example, criminal RICO would be an obvious one.  But we don't

21   know, you know, which criminal matters he thinks he may be

22   subject to.  We know what he's subject to in India, but it

23   seems that it should be their burden to show at least that the

24   statute of limitations hasn't passed in the United States.

25              THE COURT:  What's the date range of the relevant
```

1    conduct?

2         MS. ALLEN:  So the bankruptcy was filed February 28,

3    2018, and then there are some allegations that go later in 2018

4    in the complaint.  I can check to verify exactly what the last

5    date of the allegation is.

6         THE COURT:  Okay.

7         MR. LEVIN:  Your Honor, if I may, Richard Levin.

8         Going back to my point about the date, the

9    allegations don't go beyond when he resigned as the executive

10   of the debtors.

11        THE COURT:  Right.  So -- which happens to be, if

12   it's May of 2018, this is May 2nd of 2024.  So six years

13   matters in some circles.  And if you just wait for me to rule

14   until the end of the month, I guess we will have cleared six

15   years, right?  Everyone's smiling.  I'd love to have the word

16   "yes."  I don't know if six years is a magic number here.

17        Let me ask this.  Is anyone on either side aware of a

18   statute of limitations that could apply that's longer than six

19   years?  And don't tell me about fraudulent concealment or

20   tolling or tolling issues.  Just first off, is there a longer

21   statute out there?

22        MS. SULLIVAN:  Your Honor, it's Nicole Sullivan for

23   Mr. Bhansali.

24        I think it might make sense, given the length of time

25   since we breached this issue, you know, at the end of last year

1  or -- I mean, 2020 -- I don't remember what the dates are now,

2  but for us to maybe talk to criminal counsel again and see if

3  the pending concerns are still there or if the statutes have

4  run and we can submit a letter to the Court, if that's helpful.

5        THE COURT:  Yes.  If you can do it within, like, a

6  week.

7        MS. SULLIVAN:  Sure.

8        THE COURT:  Because, I mean, I will say the reply

9  brief is dated January 4.  You know, I will say, yeah, this

10  just took a while to get to, and I know Judge Lane was

11  finishing up some merits decisions for you all and probably set

12  this aside until that could be dealt with.  And he's generally

13  crushed.  He is the -- there's seven of us bankruptcy judges in

14  Manhattan, and he is it for Westchester, which is a very, very

15  active docket.  So anyway, thus me on the scene and thus the

16  passage of time.

17        I mean, look, if the -- if -- I think that would be

18  helpful, because if it just takes Fifth Amendment issues off

19  the table entirely, that's great.  I want to unleash you and

20  get actual work going in this case.

21        MS. SULLIVAN:  Understood, Your Honor.  Understood.

22  We'll mark it down for a week from today.

23        THE COURT:  Okay.  Ms. Allen, does that work for you?

24        MS. ALLEN:  Yes, Your Honor.

25        THE COURT:  Okay, so let's do that.  I mean.  All

1  right, so, Ms. Allen, but let me come back to you and let you

2  finish your argument.  We're just going to do our argument now,

3  and we'll -- so that -- and I'll reserve on Fifth Amendment

4  waiting to hear from Mr. Bhansali, which may make the Fifth

5  Amendment issues go away.  But if it doesn't make the issues go

6  away, then I will be ready to promptly rule on hearing.  Okay?

7  So let me give you your chance to continue with your rebuttal,

8  which I, a little bit, derailed there.

9          MS. ALLEN:  Yes, no problem.  So, to start with the

10 laptop, I do believe the laptop is a little bit of a red

11 herring because there's a limit to how much an image is going

12 to capture.  If he had tax returns saved on the desktop of that

13 laptop, would we have captured them?  Yes.  If he doesn't have

14 tax returns saved on that laptop, would we have captured them?

15 No.  There are certain records that we request:  tax returns,

16 passports, bank statements, that may not have been saved to his

17 laptop to be imaged.  And so, you know, whether or not he wants

18 to admit that's his laptop, or whether that would be a Fifth

19 Amendment issue, I think is just besides the point, because his

20 explanation of, well, you already have the laptop, you already

21 have the debtors' records, you couldn't possibly need anything

22 else is just not appropriate, given the circumstances of this

23 fraud.

24          THE COURT:  Right.  So I'm just going to say some

25 words gratuitously.  So that's a completeness issue, right, of

1  production?

2          MS. ALLEN:  Correct.

3          THE COURT:  He needs to produce anything he has

4  anywhere in his possession, custody, or control, in your view.

5  Right?  Unless a privilege applies or it's not relevant.

6          MS. ALLEN:  Yes.  And moving back, privilege point,

7  you asked a question about resignation.  I would like to note

8  that he resigned from the U.S. debtors on that date.  We do not

9  know whether he resigned from other Firestar enterprises and

10 what dates those resignations would have taken place.  And so

11 while -- and your timing framework is correct, at least with

12 respect to the U.S. records.  If it was U.S. records that he

13 had before he resigned, they should not be subject to the Fifth

14 Amendment.  If there are records that were created before he

15 resigned and he received them after he resigned, they should

16 not be subject.

17         But that being said, it's really just limited at this

18 point to his U.S. resignation.  He would need to support that

19 he resigned from the other entities at some point in time, and

20 then we would have the same framework of timing applying to

21 those records, but at this point, there's just a blanket

22 assertion and no review or production.

23         THE COURT:  Right.  Okay.  Got it.

24         MS. ALLEN:  The last thing, I'll just add really

25 briefly on the time delay and the prejudice here, we do attach,

 1 | you know, to our motion in great detail some of the chronology,
 2 | but I would focus you in on the email chain at Exhibit E, which
 3 | is very, very long, and then the Court's transcript at Exhibit
 4 | J.  I think part of the issue here is we were operating off of
 5 | the initial responses and objections that had an initial set of
 6 | issues.  And, yes, did they say any other applicable privilege?
 7 | Yes, but we focused in on what they were objecting to, which
 8 | is, you already have this stuff, and it's improper asset
 9 | collection and whatever else.
10 |        And we had letters back and forth, meet and confers
11 | back and forth, two proceedings before Judge Lane, operating
12 | under the understanding that those were the issues and that
13 | when they finally produced, we may narrow the issues.  We were
14 | not operating under the assumption that we were going to take
15 | this in buckets and we were going to have a whole 'nother round
16 | of fights and a whole 'nother year fighting on another issue
17 | that wasn't erased initially.  And whether or not they said
18 | Fifth Amendment at some meet and confer at some point in time,
19 | but it's not in any of the letters.  They didn't amend their
20 | responses to assert it such that we could brief it before Judge
21 | Lane when we were here before him last fall.  So that's where
22 | we are.
23 |        THE COURT:  Okay.  Okay.  Got it.  All right.  So
24 | here's -- thank you.  Look, here's what I want to do on the
25 | Fifth Amendment set of issues.  I will say -- yeah, let's say

1   that Mr. Bhansali is to submit a letter by the end of next

2   week, meaning by May 10th, advising the Court whether

3   Mr. Bhansali perceives there's any ongoing risk of potential

4   U.S. prosecution, and with specific reference to how any such

5   prosecution could be timely commenced at this point, given the

6   passage of time.

7           And further, if that risk has not yet expired, what's

8   his view on when will it expire?  That's too open ended.  Well,

9   I'll state it open-endedly, and the thought that really lies

10  behind it is that we're within a month of the end of May.  And

11  so if May 2018 is an exposure cutoff date, once you're past six

12  months [sic], is there any real ongoing problem?

13          I will say the waiver arguments, I think, are quite

14  strong.  I know it's not to be applied lightly, I think is what

15  the case law tells me.  But just the sort of tough-ish question

16  I posed to Mr. Bhansali's counsel really does weigh on me.  The

17  sequence here just really does strike me as discover -- as

18  suggestive of a strategy of delay and avoidance rather than

19  true prioritization of Fifth Amendment.  I also think the -- I

20  have to think through how real and substantial a risk of

21  prosecution I think exists.

22          I will say the fraud as described as being the

23  biggest -- I forget what buzzwords the trustee uses, but

24  something like the most mammoth financial fraud ever in India

25  suggests that it's inherently something that prosecutors might

 1  well be interested in, so I'm weighing that.  But on the other

 2  hand, the only concrete activity that's been identified is

 3  being handled, apparently out of India.  I think the Balsys

 4  case takes foreign proceedings out of the ambit of the Fifth

 5  Amendment, and if there were investigatory activity or

 6  pre-prosecutorial activity, I would think Mr. Bhansali would

 7  know by now.  So -- and it is Mr. Bhansali's burden to

 8  demonstrate a risk.

 9       So I think I'll just sort of make those observations

10  in the interest of transparency and letting Mr. Bhansali know

11  what kinds of concerns the follow-up submission from

12  Mr. Bhansali ought to address to give me a sense that the Fifth

13  Amendment invocation is real and is addressed to a real risk

14  that qualifies for protection.  Okay?

15       Let me -- Ms. Sullivan was nodding, so I think you

16  think I'm making some degree of sense here.

17       Ms. Allen, let me ask if you want to add anything or

18  push back on this approach.

19       MS. ALLEN:  No, I think that makes sense, Your Honor.

20       THE COURT:  Okay.  So let's do that.  Okay.  So --

21       MS. SULLIVAN:  I will only note, Your Honor, that

22  while I was nodding in agreement that what you want to do makes

23  sense, I don't agree with, like, all the comments that you made

24  about Mr. Bhansali.

25       THE COURT:  No, that's fair.  And you may well have

1   just been nodding to say, oh, I understand where this misguided

2   jurist is coming from, and I need to respond to that.  That's

3   fine.  So I won't draw any inferences.

4        Okay.  We've been going for pretty long, but do --

5   would it be productive to go through the objections more

6   granularly?  The other piece of your briefing is dealing with

7   the kind of request-by-request objections, or I can go through

8   them and give you reactions.  What -- how do you want to deal

9   with that?  Oh, and let me be more explicit.

10        So to the extent the Fifth Amendment invocation is

11   upheld and knocks requests out, that's that.  To the extent

12   it's not upheld, then we need to get to any outstanding other

13   objections and deal with those.  And to the extent the Fifth

14   Amendment invocation is not aimed at particular requests, we

15   need to get to those.  I am happy to talk these through with

16   you and kind of leave you with resolutions so that you can just

17   act already, if you all feel ready to do that.  Does that --

18   what do you want to do?  Do you want to continue, or do you

19   want to resume after a Fifth Amendment determination?

20        MS. ALLEN:  I think it makes sense to go ahead and

21   continue now so that we can work in parallel streams to the

22   extent they have production --

23        THE COURT:  Yeah.

24        MS. ALLEN:  -- gather on the non-Fifth Amendment.

25        THE COURT:  Okay.  That's my thought.  So I'll never

 1  know if Mr. Nakahara and Ms. Sullivan agree, but let's just

 2  march through it.  Okay?

 3          So let me just tell you, I'm looking at Exhibit K to

 4  ECF 126 as my handy reference for marching through these.

 5  That's the Bhansali amended responses and objections.  Is that

 6  the correct set of -- that sets forth the requests and then

 7  sets forth objections to each.  Does that make -- is that

 8  right?

 9          MR. NAKAHARA:  Yes.

10          THE COURT:  I want to make sure I'm looking at the

11  right thing.

12          MS. ALLEN:  Yes, Your Honor.  They're dated

13  October 3rd, 2023, so this would be the most recent responses.

14          THE COURT:  Yes.  Okay.

15          MS. SULLIVAN:  I'm looking at ones -- oh, they're

16  dated.  Okay, never mind.  I apologize.

17          THE COURT:  Oh, yeah.  You were maybe looking at the

18  document date.  This is -- yeah, the signature block on the

19  document is October 3rd, 2023, and it's Exhibit K to ECF 126,

20  which was the motion to compel.  So maybe we -- I have some

21  hope of not bogging down, but maybe blitzing through these.

22  And I think the best way is for me to just go through each in

23  order and then give you quick reactions so -- and see where we

24  get.

25          So request one is for all communications in any

1    format or media medium, with or concerning any relevant person

2    during a date range.  We noticed, in preparation, that

3    "relevant persons" is a defined term and means 60 people.  So I

4    guess my thought on that is, first, that the allegations here

5    and the scope of alleged unlawful activity is very sweeping, so

6    that it's sensible that there would be a broad list of relevant

7    persons.  On the other hand, maybe that could be narrowed and

8    focused some more or not.  I don't know.  I'd be willing to

9    hear you on that.

10         And then the other thing is, I don't know enough to

11   know whether that date range is -- makes sense or whether that

12   should be narrowed.  So let me -- I guess I'll start with

13   Ms. Allen on that and hear your thoughts, and then we can take

14   it from there.

15         MS. ALLEN:  So on the list of relevant persons, you

16   know, it would be one thing if, for example, this was a

17   business looking for, you know, correspondence with John Smith.

18   It's very hard to narrow that down and maybe we could work on

19   some search terms. I do think that these names are all, you

20   know, pretty unique names.  They are all alleged to be involved

21   in the allegations of the complaint.  And, you know, like I

22   said, if there were a situation where they're getting a lot of

23   false hits with a search term, but I don't understand why these

24   search terms couldn't just be run to capture any of the

25   responsive documents.  The relevant persons are all -- and the

1  entities are all part of this overall web of the conspiracy.

2       THE COURT:  Okay, got it.  Oh, I should have said

3  something, and I'm sorry, let me say an analytical underpinning

4  of my approach to this.  I'll say it a little more explicitly.

5       A thing one considers in dealing with discovery

6  disputes is proportionality to the needs of the case.  Here,

7  this is a really big case with really big fraud alleged and

8  huge financial consequences.  And therefore, that which is

9  proportional to the needs of the case is large.  So I don't --

10  so it might not be limitless.  I'm interested in finding

11  searches and sort of framing discovery obligations in a way

12  that can be achieved in this lifetime and are not crazy, but

13  substantial effort is justified by the scope of the case.

14  Okay?

15       So -- and, Ms. Allen, how about the date range?  The

16  date -- why does that date range make sense, just to educate

17  me?

18       MS. ALLEN:  Yeah, I mean, we actually narrowed the

19  date range quite dramatically.  We're only covering a two-year

20  period.  And that's the two years -- you know, it's the year --

21  so the case filed in February 2018.  So it includes the entire

22  year prior, which we understand there were a lot of transfers,

23  a lot of transactions that occurred in that year leading up to

24  the exposure, and then following exposure all the way to the

25  end of that year in 2018.

 1              THE COURT:  Okay.  So let me hear from Mr. Bhansali

 2   on this one.  Apart from Fifth Amendment, are there really

 3   issues with this?

 4              MR. NAKAHARA:  So I think there are, because, you

 5   know, we're dealing, first of all, with, again, a large amount

 6   of communications that are already in the trustee's possession

 7   through the debtors' records, which would go up to early 2018.

 8   Then also the list of people, there's 60 people on there.  With

 9   a few exceptions, like Mr. Modi and Mr. Gandhi, there's no

10   indication in the pleadings of how they're relevant toward, you

11   know, that what they're seeking.  Nor is there any proffer of

12   why they are relevant in the discovery requests or, I think, in

13   any of our meet and confers.

14              THE COURT:  Okay.  I got it.  You know what?

15   Here's -- I think -- here's what I think I'm going to do.  I'm

16   going to overrule the objection to this with maybe a slight

17   wrinkle.  So first off, the argument based on the notion that

18   the trustee already has information via the laptop or other

19   sources does not move me and doesn't justify sustaining an

20   objection because the trustee is entitled to ensure that they

21   have a totality of communications that are relevant.  And there

22   are allegations that Mr. Bhansali used a variety of corporate

23   and non-corporate means of communication and different

24   platforms. And so the media list contained in this objection

25   is -- excuse me, in this request is potentially broader than

1  that which they have already, and they can't know what they're

2  missing unless they're allowed to proceed with that.  So that's

3  fine.

4        I think the date range does strike me as targeted.

5  It's a two-year period that seems to be at the heart of the

6  action, so I'm fine with the date range.

7        I'm not going to granularly rule with respect to the

8  60 persons, but so I'll -- but I'll overrule the objection

9  without prejudice to a supplemental application from

10 Mr. Bhansali with respect to particular persons listed as a

11 relevant person whose relevance Mr. Bhansali challenges.  Any

12 such application should come within two weeks and let's say two

13 weeks of today, because the Fifth Amendment issue will or won't

14 drop off the table, but I want to keep things moving.  Okay?

15        Okay.  So let's go -- and then number two, this one

16 really seemed okay because it's done -- burden is limited by

17 making -- by the wording of "documents sufficient to determine,

18 or in the alternative, producing a list of email accounts."  It

19 seems to me your issue really is a Fifth Amendment issue on

20 this one.  And you have an argument, oh, no, interrogatories

21 are better, but this functionally is the same as an

22 interrogatory in the alternative, and the information seems

23 relevant and necessary for the trustee unless there's a

24 privilege objection.  Do you have any pushback on that that's

25 substantial?

1          MR. NAKAHARA:  No.

2          THE COURT:  No?  Okay.  So I'll overrule the

3   objection.  And when I -- I should say, whenever -- I'll

4   repeatedly say overrule or grant objections.  All of this is

5   subject to the outcome of the Fifth Amendment issues.  Okay.

6   Yeah.

7          Number three struck me as broad but necessary, which

8   is -- again, it has "documents sufficient to determine," so

9   that's a scope -- a burden-limiting wording, the extent and

10  nature of your interest or involvement with each related entity

11  or a list.  I guess I have the same reaction as number two.

12  Mr. Nakahara, any issue with that analytical approach?

13         MR. NAKAHARA:  We just feel the definition of

14  "related entity" is over broad because it goes back to 2010.

15  And the definition -- I'm just going to read it here because it

16  just covers so many different possibilities.

17              "Any domestic or overseas legal entity, including any

18              corporation, limited liability company, partnership,

19              or trust, that at any point from January 1, 2010 to

20              the present, such person established, managed, or

21              controlled, or in which such person held beneficial

22              or ownership interest, whether" --

23         THE COURT:  I'm sorry.  What's "such person" refer

24  to?

25         MR. NAKAHARA:  Here it would refer to Mr. Bhansali.

 1              -- "whether direct or indirect, partial or complete,

 2              contingent or non-contingent, or as to which such

 3              person served as an officer, director, manager, or in

 4              a similar role or position."

 5          THE COURT:  Do you have a proposed narrowing?

 6          MR. NAKAHARA:  I would probably suggest -- I mean,

 7   what would be ideal would be a list of specifics, but I think

 8   we could -- I might need to defer to Nicole on this, but maybe

 9   just like the actual entities they list in the other

10   categories, like the shadow entities and LOU entities.

11          THE COURT:  Okay.  Well, let me hear from --

12          MR. NAKAHARA:  As well as -- I'm, sorry.  Just to add

13   on, like, I know there's a few -- I know, for instance, there's

14   the family trust, which I think would fall under this, so --

15          THE COURT:  Right.  I mean, I am going to guess that

16   Ms. Allen's going to tell me that part of the trustee's problem

17   is they aren't certain they've got their arms around the

18   complete universe of entities that Mr. Bhansali was involved

19   in; and that the definition, although broad in other ways, is

20   specific to him, and therefore is at least limited to that

21   extent.  And that's good enough.

22          So let me just ask you for your response to that

23   anticipated response from Ms. Allen.

24          MR. NAKAHARA:  Well, I think they do have a pretty

25   good idea of the universe because of, again, their access to

 1   the debtors' records.

 2          THE COURT:  Okay.  Well, that's not going to cover

 3   everything pertinent to Mr. Bhansali.  Right?  There's concern

 4   about sort of multiple entities participating in a scheme, and

 5   with Mr. Bhansali potentially having his hand in other

 6   entities.

 7          MR. NAKAHARA:  Understood.  But I just struggle to

 8   see how they wouldn't have come up in the debtors' records.

 9          THE COURT:  Okay.

10          MR. NAKAHARA:  You know, where -- you know, the

11   implication is that they're involved in the alleged fraud.

12          THE COURT:  Okay.  I'm going to overrule that

13   objection, really for the reason I just posited to you as a

14   question, without prejudice to -- with -- your making a --

15   Mr. Bhansali making a request within, again, the end of two

16   weeks from tomorrow, that I narrow the definition of "related

17   entities" in some way.  I don't know what that way would be.

18   And such a request should be preceded by a meet and confer.

19   Okay?  So if there's some --

20          MS. SULLIVAN:  If I may, Your Honor.

21          THE COURT:  Yeah, sure.

22          MS. SULLIVAN:  Nicole Sullivan for the record.

23          I assume this might come up more than just in these

24   two, where you ask us for, you know, without prejudice, to

25   bring an application.  Do you want us to meet and confer with

1 | the trustee's council before all of those?

2 |        THE COURT:  Yes.  Yeah.  Thank you.  Let's just put

3 | in a blanket rule.  So I think I'm going to be overruling

4 | objections, but in what I consider maybe not required kindness

5 | and fairness to you, but in kindness and fairness to you.  And

6 | also, I mean, I'm a believer in both of those attributes.  I

7 | want to give you a chance to push back.  And, yes, the pushing

8 | back should be preceded by a meet and confer.

9 |        And I think my template I'm coming up with is

10 | basically, get to me within a week and a day on Fifth Amendment

11 | issues, and then within two weeks and a day on any other little

12 | open ajar doors that I leave for you to push back on adverse

13 | rulings.  Okay?  And if you want -- yeah, if you want, you can

14 | wait until the outcome of your Fifth Amendment inquiries and

15 | then spend the ensuing week in any necessary meet and confers,

16 | like, if the Fifth Amendment -- I guess if you stand down on

17 | the Fifth Amendment, everything's in play.  And if you don't, I

18 | think I don't want to have -- I'll try to rule fast, but I

19 | don't want you to defer --

20 |        MS. SULLIVAN:  I think some of these issues are going

21 | to --

22 |        THE COURT:  -- work.

23 |        MS. SULLIVAN:  Yeah.  So my only caveat is I'm going

24 | to be away from the 13th to the 18th, so, you know, I can work

25 | with the trustee to meet and confer next week to resolve some

1    of these issues pending the Fifth Amendment.  I'm happy to do

2    so.  I just asked that maybe we could submit whatever we're

3    submitting to the Court on the 21st of May.

4            THE COURT:  Yeah, I think that's fine.  I mean, let

5    me -- on the non-Fifth Amendment part.

6            MS. SULLIVAN:  On the non-Fifth Amendment part,

7    correct.

8            THE COURT:  Yeah.  I'm just looking at my calendar.

9    So, yeah, May 21 is a Tuesday.  Okay.  I think that's -- I

10   think that's fine.  Okay?

11           Ms. Allen, can you live with that?  Sorry, I should

12   ask you before saying it's fine.

13           MS. ALLEN:  Yes, Your Honor.  But obviously, we'll

14   want to work as quickly as possible to --

15           THE COURT:  Yeah.  Yes.  Try to have these

16   discussions, in light of your travel, before you travel, and

17   then just see where you can get.  And I'll tell you, I'll want,

18   you know, work to be proceeding.  And if you -- to the extent,

19   you know, my -- to the extent it's clear that you're going to

20   have to be doing a production, I want that work to be

21   regressing, if possible, recognizing that search terms need to

22   be finalized.  Okay?

23           MS. SULLIVAN:  Understood, Your Honor.

24           MS. ALLEN:  Thank you.

25           THE COURT:  All right.  And then, so four is

1  documents under which related entities were established or were

2  governed.

3          MS. ALLEN:  Yeah, and I may just flag --

4          THE COURT:  Okay, but for the list of related

5  entities, unless you think that's more burdensome than I'm

6  realizing.

7          MS. ALLEN:  Yeah, and if I may just note one thing

8  here, you know, related entities does flow through.  The

9  definition of "related entities" is dependent on what entities

10  Mr. Bhansali owned, controlled, was an officer of, had

11  involvement in.  We don't have a list of related entities that

12  we're throwing out there, like pick between these.  What we

13  have is a list of persons, and then we have a list of shadow

14  entities.  But Your Honor's correct.  The way that this scheme

15  operated is that they had basically two sets of records.  One,

16  records were the Firestar records that the lenders and the

17  auditors and everyone could see.  And then there was this other

18  enterprise that was, you know, on personal email addresses, et

19  cetera, so --

20          THE COURT:  Right.  And so the category is defined,

21  Ms. Allen, if I'm right, by the fact of relationship to

22  Mr. Bhansali.  Right?

23          MS. ALLEN:  Correct.

24          THE COURT:  Yeah.  Okay.  So, yeah, I mean, I will

25  just say I think it's made clear I find the trustee's need to

1   understand the universe of Bhansali created or controlled

2   entities to be a substantial need.  And so I'm sympathetic to

3   that.  And so I'm just giving the -- Mr. Bhansali a chance to

4   seek agreement that something's off the table.  For example, if

5   I'm -- I mean, I don't know what it would be, but if I'm

6   missing -- if there's something that really isn't fairly in

7   play, I want to give him a chance to make the case that that's

8   so.  Okay?  But otherwise, I think this -- the logic of the

9   request is pretty compelling to me.

10          MS. SULLIVAN:  Thank you, Your Honor.  You know, that

11  makes your position, we understand with respect to number

12  three, but with respect to number four, you know, regarding all

13  the articles of incorporation, operating agreements,

14  membership, bylaws, trust agreements, or instruments related to

15  those related entities, doesn't seem to be actually relevant

16  material or probing of anything, and just burdensome and

17  unnecessary discovery.

18          THE COURT:  Okay.  Let me -- let's take a minute on

19  that.  I'm rereading the list.  Well, let me hear from the

20  trustee, from Ms. Allen on this.

21          MS. ALLEN:  Yeah, and again, I don't want to have

22  confusion here.  There's related entities, which is defined as

23  dependent on Mr. Bhansali being in control, managing, holding a

24  beneficial interest, or serving as an officer.  And then

25  there's relevant person, and that's a list of individuals.  So

 1  │ I don't want to --

 2  │        THE COURT:  Wait.  Yeah, I got it.  No, Ms. Allen,

 3  │ the thing I want you to respond to is in number four.  Really,

 4  │ it's the parenthetical, it's the list of all of the types of

 5  │ documents you're seeking for each related entity.  So is that

 6  │ over broad?  And do you have -- do those all actually serve a

 7  │ relevant purpose for the trustee's litigation of this case?

 8  │        MS. ALLEN:  Yeah, I mean, we're trying to determine

 9  │ the overall web of this enterprise and the way that it was

10  │ controlled by various parties.  If Mr. Bhansali is, you know,

11  │ in those operating agreements, there's a provision for payments

12  │ of salary to him or payment of membership interests.  You know,

13  │ having those governing documents lets us know who's in control,

14  │ what are the, you know, restrictions that they were supposed to

15  │ operate under under their own governing documents, and who had

16  │ involvement in establishing those entities and then controlling

17  │ those entities going forward.

18  │        THE COURT:  Yeah, I think that's a correct and fair

19  │ statement of a relevant issue.  The allegation is a complex web

20  │ of interconnected enterprises doing nefarious things, and so

21  │ the trustee needs to make sure that they can develop and

22  │ understand --

23  │        MS. SULLIVAN:  I just want to, for the record -- I'm

24  │ sorry, Your Honor.

25  │        THE COURT:  Yeah, go ahead.

1            MS. SULLIVAN:  Just for the record, Nicole Sullivan.

2            Literally, just for the record, I want to make this

3   point that, you know, if you read the amended complaint, it's

4   very detailed.  There's information about the financial

5   records, there's information about tons of emails.  The trustee

6   has a very good understanding of the alleged web of this

7   massive fraud that they are purporting existed and that

8   Mr. Bhansali was at the forefront of with others that are

9   defendants as well.  So I think that this is more of like a

10  fishing expedition into Mr. Bhansali's assets and his things

11  that he might have control of or ownership of that they could

12  try to probe as post-judgment.  It really isn't.

13           They know from the financial records of the debtors,

14  you know, these LOU and the -- I'm forgetting the name of what

15  they call it.  But however the circle went around to perpetrate

16  the fraud, they know how that happened, which entity, that this

17  one was saying they were sending jewelry when they never really

18  sent the jewelry, it was to this entity and this third party.

19  They have all of that in there.  So this really isn't about any

20  of that.

21           I mean, I understand with number three, we could

22  provide that if they had a deposition, you know, and he doesn't

23  assert the Fifth, they could probably get that.  But this

24  number four and some of the ones that are going to follow, I

25  really don't think that you can just say because you alleged a

1  massive fraud, you're entitled to everything and anything

2  related to his ownership and financials, you know, carte

3  blanche, I mean, without any pressing need or explanation as to

4  how it's related or possibly related, without it being

5  completely disproportionate and unfair to Mr. Bhansali about

6  his personal records.

7          THE COURT:  Okay.

8          Ms. Allen, you want to respond to that?

9          MS. ALLEN:  Yes.  If I may just add one more thing.

10  And in our complaint, there's a section of it titled "diversion

11  of funds for the benefit of Mihir Bhansali and his family."

12  That's at Paragraphs 129 to 141.  And there we detail how

13  there's this entity called Nishall Merchandising (phonetic).

14  There's an entity called the MR Family Trust.  And those are

15  just two examples.  But we understand there may be entities

16  that we're not even aware of that he is an officer of, or was

17  an officer of, or controlled that received transfers out of the

18  Firestar Enterprise.  And so that's really what we're focused

19  on.

20          THE COURT:  Okay, I got it.  So, Ms. Sullivan, I

21  appreciate your statement, but it doesn't change my conclusion,

22  which is that the trustee's -- the objection's overruled to

23  this, subject to any possible narrowing that you can achieve on

24  the list of related entities.  The trustee has pled in great

25  detail the nature of the fraudulent enterprise.  But I don't

1  know if I have to say "alleged," the alleged fraudulent

2  enterprise, but they're entitled to gather records to prove up

3  that which they've alleged, and also to explore it, and then

4  also to explore whether there are additional aspects to it that

5  they're not yet aware of.  So therefore, I'll overrule the

6  objection to request number four, subject to the reserved right

7  you've got to push back on the related entities definition as

8  well as to the Fifth Amendment issued that I reserved on.

9  Okay?

10        Then number five, I think this is for documents

11  sufficient to identify financial institutions and accounts and

12  related information, or through the production of a list.  I

13  think the objection on this was essentially that this goes to

14  post - - this is more appropriate for post-judgment asset

15  discovery, if ever.

16        And my view -- and I disagree with that position,

17  again, because what is being investigated is a substantial

18  financial fraud.  And those investigating a financial fraud

19  need to know what the universe of financial institutions and

20  bank accounts were potentially used in the course of that

21  scheme.  That I'll call that a tentative ruling and see if

22  Mr. Bhansali has any pushback that might change my mind on

23  that.

24        MS. SULLIVAN:  Okay.  I do have pushback.  I was just

25  trying to give Mr. Nakahara an opportunity to speak.

1                  THE COURT:  Okay.  So I'll let you -- yeah.  If you

2     want to be heard on it, be my guest.

3                  MS. SULLIVAN:  Yeah, I do.  I mean, I do think that

4     this -- what they're asking for isn't limited just to

5     financials because I assume this is going to be the tentative

6     ruling for the category of document requests related to

7     financials.  I mean, they asked for, you know, every financial

8     account, every statement.  It's not limited in time, the

9     account numbers, the -- for opening, closing --

10                 THE COURT:  Yeah, you're mashing together five and

11    six right now.  I'm just looking at five, which is just listed

12    financial institutions and accounts.

13                 MS. SULLIVAN:  Yeah, I'm looking at five.  It's for

14    each financial account in which you or any of your related

15    entities.  Now, you know, I understand that you, you know, you

16    agree that they should be able to probe the related entities,

17    but you could have a related entity that has no bearing on this

18    fraud.  And now we have to produce to the trustee their

19    financial institution, the account number.

20                 I mean, these are things that don't get produced in

21    the ordinary course.  Even in cases involving, you know,

22    financial fraud, there has to be some, you know, connection,

23    some tie to the actual fraud.  It can't just be purely

24    speculative or a fishing expedition, even under Rule 26.  It's

25    just not appropriate.

1          I mean, I'll limit it just to five, and then we can

2   go through the other ones as they come up.  But we think it's

3   overly broad to all the information they're asking for.  I

4   think in the first instance, they should have to tie the

5   related entity to the fraud before they're required to produce

6   the information.

7          THE COURT:  Do you have a limiting mechanism that you

8   think would be potentially adequate to their legitimate needs?

9          MS. SULLIVAN:  I mean, now that you've agreed that

10  they have a legitimate need, I'd have to think about it.  I'm

11  happy to meet and confer with the trustee and see if we can

12  reach an agreement on that.  I mean, it just seems like, I

13  don't know, because I don't know how many related entities

14  there could be, and it could be very burdensome and a lot of

15  information that's not really necessary or material to

16  anything.

17         THE COURT:  Okay.  Well, let me hear from Ms. Allen

18  on this one.

19         MS. ALLEN:  Your Honor, so we're operating in the

20  dark of not knowing what this list of related entities may be.

21  But, for example, if he -- you know, if he's a member of the

22  school board, and you want to say this is not relevant to the

23  trustee's complaint, we would be willing to work with you, but

24  it's impossible to do so without knowing what the -- that list

25  of related entities is.

 1           We have also had issues in the past of us, you know,

 2   in our complaint alleging that there were transfers made to

 3   Nishal Merchandising (phonetic) or M.R. Family Trust.  And

 4   then, you know, the response is that that's not accurate and

 5   that those aren't relevant to the matter.

 6           And so, you know, having a fight over relevancy may

 7   be difficult, but if there's obvious irrelevant related

 8   entities, the trustee is definitely willing to discuss those.

 9           THE COURT:  Okay.  So what's the need for current

10   account balances, Ms. Allen?  That's the one thing that sounds

11   kind of -- that does sound like judgment enforcement

12   orientation.

13           MS. ALLEN:  And I will agree with you on that point.

14   I would be willing to remove the current account balances.  I

15   will flag though, however, that pursuant to Judge Lane's most

16   recent ruling on attachment, we are entitled to attachment

17   discovery, and so that might be captured at another later

18   stage.

19           That said, I do want to point out that Judge Lane had

20   limited our request to the date of the filing of the complaint.

21   So if that limit applies, this is a moot point anyways.  But in

22   any event, we agree we could extract that current account

23   balances at this phase and then determine whether we want to

24   ask that again in connection with asset discovery, given that

25   it is later in time.

1           THE COURT:  Okay.  So I'm going to --

2           MS. SULLIVAN:  I would like just make on the record,

3    Your Honor, that we did ask the trustee before today,

4    yesterday, to remove Request for Productions 5, 6, 8, 9, 10,

5    11, and 26 because they're identical to the attachment requests

6    that they served on Mister Bhansali Numbers 1 to 7, which

7    seemed to, you know, obviate the need for this Court to rule on

8    our objections relating to whether it's post-judgment or

9    related to the merits because of Judge Lane's ruling on the

10   attachment, and the trustee refused to do so.

11          But I still think that that would be the better way

12   forward on those seven requests rather than, you know, dealing

13   with them intermittently here.

14          THE COURT:  Okay.  I think they -- I understand the

15   logic of your position, but I'm sorry to say I disagree with it

16   because I think the request serves multiple purposes.  It

17   certainly is going to be part of the trustee's effort to

18   attain -- identify assets for possible attachment.  But on top

19   of that, it also is relevant to investigating and assessing the

20   full extent and scope of the financial web alleged in the

21   complaint.

22          So I'm going to overrule the objection, except that

23   I'm going to sustain it as to current account balances, which

24   to my mind has no purpose other than serving attachment.  Now,

25   if Mr. Bhansali through counsel decides, oh, I'd rather just

 1  provide account balances in one fell swoop rather than do it in

 2  a separate attachment proceeding, that's fine.  You can talk

 3  about that.  Okay?

 4          I'm sorry, my brain is hopping around a lot today, so

 5  I'm going to say another thing that's generally applicable.

 6  Every single ruling I'm making today, to the extent I'm

 7  directing productions, comes with encouragement that you all

 8  have ongoing engagement, and if -- and work on logical

 9  efficiency gaining measures so that if Mr. Bhansali comes to

10  the trustee and says, this is ridiculous and will take

11  whatever, ten months and a billion dollars to generate, let's

12  do it this more sensible way, I would encourage you to have

13  that conversation and try to streamline things.  Okay?

14  Streamlining is maybe an ambitious word, because in the

15  circumstances, but you can make -- you know, make a mountainous

16  task into a smaller mountainous task.  Okay?

17          If that's possible, just please do that.  All right.

18  S let's then go to, okay, Number 6 is where, when I said you

19  were conflating 5 and 6, 6 is the one that asked for all

20  statements.  So that gets to be I guess really a lot of volume,

21  I assume.

22          So let me start with Ms. Allen.  Do you really need

23  all of that, or do you want to defer that until you see where

24  you get on 5, or do you -- I mean, you can tell me you need all

25  of it and I'll listen and I'll hear from Ms. Sullivan.  But

```
 1  even though I do think that the needs of the case are great

 2  here, this is a pretty potentially heavy lift.  What do you

 3  think?

 4           MS. ALLEN:  Yes.  On this one, I mean, it would be

 5  limited to the extent he possesses or controls monthly

 6  statements, and it is limited as I mentioned by date to the

 7  filing of the complaint.  That said, it may be that we can

 8  narrow this based on related entities once we have that

 9  information.  We don't necessarily need it for all related

10  entities, and we can work with them on that.

11           THE COURT:  Okay.

12           MS. ALLEN:  But that may be where it's particularly

13  important and pertinent.

14           THE COURT:  Okay.  So here's what I'm going to do on

15  this one.  I'm going to overrule the objection without

16  prejudice to an additional type of further request from

17  Mr. Bhansali.  And that is it's -- as all my other rulings are

18  involving related entities, it's without prejudice to an

19  attempt to narrow the depth of the scope of related entities.

20  That's a discussion you're going to have for multiple requests.

21           And in addition, if Mr. Bhansali can demonstrate,

22  make a supplemental showing of true excessive burden that is

23  not proportional to the needs of the case, meaning it won't

24  actually accomplish too much, and the burden doesn't justify

25  the potential benefit, I'll listen to that.  Okay?
```

```
 1              But for now, let's assume you're going to do it, but

 2    do meet and confer and try to narrow and make this more

 3    possible.  Sorry, you're hearing street noise I'm sure.

 4              MS. ALLEN:  We don't hear it.

 5              THE COURT:  (Indiscernible) out in front of my house.

 6    Okay.

 7              MS. SULLIVAN:  May I ask a clarifying question?

 8              THE COURT:  Yeah.

 9              MS. SULLIVAN:  This is Ms. Sullivan.  I am aware that

10    Judge Lane ordered the production end date to be the filing of

11    the adversary proceeding, but, you know, what's the start date

12    for all of this?  I mean, are we going back to 2010, from 2010

13    to 2019, for all these records?

14              THE COURT:  That's a good question, and I don't know

15    the answer.  Ms. Allen, what's the -- what's your answer?

16              MS. ALLEN:  Yeah.  And on that note, I'm checking the

17    original request.  So unless stated otherwise, it goes

18    January 1st, 2010 to the present.  But again we'd be willing to

19    work with them on date frames, dependent on related entities,

20    because there are some related entities, for example, that we

21    know transfers happened at certain points in time, and so we

22    might not be able to limit those as much.  But if there are

23    truly, you know, likely irrelevant entities, we may be able to

24    determine that they're irrelevant before requesting this

25    information.
```

1          THE COURT:  Okay.  So just meet and confer on that,

2   right, and put date range on your list of potential limiting

3   factors, and I'll listen to it.  If there's a disagreement, you

4   can come back to me in that two week and a day follow-up that

5   you're going to be doing.  All right?

6          Does that adequately finish off Number 6?  I think

7   so.  Okay.  No one said otherwise.

8          Number 7, all --

9          MR. LEVIN:  Your Honor, excuse me.

10          THE COURT:  Yeah, go ahead.

11          MR. LEVIN:  This is Mr. Levin.  If I made be excused

12   from the hearing, my lawyer is doing such a great job, I don't

13   want to get in the way.

14          THE COURT:  Yeah.  Anybody who's here and doesn't

15   actually need to be here is free to go, and that's completely

16   fine.  Okay.

17          MR. LEVIN:  Thank you so much.

18          THE COURT:  Yep.  And I'm sorry this is kind of a

19   painfully slow process, but it's -- I think it's just going to

20   be necessary to get you where you need to be, and I'm happy to

21   devote the time and try to accomplish that.

22          Okay.  Number 7 is documents and communications about

23   transactions, meaning purchases, sale, or transfer -- it should

24   say including purchases, sales, or transfers worth 50,000 or

25   more.  Again, this seems -- if it can be made less burdensome

1    for efficiency's sake, that's fine.  The subject matter makes

2    sense to me.  The only question I have is whether 50,000 is the

3    right number, but I don't know a reason to say it isn't.

4         So let me hear from -- who should I hear from first?

5    I guess, Ms. Allen, just give me a really succinct statement of

6    what you want and do you see a basis for narrowing this.

7         MS. ALLEN:  So we thought that $50,000 was a pretty

8    large threshold for a transaction.  So if he has a $40,000

9    transaction, that's not going to be a part of this.  Also, you

10   know, similarly we can -- if we narrow down that there are some

11   irrelevant related entities, we're happy to do that, even with

12   respect to relatives, if they -- but at the same time, with

13   relatives, if Mr. Bhansali and Mrs. Bhansali are regularly

14   transferring $50,000 between each other, then I don't know that

15   we would necessarily want to narrow it on that.

16        THE COURT:  Okay.  I'm sorry, what -- give me your

17   last sentence again.  If they were regularly transferring

18   $50,000?

19        MS. ALLEN:  I don't know that we necessarily want to

20   narrow, given the amount of the threshold being so high.

21        THE COURT:  Okay.  All right.  So let me hear from

22   whoever wants to speak to this, Mr. Nakahara or Ms. Sullivan.

23        MR. NAKAHARA:  I can speak to this.  I mean, it's --

24   It really is a scope issue here just because related entities,

25   relatives, all those other entities and relevant persons,

1  that's hundreds of potential, you know, counterparties.  And

2  especially, you know, I think relatives is one where we're

3  likely to get into the stuff that's highly personal and not at

4  all relevant.

5        THE COURT:  Okay.  I'm going to -- let's do this.

6  I'm going to -- again, I expect this one to come back to me

7  unless you reach an agreement, but I'm going to formally say

8  I'll overrule the objection as to Number 7, but without

9  prejudice to a further request in two weeks -- within two weeks

10  and a day.  Or I guess I get -- I'm sorry, did I make it a

11  different date?  The 21st is the date we're talking, right?

12        MS. ALLEN:  Yes, Your Honor.

13        THE COURT:  That's blanket.  That's your next date on

14  these sets of issues.  On -- I'll just call it on scope, I

15  think the dollar amount makes sense.  Ms. Allen's right, that's

16  a pretty big chunk of change and -- but, you know, if the list

17  of people affected is too broad, I'll listen to you on that.

18        MS. SULLIVAN:  Can I just be heard, Your Honor,

19  please?

20        THE COURT:  Yeah.

21        MS. SULLIVAN:  This one is -- you know, we objected,

22  not just like on scope, but it's vague.  Like, it's like

23  confusing to me.  Like 50,000 or more involving you, so

24  anything -- any transfer Mr. Bhansali made that exceeds 50,000,

25  or is it any transfer he made with a related entity or a

1  relative, or does he have to produce his relatives and ask for

2  their transfers?  And, you know, these are my --

3         THE COURT:  Can I interrupt you to say I agree with

4  you?  The word "involving" is vague in particular.  So are you

5  looking for -- let's just get some clarity on what exactly is

6  covered by this.  So I'll come back to Ms. Allen on that.

7         MS. ALLEN:  Yeah, and I am noticing the same.  I do

8  think we could propose tightened language.  I think the intent

9  here is to capture transactions that he was either on, you

10  know, one side of the transaction or the other, and not

11  necessarily determining whether related entities had a

12  transaction between them that entirely did not involve

13  Mr. Bhansali.  So I would request that we meet and confer and

14  that we, you know, take a stab at revising this to tighten the

15  language to make it more clear.

16         THE COURT:  Can I suggest -- this may not work, but

17  how about any transaction, and then with the parenthetical

18  "made, caused to be made, or received by Mr. Bhansali, and then

19  the rest.  Would that work?  If you can improve it, you can

20  improve it, but I think that's what you're -- is that what

21  you're looking for?

22         MS. ALLEN:  The only difficulty with that proposal is

23  that, for example, if he controls an entity, it's his entity,

24  and there's transactions of $50,000 between that entity and

25  Firestar.  We still want to capture it, even though it wasn't

1   with respect to him personally.

2          THE COURT:  Well, that's -- what about "caused to be

3   made" as covering that?

4          MS. ALLEN:  Yeah, I think that may work.  I'm willing

5   to go with that.

6          THE COURT:  Okay.

7          MS. SULLIVAN:  My concern here, and just thinking out

8   loud, is like let's say he has a related entity that he does

9   receive compensation for, and this is hypothetical.  I'm not

10  conceding anything, but -- and they give him a $50,000 bonus,

11  right?  Why does he have to produce that here?  Like, what

12  relevance or materiality does that have here?  I mean, I

13  understand -- I disagree but I understand in concept why, you

14  know, you could argue that his transaction with a Firestar

15  entity, or a shadow entity, or his related entity with one of

16  those entities could have some relevance to them in discovery.

17  But personal -- completely personal transactions just seem to

18  be too much for me.

19         THE COURT:  I think you -- I don't think you can

20  define that out of the scope of the request in a way that

21  doesn't poke holes in the -- harmful holes in the scope of the

22  request.  I think certainly --

23         MS. SULLIVAN:  I think if you made it may cause to be

24  made or received by Mr. Bhansali and, you know, any Firestar

25  entity or any shadow entity versus, you know, where it's

```
 1  connected to the any Firestar entity, you know, to any relevant

 2  person.  And I know we disagree about the scope of relevant

 3  person, and we'll put that before Your Honor, but I don't see

 4  why if Mr. Bhansali's, you know, parents give him 50,000 or

 5  $100,000, why that matters to this case or what the trustee is

 6  seeking.

 7         THE COURT:  What do you think, Ms. Allen?

 8         MS. ALLEN:  Well, two points there.  First is, as

 9  we've discussed on the related entities, we don't know whether

10  he has entities that are relevant or irrelevant.  I believe it

11  should be on Mr. Bhansali to establish here's a related entity.

12  It is irrelevant.  And then if we agree, we will excise that

13  entity from any of our requests.  The difficulty here is that,

14  you know, for example, Nishal Merchandising.  And again, if you

15  go back to those paragraphs of the complaint, 129 to 141, we

16  detail diversion of funds for the benefit of Mihir Bhansali and

17  his family, and involves some of these related entities.  And

18  we do believe that if there are transactions of over $50,000,

19  that we should be entitled to review those to assess whether

20  they were part of the Firestar enterprise and the diversion of

21  assets.

22         THE COURT:  Okay.  I got it.  Look, I hear you,

23  Ms. Sullivan, but I think with the $50,000 floor on transfers,

24  I'm going to allow that to -- I'm not going to try to come up

25  with words to carve out personal and unrelated transactions,
```

1    because partly I think that may be in the eye of the beholder.

2    I think there's allegations of money flows among related

3    people.

4            But I will say, if you identify -- this is

5    hypothetical, right?  If you identify some cluster of purely

6    personal, unrelated to the alleged scope of activity

7    transactions, you can approach Ms. Allen and her colleagues

8    about that.

9            And you can also approach me if you want to say,

10   Judge, we didn't know at the time, we couldn't articulate it

11   with specificity, but there's this sensitive and personal

12   matter, whatever.  He lovingly funded some relative's serious

13   and expensive medical treatment, right?  I will not make that

14   go public, so --

15           MS. SULLIVAN:  And just for point of reference,

16   Ms. Allen's represent -- reference Nishall Merchandising many

17   times.  And my understanding is Mr. Bhansali -- that's not a

18   related entity as it's defined here.  Mr. Bhansali --

19           THE COURT:  Okay.

20           MS. SULLIVAN:  -- is not an owner or operator of

21   that.  I'm just not understanding, and maybe -- and I asked for

22   the clarification just because we're going to have to respond

23   if you overrule all our -- you know, our Fifth Amendment stuff

24   is why limiting it to that involve, you know, Mr. Bhansali

25   transfers to a Firestar entity or the other entities

 1  thereafter, or Mr. Bhansali's related entities and those

 2  entities thereafter doesn't get to what the trustee and what

 3  Ms. Allen just said she's looking for versus transactions

 4  between the related entity and Mr. Bhansali.

 5          I mean, a transaction between the related entity.

 6  Mr. Bhansali isn't going to provide any evidence or proof that

 7  it's part of a fraud.

 8          THE COURT:  Okay.  Let me ask Ms. Allen to respond to

 9  that.

10          MS. ALLEN:  I do think this goes back to the

11  definition of related entity.  If they show us here's some

12  related entities that are irrelevant, then we will absolutely

13  agree to remove them.  But I do think that that issue of

14  relevancy is where we're going to have a debate.  But if he has

15  an entity that received transfers from Firestar, that is what

16  we're really trying to capture here.

17          MS. SULLIVAN:  Right.  So that's why my clarifying

18  point is what actually makes sense then.

19          THE COURT:  All right.  Look, I think you're going to

20  have to talk --

21          MS. SULLIVAN:  That's fine.

22          THE COURT:  -- further and come back to me if there's

23  a dispute that you sharpen about how to apply this.  For now

24  I'm going to, again subject to that, overrule the objection,

25  but with the request modified to replace -- well, to try to

1   avoid the ambiguity caused by the word "involving" there.  And

2   I think the wording I came up with was "Made or caused to be

3   made by Mr. Bhansali or received by Mr. Bhansali."  I think

4   that's what I've got.

5           MS. SULLIVAN:  To be clear, we're taking relatives

6   out, right?  Because Mr. Bhansali wouldn't have control over

7   relatives' records or transfers with those other entities.

8           MS. ALLEN:  Well, let me --

9           THE COURT:  Unless they're -- well, unless they're

10  recipients of the transfer, right?

11          MS. ALLEN:  Well, and all of our requests only go to

12  the records that he possesses and controls, so --

13          THE COURT:  Right.

14          MS. SULLIVAN:  Okay, fine.

15          THE COURT:  Okay.  Ms. Sullivan, did you just say the

16  word fine?

17          MS. SULLIVAN:  I did.  I said okay, fine.

18          THE COURT:  Okay.  I mean, I may well be hearing more

19  from you on this, but I'm just trying to do my best to move

20  things along.  And I will confess that I was a white-collar

21  defense lawyer as a baby lawyer, so I have a little bit of

22  sympathy, but also a little bit of awareness of fraud cases and

23  how to deal with them.  And I know it can be kind of a fraught

24  and challenging process all around, but I also know that the

25  trustee is entitled to build the case, okay, within reason, and

1  subject to appropriate defenses.

2          Okay.  Now, Number 8, I guess I'm going to get a

3  breadth and relevance objection to this basically, right?  And

4  any dealings with any financial advisor, accountant, investment

5  advisor or lender.

6          Ms. Allen, do you want to offer up any -- well, what

7  are you getting at, and can it be sharpened?

8          MS. ALLEN:  Yes.  And what we're getting at here is

9  we do allege that there were a number of transfers and

10  transactions in the months leading up to exposure of the fraud,

11  where we believe that documents and communications with respect

12  to his personal finances or any of the related entities will

13  lead to -- will reveal what those transactions and those assets

14  might have been.

15          THE COURT:  Okay.  So as written, this says with

16  respect to your personal finances or any of your related

17  entities.  Can you -- I mean, with respect to your personal

18  finances is very, very broad.  Is there anything you can do to

19  sharpen that?

20          MS. ALLEN:  I mean, unfortunately, these transfers

21  were made to him personally.  For example, you know, Nirav

22  Modi's sister, Purvi Mehta, transferred $1.5 million to him in

23  2017.  And so, you know, looking at his personal assets is then

24  naturally -- or, you know, transfers and a value of assets,

25  given the compensation he was receiving from the Firestar

1   entities that we know of, is really what we're trying to seek

2   here.

3           I will also add, again with related entities, to the

4   extent they're truly irrelevant related entities, we do not

5   need documents and communications regarding those.  And also it

6   is limited to -- these are communications that he, Mr. Bhansali

7   himself, would have had, not seeking to have him locate records

8   that someone else might have had communications about.

9           THE COURT:  Okay.  Let me hear from whoever wants to

10  speak to this for Mr. Bhansali.

11          I think you're getting a pointed look, Mr. Nakahara,

12  if I'm interpreting the screen correctly.

13          MR. NAKAHARA:  Hey, now.

14          MS. SULLIVAN:  If you don't want to speak, I'm happy

15  to do it.  I just want to give you as much opportunity to argue

16  as possible.

17          THE COURT:  Yeah, that's great.

18          MR. NAKAHARA:  No, I do appreciate it.  I was just

19  getting my thoughts together.  Yeah, I mean, obviously personal

20  finances is a concern.  I don't think we need to rehash that

21  much further.  I also think there could be some privilege

22  issues implicated here.  And we do have a privilege log that

23  we'll produce, subject to the outcome of this hearing and

24  subsequent productions.

25          And, yeah, I just -- I think our main concern here

```
 1  too is just that it'll scoop up a lot of, you know, financial

 2  information and transactions that aren't relevant here.

 3          THE COURT:  Okay.  I got it.  I think -- I'm thinking

 4  about every email and text with your accountant about when can

 5  we get together.  Is Tuesday good?  No, but what about

 6  Thursday?  Right?  But maybe that's just the price of doing

 7  business.  I don't know.  I don't have a limitation to --

 8          MS. SULLIVAN:  It's not just your -- I mean, you

 9  know, it's not just your accountant and financial advise --

10  it's accountant, financial advisor, investment advisor, or

11  lender with respect to your personal finances.

12          So let's say Mr. Bhansali reached out to a lender in

13  2012 to get a personal loan for a car, to buy a car.  What

14  relevance is that?  I mean, you have to remember these go back

15  to January 1, 2010, to the filing of this adversary proceeding.

16  I mean, that doesn't have any materiality.  I get that we

17  disagree, but Your Honor is ruling that they're entitled to

18  make their case, and this discovery is what they need to do

19  that.  But this seems to be, you know, a real example of a pure

20  fishing expedition.

21          And, you know, maybe they should hold this one off,

22  pending the results of the other requests that you've ordered

23  to be produced, and some of which will come thereafter, and I

24  presume will also be ordered to be produced.  Because this just

25  seems overreaching in that sense.  And they do have the
```

```
 1  attachment discovery.  I mean, personal finances, I mean, she
 2  mentions -- Ms. Allen mentions the 1.5 million from Ms. Maida
 3  [sic], but we produced the bank records that show that that was
 4  repaid by Mr. Bhansali with interest.  And it was a personal
 5  loan unrelated to the fraud.
 6           So, you know, no matter what we end up producing,
 7  which is why we're going to have battles about whether the
 8  company is irrelevant or not.  I'm not sure how we'll prove the
 9  negative.  But, you know, no matter what we show them, just
10  show that their allegations are not -- or at least a specific
11  allegation is not based in fact.  It doesn't matter.  And they
12  keep pushing for all this stuff because, you know, ultimately I
13  don't think they have a basis to prove the fraud, and even
14  these productions aren't going to support it.  But I understand
15  the Court's rulings, too.
16           THE COURT:  Okay.  I got it.  Ms. Allen, let me ask
17  you this.  And what if --
18           MS. ALLEN:  If I --
19           THE COURT:  Yeah, well, let me float at a thought
20  that's slowly germinating in my head.  What if this were
21  modified to just be without prejudice to follow-up requests,
22  but for now documents and communication sufficient to identify
23  any accountant, financial advisor, investment advisor, or
24  lender with whom you interacted with respect to your personal
25  finances or any of your related entities.
```

```
 1              So you have the list, and I'm thinking about the fact
 2   that your Request Number 9 is for all financial statements, and
 3   might get you more directly the substantive financial
 4   information you actually want.  And you can follow up with the
 5   individuals who are identified in Number 8 without making them
 6   capture every single communication to any of those people.
 7              MS. ALLEN:  That makes sense to me.  And I agree, I
 8   was thinking around the terms of with respect to your personal
 9   finances.  I think what we're really trying to capture here is
10   there are times where a party may describe their assets as one
11   way to a lender than they do to -- for example, to the IRS.
12   And so, you know, having whether it's financial statements or,
13   you know, disclosures that he made, for example, to a lender.
14   If it's a lender for a vehicle, no.  If it's a lender for a
15   house and they're requesting, you know, a list of your assets
16   at that time, then that's more relevant.  So -- but that's
17   really what we're trying to get at.
18              THE COURT:  Okay.
19              MS. SULLIVAN:  I don't see how that's at all relevant
20   to proving the allegations of the fraud here, or the other
21   complaints -- claims at issue.  I mean, that's just like what
22   does he do with his money?  How does he spend it?  Which I
23   understand that they get in the pre-attachment discovery that
24   was allowed by Judge Lane, but it just doesn't seem like it has
25   any merit or relation to proving the underlying allegations.
```

1              THE COURT:  Right.  Well, personal lifestyle and

2    expenditure choices I agree are not relevant to proving up the

3    case.  The question is how do you design requests that don't

4    scoop those up in the course of scooping up information that is

5    relevant to the financial --

6              MS. SULLIVAN:  Right.  But I think the trustee's

7    counsel just admitted that they're really seeking how he

8    describes his assets, which really is post-judgment discovery,

9    not related to the underlying factors.

10             THE COURT:  Okay.  Well, how about what I floated,

11   which is just documents sufficient to identify those

12   individuals and not more at this time, subject to possible

13   follow-up requests later?  Doesn't that eliminate the --

14             MS. SULLIVAN:  That eliminates our concern for the

15   document production here, Your Honor.

16             THE COURT:  Yeah.  So let's do that for the document

17   production.  I mean, you're -- because I'm already directing a

18   lot of production, and I think the trustee will be in good

19   shape, again pending -- depending on the outcome of the Fifth

20   Amendment issues.  And then we'll -- we can see where we get,

21   and if more is necessary later, we can deal with that then.

22             Okay.  So 9 is all financial statements, and we've

23   got a vagueness, breadth, burdensomeness request, and

24   relevance, which really an updated -- you know, the current

25   rule wording is proportional to the needs of the case, but --

1          MS. SULLIVAN:  I would just note for the record that

2    I would make the same argument that we made in response to

3    Number 8 with respect --

4          THE COURT:  Right.

5          MS. SULLIVAN:  -- to Number 9 and its relevance and

6    materiality to proving the claims here.

7          THE COURT:  Okay.  Sorry, Ms. Allen, but let me ask

8    you to give me again, why do you need this and if -- or do you?

9          MS. ALLEN:  Yes.  On the financial statements, the

10   goal here is that we understand here is where his accounts are.

11   Here are the different places where he has assets so that we

12   can -- and also those financial statements will show inflows

13   and outflows to the extent there's transfers from Firestar or

14   from some shadow entity or for some related entity or Nishal

15   Merchandising.  That's the information we're trying to capture

16   here.

17         THE COURT:  I got it.  And what's the date range?

18         MS. ALLEN:  This would be from 2010, which is what we

19   allege to be the beginning of the fraud, until the date of the

20   filing of the complaint.  And the reason for that is again

21   these transfers spanned a large period of time.

22         THE COURT:  Okay.  I got it.  This one seems like a

23   fair request to me because, look, financial statements are just

24   classic material that forensic accountant types or people

25   investigating frauds have to pore over, and that are

1  institutional record of transfers that will -- that just seems

2  like something that needs to be looked at, and so I'm going

3  to --

4          MS. SULLIVAN:  Can I --

5          THE COURT:  Yeah, go ahead, Ms. Sullivan.

6          MS. SULLIVAN:  So if I'm understanding trustee's

7  counsel correctly, you know, maybe if we only -- if we have

8  financial statements that don't have any transfers from any of

9  the shadow LOU Firestar related entities, then, you know, it

10  doesn't have to be produced.  Right?  It's only to the extent

11  that it would include any transfers from those, and we can, you

12  know, have it formalized in writing.

13          THE COURT:  So your proposal, Ms. Sullivan, is to --

14          MS. SULLIVAN:  Like let's say he has related

15  entities, but there's no transfer other than his compensation

16  from Firestar entities.  Right?  You know, and there's no other

17  transfers from a shadow entity, LOU entity, or a related

18  entity, then those financial statements don't have to be

19  produced.  To the extent that there is a transfer other than

20  his own salary, which we all know what that was, from Firestar

21  or a shadow entity or LOU or a related entity, then we would

22  produce it.

23          THE COURT:  Do you -- can I ask what's the

24  sensitivity that justifies -- this would require a really

25  laborious statement-by-statement review, wouldn't it, to sort

1   of identify a subset where you say there's nothing to see here?

2          MS. SULLIVAN:  I just don't know how many financial

3   statements there are, if any, to be honest.  I think we -- on

4   this one, well, we are withholding documents, so there are

5   responsive financial statements, but I don't know if it's a

6   handful or, you know, if there's five a year.  I can't imagine

7   that it's that laborious.  I'm just -- I think that there's

8   sensitivity to his personal financials, right?

9          Like, usually in your -- you know, even when you're a

10  defendant in litigation, your personal financials and your tax

11  returns do not get produced.  And I've been involved in other

12  cases where we have fraud, maybe not alleged to this -- you

13  know, to this extent, but there's fraudulent activity and

14  embezzlement and other things, and your -- you know, certain

15  perspectives of your financial statements just aren't

16  disclosed.

17         And here it just seems like, you know, everything

18  that he's ever done has to be an open book because there's

19  allegations of massive fraud.  And so I'm just trying to think

20  of ways where it limits it and protects his, you know, personal

21  privacy, but gets at what Your Honor is looking for.

22         THE COURT:  I want to say that doesn't ring true to

23  me that in fraud cases financial records don't get produced and

24  tax returns don't get produced.  But, I mean, all the time

25  there's certainly privacy protections baked in and

 1  confidentiality (indiscernible), but --

 2        MS. SULLIVAN:  But usually when you have -- other

 3  financials have been produced, then the tax returns are not

 4  produced, unless there's some other reason that the information

 5  wasn't provided or there's something you think that would have

 6  been provided that wasn't.  And so those are usually not

 7  produced.  And there are financial statements, but they're

 8  getting other information that probes that.  It was just a

 9  suggestion, Your Honor.

10        THE COURT:  Okay.  Yeah, Ms. Allen?

11        MS. ALLEN:  So two things.  First is we are entitled

12  to discovery of his assets as of this point.  We've issued

13  discovery.  And we agree, yes, those questions are the same.

14  And that was because in case Your Honor ruled against us that

15  this was improper asset discovery, we would have an ability to

16  capture it at that later stage.

17        We do agree that, you know, it is -- even just a

18  prejudgment attachment is a very, you know, serious remedy that

19  shouldn't be issued lightly.  And we -- the Judge found --

20  Judge Lane found that we were entitled to that extreme remedy

21  to attach his residence or his wife's residence and to allow

22  for asset discovery.

23        That being said, we think we're entitled to it at

24  this stage, too, given the nature of this fraud and the number

25  of transactions that float around, and the circular nature of

1   those transactions, where it usually wasn't just Firestar sends

2   it out.  It's usually through a web of entities before it goes

3   to where it was intended.  So we're definitely trying to track

4   down those circular transactions and to the extent they hit

5   Mr. Bhansali's personal bank accounts.

6           THE COURT:  Okay.  Look, that rings true to me as

7   being pretty central to the alleged course of conduct.  I

8   appreciate the potential personal privacy issues that

9   Ms. Sullivan raised.  I think the cure for that is a protective

10  order and -- but the cure for that is not to bar the

11  production.

12          So I'm going to overrule the objection on Number 9,

13  but subject to negotiation and submission of an appropriate

14  confidentiality order, protective order, whatever you want to

15  call it.  And anticipating something Ms. Sullivan might say,

16  gosh, the same concern might apply to different things we're

17  being made to produce here against our will.  And if so, you

18  can say, please also cover this, that, whatever.  Tell me what

19  you want covered.  I'm not averse to that.  Okay.

20          And then we've got financial statements for each of

21  your related entities.  I think that somewhat can be just

22  controlled by the outcome of whatever discussions or ruling

23  happen on trimming the related entity list, right?

24          MS. ALLEN:  Correct.  It's limited to what's in his

25  possession and control.

1          THE COURT:  Yeah.

2          MS. ALLEN:  And that we are willing to further limit

3    it if we can have agreement that there are certain related

4    entities that are truly irrelevant.

5          THE COURT:  Okay.  I think that's the right place to

6    end up.  Okay.  I will be here for -- literally forever if I

7    keep asking everyone to weigh in on everyone, so let's just go

8    with that.  Okay, 11 is tax returns.

9          MS. SULLIVAN:  I would ask that these not be produced

10   at this time.  You know, we are going to have to produce

11   certain financial information.  There is case law that we cited

12   to in the motion --

13         THE COURT:  Yeah.

14         MS. SULLIVAN -- (indiscernible) takes tax returns.

15   So I would ask that it be either you sustain the objection, or

16   in the alternative, that it be held in abeyance, you know,

17   pending the production of the other documents to see if --

18         THE COURT:  Right.  Which sort of could be either.  I

19   could -- like, that's substantively the same thing because if I

20   were to sustain the objection, it would be without prejudice.

21         MS. SULLIVAN:  Right.

22         THE COURT:  What do you think, Ms. Allen, about -- do

23   you want to push back on the idea of my not compelling

24   immediate release of tax returns?

25         MS. ALLEN:  Briefly, in that it may be that the

1   earlier records don't necessarily reflect the same as what the

2   tax returns reflect.  Having to, you know, disclose to the IRS

3   what your interests are and what your returns are is, you know,

4   an important avenue to look at given the circumstances.

5         MS. SULLIVAN:  I mean, that would be true in every

6   case.  And there's -- the case law exists for a reason.

7         THE COURT:  All right.  I'm going to defer ruling on

8   that because I haven't studied the case law and tax returns

9   closely enough.  So, yes -- so I'm just -- I guess I don't need

10  to say any more words than that.  I'm going to defer ruling

11  with respect to Request Number 11 to take a closer look at the

12  case law regarding tax returns in the context where financial

13  statements are being produced.

14        Okay.  I do see some potential practical use for them

15  for the trustee, but I also see the sensitivity of the

16  documents.  And I want to study the law Ms. Sullivan is

17  referring to more closely.

18        All right.  Number 12 -- what?  Sorry?

19        MS. SULLIVAN:  Nobody said anything.

20        THE COURT:  Oh, okay.  I just got some Internet

21  garble sounds.  Okay.  Number 12, Internet -- all documents and

22  communications concerning any transaction in precious or

23  semiprecious stones or various other -- well, I'll just

24  specify.  Or jewelry or foreign currency or cryptocurrency

25  involving you or related entities or relatives, any Firestar

1   entity, shadow entity, or LOU entity, or any relevant person.

2   So this is going to be the same breadth discussion we had,

3   right?  And then also is there -- should there be a dollar

4   floor?

5          Ms. Allen, what do you want to say about this one?

6          MS. ALLEN:  Yeah.  So in rereviewing it, I would be

7   willing to strike the word "foreign currency."  I do think that

8   has the potential to make this a much broader request.  But

9   limiting it to transactions on stones or metals or crypto, in

10  particular, given the allegations of this fraud and the way

11  that we understand crypto can sometimes be used, that would be

12  the focus there.

13         THE COURT:  So this is a kind of a traceability

14  and -- yeah, I got it.  And what about any other limitations

15  you could live with or -- the scope of participants in the

16  transactions is broad.  We're already going to be talking about

17  that, right?

18         MS. ALLEN:  Yeah.  And the related entity relevancy

19  issue flows all the way through.  And so if they show us that

20  there's related entities that are irrelevant, we will remove

21  them.  And it is -- again, all of this is documents within his

22  possession and control.  We're not asking him to go ask any

23  other entity to provide documents.

24         THE COURT:  No, understood.  Right.  You don't have

25  to keep telling me that.  I mean, that's understood.  Okay.

1          And -- well, let me hear from Mr. Nakahara or

2   Ms. Sullivan on this one.  And I'm flirting with a dollar value

3   floor on this one, but I don't know if that actually gets you

4   anything, so maybe it's a dumb idea.  Let me just hear from you

5   about your thoughts on this one.

6          MR. NAKAHARA:  Yeah.  I mean, I think our objections

7   here are ones that are at this point not new, because again

8   it's the similar language to, was it Request 8, where it's like

9   you or involving you or any of those.  So we understand that

10  it's limited to just documents and Mr. Bhansali's custody or

11  control, but that still encompasses a potentially very large

12  range of transactions.  And again I think one of our main

13  concerns here is, especially with relatives as well, because,

14  you know, a transaction for jewelry for a relative could be

15  like a gift for his wife.

16         THE COURT:  Right.  What about imposing a dollar

17  value floor to eliminate -- I guess maybe he gave more generous

18  jewelry to his spouse than I do, but, you know, to eliminate

19  personal gifts.

20         MR. NAKAHARA:  Yeah, I might need to defer to Nicole

21  on this one just for the values of like transfers that we might

22  be getting at here.

23         MS. SULLIVAN:  I mean, I think this is similar to the

24  prior request we talked about with the $50,000 limit.  You

25  know, I don't know if that's the appropriate value, but, you

1   know, I have the same concern about all the "ors" at the end.

2   And so I'd ask, like, whenever we --

3         THE COURT:  Right.

4         MS. SULLIVAN: -- reach an agreement on there, you

5   know, applies to this one.  And I can't remember right now if

6   there's other ones that are similar, and we just do that.

7         THE COURT:  Yeah.  I should have said this out loud.

8   I contemplate that you're going to have a discussion about who

9   the correct counterparties to these transactions or transfers

10  are, and I think that will -- that arose in other requests and

11  it's going to arise here as well.  So I think that's maybe your

12  most important thing you need to clean up.  And then the other

13  thing, I guess I don't want to insert a limitation that you

14  aren't even seeking, but it does strike me, I don't know if

15  50,000 is the right number, but some -- you know, 10-, 25-,

16  something might eliminate -- well, kind of I'll say immaterial

17  transactions or transfers and yet let the trustee capture stuff

18  they care about.

19        However, I don't actually know what the trustee cares

20  about and considers material, so what's the answer to that,

21  Ms. Allen?

22        MS. ALLEN:  Yeah.  So I think for cash, but I think

23  when it comes to jewelry (audio interference).

24        THE COURT:  Oh, hang on a sec.  I know what's

25  happening.  I'm getting feedback loops, so if you're not

 1  talking, please mute yourself.

 2          MS. ALLEN:  I'll just start over.  So the 50,000 made

 3  more sense for the cash I think with respect to these.  When

 4  it's limited to precious stones, jewelry, like I said, we'll

 5  eliminate foreign currency and then crypto, so it's really just

 6  stones, jewelry, crypto.  I think a $10,000 amount is

 7  reasonable.  If he's providing a more than $10,000 piece of

 8  jewelry to someone, given that this is a jewelry and diamond

 9  case and there's allegations of, you know, stolen pearl (audio

10  interference) we'd want to know.

11          THE COURT:  Okay.  That makes sense to me.  So

12  let's -- I'll approve this request and overrule the objection,

13  subject to further discussion or application if necessary about

14  the list of, I'll call it counterparties at the end of the

15  request.  We're going to -- with foreign currency eliminated

16  and a $10,000 floor on the value of the transaction.  So you

17  don't -- if it's -- if the transaction is worth less than that,

18  it doesn't have to be produced.

19          MS. SULLIVAN:  I think this my next -- this is Nicole

20  Sullivan for the record.  I think the question would relate to

21  this one and one or two prior that we talked about, too, with

22  the timeframe.  So I understand the time frame is January 1,

23  2010 to present.  But if I understood Ms. Allen correctly

24  earlier, the trustee is mostly concerned with like something

25  that happened, transfers that happened within the 12 or 18

```
1   months prior to the filing.  And I'm making that -- those

2   months up.  Maybe it's six months before the bankruptcy.

3         So does it make sense maybe to limit these requests

4   to that, if that's really what they're seeking, versus

5   something that happened in 2010?

6         THE COURT:  I'm letting -- so if you agree on a

7   restrictor, it's going to be fine with me.  A date restrictor,

8   that's going to be fine with me.  Oh, also, you said 2010 to

9   the present.  I think it's 2010 to the date of the filing of

10  the complaint.

11        MS. SULLIVAN:  It is, yeah.  I am aware of that.

12  Sorry if I misspoke.

13        THE COURT:  Okay.  So, Ms. Allen, do you -- should I

14  tell you to meet and confer about a possible date restrictor

15  and come back to me if you can't agree, or do you want to agree

16  on the spot?

17        MS. ALLEN:  So I just want to clarify on the earlier

18  date range of 2017 to 2018, that was applicable only to

19  Number 1.  And so when we talked about Number 1, that was

20  limited specifically in that request to that date range.  Any

21  other request starts at 2010.

22        THE COURT:  Right.  Ms. Sullivan's suggesting you

23  apply a similar restrictor to this one.

24        MS. ALLEN:  And I will take that to the trustee.  It

25  may be beneficial for a request like this.  I think some of the
```

1   other requests, the difficulty is the transactions happened

2   over a long period of time, but I would --

3            MS. SULLIVAN:  But just to be clear, I wasn't talking

4   about every single request Angela is talking about.

5            THE COURT:  Yeah.

6            MS. SULLIVAN:  This one and I think the one related

7   to the $50,000 transfer, and maybe there's other ones that are

8   similar in concept because you represented that what you were

9   really concerned about with like the time, close in time to the

10  bankruptcy filing.  So if you want to talk to the trustee and

11  then we can have a conversation, that's why I was making that

12  suggestion.  I don't want (indiscernible).

13           THE COURT:  All right.  So let me do this.  Meet and

14  confer about a date range restrictor, and you can come back to

15  me if you can't reach agreement on it, and you want to have me

16  impose one that the trustee won't agree to.  Okay.

17           All right.  So let's keep going.  That was 13.  We're

18  up to 13, power of attorney.  What -- well, I'll just -- it

19  seems to me if Mr. Bhansali had a surgery and appointed a power

20  of attorney during a temporary period of temporary disability,

21  that's private and doesn't necessarily -- probably doesn't need

22  to be produced.

23           Actually, let me ask Ms. Allen.  Other than that,

24  what is it you're getting after here?

25           MS. ALLEN:  And we're definitely not getting after

1  that.  But what we are wanting to look for is, given the way

2  that this conspiracy worked, to the extent that he, you know,

3  either bestowed power of attorney on a party to control certain

4  aspects of this, or received power of attorney from, for

5  example, Nirav Modi, we would want to know that.

6       THE COURT:  And then what will you do with that

7  information?

8       MS. ALLEN:  To show who was controlling at any given

9  time, who had the power to control at any given time.

10       THE COURT:  Which lets you assign personal

11  responsibility for transactions that occurred by, for, or on

12  behalf of somebody?

13       MS. ALLEN:  Correct.  As to -- to the extent there

14  are acts in furtherance of the conspiracy.  And maybe there

15  is --

16       THE COURT:  Okay.

17       MS. ALLEN:  -- a way to make it more targeted to not

18  encompass medical power of attorney, for example.

19       THE COURT:  Yeah.  Do you know whether powers of

20  attorney were granted, or is this just trying to nail that

21  down -- that possibility down?

22       MS. ALLEN:  I don't know specifically, and if they

23  tell us there are none other than --

24       THE COURT:  Well, that's that, yeah.

25       MS. ALLEN:  -- personal medical, then -- you know, or

1   something along those lines, then we would be satisfied.  This

2   isn't a priority of ours.

3          THE COURT:  Okay.  Let me hear from counsel for

4   Mr. Bhansali.

5          MR. NAKAHARA:  Sorry, had to unmute.  This is Mike

6   Nakahara.  I think the trustee's counsel addressed many of our

7   concerns because obviously nothing medical or personal.  And

8   I'm not sure if I'm aware that he ever granted or was granted

9   power of attorney.  It's very possible the answer is just going

10  to be there are no responsive documents.

11         THE COURT:  Okay.  Let's do this.  Find out if this

12  ever happened.  The answer may be no.  If the answer is not no,

13  I'll just reserve on this one.  Okay?  You can come back to me

14  and present a power of attorney fight if you want.  It may be,

15  as Ms. Allen said, this isn't a super big priority of the

16  trustee, and it may be that this is a nothing anyway.  So let's

17  just find out if we're talking about anything or not here, and

18  then you can report back at a conference, if we all can

19  remember to follow up on this.  Okay?  So I'm just not going to

20  make any ruling with respect to powers of attorney right now.

21  I'll just await developments and deal with it if necessary.

22         Copies of passports, that one really seems, but for

23  Fifth Amendment, like it's correctly in play.  Am I missing

24  something?  Maybe "in play" is an inart -- is a messy way of

25  saying it.  I think the trustee has established a legitimate

1  need for that information based on the nature of the

2  allegations, subject only to the Fifth Amendment ruling.  But

3  I'll let the counsel for Mr. Bhansali push back if they think

4  I'm overlooking something.

5          MR. NAKAHARA:  Yeah.  So one point we wanted to raise

6  here is the timeframe because, I mean, I kind of take 14 and 15

7  as being, you know, kind of in tandem with one another.  And 15

8  is limited to just January 1st, 2017 to the end of 2018.  And

9  we would suggest, you know, because the focus is on after the

10  fraud was -- the alleged fraud was discovered, that a similar

11  timeframe would be appropriate for 14, and it may be.  There's

12  -- well, I'm not sure, like, when his passport would have been

13  up for renewal or anything, but we just think the narrower

14  timeframe is more appropriate.

15          THE COURT:  Okay.  And, Ms. Allen, I guess you're

16  going to tell me the alleged misconduct began in 2010, and

17  we're trying to harmonize whereabouts with known or not yet

18  known meetings and interactions and so forth that are relevant

19  to the alleged conspiracy.

20          MS. ALLEN:  Yeah.  And with Number 14, I mean, even

21  if he renewed his passport a number of times, we're only

22  talking about a, you know, single digit production of copies.

23          With respect to 15, it's all documents and

24  communications, and so we did think it made sense to limit it

25  for that reason to just a shorter period of time.  But for

1   passports, I don't really understand how that's burdensome to

2   produce.

3           THE COURT:  Okay.  Yeah, I'm going to overrule --

4           MS. SULLIVAN:  (Audio interference) if I may, Your

5   Honor?

6           THE COURT:  Yeah.

7           MS. SULLIVAN:  Objection to relevancy.  I mean, what

8   the trustee has claimed is relevant about this is the

9   allegations that Mr. Bhansali traveled to India, made threats

10  to witnesses and staff, and that all would have been in that

11  same time period of, you know, right, in 2000 -- late 2017,

12  early 2018.  And so I don't -- I really think, you know,

13  anything prior to that has no bearing on any allegations here,

14  and they --

15          THE COURT:  All right.

16          MS. SULLIVAN:  -- haven't asserted any.

17          MS. ALLEN:  If I may just --

18          THE COURT:  Ms. Allen, what are you trying to link up

19  with the travels that would be reflected in the earlier period

20  passports?

21          MS. ALLEN:  To the extent he was traveling overseas

22  to set up shadow entities and involved in the setting up of

23  those shadow entities, or meeting with people in those shadow

24  entities where we can match up the dates and the timing of

25  those, you know, documents that we may have.

 1           MS. SULLIVAN:  I mean, usually pure speculation

 2   doesn't form the basis for a legitimate discovery request.  And

 3   I don't know that it matters if he is in India on January 2012,

 4   whether or not that's going to prove that he set up a shadow

 5   entity or not.  I don't think it is.  You know, they could have

 6   set them up arguably anywhere.  It doesn't matter where you are

 7   for those purposes.

 8           I mean, the real point here was whether he was going

 9   to -- my understanding of the real relevance here was whether

10   he was going to threaten witnesses or not.  And then obviously

11   his physical presence to do so, you know, could arguably be

12   relevant.

13           MS. ALLEN:  And again I'll just go back to the burden

14   of production is just copies of passports that he has in --

15           THE COURT:  Yeah, I -- look, I think it's clear that

16   the burden is limited.  And it's -- again, as you like to tell

17   me, it's only for information within his possession, custody,

18   or control, right?  Are you going to impose an obligation on

19   Mr. Bhansali to seek a governmental copy of expired passports

20   if he didn't retain a copy?

21           MS. ALLEN:  No.

22           THE COURT:  Okay.  And why -- I mean, you have me on

23   the burden being low, and then the question is, so how do you

24   articulate the relevance again for earlier periods?

25   Ms. Sullivan tells me you're just trying to nail down alleged

1  incidents of traveling to threatened witnesses in a more

2  confined time period.  So why the earlier -- just give me an

3  articulation of the need for the earlier period.

4        MS. ALLEN:  Yes.  So this is a worldwide enterprise,

5  not just focused in India.  There are, you know, entities all

6  around the world.  And so, for example, if there's an entity in

7  a very, you know, discrete country that would not be routinely

8  traveled to, and he just happened to travel to it at the time

9  that dummy directors were appointed, then that would be

10 relevant information.

11       THE COURT:  Got it.  Okay.  Look, I'm going to

12 overrule the objection to the passport production because the

13 burden is quite limited in making the production, and the

14 nature of the allegations in the case are sweeping and global

15 enough that -- and involve alleged or suspected meetings and

16 other -- and transactions that -- so that the whereabouts of

17 Mr. Bhansali at given dates in various global locations fall

18 within the meaning of relevance under the federal rules.  And

19 the burden of the production is not disproportional to the

20 needs of the case.  So I'm going to direct that the passports

21 be produced.  That's Number 14.

22       Request 15 is all documents and communications

23 concerning any trip over a two-year period, 2017 and 2018.

24 That is sweeping and burdensome, but you've time limited it.

25 Why do you need literally all documents and communications

 1  concerning any trip?  I mean, that's very broad wording.

 2         MS. ALLEN:  Your Honor --

 3         THE COURT:  Oh, a compound question.  And what do you

 4  mean activities you engaged in?

 5         MS. ALLEN:  Correct.  And for that it would be, you

 6  know, on this trip to India, I went to this office, I went to

 7  this office, I took a cab here, I went to this location, to the

 8  extent he has those records.  I agree I'm struggling, though,

 9  to find a --

10         THE COURT:  I had lunch, I had dinner, I talked to a

11  nice man at the street corner, I went running.

12         MS. ALLEN:  And troubling in a way to narrow it,

13  given the circumstances of the allegations, which is that there

14  was travel overseas as part of a coverup.  So, I mean, we may

15  be able to narrow it by listing the trips.  And if there's a

16  trip to Disneyland, you know, obviously that's not --

17         THE COURT:  I mean, let's look --

18         MS. SULLIVAN:  Can I state something obvious maybe?

19         THE COURT:  Sure.

20         MS. SULLIVAN:  You know, if we're producing financial

21  records and transactions, wouldn't that provide a lot of the

22  information that they're seeking in 14 and 15?  I mean, it

23  wouldn't be all documents and communications concerning that

24  meeting --

25         THE COURT:  All right.  Yeah, let's (indiscernible).

1           MR. SULLIVAN:  -- but it would show that he was

2    getting a dinner in India or Singapore or wherever they think

3    he might have been.

4           THE COURT:  Yeah.  Ms. Sullivan, I'm going to

5    interrupt you a little, because I think I'm going to rule for

6    you, at least in large part, on this one.  So, look, let's -- I

7    think I'm going to sustain the objection to the request as

8    written, but I'll allow it in modified form for now just to say

9    all documents.  Not all.  Documents and communication

10   sufficient to identify any or show any trip you made outside of

11   the United States from January 1, 2017 to December 31, 2018,

12   full stop.  And then that avoids the ambiguity of the request

13   and the sweepingness of the request and the likelihood that

14   it'll include a lot of irrelevant information, and the trustee

15   can engage in appropriate follow-up requests if and when they

16   get that information, and if and when they need it in light of

17   all the other information they're getting.

18          MS. ALLEN:  That makes sense.  If I may just request

19   that that -- so sufficient to identify trips made during this

20   time and the dates and the locations of travel or something to

21   that effect so that -- or do you think that that's implied?

22          THE COURT:  Oh, yeah.  Where you went when, right, is

23   what you want?

24          MS. ALLEN:  Correct.

25          THE COURT:  Is that -- that's the intent, right?

1           MS. ALLEN:  Correct.

2           THE COURT:  So, Ms. Sullivan, am I blundering into

3   doing a thing that you think is harmful for your client's

4   interests in some way or ill-advised?  I think that sharpens it

5   and avoids a lot of the --

6           MS. SULLIVAN:  How would the language be amended?  It

7   would say from January to December 31, 2008 [sic] with respect

8   to what?

9           THE COURT:  So you'd get rid of the word "all." so

10  it's just documents and/or communications sufficient to

11  identify any trip you made outside of the United States and the

12  destinations visited from January 1, 2017 to December 31, 2018.

13          MS. SULLIVAN:  You mean -- by destination you mean I

14  went to Bangalore, India, or you mean I went to this

15  restaurant?

16          THE COURT:  No, no, no, no, no.  Like, and first off,

17  yes, I mean, you can play with the wording, but the concept is

18  what cities and countries were visited.

19          MS. SULLIVAN:  Sure.  I mean, I included that

20  insufficient to identify, so that's fine to add that.

21          THE COURT:  Yeah.

22          MS. SULLIVAN:  As long as we -- with the

23  understanding.

24          THE COURT:  Yeah.  No.  I think Ms. Allen was wisely

25  making sure that I didn't set up a world where she just gets,

```
 1   you know, a list that says from February 3rd to 8th, I went

 2   somewhere.

 3            MS. SULLIVAN:  Understood.

 4            THE COURT:  So that's -- yeah, so it's the fill in

 5   the where.  Okay.  And then we'll see where we get with that.

 6            16, transactions between you and any of your related

 7   entities, and then any shadow entities or LOU entity.  That

 8   seems big.  But let me hear from you on this one, Ms. Allen.

 9            MS. ALLEN:  I will say it isn't as big as you may

10   think.  Shadow entity and LOU entities is a very discrete list.

11   And if there were any transactions with those entities, we

12   think they would be highly relevant because they are kind of,

13   you know, outside of the -- or they were supposed to look like

14   outside side of this overall enterprise.

15            THE COURT:  Okay.  And the specific thing the

16   objection singled out is the phrase "related entities," which I

17   know is the subject of ongoing discussion and for multiple

18   requests, right?  So I would think that discussion would apply

19   to that as this request as well.

20            MS. ALLEN:  It would not, only because if one of his

21   related entities is doing business with a shadow entity, it's

22   highly relevant.

23            THE COURT:  Oh, then by definition it's not

24   irrelevant.  I see.  Okay.

25            MS. ALLEN:  Correct.
```

```
 1              THE COURT:  Okay.  Let me hear from Mr. Bhansali's

 2    counsel on this one.

 3              MR. NAKAHARA:  I mean, this request feels highly

 4    repetitive, the one earlier which dealt with transactions.  Let

 5    me just go back and look so I can get the exact language.

 6    Yeah, Number 7.  Number 7 had the $50,000 floor, which isn't

 7    present in this one.  But it seems to me that any responsive

 8    documents to 16 or any -- sorry, the other way around.  Any

 9    documents responsive to Number 7 are going to be responsive to

10    doc -- to Request Number 16 as well.

11              THE COURT:  I think -- I mean, that might be right

12    except for the absence of the $50,000 floor, right?

13              MR. NAKAHARA:  Uh-huh.

14              MS. ALLEN:  Correct.  And if they did a $10,000

15    transaction with a shadow entity, it's highly relevant.

16              THE COURT:  Yeah, I get it.  I mean, look, this is

17    more particularized to transaction participant requests and

18    aimed at a -- with a lower dollar amount.  I mean, I don't know

19    enough to know the nature of the dealings, but I think it does

20    seem to me that the specified participants in the transactions

21    covered by 16 are at the core of the alleged scheme, and

22    therefore a lower dollar threshold makes sense and the request

23    makes sense.

24              I don't know if there should be any floor or not.  I

25    don't -- I mean, but I don't know that that would actually
```

1  accomplish anything.  So I guess it's Ms. Allen's request, so

2  I'll ask her.

3       I mean, do you want to put a $5,000 floor in there or

4  not?  I don't know.

5       MS. ALLEN:  Given the nature of a shadow entity, I

6  believe that that makes sense.

7       THE COURT:  Okay.  That's fine.  I think that would

8  make -- okay.  Yeah, I mean, I'm going to overrule the

9  objection as to this.  It is central to the allegations.  The

10 trustee tells me it's central to the case they're trying to

11 make.  It involves flows between central player entities, and

12 given that, I think completeness is particularly appropriate

13 and important.

14       So I appreciate the overlap with Number 7, but I

15 think really the effect is probably to just make sure that

16 smaller transactions are captured with respect to these central

17 players.

18       Ms. Sullivan, you look like you're perhaps wanting to

19 say something.

20       MS. SULLIVAN:  I have two points to make.

21       THE COURT:  Yep.

22       MS. SULLIVAN:  Okay.  One is this is the kind of

23 language I was looking for in Requests 7 and 12, where it was

24 clear that you were talking about transfers or transactions

25 from Mr. Bhansali on the one hand, and the Firestar or shadow

1   or L -- you know, when I was trying to divide the request.  I

2   don't know if seeing it here in black and white changes the

3   Court's opinion about how to phrase 7 and 12.

4          THE COURT:  No.  I mean, I will --

5          MS. SULLIVAN:  That was trying -- how I was trying to

6   clean up the language.  Maybe I didn't articulate it well, but

7   I think that (indiscernible) my concern.

8          THE COURT:  Yeah, no, no, I'm looking -- thank you.

9   I'm looking back now.  I mean, we were all trying to find a

10  clean way to articulate that concept or a similar one.  We

11  didn't like involving in 7 and, let me see 12.

12         MS. ALLEN:  Yeah, I mean, if we -- I guess the

13  alternative is, instead of the made -- cause to be made or

14  received, we change 7, instead of involving, we say between.

15         THE COURT:  I'm not wedded to the wording I came up

16  with previously.  I wanted it to be more concrete and --

17         MS. SULLIVAN:  Yeah, I can work with Ms. Allen on the

18  language.  I think we understand the Court's position.  I'm

19  just saying, like, this is -- I think it should be like on the

20  one hand, for 7 and 12, it was between Mr. Bhansali, and on the

21  other hand, a Firestar entity or the shadow entity or the LOU

22  entity, rather than anything between Mr. Bhansali and his

23  related entities or anything between Mr. Bhansali and his

24  relatives.  Because that's really the core of what the trustee

25  is trying to get at is what Mr. Bhansali did vis-a-vis these

1   other entities that could be used to prove the fraud or other

2   allegations they have.

3           THE COURT:  Right.  Ms. Allen, does that work for

4   you?

5           MS. ALLEN:  I do believe that this change, to make 7

6   look more like how 16 is phrased, will work.

7           THE COURT:  Okay.  So --

8           MS. SULLIVAN:  I assume we can get there on 12 too.

9   And then I just want to make clear, like any transaction,

10  because in the earlier one, the transaction was defined as, I

11  think purchase, sale.  Just looking for right now.  I just

12  closed it.  Purchase, sale or transfer.  Would that -- is that

13  being defined in the same way here?

14          MS. ALLEN:  We could do that.

15          MS. SULLIVAN:  Okay.

16          THE COURT:  Okay.

17          MS. SULLIVAN:  Thank you.

18          THE COURT:  So -- okay.  So I'm just going to say I

19  appreciate your constructive engagement on this, and I agree

20  that it's appropriate to make these kinds of edits to requests

21  7 and 12 and sort of modify my prior ruling accordingly, as

22  well as that being the outcome on 16.

23          Let me just pause a minute and say, in terms of

24  implementing this, I think -- well, I'll want to hear from you

25  about something that -- a way to memorialize this accurately,

```
 1   but I'm thinking that I could enter an order that you all can

 2   draft that's going to list my rulings with request-by-request,

 3   and where the request language is modified, you can just set

 4   forth what the modified wording is, and then hopefully you can

 5   agree on the outcome.

 6           Of course, without the non-prevailing party conceding

 7   that I'm right in the ruling, but you can agree that we've --

 8   that the document accurately captures the rulings, and then I

 9   can enter that, and as part of that order it'll recite that

10   it's without prejudice to further applications described on the

11   record.

12           If you want more specifically with regard to Fifth

13   Amendment issues that are going to be followed up on by

14   May 10th, and then other issues are going to be followed up on

15   by May 21st.  Okay.  Does that work as a housekeeping matter?

16           MS. ALLEN:  Yes, Your Honor.

17           THE COURT:  Okay.  So let's do that.

18           MR. NAKAHARA:  Yes.

19           THE COURT:  Okay, great.  Thanks.  So let's see, do

20   we have to keep slugging through one by one?  I'm willing to do

21   it and I'm all yours, but it's -- if you've got a time-saving

22   mechanism in mind, that's fine too, but otherwise I'll just

23   keep going.

24           MS. ALLEN:  Well, and, you know, I -- my sense is at

25   this point we have a pretty good understanding of where you're
```

1   going to come out on a lot of these things and we have a pretty

2   good understanding of where we need to follow up with respect

3   to relevant related entities or whether the trustee will work

4   on timeframes.  So I would propose that we all quickly look at

5   the remaining ones and see if there's anything that we think

6   worth raising with you.

7          THE COURT:  Okay.  Let's just flip through, and so

8   let's do that.  Oh, sorry.

9          Ms. Sullivan and/or Mr. Nakahara, does that work for

10  you as well?  That's -- in other words, do you want a detailed

11  and laborious plowing through of the remaining requests or just

12  a quick flip and then build from what we've done so far?

13         MS. SULLIVAN:  What I would suggest -- okay, go

14  ahead.

15         MR. NAKAHARA:  I was going to say, I think can we go

16  quickly.  I know there's a few coming up that are -- maybe

17  touch on a few unique issues which might need a little time,

18  but --

19         THE COURT:  Okay.

20         MS. SULLIVAN:  What I would suggest, Your Honor, you

21  know, we've been going for three hours.  Maybe we could take a

22  short break and just look -- you know, use the restroom and

23  look at them --

24         THE COURT:  Sure.

25         MS. SULLIVAN:  -- and then come back and we -- I'm

1    happy to stay on the Zoom and just go off on video mute in the

2    meantime, or come back to the Zoom, whatever Your Honor

3    prefers.

4          THE COURT:  That is fine.  I'm going to --

5          MS. SULLIVAN:  I mean, I'm talking about like

6    15 minutes.  Like it's 1:12.

7          THE COURT:  Yeah, yeah, yeah.

8          MS. SULLIVAN:  Come back at 1:30.

9          THE COURT:  My very smart and experienced clerk is

10   saying maybe we should give them a few hours to meet and confer

11   and then resume later today.  What about that?  Would that be

12   better?  I mean, I'm at your disposal.  I'm definitely going to

13   let everyone take a little breather.

14          I will confess -- well, never mind.  I have to make

15   sure my dog doesn't interfere with our hearing too much, but so

16   far so good.  Let's see.

17          MS. SULLIVAN:  I'm happy to do that and come back,

18   but I'm in the city today, and I'm leaving at 3:45 today so --

19          THE COURT:  Oh, all right.

20          MS. SULLIVAN:  We can come back this afternoon

21   earlier than that, or we could do it again -- I could come back

22   tomorrow.

23          THE COURT:  Well, what do you want to -- how do you

24   want to proceed, Ms. Allen?  I mean, I'm happy to do a high --

25   let's -- we can -- what I'm thinking is, let's -- in light of

1 | Ms. Sullivan's travel, why don't we take a ten-minute breather

2 | and then just resume and march through?  Or it's a little after

3 | one, if you want to eat lunch.  Oh, but you have to get out of

4 | here when?

5 |    MS. SULLIVAN:  We can come back at 2:30.  I mean, I

6 | think that's fine, because I think, you know, I can go over it

7 | with Mark quickly and then talk to Angela and Carl if they're

8 | available.

9 |    THE COURT:  Okay.

10 |    MS. SULLIVAN:  Maybe -- and then maybe we'll just

11 | raise these are the three or four that we still think the Court

12 | needs to, you know, make a statement about.

13 |    THE COURT:  Okay.

14 |    MS. SULLIVAN:  If that makes sense to everybody.

15 |    THE COURT:  Yeah, that sounds good.  I'm just going

16 | to really quick flip through and see if there's anything I want

17 | to alert you to.  A couple of them you've got this wording, all

18 | documents and communications concerning fill in the blank, and

19 | that's just inherently elastic.  So I'm always nervous about

20 | that wording and looking for sharpening.

21 |    You all know to talk about date range and scope

22 | restrictions that are fair and logical.  I think, other than

23 | that, I'll just sort of leave it at that.  Okay, let's do that.

24 | So let's give you all a break.  Does 2:30 leave us enough time

25 | before your --

```
 1              MS. SULLIVAN:  I hope so.

 2              THE COURT:  -- drop dead point?  Okay.

 3              MS. SULLIVAN:  If not, I'll stay on, but --

 4              THE COURT:  No.  Okay.  Let's resume at 2:30, and

 5    maybe that'll inspire some speed, too.  Okay.  So let me just

 6    recap.  We're going to take a pause.  We're going to resume at

 7    2:30.  Just try to log in a little before.  I want to make

 8    sure -- yeah, I'm pausing because my courtroom deputy, who is

 9    the Zoom master, has a way of letting me know if this is bad.

10    So -- okay.  She has communicated with me that, yes, 2:30 is

11    fine.  So up to you.  You can log out and then re-login at

12    2:30.  Or if you want, you can just turn your cameras and mics

13    off, whatever you prefer.

14              Okay.  And we'll resume at 230.

15              MS. ALLEN:  Thanks, Your Honor.

16              THE COURT:  All right.

17              MS. SULLIVAN:  Thank you.

18              THE COURT:  Thank you.  Take care.

19              MR. NAKAHARA:  Thank you, Your Honor.

20         (Recess taken)

21         (Proceedings resumed)

22              THE COURT:  Okay.  Hello.  We're back on the record

23    in Firestar after a midday break.  Let me not say a lot of

24    words and find out what the fruits of our break were.  I'll

25    start with Ms. Allen.  Oh, except that Ms. Sullivan is not
```

1  muted and Ms. Allen is.  Does that mean Ms. Sullivan is

2  supposed to go first?

3          MS. SULLIVAN:  I think she wants me to go first, Your

4  Honor.

5          THE COURT:  That's fine.  Let me know where we are,

6  Ms. Sullivan.

7          MS. SULLIVAN:  So we had a meet and confer with

8  trustee's counsel, and we were able to reach an agreement on a

9  large majority of the remaining requests, either by refining

10  language or we reached an agreement where we would run certain

11  searches and then determine if, as they were, they were

12  excessive or not, and then we revisit them.

13          THE COURT:  Great.

14          MS. SULLIVAN:  And those agreements we reached were

15  without prejudice to bring them to the Court, if the agreements

16  fail for some reason or otherwise.  But we were only left with

17  a few discrete requests to go over with Your Honor.

18          THE COURT:  Perfect.  That sounds great.

19          MS. SULLIVAN:  All right.  So we can start with --

20  the first one would be request 20.

21          THE COURT:  Okay.  I'm there.

22          MS. SULLIVAN:  So I don't know if you want to take

23  the lead, Mark, or you want me to keep going.  I'm happy to let

24  you argue again.  You're on mute.

25          MR. NAKAHARA:  Can you do this one and I'll handle

1   some of the others?

2          MS. SULLIVAN:  Fine.  So this is all documents that

3   you sent or received and communication you sent or received

4   through two email servers.  And we just think by its nature,

5   it's very over broad, and we couldn't reach an agreement on any

6   limitation.

7          THE COURT:  Yeah, let me hear from Ms. Allen.  I

8   mean, the lack of any topical restrictor kind of does jump out

9   at me.  I know you think they have a practice of using these

10  servers for nefarious ends, but what's your position on this

11  one?

12         MS. ALLEN:  Yeah, so we do -- I'm trying to see

13  exactly what our complaint alleges.  With respect to Panemail,

14  it's our understanding that this was a specific use that

15  automatically deletes messages.  So if you look at Paragraph 81

16  of our complaint, for example, we describe it as a web-based

17  email service that automatically deletes messages that was used

18  for exactly that purpose.

19         If it is the case that he has Panemail and Kricket

20  email servers that he used purely for personal purposes, we

21  would be, you know, amenable to considering that.  But we do

22  believe that these had a particular targeted purpose.  For

23  example, it would not include Gmail, Yahoo.  These are very

24  specific emails.

25         THE COURT:  No, I get it.  I mean, to avoid coming

 1  back, can we include some characterization of the type of

 2  communication you're looking for?  I mean, it would be a broad

 3  characterization.

 4          MS. ALLEN:  It's difficult because, as I said, as we

 5  understand it, the purpose of using these email servers is to

 6  avoid, you know, a record of it.  So while I could limit it --

 7  we could try to limit it to again describe all the different

 8  relevant persons and related entities, but I don't know that

 9  that necessarily gained much.

10          THE COURT:  Okay.

11          MS. SULLIVAN:  And it goes to my point --

12          THE COURT:  Yeah, or -- go ahead, Ms. Sullivan.

13          MS. SULLIVAN:  That's okay if Your Honor has

14  something to say.

15          THE COURT:  No, I was just going to say -- I was

16  basically going to ask you to comment.  I mean, I -- your

17  concern is the sweepingness, because it is -- calls for

18  everything that was used on either of those two servers, right,

19  or --

20          MS. SULLIVAN:  Yes.  And if it's really limited to,

21  like, we think that they -- that he only use these, you know,

22  to conduct business related to the shadow entities or to the

23  debtors, you know, it could be limited in some way that way.

24  But right -- the way it's written right now, it's basically

25  like take the server for your email and just hand it over to

1   us.  And, I mean, that's just not done in the ordinary course.

2          THE COURT:  Yeah, no, I agree.  Can we do -- how

3   about just if we say -- just add at the end of the request,

4   related to a very broad list of entities and/or activities?

5   You've got -- in some of your earliers, you know, you've

6   got -- I'll mess it up, but certainly it would include relevant

7   person, Firestar entity, relevant entity, shadow entity, or LOU

8   entity I would think and -- don't think it would.

9          MS. SULLIVAN:  I don't think it would.  And, like,

10  see, that's the problem.  The relevant person thing is, like,

11  60 people, many of which they haven't even addressed why

12  they're relevant.  They're not even --

13         THE COURT:  No.  But you're going to come to me with

14  a fight about what that list should be and, I mean, so wherever

15  that ends up being is probably something they're going to want

16  included, right?

17         MS. SULLIVAN:  I mean, I think it's really more -- if

18  we want to do related to it, it would be more related to like

19  the Firestar entities, the shadow entities, the LOU entities.

20  Those are the entities that they allege were, you know,

21  perpetrating the fraud and who Mr. Bhansali was using to

22  conduct the fraud.  So it seems like if it was related to any

23  of those entities, it could arguably, you know, have

24  evidentiary value to them.

25         MS. ALLEN:  And if I may, that just begs the question

1    of what exactly is the web of entities that were involved?  And

2    that kind of goes back to the related entities.  If he is

3    controlling an entity that was involved, for example, you know,

4    Nichal Merchandising, you know, we don't think it should be

5    limited just to the ones that we know were a part of the

6    Firestar Enterprise as opposed to the shadow web.

7            MS. SULLIVAN:  But I didn't -- like the way I phrased

8    it doesn't limit it to that, right?  But you're -- that's

9    assuming, like, now we're saying, like, Nichal is involved in a

10   fraud independent of any of the other entities, independent of

11   the Firestar entities, independent of the shadow or LOU

12   entities, and I just don't think those are the allegations,

13   right?  Like, that's just very broad.

14           I mean, they have to tie it back to some allegation.

15   They have like 300 paragraphs of allegations, and none of those

16   entities have been tied in.  So I think maybe it's just a good

17   starting place and we can come back, you know, if they think

18   there's more there related to something else, but --

19           MS. ALLEN:  Well, all of this assumes that he has a

20   Panemail email and that he has a Kricket email.  If you were to

21   tell me, yes, he has a Kricket email and he uses it for

22   personal email, then we can seek to narrow down the request.

23   But at this stage, you know, it is our assumption that these

24   email servers were used for a very particular purpose, which is

25   to delete and not show up as part of the Firestar records.

1          THE COURT:  I think -- so I'm hearing, Ms. Sullivan,

2    two concerns.  One is when I floated the idea of a concerning

3    restrictor, that "concerning" is a very elastic word.  And then

4    the other is what the list of things that the communications

5    concern ought to be.  Right?  So I want the list to be broad.

6    And is concerning what's -- but do you have a thought about

7    what -- let me just try to understand where you are.

8          MS. SULLIVAN:  Maybe if you take out the -- you can

9    take out the "our concern" and leave it with "reference."

10   Well, I guess that's -- I mean, that's the way it's written.

11   The way you're limiting it would be, you know, the reference,

12   and then you could list the entities or, you know, identified

13   parties.

14          THE COURT:  All right.  I think that in substance it

15   fairly should be, "concerning suspect types of transactions or

16   transfers that are at issue in the litigation."  So that's a

17   type of -- that's a topical thing, not a recipient thing or a

18   party to the communication thing.  And then it could also

19   include communications, what, with a list of types of entities,

20   categories of entities that are of particular concern.

21          And I don't know if it should also include

22   communications about those entities, or if we should just make

23   it about types of transactions and events that are at issue

24   coupled with communications directly with the entities.  So let

25   me -- I know Ms. Sullivan wants the narrowest possible world of

```
 1  that, so let me do -- have I -- if I just stick with,

 2  concerning words of your choosing, describing types of

 3  activities and transactions and communications with a

 4  reasonably discrete type of category of recipients, does that

 5  work, or senders?

 6          MS. SULLIVAN:  I think it's going to be very

 7  difficult for us to reach an agreement on that.

 8          THE COURT:  Yeah.  I'm ask -- well, I'm asking

 9  Ms. Allen.

10          MS. SULLIVAN:  I was going to have an alternative

11  solution.

12          THE COURT:  Oh.

13          MS. SULLIVAN:  You know, let me go back to my client.

14  I know that at least one of these accounts did exist, so I'm

15  not -- you know, if it -- to Ms. Allen's point, if they didn't

16  exist at all, I could have just, you know, said --

17          THE COURT:  Right.

18          MS. SULLIVAN:  But let me go back and even see what

19  we have access to, or to Ms. Allen's earlier point, what else

20  they were used for, how much content is on there, because maybe

21  we're discussing something that is really of no importance

22  because it doesn't exist, or there's, you know, five pages of

23  emails or something, you know, if that helps.  And then we

24  can -- I can work with the trustee's counsel, based on your

25  guidance here, to see if we can reach an agreement on language
```

1    to propose when we submit our application in a couple of weeks.

2              THE COURT:  That might be okay, but let me hear from

3    Ms. Allen.  I mean, I don't want to just kick a can --

4              MS. SULLIVAN:  No, I understand.

5              THE COURT:  -- pointlessly down the road if this is

6    ripe for decision, but if not -- oh, and I should say I

7    appreciate your candor of acknowledging the existence of the

8    platform.

9              MS. ALLEN:  I do think that'll work.  There's just

10   one limited area where it wouldn't necessarily capture, which

11   is an example of, you know, there's a email to his Gmail and

12   then the response is like, don't forget to use Panemail

13   instead, right?

14             THE COURT:  Right.

15             MS. ALLEN:  But in an effort to compromise, I do

16   think at this point, you know, starting where Ms. Sullivan said

17   makes good sense.

18             THE COURT:  So let's reserve on that.  And you've got

19   my general thoughts.  I just want to delay you even further by

20   asking if Panemail is an auto deleting platform, do we know

21   whether stuff would exist?  Are you looking for screenshots

22   that were captured, or what exists in Panemail?  I just want an

23   education about Panemail basically.

24             MS. ALLEN:  It is our understanding that it is -- it

25   was a platform used, and that there was email saying, you know,

1  remember to use this because of the auto deletion.  It may be

2  that everything has been deleted and isn't recoverable, or it

3  may be that there's, you know, five emails that haven't been

4  deleted.  So I agree with Ms. Sullivan.

5          THE COURT:  Okay.

6          MS. ALLEN:  I may be a nothing burger here.

7          THE COURT:  That's just me being curious, so that's

8  fine.  Okay.  So I'll reserve on that.  And you'll have

9  reference to the transcript for -- or my -- or your memory of

10 my thoughts on it and we'll see what we get.  Okay, so what's

11 next?

12         MS. SULLIVAN:  33.

13         THE COURT:  Okay.

14         MS. SULLIVAN:  And I think --

15         THE COURT:  That's a nice big jump forward.  Okay, I

16 see it.  Any and all documents and communications concerning

17 your purchase of the Bhansali residence in 2014, including

18 those concerning the source of the purchase funds.  What's the

19 issue with that, Ms. Sullivan?

20         MS. SULLIVAN:  Mr. Nakahara is going to speak to

21 that.

22         THE COURT:  Oh, sure.  Great.

23         MR. NAKAHARA:  So we proposed basically amending this

24 request to say documents and communications sufficient to show

25 the source of the purchase funds of the Bhansali residence in

1   2017.  Just narrowing it for -- because it seems like it's

2   directed towards the source of the funds.

3          THE COURT:  Okay.  And, Ms. Allen, what's wrong with

4   that, if anything?

5          MS. ALLEN:  Yeah.  And, you know, I don't want to

6   jump ahead, but 33 and 34 are kind of tied together.  They

7   relate to the purchase of the residence in 2017, where there's

8   some allegations of transfers immediately preceding that

9   purchase, and then also the transfer, you know, two days after

10  the bankruptcy.

11         Now, I will note that we have alleged in our

12  complaint that these actions, you know, took place in our

13  original complaint against Mihir Bhansali.  We then

14  subsequently brought a fraudulent transfer action against

15  Ms. Rakhi Bhansali.  And that is tied into the whole attachment

16  proceeding, and we sought to attach the residence, and then we

17  also sought to avoid the fraudulent transfer.

18         So I do believe, one way or another, we're going to

19  need more than just like this isn't just a limited narrow issue

20  here.  We're going to want a lot of documents and

21  communications surrounding the purchase and the transfer, and

22  we don't want to necessarily limit it to just the source of the

23  purchase of the funds.

24         MS. SULLIVAN:  I'll speak to that if I may, Your

25  Honor.

1            THE COURT:  In a second.  Let me just ask Ms. Allen

2    whether that broader need can be addressed through 34, which we

3    could get to separately.

4            MS. ALLEN:  Well, so 33 is with respect to his

5    purchase, and then 34 is with respect to --

6            THE COURT:  The conveyance, yeah.

7            MS. SULLIVAN:  Later transfer, correct.  And

8    they're -- you know, they're very limited in time.  It's two

9    different events.  It's very specific to a purchase of a

10   residence and a transfer of residence.  But we would like any

11   and all communications referencing related to -- I understand

12   you don't like "concerning," but, you know, we do expect these

13   to stay broad.

14           THE COURT:  How much was the residence bought for?

15   Do you know?

16           MS. ALLEN:  Yes, hold on one second.

17           THE COURT:  I mean, ballpark is fine.

18           MS. NAKAHARA:  Six and a half, right?

19           MS. SULLIVAN:  I remember it was like 7 million,

20   around 7 million.  It's a significant sum of money.

21           THE COURT:  Right.

22           MS. SULLIVAN:  So --

23           THE COURT:  And what's the -- so let me hear back

24   from I guess Mr. Nakahara.  I mean, you've heard the concern

25   and that I guess there's allegations not only about the

1  sort -- and interest, not only about the source of the funds,

2  but also sort of what, I guess, the nature, purpose, and any

3  agreements or arrangements relating to the purchase.  I'll

4  put -- I'll sort of -- that's maybe an imprecise

5  characterization, but the circumstances leading to the

6  transaction and the purchase.  So that's broader than source of

7  funds, so what's your response to that?

8          MR. NAKAHARA:  I may be misremembering, but I think

9  we've already produced at least some documents relating to

10  the -- I think the initial purchase in 2017.  And then, Nicole,

11  please correct me if I'm wrong, but I think the purchase in

12  2017, there's some questions over a loan from Purvi Mehta,

13  which I believe --

14          MS. SULLIVAN:  No, I think it's different than that.

15  Sorry, Mark, I don't mean to interrupt.

16          MR. NAKAHARA:  No worries.

17          MS. SULLIVAN:  Just to answer the Court's question,

18  like, so the allegation here related to this complaint, the

19  complaints that are issued for this motion to compel are --

20          THE COURT:  Right.

21          MS. SULLIVAN:  -- there was a -- this part of the

22  source of funds came from the PNB fraud.  Of course, we dispute

23  that, but, you know, arguably that's relevant to the claim

24  here, but it's really just the source of the purchase funds.

25  We've already produced records that show that it was

1  essentially purchased by family money of Mrs. Bhansali, not Mr.

2  Bhansali.

3         To the extent that we haven't produced that, we can

4  do it again, or if there's some issue with the -- you know,

5  that's why I suggested documents and communication sufficient

6  to show the source of the funds.  With respect to 34, which is

7  what Your Honor hinted at relating to this one, the fraudulent

8  transfer of the apartment, that's not related to the -- this

9  action or the action --

10        THE COURT:  Yeah.  No, I got it.  Okay.

11        MS. SULLIVAN:  We had an action where discovery will

12  be had in there, and it's not just against Mrs. Bhansali, it's

13  against Mr. Bhansali.  And it was only filed I think in

14  February or March of this year.

15        THE COURT:  All right.  So I guess I'm not getting

16  concretely what more you need, Ms. Allen, than source of the

17  funds, and so -- which isn't to mean that there isn't some

18  further issue, but what is it that you're actually trying to

19  get?

20        MS. ALLEN:  So -- and just to put a fine point on

21  that, our allegations of the complaint are at Paragraphs 137 to

22  141.  It starts with Purvi Mehta, the sister who was often the

23  linchpin of transfers, wired $1.5 million to Mr. Bhansali's

24  personal checking account on February 24, 2017.

25        They purchased the apartment one month later, and

1 then a year later and two days after the bankruptcy it was

2 transferred.  And we do have all of those allegations in the

3 complaint, so it's not necessarily accurate that this only

4 relates to the Rakhi fraudulent transfer, and this doesn't

5 relate to the allegations of the complaint.

6          But that said, we do very much want to accommodate

7 today.  I think it is agreeable that we can for 33, start with

8 just sufficient to identify the source of the funds and then --

9          THE COURT:  Yeah, let's do that.  I mean, there's apt

10 to be follow-up questions later anyway --

11          MS. SULLIVAN:  Right.

12          THE COURT:  -- after those things.

13          MS. SULLIVAN:  Yes.

14          THE COURT:  Okay.  Let's do that because it's just

15 very hard to articulate.  If you want to get a whole swirl of

16 rapid-fire transaction transfers between six people, it's hard

17 to just build that into this request.  So what you suggested is

18 great.

19          Okay.  And are we going to talk about 34 as well?

20          MS. SULLIVAN:  Yes.

21          THE COURT:  Okay.

22          MS. SULLIVAN:  I mean, I think I already did talk

23 about it, but I'm happy to say it again.  I mean, I don't think

24 this is related to this action.  You know, whether it was an

25 allegation in the complaint that there was a transfer, it's not

1  alleged that that contributed to the fraud or any of the other

2  breach of fiduciary duty (indiscernible) serving complaints --

3  claims that are at issue here, and it is relevant, and if

4  discovery will be had in the attachment proceeding in due

5  course, then that should be done in that case that way.

6          THE COURT:  Okay, got it.

7          Ms. Allen, let me hear you on this one.

8          MS. ALLEN:  We would argue that it is relevant to the

9  merits of the breach of fiduciary duty complaint.  These

10  paragraphs fall within the section of diversion of funds for

11  the benefit of Mihir Bhansali and his family.  If he's taking

12  transfers from Purvi Mehta that come from Firestar, that is

13  part of our breach of fiduciary duty allegations, so we would

14  think it's highly relevant here as well.

15          MS. SULLIVAN:  But, I mean, those allegations don't

16  have anything to do with transferring his interest in the

17  apartment from himself to his wife.

18          MS. ALLEN:  Well, I mean, we do allege that it's two

19  days after the bankruptcy.  He transferred it for nominal

20  consideration.  And then the next paragraph says, upon

21  information and belief, this apartment was purchased using

22  proceeds of the bank fraud.  So he transferred it out of his

23  possession and control to (indiscernible) filing of the

24  bankruptcy.

25          THE COURT:  Right.  And tried -- yeah, that seems

1  scheme or scheme adjacent, or at least allegedly part of a -- I

2  guess, in the implementation of a fraudulent scheme, so I'm

3  satisfied that it's a fair topic of inquiry.  And then the

4  question is whether the wording is overly broad.

5       MS. SULLIVAN:  I could say relating to.  I don't know

6  that that's much better, but I --

7       THE COURT:  I always think of those as essentially

8  synonymous, but -- well, you know what?  Let's just leave it as

9  it is.  I'm going to approve the request.  But if it turns out

10  to involve some huge number of communications, many of which

11  seem not really relevant or going to any issue that matters in

12  the case, I'll listen to a report to that effect and a request

13  to rein it in somehow more sensibly.

14       And I'll also just want you two to talk about that,

15  right?  We may be again arguing about something that's not very

16  consequential, because I do think the subject matter is fairly

17  in play.  That's a square holding.  And then the question is

18  just breadth and whether we're scooping up too much irrelevant

19  material due to the wording.  Okay.  So until we find out

20  that's a problem, let's just stick with it.

21       MS. SULLIVAN:  And then we have 35, 36, 37, and 40,

22  which are all the same wording with different entities at the

23  end.  So all documents and communications concerning Diamond

24  Holdings and then, you know, four other entities.  We tried to

25  reach an agreement to narrow these in some way, you know,

1   especially, you know, the M.R. Family Trust, and we weren't

2   able to reach an agreement, so we're bringing it to Your Honor

3   to see if you can assist us in narrowing the requests.

4          MS. ALLEN:  Yes.  And just briefly, we did agree --

5   oh, go ahead, sorry.

6          THE COURT:  Go ahead, no.  I wanted to ask you, is

7   this specifically about M.R. Family Trust or is it about all of

8   those?

9          MS. SULLIVAN:  All of them.

10          THE COURT:  Okay.  You said 35, 36, 37, and 40?

11          MS. SULLIVAN:  Yes.  There's four of them.

12          MS. ALLEN:  Correct.  And just to note, there were

13   two -- you know, 38 and 39 are in there as well, but we agreed

14   to withdraw those as not as pertinent, those entities.

15          THE COURT:  Okay.

16          MS. ALLEN:  When it comes to the remaining ones, you

17   know, Diamond Holdings, M.R. Family Trust, Twin Fields and

18   Nishall, you know, there are specific allegations in our

19   complaint regarding those entities.  Maybe not Diamond

20   Holdings, but definitely M.R. Family Trust, Twin Fields, and

21   Nishall are all alleged in our complaint as being specific

22   entities that we believe were involved in this overall

23   enterprise.

24          MS. SULLIVAN:  And it's dated --

25          MS. ALLEN:  And that we believe Mr. Bhansali had

 1  involvement with, as well.  I would say Diamond Holdings is the

 2  only exception to that, but we also wouldn't expect that he

 3  would have a number of documents about Diamond Holdings.  But

 4  if he has any, it would be relevant.

 5      THE COURT:  What's the universe of source material

 6  that would need to be -- this would need to be pulled from?  Or

 7  can you have a negotiate -- I don't know if that's something

 8  you want to get into.  Can there be a restrictor on what you

 9  have to look at or search mechanisms or -- and the reason I

10  ask, I'll just be more explicit about it, is I accept the

11  explanation that these -- the entities specified in these four

12  requests are the subject of allegations in the complaint and

13  material to the case being developed.  Yet all documents

14  concerning is pretty broad, so I'm wondering if there's date or

15  other forms of restrictors that could make this reasonably

16  targeted.  And I'm also wondering what universe we're pulling

17  from and how feasible or not feasible this is.

18      MS. SULLIVAN:  I assume that's directed at me.

19      THE COURT:  Yeah, it has to be.

20      MS. SULLIVAN:  And I don't really know.  I mean, I'm

21  happy to go back and, I mean, some of these might be -- you

22  know, it's just checking the document database we already have.

23  But like M.R. Family Trusts, you know, could be we have to go

24  to bank accounts and other things that are just outside the

25  documents we've already collected.

1            I'm happy to go back and talk to the client, you

2    know.  With respect to certain other requests that we took off

3    your plate today, we had agreed to run search terms to see if

4    it would be excessive or not.  I can do that for these if that

5    aids the process and discuss it.

6            THE COURT:  Well, what if you run search terms --

7    yeah, you've got everything -- you've assembled a lot of stuff,

8    I trust, and you -- and that's electronically searchable at

9    this point, right?  And then the question is what you have to

10   look for that you don't yet have.

11           MS. SULLIVAN:  That's correct.

12           THE COURT:  So I don't want to wrongly deprive the

13   trustee, but what about, at least as a starting place, just do

14   searches for those entity names in the existing universe of

15   information you have and see where you get?

16           MS. SULLIVAN:  We're happy to do that, Your Honor.

17           MS. ALLEN:  It makes sense.

18           THE COURT:  Okay.  And if you realize offline that

19   there should be variants on entity names or abbreviated names

20   or whatever search term discussions, please have that search

21   term discussion.  Okay?

22           MS. SULLIVAN:  Yes.

23           THE COURT:  And that kind of cuts both ways.  Like,

24   don't cause Mr. Bhansali's counsel to do a ton of work and then

25   say, oh, my gosh, you forgot to do this variant.  Like, come up

1  with -- try to drill down on a protocol in advance so that you

2  don't have a need to redo.  Okay?

3           MS. SULLIVAN:  Will do.

4           THE COURT:  Okay.  Let's see, the highest number we

5  could possibly go to is 42.  Is there anything left?  We have

6  41 and 42 it sounds like.

7           MS. SULLIVAN:  Those relate I think to trial and

8  experts, trial evidence and experts.

9           THE COURT:  Oh, right.  Okay.  All right.  Does that

10  mean we're done?

11           MS. SULLIVAN:  We are.

12           THE COURT:  Okay.

13           MS. ALLEN:  Thanks, Your Honor.

14           THE COURT:  Thank you all very much.  I'm going to be

15  a little unprofessional and share with you that I have a

16  four-month-old puppy that my wife and I have to take turns

17  being home with, and she has spent this whole hearing in a

18  crate in service of justice in this case, so -- and she's been

19  very good.  So I hope that inspires you to, you know,

20  constructive behavior and cutting through things.

21           All right.  So listen, let me just recap on the

22  hearing.  Thank you for your efforts.  I'm presumably going --

23  I'm going to hear a follow-up report from Mr. Bhansali's

24  counsel a week from tomorrow, meaning May 10th or before, which

25  I was thinking conceptually, what this is, is a follow-up

1  opportunity to better explain and demonstrate the existence of

2  some sort of -- I'm looking for the right case law term.  I

3  think it's real and substantial risk of U.S.-based prosecution,

4  as I think is necessary to support the act of the asserted

5  active production privilege.

6       And so I'll just hear from you on that.  And then on

7  the 21st, I'm going to hear from you on open issues on the

8  granular request-by-request type issues that we discussed

9  today.  And I would like to get -- before we all forget, I'd

10 like to get an order entered.  You can call it an interim order

11 or something.  An order partially resolving discovery issues

12 maybe would be a descriptive title for it, just as I mentioned

13 on the record earlier, to sort of capture the rulings I've made

14 thus far.  Okay.  Does that work for you all?

15      MS. SULLIVAN:  That works, Your Honor.  And I would

16 just ask that when we submit the interim order, that we

17 incorporate the stipulations we made on the other requests.

18      THE COURT:  Yeah, that's fine.  Look, my big picture

19 objective is to make as much progress as we can, however we

20 can.  And so, yeah, fold that in.  That's great.  And

21 obviously, if you can't nail down a stipulation, I still want

22 to get the order entered, so let's do that.

23      And to be very clear, it's wherever I said on the

24 record things are without prejudice or subject to further

25 developments, that can be referenced in the order as well.  And

1    I know you'll do this, but make sure you order the transcript.

2    All right?

3              MS. SULLIVAN:  Thank you.

4              THE COURT:  Okay.  Thank you all very much.

5              MR. NAKAHARA:  I'm sorry, if I can indulge you just

6    for a moment.  In terms of the scheduling order for the broader

7    litigation, should we wait on submitting that until --

8              THE COURT:  Oh, right.

9              MR. NAKAHARA:  -- the motion to compel is resolved?

10             THE COURT:  I don't care.  The way we set it up is

11   that it was going to specify six months for fact discovery from

12   the date of issuance of a decision resolving the privilege

13   assertion.  And so if you want, you can submit that now or you

14   can just wait for that resolution to emerge and then submit it

15   promptly.  Either way is fine, right?  Am I --

16             MR. NAKAHARA:  Yes, Your Honor.

17             THE COURT:  Unless I'm --

18             MS. SULLIVAN:  I think if there's any --

19             THE COURT:  -- having a mental lapse, and that's --

20   what I said doesn't make sense.  So you tell me.

21             Ms. Sullivan?

22             MS. SULLIVAN:  I was just going to say, if there's

23   any concerns, I mean, if you want to draft up the interim

24   order, you know, while we're waiting for the other pieces,

25   Carl, we can review it with you.  And I think it was pretty

1   clear on the transcript where we land on each and every

2   request, you know, pending a decision on the Fifth Amendment.

3           THE COURT:  Yeah.  Oh, were you asking if the

4   scheduling order should be merged with the interim order I was

5   talking about?

6           MR. NAKAHARA:  It was really a question, because we

7   had posited that it would be six months from a decision on

8   these issues that are still somewhat, you know, unresolved.

9           THE COURT:  Right.

10          MR. NAKAHARA:  I didn't know whether we should just

11  wait to submit something or if we can just pick a date that's,

12  you know, mid-November, for example.

13          THE COURT:  Oh, well, I want something -- I got it.

14  Yeah, I want something now-ish on the granular resolutions, the

15  discovery rulings I made.  And as far as the scheduling order,

16  I think the main thing is I want the six months to start when

17  privilege objections are resolved.  So if there's some stray,

18  not fully resolved, request by reject -- request-by-request

19  disputes, I want the clock to be running as of that time.

20          And so -- all right.  So you can submit -- I would

21  suggest you just submit a separate scheduling order that's very

22  plain vanilla that just says fact discovery shall be complete

23  by six months from issuance of any order or other agreed

24  resolution of privilege issues.  Or I'll give you the option,

25  if you want, you can just wait to submit an order and put a

1    date certain in, and that'll avoid record ambiguity about what

2    the actual date is.

3           MR. NAKAHARA:  Yeah, that would be my preference.

4           THE COURT:  Yeah, that's fine.  That's fine.  I don't

5    want -- that will spare us some possible crossed wires down the

6    road, so we can do it that way.  Okay.  All right.  Anything

7    else anyone wants to raise? All right.

8           MS. ALLEN:  Your Honor, thank you for all your time

9    today.

10          THE COURT:  Yeah, thank you.  Look, I hope it was

11   helpful.  I really am sincere in trying to get you to where you

12   need to be and not let time just keep slipping through the

13   hourglass.  So hopefully I'm moving things forward.  That's my

14   intent anyway.  Okay.  Take care and thank you.  We're

15   adjourned.

16        (Proceedings concluded)

17                          *  *  *  *  *

18

19

20

21

22

23

24

25

1        **C E R T I F I C A T I O N**

2

3              I, Lisa Luciano, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter, to the best of my ability.

7

8

9    _____

10   LISA LUCIANO, AAERT NO.  327        DATE:  May 5, 2024

11   ACCESS TRANSCRIPTS, LLC

12

13

14       **C E R T I F I C A T I O N**

15

16             I, Ilene Watson, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22   _____

23   ILENE WATSON, AAERT NO. 447     DATE:  May 5, 2024

24   ACCESS TRANSCRIPTS, LLC

25